# EXHIBIT B

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

Andrea Juncadella, Patrick Young,    )
Omar Alsaedi, Ethan Arellano,     )   **Case No.:** _____
Travis Elliott, Jessica Hines,      )
Michelle del Valle, Michael Ridpath,  )
Charles Fellows, Bryan Joyner,    )   **JURY TRIAL DEMANDED**
Christine Bukowski, Carolyn Collier,  )
Amanda Giuliani, Chastity Woodward, )
Matt Scime, and William Urrutia,   )
individually and on behalf of      )
others similarly situated,        )
                         )
        Plaintiffs,       )
                         )
v.                         )
                         )
Robinhood Financial LLC,     )
Robinhood Securities, LLC,     )
Robinhood Markets, Inc.,      )
Citadel LLC, d/b/a Citadel Securities, )
Point72 Asset Management, L.P.,   )
and JOHN DOES 1-50,       

        Defendants.

## CLASS ACTION COMPLAINT

Plaintiffs, Andrea Juncadella, Patrick Young, Omar Alsaedi, Ethan Arellano, Travis Elliott, Jessica Hines, Michelle del Valle, Michael Ridpath, Charles Fellows, Bryan Joyner, Christine Bukowski, Carolyn Collier, Amanda Giuliani, Chastity Woodward, Matt Scime, and William Urrutia ("Plaintiffs"), individually and on behalf of all other similarly situated individuals (collectively referred to as, "Class Members" or the "Class"), by and through undersigned counsel, hereby file this Class Action Complaint against Defendants Robinhood Financial LLC, Robinhood Securities, LLC, Robinhood Markets, Inc. (referred to herein as, "Robinhood" or the "Robinhood Defendants"), each a Delaware corporation, Citadel LLC (d/b/a Citadel Securities) ("Citadel"), an

Illinois limited liability company, Point72 Asset Management, L.P. ("Point72"), a Connecticut partnership, and John Does 1-50 (collectively, "Defendants"), and allege as follows:

## INTRODUCTION

1.      It has often been said that America's financial system is set up to benefit the top 1% of its citizens, the rich, powerful, and elite. While the dog-eat-dog ruthlessness of Wall Street is well known, what makes the conduct that precipitated this lawsuit particularly egregious is that Point72, Citadel, and its subsidiary, Melvin Capital Management ("Melvin"), together with Robinhood, went out of their way to target "mom and pop" retail investors.

2.      Wall Street Fat Cats are known to brag that "a sucker is born every day" and they are known to prioritize greed in designing a financial system to benefit themselves at the expense of ordinary, everyday Americans who comprise the other 99% of its citizens. Along came financial service conglomerate Robinhood -- purposefully named "Robinhood" as if it were here to save the day. But alas, this company turned out to be yet another Wall Street Wolf disguised in sheep's clothing. While Robinhood claims to help to "democratize finance for all," it appears the truth is they are simply another financial company designed to operate for the benefit of Wall Street. Rather than live up to their self-proclaimed promises, it turns out that their true intent is to "rob from the poor and give to the rich!" Robinhood and its co-conspirators betrayed their users for the benefit of the same moneyed interests they claimed to protect its users from.

3.      On January 28, 2021, Robinhood released a statement entitled "Keeping Customers Informed Through Market Volatility," in which they reiterated their claim that "Our mission at Robinhood is to democratize finance for all." The statement then goes on to say that trading in certain securities is being restricted to "position closing only." Such securities include some of the highest traded securities on the Robinhood platform and included stocks with symbols GME,

AAL, BB, BBBY, CTRM, EXPR, GME, KOSS, NAKD, NOK, SNDL, TR, and TRVG (collectively the "Restricted Basket"). Robinhood also raised margin requirements for these securities. Ironically, just as Robinhood was RESTRICTING transactions in the most popular securities on its platform, the statement concluded with saying "We fundamentally believe that everyone should have access to financial markets."

4.     Robinhood is a financial services company based in Menlo Park, California. In May 2020, Robinhood raised over $200 million in a transaction that valued Robinhood at over $8 billion and included prominent investors, such as Sequoia Capital, who regularly do business with many Wall Street Fat Cats. Robinhood makes money primarily in three ways: (1) interest earned on customer's cash balances; (2) selling order information to high frequency traders and being paid for order flow; and (3) margin lending. Their actions today appear to only benefit Robinhood in each of these categories and were implemented not for the benefit of its users, but rather, for the benefit of themselves and other Wall Streeters.

5.     On or about January 28, 2021, Robinhood took the unheard-of action of restricting sale of many popular securities to SELLING ONLY and shortly thereafter its Chief Executive Officer Vladimir Tenev took to primetime television to say their decision was made for the benefit of investors. However, knowing the volume of trades on its platforms in these securities, Robinhood knew its actions would result in the restricted stock's prices to plummet. By doing so, they were looking out for Wall Street hedge funds at the expense of the individuals who were customers of Robinhood. So egregious were their actions that they suffered widespread backlash from their customers condemning the company, but Robinhood pressed on with their disgusting actions anyway. It is clear from their statements and actions that Robinhood and their real constituency are afraid of a "populist financial revolution" and desire to crush it at all costs.

Robinhood is also taking inconsistent positions. On the one hand, it claims not to have any liquidity crisis. On the other hand, it raised an emergency $1 billion cash investment in recent days. Apparently, Robinhood's only concern is its own self-interest.

