```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                         MIAMI DIVISION
                     CASE NO. 1:21-md-02989-CMA
 3

 4     IN RE:

 5     JANUARY 2021 SHORT SQUEEZE
       TRADING LITIGATION
 6
                                        May 17, 2021
 7
                                        11:55 a.m. to 4:10 p.m.
 8
                                        Pages 1 to 113
 9     _____

10
                               HEARING
11                      BEFORE THE HONORABLE
            UNITED STATES DISTRICT JUDGE CECILIA ALTONAGA
12

13     APPEARANCES:

14
                          GABRIEL A. ASSAAD, ESQUIRE
15                        McDONALD WORLEY, P.C.
                          1770 St. James Place
16                        Suite 100
                          Houston, TX  77056
17                        Gassaad@mcdonaldworley.com

18

19                        DENNIS ELLIS, ESQUIRE
                          BROWNE GEORGE ROSS O'BRIEN
20                        ANNAGUEY & ELLIS, LLP
                          2121 Avenue of the Stars
21                        Suite 2800
                          Los Angeles, CA  90067
22

23                        RACHEL W. FURST, ESQUIRE
                          Grossman Roth Yaffa Cohen P.A.
24                        2525 Ponce de Leon Boulevard
                          Suite 1150
25                        Coral Gables, FL  33134
                          Rwf@grossmanroth.com
```

```
 1

 2              APPEARANCES (Cont'd)

 3
                            JEFFREY A. KLAFTER, ESQUIRE
 4                          KLAFTER LESSER LLP
                            2 International Drive
 5                          Suite 350
                            Rye Brook, NY  10573
 6                          Jak@klafterlesser.com

 7

 8                          PETER SAFIRSTEIN, ESQUIRE
                            SAFIRSTEIN METCALF, LLP
 9                          1345 Avenue of the Americas
                            2nd Floor
10                          New York, New York  10105

11

12                          MAURICE DAVID PESSAH, ESQUIRE
                            PESSAH LAW GROUP, PC
13                          661 North Harper Avenue
                            Suite 208
14                          West Hollywood, CA  90048
                            Maurice@pessahgroup.com
15

16
                            NATALIA MARIA SALAS, ESQUIRE
17                          THE FERRARO LAW FIRM, P.A.
                            600 Brickell Avenue
18                          38th Floor
                            Miami, FL  33131
19                          Nms@ferrarolaw.com

20

21                          JOSEPH SAVERI, ESQUIRE
                            JOSEPH SAVERI LAW FIRM, LLP
22                          601 California Street
                            Suite 1000
23                          San Francisco, CA  94108
                            Jsaveri@saferilawfirm.com
24

25
```

```
 1

 2
                              APPEARANCES (Cont'd)
 3

 4
                         FRANK SCHIRRIPA, ESQUIRE
 5                       HACH, ROSE, SCHIRRIPA AND CHEVERIE
                         112 Madison Avenue
 6                       10th Floor
                         New York, NY  11016
 7                       Fschirripa@hrsclaw.com

 8

 9                       ROY T. WILLEY, IV, ESQUIRE
                         ANASTOPOULO LAW FIRM,  LLC
10                       32 Ann Street
                         Unit B
11                       Charleston, South Carolina 29403
                         Roy@akimlawfirm.com
12

13

14
     STENOGRAPHICALLY REPORTED BY:
15
                              SHARON VELAZCO, RPR, FPR
16                            Official Court Reporter
                              United States District Court
17                            400 North Miami Avenue
                              8th Floor
18                            Miami, Florida 33128

19

20                                _      _      _

21

22

23

24

25
```

```
 1              (The following proceedings were had:)

 2              THE COURT:  Good morning.  We have with us

 3   Mr. Assaad --

 4              I can't hear you, Mr. Assaad.

 5              You are muted, I believe.

 6              You are not muted, but we can't hear you.

 7              MR. ASSAAD:  Good morning, Your Honor.

 8              THE COURT:  Good morning.  We can now hear you.  I

 9   apologize for these technical difficulties.  We haven't had

10   this issue with Zoom until now.

11              Can you all hear me okay?

12              ZOOM PANEL IN UNISON:  Yes, your Honor.

13              THE COURT:  Very good.  Thank you.  So, we'll start --

14   I think we are due to take a break in about half an hour.  My

15   apologies.

16              Why don't we begin with Mr. Assaad's application?

17              Mr. Assaad, I will hear from you briefly, and then I

18   have some questions for you.

19              MR. ASSAAD:  Thank you, your Honor.  May it please the

20   Court.

21              My name is Gabriel Assaad, and I thank you for this

22   opportunity to be in front of you today, as well as my fellow

23   colleagues.

24              Obviously, just looking at the attorneys on both sides

25   of the aisle, I am very confident there will be some fantastic
```

1    lawyering throughout this MDL.

2         I plan on spending three to five minutes on a little

3    bit of introducing myself and to answer any questions the Court

4    my have.

5         Feel free to interrupt me if there are any questions

6    during my presentation.  I will begin with who I am.  I am a

7    first generation Coptic Egyptian.  My parents came to this

8    country in the late '60s, and I am the first of my family to

9    attend law school and be an attorney.

10        I grew up in Rochester, New York, that we -- my parents

11   immigrated to and, at my first opportunity, I left cold weather

12   and came down to the University of Florida and got my

13   mechanical engineering degree from the University of Florida.

14        I practiced in DC for about ten years, and then I met

15   my wife, from Texas, and moved down to Texas, and have been

16   practicing in Texas since 2011.  My wife is currently an

17   assistant district attorney with Harris County, and usually her

18   presentations are much better because her cases are much more

19   exciting than mine.

20        I would like to talk a little bit about my MDL personal

21   experience.  I have been involved with MDLs since 2013, and

22   that time is on my application.  But, I want to talk a little

23   bit about the good and the bad that I have learned from the MDL

24   process.

25        The good is fantastic lawyering, great issues.  I got

1    to meet many great attorneys, some have become some of my best

2    friends.  But, being involved with some MDLs, I have also seen

3    a little bit of negative MDLs; particularly, I see that a lot

4    of MDLs, they start off strong and then, over time, people are

5    not getting work, they are not getting gainful work, and there

6    is a fall-out, and -- for the work they are getting, because

7    they are not getting meaningful work.  Maybe people are not

8    engaged, there is a lack of communication and, after a period

9    of time, they are so far behind the ball they can't get up to

10   speed on the case anymore.  And, I believe one of the reasons

11   that occurs, your Honor, is there is no accountability.

12         We hear many things about the diversity, Let's spread

13   the experience around, membership, inclusiveness, and these are

14   great words we hear.  We hear them on every single application

15   from people that are lead- -- say they want to be inclusive on

16   their mentorship.  But, after the time -- after the time of

17   leadership, no one is held accountable.

18         So yes, I propose a structure, and I am the only one

19   that has proposed a structure and thought this out, how to make

20   this MDL -- which is a very large MDL -- inclusive and to keep

21   people engaged.

22         And, I also have a tremendous mentorship.

23         For example, I strongly believe that the younger

24   attorneys, the lesser experienced attorneys should be involved

25   with the experts, in meeting the experts, not just getting, you

1    know, paragraph summaries of what happened.

2          You know, you learn a lot from meeting experts and

3    asking questions and learning about the case.  Same thing with

4    motion practice and depositions.

5          I have seen some courts that allow the younger

6    attorneys to argue the motion and allow the more senior to come

7    in later on to make -- do any cleanup or to add a little bit

8    more argument.

9          And the same thing with depositions, not allowing more

10   than one or two attorneys, you know, to take the depositions,

11   and a senior attorney with more experience coming in.

12         And that is why this proposal -- what I think people

13   are going to criticize later on, because this is -- basically,

14   this is a leadership structure of about 55 to 57 members.

15         But, if we look at the defendants, there are over 30

16   defendants.  And, there are going to be dozens, if not hundreds

17   of attorneys on that side of the litigating this case.

18         And, this is a big case, with a lot of issues, a lot of

19   defendants, and a lot of money.  And, therefore, there will be

20   a lot of money put before the case on the defendants' side.

21         But, at the same time, we have a ton of attorneys on

22   the plaintiffs' side that are willing to work, that are

23   experienced on all levels, and we have numerous firms that can

24   staff and that have the attorney power to match the defendants'

25   side.

1          So, as you have heard before, your Honor, what we are

2     preparing -- I think a lot of the opportunities will be like

3     three tranches.  And, by having three tranches, we can split

4     into basically three teams of people and, as I proposed in my

5     application, 17 persons per tranche, and they are kind of

6     intertwined.  I will explain a little bit later.

7          But, one of my goals -- and I have been involved in the

8     little -- a little bit involved in the litigation -- air

9     quality litigation up in the Middle District of Florida.

10          And, Judge Schlesinger made a comment that because of

11     the large leadership structure, that the Court was able to go

12     from appointment to the first level of the trial, which was

13     last month, in less than two years.  And, that is -- having

14     this many attorneys, we don't have to wait for the normal

15     deadlines for those back to motions practices, discovery

16     practices.

17          Many times, Judge Schlesinger would get a motion to

18     compel and have a response in three days, one response in three

19     days, and argument before the magistrate judge within five

20     days.

21          And, having this -- and this is -- could be a heavy --

22     a lot of discovery issues.  There are 30 defendants.  There

23     will be many motions to compel.  And, I think, by having the

24     larger structure, we can be efficient, speedy, and get this

25     case to trial very quickly, and get this case resolved.

 1          That's why I propose the leadership structure of seven

 2    co-leads.  And, the way that is broken down is two co-leads per

 3    tranche.  And, if the Court -- I have a PowerPoint I would kind

 4    of like to read, if I could share with the Court, if that would

 5    be okay.

 6          THE COURT:  Yes, thank you.

 7          MR. ASSAAD:  Can you see my screen, your Honor?

 8          THE COURT:  I can, yes.

 9          MR. ASSAAD:  So, the way I propose the structure from

10    the leadership structure is having seven co-leads, two per

11    tranche.  And, one -- and one general, common benefit with

12    having co-leads is what I am proposing.

13          And, the purpose of the contact person, the person

14    being held accountable to the Court, is to oversee the

15    application process, to make sure that diversity -- for people

16    to go to, to say, "I'm not getting enough work," or, "I am

17    being left behind," and, to be that person, the representative

18    that everyone can go to, that is on the executive committee or

19    the steering committee, to -- almost like managing the

20    attorneys to make sure that everyone is getting work, and

21    meaningful work.

22          I also propose to have 11 executive committee members.

23    And, what I have highlighted in yellow are general leadership

24    members.  They are not assigned to any tranche.

25          So, I believe ESI is going to be one ESI order, so

1      someone should receive that, and liaison, one liaison.

2             And then also there is a state arbitration liaison

3      because my understanding is there are state cases as well as

4      there will be arbitrations, and there should be some type of

5      coordination.

6             So, when you break it off per tranche, we have 17

7      members per tranche; two lead counsel, one of them will be

8      chair of discovery, three executive committee members, and each

9      one individual -- one will be chair.

10            You have an expert committee; one will be chair of

11     discovery, one will be chair of law and briefing.

12            Judge Schlesinger thought the law and briefing

13     committee was actually very effective, especially when we had,

14     from the get-go, a lot of 12(b) motions, probably 30 or 40

15     12(b) motions for each defendant.  And, I think law and

16     briefing will be a very busy group.  And, it is good to have

17     dedicated people that like to do research and writing to be

18     involved in law and briefing.

19            Second, your Honor, I also have a settlement committee,

20     which is kind of a new trend in the MDLs nowadays.  Not that

21     they're talking numbers in the beginning, but they start

22     talking about what's needed to get this case settled, what type

23     of structure, what will it look like as the case goes on.

24            And also each tranche will have a common benefit member

25     that oversees that tranche who is appointed to make sure that

1    those people are getting work and the wealth of work is spread.

2         What I see a lot of -- and what I'm trying to avoid --

3    in the case where you have a small sprawl or people appointed

4    and, all of a sudden, the leadership are having five, 10, 15

5    people from their own firm working on a case, and people that

6    have been appointed by this Court, for the Court, qualified to

7    work on the case, are not getting work because no one is

8    getting assigned work because it is all being held in-house.

9         And again, my proposed structure is going to take into

10   account age, ethic, gender, and race.

11        And, I believe, unfortunately, this might take a little

12   bit more time because I believe the Court should oversee it to

13   make sure that leadership has appointed people, or has people

14   controlling that -- that fall into what -- what are the goals

15   of an MDL nowadays, of kind of having a diverse group, an

16   inclusive group.  And, therefore, I believe another application

17   process should occur, to be sure, for executive members to get

18   the Court's blessing.  This is an actual approval by the Court

19   that we have fulfilled our duty to make that diverse and

20   inclusive.

21        And finally, your Honor, looking at the people that

22   have applied for leadership, they all kind of fall in, follow

23   the structure.  If you look, Mr. Ellis and Ms. Salas have both

24   applied for leadership for the contract and fourth tranche, the

25   common law tranche.

1        You have experience with Mr. Ellis, who's fantastic,

2   and Ms. Salas, who, as she mentioned, clerked for the Southern

3   District of Florida.  And, you have diversity there.

4        I think it would be a good fit there.

5        The same thing with Mr. Klafter and Mr. Willey.  I

6   think they are co-leads for the broker dealer for the Robinhood

7   tranche.  Again, it blends diversity with experience, as well

8   as, you know, someone that is well-versed and has done many

9   class actions.  And, as someone that is younger, they could

10  learn a lot from working with Mr. Klafter.

11       Finally, Mr. Saveri and Mr. Schirripa, they are both

12  very experienced.  But, the only diversity we are getting there

13  is geographical; one is east coast and one is west coast.

14       So, to have geographical diversity is important in this

15  case because it could affect the entire country.

16       And finally, Ms. Furst is the only person who applied

17  for the liaison.  But, besides that, your Honor, she has -- I

18  spoke to her.  She was at the top of her class in University of

19  Florida Law School, business undergrad, clerked in the Southern

20  District of Florida.

21       She is -- not just because she is the only person, but

22  she is also well qualified to make the decision, and she also

23  brings in diversity and difference of -- and difference in age

24  and experience.

25       Finally, the last four or five people that applied --

1    they really didn't apply for a lead position.  Mr. Pessah -- it

2    changed here, I don't want to speak for him -- but he was more

3    for an executive committee position.

4         And then the last four, Mr. Safirstein, Ms. Metcalf,

5    Mr. Graifman and Ms. Emert, they only applied for leadership

6    for TD Ameritrade.  And, as a result, they kind of fall in

7    maybe as executive member in the contract and fourth tranche

8    because they only pursued common law claims in their

9    application, as well as their complaint.

10        So, that's my proposal, your Honor.

11        That is the reason why I applied for leadership, was

12   because during this whole process, everyone was discussing, you

13   know, lead, lead, lead, and then we will figure out what we

14   will do, how we will staff this case.

15        But, I think it is important, from the beginning, to

16   discuss how we are going to staff this case and move forward in

17   large litigation which will require a lot of funding and lot of

18   people to move this case forward, especially with the dozens,

19   or hundreds of attorneys on the defense side.

20        THE COURT:  Mr. Assaad, thank you for your very

21   thoughtful presentation.

22        I think you are one of those who has provided a

23   structure -- well-thought-out structure, with reasons for your

24   proposal.  I had several questions for you.  Your presentation

25   has left me with about two minutes to ask the questions.  So --

1          MR. ASSAAD:  Sorry, your Honor.

2          THE COURT:  So -- that's all right.

3          So, let me just jump in and ask you about your time

4     commitment.

5          How can you assure the Court that you have enough time

6     for this case, and those in your firm do, as well?

7          MR. ASSAAD:  Your Honor, as an officer of the Court,

8     that's my number one assurance, is that I have the time to work

9     on this case.  I am one of the first people that when this

10    occurred back in January, I got the complaint on file within a

11    day.

12         I -- I have the staff.  I have -- we have a large firm,

13    about 50 attorneys.  But, if you look at my experience and my

14    MDL experience, there will be no complaints that I never

15    stepped up on or got the work done that was required.  And,

16    that goes from the -- your Honor, from the Verifund litigation

17    to the Smith and Nephew case, where any time anyone asked

18    anything of me, I always made time for cases.  I live and

19    breathe them.  And, to be honest, I will make time for this

20    case, and I will devote a hundred percent of my time to this

21    case, as necessary.

22         THE COURT:  If you were in a leadership position,

23    Mr. Assaad, how many master complaints do you think should be

24    filed?

25         MR. ASSAAD:  That is a very good question, your Honor.

1          At this time, I think that three, one for each tranche.

2     However when, pen to paper, we start to compare the complaints,

3     it might change.  But, right now, my position is three.  That

4     way, each tranche has a working, live complaint that they

5     can -- that they can go to the Court and file any potential

6     motions to compel, with any issues, to see what the issues are

7     for each tranche.

8          THE COURT:  Last question:  What is your biggest

9     concern about the MDL, including challenges that we will face

10    and have to overcome?

11         MR. ASSAAD:  I believe one of the biggest challenges in

12    this MDL is the amount of defendants in this case.

13         And, there is going to be a lot of discovery and

14    motions to compel.  Having that many different defendants

15    coming from many large firms, it will need a lot of finance

16    backing up.

17         And, these are big cases.  So, I think organization and

18    a streamlined discoveries processes, knowing -- one of my

19    ideas, to settle our discovery requests, we have 30 days, I

20    think, and usually after 30 days, we have a bunch of objections

21    -- to maybe streamline that so that the defendants pose their

22    objections after 15 days; vagueness, overbroadness.

23         So, that would streamline it and start the discovery

24    responses because sometimes, they are overly broad and/or

25    vague, and we can work together so the discovery moves faster.

1          I think that is going to be the bottleneck of this

2     case, is having discovery with 30 different defendants.

3          THE COURT:  Mr. Assaad, thank you very much.

4          MR. ASSAAD:  Thank you, your Honor, very much.  It was

5     a pleasure speaking with you today.

6          THE COURT:  Nice to see you, Mr. Ellis.

7          MR. ELLIS:  Good morning, your Honor.

8          THE COURT:  Good morning, Mr. Ellis.

9          MR. ELLIS:  Thank you for allowing me time to present

10    my position as to why I should be one of the leads for this

11    MDL.

12         I would like to thank the other lawyers that have

13    already supported our leadership group, with myself,

14    Mr. Schirripa, and Ms. Salas.  I do believe that we demonstrate

15    the type of diversity, experience at all levels to lead.

16         The most important issue is representing the clients

17    that have all come before the Court.  A little bit about

18    myself; I have been in practice for 25 years.  I am not new to

19    a small litigation boutique.  I practiced 25 years, 24 years in

20    all these things.  And, through that, I was chair for more than

21    a decade of its complex litigation practice group which

22    specialized in class action work.

23         I have a -- have had a diverse practice throughout my

24    career, both representing plaintiffs and defendants in

25    litigation.

1          I am proud to say that I have had a case in one year,

2     in 2006, where I was named to be Capital Lawyer of the Year.

3     In that year, I defended a group on trial, for General Electric

4     Company, successfully in Santa Barbara Superior Court.

5          And, in that same year, I actually won a $2.7 billion

6     judgement for a client from Hong Kong in a case.

7          So, I have a diverse practice that has represented both

8     plaintiffs and defendants.  And, I actually have done -- I was

9     trying to count them up, your Honor -- I don't know that I

10    really can -- but, I have probably done at least 40 or so class

11    actions.  And I think you said 20 or so, that we had done as a

12    team.  But probably, myself, had been 40, including, actually

13    having an MDL before Judge Cohn for the Southern District of

14    Florida, at one point in time.

15         I think what I offer, individually, and our group

16    offers, collectively, is diversity.  But, I want to be clear.

17    Our diversity, and my diversity, specifically, is not based on

18    ethnicity, or gender, or anything else.  It is based on

19    experience.

20         And, if the Court believes that there is a nondiverse,

21    ethnical person that is better to lead these clients, I urge

22    the Court to appoint that person over me.

23         What I know is that you -- if you take all the issues

24    the Court is required to consider for interim counsel or

25    permanent counsel, during Rule 23(g), I believe that my history

 1    and my experience shows that I could do that, and represent the

 2    mosaic of the client base that we are going to be charged with

 3    representing to the fullest of our abilities.

 4            I was born in San Diego, California, and I was raised

 5    by a single parent.  I watched my mom go to night school.  When

 6    I was in high school, my mom became a lawyer, a district

 7    attorney, and now she is a judge.

 8            But, I have gotten to see the effort and the work that

 9    that takes, because she was going to law school when I was in

10    high school.  She was becoming a attorney when I was in

11    college.  She was becoming a lawyer when I was going to law

12    school, myself, and starting to do great things.  And, through

13    that, I know that dedication and that is needed to represent,

14    and I always brought that to all of my cases.

15            There is obviously -- I think the headline for me is

16    that I have a lot of experience, and I represented clients and

17    in some of the biggest class action lawsuits and commercial

18    cases this country has ever seen.

19            One of the things that I saw the Court said is that

20    there are other considerations that are needed, and this is one

21    of the things your Honor wrote, is that, from what I recall as

22    the panoramic breast case, when you were appointing counsel,

23    and you said it is -- one of the things that is important is

24    the ability to gain the respect and work collaboratively with

25    all of the other counsel on the plaintiffs' side, and also on

1    opposition, and also with the Court.

2         And, I think if you consider all of the things I have

3    done in my 25 years of practice, that it -- I, along with me,

4    Mr. Schirripa and Ms. Salas, could do that effectively.

5         I have represented clients against some of the biggest

6    law firms in this country.  I have gone to trial against

7    Simpson Thacher.  I have represented in the case -- I went to

8    26 million dollars, Simpson Thacher was on the other side.

9         I have represented plaintiffs' firms that are

10   well-known, sophisticated in the commercial complex litigation;

11   it was Viversa and -- Eraclides Gelman, and I represented all

12   those people, and I -- against -- in those cases, and I do

13   believe that if you ask them, they will tell you I told the

14   truth, I fought hard for my clients, but I did it fair.

15        And, that's why I believe that I will bring to most of

16   this.  We won't get bogged down in the process.  We won't get

17   into the bickering and the defensibility.

18        If I am able to lead the team effectively, and that

19   will be my goal, is to nominate the process, perfect the

20   substance, and to bring forward people who, for the first time,

21   just like they chose Robinhood, are venturing into our court

22   system.

23        And, at the end of the day, those clients that we all

24   represent need to believe that this process was fair.  And,

25   they can't see that if we use lawyers to delay their right to

1    present their case to this Court.

2            And, we all know that that can be a tactic in

3    litigation, is to prevent the barriers for resolution.  And, I

4    think that will be our ultimate goal, is to prevent that from

5    happening.

6            I am happy to answer any questions the Court has.

7            THE COURT:  Thank you very much, Mr. Ellis.

8            Yes, I note that you, Ms. Salas, and Mr. Schirripa have

9    proposals that the three of you be at the lead.  Let me ask you

10    about your time commitment for this case, and that of your --

11    the lawyers at your firm.

12            What can you tell me about the time you all have

13    available to be on the leadership of this MDL?

14            MR. ELLIS:  Well, your Honor, I must make full

15    disclosure.  I have an eight-month-old son.  It is my first

16    child.  So --

17            THE COURT:  Congratulations.

18            MR. ELLIS:  -- other than that, other than the demands

19    of my young son, we are ready to go.

20            And, I don't think we will have any problems.  I know

21    we won't have any problems meeting this -- and if -- some of my

22    team, in that event, would take over.

23            Ms. Cathy Murray worked on this case with me.  Cathy

24    and I worked for more than 20 years together.  She actually is

25    from Miami, born and raised -- well, not born and raised.  She

1    was not born here.  She was born in Peru, but raised in Miami.

2         So, we are familiar there -- we actually are familiar

3    with the MDLs down there.  We worked on cases together.  And,

4    we just have always been able to get it done, somehow, some

5    way, and to not have the time -- we do have the time.  We have

6    a 50-person law firm dedicating several lawyers to this

7    particular matter.

8         And, I am just -- I'm just really excited about all of

9    the talent we have on this case and all of the law firms.

10        I was actually getting ready for this, and I took a

11   look at some of the work that Mr. Assaad has done.  He is down

12   the street from us, actually, in West Hollywood.  I actually

13   lived in West Hollywood for a long time, and I saw a youTube

14   presentation recently he put together with a Let Us Trade.  It

15   was kind of a hashtag.

16        And I saw the mosaic of the clients that he represents,

17   and I look forward to working with lawyers like that who have

18   done so much already.  Or, I read his complaint and he added to

19   his comment, discussions about Wall Street taking advantage of

20   Main Street, and, coincidentally, that is what I was thinking,

21   is that we have to protect Main Street.

22        Robinhood decided to reach out to Main Street, and Joe

23   Public, and David Investor.  If you look at their website, they

24   remind you of some of the cases we dealt with, with the

25   consumer class action defense placed in some of the different

1    things.  It is animated.  It is -- it is -- it is colored.  It

2    is not -- does not have any of the facts.  So, who are they

3    attracting with that?

4           Who are they attracting with the animations?

5           The more subtle, young investor.

6           The pictures of people that are up there are 22.  You

7    don't have, obviously, other 60-year olds.  They are 22, 27,

8    33.

9           So, those are the people who have to believe this

10   process works.  My mom is a judge, and I'm sure you will

11   probably share this viewpoint, is that some people -- when they

12   do deal with the government for the first time in our judicial

13   system, they have to meet that process, believe it is fair.

14   And, they can believe the process is fair when somebody who

15   looks like them is representing them effectively.

16          And that's what we hope to do.

17          THE COURT:  Mr. Ellis, how much of your time can you

18   give this case if you were part of the leadership structure of

19   plaintiffs' counsel?

20          MR. ELLIS:  Well, let me answer it this way, your

21   Honor.

22          One of the questions was if we have a weakness for

23   something.  I can be a little bit demanding about my own self

24   being involved.  So, I would want to do -- or I would want to

25   be involved.  I must be involved, I think, for things to do

1    well.

2          And, I hope that doesn't sound too conceited.  So, I do

3    have the time.  I do intend to work.  I do intend to take a

4    personal involvement in the case.

5          I do want to know what's going on.

6          I do believe that I can do that, in coordination of

7    efforts, both with the executive committee and then the other

8    leads, relying on them; because, to answer your question, I

9    have whatever time is required of me.

10          And, on all of the things that I have ever done, in

11    every case I have ever worked on, I believe my clients would

12    have -- always tell you, "If I have a question, or something

13    needed to be done, I could call Dennis and he would know the

14    answer, or get right back to me, and he would show up in all of

15    the biggest moments in that case."

16          And, I hope to do that here, as well.

17          THE COURT:  So, if you could, just be a little more

18    precise.  You know what's on your plate right now.  If this was

19    added to your plate, how much time could you devote to it?

20    20 percent of your time?

21          30 percent of your time?

22          You know, at the end of Friday, as you are writing down

23    your billable time sheets and what work you accomplished, what

24    more you can squeeze in -- so, if this was added to it, what

25    percentage of that time would it be?

```
 1              MR. ELLIS:  Well, I'll use last week as an example.  To

 2    get ready for this hearing, I think I spent 15 hours.  And, I

 3    want to be about -- 35, 30 percent more of my time.  I am doing

 4    -- we have an arbitration running right now.  I have been the

 5    one representing -- it's got three more weeks, and it is kind

 6    of split up through July.

 7              Fortunately, for me, I had two trials, or one trial

 8    that was set for June 21st -- that was my mom's birthday -- and

 9    that was with L'Oreal, we won summary judgment.  So, that case

10    has gone away.

11              There was another case that was looking at a retrial at

12    the end of the year.  However, we actually got a very strong

13    suit -- in the decision -- in the Fifth Circuit, and I don't

14    believe that is going to happen now.

15              So, I have the time to work on this particular matter.

16    If you ask me for a percentage, your Honor, I could guarantee

17    you it would be 30 percent, probably a little bit more.  But,

18    if it was more, as lead, it would be whatever it takes.

19              THE COURT:  Thank you.

20              And can you -- what can you offer in terms of your

21    insights about the overall structure of -- that you see in this

22    MDL?

23              MR. ELLIS:  In terms of the tranches, I do think

24    that -- I agree, actually, with Mr. Assaad.

25              I think tranches -- I don't believe you need to split
```

 1    up the defendants into two separate groups, into the contract

 2    and tort case, if you put them all together.  It is one group

 3    of defendants.  I think that would be appropriate.

 4            I think that is just a logical direction, for the Court

 5    to take it.

 6            There is also an antitrust case.  And, I think that

 7    there should be a complaint for that one.

 8            And, of course, that is a securities issue.

 9            Of course, it works its way through.  The third one, as

10    well.

11            I do believe that our structure, as proposed, is good.

12    It is one of the more neoclassical structures.  I was undergrad

13    business major and management.  And so you have kind of a very

14    flat structure.  You don't have a bunch of tranches that --

15    where different people do different things like that.

16            That is more of a classical structure.

17            And, I think that's more along the lines of what

18    Mr. Assaad was approaching.  It was very successful for a long

19    period of time, but I do believe we want to have more people

20    involved in the process, working.  It is more of this

21    neoclassical, flat-triangle structure, where you have just a

22    very small group of people in the lead, and you have a very

23    broad aspect of people working on different projects, and

24    different things.

25            And, I think the way to communicate with that is

1    through an executive committee.  And, you can almost see it as

2    part of our government.  There is a small group of people, the

3    House, that, you know, kind of represents the broader people,

4    and then all the rest of the council below that is the

5    government.

6           And so it is very flat-structured in terms of how it

7    was managed from the plaintiffs' side.

8           But, what I don't think -- what I don't think that will

9    be effective, in having been in defendants' position, and quite

10   often, represented defendants, is for the defense counsel to

11   want to talk, to get an answer for the group on a specific

12   issue regarding discovery, or approach, or motion or timing,

13   things like that -- they don't want to have, like, a Rolodex of

14   people they have to call to get an answer.  They want to know

15   that if there is a person they are talking to -- if it is

16   Mr. Schirripa or Ms. Salas or myself -- that we, in speaking,

17   we are positioned and have the authority to really enter into a

18   discussion where something could be resolved.

19          And, you can't have a structure where they are

20   literally trying to figure out who to talk to about a

21   particular issue, to define the issue, for example, ESI -- what

22   is going to be the approach?

23          Documents, or what are we going to do about that?

24          They don't want to know, "Let me figure out, who within

25   the group can do that."

1          I want them to know they could call me and I would have

2     the answer to that.

3          And, to go back to your question, your Honor, about

4     well, how much time can you do -- you have to be committed in

5     terms of time, if you are going to do that, you are going to

6     make yourself available.

7          They cannot be looking for you.  And so myself, I, on

8     my own card and I -- probably, that is probably not a big deal

9     in the Zoom world, but anybody can call me at any time, whether

10    it be in our group, the defense side, or anybody else.  I think

11    that's what I will try to do, is try to make sure that we get

12    answers and solve issues.

13         It is not about -- for me, the departing from Federal

14    Rules of Civil Procedure.  It is just about using those rules

15    and using them effectively.

16         THE COURT:  Thank you very much, Mr. Ellis.

17         I appreciate all of the information that you have given

18    me.  Thank you so much.

19         MR. ELLIS:  Thank you.

20         THE COURT:  Ms. Furst?

21         MS. FURST:  Good afternoon, your Honor.

22         Rachel Furst from Grossman, Roth here in Coral Gables.

23    We thank you for your time.

24         I am applying for the position of the liaison counsel,

25    which I hope would have a seat for either on an executive

1    committee or steering committee, depending on the leadership

2    structure implemented.

3         As Mr. Assaad mentioned, I am the only attorney who has

4    applied for this position.  No counsel has opposed my

5    appointment.  And, several have expressly suggested that I fill

6    this role in their own filing and at the last status conference

7    with the Court, which I appreciate.

8         And, I think there is a reason for that, in that I have

9    already undertaken some of the work, in coordinating

10   plaintiffs' counsel and sort of serving in a liaison

11   counsel-type role; most recently, facilitating the filing of

12   the consolidated leadership applications which bring us all

13   here today.

