**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-2989-MDL-ALTONAGA/Torres**

In re:

**JANUARY 2021 SHORT SQUEEZE**
**TRADING LITIGATION**

_____/

This Document Relates to All Claims Included
in the Robinhood and Other Broker Tranches

## CONSOLIDATED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

JURISDICTION AND VENUE .................................................................................... 6

THE PARTIES ............................................................................................................... 7

    I.    **Plaintiffs** ......................................................................................................... 7

        a.  Robinhood Plaintiffs ........................................................................ 7

        b.  Apex Plaintiffs ................................................................................ 12

    II.   **Defendants** .................................................................................................... 13

        a.  Robinhood ...................................................................................... 13

        b.  Apex ................................................................................................ 17

FACTUAL ALLEGATIONS ....................................................................................... 18

    I.    **The Robinhood Business Model** ................................................................ 19

        a.  History and Growth ........................................................................ 19

        b.  Driving Force in Bringing New Investors to the Marketplace: the "Gamification" of Trading .................................................................. 21

        c.  "Payment for Order Flow" and Robinhood's Role in Driving the Market Volatility it was Unprepared to Address .................................... 23

        d.  Rapid Growth Leads to Systemic Failures: History of Compliance Issues .......... 24

    II.   **Industry Standards** ..................................................................................... 26

        a.  Managing Market Risk: Collateral Deposit and Capital Requirements ................ 26

        b.  Governing Broker FINRA Rules and Regulations ................................. 30

        c.  Circuit Breakers: Procedures for Brokers to Operate During Times of Extreme Market Volatility .................................................................. 31

    III.  **The January 2021 "Short Squeeze"** ......................................................... 32

        a.  Price Volatility Ahead of January 28, 2021 Was Well-Known to Defendants ..... 32

IV.    Robinhood was on Notice of the Risk  Associated with the Volatility..........................34

    a.   The $3 Billion Capital Call ................................................39

    b.   Defendants' Unprecedented, One-Sided Trading Restrictions ............................45

      i.   Robinhood..........................................................45

      ii.  Apex ...............................................................50

    c.   The January 28, 2021 Trading Restrictions Catch the Attention of Regulators ....54

    d.   Trading Restrictions Continue After January 28, 2021 .......................55

V.    Government Investigations into the January 2021 Short Squeeze............................57

CLASS ACTION ALLEGATIONS ..........................................................59

    I.    Nationwide Investor Class ...........................................................59

    II.   Broker Classes ......................................................................59

      A.    Robinhood Class ...............................................................59

      B.    Apex Class .....................................................................60

CAUSES OF ACTION .....................................................................63

    COUNT I – Negligence (against Robinhood) ........................................63

    COUNT II – Gross Negligence  (against Robinhood) ...........................64

    COUNT III – Negligence Per Se (against Robinhood)  .......................66

    COUNT IV – Breach of Fiduciary Duty (against Robinhood Securities and Robinhood Financial) .............................................................67

    COUNT V – Negligence (against Apex) ............................................69

PRAYER FOR RELIEF...................................................................69

DEMAND FOR JURY TRIAL..............................................................70

Plaintiffs Andrea Juncadella, Cody Hill, Edward Goodan, Jaime Rodriguez, Jonathan Cornwell, Joseph Daniluk, Mark Sanders, Patryk Krasowski, William Makeham, Sammy Gonzalez, Julie Moody, Erik Chavez, and Peter Jang (collectively, "Plaintiffs"), on behalf of themselves and all other similarly-situated customers and investors (the "Class"), bring this Consolidated Class Action Complaint against Defendants, Robinhood Markets, Inc., Robinhood Financial LLC, Robinhood Securities, LLC (collectively, "Robinhood"), and Apex Clearing Corporation ("Apex"), for negligence and breach of fiduciary duty, demanding a trial by jury.

## INTRODUCTION

1.      Through Robinhood Market, Inc.'s Registration Statement for its upcoming Initial Public Offering ("IPO"), Robinhood continues to emphasize equal access to financial markets and claims, "Our founders deeply believe that everyone should have *access* to the financial system." *See* Robinhood Markets, Inc., Form S-1 ("Robinhood S-1"), at 8 (July 1, 2021), as amended July 19, 2021 (emphasis added). This case is about the extreme divergence between that professed belief and how Robinhood actually runs its business.

2.      On January 28, 2021, Robinhood and others took unprecedented action to render the financial system *inaccessible* to millions of customers and investors by deleting, at the push of a button, billions of dollars' worth of demand for certain "hot stocks"—wiping away over 10 billion dollars ($10,000,000,000) in "hot stock" market caps.

3.      Leading up to January 28, 2021, Plaintiffs and the Class were aggressively recruited—through marketing and addictive user interfaces—to Robinhood's platform for trading popular "hot stocks," including the following symbols: GameStop Corporation (symbol: GME), BlackBerry Ltd. (symbol: BB), Nokia (symbol: NOK), AMC Entertainment Holdings, Inc. (symbol: AMC), AMC Networks, Inc. (symbol: AMCX), American Airlines Group, Inc. (symbol:

1

AAL), Bed Bath & Beyond, Inc. (symbol: BBBY), Castor Maritime Inc. (symbol: CTRM), Express, Inc. (symbol: EXPR), Koss Corporation (symbol: KOSS), Naked Brand Group Ltd. (symbol: NAKD), Sundial Growers, Inc. (symbol: SNDL), Tootsie Roll Industries, Inc. (symbol: TR), and Trivago NV (symbol: TRVG) (collectively, the "Suspended Stocks").

4.      Robinhood's business model was designed to attract a demographic most likely to trade in "hot stocks" and boost order flow in "hot stocks," which Robinhood knew were extremely volatile. Robinhood, in fact, monetized the order flows for such stocks, but as a true amateur among institutional brokers, failed to protect itself, the financial markets, and its customers from the systemic risks that came with fueling volatile trading. As described herein, Robinhood did not have appropriate cash reserves to meet the well-defined margin requirements to support the market activity that it was facilitating.

5.      While Robinhood built its business to attract inexperienced, first-time traders, who focused on these "hot stocks," it failed to sufficiently capitalize its business according to the rules designed to protect the market and traders from at-risk brokers that maintain high concentrations of volatile stocks.

6.      Reporting on an interview of a former trading executive at TD Ameritrade, the *New York Times* wrote, "[Robinhood] w[as] trying to change the rules of the road without understanding how the road was paved and without any respect for the existing guard rails . . . [Robinhood] ended up creating risk for their customers and systemic risk for the market more broadly."[1]

7.      Although Robinhood is a startup of recent vintage, the nascent company has already paid all-time record-breaking penalties, including the ***largest financial penalty ever***

---

[1] Nathaniel Popper, Matt Phillips, Kate Kelly, and Tara Siegel Bernard, The Silicon Valley Start-Up that Caused Wall Street Chaos, NY. Times (Jan. 30, 2021), https://www.nytimes.com/2021/01/30/business/robinhood-wall-street-gamestop.html.

ordered by FINRA for "systemic supervisory failures and significant harm suffered by millions of customers."[2] Robinhood has paid approximately **$135 million** to the U.S. Securities and Exchange Commission ("SEC") and Financial Industry Regulatory Authority ("FINRA") to settle allegations that it misled customers about its use of payment for order flow, outages on its app, and its failure to seek the best reasonably available terms to execute customer orders.

8.      Despite its short existence, Robinhood's history is replete with serious and profound regulatory failures. Robinhood's pattern of indifference to known risks left it woefully unprepared to address the events of January 2021.

9.      Beginning on January 28, 2021, Robinhood, without seeking or receiving approval from the SEC, FINRA, nor any market regulator, removed one or more of the widely-traded Suspended Stocks from its trading platform, prohibited investors from purchasing shares of, or call options on, the Suspended Stocks, and/or unilaterally sold the Suspended Stocks at rock-bottom prices from customer accounts. On January 29, 2021, Robinhood began to allow only extremely limited purchases of shares of, or call options on, the Suspended Stocks, and did not remove all restrictions until February 4, 2021. The period between January 27, 2021 and February 23, 2021, is referred to herein as the "Class Period."

10.     Likewise, Apex Clearing Corporation, a broker-dealer registered with the SEC and a member of FINRA, that provides clearing broker services to introducing broker-dealers, including, but not limited to, Ally Financial, Dough, M1 Finance, Public.com, Sofi, Stash, Tastyworks, and Webull (collectively, the "Apex Introducing Broker-Dealers"), took the unprecedented step of unilaterally and abruptly instructing its clients, including Apex Introducing

---

[2] *See* "[Robinhood] Ordered to Pay Approximately $70 Million for Systemic Supervisory Failures and Significant Harm Suffered by Millions of Customers," *available at* https://www.finra.org/media-center/newsreleases/2021/finra-orders-record-financial-penalties-against-robinhood-financial.

Broker-Dealers, to block purchases of AMC, GME, and KOSS, on January 28, 2021, based on a possible future collateral requirement that Apex ████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████.

11.     Contrary to governing industry rules and regulations aimed at addressing market volatility, their fiduciary duties of care and loyalty as broker-dealers, and customer expectations, Defendants failed to adequately mitigate risk and knew or should have known that their abruptly implemented, one-way trading restrictions would harm their customers and investors.

12.     By imposing restrictions on only one side of the transaction—the buy side—and depriving Plaintiffs and other members of the Class of the ability to purchase the Suspended Stocks, the majority of which were traded on its platform, while allowing selling to continue, Robinhood artificially depressed prices of the Suspended Stocks.

13.     Robinhood's internal documents reveal ████████████████████████



14.     As Robinhood's own Co-Founder, Vladimir Tenev ("Tenev"), admits, Robinhood could not pay its clearinghouse-mandated deposit requirements when the call came in the morning of January 28, 2021. *See* Tenev Testimony, Robinhood Markets, to U.S. House Financial Services Committee, at 9 (Feb. 18, 2021). Even after the National Securities Clearing Corp. ("NSCC") exercised its discretion in reducing the call to protect the system from Robinhood Securities'

default, and Robinhood met its revised deposit requirements a little after 9:00 a.m. EST, Robinhood held fast to its decision to pull the plug on purchases when the market opened.

15.     Robinhood halted buying the morning of January 28, 2021, knowing that it was ███████████████████ for moving the Suspended Stocks to position closing only ("PCO"),[3] and also knowing that it ████████████████████████████████████████.

16.     In an internal Robinhood chat, ███████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████



17.     As a result, Plaintiffs and other members of the Class were forced to sell at artificially suppressed prices or watch as the value of their holdings fell precipitously.

18.     Plaintiffs assert claims for negligence and breach of fiduciary duty on behalf of themselves and all similarly situated investors.

---

[3] Moving a security to what Robinhood terms "PCO," means that buying is restricted. Even according to Robinhood's website, PCO occurs in very narrow circumstances: (1) when a company's stock is delisted; (2) during mergers and acquisitions, when a symbol may no longer be trading on the exchange or is planned to be delisted; (3) in response to an Executive Order; and (4) for unsupported security types, such as certain closed end funds, limited partnerships and other non-standard listed securities, and when a company merges with a foreign company not listed in the U.S. *See* Robinhood webpage, "When and why we restrict trading," by Jim Swartwout (March 23, 2021), *available at* https://robinhood.engineering/when-and-why-we-restrict-trading-a4df54e0c839. Robinhood's decision to move the same Suspended Stocks its customers held in high positions, including AMC and GME, to PCO because of "extreme volatility" does not fit in any of these defined events and had never been done by Robinhood in response to volatility.

## JURISDICTION AND VENUE

19.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §

1332(d)(2) because this is a class action subject to the Class Action Fairness Act ("CAFA"), Pub.L.

