**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-2989-MDL-ALTONAGA/Torres**

**IN RE:**

**JANUARY 2021 SHORT SQUEEZE
TRADING LITIGATION**
_____/

This Document Relates to All Claims Included
In the Other Broker Tranche

**DEFENDANT APEX CLEARING CORPORATION'S RULE 12 MOTION TO DISMISS
PLAINTIFFS' CONSOLIDATED ROBINHOOD AND OTHER BROKER TRANCHE
CLASS ACTION COMPLAINT AND INCORPORATED MEMORANDUM OF LAW**

**Table of Contents**

INTRODUCTION ........................................................................................................ 1

FACTUAL BACKGROUND ...................................................................................... 4

ARGUMENT .............................................................................................................. 8

I.      This Court Does Not Have Subject-Matter Jurisdiction Over Plaintiffs Jang and
        Chavez's Negligence Claim—Brought in the MDL for the First Time Against
        Apex, and Thus Lacking an Underlying Original Complaint Filed in Another
        District and Home Forum ............................................................................... 8

II.     This Court Lacks Personal Jurisdiction Over Apex Because the Apex
        Plaintiffs Have Not Served a Valid Summons on Apex in Any Negligence
        Action ........................................................................................................... 11

III.    Plaintiffs Jang and Chavez Lack Article III Standing .......................................... 12

        A.      Plaintiffs Fail to Allege Injury in Fact Because Their Claims That
                They Would Have Sold at a Higher Price Are Completely Speculative
                and Implausible ............................................................................... 13

        B.      Plaintiffs Fail to Allege They Have a "Legally Protected Interest" in
                Lost Earnings Due to Plaintiffs' Thwarted Scheme ................................ 15

IV.     Plaintiffs' Negligence Claim Fails as a Matter of Law ....................................... 16

        A.      Choice of Law Considerations Compel Application of Texas Law
                Where Apex Has Its Headquarters ........................................................ 17

        B.      It Is Well-Established That a Clearing Broker Such as Apex Owes
                No Duty of Care to Investors Such as Plaintiffs ..................................... 19

                1.      It Is Well Established That Clearing Brokers Owe No Duty of
                        Care to Investors ................................................................... 20

                2.      Plaintiffs New Duty Would Change the Role of Clearing
                        Brokers:  Clearing Brokers Are Not Public Utilities, and
                        They Owe No Duty to Accept All Orders Under All
                        Circumstances ....................................................................... 20

                3.      Apex Owes Plaintiffs No General Duty of Care to Prevent
                        Economic Losses, Particularly Ones Governed by Contract ........ 21

        C.      Plaintiffs Fail to Allege a Standard of Care That Apex's Conduct
                Could Have Breached with a Mid-Day, Few Hour Interruption in a
                Single Day's Trading of Three Meme Stocks ......................................... 22

i

1.      Plaintiffs' First Alleged Negligent Act (the Duty to Dicker with DTCC):  Halting Trading to Comply with Net Capital Requirements Too Quickly Without "Seek[ing] to Negotiate It Down."  Compl. ¶ 240................................................................ 23

2.      Plaintiffs' Second Alleged Negligent Act (the Duty to Rush):  Reopening Trading to Ensure Compliance with Net Capital Requirements Too Slowly.  Compl. ¶¶ 242, 246. ........................ 26

3.      Plaintiffs' Third Alleged Negligent Act (the Duty to Provide Unlimited Capital):  Failure to Foresee and Access Unlimited Capital to Withstand Unprecedented Market Manipulation of Meme Stocks on January 28, 2021.  Compl. ¶ 318. .................... 27

D.      Apex's Actions Did Not Proximately Cause Plaintiffs' Alleged Injury... 29

V.      This Action Is Pre-Empted by Federal Securities Law Because Apex Is Heavily Regulated and Because the Duty that Plaintiffs Assert Against Apex Would Prove an Obstacle to the Uniform Federal Regulatory Scheme in the Interstate Trading of Publicly-Listed Securities .................................................. 31

VI.     The Claims of Plaintiffs Whose Brokers Did Not Use Apex as a Clearing Broker Must Be Dismissed ...................................................................... 35

VII.    With 25,000 Pages Produced and Numerous Pleading Opportunities, the Consolidated Amended Complaint Should Be Dismissed with Prejudice ........... 35

CONCLUSION.......................................................................................................... 36

AMERICAS 108801954

## Table of Authorities

### CASES

*A&H Props. P'ship v. GPM Eng'g*,
  2015 Tex. App. LEXIS 12879 (Tex. App. Dec. 23, 2015) ......................................................22

*Aaron Private Clinic Mgmt. LLC v. Berry*,
  912 F.3d 1330 (11th Cir. 2019) ....................................................................................14, 15

*Adams v. Graves*,
  1990 Ohio App. LEXIS 4964 (Ohio App. Oct. 23, 1990) ....................................................27

*Allways Auto Grp., Ltd. v. Walters*,
  530 S.W.3d 147 (Tex. 2017) ................................................................................................30

*Anderson v. Dairy Farmers of Am., Inc.*,
  2010 U.S. Dist. LEXIS 104191 (D. Minn. Sep. 30, 2010) ..................................................28

*Andrew v. Radiancy, Inc.*,
  2017 U.S. Dist. LEXIS 96384 (M.D. Fla. June 22, 2017) ...................................................12

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..........................................................................................16, 28, 30

*Balt. Orioles, Inc. v. Major League Baseball Players Ass'n*,
  805 F.2d 663 (7th Cir. 1986) ..............................................................................................17

*Banzhaf v. ADT Sec. Sys. Sw., Inc.*,
  28 S.W.3d 180 (Tex. App. 2000) .........................................................................................28

*Beckwith v. Hart*,
  263 F. Supp. 2d 1018 (D. Md. 2003) ...................................................................................19

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................................16

*Bishop v. Florida Specialty Paint Company*,
  389 So. 2d 999 (Fla. 1980) .................................................................................................18

*Bryant v. Dupree*,
  252 F.3d 1161 (11th Cir. 2001) ...........................................................................................35

*Buckman Co. v. Plaintiffs' Legal Comm.*,
  531 U.S. 341 (2001) ............................................................................................................34

*Capital Options Invest., Inc. v. Goldberg Bros. Commodities, Inc.*,
  958 F.2d 186 (7th Cir. 1992) ..............................................................................................26

iii

*Chapman v. DePuy Orthopedics, Inc.*,
   760 F. Supp. 2d 1310 (M.D. Fla. 2011)...................................................................................18

*Coleman v. Equitable Real Estate Inv.*,
   971 S.W.2d 611 (Tex. App.—Dallas 1998)..............................................................................31

*Costa v. Kerzner Int'l Resorts Inc.*,
   2011 US Dist. LEXIS 66921 (S.D. Fla. June 23, 2011) ..........................................................18

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000)..................................................................................................................32

*Dallas v. Maxwell*,
   248 S.W. 667 (Tex. 1923)..........................................................................................................28

*Day v. Taylor*,
   400 F.3d 1272 (11th Cir. 2005) .................................................................................................22

*Default Proof Credit Card Sys. Inc. v. State Street Bank & Trust Co.*,
   753 F. Supp. 1566 (S.D. Fla. 1990) ..........................................................................................18

*Doe v. Boys Clubs*,
   907 S.W.2d 472 (Tex. 1995).......................................................................................................28

*Espinoza v. Countrywide Home Loans Servicing, L.P.*
   2014 U.S. Dist. LEXIS 107263 (S.D. Fla. Aug. 5, 2014).......................................................35

*Geier v. Am. Honda Co.*,
   529 U.S. 861 (2000)............................................................................................................32, 34

*Gonzalez v. Acosta*,
   2001 Tex. App. LEXIS 5623 (Tex. App. Aug. 16, 2001) ........................................................26

*Greater Hous. Transp. Co. v. Phillips*,
   801 S.W.2d 523 (Tex. 1990)......................................................................................................29

*Griffin Indus. v. Irvin*,
   496 F.3d 1189 (11th Cir. 2007) .................................................................................................17

*Hall v. Burger King Corp.*,
   912 F. Supp. 1509 (S.D. Fla. 1995) ..........................................................................................17

*Hand v. Dean Witter Reynolds Inc.*,
   889 S.W.2d 483 (Tex. App. 1994).................................................................................21, 26, 29

*Horsley v. Feldt*,
   304 F.3d 1125 (11th Cir. 2002) ...................................................................................................5

iv

*Humble Sand & Gravel, Inc. v. Gomez*,
   146 S.W.3d 170 (Tex. 2004) ................................................................................................27

*In re Cadwallder*,
   No. 06-36424, 2007 Bankr. LEXIS 2260 (Bankr. S.D. Tex. June 28, 2007) .........................24

*In re Cmty. Health Sys.*,
   2016 U.S. Dist. LEXIS 123030 (N.D. Ala. Sept. 12, 2016) ...................................................11

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*,
   2021 U.S. Dist. LEXIS 116925 (D. Kan. June 23, 2021) .........................................................9

*In re Farmers Ins. Exch. Claims Representatives' Overtime Pay Litig.*,
   2008 U.S. Dist. LEXIS 90136 (D. Or. Oct. 28, 2008) ..............................................................9

*In re FCA US LLC Monostable Elec. Gearshift Litig.*,
   2017 U.S. Dist. LEXIS 216672 (E.D. Mich. Mar. 21, 2017) .............................................9, 10

*In re Managed Care Litig.*,
   298 F. Supp. 2d 1259 (S.D. Fla. 2003) ..................................................................................17

*In re Monitronics Int'l, Inc.*,
   2014 U.S. Dist. LEXIS 192814 (N.D.W. Va. June 5, 2014) ..................................................11

*In re Packaged Ice Antitrust Litig.*,
   2011 U.S. Dist. LEXIS 150426 (E.D. Mich. Dec. 12, 2011)...................................................9

*In re Showa Denko K.K.*,
   953 F.2d 162 (4th Cir. 1992) .................................................................................................11

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*,
   785 F. Supp. 2d 925 (C.D. Cal. 2011) ..................................................................................10

*Jim Walter Homes, Inc. v. Reed*,
   711 S.W.2d 617 (Tex. 1986).................................................................................................21

*La Grasta v. First Union Sec., Inc.*,
   358 F.3d 840 (11th Cir. 2004) .............................................................................................31

*LAN/STV v. Martin K. Eby Constr. Co.*,
   435 S.W.3d 234 (Tex. 2014)...........................................................................................21, 22

*Lexecon Inc. v. Milberg Weiss*,
   523 U.S. 26 (1998)..........................................................................................2, 8, 9, 10

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992).............................................................................................................13

v

*Mars v. Wedbush Morgan Sec.*,
  283 Cal. Rptr. 238 (Cal Ct. App. 1991) ...................................................................19, 20

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
  547 U.S. 71 (2006) ..........................................................................................................3

*Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.)*,
  247 B.R. 51 (Bankr. S.D.N.Y. 1999) .......................................................................24, 25, 31

*Murphy Bros. v. Michetti Pipe Stringing*,
  526 U.S. 344 (1999) .......................................................................................................12

*Mut. Pharm. Co. v. Bartlett*,
  570 U.S. 472 (2013) .......................................................................................................31

*New Orleans Emplrs. Int'l Longshoremen's Ass'n v. Mercer Inv. Consultants*,
  635 F. Supp. 2d 1351 (N.D. Ga. June 2009) ...........................................................14

*Omni Capital Int'l v. Rudolf Wolff & Co.*,
  484 U.S. 97 (1987) .........................................................................................................12

*Otis Eng'g Corp. v. Clark*,
  668 S.W.2d 307 (Tex. 1983) ......................................................................................23, 28

*Palsgraf v. Long Island R. Co.*,
  248 N.Y. 339 (1928) (Cardozo, C.J.) ..........................................................................2

*Perret v. Wyndham Vacation Resorts, Inc.*,
  846 F. Supp. 2d 1327 (S.D. Fla. 2012) .....................................................................30

*PLIVA, Inc. v. Mensing*,
  564 U.S. 604 (2011) .......................................................................................................33

*Pulka v. Edelman*,
  358 N.E.2d 1019 (N.Y. 1976) ....................................................................................19

*Quiroz v. Alcoa Inc.*,
  416 P.3d 824 (Ariz. 2018) ...........................................................................................19

*Read v. Scott Fetzer Co.*,
  990 S.W.2d 732 (Tex. 1998) .......................................................................................19

*Riggs v. Schappell*,
  939 F. Supp. 321 (D.N.J. 1996) .................................................................................19, 20

*Ross v. Bolton*,
  904 F.2d 819 (2d Cir. 1990) .......................................................................................19, 20

