**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-MD-2989-ALTONAGA/TORRES**

In re:

**JANUARY 2021 SHORT SQUEEZE**
**TRADING LITIGATION**

_____/

This Document Relates to:

ALL ANTITRUST ACTIONS

**DEFENDANTS' MOTION TO DISMISS THE ANTITRUST TRANCHE COMPLAINT**
**AND INCORPORATED MEMORANDUM OF LAW**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................1

BACKGROUND ...............................................................................................................4

    I.     The Industry Participants. ...............................................................................4

          A.     Introducing Brokers. ........................................................................4

          B.     Clearing Brokers. ...........................................................................5

          C.     Market Makers. ..............................................................................6

          D.     Clearing Agencies. .........................................................................6

    II.    The Mechanics of Securities Trading. ............................................................7

    III.   The Unprecedented Market Volatility of January 2021. .......................................8

    IV.   The Events of January 28, 2021 and Onward. .................................................10

ARGUMENT ...................................................................................................................12

    I.     PLAINTIFFS FAIL SUFFICIENTLY TO PLEAD THAT
          DEFENDANTS AGREED TO CONSPIRE. ....................................................14

          A.     Plaintiffs Fail To Allege Any Direct Evidence of an Agreement. .............15

          B.     Plaintiffs Fail Adequately To Allege Circumstantial Evidence of an
                Agreement. ...................................................................................16

    II.    PLAINTIFFS FAIL TO PLEAD THE REMAINING ELEMENTS OF A
          SECTION 1 CLAIM. ...................................................................................27

          A.     The Court Should Address the Question of *Per Se* vs. Rule of
                Reason at the Motion To Dismiss Stage. .............................................28

          B.     Plaintiffs' Allegations Do Not Qualify for *Per Se* Treatment under
                the Antitrust Laws. .........................................................................28

          C.     Plaintiffs Do Not Even Attempt To Plead a Section 1 Violation
                Based on the Rule of Reason. ............................................................30

    III.   PLAINTIFFS' ANTITRUST THEORY IS PRECLUDED BY THE
          FEDERAL SECURITIES LAWS ....................................................................33

          A.     Plaintiffs' Antitrust Claims Are Precluded under *Billing* Because
                the Conduct at Issue Is Regulated by the Federal Securities Laws ...........33

          B.     There Is No Applicable Savings Clause. ..............................................38

    IV.   INDEPENDENT REASONS EXIST TO DISMISS ALL CLAIMS
          AGAINST PEAK6, E*TRADE HOLDINGS AND ROBINHOOD
          MARKETS. ................................................................................................38

    V.    PLAINTIFFS' CLAIMS SHOULD BE DISMISSED WITH PREJUDICE. ........39

CONCLUSION ................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Dental Ass'n v. Cigna Corp.*,
   605 F.3d 1283 (11th Cir. 2010) ............................................................................17

*Anderson News, L.L.C. v. Am. Media, Inc.*,
   899 F.3d 87 (2d Cir. 2018).....................................................................................20

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................................16

*Austin v. Blue Cross & Blue Shield of Ala.*,
   903 F.2d 1385 (11th Cir. 1990) .............................................................................32

*Auto. Alignment & Body Serv. v. State Farm Mut. Auto. Ins. Co.*,
   953 F.3d 707 (11th Cir. 2020) ...............................................................................16

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)......................................................................................... passim

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
   441 U.S. 1 (1979)......................................................................................28, 29, 30

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962)................................................................................................31

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977)................................................................................................32

*Burtch v. Milberg Factors, Inc.*,
   662 F.3d 212 (3d Cir. 2011)...................................................................................15

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
   485 U.S. 717 (1988)..........................................................................................14, 28

*Cavero v. Law Offices of Erskine & Fleisher*,
   No. 12-21196-CIV, 2012 WL 13134213 (S.D. Fla. Aug. 28, 2012) ......................11

*Cement Manufacturers Protective Association v. United States*,
   268 U.S. 588 (1925)................................................................................................24

*Chapman v. N.Y. State Div. for Youth*,
   546 F.3d 230 (2d Cir. 2008)...................................................................................31

*Consultants & Designers, Inc. v. Butler Serv. Grp., Inc.*,
   720 F.2d 1553 (11th Cir. 1983) .............................................................................28

*Copperweld Corp. v. Independence Tube Corp.*,
467 U.S. 752 (1984)...................................................................................................14

*Credit Suisse Sec. (USA) LLC v. Billing*,
551 U.S. 264 (2007).............................................................................................. passim

*D.A.M. v. Barr*,
474 F. Supp. 3d 45 (D.D.C. 2020) ...........................................................................12

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
504 U.S. 451 (1992)...................................................................................................32

*Elec. Trading Grp., LLC v. Banc of Am. Sec. LLC*,
588 F.3d 128 (2d Cir. 2009)................................................................................34, 37

*In re Farm-Raised Salmon & Salmon Prods. Antitrust Litig.*,
No. 19-21551-CIV, 2021 WL 1109218 (S.D. Fla. Mar. 23, 2021) ................................. passim

*In re Fla. Cement & Concrete Antitrust Litig.*,
746 F. Supp. 2d 1291 (S.D. Fla. 2010) ...............................................................16, 25, 26, 38

*Friedman v. Salomon/Smith Barney, Inc.*,
313 F.3d 796 (2d Cir. 2002)..........................................................................35, 36, 37

*FTC v. Ind. Fed'n of Dentists*,
476 U.S. 447 (1986)...................................................................................................30

*Gordon v. New York Stock Exchange, Inc.*,
422 U.S. 659 (1975)...................................................................................................37

*Graphic Prods. Distribs., Inc. v. Itek Corp.*,
717 F.2d 1560 (11th Cir. 1983) ...............................................................................31

*Hoover v. Blue Cross & Blue Shield of Ala.*,
855 F.2d 1538 (11th Cir. 1988) ...............................................................................40

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3rd Cir. 2010) ...................................................................................15

*Interstate Cir. v. United States*,
306 U.S. 208 (1939)...................................................................................................21

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
626 F.3d 1327 (11th Cir. 2010) ........................................................................ passim

*Kalmanovitz v. G. Heileman Brewing Co.*,
769 F.2d 152 (3d Cir. 1985)......................................................................................31

*La Grasta v. First Union Sec., Inc.*,
  358 F.3d 840 (11th Cir. 2004) ...................................................................................8

*Levine v. Cent. Fla. Med. Affiliates, Inc.*,
  72 F.3d 1538 (11th Cir. 1996) ...................................................................13, 27, 28

*In re Loc. TV Advert. Antitrust Litig.*,
  No. 18-C-6785, 2020 WL 6557665 (N.D. Ill. Nov. 6, 2020) ..................................15

*Mayor & City Council of Balt. v. Citigroup, Inc.*,
  709 F.3d 129 (2d Cir. 2013)......................................................................15, 18, 22

*Mayor & City Council of Balt. v. Citigroup, Inc.*,
  Nos. 08-cv-7746 (BSJ), 08-cv-7747 (BSJ), 2010 WL 430771 (S.D.N.Y. Jan.
  26, 2010), *aff'd on other grounds*, 709 F.3d 129 (2d Cir. 2013) ...........................36

*In re Mexican Gov't Bonds Antitrust Litig.*,
  412 F. Supp. 3d 380 (S.D.N.Y. 2019)......................................................................25

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
  465 U.S. 752 (1984).......................................................................................13, 14, 18

*In re Musical Instruments & Equip. Antitrust Litig.*,
  798 F.3d 1186 (9th Cir. 2015) ...........................................................................20, 22

*Nat'l Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*,
  779 F.2d 592 (11th Cir. 1986) ...............................................................................28

*Nat'l Soc'y of Pro. Eng'rs v. United States*,
  435 U.S. 679 (1978)...........................................................................................27, 28

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
  472 U.S. 284 (1985)..................................................................................................30

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018)..................................................................................28, 30, 32

*Pressner v. Target Corp.*,
  No. 00-cv-6636, 2001 WL 293993 (N.D. Ill. Mar. 27, 2001) .................................40

*Procaps S.A. v. Pantheon, Inc.*,
  845 F.3d 1072 (11th Cir. 2016) ..........................................................................27, 28

*In re Publ'n Paper Antitrust Litig.*,
  690 F.3d 51 (2d Cir. 2012)........................................................................................29

*Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*,
  917 F.3d 1249 (11th Cir. 2019) (en banc) ....................................................... passim

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997)..................................................................................31

*Re-Alco Indus., Inc. v. Nat'l Ctr. for Health Educ., Inc.*,
   812 F. Supp. 387 (S.D.N.Y. 1993)..........................................................................30

*In re Se. Milk Antitrust Litig.*,
   739 F.3d 262 (6th Cir. 2014) ..................................................................................30

*Sinaltrainal v. Coca-Cola Co.*,
   578 F.3d 1252 (11th Cir. 2009) (abrogated on other grounds)...............................13

*St. Paul Fire & Marine Ins. Co. v. Barry*,
   438 U.S. 531 (1978)...........................................................................................29, 30

*Starr v. Sony BMG Music Ent.*,
   592 F.3d 314 (2d Cir. 2010)....................................................................................22

*State Oil Co. v. Khan*,
   522 U.S. 3 (1997)....................................................................................................29

*In re Stock Exchs. Options Trading Antitrust Litig.*,
   317 F.3d 134 (2d Cir. 2003)....................................................................................37

*Texaco Inc. v. Dagher*,
   547 U.S. 1 (2006)....................................................................................................29

*Todorov v. DCH Healthcare Auth.*,
   921 F.2d 1438 (11th Cir. 1991) ..............................................................................24

*TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*,
   964 F.2d 1022 (10th Cir. 1992) ..............................................................................31

*United Am. Corp. v. Bitmain, Inc.*,
   No. 18-CV-25106, 2021 WL 1807782 (S.D. Fla. Mar. 31, 2021)..........................20

*United States v. Apple, Inc.*,
   791 F.3d 290 (2d Cir. 2015)....................................................................................21

*United States v. Socony-Vacuum Oil Co.*,
   310 U.S. 150 (1940)................................................................................................29

*Universal Express, Inc. v. U.S. S.E.C.*,
   177 F. App'x 52 (11th Cir. 2006) ...........................................................................12

*Williamson Oil Co. v. Philip Morris USA*,
   346 F.3d 1287 (11th Cir. 2003) ..............................................................................22

## Statutes & Rules

17 C.F.R. § 240.10b-5.................................................................................................36

17 C.F.R. § 240.10b-10...............................................................................................7

17 C.F.R. §§ 240.15a-1 to 240.15c6-1........................................................................37

17 C.F.R. §§ 240.15c3-1 to 240.15c3-5......................................................................35

17 C.F.R. §§ 240.17Ab2-1 to -2..................................................................................37

17 C.F.R. §§ 240.17Ad-1 to -24..................................................................................37

17 C.F.R. § 240.17Ad-22............................................................................................36

17 C.F.R. §§ 240.17h-1T to 240.17h-2T.....................................................................36

17 C.F.R. §§ 242.100 to 242.105............................................................................36, 37

15 U.S.C. § 1 ...................................................................................................... passim

15 U.S.C. § 78a, et seq........................................................................................ passim

Dodd–Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-
  203, 124 Stat. 1376 (2010)....................................................................................38

Fed. R. Civ. P. 12 ..................................................................................................1, 30

Fed. R. Civ. P. 15 ................................................................................................39, 40

Fed. R. Evid. 201 .......................................................................................................12

## Other Authorities

6 C. Wright & A. Miller, Fed. Prac. & Proc. Civ. § 1485 (1971)................................40

Maggie Fitzgerald, *Robinhood restricts trading in GameStop, other names
  involved in frenzy*, CNBC (Jan. 28, 2021, 9:19 AM EST), *available at*
  https://www.cnbc.com/2021/01/28/ robinhood-interactive-brokers-restrict-
  trading-in-gamestop-s.html ..................................................................................11

Nasdaq, *Market Activity*, https://www.nasdaq.com/market-activity (last visited
  Aug. 24, 2021) ..................................................................................................8, 10

SEC Division of Enforcement, 2018 Annual Report (Nov. 2, 2018) ...........................36

SEC Division of Enforcement, 2019 Annual Report (Nov. 6, 2019) ...........................36

SEC Division of Enforcement, 2020 Annual Report (Nov. 2, 2020) ............................................36

SEC, *Thinking About Investing in the Latest Hot Stock?* (Jan. 30, 2021),
    https://www.sec.gov/oiea/investor-alerts-and-bulletins/risks-short-term-
    trading-based-social-media-investor-alert ........................................................................12, 37

Defendants respectfully submit this memorandum of law in support of their Motion to Dismiss the "Corrected Consolidated Class Action Complaint" (the "CCAC") filed in the Antitrust Tranche pursuant to Federal Rule of Civil Procedure 12(b)(6).[1]

## PRELIMINARY STATEMENT

This putative class action arises from historically unprecedented volatility in the securities markets during the week of January 25, 2021. Spurred by social media and online forums, retail investors sent stock prices and trading volumes for certain stocks soaring, driving the price of GameStop, Inc. ("GME") up 134% on January 27, 2021 *alone*. Other symbols increased between 200% and 300% that same day. A frenzied interest in GME, AMC Entertainment Holdings, Inc. ("AMC") and other "meme" stocks, which Plaintiffs label the "Relevant Securities," pushed trading volatility to record levels. That unprecedented market volatility impacted brokerages in different ways and led market participants to take different actions in an effort to address the impact of the volatility. Clearing agencies (not named in this suit) imposed extraordinary capital requirements on brokerages, including defendants in this action, consistent with SEC regulations and designed to mitigate risk in volatile markets. These sudden requests effectively required those brokerages to post massive amounts of capital (including more than $3 billion for one defendant) with only a few hours' notice.

