**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-2989-MDL-ALTONAGA/Torres**

In re:

**JANUARY 2021 SHORT SQUEEZE**
**TRADING LITIGATION**

_____/

This Document Relates to the Robinhood Tranche

**<u>AMENDED CONSOLIDATED CLASS ACTION COMPLAINT</u>**

<u>**TABLE OF CONTENTS**</u>

**INTRODUCTION**....................................................................................................1

**JURISDICTION AND VENUE**............................................................................7

**THE PARTIES**......................................................................................................8

    **A. Plaintiffs**.......................................................................................................8

    **B. Defendants**....................................................................................................15

        i.    Robinhood Markets.............................................................................15

        ii.   Robinhood Financial ..........................................................................16

        iii.  Robinhood Securities .........................................................................16

        iv.  Robinhood Markets' Control Over its Subsidiaries ...........................17

**FACTUAL ALLEGATIONS**..............................................................................18

    **A. The Robinhood Business Model** ................................................................20

        i.    History and Growth............................................................................20

        ii.   Driving Force in Bringing New Investors to the Marketplace: the "Gamification" of Trading.............................................................................................24

        iii.  "Payment for Order Flow" and Robinhood's Role in Driving the Market Volatility it was Unprepared to Address........................................28

        iv.  Rapid Growth Leads to Systemic Failures: History of Compliance Issues...........30

    **B. Industry and Professional Standards of Care** ..........................................32

        i.    Managing Market Risk: Collateral Deposit and Capital Requirements................32

        ii.   Broker-Dealer Rules and Regulatory Requirements...........................35

        iii.  Circuit Breakers: Procedures for Brokers to Operate During Times of Extreme Market Volatility................................................................36

    **C. The January 2021 "Short Squeeze"** ........................................................39

        i.    Price Volatility Ahead of January 28, 2021 Was Well-Known to Robinhood......39

**D. Robinhood was on Notice of the Risk Associated with the Volatility It Fueled** .........40

    i.    The $3 Billion Capital Call .....................................................................46

    ii.   Robinhood's Unprecedented, One-Sided Trading Halt .........................53

   iii.   Institutional Broker-Dealers Did Not Impose a Similar One-Sided Trading Halt, Which Regulators Criticized as "Disadvantageous" to Investors...........................57

   iv.   Trading Restrictions Continue After January 28, 2021 ........................58

**E. Government Investigations into the January 2021 Short Squeeze**............................60

**CLASS ACTION ALLEGATIONS** ........................................................................61

    I.    Nationwide Investor Class ...........................................................................61

   II.   Robinhood Class .........................................................................................62

**CAUSES OF ACTION** ...........................................................................................65

    COUNT I – Negligence .........................................................................65

    COUNT II – Gross Negligence................................................................67

    COUNT III – Breach of Fiduciary Duty
    (against Robinhood Securities and Robinhood Financial) ...................68

    COUNT IV – Breach of the Implied Duty of Care
    (against Defendants Robinhood Financial and Robinhood Securities) ...............70

    COUNT V –Breach of the Implied Covenant of Good Faith and Fair Dealing
    (against Robinhood Financial and Robinhood Securities)...................74

    COUNT VI – Tortious Interference with Contract and Business Relationship
    (against Robinhood Markets) ...............................................................76

    COUNT VII – Civil Conspiracy (Against Robinhood) ........................77

**PRAYER FOR RELIEF**.........................................................................................78

**DEMAND FOR JURY TRIAL**............................................................................79

Plaintiffs, Andrea Juncadella, Cody Hill, Edward Goodan, Jaime Rodriguez, Jonathan Cornwell, Joseph Daniluk, Mark Sanders, Patryk Krasowski, William Makeham, Sammy Gonzalez, Paul C. Prunean, and Julie Moody (collectively, "Plaintiffs"), on behalf of themselves and all persons similarly situated (the "Class"), hereby bring this Amended Consolidated Class Action Complaint against Defendants, Robinhood Markets, Inc., Robinhood Financial LLC, Robinhood Securities, LLC (collectively, "Robinhood" or "Defendants"), for negligence, breach of fiduciary duty, breach of due care and the implied covenant of good faith and fair dealing, tortious interference, and civil conspiracy, demanding a trial by jury. Plaintiffs make the following allegations based on personal knowledge as to the facts pertaining to themselves and on information and belief, including the investigation of counsel, as to all other allegations.

## INTRODUCTION

1.      Through Robinhood's Registration Statement, filed in connection with its IPO and with a $35 billion valuation, Robinhood emphasizes equal access to financial markets and claims, "Our founders deeply believe that everyone should have **access** to the financial system." *See* Robinhood Markets, Inc., Form S-1 ("Form S-1"), at 8 (Aug. 31, 2021) (emphasis added). This case is about the extreme divergence between that professed belief and how Robinhood actually runs its business.

2.      On January 28, 2021, Robinhood took unprecedented action to render the financial system ***inaccessible*** to millions of customers and investors by deleting, at the push of a button, billions of dollars' worth of demand for certain popular stocks—wiping away over 10 billion dollars ($10,000,000,000) in market cap.

3.      By suspending only one side of the transaction—the buy side—Robinhood eliminated national demand for certain "hot stocks," the majority of which were being traded on

its platform, a move designed to artificially suppress market prices, foreseeably harming Plaintiffs and Class members who were forced to sell at depressed prices or hold and watch as the value of their holdings fell precipitously. These artificially suppressed prices continued to permeate in the market even after Robinhood fully lifted its restrictions.

4.      Leading up to January 28, 2021, Plaintiffs and the Class were aggressively recruited, through targeted marketing campaigns and addictive, gamified user interfaces, to Robinhood's platform. To anyone paying attention, and Robinhood certainly was, the tidal wave of new accounts being opened through its online brokerage was driven by a ferocious interest in certain stocks, including GameStop Corporation (symbol: GME), BlackBerry Ltd. (symbol: BB), Nokia (symbol: NOK), AMC Entertainment Holdings, Inc. (symbol: AMC), American Airlines Group, Inc. (symbol: AAL), Bed Bath & Beyond, Inc. (symbol: BBBY), Castor Maritime Inc. (symbol: CTRM), Express, Inc. (symbol: EXPR), Koss Corporation (symbol: KOSS), Naked Brand Group Ltd. (symbol: NAKD), Sundial Growers, Inc. (symbol: SNDL), Tootsie Roll Industries, Inc. (symbol: TR), and Trivago NV (symbol: TRVG) (the "Suspended Stocks").

5.      Robinhood's meteoric rise in popularity up to and through January 28, 2021, was fueled by a legion of relatively inexperienced retail investors seeking to trade in the Suspended Stocks and benefit from Robinhood's promise of "access." Robinhood knew this, and its sophisticated cadre of C-suite executives understood that high volume and volatility in the certain stocks was inevitable.

6.      Robinhood, undoubtedly pleased by the surge in new accounts, forged ahead under the assumption that, in the words of its own Chief Operating Officer, David Dusseault, it was *"to [sic] big for them to actually shut us down*."[1] Mr. Dusseault's "too big to fail" presumption, in

---

[1] Excerpt from a January 28, 2021 Slack chat, which Robinhood disclosed to Plaintiffs' counsel pursuant to this Court's June 3, 2021 Order [ECF No. 323].

response to inquiries by the National Securities Clearing Corporation (NSCC) related to deposit requirements intended to protect all market participants against clearing member defaults, is indicative of how Robinhood perceived the power it wielded in the market.

      7.     Incredibly, Robinhood took the extraordinary measure of implementing a "PCO," or position closing only policy, designed to artificially suppress the prices of Suspended Stocks held by Plaintiffs and the Class, despite flaunting that it did not believe that it was in any serious danger of being shut down by the NSCC. A Robinhood Product Manager recognized the danger of the PCO policy: "*[W]e're going to get crucified for pco'ing*." Below is a relevant excerpt from the internal Robinhood chat on January 28, 2021:

**david.dusseault**

01/28/2021 05:33:56

ah we will navigate through this nscc issue

**david.dusseault**

01/28/2021 05:34:19

we are to big for them to actually shut us down

▬▬▬▬▬▬▬▬▬▬▬

01/28/2021 05:35:32

we're going to get crucified

▬▬▬▬▬▬

01/28/2021 05:35:34

for pco'ing

      8.     Contrary to CEO Vlad Tenev's assertion, the events at issue in this case are **not** aptly described as "black swan" or "five sigma." Robinhood was knowingly pushing the envelope under the assumption that it was untouchable, an apparent symptom of a newcomer to the brokerage business that scaled too fast at the expense of the Class and Plaintiffs.

      9.     The reality is that Robinhood was not only aware of the increasing "market

volatility" it now uses to deflect blame, but it deliberately fueled that volatility from the highest levels of its operations ahead of January 28, 2021, with Tenev directing a "ramp-up" of marketing, while the platform was "redlining" towards a breaking point.

10.     Robinhood's internal communications reveal that in the days before its decision to "PCO" the Suspended Stocks, Robinhood insiders knew about the volume and volatility around those stocks and rightfully predicted an increase in the same:

> Today was a high volume day, but stories about Reddit/WSB and stocks other than GME are heating up. **We should not rule out a bigger day than today this week**.

11.     As if the Titanic had continued selling tickets even after hitting the iceberg, Robinhood kept allowing (and encouraging) new customers to join and place further strain on its platform even after it was dangerously unstable.

12.     Robinhood knew at the highest levels of the company that its risk management system was strained to the breaking point during the week of January 25th. Robinhood Securities President and COO, James (Jim) Swartwout, who Tenev points to as making the ultimate call to PCO, says in an internal chat on January 26, 2021, "I sold my AMC today. FYI – tomorrow morning we are moving GME to 100% - so you are aware."

13.     Yet, Robinhood failed to protect its customers, Plaintiffs, and the Class, as well as U.S. financial markets from the systemic risks it abetted by encouraging the very volume and volatility that it later advanced as justification for its decision to prohibit an indispensable component of the market—buying. Robinhood greedily pursued payment for order flow revenues and a rapid increase in customers while knowingly and recklessly continuing to facilitate a level of volatile trading on its platform that it was unable and/or unwilling to support until it made the sudden decision to pull itself back from the brink by intentionally devastating the market for

Suspended Stocks and the value of its own customers' portfolios.

14.     In its zeal to attract as many users as possible, Robinhood knowingly failed to maintain sufficient capital reserves to meet the well-defined margin requirements to support the market activity that it was facilitating. Indeed, Robinhood admits it could not pay its clearinghouse deposit requirements when the call came in the morning of January 28, 2021. But the call from the NSCC was inevitable, and Robinhood had every opportunity to prepare.

15.     Even after the NSCC exercised its discretion to reduce the capital call to protect the system from Robinhood's admitted default, Robinhood held fast to its decision to implement a position closing only policy, deciding before 8 a.m. Eastern on January 28th to, "PCO Top 4 symbols, AMC, GME, NOK, BB," despite acknowledging, "***We aren't paying 3B worth***."

16.     On January 29, 2021, Robinhood began to allow only extremely limited purchases of shares of, or call options on, the Suspended Stocks, and did not remove all restrictions until February 5, 2021. The period between January 27, 2021 and February 5, 2021, is referred to herein as the "Restricted Period."

17.     Robinhood advanced numerous lackluster and contradictory justifications for its actions. First, it asserted that "unprecedented market volatility" was the cause. Then, Robinhood began focusing on the Depository Trust Clearing Corporation's (DTCC) "massive capital call" to justify its clumsy and draconian actions. But, as DTCC President and CEO, Michael C. Bodson ("Bodson"), acknowledged in testimony to the U.S. House Financial Services Committee, "Extreme market volatility and even 'short squeeze' events are ***not*** new phenomena." *See* Bodson Testimony, DTCC, to U.S. House Financial Services Committee, at 4 (May 6, 2021).[2] What was

---

[2] As explained by Bodson, NSCC's aggregate clearing fund requirement on January 28 was only "slightly higher than the peak that occurred in March 2020 and just under NSCC's historical maximum" of $36.4 billion when Tesla was added to the S&P 500 Index in December 2020. (*Id*. at 4 n. 3.)

"unusual," however, was that the activity was "concentrated in the portfolios of firms that primarily support individual investors," such as Robinhood. (*Id*.)

18.     Nevertheless, Robinhood, in its standard irreverent fashion, continued to defend its actions even in the face of the unprecedented fines it coughed up to the Securities Exchange Commission (SEC) and the Financial Industry Regulatory Authority (FINRA). Amazingly, even as it pays hundreds of millions of dollars in fines for its various unlawful practices, Robinhood continues to aggressively market its platform on the notion of "access" for all.

19.     Reporting on an interview of a former trading executive at TD Ameritrade, the *New York Times* wrote, "[Robinhood] w[as] trying to change the rules of the road without understanding how the road was paved and without any respect for the existing guard rails . . . [Robinhood] ended up creating risk for their customers and systemic risk for the market more broadly."[3]

20.     Robinhood often crosses the line, as demonstrated by its extensive record of regulatory fines, but the events complained of here not only put Robinhood's customers at risk, but put the entire market at risk.

21.     Robinhood's actions in January 2021 are all the more egregious due to Robinhood's history of such failures. Although Robinhood is a startup of recent vintage, the nascent company's history is replete with serious and profound regulatory failures, including *all-time record-breaking financial penalties* for "systemic supervisory failures and significant harm suffered by millions of customers."[4] Robinhood has paid approximately **$135 million** to the SEC and FINRA to settle allegations that it misled customers about its use of payment for order flow,

---

[3] Nathaniel Popper, Matt Phillips, Kate Kelly, and Tara Siegel Bernard, The Silicon Valley Start-Up that Caused Wall Street Chaos, NY. Times (Jan. 30, 2021), *available at* https://www.nytimes.com/2021/01/30/business/robinhood-wall-street-gamestop.html.
[4] *See* "[Robinhood] Ordered to Pay Approximately $70 Million for Systemic Supervisory Failures and Significant Harm Suffered by Millions of Customers," *available at* https://www.finra.org/media-center/newsreleases/2021/finra-orders-record-financial-penalties-against-robinhood-financial.

outages on its app, and its failure to seek the best reasonably available terms to execute customer orders.

22.     Robinhood's pattern of indifference to known risks left it woefully unprepared to address the events of January 2021.

## JURISDICTION AND VENUE

23.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because this is a class action subject to the Class Action Fairness Act ("CAFA"), Pub.L. No. 109-2, 119 Stat. 4 (codified in various sections of 28 U.S.C.), with aggregate claims of all members of the proposed class and subclass(es) in excess of $5 million, exclusive of interest and costs, and there are more than 100 putative Class Members. Many members of the proposed Class are citizens of a state different from Defendants. This Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy as the claims within the Court's original jurisdiction.

24.     This Court is the proper venue for this action because the Judicial Panel for Multidistrict Litigation determined that the actions that are before this Court should be centralized in this Court pursuant to 28 U.S.C. § 1407.

25.     Jurisdiction and venue are proper in this District pursuant to 28 U.S.C. § 1391 because one or more of the Defendants reside in this District or are licensed to do business in this District. Each Defendant has transacted business, maintained substantial contacts, or committed tortious acts in this District, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

26.     This Court has personal jurisdiction over each Defendant because each Defendant: (a) transacted business throughout the United States, including in this District; (b) transacted in

substantial amounts of the Suspended Stocks throughout the United States, including in this District; (c) had substantial contacts with the United States, including this District; and/or (d) engaged in actions that had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

27.     This Court has personal jurisdiction over Defendants under Florida's long-arm statute, through Defendants' operation of businesses in this District. Defendants operate, conduct, engage in, and carry-on business or business ventures in this state or have an office or agency in this state; have caused injury to persons or property within this state arising out of an act or omission by the Defendants outside this state, while the Defendants were engaged in solicitation or service activities within this state. Defendants regularly do or solicit business, or engage in other persistent courses of conduct, or derive substantial revenue from goods used or consumed or services rendered in this state. The activities of Defendants within the state are substantial and not isolated.

