**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-2989-MDL-ALTONAGA/Torres**

IN RE:

**JANUARY 2021 SHORT SQUEEZE**
**TRADING LITIGATION**

_____/

This Document Relates to:

ALL ANTITRUST ACTIONS

**ANTITRUST PLAINTIFFS' OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**

## TABLE OF CONTENTS

**Page(s)**

I.     INTRODUCTION ................................................................................................. 1

II.    FACTUAL BACKGROUND ............................................................................... 2

III.   LEGAL STANDARD .......................................................................................... 3

IV.    ARGUMENT ........................................................................................................ 4

       A.    Plaintiffs Plead a Plausible Conspiracy in Violation of § 1 of the Sherman Act .... 4

       B.    Defendants' Anticompetitive Agreement is *Per Se* Unlawful .............................. 21

       C.    Plaintiffs' Allegations Suffice Under the Quick Look Approach ......................... 28

       D.    Plaintiffs' Allegations Satisfy the Rule of Reason ................................................. 28

       E.    Plaintiffs' Claims Are a Paradigmatic Antitrust Injury ......................................... 31

       F.    Plaintiffs' Antitrust Claims Are Not Precluded by Federal Securities Laws ........ 32

       G.    Peak 6/E*TRADE Holdings/RH Markets cannot be dismissed .......................... 39

V.     CONCLUSION .................................................................................................... 40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Soc. of Mech. Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556 (1982)............................39

*Am. Tobacco Co. v. United States*, 328 U.S. 781 (1946)........................................................11, 15

*Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162 (2d Cir. 2012)....................................10

*Anderson News, L.L.C. v. Am. Media, Inc.,* 899 F.3d 87 (2d Cir. 2018).........................................9

*Anderson v. Shipowners Ass'n of the Pac. Coast,* 272 U.S. 359 (1926)........................................24

*Apex Oil Co. v. DiMauro*, 822 F.2d 246 (2d Cir.) ........................................................................11

*Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623 (9th Cir. 2018)................39, 40

*Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332 (1982)......................................................21

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)..............................................................................3, 4, 5

*Austin v. Blue Cross & Blue Shield of Ala.*, 903.F.2d 1385 (11th Cir. 1990)..............................32

*Auto. Alignment & Body Serv., Inc. v. State Farm Mut. Auto. Ins. Co.*, 953 F.3d
707 (11th Cir. 2020)...............................................................................................................8

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................. *passim*

*Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360 (9th Cir. 1980) .......................15

*In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241 (N.D. Ala.
2018) ....................................................................................................................................24

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 10 (1979)............................22, 25, 29

*Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364 (11th Cir. 1997) .......................4

*Brown v. Pro Football, Inc.,* 518 U.S. 231 (1996) ........................................................................24

*Cal. Dental Ass'n v. Fed. Trade Comm'n*, 526 U.S. 756 (1999)....................................................28

*Cement Mfrs. Protective Ass'n v. United States*, 268 U.S. 588 (1925) ...........................................7

*ChoiceParts, LLC v. Gen. Motors Corp.*, 203 F. Supp. 2d 905 (N.D. Ill. 2002)....................16, 27

*City of Tuscaloosa v. Harcros Chems.*, 158 F.3d 548 (11th Cir. 1998) .......................8, 11, 13, 14

*Conley v. Gibson*, 355 U.S. 41 (1957) ........................................................................4

*Cont'l Ore Co. v. Union Carbide and Carbon Corp.*, 370 U.S. 690 (1962) ..................5

*Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984)........................21, 39, 40

*In re Credit Default Swaps Antitrust Litig.*, No. 13md2476 (DLC), 2014 WL
    4379112 (S.D.N.Y. Sept. 4, 2014)..................................................................34

*Credit Suisse Securities (USA) LLC v. Billing,* 551 U.S. 264 (2007) ................... *passim*

*Dahl v. Bain Capital Partners, LLC*, 589 F. Supp. 2d 112 (D. Mass. 2008)................37

*DeLong Equip. Co. v. Wash. Mills Abrasive Co.*, 887 F.2d 1499 (11th Cir. 1989).......................5

*In re Delta/Airtran Baggage Fee*, 245 F. Supp. 3d 1343 (N.D. Ga. 2017)...............8, 11

*In re Delta/AirTran Baggage Late Fee*, 733 F. Supp. 2d at 1348 (N.D. Ga. 2017).......................8

*In re Diisocyanates Antitrust Litig.*, No. 18-1001, 2020 WL 1140244 (W.D. Pa.
    Mar. 9, 2020)................................................................................................18

*In re Disposable Contact Lens Antitrust Litig.*, 215 F. Supp. 3d 1272 (M.D. Fla.
    2016) ......................................................................................................... *passim*

*Elec. Trading Grp., LLC v. Banc of Am. Sec. LLC*, 588 F.3d 128 (2d Cir. 2009)................ *passim*

*Erickson v. Pardus*, 551 U.S. 89 (2007) .....................................................................3

*ES Dev., Inc. v. RWM Enters., Inc.*, 939 F.2d 547 (8th Cir. 1991) ..............................33

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp.
    2d 141 (D. Conn. 2009) ...............................................................................19

*Fed. Trade Comm'n v. Ind. Fed'n of Dentists*, 476 U.S. 447 (1986) ...........................30

*In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291 (S.D. Fla.
    2010) ....................................................................................................9, 10, 39

*Fla. Power & Light Co. v. Allis Chalmers Corp.*, 85 F.3d 1514 (11th Cir. 1996) .......................40

*In re Flat Glass Antitrust Litig.*, 385 F.3d 350 (3d Cir. 2004)....................11, 12, 15, 16

*In re Generic Pharm. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404 (E.D. Pa.
    2018) ................................................................................................15, 18, 19

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485 (2d Cir. 2004)............................29

*Gordon v. N.Y. Stock Exch., Inc.,* 422 U.S. 659 (1975).................................................34

*California ex rel. Harris v. Safeway Inc.*, 651 F.3d 1118 (9th Cir. 2011) (en banc) .................... 28

*In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651 (7th Cir. 2002) ...................... 8, 19

*In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103 (N.D. Cal. 2012) ........................ 21

*Hosp. Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738 (1976) ...................................... 4

*Image Tech. Servs. v. Eastman Kodak Co.*, 125 F3d 1195 (9th Cir. 1997) .................................. 30

*In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010) .................................... 6

*In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430 (S.D.N.Y. 2017) ........................ 34

*Interstate Cir. v. United States*, 306 U.S. 208 (1939) ............................................. 14, 26

*Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698 (7th Cir. 1984) ......................... 7

*Jackson v. Wal-Mart Stores, Inc.*, 753 F. App'x 866 (11th Cir. 2018) .................................... 4

*Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327 (11th Cir. 2010) .................................. 23, 31

*Jennings v. BIC Corp.*, 181 F.3d 1250 (11th Cir. 1999) ................................................. 40

*Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897 (N.D. Cal. 2019) ...................................... 8

*Kotteakos v. United States*, 328 U.S. 750 (1946) ...................................................... 26

*Leegin v. Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007) ............................ 23

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221 (10th Cir. 2017) .................................................................... 39, 40

*Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538 (11th Cir. 1996) .................................. 25

*In re Loc. TV Advert. Antitrust Litig.*, No. 18 C 6785, 2020 WL 6557665 (N.D. Ill. Nov. 6, 2020) .......................................................................................... 5

*In re LTL Shipping Servs. Antitrust Litig.*, No. 1:08-MD-01895-WSD, 2009 WL 323219 (N.D. Ga. Jan. 28, 2009) ............................................................................ 8

*Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.,* 334 U.S. 219 (1948) ......................... 24

*In re Marine Hose Antitrust Litig.*, MDL No. 1888, 2009 WL 10692670 (S.D. Fla. May 26, 2009) ............................................................................................. 40

*Mayor & City Council of Balt., Md. v. Citigroup, Inc.*, Nos. 08-cv-7746 (BSJ), 08-cv-7747 (BSJ), 2010 WL 430771 (S.D.N.Y. Jan. 26, 2010) ............................................... 37

*In re: McCormick & Co., Inc.*, 217 F. Supp. 3d 124 (D.D.C. 2016) ..............................................16

*Merck-Medco Managed Care, LLC v. Rite Aid Corp.*, No. 98-2847, 1999 WL
    691840 (4th Cir. 1999)................................................................................................11

*Mitchael v. Intracorp, Inc.*, 179 F.3d 847 (10th Cir. 1999) ........................................39

*In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186 (9th Cir. 2015)..........4, 11, 26

*N. Jackson Pharm., Inc. v. Express Scripts Inc.*, 345 F. Supp. 2d 1279 (N.D. Ala.
    2004) ................................................................................................................................9

*N. Pac. Ry. Co. v. United States*, 356 U.S. 1 (1958)................................................21, 23

*In re Nasdaq Mkt-Makers Antitrust Litig.*, 894 F. Supp. 703 (S.D.N.Y. 1995)......................7, 35

*Nat'l Bancard Corp. v. VISA U.S.A., Inc.*, 779 F.2d 592 (11th Cir. 1986)..................................29

*Nat'l Coll. Ath. Ass'n v. Alston*, 141 S.Ct. 2141 (2021) ............................................28

*Nat'l Coll. Ath. Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85 ........................................31

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136 (9th
    Cir. 2019) ........................................................................................................22, 23, 32

*Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679 (1978).............................................23

*Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038 (9th Cir. 2008) ........................................31

*Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) ......................................28, 29, 30, 31

*Persian Gulf Inc. v. BP W. Coast Prods. LLC*, 324 F. Supp. 3d 1142 (S.D. Cal.
    2018) ................................................................................................................................4

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991
    (N.D. Ill. 2011)..........................................................................................................5, 13

*Polk Bros. v. Forest City Enters.*, 776 F.2d 185 (7th Cir. 1985) ................................22

*Procaps S.A. v. Patheon Inc.*, 36 F. Supp. 3d 1306 (S.D. Fla. 2014) ....................22, 29

*Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072 (11th Cir. 2016) ..............................23, 25

*In re Publication Paper Antitrust Litigation*, 690 F.3d 51 (2d Cir. 2012)....................................24

*Radovich v. Nat'l Football League,* 352 U.S. 445 (1957) ............................................24

*In re Salmon*, Case No. 19-21551-CIV-ALTONAGA/Louis, 2021 WL 1109128
    (S.D. Fla. Mar. 23, 2021) .................................................................................. *passim*

*Schine Chain Theatres, Inc. v. United States*, 334 U.S. 110 (1948) ................................................33

*SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412 (4th Cir. 2015) .........................................1

*Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555 (11th Cir. 1991) .......................................5

*Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497 (2001) ................................................2

*Spain v. Brown & Williamson Tobacco Corp.*, 363 F.3d 1183 (11th Cir. 2004)..........................4

*Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns., Inc.*, 376 F.3d
    1065 (11th Cir. 2004)....................................................................................................13

*Starr v. Sony BMG Music Entm't*, 592 F.3d 314 (2d Cir. 2010) ...................................................5

*State Oil v. Khan*, 522 U.S. 3 (1997) ............................................................................................23

*In re Terazosin Hydrochloride Antitrust Litig.*, 352 F.Supp.2d 1279 (S.D. Fla.
    2005) .............................................................................................................................22

*Texaco Inc. v. Dagher*, 547 U.S. 1 (2006) ...................................................................................25

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) ...............................................................29, 30

*Tops Mkts. Inc. v. Quality Mkts. Inc.*, 142 F.3d 90 (2d Cir. 1998) ..............................................29

*Toys "R" Us, Inc. v. Fed. Trade Comm'n.*, 221 F.3d 928 (2000) ...........................................26, 27

*United Am. Corp. v. Bitmain, Inc.*, No. 18-CV-25106, 2021 WL 1807782 (S.D.
    Fla. Mar. 31, 2021) ........................................................................................................5

*United States v. Akwuba*, 7 F.4th 1299 (11th Cir. 2021) ........................................................7, 15

*United States v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015)...........................................9, 21, 26, 27

*United States v. eBay, Inc.*, 968 F. Supp. 2d 1030 (N.D. Cal. 2013)...........................................21

*United States v. Falstaff Brewing Corp.*, 410 U.S. 526 (1973) .....................................................8

*United States v. Gen. Motors Corp.*, 384 U.S. 127 (1996) ....................................................24, 26

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940)............................................25, 32

*United States v. Topco Assocs., Inc.,* 405 U.S. 596 (1972)..........................................................21

*United States v. Vernon*, 723 F.3d 1234 (11th Cir. 2013) ............................................................7

*Universal Express, Inc. v. U.S. Sec. Exchange Comm'n*, 177 F. App'x 52 (11th
    Cir. 2006)......................................................................................................................37

*In re Urethane Antitrust Litig.*, 913 F. Supp. 2d 1145 (D. Kan. 2012) .......................................... 16

*Verizon Commc'ns, Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398
(2004) ....................................................................................................................... 34

*West Penn Allegheny Health System, Inc. v. UPMC*, 627 F.3d 85 (3d Cir. 2010) ......................... 5

*White Motor Co. v. United States,* 372 U.S. 253 (1963) ................................................................ 29

*Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003) ............................. 9, 10

**Statutes**

Clayton Act, 15 U.S.C. § 15 ..................................................................................................... 33, 34

Copyright Act, 17 U.S.C. § 1 ......................................................................................................... 25

Dodd-Frank Wall Street Reform and Consumer Protection Act, 124 Stat. 1376 ................. *passim*

Securities Exchange Act, 15 U.S.C. § 78a .................................................................................. *passim*

Sherman Act, 15 U.S.C. § 3 ..................................................................................................... 1, 3, 5

**Other Authorities**

AREEDA & HOVENKAMP, ANTITRUST LAW (2d ed. 2003) ...................................................... 10, 30

HOVENKAMP, ANTITRUST LAW (2d ed. 2005) ........................................................................ 22, 28

AREEDA, ANTITRUST LAW (2d ed. 2007) ..................................................................................... 21

POSNER, ANTITRUST LAW (2d ed. 2001) ....................................................................................... 19

SEC, *Thinking About Investing in the Latest Hot Stock?* (Jan. 30, 2021),
https://www.sec.gov/oiea/investor-alerts-and-bulletins/risks-short-term-
trading-based-socialmedia-investor-alert ....................................................................... 38

## I.      INTRODUCTION

Plaintiffs' Corrected Consolidated Class Action Complaint (the "CCAC") plausibly alleges that Defendants entered an agreement, on or about January 27, 2021, to restrict retail investors from purchasing the Relevant Securities[1] in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. While not required, the CCAC goes further by alleging the "who, what, where, and when" of Defendants' agreement—it explains how the financial services market is extraordinarily susceptible to collusion, how Defendants had the motive and opportunity to enter into the anticompetitive agreement, and how they monitored and enforced their agreement. *See SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 430 (4th Cir. 2015) ("Antitrust complaints . . . that include detailed fact allegations as to the who, what, when and where of the claimed antitrust misconduct not surprisingly survive dismissal") (citations and internal quotation marks omitted).

