**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-2989-MDL-ALTONAGA/Torres**

IN RE:

**JANUARY 2021 SHORT SQUEEZE
TRADING LITIGATION**

_____/

This Document Relates to:

ALL ANTITRUST ACTIONS

**CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT**

**[PARTIALLY UNREDACTED VERSION]**⁕

---

⁕Pursuant to the Court's Order dated July 27, 2021 [ECF No. 362], the Antitrust Plaintiffs file this partially unredacted Corrected Class Action Complaint. This Corrected Class Action Complaint is otherwise identical in all respects to the complaint filed on August 23, 2021 [ECF No. 388].

## TABLE OF CONTENTS

Page(s)

INTRODUCTION ................................................................................................................. 1

JURISDICTION AND VENUE ........................................................................................... 5

PARTIES ............................................................................................................................. 6

    A.    Plaintiff Angel Guzman ............................................................................... 6

    B.    Plaintiff Burke Minahan ............................................................................. 7

    C.    Plaintiff Christopher Miller ........................................................................ 8

    D.    Plaintiff Terell Sterling ............................................................................... 8

    E.    Introducing Brokerage Defendants ............................................................ 9

    F.    Self-Clearing Brokerage Defendants ....................................................... 11

    G.    Market Maker Defendants ......................................................................... 13

    H.    Clearing Defendants .................................................................................. 13

AGENTS AND CO-CONSPIRATORS ............................................................................ 14

CLASS ALLEGATIONS ................................................................................................... 15

FACTUAL ALLEGATIONS ............................................................................................. 17

CLAIMS FOR RELIEF .................................................................................................... 132

PRAYER FOR JUDGMENT ........................................................................................... 134

JURY TRIAL DEMANDED ............................................................................................ 135

Plaintiffs Angel Guzman, Burke Minahan, Christopher Miller, and Terell Sterling, on behalf of themselves and all others similarly situated, bring this Class Action Complaint against Defendants for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## INTRODUCTION

1.      This case is about individual investors (the "Retail Investors") who invested their hard-earned money in the stock market and were stripped of their rights to control their own investments. Defendants and other market players hatched an anticompetitive scheme to restrict Retail Investors' access to the stock market and prevent the market from operating freely and fairly. Defendants did so to protect each other, and to stop the hemorrhaging losses incurred by the Market Maker Defendants as a result of their accumulation of large short positions.

2.      Retail Investors are individual investors who make investments on their own behalf. Retail Investors purchase securities such as stocks, bonds, options, mutual funds, and exchange traded funds (ETFs). They execute their personal trades through websites, apps and trading platforms provided by brokerage firms or other investment service providers. Retail Investors tend to invest smaller amounts, as compared to institutional investors, and have little ability to influence market prices or market dynamics on their own.

3.      Historically, Retail Investors paid a fee or commission to their brokerages for executing personal trades. Today, most brokerages do not charge their investors a fee per transaction, rather, they earn revenue through rebates, kickbacks and other payments from market makers. These payments are collectively known as payment for order flow.

4.      When a Retail Investor places a trade through a brokerage such as Robinhood, the brokerage routes the order to a market maker for processing and execution. When a market maker executes an order, it makes a profit on the spread between the "bid" price, the price at

which a market maker is willing to buy a security, and the "ask" price, the price at which a market maker is willing to sell the security. While the market maker typically earns a modest amount on each share of an order it fulfills, by processing a vast number of orders, market makers can earn a substantial profit.

5.      For every order, there must be a buyer and a seller. Market makers, through a process called "internalization," typically will take the other side of a transaction for orders routed to them. For example, if a buy order is routed to a market maker and there is no sell order available, market makers execute the order, either by selling a security in its inventory or by selling short.

6.      Leading up to January 27, 2021, based on their research and observations, the Retail Investors, through stock brokerages, including the Brokerage Defendants, invested in certain stocks—GameStop (GME), AMC Entertainment (AMC), Bed Bath & Beyond (BBBY), BlackBerry (BB), Express (EXPR), Koss (KOSS), Nokia (NOK), Tootsie Roll Industries (TR), and Trivago NV (TRVG) (the "Relevant Securities")—that they believed would increase and serve as good investment opportunities.

7.      As more Retail Investors bought the Relevant Securities and these orders were routed to market makers, such as Citadel Securities LLC ("Citadel Securities"), the market makers acquired substantial short positions in the Relevant Securities, and were thus exposed to massive potential losses as the prices of the Relevant Securities increased.

8.      "Short" sellers borrow securities believing that that price of the securities will decrease. If the price of the security in fact drops, a short seller buys the security back at a lower price and returns it to the lender. The difference between the sell price and the buy price is the

profit. Short sellers essentially bet on a security's failure or decline rather than its success or increase.

9.      Along with market makers such as Citadel Securities, several large hedge funds and investment firms, including Maplelane Capital, LLC, Melvin Capital Management LP, and others, established massive short positions in the Relevant Securities.

10.      In so doing, the hedge funds, market makers, and other unnamed co-conspirators made highly speculative bets. When the Relevant Securities increased in value, due in large part to Retail Investors purchasing the Relevant Securities, hedge funds were exposed to massive potential losses of several billion dollars.

11.      As more Retail Investors bought the Relevant Securities, those orders were routed to Citadel Securities through the Brokerage Defendants. Citadel Securities took the other side of the buy orders placed by the Retail Investors, i.e., Citadel Securities sold the Relevant Securities short in order to complete the routed retail investors' orders. Citadel Securities, as it took the other side of more and more buy orders, acquired a substantial short position in the Relevant Securities, and was similarly exposed to massive potential losses.

12.      As Retail Investors and others continued to purchase the Relevant Securities, the hedge funds, Clearing Defendants, Citadel Securities and unnamed co-conspirators were caught in a classic "short squeeze." A "short squeeze" occurs when a stock or other asset rises sharply in value, distressing short positions. Short selling investors are faced with a rapid increase in the shorted asset's value, exposing the short seller to increased and theoretically limitless loss. As the price of the asset rises, short sellers face pressure to buy back stock to exit their short positions to mitigate their losses. In the absence of intervention, as short sellers exit their short positions to

buy back stocks to cover their shorts, their repurchase of stock further increases the price of the stock, compounding their losses.

13.     On January 27, 2021, Citadel Securities executed short trades in the Relevant Securities in the after-hours session to develop larger short positions in the Relevant Securities in anticipation of the Relevant Securities declining in price on January 28, 2021.

14.     The Brokerage Defendants, along with Citadel Securities and the Clearing Defendants (collectively, "Defendants") conspired to prevent the Retail Investors from purchasing shares of the Relevant Securities. On January 28, 2021, the Brokerage Defendants disabled all buy features for the Relevant Securities on their platforms thereby stripping the demand-side and halting the price appreciation in the Relevant Securities. Defendants' action drove the stock prices down and forced Retail Investors to sell shares of their Relevant Securities. At the point in time where the Brokerage Defendants engaged in this conspiratorial effort to thwart buyers, the Relevant Securities had appreciated to unprecedented levels. Such highly appreciated stocks are generally sensitive to reversals in price and can make sharp price movements lower when a reversal occurs. Defendants were aware of this dynamic and the propensity of the Relevant Securities to drop substantially as a result of the Defendants' collective action to prevent customers from buying the Relevant Securities.

15.     In furtherance of the conspiracy, the Brokerage Defendants, operating trading platforms through websites and mobile applications—restricted Retail Investors from purchasing the Relevant Securities on their platforms and thereby halted the price appreciation in the Relevant Securities. This conduct predictably and foreseeably caused a loss of confidence in the Relevant Securities and an ensuing panic selloff by the Retail Investors. The Brokerage

Defendants did this to ensure that the stock prices for the Relevant Securities did not appreciate further and would instead sharply decrease in furtherance of the conspiracy.

16.     Defendants and their co-conspirators forced Retail Investors to choose between selling the Relevant Securities at a lower price or holding their rapidly declining positions in the Relevant Securities. Defendants did so with the propose of driving down the prices of the Relevant Securities. By forcing the Retail Investors to sell their Relevant Securities at lower prices than they otherwise would have, Defendants artificially constricted the price appreciation of the Relevant Securities, and reduced the price of the Relevant Securities that Retail Investors either sold or held below the prices that they would have otherwise obtained in a competitive market free of collusion.

### JURISDICTION AND VENUE

17.     Plaintiffs bring this action on their own behalf as well on behalf of the members of the Class to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, as well as any and all equitable relief afforded to them under the federal laws pleaded herein.

18.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because the case arises under the Constitution, laws, or treaties of the United States.

19.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Class are citizens of a state different from some Defendants.

20.     Venue is proper in this judicial District pursuant to 28 U.S.C. § 1391(b), (c) and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this

District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more of the Defendants reside in this District or are licensed to do business in this District. Each Defendant has transacted business, maintained substantial contacts, or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this District. The conspiracy occurred in this judicial District. The conspiracy has been directed at, and has had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

21.     This Court has personal jurisdiction over each Defendant because, each Defendant: (a) transacted business throughout the United States, including in this District; (b) transacted in substantial amounts of the Relevant Securities throughout the United States; (c) had substantial contacts with the United States, including this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

22.     The activities of the Defendants and all co-conspirators—whether unnamed or as of yet unknown—as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the foreign and interstate commerce of the United States.

## PARTIES

### A.  Plaintiff Angel Guzman

23.     Plaintiff Angel Guzman ("Guzman") is a resident of the State of New York. Guzman purchased shares of BlackBerry Ltd., GameStop Corp., and Nokia Corp. on Robinhood and held said shares as of the close of market on January 27, 2021.

24.     On January 28, 2021, Guzman was prohibited from purchasing the Relevant Securities on Robinhood due to the anticompetitive conduct alleged herein.

25.     Consequently, on January 28, 2021, in an effort to purchase the Relevant Securities, Guzman applied for an account with Charles Schwab ("Schwab") because Schwab was not prohibiting its customers from purchasing the Relevant Securities. Yet, on January 28, 2021, Guzman was unable to purchase any of the Relevant Securities on Schwab due to the amount of time required to open the account.

26.     From January 29, 2021 through February 4, 2021, Guzman was subject to the trading limitations Robinhood imposed on certain of the Relevant Securities.

27.     As a result of the anticompetitive conduct alleged herein, Guzman sold shares of BlackBerry Ltd., GameStop Corp., and Nokia Corp. on Robinhood during the Class Period.

**B.  Plaintiff Burke Minahan**

28.     Plaintiff Burke Minahan ("Minahan") is a resident of the State of Minnesota. Minahan purchased shares of BlackBerry Ltd., GameStop Corp., and Nokia Corp. on Robinhood and held said shares as of the close of market on January 27, 2021.

29.     On January 28, 2021, Minahan was prohibited from purchasing the Relevant Securities on Robinhood as a result of the anticompetitive conduct alleged herein.

30.     Consequently, on January 28, 2021, in an effort to purchase the Relevant Securities, Minahan applied for an account with Fidelity because Fidelity was not prohibiting its customers from purchasing the Relevant Securities. Minahan was subsequently able to purchase a share of GameStop Corp. on Fidelity that day.

31.     From January 29, 2021 through February 4, 2021, Minahan was subject to the trading limitations Robinhood imposed on certain of the Relevant Securities.

32.     As a result of the anticompetitive conduct described herein, Minahan sold shares of BlackBerry Ltd., GameStop Corp. and Nokia Corp. on Robinhood during the Class Period.

**C.  Plaintiff Christopher Miller**

33.     Plaintiff Christopher Miller ("Miller") is a resident of the State of Kansas. Miller purchased shares of GameStop Corp. on Robinhood and held said shares as of the close of market on January 27, 2021.

34.     On January 28, 2021, Miller was prohibited from purchasing the Relevant Securities on Robinhood due to the anticompetitive conduct described herein.

35.     Consequently, on January 28, 2021, in an effort to purchase the Relevant Securities, Miller applied to open accounts with Fidelity and TD Ameritrade ("TD"), because these firms were not prohibiting their customers from purchasing the Relevant Securities. Yet, on January 28, 2021, Miller was unable to purchase any of the Relevant Securities on Fidelity or TD due to the amount of time required to setup the accounts.

36.     From January 29, 2021 through February 4, 2021, Miller was subject to the trading limitations Robinhood imposed on certain of the Relevant Securities.

37.     As a result of the anticompetitive conduct alleged herein, Miller sold shares of GameStop on Robinhood during the Class Period.

**D.  Plaintiff Terell Sterling**

38.     Plaintiff Terell Sterling ("Sterling") is a resident of the State of California. Sterling purchased shares of AMC Entertainment Holdings, Inc., BlackBerry Ltd., GameStop Corp. on Robinhood and held said shares as of the close of market on January 27, 2021.

39.     On January 28, 2021, Sterling was prohibited from purchasing the Relevant Securities on Robinhood due to the anticompetitive conduct described herein.

40.     From January 29, 2021 through February 4, 2021, Sterling was subject to the trading limitations Robinhood imposed on certain of the Relevant Securities.

41.     As a further result of the anticompetitive conduct alleged herein, Sterling sold shares of AMC Entertainment Holdings, Inc., BlackBerry Ltd. and GameStop Corp. on Robinhood during the Class Period.

### E.  Introducing Brokerage Defendants

#### a.  Defendant Ally Financial Inc.

42.     Defendant Ally Financial Inc. ("Ally") is a Delaware corporation, with its headquarters located at Ally Detroit Center 500, Woodward Ave., Floor 10, Detroit, Michigan. Ally provides financial services including an electronic trading platform to trade financial assets. During the relevant period, Ally restricted and/or otherwise limited the ability of investors to purchase the Relevant Securities. At all relevant times stated herein, Apex Clearing Corporation served as Ally's clearing firm.

#### b.  Defendant Alpaca Securities LLC

43.     Defendant Alpaca Securities LLC ("Alpaca") is a Delaware limited liability company, with its headquarters at 20 N. San Mateo Drive Suite 10, San Mateo, California. Alpaca provides financial services including an electronic trading platform to trade financial assets. During the relevant period, Alpaca restricted and/or otherwise limited the ability of investors to purchase the Relevant Securities. At all relevant times stated herein, Electronic Transaction Clearing served as Alpaca's clearing firm.

#### c.  Defendant Dough

44.     Defendant Dough LLC ("Dough") is a Delaware limited liability company and wholly-owned subsidiary of Tastytrade, Inc., with its headquarters located at 327 N. Aberdeen

Street, Chicago, Illinois. Dough provides financial services including an electronic trading platform to trade financial assets. During the relevant period, Dough restricted and/or otherwise limited the ability of investors to purchase the Relevant Securities. At all relevant times stated herein, Apex Clearing Corporation served as Dough's clearing firm.

### d. Defendant Public.com

45.     Defendant Open To The Public Investing, Inc. ("Public.com") is a New York corporation and wholly-owned subsidiary of Public Holdings Inc., headquartered at 1 State Street Plaza, 10th Floor, New York, New York.

46.     Public.com provides financial services including an electronic trading platform to trade financial assets. During the relevant period, Public.com restricted and/or otherwise limited the ability of investors to purchase the Relevant Securities. At all relevant times stated herein, Apex Clearing Corporation served as Public.com's clearing firm.

### e. Defendant SoFi

47.     Defendant SoFi Securities LLC ("SoFi") is a New York limited liability company headquartered at 234 1st Street, Building A, Suite 4700, San Francisco, California. SoFi provides financial services including an electronic trading platform to trade financial assets. During the relevant period, SoFi restricted and/or otherwise limited the ability of investors to purchase the Relevant Securities. At all relevant times stated herein, Apex Clearing Corporation served as SoFi's clearing firm.

### f. Defendant Tastyworks

48.     Defendant Tastyworks, Inc. ("Tastyworks") is a Delaware corporation and wholly-owned subsidiary of Tastytrade, Inc., headquartered at 1000 West Fulton Market Street, Suite 220, Chicago, Illinois.

49.     Tastyworks provides financial services including an electronic trading platform to trade financial assets. During the relevant period, Tastyworks restricted and/or otherwise limited the ability of investors to purchase the Relevant Securities. At all relevant times stated herein, Apex Clearing Corporation served as Tastyworks clearing firm.

### g.  Defendant Webull

50.     Defendant Webull Financial LLC ("Webull") is a Delaware limited liability company headquartered at 44 Wall Street, Ste. 501, New York, New York. Webull provides financial services including an electronic trading platform to trade financial assets. During the relevant period, Webull restricted and/or otherwise limited the ability of investors to purchase the Relevant Securities. At all relevant times stated herein, Apex Clearing Corporation served as Webull's clearing firm.

## F.  Self-Clearing Brokerage Defendants

### a.  Defendant E*Trade

51.     Defendant E*Trade Securities LLC is a Delaware limited liability company, with its headquarters at 671 North Glebe Road, Ballston Tower, Arlington, Texas.

52.     Defendant E*Trade Financial Holdings, LLC is a Delaware limited liability company, with its headquarters at 671 North Glebe Road, Ballston Tower, Arlington, Texas.

53.     During the relevant period, E*Trade restricted and/or otherwise limited the ability of investors to purchase the Relevant Securities.

54.     At all relevant times stated herein, E*Trade acted as a self-clearing broker.

### b.  Defendant Interactive Brokers

55.     Defendant Interactive Brokers LLC ("Interactive Brokers") is a Delaware limited liability company headquartered at 1 Pickwick Plaza, Greenwich, Connecticut. Interactive

Brokers provides financial services including an electronic trading platform to trade financial assets. During the relevant period, Interactive Brokers restricted and/or otherwise limited the ability of investors to purchase the Relevant Securities.

56.     At all relevant times stated herein, Interactive Brokers acted as a self-clearing broker.

### c.   Defendant Robinhood

57.     Defendant Robinhood Markets, Inc. is a Delaware corporation with its principal place of business at 85 Willow Road, Menlo Park, California. Defendant Robinhood Markets, Inc. is the corporate parent of and manages, controls and directs the affairs of Defendants Robinhood Financial LLC and Robinhood Securities, LLC.

58.     Defendant Robinhood Financial LLC is a Delaware limited liability company with its principal place of business at 85 Willow Road, Menlo Park, California. It is a wholly-owned subsidiary of Robinhood Markets, Inc.

59.     Robinhood Financial LLC provides financial services including an electronic trading platform to trade financial assets.

60.     Defendant Robinhood Securities, LLC is a Delaware limited liability company with its principal place of business at 500 Colonial Center Parkway, Suite 100, Lake Mary, Florida. It is a wholly owned subsidiary of Robinhood Markets, Inc.

61.     Defendant Robinhood Securities, LLC, Robinhood Financial LLC and Robinhood Markets, Inc. are collectively referred to herein as "Robinhood."

62.     During the relevant period, Robinhood restricted and/or otherwise limited the ability of investors to purchase the Relevant Securities.

63.     At all relevant times stated herein, Robinhood acted as a self-clearing broker.

### G.  Market Maker Defendants

#### a.  Defendant Citadel Securities

64.      Defendant Citadel Securities LLC is a Delaware limited liability company, headquartered at 131 South Dearborn Street, Chicago, Illinois.

65.      Citadel Securities took short positions in the Relevant Securities. During the relevant period, Citadel Securities actively participated in the conspiracy and the wrongful acts alleged herein.

### H.  Clearing Defendants

#### a.  Defendant Apex

66.      Defendant Apex Clearing Corporation ("Apex") is a New York corporation headquartered at One Dallas Center, 350 N. St. Paul, Suite 1300, Dallas, Texas.

67.      Apex Clearing Holdings LLC and PEAK6 Investments LLC are the parent corporations of Apex.

68.      During the relevant period, Defendant Apex participated in the conspiracy and the wrongful acts alleged herein.

#### b.  Defendant ETC

69.      Defendant Electronic Transaction Clearing, Inc. ("ETC") is a Delaware Corporation located at 660 South Figueroa Street, Suite 1450, Los Angeles, California.

70.      Apex Clearing Holdings LLC and PEAK6 Investments LLC are the parent corporations of ETC.

71.      During the relevant period, Defendant ETC participated in the conspiracy and the wrongful acts alleged herein.

#### c.  Defendant PEAK 6

72.     Defendant PEAK6 Investments LLC ("PEAK6") is a Delaware limited liability company located at 141 West Jackson Boulevard, Suite 500, Chicago, IL 60640.

73.     During the relevant period, PEAK6 is the parent corporation of Apex and ETC.

74.     PEAK6 exercised direction and control over Defendants Apex and ETC during the Relevant Period.

75.     During the relevant period, Defendant PEAK6 participated in the conspiracy and the wrongful acts alleged herein.

## AGENTS AND CO-CONSPIRATORS

76.     The anticompetitive and unlawful acts alleged against the Defendants in this class action complaint were authorized, ordered or performed by the Defendants' respective officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction, or control of the Defendants' businesses or affairs. The respective Defendant parent entities identified herein exercise dominance and control over all of their respective Defendant subsidiary entities and those respective subsidiaries have a unity of purpose and interest with their respective parents.

77.     To the extent any respective parent Defendant did not keep a tight rein on its respective subsidiary Defendant(s), it had the power to assert control over the subsidiary if the latter failed to act in the parent's best interest. The respective parent Defendants and their respective subsidiaries, affiliates and agents thus operated as a single unified entity.

