**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-MD-2989-ALTONAGA/TORRES**

In re:

**JANUARY 2021 SHORT SQUEEZE**
**TRADING LITIGATION**

_____/

This Document Relates to the Antitrust Tranche

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS THE**
**ANTITRUST TRANCHE COMPLAINT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT........................................................................................................................2

    I.    PLAINTIFFS FAIL TO PLEAD PLAUSIBLY THAT DEFENDANTS AGREED TO CONSPIRE.....................................................................................2

        A.    Plaintiffs Allege No Direct Evidence of an Agreement Among Defendants. .......................................................................................2

        B.    Plaintiffs Do Not Plausibly Allege Circumstantial Evidence of an Agreement. .......................................................................................4

    II.    PLAINTIFFS FAIL TO PLEAD THE REMAINING ELEMENTS OF A SECTION 1 CLAIM....................................................................................9

        A.    The Court Should Address the Question of *Per Se* vs. Rule of Reason at the Motion to Dismiss Stage. ..................................................10

        B.    Plaintiffs' Allegations Do Not Qualify for *Per Se* Treatment. .................10

        C.    Plaintiffs' Allegations Do Not Qualify for Quick Look Review...............14

        D.    Plaintiffs Fail to Plead a Section 1 Violation Based on the Rule of Reason..............................................................................................14

    III.    PLAINTIFFS' ANTITRUST CLAIMS ARE PRECLUDED BY FEDERAL SECURITIES LAWS..........................................................................16

        A.    The Dodd-Frank Act Savings Clause Does Not Apply. ...........................16

        B.    Plaintiffs' Antitrust Claims Are Precluded Under *Billing* Because the Conduct at Issue Is Regulated by the Federal Securities Laws............18

    IV.    INDEPENDENT REASONS EXIST TO DISMISS ALL CLAIMS AGAINST PEAK6, E*TRADE HOLDINGS AND ROBINHOOD MARKETS. ..............................................................................................20

    V.    THE CCAC SHOULD BE DISMISSED WITH PREJUDICE............................20

CONCLUSION...................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. Maricopa Cty. Med. Soc'y*,
  457 U.S. 332 (1982)..................................................................................................................10

*Auto Alignment & Body Serv. v. State Farm Mut. Auto. Ins. Co.*,
  953 F.3d 707 (11th Cir. 2020) ..................................................................................................4

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007).............................................................................................................2, 4, 5

*In re Blue Cross Blue Shield Antitrust Litig.*,
  308 F. Supp. 3d 1241 (N.D. Ala. 2018)..................................................................................12

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
  441 U.S. 1 (1979)......................................................................................................................13

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
  485 U.S. 717 (1988)..................................................................................................................10

*California ex rel. Harris v. Safeway Inc.*,
  651 F.3d 1118 (9th Cir. 2011) ................................................................................................14

*City of Tuscaloosa v. Harcros Chems.*,
  158 F.3d 548 (11th Cir. 1998) ..................................................................................................8

*In re Credit Default Swaps Antitrust Litig.*,
  No. 13-md-2476, 2014 WL 4379112 (S.D.N.Y. Sept. 4, 2014)............................................16

*Credit Suisse Sec. (USA) LLC v. Billing*,
  551 U.S. 264 (2007)............................................................................................................17, 19

*In re Delta/AirTran Baggage Fee Antitrust Litig.*,
  733 F. Supp. 2d 1348 (N.D. Ga. 2020) ....................................................................................7

*Dickson v. Microsoft Corp.*,
  309 F.3d 193 (4th Cir. 2002) ..................................................................................................12

*In re Disposable Contact Lens Antitrust*,
  215 F. Supp. 3d 1272 (M.D. Fla. 2016)..............................................................................8, 13

*Elec. Trading Grp., LLC v. Banc of Am. Sec. LLC*,
  588 F.3d 128 (2d Cir. 2009)....................................................................................................20

*In re Farm-Raised Salmon & Salmon Prods. Antitrust Litig.*,
  No. 19-21551-CIV, 2021 WL 1109128 (S.D. Fla. Mar. 23, 2021) ..................................2, 6, 9

*In re Fla. Cement & Concrete Antitrust Litig.*,
  746 F. Supp. 2d 1291 (S.D. Fla. 2010) ........................................................................ *passim*

*In re High-Tech Emps. Antitrust Litig.*,
  856 F. Supp. 2d 1103 (N.D. Cal. 2012) ....................................................................10

*In re Interest Rate Swaps Antitrust Litig.*,
  261 F. Supp. 3d 430 (S.D.N.Y. 2017)........................................................................16

*Interstate Cir. v. United States*,
  306 U.S. 208 (1939).....................................................................................................8

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
  626 F.3d 1327 (11th Cir. 2010) ........................................................................ *passim*

*Kalmanovitz v. G. Heileman Brewing Co.*,
  769 F.2d 152 (3d Cir. 1985).....................................................................................15

*Lenox v. MacLaren Surgical Corp.*,
  847 F.3d 1221 (10th Cir. 2017) ...............................................................................20

*Levine v. Cent. Fla. Med. Affiliates, Inc.*,
  72 F.3d 1538 (11th Cir. 1996) ...........................................................................10, 14

*Mitchael v. Intracorp, Inc.*,
  179 F.3d 847 (10th Cir. 1999) .................................................................................20

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
  465 U.S. 752 (1984).....................................................................................................2

*In re Musical Instruments & Equip. Antitrust Litig.*,
  798 F.3d 1186 (9th Cir. 2015) .............................................................................7, 12

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*,
  468 U.S. 85 (1984).....................................................................................................13

*Nat'l Soc. of Prof'l Eng'rs v. United States*,
  435 U.S. 679 (1978)...........................................................................................10, 13

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018)......................................................................................10, 12, 15

*Procaps S.A. v. Pantheon, Inc.*,
  845 F.3d 1072 (11th Cir. 2016) ...............................................................................10

*PSKS, Inc. v. Leegin Creative Leather Prod., Inc.*,
    615 F.3d 412 (5th Cir. 2010) ...................................................................................15

*Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*,
    917 F.3d 1249 (11th Cir. 2019) ........................................................... *passim*

*Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
    552 F.3d 430 (6th Cir. 2008) ...................................................................................12

*United States v. Andreas*,
    39 F. Supp. 2d 1048 (N.D. Ill. 1998) ......................................................................13

*United States v. eBay, Inc.*,
    968 F. Supp. 2d 1030 (N.D. Cal. 2013) ...................................................................10

*United States v. Gen. Motors Corp.*,
    384 U.S. 127 (1966) .................................................................................................12

**Statutes & Rules**

12 U.S.C. § 5303 ...............................................................................................................16

15 U.S.C. § 1 ............................................................................................... *passim*

15 U.S.C. § 78a, *et seq* ....................................................................................................17

Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1508 (4th & 5th eds.,
    2021 Cum. Supp. 2013-2020) ................................................................................14

Dodd-Frank Act §§ 1(a), 6, 124 Stat. 1376 (2010) ..........................................................16

Dodd-Frank Act § 913(g) ..................................................................................................17

Exchange Act § 9, 15 U.S.C. § 78i ......................................................................17, 18, 19

Exchange Act § 10, 15 U.S.C. § 78j .....................................................................17, 18, 19

Exchange Act § 15, 15 U.S.C. § 78o ...........................................................................17, 19

Exchange Act § 17, 15 U.S.C. § 78q ................................................................................19

Exchange Act § 17A, 15 U.S.C. § 78q-1 ..........................................................................19

Fed. R. Civ. P. 12(b)(6) .....................................................................................................10

**Other Authorities**

17 C.F.R. §§ 240.15a-1 to 240.15c6-1 ..............................................................................19

iv

17 C.F.R. § 240.15c3-5 ................................................................................................18, 19

SEC, *Thinking About Investing in the Latest Hot Stock?* (Jan. 30, 2021),
    https://www.sec.gov/oiea/investor-alerts-and-bulletins/risks-short-term-
    trading-based-social-media-investor-alert .............................................................................18

