UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-2989-MDL-ALTONAGA/Torres

IN RE:

JANUARY 2021 SHORT SQUEEZE
TRADING LITIGATION
_____/

This Document Relates to All Claims Included
In the Other Broker Tranche

DEFENDANT APEX CLEARING CORPORATION'S RULE 12 MOTION TO DISMISS
PLAINTIFFS' AMENDED CONSOLIDATED OTHER BROKER TRANCHE CLASS
ACTION COMPLAINT AND INCORPORATED MEMORANDUM OF LAW

**Table of Contents**

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ............................................................................... 5

ARGUMENT ...................................................................................................... 10

I.     This Court Does Not Have Subject-Matter Jurisdiction Over Plaintiffs Jang and Chavez's Common Law Claims—Brought in the MDL for the First Time Against Apex— and Thus Lack a Transferor Forum ...................................................... 10

II.    Plaintiffs Jang and Chavez Lack Article III Standing (All Counts) ................... 12

    A.    Plaintiffs Fail to Allege Injury in Fact Because Their Claims That They Would Have Sold Meme Stocks at a Higher Price Are Speculative and Implausible ............................................................................................ 12

    B.    Plaintiffs Fail to Allege They Have a "Legally Protected Interest" in Lost Earnings Due to Plaintiffs' Thwarted Meme Stock Scheme ................... 14

    C.    Named Plaintiffs Lack Standing to Bring Claims on Behalf of a Class of Direct Customers Because Named Plaintiffs Are Not Direct Customers of Apex ....................................................................................................... 15

III.    Plaintiffs' Common Law Negligence, Breach of Fiduciary Duty, and Tortious Interference Claims Fail to State a Claim and Must Be Dismissed ................... 16

    A.    Choice of Law Considerations Compel Application of Texas Law Where Apex Has Its Headquarters ..................................................................... 18

    B.    Plaintiffs' Negligence Claim (Count I) Fails as a Matter of Law ............ 19

        1.    It Is Well-Established That a Clearing Broker Such as Apex Owes No Duty of Care to Meme Stock Speculators Such as Plaintiffs .. 21

        2.    Plaintiffs Fail to Allege a Standard of Care That Apex's Conduct Could Have Breached with a Mid-Day, Few Hour Interruption in a Single Day's Trading of Three Meme Stocks ............................... 25

    C.    Plaintiffs Fail to State a Claim for Breach of Fiduciary Duty (Count II) . 32

        1.    Apex, a Clearing Broker, Is Not a Fiduciary of Plaintiffs Jang and Chavez, and a Clearing Broker Owes No Fiduciary Duty to Retail Customers Jang and Chavez as the Courts Universally Hold (*Spear, Leeds*) .............................................................................. 33

        2.    Apex Was Not Plaintiffs' Agent ................................................... 34

i

3.      Apex's Status as a Registered Broker-Dealer Does Not Transform Its Back-Office Services into a Fiduciary Relationship ............... 35

4.      Plaintiffs' Arms-Length Contracts with Apex Specifically Permit Apex to Act in Its Own Interest ..................................................... 37

5.      Apex Did Not Breach Any Fiduciary Duty by Refusing to Accept New Trades ................................................................................. 38

D.      Plaintiffs Fail to State a Claim for Tortious Interference (Count III) ....... 39

1.      Plaintiffs Fail to Allege "Willful and Intentional" Interference ... 39

2.      Plaintiffs Fail to Allege a Key Element of a Tortious Interference Claim:  The Existence of a Contract ............................................. 40

3.      Plaintiffs Fail to Allege that the Apex Introducing Brokers Were Contractually Forbidden from Declining to Open New Positions 41

4.      Apex Was Permitted, as a Matter of Law, to Decline to Clear New Positions ...................................................................................... 42

E.      Apex's Actions Did Not Proximately Cause Plaintiffs' Alleged Injury (All Counts) ...................................................................................... 42

IV.     This Action Is Pre-Empted by Federal Securities Laws Because Apex Is Subject to Active and Heavy Federal Regulation and Because the Duty that Plaintiffs Assert Against Apex Would Prove an Obstacle to the Uniform Federal Regulatory Scheme in the Interstate Trading of Publicly-Listed Securities ........................... 45

V.      The Claims of Plaintiffs Whose Brokers Did Not Use Apex as a Clearing Broker Must Be Dismissed .............................................................................. 49

VI.     With 25,000 Pages Produced and Multiple Pleading Opportunities, the Consolidated Amended Complaint Should Be Dismissed with Prejudice .......... 50

CONCLUSION ................................................................................................. 50

AMERICAS 109061325

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*A&H Props. P'ship v. GPM Eng'g*,
  2015 Tex. App. LEXIS 12879 (Tex. App. Dec. 23, 2015) .................................................... 25

*Aaron Private Clinic Mgmt. LLC v. Berry*,
  912 F.3d 1330 (11th Cir. 2019) .................................................................................. 12, 14, 16

*Abad v. G4S Secure Sols. (USA), Inc.*,
  293 So. 3d 26 (Fla. Dist. Ct. App. 2020) .............................................................................. 19

*Adams v. Graves*,
  1990 Ohio App. LEXIS 4964 (Ohio App. Oct. 23, 1990) ...................................................... 29

*Ala. Legis. Black Caucus v. Alabama*,
  135 S. Ct. 1257 (2015) ........................................................................................................... 15

*Allways Auto Grp., Ltd. v. Walters*,
  530 S.W.3d 147 (Tex. 2017) .................................................................................................. 43

*Anderson v. Dairy Farmers of Am., Inc.*,
  2010 U.S. Dist. LEXIS 104191 (D. Minn. Sep. 30, 2010) ...................................................... 31

*Anderton v. Cawley*,
  378 S.W.3d 38 (Tex. App. 2012) ........................................................................................... 33

*Anton v. Merrill Lynch*,
  36 S.W.3d 251 (Tex. App. 2001) ........................................................................................... 38

*Appert v. Morgan Stanley Dean Witter, Inc.*,
  2009 WL 3764120 (N.D. Ill. Nov. 6, 2009) .......................................................................... 48

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................................ 18, 30, 34, 43

*Baker v. Welch*,
  735 S.W.2d 548 (Tex. App. 1987) ........................................................................................ 42

*Balt. Orioles, Inc. v. Major League Baseball Players Ass'n*,
  805 F.2d 663 (7th Cir. 1986) ................................................................................................. 18

*Banzhaf v. ADT Sec. Sys. Sw., Inc.*,
  28 S.W.3d 180 (Tex. App. 2000) ........................................................................................... 31

*Beckwith v. Hart*,
    263 F. Supp. 2d 1018 (D. Md. 2003) ................................................................................20

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................................................18

*Bishop v. Florida Specialty Paint Company*,
    389 So. 2d 999 (Fla. 1980) ............................................................................................18

*Bos v. Smith*,
    556 S.W.3d 293 (Tex. 2018) ..........................................................................................33

*Brenner v. Centurion Logistics LLC*,
    2020 Tex. App. LEXIS 9810 (Tex. App. Dec. 14, 2020) ................................................42

*Brink v. James*,
    341 F. Supp. 3d 1314 (S.D. Fla. 2018) ..........................................................................22

*Browning-Ferris, Inc. v. Reyna*,
    865 S.W.2d 925 (Tex. 1993) .....................................................................................39, 40

*Bryant v. Dupree*,
    252 F.3d 1161 (11th Cir. 2001) .....................................................................................50

*Buckman Co. v. Plaintiffs' Legal Comm.*,
    531 U.S. 341 (2001) ........................................................................................................49

*Capital Options Invest., Inc. v. Goldberg Bros. Commodities, Inc.*,
    958 F.2d 186 (7th Cir. 1992) .........................................................................................29

*Chapman v. DePuy Orthopedics, Inc.*,
    760 F. Supp. 2d 1310 (M.D. Fla. 2011) .........................................................................19

*City of St. Petersburg v. Total Containment, Inc.*,
    No. 06-20953-CIV, 2008 U.S. Dist. LEXIS 106257 (S.D. Fla. Nov. 4, 2008) ...............16

*Coleman v. Equitable Real Estate Inv.*,
    971 S.W.2d 611 (Tex. App.—Dallas 1998) ...................................................................45

*Connolly v. Havens*,
    763 F. Supp. 6 (S.D.N.Y. 1991) ....................................................................................34

*Costa v. Kerzner Int'l Resorts Inc.*,
    2011 US Dist. LEXIS 66921 (S.D. Fla. June 23, 2011) ............................................18, 19

*Crosby v. Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000) ........................................................................................................46

AMERICAS 109061325

*Dallas v. Maxwell*,
   248 S.W. 667 (Tex. 1923)........................................................................................32

*Day v. Taylor*,
   400 F.3d 1272 (11th Cir. 2005) ...............................................................................23

*Default Proof Credit Card Sys. Inc. v. State Street Bank & Trust Co.*,
   753 F. Supp. 1566 (S.D. Fla. 1990) ...................................................................18, 19

*Dercole v. Divico Fin of Am.*,
   2005 U.S. Dist. LEXIS 59757 (E.D.N.Y. 2005)................................................16, 33

*Dixon v. Allergan United States*,
   2015 U.S. Dist. LEXIS 198315 (S.D. Fla. Apr. 2, 2015) .........................................34

*Doe v. Boys Clubs*,
   907 S.W.2d 472 (Tex. 1995)....................................................................................32

*Dunn v. Calahan*,
   2008 Tex. App. LEXIS 9498 (Tex. App. Dec. 17, 2008).........................................39

*Duradil, L.L.C. v. Dynomax Drilling Tools, Inc.*,
   516 S.W.3d 147 (Tex. App. 2017)......................................................................40, 41

*Espinoza v. Countrywide Home Loans Servicing, L.P.*,
   2014 U.S. Dist. LEXIS 107263 (S.D. Fla. Aug. 5, 2014)........................................50

*Ethan Allen, Inc. v. Georgetown Manor, Inc.*,
   647 So. 2d 812 (Fla. 1994).......................................................................................42

*Ferguson Transp., Inc. v. N. Am. Van Lines, Inc.*,
   687 So. 2d 821 (Fla. 1996)..................................................................................40, 41

*Fernandez v. Sch. Bd. of Miami-Dade Cnty.*,
    201 F. Supp. 3d 1353 (S.D. Fla. 2016) ..................................................................15

*First United Pentecostal Church of Beaumont v. Parker*,
   514 S.W.3d 214 (Tex. 2017).....................................................................................33

*Fox v. Lifemark Sec. Corp.*,
   84 F. Supp. 3d 239 (W.D.N.Y. 2015) .................................................................22, 35

*Friendswood Dev. Co. v. McDade & Co.*,
   926 S.W.2d 280 (Tex. 1996).....................................................................................42

*Geier v. Am. Honda Co.*,
   529 U.S. 861 (2000)......................................................................................46, 48, 49

v

*Gonzalez v. Acosta*,
   2001 Tex. App. LEXIS 5623 (Tex. App. Aug. 16, 2001) ......................................................29

*Gracey v. Eaker*,
   837 So. 2d 348 (Fla. 2002).................................................................................................33, 43

*Greater Houston Transp. Co. v. Phillips*,
   801 S.W.2d 523 (Tex. 1990)....................................................................................................42

*Griffin v. Dugger*,
   823 F.2d 1476 (11th Cir. 1987) ...............................................................................................16

*Hall v. Burger King Corp.*,
   912 F. Supp. 1509 (S.D. Fla. 1995) ........................................................................................18

*Hand v. Dean Witter Reynolds Inc.*,
   889 S.W.2d 483 (Tex. App. 1994).................................................................................. passim

*Hill v. Heritage Res., Inc.*,
   964 S.W.2d 89 (Tex. App. 1997)..............................................................................................42

*Holmes v. Newman*,
   2017 Tex. App. LEXIS 6177 (Tex. App. July 6, 2017)......................................................36, 38

*Horsley v. Feldt*,
   304 F.3d 1125 (11th Cir. 2002) .................................................................................................7

*Humble Sand & Gravel, Inc. v. Gomez*,
   146 S.W.3d 170 (Tex. 2004)......................................................................................................32

*In re Brinker Data Incident Litig.*,
   2020 U.S. Dist. LEXIS 247918 (M.D. Fla. Jan. 27, 2020)......................................................17

*In re Cadwallder*,
   2007 Bankr. LEXIS 2260 (Bankr. S.D. Tex. June 28, 2007) ...................................................27

*In re Catanella & E.F. Hutton & Co., Inc. Sec. Litig.*,
   583 F. Supp. 1388 (E.D. Pa. 1984) .........................................................................................45

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*,
   2021 U.S. Dist. LEXIS 116925 (D. Kan. June 23, 2021)..................................................10, 11

*In re Farmers Ins. Exch. Claims Representatives' Overtime Pay Litig.*,
   2008 U.S. Dist. LEXIS 90136 (D. Or. Oct. 28, 2008)..............................................................11

*In re FCA US LLC Monostable Elec. Gearshift Litig.*,
   2017 U.S. Dist. LEXIS 216672 (E.D. Mich. Mar. 21, 2017) ...................................................11

vi

*In re Managed Care Litig.*,
    298 F. Supp. 2d 1259 (S.D. Fla. 2003) .................................................................18

*In re Packaged Ice Antitrust Litig.*,
    2011 U.S. Dist. LEXIS 150426 (E.D. Mich. Dec. 12, 2011)....................................11

*In re Series 7 Broker Qualification Exam Scoring Litig.*,
    510 F. Supp. 2d 35 (D.D.C. 2007) ....................................................................22, 47

*Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund*,
    500 U.S. 72 (1991)...................................................................................................15

*Jim Walter Homes, Inc. v. Reed*,
    711 S.W.2d 617 (Tex. 1986).....................................................................................24

*La Grasta v. First Union Sec., Inc.*,
    358 F.3d 840 (11th Cir. 2004) .................................................................................45

*Lamm v. State St. Bank & Tr.*,
    749 F.3d (11th Cir. 2014) .........................................................................21, 24, 25

*LAN/STV v. Martin K. Eby Constr. Co.*,
    435 S.W.3d 234 (Tex. 2014)...........................................................................24, 25

*Levitt v. J.P. Morgan Sec., Inc.*,
    710 F.3d 454 (2d Cir. 2013).....................................................................................33

*Lexecon Inc. v. Milberg Weiss*,
    523 U.S. 26 (1998)............................................................................................3, 10

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
    523 U.S. 26 (1998)...................................................................................................10

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992).................................................................................................12

*Mars v. Wedbush Morgan Sec.*,
    283 Cal. Rptr. 238 (Cal Ct. App. 1991) ...........................................................20, 21

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
    547 U.S. 71 (2006)...................................................................................................4

*Meyer v. Cathey*,
    167 S.W.3d 327 (Tex. 2005).....................................................................................33

*Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.)*,
    247 B.R. 51 (Bankr. S.D.N.Y. 1999) ..........................................................26, 28, 45

AMERICAS 109061325

*MM&S Fin., Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*,
    364 F.3d 908 (8th Cir. 2004) ............................................................48

*Mut. Pharm. Co. v. Bartlett*,
    570 U.S. 472 (2013)........................................................................46

*New Orleans Emplrs. Int'l Longshoremen's Ass'n v. Mercer Inv. Consultants*,
    635 F. Supp. 2d 1351 (N.D. Ga. June 2009)...................................13

*Otis Eng'g Corp. v. Clark*,
    668 S.W.2d 307 (Tex. 1983)......................................................26, 31

*Palsgraf v. Long Island R. Co.*,
    248 N.Y. 339 (1928) ........................................................................2

*Parm v. Nat'l Bank of Cal., N.A.*,
    242 F. Supp. 3d 1321 (N.D. Ga. 2017) .....................................17, 41

*Perret v. Wyndham Vacation Resorts, Inc.*,
    846 F. Supp. 2d 1327 (S.D. Fla. 2012) ...........................................43

*PLIVA, Inc. v. Mensing*,
    564 U.S. 604 (2011)........................................................................48

*Pulka v. Edelman*,
    358 N.E.2d 1019 (N.Y. 1976)........................................................20

*Quiroz v. Alcoa Inc.*,
    416 P.3d 824 (Ariz. 2018)..............................................................19

*Read v. Scott Fetzer Co.*,
    990 S.W.2d 732 (Tex. 1998)..........................................................21

*Riggs v. Schappell*,
    939 F. Supp. 321 (D.N.J. 1996) ..................................6, 19, 21, 33

*Ross v. Bolton*,
    904 F.2d 819 (2d Cir. 1990).....................................................20, 21

*Rozsa v. May Davis Grp., Inc.*,
    152 F. Supp. 2d 526 (S.D.N.Y. 2001)............................................33

*Rozsa v. May Davis Grp., Inc.*,
    187 F. Supp. 2d 123 (S.D.N.Y. 2002)......................................20, 21

*S & A Marinas v. Leonard Marine Corp.*,
    875 S.W.2d 766 (Tex. App. 1994).................................................40

AMERICAS 109061325

*S. Pan Servs. Co. v. S.B. Ballard Constr. Co.*,
   2008 U.S. Dist. LEXIS 59903 (M.D. Fla. Aug. 6, 2008) ......................................................34

*Schlueter v. Latek*,
   683 F.3d 350 (7th Cir. 2012) ...........................................................................................15

*Scott v. Watson*,
   359 A.2d 548 (Md. 1976) .................................................................................................19

*Secs. & Exch. Comm'n v. Aaron et al.*,
   No. 1:15-cv-05704 (S.D.N.Y. Jul. 21, 2015) .....................................................................15

*SFM Holdings, Ltd. v. Banc Of Am. Sec., LLC*,
   2007 WL 7124464 (S.D. Fla. Feb. 12, 2007) ...................................................................24

*SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*,
   600 F.3d 1334 (11th Cir. 2010) ..................................................................................37, 38

*Solomon v. New York*,
   489 N.E.2d 1294 (N.Y. 1985) ...........................................................................................19

*Stag Canon Fuel Co. v. Rose*,
   145 S.W. 677 (Tex. App. 1912) ........................................................................................29

*Sterner v. Marathon Oil Co.*,
   767 S.W.2d 686 (Tex. 1989) ........................................................................................39, 40

*Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*,
   305 F.3d 1293 (11th Cir. 2002) ................................................................................. passim

*Texas Bank & Trust Co. v. Moore*,
   595 S.W.2d 502 (Tex. 1980) ........................................................................................33, 35

*Tietig v. Se. Reg'l Const. Corp.*,
   557 So. 2d 98 (Fla. Dist. Ct. App. 1990) .........................................................................43

*Tokyo Gwinnett, LLC v. Gwinnett Cty.*,
   940 F.3d 1254 (11th Cir. 2019) ........................................................................................14

*Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices and Products Liab.
Litig.*,
   785 F. Supp. 2d 925, 930 (C.D. Cal. 2011) .....................................................................11

*Travis v. Mesquite*,
   830 S.W.2d 94 (Tex. 1992) ..........................................................................................43, 45

