# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re:* | 19 Civ. 9236 (KPF) |
| TETHER AND BITFINEX CRYPTO ASSET LITIGATION | **OPINION AND ORDER** |

KATHERINE POLK FAILLA, District Judge:

In a 593-paragraph complaint, a group of individual investors who purchased cryptocommodities — a class of crypto-assets that includes bitcoin — detailed a wide-ranging conspiracy to artificially inflate the price of those cryptocommodities. The thrust of Plaintiffs' allegations is that iFinex Inc., BFXNA Inc., BFXWW Inc., Tether Holdings Limited, Tether Operations Limited, Tether Limited, Tether International Limited, DigFinex Inc., Giancarlo Devasini, Ludovicus Jan van der Velde, Philip G. Potter, Reginald Fowler, Crypto Capital Corp., Bittrex, Inc., and Poloniex, LLC (collectively, "Defendants")[1] engaged in a scheme to make large, carefully-timed purchases of cryptocommodities using a fraudulently issued crypto-asset — called "tether" or "USDT" — in an effort to signal to the market that there was enormous, organic demand for cryptocommodities, thus causing the price of those

---

[1] For convenience, the Court refers to Defendants as follows: iFinex Inc., BFXNA Inc., and BFXWW Inc. are collectively referred to as "Bitfinex" or the "Bitfinex Defendants"; Tether Holdings Limited, Tether Limited, Tether Operations Limited, and Tether International Limited are collectively referred to as "Tether" or the "Tether Defendants"; Giancarlo Devasini, Ludovicus Jan van der Velde, and Philip G. Potter are collectively referred to as the "Individual Defendants"; DigFinex, the Bitfinex Defendants, the Tether Defendants, Velde, and Devasini are collectively referred to as the "B/T Defendants"; the B/T Defendants and Potter are collectively referred to as the "DigFinex Defendants"; Bittrex, Inc. and Poloniex, LLC are collectively referred to as the "Exchange Defendants"; and Crypto Capital Corp. and Reginald Fowler are collectively referred to as the "CC Defendants."

commodities to spike, and thereby creating and sustaining a "bubble" in the cryptocommodity market.

Plaintiffs initiated this putative class action in October 2019, and bring claims against Defendants under: (i) the Sherman Act, 15 U.S.C. §§ 1-38; (ii) the Commodities Exchange Act ("CEA"), 7 U.S.C. §§ 1-27; (iii) the civil provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968; (iv) the common law tort of fraud; and (v) New York General Business Law ("GBL") § 349, for misconduct that is alleged to have occurred from February 17, 2015, to the present (the "Class Period").

The B/T Defendants, the Exchange Defendants, Potter, and Fowler (collectively, the "Moving Defendants") have moved to dismiss the Amended Consolidated Class Action Complaint (the "Amended Complaint" or "CAC") under Federal Rule of Civil Procedure 12(b)(6), and Fowler further moves to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2).  As set forth in the remainder of this Opinion, the Court grants in part and denies in part the Moving Defendants' motions to dismiss.

## BACKGROUND[2]

### A.   Factual Background

#### 1.    The Parties

The Tether Defendants are the central authority over and issuer of USDT — a "stablecoin," so called because it is purportedly pegged to and

---

[2]        This Opinion draws its facts from Plaintiffs' Amended Consolidated Class Action Complaint (the "Amended Complaint" or "CAC" (Dkt. #114)), the well-pleaded allegations of which are taken as true for purposes of the instant motions.  Additionally,

backed by U.S. dollars held in reserve by Tether. (CAC ¶¶ 5, 29, 112-119).[3]

Plaintiffs allege that Tether "represented to the market that every USDT in circulation was backed by a U.S. dollar in Tether's bank account, and holders could exchange their USDT for those dollars anytime they wished. USDT was thus held out as the digital equivalent of U.S. dollars." (*Id.* at ¶ 5; *see also id.* at ¶¶ 116-117). Plaintiffs further allege that USDT is the most widely used crypto-asset in the world by trading volume, and the third-largest crypto-asset in the world by market capitalization, the latter of which Plaintiffs estimate at $9.1 billion, based on the more than 9.1 billion USDT in circulation. (*Id.* at ¶¶ 135, 137). In 2019, Bitfinex and Tether represented that USDT possessed a near-perfect monopoly on the stablecoin market by accounting for 98.7% of worldwide stablecoin trading volumes; and Plaintiffs allege that for much of the

---

a court may consider any written instrument attached to the complaint as an exhibit, any statements or documents incorporated by reference in the complaint, and documents that are "integral" to the complaint even if they are not incorporated by reference. *See Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002); *see generally Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).

For ease of reference, the Court refers to the B/T Defendants' memorandum in support of their joint motion to dismiss as "B/T Br." (Dkt. #143); to the Exchange Defendants' memorandum in support of their joint motion to dismiss as "Exchange Br." (Dkt. #147); to Philip G. Potter's memorandum in support of his motion to dismiss as "Potter Br." (Dkt. #145); to Reginald Fowler's memorandum in support of his motion to dismiss as "Fowler Br." (Dkt. #149); to Plaintiffs' omnibus memorandum in opposition to the motions to dismiss as "Pl. Opp." (Dkt. #154); to the B/T Defendants' joint reply as "B/T Reply" (Dkt. #164); to the Exchange Defendants' joint reply as "Exchange Reply" (Dkt. #166); to Philip G. Potter's reply as "Potter Reply" (Dkt. #165); and to Reginald Fowler's reply as "Fowler Reply" (Dkt. #171).

[3] Tether Holdings Limited is the holding company of Defendants Tether Limited, Tether Operations Limited, and Tether International Limited, and it is incorporated in and a citizen of the British Virgin Islands. (CAC ¶ 30). Plaintiffs allege that Tether Operations Limited appears to be incorporated in and a citizen of the British Virgin Islands. (*Id.* at ¶ 31). Tether International Limited is incorporated in and a citizen of the British Virgin Islands. (*Id.* at ¶ 32). Tether Limited is incorporated in and a citizen of Hong Kong. (*Id.* at ¶ 33).

relevant time period, Tether had a nearly 100% market share in stablecoin.  (*Id.* at ¶¶ 135-136).

The Bitfinex Defendants operate an online platform called "Bitfinex" for exchanging and trading crypto-assets.  (CAC ¶ 25).[4]  Bitfinex is one of the "largest and least regulated" crypto-exchanges in the world, and it allows users to deposit and withdraw "fiat" currency, such as U.S. dollars or euros, in addition to facilitating crypto-to-crypto transactions.  (*Id.* at ¶ 139).

DigFinex Inc. ("DigFinex") operates as the ultimate parent company of the Bitfinex Defendants and the Tether Defendants.  (CAC ¶ 23).  Plaintiffs allege that, due in part to DigFinex's common ownership and control of Bitfinex and Tether, Bitfinex and Tether are "essentially the same," a fact that the DigFinex Defendants purportedly concealed.  (*Id.* at ¶¶ 7, 152-161).  DigFinex is incorporated in and a citizen of the British Virgin Islands, and the Individual Defendants are among DigFinex's shareholders.  (*Id.* at ¶¶ 23-24).

Ludovicus Jan van der Velde ("Velde") is a citizen of the Netherlands and is the Chief Executive Officer ("CEO") of iFinex Inc., BFXNA Inc., BFXWW Inc., and Tether Limited, positions he has held since early 2013.  (CAC ¶ 34).  Velde is one of two directors listed on the corporate registries of DigFinex, iFinex Inc., and Tether Limited; is a shareholder of DigFinex and Tether Holdings Limited;

---

[4]    iFinex Inc. is incorporated in and is a citizen of the British Virgin Islands.  iFinex Inc. owns and operates the online crypto-exchange called "Bitfinex," and is the holding company that wholly owns Defendants BFXNA Inc. and BFXWW Inc.  (CAC ¶ 26). BFXNA Inc. and BFXWW Inc. are incorporated in and are citizens of the British Virgin Islands.  (*Id.* at ¶¶ 27-28).

and is the former CEO of Perpetual Action Group (Asia), a shareholder of DigFinex. (*Id.*).

Giancarlo Devasini is a citizen of Italy and the Chief Financial Officer ("CFO") of Bitfinex and Tether. (CAC ¶ 35). Along with Velde, he is the other director identified on the corporate registries of DigFinex, iFinex Inc., and Tether Limited; and he is also a shareholder of Tether Holdings Limited and DigFinex. (*Id.*). Plaintiffs allege that Devasini was involved in creating Bitfinex. (*Id.*).

Philip G. Potter is a citizen of New York and a co-founder of Tether. (CAC ¶¶ 36, 122). He was the Chief Strategy Officer ("CSO") of Bitfinex and Tether from in or around 2013 until "around the end of February 2018." (Potter Br. 3; *see also* CAC ¶ 36). Plaintiffs allege that Potter was or is a director of Tether Holdings Limited and a shareholder of DigFinex. (CAC ¶ 36).

Bittrex and Poloniex operate online platforms for exchanging and trading crypto-assets. (CAC ¶ 37).[5] Each was founded in 2014. (*Id.* at ¶¶ 162, 170). As relevant here, both exchanges were, for much of the relevant period, so-called "crypto-to-crypto exchanges," allowing their customers to trade only different crypto-assets for each other and refusing to offer fiat-based deposits or exchanges. (*Id.* at ¶¶ 164-165, 172). Both exchanges are registered as money services businesses with the Department of the Treasury's Financial

---

[5]     Bittrex is incorporated in and a citizen of Delaware, with a principal place of business is in Washington. (CAC ¶ 38). Poloniex is incorporated in and a citizen of Delaware, with a principal place of business in Massachusetts. (*Id.* at ¶ 39).

Crime Enforcement Network, and both entities purport to comply with Know-Your-Customer and anti-money-laundering regulations. (*Id.* at ¶¶ 169, 179).

Crypto Capital Corp. ("Crypto Capital") is incorporated in and a citizen of Panama. (CAC ¶ 40). It operated as a "payment processor" that marketed itself to crypto-asset exchanges. (*Id.*). Reginald Fowler, a citizen of Arizona, acted as an employee, agent, or partner of Crypto Capital, and was responsible for, *inter alia*, creating shell companies and opening bank accounts that could be used by Bitfinex and Tether to process U.S. dollar and other fiat currency transactions. (*Id.* at ¶¶ 41, 182). Plaintiffs allege that Bitfinex and Tether first partnered with Crypto Capital in 2014 and had become completely dependent on it for day-to-day business operations by 2017 — as "conventional banks began shutting down Tether and Bitfinex accounts" — to the point that, by early 2018, the CC Defendants controlled more than $1 billion of Bitfinex funds. (*Id.* at ¶¶ 180, 183-184).[6]

Plaintiffs Matthew Script, Jason Leibowitz, Benjamin Leibowitz, Aaron Leibowitz, and Pinchas Goldstein are purchasers of various cryptocommodities. (*See* CAC ¶¶ 18-22). Plaintiffs allege that during the Class Period, they each purchased cryptocommodities at prices that had been artificially inflated by Defendants' market manipulation, causing Plaintiffs to suffer economic losses and actual damages. (*Id.*). Plaintiffs provide examples of specific cryptocommodity purchases made during the class period. (*Id.*).

---

[6]     To date, Crypto Capital Corp. has not appeared or otherwise participated in this litigation.

Only one of the named plaintiffs, Goldshtein, is alleged to have purchased cryptocommodities futures.  (*Id.* at ¶ 22).  In particular, Goldshtein is alleged to have purchased bitcoin futures between January 16, 2018, and June 3, 2020 (shortly before the filing of the Amended Complaint).  (*Id.*).

### 2.     Crypto-assets and the Cryptocommodity Market

### a.     Types of Crypto-assets

As noted, this case involves the purportedly fraudulent creation of crypto-assets for the purpose of manipulating the market for cryptocommodities.  Crypto-assets are "digital assets that use a variety of cryptographic principles to secure transactions, control the creation of additional units, and verify their transfer."  (CAC ¶ 47).[7]  As of the time Plaintiffs initiated this lawsuit, there were more than 2,000 different crypto-assets available.  (*Id.* at ¶ 58).  Of relevance to the instant suit are two types of crypto-assets: cryptocommodities and stablecoins.  Plaintiffs allege that the DigFinex Defendants' dominance in the stablecoin market allowed them to directly manipulate prices in the cryptocommodity market (*see id.* at ¶ 394), and for this reason, the Court considers their allegations regarding each crypto-asset and its functions in the crypto-economy.

Plaintiffs contend that cryptocommodities are distinguished from other crypto-assets by three defining features.  (CAC ¶ 64).  Cryptocommodities

---

[7]     "Cryptocurrency" is a commonly used term to refer to crypto-assets (CAC ¶ 47 n.37); however, for the purpose of resolving the instant motions, the Court adopts Plaintiffs' nomenclature for specific elements of the cryptocommodity market, including using the term "crypto-assets" in lieu of the term "cryptocurrencies."

(i) provide a secure medium of exchange for general purposes, (ii) have a controlled supply that cannot be unilaterally increased, and (iii) are decentralized. (*Id.*).[8] One of the first and most widely known cryptocommodities is Bitcoin. (*Id.* at ¶ 48).[9]

According to Plaintiffs, the first distinguishing feature of a cryptocommodity is that it provides a secure medium of exchange. Plaintiffs explain that the blockchain — a "digital ledger system" that "tracks the ownership and transfer of every bitcoin in existence" — is what allows cryptocommodities to provide a secure medium of exchange; the blockchain was a unique development for digital assets, which typically are easy to duplicate. (CAC ¶¶ 49-50). For example, the Bitcoin blockchain effectively prevents the duplication or counterfeiting of bitcoin because it: (i) provides a full transaction history of each bitcoin, (ii) publicly lists every address and the number of bitcoin associated with that address, and (iii) allows anyone to see every bitcoin transaction in which that address has engaged. (*Id.* at ¶¶ 50-51).

The second distinguishing feature of a cryptocommodity is that it has a controlled supply. For example, Bitcoin maintains its blockchain and provides for new bitcoin to enter the economy through a consensus mechanism known

---

[8]    Examples of cryptocommodities Plaintiffs purchased include bitcoin, ethereum, ethereum classic, litecoin, monero, dash, and ZCash. (CAC ¶ 66; *see also id.* at ¶¶ 18-22).

[9]    The term "bitcoin" can refer to a computer protocol or a unit of exchange. The Court adopts Plaintiffs' practice and uses the term "Bitcoin" when referring to the protocol, software, and community, and the term "bitcoin" when referring to the units of exchange. (CAC ¶ 48 n.38). Similarly, "ether" refers to one unit of exchange in the "Ethereum" system. (*Id.* at ¶ 67 n.41).

as "mining," which process entails the use of computer programs to perform "complex, resource-intensive automated verifications of past transactions, which are then added to the blockchain." (CAC ¶ 52). Bitcoin "miners" are rewarded with new bitcoin. (*Id.*). Bitcoin is designed to become progressively more difficult to mine as more bitcoin is mined, creating scarcity and ensuring a predictable supply of bitcoin, thus "preventing a flood of new bitcoin that could undercut the value of the preexisting bitcoin." (*Id.* at ¶¶ 53-54).

Finally, cryptocommodities are decentralized, meaning that there is no central authority or entity that administers or manages any cryptocommodity. (CAC ¶ 56). As Plaintiffs explain, decentralization impacts value because:

> [i]f Bitcoin were run on centralized servers, the underlying value of bitcoin would rely on the trust that individuals had in those operating the centralized servers. If Bitcoin's creator could issue more bitcoin at a whim, the value of bitcoin would reflect that uncertainty. But because Bitcoin's cryptographic protocols are self-sustaining and cannot be affected by the originator, the success of Bitcoin does not hinge on any single entity.

(*Id.*). As such, the values of cryptocommodities are not tied to the authority or entity issuing the asset, distinguishing it from corporate stocks and bonds or fiat currency, all of which are tied to the value of the issuing company or the creditworthiness or political stability of the issuing government. (*Id.* at ¶¶ 56-57).

Not all crypto-assets fit Plaintiffs' definition of a cryptocommodity. For example, some crypto-assets are distributed through issuances akin to those of traditional corporate securities and do not have a controlled supply. (CAC

¶ 61).  Others are not decentralized or meant to be used as a secure medium of exchange.  (*Id.* at ¶¶ 60, 62).  As relevant here, one example of a crypto-asset that is not a cryptocommodity is stablecoin.  (*Id.* at ¶¶ 112, 114).  Stablecoins are designed to maintain a consistent value relative to non-digital assets like gold or fiat currency, and for this reason they are neither decentralized nor mined.  (*Id.* at ¶¶ 113-115).  Generally, an issuer unilaterally controls the creation of new stablecoins.  (*Id.* at ¶ 114).  As such, for a stablecoin to have value, its issuer must guarantee that it will keep the coin "stable," for example, by issuing new coins only in a manner linked to the asset it is intended to mirror.  (*Id.* at ¶ 115).  If not, the coin "would be subject to potentially unlimited inflation as more was created."  (*Id.* at ¶ 114).  Generally, the issuer promises to issue coins fully backed by the corresponding asset.  (*Id.* at ¶ 113).

### b.  The Storage and Transfer of Crypto-assets

Crypto-assets are typically stored on cryptographic "keys."  (CAC ¶ 99).  Thus, control of crypto-assets is primarily attested through the control of the key where those assets are stored.  (*Id.*).  Cryptographic keys generally have two components: a public key and a private key.  (*Id.*).  To use Bitcoin as an example, the public key is used to produce the "bitcoin address" — a destination for transfers of bitcoin, like the account number of a conventional bank account.  (*Id.* at ¶ 100).[10]  The private key, by contrast, allows the owner

---

[10]  Bitcoin addresses are long strings of alphanumeric text, often abbreviated by a small group of numbers and letters appearing in the string, such as "1s5F" or "R3w9."  (CAC ¶ 100).

of bitcoin to access the bitcoin stored on a key, or to authorize the transfer of crypto-assets from a key to the bitcoin address of another user. (*Id.* at ¶¶ 101-102). As noted above, the blockchain means that the transfer of bitcoin (or any cryptocommodity) is public. In practice, this means that anyone can see the transferor's bitcoin address, the recipient's bitcoin address, and the quantity of assets transferred; however, the names of the individuals or entities that control these addresses are private. (*Id.* at ¶ 103). This system of transfer and exchange is generally the same for most crypto-assets, including for bitcoin and USDT. (*Id.* at ¶ 99).

Crypto-exchanges emerged to enable smoother and faster trading of crypto-assets. (CAC ¶ 105). To use an exchange to trade crypto-assets, including cryptocommodities, a user must first create an account on that exchange. (*Id.* at ¶ 106). The exchange then provides the user with a deposit address controlled by the exchange; this exchange-generated and -controlled deposit address is distinct from a user's cryptographic key. (*Id.*). When the user deposits crypto-assets into that deposit address from the user's cryptographic key, the exchange will credit her trading account with the corresponding crypto-assets. (*Id.*). The exchange will typically then transfer the crypto-assets into one of its own cryptographic keys for storage. (*Id.*). Similarly, when a user withdraws crypto-assets from an exchange, the exchange debits the user's account and transfers a corresponding amount of crypto-asset from the exchange's reserve to the address specified by the user.

11

(*Id.* at ¶ 109).[11]  As such, transfers within a single crypto-exchange are not
visible in the same way that trades between cryptographic keys are visible
because these transfers do not actually transfer crypto-assets and are thus not
recorded on the blockchain.  (*Id.* at ¶ 110).[12]  Plaintiffs allege that "[w]hen a
customer with an existing account wishes to transfer more crypto-assets into
an exchange," the customer "must ask the exchange for a deposit address[,]
[which] destination address is often different each time the customer makes a
transfer, meaning that one cannot easily trace transactions belonging to a
particular individual.  (*Id.* at ¶ 107).[13]

### c.    The Cryptocommodity Market

Cryptocommodities make up a distinct market — which has grown
exponentially since its establishment — and had a total market capitalization
of over $176 billion in June 2020.  (CAC ¶ 64).  Due to the digital nature of
cryptocommodities, the geographic market is global.  (*Id.* at ¶ 78).  For

---

[11]   As Plaintiffs explain, this process is similar to the process used by a customer transferring funds to an online account with a stockbroker, in that the customer wires funds from her personal bank account to an account controlled by the broker, for which she has a personal identification number (or "PIN") and password.  The broker then credits her with an equivalent amount of funds on its trading platform and places the funds it received into its reserve.  (*See* CAC ¶ 108).

[12]   Plaintiffs provide an illustrative example in the Amended Complaint: if a user transfers bitcoin from her "1s5F" address, which is not on an exchange, to an address controlled by an exchange, the blockchain will record a transfer from the 1s5F address to an address designated by the exchange and from there to an address that the exchange uses to store consumer bitcoin.  But trades the user makes within the exchange will not be recorded on the blockchain.  Instead, intra-exchange transactions will be logged only on the account balance sheets for customers trading on the platform.  Such intra-exchange activity is visible to the exchange itself, and may be publicized by the exchange, but it is not public.  (*See* CAC ¶ 110).

[13]   The Exchange Defendants dispute that they prohibit their customers from reusing deposit addresses.  (*See* Exchange Br. 5-6).

example, crypto-exchanges are located all over the world and often allow customers from any country to access and use them.  (*Id.*).[14]  Plaintiffs allege that there are "meaningful barriers to entry into the cryptocommodity market," including (i) the need to create a sufficiently large community of independent "miners" and other users to "create a distributed peer-to-peer network to verify transactions on their own blockchains"; and (ii) the need for cryptocommodities to be traded on exchanges, a process that entails significant technical challenges.  (*Id.* at ¶ 71).  This latter barrier must be overcome "before any cryptocommodity can become a widely accepted means of exchange with a long-term, independent store of value."  (*Id.*).

Plaintiffs allege that the cryptocommodity market includes "both the cryptocommodities themselves ... and their corresponding futures contracts." (CAC ¶ 72).  They further allege that futures and spot transactions for the same commodity are "inherently part of the same product market because they involve the same commodity.  While a commodity's prices may be lower or higher in futures transactions than in spot transactions, those prices will necessarily converge as the delivery date for the futures converges to the present."  (*Id.* at ¶ 74).

---

[14]     According to Plaintiffs, the demand for cryptocommodities is attributable to their ability
to satisfy three needs that are intertwined with the global nature of the market.  (CAC
¶ 65).  Specifically, cryptocommodities (i) "are suitable for satisfying the demand for
products that allow for quick and secure transactions" — "especially those conducted
on international digital platforms"; (ii) "can serve as long-term stores of value not
controlled by a government or a private entity"; and (iii) "are efficient for both large and
small transaction volumes."  (*Id.* at ¶¶ 65, 67).  As a result, other crypto-assets or non-
digital assets are not substitutes for cryptocommodities.  (*Id.* at ¶¶ 68-70).

13

The Amended Complaint illustrates the relationship between spot and
futures transactions in the cryptocommodity market using bitcoin and bitcoin
futures as an example.[15] Plaintiffs include a chart of bitcoin and bitcoin
futures prices on the Chicago Mercantile Exchange ("CME") from December
2017 until February 2020, demonstrating that the prices of bitcoin and bitcoin
futures "move[d] in step." (CAC ¶¶ 75-76). Plaintiffs further allege that
regulatory filings "confirm the connection between the 'spot' price and futures
prices," citing information provided to the Commodity Futures Trading
Commission ("CFTC") by the CME, which information Plaintiffs contend
establishes that "CME designed bitcoin futures to track the spot price as
closely as possible." (*Id.* at ¶ 77). Plaintiffs allege that the bitcoin futures that
traded on the Chicago Board Options Exchange ("CBOE") were similarly
engineered. (*Id.*). From this information, Plaintiffs posit that "[a]ny price
manipulation or interference with price discovery in the 'spot' market
accordingly has direct and immediate effects on bitcoin futures prices." (*Id.* at
¶ 75).

Plaintiffs also allege that the cryptocommodity market has historically
been vulnerable to price manipulation because it is volatile and lightly
regulated, as compared to other commodity markets. (CAC ¶ 79). From 2014
to 2019, the average daily volatility of bitcoin, ethereum, and litecoin was seven

---

[15]    Bitcoin futures have traded on the Chicago Mercantile Exchange ("CME") and Chicago
       Board Options Exchange ("CBOE") since December 2017, though bitcoin futures
       stopped trading on the Chicago Board Options Exchange ("CBOE") in June 2019. (CAC
       ¶ 73).

times greater than that of the Bloomberg commodity index; three times greater than that of the Bloomberg energy index; and six times greater than that of the Bloomberg precious metal index. (*Id.* at ¶ 80). Plaintiffs attribute this volatility to several factors, including the lack of: (i) a long trading history; (ii) easily reportable figures understood to correlate with growth; and (iii) significant price anchors that come with large-scale institutional capital investments. (*Id.* at ¶ 81). Additionally, although the CFTC categorized bitcoin as a commodity in 2015, the cryptocommodity market has been subject to limited regulation. (*Id.* at ¶ 82).

### d. The Cryptocommodity Market During the Class Period

The price of bitcoin and most cryptocommodities increased significantly from the beginning of the class period until early 2018, when the market crashed. (CAC ¶¶ 93-94). For example, Plaintiffs allege that from 2014 to 2016, the price of bitcoin fluctuated between $200 and $800, but that starting in late 2016 the price began spiking; that by March 2017 the price of bitcoin was $1,200; and that by July 2017 it had risen above $2,000. (*Id.* at ¶ 93). Between July 2017 and December 2017, the price of bitcoin increased tenfold, and on December 17, 2017, the price of bitcoin peaked — at an astounding $20,000 per unit. (*Id.* at ¶ 94). At that time, bitcoin's market capitalization was nearly $327 billion. (*Id.*).

Shortly thereafter, however, the market began to crash, and the price of bitcoin fell to $6,200 by February 2018. (CAC ¶ 96). By December 2018, the price of bitcoin was $3,500 and its market capitalization was $62 billion. (*Id.*).

15

Similarly, the combined market capitalization of all virtual currencies, not just bitcoin, was roughly $795 billion on January 6, 2018, and by February 6, 2018, had dropped more than 50% to $329 billion.  (*Id.* at ¶ 98).

### 3.    Plaintiffs' Allegations of Misconduct

The crux of Plaintiffs' Amended Complaint is that the DigFinex Defendants, who controlled Tether and Bitfinex (CAC ¶¶ 152-161), fraudulently issued between $1 and $3 billion worth of the crypto-asset USDT, which asset Defendants claimed was backed at all times by an equivalent amount of U.S. dollar reserves, but was in fact completely unbacked and "print[ed] out of thin air." (Pl. Opp. 1; *see also* CAC ¶¶ 185-189, 193-194, 216-218).  Plaintiffs allege that the unbacked USDT was transferred from Tether to Bitfinex, and then further transferred to accounts maintained by Bitfinex on two crypto-exchanges operated by the Exchange Defendants, Poloniex and Bittrex.  (CAC ¶¶ 195-218, 261-263).  Once the unbacked USDT was transferred to Poloniex and Bittrex, Defendants used it to make carefully timed purchases of cryptocommodities when prices threatened to fall, thereby fraudulently giving the appearance of price "floors" in the market, artificially simulating organic demand, and creating a "colossal bubble" in the cryptocommodity market.  (*Id.* at ¶¶ 264-309).  Plaintiffs allege that the CC Defendants assisted in covering up that USDT was unbacked (*id.* at ¶¶ 342-366), and that the Exchange Defendants were knowing and willing participants in the scheme, despite ostensibly competing with Bitfinex (*id.* at ¶¶ 310-341).  Given the extensive factual allegations contained in Plaintiffs' 150-plus-page Amended Complaint,

the Court relays only those facts regarding Defendants' scheme that are relevant to resolving the instant motions.

