UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-2989-MDL-ALTONAGA/Torres

In re:

JANUARY 2021 SHORT SQUEEZE
TRADING LITIGATION

_____/

This Document Relates to All Claims Included
in the Other Broker Tranche

PLAINTIFFS' MEMORANDUM OF LAW IN
OPPOSITION TO THE MOTION TO DISMISS OF DEFENDANT
<u>APEX CLEARING CORP.  IN THE OTHER BROKER TRANCHE</u>

**GROSSMAN ROTH YAFFA COHEN, P.A.**
Rachel W. Furst (FBN 45155)
2525 Ponce de Leon Blvd., Ste 1150
Coral Gables, FL 33134-6040
Tel: 305-442-8666
rwf@grossmanroth.com

*Plaintiffs' Liaison Counsel*

**SAFIRSTEIN METCALF LLP**
Peter Safirstein (NY SBN 2044550)
1345 Avenue of the Americas, 2nd Floor
New York, NY 10105
Tel: (212) 201-5845
psafirstein@safirsteinmetcalf.com

*Plaintiffs' Lead Counsel for the
Other Broker Tranche*

*[Additional Counsel Listed
On Signature Page]*

# TABLE OF CONTENTS

I.  INTRODUCTION ..............................................................................1

II.  FACTUAL BACKGROUND ............................................................5

    A.  Apex's Roles As a Broker-Dealer and a Clearing
        Broker-Dealer .......................................................................5

    B.  The Events of January 28, 2021.............................................6

        1.  Apex's Attempt to Conflate the Time Zones is
            Patently Transparent And Deceptive ...................................10

III.  ARGUMENT .................................................................................12

    A.  Standard of Review...............................................................12

    B.  This Court Has Subject Matter Jurisdiction
        Over The Other Broker Tranche ...........................................13

    C.  Plaintiffs Jang and Chavez Have Article III Standing ...............16

        1.  Plaintiffs Allege an Injury in Fact Which Apex
            Attempts to Mischaracterize as "Speculative"....................16

        2.  Plaintiffs Allege a "Legally Protected Interest".................18

        3.  Plaintiffs Have Standing To Bring
            Claims on Behalf of Direct Customers..............................20

    D.  New York Substantive Law Applies .........................................21

    E.  Plaintiffs Have Stated A Claim For Negligence (Count I) .........23

        1.  Apex Owes Duties to Both "Introduced"
            Customers and "Direct" Customers. ...................................24

        2.  Clearing Broker Liability...................................................29

        3.  The Economic Loss Rule Does Not Undermine
            Defendant's Negligence Or The
            Ability of Plaintiffs to Recover..........................................31

        4.  Apex Breached its Duty To Plaintiffs.................................34

i

        5.   The Complaint Properly Alleges that Apex's
              Actions Proximately Caused Plaintiffs'
              Alleged Injury ....................................................................37

   F.    Plaintiffs State A Claim For Breach of
        Fiduciary Duty (Count II) ........................................................38

   G.   Plaintiffs Have Properly Stated An Alternative Claim
        for Tortious Interference With Business Relationship.............42

   H.   Plaintiffs State Law Claims Are Not Preempted
        By Federal Securities Laws .....................................................43

   I.    Plaintiffs' Claims Are Viable As Pleaded on Behalf of Apex's
        Shared Customers and Investors Who Were Foreseeably
        Harmed by Apex ....................................................................45

IV.  SHOULD THE COURT DISMISS THE COMPLAINT IN
     WHOLE OR IN PART, LEAVE
     SHOULD BE GRANTED TO REPLEAD .................................................46

V.   CONCLUSION ............................................................................................46

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*,
  2002 WL 88226 (S.D.N.Y. Jan. 23, 2002) ............................................................... 31

*Aaron Private Clinic Mgmt. LLC v. Berry*,
  912 F.3d 1330 (11th Cir. 2019) .............................................................................. 17

*AMBAC Assur. v. US Bank Natl Association*,
  328 F. Supp. 3d 141 (S.D.N.Y. 2018) ................................................................. 33, 34

*Appert v. Morgan Stanley Dean Witter, Inc.*,
  2009 WL 3764120 (N.D. Ill. Nov. 6, 2009) ............................................................ 44

*Arkin v. Innocutis Holdings, L.L.C.*,
  188 F. Supp. 3d 1304 (M.D. Fla. 2016) .................................................................. 19

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................................ 13

*Atkins v. Glen Falls City Dist.*,
  53 N.Y.2d 325 (1981) .............................................................................................. 23

*Bass v. Facebook, Inc.*,
  394 F. Supp. 3d 1024 (N.D. Cal. 2019) .................................................................. 45

*Beckwith v. Hart*,
  263 F. Supp. 2d 1018 (D. Md. 2003) ...................................................................... 31

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................ 12

*Berwecky v. Bear Stearns & Co.*,
  197 F.R.D. 65 (S.D.N.Y. 2000) ............................................................................... 30

*Brink v. James*,
  341 F.Supp.3d 1314 (S.D. Fla. 2018) ..................................................................... 26

*Brink v. Raymond James & Assocs, Inc.*,
  2015 WL 11198241 (S.D. Fla. June 29, 2015) ....................................................... 25

*Brown v. SCI Funeral Servs. of Fla., Inc.*,
  212 F.R.D. 602 (S.D. Fla. 2003) ............................................................................. 20

iii

*Bryant v. Avado Brands, Inc.*,
187 F.3d 1271, fn.1 (11th Cir. 1999) ................................................................. 10

*Cannizaro v Bache, Halsey, Stuart, Shields, Inc.*,
81 F.R.D. 719 (S.D.N.Y., 1979) ......................................................................... 30

*Carvel Corp. v. Noonan*,
3 N.Y.3d, 182 (2004) .......................................................................................... 42

*Clements v. Withers*,
437 S.W. 2d 818 (Tex. 1969) .............................................................................. 43

*Coker v. Coker*,
650 SW 2d 391 (Texas Supreme Court, 1983) ................................................... 28

*Commerzbank AG v. U.S. Bank National Association*,
277 F. Supp. 3d 483 (S.D.N.Y. 2017) ........................................................... 33, 34

*Conway v. Icahn & Co., Inc.*,
16 F.3d 504 (2d Cir. 1994) ................................................................................. 39

*Cooper v. Meridian Yachts, Ltd.*,
575 F. 3d 1151 (11th Cir. 2009) ......................................................................... 23

*Costa v. Kerzner Int'l Resorts Inc.*,
2011 US Dist. LEXIS 66921 (S.D. Fla. June 23, 2011) ...................................... 22

*Curry Road Ltd. v. K Mart Corp.*,
893 F.2d 509 (2d Cir. 1990) ............................................................................... 28

*D. Houston v. Love*,
92 S.W.3d 450 (Tex. 2002) ................................................................................. 24

*Davis v. S. Bell Tel. & Tel. Co.*,
1993 WL 593999 (S.D. Fla. Dec. 23, 1993) ....................................................... 20

*De Kwiatkowski v. Bear, Stearns & Co.*,
126 F.Supp.2d 672 (S.D.N.Y. 2000) ............................................................. 24, 40

*De Kwiatkowski v. Bear, Stearns & Co.*,
306 F.3d 1293 (2d Cir. 2002) ........................................................................ 24, 40

*Derdiarian v. Felix Contr. Corp.*,
51 N.Y.2d 308 (1980) ......................................................................................... 38

iv

*EBC I v.* Goldman Sachs & Co.,
   5 N.Y. 3d 11 (2005) ................................................................................................ 39

*ERI Consulting Eng'rs, Inc. v. Swinnea,*
   318 S.W.3d 867 (Tex. 2010) .................................................................................... 34

*Etzel v. Hooters of America, LLC,*
   2016 WL 8604317 (N.D. Ga. Nov. 15, 2016) ........................................................ 19

*Fernandez v Sch. Bd. Of Miami-Dade Cnty.,*
   201 F.Supp.3d 1353 (S.D. Fla 2016) ........................................................................ 7

*First Assembly Of God, Inc. v. Texas Utilities Elec. Co.,*
   52 S.W. 482 (Tex. 2001) ......................................................................................... 38

*First Nat. Bank of Eagle Pass v. Levine,*
   721 S.W.2d 287 (1986) ........................................................................................... 43

*Fuller v. SunTrustBanks, Inc.,*
   744 F.3d 685 (11th Cir. 2014) .................................................................................. 7

*Glob. Enter. Grp. Holding, S.A.* v. Ottimo,
   2010 WL 11629556 (E.D.N.Y., June 8, 2010) ........................................... 30, 31, 41

*Gochnauer v. A.G. Edwards & Sons, Inc.,*
   810 F.2d 1042 (11th Cir. 1987) .............................................................................. 39

*Goldman v. Belden,*
   754 F. 2d 1059 (2d Cir. 1985) ................................................................................ 12

Goldman v. *McMahan, Brafman, Morgan & Co.,*
   1987 WL 12820 1, 22 (S.D.N.Y, 1987) .................................................................. 30

*Green Leaf Nursery v. E.l. DuPont De Neumours and Co.,*
   341 F.3d 1292 (11th Cir. 2003) .............................................................................. 23

*Hain v. Jamison,*
   28 N.Y. 3d 524 (N Y. 2016) .............................................................................. 37, 38

*Hall v. Burger King Corp.,*
   912 F. Supp. 1509 (S.D. Fla. 1995) ................................................................... 21, 22

*Hand v. Dean Witter Reynolds Inc.,*
   889 S.W.2d 483 (Tex. App. 1994) .......................................................................... 31

v

*In re Arris Cable Modem Cons. Litig.*,
  327 F.R.D. 334 (N.D. Cal. 2018) ........................ 21

*In re Blech Sec. Litig.*,
  961 F. Supp. 569 (S.D.N.Y. 1997) ...................... 30

*In re Checking Account Overdraft Litig.*,
  275 F.R.D. 666 (S.D. Fla. 2011) ....................... 20

*In re Equifax, Inc. Customer Data Sec. Breach Litig.*,
  362 F.Supp.3d 1295 (N.D. Ga. 2019) .................... 45

*In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*,
  2011 WL 1232352 (S.D. Tex. Mar. 31, 2011) ............ 13

*In re Korean Air Lines Co., Ltd., Antitrust Litig.*,
  642 F.3d 685 (9th Cir. 2011) ......................... 15

*In re Letterman Bros. Energy Securities Litigation*,
  799 F.2d 967 (5th Cir. 1986) ......................... 39

*In re Managed Care Litig.*,
  150 F.Supp.2d 1330 (S.D. Fla. 2001) .................. 13

*In re Series 7 Broker Qualification Exam Scoring Litig.*,
  510 F. Supp. 2d 35 (D.D.C. 2007) ..................... 44

*In re Takata Airbag Products Liability Litigation*,
  255 F. Supp. 3d 1241 (S.D. Fla. 2017) ................ 21

*In re Takata Airbag Products Liability Litigation*,
  379 F.Supp.3d 1333 (S.D. Fla. 2019) ............... 13, 14

*In re Worldcom, Inc. Sec. Litig.*,
  219 F.R.D. 267 (S.D.N.Y. 2003) ....................... 21

*Independent Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*,
  157 F. 3d 933 (2d Cir. 1998) ......................... 40

*Javitch v. First Montauk Fin. Corp.*,
  279 F. Supp.2d 931 (N.D. Ohio) ....................... 25

*Jim Walter Homes, Inc. v. Reed*,
  711 S.W.2d 617 (Tex.1986) ............................ 33

vi

*King Cty., Wash. v. IKB Deutsche Industriebank AG*,
  863 F. Supp. 2d 288 (S.D.N.Y. 2012) ................................................. 34

*Kneese v. Pershing, LLC*,
  2012 WL 13019677 (N.D. Tex. 2012) .................................................. 31

*Kornberg v. Carnival Cruise Lines, Inc.*,
  741 F.2d 1332 (11th Cir. 1984) .......................................................... 20

*Kuoruga v. Fiserv Correspondent Servs.*,
  183 F. Supp. 2d 1245 (D. Or. 2001) .................................................... 30

*Kurtzman v. Bergstol*,
  835 N.Y.S. 2d 644 (2nd Dep't 2007) .................................................. 39

*LAN/STV v. Martin K. Eby Const. Co.*,
  435 S.W.3d 234 (Tex. 2014) .................................................. 32, 33, 34

*Lange v. Hentz & Co.*,
  418 F. Supp. 1376 (N.D. Tex. 1976) ................................................... 25

*Levitt v. J.P. Morgan Sec., Inc.*,
  710 F.3d 454 (2d Cir. 2013) ................................................................ 41

*Lexecon, Inc. v Milberg Weiss Bershad Hynes & Lerach*,
  523 U.S. 26 (1998) ............................................................................. 13

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ..................................................................... 16, 20

*MacDonald v. Follett*,
  180 S.W. 2d 334 (1944) ..................................................................... 39

*Magnum Corp. v. Lehman Bros. Kuhn Loeb, Inc.*,
  794 F.2d 198 (5th Cir. 1986 ) ........................................................ 24, 39

*Maliner v. Wachovia Bank, NA*,
  2005 WL 670293 (S.D. Fla. 2005) ..................................................... 34

*Mars v. Wedbush Morgan*,
  283 Cal. Rptr. 238 (Cal Ct. App. 1991)............................................... 31

*Martinez Tapia v. Chase Manhattan Bank, NA*,
  149 F.3d 404 (5th Cir. 1998) ............................................................. 40

*McCarthy v. Dun & Bradstreet Corp.*,
  482 F.3d 184 (2d Cir. 2007) ................................................................. 10, 12

*McDaniel v. Bear Stearns & Co., Inc.*,
  196 F. Supp. 2d. 343 (S.D.N.Y. 2002) .................................... 29, 30, 31

*McLean v. Triboro Coach Corp.*,
  302 N.Y. 49 (1950) ................................................................................. 23

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng*,
  697 F. Supp. 1224 (D.D.C. 1988) ....................................................... 25

*Miley v. Oppenheimer & Co., Inc.*,
  637 F. 2d 318 (5th Cir. 1981) ............................................................. 25

*Mills v. Foremost Ins. Co.*,
  511 F.3d 1300 (11th Cir. 2008) .......................................................... 19

*MM&S Fin., Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*,
  364 F.3d 908 (8th Cir. 2004) .............................................................. 44

*Nelson v. Matrixx Initiatives, Inc.*,
  2012 WL 1094316 (N.D. Cal. Mar. 30, 2012) .................................. 15

*Palsgraf v. Long Island R. Co.*,
  248 N.Y. 339 (1928) ............................................................................. 2, 4

*Paris v. Progressive Am. Ins. Co.*,
  2020 WL 7039018 (S.D. Fla. 2020) ................................................... 21

*Paterson v. Deeb*,
  473 So.2d 1210 (Fla. 1st DCA 1985) ................................................ 24

*Piazza v. Ebsco Indus., Inc.*,
  273 F.3d 1341 (11th Cir. 2001) .......................................................... 20

*Pinchinat v. Graco Children's Prod., Inc.*,
  390 F.Supp.2d 1141 (M.D. Fla. 2005) .............................................. 24

*Press v. Chem. Inv. Servs. Corp.*,
  166 F. 3d 529 (2d Cir. 1999) .............................................................. 40

*Pulka v. Edelman*,
  358 N.E. 2d 1019 (N.Y. 1976) ........................................................... 31

*R2 Investments LDC v. Phillips,*
    401 F. 3d 638,fn. 2 (5th Cir. 2005) ........................................................................ 7

*Remington v. Newbridge Sec. Corp.,*
    2013 WL 2444719 (S.D. Fla. June 5, 2013) ..................................................... 24, 25

*Riggs v. Schappell,*
    939 F. Supp. 321 (D.N.J. 1996) ........................................................................... 31

*Robins Dry Dock & Repair Co. v. Flint,*
    275 U.S. 303 (1927) ............................................................................................. 32

*Ross v. Bolton,*
    904 F.2d 819 (2d Cir. 1990) ................................................................................ 31

*Rozsa v. May Davis Group, Inc.,*
    152 F. Supp. 2d 526 (S.D.N.Y. 2001) ................................................................. 30

*Rozsa v. May Davis Grp., Inc.,*
    187 F. Supp. 2d 123 (S.D.N.Y. 2002) ................................................................. 31

*Schenck v. Bear, Stearns & Co.,*
    484 F. Supp. 937 (S.D.N.Y. 1979) ...................................................................... 40

