**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-2989-MDL-ALTONAGA/Torres**

IN RE:

**JANUARY 2021 SHORT SQUEEZE
TRADING LITIGATION**

_____/

This Document Relates to the Robinhood Tranche

**PLAINTIFFS' OPPOSITION TO DEFENDANTS ROBINHOOD MARKETS, INC.,
ROBINHOOD FINANCIAL LLC, AND ROBINHOOD SECURITIES, LLC'S
<u>MOTION TO DISMISS THE ROBINHOOD TRANCHE COMPLAINT</u>**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

I.     FACTUAL BACKGROUND ........................................................................................ 7

     A.     Robinhood Profits From Exponential Customer Growth and
           High-Volume Trading ........................................................................................ 7

     B.     The Regulatory Framework for Securities Trading and the Standard of Care
           for Broker-Dealers Professionals ..................................................................... 9

     C.     Robinhood's History of Systemic Regulatory Failures ................................... 10

     D.     The Events of January 2021 ............................................................................ 10

II.    LEGAL STANDARDS ............................................................................................ 14

     A.     Standard of Review ......................................................................................... 14

     B.     Applicable Law ............................................................................................... 14

           (i)     Robinhood's Contractual "Governing" Law Provision Does Not Govern
                  Plaintiffs' Tort Claims ....................................................................... 15

           (ii)    Florida has the "Most Significant Relationship" to Plaintiffs'
                  Tort Claims ......................................................................................... 17

III.   ARGUMENT ........................................................................................................... 19

     A.     Plaintiffs' Detailed Factual Allegations Are More than Sufficient to State
           Plausible Negligence and Gross Negligence Claims (Counts I–II) ...................... 19

           (i)     Robinhood Owes All Foreseeable Plaintiffs Independent Tort Duties ...... 20

           (ii)    The Economic Loss Rule Does Not Bar Plaintiffs' Negligence Claims ... 22

           (iii)   Robinhood's Extreme Departures from the Standards and Regulations
                   Governing Securities Brokers Support Plaintiffs' Negligence Claims ...... 26

     B.     Plaintiffs' Allegations Support a Plausible Breach of Fiduciary Duty
           (Count III) ....................................................................................................... 29

           (i)     Stockbrokers Have Fiduciary Duties, the Scope and Extent of Which
                   Depends on the Particular Facts of Each Case ................................... 29

(ii)   Plaintiffs' Plead Facts Supporting a Fiduciary Relationship Arising from a Special or Confidential Relationship.............................................31

(iii)   Defendants' Cited Case Law is Inapposite .................................................34

(iv)   Robinhood Securities Owed a Fiduciary Duty to the Robinhood Plaintiffs.......................................................................................................35

C.   Plaintiffs Adequately Plead Alternative Claims for Breach of Implied Covenant of Good Faith and Fair Dealing and Duty of Care (Counts IV–V) .......37

(i)   Robinhood's Bad Faith and Unfair Dealing in Furnishing Brokerage Services Frustrated the Customer Agreement's Purpose and Thwarted Plaintiffs' Expectation of Contractual Benefits .........................................37

(ii)   Plaintiffs Plead Sufficient Facts to Plausibly Allege Robinhood Financial and Robinhood Securities Breached their Implied Duties .........43

D.   Plaintiffs' Count VI States Plausible Claims for Tortious Interference with their Contractual and Business Relationships Against Robinhood Markets .........45

(i)   Plaintiffs Plead Facts Showing that Robinhood Markets Interfered with their Contracts with its Subsidiaries ...................................................45

(ii)   Robinhood Markets' Half-Hearted Assertion that Plaintiffs Do Not Plead it Acted Intentionally or Unjustifiably is Meritless .........................47

E.   Plaintiffs Plead the Essential Elements of Civil Conspiracy (Count VII) ............49

F.   Should the Court Disagree, Any Dismissal Should Be with Leave to Amend......50

CONCLUSION....................................................................................................................50

# TABLE OF AUTHORITIES

**Cases**                                                                                                  **Page(s)**

*Aas v. Super. Ct.*,
   24 Cal. 4th 627 (2000) ............................................................................................25, 26

*Am. Diversified Ins. Services, Inc. v. Union Fid. Life Ins. Co.*,
   439 So.2d 904 (Fla. 2d DCA 1983) ............................................................................49

*Am. United Life Ins. v. Martinez*,
   480 F.3d 1043 (11th Cir. 2007) ..................................................................................14

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*,
   7 Cal. 4th 503 (1994) ..................................................................................................50

*Apollo Capital Fund, LLC v. Roth Capital Partners, LLC*,
   158 Cal. App. 4th 226 (2007) ..............................................................30, 31, 33, 34

*April Enterprises, Inc. v. KTTV*,
   147 Cal. App. 3d 805 (1983) ......................................................................................42

*AREI II Cases*,
   157 Cal. Rptr. 3d 368 (Ct. App. 2013)...............................................................49, 50

*Arndt v. Twenty-One Eighty-Five, LLC*,
   448 F. Supp. 3d 1310 (S.D. Fla. 2020) ......................................................................15

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)....................................................................................................14

*Automatic Vending Co. v. Wisdom*,
   182 Cal. App. 2d 354 (Ct. App. 1960)........................................................................41

*Badie v. Bank of Am.*,
   67 Cal. App. 4th 779 (Ct. App. 1998)........................................................................41

*Banc of Am. Sec. LLC v. Stott*,
   No. 04-81086-CIV, 2005 WL 8156027 (S.D. Fla. Aug. 30, 2005) ...........................29

*Bankest Imports, Inc. v. ISCA Corp.*,
   717 F. Supp. 1537 (S.D. Fla. 1989) ....................................................................31, 33

*Barnett Bank of W. Fla. v. Hooper*,
   498 So. 2d 923 (Fla. 1986) ..................................................................................31, 33

*Barnext Offshore, Ltd. v. Ferretti Grp. USA, Inc.*,
   No. 10-23869, 2012 WL 1570057 (S.D. Fla. May 2, 2012)........................................4

*Bell Atl. v. Twombly*,
   550 U.S. 544 (2007)....................................................................................................14

*Berwecky v. Bear Stearns & Co.*,
   197 F.R.D. 65 (S.D.N.Y. 2000) .................................................................................36

*Bishop v. Fla. Specialty Paint Co.*,
    389 So. 2d 999 (Fla. 1980)..................................................................................17

*Britt Fertilizers, Inc. v. Bayer Corp.*,
    No. 1:07-cv-00846-OWW-SMS, 2008 WL 341628 (E.D. Cal. Feb. 5, 2008) ......................43

*Brown v. Cal. Pension Admin'r & Consultants, Inc.*,
    45 Cal. App. 4th 333, 52 Cal. Rptr. 2d 788 (1996) ..................................................29

*Bryant v. Avado Brands, Inc.*,
    187 F.3d 1271 (11th Cir. 1999) ...........................................................................1, 3

*Buckner v. Lower Fla. Keys Hosp. Dist.*,
    403 So.2d 1025 (Fla. 3d DCA 1981) ....................................................................49

*Bulletin Mktg. LLC v. Google LLC*,
    No. 17-cv-07211-BLF, 2018 WL 3428562 (N.D. Cal. July 13, 2018)..................................43

*Burger King Corp. v. Austin*,
    805 F.Supp. 1007 (S.D.Fla.1992) ........................................................................16

*Burns v. Neiman Marcus Group*,
    173 Cal. App. 4th 479 (2009) .............................................................................19

*Cannizzaro v. Bache, Halsey, Stuart, Shield, Inc.*,
    81 F.R.D. 719, 721 (S.D.N.Y. 1979) ....................................................................36

*Catano v. Capuano*,
    No. 18-20223, 2020 WL 639406 (S.D. Fla. Feb. 11, 2020) ............................................31, 34

*City of Santa Barbara v. Super. Ct.*,
    41 Cal. 4th 747, 161 P.3d 1095 (2007)..................................................................19

*Clay Elec. Co-op v. Johnson*,
    873 So. 2d 1182 (Fla. 2003)....................................................................19, 20, 21, 22, 23

*Cobos v. Robinhood Financial LLC, et al.*,
    No. 2:21-cv-00843-VAP-MRWx, 2021 WL 1035123 (C.D. Cal. Feb. 10, 2021) ....................5

*Comunale v. Traders & Gen. Ins. Co.*,
    328 P.2d 198 (Cal. 1958) .................................................................................38

*Cooper v. Meridian Yachts, Ltd.*,
    575 F.3d 1151 (11th Cir. 2009) ......................................................................14, 15, 38

*Corral v. Select Portfolio Servicing, Inc.*,
    No. C-15-1542 EMC, 2015 WL 4149144 (N.D. Cal. July 9, 2015).......................................45

*Day v. Taylor*,
    400 F.3d 1272 (11th Cir. 2005) .........................................................................14

*Diamond Resorts Int'l, Inc. v. U.S. Consumer Attys., P.A.*,
    No. 18-80311-CIV-Rosenberg/Reinhart, 2019 WL 3412169, (S.D. Fla. May 14, 2019) ........48

*Digerati Holdings, LLC v. Young Money Ent., LLC*,
    123 Cal. Rptr. 3d 736 (Ct. App. 2011)..................................................................38

*Doe v. Evans*,
  814 So.2d 370 (Fla. 2002)..........................................................................................34

*Duffy v. Cavalier*,
  215 Cal. App. 3d 1517 (1989) ...........................................................................30, 31, 33

*eCapital Commercial Fin. Corp. v. Hitachi Capital Am. Corp.*,
  519 F. Supp. 3d 1129 (S.D. Fla. 2021) ........................................................................17

*Eads v. Marks*,
  39 Cal. 2d 807, 249 P.2d 257 (1952) ...........................................................................22

*Eastburn v. Reg'l Fire Prot. Auth.*,
  31 Cal. 4th 1175 (2003) ..............................................................................................19

*Erlich v. Menezes*,
  21 Cal. 4th 543 (1999) ................................................................................................26

*Est. of Rotell ex rel. Rotell v. Kuehnle*,
  38 So. 3d 783 (Fla. 2d DCA 2010) ..............................................................................20

*Ethyl Corp. v. Balter*,
  386 So. 2d 1220 (Fla. 3d DCA 1980) ...........................................................................50

*Fed. Deposit Ins. Corp. for IndyMac Bank, FSB v. Genesis Title Co., LLC*,
  No. 11-20841-CIV, 2011 WL 13223744 (S.D. Fla. July 1, 2011) .............................22

*Fla. Power & Light Co. v. Allis Chalmers Corp.*,
  85 F.3d 1514 (11th Cir. 1996) .....................................................................................50

*Fresh Results, LLC v. ASF Holland, B.V.*,
  No. 17-cv-60949, 2019 WL 4573257 (S.D. Fla. Sept. 20, 2019) ..............................48

*George v. Pinellas Cnty.*,
  285 F.3d 1334 (11th Cir. 2002) ...................................................................................14

*Gilison v. Flagler Bank*,
  303 So. 3d 999 (Fla. 4th DCA 2020) ............................................................................49

*Gochnauer v. A.G. Edwards & Sons, Inc.*,
  810 F.2d 1042 (11th Cir. 1987) ...........................................................................30, 34, 36

*Gracey v. Eaker*,
  837 So. 2d 348 (Fla. 2002)...........................................................................................29

*Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*,
  341 F.3d 1292 (11th Cir. 2003) ...........................................................................15, 16, 17

*Grupo Televisa, S.A. v. Telemundo Commc'n Group, Inc.*,
  485 F.3d 1233 (11th Cir. 2007) ...................................................................................17

*Hicks v. E. T. Legg & Assoc.*,
  108 Cal. Rptr. 2d 20 (Ct. App. 2001).............................................................................38

*Holguin v. Dish Network LLC*,
  178 Cal. Rptr. 3d 100 (Ct. App. 2014) .........................................................................43

*Honig v. Kornfeld*,
  339 F. Supp. 3d 1323 (S.D. Fla. 2018) ................................................................34

*Ixchel Pharma, LLC v. Biogen, Inc.*,
  470 P.3d 571 (Cal. 2020) ...................................................................................45

*J'Aire Corp. v. Gregory*,
  24 Cal.3d 799, 598 P.2d 60 (1979) ................................................23, 24, 25, 26

*Javitch v. First Montauk Fin. Corp.*,
  279 F. Supp. 2d 931, 938 (N.D. Ohio 2003) ....................................................28

*Jennings v. BIC Corp.*,
  181 F.3d 1250 (11th Cir. 1999) .........................................................................50

*Kaiser Steel Corp. v. Westinghouse Elec. Corp*,
  55 Cal. App. 3d 737 (Cal. 1976) .......................................................................26

*Kalitta Air v. Central Texas Airborne Sys.*,
  315 Fed. App'x 603 (9th Cir. 2008) ..................................................................25

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
  313 U.S. 487 (1941) ...........................................................................................17

*Korea Supply Co. v. Lockheed Martin Corp.*,
  63 P.3d 937 (Cal. 2003) .....................................................................................47

*Koruga v. Fiserv Correspondent Servs.*,
  183 F. Supp. 2d 1245 (D. Or. 2001) ..................................................................37

*L.A. Fitness Intern. v. Mayer*,
  980 So. 2d 550 (Fla. 4th DCA 2008) .................................................................26

*Lamm v. State St. Bank & Tr.*,
  749 F.3d 938 (11th Cir. 2014) ...........................................................................21

*Land O'Lakes, Inc. v. DairyAmerica, Inc.*,
  No. 1:15-cv-01937-DAD-MJS, 2017 WL 495644, (E.D. Cal. Feb. 6, 2017)........43

*Letizia v. Facebook Inc.*,
  267 F. Supp. 3d 1235 (N.D. Cal. 2017) .............................................................43

*Lipman v. Brisbane Elementary Sch. Dist.*,
  359 P.2d 465 (Cal. 1961) ...................................................................................46

*Margaret Hall Found., Inc. v. Atlantic Fin. Mgmt., Inc.*,
  572 F. Supp. 1475 (D. Mass. 1983) ...................................................................36

*MasTec Renewables P. R. LLC v. Mammoth Energy Servs., Inc.*,
  No. 20-CIV-20263, 2020 WL 6781823 (S.D. Fla. Nov. 18, 2020) .........................17

*McCain v. Fla. Power Corp.*,
  593 So. 2d 500 (Fla. 1992)............................................................................22, 23

*McDaniel v. Bear Stearns & Co., Inc.*,
  196 F.Supp.2d 343 (S.D.N.Y. 2002)..............................................................35, 36

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng*,
    697 F. Supp. 1224 (D.D.C. 1988) .................................................................28

*Michelson v. Hamada*,
    29 Cal. App. 4th 1566, 36 Cal. Rptr. 2d 343 (1994).....................................31

*Middleton v. IBM*,
    787 F. App'x 619 (11th Cir. 2019) .............................................................14

*Milburn v. United States*,
    734 F.2d 762 (11th Cir. 1984) ...................................................................14

*Miley v. Oppenheimer & Co.*,
    637 F.2d 318 (5th Cir. 1981) .....................................................................29

*MP, LLC v. Sterling Holding, LLC*,
    231 So. 3d 517 (Fla. 3d DCA 2017) ..........................................................49

*N. Am. Chem. Co. v. Super. Ct.*,
    59 Cal. App. 4th 764 (Cal. 1997).............................................4, 21, 22, 23, 26

*Orangi v. JPMorgan Chase Bank*,
    No. 5:11-cv-1229 JF (HRL), 2011 WL 1807174 (N.D. Cal. May 11, 2011) .........22

*Owens v. Stifel, Nicolaus & Co., Inc.*,
    No. 7:12-CV-144 HL, 2014 WL 2769044 (M.D. Ga. June 18, 2014)....................27

*Pac. Gas & Elec. Co. v. Bear Stearns & Co.*,
    971 P.2d 587 (Cal. 1990) ...........................................................................46

*Paszamant v. Ret. Accts., Inc.*,
    776 So. 2d 1049 (Fla. 5th DCA 2001) .........................................................21

*Peregrine Pharm. v. Clinical Supplies Mgmt.*,
    No. 12-cv-1608-JGB-ANx, 2015 WL 13309286 (C.D. Cal. June 22, 2015) ......25, 26

*Petersen v. Sec. Settlement Corp.*,
    277 Cal. Rptr. 468 (Ct. App. 1991) ...........................................................35

*Pierce v. Lyman*,
    1 Cal. App. 4th 1093, 3 Cal. Rptr. 2d 236 (1991)...................................28, 29

*R. Power Biofuels v. Chemex*,
    No. 16-cv-00716-LHK, 2016 WL 6663002 (N.D. Cal. 2016) .......................25, 26

*Rayle Tech, Inc. v. DEKALB Swine Breeders, Inc.*,
    133 F.3d 1405 (11th Cir.1998) .................................................................16

*Remington v. Newbridge Sec. Corp.*,
    No. 13-60384-CIV, 2013 WL 2444719 (S.D. Fla. June 5, 2013 ..................27, 28

*Richelle L. v. Roman Cath. Archbishop*,
    106 Cal. App. 4th 257, 130 Cal. Rptr. 2d 601 (2003).................................31, 34

*Robinson Helicopter Co. v. Dana Corp.*,
    102 P.3d 268 (Cal. 2004) ...........................................................................23

*Series AGI W. Linn of Appian Grp. Inv'rs DE, LLC v. Eves*,
　158 Cal. Rptr. 3d 193 (Cal. App. 2013)......................................................................45

*SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*,
　600 F.3d 1334 (11th Cir. 2010) ....................................................................35, 36

*Siedman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
　465 F. Supp. 1233 (S.D.N.Y. 1979) ..............................................................................28

*Sunbelt Veterinary Supply, Inc. v. Intl. Bus. Sys. U.S., Inc.*,
　985 F. Supp. 1352 (M.D. Ala. 1997) ............................................................................16

*Starr Indemnity & Liab. Co.*,
　No. 1:17-CV-00213-DAD-BAM, 2018 WL 1142207 (E.D. Cal. Mar. 2, 2018) ...................30

*Strategic Income Fund, LLC v. Spear, Leeds & Kellogg Corp.*
　305 F.3d 1293 (11th Cir. 2002) ....................................................................................36

*Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*,
　971 F.2d 401 (9th Cir. 1992) ........................................................................................17

*Syverson v. Jones*,
　10 So. 3d 1123 (Fla. 1st DCA 2009) .............................................................................17

*In re Takata Airbag Prod. Liab. Litig.*,
　255 F. Supp. 3d 1241 (S.D. Fla. 2017) .........................................................................17

*Tank Tech, Inc. v. Valley Tank Testing, L.L.C.*,
　244 So. 3d 383 (Fla. 2d DCA 2018) .............................................................................22

*Taylor Woodrow Homes Fla., Inc. v. 4/46-A Corp.*,
　850 So. 2d 536 (Fla. 5th DCA 2003) ............................................................................34

*Thompson v. Smith Barney, Harris Upham & Co., Inc.*,
　709 F.2d 1413 (11th Cir. 1983) ....................................................................................30

