UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  21-2989-MDL-ALTONAGA/Torres

In re:

JANUARY 2021 SHORT SQUEEZE
TRADING LITIGATION
_____/

This Document Relates to the Antitrust Actions

## ORDER

**THIS CAUSE** came before the Court on Defendants'[1] Motion to Dismiss the Antitrust

Tranche Complaint [ECF No. 408].  Plaintiffs[2] filed a [Response] in Opposition [ECF No. 413],

to which Defendants filed a Reply [ECF No. 419].  The Court has carefully considered The

Corrected Consolidated Class Action Complaint (the "CCAC") [ECF No. 416], the parties' written

submissions, the record, and applicable law.  For the following reasons, the Motion is granted.

## I.     BACKGROUND

This putative class action is brought on behalf of individual investors (the "Retail

Investors") who suffered losses as a result of Defendants' response to a "short squeeze" — a

situation in which stocks or other assets rise sharply in value, distressing short positions.[3]  (*See id.*

---

[1] The Defendants are E*Trade Securities LLC; E*Trade Financial Holdings, LLC; Interactive Brokers LLC; Robinhood Markets, Inc.; Robinhood Financial LLC; Robinhood Securities, LLC; Citadel Securities LLC; Apex Clearing Corp.; Electronic Transaction Clearing, Inc.; and PEAK6 Investments LLC (collectively, "Defendants").  (*See* CCAC ¶¶ 51–75).

[2] The Plaintiffs are Angel Guzman, Burke Minahan, Christopher Miller, and Terell Sterling (collectively, "Plaintiffs").  (*See* CCAC ¶¶ 23–41).

[3] A "short" seller borrows a security believing the price of the security will decrease.  (*See* CCAC ¶ 8).  If the price of the security drops, the short seller buys the security back at a lower price and returns it to the lender.  (*See id.*).  Because the difference between the sell price and the buy price is the short seller's profit, the short seller loses money if the price of the security increases.  (*See id.*).

¶ 12).  This short squeeze occurred in late January 2021, as the Retail Investors rapidly purchased the Relevant Securities,[4] exposing those with short positions in the Relevant Securities to "massive potential losses[.]"  (*Id.* ¶ 7 (alteration added); *see id.* ¶ 6).  According to Plaintiffs, Defendants conspired to prevent these losses by "artificially constrict[ing] the price appreciation of the Relevant Securities," in violation of the Sherman Act, 15 U.S.C. § 1.  (CCAC ¶ 16 (alteration added); *see id.* ¶¶ 494–507).

### *The parties*.

**The Defendants**.  The CCAC categorizes Defendants into three[5] groups: the Clearing Defendants, the Brokerage Defendants, and the Market Maker Defendants.  (*See id.* ¶¶ 51–75).

---

[4] The "Relevant Securities" are certain stocks the Retail Investors believed would increase in price: GameStop (GME), AMC Entertainment (AMC), Bed Bath & Beyond (BBBY), BlackBerry (BB), Express (EXPR), Koss (KOSS), Nokia (NOK), Tootsie Roll Industries (TR), and Trivago NV (TRVG).  (*See* CCAC ¶ 6).

[5] In the CCAC, Plaintiffs allege there was a fourth group called the Introducing Brokerage Defendants (*see* CCAC ¶¶ 42–50), but they have since voluntarily dismissed those Defendants (*see* [ECF No. 380] (Stash Financial, Inc.); [ECF No. 396] (Open to the Public Investing, Inc.); [ECF No. 397] (Ally Financial Inc.); [ECF No. 398] (Alpaca Securities, LLC); [ECF No. 400] (Dough LLC); [ECF No. 401] (Tastyworks, Inc.); [ECF No. 402] (Webull Financial LLC); [ECF No. 404] (SoFi Securities LLC)).  The Court refers to this group as the "Introducing Brokerages."

The Introducing Brokerages provide financial trading services through an electronic trading platform.  (*See* CCAC ¶¶ 42–44, 46, 47, 49, 50).  During the relevant period, each Introducing Brokerage restricted and/or limited the ability of investors to purchase the Relevant Securities.  (*See id.*).

Because the Introducing Brokerages are only introducing brokerages — as opposed to self-clearing brokerages — they contract with an independent clearing firm to handle the execution and settlement of securities trade orders from clients or their own trading desks, rather than handle the process themselves.  (*See id.* ¶¶ 105, 111).  The independent clearing firm receives payments and maintains custody of the security.  (*See id.* ¶ 111).  At all relevant times, each Introducing Brokerage used a Clearing Defendant as its clearing firm.  (*See id.* ¶¶ 42–44, 46, 47, 49, 50).

*The Clearing Defendants*.   Defendants, Apex Clearing Corporation ("Apex") and Electronic Transaction Clearing, Inc. ("ETC"), are, collectively, the "Clearing Defendants[.]"[6] (*Id.* ¶¶ 66–75 (alteration added)).

The Clearing Defendants are independent clearing firms: they handle the back-office details of securities transactions for broker-dealers, such as the Introducing Brokerages.  (*See id.* ¶ 105).  Independent clearing firms are supervised by the Financial Industry Regulatory Authority ("FINRA") and the Depository Trust and Clearing Corporation ("DTCC").[7]  (*See id.* ¶¶ 96–97, 108, 110).  Apex and ETC acted as the clearing firms for one or more of the Introducing Brokerages.  (*See id.* ¶¶ 42–44, 46, 47, 49, 50).

*The Brokerage Defendants*.   Defendants, E*Trade;[8] Interactive Brokers LLC; and Robinhood,[9] are, collectively, the "Brokerage Defendants[.]"  (*Id.* ¶¶ 51–63 (alteration added)).

---

[6] Apex Clearing Holdings LLC and Defendant, PEAK6 Investments LLC, are the parent corporations of Defendants, Apex and ETC.  (*See* CCAC ¶¶ 67, 70).

[7] The DTCC is a holding company that owns and operates three clearing agencies registered with the U.S. Securities and Exchange Commission ("SEC"): the National Securities Clearing Corporation ("NSCC"), the Fixed Income Clearing Corporaton ("FICC"), and the Depository Trust Company ("DTC").  (*See* CCAC ¶ 96).  The NSCC is the central counterparty that clears cash transactions in the U.S. equities markets by netting securities deliveries and payments among NSCC's clearing members and guaranteeing the completion of trades, even if one party to the transaction defaults.  (*See id.* ¶ 98).  It takes two business days for the NSCC to transfer the security to the buyer and the cash to the seller.  (*See id.* ¶ 101).  If a clearing member defaults on its settlement obligations, the NSCC guarantees the delivery of cash and securities to its non-defaulting members.  (*See id.* ¶ 102).

In line with the CCAC and the parties' briefings, the Court refers to the DTCC and NSCC interchangeably.

[8] Defendant, E*Trade Financial Holdings, LLC (*see* CCAC ¶ 52), is the parent corporation of Defendant, E*Trade Securities LLC (*see* Mot. 22 n.9; Resp. 47).  The Court refers to these two Defendants collectively as "E*Trade[.]"  Doing so has no impact on the Court's analysis.

The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

[9] Defendants, Robinhood Markets, Inc.; Robinhood Financial LLC; and Robinhood Securities, LLC, are, collectively, "Robinhood[.]"  Robinhood Financial LLC and Robinhood Securities, LLC are wholly-owned subsidiaries of Robinhood Markets, Inc.  (*See* CCAC ¶¶ 58, 60).  Defendants dispute the inclusion of Robinhood as a self-clearing broker, arguing Robinhood Financial LLC is an introducing broker entity

The Brokerage Defendants act as self-clearing brokers: they act as both an introducing broker and as their own clearing firm.  (*See id.* ¶¶ 54, 56, 63, 113).  In other words, the Brokerage Defendants handle orders to buy and sell securities, as well as execute and settle orders, maintain custody of securities and other assets, and maintain the paperwork associated with clearing and executing a transaction.  (*See id.* ¶ 113).  Self-clearing brokers are subject to DTCC rules and regulations.  (*See id.* ¶ 116).

*The Market Maker Defendant*.[10]  Defendant, Citadel Securities LLC, is the only named "Market Maker Defendant[] [.]"  (*Id.* ¶¶ 64–65 (alterations added)).

Citadel Securities is a market maker: it acts as a market participant by providing bid prices and ask prices for securities; maintaining an inventory of securities from its own trading; and matching incoming buy and sell orders to fill those orders.  (*See id.* ¶ 118).  Relevant here, "if a market maker receives an order to buy a certain security, it may route that order to an exchange or it may execute the orders off-exchange in its capacity as a dealer by transacting against the buy orders with contra-side sell order, either from its own inventory or by selling the security short."  (*Id.* ¶ 124).  Citadel Securities took short positions in the Relevant Securities during the relevant period.  (*See id.* ¶ 65).

*Agents and co-conspirators*.  Defendants' alleged acts "were authorized, ordered or performed by the Defendants' respective officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction, or control of the Defendants' businesses or affairs."  (*Id.* ¶ 76).  The Defendant parent entities exercise dominance and control

---

separate from Robinhood Securities, LLC, the clearing entity.  (*See* Mot. 13, 14 n.2).  This distinction, however, has no impact on the Court's analysis.

[10] Although Plaintiffs refer to "Market Maker Defendants" (*see, e.g.*, CCAC ¶ 92), Plaintiffs name only one Market Maker Defendant (*see id.* ¶¶ 64–65).

over all their subsidiary entities; and the Defendant subsidiary entities have a unity of purpose and interest with their respective parents. (*See id.* ¶¶ 76–78). In addition, "[e]ach Defendant acted as the principal, agent, or joint venture of, or for other Defendants with respect to the acts, violations, and common course of conduct alleged[.]" (*Id.* ¶ 80 (alterations added)). Plaintiffs allege there may be various persons and/or firms that have participated as co-conspirators but are unknown at this time. (*See id.* ¶ 79).

    ***The Plaintiffs***. The named Plaintiffs are four individual investors who were subject to trading limitations imposed on the Relevant Securities between January 28, 2021 and February 4, 2021 (the "Class Period"). (*See id.* ¶¶ 23–41). Each Plaintiff held shares of one or more of the Relevant Securities at the close of the stock market on January 27, 2021. (*See id.* ¶¶ 23, 28, 33, 38). The next day, January 28, 2021, each Plaintiff was prohibited from purchasing the Relevant Securities on Robinhood's trading platform. (*See id.* ¶¶ 24, 29, 34, 39).

    That same day, Guzman and Miller applied for accounts with Charles Schwab, Fidelity, and TD Ameritrade — who were not prohibiting customers from purchasing the Relevant Securities — but were unable due to the amount of time required to set up the accounts. (*See id.* ¶¶ 25, 35). Minahan successfully applied for an account with Fidelity and was able to purchase a share of GameStop Corp. stock that day. (*See id.* ¶ 30). Each Plaintiff then sold his or her shares of the Relevant Securities on Robinhood between January 28, 2021 and February 4, 2021. (*See id.* ¶¶ 26–27, 31–32, 36–37, 40–41).

    <u>*Injury and proposed class*</u>. According to the named Plaintiffs:

> As a direct and intended result of Defendants [sic] contract, combination, agreement and restraint of trade or conspiracy, Defendants caused injury to Plaintiffs by restricting purchases of Relevant Securities. The Brokerage Defendants deactivated the buy option on their platforms and left Plaintiffs with no option but to sell shares of the stocks on their platforms. Plaintiffs and Class members, faced with an imminent decrease in the price of their positions in the

Relevant Securities due to the inability of Retail Investors to purchase shares, were induced to sell their shares in the Relevant Securities at a lower price than they otherwise would have, but for the conspiracy, combination, agreement and restraint of trade.

(*Id.* ¶ 501).

