**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-MD-2989-ALTONAGA/TORRES**

In re:

**JANUARY 2021 SHORT SQUEEZE**
**TRADING LITIGATION**

_____/

This Document Relates to the Robinhood Tranche

**ROBINHOOD'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS THE**
**ROBINHOOD TRANCHE COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................................1

APPLICABLE LAW ......................................................................................................................5

I.      CALIFORNIA LAW APPLIES TO ALL OF PLAINTIFFS' CLAIMS.............................5

II.     THE AMENDED COMPLAINT SHOULD BE DISMISSED EVEN IF THE
        CHOICE OF LAW PROVISION IS INAPPLICABLE. .....................................................7

ARGUMENT ..................................................................................................................................9

I.      PLAINTIFFS' NEGLIGENCE AND GROSS NEGLIGENCE CLAIMS FAIL...............9

        A.      Robinhood Does Not Owe a Generalized Duty of Care. ........................................9

        B.      Robinhood Owes Its Customers Contractual Obligations, Not Tort Duties..........12

        C.      Plaintiffs' Arguments Based on Regulations and Self-Regulatory Rules
                Are Irrelevant to This Motion. ..............................................................................16

II.     PLAINTIFFS DO NOT STATE A CLAIM FOR BREACH OF ANY
        FIDUCIARY DUTIES......................................................................................................17

        A.      None of the Robinhood Defendants Owe Customers a General
                Fiduciary Duty. ....................................................................................................18

        B.      Robinhood Securities, As a Clearing Broker, Does Not Owe
                Fiduciary Duties....................................................................................................21

III.    PLAINTIFFS CANNOT STATE A CLAIM FOR BREACH OF THE IMPLIED
        COVENANT OF GOOD FAITH AND FAIR DEALING...............................................22

IV.     PLAINTIFFS CANNOT STATE A CLAIM FOR BREACH OF AN IMPLIED
        DUTY OF CARE..............................................................................................................25

V.      PLAINTIFFS' TORTIOUS INTERFERENCE CLAIM AGAINST
        ROBINHOOD MARKETS FAILS TO STATE A CLAIM...............................................26

VI.     PLAINTIFFS FAIL TO STATE A CLAIM OF CIVIL CONSPIRACY...........................28

VII.    ROBINHOOD OWES NO DUTIES TO NON-ROBINHOOD CUSTOMERS—
        ALL CLAIMS BROUGHT BY NON-ROBINHOOD CUSTOMERS
        THEREFORE FAIL...........................................................................................................29

VIII.   PLAINTIFFS' AMENDED COMPLAINT SHOULD BE DISMISSED WITH
        PREJUDICE. ....................................................................................................................30

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aas v. Superior Court*, 12 P.3d 1125 (Cal. 2000) ...................................................................10, 13

*Anthem Leather, Inc. v. Kamino Int'l Transp., Inc.*, No. Civ. A. 1:06-CV-3130JE,
    2008 WL 516289 (N.D. Ga. Feb. 25, 2008) ...............................................................................6

*Apollo Cap. Fund LLC v. Roth Cap. Partners LLC*, 70 Cal. Rptr. 3d 199
    (Ct. App. 2007) ...............................................................................................................17, 18, 19

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454 (Cal. 1994) ..............................28

*Arndt v. Twenty-One Eighty-Five, LLC*, 448 F. Supp. 3d 1310 (S.D. Fla. 2020)...........................6

*Automatic Vending Co. v. Wisdom*, 6 Cal. Rptr. 31 (Ct. App. 1960) ...........................................24

*Badie v. Bank of Am.*, 79 Cal. Rptr. 2d 273 (Ct. App. 1998).........................................................24

*Banc of Am. Sec. LLC v. Stott*, No. 04-81086-CIV, 2005 WL 8156027 (S.D. Fla.
    Aug. 30, 2005) ............................................................................................................................20

*Bankest Imports, Inc. v. ISCA Corp.*, 717 F. Supp. 1537 (S.D. Fla. 1989)...................................21

*Barrier Specialty Roofing & Coatings, Inc. v. ICI Paints N. Am., Inc.*,
    No. CV-F-07-1614 LJO TAG, 2008 WL 1994947 (E.D. Cal. May 6, 2008).........................14

*Beattey v. Coll. Ctr. of Finger Lakes Inc.*, 613 So. 2d 52 (Fla. 4th DCA 1992) ...........................8

*Berwecky v. Bear Stearns & Co.*, 197 F.R.D. 65 (S.D.N.Y. 2000) ...............................................22

*Biakanja v. Irving*, 320 P.2d 16 (Cal. 1958) .................................................................................14

*Bishop v. Florida Specialty Paint Co.*, 389 So. 2d 999 (Fla. 1980) ...............................................8

*Body Jewelz, Inc. v. Valley Forge Ins. Co.*, 241 F. Supp. 3d 1084 (C.D. Cal. 2017)..............10, 14

*Bombardier Cap. Inc. v. Progressive Mktg. Grp., Inc.*, 801 So. 2d 131
    (Fla. 4th DCA 2001) ..................................................................................................................12

*Brehm v. 21st Century Ins. Co.*, 83 Cal. Rptr. 3d 410 (Ct. App. 2008)........................................22

*Brown v. Cal. Pension Adm'rs & Consultants, Inc.*, 52 Cal. Rptr. 2d 788
    (Ct. App. 1996) ..........................................................................................................................18

*Cannizzaro v. Bache, Halsey, Stuart, Shields, Inc.*, 81 F.R.D. 719 (S.D.N.Y.
    1979) ...........................................................................................................................................22

*Caravan Mobile Home Sales, Inc. v. Lehman Bros. Kuhn Loeb, Inc.*, 769 F.2d 561
(9th Cir. 1985) ................................................................................................................19

*Casamassina v. U.S. Life Ins. Co.*, 958 So. 2d 1093 (Fla. 4th DCA 2007) ...................................11

*Certain Underwriters at Lloyd's of London, UK Subscribing to Pol'y No.
B1230AP56189A14 v. Ocean Walk Resort Condo. Ass'n*, No. 6:16-cv-258-
ORL-37GJK, 2017 WL 3034069 (M.D. Fla. July 18, 2017) .................................16

*Chicago Title Ins. Co. v. Alday-Donalson Title Co. of Fla.*, 832 So. 2d 810
(Fla. 2d DCA 2002) ........................................................................................................27

*City of San Diego v. Amoco Chem. Co.*, No. Civ. 98-0474-E (LSP), 1999 WL
33548157 (S.D. Cal. Sept. 9, 1999) ...........................................................................14

*City Sols., Inc. v. Clear Channel Commc'ns, Inc.*, 201 F. Supp. 2d 1048
(N.D. Cal. 2002) ...............................................................................................................19

*Clay Elec. Co-op., Inc. v. Johnson*, 873 So. 2d 1182 (Fla. 2003) ...................................11

*County of Kern v. Tyler Techs., Inc.*, No. 1:20-cv-00853-AWI-HBK, 2021 WL
369588 (E.D. Cal. Feb. 3, 2021) .................................................................................13

*Curd v. Mosaic Fertilizer, LLC*, 39 So. 3d 1216 (Fla. 2010) ...................................11

*Doctors' Co. v. Superior Ct.*, 49 Cal. 3d 39 (1989) ...................................28

*Duffy v. Cavalier*, 264 Cal. Rptr. 740 (Ct. App. 1989) ...................................18

*Dwyer v. Bicoy*, No. SACV 09-0064-JVS (RNBx), 2009 WL 10697966 (Nov. 17,
2009) ...................................13

*Eads v. Marks*, 249 P.2d 257 (Cal. 1952) ...................................13

*eCapital Commercial Fin. Corp. v. Hitachi Capital Am. Corp.*,
519 F. Supp. 3d 1129 (S.D. Fla. 2021) ...................................8

*Elsayed v. Maserati N. Am., Inc.*, 215 F. Supp. 3d 949 (C.D. Cal. 2016) ...................................14

*Enhanced Athlete Inc. v. Google LLC*, No. 19-cv-08260-HSG, 2020 WL 4732209
(N.D. Cal. Aug. 14, 2020) ...................................23, 24

*Erlich v. Menezes*, 981 P.2d 978 (Cal. 1999) ...................................10, 12, 13, 14

*Estate of Johnson ex rel. Johnson v. Badger Acquisition of Tampa LLC*,
983 So. 2d 1175 (Fla. 2d DCA 2008) ...................................11

*Estate of Rotell ex rel. Rotell v. Kuehnle*, 38 So. 3d 783 (Fla. 2d DCA 2010) ...................................11

*FDIC for IndyMac Bank, FSB v. Genesis Title Co., LLC*, No. 11-20841-CIV,
    2011 WL 13223744 (S.D. Fla. July 1, 2011)................................................15

*Fla. Power & Light Co. v. Westinghouse Elec. Corp.*, 510 So. 2d 899 (Fla. 1987)....................15

*Florida Power & Light Co. v. Allis Chalmers Corp.*, 83 F.3d 1514 (11th Cir.
    1996).................................................................................................30

*Foman v. Davis*, 371 U.S. 178 (1962)..........................................................30

*Genet Co. v. Anheuser-Busch, Inc.*, 498 So. 2d 683 (Fla. 3d DCA 1986)..............................28, 29

*Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d 1042 (11th Cir. 1987).........................18, 20

*Graham v. Scissor-Tail, Inc.*, 623 P.2d 165 (Cal. 1981)....................................................12

*Green Leaf Nursery v. E.I. DuPont de Nemours & Co.*, 341 F.3d 1292
    (11th Cir. 2003)........................................................................................5

*Grey Fox, LLC v. Plains All Am. Pipeline, L.P.*, No. CV 16-3157 PSG, 2019 WL
    4196066 (C.D. Cal. Apr. 8, 2019)..................................................................14

*Guz v. Bechtel Nat'l Inc.*, 8 P.3d 1089 (Cal. 2000)..................................................22, 25

*Hatton v. Chrysler Canada, Inc.*, 937 F. Supp. 2d 1356 (M.D. Fla. 2013) ....................................7

*Heidelberg USA, Inc. v. PM Lithographers, Inc.*, No. CV 17-02223-AB, 2017
    WL 7201872 (C.D. Cal. Oct. 19, 2017)..............................................................14

*Holguin v. Dish Network LLC*, 178 Cal. Rptr. 3d 100 (Ct. App. 2014) .................................25

*In re Checking Account Overdraft Litig.*, 694 F. Supp. 2d 1302 (S.D. Fla. 2010).........................7

*In re Fundamental Long Term Care, Inc.*, 873 F.3d 1325 (11th Cir. 2017)...............................30

*Integrity Factoring Grp. Inc. v. Powerhouse Fresh Holdings, LLC*,
    No. 17-81314-CIV, 2018 WL 7954520 (S.D. Fla. Oct. 30, 2018) .............................6

*Ixchel Pharma, LLC v. Biogen, Inc.*, 470 P.3d 571 (Cal. 2020) ...........................................26, 27

*J'Aire Corp. v. Gregory*, 598 P.2d 60 (Cal. 1979).........................................................14

*Jennings v. BIC Corp.*, 181 F.3d 1250 (11th Cir. 1999)..................................................30

*Kalitta Air, L.L.C. v. Cent. Tex. Airborne Sys., Inc.*, 315 F. App'x 603
    (9th Cir. 2008).....................................................................................14, 15

*Kaye v. Ingenio, Filiale de Loto-Quebec, Inc.*, No. 13-61687-CIV, 2014
    WL 2215770 (S.D. Fla. May 29, 2014).............................................................16

*Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937 (Cal. 2003) ........................................27

*Koruga v. Fiserv Correspondent Servs.*, 183 F. Supp. 2d 1245 (D. Or. 2001) ............................22

*Lacy v. BP P.L.C.*, 723 Fed. Appx. 713 (11th Cir. 2018) ..............................................................30

*Lewis v. Guthartz*, 428 So. 2d 222 (Fla. 1982) ............................................................................15

*Lipman v. Brisbane Elementary Sch. Dist.*, 359 P.2d 465 (Cal. 1961)........................................26

*Loeb v. Geronemus*, 66 So. 2d 241 (Fla. 1953) ..........................................................................28

*Margaret Hall Found., Inc. v. Atl. Fin. Mgmt., Inc.*, 572 F. Supp. 1475
    (D. Mass. 1983)........................................................................................................................22

*MasTec Renewables Puerto Rico LLC v. Mammoth Energy Services, Inc.*,
    No. 20-20263-Civ-Scola, 2020 WL 6781823 (S.D. Fla. Nov. 18, 2020) ..............................8

