**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-2989-MDL-ALTONAGA/Torres**

**IN RE:**

**JANUARY 2021 SHORT SQUEEZE TRADING LITIGATION**
______________________________________/

This Document Relates to All Claims Included
In the Other Broker Tranche

**DEFENDANT APEX CLEARING CORPORATION'S REPLY IN SUPPORT OF ITS RULE 12 MOTION TO DISMISS PLAINTIFFS' AMENDED CONSOLIDATED OTHER BROKER TRANCHE CLASS ACTION COMPLAINT**

**Table of Contents**

INTRODUCTION ..... 1

ARGUMENT ..... 3

I. Plaintiffs' Negligence and Fiduciary Duty Claims Fail Because Plaintiffs Fail to Show that Apex Owes Plaintiffs Any Open-Ended, Ongoing Duties of Care Here 3

A. Apex Does Not Owe an Open-Ended, Ongoing Common Law or Fiduciary Duty to Named Plaintiffs ..... 3

B. Plaintiffs' Securities Fraud Cases Do Not Establish that Apex Owed Named Plaintiffs Any General Common Law Tort Duty or a Fiduciary Duty ..... 9

II. Even if This Court Were to Find That Apex Owed Some Duty to Named Plaintiffs, Those Duties Do Not Include the Novel Duties Plaintiffs Seek to Create Here ..... 12

A. Setting the Record Straight: Plaintiffs' Complaint In Fact Does Seek to Impose Duties (i) to Dicker, (ii) to Rush, and (iii) to Maintain Access to Unlimited Capital, But Plaintiffs Do Not Defend These Novel Duties in the Opposition ..... 13

B. Plaintiffs' Proposed Duties Are Contrary to Well-Settled Law, and Plaintiffs Allege a Common Law Duty to Follow FINRA Rules for the First Time in the Opposition ..... 16

C. This Court Cannot Create a Novel Private Right of Action to Enforce FINRA Rules Through State Law ..... 20

III. Plaintiffs' Tortious Interference Claim Fails Under Both New York and Texas Law, Particularly Where No Contract Is Alleged ..... 22

IV. Plaintiffs Remaining Arguments Are Meritless ..... 24

A. Plaintiffs Fail to Plausibly Plead Causation or Article III Standing ..... 24

B. Plaintiffs' Amended Complaint Was Not Properly Filed Because This Court Did Not Implement a Direct File Order in This Action ..... 26

C. Plaintiffs' Complaint Seeks to Enforce Securities Laws Through Conflicting State Tort Law and Therefore Is Preempted ..... 28

D. Absent a "Special Relationship," New York Law Precludes Tort Claims for Purely Economic Losses ..... 29

E. This Court Should Reject Plaintiffs' Invitation to Use New York Tort Law to Create Unlimited Negligence Liability ........ 30

CONCLUSION ........ 30

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*10 Am. Title Ins. Co. v. Lacelaw Corp.*,
861 F.2d 224 (9th Cir. 1988) ....................2

*532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*,
96 N.Y.2d 280 (N.Y. 2001) ....................29, 30

*Alfaro v. Wal-Mart Stores, Inc.*,
210 F.3d 111 (2d Cir. 2000)....................9, 11, 30

*Am. Dental Ass'n v. Cigna Corp.*,
605 F.3d 1283 (11th Cir. 2010) ....................18

*AMBAC Assur. Corp. v. U.S. Bank N.A*,
328 F. Supp. 3d 141 (S.D.N.Y. 2018)....................29

*Appert v. Morgan Stanley Dean Witter, Inc.*,
2009 WL 3764120 (N.D. Ill. Nov. 6, 2009) ....................28

*Baker v. Welch*,
735 S.W.2d 548 (Tex. App. 1987)....................24

*Bank of America, N.A. v. Cartwright*,
2021 WL 3912563 (N.D. Ind. Sept. 1, 2021) ....................21

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................18, 22, 25

*Berwecky v. Bear Stearns & Co.*,
197 F.R.D. 65 (S.D.N.Y. 2000) ....................11

*Biscone v. JetBlue Airways*,
681 F. Supp. 2d 383 (E.D.N.Y. 2010) ....................8

*Bissell v. Merrill Lynch & Co.*,
937 F. Supp. 237 (S.D.N.Y. 1996)....................7

*Blyth v. White*,
49 G.A. App. 738, 832 (Ga. Ct. App. 1934)....................5

*Brink v. Raymond James & Assocs., Inc.*,
2015 WL 11198241 (S.D. Fla. June 29, 2015)....................5

*Burgess v. Religious Tech. Ctr., Inc.*,
600 F. App'x 657 (11th Cir. 2015) ....................................................................9, 16

*Busch v. L.F. Rothschild & Co.*,
23 A.D.2d 189 (1st Dept. 1965)....................................................................4, 15, 19

*Cannizaro v. Bache, Halsey, Stuart, Shields, Inc.*,
81 F.R.D. 719 (S.D.N.Y. 1979) ....................................................................10, 11

*Cap. Options Invest., Inc. v. Goldberg Bros. Commodities, Inc.*,
958 F.2d 186 (7th Cir. 1992) ....................................................................15

*Capital Options Investments, Inc. v. Goldberg Bros. Commodities*,
1990 WL 180583 (N.D. Ill. Nov. 5, 1990) ....................................................................4

*Carvel Corp. v. Noonan*,
3 N.Y.3d 182 (N.Y. 2004) ....................................................................23

*Clements v. Withers*,
437 S.W.2d 818 (Tex. 1969)....................................................................24

*Cortland v. Walston & Co., Inc.*,
340 F. Supp. 1076 (S.D.N.Y. 1972)....................................................................4, 15

*de Kwiatkowski v. Bear, Stearns & Co.*,
126 F. Supp. 2d. 672 (S.D.N.Y. 2000).................................................................... passim

*Erie R. Co. v. Tompkins*,
304 U.S. 64 (1938)....................................................................9

*First Nat'l Bank of Eagle Pass v. Levine*,
721 S.W.2d 287 (Tex. 1986)....................................................................23

*French v. Bache Halsey Stuart, Inc.*,
Comm. Fut. L. Rep. ¶ 20, (CFTC 1977) ....................................................................5

*Gelboim v. Bank of Am. Corp.*,
574 U.S. 405 (2015)....................................................................27, 28

*Glob. Enter. Grp. Holding, S.A. v. Ottimo*,
2010 WL 11629556 (E.D.N.Y. June 8, 2010) ....................................................................8, 10, 11

*Goldberger v. Bear, Stearns & Co.*,
2000 WL 1886605 (S.D.N.Y. Dec. 28, 2000) ....................................................................22

*Griffin v. Dugger*,
823 F.2d 1476 (11th Cir. 1987) ....................................................................25

*Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*,
50 N.Y.2d 183 (N.Y. 1980) ....................23

*Hamilton v. Beretta U.S.A. Corp.*,
96 N.Y.2d 222 N.E.2d 1055 ....................7, 21, 30

*Hand v. Dean Witter Reynolds Inc.*,
889 S.W.2d 483 (Tex. App. 1994)....................5, 7, 19

*Humphrey v. Hollywood Police Dep't*,
2019 U.S. Dist. LEXIS 35022 (S.D. Fla. Mar. 4, 2019)....................16

*In re Blech Sec. Litig.*,
961 F. Supp. 569 (S.D.N.Y. 1997)....................11

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*,
2021 U.S. Dist. LEXIS 116925 (D. Kan. June 23, 2021)....................28

*In re Farmers Ins. Exch. Claims Representatives' Overtime Pay Litig.*,
2008 WL 4763029 (D. Or. Oct. 28, 2008)....................28

*In re FCA US LLC Monostable Elec. Gearshift Litig.*,
2017 WL 6402992 (E.D. Mich. Mar. 21, 2017) ....................26, 27, 28

*In re Managed Care Litig.*,
150 F. Supp. 2d 1330 (S.D. Fla. 2001) ....................28

*In re Merrill Lynch & Co. Research Reps. Sec. Litig.*,
568 F. Supp. 2d 349 (S.D.N.Y. 2008)....................25

*In re Packaged Ice Antitrust Litig.*,
2011 WL 6178891 (E.D. Mich. Dec. 12, 2011) ....................28

*In re Series 7 Broker Qualification Exam Scoring Litig.*,
548 F.3d 110 (D.C. Cir. 2008)....................21

*In re Takata Airbag Products Liability Litigation*,
379 F. Supp.3d 1333 (S.D. Fla. 2019) ....................26

*In re Vioxx Prod. Liab. Litig.*,
478 F. Supp. 2d 897 (E.D. La. 2007)....................27

*Indep. Ord. of Foresters v. Donald, Lufkin & Jenrette, Inc.*,
157 F.3d 933 (2d Cir. 1998)....................6

*Iqbal. Ashcroft v. Iqbal*,
556 U.S. 652 (2009)....................18, 22

*Javitch v. First Montauk Fin. Corp.*,
279 F. Supp. 2d 931 (N.D. Ohio)....................................................................................5

*Kneese v. Pershing LLC*,
2012 WL 13019677 (N.D. Tex. Nov. 14, 2012)...............................................................10, 11

*Koruga v. Fiserv Correspondent Servs.*,
183 F. Supp. 2d 1245 (D. Or. 2001) ...............................................................................11

*Lange v. Hentz & Co.*,
418 F. Supp. 1376 (N.D. Tex. 1976) ...............................................................................8

*Magnum Corp. v. Lehman Bros. Kuhn Loeb, Inc.*,
794 F.2d 198 (5th Cir. 1986) ........................................................................................5, 8

*McDaniel v. Bear Stearns & Co., Inc.*,
196 F. Supp. 2d 343 (S.D.N.Y. 2002).........................................................................10, 11

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng*,
697 F. Supp. 1224 (D.D.C. 1988) ..................................................................................5

*NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*,
87 N.Y.2d 614 (N.Y. 1996) ..........................................................................................23

*Norwood v. Raytheon Co.*,
414 F. Supp. 2d 659 (W.D. Tex. 2006)...........................................................................9

*Press v. Chemical Inv. Servs. Corp.*,
988 F. Supp. 375 (S.D.N.Y. 1997)...........................................................................6, 7, 15

*Remington v. Newbridge Sec. Corp.*,
2013 WL 2444719 (S.D. Fla. June 5, 2013) ....................................................................5

*Scott v. Dime Sav. Bank of New York, FSB*,
886 F. Supp. 1073 (S.D.N.Y. 1995).................................................................................5

*Turk v. Pershing LLC*,
2014 WL 12572906 (N.D. Tex. Dec. 8, 2014) ...........................................................10, 11, 12

*Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
464 F. Supp. 3d 634 (S.D.N.Y. 2020)......................................................................3, 21, 29

*Warth v. Seldin*,
422 U.S. 490 (1975).....................................................................................................25

*Weatherly v. Pershing*,
2015 WL 13742270 (N.D. Tex. June 23, 2015) ...............................................................20

*Wilcox v. Wilcox*,
2006 Tex. App. LEXIS 11106 (Tex. App. Dec. 28, 2006)....................................................19

