# Exhibit 9

VitalLaw™   

# [Commodity Futures Archive - Selected materials, French v. Bache Halsey Stuart, Inc., U.S. Commodity Futures Trading Commission, ¶20,444, (Jun. 23, 1977)](#)

Commodity Futures Archive - Selected materials
No. R 76-17
Commodity Futures Archive - Selected materials ¶20,444

[Click to open document in a browser](#)

French v. Bache Halsey Stuart, Inc.

¶20,444. U.S. Commodity Futures Trading Commission. No. R 76-17.June 23, 1977. Initial decision in full text.

## Headnote

**Reparations: Failure to Execute Trade: Establishment of New Positions Against FCM's Policy at Time: Limited Obligation to Customer..–**
A futures commission merchant which perceives that a market will move drastically and imposes increased margin requirements in accordance with contract market rules to reduce its position in that market does not breach its duty to customers by refusing to establish new positions for customers in that market. The administrative law judge differentiated between a liquidating order, which the FCM may have had an obligation to execute under the circumstances and an order for a new position, which it could refuse. The failure to execute such an order was not a violation of the antifraud provisions of the Commodity Exchange Act.
See [¶11,700](#) and [12,555](#), "Liabilities—Prohibitions" division.

*Charles E. French* Pro Se.

*Jon Paugh* and *Timothy S. Hardy* for respondents.

Shipe, Administrative Law Judge:

This proceeding was instituted on September 8, 1976, with the forwarding of a complaint and answer to the Office of Hearings and Appeals by the Reparations Unit, Division of Enforcement. The proceeding is brought pursuant to Section 14 of the Commodity Exchange Act, as amended (7 U.S.C. §18). The complainant is an individual investor, residing in Arlington, Virginia. The respondent is a registered futures commission merchant maintaining an office in, among other places, Washington, D. C.

A motion to dismiss by respondent was denied at a prehearing conference on November 22, 1976. An oral hearing was held on February 2, 1977 in Washington, D.C. Post-hearing briefs have been filed. The transactions in dispute were in Mexican peso futures contracts.

The complaint contains allegations which, if proved, could constitute fraud under Section 4b of the Act (7 U.S.C. §6b), pertaining to improper refusal to execute trades. Damages in the amount of $28,559 are sought. Respondent denies any violations of the Act with respect to the involved transactions.

### Findings of Fact

1. The complainant is a retired businessman, and an experienced trader in commodity futures, having traded since 1968. He has traded in currencies, including Swiss francs and Mexican pesos. His trading of the latter was based on a knowledge of currency agreements between the United States and Mexico, as well as on information obtained during visits to Mexico and discussions with knowledgeable persons there. Tr. 31-33.

Case 1:21-md-02989-CMA   Document 440-3   Entered on FLSD Docket 11/19/2021   Page 3 of 7

Commodity Futures Archive - Selected materials, French v. Bache Halsey Stuart, Inc., U.S....



2. Complainant maintained a commodity margin account with respondent during the time relevant to this proceeding, and previously had signed a customer agreement which provided, *inter alia,* that complainant would maintain such margins as respondent, in its discretion, required. Exhibit 1.

3. The rules of the International Monetary Market of the Chicago Mercantile Exchange, Inc., which apply to the transactions in issue, provide in part that:

> The clearing member may call for additional security deposits at his discretion, but whenever a customer's security deposits are depleted below the minimum amount required, the clearing member must call for such additional security deposits as will bring the account up to initial deposit requirements and if within a reasonable time the customer fails to comply with such demand (except for unusual circumstances the clearing member may deem one hour to be a reasonable time), the clearing member must close out the customer's trades or sufficient thereof to restore the customer's account to required security status.

Rule 822 (d), Rules of the International Monetary Market of the Chicago Mercantile Exchange, Inc.

4. On September 8, 1975, respondent's Commodity Credit Committee in New York issued the following order to all branch offices:

> Effective immediately, margin requirements for existing speculative long positions in Mexican peso contracts are increased to $20,000 per contract regardless of whether accounts have been previously approved for minimum speculative requirements. 'This additional margin may be satisfied by the deposit of collateral such as treasury bills, letters of credit or equity in the clients' securities accounts provided that minimum margin as required under the rules of the international monetary market has been satisfied.
>
> If a client is unable or unwilling to deposit adequate funds we will be glad to transfer his Mexican peso positions to another broker of his choice and waive commission on the transfer.
>
> In addition, all trading in Inter-bank and International Monetary Market Mexican pesos, including hedging, speculative and straddle transatcions are prohibited.
>
> Exceptions to this must receive the prior approval of the Commodity Credit Committee.

