**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-MD-2989-ALTONAGA/TORRES**

In re:

**JANUARY 2021 SHORT SQUEEZE**
**TRADING LITIGATION**

_____/

This Document Relates to the Federal Securities Tranche

**DEFENDANTS ROBINHOOD MARKETS, INC., ROBINHOOD FINANCIAL LLC AND
ROBINHOOD SECURITIES, LLC'S MOTION TO DISMISS THE FEDERAL
SECURITIES TRANCHE COMPLAINT AND INCORPORATED
MEMORANDUM OF LAW**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND ................................................................................................................ 4

LEGAL STANDARD ........................................................................................................ 11

ARGUMENT ..................................................................................................................... 13

I.  PLAINTIFFS DO NOT PLEAD MARKET MANIPULATION UNDER EITHER
SECTION 9(a) OR SECTION 10(b) OF THE SECURITIES EXCHANGE ACT .......... 13

    A.  Plaintiffs Do Not Adequately Plead Manipulative Conduct ................................. 14

        1.  Plaintiffs Do Not Allege that Robinhood Deceived Investors About
Its Purchase Restrictions. ........................................................................ 15

        2.  Plaintiffs Do Not Allege a Violation of Any of the Six Subsections
of Section 9(a). ......................................................................................... 19

    B.  Plaintiffs Do Not Adequately Plead the Requisite State of Mind ......................... 23

II.  PLAINTIFFS DO NOT PLEAD A MISREPRESENTATION CLAIM UNDER
SECTION 10(b) OF THE SECURITIES EXCHANGE ACT. ........................................ 26

    A.  Plaintiffs Cannot Bring a Section 10(b) Claim Based on Robinhood's
Statements About Its Own Business To Recover Alleged Losses from
Plaintiffs' Sale of Securities of Other Companies. ............................................. 28

        1.  Plaintiffs Lack Statutory Standing. .......................................................... 28

        2.  Plaintiffs Cannot Satisfy the "In Connection With" Element ................... 30

    B.  Plaintiffs Do Not Adequately Plead Other Essential Elements of Their
Section 10(b) Misrepresentation Claim. ............................................................. 31

        1.  Plaintiffs Do Not Adequately Plead Any False or Misleading
Statements. ............................................................................................... 31

        2.  Plaintiffs Do Not Adequately Plead Loss Causation. ............................... 34

        3.  Plaintiffs Do Not Adequately Plead Scienter ........................................... 36

III.  PLAINTIFFS' CLAIMS SHOULD BE DISMISSED WITH PREJUDICE. ................... 39

CONCLUSION .................................................................................................................. 39

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................11

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ..................... passim

*Baum v. Phillips, Appel & Walden, Inc.*, 648 F. Supp. 1518 (S.D.N.Y. 1986), *aff'd sub nom. Asch v. Philips, Appel & Walden, Inc.*, 867 F.2d 776 (2d Cir. 1989) ...............20, 24

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................11

*Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975) ...........................................29, 30

*Brady v. Top Ships Inc.*, No. 17-cv-4987 (BMC), 2019 WL 3553999 (E.D.N.Y. Aug. 5, 2019), *aff'd sub nom. Onel v. Top Ships, Inc.*, 806 F. App'x 64 (2d Cir. 2020) ...............................................16, 18, 23

*Bryant v. Avado Brands, Inc.*, 187 F.3d 1271 (11th Cir. 1999) ...........................................6, 13

*Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307 (11th Cir. 2019) ........................................12

*Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996) .........................................37

*Cohen v. Stevanovich*, 722 F. Supp. 2d 416 (S.D.N.Y. 2010) .....................................12, 17, 19, 26

*Connolly v. Havens*, 763 F. Supp. 6 (S.D.N.Y. 1991) ....................................................12

*Crane Co. v. Westinghouse Air Brake Co.*, 419 F.2d 787 (2d Cir. 1969) ..............................16, 24

*Crummere v. Smith Barney, Harris, Upham & Co.*, 624 F. Supp. 751 (S.D.N.Y. 1985) ...................................................30

*D.A.M. v. Barr*, 474 F. Supp. 3d 45 (D.D.C. 2020) ......................................................5, 7

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) .....................................................34, 35, 36

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) ......................................................13, 19

*Fezzani v. Bear, Stearns & Co.*, 384 F. Supp. 2d 618 (S.D.N.Y. 2004) .....................................12

*FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282 (11th Cir. 2011) ....................... passim

*GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189 (3d Cir. 2001) ...........................................15

*Gurary v. Winehouse*, 190 F.3d 37 (2d Cir. 1999) ......................................................15

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014)..............................27

*Harbinger Capital Partners LLC v. Deere & Co.*, 632 F. App'x 653
(2d Cir. 2015)........................................................................................28

*Harris v. Ivax Corp.*, 182 F.3d 799 (11th Cir. 1999)........................................32

*Henningsen v. ADT Corp.*, 161 F. Supp. 3d 1161 (S.D. Fla. 2015) .......................31, 38

*I.B. Trading, Inc. v. Tripoint Glob. Equities, LLC*, 280 F. Supp. 3d 524
(S.D.N.Y. 2017).....................................................................................14

*In re Altisource Portfolio Solutions, S.A. Securities Litigation*, No. 14-81156,
2015 WL 12001262 (S.D. Fla. Sept. 4, 2015) ...............................................29

*In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257 (11th Cir. 2016)...........13

*In re GeoPharma, Inc. Sec. Litig.*, 399 F. Supp. 2d 432 (S.D.N.Y. 2005) .............38, 39

*In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378
(S.D.N.Y. 2010), *aff'd sub nom. Wilson v. Merrill Lynch & Co., Inc.*,
671 F.3d 120 (2d Cir. 2011)....................................................................17

*In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613 (S.D.N.Y. 2003) .........30

*In re Williams Sec. Litig.–WCG Subclass*, 558 F.3d 1130 (10th Cir. 2009)..............34

*Janus Capital Group v. First Derivative Traders*, 564 U.S. 135 (2011).....................29

*Kraft v. Third Coast Midstream,* No. 19-CV-9398 (LJL), 2021 WL 860987
(S.D.N.Y. Mar. 8, 2021) .......................................................................16

*La Grasta v. First Union Sec., Inc.*, 358 F.3d 840 (11th Cir. 2004)...........................6

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005)................................35

*Luce v. Edelstein*, 802 F.2d 49 (2d Cir. 1986) ...............................................27

*Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*,
No. 19 CIV. 7536, 2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021) ...................29, 30

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049 (9th Cir. 2008)........27

*Meyer v. Greene*, 710 F.3d 1189 (11th Cir. 2013)........................................34, 35

*Mills v. Polar Molecular Corp.*, 12 F.3d 1170 (2d Cir. 1993)...............................31

*Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230 (11th Cir. 2008) .............................13

*Ontario Public Service Employees Union Pension Trust Fund v.*
    *Nortel Networks Corp.*, 369 F.3d 27 (2d Cir. 2004) .........................................28, 29

*Panfil v. ACC Corp.*, 768 F. Supp. 54 (W.D.N.Y. 1991) .................................21, 22, 24

*Pelletier v. Stuart-James Co.*, 863 F.2d 1550 (11th Cir. 1989) ...................................30

*Pross v. Katz,* 784 F.2d 455 (2d Cir. 1986) ................................................................30

*Ray v. Lehman Bros. Kuhn Loeb*, 624 F. Supp. 16 (N.D. Ga. 1984) ...........................24

*Robbins v. Koger Properties, Inc.*, 116 F.3d 1441 (11th Cir. 1997).............................34

*Santa Fe Indus., Inc. v. Green*, 430 U.S. 462 (1977).....................................................15

*Saxe v. E.F. Hutton & Co.*, 789 F.2d 105 (2d Cir. 1986) ............................................31

*SEC v. Lek Sec. Corp.*, 276 F. Supp. 3d 49 (S.D.N.Y. 2017) .......................................20

*SEC v. Malenfant*, 784 F. Supp. 141 (S.D.N.Y. 1992) ................................................15

*SEC v. Resch-Cassin & Co.*, 362 F. Supp. 964 (S.D.N.Y. 1973) ...........................15, 24

*South Cherry Street, LLC v. Hennessee Group LLC*, 573 F.3d 98 (2d Cir. 2009) .......23

*Spencer Cos. v. Agency Rent-A-Car, Inc.*, No. 81-2097-S, 1981 WL 1680
    (D. Mass. Sept. 21, 1981) .......................................................................................20

*Sterne, Agee & Leach, Inc. v. Nat'l Sec. Clearing Corp.*, No. CV-07-BE-909-S,
    2008 WL 11424178 (N.D. Ala. Sept. 30, 2008) ......................................................12

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008) ..........29

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308 (2007) .......................12, 26, 38

*Trane Co. v. O'Connor Sec.*, 561 F. Supp. 301 (S.D.N.Y. 1983).......................17, 23, 25

*Univ. Express, Inc. v. SEC*, 177 F. App'x 52 (11th Cir. 2006)......................................17

*Urcuyo v. Invertec Corp.*, No. 05-22291-CIV, 2006 WL 8433171
    (S.D. Fla. May 2, 2006) ...........................................................................................30

*Wilson v. Merrill Lynch & Co.*, 671 F.3d 120 (2d Cir. 2011)......................................15

*Y-GAR Cap. LLC v. Credit Suisse Grp. AG*, No. 19 Civ. 2827 (AT),
    2020 WL 71163 (S.D.N.Y. Jan. 2, 2020) ................................................................22

**Statutes & Rules**

15 U.S.C. § 78i ................................................................................................ passim

15 U.S.C. § 78j ................................................................................................ passim

15 U.S.C. § 78u-4 ........................................................................................... passim

17 C.F.R. § 240.10b-5 ..................................................................................... passim

17 C.F.R. § 240.17Ad-22 ........................................................................................4

Fed. R. Civ. P. 9 .............................................................................................. passim

Fed. R. Civ. P. 12 .............................................................................................1, 11

Fed. R. Evid. 201 .....................................................................................................5

**Other Authorities**

62 Fed. Reg. 520-01 (Jan. 3, 1997) .......................................................................22

Order Dismissing the Antitrust Amended Complaint, *In re January 2021 Short
  Squeeze Trading Litigation*, 21-2989-MDL-ALTONAGA/Torres
  (S.D. Fla. Nov. 17, 2021), ECF No. 438 ...........................................25, 31, 32, 37

Securities and Exchange Comm'n, Securities Exchange Act Release No. 4163
  (Sept. 16, 1948)...................................................................................................23

Securities and Exchange Comm'n, "Thinking About Investing in the Latest Hot
  Stock?" (Jan. 30, 2021) ("Jan. 30 SEC Statement"), *available at*
  https://www.sec.gov/oiea/investor-alerts-and-bulletins/risks-short-term-
  trading-based-social-media-investor-alert ...........................................................17

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants Robinhood Markets, Inc., Robinhood Financial LLC and Robinhood Securities, LLC (together, "Robinhood") respectfully submit this memorandum of law in support of their Motion to Dismiss the Amended Consolidated Class Action Complaint for the Federal Securities Tranche ("Compl.") (ECF No. 446) for failure to state a claim.

## PRELIMINARY STATEMENT

Plaintiffs in this tranche of the MDL bring federal securities claims against Robinhood, alleging market manipulation and fraudulent misrepresentations. Plaintiffs' claims fail because the securities laws do not prohibit the conduct alleged here.

The market manipulation claims fail for a number of reasons, most fundamentally because Robinhood publicly disclosed the purchase restrictions it temporarily imposed on the volatile stocks at issue. As a result, Plaintiffs do not—and cannot—state a claim for market manipulation, which necessarily requires a defendant to *deceive* the market about its conduct.

Separately, Plaintiffs' misrepresentation claim fails for numerous reasons, but the most basic reason is that the alleged misstatements were made by Robinhood about Robinhood, not about any company in which Plaintiffs held stock. At the time of the alleged misrepresentations, Plaintiffs did not hold Robinhood stock. They held stock of various *other* companies. In these circumstances, Plaintiffs do not—and cannot—state a claim for fraudulent misrepresentation.

As this Court is now well aware, the events of January 2021 led to unprecedented trading volatility for a number of "meme" stocks. Trading volume rapidly ratcheted up over the course of several days as retail investors sought to effect a short squeeze in stocks perceived to be the target of short selling by hedge funds. As a result, trading volume and volatility in several stocks reached historic levels on January 27 and 28, 2021. This led the National Securities Clearing Corporation ("NSCC"), early in the morning on January 28, 2021, to impose large collateral requirements on its members to cover the trade orders and risk, including an unprecedented *$3 billion* deposit requirement for Robinhood Securities. Despite various proactive efforts over the preceding days to mitigate the volatility, Robinhood Securities had no choice but to implement a "position closing only" restriction (a "PCO") on 13 of the most volatile stocks. The PCO temporarily restricted purchases of the stocks at issue. It did not

restrict sales of those stocks.  Robinhood lifted the PCO restriction for those 13 stocks after only a day.  For the next five trading days, Robinhood Securities maintained purchasing limits that temporarily capped the number of shares of certain volatile stocks a customer could hold on Robinhood's platform.  Robinhood publicly announced each of those purchase limits on its website, which it regularly updated as Robinhood Securities adjusted those limits.  By Friday, February 5, 2021, Robinhood Securities had lifted all of the purchase limits.

