# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO.  21-02989-MDL-ALTONAGA/Torres

In re:

**JANUARY 2021 SHORT SQUEEZE**
**TRADING LITIGATION**

_____/

This Document Relates to the Robinhood Tranche

## ORDER

**THIS CAUSE** came before the Court on the Motion to Dismiss the Robinhood Tranche

Complaint [ECF No. 421] filed by Defendants Robinhood Markets, Inc.; Robinhood Financial

LLC; and Robinhood Securities, LLC (collectively, "Defendants" or "Robinhood") on October

15, 2021.  Plaintiffs filed a Response in Opposition [ECF No. 436], and Defendants filed a Reply

[ECF No. 439].  The Court has carefully considered the Amended Consolidated Class Action

Complaint [ECF No. 409], the parties' written submissions, the record, and applicable law.

## INTRODUCTION

This case is about meme stocks.[1]  In January 2021, scores of retail investors rushed to

purchase stocks that hedge funds and institutional investors had bet would decline in value, causing

a dramatic increase in those stocks' share prices.  The mass rush to purchase these "meme stocks"

led to a highly volatile securities trading market, with the prices of certain stocks varying wildly

by the hour.

---

[1] The Securities and Exchange Commission ("SEC") recently defined "meme stocks" as stocks that "experienced a dramatic increase in their share price in January 2021 as bullish sentiments of individual investors filled social media."  SEC, *Staff Report on Equity and Options Market Structure Conditions in Early 2021*, at 2 (Oct. 28, 2021), https://www.sec.gov/files/staff-report-equity-options-market-struction-conditions-early-2021.pdf.

For securities brokers who execute investor trades, the regulatory environment became correspondingly unpredictable.  In the securities trading industry, registered clearing brokers must meet daily deposit requirements set by self-regulatory organizations.  The amount clearing brokers must deposit each day depends on the level of volatility in the securities they trade.  The purpose of deposit requirements is to stabilize the marketplace and reduce the risk that market participants will prove unable to meet financial obligations related to securities trades.

When meme stock share prices took off in January 2021, regulators reacted.  In a span of three days, Robinhood Securities, a clearing broker, incurred both a deposit *surplus* of $11 million and a deposit *deficit* of over $3 billion.  These oscillating collateral requirements were driven primarily by Robinhood customers' concentrated positions in meme stocks.  Robinhood Securities proved able to meet its daily deposit requirements each day up to January 28, 2021.

Still, it and its affiliates — parent company Robinhood Markets and introducing broker Robinhood Financial — grew concerned about the rapidly changing circumstances.  It then made the fateful decision to restrict purchases of the meme stocks on the Robinhood platform for a week. That decision helped fix Robinhood's compliance quandary.  But, Robinhood customers say, it also forced share prices of the meme stocks into a steep decline.

Several of those customers sued Robinhood, and their suits were consolidated into this Multi-District Litigation.[2]   Robinhood now moves to dismiss.  The Motion to Dismiss challenges whether any of Plaintiffs' seven claims is viable.

---

[2] The Plaintiffs are Andrea Juncadella, Edward Goodan, William Makeham, Mark Sanders, Jaime Rodriguez, Patryk Krasowski, Cody Hill, Sammy Gonzalez, Joseph Daniluk, Jonathan Cornwell, Paul Prunean, and Julie Moody.  (*See* Am. Compl. ¶¶ 29–84).

**BACKGROUND**

I.      **The Mechanics of Securities Trading**

        a.  **Securities Transactions**

A securities transaction involves several steps.  A decision to invest in or disinvest from a particular security is referred to as taking a "position."  Positions may be long or short.  A "long" position refers to the purchase of a security based on the belief that its value will rise over time. Investors who take a long position on a security may close their position by selling the security.

By contrast, a "short" position assumes that the price of the security will fall.  (*See* Am. Compl. ¶ 106 n.8).  Short position holders typically borrow a security from a lender, sell the security at a high price, and then purchase the security at a much lower price before it is due back to the lender.  (*See id.*).  Short traders earn revenue from the difference between the purchase and sale prices of the shorted security.  (*See id.*).  If the price of the security increases between the time of the sale and repurchase, the short seller incurs a loss.  (*See id.*).

Investors may initiate a securities transaction by placing an order to buy or sell a security with an introducing broker.  (*See id.* ¶¶ 89–90; Robinhood Financial LLC Form CRS Relationship Summ., Am. Compl. Ex. B [ECF No. 409-2] 2 [hereinafter CRS]).[3]  The introducing broker may choose to accept or reject the order.  (*See, e.g.*, Robinhood Financial LLC & Robinhood Securities, LLC Customer Agreement, Am. Compl. Ex. A [ECF No. 409-1] § 16 [hereinafter Cust. Agmt.]). If the introducing broker accepts an order, it sends the order to a clearing broker.  (*See* Am. Compl. ¶ 93; CRS 2).

Clearing brokers forward accepted orders to "market makers" — firms that execute the orders.  (Am. Compl. ¶ 140).  In executing orders, market makers determine what prices investors

---

[3] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

will pay and receive.  (*See id.*).  Market makers profit by buying and selling the ordered securities for better prices than those investors pay or receive.  (*See id.*).  Thus, market makers pay brokers like Robinhood significant sums for the right to fill investors' orders.  (*See id.*).  These payments are known in the industry as "payment for order flow."  (*Id.* ¶ 137; *see id.* ¶¶ 137–41).  A consequence of this revenue structure is that brokers earn more the more that investors trade.  (*See id.* ¶ 137).

### b.  Regulation of Securities Markets

After an order is executed, the clearing broker submits the trade to a clearinghouse for final clearance and settlement.  (*See id.* ¶¶ 152–54).  The National Securities Clearing Corporation ("NSCC") is the main clearinghouse for securities traded in the United States.  *See* Rules Relating to Confidentiality Requirements and Market Disruption Events, 86 Fed. Reg. 57,230 (Oct. 8, 2021).  The NSCC is part of a larger holding company called the Depository Trust & Clearing Corporation ("DTCC") that operates clearing agencies registered with the Securities and Exchange Commission ("SEC"), the independent agency authorized to regulate U.S. financial markets.  *See id.*; 15 U.S.C. § 78d.

Securities trading can be risky.  Sometimes, market participants will be unable to meet obligations in connection with their trades.  (*See, e.g.*, Am. Compl. ¶ 158).  This possibility creates risks not just for the parties to a particular transaction, but also for the market as a whole.  (*See id.*).  In part for that reason, the securities trading industry is heavily regulated.

The DTCC plays an important role in mitigating systemic risk to securities markets.  It "keeps a record of the stocks owned through the clearing brokerage firms for NSCC members" and imposes daily deposit requirements on clearing brokers.  (*Id.* ¶ 152; *see id.* ¶ 156).  The DTCC sets daily deposit requirements based on several volatility-based metrics.  (*See id.* ¶¶ 156, 158).

For example, if the DTCC determines that certain securities are particularly risky, it may assign those securities a "volatility multiplier" that increases the amount of collateral a clearing broker must post.  (*Id.* ¶ 156).  Although the DTCC follows formulas in setting deposit requirements, it also retains discretion to depart from formulaic calculations.  (*See, e.g.*, *id.* ¶ 223).  Clearing brokers must meet the deposit requirements set by the DTCC every trading day by 10:00 a.m. EST until their trades clear and settle.  (*See id.* ¶ 156).  A broker that fails to meet the DTCC's daily requirements might suffer significant penalties, including the forced liquidation of its business. (*See id.* ¶ 155).  The DTCC may also require intraday deposits.  (*See id.* ¶¶ 209, 212).

Securities brokers and dealers must comply with regulations issued by the Financial Industry Regulatory Authority, or "FINRA."  Although FINRA is a private nonprofit corporation, it is authorized by statute to regulate the trading of certain types of securities.  *See* 15 U.S.C. § 78o-3(b).  FINRA rules obligate members to "observe high standards of commercial honor and just and equitable principles of trade."  FINRA Rule 2010.[4]  FINRA also requires its members to design and implement supervisory systems that permit them to monitor and mitigate systemic risks.  *See* FINRA Rule 3110; FINRA Rule 4370; (*see also* Am. Compl. ¶ 169).  On March 18, 2021, FINRA issued a notice announcing: "Fair dealing is a core principle that underlies many FINRA rules, and FINRA guidance repeatedly has emphasized the importance of preserving fair customer treatment, even during times of market stress."  FINRA Regulatory Notice 21-12.

The SEC likewise issues regulations to sustain the health of securities markets.  Brokers must comply with the SEC's Net Capital Rule, which requires all registered brokers and dealers to "at all times have and maintain net capital no less than the greater of the highest minimum

---

[4] The Court takes judicial notice of FINRA regulations under Federal Rule of Evidence 201, subsections (b)(2) and (d).  *See Banco Safra S.A.-Cayman Islands Branch v. Samarco Mineracao S.A.*, 849 F. App'x 289, 294 (2d Cir. 2021) (taking judicial notice of FINRA rules).

requirement applicable to its ratio requirement . . . and [to] otherwise not be 'insolvent[.]'" 17 C.F.R. § 240.15c3-1(a) (alterations added); *see also id.* § 240.17Ad-22.  Ultimately, liquidity-focused regulations like the Net Capital Rule and the DTCC deposit requirements aim to preserve market stability and protect investors from broker defaults.  (*See* Am. Compl. ¶¶ 158, 161).

## II.  Robinhood and its Customers

### a.  Robinhood's Business Model and Compliance History

Robinhood is a collection of financial services companies that prides itself on "democratiz[ing] finance" and providing "everyone [with] access to the financial system."  (*Id.* ¶¶ 1, 108 (alterations added; emphasis, citations, and quotation marks omitted)).  Three Robinhood entities are relevant here.  Robinhood Markets, Inc. is the parent company of Robinhood Financial LLC and Robinhood Securities, LLC.  (*See id.* ¶¶ 85–94).  Robinhood Financial is a customer-facing introducing broker that offers investors access to various types of financial assets on its electronic trading platform.  (*See id.* ¶ 88).  Robinhood Securities clears trades introduced to customers by Robinhood Financial.  (*See id.* ¶ 93).

Robinhood Financial and Robinhood Securities are registered brokers and FINRA members.  (*See id.* ¶¶ 89, 92).  Robinhood Securities is a member of the NSCC and DTCC.  (*See id.* ¶ 92).

In its effort to "democratize finance[,]" Robinhood provides customers with an electronic trading platform that caters to non-professional retail investors.  (*Id.* ¶ 108 (alteration added; citation and quotation marks omitted)).  Robinhood does not charge customers commissions for trades or require them to maintain account minimums to invest.  (*See id.* ¶¶ 107, 109, 133).  Because Robinhood does not charge commissions, it derives most of its revenue from payment for order flow.  (*See id.* ¶¶ 142, 145).

Robinhood also offers customers various user-friendly educational resources.  These tools include the "Robinhood Snacks" daily podcast with courses on the basics of investing; the "Robinhood Snacks" newsletter, which provides daily financial news to tens of millions of people; "Robinhood Learn," a series of web publications with tutorials on investment fundamentals; and Robinhood's "Gold" paid subscription service, which provides professional market research and data prepared by outside research firms like Morningstar and NASDAQ.  (*Id.* ¶ 123 (citations and quotation marks omitted); CRS 2).  Additionally, Robinhood provides its customers with cash management services that enable them to write checks, withdraw funds, and make payments with Robinhood-branded debit cards.  (*See* Am. Compl. ¶ 123).

Other features make Robinhood's trading platform especially attractive to younger, less experienced investors who use smartphones.  (*See id.* ¶ 133).  The platform uses a variety of "behavioral nudges" and "gamification" features, including emojis, prizes, graphics, and animation.  (*Id.* ¶¶ 128–29 (citation and quotation marks omitted)).  For instance, traders might receive an image of falling confetti after making their first trade using Robinhood's smartphone application.  (*See id.* ¶ 130).

Robinhood's access-focused approach to facilitating trading has fueled rapid company growth.  Between 2015 and today, Robinhood's customer base increased from 500,000 to more than 31 million.  (*See id.* ¶ 116).  By the second quarter of 2021, Robinhood had 21 times the number of funded customer accounts than it did in 2016.  (*See id.* ¶ 117).

The Amended Complaint alleges that Robinhood was unprepared to scale up its business to then-current levels and connects this putative unpreparedness to a series of regulatory violations.  (*See id.* ¶¶ 146–151).  Between 2015 and 2016, Robinhood Financial violated FINRA rules by, among other things, failing to satisfy its obligations of best execution and to maintain supervisory

systems and procedures designed to satisfy those obligations.  (*See id.* ¶ 149).  FINRA fined Robinhood Financial $1,250,000 as a result.  (*See id.* ¶ 148).

In June 2021, FINRA again penalized Robinhood Financial, this time to the tune of $70 million, after finding "systemic supervisory failures and significant harm suffered by millions of customers."  (*Id.* ¶ 146 (quotation marks omitted)).  The acts and omisions pertained to Robinhood's "false and misleading statements to customers, failure to supervise technology critical to providing customers with core broker-dealer services, and failure to create a reasonably designed business continuity plan[.]"  (*Id.* ¶ 147 (alteration added; quotation marks omitted)).  The $70 million fine was the largest financial penalty ever imposed by FINRA.  (*See id.* ¶ 146).

The Amended Complaint alleges that Robinhood's reliance on payment for order flow "create[s] conflicts of interest" because Robinhood earns greater profit the more its customers trade.  (*Id.* ¶ 144 (alteration added; citation and quotation marks omitted); *see id.* ¶ 137).  It further alleges that Robinhood has designed its trading platform in a manner "intended to keep the attention of [Robinhood] users" and "draw inexperienced investors into risky trading." (*Id.* ¶ 129 (alteration added)).  These features allegedly go beyond merely introducing investors to securities and executing trades.  According to Plaintiffs, the Robinhood platform's "gamified" features "encourage more rapid trading than a buy-and-hold approach[] and . . . recommend particular strategies, such as option trading or use of margin."  (*Id.* ¶ 131 (alterations added; citation and quotation marks omitted)).

### b.  The Customer Agreement

Robinhood requires its customers to enter into a Customer Agreement between the customer, Robinhood Financial, and Robinhood Securities.[5]  (*See, e.g.*, *id.* ¶¶ 311, 328).  Each of

---

[5] Robinhood Markets is not a party to the Customer Agreement.  (*See* Cust. Agmt.; Mot. 21 n.8).

the Plaintiffs entered into the Customer Agreement. (*See* Am. Compl. ¶¶ 30, 34, 42, 47, 51, 55, 61, 65, 69, 73, 77, 81, 311, 328). In it, they agreed to "appoint Robinhood Financial as [their] agent for the purpose of carrying out [their] directions to Robinhood Financial in accordance with the terms and conditions of th[e] Agreement and any attendant risks with respect to the purchase or sale of securities." (Cust. Agmt. § 4 (alterations added)).

The Customer Agreement suggests that customers bear responsibility for their own investment decisions on Robinhood's platform. Investors who sign the Customer Agreement agree that their Robinhood accounts are "self-directed," they are "solely responsible for any and all orders" made on their account, and their orders reflect their "own investment decisions[.]" (Cust. Agmt. § 5.A (alteration added)). They also agree that Robinhood Financial and Robinhood Securities do not "provide investment advice in connection with [the customer's] Account" or "recommend any security, transaction or order[.]" (*Id.* (alterations added)).

Several provisions of the Customer Agreement purport to reserve Robinhood's discretion to accept customer orders and restrict customers' abilities to trade on its platform. These are a few examples:

- Robinhood Financial and Robinhood Securities "may at any time, at [their] sole discretion and without prior notice to [the customer] (i) prohibit or restrict [the customer's] access to the use of the App or the Website or related services and . . . ability to trade, (ii) refuse to accept any of [the customer's] transactions, (iii) refuse to execute any of [the customer's] transactions, or (iv) terminate [the customer's] Account." (*Id.* § 16 (alterations added)).

- Robinhood Financial and Robinhood Securities "may, in [their] discretion, prohibit or restrict the trading of securities, or the substitution of securities, in any of [the customer's] Accounts." (*Id.* (alterations added)).