6.      If Robinhood's claim that it had no liquidity concern is true, then it paternalistically unplugged its own customers from trading stocks. However, nobody authorized Robinhood to supersede the will of its own customers. Further, it is quite ironic, if not outright dishonest, that Robinhood's purported attempt to protect its customers inured to the benefit of itself and its multi-billion-dollar hedge fund network. Robinhood's customers did not join the platform so that billionaires, like its Chief Executive Officer Vladimir Tenev, could look out for their best interests while simultaneously betting against them. Plainly, Robinhood was either malicious, grossly negligent, or a combination. Vladimir Tenev is clearly in over his head. His business model either cannot (perhaps due to excessive leverage and illiquidity) or chose not to keep up with customer demand. Either way, Robinhood took on contractual obligations that it was not in a position to perform. This contrasts with countless other broker/dealer platforms that had little or no issue fulfilling stock trades that, for Robinhood customers, were in a Restricted Basket.

7.      At no time was Robinhood permitted to restrict customers' access to stock trades where such restrictions created a conflict of interest, this is especially so under circumstances where Robinhood's own CEO claimed there was no emergency liquidity need.

8.      Not surprisingly, this is not the first time Robinhood has encountered problems with their sleazy business ethics and practices. The Financial Industry Regulatory Authority ("FINRA") fined Robinhood $1.25 million in December 2019 for failing to ensure their customers got the best prices in their trades which they funneled to companies who paid them. Robinhood did so without regard to the prices they received for their clients.

9.     Nevertheless, by intensely marketing themselves as Main Street's ally, Robinhood has been able to continue signing up customers despite its checkered past.

10.     As it turns out, Robinhood's "commission-free" trading service is not really free. Robinhood resells orders for backdoor fees that are not made clear to customers.  The Securities and Exchange Commission ("SEC") investigated Robinhood for failing to disclose their practice of selling client orders to high frequency traders and in December 2020, Robinhood settled the lawsuit by paying an enormous fine of $65 million.  The SEC determined that not getting the best prices cost Robinhood users over $34 million, which far exceeded any savings in "free" commissions.  Such a scandal would have made front page news had it affected the Wall Street establishment, but apparently Robinhood and co-Defendants know the system is designed to cater to the needs of the "1 percenter" at the expense of the 99 percent.  Rather than representing new investors and "democratizing finance," Robinhood instead picked their pockets in the shadows.

11.     Defendants Citadel and Point72 are no strangers to scandal.  In 2017, the SEC fined Citadel $22 million because its algorithms took advantage of the retail investors whose order flows it was purchasing. Citadel's accomplice, "Point72," is just a rebrand of S.A.C. Capital ("SAC"), which was disbanded in 2014 after the firm pleaded guilty to federal insider trading charges and paid a $1.8 billion fine. Among the persons named in a smattering of SAC emails containing insider trading-related information was Melvin Capital's founder, a former SAC employee who managed over $1 billion for SAC. If there are "nice guys" on Wall Street, they're not Citadel, Point72, or Melvin.  Defrauding Main Street is not an accident for these firms. It's their business model.

12.     Robinhood works as the shepherd leading sheep, with the lure of "free trading," to the Citadel-Point72-Melvin slaughterhouse.  In a bombshell exposé, Bloomberg Businessweek

revealed that "Robinhood Gets Almost Half Its Revenue in Controversial Bargain With High-Speed Traders." *See* https://www.bloomberg.com/news/articles/2018-10-15/robinhood-gets-almost-half-its-revenue-in-controversial-bargain-with-high-speed-traders (last visited Jan. 29, 2021). The story went on to explain that: "Robinhood Markets Inc. has built a reputation on its origins in finance counterculture and a steal-from-the-rich ethos. ***But the firm, which offers no-fee stock trading, is making almost half its revenue from one of the most controversial practices on Wall Street***." *Id*. (emphasis added).

13. As publication *Vice* explained, "[p]ayment for order flow wasn't invented by Robinhood;" instead, "that honor belongs to Bernie Madoff." *See* Vice, "Robinhood's Customers Are Hedge Funds Like Citadel. Its Users Are the Product," at https://www.vice.com/en/article/qjpnz5/robinhoods-customers-are-hedge-funds-like-citadel-its-users-are-the-product (last visited Jan. 29, 2021). Among these victims are everyday Americans, such as a hardworking single mother who is pursuing her education, and others who were lured by Robinhood into the crosshairs of these massive market manipulators.

14. Recent buying in the now restricted securities has resulted in much publicity especially around losses large Wall Street hedge funds were suffering at the hands of these small, individual retail investors whom Robinhood specifically targeted. By cutting off the ability of Robinhood users to profit at the expense of the typical Wall Street monied interests, Robinhood ensured good standing with the entrenched financial community which they really serve. Since Robinhood users could only sell stocks, now large funds and entrenched financial institutions could benefit by "shorting" the restricted securities knowing that the stocks would most likely go down since the flow of buyers was now being intentionally choked. Upon information and belief, Robinhood may have "tipped off" Wall Street funds so they could reload their short positions and

benefit from the ensuing collapse of stock prices when buyers are eliminated.  Indeed, Robinhood's profit model is specifically designed to profit off of giving these financial institutions advance notice of transactions, thus allowing those institutions to place bets against Robinhood's own clients.  These John Doe Defendants who are part of the bilking of Main Street investors also need to be held accountable.