14        Throughout that process, I have had the opportunity to

15   speak with nearly all of the attorneys who are applying for

16   leadership, many of them, at length, and many times.

17        And, I think there is a consensus around the idea that

18   this case does need a liaison counsel, would benefit from one.

19        There is -- there is agreement, more or less, that

20   there will be several tranches, whether it is three or four,

21   maybe there is some dispute over it, including PSRA cases, and

22   yet, there can't be four phone calls every time, to and from

23   plaintiffs' counsel, every time there's a scheduling issue that

24   needs to be coordinated, either from defense counsel or from

25   the Court.

1          So, I really think that, you know, you need somebody,

2     liaison counsel here in the District, in the same time zone as

3     the Court, which plaintiffs can call and defense counsel can

4     call and know the necessary coordination and communication will

5     be done in a timely and professional and reliable manner.

6          So, I do think this will add some efficiency to the

7     MDL.

8          And, I believe that I am the right person for the job.

9     I clerked in this District for Judge Ursula Ungaro.  I was one

10    of her civil clerks for over a year.

11         And, the entirety of my practice has really been spent

12    here.  I started my career at White and Case, where I worked

13    for nearly five years as a commercial litigation associate.

14    There, I did some MDL experience, and certainly have experience

15    with the substantive claims that are brought in this lawsuit;

16    breach of contract, negligence, deceptive trade practices, and

17    breach of fiduciary duty.

18         I also have a says pa sample experience in the eight

19    years I spent at Grossman Roth Yaffa Cohen here in Miami.  When

20    I began at Grossman Roth, I did a bank hold and rescue for

21    underwriters in front of Judge King, the MDLs.  And, I watched

22    and learned from my colleagues, Bob Gillberg and Stuart

23    Grossman, who were appointed as leadership positions in that

24    case.

25         And, since then, I have also worked on class actions on

1    behalf of -- on behalf of plaintiffs at Grossman Roth Yaffa

2    Cohen.

3         Right, now, I'm a partner.  Currently, I am working on

4    the Allergan MDL in the District Court in New Jersey, working

5    alongside cocounsel Julie Kane at Colson Hicks.

6         So, I have familiarity with class actions and MDLs, and

7    cases, and I have an intimate, I think, knowledge of the local

8    rules and court and the way things are done in this District

9    which I can bring to bear on lead counsel.

10         Nearly all of the attorneys who are involved in this

11   case are from elsewhere.  They will be litigating remotely,

12   which has been made easier now we have Zoom.  But, it still

13   presents some challenges.  So, I think my aid would be to make

14   litigation from afar a seamless experience for the plaintiffs'

15   counsel.  And, I think I can do that.

16         And, I also have had the pleasure of, again, speaking

17   with most or nearly all of the plaintiffs' attorneys who are

18   applying for the leadership, and honestly, I would be honored

19   to work with all of them.  There is an enormous amount of

20   talent and enthusiasm, and I would be very pleased to serve in

21   the role as liaison counsel and assist the Court, really make

22   the Court's administration of these cases easier in that role.

23   So, I welcome the opportunity, and I welcome your questions.

24         THE COURT:  Thank you very much, Ms. Furst.

25         You and I first interacted many years ago when you were

1   at White and Case, and you were very gracious when I was at the

2   firm presenting.

3          MS. FURST:  I remember.

4          THE COURT:  Why are you the only one who wants this

5   position?

6          Do you know?

7          MS. FURST:  Well, I mean, I would like to think it is

8   not a thankless job.

9          But, you know, I think that from the onset, really,

10  from our first plaintiffs' call and when the coordination of

11  these cases began, I kind of made my interest in this role

12  known, and sort of took on the responsibility.

13         So, I think -- I mean, I would like to think that's

14  why.  Some consensus has been formed around my serving in this

15  role, and I have shown I have the ability to do so.

16         I think I also have the stability and diligence it

17  takes, and diplomatic skill set that will enable me to work

18  with the various personalities who will be involved on the

19  plaintiffs' side.  And, I think that has been apparent in this

20  process, and I have successfully navigated just on the

21  leadership applications, so far.  So, I think that's why.

22         THE COURT:  Have you served as the liaison counsel in

23  any other MDL?

24         MS. FURST:  I have not, your Honor.  And so in that

25  respect, I would be a new intern, as I suppose the term is

1    used, and I feel that appointing me to that role would further

2    the aim of inclusivity and -- by promoting younger attorneys to

3    take on leadership positions.

4           But, that doesn't mean that because I haven't served my

5    term, my name in the law -- that I have not watched and learned

6    from others at my law firm, like Stuart Grossman, who have been

7    named to executive positions of leadership in MDLs.

8           And also, as part of my research for this case, I

9    reached out to liaison counsel serving in other cases in this

10   District.  My cocounsel, as liaison attorney in the Zantac

11   right now -- Bobby Gillberg, who is a former lawyer of the

12   Grossman law firm -- he is serving as liaison counsel in the

13   panoramic breast case; Julie Kane, who is serving as liaison

14   counsel in the Monet case in front of Judge Gayles, an MDL

15   there.

16          So, I raise their names simply to say I have an

17   extensive network of friends and attorneys who -- from whom I

18   can sort of glean best practices.  So I am confident that I can

19   handle the responsibility.

20          THE COURT:  You mentioned being on the same time zone

21   as the Court.  But, there are a number of lawyers who are not.

22   If they needed to communicate with you, would they be available

23   during hours that we are normally closed over here?

24          MS. FURST:  Certainly.  And that has already -- you

25   know, over the last two months, sort of the coordination has

1    been, has been going on, on the plaintiffs' side.  I have got

2    accustomed to taking calls, you know, after 8:00 P.M., and

3    certainly after seven P.M.

4         And, I currently serve as cocounsel with a Seattle firm

5    on perhaps several class actions.  So, I am comfortable working

6    with California counsel, and I have that experience, and I am

7    used to it.

8         THE COURT:  Well, I won't keep you for the full

9    15 minutes.  Given that you are the only applicant who wants

10   this position, I think we can safely say that you have got it.

11   But, one last question.

12        Are you amenable to serving in this role, regardless of

13   which of these fine lawyers I select to be on the committee,

14   the leadership committee?

15        MS. FURST:  Yes, your Honor, I am.  Certainly.

16        THE COURT:  Thank you very much.

17        MS. FURST:  Thank you.

18        THE COURT:  So, we started late, for the reasons you

19   are all quite familiar with.

20        I am going to pick up with Mr. Klafter for the next

21   presentation.  We will take a 45-minute lunch break.  It might

22   be breakfast for those of you on the west coast.  I am not

23   sure.  And then we will continue at 1:20.

24        (Whereupon, there was a recess at 12:56 p.m., after

25   which the following proceedings were had at 1:32 p.m.:)

1          THE COURT:  Good afternoon.  I think our next presenter

2     at this hearing is Mr. Klafter.

3          MR. KLAFTER:  Good afternoon, your Honor.

4          THE COURT:  Good afternoon.

5          MR. KLAFTER:  I have some limited opening remarks

6     because I certainly want to allow enough time for your Honor to

7     ask questions.  So, I will get through them as quickly as

8     possible.

9          First, I believe my application for lead counsel

10    primary responsibility with the Robinhood charge -- which is

11    something I want to address as to what that tranche is, because

12    --

13         THE COURT:  I'm sorry.  Mr. Klafter, my court reporter

14    and I are both having trouble hearing you.  So, if you could

15    perhaps speak closer to the microphone --

16         MR. KLAFTER:  I will try.  Can you hear me?

17         THE COURT:  Better.  Thank you.

18         MR. KLAFTER:  Okay.  Okay.  So, I believe my

19    application as lead counsel with primary responsibility for the

20    Robinhood tranche -- and that's a tranche which I think we need

21    to clarify, in light of some of the comments earlier today --

22    that demonstrates that the interest of the class of Robinhood

23    customers would be best served with me in the leadership, based

24    upon my experience in class actions, but as well as my specific

25    experience in the breach of fiduciary duty, breach of contract

 1   claims, and negligence/fraudulent types of claims that will be

 2   the ones that are primarily asserted against Robinhood in this

 3   MDL, aside from the antitrust.

 4        Now, first, Mr. Assaad talked about his experience in

 5   MDLs.  I will be frank with your Honor.  I have led many class

 6   actions, but I have not led an MDL.  I have participated in

 7   MDLs.  I have been on committees.  I have even been on

 8   committees.

 9        But, my experience in leading cases and in being a rank

10   and file or committee member of an MDL is that I was always

11   treated fairly, and when I was willing to step up and commit

12   resources and work in the case, that lead counsel always

13   welcomed that.

14        So, what Mr. -- the fears that Mr. Assaad puts forth

15   are very foreign to me, and I don't think that you -- if I am

16   in the lead, that that would not happen.

17        And, the second thing I want to mention is that -- is

18   that about tranches, that Mr. Assaad sort of separated

19   Robinhood from the contract and tort tranche.  That makes no

20   sense to me.  The claims that will be asserted against

21   Robinhood are breach of contract, breach of fiduciary,

22   negligence, and maybe some aid and abetting claims.  So I'm not

23   sure what they are leaving for Robinhood, but that makes no

24   sense.

25        And, even Mr. Ellis, in his papers, talked about he and

1    Ms. Salas presiding over the state law contract and tort-based

2    claims.  So, they are mushing them all together and leaving

3    Mr. Schirripa for the antitrust claims.

4          Just a flashback to the -- the initial conference

5    before your Honor, I think that there was general acceptance of

6    the view that there would be an antitrust tranche, there would

7    be a Robinhood tranche, which would have all these common law

8    claims, and then there would be another broker tranche, such as

9    eTrade.  And the other brokers are TD Bank, Schwab, eTrade, and

10   Webull.

11         And, I think that makes good sense to split them up

12   that way, and not to conflate the other brokers in with

13   Robinhood for a couple of reasons:  One, that -- I think

14   95 percent of the cases only assert claims against Robinhood.

15   There is a unique story with regard to Robinhood, with unique

16   players.  They are all relationships with the depository trust

17   company; Citadel, Nomad Capital, perhaps other entities.

18         None of those entities are involved in the TD trade --

19   TD Ameritrade.  For example, if you look at the TD Ameritrade

20   complaints that were filed in the MDLs, no one is sued other

21   that the TD Ameritrade.

22         If you push them all together in one solid complaint,

23   it would be like book one and book two.

24         And so -- and also, the -- we also think it is sort of

25   like -- Robinhood is sort of a big tiger, and maybe the other

1    brokers are sort of the tail.  And -- but they don't deserve,

2    if we put them together, they would be the tail.

3           And, the investors in TD Ameritrade -- which my clients

4    are not, or Schwab, or eTrade -- they deserve to be their own

5    tiger and not be the tail of the Robinhood situation.

6           Okay.  The next point is -- is that the structure that

7    Mr. Assaad talks about, from the combat ear plug, arms ear

8    plug, your Honor, this case has been billed as the largest MDL

9    in history.  There are over two hundred thousand individual

10   cases that are part of that MDL.  They are all individual

11   cases, no class actions.

12          So, it is the biggest mass tort, you know, MDL in the

13   history of the cases.  So, out of 200,000, they had 40 some-odd

14   attorneys.

15          But, to put all of the -- almost all of the attorneys

16   in this case into a leadership structure, which I think

17   turns -- and I agree with Mr. Ellis that the structure should

18   be more of a triangle, it inverts the triangle.  It doesn't

19   make any sense.

20          And also, the idea of having a common benefit

21   committee -- well, you have those in mass tort committees

22   because there is interest of people representing their own

23   individual clients, or whether they are doing something for the

24   common good -- so, you need a police for them.

25          Everyone has a common class action.  We don't need a

1    common benefits leader, a committee or anything like that.

2            I think I want to mention adversity and inclusiveness,

3    as that has been a focus of this morning's interviews.  And, in

4    light of your Honor's questions, that I feel compelled to --

5    and I have really never done this before -- to tell the truth,

6    that I do represent adversity as a lead.

7            I have a physical disability.  I have had it for my

8    entire life, and I have never had to raise it.  And, had I been

9    in court, you would not even have seen me -- and no one would

10   -- by either overtly or by my negative implications suggest

11   that I not be the first candidate.  But, because we are in the

12   Zoom world, I just feel compelled to put it on tape.

13           And that, your Honor, are the totality of my comments.

14   I do have other ideas about how to promote other diversity in

15   the leadership structure.  But, I know your Honor has questions

16   for me, so I will turn it over to you.

17           THE COURT:  Mr. Klafter, I appreciate your very

18   insightful observations shared, and the proposals that we have

19   heard thus far.

20           How do you envision the overall structure of leadership

21   in this MDL, besides agreeing with Mr. Ellis that it should be

22   more of a triangular than an inverted triangle?

23           MR. KLAFTER:  It was my view, your Honor, that there

24   are -- and putting aside securities -- but other than the

25   securities, there should be three tranches and three impacts;

1   one for antitrust counsel, one for Robinhood, and all the state

2   law claims, including statutory claims that might -- state

3   statutory claims that might be asserted against Robinhood --

4   and then the other brokers.

5        I then see -- and I would suggest, your Honor, that we

6   have -- to promote diversity, additional diversity into the

7   case, that we have sort of a diverse second chair for each lead

8   counsel, that we would -- lead counsel would propose, or your

9   Honor could take applications for it -- that would work closely

10  with the lead counsel and learn what it takes to lead a case

11  like this.

12       And, one of the things that I looked at, your Honor, in

13  the preparing for this is that George Washington Law School put

14  out a whole extensive paper on what judges should look at in

15  promoting diversity.  And, one of the things they said is that

16  when lawyers, who are -- when they are lieutenants, when they

17  are lieutenants, that they often go on to become leaders,

18  themselves.

19       And, we have people which are, obviously, experienced,

20  but don't have the experience of prosecuting a class action,

21  from end to end, and dealing with all of the issues that are

22  involved in getting class certification.

23       And also taking discovery, which -- which I think is

24  different than being a defendant.  Where you are more putting

25  up obstacles, slap things down, try to slow the train down --

1   us plaintiffs are working on a contingency fee.  We want to get

2   to the finish line as reasonably, quickly as possible.

3          I also think that your Honor could require each of the

4   lead counsel, in terms of their staffing of their -- within

5   their offices to have, you know, one or two diverse attorneys.

6   I have been working with Amir Alimehri.  He is a first

7   generation Iranian.  His parents escaped from Iran, and he is

8   very active in diversity.

9          And, I know, your Honor, Mr. Saveri also has diverse

10  candidates.  So, we can increase the pool.

11         So, the idea is that even though there may not be as

12  many diverse candidates in the top that have the experience to

13  do this, let's -- let's grow them, in different levels, from

14  all different levels, so that in the near future, we have more

15  diversity, more qualified candidates.  And, I think that's an

16  approach that your Honor might embrace.

17         And, I also believe that there should be, lastly, a

18  steering committee, executive committee.  I believe it should

19  be per tranche.

20         And then perhaps -- we have heard a lot about how

21  complicated that case is, of all of the defendants.  Well, your

22  Honor, there are only all these defendants in the antitrust

23  tranche.  For the Robinhood tranche, you have three Robinhood

24  entities; maybe Citadel, Melvin Capital, maybe something else.

25  And so the very limited number of defendants in the other

1   broker and Robinhood tranches -- they are all in the massive

2   conspiracy alleged in the antitrust.

3        So, I think that you can have a relatively small

4   executive committee, you know, four or five, six lawyers, which

5   also can be diverse, that supports each tranche, but perhaps

6   should be over -- it should be much larger than for the

7   antitrust tranche, because that's where you have all of the

8   defendants.

9        That is -- and that's where, again, we have to see

10  whether they are all included in a consolidated regular

11  complaint, whether they will survive a motion to dismiss.

12       So, it is -- the idea that this case is going to have

13  20 defendants, or all these different defense counsel, and

14  there is going to be thermonuclear war -- I don't think it is

15  necessarily so.

16       And, your Honor, I subscribe to the KISS principle --

17  which is Keep It Simple Stupid.

18       I believe that if I am the lead, I am going to navigate

19  this case in the most efficient way to get to the finish line,

20  which is to get the class certified, get the discovery we need

21  so we put this case in a position to be tried.

22       THE COURT:  So, you mentioned an interest, obviously,

23  in the Robinhood tranche.  And, you are proposing that there be

24  three lead counsel, one for each.

25       Could you speak to the possibility of having two colead

1    counsel for each?

2        MR. KLAFTER:  Okay.  I think that, again, if we focus

3    on the claims against Robinhood and the claims against the

4    other brokers, I'm not sure that it would warrant that.

5        But -- I'm not opposed to it.

6        But, what I am opposed to -- what I am opposed to --

7    what -- I think Mr. Assaad put that forth in his written

8    submission, or his slide presentation today, which is to have

9    two leads where one is experienced and one is less

10   experienced -- I think that that doesn't work as well.

11       I think that -- that the less-experienced person has to

12   earn their title to be a lead, and that -- and that's why I

13   proposed first chair, or designated chair from the executive

14   committee.  And, they could be done a lot of different ways.

15   But, the idea is that would be the mentoring that I would

16   propose.

17       But, I am not opposed to there being two lead counsel.

18   I have worked many cases with colead counsel, and I think I can

19   do that efficiently, as well.

20       THE COURT:  And what is your time commitment?

21       How much time would you envision devoting to this case,

22   if you were selected to lead the Robinhood tranche?

23       MR. KLAFTER:  Well, since I was -- learned of this

24   situation, I was retained back in January, I have been devoting

25   as much time as I possibly can to this case, which there has

1    been some fortuitous circumstances of cases settling.

2            I have been able to devote a significant amount of

3    time.

4            I have listened to all the impression hearings.  I

5    downloaded all the written statements.  I drilled down on the

6    DEC Capital algorithms and the like because they claimed, you

7    know, there were a lot of issues in this case about the size of

8    the Capital defaults.

9            I have not stopped focusing on this case.

10           I already worked out a plan for how to draft the

11   complaint.  I have reviewed all of the pleadings in the

12   Robinhood outage case because there are a lot of comparisons

13   between the Robinhood outage case and -- which is out of the

14   Northern District of California, and this one, where there are

15   breaches of contract, breaches of fiduciary duty, and

16   negligence-type claims and gross negligence claims.

17           And, Robinhood didn't even move to dismiss the

18   individual claims in that case because -- I don't know why, but

19   I think it is because they were so well pled.  And, this could

20   provide a roadmap.

21           But, to answer your question, your Honor, I have

22   cleared the deck so that I can make this my primary

23   responsibility.  And, it will continue to be my primary

24   responsibility, which is over 50 percent of my time.  And, if I

25   need to spend a hundred percent of my time in a given week or

1   two weeks, a month, I will do that.

2         I have the support of my firm to commit whatever

3   resources of my own time and of the firm to do what it takes to

4   bring this case to resolution.

5         THE COURT:  Mr. Klafter, thank you very much for your

6   very thoughtful observations and suggestions.  Thank you.

7         Mr. Oberlin?

8         MR. SAFIRSTEIN:  It is Peter Safirstein on behalf of

9   Michael Oberlin.

10        Can you hear me?

11        THE COURT:  We can.

12        MR. SAFIRSTEIN:  Good afternoon, your Honor; Peter

13  Safirstein.  And, thank you very much for the opportunity to

14  appear before you today.

15        I am also speaking for my cocounsel on this litigation,

16  Melissa Emert and Gary Graifman of Kantrowitz, Goldhamer and

17  Graifman.  They are on the line, as well, your Honor, and they

18  are available for any questions that the Court may have.

19        Your Honor, our application for a lead position is

20  focused on the claims in this MDL that are supposedly or

21  so-called the broker-dealer claims, and our specific claim, it

22  is with regard to TD Ameritrade.  And, we were applying for

23  lead with regard to ensuring that those claims are prosecuted

24  as vigorously as possible.

25        Our client, your Honor, is Michael Oberlin.  He is a

 1    Miramar Beach, Florida resident.  He is an individual trader

 2    who traded in a large volume of stock at TD Ameritrade, and was

 3    blocked from making trades that he wanted to make at TD

 4    Ameritrade in a timely manner.  We are concerned that these

 5    very important allegations are vigorously pursued in this MDL.

 6          I know that your Honor has heard much about Robinhood.

 7    We understand this is a Robinhood-centric MDL.  But, Robinhood

 8    is not the only defendant, and there are other broker dealers

 9    involved here, as well.  And, as we understand from the

10    previous appearances before your Honor, that your Honor is

11    aware of that and is diligent in making sure that those

12    interests are protected as well.

13          I will be brief in describing my background.

14          I have been a litigator for more than 35 years.  I was

15    an Assistant United States Attorney in this judicial district,

16    in the Southern District of Florida.  I specialized in the

17    investigation of and prosecution of white collar crime.

18          Before that, I was a special assistant for the United

19    States Attorney in the Southern District of New York, where I

20    was assigned to the Commodities and Securities Fraud division

21    and was very active there, as well.

22          And, before that, I was with the enforcement division

23    of the SEC.

24          I have years and years of securities experience.  And,

25    I have tried federal cases.

1          After I left the Justice Department, your Honor, I went

2     into the plaintiffs' bar, more specifically, into the class

3     action bar, and I was a longtime partner in the securities

4     class action Powerhouse case where, for years, I served as the

5     day-to-day lead counsel and coordinating attorney in the IPO

6     securities, the IPO antitrust cases, which is actually the

7     largest securities case that has ever been prosecuted.  It

8     involved 312 coordinated cases before a single judge.  It was

9     against more than 60 financial institutions, against over 300

10    issuers of securities, and more than a thousand individual

11    defendants, as well.

12         There were more than 60 plaintiff law firms involved;

13    countless defense firms involved.  And, as the leader of the

14    day-to-day prosecution of that case, I have deep personal

15    knowledge in coordinating and running massive financial fraud

16    cases.

17         In 2016, together with my partner, Liz Metcalf, I

18    formed -- we formed our own firm.  We have been very successful

19    in prosecuting and leading securities, antitrust, and consumer

20    cases.

21         My colleagues, as I have mentioned to you earlier on

22    the call, are Melissa Emert and Gary Graifman.  Melissa Emert

23    is a partner, and she is co-chair of Kantrowitz, Goldhamer and

24    Graifman, which is a class action practice.  She has

25    represented consumers and investors for more than 30 years,

1    both at her current firm and her previous firm.

2           Ms. Emert hold prominent positions in a number of large

3    MDLs.  And, she was actually recently named as one of two women

4    attorneys in the country who received the highest number of

5    appointments to leadership structures in nationwide MDLs.

6           My other cocounsel, also from the same firm,

7    Kantrowitz, Goldhamer and Graifman -- Gary Graifman is also on

8    the line.  Mr. Graifman has chaired for consumer class actions,

9    a partner in his firm for years; litigated many, many cases for

10   many years.  We have worked together for many years.  He brings

11   practical experience, litigation experience, and recently

12   completed a retrial in civil Graco matters.

13          The entire nature of my firm -- my firm has a

14   nationwide practice, and we have a lot of experience in -- and

15   as I said, there is a specific area in this case that --

16   that -- you know, we don't believe the Court has heard too much

17   about today, which is the nonRobinhood, TD Ameritrade part of

18   the case.

19          And, we would appreciate consideration for being

20   appointed lead for that tranche.

21          Thank you, your Honor.

22          THE COURT:  Thank you very much, Mr. Safirstein.

23          You mentioned and in your application materials

24   highlighted that Ms. Emert has been recognized for leadership

25   in MDLs, and she was just court-appointed colead counsel rather

1    recently in Carter versus Graco Children's Products.  So, can

2    you speak to the time that she can devote, if she were part of

3    this group that you put forward of your firm and the Kantrowitz

4    firm?

5           MR. SAFIRSTEIN:  Sure.  We would all be working

6    collaboratively, and Ms. Emert -- we would certainly see to it

7    that she devoted a substantial part of her time to this case,

8    as well -- as well as the other MDL case that she has.

9           She also has, as we have indicated, the support of her

10   firm that she -- support of our firm, and collaboratively, you

11   know, we are a task-oriented group.  We have deep experience.

12   We know exactly what is required in terms of the pleadings, the

13   motion practice, the discovery, and Ms. Emert would devote a

14   significant amount of her time to this case, as would we all.

15          THE COURT:  So, what you are putting forward is a group

16   of four of you; correct?

17          MR. SAFIRSTEIN:  Well, we are putting forward a

18   group -- well, we are.  We are putting up a group of four.

19          We believe that, you know, the other so-called tranches

20   are being represented by many, many lawyers, and many law

21   firms.  We think it is reasonable that the two firms here work

22   collaboratively and work together with regard to the TD

23   Ameritrade, or the broker-dealer part of this case that's not

24   centered on Robinhood.

25          THE COURT:  I can certainly -- I call this sort of like

1    the Oberlin -- where it would be the four of you, and you would

2    seek to have a leadership position in this broker-dealer

3    tranche; correct?

4         MR. SAFIRSTEIN:  That's correct.

5         THE COURT:  And how many master complaints do you

6    envision in this MDL?

7         MR. SAFIRSTEIN:  Well, I -- I think our position is a

8    little bit different from maybe what you have heard earlier in

9    that it is -- if you put aside what I think, which is not just

10   being considered today, which is a 10b-5 master complaint, if

11   that is to decide, I think realistically, for efficiency

12   purposes, the Court would be well-served with two master

13   complaints; one is an antitrust case, and one is a securities

14   case.

15        At the end of the day, if it is one or two cases, where

16   Robinhood is in one complaint, or TD Ameritrade is in a

17   different complaint, I don't think it makes a real difference

18   because the Court is going to have to consider all those in any

19   event, those are all coordinated.  It is just a question of

20   whether or not they are consolidated, I believe.

21        And, the reason that we are so vociferously speaking on

22   behalf of the TD Ameritrade part is there are distinct issues

23   there that need to be considered separately.

24        But, whether or not -- so they need to have real estate

25   space, so to speak.  But, whether or not that real estate space

1    is in one master complaint, together with Robinhood, or it is a

2    separate complaint, I don't think, at the end of the day, it

3    makes that much of a difference.

4         And, I think that perhaps for -- convenience, but for

5    efficiency purposes, it might make more sense to put all of

6    these securities-type issues, so -- and, we understand it is

7    not a 10b-5 case.  When I say "securities," I -- we are talking

8    about in this case, either the statutory, as Mr. Klafter was

9    referring to, the common law claims, the breach of state law

10   claims, all those claims.  So, they would have the distinction

11   between those claims and the antitrust.

12        I think the antitrust case is a different case.  In

13   fact, the very large IPO litigation that I was deeply involved

14   in -- that, too, was split between the IPO securities case,

15   which, as I said, was 312 coordinated cases -- and the -- the

16   IPO antitrust case.  And, those cases were -- were distinct

17   cases in front of the same judge out of the Southern District

18   of New York.

19        THE COURT:  So, how do you envision the leadership of

20   this MDL?

21        MR. SAFIRSTEIN:  Well, I think that the leadership --

22   the leadership that makes the most sense would be an executive

23   committee where there is an executive committee that is in

24   charge of however many tranches the Court decides, that then

25   would be subspecialties, if you will, with regard to the

```
1    Robinhood tranche, and then also with regard to the TD

2    Ameritrade broker-dealer tranche.

3              And, you know, our firms have moved to the leadership

4    position with regard to the nonRobinhood part of it, and they

5    would have, you know, diligent representation because there are

6    going to be issues at the end of the day with regard to -- to

7    pleadings, litigation strategy, discovery.

8              It -- they are all going to be similar, and they are

9    all going to have distinctions.

10             So, I think that a leadership that takes into account

11   that the antitrust case is different, I think is, is -- at

12   least, from our perspective -- seems clear.

13             And, the real question with regard to everything else

14   is -- is how to put those two together.  And, they should

15   certainly have their own distinct leadership.  So the only

16   question is whether or not there is only one pleading.

17             THE COURT:  Only question is what?

18             Sorry.  Repeat that.

19             MR. SAFIRSTEIN:  Whether or not that is on one

20   complaint or two complaints, in our view.

21             So, if it is on one complaint, you have distinct

22   leadership for that part of the case, the TD Ameritrade, as

23   part of the large consolidated action.

24             And, if the Court decides that -- the Court prefers the

25   separate master complaint, then you would have leadership on
```

1    that separate master complaint.

2         But, I think the -- one of the issues -- I think one of

3    the reasons that we would speak to having one master complaint

4    is that invariably, you are going to need coordination from a

5    prosecutorial point of view between the TD Ameritrade part of

6    the case and the Robinhood part of the case, because there

7    are -- while there are differences, there are also

8    similarities, and there are commonalities.

9         So, it all needs to be, you know, thought through

10   carefully and work together.  And, as I said, I believe there

11   are efficiencies in having one complaint, but certainly, it is

12   distinct claims.

13   THE COURT:  Can you speak to the proposal that the

14   Ferraro Firm has put forward through Ms. Salas?

15   MR. SAFIRSTEIN:  Well, I think that the -- the proposal

16   of having, you know, those firms in a leadership position, you

17   know, I -- I am sure that they are all, you know, very able

18   firms in terms of the actual -- in terms of the structure.

19        THE COURT:  Right.

20   MR. SAFIRSTEIN:  We agree with the notion that there be

21   a structure that contemplates separate leadership for the

22   Robinhood part of the case, for the -- what we will call the

23   nonRobinhood broker-deal parts of the case and the antitrust

24   part of the case.  We do agree with that, conceptually.

25        THE COURT:  So, but -- in what you have put forward,

 1   you had omitted sort of a separate, third antitrust tranche.

 2   Right?

 3          MR. SAFIRSTEIN:  No, no, no. We are not omitting that.

 4          What we are saying is that we are -- we are seeking a

 5   limited position to be appointed to the leadership of what I

 6   think your Honor is going to view as a broker-dealer tranche.

 7          We -- we are not applying for a position with regard to

 8   the antitrust or with regard to the Robinhood tranche.  And, we

 9   support the notion of three distinct tranches, and believe that

10   that is the proper way to go forward.

11          But, we are concerned that the tranche that has been

12   given the least amount of attention, if you will, is the

13   so-called broker dealer tranche, or the TD Ameritrade tranche.

14   And, we have put forward an application that says that we

15   believe that we are well-suited to lead that tranche, and are

16   seeking a leadership position with regard to that very specific

17   part of the case.

18          THE COURT:  So, if you were given that, who, from the

19   four of you, would be the point person?

20          MR. SAFIRSTEIN:  I would be.

21          And, your Honor, we have spoken -- when we made the

22   application, we -- we have had those discussions.  We have

23   applied jointly, but it would be my very person here, and I

24   would be the lead of our group.

25          THE COURT:  What amount of time could you commit in

1    that capacity?

2         MR. SAFIRSTEIN:  Well, hearing what Mr. Klafter just

3    said, I, too, am fortunate in that I have had a number of cases

4    just recently settle.  So, I have more time on my hands right

5    now.

6         And I would certainly -- you know, I have been spending

7    a lot of time on this recently.  You know, once this case wraps

8    up -- and that will be very soon -- I will be spending a

9    substantial part of my time, certainly 50 percent of my time --

10   I can spend on it on an as-needed basis; or, more than that.

11        And, particularly with my cocounsel, we have the

12   bandwidth to do that.  But, my anticipation is to spend a

13   substantial part of my time to make sure this important

14   litigation is prosecuted.

15        THE COURT:  Thank you very much, Mr. Safirstein.

16        Mr. Pessah?

17        MR. PESSAH:  Yes.  Good afternoon, your Honor.

18        THE COURT:  Good afternoon.

19        MR. PESSAH:  Thank you for the opportunity to address

20   the Court and the Court's request that I prepare a brief

21   statement guided by your Honor, with some questions, and I will

22   be addressing some of those in my introductory remarks today.

23        The fact that we are meeting via videoconference is a

24   terrific example of how the events of last year have

25   contributed to our reliance on technology.

1          While the tools we use to interact with the justice

2     system have changed, the law remains a priority.  And, our laws

3     continue, and should continue to govern and guide us.

4          Never once did the obstacles of this new normal cause

5     us to abandon longstanding principles of law that govern our

6     commercial relationships and, where necessary, remediate the

7     wrongs committed by large institutions.