No. 109-2, 119 Stat. 4 (codified in various sections of 28 U.S.C.), with aggregate claims of all

members of the proposed class and subclass(es) in excess of $5 million, exclusive of interest and

costs, and there are more than 100 putative Class Members. Many members of the proposed Class

are citizens of a state different from Defendants. This Court also has supplemental jurisdiction

over state law claims pursuant to 28 U.S.C. § 1367 because they form part of the same case or

controversy as the claims within the Court's original jurisdiction.

20.     This Court is the proper venue for this action because the Judicial Panel for

Multidistrict Litigation determined that the actions that are before this Court should be centralized

in this Court pursuant to 28 U.S.C. § 1407.

21.     Jurisdiction and venue are proper in this District pursuant to 28 U.S.C. § 1391

because one or more of the Defendants reside in this District or are licensed to do business in this

District. Each Defendant has transacted business, maintained substantial contacts, or committed

tortious acts in this District, causing injury to persons residing in, located in, or doing business

throughout the United States, including in this District.

22.     This Court has personal jurisdiction over each Defendant because, each Defendant:

(a) transacted business throughout the United States, including in this District; (b) transacted in

substantial amounts of the Suspended Stocks throughout the United States, including in this

District; (c) had substantial contacts with the United States, including this District; and/or (d)

engaged in actions that had a direct, foreseeable, and intended effect of causing injury to the

business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

23.     This Court has personal jurisdiction over Defendants under Florida's long-arm statute, through Defendants' operation of businesses in this District. Defendants operate, conduct, engage in, and carry-on business or business ventures in this state or have an office or agency in this state; have caused injury to persons or property within this state arising out of an act or omission by the Defendants outside this state, while the Defendants were engaged in solicitation or service activities within this state. Defendants regularly do or solicit business, or engage in other persistent courses of conduct, or derive substantial revenue from goods used or consumed or services rendered in this state. The activities of Defendants within the state are substantial and not isolated. In addition, this action arises, in part, out of a decision to halt buying that was effectuated in Florida by Robinhood Securities, LLC, a company headquartered in Florida.

<b><u>PARTIES</u></b>

I.     <u>Plaintiffs</u>

    a.     <u>Robinhood Plaintiffs</u>

        i.  **Plaintiff Andrea Juncadella**

24.     Plaintiff Andrea Juncadella is a resident of the State of Florida.

25.     Plaintiff Juncadella is an investor who used Robinhood as her broker-dealer and owned or held shares in the Suspended Stocks during the Class Period.

26.     As of end of the day on January 27, 2021, Plaintiff Juncadella held 400 shares of AMC stock and 5 shares of GME stock.

27.     On February 9, 2021, Plaintiff Juncadella sold all of her shares in GME and AMC for less than what she would have sold for but for Robinhood's negligence and breach of fiduciary

7

duty alleged herein.

### ii.  Plaintiff Edward Goodan

26.     Plaintiff Edward Goodan is a resident of the State of Florida.

27.     Plaintiff Goodan is an investor who used Robinhood as his broker-dealer during the Class Period.

28.     As of end of the day on January 27, 2021, Plaintiff Goodan held 168.6 shares of AMC stock.

29.     On February 1, 2021, Plaintiff Goodan, sold all of his 168.60 shares in AMC for less than he would have sold for but for Robinhood's negligence and breach of fiduciary duty alleged herein.

30.     As of end of the day on January 27, 2021, Plaintiff Goodan held 11 call options on AMC stock, representing options 1,100 shares of AMC stock.

31.     On January 28, 2021, Plaintiff Goodan, sold all of these call options on AMC stock for less than he would have sold for but for Robinhood's negligence and breach of fiduciary duty alleged herein.

28.     On January 29, 2021, once Robinhood permitted limited buying of options, Plaintiff Goodan purchased 41 call options on AMC stock representing options on 4,100 shares of AMC stock.

32.     On February 1, 2021, after Robinhood reintroduced restrictions on buying, sold Plaintiff Goodan sold all 41 of his call options on AMC stock for less than he would have sold for but for Robinhood's negligence and breach of fiduciary duty alleged herein.

### iii.  William Makeham

33.     Plaintiff William Makeham is a resident of the State of Florida.

34.    Plaintiff Makeham is an investor who used Robinhood as his broker-dealer during the Class Period.

35.    As of end of the day on January 27, 2021, Plaintiff Makeham held 6 call options on AMC stock, representing options on 600 shares of AMC stock.

36.    On January 29, 2021, once Robinhood permitted limited buying of options, Plaintiff Makeham purchased 44 call options on AMC stock and 9 call options on AMC stock, representing options on 4,400 shares of AMC stock.

29.    On February 2, 2021, after Robinhood reintroduced restrictions on buying AMC stock, Plaintiff Makeham sold all 45 of his call options on AMC stock for less than he would have sold at but for Robinhood's negligence and breach of fiduciary duty alleged herein.

### iv.   Mark Sanders

37.    Plaintiff Mark Sanders is a resident of the State of Missouri.

38.    Plaintiff Sanders is an investor who used Robinhood as his broker-dealer during the Class Period.

39.    As of end of the day on January 27, 2021, Plaintiff Sanders held 761 shares of AMC stock.

40.    On February 2, 2021, Plaintiff Sanders sold 621 shares of AMC stock for less than he would have sold for but for Robinhood's negligence and breach of fiduciary duty alleged herein.

### v.   Jaime Rodriguez

41.    Plaintiff Jaime Rodriguez is resident of the State of Michigan.

42.    Plaintiff Rodriguez is an investor who used Robinhood as his broker-dealer during the Class Period.

43.    As of the end of the day on January 27, 2021, Plaintiff Rodriguez held 20.25 shares

of GME stock.

44.     On January 28, 2021, Plaintiff Rodriguez sold all 20.25 shares of GME stock for less than he would have sold for but for Robinhood's negligence and breach of fiduciary duty alleged herein.

### vi.   Patryk Krasowski

45.     Plaintiff Patryk Krasowski is a resident of the State of Illinois.

46.     Plaintiff Krasowski is an investor who used Robinhood as his broker-dealer during the Class Period.

47.     As of the end of the day on January 27, 2021, Plaintiff Krasowski held 9 call options on GME stock, representing options on 900 shares of GME stock.

30.     On January 28, 2021, Plaintiff Krasowski sold all 9 of his call options on GME stock for less than he would have sold for but for Robinhood's negligence and breach of fiduciary duty alleged herein.

48.     Plaintiff Krasowski also owned 6 call options to purchase GME stock. Just before Robinhood restricted purchases of GME stock, this position could have been exercised and proceeds realized in the amount of approximately $400,000.00.

49.     Plaintiff Krasowski attempted to exercise these calls, which would have resulted in realized gains of approximately $400,000.00, but was blocked from exercising them by Robinhood. Plaintiff Krasowki's position with respect to these is now worth approximately $200,000.00.

### vii.   Plaintiff Cody Hill

50.     Plaintiff Cody Hill is a resident of the State of Texas.

51.     Plaintiff Hill is an investor who used Robinhood as his broker-dealer during the

Class Period.

52.    As of the end of the day on January 27, 2021, Plaintiff Hill held 538 shares of AMC stock, 59 shares of BB stock, and 160 shares of NOK stock.

53.    On January 28, 2021, Plaintiff Hill sold all 528 shares of AMC stock, 59 shares of BB stock, and 160 shares of NOK stock for less than he would have sold for but for Robinhood's negligence and breach of fiduciary duty alleged herein.

### viii.   Sammy Gonzalez

54.    Plaintiff Sammy Gonzalez is a resident of the State of Florida.

55.    Plaintiff Gonzalez is an investor who used Robinhood as his broker-dealer during the Class Period.

56.    As of the end of the day on January 27, 2021, Plaintiff Gonzalez held 11.6 shares of AMC stock.

57.    On February 9, 2021, Plaintiff Gonzalez sold all 11.6 shares of AMC stock for less than he would have sold for but for Robinhood's negligence and breach of fiduciary duty alleged herein.

### ix.   Joseph Daniluk

58.    Plaintiff Joseph Daniluk is a resident of the State of Illinois.

59.    Plaintiff Daniluk is an investor who used Robinhood as his broker-dealer during the Class Period.

60.    As of end of the day on January 27, 2021, Plaintiff Daniluk held 22 shares of GME stock.

31.    On January 28, 2021, Plaintiff Daniluk sold 10 shares of GME stock for less than he would have sold for but for Robinhood's negligence and breach of fiduciary duty alleged herein.

### x.   Jonathan Cornwell

61.     Plaintiff Jonathan Cornwell is a resident of the State of California.

62.     Plaintiff Cornwell is an investor who used Robinhood as his broker-dealer during the Class Period.

63.     As of the end of the day on January 27, 2021, Plaintiff Cornwell held 2.48 shares of GME stock, 14.44 shares of NOK stock, and 6.8 shares of AMC stock.

64.     On February 2, 2021, Plaintiff Cornwell sold all 2.48 shares of GME stock, 6.8 shares of AMC stock, and 14.44 shares of NOK stock for less than he would have sold for but for Robinhood's negligence and breach of fiduciary duty alleged herein.

### xi.   Plaintiff Julie Moody

65.     Plaintiff Julie Moody is a resident of the State of South Carolina.

66.     Plaintiff Moody is an investor who used Robinhood as her broker-dealer during the Class Period.

67.     On January 27, 2021, and prior to market opening on January 28, 2021, Plaintiff Moody submitted orders for NOK, NAKD, and AMC stock.

68.     Plaintiff Moody's last 58 shares of NAKD stock were confirmed by Robinhood at approximately at 7:18 a.m. EST on January 28, 2021.

69.     Two hours later, on January 28, 2021, at approximately 9:20 a.m. EST, Robinhood unilaterally cancelled Moody's market orders for NOK, NAKD, and AMC stock.

### b.   **Apex Plaintiffs**

### i.   Erik Chavez

70.     Plaintiff Erik Chavez is a resident of the State of Arizona.

71.     Plaintiff Chavez is an investor who used Webull Financial LLC as his introducing

broker-dealer and Apex as his clearing broker. The trading account was carried by Apex Corporation.

72.     As of the end of the day on January 27, 2021, Plaintiff Chavez held 607 shares of AMC stock.

73.     On February 2, 2021, Plaintiff Chavez sold all of his shares of AMC stock for less than he would have sold for but for the negligence alleged herein.

### ii.     Peter Jang

74.     Plaintiff Peter Jang is a resident of the State of Maryland.

75.     Plaintiff Jang is an investor who used Ally Invest Securities as his introducing broker-dealer and Apex as his clearing broker. The trading account was carried by Apex Clearing Corporation.

76.     As of the end of the day on January 27, 2021, Plaintiff Jang held 3,500 shares of GME stock in his account at Ally.

77.     On February 4, 2021, Plaintiff Jang, who had journaled his shares of GME to a different brokerage house, sold 401 shares of GME stock for less than he would have sold for but for the negligence alleged herein.

## II.   Defendants

### a.   Robinhood

78.     Defendant Robinhood Markets, Inc. ("Robinhood Markets" or the "Parent") is a Delaware corporation, with principal executive offices at 85 Willow Road, Menlo Park, CA 94025. Robinhood Markets is the corporate parent of Defendants Robinhood Financial, LLC and Robinhood Securities, LLC. *See* Figure 1, below (Robinhood S-1, at 12).



*Figure 1: Robinhood Organizational Structure*

79.     Robinhood Markets boasts a "Founder-Led, Passionate and Experienced Team," created in 2013, by Co-Founders, Chief Executive Officer ("CEO"), President, and Director, Tenev, and Chief Creative Officer, Baiju Bhatt ("Bhatt"), to "democratize finance." (Robinhood S-1, at 203). To "execute on this mission," Robinhood Markets created a "Management Team" that includes Chief Financial Officer ("CFO") Jason Warnick, former VP of Finance and Chief of Staff to the CFO at Amazon, Chief Marketing and Communications Officer Christina Smedley, former VP of Marketing at Facebook, Chief Operating Officer, Gretchen Howard, former Partner at CapitalG, Chief Legal Officer, Daniel Gallagher, former SEC Commissioner under President Obama, and Chief Product Officer, Aparna Chennapragada, former VP and General Manager at Google. (Robinhood S-1, at 12).