AMERICAS 108801954

*Rozsa v. May Davis Grp., Inc.*,
    187 F. Supp. 2d 123 (S.D.N.Y. 2002) .............................................................19, 20

*Schlueter v. Latek*,
    683 F.3d 350 (7th Cir. 2012) ......................................................................15

*Scott v. Watson*,
    359 A.2d 548 (Md. 1976) ..........................................................................19

*Secs. & Exch. Comm'n v. Aaron et al.*,
    No. 1:15-cv-05704 (S.D.N.Y. Jul. 21, 2015) ..........................................16

*Solomon v. New York*,
    489 N.E.2d 1294 (N.Y. 1985) ..................................................................19

*Stag Canon Fuel Co. v. Rose*,
    145 S.W. 677 (Tex. App. 1912) ..............................................................26

*Tokyo Gwinnett, LLC v. Gwinnett Cty.*,
    940 F.3d 1254 (11th Cir. 2019) ..............................................................14

*Travis v. Mesquite*,
    830 S.W.2d 94 (Tex. 1992) .................................................................30, 31

*Turk v. Pershing LLC*,
    2014 U.S. Dist. LEXIS 190624 (N.D. Tex. Dec. 8, 2014) .................19, 20

*United Scaffolding, Inc. v. Levine*,
    537 S.W.3d 463 (Tex. 2017) ....................................................................19

*W. Invs., Inc. v. Urena*,
    162 S.W.3d 547 (Tex. 2005) ....................................................................30

*Weatherly v. Pershing*,
    2015 U.S. Dist. LEXIS 197128 (N.D. Tex. June 23, 2015) ....................20

*West v. Cruz*,
    251 P.2d 311 (Ariz. 1952) ........................................................................19

## CONSTITUTIONAL PROVISIONS, STATUTES AND OTHER AUTHORITY

U. S. Const., Art. VI, cl. 2 ...................................................................................31

15 U.S.C. § 78q-1 ..........................................................................................32, 34

28 U.S.C. § 1407 ...........................................................................2, 8, 9, 10, 17

17 C.F.R. § 240.15c3-1 .............................................................................7, 24, 25

vii

17 C.F.R. § 240.17Ad-22 (2020) .............................................................................6, 24

*Bear, Stearns Sec. Corp.*,
    Exchange Act Release No. 41,707, 70 SEC No. 710 (Aug. 5, 1999) ....................................23

Henry Minnerop, *Role and Regulation of Clearing Brokers—Revisited*, 75 Bus. Law. 2201
    (2020)..............................................................................................................20, 33

Federal Rules of Civil Procedure 12(b)(1), (2), (5), (6)......................................8, 10, 11, 12, 16 36

FINRA Rule 4311(c)(1) .................................................................................................5

S.D. Florida Local Rule 7.1(a)(3)(A), ...........................................................................36

NSCC Rule 4, § 8 (August 17, 2021) ..............................................................................7

AMERICAS 108801954

This Court should dismiss Plaintiffs' Other Broker Tranche negligence claim now asserted exclusively (and for the first time) against clearing broker Apex Clearing Corporation ("Apex") in the Other Broker Tranche Consolidated Class Action Complaint ("Common Law Complaint" or "Complaint").  The afterthought negligence claim newly asserted against Apex should be dismissed for lack of subject matter and personal jurisdiction and lack of Article III standing, but most fundamentally because Plaintiffs' negligence claim depends on the existence of a duty and standard of care that does not exist in the law governing clearing brokers.

Plaintiffs allege that investors colluded among themselves in "online discussions" in public forums (Compl. ¶ 169) to create unprecedented market volatility in and demand for a group of "meme stocks," and that on January 28, 2021, this unprecedented and historic trading volume led the two SEC-registered clearing agencies (DTCC and NSCC) to increase collateral requirements for Apex, a clearing broker responsible for maintaining sufficient cash to cover the buy and sell obligations of its broker-dealer customers.  Compl. ¶¶ 169–75.  Plaintiffs allege that Apex's response to the DTCC's unprecedented collateral requirements—Apex's restricting for 3 hours and 25 minutes (Compl. ¶¶ 241–42, 235, 246), in the middle of a single trading day, new purchases of three volatile "meme stocks" (GameStop, AMC, and Koss) while continuing to allow customers to liquidate their positions in those stocks—was somehow negligent.  Compl. ¶¶ 233–53; Pace Decl. Ex. 1 at 6 (Feb. 9, 2021, Letter from Apex to the Bureau of Securities, New Jersey Office of the Attorney General ("NJBS" or "N.J. Bureau of Securities"), quoted in Compl. ¶ 246).  But Plaintiffs fail to allege any duty or reasonable standard of care that would have required Apex to ignore its collateral requirements and continue allowing trading, particularly when the SEC immediately endorsed trading restrictions during that week's volatility and Apex's customer contracts expressly allow such restrictions.  No court has imposed the extraordinary duty sought here for clearing brokers to cover market events "no matter what."  Clearing brokers have never been obligated to provide unlimited capital in response to DTCC collateral requirements at times of extreme market volatility.

This is *Palsgraf*, only here the injured bystander not only caused the fireworks explosion but also alleges that, had the Long Island Railroad not been delayed, she would have reached her

AMERICAS 108801954

destination in time to purchase a winning lottery ticket.[1]   Plaintiffs seek to impose an unreasonable standard of care on Apex and to recover for impossibly speculative harms—caused in fact by their own conduct.

Plaintiffs fail to state a claim for negligence against Apex for the following reasons:

*First*, as a threshold matter, this Court lacks both subject matter and personal jurisdiction over Apex in light of Plaintiffs' attempt to add new plaintiffs asserting a new claim against a new defendant as part of an MDL proceeding.   Plaintiffs' claim is an impermissible MDL afterthought, asserted for the very first time against Apex in Plaintiffs' "consolidated" complaint filed in this Court on July 26, 2021.  The two "Apex Plaintiffs" had filed no previous lawsuit in any district that named Apex as a negligence defendant, nor had any other named Plaintiff, and the named Apex Plaintiffs have served no summons on Apex for the new negligence claim they assert.  Thus, Plaintiffs' negligence claim against Apex was not the result of any consolidation of actions filed in an original district following the JPML's decision, and service of process—a prerequisite to personal jurisdiction—has not been effected.   Plaintiffs' claim against Apex therefore has no transferor district to which to return for trial in this matter at the conclusion of pretrial MDL proceedings as commanded by the JPML statute.[2]   And *this Court is not a transferee court under the JPML order for this Apex claim* (28 U.S.C. § 1407(a)) because no negligence lawsuit against Apex has been *transferred to* it.   Therefore, this Court lacks both subject matter and personal jurisdiction.

*Second*, Plaintiffs lack Article III standing.  They do not allege that they would have purchased additional shares of the three meme stocks Apex temporarily suspended mid-day (GameStop, AMC, and Koss) in the absence of Apex's temporary restriction; Plaintiffs' "someday" assertion now that they would have timed the market correctly and sold their shares for some additional profit is speculative and implausible.

---

[1] *Palsgraf v. Long Island R. Co.,* 248 N.Y. 339, 341 (1928) (Cardozo, C.J.) (dismissing negligence claim by plaintiff injured by train platform scales dislodged after passenger attempting to board the train, many feet away, was pushed by a guard and dropped a package of fireworks, causing an explosion).

[2] *See Lexecon Inc. v. Milberg Weiss*, 523 U.S. 26, 28 (1998) (28 U.S.C. § 1407(a) "imposes a duty on the [JPML] Panel to remand any such action to the original district 'at or before the conclusion of such pretrial proceedings.'").

AMERICAS 108801954

*Third*, Plaintiffs cannot allege the necessary elements of their negligence claim.  Under long-standing, controlling law, clearing brokers like Apex owe no duty to Plaintiffs.  And in any event Plaintiffs' allegations that Apex's response to the NSCC's imposition of unprecedented collateral requirements fail to support even the inference that Apex breached any standard of care, because Plaintiffs allege only that (a) Apex was *too* cautious by restricting trading too quickly in the face of unforeseen risk and should have anticipated Plaintiffs' newly-minted "duty to dicker" with DTCC, (b) Apex was *too* cautious in removing those restrictions too slowly (Compl. ¶ 244), and (c) Apex simply should have had on hand effectively limitless capital to cover any and all collateral requirements—even when retail brokerage firms like Charles Schwab also imposed trading restrictions a day earlier.  Compl. ¶ 256–57.  Plaintiffs' allegations also fail to support any inference that Plaintiffs suffered any non-speculative injury, let alone that Apex's conduct was the proximate cause of any injury to Plaintiffs.

*Fourth*, the state common law duty Plaintiffs seek to impose intrudes impermissibly into the heavily regulated and carefully balanced multi-level, uniform federal regulatory scheme for the interstate trading of publicly-listed securities—with self-regulatory organizations and the SEC providing exclusive, plenary regulation over the trading of securities over stock exchanges—and would present an obstacle to federal regulatory objectives as set forth in the Securities Exchange Act of 1934.  "The magnitude of the federal interest in protecting the integrity and efficient operation of the market for nationally traded securities cannot be overstated."  *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 78 (2006).

*Fifth*, Plaintiffs allege no facts supporting their claims against Apex on behalf of investors whose brokers did not use Apex's clearing services; Apex is not a public utility and has no duty to take on additional risk to protect investors with whom it has absolutely no relationship.  Those claims should be dismissed with the rest.

For the reasons described below, this Court should dismiss Plaintiffs' negligence claim against Apex—and given the extensive discovery Plaintiffs have already received, and the futility of amendment, Plaintiffs' claim should be dismissed with prejudice.

## FACTUAL BACKGROUND[3]

### A.  Reddit Posters and Other Purchasers Collectively Executed a Short Squeeze on "Meme Stocks"

On January 27, 2021, several companies' stocks that were popular in online forums (so-called "meme stocks") were subject to unprecedented trading volume.  Compl. ¶¶ 169–75; Compl. ¶¶ 164, 167 (admitting that the New York Stock Exchange imposed trading halts, which can be "triggered on the way up with manic-buying").  Those stocks included the three stocks for which Apex temporarily suspended clearing purchases—GameStop ("GME"), AMC Theatres ("AMC"), and Koss Corporation ("KOSS")—and at least 11 others.  Compl. ¶ 3.  As Plaintiffs admit, the astronomical increase in trading volume was due ironically to investors themselves engaging in "online discussions" and agreeing to purchase more and more shares in these stocks for the purpose of raising the stock price.  Compl. ¶ 169.  Those "online discussions" among investors consisted of public, online forum communications, which the Majority Staff of the U.S. House of Representatives Committee on Financial Services described as follows:

> In January 2021, *investors collectively established a strategy to achieve what is known as a "short squeeze" on stocks* that had been heavily shorted, particularly by hedge funds . . . .  A short squeeze occurs when the market price of shorted stocks rises above the price at which the stock was borrowed, forcing short sellers to purchase the stock at a higher price.  The short squeeze of GameStop's stock . . . led to a 600% surge in the stock price.  Much of the strategizing occurred on *WallStreetBets, a Reddit subchannel* (or "subreddit") where approximately *8.5 million users* discuss trading ideas and investment strategies, including retail investors.[4]

And as Plaintiffs further admit, the skyrocketing prices for shares of so-called "meme stocks" continued, *despite* the fact that "hedge funds and market makers were shorting the Suspended Stocks," which "tends to drive the prices down."  Compl. ¶¶ 170, 172.  The unprecedented

---

[3] Apex will not repeat the factual background that Robinhood has included in its Motion to Dismiss the Common Law Complaint, and that is pertinent to both the Robinhood and Other Broker Tranches allegations, such as the nature and mechanics of the securities markets.

[4] U.S. House Financial Servs. Comm. Majority Staff, Feb. 18, 2021 Full Comm. Hearing entitled, *"Game Stopped?  Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide?"*, U.S. H. R. Comm. on Fin. Servs., at 4 (Feb. 15, 2021), available at https://financialservices.house.gov/uploadedfiles/hhrg-117-ba00-20210218-sd002.pdf (https://perma.cc/4NA7-9GZY) (emphasis added).

AMERICAS 108801954

increase in purchases of shares in these stocks thus created unprecedented volatility in the markets.  Compl. ¶¶ 169–75.  In fact, Plaintiffs admit that this "wild ride" resulted in the New York Stock Exchange itself temporarily halting trading on some of the "meme stocks" on January 28, 2021.  Compl. ¶ 167.  Charles Schwab restricted trading the day before and held a conference call with "more than 25 regulators" about meme stock trading.  Compl. ¶¶ 256–57.  And the SEC issued an extraordinary statement relating to market volatility in the meme stocks.  Compl. ¶ 218.  Plaintiffs do not allege, nor could they, that they simply happened upon a bargain.  Rather, Plaintiffs and other "meme stock" investors admit that they sought to exploit unprecedented market conditions for financial gain.  Compl. ¶¶ 169–75.