Each brokerage firm responded to these market developments differently. For instance, Plaintiffs allege that only one of the Introducing Broker Defendants restricted all of the Relevant Securities. The remaining Introducing Broker Defendants adopted restrictions that varied in scope, type and duration. Other brokers—not alleged to be part of the purported conspiracy—adopted restrictions that also differed from broker to broker in scope, type and duration. One of the defendants in this case, Defendant Citadel Securities LLC, continued to

---

[1] Defendants have moved against the unredacted version of the CCAC that Plaintiffs served on August 23, 2021, which is a "corrected" version of what they served on July 27, 2021. Plaintiffs only gave Defendants several hours' notice concerning what Protected Material they intended to include in the Master Complaints, without any meaningful opportunity for Defendants to meet and confer or to substantiate the confidentiality designations. After the Master Complaints were filed, Defendants sought to meet and confer multiple times concerning the filing of lesser-redacted versions of the Consolidated Complaint (ECF No. 358) and the CCAC—specifically, to redact only personally-identifying information—but Plaintiffs declined to do so. Defendants thus reserve the right to seek a protective order concerning the remaining redactions.

facilitate the trading activity from its retail brokerage clients during the relevant time period without interruption or restriction every minute of January 28, 2021.

After brokers imposed different trading restrictions on January 28, counsel for the Antitrust Plaintiffs quickly filed a broad lawsuit against dozens of defendants and then promptly sought MDL coordination. The antitrust claim is predicated on the speculative contention that the "meme" stock prices would have been even higher but for the alleged conduct, combined with the absurd contention that every member of the putative class was harmed because they would all somehow have timed the market perfectly absent the restrictions and sold their shares of the "meme" stocks at a profit. But the claim fails from its inception and in fact has nothing to do with competition at all.

Plaintiffs filed a new consolidated complaint in this MDL still alleging a broad conspiracy at different levels of the securities markets, but dropping more than 19 defendants who were named in the original complaints, effectively conceding the lack of viability of any conspiracy claim against them. Plaintiffs have since "corrected" that complaint to fix critical allegations concerning alleged timing and relationships. They have also dropped from the case an additional eight brokers who they concede implemented trading restrictions at the same time as the remaining broker defendants. Lacking evidence of an actual agreement—and even admitting that they do not know what Citadel Securities' positions were in the Relevant Securities—Plaintiffs continue to insist that disparate trading restrictions, as implemented by Defendants, evidence an unlawful conspiracy. It is a conspiracy born of speculation and contradicted by logic. The allegations do not support, let alone reveal, an unlawful conspiracy or rebut the obvious—and accurate—explanation for the restrictions about which Plaintiffs complain.

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 n.4, 557 (2007), the United States Supreme Court explained that a court assessing a Section 1 conspiracy claim under the Sherman Act must ask whether the factual allegations suffice to create a plausible inference that defendants' conduct makes sense only as part of an unlawful conspiracy, or do those facts instead provide a plausible non-conspiratorial explanation of "independent responses to common stimuli . . . unaided by an advance understanding among the parties?" The facts described above are pleaded in the CCAC, and those facts plausibly establish that there was a "common market stimulus" to which brokers—both those named as defendants and those who are not—each

reacted in their own independent financial interests, unaided by any advance agreement.  That was the unprecedented market volatility for the Relevant Securities, which in turn led to clearing agency demands some brokers could not meet without restrictions.  Plaintiffs' Section 1 claim must, therefore, fail.

While Plaintiffs attempt to brush aside this plausible (and accurate) explanation for what happened as just "cover," their conspiracy theory rings hollow.  According to Plaintiffs, the real reason the Introducing Brokers introduced the disparate restrictions was because Citadel Securities—alleged to have a commercial relationship with some, but not all, of the defendants—sought to depress the prices of the Relevant Securities to protect Citadel Securities' alleged short position.  Despite access to tens of thousands of pages of document productions to government agencies investigating the restrictions, Plaintiffs offer zero direct evidence that:  (1) Citadel Securities actually held a short position in the Relevant Securities; or (2) that any unlawful agreement existed between any two Defendants, never mind among all Defendants.  Plaintiffs fail even to allege that most of the Defendants ever spoke to a single other Defendant during the relevant time period.

The alleged conspiracy is also implausible.  As Plaintiffs acknowledge, Citadel Securities' business is predicated on facilitating trading activity.  There is no allegation—nor could there be—that Citadel Securities ever refused to facilitate trades in any of the Relevant Securities.  Moreover, even if Citadel Securities did stand to benefit from a lower price in the Relevant Securities, none of the brokers did; they are not alleged to have bought or sold these securities for their own account.  To the contrary, restricting trading causes the brokers to lose revenue, and they are agnostic to the price of the Relevant Securities (no different from the thousands of other publicly traded securities).  And they are not alleged to have received *any* financial benefit from Citadel Securities in return for joining the alleged conspiracy.

The circumstances alleged here are a far cry from an actual antitrust conspiracy, where the challenged conduct is unprofitable for any individual firm to engage in alone but becomes profitable when pursued as a group.  Instead, the restrictions cost each broker revenue because they reduced trading volume, regardless of how many other brokers also limited trading, and any one broker's ability to implement restrictions did not depend on others doing the same.  There is no plausible explanation for why the various broker defendants would have sacrificed

3

their own financial interests to help Citadel Securities and protect it against alleged short position for which Plaintiffs concede they lack any actual evidence.  (*See* Section I.)

Plaintiffs' claim also suffers from two other independent fatal defects.  *First*, even if Plaintiffs had plausibly pleaded an agreement among the Defendants—they have not—they still have not pleaded any of the remaining elements of their Section 1 claim.  The novel conspiracy they allege between actors at different levels of the financial services industry does not fit within the narrow category of restraints for which extensive judicial analysis has confirmed *per se* condemnation applies.  The rule of reason thus applies, and Plaintiffs must adequately allege market definition, market power and anticompetitive effects.  They allege none of those.  (*See* Section II.)  *Second*, this case is no more than a "securities complaint in antitrust clothing," *Credit Suisse Sec. (USA) LLC v. Billing*, 551 U.S. 264, 284 (2007), and therefore is implicitly precluded by the federal securities laws.  Congress and the expert regulatory agencies have created a complex system of statutes and regulations that govern the functioning of the securities markets, including the conduct at issue here.  Thus, even if Plaintiffs had adequately pleaded an agreement—they have not—and had also pleaded all the other elements of a Section 1 claim—again, they have not—they still could not pursue antitrust claims as a matter of law.  (*See* Section III.)  This case must be dismissed with prejudice.  (*See* Sections IV and V.)

## BACKGROUND

## I.     THE INDUSTRY PARTICIPANTS.

The allegations at issue here involve a broad number of participants that operate at different levels of the securities industry, many of which are not named as Defendants.  The Defendants fall into three categories:  introducing brokers, clearing brokers and market makers.  (CCAC, ECF No. 388, ¶¶ 42-75.)  Also critical to the allegations are centralized, regulated bodies called clearing agencies, which guarantee completion of trades and work with the other three categories of industry participants to ensure the smooth functioning of the securities markets.  (CCAC ¶¶ 96-104.)  There are no allegations that any of these different categories of industry participants compete with one another.

### A.     Introducing Brokers.

"Introducing Brokers" are customer-facing service providers through which retail investors can place trade orders.  (CCAC ¶¶ 42-63, 126.)  Through an Introducing Broker, customers can place trade orders on the broker's website or mobile application.  Once a trade is

placed, the Introducing Broker routes the order to a clearing broker, which, as described below, processes the customer trade orders.

Plaintiffs have now dismissed all defendants they defined as Introducing Brokers. The only retail customer-facing Defendants that remain in this Action—Robinhood, E*TRADE Securities LLC ("E*TRADE") and Interactive Brokers LLC ("Interactive Brokers")—are what Plaintiffs call "Self-Clearing Brokers," which they allege consist "of an introducing broker . . . [that] also acts as its own clearing firm in that it executes and settles orders and maintains custody of securities."  (*Id.* ¶¶ 113-117.)  This is incorrect as to Robinhood, which maintains a separate introducing entity, Robinhood Financial LLC ("Robinhood Financial"), and clearing entity, Robinhood Securities, LLC ("Robinhood Securities").  For the purposes of this motion, Defendants refer to the so-called Self-Clearing Brokers as "Introducing Brokers."

Plaintiffs do not allege that any of the Introducing Broker Defendants engages in securities trades for its own account, *i.e.*, proprietary trading in stocks or options to generate returns for its business.  The Introducing Brokers are alleged only to provide retail investors with access to the financial markets.  (*Id.* ¶¶ 126, 149.)  There are numerous other Introducing Brokers in the securities industry that are not alleged to be a part of the purported conspiracy (notwithstanding that certain of these brokers are alleged to have imposed trading restrictions), including such major firms as Fidelity, Vanguard, Charles Schwab, TD Ameritrade and, now, the eight Introducing Brokers that were initially named in the CCAC but were subsequently dismissed.  (*Id.* ¶ 115; ECF No. 380, 396-398, 400-404.)

Plaintiffs do not allege that Introducing Brokers (including the so-called Self-Clearing Brokers) compete with Clearing Brokers or Market Makers.  (*Id.* ¶¶ 105-124.)

B.    **Clearing Brokers.**

Clearing Brokers receive accepted customer trade orders from an Introducing Broker, and then, for these accepted trades, are responsible for processing and, in some cases, executing the trade order on the customer's behalf.  (CCAC ¶¶ 66-75, 105.)  They are also responsible for maintaining custody of the securities and assets necessary to clear customer trade orders.  (*Id.*)  As noted above, clearing entities may be either affiliated with an Introducing Broker, or independent companies that contract with unaffiliated Introducing Brokers.  Plaintiffs categorize three entities as Clearing Brokers:  Apex Clearing Corporation ("Apex") and Electronic Transaction Clearing, Inc. ("ETC"), which provide clearing services for various

unaffiliated Introducing Brokers, and PEAK6 Investments LLC ("PEAK6"), a holding company that is the majority owner for both Apex and PEAK6.  (*Id.* ¶¶ 73, 108.)  As a result, all three alleged Clearing Broker Defendants are part of a single corporate family.  (*Id.* ¶ 74.)  Apex performs clearing services for a number of Introducing Brokers that were originally named as defendants, but have since been dismissed from the case.  (*Id.* ¶ 109.)  ETC performs clearing services for Alpaca Securities LLC, which has also been dismissed.  (*Id.*)[2]

As with the Introducing Brokers, Plaintiffs do not allege that any of the Clearing Brokers engages in proprietary trading—buying and selling stocks or options to generate returns for its business.  Plaintiffs also do not allege that the Clearing Brokers compete with Introducing Brokers (including the Self-Clearing Brokers) or Market Makers.  (*Id.* ¶¶ 105-124.)

C. **Market Makers.**

A "Market Maker" is an entity that stands ready to fill orders for a particular security at publicly quoted prices, and upon receiving an order from a broker, fills that order with available inventory or by sourcing liquidity from an exchange or other market venue.  (CCAC ¶¶ 118, 124.)  Citadel Securities LLC ("Citadel Securities") is one of many Market Makers.  Plaintiffs do not allege Citadel Securities possesses market power among all Market Makers.  (*See id.*)  Plaintiffs also do not allege that Citadel Securities was the only Market Maker performing such services for any of the defendants that cleared securities transactions during the period of volatility.  (*See id.*; *id.* ¶ 135.)  And while Plaintiffs refer throughout the CCAC to "Market Maker Defendants," they, in fact, have sued only a single Market Maker.  Plaintiffs do not allege that Citadel Securities, or any other Market Maker, competes with Introducing Brokers or Clearing Brokers.  (*See id.*)

D. **Clearing Agencies.**

Clearing agencies are centralized entities that validate and finalize securities transactions (*i.e.*, "settle" transactions), and guarantee completion of trades even if a party to the transaction defaults.  (CCAC ¶¶ 98, 101.)  The main clearing agency for the U.S. equities market is the NSCC, which is owned and operated by the DTCC.  (*Id.* ¶¶ 96, 98.)  Both the DTCC and the NSCC are regulated by the Securities and Exchange Commission ("SEC").  (*Id.* ¶¶ 96, 98.)

---

[2] As noted above, Plaintiffs incorrectly lump Defendant Robinhood Securities into the category of "Self-Clearing Brokers."  Robinhood Securities is in fact a Clearing Broker that currently clears accounts exclusively for Robinhood Financial.

## II.      THE MECHANICS OF SECURITIES TRADING.

Retail investors are "individual investors who make investments on their own behalf." (CCAC ¶ 2.)  They can make such investments by opening a brokerage account with an Introducing Broker.  (*Id.* ¶¶ 2, 111-112.)  Some Introducing Brokers offer electronic trading platforms that enable retail investors to place trade orders through a website or mobile application.  (*Id.*)  After a retail investor places a trade order with an Introducing Broker, and the Introducing Broker accepts that order, the Introducing Broker either sends the order to a Clearing Broker for clearing services (as is the case for Robinhood Financial, which sends trade orders to Robinhood Securities), or, if it is an Introducing Broker that clears trades as well, it executes the order itself (as is the case for E*TRADE and Interactive Brokers).  (*Id.* ¶¶ 105, 111.)  The entity clearing the trade (whether it is a Clearing Broker, or an Introducing Broker performing its own clearing services) executes the trade order through an exchange or other trading venue, or sends the order to a Market Maker, which fills the buy or sell order through its inventory or by sourcing liquidity from the market.  (*Id.* ¶¶ 118, 124.)