28.     In addition, this action arises, in part, out of a decision to "PCO" the Suspended Stocks by Robinhood Securities, LLC, a company headquartered in Florida, and effectuated, according to Robinhood, by Robinhood Securities President and COO, James (Jim) Swartwout ("Swartwout"). *See* Robinhood Securities, LLC's Apr. 14, 2020 Form X-17A-5 (identifying Robinhood Securities, LLC's "Principal Place of Business" as Lake Mary, Florida).

## **PARTIES**

### A.  **Plaintiffs**

#### i.     **Plaintiff Andrea Juncadella**

29.     Plaintiff Andrea Juncadella is a resident of the State of Florida.

30.     Plaintiff Juncadella is an investor who used Robinhood as her broker-dealer and owned or held shares in the Suspended Stocks during the Restricted Period. As a precondition to using Robinhood's brokerage services, Robinhood required Plaintiff Juncadella to enter into standardized Customer Agreements and related documents, which are contracts of adhesion.

31.     As of the end of the day on January 27, 2021, Plaintiff Juncadella held 400 shares of AMC stock and 5 shares of GME stock.

32.     On February 9, 2021, Plaintiff Juncadella sold all of her shares in GME and AMC for less than what she would have sold for but for Robinhood's unlawful conduct alleged herein.

### ii.     **Plaintiff Edward Goodan**

33.     Plaintiff Edward Goodan is a resident of the State of Florida.

34.     Plaintiff Goodan is an investor who used Robinhood as his broker-dealer during the Restricted Period. As a precondition to using Robinhood's brokerage services, Robinhood required Plaintiff Goodan to enter into standardized Customer Agreements and related documents, which are contracts of adhesion.

35.     As of the end of the day on January 27, 2021, Plaintiff Goodan held 168.6 shares of AMC stock.

36.     On February 1, 2021, Plaintiff Goodan, sold all of his 168.60 shares in AMC for less than he would have sold for but for Robinhood's unlawful conduct alleged herein.

37.     As of the end of the day on January 27, 2021, Plaintiff Goodan held 11 call options on AMC stock, representing options on 1,100 shares of AMC stock.

38.     On January 28, 2021, Plaintiff Goodan sold all of these call options on AMC stock for less than he would have sold for but for Robinhood's unlawful conduct alleged herein.

39.     On January 29, 2021, once Robinhood permitted limited buying of options,

Plaintiff Goodan purchased 41 call options on AMC stock representing options on 4,100 shares of AMC stock.

40.    On February 1, 2021, after Robinhood reintroduced restrictions on buying, Plaintiff Goodan sold all 41 of his call options on AMC stock for less than he would have sold for but for Robinhood's unlawful conduct alleged herein.

### iii.    Plaintiff William Makeham

41.    Plaintiff William Makeham is a resident of the State of Florida.

42.    Plaintiff Makeham is an investor who used Robinhood as his broker-dealer during the Restricted Period. As a precondition to using Robinhood's brokerage services, Robinhood required Plaintiff Makeham to enter into standardized Customer Agreements and related documents, which are contracts of adhesion.

43.    As of the end of the day on January 27, 2021, Plaintiff Makeham held 6 call options on AMC stock, representing options on 600 shares of AMC stock.

44.    On January 29, 2021, once Robinhood permitted limited buying of options, Plaintiff Makeham purchased 44 call options on AMC stock, representing options on 4,400 shares of AMC stock.

45.    On February 2, 2021, after Robinhood reintroduced restrictions on buying AMC stock, Plaintiff Makeham sold his call options on AMC stock for less than he would have sold at but for Robinhood's unlawful conduct alleged herein.

### iv.    Plaintiff Mark Sanders

46.    Plaintiff Mark Sanders is a resident of the State of Missouri.

47.    Plaintiff Sanders is an investor who used Robinhood as his broker-dealer during the Restricted Period. As a precondition to using Robinhood's brokerage services, Robinhood

required Plaintiff Sanders to enter into standardized Customer Agreements and related documents, which are contracts of adhesion.

48.     As of the end of the day on January 27, 2021, Plaintiff Sanders held 761 shares of AMC stock.

49.     On February 2, 2021, Plaintiff Sanders sold 621 shares of AMC stock for less than he would have sold for but for Robinhood's unlawful conduct alleged herein.

    **v.**    **Plaintiff Jaime Rodriguez**

50.     Plaintiff Jaime Rodriguez is resident of the State of Michigan.

51.     Plaintiff Rodriguez is an investor who used Robinhood as his broker-dealer during the Restricted Period. As a precondition to using Robinhood's brokerage services, Robinhood required Plaintiff Rodriguez to enter into standardized Customer Agreements and related documents, which are contracts of adhesion.

52.     As of the end of the day on January 27, 2021, Plaintiff Rodriguez held 20.25 shares of GME stock.

53.     On January 28, 2021, Plaintiff Rodriguez sold all 20.25 shares of GME stock for less than he would have sold for but for Robinhood's unlawful conduct alleged herein.

    **vi.**    **Plaintiff Patryk Krasowski**

54.     Plaintiff Patryk Krasowski is a resident of the State of Illinois.

55.     Plaintiff Krasowski is an investor who used Robinhood as his broker-dealer during the Restricted Period. As a precondition to using Robinhood's brokerage services, Robinhood required Plaintiff Krasowski to enter into standardized Customer Agreements and related documents, which are contracts of adhesion.

56.     As of the end of the day on January 27, 2021, Plaintiff Krasowski held 9 call

options on GME stock, representing options on 900 shares of GME stock.

57.     On January 28, 2021, Plaintiff Krasowski sold all 9 of his call options on GME stock for less than he would have sold for but for Robinhood's unlawful conduct alleged herein.

58.     Plaintiff Krasowski also owned 6 call options to purchase GME stock. Just before Robinhood restricted purchases of GME stock, this position could have been exercised and proceeds realized in the amount of approximately $400,000.00.

59.     Plaintiff Krasowski attempted to exercise these calls, which would have resulted in realized gains of approximately $400,000.00, but was blocked from exercising them by Robinhood. Plaintiff Krasowki's position with respect to these is now worth approximately $200,000.00.

### vii.     Plaintiff Cody Hill

60.     Plaintiff Cody Hill is a resident of the State of Texas.

61.     Plaintiff Hill is an investor who used Robinhood as his broker-dealer during the Restricted Period. As a precondition to using Robinhood's brokerage services, Robinhood required Plaintiff Hill to enter into standardized Customer Agreements and related documents, which are contracts of adhesion.

62.     As of the end of the day on January 27, 2021, Plaintiff Hill held 538 shares of AMC stock, 59 shares of BB stock, and 160 shares of NOK stock.

63.     On January 28, 2021, Plaintiff Hill sold all 528 shares of AMC stock, 59 shares of BB stock, and 160 shares of NOK stock for less than he would have sold for but for Robinhood's unlawful conduct alleged herein.

### viii.     Plaintiff Sammy Gonzalez

64.     Plaintiff Sammy Gonzalez is a resident of the State of Florida.

65.     Plaintiff Gonzalez is an investor who used Robinhood as his broker-dealer during the Restricted Period. As a precondition to using Robinhood's brokerage services, Robinhood required Plaintiff Gonzalez to enter into standardized Customer Agreements and related documents.

66.     As of the end of the day on January 27, 2021, Plaintiff Gonzalez held 11.6 shares of AMC stock.

67.     On February 9, 2021, Plaintiff Gonzalez sold all 11.6 shares of AMC stock for less than he would have sold for but for Robinhood's unlawful conduct alleged herein.

###     ix.     **Plaintiff Joseph Daniluk**

68.     Plaintiff Joseph Daniluk is a resident of the State of Illinois.

69.     Plaintiff Daniluk is an investor who used Robinhood as his broker-dealer during the Restricted Period. As a precondition to using Robinhood's brokerage services, Robinhood required Plaintiff Daniluk to enter into standardized Customer Agreements and related documents, which are contracts of adhesion.

70.     As of the end of the day on January 27, 2021, Plaintiff Daniluk held 22 shares of GME stock.

71.     On January 28, 2021, Plaintiff Daniluk sold 10 shares of GME stock for less than he would have sold for but for Robinhood's unlawful conduct alleged herein.

###     x.     **Plaintiff Jonathan Cornwell**

72.     Plaintiff Jonathan Cornwell is a resident of the State of California.

73.     Plaintiff Cornwell is an investor who used Robinhood as his broker-dealer during the Restricted Period. As a precondition to using Robinhood's brokerage services, Robinhood required Plaintiff Cornwell to enter into standardized Customer Agreements and related

documents, which are contracts of adhesion.

74.     As of the end of the day on January 27, 2021, Plaintiff Cornwell held 2.48 shares of GME stock, 14.44 shares of NOK stock, and 6.8 shares of AMC stock.

75.     On February 2, 2021, Plaintiff Cornwell sold all 2.48 shares of GME stock, 14.44 shares of NOK stock, and 6.8 shares of AMC stock for less than he would have sold for but for Robinhood's unlawful conduct alleged herein.

  xi.   **Plaintiff Paul C. Prunean**

76.     Plaintiff Paul C. Prunean is a resident of the State of California.

77.     Plaintiff Prunean is an investor who used Robinhood as his broker-dealer during the Restricted Period. As a precondition to using Robinhood's brokerage services, Robinhood required Plaintiff Prunean to enter into standardized Customer Agreements and related documents, which are contracts of adhesion.

78.     As of the end of the day on January 27, 2021, Plaintiff Prunean held approximately 20,896 shares of NOK stock.

79.     On February 4, 2021, Plaintiff Prunean sold all 20,896 shares of NOK stock for less than he would have sold for but for Robinhood's unlawful conduct alleged herein.

  xii.  **Plaintiff Julie Moody**

80.     Plaintiff Julie Moody is a resident of the State of South Carolina.

81.     Plaintiff Moody is an investor who used Robinhood as her broker-dealer during the Restricted Period. As a precondition to using Robinhood's brokerage services, Robinhood required Plaintiff Moody to enter into standardized Customer Agreements and related documents, which are contracts of adhesion.

82.     On January 27, 2021, and prior to market opening on January 28, 2021, Plaintiff

Moody submitted orders for NOK, NAKD, and AMC stock.

83.     Plaintiff Moody's last 58 shares of NAKD stock were confirmed by Robinhood at approximately 7:18 a.m. EST on January 28, 2021.

84.     Two hours later, on January 28, 2021, at approximately 9:20 a.m. EST, Robinhood unilaterally cancelled Moody's market orders for NOK, NAKD, and AMC stock.

## B. Defendants

### i.     Robinhood Markets

85.     Defendant Robinhood Markets, Inc. ("Robinhood Markets") is a Delaware corporation with principal executive offices at 85 Willow Road, Menlo Park, CA 94025. Robinhood Markets is the corporate parent of Defendants Robinhood Financial LLC and Robinhood Securities, LLC. *See* Figure 1 below (excerpt from Robinhood's Form S-1, at 12.)



*Figure 1: Robinhood Organizational Structure*

86.     Robinhood Markets boasts a "Founder-Led, Passionate and Experienced Team" created in 2013 by Robinhood Markets' Co-Founder, CEO, President, and Director, Tenev, who is not licensed by FINRA, and Co-Founder and Chief Creative Officer, Baiju Bhatt ("Bhatt"), whose stated mission is to "democratize finance." (*Id.*, at 203.)

87.     To "execute on this mission," Robinhood Markets created a "Management Team" that includes CFO Jason Warnick, former VP of Finance and Chief of Staff to the CFO at Amazon, Chief Marketing and Communications Officer Christina Smedley, former VP of Marketing at Facebook, Chief Operating Officer, Gretchen Howard, former Partner at CapitalG, Chief Legal Officer, Daniel Gallagher, former SEC Commissioner under President Obama, and Chief Product Officer, Aparna Chennapragada, former VP and General Manager at Google. (*Id*. at 12.)

   **ii.    Robinhood Financial**

88.     Defendant Robinhood Financial LLC ("Robinhood Financial") is a Delaware limited liability company with principal executive offices at 85 Willow Road, Menlo Park, CA 94025.

89.     Robinhood Financial is a registered introducing broker-dealer in securities under the Securities and Exchange Act of 1934 and a member of FINRA.

90.     Robinhood Financial introduces retail users to purchase and sell equities, options, and cryptocurrencies through the Robinhood platform. Robinhood Financial has a clearing arrangement with its affiliate, Robinhood Securities, LLC. Robinhood Financial is a wholly-owned subsidiary of Robinhood Markets.

   **iii.    Robinhood Securities**

91.     Defendant Robinhood Securities, LLC ("Robinhood Securities") is a Delaware corporation with its principal place of business at 500 Colonial Center Parkway, Suite 100, Lake Mary, Florida 32746.

92.     Robinhood Securities is a registered clearing broker-dealer in securities and under the Securities and Exchange Act of 1934 and a member of FINRA and the NSCC/DTCC.

93.     Robinhood Securities clears for customers introduced by Robinhood Financial on

a fully-disclose basis and pursuant to a clearing arrangement with Robinhood Financial. Robinhood Securities is a wholly-owned subsidiary of Robinhood Markets.

94.    Robinhood Securities' President and COO, Swartwout, is licensed by FINRA.

**iv.    Robinhood Markets' Control Over its Subsidiaries**

95.    Robinhood Markets and its subsidiaries are treated as one entity for purposes of its IPO Registration Statement. (*See* Form S-1, at 32; *see also, e.g.*, *id*. at F-9 ("The consolidated financial statements include the accounts of RHM ***and its wholly-owned subsidiaries***. All intercompany balances and transactions have been eliminated.") (emphasis added).) The S-1 describes Robinhood Markets and its subsidiaries as comprising a "***Vertically Integrated Platform***," that has enabled them "to rapidly introduce new products and services . . . , while also supporting [their] ability to ***quickly scale***, including onboarding millions of new customers during 2020 and the first quarter of 2021." (Form S-1, at 7.)

96.    Robinhood Financial and Robinhood Securities are single member, limited liability companies, with all tax effects of income or loss included in the tax returns of their parent, Robinhood Markets.

97.    According to Robinhood Financial's Annual Audited Report filed with the SEC, as sworn to under oath or affirmation by Daniel Kelati ("Kelati")[5] as "Chief Financial Officer," as of December 31, 2020, Robinhood Financial has a "revolving, committed and unsecured line for **$25.0 million *with the Parent*.**" Annual Audited Report, at Note 6 (emphasis added).

98.    Robinhood Financial also has "an expense sharing agreement with the Parent," pursuant to which Robinhood Financial "reimburse[s] the Parent for payroll, technology,

---

[5] According to LinkedIn, Kelati is now Robinhood's FINRA-designated Finance and Operations Principal ("FinOp"), charged with ensuring regulatory compliance and protecting customers. In December 2018, Robinhood Markets hired Jason Warnick from Amazon to serve as CFO.

information services, occupancy, and other expenses. The Parent also pays certain direct expenses on [its] behalf and cash settles monthly with allocated expenses." *Id.* As of December 31, 2020, "the balance due to the Parent was $25.0 million," and "***the Parent contributed $20.0 million in capital to [Robinhood Financial]***" during 2020. *Id.* (emphasis added).

99.     According to Robinhood Securities' Annual Audited Report filed with the SEC, as sworn to under oath or affirmation by Kelati, as "CFO and Principal Financial Officer," as of December 31, 2020, Robinhood Securities has "six revolving and unsecured lines of credit *with the Parent* for a total of **$550.0 million**." *See* Annual Audited Report, at Note 9 (emphasis added).