As Plaintiffs allege, Defendants simultaneously imposed restrictions on their stock trading platforms leaving retail investors with no option but to sell or hold the Relevant Securities. Defendants did so to suppress the prices of the Relevant Securities and enable Defendant Citadel Securities to offload its highly speculative short positions. Plaintiffs allege facts constituting direct evidence of the agreement—including emails and communications between high level executives at Robinhood, Apex, E*Trade, and Citadel—where Defendants explicitly agreed to restrict the purchase of the Relevant Securities. Such direct evidence establishes a *per se* violation of the Sherman Act, and the Court need not draw any further inferences. For Rule 12 purposes the inquiry ends there. Nevertheless, Plaintiffs allege additional circumstantial evidence involving all Defendants that, when viewed as a whole, plausibly suggest an agreement. These allegations are more than sufficient at the pleading stage and Defendants' Motion to Dismiss (ECF No. 408; the "MTD") should be denied.

The MTD attacks the CCAC on three grounds. First, Defendants assert that the CCAC fails to set forth allegations of an anticompetitive agreement. Defendants are incorrect. The CCAC is replete with facts which when proven at trial will constitute evidence—both direct and circumstantial—that Defendants entered an anticompetitive agreement to restrict the Relevant

---

[1] The Relevant Securities include the following: GameStop (GME); AMC Entertainment (AMC); Bed Bath & Beyond (BBY); Blackberry (BB); Express (EXPR); Koss (KOSS); Nokia (NOK); Tootsie Roll Industries (TR) and Trivago NV (TRVG). ¶ 6. References to paragraph numbers in this brief denote paragraphs in the CCAC (ECF No. 388) unless otherwise indicated.

Securities. Second, Defendants claim that the CCAC fails to set forth an antitrust violation either under the *per se* rule or the rule of reason. Here too Defendants' arguments fail. The determination of whether the *per se* test applies is premature at the pleading stage. Even so, the CCAC sets forth a paradigmatic antitrust injury—an agreement to reduce output—that is a *per se* violation of Section 1 of the Sherman Act. Even under the rule of reason, the allegations in the CCAC should be sustained. Lastly, Defendants argue that the securities laws preempt Plaintiffs' antitrust claims. Not so. There is no repugnancy between antitrust law and securities law here. Even assuming *arguendo* that there were, Congress has already determined that Plaintiffs' antitrust claims should move forward by embedding into the Dodd-Frank Act an expansive savings clause applicable to Plaintiffs' claims. 12 U.S.C. § 5303 (2012).

In short, Plaintiffs allege an overarching conspiracy and each Defendants' role in it.. Plaintiffs' allegations detail when Defendants entered into the alleged agreement, including the names of key individuals, when the agreements were reached and enforced, and how the agreements were implemented. While Defendants offer alternative explanations, these questions are not appropriately resolved at the pleading stage, but rather at a later stage in the litigation.[2] Thus, Plaintiffs' CCAC satisfies Rule 8 and Defendants' MTD should be denied in its entirety.

## II.   FACTUAL BACKGROUND

Leading up to January 27, 2021, retail investors, including Plaintiffs, had been utilizing Brokerage Defendants' platforms to invest in certain stocks (i.e., the Relevant Securities) that, based on their research and observation, appeared to be undervalued. ¶ 6. As word of these undervalued stocks began to spread, more and more retail investors purchased the Relevant Securities causing their share prices to skyrocket. ¶¶ 185, 188-91. Meanwhile, as alleged in the CCAC, Citadel Securities, as a market maker, acquired massive short positions in the Relevant Securities by taking the sell side of these transactions. ¶¶ 192, 216. These short positions exposed Citadel Securities to infinite losses if the price of the Relevant Securities continued to rise – which

---

[2] Plaintiffs' dismissal of other entities is not a concession that a conspiracy did not occur. Plaintiffs *voluntarily* dismissed those defendants *without prejudice*. ECF Nos. 319, 380, 396-398, 400-402, 404. Voluntary dismissal without prejudice is not an adjudication on the merits and carries no weight as to the credibility of Plaintiffs' claims, particularly the voluntary dismissal of other parties to the action. *See Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 505 (2001) ("Rule 41(a), which, in discussing the effect of voluntary dismissal by the plaintiff, makes clear that an 'adjudication upon the merits' is the opposite of a 'dismissal without prejudice'").

is exactly what happened. ¶¶ 157, 406. At the close of market on January 27, 2021, GME's share price increased over 130% from the previous day, while shares of AMC rose over 300%. ¶ 190.

Rather than cut their losses, Citadel Securities acquired even larger short positions in the Relevant Securities after the market closed on January 27, 2021, and did so with the knowledge that prices of the Relevant Securities would soon fall. ¶¶ 13, 295. In an unprecedented move, on January 28, 2021, Brokerage Defendants imposed purchasing restrictions on some or all of the Relevant Securities, which resulted in an immediate and significant price depreciation of the once booming stocks. ¶¶ 14-15, 234, 254, 256-66. As a result of the restrictions, retail investors were forced to either hold or sell their shares of the Relevant Securities. ¶¶ 16, 235. Plummeting share prices and loss of investor confidence forced many retail investors, including Plaintiffs, to sell their shares of the Relevant Securities at prices lower than they otherwise would have but for Defendants' collusive behavior, thereby sustaining damages. ¶¶ 16, 27, 32, 37, 41, 255.

As alleged in the CCAC, Citadel Securities conspired with the Brokerage Defendants and the Clearing Defendants to prevent retail investors from purchasing shares of the Relevant Securities to artificially suppress share prices so that Citadel Securities could cover its short positions and mitigate its potential losses. ¶¶ 14-15, 295-361. In support of Plaintiffs' claims that Defendants conspired to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, Plaintiffs not only allege direct evidence, but also circumstantial evidence—including numerous "plus factors" that, when taken together, plausibly demonstrate Defendants' collusion. ¶¶ 362-440.

## III.    LEGAL STANDARD

"[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rule 8(a)(2) requires only a short and plain statement of a claim for relief to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Twombly*, 550 U.S. at 555); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'"). There are no "heightened" pleading standards for antitrust cases. *Twombly*, 550 U.S. at 570; *see also In re Disposable Contact Lens Antitrust Litig.*, 215 F. Supp. 3d 1272, 1300 (M.D. Fla. 2016) ("*Twombly* does not impose a heightened pleading requirement on antitrust complaints.").

Under Rule 12(b)(6) "[w]hen reviewing a motion to dismiss, a court construes the complaint in the light most favorable to the plaintiff and takes the factual allegations as true." *In re Salmon*, Case No. 19-21551-CIV-ALTONAGA/Louis, 2021 WL 1109128, at *9 (S.D. Fla. Mar. 23, 2021) (citing *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997)); *Jackson v. Wal-Mart Stores, Inc.*, 753 F. App'x 866, 869 (11th Cir. 2018) ("*Iqbal* tells us we must assume the truth of all well-pleaded allegations except legal conclusions, regardless of whether evidence may ultimately support them."). "A motion to dismiss is granted only when the movant demonstrates 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Spain v. Brown & Williamson Tobacco Corp.*, 363 F.3d 1183, 1187 (11th Cir. 2004) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). Particularly in antitrust cases, where "'the proof is largely in the hands of the alleged conspirators,' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hosp. Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746 (1976) (citation omitted).[3]

## IV.    ARGUMENT

### A.    Plaintiffs Plead a Plausible Conspiracy in Violation of § 1 of the Sherman Act

To state a claim under Section 1 of the Sherman Act, Plaintiffs need not plead "detailed factual allegations." *Twombly*, 550 U.S. at 555. "Proof" of an agreement is not required at the pleading stage. *See Persian Gulf Inc. v. BP W. Coast Prods. LLC*, 324 F. Supp. 3d 1142, 1147 (S.D. Cal. 2018) ("The issue before the Court is whether Plaintiff pleaded sufficient facts to provide a plausible basis from which to infer 'an agreement, tacit or express.'") (citation omitted). The standard merely "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (emphasis added).

An agreement in restraint of trade can be established: (i) by direct evidence showing the existence of an agreement; (ii) through circumstantial evidence, i.e., a combination of parallel conduct and "plus factors," defined as "economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action[;]" or (iii) through a combination of direct and circumstantial evidence. *In re Musical Instruments &*

---

[3] Remarkably, Defendants criticize the sufficiency of the CCAC on the basis that Plaintiffs had access to some documents. That is not the standard under Rule 8—the CCAC should be judged on its face, and it is of no moment that Plaintiffs have obtained access to some documents. Further, Defendants omit that many documents were shared only *after* the consolidated complaint was filed.

*Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015); *DeLong Equip. Co. v. Wash. Mills Abrasive Co.*, 887 F.2d 1499, 1508 (11th Cir. 1989) (citation omitted).

Plaintiffs are not required to allege an explicit agreement or specific communications among Defendants. *See DeLong*, 887 F.3d at 1515. Plaintiffs' claims should be viewed as a whole; "[t]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Cont'l Ore Co. v. Union Carbide and Carbon Corp.*, 370 U.S. 690, 699 (1962)) (citation omitted, alteration in original).

Here, Plaintiffs allege, with particularity, facts constituting direct and circumstantial evidence. When viewed together this evidence strongly supports the inference that Defendants illegally conspired to restrict retail trading in order to profit from their short sale positions in the Relevant Securities in violation of Section 1 of the Sherman act.[4] *See* 15 U.S.C. § 1.

    **a.**    **Plaintiffs plausibly allege direct evidence of Defendants' agreement**

"Direct evidence of an agreement is explicit and requires no inferences to establish the proposition or conclusion being asserted." *Salmon*, 2021 WL 1109128, at *10 (quoting *In re Loc. TV Advert. Antitrust Litig.*, No. 18 C 6785, 2020 WL 6557665, at *7 (N.D. Ill. Nov. 6, 2020)). "If a complaint includes non-conclusory allegations of direct evidence of an agreement, a court need go no further on the question whether an agreement has been adequately pled." *W. Penn Allegheny Health Sys., Inc.*, 627 F.3d at 99 (reversing dismissal under *Twombly*). Courts have recognized that direct evidence in antitrust cases is "rare." *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1573 (11th Cir. 1991); *United Am. Corp. v. Bitmain, Inc.*, No. 18-CV-25106, 2021 WL 1807782, at *10 (S.D. Fla. Mar. 31, 2021) (citing *DeLong*, 887 F.2d at 1515) ("Direct evidence of a § 1 conspiracy is rare, and most antitrust conspiracies are proved by circumstantial evidence.").

---

[4] Apparently conceding that their arguments fail under the correct "plausibility" standard, Defendants suggest that the Court apply a "probability" standard—whether the explanations Defendants offer for the facts alleged are "far more likely" (i.e., more probable) than Plaintiffs' allegations. MTD at 14. However, the standard at the motion to dismiss stage "does not impose a probability requirement…; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556; *see also Iqbal*, 556 U.S. at 678 ("[t]he plausibility standard is not akin to a 'probability requirement.'"). In any event, Defendants' innocent-sounding *post hoc* excuses for their conduct are not a basis to grant their motion to dismiss. *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1002 (N.D. Ill. 2011) (rejecting argument that allegations suggesting conspiracy to reduce output could "be explained as behavior perfectly in line with the firms' independent self-interest"); *see also Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 325 (2d Cir. 2010).

This is one of those rare cases. Contrary to Defendants' argument (MTD at 15-16), Plaintiffs plead direct evidence of Defendants unlawful agreement. The CCAC sets forth numerous instances[5] where Defendants openly communicated in furtherance of the conspiracy, including discussing the nature and scope of the scheme, coordinating and confirming the implementation of retail trading restrictions, instructing brokerages to further the scheme, efforts to conceal it, and continuing the scheme after January 28, 2021.

These communications, which constitute direct evidence of the anticompetitive agreement, show that Defendants did not restrict trading independently, but rather with advance knowledge and coordination. For example, Plaintiffs allege that high level executives of Citadel Securities and Robinhood communicated with each other in the days leading up to the trading restrictions and reached an express agreement on January 25, 2021.[6] ¶¶ 296-305, 307-13, 452-53; *see In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 324 n.23 (3d Cir. 2010) ("a document or conversation explicitly manifesting the existence of the agreement" is direct evidence of a conspiracy). Robinhood and Citadel Securities were not the only Defendants to communicate with one other in furtherance of the conspiracy. High level employees of E*Trade and Citadel Securities also exchanged communications throughout January 28th to confirm certain orders were cancelled (¶ 454), while Apex instructed brokerages, including Ally, Dough, Public.com, SoFi, Stash, Tastyworks and Webull to halt all opening transactions of GME, AMC and KOSS (¶¶ 274-76), and verbally informed certain brokerages of the same (¶ 341, 443). The CCAC sets forth allegations relating to all Defendants' participation in the conspiracy, e.g., the statement of Interactive Brokers' Thomas Peterffy admitting that Interactive Brokers restricted to "protect ourselves" and ETC instructed brokers to restrict. ¶¶ 277, 279.

Further, Plaintiffs proffer direct evidence that Defendants acted in concert. Shortly after Robinhood decided to move the Relevant Securities to restrict trading, an internal Robinhood

---

[5] Defendants characterize the number of interfirm communications as a "handful." MTD at 23. But Plaintiffs have not had the benefit of discovery. And the fact that Plaintiffs have already identified numerous incriminating interfirm communications suggests that even more inculpatory communications will surface in discovery. At the motion to dismiss stage, this is sufficient. *See Twombly*, 550 U.S. at 556 (plausibility standard "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement").

[6] The written communications appear deliberately vague and do not describe the contents of what was agreed to in the communications. Secret communications are hallmarks of antitrust conspiracies. *See* Part IV.A.b.ii.4, *infra.*

communication confirmed that Robinhood was monitoring the conspiracy. Robinhood employees were discussing that others were doing the same. ¶¶ 242-46. Further, Robinhood decided to impose purchasing restrictions on the Relevant Securities shortly after the NSCC margin call, indicating that Robinhood had premeditated its decision prior to the call. ¶¶ 339, 415, 474.