78.     The Defendants' agents operated under the explicit and apparent authority of their principals.

79.     Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and

made statements in furtherance thereof.

80.     Each Defendant acted as the principal, agent, or joint venture of, or for other

Defendants with respect to the acts, violations, and common course of conduct alleged herein.

## CLASS ALLEGATIONS

81.     Plaintiffs bring this action for damages on behalf of themselves and all others

similarly situated as a class action pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules

of Civil Procedure, on behalf of the following Class:

> All persons or entities in the United States that held shares of stock or call options in
> GameStop Corp. (GME), AMC Entertainment Holdings Inc. (AMC), Bed Bath &
> Beyond Inc. (BBBY), BlackBerry Ltd. (BB), Express, Inc. (EXPR), Koss Corporation
> (KOSS), Nokia Corp. (NOK), Tootsie Roll Industries, Inc. (TR), or Trivago N.V. (TRVG)
> as of the close of market on January 27, 2021, and sold the above-listed securities from
> January 28, 2021 up to and including February 4, 2021 (the "Class Period").

82.     This Class definition specifically excludes the following person or entities:

    a.     any of the Defendants named herein;

    b.     any of the Defendants' co-conspirators;

    c.     any of Defendants' parent companies, subsidiaries, and affiliates;

    d.     any of Defendants' officers, directors, management, employees, or agents;

    e.     all governmental entities; and

    f.     the judges and chambers staff in this case, as well as any members of their

        immediate families.

83.     Plaintiffs do not know the exact number of Class members, because such

information is in the exclusive control of Defendants. Plaintiffs are informed and believe that,

due to the nature of the trade and commerce involved, there are millions of Class members

geographically dispersed throughout the United States and elsewhere, such that joinder of all

Class members in the prosecution of this action is impracticable.

84.     Plaintiffs' claims are typical of the claims of their fellow Class members because Plaintiffs and all Class members were damaged by the same wrongful conduct of Defendants as alleged herein, and the relief sought herein is common to all members of the Class.

85.     Plaintiffs will fairly and adequately represent the interests of the Class. Plaintiffs have no conflicts with any other members of the Class. Furthermore, Plaintiffs have retained sophisticated and competent counsel who is experienced in prosecuting antitrust class actions, as well as other complex litigation.

86.     Numerous questions of law or fact common to the entire Class—including, but not limited to those identified below—arise from Defendants' anticompetitive and unlawful conduct:

a.     whether Defendants combined or conspired with one another to artificially suppress prices for the Relevant Securities at any time during the Class Period to shareholders of the Relevant Securities in the United States;

b.     whether Defendants combined or conspired with one another to fix, raise, maintain, stabilize and/or suppress prices for Relevant Securities at any time during the Class Period to shareholders of the Relevant Securities in the United States;

c.     whether Defendants' conduct caused the prices of the Relevant Securities, sold or held by the Retail Investors in the United States at any time during the Class Period to be artificially fixed, suppressed, maintained or stabilized; and

d.     whether Plaintiffs and the other members of the Class were injured by Defendants' conduct and, if so, the appropriate Class-wide measure of damages.

87.     These and other questions of law and fact are common to the Class and

predominate over any questions affecting the Class members individually.

88.     Defendants have acted on grounds generally applicable to the Class. This class action is superior to alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

89.     The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## FACTUAL ALLEGATIONS

90.     Many of the Retail Investors regularly participate in online financial discussion forums, including but not limited to Reddit, Facebook, and TikTok. Through these forums, and elsewhere, Retail Investors are able to share information about their market observations and help fellow members of these online forums to benefit from their research. During the Relevant Period, Retail Investors communicated and exchanged information regarding the Relevant Securities, among other things.

91.     Based on their research, the Retail Investors, through SEC registered broker-dealers, such as the Brokerage Defendants, purchased the Relevant Securities.

92.     The Market Maker Defendants, hedge funds, and unnamed co-conspirators established "short" positions in the Relevant Securities. By the nature of the developed short positions, the Market Maker Defendants, hedge funds, Clearing Defendants, and certain unnamed co-conspirators, stood to benefit and substantially profit were the prices of the Relevant Securities to decrease. Entering into short positions is highly speculative. In a free and open market, there would be substantial financial risk that prices might increase causing traders with

short positions to experience losses.

93.     The Market Maker Defendants, hedge funds, Clearing Defendants, and unnamed co-conspirators found themselves poorly positioned for the rise in Relevant Securities prices that occurred in late January 2021. As Relevant Securities increased in price, Market Maker Defendants were exposed to billions of dollars in losses, exposing the Clearing Defendants to increased collateral requirements if Robinhood were to fail.

94.     Rather than facing the consequences of their exposure to rising Relevant Securities' prices, the Market Maker Defendants, Clearing Defendants, Brokerage Defendants and their co-conspirators entered into an anticompetitive scheme to prevent the market from operating freely, to halt the significant increase in the prices of the Relevant Securities, to avoid their own financial losses and reduced profits, and to cause financial losses to Plaintiffs and the members of the Class.

### *Role of Participants*

95.     There are numerous participants in the securities market who serve different roles. A brief explanation of some of these players and their roles is below.

#### *The Depository Trust & Clearing Corporation*

96.     The Depository Trust & Clearing Corp. ("DTCC") is a holding company that owns and operates three clearing agencies that are registered with the U.S. Securities and Exchange Commission ("SEC") under the Securities and Exchange Act of 1934: National Securities Clearing Corp. ("NSCC"), Fixed Income Clearing Corporation ("FICC") and The Depository Trust Company ("DTC").

97.     The DTCC is a member owned and governed entity. Its members include, among others, Clearing Defendants Apex and ETC, as well as Brokerage Defendants E*Trade,

Interactive Brokers, and Robinhood.

98.     NSCC is the central counterparty (CCP) that clears cash transactions in the U.S. equities markets, netting securities deliveries and payments among NSCC's clearing members and guaranteeing completion of trades even if one party to the transaction defaults.

99.     On May 6, 2021, Michael C. Bodson ("Bodson"), the CEO of the DTCC, testified before the U.S. House Committee on Financial Services and explained that:

> The U.S. Markets are multi-layered, and customers generally execute trades through one or more brokers or broker-dealers. NSCC direct clearing members are responsible for completing their customers' trades at the NSCC. NSCC's rules outline clear financial and operation risk management obligations that apply to direct clearing members.

100.     When an investor purchases a security, the transaction is not instantaneous, and instead takes time to settle and clear.

101.     Once the trade is executed, the trade information is relayed to the NSCC for clearing services. Securities trades submitted to the NSCC settle at the end of the second business day after submission, in what is known as T+2 settlement. This means that when an investor executes into a trade on a Monday, the cash and the securities related to that trade are electronically transferred on Wednesday.

102.     The NSCC's stated purpose is to reduce the cost, settlement risk, and operational risk of clearing and settling multiple transactions among multiple parties. Between trade submission and settlement, NSCC guarantees all cleared trades among its members. If a clearing member defaults on its settlement obligations, NSCC guarantees the delivery of cash and securities to its non-defaulting members.

103.    As explained by Bodson in his Congressional testimony, margin protects NSCC and all market participants against clearing member defaults, and margin requirements must be met by clearing members on a timely basis. NSCC's margin requirements are rules-based and subject to regulatory review and approval. The NSCC collects clearing fund contributions, or margin, at the start of each day and intraday in volatile markets. According to Bodson, the rules for calculating on the contribution requirements and the timing of collection of these margin requirements are known to every member. Furthermore, according to Bodson, NSCC provides reporting tools, calculators and documentation that allow clearing members to monitor their risk in near real-time and estimate clearing fund contribution requirements. Bodson indicated that many clearing members have employed this information to build their own internal calculators and monitoring tools to aid them in risk management.

104.    The internal communications at Robinhood over the period demonstrate that Robinhood's staff did not use these tools in a proactive manner to anticipate the events of January 28, nor was there a consistent practice of tracking concentration levels relative to margin requirements. Robinhood did not utilize NSCC tools to conduct routine and rigorous risk assessment and scenario analysis of the Relevant Securities despite the significant role Robinhood played in providing services to traders that actively traded such securities.

*Independent Clearing Firms*

105.    An independent clearing firm handles the back-office details of securities transactions for broker-dealers (i.e., introducing brokers). An independent clearing firm executes and settles orders and maintains custody of securities and other assets. Essentially, the independent clearing firm handles the back-office operations behind making securities trades actually happen once a trade is submitted by an investor on an introducing broker's website

and/or application. Independent clearing firms are also responsible for maintaining the paperwork associated with the clearing and executing of a transaction.

106.    Independent clearing firms have several revenue streams. Independent clearing firms receive interest on uninvested user cash. Additionally, independent clearing firms generate revenue by lending the stock owned by individual investors to other traders. When one broker or dealer lends securities to another, the borrower pays collateral slightly higher than their market value along with a fee. Both of these streams represent revenue-generating opportunities for the independent clearing firms.

107.    As described below, independent clearing firms also generate a significant portion of their revenue from payment for order flow.

108.    Apex and ETC are independent clearing firms. Operating independently, each of these firms is supervised by the Financial Industry Regulatory Authority ("FINRA") and each serve as clearing agents for introducing brokers that do not have clearing capacity on their own.

109.    Apex serves as the independent clearing firm for Ally, Dough, Public.com, Sofi, Stash, Tastyworks and Webull, while ETC serves as the clearing firm for Alpaca.

110.    Independent clearing firms, including Apex and ETC, are members of the DTCC and therefore subject to its rules and regulations.

*Introducing Brokers*

111.    An introducing broker is a broker-dealer that contracts with an independent clearing firm to handle the execution and settlement of orders that the introducing firm receives from its clients or its own trading desk to buy and sell securities. The introducing broker's independent clearing firm, not the introducing broker, receives payments and maintains custody of the securities.

112.     Ally, Alpaca, Dough, Public.com, Sofi, Stash, Tastyworks and Webull are all introducing brokers.

*Self-Clearing Brokers*

113.     A self-clearing broker is likewise an introducing broker, but in addition to handling orders to buy and sell securities, a self-clearing broker also acts as its own clearing firm in that it executes and settles orders and maintains custody of securities and other assets. Self-clearing brokers are also responsible for maintaining the paperwork associated with the clearing and executing of a transaction.

114.     Robinhood began as an introducing broker, clearing customer assets through Apex. As customer growth surged, Robinhood announced in 2018 that it received regulatory approval to become a self-clearing broker and did so.

115.     Other self-clearing brokers include E*Trade and Interactive Brokers, and non-defendants Fidelity and Vanguard.

116.     Each self-clearing broker is a member of the DTCC and therefore subject to its rules and regulations.

117.     Under Rule 15c3-l, a broker-dealer is required to "at all times have and maintain net capital" no less than the greatest of the minimum requirement applicable to its business. The rule is designed to require a broker-dealer to maintain sufficient liquid assets to meet all obligations to customers and counterparties and have adequate additional resources to wind down its business in an orderly manner without the need for a formal proceeding if the firm fails financially. All broker-dealers have the ability, using the NSCC's reporting tools, calculators and documentation and internally developed calculators and monitoring tools, to inform themselves in real time of their anticipated daily DTCC deposit requirements.

*Market Makers*

118.   Market makers are market participants who provide bid prices (i.e., the price investors are willing to purchase at) and ask prices (i.e., the price investors are willing to sell at) for securities. The difference between the two is known as the "spread." Market makers maintain an inventory of securities from their own trading and match incoming buy and sell orders in order to fill those orders. Once an order is filled, the spread is pocketed by the market maker as profit. These spreads can be very small (e.g., under even a penny per transaction) but becomes significant due to the very large volume of orders filled.

119.   Market makers are typically large financial technological firms that rely on sophisticated software and algorithms.

120.   Many market makers are now entirely automated and are high-frequency trading ("HFT") firms. HFT firms are computerized and rely on software and data access to connect with markets with minimal latency or delay. Low latency, or a relatively short time that elapses from the moment a signal is sent to its receipt, is important for HFT market makers as it permits arbitrage strategies. Price differences in the bid and offer prices of a security may fluctuate in milliseconds, so latency is crucial for a HFT to quickly react in order to maximize potential profits. Citadel Securities is an example of one of these firms.

121.   Market makers may also make trades for their own accounts.

122.   Orders placed through brokerages may be routed to a market maker for execution.

123.   A market maker may execute an order routed to it by broker by taking the other side of the transaction, a process known as "internalization."

124.   For example, if a market maker receives an order to buy a certain security, it may

route that order to an exchange or it may execute the orders off-exchange in its capacity as a dealer by transacting against the buy orders with contra-side sell order, either from its own inventory or by selling the security short.

*How an Order is Executed*

125.    Each of the players may play a role in how an order is executed.

126.    If a Retail Investor places a buy order through a retail broker—such as the Introducing Brokerage Defendants or the Self-Clearing Brokerage Defendants—the retail broker might route the order through its Smart Order Router ("SOR") to execute the trade on one or more securities exchanges and other trading destinations where it is authorized to execute orders and where it deems it can meet its fiduciary duty of best execution.

127.    If a retail broker has not invested in the technology, connectivity, and memberships required to effectively route orders through a SOR that can satisfy its duty of best execution, the retail broker typically routes to an executing broker that can provide the smart order routing services, such as Citadel Execution Services or G1 Execution Services.

128.    Often the executing broker will operate an off-exchange market maker unit that is provided preferential access to the retail broker's orders and executes a significant percentage of such orders for its own "book" as a dealer instead of routing the order to any exchange or trading destination. Often the market maker unit provides the retail broker with payment-for-order-flow to compensate the retail broker for providing it preferential access to the retail broker's order. Furthermore, such arrangements typically do not charge the retail broker execution fees for orders directed to the market maker unit.

129.    After a Self-Clearing Brokerage's order is executed, the Self-Clearing Brokerage will send the details of the execution to the DTCC-affiliated clearinghouse entity (e.g., the

NSCC) for clearinghouse and settling services. If, instead, the Introducing Brokerage does not self-clear, the Introducing Brokerage would instead route the details of the execution to an independent clearing firm such as Apex who would then send such details to the DTCC-affiliated entity for clearinghouse services.

*Background*

130.    As reported in the Financial Times, among other sources, Retail Investors' market

share of U.S. equity trading has steadily increased since 2019.



131.    Credit Suisse estimated that at various times in 2021, Retail Investors accounted

for a third of all U.S. stock market trading.

132.    Retail Investors execute their personal trades through brokerage firms, such as the

Brokerage Defendants that run online platforms from which Plaintiffs and other Retail Investors

are able to buy and sell securities.

133.    Due to their smaller trades, Retail Investors have traditionally paid higher fees

and commissions. Many of the Brokerage Defendants, including Robinhood, represent to Retail

Investors that they offer "commission-free" brokerage services to facilitate fair trading in the stock market. While these brokerages hold themselves out as free, the consumer incurs costs in other ways besides paying commissions. For example, while Robinhood users do not pay trade commissions, they pay a hidden price with each trade in the form of higher transaction costs as Robinhood earns revenue through rebates, kickbacks and other payments from market makers like Citadel Securities who compensate Robinhood for preferential access to Robinhood's order flow.

134.    When a Robinhood user executes a trade, the order is typically executed by an off-exchange market maker instead of being directly routed to a national securities exchange. Robinhood's practice of selling its users' orders to third parties is known as selling "order flow," and Robinhood derives the majority of its profit from this practice. In Robinhood's Form S-1 dated July 1, 2021, Robinhood states "[b]ecause a majority of [Robinhood's] revenue is transaction-based (including payment for order flow, or "PFOF"), reduced spreads in securities pricing, reduced levels of trading activity generally, changes in our business relationships with market makers and any new regulation of, or any bans on, PFOF and similar practices may result in reduced profitability, increased compliance costs and expanded potential for negative publicity." Robinhood's Form S1 is available at: https://www.sec.gov/Archives/edgar/data/1783879/000162828021013318/robinhoods-1.htm.

135.    For example, if a Retail Investor purchases a share of stock through Robinhood, Robinhood sends the order to a large market maker like Citadel Securities and receives payment in return—i.e., the "payment for order flow" fees. Citadel Securities, meanwhile, makes money itself by executing an offsetting trade at a more favorable price than it transacted for the Robinhood user's purchase, a practice known as "capturing the spread." While the profit may be

relatively small for an individual trade, the sheer number of trades sum to a significant value.

Citadel Securities is Robinhood's largest counterparty. In 2019, 29% of Robinhood's revenue

derived from transactions with Citadel Securities. For 2020, 34% of Robinhood's revenue

derived from transactions with Citadel Securities. Below is an excerpt from Robinhood's Form

S-1, where it details its revenues from market makers in "excess of 10% of total revenues":

### Concentration of credit risk

We had revenues from market makers in excess of 10% of total revenues, as follows:

| | Year Ended December 31, | |
|---|---|---|
| | 2019 | 2020 |
| Market maker: | | |
| Citadel Securities, LLC | 29 % | 34 % |
| Entities affiliated with Susquehanna International Group, LLP[1] | 13 % | 18 % |
| Entities affiliated with Wolverine Holdings, L.P.[2] | 12 % | 10 % |
| All others individually less than 10% | 8 % | 13 % |
| Total as percentage of total revenue: | 62 % | 75 % |

(1)  Consists of Global Execution Brokers, LP and G1X Execution Services, LLC
(2)  Consists of Wolverine Execution Services, LLC and Wolverine Securities LLC

We are engaged in various trading and brokerage activities in which the counterparties primarily include broker-dealers, banks, and other financial institutions when applicable. In the event our counterparties do not fulfill their obligations, we may be exposed to risk. The risk of default depends on the creditworthiness of the counterparty. It is our policy to review, as necessary, the credit standing of each counterparty.

136.    For Robinhood, the payment-for-order-flow compensation is a materially

significant component of its revenue, with the mechanism of payment-for-order-flow effectively

operating as a profit-sharing mechanism through which Citadel Securities compensates

Robinhood for its order flow with profits extracted from such order flow by its market maker.

137.    The SEC requires broker dealers to disclose how their customers' orders are

handled, including reporting the entities that handle their order flow, in what are known as Rule

606 disclosures.

138.    Robinhood is not the only Defendant that sells order flow.

139.    Based upon Apex's SEC Rule 606 filing, Apex directed order flow for 99.99% of

all its "non-directed orders" in January 2021 for S&P 500 stocks and non-S&P 500 stocks.

140.    Apex sent 23.26% of all "non-directed" order flow to Citadel Securities in S&P 500 stocks and 13.26% of all "non-directed" order flow for non-S&P500 stocks to Citadel Securities in January 2021.

141.    As mentioned above, Retail Investors exchange investment information via online discussion forums. Through these forums, as early as 2019, the Retail Investors developed the trading hypothesis that shares of GameStop's (GME) stock were trading at lower prices than they should be based on GameStop's publicly available financial disclosures and future prospects.

142.    GameStop for example, despite being a brick-and-mortar store specializing in video games that can now be downloaded from a person's home, possessed ample cash reserves, was regularly paying off its debts and was presented new opportunity with the release of the next generation of gaming platforms. Despite this, in 2019, shares of GameStop's stock were trading as low as $3 per share. Some Retail Investors correctly deduced that GameStop was undervalued for a variety of reasons that included the observation that large financial institutions had taken large short positions that resulted in levels of short-interest that would bear significant costs if the outlook on GameStop improved and the short positions had to be exited. This was essentially a bet on GameStop's failure by institutional investors that were significantly exposed to a potential "short squeeze" that could drive the stock sharply higher if the price of GameStop was challenged by any significant buying activity by well-capitalized market participants. Due to GameStop's low share price and the belief that short-sellers were pressuring GameStop in a manner that maintained the stock at an artificially low price, these Retailer Investors determined GameStop represented a good investment opportunity.

143.     In addition to GameStop, Retail Investors invested in the other Relevant Securities based on their own valuations and anticipated business performance.

144.     For example, Retail Investors invested in Nokia (NOK) because Nokia, which had historically focused its business on the manufacture and sale of mobile phone handsets, had been expanding in other industries, including investing in 5G communication networks, including towers and other infrastructure.

145.     Like other Retail Investors, Plaintiffs purchased "long" positions in the Relevant Securities.

146.     In a free and open market, stock prices are determined by supply and demand and other market forces. Ordinarily, as more investors buy a certain stock, they tend to bid up the stock's price, and the market price for the stock rises. Conversely, as investors sell stock, the stock price is bid down and the market price for the stock declines.

147.     If an investor has long positions, it means that the investor has bought and owns those shares of stocks (in contrast to a short position, where the investor owes those stocks to someone, but does not actually own them yet). Investors holding long positions generally own the stock with the expectation that it will rise in value and it will be worth more than they paid for it. When the investor sells a long position, the profit or loss from the sale is the difference between the purchase price of the security and the sale price of the security.

148.     Retail Investors took long positions in the Relevant Securities with the expectation that the stock would increase in value, generally because they believed that the respective companies' business prospects were improving. Investors in the Relevant Securities generally believed they were good investment opportunities, and that prices of their securities

would rise as can be expected when a market is operating freely, without fraud, conspiracy or manipulation.

149.    Retail Investors have limited access to the stock market. Generally, Retail Investors must invest in the stock market through intermediaries such as the Brokerage Defendants.