## PRELIMINARY STATEMENT

After eight months to consider their claims, review of tens of thousands of pages of documents produced by Defendants concerning the relevant events and three rounds of complaints (including the current "Corrected Consolidated Class Action Complaint" ("CCAC")), Plaintiffs have utterly failed to plead a cognizable antitrust claim that can survive a motion to dismiss. The crux of Plaintiffs' implausible theory is that a group of unrelated Self-Clearing Brokers and Clearing Brokers all decided to impose different trading restrictions on partially overlapping, but different, sets of stocks to help save Citadel Securities from its supposed short position in some unspecified, speculative number of those stocks. What is missing from the CCAC are, *inter alia*, (1) sufficient factual allegations of *any* agreement between *any* Defendants (let alone among all of them) to restrict trading in any security; (2) any attempt to identify any benefit that any of the brokers (self-clearing or otherwise) received from allegedly restricting trading to help Citadel Securities; or (3) any plausible explanation for how a conspiracy arose that resulted in the members imposing disparate restrictions on disparate sets of stocks, while at the same time other brokers not alleged to be part of the conspiracy and/or now voluntarily dismissed from the case took similar steps. Plaintiffs' Opposition does nothing to deal with these deficiencies. The facts alleged in the CCAC give rise to only one plausible explanation: in the face of unprecedented market volatility spurred on by internet speculation, various brokers, including non-Defendants, acted independently to protect the integrity of the marketplace and their customers' ability to trade broadly in securities by implementing a variety of temporary trading restrictions that differed in duration and scope, tailored to each of their circumstances.

Rather than deal with these problems, Plaintiffs present an array of often inconsistent factual and legal arguments that misconstrue and ignore their own pleadings, the evidence on which they rely, the relevant law and the very cases they cite. Plaintiffs boldly proclaim that this is the rare case in which there is direct evidence of a conspiracy—and then immediately walk that back by conceding that none of the cited documents actually reflects any agreement at all. (Section I.A.) Plaintiffs claim to have plausibly alleged parallel conduct and plus factors, but ignore the plausible (and accurate) alternative explanation and fail to establish that any plus factors even apply to the facts alleged. (Section I.B.) Plaintiffs cling to claims of *per se* condemnation, but ignore the fact that they have not alleged a horizontal conspiracy, let alone one that meets the *per se* test. (Section II.A-B.) Plaintiffs assert that the CCAC adequately

pleads a rule of reason violation, but fail even to identify the relevant market with any specificity (never mind allege facts that would support any market definition), or to allege market power or anticompetitive effects.  (Section II.C.)  Finally, Plaintiffs attempt to save their antitrust claims from preclusion by the securities laws by invoking a savings clause from the Dodd-Frank Act, but ignore the fact that this clause has nothing to do with the alleged unlawful conduct. (Section III.)  For these reasons and those set forth below and in Defendants' opening motion ("MTD"), the CCAC should be dismissed with prejudice.

## **ARGUMENT**

## I.   **PLAINTIFFS FAIL TO PLEAD PLAUSIBLY THAT DEFENDANTS AGREED TO CONSPIRE.**

Courts must determine whether the complaint "contains 'allegations plausibly suggesting (not merely consistent with) [a conspiracy or] agreement.'"  *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1332-33 (11th Cir. 2010) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).  Plaintiffs must allege "direct or circumstantial evidence that reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective."  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984).  They must plead such an agreement involving *each* and *every* Defendant.  *See Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1261-62 (11th Cir. 2019) (en banc) (requiring allegations for "each defendant" in the conspiracy).  But, as set forth in Defendants' MTD, Plaintiffs fail to do so—even after gaining access to the tens of thousands of pages of documents Defendants have produced to regulators.  (MTD at 15.)

### A.   **Plaintiffs Allege No Direct Evidence of an Agreement Among Defendants.**

Plaintiffs boast that this is the "rare case" in which there is "[d]irect evidence of an agreement [that] is explicit and requires no inferences to establish the proposition or conclusion being asserted."  (Opp. at 5-6 (citing *In re Farm-Raised Salmon & Salmon Prods. Antitrust Litig.*, No. 19-21551-CIV, 2021 WL 1109128, at *10 (S.D. Fla. Mar. 23, 2021)).)  Plaintiffs promptly retract this baffling assertion when they concede—in a footnote—that "the written communications appear deliberately vague and do not describe the contents of what was agreed to . . . ."  (Opp. at 6 n.6.)  Therefore, by their own concession, Plaintiffs *do not* have "direct evidence of an agreement [that] is explicit and requires no inferences to establish the proposition or conclusion being asserted."  *Salmon*, 2021 WL 1109128, at *10.

Even aside from that concession, it is clear that the communications cited by

2

Plaintiffs do not evidence *any* agreement at all, let alone the anticompetitive agreement Plaintiffs ask the Court to infer.  (*See* Opp. at 6; MTD at 15-16.)  The communications between Robinhood and Citadel Securities (and among Robinhood employees about Citadel Securities) do not contain or indicate any agreement to restrict trading in any security.  (CCAC ¶¶ 296-305, 307-13, 452-53.)  The email that Plaintiffs quote between E*TRADE and Citadel Securities employees is no more than a routine daily trading account reconciliation email canceling ten trade orders, and Plaintiffs fail to allege that the email even pertains to the Relevant Securities.  (*Id.* ¶¶ 316, 454.)  Plaintiffs' allegation that Apex "instructed brokerages," such as Ally, Dough, Public.com, SoFi, Stash, Tastyworks and Webull (who were all Introducing Broker Defendants before Plaintiffs voluntarily dismissed them), also does not *at all* indicate an agreement to restrict trading between Apex and *any* party.  At best it reflects a notification from Apex, as the Clearing Broker for these Introducing Broker Defendants (Apex's customers), that it would not accept trade orders for GME, AMC and KOSS on the morning of January 28, 2021, and complaints by at least some of those brokers about Apex's notification.  (*Id.* ¶¶ 274-76, 241, 443.)  Finally, Plaintiffs refer to a message describing a call between a Robinhood Financial employee and an Apex employee that flags a Reddit thread highlighting a way in which customers were circumventing Robinhood's restrictions on options trading.  (Opp. at 7.)  Plaintiffs do not explain—in either the CCAC or the Opposition—why this message suggests the existence of a conspiracy, particularly where Apex had already lifted its trading restrictions at that time.  (*Id.*)  Nor do they explain why Apex would have "policed" the alleged conspiracy after discontinuing its own trading restrictions.  (*Id.*)

Moreover, the CCAC is devoid of *any* allegation of *any* communications (let alone any agreement) between:  (1) Citadel Securities and Apex, (2) Citadel Securities and Interactive Brokers, (3) Citadel Securities and any (now dismissed) Introducing Broker Defendants, (4) Robinhood and E*TRADE, (5) Robinhood and Interactive Brokers, (6) Robinhood and any (now dismissed) Introducing Broker Defendants, (7) Apex and E*TRADE, (8) Apex and Interactive Brokers, (9) E*TRADE and Interactive Brokers, (10) E*TRADE and any (now dismissed) Introducing Broker Defendants, and (11) Interactive Brokers and any (now dismissed) Introducing Broker Defendants.[1]

---

[1] Because Plaintiffs do not (and cannot) allege any communications between Interactive Brokers and any other defendant, Plaintiffs again point to Thomas Peterffy's public statement but, as

In short, the cited communications show only that some defendants have pre-existing business relationships.  The fact that they would communicate during the relevant time is not only unremarkable, it is in fact fully expected.  It certainly does not give rise to an inference of a conspiracy, let alone provide direct evidence of one.