*Turk v. Pershing LLC*,
   2014 U.S. Dist. LEXIS 190624 (N.D. Tex. Dec. 8, 2014) ................................................19

ix

*Turk v. Pershing LLC*,
    2014 US Dist. LEXIS 190624 (N.D. Tex. Dec. 8, 2014) ......................................................21

*Turman v. POS Partners, LLC*,
    541 S.W.3d 895 (Tex. App. 2018) ......................................................................................33

*Underwriters at Int. v. All Logistics Grp., Inc.*,
    483 F. Supp. 3d 1199 (S.D. Fla. 2020) ................................................................................24

*Union Pac. R.R. Co. v. Nami*,
    498 S.W.3d 890 (Tex. 2016)................................................................................................40

*United Scaffolding, Inc. v. Levine*,
    537 S.W.3d 463 (Tex. 2017)................................................................................................21

*Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
    464 F. Supp. 3d 634 (S.D.N.Y. 2020) ...........................................................................22, 35

*W. Invs., Inc. v. Urena*,
    162 S.W.3d 547 (Tex. 2005)................................................................................................43

*Warth v. Seldin*,
    422 U.S. 490 (1975)......................................................................................................15, 41

*Weatherly v. Pershing*,
    2015 U.S. Dist. LEXIS 197128 (N.D. Tex. June 23, 2015) ........................................ passim

*Wehrs v. Benson York Grp.*,
    No. 07 C 3312, 2008 U.S. Dist. LEXIS 21385 (N.D. Ill. Mar. 18, 2008) ..............................34

*West v. Cruz*,
    251 P.2d 311 (Ariz. 1952)...................................................................................................20

*Whitt v. Silverman*,
    788 So. 2d 210 (Fla. 2001).................................................................................................42

*Wilcox v. Wilcox*,
    2006 Tex. App. LEXIS 11106 (Tex. App. Dec. 28, 2006)..............................................33, 38

## CONSTITUTIONAL PROVISIONS, STATUTES AND RULES

U. S. Const., Article VI, cl. 2 ................................................................................................46

15 U.S.C. § 78q..............................................................................................................46, 48

15 U.S.C. § 78s(g)...................................................................................................................48

28 U.S.C. § 1407.................................................................................................3, 10, 11, 18

x

Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ........................................8

## SEC AND SEC-REGULATED SRO ENFORCMENET AUTHORITIES

17 C.F.R. § 240.15c3-1 ........................................................................................9, 27, 28, 48

17 C.F.R. § 240.17Ad-22 (2020) ...........................................................................................8, 27

FINRA Rule 4311 ....................................................................................................................7, 37

*Bear, Stearns Sec. Corp.*,
    Exchange Act Release No. 41,707, 70 SEC No. 710 (Aug. 5, 1999)………………………..26

NSCC Rule 4, § 8 (August 17, 2021) ...........................................................................................9

## MISCELLANEOUS

Henry Minnerop, *Clearing Arrangements*, 58 Bus. Law. 917 (May 2003)..................................35

Henry Minnerop, *Role and Regulation of Clearing Brokers - Revisited*, 75 Bus. Law. 2201
    (2020)................................................................................................................................ passim

*The Highwayman's Case*, 9 L. Q. Rev. 197 (1983) .....................................................................14

Nathaniel Popper, et al., *The Silicon Valley Start-Up That Caused Wall Street Chaos*, The New
    York Times (Jan. 30, 2021) ...................................................................................................26

U.S. Dep't of the Treas., 2012 Annual Rep., Appendix A: Designation of Systemically Important
    Financial Market Utilities (July 18, 2012), https://home.treasury.gov/system/
    files/261/here.pdf .....................................................................................................................8

U.S. House Financial Servs. Comm. Majority Staff, Feb. 18, 2021, *"Game Stopped? Who Wins
    and Loses When Short Sellers, Social Media, and Retail Investors Collide?"* U.S. H. R.
    Comm. on Fin. Servs., at 4 (Feb. 15, 2021), available at https://financialservices.house.gov/
    uploadedfiles/hhrg-117-ba00-20210218-sd002.pdf...................................................................5

U.S. Securities and Exchange Commission, *SEC Suspends Trading in Multiple Issuers Based on
    Social Media and Trading Activity*, Press Releases (Feb. 26, 2021),
    https://www.sec.gov/news/press-release/2021-35 ....................................................................2

U.S. Securities and Exchange Commission, Investor Alerts and Bulletins, *Thinking About
    Investing in the Latest Hot Stock?: Understand the Significant Risks of Short-Term Trading
    Based on Social Media* (Jan. 30, 2021), available at https://www.sec.gov/oiea/investor-alerts-
    and-bulletins/risks-short-term-trading-based-social-media-investor-alert .............................44

U.S. Securities and Exchange Commission, *Thinking About Investing in the Latest Hot Stock?:
    Understand the Significant Risks of Short-Term Trading Based on Social Media*, Investor
    Alerts and Bulletins (Jan. 30, 2021)........................................................................................2

AMERICAS 109061325

This Court should dismiss Plaintiffs' Other Broker Tranche Amended Consolidated Complaint, now asserted exclusively (with no home forum) against clearing broker Apex Clearing Corporation ("Apex") in the Other Broker Tranche Amended Consolidated Class Action Complaint ("Amended Complaint"). The common law claims against Apex should be dismissed because they depend on the existence of duties that not only do not exist in the law governing clearing brokers such as Apex but also are at war with the complex and comprehensive federal regulatory scheme governing the securities industry. As discussed below, this Court also should dismiss Plaintiffs' claims for lack of subject matter jurisdiction and Article III standing.

The Apex Tort Plaintiffs are speculators in "meme stocks." The Apex Tort Plaintiffs not only were chasing a market bubble, but also helped create the bubble in meme stocks. They admitted in their original complaint (ECF No. 359, "Compl.") that plaintiffs colluded among themselves in "online discussions" in public forums (Compl. ¶ 169) to create unprecedented market volatility in and demand for a group of "meme stocks," and that on January 28, 2021, it was the resulting unprecedented and historic trading volume that led the SEC-regulated clearing agencies (DTCC and NSCC) to increase collateral requirements for Apex, a clearing broker responsible for maintaining sufficient cash to cover the buy and sell obligations of its broker-dealer customers. Am. Compl. ¶¶ 60, 74–76; Compl. ¶ 169.

Plaintiffs allege that Apex's response to the DTCC's unprecedented collateral requirements was somehow negligent. But Apex's limited trading restriction on new purchases of three of the volatile "meme stocks" (GameStop, AMC, and Koss) for a few hours on a single day (Am. Compl. ¶¶ 2, 76, 81), while continuing to allow customers to sell their positions in those stocks, was consistent with—and the direct result of—Apex's obligation to meet its capital requirements. Am. Compl. ¶¶ 6, 100–108; Pace Decl. Ex. 1 at 6 (Feb. 9, 2021, Letter from Apex to the Bureau of Securities, New Jersey Office of the Attorney General ("NJBS" or "N.J. Bureau of Securities"), quoted in Am. Compl. ¶ 76). State tort law does not impose a separate, additional legal duty that would have required Apex to ignore its federally-regulated collateral requirements. Nor does state tort law forbid clearing brokers from exercising sound business judgment in deciding whether to accept new orders for highly volatile stocks. Nor does it require clearing brokers like Apex to absorb the risk of continued trading—particularly when the SEC endorsed trading restrictions during that week's volatility and noted that broker contracts expressly allow such restrictions given

1

the risks that brokers face.[1]

The relief Plaintiffs seek is unprecedented:  No court has imposed the extraordinary tort duties sought here for clearing brokers to cover market events "no matter what."  Far from Plaintiffs' proposed unlimited capital duty, as discussed below the SEC has for decades supported low capital requirements to encourage entry into the clearing function and thereby lower commissions for consumers.  Clearing brokers have never been obligated to provide unlimited capital in response to DTCC collateral requirements at times of extreme market volatility.

While Plaintiffs cast their claims in terms of duties of care, this is *Palsgraf*.  But here the injured bystander not only caused the fireworks explosion but also alleges that, had the Long Island Railroad not been delayed, she would have reached her destination in time to purchase a winning lottery ticket.[2]  The Apex Tort Plaintiffs seek to impose an unreasonable standard of care on Apex and to recover for impossibly speculative harms—caused in fact by their own conduct.

Plaintiffs fail to state a claim against Apex for the following reasons:

*First*, as a threshold matter, this Court lacks subject matter jurisdiction over Apex in light of Plaintiffs' attempt to add new plaintiffs asserting new claims against a new defendant as part of an MDL proceeding.  Plaintiffs' claim is an impermissible MDL afterthought, asserted for the very

---

[1] U.S. Securities and Exchange Commission, *Thinking About Investing in the Latest Hot Stock?: Understand the Significant Risks of Short-Term Trading Based on Social Media*, Investor Alerts and Bulletins (Jan. 30, 2021) (hereinafter "SEC Jan. 30, 2021 Investor Bulletin"), https://www.sec.gov/oiea/investor-alerts-and-bulletins/risks-short-term-trading-based-social-media-investor-alert (last visited Oct. 14, 2021) ("Also, broker-dealers may reserve the ability to reject or limit customer transactions.  This may be done for legal, compliance, or risk management reasons, and is typically discussed in the customer account agreement.  In certain circumstances, broker-dealers may determine not to accept orders where a transaction presents certain associated compliance or legal risks."); *see also* U.S. Securities and Exchange Commission, *SEC Suspends Trading in Multiple Issuers Based on Social Media and Trading Activity*, Press Releases, (Feb. 26, 2021), https://www.sec.gov/news/press-release/2021-35 ("Each of these orders stated that the suspensions were due at least in part to questions about whether ***social media accounts have been attempting to artificially increase the companies' share price***.") (emphasis added).

[2] *Palsgraf v. Long Island R. Co.,* 248 N.Y. 339, 341 (1928) (Cardozo, C.J.) (dismissing negligence claim by plaintiff injured by train platform scales dislodged after passenger attempting to board the train, many feet away, was pushed by a guard and dropped a package of fireworks, causing an explosion).

AMERICAS 109061325

first time against Apex in Plaintiffs' "consolidated" complaint filed in this Court on July 26, 2021 (as amended on September 21, 2021).  The two Apex Tort Plaintiffs Jang and Chavez have filed no previous lawsuit in any district that named Apex as a tort defendant, nor had any other named tort Plaintiff.  Thus, Plaintiffs' tort claims against Apex were not the result of any consolidation of actions filed in an original district following the JPML's decision.  Plaintiffs' claims against Apex therefore have no transferor district to which to return for trial in this matter at the conclusion of pretrial MDL proceedings as commanded by the JPML statute and the Supreme Court in *Lexecon v. Milberg Weiss*.[3]  And *this Court is not a transferee court under the JPML order for this Apex claim* (28 U.S.C. § 1407(a)) because no tort lawsuit against Apex has been *transferred to* it.  Therefore, this Court lacks subject matter jurisdiction.

*Second*, Plaintiffs lack Article III standing.  They do not allege that they would have purchased additional shares of the three meme stocks Apex temporarily suspended mid-day (GameStop, AMC, and Koss) in the absence of Apex's temporary restriction.  Instead Plaintiffs' speculative, wishful thinking that they would have timed the market correctly and sold their shares for some additional profit is speculative, implausible, and the type of "some day" assertion that is insufficiently concrete and particularized to allege injury in fact and confer Article III standing under the Eleventh Circuit's *Berry* decision.

*Third*, Plaintiffs do not and cannot allege the necessary elements of their common law claims for negligence, breach of fiduciary duty, and tortious interference.  As to negligence, courts universally hold that as a clearing broker Apex owes Plaintiffs no duty of care.  And, Plaintiffs' allegations about Apex's response to the NSCC's unprecedented collateral requirements fail to support even the inference that Apex breached any standard of care.  Instead, Plaintiffs allege only that (a) Apex was *too* cautious by restricting trading too quickly in the face of unforeseen risk and should have anticipated Plaintiffs' newly-minted "duty to dicker" with DTCC, (b) Apex was *too* cautious in removing those restrictions too slowly (Am. Compl. ¶ 77–78), and (c) Apex simply

---

[3] The Supreme Court has directly addressed this question, holding that multi-district litigations *must* be remanded to the transferor court when pretrial proceedings end—which necessarily requires the existence of a separate action *in a transferor court*. *See Lexecon Inc. v. Milberg Weiss*, 523 U.S. 26, 28 (1998) (28 U.S.C. § 1407(a) "imposes a duty on the [JPML] Panel to remand any such action to the original district 'at or before the conclusion of such pretrial proceedings,'" and the transferee court has "no . . . authority" to "assign a transferred case to itself for trial").

AMERICAS 109061325

should have had on hand effectively limitless capital to cover any and all collateral requirements. Am. Compl. ¶ 90.

As to breach of fiduciary duty, the Eleventh Circuit in *Spear, Leeds* held that clearing brokers are not fiduciaries to the customers of introducing brokers. And Plaintiffs fail to allege any facts that Apex's back-office clearing services for introducing brokers created the type of mutual, trust-based agency relationship between Apex and Erik Chavez, or between Apex and Peter Jang, that would impose fiduciary duties on Apex.

As to Plaintiffs' tortious interference claims, they are pleaded "in the alternative" (Am. Compl. ¶ 116), but the only conduct alleged is a re-plead of mere negligence—"failing to have a reasonable plan in place," *id.* ¶ 120—which is not the intentional conduct of the tort. Second, the existence of a contract is a necessary element of Plaintiffs' tortious interference claim. By strategically omitting mention of the existence of any contracts between Plaintiffs and their introducing brokers—apparently in an attempt to keep the terms of such contracts out of view on this motion to dismiss—Plaintiffs defeat their own claim. Third, by failing to include any allegations concerning their contracts with their introducing brokers, Plaintiffs also fail to allege the terms their introducing brokers purportedly breached—another necessary element. Considering Plaintiffs do not allege they intended or ever asked to purchase any meme stock themselves and were prevented from doing so by Apex, Plaintiffs' failure to specify how their introducing brokers breached any agreement is fatal. Plaintiffs' allegations also fail to support any inference that Plaintiffs suffered any non-speculative injury, let alone that Apex's conduct was the proximate cause of any injury to Plaintiffs.

*Fourth*, the state common law duty Plaintiffs seek to impose intrudes impermissibly into the heavily regulated, carefully balanced, and uniform federal regulatory scheme for the interstate trading of publicly-listed securities—with the SEC and SEC-regulated self-regulatory organizations (SROs) providing exclusive, plenary regulation over the trading of securities over stock exchanges. Plaintiffs' state law claims present an obstacle to federal regulatory objectives as set forth in the Securities Exchange Act of 1934, such as the low capital requirements the SEC has set for clearing brokers. "The magnitude of the federal interest in protecting the integrity and efficient operation of the market for nationally traded securities cannot be overstated." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 78 (2006).

*Fifth*, Plaintiffs allege no facts supporting their claims against Apex on behalf of meme

4

stock purchasers whose brokers did not use Apex's clearing services; Apex is not a public utility and has no duty to take on additional risk to protect meme stock purchasers with whom it has absolutely no relationship.  Those claims must be dismissed with the rest.

## FACTUAL BACKGROUND[4]

### A. Reddit Posters and Other Meme Stock Purchasers Collectively Executed a Short Squeeze on "Meme Stocks"

On January 27, 2021, several companies' stocks were subject to unprecedented "manic buying" due to online forum chats (so-called "meme stocks") and were subject to unprecedented trading volume.  Am. Compl. ¶¶ 57–65; Am. Compl. ¶¶ 52, 55 (admitting that the New York Stock Exchange imposed trading halts, which can be "triggered on the way up with manic-buying"). Those meme stocks included the three stocks for which Apex temporarily suspended clearing purchases—GameStop ("GME"), AMC Theatres ("AMC"), and Koss Corporation ("KOSS"). Am. Compl. ¶ 3.  Plaintiffs admit the astronomical increase in trading volume was due ironically to meme stock purchasers themselves engaging in "online discussions" and agreeing to purchase more and more shares in these stocks for the purpose of raising the stock price.  Compl. ¶ 169. Those "online discussions" among meme stock purchasers consisted of public, online forum communications, which the Majority Staff of the U.S. House of Representatives Committee on Financial Services described as follows:

> In January 2021, ***investors collectively established a strategy to achieve what is known as a "short squeeze" on stocks*** that had been heavily shorted, particularly by hedge funds . . . .  A short squeeze occurs when the market price of shorted stocks rises above the price at which the stock was borrowed, forcing short sellers to purchase the stock at a higher price.  The short squeeze of GameStop's stock . . . led to a ***600% surge*** in the stock price.  Much of the strategizing occurred on ***WallStreetBets, a Reddit subchannel*** (or "subreddit") where approximately ***8.5 million users*** discuss trading ideas and investment strategies, including retail investors.[5]

---

[4] Apex will not repeat the factual background that Robinhood has included in its Motion to Dismiss the Robinhood Tranche Amended Consolidated Complaint and that is pertinent to both the Robinhood and Other Broker Tranches allegations, such as the nature and mechanics of the securities markets.  ECF No. 421 at 6–10.

[5] U.S. House Financial Servs. Comm. Majority Staff, Feb. 18, 2021, "*Game Stopped?  Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide?*," U.S. H. R. Comm.

AMERICAS 109061325

And as Plaintiffs further admit, the skyrocketing prices for shares of so-called "meme stocks" continued, *despite* the fact that "hedge funds and market makers were shorting the Suspended Stocks," which "tends to drive the prices down." Am. Compl. ¶¶ 58, 60. The unprecedented increase in purchases of shares in these stocks thus created unprecedented volatility in the markets. Am. Compl. ¶¶ 57–65. In fact, Plaintiffs admit that this "wild ride" resulted in the New York Stock Exchange itself temporarily halting trading on some of the "meme stocks" on January 28, 2021. Am. Compl. ¶ 55. And the SEC issued an extraordinary statement relating to market volatility in the meme stocks. Am. Compl. ¶ 66. Plaintiffs do not allege, nor could they, that they simply happened upon a bargain. Rather, Plaintiffs and other "meme stock" purchasers admit that they sought to exploit unprecedented market conditions for financial gain. Am. Compl. ¶¶ 57–65.

**B. The Role of Clearing Brokers Such as Apex in the Securities Markets**

A variety of accounts are available to those who wish to trade in securities. A discretionary account is one in which an investment advisor maintains monetary discretion over an investor's account, and in which the advisor may buy and sell investments without asking the investor first. Pace Decl. Ex. 7 at 1–2 (Apex Form CRS); *Riggs v. Schappell*, 939 F. Supp. 321, 330 (D.N.J. 1996) (distinguishing between discretionary accounts and clearing accounts). By contrast, a non-discretionary account is one in which the broker is responsible only for executing an investor's requests to trade.[6] Often, these investment accounts are opened through what is called an introducing broker, such as Webull (used by Plaintiff Chavez), which contracts with a clearing broker to provide back-office support and execution of trades. Am. Compl. ¶¶ 3, 15, 25–26.