### a.   Defendants Issued USDT Unbacked by U.S. Dollars

As noted, Plaintiffs' allegations stem from the fraudulent issuance of USDT, a stablecoin that is issued and administered by the Tether Defendants. (CAC ¶ 29).  Plaintiffs allege that from Tether's founding in 2014 through the present, in order to maintain the value of USDT, Tether and other of the DigFinex Defendants (including Bitfinex), repeatedly and publicly represented that: (i) each USDT would be backed by one U.S. dollar held in Tether's reserves; (ii) Tether would issue new USDT only in response to legitimate market demand — *i.e.*, "customers willing to exchange dollars one-for-one for USDT"; and (iii) customers could exchange USDT for U.S. dollars at any time (a process called "burning" USDT).  (*Id.* at ¶¶ 116-117, 119-134, 147-151 (examples of the DigFinex Defendants' public representations)).  In fact, according to Plaintiffs, "USDT was not fully backed by U.S. dollars," and Tether "issued unbacked USDT for its own purposes without regard to real demand." (Pl. Opp. 5).  The Amended Complaint provides extensive detail about how the DigFinex Defendants issued unbacked USDT and relies on expert analysis to support their allegations.  The Court summarizes the allegations briefly below.

17

Tether's "Treasury" is the account — solely controlled by Tether — from and in which all USDT is issued and burned. (CAC ¶ 158).[16] Although customers could purchase USDT directly from Tether for most of the Class Period, the "vast majority" of USDT issued by Tether was issued to accounts on Bitfinex, and direct purchases from Tether "made up a tiny fraction of all issued USDT." (*Id.* at ¶¶ 159-160). Critically, Bitfinex "was the *only* exchange to which Tether directly transferred USDT," and due to the exclusive relationship between Tether and Bitfinex, Bitfinex was the only medium through which USDT could enter the "crypto-economy." (*Id.* at ¶¶ 160-161). Plaintiffs allege that this exclusive power over the distribution of USDT gave Bitfinex "substantial economic power in the crypto-markets" (*id.*), as Tether had a nearly 100% market share in stablecoin during the relevant period (*id.* at ¶ 136; *see also id.* at ¶ 135).

However, Plaintiffs allege that Bitfinex and Tether were secretly under common control, which facilitated Defendants' scheme to fraudulently issue unbacked USDT. (*See* CAC ¶¶ 152-161). For example, Devasini and Potter (Bitfinex's CFO and CSO, respectively) created and controlled Tether's holding company (*id.* at ¶ 153), and Devasini and Velde (Bitfinex's CEO) were the only directors of Tether Limited (*id.* at ¶ 154). Plaintiffs note that the DigFinex Defendants omitted these facts from their public statements,

---

[16]    USDT issuances and burns are visible to anyone on the blockchain; however, the corresponding U.S. dollar for USDT exchanges that are supposed to occur in issuances and burns are not visible to the public. (CAC ¶ 118).

including websites, press releases, and announcements, thereby creating the illusion that USDT was supported by two independent entities — one that issued and burned USDT while maintaining a cash reserve to "back" the crypto-asset, and one that independently distributed USDT and thus had a vested interest in monitoring the stablecoin's legitimacy. (*Id.* at ¶¶ 152-156).

With Tether and Bitfinex under common control, the DigFinex Defendants proceeded to issue, from October 2014 through December 2018, $3 billion in USDT — comprising 72% percent of all USDT issued during that time — to just two user addresses on the Bitfinex exchange. (CAC ¶¶ 203, 208, 261-262). These two addresses belong to Bitfinex. (*Id.* at ¶ 204). From these two addresses, Bitfinex then transferred nearly all of the USDT it received to two corresponding addresses, one on the Poloniex exchange and the other on the Bittrex exchange (*id.* at ¶¶ 205-209), where — and as discussed in greater detail below — it was purportedly used to make purchases that would artificially inflate the price of cryptocommodities.

Plaintiffs allege that the majority of the transfers of USDT from the Tether Treasury to the two Bitfinex accounts were made in "large, round numbers" and "in amounts and at times highly unlikely to reflect genuine customer demand." (CAC ¶¶ 203, 269). Even more suspect, these transfers were then passed on — in corresponding issuances and sizes — to just two accounts, one on Poloniex and the other on Bittrex. (*Id.* at ¶¶ 205-209). Plaintiffs allege that the Poloniex and Bittrex addresses were also controlled by Bitfinex. (*Id.* at ¶¶ 205-206). Specifically, Plaintiffs allege that one Bitfinex

address ("1KYi") transferred all USDT it received to a Poloniex address ("1DUb"), which then credited one account controlled by Bitfinex on Poloniex ("1AA6"); while the other Bitfinex address ("1Gjg") transferred all USDT it received to a Bittrex address ("1Po1"), which then credited one account controlled by Bitfinex on Bittrex ("1J1d"). (*Id.* at ¶¶ 204-207).

In sum, and despite Defendants' public claims that USDT was issued only in exchange for U.S. dollars in response to legitimate market demand, Plaintiffs allege that 72% of all USDT issued by Tether through the end of 2018 passed through just four accounts upon issuance, all controlled by Bitfinex (and the other DigFinex Defendants through common control): two belonging to Bitfinex on the Bitfinex exchange, and from there to either an account on Poloniex or to an account on Bittrex, both of which addresses were also controlled by Bitfinex. (*See* CAC ¶¶ 280-299 (summarizing independent expert analysis of unusual trading activity)). As Plaintiffs explain, the unusual pattern of distribution of USDT demonstrates that "Tether was not just issuing USDT in response to demand from consumers, which would involve distributing relatively small amounts to many accounts. Instead it was also, and in secret, making large issuances to its affiliate, Bitfinex[.]" (*Id.* at ¶ 218; *see also id.* at ¶¶ 204-207).[17]

---

[17] As further evidence of this scheme, Plaintiffs allege that the regular flow of USDT through these four addresses "dramatically changed" following public scrutiny occasioned by the publication of a report in late January 2018 (the "Tether Report"), which report concluded that "Tether may not be minted independently of Bitcoin price and may be created when Bitcoin is falling" to boost bitcoin prices. (CAC ¶ 212). In response to publication of the Tether Report, Plaintiffs allege that all USDT transfers to

In essence, Plaintiffs allege that Tether and Bitfinex were issuing USDT *to themselves*. Although Tether could have obtained U.S. dollars from Bitfinex in exchange for every USDT it issued to the two Bitfinex accounts — and thus could have maintained an adequate reserve of U.S. dollars to back each outstanding USDT as promised (*see* CAC ¶¶ 119-134) — the Amended Complaint alleges that such an explanation is "economically impossible" (*id.* at ¶ 220). For example, in December 2017, Tether issued 605 million USDT to Bitfinex, but iFinex — Bitfinex's parent company — had total revenues of only $333.5 million for the *entirety* of 2017. (*Id.*). This figure suggests that Bitfinex did not have $605 million to pay Tether for the 605 million in USDT issued to it in December 2017, and thus Tether did not have adequate cash reserves to support all of the USDT issued to Bitfinex. (*Id.*).

Furthermore, Plaintiffs' examination of Tether's historical difficulties in obtaining and retaining access to the U.S. financial system through correspondent banks is presented as support for their allegation that Defendants issued unbacked USDT to themselves. (*See* CAC ¶¶ 219-258). In order to maintain its one-to-one reserve of U.S. dollars to back outstanding USDT, Tether would need access to the banking systems required to maintain such a reserve. (*Id.* at ¶¶ 222, 236). From October 2014 through March 2017, Tether issued roughly 42 million USDT. (*Id.* at ¶ 242). However, in early 2017, Bitfinex's and Tether's banks cut off access to their U.S. correspondent

---

the 1AA6 and 1J1d addresses ceased for ten days, while USDT transfers from Bitfinex to other addresses continued as before. (*Id.* at ¶ 213).

banking services, and they did not regain access to U.S. correspondent banking for another six months. (*Id.* at ¶¶ 233-235, 239). Yet during those six months, Tether somehow issued 409 million new USDT (*id.* at ¶ 240) — nearly ten times the total USDT issued in the previous two-and-a-half-years — and thus, to maintain USDT's one-to-one backing, Tether would have needed access to U.S. correspondent banking to deposit $409 million obtained in exchange for the issuance of this new USDT. (*Id.* at ¶ 241; *see also id.* at ¶¶ 223-227 (describing how correspondent banking works and its importance to entities like Bitfinex and Tether)).[18] In response to questions about this very issue, Tether refused to disclose the names of any new banks, and thus declined to identify the location of its cash reserves. (*Id.* at ¶ 246).

### b.    The CC Defendants' Role in Defendants' Scheme

Plaintiffs allege that as Tether and Bitfinex lost access to the U.S. banking system, they became increasingly dependent on the CC Defendants to "circumvent correspondent bank monitoring and facilitate access to U.S.

---

[18]    The Amended Complaint is replete with similar examples. In April 2018, Tether issued 130 million in USDT — and should have added a corresponding $130 million to its cash reserves — yet that same month Bitfinex was having "extreme difficulty honoring its clients' requests to [withdraw] their money from the trading platform." (CAC ¶¶ 248-249). Similarly, in October 2018, as Devasini implored Crypto Capital to send Bitfinex cash to honor client redemption requests, Tether "delisted" 1.04 billion USDT, reducing the amount of outstanding USDT by nearly 40% and — if Tether's promises regarding USDT were accurate — requiring customers to send 1.04 billion in USDT to be "burned," and for Tether to send customers $1.04 billion. (*Id.* at ¶¶ 251, 253). Plaintiffs allege that an analysis of the blockchain reveals no massive transfer of 1.04 billion USDT in October 2018; instead, the blockchain reveals a net transfer of just 72 million USDT back to Bitfinex. (*Id.* at ¶¶ 254-255). Nor did Tether and Bitfinex have $1 billion in cash to distribute, as Devasini's messages to Crypto Capital reveal. (*Id.* at ¶ 257). Rather, Plaintiffs allege the 1.04 billion in USDT that was delisted could "easily [be] pull[ed] back from Bitfinex and destroy[ed] without having to pay U.S. dollars in return" because Tether "had issued that USDT directly to Bitfinex without receiving U.S. dollars in exchange." (*Id.* at ¶ 256).

banking," in order to access cash and thus maintain the illusion that USDT was backed by U.S. dollars. (*See* CAC ¶ 247; *see also id.* at ¶¶ 349-363). Specifically, the CC Defendants provided Bitfinex and Tether access to the U.S. banking system by creating bank accounts in the name of shell corporations, which accounts allowed Bitfinex and Tether to access the U.S. banking system to execute exchanges with customers. (*Id.* at ¶¶ 349-359). These "shadow accounts" were closed when banks determined the accounts were being used by Bitfinex and Tether, driving Crypto Capital and Fowler to create new accounts in what Potter called a "cat-and-mouse" game. (*See id.* at ¶¶ 344-346; *see also id.* at ¶ 362). Plaintiffs allege that the CC Defendants' conduct was "essential to Bitfinex and Tether's scheme to make manipulative purchases with debased USDT," because "[w]ithout the illicit access to the U.S. financial system facilitated by Fowler and Crypto Capital, Bitfinex and Tether would not have been able to honor any withdrawal requests, which would have quickly exposed that USDT was not redeemable or fully backed." (*Id.* at ¶ 360).

Critically, according to Plaintiffs, Fowler and Crypto Capital *knew* that (i) "Bitfinex and Tether relied on Crypto Capital's accounts to transact in fiat currency"; (ii) "these transactions supported the market's belief that USDT was fully backed"; and (iii) the illusion of USDT's full backing "facilitated the manipulation of cryptocommodity prices." (CAC ¶ 361). As support, Plaintiffs point to a series of exchanges on October 15, 2018, between Devasini — CFO of Tether and Bitfinex, and director and shareholder of DigFinex and iFinex — and a Crypto Capital employee on the messaging app Telegram, in which

Devasini pleads with Crypto Capital to "move at least 100M" to the DigFinex Defendants to honor client redemption requests. (*Id.* at ¶ 362). Devasini warns that failure to honor the requests would reveal that USDT was unbacked and "could be extremely dangerous for everybody [in] the entire crypto community," because "BTC [*i.e.*, bitcoin] could tank to below 1k if we don't act quickly[.]" (*Id.*). Plaintiffs allege that the CC Defendants participated in and benefited from the scheme because (i) they were heavily invested in the continued success of the crypto-asset market, as their entire business model depended on its continued existence; (ii) they earned fees and interest on transactions with the DigFinex Defendants; and (iii) the value of their own reserves of cryptocommodities were inflated by the scheme, allowing them to "tak[e] advantage of the bubble they helped create." (*Id.* at ¶¶ 364-366).

### c. Defendants Used USDT to Manipulate the Cryptocommodity Market

While the scheme to conceal the unbacked nature of USDT was quite complex, Defendants' scheme to use that unbacked USDT to manipulate the cryptocommodity market was relatively straightforward. In brief, having convinced the market that each USDT had the value equivalent of one U.S. dollar, the DigFinex Defendants then "us[ed] the USDT they printed for themselves to manipulate the cryptocommodity market" by signaling to the market that the purchases they made with unbacked USDT "reflect[ed] massive and measurable customer demand for … cryptocommodities. These purchases thus naturally raised cryptocommodity prices." (CAC ¶¶ 259, 272).

24

As noted above, Plaintiffs allege that from October 2014 through December 2018, Tether issued 3 billion USDT — 72% of all USDT issued during that time — to two Bitfinex-owned accounts on the Bitfinex exchange, from which accounts Bitfinex then transferred the USDT to two Bitfinex-controlled accounts on Poloniex and Bittrex. (CAC ¶¶ 203-209, 262). After the USDT sent to Bittrex and Poloniex was credited to Bitfinex's accounts, Bitfinex used it to purchase cryptocommodities. (*Id.* at ¶ 264). Those "illicitly acquired cryptocommodities" were then sent back to Bitfinex's exchange address, where Bitfinex sold them to its customers for U.S. dollars. (*Id.*).[19] Plaintiffs provide extensive data to corroborate their allegations. (*Id.* at ¶¶ 265-269).

Importantly, Plaintiffs contend that Defendants' fraudulent scheme did not just involve the conversion of unbacked USDT to valuable assets such as fiat currency and cryptocommodities; instead, Plaintiffs allege that the entire scheme was designed to, and had the effect of, artificially inflating the price of bitcoin and other cryptocommodities. (*See* CAC ¶¶ 10-12). Because the market falsely viewed USDT as equivalent to U.S. dollars, large influxes of this crypto-asset into the cryptocommodity market had an outsized impact; the market viewed influxes of USDT as a sign of an influx of new cash, and thus increased demand, into the cryptocommodity market. (*See id.* at ¶¶ 272, 274).

---

[19]     Plaintiffs suggest, but do not directly allege, that the DigFinex Defendants were able to sell off these illicitly acquired cryptocommodities in secret using so-called "hidden" orders, in which the "'hidden' order does not appear on the publicly visible order book." (CAC ¶ 144). Plaintiffs allege that "[t]hese hidden orders present an opaque channel mechanism for selling off bitcoin without crashing the price." (*Id.*).

25

Specifically, Plaintiffs allege that the DigFinex Defendants made carefully-timed, strategic purchases of cryptocommodities using their unbacked USDT when cryptocommodity prices began to fall, in order to: (i) stop prices from falling (CAC ¶¶ 276-277); (ii) push the prices of cryptocommodities back up by causing "price reversions" (*id.* at ¶¶ 273-276, 278-279); and (iii) keep prices above certain "round number thresholds" that fostered the misimpression of "floors" below which cryptocommodity prices would not drop (*see id.* at ¶¶ 295-296). In turn, this price manipulation was self-perpetuating, as it caused the market to falsely believe that: (i) there was increased, organic demand for cryptocommodities; and (ii) the value of cryptocommodities would remain stable, and would not pass below certain price thresholds, thus spurring further investment in cryptocommodities and further inflating prices. (*See id.* at ¶ 191).

As an example, Plaintiffs allege that, when cryptocommodity prices had decreased by 5% or more, the DigFinex Defendants transferred, on average, ten times more USDT to Poloniex and Bittrex than when prices had gone up. (CAC ¶¶ 276-277). Plaintiffs provide both data visualizations analyzing, and specific examples of, instances where the DigFinex Defendants sent large influxes of USDT to their Poloniex and Bittrex accounts, causing cryptocommodity prices to rise. (*See, e.g., id.* at ¶¶ 272, 274-275, 278-279). Plaintiffs also cite extensively to independent, expert analysis purporting to corroborate the relationship between unbacked USDT, large transfers of USDT from Bitfinex to Poloniex and Bittrex, and the increase in bitcoin and other cryptocommodity

26

prices between March 2017 and March 2018. (*See id.* at ¶¶ 280-309).

Plaintiffs allege that Defendants' conspiracy "created the largest asset bubble in

history" — as noted previously, at its height, bitcoin traded at $20,000 in

December 2017, before falling to $3,500 a year later. (*See id.* at ¶¶ 94, 96-97,

272)

### d. The Exchange Defendants' Role in Defendants' Scheme

Plaintiffs allege that the DigFinex Defendants needed to utilize other

crypto-exchanges to "flip" their unbacked USDT into more valuable

cryptocommodities, because to have Tether deposit massive amounts of USDT

directly to Bitfinex's accounts on the Bitfinex exchange, and then immediately

attempt to purchase bitcoin with that newly minted USDT, would raise too

many red flags. In consequence, Bitfinex transferred USDT to one account at

each of Poloniex and Bittrex — direct competitors — and from these accounts

was able to purchase cryptocommodities anonymously and in large quantities,

thereby artificially creating demand for and manipulating the price of

cryptocommodities. (CAC ¶¶ 272, 421).

Plaintiffs assert that Poloniex and Bittrex were more than just unwitting

facilitators of Defendants' scheme. For most of the relevant time period,

neither exchange accepted fiat-based deposits nor offered fiat-based exchanges,

and as such, for example, users could not exchange bitcoin for U.S. dollars on

Poloniex or Bittrex. (CAC ¶¶ 164, 172). Thus, USDT was a critical crypto-asset

for both exchanges to support, because it purported to "combine the best

aspects of fiat currency and crypto-assets: [i]t [was] stable and safe like the

27

U.S. dollar but also, like other crypto-assets, easily transferable across different crypto-exchanges, and free from many government regulations." (*Id.* at ¶ 119). Both Poloniex and Bittrex adopted and advertised Tether's guarantee that each USDT was backed by a U.S. dollar, and both worked closely with Tether to list USDT. (*See id.* at ¶¶ 166-167, 173-174, 318-319).[20] Plaintiffs allege that Poloniex and Bittrex quickly became large and successful crypto-exchanges, in part as a result of their early adoption of USDT. (*Id.* at ¶¶ 168, 175).

On the specific issue of knowledge, Plaintiffs allege that the Exchange Defendants "knew that Bitfinex was the entity depositing massive volumes of USDT into the 1J1d and 1AA6 addresses because Bittrex and Poloniex had worked specifically with Bitfinex to enable those transfers." (CAC ¶ 312). To Plaintiffs, this agreement is evidenced by the uncommon practice employed by the Exchange Defendants with respect to the 1J1d and 1AA6 addresses of allowing Bitfinex to re-use these addresses multiple times, when ordinary customers "are routinely given a new deposit address when they want to transfer USDT to their Bittrex or Poloniex account." (*Id.* at ¶¶ 313-315). Similarly, evidence of an unusual and intentional arrangement between the Exchange Defendants and the DigFinex Defendants is evident in the relative

---

[20]     Plaintiffs no longer rely on the claim in paragraph 173 of the Amended Complaint that trading of USDT on Bittrex began in March 2017. (*See* Pl. Opp. 9 n.2). However, Plaintiff continues to rely on its other assertions in paragraph 173 (*id.*), and as such the Court must "assume [those] well-pleaded factual allegations to be true," *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

proportion of USDT traded on the Exchange Defendants' platform relative to other crypto-exchanges: the cumulative net flow of USDT to Bittrex and Poloniex accounted for more than half of all USDT issued, even though trading of cryptocommodities and other crypto-assets on Bittrex and Poloniex represented only a small fraction of the overall market. (*Id.* at ¶ 334). Plaintiffs contrast the relative saturation of USDT at Poloniex and Bittrex with the minimal flow of USDT to Binance, the largest crypto-exchange in the world. (*Id.* at ¶ 335 ("[W]hen Binance first listed USDT, minimal USDT flowed to its exchange[,] [a]nd even at the peak of the bubble, Binance experience[d] relatively little USDT demand.")).

Plaintiffs further contend that the Exchange Defendants knew that Bitfinex controlled the 1J1d and 1AA6 addresses "because federal know-your-customer … requirements prohibit them from accepting such large transfers from an anonymous source," and because both exchanges purported to follow such requirements and stated that they had systems in place to comply with them. (CAC ¶¶ 320-322).[21] Proceeding from that proposition, Plaintiffs allege that because the Exchange Defendants knew that Bitfinex controlled the 1J1d and 1AA6 addresses, and thus had "direct visibility into the daily trading activity" of Bitfinex's accounts (*id.* at ¶ 322), they necessarily knew that USDT was not being issued in response to organic customer demand (*id.* at ¶¶ 324-325). More broadly, Plaintiffs contend that the Exchange Defendants were

---

[21]    Prior to the release of the Tether Report, Bitfinex sent $1.5 billon to Poloniex through the 1J1d address and $1.2 billion to Bittrex through the 1AA6 address. (CAC ¶ 314).

29

aware of the unbacked nature of USDT and its use to manipulate crypto-commodity prices because of their knowledge of the DigFinex Defendants' cashflow issues, and based on the pattern of transfers and issuances they could observe:

> Because it happened on their exchanges, Bittrex and Poloniex also knew that Tether and Bitfinex were using this debased USDT to buy cryptocommodities. They knew which assets the Tether Defendants were buying and when, and that the cryptocommodities they purchased were being transferred back to Bitfinex. They also knew how those purchases affected cryptocommodity prices on their own exchanges. Given the size and regularity of these transfers through a mechanism they created for that exact purpose and their perfect visibility into the transactions, Bittrex and Poloniex knew the manipulative effect of the transactions on their exchanges.

(*Id.* at ¶ 331; *see also id.* at ¶¶ 208, 324-333).

Despite full knowledge of the DigFinex Defendants' scheme and of their legal obligations to report suspicious transactions, the Exchange Defendants did not report such transactions, and instead are alleged to have knowingly and willingly facilitated such transactions by setting up "bespoke" accounts for Bitfinex. (CAC ¶ 332). Furthermore, despite being direct competitors of Bitfinex, the Exchange Defendants purportedly agreed to participate in the DigFinex Defendants' scheme because they benefitted from: (i) increased trading volume caused by market manipulation; (ii) increased commissions from increased trading; (iii) increased value in their cryptocommodity reserves due to the artificial price inflation; and (iv) the continued viability of the

cryptocommodity market, upon which market their entire business model depended. (*Id.* at ¶¶ 339-341).

## B.    Procedural Background

Plaintiffs filed the initial class action complaint in this case, then captioned *Leibowitz* v. *iFinex Inc. et al.*, on October 6, 2019.  (Dkt. #1). Thereafter, three related lawsuits were filed.  *See Young et al.* v. *iFinex Inc. et al.*, No. 20 Civ. 169 (KPF), Dkt. #1 (S.D.N.Y. Jan. 8, 2020); *Faubus* v. *iFinex Inc. et al.*, No. 20 Civ. 211 (KPF), Dkt. #1 (S.D.N.Y. Jan. 9, 2020); *Ebanks* v. *iFinex Inc. et al.*, No. 20 Civ. 453 (KPF), Dkt. #1 (S.D.N.Y. Jan. 16, 2020).

On January 16, 2020, plaintiffs in the *Liebowitz*, *Young*, and *Faubus* cases filed a joint letter to consolidate.  (Dkt. #61).  On January 24, 2020, the *Ebanks* Plaintiffs filed a letter joining in the motion to consolidate.  *Ebanks* v. *iFinex Inc. et al.*, No. 20 Civ. 453 (KPF), Dkt. #8 (S.D.N.Y. Jan. 24, 2020). Accordingly, by Order dated January 27, 2020, the Court granted the motion to consolidate (Dkt. #67), and on February 24, 2020, it held oral argument on the competing motions for the appointment of interim lead class counsel.  (*See* Minute Entry for February 24, 2020; *see also* Dkt. #96 (Transcript)).  On the record on February 27, 2020, the Court granted the *Leibowitz* Plaintiffs' motion to appoint interim lead counsel.  (*See* Minute Entry for February 27, 2020; *see also* Dkt. #97 (transcript)).

On March 5, 2020, the Court adopted the parties' proposed schedule for the submission of Plaintiffs' anticipated amended class complaint and for briefing Defendants' anticipated motions to dismiss.  (Dkt. #99)  After several

delays not pertinent to resolving the instant motion, on May 14, 2020, the
Court endorsed the parties' proposed case management plan and scheduling
order (Dkt. #109); Plaintiffs filed the Amended Complaint, the operative
pleading in this case, on June 5, 2020 (Dkt. #114); and on July 7, 2020, the
Court adopted the parties' joint Stipulation and Order setting a briefing
schedule for Defendants' anticipated motions to dismiss (Dkt. #130).

Thereafter, on August 7, 2020, the Exchange Defendants filed a pre-
motion letter seeking to pursue a motion for summary judgment instead of a
motion to dismiss, arguing that the Exchange Defendants had proof that the
1J1d and 1AA6 addresses did not belong to Bitfinex, and instead "belong to an
individual with no apparent connection to Bitfinex, other than as a customer of
its exchange, who is known to engage in a lawful arbitrage strategy." (Dkt.
#135). Plaintiffs filed a letter in opposition on August 12, 2020. (Dkt. #137).
By Order dated August 14, 2020, the Court denied the Exchange Defendants'
motion to pursue summary judgment before the parties had engaged in any
discovery, and reaffirmed the briefing schedule on Defendants' anticipated
motions to dismiss set by the July 7, 2020 Stipulation and Order. (Dkt. #139).