*Scott v. Dime Sav. Bank of New York, FSB,*
    886 F.Supp. 1073 (S.D.N.Y. 1995) ..................................................................... 25

*Shahar v. Bowers,*
    120 F.3d 211 (11th Cir. 1997) ............................................................................. 22

*Sierra v City of Hallandale Beach, Florida,*
    996 F.3d 1110 (11th Cir. 2021) ........................................................................... 19

*Stern v. Legent Clearing LLC,*
    2009 WL 2244616 (N.D. Ill. July 28, 2009) .................................................. 30, 41

*Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.,*
    305 F.3d 1293 (11th Cir. 2002) ........................................................................... 31

*Thropp v. Bache Halsey Stuart Shields, Inc.,*
    650 F.2d 817 (6th Cir. 1981) ............................................................................... 39

*Travis v. Mesquite,*
    830 S.W.2d 94 (Tex. 1992) .................................................................................. 38

*Trumpet Vine Investments v. Union Capital Partners*,
  92 F.3d 1110 (11th Cir. 1996) ........................................................ 21

*Turk v. Pershing LLC*,
  2014 WL 12572906 (N.D. Tex. Dec. 8, 2014) ...................................... 31

*United States v. Diebold*,
  369 U.S. 654 (1962) ........................................................ 28

*Venerus v. Avios Budget Car Rental, LLC*,
  723 Fed. App'x 807 (11th Cir.2018) ........................................ 20

*Wahl v Gen. Elec. Co.*,
  786 F.3d 491 (6th Cir. 2015) .............................................. 13

*Walco Invs., Inc. v. Thenen*
  168 F.R.D. 315 (S.D. Fla. 1996).......................................... 20

*Weatherly v. Pershing*,
  2015 U.S. Dist. LEXIS 197128 (N.D. Tex. June 23, 2015) ............... 32

*West v. Touchstone*,
  620 S.W. 2d 687 (Tex. Civ. App. 1981)................................... 24

*Western Investments Inc. v. Urena*,
  162 S.W.3d 547 (Tex. 2005) ............................................. 38

*Wistar v. Raymond James Financial Services, Inc.*,
  365 F.Supp.3d 1266  (S.D. FL. 2019) .................................... 25

Statutes

28 U.S.C. Section 1391 ........................................................... 14
28 U.S.C. Section 1404(a) ........................................................ 14
28 USC §1407..................................................................... 13, 14
Regulatory,
  Notice 21-12 .............................................................. 6, 26
Regulatory,
  Notice 21-16 .............................................................. 23, 29
Restatement (Second) of Agency § 1 (1958).................................... 24
Restatement (Second) of Torts § 874.......................................... 39

Rules

Fed. R. Civ. P. 12(b)(6).......................................................... 12
Federal Rule of Civil Procedure 23 .............................................. 21

x

Federal Rule of Evidence 201 ................................................................................................ 7, 22
FINRA Rule 2010 .......................................................................................................................... 26
FINRA Rule 2268 .......................................................................................................................... 23
FINRA Rule 3110 .......................................................................................................................... 26
FINRA Rule 4370 .......................................................................................................................... 26
FRCP 15(a)(2) ................................................................................................................................ 15
Rule 23(a) ...................................................................................................................................... 21

**Regulations**

17 C.F.R. § 240.15c3-1 ................................................................................................................ 27

**Other Authorities**

Liability of Clearing Firms: Traditional and Developing Perspectives,
  , 1062 *PLI/Corp.* 139, 143 (1998) (1998) ................................................................................ 29

The Role and Regulation of Clearing Brokers,
  48 *Bus. Law.* 841 (1993) .......................................................................................................... 29

# I.   **INTRODUCTION**

On January 28, 2021, Apex imposed an unprecedented, unilateral, unwarranted and one-sided shut down of its securities trading platform and the trading platforms it controls as a clearing broker to prevent its many customers from purchasing certain in-demand securities for approximately three and one-half hours ("Purchase Shutdown").  This Purchase Shutdown was consequential in that it foreseeably decreased and suppressed the price of those securities. As Plaintiffs alleged, and as Defendant's Motion to Dismiss ("Def. Mot.") confirms, the Purchase Shutdown was unwarranted when it began.  Compounding that, Apex maintained the Purchase Shutdown for hours after it knew that there was no justification for it to continue.  Apex's weak excuse for the Purchase Shutdown was a supposed demand by the Depository Trust & Clearing Corporation ("DTCC") for a higher collateral deposit.  But that excuse, if it ever existed or was ever justified, evaporated by 11:47 a.m. (Eastern), January 28th when the DTCC advised Apex that the increased collateral requirement was lower than previously communicated and was within the range Apex found acceptable.  This was sixteen minutes *after* Apex implemented the Purchase Shutdown at 11:31 a.m. Eastern.

In fact, Apex, by its own admission was never in danger on January 28th of failing to comply with its collateral requirements. As the Amended Consolidated Class Action Complaint (ECF No. 410, the "Amended Complaint" or "AC") alleges, "[o]n March 4, 2021, Rothschild [Apex's former President] admitted in an interview with Financial Planning, that **Apex did not restrict trading as a result of capital requirements**, stating that Apex had "'headroom' in terms of the capital available on its balance sheet and also had credit lines it could call upon." (AC ¶ 84) (emphasis added). Apex's Motion ignores its own statements that dramatically undercut the premise of its defense and asks this Court to do what no court has ever done, grant broker-dealers (including clearing broker-dealers) absolution (or blanket immunity) for their own misconduct.

Apex cannot justify its three-and a-half hour trading suspension as the evidence, provided by DTCC, demonstrates Apex was informed by DTCC no later than 11:47 a.m. Eastern that the collateral requirement was lower than previously communicated and within the range found acceptable by Apex.[1] But Apex did not lift the Purchase Shutdown until 2:55 p.m. Eastern.  In

---

[1] By Apex's own telling, it was upon learning that the collateral requirement was less than originally communicated that led Apex to lift the Purchase Shutdown. AC ¶76.

short, if Apex's then President is to be believed that Apex never faced a cash crisis on January 28th (AC ¶ 84), then Apex's implementation of an approximately 3.5 hour suspension of the ability to purchase stocks was unjustified. If Apex's then President is misinformed, and Apex did not have "headroom," Apex still cannot explain why the Purchase Shutdown lasted for more than three hours after the DTCC informed Apex that the collateral requirement was at a level that Apex found to be acceptable.

The consequences of Apex's unprecedented action were monumental. Plaintiffs' have pled, and Apex has admitted, that it acted out of fear of a rising collateral requirement. (AC ¶ 77). That requirement, that Apex intended to forestall, was linked to an increase in the price of the shut down securities. The Purchase Shutdown foreseeably halted the rise in the price of the affected securities. In other words, Apex succeeded in adversely affecting the price of the subject securities, to the injury of Plaintiffs and the class of investors in those securities.

As pled, Apex's imposition of the unwarranted hours-long Purchase Shutdown is classic negligence. Apex, a registered broker-dealer had a common law duty of care. Here, Apex, despite industry requirements, had no plan in place to address increased volatility or increased collateral requirements, and, then once it implemented the Purchase Shutdown, Apex did not timely lift the Purchase Shutdown. Apex badly misapplies *Palsgraf*.[2] Def. Mot. at 2. Apex's imposition of the Purchase Shutdown foreseeably caused the price decrease and suppression of those stocks and caused Plaintiffs and other members of the putative class to suffer damages. Blaming the victim may be a popular tactic, but Apex is wrong. Plaintiffs are victims and not remote bystanders harmed by Defendant's innocent action.

It is important to set the record straight as to Apex's role on January 28, 2021. Apex is charged in connection with its dual role as a broker-dealer and as a clearing broker-dealer. Its role as a broker-dealer is straightforward. Various investor customers have broker-dealer accounts with Apex to directly purchase and sell securities through Apex's platform. On January 28th Apex suspended the ability of each of these customers to purchase shares of (and call options to buy shares of) AMC Entertainment Holdings, Inc. ("AMC"), GameStop Corp. ("GME"), and Koss Corporation ("KOSS") (collectively, the "Suspended Stocks") for three hours and twenty-five

---

[2] *Palsgraf v. Long Island R. Co.,* 248 N.Y. 339, 341 (1928) (Cardozo, C.J.)

minutes.  Apex's role as a clearing broker-dealer is also straightforward.  As a clearing broker-dealer, Apex typically provides back-office services to generally smaller broker-dealers, called "Introducing Broker Dealers" or "Introducing Brokers."  Various investors, such as Plaintiffs, open accounts with Introducing Broker-Dealers, such as Webull Financial LLC ("Webull") and Ally Invest ("Ally"). When opening accounts with the Introducing Broker-Dealers, investors also, at the same time, enter into agreements with and become customers of Apex, as the clearing broker-dealer ("Clearing Broker-Dealer").  Typically, customers of Introducing Brokers enter their trading orders through the Introducing Broker which are then processed through the Clearing Broker-Dealer. In that regard, each customer of an Introducing Broker-Dealer is also a customer of Apex, the Clearing Broker-Dealer.  Because these customers are shared as between the Introducing Broker Dealer and Apex as part of a three-way agreement they are "Shared Customers."

A Clearing Broker-Dealer typically performs ministerial functions and, therefore, is largely immune from legal liability for any misconduct performed by the Introducing Broker-Dealer. Apex has attempted to mischaracterize its role here. Apex is not named as a defendant in connection with any ministerial role.  Here, Apex, utilizing its power as a Clearing Broker-Dealer, improperly stepped in front of the Introducing Broker-Dealers and unilaterally shut down their ability to accept purchase orders for the Suspended Stocks by customers that the Introducing Broker-Dealer and Apex shared.  The Shared Customers (as well as the Introducing Broker-Dealers) were at the mercy of the power Apex wielded by virtue of Apex's role as the gatekeeper between the Shared Customers and the securities markets. Accordingly, the law that Apex cites limiting its liability in connection with ministerial functions is irrelevant.  The law is clear that Clearing Broker-Dealers do have liability to their Shared Customers when they take action, as Apex did here, that is beyond the performance of ministerial functions and interferes directly with the customer's account causing consequential injury. Highlighting the degree to which Apex stepped out of bounds, it also incurred the public wrath of the Introducing Broker-Dealers.

Apex pretends that its unprecedented, unilateral, unwarranted one-way shut down of the market for the purchase of securities is permissible risk precaution. It is not. It is insanity. With devastating consequences. That is why in the long of history of securities trading no other broker-

3

dealer has taken the same action regarding in-demand securities, with the notable exception of Robinhood (on January 28th), separately sued in this MDL.[3]

Apex mischaracterizes the U.S. Securities and Exchange Commission (" SEC") Office of Investor Education and Advocacy's January 30, 2021 Investor Alert and Bulletin  (the investor "Bulletin") as "endors[ing] trade restrictions during the weeks' volatility," (Mot. 2, n.1), ignoring the fact that the SEC, in the same Bulletin reminded of the approved regulatory procedure for addressing market volatility, which Apex failed to follow.  That approved regulatory procedure envisions a full market shutdown as a temporary (typically measured in minutes) halting of purchases and sales by all broker-dealers.[4] Importantly, the SEC has never stated that investors cannot sue the brokerage houses for damages for the conduct undertaken by Apex.

Despite having interfered with the securities markets, Apex takes umbrage at accepting any responsibility for the effects of its actions on the market price. Instead, Apex directs its displeasure at its own customers, feigning shock that investors would seek to profit from trading in the securities market. What's more, Apex deliberately misreads Plaintiffs' since superseded complaint

---

[3] Unlike Apex and Robinhood, E*Trade reported an incidental minor shut down at the end of the trading day on January 28, 2021.

[4]  *See*, SEC Office of Investor Education and Advocacy, "Thinking About Investing in the Latest Hot Stock? Understand the Significant Risks of Short-Term Trading Based on Social Media, Investor Alerts and Bulletins (Jan. 30, 2021) *available at* https://www.sec.gov/oiea/investor-alerts-and-bulletins/risks-short-term-trading-based-socialmedia-investor-alert (last visited November --, 2021) In that Bulletin, under the same heading regarding "Market and broker-dealer protections for volatile stocks," the SEC explains:

> The national securities exchanges and FINRA have rules designed to address market volatility in stocks listed on a national securities exchange. The "Limit up-Limit Down" rules are designed to prevent trades in these stocks from occurring outside a specified price band. This price band is set at a percentage level above and below the average price of the stock over the immediately preceding five-minute trading period. If a stock's price moves outside these price bands for more than 15 seconds, trading in the stock will be paused for five minutes. For additional information on the "Limit Up-Limit Down" rules, read our investor bulletin: "Measure to Address Market Volatility." Nothing in the SEC's Release approved of the comprehensive market shutdown imposed by Apex (and Robinhood).

(*Id.*)

(ECF No. 359, the "Superseded Complaint"), finding "collusion" when no such pleading was made. Def. Mot.1.

In conjunction with their allegations for negligence, Plaintiffs also allege claims for breach of fiduciary duty and tortious interference with business relationships. Determining whether Apex breached its duty of care or fiduciary duty or tortiously interfered with a business relationship requires factual determinations that cannot be resolved as a matter of law on a motion to dismiss.

It is against this backdrop of unprecedented action by a broker-dealer that foreseeably harmed Plaintiffs and the other members of the putative class that Apex seeks court-ordered immunity for its wrongful conduct. Apex raises other groundless challenges, such as jurisdictional arguments, all of which are without merit.  Apex's Motion to Dismiss the Other Broker Tranche Complaint should be denied.

## II.  FACTUAL BACKGROUND

### A.  Apex's Roles As a Broker-Dealer and a Clearing Broker-Dealer

Apex is a broker-dealer[5] that provides broker-dealer services to investors that buy and sell securities. AC ¶¶ 25, 43.  Apex also provides clearing broker services to correspondent introducing broker dealers, such as Webull and Ally. (AC ¶¶ 25-26, 28). Customers introduced to Apex by those introducing broker-dealers are shared customers as between Apex and the introducing broker-dealers. (AC ¶ 25; see also Declaration of Jack E. Pace III In Support of Apex Motion To Dismiss The Amended Other Broker Tranche Complaint Pursuant to Rules 12(B)(1) and 12(B)(6), ECF 422-1 ("Pace Decl.), Ex. 2. Apex services approximately one hundred introducing broker-dealers. (Pace Decl., Ex. 1 at 2).

Although called a "clearing" broker, Apex facilitates the clearing function with DTCC as a "clearing broker-dealer" for the Introducing Broker-Dealers – Apex itself is not a clearinghouse.

On January 28, 2021, Apex blocked its direct customers and directed all of its Introducing Broker-Dealers to block their Shared Customers, including Plaintiffs, and all other members of the Class, from purchasing the Suspended Stocks and related call options for a period of time lasting

---

[5] Apex as a broker-dealer is registered with and subject to the rules and regulations of industry regulators such as the SEC and FINRA. AC ¶¶23, 43.  Apex is also a member of the National Securities Clearing Corporation ("NSCC"). AC ¶27.

approximately three hours and twenty-five minutes. Apex did not restrict sales of the Suspended Stocks. AC ¶¶ 2, 29.

Because Apex is a broker-dealer registered with FINRA, it must abide by industry rules governing broker-dealers that are designed primarily for the protection of Plaintiffs and class members who are customers and investors.  The industry rules are meant to protect "efficient markets." AC ¶¶43-44. FINRA Rule 2010 sets forth the guiding principle that Apex must adhere to, providing that "in the conduct of its business, [brokerages] shall observe high standards of commercial honor and just and equitable principles of trade." FINRA reiterates in Regulatory Notice 21-12, "the foundation of the securities industry is fair dealing with customers. . . **even during times of market stress**." (emphasis added). AC ¶44.

Apex, as a broker-dealer, owes Plaintiffs and members of the Class the duty of due care and loyalty, including, *inter alia*, a duty to reasonably ensure that they can continue to provide investors access to the securities markets during times of extreme market volatility. AC ¶¶47, 50. This duty was reiterated by FINRA in Regulatory Notice 21-12, issued on March 18, 2021, directly in response to the events giving rise to this action. FINRA reminded that: "Member firms should maintain strong procedures, thoughtfully crafted in advance, to reasonably ensure that they can continue to provide investors access to the securities markets during times of extreme market volatility, as in the past several months." These include "liquidity management practices to ensure the firm is able to continue to provide customers with access to the markets despite abnormal liquidity demands." *See*, Regulatory Notice 21-12, *available at*   https://www.finra.org/rules-guidance/notices/21-12.  AC ¶51.  Here, Apex is alleged to have undertaken the extraordinary measures on January 28, 2021 of suspending purchasing the Suspended Stocks without a plan reasonably designed to correlate its supposed reduction of risk to its extraordinary action. AC ¶65.