*Tiara Condo. Ass'n v. Marsh & McLennan Cos.*,
　110 So. 3d 399 (Fla. 2013)............................................................................................22

*Third Story Music, Inc. v. Waits*,
　41 Cal. App. 4th 798, 48 Cal. Rptr. 2d 747 (1996)......................................................42

*Thrifty Payless, Inc. v. The Americana at Brand, LLC*,
　160 Cal. Rptr. 3d 718 (Ct. App. 2013) .........................................................................38

*Twomey v. Mitchum, Jones & Templeton*,
　262 Cal. App. 2d 690 (1968) ........................................................................................30

*United States v. United Healthcare Ins. Co.*,
　848 F.3d 1161 (9th Cir. 2016) ......................................................................................14

*Whitesides v. E*Trade Sec., LLC*,
　No. 20-CV-05803-JSC, 2021 WL 930794 (N.D. Cal. Mar. 11, 2021).......................24, 25

*Wyndham Vacation Ownership, Inc. v. Clapp Bus. Law, LLC*,
　411 F. Supp. 3d 1310 (M.D. Fla. 2019)........................................................................49

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
  313 F. Supp. 3d 1113, 2018 WL 1243332 (N.D. Cal. 2018)....................................25


**STATUES AND REGULATIONS**

Fla. Stat. § 768.72(2)(b)....................................................................................................20


**FEDERAL RULES**

Fed. R. Civ. P. 8(a)(2).......................................................................................................14

Fed. R. Civ. P. 8(d)(2).......................................................................................................47

Fed. R. Civ. P. 8(d)(3).........................................................................................................4

Fed. R. Civ. P. 12(b)(6)..........................................................................................14, 15, 30

Fed. R. Evid. 201(b)(2).........................................................................................................1


**OTHER AUTHORITIES**

Judicial Council of California Civil Jury Instructions, No.  4100 entitled "Fiduciary Duty"
  (2020 Edition) ................................................................................................................30

Restatement (Second) of Conflict of Laws § 145......................................................17

Restatement (Second) of Agency § 425......................................................................30

5 Witkin, Cal. Procedure, Pleading § 921(5th ed. 2008) ................................................

FINRA Regulatory Notice 21-12, (March 18, 2021), https://www.finra.org/rules-
  guidance/notices/21-12 ....................................................................................................3

Securities and Exchange Comm'n, "Staff Report on Equity and Options Market Structure
  Conditions in Early 2021" (Oct. 14, 2021), https://www.sec.gov/files/staff-report-equity-
  options-market-struction-conditions-early-2021.pdf.22 ...................................................3

Securities and Exchange Comm'n, "Thinking About Investing in the Latest Hot Stock?"
  (Jan. 30, 2021) https://www.sec.gov/oiea/investor-alerts-and-bulletins/risks-short-term-
  trading-based-social-media-investor-alert ........................................................................3

*Virtual Hearing – Game Stopped?* 117th Cong. at 10 (2021) (statement of
  Vladimir Tenev, Chief Executive Officer, Robinhood Markets, Inc.),
  https://financialservices.house.gov/uploadedfiles/hhrg-117-ba00-wstatetenevv-
  20210218.pdf .................................................................................................................18


RealClearPolitics, "Elon Musk Interviews Robinhood CEO Vlad Tenev On Stock
  Trading Restrictions On 'Clubhouse' App," ("Musk Tenev Interview"),

https://www.cnbc.com/2021/01/29/robinhood-raises-1-billion-and-taps-credit-lines-to-make-trading-of-gamestop-available-tocustomers). ....................................................................5

"[Robinhood] Ordered to Pay Approximately $70 Million for Systemic Supervisory Failures and Significant Harm Suffered by Millions of Customers" (June 30, 2021), https://www.finra.org/mediacenter/newsreleases/2021/finra-orders-record-financial-penalties-against-robinhood-financial......................................................................................10

Plaintiffs, Andrea Juncadella, Cody Hill, Edward Goodan, Jaime Rodriguez, Jonathan Cornwell, Joseph Daniluk, Mark Sanders, Patryk Krasowski, William Makeham, Sammy Gonzalez, and Julie Moody (collectively, "Plaintiffs"), respectfully submit this response in opposition to Defendants Robinhood Markets, Inc. ("Robinhood Markets"), Robinhood Financial LLC ("Robinhood Financial"), and Robinhood Securities, LLC's ("Robinhood Securities," together with Robinhood Markets and Robinhood Financial, "Robinhood" or "Defendants") Motion to Dismiss the Robinhood Tranche Complaint (the "Motion" or "Mot.") [ECF No. 421].

## INTRODUCTION

*"Our founders deeply believe that everyone should have access to the financial system."*[1]

The foundation of the securities industry is fair dealing with investors. This core principle underlies the rules and regulations that govern securities brokers like Robinhood, which are designed to protect Plaintiffs and similarly situated investors *during* (as opposed to *except* during) times of market stress and price volatility. Despite operating a $35 billion company as both an introducing and clearing broker-dealer of highly-regulated securities, Robinhood claims that it owed no duty of care whatsoever to the millions of customers to whom it aggressively marketed its services even while on the precipice of a foreseeable collateral deficit. Robinhood seeks dismissal and judicial immunity from its admitted bad acts based on a one-sided, clickthrough "Customer Agreement" that, according to Robinhood, grants it unfettered discretion to abandon its duties of care, good faith, and fair dealing. Robinhood claims broad immunity from any harm flowing from its discretion to "prohibit or restrict" trading, regardless of what it knew, or should have known, as a securities broker, would be the outcome of its decision to eliminate an essential component without which no market can exist—demand.

One short email from Chief Operating Officer James Swartwout epitomizes Robinhood's audacity to bid for dismissal on this basis: "**I sold my AMC today**. FYI—tomorrow we are moving GME to 100% - so you are aware." Plaintiffs did not have the luxury of insulating their investments

---

[1] *See* Robinhood Markets, Inc., Form S-1 Registration Statement filed with the U.S. Securities and Exchange Commission ("SEC") ("Form S-1"), at 8 (Aug. 31, 2021), incorporated by reference into the Amended Consolidated Class Action Complaint (the "Amended Complaint" or "AC") [ECF No. 409], ¶¶ 1, 85, 95, 100–08, 113–17, 122–23, 127–28, 150, 155, 178, 266). The Court may take judicial notice of Robinhood's Form S-1 pursuant to FED. R. EVID. 201(b)(2) as a document legally required by and publicly filed with the SEC and not subject to reasonable dispute. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999) ("SEC filings are generally recognized as the most accurate and authoritative source of public information about a company.").

from the devastating impact of Robinhood's decision. In contrast, Robinhood's upper echelon, like Mr. Swartwout, steered clear of the havoc that the now infamous broker-dealer caused. Tellingly, Robinhood does not (and cannot) argue that its decision to shut down buying, without any limit on selling, did **not** wipe out billions of dollars in investment. Instead, the SEC and Financial Industry Regulatory Authority ("FINRA") registered and regulated broker-dealer inconsistently argues that its status as a "self-directed platform" leaves investors free to trade at their own peril and absolves it from any responsibility for those trades, while at the same time entitling it to prevent those very investors from trading.

Betraying its disarming namesake, Robinhood's decision in late January 2021 to move 13 securities (the "Suspended Stocks")[2] to position closing only ("PCO") rendered the financial system *in*accessible to millions of investors, who were forced to sell at depressed prices or hold and watch as the value of their holdings fell precipitously, while institutional investors saved billions in potential losses. Robinhood's actions in late January 2021 go far beyond its contractual "discretion" to "prohibit or restrict [its customers'] ability to trade securities." (Cust. Agmt. § 5). By implementing an unprecedented shutdown of the entire demand-side of the market for securities known to be concentrated on its platform, Robinhood severed one of the two requisite legs for a fully functioning market: its actions artificially suppressed market prices and harmed a Class of not only Robinhood customers, but all investors who held the Suspended Stocks. While broker-dealers may reserve certain discretion in their agreements, such discretion must be exercised in good faith and in accordance with applicable industry standards of care.

The crux of this case centers on Robinhood's participation in fueling the market volatility which it was unprepared to handle and now uses to deflect blame. Robinhood admitted to failing to maintain adequate capital to pay its clearinghouse-mandated deposit requirements when due and failing to take reasonable steps to make sure that its platform was available in times of market stress. Leading up to Defendants' unprecedented action, Plaintiffs and the Class were aggressively recruited to Defendants' platform by targeted marketing campaigns and addictive, gamified user interfaces on the platform. Defendants boasted about their meteoric rise, fueled by legions of

---

[2] The "Suspended Stocks" include GameStop Corporation (GME), BlackBerry Ltd. (BB), Nokia (NOK), AMC Entertainment Holdings, Inc. (AMC), American Airlines Group, Inc. (AAL), Bed Bath & Beyond, Inc. (BBBY), Castor Maritime Inc. (CTRM), Express, Inc. (EXPR), Koss Corporation (KOSS), Naked Brand Group Ltd. (NAKD), Sundial Growers, Inc. (SNDL), Tootsie Roll Industries, Inc. (TR), and Trivago NV (TRVG). (*See* AC ¶ 4.)

relatively inexperienced retail investors who were provided a "clickwrap" user agreement on a non-negotiable, take-it-or-leave-it basis before they could access Defendants' trading platform.

Defendants knew this, and their sophisticated cadre of C-suite executives understood that high volume and volatility in certain stocks was inevitable and drove business: "Extreme market volatility and even 'short squeeze' events are ___**not**___ new phenomena";[3] extreme market volatility is precisely what regulations over broker-dealers like Robinhood are designed to address:

> Member firms [including Robinhood Financial and Robinhood Securities] should maintain strong procedures, thoughtfully crafted in advance, to reasonably ensure that they can continue to provide investors access to the securities markets ***during times of extreme market volatility***, as in the past several months.

FINRA Regulatory Notice 21-12, *available at* https://www.finra.org/rules-guidance/notices/21-12 (March 18, 2021) (released in direct response to the events giving rise to this action) (AC ¶ 168) (emphasis added).[4] *See also* SEC Staff Report on Equity and Options Market Structure Conditions in Early 2021 (the "SEC Report") (Oct. 14, 2021) (finding that "while the swings in GME's share price and volume attracted significant attention, they were not unusual for January 2021 . . . In fact, since 2020 began, **134 common stocks** had at least one one-day price increase ***greater*** than GME's largest one-day price increase."), *available at* https://www.sec.gov/files/staff-report-equity-options-market-struction-conditions-early-2021.pdf.22;[5] *see also* SEC Office of Investor Education and Advocacy, *Thinking About Investing in the Latest Hot Stock?: Understand the Significant Risks of Short-Term Trading Based on Social Media*, Investor Alerts and Bulletins (Jan. 30, 2021) ("Bulletin") (describing the applicable, industry-approved rules for broker-dealers to address market volatility–**which Robinhood did not follow**–through a ***temporary***, minutes-long, ***full*** market "pause" of purchases and sales by ***all*** broker-dealers), *available at* https://www.sec.gov/oiea/investor-alerts-and-bulletins/risks-short-term-trading-based-social-

---

[3] *See* Testimony of Michael C. Bodson ("Bodson Testimony,"), DTCC President and CEO, U.S. House Financial Services Committee, at 4 (May 6, 2021) (emphasis added). As Bodson explained, the "NSCC's aggregate clearing fund requirement on January 28th was only "slightly higher than the peak that occurred in March 2020 and just under NSCC's historical maximum" of $36.4 billion when Tesla was added to the S&P 500 Index in December 2020." *Id.* at n. 3 (AC ¶ 17).

[4] All emphases are added unless otherwise stated.

[5] The Court may take judicial notice of the SEC Report pursuant to FED. R. EVID. 201(b) as a report of a government agency that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *See Bryant*, 187 F.3d at 1278.

media-investor-alert.[6]

Robinhood now ducks behind its one-sided user agreement, and selectively cites and interprets provisions as giving it *carte blanche* to "restrict the trading of securities" while its COO dumped his AMC stock 24-hours before the so-called "restrictions" took effect. But Robinhood neglects those portions of its Customer Agreement where investors are expressly asked to acknowledge that "Robinhood Financial provides trading and brokerage services through the Robinhood website (the 'Website') and the Robinhood mobile application (the 'App')." (Cust. Agmt. § 4). This is because it knows full well that "[a] contract to perform services gives rise to a duty of care which requires that such services be performed in a competent and reasonable manner. A negligent failure to do so may be ***both*** a breach of contract and a tort." *N. Am. Chem. Co. v. Superior Ct.*, 59 Cal. App. 4th 764, 774 (1997). Particularly where, as here, a negligent failure to perform brokerage and clearing services of securities has the potential to destroy the entire market.

Rather than accept the well-pleaded factual allegations in the Amended Complaint, Robinhood relies on a manufactured narrative, now debunked by both its internal documents, produced to government agencies conducting investigations and since turned over to Plaintiffs, and the SEC in its recent report examining the January 2021 GME trading activity at issue here. Robinhood's Motion seeks to dismiss a now superseded pleading,[7] misconstruing Plaintiffs' claims as rooted in contract. (Mot. 3).

In doing so, Robinhood ignores its own inconsistent and shifting executive-level admissions. First were Robinhood's contemporaneous January 28, 2021 blog post and tweets

---

[6] Defendants mischaracterize the Bulletin as "reaffirm[ing]" Robinhood's "authority to restrict trading." (Mot. 2). The Bulletin does no such thing—the educational alert to investors generally explains, without any reference to Robinhood or its Customer Agreement, "broker-dealers may reserve the ability to reject or limit customer transactions . . . for legal, compliance, or risk management reasons . . . typically discussed in the customer account agreement." *Id.* Tellingly, Defendants fail to include the SEC's description of the correct procedure for broker-dealers to address price volatility and market stress–***contained in the same section Defendants cite***–through "Limit up-Limit Down" rules designed to prevent trades outside a specified price. *Id.* Yet, Defendants urge this Court to judicially notice cherry-picked general conclusions, released just days after their PCO, to rebut factual allegations. But it is not for the Court to weigh the contents of a publication against the allegations of a complaint. *See Barnext Offshore, Ltd. v. Ferretti Grp. USA, Inc.*, No. 10-23869, 2012 WL 1570057, at *26 (S.D. Fla. May 2, 2012) (Altonaga, J.) ("It is the province of the jury, not the Court, to weigh evidence.").

[7] The consolidated pleading, which supersedes the initial complaints filed across this country (the majority within 24 to 48 hours of the events at issue), sets forth tort and implied contract claims, in the alternative, which is permitted "***regardless of consistency***." *See* FED. R. CIV. P. 8(d)(3).

citing "current market volatility" as the reason for its restrictions (AC ¶¶ 235, 247–49). Then there were Robinhood Co-Founder and CEO Vlad Tenev's ("Tenev") televised interviews attributing the restrictions as necessary "to protect the firm," (*id*. ¶ 250), and to meet Depository Trust & Clearing Corporation ("DTCC") requirements, stating, "*we had no choice* as we had to conform to our requirements." (AC ¶ 251).[8] Thereafter, in a February 18th prepared statement, Robinhood, through Tenev, told Congress that its decision was due to "increased clearinghouse-mandated deposit requirements." Then, when it came time to face its customers, and now this Court, Robinhood pivoted to its most recent (mis)characterization of its actions as an elegant "exercise of discretion" under the Customer Agreement. But Robinhood described the same actions in its Registration Statement filed with the SEC in connection with its initial public offering as an example of being "*forced* to restrict trading," which, by definition, is *not* discretionary. (*See* AC ¶ 178) (quoting Form S1, at 37).[9]

Rather than grapple with this public statement about what really happened, Robinhood ignores the operative pleading to argue, in a vacuum, that it is contractually entitled to exercise its discretion with absolute impunity. Under Robinhood's own reasoning, it could have exercised its "sole discretion" in some other way, such as insider trading or boosting its own stock price (*e.g.,* switching the HOOD symbol to purchase-only and removing supply-side downward pressure). It should be beyond dispute that there are limits to Robinhood's purported "discretion." When taken to its logical extreme, Robinhood's argument would mean that service providers can be immune from legal scrutiny if only they reserve for themselves "sole discretion" to complete (or not

---

[8] *See* RealClearPolitics, "Elon Musk Interviews Robinhood CEO Vlad Tenev On Stock Trading Restrictions On 'Clubhouse' App," ("Musk Tenev Interview"), *available at* https://www.cnbc.com/2021/01/29/robinhood-raises-1-billion-and-taps-credit-lines-to-make-trading-of-gamestop-available-tocustomers). DTCC President, Bodson, testified that the decision to restrict trading was internal to Robinhood and the DTCC "did *__not__* instruct any clearing member to impose restrictions. . ." (*See* Bodson Testimony, at 5) (AC ¶ 237).

[9] The Court should flatly reject Robinhood's argument that "the only other district court to consider the merits of these claims ruled that the plaintiff was unlikely to prevail on claims arising from the restrictions at issue." (Mot. 2–3) (citing *Cobos v. Robinhood Financial LLC, et al.*, No. 2:21-cv-00843-VAP-MRWx, 2021 WL 1035123, at *2–3 (C.D. Cal. Feb. 10, 2021)). *Cobos* has no binding or preclusive effect and is limited to the single issue of Mr. Cobos's request "that the Court enjoin Defendants from restricting trade[s] on its Application." *Id*. at *1. Mr. Cobos's *ex parte* motion for "an extraordinary and drastic remedy" is beyond the scope of, and not analogous to, this MDL. *Id*. at *2–3, n. 1 (analyzing the likelihood of success of three claims, none of which are at issue here, and highlighting that "Plaintiff fail[ed] to address his Negligence Cause of Action").

complete) the very service they are contracted to perform regardless of the resultant injury. This would also make the agreement completely illusory.

But it gets worse, because Robinhood, undoubtedly pleased by the surge in new accounts generating payment for order flow revenue, forged ahead under the belief that it was too big to fail. In response to inquiries by the National Securities Clearing Corporation ("NSCC") related to deposit requirements intended to protect all market participants against clearing member defaults, Robinhood Financial's own President and Chief Operating Officer, David Dusseault, stated they were:

**"to [*sic*] big for them to actually shut us down."**

Based on these and other internal documents, as pleaded, Plaintiffs' Amended Complaint more than plausibly states claims upon which relief can be granted. Robinhood was on notice of the high transaction volume and price volatility concentrated on its platform at least five days prior to the NSCC collateral deposit demand, yet it brazenly failed to exercise reasonable care to mitigate risk and ensure that its trading platform was equipped to deliver services despite foreseeably increasing customer demands and market conditions. Instead, Robinhood intentionally fueled demand, including by self-clearing and heavily advertising to attract more customers, which foreseeably resulted in driving trading volume in the days ahead of January 28th capital requirement increase. Instead of raising capital, Robinhood admittedly failed to maintain sufficient capital to meet the increasing risk associated with the higher trading volume. It chose to disrupt an entire market to limit its own risk, at the expense of Plaintiffs and the Class.