The named Plaintiffs seek to certify the following class:

All persons or entities in the United States that held shares of stock or call options in GameStop Corp. (GME), AMC Entertainment Holdings Inc. (AMC), Bed Bath & Beyond Inc. (BBBY), BlackBerry Ltd. (BB), Express, Inc. (EXPR), Koss Corporation (KOSS), Nokia Corp. (NOK), Tootsie Roll Industries, Inc. (TR), or Trivago N.V. (TRVG) as of the close of market on January 27, 2021, and sold the above-listed securities from January 28, 2021 up to and including February 4, 2021 (the "Class Period").

(*Id.* ¶ 81).

### *The alleged facts*.

***Mechanics of securities trading***.  Individual investors' market share of U.S. equity trading has steadily increased since 2019 and has recently accounted for a third of all U.S. stock market trading.  (*See id.* ¶¶ 130–31).  When individual investors make investments on their own behalf, they execute their personal trades through websites, apps, and trading platforms provided by brokerage firms or other investment service providers.  (*See id.* ¶ 2).  After an individual investor places a trade order with a brokerage firm, the brokerage sends the order to an independent clearing firm for clearing services if it is only an introducing broker, or the brokerage firm performs the clearing services itself if it is a self-clearing broker.  (*See id.* ¶¶ 105, 108, 111, 129).  The independent clearing firm or self-clearing broker then executes the trade order itself or sends the order to a market maker for execution.  (*See id.* ¶¶ 105, 113, 122).

Market makers are market participants who provide bid prices and ask prices and match incoming buy and sell orders to fill those orders.  (*See id.* ¶ 118).  Market makers fill these orders from their own inventory, by routing the order to an exchange, or by taking the other side of a

transaction (*e.g.*, selling a security short in response to receiving an order to buy the security).  (*See id.* ¶¶ 118, 123–24).  Once an order is filled, the market makers pocket the difference between the bid and ask prices, which is known as the "spread."  (*See id.* ¶ 118).  While the spreads may be small, they become significant due to the large volume of orders filled.  (*See id.*).

Although individual investors historically had to pay a fee or commission to their brokerages for executing personal trades, today most brokerages do not charge their investors a fee per transaction.  (*See id.* ¶ 3).  Instead, in exchange for routing the order to the market maker, brokerages earn revenue through rebates, kickbacks, and other payments — these payments are collectively known as payment for order flow.  (*See id.* ¶¶ 3, 133–35).  Clearing firms also generate a significant portion of their revenue from payment for order flow.  (*See id.* ¶ 107).

After an order is filled, the details of the executed order are sent to the NSCC for clearinghouse and settling services.  (*See id.* ¶¶ 101, 129).  Securities trades submitted to the NSCC take two days to settle — *i.e.*, it takes two business days for the cash and the securities to be electronically exchanged.  (*See id.* ¶ 101).  As stated, because there is a risk that a party to a securities transaction defaults before the trade is completed, the NSCC guarantees the delivery of cash and securities to its non-defaulting members.  (*See id.* ¶ 102).

The NSCC collects clearing fund contributions, or margin, from clearing members at the start of each day and intraday in volatile markets.  (*See id.* ¶ 103).  The margin protects the NSCC and all market participants against clearing member defaults, and margin requirements must be met by clearing members on a timely basis.  (*See id.*).  Margin requirements are based in part on market volatility and risk.  (*See id.* ¶ 470).  The rules for calculating the contribution requirements and the timing of collection of contributions are known to every clearing member; and the NSCC

provides reporting tools, calculators, and documentation to allow the members to monitor their risk in near real-time and estimate clearing fund contribution requirements.  (*See id.* ¶ 103).

***January 2021 market volatility***.  The Retail Investors exchange investment information via online discussion forums such as the WallStreetBets financial discussion forum on Reddit. (*See id.* ¶¶ 141, 180).  WallStreetBets is characterized by a particular culture centered around discussion of financial investments and memes; many of its users are sophisticated, financially savvy individual investors with business acumen.  (*See id.* ¶ 180).

Beginning in 2019, the Retail Investors, through these online discussion forums, developed the hypothesis that shares of GameStop's stock were trading at lower prices than they should have been based on GameStop's publicly available financial disclosures and prospects.  (*See id.* ¶ 141). The Retail Investors deduced that GameStop was undervalued for a variety of reasons, including because large financial institutions had taken substantial short positions in GameStop stock.  (*See id.* ¶ 142).  These substantial short positions would bear significant costs if the outlook on GameStop improved and the short positions had to be exited.  (*See id.*).  The Retail Investors saw similar investment opportunities in the other Relevant Securities.  (*See id.* ¶¶ 143–44).

Leading up to January 27, 2021, the Retail Investors, through stock brokerages, including the Brokerage Defendants, purchased long positions in the Relevant Securities with the expectation that the stocks would increase in value.  (*See id.* ¶¶ 6, 91, 148).  As more investors purchased the Relevant Securities and "out of the money" call options[11] in the Relevant Securities, the market prices for the stocks rose due to supply and demand.  (*See id.* ¶¶ 146, 162).  The Relevant Securities started appreciating to "unprecedented levels."  (*Id.* ¶ 14).

---

[11] A call option gives the holder the right to buy the asset at a stated fixed price or the "strike price."  (*See* CCAC ¶ 166).  An "out of the money" option has a strike price unfavorable in comparison to the market price for the underlying asset.  (*See id.* ¶ 169).

CASE NO. 21-2989-MDL-ALTONAGA/Torres

To illustrate this rapid growth, a share of GameStop stock was worth $3.00 in 2019 (*see id.* ¶ 142); $43.03 on January 21, 2021 (*see id.* ¶ 185); $76.79 on January 25, 2021 (*see id.*); $147.98 on January 26, 2021 (*see id.* ¶ 188); and $380.00 on January 27, 2021 (*see id.* ¶ 190). GameStop's stock price reached a closing high of $347.51 on January 27, 2021 — a 134.84% increase from the previous day.  (*See id.*).  Other Relevant Securities experienced similar surges; for example, AMC's and Express's share prices increased over 300% and 200%, respectively. (*See id.*).

As Retail Investors increased long positions in the Relevant Securities, those who held short positions in the Relevant Securities, such as Citadel Securities (*see id.* ¶¶ 7, 195–96), were caught in a short squeeze.  (*See id.* ¶¶ 162–63).  Investors with these short positions were faced with a rapid increase in the shorted assets' values, exposing short sellers to increased and theoretically limitless losses because the short sellers must at some point buy back the stocks to return them to their lenders.  (*See id.* ¶¶ 8, 12, 163).[12]

Around 5:00 p.m. on January 27, 2021, the SEC released a statement indicating it was "aware of and actively monitoring the on-going market volatility in the options and equities markets," but neither the SEC nor any other government agency issued any directive to restrict trading in the Relevant Securities.  (*Id.* ¶ 200 (quotation marks omitted)).

---

[12] Another phenomenon known as a "Gamma squeeze" occurred as the prices of the Relevant Securities increased.  (*See* CCAC ¶¶ 162, 164).  Options are priced based on a variety of risk variables, including one called "Gamma," which increases as the option nears its expiration date or as the option approaches its strike price (*i.e.* "being in the money").  (*See id.* ¶¶ 170, 172–74, 177).  When a security experiences a sharp price increase, the Gamma increases; stated differently, options that were previously unlikely to reach their strike prices before expiration become more likely to.  (*See id.* ¶ 176–78).  As the Gamma increases, market makers hedge by purchasing more of the underlying security, which further drives the price of the security higher and creates a feedback loop as even deeper out of the money options approach their strike price. (*See id.* ¶ 178).

*Events of January 28, 2021*.  Analytics reveal a significant volume of GameStop short position transactions during after-hours trading immediately before the markets opened on January 28, 2021.  (*See id.* ¶ 212).  Because retail brokers do not allow individual investors to engage in after-hours trading to the same extent as institutional investors, it is likely that this increase in short volume was the result of institutional investors, like Citadel Securities, taking new short positions.  (*See id.* ¶ 213).  Additionally, failure to delivers ("FTDs") rose dramatically in the period leading up to January 28, 2021, a phenomenon consistent with increasing short interest by market makers like Citadel Securities.[13]  (*See id.* ¶ 218).

This increase in short positions was counterintuitive, considering chatter in various financial discussion forums indicated high excitement and motivation on the part of Retail Investors to continue investing in the Relevant Securities.  (*See id.* ¶ 228).  Many Retail Investors had announced plans to increase long positions in the Relevant Securities on January 28, 2021.  (*See id.*).

Around 1:00 a.m. EST on January 28, 2021, Robinhood informed its users that in "light of unprecedented volatility surrounding [GameStop] and AMC [stock], and in an effort to help reduce risk, all [GameStop] and AMC options with expirations of January 29[], 2021 [would] be set to closing transactions only."  (*Id.* ¶ 229 (alterations added)).  Customers would be able to close out their positions in GameStop and AMC but could not make new investments.  (*See id.*).

At 5:11 a.m. EST, Robinhood received an email from the NSCC titled "NSCC Daily Margin Statement" indicating that Robinhood had a collateral requirement deficit of over $3 billion.  (*Id.* ¶ 231).  At 8:00 a.m. EST, Gretchen Howard, Robinhood's COO, messaged internally

---

[13] An FTD occurs when one party in a trading contract, such as in a short transaction, does not deliver on its obligations.  (*See* CCAC ¶ 214).  FTDs are indicative of naked short selling, which occurs when a short seller does not actually possess the security it is supposed to borrow.  (*See id.* ¶ 215).  This practice is largely inaccessible to individual investors but accessible to market makers.  (*See id.* ¶ 217).

that Robinhood had a "major liquidity issue" and it was moving the Relevant Securities to Position Close Only ("PCO"), *i.e.*, Robinhood users could sell the Relevant Securities but could not buy them. (*Id.* ¶ 233 (quotation marks omitted)). Shortly thereafter, in an internal Robinhood message, a manager asked David Dusseault, Robinhood Financial's President and COO, whether Robinhood made AMC and GameStop stocks PCO, to which Dusseault responded: "[Robinhood Securities] received a very large call — confidentially, all firms on street Jim is saying [sic] are doing [the] same thing[.]" (*Id.* ¶ 244 (alterations added; quotation marks omitted)).

Robinhood moved the Relevant Securities to PCO by the time the markets opened on January 28, 2021. (*See id.* ¶¶ 232–34). Robinhood users were no longer able to purchase the Relevant Securities — the "buy" button was deactivated as a feature, leaving users with no option but to sell or hold their securities. (*See id.* ¶¶ 235–36). On Robinhood's web platform and mobile app, users were blocked from searching for the Relevant Securities' ticker symbols. (*See id.* ¶ 239). Robinhood also canceled overnight purchase orders of the Relevant Securities placed on January 27, 2021 and queued to move forward when the markets opened on January 28, 2021. (*See id.* ¶ 237).

Customers were not given advance notice of the restriction of the Relevant Securities to PCO. (*See id.* ¶ 234). Robinhood announced the news on January 28, 2021 by tweeting that it was restricting the Relevant Securities to PCO due to market volatility. (*See id.* ¶¶ 248, 251–53).

The other Brokerage Defendants similarly prevented the Retail Investors from opening new positions in one or more of the Relevant Securities on January 28, 2021. (*See id.* ¶ 246). Around 9:05 a.m. on January 28, 2021, Interactive Brokers announced that it placed AMC, BB, EXPR, GME, and KOSS option trading into liquidation due to the "extraordinary volatility" in the

markets.  (*Id.* ¶ 249).  E*Trade halted GME and AMC, citing "extraordinary volumes" as the reason.  (*Id.* ¶ 250 (quotation marks omitted)).