*McDaniel v. Bear Stearns & Co.*, 196 F. Supp. 2d 343 (S.D.N.Y. 2002) ....................................22

*Monroe v. Sarasota Cty. Sch. Bd.*, 746 So. 2d 530 (Fla. 2d DCA 1999)......................................11

*Moransais v. Heathman*, 744 So. 2d 973 (Fla. 1999) ..................................................................15

*Morris v. ADT Sec. Servs., Inc.*, No. 07-80950-CIV, 2009 WL 10691165
    (S.D. Fla. Sept. 11, 2009)........................................................................................................8

*North American Chemical Co. v. Superior Court*, 69 Cal. Rptr. 2d 466
    (Ct. App. 1997) ......................................................................................................................10

*Pacific Gas & Electric Co. v. Bear Stearns & Co.*, 791 P.2d 587 (Cal. 1990).............................26

*Palm Beach Cty. Health Care Dist. v. Pro. Med. Educ., Inc.*, 13 So. 3d 1090
    (Fla. 4th DCA 2009) ..............................................................................................................29

*Perdue v. Crocker Nat'l Bank*, 702 P.2d 503 (Cal. 1985) ............................................................23

*Peregrine Pharms., Inc. v. Clinical Supplies Mgmt., Inc.*, No. 12-cv-1608-JGB,
    2015 WL 13309286 (C.D. Cal. June 22, 2015) ..............................................................10, 13

*Petersen v. Sec. Settlement Corp.*, 277 Cal. Rptr. 468 (Ct. App. 1991) ..................................17, 21

*Pycsa Panama, S.A. v. Tensar Earth Technologies, Inc.*, Case No. 06-20624-CIV-
    GOLD/TURNOFF, 2006 WL 8432715 (S.D. Fla. Dec. 20, 2006)..........................................7

*Pycsa Panama, S.A. v. Tensar Earth Techs., Inc.*, 625 F. Supp. 2d 1198
    (S.D. Fla. 2008)........................................................................................................................8

*Quelimane Co. v. Stewart Title Guar. Co.*, 960 P.2d 513 (Cal. 1998) ........................................10

*Rayle Tech, Inc. v. DEKALB Swine Breeders, Inc.*, 133 F.3d 1405 (11th Cir. 1998) ................................................................................................................5

*Rejects Skate Magazine, Inc. v. Acutrack, Inc.*, No. C 06-2590 CW, 2006 WL 2458759 (N.D. Cal. Aug. 22, 2006).......................................................13

*Resnick v. Hyundai Motor Am., Inc.*, No. CV 16-00593-BRO, 2017 WL 1531192 (C.D. Cal. Apr. 13, 2017) ..............................................................14

*Richardson v. Progressive Am. Ins. Co.*, Case No. 18-cv-715, 2019 WL 2287955 (M.D. Fla. May 29, 2019)....................................................................29

*Robinson Helicopter Co. v. Dana Corp.*, 102 P.3d 268 (Cal. 2004) ...........................14

*Rosen v. State Farm Gen. Ins. Co.*, 70 P.3d 351 (Cal. 2003) .......................................10

*Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 742 So. 2d 381 (Fla. 4th DCA 1999) ...........................................................................28

*Scolieri v. John Hancock Life Ins. Co. (U.S.A.)*, No. 2:16-cv-690-FTM-38CM, 2017 WL 700215 (M.D. Fla. Feb. 22, 2017) .....................................21

*Series AGI W. Linn of Appian Grp. Invs. DE, LLC v. Eves*, 158 Cal. Rptr. 3d 193 (Ct. App. 2013) ...............................................................................25

*SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334 (11th Cir. 2010)..............20, 21, 22

*Sheen v. Wells Fargo Bank, N.A.*, 250 Cal. Rptr. 3d 677 (Ct. App. 2019)....................12

*Siemonsma v. Mut. Diversified Emps. Fed. Credit Union*, No. SACV 10-1093-DOC, 2011 WL 1485979 (C.D. Cal. Apr. 19, 2011) ................................19

*Southern California Gas Leak Cases*, 441 P.3d 881 (Cal. 2019) .............................9, 10

*Stallworth v. Hospitality Rentals, Inc.*, 515 So. 2d 413 (Fla. 1st DCA 1987) ................8

*State Farm Mut. Auto. Ins. Co. v. Olsen*, 406 So. 2d 1109 (Fla. 1981) .........................8

*Sun Life Ass. Co. of Canada v. Imperial Premium Fin., LLC*, 904 F.3d 1197 (11th Cir. 2018)...............................................................................27

*Sunbelt Veterinary Supply, Inc. v. Int'l Bus. Sys. U.S., Inc.*, 985 F. Supp. 1352 (M.D. Ala. 1997)...............................................................................5

*Tech, Inc. v. Valley Tank Testing, L.L.C.*, 244 So. 3d 383 (Fla. 2d DCA 2018) ..........11

*Third Story Music, Inc. v. Waits*, 48 Cal. Rptr. 747 (Ct. App. 1995) ...........................23

*Tiara Condo. Ass'n v. Marsh & McLennan Cos.*, 110 So. 3d 399 (Fla. 2013) .....................15, 16

*Tolz v. GEICO Gen. Ins. Co.*, No. 08-80663-Civ-MARRA/JOHNSON,
    2009 WL 10667547 (S.D. Fla. July 16, 2009) .......................................................................11

*Travelers Indem. Co. of Conn. v. Richard McKenzie & Sons, Inc.*,
    326 F. Supp. 3d 1332 (M.D. Fla. 2018) ...............................................................................16

*Twomey v. Mitchum, Jones & Templeton, Inc.*, 69 Cal. Rptr. 222 (Ct. App. 1968) ....................18

*Tyson & Assocs., Inc. v. Denko*, No. 95-56351, 89 F.3d 846, 1996 WL 355566
    (9th Cir. June 25, 1996) .......................................................................................................14

*Underwriters at Int. v. All Logistics Grp., Inc.*, 483 F. Supp. 3d 1199
    (S.D. Fla. 2020) ..............................................................................................................11, 16

*Univ. Express, Inc. v. SEC*, 177 F. App'x 52 (11th Cir. 2006) .....................................................1

*Viera v. BASF Catalysts LLC*, 2016 WL 1394333 (M.D. Fla. Apr. 8, 2016) ...............................7

*Ware Else, Inc. v. Ofstein*, 856 So. 2d 1079 (Fla. 5th DCA 2003) .............................................6

*Wolf v. Walt Disney Pictures & Television*, 76 Cal. Rptr. 3d 585 (Ct. App. 2008) ....................23

**Statutes & Rules**

Rule 12(b)(6) ...............................................................................................................................19

**Other Authorities**

FINRA Rule 2010 ........................................................................................................................17

FINRA Rule 3110 ........................................................................................................................17

FINRA Rule 4370 ........................................................................................................................17

Restatement (Second) of Torts § 323 (1965) ............................................................................11

Restatement (Second) of Torts § 324A (1965) ..........................................................................11

Restatement (Third) of Torts: Liab. for Econ. Harm § 1, cmt. (e) (2020) ...................................15

Restatement (Third) of Torts: Liab. for Econ. Harm § 1(a) (2020) ...............................................9

Restatement (Third) of Torts: Liab. for Econ. Harm § 3 (2020) .................................................12

Restatement (Third) of Torts: Phys. & Emot. Harm § 7 (2010) ....................................................9

SEC Staff Report on Equity and Options Market Structure Conditions in Early
    2021, *available at* https://www.sec.gov/files/staff-report-equity-options-
    market-struction-conditions-early-2021.pdf ...........................................................................1

Testimony of Michael C. Bodson, DTCC President and CEO, U.S. House
    Financial Services Committee (May 6, 2021), *available at*
    https://financialservices.house.gov/uploadedfiles/hhrg-117-ba00-wstate-
    bodsonm-20210506.pdf ........................................................................................................3

## INTRODUCTION

Stripped of the rhetoric and hyperbole, Plaintiffs' arguments in opposition boil down to one absurd assertion:  because Robinhood was founded on the ethos of empowering all retail investors to access the financial markets, it somehow has a legal duty to all investors in the United States—those who were Robinhood customers as well as those who had never even heard of Robinhood—to permit unrestricted trading on its platform in all securities at all times.  This purported duty would exist regardless of market volume and volatility, and regardless of the existence of unprecedented collateral deposit requirements from the NSCC.  This purported duty would also exist regardless of the risk that continued trading would create to Robinhood's other customers and the financial system as a whole.  And, finally, this purported duty would exist regardless of the facts that the SEC has explicitly stated that "broker-dealers may reserve the ability to reject or limit customer transactions"[1] and that Robinhood reserved exactly that right, with each and every Robinhood customer explicitly agreeing in the Customer Agreement that Robinhood could "in its sole discretion, and without prior notice to [the customer], prohibit or restrict" any trade, refuse to accept any transaction and refuse to execute any transaction.

As discussed in more detail below, Plaintiffs fail to overcome the myriad legal infirmities identified in Robinhood's Motion.  Plaintiffs also paint a fundamentally misleading—and inaccurate—narrative of the relevant events, which is refuted by their own allegations and the documents they incorporate into the operative complaint.  Specifically, Plaintiffs assert in opposition that as trading volume and volatility increased during the week of January 25, Robinhood stood idly by while—Plaintiffs claim—its executives encouraged the unprecedented market behavior and benefited themselves.  That narrative is fanciful and has no grounding in fact.  As demonstrated by the very documents incorporated into the Amended Complaint, Robinhood was monitoring the rise in volatility for GME and other relevant securities as early as

---

[1] *See* Securities and Exchange Comm'n, "Thinking About Investing in the Latest Hot Stock?" (Jan. 30, 2021) ("Jan. 30 SEC Statement"), https://www.sec.gov/oiea/investor-alerts-and-bulletins/risks-short-term-trading-based-social-media-investor-alert; *see also* SEC Staff Report on Equity and Options Market Structure Conditions in Early 2021 ("SEC Report")*, available at* https://www.sec.gov/files/staff-report-equity-options-market-struction-conditions-early-2021.pdf, at 32.  The Court may take judicial notice of the January 30 SEC Statement and the SEC Report because they are public records, the accuracy of which cannot reasonably be questioned.  *See Univ. Express, Inc. v. SEC*, 177 F. App'x 52, 53 (11th Cir. 2006) (taking judicial notice of public records at the motion to dismiss stage).

Saturday, January 23, 2021, a day after the closing price for GME jumped from $43.93 on January 21 to $65.01 on January 22.  Among other issues, Robinhood began analyzing Robinhood Securities' overall exposure to the so-called meme stocks—particularly GME—and the extent to which customers were placing self-directed trades in volatile stocks on margin.  (Am. Compl. ¶ 195.)  In their discussions, Robinhood employees sought to understand the impact of raising margin requirements (*i.e.*, requiring customers to maintain sufficient collateral on hand with Robinhood Financial to cover the stock's purchase price), and the number of Robinhood customers who would be impacted by margin requirements.  (*Id.* ¶ 194.)  Likewise, Robinhood staffers discussed how to explain an increase in margin requirements to customers in light of the risk of trading in volatile stocks.  (*Id.* ¶¶ 194-95.)

When the markets opened on January 25, trading in the meme stocks rapidly spiked relative to the prior week, leading Robinhood to take further measures to mitigate risk and volatility across its platform in the face of rising customer trading activity.  (*Id.* ¶¶ 196-202.)  In addition to deploying additional resources to meet the technical demands imposed by the influx of customer trade orders (*id.*), Robinhood Securities increased customer margin requirements for GME to manage risk levels (*id.* ¶ 12).  These increased margin requirements helped mitigate risk by requiring that customers who held or wished to purchase GME (and later other meme stocks) to have sufficient assets (cash or other stock) in their accounts with Robinhood Financial to cover their positions.  The increased margin requirements did not otherwise limit customers' ability to purchase any of the meme stocks as long as they had sufficient cash or other stock in their account to pay for the purchase they wanted to complete.  Concurrently, Robinhood Securities timely met each and every NSCC collateral deposit requirement, which grew from $125 million on the morning of January 25 to $690 million by the end of January 27.  (Mot. at 8-9.)

But meme stock trading continued to push both share prices and volume upward, which culminated in an unprecedented one-day spike in the Suspended Stocks' trading volume: from *1.86 billion* shares on January 26 to *6.95 billion* shares on January 27.[2]  Michael Bodson,

---

[2] *See Market Activity*, Nasdaq, https://www.nasdaq.com/market-activity (last visited Aug. 24, 2021).  The Court may take judicial notice of stock information.  (Mot. at 7 n.4.)