*Wistar v. Raymond James Fin. Servs., Inc.*,
365 F. Supp. 3d 1266 (S.D. Fla. 2019)..........................................................................5

*Zurich Am. Ins. Co. v. Amerisure Ins. Co.*,
2017 WL 366232 (S.D. Fla. 2017)...............................................................................9

**DOCKETED CASES**

*In re Takata Airbag Prod. Liab. Litig.*,
Master File No. 15-MD-2599, S.D. Fla. Case No. 14-cv-24009, ECF No. 939 (May 18, 2018)
.......................................................................................................................26

**FEDERAL RULES AND STATUTES**

28 U.S.C. § 1407.........................................................................................................27, 28

17 C.F.R. § 240.15c3-1...................................................................................................17

Fed. R. Civ. P. R. 23.......................................................................................................8

FINRA, Regulatory Notice 21-12 (March 18, 2021)......................................................17

FINRA Rule 2010..........................................................................................................17

FINRA Rule 3110..........................................................................................................17

FINRA Rule 4370..........................................................................................................17

**MISCELLANEOUS**

US Securities and Exchange Commission,
*Thinking About Investing in the Latest Hot Stock?: Understand the Significant Risks of Short-Term Trading Based on Social Media*, Investor Alerts and Bulletins (Jan. 30, 2021), available at https://www.sec.gov/oiea/investor-alerts-and-bulletins/risks-short-term-trading-based-social-media-investor-alert (last accessed Nov. 19, 2021)...........................................18

# INTRODUCTION

Plaintiffs fail to allege or explain how Apex's 3 hour and 25 minute exercise of its clear right (under decades-old controlling case law and in contract) to refuse to accept purchase orders for three meme stocks violated any reasonable duty of care owed by Apex to Plaintiffs Jang and Chavez. In Plaintiffs' Opposition to Apex's motion to dismiss, Plaintiffs continue to argue that, (i) by not pushing back against the SEC-regulated market utilities responsible for collateral requirements, (ii) by not removing its trading restrictions in some amount of time less than 3 hours and 25 minutes, and (iii) by not having unlimited capital on hand, Apex committed a breach. But Plaintiffs never identify any authority supporting the existence of the duty Apex's conduct could have breached. This Court should dismiss Plaintiffs' negligence, breach of fiduciary duty, and tortious interference claims with prejudice.

Plaintiffs' Opposition retreats from Plaintiffs' earlier allegations that Apex had a specific duty not to commit the three alleged breaches listed above—the previously proposed duty to dicker, duty to rush, and duty to have unlimited capital. *Compare* Amended Compl. at ¶¶ 105–107 (alleging three specific duties of Apex) *with* Opp. at 37 ("Plaintiffs do not allege any duty to 'dicker,' 'rush', or 'supply infinite capital[.]'"). But all of Plaintiffs' duty arguments depend critically on brokers having a duty to accept orders; the case law is clear no such duty exists.

Instead, Plaintiffs now argue that Apex had an open-ended, ongoing duty of perpetual availability arising from the "common law" under New York law. Opp. at 24–26. But Plaintiffs' authority for this open-ended duty was ***reversed*** in a decision in which the Second Circuit Court of Appeals rejected the very argument Plaintiffs make here. *See* Opp. at 24 (quoting *de Kwiatkowski v. Bear, Stearns & Co.*, 126 F. Supp. 2d. 672, 694 (S.D.N.Y. 2000), *rev'd, de Kwiatkowski*, 306 F.3d 1293, 1306–07 (2d Cir. 2002) (reversing district court decision and holding, "We are aware of ***no authority*** for the view that, in the ordinary case, a broker may be held to an ***open-ended duty of reasonable care***, to a nondiscretionary client, that would encompass anything more than limited transaction-by-transaction duties.") (emphasis added). Plaintiffs fail to cite a single case in which a clearing broker was held to have a generalized common law duty of care disconnected from an individual transaction; nor could they, as it would be counter to contract and the governing regulatory regime.

That Plaintiffs are proposing an open-ended and novel accept-all-trades duty is evident in Plaintiffs' new rhetoric decrying Apex's "Purchase Shutdown" (Opp. at 1, first sentence; *id.* at

*passim*)—a late-breaking term not found in the Complaint but appearing more than 30 times in the Opposition. Plaintiffs make no bones in the Opposition about imposing a generalized accept-all-trades duty on clearing broker Apex as the basis for seeking liability for the 3 hour, 25 minute trading halt in three meme stocks, even in light of the fact that the exchanges themselves imposed a myriad of trading halts over that week due to volatility.

Oddly, plaintiffs do admit that brokers can refuse trades, and admit that Apex informed customers of its right to withhold acceptance of trades. Opp. at 6 ("member broker-dealers do have discretion to refuse particular trades"); Opp. at 28 (quoting Apex customer information brochure: "We [Apex] reserve the right to withhold acceptance of . . . any transaction for any account"; *id.*: "We may refuse to accept any order if we in good faith determine that we should."); Opp. at 28 n.27 (acknowledging as "logical common sense" that Apex has "the discretion to turn away any particular trade"). These are admissions.[1]

Going further, the Opposition at times also disclaims that there exists some "generalized duty to accept any and all orders": "There is no pleading of a generalized duty to accept any and all orders." Opp. at 42. Plaintiffs' novel duty is thus not only contrary to decades-old precedent from New York and Texas (*Busch*, *Cortland*, *de Kwiatkowski*, *Hand*), but, even if that controlling state authority were cast aside (as it cannot be under *Erie*) as argued by Plaintiffs it is also so amorphous as to defy any attempt at line drawing.

Nor does Plaintiffs' rhetorical invocation of alliteration ("unprecedented, unilateral, unwarranted" Opp. at 1) advance the analysis. The tort Plaintiffs contradict what their co-plaintiffs in this consolidated litigation allege: that several other defendant and non-defendant brokers responded to the unprecedented market volatility by similarly restricting trading of certain meme stocks. Plaintiffs acknowledge that Apex had a statutory obligation to ensure it could meet the "net capital" requirement, but they insist that they should be the ones to decide how Apex should respond to unprecedented market volatility to ensure that it meets that obligation. Opp. at 35.

---

[1] *See, e.g., 10 Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988) (quoted in *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 470 n.6 (2013)) ("Factual assertions in pleadings and pretrial orders, unless amended, are considered judicial admissions conclusively binding on the party who made them.") (emphasis added).

Plaintiffs argue in the Opposition (at 6, 24) that Apex's conduct breached a duty because it allegedly was inconsistent with FINRA rules (it wasn't). But Plaintiffs concede that FINRA rules do not create a private right of action. Instead, in this shell game of a tort claim, Plaintiffs argue "breach" without identifying a cognizable duty that was breached. However, as the Southern District of New York recently held in dismissing a negligence claim based on an alleged failure to follow FINRA rules, a plaintiff "cannot circumvent the lack of a private right of action for violations of industry rules merely by recasting her claim as a violation of a common law duty." *Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 464 F. Supp. 3d 634, 645 (S.D.N.Y. 2020).

All of Plaintiffs' claims depend on Plaintiffs' fictional duty of care, so this Court should dismiss all of Plaintiffs' claims based on the pleading failures described below and in Apex's Motion to Dismiss. This Court also should dismiss Plaintiffs' claims for lack of subject matter jurisdiction, as Plaintiffs provide no justification for filing their tort claims against Apex for the first time in this MDL without leave of the Court and without filing separate actions in home fora to which the cases would return following pre-trial proceedings.

## ARGUMENT

### I. Plaintiffs' Negligence and Fiduciary Duty Claims Fail Because Plaintiffs Fail to Show that Apex Owes Plaintiffs Any Open-Ended, Ongoing Duties of Care Here

Plaintiffs seek to create sweeping, new, and open-ended duties between clearing brokers and introduced customers that simply do not exist, whether evaluated under New York or Texas law. Although Apex maintains that Texas law applies to Plaintiffs' claims for the reasons cited in the Motion to Dismiss, in this Reply we demonstrate that Plaintiffs' reliance on New York law, though misplaced, also supports dismissal. The securities fraud cases that Plaintiffs rely upon do not support the existence of any ongoing common law duties of care to introduced customers such as named Plaintiffs. Those cases stand only for the proposition that a clearing broker may be liable for *aiding and abetting securities fraud* if the clearing broker moves beyond performing ministerial clearing functions for an introducing broker who commits fraud—none of which is alleged here.

#### A. Apex Does Not Owe an Open-Ended, Ongoing Common Law or Fiduciary Duty to Named Plaintiffs

Plaintiffs assert that New York, not Texas law, governs (Opp. at 22), and that Apex owes an ongoing, generalized common law duty of care under New York law that "arises by virtue of the broker-client relationship itself." Opp. at 24. This ongoing duty that Plaintiffs claim Apex

owed to named Plaintiffs purportedly includes an ongoing duty to comply with FINRA rules and to "ensure that [Apex] can continue to provide investors access to the securities markets during times of extreme market volatility." Opp. at 26.

**1. New York Law.** In support of this novel contention, Plaintiffs rely on and quote a single New York case, a district court opinion—*de Kwiatkowski v. Bear, Stearns & Co. See* Opp. at 24 (quoting *de Kwiatkowski v. Bear, Stearns & Co.*, 126 F. Supp. 2d. at 694). But the Second Circuit *reversed* the district court in *de Kwiatkowski* on appeal. *See de Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d at 1307. The Second Circuit held: "We conclude that the district court's judgment must be reversed because there was insufficient evidence to support the finding that Bear undertook any role triggering a duty to volunteer advice and warnings between transactions, or that Bear was negligent in performing those services it did provide." *Id.*

Despite the fact that the Opposition cites to both the district court *de Kwiatkowski* decision and the Second Circuit *de Kwiatkowski* decision (Opp. at 24, 40), the Opposition never reveals the fact that the district court decision was reversed—including omitting the "reversal" signal in its citation. Opp. at 24. And, in fact, the Second Circuit reversed the district court's decision on this very point of law about the lack of duty brokers owe. Undisclosed in the Opposition is the Second Circuit's language in its holding reversing the district court: "We are aware of ***no authority*** for the view that, in the ordinary case, a broker may be held to an ***open-ended duty of reasonable care***, to a nondiscretionary client, that would encompass anything more than limited transaction-by-transaction duties." *de Kwiatkowski*, 306 F.3d at 1306 (emphasis added).

New York law has in fact for many decades in an unbroken line of cases made clear that brokers have no obligation to accept buy orders. *See Cortland v. Walston & Co., Inc.*, 340 F. Supp. 1076, 1080 (S.D.N.Y. 1972) ("A stockbroker need not accept the orders of a customer so long as he makes clear at the time the orders are given that he refuses to perform them."); *Busch v. L.F. Rothschild & Co.*, 23 A.D.2d 189, 190 (1st Dept. 1965) ("A *broker is not obligated to accept an order of a customer for execution*, even if the customer has a credit balance with the broker.") (emphasis added). This decisional law in New York that a broker has no duty to accept buy orders is accepted throughout the United States, not simply in the line of cases in Texas. *See, e.g., Capital Options Investments, Inc. v. Goldberg Bros. Commodities*, 1990 WL 180583, at *7 (N.D. Ill. Nov. 5, 1990), *aff'd*, 958 F.2d 186 (7th Cir. 1992) ("*A broker generally has a duty to accept customer orders to liquidate existing positions, but has no duty to accept customer orders for new positions*.