This order was immediately communicated to complainant, who was in its Washington, D. C. office when the ruling was received there. Tr. 11, I'll and Exhibit 3.

The order reflected the opinion of respondent's Commodity Credit Committee that the Mexican peso was grossly overvalued in view of that country's balance of payments problem and its rising debt In proportion to its gross national product, Tr. 90. The possible weakness of the peso had been discussed in the Financial press. Exhibits 11 and 12. The September 8 order raised to $20,000 the existing margin requirement of $6,000 which had been increased from $4,000 in August 1975. Tr. 87. The International Monetary Market required an initial margin of $4,000 per contract in August 1975. Tr. 87. This was increased to $6,000 in September, 1975. Tr. 65.

6. The official dollar/peso exchange rate during 1975 was eight cents per peso. Because of a possible devaluation in the peso, future peso contracts were traded at substantial discounts below the official exchange rate. By purchasing such contracts and holding them to delivery date, when they could be covered at the official exchange rate, investors made substantial profits for bearing the risk of devaluation. Tr. 89 and Exhibit 12. In 1976 there was a drastic devaluation of the Tr. 94.

7. On September 8, 1975, complainant's account with respondent held eight long contracts in Mexican pesos: one December 1975; one March 1976; four June 1976 and two September 1976. Exhibit 4.



8. On September 8, 1975, complainant, seeking to transfer his positions from the more distant months to the nearest delivery month, placed an order to sell two June 1976 peso contracts and buy two December 1975 peso contracts. Respondent refused to execute the order. On subsequent days other orders to sell two June or September contracts and buy two December contracts were refused. An order to sell the two June 1976 contracts separately was also refused. Tr. 12; Complaint, 4/6/76, Exhibit Al.

9. Complainant considered the December contracts to be safer from possible devaluation because they would be exposed to that risk for a shorter period. This view of risk was reflected in the prices of the contracts for the respective months. Tr. 33, 5 2, 5 4.

10. During the days following September 8, 19715, some of the contracts declined the limit in value, or $750 per day. Tr. 74,104.

11. Although complainant's account was not brought up to the margin requirements imposed by the September 8 order, it was not liquidated bemuse respondent anticipate that the account would be transferred to another broker. Tr. 111-112.

12. Some of respondent's other peso customers put tip the additional margins or transferred their accounts to other brokers but most of them liquidated their positions Tr. 99.

13. On September 23, 1975, complainant, at respondent's insistence, sold four December peso contracts at 7.795 (cents per peso), the lowest point of the contract, thereby hedging his open long contracts. Tr. 24.

14. Complainant's monthly statement for August, 1975 shows a total deficit in the account of $748.03. Although $24,450 was transferred into the account from a stock account during September 1975, the total equity in the account on September 30, 1975 was $4,229. No additional outside funds were placed in the account during October, 1975, and on October 31, 1975, the total equity was $4,186.97. Exhibit 4.

15. On November 18, 1975, complainant requested, in writing, that his account be transferred to another broker, which was accomplished November 21, 1975.

*Discussion of Facts and Law*

The complainant seeks damages on the grounds that respondent refused to execute his orders on September 8, 9, and 10, 1975; required him, against his wishes, to execute sales of short contracts on September 23, 1975; and failed to liquidate two contracts as ordered on October 14, 1975.

Although much of the testimony and record in this proceeding is somewhat confusing, many of the relevant facts are not disputed, I or can be clearly ascertained. It is not disputed, for instance, that following the increased margin ruling by respondent's Commodity Credit Committee on September 8, 1975, that respondent frustrated complainant's strategy of moving his "outer" contracts, i.e., those expiring in March 1976, or later, to the spot month, December 1975.

There is some dispute whether a liquidating order was refused on September 8, 1975. In this connection, respondent moved to have excluded copies of alleged order slips, one of which has the appearance of a liquidating order. The ruling receiving those slips is affirmed.

Complainant stated that he always handed the account executive his orders on slips because the latter had a hearing problem. The latter claimed that he would have rejected orders on slips if prices were not stated thereon. The slips in question do not indicate prices. However, the account executive had previously stated: "(Complainant) always wrote out (his orders) on a slip of paper and specified the contract. And if he failed to put a price on the slip, I asked him what it was, whether it was a market price or a specified price." Tr. 159. That the proffered slips, when supplemented by oral instructions, constituted orders, as claimed by complainant, must be accepted.