Plaintiffs traded in the meme stocks both during and after the January 2021 short squeeze and now seek to blame Robinhood for losses from their decision to sell some of those stocks while Robinhood's PCO was in place.  Plaintiffs bring their claims on behalf of a putative class of *all* investors in the United States—including non-Robinhood customers, with whom Robinhood never interacted—who held any of the nine Affected Stocks on January 27, 2021, and sold shares of those stocks at a loss during the alleged Class Period of the six trading days from January 28 through February 4, 2021.  Of course, it was Plaintiffs' decision to sell shares when they did; Robinhood did nothing to force them to sell.  Indeed, for many of the stocks at issue, Plaintiffs could have sold their shares at a *profit* during the alleged Class Period, and Lead Plaintiff Laine-Beveridge did just that.  In any event, Plaintiffs fail entirely to state a claim under the Federal securities laws.

*First*, Plaintiffs assert claims for market manipulation under Sections 9(a) and 10(b) of the Securities Exchange Act (the "Exchange Act").  They allege that Robinhood put in place its purchasing limits with the knowledge that doing so would drive down the market prices of the Affected Stocks.  As a threshold matter, market manipulation claims under either section require deception, and there can be no deception where information is publicly disclosed and available to the market.  This alone is fatal to Plaintiffs' claims, as they concede that Robinhood disclosed *all* of its purchasing restrictions promptly and *publicly*.  (*See infra* Section I.A.1.) Beyond this fundamental threshold problem, Plaintiffs also fail to plead conduct that violates any of the provisions of Section 9(a) of the Exchange Act, which consists of six specific subsections, setting out the various forms of prohibited market manipulation.  Plaintiffs do not even identify which subsection they allege Robinhood violated, and, in any event, Plaintiffs fail to plead the elements of a claim under any of the six subsections.  (*See infra* Section I.A.2.)

In addition, Plaintiffs fail to plead facts that give rise to a strong inference of scienter, as required under either Section 9(a) or Section 10(b).  Plaintiffs cannot point to any

direct evidence of scienter or articulate a plausible reason *why* Robinhood would manipulate the market to lower the prices of the Affected Stocks.  Plaintiffs do not allege that Robinhood owned or bought any of the Affected Stocks or stood to profit in any way from price declines in the Affected Stocks.  Instead, Plaintiffs offer two potential motives for Robinhood to allegedly manipulate the prices for the Affected Stocks.  Their first theory is that Robinhood sought to protect a potential future IPO by lowering the prices of the Affected Stocks to meet its deposit requirements.  But the success of Robinhood's IPO, which would not occur for another six months, had *nothing* to do with the prices at which the Affected Stocks traded.  Plaintiffs' second theory, relying on paraphrased and generalized allegations from the Antitrust Tranche complaint that the Court has already rejected, is that Robinhood acted to "help" Citadel Securities cover a hypothetical proprietary trading position by driving down the prices of the Affected Stocks. What both of these theories lack is a core requirement for a manipulation claim—that Robinhood acted with the intent to drive down the prices of the Affected Stocks and thereby *profit* from the manipulated stock prices.  For each of these reasons, Plaintiffs' market manipulation claims fail. (*See infra* Section I.B.)

   *Second*, Plaintiffs allege a violation of Section 10(b) and Rule 10b-5 based on alleged fraudulent misrepresentations.  Specifically, Plaintiffs allege that Robinhood made false statements about Robinhood's own business that somehow deceived investors in connection with their purchase or sale of securities issued by *other* companies (the Affected Stocks).  None of the Plaintiffs alleges that he or she was an investor in Robinhood (which was not even a public company at the time).  Section 10(b) does not give rise to such an expansive right of action for misrepresentations.  Robinhood is unaware of *any* case in which a court has permitted a Section 10(b) claim for losses in securities issued by Company B based on Company A's allegedly false statements about *Company A's* business.  Such a theory is particularly illogical here, where *none* of the statements alleged by Plaintiffs even refers to any of the Affected Stocks or their issuers. As a result, Plaintiffs lack statutory standing to bring a Section 10(b) claim and fail to allege facts that would meet the element that any misrepresentation was made "in connection with" the purchase or sale of securities.  (*See infra* Section II.A.)

   Plaintiffs also fail sufficiently to plead a number of other required elements of a Section 10(b) misrepresentation claim including:  (1) facts sufficient to show that any of Robinhood's statements were false or misleading; (2) loss causation, as Plaintiffs do not allege

that disclosure of the alleged falsity of Robinhood's statements affected the price of any of the Affected Stocks; or (3) facts sufficient to establish scienter. (*See infra* Section II.B.)

Accordingly, for the reasons stated above and explained in greater detail below, the Complaint must be dismissed.

## BACKGROUND

A.    Robinhood's Trading Platform.

Robinhood is an industry-changing financial services company founded on the ethos of putting financial power into the hands of everyday people. (Compl. ¶ 31.) Robinhood's securities business currently comprises three entities: Robinhood Markets, Inc. ("Robinhood Markets"), which wholly owns Robinhood Financial LLC ("Robinhood Financial"), the customer-facing introducing broker, and Robinhood Securities, LLC ("Robinhood Securities"), the clearing broker. (*Id.* ¶¶ 23-25.) Robinhood provides intuitive, easy access to the financial markets by offering zero commission trades and a logical trading platform available on a computer or mobile device. (*Id.* ¶ 38.)

A securities transaction is a multi-step process. When a Robinhood customer places an order to buy or sell a security using their Robinhood account, Robinhood Financial, as the introducing broker, may first choose whether to accept the order; should it do so, it sends the order to Robinhood Securities, the clearing broker. (*Id.* ¶¶ 23-24.) Robinhood Securities then routes the order for execution to a market maker; following execution, Robinhood Securities submits the resulting trade to a clearinghouse for clearance and settlement. (*Id.* ¶¶ 31-32, 114.) The main clearinghouse for equities traded in the U.S. is the National Securities Clearing Corporation ("NSCC"), part of a larger clearing organization called the Depository Trust & Clearing Corporation ("DTCC"). (*Id.* ¶ 58.) Clearinghouses such as NSCC and DTCC are regulated by the SEC. *See* 17 C.F.R. § 240.17Ad-22.

As this multi-step process unfolds, there can be some risk that market participants will be unable to satisfy their obligations in connection with a trade. (*See generally* Compl. ¶¶ 57-58.) To mitigate this risk, clearing brokers, such as Robinhood Securities, are required to post collateral with NSCC to cover the risk until the trade settles. (*Id.* ¶¶ 58, 60.) These collateral requirements are often referred to as deposit requirements. (*Id.* ¶ 58.) To clear and settle customer transactions, each trading day Robinhood Securities must meet the deposit

requirements set by NSCC.  (*Id.*)[1]  Depending on NSCC's calculation of the day's deposit requirements, Robinhood Securities may be able to withdraw money that it left on deposit the previous day, or it may be required to deposit additional money.  (*Id.*)

In setting the deposit requirements, NSCC considers volatility in the market; if NSCC perceives certain securities as being particularly risky or volatile, NSCC may assign a volatility multiplier or special charge that increases the deposit requirements.  (*Id.*)  Another component of the NSCC capital requirements is referred to as an excess capital premium, which NSCC may apply following a comparison of the member's core deposit requirement against the member's excess net capital.  (*Id.*)  NSCC releases the capital premium when the level of risk is reduced or Robinhood raises additional capital.  (*Id.*)  While NSCC calculates its daily deposit requirements according to set formulas, it also can exercise discretion in setting the requirements.  (*See, e.g., id.* ¶¶ 12(a), 60, 91.)  If Robinhood Securities were unable to meet its deposit requirements on a given day, NSCC could liquidate Robinhood Securities' entire portfolio.  (*Id.* ¶¶ 60, 122.)  Under such circumstances, not only would Robinhood customers be prevented from buying *any* stocks (not just the Affected Stocks), but all of Robinhood customers' positions would be liquidated as well.  (*Id.* ¶ 60.)

B.    The Unprecedented Market Volatility of January 2021.

January 2021 was marked by a series of unprecedented events in the securities markets that presented significant challenges to Robinhood's ability to satisfy its initial collateral deposit requirements to NSCC on January 28.  (*Id.* ¶¶ 40-43, 58-62.)  In late January 2021, trading spiked when retail investors banded together through online forums to drive a massive short squeeze involving certain stocks they perceived to be the target of short selling by hedge funds (the "meme stocks").  (*Id.* ¶¶ 35, 40-47.)

---

[1] NSCC may also require additional deposits during a trading day.  *See* Virtual Hearing – Game Stopped?  Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, 117th Cong. at 10 (2021) (statement of Vladimir Tenev, Chief Executive Officer, Robinhood Markets, Inc.), *available at* https://financialservices.house.gov/uploadedfiles/hhrg-117-ba00-wstate-tenevv-20210218.pdf ("Tenev Testimony").  The Court may take judicial notice of NSCC's requirements for brokers like Robinhood Securities, which are described in Mr. Tenev's testimony.  *See D.A.M. v. Barr*, 474 F. Supp. 3d 45, 55 n.12 (D.D.C. 2020) (taking judicial notice of Congressional testimony because Congressional testimony "is not subject to reasonable dispute") (quoting Fed. R. Evid. 201(b)(2)).

Retail investors' activity resulted in extreme market volatility, with dramatic increases in stock prices.  (*Id.* ¶¶ 40-43.)  For example, on January 27, GameStop's (GME) price closed at $347.51 per share, a 707.6% increase from just five trading days earlier.[2]  (*Id.* ¶¶ 41, 76.)  This surging price movement was observed despite GME's report just a month earlier that its gross profit dropped from $1,311.4 million in 2019 to $810.9 million in 2020.[3]



---

[2] *See* Market Activity, Nasdaq, https://www.nasdaq.com/market-activity (last visited Dec. 24, 2021).  The Court may take judicial notice of this stock information.  *See La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 842 (11th Cir. 2004) (taking judicial notice of stock information at the motion to dismiss stage).

[3] *See* GameStop Corp., Annual Report (Form 10-Q) (Dec. 8, 2020) at 2.  The Court may take judicial notice of this SEC filing.  *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999) ("[A] court, when considering a motion to dismiss in a securities fraud case, may take judicial notice (for the purpose of determining what statements the documents contain and not to prove the truth of the documents' contents) of relevant public documents required to be filed with the SEC, and actually filed.").

Indeed, in the span of just five trading days (from January 21 to January 27, 2021), the total daily trading volume for the Affected Stocks[4] increased from 230 million to 3.3 billion shares.[5]



While these unprecedented events were taking place, Robinhood Securities was managing the risk that the increasing trading volatility in certain securities could affect its deposit requirements and risk exposure. (*Id.* ¶¶ 13(a), 42.) As volatility involving the meme stocks increased, so too did Robinhood Securities' daily deposit requirements with NSCC. On the days leading up to January 28, Robinhood Securities' daily deposit requirements steadily increased, reaching a total of $690 million on the evening of January 27, 2021.[6]

---

[4] Plaintiffs refer to the following nine stocks as the "Affected Stocks": AMC Entertainment Holdings, Inc. (AMC), Bed Bath & Beyond, Inc. (BBBY), BlackBerry Ltd. (BB), Express, Inc. (EXPR), GameStop Corporation (GME), Koss Corporation (KOSS), Nokia Oyj (NOK), Tootsie Roll Industries, Inc. (TR) and Trivago NV (TRVG). (Compl. ¶ 1.)

[5] *See* Market Activity, Nasdaq, https://www.nasdaq.com/market-activity (last visited Aug. 24, 2021). The Court may take judicial notice of stock information. *See supra* note 2.

[6] *See* Tenev Testimony at 9-10. The Court may take judicial notice of the approximate deposit requirements described in Mr. Tenev's testimony in the days leading up to January 28, 2021. *See D.A.M.*, 474 F. Supp. 3d at 55 n.12. Indeed, Plaintiffs themselves cite Mr. Tenev's

Accordingly, in the days leading up to January 28, Robinhood Securities increased both initial and maintenance margin requirements to 100% for volatile securities such as GME, which meant that customers needed sufficient funds to pay for such shares in full, rather than being able to buy shares with credit, and needed to maintain sufficient funds in their accounts to cover the value of those securities, rather than using such shares as collateral to buy other securities on credit. (*See id.* ¶ 47.) This requirement protected Robinhood (and the rest of its customers) from the risk that customers might default on their ability to pay for these volatile securities. (*Id.* ¶ 42.) As Mr. Tenev explained during a January 27 interview, it is common in the brokerage industry to have "processes that respond to increases in volatility in certain names by doing things like raising the margin requirements," which Robinhood had done "in lots of cases." (*Id.* ¶¶ 45-46.) In other steps taken to reduce volatility-based risks, Robinhood Securities also limited the number of options contracts for certain stocks that customers could purchase on Robinhood's platform, and later required customers seeking to exercise their options to purchase GME to have sufficient capital in their Robinhood accounts to exercise the option. (*Id.* ¶¶ 52-53.)