- Robinhood Financial and Robinhood Securities "may at any time, in [their] sole discretion and without prior notice . . . prohibit or restrict [the customer's] ability to trade securities." (*Id.* § 5.F (alterations added)).

Section 13 of the Customer Agreement is captioned "Market Volatility; Market Orders; Limit Orders; and Queued Orders." (*Id.* § 13). Section 13 addresses what customers can expect in a volatile securities market. It provides: "Particularly during periods of high volume, illiquidity, fast movement or volatility in the marketplace, the execution price received may differ from the quote provided on entry of an order, and [customers] may receive partial executions of an order at different prices." (*Id.* (alteration added)). Despite its caption, Section 13 does not state that it contains an exhaustive list of rights that Robinhood retains to address volatile market conditions.

Finally, the Agreement contains a choice-of-law clause that states:

> This Agreement and all transactions made in [the customer's] Account shall be governed by the laws of the State of California (regardless of the choice of law rules thereof), except to the extent governed by the federal securities laws, FINRA Rules, and the regulations, customs and usage of the exchanges or market (and its clearing house) on which transactions are executed.

(*Id.* § 37.K (alteration added)).

The Customer Agreement is attached to the Complaint.

## III.    The Meme Stock Short Squeeze

### a.  The Short Squeeze Drives Volatility and Large Daily Deposit Requirements

Plaintiffs' claims center around the rapidly shifting conditions of securities trading markets in January 2021. That month, many retail investors, including Plaintiffs, collectively began purchasing stocks that hedge funds were short selling. (*See* Am. Compl. ¶¶ 183–84). The mass rush to purchase these meme stocks upended many institutional investors' and regulators' expectations and volatilized the securities trading market.[6] (*See id.* ¶¶ 185, 191, 209, 213, 239).

---

[6] The "meme stocks" at issue in this case include GameStop Corporation (GME); Blackberry Ltd. (BB); Nokia (NOK); AMC Entertainment Holdings, Inc. (AMC); American Airlines Group, Inc. (AAL); Bed Bath & Beyond, Inc. (BBBY); Castor Maritime, Inc. (CTRM); Express, Inc. (EXPR); Koss Corporation (KOSS); Naked Brand Group Ltd. (NAKD); Sundial Growers, Inc. (SDNL); Tootsie Roll Industries, Inc. (TR); and Trivago NV (TRVG). (*See* Am. Compl. ¶ 4).

For example, the closing share price of GameStop Corporation (GME), a meme stock, increased by more than 707 percent between January 21 and January 27, 2021.  (*See id.* ¶¶ 185, 191).

The precipitously increasing value of the meme stocks resulted in a "short squeeze."  (*Id.* ¶¶ 187–88).  A short squeeze occurs when the price of a security that traders have taken short positions on begins rising, thus pressuring short traders to repurchase shares to prevent even greater losses.  (*See id.*).  In a short squeeze, investors who take long positions benefit from securities' rising prices, while short sellers risk incurring significant losses.  (*See id.* ¶ 189).  Market makers whose payments for order flow account for the majority of Robinhood's revenue were among the investors who had taken short positions on the meme stocks.  (*See id.* ¶ 190).  Thus, according to Plaintiffs, the short squeeze pitted the interests of Robinhood's retail-investor customer base against those of Robinhood's revenue-generating clients.  (*See id.*).

As the squeeze progressed, Robinhood sensed that something was awry.  One Robinhood "insider" suggested "consider[ing] the risks our customers face[,]" noting that "[a]lthough we don't have a straightforward obligation here because our customers are self directed, the perception is that they are relatively inexperienced[.]"  (*Id.* ¶ 195 (alterations added; emphases omitted)).  On January 26, 2021, Jim Swartwout, Robinhood Securities' President and COO, told others: "I sold my AMC today.  FYI — tomorrow morning we are moving GME to 100% - so you are aware."  (*Id.* ¶ 12 (quotation marks omitted)).

---

Throughout the Complaint, Plaintiffs refer to these stocks as the "Suspended Stocks," while Defendants call them "meme stocks," borrowing the phrase assigned to the stocks by popular and social media.  At the time the market volatility began in January 2021, Robinhood had not yet suspended trading on its platform.  Thus, the Court refers to the stocks as "meme stocks" here but alternates between the phrases "meme stocks" and "suspended stocks" as contextually appropriate.

CASE NO.  21-02989-MDL-ALTONAGA/Torres

Both AMC and GME are meme stocks.  (*See id.* ¶ 4).  On January 27, 2021, Robinhood broke its record for single-day app downloads and became the number one app on the Apple App Store for the first time.  (*See id.* ¶ 203).

The ongoing market volatility exposed Robinhood Securities to wildly fluctuating daily deposit requirements.  On January 25, 2021, the NSCC informed Robinhood Securities that it had a deposit surplus exceeding $11 million.  (*See id.* ¶ 208).  Just two days later, the firm had a deposit *deficit* of roughly $407 million.  (*See id.* ¶ 213).

This volatility culminated early the next morning — January 28, 2021 — when the NSCC advised Robinhood Securities that its deposit deficit had ballooned to *more than $3 billion*.  (*See id.* ¶ 215).  The NSCC's notice also warned that "[i]f an intraday call is made, all deficits must be received within one hour of the notification[.]"  (*Id.* (alterations added; emphasis omitted)).  Markets would not open for several more hours.  (*See id.*; Resp. 23).  In an internal communication, a Robinhood employee said, "We aren't paying $3B worth."  (Am. Compl. ¶ 219 (emphasis and quotation marks omitted)).

Plaintiffs suggest that Robinhood was never in real danger of having to pay the initial $3 billion deficit because "[t]he DTCC was willing to work with Robinhood, adjust the premiums, and not let it fail."  (*Id.* ¶ 218 (alteration added); *see also id.* ¶ 234).  The morning of January 28, Robinhood Markets Chief Operating Officer David Dusseault told colleagues in a Slack chat that Robinhood was "to [sic] big for [the NSCC] to actually shut us down."  (*Id.* ¶ 6 (second alteration added; emphasis, footnote call number, and quotation marks omitted)).

**b. Robinhood's Position Closing Only ("PCO") Policy**

Several hours after receiving the NSCC's notice, but before markets opened for the day, Robinhood elected to prohibit further purchases of some, but not all, of the meme stocks.[7]  (*See id.* ¶¶ 219–20).  Although Plaintiffs allege that Swartwout, in his capacity as COO of Robinhood Securities, made the ultimate decision to restrict these stock purchases (*see id.* ¶ 28), they at times suggest that all three Defendants collectively made the decision (*see id.* ¶ 219).

The initial restriction on purchases of the meme stocks was a "position closing only" or "PCO" restriction.  (*Id.* ¶¶ 7, 15–16, 219–20, 240, 247).  A PCO restriction permits customers to close out their positions on the restricted stocks by selling their holdings but prohibits them from purchasing new shares.  (*See id.* ¶¶ 3, 7).  The initial PCO restriction affected Plaintiffs.  They and other Robinhood customers could not purchase shares of the meme stocks covered by the restriction on January 28.  (*See id.* ¶¶ 240–41).  And Robinhood notified those customers who had placed orders to purchase shares of those stocks the day before that their orders were cancelled.  (*See id.* ¶¶ 242–44).

Markets still had not opened on January 28 when the NSCC informed Robinhood Securities that it had waived the excess capital premium charge for the day, decreasing Robinhood Securities' deposit deficit to $1.4 billion.  (*See id.* ¶ 223).  Shortly after Robinhood Securities received the NSCC's notice, Robinhood Securities' Clearing Operations Manager wrote in a note, "We don't have that either."  (*Id.* ¶ 224 (quotation marks omitted)).  The NSCC reduced Robinhood's deposit deficit "despite no change in the underlying factors that go into a calculation of the risk of the"

---

[7] The stocks covered by this initial restriction included GameStop Corporation; Blackberry Ltd.; Nokia, AMC Entertainment Holdings, Inc.; Bed Bath & Beyond, Inc.; Express, Inc.; Koss Corporation; and Naked Brand Group Ltd.  (*See* Am. Compl. ¶ 220).

meme stocks.  (*Id.* ¶ 223).  The NSCC then further reduced the firm's net deposit requirement — again before markets opened for the day — to roughly $734 million.  (*See id.* ¶ 225).

Robinhood met its revised deposit requirements shortly after 9 a.m. EST that morning. (*See id.* ¶ 235).  Yet Robinhood kept its initial PCO restriction in place.  (*See id.*).  In the meantime, Robinhood Securities rushed to raise enough cash to meet clearinghouses' rapidly evolving deposit requirements.  (*See id.* ¶¶ 226–34).  The firm managed to round up roughly $3.4 billion in a few days, including hundreds of millions of dollars borrowed from its parent, Robinhood Markets. (*See id.* ¶¶ 226–34, 265).  Robinhood Securities drew some of these funds from several revolving, unsecured lines of credit with Robinhood Markets worth $550 million.  (*See id.* ¶¶ 99, 232).

Throughout the next week, Robinhood adjusted the restrictions placed on users.  Later on January 28, Robinhood applied its PCO restriction to all of the meme stocks, citing "current market volatility."  (*Id.* ¶ 247 (quotation marks omitted); *see id.* ¶ 248).  It raised margin requirements — the amount of the purchase price that an investor must pay in cash — for certain securities.  (*See id.* ¶ 249).  It also imposed limitations on long option contracts and capped the numbers of shares and options contracts that a user could hold in some securities.  (*See id.* ¶ 259).  On January 29, Robinhood permitted customers to purchase limited shares of most of the suspended stocks.  (*See id.* ¶ 261).[8]

The next day, the SEC released an investor alert summarizing the risks associated with short-term trading based on recommendations made on social media.  *See* SEC, *Thinking About Investing in the Latest Hot Stock*? (Jan. 30, 2021), https://www.sec.gov/oiea/investor-alerts-and-bulletins/risks-short-term-trading-based-social-media-investor-alert (hereinafter SEC Invs. Alert).

---

[8] The only meme stock not covered by this restriction was Castor Maritime, Inc.  (*See* Am. Compl. ¶¶ 4, 261).

The Alert warned that "broker-dealers may reserve the ability to reject or limit customer transactions[,]" especially when "a transaction presents certain associated compliance or legal risks." *Id.* (alteration added).  It also noted that the flexibility to impose such restrictions "is typically discussed in the customer account agreement."[9]  *Id.*

Robinhood lifted all purchasing restrictions on February 5.  (*See* Am. Compl. ¶ 266).  Plaintiffs acknowledge that other broker-dealers imposed trading restrictions during the same week.  (*See id.* ¶¶ 252–53).  But they assert that Robinhood's restrictions lasted longer and swept more broadly than those implemented by its peers.  (*See id.*).

Robinhood publicly explained its decision to impose the PCO restrictions.  In a January 28, 2021 blog post, Robinhood Markets' Chief Executive Officer, Vlad Tenev, suggested that Robinhood had imposed the restrictions because of "market volatility[.]"  (*Id.* ¶ 235 (alteration added; quotation marks omitted)).  Tenev later testified before Congress that Robinhood imposed the restrictions "[i]n the face of . . . unprecedented volatility . . . to facilitate compliance with clearinghouse deposit requirements."[10]  *Hearing Before the H. Comm. on Fin. Servs.*, 117th Cong. 8 (2021) (statement of Vlad Tenev, Chief Executive Officer, Robinhood Markets, Inc.) (alterations added),  https://financialservices.house.gov/uploadedfiles/hhrg-117-ba00-wstate-tenevv-20210218.pdf.

---

[9] Federal Rule of Evidence 201(b)(2) allows the Court to take judicial notice of the SEC's statement.

[10] The Amended Complaint references portions of Tenev's testimony.  (*See* Am. Compl. ¶ 235).  The Court takes judicial notice of Tenev's full statement to Congress under Federal Rules of Evidence 201 (b)(2) and (d).  *See D.A.M. v. Barr*, 474 F. Supp. 3d 45, 55 n.12 (D.D.C. 2020); *see also In re Healthsouth Corp. Secs. Litig.*, No. CV-98-J-2634-S, 2000 WL 34211319, at *2 (N.D. Ala. Dec. 13, 2000) (taking judicial notice of congressional testimony on motion to dismiss).  Plaintiffs have neither contested Defendants' citation to Tenev's full testimony (*see* Mot. 18 n.6) nor requested to be heard further on the matter, *see* Fed. R. Evid. 201(e).  *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1279 (11th Cir. 1999) ("The prohibition against going outside of the facts alleged in the complaint protects against a party being caught by surprise when documents outside the pleadings are presented at that early stage.  However[,] in the instant case, . . . Plaintiffs were well aware of the [documents]." (alterations added)).

Robinhood Markets made similar statements in its most recent SEC registration statement. (*See* Resp. 24 (citation omitted)).  In that statement, Robinhood Markets suggested if it failed to meet clearinghouse deposit requirements, it could "be forced to restrict trading in certain stocks[.]"[11]  Robinhood Markets, Inc., Registration Statement (Form S-1) 37 (July 1, 2021) (alteration added); (*see also* Am. Compl. ¶ 178).

## IV.    Procedural History

On April 1, 2021, the U.S. Judicial Panel on Multi-District Litigation consolidated various actions relating to the events of January 2021 into this Multi-District Litigation.  (*See* Transfer Order [ECF No. 1]).  The parties later filed a Joint Status Report that contemplated the filing of "Master Complaints" in this tranche and others.  (Joint Status Report [ECF No. 322] 2).  The parties stipulated that the "Master Complaints will supersede the individual complaints filed to date and will constitute the operative pleadings with respect to those claims pursuant to Fed. R. Civ. P. 8."  (*Id.*).

The Court then entered an Order providing deadlines for filing a master complaint in each tranche.  (*See* June 3, 2021 Order [ECF No. 323] 1–2).  In the Order, the Court partially stayed discovery.  (*See id.* 2).  The partial stay required Defendants to produce to Plaintiffs the same records already produced to Congress and other governmental entities but halted further production.  (*See id.*).  That discovery turned out to be substantial, so the Court granted Plaintiffs' request for an extension of time to amend their initial Complaint to allow them to review the many

---

[11] The Court likewise takes judicial notice of this statement from the S-1 form that Robinhood submitted to the SEC on July 1, 2021, because Plaintiffs have quoted it in their filings, and it is not subject to reasonable dispute.  *See* Fed. R. Evid. 201(b)(2), (d); *see also Bryant*, 187 F.3d at 1278–79 (taking judicial notice of SEC filing because "SEC filings are generally recognized as the most accurate and authoritative source of public information about a company").

documents Defendants produced.  (*See* Pls.' Unopposed Motion for Extension of Time [ECF No. 334] 1; July 8, 2021 Order [ECF No. 335] 1).

Plaintiffs filed an initial Complaint [ECF No. 359] on July 27, 2021.  After Defendants moved to dismiss it (*see* [ECF No. 406]), Plaintiffs filed the Amended Complaint on September 21, 2021.  (*See* Am. Compl. [ECF No. 409]).  Focusing on the PCO restrictions that Robinhood placed on customer accounts between January 28 and February 5, 2021, the Amended Complaint asserts seven causes of action on behalf of Plaintiffs and a putative class.

In Counts I and II, Plaintiffs allege negligence and gross negligence, respectively, against all three Defendants.[12]   (*See id.* ¶¶ 282–301).  Count III claims that Robinhood Securities and Robinhood Financial breached fiduciary duties owed to Plaintiffs.  (*See id.* ¶¶ 302–308).  Counts IV and V assert breaches of certain implied covenants against Robinhood Securities and Robinhood Financial.  (*See id.* ¶¶ 309–33).  Count VI alleges that Robinhood Markets tortiously interfered with Plaintiffs' business relationships with the other Defendants.  (*See id.* ¶¶ 334–41).  Finally, Count VII seeks to hold all three Defendants liable for civil conspiracy.  (*See id.* ¶¶ 342–46).

Defendants move to dismiss the Amended Complaint.  (*See* Mot.).  They argue that their duties to Plaintiffs are defined by the Customer Agreement rather than by tort law.  (*See id.* 22–26).  And because the Customer Agreement permitted Robinhood to restrict customers' abilities to trade, Defendants assert that their decision to impose the PCO restrictions did not transgress their obligations under the Agreement.  (*See id.* 12).