15.     Defendants' actions are being widely condemned not just by Robinhood users but also by elected officials known for fighting for "the little guy" against Wall Street.  United States House Representative Rashida Tlaib called for Congressional hearings on the matter and tweeted that Robinhood's actions are "market manipulation" to protect Hedge funds. "They're [Robinhood] blocking the ability to trade to protect Wall Street hedge funds, stealing millions of dollars from their users to protect people who've used the stock market as a casino for decades."

16.     Congresswoman   Alexandria   Ocasio-Cortez   tweeted   today,   "This   is unacceptable.  We now need to know more about [Robinhood's] decision to block retail investors from purchasing stock while hedge funds are freely able to trade the stock as they see fit."  She tweeted an hour later "This is a serious matter.  Committee investigators should examine any retail services freezing stock purchases in the course of potential investigations – especially those allowing sales, but freezing purchases."

17.     Congressman   Ro   Khanna   agreed   that   "We   need   an   investigation   into RobinhoodApp's decision and who influenced that." Even Senator Ted Cruz weighed in on the need to investigate Robinhood.

18.     While it is laudable that some legislators are pressing for hearings and investigations, Robinhood and its owners know that they will not be held fully accountable because the victims are not the rich, powerful, and elite.  Plaintiffs intend to pursue the company and any

co-conspirators hiding behind the mask of democracy and expose who they really are and to be compensated for their losses.

19.     As United States Congressman Paul A. Gosar wrote in a January 28, 2021 letter to Acting Attorney General Monty Wilkinson of the Department of Justice:

> I am greatly troubled with the events that have unfolded on Wall Street and demand action from the U.S. Department of Justice. Today, a FINRA regulated broker-dealer called "Robinhood Markets, Inc." halted the purchase of stocks for several publicly traded companies including Gamestop, Blackberry, AMC and others. **This unilateral move was done so in a concerted effort to de-platform and silence individual investors**.
>
> This began when an investment management fund called "Melvin Capital Management" placed an aggressive short sell on the company Gamestop. To contradict this decision, the heavily followed reddit page "r/wallstreetbets" and their administrators advocated that their followers purchase Gamestop stock using the broker Robinhood. The movement was so immense that it drove the stock price to over 400% of its previous value. As a result, Melvin Capital lost billions on their return and Robinhood blocked users from buying anymore of Gamestop stock but still allowed liquidation.
>
> Melvin Capital Management is owned by the parent company "Citadel, LLC" which, according to a Bloomberg Report, gave Robinhood roughly 40% of their revenue. **Knowing the involvement Citadel has with Robinhood, it is clear that the actions taken today were motivated by anti-competitive reasons not for concerns of volatility claimed by Robinhood. Because of this blatant conflict of interest and obvious monopolistic activity, I am calling on an immediate investigation by the U.S. Department of Justice into Robinhood and the hedge fund of Citadel, LLC**.

(Emphasis added and footnote omitted).

20.     Ominous figures looming over this scandal include Defendants Citadel, Point72, and Melvin.

21.     Citadel, which appropriately takes its name from the medieval word for "a fortress that commands a city," is one of the shrewdest and most sophisticated financial institutions on the planet. Citadel controls over $35 billion worth of assets.

22.     As Congressman Gosar explained, when individual retail investors invested in GameStop, natural market forces caused Melvin to lose its bet that GameStop's stock price would go down. Melvin lost billions of dollars.

23.     While many saw blood in the water, Citadel and Point72 saw an opportunity that they were well suited to exploit. If they could interfere with Robinhood customers' ability to buy stocks of GameStop and other wrongfully restricted stocks, then Melvin would be stabilized, and its bets could become lucrative.  As it turns out, Citadel and Point72 were in a position to stop Melvin's downfall.

24.     The special trust between Melvin, on the one hand, and Citadel and Point72 on the other, explains why Citadel and Point72 were happy to provide a multi-billion dollar "emergency influx of cash" on short notice to rescue Melvin. The founders of each firm are, as the saying goes, thick as thieves.  Melvin founder Gabriel Plotkin used to work for Citadel. After Plotkin worked for Citadel, he went on to work for S.A.C. Capital.  During Plotkin's time at S.A.C., "his name surfaced in emails in the insider trading trial of Michael Steinberg, one of eight people who once worked for SAC to either be convicted or plead guilty to insider trading charges," according to the New York Times, although Plotkin was not charged with a crime.  The Citadel-SAC-Melvin trifecta is ironclad.

25.     However, the multi-billion-dollar investment in Melvin, amidst its downward spiral, could only make sense if someone could stop the meltdown.  That is where Citadel comes in.

9

26.     Citadel and Point72 knew that their investment in Melvin was secure because they all knew that Citadel had immense influence over Robinhood.  In a disclosure to the SEC, Robinhood disclosed that Citadel and a handful of other firms paid Robinhood nearly $100 million in the first quarter of 2020 alone.  *See* RHS SEC Rule 606A and 607 Disclosure Report Q1 2020. A June 2020 *Fortune* magazine article explained that "[t]hese payments are the company's primary revenue stream—far outstripping what it earns from its premium service, Robinhood Gold, or from the interest it makes on cash balances in customer accounts."  Fortune Magazine, "Robinhood makes millions selling your stock trades…is that so wrong?," at https://fortune.com/2020/07/08/robinhood-makes-millions-selling-your-stock-trades-is-that-so-wrong/ (last visited Jan. 29, 2021).  Citadel is Robinhood's lifeblood.  It strains credulity to believe that it is a mere coincidence that the primary beneficiary of Robinhood's sacrifice of retail investors is the Citadel-Point72-Melvin trifecta.