8          The same pertains to securities brokers.

9          Online brokers and, in particular, Robinhood, have

10    dramatically re-imagined a relationship between the public

11    markets and retail investors.  Millions of people can now

12    communicate online about investments, make decisions and trade

13    securities and derivatives on an app with a push of a button

14    from their mobile device.

15         But, these innovations did not come at the expense of

16    well-settled and legally recognized duties that govern brokers

17    in the public markets.  And, we believe Robinhood ran afoul of

18    those duties, as did some other brokers.  This is why we filed

19    this lawsuit and why, since filing, we have sought to

20    investigate and gather as much information as possible about

21    what drove the events of January 28, 2021, and how those who

22    were hurt by such events can access justice.

23         As we outlined in our application, our firm has been

24    retained by and collected information from over 4,600

25    demographically diverse plaintiffs from all walks of life.

1   These victims run the gamut and include college students, young

2   professionals, women and men from around the country who trust

3   that their broker is going to honor their fiduciary duties.

4        And, to hear, firsthand, the stories of these people

5   has been a life-changing experience for me, personally, and I

6   know I can say the same for members of my firm and our counsel.

7   And, to be part of their path to justice would certainly be the

8   honor of a lifetime.

9        I know Mr. Ellis mentioned a video that we created.

10  And, the reason why we created this video was like -- that was

11  really to garner support and awareness for what had gone on,

12  and to give a voice to our clients.

13       There was a lot of, obviously, media attention and

14  scrutiny around the events of January 28, 2021, and we wanted

15  to give the perspective of these potential class members and

16  give them a voice.

17       We have tried to articulate that in aspects in

18  relationships with counsel, and I am prepared to answer any

19  questions the Court has.  I know we have outlined quite a bit

20  of where we feel we can be helpful in our application, and I am

21  happy to answer your Honor's questions.

22       THE COURT:  Thank you very much.

23       You don't want to be lead counsel.  You want a position

24  on a committee.

25       Can you elaborate on that?

```
 1              Tell me what role you envision playing, contributing.

 2              MR. PESSAH:  Certainly, your Honor.

 3              Just a brief note about -- and I'm assuming I did put a

 4     footnote in our application.  It wasn't our intention to

 5     disregard what the Court's intentions were for this process,

 6     and certainly not to overburden the Court.

 7              The reason why we see ourselves well suited to serve on

 8     a committee is because we just really want to be honest about

 9     our capabilities and our level of experience.

10              Some of our experienced attorneys here have served on

11     MDLs.  I have done some class action work, and I have run my

12     litigation practice for seven years, and have been practicing

13     litigation for ten.  So, that was sort of the reason we wanted

14     to make sure the Court understands who we are, and knows how

15     many people we represent.

16              And, I think where we can be most helpful -- and I sort

17     of narrow it down to three potential categories -- one is,

18     obviously, organizing and analyzing information.

19              I think that there will be some need for us to

20     collaborate with, obviously, leadership in terms of how they

21     would like this information organized, analyzed.

22              Certainly, there is plenty of software and digital

23     tools that we have looked into already to dissect this

24     information.

25              We also feel we can be very helpful in law and motion
```

1    practice and advocacy in the study of the cases, counsel in

2    those cases, in I think there is somewhat of a roadmap -- not

3    exactly the same, but somewhat of a roadmap of how certain

4    defendants are going to behave just procedurally in this

5    litigation.

6            We are, obviously, going to have a slew of motions to

7    dismiss as Mr. Ursini has been -- very candidly outlined for us

8    on April 19th.

9            And then there is the question of how we can assist in

10   terms of what type of information to ask for, the information

11   that we have already received, which I want to be careful about

12   discussing that too much because a lot of that is just

13   privileged information coming to our firm from our clients.

14           But, I think that level of -- and that -- that volume

15   of information has given us a lot of clues about where we

16   should look.  And, obviously, we want to collaborate with

17   leadership about, you know, how we can tailor discovery, not

18   only in terms of efficiencies, but in terms of substance, as

19   well.

20           THE COURT:  So, you mentioned organizing and analyzing

21   the information, motion practice, and advocacy -- and what was

22   the third?

23           MR. PESSAH:  The third was tailoring discovery briefs

24   and really being, both on substance and in terms of

25   efficiencies -- what to ask for and how to ask for it.

 1          I was speaking with Mr. Safirstein on Friday.  I know

 2     he has some unique ideas about how to make discovery more

 3     efficient.  We are certainly open to those.  And, obviously,

 4     that is going to require coordination with defendants, as well.

 5          I know Mr. Assaad mentioned that he felt strongly that

 6     there would be a lot of motions to compel.  Certainly, that is

 7     a possibility, and that's what happens in most litigation.

 8          But, I hope there will be an opportunity to avoid that

 9     and really engage in coordination, not only with leadership on

10     the plaintiffs' side, but with defendants' counsel, as well, to

11     determine if there is any way to structure our discovery in

12     this case; what we can all agree on -- at least, a baseline of

13     what is needed.

14          THE COURT:  What substantive areas of expertise do you

15     think you would bring to the case?

16          MR. PESSAH:  Well, I have been practicing law for ten

17     years.  And, we have, I think, very qualified attorneys and, of

18     course, of counsel in this law firm.

19          My specialty has been litigation throughout my

20     practice.  I have litigated these specific claims before; I

21     litigate against large banks in a class action context before.

22     So, certainly, and -- I and my associates have MDL experience;

23     the opioid litigation, the RoundUp litigation, the Volkswagen

24     and diesel MDL -- so, both on the class action side and on the

25     MDL side.  And, also in terms of just specific expertise and

1    focusing on litigation in the commercial context, I think it

2    will contribute to our role here.

3              THE COURT:  So, you do not envision being or occupying

4    the position of lead counsel for any of the tranches, is that

5    right?

6              MR. PESSAH:  We are -- our complaint is against three

7    Robinhood defendants.  So, we would like to focus on the

8    Robinhood-centric tranche, if there is one.  That's what most

9    of our clients were using, the Robinhood platform.

10             But, that is not to say that some of that information

11   won't be useful to the other tranches.  And, we are certainly

12   open to collaborating and sharing, obviously, with the other

13   tranches.

14             But, our focus has been very Robinhood-centric, and

15   that's where we -- we are hoping we can play a role and focus

16   on.  But we are -- have not applied for a top level leadership

17   position, if you will.  We are looking for a seat on an

18   executive committee that is specific to the Robinhood-centric

19   tranche.

20             THE COURT:  And can you give me assurances of the time

21   commitment that you can make to this case?

22             MR. PESSAH:  Of course.  We have been fully committed

23   to this case since we filed our lawsuit on January 29th.  This

24   case gets litigated, certainly gets addressed in our offices

25   every single day.

1          Certainly, more than 50 percent of our time and our

2     associates' time will be devoted to this case, on an as-needed

3     basis; more, if that's required.

4          But, we have really cleared our schedules to address

5     this case, and we are fully committed to litigating and

6     participating in this case.

7          THE COURT:  What is your biggest concern about this

8     MDL, including any problems or challenges that you will be

9     facing?

10          MR. PESSAH:  It is a sensitive area to discuss

11     challenges.  I know there are people listening today.  But, I

12     think that, you know, there is a challenge -- there is going to

13     be a challenge that needs to be addressed in terms of really

14     communicating with class members.  They have a lot of

15     questions.  We get inquiries every single day from our class

16     members.  And, I think that needs to be something that everyone

17     looks at, because people want to know what's going on.

18          So, I think that has to be something that is

19     streamlined and that people pay attention to.

20          Obviously, there are a lot of defendants in this case,

21     and counsel will have their own ideas about what they want to

22     focus on and what the viable legal theories are.

23          So, I think one notable challenge is going to be

24     building consensus around that.  But, I think that is possible.

25     In speaking to all plaintiffs' counsel, I think it going to be

1    possible to achieve a consensus about what we focus on in each

2    tranche.

3            THE COURT:  Thank you very much, Mr. Pessah.

4            MR. PESSAH:  Thank you, your Honor.

5            THE COURT:  Ms. Salas?

6            MS. SALAS:  Good afternoon, your Honor.

7            Thank you for the opportunity to be interviewed with

8    respect to my application for a leadership position in this

9    case.

10           In your Honor's first pre-trial order, the Court

11   stated, that -- and this is my --

12           THE COURT:  Ms. Salas, my court reporter is still

13   having difficulty hearing you.

14           MS. SALAS:  I will speak up.

15           In your Honor's first pre-trial order, the Court stated

16   that "The added demand and burden of this type of litigation

17   places a premium on professionalism, and requires counsel to

18   fulfill their obligations as advocates in a manner that

19   postures and sustains good working relations among fellow

20   counsel and the Court."

21           I could not agree with your Honor more.

22           I initiated collaboration in this case from the moment

23   that our motion was granted and the case was transferred to

24   this District.

25           The best test of my leadership is the support I have

1    and the respect I have from my peers.  That support is on the

2    record.  And, the majority of the support for my application as

3    a lead counsel is not a product of any dealmaking.  And,

4    instead, it is the organic product of demonstrated leadership

5    over the last several months that includes Zoom meetings,

6    countless phone calls, and emails.

7            Now, thankfully, the Court does not have to choose here

8    between professionalism, civility, and cooperation on the one

9    hand and competence on the other.

10           I stand before the Court on my own two feet, confident

11   in my ability, and ready, willing, and able to prosecute this

12   case on behalf of the putative class that I represent.

13           I may not have been on every single signature block in

14   every MDL action.

15           I certainly have not filed the largest class action on

16   behalf of plaintiffs in any case that happens, and

17   particularly, with young lawyers who have been trained at top

18   defense law firms.

19           But, I have been appointed by a senior judge in this

20   court as the designated MDL clerk, and have worked on the

21   inside of a complex consumer class action MDL.  And, I have

22   worked in the trenches with prominent law firms and

23   institutions; most recently having served as assistant general

24   counsel to the University of Miami in the midst of a global

25   pandemic.

1        I have served in all these roles on a strategic level

2   and, importantly, I have substantive experience over the state

3   law tranche claims that I seek to lead.

4        My first, ever, jury trial to verdict was a negligence.

5   That is, of course, one of the primary claims at issue in the

6   state law tranche that I have asked to lead.

7        I did the voir dire, as the third-year lawyer, voir

8   dire on the economy experts and the closing.  I won the full

9   amount for my client.

10        My first year at Foley and Lardner, I tried to verdict

11   a conspiracy claim, one of the other claims at issue in this

12   case.

13        I represented the plaintiffs against the largest

14   developer in the state of Florida, and also one of the most

15   well-connected and most ably represented in a case that few

16   lawyers would have been able to see through to the finish line.

17        While both at Coffey Burlington and Foley and Lardner,

18   I was on the other side, the defense side of a high stakes,

19   billion-dollar securities action.

20        I have successfully defended those actions, and can

21   anticipate all of those issues here, and work with specialists

22   on those tranches.

23        I was specifically recruited to the plaintiffs' side,

24   Ferraro, by a former colleague which, again, speaks to the

25   respect that I have from fellow practitioners.

1          A fellow colleague at Foley Lardner, who is also a

2     former law clerk to Judge Leslie Rothenberg, is also part of

3     our firm.

4          And, I have worked thus far as counsel in a putative

5     class action on behalf of current black McDonald's owner

6     operators, franchisees, for racial discrimination under

7     Section 1981, in what really is a modern-day equivalent of

8     sharecropping and redlining.

9          I am being tasked with a growing consumer class action

10    practice and MDL group.

11         Now, I am confident in my ability.  But, I am very

12    aware that a case of this size, and in an MDL, in particular,

13    it takes a village to see that case through.

14         So, standing behind me in support is the full force of

15    the Ferraro Law Firm.  I am, of course, not a sole

16    practitioner.  I have the Ferraro firm and the assistance of

17    lawyers such as Jim Ferraro, who has served the needs in the

18    leadership position in mass tort cases, who has more

19    seven-figure verdicts than any other plaintiffs' mass tort

20    firm, and whose work, both as a trial and appellate lawyer,

21    which includes close to a hundred cases to verdict, has really

22    helped to shape the landscape of Florida tort law.

23         His son, who is a cocounsel in this case, was a former

24    trader on Wall Street.  So, he brings industry-level expertise.

25    And, he also has significant MDL experience, having worked with

1    Zantac, opioids actions.

2            I am also fortunate enough that the firm has committed

3    a significant amount of financial and human resources to this

4    case.

5            We are not a small firm or a firm that is at risk of

6    being inundated here.  We been have been around for more than

7    30 years.  We never seek litigation funding.  We are staffed in

8    Miami with over 20 attorneys, both trial and appellate lawyers,

9    at the trial and appellate levels.

10           And, also, if you include our affiliate law firm,

11   Kelley and Ferraro, we have over 50 lawyers on our team.

12           So, we have what it takes to see a case of this nature

13   through to the end.

14           I am also proud to have the support of Professor Bruce

15   Rogow, who is here today, and whose reputation precedes him.

16   It also speaks to my work in the overtime litigation in which

17   Mr. Rogow, Professor Rogow served as lead counsel, and dealing

18   with such interface directly on class certification issue;

19   scheduling orders, all of the issues that have been set out in

20   this record here today.

21           He will not only help round out our team, but really

22   will help us here for the benefit of the class, and brings in

23   knowledge and experience as special counsel, should we need

24   him, for the class.

25           And, finally, my cocounsel, Sean Burstyn, who is not

1    able to be here today -- it's a Jewish holiday -- but who is a

2    recent clerk for Judge Scola, who also has been on the defense

3    side of class actions, working in New York at Skadden Arps, who

4    brings his energetic view and a real passion for the facts of

5    this case, which are also going to be a huge benefit in this

6    case.

7            I am humbled by all of the support, and thank the Court

8    for having me here before you to answer questions.

9            And, with that, I am available to the Court for

10   questions.

11           THE COURT:  Thank you, Ms. Salas.

12           Would you speak to the leadership structure that you're

13   proposing and compare it to the structure that Mr. Klafter

14   proposed?

15           MS. SALAS:  Yes, your Honor.

16           I am proposing a three-total lead structure; that the

17   lion's share of the work in this case -- and this -- this is

18   really guided by the chart that was filed with the Court, a

19   case chart that was filed in the case initial conference --

20   that chart lays out that the lion's share of the work in the

21   case is going to be in the Robinhood tranche, which is how

22   Mr. Klafter named it.  And, I am naming it, instead of by the

23   defendants, I am naming it by the type of action, which is more

24   in the line of state law tranche.  That is where the lion's

25   share of the work, in our opinion, will be in this case.

1           So, we would propose a full lead structure.

2           So, I would -- I would seek to lead that tranche,

3    alongside Mr. Ellis.  It is a state law cause of action.  Also,

4    substantively, as I just mentioned, these are the claims that I

5    feel that I can represent most substantively.

6           THE COURT:  Don't the -- don't the broker dealers also

7    involve state law claims?

8           Would you address Mr. Safirstein's remarks that

9    essentially, you have two tranches that deal with state law

10   claims, right?

11          MS. SALAS:  Yes, your Honor.  We have two different

12   views of the tranches.  Our view is that the tranches should be

13   divided in terms of the nature of the claims.

14          And, the view that -- that Mr. Safirstein and

15   Mr. Klafter have put forth is more towards the type of

16   defendant involved.

17          So, in this case, you have 50 cases that involve TD

18   Ameritrade, out of 55.  I agree with Mr. Ellis that these

19   issues can be addressed in the complaints through, you know,

20   the rules you'll find under the joinder.

21          I don't think that there needs to be a division of the

22   leadership level with respect to defendants.

23          Instead, I think that that if you confine the claims,

24   that you have two coleads for state law causes of actions, and

25   that includes the Robinhood entities, and the other entities,

 1    and a special designation can be addressed at the executive

 2    committee, but at the PSE level.

 3              And then you have a third, which is the antitrust, and

 4    a fourth, which is securities.

 5              So, essentially, you are looking at four leads.

 6              And, underneath each of those leads, an executive

 7    committee.  And, what we propose is an executive committee of

 8    approximately three each, for a total of 17, as far as the

 9    leads and the executive committee, instead of what was

10    addressed earlier, which is 17 total leads.

11              So, we are looking at three total leads, setting aside

12    securities.

13              And, I think -- and the important point here is that as

14    far as the representation of counsel, I think -- of the

15    class -- which I keep coming back to -- and also for

16    efficiency, which is -- should be our guiding principle in the

17    Court is that the class needs to be heard with one voice.

18              So, I am a proponent of having mass hearings as to the

19    total leads at the top.  But, again, with respect to the

20    endorsements on my application, I think that that speaks to my

21    ability to work with others at the executive committee level so

22    that everyone's voice would be heard, including the TD

23    Ameritrade and other broker dealers clients.

24              THE COURT:  Can you describe the time commitment you

25    can make to this role that you are proposing to have in this

1   case?

2            MS. SALAS:  Yes, your Honor.

3            I am committed to devoting over 50 percent, but up to a

4   hundred percent of my time on this case.  It is an important

5   case and, thankfully, I have the whole support of my firm

6   behind me.  And, I am able to reallocate any work that I may

7   have to devote a hundred percent of my time to this case.

8            I understand the MDL scope and nature because I have

9   been on the inside of it.  It takes a lot of time to manage the

10  day-to-day management.  So, my firm has -- has supported my

11  application, and I am willing to commit as much time that it

12  takes, up to a hundred percent of my time.

13           THE COURT:  What is your biggest concern about the

14  problems or challenges we are going to face in this MDL,

15  Ms. Salas?

16           MS. SALAS:  We see some of them, we previewed some of

17  them here today.  There is -- the nexus of this case really

18  involved Robinhood, and some of the more -- we can call it

19  coconspirators, we have a lot of other defendants in some of

20  these cases that may also feel like -- like they are victims in

21  the case as much as our putative case.

22           So, I think there could be an overcomplication of some

23  of the legal issues, if you look -- if you try to look at it at

24  a triangular level, instead of high level.

25           And, I think if we can just go back to the arguments

1    that were made before the judicial panel where we saw the

2    reason why these cases are before your Honor is because you

3    have a discrete set of operative facts, that this occurred over

4    a short period of time, such that, you know, those concerns, as

5    far as the large number of defendants, in my view, shouldn't be

6    of concern in that it needs to be addressed by scheduling

7    orders, and through consolidated complaints in this case.

8            THE COURT:  Thank you.  Thank you, Ms. Salas.

9            MS. SALAS:  Thank you.

10           THE COURT:  Mr. Saveri?

11           You are muted, Mr. Saveri.

12           MR. SAVERI:  Is that better?

13           THE COURT:  Much better, thank you.

14           MR. SAVERI:  I said good morning from San Francisco,

15   where I -- I am this morning, and it is a pleasure to be here.

16           I'm speaking on behalf of myself and my firm, including

17   Steve Williams, Anupama Reddy, Chris Young -- we provided our

18   biographies of the team we proposed along with the materials

19   that we submitted.  So, we are grateful for the opportunity to

20   be here today.

21           Let me -- let me try to just jump in and answer a

22   question about time commitment, your Honor.

23           I and my firm are well experienced in having cases of

24   this size.  I will be personally involved in the day-to-day

25   management and organizations of the case.  It is the way I have

1     handled every case in which I have been appointed lead.

2             We have significant experience in MDL litigation, other

3     class actions.  And, any antitrust cases and complex

4     litigation, we take these cases from inception to trial.

5             Indeed, our firm appears to have the most numerous team

6     devoted to this case, including Mr. Williams, Ms. Reddy, Chris

7     Young, our paralegals, our investigators, our professional

8     staff.

9             Mr. Williams and I are two of the most experienced and

10    accomplished plaintiffs' lawyers in the United States.  We have

11    extensive experience managing and resolving cases of this type.

12            I also note that we are close right now to wrapping up

13    a jury trial in a large multidistrict case.

14            On that note, we were preparing that case for trial

15    when this case started.  So, we have demonstrated our ability

16    to manage and lead and prosecute more than one case at a time.

17            During that period, we did the investigation.  We filed

18    the antitrust complaint.  I think, if you look at that 51-page

19    complaint, it reveals substantial work product.

20            Indeed, it was copied by many of the other counsel in

21    this case, and has become a model in this case.

22            During that period, we also moved the JPML Panel to

23    initiate the JPML proceedings.  During that time, we have been

24    involved in expert work.  We have taken affirmative steps to

25    preserve records from third parties.

1          We have been involved in extensive discussions

2    regarding leadership in Item 35 in front of your Honor at the

3    last hearing.

4          So, if there are any concerns or questions about our

5    commitment to the case, I would just refer the Court to those

6    items.

7          You know, indeed, it is my observation that in this

8    case, many of the lawyers and law firms have taken advantage of

9    the work we have done and used that as a platform, themselves,

10   as they filed their cases.

11         You know, I think it is also important, too, to talk

12   about the Rule 23(g) requirements.  Under Rule 23(g), there are

13   a set of specific factors that the Court should cover in

14   appointing lead counsel; one is the work done to investigate

15   and identify the potential case.

16         As I have noted, we were -- while not the first to the

17   courthouse, we moved with remarkable dispatch to investigate

18   and develop these claims.

19         We have taken numerous affirmative steps to advance the

20   case during that period.  The second would be our credentials

21   and experience.  No firm applying for leadership in this case

22   has the same credentials as myself or my partner, Steve

23   Williams.

24         Mr. Williams and I have over 55 years of experience in

25   the field leading antitrust and other complex class actions.

1          We have organized cases as sole lead counsel or serving

2     as committees with other lead counsel.

3          We have taken these cases from inception to trial.

4          I would also note that our junior lawyers, Ms. Reddy

5     and Mr. Young have already had, in their careers, important

6     substantive experience, which includes taking depositions, it

7     includes working with experts, it includes conducting witness

8     examinations in a complex antitrust trial.

9          Third, knowledge of the applicable law -- I and the

10    firm has substantial area expertise, not only in the area of

11    antitrust law, but also in managing complex litigation.  It

12    includes putting together a team of lawyers, managing

13    discovery, preparing the case for trial, handling class

14    certification.

15         In terms of resources, this firm has the resources to

16    represent the class.  This includes the professional resources

17    of the firm, but also the financial resources of the firm.

18         I know a case of this type can cost many millions of

19    dollars with respect to -- and I know that because we -- we

20    have incurred those expenses on behalf of our clients in a

21    number of other cases -- and we are prepared to do that here.

22         In terms of efficiency, your Honor, I think it is

23    important to note that we are the only firm in San Francisco --

24    with an office in San Francisco and New York.

25         And, we would envision that the pandemic will unwind,

1    there will be in-person discovery depositions, and we are the

2    only firm that has offices in both San Francisco and New York.

3    And, I think that that's going to be a way of obtaining

4    substantial efficiencies here.

5         I guess I would also just stop for a moment on our

6    commitment to professionalism.  Our firm's commitment to the

7    values of civility and professionalism are very important.  We

8    are organized, we are accountable, we have developed a

9    reputation for working collaboratively and collegially, not

10   only with members of the Plaintiffs' Bar, but also with other

11   opponents, as well.  That is how we interact with each other,

12   our opponents in the Court.

13        And, recently, Judge Donato has recognized that, as

14   well.

15        So, maybe, your Honor, I will stop right there and

16   pause, and answer any questions that you have.

17        Thank you very much.

18        THE COURT:  You have a presence on the west coast and

19   on the east.  And, you are proposing yourself, Mr. Williams,

20   Mr. Davis, Ms. Reddy, and Mr. Young.  Which of those are on the

21   east coast?

22        MR. SAVERI:  All of those lawyers right now are based

23   in offices in San Francisco exclusively.  Mr. Williams spends

24   time, plans on spending time post pandemic in the New York

25   office.  But, our principal office of each of those lawyers is

1     in San Francisco, your Honor.

2          THE COURT:  And you are proposing to be interim lead

3     counsel over the antitrust tranche, is that right?

4          MR. SAVERI:  Yes, your Honor.

5          THE COURT:  And, I understand that your competitor for

6     this is Mr. Schirripa, who is going to speak next.  He is being

7     proposed, I believe, by the Ferraro Law Firm to head the

8     antitrust tranche.

9          And, since there has been some discussion of having

10    colead counsel for each, could you speak to your ability to

11    work with Mr. Schirripa in that capacity?

12         MR. SAVERI:  Sure, your Honor.  I -- I am happy to work

13    with Mr. Schirripa in that capacity.  We have been in some

14    cases together.  Even during this case, we have had a

15    collegial, collaborative communication about the case.  I don't

16    anticipate any particular issues with that, and I think that

17    would be fine, to me.

18         Ultimately, your Honor, it is a choice, which is your

19    choice, about how many jobs are created and who fills those

20    jobs.  I certainly have a preference for smaller and leaner

21    structures.  Certainly, it is my experience that courts prefer

22    nimble and agile leadership structures, and that would

23    certainly call for smaller groups.

24         Having said that, I worked in much larger groups.  And,

25    it is really your decision, your Honor, and what makes the most

1    sense for this case, given what we know about this case right

2    now.  And, I am happy to work with anybody who is part of this

3    group.

4          THE COURT:  How many master complaints do you envision,

5    Mr. Saveri?

6          MR. SAVERI:  I envision four, right now.  And, one

7    would be -- I think the easy ones are kind of -- I don't know

8    if they are the alpha and omega or the bookends of this case.

9    This is -- the antitrust and the securities case, it seems to

10   me there is a general agreement that those cases should have

11   their own complaint.

12         There is -- and I have heard the discussion today about

13   how one is to group or organize the Robinhood or broker-dealer

14   cases.

15         My -- the idea of tranches, by the way, your Honor, is

16   largely my idea in this case.  This is something that I have

17   suggested in socializing with the group some months ago.

18         And, I have always felt like four seems the right

19   number.  I do think there are a couple of issues floating

20   around in that, that probably should be kind of unpacked; one

21   is how you organize the case, for pleading purposes, in a law

22   practice, and how you deal with the motions to dismiss.

23         But, I think it is also important to think ahead to a

24   class certification in a Rule 23 practice.

25         I think one of the things that is important about the

1    tranches is that to the extent there are claims that deserve or

2    merit separate representation, in the class action context,

3    that those have their own counsel, or own designated counsel,

4    because there will have to be decisions made about those cases;

5    how to proceed, how to define the classes and, ultimately, how

6    to try those cases, and perhaps settle them.  And, giving some

7    thought to how that develops, I think, is important.

8         For pleading purposes, I -- I actually think I am

9    agnostic about whether we have two separate complaints or one

10   really big one.  And, it is really your decision, your Honor,

11   about how best to organize the pleading.

12        I suspect that whatever will happen will be a long way

13   from Rule 8.  There will be a lot more than a short claim

14   statement.  But, that really is a discussion for another day,

15   your Honor.

16        So, I don't know if that answers your question, but --

17   or if that is helpful.  But, those are my thoughts.

18        Excuse me, your Honor.  I would also just generally say

19   that what Mr. Klafter describes is, I think, a proposal that

20   was submitted to your Honor when we first -- last appeared.  I

21   think that made sense at the time, and I still think it makes

22   sense.

23        THE COURT:  And what time can you commit to this case,

24   Mr. Saveri?

25        MR. SAVERI:  Well, your Honor, I think certainly in the

1    short term, if I am going to be appointed, this may be my

2    biggest commitment because -- because -- and that, when I say

3    biggest commitment, I say virtually all of my time and the time

4    of my team, because we are going to have important work to do,

5    including the organizing the pleadings and addressing the

6    issues that we were just talking about.

7         And again, we -- a week ago, I would have said I have a

8    trial set to start in June, in San Francisco.  But, the Court

9    couldn't get the folks as part of the venire for the jury.  So,

10   that has been postponed.

11        So, in a lot of ways, this is perfect.  We really have

12   an opening in our schedule.  We have been preparing a big

13   antitrust case to trial and we can -- we have been working on

14   this case, at the same time.  This will be our -- if appointed,

15   it will really be our full -- get our full attention.

16        THE COURT:  Thank you, Saveri.

17        MR. SAVERI:  Thank you, your Honor.

18        THE COURT:  Mr. Schirripa.

19        MR. SCHIRRIPA:  Good afternoon, your Honor, Frank

20   Schirripa on behalf of --

21        THE COURT:  You need to speak louder.  We can't hear

22   you, Mr. Schirripa.

23        MR. SCHIRRIPA:  Good afternoon, your Honor.  Frank

24   Schirripa from the law firm of Hach, Rose, Schirripa and

25   Cheverie.

1            Can you hear me now?

2            THE COURT:  Not much better.

3            MR. SCHIRRIPA:  I would like to start out thanking the

4    Court for the opportunity to present and speak to you today,

5    speak to your Honor about my qualifications, my firm's

6    qualifications.

7            I am a second generation Italian lawyer.

8            My parents were civil workers in New York City.

9            I was born and raised, grew up in New York City, just a

10   stone's throw from Wall Street.

11           So, I have been -- I have always been drawn towards the

12   law.  So, upon graduation from law school, I started litigating

13   and working in securities litigation at the Seyfarth firm,

14   predominantly in securities class actions.

15           I worked there for about seven years with another firm

16   which branched out and gave me more experience in consumer --

17   financial consumer cases and antitrust cases.

18           In 2011, I started my own firm, and we have

19   consistently grown and added to our attorney base.

20           I have associates that have been with me since the

21   beginning.  I have an attorney that I have worked with over the

22   last 20 years and, in the past, other law firms, and brought

23   them on with me.

24           We have a diverse group of attorneys, male, female,

25   ranging in experiences, having been defense counsel,

1   plaintiffs' counsel, and as much as 40 years' experience to

2   complement my 20, 30, plus another attorney.

3        And, we have litigated predominantly securities and

4   antitrust, consumer class action cases, a large number of MDL

5   matters in which we have had an executive position, in a

6   steering position, or been in a position where we were able to

7   contribute significantly to the case.

8        Sorry, are you having a hard time hearing me?

9        THE COURT:  I am.  You are coming in very faintly, yes.

10       MR. SCHIRRIPA:  I apologize.  I am calling from a hotel

11  room in the Bahamas.  I am here speaking at an investor

12  conference.  We did lose power earlier, and I am doing my best

13  with the wifi we have here.

14       So, my thought towards this litigation -- and

15  obviously, as your Honor pointed out earlier, I have been

16  focused on the antitrust components.  I do know Mr. Saveri.  I

17  do respect him very well, his law firm.

18       I worked a case previously, a Bank of New York FX

19  litigation with his partner, Steve Williams, and I respect the

20  work that they have done in the antitrust law and other

21  consumer and securities cases.  I would welcome the opportunity

22  to work with him in whichever capacity the Court does deem to

23  assign leadership.  And, I think I reached out to Mr. Saveri a

24  few weeks back, and we kind of spoke about that briefly.

25       However, my application, in what I presented, I do

 1    believe my firm has the resources and the experience, both in

 2    human capital and financial capital, to lead the antitrust

 3    involved in the case.

 4            Having litigated in these cases over the last 20 years,

 5    I have developed a reputation of being a fair, honest,

 6    inclusive attorney.  And, I would like to bring in other

 7    attorneys to work in these cases.

 8            I have trained and mentored the associates within my

 9    firm to take key roles and assume responsibility in the cases

10    that we have been part of.  And, most recently, in the generic

11    price fixing antitrust case, one of my associates, who has been

12    with me for about seven years now, he was handling discovery

13    for two of the defendants in that case, point person, under my

14    leadership, of discovery issues there, to enable him to develop

15    his skills as an attorney.  He learned from other attorneys

16    outside of our firm.

17            I think that is a key component in MDL litigation, in

18    large class action litigation.  There is so much you can learn

19    from your immediate mentors and who you work with on a daily

20    basis.  But, when you combine attorneys from other firms

21    together, accomplished attorneys working with younger

22    attorneys, you get to develop, both as a mentor and as a

23    mentee.  And -- more and more, and engage more in this process.

24            So, I do enjoy litigating class action, MDL-related

25    matters because of that camaraderie and mentorship ability that

1    it provides both younger attorneys as well as older attorneys

2    to really polish and practice their technique.

3              Are there are any particular questions your Honor has

4    at the moment?