80.     Defendant Robinhood Financial LLC ("Robinhood Financial") is a Delaware limited liability company, with principal executive offices at 85 Willow Road, Menlo Park, CA 94025. Robinhood Financial is a registered introducing broker-dealer in securities under the Securities and Exchange Act of 1934 and a member of FINRA. Robinhood Financial introduces retail users to purchase and sell equities, options, and cryptocurrencies through the Robinhood

platform. Robinhood Financial has a clearing arrangement with its affiliate, Robinhood Securities, LLC. Robinhood Financial is a wholly-owned subsidiary of Robinhood Markets.

81.     Defendant Robinhood Securities, LLC ("Robinhood Securities") is a Delaware corporation with its principal place of business at 500 Colonial Center Parkway, Suite 100, Lake Mary, Florida 32746. Robinhood Securities is a registered clearing broker-dealer in securities and under the Securities and Exchange Act of 1934 and a member of FINRA and the NSCC, a clearing agency and subsidiary of the DTCC, which acts as a central depository for securities transactions through its clearing agencies. Robinhood Securities clears equities and option trades for the retail users through a clearing arrangement with Robinhood Financial. Robinhood Securities is a wholly-owned subsidiary of Robinhood Markets.

82.     Robinhood Securities' President and Chief Operating Officer ("COO"), James Swartwout ("Swartwout"), is licensed by FINRA.

83.     Robinhood Market's Co-Founder, CEO, President, and Director, Tenev, is not licensed by FINRA.

84.     Unless otherwise specified, Robinhood Markets, Robinhood Financial, and Robinhood Securities are collectively referred to herein as, "Robinhood."

85.     Robinhood Financial and Robinhood Securities are single member, passthrough limited liability companies, with all tax effects of income or loss included in the tax returns of their Parent, Robinhood Markets.

86.     According to Robinhood Financial's Annual Audited Report filed with the SEC, as sworn to under oath or affirmation by Daniel Kelati ("Kelati"),[4] as "Chief Financial Officer,"

---

[4] According to LinkedIn, Kelati is now Robinhood's FINRA-designated Finance and Operations Principal ("FinOp"), charged with ensuring regulatory compliance and protecting customers. In December 2018, Robinhood Markets hired Jason Warnick from Amazon to serve as CFO.

as of December 31, 2020, Robinhood Financial has a "revolving, committed and unsecured line for **$25.0 million** *with the Parent*." Annual Audited Report, at Note 6 (emphasis added).

87.     Robinhood Financial also has "an expense sharing agreement with the Parent," pursuant to which Robinhood Financial "reimburse[s] the Parent for payroll, technology, information services, occupancy, and other expenses. The Parent also pays certain direct expenses on [its] behalf and cash settles monthly with allocated expenses." *Id*. As of December 31, 2020, "the balance due to the Parent was $25.0 million," and "*the Parent contributed $20.0 million in capital to [Robinhood Financial]*" during 2020. *Id*. (emphasis added).

88.     According to Robinhood Securities' Annual Audited Report filed with the SEC, as sworn to under oath or affirmation by Kelati, as "CFO and Principal Financial Officer," as of December 31, 2020, Robinhood Securities has "six revolving and unsecured lines of credit *with the Parent* for a total of **$550.0 million**." *See* Annual Audited Report, at Note 9 (emphasis added).

89.     Robinhood Markets and its subsidiaries are treated as one entity for purposes of its IPO Registration Statement. *See* Robinhood S-1, at F-9 ("*The consolidated financial statements include the accounts of RHM and its wholly-owned subsidiaries. All intercompany balances and transactions have been eliminated*.") (emphasis added). Similarly, the S-1 describes Robinhood Markets and its subsidiaries as comprising a "*Vertically Integrated Platform*," that has enabled them "to rapidly introduce new products and services . . . , while also supporting our ability to *quickly scale*, including onboarding millions of new customers during 2020 and the first quarter of 2021." (*Id*. at 7.)

90.     As alleged herein, Robinhood Financial was an introducing broker-dealer for Robinhood Plaintiffs and Class members who traded the Suspended Stocks during the Class Period. Robinhood Securities was a clearing broker-dealer for Robinhood Plaintiffs and Class

members who traded the Suspended Stocks during the Class Period. Robinhood Markets took actions to limit its exposure at the expense of its customers, implementing a "PCO," or position closing only policy, through its subsidiaries, that disallowed Robinhood Plaintiffs and Class members from buying the Suspended Stocks during the Class Period.

### b. **Apex**

91.      Defendant Apex Clearing Corporation ("Apex") is a New York corporation with a principal place of business at One Dallas Center, 350 N. St. Paul, Suite 1300, Dallas, Texas.

92.      Apex is a broker-dealer registered with the SEC and FINRA.

93.      Apex provides clearing broker services to correspondent introducing broker-dealers and customers introduced to Apex by those introducing broker-dealers. These customers are shared as between Apex and Apex Introducing Broker-Dealers ("Shared Customers"). Apex also serves as a broker-dealer to customers not introduced to them through an introducing broker.

94.      Apex Introducing Broker-Dealers, who have less operational capability and regulatory capital, and lack direct access to trading platforms and clearinghouses, rely on Apex to access those capabilities and services.

95.      Apex, in performing its clearing and settlement functions as a clearing broker, is a member of the NSCC.

96.      Apex was a clearing broker-dealer for Apex Introducing Broker-Dealers and their Shared Customers during the Class Period.

97.      In January 2021, Apex was a clearing broker-dealer for Shared Customers, including Apex Plaintiffs and Class members, who traded in the Suspended Stocks on the Apex Introducing Broker-Dealers' platforms during the Class Period. Apex's Introducing Broker-Dealers during the Class Period include, but are not limited to, Ally Invest, Dough LLC, M1

Finance, Public.com, Stash, and Webull Financial LLC.

98.     On January 28, 2021, Apex directed that all of its customers, including its Shared Customers, suspend purchasing of AMC, GME, and KOSS.

### FACTUAL ALLEGATIONS

99.     Defendants operate and clear for online trading platforms that intentionally blocked Plaintiffs and members of the Class from purchasing Suspended Stocks, or call options on such stocks, but allowed selling to continue.

100.    Robinhood designed its platform to drive up trading volume by offering customers zero-commission trading (facilitated by "payment for order flow," as explained below),[5] and "an *intuitive* customer interface that has changed the landscape of retail investing." (Robinhood S-1, at 168) (emphasis added).

101.    Robinhood's gamification, behavioral prompts, predictive analytics, and differential marketing, masterminded by executives Robinhood recruited from the ranks of Amazon, Google, and Facebook, target inexperienced investors, and encourage them to trade at high volumes to drive up its revenue through payment for order flow. FINRA scrutinized some of these gamification tools, including the "confetti" for first-time trading, which Robinhood has since ceased. Robinhood acknowledges its responsibility to first-time investors, "We understand that millions of our customers are using Robinhood to enter the financial markets for the first time, and we take our responsibility to them seriously." (*Id.* at 173.)

102.    A research paper by the Swiss Finance Institute reported that despite holding only

---

[5] Some brokerages, like Robinhood, do not charge users a fee per transaction, but instead sell its users' orders and trade data to third parties known as "market makers." Robinhood's practice of selling its customers' order flow and trade data to third party-market makers is known as "payment for order flow." Market makers, such as Citadel Securities, make money by completing Robinhood's customer's trade at a higher price than it paid for the share. Robinhood derives a significant amount of its revenue from these payments.

about 0.2% of aggregate U.S. market share, Robinhood customers drove 10% of the variation in returns from stocks in the second quarter of 2020, because they, in the aggregate, buy and sell more than their institutional counterparts in response to price changes.

103.    As a result, Robinhood's revenue has increased over **200 times** since March 2020, representing **annual growth of 245%**, with a reported **18 million** funded accounts, and **$81 billion** in assets as of July 1, 2021. (*Id*. at 2, 32.)

104.    By driving trading volume up in "hot stocks" and contributing to the overall volatility of these securities without the tools needed to manage the known risks associated with concentrated positions in highly volatile issues, Robinhood's business model creates systemic risk for the market.[6]

105.    These risks, which remain unmitigated while Robinhood continues to operate an undercapitalized business without adequate risk controls ahead of an IPO, culminated in the "January 2021 Short Squeeze,"[7] defined herein, and resulted in the filing of over fifty (50) class action lawsuits by investors across the United States.

I.    **The Robinhood Business Model**

    a.    **History and Growth**

106.    Robinhood launched its retail brokerage business in 2015. By mid-2018, it was one of the largest retail broker-dealers in the United States.

107.    As its namesake suggests, Robinhood touts itself as a financial product that can "give everyone—not just the wealthy—access to financial markets." Robinhood's stated mission

---

[6] In its Registration Statement, Robinhood's discloses "Risk Factors," spanning more than 70 pages.

[7] An investor who takes a "short" position in a stock bets that the stock price will fall by *borrowing* the stock from a lender, selling it at a high price and, when the time comes to return the stock to the lender, buying the stock later at a lower price. The short trader pockets the difference between the high price at which it sold the borrowed stock and the low price at which the trader bought the replacement stock to return to the trader's original lender.

is "to democratize finance for all." (Robinhood S1, at 1.)

108.    To execute on this mission, Robinhood assembled an executive leadership team that includes a former VP of Finance and Chief of Staff to the Chief Financial Officer at Amazon, a former VP of Marketing at Facebook, and a former Vice President and General Manager at Google.

109.    Robinhood has quickly attracted customers, many of whom are relatively young and new to investing, including through offerings such as no-minimum, commission-free trading, and a user interface "designed to . . . appeal to a new generation of investors who are more comfortable trading on smartphones." *See* FINRA Acceptance, Waiver, and Consent, No. 202006971201, at 2 (June 30, 2021).

110.    According to Robinhood, close to 50% of all new retail funded accounts opened in the United States from 2016 to 2021 were new accounts created on Robinhood, with over 50% of Robinhood customers comprised of first-time investors. (Form S-1, at 2.)

111.    Through these and other initiatives, Robinhood has experienced dramatic customer growth since launching its online trading platforms in December 2014—from fewer than 500,000 customers in 2015, to **over 31 million** customers today.

112.    In October 2016, Robinhood reported one million users, and by April 2017 its active user base had doubled and was growing at a rate of 140,000 new accounts per month.

113.    When Robinhood transitioned to self-clearing (by forming Robinhood Securities), customer growth surged, as Robinhood boasted, "Clearing by Robinhood will allow us to help our customers more easily and efficiently."[8] As of October 2018, after becoming a self-clearing broker,

---

[8]    *See* Robinhood   website,   "What's   Clearing   by   Robinhood?,"   *available   at* https://robinhood.com/us/en/support/articles/whats-clearing-by-robinhood/. *See also* CNBC, "Robinhood's in-house clearing   system   could   be   reason   behind   trading   restrictions,"   (Jan.   29,   2021),   *available   at*

Robinhood's users had "executed more than $150 billion in transactions."

114.    In 2019, Robinhood raised $323 million in funding at a $7.6 billion valuation. In August 2020, after raising $200 million in Series G funding, Robinhood was valued at $11.2 billion.



115.    Since March 2020, Robinhood's revenue has increased over 200 times: for the years ended 2019 and 2020, Robinhood's revenue was $277.5 million and $958.8 million, respectively, **representing annual growth of 245%**. (Robinhood S-1, at 32).