### B.  The Role of Clearing Brokers Such as Apex in the Securities Markets

Apex is a clearing broker that provides introducing brokers, which may have less operational capability and regulatory capital and may not have direct access to trading platforms and clearinghouses, with access to those back-end capabilities and services.  Compl. ¶¶ 93–94.  Apex is registered with the Securities and Exchange Commission ("SEC") and the Financial Regulatory Authority ("FINRA") as a broker-dealer, Compl. ¶ 92, and under FINRA regulations "Apex is required to maintain a clearing agreement with each introducing broker-dealer," a "primary purpose" of which is to "allocate responsibilities between the introducing broker-dealer and the clearing broker in a clear manner regarding, among other things:  opening and approving accounts, monitoring of accounts, acceptance of orders, execution of orders, and extension of credit."  Pace Decl. Ex. 1 at 2–3 (Letter to NJBS); FINRA Rule 4311(c)(1).  As Apex explained in the letter to the N.J. Bureau of Securities relied upon by Plaintiffs here (Compl. ¶ 246),[5] Apex further requires each ultimate customer of any introducing broker that uses Apex to agree to a customer agreement that gives Apex the unfettered right to "*refuse to execute securities transactions* for the Customer *at any time and for any reason*."  Pace Decl. Ex. 1 at 3 (emphasis added); Pace Decl. Ex. 2 ¶ 3 (Customer Account Agreement quoted in Exhibit 1).

---

[5] Plaintiffs rely on and quote from Apex's letter to the N.J. Bureau of Securities to assert when and why Apex restricted trading in AMC, GME, and KOSS stocks.  Compl. ¶ 246.  This Court may consider this letter because it is "central to the [Plaintiffs'] claim," and because its "authenticity . . . is not challenged."  *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002).

AMERICAS 108801954

The necessity of Apex's ability to refuse trades cannot be overstated.  As a clearing broker, Apex is required to collateralize and settle any trades that Apex accepts, and so it must have the discretion and ability to reject trades (among other controls) in order to manage the credit and settlement risks Apex takes on from introducing brokers and those introducing brokers' customers.  Pace Decl. Ex. 1 at 3.  In part, that means that Apex must ensure that it has sufficient capital on hand to meet its regulatory deposit requirements, which in turn depends upon the outstanding orders that Apex has committed to clear, as described below in Section C. Compl. ¶ 141.

### C.  The Importance of Collateral Requirements

The National Securities Clearing Corporation ("NSCC") is the main clearinghouse that clears and settles transactions in equity and corporate debt securities traded in the U.S., and is part of the Depository Trust and Clearing Corporation ("DTCC").  Compl. ¶ 138.  The NSCC and DTCC are the two SEC-registered clearing agencies and, pursuant to the Dodd Frank Wall Street Reform and Consumer Protection Act of 2010, have been designated systemically important financial market utilities.[6]

As a clearing broker, Apex is a member of the NSCC, and as such is required to post collateral for the trades that it has agreed to process but which have not yet cleared.  Compl. ¶ 141.  When the NSCC calculates its collateral requirements for Apex, the NSCC is required to take into account various factors, including market volatility, and, in its discretion, apply a volatility multiplier.  Compl. ¶ 141.  The NSCC's obligation to collect collateral from its members is imposed through SEC regulations, which require the NSCC to cover its credit exposures to its members.  17 C.F.R. § 240.17Ad-22(e)(6).  Plaintiffs admit that the collateral requirements imposed by the NSCC are not some administrative nicety, capable of being disregarded by clearing brokers.  "These margin requirements are intended to protect DTCC members and the market as a whole *from the systemic risk* that *highly volatile stocks* can produce, especially when a broker's position has significant risk concentration in such stocks." Compl. ¶ 143 (emphasis added).  As Plaintiffs further admit, "margin requirements protect

---

[6] U.S. Dep't of the Treas., 2012 Annual Rep., Appendix A:  Designation of Systemically Important Financial Market Utilities (July 18, 2012), https://home.treasury.gov/system/files/261/here.pdf.

AMERICAS 108801954

NSCC and all market participants against clearing member defaults." Compl. ¶ 144. If Apex does not have sufficient capital on hand, then it cannot agree to clear trades. *See* 17 C.F.R. § 240.15c3-1.

When the NSCC informs a clearing broker, such as Apex, of an increase in its collateral requirement, the shortfall must be met on demand.[7] As Plaintiffs acknowledge, the failure of a broker-dealer like Apex to meet such collateral requirements could result in restrictions on doing business, fines, significant losses, disciplinary actions, and, in a worst-case scenario, liquidation or winding down of Apex's business. Compl. ¶ 140.

### D. Apex Suspends Opening New Positions on a Single Trading Day for Three Hours and Twenty-Five Minutes to Ensure Compliance with Net Capital Requirements

On January 28, 2021, at 9:30 a.m. ET,[8] Apex received a report from the NSCC increasing Apex's collateral requirement approximately ***ten-fold***. Pace Decl. Ex. 1 at 6 ("[T]he NSCC report showed an increase of approximately ten times the deposit requirement from 15 minutes earlier."). Approximately 90% of the new collateral requirement imposed by the NSCC related to trading activity in GME, AMC, and KOSS stock. *Id.* Accordingly, at 10:30 a.m. ET, and having received no updated estimate from the NSCC, Apex informed its introducing broker customers that it was pausing all purchasing of new shares of AMC, GME, and KOSS stocks, but that brokers would still be permitted to close out any positions in those stocks. Compl. ¶ 241. As Apex explained in its letter to the N.J. Securities Bureau, Apex temporarily halted additional purchasing of shares in those three stocks "to manage the risk that it would not be able to meet potential increased NSCC collateral funding obligations if Apex clients were permitted

---

[7] "Each member shall deposit in the Clearing Fund such amount that is necessary to satisfy any increase in its Required Fund Deposit within such time as the Corporation shall require." NSCC Rule 4, § 8 (August 17, 2021), available at https://www.dtcc.com/~/media/Files/Downloads/legal/rules/nscc_rules.pdf [https://perma.cc/JYC4-7VQR].

[8] When discussing the timing of Apex's decisions, we use the Eastern time zone, as alleged in the Complaint and as stated in Apex's February 9, 2021 Letter to the N.J. Bureau of Securities. We note that Apex corrected its letter to the N.J. Bureau of Securities on March 22, 2021, with another letter, in which Apex informed the N.J. Bureau of Securities that the time zones were incorrect in its earlier statement that trading was halted from 10:30 a.m. ET until 1:55 p.m. ET; in fact, Apex halted trading from approximately 10:30 a.m. *Central time* (or 11:30 a.m. ET) until 1:55 p.m. *Central time*. The correction letter has been produced to Plaintiffs.

7

to continue to engage in additional purchases of AMC, GME and KOSS." Pace Decl. Ex. 1 at 6; Compl. ¶ 246. At 11:00 a.m. ET, Apex received an updated NSCC report, estimating that its required collateral deposit requirement, while still elevated, was reduced significantly from the NSCC 9:30 a.m. estimate. Compl. ¶ 246; Pace Decl. Ex. 1, at 6. After confirming with the NSCC that the new report was indeed accurate (and would not change yet again), Apex informed its customers at 1:55 p.m. ET that it had lifted the restriction of new purchases of AMC, GME, and KOSS stock. Compl. ¶ 246; Pace Decl. Ex. 1, at 6. In total, Apex restricted trading of AMC, GME, and KOSS stock for approximately 3 hours and 25 minutes. *Id.* Apex's action occurred well after the market open (9:30 a.m. ET) on January 28, 2021 and was lifted with over an hour remaining before the close of the January 28 trading day (4:00 p.m. ET).

## ARGUMENT

I.     **This Court Does Not Have Subject-Matter Jurisdiction Over Plaintiffs Jang and Chavez's Negligence Claim—Brought in the MDL for the First Time Against Apex, and Thus Lacking an Underlying Original Complaint Filed in Another District and Home Forum**

The newly-asserted negligence claim against Apex (Count V of the Other Broker Tranche Complaint)—the only claim against Apex in the Complaint—first must be dismissed under Fed. R. Civ. P. 12(b)(1) because this Court lacks subject matter jurisdiction over new claims asserted by new plaintiffs against new defendants that were not part of any "transferor" court's claims.

While Plaintiffs style their complaint a "Consolidated Class Action Complaint," in fact the complaint does not "consolidate" existing claims by existing plaintiffs against existing defendants. Plaintiffs Chavez and Jang—the so-called "Apex Plaintiffs"—instead bring their negligence claim against Apex for the very first time in the Consolidated Class Action Complaint filed on July 26, 2021, in this Court. Neither Chavez nor Jang previously had sued Apex for negligence in any district court in the United States. Nor had Chavez nor Jang brought any suit previously. Their first action is in this Court at the "consolidated" complaint phase. Chavez and Jang are thus "strangers" to this MDL proceeding, as the *Gearshift* court so eloquently put it (cited below). And no negligence claim against Apex was "pending" prior to Chavez's and Jang's additions as new parties to the "consolidated" complaint. 28 U.S.C. § 1407(a). Instead, the "consolidated" complaint asserts *new* claims by *new* plaintiffs against a *new* defendant.

The Supreme Court made clear more than two decades ago in *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach* that cases consolidated in the JPML process are by statute to be

AMERICAS 108801954

remanded to the originating home court for trial.  523 U.S. 26, 34 (1998) ("[Section] 1407 not only authorizes the Panel to transfer for coordinated or consolidated pretrial proceedings, but *obligates* the Panel to remand any pending case to its originating court when, at the latest, those pretrial proceedings have run their course.") (emphasis added); 28 U.S.C. §1407(a) (at the end of MDL "pretrial" proceedings, matter "shall be remanded . . . to the district *from which it was transferred*") (emphasis added).  Neither Jang nor Chavez *has* an originating home court to which this Court may transfer the negligence action against Apex for trial.

Accordingly, as district courts consistently have held, "an MDL proceeding isn't 'an environment that can spawn fresh actions by new plaintiffs' because that 'is at odds with' the framework established by 28 U.S.C. § 1407.  In particular, 'newly-named plaintiffs who have never filed any lawsuit anywhere, in any court,' don't have a case in any 'transferor court from which [the transferee court] could inherit its authority over their claims.'" *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, 2021 U.S. Dist. LEXIS 116925, at *259–60 (D. Kan. June 23, 2021) (dismissing new claims by newly added plaintiffs for lack of subject matter jurisdiction) (internal citation omitted); *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 2017 U.S. Dist. LEXIS 216672, at *14 (E.D. Mich. Mar. 21, 2017) (granting motion to strike the consolidated master complaint because "[t]he seventeen new plaintiffs added by the plaintiffs' steering committee to the consolidated master complaint are **strangers to this proceeding**.  Adding them and their respective claims to the pleading was improper.") (emphasis added).

MDL transferee courts consistently hold that they lack subject matter jurisdiction over newly-added claims by newly named plaintiffs which have been brought for the first time in the MDL court; new cases cannot be *created within* an MDL, but rather must be filed in a "home forum" and *consolidated* into an MDL.  *See, e.g.*, *In re EpiPen*, 2021 U.S. Dist. LEXIS 116925, at *259–60; *In re Packaged Ice Antitrust Litig.*, 2011 U.S. Dist. LEXIS 150426, at *48–51 (E.D. Mich. Dec. 12, 2011) (dismissing claims for lack of subject matter jurisdiction:  "The proper course for these proposed new plaintiffs in this MDL litigation is to file their claims in the appropriate forums and to permit the MDL consolidation process to operate as intended."); *In re Farmers Ins. Exch. Claims Representatives' Overtime Pay Litig.*, 2008 U.S. Dist. LEXIS 90136, at *13 (D. Or. Oct. 28, 2008) ("I have discovered no authority for this court, as an MDL

AMERICAS 108801954

transferee court, to exercise subject matter jurisdiction over state law claims not transferred by the MDL Panel and over which this court lacks original jurisdiction.").