Market Makers, including Citadel Securities among many others (*see id.* ¶ 423), may pay brokers a fee known as "payment for order flow" ("PFOF") to route orders to the Market Makers' systems (*id.* ¶¶ 134-135).  As alleged in the CCAC, the net amount of PFOF revenue that a broker generates is based in part on the volume of order flow it routes to different Market Makers.  (*Id.* ¶¶ 425-426.)  This practice is long-standing and accepted by the SEC (*see, e.g.*, 17 C.F.R. § 240.10b-10; CCAC ¶ 425), and enables some brokers to offer retail investors the ability to trade without paying commissions.  (CCAC ¶ 3.)  Market Makers may generate revenue by capturing a portion of the "spread" between the bid and ask prices for securities, which can often be as little as one cent per order.  (*Id.* ¶ 118.)  Filled orders are then sent to a clearing agency, such as the NSCC.  (*Id.* ¶¶ 96-98, 101, 129.)  The NSCC clears cash transactions by netting securities deliveries and payments among its members and guaranteeing completion of trades even if a party defaults.  (*Id.* ¶ 98.)  It takes two days for the clearing agency to transfer the stock to the buyer and funds to the seller.  (*Id.* ¶ 101.)

The two-day period between execution and settlement creates a risk that a party to the transaction will be unable to meet its obligations.  (*Id.* ¶¶ 99-103.)  A number of protections are in place to reduce this risk.  (*Id.*)  One protection critical to this case is that clearing agencies require Introducing and Clearing Brokers that execute customer trade orders to pay a deposit to

the clearing agency until the trades are settled.  (*Id.* ¶¶ 103, 470.)  The deposit amount is based largely on risk, which the clearing agencies calculate by looking to, among other things, a firm's customer holdings and open order volume and using a volatility multiplier.  (*Id.* ¶¶ 470-471.) The purpose of these deposit requirements is to protect all market participants—from retail investors to brokers—from potential defaults during the settlement period.  (*Id.* ¶ 103.)  To clear and settle customer transactions, brokers engaged in clearing services must satisfy the NSCC deposit requirements, which can change throughout the course of a single day.  (*Id.* ¶¶ 103, 470.) If an Introducing or Clearing Broker that executes trades fails to timely satisfy its deposit requirements, it risks being "shut down" by the NSCC.  (*Id.* ¶¶ 103, 240-241.)

### III.    THE UNPRECEDENTED MARKET VOLATILITY OF JANUARY 2021.

January 2021 was marked by a series of unprecedented events.  (CCAC ¶¶ 188-190, 228-229.)  Investors—connected through social media platforms and online forums— banded together to cause "short squeezes" by trading in GME, AMC and other stocks they perceived to be the target of short selling activity by institutional investors (the "Relevant Securities").[3]  (*Id.* ¶¶ 141, 142, 185.)  Their activity resulted in "soar[ing]" prices, and in the words of the SEC, "extreme price volatility" in the Relevant Securities.  (*Id.* ¶¶ 190, 337.)  For example, on January 27, GME's price closed at $347.51 per share, a 707.6% increase from just five trading days earlier.  (*Id.* ¶ 190.)  The trading price increase for GME is reflected in the graph below.[4]

---

[3] The "Relevant Securities" are:  GME, AMC, Bed Bath & Beyond Inc. ("BBBY"), Blackberry Ltd. ("BB"), Express, Inc. ("EXPR"), Koss Corporation ("KOSS"), Nokia Corporation ("NOK"), Tootsie Roll Industries, Inc. ("TR") and Trivago N.V. ("TRVG").  (CCAC ¶ 81.)

[4] *See* Nasdaq, *Market Activity*, https://www.nasdaq.com/market-activity (last visited Aug. 24, 2021). The Court may take judicial notice of stock information related to the securities at issue here and in the ensuing charts.  *See La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 842 (11th Cir. 2004).



The "skyrocket[ing]" and "epic price surge[s]" in the Relevant Securities were unrelated to factors that the securities industry participants traditionally expect would affect stock prices (*e.g.*, earnings reports or public announcements). (*Id.* ¶¶ 189, 190.) In the span of just five trading days (from January 21 to January 27, 2021), the total daily trading volume for the Relevant Securities increased from 230 million to 3.3 billion shares. By the end of that three-day period, the SEC released a statement warning of "on-going market volatility in the options and equities markets." (*Id.* ¶ 200.)



As the unprecedented volatility and volume unfolded, different brokers took independent, proactive measures to mitigate their exposure to the market risks.  For example, by January 27, 2021, Robinhood Securities increased customer margin requirements to 100% for GME and AMC—in other words, a customer was required to have sufficient funds to pay for the shares in full.  (*Id.* ¶ 199.)  On January 27, 2021, TD Ameritrade (which is not named as a defendant or alleged conspirator) announced that it "put in place several restrictions on some transactions in $GME, $AMC and other securities," including increasing margin requirements to trade in those and other securities.  (*Id.* ¶ 198.)  The same day, Charles Schwab (also not a defendant or alleged conspirator) similarly announced that it would put in place restrictions on three of the Relevant Securities:  GME, AMC and EXPR.  (*Id.* ¶ 199.)  Meanwhile, Plaintiffs do not allege that Citadel Securities ever failed to continue filling orders in its role as a Market Maker with respect to *any* security or broker throughout this volatile period.

## IV.    THE EVENTS OF JANUARY 28, 2021 AND ONWARD.

The historic market volume and volatility in the Relevant Securities came to a head on January 28.  (CCAC ¶¶ 256-266.)  Because brokers had differing risk exposures, they responded to the trading volume and volatility in different ways:  some brokers imposed no restrictions, while others imposed restrictions for different types of transactions, for different durations and involving different securities.  (*See generally id.* ¶¶ 247-252, 269-270.)

On the morning of January 28, the NSCC also issued significantly increased collateral calls for different brokerages.  For example, the NSCC increased Robinhood Securities' deposit requirements to over $3 billion.  (*Id.* ¶ 231.)  The massive capital call was a tenfold increase over what it had been just days before.  (*Id.* ¶ 338.)  Because deposit requirements are based on market volatility, the massive capital call was the direct result of the substantial increases in trading volume and price of the Relevant Securities in previous days—in particular, on January 27.  (*Id.* ¶¶ 102-103, 201-209.)  The capital call of more than $3 billion was also driven in part by the volatility multiplier that the NSCC assigns to securities that it perceives as having more risk.  (*See generally id.* ¶ 470.)

Robinhood Securities received the capital call of more than $3 billion at 5:11 AM EST.  (*Id.* ¶ 231.)  After several hours of internal deliberation, and in light of the "major liquidity

---

[5] *See* Nasdaq, *Market Activity*, https://www.nasdaq.com/market-activity (last visited Aug. 24, 2021).

issue[s]" created by the capital call, it made the difficult decision to impose temporary trading restrictions on the limited number of securities driving the volatility. (*Id.* ¶¶ 232-233.) Robinhood Securities put in place a "position closing only" ("PCO") restriction on stock trades and options contracts for AMC, BB, BBBY, EXPR, GME, KOSS, NOK, TR and TRVG (Plaintiffs' "Relevant Securities") (*id.* ¶ 252), as well as for American Airlines Group, Inc. ("AAL"), Castor Maritime Inc. ("CTRM"), Naked Brand Group, Ltd. ("NAKD") and Sundial Growers, Inc. ("SNDL"),[6] a measure that allowed (but did not require) Robinhood customers to exit their positions in those symbols if they wished, but restricted purchases. (*Id.* ¶¶ 233-238.) Following the imposition of the PCO restrictions, the NSCC revised Robinhood Securities' deposit requirements. (*Id.* ¶ 340.) Robinhood Securities then provided the cash to satisfy its revised deposit requirements a little after 9:00 AM EST, enabling Robinhood's customers to continue trading in all other securities. (*Id.* ¶ 340.) Robinhood Securities lifted the PCO restrictions by January 29, 2021 (*id.* ¶ 324), and removed all trading limitations by market open on February 5, 2021 (*id.* ¶ 340).

Apex also faced an apparent significant (tenfold) increase in its NSCC collateral requirements, which led it on January 28, 2021 to place temporary restrictions on clearing orders for only three stocks (as compared to the 13 that Robinhood restricted): AMC, GME and KOSS. (*See id.* ¶¶ 274, 276, 341, 470-480.) Apex communicated this limitation to its Introducing Broker customers, which in turn notified their customers. (*Id.* ¶¶ 274-276.) Apex resumed clearing transactions in AMC, GME and KOSS later that day. (*Id.* ¶ 327.) Plaintiffs originally alleged that Apex's Introducing Broker customers were members of the purported conspiracy (ECF No. 358, ¶¶ 42-51), but have since dismissed them all from the case.

The remaining Broker Defendants also imposed a variety of different restrictions, each taking its own approach given the unique issues and considerations that each faced during the period of unprecedented trading volume and volatility. Indeed, none of the defendant brokers

---

[6] *See* Maggie Fitzgerald, *Robinhood restricts trading in GameStop, other names involved in frenzy*, CNBC (Jan. 28, 2021, 9:19 AM EST), *available at* https://www.cnbc.com/2021/01/28/ robinhood-interactive-brokers-restrict-trading-in-gamestop-s.html. Plaintiffs allege that Robinhood's limited restrictions included, "*inter alia*," certain "Relevant Securities." (CCAC ¶ 252.) For completeness, Defendants identify the full set of restricted equities as reported by the media, which are "generally known" and "whose accuracy cannot reasonably be questioned." *Cavero v. Law Offices of Erskine & Fleisher*, No. 12-21196-CIV, 2012 WL 13134213, at *2 (S.D. Fla. Aug. 28, 2012).

imposed identical trading restrictions—in terms of the type of restriction and the symbols impacted.  For example, E*TRADE placed PCO restrictions on stock trading for only two symbols:  GME and AMC.  (*Id.* ¶ 250.)  Plaintiffs allege that Interactive Brokers took a different approach, and imposed PCO restrictions on options trading only (not stock trading) for only five symbols:  GME, AMC, BB, EXPR and KOSS.  (*Id.* ¶ 249.)  Plaintiffs do not allege that all of the Defendants met or otherwise coordinated these restrictions.[7]

By January 30, many of the brokers had lifted their restrictions.  (*Id.* ¶¶ 325-326.) That day, the SEC released an investor alert and bulletin warning about the risks of short-term trading based on social media, and acknowledged that "broker-dealers may reserve the ability to reject or limit customer transactions" for "legal, compliance, or risk management reasons," and that the ability to do so "is typically discussed in the customer account agreement."[8]

## ARGUMENT

Pleading a violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, requires a "(1) conspirac[y] that (2) unreasonably (3) restrain[s] interstate or foreign trade," *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1260 (11th Cir. 2019) (en banc).  In considering a motion to dismiss "a case brought under § 1 of the Sherman Act, [courts] must determine whether the complaint, in asserting a conspiracy or agreement in restraint of trade, contains 'allegations plausibly suggesting (not merely consistent

---

[7] While this fact is not necessary to this Motion, Congress heard testimony revealing that Citadel Securities "had no role in Robinhood's decision to limit trading in GameStop or any other of the 'meme' stocks." *Virtual Hearing – Game Stopped?  Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide*, 117th Cong. (2021) (statement of Kenneth C. Griffin, Chief Executive Officer, Citadel LLC), *available at* https://financialservices.house.gov/ uploadedfiles/hhrg-117-ba00-wstate-griffink-20210218.pdf.  Congress also heard testimony that the action Robinhood took "was for one reason and one reason only: to allow [Robinhood] to continue to meet [Robinhood's] regulatory deposit requirements." *Id.* (statement of Vladimir Tenev, Chief Executive Officer, Robinhood Markets, Inc.), *available at* https://financialservices.house.gov/uploadedfiles/hhrg-117-ba00-wstate-tenevv-20210218.pdf. The Court may take judicial notice of congressional testimony.  *See D.A.M. v. Barr*, 474 F. Supp. 3d 45, 55 n.12 (D.D.C. 2020) (quoting Fed. R. Evid. 201(b)(2)).

[8] SEC, *Thinking About Investing in the Latest Hot Stock?* (Jan. 30, 2021) ("SEC Statement"), https://www.sec.gov/oiea/investor-alerts-and-bulletins/risks-short-term-trading-based-social-media-investor-alert.  The Court may take judicial notice of the SEC statement because it is a public record, the accuracy of which cannot reasonably be questioned.  *See Universal Express, Inc. v. U.S. S.E.C.*, 177 F. App'x 52, 53 (11th Cir. 2006) (taking judicial notice of public records at the motion to dismiss stage).

with) [a conspiracy or] agreement,' that is, whether the complaint 'possess[es] enough heft to show that the pleader is entitled to relief." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1332-33 (11th Cir. 2010) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)); *see also In re Farm-Raised Salmon & Salmon Prods. Antitrust Litig.*, No. 19-21551-CIV, 2021 WL 1109128, at *10 (S.D. Fla. Mar. 23, 2021). A plaintiff must allege "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "Plausibility is the key, as the 'well-pled allegations must nudge the claim across the line from conceivable to plausible.'" *Jacobs*, 626 F.3d at 1333 (quoting *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (abrogated on other grounds)).

The "'crucial question' with regard to a conspiracy claim under section 1 'is whether the challenged anticompetitive conduct stems from independent decision or from an agreement.'" *Salmon Antitrust Litig.*, 2021 WL 1109128 at *10 (quoting *Twombly*, 550 U.S. at 553). Plaintiffs must present "direct or circumstantial evidence that reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.* (alteration in original) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)). To plausibly allege an agreement through circumstantial evidence, Plaintiffs must show "parallel conduct" together with sufficient "plus factors," which may include "common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Id.* (citations omitted).

Once an agreement is plausibly alleged, courts "must first decide whether to analyze [it] under the *per se* rule or the rule of reason." *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1549 (11th Cir. 1996). There is a "presumption in cases brought under section 1 of the Sherman Act that the rule-of-reason standard applies," and courts "apply the *per se* rule only when history and analysis have shown that in sufficiently similar circumstances the rule of reason unequivocally results in a finding of liability." *Id.* (citations omitted). If the alleged conduct is not anticompetitive *per se*, the "rule of reason analysis requires the plaintiff to prove (1) an anticompetitive effect of the defendant's conduct on the relevant market, and (2) that the conduct has no procompetitive benefit or justification." *Id.* at 1551 (citations omitted). To prove an anticompetitive effect on the relevant market, Plaintiffs must first sufficiently plead a relevant

13

market.  *Tempur-Pedic*, 626 F.3d at 1336.  Then, Plaintiffs must show either actual anticompetitive harm in that market, which include "reduction of output, increase in price, or deterioration in quality", or potential harm, which requires Plaintiffs also to show that "the defendants possess[] power in that market."  *Id.* at 1339 (citations omitted).