100.     As alleged herein, Robinhood Financial was an introducing broker-dealer for Plaintiffs and the Robinhood Class, as defined below, who traded the Suspended Stocks during the Restricted Period on Robinhood's platform. Robinhood Securities was a clearing broker-dealer for Plaintiffs and the Robinhood Class, who traded the Suspended Stocks during the Restricted Period on Robinhood's platform. Robinhood Markets took actions to limit its exposure and the exposure of its subsidiaries at the expense of its customers, including Plaintiffs and the Robinhood Class, and a Nationwide Class of investors, as defined below, by implementing a "PCO," or position closing only policy, through its subsidiaries, designed to artificially suppress prices of the Suspended Stocks. The PCO policy was jointly entered by the three Robinhood entities. (Form S-1, at 32 ("[W]e temporarily restricted or limited our customers from purchasing certain specified securities.") (emphasis added).)[6]

## **FACTUAL ALLEGATIONS**

101.     Robinhood's one-click trading, easy access, gamified features, behavioral prompts,

---

[6] Robinhood Markets defines "we" as follows: "Unless the context otherwise requires, we use the terms 'Robinhood,' the 'Company,' 'we,' 'us' and 'our' in this prospectus to refer to Robinhood Markets, Inc. and our consolidated subsidiaries." (Form S-1, at 1.)

predictive analytics, and differential marketing, masterminded by executives Robinhood recruited from the ranks of Amazon, Google, and Facebook, target relatively inexperienced retail investors, including Plaintiffs and the Robinhood Class, and encourages them to execute trades frequently to drive up its revenue through payment for order flow.

102.    Since March 2020, Robinhood's revenue has increased over 200 times: for the years ended 2019 and 2020, Robinhood's revenue was $277.5 million and $958.8 million, respectively, **representing annual growth of 245%**. (Form S-1, at 32.)

103.    A research paper by the Swiss Finance Institute reported that despite holding only about 0.2% of aggregate U.S. market share, Robinhood customers drove 10% of the variation in returns from stocks in the second quarter of 2020, because they, in the aggregate, buy and sell more than their institutional counterparts in response to price changes.

104.    Beginning on January 28, 2021, Robinhood—in what is believed to be an unprecedented move in the long history of securities trading in this country—**shut down only rhw demand-side of the market for the Suspended Stocks concentrated on its platform**, artificially depressing market prices and causing Plaintiffs and the Class to sustain damages.

105.    By continuing to increase its customer base ahead of January 28, 2021, Robinhood fueled trading of the Suspended Stocks without either the tools needed to manage or and capital required to protect against the known risks associated with concentrated positions in highly volatile issues Robinhood's actions, if left unchecked, create systemic risk for the market.[7]

106.    These risks, which remain unmitigated while Robinhood continues to operate an undercapitalized business without adequate risk controls, culminated in the January 2021 "short

---

[7] In its Registration Statement, Robinhood's discloses "Risk Factors," spanning more than 70 pages.

squeeze,"[8] defined herein, and the harm caused by Robinhood's inadequate preparation for, and management of, these risks resulted in the filing of over fifty class action lawsuits by investors across the United States.

### A.   The Robinhood Business Model

107.    At the core of Robinhood's business is an incentive to encourage more trading: Robinhood designed its business model to drive up trading volume by offering customers "commission-free" trading (facilitated by payment for order flow, explained below), and "an intuitive customer interface that has changed the landscape of retail investing." (Form S-1, at 168.)

### i.   History and Growth

108.    As its namesake suggests, Robinhood touts itself as a financial product that can "give everyone—not just the wealthy—*access* to financial markets." Robinhood's stated mission is "to democratize finance for all." (Form S-1, at 1) (emphasis added.)

109.    To execute on this mission, Robinhood's "Investing for Everyone" business model offers "commission-free investing" and fractional trading for no-minimum investing.



*Figure 3: Robinhood Website Screen Capture*

---

[8] An investor who takes a "short" position in a stock bets that the stock price will fall by *borrowing* the stock from a lender, selling it at a high price and, when the time comes to return the stock to the lender, buying the stock later at a lower price. The short trader pockets the difference between the high price at which it sold the borrowed stock and the low price at which the trader bought the replacement stock to return to the trader's original lender.

110. Robinhood launched its original product in 2015, offering commission-free trades of stocks and exchange traded funds. By mid-2018, it was one of the largest retail broker-dealers in the United States.

111. Robinhood targets non-professional, "retail" investors, including Plaintiffs and the Class, with its deliberately engineered one-click trading, easy access to complex investment products, and interactive user interface. Robinhood uses these tools to creates a paternalistic relationship whereby Plaintiffs and the Class trust Robinhood to help them navigate the complex system of trading, seemingly once out of reach, but now available in the palm of their hands on their smartphones.

112. When Robinhood took the deliberate step of "self-clearing" (by forming its subsidiary, Robinhood Securities), customer growth surged, as Robinhood boasted a more seamless customer experience: "Clearing by Robinhood will allow us to help our customers more easily and efficiently."[9] As of October 2018, *after becoming a self-clearing broker*, Robinhood's users had "executed more than **$150 billion** in transactions." *Id*.

113. According to Robinhood, close to 50% of all new funded retail accounts opened in the United States from 2016 to 2021 were new accounts created on Robinhood. (Form S-1, at 2.).

114. More than half of Robinhood customers are opening their first brokerage account, and the median customer age is 31 years old.

115. Robinhood has continued to increase marketing spend every year to attract more of these novice investors, including certain Plaintiffs and members of the Robinhood Class. For

---

[9] *See* Robinhood website, "What's Clearing by Robinhood?," *available at* https://robinhood.com/us/en/support/articles/whats-clearing-by-robinhood/. *See also* CNBC, "Robinhood's in-house clearing system could be reason behind trading restrictions," (Jan. 29, 2021), *available at* https://www.cnbc.com/video/2021/01/29/robinhoods-in-house-clearing-system-could-be-reason-behind-trading-restrictions.html?&qsearchterm=robinhood%20trade%20clearing.

the year ended December 31, 2020, Robinhood increased its marketing spend **by $61.0 million, or 49%**, compared to the year prior, as illustrated in Figure 4 below. (Form S-1, at 124.) The increase includes $50.3 million in costs associated with the "Robinhood Referral Program," (*id.*), marketed under the tag-line, "Invite Friends, Get Stock." *See* Robinhood website, "Our Referral Program" *available at* https://robinhood.com/us/en/support/articles/invite-friends-get-free-stock/.

**Results of Operations**

The following table summarizes our consolidated statements of operations data:

| (in thousands) | Year Ended December 31, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2019 | 2020 | 2020 | 2021 |
| **Revenues:** | | | | |
| Transaction-based revenues | $ 170,831 | $ 720,133 | $ 283,044 | $ 871,606 |
| Net interest revenues | 70,639 | 177,437 | 64,014 | 130,206 |
| Other revenues | 36,063 | 61,263 | 24,703 | 85,695 |
| Total net revenues | 277,533 | 958,833 | 371,761 | 1,087,507 |
| Operating expenses:(1) | | | | |
| Brokerage and transaction | 45,459 | 111,083 | 49,016 | 78,816 |
| Technology and development | 94,932 | 215,630 | 78,176 | 273,205 |
| Operations | 33,869 | 137,905 | 52,277 | 167,629 |
| Marketing | 124,699 | 185,741 | 113,432 | 196,407 |
| General and administrative | 85,504 | 294,694 | 73,287 | 248,460 |
| Total operating expenses | 384,463 | 945,053 | 366,188 | 964,517 |
| Change in fair value of convertible notes and warrant liability | — | — | — | 2,020,321 |
| Other expense (income), net | 657 | (50) | 43 | (149) |
| Income (loss) before income tax | (107,587) | 13,830 | 5,530 | (1,897,182) |
| Provision for (benefit from) income taxes | (1,018) | 6,381 | 448 | 49,286 |
| Net income (loss) | $ (106,569) | $ 7,449 | $ 5,082 | $ (1,946,468) |

(1)  Includes share-based compensation expense as follows:

| (in thousands) | Year Ended December 31, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2019 | 2020 | 2020 | 2021 |
| Brokerage and transaction | $ 427 | $ 227 | $ 12 | $ 12 |
| Technology and development | 9,499 | 18,024 | 2,540 | 2,025 |
| Operations | 139 | 61 | 18 | 6 |
| Marketing | 85 | 613 | 15 | 78 |
| General and administrative | 16,517 | 5,405 | 1,192 | 8,013 |
| Total share-based compensation expense | $ 26,667 | $ 24,330 | $ 3,777 | $ 10,134 |

We have not recognized share-based compensation for awards with performance-based conditions because the qualifying event, such as an IPO, had not occurred and, therefore, could not be considered probable. See Share-based compensation disclosed in Note 1 our consolidated financial statements included elsewhere in this prospectus for more information.

***Figure 4: Summary of Consolidated Statements of Operations*** (Form S-1, at 113)

116.    As a result, Robinhood has experienced dramatic customer growth since launching its online and mobile application-based trading platform—from fewer than 500,000 customers in 2015 to **over 31 million customers today**.

117.    Robinhood funded customer accounts have grown exponentially from approximately one million in 2016 to six million in October 2019, a **growth of 500%**, and **increasing 109%** to **21.3 million** in the second quarter of 2021.

118.     As a result, Robinhood's revenue increased over **200 times** since March 2020, representing **annual growth of 245%**. Robinhood's total net revenues **increased 131% to $565 million** in the second quarter of 2021, with a reported **22.5 million** funded accounts as of June 30, 2021, and assets under custody increasing **205% to $102 billion** in the second quarter of 2021.

119.     In 2019, Robinhood raised $323 million in funding at a $7.6 billion valuation. In August 2020, after raising $200 million in Series G funding, Robinhood was valued at $11.2 billion.

120.     As Robinhood grew exponentially and increased its revenues, it focused on adding more risky and complex products, including options and margin trading, as well as educational modules.

121.     Most recently, Robinhood announced that it is giving away $100,000 to students who sign up for Robinhood using a ".edu" email address. Robinhood plans to visit historically black colleges and community colleges to talk to students about investing and other financial literacy topics. *See* Business Insider, "Robinhood is giving away $100,000 in a bid to recruit college students to use its trading app," *available at* https://www.businessinsider.com/robinhood-recruiting-community-college-hbcu-students-for-app-2021-9 (Sept. 15, 2021).

122.     Robinhood publicly acknowledges this responsibility to first-time investors, including certain Plaintiffs and members of the Class: "We understand that millions of our customers are using Robinhood to enter the financial markets for the first time, and we take our responsibility to them seriously." (Form S-1, at 150.)

123.     Robinhood engages in a special relationship with Plaintiffs and the Robinhood Class by, among other things, providing educational content that certain Plaintiffs and members of the Robinhood Class subscribe to, including "Robinhood Learn," and in-app courses on the

23

basics of investing, the "Robinhood Snacks" Daily podcast, which was downloaded 11.4 million times in the second quarter of 2021, and the "Robinhood Snacks" Newsletter, which provides digestible daily financial news to 24.6 million unique people in the second quarter of 2021. Robinhood further engages in a special relationship with Plaintiffs and the Robinhood Class by offering "Cash management" that enables Robinhood customers, including certain Plaintiffs and members of the Robinhood Class, to use Robinhood-branded debit cards, save and spend by paying bills, write checks, earn interest, withdraw funds via ATMs, and receive Federal Deposit Insurance Corporation (FDIC) pass-through insurance on cash swept from their brokerage accounts. By subscribing to Robinhood's "Gold" paid monthly subscription service, certain Plaintiffs and members of the Class Robinhood provides professional research, market data, and access to margin investing. Robinhood offers these brokerage products and services to Plaintiffs and the Robinhood Class as a "comprehensive financial services platform." (*See* Form S-1, at 3, 6, 49, 140.)



*Figure 4: Robinhood products* (Form S1, at 3)

ii.   **Driving Force in Bringing New Investors to the Marketplace:**
      **the "Gamification" of Trading**

124.    By targeting non-professional "retail" investors, like Plaintiffs and certain members of the Robinhood Class, and employing gamified features on its platform, Robinhood

made it easy for individual investors to invest, driving up trading volume ahead of January 2021.

125.    Credit Suisse estimates that at times in 2021, retail investors have accounted for a third of all U.S. stock market trading. As reported in the *Financial Times*, retail investors' market share of U.S. equity trading has steadily increased since 2019.



126.    Robinhood's "Management Team" reflects its corporate priority of high-volume trading through marketing and technology. Robinhood recruited an executive leadership team that includes a former VP of Finance and Chief of Staff to the Chief Financial Officer at Amazon, a former VP of Marketing at Facebook, and a former Vice President and General Manager at Google.

127.    One of the top executives at Robinhood, a financial institution, is its co-founder and "Chief Creative Officer," an important position for a business that draws, and maintains, its users through a game-like experience. (Form S-1, at 2) Co-Founder and Chief Creative Officer, Bhatt, signed Robinhood's Form S-1 alongside Tenev.)

128.    As Robinhood admits, "We put design at the center of our product…We involve our talented product designers early and often," resulting in a platform that is "familiar in look and feel for a generation of mobile-first customers." (*Id*. at 6.)

129.     Robinhood's success is built on a Silicon Valley playbook of employing behavioral nudges like push notifications, and "gamification" features that draw inexperienced investors into risky trading. This includes design elements and psychological tools intended to keep the attention of its users, including emoji-filled notifications, prizes, graphics, and animations used to increase consumer engagement, time spent on the investment platform, and therefore, the number of trades. The gamification features deployed on Robinhood's platform encourage user behavior similar to gambling addiction, which further increases trading volume.

130.     FINRA scrutinized some of these tools, including features like falling "confetti" for first-time trading and emoji-filled phone notifications, as illustrated below:



***Figure 2: Confetti Screenshot***
(*See In re Robinhood Outage Litig.*, No. 20-01626, Sec. Am. Compl. [ECF No. 120] (N.D. Cal.))

131.     Robinhood's "gamified" platform further employs tools such as video trainings and design elements to encourage more rapid trading than a buy-and-hold approach, and to recommend particular strategies, such as option trading or use of margin. *See* "Gamification" Section of R. Cook's Statement before the Financial Services Committee to U.S. House of Representatives (May 6, 2021) (concerns about how these features may influence customer behavior has prompted FINRA to form a cross-departmental working group).

132.    These tactics have successfully hooked hundreds of thousands, if not millions, of new users. *See* CNBC, "Fintech app Robinhood is driving a retail trading renaissance during the stock market's wild ride," *available at* https://www.cnbc.com/2020/06/17/robinhood-drives-retail-trading-renaissance-during-markets-wild-ride.html ("Robinhood, mostly used by millennials to trade stocks and cryptocurrency, has grown from its 1 million subscribers in 2016 and 6 million accounts in October of 2018.").

133.    Robinhood has quickly attracted customers like Plaintiffs and the Robinhood Class, many of whom are relatively young and new to investing, including through offerings such as no-minimum, commission-free trading, and a user interface "designed to . . . appeal to a new generation of investors who are more comfortable trading on smartphones." *See* FINRA Acceptance, Waiver, and Consent, No. 202006971201, at 2 (June 30, 2021).

134.    More than at any other retail brokerage firm, Robinhood's users trade the riskiest products and at the fastest pace, according to an analysis of new filings from nine brokerage firms in the first quarter of 2020 by the research firm Alphacution for The New York Times. In the first three months of 2020, Robinhood users traded nine times as many shares as E-Trade customers, and 40 times as many shares as Charles Schwab customers, per dollar in the average customer account. They also bought and sold 88 times as many risky options contracts as Schwab customers, relative to the average account size, according to Alphacution's analysis.

**Velocity of Options Trading at Leading Retail Brokers**
Options contracts traded for every dollar in the average customer's account.

| | |
|---|---|
| Robinhood | 25,840 |
| TD Ameritrade | 2,188 |
| E-Trade | 1,844 |
| Charles Schwab | 292 |

Note:   Figure is the number of options contracts traded in the first quarter of 2020, per dollar in the average customer account. Robinhood does not provide data on customer holdings, but Alphacution estimated that the average account holds $4,800, based on customer cash holdings listed in financial filings.

By The New York Times | Source: Alphacution Research Conservatory based on company filings

135.    Robinhood monetized the order flows for trading in such stocks, but as a true amateur among brokers, failed to protect its customers, its own business, and the financial markets from the known risks that come with fueling a high volume of volatile trading.

### iii.    "Payment for Order Flow" and Robinhood's Role in Driving the Market Volatility it was Unprepared to Address

136.    Startup companies like Robinhood customarily seek to "disrupt" established industries using technological solutions. In this case, Robinhood sought to "disrupt" the discount brokerage business by offering commission-free trades. But as Milton Friedman once said, "there is no free lunch."