Even after January 28, 2021, Defendants coordinated the continued restrictions on the Relevant Securities and their homogeneous public statements to explain the events.[7] Defendants took explicit steps in concert to ensure that retail investors could not bypass the trading restrictions. Although Apex had lifted its trading restrictions by January 29, it policed the conspiracy by explicitly warning Robinhood of efforts by investors to purchase the Restricted Securities even though Apex had no business relationship with Robinhood.[8] *See* ¶¶ 327-30. This direct evidence demonstrates that the coordinated trading restrictions imposed by Defendants were not the result of happenstance or independent decision-making, but rather a result of illegal collusion.[9]

> **b.    Circumstantial evidence corroborates direct evidence of an agreement**

"Where a conspiracy claim rests on allegations of parallel conduct [by defendants], a plaintiff must allege sufficient 'plus factors' to make the parallel conduct 'more *probative* of

---

[7] High level employees of Robinhood and Citadel coordinated their messaging after the trading restrictions were imposed, in order to cast doubt and maintain secrecy over their anticompetitive scheme. ¶¶ 332-35; 445-57.

[8] Defendants say Apex's communication is "protected," MTD at 24, n.12, but the case they cite in support merely says that a communication to prevent fraud is not an unlawful restraint upon commerce. *Cement Mfrs. Protective Ass'n v. United States*, 268 U.S. 588, 604 (1925). Here, Apex's communication furthered the scheme by policing the illegal agreement. Even if Apex's communication by itself was lawful, unlawful antitrust conspiracies are often accomplished through otherwise lawful means. *See Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 709-10 (7th Cir. 1984) (conspiracies are unlawful "if the conspirators used unlawful means to a lawful end *or* lawful means to an unlawful end") (citation omitted, italics added).

[9] Defendants criticize Plaintiffs for not alleging communications as to Peak6, ETC and Interactive Brokers. MTD at 23. Interactive Brokers did not make its first production of documents until August 24, 2021 and has failed to produce the remaining balance of documents to date. PEAK6 and ETC have not produced any documents. Even so, the CCAC sets forth allegations indicating their participation in the conspiracy. ¶¶ 108-110, 249, 277-279, 358. *See United States v. Akwuba*, 7 F.4th 1299, 1307 (11th Cir. 2021) ("'a defendant can be convicted of conspiracy even if his or her participation in the scheme is slight by comparison to the actions of other co-conspirators'") (quoting *United States v. Vernon*, 723 F.3d 1234, 1273 (11th Cir. 2013)); *see also In re Nasdaq Mkt-Makers Antitrust Litig.*, 894 F. Supp. 703, 712 (S.D.N.Y. 1995) ("An overt act need not be pleaded against each defendant, because a single overt act by just one of the conspirators is enough to sustain a conspiracy claim"). Given the strength of the CCAC's allegations, it is highly likely that more inculpatory communications will be uncovered in discovery.

conspiracy than of conscious parallelism.'" *Auto. Alignment & Body Serv., Inc. v. State Farm Mut. Auto. Ins. Co.*, 953 F.3d 707, 726 (11th Cir. 2020) (emphasis added, quotation omitted). Plaintiffs have presented ample direct evidence of Defendants' anticompetitive agreement. As such, the CCAC is sufficient on that basis alone. Even so, Plaintiffs have sufficiently alleged circumstantial evidence of Defendants' agreement (i.e., both parallel conduct and sufficient plus factors) to push "their claims across the line from conceivable to plausible." MTD at 16 (citations omitted).[10]

### i. Defendants' parallel conduct implies the existence of coordinated activity and a conspiracy

"Parallel conduct occurs when competitors act similarly or follow the same course of action —for example, adopting similar policies at or around the same time in response to similar market conditions." *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 915 (N.D. Cal. 2019) (citations omitted). Parallel conduct may be found by a simple review of the factual record which reveals Defendants acting similarly. *See, e.g.*, *In re Delta/Airtran Baggage Fee*, 245 F. Supp. 3d 1343, 1370–71 (N.D. Ga. 2017) (simultaneous introduction of $15 bag fee); *City of Tuscaloosa v. Harcros Chems.*, 158 F.3d 548, 572 (11th Cir. 1998) (parallel changes in price based on market data). "Where a conspiracy claim rests on allegations of parallel conduct [by defendants], a plaintiff must allege sufficient 'plus factors' to make the parallel conduct 'more *probative* of conspiracy than of conscious parallelism.'" *Auto. Alignment & Body Serv., Inc. v. State Farm Mut. Auto. Ins. Co.*, 953 F.3d 707, 726 (11th Cir. 2020) (emphasis added, citation omitted).[11]

---

[10] The CCAC is replete with circumstantial evidence—both economic and noneconomic—of conspiracy. *See United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 536 n.13 (1973) ("circumstantial evidence is the lifeblood of antitrust law."). Circumstantial evidence is usually of two types: "economic evidence suggesting that the defendants were not in fact competing, and noneconomic evidence suggesting that they were not competing because they had agreed not to compete." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655 (7th Cir. 2002); *see also Delta/AirTran Baggage Late Fee*, 733 F. Supp. 2d at 1360 (N.D. Ga. 2017) ("unlawful conspiracies may be inferred when collusive communications among competitors precede changed/responsive business practices").

[11] Eleventh Circuit courts have stressed that, at the pleadings stage, a plaintiff need only make out a plausible claim, leaving the plus factors analysis for summary judgment. *See In re LTL Shipping Servs. Antitrust Litig.*, No. 1:08-MD-01895-WSD, 2009 WL 323219, at *10 n.7 (N.D. Ga. Jan. 28, 2009) (explaining that "plus factors" analysis is for summary judgment and that at the motion to dismiss stage, "[t]he Court is required to accept the plaintiff's factual allegations as true, and in the antitrust context to evaluate whether the plaintiff's allegations raise a reasonable expectation that discovery will reveal evidence of illegal agreement"); *In re Delta/AirTran Baggage Fee*, 733 F. Supp. 2d at 1360 n.8 (explaining that summary judgment standard involving "plus factors"

Defendants engaged in virtually identical, highly-correlated and simultaneous (i.e., parallel) conduct which, when considered in light of the plus factors outlined below, implies the existence of the alleged conspiracy. *See Twombly*, 550 U.S. at 553. Defendants' argument that Plaintiffs "do not plausibly allege parallel conduct among the defendants" (MTD at 16) is nullified by the specific allegations in the CCAC detailing how on January 28, 2021, the Brokerage Defendants and the Clearing Defendants coordinated and implemented identical or near-identical restrictions prohibiting retail investors from purchasing the Relevant Securities *less than 24 hours after* Citadel Securities acquired massive short positions in the Relevant Securities.[12] ¶¶ 13, 192, 216, 234-55, 267-77, 292-95, 308-09, 350-61. Defendants' coordinated and highly unprecedented conduct in restricting the Relevant Securities infers an illicit agreement between Defendants. *See United States v. Apple, Inc.*, 791 F.3d 290, 315 (2d Cir. 2015) ("Parallel conduct alone may support an inference of conspiracy, moreover, if it consists of complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason.").

Defendants attempt to proffer an alternative explanation as to why Defendants acted in unison.[13] MTD at 16-18. But Defendants misapply the law. "The question at the pleading stage is

---

expressed in *Williamson Oil* "is not applicable at the motion to dismiss stage, where a plaintiff is only required to allege enough facts to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement"); *N. Jackson Pharm., Inc. v. Express Scripts Inc.*, 345 F. Supp. 2d 1279, 1285 (N.D. Ala. 2004) (explaining that "plus factors" standards expressed in *Monsanto*, *Williamson Oil*, and *Todorov* are not applicable at motion to dismiss stage, and "there is no need for an antitrust plaintiff to allege a 'plus factor [which] generates an inference of illegal price fixing'") (quoting *Williamson Oil*, 346 F.3d at 1301).

[12] Defendants argue that alleged parallel conduct "varied in material ways," and cannot support the inference of a conspiracy. MTD at 18-19. This argument also fails. First, the Brokerage Defendants' purchasing restrictions did not vary in "material ways." The wholesale purchasing restrictions, while not exactly the same, had the same goal and the same effect—artificially decreasing the price of the Relevant Securities. Second, Defendants' reliance on *Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 105 (2d Cir. 2018) to support this argument is misplaced. In *Anderson News*, the appellate court was tasked with reviewing a *summary judgment* decision; however, the application before the Court is a motion to dismiss. Accordingly, *Anderson News* is not dispositive. *See id.* at 91.

[13] In relying on their "alternative explanation" theory, Defendants misapply the law. MTD at 16-18. In *In re Florida Cement & Concrete Antitrust Litig.*, this Court stated that "[a]fter *Twombly*, to successfully plead a section 1 claim *based on defendants' conduct alone*, plaintiffs must allege facts that make the existence of a preceding unlawful agreement the most plausible explanation

not whether there is a plausible alternative to the plaintiff's theory; the question is whether there are sufficient factual allegations to make the complaint's claim plausible." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 191 (2d Cir. 2012) at 189. Plaintiffs' claims are plausible—and the CCAC is sufficient.[14]

Defendants further argue that brokerages "not alleged to have been conspirators" also imposed trading restrictions and that this fact directly refutes the plausibility of Plaintiffs' claims. MTD at 18. While true that certain brokerages, such as Charles Schwab and TD Ameritrade, placed restrictions on certain transactions (e.g., increased margin requirements), neither firm restricted retail investors from purchasing the Relevant Securities. ¶¶ 198-99. In fact, Charles Schwab and TD Ameritrade's restrictions bolster Plaintiffs' claims by demonstrating how Defendants should have reacted in response to market volatility and volume, if not for the conspiracy.

### ii. Plaintiffs allege numerous specific plus factors inferring conspiracy

Plus factors are "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *Twombly*, 550 U.S. at 557 n.4 (quoting 6 AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 1425, at 167-85 (2d ed. 2003)). Plus factors "remove . . . evidence from the realm of equipoise and render that evidence more probative of conspiracy than of conscious parallelism." *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1301 (11th Cir. 2003). "[A]ny showing by [Plaintiffs] that 'tend[s] to exclude the possibility of independent action' can qualify as a 'plus factor.'" *Id.* at 1301 (citation omitted)); *id* at 1303 ("Evidence that tends to exclude the possibility of independent action *necessarily* tends to establish collusion."); *see also*

---

for defendants' behavior." 746 F. Supp. 2d 1291, 1308 (S.D. Fla. 2010) (emphasis added). As set forth directly below, Plaintiffs allege a plethora of plus factors to show that Defendants' "parallel conduct is more probative of conspiracy" than of independent conduct. *Salmon*, 2021 WL 1109128, at *10.

[14] Plaintiffs' claim survives even considering Defendants' alternative theory. Namely, Defendants argue that the increased NSCC collateral requirements provide an "obvious alternate explanation" for the Brokerage Defendants' parallel trading restrictions. MTD at 17 (citing *Twombly*, 550 U.S. at 567). This theory, however, is negated by the fact that 1) Robinhood was able to meet its increased collateral requirement *before the market opened* on January 28, 2021 (¶ 340); 2) other brokerages did not receive increased collateral calls (MTD at 17); and 3) Apex admittedly did not restrict trading as a result of any increased collateral requirement (¶¶ 341, 480-81).

*Delta/Airtran Baggage Fee*, 245 F. Supp. 3d at 1371 ("There is no finite list of potential plus factors.").

Contrary to Defendants' assertion (MTD at 20-26), Plaintiffs allege a plethora of "plus factors" demonstrating that Defendants' "parallel conduct is more probative of conspiracy" than of independent conduct. *Salmon*, 2021 WL 1109128, at \*10 (citation and quotation marks omitted). The CCAC is replete with specific factual allegations—Defendants' common motive to conspire, actions against unilateral self-interest, opportunity to coordinate and collude, evidence of concealment and pretext, and the existence of government investigations—that courts have identified as indicative of concerted action and coordinated, not unilateral, conduct. ¶¶ 362-493. *See Merck-Medco Managed Care, LLC v. Rite Aid Corp.*, No. 98-2847, 1999 WL 691840, at \*9 (4th Cir. 1999) (citing *City of Tuscaloosa*, 158 F.3d at 571 n.35; *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253-54 (2d Cir.)) ("While the Supreme Court has not recounted a list of plus factors, numerous plus factors, such as 'motive to conspire,' 'opportunity to conspire,' 'high level of inter-firm communications,' irrational acts or acts contrary to a defendant's economic interest, but rational if the alleged agreement existed, and departure from normal business practices, have been considered by other circuits."); *see also In re Salmon*, 2021 WL 1109128, at \*14–18 (S.D. Fla. Mar. 23, 2021).

## 1. Defendants had a common motive to conspire

"Where the circumstances are such as to warrant a jury in finding that the conspirators had a unity of purpose . . . the conclusion that a conspiracy is established is justified." *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946); *see also Salmon*, 2021 WL 1109128, at \*10 (S.D. Fla. Mar. 23, 2021) (considering common motive to conspire as a plus factor); *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004) (same). Defendants' argument that Plaintiffs' "fail to plausibly allege that Defendants had a common motive to conspire" is inaccurate. MTD at 20. Defendants claim to not have "collective interest in acting in concert to achieve an anticompetitive end." *Id.* (citing *Musical Instruments & Equip., 798 F.3d at 1194*). But, as alleged in the CCAC, and as set forth below, Defendants had a collective interest in maintaining their mutually beneficial business relationships. ¶ 406-19.

Plaintiffs allege that Citadel Securities accumulated large short positions in the Relevant Securities. ¶¶ 285, 295, 406-08. There was a significant increase in dark pool trading activity in the week beginning January 25, 2021, the bulk of that trading activity is attributable to Citadel Securities, and short volume reporting is consistent with Citadel taking on a large short position

immediately prior to the trading restrictions. ¶¶ 350-61. As the price of the Relevant Securities increased, so did Citadel Securities's short exposure. ¶ 408. As a result, Citadel Securities was subject to potentially infinite losses if it could not stop the price of the Relevant Securities from surging. ¶ 406. To stop the price surge and stave off billions of dollars in losses, Citadel Securities leveraged its relationships with the Brokerage and Clearing Defendants and reached an agreement to halt retail investors from purchasing the Relevant Securities. ¶¶ 408-09. Prior to the implementing this agreement, Citadel Securities entered into new short positions in the Relevant Securities at peak prices. Once the agreement was in place, Citadel Securities was able to profit from the orchestrated decrease in share price. *Id.*

Although the decision to restrict trading in the Relevant Securities is against the Brokerage and Clearing Defendants' self-interest (as discussed below at Part IV.A.b.ii.2, *infra*), each had a financial stake in the conspiracy through their lucrative payment for order flow relationships with Citadel Securities. For example, Citadel Securities was responsible for 34% of Robinhood's revenues in 2020, and in the first quarter of 2021 alone, Citadel Securities paid Robinhood over $141 million for PFOF, a controversial practice ripe for illegal coordination. ¶¶ 135, 283-85. This relationship was strong, indeed crucial to the business model of Robinhood.[15] Robinhood is not the only Defendant to profit from payment for order flow, nor is Robinhood the only defendant to direct order flow to Citadel Securities; every Brokerage Defendant, Apex and ETC profit from selling order flow. ¶¶ 107, 138-40, 416, 418. Based on the foregoing, Defendants' argument that the CCAC fails to allege that Citadel Securities "offered any financial inducement for the Introducing Brokers or Clearing Broker Defendants" carries no weight. MTD at 21. The preservation of Brokerage and Clearing Defendants' mutually beneficial and highly lucrative payment for order flow relationships alone provides sufficient motive to conspire.