150.    Institutional investors on the other hand have considerably greater access to the stock market. They can invest directly, and those that are broker-dealers do not need to use other brokerages to execute their trades in securities.

151.    Institutional investors also can trade on private stock exchanges that members of the public cannot access. These exchanges are known colloquially as "dark pools" or "dark exchanges" because of their lack of transparency and because they do not disseminate public quotations of securities prices.

152.    Similarly, as market makers internalize trades they do so within their own dark trading operations, which are not accessible to the broader market.

153.    Dark pools, which account for 40% of all U.S. stock trades, are vastly different from traditional or "lit" stock exchanges such as the New York Stock Exchange or NASDAQ. In a lit exchange, the order book including the price and amount an investor wants to trade is public and visible to all participants. Dark pools on the other hand do not display publicly how much an investor wants to buy or at what price. Stock purchased in a lit exchange can be sold on a dark exchange, and stock purchased in a dark exchange can be sold in a lit exchange.

154.    While institutional investors can trade on both dark and lit exchanges, many prefer dark pools over "lit" exchanges because they can discreetly buy or sell securities in large blocks, even in the millions, while mitigating some of the price impact their buying or selling

activity would otherwise have if they transacted on the "lit" national securities exchanges. Dark pools permit institutional investors to trade without visible exposure of their order to the market as a whole until after the trade has been executed. Furthermore, dark pools typically offer lower execution fees than national securities exchanges and may provide some access to retail order flow that market making units have decided not to internalize.

155.    Institutional investors, including the hedge funds and unnamed co-conspirators, acquired massive "short" positions in the Relevant Securities.

156.    As indicated above, "short" sellers essentially bet on an asset's failure rather than its success. Short sellers borrow shares of a company that they believe will reduce in price, in the hope that once the share price falls, they might be able to buy the shares at a reduced price and return them to the lender. They pocket the difference. A short seller's profit is the share value lost at the time a short seller "buys" a security versus the time when the short seller "borrows" the security. For example, a short seller might sell a share of a stock in Company X for $10 and then borrow a share of Company X (for a fee) from a broker for $10. The short seller immediately sells the share and hopes that the value of the share will drop. The share price then falls to $4. The short seller then purchases the share at the reduced value of $4 and returns it to the lender and earns the difference of $6 (less the fees incurred in borrowing the share). On the other hand, if the price of the share rises to $20, the short seller would need to purchase the share at $20 to return it to the lender, thereby incurring a loss of $10 on top of any fees incurred.

157.    The more a stock price increases, the greater the loss to the short seller. The theoretical loss to a short investor who predicts wrongly is potentially infinite because there is no upper boundary on the price to which a company's share price can rise. Should a short seller want to exit a short position in the face of rapidly increasing stock price, they must "buy back"

the stock at the higher price to return to the institution they borrowed the share from. Risk from bad short selling investments is potentially catastrophic.

158.    On the other hand, the loss to an investor who purchases a stock "long" is limited to the difference between the amount paid for the shares and the lowest price to which the stock can fall, which, of course, is zero.

159.    As reported by the financial analytics firm S3, on January 4, 2021, GameStop's peak short interest was 141.8% of its float (i.e., publicly tradable shares), which indicates that some short sellers were selling shares without either owning them or identifying an owner from whom shares could be borrowed. The practice of short selling without identifying a source from which they can be borrowed is an illegal practice known as "naked shorting." In a "naked" short sale, a seller does not borrow or arrange to borrow the necessary securities in time to deliver them to the buyer within the standard two-day settlement period.

160.    Naked short selling is illegal pursuant to SEC Regulation SHO, which requires broker-dealers "to identify a source of borrowable stock before executing a short sale in any equity security with the goal of reducing the number of situations where stock is unavailable for settlement." The regulation is available at: https://www.sec.gov/investor/pubs/regsho.htm. Sometimes, however, the stock being borrowed may not be available from the lender at the time of settlement, possibly resulting in a fail to deliver.

161.    Regulation SHO also requires firms that clear and settle trades to take action to close out failures to deliver by borrowing or purchasing securities of like kind and quantity. For short sale transactions, failures to deliver must be closed out by no later than the beginning of regular trading hours on the settlement day following the settlement date, referred to as T+4. For long sale transactions or bona fide market making activities, failures to deliver must be closed

out by no later than the beginning of regular trading hours on the third settlement day following the settlement date, referred to as T+6.

162.     As a result of Retail Investors building long positions in the Relevant Securities, by both buying stock in the Relevant Securities and buying "out of the money" call options in the Relevant Securities that had "strike prices" well above the prices that the Relevant Securities were then trading at, the stock price of these companies began to rise. As the value of the Relevant Securities increased, this resulted in both a "short squeeze" and a "gamma squeeze."

163.     As explained above, a short squeeze occurs when a stock or other asset rises sharply in value, distressing short positions in the asset. A short squeeze therefore is when investors in short positions are faced with a rapid increase in the shorted asset's value, exposing the short seller to increased loss. As the price of the asset rises, short sellers may face pressure to buy back shares of stock to exit their short positions to mitigate their losses. In the absence of market manipulation or some other intervention, as short sellers exit their short positions by buying shares of stock to cover their short positions, the purchase of those shares further increases the price of the stock.

164.     There is another phenomenon known as a "gamma squeeze" involving a derivative financial vehicle known as an option or an option contract.

165.     "Options" are derivative financial instruments based on the value of an underlying security. An option contract offers the buyer the opportunity, but not the obligation, to buy or sell the underlying asset depending on the type of option contract.

166.     "Call options" give the holder the right to buy the asset at a stated fixed price within a specific timeframe. "Put options" on the other hand give the holder the right to sell the

asset at the stated fixed price within a specific timeframe. The fixed price at which the options holder may exercise the option is known as the "strike price."

167.    The holder of an option contract is not required to buy or sell the asset if they choose not to.

168.    An option is "in the money" (ITM) if the option has a strike price that is favorable in comparison to the prevailing market price for the asset. For example, a call option is in the money if the option holder has the right to exercise the option to buy the underlying asset below its current market price. An ITM put option means the option holder can sell the security above the current market price.

169.    Conversely, an "out of the money" (OTM) option has a strike price unfavorable in comparison to the market price for the underlying asset. For example, an OTM call option means the underlying asset's current market price is below the strike price of the call. An option is "at the money" if the strike price equals the underlying asset price.

170.    Options are priced based on a variety of risk variables known colloquially as the "Greeks" as they are represented by letters of the Greek alphabet.

171.    "Delta" represents the rate of change between an option's price a small change in the price of the underlying asset, i.e., the price sensitivity of the option with respect to the asset. The units of Delta can be normalized to the range -1 to +1, reflecting a one-dollar change in the underlying asset price. The Delta of a call option ranges from 0 to 1, whereas the Delta of a put option ranges from 0 to -1. A call option with a Delta of 0.10 therefore will increase by 10 cents for every one dollar the price of the underlying asset rises, absent any other changes.

172.    "Gamma" represents the rate of change between an option's Delta and the underlying price. The units of Gamma can be normalized to reflect the amount the Delta would

change given a one-dollar move in the price of the underlying asset. For example, if a call option has a Gamma of 0.10, if the price of the underlying asset increases by one dollar, then the option's Delta will increase by 0.10, absent any other changes.

173.    An option that is deep out of the money or deep in the money has a small Gamma, whereas options that are at or near the money will have larger Gamma.

174.    For at and around the money options, Gamma typically increases as the expiration date of the option approaches.

175.    Market makers also attempt to reduce risk by hedging. A market maker typically hedges by looking at the Delta and buying or selling short an appropriate amount of stock to offset the option. For example, if a market maker sells a call option, then the market maker may hedge with long positions in the underlying security.

176.    Similar to a short squeeze, a Gamma Squeeze occurs when a security experiences a sharp price increase. For example, consider when the price of an underlying security rises up towards the direction of the strike prices of deep out of the money options. When such an increase occurs, options that were previously unlikely to reach their strike prices before expiration see a rapid increase in values as it becomes more likely that the options will reach their strike prices.

177.    At the same time, the options' sensitivity to the price increases, i.e., the Delta, also increases due to the options' Gamma. The Gamma also increases as the option approaches being in the money.

178.    As the Gamma increases, market makers hedge by purchasing more of the underlying security, further driving the price of the security higher. As the price goes higher, more deep out of the money options either go in the money or approach their strike price,

creating a feedback loop that rapidly increases the price of the underlying security, which then moves more out of the money options towards at the money or above.

179.    With regard to GameStop, a popular Reddit user who also creates content on YouTube under the handle Roaring Kitty ("Roaring Kitty") had reason to believe that hedge funds had entered into these short positions with respect to GameStop's stock. Based on his own financial analysis, Roaring Kitty determined that GameStop was actually undervalued due to a range of factors, including that there had been extensive shorting of GameStop by numerous funds, and made an initial purchase of $50,000 of GameStop stock and published his investments on the Reddit financial discussion forum WallStreetBets.

180.    WallStreetBets is a financial discussion forum on Reddit. WallStreetBets is characterized by a particular culture centered around discussion of financial investments and memes. Many users on WallStreetBets are sophisticated, financially savvy Retail Investors with business acumen.

181.    Roaring Kitty regularly updated and continued to publish information and analysis that GameStop stock was undervalued. In August 2020, Roaring Kitty posted an in-depth analysis of GameStop's stock on his YouTube channel, walking his subscribers through his extensive analysis of the value proposition of the stock.

182.    Attention to GameStop's stock was not limited to online financial communities and discussion forums. Dr. Michael Burry (who gained fame for his investment decisions and for correctly predicting the 2008 financial crisis as depicted in the film The Big Short) and his investment firm Scion Asset Management, LLC spent nearly $15 million to purchase stock in GameStop in 2019 at share prices between $2 and $4.20 per share for a 5% ownership position. GameStop's share price steadily increased and Retail Investors took notice.

183.     Ryan Cohen, the co-founder and former CEO of the pet e-commerce website Chewy.com, invested $76 million and acquired a 12.9% stake in GameStop in 2020. Several Retail Investors were optimistic about Ryan Cohen's involvement in GameStop, who joined the board of directors on January 11, 2021.

184.     Institutional investors, holding large short positions in GameStop and the other Relevant Securities began to push back by asserting that the Relevant Securities were not as valuable as the Retail Investors thought. For example, on January 21, 2021, when GameStop was valued at approximately $20 per share, Andrew Left, the founder of Citron Research, a capital research and investment firm, gave an interview explaining why he was shorting GameStop, calling the Retail Investors "the suckers at this poker game."

185.     In response, Retail Investors continued to build long positions and call options in GameStop and the other Relevant Securities. Given the operation of a free and open market, GameStop and other Relevant Securities were bid up and share prices increased. GameStop, for example, jumped 78.46% from $43.03 per share on January 21, 2021, to $76.79 per share on January 25, 2021. This massive price increase exposed the short sellers of the Relevant Securities, including the Market Maker Defendants, to very substantial loses. It was a textbook short squeeze.

186.     The tremendous growth in the Relevant Securities' stock price resulted in significant and potentially disastrous exposure of institutional investors, and hedge funds, holding short positions in the Relevant Securities.

187.     On January 25, 2021, Citadel LLC injected around $3 billion along with another fund, Steven Cohen's Point72 Asset Management ("Point72"), to bailout Melvin Capital from its distressed short position. Notably, Melvin Capital's founder and CEO, Gabe Plotkin, began his

career at Citadel before becoming a top portfolio manager at Point72's predecessor firm, SAC Capital Management.

188.    The following day, January 26, 2021, GameStop's share price continued to surge after Social Capital's Chamath Palihapitiya tweeted that he bought GameStop call options, betting the share price would go higher. GameStop closed at $147.98, up 92.7% from the previous day's close.

189.    Also on January 26, 2021, Tesla CEO Elon Musk ("Musk") rallied behind GameStop's epic price surge, tweeting "Gamestonk!!" along with a link to the WallStreetBets Reddit page. Shares of GameStop were up more than 60% in after-hours trading following Musk's tweet.

190.    On January 27, 2021, the price of the Relevant Securities soared as trading volumes in U.S. cash equities and options hit an all-time record level at 24.5 billion shares traded and 57.1 million contracts traded. GME's stock price peaked at $380.00, before reaching a closing high of $347.51, a 134.84% increase from the previous day. Other Relevant Securities experienced similar surges. AMC's share price skyrocketed over 300% and EXPR's rose over 200%.

191.    Concurrently, Retail Investors were buying deep out of the money call options in the weeks leading up to January 28, 2021 based on their beliefs that the Relevant Securities were unfairly valued below their true value.

192.    Market makers including Citadel Securities took the other side of these transactions, developing large short positions.

193.     As the price of the Relevant Securities increased, the Delta and Gamma of the previously deep out of the money call options purchased by Retail Investors came closer to their strike price, further increasing the price of the Relevant Securities.

194.     Additionally, January 29, 2021 was an expiry date for options. As the expiration date for options approaches, the Gamma generally increases, further compounding the effects the price increases of the Relevant Securities had on the Delta and Gamma of the Retail Investors' call options.

195.     Similarly, as retail orders for the Relevant Securities were routed to the market makers, the market makers such as Citadel Securities took the other side of those buy orders, i.e., improvidently short selling the security to execute the order by filling buy orders without owning the securities being purchased.

196.     Further, as market makers such as Citadel Securities took the other side of the incoming call option and security purchases from Retail Investors, they built up significant short positions in the Relevant Securities.

197.     As set forth above, the more a stock price increases, the greater the potential loss for the short seller. This culmination of events (i.e., the short-squeeze) triggered the Brokerage Defendants to place unprecedented trading restrictions on the Relevant Securities. In the case of the clearing brokers, the restrictions prevented the risk of liability for a potential clearing member default, and were likely in response to pressure from other market participants who stood to benefit from a decline in the stock, including market makers and funds that were short.

198.     On January 27, 2021, TD Ameritrade announced that "[i]n the interest of mitigating risk for our company and clients, we have put in place several restrictions on some transactions in $GME, $AMC and other securities" and increased the margin requirements on

certain securities. TD Ameritrade cited "unprecedented market conditions and other factors," as the reason for the restrictions.

199.     Charles Schwab similarly "put restrictions in place on certain transactions," including for GME, AMC and EXPR, and Robinhood said it would not allow margin trading of shares of both GME and AMC.

200.     At approximately 5:00 p.m. on January 27, 2021, the SEC released a statement that it was "aware of and actively monitoring the on-going market volatility in the options and equities markets," but neither the SEC nor any other government agency issued any directive to restrict trading in the Relevant Securities.

201.     The figure below summarizes the prices of GameStop's stock from December 28, 2020 through January 29, 2021.



202.    The figure below summarizes the prices of Nokia Corporation's stock from December 28, 2020 through January 29, 2021.



203.    The figure below summarizes the prices of AMC Entertainment Holdings, Inc.'s stock from December 28, 2020 through January 29, 2021.



204.    The figure below summarizes the prices of Koss Corporation's stock from December 28, 2020 through January 29, 2021.



205.    The figure below summarizes the prices of Trivago stock from December 28, 2020 through January 29, 2021.



206.     The figure below summarizes the prices of Bed Bath & Beyond stock from December 28, 2020 through January 29, 2021.



207.     The figure below summarizes the prices of Express stock from December 28, 2020 through January 29, 2021.



208.    The figure below summarizes the prices of Tootsie Roll Industries Inc.'s stock from December 28, 2020 through January 29, 2021.



209.    The figure below summarizes the prices of BlackBerry's stock from December 28, 2020 through January 29, 2021.



*The Illegal Scheme*

210.     Rather than use their financial acumen to compete and invest in good opportunities in the market to recoup the loss in their short positions as a result of the growth in the Relevant Securities' prices, or paying the price for their highly speculative accumulation of large short positions, Defendants instead hatched an anticompetitive scheme to limit trading in the Relevant Securities.

211.     After the market closed on January 27, 2021, suspicious coordinated after-hours trading occurred.

212.     Analytics reveals a significant volume of GME short volume immediately prior to the markets opening on January 28, i.e., indicating that the after-hour traders were trading in anticipation of a GME sell-off. The grey lines in the chart below represent the volume of short positions in GME. As demonstrated by the grey lines below, the volume of short positions was much higher before January 28, 2021 than any of the prior days and had steadily increased the week prior.



213.     Due to constraints imposed by retail brokers, Retail Investors cannot engage in after-hours trading to the same extent as institutional investors. It is therefore likely that this increase in short volume is the result of institutional investors, like the hedge funds and Market Maker Defendants, taking new short positions.

214.     Failure to deliver ("FTD") occurs when one party in a trading contract does not deliver on its obligations. For example, recall a short seller borrows a security at a price in hopes its price will decrease. If, however, a short seller fails to locate and borrow a security to deliver to a buyer, then that transaction is recorded as a fail to deliver.

215.     Increases in FTDs are indicative of naked short selling. That is because naked short sellers do not actually possess the security they are supposed to "borrow." Thus, when a

buyer then seeks to purchase the borrowed security, the short seller cannot deliver because the short seller never possessed the security in the first place and fails to deliver on its obligations.

216.    Increases in FTDs are also consistent with market makers taking on increased short positions. As market makers take the other side of buy orders routed to them, they borrow securities to sell short, developing a substantial short position themselves.

217.    This practice of shorting stock that is not borrowable is largely inaccessible to Retail Investors, i.e., Retail Investors cannot engage in naked short selling. However, market makers are able to short stock that is not borrowable by utilizing a market maker exemption.

218.    FTDs in the Relevant Securities also rose dramatically in the period leading up to January 28, 2021, a phenomenon consistent with both increasing short interest by the Market Maker Defendants and unnamed coconspirators as well as with improper trading in the form of selling securities without identifying stocks to borrow to deliver to the retail investors who bought them.

219.    The figure below summarizes fails to deliver for AMC from January 1, 2021 through February 9, 2021:



220.    The figure below summarizes fails to deliver for BBBY from January 1, 2021 through February 9, 2021:



221.     The figure below summarizes fails to deliver for BB from January 1, 2021 through February 9, 2021:



222.     The figure below summarizes fails to deliver for EXPR from January 1, 2021 through February 9, 2021:



223.    The figure below summarizes fails to deliver for GME from January 1, 2021 through February 9, 2021:



224.    The figure below summarizes fails to deliver for KOSS from January 1, 2021 through February 9, 2021:



225.     The figure below summarizes fails to deliver for NOK from January 1, 2021 through February 9, 2021:



226.     The figure below summarizes fails to deliver for TR from January 1, 2021 through February 9, 2021:



227.    The figure below summarizes fails to deliver for TRVG from January 1, 2021 through February 9, 2021:



228.    The dramatic increase in short positions was counterintuitive. Chatter in various financial discussion forums indicated high excitement and motivation on the part of Retail Investors to continue investing in the Relevant Securities. Many Retail Investors announced plans to increase long positions in the Relevant Securities on January 28, 2021, which would mean the prices for the Relevant Securities were likely to go further up, not down.

### *The Events of January 28, 2021*

229.    At approximately 1:00 a.m. EST on January 28, 2021, Defendant Robinhood circulated an email to its users with the subject line "[a]n important update on your expiring options," informing them that in light of unprecedented volatility surrounding GME and AMC, and in an effort to help reduce risk, all GME and AMC options with expirations of January 29th, 2021 will be set to closing transactions only. This meant that customers could close out their positions but could not make new investments.

230. The email was silent as to any restrictions placed on trading shares of GME, AMC, or other securities.

231. At 5:11 a.m. Eastern Standard Time, Robinhood received an email from NSCC indicating that Robinhood had a deficit of roughly $3 billion dollars.

| From: | CFM_NOTIFICATIONS@dtcc.com |
| Sent: | Thu, 28 Jan 2021 10:11:19 +0000 (UTC) |
| To: | |
| Subject: | 6769 ROBINHOOD SECURITIES, LLC - NSCC Daily Margin Statement |

ROBINHOOD SECURITIES, LLC          # 6769          DEFICIT:($3,006,178,364.89)

TO OBTAIN DETAILED INFORMATION REGARDING YOUR REQUIREMENT, NAVIGATE TO NSCC RISK MANAGEMENT REPORTING UNDER THE SETTLEMENT SERVICES MENU IN THE PBS PORTAL.

Questions in reference to requirements should be
addressed to the following phone numbers:
Hotline (212) 855-5770
Or via email at NSCCProductRisk@dtcc.com

TO OBTAIN DETAILED INFORMATION REGARDING YOUR DEPOSIT, NAVIGATE TO THE CLEARING FUND SECTION UNDER THE SETTLEMENT SERVICES MENU IN THE PBS PORTAL.

Questions in reference to deposit information
should be addressed to the following phone numbers:
Hotline (212) 855-3440

DTCC DISCLAIMER: This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error, please notify us immediately and delete the email and any attachments from your system. The recipient should check this email and any attachments for the presence of viruses. The company accepts no liability for any damage caused by any virus transmitted by this email. Message content created by DTCC is automatically secured using Transport Layer Security (TLS) encryption and will be encrypted and sent through a secure transmission connection if the recipient's system is configured to support TLS on the incoming email gateway. If there is no TLS configured or the encryption certificate is invalid on the recipient's system, the email communication will be sent through an unencrypted channel. Organizations communicating with DTCC should be using TLS v1.2 or newer to ensure continuation of encrypted communications. DTCC will not be responsible for any disclosure of private information or any related security incident resulting from an organization's inability to receive secure electronic communications through the current version of TLS.