**B.**      **Plaintiffs Do Not Plausibly Allege Circumstantial Evidence of an Agreement.**

Without direct evidence, Plaintiffs are left to plead circumstantial evidence of their alleged conspiracy theory.  (Opp. at 7-21.)  Plaintiffs must plead "parallel conduct" and "sufficient 'plus factors' to make the parallel conduct 'more probative of conspiracy than of conscious parallelism.'"  *Auto Alignment & Body Serv. v. State Farm Mut. Auto. Ins. Co.*, 953 F.3d 707, 726 (11th Cir. 2020).  Plaintiffs erroneously contend that Defendants urge a "probability," rather than "plausibility," standard.  (Opp. at 5 n.4.)  In fact, Defendants' MTD expressly argues the plausibility standard of *Twombly* and explains that Plaintiffs' allegations "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."  (MTD at 16 (quoting *Twombly*, 550 U.S. at 557)); *see also Auto Alignment*, 953 F.3d at 728-29 (plaintiffs "offer no allegations that explain why the loss in business they allege is plausibly explained by steering instead of 'other alternative explanation[s]'" (quoting *Twombly*, 550 U.S. at 567)).  The Court may "infer from the factual allegations in the complaint obvious alternative explanations, which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer."  *In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1308 (S.D. Fla. 2010) (citation omitted) (internal quotations and alteration omitted).

Here, Plaintiffs fail to establish that the CCAC alleges that the trading restrictions at issue are "plausibly explained by [a conspiracy] instead of 'other alternative explanations.'"  *Auto Alignment*, 953 F.3d at 728-29 (citation omitted); *see also Quality Auto*, 917 F.3d at 1267 ("Even if there were considerable uniformity with respect to the [defendants'] use of such methods, that would be suggestive of an agreement only if such usage would not plausibly arise from 'independent responses to common stimuli.'") (citation omitted).  For example, Plaintiffs offer *no* explanation for why it is plausible to infer a conspiracy among the Defendants when other brokerages—not alleged to be part of any conspiracy—"employed similar tactics to prevent

_____

explained in the MTD, that statement only confirms that Interactive Brokers was acting in its own interests and not as part of some conspiracy.  (MTD at 24-25.)

Retail Investors from opening positions in at least one or more of the Relevant Securities." (MTD at 18; CCAC ¶ 246.)  These brokerages included TD Ameritrade (restrictions on GME and AMC) and Charles Schwab (restrictions on GME, AMC and EXPR), neither of which Plaintiffs allege conspired with anyone.  (MTD at 18; CCAC ¶¶ 198-199.)  They also included Cash App Investing LLC, eToro USA Securities, Inc. and Barclays Bank PLC, which Plaintiffs similarly do not allege were part of any conspiracy.  (MTD at 18.)  The fact that parties *not alleged to be members of the conspiracy* acted similarly as alleged conspirators indicates that the restrictions arose from permissible business reasons, not anticompetitive ones.

        Nor do Plaintiffs grapple with the fact that their own allegations supply the obvious, alternative (and actual) explanation for why each broker Defendant (and non-Defendant) enacted trading restrictions in late January 2021:  the extraordinary market volatility. (CCAC ¶¶ 200-209.)  This was the "common stimul[us]" to which Defendants had "independent responses." *Twombly*, 550 U.S. at 556 n.4; *Quality Auto*, 917 F.3d at 1267.  The market volatility spurred the NSCC to issue outsized collateral calls on many brokers, including some broker Defendants, which, in turn, required them to take individual measures to reduce their firms' risk exposure.  (MTD at 16-20; CCAC ¶¶ 231, 274-276, 413.)  Still others were compelled by the volatility to implement their own restrictions, even absent outsized collateral calls.  (MTD at 11-12.)  The market volatility, as Plaintiffs plead (MTD at 8-10), thus provides a "discernible reason" for Defendants' independent conduct and defeats a plausible inference of conspiracy. *Twombly*, 550 U.S. at 556 n.4; *Fla. Cement*, 746 F. Supp. 2d at 1308 (the court may "infer from the factual allegations in the complaint 'obvious alternative explanations'") (citation omitted).

## 1.    Plaintiffs Cannot Plead Parallel Conduct.

        Plaintiffs claim that Defendants "engaged in virtually identical, highly-correlated" conduct and that this "implies the existence of an alleged conspiracy."  (Opp. at 9.)  But Plaintiffs do not plausibly explain how a conspiracy could involve the disparate restrictions of varying durations pleaded here.  (MTD at 19.)  As set forth in the MTD, each Defendant put in place restrictions for different stock symbols, for different durations and for varying types of trades.[2]  (*Id*.)  For example, Robinhood placed PCO restrictions on both stock and option trades

---

[2] Plaintiffs also contend in their Opposition that the "restrictions prohibiting retail investors from purchasing the Relevant Securities [occurred] *less than 24 hours after* Citadel Securities acquired massive short positions in the Relevant Securities."  (Opp. at 9 (emphasis in original).)  Plaintiffs

for all 9 of the Relevant Securities (as well as 4 others not alleged by Plaintiffs to have been restricted as a result of some purported conspiracy).  (*Id.*)  Plaintiffs allege Interactive Brokers restricted only the purchase of options for 5 of the 9 Relevant Securities (AMC, BB, EXPR, GME and KOSS).  (*Id.*)  Clearing Broker Apex applied stock purchasing restrictions for only 3 of the 9 Relevant Securities (AMC, GME and KOSS).  And E*TRADE limited some trading in only 2 of the 9 Relevant Securities (GME and AMC).  Plaintiffs contend that these restrictions "had the goal and the same effect—artificially decreasing the price of the Relevant Securities." (Opp. at 9 n.12.)  But if the goal were to "decrease" the price of the Relevant Securities, it is implausible that Defendants would agree to vary their restrictions in such disparate ways, *and* that many of the alleged conspirators would take *no* action with respect to *many* (and for Apex and E*TRADE, *most*) of the Relevant Securities.  By contrast, the obvious, alternative explanation, alleged in the CCAC, is that the restrictions were driven by market volatility, which forced various brokers (including the broker Defendants) separately to impose different trading restrictions to mitigate volatility flowing through their respective firms.  (MTD at 19-20.)

### 2. Plaintiffs' Alleged Plus Factors Do Not Make Their Conspiracy Claim Plausible.

Plaintiffs fare no better arguing that they pleaded "'sufficient plus factors to make the parallel conduct more probative of conspiracy'" than of independent conduct.  *Salmon*, 2021 WL 1109128, at *10 (citation omitted); *see also Quality Auto*, 917 F.3d at 1267 (recognizing plus factors as evidence that "tends to exclude the possibility of independent action").[3]

*First*, Plaintiffs fail to articulate a plausible common motive for Defendants to engage in the alleged conspiracy.  The only common motive that Plaintiffs assert is that "Defendants had a collective interest in maintaining their mutually beneficial business relationships" based on "lucrative payment for order flow relationships with Citadel Securities." (Opp. at 11-12.)  This argument fails.  As an initial matter, Plaintiffs do not allege adequately that Citadel Securities actually held a short position in the Relevant Securities.  In fact, Plaintiffs admit "it is generally impossible to ascertain which investors have a short position in a particular

---

are merely speculating, however, as they concede "it is generally impossible to know who owns a short interest at any given time despite the prevailing regulatory regime."  (CCAC ¶ 387.)
[3] The Eleventh Circuit's recent *en banc* decision in *Quality Auto* expressly considered the sufficiency of alleged plus factors in support of a conspiracy claim at the motion to dismiss stage.  917 F.3d at 1267-69.  Plaintiffs' argument that courts consider the sufficiency of alleged plus factors only at summary judgment is unavailing.  (Opp. at 8 n.11.)

security at any point in time."  (Opp. at 20; CCAC ¶ 387.)  Furthermore, Plaintiffs do not allege that Citadel Securities threatened to (or even suggested that it would) cut off business relationships with any broker Defendant, or that it would retaliate against any Defendant if those brokers did not agree to protect Citadel Securities' alleged short position in the Relevant Securities.  Plaintiffs observe that *both* parties benefit from PFOF as a mutually beneficial relationship.  (Opp. at 12.)  Further, Plaintiffs do not address the obvious fact that Citadel Securities is not the only market maker; if it had cut off PFOF, there are other entities from which brokers direct order flow and receive such payments.  (*See* CCAC ¶¶ 3, 291.)  Finally, Plaintiffs do not allege that Citadel Securities stopped accepting buy orders for the Relevant Securities from any brokers at any time.  In short, this conspiracy theory is implausible because Defendants had nothing to gain from entering into the alleged conspiracy.[4]  (MTD at 20-21.)