Apex is a *clearing broker* that provides introducing brokers with access to back-end capabilities and services; introducing brokers are required to have less regulatory capital and may not have direct access to trading platforms and clearinghouses. Am. Compl. ¶¶ 25–26. Clearing brokers take on the settlement risk, and the corresponding enhanced collateral and margin requirements, that executing securities trading imposes. Am. Compl. ¶¶ 35–41. Maintaining such

---

on Fin. Servs., at 4 (Feb. 15, 2021), available at https://financialservices.house.gov/uploadedfiles/hhrg-117-ba00-20210218-sd002.pdf (https://perma.cc/4NA7-9GZY) (emphasis added).

[6] *See generally Hand v. Dean Witter Reynolds Inc.*, 889 S.W.2d 483, 495 (Tex. App. 1994).

AMERICAS 109061325

margins and remaining in compliance with the SEC's Net Capital Rule is essential to "protect . . . the market as a whole from the systemic risk that highly volatile stocks can produce, especially when a broker's position has significant risk concentration in such stocks."  Am. Compl. ¶ 37.[7]

Apex is registered with the SEC and the Financial Regulatory Authority ("FINRA") as a broker-dealer, Am. Compl. ¶ 23.   Under FINRA rules "Apex is required to maintain a clearing agreement with each introducing broker-dealer," a "primary purpose" of which is to "allocate responsibilities between the introducing broker-dealer and the clearing broker in a clear manner regarding, among other things:   opening and approving accounts, monitoring of accounts, acceptance of orders, execution of orders, and extension of credit."  Pace Decl. Ex. 1 at 2–3 (Letter to NJBS); FINRA Rule 4311(c)(1) ("Each carrying agreement in which accounts are to be carried on a fully disclosed basis shall specify the responsibilities of each party to the agreement, including at a minimum the allocation of the responsibilities set forth in paragraphs (c)(1)(A) through (I) and (c)(2) of this Rule.").  As Apex explained to the N.J. Bureau of Securities ("NJBS") relied upon by Plaintiffs here (Am. Compl. ¶ 76),[8] Apex further requires each ultimate customer of any introducing broker that uses Apex to agree to a customer agreement giving Apex the unfettered right to "***refuse to execute securities transactions*** for the Customer ***at any time and for any reason***."  Pace Decl. Ex. 1 at 3 (emphasis added); Pace Decl. Ex. 2 ¶ 3 (Customer Account Agreement quoted in Exhibit 1).

Apex's ability to refuse trades is critical.   As a clearing broker, Apex is required to collateralize and settle any trades that Apex accepts, and so it must have the discretion and ability

---

[7] For a fuller explanation of the role of clearing brokers in the securities market, *see* Henry Minnerop, *Role and Regulation of Clearing Brokers—Revisited*, 75 Bus. Law. 2201 (2020).  "Risk management is an essential aspect of the business of a clearing broker.   Virtually all orders a clearing broker processes expose it to some financial risk. . . .   If a customer defaults, the clearing broker remains obligated to settle the executed order 'street-side.'"  *Id.* at 2210.   And with respect to margin transactions, "the clearing broker faces additional risk due to market volatility, as the value of the securities bought on margin may decline below the amount of its margin loan."  *Id.*

[8] Plaintiffs rely on and quote from Apex's letter to the N.J. Bureau of Securities to assert when and why Apex restricted trading in AMC, GME, and KOSS stocks.  Am. Compl. ¶ 76.  This Court may consider this letter because it is "central to the [Plaintiffs'] claim," and because its "authenticity . . . is not challenged."  *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002).

AMERICAS 109061325

to reject trades in order to manage the credit and settlement risks Apex takes on from introducing brokers and those introducing brokers' customers.  Pace Decl. Ex. 1 at 3.  If an introduced customer, or introducing broker, defaults on a securities transaction, Apex is still obligated to settle the executed order.[9]  That means that Apex must ensure that it has sufficient capital on hand to meet its regulatory deposit requirements, which in turn depends upon the outstanding orders that Apex has committed to clear, as described below in Section C.  Am. Compl. ¶ 35–37.

### C.  The Importance of Collateral Requirements

The National Securities Clearing Corporation ("NSCC") is the SEC-regulated clearing agency (i.e., main clearinghouse) that clears and settles transactions in equity and corporate debt securities traded in the U.S. and is part of the Depository Trust and Clearing Corporation ("DTCC").  Am. Compl. ¶¶ 31–32.  These two SEC-regulated clearing agencies have been designated systemically important financial market utilities (SIFMUs) pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010.[10]

As a clearing broker, Apex is a member of the NSCC, and is required to post collateral for the trades that it has agreed to process but which have not yet cleared.  Am. Compl. ¶ 31, 35.  When the NSCC calculates its collateral requirements for Apex, the NSCC is required to take into account various factors, including market "volatility," and, in its discretion, apply a "volatility multiplier."  Am. Compl. ¶¶ 35, 37.  The NSCC's obligation to collect collateral from its members is imposed through SEC regulations, which require the NSCC to cover its credit exposures to its members.  17 C.F.R. § 240.17Ad-22(e)(6) (a clearing agency must, "[c]over . . . its credit exposures to its participants").  Plaintiffs admit that the collateral requirements imposed by the NSCC are not some administrative nicety, but are critical.  "These margin requirements are intended to protect DTCC members and the market as a whole *from the systemic risk* that *highly volatile stocks* can produce, especially when a broker's position has significant risk concentration in such stocks."  Am. Compl. ¶ 37 (emphasis added).  Plaintiffs further admit, "margin requirements protect NSCC and all

---

[9] Minnerop, 75 Bus. Law at 2210.

[10] U.S. Dep't of the Treas., 2012 Annual Rep., Appendix A:  Designation of Systemically Important Financial Market Utilities (July 18, 2012), https://home.treasury.gov/system/files/261/here.pdf.

AMERICAS 109061325

market participants against clearing member defaults."  Am. Compl. ¶ 38.  If Apex does not have sufficient capital on hand, then under SEC regulations it cannot agree to clear trades.  *See* 17 C.F.R. § 240.15c3-1.

When the NSCC informs a clearing broker, such as Apex, of an increase in its collateral requirement, the shortfall must be met by Apex on demand.[11]  As Plaintiffs acknowledge here and elsewhere in the MDL, the failure of a broker-dealer like Apex to meet such collateral requirements could result in restrictions on doing business, fines, significant losses, disciplinary actions, and, in a worst-case scenario, liquidation or winding down of Apex's business.  Am. Compl. ¶ 34; ECF No. 409 ("Robinhood Tranche Compl.") ¶ 155.

### D. Apex Suspends Opening New Positions on a Single Trading Day for Three Hours and Twenty-Five Minutes to Ensure Compliance with Net Capital Requirements

On January 28, 2021, at 9:30 a.m. ET, Apex received a report from the NSCC increasing Apex's collateral requirement approximately ***ten-fold***.  Pace Decl. Ex. 1 at 6 ("[T]he NSCC report showed an increase of approximately ten times the deposit requirement from 15 minutes earlier.").  Approximately 90% of the new collateral requirement imposed by the NSCC related to trading activity in three meme stocks:  GME, AMC, and KOSS.  *Id.*  Accordingly, at 11:30 a.m. ET, and having received no updated estimate from the NSCC, Apex informed its introducing broker customers that it was pausing all purchasing of new shares of AMC, GME, and KOSS stocks, but that those brokers would still be permitted to close out (sell) any positions in those meme stocks.  Am. Compl. ¶ 76.[12]  As Apex explained in its letter to the N.J. Securities Bureau, Apex temporarily

---

[11] "Each member shall deposit in the Clearing Fund such amount that is necessary to satisfy any increase in its Required Fund Deposit within such time as the Corporation shall require."  NSCC Rule 4, § 8 (August 17, 2021), available at https://www.dtcc.com/~/media/Files/Downloads/legal/rules/nscc_rules.pdf [https://perma.cc/JYC4-7VQR].

[12] Plaintiffs try to manipulate the time zones in their complaint by converting the times of all but one event in Apex's February letter to the NJBS from Eastern Time to Central Time.  Specifically, Plaintiffs insinuate that Apex restricted trading *after* it received an updated collateral estimate from the NSCC by expressing the time of the updated collateral notice in Eastern Time (thereby suggesting that the event took place one hour earlier than it did).  Am. Compl. ¶ 76.  This allegation is directly contradicted by the letters Plaintiffs cite in their Amended Complaint, which make clear that the times of the events listed in Apex's February letter were expressed in the Central Time zone.  Pace Decl. Ex. 1 (February NJBS Letter); Pace Decl. Ex. 6 (March Corrected NJBS Letter).  Given that the Complaint refers to all times in Eastern Time, we do so here.

9

halted additional purchasing of shares in those three stocks "to manage the risk that it would not be able to meet potential increased NSCC collateral funding obligations if Apex clients were permitted to continue to engage in additional purchases of AMC, GME and KOSS."  Pace Decl. Ex. 1 at 6; Compl. ¶ 76.  At 12:00 p.m. ET, Apex received an updated NSCC report, estimating that its required collateral deposit requirement, while still elevated, was reduced significantly from the NSCC's 9:30 a.m. estimate.  Am. Compl. ¶ 76; Pace Decl. Ex. 1, at 6.  After confirming with the NSCC that the new report was indeed accurate (and would not change yet again), Apex informed its customers at 2:55 p.m. ET that it had lifted the restriction of new purchases of AMC, GME, and KOSS stock.  Am. Compl. ¶ 76; Pace Decl. Ex. 1, at 6; Pace Decl. Ex. 6 at 1 (correcting time zones).  In total, Apex restricted trading of AMC, GME, and KOSS stock for approximately 3 hours and 25 minutes.  *Id.*  Apex's action occurred well after the market open (9:30 a.m. ET) on January 28, 2021 and was lifted with over an hour remaining before the close of that same trading day (4:00 p.m. ET).

## ARGUMENT

### I.   This Court Does Not Have Subject-Matter Jurisdiction Over Plaintiffs Jang and Chavez's Common Law Claims—Brought in the MDL for the First Time Against Apex— and Thus Lack a Transferor Forum

This MDL Court lacks subject matter jurisdiction over the Amended Consolidated Tort Complaint, ECF No. 410, because Plaintiffs assert *new claims* by *new plaintiffs* against a *new defendant*.  The Supreme Court made clear more than two decades ago in *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach* that courts are required by statute to remand cases consolidated in the JPML process to the originating home court for trial.  523 U.S. 26, 34 (1998) ("[Section] 1407 not only authorizes the Panel to transfer for coordinated or consolidated pretrial proceedings, but *obligates* the Panel to *remand* any pending case *to its originating court* when, at the latest, those pretrial proceedings have run their course.") (emphasis added); 28 U.S.C. §1407(a) (at the end of MDL "pretrial" proceedings, matter "shall be remanded . . . to the district *from which it was transferred*") (emphasis added).  The MDL court—the transferee court—obtains its authority over "pending" claims from the transferor court.  28 U.S.C. §1407(a).  No *transferor court exists here*.

Accordingly, district courts consistently have held that they lack subject matter jurisdiction over "newly-named plaintiffs who have never filed any lawsuit anywhere in any court."  *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, 2021 U.S. Dist.

AMERICAS 109061325

LEXIS 116925, at *259 (D. Kan. June 23, 2021).  As the *EpiPen* court explained, "an MDL proceeding isn't 'an environment that can spawn fresh actions by new plaintiffs' because that 'is at odds with' the framework established by 28 U.S.C. § 1407.  In particular, [such new claims] don't have a case in any 'transferor court from which [the transferee court] could inherit its authority over their claims.'" *Id.* at *259–60 (citations omitted); *see also In re FCA US LLC Monostable Elec. Gearshift Litig.*, 2017 U.S. Dist. LEXIS 216672, at *14 (E.D. Mich. Mar. 21, 2017) (granting motion to strike the consolidated master complaint because "[t]he seventeen new plaintiffs added by the plaintiffs' steering committee to the consolidated master complaint are ***strangers to this proceeding***.  Adding them and their respective claims to the pleading was improper.") (emphasis added); *In re Packaged Ice Antitrust Litig.*, 2011 U.S. Dist. LEXIS 150426, at *48–51 (E.D. Mich. Dec. 12, 2011) (dismissing new plaintiffs' claims for lack of subject matter jurisdiction); *In re Farmers Ins. Exch. Claims Representatives' Overtime Pay Litig.*, 2008 U.S. Dist. LEXIS 90136, at *13 (D. Or. Oct. 28, 2008) (same).

Neither Jang nor Chavez previously brought suit against Apex.  ECF No. 322-1 (MDL Case List).  Neither has a "pending" action against Apex, or an originating home court to which this Court may transfer their common law actions against Apex for trial.  28 U.S.C. §1407(a).  Jang and Chavez are strangers to this proceeding.  *See Gearshift*, 2017 U.S. Dist. LEXIS 216672, at *14.  This Court must dismiss the Amended Complaint for lack of subject matter jurisdiction.

The requirement of a transferor court is not a mere procedural nicety.  The MDL proceeding is not an incubator for new startup claims, because "[w]ithin the context of MDL proceedings, individual cases that are consolidated or coordinated for pretrial purposes remain fundamentally separate actions, intended to resume their independent status once the pretrial stage of litigation is over." *Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices and Products Liab. Litig.*, 785 F. Supp. 2d 925, 930 (C.D. Cal. 2011) (quoting *In re Korean Air Lines Co. Antitrust Litig.*, 642 F.3d 685, 700 (9th Cir. 2011)).  The Apex Tort Plaintiffs do not *have* an individual case—let alone an individual case against Apex—and cannot create one through consolidation within an MDL action.  *Gearshift*, 2017 U.S. Dist. LEXIS 216672, at *13 (rejecting plaintiffs' argument that "the consolidated master complaint 'superseded' previous pleadings in the underlying cases" because the previous civil actions "'retain their separate identities' throughout the MDL process") (internal citation omitted).  The Court accordingly lacks subject matter jurisdiction over the common law claims against Apex.

AMERICAS 109061325

Apex tried to resolve this issue with Plaintiffs' counsel, but Plaintiffs' counsel informed Apex on August 26, 2021, that they did not believe they were required to file an original complaint in a home forum.  Pace Decl. ¶ 6.  Nor did Plaintiffs correct their procedural error when they filed their Amended Complaint, so Apex now asks this Court to dismiss Plaintiffs' Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1).

## II.   Plaintiffs Jang and Chavez Lack Article III Standing (All Counts)

Plaintiffs seek tort damages from Apex to recover additional profits they speculate they would have made in the stock market had the price of certain stocks continued to skyrocket.  But the basis for Plaintiffs' belief that those stocks would have continued to rise in value is the widespread coordination in online forums that led to unprecedented buying of those depreciating stocks.  And Plaintiffs (who are not direct customers of Apex) seek to have Apex indemnify them for their stock market losses, in part, on the basis that they claim Apex owed certain duties to its direct customers as their broker-dealer.  Article III does not permit such vicarious claims.

Article III requires that a plaintiff plausibly "allege injury in fact," which requires (1) that the injury be concrete, particularized, and not conjectural or hypothetical, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992), and (2) the invasion of a legally protected interest, *Aaron Private Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1336 (11th Cir. 2019).

### A.   Plaintiffs Fail to Allege Injury in Fact Because Their Claims That They Would Have Sold Meme Stocks at a Higher Price Are Speculative and Implausible

Plaintiffs do not allege that Mr. Chavez or Mr. Jang would have purchased or even *wanted* to purchase additional shares of any of the meme stocks, much less that they *tried* to do so and were prevented by Apex's actions.  Instead, Plaintiffs allege that Mr. Chavez held 607 shares of AMC stock on January 27 (Am. Compl. ¶ 16) and *sold* that AMC stock on February 2 "for less than he would have sold for but for the conduct alleged herein."  *Id.* ¶ 17.  Likewise, Plaintiffs allege that Mr. Jang held 3,500 shares of GME stock on January 27 and that on February 4 he "sold 401 shares of GME stock for less than he would have sold for but for the conduct alleged herein."  *Id.* ¶¶ 21.  But Plaintiffs admit that neither Mr. Chavez nor Mr. Jang was prevented from selling his shares on January 27, 28, or any other day.  Am. Compl. ¶ 75 (at all times the customers of Apex's introducing brokers were able to sell any positions in GME, AMC, or KOSS).  Nor did Apex's actions prevent Plaintiffs from buying more of the three meme stocks at the open or close of the market trading day on January 28, 2021 (but that "harm" is nowhere alleged).

12

Plaintiffs theorize that, but for Apex's conduct, some number of ***other investors***, who were unable to make purchases with brokers who used Apex for three hours and twenty-five minutes, would have made more net purchases than they actually did even after Apex removed all restrictions, driving up prices even higher. Plaintiffs then speculate that Mr. Chavez and Mr. Jang would have used their savvy and clairvoyance to time the market well by selling at the speculated and unspecified inflated price, rather than holding the stocks for either too little or too much time. Am. Compl. ¶¶ 16, 17, 20, 21.

Any such claim depends on assuming that Messrs. Chavez and Jang correctly would have called the top of the market and sold their meme stocks at that tip-top point—even though in the real world they did not. On January 28, GameStop shares—which previously had traded at $20–40 a share—were instead trading for $483 a share.[13] *Nothing prevented Mr. Jang from selling his shares at $483; sales were never restricted on these or any other securities.* Yet instead of selling at $483—or holding longer term until the stock price reached $344.66 in June—Mr. Jang chose to sell his GME stock on February 4 when the stock price was between $53.33 and $91.50.[14] Am. Compl. ¶¶ 20–21. Likewise, *nothing prevented Mr. Chavez from selling his AMC stock at $16.50 on January 28*, or holding until the stock hit $64.96 on June 18, but instead he sold on February 2 for between $6 and $10.10. Am. Compl. ¶¶ 16–17. Mr. Chavez and Mr. Jang each sold in a dip— but ask this Court to allow them to recover on the theory that (a) the stock price could have gone even higher, and, if it had, then (b) they definitely would have realized the top of the market and sold at that point, even though in the real world they missed the top entirely.

Allegations that a plaintiff would have taken certain steps at an unspecified future date on which it would have been most advantageous are inherently speculative and insufficient to allege injury-in-fact. In that vein, the Eleventh Circuit has made clear that injury stemming from a "some

---

[13] Yahoo Finance, Historical Data: GameStop Corp. (GME), https://finance.yahoo.com/quote/GME/history/ (last visited Aug. 30, 2021). This Court may take judicial notice of stock prices. *New Orleans Emplrs. Int'l Longshoremen's Ass'n v. Mercer Inv. Consultants*, 635 F. Supp. 2d 1351, 1362 n.7 (N.D. Ga. June 2009) ("The Court finds that the historical returns of the NASDAQ composite index are the type of historical facts that are appropriate to take judicial notice of, and that the accuracy of the Daily Stock Price Report cannot reasonably be questioned.").

[14] Yahoo Finance, Historical Data: GameStop Corp. (GME), https://finance.yahoo.com/quote/GME/history/ (last visited Aug. 30, 2021).