On September 3, 2020, the B/T Defendants, the Exchange Defendants,
Potter, and Fowler filed their respective motions to dismiss and supporting
papers. (Dkt. #142-149). On November 5, 2020, Plaintiffs filed a consolidated
memorandum of law in opposition to the motions to dismiss. (Dkt. #154). On
December 17, 2020, the B/T Defendants, the Exchange Defendants, and Potter
filed their reply briefs. (Dkt. #164-166). Fowler filed his reply brief on

January 19, 2021.  (Dkt. 171).[22]  Accordingly, the Moving Defendants' motions

to dismiss are fully briefed and ripe for decision.

### DISCUSSION[23]

**A.    The Court Has Personal Jurisdiction over Fowler**

While the Exchange Defendants, Potter, and the B/T Defendants do not

contest personal jurisdiction, Defendant Fowler argues that neither RICO, nor

the CEA, nor New York's long-arm statute allows the Court to exercise personal

jurisdiction over him.  (*See* Fowler Br. 3-11; Fowler Reply 1-6).  Fowler further

argues that the assertion of jurisdiction over him would be inconsistent with

principles of due process.  (*See* Fowler Br. 12-13; Fowler Reply 6-7).

"A court facing challenges as to both its jurisdiction over a party and the

sufficiency of any claims raised must first address the jurisdictional question."

*Cohen* v. *Facebook, Inc.*, 252 F. Supp. 3d 140, 148 (E.D.N.Y. 2017) (citing

*Arrowsmith* v. *United Press Int'l*, 320 F.2d 219, 221 (2d Cir. 1963)).  Therefore,

the Court will first address Fowler's motion to dismiss Plaintiffs' claims for lack

---

[22]    By letter dated December 11, 2020, and in the middle of briefing the instant motion, counsel for Fowler moved to withdraw as his attorney.  (Dkt. #159).  After receiving a letter from Plaintiffs regarding the motion to withdraw (Dkt. #168), and hearing oral argument on the motion (*see* Minute Entry for December 22, 2020; *see also* Dkt. #174 (transcript)), the Court conditionally granted the motion to withdraw pending the submission of a reply brief on Fowler's behalf (Dkt. #169).  After receiving Fowler's reply brief on January 19, 2021 (Dkt. #171), the Court issued an Order confirming that the motion to withdraw had been fully granted (Dkt. #172).  To the best of the Court's knowledge, Fowler is now proceeding *pro se* in this litigation.

[23]    The parties do not dispute, at least for purposes of the instant motion, that this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and 18 U.S.C. § 1964(c).

of personal jurisdiction before addressing the merits of the Moving Defendants'

motions to dismiss for failure to state a claim.

### 1. Applicable Law

On a motion to dismiss for lack of personal jurisdiction pursuant to

Rule 12(b)(2), the plaintiff bears the burden of showing that the court has

jurisdiction over the defendant. *In re Magnetic Audiotape Antitrust Litig.*, 334

F.3d 204, 206 (2d Cir. 2003); *accord In re Terrorist Attacks on Sept. 11, 2001*,

714 F.3d 659, 673 (2d Cir. 2013). "Prior to discovery, a plaintiff challenged by

a jurisdiction testing motion may defeat the motion by pleading in good faith,

legally sufficient allegations of jurisdiction. At that preliminary stage, the

plaintiff's *prima facie* showing may be established solely by allegations."

*Dorchester Fin. Sec., Inc.* v. *Banco BRJ, S.A.*, 722 F.3d 81, 84-85 (2d Cir. 2013)

(citation omitted); *accord In re Terrorist Attacks*, 714 F.3d at 673 ("In order to

survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must

make a *prima facie* showing that jurisdiction exists." (citation omitted)). All

jurisdictional allegations "are construed in the light most favorable to the

plaintiff and doubts are resolved in the plaintiff's favor[.]" *A.I. Trade Fin., Inc.* v.

*Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993). However, the court "will not

draw argumentative inferences in the plaintiff's favor" and need not "accept as

true a legal conclusion couched as a factual allegation." *In re Terrorist Attacks*,

714 F.3d at 673 (citations omitted); *accord Licci ex rel. Licci* v. *Lebanese*

*Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012).

34

District courts deciding a motion to dismiss for lack of personal jurisdiction engage in a two-part analysis. *First*, the court must establish whether there is "a statutory basis for exercising personal jurisdiction[.]" *Marvel Characters, Inc.* v. *Kirby*, 726 F.3d 119, 128 (2d Cir. 2013). *Second*, the court must decide whether the exercise of jurisdiction comports with due process. *Sonera Holding B.V.* v. *Çukurova Holding A.S.*, 750 F.3d 221, 224 (2d Cir. 2014) (per curiam). In part one of the analysis, the court "applies the forum state's personal jurisdiction rules," unless a federal statute "specifically provide[s] for national service of process." *PDK Labs, Inc.* v. *Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997) (internal quotation marks omitted).

## 2. Analysis

### a. Bases for Exercising Personal Jurisdiction

Plaintiffs proffer several separate bases for exercising personal jurisdiction over Fowler, including RICO's jurisdictional provisions, 18 U.S.C. § 1965(a)-(b); the CEA's jurisdictional provision, 7 U.S.C. § 25(c); New York's long-arm statute, N.Y. C.P.L.R. ("CPLR") § 302(a)(1); and conspiracy jurisdiction as articulated in cases such as *Charles Schwab Corporation* v. *Bank of America Corporation*, 883 F.3d 68 (2d Cir. 2018). Fowler counters that, as a resident of Arizona, he did not "transact[] his affairs" in New York or otherwise have any significant connections to the state. (Fowler Br. 3-5, 6-8).[24]

---

[24]    In their opposition brief, Plaintiffs assert jurisdiction over Fowler under the CEA, which provides that "[p]rocess ... may be served in any judicial district of which the defendant is an inhabitant or wherever the defendant may be found." 7 U.S.C. § 25(c). (*See* Pl. Opp. 76). Fowler does not contest that the Court could properly exercise jurisdiction over him pursuant to this provision, but argues instead that Plaintiffs failed to cite

### i. The Court Has Personal Jurisdiction over Fowler Pursuant to Section 1965(b)

Turning first to the RICO statute, the Court finds that Plaintiffs have

established personal jurisdiction over Fowler pursuant to Section 1965(b),

which provides in relevant part:

> In any action under section 1964 of this chapter in any
> district court of the United States in which it is shown
> that the ends of justice require that other parties
> residing in any other district be brought before the
> court, the court may cause such parties to be
> summoned, and process for that purpose may be served
> in any judicial district of the United States by the
> marshal thereof.

18 U.S.C. § 1965(b). Courts have allowed this provision to be triggered only

after a finding that a court has proper jurisdiction over at least one defendant

under Section 1965(a), which permits the institution of a civil RICO action

"against any person … for any district in which such person resides, is found,

has an agent, or transacts his affairs." 18 U.S.C. § 1965(a); *see also PT United

Can Co.* v. *Crown Cork & Seal Co.*, 138 F.3d 65, 71 (2d Cir. 1998); *Dandong Old

N.-E. Agric. & Animal Husbandry Co.* v. *Hu,* No. 15 Civ. 10015 (KPF), 2017 WL

3328239, at *6 (S.D.N.Y. Aug. 3, 2017). Courts in this Circuit have concluded

that "[t]he phrase 'transacts his or her affairs' contained in § 1965(a) 'has been

---

Section 25(c) as a ground for personal jurisdiction in the Amended Complaint and that
any attempt to raise it in opposition to the instant motion is thus improper. (Fowler
Reply 2-3). Plaintiffs did cite Section 25(c) as a basis for venue, but did not explicitly
list it in the paragraph detailing their bases for jurisdiction in the Amended Complaint.
(CAC ¶¶ 44-45). Because, as discussed *infra*, the Court finds that it has personal
jurisdiction over Fowler pursuant to three independent grounds, the Court need not
address the parties' dispute over the adequacy of Plaintiffs' invocation of Section 25(c) of
the CEA.

held to be synonymous with the "transacts business" language of section 12 of the Clayton Act' and '[t]he test for transacting business for venue purposes under the antitrust laws is co-extensive with the test for jurisdiction under New York CPLR § 302.'" *Arabi* v. *Javaherian*, No. 13 Civ. 456 (ERK) (CLP), 2014 WL 3892098, at \*8 (E.D.N.Y. May 1, 2014) (quoting *City of New York* v. *Cyco.Net, Inc.*, 383 F. Supp. 2d 526, 542 (S.D.N.Y. 2005)).

Here, given the conduct alleged in the Amended Complaint, Plaintiffs easily establish jurisdiction under Section 1965(a) as to the other RICO defendants. For example, Plaintiffs adequately pleaded RICO jurisdiction in New York as to Potter, who is a New York resident, and as to the DigFinex Defendants, who, *inter alia*, are alleged to have harmed Plaintiffs in New York through their manipulation of the cryptocommodity market and to have directed customers to transfer money to New York-based bank accounts in furtherance of their scheme. Therefore, because the scheme as alleged has many ties to New York, the ends of justice are best served by this Court exercising jurisdiction over Fowler under Section 1965(b). *See Hu*, 2017 WL 3328239, at \*6.[25]

---

[25] The parties dispute whether Plaintiffs adequately establish personal jurisdiction over Fowler under Section 1965(a). Plaintiffs allege that Fowler opened correspondent bank accounts in New York on the DigFinex Defendants' behalf, satisfying the "transacts his affairs" language in Section 1965(a). (*See* Pl. Opp. 76-77; CAC ¶¶ 359, 495). Fowler retorts that because the specific bank account Plaintiffs cite in the Amended Complaint was shuttered at the time the complaint was filed, Plaintiffs fail to satisfy Section 1965(a)'s temporal requirement that "[t]he defendant must 'transact[] his affairs in the district at the time the complaint is filed.'" (Fowler Br. 4 (quoting *Gates* v. *Wilkinson*, No. 01 Civ. 3145 (GBD), 2003 WL 21297296, at \*2 (S.D.N.Y. June 4, 2003))). The Court need not resolve this dispute because, as noted herein, the Court has jurisdiction over Fowler pursuant to Section 1965(b), CPLR § 302(a)(1), and conspiracy jurisdiction. Furthermore, for the reasons discussed below, the Court dismisses Plaintiffs' RICO

### ii. The Court Has Personal Jurisdiction over Fowler Pursuant to CPLR § 302(a)(1)

Turning next to New York's long-arm statute, the Court determines that CPLR § 302(a)(1) provides an independent basis for exercising personal jurisdiction over Fowler.  A court may exercise personal jurisdiction over a non-domiciliary defendant who, either "in person or through an agent ... transacts any business within the state or contracts anywhere to supply goods or services in the state."  CPLR § 302(a)(1).  A defendant transacts business within the state if he has "purposefully availed himself of the privilege of conducting activities within New York and thereby invoked the benefits and protections of its laws."  *United States* v. *Prevezon Holdings Ltd.*, 122 F. Supp. 3d 57, 76 (S.D.N.Y. 2015) (internal quotation marks omitted) (quoting *Reich* v. *Lopez*, 38 F. Supp. 3d 436, 457 (S.D.N.Y. 2014), *aff'd*, 858 F.3d 55 (2d Cir. 2017)).  Under New York law, the "transacts business" prong of CPLR 302(a)(1) "may be satisfied by the defendant's use of a correspondent bank account in New York, even if no other contacts between the defendant and New York can be established, if the defendant's use of that account was purposeful."  *Vasquez* v. *Hong Kong & Shanghai Banking Corp., Ltd.*, 477 F. Supp. 3d 241, 253 (S.D.N.Y. 2020) (quoting *Licci* v. *Lebanese Canadian Bank*, 20 N.Y.3d 327, 337 (2012)).

Here, Plaintiffs allege that Fowler created and operated a "shadow" banking network by opening dozens of bank accounts — using a series of front

---

claims entirely, making the viability of personal jurisdiction over Fowler under RICO of minimal importance to future litigation in this action.

companies and his own name — in order to assist the DigFinex Defendants in their scheme. (CAC ¶¶ 180-182, 342-363, 492-500). Plaintiffs allege that "the correspondent account[s] at issue" — including at least one in New York (*id.* at ¶ 359) — were maintained to "be[] used as an instrument to achieve the very wrong alleged," *Licci ex rel. Licci* v. *Lebanese Canadian Bank, SAL*, 732 F.3d 161, 171 (2d Cir. 2013), *viz.*, providing the DigFinex Defendants access to the U.S. banking system in order to cover up their issuance of unbacked USDT and to help Defendants to manipulate the cryptocommodity market (CAC ¶¶ 180-182, 342-363).

Fowler cites *Licci ex rel. Licci* v. *Lebanese Canadian Bank, SAL*, 732 F.3d at 172, for the proposition that a defendant's use of a single bank account in New York is insufficient to establish personal jurisdiction under CPLR § 302(a)(1), because here Plaintiffs allege that Fowler operated an extensive network across numerous states, minimizing the importance of the New York-based account. (Fowler Reply 4). However, *Licci* held that the existence of a single correspondent bank account in New York *was* sufficient to establish personal jurisdiction under CPLR § 302(a)(1), where — as here — plaintiffs pleaded that the account was "used as an instrument to achieve the very wrong alleged," and where the use of the account was "deliberate and recurring." *Licci*, 732 F.3d at 171-72; *see also id.* at 172 n.7 (suggesting that the "use of a forum's banking system as part of an allegedly wrongful course of conduct may expose the user to suits seeking redress in that forum *when that use is an integral part of the wrongful conduct*" (emphasis added)). As such, the Court

39

agrees that Plaintiffs have adequately alleged the means by which Fowler used

New York's "banking system as part of an allegedly wrongful course of

conduct"; that this activity was critical to Fowler's role in the illicit scheme; and

that therefore these allegations sufficiently establish Fowler's "'purposeful

availment of New York's dependable and transparent banking system, the

dollar as a stable and fungible currency, and the predictable jurisdictional and

commercial law of New York and the United States.'"  *Licci*, 732 F.3d at 171-72

(quoting *Licci* v. *Lebanese Canadian Bank*, 20 N.Y.3d at 339); *see generally*

*Vasquez*, 477 F. Supp. 3d at 253-55 (analyzing recent judicial decisions

establishing the limits of the exercise of personal jurisdiction pursuant to CPLR

§ 302(a)(1) based on the defendant's use of New York-based correspondent

bank accounts). [26]

---

[26]     Plaintiffs allege that at least one of these accounts was in New York.  (CAC ¶ 359).  The
Amended Complaint lists more than a dozen additional accounts of unknown
provenance, and Plaintiffs allege that discovery will uncover whether any of these
accounts is also in New York.  (*See id.* at ¶ 495).  Construing jurisdictional allegations
"in the light most favorable to the plaintiff" and resolving disputes "in the plaintiff's
favor," *A.I. Trade Fin., Inc.* v. *Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993), the Court
believes that Plaintiffs have plausibly pleaded that there are additional correspondent
bank accounts located in New York.  However, as discussed *supra* and based on the
facts pleaded in the Amended Complaint, Fowler's use of even the single New York
account on these facts is sufficiently "deliberate and recurring" to establish personal
jurisdiction under CPLR § 302(a)(1), *Licci ex rel. Licci* v. *Lebanese Canadian Bank, SAL*,
732 F.3d 161, 171-72 (2d Cir. 2013), and the Court need not rely on the statistical
likelihood of additional New York-based accounts or order jurisdictional discovery into
the issue.

Furthermore, Plaintiffs cite the 2019 indictment of Fowler in a criminal case arising out
of related conduct as additional support for Fowler's illicit use of correspondent banking
services in New York in connection with the scheme at issue in this case.  *See United
States* v. *Fowler*, No. 19 Cr. 254 (ALC), Dkt. #4 (S.D.N.Y. Apr. 11, 2019).  The Court may
consider the 2019 indictment because it is fairly incorporated by reference in the
Amended Complaint.  (*See* CAC ¶¶ 41 & n.36, 358 & n.208).  However, Fowler
maintains that the Court may not consider a later-filed 2020 superseding indictment,
as it is not fairly incorporated in the Amended Complaint.  (Fowler Reply 3 n.1).  The

Indeed, as Plaintiffs allege, Fowler's ability to facilitate the DigFinex Defendants' access to the U.S. banking system, including through at least one bank account in New York, was a critical component of the illicit scheme, as it allowed Defendants to maintain their fraudulent claim that USDT was fully backed by U.S. dollars, and thus to manipulate the cryptocommodity market through the use of unbacked USDT. (CAC ¶¶ 342-363). Such allegations establish a "substantial relationship between" the conduct alleged and the claim asserted. *See Al Rushaid* v. *Pictet & Cie*, 28 N.Y.3d 316, 329-30 (2016). Accordingly, the Court exercises specific personal jurisdiction over Fowler on the independent ground of New York's long-arm statute.

### iii. Plaintiffs Adequately Allege Conspiracy Jurisdiction over Fowler

Finally, Plaintiffs allege jurisdiction over Fowler by imputing to him the forum contacts of his co-conspirators, citing *Charles Schwab Corporation* v. *Bank of America Corporation*, 883 F.3d at 87. (Pl. Opp. 82-83). In *Schwab*, the Second Circuit clarified that to "alleg[e] a conspiracy theory of jurisdiction[,] the plaintiff must allege that [i] a conspiracy existed; [ii] the defendant participated in the conspiracy; and [iii] a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state." *Id.* at 87 (citing *Unspam Techs., Inc.* v. *Chernuk*, 716 F.3d 322, 329 (4th Cir. 2013)). As recently noted by a sister court in this

---

Court has no need to review the disputed 2020 superseding indictment, as it finds Plaintiffs' allegations to be sufficient without it.

District, "the requirements of conspiracy jurisdiction under New York law are unsettled," but at a minimum, "the requirements for conspiracy jurisdiction announced in *Schwab* appear to be less demanding than those established under the New York long-arm statute." *In re Platinum & Palladium Antitrust Litig.* ("*Platinum II*"), 449 F. Supp. 3d 290, 323 n.24 (S.D.N.Y. 2020). Nevertheless, this Court agrees with Judge Woods's thorough and well-reasoned observations that although "[c]ourts have been increasingly reluctant to extend this theory of [conspiracy] jurisdiction beyond the context of New York's long-arm statute," *In re Platinum & Palladium Antitrust Litig.* ("*Platinum I*"), No. 14 Civ. 9391 (GHW), 2017 WL 1169626, at *49 (S.D.N.Y. Mar. 28, 2017), "any doubts about the continued viability of conspiracy jurisdiction in the Second Circuit were resolved by *Schwab*," *Platinum II*, 449 F. Supp. 3d at 327. Accordingly, the Court considers whether Plaintiffs have adequately established conspiracy jurisdiction under *Schwab*.[27]

On this point, Fowler argues only that Plaintiffs fail to allege his participation in a conspiracy. (Fowler Reply 6). But, as discussed in greater detail below, the Court disagrees and finds that Plaintiffs have adequately alleged Fowler's participation in Defendants' conspiracy. As such, at least on the record currently before the Court, conspiracy jurisdiction exists here because Plaintiffs have adequately alleged: (i) a conspiracy, (ii) in which Fowler participated, and (iii) other Defendants in this case with minimum contacts

---

[27] In any event, and as noted *supra*, personal jurisdiction over Fowler is proper pursuant to New York's long-arm statute.

with New York, and that those "minimum contacts were in furtherance of the conspiracy." *Schwab*, 883 F.3d at 87.[28]

### b.  Due Process Considerations

A defendant satisfies the "minimum contacts" inquiry by making sufficient contacts with the forum state. *Daimler AG* v. *Bauman*, 571 U.S. 117, 144 (2014).  In turn, a defendant makes sufficient contacts by "purposefully availing himself of the privilege of conducting activities within the forum State … thereby invoking the benefits and protections of its laws." *Licci*, 673 F.3d at 61 (internal quotation marks and citation omitted).  If the defendant satisfies the "minimum contacts" requirement, courts consider those contacts in light of five factors to determine whether the exercise of personal jurisdiction is reasonable:

> [i] the burden that the exercise of jurisdiction will impose on the defendant; [ii] the interests of the forum state in adjudicating the case; [iii] the plaintiff's interest in obtaining convenient and effective relief; [iv] the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and [v] the shared interest of the states in furthering substantive social policies.

---

[28]  For example, Plaintiffs allege that Tether, a purported co-conspirator, affirmatively misrepresented USDT's backing by stating to the New York State Office of the Attorney General that "issuances of new [USDT] occur when an investor has requested to purchase [USDT] by depositing U.S. dollars with Tether the company, or by depositing U.S. dollars with a trading platform that is authorized to accept dollar deposits in exchange for USDT." (CAC ¶ 133).  And Plaintiffs allege that Potter, a purported co-conspirator and New York resident, committed overt acts in furtherance of the conspiracy by, *inter alia*, misrepresenting USDT's backing, concealing the links between Bitfinex and Tether, and coordinating with the CC Defendants to improperly access U.S. correspondent banking.  (*See, e.g., id.* at ¶¶ 152-161, 193-258, 219-258).

*Chloe* v. *Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164-65 (2d Cir. 2010)

(citing *Asahi Metal Indus. Co.* v. *Super. Ct. Cal., Solano Cnty.*, 480 U.S. 102, 113

(1987)).

Fowler argues that this Court's exercise of personal jurisdiction over him

would offend due process because he did not "transact business" within New

York.  (*See* Fowler Reply 6-7; *see also* Fowler Br. 12-13).  However, Fowler's

due process objections are simply a rehash of his arguments that the Court

cannot exercise jurisdiction over him pursuant to the RICO statute or CPLR

§ 302(a)(1).  (Fowler Reply 6-7).  Because, as just discussed, the Court rejects

Fowler's arguments, and finds both that nationwide service is proper pursuant

to Section 1965(b), and that specific jurisdiction is appropriate under CPLR

§ 302(a)(1), the exercise of personal jurisdiction over Fowler would not violate

due process.  *See Sonterra Cap. Master Fund Ltd.* v. *Credit Suisse Grp. AG*

("*Sonterra I*"), 277 F. Supp. 3d 521, 589 (S.D.N.Y. 2017); *Prevezon Holdings*,

122 F. Supp. 3d at 77.

## B.   The Moving Defendants' Motions to Dismiss Are Granted in Part and Denied in Part

### 1.   Applicable Law

Having addressed Fowler's jurisdictional challenge to Plaintiffs' suit, the

Court now turns to the merits of the Moving Defendants' four motions to

dismiss.  "To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must

contain sufficient factual matter, accepted as true, to 'state a claim to relief

that is plausible on its face.'"  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).  "A claim is
facially plausible 'when the plaintiff pleads factual content that allows the court
to draw the reasonable inference that the defendant is liable for the misconduct
alleged.'"  *Allco Fin. Ltd.* v. *Klee*, 861 F.3d 82, 94-95 (2d Cir. 2017) (quoting
*Iqbal*, 556 U.S. at 678).  "While *Twombly* does not require heightened fact
pleading of specifics, it does require enough facts to 'nudge [a plaintiff's] claims
across the line from conceivable to plausible.'"  *In re Elevator Antitrust Litig.*,
502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570).  In
resolving a Rule 12(b)(6) motion to dismiss, "the only facts to be considered are
those alleged in the complaint, and the court must accept them, drawing all
reasonable inferences in the plaintiff's favor."  *Doe* v. *Columbia Univ.*, 831 F.3d
46, 48 (2d Cir. 2016); *see generally Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d
Cir. 2016 (discussing documents a court may properly consider in resolving a
motion to dismiss under Rule 12(b)(6)).

## 2.  Analysis

### a.  Sherman Act Claims

The Court begins with the four antitrust claims that Plaintiffs advance
under the Sherman Act:

- Monopolization pursuant to Section 2 of the
  Sherman Act, against the DigFinex Defendants
  (Count One);

- Attempted monopolization pursuant to Section 2
  of the Sherman Act, against the DigFinex
  Defendants (Count Two);

45

- Conspiracy to monopolize pursuant to Section 2 of the Sherman Act, against all Defendants (Count Three); and

- Agreement in restraint of trade pursuant to Sections 1 and 3 of the Sherman Act, against all Defendants (Count Four).

(CAC ¶¶ 389-430). In their motions to dismiss, the Moving Defendants raise myriad arguments, including that: (i) Plaintiffs lack antitrust standing; (ii) Plaintiffs fail to allege that Defendants engaged in anticompetitive conduct; (iii) Plaintiffs inadequately allege Defendants' monopoly power; (iv) Plaintiffs fail to allege an intent to monopolize; and (v) Plaintiffs fail to allege an agreement among Defendants in furtherance of any Sherman Act claim. The Individual Defendants and Fowler further argue that Plaintiffs fail to implicate them individually in any purported antitrust violations. The Court first addresses antitrust injury under the Sherman Act, then turns to each of Plaintiffs' Sherman Act claims, and concludes by resolving the Individual Defendants' and Fowler's arguments against Sherman Act liability. For the reasons that follow, the Court denies the Moving Defendants' motions to dismiss Counts One, Two, and Four, but grants the motions to dismiss Count Three.

### i. Plaintiffs Adequately Allege an Antitrust Injury

Defendants first argue that Plaintiffs lack antitrust standing because Plaintiffs have not adequately alleged an antitrust injury. (B/T Br. 6-7; B/T Reply 6; Potter Br. 6; Potter Reply 3). Assuming the existence of an antitrust violation, the Second Circuit has held that to establish antitrust standing, "a private antitrust plaintiff [must] plausibly ... allege [i] that it suffered a special

46

kind of antitrust injury, and [ii] that it is a suitable plaintiff to pursue the alleged antitrust violations and thus is an 'efficient enforcer' of the antitrust laws." *Gatt Commc'ns, Inc.* v. *PMC Assocs., LLC*, 711 F.3d 68, 76 (2d Cir. 2013) (citations and internal quotations omitted). "[A]ntitrust standing is a threshold, pleading-stage inquiry[.]" *Id.* at 75-76 (quotation omitted).[29]

"'Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation,'" *Associated Gen. Contractors of Cal., Inc.* v. *Cal. State Council of Carpenters*, 459 U.S. 519, 534 (1983) (quoting *Hawaii* v. *Standard Oil Co.*, 405 U.S. 251, 263 n.14 (1972)), but only for those injuries reflecting an "anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation," *Gelboim* v. *Bank of Am. Corp.*, 823 F.3d 759, 772 (2d Cir. 2016) (quoting *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). Determining whether a plaintiff has suffered an antitrust injury involves a three-step process:

> [i] the plaintiff must "identify the practice complained of and the reasons such a practice is or might be anticompetitive"; then [ii] the court must "identify the actual injury the plaintiff alleges" by "look[ing] to the ways in which the plaintiff claims it is in a worse position as a consequence of defendant's conduct"; and finally, [iii] the court must "compare the anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges."

---

[29]  Because the Moving Defendants do not dispute the efficient enforcer prong of the test to establish antitrust standing, the Court only addresses whether Plaintiffs have adequately alleged an antitrust injury.