While member broker-dealers do have discretion to refuse particular trades, broker-dealers do not have the right to refuse all orders to buy certain stocks for hours, while permitting sales, without facing potential liability.  In instances where there is excess volatility in the marketplace, the regulatory structure has established safeguards. Those safeguards include temporary "circuit breakers" where all trading in a particular security is halted for a limited period of time.  There are no rules nor industry customs that contemplate allowing any "lone wolf" broker-dealer to shut down one side of the trading for hours, or days, without consequence. AC ¶¶ 52-54, 56.

**B. The Events of January 28, 2021**

Apex misstates the facts leading up to and occurring on January 28th, misstates the Complaint and resorts to a narrative of its own creation, now debunked by the SEC itself in its recent report examining some of the events at issue here.[6]  Apex is desperate to create a scenario to justify its unprecedented, harmful unilateral actions.

Plaintiffs allege that there was volatility surrounding the Suspended Stocks in the days leading up to and on January 28th.  Plaintiffs also allege that volatility is not an unusual phenomenon in the securities markets, nor are "short squeezes," and, that Apex knew or had reason to know in advance of January 28th of investor demand for the Suspended Stocks. AC ¶ 57. Plaintiffs do not plead, much less admit, that "the astronomical increase in trading volume was due ironically to meme stock purchasers themselves engaging in 'online discussions' and agreeing to purchase more and more shares in these stocks for the purpose of raising the stock price." Def. Mem. at 5.  Apex cannot cite to any such reference in the Amended Complaint for that proposition, but instead, wrongly relies on the Superseded Complaint that made no such allegation.[7] In any event, the SEC concluded in its recent SEC Report that it was the "positive sentiment" "that sustained the weeks long price appreciation of GameStop stock" and that "[t]he underlying

---

[6] *See,* SEC "Staff Report on Equity and Options Market Structure Conditions in Early 2021" dated October 14, 2021 ("SEC Report") *available at* https://www.sec.gov/files/staff-report-equity-options-market-struction-conditions-early-2021.pdf.  The Court may take judicial notice of this SEC Report pursuant to Federal Rule of Evidence 201. A court may take judicial notice of documents in the public record, including documents filed with the SEC, and may consider such documents in determining a motion to dismiss. *R2 Investments LDC v. Phillips*, 401 F. 3d 638,639-640 fn. 2 (5th Cir. 2005).

[7] Defendant cannot rely on pleadings not contained in the Operative Complaint.  *See, Fuller v. SunTrustBanks, Inc.*, 744 F.3d 685, 695 (11th Cir. 2014) ("In general, [courts] do not consider anything beyond the face of the complaint and documents attached thereto when analyzing a motion to dismiss under Rule 12(b)(6).") Moreover, Paragraph 169 of the Original Complaint contained no admission of responsibility for colluding to drive up the price of the stocks.  It reads "Leading up to January 28, 2021, the Suspended Stocks became increasingly popular as, among other things, investors engaged in online discussions regarding the undervaluation of the Suspended Stocks and began purchasing shares."  Defendants rely on *Fernandez v Sch. Bd. Of Miami-Dade Cnty.,* 201 F.Supp.3d 1353, 1361, n.1 (S.D. Fla 2016), (Def. Mem. at 15), but that case reinforces Plaintiffs' position that the general rule is to not rely on superseded complaints except in rare circumstances not present here.

motivation of such buy volume cannot be determined."[8]  Nonetheless, Apex states, "Plaintiffs and other 'meme stock' purchasers admit that they sought to exploit unprecedented market conditions for financial gain." Def. Mot. at 6.  Plaintiffs make no such allegation. It is astounding that Apex finds it necessary to accuse its own customers of attempting to profit from trading in securities. Enough with the unseemly misdirected customer blaming.

Plaintiffs do not plead, nor do the facts support, the proposition that trading on January 28th resulted in unprecedented price movement.  Once again, the SEC has debunked Apex's invented fact. *See,* SEC Report at 22 ("In fact, since 2020 began, 134 common stocks had at least one one-day price increase greater than GME's largest one-day price increase." (internal cites omitted)).

On the morning of January 28, 2021, Apex unilaterally and abruptly blocked its direct customers and directed its Introducing Broker Dealers to block their Shared Customers from purchasing shares of the Suspended Stocks for a time period lasting approximately three hours and twenty-five minutes. Apex's decision to implement this unilateral, one-way Purchase Shutdown—unprecedented in the long history of securities trading in this country for liquid in-demand securities—foreseeably impeded additional price appreciation and decreased and suppressed the prices of AMC, GME, and KOSS.

Predictably, Apex's unprecedented Purchase Shutdown adversely affected the market prices for shares of those securities. Apex knew of investor demand for those stocks and that such demand was causing the price of those stocks to increase. AC ¶¶ 57-64.  Apex's Purchase Shutdown caused the price of those securities "to go down and to trade at lower prices than they would have traded for absent Apex's misconduct." AC ¶65. The SEC in its recent Report observed the market decline as well. ("After peaking in late January, the volume of trading in GME shares and GME's price declined substantially. GME's decline coincided with several brokerages' decision to restrict trading in GME on January 28…"). SEC Report at 21. Apex did more than "restrict" trading, they imposed a Purchase Shutdown.

Not only did the unprecedented unilateral Purchase Shutdown cause the price of the Suspended Stocks to go down, the Purchase Shutdown "foreseeably impeded additional price appreciation and suppressed the prices of the Suspended Stocks during and beyond the Class Period causing ascertainable damages and injury."  AC ¶¶ 65, 67.  Apex does not and cannot

---

[8] SEC Report at 26.

8

deny that the action it took to suspend one-way trading in the Suspended Stocks was to adversely affect the price of the Suspended Stocks. If, as it claims, Apex was concerned that the collateral requirement would go up because of the volatility surrounding the Suspended Stocks, Apex then took its steps to affect the volatility and to decrease the price.

Apex's claimed reasons for ordering the unprecedented Purchase Shutdown and the timing surrounding such suspension do not comport with the chronology revealed by the documents. In fact, these allegations are based in part upon documents supplied by Apex, regarding the January 28, 2021 events:

- **at approximately 9:30 a.m. Eastern (8:30 a.m. Central**), Apex received a report from NSCC showing a projection of a substantially increased clearing deposit requirement for Apex. AC ¶76;

- **at approximately 11:00 a.m. (presumably Eastern; 10:00 a.m. Central),** Apex received an updated NSCC report showing a potential collateral deposit requirement that was elevated *but lower than* the 9:30 a.m. report and in line with reports Apex had received from NSCC prior to 9:30 a.m. that day. *Id.*;

- **at approximately 11:31 a.m. Eastern time (10:31 a.m. Central**), "Apex sent a client communication to all clients instructing them to restrict the purchase of new buy positions in AMC, GME and KOSS… The restrictions were imposed uniformly across all Apex clients." AC ¶¶ 68-71, 75-76;

- **by 11:41 a.m. Eastern (10:41 a.m. Central),** DTCC knew that Apex's collateral exposure was going down and there was a call between DTCC and Apex senior management six minutes later at 11:47 a.m. Eastern (10:47 a.m. Central). AC ¶ 79;

- **at approximately 2:55 p.m. Eastern (1:55 p.m. Central**), Apex finally communicated to all clients the lifting of the restriction of new purchases of AMC, GME and KOSS, after confirming with NSCC that the report it received at 11:00 a.m. Eastern was accurate, ¶ 76.

At no time is there any indication that Apex sought to confirm with DTCC that it would be required to pay the additional collateral referenced in the NSCC's 9:30 a.m. report, nor did it attempt to negotiate it down. AC ¶ 74. DTCC knew by 11:41 a.m. Eastern that Apex's collateral exposure was going down, and would have communicated that to Apex during its 11:47 a.m. Eastern call with Apex's senior management. AC ¶79. Moreover, Apex has admitted that it

lifted the trading restrictions after confirming the lower collateral requirement with the DTCC—the clear inference[9] is that Apex confirmed the lower collateral exposure during its 11:47 a.m. Eastern call with DTCC.  Nonetheless, Apex unreasonably delayed lifting its unprecedented unilateral one-sided trading suspension until 2:55 p.m. Eastern—more than three hours *after* it knew that it would not be subjected to untenable collateral requirements, thus causing havoc in the market for the Suspended Stocks.  AC ¶¶ 76,79; *See* Declaration of Peter Safirstein In Support Of Plaintiffs' Opposition To Apex's Motion To Dismiss The Amended Other Broker Tranche Complaint Pursuant To Rule 12(B)(1) and 12(B)(6), ("Safirstein Decl."), Ex. 1, DTCC_MDL_00000326-7).

If, however, as Apex seems to suggest, Apex received the updated DTCC report at 11:00 a.m. Central/ noon Eastern, it would mean that Apex received the written report 13 minutes after its executives confirmed with DTCC the lower, acceptable collateral number (at 10:47 am Central) and nevertheless unreasonably left the trading suspension in place for approximately three hours.

Under either scenario, Apex, as the Amended Complaint alleges and Apex does not deny, allowed the Purchase Shutdown to continue for hours after receiving confirmation that no large collateral payment was required.

### 1. Apex's Attempt to Conflate the Time Zones is Patently Transparent And Deceptive

Apex, relying on a document produced only after Plaintiffs' Superseded Complaint was filed, accuses Plaintiffs of attempting to "manipulate" the time zones in the pleadings. Def. Mot. at 9, n. 12.  *See,* Pace Decl. Ex. 6; Safirstein Decl. ¶ 4.  There is no such manipulation.  Apex originally responded to the N.J. Securities Bureau on February 9, 2021 reporting on a timeline of events with reference to events using the Eastern time zone. *See,* Pace Decl. Ex. 1 at 6. Apex then sent another letter to the N.J. Securities Bureau on March 22, 2021, *See,* Pace Decl. Ex. 6 at 1, stating that "[the February 9, 2021 letter] described the Restricted Period as being in effect from

---

[9] Plaintiffs are entitled to all reasonable inferences to be drawn from the pleadings. *See Bryant v. Avado Brands, Inc*., 187 F.3d 1271, 1274 fn.1 (11th Cir. 1999); *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 191 (2d Cir. 2007).

approximately 10:30 a.m. Eastern until 1:55 p.m. Eastern.  We now understand that the Restricted Period was in effect from approximately 10:30 a.m. *Central* until 1:55 p.m. *Central*, or 11:30 a.m. Eastern until 2:55 p.m. Eastern."[10]  No time other than the "Restricted Period" was "corrected." Plaintiffs' Amended Complaint reflects this corrected information. *See,* AC ¶ 76. Apex argues that the letters to the N.J. Securities Bureau "make clear that the times of the events listed in Apex's February letter were expressed in the Central Time Zone." Def. Mem. at 9, n. 12.  But the letters only "make clear" that the **restricted period** was expressed in Central Time. The time as to when Apex and DTCC communicated remained unchanged from the February 9th letter's representation as "Eastern Time Zone." Thus, the timeline for January 28th is as Plaintiffs allege in the bullet points above.

Defendant's document production is not clear with regard to the time that Apex received the updated NSCC report.  The March 22, 2021 representation to the N.J. Securities Bureau does not alter the February 9th representation that the communication was received at "approximately 11:00 a.m."  Compare Pace Decl, Ex. 1 with Ex. 6. Unlike the other representations, no time zone was reported although all other reported time zones in the February 9th letter were "Eastern time." In order to properly reflect the ambiguity, Plaintiff alleged, "At approximately 11 a.m. (**presumably** Eastern time; 10:00 a.m. Central time), 'Apex received an updated NSCC report showing a potential collateral deposit requirement that was elevated but lower than the 9:30 a.m. report and in line with reports Apex had received from NSCC prior to 9:30 a.m. that day.'" AC ¶ 76. (emphasis added).

Apex attempts to addresses this ambiguity in its brief by stating that "[a]t 12:00 p.m. ET, Apex received an updated NSCC report …" citing to Pace Decl. Ex. 6 in support of its statement, but Ex. 6 does not place the time of the report as Eastern.

Apex has no response to Plaintiffs' allegation that the entire premise of its defense is contrived.   Apex has maintained that, "[t]he reason for the …trading restrictions that Apex imposed regarding purchases of AMC, GME and KOSS relates directly to the potential future collateral requirement that NSCC appeared it may impose on Apex as part of the margin system NSCC maintains to comply with the SEC's standards for covered clearing agencies."  AC ¶ 77. But, former Apex President Tricia Rothschild, admitted in an interview with "Financial Planning,"

---

[10] This letter was produced on August 26, 2021, after the Superseded Complaint was filed on July 27, 2021.  See Safirstein Decl at ¶ 4.

published on March 4, 2021, that Apex *did not* restrict trading as a result of capital requirements. Rothschild stated that Apex had "headroom" in terms of the capital available on its balance sheet and also had credit lines it could call upon. AC ¶ 84.  And, Apex made no attempt to tap into any credit line or seek a cash infusion from its affiliated entity, Peak 6. ¶¶ 85-6.

Accordingly, the timeline shows that Apex had no basis to enact the unprecedented unilateral Purchase Shutdown to begin with and the timeline confirms that Apex wrongfully persisted in maintaining the Purchase Shutdown for approximately 3 hours.

This Purchase Shutdown drew the ire of the Introducing Brokers. AC ¶72.  Apex knew its conduct was wrong. When volatility hit the market just one day later, it opted not to restrict trading, with a senior executive noting, "we can't shut down access to the names. We are getting killed in the press. I told Bill to have Matt raise a few hundred in capital this weekend." AC ¶¶87-88.   Other than Robinhood, no other broker-dealer or clearing broker-dealer suspended one-sided trading in the manner that Apex did.  AC ¶¶ 89-90.

## III.   ARGUMENT

### A.   Standard of Review

"In reviewing a motion to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted, we accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party."  *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 191 (2d Cir. 2007).

The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient.*"* *Goldman v. Belden*, 754 F. 2d 1059, 1067 (2d Cir. 1985).  A complaint should not be dismissed if the plaintiffs have stated 'enough facts to state a claim to relief that is plausible on its face.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

"A claim has facial plausibility when the plaintiff[s] plead[] factual content that allows the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While factual allegations should be

construed in the light most favorable to the plaintiffs, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.*

Here, Plaintiffs' allegations contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.

### B.  **This Court Has Subject Matter Jurisdiction Over The Other Broker Tranche**

Apex contends that it is improper to have added plaintiffs Jang and Chavez and their tort claims to this MDL in the Amended Complaint.  Def. Mem. 10-11. Inasmuch as cases are remanded to their respective transferor districts after the MDL proceedings have been completed, (*Lexecon, Inc. v Milberg Weiss Bershad Hynes & Lerach,* 523 U.S. 26 (1998)), Apex argues that for Jang and Chavez, there is no home court for the MDL to remand those plaintiffs, and thus no basis for subject matter jurisdiction.  Defendant elevates form over substance and provides no sound basis for dismissal on jurisdiction grounds.

First, this Court can exercise general personal jurisdiction over all Plaintiffs' claims against Defendants pursuant to its authority as an MDL transferee court under 28 USC §1407.  Second, in MDLs, courts permit the direct filing of claims that otherwise would have originated in other jurisdictions "to avoid the seemingly inefficient step of filing-and-transfer" from the JPML.  *Wahl v Gen. Elec. Co.,* 786 F.3d 491, 493 (6th Cir. 2015).  The rules of the JPML likewise permit the direct filing of claims in an MDL, bypassing the JPML transfer process.  *See* J.P.M.L. R. 7.2(a) ("Potential tag-along actions filed in the transferee district do not require Panel action.  A party should request assignment of such actions to the Section 1407 transferee judge in accordance with local rules."); *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, Civil Action No. H-10-171, 2011 WL 1232352, at *4 (S.D. Tex. Mar. 31, 2011) ("The JPML's rules expressly provide for joining direct filings with the MDL cases under a court's local rules without transferring through the JPML.") (*citing* J.P.M.L. R. 7.2(a)).