Robinhood's failure to (i) have sufficient collateral posted or readily available to satisfy its industry clearing function, (ii) have an adequate supervisory control system, (iii) have adequate business contingency and continuity plans to ensure access in the event of market volatility, (iv) have sufficient back-up plans to receive and process customers' orders during times of market volatility, (v) mitigate risk, instead attracting and allowing new customers to join the platform, and (vi) comply with applicable legal regulatory requirements and industry standards of care, including those set by the SEC and FINRA, is both negligent and grossly negligent. Robinhood was fully aware, or reasonably should have been aware, that its buy-side shutdown would cause the prices of the Suspended Stocks to fall precipitously, thereby causing investors to suffer significant losses.

Robinhood further breached its duty of care to investors as a broker-dealer of securities, as well as the duty of good faith and fair dealing implied in the performance of "brokerage services"

they agreed to provide in the Customer Agreement. Robinhood Markets forced its subsidiaries to stop performing their obligations under the Customer Agreement and interfered with the business relationship amongst Plaintiffs, Robinhood Financial, and Robinhood Securities. Moreover, Defendants unlawfully conspired to tortiously interfere with Plaintiffs and the Robinhood Class's contractual and business relationships with Robinhood Financial and Robinhood Securities by directing Robinhood Securities to force the Suspended Stocks into PCO and Robinhood Markets to remove the purchase option for the Suspended Stocks from its trading app.

These allegations are more than sufficient at the pleading stage to state plausible claims for negligence (Count I), gross negligence (Count II), breach of fiduciary duty (Count III), breach of the implied duty of care and the implied covenant of good faith and fair dealing (Counts IV–V), tortious interference (Count VI), and conspiracy (Count VII). Accordingly, and as articulated further herein, Defendants' Motion should be denied in its entirety.

## I.       FACTUAL BACKGROUND

This case involves the failure of a securities broker to prepare for the risk associated with its own market disruption. Robinhood's business model was to secure revenues from payment for order flow by entities to which it steered its customers trades for execution.  It therefore pursued a continual increase in customers and their trading to fuel to generate increased revenues from payment for order flow, while knowingly and recklessly continuing to facilitate a level of volatile trading on its platform that it failed to support with adequate capital resources. It was this failure that directly led to Robinhood's sudden decision to pull itself back from the brink by intentionally devastating the market for in-demand securities concentrated on its platform. (AC ¶¶ 191–251).

The following factual allegations from the Amended Complaint, accepted as true, are germane to this Court's consideration of Defendants' Motion:

## A.       Robinhood Profits From Exponential Customer Growth and High-Volume Trading

1.       Robinhood, by its own admission, markets itself to "everyday people" desiring access to the financial system. (Mot. 4). Robinhood prioritized profit through customer growth of relatively inexperienced retail investors seeking benefit from Robinhood's promise of "access," fueling its meteoric rise in popularity up to and through January 28, 2021. (AC ¶¶ 4, 101, 115). Robinhood and its sophisticated cadre of C-suite executives from the ranks of Amazon, Google, and Facebook, understood that high volume and volatility was inevitable. (*Id.* ¶ 87).

2.       Robinhood provides its customers with a variety of brokerage products and services

as part of its "comprehensive financial services platform." (*See* Form S-1, at 8). As a precondition to using Robinhood's brokerage services, Robinhood requires users to enter into standardized Customer Agreements, which are contracts of adhesion. (AC ¶¶ 29–84, 311).

3.      As the customer-facing broker, Robinhood Financial introduces investors to stocks, exchange traded funds, and options trading through its electronic trading platform, (*id*. ¶¶ 88–90), which is cleared through Robinhood Securities. (*Id*. ¶¶ 93, 312). Robinhood Financial and Robinhood Securities are registered broker-dealers under the SEC Act, are members of FINRA, (*id*. ¶¶ 89, 92), and wholly-owned subsidiaries of Robinhood Markets, a now publicly-traded corporation registered with the SEC. (*See id*. ¶¶ 85, 95 & Form S-1).

4.      After becoming a self-clearing broker in 2018, Robinhood's users executed more than **$150 billion** in transactions, represented close to **50% of all new funded retail accounts** in the U.S. from 2016 to 2021. (AC ¶¶ 112–15).

5.      Robinhood has been able "to rapidly introduce new products and services" and "quickly scale, including onboarding millions of new customers during 2020 and the first quarter of 2021," (Form S-1, at 7), through the creation of gamified features, designed to target younger users and novice investors, including psychological tools intended to increase consumer engagement, time spent on the platform, and the number of trades, (*id*. ¶¶ 87, 129), and increasing marketing spend, including by **$61.0 million or 49%**, prior to January 2021. (*Id*. ¶ 115).

6.      Robinhood funded customer accounts have grown from approximately one million in 2016 to six million in October 2019, a **growth of 500%**, and increasing 109% to 21.3 million in the second quarter of 2021. (*Id*. ¶ 117).

7.      As a result, Robinhood's revenue has increased over 200 times since March 2020, representing a **245% annual revenue growth**, with Robinhood's total net revenues increasing by 131% to $565 million in the second quarter of 2021, a reported **22.5 million funded accounts** as of June 30, 2021, and assets under custody **increasing 205%** to $102 billion in the second quarter of 2021, (*Id*. ¶ 118). Robinhood has grown from fewer than 500,000 users in 2015, to **over 31 million customers** to date, over half of which are first-time brokerage account holders, and with a median age of only 31 years old. (*Id*. ¶¶ 114, 116).

8.      Robinhood offers educational content, such as "Robinhood Learn," in-app courses on the basics of investing, the "Robinhood Snacks" Daily podcast, and the "Robinhood Snacks" Newsletter, which provides digestible daily financial news to **24.6 million** unique people in the

second quarter of 2021. (*Id*. ¶ 123). Robinhood also offers "cash management" and "Gold" subscriptions, with professional research, market data, and access to margin investing. (*Id*.).

9.      Robinhood professes to take its responsibility to its investors seriously, acknowledging the special relationship between Robinhood and its customers: "Our customers already trust us with their hard-earned cash and assets, positioning us as the first financial services relationship for many new investors and younger generations of investors." (*See* Form S-1, at 6).

## B.      The Regulatory Framework for Securities Trading and the Standard of Care for Broker-Dealers Professionals

10.      Robinhood owes Plaintiffs and the Robinhood Class a duty to maintain requisite capital levels and satisfy cash deposit and collateral requirements with the DTCC and NSCC, as set forth in its Registration Statement:

> If we do not maintain the capital levels required by regulators and self-regulatory organizations ("SROs"), including the SEC and the Financial Industry Regulatory Authority ("FINRA"), or do not satisfy the cash deposit and collateral requirements imposed by certain other SROs such as the Depository Trust Company (the "DTC"), National Securities Clearing Corporation (the "NSCC") and the Options Clearing Corporation (the "OCC"), our broker-dealer business may be restricted and we may be fined or exposed to significant losses or subject to other disciplinary or corrective actions. In a worst-case scenario, failure to maintain these requirements could lead to our broker-dealer business being liquidated or wound down.

(AC ¶ 155) (citing Form S-1, at 10)).

11.      Information regarding Robinhood's anticipated DTCC deposit requirements and ability to meet anticipated or actual DTCC deposit requirements is readily available to Robinhood (AC ¶ 157). At any given time, on a real-time basis, Robinhood is aware of how much collateral the DTCC may ask Robinhood to post to cover the trades its customers have placed. (*Id*. ¶ 157).

12.      Robinhood is required to maintain sufficient liquid assets to meet all obligations to customers. *See* 17 CFR § 240.15c3-1(a) ("Every broker or dealer ***must*** at all times have and maintain net capital no less than the greatest of the minimum requirement applicable to its ratio requirement. . .and must otherwise not be 'insolvent'. . .".); 17 CFR § 240.17Ad-22. (*Id*. ¶ 161).

13.      Robinhood is also governed by FINRA Rule 2010 ("in the conduct of its business, [brokerages] ***shall*** observe high standards of commercial honor and just and equitable principles

9

of trade."). FINRA reiterates in Regulatory Notice 21-12, "the foundation of the securities industry is fair dealing with customers. . . *even during times of market stress*." (AC ¶ 168).

**C.     Robinhood's History of Systemic Regulatory Failures**

14.     Since launching in 2015, Robinhood has set records in financial penalties totaling over **$134 million**, including a ***record breaking $70 million sanction*** for "systemic supervisory failures and significant harm suffered by millions of customers," which represent the largest financial penalty ever ordered by FINRA and reflect the scope and seriousness of the violations." (*Id*. ¶ 146) (citing FINRA Release)).[10]

15.     In 2019, through an Acceptance, Waiver and Consent ("AWC"), Robinhood Financial consented to FINRA's findings that it did not systematically review certain order types, and it failed to establish and maintain a supervisory system, including written supervisory procedures. (*See id*. ¶ 149). The AWS details numerous areas of failures by Robinhood, including, and importantly here for purposes of negligence, "failure to create a reasonably designed business continuity plan" designed to provide mission critical services. (*Id*. ¶ 147).

16.     In 2020, Robinhood's commission "free" business model came under scrutiny when it agreed to pay **$65 million** to the SEC for charges of willfully misleading customers about its revenue sources and failing to satisfy its duty of best execution. (*Id*. ¶¶ 138–39).

17.     Despite its history of regulatory failures, Robinhood continued to drive explosive growth and volume without the resources or procedures in place to reasonably ensure that it could continue to provide investors access to the securities markets during times of extreme market volatility. (*Id*. ¶¶ 116–23).

**D.     The Events of January 2021**

18.     In the days leading up to January 28, 2021, most of the trading activity in the Suspended Stocks was concentrated in the portfolios of individual traders, including the Plaintiffs and Robinhood Class. (*Id*. ¶ 183).

19.     As early as January 23, 2021, Robinhood Securities and Robinhood Markets' employees and executives were on notice that the rally in GME (as well as other Suspended Stocks)

---

[10] "[Robinhood] Ordered to Pay Approximately $70 Million for Systemic Supervisory Failures and Significant Harm Suffered by Millions of Customers" (June 30, 2021), *available at* https://www.finra.org/mediacenter/newsreleases/2021/finra-orders-record-financial-penalties-against-robinhood-financial.

required Robinhood to monitor and manage its risk. (*Id*. ¶¶ 192–93). They were aware of the substantial trading activity which began to occur in the Suspended Stocks, and discussed in internal communications whether there was "some other action [Robinhood] should consider that would provide protection to [its] customers?" (*See, e.g., id*. ¶¶ 195, 198).

20.     On January 23, 2021, Robinhood circulated an internal communication:

> Hey team!... ***I want to make sure we're all on the same page about the risk monitoring process we have in place and controls for reacting quickly to the market for situations such as this GME rally which has some other brokers potentially overreacting to the short covering happening in this stock***. This reaction by other brokers could be driven from limiting their exposure on short sells rather than long margin exposure.

(*Id*. ¶ 193).

21.     On January 23, 2021, Robinhood Securities and Robinhood Markets' employees and executives, including Swartwout and Tenev, joined an internal group chat to discuss GME, with the "current questions on the table" identified as follows: "1. How many customers are holding GME on margin [?] 2. If we move to 100% - what are the number of calls generated [?] 3. What is our risk exposure[?]" Robinhood's Senior Director of Clearing Operations responded, "Excellent. First thing. We will want is to see if [name redacted] can run an analysis on the stock and see current potential risk." Shortly thereafter, ***Robinhood CEO Vlad Tenev joined the chat***.

22.     That same day, on January 23, 2021, one insider warned that the company was at risk of failing to provide sufficient protection to its customers: "***We may want to consider the risks our customers face***." (*Id*. ¶ 195).

23.     This chat demonstrates that Robinhood knew that it needed to address its risk exposure with regards to, at least, GME but did not take the appropriate steps to ensure that Robinhood or its customers were adequately protected, or even notified of the risks that they were about to undertake, or were already under, because of Robinhood's actions. Instead, Robinhood's team was in disarray and acted haphazardly. (*Id*. ¶¶ 196–204).

24.     Volatility in the market continued into January 25, 2021, when Robinhood Securities was first advised that it had a surplus of $11,397,650.77 with the DTCC, and then, within a matter of hours, a deficit of $74,428,708.17. (AC ¶¶ 208–09).

25.     Robinhood continued to encourage, facilitate, and fuel high trading volume on its

platform in late January 2021, increasing its revenues, as it routed increasing orders to market-makers through a process known as "payment for order flow," which accounts for over 60% of Robinhood's revenue. (*Id*. ¶¶ 137, 186, 190). According to Robinhood's SEC Rule 606 filing, it collected **$331 million** from market-makers in the first quarter of 2021, which is more than triple the amount collected in the first quarter of 2020. (*Id*. ¶ 141).

26.     On January 28, 2021, Robinhood received a notice from the NSCC that Robinhood Securities had a deposit deficit of approximately $3 billion. (*Id*. ¶ 215).

27.     Within hours of its initial margin request, and before markets opened on January 28, 2021, NSCC informed Robinhood Securities that the excess capital premium charge had been waived for that day and it would decrease its net deposit requirement ***by almost half***, to $1.4 billion (*Id*. ¶ 223). This drastic reduction was still insufficient, as Robinhood was so woefully undercapitalized that Robinhood Securities' Clearing Operations Manager wrote, "We don't have that either." (*Id*. ¶ 224). Before also before the market opened, Robinhood Securities received a NSCC Daily Margin Statement reducing the deficit to $733,976,926.71. (*Id*.).

28.     Robinhood Co-Founder and CEO, Tenev, testified that Robinhood met its revised deposit requirements a little after 9:00 a.m. EST on January 28, 2021. (*Id*. ¶ 235).

29.     Nevertheless, Robinhood suspended purchasing for the Suspended Stocks when the market opened, allowing only selling to continue, and kept restrictions in place through February 5, 2021 (AC ¶ 266) (citing Form S-1, at 167). Robinhood Markets directed the PCO through its subsidiaries, Robinhood Securities and Robinhood Financial. (*Id*. ¶ 100); (Form S-1, at 37) ("***[W]e*** temporarily restricted or limited our customers from purchasing certain specified securities.").[11]

30.     In the face of increased clearinghouse deposit requirements, Robinhood chose to limit its own settlement risk at the expense of its customers and investors by abruptly moving the Suspended Stocks to "PCO," or "position closing only," foreseeably decreasing and suppressing the price of those Suspended Stocks and causing significant harm to customers and investors who held them, including Plaintiffs and the Robinhood Classes. (*Id*. ¶¶ 100, 238–42). *See also* Elon Musk Tenev Interview, *supra* ("***We knew this was a bad outcome for customers*** . . .") (AC ¶ 251).

31.     By preventing users from purchasing the Suspended Stocks, while allowing users to sell or close their positions in those Suspended Stocks, through February 5, 2021, Robinhood

---

[11] Robinhood Markets is defined in the Registration Statement as "RHM", together with its subsidiaries, "Robinhood", the "Company", "***we***", or "us". (Form S-1, at F-46).

caused Plaintiffs and the Robinhood Class to suffer significant losses. (AC ¶¶ 29–84).

32.     Tenev testified that the decision by Robinhood to PCO the Suspended Stocks was made "due to 'increased clearinghouse-mandated deposit requirements" that occurred between 6:30 a.m. and 7:30 a.m. EST on January 28, 2021. (*Id*. ¶¶ 177, 235). (*See also* Form S-1, at 37) ("[F]rom January 28 to February 5, 2021, *due to increased deposit requirements* imposed on Robinhood Securities by NSCC in response to unprecedented market volatility, particularly in certain securities, we temporarily prevented our customers from purchasing certain specified securities, including GameStop Corp. and AMC Entertainment Holdings, Inc.").

33.     While the DTCC was willing to work with Robinhood, adjust the premiums, and not let it fail, Robinhood did not bother to tell the DTCC that they could not fund as of approximately 7:40 a.m. EST on January 28, 2021, before implementing a PCO. (*Id*. ¶ 218).

34.     Robinhood had sufficient access to additional capital resources, as evidenced by its ability to round up $3.4 billion in just two days, by January 29, 2021. (*See id*. ¶ 234).

35.     Tenev's testimony is at odds with Robinhood's January 28, 2021 blog post, disclosing that the PCO was prompted solely by "market volatility." (*See* AC ¶ 235).

36.     Moreover, Robinhood's SEC Registration Statement states that its PCO decision was *not* discretionary, but rather an example of being "*forced to restrict trading* in certain stocks in order to limit clearinghouse deposit requirements." (Form S-1, at 37).

37.     When Robinhood addressed the question, "Why don't I see a buy button?," on its Website, it told customers that the "buy button" was unavailable because: (a) "It's a foreign stock, which we don't support;" (b) "It's an over-the-counter (OTC) stock or a warrant, which Robinhood generally doesn't support;" and (c) "It's a stock undergoing corporate action…." However, the Suspended Stocks were not foreign stocks, OTC stocks or stocks undergoing corporate actions during the Restricted Period. (AC ¶ 242).

38.     Thus, neither Robinhood's Website nor its S-1 Registration Form authorize Robinhood to implement a one-way PCO due to market volatility or clearinghouse-mandated deposit requirements. (*Id*. ¶ 177).

39.     Nevertheless, Robinhood shut down the demand side of the market for the Suspended Stocks knowing the decision would depress prices and harm customers and investors who held shares in the Suspended Stocks, including Plaintiffs and the Class. (*Id*. ¶¶ 100, 234–42). Plaintiffs and the Class were left without any alternative means to protect their positions and were

forced to sell at suppressed prices or hold as the value of their holdings fell, causing ascertainable damages. (*See id.* ¶¶ 29–84, 173).

## II.    LEGAL STANDARDS

### A.    Standard of Review

A motion to dismiss for failure to state a claim only tests the sufficiency of the complaint; it does not decide the merits of the case. *See Milburn v. United States*, 734 F.2d 762, 765 (11th Cir. 1984). "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration added) (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007)). The threshold is met by a "short and plain statement of the claim showing that the pleader is entitled to relief" to give the defendant "fair notice" of what the claims are and the grounds upon which they rest. *See* Fed. R. Civ. P. 8(a)(2). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (alteration added; citing *Twombly*, 550 U.S. at 556).

To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (alteration added) (citing *Twombly*, 550 U.S. at 556). When considering facial plausibility, "a court must view a complaint in the light most favorable to the plaintiff and accept all of the plaintiff's well-pleaded facts as true." *Am. United Life Ins. v. Martinez*, 480 F.3d 1043, 1066 (11th Cir. 2007). If a court dismisses a complaint, it should give leave to amend unless the "pleading could not possibly be cured by the allegation of other facts." *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1182 (9th Cir. 2016). A court's Rule 12(b)(6) analysis is limited to the four corners of the complaint, including incorporated exhibits. *See Middleton v. IBM*, 787 F. App'x 619, 622 (11th Cir. 2019) (citing *George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002); *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005)).