While not all brokerages restricted the purchase of the Relevant Securities, the Introducing Brokerages restricted trading because the Clearing Defendants raised fees to purchase the Relevant Securities or otherwise instructed the brokerages not to consummate purchase orders.  (*See id.* ¶¶ 270–71, 273, 278).  For instance, Anthony Denier, Webull Financial's CEO, blamed Webull's clearing firm, Apex, for its restrictions on trading in the Relevant Securities placed on January 28, 2021.  (*See id.* ¶ 274).  Apex informed Denier that Webull needed to shut off the ability to open new positions in certain stocks after Apex learned that the DTCC was increasing the collateral needed to settle trades for the Relevant Securities.  (*See id.*).  Several other Introducing Brokerages also reported that Apex instructed them to halt all opening transactions of GameStop, AMC, and Koss on their platforms, while ETC prohibited Alpaca from allowing its users to purchase the Relevant Securities.  (*See id.* ¶¶ 275–77).  Apex cited increasing collateral requirements for the restrictions it imposed on trading, including through the Introducing Brokerages.  (*See id.* ¶ 479).

Altogether, numerous brokerages blocked the Retail Investors from purchasing the Relevant Securities.  (*See id.* ¶¶ 254, 269).  Some restricted the Retail Investors from buying or opening new long positions in securities altogether, whereas others restricted purchasing options only.  (*See id.* ¶ 269).

This broad prohibition on buying the Relevant Securities led to a massive sell-off, which in turn resulted in a steep decline in the prices of the Relevant Securities.  (*See id.* ¶ 255).  For example, on January 28, 2021, GameStop shares reached an intraday peak of $483.00 before dropping down to a closing price of $193.60 — a 44.29% drop from the closing price of $347.51 the day before.  (*See id.* ¶ 256).  Similarly, AMC shares dropped 56.63%, EXPR shares fell

50.79%, and BBBY shares declined 36.40%.  (*See id.*).  The Retail Investors who wanted to take advantage of the price drops to buy more shares of the Relevant Securities were unable to do so due to the prohibition on purchasing.  (*See id.*).

While individual investors were prohibited from purchasing the Relevant Securities, institutional investors were not.  (*See id.* ¶ 267).  Large investment firms were able to purchase the Relevant Securities at artificially reduced prices because they had access to private stock exchanges known as "dark pools."[14]  (*See id.*).  Citadel Securities and other firms with short positions bought the Relevant Securities at artificially reduced prices to close out their positions by returning the borrowed securities they had sold short.  (*See id.* ¶¶ 267–68).

*Events after January 28, 2021*.  As the market opened on January 29, 2021, nearly all the Brokerage Defendants had lifted their trading restrictions and permitted individual investors to open new long positions in the Relevant Securities; even so, the Brokerage Defendants continued to heavily restrict such purchases.  (*See id.* ¶¶ 319, 321).  Robinhood, for example, placed limitations on the number of new positions its users could open in the Relevant Securities, including by limiting purchases of GameStop stock to two shares.  (*See id.* ¶¶ 323–24).  The next day, January 30, as the Relevant Securities began to regain their value, Robinhood instituted a one share limit on certain Relevant Securities, including GME and AMC.  (*See id.* ¶ 325).  Robinhood maintained trading limitations on certain securities through February 4, 2021.  (*See id.* ¶ 336).  Restrictions like these continued to suppress the value of the Relevant Securities and pressured investors to sell these stocks.  (*See id.* ¶¶ 321, 325, 331).

---

[14] Private stock exchanges are known colloquially as "dark pools" or "dark exchanges" because they do not disseminate public quotations of securities prices.  (*See* CCAC ¶¶ 151–54).  Through these private exchanges, institutional investors can discreetly buy or sell securities in large blocks, mitigating some of the price impacts that their buying or selling activity would otherwise have on a "lit," or public, national securities exchange.  (*See id.* ¶ 154).

On January 31, 2021, Vlad Tenev, Robinhood's CEO, explained in an opinion piece published in USA TODAY that Robinhood maintained trading restrictions because clearinghouse-mandated deposit requirements were "increased ten-fold."  (*Id.* ¶ 338 (quotation marks omitted)).  Robinhood had announced two days earlier that it raised more than $1 billion to help meet rising demands for cash and shore up its balance sheet.  (*See id.* ¶ 336).  This money raised was on top of $500 million Robinhood accessed through credit lines to ensure it had the capital required to allow its clients to trade the Relevant Securities.  (*See id.*).  On February 1, 2021, Robinhood announced it raised an additional $2.4 billion in funding above the $1 billion it had already raised.  (*See id.*).  Weeks later, while testifying before the U.S. House Committee on Financial Services, Tenev testified that Robinhood met its revised deposit requirements a little after 9:00 a.m. on January 28, 2021.  (*See id.* ¶ 340).

Apex also initially cited increased collateral requirements as the reason for the restrictions it imposed on trading, including through other Brokerage Defendants.  (*See id.* ¶ 479).  Later, on February 9, 2021, Apex sent a letter to the New Jersey Office of the Attorney General, stating that it imposed the restrictions due "to the potential future collateral requirement that NSCC appeared it may impose on Apex[.]"  (*Id.* ¶ 480 (alteration added)).  Tricia Rothschild, Apex's president, explained in an interview with Financial Planning on March 4, 2021, that Apex had "headroom in terms of the capital available" and "lines of credit that" it could call on, but still restricted trading on January 28, 2021 "due to anomalous information."  (*Id.* ¶ 481 (quotation marks omitted); *see id.* ¶ 341).

In the period following January 28, 2021, the SEC continued to closely monitor the price volatility of the Relevant Securities.  (*See id.* ¶ 337).  On February 1, 2021, then acting SEC Chair Allison Herren Lee stated that the SEC would "closely review actions taken by regulated entities

CASE NO.  21-2989-MDL-ALTONAGA/Torres

that may disadvantage investors or otherwise unduly inhibit their ability to trade certain securities."
(*Id.* (quotation marks omitted)).  She also specified that the SEC was investigating the role that
short selling may have played in the recent events.  (*See id.*).

Publicly available data reveals short interests in the Relevant Securities generally climbed
leading up to January 28, 2021 (*see id.* ¶¶ 346–47, 361), and then decreased because of the trading
restrictions imposed during the Class Period, with the sharpest and most significant decreases
occurring after the restrictions imposed on January 28, 2021 (*see id.* ¶¶ 342–49).  FINRA data
shows significant increases in dark pool trading activity for each of the Relevant Securities on and
around January 28, 2021, during the period when restrictions were first placed on the Relevant
Securities.  (*See id.* ¶¶ 350–56).  Given that the Retail Investors are generally not able to trade in
dark pools and dark exchanges, this trading activity indicates high institutional investor trading
activity consistent with the exiting of short positions.  (*See id.* ¶ 357).

More specifically, given the scale of Citadel Securities' business, the FINRA data indicates
that the bulk of the trading activity can be attributed to Citadel Securities.  (*See id.* ¶¶ 358–61).
Because Citadel Securities accounts for about 50% of dark trading activity, a large shift in the
percentage of sales represented by short trades is likely to be caused by a shift in Citadel Securities'
position from long to short or vice versa.  (*See id.* ¶ 360).

***Collusion among Defendants***.  The CCAC alleges "Defendants were aware that they were
acting in concert to collude and manipulate the market."  (*Id.* ¶ 279).

<u>*Motive to collude*</u>.  According to the CCAC, "Defendants shared a common motive to
conspire — to prevent themselves, and their peers, from hemorrhaging losses totaling potentially
billions of dollars."  (*Id.* ¶ 406).

Citadel Securities possessed significant short positions in the Relevant Securities during the period in question.  (*See id.*).  As the prices of the Relevant Securities surged to unprecedented levels, Citadel Securities was exposed to potentially infinite losses.  (*See id.* ¶¶ 14, 406).  As of December 31, 2020, Citadel Securities reported $57.5 billion in "securities sold, not yet purchased, at fair value" — which the CCAC asserts are "likely representative of Citadel Securities's short position."  (*Id.* ¶ 407 (quotation marks omitted)).

Each of the Brokerage Defendants and Clearing Defendants earns revenue from payment for order flow sold to market makers.  (*See id.* ¶¶ 412, 416–18).  Robinhood, for example, earns somewhere between 60% and 70% of its revenue by selling its order flow — the primary purchaser of which is Citadel Securities.  (*See id.* ¶ 417).  As for the other Brokerage Defendants and the Clearing Defendants, Citadel Securities is either the largest or one of the largest payors for order flow.  (*See id.* ¶ 418).

*Communications among Defendants*.  In the lead up to, during, and after January 28, 2021, high-level executives of Citadel Securities were able to communicate with brokerages, including Robinhood, due to pre-existing relationships among them.  (*See id.* ¶ 296).

On January 20, 2021, Citadel Securities' Head of Execution Services extended an unknown proposition to Josh Drobnyk, Robinhood's Vice President of Corporate Relations and Communications, who conferred with Daniel Gallagher and Lucas Moskowitz, Robinhood's Chief Legal Officer and Deputy General Counsel, respectively.  (*See id.* ¶¶ 297–98).  The Citadel Securities executive and Drobnyk had a prior relationship through Drobnyk's employment at FINRA.  (*See id.* ¶ 297).  On January 25, 2021, Drobnyk responded via email "[w]e are on board" and that Moskowitz would be the central point of contact for Robinhood.  (*Id.* ¶ 300 (quotation marks omitted)).  The Citadel Securities executive responded to Moskowitz with an offer to chat,

emphasizing the "strong relationship between the firms[.]"  (*Id.* ¶ 302 (alteration added)).  The details of the ensuing January 26, 2021 phone call have not been disclosed.  (*See id.* ¶¶ 302–03).

On January 27, 2021, the day before the trading restrictions were implemented, Citadel Securities and Robinhood high-level employees exchanged several communications.  (*See id.* ¶ 304).  In an internal conversation around 4:40 p.m., Howard informed Tenev that she, along with Gallagher and Jim Swartwout, President and CEO of Robinhood Securities, would be joining "a call with Citadel" at 5:00 p.m. that day.  (*Id.* ¶ 307; *see id.* ¶ 305).  Howard indicated she believed Citadel Securities would make demands on limiting payment for order flow.  (*See id.* ¶¶ 305, 307).  Tenev responded that "[m]aybe this would be a good time for me to chat with Ken [G]riffin" and told Howard, "[y]ou guys can mention that[.]"  (*Id.* ¶ 307 (quotation marks omitted; alterations added)).  Tenev noted that he had never met Griffin, the CEO of Citadel Securities, before.  (*See id.*).

Shortly thereafter, around 6:25 p.m., Robinhood's Senior Director of Clearing Operations informed Swartwout in an internal chat that there is "[a]necdotal evidence that several 'very large' firms are having really bad nights too."  (*Id.* ¶ 308 (quotation marks omitted)).  Swartwout replied, "everyone is.  [Y]ou wouldnt [sic] believe the conv[ersation] we had with Citadel.  [T]otal mess[.]"  (*Id.* (alterations added)).  At 8:16 p.m., Swartwout updated a Citadel Securities employee that he was "[s]till looking for the new Citadel numbers."  (*Id.* ¶ 310 (alteration added)).  The Citadel Securities employee responded, "[f]irming up right now in light of the follow up conversation between Gallagher and [redacted.]"  (*Id.* (alterations added)).

At 8:29 p.m. that evening, the Citadel Securities Vice President of Business Development notified Swartwout that one of its executives, who Tenev had met before, was available to speak to Tenev that night.  (*See id.* ¶¶ 311, 313).  Swartwout replied, "[b]ecause of our partnership, Vlad

17

would like to have a discussion with Ken [Griffin] at some point, just given our relationship.  Not specific to this crazy issue[.]"  (*Id.* ¶ 313 (alterations added); *see id.* ¶ 312).  Swartwout emailed in the same chain later that night that he was "beyond disappointed in how this went down[,]" and that it is "difficult to have a partnership when these kind[s] of things go down this way."  (*Id.* ¶ 313 (alterations added)).

On the morning of January 28, 2021, Robinhood Securities executives participated in "a very large call — confidentially."  (*Id.* ¶ 244 (quotation marks omitted)).  Swartwout told Dusseault that "all firms on street . . . are doing [the] same thing[.]"  (*Id.* (alterations added)).  Later that day, employees of Citadel Securities communicated with high-level employees of E*Trade to ensure certain orders were cancelled.  (*See id.* ¶¶ 315–16).