President and CEO of the DTCC, testified to Congress that this trading spike led to "the two highest transaction volume days in [NSCC's] history on Wednesday, January 27 and Thursday, January 28." (*See* Bodson Testimony at 4.)[3]  That extraordinary single-day increase in the Suspended Stocks' trading volume on January 27 had an equally dramatic effect on Robinhood Securities' NSCC deposit requirement on January 28.  At approximately 5:11 a.m. EST, Robinhood Securities received an email from NSCC stating that its deposit requirements had jumped massively from the prior day's:  Robinhood Securities' deposit deficit was over *$3 billion*—more than quadruple the previous day's deposit requirement.  (Am. Compl. ¶ 215.) The DTCC confirmed that, "[r]isk at NSCC, as measured by NSCC's aggregate clearing fund requirement, also increased substantially on January 28, to $33.5 billion, slightly higher than the peak that occurred in March 2020 and just under NSCC's historical maximum." (*See* Bodson Testimony at 4.)

In the face of this extraordinary market activity, Robinhood was left with no choice but to set the Suspended Stocks to "position close only" ("PCO"), which enabled (but did not require) Robinhood customers to exit their positions in those symbols if they wished, but temporarily restricted new purchases of those volatile securities.  (Am. Compl. ¶¶ 219, 240.)  In light of the unprecedented market volatility, Robinhood had to exercise its discretion under the Customer Agreement to protect the firm and its customers.  As seen in both the internal documents that Plaintiffs cite, as well as the public statements that Plaintiffs attack, the PCO decision was one that Robinhood did not make lightly, and was necessary to protect *all* of Robinhood's customers' ability to continue trading in the thousands of other securities available on its platform.  Plaintiffs attempt to take Robinhood to task for allegedly being "inconsistent and shifting" in explaining the reasoning behind the PCO decision.  (Opp. at 4-5.)  However, as this Court recognized just two days ago when addressing this very same issue, Robinhood's statements were not inconsistent at all.  (*See* Order Dismissing Antitrust Amended Complaint, ECF No. 438 at 46.)

---

[3] *See* Testimony of Michael C. Bodson ("Bodson Testimony"), DTCC President and CEO, U.S. House Financial Services Committee, at 4 (May 6, 2021), *available at* https://financialservices.house.gov/uploadedfiles/hhrg-117-ba00-wstate-bodsonm-20210506.pdf.

Plaintiffs' charges of impropriety are similarly based on complete mischaracterizations of the documents in the record.  For example, Plaintiffs allege that Mr. Swartwout, President and COO of Robinhood Securities, engaged in self-serving trades at the expense of customers by selling "his AMC shares on January 26, 2021—a day before the restrictions took effect." (Opp. at 24.)  This is false for three obvious reasons.  *First*, the full text of the message (copied in the Amended Complaint) shows that Plaintiffs confuse Mr. Swartwout's sale of AMC shares on January 26 with Robinhood Securities' plan to increase margin requirements for GME the following day—a completely different stock, and not the restriction at issue.  (Am. Compl. ¶ 12.)  *Second*, none of the purchase restrictions at issue were decided upon, or implemented until the morning of January 28 (after Robinhood Securities received the NSCC email raising its collateral deposit requirement), and therefore Mr. Swartwout did not know and could not have known that Robinhood later was going to impose purchase restrictions on AMC at the time he sold his AMC shares.  (Am. Compl. ¶ 219; Mot. at 9-10.) *Third*, the "PCO" restriction that Robinhood implemented on January 28 permitted Robinhood customers at all times to sell out of existing positions; thus, any Robinhood customer could sell his or her AMC shares, just as Mr. Swartwout did.  (Am. Compl. ¶ 240.)  Plaintiffs also claim that Robinhood had "intentionally fueled demand" due to Robinhood's ongoing marketing efforts and planned advertising time prior to and during Super Bowl LV (on February 5, 2021). (Opp. at 21.)  But Plaintiffs do not, and cannot, link any such marketing efforts for Robinhood's services generally to trading demand for the Suspended Stocks.  (Am. Compl. ¶ 201.)

For these (and many other) reasons, the lengthy narrative that Plaintiffs present at the opening of their opposition is completely untethered from reality.  It is also entirely irrelevant.  None of those purported facts—even if true (they are not) and supported by the allegations in the Amended Complaint (again, they are not)—could overcome the legal infirmities that doom Plaintiffs' attempt to create causes of action where none exist.  That is true for two primary reasons.  *First*, as black-letter tort law doctrine, there is no duty in negligence to avoid economic (non-physical) harm to any foreseeable plaintiff.  Plaintiffs' attempt to thrust upon Robinhood such a duty, to all investors in the United States who held a share in one of the meme stocks, is legally foreclosed.  *Second*, Plaintiffs, who are all Robinhood customers, cannot evade the clear terms of the Customer Agreement they signed to open their Robinhood accounts. In short, the Robinhood Customer Agreement expressly permitted Robinhood to implement the

challenged restrictions that are the basis for each of Plaintiffs' claims. That same agreement limited the extent of any agency relationship between Robinhood and its customers, precluding the existence of any fiduciary duty. Accordingly, what Plaintiffs call an improper attempt to "immunize" allegedly improper conduct is, in fact, nothing more than a request that the Court enforce the relevant, unambiguous terms of a contract that Plaintiffs do not allege was unenforceable and do not allege was breached. The relevant law precludes each of Plaintiffs' claims, and the Amended Complaint should be dismissed with prejudice.

## APPLICABLE LAW

Plaintiffs fail to state a claim against Robinhood, regardless of whether the Court applies California law—as Robinhood argues—or Florida law—as Plaintiffs argue. Nevertheless, Robinhood explains here why the broad choice-of-law provision in the Customer Agreement should result in the application of California law.

## I.   CALIFORNIA LAW APPLIES TO ALL OF PLAINTIFFS' CLAIMS.

Plaintiffs erroneously assert that the Robinhood Customer Agreement's choice-of-law provision is a narrow one that does not apply to their tort claims. (*See* Opp. at 15-16.) Plaintiffs focus on the first two words of Robinhood's choice-of-law provision—"This Agreement"—and ignore the rest of the provision, thereby misconstruing its breadth. The full provision states: "This Agreement *and all transactions made in [customer's] Account*[s] shall be governed by the laws of the State of California (regardless of the choice of law rules thereof)." (Mot. at 12; Cust. Agmt. § 37.K (emphasis added).) Plaintiffs' focus on the first two words to the exclusion of the rest of the clause causes them two problems, which they cannot overcome.

*First*, the full scope of the choice-of-law provision renders inapposite the cases Plaintiffs cite. Each of those cases concerns a narrow choice-of-law clause purporting to govern only "[the] release," "[the] contract" or "[the] Agreement"—without any additional language broadening the clauses' scopes beyond contract claims. (Opp. at 15-16.)[4] None of Plaintiffs'

---

[4] Plaintiffs' cases all involve *narrow* choice-of-law provisions, which are limited to contract claims. *See Green Leaf Nursery v. E.I. DuPont de Nemours & Co.*, 341 F.3d 1292, 1301 (11th Cir. 2003) (holding that a choice-of-law provision limited to "[t]his release" did not encompass tort claims); *Rayle Tech, Inc. v. DEKALB Swine Breeders, Inc.*, 133 F.3d 1405, 1408 (11th Cir. 1998) (interpreting a choice-of-law provision that provided that "[t]his contract shall be governed by the laws of the State of Illinois" to exclude tort claims); *Sunbelt Veterinary Supply, Inc. v. Int'l Bus. Sys. U.S., Inc.*, 985 F. Supp. 1352, 1356 (M.D. Ala. 1997) (holding that a choice-of-

cases involves a choice-of-law provision akin to the broad "all transactions" language set forth in Robinhood's Customer Agreement.

*Second*, courts that have considered provisions like Robinhood's have confirmed that the inclusion of broader language like "all transactions made in [customer's] account" unambiguously expands the provision's scope beyond claims for breach of contract. *See Anthem Leather, Inc. v. Kamino Int'l Transp., Inc.*, No. Civ. A. 1:06-CV-3130JE, 2008 WL 516289, at *2 (N.D. Ga. Feb. 25, 2008) ("[T]he plain meaning of 'govern[s] all transactions between the Parties' is that the [agreement] would apply to every business dealing between the two parties."); *Integrity Factoring Grp. Inc. v. Powerhouse Fresh Holdings, LLC*, No. 17-81314-CIV, 2018 WL 7954520, at *2 (S.D. Fla. Oct. 30, 2018) (finding that the language "[t]his Agreement and all transactions contemplated hereunder . . . shall be governed by, construed under, and enforced in accordance with the internal laws of the state of Idaho" applied to claim for attorneys' fees under a separate contract entered into as a transaction contemplated under the contract with the choice-of-law provision). Here, each Plaintiff claims that he or she was harmed either by selling a portion of his or her meme stock holdings in Robinhood accounts at allegedly depressed prices or by placing a purchase order for one or more of the Suspended Stocks through her Robinhood account. (Am. Compl. ¶¶ 29-84.) Each of Plaintiffs' allegations thus concern "transactions made in [customers'] account."

Because the choice-of-law provision in the Customer Agreement is unambiguous and broad in scope, it applies to all of Plaintiffs' claims (both in contract and in tort) even if, as Plaintiffs contend, the Customer Agreement is a contract of adhesion. *See Arndt v. Twenty-One Eighty-Five, LLC*, 448 F. Supp. 3d 1310, 1321 (S.D. Fla. 2020) ("Simply put, when an unambiguous, valid choice-of-law provision exists, as it does here, there is no need for the court to engage in a further conflict of laws analysis.") (citations omitted); *Ware Else, Inc. v. Ofstein*, 856 So. 2d 1079, 1081 (Fla. 5th DCA 2003) (enforcing unambiguous choice-of-forum clause and "disagree[ing] that the contract under consideration is not enforceable either because it is considered to be a contract of adhesion, or is unreasonable or unjust").

---

law provision that stated that "[t]his Agreement [was] governed by and construed under the laws of the State of California" did not encompass tort claims).)

## II.     THE AMENDED COMPLAINT SHOULD BE DISMISSED EVEN IF THE CHOICE OF LAW PROVISION IS INAPPLICABLE.

Plaintiffs contend that the "most significant relationship" test results in the application of Florida law to their tort claims.  If the Court declines to apply the Customer Agreement's choice-of-law provision to the tort claims, however, the Court need not undertake the full-blown choice-of-law analysis under the "most significant relationship" test at this stage of the case.  Rather, for purposes of resolving Robinhood's Motion, the Court may assume Florida law applies to the tort claims, as Plaintiffs suggest.  *See In re Checking Account Overdraft Litig.*, 694 F. Supp. 2d 1302, 1314, 1324 n.12 (S.D. Fla. 2010) (assuming, for purposes of motion to dismiss, that law of plaintiffs' domiciles applied, but recognizing that "[a]ny arguments regarding specific Plaintiffs or specific states may be raised at a later stage upon Court consideration of class certification, summary judgment, or trial"); *Viera v. BASF Catalysts LLC*, 2016 WL 1394333, at *1 n.2 (M.D. Fla. Apr. 8, 2016) (deciding motion to dismiss assuming New York law applied but noting that "[t]he parties should be ready, however, to address the choice-of-law issue at a later stage of the litigation").

The Court may make that assumption because the choice of law does not change the outcome on this Motion:  Plaintiffs have not identified a conflict that makes a difference to their ability to state a claim.  As Robinhood demonstrated in the Motion (and addresses further below), Plaintiffs' claims all fail under Florida law as well.  If the Court does not apply the choice-of-law-provision in the Customer Agreement broadly, the Court may therefore apply Florida law to the tort claims on this Motion.  *See Pycsa Panama, S.A. v. Tensar Earth Technologies, Inc.*, Case No. 06-20624-CIV-GOLD/TURNOFF, 2006 WL 8432715, at *3 (S.D. Fla. Dec. 20, 2006) ("Because the outcome of Tensar's motion to dismiss will be the same regardless of which law is applied, no true conflict exists.  Therefore, this Court will apply the law of Florida, the forum state, to which the parties originally consented by virtue of their application of that law."); *see also Hatton v. Chrysler Canada, Inc.*, 937 F. Supp. 2d 1356, 1367-68 (M.D. Fla. 2013) (deciding motion to dismiss without deciding conflict of law issue because there was no true conflict).