. . . [T]he execution of new contracts exposes the broker, as well as the customer, to new financial risks. One party should not be able to impose risks on the other without the other's consent.") (emphasis added); *French v. Bache Halsey Stuart, Inc.*, Comm. Fut. L. Rep. ¶ 20,444 at p. 21,806 (CFTC 1977) ("The rationale of the law on this point seems evident; the execution of new contracts exposes the broker, as well as the customer, to new financial risks. One party should not be able to impose risks on the other without the other's consent") (quoted in *Hand v. Dean Witter Reynolds Inc.*, 889 S.W.2d 483, 494 (Tex. App. 1994); *Blyth v. White*, 49 G.A. App. 738, 832 (Ga. Ct. App. 1934) (no cause of action stated for recovery of "speculative damages for loss growing out of the defendants' refusal to further act as his broker").

Not one of the cases that Plaintiffs cite under either New York or Texas law holds that a broker of a non-discretionary account (much less a clearing broker) has a duty of care to accept buy orders.[2]

And none of the non-New York cases they do cite—*Remington*, *Cheng*, and *Javitch* (Opp. 23–25)—supports the creation of an open-ended duty of a broker to accept all transactions. In *Remington*, while the court considered the plaintiffs' allegation of unauthorized handling fees in light of a FINRA rule about brokers' fees, the court ***dismissed the plaintiffs' negligence claim***. *Remington v. Newbridge Sec. Corp.*, 2013 WL 2444719, at *5–7 (S.D. Fla. June 5, 2013). Nor can the decisions in *Cheng* or *Javitch*—discussing NASD and NYSE rules in evaluating the reasonableness of a stockbroker's unauthorized, high-risk trades (*Cheng*) and a receiver's use of investors' money to open accounts in its own name (*Javitch*)—be contorted into an open-ended duty of perpetual availability. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng*, 697 F. Supp. 1224, 1228 (D.D.C. 1988); *Javitch v. First Montauk Fin. Corp.*, 279 F. Supp. 2d 931, 938 (N.D. Ohio). In any event, Plaintiffs allege no facts plausibly suggesting that any of Apex's conduct violated any FINRA rule. *See infra* Section II.B.

---

[2] Plaintiffs' other cases involve instances where the broker had *accepted the order* or otherwise are simply off-point. *See Magnum Corp. v. Lehman Bros. Kuhn Loeb, Inc.*, 794 F.2d 198, 200 (5th Cir. 1986) (Texas law; case involving broker that *already agreed* to accept customer's trade); *Wistar v. Raymond James Fin. Servs., Inc.*, 365 F. Supp. 3d 1266, 1267 (S.D. Fla. 2019) (Florida law; case concerning broker charging unauthorized and excessive fees on *trades broker had accepted* and executed); *Brink v. Raymond James & Assocs., Inc.*, 2015 WL 11198241, at *3 (S.D. Fla. June 29, 2015) (same); *Scott v. Dime Sav. Bank of New York, FSB*, 886 F. Supp. 1073, 1080–81 (S.D.N.Y. 1995) (case concerning creditor-debtor fiduciary relationship).

Plaintiffs' novel position is to be distinguished from a transaction-based duty to execute, ***after*** a clearing broker *has agreed to accept the order* and execute a transaction. *See supra*, n. 4. Apex does not contend that, if it agrees to accept a trade for clearing, it does not have a duty to complete that accepted and agreed-upon trade. It does. But that is not what Plaintiffs propose here. Plaintiffs' protestations to the contrary, Opp. at 27 n.26, their theory of liability is premised upon an open-ended duty of perpetual availability for clearing brokers to accept all future transactions—no matter what.

Plaintiffs' failure to cite any cases recognizing this supposed open-ended, ongoing duty of care that clearing brokers owe to the customers of their introducing brokers is not surprising. "Under New York law, as generally, there is no general fiduciary duty inherent in an ordinary broker/customer relationship. Such a duty can arise only where," unlike here, "the customer has delegated discretionary trading authority to the broker." *Indep. Ord. of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 940–41 (2d Cir. 1998) (citing *Perl v. Smith Barney Inc.,* 230 A.D.2d 664, 666 (1st Dep't 1996), and *Press v. Chemical Inv. Servs. Corp.,* 988 F. Supp. 375, 386–87 (S.D.N.Y. 1997), *aff'd*, 166 F.3d 529 (2d Cir. 1999)). "This is because a broker's fiduciary obligation, if any, 'is *limited to affairs entrusted to the broker,* and [t]he scope of affairs entrusted to the broker is generally limited to the completion of a transaction.'" *Press*, 988 F. Supp. at 386 (quoting *Bissell v. Merrill Lynch & Co*., 937 F. Supp. 237, 246 (S.D.N.Y. 1996)).

Here, the named Plaintiffs and class members were nondiscretionary accounts of the introducing brokers, i.e., the trades were determined by the customers themselves, and the brokers did not recommend the meme stocks. The customers here decided to do their own investing and chose the meme stocks. Am. Compl. ¶¶ 15–16, 19–20. Clearing brokers such as Apex are one step removed from the Introducing Brokers for these nondiscretionary accounts. And there is no allegation that clearing brokers recommended any trades or had a discretionary trading relationship with either Plaintiff Chavez or Plaintiff Jang.

Nor do Plaintiffs allege that Apex acted negligently in performing its clearing services for accepted trades, or that Apex refused to clear any of Plaintiffs' orders. Opp. at 27 ("Apex is not charged with turning down any particular trade from an individual customer . . . ."). Rather, Plaintiffs appear to argue that, because an effect on Plaintiffs from a trading restriction on future trading *of others* allegedly was "foreseeable," Apex owed Plaintiffs a duty to "ensure that [Apex] can *continue to provide* investors access to the securities markets during times of extreme market

volatility." Opp. at 26–27 (emphasis added). But under New York law, "[f]oreseeability, alone, does not define duty—it merely determines the scope of the duty ***once it is determined to exist***." *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 232, 750 N.E.2d 1055, 1060–61 (emphasis added). Instead, the "injured party must show that a defendant owed not merely a general duty to society but a ***specific duty to him or her***, for '[w]ithout a duty running directly to the injured person there can be no liability in damages, however careless the conduct or foreseeable the harm.'" *Id.* As discussed above, New York courts (and others) repeatedly have held that clearing brokers owe no duty of care to introduced customers. Even in the case of brokers of nondiscretionary accounts, the duty of care is "generally limited to the completion of a transaction." *Bissell*, 937 F. Supp. at 246.

Thus, as in *de Kwiatkowski*, Plaintiffs' claim fails because it "presupposes an *ongoing* duty of reasonable care" to the *named plaintiffs* that extends far beyond the execution of any given transaction and encompasses how the clearing broker runs its business, generally. *See de Kwiatkowski*, 306 F.3d at 1306 (emphasis added). But New York courts specifically have limited the duties of nondiscretionary brokers—which are one step closer to investors than Apex—to "transaction-by-transaction duties" that begin and end with each transaction. *de Kwiatkowski*, 306 F.3d at 1306; *see also Press*, 988 F. Supp. at 386 ("a broker's fiduciary obligation, if any, 'is *limited to affairs entrusted to the broker*, and [t]he scope of affairs entrusted to the broker is generally limited to the completion of a transaction.'") (internal quotations omitted); *Indep. Ord. of Foresters*, 157 F.3d at 940 (general fiduciary duties in broker/customer relationship arise only where broker has discretionary authority over trading).

**2. Texas Law.** Texas courts also follow this common-sense rule. *See Hand v. Dean Witter Reynolds Inc.*, 889 S.W.2d 483, 495 (Tex. App. 1994) ("the broker/customer relationship does not come into existence until the order has been placed ***and the broker has consented to execute it***"; if the broker refuses to act as agent, the broker "has no duty to act" for the customer) (emphasis added); *id.* at 494 ("Generally, while a broker has a duty to execute a customer's order to liquidate existing positions, ***he has no duty to accept an order to open new positions unless he accepts the agency***.") (emphasis added); Mot. at 18-25 (choice of law, collecting cases). Thus, while Plaintiffs point to Apex's decision to suspend purchases, but not sales, as evidence of breach, Opp. at 15, 17, 27 ("one-sided trading suspension"), in fact Apex was *required* to allow customers to liquidate existing positions.

Plaintiffs' reliance on *Magnum Corp. v. Lehman Bros. Kuhn Loeb, Inc.* is also unavailing. 794 F.2d 198 (5th Cir. 1986). In that case, the defendant Lehman Brothers was held liable for failing to advise its client that it would be delayed in executing orders *it already had accepted to trade* because of massive market moves. *Id.* at 199 (first sentence of opinion: "A *stockbroker took orders from plaintiffs* to buy stock at a time when it was trading in the over the counter market at $13.375."; trades were executed at a higher price of $15.75) (emphasis added). In upholding the district court's judgment, the Fifth Circuit made the uncontroversial observation that "when a *dealer accepts* a market order from a customer, 'it must make every reasonable effort to execute . . . promptly and fully." *Id.* at 200 (citation omitted); *id.* at 199-201 (having accepted trade, broker under a duty to disclose its role as agent or as market maker). And *Lange v. Hentz & Co.* holds that there is *no civil liability* for broker under "Texas securities, fraud, fiduciary and negligence law," for failure to abide by [FINRA] rules because "the special class of persons sought to be benefitted or protected by [FINRA] rules is in reality the class of [FINRA] members themselves and generally not the public at large." 418 F. Supp. 1376, 1383 (N.D. Tex. 1976) (Opp. at 25).

Plaintiffs cite *Ottimo* to assert that a fiduciary duty "may arise" where an agreement exists between the clearing agent and the investor. Opp. at 30 (citing *Glob. Enter. Grp. Holding, S.A. v. Ottimo*, 2010 WL 11629556 (E.D.N.Y. June 8, 2010)). But *Ottimo* held that the clearing broker defendant did *not* owe any fiduciary duties to the introduced customer, *id.* at *5, and that a clearing broker could be held liable only in "extenuating circumstances," such as active participation in a fraud, *id*. Here, Plaintiffs allege no facts in their original or Amended Complaint that would support the imposition of a fiduciary relationship here on the basis of contract or other "extenuating circumstances"—particularly where Plaintiffs strained to avoid referring to all contracts in their Amended Complaint.[3] To the extent that Plaintiffs are now attempting to add new complaint allegations in their opposition briefing, the Eleventh Circuit repeatedly has held that such tactics

---

[3] Plaintiffs attempt to muddy the water by arguing that Apex owes a duty "to both its direct customers, and, to its Shared Customers." At the motion to dismiss stage, however, this Court must evaluate only the *named plaintiffs'* claims in this proposed class action. *Biscone v. JetBlue Airways*, 681 F. Supp. 2d 383, 386 (E.D.N.Y. 2010) ("As a general rule, until a class action is certified pursuant to Rule 23 of the Federal Rules of Civil Procedure, the claims of potential class members cannot be considered."). Thus, at this stage, this Court need not evaluate whether Apex owes a duty to any purchaser of meme stocks other than the named plaintiffs.

are improper. *E.g.*, *Burgess v. Religious Tech. Ctr., Inc.*, 600 F. App'x 657, 665 (11th Cir. 2015) ("We repeatedly have held that plaintiffs cannot amend their complaint through a response to a motion to dismiss.").[4]

And 2021 FINRA and SEC guidance issued after January 28th, as set forth below, also confirm the clear right of brokers to refuse orders. *See* Section II-B below.