The slip asserted by complainant to represent an order tendered on September 8, 1975, reads: "Sell 2 June '76, Buy 2 Dec. '75," with the latter instruction crossed out. Complainant states that when the order as originally submitted was refused he struck out the "Buy 2 Dec. '75," and resubmitted it. Tr. 11-12.


This would apparently constitute a liquidating order, as complainant then held four long June '76 contracts. However, it is clear from other testimony that complainant did not at this time intend to liquidate his June 1976 contracts without establishing commensurate December 1976 contracts. There are numerous statements to that effect in the record. For instance, complainant stated, "every one of these orders was based on trying to get into December '75, which was the upcoming contract to expire in a little over two months." Tr. 17. This is consistent with complainant's claim that the sale of a June 1976 contract, on September 9, without purchasing a December 1975 contract, was unauthorized.

In reference to a meeting with respondent's employees concerning the September 8 margin increase ruling, complainant stated that he did not remember any conversation about the liquidation of existing positions as opposed to the transfer of positions This indicates that liquidation was not being sought.

Respondent's witnesses uniformly deny that any liquidating orders were received or refused. Although such testimony can be characterized as self-serving, a refusal to liquidate a contract would have been without apparent motive and at variance with respondent's purpose of withdrawing its exposure from the risks of peso trading.

In a letter requesting that his account be transferred to another broker, complainant refers to his inability to hedge or transfer positions to the spot month, but does not mention liquidation. Complaint, 6/12/76. His complaint includes a claim based on the failure to execute a liquidating order because of market conditions after September 20. This indicates that no liquidating orders were tendered prior to that date.

Finally, complainant does not insist on brief that he did attempt liquidation at this time. He states: "The attorney for Bache in questioning his witnesses never once asked … if my orders had been refused, instead the question was constantly asked, 'Was French told lie couldn't liquidate?' The underlying reason for that question being asked was because it was the only way to get around asking witnesses if my orders had been refused from September 8 to 19th." Brief, page 2. He also refers in his brief to the daily refusals by respondent employees to execute his orders "which would have taken my positions out of losing months into profitable month, December 1975." *Id.* at page 3.

It must be concluded that no unequivocal liquidation order was made on September 8, 1975. The sell portion of the order was apparently tendered separately, but according to all of the evidence, this was done with the understanding that if that portion of the order were executed, the purchase portion of the order would follow.

Since respondent concedes that it did refuse spread orders, the legal issue is joined on this undisputed factual circumstance.

The complainant feels deeply aggrieved by respondent's refusal to execute his orders, particularly since as events developed, the later contracts declined and the December 1975 contracts returned to the official exchange rate. Thus, respondent suffered losses on the unliquidated contracts, and would have made a profit on the December 1975 contracts.

Complainant argues that because lie had never given respondent discretionary authority over his account, respondent was obligated to execute trades as he ordered.

It seems well settled that there is 110 absolute duty on the part of a broker to execute trades for a customer. See *Johnson v. Fahnestock & Co.,* [1975-1977 Transfer Binder] Comm. Fut. L. Rep, (CCH) ¶20,230. However, where a customer-broker relationship exists, there undoubtedly is all obligation of fair dealing, the absence of which, even in refusing orders, would constitute fraud under Section 4b of the Act (7 U.S.C. §6b). A review of pertinent security cases will indicate whether respondent has breached that obligation here. It is assumed that the brench by a broker of its agency contract amounts to fraud under Section 4b, and therefore, cases *ex contractu* as well as cases *ex delicto* may be considered. Cf. *Goldenburg v. Bache and Company,* 270 F. 2d 675, 680 (5th Cir. 1959); *Douglas Steen,* 21 A.D. 1076, 1089 (1962).

In an early csae involving an open account, there was a telegraphic order to sell one stock and buy another. The United States Supreme Court held that the broker was liable for failing to execute the order because, by using the mail, it had untimely communicated its refusal of the order. *Galigher v. Jones,* 129 U. S. 193 (1889).


The court stated it was the duty of the broker to give "prompt notice that he objected and declined to make the change." *Id.* at 198. The actions of respondent here are consistent with the Court's holding in *Galigher* in that the refusal to execute complainant's orders was immediately communicated.

In *Busch v. L. F. Rothschild & Co.,* 23 App. Div. 2d 189, 259 N.Y.S. 2d 239 (1st Dept. 1965), the court assumed for purposes of decision that an order to sell bonds had been refused. The court cited and followed *Galigher,* stating: "A stockbroker is an agent for the customer. Unless accepts the agency he has no duty to execute any order and may refuse to do so … The relationship is not changed by the fact that there is a margin account. The duty in such case is to give prompt notice that the order is refused." *Id.* at 240.