  C. <u>The Events of January 28, 2021 and Onward.</u>

At approximately 5:11 AM EST on January 28, Robinhood Securities received an email notice from NSCC stating that its deposit requirements had jumped dramatically to over *$3 billion*, nearly 5 times the deposit requirement from the preceding day. (*Id.* ¶ 58.) As a result, Robinhood Securities decided, after several hours of deliberations, to temporarily set a small number of the meme stocks to "position closing only" ("PCO"), which would enable (but not require) Robinhood customers to sell some or all of their positions in those symbols if they wished, but restricted new purchases of those volatile securities. (*Id.* ¶ 59.) Specifically, Robinhood Securities moved 13 stocks to PCO: "$AAL, $AMC, $BB, $BBY, $CTRM, $EXPR, $GME, $KOSS, $NAKD, $NOK, $SNDL, $TR, and $TRVG." (*Id.* ¶ 63.) Robinhood announced the PCO decision to its customers in a blog post that explained that the restrictions were being implemented in light of the recent volatility. (*Id.*)

---

testimony to support their allegations regarding Robinhood's capital requirements. (*See* Compl. ¶ 59 n.36.)

The purchase restrictions were a necessary, but difficult, step that Robinhood took to protect the company, its customers and the markets.  Shortly after Robinhood Securities put in place the majority of the restrictions, NSCC reduced Robinhood Securities' deposit requirements to approximately $1.4 billion.  (*Id*. ¶¶ 59-60.)  The revised requirements remained hundreds of millions of dollars above typical levels, but Robinhood Securities promptly complied with and paid its NSCC deposit requirements that morning so that it could continue serving its customer base.  (*Id*. ¶ 60.)  As Mr. Tenev explained that day, "[Robinhood Securities] did this proactively" and Robinhood was taking steps "to allow buying and to remove these restrictions in the morning."  (*Id*. ¶ 79.)

Robinhood Securities was far from the only clearing broker to impose restrictions on the meme stocks during this period of unprecedented volatility.  (*See* Tenev Testimony at 8.)  Apex Clearing Corporation, for example, imposed restrictions on several meme stocks, which allegedly impacted the downstream customers of Apex's eight introducing broker partners.  (Compl. ¶ 93.)  E*TRADE also limited purchases of GME and AMC on January 28, 2021.  (*Id*.)[7]  Indeed, on January 29, Mr. Tenev discussed the restrictions investors were observing on Yahoo Finance Live, explaining that, "what [Robinhood has] done is something that other brokerages have done.  It's not unique to Robinhood to place restrictions on purchasing certain things at certain times."  (*Id*. ¶ 92.)

Robinhood worked quickly to remove the restrictions, reducing them to caps on additional purchases by market open on Friday, January 29, 2021, and lifting all purchase limits by February 5, 2021.  (*Id*. ¶ 124.)  During this period, Robinhood regularly updated its customers through its website, listing all of the trading restrictions then in effect because of ongoing market volatility.  (*Id*. ¶¶ 84-87.)[8,9]

---

[7] Like Robinhood, other brokers, such as Charles Schwab and TD Ameritrade, also raised margin requirements for GME and other stocks prior to January 28, 2021.  (*See* Robinhood Tranche Amended Consolidated Class Action Complaint, ECF No. 409 ¶ 253 (citation omitted).)

[8] Robinhood notified its customers of temporary purchasing limitations that were applied on up to 51 stocks at different points between January 28 and February 4, 2021.  The Complaint alleges purchasing limitations on 50 stocks.  (*Id*. ¶ 87.)

[9] While continuously managing the PCO and purchase limit restrictions in response to rapidly changing market conditions, the company spoke with investors and lenders to raise new

While the purchase restrictions and limits imposed by Robinhood were in place, the prices of the impacted stocks were volatile and moved in different directions.  For example, while the price of GameStop (GME) shares declined from $354.83 on January 27 to $54.04 on February 5, and then remained around $50 for several weeks, Castor Maritime (CTRM) increased from $3.51 on January 27 to $6.62 on February 5, and then increased above the $10 mark for most of the remainder of February.[10]

        D.     <u>The "Short Squeeze" Litigation.</u>

In the instant Complaint, Plaintiffs assert two securities fraud claims based on Robinhood's late-January and early-February 2021 purchasing limitations.  Plaintiffs bring suit on behalf of a putative class of all U.S. investors (not just Robinhood customers) who sold shares in at least one of the volatile Affected Stocks—AMC, BBBY, BB, EXPR, GME, KOSS, NOK, TR and TRVG—during the six trading days from January 28 to February 4, 2021.

Plaintiffs base their claims on a cherry-picked group of stocks that fit their loss theory and ignore the many other stocks that do not.  Although Plaintiffs' claim that Robinhood's PCO and subsequent customer purchasing limits "manipulated" the market for the nine Affected Stocks, those 9 are only a subset of the 13 stocks that Robinhood Securities set to PCO on January 28, 2021, and an even smaller subset of the 51 stocks on which Plaintiffs allege Robinhood Securities set purchasing limits at different points on January 29 through February 4, 2021.  (*Id.* ¶¶ 1, 4, 86-87.)  Plaintiffs offer no explanation for why Robinhood's PCOs of only 9 so-called Affected Stocks allegedly constitute market manipulation, but the PCOs of the *other 4 stocks* that Robinhood also PCOed on January 28 and the purchase limits Robinhood placed on *42 other stocks* between January 29 and February 4, 2021 do not.  Presumably the reason is that the other stocks did not decline in price during the Class Period—casting doubt on a fundamental

---

[10] capital and expand its lines of credit to accommodate customer trading volume in light of the historic market volatility and the unprecedented deposit requirements; by February 1, 2021, several days after Robinhood first imposed the restrictions, Robinhood had raised $3.4 billion from investors.  (Compl. ¶¶ 9, 87, 107.)

[10] *See* Market Activity, Nasdaq, https://www.nasdaq.com/market-activity (last visited Dec. 10, 2021).

premise of Plaintiffs' "market manipulation" theory, *i.e.*, that Robinhood's PCO caused the price decline in the nine Affected Stocks.

   For many of the stocks at issue, Plaintiffs could have sold their shares at a *profit* during the alleged Class Period.  Indeed, the lead plaintiff in this action did just that.  The Court appointed Blue Laine-Beveridge to serve as lead plaintiff pursuant to the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4.  (ECF No. 420.)  Remarkably, Mr. Laine-Beveridge appears **not** to be a member of the proposed class defined in the Complaint.  (*See* Compl. ¶ 1.)  Mr. Laine-Beveridge alleges that he held two of the Affected Stocks, AMC and NOK.  According to the trading certification he filed (ECF No. 366-3), he (1) sold his AMC stock ***at a profit*** and (2) ***did not sell*** any NOK stock during the Class Period.  The Complaint also identifies Abraham Huacuja, Ava Bernard,[11] Brandon Martin, Brendan Clarke, Brian Harbison, Cecilia Rivas, Garland Ragland Jr., Joseph Gurney, Santiago Bohórquez and Trevor Tarvis as named plaintiffs.  According to certifications they filed, these named plaintiffs sold only five of the nine Affected Stocks (AMC, BB, GME, NOK and EXPR).  (ECF No. 446-1.)  None of the named Plaintiffs alleges holdings or sales of the four remaining Affected Stocks (BBBY, KOSS, TR and TRVG).

## LEGAL STANDARD

   "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (alterations added).  Because all of Plaintiffs' claims under Section 9(a), Section 10(b) and Rule 10b-5 of the Securities Exchange Act sound in fraud, Plaintiffs must further meet the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure.  Moreover, the Private Securities Litigation Reform Act ("PSLRA") imposes on plaintiffs particular pleading requirements in securities fraud claims.  15 U.S.C. § 78u-4(b).

   The heightened pleading requirements apply to both the conduct and scienter elements of Plaintiffs' claims.  *First*, with respect to the challenged conduct, to state a claim for market manipulation—whether under Section 9(a) or under Section 10(b) and Rule 10b-5—

---

[11] Ms. Bernard was purportedly assigned her claims by one Colleen Cooke.  (*See* Compl. Ex. A (ECF No. 446-1), at 6.)

Plaintiffs must plead with particularity "the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants." *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007); *see also Sterne, Agee & Leach, Inc. v. Nat'l Sec. Clearing Corp.*, No. CV-07-BE-909-S, 2008 WL 11424178, at *11-13 (N.D. Ala. Sept. 30, 2008) (applying heightened pleading standard to Section 10(b) market manipulation claim); *Fezzani v. Bear, Stearns & Co.*, 384 F. Supp. 2d 618, 642-43 (S.D.N.Y. 2004) (applying heightened pleading standard to Section 9(a) claims). To state a claim for misrepresentation under Section 10(b) and Rule 10b-5, Plaintiffs must plead, with particularity "(1) which statements or omissions were made in which documents or oral representations; (2) when, where, and by whom the statements were made (or, in the case of omissions, not made); (3) the content of the statements or omissions and how they were misleading; and (4) what the defendant received as a result of the fraud." *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1318 (11th Cir. 2019) (quoting *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011)); *see also* 15 U.S.C. § 78u-4(b)(1).

*Second*, with respect to scienter, for both market manipulation and misrepresentation claims, Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). To state a claim for a violation under Section 9(a), 10(b) or Rule 10b-5, Plaintiffs must allege that Robinhood acted with scienter.[12] *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323-24 (2007) (addressing claims brought under Section 10(b)); *ATSI*, 493 F.3d at 102 (2d Cir. 2007) (addressing market manipulation claims brought under Section 10(b)); *Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 428 (S.D.N.Y. 2010) (addressing market manipulation claims brought under Section 9(a)). Because a strong inference of scienter must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged," claims are insufficiently pleaded if an alternative motive is more compelling than an inference of scienter. *Tellabs*, 551 U.S. at 324. Courts must consider plausible alternative motives before finding a strong inference of scienter. *See id.* at 324 ("To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible,

---

[12] Plaintiffs bringing private causes of action for alleged violations of Section 9(a) must, pursuant to Section 9(f), plead with particularity that the defendant acted with a "willful[]" state of mind. *See* 15 U.S.C. § 78i(f). Courts often refer to this as a scienter requirement. *See, e.g.*, *Connolly v. Havens*, 763 F. Supp. 6, 11 (S.D.N.Y. 1991).

nonculpable explanations for the defendant's conduct."); *FindWhat*, 658 F.3d at 1300 (holding the scienter inquiry is "inherently comparative" because courts "must take into account plausible opposing inferences").  In short, to survive a motion to dismiss, Plaintiffs must plead facts strongly indicating that Robinhood intended to "deceive, manipulate or defraud."  *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1282 (11th Cir. 1999) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976)); *see also Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008) ("Putting the PSLRA and our substantive scienter case law together yields the following stringent standard:  to survive a motion to dismiss in this case, [plaintiff] must (in addition to pleading all of the other elements of a § 10(b) claim) plead 'with particularity facts giving rise to a strong inference' [of scienter].").

## ARGUMENT

Plaintiffs' attempt to convert the unprecedented events of January 28 into a federal securities claim fails because the securities laws do not prohibit the conduct that Plaintiffs allege in their claims.  *First*, Plaintiffs' allegation that Robinhood engaged in market manipulation in violation of both Sections 9(a) and 10(b) fails because there was no alleged deception.  Plaintiffs' entire theory collapses upon itself given the absence of any plausible reason why Robinhood would want the prices of the Affected Stocks to decrease.  (*See infra* Section I.)  *Second*, Plaintiffs' misrepresentation claim cannot overcome the fundamental problem that the alleged misrepresentations concerned *Robinhood's* business (in which Plaintiffs were not investors), not the businesses of the Affected Stocks that Plaintiffs held.  (*See infra* Section II.)  All of Plaintiffs' claims must be dismissed.

## I.     PLAINTIFFS DO NOT PLEAD MARKET MANIPULATION UNDER EITHER SECTION 9(a) OR SECTION 10(b) OF THE SECURITIES EXCHANGE ACT.

Plaintiffs first assert that Robinhood's purchasing restrictions constitute market manipulation in violation of both Sections 9(a) and 10(b) of the Securities Exchange Act.  Plaintiffs fail to plead the requisite elements.