---

[12] The Court assumes Plaintiffs intended to sue Robinhood Markets in Counts I and II, even though neither Count expressly names Robinhood Markets as a Defendant or singles out Robinhood Markets in any of its allegations.  (*See* Am. Compl. ¶¶ 282–301).

### STANDARDS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A pleading withstands a motion to dismiss if it alleges "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).  "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (citation omitted), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012).  A complaint's "well-pled allegations must nudge the claim 'across the line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 570).

This pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  When considering a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take the factual allegations as true. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (citing *SEC v. ESM Grp., Inc.*, 835 F.2d 270, 272 (11th Cir. 1988)).  Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted).

Typically, a court must confine its review of a motion to dismiss to the four corners of the complaint, including any attached exhibits. *See Fin. Sec. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007) (citing *Brooks*, 116 F.3d at 1368).  But courts may take judicial notice of matters "not subject to reasonable dispute," including stock prices. *La Grasta v. First*

*Union Sec., Inc.*, 358 F.3d 840, 842 (11th Cir. 2004) (citations omitted); *see also* Fed. R. Evid. 201(b).

District courts must liberally grant leave to amend pleadings "when justice so requires." Fed. R. Civ. P. 15(a)(2); *see also Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001) (holding that Rule 15(a)(2) limits a district court's discretion to dismiss pleadings without leave to amend). Only a "substantial reason" for denying leave to amend will justify the denial. *Fla. Power & Light Co. v. Allis Chalmers Corp.*, 85 F.3d 1514, 1520 (11th Cir. 1996) (quoting *Shipner v. E. Air Lines, Inc.*, 868 F.2d 401, 407 (11th Cir. 1989)). A plaintiff who seeks to amend a complaint under Federal Rule of Civil Procedure 15(a)(2) must request leave by filing a written motion and setting forth the substance of the proposed amendment. *See United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1361–62 (11th Cir. 2006) (citations and footnote call number omitted).

## DISCUSSION

### I.       Choice of Law

Plaintiffs and Defendants agree that California law governs Plaintiffs' contract claims (Counts IV and V). (*See* Resp. 26 n.12; Reply 31 n.15). They disagree about what law applies to Plaintiffs' tort claims (Counts I, II, III, VI, and VII). (*See* Resp. 26–30; Reply 14–15). Defendants cite the Customer Agreement's choice-of-law clause's selection of California law to insist that California law extends to the tort claims. (*See* Reply 14–15). Plaintiffs argue that the tort claims fall outside the scope of the choice-of-law clause and Florida's "most significant relationship" test requires applying Florida law to these claims. (Resp. 28–30).

Consolidated pleadings in multidistrict litigation are generally a procedural device that facilitates streamlined litigation and does not affect the substantive rights of the parties. *See In re 21st Century Oncology Customer Data Breach Litig.*, 380 F. Supp. 3d 1243, 1258–59 (M.D. Fla.

2019) (citing *In re Takata Airbag Prod. Liab. Litig.*, 193 F. Supp. 3d 1324, 1332 (S.D. Fla. 2016)).

Thus, in multidistrict litigation, the transferee court usually must follow the choice-of-law rules of

the forum state of each transferor court.  *See id.* at 1258.  But parties to multidistrict litigation may

consent to filing a "master complaint" that supersedes the previously filed individual pleadings

and merges the transferred actions until pretrial proceedings have concluded.  *Gelboim v. Bank of*

*Am. Corp.*, 574 U.S. 405, 413 n.3 (2015).  When parties consent to filing a superseding master

complaint, the transferee court becomes the forum court, and the choice-of-law rules of the

transferee court's forum state apply.  *See In re Bridgestone/Firestone, Inc. Tires Prods. Liab.*

*Litig.*, 155 F. Supp. 2d 1069, 1078 (S.D. Ind. 2001).

      Here, the parties agreed that Plaintiffs' Complaint would supersede all previous pleadings.

(*See* Joint Status Report 2).  So, Florida's choice-of-law rules apply.

      Under Florida's choice-of-law rules, courts need not decide a choice-of-law dispute unless

a true conflict of laws exists.  *See Hatton v. Chrysler Canada, Inc.*, 937 F. Supp. 2d 1356, 1367

(M.D. Fla. 2013).  "A false conflict can exist under at least three different circumstances."  *Tune*

*v. Philip Morris Inc.*, 766 So. 2d 350, 352 (Fla. 2d DCA 2000).  Those circumstances include (1)

when the laws of the relevant jurisdictions are the same; (2) when the laws of the relevant

jurisdictions are different but would produce the same outcome; or (3) when applying one state's

law would promote the policies of that state and applying the law of another state would not

advance that state's policies.  *See id.* (citation omitted).

      This case does not present a genuine conflict of laws.  For reasons that will be explained,

California law and Florida law both require dismissal of the Amended Complaint.  *See id.* (noting

that a false conflict exists when application of different states' laws would produce the same

outcome).  Consequently, the Court need not decide whether the Customer Agreement's choice-

of-law clause applies to Plaintiffs' tort claims or what law applies to Plaintiffs' claims under Florida's "most significant relationship" test.  *See James River Ins. Co. v. Arlington Pebble Creek, LLC*, 188 F. Supp. 3d 1246, 1254 (N.D. Fla. 2016); *William Morris Endeavor Ent., LLC v. Cantor*, No. 1:11-cv-24470, 2012 WL 13014664, at *3 (S.D. Fla. Mar. 2, 2012).

Because state law applies, the Court must apply decisions of each state's highest court and, absent a decision by that court, must look to the decisions of the state's lower courts and other available data to ascertain state law.  *See West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 236–37 (1940); *U.S. Fid. & Guar. Co. v. Lee Invs. LLC*, 641 F.3d 1126, 1133–34 (9th Cir. 2011).

## II.      Negligence and Gross Negligence (Counts I and II)

Counts I and II assert claims of negligence and gross negligence, respectively, against Defendants.[13]  (*See* Am. Compl. ¶¶ 282–301).  Boiled down to their essence, the claims allege that Robinhood's way of doing business — its marketing, corporate structure, revenue model, platform features, and undertaking to provide brokerage services to customers — obligated it to make reasonable efforts to keep trading open, even "during periods of market volatility."  (*Id.* ¶ 174). Plaintiffs allege Robinhood failed to meet that obligation when it restricted Plaintiffs' abilities to trade in January 2021.  (*See id.* ¶¶ 288, 299).

Defendants seek dismissal of Counts I and II.  They argue they had no tort duty to protect Plaintiffs from economic loss.

---

[13] Defendants' asserted bases for requesting dismissal of Counts I and II — that Defendants do not owe Plaintiffs tort duties — are the same.  Under both California and Florida law, the analysis of whether a party owes a duty in negligence applies equally to negligence and gross negligence claims.  *See, e.g., Verso Paper LLC v. HireRight, Inc.*, No. 10–01959, 2012 WL 2343314, at *4 (C.D. Cal. June 19, 2012) (citations omitted); *Lamm v. State St. Bank & Tr. Co.*, 889 F. Supp. 2d 1321, 1332 (S.D. Fla. 2012).  Therefore, the Court addresses these two claims together.

CASE NO.  21-02989-MDL-ALTONAGA/Torres

### a.  California Law

"Recovery in a negligence action depends as a threshold matter on whether the defendant had 'a duty to use due care toward an interest of the plaintiff's that enjoys legal protection against unintentional invasion.'" *S. Cal. Gas Leak Cases*, 441 P.3d 881, 885 (Cal. 2019) (other alteration adopted; quotation marks and citation omitted).  The existence of a duty is a question of law.  *See Weimer v. Nationstar Mortg., LLC*, 260 Cal. Rptr. 3d 712, 720 (Cal. Ct. App. 2020) (citation omitted).

Generally, parties have no duty to protect others against purely economic losses.[14]  *See* Restatement (Third) of Torts: Liab. for Econ. Harm § 1(1) (Am. L. Inst. 2020) ("An actor has no general duty to avoid the unintentional infliction of economic loss on another.").  California follows this general principle.  In California, "liability in negligence for purely economic losses . . . is 'the exception, not the rule[.]'" *S. Cal. Gas Leak Cases*, 441 P.3d at 886 (alterations added; quoting *Quelimane Co. v. Stewart Title Guar. Co.*, 960 P.2d 513, 532 (Cal. 1998)).  "[P]urely economic losses flowing from a financial transaction gone awry[,]" in particular, "are primarily the domain of contract and warranty law or the law of fraud, rather than of negligence." *Id.* at 888 (alterations added; citation and quotation marks omitted).

The rationale for prohibiting tort recoveries for purely economic losses turns on a fundamental concern of tort law: promoting socially responsible behavior while also avoiding indeterminate, limitless liability.  *See id.* at 896.  The prohibition also keeps important distinctions between contract and tort law intact.  *See* Restatement (Third) of Torts: Liab. for Econ. Harm § 1 cmt. c(2) (Am. L. Inst. 2020).

---

[14] California law defines a purely economic loss as a "pecuniary or commercial loss that does not arise from actionable physical, emotional, or reputational injury to persons or physical injury to property." *S. Cal. Gas Leak Cases*, 441 P.3d at 885 (quotation marks and citation omitted).

CASE NO.  21-02989-MDL-ALTONAGA/Torres

Like many other rules, the rule that parties generally need not protect others from suffering economic losses has exceptions.  Relevant here, a plaintiff may recover purely economic losses in a negligence action if a "special relationship" exists between the plaintiff and defendant.  *Aas v. Superior Ct.*, 12 P.3d 1125, 1131 (Cal. 2000) (citation and quotation marks omitted), *superseded by statute on other grounds as recognized in S. Cal. Gas Leak Cases*, 441 P.3d at 888.

The "special relationship" exception was announced in *Biakanja v. Irving*, 320 P.2d 16 (Cal. 1958).  In *Biakanja*, the California Supreme Court held that the intended beneficiary of a failed testamentary gift could recover from a notary public who negligently prepared the will.  *See id.* at 19.  The notary owed a contractual duty only to the testator — not to the plaintiff.  *See id.* at 17.  Yet, the court held that the notary owed a tort duty to the plaintiff "even though they were not in privity of contract" and set out a case-by-case test for determining whether "the defendant will be held liable to a third person not in privity[.]"  *Id.* at 18–19 (alteration added).  The test requires consideration of six factors: (1) the extent to which the transaction was intended to affect the plaintiff; (2) the foreseeability of harm to the plaintiff; (3) the degree of certainty that the plaintiff suffered injury; (4) the closeness of the connection between the defendant's conduct and the injury; (5) the moral blameworthiness of the defendant's conduct; and (6) the policy of preventing future harm.  *See id.* (citations omitted).

Twenty-one years later, the California Supreme Court applied the six factors and held that a special relationship existed in a different scenario.  In *J'Aire Corporation v. Gregory*, 598 P.2d 60 (Cal. 1979), the court held that the tenant of a building used as a restaurant could sue a contractor hired by the building's owner in negligence for failing to timely complete the construction project.  *See id.* at 64.  It explained "that a contractor owes a duty of care to the tenant of a building undergoing construction work to prosecute that work in a manner which does not cause undue

injury to the tenant's business, where such injury is reasonably foreseeable." *Id.*  Addressing concerns about creating unwieldy liability, the court maintained that its six-factor test "and ordinary principles of tort law such as proximate cause are fully adequate to limit recovery without the drastic consequence of an absolute rule which bars recovery in all such cases." *Id.* at 65 (citation omitted).

In later years, California's lower appellate courts have expanded the reach of the special relationship test.  Several of these courts have held that the six-factor test applies even when the plaintiff and defendant are parties to a contract.  *See, e.g.*, *N. Am. Chem. Co. v. Superior Ct.*, 69 Cal. Rptr. 2d 466, 477 (Cal. Ct. App. 1997); *Ott v. Alfa-Laval Agri, Inc.*, 37 Cal. Rptr. 2d 790, 801 (Cal. Ct. App. 1995); *Pisano v. Am. Leasing*, 194 Cal. Rptr. 77, 79 (Cal. Ct. App. 1983).  In *North American Chemical Company v. Superior Court*, the California Court of Appeal stated that "[a] contract for the performance of services . . . necessarily carries with it both the reasonable expectation and implied at law promise that it will be performed with reasonable care."  69 Cal. Rptr. 2d at 478 (alterations added).  Nonetheless, the court held that "the reasoning of *J'Aire* and the six criteria on which it relies will determine the existence of the necessary special relationship[,] and it does not matter whether the plaintiff and defendant are in privity or not." *Id.* (alteration added).

The California Supreme Court has never definitively held that the special relationship test applies to negligence claims for economic losses regardless of privity.  In *Aas v. Superior Court*, the California Supreme Court considered whether homeowners could recover in negligence for construction defects that had not yet caused property damage.  *See* 12 P.3d at 1128.  The court recognized that at least some of the plaintiffs were in privity of contract with one defendant.  *See id.* at 1135.  It then rejected these plaintiffs' argument that privity *supported* a finding that the

defendant owed them tort duties.  *See id.*

The *Aas* court also observed that "[t]he lower courts have . . . . applied *J'Aire* to cases in which privity did exist[,]" even though it stopped short of endorsing that expansion.  *Id.* at 1137 (alterations added).  Ultimately, the court held that the homeowners could not recover for the cost of repairing construction defects that had not yet caused property damage.  *See id.* at 1128.  Its precise rationale for this holding is not obvious.  On the one hand, the court stated it was "[a]pplying settled law limiting the recovery of economic losses in tort actions[,]" citing a previous decision that forbade recovery without analyzing the six factors set out in *Biakanja*. *Id.* (alterations added; citing *Seely v. White Motor Co.*, 403 P.2d 145 (Cal. 1965)).  On the other hand, the court concluded the plaintiffs could not recover under the special relationship exception after applying the six factors.  *See id.* at 1137–43.

Later, in *Bily v. Arthur Young & Company*, 834 P.2d 745 (Cal. 1992), the California Supreme Court held that investors in a failed company could not recover from the company's auditor financial losses they allegedly suffered because of the auditor's negligent preparation of a public financial report.  *See id.* at 761.  The court conceded the plaintiffs suffered a foreseeable injury, but it also explained that foreseeability "is but one factor to be considered in the imposition of negligence liability" and "[f]oreseeability is endless because it, like light, travels indefinitely in a vacuum." *Id.* at 761–62 (alteration added; other alterations adopted; quotation marks and citation omitted).

Then came the *Southern California Gas Leak Cases*.  There, the California Supreme Court considered whether the special relationship exception could support claims asserted by local businesses for purely economic losses they suffered because of their proximity to a natural gas leak.  *See* 441 P.3d at 883.  Discussing *J'Aire* and *Biakanja*, the court explained that a "special

relationship" is one where "the plaintiff was an intended beneficiary of *a particular* transaction but was harmed by the defendant's negligence in carrying it out."  *Id.* at 887 (emphasis added).

The court then held that the defendant did not owe any duty to avoid inflicting economic losses on the plaintiffs.  *See id.* at 895–96.  In doing so, it neither expressly applied the six factors of the special relationship test nor overruled *Biakanja* and *J'Aire*.  Instead, the court explained that "[d]eciding whether to impose a duty of care turns on a careful consideration of 'the sum total' of the policy considerations at play, not a mere tallying of some finite, one-size-fits-all set of factors." *Id.* at 887 (alteration added; citations and quotation marks omitted).

The court next addressed the purpose of duty as a threshold requirement in negligence actions.  It reinforced the holding of *Bily*, explaining that "[i]n requiring more than mere foreseeability for imposing a duty of care in *Bily*, we appreciated the need to safeguard the efficacy of tort law by setting meaningful limits on liability."  *Id.* (alteration added; citation omitted).  In like vein, the court extensively quoted the then-draft Restatement (Third) of Torts and its commentary, noting the "widespread judicial concern that purely economic losses 'proliferate more easily than losses of other kinds'" and thus "threaten 'liabilities that are indeterminate and out of proportion to a defendant's culpability[.]'"  *Id.* at 892 (alteration added; other alterations adopted; citation omitted).  The court went on: "Only when the foregoing considerations are weak or absent . . . does a duty to guard against purely economic losses exist under the Restatement approach to negligence claims."  *Id.* (alteration added; citation omitted).