## PARTIES

27.     Plaintiff Andrea Juncadella was and is a citizen of the State of Florida who owns or owned stock within the Restricted Basket during the Class period.

28.     Plaintiff Patrick Young was and is a citizen of the State of California who owns or owned stock within the Restricted Basket during the Class period.

29.     Plaintiff Michelle del Valle was and is a citizen of the State of Florida who owns or owned stock within the Restricted Basket during the Class period.

30.     Plaintiff Omar Alsaedi was and is a citizen of the State of New York who owns or owned stock within the Restricted Basket during the Class period.

31.     Plaintiff Ethan Arellano was and is a citizen of the State of California who owns or owned stock within the Restricted Basket during the Class period.

32.     Plaintiff Michael Ridpath was and is a citizen of the State of Washington who owns or owned stock within the Restricted Basket during the Class period.

33.     Plaintiff Travis Elliott was and is a citizen of the State of California who owns or owned stock within the Restricted Basket during the Class period.

34.     Plaintiff Jessica Hines was and is a citizen of the State of Colorado who owns or owned stock within the Restricted Basket during the Class period.

35.     Plaintiff Charles Fellows was and is a citizen of the State of California who owns or owned stock within the Restricted Basket during the Class period.

36.     Plaintiff Bryan Joyner was and is a citizen of the State of Florida who owns or owned stock within the Restricted Basket during the Class period.

37.     Plaintiff Christine Bukowski was and is a citizen of the State of Florida who owns or owned stock within the Restricted Basket during the Class period.

38.     Plaintiff Amanda Giuliani was and is a citizen of the State of Oregon who owns or owned stock within the Restricted Basket during the Class period.

39.     Plaintiff Carolyn Collier was and is a citizen of the State of Arizona who owns or owned stock within the Restricted Basket during the Class period.

40.     Plaintiff Chastity Woodward was and is a citizen of the State of Texas who owns or owned stock within the Restricted Basket during the Class period.

41.     Plaintiff William Urrutia was and is a citizen of the State of California who owns or owned stock within the Restricted Basket during the Class period.

42.     Plaintiff Matt Scime was and is a citizen of the State of California who owns or owned stock within the Restricted Basket during the Class period.

43.     Defendant Robinhood Financial LLC is a Delaware corporation with its principal place of business at 85 Willow Road, Menlo Park, California 94025.  It is a wholly-owned subsidiary of Robinhood Markets, Inc. Robinhood Financial LLC is registered as a broker-dealer with the U.S. Securities & Exchange Commission ("SEC").  Defendant Robinhood Financial LLC acts as an introducing broker and has a clearing arrangement with its affiliate Defendant Robinhood Securities, LLC.

44.     Defendant Robinhood Securities, LLC is a Delaware corporation with its principal place of business at 500 Colonial Center Parkway, Suite 100, Lake Mary, Florida 32746.  It is a wholly owned subsidiary of Defendant Robinhood Markets, Inc. Defendant Robinhood Securities, LLC is registered as a broker-dealer with the SEC. Defendant Robinhood Financial LLC acts as a clearing broker and clears trades introduced by its affiliate Defendant Robinhood Financial.

45.     Defendant Robinhood Markets, Inc. is a Delaware corporation with its principal place of business at 85 Willow Road, Menlo Park, California 94025. Defendant Robinhood Markets, Inc. is the corporate parent of Defendants Robinhood Financial LLC and Robinhood Securities, LLC.

46.     Defendant Citadel LLC is an Illinois limited liability company with its principal place of business in Illinois.

47.     Defendant Point72 is a partnership with its principal place of business in Connecticut.

## **JURISDICTION AND VENUE**

48.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because this is a class action subject to the Class Action Fairness Act ("CAFA"), Pub.L. No. 109-2, 119 Stat. 4 (codified in various sections of 28 U.S.C.), with an aggregate claims of all

members of the proposed class and subclass(es) are in excess of $5 million, exclusive of interest and costs, and there are more than 100 putative Class Members.   Many members of the proposed Class are citizens of a state different from Defendants.

49.     Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District where Robinhood, distributed, marketed, advertised, and sold the trading services which are the subject of the present complaint.  Finally, venue is appropriate in this District pursuant to 28 USC § 1391(b)(2) because a substantial part of the acts and omissions that gave rise to this Complaint occurred or emanated from this District.

50.     This Court has personal jurisdiction over the Defendants because they are authorized to do business and do conduct business in Florida, and because they have specifically marketed, advertised, and made substantial sales in Florida, and have sufficient minimum contacts with this state and/or sufficiently avail themselves of the markets of this state through their promotion, sales, and marketing within this state to render the exercise of jurisdiction by this Court permissible.