5              THE COURT:  Thank you, Mr. Schirripa.

6              You heard Mr. Saveri make a commitment to investing the

7    time necessary in this case, were you appointed and/or his law

8    firm appointed in a leadership role.

9              In your application materials, you -- you describe how

10   your firm is serving on the plaintiffs' executive committee in

11   the Eastern District of Pennsylvania, and in an antitrust

12   litigation that is also working with the plaintiffs' steering

13   committee in another antitrust case there, as well, a series of

14   complex cases alleging price fixing.

15             So, what time commitment can you make, if you are given

16   a leadership role over the antitrust tranche in this MDL?

17             MR. SCHIRRIPA:  My role in these particular cases are

18   supervisory of our attorneys in my office.  And, I am able to

19   dedicate more than 50 percent of my time to this litigation.

20             I am fortunate to be in a position where we have

21   resolved a few matters through mediation and settlement right

22   now, kind of clearing my calendar.

23             I met with my partners, and we started to refocus some

24   of the cases that I am actively involved in to them, in the

25   event that your Honor does place me in a leadership role here.

1    So, I would be really making this case my number one priority.

2         And, I do have the support of my partners and

3    associates within the firm to make sure that we can make

4    commitments to take on a case of this size.  I have mitigated

5    many of these cases over the years.  So, we know what that

6    takes.

7         THE COURT:  What can you offer in terms of your

8    insights about the overall structure of leadership in this MDL?

9         MR. SCHIRRIPA:  I think it is important, having

10   litigated antitrust consumer and securities cases in five

11   cases, I have an intimate knowledge of the PSR-related

12   antitrust consumer matters, and I can see how there is an

13   interplay and how it will play out.

14        I do think it is important to have distinct leadership

15   over obviously PSR securities cases.  There, let's put that to

16   the side, because that is -- that is a separate issue.

17        But, here, with the antitrust, and as well as the state

18   law claims, you want to have leadership that is working

19   together.

20        There is significant overlap in a case like this.  And,

21   in my complaint, Mr. Saveri's complaint, they do have the state

22   law claims in there, as well.  It is not just drafts of these

23   complaints as an antitrust-only complaint, and then there is a

24   state law complaint elsewhere.

25        So,derivatively, looking at this case, how does it get

 1    litigated?

 2            It is important to realize there is tremendous overlap

 3    in the issues.

 4            In the Bank of New York FX litigation, I had the -- I

 5    represented the plaintiff in that case, and it was -- we had a

 6    consumer claim case, a breach of implied good faith and breach

 7    of contract claim.

 8            And there, it was simultaneously litigated with a

 9    securities case, an ERISA case.  We had combined efforts to do

10    combined discovery and overlapping issues.  So, the structure

11    there -- it is important to have dedicated attorneys in each

12    particular discipline.  But, it is important to also have a

13    good view of the entire case and the interplay to make sure

14    that they all work together.

15            There is -- there was discussion amongst the plaintiffs

16    on this call about one lead, two lead, three lead, and a

17    cochair, which is a -- may be a shadowing in the sense,

18    something that I have seen in other cases where there is -- two

19    or three or four court-appointed leads, and then there is

20    shadow leads that operate almost with the same level of

21    authority as the lead, but they are not given that title.

22            I think, in the right circumstances, that does work.

23    If there is an executive committee that -- with each individual

24    grouping, you could have more attorneys in the driver's seat,

25    making sure that everything is being covered; but, also not a

1    bloated structure that you have too many people that -- with

2    titles but no real responsibility.

3          And I think, particularly, in the generic drugs price

4    fixing case, which is -- it was being run by Roberta

5    Liebenberg, the liaison counsel there, overseeing a committee

6    of eleven plaintiffs' firms who were named as plaintiffs'

7    executive committee, then, below that were plaintiffs' firms

8    that were not specifically named as executive committee, but

9    they have been a given substantial amount of work to do in the

10   case.

11         And there -- you know, there is the financial

12   commitment being given to the litigation, assessments.  It

13   is to help fund the litigation.

14         But, also, they are putting the money where their mouth

15   is.  They are working the case, providing real support.

16         And, this is a structure that I see working here, where

17   you will have large firms specifically assigned to the

18   discovery-related issues with a particular defendant, getting

19   involved with meet and confers, obviously, document review, and

20   some of the briefing issues.

21         So, I do think a leader-type level that will allow for

22   other people to come below, certainly.  And, I have experienced

23   that, on both ends.  I was leader and also in a lower level,

24   you know, nonlead position in cases.  I think that works if

25   everyone is working together.

 1          THE COURT:  How many master complaints do you envision?

 2          MR. SCHIRRIPA:  I think antitrust should have its own

 3   separate complaint.  The legal issues there, possibly stand --

 4   and I say stand alone, in the securities complaint, I do think

 5   the state law claims -- it could be -- possibly, it could be

 6   one master complaint with the antitrust and the state law

 7   issues.  And, because that is how we drafted it initially.

 8          It possibly could be divided into two separate

 9   complaints, the state law and antitrust complaint, and state

10   law complaint, with TD and the others, grouping with Robinhood.

11   Many of the legal issues are going to be the same, the briefing

12   is going to be the same.

13          Perhaps, as Mr. Saveri mentioned earlier, these are

14   class certification issues with subclasses, and you can have

15   assigned counsel to be responsible for representing a

16   particular subclass to make sure that you are fully, you know,

17   vetting subclass issues and issues that relate to those

18   specific group of investors and those defendants.

19          So -- and obviously, the securities case will be off on

20   its own.  So, you have a securities complaint, and really, it

21   would be something we work through without really getting too

22   far into the work product and work strategies.

23          THE COURT:  Thank you very much, Mr. Schirripa.

24          MR. SCHIRRIPA:  Thank you.

25          THE COURT:  And Mr. Willey, you are the last one.

1              MR. WILLEY:  May it please the Court.

2              THE COURT:  Yes.

3              MR. WILLEY:  Your Honor, Roy Willey.  I represent David

4    Moody and his wife, Julie Moody in cases brought against five

5    defendants, Robinhood and Citadel defendants, from the

6    Anastopoulo Law Firm in Charleston, South Carolina.

7              And this case appeals to me because I am the typical

8    Robinhood user.  I am a 34-year-old, and the first generation

9    of my family to spend at least the latter part of my childhood

10   in the middle class.  I was raised by a single mother who

11   attended night school to get her associate's degree, which led

12   her to a good job and decent living, and allowed her the

13   opportunity to have access to the market.

14             I was the first in my family to graduate from a

15   four-year college and, certainly, law school.  In fact -- which

16   I never knew a lawyer until college.

17             It is this experience, through my mom and then through

18   my origin story, where I witnessed, firsthand, the power of the

19   free market, the power of capitalism, and where access is often

20   the differentiator between the haves and the have-nots.

21             And, that's why this case is extremely important and

22   personal to me.  It is not just another case.  But, it is a

23   case about a whole generation of Americans and a whole class of

24   Americans that have had the free market opened up to them by

25   Robinhood and other traders and apps, and then taken away

1    simply because of the power of collective masses in that

2    market, they claim, were too much for it to bear.

3         But, we know what was really going on.  And, what was

4    going on is the collective power of the masses began to

5    accumulate more wealth and more power than those who

6    traditionally had, the hedge funds and those that invest in

7    them.

8         And so it is that experience, that life experience that

9    brought me to this case and made this case appeal to me.

10        And, it is through a combination of frankly, good

11   fortune, foresight, timing, and hard work, that that experience

12   aligns very well with the needs of this case because I have had

13   significant class action trial litigation and complex

14   litigation experience, despite my age.

15        I currently serve as lead of a class action in this

16   District in a case in front of Judge Singhal.  I have been

17   nominated and elected as chair of the Business Interruption

18   Litigation Task Force by hundreds of plaintiffs' lawyers for

19   the American Association of Justice, which I currently lead in

20   coordinating hundreds of members through multiple MDL

21   processes, class actions, and individual actions arising out of

22   the business interruption losses.

23        And, in addition to that, I have significant trial

24   experience.  In fact, on the very first day that I was sworn in

25   as a lawyer, I picked a jury in the morning, drove to get sworn

1    in, and then came back for the opening statements the following

2    day.  And, since then, I haven't stopped trying cases.

3         I enjoy trying cases because I truly believe that the

4    courtroom is the one place in this country where simple people

5    like Mr. and Mrs. Moody can bring Robinhood and its billions of

6    dollars in revenue and profits, the hedge funds and the

7    investors from Wall Street into the same room and sit across

8    the aisle and actually be on a level playing field.

9         And, that's what this case is about.  And, that is why

10   my life experience, combined with my experience in the

11   courtroom and in leading class actions, which is what these

12   cases are, and in trial experience and complex litigation, will

13   significantly benefit the putative classes in this case.

14        And, I would point out that I have worked tirelessly on

15   this case since the beginning, both on the merits of the case

16   and discussing the merits.

17        I have discussed the case several times with lawyers on

18   this call.  And, although Ms. Furst and I, for example, are in

19   the same time zone, we have spoken after-hours before taking

20   our evening run about the case.

21        And, I have spoken with lawyers in California,

22   after-hours on the case, as well.  And, I would note that if we

23   do go back to a pandemic where flights are limited, Charleston

24   is roughly halfway between the New York and Miami.  So, it is a

25   good stopover point, and we have plenty of transfers.

 1          But, I would say, in all candor, your Honor, that I do

 2    believe that the structure of this case should be relatively

 3    simple.  I coordinated with the lawyers on this call early on,

 4    on the tranche system with Mr. Saveri, with Mr. Klafter, Ms.

 5    Furst and others, and I believe that the four-tranche system is

 6    the most efficacious way for the case and would provide the

 7    most efficiencies.

 8          And, I think that the tranches should be divided by

 9    defendants, not by claims, because it is still unclear to me

10    how you would have complaints with individual defendants that

11    would stretch across tranches when you are attempting to do

12    discovery and motions practice.

13          I would also point out for the Court that the lawyers

14    on this case, for the most part, have worked well together, and

15    that I -- I do believe that any lawyers that are appointed in

16    the case will work hard for the putative classes.  And, in

17    fact, we did have earlier consensus on structures.  But, I do

18    not believe, personally, that a structure that has 12 or 17 or

19    20 members of an executive committee per tranche is in the

20    benefit of the classes.  And, that is really what I am most

21    concerned with in this case.

22          I -- I, of course, would like for the lawyers in all of

23    the cases to be rewarded for their work.  But, I also think,

24    and I know, because I know several of these people, that there

25    are individual class members that have their life savings tied

1    up into this case and into the outcome of this case.

2          And, it is incumbent upon us, as their advocates and

3    upon the Court, to ensure that we bring this case to as

4    efficient and quick a resolution as possible.

5          And, anything done in committee, in general, slows

6    things down.  When you start talking about 40 and 50-member

7    committees, we have calls much like we have had in this case,

8    which, while they have been productive, have not really

9    garnered a lot of progress, which brings us before your Honor

10   today.

11         And, I would just simply close my remarks with this,

12   which is a quote from President Bush, which simply says, "Free

13   market capitalism is far more than economic theory.  It is the

14   engine of social mobility, the highway to the American dream."

15         And, that is what this case is about; somebody got in

16   the way of ordinary Americans who were trying to take advantage

17   of that highway to the American dream, and this case, largely,

18   will decide whether or not, in this country, that is okay.

19         THE COURT:  Thank you very much, Mr. Willey.

20         That was an excellent presentation.

21         You envisioned a similar structure to the case than

22   some of the proposals that we have read and heard about today.

23         Tell me how you would structure it.

24         MR. WILLEY:  Well, I am not so sure it is different

25   than all the structures you have heard about, but I think that

1    the four-tranche structure, with a lead and additional cochair

2    or colead, is really the best way to proceed.

3           And I think, of course, I also -- and I said this in my

4    paper, support Ms. Furst as liaison counsel.  I think it is

5    important that we have that.  And, she has done a phenomenal

6    job thus far in that regard, which, by the way, although she

7    was humble -- and why no one else would apply.

8           And, I would also, you know, just note for the Court

9    that I do think that there is some room beyond that for a

10   committee structured around discovery and some of the other

11   issues.

12          But, I think, largely, the co-leads need to look at

13   each case and, more importantly, as far as what the Court

14   wants, as far as a consolidated complaint, and then determine

15   exactly what that would look like.

16          You know, I was not willing to commit myself to 17 or

17   20 other firms and supporting, you know, the applications and

18   doing the political because I don't know what the case is going

19   to look like, at this point.  And, I think this is the first

20   step towards getting us there.

21          Of course, I wish we could have done it by consensus,

22   but that wasn't to be, and so we are here.  And, you know, it

23   is really my interest to make sure that we get the actual case

24   underway and move it forward for the members of the classes.

25          THE COURT:  So, you are willing to serve as cochair, or

1    on a steering committee, ideally.

2            If you were appointed to some leadership position, what

3    would you have it be?

4            MR. WILLEY:  I would like to be the cochair, the colead

5    on the Robinhood tranche.  That is the case that I filed.  That

6    is the case that I and my associates have dedicated five

7    lawyers at our firm that have been working on this case, have

8    been -- they have been doing research on and really working

9    towards this.

10           Having said that, I think all of the cases are

11   important.  And, at the end of the day, how the plaintiffs get

12   their remedy is of less import to me than that they get a

13   remedy.  And so if the Court saw it suitable for me to serve in

14   some other case or in some other capacity, I would be willing

15   to do that for the benefit of the classes, just as I have been

16   all along.

17           THE COURT:  And what time could you commit to, if you

18   were given a leadership position?

19           MR. WILLEY:  This case will be my primary case

20   responsibility.  As I noted, we have a team of lawyers in our

21   law firm that have been working on this case.  I have a team of

22   lawyers on every case that I am assigned to in the law firm.

23   And, we are prepared to shift responsibilities in those cases

24   accordingly so that I can give this case my primary attention.

25           THE COURT:  Thank you very much, Mr. Willey.

```
 1           MR. WILLEY:  Thank you.

 2           THE COURT:  I think we covered everyone who wanted to

 3   present and who submitted a -- an application to be considered.

 4           I want to thank everyone for their fine written

 5   presentations, as well as the oral presentations today.

 6           Again, my apologies for the technical difficulties we

 7   encountered this morning.  You would think by now we would have

 8   it right, and we didn't.  So, my apologies.

 9           I hope to have my decision for you this week to move

10   the case along.

11           And you all have a good day.

12           And, for those on the west coast, have a nice lunch.

13           ZOOM PANEL IN UNISON:  Thank you, your Honor.

14           (Proceedings concluded at 4:10 p.m.)

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    C E R T I F I C A T E

 2

 3             I hereby certify that the foregoing is an

 4    accurate transcription of the proceedings in the

 5    above-entitled matter.

 6

 7             Please note:  This hearing occurred during the

 8    COVID-19 pandemic and is therefore subject to the

 9    technological limitations of reporting remotely.

10

11

12

13
      May 19, 2021            /s/SHARON VELAZCO
14    DATE                  SHARON VELAZCO RPR, FPR
                            Official Court Reporter
15                          United States District Court
                            400 North Miami Avenue,
16                          Miami, Florida 33128

17

18

19

20

21

22

23

24

25
```

**'**

**'60s** [1] - 5:8

**/**

**/s/SHARON** [1] - 96:13

**1**

**1** [1] - 1:8
**10** [1] - 11:4
**100** [1] - 1:15
**1000** [1] - 2:22
**10105** [1] - 2:9
**10573** [1] - 2:5
**10b-5** [2] - 49:10, 50:7
**10th** [1] - 3:5
**11** [1] - 9:22
**11016** [1] - 3:5
**112** [1] - 3:4
**1150** [1] - 1:24
**11:55** [1] - 1:7
**12** [1] - 91:18
**12(b** [2] - 10:14, 10:15
**12:56** [1] - 33:24
**1345** [1] - 2:8
**15** [4] - 11:4, 15:22, 24:2, 3:9
**17** [7] - 1:6, 8:5, 10:6, 69:8, 69:10, 91:18, 93:16
**1770** [1] - 1:15
**19** [1] - 96:13
**1981** [1] - 65:7
**19th** [1] - 58:8
**1:20** [1] - 33:23
**1:21-md-02989-CMA** [1] - 1:2
**1:32** [1] - 33:25

**2**

**2** [1] - 2:4
**2.7** [1] - 17:5
**20** [10] - 17:11, 20:24, 23:20, 41:13, 66:8, 80:22, 81:2, 82:4, 91:19, 93:17
**200,000** [1] - 37:13
**2006** [1] - 17:2
**2011** [2] - 5:16, 80:18
**2013** [1] - 5:21
**2016** [1] - 46:17
**2021** [4] - 1:6, 55:21, 56:14, 96:13
**208** [1] - 2:13

**2121** [1] - 1:20
**21st** [1] - 24:8
**22** [2] - 22:6, 22:7
**23** [1] - 77:24
**23(g** [3] - 17:25, 73:12
**24** [1] - 16:19
**25** [3] - 16:18, 16:19, 19:3
**2525** [1] - 1:23
**26** [1] - 19:8
**27** [1] - 22:7
**28** [2] - 55:21, 56:14
**2800** [1] - 1:20
**29403** [1] - 3:10
**29th** [1] - 60:23
**2nd** [1] - 2:9

**3**

**30** [12] - 7:15, 8:22, 10:14, 15:19, 15:20, 16:2, 23:21, 24:3, 24:17, 46:25, 66:7, 81:2
**300** [1] - 46:9
**312** [2] - 46:8, 50:15
**32** [1] - 3:9
**33** [1] - 22:8
**33128** [2] - 3:17, 96:16
**33131** [1] - 2:18
**33134** [1] - 1:24
**34-year-old** [1] - 88:8
**35** [3] - 24:3, 45:14, 73:2
**350** [1] - 2:4
**38th** [1] - 2:17

**4**

**4,600** [1] - 55:24
**40** [6] - 10:14, 17:10, 17:12, 37:13, 81:1, 92:6
**400** [2] - 3:16, 96:15
**45-minute** [1] - 33:21
**4:10** [2] - 1:7, 95:14

**5**

**50** [8] - 14:13, 43:24, 54:9, 61:1, 66:11, 68:17, 70:3, 83:19
**50-member** [1] - 92:6
**50-person** [1] - 21:6
**51-page** [1] - 72:18
**55** [3] - 7:14, 68:18, 73:24
**57** [1] - 7:14

**6**

**60** [2] - 46:9, 46:12
**60-year** [1] - 22:7
**600** [1] - 2:17
**601** [1] - 2:21
**661** [1] - 2:12

**7**

**77056** [1] - 1:16

**8**

**8** [1] - 78:13
**8:00** [1] - 33:2
**8th** [1] - 3:16

**9**

**90048** [1] - 2:13
**90067** [1] - 1:21
**94108** [1] - 2:22
**95** [1] - 36:14

**A**

**a.m** [1] - 1:7
**abandon** [1] - 55:5
**abetting** [1] - 35:22
**abilities** [1] - 18:3
**ability** [8] - 18:24, 63:15, 63:11, 65:11, 69:21, 72:15, 76:10, 82:25
**able** [11] - 8:11, 19:18, 21:4, 43:2, 52:17, 63:11, 64:16, 67:1, 70:6, 81:6, 83:18
**ably** [1] - 64:15
**above-entitled** [1] - 96:5
**acceptance** [1] - 36:5
**access** [3] - 55:22, 88:13, 88:19
**accomplished** [3] - 23:23, 72:10, 82:21
**accordingly** [1] - 94:24
**account** [2] - 11:10, 51:10
**accountability** [1] - 6:11
**accountable** [3] - 6:17, 9:14, 75:8
**accumulate** [1] - 89:5
**accurate** [1] - 96:4

**accustomed** [1] - 33:2
**achieve** [1] - 62:1
**action** [26] - 16:22, 18:17, 21:25, 37:25, 39:20, 46:3, 46:4, 46:24, 51:23, 57:11, 59:21, 59:24, 63:14, 63:15, 63:21, 64:19, 65:5, 65:9, 67:23, 68:3, 78:2, 81:4, 82:18, 82:24, 89:13, 89:15
**actions** [19] - 12:9, 17:11, 29:25, 30:6, 33:5, 34:24, 35:6, 37:11, 47:8, 64:20, 66:1, 67:3, 68:24, 72:3, 73:25, 80:14, 89:21, 90:11
**active** [2] - 40:8, 45:21
**actively** [1] - 83:24
**actual** [3] - 11:18, 52:18, 93:23
**add** [2] - 7:7, 29:6
**added** [5] - 21:18, 23:19, 23:24, 62:16, 80:19
**addition** [1] - 89:23
**additional** [2] - 39:6, 93:1
**address** [4] - 34:11, 54:19, 61:4, 68:8
**addressed** [6] - 60:24, 61:13, 68:19, 69:1, 69:10, 71:6
**addressing** [2] - 54:22, 79:5
**administration** [1] - 30:22
**advance** [1] - 73:19
**advantage** [3] - 21:19, 73:8, 92:16
**adversity** [2] - 38:2, 38:6
**advocacy** [2] - 58:1, 58:21
**advocates** [2] - 62:18, 92:2
**afar** [1] - 30:14
**affect** [1] - 12:15
**affiliate** [1] - 66:10
**afoul** [1] - 55:17
**after-hours** [2] - 90:19, 90:22
**afternoon** [10] - 27:21, 34:1, 34:3, 34:4, 44:12, 54:17, 54:18, 62:6, 79:19,

79:23
**age** [3] - 11:10, 12:23, 89:14
**agile** [1] - 76:22
**agnostic** [1] - 78:9
**ago** [3] - 30:25, 77:17, 79:7
**agree** [7] - 24:24, 37:17, 52:20, 52:24, 59:12, 62:21, 68:18
**agreeing** [1] - 38:21
**agreement** [2] - 28:19, 77:10
**ahead** [1] - 77:23
**aid** [2] - 30:13, 35:22
**aim** [1] - 32:2
**air** [1] - 8:8
**aisle** [2] - 4:25, 90:8
**algorithms** [1] - 43:6
**aligns** [1] - 89:12
**Alimehri** [1] - 40:6
**allegations** [1] - 45:5
**alleged** [1] - 41:2
**alleging** [1] - 83:14
**Allergan** [1] - 30:4
**allow** [4] - 7:5, 7:6, 34:6, 86:21
**allowed** [1] - 88:12
**allowing** [2] - 7:9, 16:9
**almost** [4] - 9:19, 26:1, 37:15, 85:20
**alone** [1] - 87:4
**alongside** [2] - 30:5, 68:3
**alpha** [1] - 77:8
**ALTONAGA** [1] - 1:11
**amenable** [1] - 33:12
**American** [3] - 89:19, 92:14, 92:17
**Americans** [3] - 88:23, 88:24, 92:16
**Americas** [1] - 2:8
**Ameritrade** [18] - 13:6, 36:19, 36:21, 37:3, 44:22, 45:2, 45:4, 47:17, 48:23, 49:16, 49:22, 51:2, 51:22, 52:5, 53:13, 68:18, 69:23
**Amir** [1] - 40:6
**amount** [9] - 15:12, 30:19, 43:2, 48:14, 53:12, 53:25, 64:9, 66:3, 86:9
**analyzed** [1] - 57:21
**analyzing** [2] - 57:18, 58:20
**ANASTOPOULO** [1]

- 3:8
**Anastopoulo** [1] - 88:6
**AND** [1] - 3:4
**Angeles** [1] - 1:21
**animated** [1] - 22:1
**animations** [1] - 22:4
**Ann** [1] - 3:9
**ANNAGUEY** [1] - 1:19
**answer** [14] - 5:3, 20:6, 22:20, 23:8, 23:14, 26:11, 26:14, 27:2, 43:21, 56:18, 56:21, 67:8, 71:21, 75:16
**answers** [2] - 27:12, 78:16
**anticipate** [2] - 64:21, 76:16
**anticipation** [1] - 54:12
**antitrust** [44] - 25:6, 35:3, 36:3, 36:6, 39:1, 40:22, 41:2, 41:7, 46:6, 46:19, 49:13, 50:11, 50:12, 50:16, 51:11, 52:23, 53:1, 53:8, 69:3, 72:3, 72:18, 73:25, 74:8, 74:11, 76:3, 76:8, 77:9, 79:13, 80:17, 81:4, 81:16, 81:20, 82:2, 82:11, 83:11, 83:13, 83:16, 84:10, 84:12, 84:17, 84:23, 87:2, 87:6, 87:9
**antitrust-only** [1] - 84:23
**Anupama** [1] - 71:17
**apologies** [3] - 4:15, 95:6, 95:8
**apologize** [2] - 4:9, 81:10
**app** [1] - 55:13
**apparent** [1] - 31:19
**appeal** [1] - 89:9
**appeals** [1] - 88:7
**appear** [1] - 44:14
**APPEARANCES** [1] - 1:12
**appearances** [3] - 2:1, 3:2, 45:10
**appeared** [1] - 78:20
**appellate** [3] - 65:20, 66:8, 66:9
**applicable** [1] - 74:9
**applicant** [1] - 33:9
**application** [23] - 4:16, 5:22, 6:14, 8:5,

9:15, 11:16, 13:9, 34:9, 34:19, 44:19, 47:23, 53:14, 53:22, 55:23, 56:20, 57:4, 62:8, 63:2, 69:20, 70:11, 81:25, 83:9, 95:3
**applications** [4] - 28:12, 31:21, 39:9, 93:17
**applied** [9] - 11:22, 11:24, 12:16, 12:25, 13:5, 13:11, 28:4, 53:23, 60:16
**apply** [2] - 13:1, 93:7
**applying** [6] - 27:24, 28:15, 30:18, 44:22, 53:7, 73:21
**appoint** [1] - 17:22
**appointed** [17] - 10:25, 11:3, 11:6, 11:13, 29:23, 47:20, 47:25, 53:5, 63:19, 72:1, 79:1, 79:14, 83:7, 83:8, 85:19, 91:15, 94:2
**appointing** [3] - 18:22, 32:1, 73:14
**appointment** [2] - 8:12, 28:5
**appointments** [1] - 47:5
**appreciate** [4] - 27:17, 28:7, 38:17, 47:19
**approach** [3] - 26:12, 26:22, 40:16
**approaching** [1] - 25:18
**appropriate** [1] - 25:3
**approval** [1] - 11:18
**apps** [1] - 88:25
**April** [1] - 58:8
**arbitration** [2] - 10:2, 24:4
**arbitrations** [1] - 10:4
**area** [4] - 47:15, 61:10, 74:10
**areas** [1] - 59:14
**argue** [1] - 7:6
**argument** [2] - 7:8, 8:19
**arguments** [1] - 70:25
**arising** [1] - 89:21
**arms** [1] - 37:7
**Arps** [1] - 67:3
**articulate** [1] - 56:17

**as-needed** [2] - 54:10, 61:2
**aside** [4] - 35:3, 38:24, 49:9, 69:11
**aspect** [1] - 25:23
**aspects** [1] - 56:17
**ASSAAD** [10] - 1:14, 4:7, 4:19, 9:7, 9:9, 14:1, 14:7, 14:25, 15:11, 16:4
**Assaad** [17] - 4:3, 4:4, 4:17, 4:21, 13:20, 14:23, 16:3, 21:11, 24:24, 25:18, 28:3, 35:4, 35:14, 35:18, 37:7, 42:7, 59:5
**Assaad's** [1] - 4:16
**assert** [1] - 36:14
**asserted** [3] - 35:2, 35:20, 39:3
**assessments** [1] - 86:12
**assign** [1] - 81:23
**assigned** [6] - 9:24, 11:8, 45:20, 86:17, 87:15, 94:22
**assist** [2] - 30:21, 58:9
**assistance** [1] - 65:16
**assistant** [3] - 5:17, 45:18, 63:23
**Assistant** [1] - 45:15
**associate** [1] - 29:13
**associate's** [1] - 88:11
**associates** [6] - 59:22, 80:20, 82:8, 82:11, 84:3, 94:6
**associates'** [1] - 61:2
**Association** [1] - 89:19
**assume** [1] - 82:9
**assuming** [1] - 57:3
**assurance** [1] - 14:8
**assurances** [1] - 60:20
**assure** [1] - 14:5
**attempting** [1] - 91:11
**attend** [1] - 5:9
**attended** [1] - 88:11
**attention** [3] - 53:12, 56:13, 61:19, 79:15, 94:24
**Attorney** [2] - 45:15, 45:19
**attorney** [14] - 5:9, 5:17, 7:11, 7:24, 18:7, 18:10, 28:3, 32:10,

46:5, 80:19, 80:21, 81:2, 82:6, 82:15
**attorneys** [35] - 4:24, 6:1, 6:24, 7:6, 7:10, 7:17, 7:21, 8:14, 9:20, 13:19, 14:13, 28:15, 30:10, 30:17, 32:2, 32:17, 37:14, 37:15, 40:5, 47:4, 57:10, 59:17, 66:8, 80:24, 82:7, 82:15, 82:20, 82:21, 82:22, 83:1, 83:18, 85:11, 85:24
**attracting** [1] - 22:3, 22:4
**authority** [2] - 26:17, 85:21
**available** [5] - 20:13, 27:6, 32:22, 44:18, 67:9
**Avenue** [7] - 1:20, 2:8, 2:12, 2:17, 3:4, 3:16, 96:15
**avoid** [1] - 11:2, 59:8
**aware** [2] - 45:11, 65:12
**awareness** [1] - 56:11

---

# B

**background** [1] - 45:13
**backing** [1] - 15:16
**bad** [1] - 5:23
**Bahamas** [1] - 81:11
**ball** [1] - 6:9
**bandwidth** [1] - 54:12
**bank** [1] - 29:20
**Bank** [3] - 36:9, 81:18, 85:4
**banks** [1] - 59:21
**Bar** [1] - 75:10
**bar** [2] - 46:2, 46:3
**Barbara** [1] - 17:4
**barriers** [1] - 20:3
**base** [2] - 18:2, 80:19
**based** [5] - 17:17, 17:18, 34:23, 36:1, 75:22
**baseline** [1] - 59:12
**basis** [3] - 54:10, 61:3, 82:20
**Beach** [1] - 45:1
**bear** [2] - 30:9, 89:2
**became** [1] - 18:6
**become** [3] - 6:1, 39:17, 72:21
**becoming** [2] -

18:10, 18:11
**BEFORE** [1] - 1:10
**began** [3] - 29:20, 31:11, 89:4
**begin** [2] - 4:16, 5:6
**beginning** [4] - 10:21, 13:15, 80:21, 90:15
**behalf** [10] - 30:1, 44:8, 49:22, 63:12, 63:16, 65:5, 71:16, 74:20, 79:20
**behave** [1] - 58:4
**behind** [4] - 6:9, 9:17, 65:14, 70:6
**believes** [1] - 17:20
**below** [3] - 26:4, 86:7, 86:22
**benefit** [9] - 9:11, 10:24, 28:18, 37:20, 66:22, 67:5, 90:13, 91:20, 94:15
**benefits** [1] - 38:1
**best** [7] - 6:1, 32:18, 34:23, 62:25, 78:11, 81:12, 93:2
**better** [6] - 5:18, 17:21, 34:17, 71:12, 71:13, 80:2
**between** [8] - 43:13, 50:11, 50:14, 52:5, 55:10, 63:8, 88:20, 90:24
**beyond** [1] - 93:9
**bickering** [1] - 19:17
**big** [6] - 7:18, 15:17, 27:8, 36:25, 78:10, 79:12
**biggest** [10] - 15:8, 15:11, 18:17, 19:5, 23:15, 37:12, 61:7, 70:13, 79:2, 79:3
**billable** [1] - 23:23
**billed** [1] - 37:8
**billion** [2] - 17:5, 64:19
**billion-dollar** [1] - 64:19
**billions** [1] - 90:5
**biographies** [1] - 71:18
**birthday** [1] - 24:8
**bit** [13] - 5:3, 5:20, 5:23, 6:3, 7:7, 8:6, 8:8, 11:12, 16:17, 22:23, 24:17, 49:8, 56:19
**black** [1] - 65:5
**blends** [1] - 12:7
**blessing** [1] - 11:18