**b.    Driving Force in Bringing New Investors to the Marketplace: the "Gamification" of Trading**

116.    Many retail investors, like Plaintiffs and certain members of the Class, are non-professional investors that execute their personal trades through firms or investment accounts.

117.    Robinhood made it easy for retail investors to invest, driving up volume.

118.    Credit Suisse estimated that at times in 2021, retail investors have accounted for a

---

https://www.cnbc.com/video/2021/01/29/robinhoods-in-house-clearing-system-could-be-reason-behind-trading-restrictions.html?&qsearchterm=robinhood%20trade%20clearing.

third of all U.S. stock market trading. As reported in the Financial Times, Retail Investors' market share of U.S. equity trading has steadily increased since 2019.

119.    One of the top executives at Robinhood—a financial institution—is its "Chief Creative Officer," an important position for a business that draws its users through a game-like experience. (Robinhood S1, at 2) (Co-Founder and Chief Creative Officer, Bhatt, signed Robinhood's Form S1 alongside Tenev). As Robinhood admits, "We put design at the center of our product…We involve our talented product designers early and often," resulting in a platform that is "familiar in look and feel for a generation of mobile-first customers." (*Id*. at 6).

120.    This "gamification" "involves tactics used to increase consumer engagement, time spent on an investment platform, and number of trades. This includes design elements and psychological tools intended to keep the attention of its users, including emoji-filled notifications, prizes, graphics, and animations."

121.    The gamification features, such as those seen on Robinhood's platform, encourages behavior similar to a gambling addiction, which further increases trading volume. Robinhood's "gamified" platform employs tools such as video trainings and design elements to encourage more rapid trading than a buy-and-hold approach, and to recommend particular strategies, such as option trading or use of margin. *See* "Gamification" Section of R. Cook's Statement before the Financial Services Committee to U.S. House of Representatives (May 6, 2021) (concerns about how these features may influence customer behavior has prompted FINRA to form a cross-departmental working group).

122.    These tactics have successfully hooked hundreds of thousands, if not millions, of new users. *See* CNBC, "Fintech app Robinhood is driving a retail trading renaissance during the stock market's wild ride," *available at* https://www.cnbc.com/2020/06/17/robinhood-drives-

retail-trading-renaissance-during-markets-wild-ride.html    ("Robinhood,    mostly    used    by

millennials to trade stocks and cryptocurrency, has grown from its 1 million subscribers in 2016

and 6 million accounts in October of 2018. More than half of Robinhood customers are opening

their first brokerage account, and the median customer age is 31 years old, according to the

company.").

### c.   "Payment for Order Flow" and Robinhood's Role in Driving the Market Volatility it was Unprepared to Address

123.    As customary with startup companies like Robinhood, they seek to "disrupt"

established industries using technological solutions. In this case, Robinhood sought to "disrupt"

the discount brokerage business by offering commission free trades. But as Milton Friedman once

said, "there is no free lunch."

124.    As the SEC explained in its December 17, 2020 Order, charging Robinhood

Financial with willfully misleading its customers about Robinhood's revenue sources and failing

to satisfy its duty of best execution (which means the broker must attempt to execute a customer's

trade in the way that is most advantageous to the customer):

> One of Robinhood's primary selling points was that it did not charge
> its customers trading commissions. In reality, however,
> "commission free" trading at Robinhood came with a catch:
> Robinhood's customers received inferior execution prices compared
> to what they would have received from Robinhood's competitors.
> For larger value orders, this price difference at Robinhood exceeded
> the commission its competitors would have charged. These inferior
> prices were caused in large part by the unusually high amounts
> Robinhood charged the principal trading firms for the opportunity
> to obtain Robinhood's customer order flow. These payments are
> generally referred to as "payment for order flow."

(SEC Order, ¶ 2) (Dec. 17, 2020).

125.    Robinhood Financial agreed to pay $65 million to settle the SEC charges.

126.    Robinhood's largest revenue source derives from market makers, such as Citadel

Securities, through a "payment for order flow" ("PFOF") relationship.

127.    The PFOF relationship provides market makers with an opportunity to profit from the large amount of trading data collected by Robinhood and provides Robinhood with the revenue necessary to provide zero-commission trading to its users.

128.    The practice of PFOF is controversial. While still allowed in the United States, PFOF has been outlawed in the United Kingdom and Canada.

129.    PFOF can "create conflicts of interest for brokers because of the tension between the broker's interests in maximizing payment for order flow or trading profits generated for itself from internalizing their customers' orders, and their fiduciary obligation to their customers to route their customers' orders to the best markets." *See* SEC Special Study, "Payment for Order Flow and Internalization in the Options Markets" (Dec. 2000).

130.    Robinhood disclosed that it collected payments of **$331 million** from market makers in the first quarter of 2021, an amount that was **more than triple** the $91 million Robinhood brought in from payment for order flow in the first quarter of 2020, according to its SEC Rule 606 filing.

d.    **Rapid Growth Leads to Systemic Failures: History of Compliance Issues**

131.    Less than one month ago, on June 30, 2021, FINRA announced that Robinhood Financial was ordered to pay a **record financial penalty of $70 million** for "systemic supervisory failures and significant harm suffered by millions of customers." According to FINRA, "the sanctions represent the largest financial penalty ever ordered by FINRA and reflect the scope and seriousness of the violations."

132.    The Acceptance, Waiver and Consent ("AWC") lists numerous areas of failures by Robinhood, including, "false and misleading statements" to customers, "failure to supervise

technology critical to providing customers with core broker-dealer services," and "failure to create a reasonably designed business continuity plan" designed to achieve mission critical services. FINRA further explained that Robinhood's failure to execute trades due to technology outages violated the firm's obligations to maintain its "mission critical" systems.

133.    Previously, based on a review of trades between October 2016 and November 2017, on December 19, 2019, Robinhood Financial entered into yet another a AWC, Waiver and Consent with FINRA (its primary regulator), which fined Robinhood Financial $1,250,000.00, and ordered it to retain an independent compliance consultant to conduct a comprehensive review of the policies, systems, procedures, and training of Robinhood Financial and its affiliated clearing firm, Robinhood Securities.

134.    As part of the 2019 AWC, FINRA alleged, and Robinhood Financial consented to, a finding that it failed to provide the best market for the subject securities to ensure its customers received the best execution quality from the electronic market makers it was routing orders to (including Robinhood Securities) as compared to other execution venues (such as the exchanges themselves). In addition, Robinhood Financial consented to findings that it did not systematically review certain order types, and it failed to establish and maintain a supervisory system, including written supervisory procedures, reasonably designed to achieve compliance with its best execution obligations under FINRA's rules. Furthermore, FINRA found that Robinhood's periodic reviews did not systematically consider the likelihood of execution of limit orders generally (whether marketable or nonmarketable), or fill rates overall, even though notable proportions of certain orders went unfilled.

135.    In 2020, Robinhood hired Chief Legal Officer Daniel Gallagher, former SEC Commissioner under the Obama administration and the highest paid Robinhood executive, with

compensation totaling over $30 million. (Robinhood S1, at 212).

136.    Yet, Robinhood continued to drive explosive growth and volume without the resources or procedures in place to reasonably ensure that it could continue to provide investors access to the securities markets during times of extreme market volatility.

## II.    **Industry Standards**

### a.    **Managing Market Risk: Collateral Deposit and Capital Requirements**

137.    To manage risk to the markets and utilize DTCC's Insurance Services, clearing broker-dealers such as Robinhood Securities and Apex Clearing become NSCC members. The DTCC keeps a record of the stocks owned through the clearing brokerage firms for NSCC members, including Robinhood Securities and Apex, and establishes financial requirements for clearing brokerage firm members, which include deposit requirements designed to reduce risk to the DTCC.

138.    NSCC is the central counterparty that clears cash transactions in the U.S. equities markets, netting securities deliveries and payments among NSCC's clearing members, and guaranteeing completion of trades even if one party to the transaction defaults.

139.    As President and Chief Executive Officer of the DTCC, FICC, and NSCC, Michael C. Bodson ("Bodson"), explained:

> The U.S. Markets are multi-layered, and customers generally execute trades through one or more brokers or broker-dealers. NSCC direct clearing members are responsible for completing their customers' trades at the NSCC. NSCC's rules outline clear financial and operation risk management obligations that apply to direct clearing members.

DTCC Testimony to U.S. House Financial Services Committee ("Bodson DTCC Testimony"), at 1 (May 6, 2021).

140.    Robinhood Securities was at all times fully aware of its obligations to maintain

requisite capital levels, satisfy cash deposit and collateral requirements with DTCC and NSCC, and the serious consequences of violating those obligations. As disclosed in its IPO Registration Statement:

> If we do not maintain the capital levels required by regulators and self-regulatory organizations ("SROs"), including the SEC and the Financial Industry Regulatory Authority ("FINRA"), or do not satisfy the cash deposit and collateral requirements imposed by certain other SROs such as the Depository Trust Company (the "DTC"), National Securities Clearing Corporation (the "NSCC") and the Options Clearing Corporation (the "OCC"), our broker-dealer business may be restricted and we may be fined or exposed to significant losses or subject to other disciplinary or corrective actions. In a worst-case scenario, failure to maintain these requirements could lead to our broker-dealer business being liquidated or wound down.

(Robinhood, S-1, at 10).

141.     To clear and settle customer transactions, each trading day by 10:00 am ET, clearing brokerage firms like Robinhood Securities and Apex have to meet the deposit requirements required by DTCC to support their customer trades between the trade date and the date the trades settle. On some days clearing brokerage firms may be able to withdraw money that they left on deposit, whereas on other days they may be required to deposit additional money, depending on that day's requirement. Clearing brokerage firms like Robinhood Securities and Apex also know that DTCC may assign a volatility multiplier on certain securities which the DTCC perceives as having more risk.

142.     Based on the orders its customers are placing, Robinhood Securities and Apex has the ability to (i) monitor its anticipated DTCC deposit requirements in real time (or near real time); and (ii) monitor its ability to meet anticipated or actual DTCC deposit requirements in real time (or near real time). Based on the relationship between the affiliated entities, Robinhood Financial would have access to the same information on anticipated DTCC requirements. At any given time

Robinhood Financial and Robinhood Securities would know how much collateral the DTCC may ask Robinhood Securities to post to cover the trades its customers have placed.

143.    NSCC's volatility-based margin requirements stipulate the capital charges that should be borne by firms based on various measures of the volatility of firms' stock positions. This analysis generally uses several metrics to measure volatility of the stock positions and applies a "Gap Risk" measure for firms that have high concentrations in volatile stocks and a "Portfolio Margin Floor" measure to ensure that the margin requirement does not drop below certain value-based measures. These margin requirements are intended to protect DTCC members and the market as a whole from the systemic risk that highly volatile stocks can produce, especially when a broker's position has significant risk concentration in such stocks.

144.    As explained by Bodson in his Congressional testimony, margin requirements protect NSCC and all market participants against clearing member defaults. NSCC collects clearing funds, or margin, at the start of each day and intraday in volatile markets. According to Bodson, the calculation and timing of these margin requirements are known to every member, including Robinhood Securities and Apex.

145.    It was reasonably foreseeable to Robinhood that its business model would cause the very scenario the volatility margin requirement was designed to mitigate, scenarios which the NSCC had anticipated could create systemic risks in the market.

146.    Robinhood knew or should have known of its anticipated DTCC deposit requirements given the trading activity in the Suspended Stocks during the week prior to January 28, 2021, and that failure to prepare for the anticipated DTCC deposit requirements would impair Robinhood's ability to perform its obligations as a trading platform to its large customer base, as required under SEC and FINRA rules and regulations.