The complete absence of transferor courts for the claim against Apex is not a missing procedural nicety, but a fundamental flaw. MDL courts recognize that the MDL proceeding is not an incubator for new startup claims. MDL courts have dismissed new claims created in their proceedings because, "[w]ithin the context of MDL proceedings, individual cases that are consolidated or coordinated for pretrial purposes remain fundamentally separate actions, intended to resume their independent status once the pretrial stage of litigation is over." *Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices and Products Liab. Litig.*, 785 F. Supp. 2d 925, 930 (C.D. Cal. 2011) (quoting *In re Korean Air Lines Co. Antitrust Litig.*, 642 F.3d 685, 700 (9th Cir. 2011)). Indeed, the Supreme Court in *Lexecon* has ruled that transfer back to the transferee court upon the conclusion of pretrial proceedings is mandatory. 523 U.S. at 34–35; *see also* 28 U.S.C. § 1407(a) (transferred actions "shall be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated."). The Apex Plaintiffs do not *have* an individual case—let alone an individual case against Apex—and cannot create one within an MDL action. *Gearshift*, 2017 U.S. Dist. LEXIS 216672, at *13 (rejecting plaintiffs' argument that "the consolidated master complaint 'superseded' previous pleadings in the underlying cases" because the previous civil actions "'retain their separate identities' throughout the MDL process") (internal citation omitted). The Court accordingly lacks subject matter jurisdiction over the negligence claim against Apex.

Apex tried to resolve this issue with Plaintiffs' counsel. On August 16, 2021, Apex contacted Plaintiffs' counsel concerning this fatal flaw in the Other Broker Tranche Complaint and, in a telephonic conference on August 18, provided Plaintiffs' counsel with case law explaining this Court's lack of subject matter jurisdiction in light of the lack of an original home forum court. Pace Decl. ¶¶ 2–4. Apex provided Plaintiffs' counsel with still further case law, cited above, on August 23, 2021. Pace Decl. ¶ 2–3. Plaintiffs' counsel informed Apex on August 26, 2021, that they did not plan to try to rectify this procedural error, Pace Decl. ¶ 6, and so Apex now asks this Court to dismiss Plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1).

## II.     This Court Lacks Personal Jurisdiction Over Apex Because the Apex Plaintiffs Have Not Served a Valid Summons on Apex in Any Negligence Action

The complaint against Apex must be dismissed under Rules 12(b)(2) and 12(b)(5) of the Federal Rules of Civil Procedure in light of Plaintiffs' failure to properly serve a valid summons on Apex.  Fed. R. Civ. P. 12(b)(2), (5).

As discussed in Section I, neither of the Plaintiffs in this negligence action who purport to bring claims against Apex actually filed or appeared in any underlying complaint transferred to this MDL.  The Complaint names Erik Chavez and Peter Jang as the two "Apex Plaintiffs," and only those two Plaintiffs are described as having been customers of introducing brokers that used Apex as a clearing broker.  *See* Compl. ¶¶ 70–77.  But neither Mr. Chavez nor Mr. Jang filed or appeared in any underlying complaint in a district court that was transferred to this MDL.  *See supra* Section I.  Their appearance in the purportedly "consolidated" complaint is their first involvement in the case, and neither Plaintiff has served Apex with a valid summons.

Service effected by other plaintiffs of other complaints does not suffice to satisfy the requirement that Mr. Chavez and Mr. Jang properly serve a summons and complaint for their claim—on Apex.  *In re Cmty. Health Sys.*, 2016 U.S. Dist. LEXIS 123030, at *10–11 (N.D. Ala. Sept. 12, 2016) (finding that "the establishment of personal jurisdiction over [defendant] in one transferor forum of this MDL—here, Tennessee—does not confer to this transferee court personal jurisdiction over [defendant] for all other claims asserted against [defendant] by all other Plaintiffs in the MDL's Consolidated Amended Complaint where the other transferor jurisdictions could not establish jurisdiction over [defendant]"); *In re Monitronics Int'l, Inc.*, 2014 U.S. Dist. LEXIS 192814, at *17 (N.D.W. Va. June 5, 2014) ("Just because the MCC is an amended complaint, however, does not relieve the plaintiffs of serving new defendants in accordance with Rule 4 . . . .  With the exception of Mey, none of the other plaintiffs named UTC as a defendant in their underlying complaints, and thus the respective transferee courts never had personal jurisdiction over UTC.  Therefore, upon consolidation, this Court did not inherit personal jurisdiction over UTC in relation to any plaintiff other than Mey."); *see also In re Showa Denko K.K.*, 953 F.2d 162, 165–66 (4th Cir. 1992) ("As in any other case, a transferee court's jurisdiction in multi-district litigation is limited to cases and controversies between

11

persons who are properly parties to the cases transferred, and any attempt without service of process to reach others who are unrelated is beyond the court's power.").

Personal jurisdiction is evaluated on a claim by claim basis. *Andrew v. Radiancy, Inc.*, 2017 U.S. Dist. LEXIS 96384, at *5 (M.D. Fla. June 22, 2017) ("'[T]he issue of whether personal jurisdiction is present is a question of law' that courts must resolve on a claim-by-claim basis.") (internal citation omitted). Therefore, personal jurisdiction for the antitrust claims, effected by service of a summons by *other plaintiffs*, in *other transferor courts*, in *other actions*, does not establish personal jurisdiction for the negligence claim.

Nor is the failure to properly serve Apex a mere technical error that can be brushed aside. Personal jurisdiction may be asserted by a court only if a summons has been issued and validly served upon the defendant. *Omni Capital Int'l v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987) ("Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied."). The Supreme Court repeatedly has said that a court may not adjudicate claims against a defendant over which that court lacks personal jurisdiction. *See, e.g.*, *Murphy Bros. v. Michetti Pipe Stringing*, 526 U.S. 344, 350 (1999) ("In the absence of service of process (or waiver of service by the defendant), a court ordinarily may not exercise power over a party the complaint names as defendant."). Because neither of the Apex Plaintiffs nor Apex, the Defendant here, were party to any underlying negligence complaint, and because no such complaint has been served on Apex, Plaintiffs claims must be dismissed under Rules 12(b)(2) and 12(b)(5).

### III.    Plaintiffs Jang and Chavez Lack Article III Standing

Plaintiffs do not allege that they were injured because they were not able to purchase additional shares of any securities they intended to purchase. Rather, Plaintiffs base their injury claim on an even more speculative chain of hypothetical events, that: (1) *others would have* continued to purchase the relevant meme stocks during the few hours on one trading day when Apex halted purchases, (2) which *would have* caused the price of the securities to increase, and (3) which, in turn, *would have* caused Plaintiffs to sell their shares at a higher price at some later point in the future. Plaintiffs' speculative claims do not confer Article III standing.

### A. Plaintiffs Fail to Allege Injury in Fact Because Their Claims That They Would Have Sold at a Higher Price Are Completely Speculative and Implausible

To plead Article III standing, a Plaintiff plausibly must allege (1) injury in fact—that is, an injury that is concrete, particularized, and actual or imminent, not conjectural or hypothetical; (2) that the injury is "fairly traceable to the challenged action;" and (3) that the injury is likely to be redressed by a favorable decision by the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

Plaintiffs do not allege that Mr. Chavez or Mr. Jang would have purchased or even *wanted* to purchase additional shares of any of the meme stocks, much less that they *tried* to do so and were prevented by Apex's actions.  Instead, Plaintiffs allege that Mr. Chavez held 607 shares of AMC stock on January 27 (Compl. ¶ 72) and *sold* that AMC stock on February 2 "for less than he would have sold for but for the negligence alleged herein." *Id.* ¶ 73.  Likewise, Plaintiffs allege that Mr. Jang held 3,500 shares of GME stock on January 27 and that on February 4 he "sold 401 shares of GME stock for less than he would have sold for but for the negligence alleged herein." *Id.* ¶¶ 76–77.  But Plaintiffs admit that neither Mr. Chavez nor Mr. Jang was prevented from selling his shares on January 27, 28, or any other day.  Compl. ¶ 241 (brokers were able to close out any positions in GME, AMC, or KOSS at all times).  Nor did Apex's actions prevent Plaintiffs from buying more of the three meme stocks at the open or close of the market trading day on January 28, 2021.

Plaintiffs' theory therefore seems to be that, but for Apex's conduct, some number of *other investors*, who temporarily were unable to make purchases with brokers who used Apex would have made more purchases than they did, driving up prices.  Plaintiffs then appear to speculate that Mr. Chavez and Mr. Jang then would have used their savvy and clairvoyance to time the market well by selling at the unspecified inflated price, rather than holding the stocks for either too little or too much time.  Compl. ¶¶ 72, 73, 76, 77.

Any such claim depends on assuming that Mr. Chavez and Mr. Jang perfectly would have timed the stock market—that is, that they correctly would have called the top of the market and sold their stocks at that point—even though in the real world they did not.  On January 28,

AMERICAS 108801954

GameStop shares—which previously had traded at $20–40 a share—were instead trading for $483 a share.[9]  Nothing prevented Mr. Jang from selling his shares at $483; sales were never restricted on these or any other securities.  Yet instead of selling at $483—or holding longer term until the stock price reached $344.66 in June—Mr. Jang sold his GME stock on February 4 when the stock price was between $53.33 and $91.50.[10]  Compl. ¶¶ 72, 73, 76, 77.  Likewise, nothing prevented Mr. Chavez from selling his AMC stock at $16.50 on January 28, or holding until the stock hit $64.96 on June 18, but instead he sold on February 2 for between $6 and $10.10.  In other words, Mr. Chavez and Mr. Jang each sold in a dip—but ask this Court to allow them to recover on the theory that (a) the stock price could have gone even higher, and, if it had, then (b) they definitely would have realized the top of the market and sold at that point, even though in the real world they missed the top entirely.

Allegations that a plaintiff would have taken certain steps at an unspecified future date on which it would have been most advantageous are inherently speculative and insufficient to allege injury-in-fact.  Indeed, the Eleventh Circuit has made clear that injury stemming from a "some day" intention to do something in the future is not sufficient to confer Article III standing:

> Because Aaron has alleged only that it intends to found a clinic at some unspecified time in the future, its "some day" intention []—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do[es] not support a finding of . . . "actual or imminent" injury. . . . A plaintiff alleging that it would have opened a business absent the challenged action must point to at least some facts suggesting a likelihood that its business would have come about absent the challenged action.

*Aaron Private Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1337–38 (11th Cir. 2019) (internal citation omitted); *see also Tokyo Gwinnett, LLC v. Gwinnett Cty.,* 940 F.3d 1254, 1263–64 (11th Cir. 2019) ("[A] plaintiff does not meet this burden by merely outlining in a complaint 'facts

---

[9] Yahoo Finance, Historical Data: GameStop Corp. (GME), https://finance.yahoo.com/quote/ GME/history/ (last visited Aug. 30, 2021).  This Court may take judicial notice of stock prices. *New Orleans Emplrs. Int'l Longshoremen's Ass'n v. Mercer Inv. Consultants*, 635 F. Supp. 2d 1351, 1362 n.7 (N.D. Ga. June 2009) ("The Court finds that the historical returns of the NASDAQ composite index are the type of historical facts that are appropriate to take judicial notice of, and that the accuracy of the Daily Stock Price Report cannot reasonably be questioned.").

[10] Yahoo Finance, Historical Data: GameStop Corp. (GME), https://finance.yahoo.com/quote/ GME/history/ (last visited Aug. 30, 2021).

14

from which we could *imagine* an injury sufficient to satisfy Article III's standing requirements,' since 'we should not speculate concerning the existence of standing, nor should we imagine or piece together an injury sufficient to give plaintiff standing when it has demonstrated none.'") (emphasis added) (internal citations omitted).

Nothing in the Complaint asserts a concrete plan that would suggest that Mr. Chavez or Mr. Jang actually would have earned even greater returns or that they suffered any injury as a result of Apex's 3.5 hour trading pause.  And nothing of this sort of chain of hypothetical actions, as *Lujan* teaches, can be redressed by a favorable decision of this Court.

Having failed to allege any concrete plans to purchase or sell their stock at a particular time, Plaintiffs' optimistic and conclusory allegations of injury are insufficient to confer standing on Plaintiffs Chavez and Jang.

### B.  Plaintiffs Fail to Allege They Have a "Legally Protected Interest" in Lost Earnings Due to Plaintiffs' Thwarted Scheme

The injury in fact prong of Article III standing requires the "invasion of a legally protected interest."  *See Aaron Private Clinic Mgmt.*, 912 F.3d at 1336.  But here, Plaintiffs are in effect suing to recover the greater ill-gotten gains that they hoped to receive as a result of a thwarted market manipulation scheme.  However, it has long been understood that courts will not allow a plaintiff to recover profits that would result from improper or illegal conduct.  *See The Highwayman's Case*, 9 L. Q. Rev. 197 (1893).  The Seventh Circuit succinctly has described this commonsense rule:

> [I]f awarding relief to the plaintiff would reward wrongdoing—courts will not adjudicate their dispute.  The classic illustration is *Everet v. Williams* (Ex. 1725), better known as The Highwayman's Case and reported (long afterward) in a note by that name in 9 L.Q. Rev. 197 (1893).  A highwayman sued his partner in crime for an accounting of the illegal profits of their criminal activity.  The court refused to adjudicate the case, and both parties were hanged.  A modern example would be a suit by the owner of a misleading trademark for infringement of the mark.