Finally, where antitrust claims arise from activity regulated by the federal securities laws, those claims are precluded by the federal securities laws.  In *Credit Suisse Sec. (USA) LLC v. Billing*, the Supreme Court held that securities laws implicitly preclude antitrust laws if they are "clearly incompatible."  551 U.S. 264, 285 (2007).

Plaintiffs' claims fail for three independent reasons under these applicable legal standards.  *First*, Plaintiffs fail to plead any allegations sufficient to support an inference of an illegal agreement, and instead rely on hollow—and legally deficient—conclusions that a conspiracy was formed.  The alleged conspiracy is wholly implausible; the facts conceded in the CCAC present a far more likely—and lawful—explanation for the challenged conduct.  *Second*, Plaintiffs fail to allege the necessary elements to plead a claim under Section 1 of the Sherman Act.  *Third*, even if Plaintiffs' claims were taken to plead some kind of antitrust claim (which they do not), such a claim would nonetheless be precluded by the federal securities laws.

I.  **PLAINTIFFS FAIL SUFFICIENTLY TO PLEAD THAT DEFENDANTS AGREED TO CONSPIRE.**

Plaintiffs must allege "direct or circumstantial evidence that reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective."  *Monsanto*, 465 U.S. at 768.  "Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints."  *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988).

Plaintiffs allege that entities at three different levels of the financial industry—Citadel Securities as a Market Maker Defendant, the Clearing Broker Defendants and the Introducing Broker Defendants—all conspired in the span of a few days to impose different trading limitations on different stocks.[9]  Plaintiffs are therefore required to allege direct or

---

[9] Among the Defendants, members of the same corporate family are considered as a single economic actor and are thus "incapable of conspiring with each other."  *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 776 (1984).  While the CCAC discusses "Clearing Brokerage Defendants"—plural—and lists three entities (Apex, ETC and PEAK6) (CCAC

circumstantial evidence that *each* of the Introducing Broker and Clearing Broker Defendants reached an unlawful agreement with Citadel Securities, that *each* Introducing Broker Defendant reached an agreement with each Clearing Broker Defendant, and that *each* Introducing Broker Defendant reached an agreement with each of the other Introducing Broker Defendants.  *See Twombly*, 550 U.S. at 565 n.10 (dismissing conspiracy allegations because "the pleadings mentioned no specific time, place, or person involved in the alleged conspiracies" and gave "no clue as to which [defendant] (much less which of their employees) supposedly agreed"); *Quality Auto*, 917 F.3d at 1262 (requiring allegations for "each defendant" in the conspiracy).  But Plaintiffs do not specify in any way what the alleged agreement was, its contours, or even the structure of the alleged conspiracy involving market participants that admittedly are not horizontal competitors.

### A.      Plaintiffs Fail To Allege Any Direct Evidence of an Agreement.

Direct evidence "is explicit and requires no inferences to establish the proposition or conclusion being asserted." *Salmon Antitrust Litig.*, 2021 WL 1109128 at *10 (quoting *In re Loc. TV Advert. Antitrust Litig.*, No. 18-C-6785, 2020 WL 6557665, at *7 (N.D. Ill. Nov. 6, 2020)).  Such evidence would consist, for example, of a "document or conversation explicitly manifesting the existence of" an agreement.  *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 226 (3d Cir. 2011) (quoting *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 324 n.23 (3rd Cir. 2010)); *see also Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) ("[Direct] evidence would consist, for example, of a recorded phone call in which two competitors agreed to fix prices at a certain level.").  Plaintiffs had the opportunity to review more than 25,000 pages of documents that Defendants produced to government regulators and then re-produced to Plaintiffs; they even requested a 14-day extension of their deadline to file the instant complaint to allow for more time to review those materials.  (*See* Plaintiffs' Unopposed Motion For Extension of Time, ECF No. 334.)  Notwithstanding those documents and that additional time, Plaintiffs have provided *no* direct evidence of the unlawful agreements they

---

¶¶ 66-75), it then admits that PEAK6 owns both Apex and ETC (*id.* ¶ 73).  Likewise, Robinhood Financial and Robinhood Securities are both owned by Robinhood Markets, Inc ("Robinhood Markets"), and E*TRADE Financial Holdings LLC ("E*TRADE Holdings") owns E*TRADE. No alleged agreement within any of these intra-family groups could give rise to an actionable conspiracy claim.

allege in the CCAC.  Specifically, there is no direct evidence concerning when, where or how the alleged conspiracy was entered, who was part of it, or what its structure or purpose was.

> **B.**     **Plaintiffs Fail Adequately To Allege Circumstantial Evidence of an Agreement.**

Where, as here, plaintiffs are unable to present direct evidence of an agreement, they must plead "parallel conduct" and "sufficient 'plus factors.'" *Auto. Alignment & Body Serv. v. State Farm Mut. Auto. Ins. Co.*, 953 F.3d 707, 726 (11th Cir. 2020) (quoting *Quality Auto*, 917 F.3d at 1262).  Critically, "[a]llegations of parallel conduct . . . are insufficient standing alone to raise an inference of conspiracy." *Salmon Antitrust Litig.*, 2021 WL 1109128 at *10 (quoting *Auto. Alignment*, 953 F.3d at 726).  Instead, plaintiffs must allege both parallel conduct *and* "sufficient 'plus factors' to make the parallel conduct 'more probative of conspiracy than of conscious parallelism.'" *Auto. Alignment*, 953 F.3d at 726 (quoting *Quality Auto*, 917 F.3d at 1262).  Plaintiffs do not and cannot allege parallel conduct or sufficient plus factors, and therefore fail to push "their claims across the line from conceivable to plausible." *Quality Auto*, 917 F.3d at 1256-57 (citing *Twombly*, 550 U.S. at 570).

> **1.**     **Plaintiffs Fail Plausibly To Allege Parallel Conduct Among Any of the Defendants From Which One Should Infer a Conspiracy.**

Plaintiffs do not plausibly allege parallel conduct among the defendants from which a conspiracy could be inferred.

Under *Twombly*, allegations of parallel conduct alone cannot survive a motion to dismiss, but "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." 550 U.S. at 557.  As this Court has explained, "[f]actual allegations that are 'consistent with conspiracy, but just as much in line with . . . rational and competitive business strategy' are insufficient." *In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1308 (S.D. Fla. 2010) (quoting *Twombly*, 550 U.S. at 554).  The Court "may infer from the factual allegations in the complaint obvious alternative explanations, which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009)) (internal quotation and alteration omitted); *see also id.* ("After *Twombly*, to successfully plead a Section 1 claim based on defendants' conduct alone, plaintiffs must allege facts that make the existence of a preceding unlawful agreement the most plausible explanation for a defendants' [sic] behavior."); *Auto. Alignment*, 953 F.3d at 728-29 (holding that plaintiffs failed plausibly to

allege a Section 1 claim when they "offer[ed] no allegations that explain[ed] why the loss in business they allege[ed] [was] plausibly explained by steering instead of other 'obvious alternative explanation[s]'") (quoting *Twombly*, 550 U.S. at 567).

Here, Plaintiffs not only fail to make allegations plausibly suggesting a preceding agreement, but also themselves provide the "obvious alternative explanation" for the allegedly collusive behavior. *Twombly*, 550 U.S. at 567. Specifically, Plaintiffs allege (accurately) that the NSCC—the clearing agency for securities transactions—imposed collateral requirements on brokers to "mitigate the risk of settling trades." (CCAC ¶ 413.) Plaintiffs further allege (correctly) that the NSCC "collateral requirement changes depending on the perceived risk of the order" (*id.*), that the Clearing Brokers "typically pass down to the brokerages [the Introducing Brokers]" those collateral requirements (*id.*),[10] and (again, correctly) that the NSCC "demanded that its member clearing agents supply additional collateral to support" trades in the so-called meme stocks on January 28 (the day of the alleged conspiracy) (*id.* ¶ 414). For example, according to Plaintiffs' own allegations, Robinhood faced a deficit of more than $3 billion on January 28 as a result of the NSCC's collateral call. (*Id.* ¶ 231.) Apex also received a significant increase in its NSCC collateral requirement. (*Id.* ¶¶ 274-276.) Again, according to Plaintiffs themselves, these collateral requirements "protect[] NSCC and all market participants against clearing member defaults," "margin requirements must be met by clearing members on a timely basis," and the "NSCC collects clearing fund contributions, or margin, at the start of each day and intraday in volatile markets." (*Id.* ¶ 103.) Plaintiffs also allege (correctly), that the markets for the Relevant Securities were extraordinarily volatile on the days in question and trading volume was unprecedented, providing an independent rationale for the restrictions implemented by brokers not alleged to have received an increased collateral call. (*Id.* ¶¶ 200-209.)

These pleaded facts are not, as Plaintiffs assert, simply "cover" for an alleged conspiracy (*id.* ¶ 415)—they provide a plausible (and the actual) non-conspiratorial explanation of the brokers' "independent responses to common stimuli . . . unaided by an advance understanding among the parties." *Twombly*, 550 U.S. at 556 n.4 (citation omitted); *see also Am.*

---

[10] This allegation is incorrect as Clearing Brokers do not typically pass on collateral requirements to Introducing Brokers—Clearing Brokers may communicate to Introducing Brokers whether the clearing entity needs to put in place certain restrictions to address volatility-based deposit requirements. (*See, e.g.*, *id.* ¶¶ 273, 470-471.)

*Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1295 (11th Cir. 2010) (noting that "[t]he complaint does not plausibly suggest that by using similar methods to downcode and bundle claims, Defendants have acted in any way inconsistent with the independent pursuit of their own economic self-interest," and "[a]ccordingly, Defendants' parallel conduct is equally indicative of rational independent action as it is concerted, illegitimate conduct"); *Mayor & City Council of Balt.*, 709 F.3d at 138 (noting that "Defendants' alleged actions—their en masse flight from a collapsing market in which they had significant downside exposure—made perfect business sense"). And for those reasons the pleaded facts are dispositive.

        The independent, non-conspiratorial rationale for the challenged conduct—and the lack of parallel conduct that could plausibly support a conspiracy claim—is confirmed by two additional facts, each admitted by Plaintiffs. *First,* Plaintiffs concede that a significant number of brokers that are not alleged to have been conspirators enacted trading restrictions in response to the market volatility and volume. (CCAC ¶ 246 ("[T]he other Brokerage Defendants *and other brokerages* employed similar tactics to prevent Retail Investors from opening new positions in at least one or more of the Relevant Securities." (emphasis added)).) This includes major retail brokerages such as Charles Schwab and TD Ameritrade, as well as the eight Introducing Brokers that Plaintiffs have voluntarily dismissed since filing their Consolidated Complaint (ECF No. 358), and other brokers that were listed as Defendants in the original (pre-MDL) Complaints but dropped in Plaintiffs' Consolidated Complaint such as Cash App Investing LLC, eToro USA Securities, Inc. and Barclays Bank PLC (*compare* ECF No. 358, *with Shane Cheng and Terell Sterling v. Ally Financial Inc. et al.*, 21-cv-00781 (N.D. Cal.) (Complaint, ECF No. 1, at 1)). For example, the CCAC recognizes that Charles Schwab implemented restrictions on transactions for GME, AMC and EXPR, and TD Ameritrade restricted transactions in various securities including GME and AMC. (CCAC ¶¶ 198-199.) These actions, undertaken by entities not alleged to be part of the conspiracy, directly refute the plausibility of any claim that the imposition of trading restrictions during the last week of January 2021 "tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Salmon Antitrust Litig.*, 2021 WL 1109128 at *10 (alteration in original) (quoting *Monsanto*, 465 U.S. 764).

        *Second,* the allegedly parallel conduct undertaken by the Defendants varied in material ways, both before and after the NSCC's collateral calls on January 28, 2021. Although

the CCAC discusses nine "Relevant Securities," 11 of the 15 original defendants (and 4 of the remaining 8 defendants) are alleged to have restricted trading in only three of these symbols. (*Compare* CCAC ¶ 6 (listing the nine Relevant Securities), *with* CCAC ¶ 276 (Apex restricted only GME, AMC and KOSS).)  Interactive Brokers is alleged to have restricted trading on *options* (but not stock purchases) for five of the nine Relevant Securities (AMC, BB, EXPR, GME and KOSS).  (*See id.* ¶¶ 249-252.)  For at least four of the Relevant Securities (BBBY, NOK, TR and TRVG)—and four others not listed by Plaintiffs (AAL, CTRM, NAKD, SNDL)— only Robinhood is alleged to have actually imposed *any* restriction.  (*Id.* ¶¶ 251-252)  E*TRADE is alleged only to have "halted GME and AMC."  (*Id.* ¶ 250.)  Finally, for an alleged conspiracy where Citadel Securities purportedly had brokers restricting retail investor purchases of the Relevant Securities for its benefit, *nowhere* in the CCAC do Plaintiffs allege that Citadel Securities adopted any restrictions of its own.  Plaintiffs do not allege *any* facts even suggesting that Citadel Securities did anything other than fulfill all orders for each of the Relevant Securities that it received from Introducing and Clearing Brokers.