137.    Robinhood does not charge fees for trading but still earns greater revenues if its customers trade more. That is because Robinhood makes money by selling its customers' order flow and trade data to third party market-makers in a practice known as "payment for order flow."

138.    As the SEC explained in its December 17, 2020 Order, charging Robinhood Financial with willfully misleading its customers about Robinhood's revenue sources and failing to satisfy its duty of best execution (which means the broker must attempt to execute a customer's trade in the way that is most advantageous to the customer):

> One of Robinhood's primary selling points was that it did not charge
> its customers trading commissions. In reality, however,

"commission free" trading at Robinhood came with a catch: Robinhood's customers received inferior execution prices compared to what they would have received from Robinhood's competitors. For larger value orders, this price difference at Robinhood exceeded the commission its competitors would have charged. These inferior prices were caused in large part by the unusually high amounts Robinhood charged the principal trading firms for the opportunity to obtain Robinhood's customer order flow. These payments are generally referred to as "payment for order flow."

(SEC Order, ¶ 2) (Dec. 17, 2020).

139.    Robinhood Financial agreed to pay **$65 million** to settle the SEC charges.

140.    Each time a Robinhood customer trades, market-makers, such as Citadel Securities LLC ("Citadel"), actually buy or sell the shares and determine what price the customer gets. These firms pay Robinhood for the right to do this, because they then try to buy or sell the stock for a profit over what they give the Robinhood customer.

141.    Robinhood's largest revenue source derives from these payments for order flow from market-makers. Robinhood collected payments of **$331 million** from market-makers in the first quarter of 2021, an amount that is ***more than triple*** the first quarter of 2020, according to its SEC Rule 606 filing.

142.    The payment for order flow relationship provides market makers with an opportunity to profit from the large amount of trading data collected by Robinhood and provides Robinhood with the revenue necessary to provide zero-commission trading to its users.

143.    The practice of payment for order flow is controversial. While still allowed in the United States, payment for order flow has been outlawed in the United Kingdom and Canada.

144.    Payment for order flow can "create conflicts of interest for brokers because of the tension between the broker's interests in maximizing payment for order flow or trading profits generated for itself from internalizing their customers' orders, and their fiduciary obligation to

their customers to route their customers' orders to the best markets." *See* SEC Special Study, "Payment for Order Flow and Internalization in the Options Markets" (Dec. 2000).

145.    Robinhood derives over 60% of its revenue from payment for order flow, as disclosed in Robinhood Market's Form-S1:

**Concentration of credit risk**

We had revenues from market makers in excess of 10% of total revenues, as follows:

| | Year Ended December 31, | |
|---|---|---|
| Market maker: | 2019 | 2020 |
| Citadel Securities, LLC | 29 % | 34 % |
| Entities affiliated with Susquehanna International Group, LLP[(1)] | 13 % | 18 % |
| Entities affiliated with Wolverine Holdings, L.P.[(2)] | 12 % | 10 % |
| All others individually less than 10% | 8 % | 13 % |
| Total as percentage of total revenue: | 62 % | 75 % |

(1)  Consists of Global Execution Brokers, LP and G1X Execution Services, LLC
(2)  Consists of Wolverine Execution Services, LLC and Wolverine Securities LLC

We are engaged in various trading and brokerage activities in which the counterparties primarily include broker-dealers, banks, and other financial institutions when applicable. In the event our counterparties do not fulfill their obligations, we may be exposed to risk. The risk of default depends on the creditworthiness of the counterparty. It is our policy to review, as necessary, the credit standing of each counterparty.

### iv.    <u>Rapid Growth Leads to Systemic Failures: History of Compliance Issues</u>

146.    On June 30, 2021, FINRA announced that Robinhood Financial was ordered to pay a **record financial penalty of $70 million** for "systemic supervisory failures and significant harm suffered by millions of customers." According to FINRA, "the sanctions represent the largest financial penalty ever ordered by FINRA and reflect the scope and seriousness of the violations."

147.    The Acceptance, Waiver and Consent ("AWC") lists numerous areas of failures by Robinhood, including "false and misleading statements" to customers, "failure to supervise technology critical to providing customers with core broker-dealer services," and "failure to create a reasonably designed business continuity plan" designed to provide mission critical services. FINRA further explained that Robinhood's failure to execute trades due to technology outages violated the firm's obligations to maintain its "mission critical" systems.

148.    Previously, based on a review of trades between October 2016 and November 2017, on December 19, 2019, Robinhood Financial entered into yet another AWC with FINRA (its primary regulator), which fined Robinhood Financial $1,250,000.00, and ordered it to retain an independent compliance consultant to conduct a comprehensive review of the policies, systems, procedures, and training of Robinhood Financial and its affiliated clearing firm, Robinhood Securities.

149.    As part of the 2019 AWC, FINRA made, and Robinhood Financial consented to, a finding that it failed to provide the best market for the subject securities to ensure its customers received the best execution quality from the electronic market-makers it was routing orders to (including Robinhood Securities) as compared to other execution venues (such as the exchanges themselves). In addition, Robinhood Financial consented to findings that it did not systematically review certain order types, and it failed to establish and maintain a supervisory system, including written supervisory procedures, reasonably designed to achieve compliance with its best execution obligations under FINRA's rules. Furthermore, FINRA found that Robinhood's periodic reviews did not systematically consider the likelihood of execution of limit orders generally (whether marketable or nonmarketable), or fill rates overall, even though notable proportions of certain orders went unfilled.

150.    In 2020, Robinhood hired Chief Legal Officer Daniel Gallagher, former SEC Commissioner under the Obama administration and the highest paid Robinhood executive, with compensation totaling **over $30 million**. (Form S-1, at 212.)

151.    Yet Robinhood continued to drive explosive growth and volume without the resources or procedures in place to reasonably ensure that it could continue to provide investors access to the securities markets during times of extreme market volatility.

B. **Industry and Professional Standards of Care**

    i.    **Managing Market Risk: Collateral Deposit and Capital Requirements**

152.    Clearing broker-dealers, such as Robinhood Securities, become NSCC members to manage risk to the markets and utilize DTCC's Insurance Services. The DTCC keeps a record of the stocks owned through the clearing brokerage firms for NSCC members and establishes financial requirements for clearing brokerage firm members, which include deposit requirements designed to reduce risk to the DTCC.

153.    NSCC is the central counterparty that clears cash transactions in the U.S. equities markets, netting securities deliveries and payments among NSCC's clearing members, and guaranteeing completion of trades even if one party to the transaction defaults.

154.    As DTCC President and CEO Bodson explained:

> NSCC direct clearing members are responsible for completing their customers' trades at the NSCC. NSCC's rules outline clear financial and operation risk management obligations that apply to direct clearing members.

(Bodson Testimony, at 1.)

155.    Robinhood Securities was at all times aware of its duty to Plaintiffs and the Class to maintain requisite capital levels, satisfy cash deposit and collateral requirements with DTCC and NSCC, and the serious consequences of violating those obligations. As disclosed in its Registration:

> If we do not maintain the capital levels required by regulators and self-regulatory organizations ("SROs"), including the SEC and the Financial Industry Regulatory Authority ("FINRA"), or do not satisfy the cash deposit and collateral requirements imposed by certain other SROs such as the Depository Trust Company (the "DTC"), National Securities Clearing Corporation (the "NSCC") and the Options Clearing Corporation (the "OCC"), our broker-dealer business may be restricted and we may be fined or exposed to significant losses or subject to other disciplinary or corrective

> actions. In a worst-case scenario, failure to maintain these requirements could lead to our broker-dealer business being liquidated or wound down.

(Form S-1, at 10.)

156.    To clear and settle customer transactions, each trading day by 10:00 am ET, Robinhood Securities has to meet the deposit requirements required by DTCC to support their customer trades between the trade date and the date the trades settle. DTCC may assign a volatility multiplier on certain securities which the DTCC perceives as having more risk.

157.    Based on the orders its customers are placing, Robinhood is able to: (i) monitor its anticipated DTCC deposit requirements in real time (or near real time); and (ii) monitor its ability to meet anticipated or actual DTCC deposit requirements in real time (or near real time). Based on the relationship between the affiliated entities, Robinhood Financial and Robinhood Markets have access to the same information on anticipated DTCC requirements provided directly to Robinhood Securities. At any given time, and as shown by correspondence from DTCC to Robinhood Securities, as shared with its parent and clearing partner, Robinhood knows how much collateral the DTCC may ask Robinhood to post to cover the trades its customers have placed.

158.    NSCC's volatility-based margin requirements stipulate the capital charges that should be borne by firms based on various measures of the volatility of firms' stock positions. This analysis generally uses several metrics to measure volatility of the stock positions and applies a "Gap Risk" measure for firms that have high concentrations in volatile stocks and a "Portfolio Margin Floor" measure to ensure that the margin requirement does not drop below certain value-based measures. These margin requirements are intended to protect DTCC members and the market as a whole from the systemic risk that highly volatile stocks can produce, especially when a broker's position has significant risk concentration in such stocks.

159.     As explained by Bodson in his Congressional testimony, margin requirements protect NSCC and all market participants against clearing member defaults. (Bodson Testimony, at 2.) NSCC collects clearing funds, or margin, at the start of each day and intraday in volatile markets. According to Bodson, the calculation and timing of these margin requirements are known to every member, including Robinhood Securities. (*Id.*)

160.     It was reasonably foreseeable to Robinhood that its business model would cause the very scenario the volatility margin requirement was designed to mitigate, scenarios which the NSCC had anticipated could create systemic risks in the market.

161.     Robinhood knew or should have known of its anticipated DTCC deposit requirements given the trading activity in the Suspended Stocks during the week prior to January 28, 2021, and that failure to prepare for the anticipated DTCC deposit requirements would impair Robinhood's ability to perform its obligations as a trading platform to its large customer base, as required under SEC and FINRA rules and regulations. *See* 17 CFR § 240.15c3-1(a) (the "Net Capital Rule") ("Every broker or dealer ***must*** at all times have and maintain net capital no less than the greatest of the minimum requirement applicable to its ratio requirement. . .and must otherwise not be 'insolvent'. . .".) (emphasis added); *see also* 17 CFR § 240.17Ad-22 (standard for clearing firms). The Net Capital Rule is designed to require broker-dealers and clearing firms to maintain sufficient liquid assets to meet all obligations to customers. This regulatory framework provides a mechanism for early warning of problems regarding net capital.

162.     As a DTCC member, Robinhood was able to reasonably anticipate its net capital and collateral requirements on a daily basis.

163.     In failing to properly monitor anticipated DTCC deposits and ensure that it had the ability to meet the anticipated DTCC deposit demand (with net capital or through available

capital), Robinhood failed to act in accordance with its duties as a broker-dealer and clearing firm.

164.    By virtue of their obligations under industry rules and professional standards of care, broker-dealers cannot simply unilaterally decline to accept a customer's order because it is inconvenient or unprofitable, or because a clearinghouse demands additional capital.

165.    Robinhood's gross negligence required NSCC/DTCC to provide exemptions for the firm to remain solvent.

166.    Despite being unprepared and under-capitalized, Robinhood did not properly respond to the lenience it was provided by the NSCC through such exemptions by capitalizing in a manner that should be expected of its business model. Instead, it chose to disregard the corporate form by borrowing from its parent, while interfering with market prices and access to its platform.

### ii.    Broker-Dealer Rules and Regulatory Requirements

167.    Registered FINRA "Broker-Dealers," including Robinhood Securities and Robinhood Financial, are required to comply with FINRA Rules, which are designed primarily to protect customers, investors, and efficient markets. As Robinhood knows, violations of FINRA Rules by broker-dealers can be used as evidence of negligence.

168.    FINRA Rule 2010 sets forth the guiding principle which every brokerage firm in the United States must follow and mandates, "in the conduct of its business, [brokerages] ***shall*** observe high standards of commercial honor and just and equitable principles of trade." (Emphasis added). FINRA reiterates in Regulatory Notice 21-12, "the foundation of the securities industry is fair dealing with customers. . . ***even during times of market stress***" (emphasis added); *see also* FINRA By-Laws, Article XI (authorizing the Board to adopt rules or amendments to, among other things, "protect investors and the public interest, . . . [and] promot[e] [] fair practices . . .").

169.    In assuring investor protection and the integrity of the firm's financial condition,

FINRA requires members, including Robinhood, to establish, maintain, and enforce a supervisory system, that monitors credit and other systemic risks (FINRA Rule 3110, Supervision), and requires members to "engage in continual risk management to ensure continuation of its trading and financial 'mission critical systems.'" (FINRA Rule 4370, Business Continuity Plans).

170.    As introducing and clearing broker-dealers, respectively, Robinhood Financial and Robinhood Securities are expected to exercise their duties as broker-dealers in accordance with industry and professional standards of care. As broker-dealers, Robinhood Financial and Robinhood Securities owe Plaintiffs and the Robinhood Class a duty of diligence and competence, *inter alia*, taking steps to reasonably ensure that they can continue to provide investors access to the securities markets during times of extreme market volatility.

171.    Additionally, Robinhood Financial and Robinhood Securities are obligated as broker-dealers to implement and utilize daily (even hourly) risk assessment tools to manage potential operational and credit risks.

172.    Robinhood Securities and Robinhood Financial, as directed by Robinhood Markets, breached its duties of due care and loyalty by arbitrarily shutting down demand to depress prices, putting their own interests ahead of their customers interests.

173.    By shutting down the entire demand side of the market for the Suspended Stocks, Robinhood left Plaintiffs and the Robinhood Class without any alternative means to protect their positions and investments and were forced to sell at suppressed prices or hold as the value of their holdings fell, causing ascertainable damages and injury.

### iii.    Circuit Breakers: Procedures for Brokers to Operate During Times of Extreme Market Volatility

174.    Broker-dealers are expected to take reasonable steps to ensure that they can provide access to the securities markets during periods of extreme market volatility.

175.     In fact, FINRA reiterated this obligation in Regulatory Notice 21-12, which was issued on March 18, 2021, directly in response to the events giving rise to this action. FINRA was clear: "Member firms should maintain strong procedures, thoughtfully crafted in advance, to reasonably ensure that they can continue to provide investors access to the securities markets during times of extreme market volatility, as in the past several months." *See* Regulatory Notice 21-12, *available at* https://www.finra.org/rules-guidance/notices/21-12.

176.     Despite being on notice of the price volatility and trading volume concentrated on its platform, Robinhood failed to take *any* (let alone reasonable) steps to ensure that its trading platform remained available during times of extreme market volatility. Instead, Robinhood put the *entire market* at risk by admittedly failing to meet its capital requirements to support the market activity that it was facilitating and then abruptly imposing a one-sided, self-declared circuit breaker in the form of a PCO policy designed to drive prices down and protect itself at the expense of its customers and investors, including Plaintiffs and the Class.

177.     Even according to Robinhood's website, PCO occurs in very narrow circumstances: (1) when a company's stock is delisted; (2) during mergers and acquisitions, when a symbol may no longer be trading on the exchange or is planned to be delisted; (3) in response to an Executive Order; and (4) for unsupported security types, such as certain closed end funds, limited partnerships and other non-standard listed securities, and when a company merges with a foreign company not listed in the U.S.[10] Robinhood's decision to move the same Suspended Stocks its customers held in high positions to PCO because of "extreme volatility" does not fit in any of these defined events and had never been done in response to market volatility.

178.     In its Registration Statement, Robinhood describes these PCO restrictions not as

[10] *See* Robinhood webpage, "When and why we restrict trading," by Swartwout (March 23, 2021), *available at* https://robinhood.engineering/when-and-why-we-restrict-trading-a4df54e0c839.

37

discretionary, but rather as an example of being "***forced to restrict trading*** in certain stocks in order to limit clearinghouse deposit requirements." (Form S-1, at 32 (emphasis added).) Discretion means freedom to decide what should be done in a particular situation. By saying that the restrictions in early January 2021 are an example of Robinhood being "forced to restrict trading," Robinhood did not, by definition, exercise "discretion" to restrict trading under its Customer Agreement.