Defendants further contend that Plaintiffs "fail to allege *any* facts to establish that Citadel Securities held short positions in the Relevant Securities." MTD at 20. This argument is flawed. First, while true that it is difficult to ascertain which investor has a short position in any particular securities at any particular time, the CCAC is rife with facts that support Plaintiffs' allegation that

---

[15] High level executives of Robinhood and Citadel Securities stated the firms had a "strong relationship" and that they viewed the relationship as a "partnership." ¶ 412.

Citadel Securities acquired short positions in the Relevant Securities. [16] Second, Defendants' argument that there is nothing "establishing" that Citadel held short positions in the Relevant Securities is improper at the pleading stage. This fact is specifically alleged. The Court must "accept the factual allegations in the complaint as true and make all reasonable inferences in favor of the non-moving party." *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns., Inc.*, 376 F.3d 1065, 1070 (11th Cir. 2004); *see also Plasma-Derivative*, 764 F. 2d at 1002 n.10 ("[i]f private [antitrust] plaintiffs, who do not have access to inside information, are to pursue violations of the law, the pleading standard must take into account the fact that a complaint will ordinarily be limited to allegations pieced together from publicly available data.")

The CCAC contains publicly available data establishing that short positions increased leading up to January 28, 2021, and dropped significantly thereafter. ¶¶ 342-49. FINRA data shows notable and significant increases in dark pool trading activity for each of the Relevant Securities on and around January 28, 2021, consistent with institutional investors taking advantage of the trading restrictions to exit their vulnerable short positions at the expense of retail investors. ¶ 353. FINRA OTC transparency data further indicates that the bulk of the elevation in dark trading activity for the week of January 25, 2021 can be attributed to Citadel Securities. ¶¶ 358-61. Defendants' concerted activity resulted in lockstep price movements of the Relevant Securities that can only be explained by concerted actions by Defendants, in particular when considering retail investors were only permitted to *sell* positions in the Relevant Securities. ¶¶ 317-18.

Market data supports the inference of a coordinated scheme by Defendants to restrict retail trading to profit on short positions through large-scale dark pool trading. Where Defendants' actions or resulting market conditions would be unlikely to occur without collusion—i.e., if the Defendants were engaging in competition—the jury may infer collusion and that Defendants were taking actions in order to protect each other. *See City of Tuscaloosa*, 158 F.3d at 572; *Salmon*, 2021 WL 1109128, at *14 (considering "market dynamics and conditions").

### 2. Defendants' actions are against unilateral self-interest

Even without evidence of an explicit agreement, the jury can infer an agreement from the commission of an act that would normally be against a Defendant's individual self-interest. That

---

[16] Since Citadel paid hundreds of millions of dollars for order flow it was in a unique position to measure its positions against real time trading information which itself was fulfilling. This information, especially in the context of millions of fractional share trades, allowed significant financial gain even in the face of restricting the core function of getting paid by making trades.

is enough to infer that the Defendants participated in the scheme. *Interstate Cir. v. United States*, 306 U.S. 208, 226-27 (1939); *City of Tuscaloosa*, 158 F.3d at 572 ("defendants would not have acted as they did had they not been conspiring in restraint of trade"). "[T]he plaintiff must establish that each defendant would have acted unreasonably in a business sense if it had engaged in the challenged conduct unless that defendant had received assurances from the other defendants that they would take the same action." *City of Tuscaloosa*, 158 F.3d at 571 n.33 (citation and quotation marks omitted).

Defendants argue that Plaintiffs "fail to allege any actions taken by Defendants against their self-interest that are probative of a conspiracy," because there is no "*collective* self-interest." MTD at 22. This misconstrues the law. The insight underlying this plus factor is that individuals would ordinarily act in their own self-interest—particularly profit maximizing businesses—and if they took acts which are contrary to that inference, one can reasonably conclude that the act was not the product of independent unilateral conduct, but instead, a result of an agreement or understanding. *Disposable Contact Lens*, 215 F. Supp. 3d at 1294-97. Moreover, Plaintiffs allege that *each* defendant took actions against *their own* self-interest. *See* ¶¶ 420-40. And Defendants concede as such. *See* MTD 22-23 ("such restrictions create a real risk of both immediate and long-term reputational harm … the restrictions cost each broker revenue—fewer trades mean fewer payments for order flow (or fewer commissions) for the Clearing and Introducing Brokers Defendants, and less spread capture for the Market Makers"). Simply put, if a broker were to unilaterally restrict trading, they would lose investors to other brokers who were not restricting *unless* the broker knew others were restricting. Because imposing such restrictions were so against Defendants' individual self-interest, any act to restrict trading would be sufficient. Here, there were multiple identical acts against self-interest—the decision to restrict trading—which is not only highly suggestive, but highly corroborative, of concerted action or agreement.

### 3. Defendants had ample opportunity to coordinate and collude

Opportunities to conspire plausibly suggest an antitrust violation because they "facilitated Defendants' ability to . . . conspire." *Salmon*, 2021 WL 1109128, at *16 & n.27. Defendants argue that the "CCAC [] lacks sufficient allegations of opportunities between Defendants to enter into the supposed conspiracy and conceal such an agreement." MTD at 23. This argument is nonsense. Plaintiffs allege numerous opportunities to conspire, and moreover, have documented numerous confidential inculpatory or suspicious communications. For example, Defendants communicated

on the telephone or through agents, including lawyers. Plaintiffs provide ample evidence that Defendants had numerous opportunities to conspire to restrain trade and did exactly that. ¶ 449.

Defendants had ample opportunity to conspire. The financial industry is close-knit and secretive, replete with specialized jargon and terminology. ¶ 445. Individuals within the industry frequently move from one company to another and often work closely with competitors. For example, Robinhood previously used Apex as its clearing firm (¶¶ 447, 450), and Citadel Securities has a payment for order flow relationship with the other Defendants (¶¶ 133-40; 306). These pre-existing relationships allowed Defendants to communicate swiftly and effectively with one another to effectuate the conspiracy. ¶ 296.

Not only do Plaintiffs allege that Defendants had ample opportunity to coordinate, the CCAC shows that they did—as described above in Part IV.A.a, *supra*, the CCAC contains specific instances of communications by and between Defendants leading up to, during, and after the imposition of the January 28, 2021 trading restrictions, which reveal that Defendants were regularly in contact with one another. ¶¶ 296, 441-57. Evidence of the conspiratorial communications between the Clearing Defendants and the Brokerage Defendants, as well as between the Market Maker Defendant and the Brokerage Defendants (*see, e.g.*, ¶¶ 441-57), suffices at the motion to dismiss stage. *Salmon*, at *10 ("evidence of a high level of interfirm communications" a plus factor). Defendants provide no authority requiring this plus factor to include evidence of communications between each pertinent entity, as they seem to suggest. MTD at 23-25. It is hornbook law that "[p]articipation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the desired result." *Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980) (citing *Am. Tobacco*, 147 F.2d at 119); *see also Akwuba*, 7 F.4th at 1307 (conviction for conspiracy proper even if participation is "slight").[17]

Defendants attempt to avoid these specific allegations by complaining that "after reviewing tens of thousands of pages of discovery," Plaintiffs "point to only a handful of inter-firm communications in their complaint." MTD at 23. This argument is a red-herring. First, the court

_____

[17] Defendants' argument that direct communications are a plus factor is illogical. Direct communications are direct evidence of participation. If plaintiffs allege direct evidence, the inquiry ends there—no further examination is required. *See In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 440-41 (E.D. Pa. 2018) (plus factors "'serve as proxies for direct evidence of an agreement'") (quoting *In re Flat Glass*, 385 F.3d at 360).

has stayed discovery. The Court has permitted Plaintiffs to obtain a limited set of materials which Defendants had previously produced in response to subpoenas and requests from government regulators in the aftermath of the events giving rise to this lawsuit. They were the products of requests of others and were limited in scope. *See* ECF No. 323. Plaintiffs have not had the benefit of full discovery; yet have still uncovered numerous inculpatory communications. Second, as discussed in Part IV.A.b.iii.4, *infra*, many of the uncovered communications are cryptic in nature and make arrangements for further substantive discussions through telephone calls, implying that Defendants effectuated the conspiracy through unrecorded means that would not appear in the documents produced. ¶ 461. Elusive practices that while not in themselves illegal may still lead to the inference of the existence of a conspiracy. *Salmon*, at *10 (S.D. Fla. Mar. 23, 2021) ("evidence of a high level of interfirm communications" a plus factor).

### 4. Plaintiffs allege evidence of concealment and pretext

Pretextual statements and explanations support an inference of an illegal conspiracy. *See In re: McCormick & Co., Inc.*, 217 F. Supp. 3d 124, 132 (D.D.C. 2016) (considering pretext as a plus factor); *ChoiceParts, LLC v. Gen. Motors Corp.*, 203 F. Supp. 2d 905, 910 (N.D. Ill. 2002) (same). And, "Plaintiffs need not rebut [Defendants' asserted] reasons to defeat a motion to dismiss." *See Salmon*, 2021 WL 1109128, at *15.

The suspicious timing and the cryptic nature of certain of the interfirm communications support the inference of an illegal conspiracy. ¶ 461. For example, days before the trading restrictions were imposed, high level executives of Robinhood and Citadel communicated and reached an express agreement. The substance of their agreement was deliberately omitted from their written communications and further discussions were held via unrecorded means. ¶¶ 297-303. Additionally, on January 27, 2021—*less than 24 hours before the purchasing restrictions were imposed*—an unrecorded telephone conversation transpired between high level employees of Citadel Securities and Robinhood to presumably discuss PFOF, but the exact substance and nature of the discussion is unknown. ¶¶ 305-09. Similarly, Apex instructed brokers to restrict trading "verbally," i.e., through unrecorded means, ¶ 341; 444. Further, Defendants' employees attempted to conceal communications by copying lawyers and explaining they were doing so "for privilege," with no indicia of asking for legal advice. ¶ 333, 462. Unrecorded communications between coconspirators are hallmarks of antitrust conspiracies. *See*, *e.g.*, *In re Flat Glass*, 385 F.3d at 364-65 (conspirators coordinated price increases via phone calls placed in hotel rooms) *In re Urethane*

*Antitrust Litig.*, 913 F. Supp. 2d 1145, 1155-56 (D. Kan. 2012) (executives used telephones to contact one another and conducted meetings in off-site locations where they could speak in confidence in close proximity to coordinated price increase announcements).

In addition to suspicious communications, Plaintiffs' antitrust claims are bolstered by pretextual statements that provide evolving, inconsistent and conflicting explanations for the trading restrictions.[18] ¶¶ 459-81. Robinhood initially attributed the trading restrictions to market volatility, only to later assert that clearinghouse collateral requirements forced Robinhood to impose said restrictions. ¶¶ 253, 338, 466, 468. However, contrary to its explanations, Robinhood was in fact able to meet its January 28 clearinghouse collateral requirement a little after 9:00 AM EST and *before the stock markets opened*. ¶¶ 340. Yet, Robinhood nonetheless decided to restrict purchases of the Relevant Securities throughout the entirety of the trading day and continued to place restrictions on the Relevant Securities up to and including February 4, 2021. ¶¶ 336, 340. Meanwhile, Robinhood's Chief Executive Officer ("CEO") publicly denied that Robinhood had a liquidity problem. ¶ 467. This assertion is in stark contrast to an internal message from Robinhood's Chief Operating Officer the same day which revealed that, in fact, Robinhood had "major liquidity issues." ¶ 233. Robinhood's statements were further contradicted by the DTCC.[19]

Apex also presented conflicting explanations as to why it restricted trading. ¶¶ 478-81. Although Apex cited increased collateral requirements as the reason for the restrictions, Apex later admitted that it was not subject to any heightened collateral requirements but rather made the decision to restrict trade based solely on a "potential future" collateral requirement despite having sufficient capital and available lines of credit. ¶¶ 479-81.

---

[18] Statements by government regulators contradict Defendants' statement that their restrictions were necessary to comply with government requirements. In statements issued on January 27, January 29, and thereafter, the SEC never called on Defendants to restrict trading. ¶¶ 200, 337. SEC's statements therefore rebut any argument that Defendants implemented their trading restrictions to comply with any legal requirements. There is no provision under SEC, DTCC, NSCC, or FINRA rules that allows broker-dealers to unilaterally decline, restrict, or prevent trading because market conditions make executing trading unprofitable. ¶¶ 432-40.

[19] Michael Bodson, the President of DTCC, stated in testimony to the House Financial Services Subcommittee that the decision to restrict trading was internal to Robinhood and DTCC and NSCC did not have discussions about restricting securities. ¶ 472.

### 5. Multiple government investigations are indicative of collusion

Government investigations are indicative of anticompetitive collusion. *See e.g.*, *In re Salmon*, 2021 WL 1109128, at *17; *In re Diisocyanates Antitrust Litig.*, No. 18-1001, 2020 WL 1140244, at *2 (W.D. Pa. Mar. 9, 2020); *In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 451 (E.D. Pa. 2018). Defendants do not contend otherwise. Rather, Defendants argue that in the absence of more substantive allegations, government inquiries alone are insufficient to raise an inference of a conspiracy. MTD at 25 (citations omitted). Such is not the case here. As alleged in the CCAC, Plaintiffs have sufficiently pleaded both direct and circumstantial evidence, including specific plus factors, to support their claims of a conspiracy. Accordingly, this Court may consider the many investigations (including the issuance of grand jury subpoenas) related to Defendants' conduct as indicative of collusion.[20]

### 6. Structural characteristics of the securities market support the existence of an anticompetitive agreement

Defendants concede that courts generally recognize that economic factors and market characteristics, such as "high market concentration," "significant barriers to entry" and a "commoditized product," "contribute to [a] circumstantial case." MTD at 26 (citing *Salmon Antitrust Litig.*, 2021 WL 1109128, at *14). Defendants instead contend that the structural characteristics of the market here "do[ ] nothing to support Plaintiffs' claim." MTD at 26. In so arguing, Defendants attempt to mislead this Court by asserting that Plaintiffs do not define the relevant market. MTD at 27. However, the CCAC makes clear that the relevant market to which Plaintiff refer is the securities market. ¶¶ 362-405. Simply because Defendants may operate in certain segments of the securities market does not mean that structural characteristics of the market at large do not apply.