232. Shortly thereafter, Robinhood had made its decision to move the Relevant Securities to PCO, i.e., that users of Robinhood could not buy the Relevant Securities and could only sell them.



2021-01-28 09:23:55 -08:00

It appears RHS just changed equities GME, AMC, etc to PCO. We currently have the options tradable.
https://hood.slack.com/archives/C3ZKP2V55/p1611839928039700

[January 28th, 2021 5:18 AM] ▮▮▮▮▮ AMC, GME, NOK. BB. NAKD,KOSS,EXPR, BBBY -- all of these are now PCO. Customers can sell their existing shares but not purchase additional shares <!here>

▮▮▮▮▮ AMC, GME, NOK, BB. NAKD,KOSS,EXPR, BBBY -- all of these are now PCO. Customers can sell their existing shares but not purchase additional shares <!here>

Posted in #corp-action-updates

233. Gretchen Howard, Robinhood's Chief Operating Officer, messaged internally that Robinhood has a "major liquidity issue," and that it was moving the Relevant Securities to position close only ("PCO"). This meant that customers could only sell shares in the Relevant Securities and were foreclosed from buying them.



**DEMMUJTLP: 01/28/2021**

**Gretchen Howard**

01/28/2021 04:50:56

Can you call me?

**Gretchen Howard**

01/28/2021 05:00:32

or join https://meet.google.com//vbh-yrsm-bmv

Meet
**Meet** (meet.google.com)
Real-time meetings by Google. Using your browser, share your video, desktop, and presentations with teammates and customers.

**Gretchen Howard**

01/28/2021 05:00:36

major liquidity issue

**Gretchen Howard**

01/28/2021 05:00:48

we have PCOd' AMC, GME, NOK, BB, NAKD,KOSS,EXPR, BBBY

234. As the markets opened on January 28, 2021, the Retail Investors woke up to find that the Brokerage Defendants had suddenly and without notice restricted their ability to purchase the Relevant Securities.

235.    Retail Investors that used Robinhood as their brokerage could no longer purchase the Relevant Securities. The "buy" button was deactivated as a feature, leaving users with no option but to sell or hold their securities.

236.    Robinhood addressed the "[w]hy don't I see a buy button?" question on its website here: https://robinhood.com/us/en/support/articles/why-dont-i-see-a-buy-button/. It offered three reasons for the buy button being unavailable on a user's account. The three reasons are: 1) "It's a foreign stock, which we don't support." 2) "It's an over-the-counter (OTC) stock or a warrant, which Robinhood generally doesn't support"; and 3) "It's a stock undergoing corporate action. The stock will be tradable again once the corporate action has been finalized." Robinhood's explanations did not correspond with reality, however, because the Relevant Securities were not foreign stocks, OTC stocks or stocks undergoing corporate actions during the Class Period. Robinhood did not warn users of any situation where it could prevent users from buying stock out of its own volition. This explanation was incomplete, inaccurate, untrue, and did not disclose the conspiracy underlying the change.

237.    Worse, Retail Investors who had queued purchase orders overnight on January 27, 2021 to purchase stock when the markets opened on January 28, 2021 discovered that their purchase orders had been cancelled without their consent. Some received messages that claimed "[y]ou canceled your order" despite the fact that they did no such thing.

238.    The restrictions on trading took different forms but had the same effect. Retail Investors were prohibited from opening new long positions in the Relevant Securities. In other words, Retail Investors were not permitted to purchase new positions but only permitted to sell their long positions and not buy more.

239.    On Robinhood's web platform and mobile app, Retail Investors were blocked from searching for the Relevant Securities' ticker symbols.



240.    When Robinhood implemented its restrictions early in the morning of January 28, 2021, it did so knowing that it was wrong, and also knowing that it was not in serious danger of being shut down by the NSCC.

241.    In an internal Robinhood Slack chat, David Dusseault, President and Chief Operating Officer of Robinhood Financial, says "we are to[sic] big for them to actually shut us down" in response to queries about the NSCC.



242.    The decision to restrict the sale of Relevant Securities was not happenstance. Robinhood did so with the knowledge that other members of the conspiracy had agreed to do so as well. Shortly after Robinhood decided to move the Relevant Securities to PCO, an internal Slack chat between Robinhood employees confirmed that Robinhood knew other brokerages would similarly restrict the relevant securities.

243.    ▮▮▮▮▮▮▮▮, a manager of market operations for Robinhood, asks David Dusseault, President and COO of Robinhood Financial, "[d]id we make amc gme only PCO?"

244.    Dusseault responds "yeah." Dusseault further says "rhs received a very large call–confidentially. All firms on street Jim is saying are doing same thing." Plaintiffs are informed and believe that Jim is likely Jim Swartwout, President and COO of Robinhood Securities.

## DUV5WF528: 01/28/2021

▬▬▬▬

01/28/2021 05:19:06

   Did we make amc gme only PCO?

**david.dusseault**

01/28/2021 05:47:07

   yeah

▬▬▬▬

01/28/2021 05:47:22

   Yeah seeing the channel now. Unfortunate

**david.dusseault**

01/28/2021 05:47:34

   rhs received a very large call - confidentially. all firms on street Jim is saying are doing same thing

▬▬▬▬

01/28/2021 05:48:09

   Yeah I figured. This is such a horrible look industry wide

245.   Dusseault's statement to ▬▬▬ reveals that early in the morning of January 28, 2021, Swartwout had been informed and was communicating internally at Robinhood that "all firms" "are doing the same thing", i.e., restricting buying but permitting retail investors to sell. It was not in the independent common interest of Robinhood or other conspirators to do so without the agreement of its co-conspirators.

246.   Consistent with their agreement, the other Brokerage Defendants and other brokerages employed similar tactics to prevent Retail Investors from opening new positions in at least one or more of the Relevant Securities.

247.     For instance, Stash prohibited users from viewing tickers for GME and AMC. Other tickers were under no such restriction and were easily searchable on the platform. Because of Stash's platform design, a Retail Investor who cannot view the page for a particular asset cannot trade in that asset. As a result, Retail Investors were unable to access the page for GME and AMC to open new long positions in the Relevant Securities.

248.     News of the trading restrictions imposed by the Brokerage Defendants and other brokerage firms soon came to light via widespread media coverage and through the Brokerage Defendants' own admissions.

249.     Around 9:05 a.m. on January 28, 2021, Interactive Brokers announced via Twitter that it put AMC, BB, EXPR, GME, and KOSS option trading into liquidation only due to the extraordinary volatility in the markets. It also announced that long stock positions would require 100% margin and short stock positions would require 300% margin.

250.     E*Trade likewise confirmed that it halted GME and AMC stock citing "extraordinary volumes" as the reason, and various media outlets reported that Alpaca also restricted trade in the Relevant Securities.

251.     Robinhood tweeted that in light current market volatility, it was restricting transactions for certain securities to position closing only, including $AMC and $GME.

252.     Robinhood subsequently updated its website with a list of securities set to position-closing only, meaning that the Retail Investors could sell and close their positions in these securities, but they were prohibited from opening new positions. The securities included, *inter alia*, AMC, BB, BBBY, EXPR, GME, KOSS, NOK, TR and TRVG.

253.     Robinhood attributed the aforesaid restrictions to ongoing market volatility and other pretextual explanations while not disclosing its communications with other members of the

conspiracy. Robinhood, acknowledged that it had canceled open orders for the listed securities and also disabled the ability for users to search for these securities in Robinhood's mobile app. Robinhood's January 28 blog post titled, *Keeping Customers Informed Through Market Volatility*, also attributed the restrictions to "significant market volatility" and further disclosed that Robinhood raised margin requirements for certain securities.

254.    Reporting throughout January 28, 2021, revealed that the ban on purchasing stock of the Relevant Securities occurred at many brokerages. On information and belief, the Brokerage Defendants adopted similar if not identical restrictions to Retail Investors from opening new positions in all, or at least one or more of the Relevant Securities. It is unlikely that they would have done so but for the conspiratorial agreement. Members of the conspiracy acted to shut down the market with the purpose of benefitting the participants in the conspiracy and with the intent to harm Plaintiffs and the members of the Class.

255.    As intended, Pursuant to the illegal anticompetitive scheme, the coordinated prohibition on buying any new Relevant Securities—through the Brokerage Defendants' forced foreclosure on Retail Investors from buying Relevant Securities—led to a massive sell-off. This resulted in a steep decline in the stock prices of the Relevant Securities.

256.    For example, on January 28, 2021, GME shares reached an intraday peak of $483.00—before plunging down to $112.25, eventually closing at $193.60, a 44.29% drop from GME's close of $347.51 just one day prior. Similarly, shares of AMC plummeted 56.63%, shares of EXPR fell 50.79% and shares of BBBY fell 36.40%. Retail Investors who wanted to take advantage of the price drop to buy more shares of the Relevant Securities were unable to due to the prohibition on purchasing.

257.    The figures below (reproduced from above for ease of reference) illustrate the share prices of Relevant Securities from December 28, 2020 through January 29, 2021, and show the rise in share price attributable to the Retail Investors continued purchase of the stocks, as well as the sharp decrease in share price resulting from the restrictions imposed by the Brokerage Defendants on or about January 28, 2021.

258.    The figure below summarizes the prices of GameStop's stock from December 28, 2020 through January 29, 2021.



259.    The figure below summarizes the prices of Nokia Corporation's stock from December 28, 2020 through January 29, 2021.



260.    The figure below summarizes the prices of AMC Entertainment Holdings, Inc.' stock from December 28, 2020 through January 29, 2021.



261.    The figure below summarizes the prices of Koss Corporation's stock from December 28, 2020 through January 29, 2021.



262.    The figure below summarizes the prices of Trivago stock from December 28, 2020 through January 29, 2021.



263.     The figure below summarizes the prices of Bed Bath & Beyond stock from December 28, 2020 through January 29, 2021.



264.     The figure below summarizes the prices of Express stock from December 28, 2020 through January 29, 2021.



265.    The figure below summarizes the prices of Tootsie Roll Industries Inc.'s stock from December 28, 2020 through January 29, 2021.



266.    The figure below summarizes the prices of BlackBerry's stock from December 28, 2020 through January 29, 2021.



267.     The prohibition on purchasing stock did not apply to all investors. Large investment firms such as the hedge funds and Market Maker Defendants were not restricted from purchasing the Relevant Securities. While Retail Investors were excluded from purchasing securities at the reduced rate, investment firms and market makers such as Citadel Securities holding short positions were permitted to cover their short positions by buying securities at the artificially reduced price, including from dark pools such as the Market Maker Defendants' own internalized exchanges.

268.     As the Retail Investors sold their shares in the Relevant Securities due to the trading restrictions, the Market Maker Defendants internalized those transactions and took the other side of those sell orders, i.e., they bought the shares the Retail Investors were selling—at an artificially reduced price—to close their short positions. In doing so, the Market Maker Defendants were able to buy and return the borrowed securities they had sold short.

269.     Numerous broker-dealer firms collectively prohibited Retail Investors from opening new positions in GME, AMC and other Relevant Securities on January 28, 2021. Some restricted Retailer Investors from buying or opening new long positions in securities wholesale, whereas others restricted purchasing options only.

270.     Not all brokerages restricted the purchase of the Relevant Securities. Even in the cases where brokerages were allowing Retail Investors to open new long positions, however, clearing firms began to raise fees to purchase securities or otherwise instruct brokerages not to consummate purchase orders.

271.     Brokerages and trading venues route trades through clearing brokers which streamlines the trading process. By increasing fees to purchase a particular stock, the clearing firm can suppress the number of purchases of that stock and negatively affect the stock's price.

272.     Many of the Brokerage Defendants, including Robinhood, act as their own clearing firm. These self-clearing Brokerage Defendants were able to use their own self-clearing ability to restrict trading through their own brokerages.

273.     For the Brokerage Defendants who did not self-clear, they restricted trading at the direction of their clearing broker.

274.     For instance, Anthony Denier ("Denier"), the CEO of Webull, a brokerage which had restricted trading in the Relevant Securities, placed the blame squarely on its clearing firm, Apex. According to Denier, the collateral required by Apex for GameStop increased by 100% and Apex had informed him that Webull needed to shut off the ability to open new positions in certain stocks. Denier further said that the restrictions originated the morning of January 28, 2021 and was informed that Apex was instructed by the DTCC that it was increasing the collateral needed to settle trades for the Relevant Securities.

275.     SoFi also restricted trading at the direction of Apex.



276.     Other brokerages, including Ally, Dough, Public.com, Stash and Tastyworks also reported that Apex had instructed them to halt all opening transactions of GameStop, AMC and Koss on their platforms. For example, Dough tweeted, "[o]ur clearing has notified us that we must set GME, AMC, and KOSS to closing only. We will comply." Public.com similarly tweeted, "[o]ur clearing firm, Apex Holdings, has decided to halt the buying of $KOSS, $GME, and $AMC." Public.com subsequently tweeted "[w]e disagree with this decision and are working hard for our members to resolve the issue."

277.     Upon information and belief, ETC also prohibited Alpaca from allowing its users to purchase the Relevant Securities.

278.     Perhaps fearing reprisal or worried that Apex or ETC would fail to execute, clear, and/or settle its customers' transactions, the Introducing Brokerage Defendants acquiesced to Apex's and ETC's demand to restrict trading in the Relevant Securities.

*Collusion Amongst Defendants*

279.     Defendants were aware that they were acting in concert to collude and manipulate the market. In an interview given by Interactive Brokers's chairman Thomas Peterffy ("Peterffy") on January 28, 2021, Peterffy admitted that Interactive Brokers had restricted trading in order to "protect ourselves." That same evening, Robinhood's CEO Vlad Tenev ("Tenev") told CNBC that Robinhood decided to stop trading in the Relevant Securities, in part "to protect the firm."

280.     The anticompetitive conspiracy described herein was authorized, ordered or performed by the Defendants' respective officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction, or control of the Defendants' businesses or affairs.

281.     The coordinated and collusive prohibition on purchasing placed on Retail Investors quickly resulted in criticism from journalists and lawmakers. Robinhood in particular drew criticism from lawmakers on both sides of the aisle, including calls for congressional hearings and investigations by the U.S. Department of Justice.

282.     Following the unprecedented restriction on trading, Robinhood's conflict-ridden relationships quickly came to light. It was revealed that Citadel Securities regularly worked closely with Robinhood, serving as Robinhood's market maker over 60% of the time.

283.     Citadel Securities pays Robinhood for order flow. The "payment for order flow" relationship provides market makers with an opportunity to profit from the large amount of

trading data collected by Robinhood and other Brokerage Defendants and provides Robinhood with profits as well as the funds required to provide zero-commission trading to its users. According to Robinhood's SEC Rule 606 filing, Citadel Securities was responsible for over $141 million of the approximate $330 million that Robinhood received as payment for order flow in the first quarter of 2021 alone.

284.     According to the SEC, payment for order flow can "create conflicts of interest for brokers because of the tension between the firms' interests in maximizing payment for order flow or trading profits generated from internalizing their customers' orders, and their fiduciary obligation to route their customers' orders to the best markets."

285.     Indeed, payment for order flow relationships between Citadel Securities and Robinhood as well as between Citadel Securities and other brokerages create a system ripe for illegal coordination.

286.     Market makers like Citadel Securities developed large short positions in the Relevant Securities in the days leading up to and including January 28, 2021 as a result of the market makers' regular market making activities. As stock prices rise in an environment driven by retail trader buying activity, market makers typically take the other side of the retail traders' stock buys and as a result the market makers develop short positions in the stocks that the retail traders have been buying. Traditional market makers would try to avoid building a short position and remain market neutral in such an environment by buying back shares that the market makers have sold short, while aiming to capturing the bid and ask spread to profit. However, a different type of market maker will integrate market making and speculative position taking in such an environment, which would allow the market maker to take on more trading volume by assuming more risk. It can be difficult for a market maker to both remain neutral and handle high order

71

flow, and it can be natural for more aggressive market makers to take on more risk. Thus, many larger market makers become a hybrid of a market maker and a proprietary trader.

287.    Market makers that engage in hybrid market making and proprietary trading, in an environment such as that seen in late January 2021 where retail traders are continually buying certain stocks, will see the size of the market makers' short positions grow as they take the other side of the retail trading activity and do not adhere to a strictly market neutral approach. As those market makers' short positions increase, the short positions will at some point begin to reach the market makers' risk limits. This is particularly the case when there are unidirectional market flows, i.e., when a stock is "breaking out," and there are no correlated instruments with which the market makers can hedge their positions. In such a time, it may be impossible for the market makers to buy back all the shares that the market makers have sold short without locking in a loss. A market maker is then faced with the choice of either allowing a continued speculative buildup of a short position, presumably because the market maker expects the market to subsequently reverse, or closing out at the position at loss. Market makers that hold significant short positions that continue to build up during break-out conditions where a security has no natural hedges are clear examples of the hybrid model where speculative position taking is embedded in a market maker operation.

288.    As market makers build their short positions under the dynamic described above, the market makers will approach the market makers' risk limits. When a market maker approaches the market maker's risk limit, the market maker will be faced with the decision to either stop selling and begin buying back the shorted stock at a loss, or to work with the firm's management and risk group to increase the firm's risk limits.

289.    For a market maker that chooses not to increase the risk limits and instead routes

orders away to the exchange, that market maker will face dramatic adverse consequences for the following two reasons.

290.    The first reason is that market makers have an incentive to keep the retail traders' buy orders off the exchange to prevent the buy orders from driving further up the price of the securities that the retail traders are buying. For example, directing an order of $500,000 for a given security towards a public exchange would increase the demand for that security on the exchange and drive the security's price up. If the market maker had already developed significant short positions in that security from the dynamic described above, then any increase in the price of the security would make it difficult for the market maker to buy back that security and close the market maker's short positions, and the market maker would experience mark to market losses as the security moved upward against the market maker's short position.

291.    The second reason is that these market makers have arrangements whereby the market makers pay retail brokers for payment for order flow. Under these arrangements, the market makers pay retail brokers to direct trades towards the market makers, thereby creating volume for the market makers' market making services. If a market maker is unable to take the other side of a trade itself internally, the market maker must instead route the trade to the exchange. In doing so, the market maker then pays a "taker fee" for each trade that the market maker directs to an exchange. In other words, the market maker must realize a mark to market loss for each trade that the market maker directs away from itself to an exchange. This loss may amount to roughly one-half of one cent per share, when payments to the broker and exchange transactions fees are considered.

292.     Those two reasons were strong enough incentives to not route orders away to an exchange that the reasons led the Market Maker Defendants to build large short positions in the Relevant Securities in the days leading up to January 28, 2021.

293.     Market makers that continue to grow large short positions in the way described above may at some point cross the line from market making activity to speculative proprietary trading as the market makers begin to take directional bets on the direction of the market. Such speculative proprietary trading violates SEC Regulation SHO, which allows market makers that engage in bona fide market making activities to benefit from an exception to the "locate" rules that would otherwise require a broker-dealer to locate stock before selling the stock short.

294.     Regulation SHO, which was promulgated in 2004, only applies to bona fide market making activities, and the preamble to Regulation SHO indicates that "[b]ona-fide market making does not include activity that is related to speculative selling strategies or investment purposes of the broker-dealer and is disproportionate to the usual market making patterns or practices of the broker-dealer in that security." (69 FR at 48015). A significantly large short position developed by a market maker should be considered evidence that the market maker actually has a speculative view on the direction that the market will move and that the market maker has chosen not to maintain a neutral position. When large market makers such as Citadel develop such large short positions, those large market makers divert from bona fide market making activities within the meaning of Regulation SHO by not keeping a neutral book and instead taking a bet that the market will drop. Such market makers are then no longer engaged in a bona fide market making activity within the meaning of Regulation SHO but are instead engaged in "speculative selling strategies" that are "disproportionate to the usual market making patterns or practices" of the market maker. Notably, the SEC has successfully pursued actions

against several market makers for violating Regulation SHO through similar speculative short

selling activities that did not constitute bona fide market making activities. *See*, *e.g.*,

https://www.sec.gov/litigation/admin/2016/34-79579.pdf and

https://www.sec.gov/litigation/admin/2012/34-66283.pdf.

295.    Citadel Securities built substantial short positions in the Relevant Securities in

late January 2021 through the dynamic described above. Since short positions are not disclosed

on Form 13F, though, such positions are not publicly disclosed.

296.    The Market Maker Defendants were able to communicate with the brokerages

swiftly and effectively because of their pre-existing relationships. Indeed, high-level executives

of Citadel Securities regularly communicated with and coordinated with high-level executives of

Robinhood and others in the lead up to, during and after the restrictions imposed on or around

January 28, 2021.

297.    For example, on January 20, 2021, ██████████, Head of Execution Services

for Citadel Securities, and Josh Drobnyk, the newly hired Vice President of Corporate Relations

and Communications for Robinhood, agreed to communicate. ██████ and Drobnyk had a prior

relationship through Drobnyk's employment at FINRA when ██████ served on FINRA's board.

298.    During this communication, ██████ extended a proposition to Drobnyk.

Drobnyk discussed with Dan and Lucas, likely Daniel Gallagher and Lucas Moskowitz,

Robinhood's chief legal officer and deputy general counsel respectively and agreed to revert to

██████ "by early next week at the latest."