> *Second*, and relatedly, Plaintiffs fundamentally misunderstand the acting-against-unilateral-self-interest plus factor and therefore fail to plead that it is probative of a conspiracy. Actions against unilateral self-interest are probative only if they further a *collective* self-interest. *See In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1195 (9th Cir. 2015) (noting that this plus factor weighed against collusion where there were "ample independent business reasons why each of the [defendants] adopted and enforced [certain] policies even absent an agreement among the defendant[s]"); *see also In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1361 (N.D. Ga. 2020) ("Plaintiffs have alleged that Delta and AirTran communicated with each other in public regarding how both airlines could 'get average prices up' . . . and would impose a first-bag fee during a recession even though it was counter to either Defendant's self interest to do so alone.").  Under such circumstances, a firm acts against *unilateral* self-interest to pursue a larger profit opportunity that cannot be realized except by agreement among competitors.

> But here, all Plaintiffs offer by way of explanation is that "if a broker were to unilaterally restrict trading, they would lose investors to other brokers who were not restricting *unless* the broker knew others were restricting."  (Opp. at 14.)  This does not explain *why* any broker Defendant would impose the trading restrictions pursuant to any agreement in the first

---

[4] Plaintiffs' theory of a common motive is further belied by the fact that they do not—and cannot—allege that Interactive Brokers receives significant PFOF revenue from Citadel Securities.

place.  Imposing the restrictions reduced transactions and order flow for each broker and cost that broker revenue whether done individually or collectively; the fact that other brokers also imposed some restrictions did nothing to offset that loss.  And Plaintiffs do not plead (and do not argue in their Opposition) that any broker Defendant engages in short-selling for their own accounts or would otherwise benefit from any stock price movement.  (MTD at 20.)  Therefore, this is nothing like the paradigmatic situation where it makes no sense for one competitor to raise prices, but all competitors benefit if all raise prices, and Plaintiffs thus fail to establish that this plus factor is at all probative of an alleged conspiracy.[5]

   *Third*, Plaintiffs' claims of alleged opportunity to collude fall far short of the allegations that this Court has found sufficient in other cases.  (Opp. at 15-17; MTD at 23-25.)  Plaintiffs contend, in generic terms, that Defendants had opportunity to collude because the "financial industry is close-knit" and "secretive, replete with specialized jargon and terminology."  (Opp. at 15.)  They also claim Defendants "communicated on the telephone or through agents," which Plaintiffs claim is "inculpatory or suspicious," even though the emails regarding those limited communications were replicated in the CCAC, and none indicate any agreement.  (*Id.* at 14-16.)  These alleged factors fall well short of what this Court rejected in *Florida Cement*, in which the defendants held meetings and social events to coordinate the alleged conspiracy.  (MTD at 25.)  Plaintiffs' allegations of concealment and pretext fare no better.  Plaintiffs argue that "Robinhood initially attributed the trading restrictions to market volatility, only to later assert that clearinghouse collateral requirements forced Robinhood to impose said restrictions."  (Opp. at 17.)  This is not "inconsistent and conflicting" (*id.*)—rather market volatility led to the increased collateral requirements.  As Plaintiffs alleged, the NSCC calculates its collateral requirements based, in part, on a volatility multiplier, where greater market volatility increases the amount of collateral the NSCC requires.  (MTD at 7-8; CCAC ¶¶ 470-471.)  Nor is it conflicting that "Robinhood nonetheless decided to restrict purchases of

---

[5] It is for this reason that all of Plaintiffs' cited authorities undermine, rather than support, their position.  *See Interstate Cir. v. United States*, 306 U.S. 208, 216-18, 226-27 (1939) (finding parties joining conspiracy would benefit from supracompetitive profits); *City of Tuscaloosa v. Harcros Chems.*, 158 F.3d 548, 570 n.33 (11th Cir. 1998) (noting "a price-fixing conspiracy, if successfully implemented, is in the collective self-interest of the conspirators"); *In re Disposable Contact Lens Antitrust*, 215 F. Supp. 3d 1272, 1294-97 (M.D. Fla. 2016) (observing actions taken against self-interest would result in higher retail sales prices for all conspirators).

the Relevant Securities throughout the entirety of the trading day" after "Robinhood was in fact able to meet its January 28 clearinghouse collateral requirement." (Opp. at 17.) Robinhood placed those trading restrictions on the most volatile stocks at the time (including the Relevant Securities), which would be expected to reduce the volatility multiplier on the collateral that Robinhood Securities was required to post with the NSCC. (MTD at 10-11.) Moreover, as Plaintiffs acknowledge, the market volatility in late January 2021 was extraordinary, with events occurring quickly to meet market and clearinghouse demands. Therefore, it is understandable that earlier-in-time internal Robinhood and Apex communications, as Plaintiffs identified, did not reflect final information later presented publicly. (Opp. at 17.)

*Fourth*, Plaintiffs repeat that government investigations "are indicative of anticompetitive collusion." (Opp. at 18.) But simply pleading "the existence of government inquiries [is] insufficient to raise an inference of conspiracy." *Salmon*, 2021 WL 1109128, at *17. Indeed, Plaintiffs later claim: "there is no evidence that the SEC is investigating or plans to investigate Defendants' collusive behavior." (Opp. at 39.)

*Fifth*, Plaintiffs' allegations about the "structural characteristics of the market" do nothing to support their inference of conspiracy. (MTD at 26.) As Defendants' MTD explains, the "structural characteristics" plus factor involves scenarios where a "series of horizontal competitors commanded such an uncontestable share of the marketplace that they would profit from raising prices, restricting output or reducing quality." (*Id.* (citing *Fla. Cement*, 746 F. Supp. 2d at 1317).) Although Plaintiffs generally allege that structural market characteristics support an inference of conspiracy, it is unclear *which* alleged relevant market or markets they seek to characterize. For example, Plaintiffs conflate starting a securities brokerage firm, for which they assert there are barriers to entry, with the ability for retail investors to open accounts to trade securities on competing retail brokerage platforms, for which there are no barriers to entry. (Opp. at 19.) In sum, Plaintiffs fail to show direct or circumstantial evidence of a conspiracy. The CCAC should be dismissed for this reason alone.

## II.   PLAINTIFFS FAIL TO PLEAD THE REMAINING ELEMENTS OF A SECTION 1 CLAIM.

Even if Plaintiffs had adequately alleged an agreement—and they have not—they still have not adequately pleaded their antitrust claim because their alleged conspiracy cannot be subject to *per se* condemnation and the CCAC fails to define the relevant market, adequately allege market power and plead anticompetitive effects as required to plead a rule of reason claim.

A.    **The Court Should Address the Question of *Per Se* vs. Rule of Reason at the Motion to Dismiss Stage.**

Plaintiffs wrongly assert that the antitrust standard of review is "not ripe" on a Rule 12(b)(6) motion.  In fact, it is common and appropriate for courts to consider at the motion to dismiss stage whether the allegations in a complaint should be analyzed under the *per se* standard or the rule of reason.  (MTD at 28.)  None of the cases cited by Plaintiffs dictates a different result.  *See Arizona v. Maricopa Cty. Med. Soc'y*, 457 U.S. 332, 342-46 (1982) (discussing per se and rule of reason analysis generally); *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1037-40 (N.D. Cal. 2013) (deciding on motion to dismiss whether complaint adequately alleged a *per se* or quick look violation); *In re High-Tech Emps. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1115 n.9 (N.D. Cal. 2012) (noting that parties agreed that court need not decide between *per se* and rule of reason on motion to dismiss in that case, where plaintiff alleged horizontal agreement).  Here, Plaintiffs fail to allege any possible agreement to which *per se* treatment could apply.  *See Tempur-Pedic*, 626 F.3d at 1334-36; *Quality Auto*, 917 F.3d at 1271-72.  Although the Court should dismiss based on the lack of plausible allegations of an agreement alone, if it is not inclined to do so, the Court should determine which standard applies now as that implicates the additional reasons for dismissal set forth in this section.