AMERICAS 109061325

day" intention to do something in the future is not sufficient to confer Article III standing:

> Because Aaron has alleged only that it intends to found a clinic at some unspecified time in the future, its "some day" intention []—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do[es] not support a finding of . . . "actual or imminent" injury. . . . A plaintiff alleging that it would have opened a business absent the challenged action must point to at least some facts suggesting a likelihood that its business would have come about absent the challenged action.

*Aaron Private Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1337–38 (11th Cir. 2019) (internal citation omitted); *see also Tokyo Gwinnett, LLC v. Gwinnett Cty.,* 940 F.3d 1254, 1263–64 (11th Cir. 2019) ("[A] plaintiff does not meet this burden by merely outlining in a complaint 'facts from which we could *imagine* an injury sufficient to satisfy Article III's standing requirements,' since 'we should not speculate concerning the existence of standing, nor should we imagine or piece together an injury sufficient to give plaintiff standing when it has demonstrated none.'") (emphasis added) (internal citations omitted).

Nothing in the Amended Complaint asserts a concrete plan that would suggest that Mr. Chavez or Mr. Jang actually would have earned even greater returns or that they suffered any injury as a result of Apex's 3.5 hour trading pause. And nothing of this sort of chain of hypothetical "some day" actions, as *Lujan* and *Berry* teach, can be redressed by a favorable decision of this Court. Plaintiffs' conclusory allegations of injury are insufficient to confer Article III standing.

### B.  Plaintiffs Fail to Allege They Have a "Legally Protected Interest" in Lost Earnings Due to Plaintiffs' Thwarted Meme Stock Scheme

The injury-in-fact prong of Article III standing requires the "invasion of a legally protected interest." *See Berry*, 912 F.3d at 1336. But here, Plaintiffs are in effect suing to recover the greater ill-gotten gains that they hoped to receive as a result of a thwarted market manipulation scheme. However, it has long been understood that courts will not allow a plaintiff to recover profits that would result from improper or illegal conduct. *See The Highwayman's Case*, 9 L. Q. Rev. 197 (1893). The Seventh Circuit succinctly has described this commonsense rule:

> [I]f awarding relief to the plaintiff would reward wrongdoing—courts will not adjudicate their dispute. The classic illustration is *Everet v. Williams* (Ex. 1725), better known as The Highwayman's Case and reported (long afterward) in a note by that name in 9 L.Q. Rev. 197 (1893). A highwayman sued his partner in crime for an accounting of the illegal profits of their criminal activity. The court refused to adjudicate the case, and both parties were hanged. A modern example would be a suit by the owner of a misleading trademark for infringement of the mark.

14

*Schlueter v. Latek*, 683 F.3d 350, 355 (7th Cir. 2012).

The Plaintiffs unabashedly admitted in their original complaint that this litigation arises from the Plaintiff purchasers own coordinated "short squeeze" working collusively as a group to purchase stocks to pump up "the value of the stock they purchased."  Am. Compl. ¶ 63.  Plaintiffs admitted that the increase in value of the meme stocks was the product of online discussions that resulted in unprecedented and coordinated purchasing of shares of those stocks.  Compl. ¶ 169 ("[T]he Suspended Stocks became increasingly popular as, among other things, investors engaged in online discussions regarding the undervaluation of the Suspended Stocks and began purchasing shares.").  Simply put, Plaintiffs cannot allege the invasion of a legally protected interest in their lost profits from a partially-blunted market manipulation scheme.  *See* Complaint, *Secs. & Exch. Comm'n v. Aaron et al.*, No. 1:15-cv-05704 (S.D.N.Y. Jul. 21, 2015) (action alleging "multiple 'pump-and-dump' schemes dating back to at least mid-2011").  The fact that Plaintiffs have now omitted such earlier admissions from their Amended Complaint is of no moment.  This Court may consider their previous judicial admissions in a pleading filed before this Court.  *See Fernandez v. Sch. Bd. of Miami-Dade Cnty.,* 201 F. Supp. 3d 1353, 1361, n.1 (S.D. Fla. 2016) (courts may accept "the facts as alleged in the plaintiff's original complaint as true for the purposes of a motion to dismiss" where the plaintiff has made a "transparent attempt" to "manipulat[e] the allegations in their pleadings to avoid a dispositive defense.").

### C. Named Plaintiffs Lack Standing to Bring Claims on Behalf of a Class of Direct Customers Because Named Plaintiffs Are Not Direct Customers of Apex

The named Plaintiffs lack Article III standing to bring claims based on a direct broker-dealer relationship because they do not claim to be direct customers of Apex.  Standing is an "indispensable part of the plaintiff's case," and so "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof."  *Ala. Legis. Black Caucus v. Alabama*, 135 S. Ct. 1257, 1276 (2015) (internal quotations omitted).  And "standing is gauged by the specific common-law, statutory, or constitutional claims that a party presents," and thus whether the particular plaintiff is entitled to an adjudication of the particular claims asserted."  *Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72, 77 (1991).  In a class action, the named plaintiffs must possess the same claims as those of the class members they represent.  *Warth v. Seldin*, 422 U.S. 490, 502 (1975) ("Petitioners must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to

AMERICAS 109061325

which they belong and which they purport to represent.").  And even where a named Plaintiff has standing to assert one claim, that does not allow it to use the class mechanism to circumvent the requirements of Article III standing to assert additional claims for which it lacks an entitlement to relief.  *Griffin v. Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1987) (Class cannot acquire standing "by virtue of [the representative] having standing as to just one of many claims he wishes to assert.  Rather, each claim must be analyzed separately, and a clam cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim.").

Here, the named Plaintiffs are not direct customers but *introduced* customers, and Apex owed the named Plaintiffs no duty of care, nor any fiduciary duties.  As such, Plaintiffs Jang and Chavez have suffered no legally cognizable injury.  *See* Section III.B-C; *see, e.g.*, *Dercole v. Divico Fin of Am.,* 2005 U.S. Dist. LEXIS 59757, at *54 (E.D.N.Y. 2005) (It "is clear under New York state law that '[c]learing brokers generally do not owe a fiduciary duty to the customers of an introducing broker."); *Weatherly v. Pershing*, 2015 U.S. Dist. LEXIS 197128, at *10–11 (N.D. Tex. June 23, 2015) ("clearing brokers, as opposed to introducing brokers, do not owe common law duties to investors").  Even if this Court were to give credit to Plaintiffs' bare-bones allegations concerning Apex's direct customers, and even if this Court were to conclude that Apex owed some form of duty to those *direct* customers, as *introduced* customers, named Plaintiffs lack standing to assert any such claims.  *See Berry*, 912 F.3d at 1336 (injury in fact prong of Article III standing requires the "invasion of a legally protected interest").

Plaintiffs Jang and Chavez have suffered no invasion of a *legally protected* interest by Apex because Apex owes them no duties, and so Plaintiffs lack standing to bring such claims.  *See Dercole*, 2005 U.S. Dist. LEXIS 59757, at *4.  And because they lack standing to bring such claims, they cannot bring such claims on behalf of a putative class of Apex's direct customers.  *City of St. Petersburg v. Total Containment, Inc.*, No. 06-20953-CIV, 2008 U.S. Dist. LEXIS 106257, at *15 (S.D. Fla. Nov. 4, 2008) ("because the named Plaintiffs lack standing as to Polyflow-manufactured piping, they cannot represent putative class members with potential claims arising out of damage from Polyflow pipe products").  Therefore, Plaintiffs lack Article III standing to bring any claims based on a direct customer relationship with Apex.

## III.    Plaintiffs' Common Law Negligence, Breach of Fiduciary Duty, and Tortious Interference Claims Fail to State a Claim and Must Be Dismissed

The Amended Complaint asserts three common law claims:  negligence, breach of

AMERICAS 109061325

fiduciary duty, and "tortious interference with business relationship."  All three claims fail to state a claim under Texas law because:  (1) as a clearing broker Apex owed no common law duties to named Plaintiffs; (2) the standard of care and duties that Plaintiffs seek to impose are contrary to law; (3) Plaintiffs have failed to allege the basic elements of a tortious interference claim, including the existence of a contract; and (4) Plaintiffs cannot show that Apex's three hour and twenty-five minute pause in trading proximately caused them injury by speculating what other purchasers would have done, the price path the meme stocks would have taken, and how Plaintiffs themselves would have timed the market to sell (or not sell) their stocks.

     *Named Tort Plaintiffs Are Not Direct Customers*.  Plaintiffs purport to bring their claims on behalf of both introduced customers and "direct customers," i.e., customers who contracted directly with Apex, in a seemingly last-ditch effort to avoid the unfavorable law cited in Apex's first motion to dismiss.  Am. Compl. ¶ 93.[15]  But "[a]t the motion to dismiss stage, the Court considers the allegations of the Named Plaintiffs."  *In re Brinker Data Incident Litig.*, 2020 U.S. Dist. LEXIS 247918, at *16 n.5 (M.D. Fla. Jan. 27, 2020).  Plaintiffs Jang and Chavez are the only named plaintiffs before the court, and they are both *introduced customers* (meaning an introducing broker, not Apex, had the customer relationship with them) to whom Apex, as a matter of law, owes no common law duties.  *See* Sections III.B, III.C; Am. Compl. ¶¶ 15, 19.  This Court may not consider any claims that any direct customers may have had because such direct customers are not before this Court.  *Parm v. Nat'l Bank of Cal., N.A.*, 242 F. Supp. 3d 1321, 1342 (N.D. Ga. 2017) ("When considering a motion to dismiss filed in a putative class action before certification of a class, the Court considers only Plaintiff's individual allegations relating to her loan, not the generalized allegations of the putative class members.").

     *Apex's Direct Customers.*  Even if this court were to consider Apex's direct customers— and it should not—to the extent that Apex owed its direct customers any common law duties, those duties certainly do not include the duties that Plaintiffs seek to impose here (*see* Sections III.B III.C).  Moreover, Plaintiffs' mere reference to Apex's direct customers (Am. Compl. ¶¶ 1–2, 24– 25, 29, 67, 93, 112), without more, does not constitute "sufficient factual matter" to state a claim

---

[15] Plaintiffs also purport to represent a class of all investors.  Plaintiffs' claims on behalf of investors with no ties to Apex fail for the reasons set forth in Section V.

to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Plaintiffs provided no "factual matter" concerning the services Apex provides to its direct customers, or the terms under which it agrees to provide such services. Absent such factual allegations, Plaintiffs cannot support claims that Apex owed its direct customers common law duties, much less that Apex owed the particular duties that Plaintiffs seek to create here.

### A. Choice of Law Considerations Compel Application of Texas Law Where Apex Has Its Headquarters

Federal courts adjudicating state law claims must apply state choice of law rules. *In re Managed Care Litig.*, 298 F. Supp. 2d 1259, 1296–97 (S.D. Fla. 2003); *see also Balt. Orioles, Inc. v. Major League Baseball Players Ass'n*, 805 F.2d 663, 681 (7th Cir. 1986) (collecting cases). While ordinarily an MDL court would apply the choice of law rules of the transferor forum, no such court exists here.[16] *See* Section I. Plaintiffs improperly brought their claims for the first time in this Florida MDL court; if the claims were legitimately brought here, the Court would apply Florida choice of law. *See Hall v. Burger King Corp.*, 912 F. Supp. 1509, 1534 (S.D. Fla. 1995).

The Supreme Court of Florida has adopted the "significant relationships" choice of law rule, which requires courts to consider: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered. These contacts are to be evaluated according to their relative importance with respect to the particular issue." *Bishop v. Florida Specialty Paint Company*, 389 So. 2d 999, 1001 (Fla. 1980). Greater weight should be given to a defendant's location, rather than the location of the plaintiffs' alleged injury, when the alleged conduct was centralized or had widespread effect, *Costa v. Kerzner Int'l Resorts Inc.*, 2011 US Dist. LEXIS 66921, at *13 (S.D. Fla. June 23, 2011), when Plaintiffs' alleged injury occurred in two or more states, *Default Proof Credit Card Sys. Inc. v. State Street Bank & Trust Co.*, 753 F. Supp. 1566, 1570 (S.D. Fla. 1990), and where, as here, Plaintiffs have not bothered to sue Apex in a forum court anywhere else.

---

[16] *See In re Managed Care Litig.*, 298 F. Supp. 2d at 1296 ("In cases transferred pursuant to 28 U.S.C. § 1407, the transferee district court must apply the state law, including its choice of law rules, that would have been applied had there been no change of venue.").

AMERICAS 109061325

These choice of law factors support Texas law governing the Apex Tort Plaintiffs' common law claims.  First, Apex's Customer Account Agreement, which is quoted in the letter from Apex to the N.J. Bureau of Securities relied upon by Plaintiffs (Am. Compl. ¶ 76), requires that Texas law govern any disputes.  Pace Decl. Ex. 1 at 3 (NJBS Letter); Ex. 2 at ¶ 15 (Customer Account Agreement).  Second, because the Plaintiffs have not filed an action in a home forum—instead impermissibly seeking to create a new action in the MDL court—Plaintiffs have no choice of forum to consider.  Third, the locus of the conduct Plaintiffs' allege to be negligent is centered in Dallas, Texas, which is where Apex maintains its headquarters.  *See Costa*, 2011 US Dist. LEXIS 66921, at *13; Am. Compl. ¶ 22.

Fourth, Apex is domiciled in Texas.  Am. Compl. ¶ 22.  Fifth, the Apex Plaintiffs' domiciles are each different, Am. Compl. ¶¶ 14, 18, so their locations should be given little weight.  *Default Proof*, 753 F. Supp. at 1570.  Finally, the relationship between Plaintiffs and Apex—to the extent there is any relationship—is centered in Texas, given that Apex has customers nationwide.  *Chapman v. DePuy Orthopedics, Inc.*, 760 F. Supp. 2d 1310, 1313–14 (M.D. Fla. 2011); Am. Compl. ¶¶ 14, 18.

### B.  Plaintiffs' Negligence Claim (Count I) Fails as a Matter of Law

Under Texas law, "[t]o state a claim for negligence, a plaintiff must allege three elements: (1) the existence of a legal duty; (2) a breach of that duty; and (3) damages proximately resulting from that breach.  The existence of a legal duty is a threshold question, and is a question of law for the court to resolve.  If no duty exists, then the negligence claim is not viable and the Court need not consider the remaining elements."  *Turk v. Pershing LLC*, 2014 U.S. Dist. LEXIS 190624, at *14 (N.D. Tex. Dec. 8, 2014).[17]

Courts nationwide have universally disclaimed any common law or general duty of clearing brokers to investors to accept trades, and have similarly disclaimed any duty to guard against unforeseeable events (discussed further below).  *See, e.g.*, *Riggs v. Schappell*, 939 F. Supp.

---

[17] However, even if another state's laws govern, the standard for negligence is effectively identical in all states that could be at issue here.  *Scott v. Watson*, 359 A.2d 548, 552 (Md. 1976) (summarizing law of Maryland, home to Apex Plaintiff Jang); *Quiroz v. Alcoa Inc.*, 416 P.3d 824, 827–28 (Ariz. 2018) (summarizing law of Arizona, home to Apex Plaintiff Chavez); *Solomon v. New York*, 489 N.E.2d 1294, 1294 (N.Y. 1985) (same); *Abad v. G4S Secure Sols. (USA), Inc.*, 293 So. 3d 26, 29 (Fla. Dist. Ct. App. 2020) (same).

AMERICAS 109061325

321, 329–30 (D.N.J. 1996) (applying New Jersey state law and holding that clearing broker defendant did not owe plaintiff investors a "broad fiduciary duty" sufficient to support a cause of action for negligence and granting defendant's motion to dismiss); *Mars v. Wedbush Morgan Sec.,* 283 Cal. Rptr. 238, 241–42 (Cal Ct. App. 1991) (same); *Ross v. Bolton*, 904 F.2d 819, 824 (2d Cir. 1990) (same); *Rozsa v. May Davis Grp., Inc.*, 187 F. Supp. 2d 123, 131–32 (S.D.N.Y. 2002) (same); *Pulka v. Edelman*, 358 N.E.2d 1019, 1022–23 (N.Y. 1976) ("foreseeability is a limitation on duty"); *West v. Cruz*, 251 P.2d 311, 315 (Ariz. 1952) (no duty to plaintiffs where circumstances were unforeseeable); *Beckwith v. Hart*, 263 F. Supp. 2d 1018, 1023 (D. Md. 2003) (no liability for unforeseeable injury).  And even as to broker-dealers who contract directly with customers and manage non-discretionary accounts, Texas courts do not impose a common law duty to *agree* to execute those brokers' trades.  *Hand v. Dean Witter Reynolds Inc.*, 889 S.W.2d 483, 495 (Tex. App. 1994) (refusing to recognize a common law duty on broker-dealers to "open a new position in the market" at their customer's request).

Even if Apex owed some form of duty to Plaintiffs, Plaintiffs fail to allege any conduct that amounts to negligence.  *First*, Plaintiffs contend that Apex acted *too quickly* when it took emergency action to restrict its clearing of trades in three highly volatile stocks—that Apex had a "duty to dicker" rather than take decisive action.  Am. Compl. ¶¶ 74, 105.  *Second*, Plaintiffs claim that Apex acted *too slowly* to lift its emergency restrictions after receiving a reduced collateral requirement from NSCC—that Apex had a "duty to rush" rather than taking the time to understand the facts and exercise due caution.  Am. Compl. ¶ 106.  And *third*, Plaintiffs argue that it was negligent for Apex to not have immediately on hand the amount of capital the NSCC demanded in response to the unprecedented market volatility and risk.[18]  In other words, Plaintiffs allege that Apex did not have—but should have had—sufficient capital on hand to manage what the Complaint recognizes was literally unlimited risk, and that Apex therefore has a duty to tap unlimited funds.  Am. Compl. ¶ 107.  Each of Plaintiffs' novel purported duties has never been previously imposed by any court and must be rejected.

---

[18] Pace Decl. Ex. 1 (Feb. 9, 2021 NJBS Letter); Pace Decl. Ex. 8 (APEX-MDL00002375) (quoted in Am. Compl. at ¶ 104).

AMERICAS 109061325

1. **It Is Well-Established That a Clearing Broker Such as Apex Owes No Duty of Care to Meme Stock Speculators Such as Plaintiffs**

This Court should dismiss Plaintiffs' negligence claims because courts consistently have held that clearing brokers like Apex do not have a duty of care to investors.

"Whether a duty exists is a question of law for the court . . . ." *United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 473 (Tex. 2017). To determine the existence of a duty, courts in Texas apply a "straightforward common-law duty analysis, balancing the risk, foreseeability, and likelihood of injury against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant." *Read v. Scott Fetzer Co.*, 990 S.W.2d 732, 736 (Tex. 1998).