*City of Long Beach* v. *Total Gas & Power N. Am., Inc.*, 465 F. Supp. 3d 416, 444-

45 (S.D.N.Y. 2020) (quoting *Harry* v. *Total Gas & Power N. Am., Inc.*, 889 F.3d

104, 115 (2d Cir. 2018)). Here, Defendants argue that Plaintiffs have not

alleged an injury to competition because price manipulation — without more —

is insufficiently anticompetitive to establish injury under the Sherman Act.

(*See* B/T Br. 6-8). Plaintiffs counter that antitrust injury is established when a

plaintiff alleges that it transacted in a market subject to price manipulation

and lost money as a result. (Pl. Opp. 12-13). While the Court disagrees with

Plaintiffs' argument that merely purchasing an item in a market subject to

price manipulation necessarily suffices to demonstrate antitrust injury, it

ultimately concludes that Plaintiffs have sufficiently alleged facts to establish

that the price manipulation by which they claim to have been injured was the

product of an anticompetitive scheme.

The Second Circuit has explained that "when consumers, because of a

conspiracy, must pay prices that no longer reflect ordinary market conditions,

they suffer 'injury of the type the antitrust laws were intended to prevent and

that flows from that which makes defendants' acts unlawful.'" *Gelboim*, 823

F.3d at 772 (quoting *Brunswick Corp.*, 429 U.S. at 489). The nature of an

antitrust injury described in *Gelboim* maps easily onto Plaintiffs' claims that

they purchased cryptocommodities at prices artificially produced by

anticompetitive price manipulation. In *Gelboim*, the Second Circuit held that

the manipulation of LIBOR rates by banks that participated in the LIBOR

benchmarking process gave rise to an antitrust injury on the part of those

48

plaintiffs who had transacted in LIBOR-dependent financial instruments. *Id.* at 772-75. Even though the defendants did not "control the market," and even though the plaintiffs were free to negotiate the interest rates attached to certain financial instruments, the Second Circuit nonetheless found that plaintiffs had adequately alleged that they were in a "worse position" because of the defendant banks' horizontal price-fixing and, therefore, had plausibly alleged an antitrust injury. *Id.* at 773-75 ("Even though the members of the price-fixing group were in no position to control the market, to the extent that they raised, lowered, or stabilized prices they would be directly interfering with the free play of market forces." (quoting *United States* v. *Socony-Vacuum Oil Co.*, 310 U.S. 150, 221 (1940) (internal quotation marks omitted))).

Here, although Plaintiffs do not allege the same kind of horizontal price-fixing as in *Gelboim*, they do allege that they were harmed by purchasing cryptocommodities at artificially inflated prices that were the product of Defendants' manipulation of the cryptocommodity market, including, *inter alia*, Defendants' conspiracy to use unbacked USDT to simulate organic demand for cryptocommodities. (*See, e.g.*, CAC ¶¶ 393-394).[30] Defendants' scheme

---

[30]    Defendants argue that the price manipulation alleged in the Amended Complaint was of the type that "any other participant in the market could have made" (B/T Reply 6 (quoting *City of Long Beach* v. *Total Gas & Power N. Am., Inc.*, 465 F. Supp. 3d 416, 447 (S.D.N.Y. 2020))), and is thus insufficiently anticompetitive to establish antitrust standing. The *Long Beach* plaintiff alleged only a Sherman Act Section 2 monopolization claim, and the *Long Beach* court found allegations that the defendant single-handedly "influenced natural gas prices" by "manipulating the Monthly Index Prices by means of its bidweek transactions" insufficient to establish antitrust injury. 465 F. Supp. 3d at 446. The *Long Beach* court explained that price manipulation by a single entity, without more, is insufficient to establish an antitrust injury, because price manipulation on its own "ha[s] nothing to do with competition," and because the plaintiff "d[id] not allege that [defendant's strategically-timed trades] involved the willful

purportedly aimed to and succeeded in intentionally creating an anticompetitive market by artificially inflating prices of cryptocommodities. Because Plaintiffs have alleged that their "loss[es] stem[ ] from a competition-reducing aspect or effect of the [Defendants'] behavior," *Atl. Richfield Co.* v. *USA Petroleum Co.*, 495 U.S. 328, 329 (1990) (emphasis omitted) — namely, Defendants' agreement to use USDT to manipulate cryptocommodity prices — Plaintiffs' alleged "injury is of the type the antitrust laws were intended to prevent and that flows from that which makes [or might make] Defendants' acts unlawful" *Gatt*, 711 F.3d at 76 (citations and internal quotation marks omitted); *see also Merced Irrigation Dist.* v. *Barclays Bank PLC*, 165 F. Supp. 3d 122, 133 (S.D.N.Y. 2016) (holding that plaintiff who purchased electricity at artificially inflated prices due to Defendants' price manipulation, "instead of [at prices derived from] the forces of supply and demand," alleged antitrust injury),

---

attainment, maintenance, or exercise of monopoly power." *Id.* at 446-47; *see also id.* at 447 n.163 (declining to hold that antitrust injury can be established by allegations of paying higher supra-competitive prices or receiving lower sub-competitive prices as a result of a defendant's rate-manipulation).

The instant case is distinguishable from *Long Beach*. *First*, the *Long Beach* court noted that antitrust injury could be established by pleading a conspiracy to manipulate prices. 465 F. Supp. 3d at 445-46. Here, Plaintiffs do allege a conspiracy among Defendants to artificially inflate cryptocommodity prices using unbacked USDT, and provide detailed allegations of Defendants' scheme to engage in anti-competitive price-fixing. (*See, e.g.*, CAC ¶¶ 310-366, 417-430). *Second*, Plaintiffs allege more than "strategically timed trades," *Long Beach*, 465 F. Supp. 3d at 447, in an otherwise healthy market because the trades here were executed using unbacked USDT with the intent to manipulate the market. Specifically, Plaintiffs describe how the DigFinex Defendants' monopoly control over the stablecoin market allowed them, with the purported assistance of the CC and Exchange Defendants, to manipulate prices in the cryptocommodity market by issuing unbacked USDT to create the illusion of price floors and organic market demand when neither existed, causing appreciable manipulation in the price of cryptocommodities. (*See id.* at ¶¶ 393-394). As such, Plaintiffs plead more than antitrust injury caused by strategically timed purchases that any market participant could make, which the *Long Beach* court held was insufficiently anticompetitive to state a Section 2 claim.

*reconsideration denied*, 178 F. Supp. 3d 181 (S.D.N.Y. 2016). The Court therefore finds that Plaintiffs have adequately pleaded an antitrust injury.

### ii. Section 2 Claims

Plaintiffs allege a claim for monopolization, or in the alternative, attempted monopolization, in violation of Section 2 of the Sherman Act against the DigFinex Defendants. (CAC ¶¶ 389-409). Plaintiffs further allege a violation of Section 2 against all Defendants for engaging in a conspiracy to monopolize the cryptocommodity market. (*Id.* at ¶¶ 410-416). The Court first addresses Plaintiffs' Section 2 claims against the DigFinex Defendants, and then addresses the broader conspiracy to monopolize claim brought against all Defendants.

### (a) Plaintiffs Adequately Allege a Monopolization Claim

"[T]o state a claim for monopolization under Section 2 of the Sherman Act, a plaintiff must establish: '[i] the possession of monopoly power in the relevant market and [ii] the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *PepsiCo, Inc.* v. *Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (quoting *United States* v. *Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)). "Inherent to the second element, there must be a showing of anticompetitive conduct." *In re Term Commodities Cotton Futures Litig.* ("*Cotton Futures I*"), No. 12 Civ. 5126 (ALC), 2013 WL 9815198, at *23 (S.D.N.Y. Dec. 20, 2013) (citing *Verizon Commc'ns Inc.* v. *Law Offices of Curtis*

51

*V. Trinko, LLP*, 540 U.S. 398, 407 (2004)), *on reconsideration in part,* 2014 WL 5014235 (S.D.N.Y. Sept. 30, 2014).  For the reasons discussed below, the Court denies the motions to dismiss Plaintiffs' monopolization claim.

### *Monopoly Power*

"There are two ways a plaintiff can show the possession of monopoly power: [i] through direct evidence of anticompetitive effects or [ii] by defining a relevant market and showing defendants' excess market share." *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 51 (S.D.N.Y. 2012) (citing *PepsiCo*, 315 F.3d at 107).  "[M]onopoly power may be established, not only by proof of a defendant's market share in a relevant market, but alternatively by direct evidence of a defendant's price control or exclusion of competitors from a particular market in a manner indicative of its possession of monopoly power." *Shak* v. *JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 482 (S.D.N.Y. 2016); *see also Heerwagen* v. *Clear Channel Commc'ns*, 435 F.3d 219, 227 (2d Cir. 2006); *Geneva Pharm. Tech. Corp.* v. *Barr Labs. Inc.*, 386 F.3d 485, 500 (2d Cir. 2004); *Tops Mkts., Inc.* v. *Quality Mkts., Inc.*, 142 F.3d 90 (2d Cir. 1998).

Here, Plaintiffs argue that they have adequately pleaded the DigFinex Defendants' monopoly power in the cryptocommodity market by establishing their direct control over prices, which control Plaintiffs argue was accomplished through Defendants' "dominat[ion of] the stablecoin market."  (CAC ¶¶ 393-394; *see* Pl. Opp. 14-16; *see also* CAC ¶¶ 34-78 (delimiting the cryptocommodity market)).  In particular, Plaintiffs allege that Defendants leveraged their domination of the stablecoin market to capture market power in

the cryptocommodity market by issuing unbacked USDT to simulate organic market demand for cryptocurrencies.  (CAC ¶ 393).  The DigFinex Defendants argue that Plaintiffs must allege more than direct control over prices to adequately plead monopoly power (B/T Br. 9-10; B/T Reply 2-3), because "whatever 'power' the Defendants had over prices arose from the allegedly manipulative scheme" (B/T Br. 9), and further argues that the scheme "had nothing to do with exploiting a market-dominant position to unilaterally move markets" (B/T Reply 2-3).

Plaintiffs rely primarily on three cases to support their argument that pleading evidence of Defendants' ability to control prices is sufficient to establish monopoly power.  *First*, in *In re Crude Oil Commodity Futures Litigation*, the plaintiffs alleged that the defendants amassed a dominant position in physical crude oil — 92% of the market — and then dumped the commodity onto the market on certain dates with the purpose and effect of shifting futures prices, so as to benefit the defendants' positions in certain calendar spreads in the futures market.  *See* 913 F. Supp. 2d at 49-50.  The *Crude Oil* court found these allegations of control over prices in the futures market — along with allegations of domination in the closely-related physical commodity market — sufficient to plead monopoly power.  *Id.* at 52-53.

*Second*, in *Cotton Futures I*, the plaintiffs alleged that the defendants acquired 99% of the market share for two futures contracts during the relevant period, which they used to "effectuate[] a squeeze" that forced others to pay artificially high prices in order to settle their contracts.  2013 WL 9815198, at

*23-25.  The *Cotton Futures I* court found that the plaintiffs' allegations concerning the defendants' control over prices and dominant market share were sufficient to plead monopoly power.  *Id.* at *25; *see also In re Term Commodities Cotton Futures Litig.* ("*Cotton Futures II*"), No. 12 Civ. 5126 (ALC), 2020 WL 5849142, at *35-36 (S.D.N.Y. Sept. 30, 2020) (holding that plaintiffs established monopoly power on summary judgment by demonstrating control over prices without reference to defendants' relative domination of the market).

*Third*, in *Merced Irrigation District* v. *Barclays Bank PLC*, the plaintiff alleged that the defendant manipulated the daily index prices for electricity by purchasing swaps contracts, purchasing physical electricity contracts in the opposite direction from the swaps, and then buying or selling "large quantities of underlying daily contracts at artificial money-losing prices."  165 F. Supp. 3d at 129-30.  The *Merced* plaintiff alleged that the defendant's "large position in swap contracts and significant trading in daily contracts" manipulated the index price.  *Id.* at 131.  The *Merced* court held that these allegations, plus evidence from the complaint of the correlation between the defendant's uneconomical, anti-competitive trading and the index price, established that the defendant "successfully capture[d] market share sufficient to move index prices in its favor," and thus that plaintiff adequately pleaded monopoly power through the ability to control prices.  *Id.* at 142.

As noted above, "it is well-settled law in this Circuit that 'pleading a defendant's direct control over prices is an alternative to pleading relevant market share.'" *Cotton Futures II*, 2020 WL 5849142, at *36 (quoting *Merced*,

54

165 F. Supp. 3d at 141) (collecting cases). However, the DigFinex Defendants argue that Plaintiffs must still plead some form of relative market share, even when establishing monopoly power via direct evidence of control over prices. (B/T Reply 3-4). In support of this argument, Defendants note that in *Crude Oil*, the plaintiffs had alleged that the defendants controlled 92% of the market for physical crude oil when the market at issue was a futures market, and that in *Cotton Futures I,* the plaintiffs had alleged temporary control of 99% of the market at issue. (B/T Reply 3 (first citing *Crude Oil*, 913 F. Supp. 2d at 52, 57; then citing *Cotton Futures I*, 2013 WL 9815198, at *15, 24-25)). Defendants quote with approval Judge Engelmayer's synthesis of *Crude Oil* and *Cotton Futures I* in *Shak* v. *JPMorgan Chase & Co.*, to the effect that "concrete allegations *of a dominant position* in either a physical commodity or a related futures market, combined with significant pricing anomalies that are closely correlated with defendants' alleged conduct, *may* be sufficient to plead monopoly power." (*Id.* at 4 (emphases in B/T Reply) (quoting *Shak*, 156 F. Supp. 3d at 485)). The DigFinex Defendants thus argue that Plaintiffs' failure to provide "concrete allegations of a dominant position" in the cryptocommodity market is fatal to their monopolization claim. (*Id.*).

The Court's reading of *Crude Oil* leads it to conclude that Plaintiffs have alleged monopoly power by showing direct evidence of anticompetitive effects through price control. In *Crude Oil*, the plaintiffs alleged that the defendants had amassed a dominant position in a market closely related to the market at issue — they dominated the physical crude oil market and manipulated the

55

futures market — and Judge Pauley inferred monopoly power in the futures market from defendants' ability to control prices. *Crude Oil*, 913 F. Supp. 2d at 49-52. Similarly, Plaintiffs here allege that the DigFinex Defendants maintained a "nearly 100% market share" of the stablecoin market, and leveraged their dominant market share in stablecoin to directly control prices in the closely-related cryptocommodity market. (CAC ¶¶ 135-136, 272-279, 295-300, 393-394).

*Merced* offers even greater support for Plaintiffs' argument. In *Merced*, Judge Marrero rejected an argument nearly identical to the one advanced by Defendants here, and held that allegations of the defendant's ability to control prices through manipulative trading, without allegations of its dominant market share, sufficiently pleaded monopoly power at the motion to dismiss stage. *Merced*, 165 F. Supp. 3d at 141-42; *see also id.* at 142 ("Merced presents factual allegations that Barclays did successfully capture market share sufficient to move index prices in its favor."). Here, Plaintiffs have similarly provided concrete allegations of the DigFinex Defendants' direct control over prices through manipulative trading; unlike in *Merced*, they have also provided detailed allegations of how Defendants exploited their monopoly control over a related market to exert anticompetitive control over prices in the cryptocommodity market.

While Defendants are correct that, in holding that the plaintiffs adequately pleaded monopoly power in *Cotton Futures*, Judge Carter cited both the defendants' ability to directly control prices and their "control[] [of] 99% of

the relative market during the relevant period," this Court's reading of *Cotton Futures I* does not establish that Judge Carter required satisfaction of both elements to establish monopoly power.  *See Cotton Futures I*, 2013 WL 9815198, at *24-25.  Rather, Judge Carter analyzed first whether the plaintiffs had established market power by pleading market share, and then whether the plaintiffs had established monopoly power by pleading the defendants' "direct ability to control prices," ultimately concluding that both sets of allegations provided support for a finding of monopoly power.  *Id.*  Indeed, in *Cotton Futures II*, Judge Carter cited only the defendants' ability to control prices — and not the defendants' market share — as grounds for denying summary judgment with respect to the monopoly power element of the plaintiffs' Section 2 monopolization claim.  2020 WL 5849142, at *35-36.  In any event, while Plaintiffs have not provided concrete allegations that the DigFinex Defendants controlled a dominant share of the cryptocommodity market, as noted above, they have provided detailed allegations of how the DigFinex Defendants used their dominance of the closely related stablecoin market to manipulate prices in the cryptocommodity market, bringing this case closer to *Crude Oil* than to Defendants' reading of *Cotton Futures I*.[31]

---

[31]     Defendants also cite *Long Beach* for the proposition that allegations of price manipulation without more are insufficient to establish monopoly power.  (B/T Reply 3 (citing *Long Beach*, 465 F. Supp. 3d at 447)).  For starters, *Long Beach* did not reach the issue of monopoly power, dismissing the plaintiff's Section 2 claim for lack of antitrust injury.  *Long Beach*, 465 F. Supp. 3d at 446-47.  However, to the extent *Long Beach* says anything about pleading monopoly power, it is distinguishable for essentially the same reasons the Court believes the decision is distinguishable with respect to antitrust injury.  Here, Plaintiffs allege more than simple, strategic purchases in an otherwise healthy market by connecting the DigFinex Defendants' monopoly control over the

To be sure, Judge Engelmayer's synthesis of *Crude Oil* and *Cotton Futures* called for "concrete allegations of a dominant position in either a *physical commodity* or a related *futures* market." *Shak*, 156 F. Supp. 3d at 485 (emphases added). In the instant case, however, given the unique qualities of the cryptocommodity market and its close relationship to the stablecoin market (*see, e.g.*, CAC ¶¶ 119, 135-136, 165-168, 172, 175), the Court believes that Plaintiffs' allegations establishing the DigFinex Defendants' dominance over the stablecoin market accord with the rationales of *Cotton Futures* and *Crude Oil*, as articulated by Judge Engelmayer in *Shak*. Put differently, Plaintiffs have provided "concrete allegations of [Defendants'] dominant position" in a "related ... market," and have pleaded "significant pricing anomalies that are closely correlated with defendants' alleged conduct," which is "sufficient to plead monopoly power." *Shak*, 156 F. Supp. 3d at 485. Here, Plaintiffs have adequately alleged the DigFinex Defendants' ability to control prices in the cryptocommodity market by describing an improper scheme whereby Defendants leveraged their near-100% share in the stablecoin market to issue unbacked USDT to simulate organic demand and create artificial price floors. (*See* CAC ¶¶ 135-136, 272-279, 295-300, 393-394).[32] At the motion to dismiss stage, this is sufficient to establish monopoly power.

---

stablecoin market to their ability to control prices in the cryptocommodity market. (*See, e.g.*, CAC ¶¶ 393-394).

[32] The DigFinex Defendants compare the monthly trading volumes of USDT on the Bittrex and Poloniex exchanges to the total amount of unbacked USDT they allegedly issued to argue that, according to the Amended Complaint, Tether did not have a monopoly in the stablecoin market. (*See* B/T Reply 4). This fact-based argument fails for at least two reasons. *First*, Plaintiffs adequately allege Tether "had nearly 100% market share in

### *Willful Acquisition of Monopoly Power*

The second element of a Section 2 claim is demonstrating "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *PepsiCo*, 315 F.3d at 105 (quoting *Grinnell Corp.*, 384 U.S. at 570-71). As discussed above, as part of this element, Plaintiffs must show anticompetitive conduct. *See Verizon Commc'ns Inc.*, 540 U.S. at 407 ("To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*."). "The Second Circuit has defined anticompetitive conduct as 'conduct without a legitimate business purpose that makes sense only because it eliminates competition.'" *Cotton Futures II*, 2020 WL 5849142, at *37 (quoting *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014)).

Here, none of the DigFinex Defendants' statements explicitly articulates an intent to build a monopoly in the cryptocommodity market or to exclude competition. Plaintiffs argue that "[i]ntentional distortion of a commodities

---

stablecoin," citing a statement by Bitfinex's and Tether's Chief Technical Officer to that effect. (*See, e.g.*, CAC ¶¶ 135-136). *Second*, and more fundamentally, the comparison of monthly trading volume to the absolute number of unbacked USDT issued by the DigFinex Defendants says nothing about Defendants' market share or control of the stablecoin market. Plaintiffs allege that Tether issued nearly 100% of the stablecoin for much of the relevant time period, and that much of it was unbacked and issued directly to Bitfinex, making Plaintiffs' allegation of the DigFinex Defendants' monopoly power in the stablecoin market plausible. (*See id.* at ¶¶ 136, 208). "A court ruling on a Rule 12(b)(6) motion 'may not properly dismiss a complaint that states a plausible version of events merely because the court finds a different version more plausible.'" *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 688 (S.D.N.Y. 2012) (quoting *Anderson News LLC* v. *Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012)). Thus, the Court rejects this fact-based counternarrative at the motion to dismiss stage.

market through manipulation for profit is anticompetitive," and that from this, the Court can infer willful acquisition of monopoly power. (Pl. Opp. 17). The DigFinex Defendants protest that Plaintiffs must further allege specific facts regarding their willfulness to "exclude ... other participant[s] [from] entering the cryptocommodities market," or to "control[] bitcoin or other cryptocommodity supply in a way that excluded competitors from participating." (B/T Br. 10).

Plaintiffs have adequately pleaded willful acquisition by offering evidence of the DigFinex Defendants' scheme to leverage their monopoly position in the stablecoin market to artificially inflate cryptocommodity prices for profit and anticompetitive effect. (*See* CAC ¶¶ 394-395). In other words, Plaintiffs have plausibly alleged conduct from which the Court can draw a reasonable inference of the DigFinex Defendants' intent to control prices, and thus to "constrain the market for other buyers and sellers" of cryptocommodities. *Merced*, 165 F. Supp. 3d at 143. Specific allegations in support of this finding include: (i) the timing and volume of Bitfinex's seemingly irrational purchases of large quantities of bitcoin with USDT when bitcoin prices dropped by more than 5% or to certain threshold prices (CAC ¶¶ 277, 289, 295-296); (ii) evidence of the DigFinex Defendants' scheme to cover up links between Tether and Bitfinex (*id.* at ¶¶ 152-161); (iii) Tether's and Bitfinex's repeated misrepresentations that each USDT was fully backed by one U.S. dollar (*id.* at ¶¶ 116-117, 119-134, 147-151); and (iv) Devasini's messages to Crypto Capital explicitly acknowledging the link between maintaining the illusion of USDT's

60

one-to-one backing and the price of bitcoin (and other cryptocommodities) (*id.* at ¶ 362).

Putting it colloquially, Plaintiffs allege that the DigFinex Defendants "print[ed]" the crypto-equivalent of money "out of thin air" (Pl. Opp. 1), and then used that counterfeit "money" to purchase cryptocommodities when prices of those commodities began tanking, increasing Defendants' market share through anticompetitive means and, more critically, artificially inflating cryptocommodity prices divorced from any legitimate market forces. A rational market actor would be unlikely to make large purchases of cryptocommodities when the prices of those commodities dropped significantly — as Plaintiffs allege here (CAC ¶¶ 277, 289, 295-296) — supporting the inference that the DigFinex Defendants "willful[ly] maint[ained] power" "to distort ordinary forces of supply and demand" through "uneconomical physical trading positions." *Merced*, 165 F. Supp. 3d at 143.

It remains to be seen whether Plaintiffs will be able to establish willful acquisition in discovery. But taking the allegations in the Amended Complaint as true and drawing all reasonable inferences in Plaintiffs' favor, Plaintiffs plausibly allege the DigFinex Defendants' willful intent to acquire monopoly power. Accordingly, the motions to dismiss Count One are denied.

### (b)    Plaintiffs Adequately Allege an Attempted Monopolization Claim

To the extent the DigFinex Defendants "did not or do not possess actual monopoly power," Plaintiffs assert a claim for attempted monopolization under

Section 2 of the Sherman Act. (CAC ¶ 402; *see id.* at ¶¶ 400-409). "To state a claim for attempted monopolization in violation of Section 2, a plaintiff must allege '[i] that the defendant has engaged in predatory or anticompetitive conduct with [ii] a specific intent to monopolize and [iii] a dangerous probability of achieving monopoly power.'" *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 219 (S.D.N.Y. 2019) (quoting *Spectrum Sports, Inc.* v. *McQuillan*, 506 U.S. 447, 456 (1993)), *reconsideration denied*, No. 14 MDL 2542 (VSB), 2019 WL 2603187 (S.D.N.Y. June 25, 2019); *see also Tops Mkts.*, 142 F.3d at 99. For the reasons discussed above, Plaintiffs have already adequately pleaded elements one and three of an attempted monopolization claim, because the DigFinex Defendants "successfully capture[d] market share sufficient to move [cryptocommodity] prices in [their] favor." *Merced*, 165 F. Supp. 3d at 140, 142 (denying motion to dismiss attempted monopolization claim).

However, while "the completed offense of monopolization requires only a general intent, 'a specific intent to destroy competition or build monopoly is essential to guilt for the mere attempt.'" *Tops Mkts.*, 142 F.3d at 101 (quoting *Times-Picayune Publ'g Co.* v. *United States*, 345 U.S. 594, 626 (1953)). The Supreme Court has characterized specific intent as "an intent which goes beyond the mere intent to do the act[,]" contrasting it with a claim for actual monopolization, where "evidence of intent is merely relevant to the question whether the challenged conduct is fairly characterized as 'exclusionary' or 'anticompetitive.'" *Aspen Skiing Co.* v. *Aspen Highlands Skiing Corp.*, 472 U.S.

62

585, 602 (1985).  Here, as noted above, the DigFinex Defendants' statements do not contain any explicit attestations of specific intent to build monopoly or to exclude competitors.  Nevertheless, and for the same reasons the Court finds Plaintiffs' allegations regarding willful acquisition to be plausible, the Court believes that Plaintiffs have sufficiently pleaded facts to survive a motion to dismiss with respect to the intent element of an attempted monopolization claim.  *See Tops Mkts.*, 142 F.3d at 101-02 (holding that specific intent can be "reasonably infer[red]" from defendants' uneconomic conduct, which a jury could determine "was not motivated by a valid business justification" (collecting cases)).

In sum, to the extent discovery reveals that the DigFinex Defendants did not possess monopoly power, Plaintiffs may maintain their attempted monopoly claim and seek to meet the lower threshold required to demonstrate "a dangerous probability" of achieving monopoly power.  *Tops Mkts.*, 142 F.3d at 100).  The motions to dismiss Count Two are therefore denied.

### (c) Plaintiffs' Section 2 Conspiracy to Monopolize Claim Is Dismissed

In contrast to their Section 2 monopolization and attempted monopolization claims, brought only against the DigFinex Defendants, Plaintiffs assert a Section 2 conspiracy to monopolize claim against all Defendants.  (CAC ¶¶ 410-416).  A claim for conspiracy to monopolize under Section 2 requires a showing of: "[i] concerted action, [ii] overt acts in furtherance of the conspiracy, and [iii] specific intent to monopolize." *Elecs.*

*Commc'ns Corp.* v. *Toshiba Am. Consumer Prod., Inc.*, 129 F.3d 240, 246 (2d Cir. 1997) (quoting *Volvo N. Am. Corp.* v. *Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 74 (2d Cir. 1988)); *see also Shak*, 156 F. Supp. 3d at 490-91 (same). Furthermore, because "a Section 2 conspiracy claim based on a shared monopoly theory" is not viable, *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 382 (S.D.N.Y. 2016) (citing *H.L. Hayden Co. of N.Y.* v. *Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1018 (2d Cir. 1989)) (collecting cases), Plaintiffs must allege that Defendants conspired to confer monopoly power upon a single entity.