While Defendant has searched for courts in other circuits, Apex ignores that courts in this jurisdiction have fashioned a practical solution that complies with *Lexecon Inc.* and preserves the efficiencies that MDL courts embrace.  Rather than dismiss direct file plaintiffs' claims, courts may designate a different originating district at a later time for certain claims.  *See In re Takata Airbag Products Liability Litigation,* 379 F.Supp.3d 1333 (S.D. Fla. 2019); *In re Managed Care Litig.,* 150 F.Supp.2d 1330, 1336 (S.D. Fla. 2001) (declining to dismiss direct-file complaints).

13

Accordingly, Apex's concern regarding remand jurisdiction of Jang and Chavez's tort claims is easily solved and does not require Apex's needlessly punitive approach of dismissal.

An MDL from this District is instructive: In the *In re Takata Airbag Products Liability Litigation,* the consolidated class action complaints "directly add[ed] the Direct File Plaintiffs and their respective claims." 379 F.Supp.3d 1333, 1337 (S.D. Fla. 2019). The Court observed "[t]he Direct File Complaints are not simply consolidations of the Transferor Complaints. The Direct-File Complaints include several new plaintiffs who are not named in the Transferor Complaints and who have not separately filed lawsuits in any other federal district court…" *Id.* at 1336. Furthermore, "the Direct-File Complaints add a litany of new claims—on behalf of the new plaintiffs and the plaintiffs originating in the Transferor Complaints…" *Id.* at 1337. Nevertheless, the *Takata* court denied defendants' motion to dismiss on direct-filing grounds.

The *Takata* court noted that "direct filing complaints in MDL proceedings is not uncommon, nor is it *per se* impermissible under the MDL statute, the JPML Rules of Procedure, or interpretive case law," *Id.* at 1338. The Court declined to dismiss the direct file plaintiffs and held that, absent "a stipulation by the parties as to where these legal actions should be transferred, the Court will transfer them 'to a federal district court of proper venue as defined by 28 U.S.C. Section 1391,' 'pursuant to the Rules of the Judicial Panel on Multidistrict Litigation and 28 U.S.C. Section 1404(a).'" *Id.* at 1345. The Court, however, deferred "ruling on the proper venue for these legal actions until a more appropriate time." *Id.*

The *Takata* court recognized that multidistrict litigation is designed to increase efficiency, avoid thorny spin-off litigation and eliminate the delays associated with transfer of cases into an MDL proceeding. *Id.* at 1339 (quotations omitted). There is nothing impermissible about exercising jurisdiction over plaintiffs and claims that did not become a part of an MDL through the Section 1407 transfer procedure and transferring the action to an appropriate venue at a later time. Moreover, Apex fails to identify any practical reason why plaintiffs added to the MDL via a consolidated complaint must be dismissed. Defense Counsel's Declaration submitted in support of Apex's motion omits a critical part of counsels' telephone conversation. *See,* Pace Decl. at ¶¶ 3-4. When asked what steps Apex's counsel suggested be taken to address its concern, Apex's counsel suggested dismissal of the action followed by refiling in a "home court" and then moving before the JPML for transfer to this Court to which Apex would consent. Additionally, although counsel claimed in August that Apex had not been served with the Complaint, service of the

14

operative Amended Complaint has been effected. Safirstein Decl. at ¶ 2. Apex's subject matter jurisdiction gambit appears to be little more than a stall tactic that would result in the identical outcome of adding plaintiffs Jang and Chavez's tort claims to a consolidated action before this MDL Court, but only after wasting time and judicial resources.[11]

None of the cases upon which Apex relies are in this circuit, much less this district.

### C.   Plaintiffs Jang and Chavez Have Article III Standing

Apex's challenge to Plaintiffs' Article III standing arises from a set of facts of its own making, laced with unvarnished contempt for Apex's own customers and investors in general. Plaintiffs' allegations look nothing like the speculation with which Apex attacks them.  Instead, Plaintiffs have pled direct, non-speculative, injury directly resulting from Defendant's action.

Specifically Plaintiffs allege that "[w]hen Apex undertook the extraordinary measure on January 28, 2021 of suspending and directing the suspension of the purchasing of the Suspended Stocks, stocks that were in great demand, Apex caused the price of each of the Suspended Stocks to go down and to trade at lower prices than they would have traded for absent Apex's misconduct." AC ¶ 65.  Moreover, Apex's Purchase Shutdown "foreseeably impeded additional price appreciation and suppressed the prices of the Suspended Stocks during and beyond the Class Period causing ascertainable damages and injury." AC ¶ 67.  Not only have Plaintiffs alleged as such, Defendant's Memorandum confirms that Apex's one-sided trading halt was done for the purpose of adversely affecting the price of the stocks. ("As Apex explained in its letter to the N.J. Securities Bureau, Apex temporarily halted additional purchasing of shares in those three stocks 'to manage the risk that it would not be able to meet potential increased NSCC collateral funding

---

[11] To the extent that Plaintiffs added tort claims directly via the Superseded Complaint, and now the Amended Complaint, allowing MDL plaintiffs to amend their pleadings is consistent with FRCP 15(a)(2)'s directive that district courts "should freely give leave [to amend] when justice so requires," and "the general rule that, in multidistrict litigation, a transferee judge can handle all types of pretrial matters that otherwise would have been handled by the transferor court," *In re Korean Air Lines Co., Ltd., Antitrust Litig.*, 642 F.3d 685, 699 (9th Cir. 2011). Many MDL transferee courts have allowed plaintiffs to amend a transferred-in complaint to add new causes of action at early stages in the proceedings. *See, e.g.*, *Nelson v. Matrixx Initiatives, Inc.*, 2012 WL 1094316, at *2 (N.D. Cal. Mar. 30, 2012) (granting leave to amend complaint to add new claims in MDL proceeding).

obligations if Apex clients were permitted to continue to engage in additional purchases of AMC, GME and KOSS.'") Def. Mot. at 9-10.  In other words, if the trading price of AMC, GME and/or KOSS went up, Apex perceived a risk to its ability to meet a potential increased NSCC collateral funding obligation.  Thus, Apex took affirmative steps to directly interfere with market forces and foreseeably impeded the price movement of these stocks in the market for its own self-serving purposes.  The SEC recently observed in its Report that the price of the one of the Suspended Stocks went down following the imposition of such action. ("After peaking in late January, the volume of trading in GME shares and GME's price declined substantially. GME's decline coincided with several brokerages' decision to restrict trading in GME on January 28."). SEC Report at 21.

As a consequence of Apex's actions, both Plaintiffs, Chavez and Jang, alleged that the price of the securities they purchased as Shared Customers of Apex and the Introducing Brokers, went down in value such that when they did sell, the price at which they sold was less than it would have been had Apex not engaged in the alleged misconduct. AC ¶¶ 14-17; (Chavez: 607 shares of AMC (purchased through Webull as Shared Customer with Apex); sold on February 2, 2021 "for less than he would have sold for but for the conduct alleged here") AC ¶¶ 18-21; (Jang: 401 shares of GME (purchased through Ally Invest Securities as Shared Customer with Apex); sold on February 4, 2021 "for less than he would have sold for but for the conduct alleged here"). Just as one cannot unring a bell, or put toothpaste back in the tube, Apex cannot undo the harm it did to the marketplace. Having contaminated the securities market on January 28th, Apex is accountable for the foreseeable consequences of its action that adversely affected the price of the securities.

## 1.  Plaintiffs Allege an Injury in Fact Which Apex Attempts to Mischaracterize as "Speculative"

For Article III standing, a Plaintiff must allege an injury in fact, being an invasion of a legally protected interest, that is (1) concrete, particularized, and actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of (meaning fairly traceable to the defendant's conduct), and (3) it must be likely, as opposed to merely speculative, that a favorable decision will redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Plaintiffs sufficiently plead injury to a protected, concrete and particularized legal interest in their respective shares of AMC and GME shares. Plaintiffs allege a direct causal connection between Apex's unprecedented, unilateral,

16

unwarranted one-sided market shutdown and the foreseeable decrease in the value of their AMC and GME shares.

Plaintiffs' claims do not require, or rest upon, any speculative or hypothetical conduct as Apex argues. The conduct which caused the harm, as alleged, has already occurred and the losses have already been suffered and are unconcerned with future events or intentions or plans of future conduct (such as was the case in *Aaron Private Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1336 (11th Cir. 2019) referred to by Apex. Def. Mot. at 13-14.). [12]

Apex mischaracterizes Plaintiffs' Amended Complaint. Their claimed injury is not based upon any allegation that Mr. Chavez and Mr. Jang had a plan, which was thwarted, to have sold at the top of the market. Rather, they owned shares of a certain value in a free and open market, and Apex's Purchase Shutdown foreseeably caused a drop in share values and market suppression, causing Plaintiffs' losses.

### 2.   Plaintiffs Allege a "Legally Protected Interest"

Plaintiffs satisfy the "injury-in-fact" prong of Article III.  Yet Apex argues against the "straw person" of a non-existent, never pled, "scheme" supposedly contrived by Plaintiffs to manipulate the market.  Not only was no such scheme alleged, the SEC's recently released Report of the events of January 28, 2021 does not even hint at such a "scheme."  From this false premise, Apex argues that Plaintiffs should not benefit from their wrongdoing. Def. Mot. at 14-15.  Apex will apparently stop at nothing to try to misdirect from its own unprecedented, unilateral, unwarranted, wrongful one-sided trading halt.

Apex engages in fabrication of facts which are not in the Amended Complaint and deliberately excerpts snippets from the Superseded Complaint in a disingenuous attempt to suggest that the Plaintiffs were involved in illegal market manipulation. For example, Apex puts the following falsity before the Court: "The Plaintiffs unabashedly admitted in their original complaint that this litigation arises from the Plaintiff purchasers own coordinated 'short squeeze' working collusively as a group to purchase stocks to pump up 'the value of the stock they purchased." Def. Mot. at 15.  Despite citing to the "original complaint," Apex cites to ¶ 63 of the Amended

---

[12] See Def. Mot. at  13. Apex's Article III standing argument is similar to the argument Robinhood advanced, and the Court rejected in the Robinhood "Outage" case. See, *In re Robinhood Outage Litigation*, 3:20-cv-01626-JD, Minute Order (N.D.Cal Feb. 18, 2021).

Complaint for support for this proposition.  Paragraph 63 says nothing of the sort.[13]  Then, compounding their misstatement, Apex states, "Plaintiffs admitted that the increase in value of the meme stocks was the product of online discussions that resulted in unprecedented and coordinated purchasing of shares of those stocks. Original Complaint ¶ 169." Not only is it improper for Apex to rely on the Superseded Complaint[14], they misstate the pleading.[15]  It is from these threads of a false reading of Plaintiffs' allegations that Apex preposterously concludes, "[s]imply put, Plaintiffs cannot allege the invasion of a legally protected interest in their lost profits from a partially-blunted market manipulation scheme." Def. Mot. at 15. They even go so far as to infer that Plaintiffs are participating in a pump and dump scheme.

These arguments are a shameful misreading of both complaints. There are no allegations in the Amended Complaint (or the Superseded Complaint) which allege, or even support any inference, that Plaintiffs were engaged in, or admitted to coordinating or working as a group to "pump" up stock values as part of a market manipulation scheme to achieve ill-gotten gains. There

---

[13] Paragraph 63 reads: "In a 'short squeeze,' individual investors like Plaintiffs and the Class stand to benefit (absent one-sided market restrictions) as the value of the stocks they purchased increases. Short sellers, on the other hand, risk further losses, as stock prices rise as a natural consequence of market forces." This pleading makes economic sense and reflects market reality. It does not "unabashedly admit" that Plaintiffs participated in an illegal conspiracy.  If Apex really meant to refer to the Original Complaint, Paragraph 63 of that Complaint pled particularity relating to Plaintiff Cornwall's holdings in connection with the Robinhood tranche.

[14] It is well established law that Defendants must contest the operative complaint and not cite to earlier superseded pleadings. *See* n 7.  Apex seeks to avoid the plain reading of the law by suggesting that Plaintiffs are engaging in a transparent attempt to manipulate the allegations to avoid a dispositive defense. Plaintiffs' pleadings do not and have never admitted of any participation by any plaintiff in any market manipulation scheme.  Such insinuation is just a continuation of Apex's attempt to misdirect the Court from its own actions, while casting contempt on its own customers and investors generally.

[15]  Paragraph 169 of the Superseded Complaint reads, under the rubric, "Price Volatility Ahead of January 28, 2021 Was Well Known To Defendants" "Leading up to January 28, 2021, the Suspended Stocks became increasingly popular as, among other things, investors engaged in online discussions regarding the undervaluation of the Suspended Stocks and began purchasing shares." That is not an allegation of a nefarious scheme orchestrated by Plaintiffs to engage in a market manipulation.  In fact, in the next Paragraph of the Superseded Complaint, Plaintiffs further described the market forces by reflecting that "[s]ome institutional investors also increased demand for the Suspended Stocks." Superseded Compl. ¶ 170.  The same allegation is in the Amended Complaint, at ¶ 58.

are no allegations in the Amended Complaint that allege, or even support an inference, that Plaintiffs were engaged in anything other than legal free market activity. [16]

### 3.    Plaintiffs Have Standing To Bring Claims on Behalf of Direct Customers

Apex mistakenly argues that Plaintiffs lack Article III standing to bring claims "on behalf of a putative class of Apex's direct customers." Def. Mot. at 16.   However, Defendant improperly conflates "standing" with the class action Rule 23(a) elements of commonality, typicality and adequacy.  The reason Defendant attempts to frame the issue as "standing" is obvious—Courts are usually hesitant to dismiss class allegations at the motion to dismiss stage and generally find such attempt premature.[17]  Thus, Defendant instead attempts to improperly recast its argument as a standing issue. However, given that Plaintiffs have clearly asserted a tangible injury to support standing to assert their claims on behalf of the class of those similarly injured purchasers of the Suspended Stocks— be they direct Apex customers or Shared Apex customers— they have satisfied the threshold issue of standing to bring suit.[18]

As the Eleventh Circuit recently observed in *Sierra v City of Hallandale Beach, Florida*, 996 F.3d 1110, 1112-13 (11th Cir. 2021), there are three elements the Court looks at to determine "whether a plaintiff has standing to sue: (1) injury in fact, (2) causation, and (3) redressability. To establish an injury-in-fact, the plaintiff must demonstrate that he or she suffered 'an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not

---

[16] Reprehensibly, and without any basis, Apex sinks to the level of trying to defend its own unlawful conduct by suggesting that the retail investors it harmed are a modern example of the litigating thieves in *The Highwayman's Case*, 9 L. Q. Rev. 197 (1893) who the Court determined were unworthy of resort to the courts but were worthy of being hanged. Def. Mem. at 14.

[17] As the Eleventh Circuit in *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1309 (11th Cir. 2008) noted with approval, "[s]everal of our sister circuits have reversed denials of class certification that were made without the opportuntiy for discovery, when the pleadings on their face did not show non-compliance with Rule 23 or when the satisfaction of the Rule 23 requirements may have depended on factual matters within the knowledge or possession of the defendant." *Id.* at n.1;  *See also, Etzel v. Hooters of America, LLC*, 2016 WL 8604317 (N.D. Ga. Nov. 15, 2016); *Arkin v. Innocutis Holdings, L.L.C.*, 188 F. Supp. 3d 1304 (M.D. Fla. 2016).

[18] The existence of Plaintiffs' tangible injuries is addressed elsewhere in this brief, *supra* at Point III. Subd.C., Subparts. 1 and 2.

conjectural or hypothetical.' [quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130]."  Putting aside the fact that Plaintiffs have pled a concrete and particularized injury here, none of these three elements (*i.e.*, injury, causation and redressability) are implicated in whether they are *typical* of a class that may include direct and Shared Customers.

"Typicality" merely "requires that 'the claims or defenses of the representative parties [be] typical of the claims or defenses of the class.'" [internal citations omitted]. *In re Checking Account Overdraft Litig.*, 275 F.R.D. 666, 674 (S.D. Fla. 2011).