### B.    Applicable Law

While it is generally true that Florida courts will enforce choice-of-law provisions in agreements between parties, "[i]n determining whether a choice of law clause…also governs tort claims between those parties, a court must first examine the scope of the provision." *Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1162 (11th Cir. 2009). "A choice of law provision that relates only to the agreement will not encompass related tort claims." *Id.* (citing *Green Leaf*

*Nursery v. E.I. DuPont De Nemours & Co.*, 341 F.3d 1292, 1300–01 (11th Cir. 2003)).

> (i)      **Robinhood's Contractual "Governing" Law Provision Does *Not* Govern Plaintiffs' Tort Claims**

Defendants take it as a foregone conclusion that California law applies to all of Plaintiffs' claims because the Customer Agreement includes a "Governing Law" provision selecting California law. (*See* Mot. 12). The existence of such a provision is only the starting point for the analysis where, as here, Plaintiffs assert non-contractual, tort-based claims. [12]

The "Governing Law" provision states, in pertinent part:

> ***This Agreement and all transactions made in [customer] Account[s]*** shall be governed by the laws of the State of California (regardless of the choice of law rules thereof), except to the extent governed by the federal securities laws, FINRA Rules, and the regulations, customs, and usage of the exchanges or market (and its clearing house) on which transactions are executed.

(Cust. Agmt. § 37.K.) Turning a blind eye to the provision's narrow language and the analyses of the cases they cite, Defendants read expansive language into the provision to argue that it applies because Plaintiffs' claims "all arise from their use of and interactions with their Robinhood brokerage accounts." (Mot. 12). Contrary to this assertion, this is ***not*** a "broad provision that applies to tort claims as well as breach of contract claims." (*Id*.). *Compare Cooper*, 575 F.3d at 1162 (construing choice of law provision that stated "all disputes ***arising out of or in connection with***" the agreement governs "***all*** disputes" having a connection to the agreement, and not just the agreement itself); *Arndt v. Twenty-One Eighty-Five, LLC*, 448 F. Supp. 3d 1310, 1315–21 (S.D. Fla. 2020) (analyzing plaintiffs' claims against ***broad*** choice of law provision that read "[t]his [agreement] is governed by federal law and, to the extent not preempted thereby, by the law of the State of Illinois," and determining plaintiffs' ***contract-based*** claims seeking to enforce the subject agreement fell within the choice of law provision).

Rather, Robinhood's choice of law provision is limited to "***[t]his*** Agreement." *Id*. Like in *Green Leaf Nursery*, where the choice-of-law clause was limited to "***[t]his*** release," and did not refer to related tort claims or to any and all claims or disputes arising out of the agreement, Robinhood's choice-of-law provision is "narrow," in that only the Agreement itself is to be

---

[12] Plaintiffs do not dispute that California law governs their alternative claims for breach of implied contract against Robinhood Financial and Robinhood Securities. *See infra*. Section III.C.

construed in accordance with the laws of the State of California, not tort claims arising out of the Agreement. 341 F.3d at 1300. *See also, e.g.*, *Rayle Tech, Inc. v. DEKALB Swine Breeders, Inc.*, 133 F.3d 1405, 1409–10 (11th Cir.1998) (explaining that a provision stating that a contract was "governed by" Illinois law did not incorporate Illinois tort law); *Sunbelt Veterinary Supply, Inc. v. Intl. Bus. Sys. U.S., Inc.*, 985 F. Supp. 1352, 1354 (M.D. Ala. 1997) (holding governing law clause stating, "***This Agreement*** shall be governed by and construed under the laws of the State of California, without reference to principles of conflict of laws," in software and services purchase agreement was not broad enough to prevent application of the forum state's tort law to negligence claims arising from performance of software services); *Burger King Corp. v. Austin*, 805 F. Supp. 1007, 1012 (S.D. Fla. 1992) (applying Florida law despite governing law clause in franchise agreement, explaining that "claims arising in tort are not ordinarily controlled by a contractual choice of law provision....Rather, they are decided according to the law of the forum state").

Plaintiffs' claims also do not arise from "transactions ***made***" in their accounts, but rather from Robinhood's conduct in connection with ***dis***abling purchasing. (*Id*. ¶ 24143). Under the operative facts pleaded, Robinhood's tort duty did not—and could not—arise out of a Customer Agreement that neither includes the puppet master behind the decision to PCO, Robinhood Markets, its CEO, Tenev, nor the "Nationwide Investor Class," with no contractual privity,[13] who held shares or call options in shares in the Suspended Stocks as of the end of the day January 27, 2021, and suffered damages as a result of Robinhood's actions to artificially suppress market prices of those stocks. (*See* AC ¶¶ 96–100, 198–201, 234–42, 273, 337). Plaintiffs' tort claims, as alleged, therefore arise from duties and actions ***independent of*** the Customer Agreement, including, but not limited to, Robinhood's failure to maintain adequate capital and strong risk controls to prepare for the untenable growth and volatility it fueled, and its choice to save itself at the expense of investors and destroy the market for the Suspended Stocks. (AC ¶¶ 4–5, 9–14, 105–06, 135, 146, 147, 151, 155, 157-66, 171, 174–76, 186, 192–206, 214–19, 223–24, 227–28, 231, 283–94, 301).

Plaintiffs further allege that Robinhood "required [them] to enter into the Customer Agreements and related documents, which are contracts of adhesion," in that the Customer Agreement contains standard terms drafted by Robinhood Financial and Robinhood Securities,

---

[13] Likewise, Robinhood Markets is not a party to the Customer Agreement. (AC ¶ 311 & Ex. A). Yet, while Defendants invoke the Customer Agreement to absolve all collective Robinhood entities of liability, Defendants argue that Robinhood Markets "does not owe any tort duties to its customers ***irrespective of the fact that it is not a party to the Customer Agreement***. (Mot. 13, n.9).

who have superior bargaining power, on a non-negotiable and take-it-or-leave-it basis, including by referencing terms, conditions, and other policies outside of the Customer Agreement. (*Id*. ¶¶ 30, 34, 42, 47, 51, 55, 61, 65, 69, 73, 77, 81, 311). As the drafter, any ambiguities in Robinhood's choice of law provision should be construed against it. *See Syverson v. Jones*, 10 So. 3d 1123, 1125 (Fla. 1st DCA 2009); *accord Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*, 971 F.2d 401, 407 (9th Cir. 1992) ("Sutter Home drafted the distributor agreement, and any ambiguity in the choice of law clause must therefore be construed against it.").

### (ii)   Florida has the "Most Significant Relationship" to Plaintiffs' Tort Claims

The Court should apply the choice of law rules of Florida, the forum state for this MDL. *Green Leaf Nursery*, 341 F.3d at 1301 (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)); *see also In re Takata Airbag Prod. Liability Litig.* 255 F. Supp. 3d 1241, 1254–55 (S.D. Fla. 2017). Florida employs the "most significant relationship test" when conducting a choice of law analysis in tort actions. *Id*. at 1256 (citing *Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007)); *see also Bishop v. Fla. Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980) (adopting the Restatement (Second) of Conflict of Laws ("Restatement") § 145, which instructs courts to look to the state that has "the most significant relationship to the occurrence and the parties").

For purposes of evaluating which state has the "most significant relationship" to the subject occurrences and the parties, "[t]he inquiry is qualitative, not quantitative" and the court must evaluate the contacts "according to their relative importance with respect to the particular issue." Restatement § 145(2). Courts consider: (1) the place where the injury or injuries occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered. *Green Leaf Nursery*, 341 F.3d at 1301 (quoting Restatement).

Plaintiffs allege facts weighing in favor of Florida law's application to Plaintiffs' tort claims for negligence, gross negligence, breach of fiduciary duty, tortious interference, and conspiracy. While ordinarily the first factor – the place where the injury or injuries occurred – is the most heavily weighted factor, the site of the injury for purposes of Plaintiffs' tort claims is the location where the breaches of Robinhood's duty of care occurred. *See eCapital Com. Fin. Corp. v. Hitachi Cap. Am. Corp.*, 519 F. Supp. 3d 1129, 1134 n. 4 (S.D. Fla. 2021) (citing *MasTec Renewables Puerto Rico LLC v. Mammoth Energy Servs., Inc.*, No. 20-CIV-20263, 2020 WL

6781823, at *6–7 (S.D. Fla. Nov. 18, 2020)). Plaintiffs reside in seven different states (four of the plaintiffs reside in Florida; one plaintiff resides in Missouri; one plaintiff resides in Michigan; two plaintiffs reside in Illinois; one plaintiff resides in Texas; one plaintiff resides in South Carolina; and two plaintiffs reside in California). Plaintiffs allege that Defendants inflicted injury across the national stock market by halting the buying, but not selling, of the Suspended Stocks, which impeded additional price appreciation and suppressed the prices of the Suspended Stocks for Robinhood customers and non-customers alike. (AC ¶ 300).

The single common denominator and culmination of Plaintiffs' and the Class's injuries was Robinhood's decision to PCO the Suspended Stocks, which, according to Tenev, was implemented by Robinhood Securities through its COO, James (Jim) Swartwout ("Swartwout") in Florida. (*See* AC ¶¶ 28, 91, 100) (citing Form S-1, at 37). *See also Virtual Hearing – Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide*, 117th Cong. at 10 (2021), Statement of Vladimir Tenev, Chief Executive Officer, Robinhood Markets, Inc. ("Tenev Testimony"), at 58:43 ("It was a collateral depository requirement decision **made by our Robinhood Securities President**, and I fully stand by it."), *available at* https://financialservices.house.gov/uploadedfiles/hhrg-117-ba00-wstate-tenevv-20210218.pdf.

The second factor – the place where the conduct causing the injury occurred – weighs decisively in favor of Florida law applying to these claims. Plaintiffs allege that the decision to halt buying was effectuated in Florida by Robinhood Securities, a company headquartered in Florida, through its COO, Swartwout. (AC ¶¶ 28, 91). Given that Plaintiffs' claims center around this PCO decision, including the influence over the decision by Robinhood Markets, and Defendants' acts and omissions in coordination with each other, (*id*. ¶ 100), this factor should weigh more heavily when evaluating choice of law in this action. Robinhood Markets may direct operations of its subsidiaries from its principal business location in California, but it caused Robinhood Securities to effectuate the PCO decision from Florida.

The third factor – the domicile, residence, nationality, place of incorporation, and place of business of the parties also supports the application of Florida law to these claims.  As the JPML observed, the majority of the initial cases filed in this action were filed in Florida on behalf of Florida-based plaintiffs. (*See* JPML Transfer Order, MDL No. 2989 [ECF No. 272], at 5). Moreover, and as discussed previously, Robinhood Securities is headquartered in Florida, and Swartwout, its internal decisionmaker, is domiciled in Florida. *See* Robinhood Securities, LLC's

Form X-17A-5 (identifying, in a filing with SEC, Robinhood Securities, LLC's "Principal Place of Business" as Lake Mary, Florida). Robinhood Markets and Robinhood Financial are Delaware entities with their principal executive offices in Menlo Park, California. (AC ¶¶ 85, 88).

The fourth and final factor — the place where the relationship, if any, between the parties is centered — is neutral, as the Plaintiffs' app-based relationship with Robinhood Securities and Robinhood Financial is not centered in any particular geographic location.

In sum, Florida has the most significant relationship to Plaintiffs' tort claims.[14]  Indeed, Florida's connection to this action was central to the briefing before the JPML, as well as in the JPML's Order consolidating and transferring the over 50 actions to this District. (*See* Transfer Order [ECF No. 272], at 5). The JPML highlighted the volume of actions then-pending in Florida, and that "some of the events central to this litigation—in particular, Robinhood Securities' decision to restrict trading on the meme stocks, took place in Florida." (*Id.*).

## IV.    ARGUMENT

### A.    Plaintiffs' Detailed Factual Allegations Are More than Sufficient to State Plausible Negligence and Gross Negligence Claims (Counts I–II)

To state a claim for negligence, Plaintiffs must allege facts showing that Robinhood had a duty "to conform to a certain standard of conduct, for the protection of others against unreasonable risks." *Clay Elec. Co-op v. Johnson*, 873 So. 2d 1182, 1186 (Fla. 2003); *accord Burns v. Neiman Marcus Grp.*, 173 Cal. App. 4th 479, 487–88 (2009). Gross negligence further requires Plaintiffs to establish each element of negligence plus "an extreme departure from the ordinary standard of conduct" or "want of even scant care[.]" *City of Santa Barbara v. Super. Ct.*, 41 Cal. 4th 747, 754, 62 Cal. Rptr. 2d 527, 531–32 (2007) (quoting *Eastburn v. Reg'l Fire Prot. Auth.*, 31 Cal. 4th 1175, 1185-86 (2003)); *see also* Fla. Stat. § 768.72(2)(b) (defining "gross negligence" to mean that "the defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct").

The Amended Complaint pleads facts supporting a plausible duty to Robinhood customers and investors, breach, causation, and damages. Plaintiffs also pled detailed facts beyond simple negligence, relying on internal Robinhood documents and correspondence that reveal:

---

[14] While Florida choice of law rules support applying Florida law to the tort claims, for the reasons below, Plaintiffs' claims nevertheless survive dismissal under California law.

- Robinhood had advance notice of the surge in trading volume and volatility (AC ¶¶ 193–96);

- Robinhood knew its systems were at a breaking point due to the surge in trading volume (*id.* ¶ 198);

- Even as its systems were buckling, Robinhood **ramped-up** marketing and recruitment to drive even more trading volume to its platform. (*Id.* ¶ 203); and

- Robinhood knowingly and intentionally tanked the prices of the Suspended Stocks by enacting one-sided trading restrictions. (*Id.* ¶¶ 172–73).

Plaintiffs further allege that Robinhood Securities was at all times aware of (yet failed to meet) its duty to maintain requisite capital levels to satisfy its collateral requirements with NSCC. (*Id.* ¶ 155). Because Robinhood failed to take reasonable steps to support the market activity it was promoting, Robinhood failed to meet its collateral requirements, forcing the NSCC to extend an exemption and placing the entire market at risk. (*Id.* ¶¶ 165, 176). Despite the breathing room afforded by the NSCC's exemption, Robinhood still failed to have adequate capital in reserve, instead continuing to recklessly ignore its responsibilities. (*Id.* ¶ 176).

Seeking dismissal of Plaintiffs' negligence claims in Counts I and II, Robinhood argues that Plaintiffs fail to allege that Robinhood owed its customers any cognizable tort duty. (Mot. 13). Robinhood relies on the adhesive, unilateral Customer Agreement to disclaim any liability to Plaintiffs for its negligence, contending, "Plaintiffs' negligence claims are premised on the imposition of restrictions that were expressly permitted by the Customer Agreement." (*Id.* 15). Robinhood further argues that it is exempt from the industry standards of care set by the regulatory bodies that govern Robinhood Financial and Robinhood Securities because they do not provide a "private right of action." (Mot. 21).

**(i)      Robinhood Owes All Foreseeable Plaintiffs Independent Tort Duties**

Under both Florida and California law, Robinhood owes all foreseeable Plaintiffs tort duties separate and independent from any contractual duties to its customers. That duty is linked to the foreseeability of the risk: "Whenever one undertakes to provide a service to others, whether one does so gratuitously or by contract, the individual who undertakes to provide the service—i.e., the "undertaker"—thereby assumes a duty to act carefully and to not put others at an undue risk of harm." *Clay Elec. Co-op*, 873 So. 2d at 1186. *See also Est. of Rotell ex rel. Rotell v. Kuehnle*, 38 So. 3d 783, 789 (Fla. 2d DCA 2010) (holding that a legal duty arises whenever a human endeavor

creates a generalized and foreseeable risk of harming others). *Accord N. Am. Chem.*, 59 Cal. App. 4th at 782 ("The foreseeability of economic harm to the plaintiff from the defendant's negligent conduct was the critical factor.").

Where, as here, a broker-dealer creates the risk of harm giving rise to a legal duty (because, for example, it takes money from investors who expect their money and investments will not be harmed by their own broker's negligence), the distinction between whether customers had discretionary or nondiscretionary accounts is irrelevant. *See Clay Elec. Co-op*, 873 So. 2d at 1186. The type of investment account has no bearing where Plaintiffs allege that Robinhood intentionally fueled the volatility, increased the risk of harm, and at least negligently failed to take appropriate action to mitigate such risks. As such, the cases involving nondiscretionary accounts relied upon by Robinhood, *v. State St. Bank & Tr.*, 749 F.3d 938, 948 (11th Cir. 2014), and *Paszamant v. Ret. Accts., Inc.*, 776 So. 2d 1049, 1053 (Fla. 5th DCA 2001), are unavailing. In both cases, the risk of harm was not created by the financial institutions themselves. Unlike the plaintiffs in *Lamm* and *Paszamant*, Plaintiffs here do not seek to impose any duty on the Defendants to supervise and monitor a customer's account to guard against losses caused *by others*. Any argument that Robinhood does not owe a duty of care for risks it **knowingly**, or at least foreseeably, created is fundamentally at odds with bedrock negligence law.

Robinhood's buy-side shut down artificially suppressed prices for the Suspended Stocks to Robinhood's benefit (in the form of decreased clearinghouse deposit requirements), and at the expense of Plaintiffs and non-Robinhood customers (in the form of significant losses in the value of their respective holdings). (AC ¶¶ 100, 234–42). These consequences were foreseeable to Defendants because they were the result of Robinhood's efforts to aggressively "ramp up" marketing of its services to attract novice, "everyday" investors while also knowingly failing to properly capitalize itself and adopt adequate internal risk controls. (*Id.* ¶¶ 14, 191–208, 324) (internal message with CEO Tenev in the days leading up to Robinhood's collapse, stating that "Marketing is ramping up, Super Bowl ads is coming up, crypto volatility/speculation on reddit seems to be increasing."). *See also* SEC Report, at 20 & Figure 4 (showing that GME price increases "coincided with a sharp increase in the number of individual accounts actively trading GME," with the "number of unique accounts trading GME on a given day increasing from less than 10,000 at the beginning of January 2021, to nearly 900,000 as of January 27, 2021").