Plaintiffs allege two specific communications among Defendants in the days following January 28, 2021.  (*See id.* ¶¶ 327–35).  First, on January 29, 2021, Apex notified Robinhood about a post on WallStreetBets indicating that the Retail Investors found a loophole allowing them to purchase shares of the Relevant Securities above Robinhood's imposed limitations.  (*See id.* ¶ 330).  This assistance came even though Apex had already lifted its restrictions and did not have an economic relationship with Robinhood at the time.  (*See id.* ¶¶ 457–58).

Second, on January 30, 2021, a Citadel Securities executive sent an email to Drobnyk, stating he "wanted to generally coordinate messaging[.]"  (*Id.* ¶ 335 (alteration added); *see id.* ¶ 333).  The Citadel Securities executive also introduced Drobnyk to someone who was "running point on this narrative for [them]" and copied company lawyers "as an FYI and for privilege."  (*Id.* ¶ 335 (alteration added); *see id.* ¶ 333).

*Actions against unilateral self-interest*.  The Brokerage Defendants and Clearing Defendants sell order flow.  (*See id.* ¶ 427).  Firms that sell order flow, like Robinhood, benefit

CASE NO.  21-2989-MDL-ALTONAGA/Torres

the more investors transact on their platforms.  (*See id.* ¶¶ 420, 423, 425).  Because these entities earn order flow revenue — which is generated by volume — restricting trading is an action against their unilateral self-interest.  (*See id.* ¶¶ 420, 426).

Likewise, Citadel Securities, who pays for order flow and earns revenue through spreads, benefits from a large volume of transactions.  (*See id.* ¶ 428).  If any entity that sells it order flow restricts trade, Citadel Securities will lose revenue from the reduced volume of orders and the number of spreads it can pocket.  (*See id.*).

In addition to lost order flow revenue, when Apex restricted trading in the Relevant Securities, it was unable to generate revenue from users purchasing the shares and from using those shares as stock loans to generate even further revenue.  (*See id.* ¶ 422).

*Opportunities to coordinate and collude*.  Along with the referenced communications between some of the Defendants, the CCAC states certain features of the financial services industry potentially afford Defendants opportunities to coordinate and collude.  (*See id.* ¶¶ 442–58).  The industry is close-knit and built on preexisting relationships; and it is replete with specialized jargon, terms of art, and specialized terminology, providing those in the industry a common language.  (*See id.* ¶ 445).  Further, individuals within the industry frequently move from one market participant to another or invest financial resources in other market participants.  (*See id.* ¶ 446).

*Evidence of concealment and pretext*.  Plaintiffs allege that many of the communications between certain Defendants were verbal or telephonic to avoid detection.  (*See id.* ¶ 460).

In addition, Plaintiffs claim that both Robinhood and Apex provided "changing and conflicting explanations for the trading restrictions."  (*Id.* ¶ 465; *see id.* ¶ 478).  On January 28, 2021, Robinhood explained that it restricted trading due to market volatility.  (*See id.* ¶ 466).

19

CASE NO.  21-2989-MDL-ALTONAGA/Torres

Tenev also told the media that the shutdowns were unrelated to Robinhood's liquidity and Robinhood did not have a liquidity problem.  (*See id.* ¶ 467).  Later, Robinhood blamed the trading restrictions on being unable to meet the deposit requirements imposed by clearinghouses.  (*See id.* ¶ 468).

More specifically, when Tenev testified before the House Financial Services Subcommittee, he explained that the trading restrictions were put in place to meet regulatory deposit requirements imposed by the DTCC affiliate, the NSCC.  (*See id.* ¶ 469).  Michael Bodson, the President of the DTCC, testified to the House Financial Services Subcommittee that the decision to restrict trading was internal to Robinhood and the DTCC and NSCC did not have discussions about restricting securities.  (*See id.* ¶ 472).  Further, Plaintiffs assert that Robinhood Securities would have at all times known how much collateral the DTCC may ask it to post to cover customer trades.  (*See id.* ¶¶ 470–71).

As for Apex's conflicting explanation, on January 28, 2021, Apex cited increasing collateral requirements for the restrictions it imposed on trading, including through the Introducing Brokerages.  (*See id.* ¶ 479).  On March 4, 2021, however, Rothschild stated that Apex restricted trading "due to anomalous information" and that "it was not a similar situation to Robinhood." (*Id.* ¶ 481 (quotation marks omitted)).

*Government Investigations*.  Several governmental entities have investigated the trading restrictions imposed on January 28, 2021.  (*See id.* ¶¶ 486–93).  The Congressional House Financial Services Committee issued subpoenas and held three highly publicized hearings regarding the restrictions, and the Senate Banking Committee also held hearings on the topic.  (*See id.* ¶¶ 487–88).  The fraud division of the Department of Justice and the San Francisco U.S. Attorney's office have also sought information about the restrictions from brokers and social media

companies.  (*See id.* ¶¶ 489, 492).  And according to GameStop's 10-Q report dated June 9, 2021,

the SEC is investigating the trading restrictions imposed on January 28, 2021.  (*See id.* ¶ 490).

Robinhood's Focus Report filed with the SEC on February 26, 2021 confirms many of

these investigations and reveals that Robinhood received inquiries related to the trading restrictions

from the U.S. Attorney's Office of the Northern District of California, the SEC's Division of

Examinations, FINRA, the New York Attorney General's Office, the offices of other states'

Attorneys General, and Congress.  (*See id.* ¶ 491).  On June 30, 2021, FINRA announced that

Robinhood was ordered to pay a record financial penalty of $70 million for "systemic supervisory

failures and significant harm suffered by millions of customers."  (*Id.* ¶ 493 (quotation marks

omitted)).

*Structure and characteristics of the market*.  According to the CCAC, the "structure and

characteristics of the market for securities, and in particular the lack of disclosure of short interest

positions at any given time, make it conducive to collusion and anticompetitive conduct."  (*Id.*

¶ 362).

*High barriers to entry*.  An entrant to the financial services industry seeking to become a

broker-dealer or a clearing firm would need specialized knowledge, several licenses, and

memberships, including memberships in organizations such as FINRA.  (*See id.* ¶ 365).  In

addition to licensure costs, compliance costs to adhere to industry and regulatory standards are

significant.  (*See id.*).  Entrants would also need significant amounts of cash or capital to deposit

at clearinghouses such as the DTCC as collateral.  (*See id.* ¶ 366).  And entrants would need to

have the necessary technological infrastructure and expertise to navigate the digital market.  (*See*

*id.* ¶ 367).

*High fixed costs and low variable costs*.  The markets for broker-dealers, clearing firms, and market makers are defined by high fixed costs and low variable costs.  (*See id.* ¶ 368).  These market participants benefit greatly from scale, particularly with regard to online broker-dealers and clearing firms.  (*See id.*).  Online broker-dealers, for example, require significant IT infrastructure, software, and data security infrastructure to develop and maintain the applications through which investors trade.  (*See id.* ¶ 369).  Clearing firms require similar infrastructures and software to facilitate the digital clearing and custodial services they provide to online broker-dealers.  (*See id.* ¶ 370).  Market makers — in particular, high frequency trading market makers — must invest significant effort and resources to increase the speed of trading technology to maximize their profits.  (*See id.* ¶¶ 371–72).

*Commoditization*.  The Relevant Securities are homogenous products: one share in a Relevant Security is identical to another share in that security and thus can be substituted for another.  (*See id.* ¶ 374).  Competition in trading the Relevant Securities is purely based on price, which is determined by current market conditions.  (*See id.*).  The determinant of price is the relative supply and demand in investors who want to buy or sell shares in the Relevant Security, and price at one point in time is identical globally.  (*See id.* ¶¶ 375–76).

*Captive market*.  In the short run, an investor in the securities market is generally locked into the broker-dealers it already invests with.  (*See id.* ¶ 379).  The process to open a trading account with a broker-dealer may take several days.  (*See id.* ¶ 380).  If coordinated trading restrictions occur in a short time window, investors do not have the opportunity to switch or change broker-dealers.  (*See id.* ¶ 381).  Even investors with multiple trading accounts may be without a short-term trading option if multiple broker-dealers restrict trading at the same time.  (*See id.* ¶ 385).

*Opaque market.*  While financial markets are generally regulated, important aspects of these are opaque.  (*See id.* ¶ 386).  Specifically, it is generally impossible to know who owns a short interest at any given time despite the prevailing regulatory regime.  (*See id.* ¶¶ 387, 399).  While an investor may voluntarily disclose its short positions, this does not occur often.  (*See id.* ¶¶ 388, 399).

To provide transparency to investors and the public, the SEC requires investment managers who have at least $100 million in assets under management to file a Form 13F up to 45 days after the end of every quarter.  (*See id.* ¶¶ 389, 394).  Disclosures in Form 13F filings, however, are limited: investors must only report long positions, put options, and call options, but not short positions; and 13F filings do not require the reporting of when a particular position was purchased, or in the case of put or call options, the strike price or expiry date.  (*See id.* ¶¶ 391, 394–95).

FINRA also requires member firms to report short interest positions in all equity securities twice a month, typically on the 15th and the last day of each month.  (*See id.* ¶ 396).  Even though FINRA publishes short interest reports publicly, it takes several days before the information is published — the number of shares sold short in the market may have changed dramatically in that time.  (*See id.* ¶ 397).

Although it is not possible to detect which specific investors are in large exposed short positions, the companies issuing securities can and sometimes do confirm if their stock has been significantly shorted or subject to a short squeeze.  (*See id.* ¶ 400).  For example, GameStop disclosed in its Form 10-K filed on March 23, 2021 that a large proportion of its stock had been sold short and that it experienced a short squeeze.  (*See id.* ¶ 401).

**<u>The CCAC and Defendants' Motion</u>**.  The CCAC alleges a violation of section 1 of the Sherman Act, 15 U.S.C. § 1, against all Defendants.  (*See* CCAC ¶¶ 494–507).  Plaintiffs'

overarching theory is that "Citadel Securities conspired with the Brokerage Defendants and the Clearing Defendants to prevent retail investors from purchasing shares of the Relevant Securities to artificially suppress share prices so that Citadel Securities could cover its short positions and mitigate its potential losses."  (Resp. 11).

Defendants move to dismiss the CCAC.  (*See generally* Mot.).  They argue: (1) Plaintiffs fail to sufficiently plead that Defendants agreed to conspire; (2) Plaintiffs fail to plead the remaining elements of a Sherman Act section 1 claim; and (3) Plaintiffs' antitrust theory is precluded by federal securities laws.  (*See generally* Mot.; Reply).

## II.    LEGAL STANDARD

"To survive a motion to dismiss [under Federal Rule of Civil Procedure 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration added; quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* (alteration added; quoting *Twombly*, 550 U.S. at 555). Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (citation omitted).  "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss."  *Iqbal*, 556 U.S. at 679 (alteration added; citing *Twombly*, 550 U.S. at 556).

To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (alteration added; citing *Twombly*, 550 U.S. at 556).  "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss."  *Sinaltrainal v. Coca-Cola Co.*,

578 F.3d 1252, 1261 (11th Cir. 2009) (citation omitted), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012).  When considering a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take the factual allegations as true.  *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (citing *SEC v. ESM Grp., Inc.*, 835 F.2d 270, 272 (11th Cir. 1988)).

## III.    ANALYSIS

As stated, Plaintiffs assert one claim under section 1 of the Sherman Act, 15 U.S.C. § 1. (*See* CCAC ¶¶ 494–507).

Section 1 of the Sherman Act provides "[e]very contract, combination . . . , or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1 (alterations added).  "Despite the different terminology, there is no magic unique to each term in [section] 1; the terms 'contract,' 'combination,' and 'conspiracy' are used interchangeably to capture the concept of concerted action, that is an 'agreement.'"  *Am. Contractors Supply, LLC v. HD Supply Constr. Supply, Ltd.*, 989 F.3d 1224, 1233 (11th Cir. 2021) (alteration added; some quotation marks and citation omitted).