Although it is unnecessary for the Court to undertake a full-blown choice-of-law analysis at this stage, if the Court were to reach the issue now (or at a later stage in the case), Florida's most significant relationship test would not—as Plaintiffs urge—result in application of

Florida law to the merits of Plaintiffs' tort claims.  Under Florida's most significant relationship test, courts consider four factors:  (i) where the alleged injury occurred, (ii) where the alleged conduct causing injury occurred, (iii) the domicile, residence, nationality, place of incorporation and place of business of the parties and (iv) the place where the relationship, if any, between the parties is centered.  *See Bishop v. Florida Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980).  The first factor—where the alleged injury occurred—is given the most weight.  *Id.*  ("The state where the injury occurred would, under most circumstances, be the decisive consideration in determining the applicable choice of law."); *see also State Farm Mut. Auto. Ins. Co. v. Olsen*, 406 So. 2d 1109, 1111 (Fla. 1981) (holding "Illinois has the most significant relationship with the occurrence since the accident happened there"); *Morris v. ADT Sec. Servs., Inc.*, No. 07-80950-CIV, 2009 WL 10691165, at *6 (S.D. Fla. Sept. 11, 2009) (holding application of Florida law to be "inappropriate" where the places of injury for the named plaintiffs included four different states).  Here, Plaintiffs are domiciled in seven different states, and Plaintiffs seem to acknowledge that any alleged harm occurred in their respective home jurisdictions.  (Opp. at 18); *see also MasTec Renewables Puerto Rico LLC v. Mammoth Energy Services, Inc.*, No. 20-20263-Civ-Scola, 2020 WL 6781823, at *6 (S.D. Fla. Nov. 18, 2020) (holding, for factor one purposes, that injury in tortious interference case occurred where plaintiff's business was harmed); *eCapital Commercial Fin. Corp. v. Hitachi Capital Am. Corp.*, 519 F. Supp. 3d 1129, 1134 n.4 (S.D. Fla. 2021) (same).[5]

While the second factor (where the decision was made) points to Florida, the remaining two factors point to California:  it is where two of the three corporate defendants maintain their principal place of business, *see Pycsa Panama, S.A. v. Tensar Earth Techs., Inc.*, 625 F. Supp. 2d 1198, 1225 (S.D. Fla. 2008) (holding factor three supported applying Panama law to product liability claims because "three of the four key parties" were incorporated and had

---

[5] Plaintiffs erroneously contend that because Robinhood's decision to PCO the Suspended Stocks was made in Florida, the "culmination" of Plaintiffs' injuries occurred there.  (Opp. at 18.)  But Plaintiffs are improperly conflating the location where the alleged injury occurred (among the Plaintiffs, across seven states) with the place where the alleged *conduct causing the injury* occurred.  *See Bishop*, 389 So.2d at 1001.  As Plaintiffs acknowledge, the location where the conduct occurred is the second factor of the significant relationship test, not the first.  (Opp. at 18.)  Unsurprisingly, Plaintiffs' position is not supported by their cited authorities or by Florida law.  *See MasTec*, 2020 WL 6781823, at *6; *eCapital*, 519 F. Supp. 3d at 1134 n.4.

their principal place of business there), and it is the forum identified in the Robinhood Customer Agreement, *see Beattey v. Coll. Ctr. of Finger Lakes Inc.*, 613 So. 2d 52, 54-55 (Fla. 4th DCA 1992) (applying New York law where parties' contract included "several provisions pertaining to New York law"); *see also Stallworth v. Hospitality Rentals, Inc.*, 515 So. 2d 413, 417 (Fla. 1st DCA 1987) (holding relationship centered in Florida because parties' agreements had various connections to Florida). While the Court may need to weigh this choice-of-law issue at later stages if the case proceeds, Robinhood still wins this Motion regardless of the outcome of the most significant relationship analysis because Plaintiffs do not state a claim under Florida law— the law which they themselves advocate for their tort claims.

## ARGUMENT

### I.   PLAINTIFFS' NEGLIGENCE AND GROSS NEGLIGENCE CLAIMS FAIL.

Plaintiffs' lead argument in support of their claims for negligence and gross negligence (Counts I and II) is that Robinhood supposedly owes negligence duties to "all foreseeable Plaintiffs" (Opp. at 20), by which Plaintiffs apparently mean their "Nationwide Investor Class." That is, Plaintiffs claim Robinhood owes tort duties to every single person or entity in the United States who held one of the 13 stocks at issue, regardless of whether he, she or it had ever even heard of Robinhood, or Robinhood had ever heard of them. This breathtaking assertion is wrong as a matter of law, both with respect to Robinhood Customers (as addressed in this Section I) and with respect to non-Robinhood Customers (as addressed in Section VII). The relevant tort law upon which Plaintiffs rely makes clear that the concept of "foreseeable risk" gives rise to a tort duty only in situations involving *physical harm*. (*See infra* Part I.A.) Once stripped of their "foreseeable risk" argument, Plaintiffs cannot successfully invoke any exception to the general rule that liability for their alleged losses must arise in contract rather than tort given the existence of a binding contract between the parties. (*See infra* Part I.B.)

### A.   Robinhood Does Not Owe a Generalized Duty of Care.

Plaintiffs' argument that Robinhood owes negligence duties to all foreseeable plaintiffs is wrong. As explained in the Motion, black-letter law imposes a tort duty arising from foreseeability of harm *only* when an "*actor's conduct creates a risk of physical harm*." Restatement (Third) of Torts: Phys. & Emot. Harm § 7 (2010) (emphasis added). By contrast, "[a]n actor has no duty to avoid the unintentional infliction of *economic loss* on another."

Restatement (Third) of Torts: Liab. for Econ. Harm § 1(a) (2020) (emphasis added).  It does not matter whether California or Florida law applies.

**California law.**  The California Supreme Court most recently applied these principles in *Southern California Gas Leak Cases*, 441 P.3d 881 (Cal. 2019), where the court held that a natural gas utility, which permitted a prolonged gas leak, did not owe a duty not to inflict economic damages on nearby businesses.  The court explained that its precedents "requir[e] more than mere foreseeability for imposing a duty of care" in cases involving economic losses because the court has "appreciated the need to safeguard the efficacy of tort law by setting meaningful limits on liability." *Id.* at 887.  This holding was consistent with many prior decisions by the California Supreme Court confirming that there is no generalized negligence duty to avoid non-physical harms.  *See Aas v. Superior Court*, 12 P.3d 1125, 1130-31 (Cal. 2000) ("In actions for negligence, a manufacturer's liability is limited to damages for physical injuries; no recovery is allowed for economic loss alone.");[6] *Erlich v. Menezes*, 981 P.2d 978, 983 (Cal. 1999) (explaining that "foreseeability alone is not sufficient to create an independent tort duty," and "foreseeability is not synonymous with duty; nor is it a substitute"); *Quelimane Co. v. Stewart Title Guar. Co.*, 960 P.2d 513, 532 (Cal. 1998) ("Recognition of a duty to manage business affairs so as to prevent purely economic loss to third parties in their financial transactions is the exception, not the rule, in negligence law" and "[f]oreseeability of financial injury to third persons alone is not a basis for imposition of liability for negligent conduct . . . .").

Plaintiffs ignore these controlling California Supreme Court cases and instead rely entirely on, and misread, a non-binding Court of Appeal case, *North American Chemical Co. v. Superior Court*, 69 Cal. Rptr. 2d 466, 476 (Ct. App. 1997).  (*See* Opp. at 21.)  *North American Chemical Co.* does not hold that a general foreseeability test applies in cases that do not involve physical harm.  To the contrary, it applies the *J'Aire* "special relationship" test, which is an *exception* to the general rule (on which Robinhood relies) that there is no general duty to avoid non-physical harms.  As discussed below, the *J'Aire* test is inapplicable in this case and, in any event, the application of the *J'Aire* test in *North American Chemical Co.* has been widely

---

[6] A narrow aspect of *Aas* relating to construction defects in newly constructed housing has been superseded by California statute.  *See Rosen v. State Farm Gen. Ins. Co.*, 70 P.3d 351, 356-57 (Cal. 2003).  But this does not disturb the reasoning in *Aas* relevant here.

criticized.  *See Peregrine Pharms., Inc. v. Clinical Supplies Mgmt., Inc.*, No. 12-cv-1608-JGB, 2015 WL 13309286, at *6 (C.D. Cal. June 22, 2015) (explaining that the "reasoning and holdings" of *N. Am. Chem. Co.* "have been largely ignored or distinguished by subsequent opinions of the California Supreme Court"); *Body Jewelz, Inc. v. Valley Forge Ins. Co.*, 241 F. Supp. 3d 1084, 1094 (C.D. Cal. 2017) (declining to follow *N. Am. Chem. Co.*).

 **Florida law.**  Plaintiffs fail to state a negligence claim under Florida law for the same reasons.  Florida courts also recognize that a plaintiff generally cannot recover in tort for purely economic losses.  *See Tech, Inc. v. Valley Tank Testing, L.L.C.*, 244 So. 3d 383, 393 (Fla. 2d DCA 2018) ("[T]o proceed on a common law negligence claim based solely on economic loss, there must be some sort of link between the parties or some other extraordinary circumstance that justifies recognition of such a claim."); *Monroe v. Sarasota Cty. Sch. Bd.*, 746 So. 2d 530, 531 (Fla. 2d DCA 1999) ("[W]e continue to hold, as a general rule, that bodily injury or property damage is an essential element of a cause of action in negligence."); *Underwriters at Int. v. All Logistics Grp., Inc.*, 483 F. Supp. 3d 1199, 1211 (S.D. Fla. 2020) ("[P]laintiffs are generally not permitted to recover 'for purely economic losses when the plaintiff has sustained no bodily injury [or] property damage.'") (quoting *Curd v. Mosaic Fertilizer, LLC*, 39 So. 3d 1216, 1223-24 (Fla. 2010)), *appeal dismissed*, No. 20-14453-JJ, 2021 WL 2190226 (11th Cir. Mar. 4, 2021).

 The two Florida cases Plaintiffs cite to support their general foreseeability theory (*see* Opp. at 20-21) do nothing to rebut this well-established doctrine—*Clay Elec. Co-op., Inc. v. Johnson*, 873 So. 2d 1182, 1184 (Fla. 2003), and *Estate of Rotell ex rel. Rotell v. Kuehnle*, 38 So. 3d 783, 785 (Fla. 2d DCA 2010), each involve the risk of *physical* harm.  Indeed, in *Clay Electric Co-op.*, the Florida Supreme Court relied on the Restatement standard, which requires "physical harm" for a generalized negligence duty.  873 So. 2d at 1186 (quoting Rest. (Second) of Torts § 324A (1965)); *see also* Rest. (Second) of Torts § 323 (1965).  Accordingly, Florida courts have held that the doctrine of *Clay Electric Co-op.* is "inapplicable" in "a case not involving 'physical harm' within the meaning of Section 323 of the Restatement (Second) of Torts (1965)."  *Casamassina v. U.S. Life Ins. Co.*, 958 So. 2d 1093, 1102 (Fla. 4th DCA 2007); *see also Estate of Johnson ex rel. Johnson v. Badger Acquisition of Tampa LLC*, 983 So. 2d 1175, 1186 (Fla. 2d DCA 2008) (doctrine of *Clay Electric Co-op.* "is inapplicable where there is

no physical harm"); *Tolz v. GEICO Gen. Ins. Co.*, No. 08-80663-Civ-MARRA/JOHNSON, 2009 WL 10667547, at *4 (S.D. Fla. July 16, 2009) (same).

      In short, Plaintiffs' contention that Robinhood owes all foreseeable plaintiffs who suffer economic harm a duty of care is wrong under basic principles of tort law.

      **B.**    **Robinhood Owes Its Customers <u>Contractual</u> Obligations, Not <u>Tort</u> Duties**.

      Stripped of their general foreseeability argument, Plaintiffs are left to argue that some other aspect of their relationship with Robinhood gave rise to a tort duty.  As a general rule, however, "there is no liability in tort for economic loss caused by negligence in the performance or negotiation of a contract between the parties."  Restatement (Third) of Torts: Liab. for Econ. Harm § 3 (2020).  Plaintiffs do not contest here that there is a binding contract between Robinhood and its customers; indeed they bring claims premised on the very enforceability of that contract.  (*See* Counts IV–V.)  The fact that Plaintiffs contend the contract is a contract of adhesion is irrelevant here.  *See Graham v. Scissor-Tail, Inc.*, 623 P.2d 165, 172 (Cal. 1981) ("[A] contract of adhesion is fully enforceable according to its terms."); *Bombardier Cap. Inc. v. Progressive Mktg. Grp., Inc.*, 801 So. 2d 131, 135 (Fla. 4th DCA 2001) (finding allegations that a contract is one of adhesion does not "in itself . . . render the contract[] void").[7]

      Because Robinhood and its customers are parties to an enforceable contract, the basic tort-law principle (recognized under both California and Florida law) that bars parties to a contract from recovering in tort for economic loss precludes Plaintiffs' negligence claims.