Thus, Plaintiffs ask this Court for the first time in history to expand the duties of securities brokers and clearing brokers beyond the clear decision law of either New York or Texas—something this Court, as a federal court applying state law for the rule of decision, lacks authority to do. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 79 (1938) (overturning the doctrine of *Swift v. Tyson* of a federal common law trumping state law as "an unconstitutional assumption of powers by courts of the United States") (quoting Justice Holmes). *See also Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 115 (2d Cir. 2000) (where the "applicable duty relationship is well established" a district court lacks authority to expand its scope on an *ad hoc* basis); *Norwood v. Raytheon Co.,* 414 F. Supp. 2d 659, 663 (W.D. Tex. 2006) ("[A] federal court should not 'expand state law beyond its presently existing boundaries.'") (citing to *Barfield v. Madison County*, 212 F.3d 269, 272 (5th Cir. 2000) ("Nor is it the function of the federal court to expand the existing scope of state law.")); *id.* at 663 ("If no state appellate decision has approved of a theory of recovery or defense, even in dicta, a federal court 'will not create innovative theories of recovery or defense under local law.'").[5]

### B. Plaintiffs' Securities Fraud Cases Do Not Establish that Apex Owed Named Plaintiffs Any General Common Law Tort Duty or a Fiduciary Duty

Plaintiffs broadly state that a clearing firm "exposes itself to liability" when it "moves beyond performing mere ministerial or routine clearing functions." Opp. at 30. But Plaintiffs use the term "liability" (rather than "duty" or "negligence") to gloss over the fact that Plaintiffs rely a

---

[4] *See also Zurich Am. Ins. Co. v. Amerisure Ins. Co.,* 2017 WL 366232, at *7 (S.D. Fla. 2017) ("While the Court must accept as true all factual allegations contained in the Complaint, the same does not hold for new facts that a plaintiff belatedly raises in response to a motion to dismiss. That amounts to an impermissible attempt to amend the Complaint without leave of Court.").

[5] Plaintiffs also point to the fact that their complaint "*allege[s]* that Apex owed them a common law duty of care," but that is immaterial. Opp. at 26. "The question of the existence and scope of an alleged tortfeasor's duty 'is, in the first instance, a legal issue for the court to resolve.'" *Alfaro*, 210 F.3d at 114 (quoting *Waters v. New York City Hous. Auth.*, 69 N.Y.2d 225, 229 (N.Y. 1987)).

line of inapposite cases that address liability for brokers *aiding and abetting securities fraud*. Opp. 29–31. Those cases simply do not hold that a clearing broker owes open-ended common law duties of care to its introduced customers. Rather, those cases address when a clearing firm's failure to prevent an introducing broker's security fraud can be found to constitute aiding and abetting for which the clearing broker is liable. *E.g.*, *McDaniel v. Bear Stearns & Co., Inc.*, 196 F. Supp. 2d 343, 346 (S.D.N.Y. 2002) (aiding and abetting fraudulent conduct of introducing broker-dealer); *Cannizaro v. Bache, Halsey, Stuart, Shields, Inc.*, 81 F.R.D. 719, 721 (S.D.N.Y. 1979) (allegations that clearing broker aided and abetted fraudulent activity); *Ottimo*, 2010 WL 11629556, at *3-4 (plaintiffs alleged clearing broker committed fraud in aiding and abetting the fraudulent activities of introducing broker); *Turk v. Pershing LLC*, 2014 WL 12572906, at *5 (N.D. Tex. Dec. 8, 2014) (evaluating claims against clearing broker for (1) participation in breach of fiduciary duty, (2) aiding and abetting breach of securities laws, and (3) negligence, and holding, "there [was] no duty of care on which Plaintiffs [could] base their negligence claim); *Kneese v. Pershing LLC*, 2012 WL 13019677, at *2-3 (N.D. Tex. Nov. 14, 2012) (allegations of clearing broker aiding and abetting securities fraud of introducing broker).

The distinction between aiding and abetting liability and tort duties is crucial, and the court in *McDaniel*, a case on which the Plaintiffs rely, explained the issue well. To state a claim for aiding and abetting securities fraud under New York law, one element a plaintiff must allege is "substantial assistance to advance the fraud's commission." *McDaniel*, 196 F. Supp. 2d at 352. Substantial assistance requires a showing that the defendant "affirmatively assists, helps conceal, or by virtue of *failing to act when required to do so* enables the fraud to proceed." *Id.* (emphasis added). But where a defendant does not owe a fiduciary duty directly to the plaintiffs, a defendant's alleged "failing to act" cannot constitute actionable aiding and abetting—let alone negligence. *Id.* In the case of clearing broker liability, the court in *McDaniel* explained that, because clearing brokers do not owe fiduciary duties to introduced customers, New York courts require a showing that the clearing broker did more than simply fail to act—the clearing broker must have "move[d] beyond performing mere ministerial or routine clearing functions" and instead have become "actively and directly involved" in the introducing broker's fraudulent scheme. *Id.* at 353.

Each and every case Plaintiffs cite (Opp. at 30–31) that involved a clearing broker has, consistent with *McDaniel*, required that the clearing broker be an active participant in a *fraudulent*

scheme. *McDaniel*, 196 F. Supp. 2d at 343 (addressing aiding and abetting fraudulent conduct of introducing broker-dealer); *Berwecky v. Bear Stearns & Co.*, 197 F.R.D. 65, 67 (S.D.N.Y. 2000) (defendant clearing broker "shed their role as a mere clearing broker" and participated in introducing broker's "***scheme to defraud*** investors of certain publicly-traded securities.") (emphasis added); *Koruga v. Fiserv Correspondent Servs.*, 183 F. Supp. 2d 1245, 1246 (D. Or. 2001) (addressing material aid in securities fraud); *In re Blech Sec. Litig.*, 961 F. Supp. 569, 578–79 (S.D.N.Y. 1997) (addressing fraud claims against clearing broker for "knowingly execut[ing] manipulative sham transactions" on behalf of introducing broker.); *Cannizzaro*, 81 F.R.D. at 721 (addressing clearing broker aiding and abetting securities fraud for "churning" account); *Ottimo*, 2010 WL 11629556, at *3-4 (denying leave to amend claims of clearing broker fraud and aiding and abetting fraudulent activities of introducing broker); *Turk*, 2014 WL 12572906, at *15 (addressing participation in breach of fiduciary duty, aiding and abetting securities fraud, and negligence claims against clearing broker; dismissing negligence claims); *Kneese*, 2012 WL 13019677, at *2 (addressing clearing broker aiding and abetting securities fraud).

Far from holding that clearing brokers owe their introduced customers ongoing common law duties of care, the securities fraud cases Plaintiffs cite are *premised* on the foundation that clearing brokers owe *no duty* of care to introduced customers. As the *McDaniel* court put it, "courts have refused to hold clearing firms liable for the practices of introducing brokers even where the clearing firm continued to provide clearing services *after it knew or should have known* of the introducing broker's fraudulent scheme." *McDaniel*, 196 F. Supp. 2d at 352 (emphasis added). Thus, Plaintiffs' attempt to distinguish the cases Apex cites on the ground that they involved holding "clearing firms liable for the acts of the Introducing Broker" is unavailing. Opp. at 32 n.30. Plaintiffs' claim that the cases Apex cites "do not address the liability of clearing brokers for their own misconduct" misses the point. Opp. at 31. "The existence of a duty is thus a *sine qua non* of a negligence claim: 'In the absence of a duty, as a matter of law, no liability can ensue.'" *Alfaro*, 210 F.3d at 114. Plaintiffs have not cited a single case, nor do they allege any facts, that support their argument that Apex owed named Plaintiffs any ongoing duties at common law.

The court's analysis in *Turk v. Pershing* is instructive, though Plaintiffs misstate the court's holding. Opp. at 32 n.30 (claiming *Turk* held a "viable negligence claim pled against clearing firm when allegation is that its conduct went beyond mere ministerial role"). Contrary to Plaintiffs'

assertion, the *Turk* court ***dismissed*** the plaintiffs' negligence claim against the clearing broker and rejected the same argument Plaintiffs make here. 2014 WL 12572906, at *5. In *Turk*, the plaintiffs argued that the clearing broker was liable for negligence (as well as for aiding and abetting securities fraud) because it moved beyond providing merely ministerial clearing services. In support of their argument, the plaintiffs in *Turk* listed "a series of cases in which courts permitted claims to go forward against clearing brokers where it was alleged the clearing broker went beyond the provision of merely ministerial services." *Turk*, 2014 WL 12572906, at *5. But the court in *Turk* rejected the plaintiffs' reasoning and dismissed the negligence claim (while maintaining the aiding and abetting claim):

> [E]ach of Plaintiffs' proffered cases pertains to the maintenance of claims based on violations of various securities laws, not on the existence of a duty of care supporting a negligence claim. In other words, there is a ***meaningful distinction*** between a clearing broker's amenability to suit for ***statutory violations*** on one hand, and the existence of an ***independent duty supporting a negligence claim*** on the other. As previously discussed, providing services that are more than ministerial may indeed expose a clearing broker to statutory liability. But ***Plaintiffs' cited cases do not support their contention that provision of such services also creates an independent duty of care***. Having found no duty of care sufficient to support a claim for negligence, the Court dismisses Plaintiffs' negligence claims.

*Turk*, 2014 WL 12572906, at *5.

Thus, whether evaluated under New York or Texas law, Plaintiffs have cited no authority on which this Court could create a common law duty of care sufficient to support Plaintiffs' negligence claim.

## II. Even if This Court Were to Find That Apex Owed Some Duty to Named Plaintiffs, Those Duties Do Not Include the Novel Duties Plaintiffs Seek to Create Here

Plaintiffs claim to have backtracked from the allegations in their Amended Complaint (¶¶ 105–107) that Apex had the duties to dicker, rush to resume purchases of meme stocks, and all along maintain unlimited capital. Opp. at 37. In their brief, Plaintiffs recast their case as an even broader private common law action to enforce FINRA rules, which Plaintiffs argue (but do not allege) that Apex violated. This Court should reject Plaintiffs' attempt to use their Opposition brief as a mechanism for amending the Amended Complaint and, more importantly, should reject Plaintiffs' attempt to circumvent the lack of a private right of action to enforce FINRA rules by alleging Apex breached some sort of common law FINRA duty.