The rationale of the law on this point seems evident; the execution of new contracts exposes the broker, as well as the customer, to new financial risks. One party should not be able to impose risks on another without the other's consent. Whether the new risks are more or less than existing risks must be determined by both affected parties.

A liquidation order may reduce the risks of the broker, and consequently, the right to refuse a liquidation order is more limited. *Cf. PSG Co. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 417 F. 2d 659 (9th Cir. 1969). But it has been found that the orders in issue here were not liquidation orders.

Here the respondent determined, apparently for good faith reasons, that it did not wish to continue holding peso accounts. To carry out that decision it imposed drastically increased margin requirements, its right to do so being reserved in the margin agreement, and set forth in the governing exchange rules. Though it seems unlikely that this right is absolute, its existence has been recognized by the courts. *See e.g., Kayser v. Estabrook & Company, Inc.,* 45 Ohio App. 2d 38, 340 N.E. 2d 427 (1974), where it is stated:

> If at any time the broker becomes unwilling to stand any longer without additional margin or security being deposited to secure him, he has the right to notify his customer of that fact, and to demand of him the payment or deposit of such additional margin as the broker may require and definitely specify. If, after demanding of his customer such further deposit of money as security against loss to himself, the customer does not promptly, and within a reasonable time after receiving such notifications make a deposit of such additional margin as had been required, then the broker has the right to take such fair and reasonable steps as may be necessary to prevent loss to himself, and this right is equivalent to an instruction by the customer to the broker to close out the transaction. The broker can close the transaction at any time if the margin, on his demand and notice, is not kept good. 45 Ohio App. 2d at 41-2, 340 N.E. 2d at 430.

Reparations were awarded for the liquidation of an account in *Baker v. Edward D. Jones & Co.,* [1975-1977 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶20,241, where a flawed notice, purportedly on existing margin requirement, had been issued; however, the right of a broker to increase its margin requirements was explicitly recognized.

As discussed, complainant's orders were to sell March 1976, or later contracts, and to buy December 1975 contracts. In his view, there was less risk in the latter. Respondent declined to execute the orders because they would have entailed, contrary to its policy, the establishment of new positions. In the circumstances, this cannot, consistent with established law, be deemed violative of respondent's duty to complainant, or all exercise of bad faith.

Although the complainant made no effort to comply with the newly established margin requirement, his position was not precipitously liquidated. Complainant was given all opportunity, eventually exercised, of transferring Ills account to another broker, without being charged commission fees. During the time of this controversy, complainant found none of the alternatives presented by respondent acceptable. He did not choose to meet the additional margin; he did not wish to liquidate his position; and transferring to another broker would have required meeting the initial margin requirements of such broker, which exceeded the amount in complainant's account by



the time a transfer could be arranged. These are explanations for complainant's sense of frustration. They are not proof that respondent had a continued obligation to share complainant's risk in maintaining or establishing positions in pesos. Respondent wanted out and took steps to that end. It cannot be found that these steps were unfair or unlawful.

Complainant, besides seeking damages for the failure to execute his orders, also requests damages for losses incurred in the short hedge contracts entered on September 23, 1975. He claims that these were forced upon him. The only coercion claimed is a threat of liquidation, which as discussed, was within respondent's right under the customer agreement, governing exchange rules and established legal precedent. Complainant apparently preferred being short in the December 1975 contract to liquidation of his positions. The threat of liquidation where the right to liquidate exists is not unlawful coercion.

Complainant alleged in his complaint that the market was such after September 20, 1975, that he wanted to enter a liquidating spread that would cancel out two existing contracts, and that his order to that effect was executed but then cancelled. In response to interrogatories, lie states this occurred on October 14, 1975.

Respondent's employees deny that the incident occurred, and the employee who allegedly ordered the cancellation stated that such action was riot within his authority.

It is riot explained why an order based on market conditions existing on September 20 was not tendered until October 14. Moreover, complainant's monthly statements show that liquidating orders were executed for his account before and after October 14. No oral testimony on this claim was given at the hearing. This claim has not substantiated.

It is found that complainant has not established his claim for reparations under the Commodity Exchange Act, as, amended.

Accordingly, it is ordered that the complaint be, and it is hereby, dismissed.

© 2021 CCH Incorporated and its affiliates and licensors. All rights reserved.