As a threshold matter, a market manipulation claim under either Section requires pleading that a defendant engaged in "intentional or willful conduct designed to deceive or defraud investors."  *In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257, 1273 (11th Cir. 2016) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976)).

Section 9(f) provides the private right of action for a violation of Section 9(a).  To sustain their Section 9(a) claim, Plaintiffs must also adequately plead that Robinhood engaged in at least one of six proscribed forms of manipulative conduct, *see* 15 U.S.C. § 78i(a)(1)–(6); that Robinhood did so "willfully," *see* 15 U.S.C. § 78i(f); and that Plaintiffs bought or sold a security "at a price which was affected" by Robinhood's alleged violation of Section 9(a), *see id.*; *see also I.B. Trading, Inc. v. Tripoint Glob. Equities, LLC*, 280 F. Supp. 3d 524, 540 (S.D.N.Y. 2017).

To sustain their Section 10(b) claim, Plaintiffs must allege that Robinhood, "in connection with the purchase or sale of any security . . . [engaged in] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."  15 U.S.C. § 78j(b).  Under Rules 10b-5(a) and (c), which specify the conduct constituting market manipulation under Section 10(b), a defendant may not employ a device, scheme, or artifice to defraud, or engage in any act, practice, or course of business that operates as a fraud or deceit upon any person.[13]  17 C.F.R. § 240.10b-5.  Therefore, to prevail on a Section 10(b) market manipulation claim, Plaintiffs must plead, with particularity, "(1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." *ATSI*, 493 F.3d at 101.

Plaintiffs cannot prevail on a market manipulation claim under either Section 9(a) or Section 10(b), and these claims must be dismissed, for two reasons.  Under either Section of the Exchange Act, Plaintiffs fail to plead (1) manipulative conduct or (2) the requisite state of mind to state a claim.

A.   <u>Plaintiffs Do Not Adequately Plead Manipulative Conduct.</u>

Plaintiffs' market manipulation claim is deficient because Plaintiffs fail to plead the requisite manipulative conduct.  *First*, Plaintiffs fail to allege that Robinhood deceived investors about the purchase restrictions.  *Second*,  Plaintiffs fail to allege the elements of any of

---

[13] Rule 10b-5(b), which addresses misrepresentations and omissions, prohibits making any untrue statements or omissions of material fact, 17 C.F.R. § 240.10b-5, and is addressed in Section II below.

the subsections of Section 9(a) defining manipulative conduct.  Plaintiffs' claims therefore should be dismissed.

> ### 1.      Plaintiffs Do Not Allege that Robinhood Deceived Investors About Its Purchase Restrictions.

Market manipulation claims are fundamentally concerned with the integrity of the market for the securities at issue.  Therefore, the viability of a claim depends on whether the defendant allegedly profits from the fact that investors are trading in a market unaware of conduct that undermines the integrity of trading in the securities at issue.  *See Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999) ("[A] private plaintiff . . . must establish that he or she engaged in a securities trade in ignorance of the fact that the price was affected by the alleged manipulation.").  "In order for market activity to be manipulative, that conduct must involve misrepresentation or nondisclosure."  *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir. 2011).  The "critical question" in determining whether manipulation has occurred is whether the conduct at issue "'artificially' affects a security's price *in a deceptive manner*."  *ATSI*, 493 F.3d at 100 (emphasis added, internal citation omitted).  As a result, when evaluating a market manipulation claim, courts consider whether the alleged "manipulator 'inject[ed] inaccurate information into the marketplace or creat[ed] a false impression of supply and demand . . . for the purpose of artificially depressing or inflating the price of the security.'"  *ATSI*, 493 F.3d at 101 (quoting *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 207 (3d Cir. 2001)).  "[N]ondisclosure is usually essential to the success of a manipulative scheme."  *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477 (1977).

Reported cases on market manipulation illustrate these requirements.  A paradigmatic example of manipulative conduct is a pump-and-dump scheme in which a defendant inflates the price of stock that the defendant owns through false and misleading statements to other investors in order to drive up the price of that stock, so the defendant can sell the stock at an artificially inflated price.  *See, e.g.*, *SEC v. Resch-Cassin & Co.*, 362 F. Supp. 964, 978 (S.D.N.Y. 1973); *SEC v. Malenfant*, 784 F. Supp. 141, 142 (S.D.N.Y. 1992).  Manipulative conduct is also often found where the defendant engages in some kind of fictional transaction "such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity."  *ATSI*, 493 F.3d at 100.  Another example of manipulative conduct is where the defendant engages in covert, large-scale purchasing to drive

15

up the price of a security and dissuade shareholders from accepting a rival's tender offer.  *See Crane Co. v. Westinghouse Air Brake Co.*, 419 F.2d 787, 795 (2d Cir. 1969).  The common factor underlying a market manipulation claim is that the defendant engages in *deceptive* conduct with the express purpose of affecting a stock's price *without the plaintiff's knowledge* in order to profit from the manipulated price of that stock.

There are no such allegations of market manipulation here.  Plaintiffs contend that Robinhood "affected and distorted the normal market dynamics" for the Affected Stocks by: (a) raising initial and maintenance margin requirements for GME and other stocks; (b) notifying customers about closing out customers' options positions in AMC and GME where customers failed to maintain collateral sufficient to execute in-the-money positions on the strike date; (c) implementing the PCO restrictions prior to market open on January 28; and (d) limiting customer purchases for the Affected Stocks following January 28.  (*Id.* ¶¶ 52, 59, 62, 63, 84-87, 107, 112, 117, 121, 137.)  However, Plaintiffs do not allege—nor could they allege—that Robinhood withheld or concealed any of this supposed "manipulative" conduct from the market. To the contrary, Robinhood informed its customers of each of the actions it was taking and, indeed, a number of them were widely reported.  For example, customers were notified of margin requirement increases in order for those customers to provide sufficient assets to cover their positions.[14]  As another example, and as shown in the Complaint, Robinhood emailed customers on the evening of January 27 regarding closing out options positions.  (*Id.* ¶¶ 52-53.) Finally, the purchasing restrictions and the scope and duration of the restrictions were disclosed on Robinhood's public website for all to see until such time as they were lifted in their entirety. (*Id.* ¶¶ 84-88, 124.)  Because the challenged conduct was fully disclosed, there can be no manipulation.  *See Kraft v. Third Coast Midstream,* No. 19-CV-9398 (LJL), 2021 WL 860987, at *23 (S.D.N.Y. Mar. 8, 2021) (dismissing market manipulation claim where the underlying conduct was "fully disclosed"); *Brady v. Top Ships Inc.*, No. 17-cv-4987 (BMC), 2019 WL 3553999, at *8 (E.D.N.Y. Aug. 5, 2019) (dismissing market manipulation claim predicated on a series of reverse stock splits because the transactions were "fully disclosed to the

---

[14] Indeed, the increases in margin requirements were also reported by the press.  *See* Matt Egan, *Robinhood Ramps Up Margin Requirements on Zooming GameStop, AMC*, CNN Business (Jan. 27, 2021, 1:53 PM), *available at* https://www.cnn.com/business/live-news/stock-market-news-012721/h_f037344e14a037160cc724607ff72da0#:~:text=Robinhood%2C%20the%20free%20trading%20app,initial%20margin%20requirement%20and%20maintenance.

market"), *aff'd sub nom. Onel v. Top Ships, Inc.*, 806 F. App'x 64 (2d Cir. 2020); *In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 390 (S.D.N.Y. 2010) (dismissing market manipulation claim because "[t]he market is not misled when a transaction's terms are fully disclosed"), *aff'd sub nom. Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120 (2d Cir. 2011).

None of Plaintiffs' other allegations cures this fundamental flaw. For example, Plaintiffs' conclusory allegations that the restrictions "affected and distorted the normal market dynamics" (Compl. ¶ 137) do not render the conduct manipulative. Just two days after Robinhood imposed the purchasing limitations, the SEC reiterated in an investor alert and bulletin that brokers have the authority to restrict trading during periods of volatility and that brokers may reserve that right in their customer agreements.[15] That conduct is exactly what Robinhood Securities did here. In other words, the bulletin noted that brokers may engage in the very activity that may cause the "distort[ion]" Plaintiffs contend is unlawful. Additionally, the mere allegation that the purchasing limitations affected the price of the Affected Stocks—which Robinhood denies—also does not render the conduct manipulative. Courts have resoundingly rejected broad arguments that any conduct allegedly affecting the trading prices of a security constitutes market manipulation. *See Cohen*, 722 F. Supp. 2d at 426 (dismissing market manipulation claims under Sections 9(a) and 10(b) where "[a]side from bald conclusions, there [were] no allegations . . . that the [trading] alleged here was manipulative in any respect, even assuming that the effect of such trading was to depress the price of SulphCo stock"); *Trane Co. v. O'Connor Sec.*, 561 F. Supp. 301, 305 (S.D.N.Y. 1983) (finding no manipulative conduct where defendant's trading affected the price of a particular stock because "[i]f what defendants did constituted manipulation within the meaning of Section 9(a), most large scale transactions in a single security would be prohibited [and] [t]hat was clearly not the purpose of Congress").

Plaintiffs' conclusory allegation that Robinhood "misrepresented material facts to give the false impression to Class members that the markets for the Affected Stocks were free of

---

[15] *See* Securities and Exchange Comm'n, "Thinking About Investing in the Latest Hot Stock?" (Jan. 30, 2021) ("Jan. 30 SEC Statement"), https://www.sec.gov/oiea/investor-alerts-and-bulletins/risks-short-term-trading-based-social-media-investor-alert. The Court may take judicial notice of the Jan. 30 SEC Statement because it is a public record, the accuracy of which cannot reasonably be questioned. *See Univ. Express, Inc. v. SEC*, 177 F. App'x 52, 53 (11th Cir. 2006) (taking judicial notice of public records at the motion to dismiss stage).

manipulation" (Compl. ¶ 139) similarly misses the mark.  To the extent Plaintiffs claim that Robinhood "manipulated" the market by failing to disclose to investors that its trading restrictions were a "manipulation," their logic is circular and inadequate.  For example, in *Brady*, the plaintiffs advanced a similar argument that fully disclosed transactions were manipulative because the defendants did not disclose the transactions were part of a "manipulative scheme." 2019 WL 3553999, at *7-8.  The court rejected that reasoning, explaining that it was "a classic example of circular reasoning and conclusory pleading" because, as is the case here, the plaintiffs did nothing more than allege that the "defendants' conduct was manipulative because they did not tell [investors] that their conduct was manipulative."  *See id.*

To the extent that Plaintiffs contend that Robinhood misled investors about the value of the Affected Stocks, as discussed in Section II.A, such claims fail because *all* the alleged misstatements identified by Plaintiffs concern Robinhood's business, not the Affected Stocks.  Nowhere do Plaintiffs allege any misrepresentations or deception by Robinhood concerning any of the Affected Stocks.  Setting aside the fact that the alleged misrepresentations identified by Plaintiffs were *not* false or misleading (as explained in Section II.B.1), Plaintiffs do not state a claim for market manipulation because they fail to identify any representation by Robinhood (and there was none) that "inject[ed] inaccurate information into the marketplace" about the value of the Affected Stocks.  *See ATSI*, 493 F.3d at 100-01 (explaining that a key indicator of market manipulation is whether the conduct "sends a false pricing signal to the market" about the relevant securities).  Nor could they; not one of the alleged misstatements about Robinhood's business changes the fact that the various purchasing limitations that Plaintiffs complain disrupted the functioning of the marketplace were fully disclosed and widely reported to the public.

In sum, comparing the Complaint's core allegations to the conduct that courts have found manipulative in the seminal market manipulation cases only underscores that Robinhood's conduct was not "market manipulation."  In cases such as *Crane*, *Resch-Cassin* and *Malenfant* described above, the defendants' conduct was manipulative because they engaged in conduct that conveyed to investors a false or misleading impression about the value of particular securities and then defendants profited from investors' transactions in those securities at the manipulated price.  None of that resembles what Plaintiffs allege in the Complaint.  Plaintiffs do not allege that Robinhood engaged in any covert conduct or made any misstatements about any

of the Affected Stocks.  They also do not allege that Robinhood owned or bought any of the Affected Securities or profited in any way from any decreases in the prices of those securities. These fundamental defects preclude any finding that Robinhood engaged in manipulative conduct under either Section 9(a) or Section 10(b) and Rule 10b-5.

### 2.    *Plaintiffs Do Not Allege a Violation of Any of the Six Subsections of Section 9(a).*

As noted above, a plaintiff asserting a claim for market manipulation under Section 9(a) must plead facts sufficient to sustain a violation of at least one of Sections 9(a)(1) through 9(a)(6).  Remarkably, Plaintiffs never identify which subsection they contend Robinhood violated.  (*See* Compl. ¶¶ 136-141.)  No doubt that is because, as explained below, Plaintiffs cannot state a claim under any of Section 9(a)'s subsections.