Now, this case.  Plaintiffs suggest they have a special relationship with Defendants *as a matter of law* simply because the Customer Agreement is one for services.  (*See* Resp. 33–34 (citations omitted)).  Put differently, they contend that the Court need not apply the six-factor *Biakanja* test to conclude that they have alleged a special relationship.  (*See id.*).  Yet, the case

Plaintiffs rely on — *North American Chemical* — does not support their argument.  There, the Court of Appeal held that a special relationship existed only after applying the six factors.  *See* 69 Cal. Rptr. 2d at 478 ("[T]he reasoning of *J'Aire* and the six criteria on which it relies will determine the existence of the necessary special relationship[.]" (alterations added)).  Plaintiffs' argument also ignores the principle that "conduct . . . becomes tortious when it also violates a duty independent of the contract arising from principles of tort law."  *Aas*, 12 P. 3d at 1136 (alteration added; citation omitted).

Defendants likewise seek to avoid application of the special relationship test.  They argue that no special relationship can exist when parties are in privity of contract.  (*See* Reply 23).  As support, they point to a long list of decisions by federal courts that have reached that conclusion.  (*See id.* n.9); *see also Grey Fox, LLC v. Plains All Am. Pipeline, L.P.*, No. cv 16-3157, 2019 WL 4196066, at *7 n.5 (C.D. Cal. Apr. 8, 2019); *Body Jewelz, Inc. v. Valley Forge Ins. Co.*, 241 F. Supp. 3d 1084, 1093 (C.D. Cal. 2017); *Elsayed v. Maserati N. Am., Inc.*, 215 F. Supp. 3d 949, 963 (C.D. Cal. 2016); *Barrier Specialty Roofing & Coatings, Inc. v. ICI Paints N. Am., Inc.*, No. cv-F-07-1614, 2008 WL 1994947, at *8 (E.D. Cal. May 6, 2008); *City of San Diego v. Amoco Chem. Co.*, No. Civ. 98-0474-E, 1999 WL 33548157, at *4 (S.D. Cal. Sept. 9, 1999).[15]  For two reasons, Defendants' position is misguided.

First, Defendants fail to cite a single decision by a California *state* court holding that a special relationship cannot exist when parties are in privity.  California's intermediate courts of appeal generally agree that "privity or the absence of privity is not a controlling factor in *J'Aire*-type cases[,]" at least when the contract is one for *services*.  *Ott*, 37 Cal. Rptr. 2d at 801 (alteration

---

[15] As Plaintiffs point out, many federal courts have reached the opposite conclusion too.  *See Whitesides v. E*Trade Secs., LLC*, No. 20-cv-05803, 2021 WL 930794, at *5 (N.D. Cal. Mar. 11, 2021) (collecting cases).

added); *see also N. Am. Chem. Co.*, 69 Cal. Rptr. 2d at 477–78.  Only one state appellate court has

held otherwise.  *See Stop Loss Ins. Brokers, Inc. v. Brown & Toland Med. Grp.*, 49 Cal. Rptr. 3d

609, 613–14 (Cal. Ct. App. 2006).  Certainly, the consensus of a majority of California's

intermediate appellate courts is "a datum for ascertaining state law which is not to be disregarded

by a federal court unless it is convinced by other persuasive data that the highest court of the state

would decide otherwise."  *West*, 311 U.S. at 237.

Second, Defendants have not offered "other persuasive data" that the California Supreme

Court would decide differently.  Defendants contend that the California Supreme Court has applied

the six-factor special relationship test only when parties are *not* in privity of contract.  (*See* Reply

23).  But recall *Aas*.  The *Aas* court recognized that at least some of the plaintiffs had entered a

service contract with a defendant, *see* 12 P.3d at 1135, and yet it applied the special relationship

test to determine whether the defendants owed plaintiffs a duty, *see id.* at 1137–43.

The *Aas* court's application of the special relationship test may or may not have been

*dictum*.  Still, the court *did* apply the test to parties in privity of contract.  And although one

intermediate appellate court in California has held that privity of contract between the plaintiff and

defendant bars a negligence claim for economic losses, the majority opinion in that case appears

to have overlooked the *Aas* court's application of the six factors.  *See Stop Loss*, 49 Cal. Rptr. 3d

at 613–15.[16]  The concurring opinion recognized this omission.  *See id.* at 629 (Pollak, J.,

concurring).  Thus, on balance, *Aas* and the decisions of a majority of state appellate courts in

California suggest that privity does not preclude the existence of a special relationship.  *See*

*Whitesides*, 2021 WL 930794, at *6 ("[T]he Court predicts that the California Supreme Court

---

[16] In a recent, non-precedential decision, the Ninth Circuit applied *Stop Loss* and ruled that plaintiffs who
were not in privity with the defendant could not recover for economic losses in negligence.  *See Berk v.
Coinbase, Inc.*, 840 F. App'x 914, 915–16 (9th Cir. 2020).

would hold that courts must examine the particular policy considerations at play under the facts of each case to determine if a special relationship exists[.]"  (alterations added)).

That said, the Customer Agreement remains *relevant*.  Courts may consider the existence of a contract as one factor in "the sum total of the policy considerations at play" in determining whether the parties' relationship warrants imposition of a tort duty.  *S. Cal. Gas Leak Cases*, 441 P.3d at 887 (citation and quotation marks omitted).  The California Supreme Court's endorsement of the Restatement (Third) supports exactly this approach.  *See id.* at 891–92.  As the Restatement (Third) explains, "[r]isks of economic loss tend to be especially well suited to allocation by contract" because "[c]ontracts . . . are governed by a body of commercial law that has been developed to address economic loss, and that tends to be better suited for that task than the law of torts."  Restatement (Third) of Torts: Liab. for Econ. Harm § 1 cmt. c(2) (Am. L. Inst. 2020) (alterations added); *see also Sheen v. Wells Fargo Bank, N.A.*, 250 Cal. Rptr. 3d 677, 684 (Cal. Ct. App. 2019) ("The law of contract and the law of restitution . . . . provide a more extensive and finely tuned apparatus for [allocating economic losses] than the law of torts, which has developed primarily to address injuries that occur outside contractual relationships." (alterations added; citation and quotation marks omitted)).

Also relevant is the California Supreme Court's treatment of the special relationship exception since *J'Aire.*  Only two of that court's post-*J'Aire* decisions have extended the special relationship exception to new situations.  And both situations involved circumstances vastly different from those present here.  *See, e.g.*, *Centinela Freeman Emergency Med. Assocs. v. Health Net of Cal., Inc.*, 382 P.3d 1116, 1131 (Cal. 2016) (holding that health care service plans owe duty to noncontracting emergency service providers when entering into contracts delegating financial responsibility for emergency services to individual practice associations); *Christensen v. Superior*

*Ct.*, 820 P.2d 181, 193 (Cal. 1991) (holding that defendants owed duty to close family members for whose benefit funeral services were intended to avoid mishandling decedent's remains). Today, commentators question *J'Aire* and *Biakanja*'s continuing import.  *See, e.g.*, Restatement (Third) of Torts: Liab. for Econ. Harm § 1 reporter's note e (Am. L. Inst. 2020) ("*J'Aire* has not been overruled, but the extent of its vitality in California is questionable, and it has not been influential elsewhere." (citation omitted)); David Gruning, *Pure Economic Loss in American Tort Law: An Unstable Consensus*, 54 Am. J. Comp. L. 187, 194 n.26 (2006) ("*J'Aire*, while still authority in California, is even taught as an outlier." (citation omitted)).

    With these principles in mind, the Court considers the viability of Counts I and II under the special relationship exception.  The first of the six *Biakanja* factors examines the extent to which the transaction was intended to affect the plaintiff.  *See* 320 P.2d at 19.  Plaintiffs do not allege that the PCO restriction applied only to them: the restriction applied to *all users* of Robinhood's platform.  For that reason, the first factor disfavors finding a special relationship here. *See Whitesides*, 2021 WL 930794, at *6 (concluding that first factor did not support special relationship because "Plaintiffs in this case do not plead intent particular to them, as opposed to all users of E*TRADE's trading platform"); *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 996 F. Supp. 2d 942, 972 (S.D. Cal. 2014) (concluding that first factor weighed against special relationship because "Plaintiffs have failed to allege why the transactions at issue were intended to affect Plaintiffs 'in a way particular to them, as opposed to all potential' consumers" (alteration adopted; quoting *Greystone Homes, Inc. v. Midtec, Inc.*, 86 Cal. Rptr. 3d 196 (Cal. Ct. App. 2008))); *Ott*, 37 Cal. Rptr. 2d at 801 (concluding that first factor weighed against special relationship because nothing suggested action "particular to the plaintiffs, as opposed to all potential purchasers of the equipment").

The second factor is foreseeability.  *See Biakanja*, 320 P.2d at 19.  The Court assumes Plaintiffs have plausibly alleged that the market volatility and other circumstances that led Robinhood to impose the PCO restrictions were foreseeable.  The question is how much weight foreseeability deserves in cases involving only economic harm.  The answer from the California Supreme Court is clear: not much.  That is because "although foreseeability 'may set tolerable limits for most types of physical harm, it provides virtually no limit on liability for nonphysical harm.'"  *S. Cal. Gas Leak Cases*, 441 P.3d at 887–88 (quotation marks omitted; quoting *Bily*, 834 P.2d 745).

The third and fourth factors involve the degree of certainty that Plaintiffs were injured and the closeness of the connection between their injury and Defendants' conduct, respectively.  *See Biakanja*, 320 P.2d at 19.  Plaintiffs have adequately alleged the value of their meme stock holdings declined after Robinhood implemented the PCO restriction.  But the link between that decline and Defendants' conduct is attenuated at best.

Plaintiffs allege that the rapidly rising value of the meme stocks created extremely volatile market conditions.  (*See, e.g.*, Am. Compl. ¶¶ 191, 209).  Those conditions, in turn, presented significant compliance risks to brokers, as the SEC recognized.  *See* SEC Invs. Alert.  Robinhood allegedly "fueled" the volatile conditions through marketing and other efforts.  (*See* Am. Compl. ¶¶ 5, 9, 105).

These allegations discount the self-directed nature of Robinhood investment accounts and the many investment decisions that drove the volatile market conditions.  Even accepting Plaintiffs factual allegations as true, it is evident that the January 2021 short squeeze was caused by the aggregation of many individual decisions by independent decision-makers.  Robinhood's actions were just one link in the causal chain.  *See Whitesides*, 2021 WL 930794, at *7.  And, as the SEC

noted, Plaintiffs' investments in the meme stocks were risky to begin with.  *See* SEC Invs. Alert.

The fifth *Biakanja* factor — moral blameworthiness — favors Defendants.  Robinhood operates in a heavily regulated market under the daily risk of burdensome compliance requirements.  Faced with market conditions that Plaintiffs admit were highly volatile, Defendants elected to *partially* limit trading in a few stocks that were driving significant compliance risks for only a short period of time.  Both the Customer Agreement and the SEC expressly permitted the types of trading restrictions that Defendants implemented.  (*See* Cust. Agmt. 5.F); SEC Invs. Alert.  And notably, Plaintiffs admit other brokers restricted trading of the same stocks, even though they allege that these brokers did not go quite as far as Robinhood.  (*See, e.g.*, Am. Compl. ¶ 253; Resp. 38 n. 19).

Even when drawing all reasonable inferences to benefit Plaintiffs, the Amended Complaint's factual allegations suggest that Robinhood decided to exercise a contractual right under difficult circumstances.  (*See* Am. Compl. ¶¶ 191–226, 233–40).  Plaintiffs' attempt to hold Defendants liable nonetheless would "threaten 'liabilities that are indeterminate and out of proportion to [Defendants'] culpability[.]'"  *S. Cal. Gas Leak Cases*, 441 P.3d at 892 (alterations added; citation omitted); *see also Mega RV Corp. v. HWH Corp.*, 170 Cal. Rptr. 3d 861, 881 (Cal. Ct. App. 2014) (holding that fifth factor weighed in favor of defendant because "there was certainly no evidence of reckless or purposeful behavior, or of anything other than economic damages").

The policy of preventing future harm is the sixth *Biakanja* factor, and it, too, favors Defendants.  Holding Defendants liable for their conduct in January 2021 would likely deter brokers from imposing trading restrictions in the future.  It might also discourage the provision of brokerage services altogether.  *See S. Cal. Gas Leak Cases*, 441 P.3d at 892 (concluding that liability for economic losses could create "exaggerated pressure to avoid an activity altogether"

(citation and quotation marks omitted)).

Indeed, the duty that Plaintiffs seek to impose is remarkably broad: they assert Defendants owe a tort duty to permit trading in all securities, at all times, to all "foreseeable" Plaintiffs, even during periods of market volatility.  (Resp. 31; Am. Compl. ¶ 174).  Plaintiffs offer virtually no limiting principle to this theory of duty, other than to point to Robinhood's retail investor-focused marketing tactics.  (*See* Am. Compl. ¶ 9, 115, 126, 202).  All the while, they do not cite a single California case holding that a company's marketing or business philosophy created an independent duty in tort — much less a duty of the breadth that Plaintiffs propose.

For similar reasons, "the sum total of the policy considerations at play" in this case warrant dismissal.  *See S. Cal. Gas Leak Cases*, 441 P.3d at 886 (citations and quotation marks omitted).  Every investor who uses Robinhood's platform agrees to enter a contract — the Customer Agreement.  The Customer Agreement permits Robinhood Securities and Robinhood Financial to restrict trading.  (*See* Cust. Agmt. § 5.F).  The primary regulator of securities markets in the United States — the SEC — recognizes that many brokers retain rights to impose similar restrictions.  *See* SEC Invs. Alert.  And California law favors contract law over tort law as an avenue for allocating economic losses absent extraordinary circumstances.

The California Supreme Court has explained:

> When two parties make a contract, they agree upon the rules and regulations which will govern their relationship; the risks inherent in the agreement and the likelihood of its breach.  The parties to the contract in essence create a mini-universe for themselves, in which each voluntarily chooses his contracting partner, each trusts the other's willingness to keep his word and honor his commitments, and in which they define their respective obligations, rewards and risks.  Under such a scenario, it is appropriate to enforce only such obligations as each party voluntarily assumed, and to give him only such benefits as he expected to receive; this is the function of contract law.

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454, 461 (Cal. 1994) (alteration

adopted; quotation marks omitted).

Here, Plaintiffs repackage their dissatisfaction with the PCO restrictions as negligence claims.[17]  In doing so, they seek to obtain precisely what the Customer Agreement that they freely entered denied: a right to unrestricted trading.  They also ask the Court to extend California tort law into uncharted waters by imposing on Robinhood a tort duty to all foreseeable investors to permit trading of any security, at any time.  California law does not endorse such freewheeling liability, and it is not the Court's role to second-guess that policy determination.

Counts I and II fail under California law.

### b.  Florida Law

Negligence claims under Florida law involve four elements: duty, breach, causation, and damages.  *See Virgilio v. Ryland Grp.*, 680 F.3d 1329, 1339 (11th Cir. 2012) (citation omitted). "[T]he existence of a duty under [Florida] negligence law is a minimum threshold legal requirement that opens the courthouse doors . . . and is ultimately a question of law for the court rather than a jury."  *Williams v. Davis*, 974 So. 2d 1052, 1056 n.2 (Fla. 2007) (alterations added; citation omitted).

Florida law generally does not obligate parties to avoid causing economic loss.  *See Virgilio*, 680 F.3d at 1339–40; *see also Monroe v. Sarasota Cnty. Sch. Bd.*, 746 So. 2d 530, 531

---

[17] The Court's analysis applies equally to all three Defendants, even though Robinhood Markets is not a party to the Customer Agreement.  Plaintiffs' negligence claims against Robinhood Markets allege that Robinhood Markets controlled its subsidiaries' conduct or at least collaborated with its subsidiaries in implementing the PCO restriction.  (*See* Am. Compl. ¶¶ 95–100, 194, 214, 226–29).  Nothing in the Customer Agreement prevented Robinhood Markets from taking these actions.