51.     Additionally, this Court has personal jurisdiction under Florida's long-arm statute, through Defendants' operation businesses in this District.  Defendants operate, conduct, engage in, and carry-on business or business ventures in this state or have an office or agency in this state; have caused injury to persons or property within this state arising out of an act or omission by the Defendants outside this state, while the Defendants were engaged in solicitation or service activities within this state; and breached contracts in this state by failing to perform acts required by the contracts to be performed in this state.  Defendants regularly do or solicit business, or engage in other persistent courses of conduct, or derive substantial revenue from goods used or consumed

or services rendered in this state. The activities of Defendants within the state are substantial and not isolated. In addition, this action arises out of transactions and operations connected with and incidental to Defendants' business within the state and, specifically, the business relationship between Plaintiffs and Defendants.

## FACTUAL ALLEGATIONS

52. Robinhood is an online brokerage firm. Its customers place securities trades through the firm's website, by using a web-based application (or "app"). Robinhood permits customers to purchase and sell securities, including futures contracts.

53. Robinhood has experienced significant growth as a relatively new online brokerage firm. In 2019, Robinhood raised $323 million in funding at a $7.6 billion valuation. The firm markets itself primarily to younger investors and claims over 10 million users of its trading app.

54. On or about March 23, 2016, Robinhood's official Twitter account stated: "*Let the people trade.*" They have since disregarded their mantra and have blocked access for millions of its customers to trade particular securities.

55. On or around January 11, 2021, stocks in GameStop Corp. ("GME") began to rise.

56. At that time, Robinhood allowed retail investors to trade GME on the open market.

57. On or about January 27, 2021 Robinhood, in order to slow the growth of GME and deprive their customers of the ability to use their service, abruptly, purposefully, willfully, and knowingly pulled GME from their app. As a result, retail investors could no longer buy or even search for GME on Robinhood's app. This phenomenon took place with the remaining companies in the Restricted Basket.

58.     Upon information and belief, Robinhood's actions were done purposefully and knowingly to manipulate the market to the detriment of its customers and for the benefit of people and financial intuitions who were not Robinhood's customers.

59.     Since pulling the stock from their app, GME prices have gone up, depriving investors of potential gains.

60.     Robinhood essentially froze the Plaintiffs' cash by holding it and restricting the Plaintiffs from using their own cash to buy the stocks of their choice, without any advance notice. As a result, the Plaintiffs were unable to complete stock purchase orders and they missed out on material gains. Further, Robinhood—without authorization—cancelled its customers' orders.

61.     In sum, Robinhood has completely blocked retailer investors from purchasing GME for no legitimate reason, thereby depriving retailer investors from the benefits of Robinhood's services.

62.     FINRA, which governs brokers like Robinhood, espouses rule 5310 regarding "Best Execution and Interpositioning."  Rule 5310.01 requires that Robinhood "*must make every effort to execute a marketable customer order that it receives promptly and fully.*"  By failing to respond at all to customers' placing timely trades—and outright blocking customers from trading a security—Robinhood has breached these, among other, obligations and caused its customers substantial losses due solely to its own gross negligence and failure to maintain adequate infrastructure.

63.     Robinhood continues to randomly pull other securities from its app for no legitimate reason.

64.     Upon information and belief, Robinhood is restricting securities such as GME from its platform in order to slow growth and help benefit individuals and institutions who are *not* Robinhood customers but are Robinhood large institutional investors or potential investors.

65.     On the morning on January 28, 2021, Plaintiffs used the Robinhood app, searched for GME on Robinhood's app, and found it was unavailable. The stock did not even appear, although GME is a publicly traded company available on all other platforms.

66.     Plaintiffs, like other members of the Class, lost out on all earning opportunities.

## CLASS ACTION ALLEGATIONS

67.     Plaintiffs bring claims pursuant to Federal Rule of Civil Procedure 23 on behalf of the following Class, as defined below:

**All Robinhood customers within the United States.**

68.     Additionally, or in the alternative, Plaintiffs bring claims pursuant to Federal Rule of Civil Procedure 23 on behalf of the following Subclass, as defined below:

**All Robinhood customers within the United States who were not able to execute trades on stocks in the Restricted Basket after Robinhood, together with Citadel and Point72, knowingly, willfully, and purposefully removed them completely from their platform.**

69.     Excluded from the Class are the Robinhood entities and their current employees, counsel for either party, as well as the Court and its personnel presiding over this action.

70.     This action has been brought and may properly be maintained as a class action against Robinhood pursuant to the provisions of Federal Rule of Civil Procedure 23.

71.     **Numerosity**:  The precise number of members of the proposed Class is unknown to Plaintiff at this time, but, based on information and belief, Class members are so numerous that their individual joinder herein is impracticable. Based on information and belief and publicly available reports, Class members number in the hundreds of thousands and up to ten million.

Subclass members are likely in the thousands.  All Class and Subclass members may be notified of the pendency of this action by reference to Robinhood's records, or by other alternative means.