**bloated** [1] - 86:1
**block** [1] - 63:13
**blocked** [1] - 45:3
**Bob** [1] - 29:22
**Bobby** [1] - 32:11
**bogged** [1] - 19:16
**book** [2] - 36:23
**bookends** [1] - 77:8
**born** [6] - 18:4,
20:25, 21:1, 80:9
**bottleneck** [1] - 16:1
**Boulevard** [1] - 1:23
**boutique** [1] - 16:19
**branched** [1] - 80:16
**breach** [9] - 29:16,
29:17, 34:25, 35:21,
50:9, 85:6
**breaches** [2] - 43:15
**break** [3] - 4:14,
10:6, 33:21
**breakfast** [1] - 33:22
**breast** [2] - 18:22,
32:13
**breathe** [1] - 14:19
**Brickell** [1] - 2:17
**brief** [3] - 45:13,
54:20, 57:3
**briefing** [6] - 10:11,
10:12, 10:16, 10:18,
86:20, 87:11
**briefly** [2] - 4:17,
81:24
**briefs** [1] - 58:23
**bring** [9] - 19:15,
19:20, 28:12, 30:9,
44:4, 59:15, 82:6,
90:5, 92:3
**brings** [6] - 12:23,
47:10, 65:24, 66:22,
67:4, 92:9
**broad** [2] - 15:24,
25:23
**broader** [1] - 26:3
**broken** [1] - 9:2
**broker** [15] - 12:6,
36:8, 41:1, 44:21,
45:8, 48:23, 49:2,
51:2, 52:23, 53:6,
53:13, 56:3, 68:6,
69:23, 77:13
**broker-deal** [1] -
52:23
**broker-dealer** [6] -
44:21, 48:23, 49:2,
51:2, 53:6, 77:13
**brokers** [9] - 36:9,
36:12, 37:1, 39:4,
42:4, 55:8, 55:9,
55:16, 55:18
**Brook** [1] - 2:5

**brought** [5] - 18:14,
29:15, 80:22, 88:4,
89:9
**BROWNE** [1] - 1:19
**Bruce** [1] - 66:14
**building** [1] - 61:24
**bunch** [2] - 15:20,
25:14
**burden** [1] - 62:16
**Burlington** [1] -
64:17
**Burstyn** [1] - 66:25
**Bush** [1] - 92:12
**business** [3] - 12:19,
25:13, 89:22
**Business** [1] - 89:17
**busy** [1] - 10:16
**button** [1] - 55:13
**BY** [1] - 3:13

**C**

**CA** [3] - 1:21, 2:13,
2:22
**calendar** [1] - 83:22
**California** [5] - 2:21,
18:4, 33:6, 43:14,
90:21
**camaraderie** [1] -
82:25
**candidate** [1] - 38:11
**candidates** [3] -
40:10, 40:12, 40:15
**candidly** [1] - 58:7
**candor** [1] - 91:1
**cannot** [1] - 27:7
**capabilities** [1] -
57:9
**capacity** [5] - 54:1,
76:11, 76:13, 81:22,
94:14
**capital** [2] - 82:2
**Capital** [5] - 17:2,
36:17, 40:24, 43:6,
43:8
**capitalism** [1] -
88:19, 92:13
**card** [1] - 27:8
**career** [2] - 16:24,
29:12
**careers** [1] - 74:5
**careful** [1] - 58:11
**carefully** [1] - 52:10
**Carolina** [3] - 3:10,
88:6
**Carter** [1] - 48:1
**case** [212] - 6:10, 7:3,
7:17, 7:18, 7:20, 8:25,
10:22, 10:23, 11:3,
11:5, 11:7, 12:15,

13:14, 13:16, 13:18,
14:6, 14:9, 14:17,
14:20, 14:21, 15:12,
16:2, 17:1, 17:6,
18:22, 19:7, 20:1,
20:10, 20:23, 21:9,
22:18, 23:4, 23:11,
23:15, 24:9, 24:11,
25:2, 25:6, 28:18,
29:24, 30:11, 32:8,
32:13, 32:14, 35:12,
37:8, 37:16, 39:7,
39:10, 40:21, 41:12,
41:19, 41:21, 42:21,
42:25, 43:7, 43:9,
43:12, 43:13, 43:18,
44:4, 46:4, 46:7,
46:14, 47:15, 47:18,
48:7, 48:8, 48:14,
48:23, 49:13, 49:14,
50:7, 50:8, 50:12,
50:14, 50:16, 51:11,
51:22, 52:6, 52:22,
52:23, 52:24, 53:17,
54:7, 59:12, 59:15,
60:21, 60:23, 60:24,
61:2, 61:5, 61:6,
61:20, 62:9, 62:22,
62:23, 63:12, 63:16,
64:12, 64:15, 65:12,
65:13, 65:23, 66:4,
66:12, 67:5, 67:6,
67:17, 67:19, 67:21,
67:25, 68:17, 70:1,
70:4, 70:5, 70:7,
70:17, 70:21, 71:7,
71:25, 72:1, 72:6,
72:13, 72:14, 72:15,
72:16, 72:21, 73:5,
73:8, 73:15, 73:20,
73:21, 74:13, 74:18,
76:14, 76:15, 77:1,
77:8, 77:9, 77:16,
77:21, 78:23, 79:13,
79:14, 81:7, 81:18,
82:3, 82:11, 82:13,
83:7, 83:13, 84:1,
84:4, 84:20, 84:25,
85:5, 85:6, 85:9,
85:13, 86:4, 86:10,
86:15, 87:19, 88:7,
88:21, 88:22, 88:23,
89:9, 89:12, 89:16,
90:9, 90:13, 90:15,
90:17, 90:20, 90:22,
91:2, 91:6, 91:14,
91:16, 91:21, 92:1,
92:3, 92:7, 92:15,
92:17, 92:21, 93:13,
93:18, 93:23, 94:5,
94:6, 94:7, 94:14,

94:19, 94:21, 94:22,
94:24, 95:10
**CASE** [1] - 1:2
**Case** [2] - 29:12,
31:1
**cases** [75] - 5:18,
10:3, 14:18, 15:17,
18:14, 18:18, 19:12,
21:3, 21:24, 28:21,
30:7, 30:22, 31:11,
32:9, 35:9, 36:14,
37:10, 37:11, 37:13,
42:18, 43:1, 45:25,
46:6, 46:8, 46:16,
46:20, 47:9, 49:15,
50:15, 50:16, 50:17,
54:3, 58:1, 58:2,
65:18, 65:21, 68:17,
70:20, 71:2, 71:23,
72:3, 72:4, 72:11,
73:10, 74:1, 74:3,
74:21, 76:14, 77:10,
77:14, 78:4, 78:6,
80:17, 81:4, 81:21,
82:4, 82:7, 82:9,
83:14, 83:17, 83:24,
84:5, 84:10, 84:11,
84:15, 85:18, 86:24,
88:4, 90:2, 90:3,
90:12, 91:23, 94:10,
94:23
**categories** [1] -
57:17
**Cathy** [2] - 20:23
**causes** [1] - 68:24
**CECILIA** [1] - 1:11
**centered** [1] - 48:24
**centric** [4] - 45:7,
60:8, 60:14, 60:18
**certain** [1] - 58:3
**certainly** [28] - 29:14,
32:24, 33:3, 33:15,
34:6, 48:6, 48:25,
51:15, 52:11, 54:6,
54:9, 56:7, 57:2, 57:6,
57:22, 59:3, 59:6,
59:22, 60:11, 60:24,
61:1, 63:15, 76:20,
76:21, 76:23, 78:25,
86:22, 88:15
**certification** [5] -
39:22, 66:18, 74:14,
77:24, 87:14
**certified** [1] - 41:20
**certify** [1] - 96:3
**chair** [10] - 10:8,
10:9, 10:10, 10:11,
16:20, 39:7, 42:13,
46:23, 89:17
**chaired** [1] - 47:8

**challenge** [3] -
61:12, 61:13, 61:23
**challenges** [6] -
15:9, 15:11, 30:13,
61:8, 61:11, 70:14
**change** [1] - 15:3
**changed** [2] - 13:2,
55:2
**changing** [1] - 56:5
**charge** [2] - 34:10,
50:24
**charged** [1] - 18:2
**Charleston** [3] -
3:10, 88:6, 90:23
**chart** [3] - 67:18,
67:19, 67:20
**Cheverie** [1] - 79:25
**CHEVERIE** [1] - 3:4
**child** [1] - 20:16
**childhood** [1] - 88:9
**Children's** [1] - 48:1
**choice** [2] - 76:18,
76:19
**choose** [1] - 63:7
**chose** [1] - 19:21
**Chris** [2] - 71:17,
72:6
**Circuit** [1] - 24:13
**circumstances** [2] -
43:1, 85:22
**Citadel** [3] - 36:17,
40:24, 88:5
**City** [2] - 80:8, 80:9
**Civil** [1] - 27:14
**civil** [3] - 29:10,
47:12, 80:8
**civility** [2] - 63:8,
75:7
**claim** [6] - 44:21,
64:11, 78:13, 85:6,
85:7, 89:2
**claimed** [1] - 43:6
**claims** [41] - 13:8,
29:15, 35:1, 35:20,
35:22, 36:2, 36:3,
36:8, 36:14, 39:2,
39:3, 42:3, 43:16,
43:18, 44:20, 44:21,
44:23, 50:9, 50:10,
50:11, 52:12, 59:20,
64:3, 64:5, 64:11,
68:4, 68:7, 68:10,
68:13, 68:23, 73:18,
78:1, 84:18, 84:22,
87:5, 91:9
**clarify** [1] - 34:21
**class** [56] - 12:9,
12:18, 16:22, 17:10,
18:17, 21:25, 29:25,
30:6, 33:5, 34:22,

34:24, 35:5, 37:11,
37:25, 39:20, 39:22,
41:20, 46:2, 46:4,
46:24, 47:8, 56:15,
57:11, 59:21, 59:24,
61:14, 61:15, 63:12,
63:15, 63:21, 65:5,
65:9, 66:18, 66:22,
66:24, 67:3, 69:15,
69:17, 72:3, 73:25,
74:13, 74:16, 77:24,
78:2, 80:14, 81:4,
82:18, 82:24, 87:14,
88:10, 88:23, 89:13,
89:15, 89:21, 90:11,
91:25

**classes** [6] - 78:5,
90:13, 91:16, 91:20,
93:24, 94:15

**classical** [1] - 25:16

**cleanup** [1] - 7:7

**clear** [2] - 17:16,
51:12

**cleared** [2] - 43:22,
61:4

**clearing** [1] - 83:22

**clerk** [3] - 63:20,
65:2, 67:2

**clerked** [3] - 12:2,
12:19, 29:9

**clerks** [1] - 29:10

**client** [4] - 17:6,
18:2, 44:25, 64:9

**clients** [15] - 16:16,
17:21, 18:16, 19:5,
19:14, 19:23, 21:16,
23:11, 37:3, 37:23,
56:12, 58:13, 60:9,
69:23, 74:20

**close** [3] - 65:21,
72:12, 92:11

**closed** [1] - 32:23

**closely** [1] - 39:9

**closer** [1] - 34:15

**closing** [1] - 64:8

**clues** [1] - 58:15

**co** [7] - 9:2, 9:10,
9:12, 12:6, 46:23,
93:12

**co-chair** [1] - 46:23

**co-leads** [6] - 9:2,
9:10, 9:12, 12:6,
93:12

**coast** [6] - 12:13,
33:22, 75:18, 75:21,
95:12

**cochair** [4] - 85:17,
93:1, 93:25, 94:4

**coconspirators** [1] -
70:19

**cocounsel** [8] - 30:5,
32:10, 33:4, 44:15,
47:6, 54:11, 65:23,
66:25

**Coffey** [1] - 64:17

**Cohen** [3] - 1:23,
29:19, 30:2

**Cohn** [1] - 17:13

**coincidentally** [1] -
21:20

**cold** [1] - 5:11

**colead** [6] - 41:25,
42:18, 47:25, 76:10,
93:2, 94:4

**coleads** [1] - 68:24

**collaborate** [2] -
57:20, 58:16

**collaborating** [1] -
60:12

**collaboration** [1] -
62:22

**collaborative** [1] -
76:15

**collaboratively** [5] -
18:24, 48:6, 48:10,
48:22, 75:9

**collar** [1] - 45:17

**colleague** [2] -
64:24, 65:1

**colleagues** [3] -
4:23, 29:22, 46:21

**collected** [1] - 55:24

**collective** [2] - 89:1,
89:4

**collectively** [1] -
17:16

**college** [4] - 18:11,
56:1, 88:15, 88:16

**collegial** [1] - 76:15

**collegially** [1] - 75:9

**colored** [1] - 22:1

**Colson** [1] - 30:5

**combat** [1] - 37:7

**combination** [1] -
89:10

**combine** [1] - 82:20

**combined** [3] - 85:9,
85:10, 90:10

**comfortable** [1] -
33:5

**coming** [5] - 7:11,
15:15, 58:13, 69:15,
81:9

**comment** [2] - 8:10,
21:19

**comments** [2] -
34:21, 38:13

**commercial** [5] -
18:17, 19:10, 29:13,
55:6, 60:1

**commit** [7] - 35:11,
44:2, 53:25, 70:11,
78:23, 93:16, 94:17

**commitment** [14] -
14:4, 20:10, 42:20,
60:21, 69:24, 71:22,
73:5, 75:6, 79:2, 79:3,
83:6, 83:15, 86:12

**commitments** [1] -
84:4

**committed** [6] - 27:4,
55:7, 60:22, 61:5,
66:2, 70:3

**committee** [41] -
9:18, 9:19, 9:22, 10:8,
10:10, 10:13, 10:19,
13:3, 23:7, 26:1, 28:1,
33:13, 33:14, 35:10,
37:21, 38:1, 40:18,
41:4, 42:14, 50:23,
56:24, 57:8, 60:18,
69:2, 69:7, 69:9,
69:21, 83:10, 83:13,
85:23, 86:5, 86:7,
86:8, 91:19, 92:5,
93:10, 94:1

**committees** [5] -
35:7, 35:8, 37:21,
74:2, 92:7

**Commodities** [1] -
45:20

**common** [10] - 9:11,
10:24, 11:25, 13:8,
36:7, 37:20, 37:24,
37:25, 38:1, 50:9

**commonalities** [1] -
52:8

**communicate** [3] -
25:25, 32:22, 55:12

**communicating** [1] -
61:14

**communication** [3] -
6:8, 29:4, 76:15

**company** [1] - 36:17

**Company** [1] - 17:4

**compare** [2] - 15:2,
67:13

**comparisons** [1] -
43:12

**compel** [5] - 8:18,
8:23, 15:6, 15:14,
59:6

**compelled** [2] - 38:4,
38:12

**competence** [1] -
63:9

**competitor** [1] - 76:5

**complaint** [34] -
13:9, 14:10, 15:4,
21:18, 25:7, 36:22,

41:11, 43:11, 49:10,
49:16, 49:17, 50:1,
50:2, 51:20, 51:21,
51:25, 52:1, 52:3,
52:11, 60:6, 72:18,
72:19, 77:11, 84:21,
84:23, 84:24, 87:3,
87:4, 87:6, 87:9,
87:10, 87:20, 93:14

**complaints** [15] -
14:14, 14:23, 15:2,
36:20, 49:5, 49:13,
51:20, 68:19, 71:7,
77:4, 78:9, 84:23,
87:1, 87:9, 91:10

**complement** [1] -
81:2

**completed** [1] -
47:12

**complex** [10] - 16:21,
19:10, 63:21, 72:3,
73:25, 74:8, 74:11,
83:14, 89:13, 90:12

**complicated** [1] -
40:21

**component** [1] -
82:17

**components** [1] -
81:16

**conceited** [1] - 23:2

**conceptually** [1] -
52:24

**concern** [4] - 15:9,
61:7, 70:13, 71:6

**concerned** [3] - 45:4,
53:11, 91:21

**concerns** [2] - 71:4,
73:4

**concluded** [1] -
95:14

**conducting** [1] -
74:7

**conference** [4] -
28:6, 36:4, 67:19,
81:12

**confers** [1] - 86:19

**confident** [4] - 4:25,
32:18, 63:10, 65:11

**confine** [1] - 68:23

**conflate** [1] - 36:12

**congratulations** [1] -
20:17

**connected** [1] -
64:15

**consensus** [6] -
28:17, 31:14, 61:24,
62:1, 91:17, 93:21

**consider** [3] - 17:24,
19:2, 49:18

**consideration** [1] -

47:19

**considerations** [1] -
18:20

**considered** [3] -
49:10, 49:23, 95:3

**consistently** [1] -
80:19

**consolidated** [6] -
28:12, 41:10, 49:20,
51:23, 71:7, 93:14

**conspiracy** [2] -
41:2, 64:11

**consumer** [12] -
21:25, 46:19, 47:8,
63:21, 65:9, 80:16,
80:17, 81:4, 81:21,
84:10, 84:12, 85:6

**consumers** [1] -
46:25

**Cont'd** [2] - 2:1, 3:2

**contact** [1] - 9:13

**contemplates** [1] -
52:21

**context** [3] - 59:21,
60:1, 78:2

**contingency** [1] -
40:1

**continue** [4] - 33:23,
43:23, 55:3

**contract** [10] - 11:24,
13:7, 25:1, 29:16,
34:25, 35:19, 35:21,
36:1, 43:15, 85:7

**contribute** [2] - 60:2,
81:7

**contributed** [1] -
54:25

**contributing** [1] -
57:1

**controlling** [1] -
11:14

**convenience** [1] -
50:4

**cooperation** [1] -
63:8

**coordinated** [5] -
28:24, 46:8, 49:19,
50:15, 91:3

**coordinating** [4] -
28:9, 46:5, 46:15,
89:20

**coordination** [8] -
10:5, 23:6, 29:4,
31:10, 32:25, 52:4,
59:4, 59:9

**copied** [1] - 72:20

**Coptic** [1] - 5:7

**Coral** [2] - 1:24,
27:22

**correct** [3] - 48:16,

5

49:3, 49:4
cost [1] - 74:18
council [1] - 26:4
counsel [69] - 10:7,
17:24, 17:25, 18:22,
18:25, 22:19, 26:10,
27:24, 28:4, 28:10,
28:11, 28:18, 28:23,
28:24, 29:2, 29:3,
30:9, 30:15, 30:21,
31:22, 32:9, 32:12,
32:14, 33:6, 34:9,
34:19, 35:12, 39:1,
39:8, 39:10, 40:4,
41:13, 41:24, 42:1,
42:17, 42:18, 46:5,
47:25, 56:6, 56:18,
56:23, 58:1, 59:10,
59:18, 60:4, 61:21,
61:25, 62:17, 62:20,
63:3, 63:24, 65:4,
66:17, 66:23, 69:14,
72:20, 73:14, 74:1,
74:2, 76:3, 76:10,
78:3, 80:25, 81:1,
86:5, 87:15, 93:4
counsel-type [1] -
28:11
count [1] - 17:9
countless [2] -
46:13, 63:6
country [8] - 5:8,
12:15, 18:18, 19:6,
47:4, 56:2, 90:4,
92:18
County [1] - 5:17
couple [2] - 36:13,
77:19
course [9] - 25:8,
25:9, 59:18, 60:22,
64:5, 65:15, 91:22,
93:3, 93:21
Court [65] - 3:15,
3:15, 4:20, 5:3, 8:11,
9:3, 9:4, 9:14, 11:6,
11:12, 11:18, 14:5,
14:7, 15:5, 16:17,
17:4, 17:20, 17:22,
17:24, 18:19, 19:1,
20:1, 20:6, 25:4, 28:7,
28:25, 29:3, 30:4,
30:21, 32:21, 44:18,
47:16, 49:12, 49:18,
50:24, 51:24, 54:20,
56:19, 57:6, 57:14,
62:10, 62:15, 62:20,
63:7, 63:10, 67:7,
67:9, 67:18, 69:17,
73:5, 73:13, 75:12,
79:8, 80:4, 81:22,

88:1, 91:13, 92:3,
93:8, 93:13, 94:13,
96:14, 96:15
COURT [86] - 1:1,
4:2, 4:8, 4:13, 9:6,
9:8, 13:20, 14:2,
14:22, 15:8, 16:3,
16:6, 16:8, 20:7,
20:17, 22:17, 23:17,
24:19, 27:16, 27:20,
30:24, 31:4, 31:22,
32:20, 33:8, 33:16,
33:18, 34:1, 34:4,
34:13, 34:17, 38:17,
41:22, 42:20, 44:5,
44:11, 47:22, 48:15,
48:25, 49:5, 50:19,
51:17, 52:13, 52:19,
52:25, 53:18, 53:25,
54:15, 54:18, 56:22,
58:20, 59:14, 60:3,
60:20, 61:7, 62:3,
62:5, 62:12, 67:11,
68:6, 69:24, 70:13,
71:8, 71:10, 71:13,
75:18, 76:2, 76:5,
77:4, 78:23, 79:16,
79:18, 79:21, 80:2,
81:9, 83:5, 84:7, 87:1,
87:23, 87:25, 88:2,
92:19, 93:25, 94:17,
94:25, 95:2
court [8] - 19:21,
30:8, 34:13, 38:9,
47:25, 62:12, 63:20,
85:19
Court's [4] - 11:18,
30:22, 54:20, 57:5
court-appointed [2]
- 47:25, 85:19
courthouse [1] -
73:17
courtroom [2] - 90:4,
90:11
courts [2] - 7:5,
76:21
cover [1] - 73:13
covered [2] - 85:25,
95:2
COVID-19 [1] - 96:8
created [3] - 56:9,
56:10, 76:19
credentials [2] -
73:20, 73:22
crime [1] - 45:17
criticize [1] - 7:13
current [2] - 47:1,
65:5
customers [1] -
34:23

D

daily [1] - 82:19
DATE [1] - 96:14
DAVID [1] - 2:11
David [2] - 21:23,
88:3
Davis [1] - 75:20
day-to-day [4] - 46:5,
46:14, 70:10, 71:24
days [6] - 8:18, 8:19,
8:20, 15:19, 15:20,
15:22
DC [1] - 5:14
de [1] - 1:23
deadlines [1] - 8:15
deal [5] - 22:12, 27:8,
52:23, 68:9, 77:22
dealer [8] - 12:6,
44:21, 48:23, 49:2,
51:2, 53:6, 53:13,
77:13
dealers [3] - 45:8,
68:6, 69:23
dealing [2] - 39:21,
66:17
dealmaking [1] -
63:3
dealt [1] - 21:24
DEC [1] - 43:6
decade [1] - 16:21
decent [1] - 88:12
deceptive [1] - 29:16
decide [2] - 49:11,
92:18
decided [1] - 21:22
decides [2] - 50:24,
51:24
decision [5] - 12:22,
24:13, 76:25, 78:10,
95:9
decisions [2] -
55:12, 78:4
deck [1] - 43:22
dedicate [1] - 83:19
dedicated [3] -
10:17, 85:11, 94:6
dedicating [1] - 21:6
dedication [1] -
18:13
deem [1] - 81:22
deep [2] - 46:14,
48:11
deeply [1] - 50:13
defaults [1] - 43:8
defendant [5] -
10:15, 39:24, 45:8,
68:16, 86:18
defendants [33] -
7:15, 7:16, 7:19, 8:22,

15:12, 15:14, 15:21,
16:2, 16:24, 17:8,
25:1, 25:3, 26:10,
40:21, 40:22, 40:25,
41:8, 41:13, 46:11,
58:4, 59:4, 60:7,
61:20, 67:23, 68:22,
70:19, 71:5, 82:13,
87:18, 88:5, 91:9,
91:10
defendants' [4] -
7:20, 7:24, 26:9,
59:10
defended [2] - 17:3,
64:20
defense [12] - 13:19,
21:25, 26:10, 27:10,
28:24, 29:3, 41:13,
46:13, 63:18, 64:18,
67:2, 80:25
defensibility [1] -
19:17
define [1] - 26:21,
78:5
degree [2] - 5:13,
88:11
delay [1] - 19:25
demand [1] - 62:16
demanding [1] -
22:23
demands [1] - 20:18
demographically [1]
- 55:25
demonstrate [1] -
16:14
demonstrated [2] -
63:4, 72:15
demonstrates [1] -
34:22
Dennis [1] - 23:13
DENNIS [1] - 1:18
departing [1] - 27:13
Department [1] -
46:1
depositions [5] - 7:4,
7:9, 7:10, 74:6, 75:1
depository [1] -
36:16
derivatives [1] -
55:13
describe [2] - 69:24,
83:9
describes [1] - 78:19
describing [1] -
45:13
deserve [3] - 37:1,
37:4, 78:1
designated [3] -
42:13, 63:20, 78:3
designation [1] -

69:1
despite [1] - 89:14
determine [2] -
59:11, 93:14
develop [3] - 73:18,
82:14, 82:22
developed [2] - 75:8,
82:5
developer [1] - 64:14
develops [1] - 78:7
device [1] - 55:14
devote [6] - 14:20,
23:19, 43:2, 48:2,
48:13, 70:7
devoted [3] - 48:7,
61:2, 72:6
devoting [3] - 42:21,
42:24, 70:3
Diego [1] - 18:4
diesel [1] - 59:24
difference [4] -
12:23, 49:17, 50:3
differences [1] - 52:7
different [18] - 15:14,
16:2, 21:25, 25:15,
25:23, 25:24, 39:24,
40:13, 40:14, 41:13,
42:14, 49:8, 49:17,
50:12, 51:11, 68:11,
92:24
differentiator [1] -
88:20
difficulties [2] - 4:9,
95:6
difficulty [1] - 62:13
digital [1] - 57:22
diligence [1] - 31:16
diligent [2] - 45:11,
51:5
diplomatic [1] -
31:17
dire [2] - 64:7, 64:8
direction [1] - 25:4
directly [1] - 66:18
disability [1] - 38:7
discipline [1] - 85:12
disclosure [1] -
20:15
discoveries [1] -
15:18
discovery [26] - 8:15,
8:22, 10:8, 10:11,
15:13, 15:19, 15:23,
15:25, 16:2, 26:12,
39:23, 41:20, 48:13,
51:7, 58:17, 58:23,
59:2, 59:11, 74:13,
75:1, 82:12, 82:14,
85:10, 86:18, 91:12,
93:10

**discovery-related** [1] - 86:18

**discrete** [1] - 71:3

**discrimination** [1] - 65:6

**discuss** [2] - 13:16, 61:10

**discussed** [1] - 90:17

**discussing** [3] - 13:12, 58:12, 90:16

**discussion** [5] - 26:18, 76:9, 77:12, 78:14, 85:15

**discussions** [3] - 21:19, 53:22, 73:1

**dismiss** [4] - 41:11, 43:17, 58:7, 77:22

**dispatch** [1] - 73:17

**dispute** [1] - 28:21

**disregard** [1] - 57:5

**dissect** [1] - 57:23

**distinct** [7] - 49:22, 50:16, 51:15, 51:21, 52:12, 53:9, 84:14

**distinction** [1] - 50:10

**distinctions** [1] - 51:9

**District** [18] - 3:15, 8:9, 12:3, 12:20, 17:13, 29:2, 29:9, 30:4, 30:8, 32:10, 43:14, 45:16, 45:19, 50:17, 62:24, 83:11, 89:16, 96:15

**district** [3] - 5:17, 18:6, 45:15

**DISTRICT** [3] - 1:1, 1:1, 1:11

**diverse** [11] - 11:15, 11:19, 16:23, 17:7, 39:7, 40:5, 40:9, 40:12, 41:5, 55:25, 80:24

**diversity** [17] - 6:12, 9:15, 12:3, 12:7, 12:12, 12:14, 12:23, 16:15, 17:16, 17:17, 38:14, 39:6, 39:15, 40:8, 40:15

**divided** [3] - 68:13, 87:8, 91:8

**division** [3] - 45:20, 45:22, 68:21

**DIVISION** [1] - 1:2

**document** [1] - 86:19

**documents** [1] - 26:23

**dollar** [1] - 64:19

**dollars** [3] - 19:8, 74:19, 90:6

**Donato** [1] - 75:13

**done** [22] - 12:8, 14:15, 17:8, 17:10, 17:11, 19:3, 21:4, 21:11, 21:18, 23:10, 23:13, 29:5, 30:8, 38:5, 42:14, 57:11, 73:9, 73:14, 81:20, 92:5, 93:5, 93:21

**down** [12] - 5:12, 5:15, 9:2, 19:16, 21:3, 21:11, 23:22, 39:25, 43:5, 57:17, 92:6

**downloaded** [1] - 43:5

**dozens** [2] - 7:16, 13:18

**draft** [1] - 43:10

**drafted** [1] - 87:7

**drafts** [1] - 84:22

**dramatically** [1] - 55:10

**drawn** [1] - 80:11

**dream** [2] - 92:14, 92:17

**drilled** [1] - 43:5

**Drive** [1] - 2:4

**driver's** [1] - 85:24

**drove** [2] - 55:21, 89:25

**drugs** [1] - 86:3

**due** [1] - 4:14

**during** [10] - 5:6, 13:12, 17:25, 32:23, 72:17, 72:22, 72:23, 73:20, 76:14, 96:7

**duties** [3] - 55:16, 55:18, 56:3

**duty** [4] - 11:19, 29:17, 34:25, 43:15

---

**E**

**ear** [2] - 37:7

**early** [1] - 91:3

**earn** [1] - 42:12

**easier** [2] - 30:12, 30:22

**east** [3] - 12:13, 75:19, 75:21

**Eastern** [1] - 83:11

**easy** [1] - 77:7

**economic** [1] - 92:13

**economy** [1] - 64:8

**effective** [2] - 10:13, 26:9

**effectively** [4] - 19:4, 19:18, 22:15, 27:15

**efficacious** [1] - 91:6

**efficiencies** [5] - 52:11, 58:18, 58:25, 75:4, 91:7

**efficiency** [5] - 29:6, 49:11, 50:5, 69:16, 74:22

**efficient** [4] - 8:24, 41:19, 59:3, 92:4

**efficiently** [1] - 42:19

**effort** [1] - 18:8

**efforts** [2] - 23:7, 85:9

**Egyptian** [1] - 5:7

**eight** [2] - 20:15, 29:18

**eight-month-old** [1] - 20:15

**either** [4] - 27:25, 28:24, 38:10, 50:8

**elaborate** [1] - 56:25

**elected** [1] - 89:17

**Electric** [1] - 17:3

**eleven** [1] - 86:6

**ELLIS** [10] - 1:18, 1:19, 16:7, 16:9, 20:14, 20:18, 22:20, 24:1, 24:23, 27:19

**Ellis** [13] - 11:23, 12:1, 16:6, 16:8, 20:7, 22:17, 27:16, 35:25, 37:17, 38:21, 56:9, 68:3, 68:18

**elsewhere** [2] - 30:11, 84:24

**emails** [1] - 63:6

**embrace** [1] - 40:16

**Emert** [3] - 13:5, 44:16, 46:22, 47:2, 47:24, 48:6, 48:13

**enable** [2] - 31:17, 82:14

**encountered** [1] - 95:7

**end** [10] - 19:23, 23:22, 24:12, 39:21, 49:15, 50:2, 51:6, 66:13, 94:11

**endorsements** [1] - 69:20

**ends** [1] - 86:23

**energetic** [1] - 67:4

**enforcement** [1] - 45:22

**engage** [2] - 59:9, 82:23

**engaged** [2] - 6:8, 6:21

**engine** [1] - 92:14

**engineering** [1] -

**5:13**

**enjoy** [2] - 82:24, 90:3

**enormous** [1] - 30:19

**ensure** [1] - 92:3

**ensuring** [1] - 44:23

**enter** [1] - 26:17

**enthusiasm** [1] - 30:20

**entire** [4] - 12:15, 38:8, 47:13, 85:13

**entirety** [1] - 29:11

**entities** [5] - 36:17, 36:18, 40:24, 68:25

**entitled** [1] - 96:5

**envision** [1] - 38:20, 42:21, 49:6, 50:19, 57:1, 60:3, 74:25, 77:4, 77:6, 87:1

**envisioned** [1] - 92:21

**equivalent** [1] - 65:7

**Eraclides** [1] - 19:11

**ERISA** [1] - 85:9

**escaped** [1] - 40:7

**ESI** [3] - 9:25, 26:21

**especially** [2] - 10:13, 13:18

**ESQUIRE** [10] - 1:14, 1:18, 1:22, 2:3, 2:7, 2:11, 2:16, 2:20, 3:3, 3:8

**essentially** [2] - 68:9, 69:5

**estate** [2] - 49:24, 49:25

**ethic** [1] - 11:10

**ethnical** [1] - 17:21

**ethnicity** [1] - 17:18

**eTrade** [3] - 36:9, 37:4

**evening** [1] - 90:20

**event** [3] - 20:22, 49:19, 83:25

**events** [4] - 54:24, 55:21, 55:22, 56:14

**exactly** [3] - 48:12, 58:3, 93:15

**examinations** [1] - 74:8

**example** [6] - 6:23, 24:1, 26:21, 36:19, 54:24, 90:18

**excellent** [1] - 92:20

**excited** [1] - 21:8

**exciting** [1] - 5:19

**exclusively** [1] - 75:23

**excuse** [1] - 78:18

**executive** [27] - 9:18, 9:22, 10:8, 11:17, 13:3, 13:7, 23:7, 26:1, 27:25, 32:7, 40:18, 41:4, 42:13, 50:22, 50:23, 60:18, 69:1, 69:6, 69:7, 69:9, 69:21, 81:5, 83:10, 85:23, 86:7, 86:8, 91:19