147.     Pursuant to 17 C.F.R. § 240.15c3-1 (the "Net Capital Rule"), the SEC requires broker-dealers to "at all times have and maintain net capital" no less than the greatest of the minimum requirement applicable to its business. 17 CFR § 240.15c3-1(a). The Net Capital Rule is designed to require broker-dealers to maintain sufficient liquid assets to meet all obligations to customers.

148.     These DTCC, NSCC, and SEC rules provide a mechanism for early warning of problems regarding net capital.

149.     In failing to properly monitor their anticipated DTCC deposits and ensure that it had the ability to meet the anticipated DTCC deposit demand (with net capital or through available capital), Robinhood failed to act in accordance its duties as a broker-dealer.

150.     By virtue of their obligations under the law and industry rules and practice, brokers cannot simply unilaterally decline to accept a customer's order because it is inconvenient or unprofitable, or because a clearinghouse demands additional capital.

151.     While Robinhood built its business to attract retail traders who focused on the "hot stocks," it failed to capitalize to meet NSCC rules that were designed to address scenarios where a broker maintains high concentrations of highly volatile names.

152.     In other words, Robinhood's business model and revenue focus was designed to attract order flow in "hot stocks," which often are extremely volatile, and the NSCC created specific rules which stipulated the capital charges that should be borne by firms that have high concentrations in such names. Robinhood monetized the order flows for such names, but failure to design the appropriate processes and allocate the appropriate cash reserves to in fact meet the well-defined margin requirements for such names. These margin requirements were intended to protect DTCC members and the market as a whole from the systemic risk that highly volatile

stocks can produce when a broker's position has significant risk concentration in such stocks.

153.    Robinhood's negligence required NSCC/DTCC to provide exemptions for the firm to remain solvent.

154.    Despite being unprepared and under-capitalized, Robinhood did not properly respond to the lenience it was provided by the NSCC through such exemptions by capitalizing in a manner that should be expected of its business model. Instead, it chose to interfere with the market and its customers.

b.  **Governing Broker FINRA Rules and Regulations**

155.    "Broker-Dealers," including Defendants, are required to register as members of self-regulatory organizations ("SROs"), such as FINRA, the largest non-governmental securities regulator for broker-dealers in the United States, and to comply with all applicable state laws and regulatory requirements.

156.    FINRA rules are designed primarily to protect customers, investors, and efficient markets. FINRA Rule 2010 sets forth the guiding principle which every brokerage firm in the United States must follow and mandates, "in the conduct of its business, [brokerages] ***shall*** observe high standards of commercial honor and just and equitable principles of trade." (Emphasis added). FINRA reiterates in Regulatory Notice 21-12, "the foundation of the securities industry is fair dealing with customers. . . ***even during times of market stress***." (Emphasis added); *see also* FINRA By-Laws, Article XI (authorizing the Board to adopt rules or amendments to, among other things, "protect investors and the public interest, . . . promot[e] [] fair practices . . .").

157.    In assuring investor protection and the integrity of the firm's financial condition, FINRA obligates broker-dealers to establish, maintain, and enforce a supervisory system, which includes monitoring its technology and other risks, including credit and other systemic risks

(FINRA Rule 3110, Supervision), and **engage in continual risk management to ensure continuation of its trading and financial "mission critical systems**." (FINRA Rule 4370, Business Continuity Plans). NASD Notice to Members 99-92, "Broker-Dealer Risk Management Practices Joint Statement of the SEC, NASD and NYSE" (July 29, 1999) (emphasis added).

158.    As FINRA registered broker-dealers, Robinhood and Apex are supervised by FINRA and subject to its Rules.

159.    As broker-dealers, Robinhood Securities and Robinhood Financial owe Plaintiffs and the Class a duty of due care and loyalty, including, *inter alia*, handling customer orders promptly and in a manner best suited to serve the customer's interests, not arbitrarily shutting down the ability to purchase without advance notice, and refraining from putting their own interests ahead of their customers interests.

160.    Broker-dealers are further (and importantly here) obligated to implement and utilize daily (even hourly) risk assessment tools to manage potential operational and credit risks.

161.    Violations of FINRA rules by broker-dealers can be used as evidence of negligence. *See Brink v. Raymond James & Assocs., Inc.*, 892 F.3d 1142 (11th Cir. 2018).

### c.    Circuit Breakers: Procedures for Brokers to Operate During times of Extreme Market Volatility

162.    Broker-dealers are expected to ensure that they can continue to provide access to the securities markets during periods of extreme market volatility.

163.    In fact, FINRA reiterated this obligation in Regulatory Notice 21-12, which was issued on March 18, 2021, directly in response to the events giving rise to this action. FINRA was clear: "Member firms should maintain strong procedures, thoughtfully crafted in advance, to reasonably ensure that they can continue to provide investors access to the securities markets during times of extreme market volatility, as in the past several months." *See* Regulatory Notice

21-12, *available at* https://www.finra.org/rules-guidance/notices/21-12.

164.     There is an industry-recognized mechanism by which trading is halted during volatility: A circuit breaker is an emergency-use regulatory measure imposed by an exchange to temporarily halt trading on an exchange. Circuit breakers are in place to try to curb in panic-selling. They can also be triggered on the way up with manic-buying.

165.     However, when an exchange employs a "circuit breaker," it is done for a limited time period, typically lasting mere minutes—not *days*, which is a figurative lifetime in the multi-trillion-dollar public markets.

166.     Moreover, there exists no mechanism by which an exchange imposes a circuit breaker that restricts only one side of the trading such that sales are permitted, but purchases are not. Either all trading is or is not halted by an exchange. Exchanges do not employ "circuit breakers" to allow only one-sided trading.

167.     Here, the New York Stock Exchange did impose very limited trading halts regarding some of the Suspended Stocks on January 28, 2021.

168.     Nowhere do the securities laws or rules contemplate that any broker-dealer will ever employ a self-declared circuit breaker and unilaterally halt trading for an indefinite time period in any security without direction from an exchange. This is part of what makes Defendants' actions commencing on January 28, 2021, extraordinary, unprecedented, and grossly negligent.

III.    **The January 2021 "Short Squeeze"**

      a.    **Price Volatility Ahead of January 28, 2021 Was Well-Known to Defendants**

169.     Leading up to January 28, 2021, the Suspended Stocks became increasingly popular as, among other things, investors engaged in online discussions regarding the undervaluation of the Suspended Stocks and began purchasing shares.

170.    Some institutional investors also increased demand for the Suspended Stocks, including Scion Asset Management, LLC, which spent approximately $15 million purchasing GME, and Ryan Cohen, founder of Chewy.com, who invested $76 million in GME. During this time, hedge funds and market makers were shorting the Suspended Stocks, and Defendants continued to allow their customers to place orders without restriction.

171.    Plaintiffs and similarly-situated investors continued to go long on GameStop and other Suspended Stocks. Given the operation of a free and open market, the prices of GameStop and other Suspended Stocks were bid up and prices increased. GameStop, for example, increased 78.46% from $43.03 per share on January 21, 2021, to $76.79 per share on January 25, 2021. This exposed short sellers in those stocks to substantial losses.

172.    Despite certain investors' short selling, which tends to drive the prices down, the market volatility brought on by increased demand for the Suspended Stocks by Plaintiffs and similarly-situated investors, encouraged and facilitated by Robinhood Financial, through its gamified app and platform, drove the market prices up, exposing short sellers to massive losses on their short positions.

173.    Increasing prices forced holders of short positions to either close-out their short positions by purchasing shares or post additional capital to ensure that they had enough money to re-purchase and return the shorted stocks. For example, Citadel and Point72 Asset Management infused around $3 billion into hedge fund Melvin Capital Management LP[9] on January 25, 2021, bailing Melvin Capital out from the effects of its failed short position.

174.    As holders of short positions re-purchased the shorted stocks, prices continued to

---

[9] Notably, Melvin Capital's founder and CEO, Gabe Plotkin, began his career at Citadel before becoming a top portfolio manager at Point72's predecessor firm, SAC Capital Advisors, a hedge fund once run by billionaire Steven Cohen, which was disbanded in 2014, after pleading guilty to federal insider trading charges and paying $1.8 billion, the largest insider trading fine in history at the time.

up, putting pressure on short sellers to purchase the Suspended Stocks at the current (and rising) prices in order to cover their losses and forestall potentially greater losses. This "pressure" is what is referred to as a "short squeeze."

175.    In a "short squeeze," individual investors like Plaintiffs and the Class stand to benefit (absent one-sided market restrictions) as the value of the stocks they purchased increases. Short sellers, on the other hand, risk further losses in the billions of dollars, as stock prices rise as a natural consequence of market forces.

**IV.    Robinhood was on Notice of the Risk Associated with the Volatility**

176.    Substantial trading activity in the stock and options contracts among the Suspended Stocks continued on January 27, 2021. On that day, the price of the Suspended Stocks increased as trading volumes in U.S. cash equities and options hit 24.5 billion shares traded and 57.1 million contracts traded. GME's stock peaked at $380.00, before reaching a closing high of $347.51, a 134.84% increase from the previous day. Other Suspended Stocks experienced similar increases, including AMC, whose share price increased by 300%, while EXPR's rose over 200%.

177.    Robinhood was well aware, ████████████████████████████, that the rally in GME (as well as other Suspended Stocks) required Robinhood to monitor its risk.

178.    On Saturday, January 23, 2021, Robinhood circulated an internal communication,

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████

179.    At 8:46 a.m. on the morning of January 23, 2021, several Robinhood executives

joined an internal group chat to discuss GME, ███████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████



180.   That same day, one person at Robinhood warned ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

181.   ████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████

182.   Instead, Robinhood's team was in disarray and acted haphazardly.

183.   On January 25, 2021, Robinhood had an internal chat under the rubric ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

██████████████████████████

████████████████████████████████████

██████████████████████████

184.





186.    Not only was Robinhood very much aware of the increasing volatility in the market, ████████████████████████████████, while the platform was spiraling downward, thereby impeding Robinhood's ability to provide reliable operations, and exacerbating instability in Robinhood Securities' interactions with the OCC, DTCC/NSCC, and trading partners.

187.    At 9:11 p.m. PST, Robinhood's Senior Engineering Manager wrote, ████████



188.    Robinhood knew at the highest levels of the company that its risk management

system was strained to the breaking point ████████████████████ with regard to the

Suspended Stocks. Robinhood failed to take the necessary precautions to ensure that its customers

and the market that Robinhood would continue making its platform available for trading.

189.    On January 28, 2021, at 8:13 a.m. EST, in another Robinhood chat, Robinhood's

User Experience Content Designer, acknowledged, ██████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████

190.    When Robinhood undertook the extraordinary measure of suspending the

purchases of stocks that were in great demand, Robinhood did so without a plan designed to

correlate its reduction of risk to its extraordinary action.

   a.   **The $3 Billion Capital Call**

191.    ████████████████████████████████

██████████████████████████████████████

████████████ .

192.    Reflecting the volatility in the marketplace, ██████████████████

██████████████████████████████████████

██████████████████████████████ .

193.    ████████████████████████████████

██████████████████████████████████████

████████████

194.    ████████████████████████████████

██████████████████████████████████████



██████████.

195.   ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████

196.   ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

197.   █████████████████████████████ Robinhood sent an internal email stating

████████████████████████████████████████

███████████████████████████████

198.   At approximately 5:11 a.m. EST, on January 28, 2021, Robinhood received a notice from the NSCC that Robinhood Securities had a deposit deficit of approximately **$3 billion**. *See* Tenev Testimony, Robinhood Markets, to U.S. House Financial Services Committee, at 9 (Feb. 18, 2021). *Compare* ██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████

199.   As was standard practice, each one of the DTCC emails informed Robinhood that detailed information regarding its requirement was available by navigating to the NSCC risk management reporting portion of the relevant portal. Additionally, DTCC's email informed

40

Robinhood that detailed information regarding their deposit was also available on the website.