*Schlueter v. Latek*, 683 F.3d 350, 355 (7th Cir. 2012).

The Plaintiffs unabashedly admit that this litigation arises from Plaintiffs' own coordinated "short squeeze" working as a group to purchase stocks to pump up "the value of the stock they purchased."  Compl. ¶ 175.  Plaintiffs admit that the increase in value of the meme stocks was the product of online discussions that resulted in unprecedented coordinated purchasing of shares of those stocks.  Compl. ¶ 169 ("[T]he Suspended Stocks became

AMERICAS 108801954

increasingly popular as, among other things, investors engaged in online discussions regarding the undervaluation of the Suspended Stocks and began purchasing shares."); Compl. ¶ 122. Simply put, Plaintiffs cannot allege the invasion of a legally protected interest in their lost profits from a partially-blunted market manipulation scheme.  *See* Complaint, *Secs. & Exch. Comm'n v. Aaron et al.*, No. 1:15-cv-05704 (S.D.N.Y. Jul. 21, 2015) (action alleging "multiple 'pump-and-dump' schemes dating back to at least mid-2011").

## IV. Plaintiffs' Negligence Claim Fails as a Matter of Law

The Common Law Complaint also should be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure because it fails to state a claim for negligence against Apex. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). For that reason, factual allegations that allow the court to infer only "the mere possibility of misconduct," without more, are insufficient. *Iqbal*, 556 U.S. at 679.

Plaintiffs' allege that Apex was negligent for three reasons, all of which fail as a matter of law. First, Plaintiffs contend that Apex did not spend enough time debating or "negotiating" with the DTCC over the collateral requirements before taking emergency action to restrict its clearing of trades in three highly volatile stocks—that Apex had a "duty to dicker" rather than take decisive action. Compl. ¶¶ 240, 316. Second, Plaintiffs claim that Apex's conduct was negligent when, after receiving a reduced collateral requirement from NSCC, Apex evaluated and deliberated for two hours and thirty minutes[11] to understand whether continuing to clear trades in these three stocks would put Apex at risk of violating FINRA and SEC rules before it re-opened clearing of those stocks—that Apex had a "duty to rush" rather than taking the time to

---

[11] Pace Decl. Ex. 1 (Feb. 9, 2021 NJBS Letter) ("At approximately 11:00 am, Apex received an updated NSCC report showing a potential collateral deposit requirement that was elevated but lower than the 9:39 am report and in line with reports Apex had received from NSCC prior to 9:30 am that day.  After confirming that the new report as accurate, Apex communicated to all clients the lifting of the restriction of new purchases of AMC, GME and KOSS at approximately 1:55 pm on January 28, 2021.  No restriction has been in place since.").

AMERICAS 108801954

understand the facts and exercise due caution.[12]  Compl. ¶ 317.  And third, Plaintiffs argue that it was negligent for Apex to not have immediately on hand the full amount of capital sufficient to cover the ten-fold increase in collateral demanded by NSCC in response to the unprecedented market volatility and risk.[13]  In other words, Plaintiffs allege that Apex did not have—but should have had—sufficient capital on hand to manage what the Complaint recognizes was literally unlimited risk, and that Apex therefore has a duty to tap unlimited funds.  Compl. ¶ 318.  Each of Plaintiffs' novel purported duties has never been previously imposed by any court.

Plaintiffs fail to state a negligence claim for the reasons discussed below.

### A.  Choice of Law Considerations Compel Application of Texas Law Where Apex Has Its Headquarters

Federal courts adjudicating state law claims must apply state choice of law rules.  *In re Managed Care Litig.*, 298 F. Supp. 2d 1259, 1296–97 (S.D. Fla. 2003); *see also Balt. Orioles, Inc. v. Major League Baseball Players Ass'n*, 805 F.2d 663, 681 (7th Cir. 1986) (collecting cases).  While ordinarily an MDL court would apply the choice of law rules of the transferor forum, there is no transferor court here.[14]  *See* Section I.  We therefore apply Florida choice of law rules because, lacking any transferor forum, this MDL court is the forum in which Plaintiffs' claims have been brought.  *See Hall v. Burger King Corp.*, 912 F. Supp. 1509, 1534 (S.D. Fla. 1995) ("In actions in which jurisdiction depends upon diversity of citizenship, federal courts must follow the conflict of law rules prevailing in the state in which they sit.  The same principle holds true with respect to pendent jurisdiction claims.") (internal citations omitted).

---

[12] Plaintiffs point to an internal document suggesting that trading resumed at 3:00 p.m. U.S. ET in order to insinuate an additional hour of restriction.  Compl. ¶¶ 242–43.  However, as explained above, once the correct time zone is applied to Plaintiffs' allegations, any alleged additional hour of restriction that Plaintiffs imply falls away, because the trading restrictions also went into effect an hour later than alleged in the Complaint.  *See supra* note 8; *see also* Compl. ¶ 242; Pace Decl. Ex. 1 (Feb. 9, 2021 NJBS Letter); *Griffin Indus. v. Irvin*, 496 F.3d 1189, 1205–06 (11th Cir. 2007) ("Our duty to accept the facts in the complaint as true does not require us to ignore specific factual details of the pleading in favor of general or conclusory allegations.  Indeed, when the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern.").

[13] Pace Decl. Ex. 1 (Feb. 9, 2021 NJBS Letter).

[14] *See In re Managed Care Litig.*, 298 F. Supp. 2d at 1296 ("In cases transferred pursuant to 28 U.S.C. § 1407, the transferee district court must apply the state law, including its choice of law rules, that would have been applied had there been no change of venue.").

AMERICAS 108801954

The Supreme Court of Florida has adopted the "significant relationships" choice of law rule, which requires courts to consider:  "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered.  These contacts are to be evaluated according to their relative importance with respect to the particular issue." *Bishop v. Florida Specialty Paint Company*, 389 So. 2d 999, 1001 (Fla. 1980).  Greater weight should be given to a defendant's location, rather than the location of the plaintiffs' alleged injury, when the alleged conduct was centralized or had widespread effect, *Costa v. Kerzner Int'l Resorts Inc.*, 2011 US Dist. LEXIS 66921, at *13 (S.D. Fla. June 23, 2011), when Plaintiffs' alleged injury occurred in two or more states, *Default Proof Credit Card Sys. Inc. v. State Street Bank & Trust Co.*, 753 F. Supp. 1566, 1570 (S.D. Fla. 1990), and where, as here, Plaintiffs have not bothered to sue Apex anywhere else.

These choice of law factors support Texas law governing the Apex Plaintiffs' negligence claims.  First, Apex's Customer Account Agreement, which is quoted in the letter from Apex to the N.J. Bureau of Securities relied upon in Plaintiffs' Complaint (¶ 246), requires that Texas law govern any disputes.  Pace Decl. Ex. 1 at 3 (NJBS Letter); Ex. 2 at ¶ 15 (Customer Account Agreement).  Second, because the Plaintiffs have not filed an action in a home forum—instead impermissibly seeking to create a new action in the MDL court—Plaintiffs have no choice of forum to consider.  Third, the locus of the conduct Plaintiffs' allege to be negligent is centered in Dallas, Texas, which is where Apex maintains its headquarters.  *See Costa*, 2011 US Dist. LEXIS 66921, at *13.

Fourth, Apex is domiciled in Texas.  Compl. ¶ 91.  Fifth, the Apex Plaintiffs' domiciles are each different, Compl. ¶¶ 70, 74, so their locations should be given little weight.  *Default Proof*, 753 F. Supp. at 1570.  Finally, the relationship between Plaintiffs and Apex—to the extent there is any relationship—is centered in Texas, given that Apex has customers nationwide. *Chapman v. DePuy Orthopedics, Inc.*, 760 F. Supp. 2d 1310, 1313–14 (M.D. Fla. 2011).

Under Texas law, "[t]o state a claim for negligence, a plaintiff must allege three elements:  (1) the existence of a legal duty; (2) a breach of that duty; and (3) damages proximately resulting from that breach.  The existence of a legal duty is a threshold question, and is a question of law for the court to resolve.  If no duty exists, then the negligence claim is not

18

viable and the Court need not consider the remaining elements." *Turk v. Pershing LLC*, 2014 U.S. Dist. LEXIS 190624, at *14 (N.D. Tex. Dec. 8, 2014) (internal citations omitted). However, even if another state's laws govern, the standard for negligence is effectively identical in all states that could be at issue here. *Scott v. Watson*, 359 A.2d 548, 552 (Md. 1976) (summarizing law of Maryland, home to Apex Plaintiff Jang); *Quiroz v. Alcoa Inc.*, 416 P.3d 824, 827–28 (Ariz. 2018) (summarizing law of Arizona, home to Apex Plaintiff Chavez); *Solomon v. New York*, 489 N.E.2d 1294, 1294 (N.Y. 1985) (same).

Courts nationwide have disclaimed any common law or general duty of clearing brokers to investors to accept trades, and have similarly disclaimed any duty to guard against unforeseeable events (discussed further below). *Riggs v. Schappell*, 939 F. Supp. 321, 329–30 (D.N.J. 1996) (clearing broker defendant did not owe plaintiff investors a "broad fiduciary duty" sufficient to support a cause of action for negligence and granted defendant's motion to dismiss); *Mars v. Wedbush Morgan Sec.*, 283 Cal. Rptr. 238, 241–42 (Cal Ct. App. 1991) (same); *Ross v. Bolton*, 904 F.2d 819, 824 (2d Cir. 1990) (same); *Rozsa v. May Davis Grp., Inc.*, 187 F. Supp. 2d 123, 131–32 (S.D.N.Y. 2002) (same); *Pulka v. Edelman*, 358 N.E.2d 1019, 1022–23 (N.Y. 1976) ("foreseeability is a limitation on duty"); *West v. Cruz*, 251 P.2d 311, 315 (Ariz. 1952) (no duty to plaintiffs where circumstances were unforeseeable); *Beckwith v. Hart*, 263 F. Supp. 2d 1018, 1023 (D. Md. 2003) (no liability for unforeseeable injury).

### B. It Is Well-Established That a Clearing Broker Such as Apex Owes No Duty of Care to Investors Such as Plaintiffs

This Court should dismiss Plaintiffs' negligence claims because courts consistently have held that clearing brokers like Apex do not have a duty of care to investors.

"Whether a duty exists is a question of law for the court . . . ." *United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 473 (Tex. 2017). To determine the existence of a duty, courts in Texas apply a "straightforward common-law duty analysis, balancing the risk, foreseeability, and likelihood of injury against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant." *Read v. Scott Fetzer Co.*, 990 S.W.2d 732, 736 (Tex. 1998). Here, Apex owed no duty to Plaintiffs because, as a clearing broker, Apex did not undertake to act on behalf of investors such as the named Plaintiffs and because, more fundamentally, clearing brokers are not public utilities and owe no duty to investors to accept new orders. Moreover, Texas law does not impose a

AMERICAS 108801954

general duty of care to prevent economic injury.   Plaintiffs therefore fail to make out a negligence claim here.

### 1.  It Is Well Established That Clearing Brokers Owe No Duty of Care to Investors

First, the law is clear that clearing brokers do not owe a duty to investors who use brokerages that in turn use the clearing broker's clearing services.   *See, e.g.*, *Weatherly v. Pershing*, 2015 U.S. Dist. LEXIS 197128, at \*11 (N.D. Tex. June 23, 2015) ("[Defendant Pershing] did not undertake to act on behalf of investors; [Defendant's] contract was with SGC [Stanford Group Company—an introducing broker].   Plaintiffs do not cite any text from the clearing agreements indicating that [Defendant] agreed to perform any services for investors."); *Turk v. Pershing LLC*, 2014 US Dist. LEXIS 190624, at \*14–16 (N.D. Tex. Dec. 8, 2014) (holding that, "as a clearing broker, [defendant] owed no common law duty of care to Plaintiffs that could form the basis of a negligence claim," and noting that "[t]he majority of case law supports [defendant's] contention"); *see also Riggs*, 939 F. Supp. at 329–30; *Mars,* 283 Cal. Rptr. at 241–42; *Ross*, 904 F.2d at 824; *Rozsa*, 187 F. Supp. 2d at 131–32; Henry Minnerop, *Role and Regulation of Clearing Brokers—Revisited*, 75 Bus. Law. 2201, 2241 (2020).