The table below summarizes Plaintiffs' allegations concerning the trading restrictions implemented by various brokers, both alleged conspirators and non-conspirators:

| Date | Broker | Security | Action | CCAC | Named as Defendant |
|---|---|---|---|---|---|
| January 27 | TD Ameritrade | GME, AMC and other securities | Placed restrictions and increased margin requirements | 198 | No |
| | Schwab | GME, AMC, EXPR | Placed restrictions | 199 | No |
| | Robinhood | GME, AMC | Disabled margin trading | 199 | Yes |
| January 28 | Robinhood | GME, AMC | Moved options contracts to position closing only | 229 | Yes |
| | Stash | GME, AMC | Prevented users from viewing the securities | 247 | No |
| | Interactive Brokers | AMC, BB, EXPR, GME, KOSS | Moved options trading into liquidation only; increased margin requirements | 249 | Yes |
| | E*Trade | GME, AMC | Halted trading | 250 | Yes |
| | Robinhood | AMC, BB, BBBY, EXPR, GME, KOSS, NOK, TR, TRVG | Moved equities and options to position closing only | 252 | Yes |
| | Webull | Relevant Securities | Restricted trading | 274 | No |
| | SoFi | GME | Moved equities and options to position closing only | 275 | No |
| | Apex | GME, AMC, KOSS | Moved equities and options to position closing only | 276 | Yes |
| | Ally, Dough, Public.com, Stash, Tastyworks | GME, AMC, KOSS | Moved equities and options to position closing only | 276 | No |

Plaintiffs must thus concede that the "restrictions on trading took different forms."  (*Id.* ¶ 238.)

These allegations simply cannot "support[] an inference of a conspiracy" because Defendants' actions were "not uniform" and "defendants each reacted in different ways." *Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 105 (2d Cir. 2018) (explaining that "defendants' conduct was not, in fact, parallel" where some defendants refused to pay imposed surcharge, while others "undertook independent efforts to negotiate" or "agreed to temporarily pay the surcharge").

## 2. Plaintiffs Fail To Allege Sufficient Plus Factors in Support of a Conspiracy.

Plaintiffs further fail to plead "sufficient plus factors to make the parallel conduct more probative of conspiracy" than of independent conduct. *Salmon Antitrust Litig.*, 2021 WL 1109128, at *10; *see also Quality Auto*, 917 F.3d at 1267 (recognizing plus factors as circumstantial evidence that "tends to exclude the possibility of independent action").

### (a) There Is No Common Motive To Conspire.

Plaintiffs fail to plausibly allege that Defendants had a common motive to conspire.  (CCAC ¶ 406.)  Such a common motive to conspire would require that the parties had a collective interest in acting in concert to achieve an anticompetitive end, such as raising prices. *See In re Musical Instruments & Equip. Antitrust Litig.,* 798 F.3d 1186, 1194 (9th Cir. 2015) (noting that a "firm that believes that it could increase profits by raising prices has a motive to reach an advance agreement with its competitors").  In support of this factor, Plaintiffs assert that Citadel Securities had a motive to restrict trading to avoid incurring losses on its supposed short positions.  (CCAC ¶ 406.)  But Plaintiffs fail to allege *any* facts to establish that Citadel Securities held short positions in the Relevant Securities during the relevant time period, sheepishly conceding "it is not possible to ascertain which investor has a short position in a particular security at any particular time."  (*Id.* ¶ 399; *see also id.* ¶ 387).  "Pure speculation does not make out a plus factor."  *United Am. Corp. v. Bitmain, Inc.*, No. 18-CV-25106, 2021 WL 1807782, at *13 (S.D. Fla. Mar. 31, 2021).  Nor do Plaintiffs allege that Citadel Securities itself restricted any trading.  In short, Plaintiffs' conclusory allegations that Citadel Securities had a motive to concoct this entire conspiracy simply do not add up.

There is also no allegation—conclusory or otherwise—that any Clearing Broker or Introducing Broker Defendant was engaged in proprietary short selling.  To the contrary, Plaintiffs concede that the various brokers make money only when trades are processed.  (CCAC ¶¶ 420-422.)  For the securities trade orders at issue, the trading price at which each security is

20

bought and sold has no direct bearing on the per-trade fees each of the Introducing Brokers and Clearing Brokers earns from their customers' trading activity.  As Plaintiffs concede, the Introducing Broker and Clearing Broker Defendants thus stood to *lose* significant revenues by implementing trading restrictions, in addition to the significant reputational harm that they faced. (*Id.*)  Why, then, would the various Clearing and Introducing Broker Defendants decide they wanted to *lose* money and risk negative publicity simply to help Citadel Securities?

The CCAC lacks an answer to that critical question.  Indeed, there is no factual allegation—simply mere innuendo—supporting the proposition that Citadel Securities asked, induced or coerced any of the Defendants.  While Plaintiffs allege that Robinhood (but not several other Introducing Broker and Clearing Broker Defendants) had a PFOF relationship with Citadel Securities, the CCAC does not allege that Citadel Securities had sufficient market power to force any of the Clearing Brokers or Introducing Broker Defendants to do something purely to benefit Citadel Securities.  *Contrast with Interstate Cir. v. United States*, 306 U.S. 208, 214 (1939) (finding that the distributors distributed "about 75 per cent. of all first-class feature films exhibited in the United States," and this market power enabled them to enforce the conspiracy).[11] There also is no allegation that Citadel Securities offered any financial inducement for the Introducing Broker or Clearing Broker Defendants to forgo profits to allegedly save Citadel Securities money.  *Contrast with United States v. Apple, Inc.*, 791 F.3d 290, 298 (2d Cir. 2015) (finding conspiracy where publishers agreed to "raise the price of ebooks and thus protect their profit margins" with Apple's help).  Plaintiffs also fail to provide a plausible theory why the broker defendants would comply with Citadel Securities' alleged wishes to restrict trading, rather than simply re-directing trades to competing market makers (which are noticeably absent from the CCAC).

In sum, Plaintiffs ask this Court to infer that the Introducing and Clearing Broker Defendants decided to introduce varying versions of trading restrictions (at the same time that alleged non-conspirators were also implementing a variety of trading restrictions) simply because *some* had existing business relationships with Citadel Securities, rather than because these Defendants faced unprecedented challenges, such as (in some cases) *billions of dollars in*

---

[11] Plaintiffs allege that Citadel Securities' PFOF made up 29% of Robinhood's revenue in 2019, 34% in 2020 and 43% in the first quarter of 2021 (CCAC ¶¶ 135, 283), and less than one-quarter of Apex's revenue from market makers (*id.* ¶ 140).

*unexpected collateral requirements* in the middle of one of the most volatile market moments in history. That inference is totally implausible; if these allegations meet the *Twombly* test, it is hard to imagine an alleged conspiracy that would not.

> **(b)     Actions Taken Against Unilateral Self-Interest Are Not Probative Here.**

Plaintiffs entirely fail to allege any actions taken by Defendants against their self-interest that are probative of a conspiracy. This plus factor is only probative of a conspiracy if Plaintiffs allege some furthered *collective* self-interest. *See Mayor & City Council of Balt.*, 709 F.3d at 138 (noting that "alleged behavior that would plausibly contravene each defendant's self-interest 'in the absence of similar behavior by rivals'" may suggest prior agreement) (citing *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 327 (2d Cir. 2010)). In other words, this plus factor is present when alleged conspirators do something that would be unprofitable if done individually, but *becomes* profitable through collective action—such as imposing a price increase, which would lose business if no competitor raised prices but would help everyone if all sellers in the market raised prices. *See In re Musical Instruments*, 798 F.3d at 1195. Plaintiffs face two problems here.

*First*, the allegations give rise to plausible, non-conspiratorial reasons why implementing trading restrictions was *in*—rather than *against*—the independent self-interest of each Clearing Broker and Introducing Broker Defendant: namely to protect the firms and their customers from exceedingly volatile market trading, as well as to reduce each of their NSCC collateral requirements resulting from the volatility. (*See* Section I.B.1.) Each broker's primary interest is to attract and retain a strong customer base. The Clearing and Introducing Broker Defendants nonetheless were forced out of necessity to impose restrictions, even though such restrictions create a real risk of both immediate and long-term reputational and financial harm (including this Action). Plaintiffs recognize that various brokers not alleged to be part of the conspiracy and not added as defendants (or originally sued but now dismissed as outlined above) implemented their own restrictions on some of the same securities at the same time. (*See* Section I.B.1.) Where a "benign explanation for the action is equally or more plausible than a collusive explanation, the action cannot constitute a plus factor." *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1310 (11th Cir. 2003).

*Second*, although the restrictions cost each broker revenue—fewer trades mean fewer payments for order flow (or fewer commissions) for the Clearing and Introducing Broker

Defendants, and less spread capture for the Market Makers (CCAC ¶¶ 420-422)—the fact that others may also decide to reduce trading volume does nothing to fill that revenue hole. There is no allegation—nor could there be—that *lower* trading volume somehow collectively increases profits for brokers. This simply is nothing like the cases that involve raising prices or reducing output, where concerted action makes an otherwise unprofitable individual action collectively profitable.

### (c)     Plaintiffs Fail To Allege Opportunities To Coordinate and Collude and Evidence of Concealment and Pretext.

The CCAC also lacks sufficient allegations of opportunities between the Defendants to enter into the supposed conspiracy and to conceal such an agreement. Conversations that courts have found to "support a reasonable inference of conspiracy" include "bilateral and multilateral agreements not to compete and a high level of communications among Defendants." *Salmon Antitrust Litig.*, 2021 WL 1109128, at *15.

After reviewing tens of thousands of pages of discovery produced to entities investigating the trading restrictions, Plaintiffs can point to only a handful of inter-firm communications in their complaint. For most of the Defendants, they allege literally no communications. Indeed, there are no allegations that Defendants PEAK6, ETC or Interactive Brokers *ever spoke or otherwise communicated during the relevant time with each other or any of the other alleged conspirators, including Citadel Securities*. That pleading failure itself negates Plaintiffs' conspiracy claim as to those Defendants.

E*TRADE is alleged to have communicated with Citadel Securities—but no other alleged conspirator—and those communications related only to order cancellations as a routine part of their ongoing business relationship and resulted in the cancellations of four total orders—none of which are alleged to pertain to the Relevant Securities. (CCAC ¶¶ 315-316.)

With respect to Apex, Plaintiffs unpersuasively point to a single chat message describing a call between a Robinhood Financial employee (not alleged to be involved in the decisions to impose trading restrictions) and an unidentified Apex employee that flags a Reddit thread highlighting a way in which customers were circumventing Robinhood's restrictions on options. (*Id.* ¶ 457.) As Plaintiffs acknowledge, the communication occurred on January 29, 2021, one day *after* Apex had lifted its own trading restrictions for GME and AMC. (*Id.* ¶ 327.) Plaintiffs do not explain why such a communication suggests the existence of a conspiracy if one of the parties had already abandoned the alleged collusive conduct and offer no basis for their

assertion that Apex "continued its participation in the scheme by policing the conspiracy," particularly since Apex was no longer effecting the alleged scheme itself.  (*Id.*)[12]  The remaining allegations concerning Apex simply reflect that Apex communicated with its *customers* on business matters.  (*Id.* ¶¶ 443-444.)

Finally, with respect to Robinhood, Plaintiffs point to limited communications with Citadel Securities that, as is clear from the face of those documents and others produced to Plaintiffs and cited in the CCAC, reflect ordinary business dealings between a Market Maker and its client.[13]  Specifically, those communications related to the ongoing "'payment for order flow' relationship" between Robinhood and Citadel Securities and had nothing to do with the restrictions Robinhood later imposed.  (*Id.* ¶¶ 283, 312-313.)  Plaintiffs concede as much when they note that a Robinhood executive, in discussing an upcoming call with Citadel Securities, "indicated that she believed Citadel Securities would make demands on limiting payment for order flow."  (*Id.* ¶ 305.)  Additional correspondence Plaintiffs rely on further demonstrates that the conversations between Robinhood and Citadel Securities were about PFOF, not trading restrictions.  (*See id.* ¶¶ 307, 310.)  Plaintiffs plead no communications whatsoever indicating even that Citadel had advance notice of the Robinhood restrictions on trading of any of the Relevant Securities, let alone any conspiracy to impose such restrictions.  *See Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1456 (11th Cir. 1991) ("[T]he mere opportunity to conspire among antitrust defendants does not, standing alone, permit the inference of conspiracy.").

That leaves only Plaintiffs' allegations concerning public statements by Interactive Brokers' Chairman, Thomas Peterffy,[14] and Robinhood's CEO, Vlad Tenev, on

---

[12] This communication—made for the purpose of informing Robinhood that Robinhood's customers were publicly discussing a plan to evade Robinhood's trading policies (CCAC ¶¶ 327-330)—is moreover protected under *Cement Manufacturers Protective Association v. United States*, 268 U.S. 588, 604 (1925), which holds that it is not an antitrust violation for even competitors to warn one another of fraudulent conduct by others.

[13] Plaintiffs also contend that a communication between Citadel Securities and Robinhood on January 30, 2021 suggests an effort "to coordinate messaging regarding the restrictions placed on January 28, 2021."  (CCAC ¶ 463.)  This does not give rise to an inference of a conspiracy.  As Plaintiffs concede, these communications, which occurred *after* the alleged conspiracy and relevant events, were between public relations teams (*id.* ¶¶ 335, 448), which stands to reason in light of the significant media attention on both companies—among many others—after the market events of late January 2021.

[14] This is Plaintiffs' only allegation pertaining to Interactive Brokers' alleged conduct in the entirety of their 135-page complaint.  It provides no support whatsoever for their claimed

January 28, 2021.  (*See* CCAC ¶ 279.)  Plaintiffs allege that each alluded to the need to "protect" his respective company by restricting trading in the relevant securities, and implausibly suggest the statements evidence the alleged agreement.  (*Id.*)  In fact, they do the opposite, confirming that each broker had an independent incentive to take action to protect its own business and customers in a time of unprecedented market volatility.  The fact that both Peterffy and Tenev made similar true statements on the same day merely reflects the day's unprecedented circumstances, as each company faced common stimuli at the same time.