179.    Moreover, as a registered broker-dealer, Robinhood knew or should have known that there is an industry-recognized mechanism in which trading is halted during volatility: A circuit breaker is an emergency-use regulatory measure *imposed by an exchange* to *temporarily* halt trading on an exchange. When an exchange employs a "circuit breaker," it is done for a limited time period, typically lasting mere minutes—not *days*, which is a figurative lifetime in the multi-trillion-dollar public markets.

180.    There exists no mechanism by which an exchange imposes a circuit breaker that restricts only one side of trading such that sales are permitted, but purchases are not. Either all trading is or is not halted by an exchange. Exchanges do not employ "circuit breakers" to allow only one-sided trading.

181.    Here, for example, the exchange did impose very limited, temporary trading halts on ***both*** buying and selling of the Suspended Stocks on January 28, 2021.

182.    Nowhere do the securities laws or rules contemplate that any broker-dealer will ever employ a self-declared circuit breaker and unilaterally halt buy-side trading in any security for an indefinite period of time and without direction from an exchange. This is part of what makes Robinhood's actions in January 2021 extraordinary, unprecedented, and grossly negligent.

C. **The January 2021 "Short Squeeze"**

    i.    **Price Volatility Ahead of January 28, 2021 Was Well-Known to Robinhood**

183.     Leading up to January 28, 2021, the majority of trading volume in the Suspended Stocks was concentrated in the portfolios of firms that primarily support individual investors, namely Robinhood.

184.     During the same time retail interest concentrated in the clearing members whose clients traded on the Suspended Stocks, hedge funds and market-makers were shorting the Suspended Stocks, and Robinhood continued to allow investors to place orders without restriction.

185.     Plaintiffs and the Class continued to go long on GME and other Suspended Stocks. Given the operation of a free and open market, the prices of GME and other Suspended Stocks increased. GME, for example, increased 78.46% from $43.03 per share on January 21, 2021, to $76.79 per share on January 25, 2021. This exposed short sellers in those stocks to substantial losses.

186.     Despite certain investors' short selling, which tends to drive the prices down, prices of the Suspended Stocks increased as Robinhood continued to encourage, facilitate, and fuel high trading volume on its platform, which increased revenue for Robinhood.

187.     As Robinhood continued to encourage buying on its platform, the rising prices forced holders of short positions to either close-out their short positions by purchasing shares or post additional capital to ensure that they had enough money to re-purchase and return the shorted stocks. For example, Citadel and Point72 Asset Management infused $3 billion into hedge fund Melvin Capital Management LP ("Melvin Capital"),[11] bailing Melvin Capital out from the effects

---

[11] Notably, Melvin Capital's founder and CEO, Gabe Plotkin, began his career at Citadel before becoming a top portfolio manager at Point72's predecessor firm, SAC Capital Advisors, a hedge fund once run by billionaire Steven Cohen, which was disbanded in 2014, after pleading guilty to federal insider trading charges and paying $1.8 billion, the largest insider trading fine in history at the time.

of its failed short position on January 25, 2021.

188.    Prices continued to go up as holders of short positions re-purchased the shorted stocks, putting pressure on short sellers to purchase the Suspended Stocks at the current (and rising) prices to cover their losses and forestall potentially greater losses. The "pressure" of this market dynamic is what is referred to as a "short squeeze."

189.    In a "short squeeze," individual investors like Plaintiffs and the Class stand to benefit (absent one-sided market restrictions) as the value of the stocks they purchased increases. Short sellers, on the other hand, risk further losses in the billions of dollars, as stock prices rise as a natural consequence of market forces.

190.    Here, those short sellers include the same market-makers that Robinhood routes its orders to and which account for over 60% of Robinhood's revenue.

**D.  Robinhood was on Notice of the Risk Associated with the Volatility it Fueled**

191.    Substantial trading activity in the stock and options contracts among the Suspended Stocks continued on January 27, 2021. On that day, the prices of the Suspended Stocks increased as trading volumes in U.S. cash equities and options hit 24.5 billion shares traded and 57.1 million contracts traded. GME's stock peaked at $380.00, before reaching a closing high of $347.51, a 134.84% increase from the previous day. Other Suspended Stocks experienced similar increases, including AMC, whose share price increased by 300%, while EXPR's rose over 200%.

192.    According to internal Robinhood documents, Robinhood was on notice, at least 5 days prior to January 28, 2021, that the rally in GME (as well as other Suspended Stocks) required Robinhood to monitor its risk.

193.    On January 23, 2021, Robinhood circulated an internal communication:

> Hey team!... ***I want to make sure we're all on the same page about the risk monitoring process we have in place and controls for***

> *reacting quickly to the market for situations such as this GME rally which has some other brokers potentially overreacting to the short covering happening in this stock*. This reaction by other brokers could be driven from limiting their exposure on short sells rather than long margin exposure.

(Emphasis added).

194.    On January 23, 2021, Robinhood Securities and Robinhood Markets' employees and executives, including Swartwout and Tenev, joined an internal group chat to discuss GME, with the "current questions on the table" identified as follows: "1. How many customers are holding GME on margin [?] 2. If we move to 100% - what are the number of calls generated [?] 3. What is our risk exposure[?]" Robinhood's Senior Director of Clearing Operations responded, "Excellent. First thing. We will want is to see if ▮▮▮▮▮▮▮▮ can run an analysis on the stock and see current potential risk." Shortly thereafter, Robinhood CEO Vlad Tenev joined the chat.



**jim.swartwout**
2021-01-23 08:47:25 -08:00

Lets consolidate discussion of GME margin here to avoid multi stringing the discussion across channels

▮▮▮▮▮▮▮▮
2021-01-23 08:49:29 -08:00

<( ▮▮▮▮▮▮▮▮ has joined the group

▮▮▮▮▮▮▮▮
2021-01-23 08:49:29 -08:00

<( ▮▮▮▮▮▮▮▮ > has joined the group

**jim.swartwout**
2021-01-23 08:50:57 -08:00

<!here> The current questions on the table:

1. How many customers are holding GME on margin
2. If we move to 100% - what are the number of calls generated
3. What is our risk exposure

▮▮▮▮▮▮▮▮
2021-01-23 08:51:03 -08:00

Excellent. First thing. We will want is to see if <( ▮▮▮▮▮▮▮▮ can run an analysis on the stock and see current potential risk.

**Vlad Tenev**
2021-01-23 08:51:17 -08:00

195.    That same day, one person at Robinhood warned that the company was at risk of failing to provide sufficient protection to its customers. In an internal note on Saturday, January

23, 2021, one insider wrote, "[i]t seems that the process outlined above covers firm risk well, but from a public perception POV, *we may want to consider the risks our customers face*. Is there a comms need or other action we should consider that would provide protection to our customers? I defer to … and … on that point, but something to consider. Although we don't have a straightforward obligation here because our customers are self directed, *the perception is that they are relatively inexperienced and our action may well be compared to the actions of other firms* (with other obligations to customers)." (Emphasis added).

196.    This chat demonstrates that Robinhood knew that it needed to address its risk exposure with regard to GME, but, as demonstrated herein, did not take the appropriate steps to ensure that Robinhood or its customers were adequately protected, or even notified of the risks that they were about to undertake, or were already under, because of Robinhood's actions.

197.    Instead, Robinhood's team was in disarray and acted haphazardly.

198.    On January 25, 2021, in an internal Robinhood chat, which included Robinhood Markets CEO Tenev, under the rubric "scaling-plan," Robinhood's Director of Engineering wrote, "Maybe I am being alarmist but I think we should consider all-hands on deck kind of situation and shuffle some priorities to deal with increasing volumes." Robinhood's Head of Data Science immediately responded, "you may not be being an alarmist." After viewing a chart showing dramatic increase, the conversation continued:

> [Robinhood Head of Data Science]: "this success of GME short squeeze and people knowing more about other short squeezes WSB is talking about may lead to a ton of volume in the next few weeks."

> [Robinhood Software Engineer]: "today was a huge day. There are internal things that are starting to buckle under pressure – and almost all of our vendors (S3, FIS, Scivantage, etc[.])

> [VP of Engineering]: "███████ is planning to declare a code yellow."

Tenev: "**only the paranoid survive**."

[Robinhood Head of Data Science]: "haha I remember once ralph said 'one who panics first panics best.'"

(Emphasis added) (cleaned up).

199.     Tenev's one word response to, "one who panics first panics best" mantra was

"**joy**."

200.     Then, after additional jovial remarks, a Robinhood Software Engineer posted:

> For reference, Code Yellow is when there is an upcoming near-term significant business risk requiring work that should be to mitigate that must be prioritized over anything else (except a SEV)[]. [T]o declare a CY you must specify clear exit criteria, so that you can avoid scope creep . . . . and CY work takes priority over all other work except an active SEV or a Code Red (defined below).[12]

201.     Later the same day, Robinhood's Vice President of Engineering wrote, "Thanks. We're going to follow up on all this EOD tomorrow to see if we need to take some broader action e.g. declaring code yellow." Tenev then asked if anything was needed for the next day, January 26th as the team continued to scramble:

> [Robinhood Principal Software Engineer]: "several nummus [*sic*] corrective actions will be done by then."
>
> Vlad: "runner lag?"
>
> [Robinhood Principal Software Engineer]: "we should be in a much better place on numbers given the load tests we ran in the evening to confirm that these optimizations are better." . . . .
>
> Tenev: "one thing I am not clear about runner lag is how close we are to redlining…for example, if we had 30% more events tomorrow, what would happen…seems like OCC file was sent with 1 minute to spare…seems like it's very redline."
>
> [Robinhood Dir. of Engineering]: "Yes, that's pretty scary. Also that's after we got an extension from the OCC."

---

[12] Robinhood's Principal Software Engineer wrote, "Code Red is similar but even more urgent, as the time horizon for business impact is 'in the immediate short term future or already ongoing.'"

[Robinhood VP of Engineering]: "yeah, for some time we thought it wouldn't make it…" . . . .

[Robinhood Head of Data Science]: "Today was a high volume day, but stories about Reddit/WSB and stocks other than GME are heating up. We should not rule out a bigger day than today this week."

[Robinhood Head of Data Science]: "***It may be worth looking into the playbooks for contingencies where we miss the deadlines.***" . . . .

[Robinhood Dir. of Engineering]: "This clearing thing seems pretty scary to me. I would say this is our biggest fire right now. I asked Jim what is the consequence of us submitting this file late to the OCC and this is what he had to say… 'OCC matches off our long and short positions to give us the ability to offset spread positions. If the file is not delivered they assume none offset so the firm requirement is the maximum long and short requirement for the firm. ***In our case that would mean a margin call of hundreds of millions of dollars, that we would need to meet in the a.m. In the worst case scenario we max out our credit lines and they liquidate our positions.***"

[Robinhood Senior Engineering Manager]: "'very readline' [*sic*] is right."

[Robinhood Dir. of Engineering]: "The number of events runner has to process is growing almost 2x week over week (from last Monday to this Monday). We submit an options spread file which is dependent on runner. This file *must* be submitted on time, at least that's what Jim is saying. If the number of events grow another 50% or above next week, we will certainly be late and I think this is very likely to happen. ***Marketing is ramping up, superbowl ads is coming up, crypto volatility/speculation on reddit seems to be increasing***."

(Emphasis added) (cleaned up).

202.    Late on January 25, 2021, Robinhood's Senior Engineering Manager wrote:

> To the larger question of how close are we across all "runner lag", varying degrees of consequences for missing the deadline across parts that runner lag backs up: *OCC spread is the riskiest * Sweep is not too bad in terms of daily consequences, but missing it frequently and repeatedly increases the risks exponentially*ACATS: regulatory violations if we don't action ACATS by 11 am on T+1. This one is the quickest to remediation and it's being worked on right now. 0 days.

203.    On January 27th, "Robinhood had its best day ever in terms of single-day

downloads . . . when 120,000 new users downloaded the stocks app for the first time across both iOS and Android."[13] "Robinhood also broke records for its highest number of daily active users on mobile at 2.6 million." *Id.* Again, rather than stop the bleeding, Robinhood kept its doors open while, unbeknownst to the general public, the platform was teetering on the verge of collapse. On January 28, 2021, at the height of the crisis, Robinhood "bec[a]me the No. 1 app overall on the [Apple] App Store for the first time." *Id.*

204.    Robinhood failed to take the necessary precautions to ensure that its platform would continue to be available for trading, while simultaneously expanding its marketing, taking on new customers and facilitating trading that both exacerbated the underlying instability of the entire Robinhood platform and business and dramatically increased the risk to customers who were taking positions in the Suspended Stocks unaware that Robinhood was spinning out of control.

205.    On January 28, 2021, at 8:13 a.m. EST, in another Robinhood chat, Robinhood acknowledged, "Is there a level to which we are aiming for? ***I think the blowback from this is going to be exponentially worse as time goes on***. Not sure where the line is as a brand ... not sure yet – I know there is a team working on our response here and we'll know more shortly. Ok. ***Just worried about the long term affects [sic] of this***."

206.    When Robinhood undertook the extraordinary measure of suspending the purchases of Suspended Stocks that were in great demand, Robinhood did so without a plan designed to correlate its reduction of risk to its extraordinary action.

### i.   The $3 Billion Capital Call

207.    The DTCC and NSCC created specific rules for scenarios like this where a broker

---

[13] Tech Crunch, "Robinhood and Reddit top the App Store, as trading apps surge following GameStop mania," (Jan. 28, 2021), *available at* https://techcrunch.com/2021/01/28/robinhood-and-reddit-top-the-app-store-as-trading-apps-surge-following-gamestop-mania/.

maintains high concentrations of highly volatile names. Robinhood monetized the order flows for such names, but failed to design the appropriate processes and allocate the appropriate cash reserves to in fact meet the well-defined margin requirements for such names. These margin requirements were intended to protect DTCC members and the market as a whole from the systemic risk that highly volatile stocks can produce when a broker's position has significant risk concentration in such stocks.

208.    On January 25, 2021, at 5:19 a.m. UTC,[14] Robinhood Securities received a NSCC Daily Margin Statement from the DTCC informing Robinhood Securities that it had a surplus of $11,397,650.77.

209.    Reflecting the volatility in the marketplace, hours later on the same date, Robinhood Securities received a NSCC Daily Margin Statement from DTCC informing Robinhood Securities that it had a deficit of $74,428,708.17.

210.    On January 26, 2021, at 8:34 a.m. UTC, Robinhood Securities received a NSCC Daily Margin Statement from the DTCC informing Robinhood Securities that it had a deficit of $84,930,632.62.

211.    On January 27, 2021, at 8:20 a.m. UTC, Robinhood Securities received a NSCC Daily Margin Statement from the DTCC informing Robinhood Securities that it had a surplus of $11,348,423.58.

212.    On January 27, 2021, Robinhood Securities received notice from the DTCC at 3:41 p.m. EST that "due to the volatility in the market, NSCC may be making intraday calls for additional clearing fund, as needed ... In response to recent market events, until further notice, NSCC is extending the payment deadline for intraday call deficits to 90 minutes to allow Members

---

[14] Coordinated Universal Time ("UTC") is five hours ahead of Eastern Standard Time ("EST") during standard time (autumn/winter), and four hours behind UTC during daylight saving time (spring/summer).

more time to source funding and facilitate approvals."

213.     Reflecting the increasing volatility in the marketplace, hours later, on the same date, on January 27, 2021, at 8:03 p.m. UTC, Robinhood Securities received a NSCC Daily Margin Statement from the DTCC informing Robinhood Securities that it had a deficit of $407,770,190.70.

214.     On January 27, 2021, at 10:32 p.m. EST, Robinhood sent an internal email stating that "RHS needs to borrow $300mil *from the parent* to cover the cash deficit mainly driven by NSCC and OCC [Options Clearing Corp.] intraday clearing deposits." (emphasis added).

215.     At approximately 5:11 a.m. EST, on January 28, 2021, Robinhood received a notice from the NSCC that Robinhood Securities had a deposit deficit of approximately **$3 billion**. *See* "Final Notice" from the NSCC, advising Robinhood Securities that its "***clearing fund deposit is below your clearing fund requirement***," in a deficit totaling **$3,006,178,364.89**, due by 10:00 a.m. EST. NSCC advised, "If an intraday call is made, **all deficits must be received *within one hour* of the notification of this letter**." (*Id*.) (emphasis added).