Indeed, the securities market is by its very nature conducive to collusion and anticompetitive conduct. ¶¶ 362-405. Market characteristics sustaining this allegation include high barriers to entry, a lack of substitutes, a high degree of consolidation, a market that trades mainly on price, high fixed and low variable costs, a commoditized product, captive consumers and an

---

[20] The Securities and Exchange Commission ("SEC"), FINRA, Congress, the Department of Justice, the San Francisco U.S. Attorney's Office, and the Attorneys General of various states are investigating the events concerning the January 28, 2021 trading restrictions. *See* ¶¶ 486-93.

opaque market.[21] *Id.* These market characteristics indicate collusive activity and concerted action. *See Disposable Contact Lens*, 215 F. Supp. 3d at 1295-96.

Defendants do not contest that they operate in a market that requires a large amount of entry capital, as well as specialized knowledge, both financial and technological. *See* ¶¶ 364-67. Once an entrant is able to establish itself in the securities market, variable costs are comparatively low, since it is generally not more expensive to process a large number of trades as it is to process a single trade. ¶¶ 368-73. In addition, the Relevant Securities are homogenous, meaning one share of a Relevant Security is identical to another. ¶¶ 374-76. And, while it may seem as though retail investors could easily jump platforms if they were not able to purchase securities from a certain broker dealer (i.e., the Brokerage Defendants), the process of opening an account takes time, and depending on the type of account being opened, may even require a credit check. ¶¶ 377-85. Indeed, Plaintiffs allege that on January 28, 2021, Plaintiffs Guzman and Miller, both users of Robinhood, applied to open accounts at competing brokerages (e.g., Charles Schwab, Fidelity and TD Ameritrade) because these brokerages did not have purchasing restrictions in place. ¶¶ 23, 25, 33, 35. Despite their best efforts, neither Plaintiff Guzman nor Plaintiff Miller was able to purchase any of the Relevant Securities on January 28, 2021, due to the amount of time required to open their respective new accounts.[22] ¶¶ 25, 35.

Perhaps the most telling market factor rendering the securities market susceptible to collusion is the opaqueness of investors' short positions. ¶¶ 386-405. Investment managers who control over $100 million in assets are required by the SEC to report their long positions, put

---

[21] Courts, scholars and government agencies have long recognized that market structure and characteristics can help assess whether anticompetitive collusion has occurred. *See, e.g.*, *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141, 169 (D. Conn. 2009) ("The EPDM market has many characteristic that would make illegal collusion feasible: (1) EPDM's commodity-like nature; (2) the lack of economic substitutes; (3) the product's price inelastic demand; (4) defendants' dominance of the highly-concentrated market; (5) the barriers to market entry; and (6) defendants' use of national (as opposed to regional) price lists and price increase announcements") (citing *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656-58 (7th Cir. 2002)); RICHARD A. POSNER, ANTITRUST LAW 69-93 (2d ed. 2001) (setting forth plus factors including, *inter alia*, economic factors relating to market structure).

[22] Although Plaintiff Minahan was able to apply for and open an account on Fidelity to purchase a share of GameStop, it was the exception rather than the rule. Indeed, Plaintiff Miller attempted to apply for and open an account with Fidelity (and other brokers) but was unable to. Additionally, the trading restrictions led to a significant selloff of the Relevant Securities, depressing the value of the Relevant Securities that Plaintiff Minahan had purchased before January 28, 2021.

options and call options quarterly via Form 13Fs, but they are not required to disclose their short positions. ¶¶ 389, 391. Moreover, these reports have a reputation for being riddled with errors, making any information gleaned from them extremely unreliable. ¶ 390. Although FINRA requires its member firms to report their short positions in all equity securities twice a month, FINRA reporting is likewise flawed in that short interest reports are not published concurrently with member disclosures and do not capture short intervals of time wherein short positions could have changed dramatically. ¶¶ 344, 396-98. As a result, and as alleged in the CCAC, it is generally impossible to ascertain which investors have a short position in a particular security at any point in time. ¶¶ 343, 387, 399. The foregoing economic market factors paint a picture of a market whose characteristics make it ripe for collusion in violation of the antitrust law.

### 7.    Defendants' acts are inconsistent with unilateral conduct

In evaluating a Section 1 claim, courts look to whether the allegations suggest a "preceding agreement" rather than behavior "that is the result of chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *Disposable Contact Lens*, 215 F. Supp. 3d at 1289. Plaintiffs have pleaded several direct and concrete factual allegations of behavior by Defendants which suggest a collusive agreement rather than permissible unilateral conduct.

By way of example and as described more fully *supra*, Plaintiffs allege that internal communications among Robinhood's upper echelons of management reflect that, in response to the decision to restrict trading to retail investors on January 28, 2021, Robinhood received direct information that "all firms were doing the same thing." ¶¶ 242-45. Further, as described *supra* at Part IV.A.a., Plaintiffs allege numerous contacts between Defendants in the days before the trading restrictions were imposed on January 28, 2021, including many communications on January 27, 2021. Plaintiffs also allege that Defendant Apex, a competitor of Robinhood who had no business relationship with Robinhood at this time, contacted Robinhood on January 29, 2021, to inform them that retail investors had discovered a loophole to the trading restrictions Robinhood implemented. After being notified, Robinhood eliminated this loophole. *See* ¶¶ 327-31. Plaintiffs also allege an agreement between Robinhood and Citadel, suggested by Citadel, to coordinate messaging and copied their corporate General Counsel on the communication in an attempt to cloak the communication under the protection of attorney-client privilege. *See* ¶¶ 332-35. High

levels of interfirm communications before coordinated action is inconsistent with unilateral conduct and consistent with collusion. *See Apple*, 791 F.3d at 315.

### B. Defendants' Anticompetitive Agreement is *Per Se* Unlawful

Whether *per se* rule or rule of reason applies in this action is not ripe for consideration on a Rule 12(b)(6) motion. *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 343 (1982); *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1115 n.16, 1122 (N.D. Cal. 2012) ("the Court need not decide now whether per se or rule of reason analysis applies. Indeed, that decision is more appropriate on a motion for summary judgment."). Whether Plaintiffs' claims should be analyzed under a standard other than the *per se* rule should not be resolved at the pleading stage. *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1038-39 (N.D. Cal. 2013). Such a determination would require adjudication of disputed facts, such as Defendants' purported justifications for the trade restrictions, and requires a more fully developed record. PHILLIP E. AREEDA ET AL., ANTITRUST LAW, ¶ 305e at 69 (3d ed. 2007) ("Areeda") ("Often, however, the decision about which rule is to be employed will await facts that are developed only in discovery").

Defendants erroneously argue that the Court should employ a rule of reason analysis instead of treating the agreements between horizontal competitors as *per se* violations of the antitrust law. Defendants' argument is incorrect. It is premature for the Court to determine whether the *per se* or the rule of reason test applies at the motion to dismiss stage. Even if the Court chooses to make such a determination, Plaintiffs have sufficiently alleged facts giving rise to application of the *per se* rule.

#### a. *Per se* treatment is appropriate here because Plaintiffs allege a horizontal agreement between the Defendants

As alleged, Defendants are horizontal competitors. It is well settled that horizontal agreements are classic *per se* antitrust violations. *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984) ("Certain agreements, such as horizontal price fixing and market allocation, are thought so inherently anticompetitive that each is illegal per se without inquiry into the harm it has actually caused"); *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972) ("One of the classic examples of a per se violation of §1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition"); *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958) ("Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing, division of markets . . . .") (citation omitted).

To evaluate whether conduct is properly analyzed under the *per se* framework, the court "must inquire into whether the restraint, on its face, is a naked restraint of trade that always or almost always tends to restrict output, or an ancillary restraint that results in an efficiency-enhancing integration among the parties to the agreement." *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 10, 23 (1979) (hereinafter "*BMI*") (citations omitted). A horizontal agreement is a naked restraint "if it is formed with the objectively intended purpose or likely effect of increasing price *or decreasing marketwide output in the short run, with output measured by quantity or quality.*" *In re Terazosin Hydrochloride Antitrust Litig.*, 352 F.Supp.2d 1279, 1314 (S.D. Fla. 2005) (emphasis added) (citing 11 HERBERT HOVENKAMP, ANTITRUST LAW ¶ 1906a (2d ed. 2005) (hereinafter "Hovenkamp"). If the agreement presents a "naked restraint of trade with no purpose except stifling competition," it qualifies for *per se* treatment.[23] *Id.*; *see also* Hovenkamp ¶ 1906a ("Once a restraint is classified as 'naked,' condemnation follows almost as a matter of course, most often without elaborate inquiry into power or actual effects and with only a several limited recognition of defenses."). Therefore, *any* horizontal agreement that involves a naked restraint on trade receives *per se* treatment, not just horizontal agreements that involve horizontal price fixing among competitors, group boycotts, and horizontal market division. *See In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1152 (9th Cir. 2019) ("in general, horizontal agreements are analyzed under per se rules") (hereinafter "*NFL Sunday Ticket*").

The agreement among Defendants to impose restraints on the market was not formed as a legitimate business collaboration, but rather was formed with the objective intent to restrict retail investors' access to the stock market and prevent the market from operating freely, thereby decreasing the quality of market output. Defendant's conduct was therefore a naked restraint on trade properly evaluated under the *per se* framework.

---

[23] By contrast, a restraint is ancillary "if its objectively intended purpose or likely effect is lower prices or increased output as measured by quantity or quality." *See* Hovenkamp ¶ 1906a. Ancillary restraints are those that are "an essential or at least important part of some arrangement that has potentially redeeming virtues." *Procaps S.A. v. Patheon Inc.*, 36 F. Supp. 3d 1306, 1327 (S.D. Fla. 2014) (citing Hovenkamp, ¶ 1904, at 251 (1978)). That is, "restraints . . . that are part of a larger endeavor whose success they promote." *Procaps S.A.*, 36 F. Supp. 3d at 1327 (citing *Polk Bros. v. Forest City Enters.*, 776 F.2d 185, 188–89 (7th Cir. 1985)). Additionally, "ancillary" restraints only escape the *per se* rule because they are counterbalanced by an otherwise unattainable procompetitive benefit. *Terazosin*, 352 F. Supp. 2d at 1318. In any event, as explained in Part IV.D., *infra*, there are no redeeming virtues of the anticompetitive restriction here.

Under Section 1 of the Sherman Act, the *per se* rule applies to agreements "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1083 (11th Cir. 2016) (quoting *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978)). *Per se* illegality "avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable." *N. Pac. Ry. Co.*, 356 U.S. 5. Agreements that "have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit . . . are deemed unlawful *per se*." *State Oil v. Khan*, 522 U.S. 3, 10 (1997).

Here, Defendants conspired to completely foreclose retail investors from purchasing the Relevant Securities. This is a textbook restriction on output susceptible to *per se* treatment. "Under antitrust law, some restraints of trade, such as horizontal agreements among competitors to fix prices, restrict output, and divide markets, are generally deemed to be per se unreasonable, and therefore it is unnecessary to apply the rule of reason in order to determine whether such agreements violate Section 1." *NFL Sunday Ticket*, 933 F.3d at 1150, n.5 (citation omitted).

Defendants' argument that Plaintiffs' claims do not warrant *per se* analysis is meritless. Defendants imply, without stating directly, that the conspiracy as one that was between entities in "vertical" relationships, making the conspiracy not subject to *per se* treatment. *See* MTD at 14-15, 29. This characterization is erroneous, as vertical restraints have been found consisting of agreements between firms at different levels of distribution. *See, e.g., Leegin v. Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 882-84 (2007) (manufacturer's refusal to sell goods to its distributors who resold goods at discounts were vertical arrangements warranting Rule of Reason analysis); *Khan*, 522 U.S. 3, 22 (supplier's agreement restricting dealer's ability to sell above a maximum price was a vertical agreement subject to the Rule of Reason); *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1332 (11th Cir. 2010) (manufacturer's establishment of minimum retail prices its distributors could charge for products constituted vertical agreements subject to the Rule of Reason).

The CCAC alleges that Defendants dealt in transactions of the Relevant Securities by: receiving orders for the Relevant Securities placed by retail investors (Introducing Brokers; Self-Clearing Brokers); executing, settling, and maintaining orders for the Relevant Securities, (Independent Clearing Firms; Self-Clearing Brokers); or filling orders for the Relevant Securities

(Market Makers). ¶¶ 105-24. While these entities may not have played the same role in the process of executing a transaction upon behalf of the Retail Investors, such a dynamic is not evidence of "vertical relationships" and therefore, does not preclude *per se* treatment. The facts alleged do not describe a vertical relationship where Defendants were at "different levels of distribution."

Plaintiffs' allegations evidence an unlawful horizontal agreement by Defendants engaging in anticompetitive conduct by restricting markets and limiting transactions which could be placed in a free and fair market. *See United States v. Gen. Motors Corp.*, 384 U.S. 127, 145 (1996) (conspiracy involving a car manufacturer, dealers, and dealer associations to prevent other dealers from selling at a discount constituted a *per se* violation of the Sherman Act.); *cf. In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1259-60 (N.D. Ala. 2018) (explaining that in the Eleventh Circuit, an antitrust plaintiff's ability to proceed on a *per se* theory depends on whether there was an agreement to commit conduct that the Supreme Court has held to be unreasonable *per se*, and not strictly on whether the plaintiff has shown the agreement to have no plausible procompetitive benefits, that judicial experience has confirmed the agreement is anticompetitive, and that the agreement has a purely horizontal character.) (internal quotations omitted) (alterations in original); *Disposable Contact Lens*, 215 F. Supp. 3d at 1279 (alleged conspiracy in which contact lenses manufacturer, eye care professionals, trade association, and wholesaler conspired to maintain price for contact lenses stated a *per se* violation of the Sherman Act).