299.    ██████ responded it was "good to reconnect and very happy that we will be

working together." Additionally, ██████ responded for Drobnyk to "just let us know if interested

and who the main contact should be."

| From: | ████████████████████ |
| Sent: | Wed, 20 Jan 2021 22:53:44 +0000 (UTC) |
| To: | "Josh Drobnyk" ████████████████ |
| Subject: | RE: [EXTERNAL] Great to connect |

Thanks Josh, good to reconnect and very happy that we will be working together.  Sounds good, just let us know if interested and who the main contact should be.

From: Josh Drobnyk ████████████████████████
Sent: Wednesday, January 20, 2021 5:35 PM
To: ████████████████████████
Subject: [EXTERNAL] Great to connect

**CAUTION:** This email is from an external sender.

████ Really great to connect today. Glad we will be working together. Connected with Dan and Lucas and going to be discussing at our next meeting and will loop back by early next week at the latest. Ping me if you need anything in the meantime -- otherwise will be back in touch shortly.

Talk soon,

Josh

--

[_x0000_i____]

**Josh Drobnyk**
VP Corporate Relations and
Communications
Washington, DC

Don't copy, share, or use this email without permission. If you received it by accident, please let us know and then delete it right away.

300.    On Monday, January 25, 2021, Drobnyk emails ████ and says "[w]e are on board." Drobnyk says Lucas Moskowitz, Robinhood's deputy general counsel, would be the main point of contact.

**From:** Josh Drobnyk █████████████
**Sent:** Monday, January 25, 2021 1:01 PM
**To:** █████████████
**Cc:** Lucas Moskowitz █████████████
**Subject:** [EXTERNAL] follow up

**CAUTION:** This email is from an external sender.

Hi ████

Quick follow up. We are on board. Lucas Moskowitz, who I am cc'ing, is going to be central point of contact on our end. You probably know Lucas already, he is our deputy general counsel.

Talk soon,

Josh

--

Josh Drobnyk
VP Corporate Relations and
Communications

301.    █████    in turn extends an invitation to Moskowitz to "chat" and expressed that "we obviously have a strong relationship between the two firms."

302.    █████    and Moskowitz then arranged a call for 11 a.m. Eastern time on January 26, 2021.



303.    While the details of these communications have not been disclosed, it is clear that these representatives of Citadel Securities and Robinhood reached an agreement on January 25, 2021, and each took affirmative steps in furtherance of the illicit scheme.

304.    On January 27, 2021, the day before the restrictions were implemented, high level employees of Citadel Securities and Robinhood had numerous communications with each other that indicate that Citadel applied pressure on Robinhood.

305.    In an internal Slack chat conversation, Gretchen Howard, Robinhood's Chief

Operating Officer, informs Vlad Tenev that "Dan and I are joining Jim at 5pm on a call with Citadel." Dan and Jim likely refer to Dan Gallagher and Jim Swartwout, President and Chief Operating Officer of Robinhood Securities. Citadel Securities had requested to speak that evening. Howard indicated that she believed Citadel Securities would make demands on limiting payment for order flow.

306.    As described above, Robinhood makes significant sums from selling order flow, and in particular, selling order flow to Citadel Securities.

307.    Tenev muses that "Maybe this would be a good time for me to chat with Ken griffin [sic]" and tells Howard, "You guys can mention that."

# DEMMUJTLP: 01/27/2021

---

**Gretchen Howard**

01/27/2021 16:39:23

Just a FYI that Dan and I are joining Jim at 5pm on a call with Citadel. They reached out and want to speak this evening and we believe they will make some demands on limiting PFOF across the board. We won't agree to anything but wanted to give you a heads-up.

---

**Vlad Tenev**

01/27/2021 16:44:21

Ok

---

**Vlad Tenev**

01/27/2021 16:44:49

Maybe this would be a good time for me to chat with Ken griffin

---

**Vlad Tenev**

01/27/2021 16:44:54

You guys can mention that

---

**Vlad Tenev**

01/27/2021 16:46:03

I've never met him

308.    Shortly thereafter, in an internal chat, ▇▇▇▇▇▇, Senior Director of Clearing Operations at Robinhood tells Swartwout, "[a]necdotal evidence that several 'very large' firms are having really bad nights too."

▌ ████████

01/27/2021 18:24:40

Anecdotal evidence that several "very large" firms are having really bad nights too

**jim.swartwout**

01/27/2021 18:25:47

everyone is. you wouldnt believe the convo we had with Citadel. total mess

309.    Swartwout responds that "everyone is. you wouldnt [sic] believe the convo we had with Citadel. total mess."

310.    At 8:16 p.m., Swartwout emails ██████ ████████ at Citadel Securities looking for "new Citadel numbers." ████████ informs Swartwout at 9:31 p.m. that the numbers were "[f]irming up right now in light of the follow up conversation between Gallagher and ██████."



311.     At 8:29 p.m., █████████, Citadel Securities's Vice President of Business

Development, emailed Robinhood personnel including Swartwout that ████████, "whom Vlad has

met before, is available until 10pm EST to speak to Vlad." ██████ offers to set up a call.

312.     Swartwout, in turn responds minutes later, "Because of our partnership, Vlad

would like to have a discussion with Ken [Griffin] at some point, just given our relationship. Not

specific to this crazy issue."

313.     Swartwout later cryptically tells █████, "I have to say I am beyond disappointed in

how this went down. It's difficult to have a partnership when these kind of things go down this

way."



From: "Jim Swartwout" [redacted]
Sent: Thu, 28 Jan 2021 01:41:29 +0000 (UTC)
To: [redacted]
Cc: [redacted]
Subject: Re: [EXTERNAL] Re: Call w/Vlad

Nope. just got off the phone with him. Just looking for your dictated schedule and caps. I have 20 minutes until batch so whatever it is we are not going to be able to address it tomorrow given the notice.

I have to say I am beyond disappointed in how this went down. It's difficult to have a partnership when these kind of things go down this way.

Jim

On Wed, Jan 27, 2021 at 8:38 PM [redacted] wrote:

Makes sense. We can look to set that up at a later date.

Let me know if you guys and/or Vlad want to hop on with [redacted] tonight?

From: Jim Swartwout [redacted]
Sent: Wednesday, January 27, 2021 8:32 PM
To: [redacted]
Cc: [redacted]
Subject: [EXTERNAL] Re: Call w/Vlad

CAUTION: This email is from an external sender.

Because of our partnership, Vlad would like to have a discussion with Ken at some point, just given our relationship. Not specific to this crazy issue

On Wed, Jan 27, 2021 at 8:29 PM [redacted] wrote:

Hi Jim and [redacted]

The head of our business, [redacted] whom Vlad has met before, is available until 10pm EST to speak to Vlad. Let me know, and we will set this up.

Thanks,

[redacted]

314.     High-level employees of Citadel Securities did not only communicate with Robinhood's employees.

315.     For example, on January 28, 2021, high level employees of Defendant E*Trade communicated with employees of Citadel Securities to ensure certain orders were cancelled.

316.      ██████████, Senior Manager for Trading Operations for E*Trade, emails

Citadel Securities about "Potential open orders." ██████ lists a number of securities and asks

Citadel Securities if it can "confirm you're out on these." ██████ of Citadel Securities

confirmed that several of the orders were "Canceled."



317.      Defendants' conspiratorial acts resulted in lockstep price movements of the

Relevant Securities that can only be explained by coordinated, lockstep actions by Defendants, in

particular when considering Retail Investors were only permitted to sell positions in the Relevant

Securities.

318.      As demonstrated by the charts below, the stock prices of the Relevant Securities

moved in parallel fashion throughout January 28, 2021. For example, the charts revealed a

coordinated rise in the prices of the Relevant Securities from approximately 11:00-11:30 a.m., immediately after the Relevant Securities took a steep dive after the markets opened. At that time, few if any Retail Investors were permitted to purchase positions in the Relevant Securities and only institutional investors such as hedge funds and the Market Maker Defendants were permitted to purchase.



*The Anticompetitive Scheme Continued After January 28, 2021*

319.     Partly as a result of criticism, as the market opened on January 29, 2021, nearly all of the Brokerage Defendants had lifted their trading restrictions and permitted Retail Investors to open new long positions in the Relevant Securities.

320.     Even in the face of increased scrutiny, however, Defendants continued their anticompetitive scheme to suppress the price of the Relevant Securities.

321.    While purchases of the Relevant Securities were permitted, they were heavily restricted by the Brokerage Defendants, resulting in continuing suppression of their value.

322.    Many of the Brokerage Defendants restricted trading of long option contracts and announced to Retail Investors they would close out their profitable option positions automatically.



323.    Robinhood also placed limitations on the number of new positions its users could open by capping the total number of shares and options contracts an individual could hold in certain securities. Nevertheless, Retail Investors, still believing in the value of the assets, continued to purchase the Relevant Securities once they were permitted.

324.    On January 29, 2021, Robinhood limited users to purchasing imposed limitations on the Relevant Securities. With respect to GameStop, Robinhood first restricted Retail Investors to purchasing only two shares of GameStop, which resulted in a rapid decline in the value of GameStop.



325.     On January 30, 2021, the value of the Relevant Securities began to regain the value lost the prior days as a result of Defendants' coordinated action to suppress the value of the stocks. Because the Market Maker Defendants, hedge funds, and other unnamed conspirators still had distressed short positions outstanding, this threatened their ill-gotten gains achieved the day before. Robinhood then instituted a one share limit on the Relevant Securities, including GME and AMC further causing the value of the stocks to decrease.



326.     Even though some brokerages had lifted their restrictions, the effects of the restrictions persisted as a result of the continued restrictions at Robinhood and other brokerages.

327.     Although Apex had lifted restrictions on trading by January 29, 2021, it continued its participation in the scheme by policing the conspiracy and warning Robinhood of efforts to purchase the Restricted Securities.

328.     An internal Robinhood Slack chat revealed that it was Apex that alerted Robinhood to efforts to purchase the Restricted Securities. For example, on January 29, 2021, Miles Wellesley, VP of Business Development at Robinhood, shared a link to a Reddit post titled "How to Buy GME Above Broker Limits" to David Dusseault, President and COO of Robinhood Financial.

329.     Wellesley tells Dusseault, "FYI Apex pinged me on this to make sure we're aware of it."

## DSASAGQ21: 01/29/2021

**Miles Wellesley**

01/29/2021 13:11:01

https://www.reddit.com/r/wallstreetbets/comments/l82y7u/how_to_buy_gme_above_broker_limits/?utm_source=share&utm_medium=ios_app&utm_name=iossmf

reddit: How to Buy GME Above Broker Limits

How to Buy GME Above Broker Limits **(reddit)**
How to Buy GME etc [Loophole] Robinhood and other shitty brokerages are allowing us to buy 2, 5, or very low numbers of GME. However, they are...

**Miles Wellesley**

01/29/2021 13:11:19

FYI Apex pinged me on this to make sure we're aware of it.

**david.dusseault**

01/29/2021 13:11:38

thanks

**david.dusseault**

01/29/2021 13:12:17

we saw some of this today, didn't see this post yet though there were a couple of approaches

330.    Specifically, Apex notified Robinhood about posts on WallStreetBets that indicate

Retail Investors found a loophole which allowed them to purchase shares of the Relevant

Securities above the limitations imposed by Robinhood.

## DH9QUDLTU: 01/29/2021

**Miles Wellesley**

01/29/2021 13:09:15

FYI - Apex reached out to me to make sure we saw this.
https://www.reddit.com/r/wallstreetbets/comments/l82y7u/how_to_buy_gme_above_broker_limits/?utm_source=share&utm_medium=ios_app&utm_name=iossmf

reddit: How to Buy GME Above Broker Limits

**How to Buy GME Above Broker Limits** (reddit)
How to Buy GME etc [Loophole] Robinhood and other shitty brokerages are allowing us to buy 2, 5, or very low numbers of GME. However, they are...

**Miles Wellesley**

01/29/2021 13:14:20

I told Dave as well. Seems like we're on top of it.

**jim.swartwout**

01/29/2021 13:19:30

thanks

331.    Each artificial limitation in the amount of securities a Retail Investor could purchase correlated with a subsequent decrease in share value. As purchases of the Relevant Securities were limited, more investors were pressured to sell who otherwise would not have in the presence of a free and open market.

332.    In order to disguise their illegal agreement after the restrictions on or around January 28, 2021, high-level executives and communications professionals at Citadel Securities and Robinhood communicated between each other to coordinate their messaging.

333.    On January 30, 2021, Citadel Securities's ▬▬▬▬▬ sent an email to Josh Drobnyk, Robinhood's Vice President of Corporate Communications. In this email, ▬▬▬▬▬ introduced Drobnyk to ▬▬▬▬▬, who ▬▬▬▬ described as the person "running point on this

narrative for us." ███████ indicated he "wanted to generally coordinate messaging." Additionally,

███████ cc'd two individuals he described as "our GCs" "for privilege."

334.   ███████, who was on a flight, arranged to "connect" with Drobnyk once

landed. ███████ asked if the issue was "urgent" or "super urgent."

335.   ███████ called Drobnyk twice after the flight landed.



From:        ████████████████████████████

Sent:        Sat, 30 Jan 2021 15:57:41 +0000 (UTC)

To:          Josh Drobnyk ████████████████████

Subject:     Re: [EXTERNAL] Re: connecting

Hi, its Redacted for PII but I am on a plane for another hour. I Urgent? call you shortly after I land? Super urgent?

On Jan 30, 2021 10:40 AM, Josh Drobnyk <████████████████ wrote:
CAUTION: This email is from an external sender.

looks like emails just crossed. whats best # for you?

On Sat, Jan 30, 2021 at 10:36 AM ████████████████ wrote:

Thanks ████
Josh, good to meet you, happy to connect whenever you like.

On Jan 30, 2021 9:57 AM, ████████████████████ wrote:

Just want to connect ███ and Josh.

███ – Josh just joined Robinhood to run corp comms (impeccable timing 😊) and wanted to generally coordinate
messaging, in particular some of the narrative around Ken owning Robinhood.  Josh is a great professional, he ran corp
comms at Finra during my Board tenure.

Josh – ███ has been running point on this narrative for us.  I am copying Shawn and ███ (our GCs) as an FYI and for
privilege.  Both know Gallagher well.

Thanks all.

336.   Robinhood ultimately continued to impose limitations on certain securities

through February 4, 2021, despite announcing on January 29, 2021, that it raised more than $1

billion to help meet rising demands for cash and shore up its balance sheet. The money raised

91

was on top of $500 million Robinhood accessed through credit lines to ensure it had the capital required to keep allowing its clients to trade the Relevant Securities. On February 1, 2021, Robinhood announced that it raised an additional $2.4 billion in funding on top of the $1 billion it has raised the previous week.

337.    On January 29, 2021, the SEC once again issued a statement that it was "closely monitoring and evaluating the extreme price volatility of certain stocks' trading prices over the past several days," and on February 1, 2021, then acting SEC Chair Allison Herren Lee stated during an interview with NPR that "[t]he Commission will closely review actions taken by regulated entities that may disadvantage investors or otherwise unduly inhibit their ability to trade certain securities." She also stated that the SEC was investigating the role that short selling may have played in the recent events.

338.    On January 31, 2021, Robinhood's CEO Tenev published an opinion piece on USA TODAY. Despite previously citing market volatility as the reason for Robinhood's decision to impose the trading restrictions, Tenev now stated Robinhood's decision was made based on clearinghouse-mandated deposit requirements that it claimed were "increased ten-fold."

339.    However, Tenev's excuse that Robinhood restricted trading because of NSCC deposit requirements increasing ten-fold was merely pretext as Robinhood likely knew it had liquidity issues before the NSCC margin call and made the decision to restrict trading in the Relevant Securities before NSCC notified them of same.

340.    On February 18, 2021, Robinhood's CEO Tenev testified before the U.S. House Committee on Financial Services. Tenev's prepared statement disclosed that the Robinhood Securities operations team made the decision to impose trading restrictions on the Relevant securities between 6:30 and 7:30 a.m. EST. Although Robinhood had been attributing its trading

restrictions to increased clearinghouse-mandated deposit requirements, Tenev revealed that Robinhood met its revised deposit requirements a little after 9:00 a.m. EST on January 28, 2021. Nevertheless, Robinhood held fast to its decision to restrict purchases of the Relevant Securities when the market opened, continued to impose restrictions for the entirety of trading day, and limited the number of stocks and option contracts its users could acquire through February 4, 2021.

341.    Similarly, Apex's president Tricia Rothschild admitted in an interview with Financial Planning on March 4, 2021, that Apex did not restrict trading as a result of capital requirements, stating that Apex had headroom in terms of the capital available on its balance sheet and also had credit lines it could call upon. Notwithstanding, Apex instructed Ally, Dough, Public.com, Sofi, Stash, Tastyworks and Webull to halt their clients' ability to purchase shares of GME, AMC and/or KOSS on January 28. Apex's communication to suspend users' ability to purchase shares of the Relevant Securities was only made telephonically to Webull, and presumably others.

### *Data Reveals that Shorts Exited Their Exposed Short Positions*

342.    Publicly available data reveals that short interests significantly decreased as a result of the trading restrictions described herein, with the sharpest and most significant decreases occurring after the coordinated restrictions on January 28, 2021.

343.    While it is difficult to determine who owns a particular short interest at any particular time and when that investor exits their short position, entities such as FINRA and governmental organizations such as the SEC regularly aggregate and report certain statistics related to short interests.

344.    FINRA member firms are required to report their short positions as of settlement

twice every month: on the 15th (or the preceding business day if the 15th is not a business day) and the last business day of the month. FINRA compiles the data and publishes the total short interest on the 8th business day after the reporting settlement date.

345.    Short interest is defined as the number of shares of a security that have been sold short but have not yet been covered or closed out and may be expressed as a number or percentage.

346.    Based on published short interest rates, aggregate short interest in the Relevant Securities, a strong indicia of bearish market sentiment, generally climbed in the reporting periods before the restrictions on and around January 28, 2021 and dropped precipitously as of January 29, 2021 and continuing through the first few weeks of February, i.e., short interest plummeted during the periods including the trading restrictions indicating short holders had exited their short positions during or soon after the trading restrictions. While some of the Relevant Securities reflect increasing short interest as of the report on January 29, 2021, because the reports do not require investors to disclose when those short positions were purchased, the data could capture large openings of short interest before January 28, 2021.