B.    **Plaintiffs' Allegations Do Not Qualify for *Per Se* Treatment.**

Plaintiffs' allegations do not fit within the narrow category of cases to which *per se* treatment is confined.  *Per se* treatment is typically limited to certain "'horizontal restraints'—restraints 'imposed by agreement between competitors.'"  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283-84 (2018) (quoting *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988)).  And even with respect to horizontal restraints, only a limited number are "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality."  *Procaps S.A. v. Pantheon, Inc.*, 845 F.3d 1072, 1083 (11th Cir. 2016) (quoting *Nat'l Soc. of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978)).  Those are "horizontal price fixing among competitors, group boycotts, and horizontal market division—business relationships that, in the courts' experience, virtually always stifle competition."  *Tempur-Pedic*, 626 F.3d at 1334.  Finally, courts apply the *per se* standard "only when history and analysis have shown that in sufficiently similar circumstances" application of "the rule of reason unequivocally results in a finding of liability."  *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1549 (11th Cir. 1996) (citations omitted).  The *per se* standard does not apply to the claims here because (1) they

10

are not a horizontal restraint and (2) they do not fall into the *per se* categories of restraints.

### 1.      Plaintiffs Do Not and Cannot Allege a Horizontal Agreement.

Plaintiffs try to satisfy the requirement of a horizontal restraint in two ways.  They argue in the alternative either that all Defendants are competitors in the same market, so that the alleged conspiracy would be horizontal (Opp. at 21-25), or that, even though Citadel Securities operates at a different market level from any of the other Defendants (who themselves do not operate at the same market level), Plaintiffs adequately have pleaded a so-called hub-and-spoke conspiracy (*id.* at 26-27).  Neither argument succeeds.

*First*, Defendants are not horizontal competitors.  While Plaintiffs summarily assert that "Defendants are horizontal competitors" (Opp. at 21), the CCAC contains no such allegation, which is likely why there is no citation for the proposition in Plaintiffs' brief.  (*See* Opp. at 21.)  Indeed, their Opposition lacks any explanation for *how* that could possibly be true, and Plaintiffs' explanation of Defendants' different roles describes a vertical, rather than horizontal, structure.  (*Id.* at 23-24.)  Defendants act at three distinct levels:

- Introducing Brokers are customer-facing entities through which retail investors may access financial markets.  (MTD at 4-5.)  Certain introducing brokers also have affiliated clearing entities or internally clear their own trades—the CCAC refers to these firms as "Self-Clearing Brokers."  (*Id.* at 5.)  All of the Introducing Brokers that contract with separate Clearing Brokers were dismissed from this case, leaving as Defendants only three "Self-Clearing Brokers":  Robinhood, E*TRADE and Interactive Brokers.  (*Id.*)

- Clearing Brokers process the trades on the customers' behalf to ensure that the trades are able to clear and custody of the securities and assets are transferred to the appropriate entity.  (*Id.* at 5-6.)  Clearing Brokers, as defined in the CCAC, operate independently from any introducing brokers.  The two companies owned by PEAK6 Investments, Apex and ETC, are the only alleged independent Clearing Broker Defendants.  (*Id.*)

- Market Makers stand ready to fill certain orders routed to them by Introducing Brokers.  (*Id.* at 6.)  The only named Market Maker Defendant is Citadel Securities.  (*Id.*)

No Defendant is alleged to compete with Citadel Securities:  the broker Defendants are not market-makers, and Citadel Securities is neither an Introducing Broker (it has no customers of its own), nor does it provide clearing services for other brokers.  Self-Clearing Brokers are also not alleged to compete with Clearing Brokers:[6]  the Self-Clearing Brokers are not alleged to be in the business of clearing trades for other introducing brokers and the Clearing Brokers are not alleged

---

[6] And the Introducing Brokers are not alleged to compete with Clearing Brokers.  (MTD at 4-5.)

to be in the business of attracting trading accounts from retail investors.  Defendants plainly do not all compete with one another and Plaintiffs are wrong to assert that the alleged agreement is "between horizontal competitors."  *Am. Express*, 138 S. Ct. at 2284.[7]

*Second*, Plaintiffs argue in the alternative that "Plaintiffs' claims should nevertheless receive *per se* treatment because Plaintiffs have also pleaded a hub and spoke conspiracy," where Citadel Securities is the alleged hub and the broker Defendants are all spokes on the wheel.  (Opp. at 26-27.)  But Plaintiffs fail to allege any communications between Citadel Securities and many of the purported "spokes."  And as Plaintiffs concede, a hub-and-spoke conspiracy is subject to *per se* treatment *only* where there is an underlying horizontal agreement, *i.e.*, not just agreements between the hub and each spoke, but *also* a series of agreements along the rim of the wheel.  (*Id*.)  Here, that would mean each broker Defendant would need to be in agreement with each other, but there are no allegations to that effect.  Without the agreements along the rim, Plaintiffs are left with a series of alleged *vertical* agreements (between the hub and each spoke) and no *horizontal* agreement, as required for *per se* treatment.

Numerous courts have confronted similar allegations, where "various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's involvement in each transaction," and have labeled such allegations as a "rimless hub-and-spoke conspiracy."  *See, e.g.*, *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203 (4th Cir. 2002).  Notably, however, there is "one key difference between a rimless hub-and-spoke conspiracy (*i.e.*, a set of purely vertical agreements) and a rimmed hub-and-spoke conspiracy (*i.e.*, a set of vertical agreements joined by horizontal agreements):  courts analyze vertical agreements under the rule of reason . . . whereas horizontal agreements are violations per se."  *Musical Instruments*, 798 F.3d at 1192 n.3; *see also Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008) ("[T]he critical issue for establishing a *per se* violation with the hub and spoke system is how the spokes are connected to each other.").  Because Plaintiffs fail to allege any

---

[7] The cases Plaintiffs cite in support of their conclusory assertion that the alleged conspiracy is among horizontal competitors are inapposite .  *See In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1260 (N.D. Ala. 2018) (requiring "'an agreement' to commit conduct that the Supreme Court has held to be unreasonable [*per se*] 'because the unreasonableness of the restraint is presumed'"); *United States v. Gen. Motors Corp.*, 384 U.S. 127, 145-46 (1966) (*per se* rule applied to a group boycott among *horizontally* situated car dealers).

*horizontal* agreement, Plaintiffs cannot rely on a hub-and-spoke theory to obtain *per se* treatment.  Indeed, Plaintiffs fail to identify a single case where a hub-and-spoke conspiracy lacked horizontal coordination, and still was determined to be illegal *per se*.  While they attempt to rely on *In re Disposable Contact Lens*, the court there explained that the "'relevant agreement in restraint of trade' was not [the hub's] vertical contracts with the [spokes], but rather 'the horizontal agreement that [hub] organized among the [spokes] . . .' which was '*per se* unreasonable.'" 215 F. Supp. 3d at 1292.  The absence of such horizontal agreements dispositively precludes *per se* treatment here.

### 2.     Plaintiffs Fail to Allege a Type of Horizontal Agreement That Is So Plainly Anticompetitive That *Per Se* Treatment Is Appropriate.

Even if Plaintiffs *had* pleaded a horizontal restraint (they have not), the alleged agreement does not fall within the limited set of circumstances where *per se* treatment is warranted because Plaintiffs fail to allege the agreement is "so plainly anticompetitive that no elaborate study of the industry is needed to establish [its] illegality."  *Prof'l Eng'rs*, 435 U.S. at 692.  Specifically, *per se* treatment is limited to "naked restrain[ts] of trade with no purpose except stifling of competition."  *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 20 (1979).  Examples of such practices are horizontal price fixing, output limitations, group boycotts, and horizontal market division.  *See Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 100 (1984); *Tempur-Pedic*, 626 F.3d at 1334.