Here, Apex owed no duty to Plaintiffs Jang and Chavez because, as a clearing broker, Apex did not undertake to act on behalf of investors such as the named Plaintiffs and because, more fundamentally, brokers (whether clearing brokers or not) are not public utilities and owe no duty to investors to accept new orders. Moreover, Texas law does not impose a general duty of care to prevent economic injury. Applying Florida law to Plaintiffs' claims would not change this result because there is no conflict between Florida and Texas law. *Lamm v. State St. Bank & Tr.*, 749 F.3d at 938, 947 (11th Cir. 2014) (existence of duty is a question of law, where courts look to foreseeability of harm). Plaintiffs therefore fail to make out a negligence claim here.

***Clearing Brokers Owe No Duties to Introduced Customers.*** The law is clear that clearing brokers do not owe a duty to investors who use brokerages that in turn use the clearing broker's clearing services. *See, e.g.*, *Weatherly*, 2015 U.S. Dist. LEXIS 197128, at *11 ("[Defendant Pershing] did not undertake to act on behalf of investors; [Defendant's] contract was with SGC [Stanford Group Company—an introducing broker]. Plaintiffs do not cite any text from the clearing agreements indicating that [Defendant] agreed to perform any services for investors."); *Turk v. Pershing LLC*, 2014 US Dist. LEXIS 190624, at *14–16 (N.D. Tex. Dec. 8, 2014) (holding that, "as a clearing broker, [defendant Pershing] owed no common law duty of care to Plaintiffs that could form the basis of a negligence claim," and noting that "[t]he majority of case law supports [defendant's] contention"); *see also Riggs*, 939 F. Supp. at 329 ("Numerous courts . . . have concluded that the clearing broker owes no duty to the client of the introducing broker."); *Mars,* 283 Cal. Rptr. at 241–42; *Ross*, 904 F.2d at 824; *Rozsa*, 187 F. Supp. 2d at 131–32; Henry Minnerop, *Role and Regulation of Clearing Brokers—Revisited*, 75 Bus. Law 2201, 2241 (2020).

AMERICAS 109061325

The Eleventh Circuit also has recognized the "general rule that clearing firms have no fiduciary relationship with the customers of introducing brokers." *Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1296 n.12 (11th Cir. 2002). Plaintiffs Jang and Chavez admit that their connection to Apex was solely as a clearing broker. Am. Compl. ¶¶ 15, 19, 25–26. Therefore, Apex owed them no duty of care.

The fact that Apex is subject to various rules and regulations of the SEC, FINRA, DTCC and NSCC does not change this outcome. As courts repeatedly have held, those rules and regulations do not provide for a private right of action, and Plaintiffs may not create such private rights of action out of state common law. *See Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 464 F. Supp. 3d 634, 645 (S.D.N.Y. 2020) ("Plaintiff cannot circumvent the lack of a private right of action for violations of industry rules merely by recasting her claim as a violation of a common law duty."); *Fox v. Lifemark Sec. Corp.*, 84 F. Supp. 3d 239, 245 (W.D.N.Y. 2015) ("FINRA does not provide a private right of action . . . ."); *In re Series 7 Broker Qualification Exam Scoring Litig.*, 510 F. Supp. 2d 35, 47 (D.D.C. 2007), *aff'd*, 548 F.3d 110 (D.C. Cir. 2008) ("[C]ourts have logically concluded that the Exchange Act preempts common-law claims that are nothing more than disguised actions to enforce regulatory duties"). Thus, Plaintiffs' citation to *Brink v. James* for the unremarkable proposition that "[v]iolations of FINRA rules by broker-dealers can be used as evidence of negligence," is beside the point. *See* Am. Compl. ¶ 49, citing *Brink v. James*, 892 F.3d 1142 (11th Cir. 2018).[19] The overwhelming authority concludes—as did the court in *Brink*—that FINRA rules do not *create* a duty, common law or otherwise, to Plaintiffs. *Brink v. James*, 341 F. Supp. 3d 1314, 1325 (S.D. Fla. 2018) ("[T]he Court agrees with Defendant that Plaintiff's negligence claim will ultimately fail if it is based solely and exclusively on a violation of a FINRA Rule . . . ."); *Weatherly*, 2015 U.S. Dist. LEXIS 197128 at *10–11 ("Plaintiffs fail to establish that the NASD/FINRA conduct rules ***create a duty of care owed by clearing brokers to investors***; rather, the rules may be used to determine whether a breach has occurred once it has been established that a duty of care existed.") (emphasis added).

**Contracts Gave Apex the Right to Refuse Trades.** Plaintiffs seek to avoid the terms of the

_____

[19] Based on the substance of the decision and the assertion it purports to support in the Complaint, Plaintiffs appear mistakenly to have cited the wrong case, which ostensibly should be *Brink v. James*, 341 F. Supp. 3d 1314 (S.D. Fla. 2018).

AMERICAS 109061325

contracts that they signed with Apex by pleading around them, but their failure to cite the contracts only further undermines their claims. As in *Weatherly*, nowhere in the Complaint do Plaintiffs allege any agreement "indicating that [Apex] agreed to perform any services for investors," let alone that Apex had agreed to perform any services for Plaintiffs Jang or Chavez in particular. *Weatherly*, 2015 U.S. Dist. LEXIS 197128, at *11. But Plaintiffs do cite Apex's response to the N.J. Bureau of Securities (Am. Compl. ¶ 76), and that response quotes the language from Apex's customer agreements stating that Apex "***shall have the right to refuse to execute securities transactions for the Customer at any time and for any reason***," and that Apex "shall not be liable for losses caused directly or indirectly by any events beyond your reasonable control, including without limitation, government restrictions, exchange or market rulings, ***suspension of trading or unusually heavy trading in securities***, a general change in economic, political or financial conditions, war or strikes." Apex Letter to NJBS, Pace Decl. Ex. 1, at 3. This Court may consider the existence of such contracts, because standard language from those contracts is quoted at length in the letter from Apex to the N.J. Bureau of Securities relied upon in Plaintiffs' Complaint. Am. Compl. ¶ 76–77. *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) ("Our prior decisions . . . make clear that a document need not be physically attached to a pleading to be incorporated by reference into it; if the document's contents are alleged in a complaint and no party questions those contents, we may consider such a document provided it meets the centrality requirement[].").

   ***Clearing Brokers Are Not Public Utilities and Owe No Duty of Constant Availability.*** Even if Apex owed some duty of care to Plaintiffs, Plaintiffs fail to allege anything to support their proposed duty of *providing unlimited capital and assuring constant availability*. Apex is not an exchange or a public utility, required to continue operating its clearing services all day, every day, without interruption, even when doing so would create hazards to its business. As one court in Texas noted with respect to brokers (*i.e.*, a step *closer* to Plaintiffs than Apex):

> A customer's right to sue a broker for refusing to open a new position in the market must be considered in light of countervailing concerns, particularly the consequences of placing that requirement on a broker. ***To impose this duty on broker or brokerage houses would be to require them to act as a public utility and would deny them the right to exercise business judgment in the acceptance of customers and customers' orders. There are no Texas cases imposing such a duty***, and the authorities in other jurisdictions have refused to impose it. Lastly, an analysis under the risk-utility balancing test supports our decision not to impose this duty on brokers.

AMERICAS 109061325

*Hand v. Dean Witter Reynolds Inc.*, 889 S.W.2d 483, 495 (Tex. App. 1994) (emphasis added); *see also id.* at 495 ("[T]he execution of new contracts exposes the broker, as well as the customer, to new financial risks.  One party should not be able to impose risks on the other without the other's consent.").   Thus, Plaintiffs' negligence claim—purportedly on behalf of Apex's direct customers—also must fail on this ground:  Texas law recognizes no general duty on broker-dealers to open new positions for their customers on request.  *Id.*

Indeed, the original Complaint admitted that moving to "position closing only" (allowing any investor to sell a position but not clearing trades for new purchases) is entirely appropriate in certain circumstances.  Am. Compl. ¶ 52; Original Compl. ¶ 15 n.3 (listing circumstances in which restricting buying of securities may occur).  Plaintiffs also admit that it is acceptable to stop selling stocks for a period of time due to events that might result in damage to Apex or the markets.  *Id*.  Thus Plaintiffs provide no support for, and in fact undermine, their allegation that Apex was negligent in not remaining available to clear all trades in all circumstances.

***Plaintiffs Cannot Recover in Negligence for Purely Economic Losses.***  Apex does not owe Plaintiffs (or its direct customers) a general duty of care to prevent economic losses, particularly when those losses are governed by contract.  Plaintiffs' only allegations of injury are that they held shares of GME and AMC stock and that they sold the shares "for less than [they] would have sold for but for the negligence alleged herein."  Am. Compl. ¶¶ 16, 17, 20, 21.  Texas law follows the "economic loss rule," which disallows "purely economic damages unaccompanied by injury to the plaintiff or his property" for actions in negligence.  *LAN/STV v. Martin K. Eby Constr. Co.*, 435 S.W.3d 234, 235 (Tex. 2014).  Indeed, "Texas courts of appeals have uniformly applied the economic loss rule to deny recovery of purely economic losses in actions for negligent performance of services."  *Id.* at 243.  Often, the economic loss rule is applied in the context of a claim for negligent performance under a contract and disallows tort claims for purely economic injury that is the subject of a contract.  *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986) ("When the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone.").  And if Florida law applies, Florida courts follow a similar rule precluding recovery for purely economic damages, particularly as to financial institutions with no discretion over Plaintiffs' accounts.  *Underwriters at Int. v. All Logistics Grp., Inc.*, 483 F. Supp. 3d 1199, 1211 (S.D. Fla. 2020); *Lamm*, 749 F.3d at 948; *SFM Holdings, Ltd. v. Banc Of Am. Sec., LLC*, 2007 WL 7124464, at *8 (S.D. Fla. Feb. 12, 2007), *aff'd*, 600 F.3d 1334 (11th Cir. 2010).

24

Here, Plaintiffs' relationship with Apex is governed by Plaintiffs' customer agreement with Apex, which expressly states that Apex has "the right to refuse to execute securities transactions for the Customer at any time and for any reason."  Pace Decl. Ex. 1, at 3; Pace Decl. Ex. 2, ¶ 3. But even if this Court does not take judicial notice of the terms of the Customer Account Agreement, its very existence precludes Plaintiffs' from recovering in tort for losses that are purely economic and the subject of the agreement.  The Apex Plaintiffs cannot avoid the economic loss rule simply by omitting mention of the customer agreements they signed.

However, even if this Court does not consider the existence of these contracts, the economic loss rule still precludes Plaintiffs' negligence claim against Apex.  "The economic-loss rule not only applies to bar claims against those in a direct contractual relationship but also applies to preclude tort claims between parties who are not in contractual privity."  *A&H Props. P'ship v. GPM Eng'g*, 2015 Tex. App. LEXIS 12879, at *4 (Tex. App. Dec. 23, 2015); *LAN/STV*, 435 S.W.3d at 235–36 (discussing and applying economic loss rule to contractual strangers).  Plaintiffs have asserted nothing more than negligence resulting in purely economic loss.  Am. Compl. ¶¶ 16, 17, 20, 21.  Florida law similarly bars Plaintiffs' claim because Plaintiffs have alleged nothing more than that Apex provided them with clearing services, thereby negating any discretion over Plaintiffs' accounts.  *See Lamm*, 749 F.3d at 948.  Thus, regardless of whether this Court considers the contracts between Plaintiffs and Apex, Plaintiffs' Complaint fails to state a claim under either Texas or Florida law and must be dismissed.

### 2. Plaintiffs Fail to Allege a Standard of Care That Apex's Conduct Could Have Breached with a Mid-Day, Few Hour Interruption in a Single Day's Trading of Three Meme Stocks

Even if the Court does not dismiss the claims for lack of a duty owed by Apex, the Complaint fails to state a claim for anything approaching negligence—instead trying to make do by alleging that Apex violated a "duty to dicker," a "duty to rush," and a "duty to supply infinite capital."  No such duties exist.

#### a. Plaintiffs' First Alleged Negligent Act (the Duty to Dicker with DTCC).

Plaintiffs complain that Apex acted too quickly when it took emergency action to pause purchases of three of the meme stocks.  Am. Compl. ¶¶ 4, 105.  But Plaintiffs have it backwards. Instead of alleging "negligence," Plaintiffs allege that they were harmed by an overabundance of *caution* by Apex; they allegedly were harmed by a surplus of care, not a lack of care.  In other

AMERICAS 109061325

words, Plaintiffs' theory is that Apex was too careful in taking decisive emergency action to ensure it remained in compliance with its federal capital requirements. State tort law simply does not punish actors in negligence for having used an overabundance of caution—for having used too much care. *See Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex. 1983) ("[F]actors which should be considered in determining whether the law should impose a duty are the risk, foreseeability, and likelihood of injury *weighed against the social utility of the actor's conduct*, the magnitude of the burden of guarding against the injury and *consequences of placing that burden on the employer*.") (emphasis added). Plaintiffs believe Apex should have lollygagged.

Plaintiffs' first theory of negligence highlights the backwards nature of Plaintiffs' claims. Plaintiffs complain that Apex simply acted too decisively to limit the risk that DTCC's collateral requirements would impose, "without even trying to confirm the collateralization number received from DTCC at approximately 9:30 a.m. on January 28, 2021, *or seeking to negotiate it down*." Am. Compl. ¶ 105 (emphasis added); *see also* Am. Compl. ¶¶ 74–76 (alleging that Apex received a demand from the DTCC at 9:30 a.m. Eastern Time and suspended clearing services at 11:31 a.m. Eastern Time). But, as Plaintiffs well know, the DTCC's collateralization numbers are not subject to negotiation. As the New York Times reported in the aftermath of the January 28, 2021 volatility:

> The D.T.C.C.'s demand is *not negotiable*. A firm that can't meet its margin call is *effectively out of the stock trading business* because D.T.C.C. won't clear its trades any more. "If you can't clear a trade, you can't trade a trade," said Robert Greifeld, the former chief executive of Nasdaq and current chairman of Virtu Financial. "You're off the island. You're banished."

Nathaniel Popper, et al., *The Silicon Valley Start-Up That Caused Wall Street Chaos*, The New York Times (Jan. 30, 2021), https://www.nytimes.com/2021/01/30/business/robinhood-wall-street-gamestop.html (emphasis added).

The social utility of clearing brokers like Apex taking these precautions and halting trading to ensure that they continue to meet their net capital and other regulatory requirements cannot be overstated. *See, e.g.*, *Bear, Stearns Sec. Corp.*, Exchange Act Release No. 41,707, 70 SEC No. 710 (Aug. 5, 1999) (ordering clearing firm to pay civil penalties and pay into settlement fund for violating net capital rule). Negligence law does not require clearing brokers to risk violating regulatory requirements simply to economically benefit a class of investors. In fact, the law requires the opposite. *See, e.g.*, *Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.)*, 247 B.R. 51, 64 (Bankr. S.D.N.Y. 1999) (introducing broker was "*obligated* by law *to cease trading*"

26

when it was "operating in violation of its net capital requirements") (emphasis added).

Even if it could be considered negligence to take quick and decisive action (one hour after receiving NSCC's notice) to limit risk in response to unprecedented market conditions, Plaintiffs allege that what Apex should have done instead was "negotiate" with the NSCC regarding the collateralization requirements.   Am. Compl. ¶ 105.   But Plaintiffs badly misunderstand these requirements; they are not, as the Complaint supposes, an opening offer to a negotiation about what type of collateral is required under SEC regulations and FINRA rules.   17 C.F.R. § 240.15c3-1(a) ("Every broker or dealer *must* at all times have and maintain net capital no less than the greater of the highest minimum requirement applicable to its ratio requirement under paragraph (a)(1) of this section, or to any of its activities under paragraph (a)(2) of this section, and must otherwise not be 'insolvent' as that term is defined in paragraph (c)(16) of this section.") (emphasis added); *see also* 17 C.F.R. § 240.17Ad-22 (2020) (standard for clearing agencies).

The Complaint summarizes the Net Capital Rule as a duty "to maintain sufficient liquid assets to meet all *obligations* to customers."  Am. Compl. ¶ 40.  But nowhere do the rules force clearing brokers to take on *more obligations*.  The Rule requires only that the existing "obligations" be covered.  The suspension of trading was to meet the obligations of existing Apex customers. The Plaintiffs turn the Net Capital Rule on its head to read it as a duty to provide unlimited capital to cover unlimited future obligations.  The Rule nowhere imposes such a draconian duty; the imposition of such a duty would discourage firms from becoming clearing brokers in the first place, at war with the democratization efforts of the SEC in 1975 and beyond.  *See, e.g.*, Minnerop, 75 BUS. LAW, at 2212–13.

The NSCC's communications are simply a real-time estimate and calculation of the necessary capital under the SEC's and FINRA's requirements.  A company has no duty to perform futile acts such as disobey the capital requirements in the hopes that the NSCC might calculate different ones.  *In re Cadwallder*, 2007 Bankr. LEXIS 2260, at *45 (Bankr. S.D. Tex. June 28, 2007) ("The law does not require the impossible.").

Plaintiffs admit, however, that the collateral requirements communicated by the NSCC are not some administrative nicety, lightly to be disregarded by clearing brokers.  "These margin requirements are intended to protect DTCC members and the market as a whole from the systemic risk that highly volatile stocks can produce, especially when a broker's position has significant risk concentration in such stocks."  Am. Compl. ¶ 37.  As Plaintiffs admit, "margin requirements

AMERICAS 109061325

protect NSCC and all market participants against clearing member defaults."  Am. Compl. ¶ 38.

Notably, if Apex had continued to permit purchases, the 9:30 a.m. collateralization demand had been correct, and the demand had continued to grow at the same exponential pace as it had from the prior day, then Apex very quickly and very easily could have violated the SEC's Net Capital Rule—effectively promising to settle trades that it lacked the capital to cover.  *See* Am. Compl. ¶ 40 ("Pursuant to 17 C.F.R. § 240.15c3-1 (the 'Net Capital Rule'), the SEC requires broker-dealers to 'at all times have and maintain net capital' no less than the greatest of the minimum requirement applicable to its business.  17 CFR § 240.15c3-1(a).  The Net Capital Rule is designed to require broker-dealers to maintain sufficient liquid assets to meet all obligations to customers."); *see also* Am. Compl. ¶¶ 31–35 (describing capital requirements).  State negligence law cannot force a firm to violate federal securities law.  *See, e.g.*, *In re Adler, Coleman Clearing Corp.*, 247 B.R. 51 (consequences of continuing trading in violation of net capital rule).  Acting quickly to avoid violating federal securities law is not negligence.

Plaintiffs urge this court to create out of thin air a brand new "duty to dicker" rather than take decisive action in the face of potential threats from market volatility.  But such a duty not only does not exist, it also could well be deleterious to future investors.  If clearing brokers were not permitted to decide to discontinue clearing for a period of time in response to collateral requirements, but rather were required to continue clearing at ever-increasing levels of risk while trying to get the NSCC on the phone to "negotiate," then clearing brokers would be at greater risk of failing to maintain adequate collateral, and even greater harm to Plaintiffs and others would occur.  *See* Am. Compl. ¶¶ 36–40 (explaining the risks to both Apex and the markets of a failure to meet collateralization requirements in response to a collateral call from the NSCC).  Simply put, there is not and has never been a duty to delay decisive action and "negotiate" with the DTCC.