Here, the Amended Complaint appears to plead a shared monopoly theory, inasmuch as Plaintiffs do not specify which entity Defendants conspired to confer monopoly power upon, and instead plead that all Defendants "took these [anticompetitive] actions with the specific intent to obtain market power[.]" (CAC ¶ 414; *see generally id.* at ¶¶ 410-416). But as just explained, a shared monopoly theory cannot support a Section 2 claim. *See FLM Collision Parts, Inc.* v. *Ford Motor Co.*, 543 F.2d 1019, 1030 (2d Cir. 1976) (explaining that allegations of a "shared monopoly" amount to no more than a "[Section] 1 claim under another name"); *In re Aluminum Warehousing Antitrust Litig.*, No. 13 MDL 2481 (KBF), 2014 WL 4277510, at *36 (S.D.N.Y. Aug. 29, 2014) (same), *supplemented*, 2014 WL 4743425 (S.D.N.Y. Sept. 15, 2014), *and aff'd*, 833 F.3d 151 (2d Cir. 2016).

To the extent Plaintiffs argue that the Exchange and CC Defendants intended to assist the DigFinex Defendants in monopolizing the cryptocommodity market, the supporting allegations in the Amended

Complaint fall short. There are no allegations regarding the Exchange Defendants' intent to assist the DigFinex Defendants to monopolize, for example, by refusing to allow transactions to or from other crypto-exchanges or by restricting other exchanges' or users' access to fiat currency, cryptocommodities, or USDT. Similarly, there are no allegations regarding Fowler's intent to assist the DigFinex Defendants in monopolizing the cryptocommodity market by refusing to provide U.S. correspondent banking to competitors or providing specialized treatment to the DigFinex Defendants. As such, Count Three must be dismissed.[33]

### iii. Plaintiffs Adequately Allege That Defendants Conspired to Restrain Trade in Violation of Sections 1 and 3 of the Sherman Act

Separately, Plaintiffs allege that all Defendants conspired to inflate cryptocommodity prices in violation of Sections 1 and 3 of the Sherman Act. Section 1 of the Sherman Act prohibits restraints on trade "effected by a contract, combination, or conspiracy[.]" *Twombly*, 550 U.S. at 553.[34] "The critical question for purposes of a Section 1 claim is whether the challenged

---

[33] To the extent the Amended Complaint contains allegations supporting a cognizable shared monopolization theory, Plaintiffs fail to plead the Exchange and CC Defendants' specific intent to monopolize, the third element required to establish a Section 2 conspiracy to monopolize claim. Rather, and as discussed in greater detail below, Plaintiffs' Amended Complaint more properly describes an agreement, *inter alia*, in restraint of trade or to manipulate cryptocommodity prices for profit — not to reduce competition in that market or exclude competitors from the market. Plaintiffs accordingly fail to plead the Exchange Defendants' or the CC Defendants' (including Fowler's) specific intent to monopolize, and as such, this claim must be dismissed for this independent reason.

[34] Section 3 simply "extends the reach of Section 1 to trade or commerce involving U.S. Territories and the District of Columbia." *Spinelli* v. *Nat'l Football League*, 96 F. Supp. 3d 81, 107 n.10 (S.D.N.Y. 2015).

65

anticompetitive conduct 'stems from independent decision or from an agreement, tacit or express.'" *Merced*, 165 F. Supp. 3d at 137 (quoting *Twombly*, 550 U.S. at 553). To state a claim under Section 1 of the Sherman Act, a plaintiff must show "[i] a combination or some form of concerted action between at least two legally distinct economic entities that [ii] unreasonably restrains trade." *United States* v. *Am. Express Co.*, 838 F.3d 179, 193 (2d Cir. 2016). The Court addresses each element in turn.

### *Conspiracy*

With respect to the first element, "[t]o allege an unlawful agreement under Section One of the Sherman Act, Plaintiffs must assert either direct evidence (such as a recorded phone call or email in which competitors agreed to fix prices) or 'circumstantial facts supporting the *inference* that a conspiracy existed.'" *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 659 (S.D.N.Y. 2016) (quoting *Mayor & City Council of Balt.* v. *Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013)); *see also Gelboim*, 823 F.3d at 781 ("At the pleading stage, a complaint claiming conspiracy, to be plausible, must plead 'enough factual matter (taken as true) to suggest that an agreement was made[.]'" (quoting *Anderson News*, 680 F.3d at 184)). Because "'conspiracies are rarely evidenced by explicit agreements,'" however, a conspiracy "'nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators.'" *Gelboim*, 823 F.3d at 781 (quoting *Anderson News*, 680 F.3d at 183). "The line separating conspiracy from parallelism is indistinct, but may be crossed with allegations of interdependent conduct, accompanied by

66

circumstantial evidence and plus factors." *Id.* (internal quotation marks omitted) (quoting *Mayor & City Council of Balt.*, 709 F.3d at 136). Those illustrative, non-exhaustive "plus factors" include "[i] a common motive to conspire; [ii] evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators; and [iii] evidence of a high level of interfirm communications." *Id.* (internal quotation marks omitted) (quoting *Mayor & City Council of Baltimore*, 709 F.3d at 136). "[A]t the motion-to-dismiss stage, appellants must only put forth sufficient factual matter to plausibly suggest an inference of conspiracy, even if the facts are susceptible to an equally likely interpretation." *Id.* at 782.

Applying the foregoing principles here, the Court concludes that Plaintiffs plausibly allege that Defendants engaged in an antitrust conspiracy. Plaintiffs offer the following allegations to demonstrate the existence of an agreement between Defendants to manipulate the price of cryptocommodities:

- Defendants' misrepresentations to the market that USDT was fully backed by U.S. dollars (CAC ¶¶ 116, 125-135, 147-150, 165-167, 173-174);

- Defendants' knowing concealment of the unbacked nature of USDT: for example, the Exchange Defendants violated regulations that would have revealed the truth of USDT's backing (*id.* at ¶¶ 331-333), and the CC Defendants facilitated access to the U.S. banking system to assist the DigFinex Defendants in preserving the illusion of USDT's backing (*id.* at ¶¶ 342-366);

- The Exchange Defendants' willing facilitation of the distribution of unbacked USDT from Bitfinex-controlled accounts on the Bitfinex exchange, to Bitfinex-controlled accounts on the Poloniex and

67

Bittrex exchanges, because, for example, the Exchange Defendants were able to see every trade on their platform and were required to know basic information about their users pursuant to anti-money laundering regulations, and as such knew or should have known that Bitfinex controlled those accounts and that USDT was not fully backed (*id.* at ¶¶ 195-207, 310-324);

- The Exchange Defendants' knowing facilitation of the use of that unbacked USDT to buy large quantities of cryptocommodities with the intent to inflate the price of those cryptocommodities (*id.* at ¶¶ 260-271, 320-324);

- Specific communications about the need to preserve the illusion of USDT's full backing to preserve the value of bitcoin (*id.* at ¶ 362);

- Close communication and coordination between the DigFinex Defendants and the Exchange Defendants with respect to the use of USDT on their respective crypto-exchanges (*id.* at ¶¶ 318-319); and

- The fact that the Exchange Defendants and DigFinex Defendants coordinated in response to the publication of the Tether Report to minimize the conspicuousness of their unusual activity (*id.* at ¶¶ 212-215).

Plaintiffs also allege a common intent and common motive, to wit, the intent to stop the prices of cryptocommodities from falling, and to artificially increase prices in the cryptocommodity market, because each Defendant's continued viability was wholly dependent on the continued growth of the cryptocommodity market and each stood to profit significantly from the bubble in the cryptocommodity market. (*Id.* at ¶¶ 187, 341-340, 364, 366).[35]

---

[35]    Furthermore, as Plaintiffs note, allegations that the Bitfinex and Tether Defendants were under investigation by the New York State Attorney General (CAC ¶¶ 367-371; *see*

The Moving Defendants' arguments to the contrary fall short. The B/T and Exchange Defendants argue that Plaintiffs fail to cite to communications among Defendants specifically regarding the conspiracy. (B/T Br. 13; Exchange Br. 9). Yet Plaintiffs do cite evidence of interfirm communications between the purported conspirators (*see* CAC ¶¶ 318-319), and further cite specific evidence of communications about the conspiracy between Devasini and the CC Defendants (*see id.* at ¶ 362). More fundamentally, at the motion to dismiss stage, the failure to quote specific communications is not fatal to a Section 1 claim if the other circumstantial evidence "'support[s] the inference that a conspiracy existed.'" *Mayor & City Council of Balt.*, 709 F.3d at 136 (emphasis omitted).

The B/T Defendants, Exchange Defendants, and Fowler all argue that they acted in their respective self-interests (*see* B/T Br. 13, Exchange Br. 12, Fowler Br. 10, Fowler Reply 16), such that their actions in furtherance of the agreement, as alleged in the Amended Complaint, could not be viewed as "against [their] apparent individual economic self-interest[s],'" *Gelboim*, 823 F.3d at 781.[36] However, Plaintiffs plausibly allege that these groups of

---

*also* Dkt. #176), are an additional "plus factor" bolstering the plausibility of a Section 1 claim. *See City of Philadelphia* v. *Bank of Am. Corp.*, 498 F. Supp. 3d 516, 526 (S.D.N.Y. 2020) (collecting cases).

[36] The Exchange Defendants attempt to characterize the allegations as making them "strictly liable for market manipulation on their exchanges." (Exchange Reply 4). However, as noted above, Plaintiffs allege far more than that the DigFinex Defendants merely carried out market manipulation in the ordinary course of using the Exchange Defendants' platforms. For example, Plaintiffs plausibly allege the Exchange Defendants: (i) knew of and agreed to cover up the unbacked nature of USDT; (ii) facilitated unusually large and repeated transfers of unbacked USDT to the same accounts on their exchanges; (iii) knew the DigFinex Defendants controlled those accounts; and (iv) allowed the DigFinex Defendants to trade large quantities of that

69

Defendants acted against self-interest.  For example, Plaintiffs allege that:
(i) the Exchange Defendants violated federal and state law to protect the
economic interest of a direct competitor (*see* CAC ¶¶ 331-333); (ii) the DigFinex
Defendants purchased large quantities of cryptocommodities when prices
began to fall (*id.* at ¶¶ 277, 289, 295-296); and (iii) Fowler repeatedly violated
banking regulations to further the scheme (*id.* at ¶¶ 351-361).  Additionally, as
noted above, Plaintiffs plead equally plausible economic motives for Defendants
to engage in the scheme: all three groups of Defendants (*i.e.*, the DigFinex,
Exchange, and CC Defendants) were heavily invested in, and completely
dependent on, the continued viability and growth of the cryptocommodity
market.  (*Id.* at ¶¶ 340, 364).  Furthermore, Defendants stood to profit by
artificially inflating the value of their cryptocommodity stores.  (*Id.* at ¶¶ 187,
341, 366).

    The Exchange Defendants further ask the Court to draw factual
inferences in their favor instead of Plaintiffs', for example, by (i) accepting the
Exchange Defendants' proffer that the owner of the 1AA6 and 1J1d accounts
was unaffiliated with Bitfinex and was engaged in lawful arbitrage trading
(Exchange Br. 4-6); (ii) accepting the Exchange Defendants argument that they
had no insight into the common ownership of Tether and Bitfinex, despite
factual allegations in the Amended Complaint to the contrary (*id.* at 6-7, 10-
11); (iii) rejecting Plaintiffs' extensive factual allegations that USDT was

---

unbacked USDT on their exchanges with the intent to inflate the price of
cryptocommodities.  (*See, e.g.*, CAC ¶¶ 310-341).

unbacked (*id.* at 7); (iv) selecting the Exchange Defendants' benign explanations for the unusual and highly suspicious trading activity described in the Amended Complaint over the explanations offered by Plaintiffs (*id.* at 8-9); and (v) inferring a lack of knowledge (rather than culpable knowledge) from various factual allegations regarding the Exchange Defendants' purported insight into trades on their exchanges and into the owners of the accounts operated on their exchanges (*id.* at 9-10). As described above, Plaintiffs' factual allegations plausibly give rise to the inference of an agreement between DigFinex and the Exchange Defendants and, "at the motion-to-dismiss stage, [plaintiffs] must only put forth sufficient factual matter to plausibly suggest an inference of conspiracy, *even if* the facts are susceptible to an equally likely interpretation." *Gelboim*, 823 F.3d at 782.

### *Agreement in Restraint of Trade*

Having established that Plaintiffs adequately allege an agreement, the Court now turns to the second element of a Section 1 claim. Section 1 of the Sherman Act "does not disallow any and all agreements; it disallows only those 'in restraint of trade or commerce among the several States.'" *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 682 (S.D.N.Y. 2012) (quoting 15 U.S.C. § 1). Moreover, Section 1 "outlaws only unreasonable restraints." *Leegin Creative Leather Prods., Inc.* v. *PSKS, Inc.*, 551 U.S. 877, 885 (2007). Therefore, to plead the second element of a Section 1 claim, a plaintiff must show that the concerted action was unreasonable.

71

Price-fixing "conspiracies concentrate the power to set prices among the conspirators, including the power to control the market and to fix arbitrary and unreasonable prices." *United States* v. *Apple, Inc.*, 791 F.3d 290, 326 (2d Cir. 2015). "[A]ny conspiracy 'formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity is illegal *per se*,' and the precise 'machinery employed is immaterial.'" *Id.* at 327 (quoting *Socony-Vacuum Oil Co.*, 310 U.S. at 223); *see also Merced*, 165 F. Supp. 3d at 138 ("Certain restraints on trade, such as minimum price fixing, may have 'such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit' that they are deemed *per se* unreasonable." (quoting *State Oil Co.* v. *Khan*, 522 U.S. 3, 17 (1997))). Accordingly, Plaintiffs have adequately pleaded that the agreement at issue here was "unreasonable" as they allege it was formed with the intent to engage in price-fixing (*see* CAC ¶¶ 135-136, 272-279, 295-300, 310-366, 393-394), which is *per se* unreasonable, *accord Merced*, 165 F. Supp. 3d at 138.

\* \* \*

In sum, although Defendants offer plausible non-collusive explanations for many of the facts alleged in the Amended Complaint, "[t]he choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Anderson News*, 680 F.3d at 185. Rather, the question for the Court on a motion to dismiss is whether Plaintiffs have put forward "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*,

550 U.S. at 556. Taking all of Plaintiffs' allegations together and drawing all reasonable inferences in their favor, as the Court must, *see, e.g.*, *Cont'l Ore Co.* v. *Union Carbide & Carbon Corp.*, 370 U.S. 690, 696 (1962), the Court concludes that Plaintiffs meet that burden on their claims brought pursuant to Sections 1 and 3 of the Sherman Act.

### iv. Plaintiffs Adequately Allege Sherman Act Claims Against the Individual Defendants and Fowler

Each of Defendants Devasini, Velde, Potter, and Fowler argues that the Amended Complaint fails to allege sufficiently particularized facts to sustain antitrust claims against them. (*See* B/T Br. 4 n.1; Potter Br. 6-7; Fowler Br. 16-17; Potter Reply 3-5; Fowler Reply 9-10). Plaintiffs respond that "[c]orporate officers may be held 'personally liable for damages arising from an antitrust violation' when they 'participated in the unlawful acts' or 'acquiesced or ratified the actions of other officers or agents of the corporation who violated the antitrust laws.'" (Pl. Opp. 24 (quoting *Six W. Retail Acquisition, Inc.* v. *Sony Theatre Mgmt. Corp.*, No. 97 Civ. 5499 (DNE), 2000 WL 264295, at *35 (S.D.N.Y. Mar. 9, 2000))). More to the point, Plaintiffs argue that they have sufficiently alleged the Individual Defendants' and Fowler's roles in the conspiracy and provided evidence from which the Court can infer "'that they joined or were members of the alleged conspiracy.'" (*Id.* (quoting *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06 MDL 1775 (JG) (VVP), No. 10 Civ. 639 (JG) (VVP), 2010 WL 10947344, at *8 (E.D.N.Y. Sept. 22, 2010))).

The Court agrees with Plaintiffs that the Amended Complaint sufficiently alleges each Individual Defendant's involvement in the conspiracy to defeat a motion to dismiss. For example, Plaintiffs argue that the Individual Defendants dominated DigFinex, Tether, and Bitfinex through their leadership positions (*see* CAC ¶¶ 23-24, 34-36, 478-480), and further allege the following specific allegations regarding their individual participation in the antitrust schemes:

- Potter, Devasini, and Velde concealed their simultaneous control over Bitfinex, Tether, and DigFinex, a key element of the scheme to conceal the unbacked nature of USDT and to use USDT to inflate cryptocommodity prices and monopolize the cryptocommodity market (*id.* at ¶¶ 152-161);

- On April 5, 2017, Velde stated under penalty of perjury that each USDT was fully backed by a corresponding U.S. dollar, furthering the conspiracy (*id.* at ¶ 130);

- On October 15, 2018, Devasini pleaded with Crypto Capital to "move at least 100M" to the DigFinex Defendants to honor client redemption requests, and warned that failure to do so would reveal that USDT was unbacked, which would "tank" the price of bitcoin (*id.* at ¶ 362); and

- Potter made multiple, specific public statements of Tether's intent to evade banking laws and anti-money laundering regulations, especially around the time the DigFinex Defendants lost access to U.S. correspondent banking, suggesting his knowledge of and active participation in the illicit scheme (*id.* at ¶¶ 343-347).

With particular respect to Fowler, Plaintiffs plead that he was "an employee, agent, or partner of Defendant Crypto Capital" (CAC ¶ 41), and that

he was at the center of Crypto Capital's "scheme to operate a shadow bank on behalf of crypto-exchanges in which hundreds of millions of dollars passed through accounts controlled by him in jurisdictions around the world" (*id.* at ¶ 352 (alteration omitted); *see also id.* at ¶ 351).  Plaintiffs also advance specific allegations as to Fowler's involvement in the antitrust conspiracy, for example, that he set up specific shell companies and bank accounts to facilitate the DigFinex Defendants' scheme throughout the relevant period.  (*See id.* at ¶¶ 354-363).

These allegations, considered in the aggregate, are sufficiently specific to survive a motion to dismiss.  This is not a case where Plaintiffs allege only that the Individual Defendants "had knowledge of [their employers'] conduct, approved of it, and participated in it," which "might not by itself give rise to individual liability under the Sherman Act."  *Air Cargo*, 2010 WL 10947344, at *8.  While Plaintiffs do not allege *multiple* specific communications in furtherance of the conspiracy from any of the Individual Defendants or Fowler, the Court can nonetheless infer the Individual Defendants' involvement in controlling DigFinex, Tether, and Bitfinex from the allegations in the Amended Complaint, as well as Fowler's control over Crypto Capital.  *See id.* (explaining that factual allegations that individual's employer joined alleged conspiracy are "more suggestive of [the individual] having joined and directly participated in the conspiracy").  Furthermore, Plaintiffs provide specific allegations as to Fowler's and each Individual Defendant's actions in furtherance of the antitrust scheme.  *See Precision Assocs., Inc.* v. *Panalpina World Transp. (Holding) Ltd.*,

75

No. 08 Civ. 42 (JG) (VVP), 2012 WL 3307486, at *2 (E.D.N.Y. Aug. 13, 2012)

("[O]nly 'slight evidence' is necessary to connect a defendant to an antitrust

conspiracy once the conspiracy is established[.]" (collecting cases)).

### b. Commodities Exchange Act Claims

The Court now turns to Plaintiffs' three claims against all Defendants

under the Commodities Exchange Act:

- market manipulation in violation of 7 U.S.C. §§ 9, 25 and CFTC Rule 180.1(a) (Count Five);[37]

- principal-agent liability in violation of 7 U.S.C. § 2(a)(1) (Count Six); and

- aiding and abetting manipulation in violation of 7 U.S.C. § 25(a)(1) (Count Seven).[38]

---

[37] As discussed further below, Plaintiffs allege a market manipulation claim under two theories: *first*, that Defendants engaged in price manipulation, and *second*, that Defendants utilized a "manipulative device."

[38] In the Amended Complaint, the headings for each of Plaintiffs' three CEA claims specify that Plaintiffs assert each claim "Against All Defendants." However, Plaintiffs failed to include the Exchange Defendants or the CC Defendants in the *ad damnum* clauses for each of the three CEA causes of action. (*See* CAC ¶¶ 439, 444, 448). Plaintiffs also failed to specify that the Exchange Defendants or the CC Defendants "had the ability to cause, and did cause, artificial prices" in support of their price manipulation claim. (*See id.* at ¶ 434). Fowler argues that Plaintiffs failed to assert any CEA claims against him because they omitted him from each of the *ad damnum* clauses and pleaded no specific references to him in the paragraphs asserting the CEA claims. (Fowler Reply 8-9). More broadly, Fowler argues that he did not have "fair notice" of the CEA claims asserted against him, and that it would be improper to allow Plaintiffs to assert these "new claims" for the first time in an opposition to a motion to dismiss. (*Id.*). For the same reasons, the Exchange Defendants argue that Plaintiffs failed to assert a price manipulation claim against them. (*See* Exchange Reply 9).

The Court declines to dismiss Plaintiffs' CEA claims against Fowler or their price manipulation claim against the Exchange Defendants on this ground. "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests[.]'" *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007) (alteration in *Twombly*) (quoting Fed. R. Civ. P. 8(a)(2)). The Amended Complaint explicitly states that CEA claims are asserted against "All Defendants," giving Fowler and the Exchange Defendants fair notice that CEA claims are asserted against them.

Plaintiffs assert these claims on behalf of a subclass of "[a]ll persons or entities that purchased or otherwise acquired Cryptocommodity Futures in the United States or its territories at any time from February 17, 2015, through the present and were injured thereby." (CAC ¶ 377). Defendants move to dismiss Plaintiffs CEA claims in their entirety. The Court first addresses the Moving Defendants' argument that Plaintiffs lack standing under the CEA and then addresses each of Plaintiffs' CEA claims. As explained below, the Court denies the Moving Defendants' motions to dismiss Plaintiffs' CEA claims.

### i. Plaintiffs Adequately Allege CEA Standing

Section 22 of the CEA creates a private right of action for any person "who purchased or sold a [futures contract] or swap if the violation constitutes ... a manipulation of the price of any such contract or swap or the price of the commodity underlying such contract or swap." 7 U.S.C. § 25(a)(1)(D). To have standing to sue under the CEA, the plaintiff must show

---

The Exchange Defendants were not named in any of the three CEA claim *ad damnum* clauses, and yet they still opposed the market manipulation-manipulative device claim, the aiding and abetting claim, and the principal-agent liability claim. (*See* Exchange Br. 17-20). This fact undermines their argument that they had no notice of the price manipulation claim. Furthermore, Plaintiffs included allegations of the Exchange Defendants' ability to control prices in support of their Section 1 Sherman Act claims (*see* CAC ¶¶ 419, 424-425, 428-429), which allegations were then incorporated into Plaintiffs' CEA claims (*see id.* at ¶ 431).

Plaintiffs also advanced extensive factual allegations in support of Fowler's involvement in the scheme to manipulate cryptocommodity prices, and as such, Fowler had adequate notice of the grounds upon which Plaintiffs' CEA claims rested, and Plaintiffs noted that they asserted all CEA claims against all Defendants, giving Fowler adequate notice that he needed to respond to the claims. The Court therefore declines to find that Fowler had inadequate notice of the CEA claims asserted against him. Finally, neither Fowler nor the Exchange Defendants cite any case for the proposition that a failure to list a specific defendant in an *ad damnum* clause while otherwise signaling an intent to assert the claim against the omitted defendant constitutes inadequate notice of the claim.

that he or she suffered "actual damages" as a result of the manipulation. *Id.*
§ 25(a)(1); *see also Platinum I*, 2017 WL 1169626, at *28. "To establish 'actual
damages' a plaintiff must show an 'actual injury caused by the violation.'" *In re
London Silver Fixing, Ltd., Antitrust Litig.* ("*In re Silver*"), 213 F. Supp. 3d 530,
564 (S.D.N.Y. 2016) (quoting *In re LIBOR-Based Fin. Instruments Antitrust Litig.*
("*LIBOR II*"), 962 F. Supp. 2d 606, 620 (S.D.N.Y. 2013)); *see also In re Amaranth
Nat. Gas Commodities Litig.* ("*Amaranth II*"), 269 F.R.D. 366, 379 (S.D.N.Y.
2010) (finding that plaintiffs had standing to sue under the CEA because they
established that they "suffered net losses ... caused by the [defendants'] alleged
[price] manipulation").

When "CEA claims are based on discrete, episodic instances of
manipulation, plaintiffs must allege that they 'engaged in a transaction at a
time during which prices were artificial as a result of defendants' alleged ...
manipulative conduct, and that the artificiality was adverse to their position.'"
*In re Silver*, 213 F. Supp. 3d at 564 (quoting *LIBOR II*, 962 F. Supp. 2d at 622).
Of potential significance to the instant motion, however, where the CEA claims
are based on persistent manipulation, CEA plaintiffs may establish actual
injury at the motion to dismiss stage by pleading that they engaged in
transactions during the period of sustained manipulation because prices were
"allegedly artificial throughout the Class Period." *LIBOR II*, 962 F. Supp. 2d at
622; *see also Platinum I*, 2017 WL 1169626, at *28.

Here, the parties agree that Plaintiff Goldshtein is the only named
plaintiff alleged to have purchased cryptocommodity futures during the Class

78

Period.  (*See* Pl. Opp. 26; B/T Reply 8; *see also* CAC ¶ 22).  As relevant here, Plaintiffs allege that "between January 16, 2018[,] and June 3, 2020, Pinchas Goldshtein purchased 629 bitcoin futures positions," "the prices of which [futures] had been artificially inflated by Defendants' market manipulation and as a result suffered economic losses and actual damages."  (CAC ¶ 22).

The Moving Defendants argue that Plaintiffs' claims are based on "discrete, episodic instances of manipulation" and that they therefore fail to allege loss with sufficient specificity.  (*See, e.g.*, B/T Br. 15-17, Exchange Br. 15-16; B/T Reply 8-11).  Relatedly, they argue that Plaintiffs must plead facts about the specific purchases that Goldshtein made and connect those individual purchases to Defendants' misconduct in order to prove that Goldshtein actually suffered a loss on any of the transactions.  (*See, e.g.*, B/T Br. 16; Exchange Br. 15-16; B/T Reply 8-9).  Plaintiffs, in contrast, characterize their claims as based on "persistent manipulation," obviating their need to plead facts establishing that Goldshtein was injured by any specific transaction.  (Pl. Opp. 26-27).  The Court agrees with Plaintiffs that the allegations here make out a claim for persistent manipulation rather than for episodic manipulation, and that the allegations are sufficient to survive a motion to dismiss.