As the *In re Checking Account Overdraft* court held:

> Like the commonality requirement, the typicality requirement is permissive: representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical. *Brown v. SCI Funeral Servs. of Fla., Inc.,* 212 F.R.D. 602, 605 (S.D. Fla. 2003). Moreover, if "the same unlawful conduct was directed at or affected both the class representatives and the class itself, the typicality requirement is usually met irrespective of varying fact patterns which underlie the individual claims." *Davis v. S. Bell Tel. & Tel. Co.,* No. 89–2839, 1993 WL 593999, *4 (S.D. Fla. Dec. 23, 1993). **To defeat typicality, a defendant must show that conflict between the named representative and the class members is "such that the interests of the class are placed in significant jeopardy.**" *Walco Invs., Inc. v. Thenen,* 168 F.R.D. 315, 326 (S.D. Fla. 1996)[19]

*Id.* at 674. *See also Piazza v. Ebsco Indus., Inc*., 273 F.3d 1341, 1346 (11th Cir. 2001) ("**Typicality**, along with the related requirement of **commonality**, focuses on whether a sufficient nexus exists between the legal claims of the named class representatives and those of individual class members to warranty class certification.") (emphasis added).

Relevant to Plaintiffs representing both direct and Shared Customers, the Eleventh Circuit held in *Kornberg v. Carnival Cruise Lines, Inc.,* 741 F.2d 1332, 1337 (11th Cir. 1984), that "[a] sufficient nexus is established if the claims or defenses of the class and the class representatives arise from the same event or pattern or practice and are based on the same legal theory.  Typicality, however, does not require identical claims or defenses.  A factual variation will not render a class representative's claim atypical unless the factual position of the representative markedly differs from that of other members of the class. [citations omitted]."

Courts have admonished defendants for conflating constitutional "standing" arguments with class action Rule 23 elements or even merits challenges.  *Venerus v. Avios Budget Car Rental,*

---

[19] *Id.* at 674

*LLC,* 723 Fed. App'x 807, 813-14 (11th Cir.2018) (finding error where "the district court conflated Article III standing with the Federal Rule of Civil Procedure 23 requirements for class certification."); *Paris v. Progressive Am. Ins. Co*., WL 7039018, 4 (S.D. Fla. 2020) ("Defendant's arguments as to Paris's standing to bring his individual claim are really arguments contesting Paris's adequacy to represent the interests of the class, which the Court addresses below*."); In re Arris Cable Modem Cons. Litig.*, 327 F.R.D. 334, 351 (N.D. Cal. 2018) (defendant erroneously conflates standing with challenges to the merits of plaintiff's claim); *In re Worldcom, Inc. Sec. Litig.,* 219 F.R.D. 267, 283 (S.D.N.Y. 2003)  (injured bond purchaser claim analyzed under Rule 23(a) requirements, whether characterized as adequacy or typicality concerns).

Accordingly, this Court should reject Defendant's misbegotten "standing" argument which concerns whether Plaintiffs can later, at the motion for class certification stage, demonstrate typicality, commonality and adequacy, all of which is properly pled.

### D.   New York Substantive Law Applies

Plaintiffs' common law claims should be adjudicated under Florida's choice of law provisions.  In considering a direct-filed action as part of an MDL filed in this district, Judge Moreno applied Florida's choice of law rules. *In re Takata Airbag Products Liability Litigation*, 255 F. Supp. 3d 1241, 1254-55 (S.D. Fla. 2017).  Moreover,  "[a] federal court sitting in diversity must look to the choice of law rules of the forum state when determining which law should apply to a claim." *Trumpet Vine Investments v. Union Capital Partners*, 92 F.3d 1110, 1115 (11th Cir. 1996). Inasmuch as this action is properly filed in the Southern District of Florida, Florida's choice of law rules apply.[20]

Florida applies the "most significant relationship" test in determining choice of law as set forth in the Restatement (Second) of Conflict of Laws. *Trumpet Vine Investments*, *Id.* at 1115-16. Accordingly, the Court is to take into account: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered. These contacts are to be evaluated according to their relative

_____

[20] Apex concedes the point, noting, "if the claims were legitimately brought here, the Court would apply Florida choice of law. *See Hall v. Burger King Corp*., 912 F. Supp. 1509, 1534 (S.D. Fla. 1995). 'Def. Mem. at 18 (See Section I).

importance. *Id.*

New York law, not Texas law, governs this action. The application of Florida's multi-factor choice of law analysis to Plaintiff's claim requires that New York law be applied. Apex is a New York corporation, AC ¶ 22, [21] with offices in Manhattan. Two of the Suspended Stocks, AMC and GME, are listed on the New York Stock Exchange which is in New York. The third Suspended Stock, KOSS, is listed on Nasdaq. Nasdaq's principal executive offices are in New York. And, DTCC is headquartered in New York (Safirstein Decl. at ¶¶ 5-8). [22]  Thus, New York law satisfies Florida's most significant relationship test.

Apex argues for the application of Texas law citing to the location of its headquarters and to its customer agreements.  But Apex's key personnel are New York based.  Apex CEO William Capuzzi identifies his "Contact info" on his Linked-In page under "New York City Metropolitan Area." Apex Chief Administrative Officer William Brennan lists a "Summit, New Jersey" location and lists work locations as both Dallas (May 2016 - Present) and Greater New York City Area (September 2019-Present). And an Apex' Chief Compliance Officer recent job posting is listed for an Apex New York office at 28 Liberty Street, New York, NY. (Safirstein Decl. at ¶¶ 9-11). [23] Moreover, the events complained about occurred during the pandemic with offices closing down around the world and thereby lessening the importance of the "location" of a corporate headquarters.

---

[21] Because Plaintiffs' analysis focuses on actions taken by Apex, less weight should be afforded to the states of residence of the Plaintiffs.  *See, Costa v. Kerzner Int'l Resorts Inc.*, 2011 US Dist. LEXIS 66921, at *13 (S.D. Fla. June 23, 2011).

[22] The court can take judicial notice under Federal Rule of Evidence 201 of such facts that are not subject to reasonable dispute because the fact is either generally known within the territorial jurisdiction of the Court or capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. *Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997). In particular, the Eleventh Circuit has noted that the types of facts a court can take judicial notice of are things like scientific facts, matters of geography, or matters of political history. I*d.* Here, Plaintiffs submit that the Court can take judicial notice of listings on various securities exchanges and geographical matters.  In addition, the Court may consider matters of which it takes judicial notice of in considering a motion to dismiss. See, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551. U.S. 308, 322, 127 S. Ct. 2499, 2509, 168 L. Ed. 2d 179 (2007).

[23] The Court may take judicial notice of matters of geography.  *See* n. 22.

As to Apex's customer agreement, the reference to Texas law only applies with regard to the agreement and an action seeking to enforce the customer agreement. See Pace Decl., Ex. 2 at Par. 15; That is not this action. *See also, Cooper v. Meridian Yachts, Ltd*., 575 F. 3d 1151, 1162 (11th Cir. 2009) ("A choice of law provision that relates only to the agreement will not encompass related tort claims.") (citing *Green Leaf Nursery v. E.l. DuPont De Neumours and Co.*, 341 F.3d 1292, 1300-1 (11th Cir. 2003). Moreover, FINRA rules prohibit member firms such as Apex from using "choice of law" provisions in customer agreements to "[include] a choice of law or governing law clause in a customer agreement without an adequate nexus, which suggests an intent to limit an award, or otherwise including provisions that attempt to limit the ability of a customer to file a claim or the authority of arbitrators to make an award, is a prohibited condition under FINRA Rule 2268(d)."

*See,* Regulatory Notice 21-16, p. 4, *available at* https://www.finra.org/sites/default/files/2021-04/Regulatory-Notice-21-16.pdf. Here, the "customer agreement" is a predispute arbitration agreement and Apex cannot use a "choice of law" clause to limit the ability of its customers to recover under the law.

Weighing the two choices, it is clear that New York is more central to and has a more significant relationship to this action.

### E.  Plaintiffs Have Stated A Claim For Negligence (Count I)

Plaintiffs allege that Apex was negligent because it was not properly prepared to address market volatility on January 28, 2021 with regard to its DTCC requirements; that it was negligent in addressing the communications from DTCC on January 28th by implementing the Purchase Shutdown for nearly three and one-half hours when it did not need to, and then was negligent in persisting in the Purchase Shutdown for hours after DTCC informed Apex that the increased collateral deposit that prompted the trading halt was not required. *See* AC ¶¶ 100-108.

The New York Court of Appeals describes negligence as the "failure to employ reasonable care – the care which the law's reasonably prudent [person] should use under the circumstances of a particular case." *McLean v. Triboro Coach Corp*., 302 N.Y. 49, 51 (1950). To establish a claim for negligence under New York law, a plaintiff must show: (1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof. *Atkins v. Glen Falls City Dist.,* 53 N.Y.2d 325,333 (1981).

As Defendant concedes, the elements of a negligence claim are substantially similar in other states. Def. Mem. at 19 n. 7.   For example, to establish a claim for negligence under Texas law, a plaintiff must similarly show: (1) a legal duty owed by one person to another, (2) a breach of that duty, and (3) damages proximately caused by the breach. *D. Houston v. Love*, 92 S.W.3d 450, 454 (Tex. 2002). [24]

### 1. Apex Owes Duties to Both "Introduced" Customers and "Direct" Customers.

Apex owed and owes duties as a broker-dealer to both its direct customers, and, to its Shared Customers.   Apex's duty of care that it owed to its customers is grounded in common law. As courts in New York and elsewhere have recognized, a duty of care arises by virtue of the broker-client relationship itself.  Assessment is then made as to how a reasonable broker-dealer exercising ordinary care would behave towards its client(s) under the circumstances present.  *De Kwiatkowski v. Bear, Stearns & Co.,* 306 F.3d 1293, 1304 (2d Cir. 2002).   As the District Court in *De Kwiatkowski* explained, "the duty of due care arises not by agreements or imposition of the parties governing their relations, but by operation of law. The duty emerges out of a totality of given circumstances and holds the defendant in an action to a standard of conduct designed to protect persons located within a reasonable zone of foreseeability who were injured by a defendant's careless behavior." *De Kwiatkowski v. Bear, Stearns & Co.,* 126 F.Supp.2d 672, 694 (S.D.N.Y. 2000).  Texas law is consistent with this finding.  *See, Magnum Corp. v. Lehman Bros. Kuhn Loeb, Inc.,* 794 F.2d 198, 200 (5th Cir. 1986 ), *citing West v. Touchstone*, 620 S.W. 2d 687, 690 (Tex. Civ. App. – Dallas 1981, writ ref'd n.r.e. (*citing, Restatement (Second) of Agency § 1 (1958)* ("The implicit agreement between customer and stockbroker is that the latter will use reasonable efforts to execute the order promptly at the best obtainable price.")).

FINRA Rules set out general standards of industry conduct and are evidence of the standard of care by which brokers must abide in dealing with their clients.  *Remington v. Newbridge Sec. Corp.*, 2013 WL 2444719, at *5–6 (S.D. Fla. June 5, 2013) (finding that failure to comply with a FINRA Rule is evidence of a breach of duty to comply with applicable standard of care).   In *Remington*, defendants argued, as Apex does here, that the violation of FINRA rules do not create a private right of action for negligence.  The court, in rejecting this analysis, found that "even if

---

[24] *See also, Pinchinat v. Graco Children's Prod., Inc.*, 390 F.Supp.2d 1141, 1149 (M.D. Fla. 2005) (citing to *Paterson v. Deeb,* 473 So.2d 1210, 1214 (Fla. 1st DCA 1985).

the [FINRA] Rules did not provide a private cause of action, the negligence claim was nonetheless properly brought because 'violation by [the defendant] of the rule will not automatically result in his being held liable for negligence; it would simply be a factor for consideration by the jury as to whether he acted as a `reasonable' person in his conduct toward [the plaintiffs] and their account. . . .'" (*citing, Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng*, 697 F. Supp. 1224,1228 (D.D.C. 1988). Following *Cheng*, the *Remington* court held, "[w]hile there may not be a private right of action for violation of Rule 2430, Plaintiffs are not suing merely for a violation of Rule 2430. Rather, they allege that Newbridge's failure to comply with the rule is evidence that they breached their duty of care, which includes a duty to act in accordance with the standard of care used by other professionals in the community." *Id.*

The *Remington* court also relied on *Javitch v. First Montauk Fin. Corp.*, 279 F. Supp.2d 931, 938 (N.D. Ohio) (finding that, even if there is no private cause of action for violation of NASD or NYSE rules, "the standard [of practice] in the industry is reflected in the rules of both NASD and NYSE."); *Miley v. Oppenheimer & Co., Inc.* 637 F. 2d 318, 333 (5th Cir. 1981) (finding that "NYSE and NASD rules are excellent tools against which to assess in part the reasonableness or excessiveness of a broker's handling of an investor's account."). *Id.*

More recently, courts sitting in this jurisdiction have agreed with the *Remington* holding. *See, Wistar v. Raymond James Financial Services, Inc.*, 365 F.Supp.3d 1266   (S.D. FL. 2019); *Brink v. Raymond James & Assocs, Inc.,* No. 15-60334-CIV, 2015 WL 11198241, at *3 (S.D. Fla. June 29, 2015) (holding plaintiff sufficiently alleged that apart from any agreement, a defendant owed plaintiff a duty of care in accordance with the standard of care used by similar professionals in the community.).

Courts applying New York law and Texas law have agreed with the analysis expressed in *Remington* et al. *See, Scott v. Dime Sav. Bank of New York, FSB*, 886 F.Supp. 1073, 1080-81 (S.D.N.Y. 1995) (violations of industry rules and practices give rise to common law claims of negligence; *Lange v. Hentz & Co.,* 418 F. Supp. 1376, 1384 (N.D. Tex. 1976) ("It is…the decision of this Court that [FINRA] rules are admissible on the issue of what fiduciary duties are owed by a broker to an investor.").

Nonetheless, Apex persists in arguing that violations of industry rules do not create a private right of action,[25] ignoring that the allegations pled here are based in common law tort.

Moreover, Apex misapplies its own caselaw, which, when read fully, supports Plaintiffs' position that Defendant's failure to abide by industry rules sufficiently demonstrates its failure to abide to accepted common law standards of care. *See, Brink v. James*, 341 F.Supp.3d 1314, 1325 (S.D. Fla. 2018) ("[T]he Court agrees with Defendant that Plaintiff's negligence claim will ultimately fail **if it is based solely and exclusively on a violation of a FINRA Rule** . . . .") (emphasis added).  The very next sentence of the opinion reads "However, at this stage of the litigation, Plaintiff has adduced sufficient evidence to withstand summary judgment on this [negligence] claim, in the form of proffered expert testimony on the standard of care owed by similar professionals in the community of broker-dealers to customer/account holders such as Plaintiff." *Id.*; *Weatherly,* 2015 U.S. Dist. LEXIS 197128 at *10–11("Plaintiffs fail to establish that the NASD/FINRA conduct rules create a duty of care owed by clearing brokers to investors; rather, **the rules may be used to determine whether a breach has occurred once it has been established that a duty of care existed.**") (emphasis added).

Here, Plaintiffs allege that Apex owed them a common law duty of care (AC ¶ 47), and, the Court can look to, *inter alia,* the duties to: "observe high standards of commercial honor and just and equitable principles of trade" (FINRA Rule 2010, AC ¶ 44); "establish, maintain, and enforce a supervisory system, which includes monitoring its technology and other risks, including credit and other systemic risks" (FINRA Rule 3110, AC ¶ 45); "engage in continual risk management to ensure continuation of its trading and financial 'mission critical systems'" (FINRA Rule 4370, AC ¶ 45).

In addition, Apex owed Plaintiffs the duty in common law tort to comply with FINRA rules to "maintain strong procedures, thoughtfully crafted in advance, to reasonably ensure that they can continue to provide investors access to the securities markets during times of extreme market volatility, as in the past several months" including " liquidity management practices to ensure the firm is able to continue to provide customers with access to the markets despite abnormal liquidity demands." (FINRA Regulatory Notice 21-12; AC ¶ 51).

---

[25] Def Mot. at 22.

Moreover, Apex was statutorily required, pursuant to 17 C.F.R. § 240.15c3-1 (the "Net Capital Rule"), to maintain an appropriate level of "net capital" such as to maintain sufficient liquid assets to meet all obligations to customers. AC ¶ 40.

As demonstrated herein and below, the extreme departure from the standards of care and regulations governing securities brokers are pertinent factual allegations which more than support the plausibility of Plaintiffs' negligence claims concerning Apex's breach of its duty of care.

Apex argues that it had no duty to trade securities for Plaintiffs, citing to its standard customer agreement. Def. Mot. at 23.[26] Apex is not charged with turning down any particular trade from an individual customer for a particular reason. Apex is charged with shutting down its entire platform, for hours, to prohibit all of its customers (direct and introduced) from purchasing in demand stocks and options with the foreseeable consequence that the price of those stocks would go down. No client, or customer agreement, ever authorized Apex to do that.