Plaintiffs allege the obvious consequence of Robinhood's decision to PCO the relevant

securities—a precipitous decline in price and the value of investor portfolios holding those securities. (AC ¶ 263). Robinhood evaporated demand, which eliminated the genuine support for the stock price. (*Id.* ¶¶ 3, 7) ("By suspending only one side of the transaction—the buy side—Robinhood eliminated national demand for certain 'hot stocks,' the majority of which were being traded on its platform[.]"). The very harm that occurred—the decimation of the market and value of the Suspended Stocks—was exactly what Robinhood intended; at the very least, it was the direct and obvious outcome of Robinhood's conduct. Robinhood's employees knew as much; one Robinhood Product Manager presciently remarked: "*[W]e're going to get crucified*." (*Id.* ¶ 7)

### (ii)     The Economic Loss Rule Does *Not* Bar Plaintiffs' Negligence Claims

Florida law does not bar recovery for economic losses even when the parties are in contractual privity. *See Tiara Condo. Ass'n v. Marsh & McLennan Cos.*, 110 So. 3d 399, 407 (Fla. 2013) (limiting the economic loss rule to the products liability context); *see also McCain v. Fla. Power Corp.*, 593 So. 2d 500, 503 n.2 (Fla. 1992); *accord Clay Elec. Co-op*, 873 So. 2d at 1185. Prior to *Tiara*, the economic loss rule was intended to prevent plaintiffs from using a negligence claim to avoid contractual limitations on liability, not to bar independent tort claims. *Fed. Deposit Ins. Corp. for IndyMac Bank, FSB v. Genesis Title Co., LLC*, No. 11-20841-CIV, 2011 WL 13223744, at *2 (S.D. Fla. July 1, 2011) (Altonaga, J.) ("Florida's economic loss rule was never intended to bar well established common law causes of action.") (quoting *Moransais v. Heathman*, 744 So. 2d 973, 981 (Fla. 1999)).[15] *See also Orangi v. JPMorgan Chase Bank*, No. 5:11-cv-1229 JF (HRL), 2011 WL 1807174, at *1 (N.D. Cal. May 11, 2011) (holding that the policy rationale for the economic loss rule is inapplicable where the plaintiff alleged that the defendant-bank physically lost a tangible amount of currency that belonged to her).

Under California law, the economic loss rule does not apply where the parties have contracted for the performance of services: "A contract to perform services gives rise to a duty of care which requires that such services be performed in a competent and reasonable manner. A negligent failure to do so may be *both* a breach of contract and a tort." *N. Am. Chem. Co.*, 59 Cal. App. 4th at 774 (Cal. 1997); *see also Eads v. Marks*, 39 Cal. 2d 807, 810, 249 P.2d 257 (1952) (even where there is a contractual relationship between the parties, a cause of action in tort may

---

[15] In *Tank Tech, Inc. v. Valley Tank Testing, L.L.C.*, 244 So. 3d 383 (Fla. 2d DCA 2018), a summary judgment case limited to indemnity, there was *no contract* between plaintiff and defendant obligating defendant to repay plaintiff for the expenses incurred and *no special duty*.

arise from the negligent manner in which the contractual duty is performed). In such cases, the contract "necessarily carries with it both the reasonable expectation and implied at law promise that it will be conducted with reasonable care." *N. Am. Chem.*, 59 Cal. App. 4th at 484.

While Robinhood urges that its role is akin to an innocent bystander "platform," there is no dispute that Robinhood and its customers contracted for professional services. The Customer Agreement specifies that "Robinhood Financial offers brokerage **services** to retail investors. Our **services** involve effecting securities transactions **for** investors exclusively online." (AC ¶¶ 319–20 & Ex. A) (quoting Cust. Agmt. § 2). Indeed, customers are expressly asked to acknowledge that "Robinhood Financial **provides** trading **and** brokerage services through the Robinhood website (the 'Website') and the Robinhood mobile application (the 'App')." (Cust. Agmt. § 4). Robinhood's attempts to diminish its role to strictly one of a "platform through which its customers may place self-directed trade orders," (Mot. 16), is belied by the express terms of its agreement.

Moreover, and irrespective of whether the parties are in privity, "the contract itself is but one facet of the general facts of the case." *Clay Elec. Co-op*, 873 So. 2d at 1185. "The statute, books and case law . . . are not required to catalog and expressly proscribe every conceivable risk in order for it to give rise to a duty of care. Rather, each defendant who creates a risk is required to exercise prudent foresight whenever others may be injured as a result." *McCain*, 593 So. 2d at 503. Plaintiffs here allege a pattern of recklessness through deliberate choices by Robinhood's executive leadership to promote trading volume and volatility it knew its systems could not handle, failing to monitor and manage risk, and shifting the consequences of its own actions to customers by preventing the purchase of the Suspended Stocks known to be heavily traded on its platform. (*See, e.g.*, AC ¶¶ 3, 100, 161, 193–196, 250–252). Robinhood simultaneously allowed selling to continue, suppressing market prices and harming customers and individual investors. (*Id.*)

California law provides two exceptions under which contractual parties may recover on a negligence claim. The first is the independent tort doctrine, which enables a plaintiff to recover in tort where the tort is "independent of the breach." *Robinson Helicopter Co. v. Dana Corp.*, 102 P.3d 268, 360 (Cal. 2004). The second is the "special relationship" exception, which allows a plaintiff to recover for economic losses under a negligence theory. *J'Aire Corp. v. Gregory*, 598 P.2d 60, 63 (Cal. 1979) ("Where a special relationship exists between the parties, a plaintiff may recover for loss of expected economic advantage through the negligent performance of a contract although the parties were not in contractual privity."). Robinhood argues—unpersuasively—that

the latter exception does not apply. However, even if this Court is inclined to apply California law to Plaintiffs' tort claims, there are sufficient allegations to support a determination that a special relationship exists between Robinhood and its customers.[16]

*First*, the transaction was plainly intended to affect Plaintiffs. Robinhood invited Plaintiffs to join its platform with an aggressive campaign of marketing and outreach. (AC ¶¶ 4, 123, 134, 129, 130, 132, 133, 134). Robinhood recruited Plaintiffs who ultimately entered into the Customer Agreement for "trading **and** brokerage services." (Cust. Agmt. § 4). Plaintiffs and members of the Robinhood Class, who owned and invested in the Suspended Stocks before Robinhood imposed its trading restrictions, were predictably harmed by Robinhood's decision to restrict buying of the Suspended Stocks. (AC ¶ 4). The purpose of the restrictions was to artificially suppress the prices of assets owned by the Plaintiffs. (*Id.* ¶¶ 3, 100). Indeed, the Suspended Stocks were the very target and subject matter of Robinhood's trading restrictions. (*Id.* ¶ 5). Robinhood's decision to PCO the Suspended Stocks could only have one effect on Plaintiffs—a significant decrease in the value of their holdings. (*Id.* ¶ 3) ("Class members who were forced to sell at depressed prices or hold and watch as the value of their holdings fell precipitously.").

*Second*, the harm was plainly foreseeable, as Robinhood knew that moving securities to position-closing only would adversely affect the price of those securities. That is why Robinhood COO Jim Swartwout, who authorized the trading restrictions, sold his AMC shares on January 26, 2021—a day before the restrictions took effect. (*Id.* ¶ 12) ("I sold my AMC today. FYI—tomorrow we are moving GME to 100% - so you are aware."). Conversely, Plaintiffs such as Edward Goodan, Andrea Juncadella, William Makeham, Mark Sanders, Cody Hill, Sammy Gonzalez, Jonathan Cornwell—all of whom, like Swartwout, held shares or options in AMC but, unlike Swartwout, had no such forewarning of impending restrictions, found themselves confronting spiraling losses. (*Id.* ¶¶ 3, 35, 36). In an admission as telling as it is damning, Robinhood's CEO admitted "[w]e knew this was a bad outcome for customers." (*Id.* ¶ 251).[17]

---

[16] The California Supreme Court in *J'Aire Corp.* employed a six-factor test to determine the existence of a special relationship, but those factors are not elements; they are simply a basket of factors California courts consider in determining whether, on balance, a special relationship exists.
[17] *Cf. Whitesides v. E*Trade Sec., LLC*, No. 20-CV-05803-JSC, 2021 WL 930794, at *4–5 (N.D. Cal. Mar. 11, 2021) (dismissing negligence claim where agreement contained an exculpatory clause relieving E*Trade from any duty of ordinary care, absent a breach of the agreement, gross negligence, or willful misconduct, and plaintiffs failed to plead a "special relationship exists giving

24

*Third*, Plaintiffs were certain to have suffered. By imposing position-closing only trading restrictions, Robinhood *guaranteed* the price of those securities would decline (*Id.* ¶¶ 3, 7, 100). Plaintiffs were directly injured—the value of their shares sent into freefall.

*Fourth*, there is an undeniably close relationship between the Defendants' conduct and the injury suffered because, as explained, Robinhood caused and foresaw the injuries incurred by the Plaintiffs. (*Id.* ¶ 3, 103, 163). Robinhood's shutdown caused the stock prices to fall. (*Id.* ¶¶ 3, 103). Each artificial limitation on the Suspended Stocks correlated with a subsequent decrease in value. (*Id.* ¶ 263).

*Fifth*, Robinhood's actions are blameworthy because they attacked the foundation of free, fair, and open markets, while shifting the consequences of its negligence from itself to its completely innocent and non-blameworthy customers. (*Id.* ¶¶ 3, 13, 20, 105).

*Sixth*, Robinhood's actions have left an indelible mark on Plaintiffs and the Class. Robinhood was aware of and actively fueled the volatility it now cites to deflect blame for its actions. (*Id.* ¶ 9). CEO Vlad Tenev went as far as encouraging a "ramp up" of marketing even as his employees were warning that the platform was at its breaking point. (*Id.* ¶ 9). It was as if "the Titanic had continued selling tickets even after hitting the iceberg[.]" (*Id.* ¶ 11). There are strong public policy grounds to prevent the recurrence of such future harm to our public markets and the confidence therein, especially involving a significant market player such as Robinhood.

Robinhood cites to a lone, unpublished decision, *Peregrine Pharm. v. Clinical Supplies Mgmt.*, No. 12-cv-1608-JGB-ANx, 2015 WL 13309286 (C.D. Cal. June 22, 2015), to argue that the special relationship exception is unavailable to Plaintiffs. (*See* Mot. 17–20). But the bulk of California courts have held otherwise, routinely applying the special relationship test to parties in contractual privity. *See, e.g.*, *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 313 F. Supp. 3d 1113, 2018 WL 1243332 (N.D. Cal. 2018*); R. Power Biofuels v. Chemex*, No. 16-cv-00716-LHK, 2016 WL 6663002 (N.D. Cal. 2016). Further, the Ninth Circuit has admonished district courts for failing to properly apply all six *J'Aire* factors. *See Kalitta Air v. Central Texas Airborne Systems*, 315 Fed. App'x 603, 604 (9th Cir. 2008). Indeed, the district court in *Peregrine* misinterprets the holding in *Aas v. Sup. Ct.*, 24 Cal. 4th 627 (2000), which held that homeowner plaintiffs could not

---

rise to an independent duty of care"). In *Whitesides*, it was E*Trade's system failure for all users— rather than an intentional shut down of one-side of trading for certain stocks—that plaintiffs claimed caused them injury when the price of crude oil went negative (because of external forces).

recover tort damages for design or construction defects in the absence of resulting property damage. In *Aas*, the court **did** apply the six-factor *J'Aire* test but concluded that no special relationship existed because the majority of the factors were not present. *Id.* at 646.

Even if the Court is inclined to credit *Peregrine*'s *dicta*, *Peregrine* is distinguishable. *Peregrine* involved two sophisticated parties "who exercised control over the contract terms." 2015 WL 13309286, at *10. By contrast, Robinhood exercised **exclusive** control over the terms of its contract of adhesion that Robinhood construes as exempting it from complying with its essential purpose—*i.e.,* providing competent brokerage services. *See N. Am. Chem.*, 59 Cal. App. 4th at 783–84 (citing *Kaiser Steel Corp. v. Westinghouse Elec. Corp*, 55 Cal. App. 3d 737, 747–48 (1976) (allowing otherwise disclaimed damages where "circumstances cause an exclusive or limited remedy to fail of its essential purpose.")). The *Peregrine* court contrasts the type of relationship between the parties with that of an insurer and an insured, "which is characterized by elements of public interest, adhesion, and fiduciary responsibility." *Peregrine*, 2015 WL 13309286, at *10 (quoting *Erlich v. Menezes*, 21 Cal. 4th 543, 553 (1999)).[18]

The relationship between the Robinhood Plaintiffs and Robinhood is not akin to two corporate entities exercising relatively equal bargaining power, as in *Peregrine*. It is on the opposite end of the spectrum, featuring a contract of adhesion. Additionally, the public has a strong interest in the operation of the markets holding brokers to their fiduciary duties. *See R. Power Biofuels*, 2016 WL 6663002, at *5.

### (iii)  Robinhood's Extreme Departures from Standards and Regulations Governing Securities Brokers Support Plaintiffs' Negligence Claims

Even if industry standards and customs do not give rise to an independent legal duty, they help define the standard of care. *L.A. Fitness Int'l Mayer*, 980 So. 2d 550, 558 (Fla. 4th DCA 2008). Factual allegations showing Robinhood's departure from best practices, industry standards, and regulatory requirements are sufficient at this stage to support a negligence claim. Contrary to Robinhood's argument, Plaintiffs have not asserted a private right of action premised on Robinhood's violations of these rules. (Mot. 20–22). Rather, Plaintiffs point to regulatory

---

[18] In *Erlich v. Menezes*, the court distanced itself from the special relationship test that Plaintiffs address here, as *Erlich* explained "[the special relationship test] has little relevance to the question before us." 21 Cal. 4th at 553. Robinhood's reference to the special relationship test as "illusory and not sufficiently precise," (Mot. 23), comes from a 1987 law review article cited in *dicta*. Plaintiffs' reference to courts applying the special relationship test should govern.

violations to underscore the degree to which Robinhood's actions grossly departed from the standards of care contemplated and codified by Congress, the SEC, FINRA, and the DTCC/NSCC. (*See, e.g., id.* ¶¶ 152–82). That is why in the long of history of securities trading, **no other broker** has taken the same action of imposing a one-sided, days-long trading halt of in-demand securities.[19]

Robinhood's actions were so flagrantly at odds with industry standards, its regulatory obligations, and plain common sense, that it strains logic for Robinhood to assert, in its Form S-1, that it was "forced to restrict trading" or that it acted appropriately in response to market volatility, while also claiming that the restrictions were an act of "discretion." (*Id.* ¶ 178). Notwithstanding Robinhood's contention, the Amended Complaint does not allege a private right of action. The Amended Complaint, however, correctly notes that regulators have instituted guardrails to ensure the stability of the financial markets irrespective of market conditions. Registered FINRA Broker-Dealers, such as Robinhood Securities and Financial, must comply with FINRA rules. Accordingly, Plaintiffs allege, *inter alia*, that Robinhood knew or should have known of its anticipated DTCC deposit requirements and that the failure to prepare for the anticipated DTCC deposit requirements would impair Robinhood's ability to perform its obligations as a trading platform as required under SEC and FINRA rules and regulations. (AC ¶ 161).

While Plaintiffs need not prove at the pleading stage specific violations of regulations to state a claim for negligence, violations of various SEC and FINRA regulations help establish and inform the duty of care that Robinhood owed and breached. (AC ¶¶ 152–73). Tellingly, Robinhood does not even deny any of the alleged violations. Its sole contention is none of the regulations cited give rise to a private right of action. (Mot. 20–23). That is completely beside the point.

Robinhood has many regulatory duties and operates in a heavily regulated sector. Inconveniently for Robinhood, "***failure to comply with the rules [is] evidence of a breach of the duty of care***." *Owens v. Stifel, Nicolaus & Co., Inc.*, No. 7:12-CV-144 HL, 2014 WL 2769044, at *2 (M.D. Ga. June 18, 2014) (quoting *Remington v. Newbridge Sec. Corp.*, No. 13-60384-CIV, 2013 WL 2444719, at *6 (S.D. Fla. June 5, 2013). FINRA Rules "standardiz[e] the expectation[s] of professionalism within the industry." *Owens, supra*, at *2. These rules and others form the basis of an industry standard of care. Whether or not a duty is breached depends, in part, on determining

---

[19] Aside from Robinhood, only one other broker, Apex Clearing Corporation, imposed a one-sided trading shutdown of buying for approximately 3.5 hours on January 28, 2021.

the extent to which the Defendant acted in accordance with the standard of care used by other professionals in the community. *Remington*, 2013 WL 2444719, at *6 (S.D. Fla. June 5, 2013).

"[T]he standard in the industry is reflected in the rules of both NASD and NYSE . . . they have been deemed to be the standards of practice relative to this industry imposing regulatory duties on industry players that can be enforced by regulators or used as evidence of negligence by private litigants." *Javitch v. First Montauk Fin. Corp.*, 279 F. Supp. 2d 931, 938 (N.D. Ohio 2003). Plaintiffs allege Robinhood's failure to maintain adequate capital to meet its collateral requirements and to remain solvent violated the Net Capital Rule, 17 CFR § 240.15c3-1(a), (*id.* ¶ 161), and FINRA Rules 2010, 3110, 4370, and Regulatory Notice 21-12. (*Id.* ¶¶ 168-169). Further, Robinhood's conduct departed markedly from that of its peers, (*id.* ¶ 252), and, despite having tools to monitor and anticipate its clearing requirements, (*id.* ¶¶ 157, 158, 162, 163), Robinhood remained so inadequately capitalized that it risked default and forced the NSCC to authorize an exemption from collateral deposit requirements. (*Id.* ¶ 165). In doing so, Robinhood placed the other members of the NSCC (*i.e.,* its peer firms), and thereby the entire market, at risk of collapse. (*Id.* ¶ 207). But even that was not enough. Robinhood still could not meet its relaxed obligations, sending executives to borrow from its corporate parent and raise money from investors. (*Id.* ¶¶ 224, 225, 231, 234). When it decided to PCO the Suspended Stocks, it did so on its own, and not at the behest of the DTCC/NSCC. (*Id.* ¶ 237)

For the reasons above, it is irrelevant that some rules and regulations Robinhood violated carry no private right of action. None of Plaintiffs' claims for relief purports to fashion a private right of action for these violations. (Mot. 19–20; AC ¶ 167) The bottom line is that Robinhood blew straight past the regulations that explain its standard of care, as a result it paid unprecedented penalties (but not to Plaintiffs), and also departed flagrantly from its peers in its decision to impose the PCO in late January 2021. Moreover, the law is clear that such a departure is material in a negligence analysis. "It is clear from the case law that a stockbroker can be held liable to his client for negligence." *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng*, 697 F. Supp. 1224 (D.D.C. 1988) (violation by a broker of NASD "suitability rule" was a factor that jury could weigh in considering negligence claim against broker); *see also Siedman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 465 F. Supp. 1233, 1236 (S.D.N.Y. 1979) (brokers' violations of NYSE Rules can be remedied by state common law actions for breach of contract and negligence). Moreover, it is well-settled that even if no private claims for a violation of NASD rules may be brought, "the

negligence claim which is based on violation of such a rule, would not improperly circumvent such a holding." *Miley v. Oppenheimer & Co.*, 637 F.2d 318, 333 (5th Cir. 1981).