"The purpose of the Sherman Act is to protect consumers from injury that results from diminished competition."  *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 334–35 (7th Cir. 2012) (citation omitted).  "[T]he Supreme Court has long concluded that Congress intended only to prohibit 'unreasonable' restraints on trade."  *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1260 (11th Cir. 2019) (alteration added; citation omitted).  Thus, section 1 "prohibits (1) conspiracies that (2) unreasonably (3) restrain interstate or foreign trade."  *Id.* (citation omitted).

In their Motion, Defendants start by attacking the sufficiency of the allegations directed at

CASE NO.  21-2989-MDL-ALTONAGA/Torres

the first requirement — that Plaintiffs plead a conspiracy among Defendants.  (*See* Mot. 22–35).

Defendants next dispute whether Plaintiffs adequately plead that the alleged agreement among

Defendants unreasonably restrained trade.  (*See id.* 35–40).  Lastly, Defendants assert that

Plaintiffs' antitrust theory is precluded by federal securities laws.  (*See id.* 41–46).  Because

Plaintiffs fail to plead a conspiracy, the Court declines to reach the second and third suggested

grounds for dismissal.

> ***Conspiracy***.  "The first inquiry[] in any section 1 claim . . . is to locate the agreement that
restrains trade."  *Tidmore Oil Co., Inc. v. BP Oil Co./Gulp Prods. Div., a Div. of BP Oil Co.*, 932
F.2d 1384, 1388 (11th Cir. 1994) (alterations added).  Adequately stating a section 1 claim
"requires a complaint with enough factual matter (taken as true) to suggest that an agreement was
made."  *Twombly*, 550 U.S. at 556.  The "crucial question" with regard to a conspiracy claim under
section 1 "is whether the challenged anticompetitive conduct stems from independent decision or
from an agreement, tacit or express[.]"  *Id.* at 553 (alteration added; other alteration adopted;
quotation marks and citation omitted).  To allege an antitrust conspiracy, the plaintiff "should
present direct or circumstantial evidence that reasonably tends to prove that the [defendant] and
others had a conscious commitment to a common scheme designed to achieve an unlawful
objective."  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (alteration added;
quotation marks and citations omitted).

Plaintiffs contend they have plausibly alleged facts, both direct and circumstantial, that
"Citadel Securities conspired with the Brokerage Defendants and the Clearing Defendants to
prevent retail investors from purchasing shares of the Relevant Securities to artificially suppress
share prices so that Citadel Securities could cover its short positions and mitigate its potential
losses."  (Resp. 11; *see id.* 12–29).  The Court examines these allegations that purport to support

CASE NO.  21-2989-MDL-ALTONAGA/Torres

the existence of a conspiracy directly or circumstantially.

     ***Allegations of direct evidence of an agreement***.  "[I]t is only in rare cases that a plaintiff can establish the existence of a conspiracy by showing an explicit agreement; most conspiracies are inferred from the behavior of the alleged conspirators."  *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1573–74 (11th Cir. 1991) (alteration added; citation omitted).  According to Plaintiffs, "[t]his is one of those rare cases" that involves "direct evidence of [an] unlawful agreement."  (Resp. 14 (alterations added)).  The Court disagrees.

     "Direct evidence of an agreement is explicit and requires no inferences to establish the proposition or conclusion being asserted."  *In re Loc. TV Advert. Antitrust Litig.*, No. 18 C 6785, 2020 WL 6557665, at *7 (N.D. Ill. Nov. 6, 2020) (quotation marks and citations omitted); *see also Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) ("[A] plaintiff may . . . assert direct evidence that the defendants entered into an agreement in violation of the antitrust laws. . . .  Such evidence would consist, for example, of a recorded phone call in which two competitors agreed to fix prices at a certain level." (alterations added; citation omitted)).  The CCAC contains several allegations that Plaintiffs claim constitute direct evidence.  Upon further examination, each allegation requires an inference to establish that an unlawful agreement was entered into between Defendants and therefore cannot be direct evidence.

     To begin, Plaintiffs allege that "high-level executives of Citadel Securities regularly communicated with and coordinated with high-level executives of Robinhood and others in the lead up to, during and after the restrictions imposed on or around January 28, 2021."  (CCAC ¶ 296; *see also* Resp. 14).  Yet, by Plaintiffs' own admission, "[t]he written communications appear deliberately vague and do not describe the contents of what was agreed to in the communications."  (Resp. 14 n.6 (alteration added)).  Indeed, the alleged communications between

Citadel Securities and Robinhood merely show that high-level executives at both firms agreed to "chat" and "work[] together."  (CCAC ¶¶ 299, 302 (alteration added); *see id.* ¶¶ 297–307, 452–53).  The CCAC does not detail any subsequent discussions because "these communications have not been disclosed[.]"  (*Id.* ¶ 303 (alteration added)).  These unknown discussions have no relevance at all unless one *infers* that Citadel Securities requested that Robinhood restrict trading in the Relevant Securities and Robinhood agreed.[15]

Similarly, Plaintiffs claim that "on January 28, 2021, high level employees of [] E*Trade communicated with employees of Citadel Securities to ensure certain orders were cancelled." (CCAC ¶ 315 (alteration added); *see also* Resp. 14).  As support, the CCAC contains a screenshot of a January 28, 2021 email between the Senior Manager for Trading Operations for E*Trade and a Citadel Securities employee titled, "RE: Potential open orders[.]"  (CCAC ¶ 316 (alteration added)).  The E*Trade executive lists a number of securities and asks: "[c]an you confirm you're out on these?"  (*Id.* (alteration added)).  The Citadel Securities employee responds, "[c]anceled[.]" (*Id.* (alterations added)).

As described by Defendants, this appears to be "no more than a routine daily trading account reconciliation email canceling ten trade orders, and Plaintiffs fail to allege that the email even pertains to the Relevant Securities."  (Reply 9).  To conclude this email evidences an unlawful agreement to restrain trade requires an exercise in incredible leaping logic in which the Court declines to engage.

---

[15] Plaintiffs find no support in *In re Insurance Brokerage Antitrust Litigation*, 618 F.3d 300, 324 n.23 (3d Cir. 2010).  (*See* Resp. 14).  There, the court explained that direct conspiracy includes "document[s] or conversation[s] explicitly manifesting the existence of the agreement in question[.]"  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 324 n.23 (alterations added; citations omitted).  As Plaintiffs concede, the alleged conversations between Citadel Securities and Robinhood were "vague and do not describe the contents of what was agreed to in the communications" — in other words, the opposite of explicit.  (Resp. 14 n.6).

Plaintiffs also assert that Apex "instructed" several Introducing Brokerages "to halt all opening transactions of GameStop, AMC and Koss on their platforms" (CCAC ¶ 276; *see id.* ¶¶ 274–75), which purportedly is direct evidence of an unlawful agreement to restrain trade (*see* Resp. 14).  The only specific details provided in the CCAC about these instructions are: (1) the CEO of Webull explained that the brokerage restricted trading in the Relevant Securities on January 28, 2021 because "the collateral required by Apex for GameStop increased by 100% and Apex had informed him that Webull needed to shut off the ability to open new positions in certain stocks[,]" and "Apex was instructed by the DTCC that it was increasing the collateral needed to settle trades for the Relevant Securities" (CCAC ¶ 274 (alteration added)); (2) SoFi informed users that its clearing partner, Apex, "ha[d] prevented purchases in GME" (*id.* ¶ 275 (alteration added)); (3) Dough LLC tweeted, "our clearing has notified us that we must set GME, AMC, and KOSS to closing only.  We will comply." (*id.* ¶ 276 (alteration adopted; quotation marks omitted)); and (4) Public.com tweeted, "our clearing firm, Apex Holdings, has decided to halt the buying of $KOSS, $GME, and $AMC" (*id.* (alteration adopted; quotation marks omitted)).

According to Plaintiffs, these Introducing Brokerages' statements show an explicit agreement between Apex and the Introducing Brokerages to *unlawfully* restrain trade; curiously an alternative explanation for the trading restrictions is provided by the CEO of Webull himself and appears in the pleading's factual allegations — "the DTCC . . . was increasing the collateral needed to settle trades for the Relevant Securities."  (*Id.* ¶ 274 (alteration added)).  The CCAC provides further support for this alternative explanation: "on February 9, 2021, in its letter to the New Jersey Office of the Attorney General, Apex stated" that "[t]he reason for the temporary trading restrictions [it] imposed regarding purchases of AMC, GME and KOSS relates directly to the potential future collateral requirement that NSCC appeared it may impose on Apex as part of

the margin system NSCC maintains to comply with the SEC's standards for covered clearing agencies." (*Id.* ¶ 480 (alterations added)).  This explanation makes sense because NSCC clearing members can "monitor their risk in near real-time and estimate clearing fund contribution requirements." (*Id.* ¶ 103).  Plaintiffs thus ask the Court to *infer* that the publicly stated explanations recited in the CCAC are untrue.

It is important to remember that Plaintiffs' conspiracy theory is that Citadel Securities influenced the Clearing Defendants and Brokerage Defendants to restrain trading in the Relevant Securities to protect itself from a short squeeze.  Therefore, if the Introducing Brokerages' statements are to have any relevance to the alleged conspiracy at all, one must also *infer* that the true reason Apex instructed the Introducing Brokerages to restrict trading was to benefit Apex's business partner, Citadel Securities.  These statements clearly cannot constitute direct evidence of an unlawful agreement given the chain of inferences that must be made for them to have relevance.

Plaintiffs proffer several other pieces of purported "direct evidence that Defendants acted in concert": "an internal Robinhood communication . . . discussing that others were doing the same"; "Robinhood['s] deci[sion] to impose purchasing restrictions on the Relevant Securities shortly after the NSCC margin call"; Defendants' "homogenous public statements to explain the events"; and Apex's warning to Robinhood "of efforts by investors to purchase the Restricted Securities even though Apex had no business relationship with Robinhood." (Resp. 14–15 (alterations added; footnote call numbers omitted)).  Yet, by Plaintiffs' own admission, these allegations — at the most — "*demonstrate*[] that the coordinated trading restrictions imposed by Defendants were not the result of happenstance or independent decision-making[.]" (*Id.* 15 (emphasis and alterations added; footnote call number omitted)).  Put differently, one can only *infer* an unlawful agreement was entered into based on these alleged facts.

CASE NO.  21-2989-MDL-ALTONAGA/Torres

Taken together, Plaintiffs fall far short of providing allegations "explicitly manifesting the existence of the agreement in question[.]"  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 324 n.23 (alteration added; citations omitted).  Certainly, "the complaint leaves no doubt that [P]laintiffs rest their [section] 1 claim on descriptions of parallel conduct and not on any independent allegation of actual agreement among [Defendants]."  *Twombly*, 550 U.S. at 564 (alterations added).  "Although in form a few stray statements speak directly of agreement, on fair reading these are merely legal conclusions resting on the prior allegations. . . .  The nub of the complaint, then, is [Defendants'] parallel behavior, . . . and its sufficiency turns on the suggestions raised by this conduct when viewed in light of common economic experience."  *Id.* at 564–65 (alterations added; footnote call numbers omitted).

***Allegations of circumstantial evidence of an agreement***.  As an alternative to alleging direct evidence, a plaintiff "may present circumstantial facts supporting the inference that a conspiracy existed."  *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 465 (2d Cir. 2019) (quotation marks and citation omitted).  A conspiracy "may be inferred on the basis of conscious parallelism,[16] when such interdependent conduct is accompanied by circumstantial evidence and plus factors such as defendants' use of facilitating practices."  *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (alteration added; citations omitted).  In other words, "[a]llegations of parallel conduct . . . are insufficient standing alone to raise an inference of conspiracy[;]" rather, "a plaintiff must allege sufficient plus factors to make the parallel conduct more probative of conspiracy than of conscious parallelism."  *Auto. Alignment & Body Serv., Inc. v. State Farm Mut.*

---

[16] Conscious parallelism is a "process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions."  *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993) (citation omitted).