      **California law.**  As Robinhood explained in its Motion to Dismiss, "the duties of care between parties who negotiate contracts are not governed by the law of tort."  *Sheen v. Wells Fargo Bank, N.A.*, 250 Cal. Rptr. 3d 677, 684 (Ct. App. 2019) (quoting Rest. 3d Torts, Liability for Economic Harm (Tent. Draft No. 1) § 3, cmt. d).  The California Supreme Court has declared that "[i]f every negligent breach of contract gives rise to tort damages the limitation [on tort recovery in contract breach cases] would be meaningless, as would the statutory distinction between tort and contract remedies."  *Erlich*, 981 P.2d at 984.  To be clear, Robinhood does not take the position that it owes its customers no legal obligations.  To the contrary, Robinhood's

---

[7] While it is true that an *unconscionable* contract of adhesion may be unenforceable, Plaintiffs do not allege the Customer Agreement is unconscionable.  (Mot. at 14; Opp. at 1.)

obligations to its customers are clearly defined and governed by *contract*, the terms of which each and every customer reviews and accepts prior to opening their accounts.  (*See* Mot. at 14.)

As Robinhood also explained in the Motion, there are two exceptions that could permit a plaintiff to bring a tort claim based on a contractual relationship—the independent tort doctrine and the existence of a professional duty.  (*See* Mot. at 15-17.)  Plaintiffs do not argue that either exception applies.  Instead, Plaintiffs seek to rely on two other purported bases for evading the default rule that no tort duties arise from a contractual relationship:  (1) a supposed exception for services contracts; and (2) the "special relationship" doctrine.  Each argument fails.

*First*, Plaintiffs wrongly assert that "the economic loss rule does not apply where the parties have contracted for the provision of services . . . ."  (Opp. at 22.)  The only decision by the California Supreme Court that Plaintiffs cite is inapplicable because it involved physical injury.  *See Eads v. Marks*, 249 P.2d 257 (Cal. 1952) (severe facial injuries to toddler from broken glass milk bottle).  And the only other case Plaintiffs cite is *North American Chemical Co.*, which as discussed above has been roundly criticized and not followed.  Since the California Court of Appeal issued its decision in *North American Chemical Co.*, the California Supreme Court has confirmed that there is no special rule for services contracts, *see Erlich*, 981 P.2d at 980 (claim for emotional distress damages from negligent performance of a home construction contract), and separately has explained that the argument in *North American Chemical Co.* about services contracts "is not persuasive" because "[a] person may not ordinarily recover in tort for the breach of duties that merely restate contractual obligations," *Aas*, 12 P.3d at 1135.  Unsurprisingly, the court in *Peregrine* concluded that "the "reasoning and holdings" of *North American Chemical Co.* "have been largely ignored or distinguished by subsequent opinions of the California Supreme Court."  2015 WL 13309286, at *6.[8]

---

[8] Other federal courts in California have agreed.  *See, e.g.*, *County of Kern v. Tyler Techs., Inc.*, No. 1:20-cv-00853-AWI-HBK, 2021 WL 369588, at *9 (E.D. Cal. Feb. 3, 2021) ("In light of *Erlich*, the Court cannot find, as [plaintiff] urges, that the economic loss rule does not apply to service contracts."); *Dwyer v. Bicoy*, No. SACV 09-0064-JVS (RNBx), 2009 WL 10697966, at *4 (Nov. 17, 2009) ("The principles found in *Erlich*, rather than *North American*, are controlling in this case."); *Rejects Skate Magazine, Inc. v. Acutrack, Inc.*, No. C 06-2590 CW, 2006 WL 2458759, at *5 (N.D. Cal. Aug. 22, 2006) (holding that "the limitation on tort recovery applies to the negligent performance of services as well as to the negligent manufacture of goods").

*Second*, Plaintiffs contend that, under California law, the *J'Aire* "special relationship exception" applies.  (Opp. at 23-26.)  Notably, the *J'Aire* test is an exception to the very rule that Plaintiffs contend does not exist—that a plaintiff generally cannot recover in tort solely for economic losses.  In any event, the *J'Aire* special relationship exception does not apply here as a matter of law because Robinhood and its customers are in contractual privity through the Robinhood Customer Agreement.

As Robinhood explained in its Motion, the California Supreme Court has applied the exception *only* where the parties do not have a contract.  *See J'Aire Corp. v. Gregory*, 598 P.2d 60, 63 (Cal. 1979) ("not in contractual privity"); *Biakanja v. Irving*, 320 P.2d 16, 18 (Cal. 1958) ("not in privity of contract").  Indeed, since deciding *J'Aire* and *Biakanja*, the California Supreme Court has consistently emphasized the importance of preventing tort remedies from subsuming contract remedies, and has cautioned that expanding the *J'Aire* special relationship exception to parties in privity of contract would create exactly that problem.  *See, e.g.*, *Erlich*, 981 P.2d at 984 ("If every negligent breach of a contract gives rise to tort damages the limitation [on tort recovery] would be meaningless, as would the statutory distinction between tort and contract remedies."); *Robinson Helicopter Co. v. Dana Corp.*, 102 P.3d 268, 273 (Cal. 2004) (explaining that the rule preventing plaintiffs from recovering for economic losses in tort "prevent[s] the law of contract and the law of tort from dissolving one into the other").

Numerous federal courts have also recognized the boundary that the California courts have drawn around *J'Aire* by limiting it only to cases that do not involve parties in contractual privity.  *See, e.g.*, *Body Jewelz, Inc.*, 241 F. Supp. 3d at 1093 ("[T]he Court finds that the special relationship exception is not applicable here where, unlike in *J'Aire*, Plaintiff and Defendant are in privity of contract."); *see also Elsayed v. Maserati N. Am., Inc.*, 215 F. Supp. 3d 949, 963 (C.D. Cal. 2016) ("The Court refuses to extend the special relationship exception to encompass direct relationships.").[9]  Plaintiffs' contention that "the bulk of California courts have

---

[9] *See also Tyson & Assocs., Inc. v. Denko*, No. 95-56351, 89 F.3d 846 (table), 1996 WL 355566, at *1 (9th Cir. June 25, 1996) (*J'Aire* applies to "parties not in privity of contract"); *Grey Fox, LLC v. Plains All Am. Pipeline, L.P.*, No. CV 16-3157 PSG (JEMx), 2019 WL 4196066, at *7 n.5 (C.D. Cal. Apr. 8, 2019); *Heidelberg USA, Inc. v. PM Lithographers, Inc.*, No. CV 17-02223-AB (AJWx), 2017 WL 7201872, at *9 (C.D. Cal. Oct. 19, 2017); *Resnick v. Hyundai Motor Am., Inc.*, No. CV 16-00593-BRO (PJWx), 2017 WL 1531192, at *11 (C.D. Cal. Apr. 13, 2017); *City of San Diego v. Amoco Chem. Co.*, No. Civ. 98-0474-E (LSP), 1999 WL

held otherwise" (Opp. at 25)—a proposition for which Plaintiffs cite two unpublished cases decided by the same federal judge—is therefore without basis.[10]  Plaintiffs' overly broad reading of the special relationship exception is inconsistent with fundamental principles of tort law and should be rejected.[11]

**Florida law.**  Plaintiffs' negligence claims are also barred under Florida law, which recognizes the same fundamental principles of tort law as California.  As Florida courts have explained, "contract principles [are] more appropriate than tort principles for resolving economic loss without an accompanying physical injury or property damage." *Fla. Power & Light Co. v. Westinghouse Elec. Corp.*, 510 So. 2d 899, 902 (Fla. 1987).  Thus, there must be a tort "distinguishable from or independent of [the] breach of contract" in order for a plaintiff to have a viable tort claim based on a breach in a contractual relationship. *Lewis v. Guthartz*, 428 So. 2d 222, 224 (Fla. 1982).  Recognized independent torts include professional malpractice, *Moransais v. Heathman*, 744 So. 2d 973, 981 (Fla. 1999), and breach of fiduciary duty, *see FDIC for IndyMac Bank, FSB v. Genesis Title Co., LLC*, No. 11-20841-CIV, 2011 WL 13223744, at *2 (S.D. Fla. July 1, 2011) (Altonaga, J.)—not a (non-existent) general negligence duty to avoid economic loss to contractual counterparties.

Plaintiffs unsuccessfully try to sidestep Florida law restricting the recovery in tort for economic loss between contractual counterparties by relying on *Tiara Condo. Ass'n v. Marsh & McLennan Cos.*, 110 So. 3d 399 (Fla. 2013), where the Florida Supreme Court confined the "economic loss rule" to product liability claims.  (Opp. at 22.)  But Plaintiffs fail to respond to the showing in the Motion that *Tiara* is inapplicable here.  (Mot. at 20 n.16.)  Plaintiffs

---

33548157, at *4 (S.D. Cal. Sept. 9, 1999); *Barrier Specialty Roofing & Coatings, Inc. v. ICI Paints N. Am., Inc.*, No. CV-F-07-1614 LJO TAG, 2008 WL 1994947, at *8 (E.D. Cal. May 6, 2008).

[10] Similarly, Plaintiffs' implication that this Court could be admonished for failing to apply all six *J'Aire* factors is also baseless, as the case Plaintiffs cite for that proposition, *Kalitta Air, L.L.C. v. Cent. Tex. Airborne Sys., Inc.*, 315 F. App'x 603, 604 (9th Cir. 2008), involved parties who were not in privity, and so the exception was available to the plaintiffs.

[11] Plaintiffs do not try to argue this exception exists under Florida law.  Nor could they, since it does not.  *See* Rest. (Third) of Torts: Liab. for Econ. Harm § 1, cmt. e (2020) ("*J'Aire* has not been overruled, but the extent of its vitality in California is questionable, and it has not been influential elsewhere." (citation omitted)).

erroneously conflate the "economic loss rule"—which is indeed grounded in the product liability context—with the separate, more general principle that tort recovery for purely economic losses is unavailable without an independent tort.  As the concurrence in *Tiara* explained, the Florida Supreme Court's holding with respect to the "economic loss rule" was "neither a monumental upsetting of Florida law nor an expansion of tort law at the expense of contract principles." *Tiara*, 110 So. 3d at 408 (Pariente, J., concurring).  "Basic common law principles already restrict the remedies available to parties who have specifically negotiated for those remedies, and . . . our clarification of the economic loss rule's applicability does nothing to alter these common law concepts." *Id.*  Indeed, following *Tiara*, Florida courts regularly affirm the principle that economic losses are generally not recoverable in tort.  *See, e.g.*, *Underwriters*, 483 F. Supp. 3d at 1211 (explaining, post-*Tiara*, that plaintiffs still generally cannot recover for economic losses absent personal injury or property damage).[12]

Plaintiffs have therefore failed to identify *any* tort duty to support a negligence claim under either California or Florida law.  Their negligence and gross negligence claims (Counts I and II) should be dismissed.

### C.  Plaintiffs' Arguments Based on Regulations and Self-Regulatory Rules Are Irrelevant to This Motion.

Plaintiffs concede that "industry standards and customs do not give rise to an independent legal duty" and that they "have not asserted a private right of action" based on regulatory requirements.  (Opp. at 26.)  Rather, Plaintiffs argue only that various regulations and rules of self-regulatory organizations "help define the standard of care."  (*Id.*)  However, the contours of any negligence-based standard of care are irrelevant to this Motion because

---

[12] Other federal courts in Florida have agreed.  *See, e.g.*, *Travelers Indem. Co. of Conn. v. Richard McKenzie & Sons, Inc.*, 326 F. Supp. 3d 1332, 1345 (M.D. Fla. 2018) ("The post-*Tiara* decisions continue . . . to bar a tort claim dependent on a contractual duty . . . ."); *Certain Underwriters at Lloyd's of London, UK Subscribing to Pol'y No. B1230AP56189A14 v. Ocean Walk Resort Condo. Ass'n*, No. 6:16-cv-258-ORL-37GJK, 2017 WL 3034069, at *10 (M.D. Fla. July 18, 2017) (collecting post-*Tiara* cases where courts have reaffirmed the barriers in recovering against a contractual counterparty in tort); *Kaye v. Ingenio, Filiale de Loto-Quebec, Inc.*, No. 13-61687-CIV, 2014 WL 2215770, at *4 (S.D. Fla. May 29, 2014) ("[T]he fact that the economic-loss rule does not apply [outside products-liability cases] does not mean that parties in contractual privity may recast causes of action that are otherwise breach-of-contract claims as tort claims.").