### A. Setting the Record Straight: Plaintiffs' Complaint In Fact Does Seek to Impose Duties (i) to Dicker, (ii) to Rush, and (iii) to Maintain Access to Unlimited Capital, But Plaintiffs Do Not Defend These Novel Duties in the Opposition

Likely recognizing that there is no support in law for these duties, Plaintiffs retreat from their Amended Complaint and disclaim their effort to impose a duty to negotiate with the DTCC or NSCC (a duty to dicker), a duty to rush to resume trading, or a duty to maintain unlimited capital. Opp. at 37. Although couched in terms of "breach" language, those duties are exactly what the Plaintiffs allege in their Amended Complaint, Am. Compl. ¶¶105–107, and what Plaintiffs ask this Court to impose in their Opposition. In fact, Plaintiffs argue for these very three duties on page 35 of their Opposition:

- **Duty to Dicker.** "Apex ***did not bother to even attempt to confirm*** the higher number with DTCC, which Apex supposedly did not anticipate, before implementing the Purchase Shutdown."
- **Duty to Rush.** "Apex itself provides the impetus for the accusation of misconduct by taking the position that once it was informed by DTCC that the collateral requirement was lower, and at an acceptable amount that would not require it to suspend trading, it could not lift the self-imposed trading restriction ***without confirming the lower number*** with DTCC."
- **Duty of Unlimited Capital.** "[I]t was a breach of Apex's duty of care to implement the consequential, unprecedented, unilateral one-way trading halt ***without at least exploring an alternative mechanism by which it could satisfy its collateral requirement***."

Opp. at 35 (emphasis added).

What is more, Plaintiffs' *only* allegations of breach concern breaches of *these three proposed duties* in their Amended Complaint. Am. Compl. ¶ 105 ("Apex breached these duties when it suspended its customers' ability to purchase [the meme stocks] ***without even trying to confirm the collateralization number*** received from DTCC at approximately 9:30 a.m. on January 28, 2021, ***or seeking to negotiate it down***.") (emphasis added); Am. Compl. ¶ 106 ("Apex breached these duties ***when it learned shortly thereafter*** that the collateralization number was in fact lower than originally communicated to it and was, in fact, at a level that Apex believed warranted lifting the suspension of the purchase of stock, ***yet failed to lift the suspension*** of the purchase of shares

AMERICAS 109861068

in [the meme stocks].") (emphasis added); Am. Compl. ¶ 107 ("Apex breached these duties when it failed to take reasonable steps to mitigate its risk, including, but not limited to ***raising additional capital rather than suspend its customers***, including Shared Customers', ability to purchase shares of [meme stocks].") (emphasis added). All of these supposed duties depend on a broker's unqualified duty to accept offers to trade no matter what—a duty that does not exist at common law.

Plaintiffs also disclaim that they have pleaded a duty of constant availability, or a duty to act as a public utility. Opp. at 27 n.26 ("No such duty is pled."). But Plaintiffs plead precisely that, in a "Heads I Win, Tails You Lose" argument that effectively holds clearing brokers liable any time they suspend trading due to volatility. Opp. at 35. Specifically, Plaintiffs argue that either Apex had sufficient capital on hand to meet the DTCC's astronomical collateral demand (in which case they claim Apex breached its duties to Plaintiffs in not agreeing to clear all meme stock purchases at all times) or Apex did not have sufficient capital on hand to meet the DTCC's collateral demand (in which case Plaintiffs claim Apex breached its duty to have unlimited capital).

First, it is worth addressing Plaintiffs' misleading, edited citation to Ms. Rothschild's interview, where Plaintiffs claim that Ms. Rothschild admitted "that Apex *did not* restrict trading as a result of capital requirements." Opp. at 11–12 (emphasis in original). Ms. Rothschild made no such admission, but Plaintiffs selectively quote from Ms. Rothschild's interview to create that impression. The full text of Ms. Rothschild's answer is provided below, and the full interview is provided at Pace Decl. Ex. 8.

> We restricted the trading for approximately three hours on one day due to anomalous information that we got. We were fine ***by the end of the day***. We have headroom in terms of the capital available to us on our balance sheet. We have lines of credit that we can call on as needed. We did stop the trading for three hours, and then it was resolved and we moved forward, and have not had any issues and have not looked back. So I would say it was not a similar situation to Robinhood.

Pace Decl. Ex. 8 (emphasis added).

According to Plaintiffs, then, Apex owed a common law duty to named Plaintiffs to organize its business to ensure that it would be in a position to agree to *every single trade* its introducing brokers sought to clear through it. Such a duty amounts to a duty of ongoing and constant availability. Such an ongoing duty to introduced customers is unsupported in law. *See supra* Section I; *see also Busch*, 23 A.D.2d at 190 (1st Dept. 1965) ("A broker is not obligated to

accept an order of a customer for execution, even if the customer has a credit balance with the broker[.]"); *Cortland*, 340 F. Supp. at 1080 (no duty to accept orders). Plaintiffs admit as much. *See* Opp. at 6 ("member broker-dealers do have discretion to refuse particular trades"); Opp. at 28 (quoting Apex customer information brochure: "We [Apex] reserve the right to withhold acceptance of . . . any transaction for any account"; *id.*: "We may refuse to accept any order if we in good faith determine that we should."); Opp. at 28 n.27 (acknowledging as "logical common sense" that Apex has "the discretion to turn away any particular trade"). Moreover, even if this Court were to conclude Apex owed a common law duty to some investors, named plaintiffs do *not* allege that they themselves sought to, but were prevented from, trading. Am. Compl. ¶¶ 17, 21, 104; *see* Motion to Dismiss at Sections II (Article III Standing), III.E. (Causation). Plaintiffs seek to impose an even broader duty than the courts in *Cortland* and *Busch* disclaimed: a duty to named Plaintiffs that clearing brokers will accept *other investor's* trades. Opp. at 27 ("Apex is not charged with turning down any particular trade from an individual customer for a particular reason. Apex is charged with shutting down its entire platform, for hours, to prohibit all of its customers . . . from purchasing in demand stocks . . . ."). Such a duty to *named plaintiffs* to permit *others* to continue trading is also plainly contrary to established New York law.

Nor can Plaintiffs avoid dismissal based on a broad claim that Apex owed a duty to "ensure that the trading platforms it provided and/or supported were sufficiently equipped to reliably deliver such services," and to "safeguard[] the investments of Plaintiffs and Class members by providing a platform and/or supporting a platform to execute trades." Am. Compl. ¶¶ 102–103. As discussed above and in Section II.B below, clearing brokers and brokers for nondiscretionary accounts do not owe such broad, ongoing common law duties to individual investors for unaccepted orders, because any such duties begin and end with accepted transactions. *See supra* Section I. And "[c]ourts are not equipped to second-guess the business judgments of professional traders and brokers when it comes to risk assessments." *Cap. Options Invest., Inc. v. Goldberg Bros. Commodities, Inc.*, 958 F.2d 186, 191 (7th Cir. 1992); *de Kwiatkowski*, 306 F.3d at 1306 (fiduciary duties begin only with accepted trades); *see also Press*, 988 F. Supp. at 386 (same). For all the reasons stated in Apex's motion to dismiss, this Court should hold that no such duties exist. *See* Mot. to Dismiss at Section III.B–C.

**B. Plaintiffs' Proposed Duties Are Contrary to Well-Settled Law, and Plaintiffs Allege a Common Law Duty to Follow FINRA Rules for the First Time in the Opposition**

Plaintiffs make no attempt to defend their proposed triad of duties in their Opposition, Mot. to Dismiss at 25–32, instead characterizing Apex's argument as a "straw person" and, for the first time in their Opposition brief, alleging common law tort duties to abide by FINRA rules as enforced by private plaintiffs. Opp. at 37 ("Apex invents 'straw person' pleadings suggesting that Plaintiffs have pled 'duties' that Apex could not and did not breach. Plaintiffs do not allege any duty to 'dicker,' 'rush' or 'supply infinite capital."). Specifically, Plaintiffs now claim that "Apex owed Plaintiffs the duty in common law tort to comply with FINRA rules." Opp. at 26 ("Plaintiffs allege that Apex owed them a common law duty of care, and, the court can look to, *inter alia*, [FINRA Rules 2010, 3110 and 4370]."); Opp.at 45 ("In the case of Apex, the ***regulatory duty*** to put sufficient measures in place to continue to maintain an orderly market is undisputed . . . .").[6]

As an initial matter, the Eleventh Circuit has made clear that Plaintiffs cannot use their Opposition to amend their Complaint. *Burgess v. Religious Tech. Ctr., Inc.*, 600 F. App'x 657, 665 (11th Cir. 2015) ("We repeatedly have held that plaintiffs cannot amend their complaint through a response to a motion to dismiss."). As another court within this District has previously held, "'it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.'. . . The purpose of the complaint is to put the defendants on notice of the allegations against them. A defendant cannot properly respond to allegations that are not in the complaint." *Humphrey v. Hollywood Police Dep't*, 2019 U.S. Dist. LEXIS 35022, at *5 (S.D. Fla. Mar. 4, 2019) (internal citations omitted).

Plaintiffs do not allege in the Amended Complaint that Apex owed a common law duty to Plaintiffs to abide by FINRA rules, as they now claim; rather, the Amended Complaint paragraphs Plaintiffs cite to support these newly-alleged duties merely recite the existence of FINRA rules. Opp. at 26, citing Am. Compl. ¶¶ 44–45, 51. In particular, Plaintiffs recite in their Amended

[6] Plaintiffs' claim that their characterization of Apex's regulatory duties is "undisputed" is premature and mischaracterizes Apex's position on a motion to dismiss. Apex has not filed an answer to Plaintiffs' Amended Complaint and has not had occasion to "dispute" the many claims in Plaintiffs' Amended Complaint.

Complaint the following FINRA rules and notices, which generally deal with disaster recovery and information technology (IT) issues, or generalized risk management:

- **Rule 2010:** "[I]n the conduct of its business, [a brokerage] shall observe high standards of commercial honor and just and equitable principles of trade."
- **Rule 3110**, which Plaintiffs allege requires brokerages to "establish, maintain, and enforce a supervisory system, which includes monitoring its technology and other risks, including credit and other systemic risks."
- **Rule 4370**, which Plaintiffs allege requires brokerages to "engage in continual risk management to ensure continuation of its trading and financial 'mission critical systems.'"
- **Regulatory Notice 21-12**, which states, "Member firms should maintain ***strong procedures***, thoughtfully crafted in advance, to ***reasonably*** ensure that they can continue to provide investors access to the securities markets during times of extreme market volatility," which include "liquidity management practices."

Compl. ¶¶ 44–46. Not one of the FINRA rules Plaintiffs cite, nor the Net Capital Rule, 17 C.F.R. § 240.15c3-1, imposes an open-ended duty of a broker to accept all trades at all times.

In fact, Plaintiffs omit the relevant passage of the FINRA Regulatory Notice 21-12 (March 18, 2021), which even after the January 28 events confirms the long-standing common law rule that brokers *do not* have an open-ended duty to accept customer orders to buy stock:

> Member firms are *not obligated to receive or accept orders from customers* where the firms believe that the associated compliance or legal risks are unacceptable and there may be situations where firms determine they must change their order handling procedures *to restrict the entry or acceptance of customer orders to limit the firm's exposure to extraordinary market risk.*

FINRA, Regulatory Notice 21-12 at 3 (March 18, 2021) (emphasis added).[7]

The actual FINRA guidance, that brokers can reject customer orders, is very similar to the SEC's 2021 guidance that brokers may reject customer orders, set forth in our opening motion (at 2, n.1):

---

[7] Available at https://www.finra.org/sites/default/files/2021-03/Regulatory-Notice-21-12.pdf (last accessed Nov. 19, 2021).