#### i.    Plaintiffs Do Not Plead a Claim Under Subsection 9(a)(1).

To state a claim under Section 9(a)(1), a plaintiff must allege that the defendant (1) engaged in wash sales or matched orders;[16] (2) "for the purpose of creating a false or misleading appearance of active trading in any security . . . or a false or misleading appearance with respect to the market for any such security."  *See* 15 U.S.C. § 78i(a)(1); *Ernst & Ernst*, 425 U.S. at 205 n.25.  Plaintiffs fail to allege either element.

*First*, Plaintiffs do not allege that Robinhood engaged in either wash sales or matched orders.  (*See* Compl. ¶¶ 136-141.)  This alone precludes a claim under Subsection 9(a)(1).  *See Cohen*, 722 F. Supp. 2d at 424 (dismissing Subsection 9(a)(1) claim where Plaintiffs did not identify any wash sales or matched orders).  *Second*, Plaintiffs fail to allege that

---

[16] Specifically, the statute proscribes the following conduct:  "(A) to effect any transaction in such security which involves no change in the beneficial ownership thereof, or (B) to enter an order or orders for the purchase of such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of any such security, has been or will be entered by or for the same or different parties, or (C) to enter any order or orders for the sale of any such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of such security, has been or will be entered by or for the same or different parties."  15 U.S.C. § 78i(a)(1).  Courts refer to the conduct described in (A) as wash sales and refer to the conduct described in (B) and (C) as matched orders.  *See Ernst & Ernst*, 425 U.S. at 205 n.25.

Robinhood imposed the limited trading restrictions "for the purpose of creating a false or misleading appearance of active trading in any security . . . or a false or misleading appearance with respect to the market for any such security." *See* 15 U.S.C. § 78i(a)(1).  To the contrary, Plaintiffs allege that Robinhood *publicly announced* that it was *restricting* trading.

    ii.  Plaintiffs Do Not Plead a Claim Under Subsection 9(a)(2).

    Subsection 9(a)(2) requires establishing that the defendant engaged in (1) "a series of transactions . . . creating actual or apparent active trading in [a] security, or raising or depressing the price" of the security, (2) for "the purpose of inducing the purchase or sale of such security by others."  15 U.S.C. § 78i(a)(2).  Again, Plaintiffs do not allege either element.

    *First*, Plaintiffs do not allege that Robinhood engaged in "a series of transactions."  A defendant engages in "a series of transactions" where the defendant participates in purchasing, selling, bidding, or ordering purchases or sales of securities.  *See SEC v. Lek Sec. Corp.*, 276 F. Supp. 3d 49, 62 (S.D.N.Y. 2017).  Here, Plaintiffs do not allege that Robinhood was purchasing, selling, bidding or ordering purchases or sales of any securities for itself.  This is fatal to any claim under Subsection 9(a)(2).  *See Baum v. Phillips, Appel & Walden, Inc.*, 648 F. Supp. 1518, 1530 (S.D.N.Y. 1986) (dismissing a Subsection 9(a)(2) claim against brokerage where plaintiffs' manipulation claim was based on trades the brokerage did not execute rather than on "a series of transactions"), *aff'd sub nom. Asch v. Philips, Appel & Walden, Inc.*, 867 F.2d 776 (2d Cir. 1989).

    *Second*, Plaintiffs fail to allege that Robinhood imposed the purchasing restrictions "for the purpose of inducing the purchase or sale of such security by others."  15 U.S.C. § 78i(a)(2).  Plaintiffs allege that Robinhood's purpose for implementing the restrictions was to reduce its deposit requirements to avoid liquidation in the lead-up to its eventual IPO. (*See, e.g.*, Compl. ¶¶ 11, 12, 15.)  Plaintiffs never allege that Robinhood had any interest in whether its customers sold the Affected Stocks (and certainly cannot allege, given the PCO restrictions, that Robinhood's purpose was to induce the stocks' purchase).  The absence of any allegations that Robinhood had a *purpose to induce* anyone to purchase or sell securities is fatal to Plaintiffs' claim.  *See, e.g.*, *Spencer Cos. v. Agency Rent-A-Car, Inc.*, No. 81-2097-S, 1981 WL 1680, at *4 (D. Mass. Sept. 21, 1981) ("Since plaintiff has failed to allege that defendants'

purpose was to induce anyone to purchase the stock because of the higher market price, no violation of § 9(a)(2) has been stated.").

### iii.   Plaintiffs Do Not Plead a Claim Under Subsections 9(a)(3) or 9(a)(5).

Subsections 9(a)(3) and 9(a)(5) closely parallel each other:  Subsection 9(a)(3) prohibits (1) a person, including but not limited to a broker, (2) from disseminating information about whether the price of a security "is likely to rise or fall because of market operations," (3) where the purpose of doing so is to "induce the purchase or sale of any security."  15 U.S.C. § 78i(a)(3).  Subsection 9(a)(5) prohibits brokers from hiring another person to disseminate such information "[f]or consideration."  15 U.S.C. § 78i(a)(5).

Other than pleading that Robinhood is a broker (which Robinhood Securities and Robinhood Financial are), Plaintiffs do not plead the elements necessary to sustain a claim under Subsections 9(a)(3) or 9(a)(5).  *First*, Plaintiffs do not allege that Robinhood—or anyone to whom Robinhood paid consideration—disseminated information about whether the price of the Affected Stocks was likely to rise or fall.  Indeed, none of the statements by Robinhood identified in Plaintiffs' Complaint has anything to do with the price of the Affected Stocks. *Second*, as explained above in Section I.A.2.ii, Plaintiffs do not allege that Robinhood acted with any purpose to "induce the purchase or sale of any security."  Plaintiffs therefore fail to state a claim under either Subsection 9(a)(3) or Subsection 9(a)(5).

### iv.   Plaintiffs Do Not Plead a Claim Under Subsection 9(a)(4).

To state a claim under Subsection 9(a)(4), Plaintiffs must plead with particularity that (1) a person, including but not limited to a broker, (2) made a false or misleading statement with respect to a material fact (3) that the person knew or had reasonable ground to believe was false or misleading (4) for the purpose of inducing the purchase or sale of a security.  *See* 15 U.S.C. § 78i(a)(4).  Courts have held that Subsection 9(a)(4) "closely parallels" Section 10(b) and Rule 10b-5, and dismissal of Subsection 9(a)(4) claims is appropriate where a plaintiff fails to plead any element of a 10b-5 violation that is also necessary for a Subsection 9(a)(4) violation. *See Panfil v. ACC Corp.*, 768 F. Supp. 54, 59 (W.D.N.Y. 1991) ("Given the parallel requirements of these statutes, plaintiff's failure to show the omission of a material fact under rule 10b–5 . . . also defeats his claim under § 9(a)(4)."), *aff'd*, 952 F.2d 394 (2d Cir. 1991);

*Y-GAR Cap. LLC v. Credit Suisse Grp. AG*, No. 19 Civ. 2827 (AT), 2020 WL 71163, at \*9 (S.D.N.Y. Jan. 2, 2020) ("Because Plaintiff has failed to allege misrepresentations and scienter sufficient to sustain a Section 10(b) claim, the Section 9(a)(4) claim also fails.").

Here, Plaintiffs allege that Robinhood intentionally "misrepresented material facts to give the false impression to Class members that the markets for the Affected Stocks were free of manipulation." (Compl. ¶ 139.)  As explained in the preceding sections, Plaintiffs have not alleged that Robinhood acted "for the purpose of inducing the purchase or sale" of a security. They cannot, therefore, make out the final element of a Subsection 9(a)(4) claim, and any such attempt would fail for this reason alone.  In addition, as explained in Section II below, Plaintiffs have not pleaded any misrepresentations sufficient to sustain a claim for a violation of Section 10(b) and Rule 10b-5, which also preclude them for satisfying the second and third elements of Subsection 9(a)(4).  *See Panfil*, 768 F. Supp. at 59; *Y-GAR Cap. LLC*, 2020 WL 71163, at \*9.

v.    <u>Plaintiffs Do Not Plead a Claim Under Subsection 9(a)(6).</u>

Subsection 9(a)(6) requires a plaintiff to establish that the defendant (1) engaged in a "series of transactions," (2) for the purpose of "pegging, fixing, or stabilizing the price" of a security "in contravention of such rules and regulations as the Commission may prescribe."  15 U.S.C. § 78i(a)(6).  As explained in Section I.A.2.ii above, Plaintiffs cannot satisfy the first element because they have not alleged that Robinhood engaged "in a series of transactions." Plaintiffs also cannot satisfy the second element for two reasons.

*First,* Plaintiffs do not identify in the Complaint any SEC rule or regulation adopted under Subsection 9(a)(6) that they contend Robinhood violated.  That is because it would be impossible for Plaintiffs to do so—the SEC has repealed the rules (Rules 10b-6 to 10b-8) formerly issued under Section 9(a)(6) and replaced them with rules that apply only to underwriters and other offering participants.  *See* 62 Fed. Reg. 520-01 (Jan. 3, 1997).  Because there are no longer any SEC rules applicable to broker-dealers under Section 9(a)(6), Plaintiffs cannot state a claim under this subsection.

*Second*, Plaintiffs do not allege that Robinhood acted with a purpose of "pegging, fixing, or stabilizing the price" of any security.  (*See generally* Compl. ¶¶ 136-141.)  Market stabilizing activities are defined as "a process whereby the market price of a security is pegged or fixed for the limited purpose of preventing or retarding a decline in contemplation of or during a

22

public offering of securities."  SEC, Securities Exchange Act Release No. 4163 (Sept. 16, 1948).
Nowhere do Plaintiffs allege that Robinhood engaged in any conduct related to a public offering
of any of the Affected Stocks.

> vi.   Plaintiffs' Section 10(b) Market Manipulation Claim Fails for the Same Reasons.

Having failed to state a claim under any of the six subsections of Section 9(a),
Plaintiffs' market manipulation claim under Section 10(b) fails as well.  Courts customarily
analyze market manipulation claims under the two sections together, and dismissal of one leads
to dismissal of the other.  *See, e.g.*, *Brady*, 2019 WL 3553999, at *10 n.7 (holding that where
Section 10(b) claim was dismissed for failure to plead "a series of manipulative acts," Section
9(a) claim should be dismissed for the same reason); *Trane*, 561 F. Supp. at 306 ("In sum, the
proof is insufficient to support a finding that defendants engaged in market manipulation
forbidden under § 9(a)(2) of the Exchange Act.  Since plaintiff relies on its proof of market
manipulation to establish its claimed violation of Section 10(b), that claim must also fail.").
Thus, because Plaintiffs fail to state a Section 9(a) claim, the accompanying Section 10(b)
market manipulation claim, based on the same conduct, must be dismissed as well.

> B.   Plaintiffs Do Not Adequately Plead the Requisite State of Mind.

Plaintiffs also do not state a claim for market manipulation because they do not
plead with particularity that Robinhood had the requisite state of mind (or scienter) under either
Section 9(a) or Section 10(b).  This provides an independent basis to dismiss the market
manipulation claims.

Here, Plaintiffs must "plead with particular[ity] facts giving rise to a strong
inference that the defendant intended to deceive investors by artificially affecting the market
price of securities."  *ATSI*, 493 F.3d at 102.  To state a claim under Section 10(b) and Rule
10b-5, Plaintiffs must plead specific facts supporting a strong inference that Robinhood acted
intentionally or with severe recklessness.  *See FindWhat*, 658 F.3d at 1299.  Conduct is severely
reckless if it is "highly unreasonable and constituted an extreme departure from the standards of
ordinary care to the extent that the danger was either known to the defendant or so obvious that
the defendant must have been aware of it."  *South Cherry Street, LLC v. Hennessy Group LLC*,
573 F.3d 98, 109 (2d Cir. 2009).  Although severe recklessness suffices under Section 10(b), it

does not suffice under Section 9(a).  To state a claim for a violation of Section 9(a), Plaintiffs must satisfy an even higher standard by alleging intentional and "willful" conduct.  *See* 15 U.S.C. § 78i(f); *Panfil*, 768 F. Supp. at 59.  A failure to plead scienter under Section 10(b) necessarily results in a failure to plead the willfulness requirement of Section 9(f).

Manipulative intent is generally only found where a defendant has a direct pecuniary interest in affecting the trading price of a security and thus engages in manipulative conduct in order to raise or lower the price of the security in order to profit.  For example, in *Resch-Cassin*, which involved a pump-and-dump scheme, the court found the defendants had manipulative intent because the defendants had an "obvious incentive" to drive up the price of the security so they could sell their holdings at an inflated price.  362 F. Supp. at 977.  Similarly, in *Crane*, which involved a defendant attempting to defeat a corporate takeover by making a competitor's tender offer appear less attractive, the court found manipulative intent because the defendant had a "substantial, direct pecuniary interest" in raising the price of the company's stock.  419 F.2d at 795 (citations omitted).