More fundamentally, Robinhood Markets' involvement with its subsidiaries' affairs does not change the essentials of the duty analysis: Plaintiffs suffered only economic losses, the Customer Agreement defines Plaintiffs' rights, and each of the six *Biakanja* factors applies to Robinhood Markets the same way it would to Robinhood Financial and Robinhood Securities.  Robinhood Markets' status as a non-party to the Customer Agreement means, if anything, that its relationship with Plaintiffs was more distant and attenuated than that of its subsidiaries.  Finally, neither Count I nor Count II contains allegations specific to Robinhood Markets or clearly names Robinhood Markets as a Defendant.  (*See id.* ¶¶ 282–301).

(Fla. 2d DCA 1999) ("[A]s a general rule, . . . bodily injury or property damage is an essential element of a cause of action in negligence." (alterations added)).  "[T]o proceed on a common law negligence claim based solely on economic loss, there must be some sort of link between the parties or some other extraordinary circumstance that justifies recognition of such a claim." *Tank Tech, Inc. v. Valley Tank Testing, LLC*, 244 So. 3d 383, 393 (Fla. 2d DCA 2018) (alteration added; citing *Monroe*, 746 So. 2d at 531; other citations omitted).  Courts faced with these claims must "examine the relationship between the parties to determine whether it warrants creating a duty to protect economic interests outside contract and statutory law." *Monroe*, 746 So. 2d at 534 n.6.

Plaintiffs do not agree that these principles apply.  They contend that the Florida Supreme Court's decision in *Tiara Condominium Association, Inc. v. Marsh & McLennan Companies*, 110 So. 3d 399 (Fla. 2013), confined Florida law's skepticism of negligence claims for economic losses to the products liability context.  (*See* Resp. 33).

In *Tiara*, a majority of the Florida Supreme Court held that the "economic loss rule" applies only to products liability claims.  110 So. 3d at 407.  The court criticized what it called the "unprincipled" expansion of the rule beyond its products-liability roots, including to claims for professional malpractice, fraudulent inducement, and negligent misrepresentation.  *Id.* at 406. Several justices dissented from the court's decision to limit the economic loss rule.  *See id.* at 410–11 (Polston, C.J., dissenting); *id.* at 411–14 (Canady, J., dissenting).  Justice Pariente concurred. *See id.* at 407–10 (Pariente, J., concurring).  She insisted that the court's holding was "neither a monumental upsetting of Florida law nor an expansion of tort law at the expense of contract principles." *Id.* at 408.

Plaintiffs equate the economic loss rule — a defense to negligence claims for defective products — with the duty *element* of all negligence claims.  The two concepts are distinct.  Then-

CASE NO.  21-02989-MDL-ALTONAGA/Torres

Justice Cantero of the Florida Supreme Court explained the difference in a pre-*Tiara* case:

> Limiting the scope of the economic loss rule removes one obstacle to the recovery of purely economic losses.  But significant obstacles remain.  As the majority recognizes, plaintiffs whose cases fall outside of the economic loss rule must still satisfy "the traditional negligence principles of duty, breach, and proximate cause." The "duty" prong remains a strong filter in these cases — virtually as strong as the rule itself.  A service provider's mere failure to exercise reasonable care in performing a service contract does not render it liable in tort to every party who loses revenue or incurs additional expense.  The plaintiff still must demonstrate an independent duty to protect that plaintiff's purely economic interests.

*Indem. Ins. Co. of N. Am. v. Am. Aviation, Inc.*, 891 So. 2d 532, 546 (Fla. 2004) (Cantero, J., concurring) (citations omitted).  The Restatement (Third) of Torts draws the same distinction.  *See* Restatement (Third) of Torts: Liab. for Econ. Harm §§ 1 cmt. b, 3 cmt. a (Am. L. Inst. 2020); *see also id.* § 3 reporter's notes a and b (observing that Florida follows the majority of jurisdictions in distinguishing between the economic loss rule and the general lack of a duty to avoid causing economic harm).

Other observations confirm *Tiara*'s limited impact.  As Justice Pariente noted, *Tiara*'s holding "does not undermine Florida's contract law or provide for an expansion in viable tort claims."  110 So. 3d at 408 (Pariente, J., concurring).  That is why, since *Tiara*, courts have continued to recognize that the duty requirement precludes most negligence claims predicated on economic harm alone.  *See, e.g.*, *Tank Tech*, 244 So. 3d at 393–94; *Lucarelli Pizza & Deli v. Posen Constr., Inc.*, 173 So. 3d 1092, 1094–95 (Fla. 2d DCA 2015); *see also Insight Secs., Inc. v. Deutsche Bank Tr. Co. Ams.*, No. 20-23864-Civ, 2021 WL 3473763, at *3–4 (S.D. Fla. Aug. 6, 2021); *Segev v. Lynn Univ., Inc.*, No. 19-cv-81252, 2021 WL 2269838, at *18 (S.D. Fla. Feb. 26, 2021), *report and recommendation adopted in relevant part by* 2021 WL 1996437 (S.D. Fla. May 19, 2021); *Underwriters at Interest v. All Logistics Grp., Inc.*, 483 F. Supp. 3d 1199, 1211–13 (S.D. Fla. 2020).  *Tiara* did not address the duty element of negligence claims, and thus, it did not

impose a general tort duty to avoid causing economic harm where none had existed before.

Plaintiffs next assert that Robinhood owed them a tort duty simply because it provided them with brokerage services.  (*See* Resp. 31–32).  Plaintiffs rest that contention on the notion that "[w]henever one undertakes to provide a service to others, whether . . . gratuitously or by contract, the individual who undertakes to provide the service . . . assumes a duty to act carefully and to not put others at an undue risk of harm."  *Clay Elec. Co-op, Inc. v. Johnson*, 873 So. 2d 1182, 1186 (Fla. 2003) (alterations added; footnote call omitted); *see also Est. of Rotell ex rel. Rotell v. Kuehnle*, 38 So. 3d 783, 785 (Fla. 2d DCA 2010); (Resp. 31–32).  Again, this seemingly limitless principle less likely applies when "the plaintiff seeks only the recovery of an economic loss[.]" *Virgilio*, 680 F.3d at 1339 (alteration added).  When a negligence claim alleges only economic loss, "the duty element . . . serves as an important barrier to over-extension of liability."  *Id.* (alteration added; citation and footnote call omitted).

The takeaway is that Florida law, like California law, permits courts to entertain negligence claims for economic harm "only when specific circumstances have warranted a more liberal judicial rule and an expanded duty of care."  *Lucarelli Pizza & Deli*, 173 So. 3d at 1094 (citations omitted).  Under Florida law, a duty can arise from one of four sources: (1) statutes and regulations; (2) judicial interpretations of legislation; (3) judicial decisions; or (4) the facts of a particular case.  *See Insight Secs.*, 2021 WL 3473763, at *3 (citation omitted).  Plaintiffs do not point to any specific statute, regulation, or judicial decision that imposes a duty of care on brokers such as Robinhood.[18]  Thus, the question here is whether Plaintiffs have alleged facts that

---

[18] Plaintiffs point out their allegations that Robinhood violated the Net Capital Rule and other regulations. (*See* Resp. 39).  But they also appear to admit that these purported violations are irrelevant to determining whether Defendants owed Plaintiffs a duty of care sounding in negligence.  For example, Plaintiffs do not argue that any of their cited regulations is *the source* of the tort duties they allege Defendants owe them. Instead, they assert that the regulations "help define" and "explain [Robinhood's] standard of care" (*id.* at

demonstrate "some sort of link between the parties or some other extraordinary circumstance that justifies recognition of" a duty.  *Tank Tech*, 244 So. 3d at 393 (citations omitted).

The answer is "no."  There is nothing "extraordinary" about Plaintiffs' relationship with Robinhood.  *Id.*  Plaintiffs are simply consumers who chose to use Robinhood's services.  They are parties to a contract that defines their rights as users of the Robinhood platform.  That contract permits restricting Plaintiffs' ability to trade securities (*see* Cust. Agmt. § 5.F), as do many other contracts between investors and brokers, *see* SEC Invs. Alert.  "If two parties have a contract, the argument for limiting tort claims between them is at its most powerful."  Restatement (Third) of Torts: Liab. for Econ. Harm § 3 cmt. a (Am. L. Inst. 2020).  Plaintiffs offer no compelling reason why tort law, rather than contract law, should govern a relationship with a broker they chose to use.  Although Plaintiffs point to Robinhood's marketing efforts, marketing is not generally a reason to impose a duty to protect another's economic interests.  *See Virgilio*, 680 F.3d at 1340.

Moreover, Plaintiffs do not plausibly allege that Robinhood "fits into a special professional category where the standard of care includes a duty to protect the economic interests of clients or affected parties."  *Lucarelli Pizza & Deli*, 173 So. 3d at 1095.  The Customer Agreement provides that Plaintiffs' Robinhood accounts are self-directed, Plaintiffs assume the risk of losses, and Robinhood Securities and Robinhood Financial may elect to restrict trading at any time.  (*See* Cust. Agmt. §§ 5.A, 5.C, 5.F).  These provisions confirm that Plaintiffs assumed the risk of many of the events they now complain of.

---

37, 39 (alteration added)), and that the alleged violations are "evidence" of a breach of duty (*id.* at 38 (emphasis, citation, and quotation marks omitted)).

These contentions assume that a duty of care in fact exists, and thus, they are irrelevant to whether Robinhood owed Plaintiffs a tort duty.  That irrelevance aside, Plaintiffs do not actually allege that Robinhood violated the Net Capital Rule or explain how Robinhood's conduct *in January 2021* violated any of the cited regulations.  (*See* Am. Compl. ¶ 161; Resp. 38–40).

"[T]he existence of a contractual relationship is a good reason not to create a negligence cause of action shifting economic risks that the parties could have shifted through bargaining." *Monroe*, 746 So. 2d at 537 (alteration added; citations omitted).  For that reason, courts applying Florida law have declined to impose tort duties on custodians of investment accounts when investors' customer agreements contain similar risk-allocating provisions.  *See Lamm v. State St. Bank & Tr.*, 749 F.3d 938, 948–50 (11th Cir. 2014); *Paszamant v. Ret. Accts., Inc.*, 776 So. 2d 1049, 1053 (Fla. 5th DCA 2001).

In short, the Customer Agreement merits judicial respect under Florida law.  And the Court declines Plaintiffs' invitation to rewrite the Agreement under the guise of novel negligence claims.

Because Counts I and II do not adequately allege the existence of a tort duty under either California or Florida law, they are dismissed.

### III.    Breach of Fiduciary Duty (Count III)

In Count III, Plaintiffs allege that Robinhood Financial and Robinhood Securities violated fiduciary duties "to provide an open trading platform free of self-imposed trading restrictions[.]" (Am. Compl. ¶ 304 (alteration added); *see id.* ¶ 306).  Under California and Florida law, a plaintiff who asserts a breach of fiduciary duty claim must establish (1) a fiduciary duty exists; (2) a breach of that duty; and (3) proximate cause.  *See Brown v. Cal. Pension Adm'rs & Consultants, Inc.*, 52 Cal. Rptr. 2d 788, 796 (Cal. Ct. App. 1996); *Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002).

Robinhood Securities and Robinhood Financial focus on the first element.  They argue that they never accepted any fiduciary obligations and never gave Plaintiffs investment advice or directed Plaintiffs' investments.  (*See* Mot. 32, 35).  Moreover, Robinhood Securities argues that a clearing broker like itself owes no fiduciary duties to customers as a matter of law.  (*See id.* 33 n.18).  Plaintiffs contend that all brokers owe fiduciary duties to their customers and that

Robinhood Financial and Robinhood Securities' fiduciary obligations arose from their special, confidential relationship with Plaintiffs.  (*See* Resp. 40–45).

### a.  Robinhood Financial

#### i.  California Law

"A stockbroker is an agent of his client."  *Caravan Mobile Home Sales, Inc. v. Lehman Bros. Kuhn Loeb, Inc.*, 769 F.2d 561, 567 (9th Cir. 1985).  Under California law, "[a]n agency relationship is a fiduciary one, obliging the agent to act in the interest of the principal."  *Engalla v. Permanente Med. Grp., Inc.*, 938 P.2d 903, 919 (Cal. 1997) (alteration added; citation omitted). Still, a principal and agent may limit the scope of an agency relationship by agreement.  *See, e.g.*, *Meyers v. Guar. Sav. & Loan Ass'n*, 144 Cal. Rptr. 616, 620 (Cal. Ct. App. 1978).

Stockbrokers owe general fiduciary duties to their customers if they manage a discretionary account — *i.e.*, make investments on their clients' behalf — or if they provide investment advice to their clients.  *See Twomey v. Mitchum, Jones & Templeton, Inc.*, 69 Cal. Rptr. 222, 242 (Cal. Ct. App. 1968).  But they do not owe general fiduciary duties to clients with non-discretionary accounts unless they also provide those clients with investment advice.  *See Brown*, 52 Cal. Rptr. 2d at 796.

The Customer Agreement creates and defines an agency relationship between Robinhood Financial and its customers.  (*See* Cust. Agmt. § 4).  The Agreement expressly limits the scope of Robinhood Financial's agency "in accordance with the terms and conditions of th[e] Agreement and any attendant risks with respect to the purchase or sale of securities."  (*Id.* (alteration added)). When Plaintiffs signed the Customer Agreement, they each agreed that their accounts are self-directed and Robinhood Financial does not provide them with investment advice in connection with their accounts.  (*See id.* § 5.A).  The Agreement further provides that Robinhood Financial

40

may "at any time, in its sole discretion and without prior notice . . . prohibit or restrict [customers'
abilities] to trade securities."  (*Id.* § 5.F (alterations added)).

As these provisions illustrate, Robinhood Financial's "policy was not to provide
investment advice to customers[.]"  *Petersen v. Secs. Settlement Corp.*, 277 Cal. Rptr. 468, 472
(Cal. Ct. App. 1991) (alteration added).  Instead, Robinhood Financial assumed only duties related
to carrying out customer orders (*see* Cust. Agmt. § 4), and even those duties are limited (*see id.* §
16).  This "limited role" does not warrant imposing a broad fiduciary duty.  *Petersen*, 277 Cal.
Rptr. at 472–73.

More critically, the Customer Agreement contradicts Plaintiffs' allegation that Robinhood
Financial owed them a duty "to provide an open trading platform free of self-imposed trading
restrictions[.]"  (Am. Compl. ¶ 304 (alteration added)).  Just as California law recognizes "that the
scope of a broker's duty to disclose is delimited by the nature of the broker's relationship with the
customer[,]" so, too, is a broker's putative duty to permit purchases of any securities at any time
limited by the broker's relationship with its client.  *Petersen*, 277 Cal. Rptr. at 473 (alteration
added).  Plaintiffs expressly agreed that Robinhood Financial could prohibit trading on the
Robinhood platform.  (*See* Cust. Agmt. § 5.F).  Thus, Robinhood Financial had no duty, fiduciary
or otherwise, to keep trading open.  *See Apollo Cap. Fund, LLC v. Roth Cap. Partners, LLC*, 70
Cal. Rptr. 3d 199, 214 (Cal. Ct. App. 2007) (noting that "even when a stockbroker acts on behalf
of a customer, the scope of the broker's fiduciary duty depends on the nature of the
broker/customer relationship"); *Brown*, 52 Cal. Rptr. 2d at 797 (holding that brokers had no
fiduciary duty to disclose certain facts to plaintiffs when brokers' relationship with plaintiffs "was
confined to . . . performance of transactions selected by their customers" and brokers "had
absolutely no responsibility to advise" plaintiffs how to manage their self-directed accounts

(alteration added)).