72.     **Commonality**: Numerous questions of law or fact are common to the claims of Plaintiffs and members of the proposed Class.  These common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. These common legal and factual questions include, but are not limited to the following:

    a.  Whether Robinhood knowingly failed to provide the financial services that were needed to handle reasonable consumer demand, including trading securities that are available on every other competitive trading platform;

    b.  Whether Robinhood failed to provide the duty of care to their customers when they purposefully removed the Restricted Basket;

    c.  Whether Robinhood removed Restricted Basket purposefully to harm their customers' positions in Restricted Basket and benefit their own potential financial gains;

    d.  Whether Robinhood violated FINRA Rule 5310, among other FINRA rules, state rules, and federal regulations;

    e.  Whether Robinhood violated consumer protection laws in failing to disclose that its services would not include the ability to trade on Restricted Basket, and other securities, for substantial periods of time;

    f.  Whether Robinhood was in breach of its legal, regulatory, and licensing requirements by failing to provide adequate access to financial services;

g. Whether Robinhood was in breach of its contracts and/or the implied covenant of good faith and fair dealing in connection with its failure to provide financial services;

h. Whether Robinhood was negligent or grossly negligent by failing to provide financial services in a timely manner due to its own possible nefarious desires;

i. Whether Robinhood breached its fiduciary duties to customers by failing to provide adequate access to financial services;

j. Whether Robinhood was unjustly enriched by its conduct;

k. Whether Plaintiffs and the other Class members were injured by Robinhood's conduct, and if so, the appropriate class-wide measure of damages, restitution, and other appropriate relief, including injunctive relief.

l. Whether Plaintiffs and the other Class members are entitled to injunctive and declaratory relief.

73. **Typicality:** The claims of the named Plaintiff are typical of the claims of the proposed Class in that the named Plaintiff was a customer during the class period and was unable to trade Restricted Basket and place time-sensitive trades on Restricted Basket and sustained damages as a result of Robinhood's wrongful conduct.

74. **Adequate Representation:** Plaintiff will fairly and adequately represent the interests of the Class in that he has no conflicts with any other Class members. Plaintiff has retained competent counsel experienced in prosecuting complex class actions, including those involving financial services, and they will vigorously litigate this class action.

75. **Predominance and Superiority**: There is no plain, speedy, or adequate remedy other than by maintenance of this class action. A class action is superior to other available means,

18

if any, for the fair and efficient adjudication of this controversy. Prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendant. Additionally, given the relatively modest damages sustained by most individual Class members, few, if any, proposed Class members could or would sustain the economic burden of pursuing individual remedies for Robinhood's wrongful conduct. Treatment as a class action will achieve substantial economies of time, effort, and expense, and provide comprehensive and uniform supervision by a single court. This class action presents no material difficulties in management.

76.     Class action certification is warranted under Fed. R. Civ. P. 23(b)(1)(A) because the prosecution of separate actions by individual members of the proposed Class would create a risk of inconsistent or varying adjudications with respect to individual Class members, which may produce incompatible standards of conduct for Defendants.

77.     Class action certification is warranted under Fed. R. Civ. P. 23(b)(1)(B) because the prosecution of separate actions by individual members of the proposed Class would create a risk of adjudications with respect to individual Class members which may, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

78.     The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met as Robinhood has acted or refused to act on grounds generally applicable to the Class, thereby making final injunctive, declaratory, or equitable relief appropriate with respect to the Class as a whole. Class action certification is also warranted under Fed. R. Civ. P. 23(b)(3) because questions of law or fact common to the Class members predominate over any questions affecting only individual members, and a Class action is superior

to other available remedies for the fair and efficient adjudication of this controversy. The amount of damages available to the individual Plaintiffs is insufficient to make litigation addressing Robinhood's conduct economically feasible for most in the absence of the class action procedure. Individualized litigation also presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

79. Class action certification is also warranted under Fed. R. Civ. P. 23(c)(4) because questions of law or fact common to the Class members may be certified and decided by this Court on a class wide basis.

## COUNT I
### For Breach of Contract
### (Against Robinhood)

80. Plaintiffs incorporate and re-allege paragraphs 1 through 79 above as if fully set forth hereinafter.

81. In order to use the Robinhood trading platform, a potential customer must enter into the Customer Agreement with Robinhood.

82. Plaintiffs and all Class Members did enter into a Customer Agreement with Robinhood.

83. Robinhood breached its Customer Agreement by, among other things, failing to disclose that its platform was going to randomly pull a profitable stock from its platform without necessity and/or when it had a conflict of interest; that Robinhood failed to provide adequate explanation to their customers; that Robinhood knowingly put their customers at a disadvantage

compared to customers who used other trading apps; that Robinhood failed to provide access to its own financial incentives to pull certain securities including the Restricted Basket; that Robinhood prohibited plaintiffs from performing in a timely manner (or at all) under the contract; that Robinhood failed to comply with all applicable legal, regulatory, and licensing requirements; that Robinhood failed to exercise trades and actions requested by customers; and that Robinhood set arbitrary and capricious limits on the amount of Restricted Basket stocks that could be traded. Additionally, Robinhood did not give notice that any restraints would be made on purchases only but not on sales, which distorted transaction volumes and manipulated the market.

84.     As such, Robinhood breached its Customer Agreement with Plaintiffs and Class Members.

85.     Robinhood's failure to perform and its breaches of the Customer Agreement resulted in damages and losses to Plaintiffs and Class Members and continues to expose them to harm because Robinhood continues to fail to perform under the Customer Agreement. These losses reflect damages to Plaintiffs and Class Members in an amount to be determined at trial or separate proceedings as necessary.

## COUNT II
### Breach of the Implied Covenant of Good Faith and Fair Dealing

86.     Plaintiffs incorporate and re-allege paragraphs 1 through 79 above as if fully set forth hereinafter.

87.     Plaintiffs and members of the Class and Subclass entered into the Customer Agreement with Defendant Robinhood to open a Robinhood trading account. They agreed to Robinhood's Terms and Conditions by using Robinhood's website and trading platform.