**expense** [1] - 55:15

**expenses** [1] - 74:20

**experience** [52] - 5:21, 6:13, 7:11, 12:1, 12:7, 12:24, 14:13, 14:14, 16:15, 17:19, 18:1, 18:16, 29:14, 29:18, 30:14, 33:6, 34:24, 34:25, 35:4, 35:9, 39:20, 40:12, 45:24, 47:11, 47:14, 48:11, 56:5, 57:9, 59:22, 64:2, 65:25, 66:23, 72:2, 72:11, 73:21, 73:24, 74:6, 76:21, 80:16, 81:1, 82:1, 88:17, 89:8, 89:11, 89:14, 89:24, 90:10, 90:12

**experienced** [11] - 6:24, 7:23, 12:12, 39:19, 42:9, 42:10, 42:11, 57:10, 71:23, 72:9, 86:22

**experiences** [1] - 80:25

**expert** [2] - 10:10, 72:24

**expertise** [4] - 59:14, 59:25, 65:24, 74:10

**experts** [5] - 6:25, 7:2, 64:8, 74:7

**explain** [1] - 8:6

**expressly** [1] - 28:5

**extensive** [4] - 32:17, 39:14, 72:11, 73:1

**extent** [1] - 78:1

**extremely** [1] - 88:21

---

**F**

**face** [2] - 15:9, 70:14

**facilitating** [1] - 28:11

**facing** [1] - 61:9

**fact** [5] - 50:13, 54:23, 88:15, 89:24, 91:17

**factors** [1] - 73:13

7

**facts** [3] - 22:2, 67:4, 71:3
**faintly** [1] - 81:9
**fair** [5] - 19:14, 19:24, 22:13, 22:14, 82:5
**fairly** [1] - 35:11
**faith** [1] - 85:6
**fall** [4] - 6:6, 11:14, 11:22, 13:6
**fall-out** [1] - 6:6
**familiar** [3] - 21:2, 33:19
**familiarity** [1] - 30:6
**family** [3] - 5:8, 88:9, 88:14
**fantastic** [3] - 4:25, 5:25, 12:1
**far** [12] - 6:9, 31:21, 38:19, 65:4, 69:8, 69:14, 71:5, 87:22, 92:13, 93:6, 93:13, 93:14
**faster** [1] - 15:25
**fears** [1] - 35:14
**Federal** [1] - 27:13
**federal** [1] - 45:25
**fee** [1] - 40:1
**feet** [1] - 63:10
**fellow** [4] - 4:22, 62:19, 64:25, 65:1
**felt** [2] - 59:5, 77:18
**female** [1] - 80:24
**FERRARO** [1] - 2:16
**Ferraro** [7] - 52:14, 64:24, 65:15, 65:16, 65:17, 66:11, 76:7
**few** [3] - 64:15, 81:24, 83:21
**fiduciary** [5] - 29:17, 34:25, 35:21, 43:15, 56:3
**field** [2] - 73:25, 90:8
**Fifth** [1] - 24:13
**figure** [4] - 13:13, 26:20, 26:24, 65:19
**file** [3] - 14:10, 15:5, 35:10
**filed** [10] - 14:24, 36:20, 55:18, 60:23, 63:15, 67:18, 67:19, 72:17, 73:10, 94:5
**filing** [3] - 28:6, 28:11, 55:19
**fill** [1] - 28:5
**fills** [1] - 76:19
**finally** [5] - 11:21, 12:11, 12:16, 12:25, 66:25
**finance** [1] - 15:15

**financial** [7] - 46:9, 46:15, 66:3, 74:17, 80:17, 82:2, 86:11
**fine** [3] - 33:13, 76:17, 95:4
**finish** [3] - 40:2, 41:19, 64:16
**Firm** [4] - 52:14, 65:15, 76:7, 88:6
**firm** [59] - 11:5, 14:6, 14:12, 20:11, 21:6, 31:2, 32:6, 32:12, 33:4, 44:2, 44:3, 46:18, 47:1, 47:6, 47:9, 47:13, 48:3, 48:4, 48:10, 55:23, 56:6, 58:13, 59:18, 65:3, 65:16, 65:20, 66:2, 66:5, 66:10, 70:5, 70:10, 71:16, 71:23, 72:5, 73:21, 74:10, 74:15, 74:17, 74:23, 75:2, 79:24, 80:13, 80:15, 80:18, 81:17, 82:1, 82:9, 82:16, 83:8, 83:10, 84:3, 94:7, 94:21, 94:22
**FIRM** [3] - 2:16, 2:21, 3:8
**firm's** [2] - 75:6, 80:5
**firms** [21] - 7:23, 15:15, 19:6, 19:9, 21:9, 46:12, 46:13, 48:21, 51:3, 52:16, 52:18, 63:18, 63:22, 73:8, 80:22, 82:20, 86:6, 86:7, 86:17, 93:17
**first** [25] - 5:7, 5:8, 5:11, 8:12, 14:9, 19:20, 20:15, 22:12, 30:25, 31:10, 34:9, 35:4, 38:11, 40:6, 42:13, 62:10, 62:15, 64:4, 64:10, 73:16, 78:20, 88:8, 88:14, 89:24, 93:19
**firsthand** [2] - 56:4, 88:18
**fit** [1] - 12:4
**five** [9] - 5:2, 8:19, 11:4, 12:25, 29:13, 41:4, 84:10, 88:4, 94:6
**fixing** [3] - 82:11, 83:14, 86:4
**FL** [2] - 1:24, 2:18
**flashback** [1] - 36:4
**flat** [3] - 25:14,

25:21, 26:6
**flat-structured** [1] - 26:6
**flat-triangle** [1] - 25:21
**flights** [1] - 90:23
**floating** [1] - 77:19
**Floor** [4] - 2:9, 2:17, 3:5, 3:16
**FLORIDA** [1] - 1:1
**Florida** [13] - 3:17, 5:12, 5:13, 8:9, 12:3, 12:19, 12:20, 17:14, 45:1, 45:16, 64:14, 65:22, 96:16
**focus** [2] - 38:3, 42:2, 60:7, 60:14, 60:15, 61:22, 62:1
**focused** [2] - 44:20, 81:16
**focusing** [2] - 43:9, 60:1
**Foley** [3] - 64:10, 64:17, 65:1
**folks** [1] - 79:9
**follow** [1] - 11:22
**following** [3] - 4:1, 33:25, 90:1
**footnote** [1] - 57:4
**force** [1] - 65:14
**Force** [1] - 89:18
**foregoing** [1] - 96:3
**foreign** [1] - 35:15
**foresight** [1] - 89:11
**formed** [3] - 31:14, 46:18
**former** [4] - 32:11, 64:24, 65:2, 65:23
**forth** [3] - 35:14, 42:7, 68:15
**fortuitous** [1] - 43:1
**fortunate** [3] - 54:3, 66:2, 83:20
**fortunately** [1] - 24:7
**fortune** [1] - 89:11
**forward** [12] - 13:16, 13:18, 19:20, 21:17, 48:3, 48:15, 48:17, 52:14, 52:25, 53:10, 53:14, 93:24
**fought** [1] - 19:14
**four** [16] - 12:25, 13:4, 28:20, 28:22, 41:4, 48:16, 48:18, 49:1, 53:19, 69:5, 77:6, 77:18, 85:19, 88:15, 91:5, 93:1
**four-tranche** [2] - 91:5, 93:1
**four-year** [1] - 88:15

**fourth** [3] - 11:24, 13:7, 69:4
**FPR** [2] - 3:14, 96:14
**franchisees** [1] - 65:6
**Francisco** [8] - 2:22, 71:14, 74:23, 74:24, 75:2, 75:23, 76:1, 79:8
**Frank** [1] - 79:19
**FRANK** [1] - 3:3
**frank** [2] - 35:5, 79:23
**frankly** [1] - 89:10
**Fraud** [1] - 45:20
**fraud** [1] - 46:15
**free** [3] - 5:5, 88:19, 88:24
**Free** [1] - 92:12
**FRESH** [1] - 1:5
**Friday** [2] - 23:22, 59:1
**friends** [2] - 6:2, 32:17
**front** [6] - 4:22, 29:21, 32:14, 50:17, 73:2, 89:16
**fschirripa@ hrsclaw.com** [1] - 3:6
**fulfill** [1] - 62:18
**fulfilled** [1] - 11:19
**full** [7] - 20:14, 33:8, 64:8, 65:14, 68:1, 79:15
**fullest** [1] - 18:3
**fully** [3] - 60:22, 61:5, 87:16
**fund** [1] - 86:13
**funding** [2] - 13:17, 66:7
**funds** [2] - 89:6, 90:6
**FURST** [8] - 1:22, 27:21, 31:3, 31:7, 31:24, 32:24, 33:15, 33:17
**Furst** [7] - 12:16, 27:20, 27:22, 30:24, 90:18, 91:5, 93:4
**future** [1] - 40:14
**FX** [2] - 81:18, 85:4

---

## G

**Gables** [2] - 1:24, 27:22
**GABRIEL** [1] - 1:14
**Gabriel** [1] - 4:21
**gain** [1] - 18:24
**gainful** [1] - 6:5
**gamut** [1] - 56:1

**garner** [1] - 56:11
**garnered** [1] - 92:9
**Gary** [3] - 44:16, 46:22, 47:7
**gassaad@ mcdonaldworley. com** [1] - 1:16
**gather** [1] - 55:20
**Gayles** [1] - 32:14
**Gelman** [1] - 19:11
**gender** [2] - 11:10, 17:18
**General** [1] - 17:3
**general** [6] - 9:11, 9:23, 36:5, 63:23, 77:10, 92:5
**generally** [1] - 78:18
**generation** [5] - 5:7, 40:7, 80:7, 88:8, 88:23
**generic** [2] - 82:10, 86:3
**geographical** [2] - 12:13, 12:14
**GEORGE** [1] - 1:19
**George** [1] - 39:13
**get-go** [1] - 10:14
**Gillberg** [2] - 29:22, 32:11
**given** [12] - 27:17, 33:9, 43:25, 53:12, 53:18, 58:15, 77:1, 83:15, 85:21, 86:9, 86:12, 94:18
**glean** [1] - 32:18
**global** [1] - 63:24
**goal** [2] - 19:19, 20:4
**goals** [2] - 8:7, 11:14
**Goldhamer** [3] - 44:16, 46:23, 47:7
**govern** [3] - 55:3, 55:5, 55:16
**government** [3] - 22:12, 26:2, 26:5
**gracious** [1] - 31:1
**Graco** [2] - 47:12, 48:1
**graduate** [1] - 88:14
**graduation** [1] - 80:12
**Graifman** [8] - 13:5, 44:16, 44:17, 46:22, 46:24, 47:7, 47:8
**granted** [1] - 62:23
**grateful** [1] - 71:19
**great** [4] - 5:25, 6:1, 6:14, 18:12
**grew** [2] - 5:10, 80:9
**gross** [1] - 43:16
**Grossman** [8] - 1:23,

**hearing** [8] - 24:2, 34:2, 34:14, 54:2, 62:13, 73:3, 81:8, 96:7
**hearings** [2] - 43:4, 69:18
**heavy** [1] - 8:21
**hedge** [2] - 89:6, 90:6
**held** [3] - 6:17, 9:14, 11:8
**help** [3] - 66:21, 66:22, 86:13
**helped** [1] - 65:22
**helpful** [4] - 56:20, 57:16, 57:25, 78:17
**hereby** [1] - 96:3
**Hicks** [1] - 30:5
**high** [4] - 18:6, 18:10, 64:18, 70:24
**highest** [1] - 47:4
**highlighted** [2] - 9:23, 47:24
**highway** [2] - 92:14, 92:17
**history** [3] - 17:25, 37:9, 37:13
**hold** [2] - 29:20, 47:2
**holiday** [1] - 67:1
**Hollywood** [3] - 2:13, 21:12, 21:13
**honest** [3] - 14:19, 57:8, 82:5
**honestly** [1] - 30:18
**Hong** [1] - 17:6
**honor** [2] - 56:3, 56:8
**Honor** [89] - 4:7, 4:12, 4:19, 6:11, 8:1, 9:7, 10:19, 11:21, 12:17, 13:10, 14:1, 14:7, 14:16, 14:25, 16:4, 16:7, 17:9, 18:21, 20:14, 22:21, 24:16, 27:3, 27:21, 31:24, 33:15, 34:3, 34:6, 35:5, 36:5, 37:8, 38:13, 38:15, 38:23, 39:5, 39:9, 39:12, 40:3, 40:9, 40:16, 40:22, 41:16, 43:21, 44:12, 44:17, 44:19, 44:25, 45:6, 45:10, 46:1, 47:21, 53:6, 53:21, 54:17, 54:21, 57:2, 62:4, 62:6, 62:21, 67:15, 68:11, 70:2, 71:2, 71:22, 73:2, 74:22, 75:15, 76:1, 76:4, 76:12, 76:18, 76:25, 77:15,

**group** [25] - 10:16, 11:15, 11:16, 16:13, 16:21, 17:3, 17:15, 25:2, 25:22, 26:2, 26:11, 26:25, 27:10, 48:3, 48:11, 48:15, 48:18, 53:24, 65:10, 77:3, 77:13, 77:17, 80:24, 87:18
**GROUP** [1] - 2:12
**grouping** [2] - 85:24, 87:10
**groups** [3] - 25:1, 76:23, 76:24
**grow** [1] - 40:13
**growing** [1] - 65:9
**grown** [1] - 80:19
**guarantee** [1] - 24:16
**guess** [1] - 75:5
**guide** [1] - 55:3
**guided** [2] - 54:21, 67:18
**guiding** [1] - 69:16

## H

**HACH** [1] - 3:4
**Hach** [1] - 79:24
**half** [1] - 4:14
**halfway** [1] - 90:24
**hand** [1] - 63:9
**handle** [1] - 32:19
**handled** [1] - 72:1
**handling** [2] - 74:13, 82:12
**hands** [1] - 54:4
**happy** [4] - 20:6, 56:21, 76:12, 77:2
**hard** [4] - 19:14, 81:8, 89:11, 91:16
**Harper** [1] - 2:12
**Harris** [1] - 5:17
**hashtag** [1] - 21:15
**have-nots** [1] - 88:20
**haves** [1] - 88:20
**head** [1] - 76:7
**headline** [1] - 18:15
**hear** [13] - 4:4, 4:6, 4:8, 4:11, 4:17, 6:12, 6:14, 34:16, 44:10, 56:4, 79:21, 80:1
**heard** [12] - 8:1, 38:19, 40:20, 45:6, 47:16, 49:8, 69:17, 69:22, 77:12, 83:6, 92:22, 92:25
**HEARING** [1] - 1:10

**78:10, 78:15, 78:18,** 78:20, 78:25, 79:17, 79:19, 79:23, 80:5, 81:15, 83:3, 83:25, 88:3, 91:1, 92:9, 95:13
**Honor's** [4] - 38:4, 56:21, 62:10, 62:15
**HONORABLE** [1] - 1:10
**honored** [1] - 30:18
**hope** [6] - 22:16, 23:2, 23:16, 27:25, 59:8, 95:9
**hoping** [1] - 60:15
**hotel** [1] - 81:10
**hour** [1] - 4:14
**hours** [4] - 24:2, 32:23, 90:19, 90:22
**house** [1] - 11:8
**House** [1] - 26:3
**Houston** [1] - 1:16
**huge** [1] - 67:5
**human** [2] - 66:3, 82:2
**humble** [1] - 93:7
**humbled** [1] - 67:7
**hundred** [7] - 14:20, 37:9, 43:25, 65:21, 70:4, 70:7, 70:12
**hundreds** [4] - 7:16, 13:19, 89:18, 89:20
**hurt** [1] - 55:22

## I

**idea** [7] - 28:17, 37:20, 40:11, 41:12, 42:15, 77:15, 77:16
**ideally** [1] - 94:1
**ideas** [4] - 15:19, 38:14, 59:2, 61:21
**identify** [1] - 73:15
**imagined** [1] - 55:10
**immediate** [1] - 82:19
**immigrated** [1] - 5:11
**impacts** [1] - 38:25
**implemented** [1] - 28:2
**implications** [1] - 38:10
**implied** [1] - 85:6
**import** [1] - 94:12
**important** [24] - 12:14, 13:15, 16:16, 18:23, 45:5, 54:13, 69:13, 70:4, 73:11, 74:5, 74:23, 75:7,

**77:23, 77:25, 78:7,** 79:4, 84:9, 84:14, 85:2, 85:11, 85:12, 88:21, 93:5, 94:11
**importantly** [2] - 64:2, 93:13
**impression** [1] - 43:4
**IN** [3] - 1:4, 4:12, 95:13
**in-house** [1] - 11:8
**in-person** [1] - 75:1
**inception** [2] - 72:4, 74:3
**include** [2] - 56:1, 66:10
**included** [1] - 41:10
**includes** [8] - 63:5, 65:21, 68:25, 74:6, 74:7, 74:12, 74:16
**including** [9] - 15:9, 17:12, 28:21, 39:2, 61:8, 69:22, 71:16, 72:6, 79:5
**inclusive** [6] - 6:15, 6:20, 11:16, 11:20, 82:6
**inclusiveness** [2] - 6:13, 38:2
**inclusivity** [1] - 32:2
**increase** [1] - 40:10
**incumbent** [1] - 92:2
**incurred** [1] - 74:20
**indeed** [3] - 72:5, 72:20, 73:7
**indicated** [1] - 48:9
**individual** [11] - 10:9, 37:9, 37:10, 37:23, 43:18, 45:1, 46:10, 85:23, 89:21, 91:10, 91:25
**individually** [1] - 17:15
**industry** [1] - 65:24
**industry-level** [1] - 65:24
**information** [12] - 27:17, 55:20, 55:24, 57:18, 57:21, 57:24, 58:10, 58:13, 58:15, 58:21, 60:10
**initial** [2] - 36:4, 67:19
**initiate** [1] - 72:23
**initiated** [1] - 62:22
**innovations** [1] - 55:15
**inquiries** [1] - 61:15
**inside** [2] - 63:21, 70:9
**insightful** [1] - 38:18

**insights** [2] - 24:21,** 84:8
**instead** [5] - 63:4, 67:22, 68:23, 69:9, 70:24
**institutions** [3] - 46:9, 55:7, 63:23
**intend** [1] - 23:3
**intention** [1] - 57:4
**intentions** [1] - 57:5
**interact** [2] - 55:1, 75:11
**interacted** [1] - 30:25
**interest** [5] - 31:11, 34:22, 37:22, 41:22, 93:23
**interests** [1] - 45:12
**interface** [1] - 66:18
**interim** [2] - 17:24, 76:2
**intern** [1] - 31:25
**International** [1] - 2:4
**interplay** [2] - 84:13, 85:13
**interrupt** [1] - 5:5
**Interruption** [1] - 89:17
**interruption** [1] - 89:22
**intertwined** [1] - 8:6
**interviewed** [1] - 62:7
**interviews** [1] - 38:3
**intimate** [2] - 30:7, 84:11
**introducing** [1] - 5:3
**introductory** [1] - 54:22
**inundated** [1] - 66:6
**invariably** [1] - 52:4
**inverted** [1] - 38:22
**inverts** [1] - 37:18
**invest** [1] - 89:6
**investigate** [3] - 55:20, 73:14, 73:17
**investigation** [2] - 45:17, 72:17
**investigators** [1] - 72:7
**investing** [1] - 83:6
**investments** [1] - 55:12
**Investor** [1] - 21:23
**investor** [2] - 22:5, 81:11
**investors** [5] - 37:3, 46:25, 55:11, 87:18, 90:7
**involve** [2] - 68:7,

68:17
**involved** [27] - 5:21, 6:2, 6:24, 8:7, 8:8, 10:18, 22:24, 22:25, 25:20, 30:10, 31:18, 36:18, 39:22, 45:9, 46:8, 46:12, 46:13, 50:13, 68:16, 70:18, 71:24, 72:24, 73:1, 82:3, 83:24, 86:19
**involvement** [1] - 23:4
**IPO** [5] - 46:5, 46:6, 50:13, 50:14, 50:16
**Iran** [1] - 40:7
**Iranian** [1] - 40:7
**issue** [11] - 4:10, 16:16, 25:8, 26:12, 26:21, 28:23, 64:5, 64:11, 66:18, 84:16
**issuers** [1] - 46:10
**issues** [32] - 5:25, 7:18, 8:22, 15:6, 17:23, 27:12, 39:21, 43:7, 49:22, 50:6, 51:6, 52:2, 64:21, 66:19, 68:19, 70:23, 76:16, 77:19, 79:6, 82:14, 85:3, 85:10, 86:18, 86:20, 87:3, 87:7, 87:11, 87:14, 87:17, 93:11
**Italian** [1] - 80:7
**Item** [1] - 73:2
**items** [1] - 73:6
**IV** [1] - 3:8

## J

jak@klafterlesser.
**com** [1] - 2:5
**James** [1] - 1:15
**January** [5] - 14:10, 42:24, 55:21, 56:14, 60:23
**JEFFREY** [1] - 2:3
**Jersey** [1] - 30:4
**Jewish** [1] - 67:1
**Jim** [1] - 65:17
**job** [4] - 29:8, 31:8, 88:12, 93:6
**jobs** [2] - 76:19, 76:20
**Joe** [1] - 21:22
**joinder** [1] - 68:20
**jointly** [1] - 53:23
**JOSEPH** [2] - 2:20, 2:21
**JPML** [2] - 72:22, 72:23

jsaveri@
saferilawfirm.com [1]
- 2:23
**Judge** [10] - 8:10, 8:17, 17:13, 29:9, 29:21, 32:14, 65:2, 67:2, 75:13, 89:16
**JUDGE** [1] - 1:11
**judge** [7] - 8:19, 10:12, 18:7, 22:10, 46:8, 50:17, 63:19
**judgement** [1] - 17:6
**judges** [1] - 39:14
**judgment** [1] - 24:9
**judicial** [3] - 22:12, 45:15, 71:1
**Julie** [1] - 30:5, 32:13, 88:4
**July** [1] - 24:6
**jump** [2] - 14:3, 71:21
**June** [2] - 24:8, 79:8
**junior** [1] - 74:4
**jury** [4] - 64:4, 72:13, 79:9, 89:25
**justice** [3] - 55:1, 55:22, 56:7
**Justice** [2] - 46:1, 89:19

## K

**Kane** [2] - 30:5, 32:13
**Kantrowitz** [4] - 44:16, 46:23, 47:7, 48:3
**keep** [3] - 6:20, 33:8, 69:15
**Keep** [1] - 41:17
**Kelley** [1] - 66:11
**key** [2] - 82:9, 82:17
**kind** [5] - 8:5, 9:3, 10:20, 11:15, 11:22, 13:6, 21:15, 24:5, 25:13, 26:3, 31:11, 77:7, 77:20, 81:24, 83:22
**King** [1] - 29:21
**KISS** [1] - 41:16
**KLAFTER** [9] - 2:3, 2:3, 34:3, 34:5, 34:16, 34:18, 38:23, 42:2, 42:23
**Klafter** [14] - 12:5, 12:10, 33:20, 34:2, 34:13, 38:17, 44:5, 50:8, 54:2, 67:13, 67:22, 68:15, 78:19, 91:4

**knowing** [1] - 15:18
**knowledge** [5] - 30:7, 46:15, 66:23, 74:9, 84:11
**known** [2] - 19:10, 31:12
**knows** [1] - 57:14
**Kong** [1] - 17:6

## L

**L'Oreal** [1] - 24:9
**lack** [1] - 6:8
**landscape** [1] - 65:22
**Lardner** [3] - 64:10, 64:17, 65:1
**large** [16] - 6:20, 8:11, 13:17, 14:12, 15:15, 45:2, 47:2, 50:13, 51:23, 55:7, 59:21, 71:5, 72:13, 81:4, 82:18, 86:17
**largely** [3] - 77:16, 92:17, 93:12
**larger** [3] - 8:24, 41:6, 76:24
**largest** [4] - 37:8, 46:7, 63:15, 64:13
**last** [15] - 8:13, 12:25, 13:4, 15:8, 24:1, 28:6, 32:25, 33:11, 54:24, 63:5, 73:3, 78:20, 80:22, 82:4, 87:25
**lastly** [1] - 40:17
**late** [2] - 5:8, 33:18
**latter** [1] - 88:9
**Law** [5] - 12:19, 39:13, 65:15, 76:7, 88:6
**law** [60] - 5:9, 10:11, 10:12, 10:15, 10:18, 11:25, 13:8, 18:9, 18:11, 19:6, 21:6, 21:9, 32:5, 32:6, 32:12, 36:1, 36:7, 39:2, 46:12, 48:20, 50:9, 55:2, 55:5, 57:25, 59:16, 59:18, 63:18, 63:22, 64:3, 64:6, 65:2, 65:22, 66:10, 67:24, 68:3, 68:7, 68:9, 68:24, 73:8, 74:9, 74:11, 77:21, 79:24, 80:12, 80:22, 81:17, 81:20, 83:7, 84:18, 84:22, 84:24, 87:5, 87:6, 87:9, 87:10, 88:15,

94:21, 94:22
**LAW** [4] - 2:12, 2:16, 2:21, 3:8
**laws** [1] - 55:2
**lawsuit** [3] - 29:15, 55:19, 60:23
**lawsuits** [1] - 18:17
**Lawyer** [1] - 17:2
**lawyer** [8] - 18:6, 18:11, 32:11, 64:7, 65:20, 80:7, 88:16, 89:25
**lawyering** [2] - 5:1, 5:25
**lawyers** [31] - 16:12, 19:25, 20:11, 21:6, 21:17, 32:21, 33:13, 39:16, 41:4, 48:20, 63:17, 64:16, 65:17, 66:8, 66:11, 72:10, 73:8, 74:4, 74:12, 75:22, 75:25, 89:18, 90:17, 90:21, 91:3, 91:13, 91:15, 91:22, 94:7, 94:20, 94:22
**lays** [1] - 67:20
**lead** [57] - 6:15, 10:7, 13:1, 13:13, 16:15, 17:21, 19:18, 20:9, 24:18, 25:22, 30:9, 34:9, 34:19, 35:12, 35:16, 38:6, 39:7, 39:8, 39:10, 40:4, 41:18, 41:24, 42:12, 42:17, 42:22, 44:19, 44:23, 46:5, 47:20, 53:15, 53:24, 56:23, 60:4, 63:3, 64:3, 64:6, 66:17, 67:16, 68:1, 68:2, 72:1, 72:16, 73:14, 74:1, 74:2, 76:2, 82:2, 85:16, 85:21, 89:15, 89:19, 93:1
**leader** [4] - 38:1, 46:13, 86:21, 86:23
**leader-type** [1] - 86:21
**leaders** [1] - 39:17
**leadership** [67] - 6:17, 7:14, 8:11, 9:1, 9:10, 9:23, 11:4, 11:13, 11:22, 11:24, 13:5, 13:11, 14:22, 16:13, 20:13, 22:18, 28:1, 28:12, 28:16, 29:23, 30:18, 31:21, 32:3, 32:7, 33:14, 34:23, 37:16, 38:15, 38:20, 47:5, 47:24,

49:2, 50:19, 50:21, 50:22, 51:3, 51:10, 51:15, 51:22, 51:25, 52:16, 52:21, 53:5, 53:16, 57:20, 58:17, 59:9, 60:16, 62:8, 62:25, 63:4, 65:18, 67:12, 68:22, 73:2, 73:21, 76:22, 81:23, 82:14, 83:8, 83:16, 83:25, 84:8, 84:14, 84:18, 94:2, 94:18
**leading** [4] - 35:9, 46:19, 73:25, 90:11
**leads** [17] - 9:2, 9:10, 9:12, 12:6, 16:10, 23:8, 42:9, 69:5, 69:6, 69:9, 69:10, 69:11, 69:19, 85:19, 85:20, 93:12
**leaner** [1] - 76:20
**learn** [4] - 7:2, 12:10, 39:10, 82:18
**learned** [5] - 5:23, 29:22, 32:5, 42:23, 82:15
**learning** [1] - 7:3
**least** [5] - 17:10, 51:12, 53:12, 59:12, 88:9
**leaving** [2] - 35:23, 36:2
**led** [3] - 35:5, 35:6, 88:11
**left** [4] - 5:11, 9:17, 13:25, 46:1
**legal** [4] - 61:22, 70:23, 87:3, 87:11
**legally** [1] - 55:16
**length** [1] - 28:16
**Leon** [1] - 1:23
**Leslie** [1] - 65:2
**less** [5] - 8:13, 28:19, 42:9, 42:11, 94:12
**less-experienced** [1] - 42:11
**lesser** [1] - 6:24
**LESSER** [1] - 2:3
**level** [15] - 8:12, 57:9, 58:14, 60:16, 64:1, 65:24, 68:22, 69:2, 69:21, 70:24, 85:20, 86:21, 86:23, 90:8
**levels** [5] - 7:23, 16:15, 40:13, 40:14, 66:9
**liaison** [16] - 10:1, 10:2, 12:17, 27:24, 28:10, 28:18, 29:2,

30:21, 31:22, 32:9,
32:10, 32:12, 32:13,
86:5, 93:4
  **Liebenberg** [1] -
86:5
  **lieutenants** [2] -
39:16, 39:17
  **life** [6] - 38:8, 55:25,
56:5, 89:8, 90:10,
91:25
  **life-changing** [1] -
56:5
  **lifetime** [1] - 56:8
  **light** [2] - 34:21, 38:4
  **limitations** [1] - 96:9
  **limited** [4] - 34:5,
40:25, 53:5, 90:23
  **line** [6] - 40:2, 41:19,
44:17, 47:8, 64:16,
67:24
  **lines** [1] - 25:17
  **lion's** [3] - 67:17,
67:20, 67:24
  **listened** [1] - 43:4
  **listening** [1] - 61:11
  **literally** [1] - 26:20
  **litigate** [1] - 59:21
  **litigated** [8] - 47:9,
59:20, 60:24, 81:3,
82:4, 84:10, 85:1,
85:8
  **litigating** [5] - 7:17,
30:11, 61:5, 80:12,
82:24
  **Litigation** [1] - 89:18
  **LITIGATION** [1] - 1:5
  **litigation** [43] - 8:8,
8:9, 13:17, 14:16,
16:19, 16:21, 16:25,
19:10, 20:3, 29:13,
30:14, 44:15, 47:11,
50:13, 51:7, 54:14,
57:12, 57:13, 58:5,
59:7, 59:19, 59:23,
60:1, 62:16, 66:7,
66:16, 72:2, 72:4,
74:11, 80:13, 81:14,
81:19, 82:17, 82:18,
83:12, 83:19, 85:4,
86:12, 86:13, 89:13,
89:14, 90:12
  **litigator** [1] - 45:14
  **live** [2] - 14:18, 15:4
  **lived** [1] - 21:13
  **living** [1] - 88:12
  **Liz** [1] - 46:17
  **LLC** [1] - 3:8
  **LLP** [4] - 1:19, 2:3,
2:8, 2:21
  **local** [1] - 30:7