200.   Demonstrating how woefully unprepared Robinhood was to address its collateral deficit, ███████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

201.   By approximately 7:40 am EST, on January 28, 2021, Robinhood ████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████



202.   Instead, Robinhood blocked buying of additional stocks and did not inform FINRA of that decision.

203.    According to former Citadel Securities Senior VP, ███████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████

204.    Robinhood's internal communications demonstrate that as of the morning of January 28, 2021, Robinhood had ███████████████████████████

███████████████████

205.    Robinhood knew in the early hours of January 28, 2021, that many of its customers were looking to trade in their Robinhood accounts. ███████████████████

███████████████████████████████████████████

206.    ███████████████████████████████████████████████

███████████████████████████████████

207.    Shortly after 9:00 a.m. EST, *within hours of its initial margin request*, NSCC informed Robinhood Securities that excess capital premium charge had been waived entirely for that day and the net deposit requirement decreased *by almost half* to **$1.4 billion**. The NSCC changed this margin requirement despite no change in the underlying factors that go into a calculation of the risk of the Suspended Stocks.

208.    This drastic reduction apparently was still insufficient, as Robinhood was so woefully undercapitalized that ███████████████████████████████████

███████████████████████████████



---

[11] Four months later, Gott left Citadel Securities.

209. ████████████████████████████████

████████████████████████████████████████

████████████

210. ████████████████████████████████

████████████████████████████████ One would have properly imagined

that Robinhood would have asked for such a call in advance.

211. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████



212. ████████████████████████████████

████████████████████████████████████████

213.   Robinhood had sufficient resources to obtain additional capital in the event of an

emergency, as evidenced by its ability to round up **$3.4 billion** in just **two days** to meet its regulatory requirement.

214.     Yet, and despite initially citing "market volatility" as the reason for restrictions in a January 28, 2021 blog post, Tenev's prepared statement to Congress on February 18, 2021, disclosed that the Robinhood Securities' operations team made the decision to impose trading restrictions on the Suspended Stocks on January 28, 2021, between 6:30 a.m. and 7:30 am EST due to increased clearinghouse-mandated deposit requirements. Tenev revealed that Robinhood met its revised deposit requirements a little after 9:00 a.m. EST on January 28, 2021. Nevertheless, Robinhood held fast to its decision to restrict purchases of the Suspended Stocks when the market opened, continued to impose restrictions for the entirety of trading day, and placed limitation on the number of stocks and option contracts its users could acquire through February 4, 2021.

215.     When asked by the House Financial Services Subcommittee if Robinhood had negotiated with counterparts to restrict trading in the Suspended Stocks, Tenev stated that trading restrictions were put in place to meet regulatory deposit requirements imposed by DTCC affiliate NSCC.

216.     DTCC and NSCC President, Bodson, testified before the House Financial Services Subcommittee on May 6, 2021, that the decision to restrict trading was internal to Robinhood and it did not instruct Robinhood to impose trading restrictions in response to the market volatility in late January 2021. As Bodson explained,

> NSCC's role in the market is a neutral one. It does not impose trading restrictions upon its clearing members or their customers, and ***[NSCC] did <u>not</u> instruct any clearing member to impose restrictions during the market volatility events of late January***. NSCC expects all clearing members to employ effective tools to monitor and manage their risk, and to maintain an appropriate level of capital to support any expansion of or change in their business activities. Clearing fund requirements are rules-based and subject to

limited discretion. NSCC exercises this discretion carefully, often in unique circumstances. In such cases, NSCC's sole objective is to balance the need to protect the system from a potential clearing member default against the damage and other risks that could result if NSCC were to cease-to-act and liquidate a clearing member's portfolio.

(Bodson Testimony, at 5–6) (emphasis added).

b. **Defendants' Unprecedented, One-Sided Trading Restrictions**

217.   Beginning on January 28, 2021, Defendants placed unprecedented trading restrictions on the Suspended Stocks.

218.   At 5:00 p.m. EST, on January 27, 2021, the SEC released a statement that it was "aware of and actively monitoring the on-going market volatility in the options and equities markets," but neither the SEC nor any other government agency issued any directive to restrict trading in the Suspended Stocks.

i. *Robinhood*

219.   On January 28, 2021, at 9:58 a.m. EST, Defendant Robinhood circulated an email to its users with the subject line "An important update on your expiring options," informing them that in light of unprecedented volatility surrounding GME and AMC, and in an effort to help reduce risk, all GME and AMC options with expirations of January 29th, 2021, will be set to *closing transactions only*." (Emphasis added).

220.   Robinhood's email was silent as to any restrictions placed on trading shares of GME, AMC, or other securities, but as the markets opened on January 28, 2021, the Robinhood Plaintiffs and a Class of similarly-situated investors woke up to find that Robinhood had suddenly and without notice halted their ability to purchase the Suspended Stocks.

221.   On January 28, 2021, investors that used Robinhood as their brokerage could no longer purchase the Suspended Stocks. The "buy" button was deactivated as a feature, leaving

45

users with no option but to hold or sell their securities.

222.     Robinhood addressed the "Why don't I see a buy button?" question on its website, offering three reasons for the buy button being unavailable on a user's account: (a) "It's a foreign stock, which we don't support;" (b) "It's an over-the-counter (OTC) stock or a warrant, which Robinhood generally doesn't support;" and (c) "It's a stock undergoing corporate action. The stock will be tradable again once the corporate action has been finalized." Robinhood's explanations made little sense, however, because the Suspended Stocks were not foreign stocks, OTC stocks or stocks undergoing corporate actions during the Class Period. Robinhood did not warn users of any situation where it could prevent users from buying stock out of its own volition.

223.     Worse, Plaintiffs and similarly-situated investors who had queued purchase orders overnight on January 27, 2021, to purchase stock when the markets opened on January 28, 2021, discovered that their purchase orders had been cancelled without their consent.

224.     For example, Robinhood sent Plaintiff Moody a message in her app that her orders for NAKD and NOK "ha[ve] been canceled," despite Ms. Moody never cancelling the orders.



225.     On Robinhood's web platform and mobile app, Plaintiffs and similarly-situated investors were even blocked from seeing information about the Suspended Stocks. In fact, their respective ticker symbols were not even searchable.



226.     The same day, on January 28, 2021, the Robinhood app rose to the #1 on the App Store for the first time ever since its release. While the app had its most single day downloads with over 120,000 first time installs, it also broke a new record with over 2.6 million daily active users. Robinhood had no problem welcoming tens of thousands of new users onto its platform while its ship was sinking and already out of lifeboats.

227.     Robinhood tweeted that "in light of current market volatility," it was restricting transactions for certain securities to position closing only, including AMC and GME.

228.     Robinhood subsequently updated its website with a list of thirteen (13) securities set to PCO, meaning that Robinhood Plaintiffs and Class members could sell and close their positions, but they were prohibited from opening new long positions in the Suspended Stocks.

229.    Robinhood's decision to implement a PCO policy for AMC, GMC, and other Suspended Stocks, that Robinhood customers held concentrated positions in, foreseeably impeded additional price appreciation and continued to suppress their prices beyond the Class Period.





230.    Robinhood attributed the aforesaid restrictions to ongoing market volatility, and acknowledged that they had canceled open orders for the listed securities and also disabled the ability for users to search for these securities in Robinhood's mobile app. Robinhood's January 28 blog post titled, "Keeping Customers Informed Through Market Volatility," also attributed the restrictions to "significant market volatility" and further disclosed that Robinhood raised margin requirements for certain securities.

231.    That same evening, Defendant Robinhood, through its CEO, Tenev, told CNBC that Robinhood decided to stop trading in the Suspended Stocks, in part "to protect the firm."

232.    Tenev later acknowledged in an interview with Elon Musk on the social media app

Clubhouse, "We knew this was a bad outcome for customers . . . But we had no choice as we had to conform to our requirements."[12]

### ii.     *Apex*

233.    On January 28, 2021, at approximately 10:31 a.m. EST, Apex unilaterally and abruptly directed its Introducing Broker-Dealers, and others, to block its Shared Customers from purchasing shares of AMC, GME and KOSS.

234.    Anthony Denier ("Denier"), the CEO of Webull, a brokerage that restricted trading in the Suspended Stocks, placed the blame squarely on Apex. According to Denier, the collateral required by Apex for GameStop increased by 100% and Apex had informed him that Webull needed to shut off the ability to open new positions in certain stocks. Denier further said that the restrictions originated the morning of January 28, 2021, and was informed that Apex was instructed by DTCC that it was increasing the collateral needed to settle trades for the Suspended Stocks.

235.    In written responses to the House Committee on Financial Services on February 9, 2021, Webull acknowledged that "[o]n January 28, 2021, at 11:30 AM EST Webull announced on Twitter and Facebook that it was restricting trading in GME, AMC, and KOSS." In restricting the stocks, Webull posted, "Please note that we will no longer allow clients to open new positions in following three stocks: AMC, GME and KOSS." On the same day between 2:42 PM and 2:43 PM, Webull posted an update to Twitter and Facebook lifting the restriction.

236.    Other Apex Introducing Broker-Dealers, including Ally, Dough, Public.com, SoFi, Stash, and Tastyworks, also reported that Defendant Apex had instructed them to halt all opening

---

[12] *See* RealClearPolitics, "Elon Musk Interviews Robinhood CEO Vlad Tenev On Stock Trading Restrictions On 'Clubhouse' App," *available at*
https://www.realclearpolitics.com/video/2021/02/01/elon_musk_interviews_robinhood_ceo_vl
ad_tenev_on_stock_tradigin_restrictions_on_clubhouse_app.html.

transactions of GME, AMC and KOSS on their platforms.

237.    For example, Dough tweeted, "[o]ur clearing has notified us that we must set GME, AMC, and KOSS to closing only. We will comply." Public.com similarly tweeted, "[o]ur clearing firm, Apex Holdings, has decided to halt the buying of $KOSS, $GME, and $AMC.

238.    Public.com subsequently tweeted "[w]e disagree with this decision and are working hard for our members to resolve the issue."

239.    Apex customers complained directly to Apex about the impact of its decision to halt its customers' ability to buy. For example, ███████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████

240.    Apex restricted purchasing across the board to all their clients, including their Apex Introducing Brokers and Shared Customers, based on higher numbers Apex received from the DTCC on January 28, 2021, at 9:30 a.m. EST. Apex's internal documents reveal ██████████
████████████████████████████████████████

241.    Instead, ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████

█████████████████

242.    ████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████

243.    However, an internal ████████████████████████████████

██████████████████████████████████

244.    Apex has maintained that, ████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████

245.    In fact, as Apex has admitted, ████████████████████████

██████████████████████████████████

246.    In describing the events of January 28, 2021, in response to a request by the Bureau

of Securities, New Jersey Office of the Attorney General, ███████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████

247.    Apex internal documents confirm ████████████████████████

███████████████████████████████████████████████████████████

████

248.    By its own admission, Apex took the dramatic step of unilaterally and abruptly

blocking all of its customers, including its Shared Customers, from purchasing shares of AMC,

GME, and KOSS for hours on January 28, 2021, based on a possible future collateral requirement,

that Apex had not even bothered to confer with the DTCC about prior to instructing its clients,

including Apex Introducing Broker-Dealers, to halt trading.

249.    ████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████

250.    ████████████████████████████████████████████

███████████████████████████████████████████████████

251.    On March 4, 2021, Rothschild admitted in an interview with Financial Planning, that Apex did not restrict trading as a result of capital requirements, stating that Apex had "headroom" in terms of the capital available on its balance sheet and also had credit lines it could call upon.