As in *Weatherly*, nowhere in the Complaint do Plaintiffs allege any clearing agreement "indicating that [Apex] agreed to perform any services for investors," let alone that Apex had agreed to perform any services for Plaintiffs Jang or Chavez in particular.   *Weatherly*, 2015 U.S. Dist. LEXIS 197128, at \*11.   But Plaintiffs do cite Apex's response to the N.J. Bureau of Securities (Compl. ¶ 246), which quotes the language from Apex's customer agreements stating that Apex "***shall have the right to refuse to execute securities transactions for the Customer at any time and for any reason***," and that Apex "shall not be liable for losses caused directly or indirectly by any events beyond your reasonable control, including without limitation, government restrictions, exchange or market rulings, ***suspension of trading or unusually heavy trading in securities***, a general change in economic, political or financial conditions, war or strikes."   Apex Letter to NJBS, Pace Decl. Ex. 1, at 3.

### 2.  Plaintiffs New Duty Would Change the Role of Clearing Brokers:   Clearing Brokers Are Not Public Utilities, and They Owe No Duty to Accept All Orders Under All Circumstances

But even if Apex owed some duty of care to Plaintiffs, Plaintiffs fail to allege anything to support their proposed duty of *providing unlimited capital and assuring constant availability*.

Apex is not an exchange or a public utility, required to continue operating its clearing services all day, every day, without interruption, even when doing so would create hazards to its business. As one court in Texas noted with respect to brokers (*i.e.*, a step *closer* to Plaintiffs than Apex):

> A customer's right to sue a broker for refusing to open a new position in the market must be considered in light of countervailing concerns, particularly the consequences of placing that requirement on a broker. ***To impose this duty on broker or brokerage houses would be to require them to act as a public utility and would deny them the right to exercise business judgment in the acceptance of customers and customers' orders. There are no Texas cases imposing such a duty***, and the authorities in other jurisdictions have refused to impose it. Lastly, an analysis under the risk-utility balancing test supports our decision not to impose this duty on brokers.

*Hand v. Dean Witter Reynolds Inc.*, 889 S.W.2d 483, 495 (Tex. App. 1994) (emphasis added); *see also id.* at 495 ("[T]he execution of new contracts exposes the broker, as well as the customer, to new financial risks. One party should not be able to impose risks on the other without the other's consent.").

Indeed, the Complaint admits that moving to "position closing only" (allowing any investor to get out of a position but not clearing trades for new purchases) is entirely appropriate in certain circumstances. Compl. ¶ 15 n.3. Plaintiffs also admit that it is acceptable to stop selling stocks for a period of time due to events that might result in damage to Apex or the markets. *Id*. Thus Plaintiffs provide no support for, and in fact undermine, their allegation that Apex was negligent in not remaining available to clear all trades in all circumstances.

### 3. Apex Owes Plaintiffs No General Duty of Care to Prevent Economic Losses, Particularly Ones Governed by Contract

The Apex Plaintiffs' only allegations of injury are that they held shares of GME and AMC stock and that they sold the shares "for less than [they] would have sold for but for the negligence alleged herein." Compl. ¶¶ 72, 73, 76, 77. Texas law follows the "economic loss rule," which disallows "purely economic damages unaccompanied by injury to the plaintiff or his property" for actions in negligence. *LAN/STV v. Martin K. Eby Constr. Co.*, 435 S.W.3d 234, 235 (Tex. 2014). Indeed, "Texas courts of appeals have uniformly applied the economic loss rule to deny recovery of purely economic losses in actions for negligent performance of services." *Id.* at 243. Often, the economic loss rule is applied in the context of a claim for negligent performance under a contract and disallows tort claims for purely economic injury that is the subject of a contract. *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986)

AMERICAS 108801954

("When the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone."). Here, Plaintiffs' relationship with Apex is governed by Plaintiffs' customer agreement with Apex, which expressly states that Apex has "the right to refuse to execute securities transactions for the Customer at any time and for any reason." Pace Decl. Ex. 1, at 3; Pace Decl. Ex. 2, ¶ 3. This Court may consider the existence of such contracts, because standard language from those customer contracts is quoted at length in the letter from Apex to the N.J. Bureau of Securities relied upon in Plaintiffs' Complaint. Compl. ¶ 246. *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) ("Our prior decisions . . . make clear that a document need not be physically attached to a pleading to be incorporated by reference into it; if the document's contents are alleged in a complaint and no party questions those contents, we may consider such a document provided it meets the centrality requirement[]."). And even if this Court does not take judicial notice of the terms of the Customer Account Agreement, its very existence precludes Plaintiffs' from recovering in tort for losses that are purely economic in nature and the subject of the agreement. The Apex Plaintiffs cannot avoid the economic loss rule simply by purposefully omitting mention of the customer agreements they signed.

However, even if this Court does not consider the existence of these contracts, the economic loss rule still precludes Plaintiffs' negligence claim against Apex. Although the rule most frequently is enforced where there is a contract in place between the parties, "[t]he economic-loss rule not only applies to bar claims against those in a direct contractual relationship but also applies to preclude tort claims between parties who are not in contractual privity." *A&H Props. P'ship v. GPM Eng'g*, 2015 Tex. App. LEXIS 12879, at *4 (Tex. App. Dec. 23, 2015); *LAN/STV*, 435 S.W.3d at 235–36 (discussing and applying economic loss rule to contractual strangers). Plaintiffs have asserted nothing more than negligence resulting in purely economic loss. Compl. ¶¶ 72, 73, 76, 77. Thus, regardless of whether this Court considers the contracts between Plaintiffs and Apex, Plaintiffs' Complaint fails to state a claim under Texas law and must be dismissed.

### C. Plaintiffs Fail to Allege a Standard of Care That Apex's Conduct Could Have Breached with a Mid-Day, Few Hour Interruption in a Single Day's Trading of Three Meme Stocks

Even if the Court does not dismiss the claims for lack of a duty owed by Apex, the Complaint fails to state a claim for anything approaching negligence—instead trying to make do

by alleging that Apex violated a "duty to dicker," a "duty to rush," and a "duty to have infinite money."  No such duties exist, and, in alleging that Apex was too *cautious* in discontinuing clearing services, Plaintiffs have alleged the very opposite of negligence.

> **1. Plaintiffs' First Alleged Negligent Act (the Duty to Dicker with DTCC):  Halting Trading to Comply with Net Capital Requirements Too Quickly Without "Seek[ing] to Negotiate It Down." Compl. ¶ 240.**

Plaintiffs have it backwards.  Instead of alleging "negligence," Plaintiffs allege that they were harmed by an overabundance of *caution* by Apex; they allegedly were harmed by a surplus of care, not a lack of care.  Tort law simply does not punish actors in negligence for having used an overabundance of caution—for having used too much care.  *See Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex. 1983) ("[F]actors which should be considered in determining whether the law should impose a duty are the risk, foreseeability, and likelihood of injury *weighed against the social utility of the actor's conduct*, the magnitude of the burden of guarding against the injury and *consequences of placing that burden on the employer*.") (emphasis added).

Plaintiffs' first theory of negligence highlights the backwards nature of Plaintiffs' claims. The Complaint does not claim any impropriety in Apex's decision to temporarily suspend its services for trades of certain stocks in response to an unprecedentedly large collateral demand from the NSCC.  *See* Compl. ¶ 15 n.3 (acknowledging that such suspensions can occur).  Rather, the Complaint suggests that Apex simply acted too decisively to limit the risk that such collateralization requirements would impose, "without even trying to confirm the collateralization number received from DTCC at approximately 9:30 a.m. on January 28, 2021, *or seeking to negotiate it down*."  Compl. ¶ 316 (emphasis added); *see also* Compl. ¶¶ 233, 240 (alleging that Apex received a demand from the DTCC at 9:30 a.m. and suspended clearing services at 10:31 a.m.).

The social utility of clearing brokers like Apex taking these precautions and halting trading to ensure that they continue to meet their net capital and other regulatory requirements cannot be overstated.  *See, e.g.*, *Bear, Stearns Sec. Corp.*, Exchange Act Release No. 41,707, 70 SEC No. 710 (Aug. 5, 1999) (ordering clearing firm to pay civil penalties and pay into a settlement fund for violating the net capital rule).  Negligence law does not require clearing brokers to risk violating regulatory requirements simply to economically benefit a class of

23

investors.  In fact, the law requires the opposite of brokers.  *See, e.g.*, *Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.*), 247 B.R. 51, 64 (Bankr. S.D.N.Y. 1999) (introducing broker was "obligated by law to cease trading" when it was "operating in violation of its net capital requirements").

Even if it could be considered negligence to take quick and decisive action (one hour after receiving NSCC's notice) to limit risk in response to unprecedented market conditions, Plaintiffs allege that what Apex should have done instead was "negotiate" with the NSCC regarding the collateralization requirements.  Compl. ¶ 316.  But Plaintiffs badly misunderstand these requirements; they are not, as the Complaint supposes, an opening offer to a negotiation about what type of collateral is required under SEC regulations and FINRA rules.  17 C.F.R. § 240.15c3-1(a) ("Every broker or dealer *must* at all times have and maintain net capital no less than the greater of the highest minimum requirement applicable to its ratio requirement under paragraph (a)(1) of this section, or to any of its activities under paragraph (a)(2) of this section, and must otherwise not be 'insolvent' as that term is defined in paragraph (c)(16) of this section.") (emphasis added); *see also* 17 C.F.R. § 240.17Ad-22 (2020) (standard for clearing agencies).

The Complaint summarizes the Net Capital Rule as a duty "to maintain sufficient liquid assets to meet all *obligations* to customers."  Compl. ¶ 147.  But nowhere do the rules force clearing brokers to take on *more obligations*.  The Rule requires only that the existing "obligations" be covered.  The suspension of trading was to meet the obligations of existing Apex customers.  The Plaintiffs turn the Net Capital Rule on its head to read it as a duty to provide unlimited capital to cover unlimited future obligations.  The Rule nowhere imposes such a draconian duty; and the imposition of such a duty would discourage firms from becoming clearing brokers in the first place, at war with the democratization efforts of the SEC in 1975 and beyond.  *See, e.g.*, Minnerop at 2212–13.

The NSCC's communications are simply a real-time estimate and calculation of the necessary capital under the SEC's and FINRA's requirements.  A company has no duty to perform futile acts such as disobey the capital requirements in the hopes that the NSCC might calculate different ones.  *In re Cadwallder*, No. 06-36424, 2007 Bankr. LEXIS 2260, at *45 (Bankr. S.D. Tex. June 28, 2007) ("The law does not require the impossible.").

24

Plaintiffs admit, however, that the collateral requirements communicated by the NSCC are not some administrative nicety, lightly to be disregarded by clearing brokers.  "These margin requirements are intended to protect DTCC members and the market as a whole from the systemic risk that highly volatile stocks can produce, especially when a broker's position has significant risk concentration in such stocks."  Compl. ¶ 143.  As the Complaint further explains, "margin requirements protect NSCC and all market participants against clearing member defaults."  Compl. ¶ 144.

Notably, if Apex had continued to permit purchases, the 9:30 a.m. collateralization demand had been correct, and the demand had continued to grow at the same exponential pace as it had from the prior day, then Apex very quickly and very easily could have violated the net capital rule—effectively promising to cover trades that it lacked the capital to cover.  *See* Compl. ¶ 147 ("Pursuant to 17 C.F.R. § 240.15c3-1 (the 'Net Capital Rule'), the SEC requires broker-dealers to 'at all times have and maintain net capital' no less than the greatest of the minimum requirement applicable to its business.   17 CFR § 240.15c3-1(a).   The Net Capital Rule is designed to require broker-dealers to maintain sufficient liquid assets to meet all obligations to customers."); *see also* Compl. ¶¶ 137–41 (describing capital requirements).   The consequences of doing so would have been significant, to say the least.   *See, e.g.*, *In re Adler, Coleman Clearing Corp.*, 247 B.R. 51 (consequences of continuing trading in violation of net capital rule). Acting quickly to avoid violating the law is not negligence.

Plaintiffs thus propose to create a new "duty to dicker" rather than take decisive action in the face of potential threats from market volatility.  But such a duty not only does not exist—it is not negligent to be cautious—it also could well be deleterious to future investors.  If clearing brokers were not permitted to decide to discontinue clearing for a period of time in response to collateral requirements, but rather were required to continue clearing at ever-increasing levels of risk while trying to get the NSCC on the phone to "negotiate," then clearing brokers would be at greater risk of failing to maintain adequate collateral, and even greater harm to Plaintiffs and others would occur.  *See* Compl. ¶¶ 140–44 (explaining the risks to both Apex and the markets of a failure to meet collateralization requirements in response to a collateral call from the NSCC). Simply put, there is not and has never been a duty to delay decisive action and "negotiate" with the DTCC.