These allegations are a far cry from the types of allegations upon which courts rely to satisfy this plus factor.  *See, e.g.*, *Salmon Antitrust Litig.*, 2021 WL 1109128, at *15 (referencing "bilateral and multilateral agreements not to compete and a high level of communications among Defendants," including "top management" meetings where participants "discussed plans of non-competition and cooperation between the companies" and their respective prices).  Indeed, this Court rejected as insufficient the pleaded "opportunity to conspire" plus factor in *Florida Cement*, in which the plaintiffs alleged far more than is pleaded in this Action—that the defendants had "frequently communicated through in-person meetings, telephone calls, and other means" and that "Defendants' meetings in furtherance of the conspiracy included those held at trade association meetings, social events, and corporate meetings."  746 F. Supp. 2d at 1316 (denying motion to dismiss based on separate allegations of direct evidence).  The Plaintiffs here—even with substantial discovery—offer no such allegations.

### (d)    Plaintiffs Fail To Show How the Existence of Government Inquiries Creates an Inference of Conspiracy.

Plaintiffs allege that a conspiracy can be inferred based on the announcement of regulatory investigations stemming from the events of January 2021.  (CCAC ¶¶ 486-493.)  But where, as here, "allegations are sparse, the existence of government inquiries [is] insufficient to raise an inference of conspiracy."  *Salmon Antitrust Litig.*, 2021 WL 1109128, at *17; *see also In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 390 (S.D.N.Y. 2019) ("It is far from clear that an ongoing government investigation involving Defendants would, in the absence of more substantial allegations, weigh in favor of the complaint's plausibility.").

---

conspiracy, and the dearth of allegations as to Interactive Brokers merely confirms the infirmity of Plaintiffs' claim against it.

>    **(e)**     **Plaintiffs Fail To Allege Structural Characteristics To Support the Existence of an Anticompetitive Agreement.**

Finally, Plaintiffs allege that the "structure and characteristics of the market for securities . . . make it conducive to collusion and anticompetitive conduct." (CCAC ¶ 362.) Courts generally recognize that some market characteristics, such as "high market concentration," "significant barriers to entry" and a "commoditized product," "contribute to [a] circumstantial case." *Salmon Antitrust Litig.*, 2021 WL 1109128, at *14. This plus factor also does nothing to support Plaintiffs' claim.

Typically, a plaintiff relying on this plus factor would demonstrate that a series of horizontal competitors commanded such an uncontestable share of the marketplace that they would profit from raising prices, restricting output or reducing quality. *See Fla. Cement*, 746 F. Supp. 2d at 1317 (noting that "the cement and concrete markets in Florida are controlled by a small number of companies and these markets have high barriers to entry because of high start-up costs" (citation omitted)). For example, an oil-producing cartel could limit the barrels of oil that would go onto the market for the purpose of raising prices, and the plaintiff could demonstrate that there was no meaningful supply alternative. Or salmon distributors could collude to fix prices because there is a limited supply of salmon and those producers who are part of the conspiracy would benefit from increased prices. In other words, the alleged conspirators would participate directly in the alleged market in a way that would permit them to profit from anticompetitive conduct, shielded from competition by barriers to entry or other factors.

That is not at all what Plaintiffs allege here. While the CCAC is far from a model of clarity on this point, the "product" at issue—for which the price was allegedly depressed—appears to be each of the Relevant Securities (*e.g.*, GME, AMC). Plaintiffs seem therefore to allege the existence of a market for each of the securities. (CCAC ¶ 362 (alleging "the market for securities").) However, not one of the Clearing Broker or Introducing Broker Defendants is alleged to have bought or sold the Relevant Securities for its own account. As Plaintiffs concede, regardless of the price of these securities, "[b]roker-dealers benefit from investors transacting on their platforms" (*id.* ¶ 420), and Clearing Brokers generally "earn a transaction fee every time they make a trade," with these "clearing fees [forming] the very basis of their business models" (*id.* ¶ 421). In the alleged market for each of the securities at issue, there are no barriers to entry, no fixed costs and no captive market; a fundamental tenet of the U.S. securities markets is that anyone can buy or sell a share of stock.

The fallacy of Plaintiffs' market structure allegations is that they pivot away from talking about the markets in which they seem to allege harm—the alleged markets for the Relevant Securities—to talking about other issues in other markets.  For example, Plaintiffs allege there are "substantial barriers to entry" in the "financial services industry" (*id.* ¶ 365) and "high fixed costs and low variable costs" in the "markets for broker dealers, clearing firms and market making" (*id.* ¶ 368), and that retail investors are captive consumers in the "market for broker dealers" (*id.* ¶¶ 377-379).  But the market for brokers (if there is any such market) is not relevant here; Plaintiffs do not allege that the brokers somehow conspired to raise prices (*i.e.*, charge commissions) to retail investors or to raise fees (*i.e.*, PFOF) to Market Makers.  Because Plaintiffs fail to make any market structure allegations for the market in which they allege the price was depressed (the purported markets for the Relevant Securities), their reliance on this plus factor also fails.

## II. PLAINTIFFS FAIL TO PLEAD THE REMAINING ELEMENTS OF A SECTION 1 CLAIM.

Even if Plaintiffs had adequately alleged an agreement—and they have not—they still have not adequately pleaded their antitrust claim because the CCAC fails to define the relevant market, adequately allege market power and plead anticompetitive effects.  Each of these elements is required to plead a rule of reason claim.

Plaintiffs do not even try to allege the requisite elements of a rule of reason claim, instead asserting in a single cursory allegation—without any explanation—that the purported conspiracy is unlawful *per se*.  (CCAC ¶ 505 ("Defendants' anticompetitive and unlawful conduct is per se illegal.").)  However, *per se* condemnation is a very narrow exception to the default rule of reason that is reserved for a limited category of specific factual circumstances that courts have determined—after extensive judicial experience with the same basic fact pattern— are "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.'"  *Procaps S.A. v. Pantheon, Inc.*, 845 F.3d 1072, 1083 (11th Cir. 2016) (quoting *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 692 (1978)).  Outside the limited category of conduct for which *per se* condemnation is appropriate, courts assess an alleged violation of the Sherman Act by applying the rule of reason, which as noted requires specific—and plausible— factual allegations (and ultimately proof) of an "anticompetitive effect of the defendant's conduct on the relevant market."  *Levine*, 72 F.3d at 1551.

### A. The Court Should Address the Question of *Per Se* vs. Rule of Reason at the Motion To Dismiss Stage.

"Whether to apply a *per se* or rule of reason analysis is a question of law." *Nat'l Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*, 779 F.2d 592, 596 (11th Cir. 1986). Accordingly, courts routinely address at the motion to dismiss stage whether a plaintiff has adequately pleaded an agreement that would be subject to *per se* treatment. *See, e.g.*, *Tempur-Pedic*, 626 F.3d at 1334-36 (affirming holding that alleged anticompetitive conduct was not a *per se* violation at the motion to dismiss stage); *Quality Auto*, 917 F.3d at 1271-72 (same).

### B. Plaintiffs' Allegations Do Not Qualify for *Per Se* Treatment under the Antitrust Laws.

Plaintiffs' allegations do not fit within the circumscribed category of cases to which *per se* treatment is confined. In fact, courts consider conduct to be *per se* unlawful "only when history and analysis have shown that in sufficiently similar circumstances" application of "the rule of reason unequivocally results in a finding of liability." *Levine*, 72 F.3d at 1549 (quoting *Consultants & Designers, Inc. v. Butler Serv. Grp., Inc.*, 720 F.2d 1553, 1562 (11th Cir. 1983)). *Per se* treatment is therefore typically limited to certain "'horizontal restraints'— restraints 'imposed by agreement between competitors,'" whereas "vertical restraints— *i.e.,* restraints 'imposed by agreement between firms at different levels of distribution'" are assessed under the rule of reason. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283-84 (2018) (quoting *Bus. Elecs.*, 485 U.S. at 730).

But even with respect to horizontal restraints, only a limited number of them are "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Procaps*, 845 F.3d at 1083 (quoting *Pro. Eng'rs*, 435 U.S. at 692). The category of restraints that are *per se* unlawful is therefore limited to a very small class of antitrust practices," including "horizontal price fixing among competitors, group boycotts, and horizontal market division—business relationships that, in the courts' experience, virtually always stifle competition." *Tempur-Pedic*, 626 F.3d at 1334. This case does not fit into any of those categories.

To begin, there is no suggestion of market division. This is also not a price-fixing case. Price-fixing agreements are "agreements among competitors to fix prices on their individual goods or services." *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 8 (1979). Plaintiffs provide no evidence of any agreement among *horizontal* competitors; at best,

there is an implausible conclusory suggestion of an agreement between financial services companies that occupy *vertical* relationships.  (*See* Section I.)  Further, the alleged agreement at issue here simply does not match the traditional price-fixing context:  where a group of competitors conspire to fix the price of a good or service they sell in order to reap supracompetitive profits (*i.e.*, to make more money than they would in a competitive market by charging a higher price for their product through an agreement with the companies they should be competing against).  *See, e.g.*, *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 61 (2d Cir. 2012) ("To prevail on a claim of horizontal price fixing, a plaintiff must demonstrate that the defendants entered into a conspiracy 'formed for the purpose and with the effect of raising . . . price[s].'" (alterations in original) (quoting *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940))).  Rather, Plaintiffs allege that the purported conspirators' actions depressed the price of the underlying securities.  And, as described above, none of the Introducing and Clearing Broker Defendants is alleged to have actually bought or sold the Relevant Securities for its own account or to have profited in any way from this supposed agreement.

Thus, what distinguishes this case from price-fixing cases that have been declared *per se* unlawful is that the alleged horizontal competitors (Introducing Broker Defendants) participate in a different market (broker services) from the market in which the alleged harm was suffered (the alleged market or markets for the Relevant Securities).  *Per se* treatment cannot apply to such an alleged agreement, where Defendants do not profit as market participants from the alleged scheme.  *See, e.g.*, *Broad. Music*, 441 U.S. at 10, 23 (refusing to apply *per se* rule to alleged price-fixing arrangement where the Court had "never examined a practice like this one before" and explaining that "[n]ot all arrangements among actual or potential competitors that have an impact on price are *per se* violations of the Sherman Act or even unreasonable restraints."); *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (noting that the Supreme Court has "expressed reluctance to adopt *per se* rules . . . 'where the economic impact of certain practices is not immediately obvious'" (alterations in original) (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997))).

Nor is this a *per se* group boycott case.  A group boycott consists of "pressuring a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the target."  *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 541 (1978).  The "ultimate target" of the agreement can be either a competitor or "a customer of some or all

of the [boycotters] who is being denied access to desired goods or services because of a refusal to accede to particular terms set by some or all of the [boycotters]." *Id.* at 543. Moreover, the Supreme Court has explained that the "*per se* approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor." *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458 (1986). There are absolutely no allegations that fit this pattern here; indeed, the CCAC is entirely bereft of *any* discussion of market power. The Supreme Court has twice instructed that the "category of restraints classified as group boycotts is not to be expanded indiscriminately." *Id.*; *see also Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294-95 (1985). This case does not present a situation that would merit such an indiscriminate expansion.

Thus, while Plaintiffs nod at the concept of either a price-fixing conspiracy or group boycott at various points (*see, e.g.*, CCAC ¶¶ 86, 197, 304, 495), neither label actually fits at all, never mind in a way that would sanction application of the *per se* standard. *See Broad. Music*, 441 U.S. at 8 ("[E]asy labels do not always supply ready answers.").

### C. Plaintiffs Do Not Even Attempt To Plead a Section 1 Violation Based on the Rule of Reason.

Since Plaintiffs have not alleged conduct that is a *per* se violation, their CCAC can survive only if they could plead sufficiently the elements of a Sherman Act violation under the rule of reason. Under this standard, courts are required to "first define the relevant market" and then "conduct a fact-specific assessment of market power and market structure" to determine whether a restraint serves as an unreasonable restraint on competition, *Am. Express*, 138 S. Ct. at 2284 (quotation marks omitted), and to "show that the restraint produced anticompetitive effects within the relevant product and geographic markets," *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 270 (6th Cir. 2014). Plaintiffs have not satisfied any of these elements.

### 1. Plaintiffs Do Not Plead a Cognizable Product Market.

A plaintiff attempting to state a claim under the rule of reason must plausibly allege a relevant antitrust market. *Tempur-Pedic*, 626 F.3d at 1336-39; *see also Re-Alco Indus., Inc. v. Nat'l Ctr. for Health Educ., Inc.*, 812 F. Supp. 387, 391 (S.D.N.Y. 1993) (holding that a court may grant a Rule 12(b)(6) motion if "a complaint fails to allege facts regarding substitute products, to distinguish among apparently comparable products, or to allege other pertinent facts relating to cross-elasticity of demand"). Dismissal is appropriate where the alleged product market is defined without "reference to the rule of reasonable interchangeability and cross-

elasticity of demand" or where it "clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor." *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997)); *see also TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1025 (10th Cir. 1992) (affirming dismissal for failure to plead a relevant market).

Plaintiffs do not actually define the specific contours of *any* alleged antitrust market, simply alluding instead to numerous markets, including "the market for securities," "[t]he markets for broker dealers, clearing firms, and market making," "the financial markets" and "the stock brokerage market with respect to the Relevant Securities[.]" (*See, e.g.*, CCAC ¶¶ 362, 368, 386, 498.) On their own, each passing reference fails to allege a cognizable product market. And, taken together, these alleged markets vary significantly as to the "practical indicia" that courts normally use to define a product market, including the "industry or public recognition of the submarket as a separate economic entity," "the product's peculiar characteristics and uses" and its "distinct customers[.]" *Tempur-Pedic*, 626 F.3d at 1337 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)).