216.     As was standard practice, each one of the DTCC emails informed Robinhood that detailed information regarding its requirement was available by navigating to the NSCC risk management reporting portion of the relevant portal. Additionally, DTCC's emails informed Robinhood that detailed information regarding their deposit was also available on the website.

217.     Demonstrating how woefully unprepared Robinhood was to address its collateral deficit, Robinhood had no idea on January 28th as to who Robinhood's own NSCC collateral contact was. In an email from Robinhood's Clearing Operations Manager (Securities Processing) to the DTCC, Robinhood wrote, "Can you advise who Robinhood's NSCC collateral contact is? I think it changed recently but don't have their info."

218.     The DTCC was willing to work with Robinhood, adjust the premiums, and not let

it fail. Yet, as of approximately 7:40 a.m. EST on January 28, 2021, Robinhood had not even bothered to tell the DTCC that they could not fund before reaching a decision to implement a PCO.

219.    According to Robinhood's internal communications, on January 28, 2021, before 8:00 a.m. EST, Florida, Robinhood reached a decision to "**PCO Top 4 symbols, AMC, GME, NOK, BB**," even though Robinhood acknowledged, "*We aren't paying 3B worth*." (Emphasis added). Robinhood then identified, through its Clearing Operations Manager, "Next Steps: Need to *inform FINRA of expectations* around plan for PCO symbols & *expected increase in complaint impact*." (Emphasis added). Robinhood did not inform FINRA nor any regulators and instead blocked buying of additional stocks. An excerpt of the communication from Robinhood Securities Clearing Operations Manager is included below:



220.    According to former Citadel Securities Senior Vice President, in an internal chat with Citadel Securities Head of Execution Services, on January 28, 2021, at 1:48 p.m. UTC,

"Robinhood moving the following EQUITY positions to CLOSING ONLY: AMC, GME, NOK, BB, NAKD, KOSS, EXPR, BBBY all PCO." Citadel acknowledged, "*this may cause some big moves*." (Emphasis added.) When asked about options at 1:55 p.m. UTC, Citadel stated, "options moving too . . . closing only in all symbols."

221.    Robinhood's internal communications demonstrate that as of the morning of January 28, 2021, Robinhood had $1,290,819,421.15 in the bank and that the firm's daily wire limit was $1 billion dollars.

222.    Robinhood knew in the early hours of January 28, 2021, that many of its customers were looking to trade in their Robinhood accounts. An internal communication states, "In another channel, reporting at 300k apps already this am."

223.    Shortly after 9:00 a.m. EST, *within hours of its initial margin request*, NSCC informed Robinhood Securities that NSCC's excess capital premium charge had been waived entirely for that day and the net deposit requirement decreased *by almost half* to $1.4 billion. NSCC changed this margin requirement despite no change in the underlying factors that go into a calculation of the risk of the Suspended Stocks.

224.    This drastic reduction apparently was still insufficient, as Robinhood was so woefully undercapitalized that Robinhood Securities' Clearing Operations Manager wrote in an internal note, "We don't have that either."

225.    On January 28, 2021, *before the market opened*, Robinhood Securities received a NSCC Daily Margin Statement from the DTCC informing it that the deficit had been reduced to $733,976,926.71.

226.    Robinhood's Clearing Operations Manager emailed the DTCC to ask, "Can we jump on a quick call today to discuss the collateral computation?" One would have properly

imagined that Robinhood would have asked for such a call in advance.

227.    Shortly thereafter, Robinhood Securities haphazardly asked its parent, Robinhood Markets, for over half-a-billion dollars (later reduced to $350 million after an employee who fired off a $200 million request backtracked and retracted that request), retaining authority from itself to access Robinhood Markets' cash as if it were a piggy bank, and nevertheless remained unprepared to serve its customers.

228.    On January 29, 2021, at 14:54 UTC, Robinhood's former CFO, and current FINRA-designated Finance and Operations Principal, Kelati, based out of Florida, emailed Swartwout, with the Subject Line, "Borrow," asking "to borrow $250 million *from the parent* to avoid possible intraday overdraft."



229.    About 30 minutes later, Swartwout responded: "Approved". Apparently, requests to draw against Robinhood Markets' available cash to finance a subsidiary can be approved by officers of that same subsidiary.

50

230.    Indeed, later that same day, Kelati again asked Swartwout to "[p]lease approve" the following request: "[Robinhood Securities] needs to borrow $200million from the parent credit line to cover the cash deficit from security lending return and clearing deposit." Illustrating Robinhood's informal and amateurish money management, Kelati later retracted this request for hundreds of millions of dollars with an email simply stating "Please disregard the $200M request."

231.    Again, on January 29th, Kelati emailed Swartwout and Senior Director of Clearing Operations at a Robinhood subsidiary, stating that "[Robinhood Securities] needs to borrow $100 mil from the parent to cover cash deficit driven by security lending return and clearing deposit." Just one minute later, Senior Director of Clearing Operations responds: "Approved". By the end of the day, hundreds of millions had been shuffled around but that was woefully insufficient to offset Robinhood's lack of preparedness.

232.    According to Robinhood's "Contingency Funding Plan," when Robinhood Securities needs "short term funding to cover short term cash shortage," due to, among other things, "*required* clearing deposit at DTCC and OCC," its Principal Financial Officer, who is responsible for "review[ing] daily the Firm's cash position and daily cash forecast" and "determine[ing] if the Firm needs additional funds to cover daily operations," "will email a request" (without any direction as to whom to direct such a request), to utilize one of the credit lines with its parent ($300 million committed and $750 million uncommitted, unsecured, collateralized by customers' free market securities), or with a non-affiliated bank ($550 million total). "With the approval of the President or his designated person, the Principal Financial Officer or a designated person initiates the borrowing." As illustrated above, Robinhood's so-called "Plan" in action is for Robinhood Securities (Kelati) to ask itself (Swartwout) to borrow money from its parent. In other words, Robinhood Securities approved its own requests for cash.

233.    On January 29, 2021, at 11:26 a.m. EST, Robinhood Securities received a NSCC Daily Margin Statement from the DTCC informing it that it had a deficit of $1,078,715,144.83.

234.    Robinhood had sufficient resources to obtain additional capital in the event of an emergency, as evidenced by its ability to round up **$3.4 billion** in just **two days,** on January 29, 2021. See Robinhood blog, "Robinhood Raises $3.4 Billion to Fuel Record Customer Growth" (Feb. 1, 2021), *available at* https://blog.robinhood.com/news/2021/2/1/robinhood-raises-34-billion-to-fuel-record-customer-growth

235.    Yet, and despite initially citing "market volatility" as the reason for restrictions in a January 28, 2021 blog post, Tenev's prepared statement to Congress on February 18, 2021, disclosed that the Robinhood Securities' operations team made the decision to impose trading restrictions on the Suspended Stocks on January 28, 2021, between 6:30 a.m. and 7:30 am EST due to "increased clearinghouse-mandated deposit requirements." Tenev testified that Robinhood met its revised deposit requirements a little after 9:00 a.m. EST on January 28, 2021. Nevertheless, Robinhood suspended purchasing for the Suspended Stocks when the market opened, allowing only selling to continue, with continuing off and on in iterations of poorly communicated and seemingly indefinite restrictions and limitations.

236.    When asked by the House Financial Services Subcommittee if Robinhood had negotiated with counterparts to restrict trading in the Suspended Stocks, Tenev stated that trading restrictions were put in place to meet regulatory deposit requirements imposed by DTCC affiliate NSCC.

237.    DTCC and NSCC President, Bodson, testified before the House Financial Services Subcommittee on May 6, 2021, that the decision to restrict trading was internal to Robinhood and it did not instruct Robinhood to impose trading restrictions in response to the market volatility in

late January 2021. As Bodson explained,

> NSCC's role in the market is a neutral one. It does not impose trading restrictions upon its clearing members or their customers, and ***[NSCC] did not instruct any clearing member to impose restrictions during the market volatility events of late January***. NSCC expects all clearing members to employ effective tools to monitor and manage their risk, and to maintain an appropriate level of capital to support any expansion of or change in their business activities. Clearing fund requirements are rules-based and subject to limited discretion. NSCC exercises this discretion carefully, often in unique circumstances. In such cases, NSCC's sole objective is to balance the need to protect the system from a potential clearing member default against the damage and other risks that could result if NSCC were to cease-to-act and liquidate a clearing member's portfolio.

(Bodson Testimony, at 5–6) (emphasis added).

### ii.   Robinhood's Unprecedented, One-Sided Trading Halt

238.   Beginning on January 28, 2021, Defendants placed an unprecedented trading halt on the Suspended Stocks.

239.   At 5:00 p.m. EST, on January 27, 2021, the SEC released a statement that it was "aware of and actively monitoring the on-going market volatility in the options and equities markets," but neither the SEC nor any other government agency issued any directive to restrict trading in the Suspended Stocks.

240.   On January 28, 2021, at 9:58 a.m. EST, Defendant Robinhood circulated an email to its users with the subject line "An important update on your expiring options," informing them that in light of unprecedented volatility surrounding GME and AMC, and in an effort to help reduce risk, all GME and AMC options with expirations of January 29th, 2021, will be set to ***closing transactions only***." (Emphasis added).

241.   Robinhood's email to its users was silent as to any restrictions placed on trading shares of GME, AMC, or other Suspended Stocks, but as the markets opened on January 28, 2021,

Plaintiffs and the Robinhood Class woke up to find that Robinhood had suddenly and without notice deactivated the "buy" button as a feature on the Robinhood platform, leaving users with no option but to hold or sell their securities, as prices plummeted due to the PCO policy imposed by Robinhood.

242.    Robinhood addressed the "Why don't I see a buy button?" question on its website, offering three reasons for the buy button being unavailable on a user's account: (a) "It's a foreign stock, which we don't support;" (b) "It's an over-the-counter (OTC) stock or a warrant, which Robinhood generally doesn't support;" and (c) "It's a stock undergoing corporate action. The stock will be tradable again once the corporate action has been finalized." Robinhood's explanations made little sense, however, because the Suspended Stocks were not foreign stocks, OTC stocks or stocks undergoing corporate actions during the Restricted Period. Robinhood did not warn users of any situation where it could prevent users from buying stock of its own volition.

243.    Worse, Plaintiffs and Robinhood Class members who had queued purchase orders overnight on January 27, 2021, to purchase stock when the markets opened on January 28, 2021, discovered that their purchase orders had been cancelled without their consent.

244.    For example, Robinhood sent Plaintiff Moody a message in her app that her orders for NAKD and NOK "ha[ve] been canceled," despite Ms. Moody never cancelling the orders.



245.     On Robinhood's web platform and mobile app, Plaintiffs and the Robinhood Class were even blocked from seeing information about the Suspended Stocks. In fact, their respective ticker symbols were not even searchable.



246.     The same day, on January 28, 2021, the Robinhood app rose to the #1 position on the App Store for the first time since its release. While the app had its most single day downloads with over 120,000 first time installs, it also broke a new record with over 2.6 million daily active users. Robinhood had no problem welcoming tens of thousands of new users onto its platform to trade while its ship was sinking and already out of lifeboats.

247.     Robinhood tweeted that "in light of current market volatility," it was restricting transactions for certain securities to position closing only, including AMC and GME.

248.     Robinhood subsequently set thirteen (13) Suspended Stocks to PCO, including AMC and GMC, which Robinhood knew its customers held concentrated positions in, foreseeably impeding additional price appreciation and suppressing their prices beyond the Restricted Period.



249.    Robinhood attributed the aforesaid restrictions to ongoing market volatility, and acknowledged that it had canceled open orders for the listed securities and also disabled the ability for users to search for these securities in Robinhood's mobile app. Robinhood's January 28th blog post titled, "Keeping Customers Informed Through Market Volatility," also attributed the restrictions to "significant market volatility" and further disclosed that Robinhood raised margin requirements for certain securities.

250.    That same evening, Defendant Robinhood, through its CEO, Tenev, told CNBC that Robinhood decided to stop trading in the Suspended Stocks in part "to protect the firm."

251.    Tenev later acknowledged in an interview with Elon Musk on the social media app Clubhouse, "We knew this was a bad outcome for customers . . . But we had no choice as we had to conform to our requirements."[15]

### iii.    Institutional Broker-Dealers Did Not Impose Similar One-Sided Halt, Which Regulators Criticized as "Disadvantageous" to Investors

252.    Unlike Robinhood, institutional broker-dealers with long-standing risk management practices did not take the extraordinary measure of unilaterally implementing one-sided trading restrictions on stocks in response to the same "short squeeze" at issue here.

253.    For example, neither Charles Schwab & Co. nor TD Ameritrade halted buying *or* selling of *any* stocks or basic options during the Restricted Period. Instead, amidst price volatility, both firms "put in place some restrictions on certain types of options transactions to help mitigate risk," adjusted "margin requirements in highly volatile securities," and restricted advanced options strategies such as selling naked call options. *See* Charles Schwab Corporation Statement on Recent Trading Activity, Charles Schwab Corp., https://www.aboutschwab.com/schwab-statement-on-recent-trading-activity (posted Jan. 28, 2021).

254.    These steps, as opposed to those taken by Robinhood, "appropriately balance investors' ability to trade these securities with the firm's duty to protect itself from potentially absorbing losses incurred by an individual's trading or investing strategies." *Id*.

255.    On January 29, the SEC issued a statement about brokers' responses to volatility

---

[15] *See* RealClearPolitics, "Elon Musk Interviews Robinhood CEO Vlad Tenev On Stock Trading Restrictions On 'Clubhouse' App," *available at* https://www.cnbc.com/2021/01/29/robinhood-raises-1-billion-and-taps-credit-lines-to-make-trading-of-gamestop-available-to-customers.htmlhttps://www.cnbc.com/2021/01/29/robinhood-raises-1-billion-and-taps-credit-lines-to-make-trading-of-gamestop-available-to-customers.html.

in the Suspended Stocks, noting that, "The Commission will closely review actions taken by regulated entities that *may disadvantage investors or otherwise unduly inhibit their ability to trade certain securities*."  *See* Statement of Acting Chair Lee and Commissioners Peirce, Roisman, and Crenshaw Regarding Recent Market Volatility, *available at* https://www.sec.gov/news/public-statement/joint-statement-market-volatility-2021-01-29 (Emphasis added.)

### iv.    <u>Trading Restrictions Continue After January 28, 2021</u>

256.    In anticipation of Robinhood easing some restrictions, shares of the Suspended Stocks all rose in premarket trading on Friday, January 29, 2021. Shares of GME rose 80% and shares of AMC jumped 60% on Friday.[16]

257.    Even in the face of increased scrutiny, however, Robinhood continued to suppress the value of the Suspended Stocks.

258.    Robinhood restricted trading of long option contracts and announced to Plaintiffs and the Robinhood Class that they would close out their profitable option positions automatically.

259.    Robinhood also placed limitations on the number of new positions its users could open by capping the total number of shares and options contracts an individual could hold in certain securities.

260.    Nevertheless, Plaintiffs and the Robinhood Class continued to purchase the Suspended Stocks as they were permitted.

261.    On January 29, 2021, Robinhood limited users to purchasing imposed limitations on the following securities: AAL, AMC, BB, BBY, EXPR, GME, KOSS, NAKD, NOK, SNDL, TR and TRV. With respect to GME, Robinhood first restricted investors to purchasing only two

---

[16] *See* CNBC, "Robinhood raises $1 billion and taps credit lines to make trading of GameStop available to customers," *available at* https://www.cnbc.com/2021/01/29/robinhood-raises-1-billion-and-taps-credit-lines-to-make-trading-of-gamestop-available-to-customers.html.

shares of GME, which resulted in a rapid decline in the value of GameStop.



262.     Robinhood then instituted a one share limit on some of the Suspended Stocks, including GME and AMC, further causing the value of the stocks to decrease.



263.     Each artificial limitation on the Suspended Stocks could purchase correlated with a subsequent decrease in stock value.



264.    As purchases of the Suspended Stocks were limited, Plaintiffs and the Class were pressured to sell who otherwise would not have in the presence of a free and open market.