In this regard, Plaintiffs sufficiently allege that Defendants engaged in an anticompetitive scheme. *See* ¶¶ 210-78. Plaintiffs demonstrate that Brokerage Defendants, Clearing Defendants, and Market Maker Defendants conspired to restrict Plaintiffs and retail investors from purchasing the Relevant Securities,[24] halting the price appreciation for the Relevant Securities, thereby fixing

---

[24] Defendants are wrong to assert they are not subject to the antitrust laws because their concerted activity lowered prices, rather than raising them. The antitrust law applies equally to buyers and sellers. The Supreme Court has repeatedly held that the Sherman Act applies with equal force to anticompetitive conduct by purchasers and horizontal price fixing by sellers. *Radovich v. Nat'l Football League,* 352 U.S. 445, 453-54 (1957) (purchasers of labor); *Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.,* 334 U.S. 219, 235 (1948) (purchasers of sugar beets); *Anderson v. Shipowners Ass'n of the Pac. Coast,* 272 U.S. 359, 364-65 (1926) (purchasers of labor). The Court has confirmed the governing principle that "antitrust law forbids all agreements among competitors . . . that unreasonably lessen competition among or between them in virtually any respect whatsoever." *Brown v. Pro Football, Inc.,* 518 U.S. 231, 241 (1996). Defendants cite *In re*

and stabilizing their price at artificially low levels. ¶¶ 14-16, 210-78.[25] These alleged facts demonstrate that Defendants' scheme was "plainly anticompetitive [and] that no elaborate study of the industry is needed to establish their illegality," as Plaintiffs describe in detail how Brokerage Defendants and Clearing Defendants agreed to impose restrictions that prevented retail investors from trading in the Relevant Securities, eliminating their availability to the benefit of the Market Maker Defendants. *See* ¶¶ 210-78; *ProCaps*, 845 F.3d at 1083.

Defendants attempt to avoid *per se* treatment by contending that they "participate in a different market." MTD at 29. This contention is incorrect and conflicts with the allegations of the CCAC.[26] The CCAC alleges that retail investors purchased the Relevant Securities based on independent research, putting institutional investors in a distressed short position because of their existing positions in the securities. The fact that the retail investors, as opposed to the Brokerage Defendants, made the purchases of the Relevant Securities does not preclude *per se* treatment.[27] The Court should reject this misguided attempt to remove Plaintiffs' claims from *per se* treatment.

---

*Publication Paper Antitrust Litigation*, 690 F.3d 51, 61 (2d Cir. 2012), which in turn quotes *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222 (1940), to suggest that an antitrust plaintiff must demonstrate that defendants entered into a conspiracy to *raise* prices. Defendants improperly omit the full quotation from *Socony-Vacuum Oil*, which states, "[a]n agreement to pay or charge rigid, uniform prices would be an illegal agreement under the Sherman Act. *But so would agreements to raise or lower prices whatever machinery for price-fixing was used.*" *Id.* at 222 (emphasis added). In other words, it is the *agreement* to fix or stabilize prices through market manipulation, not the direction of the manipulation that matters for purposes of determining whether the *per se* rule applies. *See Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1545-46 (11th Cir. 1996). Plaintiffs satisfy this standard. ¶¶ 495-507.

[25] The purchase prohibition restricting the market also lowered the value of those securities being held by Plaintiffs in their brokerage accounts. Concomitantly, brokerage customers who used margin or traded options were further financially impacted.

[26] The cases Defendants cite lend no support to their position. *See Texaco Inc. v. Dagher*, 547 U.S. 1, 8 (2006) (declining to apply *per se* treatment because the Defendants set prices through a joint venture); *BMI*, 441 U.S. 1 at 18-21 (blanket licensees consistent with the Copyright Act were not *per se* violations because they reduced industry costs).

[27] Defendants' rhetorical flourish that the trading activity and price movements were unprecedented is not true as professional traders and hedge funds have engaged in short squeeze plays for decades. The only unique facet here is that retail customers were able to use the Brokerage Defendants' platforms to profit in the same way as professional traders. While Defendants are correct in their assertion that what occurred was unprecedented, they miss the mark on correctly identifying it—**what was unprecedented was the decision by Brokerage Defendants to impose restrictions upon Retail Investors that restricted only purchasing of the Relevant Securities and not selling of the same, while permitting institutional investors such as their coconspirators to continue trading unfettered.**

### b.       Plaintiffs have alleged a hub and spoke conspiracy susceptible to *per se* treatment

Assuming *arguendo* that Citadel Securities is in a vertical, rather than horizontal relationship with the other Defendants,[28] Plaintiffs' claims should nevertheless receive *per se* analysis because Plaintiffs have also pleaded a hub and spoke conspiracy.[29] A traditional hub-and-spoke conspiracy consists of (1) a hub; (2) spokes, i.e., firms that deal in the same product and that enter into vertical agreements with a hub; and (3) an agreement between the firms. *See Musical Instruments & Equip.*, 798 F.3d at 1192-93.

A hub-and-spoke conspiracy is subject to *per se* treatment when the vertical actors serve to coordinate a horizontal agreement to restrict markets or to fix prices. *Apple*, 791 F.3d at 323; *see also United States v. Gen. Motors Corp.*, 384 U.S. 127, 145 (1966); *Toys "R" Us, Inc. v. Fed. Trade Comm'n.*, 221 F.3d 928, 936 (2000) (Toy retailer acting as "hub" and entering into vertical agreements with manufacturers to limit supplies of toys to warehouse stores was *per se* unlawful). That is the case here.

In *In re Disposable Contact Lens Antitrust*, the court found a hub-and-spoke agreement subject to *per se* treatment. 215 F. Supp. 3d 1272, 1279-1286. Much like the instant action where Defendants perform different functions within the securities' market, the conspirators in *Disposable Contact Lens* (manufacturers, wholesalers, a trade association, and eye care professionals) performed different functions within the contact lens market. The eye care professionals (ECPs), acting through contact lens wholesaler, entered into vertical agreements with the manufacturers to implement price restraints for the contact lenses. Applying a hub-and-spoke analysis, the court analogized the wholesaler and the ECPs as the "hub" that facilitated and assisted in the enforcement of the vertical agreements (i.e., the agreements between the ECPs and the

---

[28] Robinhood, Apex, ETC, and other Defendants sell order flow to Citadel Securities which could be construed as a vertical relationship. Because Citadel takes routed orders to settle them, it follows that Citadel would be on the same horizontal level of distribution as clearing entities such as Apex, Robinhood Securities (Robinhood's clearing entity), and other Clearing Defendants. In any event, the difficulty of classifying Citadel's level of distribution reinforces Plaintiffs' position that it is premature to determine whether the *per se* rule or rule of reason apply.

[29] The first antitrust case against a hub and spoke conspiracy never used the term hub and spoke. *See Interstate Cir. v. United States*, 306 U.S. 208 (1939). A later loan fraud conspiracy case used the metaphor of a hub and spoke of a wheel, while finding that there was no actual "rim" or horizontal agreement. *Kotteakos v. United States*, 328 U.S. 750, 756 (1946) (finding that without horizontal agreements among the rim parties, there may be multiple conspiracies, but not one unifying conspiracy.

manufacturers); the court also found a horizontal agreement between the manufacturers (the "spokes"). *Id.* at 1299.

Plaintiffs have sufficiently pleaded a hub-and-spoke conspiracy akin to the one found in *Disposable Contact Lens*. Here, Citadel served as the "hub" that facilitated the trading restrictions with the Brokerage Defendants (the "spokes") who agreed to implement them. ¶¶ 282, 296-317, 452-56. Citadel stood to benefit from these restrictions, as the restrictions helped Citadel avoid substantial losses resulting from their distressed short positions in the Relevant Securities. ¶¶ 406-11. In furtherance of the conspiracy, Citadel also served as an intermediary for communications between the Brokerage Defendants, the spokes.

Plaintiffs further plead a horizontal agreement between Brokerage and Clearing Defendants. Following the drastic share price increase of the Relevant Securities, high-level employees of the Brokerages coordinated trade restrictions. ¶¶ 243-45, 308. Brokerage Defendants and other non-party brokers announced via social media and other media sources that they were restricting trades in the Relevant Securities. ¶¶ 247-52. Additionally, Apex informed brokerages to restrict trading on the Relevant Securities. ¶¶ 443-44, 457. Apex also informed Robinhood when retail investors attempted to evade Robinhood's trade restrictions evidencing the horizontal agreement between the spokes, i.e., the wheel around the spokes. ¶¶ 327-330. The elimination of competition was organized and facilitated by this hub and spoke arrangement, which successfully altered the market by artificially depressing the volume of Relevant Securities' purchases and depressing the Relevant Securities' price. These allegations are more than sufficient to establish an agreement among the "spokes" of the conspiracy. *Apple*, 791 F.3d at 314 (Hub and spoke arrangements "consist of *both* vertical agreements between the hub and each spoke and a horizontal agreement among the spokes 'to adhere to the[hub's] terms,' often because the spokes 'would not have gone along with [the vertical agreements] except on the understanding that the other [spokes] were agreeing to the same thing.'") (citations omitted).

In sum, Plaintiffs allege that the hub and spoke conspiracy consisted of (1) Citadel Securities serving as the hub; (2) the Brokerage Defendants, Apex, and other Clearing Defendants serving as spokes, implementing the vertical trade restrictions directed by Citadel; and (3) a resulting horizontal agreement between Clearing and Brokerage firms to implement, coordinate, and maintain the restrictions. Taken as a whole, these allegations plead a *per se* conspiracy. *See Gen. Motors Corp.*, at 145; *Apple*, 791 F.3d at 322-23; *Toys "R" Us*, 221 F.3d at 933.

### C.      Plaintiffs' Allegations Suffice Under the Quick Look Approach

Even if the Court finds that restraint here is not a *per se* violation (which it is), Plaintiffs' claims should be evaluated under the "quick look" approach. Under the "quick look" approach the court inquires whether defendants' conduct is of the type that, while not *per se* illegal, appears so likely to have anticompetitive effects that it is unnecessary for a court to apply the full rule of reason analysis.[30] An alleged restraint, "while not unambiguously in the per se category, may require no more than cursory examination to establish that their principal or only effect is anticompetitive." *California ex rel. Harris v. Safeway Inc.*, 651 F.3d 1118, 1134 (9th Cir. 2011) (en banc) (quoting *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 763 (1999)) (the rule of reason analysis can be applied "'in the twinkling on an eye'"). Here, Plaintiffs allege that Defendants entered into an agreement under which the Brokerage Defendants restricted retail investors from purchasing shares of the Relevant Securities. The anticompetitive effects of this restraint are apparent. Even if Defendants' agreement to foreclose retail investors from purchasing the Relevant Securities is not *per se* unlawful, it is unlawful under the "quick look" analysis.

### D.      Plaintiffs' Allegations Satisfy the Rule of Reason

Were the CCAC to be analyzed under the rule of reason, Plaintiffs' allegations are sufficient to allege a claim under Section 1 of the Sherman Act.

Under the rule of reason analysis, a three-step burden shifting approach is employed. *See Nat'l Coll. Ath. Ass'n v. Alston*, 141 S.Ct. 2141, 2160 (2021). "These three steps do not represent a rote checklist, nor may they be employed as an inflexible substitute for careful analysis." *Id.* The plaintiff first must show that the unlawful agreement produces anticompetitive effects. "The plaintiffs can make this showing directly or indirectly. Direct evidence of anticompetitive effects would be 'proof of actual detrimental effects [on competition],' such as reduced output, increased prices, or decreased quality in the relevant market." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) (citations omitted). A plaintiff may establish anticompetitive effects indirectly by

---

[30] *See Cal. Dental Ass'n v. Fed. Trade Comm'n*, 526 U.S. 756, 770 (1999) ("[A]n observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets"); *see also* Areeda & Hovenkamp, ¶ 1911a ("What [the 'quick-look'] term is intended to connote is that a certain class of restraints, while not unambiguously in the per se category, may require no more than cursory examination to establish that their principal or only effect is anticompetitive.").

showing that the defendant has "sufficient market power to cause an adverse effect on competition." *Tops Mkts. Inc. v. Quality Mkts. Inc.*, 142 F.3d 90, 96 (2d Cir. 1998).

Once the plaintiff establishes anticompetitive effects, the burden shifts to the defendant to offer evidence of any procompetitive effects of the challenged restraint. *See Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 507 (2d Cir. 2004); *see also Am. Express*, 138 S.Ct. at 2284. If the defendant can prove procompetitive benefits, then "the burden shifts back to the plaintiff[ ] to prove that any legitimate competitive benefits offered by defendant[ ] could have been achieved through less restrictive means." *Geneva Pharms. Tech. Corp.*, 386 F.3d. at 507 (citation omitted). At the pleading stage, however, it is typically sufficient that the plaintiff plausibly allege anticompetitive effects, on which they have the burden. *Todd v. Exxon Corp.*, 275 F.3d 191 at 207 (2d Cir. 2001). And Plaintiffs have done so here.

Contrary to Defendants' assertion (MTD at 30), Plaintiffs plead facts showing anticompetitive effects. Had Defendants not restricted short selling through concerted action, Plaintiffs would have been able to sell their securities at a competitive higher price. This price effect is a classic anticompetitive effect deriving directly from Defendants' efforts to prevent the market from functioning freely and fairly. The effect of the agreement between Defendants was plainly anticompetitive. Defendants' near-identical restrictions harmed Plaintiffs, caused massive sell-offs, and therefore the steep decline of stock prices in the Relevant Securities. *See* ¶¶ 254-66. That is sufficient to set forth a prima facie case under the rule of reason. *Todd*, 275 F.3d at 207. At the pleadings, the inquiry stops there. *Id.*

### a.    There are no procompetitive justifications for Defendants' conduct

Defendants do not provide any procompetitive justifications. They do not plead facts giving rise to any, nor do they argue that the conduct at issue "increase[d] economic efficiency and render[ed] markets more, rather than less, competitive." *Procaps S.A.,* 36 F.Supp.3d 1327 (citing *White Motor Co. v. United States,* 372 U.S. 253, 263 (1963)); *BMI*, 441 U.S. at 20; *Nat'l Bancard Corp. v. VISA U.S.A., Inc.*, 779 F.2d 592, 500 (11th Cir. 1986). Nor do Defendants argue that the alleged agreement was ancillary to a legitimate business venture or that there was any efficiency that could plausibly offset the restraints on trade. Indeed, they fail to argue that the agreement would have any other purpose but to stifle competition.

Any pro-competitive justifications for Defendants' agreement are made implausible by circumstances around Defendants' conduct, including the concealment, pretextual explanations

and obfuscation around Defendants' agreement. *See*, *e.g.*, ¶¶ 242-46, 253, 475 (Robinhood pretextually attributed restrictions to market volatility); ¶¶ 332-33 (Citadel and Robinhood coordinated their public narrative around the Short Squeeze); ¶¶ 339, 476 (Robinhood CEO made pretextual statements that restrictions were put in place due to NSCC requirements); ¶ 461 (high level employees of Citadel and Robinhood communicated in a manner to obscure the substance of communications). What proffered justifications Defendants may offer for their anticompetitive conduct would not defeat Plaintiffs' claims, even if proven at trial. *See* MTD at 17, 21.