347.    The below are charts of the estimated total short interest for the Relevant Securities as reported by Market Beat from December 2020 through February 2021:

| AMC Entertainment Holdings, Inc. (AMC) | | | |
|---|---|---|---|
| Report Date | Total Shares Sold Short | Dollar Volume Sold Short | Change from Previous Report |
| Dec. 15, 2020 | 38,080,000 | $121.48 million | +13.6% |
| Dec. 31, 2020 | 38,990,000 | $84.22 million | +2.4% |
| Jan. 15, 2021 | 44,670,000 | $97.38 million | +14.6% |
| Jan. 29, 2021 | 37,720,000 | $325.52 million | -15.6% |
| Feb. 12, 2021 | 48,130,000 | $270.01 million | +27.6% |
| Feb. 26, 2021 | 55,490,000 | $460.01 million | +15.3% |

| BlackBerry Ltd. (BB) | | | |
|---|---|---|---|
| Report Date | Total Shares Sold Short | Dollar Volume Sold Short | Change from Previous Report |
| Dec. 15, 2020 | 34,570,000 | $285.20 million | +16.8% |
| Dec. 31, 2020 | 39,560,000 | $263.87 million | +14.4% |
| Jan. 15, 2021 | 43,490,000 | $396.19 million | +9.9% |
| Jan. 29, 2021 | 20,410,000 | $299.01 million | -53.1% |
| Feb. 12, 2021 | 32,350,000 | $403.08 million | -58.5% |
| Feb. 26, 2021 | 43,030,000 | $455.26 million | -33.0% |

| Bed Bath & Beyond Inc. (BBBY) | | | |
|---|---|---|---|
| Report Date | Total Shares Sold Short | Dollar Volume Sold Short | Change from Previous Report |
| Dec. 15, 2020 | 72,770,000 | $1.37 billion | +9.3 |
| Dec. 31, 2020 | 76,180,000 | $1.42 billion | +4.7% |
| Jan. 15, 2021 | 74,890,000 | $2.05 billion | -1.7% |
| Jan. 29, 2021 | 31,770,000 | $1.07 billion | -57.6% |
| Feb. 12, 2021 | 26,240,000 | $723.96 million | -17.4% |
| Feb. 26, 2021 | 25,460,000 | $669.34 million | -3.0% |

| Express, Inc. (EXPR) | | | |
|---|---|---|---|
| Report Date | Total Shares Sold Short | Dollar Volume Sold Short | Change from Previous Report |
| Dec. 15, 2020 | 6,970,000 | $7.25 million | +9.5% |
| Dec. 31, 2020 | 8,020,000 | $7.59 million | +15.1% |
| Jan. 15, 2021 | 7,220,000 | $9.24 million | -10.0% |
| Jan. 29, 2021 | 8,560,000 | $40.23 million | +18.6% |
| Feb. 12, 2021 | 5,930,000 | $16.72 million | -30.7% |
| Feb. 26, 2021 | 4,560,000 | $13.63 million | -23.1% |

| GameStop (GME) | | | |
|---|---|---|---|
| Report Date | Total Shares Sold Short | Dollar Volume Sold Short | Change from Previous Report |
| Dec. 15, 2020 | 68,130,000 | $866.61 million | +0.2% |
| Dec. 31, 2020 | 71,200,000 | $1.37 billion | +4.5% |
| Jan. 15, 2021 | 61,780,000 | $2.47 billion | -13.2% |
| Jan. 29, 2021 | 21,410,000 | $4.14 billion | -65.3% |
| Feb. 12, 2021 | 16,470,000 | $841.62 million | -23.1% |
| Feb. 26, 2021 | 14,200,000 | $1.54 billion | -13.8% |

| Koss Corporation (KOSS) | | | |
|---|---|---|---|
| Report Date | Total Shares Sold Short | Dollar Volume Sold Short | Change from Previous Report |
| Dec. 15, 2020 | 700 | $1,715.00 | -83.3% |
| Dec. 31, 2020 | 590,300 | $2.18 million | +84,228.6% |
| Jan. 15, 2021 | 12,800 | $39,296.00 | -97.8% |
| Jan. 29, 2021 | 756,100 | $31.73 million | +5,807.0% |
| Feb. 12, 2021 | 289,000 | $4.60 million | -61.8% |
| Feb. 26, 2021 | 598,700 | $12.89 million | -107.2% |

| Nokia Corp. (NOK) | | | |
|---|---|---|---|
| Report Date | Total Shares Sold Short | Dollar Volume Sold Short | Change from Previous Report |
| Dec. 15, 2020 | 48,240,000 | $192.96 million | -5.7% |
| Dec. 31, 2020 | 50,520,000 | $196.52 million | +4.7% |
| Jan. 15, 2021 | 59,550,000 | $243.56 million | +17.9% |
| Jan. 29, 2021 | 56,840,000 | $266.58 million | -4.6% |
| Feb. 12, 2021 | 16,470,000 | $841.62 million | -23.1% |
| Feb. 26, 2021 | 48,270,000 | $197.91 million | -15.1% |

| Tootsie Roll Industries, Inc. (TR) | | | |
|---|---|---|---|
| Report Date | Total Shares Sold Short | Dollar Volume Sold Short | Change from Previous Report |
| Dec. 15, 2020 | 7,260,000 | $223.03 million | -1.4% |
| Dec. 31, 2020 | 7,390,000 | $219.34 million | +1.8% |
| Jan. 15, 2021 | 7,400,000 | $222 million | +0.1% |
| Jan. 29, 2021 | 5,010,000 | $194.29 million | -32.3% |
| Feb. 12, 2021 | 3,960,000 | $122.64 million | -21.0% |
| Feb. 26, 2021 | 4,020,000 | $128.36 million | +1.5% |

| Trivago N.V. (TRVG) | | | |
|---|---|---|---|
| Report Date | Total Shares Sold Short | Dollar Volume Sold Short | Change from Previous Report |
| Dec. 15, 2020 | 2,410,000 | $5.78 million | -18.0% |
| Dec. 31, 2020 | 1,990,000 | $4.48 million | -17.4% |
| Jan. 15, 2021 | 1,940,000 | $4.33 million | -2.5% |
| Jan. 29, 2021 | 976,500 | $2.42 million | -49.7% |
| Feb. 12, 2021 | 2,900,000 | $7.74 million | +197.0% |
| Feb. 26, 2021 | 2,580,000 | $10.73 million | -11.0% |

348.    The data shows that short interest generally declined sharply after the coordinated trading restrictions on January 28, 2021 and continued to decrease into February.

349.    According to Reuters, short interest in GameStop ultimately declined to an estimated 15% as of March 24, 2021 from a peak of 141% in the first week of January.

350.    FINRA also aggregates dark pool trading activity. Generally, FINRA classifies over-the-counter ("OTC"; OTC is generally the trading of securities between two counterparties outside of formal exchanges and without the supervision of an exchange regulator) trading data into two categories, alternative trading systems ("ATS"), and OTC non-ATS dealers. Both ATS's and OTC non-ATS's are considered dark pools or dark exchanges due to their lack of transparency.

351.    As mentioned above, dark pools are the preferred trading venue for large institutional investors largely because they are not transparent. Additionally, Retail Investors generally do not have access to trading on dark pools.

352.    Additionally, the internal exchanges market makers such as Citadel Securities use to internalize order executions are also dark exchanges.

353.    FINRA data shows notable and significant increases in dark pool trading activity for each of the Relevant Securities on and around January 28, 2021, captured in the data tables below in the week beginning January 25, 2021.

354.    Below are the trading data for ATS and OTC non-ATS as published by FINRA for the Relevant Securities for the months of December 2020 through February 2021.

### AMC Entertainment Holdings Inc. (AMC)

|  | ATS Issue Data | | OTC (Non-ATS) Issue Data | |
|---|---|---|---|---|
| Week Starting | Total Shares | Total Trades | Total Shares | Total Trades |
| 12/7/2020 | 3,892,732 | 18,682 | 67,419,270 | 129,817 |
| 12/14/2020 | 18,391,507 | 46,178 | 104,778,002 | 202,961 |
| 12/21/2020 | 11,346,974 | 24,141 | 33,528,313 | 82,458 |
| 12/28/2020 | 16,302,709 | 26,755 | 64,304,993 | 117,401 |
| 1/4/2021 | 26,753,239 | 57,147 | 91,328,050 | 155,666 |
| 1/11/2021 | 34,838,029 | 52,224 | 190,054,425 | 219,454 |
| 1/18/2021 | 39,025,588 | 107,140 | 468,261,296 | 579,153 |
| **1/25/2021** | **163,944,634** | **861,814** | **1,316,481,677** | **6,387,856** |
| 2/1/2021 | 53,119,619 | 396,405 | 679,049,807 | 5,292,157 |
| 2/8/2021 | 19,006,375 | 100,007 | 267,479,975 | 1,581,292 |
| 2/15/2021 | 11,094,977 | 47,451 | 128,498,955 | 606,484 |
| 2/22/2021 | 57,563,861 | 255,961 | 655,595,790 | 2,765,472 |

### BlackBerry Ltd. (BB)

|  | ATS Issue Data | | OTC (Non-ATS) Issue Data | |
|---|---|---|---|---|
| Week Starting | Total Shares | Total Trades | Total Shares | Total Trades |
| 12/7/2020 | 6,741,741 | 28,369 | 52,582,544 | 83,413 |
| 12/14/2020 | 7,390,537 | 29,589 | 42,234,476 | 69,413 |
| 12/21/2020 | 4,080,363 | 16,744 | 22,436,470 | 33,445 |
| 12/28/2020 | 3,328,364 | 18,541 | 14,320,357 | 24,573 |
| 1/4/2021 | 5,497,996 | 23,126 | 24,320,552 | 35,956 |
| 1/11/2021 | 15,749,501 | 70,140 | 120,235,955 | 233,852 |
| 1/18/2021 | 22,768,771 | 102,523 | 214,606,499 | 485,668 |
| **1/25/2021** | **97,793,056** | **537,722** | **517,348,442** | **2,535,183** |
| 2/1/2021 | 15,853,070 | 71,561 | 115,283,157 | 706,823 |
| 2/8/2021 | 9,421,223 | 47,468 | 46,803,945 | 289,363 |
| 2/15/2021 | 4,935,816 | 27,732 | 28,637,443 | 150,047 |
| 2/22/2021 | 8,031,370 | 40,568 | 40,626,852 | 168,204 |

### Bed Bath & Beyond Inc. (BBBY)

| Week Starting | ATS Issue Data | | OTC (Non-ATS) Issue Data | |
|---|---|---|---|---|
| | Total Shares | Total Trades | Total Shares | Total Trades |
| 12/7/2020 | 5,657,584 | 32,668 | 8,876,324 | 22,509 |
| 12/14/2020 | 4,042,873 | 30,348 | 10,771,286 | 29,748 |
| 12/21/2020 | 1,750,491 | 13,449 | 5,254,166 | 14,276 |
| 12/28/2020 | 3,178,084 | 23,109 | 8,607,888 | 24,582 |
| 1/4/2021 | 11,217,626 | 58,775 | 29,015,914 | 89,634 |
| 1/11/2021 | 8,259,495 | 45,764 | 29,383,395 | 71,871 |
| 1/18/2021 | 6,835,010 | 38,787 | 25,306,634 | 64,126 |
| **1/25/2021** | **38,730,381** | **193,066** | **110,400,806** | **466,999** |
| 2/1/2021 | 5,591,490 | 28,687 | 16,197,789 | 103,485 |
| 2/8/2021 | 4,498,953 | 17,566 | 6,783,384 | 40,971 |
| 2/15/2021 | 1,599,526 | 14,266 | 2,724,684 | 17,053 |
| 2/22/2021 | 3,416,041 | 19,961 | 4,886,756 | 22,852 |

### Express, Inc. (EXPR)

| Week Starting | ATS Issue Data | | OTC (Non-ATS) Issue Data | |
|---|---|---|---|---|
| | Total Shares | Total Trades | Total Shares | Total Trades |
| 12/7/2020 | 1,380,310 | 5,117 | 10,348,509 | 10,888 |
| 12/14/2020 | 2,071,231 | 5,695 | 8,254,132 | 8,387 |
| 12/21/2020 | 409,385 | 2,000 | 4,185,373 | 4,102 |
| 12/28/2020 | 953,642 | 2,928 | 7,992,473 | 8,329 |
| 1/4/2021 | 903,858 | 3,041 | 6,556,352 | 6,822 |
| 1/11/2021 | 2,745,296 | 9,087 | 32,839,484 | 33,322 |
| 1/18/2021 | 3,192,561 | 11,068 | 29,041,757 | 31,091 |
| **1/25/2021** | **38,745,046** | **219,271** | **393,960,045** | **832,222** |
| 2/1/2021 | 5,518,566 | 24,966 | 51,136,521 | 169,630 |
| 2/8/2021 | 1,955,926 | 9,126 | 25,409,465 | 73,501 |
| 2/15/2021 | 1,483,747 | 7,268 | 16,072,575 | 31,354 |
| 2/22/2021 | 4,167,742 | 23,818 | 67,521,294 | 105,853 |

**GameStop Corp. (GME)**

| Week Starting | ATS Issue Data | | OTC (Non-ATS) Issue Data | |
|---|---|---|---|---|
| | Total Shares | Total Trades | Total Shares | Total Trades |
| 12/7/2020 | 4,150,662 | 23,690 | 26,137,279 | 107,667 |
| 12/14/2020 | 3,104,483 | 16,397 | 19,437,594 | 60,013 |
| 12/21/2020 | 4,900,689 | 28,967 | 35,405,726 | 122,854 |
| 12/28/2020 | 1,876,336 | 12,173 | 14,402,253 | 64,118 |
| 1/4/2021 | 3,458,092 | 21,807 | 13,926,925 | 63,783 |
| 1/11/2021 | 22,330,904 | 145,558 | 156,958,902 | 588,136 |
| 1/18/2021 | 29,392,454 | 206,476 | 170,039,730 | 849,773 |
| **1/25/2021** | **44,126,023** | **593,161** | **184,322,090** | **4,275,955** |
| 2/1/2021 | 17,913,654 | 392,399 | 109,775,294 | 3,417,362 |
| 2/8/2021 | 6,997,461 | 80,593 | 49,113,110 | 825,424 |
| 2/15/2021 | 3,905,721 | 45,227 | 21,554,348 | 341,014 |
| 2/22/2021 | 18,960,413 | 370,347 | 121,667,858 | 3,157,435 |

**KOSS Corporation (KOSS)**

| Week Starting | ATS Issue Data | | OTC (Non-ATS) Issue Data | |
|---|---|---|---|---|
| | Total Shares | Total Trades | Total Shares | Total Trades |
| 12/7/2020 | 1,020 | 25 | 12,957 | 141 |
| 12/14/2020 | 1,053 | 16 | 7,541 | 110 |
| 12/21/2020 | 957 | 14 | 17,168 | 99 |
| 12/28/2020 | 704,028 | 4,886 | 7,693,766 | 24,331 |
| 1/4/2021 | 49,563 | 281 | 222,980 | 1,144 |
| 1/11/2021 | 19,983 | 175 | 101,229 | 560 |
| 1/18/2021 | 84,142 | 495 | 787,582 | 3,456 |
| **1/25/2021** | **4,018,164** | **38,573** | **30,297,563** | **227,899** |
| 2/1/2021 | 1,333,623 | 13,244 | 12,227,611 | 119,411 |
| 2/8/2021 | 445,988 | 3,444 | 3,053,718 | 28,387 |
| 2/15/2021 | 691,320 | 4,516 | 4,781,106 | 25,017 |
| 2/22/2021 | 3,766,876 | 33,228 | 24,262,377 | 157,009 |

**Nokia Corp. (NOK)**

| Week Starting | ATS Issue Data | | OTC (Non-ATS) Issue Data | |
|---|---|---|---|---|
| | Total Shares | Total Trades | Total Shares | Total Trades |
| 12/7/2020 | 15,304,870 | 37,078 | 58,343,774 | 67,572 |
| 12/14/2020 | 11,046,987 | 22,587 | 38,453,491 | 51,333 |
| 12/21/2020 | 6,159,632 | 14,672 | 37,235,226 | 47,585 |
| 12/28/2020 | 6,279,603 | 13,492 | 29,688,635 | 44,172 |
| 1/4/2021 | 17,024,361 | 27,365 | 53,243,415 | 61,097 |
| 1/11/2021 | 22,745,501 | 35,962 | 84,580,606 | 83,576 |
| 1/18/2021 | 14,035,810 | 33,249 | 51,579,395 | 62,745 |
| **1/25/2021** | **244,503,016** | **912,658** | **971,216,858** | **3,015,757** |
| 2/1/2021 | 54,513,067 | 158,502 | 316,724,886 | 1,331,964 |
| 2/8/2021 | 299,776,442 | 79,687 | 147,701,559 | 519,336 |
| 2/15/2021 | 14,722,906 | 35,643 | 57,872,060 | 199,581 |
| 2/22/2021 | 33,203,315 | 71,206 | 124,573,499 | 292,852 |

**Tootsie Roll Industries, Inc. (TR)**

| Week Starting | ATS Issue Data | | OTC (Non-ATS) Issue Data | |
|---|---|---|---|---|
| | Total Shares | Total Trades | Total Shares | Total Trades |
| 12/7/2020 | 308,812 | 2,804 | 175,519 | 1,131 |
| 12/14/2020 | 132,678 | 2,076 | 166,570 | 1,263 |
| 12/21/2020 | 64,967 | 909 | 65,986 | 1,036 |
| 12/28/2020 | 229,091 | 1,890 | 118,505 | 1,394 |
| 1/4/2021 | 213,383 | 2,306 | 130,491 | 1,305 |
| 1/11/2021 | 78,974 | 1,036 | 91,898 | 1,096 |
| 1/18/2021 | 103,510 | 1,486 | 117,530 | 1,046 |
| **1/25/2021** | **3,042,836** | **17,884** | **2,490,108** | **23,595** |
| 2/1/2021 | 555,331 | 5,426 | 688,068 | 7,510 |
| 2/8/2021 | 147,255 | 1,835 | 282,505 | 2,971 |
| 2/15/2021 | 243,438 | 2,667 | 294,213 | 2,313 |
| 2/22/2021 | 408,039 | 3,555 | 303,286 | 2,759 |

**Trivago N.V. (TRVG)**

| Week Starting | ATS Issue Data | | OTC (Non-ATS) Issue Data | |
|---|---|---|---|---|
| | Total Shares | Total Trades | Total Shares | Total Trades |
| 12/7/2020 | 594,590 | 2,369 | 3,598,268 | 7,023 |
| 12/14/2020 | 289,827 | 1,184 | 2,231,256 | 4,985 |
| 12/21/2020 | 432,013 | 1,722 | 1,486,232 | 2,818 |
| 12/28/2020 | 327,779 | 1,787 | 1,517,784 | 2,911 |
| 1/4/2021 | 303,728 | 2,063 | 1,809,736 | 4,073 |
| 1/11/2021 | 188,440 | 1,216 | 1,552,429 | 3,724 |
| 1/18/2021 | 331,955 | 1,480 | 1,230,548 | 2,732 |
| **1/25/2021** | **6,425,337** | **22,467** | **31,902,982** | **64,826** |
| 2/1/2021 | 1,326,788 | 6,219 | 8,513,999 | 21,645 |
| 2/8/2021 | 2,006,351 | 8,135 | 20,579,588 | 42,034 |
| 2/15/2021 | 1,232,263 | 6,429 | 12,896,577 | 33,888 |
| 2/22/2021 | 1,864,214 | 9,477 | 18,561,297 | 54,194 |

355.     As reported by FINRA, the columns representing total shares are the total volume of shares of that security reported for that particular week. The total trades represent the total amount of transactions involving those shares.

356.     For each of the Relevant Securities, total shares and total trades in dark exchanges peaked during the week of January 25, 2021 and February 1, 2021 during the period when restrictions were first placed on the Relevant Securities, and were higher than every other week recorded from December 2020 through February 2021.

357.     Given that Retail Investors are generally not able to trade in dark pools and dark exchanges, the trading increases set forth in the FINRA reports indicate high institutional investor trading including high market maker activity around the time of the restrictions on the Relevant Securities, consistent with institutional investors taking advantage of the trading restrictions to exit their vulnerable short positions.

358.   Furthermore, FINRA OTC transparency data indicates that not only dark trading activity was elevated for the week of January 25, 2021, but that the bulk of that trading activity can be attributed to Citadel Securities.

| SYMBOL | BROKER | VOLUME | % OF VOLUME |
|---|---|---|---|
| GME | CANACCORD GENUITY LLC | 119,079 | 0% |
| **GME** | **CITADEL SECURITIES LLC** | **92,991,756** | **50%** |
| GME | CLEAR STREET LLC | 148,717 | 0% |
| GME | COMHAR CAPITAL MARKETS, LLC | 3,157,898 | 2% |
| GME | COWEN AND COMPANY | 3,030,737 | 2% |
| GME | CUTTONE & CO., LLC | 326,013 | 0% |
| GME | De Minimis Firms | 1,114,777 | 1% |
| GME | G1 EXECUTION SERVICES, LLC | 22,258,085 | 12% |
| GME | HRT EXECUTION SERVICES LLC | 249,973 | 0% |
| GME | INTERACTIVE BROKERS LLC | 2,999 | 0% |
| GME | JANE STREET CAPITAL, LLC | 6,306,835 | 3% |
| GME | LEK SECURITIES CORPORATION | 375,071 | 0% |
| GME | NASDAQ EXECUTION SERVICES, LLC | 582,562 | 0% |
| GME | NATIONAL FINANCIAL SERVICES LLC | 33,408 | 0% |
| GME | STOCKPILE INVESTMENTS, INC. | 28,622 | 0% |
| GME | TWO SIGMA SECURITIES, LLC | 4,379,714 | 2% |
| GME | UBS SECURITIES LLC | 4,163,075 | 2% |
| GME | VIRTU AMERICAS LLC | 43,388,647 | 24% |
| GME | WOLVERINE SECURITIES, LLC | 1,664,101 | 1% |
| | TOTAL | 184,322,069 | |

| SYMBOL | BROKER | VOLUME | % OF VOLUME |
|---|---|---|---|
| **AMC** | **CITADEL SECURITIES LLC** | **732,531,515** | **56%** |
| AMC | CLEAR STREET LLC | 833,054 | 0% |
| AMC | COMHAR CAPITAL MARKETS, LLC | 13,573,292 | 1% |
| AMC | COWEN AND COMPANY | 3,935,620 | 0% |
| AMC | CUTTONE & CO., LLC | 504,341 | 0% |
| AMC | De Minimis Firms | 3,739,069 | 0% |
| AMC | G1 EXECUTION SERVICES, LLC | 99,468,601 | 8% |
| AMC | HRT EXECUTION SERVICES LLC | 3,325,069 | 0% |
| AMC | INTERACTIVE BROKERS LLC | 1,595 | 0% |
| AMC | JANE STREET CAPITAL, LLC | 38,571,184 | 3% |
| AMC | LEK SECURITIES CORPORATION | 2,537,780 | 0% |
| AMC | NATIONAL FINANCIAL SERVICES LLC | 25,683 | 0% |
| AMC | SAGETRADER, LLC | 536,154 | 0% |
| AMC | STOCKPILE INVESTMENTS, INC. | 252,242 | 0% |
| AMC | TWO SIGMA SECURITIES, LLC | 37,512,324 | 3% |
| AMC | UBS SECURITIES LLC | 36,872,566 | 3% |
| AMC | VIRTU AMERICAS LLC | 333,698,597 | 25% |
| AMC | WOLVERINE SECURITIES, LLC | 8,562,991 | 1% |
| | TOTAL | 1,316,481,677 | |

359.    For example, as shown in the first two tables from FINRA's OTC transparency data reports for GME and AMC for the week of January 25, 2021, Citadel Securities represented roughly 50% of the non-dark pool over-the-counter market, the bulk of which is market maker volume. The scale of Citadel Securities's business will have significant impact on short volume reports available from FINRA and provides insight into Citadel Securities's short selling activity beyond what is disclosed in 13F reporting.