Plaintiffs have not asserted a price-fixing agreement, a group boycott or market division.  And for the reasons addressed in Defendants' MTD, none of these characterizations are applicable here.  (MTD at 28-30.)  Plaintiffs argue that this case involves a restriction of output.  (Opp. at 22.)  However, allegations that Defendants "restrict[ed] retail investors' access to the stock market" do not amount to the type of "output restriction" with which the antitrust laws are concerned.  Specifically, there is no allegation of "product scarcity," nor that Defendants "artificially inflate[d] prices by intentionally reducing product supply."  *United States v. Andreas*, 39 F. Supp. 2d 1048, 1059 (N.D. Ill. 1998), *aff'd*, 216 F.3d 645 (7th Cir. 2000).  Plaintiffs appear to say that the relevant market is the market for the Relevant Securities.  (Opp. at 31.)  Yet Plaintiffs do not (and cannot) plausibly assert that Defendants reduced output for any of the Relevant Securities.  Critically, Plaintiffs do not (and cannot) allege that any of the trading restrictions had any impact at all on the number of shares of the Relevant Securities available for purchase and sale.  Thus, the *per se* standard does not apply.

### C.    Plaintiffs' Allegations Do Not Qualify for Quick Look Review.

Plaintiffs incorrectly suggest that the "quick look" standard of review should apply to their claims.  (Opp. at 28.)  But "[m]ost of the antitrust cases that have explicitly considered a 'quick look' approach involved restraints within the context of a joint venture, professional association, network, or other joint association whose legitimacy was not in question."  Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1508 (4th & 5th eds., 2021 Cum. Supp. 2013-2020).  None of those situations are alleged here.[8]

### D.    Plaintiffs Fail to Plead a Section 1 Violation Based on the Rule of Reason.

Because Plaintiffs do not allege claims falling under the *per se* standard of review, their claims must be analyzed under the rule of reason.  *See Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1546 (11th Cir. 1996) ("Agreements that do not fit within an established per se category are analyzed under the 'rule of reason,' *i.e.*, courts will engage in a comprehensive analysis of the agreement's purpose and effect to determine whether it unreasonably restrains competition.").  But for the reasons that follow, the CCAC must be dismissed because Plaintiffs do not plead the requisite elements of a Section 1 claim proceeding under the rule of reason.

While Plaintiffs assert that the CCAC adequately alleges a product market (Opp. at 31), nowhere do they define the relevant product market with any clarity.  The CCAC makes a passing reference to "the stock brokerage market with respect to the Relevant Securities" (CCAC ¶ 498); and the Opposition refers at various points to "markets in the Relevant Securities" (Opp. at 31), the "securities market" as a whole (*id.* at 18, 31), and the "service" of "trading of securities" (*id.* at 31 n.33).  Those are four different potential markets (or more, if one treats each Relevant Security as a separate market).  Furthermore, it is unclear whether, using the term "securities market," Plaintiffs refer to the market for retail broker services, the market for clearing services, the market for the Relevant Securities individually or in the aggregate, the market for the Relevant Securities, the stock market as a whole, or any other type of market that is encompassed by the financial markets.  And while Plaintiffs assert flatly that their argument is that "restricting purchasing shares in the Relevant Securities reduced competition" (Opp. at 31), they never articulate competition *for what or between whom*; indeed, Defendants are not alleged

---

[8] Plaintiffs' own cases reject applying "quick look" to claims like theirs.  *See California ex rel. Harris v. Safeway Inc.*, 651 F.3d 1118, 1137 (9th Cir. 2011) (en banc) (rejecting "quick look" analysis because the "limited duration" of the restraint and "the existence of other significant external competitors in the market" rendered any anticompetitive effects "not obvious").

to "compete" with retail investors in trading the Relevant Securities.  (MTD at 5-6.)  Plaintiffs also fail to grapple with the fact that the purchase or sale of securities of a particular company is not covered by § 1 of the Sherman Act.  *Kalmanovitz v. G. Heileman Brewing Co.*, 769 F.2d 152, 155-57 (3d Cir. 1985) (analyzing § 1 challenge to a tender offer).

Plaintiffs are also wrong as a matter of black-letter antitrust law when they try to elide their pleading failures by arguing it is premature to assess market definition at the motion to dismiss stage.  (Opp. at 21.)  As the Eleventh Circuit has held, "antitrust plaintiffs . . . must present enough information in their complaint to plausibly suggest the contours of the relevant geographic and product markets."  *Tempur-Pedic*, 626 F.3d at 1336 (affirming dismissal of rule of reason case for, *inter alia*, failing to plead adequately the relevant market).

Plaintiffs' claim that *American Express* does not require a market definition at the outset is astonishing.  (Opp. at 30.)[9]  The Supreme Court expressly rejected the plaintiffs' argument that they "need not define the relevant market," even if plaintiffs had "offered actual evidence of adverse effects on competition."  138 S. Ct. at 2285 n.7.  The Court explained that "vertical restraints often pose no risk to competition unless the entity imposing them has market power, which cannot be evaluated unless the Court first defines the relevant market."  *Id*.  Thus, as the Supreme Court explained, "[w]ithout a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition."  *Am. Express Co.*, 138 S. Ct. at 2285 (citations omitted).  Plaintiffs here must define the relevant market in which they allege Defendants caused competitive harm, and plead that Defendants possessed market power within that market.  Plaintiffs do not even attempt to do so.

Plaintiffs also do not allege that Defendants have market power in any market. *See PSKS, Inc. v. Leegin Creative Leather Prod., Inc.*, 615 F.3d 412, 418 (5th Cir. 2010) (granting motion to dismiss, and holding that the market for "women's accessories" was "too broad and vague a definition to constitute a market," as it was "impossible to imagine that [the plaintiff] could have power over such a market").  Nor could they; there are numerous other electronic broker-dealer platforms, clearing brokers and market-makers.  Plaintiffs even allege

---

[9] The very import of *Amex* was the Supreme Court's recognition for the first time that certain markets must be defined to include two sides.  Plaintiffs' claim that the case somehow does not require identifying at the outset the relevant product market is a gross misunderstanding of the Supreme Court's latest antitrust case on market definition.

that several of the named Plaintiffs sought to switch brokers to evade the restrictions, and Plaintiff Minahan successfully did so.  (CCAC ¶ 30.)

Plaintiffs' failure to plead a relevant market also dooms their attempt to argue they have adequately pleaded anticompetitive effects, as such effects can only be measured once the relevant market has been defined.  *See Tempur-Pedic*, 626 F.3d at 1336.  And, in any event, even if Plaintiffs had sufficiently pleaded that the prices for the Relevant Securities would have been higher absent the disparate trading restrictions introduced by alleged conspirators and non-conspirators alike, there is no allegation—nor could there be—that any such price effect was the result of decreased *competition*, as the broker Defendants do not buy or sell the Relevant Securities for their own account and therefore do not compete in any such market.  (*See supra* Section II.B; MTD at 32.)  Despite multiple opportunities, Plaintiffs fail to plead the required elements of the rule of reason test, and dismissal with prejudice is warranted.

## III.   PLAINTIFFS' ANTITRUST CLAIMS ARE PRECLUDED BY FEDERAL SECURITIES LAWS.

Plaintiffs' antitrust claims are precluded by federal securities law.

### A.   The Dodd-Frank Act Savings Clause Does Not Apply.

Plaintiffs try to avoid preclusion of their claims by relying on the Dodd-Frank Act's antitrust savings clause.  That reliance is misplaced.  As Plaintiffs acknowledge, Section 6 of the Dodd-Frank Act states that "*[n]othing in this Act, or any amendment made by this Act*, shall be construed to modify, impair, or supersede the operation of any of the antitrust laws, unless otherwise specified."  (Opp. at 32 (citing 12 U.S.C. § 5303) (emphasis added).)  "[T]his Act" refers to the Dodd-Frank Act, not the Exchange Act, *see* Dodd-Frank Act §§ 1(a), 6, 124 Stat. 1376, 1390 (2010), and the savings clause is codified in title 12 (banks and banking), not title 15 (where the securities laws appear).  *See* 12 U.S.C. § 5303.