### b.  *Plaintiffs' Second Alleged Negligent Act (the Duty to Rush).*

Plaintiffs' second theory of negligence is that Apex acted too cautiously in re-opening its clearing services for these three stocks.  Am. Compl. ¶¶ 4, 106.  Plaintiffs blame Apex again for its *abundance* of care during extraordinary market activities in the three meme stocks.  Plaintiffs allege that, having received at 12:00 p.m. Eastern on January 28, 2021 a new, lower collateral requirement from the NSCC, Apex "confirm[ed] with NSCC that the new report was accurate" before lifting the restriction on purchasing.  Am. Compl. ¶¶ 76, 78.  While the Complaint alleges that Apex communicated with the DTCC at 11:47 Eastern Time, it does not allege when the NSCC

28

confirmed that the 12:00 p.m. Eastern collateral requirement was correct.  Am. Compl. ¶ 78–79. In any event, as shown in the letter to the N.J. Bureau of Securities relied upon in Plaintiffs' Amended Complaint, Apex lifted its restriction on purchases at 2:55 p.m. Eastern Time that day— approximately 2 hours and 55 minutes after receiving the NSCC's revised collateral requirement. Am. Compl. ¶ 78.  Plaintiffs thus claim that taking 2 hours and 55 minutes to confirm the new capital requirement on a day of historic volatility is negligence.

Plaintiffs ignore that, had Apex miscalculated and re-opened trading only to be hit with a collateralization demand it could not cover, then it might violate the SEC's Net Capital Rule (and other regulations for that matter).  *See* Am. Compl. ¶¶ 31–38 (describing these requirements). Instead, in addition to asking this Court to create a new duty of care for clearing brokers, Plaintiffs ask this Court to second-guess, minute-by-minute, Apex's effort to manage the risks of unprecedented volatility in trading and shifting capital requirements.  But "[c]ourts are not equipped to second-guess the business judgments of professional traders and brokers when it comes to risk assessments," such as the risk here of re-opening trading on stocks with unprecedented volatility.  *Capital Options Invest., Inc. v. Goldberg Bros. Commodities, Inc.*, 958 F.2d 186, 191 (7th Cir. 1992) (reasoning adopted in *Hand*, 889 S.W.2d at 495).  The duty of care is not a Goldilocks question requiring the exercise of *just enough* care, and an overabundance of care to ensure compliance with the law is not negligence.  *See, e.g., Gonzalez v. Acosta*, 2001 Tex. App. LEXIS 5623, at *4 (Tex. App. Aug. 16, 2001) (no negligence where defendant "proceeded slowly and with caution from [] driveway"); *see also Adams v. Graves*, 1990 Ohio App. LEXIS 4964, at *14 (Ohio App. Oct. 23, 1990) ("[A]ppellee successfully carried his burden of showing that he acted with caution and complied with the law.  Therefore, appellee was not negligent, as a matter of law[.]"); *Stag Canon Fuel Co. v. Rose*, 145 S.W. 677, 680 (Tex. App. 1912) (no negligence where appellee "out of abundant caution, which the aftermath fully justified, [] was endeavoring to place timbers as required by appellant's rule when the rock fell and injured him.").

Plaintiffs' new "duty to rush" is at odds with hornbook negligence law and demonstrates the conflicting obligations that ad hoc, litigation-driven duties can produce if negligence law is applied to a clearing broker in the manner Plaintiffs urge here.  The duty to rush is at odds with the duty to dicker.

### c.   Plaintiffs' Third Alleged Negligent Act (the Duty to Provide Unlimited Capital).

Plaintiffs' third theory of negligence—the purported duty of clearing brokers to provide

AMERICAS 109061325

unlimited capital—is also unprecedented.  Am. Compl. ¶ 107.  Plaintiffs admit that the short squeeze they created was a "rare," unprecedented event, caused by a group of coordinated actors exploiting market vulnerabilities to artificially inflate the price of a stock.  Am. Compl. ¶ 73 ("rare"); ¶ 136 ("Robinhood continued to drive explosive growth and volume"); Am. Compl. ¶ 3 ("Leading up to January 28, 2021, [the Suspended Stocks] experienced increased trading volume concentrated in portfolios of firms that, among other activities, support individual investors"); Original Compl. ¶ 169 ("Leading up to January 28, 2021, the Suspended Stocks became increasingly popular as, among other things, investors engaged in online discussions regarding the undervaluation of the Suspended Stocks and began purchasing shares.").  Elsewhere in this MDL, Plaintiffs have alleged that these actions created "theoretically limitless loss[es]" that Apex and other clearing brokers would have needed to be capable of covering.  ECF No. 416 ("Antitrust Compl.") ¶ 12; *see also* ECF No. 359, Original Compl. ¶ 189 ("[s]hort sellers . . . risk further losses in the billions of dollars").

Yet Plaintiffs nonetheless claim not only that Apex should have anticipated that Plaintiffs would engage in such conduct driving the meme stocks ever higher through Reddit chats, but also that Apex should have responded simply by "raising additional capital."  Am. Compl. ¶ 107.  This claim fails for multiple reasons.

*First*, Plaintiffs do not, and cannot, allege ***how*** Apex was supposed to simply create "additional capital," nor do Plaintiffs allege ***how much*** capital would have been enough to have on hand for this unprecedented event.  *See* Am. Compl. ¶ 107.  Simply alleging that Apex should have somehow "rais[ed] additional capital" does not suffice to state a claim that Apex was negligent—*i.e.*, that it departed from the standard of care—by having on hand the amount of capital it did.  *Iqbal*, 556 U.S. at 679 ("[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'").  And any such duty would be particularly problematic here, given that plaintiffs in this MDL have characterized the potential losses Apex needed to cover as "theoretically limitless."  Antitrust Compl. ¶ 12.  Plaintiffs thus are not merely suggesting that Apex should have had *additional* capital, but rather that Apex should have somehow had *unlimited* capital.  Tort law certainly does not impose a duty for such heroics.

*Second*, this alleged new duty conflicts with the federal securities law regulatory structure. Nowhere does Plaintiffs' Amended Complaint find any such duty to supply endless capital in the

AMERICAS 109061325

SEC Net Capital Rule.  Money does not grow on trees.  The duty Plaintiffs seek to impose on clearing brokers has no precedent.  And, in Plaintiffs' imagined world of clearing brokers having to take unlimited risks with unlimited capital, undoubtedly the SEC's democratization reforms would be impacted adversely.  *See, e.g.*, Minnerop, 75 Bus. Law at 2212–13.

      *Third*, in Plaintiffs' view of the world, clearing brokers must be capable of taking on virtually unlimited risk—and thus must have virtually unlimited resources—because in Plaintiffs' view it would be *negligent* to decide to limit risk by temporarily suspending trading.  *See* Am. Compl. ¶ 107 (alleging that it is negligence to be unable simply to "rais[e] additional capital" at will, and to suspend trading instead).  But Texas law is clear that brokers are not public utilities and are not required to continue taking *new orders* along with the corresponding unlimited risk associated with such new orders.  *Hand*, 889 S.W.2d at 495 ("[T]he execution of new contracts exposes the broker, as well as the customer, to new financial risks.  One party should not be able to impose risks on the other without the other's consent.").  There is simply no duty in the law for a broker—let alone a clearing broker—to have unlimited resources to facilitate investors' demands.  *Hand*, 889 S.W.2d at 495 (refusing to impose a duty on brokers "to open a new position in the market" at all times upon a consumer's request).

      *Fourth*, no duty of reasonable care requires Apex to guard against illegal market manipulation.  "As a general rule, a defendant has no legal duty to protect another from the criminal acts of a third person . . . ."  *Banzhaf v. ADT Sec. Sys. Sw., Inc.*, 28 S.W.3d 180, 186 (Tex. App. 2000); *see also Anderson v. Dairy Farmers of Am., Inc.*, 2010 U.S. Dist. LEXIS 104191, at *32 (D. Minn. Sep. 30, 2010) (in the context of a plaintiff's duty to mitigate damages:  "In effect, Jordan opines that a commodities trader must take constant precautions against fraud in light of the fact that someone, somewhere, may be perpetrating a fraudulent trading scheme.  Such a standard is not supported in the law.").  Here, Plaintiffs admit that they and others like them engaged in a collusive short squeeze, and their complaint is that—having joined a group of people jointly manipulating the market—they then failed to enjoy the full fruits of their manipulation. Am. Compl. ¶¶ 57–63 (allegations concerning "The January 2021 'Short Squeeze'" from which "individual investors like Plaintiffs and the Class stand to benefit").  But there is no duty for Apex to have on hand sufficient capital to grease the skids for Plaintiffs' market manipulation; even if Plaintiffs are free to manipulate the market, they are not entitled to force others to take on unlimited risk so that they may do so.  *See Otis*, 668 S.W.2d at 309 (When imposing a common law duty of

31

care, courts must weigh the social utility of the actor's conduct and "the magnitude of the burden of guarding against the injury and consequences of placing that burden on the employer.").

*Fifth*, it was unforeseeable as a matter of law that Plaintiffs would engage in the social media based market manipulation scheme to drive up the prices of the meme stocks, which in turn led to the "market volatility brought on by increased demand" for the meme stocks that are the subject of this litigation. Am. Compl. ¶ 60; *see also* Robinhood Tranche Compl. ¶ 10 (describing Reddit/Wall Street Bets driving up prices of meme stocks); *Humble Sand & Gravel, Inc. v. Gomez*, 146 S.W.3d 170, 181 (Tex. 2004) ("It is firmly established in Texas that the existence and elements of a common law duty are ordinarily legal issues for the court to decide" and identifying foreseeability as an element of duty). A duty of care does not require Apex to guard against the unforeseeable. "It is quite generally held that . . . duty . . . excludes liability for those consequences which arise from ***unusual or extraordinary occurrences***. These latter are held not reasonably to be anticipated or foreseen, and therefore no legal duty is imposed to guard against them." *Dallas v. Maxwell*, 248 S.W. 667, 670 (Tex. 1923) (emphasis added); *Doe v. Boys Clubs*, 907 S.W.2d 472, 478 (Tex. 1995) ("Foreseeability requires more than someone, viewing the facts in retrospect, theorizing an extraordinary sequence of events whereby the defendant's conduct brings about the injury."). The market volatility that Plaintiffs' and the proposed class's manic buying of meme stocks created, which in turn increased Apex's collateral requirements to the point where it was required to pause trading in those meme stocks for a short period of time, was unforeseeable, and Apex certainly did not owe named Plaintiffs a duty to guard against that type of behavior.

## C. Plaintiffs Fail to State a Claim for Breach of Fiduciary Duty (Count II)

Plaintiffs have added to their Amended Consolidated Complaint a claim for breach of fiduciary duty on two grounds: (1) that Apex should be deemed to be an "agent" of Plaintiffs and (2) that, by virtue of Apex's status as a registered securities broker-dealer, Apex owed Plaintiffs fiduciary duties. Am. Compl. ¶¶ 109–14. Plaintiffs contend that Apex thus had a duty (1) to provide an open trading platform, and (2) to not prefer its self-interest over Plaintiffs' interests. And, according to Plaintiffs, Apex breached those duties by suspending trading and instructing its introducing brokers to suspend purchases of the meme stocks subject to the extreme market volatility. Plaintiffs' claim fails for two fundamental reasons. First, courts nationwide have held that clearing brokers such as Apex do not owe any fiduciary duties to introduced customers such as Jang and Chavez. And second, Texas courts specifically have held that brokers are not public

AMERICAS 109061325

utilities who owe a duty to individual investors accept any and all orders they ask to place.

To state a claim for breach of fiduciary duty under Texas law, a Plaintiff plausibly must allege (1) the existence of a fiduciary relationship; (2) breach of the duty; and (3) injury to the plaintiff, or benefit to the defendant, that proximately was caused by defendant's breach. *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017); *Bos v. Smith*, 556 S.W.3d 293, 303 (Tex. 2018) (holding that breach of fiduciary duty claims require a showing that "damages were proximately caused by [the] breach of a duty"); *Anderton v. Cawley*, 378 S.W.3d 38, 51 (Tex. App. 2012). "[W]hether the parties have a formal fiduciary relationship is generally a question of law for the court." *Turman v. POS Partners, LLC*, 541 S.W.3d 895, 904 (Tex. App. 2018). The Supreme Court of Texas has explained that "a fiduciary relationship exists when the parties are 'under a duty to act for or give advice for the benefit of another upon matters within the scope of the relation[ship].'" *Texas Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 507 (Tex. 1980) (citing Restatement Torts, § 874). Thus, "[i]n a fiduciary relationship, one person 'binds himself to subvert his own interest to those of his principal[, and if] the relationship between the two parties does not involve the element of a solely subordinated interest . . . it is not a fiduciary relationship.'" *Wilcox v. Wilcox*, 2006 Tex. App. LEXIS 11106, at *9 (Tex. App. Dec. 28, 2006). "[A]rms-length transactions entered into for the parties' mutual benefit . . . do not establish a basis for a fiduciary relationship." *Meyer v. Cathey*, 167 S.W.3d 327, 331 (Tex. 2005). Florida courts apply the same standard. *See Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002).

1.    **Apex, a Clearing Broker, Is Not a Fiduciary of Plaintiffs Jang and Chavez, and a Clearing Broker Owes No Fiduciary Duty to Retail Customers Jang and Chavez as the Courts Universally Hold (*Spear, Leeds*)**

It is well-established that "clearing brokers, as opposed to introducing brokers, do not owe common law duties to investors." *Weatherly*, 2015 U.S. Dist. LEXIS 197128, at *11; *see, e.g., Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 465 (2d Cir. 2013) ("[A] clearing agent[] is generally under no fiduciary duty to the owners of the securities that pass through its hands."); *Dercole v. Divico Fin of Am.*, 2005 U.S. Dist. LEXIS 59757, at *5 (E.D.N.Y. 2005) (It "is clear under New York state law that '[c]learing brokers do not owe a fiduciary duty to customers of an introducing broker."); *Rozsa v. May Davis Grp., Inc.*, 152 F. Supp. 2d 526, 531 (S.D.N.Y. 2001) (clearing brokers "generally have no fiduciary duty to individual investors") (internal citations omitted); *Riggs v. Schappell*, 939 F. Supp. 321, 329 (D.N.J. 1996) ("Numerous courts . . . have concluded

33

that the clearing broker owes no duty to the client of the introducing broker."); *Connolly v. Havens*, 763 F. Supp. 6, 10 (S.D.N.Y. 1991) ("It is well-established that a clearing firm . . . does not have a fiduciary relationship with the customers . . . of the introducing broker with which it has contracted to perform clearing services."); *see also Wehrs v. Benson York Grp.*, No. 07 C 3312, 2008 U.S. Dist. LEXIS 21385, at *8–9 (N.D. Ill. Mar. 18, 2008) ("New York courts have consistently held that absent extenuating circumstances, a clearing broker does not have a fiduciary duty to an individual investor.").

Plaintiffs Jang and Chavez admit that they each interacted with introducing brokers and used Apex solely as their clearing broker. Am. Compl. ¶¶ 15, 19. Plaintiffs do not allege they entered into any agreement with Apex in which Apex agreed to act as Plaintiffs' fiduciary. Plaintiffs do not allege they relied upon Apex for any services other than back-office clearing and settlement services. Am. Compl. ¶¶ 25–26 ("Apex provides clearing broker services to correspondent introducing broker-dealers and customers introduced to Apex by those introducing broker-dealers."). Having failed to allege that Apex acted as anything other than a clearing broker for them, Plaintiffs Jang and Chavez fail to allege any facts from which this Court may infer that Apex acted as their fiduciary. *Weatherly*, 2015 U.S. Dist. LEXIS 197128, at *11.

As in *Spear, Leeds*, "counsel was certainly mindful of the general rule that clearing firms have no fiduciary relationship with the customers of introducing brokers," and thus Plaintiffs here "needed to avoid the rule's consequences." 305 F.3d 1293, 1296 n.12 (11th Cir. 2002) (affirming district court dismissal of complaint). No such attempt is made here.

2.   **Apex Was Not Plaintiffs' Agent**

Plaintiffs' assertion, with no factual support, that Apex was their "agent" (Am. Compl. ¶¶ 110, 111) is nothing more than a naked legal conclusion and therefore insufficient under *Spear, Leeds* to survive a motion to dismiss. *Spear, Leeds*, 305 F.3d at 1297 ("Material facts that detail the exact nature of the relationship between the individual plaintiffs . . . are conspicuously absent"); *see also Iqbal*, 556 U.S. at 678 (while a court "must take all of the factual allegations in the complaint as true, [it is] not bound to accept as true a legal conclusion couched as a factual allegation."); *Dixon v. Allergan United States*, 2015 U.S. Dist. LEXIS 198315, at *7 (S.D. Fla. Apr. 2, 2015) (stating that allegation of agency relationship is a legal conclusion and finding that the allegation is "unavailing" where Plaintiff pleaded "no facts establishing an agency relationship"); *S. Pan Servs. Co. v. S.B. Ballard Constr. Co.*, 2008 U.S. Dist. LEXIS 59903, at *21

34

(M.D. Fla. Aug. 6, 2008) ("bare legal conclusion" that "S.B. Ballard was acting as Liberty Mutual's agent . . . is insufficient to survive a motion to dismiss.").

To survive a motion to dismiss, Plaintiffs must do more than merely assert an agency relationship; they must allege facts that *demonstrate* that Apex was "under a duty to act for or give advice for the benefit of another upon matters within the scope of the relation[ship].'" *See Texas Bank*, 595 S.W.2d at 507. Absent any factual basis to assume the existence of an agency relationship, this Court is not required to take as true Plaintiffs' legal conclusion that Apex acted as Jang's or Chavez's agent. *Spear, Leeds*, 305 F.3d at 1297 ("Material facts . . . are conspicuously absent.") (affirming district court's dismissal of common law complaint).

### 3. Apex's Status as a Registered Broker-Dealer Does Not Transform Its Back-Office Services into a Fiduciary Relationship

Plaintiffs next attempt to circumvent *Spear, Leeds* by conjuring a fiduciary relationship between Apex and Plaintiffs on the basis that Apex provides "financial services" and is a registered broker-dealer. Am. Compl. ¶¶ 47,110. Countless entities can be provide "financial services" but these do not create fiduciary relationships and have not in the many decades of clear case law holding clearing brokers as not having fiduciary relationships. And Plaintiffs confuse Apex's registration with the SEC and FINRA as a "broker-dealer"—a regulatory requirement of *all clearing brokers*[20]—with the type of ongoing, agency-based relationship that a financial advisor or manager of a discretionary account takes on with individual investor customers. *E.g.*, *Texas Bank*, 595 S.W.2d at 507.