While Defendants correctly note that Plaintiffs assert that the manipulation was accomplished through "'massive, *carefully timed*' cryptocommodity purchases" (B/T Br. 16 (emphasis in B/T Br.) (quoting CAC ¶¶ 3, 10)), they are wrong in suggesting that Plaintiffs allege the market as

having operated free from artificial influence during the intervening time periods.  Quite to the contrary, Plaintiffs allege that Defendants' carefully timed purchases were intended to, and had the effect of, simulating organic demand and creating artificial price floors, causing prices to inflate more or less persistently, and creating a protracted bubble in the cryptocommodity market, which bubble burst around early 2018.  (*See* CAC ¶¶ 95-96, 135-136, 272-279, 295-300, 393-394, 437).  Goldshtein alleges that he purchased cryptocommodity futures starting in January 2018, right around the time the bubble burst, and continued purchasing futures through the filing of the Amended Complaint.  (*Id.* at ¶ 22; *see also id.* at ¶¶ 95-96).  As such, and accepting the allegations in the Amended Complaint as true, the Court can infer that Goldshtein suffered actual damages as to any of his purchases, as each purchase was made at an artificially inflated price that continued to fall, all as a result of Defendants' manipulation.

Defendants argue that the persistent manipulation cases on which Plaintiffs rely involved more concrete allegations regarding the purported injurious transactions than those advanced here.  (*See, e.g.*, B/T Reply 10-11 (citing *Harry*, 889 F.3d at 112; *Platinum I*, 2017 WL 1169626, at *28; *LIBOR II*, 936 F. Supp. 2d at 718-19)).  While Plaintiffs certainly could have provided more detailed, concrete allegations as to the dates and times of Goldshtein's purchases, particularly given the public nature of the crypto-asset transactions at issue here (*see* CAC ¶¶ 104, 118), nothing in the cited decisions requires Plaintiffs to plead details about specific transactions if, under a persistent

80

manipulation theory, Plaintiffs' allegations at the motion to dismiss stage adequately establish that any of those transactions caused Goldshtein actual injury. That is the case here, and accordingly the Moving Defendants' motions to dismiss Plaintiffs' CEA claims for lack of standing is denied. However, the Court notes that, while "at the pleading stage, [Plaintiffs] have adequately alleged that they were damaged by [Defendants'] manipulation" of the cryptocommodity market, "[i]t ultimately remains [P]laintiffs' burden to prove through reliable evidence that they suffered actual loss based on defendants' manipulation[.]" *Sullivan* v. *Barclays PLC*, No. 13 Civ. 2811 (PKC), 2017 WL 685570, at *31 (S.D.N.Y. Feb. 21, 2017).[39]

### ii. Plaintiffs Adequately Allege Market Manipulation

Plaintiffs assert claims under CEA Sections 6(c)(1) and 22, 7 U.S.C. §§ 9, 25, which make it unlawful for "any person, directly or indirectly, to use or employ or attempt to use or employ ... any manipulative or deceptive device

---

[39] The Exchange Defendants argue that Plaintiffs' CEA claims against them are time-barred because "publication of the Tether Report in January 2018 [and subsequent stories in major media outlets regarding the Tether Report] triggered the two-year statute of limitations for CEA claims" by putting Goldshtein on inquiry notice, thus "making the June 2020 CAC untimely." (Exchange Reply 6; *see also* Exchange Br. 13-14). For the reasons set forth in Plaintiffs' opposition brief, the Court believes that the publication of the Tether Report and news stories about that report are insufficient to find that Goldshtein was on inquiry notice of the Exchange Defendants' role in the scheme as a matter of law at this early stage in the litigation. (*See* Pl. Opp. 38-41).

Defendant Potter further argues that Plaintiffs do not have standing to advance CEA claims against him because he stopped working for Tether and Bitfinex "by late February 2018, shortly after Plaintiff Goldshtein began transacting in bitcoin futures." (Potter Br. 8). However, Potter does not contest that Goldshtein purchased Bitcoin futures in January 2018, before Potter stepped down from his role working for the DigFinex Defendants. (*See* Potter Reply 5 n.2; *see also* CAC ¶ 22). Accordingly, the Court declines to dismiss Plaintiffs' CEA claims against Potter on standing grounds, for the same reasons that the Court declines to dismiss Plaintiffs' claims against the other DigFinex Defendants for lack of CEA standing.

or contrivance," and CFTC Rule 180.1(a), which in relevant part makes it unlawful for "any person ... to intentionally or recklessly" "[m]ake, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or] ... [e]ngage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit," 17 C.F.R. § 180.1(a).

Manipulation claims that sound in fraud, including those advanced by Plaintiffs here (*see* CAC ¶ 437; *see also* Pl. Opp. 28), are evaluated under the more stringent pleading requirements of Federal Rule of Civil Procedure 9(b), *In re Amaranth Nat. Gas Commodities Litig.* ("*Amaranth III*"), 730 F.3d 170, 180-81 (2d Cir. 2013); *see also Platinum I*, 2017 WL 1169626, at *30; *In re Commodity Exch., Inc.*, 213 F. Supp. 3d at 667-68. "Despite the generally rigid requirement that fraud be pleaded with particularity, the Second Circuit has recognized that '[a] claim of manipulation ... can involve facts solely within the defendant's knowledge; therefore, at the early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim.'" *Platinum I*, 2017 WL 1169626, at *30 (quoting *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007)). "As a result, the heightened pleading standard under 9(b) 'is generally relaxed in the context of manipulation-based claims, where the complaint must simply specify what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme

82

had on the market for the securities at issue.'" *Id.* (quoting *In re Silver*, 213 F. Supp. 3d at 566).

Here, Plaintiffs advance two theories of liability for market manipulation: they assert that Defendants: (i) engaged in price manipulation and (ii) utilized a "manipulative device" pursuant to 7 U.S.C. § 25(a)(1)(D)(i). The Court addresses each theory in turn.

### (a)     Price Manipulation

"To state a claim for market manipulation under the CEA, Plaintiffs must allege that: [i] the defendant 'possessed an ability to influence market prices;' [ii] 'an artificial price existed;' [iii] the defendant 'caused the artificial price; and' [iv] the defendant 'specifically intended to cause the artificial price.'" *Platinum I*, 2017 WL 1169626, at *31 (quoting *Amaranth III*, 730 F.3d at 173); *see also In re Commodity Exch., Inc.*, 213 F. Supp. 3d at 668. This final element of scienter "can be pled by 'alleging facts [i] showing that the defendants had both motive and opportunity to commit the fraud or [ii] constituting strong circumstantial evidence of conscious misbehavior or recklessness.'" *In re Commodity Exch., Inc.*, 213 F. Supp. 3d at 670 (quoting *In re Amaranth Nat. Gas Commodities Litig.* ("*Amaranth I*"), 587 F. Supp. 2d 513, 529 (S.D.N.Y. 2008)).

The B/T Defendants argue that Plaintiffs fail to plead fraud with the particularity required to satisfy Rule 9(b). (*See, e.g.*, B/T Br. 17-18). The Court disagrees. The Amended Complaint provides sufficient details about Defendants' purportedly manipulative trading, including charts, graphs, and specific examples illustrating how and when Defendants allegedly utilized

83

unbacked USDT to inflate cryptocommodity prices. (*See* CAC ¶¶ 265-270, 272-276). While Plaintiffs did not include every purportedly manipulative transfer in the Amended Complaint, their allegations easily satisfy the "relaxed" Rule 9(b) pleading standard for price manipulation claims. *See Platinum I*, 2017 WL 1169626, at *32 (finding that pleading "examples showing predictable price movements in the platinum and palladium derivatives market" satisfies Rule 9(b) in the context of a price manipulation claim).

The B/T Defendants also argue that Plaintiffs fail to plead each of the four elements of a price manipulation claim, essentially recasting their arguments for dismissal of Plaintiffs' antitrust claims, *viz.*, that Plaintiffs have not adequately pleaded how Defendants' use of USDT caused price manipulation in the cryptocommodity market, and that Defendants lacked the specific intent to manipulate prices. (*See* B/T Br. 18-21; B/T Reply 11-12). The Exchange Defendants assert similar arguments, including that Plaintiffs have not adequately alleged their ability to influence the market, that their actions actually did influence prices, or that they had the requisite scienter. (Exchange Reply 9 n.5).

For the reasons discussed *supra* with respect to Plaintiffs' Section 1 Sherman Act claim, the Court disagrees and finds that Plaintiffs have established the elements of a price manipulation claim by plausibly alleging how Defendants conspired to manipulate cryptocommodity prices using unbacked USDT, that they did artificially inflate prices, and that Defendants acted with the requisite intent. As noted above, Plaintiffs have plausibly

84

alleged how the B/T Defendants used unbacked USDT to inflate cryptocommodity prices, and that they engaged in misconduct to achieve that goal (*see* CAC ¶¶ 135-136, 272-279, 295-300, 393-394); and have further alleged how the Exchange Defendants advanced the scheme by knowingly facilitating and concealing the B/T Defendants' manipulative trading with the specific goal of inflating the price of cryptocommodities (*see id.* at ¶¶ 310-341). Similarly, Plaintiffs have plausibly alleged the CC Defendants' role as providers of shadow banking services to the DigFinex Defendants and have pleaded facts demonstrating that the CC Defendants knew their role was critical to maintaining the illusion that USDT was fully backed, and, by extension, to artificially inflating cryptocommodity prices. (*See id.* at ¶¶ 342-366). Whether discovery will confirm these allegations remains to be seen, but at the motion to dismiss stage, the Court finds Plaintiffs have adequately pleaded price manipulation.

### (b)    Manipulative Device

Plaintiffs also assert a market manipulation claim against Defendants under a manipulative device theory pursuant to 7 U.S.C. § 25(a)(1)(D)(i) and CFTC Rule 180.1. Section 25(a)(1)(D)(i) provides a remedy for:

> the use or employment of, or an attempt to use or employ, in connection with a swap, or a contract of sale of a commodity, in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative device or contrivance in contravention of such rules and regulations as the Commission shall promulgate[.]

*Id.* CFTC Rule 180.1 prohibits:

> any person ... in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery ... to intentionally or recklessly ... [u]se or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud[.]

17 C.F.R. § 180.1(a)(1).

Although the CEA does not define the terms "manipulate device" or "contrivance," the CFTC has provided the following guidance with respect to those terms:

> The language of CEA section 6(c)(1), particularly the operative phrase "manipulative or deceptive device or contrivance," is virtually identical to the terms used in section 10(b) of the Securities Exchange Act of 1934 .... Indeed, when the Commission promulgated Rule 180.1, the Commission observed that given the similarities between CEA section 6(c)(1) and Exchange Act section 10(b), the Commission deems it appropriate and in the public interest to model final Rule 180.1 on SEC Rule 10b-5. Accordingly, case law developed under Section 10(b) of the Exchange Act and SEC Rule 10b-5 is instructive in construing CEA Section 6(c)(1) and Commission Regulation 180.1(a).

*Platinum I*, 2017 WL 1169626, at *34 (quoting *In re Total Gas & Power N. Am., Inc.*, CFTC Dkt. No. 16-03, 2015 WL 8296610, at *8 (Dec. 7, 2015)). The case law on the specific elements required to establish a manipulative device claim is unsettled; however, the Court is persuaded by Judge Woods's analysis in *Platinum I, id.* at *36, and Judge Caproni's analysis in *In re Commodity Exchange*, 213 F. Supp. 3d at 672-73, both of which conclude that where — as here — plaintiffs allege both "manipulation ... and misrepresentation ... as part of a single scheme," they may satisfy their pleading burden "by alleging with

86

particularity 'the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants,'" and need not also plead loss causation or reliance at the motion to dismiss stage. *In re Commodity Exch., Inc.*, 213 F. Supp. 3d at 673 (quoting *ATSI Comm'cns*, 493 F.3d at 101); *accord Platinum I*, 2017 WL 1169626, at *36 (same); *see also CFTC* v. *McDonnell*, 332 F. Supp. 3d 641, 717 (E.D.N.Y. 2018) ("To prove a violation of [Rule] 180.1(a)[,] the Commission must show that Defendants engaged in prohibited conduct (*i.e.*, employed a fraudulent scheme; made a material misrepresentation, misleading statement or deceptive omission; or engaged in a business practice that operated as a fraud); with scienter; and in connection with a contract of sale of a commodity in interstate commerce.").

Plaintiffs have alleged with particularity the various Defendants' roles in the manipulative scheme and have adequately pleaded scienter. For example, Plaintiffs allege in detail how the DigFinex Defendants issued unbacked USDT, transferred it to their accounts on the Exchange Defendants' exchanges, and used that unbacked USDT to artificially simulate organic demand and price floors to inflate cryptocommodity prices. (CAC ¶¶ 135-136, 272-279, 295-300, 393-394). Plaintiffs allege that the Exchange Defendants were aware of this scheme, and knowingly facilitated it by, *inter alia*, providing bespoke accounts to the DigFinex Defendants, affirmatively misrepresenting the unbacked nature of USDT, and concealing that USDT was not fully backed. (*See id.* at ¶¶ 310-341). Plaintiffs allege that the CC Defendants were also aware of the scheme and willingly participated by providing U.S. correspondent banking services to

87

help the DigFinex Defendants cover up the unbacked nature of USDT. Plaintiffs further allege that the CC Defendants were explicitly told of their role in keeping the price of Bitcoin artificially inflated. (*See id.* at ¶¶ 342-366). And as noted above, Plaintiffs need not establish loss causation or reliance at this time given Plaintiffs' allegations of sustained market manipulation, *see Platinum I*, 2017 WL 1169626, at *36 (collecting cases); *accord In re Commodity Exch., Inc.*, 213 F. Supp. 3d at 673 (same); for this reason, the Court rejects Defendants' arguments that Plaintiffs' manipulative device claim must be dismissed for failure to allege loss causation or reliance (*see* B/T Br. 21-22; Exchange Br. 18-19; B/T Reply 12; Exchange Reply 8).

Defendants' remaining arguments are equally unpersuasive. The Exchange Defendants argue that their statements that USDT was not fully backed were not false when made (*see* Exchange Br. 17-18; Exchange Reply 7 (citing CAC ¶¶ 166, 174)). But on the current record, the Court cannot conclude that the statements were true when made, or that the Exchange Defendants believed them to be true when made, especially when Plaintiffs plausibly allege that the Exchange Defendants were involved in the manipulative scheme from the get-go. Furthermore, Plaintiffs allege that the Exchange Defendants made misrepresentations to the market other than the explicit statement cited in the Exchange Defendants' briefs, for example, by covering up the unbacked nature of USDT throughout the course of the manipulative scheme and by concealing the DigFinex Defendants' manipulative trading.

88

Finally, as Plaintiffs note, case law developed under Section 10(b) of the Securities Exchange Act is instructive in construing the relevant portions of the CEA and Rule 180.1, and the Second Circuit has instructed that Section 10(b) "prohibits not only material misstatements but also manipulative acts," including "a transaction [that] sends a false pricing signal to the market," as Plaintiffs allege here. *ATSI Commc'ns*, 493 F.3d at 100; *accord In re Commodity Exch., Inc.*, 213 F. Supp. 3d at 673. As such, the Court denies the Moving Defendants' motions to dismiss Plaintiffs' manipulative device claim.

### iii. Secondary Liability

#### (a) Plaintiffs Adequately Allege a Principal-Agent Liability Claim

Plaintiffs assert a claim for principal-agent liability pursuant to Section 2(a)(1) of the CEA, 7 U.S.C. § 2(a)(1). "Under that provision, a claim for principal-agent liability requires that [i] the agent was acting in the capacity of an agent when he or she committed the unlawful acts and [ii] that the agent's actions were within the scope of his or her employment." *In re Silver*, 213 F. Supp. 3d at 571 (citations omitted); *accord Platinum I*, 2017 WL 1169626, at *37 (same).

Plaintiffs have adequately pleaded principal-agent liability as to the Individual Defendants and Fowler. *First*, Plaintiffs allege that the Individual Defendants acted as agents of Bitfinex and Tether by serving as corporate officers of those entities. (*See* CAC ¶¶ 23-24, 34-36, 476-480). Similarly, Plaintiffs allege that Fowler acted as an agent and principal of Crypto Capital.

89

(*Id.* at ¶ 41). Plaintiffs also plead specific facts to support their allegations of wrongdoing as to each of these defendants, as detailed *supra* with respect to the Individual Defendants' and Fowler's motions to dismiss Plaintiffs' Sherman Act claims. (*See id.* at ¶¶ 130, 151-161, 343-347, 354-363). *Second,* Plaintiffs adequately allege that the Individual Defendants and Fowler were acting within the scope of their employment. (*See id.* at ¶¶ 23-24, 34-36, 476-480). The Court therefore denies the Moving Defendants' motions to dismiss Count Six.[40]

### (b) Plaintiffs Adequately Allege an Aiding and Abetting Claim

Pursuant to Section 22 of the CEA, "[a]ny person ... who violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter shall be liable for actual damages resulting from [relevant transactions] ... and caused by such violation" of the statute. 7 U.S.C. § 25(a)(1). The Second Circuit has interpreted "aiding and abetting" in this context as "requir[ing] the defendant to in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed."

---

[40] Plaintiffs' opposition brief opposes only the Individual Defendants' and Fowlers' motions to dismiss the CEA principal-agent liability claim. (Pl. Opp. 36-37). Accordingly, the Court considers the motions to dismiss Count Six to be unopposed as to the other Moving Defendants. Because Plaintiffs failed to plead that those other defendants were acting as agents of Bitfinex, Tether, or other entities that allegedly manipulated cryptocommodity prices, the Court grants the motion to dismiss this claim as to the Exchange Defendants, the Tether Defendants, the Bitfinex Defendants, and DigFinex.

Plaintiffs also attempt to assert principal-agent liability claims against "other employees of the corporate Defendants, as yet unknown to Plaintiffs[.]" (Pl. Opp. 37). Plaintiffs failed to assert this claim against unnamed defendants in the Amended Complaint and the Court rejects Plaintiffs' attempt to assert such a claim in opposition to the Moving Defendants' motions to dismiss.

*Amaranth III*, 730 F.3d at 182 (internal quotation marks omitted) (quoting *United States* v. *Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)). "Consistent with the Second Circuit's holding, courts in this district have required plaintiffs alleging aiding and abetting under the CEA to plead sufficient facts showing that 'the [d]efendant [i] had knowledge of the principal's intent to violate the CEA; [ii] intended to further that violation; and [iii] committed some act in furtherance of the principal's objective.'" *Platinum I*, 2017 WL 1169626, at *36 (quoting *Laydon* v. *Mizuho Bank, Ltd.* ("*Laydon I*"), No. 12 Civ. 3419 (GBD), 2014 WL 1280464, at *4 (S.D.N.Y. Mar. 28, 2014)).

The Amended Complaint adequately pleads all three elements. As explained *supra*, Plaintiffs allege facts demonstrating that the DigFinex Defendants, Exchange Defendants, and CC Defendants knowingly assisted each other to perpetuate a manipulative scheme wherein they used unbacked USDT to artificially inflate cryptocommodity prices. *See Platinum I*, 2017 WL 1169626, at *37 (collecting cases and denying motion to dismiss CEA aiding and abetting claim where plaintiffs "plead[ed] sufficient facts showing that Defendants knowingly assisted each other and participated in the Fixing with the intent to artificially suppress ... prices"); *In re Silver*, 213 F. Supp. 3d at 571 (denying motion to dismiss CEA aiding and abetting claim where plaintiffs adequately pleaded conspiracy to restrain trade and fix prices). Accordingly, the Moving Defendants' motions to dismiss Count Seven is denied.

91

### iv. Plaintiffs Adequately Allege CEA Claims Against the Individual Defendants and Fowler

Finally, the Court declines to dismiss the CEA claims brought against the Individual Defendants and Fowler for essentially the same reasons the Court sustained the Sherman Act claims against those same Defendants. Potter argues that allegations against him are not specific enough to survive a motion to dismiss. (Potter Br. 8-11; Potter Reply 5-8). The Court disagrees, for substantially the same reasons the Court rejected this argument in the antitrust context: allegations of Potter's leadership role at Tether, Bitfinex, and DigFinex, coupled with allegations regarding his willing involvement in covering up USDT's purportedly unbacked nature, sufficiently establish the requisite conduct and intent to survive a motion to dismiss the CEA claims. Similarly, the Court disagrees with Potter's claim that Plaintiffs pleaded no act in furtherance of price manipulation (Potter Br. 10-11); as but one example, Plaintiffs pleaded that Potter worked to circumvent banking regulations, a key component of perpetuating the false claim that USDT was fully backed, and thus of the scheme to inflate cryptocommodity prices. Regarding Velde, Devasini, and Fowler, the Court has already explained why Plaintiffs' allegations implicating the Individual Defendants are not fatally vague, inasmuch as Plaintiffs allege specific facts as to each and also generally allege misdeeds carried out while the Individual Defendants were acting as agents of Bitfinex, Tether, or Digfinex. Accordingly, the Court declines to dismiss CEA claims against the Individual Defendants and Fowler.

### c. Plaintiffs' RICO Claims Are Dismissed

The Court proceeds to consider Plaintiffs' civil RICO claims.  By way of background, Congress enacted RICO in 1970 to "eradicat[e] … organized crime in the United States."  *Am. Fed'n of State, Cnty. & Mun. Emp. Dist. Council 37 Health & Sec. Plan* v. *Bristol-Myers Squibb Co.*, 948 F. Supp. 2d 338, 344 (S.D.N.Y. 2013) (citing Pub. L. No. 91-452 (1970)).  Under RICO, organized crime is defined as racketeering activity, a term that "encompass[es] dozens of state and federal statutes" that serve as punishable predicate acts.  *RJR Nabisco, Inc.* v. *European Cmty.*, 136 S. Ct. 2090, 2096 (2016).  An individual who commits two or more predicate acts within a ten-year period may violate RICO if "those predicate offenses are related to one another … and the predicates amount to or pose a threat of continued criminal activity."  *Elsevier, Inc.* v. *Grossmann*, No. 12 Civ. 5121 (KPF), 2017 WL 1843298, at *3 (S.D.N.Y. May 8, 2017) (internal quotation marks omitted) (citing *H.J. Inc.* v. *Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)).

RICO establishes four criminal offenses, and, separately, a private civil cause of action.  *RJR Nabisco*, 136 S. Ct. at 2096-97.  Sections 1962(a)-(d) make it unlawful to engage in several specific activities involving a "pattern of racketeering activity."  Specifically:

> Section 1962(a) makes it unlawful to invest income derived from a pattern of racketeering activity in an enterprise.  Section 1962(b) makes it unlawful to acquire or maintain an interest in an enterprise through a pattern of racketeering activity.  Section 1962(c) makes it unlawful for a person employed by or associated with an enterprise to conduct the

93

enterprise's affairs through a pattern of racketeering activity. Finally, [Section] 1962(d) makes it unlawful to conspire to violate any of the other three prohibitions.

*Id.* at 2097.

Of significance here, RICO affords a private right of action to individuals who are harmed by racketeering activity. *See* 18 U.S.C. § 1964. This private right of action allows a plaintiff to bring a claim under RICO for sustaining injuries "in his business or property by reason of a violation of [S]ection 1962." *Id.* § 1964(c). A plaintiff who proves injuries in his business or property may "recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee[.]" *Id.* Here, Plaintiffs assert three RICO claims:

- pursuant to Section 1962(c) against the DigFinex and CC Defendants;

- pursuant to Section 1962(a) against the DigFinex Defendants — pleaded in the alternative to Plaintiffs' Section 1962(c) claim; and

- pursuant to Section 1962(d) against all Defendants for a RICO conspiracy to violate Section 1962(a) and (c).

(*See* CAC ¶¶ 449-572). For the reasons that follow, Plaintiffs' RICO claims are dismissed in their entirety.

### i.     Plaintiffs' Section 1962(c) Claim Is Dismissed

In Count Eight, Plaintiffs allege that certain Defendants conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c). In particular, Plaintiffs allege that "DigFinex Inc., iFinex Inc., BFXNA Inc., BFXWW Inc., Tether Holdings Limited, Tether Limited, Tether Operations Limited, Tether International Limited, Poloniex, Inc., Bittrex, Inc.,

94

Ludovicus Jan van der Velde, Giancarlo Devasini, [and] Philip G. Potter … have been associated-in-fact and have constituted a RICO enterprise since at least 2015," and, further, that "Crypto Capital and Fowler were part of the enterprise from at least 2016 to October 2019." (CAC ¶¶ 453-454 (identifying the putative members of the RICO "Count Eight Enterprise")).  The Count Eight Enterprise is alleged to have conducted its affairs through a pattern of racketeering activity that included wire fraud, bank fraud, money laundering, engaging in monetary transactions in criminally derived property, and operating an unlicensed money transmitting business.  (*Id.* at ¶¶ 483-535).  Its purpose, according to Plaintiffs,

> was to manipulate the price of cryptocommodities by engaging in a scheme to defraud the market.  The Enterprise used a purported stablecoin, USDT, which the Tether, Bitfinex, and Individual Defendants fraudulently represented was backed 1:1 by U.S. dollar reserves.  These misrepresentations allowed these Defendants to issue new, unbacked USDT and use that debased USDT to artificially inflate the prices of cryptocommodities through transactions on the Bittrex and Poloniex exchanges.

(*Id.* at ¶ 456).  Finally, Plaintiffs claim injury as a consequence of the Count Eight Enterprise's racketeering acts, insofar as Plaintiffs "purchas[ed] cryptocommodities at artificially inflated prices they would not have paid but for the Count Eight Defendants' scheme."  (*Id.* at ¶ 457).

In resolving the Moving Defendants' challenge to Plaintiffs' Section 1962(c) claim, the Court focuses on the issues of standing and causation. Pursuant to Second Circuit precedent, among other things, "[t]o demonstrate

RICO standing, a plaintiff must plead, at a minimum ... causation of the injury by the defendant's violation." *Baisch* v. *Gallina*, 346 F.3d 366, 373 (2d Cir. 2003), *abrogated on other grounds by Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*, 572 U.S. 118 (2014). Under RICO, causation requires both "but for" and proximate causation. *See Holmes* v. *Secs. Inv. Protection Corp.*, 503 U.S. 258, 259, 266 (1992).