In any event, Apex misstates its own customer agreement. Apex argues essentially that it contractually has the right to do whatever it wants to any customer whenever it wants to. And without consequence. In particular, here, Apex claims that it "requires each ultimate customer of any introducing broker that uses Apex to agree to a customer agreement giving Apex the unfettered right to 'refuse to execute securities transactions for the Customer at any time and for any reason.'" Def. Mot. at 7, 23. But that is not true. The section of the customer agreement Apex refers to, ¶ 3, is prefaced with the language, "Whenever in your [Apex's] discretion you consider it necessary for your protection, or for the protection of the Customer's Introducing Broker or in the event of, but not limited to (i) any breach by the Customer of this or any other agreement with you or (ii) the Customer's failure to pay for securities…" ¶ 3. *See,* Pace Decl. Ex. 2. As Plaintiffs have pled, and as demonstrated herein, the unprecedented unilateral one-sided trading suspension was not necessary for Apex's protection.

---

[26] Apex also argues that it is not a "public utility" under Texas law irrelevant to this matter and that it has no duty of "constant availability." Def. Mem. at 23. Plaintiffs' allegations that Apex should not have shut down its customers' ability to purchase the Suspended Stocks for hours on January 28th, when only one other broker-dealer acted similarly, cannot be fairly read as an alleged duty of "constant availability." No such duty is pled. Moreover, Apex' supposed defense that had it allowed for ordinary business operations it would have been hazardous to its business has no support in the record and is contrary to Plaintiffs' allegations.

Moreover, according to Apex, each Shared Customer, such as Plaintiffs and other members of the Class, are provided with a Customer Information Brochure that has contradictory language. On one hand, the brochure states: "We [Apex] reserve the right to withhold acceptance of or to reject, for any reason, any account or any transaction for any account and to terminate any account that we have previously accepted." But on the other hand, the same brochure states, "We may refuse to accept any order if we in good faith determine that we should." *See,* Pace Decl. Ex. 1 at 3. This "good faith" overlay does not give Apex unfettered discretion, and, in any event, it is well settled law that any ambiguity in the language of an agreement must be resolved with extrinsic evidence and all reasonable inferences drawn on a dispositive motion must be construed against the moving party, Apex.[27]

Even, however, were Apex to be correct that it was permissible for it to engage in the unprecedented, unilateral, unwarranted one-way trading suspension, Apex must face the consequences for its actions as each customer and investor harmed has the right to claim for damages. The Customer Agreement to which Apex cites does not provide differently. Def. Mot. at 23. It says, in relevant part: "You [Apex] shall not be liable for losses caused directly or indirectly **by any events beyond your reasonable control,** including without limitation, government restrictions, exchange or market rulings, suspension of trading or unusually heavy trading in securities, a general change in economic, political or financial conditions, war or strikes." (emphasis added). Pace Decl., Ex. 2 at 6-7.

Here, as explained, the decision to impose the unprecedented, unilateral one-sided trading restriction was a decision imposed by Apex. **Apex** imposed the Purchase Shutdown and there were no events that justified the Purchase Shutdown that were beyond Apex' "reasonable control." Among other things, Apex should have been prepared for increased collateral demands from DTCC. Further, Apex should have promptly reacted and removed the trading restriction upon

---

[27] *See, United States v. Diebold,* 369 U.S. 654, 655 (1962) (*per curiam*); *Curry Road Ltd. v. K Mart Corp.,* 893 F.2d 509, 511 (2d Cir. 1990); *Coker v. Coker,* 650 SW 2d 391, 393-94 (Texas Supreme Court, 1983). In addition, Apex is confusing a logical common sense provision allowing it the discretion to turn away any particular trade – a trade that is perhaps done using laundered or stolen funds – and converting that provision into an unfettered license to shut down the market to thousands of its own customers for hours and driving down the price of the chosen securities.

receipt of DTCC's corrected collateral demand instead of delaying the corrective action by three hours.

Moreover, and importantly, as a member of FINRA, Apex cannot contract itself out of liability for its own actions.  What Apex characterizes as a  "Customer Account Agreement" is a predispute arbitration agreement.  *See,* Pace Decl. Ex. 2 at Par. 8. "FINRA Rule 2268 prohibits any predispute arbitration agreement from including any condition that: (1) limits or contradicts the rules of any self-regulatory organization (SRO);4 (2) limits the ability of a party to file any claim in arbitration; (3) limits the ability of a party to file any claim in court permitted to be filed in court under the rules of the forums in which a claim may be filed under the agreement; or (4) limits the ability of arbitrators to make any award … These requirements make clear that predispute arbitration agreements must preserve customers' rights under FINRA rules." See, FINRA Regulatory Notice 21-16, p. 2, *available at* https://www.finra.org/sites/default/files/2021-04/Regulatory-Notice-21-16.pdf.

It is clear that, any interpretation of Apex's customer agreement is disputed and not ripe for adjudication on a motion to dismiss.

### 2.   Clearing Broker Liability

Neither New York nor Texas law exempt clearing brokers from liability when they, as alleged here, play a non-ministerial role and directly interfere with the trading of their customers.

Apex persists in the charade that it has no liability to Plaintiffs as a "clearing broker" in that clearing brokerage firms perform largely ministerial functions.[28]  But that is not this case.  No allegations are made charging Apex in connection with any ministerial functions.  The allegations are that Apex deliberately stepped in front of the Introducing Brokers, shutting down the ability of the 100 plus Introducing Brokers (and their Shared Customers such as the Plaintiffs) to effect

---

[28] "In a typical clearing arrangement, a clearing firm provides many backroom and administrative functions for another broker-dealer's customer accounts. *See* Gerald B. Cline and Raymond L. Moss, Liability of Clearing Firms: Traditional and Developing Perspectives, 1062 *PLI/Corp.* 139, 143 (1998). Generally, the clearing firm is responsible for maintaining records and mailing customer account documentation, as well as receiving, maintaining and delivering customers' securities and funds. *See id.;* Henry F. Minnerop, The Role and Regulation of Clearing Brokers, 48 *Bus. Law.* 841, 841 (1993)."  *McDaniel v. Bear Stearns & Co., Inc.,* 196 F. Supp. 2d 343, 347 (S.D.N.Y. 2002).

purchases of three securities with the foreseeable consequence of decreasing and suppressing the price of those securities.

The law is clear that where a clearing firm, as Apex here, moves beyond performing mere ministerial or routine clearing functions (such as acting as a mere conduit) and becomes actively and directly involved in the introducing broker's actions, it exposes itself to liability. *McDaniel v. Bear Stearns & Co., Inc.,* 196 F. Supp. 2d 343, 347 (S.D.N.Y. 2002). *See also, Berwecky v. Bear Stearns & Co.,* 197 F.R.D. 65 (S.D.N.Y. 2000) (complaint against clearing broker Bear Stearns viable where allegation is that Bear Stearns "shed [its] role as a mere clearing broker for and with actual knowledge, directly participated in described scheme."); *Kuoruga v. Fiserv Correspondent Servs.*, 183 F. Supp. 2d 1245, 1247 (D. Or. 2001) (arbitration award confirmed where panel made specific factual findings that clearing firm and introducing broker were directly involved in the challenged transaction and materially participated in the wrongdoing.); *In re Blech Sec. Litig.*, 961 F. Supp. 569, 585 (S.D.N.Y. 1997)(complaint against clearing firm viable where plaintiffs alleged that Bear engaged in activities that did not "reflect ... the standard practice of [a] clearing broker."); *Cannizaro v Bache, Halsey, Stuart, Shields, Inc.,* 81 F.R.D. 719, 721 (S.D.N.Y., 1979) (denying motion to dismiss aiding and abetting claim against clearing firm where facts might show that clearing firm performed more than mere mechanical functions for introducing broker).[29] Moreover, in those instances, as here, where the clearing broker is part of a three way written brokerage agreement, it exposes itself to liability to the brokerage customer. See *Glob. Enter. Grp. Holding, S.A.* v. *Ottimo*, No. 07-CV-4904-TCP-WDW, 2010 WL 11629556 at *5 (E.D.N.Y., June 8, 2010) (holding that "where an agreement exists between the clearing agent and investor, fiduciary duties may arise.").

The court's analysis in *Global Enter. Grp.* is on point:

In 'extenuating circumstances,' where clearing firms act beyond traditional ministerial clearing functions, 'fiduciary duties may exist where a clearing broker asserts control over the introducing broker's business, or becomes actively and directly involved in an introductory broker's actions.' *See Stern v. Legent Clearing LLC*, No. 09-CV-0794, 2009 U.S. Dist. LEXIS 65053, 2009 WL 2244616, at *3 (N.D. Ill. July 28, 2009).… Extenuating circumstances were found in *Goldman*, where the court determined that there were sufficient allegations because the clearing agent 'actively engaged' with an investment company to create fraudulent trading losses. *Goldman*, 1987 U.S. Dist. LEXIS 5356, 1987 WL 12820,

---

[29] Clearing firms, only "when acting within the scope of their traditional clearing functions" owe no fiduciary duties to securities purchasers. *Rozsa v. May Davis Group, Inc.*, 152 F. Supp. 2d 526, 531 (S.D.N.Y. 2001).

at \*22. Moreover, the Southern District held that where there were allegations that a clearing broker undertook more than mere clearing duties, and became aware of the investment broker's fraud, then it could be held liable for a breach of its fiduciary duties. *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.,* No. 97-CV-4978, 2002 U.S. Dist. LEXIS 980, 2002 WL 88226, at \*4 (S.D.N.Y. Jan. 23, 2002). Furthermore, where a clearing firm moves beyond performing mere ministerial or routine clearing functions and becomes actively and directly involved in the introductory broker's actions, it may expose itself to liability with respect to the introductory broker's misdeeds. *McDaniel,* 196 F. Supp. 2d at 353.

*Glob. Enter. Grp Holding, S.A.,* 2010 WL 11629556 at \*5.

Texas courts similarly hold that clearing firms may be liable where the alleged activity of the clearing broker "went beyond the provision of mere ministerial or clerical services." *Turk v. Pershing LLC,* No. 3:09-CV-2199-N, 2014 WL 12572906 at \*3 (N.D. Tex. Dec. 8, 2014); *see also,* *Kneese v. Pershing, LLC,* 2012 WL 13019677, 5 (N.D. Tex. 2012) (dismissal inappropriate where Plaintiffs alleged that clearing broker performed "more than routine financing" including "ensuring that that the introducing broker was meeting net capital and other regulatory requirements.").

Apex relies on inapplicable case law that generally stands for the proposition that investors have no recourse against clearing brokers for the misconduct of introducing brokers. *See, e.g.*, Def. Mot. at 21-22. Those cases do not address the liability of clearing brokers for their own misconduct. Apex tries to hide behind a line of cases where a clearing firm merely performs ministerial functions.[30]

---

[30] All of the cases Apex cites in support of the proposition that clearing firms owe no duty to Plaintiffs are in the context of investors seeking to hold clearing firms liable for the acts of the Introducing Broker.  These cases are factually distinguishable to the situation here where the clearing firm is charged with misconduct. *See Riggs v. Schappell*, 939 F. Supp. 321,326 (D.N.J. 1996) (vicarious liability of clearing firm denied on allegations that clearing firm "provided plaintiffs the impression" that clearing firm backed the wrongdoing introducing broker); *Mars v. Wedbush Morgan Sec.*,283 Cal. Rptr. 238, 241–42 (Cal Ct. App. 1991) (no liability when allegations against clearing broker are no more than simply transmitting reports of trade); *Ross v. Bolton,* 904 F.2d 819, 824 (2d Cir. 1990), (no liability for clearing firm for wrongs committed by the introducing broker); *Rozsa v. May Davis Grp., Inc.*, 187 F. Supp. 2d 123, 131–32 (S.D.N.Y. 2002) (clearing broker not liable for misdeeds of introducing broker).  Similarly, Apex cites to irrelevant cases as to foreseeability.  All of its cases are factually distinguishable. *Pulka v. Edelman,* 358 N.E.2d 1019, 1022–23 (N.Y. 1976) (no clearing firm at issue, no liability in vehicular accident where "regardless of the measures taken, there is little expectation that the one made responsible could prevent the negligent conduct."); *Beckwith v. Hart*, 263 F. Supp. 2d 1018, 1023 (D. Md. 2003)(no clearing firm at issue, not foreseeable that prisoner would be

### 3.  The Economic Loss Rule Does Not Undermine Defendant's Negligence Or The Ability of Plaintiffs to Recover

Apex relies (in its interpretation of Texas law) on the "economic loss rule" in arguing against Plaintiff's ability to recover for damages for "purely economic losses."  Def. Mot. at 24. The economic loss rule, however, is not applicable here.  That rule, primarily a concept applied in product liability cases, is meant to allow for certainty in the calculation and awarding of damages by limiting the application of tort (negligence) claims, when damages can be ascertained and awarded under a breach of contract theory.  The economic loss rule is inapplicable here for numerous reasons.

First, this action is governed by New York law and no such limitation is adopted under New York law. Second, even were Texas law to apply, the economic loss rule is premised on the existence of an underlying contract markedly different from the customer agreement at issue here. In each instance cited by Apex, plaintiff(s) was (were) able to recover, at least theoretically, under a breach of contract theory.  In fact, the economic loss doctrine is premised on the notion that a challenged loss arises "only through their contract." *LAN/STV v. Martin K. Eby Const. Co.,* 435 S.W.3d 234, 238 (Tex. 2014) quoting *Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303, 308 (1927).  Moreover, the Texas Supreme Court has recognized,  "[t]he underlying purpose of the economic loss rule is to preserve the distinction between contract and tort theories in circumstances where both theories could apply*." LAN/STV,* 435 S.W.3d at 240 (internal citations omitted).

Here, Plaintiffs do not plead a breach of contract theory nor could Plaintiffs move to enforce any contract.  In fact, the "customer agreement" Apex cites to is not the type of contract for goods or services to which Defendant cites. [31]  In each case cited by Apex in support of its

---

injured "by the simple act of closing a door"); *Hand v. Dean Witter Reynolds Inc.*, 889 S.W.2d 483, 495 (Tex. App. 1994) ( no clearing firm at issue, broker-dealer had no obligation to accept futures trade when no futures account had been set up); *Weatherly v. Pershing,* 2015 U.S. Dist. LEXIS 197128 (N.D. Tex. June 23, 2015) (No liability against clearing broker for misdeeds of introducing broker); *Turk v. Pershing LLC*,  2014 WL 12572906 (viable negligence claim pled against clearing firm where allegation is that its conduct went beyond mere ministerial role); *Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1296 n.12 (11th Cir. 2002)(clearing firm not liable for alleged misdeeds of bankrupt introducing firm).

[31] No matter the outcome of this litigation, no one can be awarded shares of the Suspended Stocks as of a time certain on January 28th at a price certain and also have had the ability to sell at any moment following the purchase through a breach of contract action. Enforcing a supposed contract here cannot provide the type of relief to Plaintiffs or the Class similar to the cases cited

argument, there existed an underlying contract amenable to performance.[32]  Third, as a FINRA member, Apex is barred, by rule, from utilizing its customer agreement to contract itself out of liability.  Notably, Apex did not provide any examples of the economic loss rule barring claims against broker dealers in Texas (or New York) for misdeeds under anything even remotely related to Apex's alleged misdeeds.

Accordingly, the economic loss rule does not apply to the instant situation under either New York or Texas law.

Courts in New York have allowed for, for example, breach of  duty claims, including breach of fiduciary duty claims, to survive a motion to dismiss based on the economic loss rule solely on the basis that the plaintiff had adequately alleged an extra-contractual duty. *See, AMBAC Assur. V. US Bank Natl Association*, 328 F. Supp. 3d 141 (S.D.N.Y. 2018), *citing, Commerzbank AG v. U.S. Bank National Association AG,* 277 F. Supp. 3d 483, 496 (S.D.N.Y. 2017).

Judge Pauley's thoughtful analysis in *AMBAC* well explains the inapplicability of the economic loss rule under New York law.  The law stands for the proposition that "the economic loss rule limits the end-purchaser of a product to contract remedies and precludes a recovery in tort for purely economic losses — without personal injury or property damage — against a manufacturer." *Id.* at 158-59. (internal citations omitted) "The rule reflects the premise that 'damages arising from the failure of the bargained-for consideration to meet the expectations of the parties are recoverable in contract, not tort, unless a legal duty independent of the contract itself has been violated.'" *Id.* at 159. (internal citations omitted).