Robinhood submits that DTCC collateral requirements necessitated its actions, and that it restricted trading to ensure compliance. Robinhood claims it could not meet its net deposit requirements and was "forced to restrict trading in certain stocks in order to limit clearinghouse deposit requirements." (Form S-1, at 32; AC ¶ 178). When asked by the House Financial Services Subcommittee if Robinhood had negotiated with counterparts to restrict trading in the Suspended Stocks, Tenev stated that trading restrictions were put in place to meet regulatory deposit requirements imposed by DTCC affiliate NSCC. (AC ¶ 236). These are the very rules and regulations that Robinhood has a pattern of violating, and that Robinhood now dismisses as irrelevant to Plaintiffs' claims. (*Id*. ¶¶ 1822, 152–73). Moreover, the only reason Robinhood was in this position in the first place is because Robinhood negligently failed to mind the guardrails of the rules and regulations under which it operates and is bound.

For the foregoing reasons, the Amended Complaint clearly establishes the nature and scope of Robinhood's duty of care, and handily states plausible claims for breach of that duty of care.

**B.**     **Plaintiffs' Allegations Support a Plausible Breach of Fiduciary Duty (Count III)**

The elements of a claim for breach of fiduciary duty under Florida and California law are (1) the existence of a fiduciary duty, (2) the breach of that duty, and (3) the breach being the proximate cause of the plaintiff's damages. *Banc of Am. Sec. LLC v. Stott*, No. 04-81086-CIV, 2005 WL 8156027, at *4 (S.D. Fla. Aug. 30, 2005) (citing *Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002)); s*ee also Brown v. Cal. Pension Admin. & Consultants, Inc.*, 45 Cal. App. 4th 333, 347–48, 52 Cal. Rptr. 2d 788 (1996) (citing *Pierce v. Lyman*, 1 Cal. App. 4th 1093, 1101, 3 Cal. Rptr. 2d 236 (1991)). The Amended Complaint pleads facts to support each of these elements and is sufficient to state a claim for relief at the initial pleading stage. (*See, e.g.*, AC ¶¶ 6–17, 32, 40, 45, 49, 53, 59, 63, 67, 71, 75, 79, 101, 104, 106, 108, 109, 111, 114, 116, 121–123, 128, 129, 130, 131, 160–63, 166, 170–74, 176, 179, 192–98, 200–51, 303).

**(i)**     **Stockbrokers Have Fiduciary Duties, the Scope and Extent of Which Depends on the Particular Facts of Each Case**

Robinhood misstates the law as it relates to whether, as brokers, Robinhood Securities and Robinhood Financial owe Plaintiffs fiduciary duties, including duties of care, loyalty, honesty, and good faith. *See Bank of Am. Sec. LLC v. Stott*, No. 04-81086-CIV, 2005 WL 8156027, at *4 (S.D.

Fla. Aug. 30, 2005) (recognizing duties of care, loyalty, and good faith under Florida law); *see also Apollo Cap. Fund, LLC v. Roth Cap. Partners, LLC*, 158 Cal. App. 4th 226, 246 (2007); *Starr Indem. & Liab. Co.*, No. 1:17-CV-00213-DAD-BAM, 2018 WL 1142207, at 2 (E.D. Cal. Mar. 2, 2018) (same under California law). Robinhood claims in categorical terms that it does not owe *any* fiduciary duties to Plaintiffs because it is a "non-discretionary" broker and Plaintiffs "agreed" that it does not give "investment advice." (Mot. 24–28). Robinhood minimizes its role as a broker because it knows that, as a broker, it has actionable fiduciary obligations: "[T]he relationship between any stockbroker and his or her customer is fiduciary in nature, imposing on the former the duty to act in the highest good faith toward the customer." *Duffy v. Cavalier*, 215 Cal. App. 3d 1517, 1534 (1989).

At a minimum, brokers' fiduciary obligations stem from their capacities as agents. *Duffy*, 215 Cal. App. 3d at 1534 ("Stockbrokers act as agents for buyers and sellers of securities. Any agent is also a fiduciary, whose obligation of diligent and faithful service is the same as that of a trustee.") (citing *Twomey v. Mitchum, Jones & Templeton*, 262 Cal. App. 2d 690 (1968)). Robinhood cannot wash its hands of its fiduciary obligations to its customers by claiming to be a non-discretionary broker. As *Duffy* and its progeny have unequivocally stated, "the existence of a stockbroker's fiduciary duty to a customer does not depend on showing of 'special facts,' *including whether the stockbroker serves as an investment advisor or controls the account*." *Id.*

Indeed, the very Judicial Council of California Civil Jury Instructions (2020 Edition) No. 4100 entitled "Fiduciary Duty" Explained expressly provides as follows:

> [A/An] agent/stockbroker/real estate agent/real estate broker/corporate officer/partner/[insert other fiduciary relationship] owes what is known as a fiduciary duty to [his/her/nonbinary pronoun/its] principal/client/corporation/partner/[insert other fiduciary relationship]. A fiduciary duty imposes on [a/an] [agent/stockbroker/real estate agent/real estate broker/corporate officer/partner/[insert other fiduciary relationship]] a duty to act with the utmost good faith in the best interests of [his/her/ nonbinary pronoun/its] [principal/client/corporation/ partner/[insert other fiduciary relationship].

In Florida, the "law is clear that a broker owes a fiduciary duty of care and loyalty to a securities investor." *Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d 1042, 1049 (11th Cir. 1987) (citing *Thompson v. Smith Barney, Harris Upham & Co., Inc.,* 709 F.2d 1413, 1418 (11th Cir. 1983)); *see also* Restatement (Second) of Agency § 425. The question before the Court "is

not *whether* there is a fiduciary duty, *which there is in every broker-customer relationship*; rather it is the *scope or extent* of the fiduciary obligation, which *depends on the facts of the case*." *Apollo*, 158 Cal. App. 4th at 246–47.

The scope of a broker's fiduciary obligations involves a fact-intensive inquiry, making it unusual for a breach of fiduciary duty claim to be dismissed at the pleadings stage. *Id.*; *see also Catano v. Capuano*, No. 18-20223, 2020 WL 639406, at *12 (S.D. Fla. Feb. 11, 2020) ("[A] claim alleging the existence of a fiduciary duty usually is not subject to dismissal under Rule 12(b)(6) because it is often impossible to say that a plaintiff will be unable to prove the existence of a fiduciary relationship."); *Michelson v. Hamada,* 29 Cal. App. 4th 1566, 1575–76, 36 Cal. Rptr. 2d 343 (1994) (holding that "[t]he existence of an agency is a factual question within the province of the trier of fact whose determination may not be disturbed on appeal if supported by substantial evidence") (internal alteration).

### (ii)     Plaintiffs Plead Facts Supporting a Fiduciary Relationship Arising From a Special or Confidential Relationship

Not least among the factors for determining the scope of a broker's fiduciary duties are the "relative sophistication and experience of each customer" and the "needs of the customer." *Apollo*, 158 Cal. App. 4th at 216 (quoting *Duffy*, *supra*); *see also Bankest Imports, Inc. v. ISCA Corp.*, 717 F. Supp. 1537, 1541 (S.D. Fla. 1989) (citing *Barnett Bank of W. Fla. v. Hooper*, 498 So. 2d 923 (Fla. 1986)). Fiduciary duties arising from special or confidential relationships require (1) the vulnerability of one party to the other which (2) results in the empowerment of the stronger party by the weaker which (3) empowerment has been solicited or accepted by the stronger party and (4) prevents the weaker party from effectively protecting itself. *Richelle L. v. Roman Cath. Archbishop*, 106 Cal. App. 4th 257, 130 Cal. Rptr. 2d 601 (2003), as modified (Mar. 17, 2003).

Plaintiffs go beyond the basic fact that Robinhood performed services as a broker of securities and is thus recognized at law as owing fiduciary duties, to further plausibly allege facts showing a fiduciary relationship between Robinhood and its customers by detailing Robinhood's systematic targeting of individuals inexperienced in financial investing in order to harvest a large customer base of novice investors capable of sustaining its volume-based revenue model. (*See, e.g.*, AC ¶¶ 101, 108, 109, 111, 114, 116, 121, 122, 123, 128, 129, 130, 131, 173, 303). As alleged,

- Robinhood touts itself as a financial product that can "give everyone—not just the wealthy—*access* to financial markets." Robinhood's stated mission is "to democratize finance for all." (Form S-1, at 1) (emphasis added). (AC ¶ 108).

31

- To execute on this mission, Robinhood's "Investing for Everyone" business model offers "commission-free investing" and "fractional trading for no-minimum investing. (*Id.* ¶ 109).

- Robinhood targets non-professional, "retail" investors, including Plaintiffs and the Class, with its deliberately engineered one-click trading, easy access to complex investment products, and interactive user interface. Robinhood uses these tools to creates [sic] a paternalistic relationship whereby Plaintiffs and the Class trust Robinhood to help them navigate the complex system of trading, seemingly once out of reach, but now available in the palm of their hands on their smartphones. (*Id.* ¶ 111).

- Robinhood boasts that its interactive interface is specifically designed to be "familiar in look and feel for a generation of mobile-first customers." (*Id.* ¶ 128).

In its Motion, Robinhood chalks these efforts up to mere advertising (even willing, apparently, to concede the falsity of that advertising). (Mot. 27). Unfortunately, Robinhood's arguments in Court strike an entirely different tone from its representations to regulators and prospective investors. In its Form S-1 filing, Robinhood states that it takes "seriously" its "responsibility" to "millions of our customers [] using Robinhood to enter financial markets for the first time..." (AC ¶ 122) (internal alteration).[20]

Robinhood's deliberate recruitment of novice investors works as intended. Robinhood boasts that over half of its 31 million customers (*id.* ¶ 116) are opening their first brokerage account, with a median age of 31 years old. (*Id.* ¶ 114). Once novice investors are lured by Robinhood's parade of assurances and populist pretensions, Robinhood accepts their trust and confidence, going to great lengths towards nurturing a pseudo-paternalistic relationship. Robinhood steadily feeds its users educational content, including, but not limited to, in-app courses teaching about investing, a daily podcast, and the "Robinhood Snacks" Newsletter, which provides daily financial news. (*Id.* ¶ 123).

Robinhood deploys exploitive "gamification" features aimed at nudging its novice customers with behavioral prompts, including design elements and psychological tools intended to engage their attention and elicit emotional responses, such as emoji-filled push notifications, prizes, graphics, and animations, all to increase trading activity among its largely novice clientele.

---

[20] "This case is about the extreme divergence between that professed belief and how Robinhood actually runs its business." (AC ¶ 1).

(*Id.* ¶ 129). Robinhood employs tools such as video trainings and design elements to encourage more rapid trading and investment strategies. (*Id.* ¶ 131). FINRA scrutinized some of these tools, such as the falling "confetti" when stock purchases are made and emoji-filled phone notifications replete with happy faces. (*Id.* ¶ 130). Consequently, in the first three months of 2020, Robinhood users on average traded **9 times** as many shares as E-Trade customers and **40 times** as many shares as Charles Schwab customers per dollar (*id.* ¶ 134), exactly the sort of exuberant behavior Robinhood seeks to elicit to sell customer order flow and trade data to third party market-makers (*id.* ¶137). Robinhood users also bought and sold **88 times** as many risky options contracts as Schwab customers. (*Id.*) These are not coincidences.

Plaintiffs have thus plausibly alleged that Robinhood specifically undertakes to provide brokerage services to non-professional, novice investors. (*See* AC ¶¶ 101, 108, 109, 111, 114, 116, 121, 122, 123, 128, 129, 130, 131, 173, 303). By virtue of their inexperience, these investors naturally are especially reliant on Robinhood's protection, and, as the Amended Complaint details, Robinhood not only accepts their trust and reliance, but actively solicits and exploits it to feed its volume-based revenue model. *Id.* ¶¶ 129, 130, 131; *Apollo*, 158 Cal. App. 4th at 216 (quoting *Duffy*, 215 Cal. App. 3d 1517); *see also Bankest Imports, Inc. v. ISCA Corp.*, 717 F. Supp. 1537, 1541 (S.D. Fla. 1989) (citing *Barnett Bank of W. Fla. v. Hooper*, 498 So. 2d 923 (Fla. 1986)).

Plaintiffs further allege Robinhood's breach of fiduciary duty by operating an undercapitalized business without adequate risk controls, failing to meet the capital requirements necessary to support the market activity it was facilitating, mismanaging risk, and ultimately crashing the value of its customers' investments to avoid its collateral deposit requirements, causing Plaintiffs' damages. (*See* AC ¶¶ 6–17, 32, 40, 45, 49, 53, 59, 63, 67, 71, 75, 79, 104, 106, 160–63, 166, 170–74, 176, 179, 192–98, 200–51).

Robinhood argues that Plaintiffs fail to allege that Robinhood "accepted" fiduciary obligations, hinging its entire argument on its statement in the Customer Agreement that Robinhood does not "provide investment advice." (Mot. 26). Nowhere in the customer agreement does Robinhood disclaim any fiduciary obligations, including those of care, loyalty, protection, and good faith (indeed, the Customer Agreement does not mention the word "fiduciary").

A fiduciary relationship does not depend on the giving of advice or whether a broker is discretionary or non-discretionary, as these are merely factors among many to be considered in determining the ***extent*** and ***scope*** of the fiduciary duties owed. *See Duffy*, 215 Cal. App. 3d at

1534. The particular scope of a broker's fiduciary obligations depends on the facts of each case, determining facts of which include "the relative sophistication and experience" and "needs" of the customer." *See Apollo Capital Fund, LLC v. Roth Capital Partners, LLC*, 158 Cal. App. 4th 226, 246–47 (2007); *see also Catano v. Capuano*, No. 18-20223, 2020 WL 639406, at \*12 (S.D. Fla. Feb. 11, 2020). A fiduciary or confidential relationship exists where "confidence is reposed by one party and a trust is accepted by the other." *Honig v. Kornfeld*, 339 F. Supp. 3d 1323, 1337 (S.D. Fla. 2018) (citing *Taylor Woodrow Homes Fla., Inc. v. 4/46-A Corp.*, 850 So. 2d 536, 540 (Fla. 5th DCA 2003) (quoting *Doe v. Evans*, 814 So.2d 370, 374 (Fla. 2002))); *see also Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d 1042, 1049–50 (11th Cir. 1987) (broker had fiduciary duty to explain risks of options trading to unsophisticated customers despite customers signing agreement stating that they understood risks of options trading). Robinhood's argument here is therefore unavailing.

Moreover, Robinhood's novice customers are indisputably the weaker party. As alleged in the Amended Complaint, Plaintiffs and the Classes they were unable to protect themselves when Robinhood chose to operate on the brink of systemic failure and intentionally crashed the value of their investments to avoid the collateral deposit requirements necessitated by the very market volatility it abetted. (*See* AC ¶¶ 6–17, 160–63, 166, 170–73, 176, 179, 192–98, 200 –51). Thus, aside from the fact that Plaintiffs have plausibly pled that Robinhood is a fiduciary by virtue of being a securities broker, they have further plausibly pled (1) the vulnerability of one party to the other which (2) results in the empowerment of the stronger party by the weaker which (3) empowerment has been solicited or accepted by the stronger party and (4) prevents the weaker party from effectively protecting itself, stating a confidential relationship giving rise to fiduciary duties. *Richelle L. v. Roman Cath. Archbishop*, 130 Cal. Rptr. 2d 601, 610 (Ct. App. 2003).

### (iii)   Defendants' Cited Case Law is Inapposite

None of the California or Florida cases Defendants cite find that a broker owes no fiduciary duties at all simply because the broker does not provide investment advice. (Mot. 24–28). Rather, Defendants' cited case law consistently finds that a broker owes fiduciary duties (which include the duty of care, honesty, loyalty, full disclosure of material information and avoidance of a conflict of interest); however, the *scope* and *extent* of the expression of those duties owed depends upon the nature of the broker-client relationship and the particular facts of the case. *See Apollo*, 158 Cal.App. 4th at 246–47; *see also Catano*, No. 18-20223, 2020 WL 639406, at \*12. The entirety

of Robinhood's jurisprudential analysis focuses on cases concerning claims based upon advice or disclosure (or the lack thereof) related to issues endemic to the particular investments made by their customers. (Mot. 24–28).

None of the cases Defendants cite deals with a broker causing its customers to suffer damages because of (i) systemic or structural defects inherent to the actual operation of the broker's own business (which defects the broker caused by willingly undertaking massive risks that it failed to adequately analyze or mitigate and that it encouraged and facilitated its customers to unknowingly endure without any warning or notice), and (ii) overt steps taken by the broker which it knew would, and were apparently specifically intended to, damage the market for certain stocks in which its customers were heavily invested in order to protect the broker's own financial interests and regardless of the inevitable devaluation of its own customers' investments. (AC ¶¶ 16–17, 160–63, 166, 170–73, 176, 179, 192–98, 200–51). Moreover, Robinhood's attempt to stretch the principle set forth in *Leib,* and referred to in *Gochnauer*, that the non-discretionary broker's duties end with each transaction are not applicable to the facts and circumstances pleaded in the Amended Complaint. Again, those cases, and the more limited fiduciary duties (albeit still existing) of non-discretionary brokers, deal with ongoing monitoring and advice when their customers had not engaged the brokers for that purpose.

### (iv)    Robinhood Securities Owed a Fiduciary Duty to the Robinhood Plaintiffs

In dealing with the issue of clearing brokers and fiduciary duties, in a footnote to the Motion, Robinhood again misstates the law. It is not the case that Robinhood Securities, as a clearing broker, "could not, by definition, owe any such duties." (Mot. 24 n. 18). None of the cases Robinhood cites support such an unequivocal and sweeping proposition. Rather, what the pertinent case law, including the case law cited by Robinhood, consistently indicates is that clearing brokers can be liable to customers of introducing brokers when clearing brokers act outside the scope of routine clearing functions. *See, e.g.*, *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1339 (11th Cir. 2010); *McDaniel v. Bear Stearns & Co., Inc.*, 196 F.Supp.2d 343, 353 (S.D.N.Y. 2002); *Petersen v. Sec. Settlement Corp.*, 277 Cal. Rptr. 468 (Ct. App. 1991).

In *Petersen v. Sec. Settlement Corp.*, the court declined to find that a clearing broker who had provided no investment advice had a fiduciary duty of disclosure regarding the speculative nature of investments it had not introduced. 277 Cal. Rptr. 468 (Ct. App. 1991). Nonetheless, the Court acknowledged that "arguably there are circumstances under which even a clearing broker

nonetheless might be required to provide a customer with information about the nature of his or her investment." *Id.* at 1457. In *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, the court noted that the determination of whether a clearing broker owes fiduciary duties "is not determined by labels placed on the relationship." 600 F.3d 1334, 1339 (11th Cir. 2010). In that case, the Court again declined to find a clearing broker that had "no direct contact" with the customer owed fiduciary duties associated with providing investment advice. *Id.* at 1349 (citing *McDaniel v. Bear Stearns & Co.,* 196 F.Supp.2d 343, 353 (S.D.N.Y.2002)). The Court in *SFM Holdings* noted, however, that clearing brokers can have fiduciary liability when they are "actively and directly involved in the introductory broker's actions." *Id.* (internal quotations omitted). The court in *Strategic Income Fund, LLC v. Spear, Leeds & Kellogg Corp.* made no finding concerning clearing brokers and fiduciary duties, merely remarking that the plaintiffs had crafted their pleading to avoid the general, though not universal, rule that clearing brokers do not owe fiduciary duties to the clients of introducing brokers. 305 F.3d 1293, n.12 (11th Cir. 2002).