*Auto. Ins. Co.*, 953 F.3d 707, 726 (11th Cir. 2020) (alterations added; quotation marks and citations omitted).  Such plus factors "may include: a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Citigroup, Inc.*, 709 F.3d at 136 (quotation marks, citation, and footnote call number omitted); *see also In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1360 (N.D. Ga. 2010) (explaining circumstantial evidence can include "speeches at industry conferences, announcements of future prices, statements on earnings calls, and in other public ways" (collecting cases)).

      *Parallel conduct*.  "A plaintiff establishes parallel conduct when it pleads facts indicating that the defendants acted similarly." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 427 (4th Cir. 2015) (quotation marks and citations omitted).  "Parallel conduct occurs when competitors act similarly or follow the same course of action — for example, adopting similar policies at or around the same time in response to similar market conditions." *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 915 (N.D. Cal. 2019) (citations omitted).  Examples of parallel conduct allegations that suffice under the *Twombly* standard include "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties[;]" and "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason[.]"  *Twombly*, 550 U.S. at 556 n.4 (alterations added; quotation marks and citations omitted).

      Defendants argue the allegedly parallel conduct was not, in fact, parallel because it "varied in material ways, both before and after the NSCC's collateral calls on January 28, 2021."  (Mot. 26).  Indeed, "each Defendant put in place restrictions for different stock symbols, for different

durations and for varying types of trades."  (Reply 11 (footnote call number omitted)).  On January 28, 2021, Robinhood set to position-closing only AMC, BB, BBBY, EXPR, GME, KOSS, NOK, TR, and TRVG (*see* CCAC ¶ 252); E*Trade "halted GME and AMC" (*id.* ¶ 250); Interactive Brokers "put AMC, BB, EXPR, GME, and KOSS option trading into liquidation only" (*id.* ¶ 249); and Apex instructed the Introducing Brokerages to "halt all opening transactions of GameStop, AMC and Koss on their platforms" (*id.* ¶ 276).  As for ETC, the only allegation regarding its conduct is the general assertion that it "prohibited Alpaca from allowing its users to purchase the Relevant Securities."  (*Id.* ¶ 277).

The restrictions among Defendants also varied in duration.  For example, Apex lifted restrictions on trading by January 29, 2021 (*see id.* ¶ 327), while Robinhood maintained trading limitations on certain securities through February 4, 2021 (*see id.* ¶ 336).  And one firm — Citadel Securities — did not impose any trading restrictions at all.  (*See generally* CCAC; *see* Mot. 27).

While the Court disagrees with Plaintiffs' characterization of these restrictions as "virtually identical" (Resp. 17), Plaintiffs have at least alleged Defendants acted "similarly."  *SD3, LLC*, 801 F.3d at 427 (quotation marks omitted; quoting *Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co., Inc.*, 998 F.2d 1224, 1243 (3d Cir. 1993); other citation omitted).  The key parallel conduct allegation here is that on January 28, 2021 the Brokerage Defendants and the Clearing Defendants each restricted trading in one or more of the Relevant Securities.  (*See, e.g.*, CCAC ¶¶ 14–15).  As a result, the prices of the Relevant Securities decreased.  (*See id.* ¶ 331).  That the Brokerage Defendants and the Clearing Defendants did not restrict trading in the exact same manner or stock is not fatal to Plaintiffs' allegations of parallelism.  *See Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 191 (2d Cir. 2012) (disagreeing with the district court's holding that the plaintiff's "conspiracy claim was implausible because [the] defendants had a variety of reactions" and instead

CASE NO. 21-2989-MDL-ALTONAGA/Torres

finding that "the *key* parallel conduct allegation was that all of the publisher and distributor defendants ceased doing business with [the plaintiff]" (alterations added; quotation marks, emphasis, and citation omitted));[17] *Jones*, 400 F. Supp. 3d at 916 ("That these adjustments are not alleged to have occurred simultaneously is immaterial, and the available case law does not suggest any firm temporal limitation on 'parallel.'" (citing *Interstate Cir. v. United States*, 306 U.S. 208, 227 (1939))).

Further, the fact that Citadel Securities did not itself restrict trading is inconsequential. Plaintiffs allege the Brokerage Defendants and the Clearing Defendants restricted trading to benefit Citadel Securities, who executed short trades in the Relevant Securities on January 27, 2021, "in anticipation of the Relevant Securities declining in price on January 28, 2021." (CCAC ¶ 13). Plaintiffs contend they have pleaded a "hub-and-spoke conspiracy" wherein Citadel Securities "coordinate[d] [] horizontal agreement[s] to restrict markets or to fix prices." (Resp. 34 (alterations added; citations omitted)). In these scenarios, it is obvious that the "hub" would not necessarily take the same action as the "spoke."

In all, Plaintiffs adequately allege that Defendants engaged in parallel conduct.[18] But because Plaintiffs' parallel conduct allegations are "insufficient standing alone to raise an inference of conspiracy[,]" the Court turns to whether Plaintiffs "allege sufficient plus factors to make the parallel conduct more probative of conspiracy than of conscious parallelism." *Auto.*

---

[17] Defendants' reliance on *Anderson News, L.L.C. v. American Media, Inc.*, 899 F.3d 87 (2d Cir. 2018), is inapt. (*See* Mot. 28). There, after initially finding at the motion-to-dismiss stage that the varied responses by the defendants were inconsequential to a finding of parallel conduct, *see Anderson News, L.L.C.*, 680 F.3d at 191, the Second Circuit held at the summary judgment stage that the defendants' conduct "was not, in fact, parallel" because "*evidence presented at summary judgment* undercut[] th[e] allegation" of parallel conduct. *Anderson News, L.L.C.*, 899 F.3d at 105 (alterations and emphasis added).

[18] While the varied restrictions do not preclude a finding of parallel conduct at this stage, they do influence the Court's plausibility analysis.

34

*Alignment & Body Serv.*, 953 F.3d at 726 (alteration added; quotation marks and citations omitted).

    *Plus Factors*.  "[A]ny showing by [plaintiffs] that tends to exclude the possibility of independent action can qualify as a plus factor."  *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287, 1301 (11th Cir. 2003) (alterations added; other alteration adopted; quotation marks and citation omitted); *see also In re Delta/AirTran Baggage Fee Antitrust Litig.*, 245 F. Supp. 3d 1343, 1371 (N.D. Ga. 2017) ("There is no finite list of potential plus factors.").  The Court examines below each of the plus factors identified by Plaintiffs.  (*See* Resp. 18–29).

    *Common motive to conspire*.  The CCAC details an intricate plot in which Citadel Securities purchased short positions in the Relevant Securities — even as the Retail Investors' trading activity increased the price of the Relevant Securities to extreme, historic levels — and then "leverage[d] its relationships" with the other Defendants "to halt trading of GameStop and other Relevant Securities and artificially depress their share price[s]."  (CCAC ¶ 409 (alterations added)).

    As an initial matter, Defendants argue any allegation that Citadel Securities held short positions in the Relevant Securities during the relevant time period is based on "[p]ure speculation[.]"  (Mot. 28 (alterations added; quotation marks omitted; citing *United Am. Corp. v. Bitmain, Inc.*, No. 18-cv-25106, 2021 WL 1807782, at *13 (S.D. Fla. Mar. 31, 2021) ("Pure speculation does not make out a plus factor.")))  Notably, the CCAC admits "it is not possible to ascertain which investor has a short position in a particular security at any particular time unless the position is voluntarily publicly disclosed by the holder of the short position."  (CCAC ¶ 399; *see also id.* ¶ 387).  Plaintiffs instead rely on publicly available data.

    As detailed in the CCAC, "FINRA data shows notable and significant increases in dark pool trading activity for each of the Relevant Securities on and around January 28, 2021" (*id.*

¶ 353), and short volume reporting shows a significant shift from shares sold long to shares sold short during that time (*see id.* ¶ 361).  Given that individual investors generally cannot engage in dark trading (*see id.* ¶ 357), and "Citadel Securities represents about 50% of the dark trading activity [during that time], a large shift in the percentage of sales represented by short trades is highly likely to be caused by a shift in Citadel Securities's position from long to short or vice versa" (*id.* ¶ 360 (alteration added)).  Plaintiffs' methodology is appropriate given the circumstances.  *See In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1002 n.10 (N.D. Ill. 2011) ("If private plaintiffs, who do not have access to inside information, are to pursue violations of the law, the pleading standard must take into account the fact that a complaint will ordinarily be limited to allegations pieced together from publicly available data.").  That Citadel Securities held short interests in the Relevant Securities is a reasonable inference to be drawn in Plaintiffs' favor.  *See Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1069 n.1 (11th Cir. 2004).

Plaintiffs' theory regarding the Brokerage Defendants and Clearing Defendants' motive is more attenuated.  According to the CCAC, the Brokerage Defendants and Clearing Defendants agreed to halt trading to benefit Citadel Securities because Citadel Securities "is either the largest or one of the largest payors for order flow for most of them."  (CCAC ¶ 418).  To illustrate, in 2020, "34% of Robinhood's revenue derived from transactions with Citadel Securities" (*id.* ¶ 135); and "Apex sent 23.26% of all 'non-directed' order flow to Citadel Securities in S&P 500 stocks and 13.26% of all 'non-directed' order flow for non-S&P500 stocks to Citadel Securities in January 2021" (*id.* ¶ 140).  Plaintiffs conclude that "[t]he preservation of [the] Brokerage and Clearing Defendants' mutually beneficial and highly lucrative payment for order flow relationships alone provides sufficient motive to conspire."  (Resp. 20 (alterations added)).

36

In essence, Plaintiffs ask the Court to infer the Brokerage Defendants and Clearing Defendants had a common motive to illegally restrain trade simply because Citadel Securities is an important business partner of the other Defendants and might have suffered losses as a result of its short positions in the Relevant Securities.  Yet, as discussed below, Plaintiffs also maintain that "restrict[ing] trading in the Relevant Securities is against the Brokerage and Clearing Defendants' self-interest" because they earn revenue from each transaction and because the trading restrictions create a risk of "both immediate and long-term reputational harm[.]"  (Resp. 20, 22 (alterations added; quotation marks omitted)).  As Defendants note, there are no allegations that Citadel Securities threatened or suggested it would cut off business relationships with any other Defendants if they did not impose trading restrictions, and Plaintiffs fail to otherwise explain why each Defendant would not simply use another market maker in such a scenario.  (*See* Reply 13).  The mere fact that Citadel Securities is an important business partner of the other Defendants does not provide sufficient motive to conspire.

Plaintiffs' proffered motive theory is even less plausible given that the CCAC provides an "obvious alternative explanation" for imposing the trading restrictions provided in the CCAC: increased collateral requirements caused by market volatility.  *Iqbal*, 556 U.S. at 682 (quotation marks omitted; quoting *Twombly*, 550 U.S. at 567).  As clearing entities, each of the Brokerage Defendants and Clearing Defendants is a member of the DTCC and therefore subject to its collateral requirements.  (*See* CCAC ¶¶ 110, 116).  "The DTCC collateral requirement changes depending on the perceived risk of the order, since if one side of the trade defaults, and the broker cannot cover the loss, DTCC member firms are on the hook for completing the trade." (*Id.* ¶ 413).

As stated in the CCAC, the markets for the Relevant Securities were extremely volatile in

the days leading up to January 28, 2021.  (*See id.* ¶¶ 200–209).  "On the morning of January 28, [the] DTCC demanded that its member clearing agents supply additional collateral to support these trades [in the Relevant Securities]."  (*Id.*¶ 414 (alterations added)).  For example, "[a]t 5:11 a.m. Eastern Standard Time, Robinhood received an email from NSCC indicating that Robinhood had a deficit of roughly $3 billion dollars."  (*Id.* ¶ 231 (alteration added)).