Robinhood does not have a duty sounding in negligence to prevent economic loss as a matter of law.  Accordingly, while Plaintiffs' arguments about regulations and self-regulatory rules are premised on erroneous factual allegations, those allegations may be disregarded for this Motion.

Plaintiffs also fail to explain how Robinhood deviated from those standards even if they were relevant here.  Instead, Plaintiffs refer to a string of self-regulatory rules and regulations without citing to any authorities as to how those rules apply to brokers or how any alleged conduct constituted a violation of those rules.  For example, Plaintiffs cite FINRA Rule 2010, which provides generally that FINRA members shall observe "high standards of commercial honor" (Am. Compl. ¶ 168; Opp. at 28), but Plaintiffs do not cite any authorities suggesting Robinhood's conduct violated this rule.  Similarly, Plaintiffs invoke FINRA Rules 3110 and 4370 (Am. Compl. ¶ 169), which provide generally that a broker must maintain a supervisory system and engage in risk management, but Plaintiffs allege that Robinhood had a supervisory and risk management system in place—which resulted in the limited PCO restrictions—and again cite no authorities suggesting Robinhood's system was inadequate under either FINRA Rule 3110 or 4370.  Finally, Plaintiffs cite the SEC's Net Capital Rule, which provides a formula regarding the amount of net capital a broker must have at a given time, but Plaintiffs do not actually allege (nor could they) that Robinhood violated this rule.[13]

## II.  PLAINTIFFS DO NOT STATE A CLAIM FOR BREACH OF ANY FIDUCIARY DUTIES.

Plaintiffs' fiduciary duty claim (Count III. ) fail for two reasons.  *First*, Plaintiffs are wrong as a matter of law to contend that all brokers owe their customers general fiduciary duties, even if the broker, like Robinhood, provided no investment advice to its customers and merely executed its customers' orders.  (Opp. at 29-35.)  *Second*, contrary to Plaintiffs' contentions, clearing brokers such as Robinhood Securities do not owe fiduciary duties to their introducing broker's customers.  (*Id.* at 35-37.)

---

[13] Plaintiffs do not allege that Robinhood violated the Net Capital Rule.  (*See* Am. Compl. ¶ 161.)  Plaintiffs (impermissibly) make this assertion for the first time in their opposition to Robinhood's Motion to Dismiss.  (Opp. at 28.)

### A.    None of the Robinhood Defendants Owe Customers a General Fiduciary Duty.

Plaintiffs do not allege that Robinhood provided investment advice to them.  As Robinhood explained in its Motion, courts routinely hold that non-discretionary brokers that do not provide investment advice do not owe their customers a general fiduciary duty.  (Mot. at 23-25.)  Where the relationship between the broker and a customer is "confined to the simple performance of transactions ordered by a customer," a general fiduciary duty "do[es] not arise." *Petersen v. Sec. Settlement Corp.*, 277 Cal. Rptr. 468, 473 (Ct. App. 1991); *see also Apollo Cap. Fund LLC v. Roth Cap. Partners LLC*, 70 Cal. Rptr. 3d 199, 214 (Ct. App. 2007) (finding no fiduciary duty to undertake diligence on investments where the stockbroker was not an "adviser to the customer about investment decisions"); *Brown v. Cal. Pension Adm'rs & Consultants, Inc.*, 52 Cal. Rptr. 2d 788, 797 (Ct. App. 1996) (finding a non-discretionary broker did not have "an expansive fiduciary relationship giving rise to a duty to notify the customer of the risky nature of an investment, or . . . of the poor performance of similar investments held by different customers"); *Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d 1042, 1050 (11th Cir. 1987) ("The focus of the [fiduciary duty] inquiry is how the fiduciary acted in his selection of the investment . . . .").  Plaintiffs' arguments to the contrary fail under California and Florida law.

**California Law.**  To support their sweeping (and incorrect) statement that brokers owe customers a broad, general fiduciary duty, Plaintiffs rely on cases discussing retail brokerage practices that were commonplace before today's online, self-directed discount brokerages, such as Robinhood, E*Trade, Fidelity, Charles Schwab and many others.  Those cases involved traditional retail services in which live stockbrokers would interact directly with their customers to make investment recommendations and accept trade orders.  *See, e.g.*, *Twomey v. Mitchum, Jones & Templeton, Inc.*, 69 Cal. Rptr. 222 (Ct. App. 1968); *Duffy v. Cavalier*, 264 Cal. Rptr. 740 (Ct. App. 1989); *Apollo*, 70 Cal. Rptr. 3d 199.

In each of these cases, in finding a fiduciary duty existed, the court's conclusion was based on the fact that the relevant broker provided investment advice to its customer.  For example, in *Twomey*, the court found that a broker owed a fiduciary duty to determine the customer's actual financial situation and needs because the broker's recommendations "were for all practical purposes the controlling factor in the transactions" and the broker was not "acting merely as agent to carry out purchases or sales selected by the customer."  *Twomey*, 69 Cal. Rptr.

at 242.  The court reached a similar conclusion in *Duffy*, 264 Cal. Rptr. at 754.  Courts have properly read *Twomey*, *Duffy* and their progeny as providing that a fiduciary duty lies only where the broker provides investment advice or where the broker manages a discretionary account (*i.e.*, where the broker makes trading decisions on its customers' behalf).  *See Apollo*, 70 Cal. Rptr. 3d at 214 ("It is a long-settled rule that a stockbroker owes a fiduciary duty to his or her customer.  However, in the cases so holding, the stockbroker was an adviser to the customer about investment decisions.") (citations and internal quotations omitted).  As Robinhood explains in its Motion, none of these factors applies here.  Rather, Robinhood "act[ed] merely as agent to carry out purchases or sales selected by the customer."  *Twomey*, 69 Cal. Rptr at 242.

Instead, to the extent that Robinhood owed a duty to its customers, that duty arose under agency law.  *See Caravan Mobile Home Sales, Inc. v. Lehman Bros. Kuhn Loeb, Inc.*, 769 F.2d 561, 567 (9th Cir. 1985) ("A stockbroker is an agent of his client.").  As explained in Robinhood's Motion, parties can limit agency duties by contract, and Robinhood did so here through the Customer Agreement.  (*See* Mot. at 28-29.)  Because the Customer Agreement expressly permitted Robinhood to impose trade restrictions, Robinhood could not have breached any duty when it imposed limited purchase restrictions on the Suspended Stocks.  (*See id.*)

Plaintiffs attempt to salvage their fiduciary duty claim and get beyond the Rule 12(b)(6) motion by pointing repeatedly to the statement in *Apollo* that "the scope or extent of the fiduciary duty obligation . . . depends on the facts of the case."  70 Cal. Rptr. at 216.  (Opp. at 30-31, 34.)  But Plaintiffs have identified no case holding that a broker, like Robinhood, that was in a mere agency relationship (not providing investment advice or managing a discretionary account) owes a fiduciary duty to accept trades from its customers in all securities at all times.  That is because there is no such case.  Finding there was such a broad fiduciary duty here would be inconsistent with the Customer Agreement and the facts of the customer relationship (an online, self-directed, commission-free brokerage platform) alleged in the Amended Complaint.

In the alternative, Plaintiffs contend a fiduciary duty arose from a supposed "special" or "confidential" relationship between Robinhood and its customers.  They suggest that Robinhood had a relationship of trust and repose with each of its millions of customers by virtue of the brokerage services it offered.  (Opp. at 33-34.)  But Plaintiffs ignore the weight of authority cited in Robinhood's Motion showing that confidential or special relationships are supposed to be just that—confidential or special—something that cannot possibly exist between

19

Robinhood and its *millions* of self-directed customers.  *See Siemonsma v. Mut. Diversified Emps. Fed. Credit Union*, No. SACV 10-1093-DOC, 2011 WL 1485979, at *3 (C.D. Cal. Apr. 19, 2011) ("To find a confidential relationship arising out of the mere depositing of funds would make confidential relationships ubiquitous in the lending industry, which strikes the Court as contrary to the meaning of a confidential relationship.").

Plaintiffs also gloss over the fact that Robinhood cannot be said to have "accepted" any fiduciary obligations, as Plaintiffs must to state a claim under the "special" or "confidential" relationship doctrine.  *See City Sols., Inc. v. Clear Channel Commc'ns, Inc.*, 201 F. Supp. 2d 1048, 1050 (N.D. Cal. 2002).  Even though Plaintiffs agreed in the Customer Agreement that Robinhood neither provides investment advice nor recommends any securities, Plaintiffs contend this provision was insufficient to disclaim any fiduciary obligations because the Customer Agreement does not mention the word "fiduciary."  (Opp. at 33.)  However, as explained above, no general fiduciary duty can lie where a party does not provide investment advice or manage a customer's discretionary account—both of which Robinhood expressly disclaimed in the Customer Agreement.  Plaintiffs cite no law suggesting a party is required to include the word "fiduciary" in an agreement to disclaim legal obligations that courts have held arise only under factual circumstances expressly disclaimed in the governing agreement.

**Florida Law.**  Plaintiffs' fiduciary duty claim fares no better under Florida law. Plaintiffs primarily rely on *Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d 1042 (11th Cir. 1987) to support their proposition that brokers owe their customers general fiduciary duties, but this case was also premised on an assumption that brokers typically provide their customers investment advice (or, alternatively, direct their customers' finances through discretionary accounts).  Indeed, *Gochnauer* makes clear that a broker's duties are different depending on whether the account is "discretionary or nondiscretionary," *see id.* at 1049 n.9 (assuming that even in a nondiscretionary account, "the customer and broker confer as to a particular transaction"), and the court's finding of a fiduciary duty is premised on the broker's provision of investment advice, *see id.* at 1050 ("The focus of the inquiry is how the fiduciary acted in his selection of the investment . . . .").  Plaintiffs also cite *Banc of Am. Sec. LLC v. Stott*, No. 04-81086-CIV, 2005 WL 8156027 (S.D. Fla. Aug. 30, 2005), but in that case, the court found the broker owed a fiduciary duty because the broker "had complete discretion to do as he wished with the funds in [the plaintiff's] account."  *Id.* at *4.  Because Plaintiffs directed their own

20

finances and Robinhood did not provide them any investment advice, Robinhood does not owe them a fiduciary duty under Florida law.  Instead, to the extent Robinhood owed them any duties, it was again only in its capacity as an agent, with the scope of those duties delineated in the Robinhood Customer Agreement.  *See SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1340 (11th Cir. 2010) (finding the defendant broker, which did not make decisions regarding the accounts but "simply executed" the transactions, did not owe a fiduciary duty and that its "actions were appropriate within the limited agency created by the [] Agreement").  Because, as stated above, the Customer Agreement expressly permits Robinhood to restrict trading, Robinhood could not have breached any fiduciary duty when it imposed limited purchase restrictions on the Suspended Stocks.

A fiduciary duty also could not have arisen as a result of a special or confidential relationship under Florida law.  The services Robinhood provides through programs such as Robinhood Learn and Robinhood Snacks cannot reasonably be characterized as investment advice (*see* Mot. at 26) and accordingly do not amount to "advis[ing], counsel[ing], and protect[ing]" Robinhood customers such that they could give rise to a fiduciary duty.  *See Bankest Imports, Inc. v. ISCA Corp.*, 717 F. Supp. 1537, 1541 (S.D. Fla. 1989).  Plaintiffs have also not pleaded facts constituting a "recognition" or "acceptance" of fiduciary obligations by Robinhood that could give rise to a fiduciary duty.  *See id.*  Robinhood expressly disclaimed that it provided investment advice in the Customer Agreement, and Florida courts recognize that contracts can limit the scope of any fiduciary duties owed.  *See, e.g., Scolieri v. John Hancock Life Ins. Co. (U.S.A.)*, No. 2:16-cv-690-FTM-38CM, 2017 WL 700215, at *5 (M.D. Fla. Feb. 22, 2017) (finding no fiduciary relationship because "any expectations Plaintiffs may have for advice from [defendant] were expressly and unequivocally disclaimed" by the relevant contract).  Therefore, Plaintiffs' fiduciary duty claim fails under Florida law as well.