> *[B]roker-dealers may reserve the right to reject or limit customer transactions. This may be done* for legal, compliance, *or risk management reasons,* and is typically discussed in the customer account agreement. In certain circumstances, broker-dealers determine not to accept orders where a transaction presents certain associated compliance or legal risks.[8]

The actual FINRA and SEC guidance is entirely consistent with Apex refusing customer orders.

Moreover, Plaintiffs do not plead any *facts* plausibly suggesting that Apex violated any of the FINRA rules. *Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level."). The Amended Complaint does not contain any factual allegations that Apex did not "establish, maintain, and enforce a supervisory system," nor any *facts* that Apex failed to "engage in continual risk management," nor any *facts* that Apex failed to "maintain strong procedures" or "liquidity management practices." And Plaintiffs do not allege anywhere in the Amended Complaint that Apex actually violated the Net Capital Rule; to the contrary, the trading restrictions Apex put into place were designed to ensure that Apex would be able to comply with the Net Capital Rule. Plaintiffs' bare allegation that violations of such rules "can be used as evidence of negligence," without any factual matter that Apex actually violated such rules, cannot state a claim, even under Plaintiffs' theory of negligence. Am. Compl. ¶ 49; *Twombly*, 550 U.S. at 556. Nor does Plaintiffs' allegation that Apex temporarily halted purchases of three of the meme stocks for three and a half hours plausibly plead a violation of these rules. *Iqbal*, 556 U.S. at 682 (complaint allegations of discriminatory intent not plausible in light of "obvious alternative explanation"); *see also Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) ("Importantly, the Court held in *Iqbal*, as it had in *Twombly*, that courts may infer from the factual allegations in the complaint 'obvious alternative explanation[s],' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer.").

But even if this Court were to conclude that Plaintiffs have made such allegations in their Amended Complaint, no such common law duty to Plaintiffs to abide by FINRA rules exists, and Plaintiffs cite no case to support their bald statement. Opp. at 26–27. For good reason. FINRA

---

[8] U.S. Securities and Exchange Commission, *Thinking About Investing in the Latest Hot Stock?: Understand the Significant Risks of Short-Term Trading Based on Social Media*, Investor Alerts and Bulletins (Jan. 30, 2021), available at https://www.sec.gov/oiea/investor-alerts-and-bulletins/risks-short-term-trading-based-social-media-investor-alert (last accessed Nov. 19, 2021).

rules do not provide for a private right of action, and Plaintiffs cannot use state tort law to avoid that outcome. *See infra* Section IV.C; *see also* Motion to Dismiss at Section III.B.1.

Plaintiffs ask this Court to use New York common law to impose *ongoing* duties that clearing brokers would owe to private plaintiffs, and that would dictate how clearing brokers must order their business and respond to volatility in order to "maintain an orderly market." Opp. at 45. But the court in *de Kwiatkowski* (a case upon which the Plaintiffs rely) specifically held that the duties brokers of nondiscretionary accounts (and, by extension, clearing brokers) owe to investors "begin and end with each transaction." *de Kwiatkowski*, 306 F.3d at 1306. The Second Circuit explained "[w]e are aware of ***no authority*** for the view that, in the ordinary case, a broker may be held to an ***open-ended duty of reasonable care***, to a nondiscretionary client, that would encompass anything more than ***limited transaction-by-transaction duties***." *Id.* (emphasis added). Plaintiffs are therefore asking this court to *expand* New York law beyond the bounds of existing law.

Thus, at most, Apex would owe a duty of reasonable care to named Plaintiffs if, and only if, Apex had agreed to clear named Plaintiffs' trades, and then Apex would owe a duty of care only as to the execution of the particular trade or trades that Apex *agreed* to clear. *de Kwiatkowski*, 306 F.3d at 1306; *Hand*, 889 S.W.2d at 493 ("[T]he agency or broker/customer relationship does not come into existence until the order has been placed *and the broker has consented to execute it*.") (emphasis added); *Busch*, 23 A.D.2d at 190 ("[Plaintiffs] rely on quotations to the effect that a broker who fails to carry out an order which he has accepted is liable for the consequences. This is quite a different proposition."). Plaintiffs do not allege that Apex undertook to clear additional trades for them (in fact, they allege the opposite). And, as discussed in Apex's motion to dismiss, Apex's customer contracts, which Plaintiffs attempt to avoid but which were quoted in the documents cited in Plaintiffs' Complaint, specifically confirm Apex's right to "refuse to execute securities transactions for the Customer at any time and for any reason." Pace Decl., Ex. 1 at 3; Pace Decl. Ex. 2, at 3; Mot. to Dismiss at 22–23. [9]

Nor do Plaintiffs allege that Apex had established the type of relationship with Plaintiffs Jang and Chavez that would create any kind of ongoing duty of care, let alone the types of duties that Plaintiffs seek to impose here. *Wilcox v. Wilcox*, 2006 WL 3824012, at *3 (Tex. App. Dec.

---

[9] *See* Apex Motion to Dismiss the Amended Consolidated Class Action Complaint, ECF No. 422, at 7 ("Mot.") at 7 (describing customer agreement quoted in document relied upon in complaint).

28, 2006) ("In a fiduciary relationship, one person 'binds himself to subvert his own interest to those of his principal[, and if] the relationship between the two parties does not involve the element of a solely subordinated interest, . . . it is not a fiduciary relationship.'"); *de Kwiatkowski*, 306 F.3d at 1308 (requiring "transformative 'special circumstances,'" such as plaintiffs having "impaired faculties" or a "closer than arms-length relationship" with broker to allege existence of a fiduciary relationship for a non-discretionary broker). Thus, Apex owed no ongoing common law duties *to named plaintiffs* to establish procedures, ensure market availability, or to abide by any of the other FINRA rules cited by Plaintiffs.

Plaintiffs' attempt to recast the allegations in their Amended Complaint belies the weakness of their claims. For the reasons stated above, and in the motion to dismiss, this Court should reject Plaintiffs' attempt to impose ongoing, virtually limitless duties of care that clearing brokers would owe to the customers of their introducing brokers.

### C. This Court Cannot Create a Novel Private Right of Action to Enforce FINRA Rules Through State Law

Plaintiffs argue that "Apex owed Plaintiffs the duty in common law tort to comply with FINRA rules" and that, because Apex owed them this purported duty of care, this Court may look to FINRA rules to establish whether Apex failed to "abide to accepted common law standards of care." Opp. at 26. In other words, Plaintiffs here seek to enforce FINRA rules, and collect private damages, using state tort law. *See, e.g.*, Opp. at 45 ("In the case of Apex, the ***regulatory duty*** to put sufficient measures in place to continue to maintain an orderly market is undisputed . . . . Apex had a ***duty of care as a registered broker-dealer*** and 'Apex failed to take reasonable steps to protect its customers and investors in times of market volatility[.]'") (emphasis added). Plaintiffs implicitly acknowledge that industry rules do not create a private right of action, and instead insist the basis of their proposed duty is New York common law. Opp. at 26. As discussed above, however, neither New York nor Texas law recognizes an ongoing duty of care that clearing brokers (or nondiscretionary brokers) owe to introduced customers. *See de Kwiatkowski*, 306 F.3d at 1306; *Weatherly v. Pershing*, 2015 WL 13742270, at *3 (N.D. Tex. June 23, 2015). For that reason alone, regardless of whether FINRA rules inform any standard of reasonableness, Plaintiffs' negligence claim fails.

Moreover, New York courts have expressly rejected Plaintiffs' theory of common-law negligence liability for failure to abide by industry regulations (such as the FINRA rules on which

Plaintiffs rely in their Opposition at page 26). Last year, in *Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, the Southern District of New York dismissed the plaintiff's negligence claim that the defendant securities broker failed to act reasonably by failing to adhere to FINRA rules, on the ground that plaintiffs "cannot circumvent the lack of a private right of action for violations of industry rules merely by recasting [their] claim as a violation of a common law duty." 464 F. Supp. 3d 634, 645–46 (S.D.N.Y. 2020). In dismissing the plaintiffs' claims, the Southern District of New York relied upon *In re Series 7 Broker Qualification Exam Scoring Litig.*, in which the D.C. Circuit rejected a nearly identical argument:

> [Plaintiffs] insist ***their state law claims based on negligence*** and breach of contract are permissible. Defendants argue that such causes of action are impliedly preempted by federal law and, alternatively, that they are immune from suit based on regulatory immunity. Whether analyzed under preemption doctrine or a theory of regulatory immunity, the result is the same: ***plaintiffs cannot raise a common law complaint against defendants based on duties arising under the Exchange Act***.

*In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110, 113 (D.C. Cir. 2008) (emphasis added); *see also Bank of America, N.A. v. Cartwright*, 2021 WL 3912563, at *9 (N.D. Ind. Sept. 1, 2021) ("Mr. Cartwright can't circumvent this law by disguising his FINRA claim as a negligence claim."). Plaintiffs do not cite a single case under New York law—the law they argue governs here—that supports their argument that New York common law imposes a general duty to abide by FINRA rules.

Nor do Plaintiffs cite a single case that holds that *clearing brokers* owe such open-ended and ongoing duties to the customers of introducing brokers for whom they provide clearing services. As the New York Court of Appeals has held, "[t]he injured party must show that a defendant owed not merely a general duty to society but ***a specific duty to him or her***, for '[w]ithout a duty running directly to the injured person there can be no liability in damages, however careless the conduct or foreseeable the harm.'" *Hamilton*, 96 N.Y.2d at 232 (quoting *Lauer v. City of New York,* 95 N.Y.2d 95,100 (N.Y. 2000)). Thus, just as in *de Kwiatkowski*, Plaintiffs' assertion that Apex "had an ongoing duty to exercise 'due care' or 'behave like a reasonable broker,' breach of which could be evidenced by noncompliance with internal rules, cannot be squared with the cases holding that a broker's obligations to a nondiscretionary client arise and are satisfied transaction-by-transaction." *de Kwiatkowski*, 306 F.3d at 1311.

Even if FINRA rules may be used to inform the standard of reasonableness, and even if this Court were to conclude that Apex owed named Plaintiffs a duty of care to abide by FINRA rules, Plaintiffs fail to allege any facts that would support the inference that Apex violated any of the rules or regulations Plaintiffs cite. *See supra* Section II.B.; Mot. to Dismiss at 25–32 (summarizing Plaintiffs' failure to allege breach of reasonable duty of care).

Plaintiffs similarly fail to state a claim by alleging that "Apex undertook the extraordinary measures on January 28, 2021 of suspending trading in the Suspended Stocks without a plan reasonably designed to correlate its supposed reduction of risk to its extraordinary action." Am. Compl. ¶ 65. Such conclusory allegations cannot sustain Plaintiffs' negligence or breach of fiduciary duty claims under *Twombly* and *Iqbal*. *Ashcroft v. Iqbal*, 556 U.S. 652, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). Thus, even under the cases Plaintiffs cite—*Cheng* and *Remington* (Opp. at 24–25)—that refer to industry rules, Plaintiffs have failed to allege any *factual* matter that Apex violated industry rules so as to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555–56.