The circumstances here are nothing like those in *Resch-Cassin* or *Crane*. Plaintiffs do not allege that Robinhood had a direct pecuniary interest in the price of any of the Affected Stocks (or the other 42 stocks on which it imposed trading limitations).  Nowhere do Plaintiffs allege that Robinhood held positions in those securities or bought them, or that Robinhood had any other financial interest in depressing their trading prices.  Instead, Robinhood did not "st[and] to gain anything from artificially driving [down] the price" of the relevant securities, precluding a finding of manipulative intent.  *See Baum*, 648 F. Supp. at 1531; *see also Ray v. Lehman Bros. Kuhn Loeb*, 624 F. Supp. 16, 22 (N.D. Ga. 1984) (finding no manipulative intent where defendant had sold all of his stock in the relevant security "and thus could not profit from any purchase by [plaintiff] of the stock").

Plaintiffs offer two alternative theories to attempt to create a plausible inference of intent by Robinhood to manipulate the prices of the Affected Stocks, but neither theory succeeds.  Plaintiffs hypothesize that Robinhood imposed the PCO restrictions either (1) out of a desire to survive until the company's "lucrative IPO" (Compl. ¶¶ 12, 15, 67, 71); or (2) to somehow assist Citadel LLC and Citadel Securities by driving down the price of the Affected Stocks to help them cover alleged proprietary short positions in those stocks (*id.* ¶ 71).  Neither

of these theories of intent is sufficient to state a claim for market manipulation under the heightened pleading requirements of the PSLRA and Rule 9(b).

   *First*, Plaintiffs' theory that Robinhood acted to protect its eventual IPO does not evince manipulative intent. (*Id.* ¶¶ 137-139.) The success of Robinhood's eventual IPO had nothing to do with the purchase or sale of the Affected Stocks, or at what price any of the Affected Stocks traded, and Plaintiffs have not pleaded any allegations to the contrary. Therefore, Plaintiffs fail to establish how Robinhood's desire to have a successful IPO furthers a strong inference that Robinhood purposefully induced any investor to sell the Affected Stocks at allegedly manipulated trading prices. Moreover, at its core, Plaintiffs' scienter theory relating to Robinhood's purported desire to protect its IPO boils down to a contention that Robinhood's conduct was motivated by a general desire to profit, without a showing of profit from transacting in the specific Affected Stocks at manipulated prices. But courts have squarely held that a general motive to profit is not sufficient to establish manipulative intent. *See, e.g.*, *Trane*, 561 F. Supp. at 305 (finding no manipulative intent where defendants engaged in the relevant conduct "in the expectation of a profit").

   *Second*, Plaintiffs' alternative theory, that Robinhood manipulated the market to assist the hedge fund, Citadel LLC, and the market maker, Citadel Securities, is similarly illogical. (Compl. ¶¶ 70, 71.) As an initial matter, Plaintiffs do not allege any relationship whatsoever between Robinhood and Citadel LLC. With respect to Citadel Securities, Plaintiffs allege only that Robinhood and Citadel Securities had a lawful, ongoing business relationship and that the parties had a business discussion on January 27 regarding "across-the-board adjustments" to payment for order flow between Robinhood and Citadel Securities. (*Id.* ¶¶ 49, 50 n.29, 70.) Plaintiffs fail to allege, however, any benefit to Robinhood from "manipulating" the Affected Stock prices on behalf of Citadel Securities. Indeed, as the Court concluded based on similar allegations by the Antitrust Tranche Plaintiffs, the "mere fact that Citadel Securities is an important business partner . . . does not provide sufficient motive to conspire." (Order Dismissing the Antitrust Amended Complaint ("Antitrust Tranche Decision"), ECF No. 438, at 37.) In short, Plaintiffs do nothing more than regurgitate (in a far more abbreviated fashion) the allegations of collusion between Robinhood and Citadel Securities that this Court already has concluded are too vague and ambiguous to make a conspiracy plausible. (*See id.* at 50.) Consequently, the absence of particularized allegations here precludes any "strong inference"

that Robinhood acted intentionally to manipulate the share prices of the Affected Stocks to help either Citadel LLC or Citadel Securities. *See Cohen*, 722 F. Supp. 2d at 429 ("Generalized allegations of scienter . . . based entirely on conclusory statements are insufficient to state a claim for securities fraud.").

By contrast, Plaintiffs' Complaint offers the more cogent—and actual— explanation for why Robinhood Securities put in place its purchasing restrictions: in response to the volatility flowing through its platform and the resulting collateral deposit requirements imposed by the NSCC—*not* to benefit Citadel LLC or Citadel Securities. (*See* Compl. ¶¶ 12, 58-64, 77, 98 n.59, 99.) This more cogent explanation for Robinhood's actions defeats any inference of fraudulent intent that Plaintiffs offer. *See Cohen*, 722 F. Supp. 2d at 428 (allegations of scienter under Section 9(a) must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent") (quoting *Tellabs*, 551 U.S. at 314).

*      *      *

In sum, Plaintiffs' market manipulation claims are deficient in numerous respects: Plaintiffs have not pleaded manipulative conduct or the requisite scienter. Accordingly, their market manipulation claims should be dismissed.

## II.    PLAINTIFFS DO NOT PLEAD A MISREPRESENTATION CLAIM UNDER SECTION 10(b) OF THE SECURITIES EXCHANGE ACT.

Plaintiffs plead an extraordinary—and untenable—theory for misrepresentation liability under Section 10(b) and Rule 10b-5. Plaintiffs identify four alleged misrepresentations, each of which was made after Robinhood implemented the purchasing restrictions on the Affected Stocks:

- Mr. Tenev's statement on the evening of January 28, after NSCC had reduced Robinhood's deposit requirements, that "[t]here was no liquidity problem." (Compl. ¶ 79);

- Mr. Tenev's statement on January 29 that temporary trading restrictions on certain symbols are a common industry practice: "Brokerages and other financial institutions do this all the time. They've been doing this throughout the week and it's just part of day-to-day, normal operations. Now, sure, Robinhood gets a lot of attention for it, but this is just a standard part of practices in the brokerage industry and the broader financial industry . . . . Well, again, what we've done is something that other brokerages have done. It's not unique to Robinhood to place restrictions on purchasing certain things at certain times. Other brokers have done it." (*Id.* ¶ 92);

- Mr. Tenev's statement on January 31 that "other brokers basically restricted the same activity." (*Id.* ¶ 100); and

- Mr. Tenev's statement on January 31 that Robinhood implemented only purchase side restrictions because "[p]eople get really pissed off if they're holding stock and they want to sell it and they can't." (*Id.* ¶ 101.)[17]

Plaintiffs contend that these allegedly false or misleading statements that Robinhood made about *its own business* artificially depressed the trading prices for the Affected Stocks—securities issued by completely unrelated companies.[18] For example, Plaintiffs claim that Robinhood made allegedly false statements about its own liquidity and about typical practices in the brokerage industry that somehow influenced the prices of shares of GameStop, Blackberry and Nokia (among others). (*Id.* ¶¶ 79, 143, 147.)

Plaintiffs never explain how any of the statements at issue, particularly where none of the statements are false or about the Affected Stocks, could have influenced the trading prices of the Affected Stocks at all. Indeed, all the statements Plaintiffs identified were made *after* Robinhood implemented the purchase restrictions that Plaintiffs allege depressed the Affected Stocks' prices. Nor can Plaintiffs explain why Robinhood would have wanted to depress the Affected Stock prices in the first place, when Plaintiffs do not allege that Robinhood owned or bought the Affected Stocks or had any interest in whether the prices for those securities

---

[17] Plaintiffs refer to a litany of other public statements made by Robinhood and its executives, merely characterizing those statements as "less than candid." (Compl. ¶¶ 11, 44-46, 53, 62, 63, 65, 67, 77, 78, 80(c), 81, 82, 96, 97, 99, 114 and 126.) Plaintiffs fail to plead with any particularity how these other statements are in any way actionable. *See Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986); *see also ATSI*, 493 F.3d at 99; *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008) ("A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet th[e Rule 9(b)] standard.").

[18] In a typical misrepresentation case, the plaintiffs contend that alleged false statements artificially increased the price of a security and caused harm when the plaintiffs bought that security during the class period at an inflated price and later the truth was revealed and the price fell. *See, e.g.*, *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 265 (2014). That is a *purchaser* claim. Here, Plaintiffs argue the inverse: that Robinhood's alleged misrepresentations decreased the prices of the Affected Stocks, allegedly causing harm when Plaintiffs sold at depressed prices during the Class Period. (Compl. ¶¶ 143, 147.) The claim here is a *seller* claim.

decreased or increased.  It is no surprise, then, that this remarkably attenuated theory fails for each of the reasons set forth below.

A.   Plaintiffs Cannot Bring a Section 10(b) Claim Based on Robinhood's Statements About Its Own Business To Recover Alleged Losses from Plaintiffs' Sale of Securities of Other Companies.

The statutory standing requirement for a private right of action and the "in connection with" element of Section 10(b) both prevent a plaintiff from bringing a claim against one company, for statements about its own business, to recover losses from the plaintiff's purchase or sale of securities in an unrelated company.  Plaintiffs' misrepresentation claims fail because Plaintiffs fail to meet either of these independent requirements.

### 1.   *Plaintiffs Lack Statutory Standing.*

The right of a private litigant to bring a claim under Section 10(b) and Rule 10b-5 has been implied by the courts; it is not explicitly provided for on the face of the statute or the rule.  That implied right is, however, carefully limited.  Courts have circumscribed the categories of private litigants who can bring a misrepresentation-based Section 10(b) and Rule 10b-5 claim to those who actually transacted in the stock of the company that is the subject of the alleged misrepresentation.  Here, because Plaintiffs do not allege that they purchased or sold *Robinhood* stock, they lack standing to bring a Section 10(b) and Rule 10b-5 claim based on alleged misrepresentation about Robinhood.

This precise issue was addressed in *Ontario Public Service Employees Union Pension Trust Fund v. Nortel Networks Corp.*, 369 F.3d 27 (2d Cir. 2004).  In *Nortel*, the plaintiffs brought a Section 10(b) claim based on statements that the defendant made about its own business, even though the plaintiffs had not transacted in the securities of the defendant. Instead, the plaintiffs claimed that defendant's statements impacted the price of securities of a *different* business in which the plaintiffs *had* transacted.  That is precisely what Plaintiffs allege here.  However, as the *Nortel* court concluded, stockholders "do not have standing to sue under Section 10(b) and Rule 10b-5 when the company whose stock they purchased [was] negatively impacted by the material misstatement of another company, whose stock they [did] not purchase."  *Id*. at 34.  Various other cases that have confronted this same issue are in accord. *See, e.g., Harbinger Capital Partners LLC v. Deere & Co.*, 632 F. App'x 653, 656 (2d Cir. 2015) (affirming dismissal where shareholders of one company attempted to sue for statements made

by another company); *Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*, No. 19 CIV. 7536, 2021 WL 1199035, at *30-31 (S.D.N.Y. Mar. 30, 2021) (plaintiffs lack statutory standing under Section 10(b) "to bring a lawsuit against [defendants] for self-referential statements made by a company in which plaintiffs never invested").  Indeed, as a court in this District rightly observed in dismissing the complaint in *In re Altisource Portfolio Solutions, S.A. Securities Litigation*:  "Plaintiffs have not identified any case holding that shareholders of one public company have standing to bring a 10b-5 claim against another public company that neither issued nor sold stock to those shareholders."  No. 14-81156, 2015 WL 12001262, at *4 (S.D. Fla. Sept. 4, 2015).

These standing limitations are based on a line of Supreme Court cases restricting the scope of the private right of action under Section 10(b) and Rule 10b-5.  *See Nortel*, 369 F.3d at 31-33 (relying on *Blue Chip Stamps*); *Altisource*, 2015 WL 12001262, at *3-4 (relying on *Blue Chip Stamps* and *Stoneridge*); *Menora*, 2021 WL 1199035 (relying on those cases plus *Janus*).  Beginning with *Blue Chip Stamps v. Manor Drug Stores*, the Supreme Court has cautioned that the judicially created private right of action must also be "judicially delimited," 421 U.S. 723, 749 (1975), out of "concern that the inexorable broadening of the class of plaintiff who may sue in this area of the law will ultimately result in more harm than good," *id*. at 747-48.  That concern led the Supreme Court to limit standing to assert Section 10(b) and Rule 10b-5 claims to those who were "actual purchasers and sellers" of the security that is the subject of the alleged misrepresentation.  *Id*. at 731-32.[19]

This Court should "heed[] the Supreme Court's instructions to not expand Section 10(b)'s private right of action beyond its present boundaries and hold[] that plaintiffs lack standing to sue [Robinhood] for statements [it] made about [its own business]."  *Menora*, 2021 WL 1199035, at *32.  Any other approach—contrary to the *Nortel* holding and the other cases cited above—would "allow any investor to sue any entity simply because that entity made

---

[19] For example, in *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, the Supreme Court declined to expand Section 10(b) and Rule 10b-5 to reach aiding and abetting claims because of its view that "the § 10(b) private right of action should not be extended beyond its present boundaries."  552 U.S. 148, 165 (2008).  And in *Janus Capital Group v. First Derivative Traders*, the Court reiterated "the narrow scope that we must give to the implied private right of action" and declined to expand liability beyond those with ultimate authority over a false statement.  564 U.S. 135, 144 (2011).

misrepresentations that happened to affect the price of a security purchased or sold by the investor." *Id*. at *29.  As the Supreme Court has repeatedly cautioned, Section 10(b) does not and should not extend so far.  The misrepresentation claim should be dismissed because Plaintiffs lack standing.