Plaintiffs nonetheless insist that Robinhood Financial owes them broad, general fiduciary duties simply because it is a broker.  (*See* Resp. 40–41).  To be sure, Plaintiffs cite several cases that, when read in isolation, would broadly charge brokers with fiduciary responsibilities.  (*See id.*); *see also, e.g.*, *Duffy v. Cavalier*, 264 Cal. Rptr. 740, 752 (Cal. Ct. App. 1989) ("[T]he relationship between any stockbroker and his or her customer is fiduciary in nature, imposing on the former the duty to act in the highest good faith toward the customer." (alteration added; citations omitted)).  But each of these cases contemplated a different type of broker-client relationship — one in which the broker provided investment advice that functioned "for all practical purposes [as] the controlling factor in the [customer's] transactions."  *Twomey*, 69 Cal. Rptr. at 242 (alterations added).  They did not consider the duties of self-directed brokerages — like Robinhood, E*Trade, TD Ameritrade, and Charles Schwab — that have become common today.  In cases involving these kinds of brokers, general fiduciary duties "do not arise."  *Petersen*, 277 Cal. Rptr. at 473 (footnote call number omitted); *see also Apollo Cap. Fund*, 70 Cal. Rptr. 3d at 214; *Brown*, 52 Cal. Rptr. 2d at 797.

Plaintiffs next contend that their relationship with Robinhood Financial is "special or confidential" because they are "inexperienced" investors "target[ed]" by Robinhood.  (Resp. 42 (alteration added)).  In some circumstances, under California law, a fiduciary duty may arise out of a "confidential relationship."  *City Sols., Inc. v. Clear Channel Commc'ns, Inc.*, 201 F. Supp. 2d 1048, 1050 (N.D. Cal. 2002) (quotation marks omitted).  A confidential relationship usually arises only when there is a power imbalance between the parties and the more powerful party solicits or accepts the trust placed in it by the weaker party.  *See Richelle L. v. Roman Catholic Archbishop*, 130 Cal. Rptr. 2d 601, 611 (Cal. Ct. App. 2003) (citation omitted).  Plaintiffs point to

their relative investment inexperience, Robinhood's marketing efforts, and the allegedly volume-focused educational tools available on Robinhood's platform as evidence of a confidential relationship.[19]  (*See* Resp. 42–43; Am. Compl. ¶¶ 131, 186).

For two reasons, Plaintiffs' "confidential relationship" theory misses the mark.  First, California law typically recognizes only personal relationships with a significant power imbalance as confidential.  *See, e.g.*, *Richelle*, 130 Cal. Rptr. 2d at 611.  These relationships "usually arise[] from advanced age, youth, lack of education, weakness of mind, grief, sickness, *or some other incapacity*."  *Id.* (alteration and emphasis added).  For example, a confidential relationship might stem from a client's engagement of an attorney, *see Aoki v. Gilbert*, No. 11-cv-02797, 2020 WL 6741693, at *25 (E.D. Cal. Nov. 17, 2020), or a friend taking financial advantage of an elderly person in a weakened condition, *see Stenger v. Anderson*, 429 P.2d 164, 170–71 (Cal. 1967).

Robinhood's relationships with its many customers are not special or confidential.  Plaintiffs might not be finance experts, but they do not allege that they lack the capacity to make their own decisions or that Robinhood Financial personally took advantage of them.  Tellingly, they cite no example of a confidential relationship arising from a garden-variety consumer contract signed by millions of customers.  And understandably so.  Extending fiduciary obligations to all such relationships would revolutionize the brokerage industry — a consequence California courts have not embraced.  *See Siemonsma v. Mut. Diversified Emp. Fed. Credit Union*, No. 10-1093, 2011 WL 1485979, at *3 (C.D. Cal. Apr. 19, 2011) ("To find a confidential relationship arising out of the mere depositing of funds would make confidential relationships ubiquitous in the lending

---

[19] Although Plaintiffs allege that Robinhood's educational tools "encourage" high-volume trading, they stop short of alleging that Robinhood offers investment advice.  (Am. Compl. ¶¶ 129–30).  That is likely because Plaintiffs themselves agreed that Robinhood does not provide investment advice (*see* Cust. Agmt. § 5.A) and because California law premises fiduciary responsibility on the existence of a "direct and *personal* relationship between broker and customer," *Petersen*, 277 Cal. Rptr. 2d at 473 (emphasis added), as opposed to "behavioral nudges" that tend to "encourage" higher-volume trading (Am. Compl. ¶ 129).

industry, which strikes the Court as contrary to the meaning of a confidential relationship.").

Second, Plaintiffs do not allege that Robinhood Financial accepted or recognized its relationships with Plaintiffs as confidential.  "The mere fact that in the course of their business relationships the parties reposed trust and confidence in each other does not impose any corresponding fiduciary duty[.]"  *City Sols.*, 201 F. Supp. 2d at 1050 (alteration added; citation and quotation marks omitted).  A confidential relationship cannot exist unless the alleged confidant "voluntarily accepts or assumes to accept the confidence[.]"  *Barbara A. v. John G.*, 193 Cal. Rptr. 422, 431 (Cal. Ct. App. 1983) (alteration added; citations and quotation marks omitted).

Here, Plaintiffs do not plausibly allege that Robinhood Financial recognized confidential relationships as existing between itself and Plaintiffs.  The Customer Agreement's many provisions limiting Robinhood Financial's duties indicate that Robinhood Financial generally keeps only an arms'-length relationship with its customers.  And although Plaintiffs emphasize Robinhood's marketing efforts, advertising to the public does not amount to assuming fiduciary obligations to recipients of the advertisements.  *See Comm. on Children's Television, Inc. v. General Foods Corp.*, 673 P.2d 660, 676 (Cal. 1983) (holding that no fiduciary relationship existed between advertisers of cereal and consumers because "it is unnecessary to call upon the law of fiduciary relationships to perform a function for which it was not designed and is largely unsuited"), *superseded by statute on other grounds as recognized in Branick v. Downey Sav. & Loan Ass'n*, 138 P.3d 214, 218 (Cal. 2006). Plaintiffs' misplaced reliance on their broker is no reason to impose on it a fiduciary responsibility it never accepted.  *See, e.g.*, *Vashisht-Rota v. Ottawa Univ.*, No. 20-cv-959, 2020 WL 6544708, at *3 (S.D. Cal. Nov. 6, 2020).

    **ii.**   **Florida Law**

Count III fails under Florida law for the same reasons that it fails under California law.

Florida law, like California law, permits introducing brokers to limit the scope of their duties to customers by agreement.  *See SFM Holdings, Ltd. v. Banc of Am. Secs., LLC*, 600 F.3d 1334, 1339–40 (11th Cir. 2010).  Again, the Customer Agreement provides that Plaintiffs' Robinhood accounts are self-directed, Robinhood Financial may prohibit or restrict their abilities to trade, and Robinhood does not provide investment advice.  (*See* Cust. Agmt. §§ 5.A, 5.F).  Plaintiffs cannot override these provisions with allegations that ignore the actual relationship and contract between them and Robinhood.  Thus, Count III must be dismissed.  *See SFM Holdings*, 600 F.3d at 1339–40 (affirming dismissal of breach of fiduciary duty claim because existence of fiduciary duty "is determined by the substantive agreement of the parties[,]" the relevant agreement "explicitly stated" that the defendant "was not acting as an adviser or fiduciary to the customer[,]" and the defendant's "actions were appropriate within the limited agency created by the . . . agreement" (alterations added)).

Plaintiffs rely on *Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d 1042 (11th Cir. 1987), for the notion that a broker always owes customers general fiduciary duties.  (*See* Resp. 41).  *Gochnauer* involved a broker who, in April 1979, personally "recommended" that the plaintiffs pursue options trading with a particular investment advisor.  810 F.2d at 1044.  The court thus lacked occasion to consider the obligations of a hands-off broker, like Robinhood Financial, that holds funds in self-directed customer accounts.  Notably, the court assumed that a broker would at least have a duty to "confer as to a particular transaction[,]" *id.* at 1049 n.9 (alteration added), and the broker bore responsibility for "selection of the investment," *id.* at 1050 (citation omitted).

The *Gochnauer* court did not consider — because it did not need to — the duties of a broker in a "limited agency created by . . . [a]greement."  *SFM Holdings*, 600 F.3d at 1340

(alterations added).  Neither *Gochnauer* nor other cases involving brokers who intervene in clients' investment decisions can salvage Count III.  *Cf. Banc of Am. Secs. LLC v. Stott*, No. 04-81086-Civ, 2005 WL 8156027, at *4 (S.D. Fla. Aug. 30, 2005) (denying dismissal of breach of fiduciary duty claim because broker "had complete discretion to do as he wished with the funds in the [customer] account" (alteration added)).

Count III also fails under Florida law because Plaintiffs do not plausibly allege that Robinhood Financial accepted any confidential relationship with Plaintiffs.  "In order for a confidential or fiduciary relationship to exist under Florida law, there must be substantial evidence showing some dependency by one party and some undertaking by the other party to *advise, counsel, and protect the weaker party*."  *Lanz v. Resolution Tr. Corp.*, 764 F. Supp. 176, 179 (S.D. Fla. 1991) (emphasis added; citing *Cripe v. Atlantic First Nat'l Bank*, 422 So. 2d 820 (Fla. 1982)).

Plaintiffs do not allege that Robinhood Financial elected to "advise, counsel, and protect" them.  *Id.*  The opposite is true: Plaintiffs expressly acknowledged that Robinhood Financial does not provide investment advice.  (*See* Cust. Agmt. § 5.F).  And in Florida, "an arms length transaction" does not obligate "either party to act for the benefit or protection of the other party[.]" *Lanz*, 764 F. Supp. at 179 (alteration added; citation omitted); *see also Harris v. Zeuch*, 137 So. 135, 189 (Fla. 1931) ("[T]here is nothing to show that the complainant recognized or accepted any trust reposed in himself . . . .  A large part of the business of the world . . . is done on faith, but a contract should not be set aside and obligations canceled merely because of misplaced confidence reposed in a business adversary." (alterations added)).

For these reasons, Count III fails to state a claim against Robinhood Financial.

### b.  Robinhood Securities

Under both California and Florida law, a clearing broker does not generally owe fiduciary

duties to investors whose transactions it executes.  *See Petersen*, 277 Cal. Rptr. at 472–73 ("SSC claims that as a clearing broker it had no such [fiduciary] duty.  We agree with SSC." (alteration added)); *SFM Holdings*, 600 F.3d at 1338–39 ("[C]learing brokers ordinarily owe no fiduciary duty to the customers of introducing brokers."  (alteration added; citing *Strategic Income Fund, LLC v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1296 n.12 (11th Cir. 2002))).

Undeterred, Plaintiffs argue that a clearing broker owes fiduciary duties to the customers of an introducing broker when it involves itself in the introducing broker's actions.  (*See* Resp. 47); *see also In re Blech Secs. Litig.*, 961 F. Supp. 569, 584 (S.D.N.Y. 1997) (denying clearing broker's motion to dismiss claim for violation of federal securities laws because plaintiffs alleged the defendant's actions went beyond "mere clearing conduct").  They emphasize the Amended Complaint's allegations that suggest a close relationship between Robinhood Financial and Robinhood Securities — particularly the allegations that the two firms collaborated in imposing the PCO restriction.  (*See* Resp. 47–48; Am. Compl. ¶¶ 90, 93, 95, 99, 112 n.9, 328 338–39; *see also id.* ¶ 28 (alleging that Swartwout, Robinhood Securities' COO, ordered the PCO restriction)).

For two reasons, this theory cannot shore up the claim against Robinhood Securities.  First, it lacks legal support.  Plaintiffs do not cite a single case where a court concluded that a clearing broker owes *fiduciary* duties to the customers of an introducing broker.  *See, e.g.*, *McDaniel v. Bear Stearns & Co., Inc.*, 196 F. Supp. 2d 343, 361 (S.D.N.Y. 2002) (affirming arbitration award that held defendant liable for aiding and abetting fraud and recognized that defendant "owed no fiduciary duty to Claimants . . . as to the basic clearing relationship" (alteration in original; quotation marks and citation omitted)).  Second, even if Robinhood Securities could be equated with an introductory broker, that fact would leave it in the same position as Robinhood Financial, which, under the facts alleged, did not owe fiduciary duties to Plaintiffs.  *See SFM Holdings*, 600

F. 3d at 1339–40; (*see also* Cust. Agmt. §§ 5.A, 5.F).

The limited agency created by the Customer Agreement forecloses Plaintiffs' effort to hold Robinhood Financial and Robinhood Securities to the standard of fiduciaries in exercising their right to restrict trading.  Thus, Count III fails under both California and Florida law, and it is dismissed.

### IV.   Breach of the Implied Duty of Care (Count IV) and Breach of the Implied Covenant of Good Faith and Fair Dealing (Count V)

Counts IV and V allege that Robinhood violated implied duties owed to Plaintiffs under the Customer Agreement.  Defendants seek dismissal of both claims.  They argue that section 5.F of the Customer Agreement authorized Robinhood to impose the PCO restriction on Plaintiffs' accounts.  (*See* Mot. 39).  And because California law[20] generally does not permit implied terms to alter express agreements, Robinhood maintains it did not owe Plaintiffs any implied duty to avoid restricting stock purchases.  (*See id.*).

#### a.   Breach of the Implied Duty of Care (Count IV)

Count IV alleges that Robinhood Securities and Robinhood Financial violated the Customer Agreement's implied duty of care.  (*See* Am. Compl. ¶ 310).  The Customer Agreement authorizes Robinhood to provide "trading and brokerage services" to investors.  (Cust. Agmt. § 4). Those services include "executing, clearing and settling . . . trades[.]"  (CRS 2 (alterations added)). Plaintiffs argue that Robinhood's promise to furnish brokerage services created an implied obligation to provide those services "with due care" and Robinhood violated this implied obligation when it suspended purchases of the meme stocks.  (Resp. 55).

Under California law, courts may read implied terms into a contract only "[u]nder limited circumstances."  *Ben-Zvi v. Edmar Co.*, 47 Cal. Rptr. 2d 12, 14 (Cal. Ct. App. 1995) (alteration

---

[20] The parties agree that California law determines the fate of both claims.  (*See* Mot. 21; Resp. 49 n.21).

added).  "Implied terms are disfavored at law."  *Series AGI W. Linn of Appian Grp. Invs. DE, LLC v. Eves*, 158 Cal. Rptr. 3d 193, 203–04 (Cal. Ct. App. 2013) (quotation marks and citation omitted).  That is because judges lack "the power to create for the parties a contract that they did not make and cannot insert language that one party now wishes were there."  *Holguin v. Dish Network, LLC*, 178 Cal. Rptr. 3d 100, 114 (Cal. Ct. App. 2014) (quotation marks and citation omitted).  Thus, implied terms may be enforced "only when they are not inconsistent with some express term of the contract and, in the absence of such implied terms, the contract could not be effectively performed."  *Series AGI*, 47 Cal Rptr. 3d at 203 (citation and quotation marks omitted; quoting *Tanner v. Title Ins. & Tr. Co.*, 129 P.2d 383 (Cal. 1942)).

Defendants argue that Count IV must be dismissed because the implied term Plaintiffs allege exists would contradict the Customer Agreement's express text.  That, it would.  Once more, the Customer Agreement permits Robinhood Financial and Robinhood Securities to "at any time, in [their] sole discretion and without prior notice . . . prohibit or restrict [the customer's] ability to trade securities."  (Cust. Agmt. § 5.F (alterations added)).  It is difficult to imagine a clearer authorization to impose the limited trading restrictions Plaintiffs now object to.

This plain authorization to restrict trading creates obstacles that Plaintiffs cannot surmount.  The reason is simple: "if defendants were given the right to do what they did by the express provisions of the contract there can be no breach."  *Carma Devs. (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 826 P.2d 710, 728 (Cal. 1992) (quotation marks omitted; quoting *VTR, Inc. v. Goodyear Tire & Rubber Co.*, 303 F. Supp. 773, 777–78 (S.D.N.Y. 1969)).  Courts applying California law have routinely reinforced this principle.  *See, e.g.*, *Oakland v. GCCFC 2005-GG5 Hegenberger Retail Ltd. P'ship*, No. 19-cv-00403, 2019 WL 1571881, at *3 (N.D. Cal. Apr. 11, 2019) ("A pillar of contract law is that an implied term cannot contradict express terms of an

agreement." (citation omitted)); *Series AGI*, 158 Cal. Rptr. 3d at 204 ("The courts will not imply

a better agreement for parties than they themselves have been satisfied to enter into, or rewrite

contracts whenever they operate harshly." (citations and quotation marks omitted)).  And they

routinely dispose of claims for breaches of implied terms when those supposedly implicit

obligations would forbid conduct that an agreement expressly allows.  *See, e.g.*, *Al Owaidah v.