88.     Plaintiffs and members of the Class and Subclass fulfilled their obligations under these contracts by adhering to their terms and using Robinhood's trading services through its website and trading platform.

89.     Robinhood was obligated to provide the trading services required under those contracts at all times, including but not limited to, trades for the Restricted Basket.

90.     When initially signing up for Robinhood, Plaintiffs and all those similarly situated could and most actually did trade the Restricted Basket.

91.     Robinhood unfairly interfered with the rights of Plaintiffs and members of the Class and Subclass to receive the benefits of the Customer Agreement by, among other things, (i) failing to provide services necessary to carry out a trade; (ii) failing to provide certain trading services whatsoever; (iii) failing to inform individuals in a timely member of the drastic changes in trading abilities; and (iv) prohibiting Plaintiffs from buying the Restricted Basket for Robinhood's own pecuniary interest and not disclosing those interest to Plaintiffs and all Class and Subclass members.

92.     Robinhood's conduct has caused Plaintiffs and members of the Class and Subclass harm, losses, and damages.  These losses reflect damages to Plaintiffs and members of the Class and Subclass in an amount to be determined at trial or separate proceedings as necessary.

## COUNT III
### Negligence

93.     Plaintiffs incorporate and re-allege paragraphs 1 through 79 above as if fully set forth hereinafter.

94.     Robinhood had a duty to exercise reasonable care in conducting and facilitating transactions for its customers.

95.     Robinhood had a duty to exercise reasonable care in providing trades on the free, open market for its customers.

96.     Robinhood unlawfully breached its duties by, among other things, (i) removing the Restricted Basket without notice from its trading app; (ii) failing to provide financial services related to the Restricted Basket; (iii) failing to notify customers in a timely manner of the Restricted Basket shutdown; and (iv) failing to provide a platform that could handle the transactions that it claimed it could handle.

97.     Robinhood's conduct as set forth in this Complaint was want of even scant care, and its acts and omissions were and continue to be an extreme departure from the ordinary standard of conduct. Their actions breach any duty of care to their customers, but are also inconsistent with the standard of care expected from similar firms in the open market.

98.     Upon information and belief, no institutions similar to Robinhood has ever outright banned customers from purchasing a specific share of a specific security.

99.     Robinhood breached its obligations to its customers altogether by pulling the Restricted Basket, a standard of care so far below what is required for a business engaging in time sensitive trading services that it amounts to a complete abandonment of its duties.

100.     Robinhood's grossly negligent and wrongful breaches of its duties owed to Plaintiffs and members of the Class and Subclass proximately caused losses and damages that would not have occurred but for Robinhood's gross breach of its duty of due care. These losses reflect damages to Plaintiffs and members of the Class and Subclass in an amount to be determined at trial or separate proceedings as necessary.

**COUNT IV**
**Breach of Fiduciary Duty**
**(Against Robinhood)**

101.    Plaintiffs incorporate and re-allege paragraphs 1 through 79 above as if fully set forth hereinafter.

102.    As a licensed provider of financial services, Robinhood at all times relevant herein was a fiduciary to Plaintiffs and Class members and owed them the highest good faith and integrity in performing its financial services on their behalf. Robinhood also acted as a fiduciary to each and every customer who agreed to the Customer Agreement.

103.    Robinhood breached its fiduciary duties to Plaintiffs and Class members by, among other things, failing to disclose that its platform was going to remove Restricted Basket purchases in a timely manner; actually removing the Restricted Basket; removing the Restricted Basket for its own pecuniary benefits; that Robinhood failed to provide access to its financial services in a timely manner; that Robinhood failed to comply with all applicable legal, regulatory, and licensing requirements; and that Robinhood failed to exercise trades and actions requested by customers in a complete and timely manner (also required by FINRA Rule 5310).

104.    Robinhood failed to disclose its conflict of interest when it permitted users only to sell and not buy certain Restricted Basket stocks in a manner that inured to the benefits of itself and third parties.

105.    Robinhood's conduct has caused the Plaintiffs and Class Members' harm, losses, and damages and continues to expose them to harm because Robinhood continues to breach its fiduciary duties.

106.    These losses reflect damages to the Plaintiffs and Class Members in an amount to be determined at trial or separate proceedings as necessary.

## COUNT V
### Breach of Implied Warranty of Merchantability
### (Against the Robinhood Defendants)

106. The Plaintiffs incorporate and re-allege paragraphs 1 through 61 above as if fully set forth hereinafter.

107. The Robinhood Defendants breached their implied warranty of merchantability by failing to provide a trading platform that is acceptable and reasonably fit for the ordinary purposes for which it was being contracted, in this case, for including but not limited to: the purchase and sale of Restricted Basket stocks.

108. The Robinhood Defendants are merchants with respect to the kind of goods at issue, as Defendants are broker-dealers engaging in the securities markets.

109. Plaintiffs and Class Members have all been damaged in a similar manner due to Defendants breach of implied warranty of merchantability.