  **logical** [1] - 25:4
  **longstanding** [1] -
55:5
  **longtime** [1] - 46:3
  **look** [16] - 7:15,
10:23, 11:23, 14:13,
21:11, 21:17, 21:23,
36:19, 39:14, 58:16,
70:23, 72:18, 93:12,
93:15, 93:19
  **looked** [2] - 39:12,
57:23
  **looking** [8] - 4:24,
11:21, 24:11, 27:7,
60:17, 69:5, 69:11,
84:25
  **looks** [2] - 22:15,
61:17
  **Los** [1] - 1:21
  **lose** [1] - 81:12
  **losses** [1] - 89:22
  **louder** [1] - 79:21
  **lower** [1] - 86:23
  **lunch** [1] - 33:21,
95:12

## M

  **Madison** [1] - 3:4
  **magistrate** [1] - 8:19
  **Main** [3] - 21:20,
21:21, 21:22
  **major** [1] - 25:13
  **majority** [1] - 63:2
  **male** [1] - 80:24
  **manage** [2] - 70:9,
72:16
  **managed** [1] - 26:7
  **management** [3] -
25:13, 70:10, 71:25
  **managing** [4] - 9:19,
72:11, 74:11, 74:12
  **manner** [1] - 29:5,
45:4, 62:18
  **MARIA** [1] - 2:16
  **market** [5] - 88:13,
88:19, 88:24, 89:2,
92:13
  **markets** [2] - 55:11,
55:17
  **mass** [5] - 37:12,
37:21, 65:18, 65:19,
69:18
  **masses** [2] - 89:1,
89:4
  **massive** [2] - 41:1,
46:15
  **master** [11] - 14:23,
49:5, 49:10, 49:12,
50:1, 51:25, 52:1,

52:3, 77:4, 87:1, 87:6
  **match** [1] - 7:24
  **materials** [3] - 47:23,
71:18, 83:9
  **matter** [3] - 21:7,
24:15, 96:5
  **matters** [5] - 47:12,
81:5, 82:25, 83:21,
84:12
  **MAURICE** [1] - 2:11
  **maurice@
pessahgroup.com** [1]
- 2:14
  **McDONALD** [1] -
1:14
  **McDonald's** [1] -
65:5
  **MDL** [50] - 5:1, 5:20,
5:26, 6:20, 11:15,
14:14, 15:9, 15:12,
16:11, 17:13, 20:13,
24:22, 29:7, 29:14,
30:4, 31:23, 32:14,
35:3, 35:6, 35:10,
37:8, 37:10, 37:12,
38:21, 44:20, 45:5,
45:7, 48:8, 49:6,
50:20, 59:22, 59:24,
59:25, 61:8, 63:14,
63:20, 63:21, 65:10,
65:12, 65:25, 70:8,
70:14, 72:2, 81:4,
82:17, 82:24, 83:16,
84:8, 89:20
  **MDL-related** [1] -
82:24
  **MDLs** [16] - 5:21, 6:2,
6:3, 6:4, 10:20, 21:3,
29:21, 30:6, 32:7,
35:5, 35:7, 36:20,
47:3, 47:5, 47:25,
57:11
  **mean** [3] - 31:7,
31:13, 32:4
  **meaningful** [2] - 6:7,
9:21
  **mechanical** [1] -
5:13
  **media** [1] - 56:13
  **mediation** [1] - 83:21
  **meet** [3] - 6:1, 22:13,
86:19
  **meeting** [4] - 6:25,
7:2, 20:21, 54:23
  **meetings** [1] - 63:5
  **Melissa** [3] - 44:16,
46:22
  **Melvin** [1] - 40:24
  **member** [2] - 10:24,
13:7, 35:10

  **members** [15] - 7:14,
9:22, 9:24, 10:7, 10:8,
11:17, 56:6, 56:15,
61:14, 61:16, 75:10,
89:20, 91:19, 91:25,
93:24
  **membership** [1] -
6:13
  **men** [1] - 56:2
  **mentee** [1] - 82:23
  **mention** [2] - 35:17,
38:2
  **mentioned** [11] -
12:2, 28:3, 32:20,
41:22, 46:21, 47:23,
56:9, 58:20, 59:5,
68:4, 87:13
  **mentor** [1] - 82:22
  **mentored** [1] - 82:8
  **mentoring** [1] -
42:15
  **mentors** [1] - 82:19
  **mentorship** [3] -
8:16, 6:22, 82:25
  **merit** [1] - 78:2
  **merits** [2] - 90:15,
90:16
  **met** [2] - 5:14, 83:23
  **Metcalf** [2] - 13:4,
46:17
  **METCALF** [1] - 2:8
  **Miami** [11] - 2:18,
3:16, 3:17, 20:25,
21:1, 29:19, 63:24,
66:8, 90:24, 96:15,
96:16
  **MIAMI** [1] - 1:2
  **Michael** [2] - 44:9,
44:25
  **microphone** [1] -
34:15
  **middle** [1] - 88:10
  **Middle** [1] - 8:9
  **midst** [1] - 63:24
  **might** [7] - 11:11,
15:3, 33:21, 39:2,
39:3, 40:16, 50:5
  **million** [1] - 19:8
  **millions** [2] - 55:11,
74:18
  **mine** [1] - 5:19
  **minutes** [3] - 5:2,
13:25, 33:9
  **Miramar** [1] - 45:1
  **mitigated** [1] - 84:4
  **mobile** [1] - 55:14
  **mobility** [1] - 92:14
  **model** [1] - 72:21
  **modern** [1] - 65:7
  **modern-day** [1] -

65:7
  **mom** [4] - 18:5, 18:6,
22:10, 88:17
  **mom's** [1] - 24:8
  **moment** [3] - 62:22,
75:5, 83:4
  **moments** [1] - 23:15
  **Monet** [1] - 32:14
  **money** [3] - 7:19,
7:20, 86:14
  **month** [3] - 8:13,
20:15, 44:1
  **months** [3] - 32:25,
63:5, 77:17
  **moody** [1] - 90:5
  **Moody** [2] - 88:4
  **morning** [9] - 4:2,
4:7, 4:8, 16:7, 16:8,
71:14, 71:15, 89:25,
95:7
  **morning's** [1] - 38:3
  **mosaic** [2] - 18:2,
21:16
  **most** [21] - 16:16,
19:15, 28:11, 30:17,
41:19, 50:22, 57:16,
59:7, 60:8, 63:23,
64:14, 64:15, 68:5,
72:5, 72:9, 76:25,
82:10, 91:6, 91:7,
91:14, 91:20
  **mother** [1] - 88:10
  **motion** [9] - 7:4, 7:6,
8:17, 26:12, 41:11,
48:13, 57:25, 58:21,
62:23
  **motions** [10] - 8:15,
8:23, 10:14, 10:15,
15:6, 15:14, 58:6,
59:6, 77:22, 91:12
  **mouth** [1] - 86:14
  **move** [5] - 13:16,
13:18, 43:17, 93:24,
95:9
  **moved** [4] - 5:15,
51:3, 72:22, 73:17
  **moves** [1] - 15:25
  **MR** [68] - 4:7, 4:19,
9:7, 9:9, 14:1, 14:7,
14:25, 15:11, 16:4,
16:7, 16:9, 20:14,
20:18, 22:20, 24:1,
24:23, 27:19, 34:3,
34:5, 34:16, 34:18,
38:23, 42:2, 42:23,
44:8, 44:12, 48:5,
48:17, 49:4, 49:7,
50:21, 51:19, 52:15,
52:20, 53:3, 53:20,
54:2, 54:17, 54:19,

57:2, 58:23, 59:16, 60:6, 60:22, 61:10, 62:4, 71:12, 71:14, 75:22, 76:4, 76:12, 77:6, 78:25, 79:17, 79:19, 79:23, 80:3, 81:10, 83:17, 84:9, 87:2, 87:24, 88:1, 88:3, 92:24, 94:4, 94:19, 95:1

**MS** [14] - 27:21, 31:3, 31:7, 31:24, 32:24, 33:15, 33:17, 62:6, 62:14, 67:15, 68:11, 70:2, 70:16, 71:9

**multidistrict** [1] - 72:13

**multiple** [1] - 89:20

**Murray** [1] - 20:23

**mushing** [1] - 36:2

**must** [2] - 20:14, 22:25

**muted** [3] - 4:5, 4:6, 71:11

## N

**name** [2] - 4:21, 32:5

**named** [6] - 17:2, 32:7, 47:3, 67:22, 86:6, 86:8

**names** [1] - 32:16

**naming** [2] - 67:22, 67:23

**narrow** [1] - 57:17

**NATALIA** [1] - 2:16

**nationwide** [2] - 47:5, 47:14

**nature** [4] - 47:13, 66:12, 68:13, 70:8

**navigate** [1] - 41:18

**navigated** [1] - 31:20

**near** [1] - 40:14

**nearly** [4] - 28:15, 29:13, 30:10, 30:17

**necessarily** [1] - 41:15

**necessary** [4] - 14:21, 29:4, 55:6, 83:7

**need** [17] - 15:15, 19:24, 24:25, 28:18, 29:1, 34:20, 37:24, 37:25, 41:20, 43:25, 49:23, 49:24, 52:4, 57:19, 66:23, 79:21, 93:12

**needed** [8] - 10:22, 18:13, 18:20, 23:13, 32:22, 54:10, 59:13,

61:2

**needs** [9] - 28:24, 52:9, 61:13, 61:16, 65:17, 68:21, 69:17, 71:6, 89:12

**negative** [2] - 6:3, 38:10

**negligence** [5] - 29:16, 35:22, 43:16, 64:4

**negligence-type** [1] - 43:16

**negligence/ fraudulent** - 35:1

**neoclassical** [2] - 25:12, 25:21

**Nephew** [1] - 14:17

**network** [1] - 32:17

**never** [6] - 14:14, 38:5, 38:8, 55:4, 66:7, 88:16

**new** [4] - 10:20, 16:18, 31:25, 55:4

**New** [16] - 2:9, 3:5, 5:10, 30:4, 45:19, 50:18, 67:3, 74:24, 75:2, 75:24, 80:8, 80:9, 81:18, 85:4, 90:24

**next** [4] - 33:20, 34:1, 37:6, 76:6

**nexus** [1] - 70:17

**nice** [2] - 16:6, 95:12

**night** [2] - 18:5, 88:11

**nimble** [1] - 76:22

**nms@ferrarolaw.com** [1] - 2:18

**NO** [1] - 1:2

**Nomad** [1] - 36:17

**nominate** [1] - 19:19

**nominated** [1] - 89:17

**nondiverse** [1] - 17:20

**none** [1] - 36:18

**nonlead** [1] - 86:24

**nonRobinhood** [3] - 47:17, 51:4, 52:23

**normal** [2] - 8:14, 55:4

**normally** [1] - 32:23

**North** [3] - 2:12, 3:16, 96:15

**Northern** [1] - 43:14

**notable** [1] - 61:23

**note** [9] - 20:8, 57:3, 72:12, 72:14, 74:4, 74:23, 90:22, 93:8, 96:7

**noted** [2] - 73:16, 94:20

**notion** [2] - 52:20, 53:9

**nots** [1] - 88:20

**nowadays** [2] - 10:20, 11:15

**number** [11] - 14:8, 32:21, 40:25, 47:2, 47:4, 54:3, 71:5, 71:24, 77:19, 81:4, 84:1

**numbers** [1] - 10:21

**numerous** [2] - 7:23, 72:5, 73:19

**NY** [2] - 2:5, 3:5

## O

**O'BRIEN** [1] - 1:19

**oberlin** [1] - 44:7

**Oberlin** [3] - 44:9, 44:25, 49:1

**objections** [2] - 15:20, 15:22

**obligations** [1] - 62:18

**observation** [1] - 73:7

**observations** [2] - 38:18, 44:6

**obstacles** [2] - 39:25, 55:4

**obtaining** [1] - 75:3

**obviously** [17] - 4:24, 18:15, 22:7, 39:19, 41:22, 56:13, 57:18, 57:20, 58:6, 58:16, 59:3, 60:12, 61:20, 81:15, 84:15, 86:19, 87:19

**occupying** [1] - 60:3

**occur** [1] - 11:17

**occurred** [3] - 14:10, 71:3, 96:7

**occurs** [1] - 6:11

**odd** [1] - 37:13

**OF** [1] - 1:1

**offer** [3] - 17:15, 24:20, 84:7

**offers** [1] - 17:16

**office** [4] - 74:24, 75:25, 83:18

**officer** [1] - 14:7

**offices** [4] - 40:5, 60:24, 75:2, 75:23

**Official** [1] - 96:14

**official** [1] - 3:15

**often** [3] - 26:10, 39:17, 88:19

**old** [1] - 20:15

**older** [1] - 83:1

**olds** [1] - 22:7

**omega** [1] - 77:8

**omitted** [1] - 53:1

**omitting** [1] - 53:3

**once** [2] - 54:7, 55:4

**one** [91] - 6:10, 6:17, 6:18, 7:10, 8:7, 8:18, 9:11, 9:25, 10:1, 10:7, 10:9, 10:10, 10:11, 11:7, 12:13, 13:22, 14:8, 14:9, 15:1, 15:11, 15:18, 16:10, 17:1, 17:14, 18:19, 18:20, 18:23, 22:22, 24:5, 24:7, 25:2, 25:7, 25:9, 25:12, 28:9, 28:11, 29:9, 31:4, 33:11, 36:13, 36:20, 36:22, 36:23, 38:9, 39:1, 39:12, 39:15, 40:5, 41:24, 42:9, 43:14, 47:3, 49:13, 49:15, 49:16, 50:1, 51:16, 51:19, 51:21, 52:2, 52:3, 52:11, 57:17, 60:8, 61:23, 63:8, 64:5, 64:11, 64:14, 69:17, 72:16, 73:14, 77:6, 77:13, 77:20, 77:25, 78:9, 78:10, 82:11, 84:1, 85:16, 87:6, 87:25, 90:4, 93:7

**ones** [2] - 35:2, 77:7

**online** [2] - 55:9, 55:12

**onset** [1] - 31:9

**open** [2] - 59:3, 60:12

**opened** [1] - 88:24

**opening** [3] - 34:5, 79:12, 90:1

**operate** [1] - 85:20

**operative** [1] - 71:3

**operators** [1] - 65:6

**opinion** [1] - 67:25

**opioid** [1] - 59:23

**opioids** [1] - 66:1

**opponents** [2] - 75:11, 75:12

**opportunities** [1] - 8:2

**opportunity** [12] - 4:22, 5:11, 28:14, 30:23, 44:13, 54:19, 59:8, 62:7, 71:19, 80:4, 81:21, 88:13

**opposed** [5] - 28:4,

42:5, 42:6, 42:17

**opposition** [1] - 19:1

**oral** [1] - 95:5

**order** [3] - 9:25, 62:10, 62:15

**orders** [2] - 66:19, 71:7

**ordinary** [1] - 92:16

**organic** [1] - 63:4

**organization** [1] - 15:17

**organizations** [1] - 71:25

**organize** [3] - 77:13, 77:21, 78:11

**organized** [3] - 57:21, 74:1, 75:8

**organizing** [3] - 57:18, 58:20, 79:5

**oriented** [1] - 48:11

**origin** [1] - 88:18

**ourselves** [1] - 57:7

**outage** [2] - 43:12, 43:13

**outcome** [1] - 92:1

**outlined** [3] - 55:23, 56:19, 58:7

**outside** [1] - 82:16

**overall** [3] - 24:21, 38:20, 84:8

**overbroadness** [1] - 15:22

**overburden** [1] - 57:6

**overcome** [1] - 15:10

**overcomplication** [1] - 70:22

**overlap** [2] - 84:20, 85:2

**overlapping** [1] - 85:10

**overly** [1] - 15:24

**oversee** [2] - 9:14, 11:12

**overseeing** [1] - 86:5

**oversees** [1] - 10:25

**overtime** [1] - 66:16

**overtly** [1] - 38:10

**own** [17] - 11:5, 22:23, 27:8, 28:6, 37:4, 37:22, 44:3, 46:18, 51:15, 61:21, 63:10, 77:11, 78:3, 80:18, 87:2, 87:20

**owner** [1] - 65:5

## P

**P.A** [2] - 1:23, 2:16

**P.C** [1] - 1:14

**P.M** [2] - 33:2, 33:3
**p.m** [4] - 1:7, 33:24, 33:25, 95:14
**Pages** [1] - 1:8
**pandemic** [5] - 63:25, 74:25, 75:24, 90:23, 96:8
**panel** [1] - 71:1
**PANEL** [2] - 4:12, 95:13
**Panel** [1] - 72:22
**panoramic** [2] - 18:22, 32:13
**paper** [3] - 15:2, 39:14, 93:4
**papers** [1] - 35:25
**paragraph** [1] - 7:1
**paralegals** [1] - 72:7
**parent** [1] - 18:5
**parents** [4] - 5:7, 5:10, 40:7, 80:8
**part** [26] - 22:18, 26:2, 32:8, 37:10, 47:17, 48:2, 48:7, 48:23, 49:22, 51:4, 51:22, 51:23, 52:5, 52:6, 52:22, 52:24, 53:17, 54:9, 54:13, 56:7, 65:2, 77:2, 79:9, 82:10, 88:9, 91:14
**participated** [1] - 35:6
**participating** [1] - 61:6
**particular** [11] - 21:7, 24:15, 26:21, 55:9, 65:12, 76:16, 83:3, 83:17, 85:12, 86:18, 87:16
**particularly** [4] - 6:3, 54:11, 63:17, 86:3
**parties** [1] - 72:25
**partner** [7] - 30:3, 46:3, 46:17, 46:23, 47:9, 73:22, 81:19
**partners** [2] - 83:23, 84:2
**parts** [1] - 52:23
**passion** [1] - 67:4
**past** [1] - 80:22
**path** [1] - 56:7
**pause** [1] - 75:16
**pay** [1] - 61:19
**PC** [1] - 2:12
**peers** [1] - 63:1
**pen** [1] - 15:2
**Pennsylvania** [1] - 83:11
**people** [42] - 6:4, 6:7, 6:15, 6:21, 7:12, 8:4,

9:15, 10:17, 11:1, 11:3, 11:5, 11:13, 11:21, 12:25, 13:18, 14:9, 19:12, 19:20, 22:6, 22:9, 22:11, 25:15, 25:19, 25:22, 25:23, 26:2, 26:3, 26:14, 37:22, 39:19, 55:11, 56:4, 57:15, 61:11, 61:17, 61:19, 86:1, 86:22, 90:4, 91:24
**per** [7] - 8:5, 9:2, 9:10, 10:6, 10:7, 40:19, 91:19
**percent** [15] - 14:20, 23:20, 23:21, 24:3, 24:17, 36:14, 43:24, 43:25, 54:9, 61:1, 70:3, 70:4, 70:7, 70:12, 83:19
**percentage** [2] - 23:25, 24:16
**perfect** [2] - 19:19, 79:11
**perhaps** [8] - 33:5, 34:15, 36:17, 40:20, 41:5, 50:4, 78:6, 87:13
**period** [6] - 6:8, 25:19, 71:4, 72:17, 72:22, 73:20
**permanent** [1] - 17:25
**person** [14] - 9:13, 9:17, 12:16, 12:21, 17:21, 17:22, 26:15, 29:8, 42:11, 53:19, 53:23, 75:1, 82:13
**personal** [4] - 5:20, 23:4, 46:14, 88:22
**personalities** [1] - 31:18
**personally** [3] - 56:5, 71:24, 91:18
**persons** [1] - 8:5
**perspective** [2] - 51:12, 56:15
**pertains** [1] - 55:8
**Peru** [1] - 21:1
**PESSAH** [11] - 2:11, 2:12, 54:17, 54:19, 57:2, 58:23, 59:16, 60:6, 60:22, 61:10, 62:4
**Pessah** [3] - 13:1, 54:16, 62:3
**Peter** [2] - 44:8, 44:12
**PETER** [1] - 2:7

**phenomenal** [1] - 93:5
**phone** [2] - 28:22, 63:6
**physical** [1] - 38:7
**pick** [1] - 33:20
**picked** [1] - 89:25
**pictures** [1] - 22:6
**Place** [1] - 1:15
**place** [2] - 83:25, 90:4
**placed** [1] - 21:25
**places** [1] - 62:17
**plaintiff** [2] - 46:12, 85:5
**plaintiffs** [10] - 16:24, 17:8, 29:3, 30:1, 40:1, 55:25, 63:16, 64:13, 85:15, 94:11
**plaintiffs'** [25] - 7:22, 18:25, 19:9, 22:19, 26:7, 28:10, 28:23, 30:14, 30:17, 31:10, 31:19, 33:1, 46:2, 59:10, 61:25, 64:23, 65:19, 72:10, 81:1, 83:10, 83:12, 86:6, 86:7, 89:18
**Plaintiffs'** [1] - 75:10
**plan** [2] - 5:2, 43:10
**plans** [1] - 75:24
**plate** [2] - 23:18, 23:19
**platform** [2] - 60:9, 73:9
**play** [2] - 60:15, 84:13
**players** [1] - 36:16
**playing** [2] - 57:1, 90:8
**pleading** [4] - 51:16, 77:21, 78:8, 78:11
**pleadings** [4] - 43:11, 48:12, 51:7, 79:5
**pleased** [1] - 30:20
**pleasure** [3] - 16:5, 30:16, 71:15
**pled** [1] - 43:19
**plenty** [2] - 57:22, 90:25
**plug** [2] - 37:7, 37:8
**plus** [1] - 81:2
**point** [10] - 17:14, 37:6, 52:5, 53:19, 69:13, 82:13, 90:14, 90:25, 91:13, 93:19
**pointed** [1] - 81:15
**police** [1] - 37:24

**polish** [1] - 83:2
**political** [1] - 93:18
**Ponce** [1] - 1:23
**pool** [1] - 40:10
**pose** [1] - 15:21
**position** [31] - 13:1, 13:3, 14:22, 15:3, 16:10, 26:9, 27:24, 28:4, 31:5, 33:10, 41:21, 44:19, 49:2, 49:7, 51:4, 52:16, 53:5, 53:7, 53:16, 56:23, 60:4, 60:17, 62:8, 65:18, 81:5, 81:6, 83:20, 86:24, 94:2, 94:18
**positioned** [1] - 26:17
**positions** [4] - 29:23, 32:3, 32:7, 47:2
**possibility** [2] - 41:25, 59:7
**possible** [7] - 34:8, 40:2, 44:24, 55:20, 61:24, 62:1, 92:4
**possibly** [4] - 42:25, 87:3, 87:5, 87:8
**post** [1] - 75:24
**postponed** [1] - 79:10
**postures** [1] - 62:19
**potential** [4] - 15:5, 56:15, 57:17, 73:15
**power** [7] - 7:24, 81:12, 88:18, 88:19, 89:1, 89:4, 89:5
**Powerhouse** [1] - 46:4
**PowerPoint** [1] - 9:3
**practical** [1] - 47:11
**practice** [19] - 7:4, 16:18, 16:21, 16:23, 17:7, 19:3, 29:11, 46:24, 47:14, 48:13, 57:12, 58:1, 58:21, 59:20, 65:10, 77:22, 77:24, 83:2, 91:12
**practiced** [2] - 5:14, 16:19
**practices** [4] - 8:15, 8:16, 29:16, 32:18
**practicing** [3] - 5:16, 57:12, 59:16
**practitioner** [1] - 65:16
**practitioners** [1] - 64:25
**pre** [2] - 62:10, 62:15
**pre-trial** [2] - 62:10, 62:15

**precedes** [1] - 66:15
**precise** [1] - 23:18
**predominantly** [2] - 80:14, 81:3
**prefer** [1] - 76:21
**preference** [1] - 76:20
**prefers** [1] - 51:24
**premium** [1] - 62:17
**prepare** [1] - 54:20
**prepared** [3] - 56:18, 74:21, 94:23
**preparing** [5] - 8:2, 39:13, 72:14, 74:13, 79:12
**presence** [1] - 75:18
**present** [4] - 16:9, 20:1, 80:4, 95:3
**presentation** [7] - 5:6, 13:21, 13:24, 21:14, 33:21, 42:8, 92:20
**presentations** [3] - 5:18, 95:5
**presented** [1] - 81:25
**presenter** [1] - 34:1
**presenting** [1] - 31:2
**presents** [1] - 30:13
**preserve** [1] - 72:25
**President** [1] - 92:12
**presiding** [1] - 36:1
**prevent** [2] - 20:3, 20:4
**previewed** [1] - 70:16
**previous** [2] - 45:10, 47:1
**previously** [1] - 81:18
**price** [3] - 82:11, 83:14, 86:3
**primarily** [1] - 35:2
**primary** [7] - 34:10, 34:19, 43:22, 43:23, 64:5, 94:19, 94:24
**principal** [1] - 75:25
**principle** [2] - 41:16, 69:16
**principles** [1] - 55:5
**priority** [2] - 55:2, 84:1
**privileged** [1] - 58:13
**problems** [4] - 20:20, 20:21, 61:8, 70:14
**procedurally** [1] - 58:4
**Procedure** [1] - 27:14
**proceed** [2] - 78:5, 93:2

Proceedings [1] - 95:14

proceedings [4] - 4:1, 33:25, 72:23, 96:4

process [15] - 5:24, 9:15, 11:17, 13:12, 19:16, 19:19, 19:24, 22:10, 22:13, 22:14, 25:20, 28:14, 31:20, 57:5, 82:23

processes [2] - 15:18, 89:21

product [4] - 63:3, 63:4, 72:19, 87:22

productive [1] - 92:8

Products [1] - 48:1

professional [3] - 29:5, 72:7, 74:16

professionalism [4] - 62:17, 63:8, 75:6, 75:7

professionals [1] - 56:2

Professor [2] - 66:14, 66:17

profits [1] - 90:6

progress [1] - 92:9

projects [1] - 25:23

prominent [2] - 47:2, 63:22

promote [2] - 38:14, 39:6

promoting [2] - 32:2, 39:15

proper [1] - 53:10

proponent [1] - 69:18

proposal [6] - 7:12, 13:10, 13:24, 52:13, 52:15, 78:19

proposals [3] - 20:9, 38:18, 92:22

propose [8] - 6:18, 9:1, 9:9, 9:22, 39:8, 42:16, 68:1, 69:7

proposed [8] - 6:19, 8:4, 11:9, 25:11, 42:13, 67:14, 71:18, 76:7

proposing [7] - 9:12, 41:23, 67:13, 67:16, 69:25, 75:19, 76:2

prosecute [2] - 63:11, 72:16

prosecuted [3] - 44:23, 46:7, 54:14

prosecuting [2] - 39:20, 46:19

prosecution [2] -

Proceedings [1] - 95:14

prosecutorial [1] - 52:5

protect [1] - 21:21

protected [1] - 45:12

proud [2] - 17:1, 66:14

provide [2] - 43:20, 91:6

provided [2] - 13:22, 71:17

provides [1] - 83:1

providing [1] - 86:15

PSE [1] - 69:2

PSR [2] - 84:11, 84:15

PSR-related [1] - 84:11

PSRA [1] - 28:21

Public [1] - 21:23

public [2] - 55:10, 55:17

purpose [1] - 9:13

purposes [4] - 49:12, 50:5, 77:21, 78:8

pursued [2] - 13:8, 45:5

push [2] - 36:22, 55:13

put [19] - 7:20, 21:14, 25:2, 37:2, 37:15, 38:12, 39:13, 41:21, 42:7, 48:3, 49:9, 50:5, 51:14, 52:14, 52:25, 53:14, 57:3, 68:15, 84:15

putative [5] - 63:12, 65:4, 70:21, 90:13, 91:16

puts [1] - 35:14

putting [7] - 38:24, 39:24, 48:15, 48:17, 48:18, 74:12, 86:14

**Q**

qualifications [2] - 80:5, 80:6

qualified [4] - 11:6, 12:22, 40:15, 59:17

quality [1] - 8:9

questions [22] - 4:18, 5:3, 5:5, 7:3, 13:24, 13:25, 20:6, 22:22, 30:23, 34:7, 38:4, 38:15, 44:18, 54:21, 56:19, 56:21, 61:15, 67:8, 67:10, 73:4, 75:16, 83:3

quick [1] - 92:4

quickly [3] - 8:25, 34:7, 40:2

quite [3] - 26:9, 33:19, 56:19

quote [1] - 92:12

**R**

race [1] - 11:10

Rachel [1] - 27:22

RACHEL [1] - 1:22

racial [1] - 65:6

raise [2] - 32:16, 38:8

raised [6] - 18:4, 20:25, 21:1, 80:9, 88:10

ran [1] - 55:17

ranging [1] - 80:25

rank [1] - 35:9

rather [1] - 47:25

re [1] - 55:10

RE [1] - 1:4

re-imagined [1] - 55:10

reach [1] - 21:22

reached [2] - 32:9, 81:23

read [3] - 9:4, 21:18, 92:22

ready [4] - 20:19, 21:10, 24:2, 63:11

real [7] - 49:17, 49:24, 49:25, 51:13, 67:4, 86:2, 86:15

realistically [1] - 49:11

realize [1] - 85:2

reallocate [1] - 70:6

really [36] - 13:1, 17:10, 21:8, 26:17, 29:1, 29:11, 30:21, 31:9, 38:5, 56:11, 57:8, 58:24, 59:9, 61:4, 61:13, 65:7, 65:21, 66:21, 67:18, 70:17, 76:25, 78:10, 78:14, 79:11, 79:15, 83:2, 84:1, 87:20, 87:21, 89:3, 91:20, 92:8, 93:2, 93:23, 94:8

reason [3] - 13:11, 28:8, 49:21, 56:10, 57:7, 57:13, 71:2

reasonably [1] - 40:2

reasons [5] - 6:10, 13:23, 33:18, 36:13,

52:3

receive [1] - 10:1

received [2] - 47:4, 58:11

recent [1] - 67:2

recently [10] - 21:14, 28:11, 47:3, 47:11, 48:1, 54:4, 54:7, 63:23, 75:13, 82:10

recess [1] - 33:24

recognized [3] - 47:24, 55:16, 75:13

record [2] - 63:2, 66:20

records [1] - 72:25

recruited [1] - 64:23

Reddy [4] - 71:17, 72:6, 74:4, 75:20

redlining [1] - 65:8

refer [1] - 73:5

referring [1] - 50:9

refocus [1] - 83:23

regard [13] - 36:15, 44:22, 44:23, 48:22, 50:25, 51:1, 51:4, 51:6, 51:13, 53:7, 53:8, 53:16, 93:6

regarding [2] - 26:12, 73:2

regardless [1] - 33:12

regular [1] - 41:10

relate [1] - 87:17

related [3] - 82:24, 84:11, 86:18

relations [1] - 62:19

relationship [1] - 55:10

relationships [3] - 36:16, 55:6, 56:18

relatively [2] - 41:3, 91:2

reliable [1] - 29:5

reliance [1] - 54:25

relying [1] - 23:8

remains [1] - 55:2

remarkable [1] - 73:17

remarks [4] - 34:5, 54:22, 68:8, 92:11

remediate [1] - 55:6

remedy [2] - 94:12, 94:13

remember [1] - 31:3

remind [1] - 21:24

remotely [2] - 30:11, 96:9

Repeat [1] - 51:18

REPORTED [1] - 3:13

reporter [2] - 34:13, 62:12

Reporter [2] - 3:15, 96:14

reporting [1] - 96:9

represent [9] - 18:1, 18:13, 19:24, 38:6, 57:15, 63:12, 68:5, 74:16, 88:3

representation [3] - 51:5, 69:14, 78:2

representative [1] - 9:17

represented [12] - 17:7, 18:16, 19:5, 19:7, 19:9, 19:11, 26:10, 46:25, 48:20, 64:13, 64:15, 85:5

representing [7] - 16:16, 16:24, 18:3, 22:15, 24:5, 37:22, 87:15

represents [2] - 21:16, 26:3

reputation [3] - 66:15, 75:9, 82:5

request [1] - 54:20

requests [1] - 15:19

require [3] - 13:17, 40:3, 59:4

required [5] - 14:15, 17:24, 23:9, 48:12, 61:3

requirements [1] - 73:12

requires [1] - 62:17

rescue [1] - 29:20

research [3] - 10:17, 32:8, 94:8

resident [1] - 45:1

resolution [2] - 20:3, 44:4, 92:4

resolved [3] - 8:25, 26:18, 83:21

resolving [1] - 72:11

resources [8] - 35:12, 44:3, 66:3, 74:15, 74:16, 74:17, 82:1

respect [10] - 18:24, 31:25, 62:8, 63:1, 64:25, 68:22, 69:19, 74:19, 81:17, 81:19

response [2] - 8:18

responses [1] - 15:24

responsibilities [1] - 94:23

responsibility [9] - 31:12, 32:19, 34:10,

34:19, 43:23, 43:24, 82:9, 86:2, 94:20

**responsible** [1] - 87:15

**rest** [1] - 26:4

**result** [1] - 13:6

**retail** [1] - 55:11

**retained** [2] - 42:24, 55:24

**retrial** [1] - 24:11, 47:12

**reveals** [1] - 72:19

**revenue** [1] - 90:6

**review** [1] - 86:19

**reviewed** [1] - 43:11

**rewarded** [1] - 91:23

**risk** [1] - 66:5

**roadmap** [3] - 43:20, 58:2, 58:3

**Roberta** [1] - 86:4

**Robinhood** [54] - 12:6, 19:21, 21:22, 34:10, 34:20, 34:22, 35:2, 35:19, 35:21, 35:23, 36:7, 36:13, 36:14, 36:15, 36:25, 37:5, 39:1, 39:3, 40:23, 41:1, 41:23, 42:3, 42:22, 43:12, 43:13, 43:17, 45:6, 45:7, 48:24, 49:16, 50:1, 51:1, 52:6, 52:22, 53:8, 55:9, 55:17, 60:7, 60:8, 60:9, 60:14, 60:18, 67:21, 68:25, 70:18, 77:13, 87:10, 88:5, 88:8, 88:25, 90:5, 94:5