252.    Similarly, in an earlier draft ██████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
███████████

253.    On January 29, 2021, Apex again saw the buildup in trading volume in AMC and GME and was discussing internally ████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
█████████████████

254.    After Apex lifted restrictions on trading, ███████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
███

c.    **The January 28, 2021 Trading Restrictions Catch the Attention of Regulators**

255.    Broker-dealers who had unilaterally restricted trading on January 28, 2021, knew that their unilateral aggressive actions to restrict trading crossed the boundaries of acceptable behavior.

256.    For  example, ███████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████

257.    Commenting on the call with regulators on January 27th, ████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████

     d.    **<u>Trading Restrictions Continue After January 28, 2021</u>**

258.    In anticipation of Robinhood easing some restrictions, shares of the Suspended Stocks all rose in premarket trading on Friday, January 29, 2021. Shares of GameStop rose 80% and shares of AMC Entertainment jumped 60% on Friday.[13]

259.    Even in the face of increased scrutiny, however, Robinhood continued to suppress the value of the Suspended Stocks.

260.    Robinhood restricted trading of long option contracts and announced to Robinhood Plaintiffs and the Class of similarly-situated investors they would close out their profitable option positions automatically.

---

[13] *See* CNBC, "Robinhood raises $1 billion and taps credit lines to make trading of GameStop available to customers," *available at* https://www.cnbc.com/2021/01/29/robinhood-raises-1-billion-and-taps-credit-lines-to-make-trading-of-gamestop-available-to-customers.html.

261.     Robinhood also placed limitations on the number of new positions its users could open by capping the total number of shares and options contracts an individual could hold in certain securities.

262.     Nevertheless, Robinhood Plaintiffs and the Class of similarly-situated investors, continued to purchase the Suspended Stocks once they were permitted.

263.     On January 29, 2021, Robinhood limited users to purchasing imposed limitations on the following securities: AAL, AMC, BB, BBY, EXPR, GME, KOSS, NAKD, NOK, SNDL, TR and TRV. With respect to GameStop, Robinhood first restricted investors to purchasing only two shares of GameStop, which resulted in a rapid decline in the value of GameStop.



264.     Robinhood then instituted a one share limit on some of the Suspended Stocks, including GME and AMC further causing the value of the stocks to decrease.



265.    On January 30, 2021, the value of the Suspended Stocks began to regain the value lost the prior days.

266.    Each artificial limitation on the securities investors could purchase correlated with a subsequent decrease in stock value.



267.    As purchases of the Suspended Stocks were limited, Plaintiffs and the Class of similarly-situated investors were pressured to sell who otherwise would not have in the presence of a free and open market.

268.    On February 1, 2021, Robinhood announced that it raised an additional $2.4 billion in funding on top of the $1 billion it has raised the previous week. Yet, the very same day, Robinhood reintroduced restrictions on buying. Robinhood posted a "Letter to Our Robinhood Community," to its blogpost on February 1, 2021, stating, "Simply put, Robinhood limited buying in volatile securities to ensure it complied with deposit regulations."

269.    Robinhood continued to impose limitations on certain securities through February 4, 2021.

## V.    <u>Government Investigations Following January 2021 Short Squeeze</u>

270.    The U.S. House Financial Services Committee issued subpoenas and held three highly publicized hearings related to the trading restrictions imposed on January 28, 2021.

271.     In addition to proceedings in the House of Representatives, the Senate Banking Committee also held hearings related to the trading restrictions.

272.     According to reporting by the Wall Street Journal and public filings, the fraud division of the Department of Justice and the San Francisco U.S. Attorney's office have sought information about the restrictions imposed on January 28, 2021 from brokers and social media companies.

273.     The SEC appears to have been investigating the restrictions imposed on January 28, 2021. On June 9, 2021, GameStop Corp. reported in its 10-Q report that "On May 26, 2021, we received a request from the Staff of the SEC for the voluntary production of documents and information concerning a SEC investigation into the trading activity in our securities and the securities of other companies. We are in the process of reviewing the request and producing the requested documents and intend to cooperate fully with the SEC Staff regarding the matter. This inquiry is not expected to adversely impact us."

274.     Robinhood's FOCUS Report filed with the SEC on February 26, 2021, confirmed many of these investigations and revealed that Robinhood had received inquiries related to the trading restrictions from the U.S. Attorney's Office of the Northern District of California, the SEC's Division of Examinations, FINRA, the New York Attorney General's Office and the offices of other states' Attorneys General, state securities regulators and from Congress.

275.     Finally, on June 30, 2021, FINRA announced that Robinhood was ordered to pay a record financial penalty of $70 million for "systemic supervisory failures and significant harm suffered by millions of customers." According to FINRA, "the sanctions represent the largest financial penalty ever ordered by FINRA and reflect the scope and seriousness of the violations."

## CLASS ACTION ALLEGATIONS

276.    Plaintiffs bring this case individually and pursuant to Federal Rules of Civil

Procedure 23(a), 23(b)(2) and (b)(3) on behalf of the following proposed nationwide classes:

**I.    Nationwide Investor Class**

All persons or entities in the United States that:

(i)     held shares or call options on GameStop Corp. (GME), AMC Entertainment Holdings Inc. (AMC), American Airlines Group Inc. (AAL), Bed Bath & Beyond Inc. (BBBY), BlackBerry Ltd. (BB), Castor Maritime, Inc. (CTRM), Express, Inc. (EXPR), Koss Corporation (KOSS), Naked Brand Group Ltd. (NAKD), Nokia Corp. (NOK), Sundial Growers Inc. (SNDL), Tootsie Roll Industries, Inc. (TR), or Trivago N.V. (TRVG) (the "Suspended Stocks"), as of the end of the day on January 27, 2021, and

(ii)    sold shares or call options on the Suspended Stocks between January 28, 2021 and February 23, 2021 (the "Class Period"); and

(iii)   suffered damages.

**II.   Broker Classes**

    **A.    Robinhood Class**

       i.    All customers of Robinhood who held shares or call options on any of the Suspended Stocks as of end of the day on January 27, 2021, who sold any such shares or call options during the Class Period, and suffered damages;

      ii.    All customers of Robinhood who placed sale orders or call options on any Suspended Stocks, whose orders were delayed during the Class Period, and suffered damages;

     iii.    All customers of Robinhood who placed a buy order or call options on any Suspended Stocks, whose order was initially accepted by Robinhood, whose order was ultimately rejected by Robinhood during the Class Period, and suffered damages; and

     iv.    All customers of Robinhood who purchased shares or call options on any of the Suspended Stocks after initial restrictions were lifted as of the open of trading on January 29, 2021, sold any such shares or call options when Robinhood reintroduced further restrictions during the Class Period, and suffered damages.

**B.    Apex Class**

     i.     All Apex broker-dealer customers who held AMC, GME, and/or KOSS stocks or call options on any of the Suspended Stocks as of the end of the day on January 27, 2021, who sold any such shares or call options during the Class Period, and suffered damages;

     v.     All Apex broker-dealer customers who placed sale orders or call options on AMC, GME, and/or KOSS, whose orders were delayed during the Class Period, and suffered damages; and

     vi.     All Apex broker-dealer customers who placed a buy order or call options on AMC, GME, and/or KOSS, whose order was initially accepted by Apex or the Apex Introducing Broker-Dealers, whose order was ultimately rejected by Apex or the Apex Introducing Broker-Dealers during the Class Period, and suffered damages.

Excluded from the proposed Classes are:

     i.     Any of the Defendants named herein;

     ii.     Any of the Defendants' parent companies, subsidiaries, and affiliates;

     iii.     Any of the Defendants' officers, directors, management, employees, or agents;

     iv.     Counsel for any of the parties to this action;

     v.     All governmental entities; and

     vi.     The judge and chambers staff in this case, as well as any members of their immediate families.

This action has been brought and may properly be maintained as a class action against Defendants pursuant to the provisions of Federal Rule of Civil Procedure 23.

277.    **Numerosity**: The precise number of members of the proposed Classes is unknown to the Plaintiffs at this time; however, based on information and belief, members of the Classes, including sub-classes, number in the hundreds of thousands if not millions. The Class is so numerous that joinder of all members in a single action is impracticable. All members of the Classes may be notified of the pendency of this action by reference to Defendants' records or by

other alternative means.

278.   **Commonality**: Numerous questions of law and fact are common to the claims of the respective Plaintiffs and members of the proposed Classes. These common questions of law and fact exist as to all members of the proposed Classes and predominate over questions affecting only individual members of the proposed Classes. These common legal and factual questions include, but are not limited to, the following:

i.   Why Defendants restricted trading on January 28, 2021;

ii.   Whether Defendants' capital management was adequate;

iii.   Whether Defendants maintained adequate risk-management controls in light of their business model;

iv.   Whether Defendants' conduct in connection with the Suspended Stocks was negligent or grossly negligent;

v.   Whether Defendants owed Plaintiffs and Class members fiduciary duties;

vi.   Whether Defendants breached their fiduciary duties to Plaintiffs and Class members;

vii.   Whether Defendants knowingly failed to provide the financial services that were needed to handle reasonable consumer demand, including trading securities that are available on most other competitive trading platforms;

viii.   Whether Defendants breached their duty of care to their customers when they purposefully removed the ability to buy or view certain securities on their respective platforms;

ix.   Whether Defendants violated their regulatory obligations under federal statutes and SRO rules;

x.   Whether Defendants breached their legal, regulatory, and licensing requirements by failing to provide adequate access to financial services;

xi.   Whether the Plaintiffs and members of the proposed Classes were injured by the Defendants' conduct, and if so, the appropriate measure of damages.

279.   **Typicality**: The claims of each named Plaintiff who had an account with a Broker-Defendant are typical of the claims of corresponding Broker-Dealer Classes. Each purchased one

or more of the Suspended Stocks through that Defendant Broker-Dealer prior to the Restricted Period and were invariably harmed by that Defendant Broker-Dealer's wrongful conduct during the Class Period.

280.   **Adequate Representation**: Plaintiffs who had an account with a Broker-Defendant will fairly and adequately represent the interests of the corresponding Class in that they have no conflicts with any other members of the corresponding Broker-Defendant Class. Plaintiffs have retained competent counsel experienced in prosecuting complex class actions in federal court, including those involving financial services, and they will vigorously litigate this class action on their behalf and on behalf of members of the corresponding Class.

281.   **Predominance and Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. A class action is superior to other available means, if any, for the fair and efficient adjudication of this controversy. Prosecution of separate actions by individual members of the proposed Classes would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendants.

282.   Additionally, few, if any, members of the proposed Classes could or would sustain the economic burden of pursuing individual remedies for the Defendants' wrongful conduct and it would thus be grossly impracticable because the cost of vindicating an individual class member's claim would likely exceed the value of the claim. Treatment as a class action will achieve substantial economies of time, effort, and expense, and provide comprehensive and uniform supervision by a single court. This class action presents no material difficulties in management and provides the benefits of a single adjudication.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (against Robinhood)

283.     Plaintiffs hereby incorporate by reference paragraphs 1 through 282 as though fully set forth herein.

284.     Robinhood agreed to provide brokerage services, such as the purchase and sale of securities (including the Suspended Stocks), to Plaintiffs and Class members in accordance with applicable federal statutes, regulations, and rules and of the securities industry, including DTCC, SEC, and FINRA Rules and Regulations. At the very minimum, these regulations and rules establish minimum standards of conduct for any person or firm engaged in the securities industry.

285.     Robinhood Financial had a duty to exercise reasonable care in safeguarding the investments of Robinhood Plaintiffs' and Class members' by providing a platform to execute trades that is fair and promptly provides execution of its customers' trade orders in a lawful manner.