AMERICAS 108801954

**2. Plaintiffs' Second Alleged Negligent Act (the Duty to Rush): Reopening Trading to Ensure Compliance with Net Capital Requirements Too Slowly.  Compl. ¶¶ 242, 246.**

Plaintiffs' second theory of negligence is that Apex acted too cautiously in re-opening its clearing services for these three stocks.  Again, Plaintiffs blame Apex for its *abundance* of care during extraordinary market activities in the three meme stocks.  Plaintiffs allege that, having received at 11:00 a.m. on January 28, 2021 a new, lower collateral requirement from the NSCC, Apex "confirm[ed] with NSCC that the new report was accurate" before lifting the restriction on purchasing.   Compl. ¶¶ 242, 246.   While the Complaint cryptically alleges that Apex "communicated with the NSCC . . . before noon," it does not allege when the NSCC actually *responded*, much less when the NSCC confirmed that the 11:00 a.m. collateral requirement was correct.  Compl. ¶ 247.  In any event, as shown in the letter to the N.J. Bureau of Securities relied upon in Plaintiffs' Complaint, Apex lifted its restriction on purchases at 1:55 p.m. that day— approximately 2 hours and 55 minutes after receiving the NSCC's revised collateral requirement.  Compl. ¶ 246.  Plaintiffs thus claim that taking 2 hours and 55 minutes to confirm the new capital requirement on a day of historic volatility is negligence.

Plaintiffs ignore that, had Apex miscalculated and re-opened trading only to be hit with a collateralization demand it could not cover, then it might violate the net capital rule (and other regulations for that matter).  *See* Compl. ¶¶ 137–44 (describing these requirements).  Instead, in addition to asking this Court to create a new duty of care for clearing brokers, Plaintiffs ask this Court to second-guess, minute-by-minute, Apex's effort to manage the risks of unprecedented volatility in trading and shifting capital requirements.  But "[c]ourts are not equipped to second-guess the business judgments of professional traders and brokers when it comes to risk assessments," such as the risk here of re-opening trading on stocks with unprecedented volatility. *Capital Options Invest., Inc. v. Goldberg Bros. Commodities, Inc.*, 958 F.2d 186, 191 (7th Cir. 1992) (reasoning adopted in *Hand*, 889 S.W.2d at 495).  The duty of care is not a Goldilocks question requiring the exercise of *just enough* care, and an overabundance of care to ensure compliance with the law is not negligence.  *See, e.g., Stag Canon Fuel Co. v. Rose*, 145 S.W. 677, 680 (Tex. App. 1912) (finding no contributory negligence where appellee "out of abundant caution, which the aftermath fully justified, [] was endeavoring to place timbers as required by appellant's rule when the rock fell and injured him."); *Gonzalez v. Acosta*, 2001 Tex. App.

LEXIS 5623, at *4 (Tex. App. Aug. 16, 2001) (no negligence where defendant "proceeded slowly and with caution from [] driveway"); *Adams v. Graves*, 1990 Ohio App. LEXIS 4964, at *14 (Ohio App. Oct. 23, 1990) ("[A]ppellee successfully carried his burden of showing that he acted with caution and complied with the law.  Therefore, appellee was not negligent, as a matter of law[.]").

Plaintiffs' new "duty to rush" is at odds with hornbook negligence law, and it demonstrates the conflicting obligations that ad hoc, litigation-driven duties can produce if negligence law is applied in the manner Plaintiffs urge here.  The duty to rush is at odds with the duty to dicker.

> ### 3.  Plaintiffs' Third Alleged Negligent Act (the Duty to Provide Unlimited Capital):  Failure to Foresee and Access Unlimited Capital to Withstand Unprecedented Market Manipulation of Meme Stocks on January 28, 2021.  Compl. ¶ 318.

Nor does Plaintiffs' third theory of negligence fare any better.  Compl. ¶ 318.  Plaintiffs admit that the short squeeze they created was a "rare," unprecedented event, caused by a group of coordinated actors exploiting market vulnerabilities to artificially inflate the price of a stock. Compl. ¶ 239 ("rare"); ¶ 136 ("Robinhood continued to drive explosive growth and volume"); Compl. ¶ 169 ("Leading up to January 28, 2021, the Suspended Stocks became increasingly popular as, among other things, investors engaged in online discussions regarding the undervaluation of the Suspended Stocks and began purchasing shares.").  Elsewhere in this MDL, Plaintiffs have alleged that these actions created "theoretically limitless loss[es]" that Apex and other clearing brokers would have needed to be capable of covering.  Antitrust Compl. ¶ 12; *see also* Compl. ¶ 175 ("[s]hort sellers . . . risk further losses in the billions of dollars").

Yet Plaintiffs nonetheless claim not only that Apex should have anticipated that Plaintiffs would engage in such conduct driving the meme stocks ever higher through Reddit chats, but also that Apex should have responded by simply "raising additional capital."  Compl. ¶ 318. This claim fails for multiple reasons.

*First*, it was unforeseeable as a matter of law that Plaintiffs would engage in the short squeeze that is the subject of this litigation.  *Humble Sand & Gravel, Inc. v. Gomez*, 146 S.W.3d 170, 181 (Tex. 2004) ("It is firmly established in Texas that the existence and elements of a common law duty are ordinarily legal issues for the court to decide" and identifying foreseeability as an element of duty).  A duty of care does not require Apex to guard against the

AMERICAS 108801954

unforeseeable.  "It is quite generally held that . . . duty . . . excludes liability for those consequences which arise from *unusual or extraordinary occurrences.*  These latter are held not reasonably to be anticipated or foreseen, and therefore no legal duty is imposed to guard against them."  *Dallas v. Maxwell*, 248 S.W. 667, 670 (Tex. 1923) (emphasis added); *Doe v. Boys Clubs*, 907 S.W.2d 472, 478 (Tex. 1995) ("Foreseeability requires more than someone, viewing the facts  in retrospect,  theorizing  an extraordinary sequence  of events whereby  the  defendant's conduct brings about the injury.").

*Second*, no duty of reasonable care requires Apex to guard against illegal market manipulation.  "As a general rule, a defendant has no legal duty to protect another from the criminal acts of a third person . . . ."  *Banzhaf v. ADT Sec. Sys. Sw., Inc.*, 28 S.W.3d 180, 186 (Tex. App. 2000); *see also Anderson v. Dairy Farmers of Am., Inc.*, 2010 U.S. Dist. LEXIS 104191, at *32 (D. Minn. Sep. 30, 2010) (in the context of a plaintiff's duty to mitigate damages: "In effect, Jordan opines that a commodities trader must take constant precautions against fraud in light of the fact that someone, somewhere, may be perpetrating a fraudulent trading scheme. Such a standard is not supported in the law.").  Here, Plaintiffs admit that they and others like them engaged in a collusive short squeeze, and their complaint is that—having joined a group of people jointly manipulating the market—they then failed to enjoy the full fruits of their manipulation.  Compl. ¶¶ 169–75.  But there is no duty for Apex to have on hand sufficient capital to grease the skids for Plaintiffs' market manipulation; even if Plaintiffs are free to manipulate the market, they are not entitled to force others to take on unlimited risk so that they may do so.  *See Otis*, 668 S.W.2d at 309 (when imposing a common law duty of care, courts must weigh the social utility of the actor's conduct, "the magnitude of the burden of guarding against the injury and consequences of placing that burden on the employer.").

*Third*, Plaintiffs do not, and cannot, allege *how* Apex was supposed to simply create "additional capital," nor do Plaintiffs allege *how much* capital would have been enough to have on hand for this unprecedented event.  *See* Compl. ¶ 318.  Simply alleging that Apex should have somehow "rais[ed] additional capital" does not suffice to state a claim that Apex somehow was negligent—*i.e.*, that it departed from the standard of care—by having on hand the amount of capital it did.  *Iqbal*, 556 U.S. at 679 ("[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the Complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'").  And any such duty would be particularly

28

problematic here, given that plaintiffs in this MDL have characterized the potential losses Apex needed to cover as "theoretically limitless."  Antitrust Compl. ¶ 12.  Plaintiffs thus are not merely suggesting that Apex should have had *additional* capital, but rather that Apex should have somehow had *unlimited* capital.

Nowhere does Plaintiffs' Complaint find any such duty to supply endless capital in the SEC Net Capital Rule.  Money does not grow on trees.  The duty Plaintiffs seek to impose on clearing brokers has no precedent.    The unlimited capital duty conflicts with a duty to dicker.

*Finally*, in Plaintiffs' view of the world, clearing brokers must be capable of taking on virtually unlimited risk—and thus must have virtually unlimited resources—because in Plaintiffs' view it would be *negligent* to decide to limit risk by temporarily suspending trading. *See* Compl. ¶ 318 (alleging that it is negligence to be unable simply to "rais[e] additional capital" at will, and to suspend trading instead).  But Texas law is clear that brokers are not public utilities and are not required to continue taking *new orders* along with the corresponding unlimited risk associated with such new orders.  *Hand*, 889 S.W.2d at 495 ("[T]he execution of new contracts exposes the broker, as well as the customer, to new financial risks.  One party should not be able to impose risks on the other without the other's consent.").  There is simply no duty in the law for a broker—let alone a clearing broker—to have unlimited resources to facilitate investors' demands.  *Hand*, 889 S.W.2d at 495 (refusing to treat brokers as a public utility and therefore refusing to impose a duty on brokers "to open a new position in the market" at all times upon a consumer's request).

In Plaintiffs' imagined world of clearing brokers having to take unlimited risks with unlimited capital, undoubtedly the SEC's democratization reforms would be impacted adversely. *See, e.g.*, Minnerop, at 2212–13.  Tort law certainly does not impose a duty for such heroics.

### D.  Apex's Actions Did Not Proximately Cause Plaintiffs' Alleged Injury

Last, Plaintiffs' claims against Apex must be dismissed because Plaintiffs fail to plausibly allege that Apex's decision to halt trading proximately caused Plaintiffs' alleged injuries.  Plaintiffs allege that Erik Chavez and Peter Jang sold their shares of AMC and GME stock, respectively, "for less than [they] would have sold for but for the negligence alleged herein."  Compl. ¶¶ 73, 77.

Under Texas law, Plaintiffs plausibly must allege damages proximately resulting from Defendant's alleged breach of its duty of care.  *Greater Hous. Transp. Co. v. Phillips*, 801

S.W.2d 523, 525 (Tex. 1990).  "Proximate cause has two elements:  cause in fact and foreseeability."  *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 551 (Tex. 2005).  "These elements cannot be established by mere conjecture, guess, or speculation."  *Id*.  That standard is consistent with *Iqbal*'s instruction that the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678.  "The test for cause in fact is whether the act or omission was a substantial factor in causing the injury without which the harm would not have occurred."  *Urena*, 162 S.W.3d at 551.  The Texas Supreme Court has made clear that causation "is not established if the defendant's conduct or product does no more than furnish the condition that makes the plaintiff's injury possible."  *Allways Auto Grp., Ltd. v. Walters*, 530 S.W.3d 147, 149 (Tex. 2017).  "'Foreseeability' means that the actor, as a person of ordinary intelligence, should have anticipated the dangers that his negligent act created for others."  *Travis v. Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992).

Here, even if Plaintiffs could claim injury (and they cannot), there is no plausible, non-speculative allegation that Apex's decision to halt trading for a few hours on January 28 in fact caused Plaintiffs' to sell their shares ***more than three trading days later on February 2*** (in the case of Plaintiff Chavez), Compl. ¶ 73, and ***more than five trading days later on February 4*** (in the case of Plaintiff Jang), Compl. ¶ 77, for less than Plaintiffs think they otherwise would have sold their shares—and for significantly less than they could have sold their shares on January 28, but did not.

Plaintiffs' claims are speculative because they require a crystal ball and depend upon too many causal links.  *Perret v. Wyndham Vacation Resorts, Inc.*, 846 F. Supp. 2d 1327, 1331 (S.D. Fla. 2012) ("A complaint can only survive a 12(b)(6) motion to dismiss if it contains factual allegations that are 'enough to raise a right to relief above the speculative level, on the assumption that all the [factual] allegations in the complaint are true.'").  Finding in Plaintiffs' favor requires speculating as to:

- How much additional stock of GME, AMC, or KOSS any individual Plaintiff would have bought (if any);

- What each Plaintiffs' individual choice would have been concerning whether or when to sell his/her shares of GME, AMC, or KOSS; and

- What thousands of individual investors would have chosen to do (*i.e.*, bought or sold their GME/AMC/KOSS stock), and when they would have done it.