To the extent Plaintiffs are relying on any particular putative market, it appears to be the alleged market for each of the Relevant Securities. But they make no effort to analyze the viability of such product markets. Nor could they; the market for securities of a particular company cannot constitute a cognizable product market because transactions "concerning the stock of a single company" do not "constitute[] trade or commerce within the meaning of § 1 of the Sherman Act." *Kalmanovitz v. G. Heileman Brewing Co.*, 769 F.2d 152, 156 (3d Cir. 1985) (declining to extend antitrust liability in a tender offer for securities dispute). To the extent Plaintiffs are suggesting that there is an antitrust product market limited to the aggregate group of the Relevant Securities, this too fails as they make no effort to explain why those securities (related to companies in disparate industries, such as video game sales, movie theater operations and cell phone manufacturing) should somehow be lumped into a narrow market to the exclusion of all other securities.

### 2. Plaintiffs Do Not Plead Market Power.

"Market power is the ability to raise price significantly above the competitive level without losing all of one's business," *Graphic Prods. Distribs., Inc. v. Itek Corp.*, 717 F.2d

1560, 1570 (11th Cir. 1983), and "ordinarily is inferred from the seller's possession of a predominant share of the market," *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 464 (1992). Nowhere do Plaintiffs allege that *any* Defendant possesses market power in *any* market. Indeed, Plaintiffs allege that there were multiple competitors who were not party to the purported conspiracy and still allowed trading in more of the Relevant Securities. (CCAC ¶¶ 24-25, 29-30, 34-35.) In fact, Burke Minahan—a named Plaintiff—alleges that he was able to circumvent Robinhood's purported restrictions by applying for an account with Fidelity and purchasing GME securities through that brokerage. (*Id.* ¶¶ 29-30.)

### 3.    Plaintiffs Fail To Plead Actual Harm to Competition.

Pleading an anticompetitive effect requires Plaintiffs to demonstrate "actual detrimental effects [on competition] . . . such as reduced output, increased prices, or decreased quality in the relevant market." *Am. Express*, 138 S. Ct. at 2284. As discussed in the preceding section, Plaintiffs do not allege any of these harms on competition over the price of the good or service in the markets in which any of the Defendants actually compete. Plaintiffs do not plead that the alleged conspiracy has led to an increase in prices in the market for retail brokerage services. They similarly fail to allege that the purported conspiracy affected competition among the Introducing or Clearing Brokers—indeed, they fail to allege that the Introducing and Clearing Brokers compete at all.[15] All that Plaintiffs *do* plead is that the alleged agreement had potential impact on the trading prices for the Relevant Securities—a purported harm in a purported market in which *none* of the Defendants is alleged to compete, because they neither produce the Relevant Securities, nor are they alleged to buy or sell them for their own account. Plaintiffs' failings in this regard are not surprising since this case has nothing to do with competition at all.[16]

---

[15] Nor do Plaintiffs allege that any purported injury flowed from competitive harm. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488-89 (1977). Indeed, Plaintiff Minahan allegedly purchased GME shares through Fidelity on January 28, 2021. (CCAC ¶ 30.)

[16] Even if Plaintiffs could establish that there has been some anticompetitive effect in a relevant market—and they cannot—their claims of injury are completely speculative. Specifically, each Plaintiff could only have been injured if one assumes that he or she (along with the entire putative class) sold "their shares in the Relevant Securities at a lower price than they otherwise would have," in the absence of trading restrictions." (CCAC ¶ 501.) There is no basis for that speculative assertion that Plaintiffs and the class would have timed the markets perfectly. Courts have denied antitrust standing to plaintiffs relying on this sort of speculative damages claim. *See Austin v. Blue Cross & Blue Shield of Ala.*, 903 F.2d 1385, 1392-93 (11th Cir. 1990).

### III.   PLAINTIFFS' ANTITRUST THEORY IS PRECLUDED BY THE FEDERAL SECURITIES LAWS.

Even if Plaintiffs could plead a cognizable antitrust claim—and they cannot— federal securities laws would preclude any such claim.  The Securities Exchange Act of 1934 (the "Exchange Act") extensively regulates all of the conduct Plaintiffs allege in the CCAC.  As a result, the Supreme Court has held that where securities and antitrust law are "clearly incompatible," the securities law implicitly precludes an antitrust claim.  *Billing*, 551 U.S. at 285.  Such incompatibility is particularly likely where the conduct at issue "lie[s] squarely within an area of financial market activity that the securities law seeks to regulate," *i.e.*, "an area of conduct squarely within the heartland of securities regulations."  *Id.* at 264, 285.

Here, Plaintiffs challenge trading restrictions that brokers implemented to comply with capital requirements or otherwise to address unprecedented volume and volatility (*see* Section I.B.1), and allege an underlying agreement for the purpose of manipulating the market price of certain securities (*see* CCAC ¶ 495 (alleging that "Defendants conspired and entered into an anticompetitive scheme to fix, raise, stabilize, maintain or suppress the price of the Relevant Securities")).  Regardless of whether one considers the actual reason for the restrictions, which is plausibly provided by the facts alleged in the CCAC, or the implausible version asserted by Plaintiffs, the conduct at issue falls squarely within the heartland of federal securities law, and the regulatory authority of the SEC, which actively regulates electronic broker platforms, brokers, market makers and clearing agencies.  Federal securities claims have been brought against certain Defendants on the same set of facts alleged here (*see* Order on Leadership Structure, ECF No. 310, at 1-2 (designating a "federal security law claims" tranche)), and Defendants may not be liable under the antitrust statutes where Plaintiffs' claims are "securities complaint[s] in antitrust clothing."  *Billing*, 551 U.S. at 284.

### A.   Plaintiffs' Antitrust Claims Are Precluded under *Billing* Because the Conduct at Issue Is Regulated by the Federal Securities Laws.

Plaintiffs' antitrust claims are precluded because the conduct at issue is "squarely" within the realm of the federal securities laws.  *See Billing*, 551 U.S. at 285.  In *Billing*, the Supreme Court reaffirmed that application of the antitrust laws may be implicitly precluded by another federal regulatory regime, such as the Exchange Act—even where the plaintiffs allege an unlawful conspiracy under the Sherman Act.  *See id.* at 267-68.  The Court held that "the securities laws [were] clearly incompatible with the application of the antitrust

laws" in the case.  *Id.* at 283 (internal quotation marks omitted). In so holding, the court noted that "the fact that the SEC is . . . required to take account of competitive considerations when it creates securities-related policy and embodies it in rules and regulations" makes it "somewhat less necessary to rely upon antitrust actions to address anticompetitive behavior."  *Id.* Specifically, the Court observed that "evidence tending to show unlawful antitrust activity and evidence tending to show lawful securities marketing activity may overlap, or prove identical," and antitrust suits and the "risk of treble damages" could therefore cause market participants to avoid conduct that "securities law permits or encourages."  *Id.* at 281-82.  The Court concluded that the "threat of antitrust lawsuits, through error and disincentive, could seriously alter . . . conduct in undesirable ways," and "to allow an antitrust lawsuit would threaten serious harm to the efficient functioning of the securities markets."  *Id.* at 283.

The Court in *Billing* identified four factors that determine when the antitrust laws are implicitly precluded:  (1) whether the action involves "an area of conduct squarely within the heartland of securities regulations; (2) clear and adequate SEC authority to regulate; (3) active and ongoing agency regulation; and (4) a serious conflict between the antitrust and regulatory regimes."  *Id.* at 285.  All four factors point strongly in favor of implicit preclusion here.

## 1.  The Conduct at Issue Lies at the Very Heart of the Securities Market.

The first *Billing* factor considers whether the alleged practices "lie squarely within an area of financial market activity that the securities law seeks to regulate."  *Billing*, 551 U.S. at 276.  The focus for the first factor is not just on the specific anticompetitive conduct that is alleged, but rather the "broad underlying market activity."  *Elec. Trading Grp., LLC v. Banc of Am. Sec. LLC*, 588 F.3d 128, 133-34 (2d Cir. 2009) (citing *Billing*, 551 U.S. at 276).  Here, the underlying market activities are restrictions on customer trades on electronic broker platforms and, from Plaintiffs' perspective, alleged manipulation of market prices for exchange-traded stocks.  Brokers provide access to the securities exchanges and, without them, investors like Plaintiffs would be unable to participate in the securities markets.  For this reason, brokers and dealers must register with the SEC.  Exchange Act § 15, 15 U.S.C. § 78o.  Market integrity for stock prices is a vital aspect of securities regulation and lies at the core of the securities laws. Exchange Act §§ 9-10, 15 U.S.C. §§ 78i-78j.  The conduct at issue is "central to the proper functioning of well-regulated capital markets" and this case "concern[s] practices that lie at the very heart of the securities" market.  *Billing*, 551 U.S. at 276.

### 2. The SEC Is Authorized To Regulate All of the Activities Here in Question.

The second *Billing* factor considers "the existence of regulatory authority under the securities law to supervise the activities in question." *Billing*, 551 U.S. at 275. As in *Billing*, "the law grants the SEC authority to supervise all of the activities here in question," and "the SEC possesses considerable power to forbid, permit, encourage, discourage, tolerate, limit, and otherwise regulate virtually every aspect of the practices in which [brokers] engage." *Id.* at 276. Congress has granted the SEC authority to regulate brokers under Sections 15 and 17 of the Exchange Act. *See* 15 U.S.C. §§ 78o, 78q. As a result, no broker may transact in securities unless such broker complies with SEC rules and regulations, Exchange Act § 15(b)(7), 15 U.S.C. § 78o(b)(7), and the SEC has specific authority to enact rules and regulations to define acts and practices by brokers that "are fraudulent, deceptive, or manipulative," Exchange Act § 15(c)(2)(D), 15 U.S.C. § 78o(c)(2)(D). Similarly, Congress gave the SEC rulemaking authority to define "any manipulative or deceptive device or contrivance" in connection with the purchase or sale of exchange-traded securities, Exchange Act § 10(b), 15 U.S.C. § 78i(b), and made it unlawful:

> To effect either alone or with one or more other persons any series of transactions for the purchase and/or sale of any security . . . for the purpose of pegging, fixing, or stabilizing the price of such security in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Exchange Act § 9(a)(6), 15 U.S.C. § 78i(a)(6). Therefore, the SEC has ample "regulatory authority under the securities law to supervise the activities in question." *Billing*, 551 U.S. at 275; *see also Friedman v. Salomon/Smith Barney, Inc.*, 313 F.3d 796, 803 (2d Cir. 2002) (holding that "implied immunity bars plaintiffs' claim" regarding stock price-fixing scheme based on the SEC's authority under Section 9(a)(6)).

### 3. There Is Substantial Evidence That the SEC Is Exercising Its Authority.

The third *Billing* factor considers "evidence that the responsible regulatory entities exercise [their] authority." *Billing*, 551 U.S. at 275. Here, there is ample evidence of the SEC's exercise of its authority. Under Section 15(c) of the Exchange Act, the SEC has enacted extensive regulations covering brokers. *See* 17 C.F.R. §§ 240.15c3-1 to -5. The SEC has also

implemented a risk assessment program under Section 17 of the Exchange Act that monitors brokers and requires them to participate in monthly risk assessment meetings with the SEC.  17 C.F.R. §§ 240.17h-1T to -2T.  The SEC has also enacted regulations that specifically address the conduct of clearing agencies, including the calculation of and requirements for collateral calls. 17 C.F.R. § 240.17Ad-22.  Finally, the SEC has enacted regulations relating to manipulative or deceptive devices under Section 10(b) of the Exchange Act, 17 C.F.R. § 240.10b-5, and relating to market manipulation under Section 9(a) of the Exchange Act, Regulation M, 17 C.F.R. §§ 242.100 to -105.  Notably, neither the Exchange Act nor SEC regulations prohibit all forms of market manipulation.  *See Friedman*, 313 F.3d at 803.

Furthermore, the SEC has an enforcement program for violations of its regulations concerning both brokers and market manipulation:  out of the 405 standalone enforcement actions brought in 2020, 10% related to broker-dealers and 5% related to market manipulation.  SEC Division of Enforcement, 2020 Annual Report at 16 (Nov. 2, 2020); *see also* SEC Division of Enforcement, 2019 Annual Report at 15 (Nov. 6, 2019) (out of 526 standalone cases, 7% broker-dealer actions and 6% market manipulation actions); SEC Division of Enforcement, 2018 Annual Report at 19 (Nov. 2, 2018) (out of 490 standalone cases, 13% broker-dealer actions and 7% market manipulation actions).[17]  The ongoing SEC investigation concerning the January 2021 short squeeze events, alleged in the CCAC, demonstrates that the SEC is actively exercising its authority to regulate.  (CCAC ¶¶ 490-491.)  *See Mayor & City Council of Balt. v. Citigroup, Inc.*, Nos. 08-cv-7746 (BSJ), 08-cv-7747 (BSJ), 2010 WL 430771, at *5 (S.D.N.Y. Jan. 26, 2010) (finding that the SEC had "actively exercised its authority" by "undertak[ing] an ongoing investigation into the specific events at issue in this case"), *aff'd on other grounds*, 709 F.3d 129 (2d Cir. 2013).

### 4.   Allowing This Claim To Proceed Would Create a Conflict Between the Antitrust and Securities Laws.

The fourth *Billing* factor considers whether there is "a resulting risk that the securities and antitrust laws, if both applicable, would produce conflicting guidance, requirements, duties, privileges, or standards of conduct."  *Billing*, 551 U.S. at 275-76.  In *Billing*, the Supreme Court engaged in a practical analysis of the "likely consequences" of allowing antitrust litigation in heavily regulated areas, including whether evidence put forward to

---

[17] *See* SEC Division of Enforcement Annual Reports, *available at* https://www.sec.gov/reports.

support claims of conspiracy would "overlap" or "prove identical" with evidence showing agency-permitted conduct. *Id.* at 275, 281. The Court also recognized the potential for conflict between generalist judges and juries and expert regulators in drawing "a fine, complex, detailed line separat[ing] activity that the SEC permits or encourages (for which [plaintiffs] must concede antitrust immunity)" and conduct that it "forbid[s]." *Id.* at 279. In addition, "actual and immediate" conflict is not required; "potential conflict" is sufficient. *See Elec. Trading Grp.*, 588 F.3d at 138 (holding that implied preclusion may be based on potential conflict, for which "the proper focus is not on the Commission's current regulatory position but rather on the Commission's authority to permit conduct that the antitrust laws would prohibit" (quoting *In re Stock Exchs. Options Trading Antitrust Litig.*, 317 F.3d 134, 149 (2d Cir. 2003))).