265.    On February 1, 2021, Robinhood announced that it raised an additional $2.4 billion in funding on top of the $1 billion it raised the previous week. Yet, the very same day, Robinhood reintroduced restrictions on buying. Robinhood posted a "Letter to Our Robinhood Community," to its blogpost on February 1, 2021, stating, "Simply put, Robinhood limited buying in volatile securities to ensure it complied with deposit regulations."

266.    Robinhood continued to impose limitations on certain securities through February 5, 2021. (*See* Form S-1, at 167.)

## E.  Government Investigations Following January 2021 Short Squeeze

267.    The U.S. House Financial Services Committee issued subpoenas and held three highly publicized hearings related to the trading restrictions imposed on January 28, 2021.

268.    In addition to proceedings in the House of Representatives, the Senate Banking Committee also held hearings related to the trading restrictions.

269.    According to reporting by the Wall Street Journal and public filings, the fraud division of the Department of Justice and the San Francisco U.S. Attorney's office have sought information about the restrictions imposed on January 28, 2021 from brokers and social media companies.

270.    The SEC appears to have been investigating the restrictions imposed on January 28, 2021. On June 9, 2021, GameStop Corp. reported in its 10-Q report that "On May 26, 2021, we received a request from the Staff of the SEC for the voluntary production of documents and information concerning a SEC investigation into the trading activity in our securities and the securities of other companies. We are in the process of reviewing the request and producing the

requested documents and intend to cooperate fully with the SEC Staff regarding the matter. This inquiry is not expected to adversely impact us."

271.    Robinhood's FOCUS Report filed with the SEC on February 26, 2021, confirmed many of these investigations and revealed that Robinhood had received inquiries related to the trading restrictions from the U.S. Attorney's Office of the Northern District of California, the SEC's Division of Examinations, FINRA, the New York Attorney General's Office and the offices of other states' Attorneys General, state securities regulators and from Congress.

272.    Finally, on June 30, 2021, FINRA announced that Robinhood was ordered to pay a record financial penalty of $70 million for "systemic supervisory failures and significant harm suffered by millions of customers." According to FINRA, "the sanctions represent the largest financial penalty ever ordered by FINRA and reflect the scope and seriousness of the violations."

## CLASS ACTION ALLEGATIONS

273.    Plaintiffs bring this case individually and pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and (b)(3) on behalf of the following proposed nationwide classes:

**A.  Nationwide Investor Class**

All persons or entities in the United States that:

  i.    held shares, or call options for shares, of any of  GameStop Corp. (GME), AMC Entertainment Holdings Inc. (AMC), American Airlines Group Inc. (AAL), Bed Bath & Beyond Inc. (BBBY), BlackBerry Ltd. (BB), Castor Maritime, Inc. (CTRM), Express, Inc. (EXPR), Koss Corporation (KOSS), Naked Brand Group Ltd. (NAKD), Nokia Corp. (NOK), Sundial Growers Inc. (SNDL), Tootsie Roll Industries, Inc. (TR), or Trivago N.V. (TRVG) (the "Suspended Stocks"), as of the end of the day on January 27, 2021, and

  ii.   sold shares, or call options for shares, of the Suspended Stocks between January 28, 2021 and February 23, 2021 (the "Class Period"); and

  iii.  suffered damages.

**B. Robinhood Class**

     i.     All customers of Robinhood who held shares, or call options for shares, of any of the Suspended Stocks as of the end of the day on January 27, 2021, who sold any such shares or call options during the Class Period, and suffered damages;

    ii.     All customers of Robinhood who placed a sale order on shares, or on call options for shares, of any of the Suspended Stocks, whose orders were delayed during the Class Period, and suffered damages;

   iii.     All customers of Robinhood who placed a buy order for shares, or on call options for shares, of any of the Suspended Stocks, whose order was initially accepted by Robinhood, whose order was ultimately rejected by Robinhood during the Class Period, and suffered damages;

   iv.     All customers of Robinhood who purchased shares, or call options for shares, of any of the Suspended Stocks after initial restrictions were lifted as of the open of trading on January 29, 2021, sold any such shares or call options when Robinhood reintroduced further restrictions during the Class Period, and suffered damages; and

    v.     All customers of Robinhood who held call options for shares of any of the Suspended Stocks as of the end of the day on January 27, 2021, and whose call options expired worthless during the Class Period, and suffered damages.

Excluded from the proposed Classes are:

     i.     Any of the Defendants named herein;

    ii.     Any of the Defendants' parent companies, subsidiaries, and affiliates;

   iii.     Any of the Defendants' officers, directors, management, employees, or agents;

   iv.     Counsel for any of the parties to this action;

    v.     All governmental entities; and

   vi.     The judge and chambers staff in this case, as well as any members of their immediate families.

274.    Plaintiffs reserve the right to modify or amend the definitions of each proposed Class before the Court determines whether certification is appropriate.

275.    This action has been brought and may properly be maintained as a class action against Defendants pursuant to the provisions of Federal Rule of Civil Procedure 23.

276.    **Numerosity**: The precise number of members of the proposed Classes is unknown to the Plaintiffs at this time; however, based on information and belief, members of the Classes, including sub-classes, number in the hundreds of thousands if not millions. Each Class is so numerous that joinder of all members in a single action is impracticable. All members of the Classes may be notified of the pendency of this action by reference to Defendants' records or by other alternative means.

277.    **Commonality**: Numerous questions of law and fact are common to the claims of the respective Plaintiffs and members of the proposed Classes. These common questions of law and fact exist as to all members of the proposed Classes and predominate over questions affecting only individual members of the proposed Classes. These common legal and factual questions include, but are not limited to, the following:

    i.    Why Defendants restricted trading on January 28, 2021, and thereafter;

    ii.    Whether Defendants' capital management was adequate;

    iii.    Whether Defendants maintained adequate risk-management controls in light of their business model;

    iv.    Whether Defendants' conduct in connection with the Suspended Stocks was negligent or grossly negligent;

    v.    Whether Defendants owed Plaintiffs and Robinhood Class members fiduciary duties;

    vi.    Whether Defendants breached their fiduciary duties to Plaintiffs and Robinhood Class members;

    vii.    Whether Defendants knowingly failed to provide the financial services that were needed to handle reasonable consumer demand, including trading securities that are available on most other competitive trading platforms;

    viii.    Whether Defendants breached their duty of care and implied covenant of good faith and fair dealing owed to Plaintiffs and the Robinhood Class when they purposefully removed the ability to buy or view certain securities on Robinhood's platform;

ix.   Whether Defendants violated their duty to use due care in providing brokerage services and their duties of loyalty and good faith and fair dealing by imposing a buy-side trading halt on the Suspended Stocks specifically designed to artificially suppress the prices of the Suspended Stocks;

x.   Whether Robinhood Markets and Robinhood Financial require their customers to enter into standardized customer agreements, imposed and drafted by Robinhood, which include terms and conditions not contained in the customer agreements, but rather in a separate document not signed by Plaintiffs and the Robinhood Class;

xi.   Whether Robinhood Markets tortiously interfered with Plaintiffs' contractual and business relationships with Robinhood Financial and Robinhood Securities;

xii.   Whether Robinhood Securities, together with Robinhood Markets, and Robinhood Financial, imposed the unlawful restrictions on the Suspended Stocks, which was an overt act in furtherance of a conspiracy to tortiously interfere with Plaintiffs' contractual and business relationships for improper motive;

xiii.   Whether the Plaintiffs and members of the proposed Classes were injured by the Defendants' conduct, and if so, the appropriate measure of damages.

278.   **Typicality**: The claims of each named Plaintiff who had an account with Robinhood are typical of the claims of corresponding Robinhood Class. Each purchased one or more of the Suspended Stocks through Robinhood prior to the Class Period and were invariably harmed by Robinhood's unlawful conduct during the Class Period.

279.   **Adequate Representation**: Plaintiffs will fairly and adequately represent the interests of each Class in that they have no conflicts with any other members of the Classes. Plaintiffs have retained competent counsel experienced in prosecuting complex class actions in federal court, including those involving financial services, and they will vigorously litigate this class action on their behalf and on behalf of members of the corresponding Class.

280.   **Predominance and Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. A class action is superior to other available means, if any, for the fair and efficient adjudication of this controversy. Prosecution of separate actions by individual members of the proposed Classes would create the risk of inconsistent or varying

adjudications, establishing incompatible standards of conduct for the Defendants.

281.     Additionally, few, if any, members of the proposed Classes could or would sustain the economic burden of pursuing individual remedies for Robinhood's wrongful conduct and it would thus be grossly impracticable because the cost of vindicating an individual class member's claim would likely exceed the value of the claim. Treatment as a class action will achieve substantial economies of time, effort, and expense, and provide comprehensive and uniform supervision by a single court. This class action presents no material difficulties in management and provides the benefits of a single adjudication.

<div align="center">

**CAUSES OF ACTION**

**COUNT I**
**Negligence**

</div>

282.     Plaintiffs hereby incorporate by reference paragraphs 1 through 281 as though fully set forth herein.

283.     As a provider of financial services and registered securities investment broker-dealer, Robinhood has a duty to exercise reasonable care, skill, and ability in conducting and facilitating financial services and transactions on its platform.

284.     As a securities broker-dealer, Robinhood owes a duty of care to investors to act in accordance with the standard of care used by other broker-dealer professionals.

285.     In offering both trading and clearing services, Robinhood assumed a duty to ensure that its trading platform was sufficiently equipped to reliably deliver such services under reasonably foreseeable increasing customer demands and resulting market conditions.

286.     Robinhood Financial had a duty to exercise reasonable care in safeguarding Plaintiffs' and the members of the Classes' investments by providing a platform to execute trades that is fair and promptly provides execution of its customers' trade orders in a lawful manner.

<div align="center">

65

</div>

287.    Robinhood Securities had a duty to exercise reasonable care in carrying and providing clearing services for its customer accounts, ensuring compliance with obligations to meet capital requirements to cover foreseeable market risk, and ensuring that it had sufficient collateral posted or available to satisfy the industry clearing functions so as not to impede Plaintiffs and the Classes' ability to purchase shares of the Suspended Stocks.

288.    By failing to take reasonable steps to make sure that its platform is available in times of market volatility, failing to maintain adequate capital to meet the increasing risk associated with the trading volume Robinhood intentionally fueled, admittedly failing to have adequate capital to pay its clearinghouse-mandated deposit requirements when due, failing to adequately mitigate risk, and suspending trading on its platform to limit its own risk at the expense of Plaintiffs and the Classes, Robinhood violated these duties.

289.    Robinhood was fully aware, or reasonably ought to have been fully aware, that its buy-side trading halt would cause the prices of the Suspended Stocks to fall precipitously and that their market would be tainted for a period thereafter. In other words, after bringing itself and its customers to the brink, Robinhood intentionally disrupted the market its business was ill-equipped and unable to handle by severing one of the two requisite legs for a fully functioning market— when it knew, or ought to have known, that its customers would suffer immediate drops in the value of their portfolios and the market for the Suspended Stocks would be significantly impaired.

290.    Robinhood had a duty to maintain adequate capital and collateral during volatile markets and the volatility was either known to Robinhood or foreseeable.

291.    Robinhood's failure to maintain capital levels needed to meet anticipated capital deposit demands, failing to adequately mitigate risk, and restricting trading in the Suspended Stocks under the circumstances alleged herein, violated SEC, FINRA, and other regulatory rules,

which violations provide evidence of breach of the duty of care owed to its customers, an extreme departure from the ordinary standard of conduct, and conduct so reckless or wanting in care that it constitutes a conscious disregard or indifference to the rights of Plaintiffs and the Classes.

292.    As a direct and proximate result of Robinhood's conduct, Plaintiffs and the Classes of similarly-situated investors have been injured and sustained damages.

## COUNT II
## Gross Negligence

293.    Plaintiffs hereby incorporate by reference paragraphs 1 through 281 as though fully set forth herein.

294.    Robinhood agreed to provide brokerage services, such as the purchase and sale of securities (including the Suspended Stocks), to Plaintiffs and Class members in accordance with professional and industry standards of care applicable to broker-dealers.

295.    Robinhood Financial had a duty to exercise reasonable care in safeguarding the investments held by Plaintiffs and the Robinhood Class by providing a platform to execute trades that is fair and promptly provides execution of its customers' trade orders in a lawful manner.

296.    Robinhood Securities had a duty to exercise reasonable care in carrying and providing clearing services for its customer accounts, ensuring compliance with obligations to meet the regulatory net capital requirements applicable to broker-dealers, and ensuring that it had sufficient collateral posted or available to satisfy the industry clearing functions so as not to impede customers' ability to purchase shares of the Suspended Stocks.

297.    Robinhood had the duty and ability to reasonably anticipate its net capital and collateral requirements on a daily basis.

298.    Robinhood had a duty to maintain adequate capital and collateral during volatile markets and the volatility at issue here was either known to Robinhood or foreseeable.

299.    Despite being on notice of the high transaction volume and price volatility concentrated on its platform, and contrary to: (i) industry rules and regulations aimed at addressing market volatility, (ii) its duties of care as a broker-dealer and clearing firm, and (iii) investor expectations, Robinhood failed to adequately mitigate risk and to take reasonable steps to make sure that its platform remained available in times of market volatility.

300.    Robinhood instead took deliberate actions to hurt Plaintiffs and the Class by abruptly and unilaterally implementing one-way trading suspensions (halting of the buying, but not the selling) designed to and foreseeably impeding additional price appreciation and suppressing the prices of the Suspended Stocks during and beyond the Restricted Period.

301.    As a direct and proximate result of Robinhood's conduct, Plaintiffs and the Classes of similarly-situated investors have been injured and sustained damages.

## COUNT III
### Breach of Fiduciary Duty
### (Against Robinhood Securities and Robinhood Financial)

302.    Plaintiffs hereby incorporate by reference paragraphs 1 through 281 as though fully set forth herein.

303.    Defendants Robinhood Securities and Robinhood Financial owed a fiduciary duty of care, loyalty, and good faith to Plaintiffs the Robinhood Class, by virtue of, among other things, being a provider of financial services and a registered securities investment broker-dealer. Robinhood's fiduciary duty to Plaintiffs and the Robinhood Class also arises out of acts undertaken specifically to market and provide securities brokerage services to novice investors who, by virtue of their inexperience, are especially reliant on Robinhood's protection.

304.    As broker-dealers, Robinhood Securities and Robinhood Financial owed fiduciary duties of care, good faith, honesty, and loyalty, to the Plaintiffs and the Robinhood Class, which

include, without limitation, the duty to provide an open trading platform free of self-imposed trading restrictions, the duty to carry out orders promptly in a manner best suited to serve the customer's interests, the duty to transact business only after receiving prior authorization from the customer, the duty to use reasonable efforts to provide customers information relevant to the affairs entrusted to it, and the duty not to act out of a conflict of interest, nor to prefer the fiduciary's self-interest over that of its customers.

305.    The scope of Robinhood Securities and Robinhood Financial's fiduciary duties is informed, in part, by the fact that they retain the discretion to execute certain transactions within Plaintiffs' and the Robinhood Class members' accounts without specific approval and provide information to Plaintiffs and the Robinhood Class members on investments and investment strategies, creating a special relationship alleged herein.

306.    Robinhood Securities and Robinhood Financial breached their fiduciary duties by acting in their own self-interest and contrary to the interests of its customers, suspending trading to benefit themselves at the expense of Plaintiffs and the Robinhood Class.

307.    Robinhood Securities and Robinhood Financial further breached their fiduciary duties by engaging in the conduct alleged above to actively facilitate and encourage high volume and volatile trading on Robinhood's trading platform when Robinhood's internal structures, systems, and capitalization were unable to maintain and support that trading activity such that its business, customers, and the market of investors were being put at significant risk.

308.    As a direct and proximate result of Defendants Robinhood Securities and Robinhood Financial's conduct, Plaintiffs and the Robinhood Class of similarly-situated investors have been injured and sustained damages.