### b.      Plaintiffs do not need to plead product market and market power

Relying on *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284-85 (2018), Defendants allege that the rule of reason calls for a two-part analysis in which "courts are required to 'first define the relevant market' and then 'conduct a fact-specific assessment of market power and market structure.'" MTD at 30. As an initial matter, it is premature to assess market definition or market power at the motions to dismiss stage. "Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market," and that determination is best left for the jury. *Todd*, 275 F.3d at 199-200; *see also Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1203 (9th Cir. 1997) ("what constitutes a relevant market is a factual determination for the jury.").

Furthermore, *American Express* does not stand for the proposition Defendants rely upon it for. The first stem in a rule of reason analysis is actually showing a significant anticompetitive effect. The "fact-specific assessment of 'market power and market structure'" simply states a court's ultimate role in a rule of reason analysis, a part of which might include determining if plaintiffs have defined a relevant market.[31] *Id.* at 2284 ("The rule of reason requires courts to conduct a fact-specific assessment of market power and market structure . . . to assess the [restraint]'s *actual effect on competition*.")

---

[31] Plaintiffs have laid out anticompetitive effects. That is sufficient. *Fed. Trade Comm'n v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460–461 (1986) ("Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, 'proof of actual detrimental effects, such as a reduction of output,' can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effects.'") (quoting 7 P. AREEDA, ANTITRUST LAW, ¶ 1511, p. 429 (1986)).

c. **The CCAC adequately defines markets in the Relevant Securities**

Because the "parameters of a given market are questions of fact," Plaintiffs must only "present enough information in their complaint to plausibly suggest the contours of the relevant geographic and product markets."[32] *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1336 (11th Cir. 2010); *see also Newcal Indus.*, *Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008).

Defendants dispute the facts plaintiffs allege. Defendants assert that the only possible product market alleged is "the market for securities of a particular company" or "an antitrust product market limited to the aggregate group of the Relevant Securities." MTD at 31. But this litigation is about coordinated efforts by institutional players in the securities market to unlawfully limit access to that market.[33] *See* ¶¶ 1-2. It cannot be disputed that Defendants' businesses are integral for retail investors to invest in the Relevant Securities. Further, Defendants can offer no meaningful response to the argument that by restricting retail investors from purchasing shares in the Relevant Securities reduced competition. These facts distinguish *American Express* where the Court found that defendant's actions had not "increased the cost of credit-card transactions above a competitive level, reduced the number of credit-card transactions, or otherwise stifled competition in the credit-card market." *Am. Express*, 138 S. Ct. at 2287-88.

E. **Plaintiffs' Claims Are a Paradigmatic Antitrust Injury**

Defendants puzzlingly argue that Plaintiffs' claims have "nothing to do with competition at all." MTD at 2, 32. Their argument is plainly incorrect. "Restrictions on price and output are the paradigmatic examples of restraints of trade that the Sherman Act was intended to prohibit." *Nat'l Coll. Ath. Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85. 107-108 (1984) (footnote omitted). Defendants foreclosed retail investors' ability to purchase the Relevant Securities—retail investors who wanted to purchase the Relevant Securities were not able to as a result of Defendants'

---

[32] Defendants do not challenge the definition of the relevant geographic market.

[33] Additionally, "courts should 'combin[e]' different products or services into a 'single market' when 'that combination reflects commercial realities.'" *Am. Express*, 138 S. Ct. at 2285. Here, although Defendants may play different roles in effectuating the trades of the retail investors that invest with them, they all ultimately provide a single basic service—the trading of securities. There is little doubt that an agreement to halt the purchase/execution of trades, much less execution of trades at best prices, effected the price and value of the underlying stocks.

anticompetitive scheme.[34] This is a textbook restriction on output and a classic anticompetitive harm the antitrust laws were created to address. *See NFL Sunday Ticket*, 993 F.3d at 1158 ("when plaintiffs adequately allege that their injury was caused by a conspiracy to violate antitrust laws, even when the conspiracy involves multiple levels of producers, distributors, and sales, the plaintiffs sufficiently allege an antitrust injury that can withstand a motion to dismiss").

### F.     Plaintiffs' Antitrust Claims Are Not Precluded by Federal Securities Laws

Plaintiffs' antitrust claims should proceed regardless of the factor analysis set forth in *Credit Suisse Securities (USA) LLC v. Billing,* 551 U.S. 264 (2007), because the Dodd-Frank Act's Antitrust Savings Clause applies to Plaintiffs' claims. All of Defendants' citations to support preclusion predate Dodd-Frank's passage into law.

#### a.     Dodd-Frank Act's Antitrust Savings Clause applies to Plaintiffs' claims

Defendants assert that Plaintiffs' antitrust claims are precluded by the securities laws. MTC at 33. This is incorrect. In passing the Dodd-Frank Act, Congress amended the Securities Exchange Act of 1934 and added provisions regarding, *inter alia*, short sales, the types of transactions giving rise to Plaintiffs' antitrust claims. Further, Congress added an expansive Antitrust Savings Clause making clear that antitrust claims with respect to the matters addressed in the legislation were not precluded. Section 6 of the Dodd-Frank Act, 12 U.S.C. § 5303, states that "Nothing in this Act, or any amendment made by this Act, shall be construed to modify, impair, or supersede the operation of any of the antitrust laws, unless otherwise specified" (the "Antirust Savings Clause"). Dodd-Frank's broad antitrust savings is fatal to Defendants' preclusion argument.[35]

---

[34] Plaintiffs and other proposed class members also sold the Relevant Securities at lower prices than they would have absent Defendants' scheme. *See Socony-Vacuum*, 310 U.S. at 844 (agreement to lower prices illegal under Sherman Act). Defendants appear to challenge Plaintiffs' antitrust standing. *See* MTD at 32, n.16. Defendants argue that Plaintiffs' claimed injury is too speculative. But Defendants are wrong. This is not a case like in *Austin v. Blue Cross & Blue Shield of Ala.*, 903.F.2d 1385 (11th Cir. 1990). There, the claimed injuries were remote because the "allegations require[d] an evaluation not only of the actions taken by Blue Cross but also an evaluation of the reaction of the hospitals, who were not joined as co-Defendants, to the price-fixing allegedly engaged in." *Id.* at 1393. Whether Plaintiffs would have had "perfect timing" is irrelevant because Defendants' coordinated conduct has created a temporal anchor from which there is no need to speculate.

[35] "In attempting to elaborate on the effect of an antitrust savings clause, it does not create a different rule, but merely reaffirms the general rule. Moreover, an antitrust savings clause is itself merely a reinforcement of the well-established principle that, because the antitrust laws are 'a comprehensive charter of economic liberty aimed at preserving free and unfettered competition,'

Dodd-Frank implemented broad provisions that directly touch upon issues alleged in the CCAC. For example, as set forth in the CCAC, Section 929X of Dodd-Frank empowered the SEC to promulgate rules related to public disclosure of short positions, albeit the SEC has not promulgated any such rules. Dodd-Frank amended the Exchange Act regarding certain transactions related to short sales. 1242 Stat. 1870. Dodd-Frank also has specific provisions related to market making. *E.g.*, 1242 Stat. at 1624, 1632. Defendants' conduct falls squarely within Dodd-Frank's ambit.[36]

That the statute did not preclude antitrust is confirmed by the legislative history. As Representative Conyers, the Chairman of the House Judiciary Committee, stated:

> The final bill contains a number of provisions to ensure that the antitrust laws remain fully in effect. . . . First and foremost is the antitrust savings clause in section 6 of the bill. It is the standard antitrust savings clause found in other statutes. It applies to the entire Act, and all amendments made by the Act to other laws.

156 CONG. REC. E1347-01 (2010), 2010 WL 2788137 ("Conyers Remarks").

Defendants erroneously assert that the Dodd-Frank Act did not amend Section 15 of the Exchange Act (MTD at 38). Not so. Section 913(g) of the Dodd-Frank act modified "Section 15 of the Securities Exchange Act of 1934 (15 U.S.C. 78o)" by adding additional language that permits the SEC to promulgate rules regarding fiduciary standards and disclosure requirements for brokers. *See* Dodd-Frank Act § 913(g), 124 Stat. at 1828.

Moreover, Dodd-Frank preserved the applicability of the antitrust laws except where "otherwise specified" and Congress expressly indicated where the antitrust laws were modified by Dodd-Frank. "Dodd-Frank never mentions the Sherman Act . . . , and it explicitly modifies the Clayton Act in four provisions, none of which is relevant here. *See* 12 U.S.C. §§ 1843(k)(6)(B)(iii), 5363(b)(5), 5390(a)(1)(G)(ii), 5390(h)(11). These are the four provisions captured by the 'unless

---

there is a strong presumption against their normal operation being superseded by some other statutory scheme." (citations and internal quotations marks omitted) 156 CONG. REC. E1347-01 (2010), 2010 WL 2788137.

[36] Whether the underlying conduct, here short sales, are permitted under Dodd-Frank is of no concern for antitrust purposes. *See ES Dev., Inc. v. RWM Enters., Inc.*, 939 F.2d 547, 555 (8th Cir. 1991) ("The present case provides a further example of the antitrust maxim that 'even an otherwise lawful device may be used as a weapon in restraint of trade.'") (quoting *Schine Chain Theatres, Inc. v. United States*, 334 U.S. 110, 119 (1948)).

otherwise specified' exception to the antitrust savings clause."[37] *In re Credit Default Swaps Antitrust Litig.*, No. 13md2476 (DLC), 2014 WL 4379112, at *16 (S.D.N.Y. Sept. 4, 2014); *accord In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 497 (S.D.N.Y. 2017) (same). The legislative history indicates that Congress intended Dodd-Frank to only modify those specific provisions of the antitrust law. Conyers Remarks, at E1347 ("The phrase 'unless otherwise specified' refers only to those four specific provisions that explicitly modify the operation of those specified provisions of the antitrust laws in specified ways, and is not a basis for courts to consider whether any other provision in the bill might be intended as an implicit modification of how the antitrust laws operate. The savings clause is intended to make clear that it is not."). The conclusion is inescapable that Congress intended for the antitrust laws to apply to short sales is clear. *See In re Interest Rate Swaps*, 261 F. Supp. 3d at 497 ("As a matter of plain language, the exception to Dodd-Frank's clause preserving plaintiffs' right to bring antitrust claims is not implicated here.").

*Billing* is inapposite here. *Billing* applies "[w]here regulatory statutes are silent with respect to antitrust." 551 U.S. 264 at 271 (2007) (emphasis added). Here, however, the statute is not silent. It addresses the commerce giving rise to Plaintiffs' claims and, in addition, it provides that the reach of the antitrust laws with respect to them is preserved. Further, none of the cases Defendants cite in support of preemption post-date Dodd-Frank. "When Congress has spoken, the Supreme Court stated, a court is to apply Congress's command as to the extent, if any, to which antitrust laws are abrogated." *See In re Interest Rate Swaps,* 261 F. Supp. 3d at 496-97 (citing *Verizon Commc'ns, Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 406–07 (2004) (analyzing the antitrust savings clause of the Telecommunications Act)). As such, the Antirust Savings Clause applies and Plaintiffs' claims under the Sherman Act are not precluded.

  **b.**    **The *Billing* factors weigh against Preclusion of Plaintiffs' Claims**

Even if *Billing* applies—and it does not—Plaintiffs' claims are not precluded by the Exchange Act. The "repeal of the antitrust laws by implication is not favored and not casually to be allowed. Only where there is a '*plain repugnancy between antitrust and regulatory provisions will repeal be implied.*'" *Gordon v. N.Y. Stock Exch., Inc.,* 422 U.S. 659, 682 (1975) (citations omitted) (emphasis added). Courts should only find the antitrust laws are precluded in narrow specific circumstances. "Repeal of the antitrust laws is to be regarded as implied only if necessary

---

[37] The specified provisions relate to Hart-Scott-Rodino premerger filing and review under the Clayton Act.

to make the [] Exchange Act work, and *even then only to the minimum extent necessary*."[38] *Billing*, 551 U.S. at 271 (emphasis added) (brackets and citation omitted). In *Billing*, the Supreme Court identified four factors to determine whether antitrust claims are implicitly precluded: (1) whether the action involves an area of conduct squarely within the heartland of securities regulations; (2) clear and adequate SEC authority to regulate; (3) active and ongoing agency regulation; and (4) a serious conflict between the antitrust and regulatory regimes. *Id.* at 285. Here, there is no "clear repugnancy" between antitrust laws and securities laws. The fact that anticompetitive conduct occurred with respect to the buying and selling of securities is insufficient to warrant preclusion. Each of the *Billing* factors weighs *against* precluding Plaintiffs' claims.

### c. The underlying conduct at issue is not central to the functioning of well-regulated capital markets

"To ascertain whether 'the possible conflict' between securities law and antitrust law affects 'practices that lie squarely within an area of financial market activity that the securities law seeks to regulate,' the Supreme Court looked to the broad underlying market activity." *Elec. Trading Grp., LLC v. Banc of Am. Sec. LLC*, 588 F.3d 128, 133 (2d Cir. 2009) (citing *Billing*, 551 U.S. at 276). In *Billing*, the Supreme Court considered how the IPO process (the underlying market activity) was "central to the proper functioning of well-regulated capital markets." *Id.* In concluding that it was, the Supreme Court addressed numerous benefits of the IPO process, including how it "supports new firms that seek to raise capital," "helps spread ownership," and "directs capital flow." *Id.* The Court also noted that many financial experts considered the joint underwriting activity at issue "essential to the successful marketing of an IPO." *Id.* Similarly, in determining that short selling (the underlying market activity) was an "area of conduct squarely within the heartland of securities regulations," the court in *Elec. Trading Grp.*, considered the "liquidity and pricing benefit created by short sales." *Elec. Trading Grp.*, 588 F.3d at 133-34 (citation omitted).

Defendants argue that the underlying activity here lies at the very heart of the securities market because "[m]arket integrity" is "vital" and because brokers must "register with the SEC" (MTD at 34), but Defendants do not—and—cannot demonstrate how cutting off retail investors' access to the securities market by restricting trading (let alone doing so in an unlawfully

---

[38] Indeed, the antitrust laws have long been enforced with respect to wrongdoers in the securities market. *See generally*, *e.g.*, *Nasdaq Mkt-Makers Antitrust Litig.*, 894 F. Supp. 703 (S.D.N.Y. 1995).

coordinated fashion) is "central to the proper functioning of well-regulated markets." *Billing*, 551 U.S. at 276. Thus, this factor weighs against implied preclusion.