360.    The FINRA short volume reports provide daily numbers for Short Volume and Total Volume (one-sided volume) for all dark OTC trading activity. The percentage of the total volume represented by short sales constitutes the percentage volume of sales that were sold short. The associated volume of each trade that is reported through such metrics provides supporting evidence that a party that executed off-exchange had a short position at the time the contributing trade was executed. If a market maker maintains a consistent short position, the market maker will report significant short volume through these metrics. When a market maker that has significant market share has been maintaining a long position and then switches the position to a short position that is subsequently maintained, there will be a significant increase in the short volume reported. Because Citadel Securities represents about 50% of the dark trading activity, a large shift in the percentage of sales represented by short trades is highly likely to be caused by a shift in Citadel Securities's position from long to short or vice versa.

361.    The short volume reporting is consistent with a material change in Citadel Securities's position on January 27th, 2021, where Citadel Securities appears to have shifted from reporting shares sold long to shares sold short, as evidenced by the change in short ratios and short volume reported over the period. As seen in the table below, for each day, January 22, 25 and 26, the percentage of sells represented by shorts was about 35%. On January 27 that amount

jumped to about 53% where it plateaued for roughly 3 days. Such an increase is highly unusual and consistent with Citadel Securities taking on a large short position and strongly implies that Citadel Securities was short during that time. The transacted volume and 13F reports of other candidate market makers that might have contributed to the increase in the percentage of short volume relative to total volume does not suggest alternative explanations, given their relatively low share of the OTC market for the week of January 25, 2021.

| DATE | SYMBOL | SHORT | SHORT SALE EXEMPT | TOTAL VOLUME | % SHORT VOLUME |
|---|---|---|---|---|---|
| 20210129 | GME | 8,814,229 | 527,920 | 16,327,706 | 54% |
| 20210128 | GME | 9,606,123 | 455,032 | 18,899,860 | 51% |
| 20210127 | GME | 16,292,827 | 161,900 | 29,923,417 | 54% |
| 20210126 | GME | 27,348,512 | 514,375 | 82,653,297 | 33% |
| 20210125 | GME | 27,342,770 | 393,941 | 72,224,899 | 38% |
| 20210122 | GME | 33,257,918 | 686,860 | 97,123,046 | 34% |

***The Structure and Characteristics of the Market Support the Existence
of an Anticompetitive Agreement***

362.     The structure and characteristics of the market for securities, and in particular the lack of disclosure of short interest positions at any given time, make it conducive to collusion and anticompetitive conduct.

363.     Courts, scholars, and government agencies such as the Department of Justice recognize that structural market factors can help assess whether collusive conduct in violation of the antitrust laws has occurred.

364.     *High Barriers to Entry.* Markets with high barriers to entry are susceptible to anticompetitive collusion. Under basic economic principles, if there are high barriers to entry,

new entrants are unlikely to enter the market. If a broker dealer were to restrict trading in a security in high demand, new broker-dealers would enter the market to seek to benefit from the investors who wish to trade in the restricted security.

365.     The financial services industry is characterized by substantial barriers to entry. An entrant seeking to become a broker dealer or a clearing firm would need specialized knowledge, several licenses and memberships, including memberships in organizations such as FINRA. In addition to licensure costs, compliance costs to adhere to industry and regulatory standards are also significant.

366.     Additionally, entrants require significant amounts of cash or capital to deposit at clearinghouses such as the DTCC as collateral. The significant collateralization requirement also serves as a barrier to entry.

367.     Technological infrastructure has also become a barrier to entry. As the financial services industry shifts more and more technology focused and as many successful participants are financial technology firms, a new entrant needs to have the necessary infrastructure and expertise to navigate the digital market. Many of the exchanges on which securities are traded are electronic and fully automated, and allow institutions to directly interact with the securities on offer on the exchanges. NASDAQ for example has been fully electronic since its inception in 1971. Therefore, any potential market entrant would also need significant technological wherewithal and sophistication in order to participate in the financial markets.

368.     *High Fixed Costs and Low Variable Costs.* Markets characterized by high fixed costs and low variable costs are susceptible to anticompetitive collusion. The markets for broker dealers, clearing firms and market making are defined by high fixed costs, low variable costs and benefit greatly from scale, particularly with regards to online broker-dealers and clearing firms.

369.     For example, online broker-dealers require significant IT infrastructure, software, and data security infrastructure in order to develop and maintain the applications through which investors trade. This is in addition to the licensure and regulatory costs described above.

370.     Likewise, clearing firms require significant IT infrastructure, software, and data security infrastructure in order to facilitate the digital clearing and custodial services they provide to online broker dealers.

371.     Similarly, many market makers are high frequency traders and rely on sophisticated software and algorithms to match the incoming bids and offers of the orders routed to them from either broker dealers or clearing firms.

372.     In particular for HFT market makers, latency is critical in order to react quickly and engage in arbitrage strategies. As a result, HFT market makers invest significant effort and resources to increase the speed of trading technology to maximize their profits.

373.     Variable costs are low. Once infrastructure is in place, it generally is not more expensive to handle 10,000 trades as opposed to 10, particularly in the high-tech financial services market as exists today.

374.     *Commoditization.* The Relevant Securities are commodity (homogenous) products. A conspiracy involving commodity products can be easier to organize than one involving differentiated products. One share in a Relevant Security is identical to another share in that same security—it has similar, if not identical, characteristics and could be substituted for the another. Competition is purely based on price, in that a security purchased at a particular time could be more valuable than a security purchased at another time, depending on market conditions. Markets in which the product is commoditized are susceptible to anticompetitive collusion.

375.    Additionally, securities' prices are linked globally. The price of a security being traded on U.S. exchanges will be nearly identical to the price of the security being traded on a foreign exchange.

376.    For example, one share in stock X is functionally identical to another share of stock X. The only determinant of price is the relative supply and demand in investors who want to buy or sell shares in stock X.

377.    *Retail Investors Subject to the Conspiracy Are a Captive Market.* In a competitive market, if a consumer desires a product or service that is not offered by a particular seller, the consumer can go to a different seller who does offer the desired product or service.

378.    For example, in a competitive market for broker dealers, if a broker does not offer a particular security the investor desires, investors will move assets and invest with a broker dealer that does offer trading in that security.

379.    In the short run, however, an investor is generally locked into broker dealers that they already invest with.

380.    Generally, the process to open a trading account with a broker dealer takes a short amount of time, typically several days. Depending on the type of account, the waiting period may be longer or shorter. For example, opening a cash account typically takes a shorter amount of time than opening a margin account or options account because a broker dealer may require additional levels of proof of financial solvency such as a credit score check.

381.    If the coordinated activity however occurs in a short time window, investors have no opportunity to switch or change broker dealers, and are investing without market power.

382.     Even those Retail Investors who had accounts with different broker dealers may have been precluded from purchasing the Relevant Securities as a result of the coordinated conduct without any ability to purchase the Relevant Security of their choice.

383.     In a competitive market, Retail Investors with accounts in different broker dealers could simply purchase a security with another broker dealer that did not restrict trading.

384.     Indeed, Retail Investors may have accounts with multiple broker dealers for a variety of reasons, including the selection of securities available to trade in.

385.     If, however, multiple broker dealers restrict trading at exactly or near exactly the same time, even those Retail Investors with accounts at multiple brokerages would be restricted from purchasing the security they desire.

386.     *The Market is Opaque Rather than Transparent.* While the financial markets are generally regulated, important aspects of it are opaque and render the market susceptible for collusion.

387.     For example, it is generally impossible to know who owns a short interest at any given time despite the prevailing regulatory regime.

388.     While it is possible that a large investor may publicly disclose its present short positions, it would be unusual as it would give competitors an insight into their strategy. Also, because there is no way to verify if that were truly the short position the investor had at that moment, it could just as well be disinformation.

389.     Investment managers who have at least $100 million in assets under management are required by the SEC to file a Form 13F every quarter. Congress created the 13F requirement in 1975 with the intention of providing investors transparency into the holdings of the U.S.'s institutional investors.

390. Notwithstanding Congress's intent to provide transparency to investors and the public, these reporting requirements are significantly unregulated and subject to abuse. Form 13F filings have earned a reputation for being unreliable. Indeed, a 2010 SEC Report titled "Review of the SEC's Section 13(f) Reporting Requirements" found that "no SEC division or office regular or systemic review of the data filed on Form 13F" and that "no SEC division or office monitors the Form 13F filings for accuracy and completeness." The SEC found that, "[a]s a result, many Forms 13F are filled with errors or problems, which may not be detected or corrected in a timely manner."

391. Another issue with Form 13F filings is that disclosures are limited. Investors are only required to report long positions, and put and call options, but not short positions.

392. Because Form 13F filings do not require disclosure of short positions, Form 13F filings can paint a misleading picture as some investment firms generate most of their returns from short selling while using long positions as "hedges."

393. A "hedge" is an investment made with the intention of reducing the risk of another investment. For example, an investor with a large short position in a particular security may hedge by taking an offsetting or opposite position in a related or the same security. Hedging can also be accomplished through the use of derivative securities such as options.

394. Another issue with Form 13F filings is the temporal scope of the require reporting. 13F filings may be filed up to 45 days after the end of a quarter. As a matter of practice, 13F filings are submitted as late as possible. 13F filings, however, do not require reporting of when a particular position was purchased. Therefore, a reported position could have been purchased at any time within the four months prior to the filing.

395.     Additionally, if a 13F filing reports purchases of put or call options, there is no requirement to report the strike price or the expiry date, i.e., the price at which an option can be exercised and the date the option contract becomes invalid respectively.

396.     FINRA also requires member firms to report short interest positions in all equity securities twice a month. Reporting is typically on the 15th and the last day of each month with an adjustment to the previous business day if those days themselves do not fall on a business day.

397.     Even though FINRA publishes short interest reports publicly, as a general matter, it takes several days before the information is published and the number of shares sold short in the market may have changed dramatically.

398.     Further, the FINRA reports do not account for smaller intervals of time. Dramatic changes in short interest may occur within a particular window and not be captured in the regularly required report.

399.     Generally, it is not possible to ascertain which investor has a short position in a particular security at any particular time unless the position is voluntarily publicly disclosed by the holder of the short position. Unsurprisingly, very few investors voluntarily disclose their short positions.

400.     Although it is not possible to detect which specific investors are in large exposed short positions, the companies issuing affected securities are aware and can (and sometimes do) confirm if their stock has been significantly shorted or had been subject to a short squeeze.

401.     For example, in GameStop Corp.'s Form 10-K filed March 23, 2021, GameStop Corp. specifically identified a "short squeeze" as a potential risk factor. Further, GameStop Corp. disclosed that it experienced a short squeeze and that a large proportion of its stock had been sold short.

> A large proportion of our Class A Common Stock has been and may continue to be traded by short sellers which may increase the likelihood that our Class A Common Stock will be the target of a short squeeze. A short squeeze has led and could continue to lead to volatile price movements in shares of our Class A Common Stock that are unrelated or disproportionate to our operating performance or prospects and, once investors purchase the shares of our Class A Common Stock necessary to cover their positions, the price of our Class A Common Stock may rapidly decline.

402.    In the wake of the 2008 financial crisis, Congress legislated wide sweeping reforms designed at increasing transparency and curtailing the abuses within the financial sector that led to the crisis in the form of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010.

403.    Section 929X of the Dodd-Frank Act, titled "Short Sale Reforms," empowered the SEC to promulgate rules providing for the public disclosure of short positions to occur monthly at a minimum.

404.    To date, the SEC has not promulgated rules related to Section 929X.

405.    Additionally, Congress placed into Dodd-Frank an antitrust savings clause:

> Nothing in this Act, or any amendment made by this Act, shall be construed to modify, impair, or supersede the operation of any of the antitrust laws, unless otherwise specified. For purposes of this section, the term "antitrust laws" has the same meaning as in subsection (a) of section 12 of title 15, except that such term includes section 45 of title 15, to the extent that such section 45 applies to unfair methods of competition.

> 15 U.S.C. § 5303.

### *Motive to Collude*

406.    Defendants shared a common motive to conspire—to prevent themselves, and their peers, from hemorrhaging losses totaling potentially billions of dollars. The Market Maker Defendants and hedge funds possessed significant short positions in the Relevant Securities during the period in question. As the prices of the Relevant Securities went up, the exposure of

the Market Maker Defendants increased, and their losses were potentially infinite if they did not stop the surge of the Relevant Securities.

407.     As of December 31, 2020, Citadel Securities (the market maker), reported $57.5 billion in "securities sold, not yet purchased, at fair value," which is likely representative of Citadel Securities's short position.

408.     As Retail Investors bought securities and call options, Citadel Securities developed a large short position as a function of its market making, i.e., taking the other side of buy orders or purchased call option orders. As the price of the Relevant Securities increased, Citadel Securities's short position became increasingly distressed subjecting to a potential Short or Gamma Squeeze. Citadel Securities stood to benefit from the one-sided restrictions by taking the other side of the Retail Investors' sell orders that resulted from the one-sided sell-only restrictions placed by the Brokerage and Clearing Defendants. By taking the other side of the sell orders, Citadel Securities could return the stock it had borrowed to sell short, and benefit from the rapidly decreasing price of the Relevant Security, mitigating its loss as a result of the Short or Gamma Squeeze.

409.     Citadel Securities stood to gain from stopping the short squeeze by purchasing new short positions at the peak of the Relevant Security price increase and then profiting from the artificial decrease in share price after the trading restriction on January 28th. While there is no publicly available data to show that Citadel Securities was one of the parties that opened up new short positions on January 25—recall there is no requirement that hedge funds disclose their short positions except as described above—it would be in Citadel Securities's best interest to open up new short positions if Citadel Securities planned to leverage its relationships to halt trading of GameStop and other Relevant Securities and artificially depress their share price.

410.     Public Form 13F disclosures by market makers such as Citadel Securities reveal large short positions in Relevant Securities such as GME and AMC that grew substantially from December 2020 to March 2021. While short positions in stocks, call options and put options are not disclosed on Form 13F, long positions in put options are disclosed, and long put options represent short positions on the underlying stock.

411.     On Citadel's December 31, 2020 13F filing, which consolidated Citadel's advisory and market making subsidiaries, Citadel disclosed a long put option position on 2,224,500 shares of GameStop stock and a long put option position on 1,749,200 shares of AMC stock. On Citadel's March 31, 2021 13F filing, Citadel disclosed that the GameStop long put option position had grown by almost 50% to 3,271,400 shares and that the AMC long put option position had grown by 224% to 5,676,200 shares.

412.     Further, given Robinhood relies on payment for order flow for revenue, and sold a significant portion of its order flow to Citadel Securities, the two firms had motive to cooperate due to their close economic relationship. Indeed, in several internal conversations, high level executives of Robinhood and Citadel Securities stated the firms had a "strong relationship" and that the relationship was a "partnership."

413.     The Clearing Defendants, similarly, had reason to participate and join in the conspiracy. NSCC is a member driven corporation. Member clearing agents report the trades they receive to their parent organization, the DTCC. The DTCC then ensures the transfer of money to the seller's broker account and the transfer of security ownership to the buyer's broker account. To mitigate the risk of settling trades, the DTCC requires that NSCC member clearing firms put up collateral, which the NSCC member clearing firms typically pass down to brokerages. The DTCC collateral requirement changes depending on the perceived risk of the

order, since if one side of the trade defaults, and the broker cannot cover the loss, DTCC member firms are on the hook for completing the trade. In other words, if a member became bankrupt, DTCC and its member clearing agents would be on the hook for the short positions taken by that member.

414.    On the morning of January 28, DTCC demanded that its member clearing agents supply additional collateral to support these trades.

415.    The collateral demand by DTCC, however, also provided the perfect cover to progress the scheme. As revealed by internal Robinhood documents, the decision to PCO had likely already been made before the margin call came.

416.    The broker dealers, who position themselves as services for the benefit of retailers, succumbed to the demands of their clearing agents because of their own financial interests. Broker dealers receive an inordinate amount of revenue from market makers like Citadel Securities from payment for order flow.

417.    To reiterate, Robinhood makes up a vast majority of its revenue, somewhere between 60% to 70%, by selling its order flow. Robinhood has reportedly earned a staggering $331 million in revenues from payment for order flow in the first quarter of 2021, more than tripling its earnings from the first quarter of 2020, a record year in which Robinhood earned $687 million in payment for order flow revenue, up 514% year-on-year from 2019. From 2015 to 2016, an incredible 80% of Robinhood's revenue came from payment for order flow. Robinhood's CEO Vladimir Tenev also testified before the Congressional House Committee on Financial Services that Citadel Securities's payment for order flow revenue is Robinhood's primary source of revenue. This essentially proves that Robinhood's client is not the retail investor themselves, but rather Citadel Securities. In this relationship, it is actually the retail

investor who is Robinhood's product; the product for which Citadel Securities is in fact buying and paying Robinhood a premium.

418.     As mentioned above, Robinhood is not alone in profiting from payment for order flow. Every Brokerage Defendant, Apex, and ETC sell order flow. Additionally, Citadel Securities is either the largest or one of the largest payors for order flow for most of them.

419.     Robinhood and other broker dealers had every motivation to join the anticompetitive scheme to restrict trading to benefit their real clients: the clearing agents and the Market Maker Defendants. Robinhood has gamified the investing market to funnel young investors onto their platform, ultimately to offer the Market Maker Defendants a birds' eye view of both sides of their trades, enabling companies like Citadel to benefit from simultaneously making and playing the market.

### *Actions Against Unilateral Self Interest*

420.     If broker dealers were competing against one another, then it would not be in their self-interest to stop trading on their platforms for the Relevant Securities. Broker-dealers benefit from investors transacting on their platforms. Akin to any individual purchasing from a seller of a service—the seller benefits from more sales. Delisting the Relevant Securities and preventing investors from entering more transactions was no different from turning away a paying customer. Broker dealers acted against their self-interest by preventing any transactions.

421.     The actions taken by the clearing brokers, i.e., preventing trades in the Relevant Securities, was similarly an action against their economic and unilateral self-interest. Clearing firms such as Apex act as a third party to each trade facilitated by broker dealers. Generally, clearing firms earn a transaction fee every time they make a trade. The clearing fee is imposed no matter which brokerage firm the trader uses. By stopping the trades in the Relevant Securities,

clearing firms turned away the clearing fees that form the very basis of their business models. This conduct is against the economic interests of the Defendants if undertaken individually.

422.    Further, Apex's decisions on January 28, 2021 were against its self-interest. By restricting trading and specifically the purchase of the Relevant Securities, Apex was unable to generate revenue from users purchasing the Relevant Securities shares and Apex thereafter, using these shares as stock loans to generate even further revenue.

423.    Market makers such as Citadel Securities pay broker dealers for order flow. Payment for order flow is a practice where a broker-dealer (e.g., Robinhood) will sell its customers' orders to a high frequency trading firm ("HFT") or market maker (e.g., Citadel Securities). The HFT or market maker in turn "fills" the order by buying or selling the shares as requested, while simultaneously using a computer algorithm to pocket the difference between the price the customer was willing to sell at versus the price the market maker was able to get to fill the order.

424.    Market makers compare the bid prices (i.e., the price investors are willing to purchase at) against the offer prices (i.e., the price investors are willing to sell at). The difference between the two is known as the "spread." Market makers maintain an inventory of securities from their own trading and match incoming buy and sell orders in order to fill those orders.

425.    Market makers such as Citadel Securities pay a significant premium or "rebate" to route a broker's order flow. It stands to reason that routing order flow is a lucrative endeavor given the significant sums that market makers pay for order flow. Robinhood for example generated $682 million in payment-for-order flow revenue. All brokerage firms that sell order flow are required by the SEC to disclose who they sell order flow to. Rule 606 requires broker-dealers to publish quarterly reports disclosing the entities to which they route their order flows

and the relationship between the broker-dealer and the entity. Robinhood, for example, receives $260 per $1,000,000 of their order flow traded, and E*Trade makes about $22 per the same volume.

426.     By restricting trading, any entity that sells its order flow is acting against its economic interest. As order flow revenue is generated by volume, restricting trading necessarily diminishes the volume the entity selling order flow may receive for the period that trading is restricted.

427.     As mentioned above, according to public filings, all of the Brokerage Defendants and Clearing Defendants sell order flow.

428.     Likewise, the Market Maker Defendants who pay for order flow and make money through the spreads benefit from a large volume of transactions. Therefore, any restrictions in any entity it purchases order flow from would ultimately negatively impact their bottom line as it would reduce the volume of orders and the number of spreads it can pocket.

429.     Finally, trading restrictions were only placed on buying and only affected Retail Investors because short sellers, such as the Market Maker Defendants, still had the ability to purchase shares of the Restricted Securities via other avenues, such as dark pools, including the Market Maker Defendants own internal dark exchanges.

430.     Taking at face value Brokerage Defendants' explanation that they were concerned with market volatility, it does not justify their one-sided restrictions on the Relevant Securities.

431.     Volatility in the securities markets is often associated with large swings in prices in one direction or another. Volatility is usually characterized by wide price fluctuations and heavy trading.

432.     There is no provision under SEC, DTCC, NSCC, or FINRA rules that allows broker-dealers to unilaterally decline, restrict, or prevent trading because market conditions make executing trading burdensome or unprofitable.