The savings clause thus applies to conduct covered by the Dodd-Frank Act or amendments made by that Act, but *not* conduct covered by pre-existing provisions of the Exchange Act or other statutes otherwise unamended by the Dodd-Frank Act.  *See In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 495-98 (S.D.N.Y. 2017) (holding that Dodd-Frank Act savings clause applied to alleged conspiracy among interest rate swap dealers, where Act regulated swap markets); *In re Credit Default Swaps Antitrust Litig.*, No. 13-md-2476, 2014 WL 4379112, at *16-17 (S.D.N.Y. Sept. 4, 2014) (same for credit default swaps).

The agreement among Defendants that Plaintiffs allege in this action, however,

does *not* involve conduct covered by the Dodd-Frank Act. As Plaintiffs characterize it, the subject matter involves conduct covered by pre-existing market manipulation provisions of the Exchange Act that the Dodd-Frank Act did *not* amend. *See* Exchange Act § 15(c)(2)(D), 15 U.S.C. § 78o(c)(2)(D); Exchange Act § 9(a)(6), 15 U.S.C. § 78i(a)(6); Exchange Act § 10(b), 15 U.S.C. § 78j(b). The Exchange Act provisions concerning broker risk mitigation and management also were not amended by the Dodd-Frank Act. (*See infra* Sec. III.B.) Plaintiffs try to shoehorn their claims into the Dodd-Frank Act's savings clause by asserting that provisions of the Dodd-Frank Act "touch upon issues alleged in the CCAC," namely short-selling. (Opp. at 33.) But the antitrust conspiracy that Plaintiffs allege in this case concerns trading restrictions that "Defendants simultaneously imposed . . . on their stock trading platforms," *not* any short-selling activity. (*Id.* at 1.) Plaintiffs' (unsupported) suggestion that Citadel Securities' alleged short sales provided a *motive* for the alleged conspiracy does not make short sales an object of the conspiracy or bring this action within the ambit of the Dodd-Frank Act. Indeed, Plaintiffs acknowledge that their claims "do not attack or seek to prohibit short selling generally." (Opp. at 39.)[10] Moreover, Section 929X(a), on which Plaintiffs rely, authorizes the SEC to issue rules regarding the public disclosure of short positions on a monthly basis. 124 Stat. at 1870. The SEC has not issued any regulations under the provision, and even if it had done so, they would have nothing to do with the alleged conduct because they would not have prohibited short selling, nor would such monthly disclosures have had any impact on Plaintiffs' claims.

   Plaintiffs do not—and, as outlined in the MTD, cannot—show that the Dodd-Frank Act or any of the amendments it made cover the trading restrictions at issue in this action; therefore, the Act's antitrust savings clause does not apply.[11] (MTD at 38.) The Supreme Court's analysis in *Credit Suisse Sec. (USA) LLC v. Billing*, 551 U.S. 264, 275 (2007), governs, which holds that the general savings clauses in the Exchange Act are not "so broad as to preserve

---

[10] Plaintiffs note that "Dodd-Frank also has specific provisions related to market making" without explaining how this statement relates to the alleged antitrust conspiracy. (*Id.* at 33.) In any event, as with short sales, Plaintiffs do not allege that Citadel Securities' market-making activities were part of the alleged conspiracy.

[11] Plaintiffs also argue that the Dodd-Frank Act modified portions of "Section 15 of the Securities Exchange Act" without providing any explanation as to how this statement relates to their case. (Opp. at 33.) As Defendants noted in the MTD, however, these amendments (*see* Dodd-Frank Act § 913(g), 124 Stat. at 1828 (adding 15 U.S.C. § 78o(k)-(*l*)) have nothing to with the provisions of the Exchange Act relevant to this action. (MTD at 38.)

all antitrust actions" and do not prevent implied preclusion of Sherman Act claims.

**B.    Plaintiffs' Antitrust Claims Are Precluded Under *Billing* Because the Conduct at Issue Is Regulated by the Federal Securities Laws.**

Plaintiffs' assertion that the four *Billing* factors do not apply entirely ignores that other plaintiffs have brought claims alleging violations of federal securities laws on the facts alleged here.  (*See* Order on Leadership Structure, ECF No. 310, at 1-2.)  The conduct underlying Plaintiffs' claims is regulated by the securities laws, and Plaintiffs' antitrust claims are accordingly precluded regardless of the merit of any securities claims.  Here, all four *Billing* factors weigh in favor of preclusion.

**1.    The Conduct at Issue Lies at the Very Heart of the Securities Market.**

Plaintiffs argue that the first *Billing* factor weighs against preclusion because "Defendants do not—and—cannot demonstrate how cutting off retail investors' access to the securities market by restricting trading" is "central to the proper functioning of well-regulated markets."  (Opp. at 35-36.)  Plaintiffs' argument fails for two reasons.  *First*, Defendants showed in their MTD that market integrity for stock prices, and the prohibition on market manipulation of the kind Plaintiffs allege here, lies at the core of the securities laws.  *See* Exchange Act §§ 9-10, 15 U.S.C. §§ 78i-78j; (MTD at 34).  *Second*, Defendants explained in the MTD how restrictions on trading volatile stocks permitted certain Defendants to meet clearing agency collateral calls and continue to serve all customers trading all securities (beyond the volatile stocks).  (MTD at 17-18.)  That was central to the proper functioning of well-regulated markets.  The SEC has recognized this principle in the related context of requiring brokers with "market access" to have risk management controls and supervisory procedures in place "to systematically limit the financial exposure of the broker or dealer that could arise as a result of [customer] market access."  17 C.F.R. § 240.15c3-5(c).  Specifically, such brokers must "prevent the entry of orders," and "reject[] orders," if such orders would "exceed appropriate pre-set credit or capital thresholds in the aggregate for each customer and the broker or dealer."  *Id.* § 240.15c3-5(c)(1).  Indeed, the SEC has explicitly stated that broker-dealers "may reserve the ability to reject or limit customer transactions."[12]  Accordingly, "limit[ing] financial exposure" by implementing trading restrictions when necessary is a practice that "lie[s] squarely within an area

_____

[12] SEC, *Thinking About Investing in the Latest Hot Stock?* (Jan. 30, 2021) ("SEC Statement"), https://www.sec.gov/oiea/investor-alerts-and-bulletins/risks-short-term-trading-based-social-media-investor-alert.

of financial market activity that the securities law seeks to regulate." *Billing*, 551 U.S. at 276.

### 2.      The SEC Is Authorized To Regulate All of the Activities in Question.

Plaintiffs further argue that the second *Billing* factor weighs against preclusion because "there are no provisions under SEC rules that allow brokers to unilateral[ly] restrict access to trading markets." (Opp. at 36 n.39.)  Again, this is simply untrue.  As just outlined, SEC rules explicitly require brokers with "market access" to have procedures in place to unilaterally restrict access to trading markets.  17 C.F.R. § 240.15c3-5(c).  Moreover, as set forth in the MTD, the SEC has the authority to enact regulations governing the market manipulation that Plaintiffs allege here.  *See* Exchange Act §§ 9(a)(6) & 10(b), 15 U.S.C. §§ 78i(a)(6) & 78j(b); (MTD at 35, 37).  Thus, the SEC clearly has the "regulatory authority under the securities law to supervise the activities in question."  *Billing*, 551 U.S. at 275.

### 3.      There Is Substantial Evidence That the SEC Is Exercising Its Authority.

Curiously, Plaintiffs assert that "there is simply no evidence to suggest that the SEC is investigating the claims of concerted activity at issue here." (Opp. at 37.)  Plaintiffs' assertion is refuted by the acknowledgment earlier in their brief that the SEC is "investigating the events concerning the January 28, 2021 trading restrictions." (*Id.* at 18 n.20.)  As outlined in the MTD, the SEC is exercising its authority through various enforcement programs, as is demonstrated by the SEC's ongoing investigation.  (MTD at 35-36.)  The SEC may recognize that Plaintiffs' claims of a conspiracy to manipulate the securities markets are baseless, but that would be an entirely appropriate exercise of the SEC's authority.