Moreover, as discussed above (Section III.B.1, *supra*) SEC, FINRA, DTCC, and NSCC rules create no private right of action. *See Valelly*, 464 F. Supp. 3d at 645; *Fox*, 84 F. Supp. 3d at 245. Plaintiffs may not use state common law claims to circumvent this rule. *Valelly*, 464 F. Supp. 3d at 645. Thus, Plaintiffs' assertion that "[v]iolations of FINRA rules by broker-dealers can be used as evidence of negligence" (Am. Compl. ¶ 49) is beside the point because registration as a broker-dealer does not *create* fiduciary duties. *See Weatherly*, 2015 U.S. Dist. LEXIS 197128 at *10–11 ("Plaintiffs fail to establish that the NASD/FINRA conduct rules **create a duty of care**

---

[20] Henry Minnerop, *Clearing Arrangements*, 58 BUS. LAW. 917, 924 (May 2003) ("Clearing firms, separately or through their parent companies, are registered as broker-dealers with the SEC and with each state in which customers introduced to them reside.").

AMERICAS 109061325

*owed by clearing brokers to investors*; rather, the rules may be used to determine whether a breach has occurred once it has been established that a duty of care existed.") (emphasis added).

As Plaintiffs acknowledge, Apex "provides *clearing* broker services to correspondent introducing broker-dealers and customers introduced to Apex by those introducing broker-dealers." Am. Compl. ¶ 25 (emphasis added). In other words, Apex had an even smaller role than that of a broker of a non-discretionary account, in which "[a] broker's duty is usually restricted to executing the investor's order when the investor controls [the] account and retains the ability to make investment decisions." *See Holmes v. Newman*, 2017 Tex. App. LEXIS 6177 at *17–18 (Tex. App. July 6, 2017); *see also Spear, Leeds*, 305 F.3d at 1296 n.12 (clearing brokers owe no fiduciary duties to introduced customers).

Plaintiffs' addition of broker-dealers who are customers of Apex to their class definition—in a transparent effort to "avoid the rule's consequences" (*Spear, Leeds*, 305 F.3d at 1296 n.12) that is, to avoid the law governing the duties of clearing brokers—does not change this result.[21] First, Plaintiffs' have failed to allege any facts that "detail the exact nature of the relationship" (*id.* at 1297) indicating:  (1) the types of accounts that such "direct customers" hold with Apex, (2) whether Apex acts as an investment advisor (it does not), (3) the nature of any agreements between Apex and such customers, or (4) the services that Apex provides to such customers.  Absent such allegations, this Court is not equipped with "sufficient factual material" to determine whether a fiduciary relationship exists at all, let alone the scope of that relation.  *Spear, Leeds*, at 1297 ("Material facts . . . are conspicuously absent.").  Second, even if the court could conclude that Apex serves as a broker-dealer for its direct customers by managing their non-discretionary accounts, the "agency or broker/customer relationship does not come into existence until the order has been placed *and the broker has consented to execute it* . . . .  If a party refuses to act as an agent for the 'principal,' no relationship between the parties arises and the 'agent' has no duty to act for the 'principal.'" *Hand,* 889 S.W.2d at 493 (emphasis added).  Accordingly, "each new order is a new request that the proposed agent consents to act for the principal [and] there is no on-going agency relationship as there would be with a financial advisor or manager of a discretionary

---

[21] As discussed in Section II.C above, named Plaintiffs lack standing to assert any claims unique to direct customers, so this Court may not rely on any duties that Apex may owe to its direct customers to sustain Plaintiffs Amended Complaint.

AMERICAS 109061325

account."  *Id.* at 494.

### 4.  Plaintiffs' Arms-Length Contracts with Apex Specifically Permit Apex to Act in Its Own Interest

Despite their having signed agreements with Apex, the named Plaintiffs attempt to carefully plead around the existence of both the contracts between Apex and its Introducing Brokers and the contracts between Apex and the named Plaintiffs.  But Plaintiffs do allege the existence of a relationship among Apex, Plaintiffs, and Plaintiffs' Introducing Brokers.  Therefore, this court may consider those contracts, which definitively disprove Plaintiffs' fiduciary duty theory.  In *SFM Holdings*, the Eleventh Circuit held that the district court did not improperly consider contracts between the plaintiff and defendant clearing broker, where the plaintiff did not contest authenticity, where the contract "determined the terms of the relationship between [plaintiff] and [defendant]," and where plaintiffs referred vaguely to account opening documents in their complaint.  *See SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010) ("In ruling upon a motion to dismiss, the district court may consider an extrinsic document if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged.").

The existence of a contract governing the relationship between Apex and its introducing brokers is not in question:  FINRA Rule 4311 requires Apex to maintain a clearing agreement with each introducing broker, in which the parties allocate responsibilities.  FINRA Rule 4311(c)(1) ("Each carrying agreement in which accounts are to be carried on a fully disclosed bases shall specify the responsibilities of each party to the agreement, including at a minimum the allocation of the responsibilities set forth in paragraphs (c)(1)(A) through (I) and (c)(2) of this Rule").  Those agreements specifically state that Apex is not required to accept any orders from any introducing brokers.  Pace Decl. Ex. 1 (NJBS February Letter).

Moreover, Apex's agreements with the end customer (including Plaintiffs Chavez and Jang) specifically disclose that Apex has the "***right to refuse*** to execute securities transactions for the Customer ***at any time and for any reason***."  Pace Decl. Ex. 1 (NJBS February Letter) (emphasis added).  Far from creating a fiduciary relationship, the end-customer agreement specifically disclaims any obligation on the part of Apex to subordinate its own self-interest to that of the end customer.  Pace Decl. Ex. 1 at 3 (NJBS February Letter) ("You have the ***right to refuse to execute securities transactions*** for the Customer at any time and for any reason. . . .  You [Apex] are authorized, in your discretion, should you ***for any reason whatsoever deem it necessary for***

AMERICAS 109061325

*your protection*, without notice, to cancel any outstanding order, to close out the accounts of the Customer, in whole or in part, or to close out any commitment made on behalf of the Customer.") (emphasis added).  Such terms are incompatible with a fiduciary relationship.  *Wilcox*, 2006 Tex. App. LEXIS 11106, at *9 (in a fiduciary relationship, one party agrees "to subvert his own interest to those of his principal [and if] the relationship between the two parties does not involve the element of a solely subordinated interest . . . it is not a fiduciary relationship.").

Here, Apex had no agency or fiduciary relationship with Plaintiffs and was under no fiduciary duty to execute every order that Plaintiffs or other introduced customers wished to place with Apex.  *Hand*, 889 S.W.2d at 493.  And the Plaintiffs here should know that.  Plaintiffs' claim for breach of fiduciary duty fails because, among other reasons, Apex was not Plaintiffs' fiduciary.

**5.      Apex Did Not Breach Any Fiduciary Duty by Refusing to Accept New Trades**

Even if this Court concludes that Apex owed some duty of care to named Plaintiffs or Apex's direct customers, that duty did not include a duty to operate like a public utility regardless of the harm to Apex's business.  The scope and nature of fiduciary duties is limited by the nature of the relationship.  *Holmes*, 2017 Tex. App. LEXIS 6177, at *17–18.

For that reason, Texas law distinguishes between brokers who manage discretionary and non-discretionary accounts.  Brokers who manage discretionary accounts are given *discretion* to trade without their clients' prior approval and offer their clients financial and investment advisory services and, consequently, are held to higher fiduciary standards.  *See Anton v. Merrill Lynch*, 36 S.W.3d 251, 257 (Tex. App. 2001) (noting that "brokers managing a discretionary account  . . . [must] meet a higher standard of care than a broker who handles individual transactions at the direction of the client.").  By contrast, for brokers who manage non-discretionary accounts, "each new order is a new request that the proposed agent consents to act for the principal [and] there is no on-going agency relationship as there would be with a financial advisor or manager of a discretionary account."  *Hand*, 889 S.W.2d at 493.  In a non-discretionary account, the broker's duty arises only once "the order has been placed and [the broker] has **consented** to execute it."  *Id.* at 493 (emphasis added).  If the broker of a non-discretionary account "refuses to act as an agent for the 'principal,' no relationship between the parties arises and the 'agent' has no duty to act for the 'principal.'"  *Id*.  Florida courts recognize a similar distinction.  *SFM Holdings*, 600 F.3d at 1339 (affirming dismissal of breach of fiduciary duty claims under Florida law).  Here, Apex, as a clearing broker, is alleged to have performed only back-office clearing services for named

38

Plaintiffs.  Am. Compl. ¶¶ 15, 19, 25–26.  Plaintiffs make no allegations concerning the services that Apex provided to, or the nature of its relationship with, its direct customers.  And Plaintiffs Jang and Chavez do not allege that they (or Apex's direct customers) relied on Apex for investment or financial advice; nor do they allege that Apex agreed to subordinate its interest to theirs (or its direct customers').  Texas law imposes no general duty on Apex to accept any and all customer orders that come its way.  *See Hand,* 889 S.W.2d at 495.  Thus, at most, any duty that Apex owed to Plaintiffs and/or Apex's direct customers, would arise only once "the order has been placed and [Apex] has ***consented*** to execute it."  *Id.* at 493 (emphasis added).  Apex had no duty to consent to future trades.

### D.  Plaintiffs Fail to State a Claim for Tortious Interference (Count III)

Plaintiffs' claim for "tortious interference with [a] business relationship," which Plaintiffs state they allege "in the alternative" (Am. Compl. ¶ 116), fails on multiple grounds.  The claim is a re-hash of negligence—"failing to have a reasonable plan"—with no "willful and intentional conduct."  *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 689 (Tex. 1989)).

In Texas, "[t]he theory of tortious interference with business relations by a third person includes two causes of action:  (1) tortious interference with existing contracts, and (2) tortious interference with prospective contractual relations."[22]  *Dunn v. Calahan,* 2008 Tex. App. LEXIS 9498, at *8 (Tex. App. Dec. 17, 2008) (citing *Marathon Oil Co.,* 767 S.W.2d at 689).  The elements of a cause of action for tortious interference with a contract are:  (1) the existence of a contract subject to interference; (2) the act of interference is willful and intentional; (3) the occurrence of actual damages or loss is proximately caused by the intentional act.  *Id.*; *see also Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 926 (Tex. 1993).

### 1.    Plaintiffs Fail to Allege "Willful and Intentional" Interference

Plaintiffs state that Count III is "alleged in the alternative" (Am. Compl. ¶ 116), but in fact it alleges mere negligence by its express terms:  complaining of Apex's "*failing* to have a *reasonable* plan in place to control its risk exposure." Am. Compl. ¶ 120 (emphasis added).  Far from an "alternative" to Count I, terms such as "failing" and "reasonable" are terms of mere negligence.  *See Union Pac. R.R. Co. v. Nami*, 498 S.W.3d 890, 896) (Tex. 2016) ("[N]egligence

---

[22] Plaintiffs' Amended Complaint does not address a theory of tortious interference with *prospective* contractual relations, so we do not address it here.

AMERICAS 109061325

means . . . failing to do what a reasonable person like the defendant would have done . . .").

Texas law requires "a willful and international act of interference." *Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925 (Tex. 1993) (where jury returned verdict in favor of plaintiff on negligence and tortious interference, reversing finding of tortious interference because Texas law requires "a willful and intentional act of interference"); *Marathon Oil Co.,* 767 S.W.2d at 689 (Tex. 1989) (same).

"To establish "to establish the element of a willful and intentional act of interference, the plaintiff must produce evidence that the defendant was *a more-than-willing participant and knowingly induced* one of the contracting parties *to breach* its obligations under the contract." *Duradil, L.L.C. v. Dynomax Drilling Tools, Inc.,* 516 S.W.3d 147, 168 (Tex. App. 2017) (emphasis added).  To do so, "the plaintiff must present evidence that an obligatory provision of the contract was breached." *Id.*  Plaintiffs plead no facts that Apex willfully induced a breach of an introducing broker's contract, and the Count III must be dismissed.  *Spear, Leeds*, 305 F.3d at 1297.  Plaintiffs' claim fares no better under Florida law because they fail to even allege they intended or tried purchase additional meme stocks, but were unable to do so because of Apex's conduct.  *Ferguson Transp., Inc. v. N. Am. Van Lines, Inc.*, 687 So. 2d 821, 822 (Fla. 1996) (holding interference with "relationship with the public at large" insufficient for a tortious interference claim and requiring interference with the relationship of an "identifiable person").

### 2. Plaintiffs Fail to Allege a Key Element of a Tortious Interference Claim:  The Existence of a Contract

Plaintiffs have not alleged the existence of any contracts between themselves and their introducing brokers, presumably in an effort to hide their terms from this Court on a motion to dismiss.  Am. Compl. ¶116 ("Plaintiffs allege in the alternative, ***even absent an enforceable contract***, that Apex tortiously interfered with the business relationship between Plaintiffs and the Introducing Broker-Dealers.") (emphasis added).  This Court should hold Plaintiffs to that strategic election.  Texas law requires the existence of a contract in a tortious interference claim.  *S & A Marinas v. Leonard Marine Corp.*, 875 S.W.2d 766, 768 (Tex. App. 1994) ("It is axiomatic that a cause of action for tortious interference with a contract will not lie in the absence of a contract.").  There is no cause of action in Texas for tortious interference with a mere "business relationship."  *Id.*

40

### 3.   Plaintiffs Fail to Allege that the Apex Introducing Brokers Were Contractually Forbidden from Declining to Open New Positions

Plaintiffs' failure to plead the existence (and therefore the terms) of any contracts with their introducing brokers defeats their tortious interference claim for another reason:  they cannot allege that Apex's actions caused their introducing brokers to breach a term of any contract.  Texas law dictates that, "to establish the element of a willful and intentional act of interference, the plaintiff must produce evidence that the defendant was a more-than-willing participant and knowingly induced one of the contracting parties to breach its obligations under the contract." *Duradil, L.L.C. v. Dynomax Drilling Tools, Inc.,* 516 S.W.3d 147, 168 (Tex. App. 2017).  To do so, "the plaintiff must present evidence that an obligatory provision of the contract was breached." *Id.*

To survive a motion to dismiss, Plaintiffs must allege that their introducing brokers were contractually required to execute any and all trades Plaintiffs requested.  First, Plaintiffs have not alleged that they asked their introducing brokers to place orders to purchase the meme stocks during the time when Apex temporarily paused purchases of those stocks.  Thus, Plaintiffs cannot claim that Apex induced their introducing brokers to breach their contract or that Plaintiffs were injured in any way by their introducing brokers' breach of any contract.  *See Parm*, 242 F. Supp. 3d at 1342 ("When considering a motion to dismiss filed in a putative class action before certification of a class, the Court considers only Plaintiff's individual allegations . . . not the generalized allegations of the putative class members."); *Warth*, 422 U.S. at 502 ("Unless these petitioners can thus demonstrate the requisite case or controversy between themselves personally and respondents, 'none may seek relief on behalf of himself or any other member of the class.'") (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)).  The same holds true under Florida law.  *Ferguson Transp., Inc. v. N. Am. Van Lines, Inc.*, 687 So. 2d 821, 822 (Fla. 1996) (holding interference with "relationship with the public at large" insufficient for a tortious interference claim and requiring interference with the relationship of an "identifiable person").

And second, Plaintiffs have not alleged the existence of a contract between the introducing brokers and the Plaintiffs, let alone the specific provision that Apex allegedly induced the introducing brokers to breach.  This is not surprising, given that broker-dealers (even introducing brokers) are not required to accept new positions; rather, they are required only to close out existing positions when requested to do so.  *E.g.*, *Hand*, 889 S.W.2d at 493–94.  Plaintiffs' failure to plead that their introducing brokers were required to place their orders as a part of their business

AMERICAS 109061325

relationship (i.e., that Plaintiffs had a legal right) similarly defeats Plaintiffs' claim under Florida law. *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 815 (Fla. 1994) ("As a general rule, an action for tortious interference with a business relationship requires a business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered.").

### 4. Apex Was Permitted, as a Matter of Law, to Decline to Clear New Positions

Finally, Plaintiffs' tortious interference claim fails because Apex had a legal right to refuse to consent to opening new positions. "It is well settled that interference with contractual relations or future business relations is privileged where it results from the exercise of a party's own rights." *Baker v. Welch*, 735 S.W.2d 548, 549 (Tex. App. 1987). In a case dealing with a broker and its client, the Texas Supreme Court ruled that a "party is justified in interfering with another's contract if it exercises (1) its own legal rights or (2) a good faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken." *Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 282 (Tex. 1996).

Apex had a right not to open new positions. *Hand,* 889 S.W.2d at 493; Pace Decl. Ex. 1 (NJBS Letter) ("You [Apex] have the right to refuse to execute securities transactions for the Customer *at any time and for any reason*.") (emphasis added). Therefore, Apex's instruction to its introducing brokers that it would not accept new orders for three of the meme stocks was privileged and cannot constitute tortious interference with contractual relations. Apex's justification in refusing to execute trades in meme stocks similarly precludes Plaintiffs' claim under Florida law. *Salit*, 742 So. 2d at 385 (requiring intentional and *unjustified* interference).

### E. Apex's Actions Did Not Proximately Cause Plaintiffs' Alleged Injury (All Counts)

Plaintiffs' common law claims against Apex must be dismissed because Plaintiffs fail to plausibly allege that Apex's decision to halt trading proximately caused Plaintiffs' alleged injuries.

Under Texas law, Plaintiffs plausibly must allege damages proximately resulting from Defendant's conduct. *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990) (negligence); *Brenner v. Centurion Logistics LLC*, 2020 Tex. App. LEXIS 9810 at *22 (Tex. App. Dec. 14, 2020) (breach of fiduciary duty); *Hill v. Heritage Res., Inc.,* 964 S.W.2d 89, 126 (Tex. App. 1997) (tortious interference). Florida courts also require proof of proximate causation. *Whitt v. Silverman*, 788 So. 2d 210, 216–18 (Fla. 2001) (negligence); *Gracey*, 837 So. 2d at 353 (breach of fiduciary duty); *Tietig v. Se. Reg'l Const. Corp.*, 557 So. 2d 98, 99 (Fla. Dist. Ct. App. 1990)

AMERICAS 109061325

(tortious interference).  "Proximate cause has two elements:  cause in fact and foreseeability."  *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 551 (Tex. 2005).  "These elements cannot be established by mere conjecture, guess, or speculation."  *Id*.  That standard is consistent with *Iqbal*'s instruction that the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678.  "The test for cause in fact is whether the act or omission was a substantial factor in causing the injury without which the harm would not have occurred."  *Urena*, 162 S.W.3d at 551.  Causation "is not established if the defendant's conduct or product does no more than furnish the condition that makes the plaintiff's injury possible."  *Allways Auto Grp., Ltd. v. Walters*, 530 S.W.3d 147, 149 (Tex. 2017).  "'Foreseeability' means that the actor, as a person of ordinary intelligence, should have anticipated the dangers that his negligent act created for others."  *Travis v. Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992).