To establish proximate causation, the connection between the defendant's conduct and the plaintiff's injury must be "direct" and "straightforward," *Holmes*, 503 U.S. at 268; *see also Hemi Grp., LLC* v. *City of New York*, 559 U.S. 1, 14 (2010), and must not entail "intricate, uncertain inquiries" into the extent of the defendant's responsibility for the loss, *Anza* v. *Ideal Steel Supply Corp.*, 547 U.S. 451, 460 (2006); *accord Empire Merchants, LLC* v. *Reliable Churchill LLLP*, 902 F.3d 132, 142 (2d Cir. 2018). A link that is "too remote, purely contingent, or indirect" is insufficient, *Hemi Group*, 559 U.S. at 9-10, and even at the pleading stage, a court should rarely "go beyond the first step" in assessing causation, *Holmes*, 503 U.S. at 272. The requirement of a direct causal relation serves vital considerations of judicial administrability and convenience:

> First, "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors." Second, recognizing the claims of the indirectly injured would lead to problems of apportionment, as courts would have to adopt complicated rules to prevent multiple recoveries. Third, "directly injured victims can generally be counted on to vindicate the law as private attorneys general, without

any of the problems attendant upon suits by plaintiffs injured more remotely."

*Doe* v. *Trump Corp.*, 385 F. Supp. 3d 265, 276 (S.D.N.Y. 2019) (internal citations omitted) (quoting *Holmes*, 503 U.S. at 268-70).

The Court pauses briefly to note that all of the predicate racketeering acts alleged here — wire fraud, money laundering, bank fraud, unlawful money transactions, and operation of unlicensed money transmitting businesses — arise out of essentially the same related conduct: covering up the unbacked nature of USDT by circumventing U.S. banking regulations (bank fraud and operation of unlicensed money transmitting businesses), and then using that unbacked USDT to purchase cryptocommodities (money laundering, wire fraud, and unlawful money transactions). (*See* CAC ¶¶ 484-535).[41] The Moving Defendants argue that any alleged loss incurred by Plaintiffs is too attenuated from Defendants' purported racketeering activity to establish proximate cause under RICO. Specifically, they argue that the intervening activity of third parties — those users who exchanged cryptocommodities for the allegedly unbacked USDT — breaks the causal chain. (*See* B/T Br. 24-27; Exchange Br. 24-25; Potter Br. 11; Fowler Br. 18-21; B/T Reply 13-16). Plaintiffs offer two counterarguments in opposition: *first*, that Defendants' use of unbacked USDT to prop up cryptocommodity prices by establishing fraudulent price floors is not too remote, even if Defendants did not interact

---

[41]  Because the Court ultimately concludes that Plaintiffs lack standing to pursue their Section 1962(c) claim, the Court does not here analyze whether Plaintiffs have adequately pleaded predicate RICO offenses.

directly with Plaintiffs in issuing the unbacked USDT (Pl. Opp. 43-47); and *second*, that the subsequent price inflation was a "foreseeable and natural consequence" of the scheme irrespective of the involvement of third parties (*id.* at 47-50).

The Court agrees with the Moving Defendants that Plaintiffs' allegations require the intervening activity of third parties, that those third parties are better situated than Plaintiffs to allege RICO claims given the racketeering activity alleged here, and that the connection between the racketeering activity and the harm "is attenuated by substantial intervening factors or third party conduct." *Doe*, 385 F. Supp. 3d at 276. In so doing, it rejects Plaintiffs' arguments to the contrary. As an initial matter, Plaintiffs claim that "[c]ourts in this circuit recognize that plaintiffs who trade in a manipulated market can establish RICO injury and causation." (Pl. Opp. 44). However, the lone case Plaintiffs cite to support this proposition, *Sonterra Capital Master Fund Ltd.* v. *UBS AG*, 954 F.3d 529 (2d Cir. 2020), addresses injury only in the context of Article III standing, and says nothing about RICO's more stringent proximate cause requirement, *see id.* at 534-35.

This Court has independently identified other cases addressing proximate cause in the context of RICO market manipulation claims, but those cases are distinguishable. For example, in *Dennis* v. *JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 184 (S.D.N.Y. 2018), *adhered to on denial of reconsideration*, No. 16 Civ. 6496 (LAK), 2018 WL 6985207 (S.D.N.Y. Dec. 20, 2018), and *Sonterra I*, 277 F. Supp. 3d at 576, two sister courts in this District

found proximate cause adequately alleged in the context of market manipulation claims as to certain groups of plaintiffs. However, in both of those cases, a direct connection existed between the defendants' manipulation of interest rates and the injury suffered by the plaintiff-investors who purchased derivatives that incorporated the inflated rates.

For example, the plaintiffs in *Dennis* and *Sonterra I* did not rely on allegations that independent market participants responded to artificial market signals; instead, those cases involved situations where the purported rate manipulation directly and necessarily influenced the price of the derivatives purchased by the plaintiffs (*i.e.*, because the manipulated rates were fundamental components of pricing the derivatives). *See Dennis*, 343 F. Supp. 3d at 145-47 (explaining the direct link between the Bank Bill Swap Reference Rate ("BBSW"), a benchmark interest rate, and BBSW derivatives purchased by plaintiffs); *Sonterra I*, 277 F. Supp. 3d at 537-42 (same, but as to LIBOR instead of BBSW). Here, by contrast, there are intervening steps between the racketeering activity (*i.e.*, covering up the unbacked nature of USDT and the use of that USDT to buy cryptocommodities) and Plaintiffs' injury, which was caused by the creation of artificial price floors and price inflation. In particular, the market — and independent buyers and sellers in the market — responded to the stimulus of the unbacked USDT that the DigFinex Defendants repeatedly injected into the cryptocommodity market.[42]

---

[42]     The Court identified only one case from within this Circuit where the court found proximate cause adequately alleged in the context of market manipulation without an explicit finding that the fraudulently manipulated element was directly connected to the

Plaintiffs allege that Defendants' use of unbacked USDT simulated organic demand, thus creating artificial price floors, and argue that this act "did not depend on the actions of later investors." (Pl. Opp. 44). But the establishment of a price floor is not a unilateral action and necessarily requires the independent action of other market participants, which participants may choose to buy or not buy cryptocommodities for any number of reasons. The involvement of independent market actors in that intermediate step introduces the possibility that factors other than Defendants' racketeering activity gave rise to the artificial price inflation that injured Plaintiffs. And unlike in the LIBOR and BBSW cases, there is no direct connection between the racketeering activity and the injury to keep the causal chain intact despite the involvement of independent market actors.

The Court therefore agrees with Defendants that the facts alleged here are closer to those alleged in *7 West 57th Street Realty Company, LLC* v.

---

asset price. *See In re Sumitomo Copper Litig.*, 104 F. Supp. 2d 314, 321 (S.D.N.Y. 2000). In *Sumitomo*, the court found proximate cause adequately pleaded where defendants purportedly engaged in mail and wire fraud to overstate market transactions in copper and copper futures, causing the price of copper and copper futures to artificially increase. *Id.* at 320-21. Those allegations are much more direct than the relationship between the racketeering activity and injury alleged here. In *Sumitomo*, the racketeering activity alleged created the very misrepresentations that caused the price of copper to increase, even if that artificial increase necessarily required market participants to respond to the misrepresented transactions. An apt analogy to this case would be if Plaintiffs had alleged that Defendants' racketeering activity was not to misrepresent USDT's one-to-one backing, but instead to fraudulently claim to have purchased more bitcoin than they actually purchased, creating the illusion of artificial demand in a single step, rather than employing the multi-step process of laundering unbacked USDT outlined in the Amended Complaint to simulate organic demand. Furthermore, the Court notes that *Sumitomo* was decided before the Supreme Court's more recent decisions addressing proximate cause in *Anza* v. *Ideal Steel Supply Corp.*, 547 U.S. 451 (2006), and *Hemi Grp., LLC* v. *City of New York*, 559 U.S. 1 (2010).

*Citigroup, Inc.*, 771 F. App'x 498 (2d Cir. 2019) (summary order). (*See* B/T Reply 13-14). In *7 West 57th*, the Second Circuit declined to find proximate causation where the plaintiff alleged that the defendants manipulated LIBOR, and claimed injury because the manipulation of LIBOR purportedly caused a change in the value of bonds not directly pegged to LIBOR. 771 F. App'x at 500-01, 503-04. The Second Circuit explained that the alleged racketeering activity did not proximately cause the plaintiff's injury because "the injury was directly caused by buy/sell decisions that independent market actors made, which LIBOR may have influenced." *Id.* at 504. Here too, the manipulation of cryptocommodity prices "was directly caused by buy/sell decisions that independent market actors made," and it is these actions that established price floors and created a bubble, "which [the purchase of cryptocommodities using unbacked USDT] may have influenced." *Id.*; *accord Laydon* v. *Mizuho Bank, Ltd.* ("*Laydon II*"), No. 12 Civ. 3419 (GBD), 2015 WL 1515487, at *10 (S.D.N.Y. Mar. 31, 2015) (finding no proximate cause where multiple discrete links between defendants' racketeering conduct in fixing two rate benchmarks and injury caused by price manipulation of derivatives in which plaintiffs traded). Thus, the relationship between the use of unbacked USDT to purchase cryptocommodities and the manipulation of prices in the cryptocommodity market is more like allegations of price manipulation where the derivative at issue is responsive to independent market forces and *not* pegged to an interest rate (like LIBOR), than to the allegations in *Dennis* and *Sonterra I*, where the assets were directly pegged to the manipulated rates.

101

Additionally, this is not a scenario where the plaintiffs are those directly injured by the racketeering conduct; rather, that injury fell on those market participants who exchanged cryptocommodities for the unbacked USDT. Those individuals *may* have a stronger claim to RICO standing because the causal link between the racketeering activity and the injury is direct and does not require market participants to play along.

This Court's examination of recent Supreme Court and Second Circuit decisions addressing proximate cause reinforces its determination that proximate cause is lacking here. For example, in *Holmes*, the Supreme Court declined to find proximate causation when the plaintiffs, entities that covered the losses of two broker-dealers that failed after the defendants allegedly conspired to manipulate stock prices that the brokers purchased, claimed injury on behalf of customers who did not directly purchase the manipulated stock. *See* 503 U.S. at 261-63, 268. The chain was too attenuated because the plaintiffs could have been injured by wholly independent factors, such as the broker-dealers' "poor business practices or their failures to anticipate developments in the financial markets." *Id.* at 273. The Court explained that the broker-dealers themselves, as direct customers, would have standing under RICO. *Id.* at 274-75. Here, Plaintiffs attempt to analogize themselves to the defunct broker-dealers who purchased the manipulated stocks, which broker-dealers would have standing under *Holmes*. (Pl. Opp. 48-49). However, the defunct broker-dealers are more properly analogized to individuals who exchanged cryptocommodities for the unbacked USDT, as those individuals

102

were the ones who were directly harmed by Defendants' alleged misrepresentations.

In *Anza*, the plaintiff, a steel supply company, alleged that its principal competitor had evaded taxes, allowing it to undercut the plaintiff's prices and cost the plaintiff sales. *Anza*, 547 U.S. at 454. The Supreme Court held that the plaintiff had not adequately pleaded proximate cause because its "lost sales could have resulted from factors other than [the defendants'] alleged acts of fraud," and noted in particular that "[b]usinesses lose and gain customers for many reasons, and it would require a complex assessment to establish what portion of [the plaintiff's] lost sales were the product of" the defendant's conduct. *Id.* at 459. As in *Anza*, determining how much of the artificial price floors and price inflation is attributable to Defendants' racketeering activity (covering up the unbacked nature of USDT and using that USDT to purchase cryptocommodities), would require a similarly "complex assessment." *Id.* But such a complex assessment would be unnecessary for another group more directly injured by the racketeering activity, *i.e.*, individuals who exchanged cryptocommodities for unbacked USDT.[43]

---

[43] Plaintiffs attempt to distinguish *Anza* by arguing that Defendants' manipulation of cryptocommodity prices "was not a mere byproduct of Defendants' scheme; it was the *object* of the scheme" (Pl. Opp. 47), whereas in *Anza*, the defendants' predicate act was tax fraud, which could only harm the state, and not the plaintiffs (*id.* (citing *Anza*, 547 U.S. at 457-58)). Plaintiffs' argument is unavailing. The predicate acts alleged here all arise out of Defendants' issuance and use of unbacked USDT to purchase cryptocommodities. Plaintiffs do not allege that they accepted the unbacked USDT in exchange for cryptocommodities. Rather, the harm alleged is the product of artificial prices in the cryptocommodity market, which harm requires independent market actors to create price floors or price bubbles.

In *Hemi Group*, a plurality of the Supreme Court held that New York City had not stated a RICO claim against a business that had failed to provide statutorily required disclosures about its customers to the New York State government, making it difficult for the city to pursue tax evaders.  *See Hemi Group*, 559 U.S. at 5-7.  The court concluded that proximate cause had not been sufficiently pleaded:  "[T]he conduct directly causing the [city's] harm was distinct from the conduct giving rise to the fraud," because of the various intervening factors attenuating the link between the business's failure to disclose and the city's lost tax revenue.  *Id.* at 2, 11.  Here as well, Plaintiffs' alleged injury is too attenuated, as various intervening factors may have caused independent market actors to buy cryptocommodities, including, as the B/T Defendants note, "speculation; introduction of other cryptocurrencies; distrust of centralized, government-controlled money supply; initial coin offerings; increasing media attention; and bullish market reports."  (B/T Br. 26).

Plaintiffs counter that the Supreme Court's decision in *Bridge* v. *Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008) — a case where the plaintiffs were found to have adequately pleaded proximate causation, despite allegations that the defendants targeted a third-party with racketeering conduct — supports a finding of proximate cause here.  (Pl. Opp. 46-47).  In point of fact, the Court finds that *Bridge* provides an instructive contrast with the allegations in the Amended Complaint.  In *Bridge*, the plaintiffs were unsuccessful participants in county tax lien auctions, and they alleged that the defendants had won a

disproportionate share of auctions by fraudulently manipulating the county's process of selecting auction winners in the event of a tie. *See Bridge*, 553 U.S. at 642-44. The defendants argued that proximate cause had not been established because the county, not plaintiffs, relied on the defendants' misrepresentations. *See id.* at 653-55. In rejecting this argument, the Supreme Court explained that "here, unlike in *Holmes* and *Anza*, [i] there are no independent factors that account for respondents' injury, [ii] there is no risk of duplicative recoveries by plaintiffs removed at different levels of injury from the violation, and [iii] no more immediate victim is better situated to sue." *Id.* at 658.[44] In the instant case, by contrast, (i) there are independent factors that may account for the injury, as just noted (*see* B/T Br. 26); (ii) there are more immediate victims; and (iii) there is a risk of duplicative recovery, because at the very least, individuals who received debased USDT for cryptocommodities could pursue a RICO claim.[45]

---

[44] In other words, as the Supreme Court explained in *Hemi Group*, "the plaintiff's theory of causation in *Bridge* was 'straightforward': Because of the zero-sum nature of the auction, and because [of the county's procedure for awarding bids], each time a fraud-induced bid was awarded, a particular legitimate bidder was necessarily passed over." *Hemi Group*, 559 U.S. at 14.

Plaintiffs' attempt to shoehorn the facts alleged here to align with those alleged in *Bridge* is unpersuasive. Plaintiffs argue that "here, for every injection of USDT onto the market, subsequent purchasers of crypto-commodities — including Plaintiffs — lost money," just as, in *Bridge* (as described in *Hemi Group*) "for every bid the Bridge defendants won through their fraud, another bidder necessarily lost out." (Pl. Opp. 46 (citing *Hemi Group*, 559 U.S. at 14-15)). The Court fails to see how a zero-sum bidding system, where one bidder winning necessarily causes other bidders to lose, is analogous to an open market, wherein myriad factors may influence the price of cryptocommodities, such that Defendants' injection of USDT into the market does not *necessarily* cause prices to increase.

[45] For essentially the same reasons, Plaintiffs' citations to *D'Addario* v. *D'Addario*, 901 F.3d 80 (2d Cir. 2018), and *De Sole* v. *Knoedler Gallery, LLC*, 974 F. Supp. 2d 274, 310 n.15 (S.D.N.Y. 2013), fail to carry the day. (*See* Pl. Opp. 46-47). Both cases stand only

Finally, in *Empire Merchants*, a distributor with exclusive rights to distribute certain brands of liquor in New York sued competing distributors for illegally smuggling liquor into the state. *See Empire Merchants,* 902 F.3d at 136. The plaintiff argued that because the smuggled liquor was not subject to New York's excise taxes, it could be sold at a lower price, which in turn decreased the plaintiff's sales. *See id.* at 137. The Second Circuit held that the complaint did not sufficiently plead proximate cause because the retailers' choices not to purchase liquor from the plaintiff did not necessarily follow from the defendants' smuggling activities. *Id.* at 146-47. The *Empire Merchants* court explained that the plaintiff "might have lost sales due to bootlegging from states with even lower alcohol excise taxes ... [o]r various retailers might have purchased wine, beer, or a brand of liquor not subject to Empire's exclusive distribution contracts to offer something new to consumers or to respond to changes in consumer tastes." *Id.* at 143. The *Empire Merchants* court rejected a similar attempt to analogize the facts in that case to those in *Bridge*:

> Empire asserts that its proximate cause theory is straightforward and like that in *Bridge*: it alleges that every crate of every Empire-exclusive brand smuggled into New York cost it a sale. We disagree. As in *Anza* and *Hemi*, and unlike *Bridge*, Empire has not and cannot allege that the asserted racketeering activity

---

for the proposition that a plaintiff may pursue a RICO claim even when the defendant's misrepresentation targeted a third party, as long as the causal link between the misrepresentation and the injury alleged is direct. Here, as noted above, the link is not sufficiently direct, because Plaintiffs' allegations necessarily require the involvement of independent market actors, exposed to other market forces, to establish the price floors and inflated prices that purportedly injured Plaintiffs. *Cf. Doe* v. *Trump Corp.*, 385 F. Supp. 3d 265, 678 (S.D.N.Y. 2019) ("If a purported intervening factor does not make any less certain the quantum of loss attributable to the defendant or create problems of apportionment, it cannot be said to attenuate the causal link.").

> directly caused its injury. This is so for three principal
> reasons: [i] Empire was harmed by the New York
> retailers' decisions to purchase less alcohol from
> Empire, which is not itself racketeering activity; [ii] the
> asserted causal relationship between the alleged
> racketeering and retailers' decisions to purchase less
> alcohol from Empire is intricate and uncertain, as in
> *Anza* and *Hemi*, and not *Bridge*; and [iii] New York State
> is a better situated plaintiff that was more directly
> harmed by the defendants' alleged racketeering.

*Id.* at 142.

So too here. *First*, Plaintiffs were harmed by the decisions of
independent market participants to purchase cryptocommodities (thereby
artificially inflating prices), which conduct is not itself racketeering activity.
*Second*, the relationship between Defendants' alleged racketeering activity —
covering up the unbacked nature of USDT and using unbacked USDT to
purchase cryptocommodities — and the establishment of price floors and the
simulation of organic demand (which purportedly caused Plaintiffs' injury), is
intricate, uncertain, and contingent on numerous independent decisions made
by other market participants, subject to other market forces. *Third*, market
participants who directly exchanged cryptocommodities for unbacked USDT
are better situated plaintiffs, as they were more directly harmed by Defendants'
alleged racketeering conduct.

For the foregoing reasons, the causal connection between Defendants'
purported racketeering and Plaintiffs' injury is insufficiently "direct" and
"straightforward" to satisfy the proximate cause requirement under Section

1962(c). *Holmes*, 503 U.S. at 268. Accordingly, the Court dismisses Plaintiffs' Section 1962(c) RICO claim. [46]

### ii. Plaintiffs' Section 1962(a) Claim Is Dismissed

Plaintiffs fare no better with Count Nine, their Section 1962(a) "investment of racketeering proceeds" claim. Given the nearly twenty-eight pages over which Plaintiffs detail their Section 1962(c) claim, the three pages they devote to their Section 1962(a) claim makes it seem like an afterthought — and indeed, the claim is specifically pleaded in the alternative. (*See* CAC ¶¶ 549-560). Like the Section 1962(c) claim, the Section 1962(a) claim is brought against all of the DigFinex Defendants; unlike the Section 1962(c) claim, the Section 1962(a) claim is not also brought against the CC Defendants.

As support for the Section 1962(a) claim, Plaintiffs allege that the DigFinex Defendants engaged in a pattern of racketeering activity that included wire fraud, engaging in transactions involving criminally derived property, and operating an unlicensed money transmitting business. (CAC ¶ 553). From this conduct, the DigFinex Defendants realized both income and proceeds of

---

[46] Plaintiffs argue that proximate cause may nevertheless be established if the injury is "'a foreseeable and natural consequence of [Defendants'] scheme,' for which Defendants are liable." (Pl. Opp. 47 (quoting *Bridge* v. *Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658 (2008); *see also id.* at 46-50). Plaintiffs misapprehend the relationship between proximate cause under RICO and at common law. *See, e.g.*, *Hemi Group*, 559 U.S. at 12 (stating that the Supreme Court in "*Holmes* never even mention[ed] the concept of foreseeability"); *Lerner* v. *Fleet Bank, N.A.*, 459 F.3d 273, 278 (2d Cir. 2006) ("A plaintiff must make a different showing of proximate cause — one that is often more difficult to make — when bringing suit under the RICO statute than when bringing a common-law cause of action."). Regardless of foreseeability, Plaintiffs must first establish that proximate causation is "direct," *Holmes*, 503 U.S. at 271, and as discussed above, Plaintiffs have failed to do so.

income, the former as a result of purchases of USDT by legitimate customers and the latter in the form of debased USDT.  (*Id.* at ¶ 554).  According to Plaintiffs, "Defendants then used their self-issued, debased USDT in the operation of an association-in-fact enterprise, whose purpose was to artificially inflate cryptocommodity prices and profit therefrom.  That enterprise consisted of the Tether Defendants, the Bitfinex Defendants, the Individual Defendants, Poloniex, and Bittrex (the 'Count Nine Enterprise')."  (*Id.* at ¶ 555).[47]  In other words, most of the *dramatis personae* who are alleged to have constituted the vehicle through which a pattern of racketeering activity was conducted in Count Eight are, with nearly identical allegations of conduct, also alleged to constitute the entity into which racketeering proceeds were invested in Count Nine.  Plaintiffs claim injuries as a result of purchasing cryptocommodities at artificially inflated prices.  (*Id.* at ¶ 558).

The B/T Defendants take the laboring oar in moving for dismissal of Plaintiffs' Section 1962(a) claim, arguing in relevant part that: (i) Plaintiffs fail to demonstrate "direct causation" in the Section 1962(a) context for the same reasons as in the Section 1962(c) context (*see* B/T Br. 27 n.17; B/T Reply 16); (ii) debased USDT are not "proceeds" derived from racketeering activity within

---

[47]     *See also* CAC ¶ 556:

> The Count Nine Defendants invested debased USDT in cryptocommodities through transfers of debased USDT from Tether to the Bitfinex crypto-exchange, and then to the Bittrex and Poloniex crypto-exchanges, where the debased USDT was sold for cryptocommodities.  This use of debased USDT in the operation of the Count Nine Enterprise directly caused cryptocommodity prices to increase.

the meaning of Section 1962(a) (*see* B/T Reply 17); and (iii) Plaintiffs fail to
allege a separate enterprise into which the racketeering proceeds were invested
(*see id.* at 17-18). As discussed in the remainder of this section, certain of the
B/T Defendants' arguments have more traction than others, but the Court
ultimately dismisses Plaintiffs' Section 1962(a) claim because of pleading
deficiencies regarding the alleged enterprise, the investment of funds, and the
claimed injury.

Section 1962(a) provides that:

> [i]t shall be unlawful for any person who has received
> any income derived ... from a pattern of racketeering
> activity ... in which such person has participated as a
> principal ..., to use or invest ... any part of such income,
> or the proceeds of such income, in acquisition of any
> interest in, or the establishment or operation of, any
> enterprise which is engaged in, or the activities of which
> affect, interstate or foreign commerce.

18 U.S.C. § 1962(a). Particularly when compared with the robust caselaw
regarding Section 1962(c), there are fewer cases addressing the requirements of
a claim under Section 1962(a). A sister court in this District has explained
that "[t]o state a claim under [Section] 1962(a), a plaintiff must allege '[i] that
the defendants used or invested racketeering income to acquire or maintain an
interest in the alleged enterprise; and [ii] that the plaintiffs suffered injury as a
result of that investment by the defendants." *4 K & D Corp.* v. *Concierge
Auctions, LLC*, 2 F. Supp. 3d 525, 543 (S.D.N.Y. 2014) (quoting *R.C.M. Exec.
Gallery Corp.* v. *Rols Cap. Co.*, 901 F. Supp. 630, 642 (S.D.N.Y. 1995)). Another
frequently cited decision from the Eastern District of New York teaches that:

> in order to state a cause of action for a violation of [Section] 1962(a), a plaintiff must allege [i] that a defendant received income from a pattern of racketeering activity; [ii] invested that income in the acquisition of a stake in, or establishment of, an enterprise distinct from the one from which the income was derived; and [iii] that the plaintiff suffered an injury flowing from this reinvestment of racketeering income distinct from any injury suffered because of the commission of the original predicate acts of racketeering activity.

*Leung* v. *Law*, 387 F. Supp. 2d 105, 120 (E.D.N.Y. 2005).

The *Leung* court's articulation of a Section 1962(a) claim is echoed in the B/T Defendants' argument that Plaintiffs have failed to allege a separate enterprise into which the proceeds of the racketeering activity were deposited. (*See* B/T Reply 17-18). The Court accordingly begins its analysis of Plaintiffs' Section 1962(a) claim by considering the statute's enterprise requirement.

Section 1962(a) aims to prevent "the use of racketeering money to acquire legitimate companies." *USA Certified Merchs., LLC* v. *Koebel*, 262 F. Supp. 2d 319, 330 (S.D.N.Y. 2003) (citing *Nat'l Org. for Women, Inc.* v. *Scheidler*, 510 U.S. 249, 259 (1994)); *see also Ideal Steel Supply Corp.* v. *Anza*, 652 F.3d 310, 320 (2d Cir. 2011) ("RICO provisions such as [Section] 1962(a) reflect Congress's concern about the control of otherwise legitimate business concerns 'acquired by the *sub rosa* investment of profits acquired from illegal ventures.'" (citations omitted)), *cert denied* 565 U.S. 1241 (2012). In light of their differing policy objectives, what qualifies as an "enterprise" under Section 1962(a) can differ from what qualifies as an enterprise under other provisions of the RICO statute:

111

> The "enterprise" referred to in subsections (a) and (b) is thus something acquired through the use of illegal activities or by money obtained from illegal activities. The enterprise in these subsections is the victim of unlawful activity and may very well be a "profit-seeking" entity that represents a property interest and may be acquired. But the statutory language in subsections (a) and (b) does not mandate that the enterprise be a "profit-seeking" entity; it simply requires that the enterprise be an entity that was acquired through illegal activity or the money generated from illegal activity.
>
> By contrast, the "enterprise" in subsection (c) connotes generally the vehicle through which the unlawful pattern of racketeering activity is committed, rather than the victim of that activity. Subsection (c) makes it unlawful for "any person employed by or associated with any enterprise ... to conduct or participate ... in the conduct of such enterprise's affairs through a pattern of racketeering activity...." Consequently, since the enterprise in subsection (c) is not being acquired, it need not have a property interest that can be acquired nor an economic motive for engaging in illegal activity; it need only be an association in fact that engages in a pattern of racketeering activity.