Judge Pauley explains the distinction between the "economic loss rule" and the "economic loss doctrine" in New York.  "Under the economic loss doctrine, a defendant is not liable in tort for purely economic loss unless the plaintiff demonstrates that the defendant owed a duty, which

---

by Apex. *See* n 33.  Recovery for Plaintiffs and the Class is in tort, and not contract, with certainty of damages measured by the value of the shares as of a time certain, January 27, 2021, and the date sold.

[32] Def. Mem. at 24 *LAN/STV, 435 S.W.3d at 236, 248*( "The issue in this case is whether the rule permits a general contractor to recover the increased costs of performing its construction contract"; "In fact, construction disputes ... are good candidates for precluding recovery under the 'economic loss' rule, because the parties are in a position to protect themselves through bargaining.); *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex.1986) (case involves the sale and construction of a house).

"may arise from a special relationship[,] ... to protect against the risk of harm to plaintiff." *Id.* (internal citations omitted). "Like the economic loss rule, this doctrine rests on the principle that economic losses arising from injury to expectancy interests created by contract ought to be brought as contract claims, but also 'reflects a policy interest in protecting defendants from disproportionate, and potentially limitless, liability.'" *Id.* (internal citations omitted).

Judge Pauley concluded, "[h]ere, Ambac's breach of fiduciary duty claim survives U.S. Bank's motion to dismiss regardless of which principle is applied. As discussed, the economic loss doctrine centers on whether the defendant owed a duty to protect against the risk of harm to the plaintiff. Ambac has sufficiently alleged that U.S. Bank owes a fiduciary duty of undivided loyalty to the Trusts and their beneficiaries….As for the economic loss rule, this Court notes as an initial matter that the applicability of the economic loss rule outside the product-liability context from which it originated is doubtful… *See, King Cty., Wash. v. IKB Deutsche Industriebank AG*, 863 F. Supp. 2d 288, 301 (S.D.N.Y. 2012) (observing that in *Finlandia*, "the New York Court of Appeals cautioned that the `economic loss rule' has no application outside the product-liability context"). (additional internal citations omitted)." *Id.* at 159-160.

Plaintiffs' ability to recover for economic loss under their tort claims are also not foreclosed under Texas' view of the "economic loss doctrine." In Texas, the "economic loss doctrine" is "not generally applicable in every situation" *LAN/STV*, 435 S.W.3d at 235-36, and has historically only been applied in cases involving strict product liability or failure to perform a contract. Importantly "pure economic loss" is still recoverable under Texas law for breach of fiduciary duty, *ERI Consulting Eng'rs, Inc. v. Swinnea,* 318 S.W.3d 867, 873–74 (Tex. 2010). Moreover, under Texas law, the "economic loss rule" "reflects a preference for allocating some economic risks by contract rather than by law." *LAN/STV*, supra. Here, because Plaintiffs' alleged breach of duties, including breach of fiduciary duty, and, because there is no contract that Plaintiffs could have enforced, Texas law does not bar economic recovery.[33]

---

[33] Apex erroneously claims that recovery of economic damages is barred under Florida law. Def. Mot. at 24. Even were Florida law to apply, which it does not, Plaintiffs could still recover economic damages under their claims in tort. As this Court held in *Maliner v. Wachovia Bank, NA*, 2005 WL 670293 (S.D. Fla. 2005), there are exceptions to the economic loss rule including "those well-established torts" that include "breach of fiduciary duty".

#### 4.    Apex Breached its Duty To Plaintiffs

The events of January 28th place Apex on the horns of a dilemma, the response to which only support Plaintiffs' allegations.  Either Apex was concerned or was not concerned that it would be able to satisfy an increased collateral requirement on January 28th.

If it did not have such concern, as its President claimed, stating that not only did Apex "not restrict trading as a result of capital requirements" (AC ¶ 84), but that it had plenty of capital available to it on its balance sheet as well as on lines of credit (AC ¶84, confirmed at AC ¶ 85), then Apex had no justification for engaging in the unprecedented, unilateral, one-way trading halt.  Such an unjustified trading halt was in violation of Apex's duty of care as reflected by the rules and customs of the securities industry described herein and pled.

If Apex was concerned about satisfying its collateral requirements on January 28th, as it told regulators (AC ¶ 77), and as it argues here (Def. Mot. at 1) then Apex breached its duties to Plaintiffs in several ways.   As Plaintiffs allege, Apex had no plan in place to address DTCC's request for additional collateral on January 28th (AC ¶ 65) despite its obligation to maintain sufficient liquidity to satisfy its regulatory "net capital" requirement (AC ¶ 40) and despite it being foreseeable that Apex's collateral requirement would increase as the events leading up to January 28th unfolded. (AC ¶¶ 34-39).  Defendant's Memorandum does not reference or explain any plan to address its collateral requirements that week.  This was a breach of Apex's duties.

Then, assuming that Apex learned for the first time of an increased collateral requirement on the morning of January 28th, it was a breach of Apex's duty of care to implement the consequential, unprecedented, unilateral one-way trading halt without at least exploring an alternative mechanism by which it could satisfy its collateral requirement.  Moreover, Apex itself provides the impetus for the accusation of misconduct by taking the position that once it was informed by DTCC that the collateral requirement was lower, and at an acceptable amount that would not require it to suspend trading, it could not lift the self-imposed trading restriction without confirming the lower number with DTCC (AC ¶ 76; Def. Mem. at 10). This position, of course, begs the question as to why Apex needed to confirm the lower number with DTCC before lifting the suspension, but Apex did not bother to even attempt to confirm the higher number with DTCC, which Apex supposedly did not anticipate, before implementing the Purchase Shutdown. *Id*. Under Apex's own reasoning, a reasonable response to the higher collateral number DTCC

initially demanded would have been to confirm that higher number, first received at 9:30 a.m. (Eastern) before taking the unprecedented, unilateral action of halting one-sided trading two hours later at 11:31 a.m. (Eastern) that caused tremendous damage to Plaintiffs and the class. AC ¶¶ 74-76, 105.  Then, as Plaintiffs allege, even after Apex did confirm the lower collateral number with DTCC at 11:47 a.m. Eastern/10:47 a.m. Central (AC ¶ 79, and Safirstein Decl, Ex. 1) as demonstrated by documents produced by DTCC, Apex continued to impose its unprecedented, unilateral one-sided traded halt until 2:55 p.m. Eastern/ 1:55 p.m. Central. The trading halt continued for approximately three hours with no justification whatsoever.  Apex breached its duties to Plaintiffs with its unprecedented, unilateral, one-sided, foreseeably harmful and unjustified Purchase Shutdown.

Contrary to Apex's protestations, there is nothing ministerial about shutting down a controlled trading platform so that thousands of investors (if not more) could not purchase certain securities as evidenced by the communication Apex sent to its Introducing Broker-Dealers at 10:30:40 a.m. Central:

> "EMERGENCY NOTICE: GME, AMC, and KOSS Liquidations Only
>
> Apex would like to inform you that the below listed stocks should be liquidation only on your systems whether proprietary or through a 3rd party. This would include both equities and all option series, most importantly the January 29th 2021 expiration. These positions have been previously set at 100% margin and will continue for the foreseeable future. GME: GameStop AMC: AMC Entertainment KOSS: Koss Corp. Please note that there might be additional securities added to this restriction list before market close today, additional messages may follow. If you have any questions please contact our Risk Department (risk@apexclearing.com), or your Client Partner/Relationship Manager. Thank you, Apex Clearing Corporation

AC at ¶75.

Apex's breach is further confirmed by the facts that: 1) its own Introducing Brokers criticized Apex for the Purchase Shutdown (AC ¶ 72); 2) other than Robinhood, no other broker-dealer, or clearing broker-dealer, engaged in a similar one-sided trading halt, even though the SEC confirms that 18 brokerage houses received similar special DTCC charges (AC ¶¶ 89-90);[34] 3)

---

[34] As the SEC confirmed, "[o]n January 27, 2021, in response to market activity during the trading session, NSCC made intraday margin calls from 36 clearing members totaling $6.9 billion, bringing the total required margin across all members to $25.5 billion. Of the $6.9

facing similar market circumstances the very next day, Apex opted to avoid imposing the unprecedented, unilateral one-sided trading halt (AC ¶ 87); 4) there was a specific industry practice in place to address market volatility such as existed on January 28th that did not countenance the extreme actions taken by Apex, (AC ¶¶ 52-56) and; 5) Apex could have employed numerous mitigation strategies to minimize any perceived risk that did not involve the Purchase Shutdown such as tapping into available capital. (AC¶¶85-86).

To distract from Apex's appalling misconduct, Apex invents "straw person" pleadings suggesting that Plaintiffs have pled "duties" that Apex could not and did not breach.  But Plaintiffs do not allege any duty to "dicker," "rush" or "supply infinite capital" and Apex's entire analysis on these points is just irrelevant space filler (Def. Mot. at 25 – 32) that Plaintiffs have already addressed.  Plaintiffs, as described above, have set forth Apex's common law duty of care and how its conduct breached such duty. *See, supra,* at Point III, Subd. E, subparts 1 through 4.

### 5.   The Complaint Properly Alleges that Apex's Actions Proximately Caused Plaintiffs' Alleged Injury

Whether under New York or Texas law, Plaintiffs satisfy the "proximate cause" element of their negligence claim by plausibly alleging that defendant's conduct was a substantial factor in bringing about the harm or injury and that the harm was foreseeable . *Hain v. Jamison*, 28 N.Y. 3d

---

billion, $2.1 billion were intraday mark-to-market calls, while the remaining $4.8 billion was a special ECP charge. Specifically, NSCC observed unusual volatility in certain securities, including GME, which presented heightened risk to the clearinghouse and its members.86 As a result, it calculated and assessed against certain affected members the remaining $4.8 billion as an additional special charge pursuant to its established rules. PPP NSCC imposed this charge on 18 members, all of whom provided the additional margin. NSCC subjected one additional member to the special charge, but that member ultimately did not have to meet that charge after offsetting its exposure with a transfer from an affiliate. In addition, several NSCC members were subject to an ECP charge based on the ratio of the excess risk in their portfolios relative to their capital. Because these members' ratios of excess risk versus capital were not driven by individual clearing member actions, but by extreme volatility in individual cleared equities, NSCC exercised its rules-based discretion to waive the ECP charge for all members on January 28, 2021. Absent this waiver, one retail broker-dealer would have had an additional ECP charge of more than double its margin requirement of $1.4 billion on January 28, 2021…" SEC Report at 31.

524, 528-29 (2016); *Derdiarian v. Felix Contr. Corp.*, 51 N.Y.2d 308, 315 (1980):*Western Investments Inc. v. Urena*, 162 S.W.3d 547, 551 (Tex. 2005); *Travis v. Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992).  Plaintiffs need not exclude all possibilities, and need only demonstrate that the greater probability is that the defendant's conduct, either alone or together with the conduct of others, was the cause of the harm. *First Assembly Of God, Inc. v. Texas Utilities Elec. Co.*, 52 S.W. 482, 493 (Tex. 2001).

While a defendant will not be held liable as the proximate cause of the injury if the damage caused by the defendant's act was not foreseeable, foreseeability does not require anticipation of the precise manner in which the injury will occur.  *Travis,* 830 S.W.2d 94, 98; *First Assembly Of God, Inc.,* 52 S.W. 482, 493.  The determination of proximate cause is generally left to the trier of fact if a prime facie case is made, and is not decided as a matter of law unless only one conclusion can be drawn from the established facts. *Hain,* 28 N. Y.3d at 528.

Here, the Amended Complaint alleges that "Apex caused the price of each of the Suspended Stocks to go down and to trade at lower prices than they would have traded for absent Apex's misconduct," and that "Apex's decision to implement this unilateral one-way trading suspension (halting of the buying, but not the selling) foreseeably impeded additional price appreciation and suppressed the prices of the Suspended Stocks during and beyond the Class Period causing ascertainable damages and injury." AC ¶¶ 65, 67.  Nothing more is required to satisfy Plaintiffs' pleading of proximate cause.

Apex argues that Plaintiffs fail to show proximate cause by simply rearguing all of its misdirected arguments challenging Plaintiffs' Article III standing.  But Plaintiffs' allegations do not rely on clairvoyance or guessing.  The allegations plainly state that Plaintiffs purchased securities and sold them on a date certain and at an amount certain that was less than what Plaintiffs would have sold the securities for but for Apex's misconduct which foreseeably caused the harm. (AC ¶¶ 65, 67).  These allegations are text-book proximate causation.

### F.   Plaintiffs State A Claim For Breach of Fiduciary Duty (Count II)

Plaintiffs have alleged in Count II that Apex breached fiduciary duties to both its Shared Customers and to its direct broker-dealer customers. AC ¶¶ 109-114.  In New York, "[i]n order to establish a breach of fiduciary duties, a plaintiff must prove the existence of a fiduciary relationship, misconduct by the defendant, and damages that were directly caused by the

defendant's misconduct." *Kurtzman v. Bergstol*, 835 N.Y.S. 2d 644 (2nd Dep't 2007). A claim for breach of fiduciary duty under Texas law requires the plaintiff to plead "(1) the existence of a fiduciary duty, (2) breach of the duty, (3) causation, and (4) damages." *First United Pentacostal Church of Beaumont v. Parker*, 514 kS.W.3d 214, 220 (Tex. 2017)."  The existence of a fiduciary relationship is a question of fact under both New York law, (*see, EBC I v.* Goldman Sachs & Co., 5 N.Y. 3d 11, 19 (2005) and Texas law, (*see, MacDonald v. Follett*, 180 S.W. 2d 334 (1944)).

Plaintiffs have already set forth the facts and the law supporting the breach of fiduciary claim as part of the duties owed by Apex that were breached as part of the negligence claim.  *See supra* Point III, Subd. E.

In short, Plaintiffs have alleged that Apex provided broker-dealer services to its direct customers and clearing broker-dealer services to its Shared Customers. Apex, in breach of its fiduciary duties shut down and/or failed to timely re-open its own trading platform and the trading platform of more than 100 introducing broker dealers for hours on January 28, 2021 without any valid justification.  These facts support an allegation of breach of fiduciary duty.

"A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation."). Restatement (Second) of Torts § 874 cmt. a.  Securities brokers stand in a fiduciary relationship with their customers.  *Conway v. Icahn & Co., Inc.* 16 F.3d 504, 510 (2d Cir. 1994) ("the relationship between a stock-broker and its customer is that of principal and agent and is fiduciary in nature, according to New York law (internal cites omitted).."); *Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d 1042, 1049 (11th Cir. 1987) ("The law is clear that a broker owes a fiduciary duty of care and loyalty to a securities investor."). Texas law is similar.  *See In re Letterman Bros. Energy Securities Litigation*, 799 F.2d 967, 972 (5th Cir. 1986) ("A broker is within the category of those who owe a special fiduciary duty to one who purchases securities from the broker or upon the broker's advice."); *Magnum Corp. v. Lehman Bros. Kuhn Loeb, Inc.*, 794 F. 2d 198, 200 (5th Cir. 1986) ("The relationship between a securities broker and its customer is that of principal and agent.").

An agent breaches a fiduciary duty to the principal and is liable for damages when the agent's lack of due professional care leads to the loss of his principal's money. *Thropp v. Bache Halsey Stuart Shields, Inc.*, 650 F.2d 817 (6th Cir. 1981). "Since the fiduciary duties of a broker

[or financial advisor] include the duty to use the skill and diligence necessary to protect his customer's interests, negligent conduct may be a breach of fiduciary duty. In this regard, it is normally not sufficient for a broker to exercise ordinary care and judgment in discharging his duties; he must employ such care, skill, prudence, diligence, and judgment as might be reasonably expected of persons skilled in his calling." Norman S. Poser, Broker Dealer Law and Regulation (3rd Ed. 2002 Supplement).  "From this quality follows that certain duties deemed fiduciary may be associated with the broker's obligation to the client. These obligations may arise from and be defined by agreements, by course of conduct or business dealings reflecting matters entrusted to the broker, or by laws that specifically govern the relationship." *De Kiatkowski v. Bear Stearns & Co., Inc.*, 126 F. Supp. 2d 672, 693 (S.D.N.Y. 2000).