Where a clearing firm moves beyond performing mere ministerial clearing functions and becomes involved in the introductory broker's actions, it may assume duties with respect to the introductory broker's misdeeds. *See McDaniel,* 196 F. Supp. 2d at 353 (finding clearing broker "aided and abetted" introducing broker); *see also, e.g.*, *Berwecky v. Bear Stearns & Co.*, 197 F.R.D. 65 (S.D.N.Y. 2000) (denying clearing broker's motion to dismiss where complaint alleged that clearing broker "shed [its] role as a mere clearing broker" "and with actual knowledge, directly participated in the heretofore described scheme"); *Cannizzaro v. Bache, Halsey, Stuart, Shield, Inc.*, 81 F.R.D. 719, 721 (S.D.N.Y. 1979) (denying clearing broker's motion to dismiss where complaint alleged that clearing broker performed more than mere mechanical functions for introductory broker). Moreover, where there is a direct contract between clearing brokers and customers, clearing brokers may be held to have undertaken fiduciary duties. *McDaniel,* 196 F. Supp. 2d at 362 (affirming award against clearing broker based on direct contractual relationship between clearing broker and customer).

A close relationship between a clearing and introducing broker can form the basis for imputing duties to a clearing broker. *Margaret Hall Found., Inc. v. Atlantic Fin. Mgmt., Inc.*, 572 F. Supp. 1475, 1480-81 (D. Mass. 1983) (denying clearing firm's motion to dismiss where complaint alleged "a very close relationship" between clearing firm and introductory broker). Clearing brokers can be held jointly and severally liable with introducing brokers where clearing

brokers participate in introducing brokers' liable conduct. *Koruga v. Fiserv Correspondent Servs.*, 183 F. Supp. 2d 1245, 1247 (D. Or. 2001).

Here, Robinhood Securities is included within Robinhood's Form S-1 as part of the overall Robinhood "vertically integrated platform." (AC ¶ 95). Robinhood Securities and Robinhood Financial are closely affiliated, being wholly owned subsidiaries of Robinhood Markets, and treated as one entity for purposes of its IPO Registration Statement. (*Id.* ¶¶ 90, 93, 95). Robinhood Securities leans heavily on Robinhood for cash flow, carrying "six revolving and unsecured lines of credit with the Parent for a total of $550.0 million" (*Id.* ¶ 99). Meanwhile, Robinhood leans heavily on Robinhood Securities to market its brokerage business, holding itself out as a self-clearing broker and boasting that "Clearing by Robinhood will allow us to help our customers more easily and efficiently." (*Id.* ¶112, n. 9). The Customer Agreement entered into by Plaintiffs and Robinhood Class members is with both Robinhood Financial and Robinhood Securities. (*Id.* ¶¶ 328, 338, 339). Robinhood's Registration Statement, which defines Robinhood Markets, Robinhood Financial and Robinhood Securities as a collective "we," confirmed that Robinhood Securities' cash collateral deposits, if not met, could result in "our broker-dealer business" being restricted. (*Id.* ¶ 100, n. 6).

The circumstances leading up to the imposition of the PCO involved discussion among the various Robinhood entities, including Robinhood Securities. (*Id.* ¶ 194). Indeed, Robinhood Financial and Robinhood Securities acted in tandem, with one encouraging and introducing ever increasing high volume and volatile trading by existing and new customers it was gleefully bringing onboard, while the other deposited collateral so that trading could continue. (*Id.* ¶¶ 302–08, 323, 343). These facts, together with the inextricable role that Robinhood Securities played in Robinhood's offer of brokerage services, are sufficient to find that it owed fiduciary obligations.

## C.   Plaintiffs Adequately Plead Alternative Claims For Breach of Implied Covenant of Good Faith and Fair Dealing and Duty of Care (Counts IV–V)

### (i)   Robinhood's Bad Faith and Unfair Dealing in Furnishing Brokerage Services Frustrated the Customer Agreement's Purpose and Thwarted Plaintiffs' Expectation of Contractual Benefits

Defendants myopically misconstrue Plaintiffs' claim that Robinhood Securities and Robinhood Financial breached the implied covenant of good faith and fair dealing as based solely upon the "one-sided halt on trading on the Suspended Stocks" (Mot. 29). While Plaintiffs allege Robinhood Securities and Robinhood Financial breached the implied covenant by engaging in

conduct that "includ[es], without limitation" this one-sided halt, (AC ¶ 330), they also allege examples of other conduct. (*Id.* ¶¶ 13, 105, 204, 300, 323). As a result, Robinhood Securities and Robinhood Financial thwarted Plaintiffs' receipt of many of the core benefits they were entitled to under the Customer Agreement. (*Id.* ¶ 331.) These allegations sufficiently state claims for breach of the implied covenant of good faith and fair dealing under California law.[21]

Under California law the "[implied] covenant of good faith and fair dealing [is] implied…in[to] every contract." *Thrifty Payless, Inc. v. The Americana at Brand, LLC*, 160 Cal. Rptr. 3d 718, 729 (Ct. App. 2013) (internal quotation and citation omitted). The essence of the implied covenant of good faith and fair dealing is "'that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.'" *Comunale v. Traders & Gen. Ins. Co.*, 328 P.2d 198, 200 (Cal. 1958).

The implied covenant "functions as a *supplement* to…express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract." *Thrifty*, 160 Cal. Rptr. 3d at 729 (internal citation omitted). While the scope of conduct prohibited by the covenant cannot contradict the express terms of the contract, "breach of a specific provision of the contract is not . . . necessary to a claim for breach of the implied covenant of good faith and fair dealing." *Thrifty*, 218 Cal.App.4th at 1244 *See also* Judicial Council of California Jury Instructions, CACI 235 (2020) (allowing separate claim for breach of the covenant of good faith and fair dealing, ***even where breach of contract is also alleged***) (citing *Digerati Holdings, LLC v. Young Money Ent., LLC*, 123 Cal. Rptr. 3d 736, 885 (Ct. App. 2011)). Importantly, the issue of whether the implied covenant of good faith and fair dealing has been breached is ordinarily 'a question of fact unless only one inference [can] be drawn from the evidence.'" *Hicks v. E. T. Legg & Associates*, 108 Cal. Rptr. 2d 20 (Ct. App. 2001).

Here, as a condition of accessing Robinhood's brokerage services, all Robinhood users are required to execute the Customer Agreement – a contract of adhesion offered on a take-it-or-leave-it basis. (AC ¶ 311 & Ex. A). The essence and fundamental purpose of the Customer Agreement and the overall relationship between Plaintiffs and the Robinhood Class, on the one hand, and

---

[21] Claims for breach of the implied covenant are based in contract, and therefore, California law governs the Court's analysis as California is the law governing the Customer Agreement. (AC, Ex. A § 37.K). *Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151 (11th Cir. 2009).

Robinhood Financial and Robinhood Securities, on the other hand, is access to, and provision of, Robinhood's brokerage services. (*Id*. ¶ 312). The Customer Agreement provides that Robinhood Financial, as the introducing broker, will open accounts on behalf of Plaintiffs and members of the Robinhood Class "for the purchase, sale or carrying of securities or contracts relating thereto and/or the borrowing of funds, which transactions are cleared through Robinhood Securities." (*Id*. ¶ 313 & Ex. A). Pursuant to the Customer Agreement, Robinhood Financial accepts appointment by its customers as their "agent for the purpose of carrying out" their "directions to Robinhood Financial in accordance with the terms and conditions of this Agreement and any attendant risks with respect to the purchase or sale of securities." (*Id*. ¶ 314 & Ex. A § 4). Plaintiffs and Robinhood Class members acknowledge in the Customer Agreement that Robinhood Financial "provides brokerage services" through Robinhood's website ("Website") and mobile application ("App"). (*Id*.). The Customer Agreement expressly provides that customer accounts will be introduced to Robinhood Securities, which "will clear all transactions, on a fully-disclosed basis." (*Id*. ¶ 315 & Ex. A § 6). The Customer Agreement also incorporates as part of that agreement "other specific agreements, disclosures, policies, procedures, terms, and conditions that apply to" customers' use of the App, the Website, or their customer accounts on the Website, including without limitation, Robinhood Financial's Brokerage Customer Relationship Summary ("CRS Summary"), which is posted on Robinhood's Website and is incorporated into, and forms part of, the Customer Agreement. (*Id*. ¶¶ 316–318 & Ex. A) (citing Cust. Agmt. § 37.F & Ex. B).

The CRS Summary is unequivocal about the services that Plaintiffs and Robinhood Class members contracted for, stating in relevant part that: (1) "Robinhood Financial offers brokerage services to retail investors. Our services involve effecting securities transactions for investors exclusively online. We buy and sell securities only at your direction and we do not offer recommendations of securities, strategies involving securities or securities accounts to you;" and (2) "Robinhood Financial is an introducing broker-dealer. Your funds and securities will be custodied by our affiliate, Robinhood Securities, LLC ('Robinhood Securities' and together with Robinhood Financial, 'Robinhood'), which services your account by executing, clearing and settling your trades; preparing and distributing your account statements and trade confirmations; and extending credit to margin accounts." (*Id*. ¶¶ 319–20 & Ex. B § 2).

Pursuant to the Customer Agreement and the CRS Summary, Robinhood Financial agreed to operate and make available its introducing brokerage business and Robinhood Securities agreed

to operate and make available its clearing brokerage business so that Plaintiffs and the Robinhood Class could pursue making and maintaining their investments with the expectation that the "attendant" risks were only those which come with the purchase or sale of securities in a free market. (AC ¶ 314 & Ex. A § 4). As such, the Customer Agreement provided Plaintiffs and the Robinhood Class with the reasonable expectation that they would receive and be entitled to benefits including, without limitation: (i) utilizing the Robinhood platform to make investments in securities the value of which would be determined by the operation of the free public markets (and not Robinhood's actions); (ii) maintaining their investments with a broker who would not subject those investments to unreasonable risk of devaluation through the broker's own actions; (iii) maintaining their investments with a broker who would take reasonable steps to mitigate the risk of failing to maintain adequate net capital and deposit requirements so that the brokerage services being offered could continue without disruption or devaluation of their investments; (iv) receiving advanced notice and/or warning from their broker as to impending risks to their investments and steps their broker may take that would harm the value of those investments; and (v) expecting their broker would not take steps intended to, or which it knew or ought to have known would, harm the investments of its customers. (*Id*. ¶ 331). In short, Plaintiffs reasonably expected access to the most elemental and primary benefits of any brokerage services relationship—that their brokers would not operate their business in a manner that would risk their investments, nor would they take unilateral steps to disable the operation of the free markets and self-servingly decimate the value of its customers' investments as Robinhood ultimately did.

Retail investors make investments through brokers on the hope of making money—not losing it. It is antithetical to the entire and express purpose of the relationship outlined in the Customer Agreement, and to the reasonable expectations of Plaintiffs and the Robinhood Class members, that Robinhood took steps (including the imposition of the buy-side trading restrictions) that they knew and intended would deeply wound the high volume and volatile market for trading in the Suspended Stocks, leading to dramatic drops in share values and artificially suppressed prices to the extreme financial detriment of its customers. (AC ¶¶ 3, 100, 173, 176, 332).

Robinhood's position is that it has the complete, unfettered and absolute discretion, "at any time" and without any stated reason or notice, to unilaterally prohibit or restrict any customer from

trading securities through its brokerage. (Mot. 30).[22] The unavoidable result of Robinhood's position is that the Customer Agreement for the provision of brokerage services becomes illusory as it would impose no obligation on Robinhood Financial or Robinhood Securities to provide or perform the central services or obligations required thereunder. According to Robinhood, Plaintiffs and members of the Robinhood Class can open brokerage accounts which Robinhood can render effectively useless at its whim because Robinhood has the unbridled discretion to prohibit or restrict providing any brokerage services to allow any trading therein at any time, for no reason or any reason, and without any notice. A brokerage account which cannot be used for trading, at the sole whim of the broker, provides no consideration or value to the customer.

"The general rule is that: An agreement that provides that the price to be paid, or other performance to be rendered, shall be left to the will and discretion of one of the parties is not enforceable. This is because the party having such discretion makes no real promise to pay or to perform." *Automatic Vending Co. v. Wisdom,* 182 Cal. App. 2d 354, 357 (Ct. App. 1960) (internal citations omitted). California law is well settled that an agreement which provides a party broad discretion as to whether it will perform at all under the agreement is illusory and unenforceable unless the implied covenant of good faith and fair dealing can be invoked to provide a reasonable limit to the exercise of that discretion. This is so despite broad discretion being expressly included in the contract. *See id.* at 358; *see also Badie v. Bank of Am.*, 67 Cal. App. 4th 779, 795–977 (Ct. App. 1998) (where the defendant-bank had a discretionary right to change the agreement, affecting the rights of the plaintiff, a duty is imposed to exercise that discretion in good faith).

Even if Robinhood arguably had unbridled discretion under Section 5.F. of the Customer Agreement to impose trading restrictions on individual customers, Plaintiffs' claims for breach of the implied covenant against Robinhood remain viable because it is for a jury to determine the objectively reasonable limits of exercising such broad discretion which, without limitation and on its face, makes illusory the benefit of the brokerage services offered under the Customer Agreement. In particular, it must be determined whether that discretion can be exercised for

---

[22] To the extent Defendants argue that Plaintiffs' allegations with respect to whether they did or did not exercise discretion in implementing the PCO on the Suspended Stocks are contradictory, that argument should be disregarded. Plaintiffs appropriately plead claims in the alternative, and are permitted to plead facts alternatively in support of those claims. Moreover, Defendants should not be permitted to use their own shifting justifications for why they implemented the PCO on the Suspended Stocks as both a sword and a shield against Plaintiffs' well-founded claims.

reasons that have nothing whatsoever to do with any issue with individual customer accounts or transactions, but instead was exercised in a manner that Robinhood knew or should have known would harm the value of its customers' investments because it failed to employ reasonable risk controls to mitigate the market volatility it encouraged.

Further, the implied covenant of good faith and fair dealing is triggered to address ambiguities in a contract, which arise when a party seeks to invoke an expressly provided for broad discretion which is inconsistent with other contractual terms. *See Third Story Music, Inc. v. Waits,* 41 Cal. App. 4th 798, 48 Cal. Rptr. 2d 747, 806 (1996). "In the case of a contradictory and ambiguous contract ... the implied covenant may be applied to aid in construction." *April Enterprises, Inc. v. KTTV*, 147 Cal. App. 3d 805, 816 (1983) (internal alterations) (where the contract contained an express provision allowing one party to erase tapes of a television show produced by the other and the producer brought suit for breach of contract and breach of implied covenant after it discovered some of the tapes had been erased, the court reversed dismissal because of the possibility that the contradictory terms could be reconciled by construing the erasure clause to be limited by the implied covenant of good faith and fair dealing).

Here, the express provisions of, and benefits under, the Customer Agreement include the ability for Plaintiffs and Robinhood Class members to be able to continue to trade and maintain investments in high volume and volatile securities. At Section 13, under the heading "***Market Volatility; Market Orders; Limit Orders; and Queued Orders***," the Customer Agreement ***expressly*** states: "Particularly during periods of high volume, illiquidity, fast movement or volatility in the marketplace, the execution price received may differ from the quote provided on entry of an order, and [customers] may receive partial executions of an order at different prices." (AC, Ex. A § 13). This language does not provide for, and indeed conflicts with, the right to prohibit or restrict such trading or to remove such securities from the Robinhood platform (or for unilaterally implementing PCO buy-side restrictions). *Id*. To the extent that the Customer Agreement provides any baseline for affecting customers through trading restrictions, even if that harm will cause financial damage to the customer, the agreement only points to behavior of and concerning the individual customer and not to circumstances having nothing to do with the customer or the customer's individual account. It is for the trier of fact to resolve these ambiguities and determine the reasonable limits of Robinhood's resort to Section 5.F. of the Customer Agreement.

### (ii)     Plaintiffs Plead Sufficient Facts to Plausibly Allege Robinhood Financial and Robinhood Securities Breached their Implied Duties

Under California law, an express contract carries with it an implied duty of care. *Holguin v. Dish Network LLC*, 178 Cal. Rptr. 3d 100, 114 (Ct. App. 2014) (holding that implied duties that accompany every contract include "a common-law duty to perform with care, skill, reasonable expedience, and faithfulness the thing agreed to be done, and a negligent failure to observe any of these conditions is a tort, as well as a breach of the contract.") (internal citations omitted); *see also Letizia v. Facebook Inc.*, 267 F. Supp. 3d 1235, 1249 (N.D. Cal. 2017) ("[T]his duty, being implied by law, is as much a part of the contract as if expressly set forth"); *Bulletin Mktg. LLC v. Google LLC*, No. 17-cv-07211-BLF, 2018 WL 3428562, at \*4 (N.D. Cal. July 13, 2018) (clarifying that the implied duty of care is a contract remedy).

The focus of an implied duty of care claim is on the service to be performed under the written contract. *See Holguin*, 178 Cal. Rptr. 3d at 114–15 (implied duty of care applied to the installation of satellite television services contemplated by the contract); *Land O'Lakes, Inc. v. DairyAmerica, Inc.*, No. 1:15-cv-01937-DAD-MJS, 2017 WL 495644, at \*3 (E.D. Cal. Feb. 6, 2017) ("service contracts give rise to an implied duty of care requiring services to be performed in a reasonable manner") (citing *Britz Fertilizers, Inc. v. Bayer Corp.*, No. 1:07-cv-00846-OWW-SMS, 2008 WL 341628, at \*9 (E.D. Cal. Feb. 5, 2008)); *see also Letizia*, 267 F. Supp. 3d at 1251-52 (implied duty claim concerned accuracy of advertising metrics, which was one of the services provided by Facebook to advertisers on its platform).

As alleged, Robinhood Financial and Robinhood Securities, as introducing and clearing broker-dealers, agreed to provide brokerage and clearing services, respectively, under the Customer Agreement and agreements incorporated therein by reference, including:

- Providing "brokerage services," which "involve effecting securities transactions for investors exclusively online" (AC ¶ 319);

- Executing trades on Robinhood customers' behalf with respect to purchases or sale of securities on the Robinhood Website and App, (*id*. ¶ 314); and

- Clearing customers' purchases and sales of securities on the Robinhood Website and App, by "executing, clearing and settling your trades." (*Id*. ¶¶ 315, 320).

That Robinhood Financial and Robinhood Securities contractually agreed to provide these brokerage services to its customers is beyond dispute. *See also supra*., Section III.C(i).