Robinhood and multiple other Defendants cited the extraordinary market volatility and/or collateral requirements as the motivation for their trading restrictions.  (*See, e.g.*, *id.* ¶¶ 249–51, 274, 338–40, 479–80).  The fact that each Defendant implemented varying trading restrictions gives support to their stated reasons because each Defendant would have its own unique risk tolerance and collateral requirements.  And considering the CCAC itself states that firms *not alleged to be part of the conspiracy* also restricted transactions in the Relevant Securities and similarly cited "unprecedented market conditions[,]" the Court finds Plaintiffs' theory regarding motive implausible.  (*Id.* ¶ 198 (alteration added); *see id.* ¶ 199).

To recap, Plaintiffs adequately explain Citadel Securities' motive for allegedly orchestrating the trading restrictions imposed by the Brokerage Defendants and Clearing Defendants.  But the Court is unconvinced that Plaintiffs have set forth a coherent common motive as to the Brokerage Defendants and Clearing Defendants.  This plus factor does not weigh in Plaintiffs' favor.

*Actions against unilateral self-interest*.  "It is firmly established that actions that are contrary to an actor's economic interest constitute a plus factor[.]"  *Williamson Oil*, 346 F.3d at 1310 (alteration added; citation omitted).  Nonetheless, courts "must exercise prudence in labeling a given action as being contrary to the actor's economic interests, lest we be too quick to second-guess well-intentioned business judgments of all kinds."  *Id.* (citation omitted).  "[E]xtreme action

against self-interest . . . may suggest prior agreement — for example, where individual action would be so perilous in the absence of advance agreement that no reasonable firm would make the challenged move without such an agreement."  *In re Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d 1186, 1195 (9th Cir. 2015) (alterations added); *see also City of Tuscaloosa v. Harcros Chems. Inc.*, 158 F.3d 548, 570 n.33 (11th Cir. 1998) (citations omitted).

Defendants concede the trading restrictions imposed on January 28, 2021 were against their self-interest because the restrictions (1) "create[d] a real risk of both immediate and long-term reputational and financial harm (including this Action)" and (2) "cost each broker revenue — fewer trades mean fewer payments for order flow (or fewer commissions) for the Clearing and [Brokerage] Defendants, and less spread capture for the Market Makers[.]"  (Mot. 30–31 (alterations added); *see* Resp. 21–22).

Nevertheless, the CCAC itself "provides ample independent business reasons" why each of the Brokerage Defendants and Clearing Defendants would have restricted trading without assurances that all other brokerages and clearing firms would restrict trading.  *In re Musical Instruments*, 798 F.3d at 1195 (finding no action against self-interest at the motion-to-dismiss stage).  These Defendants faced historic market volatility and increased NSCC collateral requirements resulting from the volatility.  Based on these allegations, Plaintiffs cannot credibly argue that "no reasonable firm" would have restricted trading in such circumstances.  *Id.*  In fact, the CCAC itself identifies firms *not alleged to be part of the conspiracy* that implemented restrictions on certain transactions involving the Relevant Securities on January 28, 2021.  (*See* CCAC ¶¶ 198–99).  Plaintiffs fail to make out a plus factor here.

*Opportunity to coordinate and collude*.  Plaintiffs contend Defendants had ample opportunity to conspire because "[t]he financial industry is close-knit and secretive, replete with

specialized jargon and terminology[,]" and "[i]ndividuals within the industry frequently move from one company to another and often work closely with competitors." (Resp. 23 (alterations added)). These are generic descriptions of features that many industries share. While it is perhaps necessary to allege some opportunity to conspire to infer a conspiracy, "the mere opportunity to conspire among antitrust defendants does not, standing alone, permit the inference of conspiracy." *Williamson Oil*, 346 F.3d at 1319 (quotation marks and citation omitted); *see also Twombly*, 550 U.S. at 567 n.12.

*Interfirm communications.*[19]  (*See* Resp. 23).  "[E]vidence of a high level of interfirm communications" may constitute a plus factor.  *Citigroup*, 709 F.3d at 136 (alteration added; footnote call number, quotation marks, and citation omitted).  The CCAC alleges several interfirm communications, some of which warrant consideration here, while others do not.

Beginning with those that do not — first, Apex warned Robinhood that the Retail Investors found a loophole around some of the trading restrictions imposed by Robinhood.  (*See* CCAC ¶¶ 327–30).  The CCAC explains "Apex had lifted restrictions on trading" by January 29, 2021.  (*Id.* ¶ 327).  While Plaintiffs claim this shows Apex was "policing the conspiracy" (*id.*), they fail to explain how this makes sense considering Apex had already lifted its trading restrictions by then.  In any event, helping a competitor prevent fraudulent conduct is not an antitrust violation.  *See Cement Mfrs.' Protective Ass'n v. United States*, 268 U.S. 588, 604 (1925).

Second, the CCAC includes what appears to be a routine email between E*Trade and Citadel Securities (*i.e.*, a brokerage and its market maker) about cancelling a securities order between them.  (*See* CCAC ¶¶ 315–16).  Plaintiffs do not explain the email's relevance.

---

[19] This section addresses Plaintiffs' arguments raised in their Response under both the "ample opportunity to coordinate and collude" and "acts [] inconsistent with unilateral conduct" sections.  (Resp. 22–24, 28–29 (alteration added)).

CASE NO.  21-2989-MDL-ALTONAGA/Torres

Third and finally, several of the Introducing Brokerages reported that Apex "instructed them to halt all opening transactions of GameStop, AMC and Koss on their platforms." (*Id.* ¶ 276; *see id.* ¶¶ 274–75, 443–44).  Given that Apex served as these firms' clearing entity and "was instructed by the DTCC that it was increasing the collateral needed to settle trades for the Relevant Securities[,]" these instructions are neither here nor there.  (*Id.* ¶ 274 (alteration added); *see id.* ¶¶ 275–76).

Now, the communications that do warrant consideration.  Embedded in the CCAC are several vague and ambiguous emails between high-level executives of Robinhood and Citadel Securities and internal Robinhood emails discussing external conversations that, given the timing and overall context, could be inferred to relate to the trading restrictions imposed on January 28, 2021.

On January 20, 2021, Citadel Securities' Head of Execution Services emailed Josh Drobnyk, Robinhood's Vice President of Corporate Relations and Communications, stating he was happy they "will be working together" and asking Drobnyk to "let [him] know if [they are] interested and who the main contact should be."  (*Id.* ¶ 299 (alterations added; quotation marks omitted)).  On January 25, 2021, Drobnyk replied "[w]e are on board" and copied Lucas Moskowitz, Robinhood's Deputy General Counsel, who was "going to be [Robinhood's] central point of contact[.]"  (*Id.* ¶ 300 (alterations added)).  Moskowitz and the Citadel Securities executive then arranged a call for the morning of January 26, 2021 — the details of which are unknown.  (*See id.* ¶¶ 302–03).  Considering the CCAC admits the details of this agreement or discussion are unknown, these emails are only relevant given their timing.

Around 4:40 p.m. EST on January 27, 2021, Gretchen Howard, Robinhood's COO, messaged Vlad Tenev, Robinhood's CEO, that she, along with Daniel Gallagher and Jim

CASE NO.  21-2989-MDL-ALTONAGA/Torres

Swartwout, Robinhood's Chief Legal Officer and Robinhood Securities' President and CEO, would be joining "a call with Citadel" at 5 p.m. that day.  (*Id.* ¶ 307; *see id.* ¶ 305).  Howard told Tenev that she believed Citadel Securities would "make some demands on limiting [payment for order flow] across the board" but that they "won't agree to anything[.]"  (*Id.* ¶ 307 (alterations added)).  Tenev told Howard that although he had never met Ken Griffin, the CEO of Citadel Securities, she could mention on the call that "this would be a good time for [Tenev] to chat with [] Griffin[.]"  (*Id.* (alterations added)).  The request from a market maker to limit the order flow sent to it is not equivalent to a demand to restrict trading in certain securities; however, the timing and the involvement of high-level executives render these emails relevant.

Roughly two hours later, Swartwout received an internal message stating there was "[a]necdotal evidence that several 'very large' firms are having really bad nights too"; to which Swartwout replied, "everyone is.  [Y]ou wouldnt [sic] believe the conv[ersation] we had with Citadel.  [T]otal mess[.]"  (*Id.* ¶ 308 (alterations added)).  Around 8:30 p.m. that night, Swartwout emailed Citadel Securities' Vice President of Business Development to offer to set up a call that night with Tenev, and mentioned Tenev would like to have a discussion with Griffin at some point, given their relationship, but "[n]ot specific to this crazy issue[.]"  (*Id.* ¶ 313 (alterations added); *see id.* ¶¶ 311–12).  After the Citadel Securities executive asked Swartwout if Tenev would like to have the call that night, Swartout declined and said: "[j]ust looking for your dictated schedule and caps.  I have 20 minutes until batch so whatever it is we are not going to be able to address it tomorrow given the notice.  I have to say I am beyond disappointed in how this went down.  It's difficult to have a partnership when these kind[s] of things go down this way."  (*Id.* ¶ 313 (alterations added)).  Again, these emails are vague and ambiguous, and are only relevant considering the timing and those involved.

CASE NO.  21-2989-MDL-ALTONAGA/Torres

On the morning of January 28, 2021, after Robinhood set AMC and GME to PCO, David Dusseault, Robinhood Financial's President and COO, informed Robinhood's Manager of Market Operations that "[Robinhood Securities] received a very large call — confidentially.  [A]ll firms on street . . . are doing [the] same thing[.]"   (*Id.* ¶ 244 (quotation marks omitted; alterations added)).  The CCAC does not assert who was on this call.

Lastly, on January 30, 2021, a Citadel Securities executive informed Drobnyk that he "wanted to generally coordinate messaging" and copied on the email Robinhood's "[General Counsels] as an FYI and for privilege."   (*Id.* ¶ 335 (alteration added); *see id.* ¶¶ 332–33).  The two then arranged an "[u]rgent" phone call.  (*Id.* ¶ 335 (alteration added)).  Given the context of the preceding communications and the fact that this request to coordinate messaging occurred even as Robinhood continued to restrict trading in the Relevant Securities, these emails — while vague and ambiguous — do lend some credence to Plaintiffs' conspiracy theory.

Defendants insist each of these communications between Citadel Securities and Robinhood "reflect[s] ordinary business dealings between a Market Maker and its client."  (Mot. 32 (alteration added; footnote call number omitted)).  But given the timing, the players involved, and the fact that each of these emails could be inferred to relate to the trading restrictions imposed on January 28, 2021, Plaintiffs' allegations of interfirm communications are supportive of a conspiracy.

The support is thin, however.  Plaintiffs cite to the undersigned's opinion in *In re Salmon*, No. 19-21551-Civ, 2021 WL 1109128 (S.D. Fla. Mar. 23, 2021), but the allegations here are hardly comparable.  (*See* Resp. 22–24).  There, the plaintiffs "point[ed] to bilateral and multilateral agreements not to compete and a high level of communications among [d]efendants," including complete details of multiple meetings, such as who was in attendance, when the meetings occurred, and the contents of those communications.  *In re Salmon*, 2021 WL 1109128, at *15 (alterations

added).  Here, Plaintiffs concede they do not know what was discussed during the several calls between Robinhood and Citadel Securities executives.

In addition, the CCAC lacks specific allegations of interfirm communications between any other alleged co-conspirator.  The Court thus finds no support here for a reasonable inference of a conspiracy involving any other Defendants.

In sum, Plaintiffs establish a plus factor here supporting, albeit weakly, an inference of a conspiracy between Robinhood and Citadel Securities.