**B.     Robinhood Securities, As a Clearing Broker, Does Not Owe Fiduciary Duties**.

Plaintiffs' argument that *Robinhood Securities*, specifically as the clearing broker, owed them a general fiduciary duty is also misplaced under the law of California and Florida.  In fact, Plaintiffs do not cite a single case where a court has found that a clearing broker owed a fiduciary duty to its introducing broker's customers.  (*See* Opp. at 35-37.)  Plaintiffs wrongly contend that *Petersen v. Sec. Settlement Corp.*, 277 Cal. Rptr. 468, 474 (Ct. App. 1991), supports their position.  As Plaintiffs acknowledge, however, the *Petersen* court declined to find that a

clearing broker had a duty of disclosure regarding the nature of investments it had not introduced.  (Opp. at 35.)  The court's statement in *dicta* that "arguably there are circumstances under which even a clearing broker . . . might be required to provide a customer with information about the nature of his or her investment" has no bearing here, as Plaintiffs have not alleged that Robinhood Securities failed to provide Plaintiffs with any information about the nature of their investments.  Plaintiffs also rely on *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1338-39 (11th Cir. 2010), but in *SFM*, the court found the clearing broker defendant owed no fiduciary duty because, as was the case here, the clearing broker did not "provide investment advice" to the customer.  *Id.*  The other cases Plaintiffs cite do not even involve fiduciary duty claims, and instead concern a clearing broker's potential liability for fraud and securities violations committed by introducing brokers.[14]  These cases are completely inapposite.  Plaintiffs have provided no support for the Court to depart from the well-established rule that clearing brokers generally do not owe fiduciary duties to the customers of their introducing broker clients.

## III.   PLAINTIFFS CANNOT STATE A CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.

Plaintiffs' good faith and fair dealing claim (Count V) fails because the Customer Agreement expressly and unambiguously permitted Robinhood to put in place the limited purchase restrictions that Plaintiffs now claim constituted a breach of the implied covenant.  (Mot. at 30; Cust. Agmt. § 5.F.)  The implied covenant of good faith and fair dealing "cannot substantively alter [a contract's] terms."  *Guz v. Bechtel Nat'l Inc.*, 8 P.3d 1089, 1094-95 (Cal. 2000).[15]  Where, as here, conduct is expressly permitted by the contract, that conduct cannot

---

[14] *See McDaniel v. Bear Stearns & Co.*, 196 F. Supp. 2d 343, 353 (S.D.N.Y. 2002) (confirming arbitration award holding clearing broker liable for breach of contract and aiding and abetting fraud); *Berwecky v. Bear Stearns & Co.*, 197 F.R.D. 65, 67 (S.D.N.Y. 2000) (certifying class action alleging clearing broker "directly participated" in scheme violating the federal securities laws); *Cannizzaro v. Bache, Halsey, Stuart, Shields, Inc.*, 81 F.R.D. 719, 721 (S.D.N.Y. 1979) (denying motion to dismiss claim that clearing broker aided and abetted introducing broker's fraud); *Margaret Hall Found., Inc. v. Atl. Fin. Mgmt., Inc.*, 572 F. Supp. 1475, 1480-81 (D. Mass. 1983) (denying motion to dismiss claims that clearing broker violated securities laws and aided and abetted introducing broker's fraud); *Koruga v. Fiserv Correspondent Servs.*, 183 F. Supp. 2d 1245, 1248 (D. Or. 2001) (confirming arbitration award where the arbitration panel found clearing broker liable as "direct participant" in fraud).

[15] Plaintiffs concede that California law applies to their good faith and fair dealing claim. (Opp. at 15 n.12, 38 n.21).

serve as the basis for a breach of the implied covenant of good faith and fair dealing claim. *See Brehm v. 21st Century Ins. Co.*, 83 Cal. Rptr. 3d 410, 422 (Ct. App. 2008) ("The implied covenant of good faith and fair dealing cannot prohibit a contracting party from doing that which is expressly permitted by the agreement itself . . . ."). That is true regardless of the alleged motive for the conduct. *See Guz*, 8 P.3d at 1111 (where contract permits conduct, motive and lack of care in accomplishing conduct are irrelevant). Plaintiffs concede this basic legal principle, writing that "the scope of conduct prohibited by the covenant cannot contradict the express terms of the contract[.]" (Opp. at 38.) Their attempts to overcome this problem fail.

*First*, Plaintiffs argue that an implied covenant limiting Robinhood's discretionary power to restrict trading under Section 5.F must be read into the Customer Agreement because otherwise the Customer Agreement would be an illusory contract. (Opp. at 41.) This argument misconstrues California contract law and has been rejected by California courts. The implied covenant of good faith and fair dealing does not apply to contracts granting one party unfettered discretion unless the contract *as a whole* provides no consideration whatsoever to the other party. *See Third Story Music, Inc. v. Waits*, 48 Cal. Rptr. 747, 753 (Ct. App. 1995) (holding the implied covenant applies to discretion-granting provisions only in the "rare instances when reading the provision literally would . . . result in an unenforceable, illusory agreement."); *see also Perdue v. Crocker Nat'l Bank*, 702 P.2d 503, 510 (Cal. 1985) (a contract is illusory "only if the total discretion granted one party renders *the contract* lacking in consideration") (emphasis added). Where, as here, "the express purpose of the contract is to grant unfettered discretion, and the contract is otherwise supported by adequate consideration, then the [discretionary] conduct is, by definition, within the reasonable expectation of the parties and 'can never violate an implied covenant of good faith and fair dealing.'" *Wolf v. Walt Disney Pictures & Television*, 76 Cal. Rptr. 3d 585, 597 (Ct. App. 2008) (citations omitted). In other words, even when contractual provisions grant unfettered discretion, "implied terms cannot vary the express terms of a contract; if the defendant did what it was expressly given the right to do, there can be no breach." *Id*. (citations omitted).

Here, the implied covenant of good faith and fair dealing does not apply to Robinhood's discretionary power to restrict trading under Section 5.F because the Customer Agreement is supported by consideration separate from 5.F's discretion-granting provision. The Customer Agreement specifically provides that the consideration owed to customers is

"Robinhood . . . opening one or more accounts on my behalf . . . ."  (Cust. Agmt. Preamble.)
Plaintiffs themselves allege that as Robinhood customers with Robinhood accounts, they receive
services and other benefits from Robinhood that are unrelated to placing the specific trades at
issue here.  (*See* Am. Compl. ¶ 123.)  Courts have accordingly dismissed claims for breach of the
covenant of good faith and fair dealing where plaintiffs have attempted to challenge broad
discretionary provisions nearly identical to the provision in the Robinhood Customer Agreement,
where the contract was otherwise supported by consideration.  *See, e.g.*, *Enhanced Athlete Inc. v.
Google LLC*, No. 19-cv-08260-HSG, 2020 WL 4732209, at *6 (N.D. Cal. Aug. 14, 2020)
(dismissing plaintiff's good faith and fair dealing claim where the relevant customer agreement
gave Google the discretion "to decide whether Content violates th[e] Terms of Service," and "at
any time, without prior notice and in [their] sole discretion, [to] remove such Content and/or
terminate a user's account for submitting such material").[16]  Simply put, this is nothing like
*Badie v. Bank of Am.*, 79 Cal. Rptr. 2d 273 (Ct. App. 1998), which Plaintiffs cite to support their
position.  There, the court found the covenant of good faith and fair dealing applied to the
defendant's exercise of discretion because the defendant had "unilateral rights" to change the
terms of the contract, rendering the contract as a whole illusory and unenforceable absent
application of an implied covenant.  *Id.* at 285.[17]

  *Second*, Plaintiffs contend (in contradiction to their first argument) that the
Customer Agreement is actually ambiguous about when Robinhood may restrict trading.  (Opp.
at 42.)  It is not.  Section 5.F authorizes Robinhood to restrict trading "at any time, in its sole
discretion."  (Cust. Agmt. § 5.F.)  Plaintiffs cite to a wholly separate provision of the Customer

---

[16] Perhaps recognizing this fatal flaw in their claims, Plaintiffs further suggest that other
alleged conduct—beyond the temporary purchase restrictions—breached the implied covenant of
good faith and fair dealing, including, *inter alia*, taking on new customers, failing to maintain
adequate capital, and facilitating high volume and volatile trading on the platform.  (Opp. at 37-
38).  But absent the PCO restrictions, none of this alleged conduct would ever have affected
Plaintiffs.  It is the PCO restrictions that Plaintiffs allege caused them harm.  And those
restrictions were directly permitted by the Customer Agreement.

[17] Plaintiffs also cite *Automatic Vending Co. v. Wisdom*, 6 Cal. Rptr. 31 (Ct. App. 1960).
That case is inapposite; the party exercising discretion there had discretion over the price of the
services provided under the contract, rendering the agreement as a whole illusory.  That is not the
case here, where customers receive Robinhood's services for free.

Agreement—Section 13—to claim the contract is ambiguous with respect to "investments in high volume and volatile securities." (Opp. at 42.) But Section 13 provides, in pertinent part:

> I understand that, whether I place a market or limit order, I will receive the price at which My order is executed in the marketplace, subject to any clarification stated below. Particularly during periods of high volume, illiquidity, fast movement or volatility in the marketplace, the execution price received may differ from the quote provided on entry of an order, and I may receive partial executions of an order at different prices. I understand that Robinhood Financial is not liable for any price fluctuations. I also understand that price quotes generally are for only a small number of shares as specified by the marketplace, and larger orders are relatively more likely to receive executions at prices that vary from the quotes or in multiple lots at different prices.

(Cust. Agmt. § 13; *see also* Opp. at 42.) This provision discloses to Robinhood customers that accepted market or limit orders may vary in terms of *pricing* during times of volatility (among other scenarios), and has nothing to do with whether trade orders may or may not be accepted in the first place. Thus, Section 13 does not conflict with, or limit, Robinhood's discretionary authority to restrict trading under Section 5.F in any way. It certainly does not create ambiguity.

In sum, the implied covenant of good faith and fair dealing exists "merely to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made.*" *Guz*, 8 P.3d at 1110 (emphasis in original). None of Robinhood's alleged conduct deprived Plaintiffs of any benefits guaranteed under the Customer Agreement, which explicitly provides that customers' ability to trade can be restricted. Plaintiffs' good faith and fair dealing claim should therefore be dismissed.

## IV.   PLAINTIFFS CANNOT STATE A CLAIM FOR BREACH OF AN IMPLIED DUTY OF CARE.

Plaintiffs' implied duty of care claim (Count IV) fails for the same reason as their good faith and fair dealing claim: the assertion that Robinhood owes an implied duty of care is directly contradicted by the Customer Agreement. California law is clear that an implied duty of care claim cannot lie where, as here, express terms in the contract permit the conduct at issue.[18] *See Holguin v. Dish Network LLC*, 178 Cal. Rptr. 3d 100, 114 (Ct. App. 2014) (explaining it is "*express contractual terms* [that] give rise to implied duties, violations of which may themselves

---

[18] Plaintiffs concede that California law applies to their implied duty of care claim (Opp. at 15 n.12, 43), as they must because Florida law does not recognize an implied duty of care.

constitute breaches of contract") (emphasis added).  To permit purported implied duties to change the express terms of the contract would be inconsistent with basic principles of contract law.  *See Series AGI W. Linn of Appian Grp. Invs. DE, LLC v. Eves*, 158 Cal. Rptr. 3d 193, 204 (Ct. App. 2013) ("The courts will not imply a better agreement for parties than they themselves have been satisfied to enter into, or rewrite contracts whenever they operate harshly.").

To get around this barrier, Plaintiffs advance the same two arguments they attempted to advance with their good faith and fair dealing claim:  first, that interpreting the Customer Agreement to give Robinhood full discretion to impose trading restrictions would render the Customer Agreement unenforceable, and second, that there is an ambiguity in the contract as to when Robinhood is authorized to restrict trading.  (Opp. at 44-45.)  For the reasons explained above, these arguments are unavailing.  Because Plaintiffs advance no other arguments that could sustain their implied duty of care claim, the claim should be dismissed.

## V.   PLAINTIFFS' TORTIOUS INTERFERENCE CLAIM AGAINST ROBINHOOD MARKETS FAILS TO STATE A CLAIM.

Plaintiffs' tortious interference claim against Robinhood Markets (Count VI) fails under both California and Florida law.