## III. Plaintiffs' Tortious Interference Claim Fails Under Both New York and Texas Law, Particularly Where No Contract Is Alleged

Plaintiffs admit that they do not allege "there is an existing contract," which, not surprisingly, is a necessary element for tortious interference with contract under Texas law. Opp. at 42 ("Contrary to Defendant's argument, Plaintiffs have not pled that there is an existing contract as between Plaintiffs and the Introducing Brokers that Apex induced them to breach"). Instead, they argue that New York law applies, and that Plaintiffs have stated a claim because "Plaintiffs have pled that by directing the shutdown of the Introducing Broker's trading platform, Apex prevented Plaintiffs and members of the Class from being able to purchase the Suspended Stocks from the Introducing Brokers." Opp. at 42.

As an initial matter, Plaintiffs badly misstate the allegations in their Amended Complaint. First, Plaintiffs do not allege that Apex directed a "shutdown" of its Introducing Brokers' trading platforms. Second, nowhere in the Amended Complaint do Plaintiffs allege that the named Plaintiffs intended to, but were prevented from, purchasing the meme stocks. Absent such allegations as to named Plaintiffs specifically, Plaintiffs have failed to state a claim for tortious interference with business relations, whether evaluated under New York or Texas law. *Goldberger v. Bear, Stearns & Co.*, 2000 WL 1886605, at *1 (S.D.N.Y. Dec. 28, 2000) ("If the named plaintiffs

have no cause of action in their own right, their complaint must be dismissed, even though the facts set forth in the complaint may show that others might have a valid claim.").

Putting aside Plaintiffs' mischaracterization of the allegations in their Amended Complaint, Plaintiffs' claim that they meet the New York standard for tortious interference with an ongoing business relationship is simply incorrect. Opp. at 42. The New York Court of Appeals first recognized the existence of a claim for tortious interference with economic relations (as distinct from the tort of tortious interference with *contract*) in *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, where the court also held that, to state a claim where no breach of contract is alleged, a plaintiff must prove that the defendant used "***wrongful means***" to interfere with plaintiffs' business relationship. 50 N.Y.2d 183, 191 (N.Y. 1980). The "wrongful means" in *Guard-life* were "'physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure.'" *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 87 N.Y.2d 614, 624 (N.Y. 1996) (quoting *Guard-Life*, 50 N.Y.2d at 191).

Plaintiffs represent to this Court that their "claim has been found to be viable under New York law by the New York Court of Appeals in *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 189 (N.Y. 2004)," and that their allegations that Apex committed two independent torts—negligence and breach of fiduciary duty—are sufficient to constitute "wrongful conduct." Opp. at 42. But Plaintiffs quietly concede in a footnote that their theory has no support in the case law; it is just that it has not been explicitly rejected yet. Opp. at 42 n.35 ("The Court of Appeals explicitly left open the question as to whether the type of conduct engaged in by Apex rises to the level of culpable conduct."). Indeed, Plaintiffs do not cite a single case that has held that breach of fiduciary duty or mere negligence constitutes sufficiently "culpable conduct" to sustain a claim for tortious interference with economic relations. As the New York Court of Appeals explained in *Carvel Corp.*, "[t]he sort of 'more culpable' conduct we had in mind in *NBT* was described in *Guard-Life*," which does not include in its litany of crimes and torts either negligence or breach of fiduciary duty. *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 191 (N.Y. 2004).

Plaintiffs next claim that Texas law permits claims for tortious interference with business relations, citing a case addressing the statute of limitations only, *First Nat'l Bank of Eagle Pass v. Levine*, 721 S.W.2d 287 (Tex. 1986), and a case addressing tortious interference with a contract that did not meet the statute of frauds' written instrument requirement, and so was technically unenforceable, *Clements v. Withers*, 437 S.W.2d 818, 821 (Tex. 1969). Neither applies here

because Plaintiffs do not allege the existence of any contract, enforceable or otherwise, in the Amended Complaint. Opp. at 43 (citing Am. Compl. ¶¶ 15, 19, and 117).[10] The court in *Clements* specifically relied on this reasoning in holding that the unenforceability of a contract will not preclude liability for tortious interference with that contract. *Clements*, 437 S.W.2d at 821 ("However, to prevent fraud by those who would misrepresent verbal promises, the statutes require written proof in certain cases before performance can be enforced in the courts. That is as far as this statute goes: it does not give third parties the right to interfere with the *performance of oral contracts*."). Absent an allegation of the existence of a contract, Plaintiffs' claim for tortious interference also fails under Texas law.[11]

## IV. Plaintiffs Remaining Arguments Are Meritless

### A. Plaintiffs Fail to Plausibly Plead Causation or Article III Standing

Plaintiffs disclaim their earlier pleading describing coordinated trading in online discussions intended to manipulate the price of meme stocks and increase their value so as to create a short squeeze (the Plaintiffs' chosen name for this litigation). Mot. at 5–6, 14. But in the absence of such coordinated trading, Plaintiffs cannot plausibly allege that the price of the meme stocks would have continued to rise. Predicting the price path of stocks in times of unprecedented market volatility is an exercise in pure speculation. Mot. at 12–14. Moreover, Plaintiffs' claims are based on alleged lost value in the meme stocks named Plaintiffs held, which requires speculation as to when, and at what price, Plaintiffs would have sold their stock in the but-for world. Plaintiffs make no allegations as to what they would have done in the but-for world. Absent plausible, non-speculative allegations that the named Plaintiffs would have timed the market correctly and sold their stock at a greater profit, named Plaintiffs have failed to allege any injury in fact and thus lack

---

[10] Am. Compl. ¶ 15 ("Plaintiff Chavez is an investor who used Webull Financial LLC as his introducing broker-dealer and Apex as his clearing broker. The trading account was carried by Apex Clearing Corporation."); Am. Compl. ¶ 19 ("Plaintiff Jang is an investor who used Ally Invest Securities as his introducing broker-dealer and Apex as his clearing broker. The trading account was carried by Apex Clearing Corporation."); Am. Compl. ¶ 117 ("As alleged, Plaintiffs, as Shared Customers, have a business relationship with Ally and Webull, under which Plaintiffs have legal rights.").

[11] Plaintiffs do not argue that they have brought a claim for "tortious interference with future business relations," so we do not address that cause of action here. *See Baker v. Welch*, 735 S.W.2d 548, 549 (Tex. App. 1987).

Article III standing. *See In re Merrill Lynch & Co. Research Reps. Sec. Litig.*, 568 F. Supp. 2d 349, 363 (S.D.N.Y. 2008) (dismissing for lack of causation where plaintiffs failed to untangle loss due to defendant's behavior from losses caused by overall economic conditions unrelated to defendant's behavior).

Plaintiffs contrive an argument that Apex's temporary trading restriction was designed to depress the price of the meme stocks (and therefore supports an inference that the prices of the meme stocks would have continued to rise). Opp. at 38. But, even by Plaintiffs' own admission, Apex's three-and-a-half hour trading restriction was caused by the unprecedented *volatility* in the market. Am. Compl. ¶¶ 4–5, 104. Plaintiffs offer no facts in support of their wild accusation that Apex intended to affect the price of the at-issue meme stocks, and a claim based on such conclusory and speculative allegations cannot survive a motion to dismiss. *Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level."); *see also id.* (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235–36 (3d ed. 2004) ("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action.")).

Plaintiffs attempt to muddy the water by arguing that Apex's standing argument is better addressed at the class certification stage. Opp. at 19–21. But the applicable rule here is simple: This Court may consider the claims of only the *named plaintiffs* when considering whether the Plaintiffs have Article III standing to assert their claims. *Warth v. Seldin*, 422 U.S. 490, 502 (1975). Plaintiffs Jang and Chavez are introduced customers, to whom Apex owes no duties outside of any given transaction, and who have not alleged that they intended to purchase additional meme stocks but were prevented from doing so by Apex. The Amended Complaint must rise and fall with the fate of the *named plaintiffs'* claims. *Griffin v. Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1987) ("a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim"). Therefore, whether other potential class members (such as direct customers of Apex) potentially could assert injury or a claim for negligence, breach of fiduciary duty, or tortious interference is simply not something that this Court need consider. Lacking Article III standing to bring their own claims, Plaintiffs Jang and Chavez may not bootstrap their claims using the potential standing of unnamed and unidentified absent class members.

**B.  Plaintiffs' Amended Complaint Was Not Properly Filed Because This Court Did Not Implement a Direct File Order in This Action**

Plaintiffs seek to defend their attempt to add new Plaintiffs and new causes of action, which were not listed in the joint status report Plaintiffs (and Defendants) provided to this Court, ECF No. 322-1, and therefore were not included in this Court's order granting Plaintiffs permission to file a consolidated complaint, ECF No. 323, by claiming that courts may permit parties in multi-district litigation to directly file claims in the MDL.  That may be true, but in each case in which the parties were permitted to directly file their complaints they filed separate *actions*, which received separate civil action numbers from the MDL docket.  Opp. at 13–14 (citing *In re Takata Airbag Products Liability Litigation*, 379 F. Supp.3d 1333 (S.D. Fla. 2019); *In re Managed Care Litig.*, 150 F. Supp. 2d 1330, 1334 (S.D. Fla. 2001)).

Plaintiffs seek to skip commencing a new action in the name of efficiency.  Consequently, at the conclusion of the MDL proceedings, if this case still exists, there would not even be a separate action that this Court could segregate to send to a home forum.  Indeed, it is unclear whether Plaintiffs Jang and Chavez intend to seek transfer each to separate home fora in separate actions, or whether they intend to maintain a single action together, to be remanded back to a single home forum.  Having filed no individual action, whether in this court or in a home forum, this Court lacks subject matter jurisdiction over Plaintiffs' claims.  *See In re FCA US LLC Monostable Elec. Gearshift Litig.*, 2017 WL 6402992, at *3–4 (E.D. Mich. Mar. 21, 2017).

Plaintiffs cite *In re Takata Airbag Products Liability Litigation* to defend their conduct here, and to ask this Court to condone the procedural mess Plaintiffs have created by attempting to cut corners.  379 F. Supp. 3d 1333.  But Plaintiffs misunderstand the nature of "direct filed" complaints, as described in *Takata*.  Rather than using the consolidation process to create a new action, in *Takata* the direct-file plaintiffs were added to *existing actions*.  *See In re Takata Airbag Prod. Liab. Litig.*, 379 F. Supp. 3d at 1345 (identifying complaints at D.E. 2758, 2762, and 2759, all of which had an action *distinct* from the MDL action); *In re Takata Airbag Prod. Liab. Litig.*, Master File No. 15-MD-2599, S.D. Fla. Case No. 14-cv-24009, ECF No. 939 (May 18, 2018) (Whitaker complaint); *In re Takata Airbag Prod. Liab. Litig.*, Master File No. 15-MD-2599, S.D. Fla. Case No. 14-cv-24009, ECF No. 940 (May 18, 2018) (Puhalla Complaint); *In re Takata Airbag Prod. Liab. Litig.*, Master File No. 15-MD-2599, S.D. Fla. Case No. 14-cv-24009, ECF No. 938 (May 18, 2018) (Boyd Complaint).  For example, the court in *In re Vioxx Products*

*Liability Litigation* permitted out-of-state plaintiffs to file actions "directly in the Eastern District of Louisiana, rather than in a federal district court affording proper venue"—a procedure to which the parties stipulated. *In re Vioxx Prod. Liab. Litig.*, 478 F. Supp. 2d 897, 903–04 (E.D. La. 2007).