### 2. Plaintiffs Cannot Satisfy the "In Connection With" Element.

Plaintiffs also fail to meet the "in connection with" element of Section 10(b).  To state a claim under Section 10(b) and Rule 10b-5, Plaintiffs must allege that Robinhood's statements occurred "in connection with" the purchase or sale of a security.  15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.  The Supreme Court has established that the "in connection with" requirement limits the Section 10(b) private right of action to plaintiffs "who have at least dealt in the security to which the prospectus, representation, or omission relates." *Blue Chip Stamps*, 421 U.S. at 747; *see also Pelletier v. Stuart-James Co.*, 863 F.2d 1550, 1556 (11th Cir. 1989) ("[Claimant] must show that the fraudulent conduct 'touches' the purchase or sale of securities."); *Pross v. Katz,* 784 F.2d 455, 459 (2d Cir. 1986) (defendant's fraudulent acts must be "integral to the purchase and sale of the securities in question"); *Crummere v. Smith Barney, Harris, Upham & Co.*, 624 F. Supp. 751, 755 (S.D.N.Y. 1985) ("[T]he misrepresentation must relate to the securities alleged to satisfy the purchase and sale requirement, and not just to the transaction in its entirety.").  Simply put, the misrepresentations must be about the Affected Stocks.

As discussed above, none of Robinhood's alleged false statements concerns any of the Affected Stocks.  Instead, Plaintiffs allege that Robinhood (1) made false statements about whether Robinhood had "a liquidity problem on the morning of January 28th" and (2) "disingenuously compared Robinhood's [PCO] actions to those of other retail brokers." (Compl. ¶¶ 79, 100.)  Plaintiffs do not allege that Robinhood made *any* statements regarding the Affected Stocks, let alone that any of the purported false statements concern the Affected Stocks. This is fatal to their Section 10(b) claim.  *See Urcuyo v. Invertec Corp.*, No. 05-22291-CIV, 2006 WL 8433171, at *5 (S.D. Fla. May 2, 2006) ("The Court agrees with the defendant that the federal case law interpreting the 'in connection with' requirement has clearly established that the misrepresentations at issue must relate to the fundamental nature of the securities, the attributes that would induce an investor to buy or sell the particular securities."); *In re Nortel Networks*

*Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 624 (S.D.N.Y. 2003), *aff'd on other grounds sub nom. Ontario Pub. Servs.*, 369 F.3d at 32; *see also Saxe v. E.F. Hutton & Co.*, 789 F.2d 105, 108 (2d Cir. 1986) (holding "in connection with" element not satisfied where defendants did not mislead plaintiff "concerning the value of the securities he sold").

B.   Plaintiffs Do Not Adequately Plead Other Essential Elements of Their Section 10(b) Misrepresentation Claim.

Plaintiffs' misrepresentation claim also fails because Plaintiffs fail to adequately plead a number of additional elements, specifically that any of the statements (1) were false or misleading, (2) caused Plaintiffs' losses or (3) were made with scienter.  Plaintiffs' Section 10(b) and Rule 10b-5 claim for misrepresentations should be dismissed.

1.   *Plaintiffs Do Not Adequately Plead Any False or Misleading Statements.*

Under the PSLRA, Plaintiffs must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1)(B).  "A statement is misleading if in light of the facts existing at the time of the statement a reasonable investor, in the exercise of due care, would have been misled by it."  *Henningsen v. ADT Corp.*, 161 F. Supp. 3d 1161, 1181-82 (S.D. Fla. 2015) (citing *FindWhat*, 658 F.3d at 1305).  Plaintiffs fail to plead with particularity how or why any of the four statements identified in the Complaint that Mr. Tenev made during the Class Period were false or misleading.[20]  (*See* Compl. ¶¶ 79, 92, 100, 101.)

*First*, Mr. Tenev's statement that "[t]here was no liquidity problem" was not false or misleading.  Plaintiffs' sole basis for suggesting otherwise is that the statement was supposedly inconsistent with an earlier internal statement made by Gretchen Howard.  (Compl. ¶ 80(a).)  But this Court already has concluded that the two statements are not inconsistent (*see* Antitrust Tranche Decision at 46), and the Complaint is devoid of any further allegations suggesting otherwise.  As this Court found, the statements are consistent because, "[e]ven

---

[20] Plaintiffs allege a number of other statements by Robinhood, but they were all made either before or after the Class Period.  For example, Plaintiffs refer to Jim Swartwout's statement on February 8.  (*See* Compl. ¶ 57.)  That statement occurred after the Class Period (*see id.* ¶ 128) and therefore is not actionable.  *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) (holding statements made after the relevant purchase or sale of securities are not actionable).

viewing the pleading in the light most favorable to Plaintiffs, Howard was likely referring to Robinhood's ability to pay the increased collateral requirements caused by the market volatility, which is consistent with Robinhood later placing the blame on these collateral requirements." (*Id*. at 46-47.)  Moreover, Mr. Tenev's statement was true as a matter of fact; Robinhood ultimately had no liquidity problem and met all its deposit requirements.  (*See* Compl. ¶ 80(c).)

    *Second*, Mr. Tenev's two statements concerning the activities of other brokers were not false or misleading.  Specifically, Mr. Tenev said that brokerages and other financial institutions implement trading restrictions all the time, that they had been doing so throughout the week of January 28 and that trading limitations were common, day-to-day measures that brokerages may apply.  (*See* Compl. ¶ 92.)  Mr. Tenev also said that "other brokers basically restricted the same activity."  (*Id*. ¶ 100.)  The only support that Plaintiffs provide to argue that these two statements were false is that the restrictions Robinhood implemented were not exactly the same as those implemented by other brokers.  (*Id*. ¶ 93.)  But it is clear from Mr. Tenev's statement that he was not claiming that Robinhood's restrictions were exactly the same as those implemented by other brokers.  Instead, Mr. Tenev was explaining the general industry practice of implementing restrictions in response to volatility and stating the (true) fact that Robinhood was one of several brokers that restricted purchases of volatile securities during the week of January 28.  (*See id*. ¶ 92 n.54.)[21]  Indeed, Plaintiffs themselves allege that other brokers also implemented trading restrictions during that week (*id*. ¶ 93) and, as the Court knows, the Antitrust Plaintiffs alleged (unsuccessfully) in another tranche of this MDL that brokers conspired together to impose these trading restrictions.  (*See* Antitrust Tranche Decision at 49-50.)  No reasonable investor would have understood Mr. Tenev's statements to mean that Robinhood's restrictions were exactly the same as those implemented by other brokers.  Indeed, because the restrictions imposed by other brokers were publicly disclosed, investors would not

---

[21] Plaintiffs partially quote from Mr. Tenev's interview with Alexis Christoforous on Yahoo! Finance, which is available online in its entirety.  *See Robinhood CEO: We 'made the right decision' in response to potential investigation*, Yahoo! Finance (Jan. 29, 2021), https://www.yahoo.com/lifestyle/robinhood-ceo-made-decision-response-204254105.html (last visited Jan. 6, 2022).  The Court may consider the full transcript in which Mr. Tenev's statement appears because it is incorporated by reference into the Complaint (Compl. ¶ 92) and is central to Plaintiffs' claims, and the authenticity of its contents is not disputed.  *See Harris v. Ivax Corp.*, 182 F.3d 799, 802 n.2 (11th Cir. 1999) (considering, at motion to dismiss, the full contents of document in which allegedly false statements appeared).

have been misled by the statements.  As a result, Mr. Tenev's statements were not false or misleading.

        *Third*, Mr. Tenev's statement that Robinhood implemented purchasing restrictions, while leaving sales unrestricted, because customers prefer being able to sell was not false or misleading.  (*See id.* ¶ 101.)  Plaintiffs advance two theories for falsity, both of which fail.  Plaintiffs first suggest that the statement must be false because "Tenev's explanation for the one-sided trading halt does not appear in the internal chats on the subject."  (*Id*. ¶ 102.)  Even if that were true, it does not render the statement false.  In fact, Plaintiffs are expressly contradicted by the Robinhood documents on which they rely—here, the sworn affidavit submitted by Shiv Verma, Robinhood Markets' Head of Treasury, in *Cobos v. Robinhood Financial, et al.*, which detailed the decision-making process for implementing the PCO restrictions on January 28 and noted that Robinhood Financial permitted customers to sell their positions "[t]o provide flexibility for customers with existing positions."  (*Id.* ¶ 59); (Declaration of Shiv Verma ¶¶ 13-14, *Cobos v. Robinhood Financial, et al.*, No. 21-cv-00835 (C.D. Cal. Feb. 8, 2021), ECF No. 27-2).[22]

        Plaintiffs also suggest that Mr. Tenev's statement must be false because it is inconsistent with his later statement that the decision to PCO was made to help address growing deposit requirements.  (*See* Compl. ¶ 103.)  But the statements are entirely consistent.  Mr. Tenev's later statement explained why Robinhood implemented any restrictions:  because of rising deposit requirements.  His first statement explained why Robinhood implemented purchase restrictions, while leaving sales unrestricted:  because of customer preferences.  Moreover, Robinhood had little reason to restrict sales at the time because doing so would not have addressed the reason for Robinhood's increased deposit requirements.  That is because the volatility multiplier that NSCC assigned, and the resulting exponential increase in Robinhood's deposit requirements, was driven by Robinhood customers' net open purchase orders for shares.  As a result, prohibiting sales would not have meaningfully decreased Robinhood's deposit

---

[22] The Court may consider this portion of Mr. Verma's Declaration because it is incorporated by reference into the Complaint (Compl. ¶¶ 59-60), is central to Plaintiffs' claims, and the authenticity of its contents is not disputed.  (*See supra* note 21.)

requirements.  (*See id.* ¶¶ 99, 103, 106.)  Robinhood therefore had no reason to restrict sales and, as Mr. Tenev explained, doing so would have been inconsistent with customer preferences.

Plaintiffs offer no other reasons "why the statement[s] [are] misleading" and therefore fail to meet the heightened pleading standards of Rule 9(b) and the PSLRA.  Fed. R. Civ. P. 9(b); 15 U.S.C. § 78u-4(b)(1).

### 2.      *Plaintiffs Do Not Adequately Plead Loss Causation.*

Plaintiffs also fail to plead loss causation, *i.e.*, how the alleged misleading statements made by Robinhood—which concerned *Robinhood*, not the issuers of the Affected Stocks—caused a decline in the trading prices for the Affected Stocks.  To show loss causation, Plaintiffs must prove "a causal connection between the misrepresentation and the investment's subsequent decline in value."  *Robbins v. Koger Properties, Inc.*, 116 F.3d 1441, 1448 (11th Cir. 1997); 15 U.S.C. § 78u-4(b)(4) (requiring that the plaintiff prove that the alleged misrepresentation "caused the loss for which the plaintiff seeks to recover").  A plaintiff is required to adequately plead loss causation in the complaint.  *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005).  Specifically, Plaintiffs must allege "not only that a fraudulent misrepresentation artificially inflated [or deflated] the security's value but also that the fraud-induced inflation [or deflation] that was baked into the plaintiff's purchase [or sale] price was subsequently removed from the stock's price, thereby causing losses to the plaintiff."  *Meyer v. Greene*, 710 F.3d 1189, 1195 (11th Cir. 2013) (internal quotations and citations omitted).  This loss causation element is particularly important in this case, where (as discussed above) Plaintiffs bring a novel misrepresentation claim against Robinhood based on statements about its own business to recover losses from Plaintiffs' transactions in other companies' securities.