Mazzei*, No. 18-246, 2020 WL 1041091, at *10–12 (C.D. Cal. Jan. 27, 2020); *Oakland*, 2019 WL

15711881, at *3–4; *Yalley v. Liberty Life Assur. Co.*, Nos. A154076 & A154803, 2019 WL

2710242, at *7 (Cal. Ct. App. June 28, 2019).

"But this can't be true," Plaintiffs argue.  They insist that reading the Customer Agreement

"to afford Robinhood Financial and Robinhood Securities unbridled discretion to impose the PCO

limitations . . . . would render the brokerage services [they] agreed to provide illusory."  (Resp. 55

(alterations added)).  Put another way, Plaintiffs argue that the Customer Agreement contains

implied limits on Robinhood's discretion to restrict trading because, otherwise, the Customer

Agreement would be invalid.

This argument relies on a narrow exception to California law's skepticism of implied

contractual terms.  Under that exception, courts may imply a contract term that conflicts with an

express grant of discretionary power when — but only when — "reading the [express] provision

literally would, contrary to the parties' clear intention, result in an unenforceable, illusory

agreement."  *Third Story Music, Inc. v. Waits*, 48 Cal. Rptr. 2d 747, 753 (Cal. Ct. App. 1995)

(alteration added).  In other words, courts apply the exception only when they cannot otherwise

reconcile the parties' apparent "intent to give one party total discretion over its performance[,]" on

the one hand, and their "intent to have a mutually binding agreement[,]" on the other.  *Id.* at 751

(alterations added); *see also Ben-Zvi*, 47 Cal. Rptr. 2d at 473 (holding that "[a] term can only be

implied upon grounds of obvious necessity" (alteration added; other alterations adopted; citations and quotation marks omitted)).

An agreement that grants one party total discretion to perform lacks mutuality "only if the total discretion granted one party renders the contract lacking in consideration." *Perdue v. Crocker Nat'l Bank*, 702 P.2d 503, 510 (Cal. 1985) (citing *Auto. Vending Co. v. Wisdom*, 6 Cal. Rptr. 31 (Cal. Ct. App. 1960)).  But "[i]f there are reciprocal promises," an agreement's grant of unilateral discretion "does not render the contract illusory."  *Id.* (alteration added).

The illusory-contract exception does not help Plaintiffs here.  The Customer Agreement offers Plaintiffs and other Robinhood customers many benefits *besides trading*.  The Agreement affords Plaintiffs access to Robinhood's cash management services.  (*See* Cust. Agmt. §§ 24, 30; Am. Compl. ¶ 123; CRS 3).  It also permits Plaintiffs to use Robinhood's "investment tools and education to help . . . make investment decisions" (CRS 2 (alteration added)); like Robinhood's podcast, newsletter, and website publications (Am. Compl. ¶ 123; *see also id.* ¶¶ 317–19 (alleging that the Customer Agreement incorporates the Customer Relationship Summary by reference)).

As these provisions illustrate, the Customer Agreement confers many benefits on Plaintiffs that have nothing to do with trading.  Those benefits have value.  Thus, "whether or not an implied covenant is read into the [A]greement, the [A]greement would be supported by consideration and would be binding."  *Third Story Music*, 41 Cal. Rptr. 2d at 753 (alterations added; footnote call number omitted).

When California courts imply contract terms that conflict with the parties' express intent, they do so only to harmonize that intent with the parties' apparent "intent to have a mutually binding agreement."  *Id.* at 751.  But here, there is "no tension between the parties' express agreement and their intention to be bound, and no necessity to impose an implied covenant to

create mutuality." *Id.* at 753; *see also Sweet v. Google Inc.*, No. 17-cv-03953, 2018 WL 1184777, at *9 (N.D. Cal. Mar. 7, 2018) ("Regardless of how YouTube exercised its discretionary power . . . the agreement . . . was supported by adequate independent consideration." (alterations added)). Plaintiffs might have come to regret their decision to enter into the Customer Agreement, but the Court lacks authority to save Plaintiffs from themselves.

Plaintiffs alternatively argue that section 5.F of the Customer Agreement is ambiguous. (*See* Resp. 53). More concretely, they assert that section 5.F may not have afforded Robinhood a basis to impose the PCO restriction at all because section 13 of the Customer Agreement — which identifies certain rights that Robinhood retains "[p]articularly during periods of high volume, illiquidity, fast movement or volatility in the marketplace" — does not contain language authorizing trading restrictions. (Cust. Agmt. § 13 (alteration added)).

Any perceived conflict between sections 5.F and 13 is manufactured. Plaintiffs, to be sure, are correct that section 13 does not "give Defendants the right to bar trading in any securities." (Resp. 55–56). But section 13 certainly does not *forbid* such activity. (*See* Cust. Agmt. § 13).

Also, the phrase "Market volatility" in section 13's heading proves very little. (*Id.*). Section 13 nowhere indicates that it exhaustively lists Robinhood's rights in the event of a volatile securities market. By contrast, Section 5.F expressly permits Robinhood Financial and Robinhood Securities to restrict customer trading "at *any* time" — including, presumably, during periods of market volatility. (*Id.* § 5.F (emphasis added)). Section 13's silence on trading restrictions simply does not conflict with section 5.F's explicit authorization to limit trading.

Plaintiffs are also wrong to suggest that Count IV can survive a Rule 12(b)(6) challenge because the existence and scope of Defendants' putative implied duties are "fact questions[.]" (Resp. 55 (alteration added)).   Under California law, contract interpretation, including the

determination of whether a contract imposes implied obligations, "is essentially a judicial function[.]" *Holguin*, 178 Cal. Rptr. 3d at 114 (alteration added; quotation marks omitted; quoting *Parsons v. Bristol Dev. Co.*, 402 P.2d 839 (Cal. 1965)).  Plaintiffs attach the Customer Agreement to the Amended Complaint, so the Court may consider and interpret the Agreement on a motion to dismiss.  *See* Fed. R. Civ. P. 10(c); *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1205–06 (11th Cir. 2007).  No fact beyond the Amended Complaint would alter the inevitable conclusion that the implied obligations Plaintiffs seek to add to the Customer Agreement would contradict the Agreement's plain text.  *See Sweet*, 2018 WL 1184777, at *9–10 (dismissing claim for breach of implied term because implied term would conflict with express agreement).

Count IV is dismissed.

### b.   Breach of the Implied Covenant of Good Faith and Fair Dealing (Count V)

Plaintiffs' claim of breach of the implied covenant of good faith and fair dealing meets the same fate for essentially the same reasons.  "The covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made*."  *Guz v. Bechtel Nat'l Ins.*, 8 P.3d 1089, 1110 (Cal. 2000) (citation omitted).  The implied covenant "functions 'as a *supplement* to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract.'"  *Thrifty Payless, Inc. v. The Americana at Brand, LLC*, 160 Cal. Rptr. 3d 718, 729–30 (Cal. Ct. App. 2013) (citation and quotation marks omitted).

Plaintiffs claim that imposing the PCO restriction violated the Customer Agreement's implied covenant of good faith and fair dealing.  They fail to persuade.

Section 5.F of the Customer Agreement expressly allows Robinhood Securities and

Robinhood Financial to limit trading from customer accounts.  (*See* Cust. Agmt. § 5.F).  "[O]ne cannot invoke the implied covenant to prohibit conduct that a contract expressly allows."  *21st Century Ins. Co. v. Superior Ct.*, 213 P.3d 972, 982 (Cal. 2009) (alteration added); *see also Carma Devs.*, 826 P.2d at 728 ("We are aware of no reported case in which a court has held the covenant of good faith may be read to prohibit a party from doing that which is expressly permitted by an agreement.").  In fact, the California Supreme Court has recognized

> that the parties may, by express provisions of the contract, grant the right to engage in the very acts and conduct which would otherwise have been forbidden by an implied covenant of good faith and fair dealing. . . .  And if defendants were given the right to do what they did by the express provisions of the contract there can be no breach.

*Carma Devs.*, 826 P.2d at 728 (alteration added; quotation marks omitted; quoting *VTR, Inc.*, 303 F. Supp. at 777–78).  Plainly, California law precludes Plaintiffs from using the implied covenant to override section 5.F's express grant of discretion.

Plaintiffs again insist that the Customer Agreement would be unenforceable unless their proposed implied covenant limits the discretion afforded by section 5.F.  Once more, this is not so.

The Customer Agreement permits Robinhood Financial and Robinhood Securities in their "sole discretion" to restrict Plaintiffs' abilities to buy and sell securities (Cust. Agmt. § 5.F), but it also affords Plaintiffs many valuable benefits that have nothing to do with trading from their Robinhood accounts (*see id.* §§ 24, 30; Am. Compl. ¶¶ 123, 330; CRS 2–3).  Those benefits make the Customer Agreement enforceable regardless of how much discretion section 5.F confers on Robinhood.  As one California court has explained, "if the express purpose of the contract is to grant unfettered discretion, and the contract is otherwise supported by adequate consideration, then the conduct is, by definition, within the reasonable expectation of the parties and 'can never violate

an implied covenant of good faith and fair dealing.'"  *Wolf v. Walt Disney Pictures & Television*, 76 Cal. Rptr. 3d 585, 597 (Cal. Ct. App. 2008) (quoting *Carma Devs.*, 826 P.2d at 729).  California courts consistently uphold this principle.  *See, e.g.*, *Storek & Storek, Inc. v. Citicorp Real Est., Inc.*, 122 Cal. Rptr. 2d 267, 277–78 (Cal. Ct. App. 2007); *Third Story Music*, 48 Cal. Rptr. 2d at 753; *see also Enhanced Athlete Inc. v. Google LLC*, 479 F. Supp. 3d 824, 832–33 (N.D. Cal. 2020); *Sweet*, 2018 WL 1184777, at \*6–10; *Song fi Inc. v. Google, Inc.*, 108 F. Supp. 3d 876, 885 (N.D. Cal. 2015).  The undersigned will do the same.

Plaintiffs argue that their implied covenant claim should survive because section 5.F's explicit grant of discretion conflicts with section 13 and is therefore ambiguous.  (*See* Resp. 53).  Just as this contention could not save Count IV, it cannot support Count V.  Section 5.F expressly permits Robinhood to enforce trading restrictions "at any time" (Cust. Agmt. § 5.F), including during periods of market volatility, while section 13 says nothing about the matter (*see id.* § 13).  The two provisions plainly do not conflict.

Finally, Plaintiffs disparagingly refer to the Customer Agreement as "a contract of adhesion[.]"  (Resp. 49 (alteration added)).  Yet they stop short of arguing that the Agreement is unenforceable, and for good reason: adhesive contracts "are indispensable facts of modern life that are generally enforced."  *Murphy v. Twitter, Inc.*, 274 Cal. Rptr. 3d 360, 379 (Cal. Ct. App. 2021) (quotation marks omitted; quoting *Baltazar v. Forever 21, Inc.*, 367 P.3d 6, 11 (Cal. 2016); other citation omitted).  "To describe a contract as adhesive in character is not to indicate its legal effect."  *Graham v. Scissor-Tail, Inc.*, 623 P.2d 165, 172 (Cal. 1981); *see also AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346–47 (2011) ("[T]he times in which consumer contracts were anything other than adhesive are long past." (alteration added; citations and footnote call number omitted)).  Plaintiffs do not argue that section 5.F of the Customer Agreement is unenforceable

CASE NO.  21-02989-MDL-ALTONAGA/Torres

against them and labeling the Agreement adhesive does not change that fact.

Because Count V does not state a viable claim of breach of the Customer Agreement, it must be dismissed.[21]

## V.   Tortious Interference with Contract and Business Relationship (Count VI)

Count VI alleges that Robinhood Markets tortiously interfered with Plaintiffs' contractual relationship with Robinhood Securities and Robinhood Financial.  Plaintiffs claim that Robinhood Markets illegally interfered with the Customer Agreement by, among other things, "forcing the Suspended Stocks into PCO[,]" "failing to have adequate business contingency and continuity plans to ensure customer access in the event of market volatility[,]" and "continuing to allow new customers to join the platform[.]"  (Am. Compl. ¶ 338 (alterations added)).  In this analysis, the Court first addresses Florida law and then turns to California law.

To succeed on a claim of tortious interference with a contractual relationship under Florida law, a plaintiff must show: "(1) the existence of a contract; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the contract's breach; (4) the absence of any justification or privilege; and (5) damages resulting from the breach." *Special Purpose Accts. Receivable Co-op Corp. v. Prime One Cap. Co., L.L.C.*, 125 F. Supp. 2d 1093, 1103 (S.D. Fla. 2000) (citing *Johnson v. Enter. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1321 (11th

---

[21] Plaintiffs suggest that Robinhood Securities and Robinhood Financial breached their implied duties in ways unrelated to the PCO restrictions.  (*See* Resp. 48–49 (citing Am. Compl. ¶¶ 13, 105, 204, 300, 323)).  They point, for instance, to the Amended Complaint's allegations that "Robinhood fueled trading of the Suspended Stocks without either the tools needed to manage or and [sic] capital required to protect against the known risks associated with concentrated positions in highly volatile [securities]" (Am. Compl. ¶ 105 (alteration added)), and "Robinhood failed to take the necessary precautions to ensure that its platform would continue to be available for trading, while simultaneously expanding its marketing, taking on new customers and facilitating trading" (*id.* ¶ 204).  The problem with Plaintiffs' argument is that these alleged acts would never have affected Plaintiffs absent Robinhood's exercise of its express right to impose the PCO restriction.  And Plaintiffs cannot sue in federal court for actions that never harmed them.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

Cir. 1998)).  The elements of claims for tortious interference with contracts under California law are nearly, but not completely, the same.  *Compare id. with Ixchel Pharma, LLC v. Biogen, Inc.*, 470 P.3d 571, 575 (Cal. 2020) (citation omitted).  The main difference between the two states' laws is that Florida law requires showing that the defendant caused a breach of contract, *see Iaffaldano v. Sun West Mortg. Co., Inc.*, No. 2:17-cv-14222, 2017 WL 9362576, at *4 (S.D. Fla. Dec. 11, 2017) (citation omitted), while California law requires only that the defendant have intentionally acted "to induce a . . . *disruption* of the contractual relationship[,]" *Ixchel Pharma*, 470 P.3d at 575 (alterations and emphasis added; citations omitted).[22]

That element dooms Count VI under Florida law.  Plaintiffs do not allege that Robinhood Markets caused a violation of any express provision of the Customer Agreement.  In fact, neither Count VI nor Plaintiffs' Response identifies what term of the Customer Agreement Robinhood Markets caused to be breached.  (*See* Am. Compl. ¶¶ 334–41; Resp. 56–58).  Plaintiffs argue only that Robinhood Markets caused its subsidiaries to breach *implied* terms of the Agreement.  (*See* Resp. 57–58).  That argument fails here for the same reason it fails as to Counts IV and V: a party does not breach a contract by doing something the contract expressly allows.  *See Hogan v.*

---

[22] Although Count VI references the Customer Agreement, some of its allegations might suggest that Plaintiffs intended to allege tortious interference with *a business relationship*.  (*See, e.g.*, Am. Compl. ¶ 335 ("Robinhood Markets tortiously interfered with existing business relations[.]" (alteration added))).  Although tortious interference with a business relationship is a tort separate from tortious interference with contractual relations, courts sometimes conflate the two.  *See, e.g.*, *Palm Springs Assocs., Ltd. v. T-Mobile USA, Inc.*, No. 20-22841-Civ, 2020 WL 7711687, at *3 (S.D. Fla. Dec. 29, 2020).  One difference between the two torts is that claims for tortious interference with a business relationship require showing "that a business relationship existed," and that relationship need not be "evidenced by an enforceable contract[.]" *Register v. Pierce*, 530 So. 2d 990, 993 (Fla. 1st DCA 1988) (alteration added; citation omitted); *see also Special Purpose*, 125 F. Supp. at 1103 (citations omitted).