110. Plaintiffs requests relief as hereinafter described in the Prayer for Relief.

## COUNT VI
### (Tortious Interference with Business Relationship and Contract
### Against Defendants Citadel and Point72)

111. Plaintiffs incorporate and re-allege paragraphs 1 through 79 above as if fully set forth hereinafter.

112. Plaintiffs have a business relationship with the Robinhood Defendants pursuant to which the Robinhood Defendants agreed to take the Plaintiffs' money because the Robinhood Defendants promised to execute stock trades

113. Citadel and Point72 had knowledge of the business relationship between Plaintiffs and the Robinhood Defendants.

114.    Citadel and Point72 intentionally and unjustifiably interfered with Plaintiffs' business relationship with the Robinhood Defendants by causing the Robinhood Defendants to suspend the Plaintiffs' ability to buy GME.

115.    As a result of Citadel and Point72's intentional and unjustified interference, the Robinhood Defendants breached their business relationship with Plaintiffs, causing Plaintiffs to suffer damages.

**COUNT VII**
**Conspiracy**
**(Against All Defendants)**

116.    Plaintiffs incorporate and re-allege paragraphs 1 through 79 above as if fully set forth hereinafter.

117.    Defendants unlawfully conspired to tortiously interfere with Plaintiffs' contracts and business relationships with Robinhood by restricting the Plaintiffs' ability to trade in the Restricted Basket

118.    Defendants collectively restricted the Plaintiffs' ability to trade in the Restricted Basket, and compelled the restrictions, in an overt act in pursuance of the conspiracy.

119.    As a result of the acts done in furtherance of the conspiracy, Plaintiffs have suffered damages.

**COUNT VIII**
**Attempted Monopolization of the Stock Market**
**in Violation of Section 2 of the Sherman Act**
**(Against All Defendants)**

120.    Plaintiffs incorporate and re-allege paragraphs 1 through 79 above as if fully set forth hereinafter.

121.    By prohibiting Plaintiffs from purchasing the Stocks but not from selling the Stocks, Defendants engaged in and continue to engage in exclusionary conduct that is deleterious

26

to consumers and to the anticompetitive benefit of the Defendants. Defendants engaged in and continue to engage in anticompetitive conduct.

122.    Through the continued anticompetitive conduct of excluding Plaintiffs from the stock market as competitors by prohibiting Plaintiffs purchase of the Stocks, Defendants manifested and continue to manifest a specific intent to monopolize. Defendants' coordinated prohibition of Plaintiffs' purchase of the Stocks demonstrates Defendants' specific intent to monopolize the stock market.

123.    Upon information and belief, the Defendants collectively control a majority share of trading within the stock market. Defendants' coordinated prohibition of Plaintiffs' purchase of the Stocks is likely to increase Defendants' market share within the stock market. As a result, Defendants' anticompetitive conduct poses a dangerous probability of achieving monopoly.

## COUNT IX
### Violations of the Florida Deceptive and Unfair Trade Practice Act,
### Chapter 501, Part II, Florida Statutes
### (Against the Robinhood Defendants and Citadel)

124.    Plaintiffs incorporate and re-allege paragraphs 1 through 79 above as if fully set forth hereinafter.

125.    Section 501.204(1) provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." The provisions of the Act shall be "construed liberally to promote the protection" of the "consuming public and legitimate business enterprises from those who engage in... deceptive[] or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat § 501.202 (2014).

126.    Defendants were, at all times material to the allegations herein, engaged in "trade or commerce' as defined by the Act. Fla. Stat. § 501.203 (2014)

127.     Consumers placed or attempted to place orders for stocks in the Restrict Basket, or transferred money to Robinhood without knowing of Robinhood's conflict of interest and its inability or unwillingness to execute certain trades. Robinhood, however, failed to deliver on these obligations as promised and as contracted for in the customer agreements. The consumers, through representations made by the Defendants, had no reason to believe that their orders would not be fulfilled, or that they would only be fulfilled in compliance with an arbitrary and capricious transaction limitation scheme created by Robinhood, which had undisclosed conflicts of interest.

128.     Robinhood's failure to make good on its promises to execute stocks orders and do so in a manner free of conflicts of interest is an unfair and deceptive business act or practice.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Class, by and through their attorneys, pray for relief as follows:

a. For an Order certifying this action as a class action and appointing Plaintiffs and their Counsel to represent the Class;

b. Enter an immediate injunction requiring Robinhood to reinstate trading of stocks in the Restricted Basket;

c. Enter an award for Plaintiffs to be determined;

d. Enter an award of attorneys' fees and costs; and

e. For all such other and further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, individually on behalf of all others similarly situated, demand a trial by jury of all issues so triable as a matter of right.

DATED this 29th day of January, 2021.

Respectfully submitted,

**THE FERRARO LAW FIRM, P.A.**
*Attorneys for Plaintiffs*

*/s/ James L. Ferraro*
James L. Ferraro, Esq.
Florida Bar No.: 381659
jlf@ferrarolaw.com
Sean A. Byrstyn, Esq.
New York Bar No.: 5533120
seanburstyn@gmail.com
(*Pro hac vice* motion forthcoming)
Natalia Salas, Esq.
Florida Bar No.: 44895
nms@ferrarolaw.com
600 Brickell Avenue, 38th Floor
Miami, Florida 33131
Telephone: (305) 375-0111
Facsimile: (305) 379-6222

and

Jeffrey E. Kwatinetz, Esq.
California Bar No.: 158932
jek@prospectpk.com
15821 Ventura Blvd.
Suite 370
Encino, CA 91436-2909
(*Pro hac vice* motion forthcoming)