**Robinhood-centric** [4] - 45:7, 60:8, 60:14, 60:18

**Rochester** [1] - 5:10

**Rogow** [3] - 66:15, 66:17

**role** [16] - 28:6, 28:11, 30:21, 30:22, 31:11, 31:15, 32:1, 33:12, 57:1, 60:2, 60:15, 69:25, 83:8, 83:16, 83:17, 83:25

**roles** [2] - 64:1, 82:9

**Rolodex** [1] - 26:13

**room** [3] - 81:11, 90:7, 93:9

**ROSE** [1] - 3:4

**Rose** [1] - 79:24

**ROSS** [1] - 1:19

**Roth** [5] - 1:23, 27:22, 29:19, 29:20,

30:1

**Rothenberg** [1] - 65:2

**roughly** [1] - 90:24

**round** [1] - 66:21

**RoundUp** [1] - 59:23

**Roy** [1] - 88:3

**ROY** [1] - 3:8

**roy@akinlawfirm. com** [1] - 3:10

**RPR** [2] - 3:14, 96:14

**Rule** [5] - 17:25, 73:12, 77:24, 78:13

**Rules** [1] - 27:14

**rules** [3] - 27:14, 30:8, 68:20

**run** [4] - 56:1, 57:11, 86:4, 90:20

**running** [2] - 24:4, 46:15

**rwf@grossmanroth .com** [1] - 1:25

**Rye** [1] - 2:5

---

# S

**safely** [1] - 33:10

**Safirstein** [6] - 13:4, 44:8, 44:13, 47:22, 59:1, 68:14

**safirstein** [1] - 54:15

**SAFIRSTEIN** [15] - 2:7, 2:8, 44:8, 44:12, 48:5, 48:17, 49:4, 49:7, 50:21, 51:19, 52:15, 52:20, 53:3, 53:20, 54:2

**Safirstein's** [1] - 68:8

**SALAS** [8] - 2:16, 62:6, 62:14, 67:15, 68:11, 70:2, 70:16, 71:9

**Salas** [3] - 11:23, 12:2, 16:14, 19:4, 20:8, 26:16, 36:1, 52:14, 62:5, 62:12, 67:11, 70:15, 71:8

**sample** [1] - 29:18

**San** [9] - 2:22, 18:4, 71:14, 74:23, 74:24, 75:2, 75:23, 76:1, 79:8

**Santa** [1] - 17:4

**Saveri** [12] - 12:11, 40:9, 71:10, 71:11, 77:5, 78:24, 79:16, 81:16, 81:23, 83:6, 87:13, 91:4

**SAVERI** [10] - 2:20, 2:21, 71:12, 71:14,

75:22, 76:4, 76:12, 77:6, 78:25, 79:17

**Saveri's** [1] - 84:21

**savings** [1] - 91:25

**saw** [5] - 18:19, 21:13, 21:16, 71:1, 94:13

**schedule** [1] - 79:12

**schedules** [1] - 61:4

**scheduling** [3] - 28:23, 66:19, 71:6

**SCHIRRIPA** [10] - 3:3, 3:4, 79:19, 79:23, 80:3, 81:10, 83:17, 84:9, 87:2, 87:24

**Schirripa** [16] - 12:11, 16:14, 19:4, 20:8, 26:16, 36:3, 76:6, 76:11, 76:13, 79:18, 79:20, 79:22, 79:24, 83:5, 87:23

**Schlesinger** [3] - 8:10, 8:17, 10:12

**school** [9] - 5:9, 18:5, 18:6, 18:9, 18:10, 18:12, 80:12, 88:11, 88:15

**School** [2] - 12:19, 39:13

**Schwab** [2] - 36:9, 37:4

**Scola** [1] - 67:2

**scope** [1] - 70:8

**screen** [1] - 9:7

**scrutiny** [1] - 56:14

**seamless** [1] - 30:14

**Sean** [1] - 66:25

**seat** [3] - 27:25, 60:17, 85:24

**Seattle** [1] - 33:4

**SEC** [1] - 45:23

**second** [5] - 10:19, 35:17, 39:7, 73:20, 80:7

**Section** [1] - 65:7

**securities** [29] - 25:8, 38:24, 38:25, 45:24, 46:3, 46:6, 46:7, 46:10, 46:19, 49:13, 50:6, 50:7, 50:14, 55:8, 55:13, 64:19, 69:4, 69:12, 77:9, 80:13, 80:14, 81:3, 81:21, 84:10, 84:15, 85:9, 87:4, 87:19, 87:20

**Securities** [1] - 45:20

**securities-type** [1] - 50:6

**see** [19] - 6:3, 9:7,

11:2, 15:6, 16:6, 18:8, 19:25, 24:21, 26:1, 39:5, 41:9, 48:6, 57:7, 64:16, 65:13, 66:12, 70:16, 84:12, 86:16

**seek** [4] - 49:2, 64:3, 66:7, 68:2

**seeking** [2] - 53:4, 53:16

**select** [1] - 33:13

**selected** [1] - 42:22

**self** [1] - 22:23

**senior** [3] - 7:6, 7:11, 63:19

**sense** [10] - 35:20, 35:24, 36:11, 37:19, 50:5, 50:22, 77:1, 78:21, 78:22, 85:17

**sensitive** [1] - 61:10

**separate** [11] - 25:1, 50:2, 51:25, 52:1, 52:21, 53:1, 78:2, 78:9, 84:16, 87:3, 87:8

**separated** [1] - 35:18

**separately** [1] - 49:23

**series** [1] - 83:13

**serve** [6] - 30:20, 33:4, 57:7, 89:15, 93:25, 94:13

**served** [10] - 31:22, 32:4, 34:23, 46:4, 49:12, 57:10, 63:23, 64:1, 65:17, 66:17

**serving** [8] - 30:11, 31:14, 32:9, 32:12, 32:13, 33:12, 74:1, 83:10

**set** [6] - 24:8, 31:17, 66:19, 71:3, 73:13, 79:8

**setting** [1] - 69:11

**settle** [3] - 15:19, 54:4, 78:6

**settled** [2] - 10:22, 55:16

**settlement** [2] - 10:19, 83:21

**settling** [1] - 43:1

**seven** [7] - 9:1, 9:10, 33:3, 57:12, 65:19, 80:15, 82:12

**seven-figure** [1] - 65:19

**several** [8] - 13:24, 21:6, 28:5, 28:20, 33:5, 63:5, 90:17, 91:24

**Seyfarth** [1] - 80:13

**shadow** [1] - 85:20

**shadowing** [1] - 85:17

**shape** [1] - 65:22

**share** [5] - 9:4, 22:11, 67:17, 67:20, 67:25

**sharecropping** [1] - 65:8

**shared** [1] - 38:18

**sharing** [1] - 60:12

**SHARON** [2] - 3:14, 96:14

**sheets** [1] - 23:23

**shift** [1] - 94:23

**short** [3] - 71:4, 78:13, 79:1

**show** [1] - 23:14

**shown** [1] - 31:15

**shows** [1] - 18:1

**side** [19] - 7:17, 7:20, 7:22, 7:25, 13:19, 18:25, 19:8, 26:7, 27:10, 31:19, 33:1, 59:10, 59:24, 59:25, 64:18, 64:23, 67:3, 84:16

**sides** [1] - 4:24

**signature** [1] - 63:13

**significant** [8] - 43:2, 48:14, 65:25, 66:3, 72:2, 84:20, 89:13, 89:23

**significantly** [2] - 81:7, 90:13

**similar** [2] - 51:8, 92:21

**similarities** [1] - 52:8

**Simple** [1] - 41:17

**simple** [2] - 90:4, 91:3

**simply** [4] - 32:16, 89:1, 92:11, 92:12

**Simpson** [2] - 19:7, 19:8

**simultaneously** [1] - 85:8

**Singhal** [1] - 89:16

**single** [7] - 6:14, 18:5, 46:8, 60:25, 61:15, 63:13, 88:10

**sit** [1] - 90:7

**situation** [2] - 37:5, 42:24

**six** [1] - 41:4

**size** [4] - 43:7, 65:12, 71:24, 84:4

**Skadden** [1] - 67:3

**skill** [1] - 31:17

**skills** [1] - 82:15

**slap** [1] - 39:25

**slew** [1] - 58:6

**slide** [1] - 42:8

**slow** [1] - 39:25

**slows** [1] - 92:5

**small** [6] - 11:3, 16:19, 25:22, 26:2, 41:3, 66:5

**smaller** [2] - 76:20, 76:23

**Smith** [1] - 14:17

**so,derivatively** [1] - 84:25

**so-called** [3] - 44:21, 48:19, 53:13

**social** [1] - 92:14

**socializing** [1] - 77:17

**software** [1] - 57:22

**sole** [2] - 65:15, 74:1

**solid** [1] - 36:22

**solve** [1] - 27:12

**some-odd** [1] - 37:13

**someone** [3] - 10:1, 12:8, 12:9

**sometimes** [1] - 15:24

**somewhat** [2] - 58:2, 58:3

**son** [3] - 20:15, 20:19, 65:23

**soon** [1] - 54:8

**sophisticated** [1] - 19:10

**sorry** [4] - 14:1, 34:13, 51:18, 81:8

**sort** [13] - 28:10, 31:12, 32:18, 32:25, 35:18, 36:24, 36:25, 37:1, 39:7, 48:25, 53:1, 57:13, 57:16

**sought** [1] - 55:19

**sound** [1] - 23:2

**South** [2] - 3:10, 88:6

**Southern** [6] - 12:2, 12:19, 17:13, 45:16, 45:19, 50:17

**SOUTHERN** [1] - 1:1

**space** [2] - 49:25

**speaking** [9] - 16:5, 26:16, 30:16, 44:15, 49:21, 59:1, 61:25, 71:16, 81:11

**speaks** [3] - 64:24, 66:16, 69:20

**special** [3] - 45:18, 66:23, 69:1

**specialists** [1] - 64:21

**specialized** [2] -

16:22, 45:16

**specialty** [1] - 59:19

**specific** [10] - 26:11, 34:24, 44:21, 47:15, 53:16, 59:20, 59:25, 60:18, 73:13, 87:18

**specifically** [5] - 17:17, 46:2, 64:23, 86:8, 86:17

**speed** [1] - 6:10

**speedy** [1] - 8:24

**spend** [4] - 43:25, 54:10, 54:12, 88:9

**spending** [4] - 5:2, 54:6, 54:8, 75:24

**spends** [1] - 75:23

**spent** [3] - 24:2, 29:11, 29:19

**split** [5] - 8:3, 24:6, 24:25, 36:11, 50:14

**spoken** [3] - 53:21, 90:19, 90:21

**sprawl** [1] - 11:3

**spread** [2] - 6:12, 11:1

**SQUEEZE** [1] - 1:5

**squeeze** [1] - 23:24

**St** [1] - 1:15

**stability** [1] - 31:16

**staff** [5] - 7:24, 13:14, 13:16, 14:12, 72:8

**staffed** [1] - 66:7

**staffing** [1] - 40:4

**stakes** [1] - 64:18

**stand** [3] - 63:10, 87:3, 87:4

**standing** [1] - 65:14

**Stars** [1] - 1:20

**start** [8] - 4:13, 6:4, 10:21, 15:2, 15:23, 79:8, 80:3, 92:6

**started** [8] - 29:12, 33:18, 72:15, 80:12, 80:18, 83:23

**starting** [1] - 18:12

**state** [21] - 10:2, 10:3, 36:1, 39:1, 39:2, 50:9, 64:2, 64:6, 64:14, 67:24, 68:3, 68:7, 68:9, 68:24, 84:17, 84:21, 84:24, 87:5, 87:6, 87:9

**statement** [2] - 54:21, 78:14

**statements** [2] - 43:5, 90:1

**States** [5] - 3:15, 45:15, 45:19, 72:10, 96:15

93:10

**STATES** [2] - 1:1, 1:11

**status** [1] - 28:6

**statutory** [3] - 39:2, 39:3, 50:8

**steering** [6] - 9:19, 28:1, 40:18, 81:6, 83:12, 94:1

**STENOGRAPHICALLY** [1] - 3:13

**step** [2] - 35:11, 93:20

**stepped** [1] - 14:15

**steps** [2] - 72:24, 73:19

**Steve** [3] - 71:17, 73:22, 81:19

**still** [4] - 30:12, 62:12, 78:21, 91:9

**stock** [1] - 45:2

**stone's** [1] - 80:10

**stop** [2] - 75:5, 75:15

**stopover** [1] - 90:25

**stopped** [2] - 43:9, 90:2

**stories** [1] - 56:4

**story** [2] - 36:15, 88:18

**strategic** [1] - 64:1

**strategies** [1] - 87:22

**strategy** [1] - 51:7

**streamline** [2] - 15:21, 15:23

**streamlined** [2] - 15:18, 61:19

**street** [1] - 21:12

**Street** [9] - 2:21, 3:9, 21:19, 21:20, 21:21, 21:22, 65:24, 80:10, 90:7

**stretch** [1] - 91:11

**strong** [2] - 6:4, 24:12

**strongly** [2] - 6:23, 59:5

**structure** [42] - 6:18, 6:19, 7:14, 8:11, 8:24, 9:1, 9:9, 9:10, 10:23, 11:9, 11:23, 13:23, 22:18, 24:21, 25:11, 25:14, 25:16, 25:21, 26:19, 28:2, 37:6, 37:16, 37:17, 38:15, 38:20, 52:18, 52:21, 59:11, 67:12, 67:13, 67:16, 68:1, 84:8, 85:10, 86:1, 86:16, 91:2, 91:18, 92:21, 92:23, 93:1

**structured** [2] - 26:6,

93:10

**structures** [6] - 25:12, 47:5, 76:21, 76:22, 91:17, 92:25

**Stuart** [2] - 29:22, 32:6

**students** [1] - 56:1

**study** [1] - 58:1

**Stupid** [1] - 41:17

**subclass** [2] - 87:16, 87:17

**subclasses** [1] - 87:14

**subject** [1] - 96:8

**submission** [1] - 42:8

**submitted** [3] - 71:19, 78:20, 95:3

**subscribe** [1] - 41:16

**subspecialties** [1] - 50:25

**substance** [3] - 19:20, 58:18, 58:24

**substantial** [7] - 48:7, 54:9, 54:13, 72:19, 74:10, 75:4, 86:9

**substantive** [4] - 29:15, 59:14, 64:2, 74:6

**substantively** [2] - 68:4, 68:5

**subtle** [1] - 22:5

**successful** [2] - 25:18, 46:18

**successfully** [3] - 17:4, 31:20, 64:20

**sudden** [1] - 11:4

**sued** [1] - 36:20

**suggest** [2] - 38:10, 39:5

**suggested** [2] - 28:5, 77:17

**suggestions** [1] - 44:6

**suit** [1] - 24:13

**suitable** [1] - 94:13

**Suite** [6] - 1:15, 1:20, 1:24, 2:4, 2:13, 2:22

**suited** [2] - 53:15, 57:7

**summaries** [1] - 7:1

**summary** [1] - 24:9

**Superior** [1] - 17:4

**supervisory** [1] - 83:18

**support** [15] - 44:2, 48:9, 48:10, 53:9, 56:11, 62:25, 63:1, 63:2, 65:14, 66:14,

67:7, 70:5, 84:2, 86:15, 93:4

**supported** [2] - 16:13, 70:10

**supporting** [1] - 93:17

**supports** [1] - 41:5

**suppose** [1] - 31:25

**supposedly** [1] - 44:20

**survive** [1] - 41:11

**suspect** [1] - 78:12

**sustains** [1] - 62:19

**sworn** [2] - 89:24, 89:25

**system** [5] - 19:22, 22:13, 55:2, 91:4, 91:5

---

**T**

**tactic** [1] - 20:2

**tail** [3] - 37:1, 37:2, 37:5

**tailor** [1] - 58:17

**tailoring** [1] - 58:23

**talent** [2] - 21:9, 30:20

**talks** [1] - 37:7

**tape** [1] - 38:12

**Task** [1] - 89:18

**task** [1] - 48:11

**task-oriented** [1] - 48:11

**tasked** [1] - 65:9

**TD** [21] - 13:6, 36:9, 36:18, 36:19, 36:21, 37:3, 44:22, 45:2, 45:3, 47:17, 48:22, 49:16, 49:22, 51:1, 51:22, 52:5, 53:13, 68:17, 69:22, 87:10

**team** [17] - 17:12, 19:18, 20:22, 66:11, 66:21, 71:18, 72:5, 74:12, 79:4, 94:20, 94:21

**teams** [1] - 8:4

**technical** [2] - 4:9, 95:6

**technique** [1] - 83:2

**technological** [1] - 96:9

**technology** [1] - 54:25

**ten** [3] - 5:14, 57:13, 59:16

**term** [3] - 31:25, 32:5, 79:1

**terms** [19] - 24:20,

24:23, 26:6, 27:5,
40:4, 48:12, 52:18,
57:20, 58:10, 58:18,
58:24, 59:25, 61:13,
68:13, 74:15, 74:22,
84:7

**terrific** [1] - 54:24
**test** [1] - 62:25
**Texas** [3] - 5:15, 5:16
**Thacher** [2] - 19:7,
19:8
**thankfully** [2] - 63:7,
70:5
**thanking** [1] - 80:3
**thankless** [1] - 31:8
**THE** [87] - 1:10, 2:16,
4:2, 4:8, 4:13, 9:6,
9:8, 13:20, 14:2,
14:22, 15:8, 16:3,
16:6, 16:8, 20:7,
20:17, 22:17, 23:17,
24:19, 27:16, 27:20,
30:24, 31:4, 31:22,
32:20, 33:8, 33:16,
33:18, 34:1, 34:4,
34:13, 34:17, 38:17,
41:22, 42:20, 44:5,
44:11, 47:22, 48:15,
48:25, 49:5, 50:19,
51:17, 52:13, 52:19,
52:25, 53:18, 53:25,
54:15, 54:18, 56:22,
58:20, 59:14, 60:3,
60:20, 61:7, 62:3,
62:5, 62:12, 67:11,
68:6, 69:24, 70:13,
71:8, 71:10, 71:13,
75:18, 76:2, 76:5,
77:4, 78:23, 79:16,
79:18, 79:21, 80:2,
81:9, 83:5, 84:7, 87:1,
87:23, 87:25, 88:2,
92:19, 93:25, 94:17,
94:25, 95:2
**themselves** [2] -
39:18, 73:9
**theories** [1] - 61:22
**theory** [1] - 92:13
**therefore** [3] - 7:19,
11:16, 96:8
**thermonuclear** [1] -
41:14
**thinking** [1] - 21:20
**third** [8] - 25:9, 53:1,
58:22, 58:23, 64:7,
69:3, 72:25, 74:9
**third-year** [1] - 64:7
**thoughtful** [2] -
13:21, 44:6
**thoughts** [1] - 78:17

**thousand** [2] - 37:9,
46:10
**three** [24] - 5:2, 8:3,
8:4, 8:18, 10:8, 15:1,
15:3, 20:9, 24:5,
28:20, 38:25, 40:23,
41:24, 53:9, 57:17,
60:6, 67:16, 69:8,
69:11, 85:16, 85:19
**three-total** [1] -
67:16
**throughout** [4] - 5:1,
16:23, 28:14, 59:19
**throw** [1] - 80:10
**tied** [1] - 91:25
**tiger** [2] - 36:25, 37:5
**timely** [2] - 29:5,
45:4
**timing** [2] - 26:12,
89:11
**tirelessly** [1] - 90:14
**title** [2] - 42:12,
85:21
**titles** [1] - 86:2
**today** [20] - 4:22,
16:5, 28:13, 34:21,
42:8, 44:14, 47:17,
49:10, 54:22, 61:11,
66:15, 66:20, 67:1,
70:17, 71:20, 77:12,
80:4, 92:10, 92:22,
95:5
**together** [21] - 15:25,
20:24, 21:3, 21:14,
25:2, 36:2, 36:22,
37:2, 46:17, 47:10,
48:22, 50:1, 51:14,
52:10, 74:12, 76:14,
82:21, 84:19, 85:14,
86:25, 91:14
**ton** [1] - 7:21
**took** [2] - 21:10,
31:12
**tools** [2] - 55:1,
57:23
**top** [5] - 12:18,
40:12, 60:16, 63:17,
69:10
**tort** [8] - 25:2, 35:19,
36:1, 37:12, 37:21,
65:18, 65:19, 65:22
**tort-based** [1] - 36:1
**total** [5] - 67:16,
69:8, 69:10, 69:11,
69:19
**totality** [1] - 38:13
**towards** [5] - 68:15,
80:11, 81:14, 93:20,
94:9
**Trade** [1] - 21:14

**trade** [3] - 29:16,
36:18, 55:12
**traded** [1] - 45:2
**trader** [2] - 45:1,
65:24
**traders** [1] - 88:25
**trades** [1] - 45:3
**TRADING** [1] - 1:5
**traditionally** [1] -
89:6
**train** [1] - 39:25
**trained** [2] - 63:17,
82:8
**tranche** [56] - 8:5,
9:3, 9:11, 9:24, 10:6,
10:7, 10:24, 10:25,
11:24, 11:25, 12:7,
13:7, 15:1, 15:4, 15:7,
34:11, 34:20, 35:19,
36:6, 36:7, 36:8,
40:19, 40:23, 41:5,
41:7, 41:23, 42:22,
47:20, 49:3, 51:1,
51:2, 53:1, 53:6, 53:8,
53:11, 53:13, 53:15,
60:8, 60:19, 62:2,
64:3, 64:6, 67:21,
67:24, 68:2, 76:3,
76:8, 83:16, 91:4,
91:5, 91:19, 93:1,
94:5
**tranches** [23] - 8:3,
24:23, 24:25, 25:14,
28:20, 35:18, 38:25,
41:1, 48:19, 50:24,
53:9, 60:4, 60:11,
60:13, 64:22, 68:9,
68:12, 77:15, 78:1,
91:8, 91:11
**transcription** [1] -
96:4
**transferred** [1] -
62:23
**transfers** [1] - 90:25
**treated** [1] - 35:11
**tremendous** [2] -
6:22, 85:2
**trenches** [1] - 63:22
**trend** [1] - 10:20
**trial** [22] - 8:12, 8:25,
17:3, 19:6, 24:7,
62:10, 62:15, 64:4,
65:20, 66:8, 66:9,
72:4, 72:13, 72:14,
74:3, 74:8, 74:13,
79:8, 79:13, 89:13,
89:23, 90:12
**trials** [1] - 24:7
**triangle** [4] - 25:21,
37:18, 38:22

**triangular** [1] -
38:22, 70:24
**tried** [4] - 41:21,
45:25, 56:17, 64:10
**trouble** [1] - 34:14
**truly** [1] - 90:3
**trust** [2] - 36:16, 56:2
**truth** [2] - 19:14, 38:5
**try** [7] - 27:11, 34:16,
39:25, 70:23, 71:21,
78:6
**trying** [6] - 11:2,
17:9, 26:20, 90:2,
90:3, 92:16
**turn** [1] - 38:16
**turns** [1] - 37:17
**two** [32] - 7:10, 8:13,
9:2, 9:10, 10:7, 13:25,
24:7, 25:1, 32:25,
36:23, 37:9, 40:5,
41:25, 42:9, 42:17,
44:1, 47:3, 48:21,
49:12, 49:15, 51:14,
51:20, 63:10, 68:9,
68:11, 68:24, 72:9,
78:9, 82:13, 85:16,
85:18, 87:8
**TX** [1] - 1:16
**type** [13] - 10:4,
10:22, 16:15, 28:11,
43:16, 50:6, 58:10,
62:16, 67:23, 68:15,
72:11, 74:18, 86:21
**types** [1] - 35:1
**typical** [1] - 88:7

**U**

**ultimate** [1] - 20:4
**ultimately** [2] -
76:18, 78:5
**unclear** [1] - 91:9
**under** [4] - 65:6,
68:20, 73:12, 82:13
**undergrad** [2] -
12:19, 25:12
**underneath** [1] -
69:6
**undertaken** [1] -
28:9
**underway** [1] - 93:24
**underwriters** [1] -
29:21
**unfortunately** [1] -
11:11
**Ungaro** [1] - 29:9
**unique** [3] - 36:15,
59:2
**UNISON** [2] - 4:12,
95:13

**Unit** [1] - 3:9
**UNITED** [2] - 1:1,
1:11
**united** [1] - 3:15
**United** [4] - 45:15,
45:18, 72:10, 96:15
**University** [4] - 5:12,
5:13, 12:18, 63:24
**unpacked** [1] - 77:20
**unwind** [1] - 74:25
**up** [23] - 5:10, 6:9,
8:9, 14:15, 15:16,
17:9, 22:6, 23:14,
24:6, 25:1, 33:20,
35:11, 36:11, 39:25,
48:18, 54:8, 62:14,
70:3, 70:12, 72:12,
80:9, 88:24, 92:1
**urge** [1] - 17:21
**Ursini** [1] - 58:7
**Ursula** [1] - 29:9
**useful** [1] - 60:11
**user** [1] - 88:8

**V**

**vague** [1] - 15:25
**vagueness** [1] -
15:22
**values** [1] - 75:7
**various** [1] - 31:18
**VELAZCO** [3] - 3:14,
96:13, 96:14
**venire** [1] - 79:9
**venturing** [1] - 19:21
**verdict** [3] - 64:4,
64:10, 65:21
**verdicts** [1] - 65:19
**Verifund** [1] - 14:16
**versed** [1] - 12:8
**versus** [1] - 48:1
**vetting** [1] - 87:17
**via** [1] - 54:23
**viable** [1] - 61:22
**victims** [2] - 56:1,
70:20
**video** [2] - 56:9,
56:10
**videoconference** [1]
- 54:23
**view** [10] - 36:6,
38:23, 51:20, 52:5,
53:6, 67:4, 68:12,
68:14, 71:5, 85:13
**viewpoint** [1] - 22:11
**views** [1] - 68:12
**vigorously** [2] -
44:24, 45:5
**village** [1] - 65:13
**virtually** [1] - 79:3

**Viversa** [1] - 19:11
**vociferously** [1] - 49:21
**voice** [4] - 56:12, 56:16, 69:17, 69:22
**voir** [2] - 64:7
**Volkswagen** [1] - 59:23
**volume** [2] - 45:2, 58:14

## W

**wait** [1] - 8:14
**walks** [1] - 55:25
**Wall** [4] - 21:19, 65:24, 80:10, 90:7
**wants** [3] - 31:4, 33:9, 93:14
**war** [1] - 41:14
**warrant** [1] - 42:4
**Washington** [1] - 39:13
**watched** [3] - 18:5, 29:21, 32:5
**ways** [2] - 42:14, 79:11
**weakness** [1] - 22:22
**wealth** [2] - 11:1, 89:5
**weather** [1] - 5:11
**website** [1] - 21:23
**Webull** [1] - 36:10
**week** [4] - 24:1, 43:25, 79:7, 95:9
**weeks** [3] - 24:5, 44:1, 81:24
**welcome** [3] - 30:23, 81:21
**welcomed** [1] - 35:13
**well-connected** [1] - 64:15
**well-known** [1] - 19:10
**well-served** [1] - 49:12
**well-settled** [1] - 55:16
**well-suited** [1] - 53:15
**well-thought-out** [1] - 13:23
**well-versed** [1] - 12:8
**West** [3] - 2:13, 21:12, 21:13
**west** [4] - 12:13, 33:22, 75:18, 95:12
**whichever** [1] -

81:22
**white** [1] - 45:17
**White** [2] - 29:12, 31:1
**whole** [5] - 13:12, 39:14, 70:5, 88:23
**wife** [3] - 5:15, 5:16, 88:4
**wifi** [1] - 81:13
**willey** [1] - 92:19
**Willey** [4] - 12:5, 87:25, 88:3, 94:25
**WILLEY** [7] - 3:8, 88:1, 88:3, 92:24, 94:4, 94:19, 95:1
**Williams** [8] - 71:17, 72:6, 72:9, 73:23, 73:24, 75:19, 75:23, 81:19
**willing** [7] - 7:22, 35:11, 63:11, 70:11, 93:16, 93:25, 94:14
**wish** [1] - 93:21
**witness** [1] - 74:7
**witnessed** [1] - 88:18
**women** [2] - 47:3, 56:2
**won** [3] - 17:5, 24:9, 64:8
**words** [1] - 6:14
**workers** [1] - 80:8
**works** [3] - 22:10, 25:9, 86:24
**world** [2] - 27:9, 38:12
**WORLEY** [1] - 1:14
**wrapping** [1] - 72:12
**wraps** [1] - 54:7
**writing** [2] - 10:17, 23:22
**written** [3] - 42:7, 43:5, 95:4
**wrongs** [1] - 55:7
**wrote** [1] - 18:21

## Y

**Yaffa** [3] - 1:23, 29:19, 30:1
**year** [9] - 17:1, 17:3, 17:5, 24:12, 29:10, 54:24, 64:7, 64:10, 88:15
**Year** [1] - 17:2
**years** [27] - 5:14, 8:13, 16:18, 16:19, 19:3, 20:24, 29:13, 29:19, 30:25, 45:14, 45:24, 46:4, 46:25,

47:9, 47:10, 57:12, 59:17, 66:7, 73:24, 80:15, 80:22, 82:4, 82:12, 84:5
**years'** [1] - 81:1
**yellow** [1] - 9:23
**York** [15] - 2:9, 3:5, 5:10, 45:19, 50:18, 67:3, 74:24, 75:2, 75:24, 80:8, 80:9, 81:18, 85:4, 90:24
**Young** [2] - 71:17, 72:7
**young** [6] - 20:19, 22:5, 56:1, 63:17, 74:5, 75:20
**younger** [6] - 6:23, 7:5, 12:9, 32:2, 82:21, 83:1
**yourself** [2] - 27:6, 75:19
**youTube** [1] - 21:13

## Z

**Zantac** [2] - 32:10, 66:1
**zone** [3] - 29:2, 32:20, 90:19
**Zoom** [5] - 4:10, 27:9, 30:12, 38:12, 63:5
**ZOOM** [2] - 4:12, 95:13