286.     Robinhood Securities had a duty to exercise reasonable care in carrying and providing clearing services for its customer accounts, ensuring compliance with obligations to meet the regulatory net capital requirements applicable to broker-dealers, and ensuring that it had sufficient collateral posted or available to satisfy the industry clearing functions so as not to impede customers' ability to purchase shares of the Suspended Stocks. Specifically, Robinhood Securities had a duty to ensure compliance with its obligations to regulators, the DTCC, NSCC, and FINRA, sufficient to satisfy the industry trade processing clearing functions so as not to impede their customers' ability to purchase shares of the Suspended Stocks.

287.     Robinhood had the duty to and was able to reasonably anticipate their net capital

63

and collateral requirements on a daily basis.

288.    Robinhood had a duty to maintain adequate capital and collateral during volatile markets and the volatility at issue here was either known to Robinhood or foreseeable.

289.    Robinhood's failure to maintain capital levels needed to meet anticipated capital deposit demands, failing to adequately mitigate risk, and restricting trading in the Suspended Stocks under the circumstances alleged herein, violated SEC, FINRA, and other regulatory rules, which violations provide evidence of breach of the duty of care owed to its customers, an extreme departure from the ordinary standard of conduct, and conduct so reckless or wanting in care that it constitutions a conscious disregard or in difference to the rights of the Robinhood Plaintiffs and the class of similarly-situated investors.

290.    As a direct and proximate result of Robinhood's conduct, the Robinhood Plaintiffs and the Class of similarly-situated investors have been injured and sustained damages.

## COUNT II
## GROSS NEGLIGENCE
### (against Robinhood)

291.    Plaintiffs hereby incorporate by reference paragraphs 1 through 282 as though fully set forth herein.

292.    Robinhood agreed to provide brokerage services, such as the purchase and sale of securities (including the Suspended Stocks), to Plaintiffs and Class members in accordance with applicable federal statutes, regulations, and rules and of the securities industry, including DTCC, SEC, and FINRA Rules and Regulations. At the very minimum, these regulations and rules establish minimum standards of conduct for any person or firm engaged in the securities industry.

293.    Robinhood Financial had a duty to exercise reasonable care in safeguarding the investments of Robinhood Plaintiffs' and Class members' by providing a platform to execute

trades that is fair and promptly provides execution of its customers' trade orders in a lawful manner.

294.    Robinhood Securities had a duty to exercise reasonable care in carrying and providing clearing services for its customer accounts, ensuring compliance with obligations to meet the regulatory net capital requirements applicable to broker-dealers, and ensuring that it had sufficient collateral posted or available to satisfy the industry clearing functions so as not to impede customers' ability to purchase shares of the Suspended Stocks. Specifically, Robinhood Securities had a duty to ensure compliance with its obligations to regulators, the DTCC, NSCC, and FINRA, sufficient to satisfy the industry trade processing clearing functions so as not to impede their customers' ability to purchase shares of the Suspended Stocks.

295.    Robinhood had the duty to and was able to reasonably anticipate their net capital and collateral requirements on a daily basis.

296.    Robinhood had a duty to maintain adequate capital and collateral during volatile markets and the volatility at issue here was either known to Robinhood or foreseeable.

297.    By failing to maintain capital levels needed to meet anticipated capital deposit demands, failing to adequately mitigate risk, and restricting trading in the Suspended Stocks under the circumstances alleged herein, Robinhood failed to comply with SEC, FINRA, and other regulatory rules, which violations provide evidence of breach of the duty of care owed to its customers.

298.    As a direct and proximate result of Robinhood's conduct, the Robinhood Plaintiffs and the Class of similarly-situated investors have been injured and sustained damages.

**COUNT III**
**NEGLIGENCE *PER SE***
**(against Robinhood)**

299.     Plaintiffs hereby incorporate by reference paragraphs 1 through 282 as though fully set forth herein.

300.     Pursuant to the rules alleged herein, Robinhood Financial had a statutory duty to exercise reasonable care in safeguarding Robinhood Plaintiffs' and Class members' investments and in providing a platform to execute trades that is fair and promptly provides execution of its customers' trade orders in a lawful manner. Robinhood Securities also had a duty to reasonably anticipate its regulatory net capital requirements and collateral requirements to ensure that it could satisfy industry clearing functions so as not to impede its customers' ability to purchase the Suspended Stocks.

301.     When Robinhood Financial restricted trading in the Suspended Stocks, it violated minimally-required standards under the DTCC and the SEC, including an obligation to maintain sufficient liquid assets to meet all obligations to customers and counterparties, and under FINRA Rules, including, without limitation, an obligation to observe high standards of commercial honor and fair and equitable principles of trade and to reasonably supervise its trading platform to ensure compliance with its essential services to its customers. Because these rules and other securities regulations were enacted for the protection of investors including Plaintiffs and Class Members, the violations constitute negligence *per se*.

302.     By failing to maintain capital levels needed to meet anticipated capital deposit demands, failing to adequately mitigate risk, and restricting trading in the Suspended Stocks under the circumstances alleged herein, Robinhood violated these duties.

303.     As a direct and proximate result of Robinhood's conduct, the Robinhood Plaintiffs

and the Class of similarly-situated investors have been injured and sustained damages.

**COUNT IV**
**BREACH OF FIDUCIARY DUTY**
**(against Robinhood Securities and Robinhood Financial)**

304.    Plaintiffs hereby incorporate by reference paragraphs 1 through 282 as though fully set forth herein.

305.    Defendants Robinhood Securities and Robinhood Financial owed a fiduciary duty of care, loyalty, and good faith to Robinhood Plaintiffs and the members of the Class, by virtue of, among other things, being provider of financial services and a registered securities investment broker-dealer.

306.    The scope of those fiduciary duties is informed, in part, by the fact that Robinhood Securities and Robinhood Financial retain the discretion to execute certain transactions within its customers' accounts without specific customer approval. Specifically, for example, their Customer Agreement states that:

> If My Account has an option position on the last trading day prior to expiration, which is one cent or more in the money, Robinhood Financial will generally exercise the option, on My behalf. However, Robinhood Financial reserves the right at Its discretion to close any option position prior to expiration date or any position resulting from the exercising/assignment after option expiration. I will be charged a commission for any such transaction.

307.    In its role as such, Robinhood Securities and Robinhood Financial provides information to its customers on investments and investment strategies, which further informs the scope of the fiduciary duties owed by them to their customers.

308.    As broker-dealers, Robinhood Securities and Robinhood Financial owe fiduciary duties of care, good faith, honesty, and loyalty, which further and also include, without limitation and at the very least, the duty to carry out the customer's orders promptly in a manner best suited

67

to serve the customer's interests, the duty to transact business only after receiving prior authorization from the customer, the duty not to act out of a conflict of interest nor to prefer the fiduciary's self-interest over that of its customers, and the duty to use reasonable effort to give its customers' information relevant to the affairs that have been entrusted to it.

309.    As a result, Robinhood Securities and Robinhood Financial owed a fiduciary duty to the Robinhood Plaintiffs and the Class of similarly-situated investors to, among other things, provide an open trading platform free of self-imposed trading restrictions or conduct, as alleged herein, which was in the self-interest of Robinhood Securities and Robinhood Financial and Robinhood Securities and Robinhood Financial knew or should have known would harm the Robinhood Plaintiffs and the Class of similarly-situated investors.

310.    As alleged above, Robinhood Securities and Robinhood Financial acted in their own self-interest and contrary to the interests of its customers.

311.    Robinhood Securities and Robinhood Financial breached their fiduciary duties by imposing the trading restrictions alleged herein to benefit itself, at the expense of the interests of the Robinhood Plaintiffs and the Class of similarly-situated investors.

312.    Robinhood Securities and Robinhood Financial further breached its fiduciary duties by engaging in the conduct alleged above to actively facilitate and encourage high volume and volatile trading on its platform when its internal structures, systems, and capitalization were unable to maintain and support that trading activity such that its business and its customers were being put at significant risk.

313.    As a direct and proximate result of Defendants Robinhood Securities and Robinhood Financial's conduct, Robinhood Plaintiffs and the Class of similarly-situated investors have been injured and sustained damages.

**COUNT V**
**NEGLIGENCE**
**(Against Apex)**

314.     Plaintiffs hereby incorporate by reference paragraphs 1 through 282 as though fully set forth herein.

315.     Apex had a duty to exercise reasonable care in providing services for its customers, including Shared Customers, so as not to impede customers' ability to purchase shares.

316.     Apex breached these duties when it suspended its customers' ability to purchase shares AMC, GME, and/or KOSS and when Apex demanded that Apex Introducing Broker Dealers suspend their Shared Customer's ability to purchase shares of GME, AMC, and KOSS, without even trying to confirm the collateralization number received from DTCC at approximately 9:30 a.m. on January 28, 2021, or seeking to negotiate it down.

317.     Apex breached these duties when it learned at approximately 11:00 a.m. EST that the collateralization number was in fact lower than originally communicated to it and was, in fact, at a level that Apex believed warranted lifting the suspension of the purchase of stock, yet failed to lift the suspension of the purchase of shares in GME, AMC and KOSS until hours later.

318.     Apex breached these duties when it failed to take reasonable steps to mitigate its risk, including, but not limited to raising additional capital rather than suspend its customers, including Shared Customers', ability to purchase shares of GME, AMC, and/or KOSS.

319.     As a direct and proximate result of Apex' conduct, the Apex Plaintiffs and the Class of similarly-situated investors have been injured and sustained damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for a judgment against Defendants as follows:

a. For an order certifying the proposed Class, appointing Plaintiffs as Representatives of the proposed Class, and appointing the law firms representing Plaintiffs as counsel for the Class;

b. For compensatory damages, punitive damages, restitution, and/or refund of all funds acquired by Defendants from Plaintiffs and the proposed Class members as a result of Defendant's negligence, breach, and unlawful actions described herein, in an amount to be proven at trial;

c. Payment of costs and expenses of suit herein incurred;

d. Both pre-and post-judgment interest on any amounts awarded;

e. Payment of reasonable attorneys' fees and expert fees;

f. Such other and further relief as the Court may deem proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand trial by jury.

Dated:  July 26, 2021                                     Respectfully submitted,

*/s/ Natalia M. Salas*                                     */s/ Peter Safirstein*
**THE FERRARO LAW FIRM, P.A.**            **SAFIRSTEIN METCALF LLP**
Natalia M. Salas (FBN 44895)                    Peter Safirstein (NY SBN 2044550)
James L. Ferraro (FBN 381659)                  1345 Avenue of the Americas, 2nd Floor
James Ferraro, Jr. (FBN 107494)                New York, NY 10105
Bruce S. Rogow (FBN 067999)                    Tel: (212) 201-5845
Sean A. Burstyn (FBN 1028778)                  psafirstein@safirsteinmetcalf.com
Daniel J. DiMatteo (FBN 114914)
600 Brickell Avenue, Suite 3800                 ***Plaintiffs' Lead Counsel for the***
Miami, FL 33131                                         ***Other Broker Tranche***
Tel: (305) 375-0111
nms@ferrarolaw.com
jlf@ferrarolaw.com
jjr@ferrarolaw.com
bsr@ferrarolaw.com
sab@ferrarolaw.com
djd@ferrarolaw.com

***Plaintiffs' Lead Counsel for the***
***Robinhood Tranche***

/s/*Rachel W. Furst*
**GROSSMAN ROTH YAFFA COHEN, P.A.**
Rachel W. Furst (FBN 45155)
2525 Ponce de Leon Blvd., Ste 1150
Coral Gables, FL 33134-6040
Tel: 305-442-8666
rwf@grossmanroth.com

*Plaintiffs' Liaison Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on July 26, 2021, I electronically filed the forgoing with the Clerk of the Court using CM/ECF. I also certify that the foregoing is being served this day on all counsel of record in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel who are not authorized to receive Notices of Electronic Filing.

By: */s/ Rachel Wagner Furst*
Rachel Wagner Furst