Plaintiffs' allegations that, "but for" Apex's conduct, Compl. ¶¶ 73, 77, they would have sold their shares at a higher price than they did are further speculative in that they would require the fact finder to assume that the prices of GME and KOSS stock simply would have continued to rise higher than those prices had ever risen before, and that AMC stock would have continued to rise, despite the fact that that stock made no significant upward price movements in the following 4 months after Apex's restrictions were lifted.  Pace Decl. Exs. 3–5.[15]

Finally, Plaintiffs do not even attempt to meet the foreseeability requirement of proximate cause, as they do not allege a single fact indicating that Apex should have anticipated that its decision to stop trading to ensure compliance with capital requirements would have caused injury to investors.  *Travis*, 830 S.W.2d at 98.  Indeed, courts have held that clearing brokers are entitled to cancel trades made when a broker is in violation of its net capital requirements.  *In re Adler, Coleman Clearing Corp.*, 247 B.R. 51 (clearing trustee had no obligation to execute introducing broker's trades that would be illegal under securities law due to a failure to comply with net capital requirements).  Plaintiffs offer no insight into how Apex should have foreseen injury to Plaintiffs by complying with its regulatory requirements.  Moreover, Texas courts repeatedly have held that intervening actors' misconduct, if unforeseeable, negates causation.  *Coleman v. Equitable Real Estate Inv.*, 971 S.W.2d 611, 618 (Tex. App.—Dallas 1998, pet. denied) (employee's breach of security policies was unforeseeable and, therefore, new and independent cause).  Plaintiffs' alleged injury was caused by unprecedented, widespread, online-forum-driven market activity, not Apex's decision to halt trading, nor the timing of its decision to resume trading, nor its decision not to maintain infinite capital.

**V.      This Action Is Pre-Empted by Federal Securities Law Because Apex Is Heavily Regulated and Because the Duty that Plaintiffs Assert Against Apex Would Prove an Obstacle to the Uniform Federal Regulatory Scheme in the Interstate Trading of Publicly-Listed Securities**

Plaintiffs' state common law claims conflict with and are preempted by the federal securities laws.  "The Supremacy Clause provides that the laws and treaties of the United States

---

[15] Courts are permitted to take judicial notice of stock prices.  *See La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 842 (11th Cir. 2004) ("Those [stock] prices are not subject to reasonable dispute, and are a proper subject for judicial notice.").

'shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.'  U. S. Const., Art. VI, cl. 2.  Accordingly, it has long been settled that state laws that conflict with federal law are 'without effect.'"  *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 479–80 (2013) (internal citation omitted).  "[S]tate law is naturally preempted to the extent of any conflict with a federal statute."  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000); *see also Geier v. Am. Honda Co.*, 529 U.S. 861, 865 (2000) ("We ask whether the Act pre-empts a state common-law tort action . . . [and] conclude that the Act . . . pre-empts the lawsuit.").  "[A court] will find preemption where it is impossible for a private party to comply with both state and federal law . . . and where 'under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  *Crosby*, 530 U.S. at 372–73 (emphasis added).

It comes as no surprise that the purchase and sale of publicly-listed securities in interstate commerce is extensively regulated at the federal level, with the 1934 Exchange Act enacted in the aftermath of the Wall Street 1929 collapse.

The DTCC and its subsidiary NSCC are self-regulatory organizations (SROs) that are required to promulgate rules and procedures for their members pursuant to the Securities Exchange Act of 1934.  The authorizing statute, 15 U.S.C. § 78q-1, states the purpose of both entities, including "prompt and accurate clearance and settlement of securities transactions," and "the development of uniform standards and procedures for clearance and settlement."  Plaintiffs devote an entire section of their Complaint to the national, federal securities regulatory landscape, acknowledging that its purpose is to "manage risk to the markets."  Compl. ¶ 137; *see also* Compl. ¶¶ 137–68.

The Complaint is clear that federal regulators were active in the events of January 28, 2021.  "SEC/FINRA are very interested in our move to restrict trading in this way . . . ."  Compl. ¶ 257.  The Complaint cites SEC investigations and FINRA supervision throughout.  *See, e.g., id.* at 273–74 (investigations of January 28, 2021 activities).

Clearing in particular has a unique federal history.  As one commentator describes, the national clearing system was the subject of 1975 amendments to the 1934 Exchange Act.  The Congressional reforms were part of the efforts to democratize stock ownership and grow the number of broker dealers by federalizing the clearance process for stocks—a process in which

AMERICAS 108801954

Congress exercised its powers under the Commerce Clause to nationalize the clearance and settlement of securities transactions—taking it away from the States:

> In 1975, Congress responded to the Paper Crunch crisis by amending the Securities Exchange Act of 1934.  Congress determined that "the prompt and accurate clearance and settlement of securities transactions . . . are necessary for the protection of investors" and directed the SEC to "facilitate the establishment of a national system for the prompt and accurate clearance and settlement of transactions in securities."  The 1975 amendments marked the first time that Congress invoked its powers under the Commerce Clause, charging the SEC with "regulating the securities transfer and clearing processes, a subject previously left to state law."[16]

Part of the Congressional reforms led to the creation of the discount brokerage market with commissions deregulated on "May Day"—May 1, 1975.  *See* Minnerop at 2213.  The SEC implemented the Congressional mandate leading to "the development of the national clearance and settlement system as well as the regulatory framework governing clearing brokers."[17]

Yet Plaintiffs ask this Court, through state tort law, to impose a duty on clearing brokers to do what federal law disallows.  *See* Minnerop at 2245 n.215.  Plaintiffs chastise Apex, for example, for being too hasty to comply with its increased collateral requirements—"that it did not even try to confirm the high number or seek to negotiate it down."  Compl. ¶ 240.  But a clearing broker's interaction with the DTCC and NSCC is not a negotiation; it is a *calculation* that needs to be complied with promptly.  *See supra* Factual Background Section C.  Thus complying with Plaintiffs' proposed standard of care while complying with Apex's regulatory obligations—again, which were put in place "to protect DTCC members and the market as a whole from the systemic risk that highly volatile stocks can produce" (Compl. ¶ 143)—would be impossible.  *See PLIVA, Inc. v. Mensing*, 564 U.S. 604, 620 (2011) ("The question for 'impossibility' is whether the private party could independently do under federal law what state law requires of it.").  And Plaintiffs' state common law negligence claims against Apex are preempted.  *Id.* at 623–24 ("[I]t is enough to hold that when a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the

---

[16] Henry Minnerop, Role and Regulation of Clearing Brokers—Revisited, 75 Bus. Law. 2201, 2212 (2020).
[17] Minnerop at 2213.

AMERICAS 108801954

exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for pre-emption purposes.").

Even if compliance with both federal regulations and state negligence law as proposed by Plaintiffs were not impossible, doing so would still present an *obstacle* to the purposes and objectives of Congress, as described by the Supreme Court in *American Honda* and *Crosby*. Uniformity is the touchstone of federal securities regulation. Congress, along with the SEC and a host of self-regulatory organizations, has designed a regulatory scheme aimed at "the development of uniform standards and procedures for clearance and settlement." 15 U.S.C. § 78q-1(a)(1)(D). The SEC has never imposed any of the three duties the Plaintiffs seek to impose for the very first time on clearing brokers, and this despite the very detailed and often-amended rule about Net Capital that the SEC oversees.

Once conduct consistent with that regulatory scheme is exposed to liability under state tort law, uniformity is destroyed. *See Am. Honda*, 529 U.S. at 865 ("[P]reemption . . . reflects a desire to subject the industry to a single, uniform set of federal [] standards [and] an intent to avoid the conflict, uncertainty, cost, and occasional risk to safety itself that too many different [] cooks might otherwise create."). If Plaintiffs' proposed duties were the law, then clearing brokers would be subject to varying jury outcomes in various states as to whether and to what extent they should have ignored collateral requirements in some circumstances, had unlimited capital on hand in other circumstances, or taken some other action based on the short or long positions of downstream investors.

Finally, Plaintiffs' state law negligence claims contain another fatal flaw: they intrude on a relationship that is uniquely federal. When Plaintiffs challenge Apex's management of risk in response to the NSCC's estimate of collateral requirements, Plaintiffs effectively challenge the discretion of the NSCC and call into question its ability to regulate its members. *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001) ("[T]he relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law."). Plaintiffs may not be directly alleging wrongdoing or negligence on NSCC's part, but allowing their claim to go forward would have the same practical effect of using state tort law to regulate a federal entity. Not only would such suits be disruptive to the uniformity desired through federal regulation, but

AMERICAS 108801954

subjecting clearing firms to potentially 50 different standards of liability in 50 different states would impose a serious burden on those firms.  *See, e.g., Am. Honda.*, 529 U.S. at 871.

## VI.    The Claims of Plaintiffs Whose Brokers Did Not Use Apex as a Clearing Broker Must Be Dismissed

Although Plaintiffs divide themselves into "Robinhood Plaintiffs" and "Apex Plaintiffs," they nonetheless purport to bring their negligence claims against Apex on behalf of a "Nationwide Investor Class," which includes the eleven "Robinhood Plaintiffs" along with any and all investors in the securities markets who held or sold certain stocks, regardless of whether those investors' brokers used Apex's clearing services.  Compl. ¶¶ 276–78.  Claims by customers of introducing brokers who do not use Apex's clearing services—which are even further attenuated than the Apex Plaintiffs' claims—fail to state a negligence claim for the same reasons that the Apex Plaintiffs' claims fail.  *See* Section IV.  As a clearing broker, Apex owes no duty of care to individual investors and certainly owes no duty of care to investors whose brokers did not even use Apex's services.  In any event, for the reasons stated in Sections IV.B and C, Apex was under no duty to continue to accept trades and risk violating the SEC's net capital requirements.  And, for the reasons articulated in Section IV.D, Plaintiffs (or members of the Nationwide Investor Class) whose trades were not routed through Apex can show no injury that was proximately caused by Apex's decision to halt trading for a few hours on January 28, 2021.  Indeed, Plaintiffs make no effort to allege any facts that would support a plausible inference that Apex's decision to halt trading for a few hours harmed investors whose brokers did not use Apex as a clearing broker.

## VII.    With 25,000 Pages Produced and Numerous Pleading Opportunities, the Consolidated Amended Complaint Should Be Dismissed with Prejudice

This Court should dismiss Plaintiffs' Other Broker Tranche Common Law Complaint with prejudice.  Plaintiffs have had the opportunity to review extensive discovery to craft their Complaint and nonetheless have failed to state a claim upon which relief can be granted.  Consequently, amendment to the Complaint would be futile.  *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001) ("A district court need not, however, allow an amendment . . . where amendment would be futile."); *Espinoza v. Countrywide Home Loans Servicing*, L.P., 2014 U.S. Dist. LEXIS 107263, at *21 (S.D. Fla. Aug. 5, 2014) (Altonaga, J.) ("A more carefully drafted third amended complaint could not cure the defects that are plainly evident in the SAC, and

35

therefore leave to amend will not be granted.").  Therefore, this Court should dismiss Plaintiffs' Complaint with prejudice.

## CONCLUSION

For the foregoing reasons, Defendant Apex respectfully requests that the Court dismiss the Other Broker Tranche Common Law Complaint with prejudice as to Apex for lack of subject matter jurisdiction, lack of adequate service, lack of personal jurisdiction, and failure to state a claim under Federal Rules of Civil Procedure 12(b)(1), (2), (5), and (6).

## CERTIFICATE OF GOOD FAITH CONFERENCE

Pursuant to Local Rule 7.1(a)(3)(A), I hereby certify that counsel for the movant has conferred with all parties or non-parties who may be affected by the relief sought in this motion under Rules 12(b)(1), (2), and (5), in a good faith effort to resolve the issues but has been unable to resolve the issues.

Dated:  August 30, 2021

By:  */s/* Jack E. Pace III

Jack E. Pace III
Bryan D. Gant
**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, NY  10020
Tel:  (212) 819-8200
Fax:  (212) 354-8113
jpace@whitecase.com
bgant@whitecase.com

J. Mark Gidley
**WHITE & CASE LLP**
701 Thirteenth Street, N.W.
Washington, D.C.  20005
Tel:  (202) 626-3600
Fax:  (202) 639-9355
mgidley@whitecase.com

Angela Daker
**WHITE & CASE LLP**
200 South Biscayne Blvd.

Suite 4900
Miami, FL  33131
Tel:  (305) 371-2700
Fax:  (305) 358-5744
adaker@whitecase.com

***Counsel for Defendant***
***Apex Clearing Corporation***

**Certificate of Service**

I HEREBY CERTIFY that, on August 30, 2021, I electronically filed the foregoing

document with the Clerk of the Court using the CM/ECF filing system.  I further certify that this

motion was served on all counsel of record via transmission of the Notice of Electronic Filing

generated by the Court's CF/ECF System.

*/s/* Jack E. Pace III _____
Jack E. Pace III