        Here, the enforcement of Plaintiffs' claims would create both an actual and a potential conflict between the Exchange Act and the Sherman Act if a jury in this MDL action were to find that conduct that is otherwise lawful under the securities laws is unlawful under the antitrust laws. Most acutely, an actual conflict exists because the conduct at issue in this case is permitted by the SEC. *See Elec. Trading Grp.*, 588 F.3d at 137 (holding that an "actual conflict arises [between antitrust liability and the securities regime] because antitrust liability would inhibit the prime brokers (and other brokers) from engaging in other conduct that the SEC currently permits"). The SEC has comprehensive regulations for broker-dealers (including net capital requirements), *see* 17 C.F.R. §§ 240.15a-1 to 240.15c6-1, and for clearing agencies (including collateral call requirements), *see id.* §§ 240.17Ab2-1 to -2, 240.17Ad-1 to -24. Indeed, the SEC has explicitly stated that broker-dealers "may reserve the ability to reject or limit customer transactions,"[18] and SEC regulations on market manipulation do not prohibit the alleged conduct, *see id.* §§ 242.100 to -105 (Regulation M only applies to activities "in connection with a distribution of securities"), *see also Friedman*, 313 F.3d at 803. In addition to this actual conflict with SEC regulations, there is the potential for conflict with the SEC's enforcement program because the SEC is currently investigating the January 2021 short squeeze events. (CCAC ¶¶ 490-491.) *See Billing*, 551 U.S. at 273 (explaining that in *Gordon v. New York Stock Exchange, Inc.*, 422 U.S. 659 (1975), "in light of potential future conflict, the Court found that the securities law precluded antitrust liability even in respect to a practice that both

---

[18] SEC Statement, *supra* note 8.

antitrust law and securities law might forbid").  The antitrust claims in this case are precluded because "a fine, complex, detailed line separates that activity the SEC permits or encourages" from activity it forbids, and that "line-drawing" must be done by the SEC, not by judges and juries under the rubric of antitrust claims.  *Billing*, 551 U.S. at 279.

> **B.  There Is No Applicable Savings Clause.**

In *Billing*, the Supreme Court found that the general savings clauses in the Exchange Act are not "so broad as to preserve all antitrust actions" and do not prevent implied preclusion of Sherman Act claims.  551 U.S. at 275.  Instead, the Court found that the "securities law and antitrust law are clearly incompatible."  *Id.* at 279.  Apparently conscious of the implied preclusion problem, Plaintiffs cite in the CCAC to the antitrust savings clause in the Dodd-Frank Act.  (CCAC ¶ 405.)  But that savings clause does not apply to Plaintiffs' claims.

The Dodd-Frank Act includes a provision that "[n]othing in this Act, or any amendment made by this Act, shall be construed to modify, impair, or supersede the operation of any of the antitrust laws, unless otherwise specified."  Pub. L. No. 111-203, § 6, 124 Stat. 1376, 1390 (2010), *codified at* 12 U.S.C. § 5303.  The "Act" referred to in this savings clause is the Dodd-Frank Act.  Dodd-Frank Act § 6, 124 Stat. at 1390.  But nothing in the Dodd-Frank Act is at issue in this case:  its amendments to the Exchange Act relate to security-based swap agreements.  *See* Dodd-Frank Act §§ 761-774, 124 Stat. at 1754-1802.[19]  Accordingly, the Dodd-Frank Act and its antitrust savings clause do not apply to Section 15 of the Exchange Act at all, and apply to Sections 9(a) and 10(b) of the Exchange Act only insofar as those sections were expanded to cover security-based swap agreements.  Plaintiffs' claims do not, however, relate in any way to security-based swap agreements.  (*See, e.g.*, CCAC ¶¶ 402-405.)

> **IV.  INDEPENDENT REASONS EXIST TO DISMISS ALL CLAIMS AGAINST PEAK6, E\*TRADE HOLDINGS AND ROBINHOOD MARKETS.**

Plaintiffs name three parent holding companies as Defendants:  Robinhood Markets, E\*TRADE Holdings and PEAK6.  However, claims against all of these entities should be dismissed because Plaintiffs do not plead any allegations against them.  *See Fla. Cement*, 746

---

[19] The Dodd-Frank Act did not amend the substance of Section 15(c).  *See* Dodd-Frank Act §§ 713(a), 762(d)(4), 766(d), 929L, 975(g), 124 Stat. at 1646, 1761, 1799, 1861, 1923.  Nor did it amend the substance of 10(b) of the Exchange Act.  *See* Dodd-Frank Act §§ 762(d)(3), 929L, 124 Stat. at 1761, 1861.  The only amendments the Act made to Section 9(a) were to cover security-based swap agreements.  *See* Dodd-Frank Act § 762(d)(2), 124 Stat. at 1760-61.

F. Supp. 2d at 1324 (holding that parent entity cannot be held liable for subsidiary's actions without allegations against parent).

## V.   PLAINTIFFS' CLAIMS SHOULD BE DISMISSED WITH PREJUDICE.

The Court should dismiss Plaintiffs' CCAC with prejudice.  Plaintiffs have had months to consider their arguments and legal theories against Defendants since the first complaints were filed at the end of January 2021.  Unlike the vast majority of plaintiffs at the pleading stage, Plaintiffs had the opportunity to review tens of thousands of pages of internal communications and documents regarding the allegations and issues in this case and received a two-week extension of the deadline to file the Consolidated Complaint (ECF No. 358) so they could have more time to review and incorporate those documents.  (*See* ECF No. 335.)

Despite the additional time and discovery Plaintiffs had at their disposal, Plaintiffs amended their Consolidated Complaint just days before the filing of this Motion—Plaintiffs' third such attempt at pleading their claims (ECF No. 388)—and they did so without Defendants' written consent or leave of this Court, in violation of Rule 15(a).  Fed. R. Civ. P 15(a)(2). Plaintiffs' August 23, 2021 complaint is incorrectly labeled as a "Corrected Consolidated Class Action Complaint," in what appears to be an attempt to hide the substantive change made by Plaintiffs to the core of their conspiracy allegations.  The redline that Plaintiffs served on Defendants prior to filing their amended complaint shows that Plaintiffs "corrected" the complaint to remove the paramount allegation underlying their conspiracy claims against Robinhood.[20]  Specifically, Plaintiffs originally claimed that Robinhood Securities made its decision to impose trading restrictions on the Relevant Securities "a mere 7 minutes" after it had received its January 28, 2021 NSCC collateral call—what Plaintiffs claimed was "highly unlikely" absent premeditation pursuant to an alleged conspiracy.  (ECF No. 358 ¶ 475; *see also id.* ¶ 233.)  This false allegation stems from claiming that events transpiring at 5:18 a.m. Pacific Time—evident on the very documents cited by Plaintiffs—occurred in *Eastern* Time, thereby collapsing the timeline of events by three hours.  (*Id.* ¶ 232 (showing time zone adjustment in the time stamp).)  Plaintiffs' amended complaint now more accurately describes the time it took for

---

[20] Counsel for the Antitrust Plaintiffs served a redline showing the changes to the "corrected" Antitrust Tranche complaint on Monday, August 23, 2021 at 2:16 PM EDT, prior to filing the new complaint later that afternoon.  The changes appear in portions that the Plaintiffs filed with redactions.  Defendants will provide a copy of the redline with the Court under seal or with appropriate redactions to protect personally identifiable information upon request.

Robinhood Securities to deliberate regarding the imposition of trading restrictions as taking more than three hours—an admission that is fatal to their premeditation claims and that further undermines their purported conspiracy and premeditation claims.  Plaintiffs also removed demonstrably false allegations concerning Gabriel Plotkin, CEO of Melvin Capital, and Ken Griffin, CEO of Citadel LLC.  (*Id.* ¶ 187.)  Then, the day after filing the instant "corrected" complaint, Plaintiffs voluntarily dismissed a number of alleged co-conspirators from this Action—changing the size and make-up of the purported antitrust conspiracy a day *after* improperly filing an amended complaint.

Such changes are not simply technical corrections addressing punctuation or verb tenses—these are substantive amendments pursuant to Rule 15 of the Federal Rules of Civil Procedure.  *See Pressner v. Target Corp.*, No. 00-cv-6636, 2001 WL 293993 at *3 (N.D. Ill. Mar. 27, 2001) (striking "plaintiff's improperly filed corrected amended complaint," noting that "plaintiff did not seek or obtain leave of court to file the second amended complaint, as required by Fed. R. Civ. P. 15(a)"); *see also Hoover v. Blue Cross & Blue Shield of Ala.*, 855 F.2d 1538, 1544 (11th Cir. 1988) (explaining that "if an amendment that cannot be made as of right is served without obtaining the court's leave or the opposing party's consent, *it is without legal effect*" (quoting 6 C. Wright & A. Miller, Fed. Prac. & Proc. Civ. § 1485 (1971)) (emphasis in original)).  Given that Plaintiffs have now had three opportunities to plead their claims, any further amendment would be futile.  Therefore, Defendants respectfully submit that this Action should be dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, Defendants respectfully submit that the CCAC should be dismissed for failure to state a claim, with prejudice.

Dated:  August 30, 2021

/s/ Samuel A. Danon

**HUNTON ANDREWS KURTH LLP**
Samuel A. Danon (FBN 892671)
Gustavo Javier Membiela (FBN 513555)
María Castellanos Alvarado (FBN 116545)
333 S.E. 2 Avenue, Suite 2400
Miami, FL 33131
Telephone: (305) 810-2500
Facsimile: (305) 810-2460
sdanon@huntonak.com
gmembiela@huntonak.com
mcastellanos@hunton.com

**CRAVATH, SWAINE & MOORE LLP**
Antony L. Ryan
Kevin J. Orsini
Brittany L. Sukiennik
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700
aryan@cravath.com
korsini@cravath.com
bsukiennik@cravath.com

*Counsel for Defendants Robinhood Financial*
*LLC, Robinhood Securities, LLC and*
*Robinhood Markets, Inc.*

/s/ *Adam L. Hoeflich* (with consent)
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Christopher D. Kercher
Peter H. Fountain
51 Madison Avenue, 22nd Floor,
New York, New York, 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
christopherkercher@quinnemanuel.com
peterfountain@quinnemanuel.com

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
William A. Burck
1300 I Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100
williamburck@quinnemanuel.com

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
John F. O'Sullivan (FBN 143154)
2601 South Bayshore Drive, Suite 1550
Miami, FL 33133
Telephone: (305) 439-5008
johnosullivan@quinnemanuel.com

**BARTLIT BECK LLP**
Adam L. Hoeflich
Dawson Robinson
54 W. Hubbard St., Ste. 300
Chicago, IL 60654
Telephone: (312) 494-4400
Facsimile: (312) 494-4440
adam.hoeflich@bartlitbeck.com
dawson.robinson@bartlitbeck.com

*Counsel for Defendant Citadel Securities LLC*

/s/ *Shari Ross Lahlou* (with consent)
**DECHERT LLP**
Shari Ross Lahlou
1900 K Street, NW
Washington, D.C. 20006
Telephone: (202) 261-3300
Facsimile: (202) 261-3333
shari.lahlou@dechert.com

**DECHERT LLP**
Andrew J. Levander
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Telephone:  (212) 698 3500
Facsimile:  (212) 698 3599
***andrew.levander@dechert.com***

**DECHERT LLP**
Steven Bizar
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
Telephone: (215) 994 4000
Facsimile: (215) 994 2222
steven.bizar@dechert.com

*Counsel for Defendant Interactive Brokers LLC*

*/s/ Peter W. Homer* (with consent)
**HOMER BONNER JACOBS ORTIZ, P.A.**
Peter W. Homer (Florida Bar No. 291250)
1200 Four Seasons Tower
1441 Brickell Avenue
Miami, Florida 33131
Telephone: (305) 350-5139
Facsimile: (305) 372-2738
phomer@homerbonner.com

**DAVIS POLK & WARDWELL LLP**
Brian S. Weinstein
Gina Cora
Janet Jones-Duffey
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5972
brian.weinstein@davispolk.com
gina.cora@davispolk.com
janet.jones-duffey@davispolk.com

*Counsel for Defendants E\*TRADE Securities*
*LLC and E\*TRADE Financial Holdings, LLC*

*/s/ J. Mark Gidley* (with consent)
**WHITE & CASE LLP**
Jack E. Pace III
Bryan D. Gant
1221 Avenue of the Americas
New York, NY  10020-1095
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
jpace@whitecase.com
bgant@whitecase.com

**WHITE & CASE LLP**
J. Mark Gidley
701 Thirteenth Street, NW
Washington, DC  20005-3807
Telephone: (202) 626-3600
Facsimile: (202) 639-9355
mgidley@whitecase.com

**WHITE & CASE LLP**
Angela Daker
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, FL  33131-2352
Telephone: (305) 995-5297
Facsimile: (305) 358-5744
adaker@whitecase.com

*Counsel for Defendant Apex Clearing*
*Corporation, Electronic Transaction Clearing,*
*Inc. and PEAK6 Investments LLC*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 30, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I further certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive Notices of Electronic Filing.

Dated:  August 30, 2021

_/s/ Samuel A. Danon_
Samuel A. Danon (FBN 892671)