<u>COUNT IV</u>
**Breach of the Implied Duty of Care**
**(Against Defendants Robinhood Financial and Robinhood Securities)**

309.    Plaintiffs hereby incorporate by reference paragraphs 1 though 281 as though fully set forth herein.

310.    Plaintiffs allege, in the alternative to Counts I and II, that Defendants Robinhood Financial and Robinhood Securities breached their implied duties of care as introducing and clearing broker-dealers of Plaintiffs and the Robinhood Class.

311.    As a precondition to using Robinhood's brokerage services, Plaintiffs and members of the Robinhood Class are required to agree to the terms of Robinhood's Customer Agreement. The Customer Agreement is a type of agreement known as "clickwrap" or a contract of adhesion in that it contains standard terms drafted by Robinhood Financial and Robinhood Securities, who have superior bargaining power, on a non-negotiable and take-it-or-leave-it basis, including by referencing terms, conditions, and other policies outside of the Customer Agreement. A true and accurate copy of the Customer Agreement in effect during the Restricted Period is attached hereto as **Exhibit A** and incorporated herein by this reference for purposes of pleading Count IV in the alternative. Robinhood has since amended the Customer Agreement.

312.    The essence and fundamental purpose of the Customer Agreement is for the performance of brokerage services on behalf of Plaintiffs and the Robinhood Class, with Robinhood Financial acting as the introducing broker and Robinhood Securities acting as the clearing broker.

313.    As the Customer Agreement provides, Robinhood contracts to open an account (or accounts) on behalf of Plaintiffs and the Robinhood Class "for the purchase, sale or carrying of securities or contracts relating thereto and/or the borrowing of funds, which transactions are

cleared through Robinhood Securities."

314.    Section 4 of the Customer Agreement requires customers to:

> [A]ppoint Robinhood Financial as My agent for the purpose of carrying out My directions to Robinhood Financial in accordance with the terms and conditions of this Agreement and any attendant risks with respect to the purchase or sale of securities. Robinhood Financial is authorized to open or close My Account(s), place and withdraw orders and take such other steps as are reasonable to carry out My directions. All transactions will be effected only on My order or the order of My authorized delegate, except as described in Section 10. I understand Robinhood Financial provides trading and brokerage services through the Robinhood website (the "Website") and the Robinhood mobile application (the "App").

(Customer Agmt, Ex. A, § 4.)

315.    Section 6 of the Customer Agreement expressly states, "I understand that Robinhood Financial has entered into a clearing agreement with Robinhood Securities whereby Robinhood Financial will introduce My Account to Robinhood Securities, and Robinhood Securities will clear all transactions, on a fully-disclosed basis."

316.    The Customer Agreement further acknowledges that other terms, not expressly provided for in the agreement, are incorporated therein. Section 37 ("Miscellaneous Provisions"), Subsection F ("Entirety of Agreement") provides that the Customer Agreement includes:

> [A]ny attachments hereto, other agreements and policies referred to in this Agreement (including the Website Postings), and the terms and conditions contained in My Account statements and confirmations, contain the entire agreement between Robinhood and Me and supersede all prior or contemporaneous communications and proposals, whether electronic, oral, or written, between Robinhood and Me, provided, however, that any and all other agreements between Robinhood and Me, not inconsistent with this Agreement, will remain in full force and effect.

317.    "Website Postings" are broadly defined in Section 37, as follows:

> [O]ther specific **agreements, disclosures, policies, procedures, terms, and conditions that apply to My use of the App, the**

**Website, or My Account on the Website** ("Website Postings"). I understand that it is My continuing obligation to understand the terms of the Website Postings, and I agree to be bound by the Web Postings as are in effect at the time of My use.

*See* Ex. B (emphasis added).

318.    One example of "another agreement" is Robinhood Financial's "Brokerage Customer Relationship Summary" ("CRS Summary"), which is posted on Robinhood's Website and is incorporated into, and forms part of, the Customer Agreement.  The CRS Summary has changed since the timeframe in the Restricted Period. The CRS Summary that was in place during the Restricted Period is dated June 30, 2020, a true and correct copy of which is attached hereto as **Exhibit B**. Robinhood has since amended the CRS Summary.

319.    Section 2 of the relevant CRS Summary is unequivocal about the nature of services that Plaintiffs and Robinhood Class members contracted for: "Robinhood Financial offers brokerage services to retail investors. Our services involve effecting securities transactions for investors exclusively online. We buy and sell securities only at your direction and we do not offer recommendations of securities, strategies involving securities or securities accounts to you."

320.    Section 2 of the CRS Summary further states that "Robinhood Financial is an introducing broker-dealer. Your funds and securities will be custodied by our affiliate, Robinhood Securities, LLC ('Robinhood Securities' and together with Robinhood Financial, 'Robinhood'), which services your account by executing, clearing and settling your trades; preparing and distributing your account statements and trade confirmations; and extending credit to margin accounts."

321.    The Customer Agreement provides that California law governs the agreement. Pursuant to California law, it is an implied term of the Customer Agreement that Robinhood Financial and Robinhood Securities will perform their brokerage services competently and with

reasonable care.

322.    Plaintiffs and the Robinhood Class did all, or substantially all, of the significant things that the Customer Agreement required of them.

323.    Robinhood Financial and Robinhood Securities failed to use reasonable care in performing their brokerage services and failed to perform those services competently, including without limitation, by taking steps, including the imposition of the trading restrictions intended to disrupt, or in the alternative knew or reasonably ought to have known would disrupt, the market for the Suspended Stocks and damage the value of Plaintiffs' and the Robinhood Class members' investments. Further, in their pursuit of profits and new customers, Robinhood Financial and Robinhood Securities subjected the Plaintiffs and the Robinhood Class to a growing and unreasonable risk by facilitating a significant increase in high volume and volatile trading through their brokerage business, failing to take reasonable steps to mitigate the risks attendant with the volume and volatility of trades executed through their brokerage, including, without limitation: (i) forcing the Suspended Stocks into PCO, (ii) maintaining adequate capital, (iii) engaging in continual risk management to ensure their ability to continue providing standard brokerage services (buying and selling) to customers, including Plaintiffs and the Robinhood Class, (iv) conducting a reasonable analysis of how to manage a high volume of customers simultaneously trading in the Suspended Stocks, (v) reasonably restricting the number of new accounts opened with their brokerage, and/or (vi) availing themselves of available sources of capital.

324.    Rather, Robinhood Financial and Robinhood Securities continued to facilitate and encourage further trading in the Suspended Stocks, without commensurate regard for NSCC capital and deposit requirements, which they had a duty to maintain. Indeed, Robinhood persisted in its opening of new accounts and "ramped up" advertising, without due consideration for whether

it had adequate capital or infrastructure to clear trades from those accounts, particularly during times of market stress.

325.     Plaintiffs and the Robinhood Class members were harmed as a result of Robinhood Financial's and Robinhood Securities' breach of the implied duty of due care alleged herein.

### COUNT V
**Breach of the Implied Covenant of Good Faith and Fair Dealing**
**(Against Defendants Robinhood Financial and Robinhood Securities)**

326.     Plaintiffs hereby incorporate by reference paragraphs 1 through 281 as though fully set forth herein.

327.     Plaintiffs allege, in the alternative to Counts I and II, that Defendants Robinhood Financial and Robinhood Securities breached their implied duties of good faith and fair dealing owed to Plaintiffs and the Robinhood Class.

328.     As a condition to opening an account with Robinhood, users are required to accept a Customer Agreement drafted by Robinhood and between Plaintiffs and the Robinhood Class, on the one hand, and Robinhood Financial, Robinhood Securities, and their agents and assigns, on the other. Plaintiffs and the Robinhood Class accepted the Customer Agreement to use the Robinhood platform and fulfilled their obligations and adhered to the terms thereof.

329.     Every contract imposes upon each party a duty of good faith and fair dealing in the performance of the contract such that neither party shall do anything which will have the effect of destroying or interfering with the right of the other party to receive the benefits of the contract.

330.     Robinhood Financial and Robinhood Securities breached the covenant of good faith and fair dealing implied in the performance of "brokerage services" they agreed to provide in the Customer Agreement (including the CRS Summary) as a matter of law, and unreasonably, unfairly and in bad faith interfered with the right to receive the benefits of the Customer

74

Agreement, by engaging in the conduct alleged hereinabove, including, without limitation, imposing the above-described one-sided halt on trading on the Suspended Stocks. Further, Robinhood Financial and Robinhood Securities exercised the discretion reserved for them under the Customer Agreement to manage and operate their business (including the CRS Summary), and make decisions in respect thereof, so as to provide brokerage services for its customers, unreasonably, unfairly and in bad faith by engaging in the conduct alleged hereinabove.

331.    Plaintiffs and the Robinhood Class were entitled to the benefits of the Customer Agreement. These benefits included, without limitation, (i) utilizing the Robinhood platform to make investments in securities the value of which would be determined by the operation of the free public markets, (ii) maintaining their investments with a broker who would not subject those investments to unreasonable risk of devaluation through its actions, (iii) maintaining their investments with a broker who would take reasonable steps to mitigate the risk of failing to maintain adequate net capital and deposit requirements, (iv) receiving advanced notice and/or warning from their broker as to impending risks to their investments and steps their broker may take that would harm the value of those investments, and (v) their broker not taking steps intended to, or which it knew or ought to have known would, harm the investments of its customers.

332.    Robinhood Financial and Robinhood Securities, by and through the conduct alleged hereinabove, breached the implied covenant of good faith and fair dealing by knowingly taking action, or failing to take action, that caused harm, losses and damages to Plaintiffs and the Robinhood Class.

333.    The actions and omissions of Robinhood Financial and Robinhood Securities, as described hereinabove, are in violation of the implied covenant of good faith and fair dealing and have caused Plaintiffs and the Robinhood Class to suffer damages in an amount to be determined

at trial. As a direct and proximate result of the foregoing breach, Plaintiffs and the Robinhood Class have sustained damages in an amount to be proven at trial.

## COUNT VI
### Tortious Interference with Contract and Business Relationship
### (Against Robinhood Markets, Inc.)

334.    Plaintiffs hereby incorporate by reference paragraphs 1 through 281 as though fully set forth herein.

335.    Plaintiffs allege in the alternative that Robinhood Markets tortiously interfered with existing business relations, which are evidenced by the Customer Agreement and standards of care alleged herein, amongst Plaintiffs, Robinhood Financial and Robinhood Securities.

336.    As alleged, Plaintiffs and the Robinhood Class have a contractual relationship and business relationship with Robinhood Financial and Robinhood Securities, under which Plaintiffs have legal rights and Robinhood Financial and Robinhood Securities have legal obligations to Plaintiffs.

337.    Although not a party to the Customer Agreement, Robinhood Markets, the parent company of the two corporate subsidiary parties to the Customer Agreement, knew of the Customer Agreement and the business relationship amongst Plaintiffs, Robinhood Financial and Robinhood Securities.

338.    Robinhood Markets unjustifiably, without privilege, with improper motive, and in bad faith, procured the breaches of implied contractual duties by forcing Robinhood Financial and Robinhood Securities to stop performing their legal obligations with respect to the Customer Agreement and business relationship amongst Plaintiffs and the Robinhood Class, Robinhood Financial, and Robinhood Securities. Robinhood Markets procured these breaches by, *inter alia*, (i) forcing the Suspended Stocks into PCO; (ii) failing to have a supervisory control system that

would have identified and prevented the capitalization issues; (iii) failing to have adequate business contingency and continuity plans to ensure customer access in the event of market volatility; (iv) failing to have sufficient back-up plans to receive and process customers' orders during times of market volatility; (v) continuing to allow new customers to join the platform; failing to take steps to arrange for necessary capital that was immediately available from other sources; and (vi) failing to comply with professional and industry standards of care.

339.     As direct and proximate result of Robinhood Markets' mismanagement of its subsidiaries, as described herein, Robinhood Markets forced its subsidiaries to stop performing their obligations under the Customer Agreement and interfere with business relationship amongst Plaintiffs, Robinhood Financial, and Robinhood Securities.

340.     Robinhood Markets, a non-party to the Customer Agreement and separate corporate entity from the corporate entity parties to the Customer Agreement, had no justification or privilege for procuring the contract's breach and tortiously interfering with the business relationship amongst Plaintiffs, Robinhood Financial, and Robinhood Securities.

341.     As a direct and proximate result of Defendant Robinhood Markets' conduct, Plaintiffs and the Robinhood Class of similarly-situated investors have been injured and sustained damages.

### COUNT VII
### Civil Conspiracy
### (Against Robinhood)

342.     Plaintiffs hereby incorporate by reference paragraphs 1 through 281 as though fully set forth herein.

343.     The Robinhood Defendants unlawfully conspired to tortiously interfere with Plaintiffs and the Robinhood Class's contractual and business relationships with Robinhood

Financial and Robinhood Securities by, *inter alia*, forcing the Suspended Stocks into PCO; self-clearing to attract more customers and drive trading volume; failing to have a supervisory control system that would have identified and prevented the capitalization issues; by failing to have adequate business contingency and continuity plans to ensure access in the event of market volatility; failing to have sufficient back-up plans to receive and process customers' orders during times of market volatility; continuing to allow new customers to join the platform; and failing to comply with applicable legal regulatory requirements and industry standards of care, including those set by FINRA and its predecessor authorities.

344.    Robinhood Securities, together with Robinhood Markets and Robinhood Financial, imposed the unlawful restrictions on the Restricted Securities, which was an overt act in furtherance of the conspiracy to wrongfully force those stock prices to diminish and cause Plaintiffs and the Robinhood Class to suffer the consequences of Robinhood's lack of preparedness.

345.    As a result of the acts done in furtherance of the conspiracy, Plaintiffs and the Robinhood Class have suffered damages.

346.    As a direct and proximate result of the foregoing conspiracy, Plaintiffs and the Robinhood Class of similarly-situated investors have been injured and sustained damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Classes, pray for a judgment against Defendants as follows:

a. For an order certifying the proposed Classes, appointing Plaintiffs as Representatives of the proposed Classes, and appointing the law firms representing Plaintiffs as counsel for the Classes;

b. For compensatory damages, punitive damages, restitution, and/or refund of all funds acquired by Defendants from Plaintiffs and the proposed Classes' members as a result of Defendant's negligence, breach, and unlawful actions described herein, in an amount to be proven at trial;

c. Payment of costs and expenses of suit herein incurred;

d. Both pre- and post-judgment interest on any amounts awarded;

e. Payment of reasonable attorneys' fees and expert fees;

f. Such other and further relief as the Court may deem proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury.

Dated:  September 21, 2021                    Respectfully submitted,

                                                                    */s/ Natalia M. Salas*
                                                                    **THE FERRARO LAW FIRM, P.A.**
                                                                    Natalia M. Salas (FBN 44895)
                                                                    James L. Ferraro (FBN 381659)
                                                                    James Ferraro, Jr. (FBN 107494)
                                                                    Bruce S. Rogow (FBN 067999)
                                                                    Sean A. Burstyn (FBN 1028778)
                                                                    Daniel J. DiMatteo (FBN 114914)
                                                                    600 Brickell Avenue, Suite 3800
                                                                    Miami, FL 33131
                                                                    Tel: (305) 375-0111
                                                                    nms@ferrarolaw.com
                                                                    jlf@ferrarolaw.com
                                                                    jjr@ferrarolaw.com
                                                                    bsr@ferrarolaw.com
                                                                    sab@ferrarolaw.com
                                                                    djd@ferrarolaw.com

                                                                    ***Plaintiffs' Lead Counsel for the Robinhood Tranche***

_/s/ Rachel W. Furst_
**GROSSMAN ROTH YAFFA COHEN, P.A.**
Rachel W. Furst (FBN 45155)
2525 Ponce de Leon Blvd., Ste 1150
Coral Gables, FL 33134-6040
Tel: 305-442-8666
rwf@grossmanroth.com

**_Plaintiffs' Liaison Counsel_**

## CERTIFICATE OF SERVICE

I hereby certify that on September 21, 2021, I electronically filed the forgoing with the Clerk of the Court using CM/ECF. I also certify that the foregoing is being served this day on all counsel of record in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel who are not authorized to receive Notices of Electronic Filing.

By: _/s/ Rachel Wagner Furst_
Rachel Wagner Furst