### d.      The SEC is not authorized to regulate the activities in question

The second *Billing* factor considers whether there is "clear and adequate SEC authority" to regulate the activities in question. 551 U.S. at 285. In ascertaining "'the existence of regulatory authority under the securities law to supervise the activities in question . . . the Supreme Court looked to the role of the [defendants] in the [underlying market activity].'" *Elec. Trading Grp.*, 588 F.3d at 134 (quoting *Billing*, 551 U.S. at 275-77).

The SEC does not have authority to supervise "all of the activities in question here," and in particular broker-imposed limitations on trading.[39] Defendants' reliance on general regulations concerning fraudulent practices is insufficient to close that gap. *See* MTD at 35 (citing *Billing*, 551 U.S. at 276). To argue otherwise is entirely misleading. In *Billing*, the Supreme Court first looked to whether the SEC possessed the power to supervise the activity in question. *Billing*, 551 U.S. at 276-77. In finding that it did, the Supreme Court cited to specific regulatory statutes governing the underwriter-defendants' acts during the IPO process (the underlying market activity), including book-building, solicitations of indications of interest, and communications between underwriting participants and their customers. *Billing*, 551 U.S. at 276-77 (citing 15 U.S.C. §§ 77(b)(a)(3), 77j, 77z-2). Only *after* the Supreme Court found that SEC regulated the activity in question did it look to buttress the conclusion. *See* MTD at 35 (citing 15 U.S.C. § 78o(c)(2) and 15 U.S.C. § 78i(b)).[40]

### e.      The SEC is not exercising its authority over the conduct at issue

The third *Billing* factor considers "evidence that the responsible regulatory entities exercise [their] authority." *Billing*, 551 U.S. at 275. There is no such evidence. Defendants instead refer to a handful of SEC regulations (MTD at 35-36). But these regulations, which are more appropriately analyzed under the second *Billing* factor, provide no evidence that the SEC has been investigating or regulating the conduct at issue here (i.e., the coordinated broker-imposed restrictions by Defendants to prevent retail investors from purchasing the Relevant Securities). The referenced

---

[39] As set forth in the CCAC, there are no provisions under SEC rules that allow brokers to unilateral restrict access to trading markets. ¶ 432.

[40] Defendants' citation to 15 U.S.C.§ 78o(b)(7) is also misplaced as this statute addresses registration, training and qualification requirements for brokers, all of which are irrelevant here. *See* MTD at 35.

regulations concern, *inter alia*, over-the-counter markets rules, record keeping requirements,[41] standards for clearing agencies and securities offerings (i.e., IPOs). These are beside the point and irrelevant here. *See* MTD at 35-36; *see also* 17 C.F.R. §§ 240.15c3-1 to -5; 17 C.F.R. §§ 240.17h-1T to -2T; Regulation M, 17 C.F.R.§§ 242.100 to -105. As addressed above, Defendants' reliance on provisions of the Exchange Act is also misplaced. *See* MTD at 36.

Defendants' general reference to SEC enforcement programs (MTD at 36) is of no moment. These programs were not created to address the conduct at issue. Defendants have not been the target of such programs either. Defendants do not contend to the contrary. And, while true that the SEC is currently investigating the events concerning the market activities of January 28, 2021, there is simply no evidence to suggest that the SEC is investigating the claims of concerted activity at issue here.[42] *See Mayor & City Council of Balt., Md. v. Citigroup, Inc.*, Nos. 08-cv-7746 (BSJ), 08-cv-7747 (BSJ), 2010 WL 430771, at *5 (S.D.N.Y. Jan. 26, 2010) (finding that the SEC had "actively exercised its authority" by "undertak[ing] an ongoing investigation into *the specific events at issue in this case*") (emphasis added).

### f.    There is no conflict between antitrust and securities laws

The fourth *Billing* factor considers whether there is a "serious conflict between the antitrust and regulatory regimes," such that allowing "an antitrust lawsuit would threaten serious harm to the efficient functioning of the securities market." *Billing*, 551 U.S. at 283, 385. A conflict may occur when there is either an actual conflict or a potential conflict between antitrust law and securities regulations. *Elec. Trading Grp.*, 588 F.3d at 137-38.

Far from creating sufficient harm, this antitrust lawsuit would create no harm at all. Defendants cite to no law that would be in conflict with or undermined were Plaintiffs claims to

---

[41] Disclosure-like oversight does not rise to the level of exercise of authority to satisfy the elements in *Billing*. *See Dahl v. Bain Capital Partners, LLC*, 589 F. Supp. 2d 112, 116-17 (D. Mass. 2008) ("seeing that the SEC only required certain disclosures here, and that it did not substantively regulate the behavior in question, the second factor is not met.").

[42] SEC Chair Gary Gensler alluded to the SEC's investigative focus in his Congressional testimony. Notably, absent from Gensler's testimony was any refence to Defendants' alleged conspiratorial conduct. *Virtual Hearing – Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Part III*, 117th Cong. (May 6, 2021) (statement of Gary Gensler, SEC Chairman), *available at* https://financialservices.house.gov/uploadedfiles/hhrg-117-ba00-wstate-genslerg-20210506.pdf. The Court may take judicial notice of SEC statement because it is a public record, the accuracy of which cannot be questioned. *See Universal Express, Inc. v. U.S. Sec. Exchange Comm'n*, 177 F. App'x 52, 53 (11th Cir. 2006) (taking judicial notice of public records at the motion to dismiss stage).

succeed. In ascertaining whether an actual conflict exists, the court in *Elec. Trading Grp.* examined whether "[a]ntitrust liability would inhibit conduct that the SEC permits and that assists the efficient functioning of the [securities'] market." *Id.* at 137. No such concern pertains here. The assertion that Defendants' concerted activity is not prohibited in fact proves the reverse, namely that the conduct is not subject to regulation. Further, there is no showing that such conduct is permitted, authorized or encouraged by the SEC. Far from it.

To support their argument that an actual conflict exists because the "conduct at issue" is "permitted by the SEC," Defendants rely on an excerpted portion of an SEC investor alert, which when read in full states:

> Also, broker-dealers may reserve the ability to reject or limit customer transactions. This may be done for legal, compliance, or risk management reasons, and is typically discussed in the customer account agreement. In certain circumstances, broker-dealers may determine not to accept orders where a transaction presents certain associated compliance or legal risks.

*See* MTD at 37, n.18. Defendants do not explain how these generalized descriptions authorize their concerted activity. Moreover, the above language "is not a rule, regulation, or statement of the [SEC]," but rather an "investor bulletin," that has not been "approved" by the SEC. SEC, *Thinking About Investing in the Latest Hot Stock?* (Jan. 30, 2021), https://www.sec.gov/oiea/investor-alerts-and-bulletins/risks-short-term-trading-based-socialmedia-investor-alert. Such a bulletin, "has no legal force or effect: it does not alter or amend applicable law, and it creates no new or additional obligations for any persons." *Id.* While this description discusses situations in which rejecting or limiting customer transactions may be appropriate, it does not say that it is appropriate to do so to protect short positions of business partners or to do so in furtherance of a conspiracy.[43]

"In evaluating conflict, [ ] the proper focus is on the alleged anticompetitive conduct." *Elec. Trading Grp.*, 588 F.3d at 137. In *Billing*, the Court addressed the "*manner*" in which defendants

---

[43] 17 C.F.R. §§ 240.15a-1 to 240.15c6-1 govern "Exemption of Certain OTC Derivatives Dealers (§ 240.15a-1); "Exemption of Certain Securities From Section 15(a) (§§ 240.15a-2 - 240.15a-5)"; "Registration of Brokers and Dealers (§§ 240.15a-6 - 240.15b11-1)" and "Rules Relating to Over-the-Counter Markets (§§ 240.15c1-1 - 240.15c6-1)"; 17 C.F.R. §§ 240.17Ab2-1 to -2 relate to "Registration of clearing agencies" and "Determinations affecting covered clearing agencies" respectively; §§ 240.17Ad-1 to -24 regulate clearing agencies' collateral call requirements; and Regulation M and §§ 242.100 to -105 only apply to distribution of stock as part of the IPO process. Likewise, these statutes describe permitted practices with respect to certain securities transactions, but do not concern those at issue here.

effectuated their alleged anticompetitive conduct through practices such as laddering and tying. *Id.* (citing *Billing*, 551 U.S. at 278). In analyzing these practices, the Court determined that in relation to laddering and tying, only a fine line separated activity that the SEC permitted from that the SEC disallowed. *Billing*, 551 U.S. at 279-80. Relying on *Billing*, the court in *Elec. Trading Grp.*, reasoned that "[i]t is a lot to expect a broker 'to distinguish what is forbidden from what is allowed,'" such that it would "curb" permittable conduct. 588 F.3d at 137-38. The claims at issue here do not attack or seek to prohibit short selling generally.

There is no potential conflict either. A potential conflict exists when there is a possibility that the SEC will act upon its authority to regulate the conduct. *Id.* at 137. To support their argument of that a "potential conflict" exists, Defendants refer to the ongoing SEC investigation addressed under the third *Billing* factor above. MTD at 37. But, once again, there is no evidence that the SEC is investigating or plans to investigate Defendants' collusive behavior. And here, unlike in *Billing*, there is no fine "line-drawing" that needs to be done to distinguish permittable from permissible conduct as Defendants' actions were entirely outside the realm of the SEC's regulatory authority. *See Billing*, 551 U.S. at 279.

### G.    Peak 6/E*TRADE Holdings/RH Markets cannot be dismissed

Defendants argue that three Defendant parent holding companies, Robinhood Markets, E*Trade Holdings and PEAK6 should be dismissed. MTD at 38. They are wrong. As the Supreme Court explained long ago, a corporate parent and subsidiary "share a common purpose whether or not the parent keeps a tight rein over the subsidiary; the parent may assert full control at any moment if the subsidiary fails to act in the parent's best interests."[44] *Copperweld Corp.*, 467 U.S

---

[44] A corporation is not capable under the law of conspiring with its own agents, unincorporated divisions, or wholly-owned subsidiaries because they are treated as a single entity. *Copperweld*, 467 U.S. at 771-72. Through its agents, however, a corporation is capable of conspiring with other persons or independent corporations. *Am. Soc. of Mech. Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 565-66, 572-74 (1982) (a principal "may be held liable [under the antitrust law] for the acts of [its] agents even though the organization never ratified, authorized or derived any benefit whatsoever from the fraudulent activity of the agent and even though the agent acted solely for his private employer's gain."). Plaintiffs acknowledge that this Court did not apply the *Copperweld* doctrine in *In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1324 (S.D. Fla. 2010), relying on *Mitchael v. Intracorp, Inc.*, 179 F.3d 847 (10th Cir. 1999). But the facts at hand are distinguishable from *Mitchael*. The CCAC includes evidence of involvement of the holding companies and the subsidiaries. Further, as noted in *Arandell* (900 F.3d at 631), the Tenth Circuit later departed from *Mitchael* and applied *Copperweld*. *See Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221 (10th Cir. 2017)

at 771-72. "[T]he *Copperweld* doctrine establishes that '[w]here there is substantial common ownership, . . . individual firms function as an economic unit and are generally treated as a single entity'" for purposes of liability. *Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 630 (9th Cir. 2018) (citation omitted); *see also Lenox MacLaren Surgical Corp.*, 847 F.3d at 1236 ("the related entities' coordinated conduct must be treated as the unitary conduct of the single enterprise which together they form, and it is that aggregated conduct which must be scrutinized"); *In re Marine Hose Antitrust Litig.*, MDL No. 1888, 2009 WL 10692670, at *3 (S.D. Fla. May 26, 2009) (no need to differentiate between "related corporate entities" in complaint).

Defendants do not dispute the parent entities' ownership of the Defendant subsidiaries. Nor do they dispute that the individual firms function as an economic unit. Where they quibble is that the CCAC does not set forth specific allegations against the parent entities. The CCAC, however, contains specific allegations where individuals and agents of various individual firms within a corporate family—including the corporate parent—engaged in collusive behavior to further the anticompetitive scheme.[45] And at motion to dismiss, that is enough.[46]

## V.   CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss in its entirety. If the Court reaches a different conclusion, Plaintiffs respectfully request leave to file an amended complaint. *See Jennings v. BIC Corp.*, 181 F.3d 1250, 1258 (11th Cir. 1999) ("leave to amend should be liberally granted when necessary in the interest of justice"); *Fla. Power & Light Co. v. Allis Chalmers Corp.*, 85 F.3d 1514, 1520 (11th Cir. 1996) ("unless substantial reason exists to deny leave to amend, the discretion of the district court is not broad enough to permit denial").

---

[45] In communications, Defendants' employees did not hold themselves out as representatives of one corporate entity or another within a corporate family. For example, Robinhood employees made no distinction as to which entity they worked for. Further, Vlad Tenev, whose conduct is a central issue in this case, is described as Robinhood's CEO not the CEO of one Robinhood entity or another. *See, e.g.*, ¶¶ 340, 417, 467; *see also* MTD at 12, n.7 (describing Tenev as the CEO of Robinhood Markets, Inc.). With respect to PEAK6, PEAK6 exercised direction and control over Apex and ETC during the relevant period. Apex and ETC imposed identical or near-identical trading restrictions. Such coordinated action would be highly unlikely absent direction and control. *See, e.g.*, ¶¶ 66-75, 277-78.

[46] In any event, it would be premature to dismiss the corporate parent at this early stage when the CCAC has more than set forth enough allegations to raise the expectation that further discovery will reveal more evidence of the illegal agreement. *See Twombly*, 550 U.S. at 556.

Dated: September 21, 2021

By: _____/s/ *Joseph R. Saveri*___
      Joseph R. Saveri

Joseph R. Saveri (CA SBN 130064)
Steven N. Williams (CA SBN 175489)
Christopher K.L. Young (CA SBN 318371)
Anupama K. Reddy (CA SBN 324873)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
cyoung@saverilawfirm.com
areddy@saverilawfirm.com

*Co-Lead Counsel for the Antitrust Tranche*

By: _____/s/ *Frank R. Schirripa*_____
      Frank R. Schirripa

Frank R. Schirripa (NY SBN 4103750)
Kathryn Hettler (NY SBN 5126065)
Seth Pavsner (NY SBN 4969689)
Eugene Zaydfudim (NY SBN 5204334)
**HACH ROSE SCHIRRIPA & CHEVERIE LLP**
112 Madison Ave, 10th Floor
New York, New York 10016
Tel: (212) 213-8311
fschirripa@hrsclaw.com
khettler@hrsclaw.com
spavsner@hrsclaw.com
ezaydufim@hrsclaw.com