433.     Rather, broker-dealers are expected to ensure that they can continue to provide access to the securities markets even during periods of extreme market volatility.

434.     FINRA reiterated this obligation in Regulatory Notice 21-12, which was issued on March 18, 2021, directly in response to the events giving rise to this action. FINRA was clear: "Member firms should maintain strong procedures, thoughtfully crafted in advance, to reasonably ensure that they can continue to provide investors access to the securities markets during times of extreme market volatility, as in the past several months."

435.     There are recognized mechanisms by which trading can be halted during volatility. Exchanges such as NASDAQ have already implemented these mechanisms.

436.     For example, exchanges have put in place "circuit breakers" to halt trading in the event the market is too volatile.

437.     Similarly, the Limit Up-Limit Down mechanism is a tool intended to prevent trades in securities from occurring outside of specified price bands to address extraordinary market volatility. If trading occurs beyond the established price bands, a five-minute trading pause is implemented to allow market volatility to smooth. This is also known as a single stock circuit breaker.

438.     In both cases, circuit breakers halts trading entirely, both buying and selling.

439.     This is not what Defendants did, however, and instead only restricted purchasing of securities by Retail Investors.

440.     Further, the restrictions were not placed on the entire market—institutional investors could still buy and sell without limitations. It makes little economic sense that restriction on purchasing on only Retail Investors could address volatility concerns when institutional investors could still affect the market.

### Traditional Factors Suggesting Conspiracy or Agreement

441.     The conduct at issue here comprised of factors suggesting conspiracy or illegal agreement.

442.     *Opportunities to Coordinate and Collude.* On or around January 28, 2021, Defendants had numerous opportunities to coordinate and collude and did, both interfirm and intrafirm.

443.     For example, Apex coordinated the trade restrictions on the Relevant Securities by verbally informing certain Brokerage Defendants to restrict trading in the Relevant Securities.

444.     Webull, for example, confirmed in written submissions to the Congressional House Committee on Financial Services that the communications between Apex and Webull regarding which securities would be subject to trading restrictions on January 28, 2021 were verbal in nature.

445.     The industry is close-knit and built on preexisting relationships. The industry is replete with specialized jargon, terms of art, and specialized terminology, providing those in the industry a common language.

446.     Additionally, individuals within the industry frequently move from one market participant to another or invest financial resources in other market participants.

447.     For example, in April 2021, Bloomberg and other sources reported that Alpaca added Robinhood's ex-COO as an investor.

448.     Additionally, ███████, Citadel Securities's Head of Execution Services, had prior working relationships through FINRA with Josh Drobnyk, Robinhood's Vice President of Corporate Communications during the relevant period.

449.     As a result of the close-knit nature of the industry and the prior relationships developed by those within the industry, there are a high number of interfirm communications which tend provide opportunities to exchange information and to render a market susceptible to collusion. Given the events of late 2020 and January 2021, the participants in the conspiracy had numerous opportunities to conspire to restrain trade—restrict trading and did so.

450.     Many of the Brokerage Defendants have prior relationships with the Clearing Defendants. Robinhood for example previously used Apex as its clearing firm before Robinhood began self-clearing in 2018.

451.     Additionally, documentary evidence reveals numerous suspicious interfirm communications leading up to, during, and after the imposition of the restrictions on January 28, 2021.

452.     For example, high level executives of Citadel Securities and Robinhood coordinated communications in the weeks before, and numerous times the day before, the restrictions were ultimately imposed.

453.     Additionally, Robinhood's Drobnyk appeared to accept Citadel Securities's ███████ proposition made on January 20, 2021.

454.     High level employees of E*Trade and Citadel Securities exchanged communications throughout January 28, 2021 to confirm certain orders were cancelled.

455.     Further, high-level employees communicated after January 28, 2021, partly to coordinate messaging in response to the restrictions and also to enforce continuing restrictions.

456.    For example, Citadel Securities's ███████ connected Citadel Securities's ███

███ and Robinhood's Drobnyk to coordinate the narrative in response to the January 28, 2021

trading restrictions.

457.    Although Apex itself had lifted its restrictions as of January 29, 2021, Apex

warned high-level Robinhood employees of efforts to purchase the Relevant Securities even as

Robinhood was continuing to restrict trading. Apex had no economic justification to warn

Robinhood but to ensure the restrictions were maintained. Any collateral requirements Apex may

have been subjected to would be independent of Robinhood.

458.    Further, Apex presently has and at the relevant time period had no economic

relationship with Robinhood. Although Robinhood had previously used Apex as a clearing

broker, Robinhood became self-clearing in 2018.

459.    *Evidence of Concealment and Pretext.* Practices that while not in themselves

illegal may still lead to the inference of the existence of a conspiracy.

460.    As noted above, communications and coordination occurred between Defendants

verbally. Verbal or telephonic communication is difficult to detect and does not leave a paper trail

to the alleged wrongdoing leading to an inference that those engaged in verbal coordination were

attempting to conceal their communications. Therefore, the coordination of the trading

restrictions by verbal or telephonic means supports the inference of an illegal conspiracy.

461.    Notably, while high-level employees of Citadel Securities and Robinhood

coordinated communications via email or via internal chat channels, the emails appear cryptic

with little indication about the subject matter communicated between the participants, reserving

substantive discussions of their dealings to unrecorded telephone calls. This evidences a

deliberate attempt to obscure the actual substance of the communications.

125

462.     Additionally, participants attempted to conceal communications by merely copying lawyers, with no indicia of asking for legal advice.

463.     For example, Citadel Securities's ███████ copied internal counsel on emails sent to Robinhood's Drobnyk on January 30, 2021, connecting Citadel Securities's ███████ with Robinhood's Josh Drobnyk in order to coordinate messaging regarding the restrictions placed on January 28, 2021.

464.     Pretextual statements and explanations also support an inference of an illegal conspiracy.

465.     For example, statements by representatives of Robinhood and high-level executives provided changing and conflicting explanations for the trading restrictions.

466.     On January 28, 2021, Robinhood posted on its blog that market volatility was the reason for the restrictions.

467.     Additionally, Vlad Tenev, Robinhood's CEO, told the media that the shutdowns were unrelated to Robinhood's liquidity and that Robinhood did not have a liquidity problem.

468.     Robinhood later blamed the trading restrictions to being unable to meet the deposit requirements imposed by clearinghouses.

469.     When Tenev offered testimony to the House Financial Services Subcommittee, when asked if Robinhood had negotiated with counterparts to restrict trading in the Relevant Securities, he stated that trading restrictions were put in place to meet regulatory deposit requirements imposed by DTCC affiliate NSCC. This explanation, however, is either incomplete or misleading.

470.     To clear and settle customer transactions, each trading day by 10 a.m. Eastern Time, clearing agents like Robinhood Securities have to meet the deposit requirements required

by DTCC to support their customer trades between the trade date and the date the trades settle. On some days clearing brokerage firms may be able to withdraw money, whereas on other days it may be required to deposit money, depending on that day's requirement. Clearing brokerage firms like Robinhood Securities also know that the DTCC may assign a volatility multiplier on certain securities which the DTCC perceives as having more risk.

471. Based on the orders its customers are placing, Robinhood Securities has the ability to: (i) monitor its anticipated DTCC deposit requirements in real time (or near real time); and (ii) monitor its ability to meet anticipated or actual DTCC deposit requirements in real time (or near real time). Based on the relationship between the affiliated entities, Robinhood Financial would have access to the same information on anticipated DTCC requirements. At any given time Robinhood Financial and Robinhood Securities would know how much collateral the DTCC may ask Robinhood Securities to post to cover the trades its customers have placed.

472. Michael Bodson, the President of DTCC, later stated in testimony to the House Financial Services Subcommittee that the decision to restrict trading was internal to Robinhood and DTCC and NSCC did not have discussions about restricting securities.

473. Indeed, Robinhood's decision to move the Relevant Securities to "position closing only" ("PCO"), i.e., only allowing users to sell but not buy, was made extraordinarily quickly.

474. While Robinhood received an approximately $3 billion dollar margin call email from DTCC at 5:11 a.m., the decision to affect the PCO was made shortly after the receipt of the email. It is highly unlikely that the decision to move securities to PCO in such a short time span without premeditation.

| From: | CFM_NOTIFICATIONS@dtcc.com |
| Sent: | Thu, 28 Jan 2021 10:11:19 +0000 (UTC) |
| To: | ▇▇▇▇▇▇▇▇▇▇▇▇ |
| Subject: | 6769 ROBINHOOD SECURITIES, LLC - NSCC Daily Margin Statement |

ROBINHOOD SECURITIES, LLC            # 6769        DEFICIT:($3,006,178,364.89)

TO OBTAIN DETAILED INFORMATION REGARDING YOUR REQUIREMENT, NAVIGATE TO NSCC RISK
MANAGEMENT REPORTING UNDER THE SETTLEMENT SERVICES MENU IN THE PBS PORTAL.

Questions in reference to requirements should be
addressed to the following phone numbers:
Hotline (212) 855-5770
Or via email at NSCCProductRisk@dtcc.com

TO OBTAIN DETAILED INFORMATION REGARDING YOUR DEPOSIT, NAVIGATE TO THE CLEARING FUND SECTION
UNDER THE SETTLEMENT SERVICES MENU IN THE PBS PORTAL.

Questions in reference to deposit information
should be addressed to the following phone numbers:
Hotline (212) 855-3440

▇▇▇▇▇▇▇▇

2021-01-28 05:23:55 -08:00

It appears RHS just changed equities GME, AMC, etc to PCO. We currently have the options tradable.
https://hood.slack.com/archives/C3ZKP2V55/p1611839928039700

[January 28th, 2021 5:18 AM] ▇▇▇▇▇▇  AMC, GME, NOK, BB, NAKD,KOSS,EXPR, BBBY -- all of these are now PCO. Customers can sell their
existing shares but not purchase additional shares <!here>

▇▇▇▇▇▇▇

AMC, GME, NOK, BB, NAKD,KOSS,EXPR, BBBY -- all of these are now PCO. Customers can sell their existing shares but not purchase additional
shares <!here>

Posted in #corp-action-updates

475.    Further, internal Robinhood communications indicated that Robinhood personnel

knew shortly after the margin call that "all firms" "are doing the same thing," i.e., restricting

buying but not the selling of the Relevant Securities.

476.    Additionally, internal Robinhood communications seems to contradict Tenev's

public statements that Robinhood did not have liquidity issues.

**DEMMUJTLP: 01/28/2021**

**Gretchen Howard**

01/28/2021 04:50:56

Can you call me?

**Gretchen Howard**

01/28/2021 05:00:32

or join https://meet.google.com//vbh-yrsm-bmv

Meet

**Meet** (meet.google.com)
Real-time meetings by Google. Using your browser, share your video, desktop, and presentations with teammates and customers.

**Gretchen Howard**

01/28/2021 05:00:36

major liquidity issue

**Gretchen Howard**

01/28/2021 05:00:48

we have PCOd' AMC, GME, NOK, BB, NAKD,KOSS,EXPR, BBBY

477.    As shown, Tenev's testimony was, at best, misleading.

478.    Pretextual statements were not limited to Robinhood. Apex and its highly level executives also made pretextual statements.

479.    For example, on January 28, 2021, Apex cited increasing collateral requirements for the restrictions it imposed on trading including through other Brokerage Defendants.

480.    Later, on February 9, 2021, in its letter to the New Jersey Office of the Attorney General, Apex stated that trading restrictions were not due to any actual increased collateral requirements imposed by the NSCC, but rather "potential" future collateral requirements that may be imposed.

> The reason for the temporary trading restrictions that Apex imposed regarding purchases of AMC, GME and KOSS relates directly to the potential future collateral requirement that NSCC appeared it may impose on Apex as part of the margin system NSCC maintains to comply with the SEC's standards for covered clearing agencies. Therefore, that is the focus of the remainder of this summary response.

481.    In addition, on March 4, 2021, Apex's President, Tricia Rothschild stated that

Apex restricted "due to anomalous information." Additionally, she stated that "We [i.e., Apex] have headroom in terms of the capital available to us on our balance sheet. We have lines of credit that we can call on as needed." Ms. Rothschild further said "I would say it was not a similar situation to Robinhood." Taken at face value, Ms. Rothschild's statements meant that Apex was not faced with a collateralization problem, yet restricted trading nonetheless.

482.    Beyond statements, the opaque nature of the market as described above serve to conceal evidence of the illegal agreement.

483.    Because of the temporal nature of the reporting requirements, short sellers are able to take advantage of reporting gaps to disguise collusive behavior. Participants in the illegal conspiracy were able to exit their short positions and are only required to report periodically without having to report the suspect transactions individually.

484.    Further, because what reporting there is only identifies aggregate short interest and not by particular investor or market maker, individual anticompetitive conduct is hidden from view.

485.    Additionally, because much of the trading in the Relevant Securities recurred on so-called "dark" pools or markets, and in particular the Market Maker Defendants' own internal dark market maker units, participants in the illegal scheme are able to mask the suspect transactions. Because dark pools and dark markets are not directly accessible to the public and "lit" exchanges provide for anonymous trading, participants in the illegal scheme were able to transact without tipping off retail investors about who the trader is, the size of the blocks being traded, or even the execution price of the trade.

486.    *Government Investigations*. The conduct at issue has not escaped the eyes of government actors and are the subject of several investigations. Government investigations are

130

indicative of anticompetitive collusion.

487.    The Congressional House Financial Services Committee issued subpoenas and held three highly publicized hearings related to the trading restrictions imposed on January 28, 2021.

488.    In addition to proceedings in the House of Representatives, the Senate Banking Committee also held hearings related to the trading restrictions.

489.    According to The Wall Street Journal and public filings, the fraud division of the Department of Justice and the San Francisco U.S. Attorney's office have sought information about the restrictions imposed on January 28, 2021 from brokers and social media companies.

490.    The SEC appears to be investigating the restrictions imposed on January 28, 2021. On June 9, 2021, GameStop Corp. reported in its 10-Q report that "On May 26, 2021, we received a request from the Staff of the SEC for the voluntary production of documents and information concerning a SEC investigation into the trading activity in our securities and the securities of other companies. We are in the process of reviewing the request and producing the requested documents and intend to cooperate fully with the SEC Staff regarding the matter. This inquiry is not expected to adversely impact us."

491.    Robinhood's Focus Report filed with the SEC on February 26, 2021, confirmed many of these investigations and revealed that Robinhood had received inquiries related to the trading restrictions from the U.S. Attorney's Office of the Northern District of California, the SEC's Division of Examinations, FINRA, the New York Attorney General's Office and the offices of other states' Attorneys General, e.g., the Attorneys General of Texas and New Jersey, state securities regulators and from Congress.

492.    On or around June 22, 2021, the San Francisco office of the Department of

Justice issued grand jury subpoenas related to the trading restrictions on or around January 28, 2021 as described herein.

493.     Finally, on June 30, 2021, FINRA announced that Robinhood was ordered to pay a record financial penalty of $70 million for "systemic supervisory failures and significant harm suffered by millions of customers." According to FINRA, "the sanctions represent the largest financial penalty ever ordered by FINRA and reflect the scope and seriousness of the violations."

## CLAIMS FOR RELIEF
## COUNT ONE

## CONSPIRACY TO RESTRAIN TRADE
## IN VIOLATIONOF SECTION 1 OF THE SHERMAN ACT,
## 15 U.S.C. § 1
### (Against all Defendants)

494.     Plaintiffs hereby incorporate by reference the factual allegations as set forth above.

495.     The Defendants conspired and entered into an anticompetitive scheme to fix, raise, stabilize, maintain or suppress the price of the Relevant Securities, and in order to restrain trade.

496.     Faced with potentially disastrous losses due to their short positions, the Market Maker Defendants, rather than engage in competition or the ordinary activities of the market, conspired, combined, agreed and colluded with the Brokerage Defendants and Clearing Defendants to restrict purchases in stocks by retailer investors and to manipulate and artificially suppress the price of stock, through which they could cover their short positions.

497.     Defendants conspired and agreed with one another with the intent to artificially lower the price of the relevant stocks.

498.     Defendants coordinated a collective shutdown of the stock brokerage market with respect to the Relevant Securities, prohibiting market participants with the exception of institutional investors such as the Market Maker Defendants from purchasing stock in the

Relevant Securities. Pursuant to the conspiracy, the restriction of stock purchases resulted in a sell-off of stocks, driving down prices in the Relevant Securities to levels that would not have been obtained, but for the conspiracy, combination, agreement and restraint of trade.

499.    In furtherance of the conspiracy, combination, agreement and restraint of trade, before and before the opening of the stock market on January 28, 2021, the Market Maker Defendants increased short volumes in anticipation of short calls on January 28, 2021.

500.    In furtherance of the conspiracy, combination, agreement and restraint of trade, the Brokerage Defendants prohibited or unreasonably restricted the purchases of shares of the Relevant Securities by Plaintiffs in restraint of trade.

501.    As a direct and intended result of Defendants contract, combination, agreement and restraint of trade or conspiracy, Defendants caused injury to Plaintiffs by restricting purchases of Relevant Securities. The Brokerage Defendants deactivated the buy option on their platforms and left Plaintiffs with no option but to sell shares of the stocks on their platforms. Plaintiffs and Class members, faced with an imminent decrease in the price of their positions in the Relevant Securities due to the inability of Retail Investors to purchase shares, were induced to sell their shares in the Relevant Securities at a lower price than they otherwise would have, but for the conspiracy, combination, agreement and restraint of trade. Additionally, Class members that would have purchased more stock in the Relevant Securities given the upward trend in price could not do so.

502.    The Brokerage Defendants, in particular those who self-clear, disguised their wrongdoing by offering pretextual explanations for the restrictions, claiming they were subject to increased collateral requirements, when in reality the decision to restrict had already been made.

503.    Pursuant to the contract, combination, agreement, conspiracy and restraint of trade, the Brokerage and Clearing Defendants continued to route sell orders to the Market Maker Defendants to purchase stocks at the artificially deflated prices to reduce their distressed short positions. The Market Maker Defendants, who were in exposed short positions due to the short and gamma squeeze, purchased the artificially price-suppressed stocks to cover their short

positions and concealed their activity by using off-exchange trading, including their own internal dark market maker units.

504.     To induce compliance and to limit the effects other Brokerages could have in disrupting Defendants' anticompetitive scheme, the Clearing Defendants raised the fees and/or removed the ability to fill purchases of the Relevant Securities to the brokerages that clear through them, further facilitating the Market Maker Defendants covering of their short positions in furtherance of the conspiracy.

505.     Defendants' anticompetitive and unlawful conduct is per se illegal.

506.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Class members were injured in their business and property.

507.     Plaintiffs and the Class further seek equitable relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct the anticompetitive effects caused by Defendants' unlawful conduct.

## PRAYER FOR JUDGMENT

**WHEREFORE**, Plaintiffs request that the Court enter judgment on their behalf and on behalf of the Class defined herein, by adjudging and decreeing that:

a.     This action may proceed as a class action, with Plaintiffs serving as Class Representatives, and with Plaintiffs' counsel as Class Counsel;

b.     Defendants have contracted, combined, and conspired in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and that Plaintiffs and the Class have been injured in their business and property as a result of Defendants' violations;

c.     Plaintiffs and the Class are entitled to pre-judgment and post-judgment interest on the damages awarded them, and that such interest be awarded at the highest legal rate from and after the date this class action complaint is first served on Defendants;

d.     Defendants are to be jointly and severally responsible financially for the costs and expenses of a Court-approved notice program through post and media designed to give immediate notification to the Class;

e.      Plaintiffs and the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law;

f.      Plaintiffs and the Class are entitled to equitable relief appropriate to remedy Defendants' past and ongoing restraint of trade, including:

      1)      A judicial determination declaring the rights of Plaintiffs and the Class, and the corresponding responsibilities of Defendants;

      2)      A constructive trust over any ill-gotten property or assets, including but not limited to stocks in the Relevant Securities received as a result of the conspiracy or agreement or other wrongful conduct as alleged herein;

g.      Plaintiffs and the Class receive such other or further relief as may be just and proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all the claims asserted in this Complaint so triable.

Dated: September 22, 2021

By:      _____/s/ *Joseph R. Saveri*_____
      Joseph R. Saveri

By:      _____/s/ *Frank R. Schirripa*_____
      Frank R. Schirripa

Joseph R. Saveri (CA SBN 130064)
Steven N. Williams (CA SBN 175489)
Christopher K.L. Young (CA SBN 318371)
Anupama K. Reddy (CA SBN 324873)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone:  (415) 500-6800
Facsimile:  (415) 395-9940
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
cyoung@saverilawfirm.com
areddy@saverilawfirm.com

Frank R. Schirripa (NY SBN 4103750)
Kathryn Hettler (NY SBN 5126065)
Seth Pavsner (NY SBN 4969689)
Eugene Zaydfudim (NY SBN 5204334)
**HACH ROSE SCHIRRIPA & CHEVERIE LLP**
112 Madison Ave, 10th Floor
New York, New York 10016
Tel: (212) 213-8311
fschirripa@hrsclaw.com
khettler@hrsclaw.com
spavsner@hrsclaw.com
ezaydufim@hrsclaw.com

*Co-Lead Counsel for the Antitrust Tranche*