### 4.      Allowing This Claim To Proceed Would Create a Conflict Between the Antitrust and Securities Laws.

Plaintiffs assert that "Defendants cite to no law that would be in conflict with or undermined were Plaintiffs['] claims to succeed." (Opp. at 37-38.)  That is untrue.  Defendants cited to the SEC's comprehensive regulations for broker-dealers (including net capital requirements), *see* 17 C.F.R. §§ 240.15a-1 to 240.15c6-1, and for clearing agencies (including collateral call requirements), *see id.* §§ 240.17Ab2-1 to -2, 240.17Ad-1 to -24.  (*See* MTD at 37.)  There is an actual conflict because Congress has expressly authorized these regulations.  *See* Exchange Act §§ 15, 17 & 17A, 15 U.S.C. §§ 78o, 78q & 78q-1.  In any event, *Billing* does not require an actual conflict.  *See Billing*, 551 U.S. at 273 (noting that in the Court's prior rulings on this issue, "in light of potential future conflict, the Court found that the securities law precluded

antitrust liability even in respect to a practice that both antitrust law and securities law might forbid"). As Plaintiffs correctly note, a "conflict may occur when there is either an actual conflict *or* a potential conflict between antitrust law and securities regulations." (Opp. at 37 (citing *Elec. Trading Grp., LLC v. Banc of Am. Sec. LLC*, 588 F.3d 128, 137-38 (2d Cir. 2009)) (emphasis added).) Here, SEC regulations do not prohibit the alleged conduct, and the SEC has stated that broker-dealers "may reserve the ability to reject or limit customer transactions."[13] Accordingly, there is an actual and potential conflict between the securities laws and the federal antitrust laws in this action, and Plaintiffs' antitrust claims are precluded.

## IV.   INDEPENDENT REASONS EXIST TO DISMISS ALL CLAIMS AGAINST PEAK6, E*TRADE HOLDINGS AND ROBINHOOD MARKETS.

Other than conclusory statements in the Opposition, Plaintiffs do not allege that PEAK6, E*TRADE Holdings or Robinhood Markets were involved in the alleged conspiracy— just that parent-subsidiary relationships exist between these entities and other Defendants. (Opp. at 40.) But courts reject that "a subsidiary and its parent . . . can be considered one entity for all § 1 purposes, and either one can be liable for conspiring to restrain trade, even where there is no evidence that both were involved in the challenged conduct." *Fla. Cement*, 746 F. Supp. 2d at 1324 (quoting *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 857 (10th Cir. 1999)). The claims must be dismissed for this independent reason.[14]

## V.   THE CCAC SHOULD BE DISMISSED WITH PREJUDICE.

Plaintiffs have filed two complaints after obtaining and reviewing thousands of Defendants' internal documents. Even with the benefit of documentary evidence ordinarily unavailable at the pleading stage, Plaintiffs still fail to adequately plead a claim. Any further amendment would be futile; the CCAC should be dismissed with prejudice. (MTD at 39.)

### CONCLUSION

For the foregoing reasons, Defendants respectfully submit that the CCAC should be dismissed for failure to state a claim, with prejudice.

---

[13] SEC Statement, *supra* note 12.

[14] Plaintiffs' citation to *Lenox v. MacLaren Surgical Corp.*, 847 F.3d 1221 (10th Cir. 2017), does not suggest otherwise. The Tenth Circuit affirmed its decision in *Mitchael*, 179 F.3d at 857 (as this Court cited in *Florida Cement*, 746 F. Supp. 2d at 1324), that a corporate parent cannot be liable for a Section 1 claim under a *Copperweld* unitary entity theory absent allegations of the parent's independent conduct. *Lenox*, 847 F.3d at 1235.

Dated:  October 5, 2021

/s/ Samuel A. Danon

**HUNTON ANDREWS KURTH LLP**
Samuel A. Danon (FBN 892671)
Gustavo Javier Membiela (FBN 513555)
María Castellanos Alvarado (FBN 116545)
333 S.E. 2 Avenue, Suite 2400
Miami, FL 33131
Telephone: (305) 810-2500
Facsimile: (305) 810-2460
sdanon@huntonak.com
gmembiela@huntonak.com
mcastellanos@hunton.com

**CRAVATH, SWAINE & MOORE LLP**
Antony L. Ryan
Kevin J. Orsini
Brittany L. Sukiennik
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700
aryan@cravath.com
korsini@cravath.com
bsukiennik@cravath.com

*Counsel for Defendants Robinhood Financial*
*LLC, Robinhood Securities, LLC and*
*Robinhood Markets, Inc.*

*/s/ Adam Hoeflich* (with consent)
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Christopher D. Kercher
Peter H. Fountain
51 Madison Avenue, 22nd Floor,
New York, New York, 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
christopherkercher@quinnemanuel.com
peterfountain@quinnemanuel.com

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
William A. Burck
1300 I Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100
williamburck@quinnemanuel.com

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
John F. O'Sullivan (FBN 143154)
2601 South Bayshore Drive, Suite 1550
Miami, FL 33133
Telephone: (305) 439-5008
johnosullivan@quinnemanuel.com

**BARTLIT BECK LLP**
Adam L. Hoeflich
Dawson Robinson
54 W. Hubbard St., Ste. 300
Chicago, IL 60654
Telephone: (312) 494-4400
Facsimile: (312) 494-4440
adam.hoeflich@bartlitbeck.com
dawson.robinson@bartlitbeck.com

*Counsel for Defendant Citadel Securities LLC*

*/s/ Shari Ross Lahlou* (with consent)
**DECHERT LLP**
Shari Ross Lahlou
1900 K Street, NW
Washington, D.C. 20006
Telephone: (202) 261-3300
Facsimile: (202) 261-3333
shari.lahlou@dechert.com

**DECHERT LLP**
Andrew J. Levander
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Telephone:  (212) 698 3500
Facsimile:  (212) 698 3599
***andrew.levander@dechert.com***

**DECHERT LLP**
Steven Bizar
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
Telephone: (215) 994 4000
Facsimile: (215) 994 2222
steven.bizar@dechert.com

*Counsel for Defendant Interactive Brokers LLC*

/s/ Peter W. Homer (with consent)

**HOMER BONNER JACOBS ORTIZ, P.A.**
Peter W. Homer (Florida Bar No. 291250)
1200 Four Seasons Tower
1441 Brickell Avenue
Miami, Florida 33131
Telephone: (305) 350-5139
Facsimile: (305) 372-2738
phomer@homerbonner.com

**DAVIS POLK & WARDWELL LLP**
Brian S. Weinstein
Gina Cora
Janet Jones-Duffey
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5972
brian.weinstein@davispolk.com
gina.cora@davispolk.com
janet.jones-duffey@davispolk.com

*Counsel for Defendants E\*TRADE Securities*
*LLC and E\*TRADE Financial Holdings, LLC*

/s/ J. Mark Gidley (with consent)

**WHITE & CASE LLP**
Jack E. Pace III
Bryan D. Gant
1221 Avenue of the Americas
New York, NY  10020-1095
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
jpace@whitecase.com
bgant@whitecase.com

**WHITE & CASE LLP**
J. Mark Gidley
701 Thirteenth Street, NW
Washington, DC  20005-3807
Telephone: (202) 626-3600
Facsimile: (202) 639-9355
mgidley@whitecase.com

**WHITE & CASE LLP**
Angela Daker
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, FL  33131-2352
Telephone: (305) 995-5297
Facsimile: (305) 358-5744
adaker@whitecase.com

*Counsel for Defendant Apex Clearing*
*Corporation, Electronic Transaction Clearing,*
*Inc. and PEAK6 Investments LLC*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 5, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I further certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive Notices of Electronic Filing.

Dated:  October 5, 2021

*/s/ Samuel A. Danon*
Samuel A. Danon (FBN 892671)