      ***The intervening trading days doom the Amended Complaint***.  Here, there is no plausible, non-speculative allegation that Apex's decision to halt trading for a few hours on January 28 in fact caused Plaintiffs' to sell their shares for less than they otherwise would have, and for significantly less than they could have sold their shares on January 28, but did not.  Indeed, Plaintiff Chavez waited for ***more than three trading days***, until February 2, to sell his shares.  Am. Compl. ¶ 17.  Similarly, Plaintiff Jang waited ***more than five trading days***, until ***February 4*** to sell his shares.  Am. Compl. ¶ 21.

      ***Plaintiffs' speculative causal links doom the Amended Complaint***.  Plaintiffs' claims are speculative because they require a crystal ball and depend upon too many causal links.  *Perret v. Wyndham Vacation Resorts, Inc.*, 846 F. Supp. 2d 1327, 1331 (S.D. Fla. 2012) ("A complaint can only survive a 12(b)(6) motion to dismiss if it contains factual allegations that are 'enough to raise a right to relief above the speculative level, on the assumption that all the [factual] allegations in the complaint are true.'").  Finding for Plaintiffs' requires speculating that (1) prices would have continued to rise, and (2) that named Plaintiffs would have timed the market correctly and sold at a peak, when in reality they sold in a dip.  Plaintiffs have offered no *facts* to convert their optimistic speculation into plausible allegations.

      First, Plaintiffs offer no explanation in their Amended Complaint for why this Court should simply assume that prices in the meme stocks at issue here simply would have continued to rise indefinitely.  *See* Am. Compl. ¶¶ 57–65.  For example, Plaintiffs offer no factual allegations as to the strength of the fundamental data supporting the meme stock purchasers' decision-making.

And, in fact, Plaintiffs admit that "[d]uring this time, certain hedge funds and market makers were shorting the Suspended Stocks," and that short selling "tends to drive the prices down."  Am. Compl. ¶¶ 58–60.  Plaintiffs instead rely on their bare-bones allegation that "individual investors increased demand," and offer as an example that the price of one meme stock, GME, sharply increased in price by 78.46%.  Am. Compl. ¶¶ 57, 59.  But, as the SEC warned investors in the wake of the January 2021 events, "the rapid rise in the price of an investment, reflecting a high degree of collective enthusiasm" for the investment's prospects, is a "financial 'mania' or 'bubble,'" and the "*rapid rise is usually followed by a contraction in the investment's price . . . when there is wide-scale selling of the investment that causes a sharp decline in the investment's price*."  *See* SEC Jan. 30, 2021 Investor Bulletin.[23]  Plaintiffs have offered only wild speculation, and no *facts*, to plausibly allege that the meme stocks at issue here would have deviated from the usual course of events and continued to rise in value.

Second, Plaintiffs have offered no facts from which this Court could infer that, despite the fact they chose to sell in a dip here, Plaintiffs would have timed the market better in their "but for" world and sold at a peak.  Again, Plaintiffs have not alleged that they purchased the meme stocks based on their review of "fundamental data (that is, economic, financial, and other qualitative or quantitative data that can affect the value of the investment)."  *See* SEC Jan. 30, 2021 Investor Bulletin.  Rather, they point to what other investors were doing at the time.  But, as the SEC also warned in its bulletin, traders who trade without the use fundamental data "generally have poor timing, follow trends, and overreact to good and bad news in the market."  SEC Jan. 30, 2021 Investor Bulletin.  Plaintiffs offer no facts from which this Court could infer that they would have behaved differently in the but-for world than they did in the real world (i.e., they would have had *good* timing, they would not have relied on trends, and they would not have overreacted to news in the market).  *See In re Catanella & E.F. Hutton & Co., Inc. Sec. Litig.*, 583 F. Supp. 1388, 1417 (E.D. Pa. 1984) (ebbs and flows of market are intervening cause of Plaintiffs' losses).

---

[23] U.S. Securities and Exchange Commission, Investor Alerts and Bulletins, *Thinking About Investing in the Latest Hot Stock?:  Understand the Significant Risks of Short-Term Trading Based on Social Media* (Jan. 30, 2021) (hereinafter "SEC Jan. 30, 2021 Investor Bulletin"), available at https://www.sec.gov/oiea/investor-alerts-and-bulletins/risks-short-term-trading-based-social-media-investor-alert.

AMERICAS 109061325

Third, Plaintiffs' allegations that, "but for" Apex's conduct, Am. Compl. ¶¶ 17, 21, they would have sold their shares at a higher price than they did are further speculative in that they would require the fact finder to assume that the prices of GME and KOSS stock simply would have continued to rise higher than those prices had ever risen before, and that AMC stock would have continued to rise, despite the fact that that stock made no significant upward price movements in the following 4 months after Apex's restrictions were lifted.  Pace Decl. Exs. 3–5.[24]  Finally, Plaintiffs do not allege *facts* from which this Court may infer that Apex should have foreseen Plaintiffs' alleged injury, by merely including conclusory allegations that Apex "should have known" that its decision to stop trading to ensure compliance with capital requirements would have caused injury to investors.  *Travis*, 830 S.W.2d at 98.  For starters, courts have held that clearing brokers are entitled to cancel trades made when a broker is in violation of its net capital requirements.  *In re Adler, Coleman Clearing Corp.*, 247 B.R. 51 (clearing trustee had no obligation to execute introducing broker's trades that would be illegal under securities law due to a failure to comply with net capital requirements).

Texas courts repeatedly have held that intervening actors' misconduct, if unforeseeable, negates causation.  *Coleman v. Equitable Real Estate Inv.*, 971 S.W.2d 611, 618 (Tex. App.— Dallas 1998, pet. denied) (employee's breach of security policies was unforeseeable and therefore independent cause).  Plaintiffs' alleged injury was caused by unprecedented, widespread, online-forum-driven market activity, not Apex's decision to halt trading, nor the timing of its decision to resume trading, nor its decision not to maintain infinite capital.

IV.    **This Action Is Pre-Empted by Federal Securities Laws Because Apex Is Subject to Active and Heavy Federal Regulation and Because the Duty that Plaintiffs Assert Against Apex Would Prove an Obstacle to the Uniform Federal Regulatory Scheme in the Interstate Trading of Publicly-Listed Securities**

Plaintiffs' state common law claims conflict with and are preempted by the federal securities laws.  "The Supremacy Clause provides that the laws and treaties of the United States 'shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.'  U. S. Const., Art. VI, cl. 2.  Accordingly, it has long been settled

---

[24] Courts are permitted to take judicial notice of stock prices.  *See La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 842 (11th Cir. 2004) ("Those [stock] prices are not subject to reasonable dispute, and are a proper subject for judicial notice.").

AMERICAS 109061325

that state laws that conflict with federal law are 'without effect.'" *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 479–80 (2013) (internal citation omitted). "[S]tate law is naturally preempted to the extent of any conflict with a federal statute." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000); *see also Geier v. Am. Honda Co.*, 529 U.S. 861, 865 (2000) ("We ask whether the Act pre-empts a state common-law tort action . . . [and] conclude that the Act . . . pre-empts the lawsuit."). "[A court] will find preemption where it is impossible for a private party to comply with both state and federal law . . . and where 'under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Crosby*, 530 U.S. at 372–73 (emphasis added).

It comes as no surprise that the purchase and sale of publicly-listed securities in interstate commerce is extensively regulated at the federal level, with the 1934 Exchange Act enacted in the aftermath of the Wall Street 1929 collapse. The DTCC and its subsidiary NSCC are self-regulatory organizations (SROs) that are required to promulgate rules and procedures for their members pursuant to the Securities Exchange Act of 1934. *See, e.g.,* Am. Compl. ¶ 33 (CEO NSCC testimony); ¶ 35 (Apex's "deposit requirements required by the DTCC"); ¶ 37 ("NSCC's volatility-based margin requirements stipulate the capital charges that should be borne by firms"); ¶ 37 (describing NSCC's "'Gap Risk' measure for firms that have high concentrations in volatile stocks"). The authorizing statute, 15 U.S.C. § 78q-1, states the purpose of both SRO entities, including "prompt and accurate clearance and settlement of securities transactions," and "the development of uniform standards and procedures for clearance and settlement." Plaintiffs devote an entire section of their Amended Complaint to the national, federal securities regulatory landscape, acknowledging that its purpose is to "manage risk to the markets." Am. Compl. ¶¶ 31–56.

The original Complaint admitted that federal regulators were active in the events of January 28, 2021. "SEC/FINRA are very interested in our move to restrict trading in this way . . . ." Compl. ¶ 257. And the Amended Complaint cites SEC investigations and FINRA supervision throughout. *See, e.g.*, Am. Compl. ¶¶ 51, 92.

Clearing brokerage in particular has a unique federal history. As one commentator describes, the national clearing system was the subject of Congress's 1975 amendments to the 1934 Exchange Act. The Congressional reforms were part of the efforts to democratize stock ownership and grow the number of broker dealers by federalizing the clearance process for

AMERICAS 109061325

stocks—a process in which Congress exercised its powers under the Commerce Clause to federalize the clearance and settlement of securities transactions—taking it away from the States:

> In 1975, Congress responded to the Paper Crunch crisis by amending the Securities Exchange Act of 1934.  Congress determined that "the prompt and accurate clearance and settlement of securities transactions . . . are necessary for the protection of investors" and directed the SEC to "facilitate the establishment of a national system for the prompt and accurate clearance and settlement of transactions in securities."  *The 1975 amendments marked the first time that Congress invoked its powers under the Commerce Clause, charging the SEC with "regulating the securities transfer and clearing processes, a subject previously left to state law."*[25]

Congressional reforms included steps that led to the creation of the discount brokerage market with commissions deregulated on "May Day"—May 1, 1975.  *See* Minnerop, at 2213.  The SEC implemented the Congressional mandate leading to "the development of the national clearance and settlement system as well as the regulatory framework governing clearing brokers."[26]

Yet Plaintiffs ask this Court, through state tort law, to impose a duty on clearing brokers to do what federal law disallows.  *See* Minnerop 75 BUS. LAW at 2245 n.215.  Plaintiffs chastise Apex, for example, for being too hasty to comply with its increased collateral requirements—"that it did not even try to confirm the high number or seek to negotiate it down."  Am. Compl. ¶ 74. Plaintiffs' newly created duties impose capital demands beyond those Congress had in mind.

As the District Court for the District of Columbia has held with regard to SROs, and as the D.C. Circuit affirmed, "the Exchange Act displaces common-law actions that seek damages arising from the breach of an SRO's Exchange Act duties," and therefore "the Exchange Act preempts common-law claims that are nothing more than disguised actions to enforce regulatory duties."  *In re Series 7 Broker Qualification Exam Scoring Litig.*, 510 F. Supp. 2d 35, 47 (D.D.C. 2007), *aff'd*, 548 F.3d 110 (D.C. Cir. 2008).

Indeed, "it is well-established that no private right of action exists with respect to the Exchange Act's requirement, found in 15 U.S.C. § 78s(g), that SROs comply with the Act and their own rules."  *Id.* (collecting cases).  And as the court in *MM&S Financial* concluded, "[g]iven

---

[25] Henry Minnerop, "Role and Regulation of Clearing Brokers—Revisited," 75 BUS. LAW. 2201, 2212 (2020) (emphasis added).

[26] Minnerop at 2213.

Congress's grant of exclusive jurisdiction to federal courts to hear all claims for breach of duties created under the Exchange Act, we doubt Congress intended to allow MM&S to avoid Congress's decision not to provide an express right of action and pursue instead a common-law" claims. *MM&S Fin., Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 364 F.3d 908, 911 (8th Cir. 2004). This rule applies equally to Apex and disallows common law claims to enforce regulatory obligations imposed on it through an SRO. *Appert v. Morgan Stanley Dean Witter, Inc.*, 2009 WL 3764120, at *4 (N.D. Ill. Nov. 6, 2009), *aff'd*, 673 F.3d 609 (7th Cir. 2012).

Complying with Plaintiffs' proposed standard of care while complying with Apex's regulatory obligations—put in place "to protect DTCC members and the market as a whole from the systemic risk that highly volatile stocks can produce" (Am. Compl. ¶ 37)—would be impossible. *See PLIVA, Inc. v. Mensing*, 564 U.S. 604, 620 (2011) ("The question for 'impossibility' is whether the private party could independently do under federal law what state law requires of it."). Plaintiffs' common law claims are preempted. *PLIVA*, at 623–24 ("[I]t is enough to hold that when a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for pre-emption purposes.").

Even if simultaneous compliance with both federal regulations and state common law as proposed by Plaintiffs were not impossible, doing so would still present an *obstacle* to the purposes and objectives of Congress, as described by the Supreme Court in *American Honda* and *Crosby*. Uniformity is the touchstone of federal securities regulation. Congress, along with the SEC and a host of self-regulatory organizations, has designed a regulatory scheme aimed at "the development of uniform standards and procedures for clearance and settlement." 15 U.S.C. § 78q-1(a)(1)(D). The SEC has never imposed any of the three duties the Plaintiffs seek to impose for the very first time on clearing brokers, and this despite the very detailed and often-amended Net Capital Rule that the SEC oversees. Minnerop, 75 Bus. Law at 2213. In fact, the SEC has implemented Congress's will expressed in 1975 and in subsequent actions to have low barriers to entry with low capital requirements. *Id.* at 2204–2205; 17 C.F.R. § 240.15c3-1 (2019) (Net Capital Rule).

Once conduct is exposed to liability under the tort laws of 50 states and the District of Columbia, uniformity is destroyed. *See Am. Honda*, 529 U.S. at 865 ("[P]reemption . . . reflects a desire to subject the industry to a single, uniform set of federal [] standards [and] an intent to avoid the conflict, uncertainty, cost, and occasional risk to safety itself that too many different [] cooks

48

might otherwise create."). If Plaintiffs' proposed duties were the law, then clearing brokers would be subject to varying jury outcomes in various states as to whether and to what extent they should have ignored collateral requirements in some circumstances, had unlimited capital on hand in others, or taken some other action based on the short or long positions of downstream investors.

Finally, Plaintiffs' state common law claims contain another fatal flaw: they intrude on a uniquely federal relationship. When Plaintiffs challenge Apex's management of risk in response to the NSCC's estimate of collateral requirements, Plaintiffs effectively challenge the discretion of the federally-supervised NSCC SRO regime. *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001) ("[T]he relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law."). Plaintiffs may not be directly alleging wrongdoing or negligence on NSCC's part, but allowing their claim to go forward would have the same practical effect of using state tort law to regulate a federal entity. Not only would such suits be disruptive to the uniformity desired through federal regulation, but subjecting clearing firms to potentially 50+ different standards of liability in 50+ different states, districts, and territories would impose a serious burden on those firms. *See, e.g., Am. Honda.*, 529 U.S. at 871.

## V.    The Claims of Plaintiffs Whose Brokers Did Not Use Apex as a Clearing Broker Must Be Dismissed

Although Plaintiffs divide themselves into "Robinhood Plaintiffs" and "Apex Plaintiffs," they nonetheless purport to bring their tort claims against Apex on behalf of a "Nationwide Investor Class," which includes the eleven "Robinhood Plaintiffs" along with any and all investors in the securities markets who held or sold certain stocks, regardless of whether those investors' brokers used Apex's clearing services. Am. Compl. ¶¶ 93–95. Claims by customers of introducing brokers who do not use Apex's clearing services—which are even further attenuated than the Apex Plaintiffs' claims—fail to state a tort claim for the same reasons that the Apex Plaintiffs' claims fail. *See* Section IV. As a clearing broker, Apex owes no duty of care to individual meme stock speculators and certainly owes no duty of care to customers of brokers who did not even use Apex's services. And, for the reasons articulated in Section IV.D, Plaintiffs (or members of the Nationwide Investor Class) whose trades were not routed through Apex can show no injury that proximately was caused by Apex's decision to halt trading for a few hours on January 28, 2021. Indeed, Plaintiffs make no effort to allege any facts that would support a plausible inference that

AMERICAS 109061325

Apex's conduct harmed customers whose brokers did not use Apex as a clearing broker.

**VI.   With 25,000 Pages Produced and Multiple Pleading Opportunities, the Consolidated Amended Complaint Should Be Dismissed with Prejudice**

This Court should dismiss Plaintiffs' Other Broker Tranche Common Law Complaint with prejudice. Plaintiffs have had the opportunity to plead an action in a transferee court, to review Apex's prior motion to dismiss (ECF No. 405), to review numerous agencies' extensive discovery to craft their Complaint, and nonetheless have failed to allege any facts that state a claim upon which relief can be granted. And now, although Plaintiffs add additional claims to their Amended Complaint against Apex, they do nothing to respond to Apex's arguments in its original motion to dismiss (ECF No. 405). Consequently, amendment to the now twice Amended Complaint (which Plaintiffs filed without consent or leave of court) would be futile. *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001) ("A district court need not, however, allow an amendment . . . where amendment would be futile."); *Espinoza v. Countrywide Home Loans Servicing*, L.P., 2014 U.S. Dist. LEXIS 107263, at *21 (S.D. Fla. Aug. 5, 2014) (Altonaga, J.) ("A more carefully drafted third amended complaint could not cure the defects that are plainly evident in the SAC, and therefore leave to amend will not be granted."). Therefore, this Court should dismiss Plaintiffs' Amended Complaint with prejudice.

## CONCLUSION

For the foregoing reasons, Defendant Apex respectfully requests that the Court dismiss the Other Broker Tranche Common Law Amended Complaint with prejudice as to Apex for lack of subject matter jurisdiction and failure to state a claim under Federal Rules of Civil Procedure 12(b)(1) and (6). Alternatively, the Court should strike Plaintiffs' Amended Complaint as an improperly filed Second Amended Complaint under Federal Rule of Civil Procedure 12(f).

## CERTIFICATE OF GOOD FAITH CONFERENCE

Pursuant to Local Rule 7.1(a)(3)(A), I hereby certify that counsel for the movant has conferred with all parties or non-parties who may be affected by the relief sought in this motion under Rule 12(b)(1) in a good faith effort to resolve the issues but has been unable to resolve the issues.

Dated:  October 15, 2021

AMERICAS 109061325

By:  */s/* Jack E. Pace III

Jack E. Pace III
Bryan D. Gant
**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, NY  10020
Tel:  (212) 819-8200
Fax:  (212) 354-8113
jpace@whitecase.com
bgant@whitecase.com

J. Mark Gidley
**WHITE & CASE LLP**
701 Thirteenth Street, N.W.
Washington, D.C.  20005
Tel:  (202) 626-3600
Fax:  (202) 639-9355
mgidley@whitecase.com

Angela Daker
**WHITE & CASE LLP**
200 South Biscayne Blvd.
Suite 4900
Miami, FL  33131
Tel:  (305) 371-2700
Fax:  (305) 358-5744
adaker@whitecase.com

***Counsel for Defendant***
***Apex Clearing Corporation***

51

**Certificate of Service**

I HEREBY CERTIFY that, on October 15, 2021, I electronically filed the foregoing

document with the Clerk of the Court using the CM/ECF filing system.  I further certify that this

motion was served on all counsel of record via transmission of the Notice of Electronic Filing

generated by the Court's CF/ECF System.

                                        */s/* Jack E. Pace III _____
                                        Jack E. Pace III

52