*Scheidler*, 510 U.S. at 259; *accord Tooker* v. *Guerrera*, No. 15 Civ. 2430 (JS) (ARL), 2017 WL 3475994, at *7 (E.D.N.Y. Aug. 11, 2017) ("Unlike Section 1962(c), the Section 1962(a) and (b) 'enterprise' is 'not intended to be the vehicle through which a pattern of racketeering is undertaken, but a separate, legitimate entity purchased through moneys raised through racketeering.'" (citing *Koebel*, 262 F. Supp. 2d at 330-31)); *Rush* v. *Oppenheimer & Co., Inc.*, 628 F. Supp. 1188, 1196-97 (S.D.N.Y. 1985) ("Thus where section 1962(c) envisions the racketeering acts conducted through the enterprise, section 1962(a) portrays the enterprise as the investment object of the criminal violators.").

112

A further distinction among civil RICO claims is that "there is no requirement under section 1962(a) (as opposed to section 1962(c)) that the 'person' be distinct from the 'enterprise.'" *Riverwoods Chappaqua Corp.* v. *Marine Midland Bank, N.A.*, 30 F.3d 339, 345 (2d Cir. 1994), *abrogated on other grounds by Cedric Kushner Promotions, Ltd.* v. *King*, 533 U.S. 158, 159 (2001). Precisely because Section 1962(a) eschews this requirement, "[t]he 'enterprise' in [Section 1962(a)] is not necessarily the racketeering enterprise in [Section] 1962(c), but refers to an 'entity purchased through moneys raised through racketeering.'" *4 K & D Corp.*, 2 F. Supp. 3d at 544 (quoting *Koebel*, 262 F. Supp. 2d at 330-31).

All of that said, Plaintiffs must still allege a qualifying enterprise. As defined in the RICO statute, an "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). This broad definition "has a wide reach." *Red Fort Cap., Inc.* v. *Guardhouse Prods. LLC*, 397 F. Supp. 3d 456, 467 (S.D.N.Y. 2019) (quoting *Boyle* v. *United States*, 556 U.S. 938, 944 (2009)). The Supreme Court has further explained that a RICO enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct," the existence of which is proven "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States* v. *Turkette*, 452 U.S. 576, 583 (1981); *accord United States* v. *Applins*, 637 F.3d 59, 73 (2d Cir. 2011).

While the enterprise requirement is "most easily satisfied when the enterprise is a formal legal entity ... [,] an association-in-fact may also be a RICO enterprise." *Palatkevich* v. *Choupak*, No. 12 Civ. 1681 (CM), 2014 WL 1509236, at *11 (S.D.N.Y. Jan. 24, 2014) (internal quotation marks omitted) (citing *First Cap. Asset Mgmt., Inc.* v. *Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004)). "An association-in-fact enterprise must have, at a minimum, the following structural features: 'a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.'" *Mayfield* v. *Asta Funding, Inc.*, 95 F. Supp. 3d 685, 699 (S.D.N.Y. 2015) (quoting *Boyle*, 556 U.S. at 946).

Accepting for present purposes Plaintiffs' allegation that the debased USDT constitutes the "proceeds" of Defendants' racketeering acts, the Court nonetheless concludes that Plaintiffs have failed to allege a qualifying enterprise into which these proceeds were invested. To begin, Plaintiffs' articulation of the Section 1962(a) enterprise is decidedly conclusory:

> The [DigFinex] Defendants used their self-issued, debased USDT in the operation of an association-in-fact enterprise, whose purpose was to artificially inflate cryptocommodity prices and profit therefrom. That enterprise consisted of the Tether Defendants, the Bitfinex Defendants, the Individual Defendants, Poloniex, and Bittrex (the "Count Nine Enterprise").

(CAC ¶ 555). Nothing in this paragraph explains how this enterprise is anything other than an arbitrary, artificial creation, reverse-engineered specifically to satisfy Section 1962(a)'s requirement.

114

Worse yet, Plaintiffs fail to draw any meaningful distinctions between the Section 1962(a) "entity" enterprise charged in Count Nine and the Section 1962(c) "vehicle" enterprise charged in Count Eight. (*See* CAC ¶¶ 550, 553 (alleging that the DigFinex Defendants "engaged in a pattern of racketeering activity, as described in Count Eight"); *see also id.* at ¶¶ 454-473 (describing the Count Eight RICO enterprise in extensive detail)). There is near-complete overlap between the members of these two purported enterprises (*compare id.* at ¶ 550, *with id.* at ¶ 555), and Plaintiffs allege no distinctions between the organizations, backgrounds, or structures of the two enterprises. The principal difference alleged is a conclusory assertion that one had the goal of issuing unbacked USDT, while the other had the goal of using the unbacked USDT to buy cryptocommodities. (*Compare id.* at ¶ 553, *with id.* at ¶ 555). But elsewhere in the Amended Complaint, Plaintiffs go to great lengths to establish that the DigFinex Defendants, the Exchange Defendants, *and* the CC Defendants were all willing participants in the conspiracy to use unbacked USDT to purchase cryptocommodities with the goal of inflating cryptocommodity prices. (*See, e.g.*, *id.* at ¶¶ 419-427). Finally, and most fatal to their claims, Plaintiffs have failed to allege "a separate, legitimate entity purchased through moneys raised through racketeering." *Tooker*, 2017 WL 3475994, at *7 (citing *Koebel*, 262 F. Supp. 2d at 330-31).[48]

---

[48]    To be clear, the Court recognizes, and does not penalize, Plaintiffs for pleading their RICO claims in the alternative. But while the Moving Defendants have not challenged the adequacy of the enterprise allegations for Count Eight, the B/T Defendants have

Put simply, given the nature of their allegations, Plaintiffs cannot satisfy the enterprise pleading requirements of Section 1962(a) merely by shuffling the deck of their Section 1962(c) enterprise. For this reason, their Section 1962(a) claim must be dismissed. Of note, however, Plaintiffs' failure to plead a Section 1962(a) enterprise has ripple effects for the remaining pleading requirements. One such deficiency concerns the "investment" requirement of the statute; because Plaintiffs have failed to allege a qualifying enterprise, Plaintiffs have also failed to allege the investment of any proceeds of racketeering activity in the "acquisition of any interest in, or the establishment or operation of" a commerce-affecting enterprise. 18 U.S.C. § 1962(a). Indeed, even were the Court to find that Plaintiffs' Count Nine Enterprise had been adequately pleaded, it would still have difficulty finding the investment requirement satisfied. The gravamen of Plaintiffs' argument is that Defendants' racketeering acts yielded proceeds in the form of "debased USDT, which had the market value of U.S. dollars and was freely exchangeable at that value for other assets." (CAC ¶ 554). Yet the ensuing transactions — "transfers of debased USDT from Tether to the Bitfinex crypto-exchange, and then to the Bittrex and Poloniex crypto-exchanges, where the debased USDT was sold for cryptocommodities" (*id.* at ¶ 556) — would not qualify as "investments," either in the Count Nine Enterprise as alleged or any of its constituent entities.

---

challenged the adequacy of the enterprise allegations for Count Nine, and the Court agrees that they are deficient for Section 1962(a) purposes.

Finally, Plaintiffs have failed to allege a qualifying injury. To state a claim under Section 1962(a), a plaintiff must allege "injury from the defendant's investment of the racketeering income[.]" *Ouaknine* v. *MacFarlane*, 897 F.2d 75, 83 (2d Cir. 1990). The Second Circuit has suggested that a broader range of injuries could suffice to state a claim under Section 1962(a) than under Section 1962(c):

> Further, the numerous disjuncts in [Section] 1962(a) create a broad prohibition. Assuming a pattern of racketeering activity and a commerce-affecting enterprise, both the funds derived "directly or indirectly" from such activity and the "proceeds of such income" are tainted: no part of the "income, or the proceeds of such income" may lawfully be "use[d] or invest[ed]," whether "directly or indirectly," in "the establishment or operation" of that enterprise. Thus, although the injury alleged to result from the violation of subsection (a) — as from the violation of any other subsection of [Section] 1962 — must be sufficiently directly related to the violation to meet the legal standard of proximate cause implied in [Section] 1964(c), the many disjuncts in [Section] 1962(a) mean that any of dozens of combinations or permutations will constitute a violation of that section.

*Ideal Steel Supply Corp.* v. *Anza*, 652 F.3d 310, 322 (2d Cir. 2011). Even then, Plaintiffs must allege an injury caused by the investment of the racketeering proceeds, and not merely by the predicate acts. Plaintiffs' failures to allege a qualifying enterprise or a qualifying investment foreclose their ability to plead injury cognizable under Section 1962(a).

* * *

Because Plaintiffs did not adequately allege a substantive violation of RICO in either Count Eight or Count Nine, the Court also dismisses Count Ten,

117

which alleges a RICO conspiracy in violation of Section 1962(d).  *See First Cap.*

*Asset Mgmt., Inc.*, 385 F.3d at 182 (collecting cases).

### d.    State Law Claims[49]

Finally, Plaintiffs allege state law claims against Tether, Bitfinex, and the

Individual Defendants for common law fraud and a violation of GBL § 349.[50]

For the reasons discussed herein, the Court denies Defendants' motions to

dismiss Count Eleven, Plaintiffs' common law fraud claim, but grants

Defendants' motions to dismiss Count Twelve, Plaintiffs' GBL § 349 claim.[51]

---

[49]    In this subsection, the term "Defendants" is intended to refer jointly to Tether, Bitfinex, and the Individual Defendants, except where explicitly stated otherwise.

[50]    No party suggests that the Court should apply the law of a state other than New York. (*See generally* B/T Br.; Potter Br.; Pl. Opp.; B/T Reply; Potter Reply).  New York courts apply an "interest analysis" to choice of law issues involving torts, which analysis seeks "to effect the law of the jurisdiction having the greatest interest in resolving the particular issue[.]"  *Cooney* v. *Osgood Mach., Inc.*, 81 N.Y.2d 66, 72 (1993).  Here, all but one of the named Plaintiffs are citizens of New York, and those Plaintiffs purchased cryptocommodities in New York in reliance on Defendants' purported fraudulent misstatements, and were also subsequently injured in New York by Defendants' purported misconduct.  *See, e.g., id.* at 72-74.  Thus, New York is the jurisdiction with the greatest interest in the matter, and the Court will apply New York law to Claims Eleven and Twelve.

[51]    Defendants ask the Court to decline to exercise supplemental jurisdiction over Plaintiffs' state law claims, arguing that "a 'district court usually should decline the exercise of supplemental jurisdiction when all federal claims have been dismissed at the pleading stage.'" (B/T Br. 36 (quoting *Denney* v. *Deutsche Bank AG*, 443 F.3d 253, 266 (2d Cir. 2006))).  However, as noted above, the Court declines to dismiss all federal claims.  When a district court has original jurisdiction in a civil action, it also "shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  Plaintiffs' state law claims arise out of the same conduct and seek redress for the same harm as Plaintiffs' federal claims.  Accordingly, considerations of "economy, convenience[,] [and] fairness," *In re Methyl Tertiary Butyl Ether Prods. Liability Litig.*, 510 F. Supp. 2d 299, 329-30 & n.137 (S.D.N.Y. 2007) (citing *City of Chicago* v. *Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997)), weigh in favor of the Court's exercise of supplemental jurisdiction over Plaintiffs' state law claims, and the Court addresses the merits of Defendants' motions to dismiss Counts Eleven and Twelve.

### i. Plaintiffs Adequately Allege Common Law Fraud

"To state a claim for fraud under New York law, a plaintiff must allege that (i) the defendant made a misrepresentation or material omission of fact, (ii) that was false and known to be false by the defendant, (iii) made for the purpose of inducing the plaintiff to rely upon it, (iv) the plaintiff's justifiable reliance on the misrepresentation or material omission, and (v) injury." *Cosgrove* v. *Or. Chai, Inc.*, 520 F. Supp. 3d 562, 587 (S.D.N.Y. 2021) (citing *Pasternack* v. *Lab'y Corp. of Am. Holdings*, 27 N.Y.3d 817, 827 (2016); *In re Fyre Festival Litig.*, 399 F. Supp. 3d 203, 212-13 (S.D.N.Y. 2019)).  Claims for fraud, even under state law, must satisfy the heightened pleading requirements of Rule 9(b).  *See Premium Mortg. Corp.* v. *Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009); *see generally Malvar Egerique* v. *Chowaiki*, No. 19 Civ. 3110 (KPF), 2020 WL 1974228, at *23 (S.D.N.Y. Apr. 24, 2020).

In moving to dismiss, Defendants contend that Plaintiffs have not adequately pleaded actual reliance or damage causation.  (*See* B/T Br. 36-38; B/T Reply 21-24).  Potter further argues that Plaintiffs' allegations as to him are insufficiently specific to meet Rule 9(b)'s stringent pleading requirements. For the reasons discussed below, the Court disagrees with Defendants and denies their motions to dismiss Count Eleven.

Defendants first argue that Plaintiffs fail to allege reliance with the requisite particularity because Plaintiffs do not plead facts to show that any of the individual purchases listed in the Amended Complaint was made in "actual reliance" on any of Defendants' purported misrepresentations.  (*See* B/T

119

Br. 36). Plaintiffs rejoin that in the market manipulation context, "reliance on artificial market prices suffices" and that Plaintiffs have pleaded such reliance. (Pl. Opp. 66; *see also* CAC ¶ 579).[52] Plaintiffs rely on *Minpeco, S.A.* v. *ContiCommodity Servs., Inc.* ("*Minpeco I*"), 552 F. Supp. 332 (S.D.N.Y. 1982), and its progeny in support of their market manipulation theory of reliance. (*See* Pl. Opp. 66-67 (collecting cases)).

In *Minpeco*, the district court held that the defendants' manipulation of the price of silver through monopolization of the silver market entitled plaintiff to a presumption of reliance in alleging fraud under New York law, even though the court noted the question of reliance in such a context was an open one under New York law. 552 F. Supp. at 335-38; *see also Minpeco, S.A.* v. *Hunt* ("*Minpeco II*"), 718 F. Supp. 168, 176 (S.D.N.Y. 1989). Subsequently, sister courts in this District have followed *Minpeco I* in finding that, in a common law fraud action under New York law alleging market manipulation activity, the reliance element may be satisfied at the motion to dismiss stage by an averment that the plaintiff relied on the integrity of the market. *See Fezzani* v. *Bear, Stearns & Co.*, 384 F. Supp. 2d 618 (S.D.N.Y. 2004) (explaining that case law in this District supports the argument that common-law fraud can be

---

[52] The Court disagrees with Defendants' characterization of the Amended Complaint as failing to allege that Plaintiffs relied on artificial market prices. (*See* B/T Reply 21-22). Plaintiffs adequately alleged that they generally relied on Defendants' misrepresentations "when purchasing cryptocommodities at artificially high prices caused by these materially false statements and omissions." (CAC ¶ 579). Nor can the Court find, as a matter of law, that Plaintiffs knew the markets were inefficient at the time they purchased cryptocommodities, as Defendants argue. (*See* B/T Reply 21). Accordingly, the Court declines to dismiss Plaintiffs' fraud claim on those grounds.

120

established on a market manipulation theory), *reconsideration denied in relevant part*, No. 99 Civ. 793 (RCC), 2004 WL 1781148 (S.D.N.Y. Aug. 10, 2004); *Vandenberg* v. *Adler*, No. 98 Civ. 3544 (WHP), 2000 WL 342718, at *12 (S.D.N.Y. Mar. 31, 2000) ("Allegations of direct and knowing participation in a market manipulation scheme that injured plaintiff is sufficient to state a fraud claim under common law."); *Scone Invs., L.P.* v. *Am. Third Mkt. Corp.*, No. 97 Civ. 3802 (SAS), 1998 WL 205338, at *10 (S.D.N.Y. Apr. 28, 1998) ("In a common law fraud action [under New York law] alleging market manipulation, the reliance element may be satisfied by averment that the plaintiff relied on the integrity of the market."); *Schultz* v. *Com. Programming Unlimited Inc.*, No. 91 Civ. 7924 (LJF), 1992 WL 396434, at *3 (S.D.N.Y. Dec. 23, 1992) ("[I]n the context of allegations of market manipulation a New York court may only require a plaintiff to allege reliance on the integrity of the market to satisfy the reliance element of common law fraud."); *In re Blech Sec. Litig.*, 961 F. Supp. 569, 587 (S.D.N.Y. 1997) (same).

The cases cited by Defendants are not to the contrary. While Defendants are correct that in *Pasternack* v. *Laboratory Corporation of America Holdings*, 27 N.Y.3d at 817, the New York Court of Appeals generally "decline[d] to extend the reliance element of fraud to a claim based on the reliance of a third party, rather than plaintiff," *id.* at 829, the Court of Appeals acknowledged that fraud is actionable where a third party "acted as a conduit to relay the false statement to plaintiff, who then relied on the misrepresentation to his detriment," *id.* at 828. As such, the Court agrees with Plaintiffs that the

121

market manipulation scheme described in the Amended Complaint resembles this "conduit" theory of third-party reliance, and that *Pasternack* therefore does not foreclose reliance in this case.

Next, Defendants cite two Second Circuit cases, *Pennsylvania Public School Employees' Retirement System* v. *Morgan Stanley & Co., Inc.* ("*PSERS*"), 772 F.3d 111 (2d Cir. 2014), and *Securities Investor Protection Corporation* v. *BDO Seidman, LLP* ("*SIPC*"), 222 F.3d 63 (2d Cir. 2000), to argue that "the Second Circuit 'repeatedly has refused to apply' … the fraud-on-the-market theory, 'to state common law cases.'" (B/T Reply 22 (alteration omitted) (quoting *PSERS*, 772 F.3d at 121)). But Defendants' argument works a sleight-of-hand on Plaintiffs' claims. Neither *PSERS* nor *SIPC* addresses market manipulation claims; instead, the plaintiffs in both cases alleged fraud arising out of specific misrepresentations or omissions. *See In re Blech*, 961 F. Supp. at 587 ("It is true that a fraud on the market theory is not available in cases alleging misrepresentations or omissions. However, in the context of market manipulation, New York law requires only that a plaintiff allege reliance on the integrity of the market to satisfy the reliance element of common law fraud." (internal citations omitted) (collecting cases)). Recognizing still that neither the Second Circuit nor New York State courts have yet provided a definitive answer to the question first addressed in *Minpeco — i.e.*, whether under New York law, in a market manipulation case, allegations of reliance on the integrity of the market satisfies the reliance element of common law fraud — the Court finds the reasoning employed by the Court in *Minpeco* and its progeny persuasive

122

and holds that, at least at the motion to dismiss stage, Plaintiffs have
adequately pleaded reliance. Defendants' arguments challenging the causation
element fail for the same reasons discussed above: taking all the well-pleaded
allegations in the Amended Complaint as true, Plaintiffs have adequately
alleged that Defendants' misrepresentations regarding USDT caused Plaintiffs'
injury through a scheme to artificially inflate cryptocommodity prices.

The Court turns next to Potter's argument that Plaintiffs fail to satisfy
Rule 9(b)'s particularity requirement. (*See* Potter Br. 15-16; Potter Reply 9).
The Court disagrees, again for essentially the same reason that the Court
rejected this argument with respect to Potter's motion to dismiss Plaintiffs'
antitrust and CEA claims. Plaintiffs' allegations of (i) Potter's leadership role at
Tether, Bitfinex, and DigFinex; (ii) his status as co-founder of Tether; and
(iii) his willing involvement in covering up USDT's purportedly unbacked nature
satisfy Rule 9(b) here. (*See, e.g.*, CAC ¶¶ 24, 36, 122, 152-156, 343-347, 480).
As Plaintiffs succinctly explain, "[t]he misrepresentation about Tether being
backed dollar-for-dollar was Tether's entire supposed business model, and one
of the key features of Tether that Potter and his co-conspirators held out to the
market." (Pl. Opp. 71). Plaintiffs have pleaded Potter's involvement in Tether's
leadership from the entities' inception through his departure in early 2018. As
such, the Court concludes that Plaintiffs "have adequately stated
circumstances that give rise to a plausible inference of knowledge and
liability[,]" *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d
Cir. 2009), and denies Potter's motion to dismiss Count Eleven.

## ii.    Plaintiffs' GBL § 349 Claim Is Dismissed

Count Twelve alleges that Defendants violated GBL § 349 by misrepresenting that USDT was fully backed by U.S. dollars.  GBL § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in" the state of New York.  GBL § 349(a).  Defendants argue that the conduct at issue was not consumer-oriented and that Plaintiffs failed to adequately allege that they suffered a direct injury as a result of Defendants' allegedly deceptive conduct.  (*See* B/T Br. 38-40; Potter Br. 17-18; B/T Reply 24-25; Potter Reply 10).  The Court agrees with Defendants that Plaintiffs fail to allege a direct injury and thus do not have standing under GBL § 349.[53]

To state a claim under GBL § 349, "'a plaintiff must allege [i] that the defendant ... engaged in consumer-oriented conduct; [ii] that the conduct was materially misleading; and [iii] that the plaintiff suffered injury as a result of the allegedly deceptive act or practice.'"  *Cosgrove*, 520 F. Supp. 3d at 575 (quoting *Weisblum* v. *Prophase Labs, Inc.*, 88 F. Supp. 3d 283, 292 (S.D.N.Y. 2015)); *see also Spagnola* v. *Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009). While "standing under [GBL § 349] had been extended to consumers and

---

[53]    The Court is aware of the unsettled nature of crypto-assets under the securities and commodities laws.  *See, e.g.*, *Barron* v. *Helbiz Inc.*, No. 20 Civ. 4703 (LLS), 2021 WL 229609, at *4 (S.D.N.Y. Jan. 22, 2021) (conducting a fact-intensive inquiry into the development and use of "Helbiz Coin," a type of crypto-asset, and thereafter holding that it is a security).  Here, the Court does not decide whether USDT is a security, commodity, or some other type of good or asset.  Nor does the Court decide whether USDT is consumer-facing.  As such, this decision should not be read to foreclose the possibility that consumers of USDT have standing to pursue a claim under GBL § 349.

competitors, the statute had not yet been interpreted to grant a right of action to parties not suing in either of those capacities." *City of New York* v. *Smokes-Spirits.Com, Inc.*, 12 N.Y.3d 616, 621 (2009) (citing GBL § 349(h)). Furthermore, "'derivative actions are barred' under section 349'" and as such, a plaintiff alleging only an indirect or derivative injury does not have standing under GBL § 349. *Id.* at 622 (quoting *Blue Cross & Blue Shield of N.J., Inc.* v *Philip Morris USA Inc.* ("*BCBS of NJ*"), 3 N.Y.3d 200, 207 (2004)).

Here, Plaintiffs do not allege that they are consumers of USDT, nor are they direct competitors of Defendants. Accordingly, they do not have standing to pursue their GBL § 349 claim. *Smokes-Spirits.Com, Inc.*, 12 N.Y.3d at 621.[54] Additionally, Plaintiffs' GBL § 349 claim must be dismissed as a "derivative action" because Plaintiffs' claimed injury — in the form of inflated cryptocommodity prices — is entirely derivative of injuries that Plaintiffs allege were suffered by misled consumers who exchanged cryptocommodities for unbacked USDT. *See id.* at 622 (holding that plaintiff "failed to establish standing ... because its claimed injury, in the form of lost tax revenue, is entirely derivative of injuries that it alleges were suffered by misled consumers who purchased defendants' cigarettes over the Internet"). This is precisely the

---

[54]    To the extent Plaintiffs attempt to assert they are consumers of cryptocommodities, not USDT, that claim fails because Plaintiffs clearly argue that they *invested* in cryptocommodities and were injured when their *investments* decreased in value. (*See* Pl. Opp. 1). Thus, the Court rejects such an argument for the reasons articulated in *DeAngelis* v. *Corzine*, 17 F. Supp. 3d 270, 284 (S.D.N.Y. 2014) ("[The plaintiff] invested funds with [defendants] as investments, not as a purchase of traditional consumer goods. Further, the commodities markets, like the securities markets, are subject to federal oversight and regulation. The Court thus rejects [plaintiff's] attempt to apply [Section] 349 in this case.").

kind of derivative injury the Court of Appeals has repeatedly foreclosed. *See id.* at 621-22; *accord BCBS of NJ*, 3 N.Y.3d at 207; *Frintzilas* v. *DirecTV, LLC*, 731 F. App'x 71, 72 (2d Cir. 2018) (summary order) (affirming dismissal of GBL § 349 claim because pleading "that a misleading act led to further steps which eventually harmed [plaintiffs]" is insufficient and "purely contingent on harm to third parties"). Accordingly, Plaintiffs' GBL § 349 claim must be dismissed.[55]

---

[55]     Plaintiffs cite to the Second Department's decision in *North State Autobahn* v. *Progressive Insurance Group Co.*, 953 N.Y.S.2d 96 (2d Dep't 2012), to argue that *Smokes-Spirits.Com* is inapposite. (*See* Pl. Opp. 74-75). However, *North State Autobahn* does not suggest that Plaintiffs have standing to pursue their GBL § 349 claims here. *North State Autobahn* dealt with a plaintiff who was a direct competitor of the defendants. 953 N.Y.S.2d at 105-06. As noted *supra*, the Court of Appeals has already explained that "standing under [GBL § 349] had been extended to consumers *and competitors.*" *City of New York* v. *Smokes-Spirits.Com, Inc.*, 12 N.Y.3d 616, 621 (2009) (emphasis added). However, in *Smokes-Spirits.Com*, the Court of Appeals explicitly declined to expand standing under GBL § 349 "to parties not suing in either of those capacities." *Id.*

126

## CONCLUSION

For the reasons set forth above, Defendants' motions to dismiss are GRANTED IN PART and DENIED IN PART.  Counts Three, Eight, Nine, Ten, and Twelve are dismissed.  Count Six is dismissed in part.[56]  The Moving Defendants' motions to dismiss are denied as to Counts One, Two, Four, Five, Seven, and Eleven.  Fowler's motion to dismiss for lack of personal jurisdiction is denied.

Defendants are hereby directed to file Answers to the Amended Complaint by **October 28, 2021**.  The Parties are directed to file a revised proposed case management plan and joint status letter by **November 18, 2021**.

The Clerk of Court is directed to terminate the motions at docket entries 142, 144, 146, 148, and 167.  The Clerk of Court is further directed to mail a copy of this Opinion to Mr. Fowler at his address of record.

SO ORDERED.

Dated:      September 28, 2021
            New York, New York

_____
            KATHERINE POLK FAILLA
            United States District Judge

---

[56]      For the reasons discussed *supra*, Count Six is dismissed as to the Exchange Defendants, the Bitfinex Defendants, the Tether Defendants, and DigFinex.

127