New York recognizes that brokers and customers may be in a fiduciary relationship even if the account is nondiscretionary (meaning that the customer does not rely upon the broker to make the securities trade on the customer's behalf). *See, e.g.   De Kwiatkowski v. Bear, Stearns & Co.,* 306 F. 3d 1293, 1302, 1305 (2d Cir. 2002) ("On a transaction-by-transaction basis, the broker owes duties of diligence and competence in executing the client's trade orders…. No doubt, a duty of reasonable care applies to the broker's performance of its obligations to customers with nondiscretionary accounts."); *Press v. Chem. Inv. Servs. Corp.,* 166 F. 3d 529, 536 (2d Cir. 1999) (broker's fiduciary duty is limited to the "narrow task of consummating the transaction requested"); *Independent Order of Foresters v. Donald, Lufkin & Jenrette, Inc.,* 157 F. 3d 933, 940-41 (2d Cir. 1998) (in a nondiscretionary account, "the broker's duties are quite limited," including the duty to obtain client's authorization before making trades and to execute requested trades); *Schenck v. Bear, Stearns & Co.*, 484 F. Supp. 937, 947 (S.D.N.Y. 1979) (noting that the "scope of affairs entrusted to a broker is generally limited to the completion of a transaction").  Texas also recognizes that fiduciary duties extend to holders of non-discretionary brokerage accounts. *See, Martinez Tapia v. Chase Manhattan Bank, NA*, 149 F.3d 404, 412 (5th Cir. 1998) ("While the nature of the duty owed by a broker will vary depending on the relationship between the broker and the investor, where the investor controls a nondiscretionary account and retains the ability to make investment decisions, the scope of any duties owed by the broker will generally be confined to executing the investor's order.").

Apex's unprecedented, unilateral, one-sided, consequentially harmful and unjustified shut down qualifies as a breach of fiduciary duty.

40

As discussed previously, clearing brokers may owe fiduciary duties to their customers as well. *See, Glob. Enterp. Grp. Holding, S.A.,* 2010 WL 11629556, at *5 ("where an agreement exists between the clearing agent and investor, fiduciary duties may arise.").

As the court noted in *Global Enterp Group*, in "extenuating circumstances," where clearing firms act beyond traditional ministerial clearing functions, "fiduciary duties may exist where a clearing broker asserts control over the introducing broker's business, or becomes actively and directly involved in an introductory broker's actions." *Id.*; *see also Stern v. Legent Clearing LLC,* No. 09-CV-0794, 2009 WL 2244616, at *3 (N.D. Ill. July 28, 2009).

Apex argues that as the Clearing Broker-Dealer it does not owe fiduciary duties to Plaintiffs. Def. Mot. at. 32.  But Plaintiffs have shown otherwise  and Apex largely repeats its earlier arguments and badly misstates the law. Apex notes that clearing firms are generally not liable for the misdeeds of the introducing brokers, but Apex ignores that clearing firms are liable for their own misdeeds. Their own legal citations say so.  For example, Apex cites to *Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 465 (2d Cir. 2013) for the proposition that "a clearing agent [] is generally under no fiduciary duty to the owners of the securities that pass through its hands." Def, Mem. at 34. But *Levitt* fully supports clearing firm liability here.  Apex ignores the remainder of the *Levitt* opinion where the Court notes: "district courts in this Circuit have distinguished two categories of cases.  First, in cases where a clearing broker was simply providing normal clearing services, district courts have declined to 'impose [] liability on the clearing broker for the transgressions of the introducing broker.'….  In the second, much more limited category of cases, district courts have found plaintiffs' allegations to be adequate – and so have permitted claims to proceed – where a clearing broker is alleged effectively to have shed its role as clearing broker and assumed direct control of the introducing firm's operations and its manipulative scheme. (internal citations omitted)." *Levitt,* 710 F. 3d at 466.

Curiously, Apex argues that Apex was not Plaintiffs' agent, but Apex, as alleged, facilitated each and every trade placed by Plaintiffs and Apex's direct and Shared Customers.  AC ¶¶ 15, 19, 110, 111.  Moreover, Apex itself supplied the standard Customer Agreement which states that the customers' transactions are cleared through Apex. *See,* Pace Decl, Ex. 2.

Apex also argues that "Texas courts specifically have held that brokers are not public utilities who owe a duty to individual investors accept any and all orders they ask to place." (sic) Def. Mot. at 32-33.  But the relevant law is New York law, and Apex once again makes up its own

pleadings to suit its argument.  There is no pleading of a generalized duty to accept any and all orders.  The pleading is that under the circumstances, Apex breached its duties to its direct and Shared Customers by its unprecedented, unilateral, unwarranted, consequentially harmful one-sided shut down.  Such conduct was in breach of Apex's fiduciary duties to its direct and Shared customers.

### G.   Plaintiffs Have Properly Stated An Alternative Claim for Tortious Interference With Business Relationship (Count III)

Plaintiffs allege, alternatively, that Apex tortiously interfered with Plaintiffs' business relationship with the Introducing Brokers in shuttering the Introducing Brokers' trading platform for hours so as to prohibit purchases of the Suspended Stocks. AC ¶¶ 115-123.  Plaintiffs satisfy the elements required to plead such claims by alleging the existence of an ongoing business relationship, tortious interference with said relationship, causation and damages.

Contrary to Defendant's argument, Plaintiffs have not pled that there is an existing contract as between Plaintiffs and the Introducing Brokers that Apex induced them to breach.  Rather, Plaintiffs have pled that by directing the shutdown of the Introducing Broker's trading platform, Apex prevented Plaintiffs and members of the Class from being able to purchase the Suspended Stocks from the Introducing Brokers.  That claim has been found to be viable under New York law by the New York Court of Appeals in *Carvel Corp. v. Noonan*, 3 N.Y.3d, 182, 189 (2004). ("We have recognized that inducing breach of a binding agreement and interfering with a nonbinding "economic relation" can both be torts.").  In considering a tortious interference claim, alleging unlawful interference with the relationships between franchisees and their customers, the *Carvel* Court found in responding to a certified question from the Second Circuit, following a jury trial, that "Carvel's conduct, which did not constitute a crime or an independent tort and was not aimed solely at harming franchisees, was also not the sort of egregious wrongdoing that might support a tortious interference claim in the absence of such an independently unlawful act or evil motive." *Carvel Corp.*, 3 N.Y.3d at 188.

However, here Apex is charged with not one, but two independent torts – negligence and breach of fiduciary duty.  Accordingly, a jury could find liability for tortious interference.[35]

---

[35] The Court of Appeals explicitly left open the question as to whether the type of conduct engaged in by Apex rises to the level of culpable conduct. ("We did not decide in *Guard-Life* or *NBT,* and we do not decide today, whether any other exception to the general rule exists

Texas also recognizes a cause of action for tortious interference with business relations. This tortious interference occurs when there is an unjust act by "someone" getting in the way of business dealings with another party. *First Nat. Bank of Eagle Pass v. Levine*, 721 S.W.2d 287 (1986) (explaining that the tort is rooted in common law "trespass" jurisprudence). While Texas law is more developed for tortious interference with contractual rights, Texas law also recognizes that tortious interference can occur with an unenforceable contract (as Plaintiffs allege, AC ¶ 116). *Clements v. Withers*, 437 S.W. 2d 818, 821 (Tex. 1969) ("the unenforceability of a contract is no defense to an action for tortious interference with its performance."). Here, Plaintiffs do not allege that the "customer agreement" is an enforceable contract, but it does set out "legal rights" (AC ¶¶ 15, 19, 117; Pace Decl. Ex. 2) that form the basis of a relationship between the Introducing Brokers and Plaintiffs that Apex tortiously interfered with by instructing them to shut down trading on one side for an improper motive.

Apex, in its defense, harps on the fact that liability for this tort is predicated on "willful and intentional" interference. Def. Mot. 39-40. But Plaintiffs' alternative pleading alleges that Apex directed its correspondent Introducing Brokers to refuse to accept purchase orders for the Suspended Stocks from their customers. AC ¶75. This is actionable interference. To wit, Plaintiffs have alleged that "suspending the ability of all of its customers and its Shared Customers to purchase the Suspended Stocks for approximately three hours and twenty-five minutes forcing those stock prices to diminish… tortiously interfered with Plaintiffs' business relationships with the Introducing Broker-Dealers." AC ¶ 120.

Apex also argues that Plaintiffs' fail to plead the existence of a contract, but Plaintiffs have sufficiently addressed this argument above. Other than that, Apex just rehashes old arguments already addressed. Point III, above in this Subd. G.

---

— whether there can ever be other instances of conduct which, though not a crime or tort in itself, was so "culpable," to use *NBT*'s word, that it could be the basis for a claim of tortious interference with economic relations. That is a question we leave for another day, because no such egregious conduct was shown here." *Carvel Corp.*, 3 N.Y.3d at 190-91.

### H.   Plaintiffs State Law Claims Are Not Preempted By Federal Securities Laws

Apex's preemption claims arise from yet another mischaracterization of its role.  Apex is a clearing broker-dealer, not a clearinghouse, and it is named as a defendant as a broker-dealer. Apex is not DTCC and Apex is not a self-regulatory organization ("SRO") that serves as a "quasi –governmental agency" in the exercise of "delegated government power" that would be entitled to preemption.[36] Apex itself never claims to be an SRO.  Apex's attempt to bootstrap itself into the legal protections afforded to an SRO is an overreach[37] and its bottom-line proposition that "complying with Plaintiffs' proposed standard of care while complying with Apex's regulatory obligations…would be impossible"[38] is simply wrong.

As alleged, Apex was unprepared to address its collateral requirements on January 28, 2021 and wrongfully implemented and persisted in the Purchase Shutdown despite knowing there was no settlement risk. This litigation does not challenge DTCC's ability to set collateral requirements. No other broker-dealer on January 28th (clearing or otherwise, except for Robinhood) found it "impossible" to balance its duties of complying with their regulatory obligations and protect the interests of investors. (AC ¶¶ 89-90; *See,* SEC Report at 31).

Moreover, any protections that are afforded to SRO's do not extend to broker-dealers that abuse their roles and commit misconduct.  That is why clearing broker-dealers are historically liable for their own misdeeds.

---

[36] Apex's reliance on *In re Series 7 Broker Qualification Exam Scoring Litig.*, 510 F. Supp. 2d 35, 47 (D.D.C. 2007), *aff'd,* 548 F.3d 110 (D.C. Cir. 2008) is misplaced.  That case stands for the inapplicable proposition that SRO's such as NASD (now FINRA) and DTCC have immunity. Def. Mem. at 47. See also, *MM&S Fin., Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 364 F.3d 908, 911 (8th Cir. 2004) (same).

[37] Apex wrongly argues that SRO preemption "applies equally to Apex and disallows common law claims to enforce regulatory obligations imposed on it through an SRO" citing to *Appert v. Morgan Stanley Dean Witter, Inc.*, 2009 WL 3764120, at *4 (N.D. Ill. Nov. 6, 2009), *aff'd,* 673 F.3d 609 (7th Cir. 2012). But Apex cannot step into the shoes of an SRO and *Appert* does not even address preemption other than in the context of SLUSA, irrelevant here, and is otherwise limited to the unremarkable and irrelevant holding that an investor cannot sustain a breach of contract claim against a broker-dealer for a violation of an exchange rule.
[38] Def. Mot. at 48.

## I.     Plaintiffs' Claims Are Viable As Pleaded on Behalf of Apex's Shared Customers and Investors Who Were Foreseeably Harmed by Apex

Defendant asserts that the negligence claims of plaintiffs can only be asserted for those investors whose introducing brokers cleared through Apex.  However, Plaintiffs' have plausibly pled that Defendant's misconduct that gives rise to recovery under common law tort also proximately caused harm to Apex's direct customers and to all investors nationwide who fit within the proposed class definition. AC ¶ 93.  Apex's misconduct was not limited in scope and foreseeably caused harm to all members of the putative class. While Plaintiffs have already demonstrated that Apex owed duties to its customers, Apex was not and should not be free to cause consequential damage to all investors as a result of its appalling misconduct that foreseeably affected the price of the Suspended Stocks – no matter who held them.

The law is clear that a corporation owes duties to and may be held accountable for its misconduct to non-customers. *See, In re Equifax, Inc. Customer Data Sec. Breach Litig.*, 362 F.Supp.3d 1295, 1325 (N.D. Ga. 2019) (non-customer consumers, in putative class action, sufficiently alleged that consumer reporting agency owed a legal duty to them to take reasonable precautions to safeguard the personal information in its custody, as required to state negligence claim against the agency and affiliated entities, arising from data breach in which personal and financial information of millions of Americans was potentially stolen where consumers alleged that agency knew of a foreseeable risk to its data security systems but failed to implement reasonable security measures).

Apex's Purchase Shutdown foreseeably caused the Suspended Stocks to decrease in value, causing injury to investors in those Suspended Stocks, not limited to the direct customers and Shared Customers.  *In re Equifax, supra; See also*, *Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024, 1039 (N.D. Cal. 2019) (finding lack of reasonable care in handling of personal information can foreseeably harm the individuals providing the information).

In the case of Apex, the regulatory duty to put sufficient measures in place to continue to maintain an orderly market is undisputed and affected more than just customers of Apex and the Apex Introducing Broker-Dealers.  As set forth in the Complaint, "contrary to governing industry rules and regulations aimed at addressing market volatility," Apex had a duty of care as a registered broker-dealer and "Apex failed to take reasonable steps to protect its customers and investors in times of market volatility. As alleged herein, Apex failed to adequately mitigate risk and knew or

45

should have known that the abruptly implemented, one-way trading suspension it imposed directly and through its Introducing Broker-Dealers would and did harm Apex customers and investors." AC ¶ 5.

## IV.  SHOULD THE COURT DISMISS THE COMPLAINT IN WHOLE OR IN PART, LEAVE SHOULD BE GRANTED TO REPLEAD

While Plaintiffs believe that their well-pled Complaint should be sustained, should the Court disagree, Plaintiffs seek an opportunity to amend.  Apex argues that the discovery provided to date may render such amendment futile, Def. Mot. at 50.  But Apex's document production to date raises serious concerns about the breadth of its production.  First, there appear to be serious gaps in Apex's document production, evidenced in part by the fact that critical information relating to Apex-DTCC communications on January 28, 2021 was provided by DTCC and *not* Apex.  Safirstein Decl. at ¶¶ 3 and 12.  This raises the troubling question as to whether Apex properly produced to Plaintiffs all that it was required to pursuant to this Court's Order, and, if so, then whether Apex produced all that it should have to the regulators. Further suspicion is placed on Apex's production as Apex inexplicably produced documents in this litigation after the filing of the initial complaint, yet dated before such filing.  Safirstein Decl. at. 4 And, as demonstrated herein, there still remain open questions as to which time zone certain documents reference.

## V.  CONCLUSION

For all of the reasons stated herein, Apex's Motion To Dismiss should be denied.

Dated:  November 5, 2021

/s/*Rachel W. Furst*
**GROSSMAN ROTH YAFFA COHEN, P.A.**
Rachel W. Furst (FBN 45155)
2525 Ponce de Leon Blvd., Ste 1150
Coral Gables, FL 33134-6040
Tel: 305-442-8666
rwf@grossmanroth.com

***Plaintiffs' Liaison Counsel***

/s/ *Peter Safirstein*
**SAFIRSTEIN METCALF LLP**
Peter Safirstein (NY SBN 2044550)
1345 Avenue of the Americas, 2nd Floor

New York, NY 10105
Tel: (212) 201-5845
psafirstein@safirsteinmetcalf.com

***Plaintiffs' Lead Counsel for the
Other Broker Tranche***

/s/ *Gary S. Graifman*
**KANTROWITZ, GOLDHAMER
& GRAIFMAN, P.C.**
By: Gary S. Graifman
Daniel C. Edelman
135 Chestnut Ridge Road
Montvale, New Jersey 07645
Tel:  (201) 391-7000
 ggraifman@kgglaw.com
 dedelman@kgglaw.com

***Additional Plaintiffs' Counsel for the
Other Broker Dealer Tranche***

47

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 5, 2021, I electronically filed the forgoing with the Clerk of the Court using CM/ECF. I also certify that the foregoing is being served this day on all counsel of record in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel who are not authorized to receive Notices of Electronic Filing.

By: *<u>/s/ Rachel Wagner Furst</u>*
      Rachel Wagner Furst

48