Plaintiffs further allege that Defendants breached their duty to perform these services with due care by, *inter alia*, pursuing an ever-growing customer base to engage in more and more transactions that would increase the revenues generated from payment for order flow, while failing to adequately address the risks that came from such ever-growing trading volume that could and did undermine their ability to provide the brokerage services they had contracted to provide. (AC ¶¶ 323–24). Specifically, Plaintiffs allege that Defendants failed to engage in adequate risk management and did not maintain adequate capital to meet increasing NSCC capital and deposit requirements that could reasonably result from the dramatically increased trading activity Robinhood encouraged, and that these failures led Robinhood to force the Suspended Stocks into PCO knowing that it would harm its customers. (*Id*. ¶¶ 323–25). Plaintiffs also cite to internal Robinhood documents showing that Defendants had adequate warnings that they would need increased capitalization. (*Id*. ¶¶ 4, 12, 161, 194–96). These allegations are more than sufficient to allege a breach of the implied duty of care because they show a failure to provide the core services Defendants agreed to provide to Plaintiffs and the Robinhood Clause with due care.

Robinhood again argues that this claim should be dismissed because the Customer Agreement purportedly allowed it to unilaterally restrict trading. (*See* Mot. 31–32). For the same reasons articulated above, the Customer Agreement cannot be read to afford Robinhood Financial and Robinhood Securities unbridled discretion to impose the PCO limitations under the factual circumstances alleged here. This reading of Section 5.F of the Customer Agreement would render the brokerage services Robinhood Financial and Robinhood Securities agreed to provide illusory. There are limits on the discretion afforded under Section 5.F imposed by both the implied covenant of good faith and fair dealing and the implied duty of care. The limits these implied duties impose on the discretion afforded under Section 5.F, and whether Defendants exceeded those limits, are fact questions that cannot be resolved at this stage of the proceedings.

As is also explained above in Section III.C(i), *supra*, there is also a material dispute as to whether Section 5.F even applies. This is because there is a different section of the Customer Agreement (Section 13, that includes in its heading "Market Volatility") that explicitly addresses what a customer can expect in periods of "high volume, liquidity, fast movement or volatility in the marketplace." High market volatility was the cause of the NSCC's capital call and is one of the reasons Defendants proffered for why they put the Suspended Stocks into PCO. (AC ¶¶ 235–37). None of the consequences spelled out in Section 13 give Defendants the right to bar trading

in any securities. Instead, Section 13 contemplates continued trading with only the possibility that "the execution price received may differ from the quote provided on entry of an order, and I may receive partial executions of an order at different prices." Given this dispute as to which section of the Customer Agreement applies, it cannot be said at this stage of the proceedings that the Customer Agreement permitted Robinhood Financial and Robinhood Securities to unilaterally restrict one side of trading in the Suspended Stocks.[23] For these reasons, this Court should reject Defendants' attempt to have this Court dismiss Plaintiffs' breach of the implied duty of care claim under the Customer Agreement.

### D.    Plaintiffs' Count VI States Plausible Claims for Tortious Interference with their Contractual and Business Relationships Against Robinhood Markets

Regardless of whether California or Florida law applies, Plaintiffs allege a plausible claim against Robinhood Markets for tortious interference.

### (i)    Plaintiffs Plead Facts Showing that Robinhood Markets Interfered with their Contracts with its Subsidiaries

To plead a claim for tortious interference with contractual relations under California law, Plaintiffs must plead facts establishing: (1) a contract existed between Plaintiffs and third parties Robinhood Securities and Robinhood Financial; (2) Robinhood Markets knew of the contracts; (3) Robinhood Markets' conduct prevented performance or made performance more expensive or difficult; (4) Robinhood Markets intended to disrupt the performance of these contracts or knew that disruption was certain or substantially certain to occur; (5) Plaintiffs were harmed; and (6) Robinhood Markets' conduct was a substantial factor in causing Plaintiffs' harm. *See* Judicial Council of California Civil Jury Instructions (2020), No. 2201, "Intentional Interference with Contractual Relations;" *see also Ixchel Pharma, LLC v. Biogen, Inc.*, 470 P.3d 571, 575 (Cal. 2020) (internal citations omitted). Robinhood Markets takes issue with Plaintiffs' pleading of only

---

[23] The cases Robinhood relies on do not change this outcome. *Series AGI W. Linn of Appian Grp. Inv'rs DE, LLC v. Eves*, 158 Cal. Rptr. 3d 193, 203 (Cal. App. 2013), involved the determination of whether an implied term should be read into the contract, while the claim here involves a duty to perform with due care all terms of a contract, which is implied by law. Likewise, *Corral v. Select Portfolio Servicing, Inc.*, No. C-15-1542 EMC, 2015 WL 4149144 at *4 (N.D. Cal. July 9, 2015), did not involve discretion afforded under the agreement at issue, but rather the dispute centered on the burden to provide plaintiff a form, where in fact the contract "explicitly burden[ed] the Plaintiffs with submitting the [form], and only burdens the Defendants with waiting for the [form]," which "Defendants made . . . reasonably available." *Id.* at *9–10.

a single element, arguing that Plaintiffs have not sufficiently alleged any "actual breach or disruption of the contractual relationship." But its arguments on this point are unavailing.

Contrary to Robinhood Markets' assertion, California law does not require Plaintiffs to assert a breach of contract claim against both Robinhood Securities and Robinhood Financial. Indeed, "while the tort of inducing breach of contract requires proof of a breach, the cause of action for interference with contractual relations is distinct and requires only proof of interference." *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 971 P.2d 587, 592 (Cal. 1990) (internal citations omitted); *see also Lipman v. Brisbane Elementary Sch. Dist.*, 359 P.2d 465, 469 (Cal. 1961) (noting claim will generally lie "where the party with whom the plaintiff has entered into an agreement has been induced to breach it" and also where "performance has been prevented or rendered more expensive or burdensome…").

Plaintiffs plead ample facts establishing that Robinhood Markets interfered with their contractual relationship with its subsidiaries. Plaintiffs allege that Robinhood Markets "forc[ed] the Suspended Stocks into PCO;" "fail[ed] to have a supervisory control system that would have identified and prevented the capitalization issues;" "fail[ed] to have adequate business contingency and continuity plans to ensure customer access in the event of market volatility;" "fail[ed] to have sufficient back-up plans to receive and process customers' orders during times of market volatility;" "continu[ed] to allow new customers to join the platform;" "fail[ed] to take steps to arrange for necessary capital that was immediately available from other sources;" and "fail[ed] to comply with professional and industry standards of care." (AC ¶ 338.) As a result of these acts on Robinhood Markets' part, Plaintiffs were unable to trade in the Suspended Stocks during the relevant period. These allegations are more than sufficient to support a claim for intentional interference with contractual relations under California law.

Plaintiffs' allegations also satisfy the requirements of Florida law. Robinhood Markets again argues that Plaintiffs fail to plead that Robinhood Securities or Robinhood Financial breached their respective Customer Agreements. (Mot. 34.)  However, and again, Robinhood ignores Plaintiffs' allegations in the paragraph it cites, along with Plaintiffs' allegations in support of their breach of the implied covenant of good faith and fair dealing against Robinhood Securities and Robinhood Financial. (AC ¶¶ 326–33, 338) (including allegations that, through their actions and omissions, Robinhood Securities and Robinhood Financial "interfered with [Plaintiffs'] right to receive the benefits of the[ir] Customer Agreement[s], by engaging in the conduct alleged

[therein], including, without limitation, imposing [a] one-sided halt on trading on the Suspended Stocks," and "exercis[ing] the discretion reserved to them under the Customer Agreement[s]…unreasonably, unfairly, and in bad faith engaging in the conduct alleged [therein]"). The Court should thus disregard this argument.

### (ii) Robinhood Markets' Half-Hearted Assertion that Plaintiffs Do Not Plead it Acted Intentionally or Unjustifiably is Meritless

Robinhood Markets argues that Plaintiffs fail to plead that it engaged in any "intentional acts." (Mot. 32). But, again, Robinhood Markets cherry-picks allegations from the Amended Complaint. Robinhood Markets argues that Plaintiffs "concede" that Robinhood Securities decided to PCO the Suspended Stocks, which purportedly contradicts the allegation that Robinhood Markets "forc[ed] the Suspended Stocks into PCO." (*Compare* AC ¶ 28 and ¶ 338). *First*, any supposed "contradiction" in Plaintiffs' allegations stem from Robinhood's own inconsistent statements, through its CEO testifying that the PCO decision was "made by our Robinhood Securities President," yet later referring to the PCO as a joint decision by the three entities in its Form S-1. (*Compare* Tenev Testimony, at 58:43 and Form S-1, at 37). *Second*, Federal Rule of Civil Procedure 8(d)(2) expressly allows alternative statements and states, "[i]f a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." *Finally*, Plaintiffs plainly allege that "Robinhood Markets…implement[ed] a 'PCO,'…***through its subsidiaries***," and "[t]he PCO was jointly entered by the three Robinhood entities." (AC at ¶ 100).

Robinhood Markets' attempt to read a "specific intent" requirement into this tort under California law is also inappropriate—a fact the California Supreme Court noted in *Korea Supply Co. v. Lockheed Martin Corp.*, the case Robinhood Markets cites. 63 P.3d 937, 958–59 (Cal. 2003) (reversing lower court dismissal and concluding "a plaintiff need not plead that the defendant acted with the specific intent to interfere with the plaintiff's business expectancy," and plaintiff "pled that defendant acted with the required intent…knowledge that its actions were certain or substantially certain to interfere with plaintiff's business expectancy.").

Robinhood Markets' next argument—that Plaintiffs do not allege that it knew interference with Plaintiffs' contractual relationships with its subsidiaries was certain or substantially certain to occur—is also belied by the Amended Complaint (and common sense). Plaintiffs' allegations on this point include: (1) Robinhood received internal concerns on January 23, 2021, about whether there was "some other action [Robinhood] should consider that would provide protection

to [its] customers" (AC ¶ 195); (2) Robinhood Markets' CEO, Tenev, reviewed internal communications asking whether it should consider an "all-hands on deck kind of situation and shuffle some priorities to deal with increasing volumes," (*id.* ¶ 198); (3) internal acknowledgments that "the blowback from this is going to be exponentially worse as time goes on," and "worrie[s] about the long term effects [*sic*]" of these actions, (*id.* ¶ 205); and (4) Robinhood knew the morning of January 28, 2021, that many of its customers wanted to trade in their Robinhood accounts. (*Id.* ¶ 222). These allegations defeat Robinhood Markets' arguments for dismissal.[24]

Robinhood Markets' final argument—that Plaintiffs do not plead that Robinhood Markets' acts were "intentional and unjustified" under Florida law—similarly ignores the allegations. In addition to the allegations of Robinhood Markets' intentional conduct cited above, Plaintiffs also allege that Robinhood Markets' actions and omissions were unjustified. Robinhood Markets' CEO, Tenev, told Congress on February 18, 2021, that the decision to PCO the Suspended Stocks was made "due to 'increased clearinghouse-mandated deposit requirements," but went on to testify that "Robinhood met its revised deposit requirements a little after 9:00 a.m. EST on January 28, 2021"—***after*** imposing those restrictions on the Suspended Stocks. (AC ¶ 235); although Tenev claimed the decision to PCO the Suspended Stocks was due to "increased clearinghouse-mandated deposit requirements," Robinhood Securities had access to the necessary capital from Robinhood Markets itself. (*Id.* ¶¶ 214, 228–29, 234.)

These allegations notwithstanding, justified interference with a contract is an affirmative defense more appropriately addressed at a later stage. *See Fresh Results, LLC v. ASF Holland, B.V.*, No. 17-cv-60949, 2019 WL 4573257, at *10 (S.D. Fla. Sept. 20, 2019) ("The assertion of a privilege to interfere in an otherwise protected business relationship is an affirmative defense, and not suitable for disposition upon a motion to dismiss."); *see also Diamond Resorts Int'l, Inc. v. U.S. Consumer Attys., P.A.*, No. 18-80311-CIV-Rosenberg/Reinhart, 2019 WL 3412169, at *11 (S.D. Fla. May 14, 2019) ("[T]he 'privilege' defense is not dispositive at the motion to dismiss stage of the proceedings"). For all of these reasons, the Motion should be denied as to Count VI.

---

[24] Robinhood Markets does not argue that Plaintiffs fail to state an alternative claim for intentional interference with prospective economic advantage under California law (the California analog to tortious interference with business relationship claims under Florida law). As such, Robinhood Markets concedes Plaintiffs state this claim.

**E.      Plaintiffs Plead the Essential Elements of Civil Conspiracy (Count VII)**

Plaintiffs have pleaded the elements of civil conspiracy (Count VII), which are substantially the same under California and Florida law: (1) an agreement between two or more parties; (2) to perform an unlawful act; (3) the doing of some overt act in pursuance of the conspiracy, and (4) damage to plaintiff as a result of the acts done under the conspiracy. *See AREI II Cases*, 157 Cal. Rptr. 3d 368, 382 (Ct. App. 2013) (reversing order dismissing conspiracy claim); *Gilison v. Flagler Bank*, 303 So. 3d 999, 1004 (Fla. 4th DCA 2020) (same). Additionally, under Florida law, an independent tort of conspiracy is actionable when a plaintiff can show some peculiar power of coercion possessed by the conspirators by virtue of their combination, which power an individual could not possess. *Buckner v. Lower Fla. Keys Hospital Dist.,* 403 So.2d 1025, 1029 (Fla. 3d DCA 1981); *American Diversified Ins. Services, Inc. v. Union Fidelity Life Ins. Co.,* 439 So.2d 904, 906 (Fla. 2d DCA 1983). Plaintiffs' allegations suffice to show this coercive power.

Defendants first argue that Plaintiffs' civil conspiracy claim should be dismissed because Plaintiffs fail to adequately plead the "predicate tort claim." (Mot. 43). But, as discussed in discussed in Section III.D, *supra*, Plaintiffs allege sufficient facts to state the predicate claim for tortious interference against Robinhood Markets. *See Wyndham Vacation Ownership, Inc. v. Clapp Bus. Law, LLC*, 411 F. Supp. 3d 1310, 1320 (M.D. Fla. 2019) (denying motion to dismiss conspiracy claim where the complaint "goes into detail about the various stages of the scheme and how each group of Defendants partakes in their respective integral parts of the scheme").

Defendants next argue that because Robinhood Securities and Robinhood Financial cannot, as a matter of law, tortiously interfere with their own contract, they cannot be liable for conspiring to interfere with it. (Mot. 43). But a conspiracy claim is always asserted against non-perpetrators of the predicate tort. "The purpose of conspiracy allegations is to establish a conspirator's liability as a joint tortfeasor 'regardless of whether [the conspirator] was a direct participant in the wrongful act.'" *AREI II Cases*, 216 Cal. App. 4th at 1024 (quoting 5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 921, p. 336)). Thus, it is "not necessary" that the defendant "played an active role" in the tort. *Id.* "A conspirator only needs to know of the scheme and assist in it in some way to be held responsible for all the acts of his conspirators." *Gilison*, 303 So. 3d at 1004; *see also MP, LLC v. Sterling Holding, LLC*, 231 So. 3d 517 (Fla. 3d DCA 2017) (there is no requirement that each co-conspirator commit acts in furtherance of the scheme).

Yet, under California law and pursuant to a single case cited by Defendants, *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, a contracting party cannot be held liable in tort for conspiracy to interfere with its own contract. 7 Cal. 4th 503, 513 (1994). The reasoning set forth in *Applied* is not found in any Florida case.[25] While it is elementary that a conspiracy does not require each co-conspirator to commit an overt act such that each co-conspirator can still be held liable as though they committed them personally, the court in *Allied* found that each coconspirator must be "legally capable of committing the tort." *Id*. at 504–05. Since a claim for conspiracy to commit tortious interference with a contractual relationship necessarily involves a contract, a blanket prohibition on claims alleging a conspiracy *with* contracting parties would virtually eliminate the cause of action (even if the interference involves a third party to the contract, such as Robinhood Markets here, and unlike in *Allied*, where the conspiracy alleged was between contracting parties). Each of the conspirators need not be liable for the predicate tort to sustain an action for civil conspiracy. If that were the case, "there would be no need to include conspiracy allegations." *AREI II Cases*, 216 Cal. App. 4th at 1024.

F.      **Should the Court Disagree, Any Dismissal Should Be with Leave to Amend**

While Plaintiffs believe that their well-pleaded, detailed factual allegations are sufficient to survive dismissal, should the Court disagree, Plaintiffs seek an opportunity to amend. Robinhood argues that the discovery provided to date may render such amendment futile, (Mot. 36), but Defendants' production to date only highlights the appropriateness of allowing further discovery, given the extreme divergence between Robinhood's internal communications and its public statements. Under such circumstances, Rule 15's standard that "[t]he court should freely give leave when justice so requires" is amply satisfied. *Jennings v. BIC Corp.*, 181 F.3d 1250, 1258 (11th Cir. 1999); *Fla. Power & Light Co. v. Allis Chalmers Corp.*, 85 F.3d 1514, 1520 (11th Cir. 1996) ("unless substantial reason exists to deny leave to amend, the discretion of the district court is not broad enough to permit denial").

## CONCLUSION

For the foregoing reasons, the Court should deny Robinhood's Motion to Dismiss.

---

[25] In *Ethyl Corp. v. Balter*, 386 So. 2d 1220, 1224 (Fla. 3d DCA 1980), the court merely applied the uncontroversial rule that a tortious inference claim cannot be maintained against a contracting party. Plaintiffs have not run afoul of this rule, as only Robinhood Markets is named in the tortious interference claim.

Dated:  November 5, 2021

Respectfully submitted,

*/s/ Natalia M. Salas*
**THE FERRARO LAW FIRM, P.A.**
Natalia M. Salas (FBN 44895)
Angelica L. Novick (FBN 1050269)
James L. Ferraro (FBN 381659)
James Ferraro, Jr. (FBN 107494)
Bruce S. Rogow (FBN 067999)
Sean A. Burstyn (FBN 1028778)
Daniel J. DiMatteo (FBN 114914)
600 Brickell Avenue, Suite 3800
Miami, FL 33131
Tel: (305) 375-0111
nms@ferrarolaw.com
aln@ferrarolaw.com
jlf@ferrarolaw.com
jjr@ferrarolaw.com
bsr@ferrarolaw.com
sab@ferrarolaw.com
djd@ferrarolaw.com

***Plaintiffs' Lead Counsel for the
Robinhood Tranche***

*s/ Rachel Wagner Furst*
**GROSSMAN ROTH YAFFA COHEN,
P.A.**
Rachel W. Furst (FBN 45155)
2525 Ponce de Leon Blvd., Ste 1150
Coral Gables, FL 33134-6040
Tel: 305-442-8666
rwf@grossmanroth.com

***Plaintiffs' Liaison Counsel***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 5, 2021, I electronically filed the forgoing with the Clerk of the Court using CM/ECF. I also certify that the foregoing is being served this day on all counsel of record in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel who are not authorized to receive Notices of Electronic Filing.

By: */s/ Rachel Wagner Furst*
Rachel Wagner Furst