*Evidence of concealment and pretext*.  Plaintiffs contend "[u]nrecorded communications between coconspirators are hallmarks of antitrust conspiracies[,]" suggesting the simple fact that Robinhood and Citadel Securities[20] arranged to have discussions over the phone instead of exchanging information via email supports an inference of an illegal conspiracy.  (Resp. 24–25 (alterations added; citations omitted)).  The Court is not convinced such a proposition supports plausibility on a motion to dismiss.

In this regard, Plaintiffs cite *In re Flat Glass Antitrust Litigation*, 385 F.3d 350, 364–65 (3d Cir. 2004), wherein the court noted a coconspirator asked another coconspirator to call him — one minor fact among a litany of allegations.  (*See* Resp. 24).  It is not clear that the phone call was important to the court's analysis.

Plaintiffs also cite *In re Urethane Antitrust Litigation*, 913 F. Supp. 2d 1145, 1154–56 (D. Kan. 2012).  (*See* Resp. 24–25).  There, at summary judgment the court did find persuasive circumstantial evidence "that the alleged conspirators undertook to maintain the secrecy of their communications, particularly those involving pricing."  913 F. Supp. 2d at 1155.  The court relied

---

[20] In their Response, Plaintiffs also refer to phone calls between Apex and the Introducing Brokerages it serves.  (*See* Resp. 24).  As explained, absent animating details, the Court declines to find these phone calls suggestive of an illegal agreement.

on numerous, detailed facts indicating efforts to maintain secrecy, for example: coconspirators made calls "from a pay phone at a gas station using a prepaid credit card"; at a particular meeting with competitors, coconspirators "went outside to discuss pricing, in order to avoid listening devices in the facility"; the coconspirators' "reports of the meeting excluded their pricing discussion"; at the same meeting, coconspirators shared documents containing pricing information after "assurances that the document would be destroyed"; and coconspirators left trade association meetings to "conduct future price discussions at an off-site coffee shop so that the men could talk in confidence[.]"  *Id.* at 1155–56 (alteration added); *see id.* at 1161–63.

The only similarity between the allegations in the present case and the record in *In re Urethane* is that alleged coconspirators made phone calls around the time the alleged anticompetitive conduct occurred.  Upon further examination, however, even this shared fact is not helpful to Plaintiffs.

The coconspirators in *In re Urethane* were direct competitors conspiring to fix prices — the fact that they would have numerous phone calls around the time of price increase announcements is highly suspicious.  *See id.* at 1149, 1155–56.  Here, Citadel Securities is Robinhood's most important business partner.  It surely is not unusual for two firms in an ongoing business relationship to have conversations over the phone; and Plaintiffs admit they do not know the substance of these conversations.  (*See* CCAC ¶ 461).  The Court will not infer a conspiracy simply because two business partners chose to use phones to communicate.

In addition to these allegations of concealment, Plaintiffs insist they have set forth "pretextual statements" made by Robinhood and Apex "that provide evolving, inconsistent and conflicting explanations for the trading restrictions."  (Resp. 25 (footnote call number omitted)).  Plaintiffs first point to the fact that Robinhood "initially attributed the trading restrictions to market

volatility, only to later assert that clearinghouse collateral requirements forced Robinhood to impose said restrictions." (*Id.*). Defendants counter that those statements were not inconsistent and conflicting because "market volatility led to the increased collateral requirements." (Reply 14). Defendants have the better argument.

Indeed, the CCAC itself explains that collateral requirements change because "the DTCC may assign a volatility multiplier on certain securities which the DTCC perceives as having more risk." (CCAC ¶ 470). And the fact that Robinhood continued to impose restrictions after meeting its collateral requirements is of no moment because the trading restrictions "reduce[d] the volatility multiplier on the collateral that Robinhood Securities was required to post with the NSCC." (Reply 15 (alteration added); *see* Resp. 25; CCAC ¶ 470). It is not suspicious for Robinhood to strive to avoid higher collateral requirements.

Plaintiffs next cite several Robinhood statements that they assert conflict with its COO, Gretchen Howard's internal message that Robinhood had a "major liquidity issue" as it set certain Relevant Securities to PCO in the early morning of January 28, 2021. (CCAC ¶ 233; *see* Resp. 25). Later that day, "Robinhood posted on its blog that market volatility was the reason for the restrictions." (CCAC ¶ 466). In addition, Robinhood's CEO, Vlad Tenev, publicly stated "that the shutdowns were unrelated to Robinhood's liquidity and that Robinhood did not have a liquidity problem." (*Id.* ¶ 467). Tenev later testified before the House Financial Services Subcommittee "that trading restrictions were put in place to meet regulatory deposit requirements imposed by DTCC affiliate NSCC." (*Id.* ¶ 469; *see also id.* ¶ 340).

These statements are not conflicting because Howard's internal message stating Robinhood had a "major liquidity issue" came shortly after Robinhood "received an email from NSCC indicating that Robinhood had a deficit of roughly $3 billion dollars." (*Id.* ¶¶ 231, 233). Even

CASE NO. 21-2989-MDL-ALTONAGA/Torres

viewing the pleading in the light most favorable to Plaintiffs, Howard was likely referring to Robinhood's ability to pay the increased collateral requirements caused by the market volatility, which is consistent with Robinhood later placing the blame on these collateral requirements.

Finally, Plaintiffs again refer to Apex's "conflicting explanations as to why it restricted trading." (Resp. 25). According to Plaintiffs, "[a]lthough Apex cited increased collateral requirements as the reason for the restrictions, Apex later admitted that it was not subject to any heightened collateral requirements but rather made the decision to restrict trade based solely on a 'potential future' collateral requirement despite having sufficient capital and available lines of credit." (*Id.* (alteration added)).

As further explained in the CCAC, Apex had told state regulators it imposed restrictions because of "the potential future collateral requirement that NSCC *appeared* it may impose on Apex" (CCAC ¶ 480 (emphasis added)); and Apex's President explained that Apex restricted "due to anomalous information" (*id.* ¶ 481 (quotation marks omitted)). Considering Apex lifted its restrictions after one day, this explanation makes sense. (*See id.* ¶ 327). As Defendants put it: "the market volatility in late January 2021 was extraordinary, with events occurring quickly to meet market and clearinghouse demands. Therefore, it is understandable that earlier-in-time internal Robinhood and Apex communications, as Plaintiffs identified, did not reflect final information later presented publicly." (Reply 15).[21]

In total, Plaintiffs do not make out a plus factor here.

*Government investigations*. Plaintiffs maintain the investigations of "the events concerning the January 28, 2021 trading restrictions" by "[t]he [SEC], FINRA, Congress, the

---

[21] Contrary to Plaintiffs' suggestion, the fact that government regulators did not directly call on Defendants to restrict trading is inconsequential (*see* Resp. 25 n.18), because the restrictions lowered the volatility multiplier that determines DTCC collateral requirements (*see, e.g*, CCAC ¶ 470).

Department of Justice, the San Francisco U.S. Attorney's Office, and the Attorneys General of various states" are indicative of collusion among Defendants.  (Resp. 26 n.20 (alterations added)).  The CCAC does not allege, however, that any of these authorities is investigating possible *collusion* among Defendants.  (*See* CCAC ¶¶ 486–93).  In fact, Plaintiffs concede "there is simply no evidence to suggest that the SEC is investigating the claims of concerted activity at issue here." (Resp. 45 (footnote call number and citation omitted)).

Defendants do not disagree that government investigations can bolster conspiracy allegations.  (*Compare* Mot. 33, *and* Reply 15, *with* Resp. 26).  They instead correctly note that where "allegations are sparse, the existence of government inquiries is insufficient to raise an inference of conspiracy."  (Mot. 33 (alteration adopted; quotation marks and citations omitted)); *see also e.g.*, *In re Loc. TV Advert.*, 2020 WL 6557665, at *8 (collecting cases).  Such is the case here.  Given the thin allegations overall, and the fact that Plaintiffs have not alleged an investigation specifically into concerted activity among Defendants, Plaintiffs fail to establish a plus factor here.

*Structural characteristics of the market.*  Plaintiffs contend they have alleged "economic market factors [that] paint a picture of a market whose characteristics make it ripe for collusion in violation of the antitrust law."  (Resp. 28 (alteration added)).  While the CCAC does allege the existence of several characteristics that each tend to make a market susceptible to anticompetitive conduct and unlawful collusion, Plaintiffs present an incoherent market definition.  (*See* CCAC ¶¶ 362–405).

In their Response, Plaintiffs argue that "the CCAC makes clear that the relevant market to which [they] refer is the securities market."  (Resp. 26 (alteration added)).  But the CCAC is hardly a model of clarity on this point.  (*See* Mot. 34).  Although Plaintiffs do not elaborate, it appears

CASE NO.  21-2989-MDL-ALTONAGA/Torres

from the CCAC that Plaintiffs are attempting to define multiple markets — one for each Relevant Security — by stating "[t]he Relevant Securities are commodity (homogenous) products." (CCAC ¶ 374 (alteration added)).  To complicate matters further, the CCAC also confusingly discusses characteristics of "[t]he markets for broker dealers, clearing firms and market making[.]"  (*Id.* ¶ 368 (alterations added)).  The Court is thus unable to discern from the CCAC what the alleged market definition is.

Moreover, Plaintiffs fail to grapple with Defendants' argument that the case is unlike the typical price-fixing conspiracies where this plus factor is invoked.  (*See* Mot. 34).  In each of the cases cited by Plaintiffs — all of which involve price-fixing conspiracies — the defendants utilized their market power to raise the prices of goods they sold.  (*See* Resp. 26–28 (citing *In re Salmon*, 2021 WL 1109128, at *14; *In re Disposable Contact Lens Antitrust*, 215 F. Supp. 3d 1272, 1295–96 (M.D. Fla. 2016); *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141, 169 (D. Conn. 2009); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656–58 (7th Cir. 2002))).  Here, Plaintiffs allege that the Brokerage Defendants and Clearing Defendants restricted output to lower prices for securities they are not alleged to have bought or sold for their own accounts, all to benefit the Market Maker Defendant who actually engages in such transactions.  Plaintiffs do not address this distinction at all and do not provide any legal authority supporting the application of this plus factor to their novel anticompetitive theory.

In short, Plaintiffs fail to coherently define a market and persuade the Court that this plus factor weighs in their favor.

* * *

What factual allegations are left standing that support a plausible inference of a conspiracy?

CASE NO.  21-2989-MDL-ALTONAGA/Torres

Well, there are none — other than an allegation of parallel conduct — with respect to Defendants, E*Trade, Interactive Brokers, Apex, ETC, and PEAK6.  Each of these Defendants therefore must be dismissed because "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice" to state a section 1 claim.  *Twombly*, 550 U.S. at 556.

That leaves Robinhood and Citadel Securities.  High-level executives at these firms exchanged various vague and ambiguous emails immediately before and after Robinhood imposed trading restrictions on the Relevant Securities on January 28, 2021.  These emails set up telephone discussions between the executives, the substance of which is unknown to Plaintiffs.  Admittedly, these emails may be somewhat suspicious given the participants and their timing.  But are a few vague and ambiguous emails between two firms in an otherwise lawful, ongoing business relationship enough to "nudge[] [Plaintiffs'] claims across the line from conceivable to plausible[?]"  *Id.* at 570 (alterations added).  The Court thinks not.

Accordingly, the CCAC is dismissed.

## IV.    CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that Defendants' Motion to Dismiss the Antitrust Tranche Complaint **[ECF No. 408]** is **GRANTED**.  The Corrected Consolidated Class Action Complaint **[ECF No. 416]** is **DISMISSED without prejudice**.  Plaintiffs have until **December 20, 2021** to file their final amended complaint in the Antitrust Tranche of this Multidistrict Litigation.

Plaintiffs' Motion to Strike Defendant Citadel Securities LLC's Notice of Supplemental Authority **[ECF No. 437]** is **DENIED as moot**.

CASE NO.  21-2989-MDL-ALTONAGA/Torres

**DONE AND ORDERED** in Miami, Florida, this 17th day of November, 2021.

**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:     counsel of record
        *Pro Se* Plaintiffs