**California Law.**  As explained in the Motion, under California law, a plaintiff alleging a claim for tortious interference must allege "actual breach or disruption of the contractual relationship[.]"  *Ixchel Pharma, LLC v. Biogen, Inc.*, 470 P.3d 571, 575 (Cal. 2020) (citation omitted).  The facts Plaintiffs allege do not constitute disruption, as a matter of law.  Plaintiffs concede that they do not assert a breach of contract by either Robinhood Financial or Robinhood Securities (the parties to the Customer Agreement).  (*See* Opp. at 46.)  Plaintiffs argue that they can nevertheless satisfy this element of a tortious interference claim by alleging conduct short of breach—namely "that Robinhood Markets *interfered* with their contractual relationship with its subsidiaries" even if that interference did not cause a contractual breach. (Opp. at 46 (emphasis added).)  However, the cases on which Plaintiffs rely, *Pacific Gas & Electric Co. v. Bear Stearns & Co.*, 791 P.2d 587 (Cal. 1990) ("*PG&E*"), and *Lipman v. Brisbane Elementary Sch. Dist.*, 359 P.2d 465 (Cal. 1961), make clear that Plaintiffs are arguing for a standard that does not apply under these circumstances as a matter of law.

Specifically, *PG&E* and *Lipman* stand for the proposition that a claim for tortious interference may lie for disruption (rather than actual breach) only where "the *plaintiff's*

26

performance has been prevented or rendered more expensive or burdensome[.]" *Lipman*, 359 P.2d at 469 (emphasis added). This is not what Plaintiffs allege. Plaintiffs instead allege that Robinhood Markets, a defendant, made performance by *its subsidiaries* (Robinhood Financial and Robinhood Securities), also defendants, more difficult. (Am. Compl. ¶ 338.) That is the converse of the situation that a claim for tortious interference based on disruption of contractual performance addresses. *See PG&E*, 791 P.2d at 521 ("We have recognized that interference with the *plaintiff's* performance may give rise to a claim for interference with contractual relations if *plaintiff's* performance is made more costly or more burdensome." (emphasis added)). Plaintiffs do not allege that Robinhood Markets made *their* performance under the Robinhood Customer Agreement more burdensome or costly, nor could they. Plaintiffs have no obligations under the Robinhood Customer Agreement to trade on Robinhood's application at all—let alone in any of the Suspended Stocks. (*See generally* Cust. Agmt.) The PCO restrictions did not render Plaintiffs unable to perform under the Customer Agreement, hinder their performance, or make their performance more costly—as would be required under California law to plead tortious interference based on disruption of contractual performance.

Moreover, as Robinhood explained in its Motion, even if Plaintiffs had pleaded facts to support a "breach or disruption," Plaintiffs nonetheless fail to allege that Robinhood Markets committed any "intentional acts designed to induce a breach or disruption of the contractual relationship." *Ixchel*, 470 P.3d at 575. As an initial matter, Plaintiffs concede that the decision to implement a PCO on the Suspended Stocks was made by Robinhood Securities— not Robinhood Markets. (Am. Comp. ¶ 28.) And Plaintiffs' allegations concerning Robinhood Markets consists entirely of omissions and failures to put business plans and processes into place, rather than undertaking any purposeful, intentional acts. (*See* Am. Compl. ¶¶ 338-39.) Nowhere do Plaintiffs plead that any such alleged omissions or failures to plan ahead by Robinhood Markets were "designed to induce a breach or disruption of the contractual relationship," *Ixchel*, 470 P.3d at 575, or that it "[knew] that the interference [was] certain or substantially certain to occur as a result of [its] action," *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 952 (Cal. 2003) (citation omitted).

**Florida Law.** Plaintiffs do not argue that they could state a claim under Florida law for "disruption" of contractual relations as they argue would be the case under California law. Nor could they; Florida law requires an underlying breach of contract as an element of the

tortious interference claim.  *See Chicago Title Ins. Co. v. Alday-Donalson Title Co. of Fla.*, 832
So. 2d 810, 814 (Fla. 2d DCA 2002) (requiring that "the plaintiff establish that the defendant's
conduct caused or induced the breach" of contract); *Sun Life Ass. Co. of Canada v. Imperial
Premium Fin., LLC*, 904 F.3d 1197, 1215 (11th Cir. 2018) ("defendant's intentional and
unjustified procurement of a breach" of contract is an element).  Because Plaintiffs do not allege
a breach of contract (*see* supra Parts III–IV), that defect alone is fatal to this claim if Florida law
applies.  Plaintiffs' claim also would fail because, like California law, Florida law requires
allegations—wholly absent here for the reasons described in the preceding paragraph—that
Robinhood Markets engaged in intentional and unjustified conduct.  *See Salit v. Ruden,
McClosky, Smith, Schuster & Russell, P.A.*, 742 So. 2d 381, 385 (Fla. 4th DCA 1999).

## VI.  PLAINTIFFS FAIL TO STATE A CLAIM OF CIVIL CONSPIRACY.

Under both California and Florida law, a claim for civil conspiracy must fail
absent a wrongful predicate act.  *See Doctors' Co. v. Superior Ct.*, 49 Cal. 3d 39, 44 (1989) ("A
civil conspiracy however atrocious, does not per se give rise to a cause of action unless
a civil wrong has been committed resulting in damage."); *Loeb v. Geronemus*, 66 So. 2d 241,
243 (Fla. 1953) ("The gist of a civil action for conspiracy is not the conspiracy itself but the civil
wrong which is alleged to have been done pursuant to the conspiracy.").  Plaintiffs assert that
their tortious interference claim serves as the predicate act, but for the reasons discussed above in
Section V, Plaintiffs fail to state a claim for tortious interference.  Accordingly, Plaintiffs' civil
conspiracy claim (Count VII) must also fail for that reason alone.

Regardless, Plaintiffs' civil conspiracy claim also fails because they cannot assert
the claim against one party, as they have done here.  As discussed in Robinhood's Motion, the
Supreme Court of California has held that "tort liability arising from conspiracy presupposes that
the coconspirator is legally capable of committing the tort."  *Applied Equip. Corp. v. Litton
Saudi Arabia Ltd.*, 869 P.2d 454, 511 (Cal. 1994).  Thus, to state a civil conspiracy claim, there
must be at least two parties legally capable of committing the underlying tort (here, tortious
interference).  In *Applied Equipment*, the court held that because a party to a contract is not
legally capable of committing tortious interference with its own contract, a party to a contract
"cannot be bootstrapped into tort liability by the pejorative plea of conspiracy" to commit
tortious interference.  *Id*. at 514.  For the exact same reason, Robinhood Financial and
Robinhood Securities, which are both parties to the Robinhood Customer Agreement—the

underlying contract at issue—cannot be held liable for conspiracy to tortiously interfere with their own contract.  Plaintiffs are thus left attempting to assert a conspiracy claim, which requires two or more parties, against a single party:  Robinhood Markets.

The decision in *Applied Equipment* was based on the principle, which—as Plaintiffs acknowledge—is equally accepted by Florida courts (Opp. at 50 n.25), namely that "the tort cause of action for interference with contract does not lie against a party to the contract."  *Id.*; *see also, e.g.*, *Genet Co. v. Anheuser-Busch, Inc.*, 498 So. 2d 683, 684 (Fla. 3d DCA 1986) ("Under Florida law, a cause of action for tortious interference does not exist against one who is himself a party to the business relationship allegedly interfered with."); *Palm Beach Cty. Health Care Dist. v. Pro. Med. Educ., Inc.*, 13 So. 3d 1090, 1094 (Fla. 4th DCA 2009) ("For the interference to be unjustified, the interfering defendant must be a third party, a stranger to the business relationship.  A defendant is not a 'stranger' to a business relationship if the defendant 'has any beneficial or economic interest in, or control over, that relationship.'").  For this reason, the outcome is the same even if Florida law is applied.  *See Richardson v. Progressive Am. Ins. Co.*, Case No. 18-cv-715, 2019 WL 2287955, at *8 (M.D. Fla. May 29, 2019) (finding that under Florida law, "one cannot tortiously interfere with a contract to which it is a party" and "[t]herefore, . . . as a party to the contract with plaintiffs, [the defendant] cannot conspire to tortiously interfere with the contract").  The civil conspiracy claim should be dismissed.

## VII.   ROBINHOOD OWES NO DUTIES TO NON-ROBINHOOD CUSTOMERS—ALL CLAIMS BROUGHT BY NON-ROBINHOOD CUSTOMERS THEREFORE FAIL.

Plaintiffs double down on their extraordinary position that Robinhood owed "*all* foreseeable Plaintiffs tort duties," including individuals who are not even Robinhood customers. (Opp. at 20.)  However, Robinhood does not owe duties of care to parties with whom it has no relationship.  Plaintiffs' argument is premised entirely on their assertion that a tort duty to non-customers may be imposed on Robinhood based on "foreseeability of the risk"—a doctrine that, under California law and Florida law, applies only to *physical* harm.  (*See supra* Section I; Mot. at 17.)  Plaintiffs do not—and cannot—claim any physical harm here.

Moreover, none of the named Plaintiffs are non-Robinhood customers.  They could not, therefore, meet the typicality and adequacy requirements to represent a putative "Nationwide Investor Class."  (Am. Comp. ¶¶ 30, 34, 42, 47, 51, 55, 61, 65, 69, 73 and 81) (alleging that each named Plaintiff was a Robinhood customer).)  And, in any event, Plaintiffs

provide no argument even suggesting that Robinhood could be liable to individuals with whom it has no contractual or commercial relationship for a breach of fiduciary duty (Count III), a breach of the duty of good faith and fair dealing or implied duty of care (Counts IV–V) or for tortious interference and civil conspiracy (Counts VI–VII).  Each of these claims should be dismissed entirely for the reasons set forth in Argument Sections II–VI above, and also independent of those arguments to the extent they are brought by or on behalf of non-Robinhood customers.

## VIII.   PLAINTIFFS' AMENDED COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE.

Plaintiffs' request for leave to amend their complaint—again—should be denied. Plaintiffs already have had three opportunities, over nearly ten months, after substantial discovery and a previous motion to dismiss, to plead viable claims, but to no avail.  (Mot. at 4, 36-37.)  In these circumstances, dismissal with prejudice is appropriate.  *See Foman v. Davis*, 371 U.S. 178, 182 (1962).  Nor do Plaintiffs provide any reason to believe they could amend their complaint to remedy its deficiencies if given the opportunity.  *See Lacy v. BP P.L.C.*, 723 Fed. Appx. 713, 717 (11th Cir. 2018) (upholding dismissal of complaint with prejudice where, "despite multiple opportunities to do so, [plaintiff] failed to demonstrate that he would be able to resolve the defects in his amended complaint" if given leave to amend).

None of Plaintiffs' cases hold otherwise.  In fact, Plaintiffs cite no cases in which leave to amend was granted.  In *Florida Power & Light Co. v. Allis Chalmers Corp.*, the Eleventh Circuit affirmed a decision to deny a proposed amendment that would not survive a motion to dismiss.  83 F.3d 1514, 1520-21 (11th Cir. 1996).  Plaintiffs have similarly failed to demonstrate any amendment would survive a motion to dismiss.[19]  Indeed, Plaintiffs have already had the chance to review thousands of pages of Robinhood's documents and still have failed to state a claim.  *See In re Fundamental Long Term Care, Inc.*, 873 F.3d 1325, 1342 (11th Cir. 2017).  Plaintiffs' claims should be dismissed with prejudice.

---

[19] Plaintiffs' citation to *Jennings v. BIC Corp.*, 181 F.3d 1250, 1258 (11th Cir. 1999), is inapposite.  In *Jennings*, the Eleventh Circuit affirmed the denial of leave to amend because the deadline for amending pleadings had passed and the amendment would cause undue delay.

Dated:  November 19, 2021

<u>/s/ Samuel A. Danon</u>

**HUNTON ANDREWS KURTH LLP**
Samuel A. Danon (FBN 892671)
Gustavo Javier Membiela (FBN 513555)
María Castellanos Alvarado (FBN 116545)
333 S.E. 2 Avenue, Suite 2400
Miami, FL 33131
Telephone: (305) 810-2500
Facsimile: (305) 810-2460
sdanon@huntonak.com
gmembiela@huntonak.com
mcastellanos@hunton.com

**CRAVATH, SWAINE & MOORE LLP**
Antony L. Ryan
Kevin J. Orsini
Brittany L. Sukiennik
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700
aryan@cravath.com
korsini@cravath.com
bsukiennik@cravath.com

*Counsel for Defendants Robinhood Markets, Inc., Robinhood Financial LLC and Robinhood Securities, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on November 19, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I further certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive Notices of Electronic Filing.

Dated:  November 19, 2021          */s/ Samuel A. Danon*
                                      Samuel A. Danon (FBN 892671)