Plaintiffs Jang and Chavez did not commence any actions in the Southern District of Florida. Nor did they join a pending action in federal court. Tellingly, the Amended Complaint lists no civil action number other than this MDL action on its cover sheet. Instead, Plaintiffs chose to skip over the action commencement process and simply add an entirely new tort action through the consolidation process. But the consolidation procedure cannot spawn new actions, and *Takata* does not say it can. *See Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 406 (2015) ("Cases consolidated for MDL pretrial proceedings ordinarily retain their separate identities[.]"); *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 2017 WL 6402992, at *3 (E.D. Mich. Mar. 21, 2017) ("The idea that an MDL proceeding is an environment that can spawn fresh *actions* by new plaintiffs is at odds with this scheme.") (emphasis added).

Not only does the Amended Consolidated Complaint consolidate no existing actions, but bringing a new action in this manner exceeds the court's authority under 28 U.S.C. § 1407, and ignores that "Section 1407 refers to ***individual 'actions'*** which may be transferred to a single district court, not to any monolithic multidistrict 'action' created by transfer." *Gelboim*, 574 U.S. a 413 (emphasis added). Thus, Section 1407 presupposes the existence of an existing civil *action* and grants the MDL court jurisdiction over such "pending" actions. 28 U.S.C. §1407(a). Plaintiffs Jang and Chavez have not commenced an "action" within the meaning of Section 1407, and so this court lacks authority under Section 1407 to adjudicate their claims. 28 U.S.C. § 1407(a) ("When *civil actions* involving one or more common questions of fact are pending in different districts, such *actions* may be transferred to any district for coordinated or consolidated pretrial proceedings.").

Moreover, the court in *Takata* was not asked to decide whether it had subject matter jurisdiction; rather, the defendants in that case argued only that the court lacked personal jurisdiction over the defendants in the direct-filed cases. Plaintiffs' reliance on *In re Managed Care Litig.* fares no better. In that case, the court did not address subject matter jurisdiction because "[e]ach of these lawsuits was transferred to this Court by the Judicial Panel on Multidistrict Litigation ('MDL Panel') and consolidated with the [direct filed case], pursuant to 28 U.S.C. § 1407." *In re Managed Care Litig.*, 150 F. Supp. 2d at 1334. As in *Takata*, the "direct

filed case" in *In re: Managed Care Litigation* was a case filed in the Southern District of Florida and then consolidated with the transferred suits, *id.*, such that the direct filed case also had its own "separate identit[y]." *See Gelboim*, 574 U.S. at 413.

Plaintiffs never filed nor commenced separate actions against Apex and never obtained leave of this Court to directly file new civil actions through the consolidated complaint procedure (if that is even permissible). For that reason, Plaintiffs must follow the appropriate procedures and file separate actions here in order for this Court to have subject matter jurisdiction over their claims through the MDL procedure. The overwhelming weight of authority supports Apex's position. *See In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, 2021 U.S. Dist. LEXIS 116925, at *259 (D. Kan. June 23, 2021); *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 2017 WL 6402992, at *3-4 (E.D. Mich. Mar. 21, 2017); *In re Packaged Ice Antitrust Litig.*, 2011 WL 6178891, at *8-9 (E.D. Mich. Dec. 12, 2011); *In re Farmers Ins. Exch. Claims Representatives' Overtime Pay Litig.*, 2008 WL 4763029, at *5 (D. Or. Oct. 28, 2008).

### C. Plaintiffs' Complaint Seeks to Enforce Securities Laws Through Conflicting State Tort Law and Therefore Is Preempted

Plaintiffs assert that the holding in *Appert* cited by Apex—that "an investor cannot sustain a breach of contract claim against a broker-dealer for violation of an exchange rule" is somehow "unremarkable and irrelevant." Opp. at 44 n.37, discussing *Appert v. Morgan Stanley Dean Witter, Inc.*, 2009 WL 3764120, at *4 (N.D. Ill. Nov. 6, 2009)). But *Appert* is directly on point, because it rejects the plaintiffs' common law breach of contract action on the precise ground at issue here: "Because Plaintiff may not bring ***a common law cause of action*** based on the violation of exchange rules, for which Congress had not intended to create a private right of action, her breach of contract claim must be dismissed." *Appert*, 2009 WL 3764120, at *4. The same is true here. Plaintiffs seek to enforce a "***regulatory duty*** to put sufficient measures in place to continue to maintain an orderly market" through its common law negligence, breach of fiduciary duty, and tortious interference claims. Opp. at 45. But those securities regulations and rules do not create a private right of action, and so such claims are preempted and must be dismissed. *See* Mot. at 22, 35.

Plaintiffs incorrectly claim that Apex seeks to "bootstrap itself into the legal protections afforded to an SRO," Opp. at 44, but Plaintiffs misunderstand Apex's argument. Apex does not claim that it should be afforded immunity akin to an SRO. Rather, Apex merely asking this Court

to apply the same rule that the court in *Valelly* applied with respect to a securities broker, namely, that Plaintiffs "cannot circumvent the lack of a private right of action for violations of industry rules merely by recasting her claim as a violation of a common law duty." *Valelly*, 464 F. Supp. 3d at 645–46. In dismissing the Plaintiff's negligence claim, the court in *Valelly* relied on the holding in *In re Series 7 Broker Qualification Exam Scoring Litig.* that Plaintiffs could not maintain claims "derived from duties created at common law" where the claims were "nothing more than disguised actions to enforce regulatory duties" because such actions are preempted by the Exchange Act. *Id.* (citing *In re Series 7 Broker Qualification Exam Scoring Litig.*, 510 F. Supp. 2d 35, 47 (D.D.C. 2007), aff'd, 548 F.3d 110 (D.C. Cir. 2008)). The same rule applies here. Plaintiffs' common law claims to enforce *their interpretation* of Apex's "regulatory dut[ies]" (Opp. at 45) under FINRA rules—which they purport to bring on behalf of any and all investors in meme stocks—are preempted.

### D. Absent a "Special Relationship," New York Law Precludes Tort Claims for Purely Economic Losses

Plaintiffs argue that, with respect to the rule barring recovery for purely "economic losses," New York law applies, and "no such limitation is adopted under New York law." Opp. at 32. Even assuming New York law applies, the cases Plaintiffs cite only further support Apex's position. In *AMBAC Assur. Corp. v. U.S. Bank N.A.*, the court stated that "[u]nder the economic loss doctrine, a defendant is not liable in tort for purely economic loss ***unless*** the plaintiff demonstrates that the ***defendant owed a duty, which 'may arise from a special relationship***[.] . . . to protect against the risk of harm to plaintiff.'" 328 F. Supp. 3d 141, 159 (S.D.N.Y. 2018) (emphasis added). The court in *AMBAC* explained that "the economic loss doctrine centers on whether the defendant owed a duty to protect against the risk of harm to the plaintiff." *Id.* As discussed above, Apex simply does not owe any ongoing fiduciary or other common law duties to Plaintiffs. *See supra* Sections I–II. Moreover, Plaintiffs have not alleged any facts describing any "special relationship" that would "define[] the class of potential plaintiffs to whom the duty is owed." *See 532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 289, 292 (N.Y. 2001) (dismissing negligence claims for economic loss alone, where such claims "fall beyond the scope of the duty owed them by defendants"). Quite to the contrary, Plaintiffs would have their proposed duties apply to every investor in meme stocks, regardless of whether such investors had any connection to Apex. Opp. at 45. Because Plaintiffs fail to allege any "special

relationship" between Apex and Plaintiffs Jang and Chavez, Plaintiffs may not recover for purely economic losses, and their negligence and breach of fiduciary duty claims must fail. *See 532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 292 (N.Y. 2001).

**E. This Court Should Reject Plaintiffs' Invitation to Use New York Tort Law to Create Unlimited Negligence Liability**

Plaintiffs take the extraordinary position that this Court should make unprecedented New York law and create a New York state common law cause of action for negligence against a clearing broker by *any investor* in the stock market, regardless of whether that investor used that clearing broker. Opp. at 45. Indeed, Plaintiffs advocate, without any legal precedent, that this Court should expand tort liability under New York law to virtually limitless claimants: "Apex was not and should not be free to cause consequential damage to all investors as a result of its appalling misconduct that foreseeably affected the price of the Suspended Stocks—no matter who held them." Opp. at 45. The New York Court of Appeals put it well when it rejected a similar argument in *Hamilton v. Beretta U.S.A. Corp.*:

> The injured party must show that a defendant owed ***not merely a general duty to society*** but a ***specific duty to him or her***, for "[w]ithout a duty running directly to the injured person there can be no liability in damages, however careless the conduct or foreseeable the harm." That is required in order to avoid subjecting an actor "to limitless liability to an indeterminate class of persons conceivably injured by any negligence in that act."

96 N.Y.2d at 232 (internal citations omitted). Plaintiffs' claim that these duties arise out of Apex's status "as a broker-dealer" is similarly misplaced, because it is well-established that "[s]ecurities brokers do not owe a general duty of care or disclosure to the public simply because they are market professionals." *Kolbeck*, 923 F. Supp. at 571–72. This Court lacks the authority to expand "well established" duties under New York law on an ad hoc basis. *Alfaro*, 210 F.3d at 115–16 (reversing district court for expanding defendant's duties to plaintiff under New York law beyond the "well established" "applicable duty relationship").

## CONCLUSION

For the reasons stated in Apex's Motion to Dismiss and this Reply Memorandum, this Court should GRANT Apex's Motion to Dismiss with Prejudice.

Dated: November 19, 2021

By: /s/ Jack E. Pace III

Jack E. Pace III
Bryan D. Gant
**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, NY 10020
Tel: (212) 819-8200
Fax: (212) 354-8113
jpace@whitecase.com
bgant@whitecase.com

J. Mark Gidley
**WHITE & CASE LLP**
701 Thirteenth Street, N.W.
Washington, D.C. 20005
Tel: (202) 626-3600
Fax: (202) 639-9355
mgidley@whitecase.com

Angela Daker
**WHITE & CASE LLP**
200 South Biscayne Blvd.
Suite 4900
Miami, FL 33131
Tel: (305) 371-2700
Fax: (305) 358-5744
adaker@whitecase.com

***Counsel for Defendant***
***Apex Clearing Corporation***

**Certificate of Service**

I HEREBY CERTIFY that, on November 19, 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF filing system. I further certify that this motion was served on all counsel of record via transmission of the Notice of Electronic Filing generated by the Court's CF/ECF System.

*/s/* Jack E. Pace III
Jack E. Pace III