Typically, Section 10(b) and Rule 10b-5 plaintiffs allege loss causation by identifying supposed corrective disclosures that revealed the falsity of the defendant's prior statements and caused stock prices to fall from artificially inflated levels.  *See In re Williams Sec. Litig.–WCG Subclass*, 558 F.3d 1130, 1137 (10th Cir. 2009) ("Loss causation is easiest to show when a corrective disclosure reveals the fraud to the public and the price subsequently drops—assuming, of course, that the plaintiff could isolate the effects from any other intervening causes that could have contributed to the decline."); *FindWhat*, 638 F.3d at 1312 ("Loss causation is adequately pled by alleging 'that the market reacted negatively to a corrective disclosure

regarding the falsity of [the defendant's prior statements.'") (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005)).  Here—given that Plaintiffs bring a seller claim, the inverse of the more usual purchaser claim—Plaintiffs must allege that Robinhood's misstatements artificially decreased the Affected Stock prices, and that, when the market learned that Robinhood's statements were false, this deflation was removed from the Affected Stock prices, causing prices to rise.  They have alleged neither.

> *First*, Plaintiffs have not identified how any of Robinhood's alleged misrepresentations depressed the prices of the Affected Stocks in the first place.  Plaintiffs merely offer a conclusory allegation, in a single sentence, that Robinhood's statements "further drove down the share prices of the Affected Stocks." (*See* Compl. ¶ 68.)  But Plaintiffs have failed to allege any causal connection between the alleged misrepresentations and any decrease in the Affected Stock prices.  Plaintiffs offer no plausible explanation for why the Affected Stock prices would have been impacted by whether Robinhood had a liquidity problem or whether Mr. Tenev had misrepresented that the restrictions Robinhood implemented were the same as those implemented by other brokers.  Indeed, the trading restrictions imposed by other brokers also were publicly disclosed; there is no reason to believe that Mr. Tenev's statements about those restrictions could have influenced the Affected Stock prices.  Instead, Plaintiffs allege that the Affected Stock prices decreased because of Robinhood's decision to PCO. (*See id.* ¶¶ 69, 140.)  But absent allegations that Robinhood's alleged misrepresentations—as opposed to the trading restrictions—caused Plaintiffs' alleged losses, their misrepresentation claim fails as a matter of law.  *See Dura*, 544 U.S. at 345-48 (dismissing Section 10(b) claims for failure to allege loss causation where the complaint alleged only that plaintiffs paid "artificially inflated prices" and "suffered damages").  Plaintiffs here offer no more allegations of loss causation than did the plaintiffs in *Dura*.

> *Second*, Plaintiffs fail to allege that the prices of the Affected Stocks ever increased because the market learned that Robinhood's statements were false.  Such allegations are necessary, however, to establish for a Section 10(b) claim that Plaintiffs suffered losses as a result of Robinhood's alleged misrepresentations.  As the Eleventh Circuit has explained, it is only when "the wool is eventually pulled from the market's eyes and the truth becomes known about the company's misrepresentation" that a change "in stock price in reaction to the revelation . . . will have been caused by the fraud and will be compensable." *Meyer*, 710 F.3d at 1196.  The

reason for this loss causation pleading rule is that a court cannot credit the assertion that the price of a security was artificially inflated (or deflated) due to a misrepresentation unless the plaintiff can allege that when the truth came out (the corrective disclosure for the alleged misrepresentation), the security's price declined (or increased) to its true value.  *See Dura*, 544 U.S. at 344 (plaintiff must show that true "facts become generally known" and "as a result share value depreciates") (quotations and alterations omitted).  Because Plaintiffs fail to allege that the market ever learned that Robinhood's statements were false, through corrective disclosures or otherwise—let alone a resulting adjustment in the Affected Stock prices—Plaintiffs have not pleaded loss causation, *i.e.*, that Robinhood's alleged misrepresentations caused an artificial deflation in the Affected Stock prices during the Class Period.[23]  *See Dura*, 544 U.S. at 347 (dismissing complaint for "failure to claim that Dura's share price fell significantly after the truth became known").  Plaintiffs' misrepresentation claims should therefore be dismissed for failure to plead loss causation.

### 3.    *Plaintiffs Do Not Adequately Plead Scienter.*

Plaintiffs do not plead particularized facts that give rise to the required "strong inference" of scienter, 15 U.S.C. § 78u-4(b)(2)(A), for any of the four alleged misstatements at issue.  Nowhere do Plaintiffs allege—as they must—that Mr. Tenev "intended to deceive investors by artificially affecting the market price of [the Affected Stocks]."  *ATSI*, 493 F.3d at 102.  For the reasons that follow, Plaintiffs' half-hearted attempts to suggest the existence of scienter fail.

**The "no liquidity problem" statement.**  Plaintiffs offer three reasons to infer that Mr. Tenev's statement that there was "no liquidity problem" was made with scienter:  (1) it was allegedly contradicted by an earlier internal message from Ms. Howard, Robinhood Markets' COO, which referred to a "major liquidity problem" (Compl. ¶ 80(a)); (2) it was

---

[23] Indeed, as noted above, because the restrictions implemented by other brokers were publicly disclosed, the market knew all the relevant information concerning Mr. Tenev's statements about other brokers when the statement was made.  Plaintiffs therefore cannot allege, as they must, that the market learned the supposed "truth" after Plaintiffs sold their Affected Stock shares, causing them losses.

supposedly made to protect Robinhood's eventual IPO (*id.* ¶¶ 80(b)-(c)); and (3) Mr. Tenev reiterated that any liquidity issue "was not the case with Robinhood" (*id.* ¶ 80(d)).

        Plaintiffs' first argument—Ms. Howard's earlier-in-time internal message referring to a "liquidity problem"—does not support an inference of scienter because, as discussed above (*supra* Section II.B.1), Mr. Tenev's and Ms. Howard's statements "are not conflicting." (*See also* Antitrust Tranche Decision at 46.)  And even if Ms. Howard was right that there was a liquidity problem before NSCC waived the collateral special charge, it still does not suggest that Mr. Tenev made his statement with scienter.  By the time Mr. Tenev made his statement, NSCC had waived the special charge, which this Court has already concluded was the basis for Ms. Howard's earlier statement, and Robinhood had paid its collateral deposit requirement.  (*Id.* at 46-47.)

        Plaintiffs' second argument—that Mr. Tenev acted to "protect" Robinhood's then-potential future IPO—also fails to support an inference of scienter because Robinhood's IPO is irrelevant to the price of the Affected Stocks.  The success or failure of Robinhood's IPO was not connected to the prices of the Affected Stocks.  Even if (as Plaintiffs allege) Mr. Tenev made his statement to protect Robinhood's eventual IPO—which would not occur for another six months—that does not support an inference that Mr. Tenev intended to deceive investors about the Affected Stocks.  Further, as discussed above in Section I.B, even if Mr. Tenev's statement protected the IPO and helped the company generally continue to profit, a general motive to profit is inadequate to allege scienter as a matter of law.  *See Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996) ("The motive to maintain the appearance of corporate profitability . . . will naturally involve benefit to a corporation, but" is insufficient to allege scienter.).  Such allegations are inadequate because they generally apply to all companies.  Consequently, "[i]f scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions."  *Id.* (citations omitted).  Plaintiffs' suggestion that Mr. Tenev acted with scienter out of a desire to protect Robinhood's IPO is therefore insufficient to allege scienter as a matter of law.

        Plaintiffs' third argument—that Mr. Tenev reiterated his statement that liquidity issues were "not the case with Robinhood"—does not support an inference of scienter because the repetition only underscores Robinhood's consistent explanations about the business's capitalization.  As Mr. Tenev truthfully explained, Robinhood did not have a liquidity problem

and paid all its deposit requirements in full.  Additionally, Mr. Tenev repeating his statement "would make little sense if [Robinhood] had a plan to deceive the public on these very issues." *Henningsen*, 161 F. Supp. 3d at 1204 (rejecting an inference of scienter in light of repeated public statements).  Therefore, Mr. Tenev's consistency supports an alternative, and more persuasive, inference, *i.e.*, that he believed his statement was truthful and had no intent to deceive when he made it.  *See Tellabs*, 551 U.S. at 310 ("A court must consider plausible, nonculpable explanations for the defendant's conduct" before finding a strong inference of scienter.).  Plaintiffs have therefore pleaded no facts indicating that Mr. Tenev made the statement that Robinhood had "no liquidity problem" with scienter.

**The "part of practices in the brokerage industry" statement.**  Plaintiffs do not even attempt to plead scienter with respect to Mr. Tenev's second statement, that temporary trading restrictions on certain symbols are a common practice in the brokerage industry.  (*See* Compl. ¶ 92.)  They allege only that Mr. Tenev made the statement to minimize supposed differences between Robinhood's restrictions and those of other brokers.  (*Id*.)  Even if that is true, it does not suggest that Mr. Tenev made the statement with any intent to deceive investors concerning the Affected Stocks.  Indeed, there is no strong inference of scienter because lying about other brokers' practices, which were publicly known at the time, would have been illogical and futile.  *See In re GeoPharma, Inc. Sec. Litig.*, 399 F. Supp. 2d 432, 449-51 (S.D.N.Y. 2005) (finding no strong inference of scienter because the alleged misrepresentation was inconsistent with publicly available information and therefore "the alleged scheme could not possibly have succeeded").  Plaintiffs have therefore pleaded no fact supporting an inference of scienter for the second statement.

**The "other brokers basically restricted the same activity" statement.**
Plaintiffs seek to infer scienter from their contention that Mr. Tenev "knew (or should have known on a matter of such critical importance)" that Robinhood's restrictions were not the same as those of other brokers, and therefore, the falsity of the statement supports an inference of scienter.  (*Id*. ¶ 100.)  But even if Robinhood's restrictions on January 28 and 29 differed in some respects from the restrictions other brokers imposed, that is nevertheless insufficient to support a strong inference that Mr. Tenev made his statement with scienter.  Plaintiffs concede that other brokers also implemented trading restrictions during the same time period.  (*Id*. ¶ 93.)  Indeed, such restrictions are generally consistent with industry practice.  (*Id*. ¶ 92.)  Because the other

brokers' restrictions were publicly known, it also would have been irrational for Mr. Tenev to lie about them.  *See GeoPharma*, 399 F. Supp. 2d at 450-51.  Rather than suggest that Mr. Tenev acted with scienter, those facts support the more plausible—and actual—explanation for Mr. Tenev's statement:  that he was explaining how Robinhood was not the only broker to implement restrictions in response to the market volatility that occurred during the week of January 28.

            **The "customer preferences" statement.**  As with the industry practices statement above, Plaintiffs make no attempt to plead scienter with respect to Mr. Tenev's fourth statement, that Robinhood implemented buy-side restrictions because of customer preferences. (*Id*. ¶ 101.)  Nor would it make sense to infer an intent to deceive, as it stands to reason that customers prefer the option to sell off their position in whole or in part to being locked in to their position by a total restriction on both purchases and sales.

            Plaintiffs' claims fall far short of pleading facts supporting a "strong inference" of scienter.  15 U.S.C. § 78u-4(b)(2)(A).  Accordingly, Plaintiffs' misrepresentation claim should be dismissed.

## III.    PLAINTIFFS' CLAIMS SHOULD BE DISMISSED WITH PREJUDICE.

            All of Plaintiffs' claims should be dismissed with prejudice.  While Plaintiffs fail adequately to plead numerous elements of their claims, the incurable nature of the shortcomings in Plaintiffs' claims is readily apparent.  Plaintiffs' market manipulation claims should be dismissed with prejudice because the fact that Robinhood's purchase restrictions were fully disclosed, and therefore not manipulative, is a fundamental defect in Plaintiffs' theory of the case that cannot be cured through amendment.  Similarly, Plaintiffs' lack of statutory standing and inability to satisfy the "in connection with" element are inherent flaws in Plaintiffs' misrepresentation claim and are not curable.

## CONCLUSION

            For the foregoing reasons, Robinhood respectfully submits that the Amended Consolidated Class Action Complaint for the Securities Tranche should be dismissed with prejudice for failure to state a claim.

Dated:  January 7, 2022

/s/ Samuel A. Danon

**HUNTON ANDREWS KURTH LLP**
Samuel A. Danon (FBN 892671)
Gustavo Javier Membiela (FBN 513555)
María Castellanos Alvarado (FBN 116545)
333 S.E. 2 Avenue, Suite 2400
Miami, FL 33131
Telephone: (305) 810-2500
Facsimile: (305) 810-2460
sdanon@huntonak.com
gmembiela@huntonak.com
mcastellanos@hunton.com

**CRAVATH, SWAINE & MOORE LLP**
Antony L. Ryan
Kevin J. Orsini
Brittany L. Sukiennik
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700
aryan@cravath.com
korsini@cravath.com
bsukiennik@cravath.com

*Counsel for Defendants Robinhood Markets,
Inc., Robinhood Financial LLC and
Robinhood Securities, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on January 7, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I further certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive Notices of Electronic Filing.

Dated:  January 7, 2022                              */s/ Samuel A. Danon*
                                                      Samuel A. Danon (FBN 892671)