Plaintiffs do not suggest that they allege tortious interference with a business relationship, but the claim would fail even if they did.  A claim for tortious interference with a business relationship must allege a relationship that "afford[s] the plaintiff existing or prospective legal or contractual rights." *Register*, 530 So. 2d at 993 (alteration added).  It must also allege that those rights "have been substantively damaged[.]" *Id.* (alteration added).  Count VI alleges neither.

*Praetorian Ins. Co.*, No. 1:17-cv-21853, 2018 WL 8266803, at *7 (S.D. Fla. Jan. 11, 2018); *21st Century Ins. Co.*, 213 P.3d at 982; (*see also* Cust. Agmt. § 5.F).

That leaves California law.  In California, parties may sometimes assert tortious interference claims in circumstances where no breach has occurred.  A tortious interference claim can succeed if the defendant caused an intentional "disruption of the contractual relationship[.]" *Ixchel Pharma*, 470 P.3d at 575 (alteration added; citations omitted).  Under California law, in other words, a plaintiff may prevail on a tortious interference claim by proving only that "performance has been prevented or rendered more expensive or burdensome[,]" even absent a breach.  *Lipman v. Brisbane Elementary Sch. Dist.*, 359 P.2d 465, 469 (Cal. 1961) (alteration added), *abrogation on other grounds recognized by Brown v. Kelly Broad. Co.*, 771 P.2d 406, 433 n.37 (Cal. 1989).

Plaintiffs say they have adequately alleged a tortious interference claim under California law because they need not allege an actual breach of the Customer Agreement.  (*See* Resp. 57). They base that contention on two California Supreme Court decisions — *Lipman* and *Pacific Gas & Electric Company v. Bear Stearns and Company*, 791 P.2d 587 (Cal. 1990).  The Court disagrees.

In *Lipman*, the California Supreme Court noted that a tortious interference claim may succeed "where the *plaintiff's performance* has been prevented or rendered more expensive or burdensome[.]" 359 P.2d at 469 (alteration and emphasis added).  That is not what is alleged here. Plaintiffs do not allege the existence of any obligation to "perform[]" that the PCO restrictions supposedly interfered with.  *Id.* (alteration added).  The Customer Agreement does not *require* Plaintiffs — or even give them a right — to purchase securities.  Thus, they cannot credibly contend that the PCO restrictions made their "*performance*" of the Customer Agreement "more

expensive or burdensome[.]" *Id.* (alteration and emphasis added).

*Pacific Gas* does no more to help Plaintiffs.  In that case, the California Supreme Court commented in *dictum* that a "Plaintiff need not allege an actual or inevitable breach of contract" to state a tortious interference claim.  791 P.2d at 592.  It also reiterated "that interference with the *plaintiff's performance* may give rise to a claim . . . if *plaintiff's performance* is made more costly or more burdensome."  *Id.* (alteration and emphases added).  Nowhere does *Pacific Gas* endorse more open-ended tort liability for non-parties to contracts.  To the contrary, the court counseled "cautio[n] in defining the interference torts, to avoid promoting speculative claims."  *Id.* at 597 (alteration added).

Plaintiffs point to a litany of other allegations that purportedly establish Robinhood Markets' tortious interference with Plaintiffs' rights under the Customer Agreement.  (*See* Resp. 57).   Among those allegations: Robinhood Markets "fail[ed] to have adequate business contingency and continuity plans to ensure customer access in the event of market volatility[,]" "continu[ed] to allow new customers to join the platform[,]" and "fail[ed] to have a supervisory control system that would have identified and prevented the capitalization issues[.]"  (Am. Compl. ¶ 338 (alterations added)).  Tellingly, Plaintiffs do not tie these alleged acts and omissions to any identifiable provision of the Customer Agreement, let alone to a provision that obligated Plaintiffs to perform.  (*See* Resp. 57).  That omission is fatal.  None of the allegations that Plaintiffs cite supports an inference that Robinhood Markets caused a breach of the Customer Agreement — as required to state a claim under Florida law — or that it disrupted Plaintiffs' performance of the Agreement — as required under California law.[23]

---

[23] Because none of the alleged acts that Plaintiffs cite would have actually resulted in a breach or disruption of the Customer Agreement, Robinhood Markets' alleged inducement of its subsidiaries to commit those acts could not have amounted to an "intentional [attempt] to induce a breach or disruption of the contractual

Under either state's law, Count VI is defective.  It is therefore dismissed.

### VI.    Civil Conspiracy (Count VII)

Count VII asserts a civil conspiracy claim against all three Defendants.  (*See* Am. Compl. ¶¶ 342–46).  Under both California and Florida law, claims for civil conspiracy generally must be supported by allegations of a standalone tort.  *See Applied Equip.*, 869 P.2d at 457 ("Standing alone, a conspiracy does no harm and engenders no tort liability.  It must be activated by the commission of an actual tort."); *Tejera v. Lincoln Lending Servs., LLC*, 271 So. 3d 97, 103 (Fla. 3d DCA 2019) ("There is no freestanding cause of action in Florida for 'civil conspiracy.'  In order to state a claim for civil conspiracy, a plaintiff must allege an underlying independent tort.").

Plaintiffs allege that the predicate tort here was Robinhood Markets' tortious interference with Plaintiffs' rights under the Customer Agreement.  (*See* Am. Compl. ¶ 343; Resp. 60).  But for the reasons explained, Plaintiffs' tortious interference claim against Robinhood Markets fails.  By extension, the claim for civil conspiracy based on that alleged tort also fails.  *See, e.g.*, *Buckner v. Lower Fla. Keys Hosp. Dist.*, 403 So. 2d 1025, 1027–28 (Fla. 3d DCA 1981) (affirming dismissal of civil conspiracy claim because plaintiff did not adequately allege elements of underlying tort).

Plaintiffs alternatively contend that Count VII should proceed because of an exception to the predicate-tort requirement under Florida law.  Under that exception, a plaintiff may state a claim for an "independent tort of conspiracy" if the alleged conspirators displayed "some peculiar power of coercion . . . by virtue of their combination, which power an individual could not possess."  *Buckner*, 403 So. 2d at 1029 (alteration added; citing *Churruca v. Miami Jai-Alai, Inc.*, 353 So. 2d 547 (Fla. 1977); other citation omitted).  Courts sometimes describe this exception as

---

relationship[.]"  *Ixchel Pharma*, 470 P.3d at 575 (alterations added; citations and quotation marks omitted).  Count VI fails to state a claim for this reason too.

an "economic boycott." *Am. Diversified Ins. Servs., Inc. v. Union Life Fid. Ins. Co.*, 439 So. 2d 904, 906 (Fla. 2d DCA 1983) (quotation marks omitted).  Claims predicated on an alleged "economic boycott" must rest on "allegation[s] of anti-competitive conduct[.]"  *Banco de los Trabajadores v. Cortez Moreno*, 237 So. 3d 1127, 1136 n.9 (Fla. 3d DCA 2018) (alterations added; citation omitted).

Although Plaintiffs, in their Response, attempt to recast Count VII as an independent conspiracy claim, the Amended Complaint's allegations do not support that characterization. Plaintiffs allege only that Defendants conspired to tortiously interfere with Plaintiffs' purported rights — not that Defendants' actions were anti-competitive.  (*See* Am. Compl. ¶ 343).  Likewise, Plaintiffs do not allege that Defendants collectively possessed "power" that "an individual could not possess." *Buckner*, 403 So. 2d at 1029 (citation omitted).  Thus, Florida law's "economic boycott" exception to the predicate-tort requirement does not help Plaintiffs here.

Count VII fails for another reason too.  Under both California and Florida law, "tort liability arising from conspiracy presupposes that the coconspirator is legally capable of committing the tort[.]" *Applied Equip.*, 869 P.2d at 457 (alteration added); *see Richardson v. Progressive Am. Ins. Co.*, No. 2:18-cv-715, 2019 WL 2287955, at *8 (M.D. Fla. May 29, 2019). Here, the relevant, alleged tort is interference with the Customer Agreement.

Again, this alleged predicate creates problems for Plaintiffs.  "[O]ne cannot tortiously interfere with a contract to which it is a party." *Richardson*, 2019 WL 2287955, at *8 (alteration added; citing *Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092, 1099 (Fla. 1st DCA 1999)); *see also Applied Equip.*, 869 P.2d at 459 ("[T]he tort cause of action for interference with contract does not lie against a party to the contract." (alteration added)).  Because Robinhood Securities and Robinhood Financial are parties to the Customer Agreement, neither is "legally capable" of

committing interference.  *Applied Equip.*, 869 P.2d at 457.  That leaves only Robinhood Markets.

Yet "a civil conspiracy requires more than one party" because "it is not possible for a corporation

to conspire with itself[.]"  *Richardson*, 2019 WL 2287955, at *8 (alteration added; citing *Dickerson*

*v. Alachua Cnty. Comm'n*, 200 F.3d 761, 767 (11th Cir. 2000)).  Count VII thus fails to allege a

conspiracy by two or more parties who are legally capable of conspiring to commit a tort against

Plaintiffs.[24]  So, it must be dismissed.

## VII.   Leave to Amend

The Court has afforded Plaintiffs ample time and resources — more than most litigants —

to refine their claims.  This action was consolidated more than eight months ago, and Plaintiffs

filed their initial Complaint [ECF No. 359] in July 2021 with the benefit of having reviewed the

many pre-consolidation pleadings.  Plaintiffs also had the opportunity to review Defendants'

motion to dismiss the initial Complaint [ECF No. 406] before filing the Amended Complaint as of

right.  Before Plaintiffs filed any master pleading — and more than three months before Plaintiffs

filed the Amended Complaint — the Court ordered Defendants to produce thousands of pages of

relevant discovery.  (*See* June 3, 2021 Order [ECF No. 323] 2).  That discovery was so extensive

that the Court granted Plaintiffs' request for an extension of time to amend their initial Complaint

to allow them to review it.  (*See* July 8, 2021 Order [ECF No. 335] 1).

Here's the point.  District courts may deny a Plaintiff leave to amend only when a

"substantial reason" justifies doing so.  *Fla. Power & Light*, 85 F.3d at 1520 (quoting *Shipner*, 868

---

[24] Plaintiffs resist dismissal on this basis by emphasizing that a co-conspirator need not be "a direct participant in the wrongful act."  (Resp. 60 (quotation marks omitted; quoting *AREI II Cases*, 157 Cal. Rptr. 3d 368, 384 (Cal. Ct. App. 2013))).  That observation might be true, but it is also irrelevant.  Count VII is not defective because it fails to allege Robinhood Securities and Robinhood Financial's "direct" interference with the Customer Agreement.  *AREI II Cases*, 157 Cal. Rptr. 3d at 384 (citation and quotation marks omitted).  It is defective because Robinhood Securities and Robinhood Financial are *legally incapable* of tortiously interfering with the Agreement.

F.2d at 406).  That reason exists here.

The Amended Complaint's deficiencies cannot be explained away by a lack of opportunity to cure them.  Nearly a year has passed since the events giving rise to this lawsuit, and in that time, Plaintiffs have been offered many tools to remedy any shortcomings in their legal theories.  Those tools include Defendants' motion to dismiss the initial Complaint, the many individual pleadings filed prior to consolidation, and the exercise of Plaintiffs' right to amend under Federal Rule of Civil Procedure 15(a).  Nonetheless, Plaintiffs have failed to plead a single viable claim.

Plaintiffs also fail to explain how an amendment will resuscitate their case.  They point only to the purported "extreme divergence between Robinhood's internal communications and its public statements."  (Resp. 61).  But that argument misses the point.  "[A] plaintiff 'should not be allowed to amend his complaint without showing how the complaint could be amended to save the meritless claim.'"  *McInteer*, 470 F.3d at 1362 (alteration added; other alteration adopted; citation omitted).

Plaintiffs have not filed a motion for leave to amend or "set forth the substance of the proposed amendment."  *Id.* (citation omitted).  Plaintiffs' failure to explain how next time will be different does not inspire confidence in their ability to state a claim.  *See id.* at 1361–62 (affirming dismissal with prejudice because plaintiff did not identify proposed amendment in request for leave to amend included in response to motion to dismiss); *Lacy v. BP P.L.C.*, 723 F. App'x 713, 717 (11th Cir. 2018) (affirming dismissal with prejudice because plaintiff "failed to allege or propose any new facts that would have cured the complaint's defects").  And substance aside, Plaintiffs improperly request leave to amend "as an afterthought . . . at the ta[il]-end" of their Response.  *Insight Secs.*, 2021 WL 3473763, at *5 (alterations added); *see also Cita Tr. Co. AG v. Fifth Third Bank*, 879 F.3d 1151, 1157 (11th Cir. 2018) ("[W]here a request for leave to file an amended

complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly." (alteration added; quotation marks omitted; quoting *Rosenberg v. Gould*, 554 F.3d 962, 967 (11th Cir. 2009))).

These facts and the Amended Complaint's deficiencies persuade the Court that amendment would be futile.  Even if Plaintiffs filed another complaint, they would, at some point, run squarely into the Customer Agreement — an obstacle they cannot overcome.  *See SFM Holdings*, 600 F.3d at 1340 (affirming dismissal with prejudice because broker "acted pursuant to" its contracts with its customers).  Plaintiffs also cannot argue that dismissal results from inadequate knowledge of the facts.  They received voluminous discovery, including hundreds of pages of Defendants' internal communications, before filing the Amended Complaint.  *In re Fundamental Long Term Care, Inc.*, 873 F.3d 1325, 1342, 1348 (11th Cir. 2017) (affirming dismissal with prejudice because plaintiffs' allegations "were not made at a point in the litigation when [p]laintiffs lacked the necessary knowledge to fill in the blanks[,]" as "[p]laintiffs had enjoyed the opportunity for extensive discovery" (alterations added)).  And, again, the Court liberally granted Plaintiffs additional time review that discovery.  (*See* July 8, 2021 Order).

Simply, there is no cure for the many ailments that plague the Amended Complaint.  Further amendment would thus be futile and leave to amend is denied.

* * *

The result in this case comes down to a simple truth: both California and Florida law require courts to respect and enforce the terms of valid contracts, even when one party to a contract boasts greater bargaining power.  Plaintiffs have not argued or alleged that the Customer Agreement is unenforceable.  Thus, both California and Florida law require holding Plaintiffs to the Agreement's terms.  Those terms permitted Defendants to do precisely what they did.

Plaintiffs' request to enlarge Defendants' obligations beyond those contained in the Agreement is understandable but misguided.  California and Florida law each carve out a vital gatekeeping function for courts faced with novel tort claims.  Indeed, both California and Florida recognize that tort law is an imperfect — and often, an undesirable — mechanism for allocating financial risk and responsibility.  Unlike contract law, which encourages parties to allocate risks related to future events, tort law concerns itself with after-the-fact determinations of fault. Expanding tort law at contract law's expense may cause uncertainty.  And the uncertain threat of ruinous tort liability can discourage behavior that benefits society.  That is why California, Florida, and virtually every other state in the nation make a point of setting "[m]eaningful limits" on tort liability.  *S. Cal. Gas Leak Cases*, 441 P.3d at 896 (alteration added).  One of those limits is a healthy skepticism of tort claims better suited for resolution by contract law — for example, claims for purely economic losses, like those asserted by Plaintiffs here.

No doubt, Plaintiffs were gravely disappointed when Robinhood suspended purchases of the meme stocks and their holdings declined in value.  But the law does not afford relief to every unfulfilled expectation.  Sometimes, it requires "denying recovery in negligence cases like this one even though purely economic losses inflict real pain."  *Id.*  Plaintiffs' claims fail because entertaining them would sanction a departure from the parties' own agreement and California and Florida tort-law principles.  For that reason, the Amended Complaint must be dismissed.

## CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that Defendants' Motion to Dismiss the Robinhood Tranche Complaint **[ECF No. 421]** is **GRANTED**.  The Amended Consolidated Class Action Complaint **[ECF No. 409]** is **DISMISSED** with prejudice.

CASE NO.  21-02989-MDL-ALTONAGA/Torres

**DONE AND ORDERED** in Miami, Florida, this 26th day of January, 2022.

**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:     counsel of record