**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-2989-MDL-ALTONAGA/Torres**

In re: JANUARY 2021 SHORT SQUEEZE
TRADING LITIGATION

**This Document Relates to: All Actions Involving the Federal Securities Laws**

**PLAINTIFFS' OPPOSITION TO DEFENDANTS**
**ROBINHOOD MARKETS, INC., ROBINHOOD FINANCIAL LLC AND**
**ROBINHOOD SECURITIES, LLC'S MOTION TO DISMISS THE**
**CONSOLIDATED CLASS ACTION COMPLAINT**

## **TABLE OF CONTENTS**

I.  INTRODUCTION ................................................................................................................ 1

II. STATEMENT OF FACTS ................................................................................................. 2

   A.  Robinhood Acquires Market Power: The Rise of Robinhood and its History of
       Deception ...................................................................................................................... 2

   B.  Robinhood Uses its Market Power to Manipulate the Affected Stocks and Save
       Itself .............................................................................................................................. 4

   C.  Robinhood Profits Spectacularly From its Market Power ......................................... 7

III. ARGUMENT ..................................................................................................................... 8

   A.  The Federal Securities Laws Are to Be Broadly Interpreted to Provide Relief in
       Market Manipulation Cases ....................................................................................... 8

   B.  Robinhood's Purchase Restrictions Violated Rule 10b-5 ......................................... 11

     1.  Robinhood engaged in multiple manipulative acts ............................................... 12

       a.  Robinhood sent false pricing signals to the market ........................................... 13

       b.  The fact that manipulative purchase prohibitions and restrictions were
          disclosed does not shield Robinhood from liability ........................................... 14

     2.  To save its business, Robinhood intentionally altered the natural forces of supply
       and demand for the Affected Stocks to reduce its required NSCC deposit ............ 17

       a.  Robinhood knew or was severely reckless in not knowing that its actions would
          distort the natural forces of supply and demand ............................................... 18

       b.  Robinhood's financial desperation is evidence of scienter ................................ 20

       c.  Mischaracterizing Robinhood's actions as "standard operations" provides
          additional evidence of intent .............................................................................. 23

   C.  Robinhood Violated §9(a) of the Exchange Act ...................................................... 25

     1.  Plaintiffs' state a claim pursuant to §9(a)(2) ....................................................... 25

       a.  Robinhood engaged in a series of transactions that depressed the price of the
          Affected Stocks ................................................................................................... 26

i

b.   Robinhood intended to reduce its NSCC requirements by driving down share prices......................................................................................................28

c.   Robinhood induced Plaintiffs to sell their shares...............................................30

2.   Plaintiffs state a claim pursuant to §9(a)(4)......................................................30

a.   Robinhood was severely reckless in failing to inform customers of the NSCC deposit requirement in its statements on the morning of January 28.............. 31

b.   Robinhood publicly dissembled about its liquidity crisis while it privately searched for capital to keep the doors open ......................................................36

IV. CONCLUSION .......................................................................................................39

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### <u>Cases</u>

*A. T. Brod & Co. v. Perlow*,
  375 F.2d 393 (2d Cir. 1967) ............................................... 9

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972)........................................................ 9, 12

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)......................................................... 8

*Baum v. Phillips, Appel & Walden, Inc.*,
  648 F. Supp. 1518 (S.D.N.Y. 1986) ............................... 8, 26

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)......................................................... 8

*Brady v. Top Ships, Inc.*,
  17-cv-4987, 2019 WL 3553999 (E.D.N.Y. 2019) ............. 15

*Chemetron Corp. v. Bus. Funds, Inc.*,
  682 F.2d 1149 (5th Cir. 1982) ........................... 11, 25, 31

*Chemetron Corp. v. Bus. Funds, Inc.*,
  718 F.2d 725 (5th Cir. 1983) ....................................... 11

*City of Providence v. BATS Global Markets, Inc.*,
  878 F.3d 36 (2d Cir. 2017)............................................. 24

*Cohen v. Stevanovich*,
  722 F. Supp. 2d 416 (S.D.N.Y. 2010) ....................... 12, 15

*Crane Co. v. Westinghouse Air Brake Co.*,
  419 F.2d 787 (2d Cir. 1969) .......................................... 9

*Ernst & Ernst v. Hochfelder*,
  425 U.S. 185 (1976)......................................................... 9

*FindWhat Inv. Grp. v. FindWhat.com*,
  658 F.3d 1282 (11th Cir. 2011) .................................... 18

*Flamenbaum v. Orient Lines, Inc.*,
  No. 03-22549-CIV, 2004 WL 1773207 (S.D. Fla. July 20, 2004) ................ 12

*Flynn v. Sientra, Inc.*,
  No. CIV 15-07548, 2016 WL 3360676 (C.D. Cal. Jun. 9, 2016) .................................. 21

*GFL Advantage Fund, Ltd. v. Colkitt*,
  272 F.3d 189 (3rd Cir 2001) .................................................................... 11, 13

*In re Barclays Liquidity Cross and High Frequency Trading Litig.*,
  390 F. Supp. 3d 432 (S.D.N.Y 2019) ............................................................ 33

*In re Blech Secs. Litig.*,
  928 F. Supp. 1279 (S.D.N.Y. 1999) ................................................... 10, 11, 12, 14

*In re Hamilton Bankcorp, Inc. Secs. Litig.*,
  194 F. Supp. 2d 1353 (S.D. Fla. 2002) .......................................................... 24

*In re Portal Software, Inc. Secs. Litig.*,
  No. C-03-5138, 2005 WL 1910923 (N.D. Cal. Aug. 10, 2005) .................................... 21

*Koch v. SEC*,
  793 F.3d 147 (D.C. Cir. 2010) .................................................................. 11

*Kraft v. Third Coast Midstream*, 19-CV-9398,
  2021 WL 860987 (S.D.N.Y. Mar. 8, 2021) ....................................................... 15

*Kuehnert v. Texstar Corp.*,
  412 F.2d 700 (5th Cir. 1969) ................................................................... 11

*Nguyen v. Radient Pharms. Corp.*,
  2011 WL 13141630 (C.D. Cal. Oct. 26, 2011) .................................................... 21

*Rooney Pace, Inc. v. Reid*,
  605 F. Supp. 158 (S.D.N.Y. 1985) .............................................................. 25

*S.E.C. v. Zandford*,
  535 U.S. 813 (2002) ............................................................................. 8

*Santa Fe Indus., Inc. v. Green*,
  430 U.S. 462 (1977) ............................................................................ 10

*Schultz v. Applica Inc.*,
  488 F. Supp. 2d 1219 (S.D. Fla. 2007) .......................................................... 38

*SEC v. Conaway*,
  698 F. Supp. 2d 771 (E.D. Mich. 2010) ......................................................... 23

*SEC v. Lek Securities Corp.*,
    276 F. Supp. 3d 49 (S.D.N.Y. 2017) ........................................................................ 13, 26

*SEC v. Masri*,
    523 F. Supp. 2d 361 (S.D.N.Y. 2007) .......................................................................... 15

*SEC v. Resch-Cassin & Co.*,
    362 F. Supp. 964 (S.D.N.Y. 1973) ......................................................................... 12, 25

*Set Capital, LLC. v. Credit Suisse Group AG*,
    996 F.3d 64 (2d Cir. 2021) ............................................................................. 12, 15, 16

*Sharette v. Credit Suisse Int'l.*,
    127 F. Supp. 3d 60 (S.D.N.Y. 2015) .................................................................. 14, 15, 24

*Skiadas v. Acer Therapeutics Inc.*,
    1:19-cv-6137, 2020 WL 3268495 (S.D.N.Y. June 16, 2020) ......................................... 21

*South Cherry Street, LLC v. Hennessee Group LLC*,
    573 F.3d 98 (2d Cir. 2009) ..................................................................................... 20

*Spencer Cos. v. Agency Rent-A-Car, Inc.*,
    No. 81-2097-S, 1981 WL 1680 (D. Mass. Sept. 21, 1981) .............................................30

*Sterne, Agee & Leach, Inc. v. Nat'l. Sec. Clearing Corp.*,
    No. CV-07-BE-909-S, 2008 WL 11424178 (N.D. Ala. Sept. 30, 2008) ........................ 10

*Stevens v. GlobeTel Comm'ns. Corp.*,
    No. 06-21071-CIV, 2007 WL 9701197 (S.D. Fla. Apr. 4, 2007) .............................. 20, 31

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ...............................................................................................17

*Trane Co. v. O'Connor Secs.*,
    561 F. Supp. 301 (S.D.N.Y. 1983) .............................................................................. 15

*Zwick Partners, LP v. Quorum Health Corp.*,
    2018 WL 2933406 (M.D. Tenn. Apr. 19, 2018) ........................................................... 21

## <u>Statutes</u>

15 U.S.C. §78u-4(b)(2)(A) .................................................................................................17

15 U.S.C. § 78u-4(b)(1) .................................................................................................... 31

## <u>Rules</u>

Fed. R. Civ. P. 9(b) ......................................................................................................... 10

Fed. R. Civ. P. 12(b)(6) ........................................................................................................ 7

**Regulations**

17 C.F.R. §240.10b-5(a)&(c)................................................................................................ 11

## I.     INTRODUCTION

At bottom, this is a case about a retail broker that built up a tremendous customer base – by simplifying and gamifying the trading experience to attract first-time investors – desperately trying not to become a victim of its own success when it inexcusably found itself grossly undercapitalized. The explanation for Robinhood's[1] conduct, made both after the financial tsunami it caused, and in its motion to dismiss the complaint,[2] is that what Robinhood did during the Class Period followed "standard procedure" to comply with regulatory requirements. Untrue. None of what Robinhood did during the class period resembles "standard" broker behavior.

The misconduct that enabled Robinhood's five-year rise to prominence as the preeminent retail broker, as well as it its one-week decision to use that dominance to manipulate the prices of the Affected Stocks to save itself from liquidation, demonstrate that Robinhood fits the stereotype of a Silicon Valley start-up: Move fast and break things; let others clean up the mess as you hustle past to the IPO finish line:

> "They were trying to change the rules of the road without understanding how the road was paved and without any respect for the existing guard rails," said Chris Nagy, a former trading executive at TD Ameritrade and the co-founder of the Healthy Markets Association, a nonprofit that seeks to educate market participants. "It ended up creating risk for their customers and systemic risk for the market more broadly."[3]

---

[1] Defendants Robinhood Markets, Inc., and its subsidiaries, Robinhood Financial, LLC and Robinhood Securities, LLC are collectively referred to as "Robinhood."

[2] Citations to the Consolidated Class Action Complaint ("complaint") (Dkt. 446) are to "¶_". Robinhood's Motion to Dismiss (Dkt. 449) is referred to herein as "MTD".

[3] N. Popper, M. Phillips, K. Kelly, and T. Siegel Bernard, "The Silicon Valley Start-Up That Caused Wall Street Chaos," *The New York Times*, Jan. 30, 2021 (last accessed on January 27, 2022, at https://www.nytimes.com/2021/01/30/business/robinhood-wall-street-gamestop.html).  The article is cited in the complaint at ¶94 & n.57.

Robinhood deceived and let down the "everyday" Americans that it claimed to empower. The core mission of the federal securities laws is to protect small investors by ensuring a market ruled by the natural forces of supply and demand rather than by cunning market manipulation.  Congress enacted the Securities Exchange Act of 1934 to prevent just this sort of scheme.

## II.    STATEMENT OF FACTS

### A.    Robinhood Acquires Market Power: The Rise of Robinhood and its History of Deception

Although Robinhood takes pride in the fact that it pioneered commission-free trading for retail investors, for years it went to great lengths to conceal the fact that most of its revenue comes from selling its customer orders to several market makers, through lucrative deals known as "payment for order flow" ("PFOF"), a controversial practice banned in other countries because it pits a broker's interest against those of its customers. This is especially true for Robinhood, which reversed the 80-20 split customarily taken by brokers from the volume discount received from the market-maker, keeping 80% of PFOF and allocating only 20% to a customer discount. As a result of hiding PFOF revenue from customers and violating its duty to obtain "best execution" prices for their trades, in December 2020, Robinhood paid the SEC $65 million, agreeing to a Cease & Desist Order. ¶¶31-34.[4] *Six months later*, FINRA fined Robinhood a record $70 million for, *inter alia*, using bots to clear customers for options trading, and for failure to supervise the technology relied upon to provide core broker-dealer services, causing multiple outages, including for 26 hours on March 2-3, 2020. ¶¶35 n.13, 38 n.17. A 6-year-old brokerage

---

[4] In August 2021, the SEC sought public comment about gamification being used to induce frequent trading, a practice of which Robinhood has been accused. ¶34 & n.11.

being fined $135 million is not "standard".

Heading into 2021, Robinhood was adding new traders at an accelerating pace – increasing its customer base to 12.5 million accounts, with several million daily active traders – dwarfing the combined number of active daily users of all its competitors. ¶¶39, 94.  In early December, it was reported that Robinhood had selected Goldman Sachs to lead its IPO in 2021. *Id*. At the same time, a rise in so-called "meme stock" prices occurred in January 2021, allegedly because retail investors banded together to squeeze hedge funds that had taken large short positions in various of the Affected Stocks.[5] ¶40. As Robinhood's customers piled into these stocks, CEO Tenev continued to champion Robinhood's ability to enable "everyday" Americans to trade and share in the market rally – penning a column *and* appearing on CNBC on January 27. That day, when it was already struggling mightily to manage exploding risk, ¶42, Robinhood hit the top spot in the app store for the first time, with 120,000 downloads. ¶¶44-47.

As it attracted customers new to investing, Robinhood developed a problem as a member of the NSCC. ¶58. The NSCC is a clearinghouse that collects collateral from its members to secure the completion of trades in the two days it takes trades to settle. ¶¶58, 114-16.  Because the NSCC is responsible for unsettled trades, it monitors the risk in its members' unsettled portfolios, and makes capital calls accordingly. ¶58. NSCC capital requirements have two components: a core clearing fund charge, consisting primarily of the value at risk charge ("VaR"), based on the estimated risk in the member's unsettled portfolio, and an excess capital premium charge ("ECP") which compares the member's excess net capital to its core charges. ¶58. To avoid incurring an ECP, the member must

---

[5]The Affected Stocks' symbols are: AMC, BB, BBBY, EXPR, GME, KOSS, NOK, TR, TRVG.

either reduce the risk in its unsettled portfolio or raise additional capital. *Id*. If a member cannot meet capital requirements, it is subject to liquidation.  ¶122.

As the prices of the Affected Stocks soared in late January 2021, Robinhood became increasingly concerned, internally, about its financial ability to handle the massive volume of trading. ¶42 (January 23 email discussing plan to handle Robinhood's risk asks whether Robinhood should consider the impact of the plan on customers, who may be self-directed but are "relatively inexperienced"). Robinhood begun to ratchet up restrictions, raising both initial and maintenance margin requirements for GME and AMC. ¶¶13(a)&(b); 42. Yet it continued to add customers at a record pace.  *Id*. at ¶47. That *is not* "standard" broker procedure.

### B.    Robinhood Uses its Market Power to Manipulate the Affected Stocks and Save Itself

In the early morning hours of January 28 – after Citadel Securities, the largest source of Robinhood's revenue ($326 million in 2020), dictated across-the-board PFOF cuts ¶¶49-51, and anticipating a massive capital call from the NSCC - Robinhood acted unilaterally to cancel in-the-money GME and AMC buy options expiring on January 29 before customers could decide whether to fund the purchase. ¶52.  A few hours later, at 5:11 a.m. EST on January 28, Robinhood received a notice from the NSCC requiring an additional $3 billion (a $700 million VaR charge plus a $2.2 billion ECP charge) to satisfy its daily deposit requirement. ¶¶58, 59 & n.36. As this was far more than Robinhood could pay, Robinhood Markets COO Gretchen Howard called this a "major liquidity issue" and wrote in an internal chat that eight stocks were to be moved to PCO on the Robinhood Financial platform, with all purchases prohibited.  ¶59.

Specifically, before the markets opened, Robinhood "proposed to the NSCC that, as a temporary measure, it would limit customer purchases for volatile stocks that had driven the increased deposit requirements." ¶60. Following that discussion, the NSCC exercised its discretion to waive Robinhood's $2.2 billion ECP for the day – in fact, the NSCC waived net capital charges through February 1, 2021, to allow the trades from both January 27 and January 28 to work through the system. Only because of Robinhood's decision to halt purchases of volatile stocks *and* the NSCC's waiver of the $2.2 billion ECP was Robinhood was able to temporarily solve its "major liquidity issue," meet the NSCC's greatly reduced deposit demand with an additional $700 million payment, and avoid liquidation. ¶60. This *is not* "standard" broker procedure.[6]

When the market opened, Robinhood posted two vague blogs that referenced market volatility and provided a list of stocks moved to position closing only ("PCO").

_____

[6] Robinhood should have never been in the position it found itself on January 28, 2021. As explained in an article by A. Massa, Y. Onaran & M. Leising, "Robinhood's Collateral-Crunch Explanation Puzzles Wall Street," *Bloomberg* (Feb. 6, 2021):

> A week after Robinhood Markets tried to clear the air by explaining why it slapped controversial limits on trading hot stocks, Wall Street's risk professionals are still perplexed: How was the firm so ill-prepared for an obvious surge in collateral calls?

> To the financial industry, anticipating collateral demands from hubs such as the DTCC is Brokerage 101. Major firms assign teams to study the DTCC's methodology, estimate its requests and make sure ample cash is available. David Weisberger [has] been puzzling over Robinhood, given what he called the 'well known' requirements of clearinghouses. 'This was a franchise threatening event.'"

Rejecting excuses from Robinhood's Swartwout, that the events of the last week of January 2021 were extraordinary, and CEO Tenev, for faulting the alleged opacity of the NSCC's formulae, the article continued:  "The rejoinder from industry executives: It's pretty much just math ... In interviews, more than a half dozen senior risk executives – some from Wall Street's largest firms – reacted with bemusement to any assertions that the magnitude of the DTCC's demands cannot be anticipated." https://www.bloomberg.com/news/articles/2021-02-06/robinhood-s-collateral-crunch-explanation-puzzles-wall-street. Last accessed January 27, 2022. Plaintiffs concede that this article was not cited in the complaint, but neither was the article cited by Robinhood. MTD at 16 n.14.  A copy of the article is attached as Exhibit A hereto.

¶¶62-63. Robinhood *did not reveal* that it closed out options (¶52), canceled orders placed after markets closed on January 27 (¶72), and barred purchases of its customers' most-popular stocks because of its NSCC deposit requirements. Not surprisingly, the prices of the Affected Stocks plummeted because of Robinhood's unexplained decisions. Left in the dark as to the true causes of Robinhood's trading restrictions and seeing the prices of the Affected Stocks rapidly fall, investors rushed to sell before the prices sunk even lower. ¶76. Robinhood's actions were immediately and universally decried as market manipulation. ¶69.

The image that Robinhood tried to project in advance of its planned IPO was not one of a company saved from liquidation by *both* the grace of the NSCC's deposit waiver *and* Robinhood taking the extreme action – taken by no other retail brokers – to shut down purchases of 13 stocks for an entire session. ¶67. When CEO Tenev appeared that night on CNBC and explained, for the first time, that a NSCC deposit requirement had dictated its actions, he was asked whether Robinhood had a liquidity problem. CEO Tenev flatly denied it, claiming: "There was no liquidity problem. And to be clear this was done pre-emptively, so we did this proactively[.]" ¶79.

Believing CEO Tenev's statements that Robinhood's actions were not evidence of a liquidity problem and that Robinhood would "re-enable" purchases, premarket trading activity on January 29 was high as investors looked forward to purchasing the Affected Stocks. ¶83. While Robinhood had eased its complete prohibition on purchasing, as the price of the Affected Stocks rose on January 29, Robinhood repeatedly restricted customers' ability to invest by lowering the number of shares customers could purchase. ¶¶84-88. Purchase limits imposed just around 12:30 p.m. and 2:30 p.m. caused an immediate decline in the price of the Affected Stocks. ¶89. This distortion is directly

attributable to Robinhood because no other broker restricted *any* stock's purchase on January 29 (¶90); by the end of the day, Robinhood had restricted 50. ¶87. While CEO Tenev has repeatedly tried to justify extreme trading restrictions by claiming it was "standard procedure," Robinhood's restrictions were far more extreme than any other broker or clearinghouse. ¶¶92-93.

Robinhood was undercapitalized and had to stop the rally in the Affected Stocks because the NSCC had only waived the ECP through the close of business on February 1. Robinhood could have faced another liquidity crisis on February 2 if share prices had continued to rebound on January 29. ¶91. Over the weekend, Robinhood raised $2.4 billion to meet its deposit requirements, but continued to retain various restrictions for another four days. ¶¶107, 112, 117 & 121. By the end of the February 4 trading day, when the "temporary" restrictions were finally lifted, tens of billions of dollars in market value had been erased from the Affected Stocks. ¶125.

## C.    Robinhood Profits Spectacularly From its Market Power

By February 1, only four days after its severe undercapitalization almost caused Robinhood to close its doors, Robinhood had raised $3.4 billion in 96 hours – significantly more that it had raised in the eight years since its founding. ¶9. In fact, one of those lining up to inject capital saw Robinhood's new customer metrics and concluded: "Robinhood is still the only game in town." ¶¶9, 119. Having weathered the storm, Robinhood conducted its IPO on the NASDAQ in July 2021, raising an additional $2 billion. ¶126. While retail investors came away with staggering losses, the internal assessment of Robinhood Financial's President and COO, David Dusseault, that Robinhood would "navigate through this nscc issue" because the company was "to [sic] big for them to actually shut us down," proved to be correct after all. ¶61.

## III.   ARGUMENT

Pursuant to Fed. R. Civ. P. 12(b)(6), for a complaint to withstand a motion to dismiss, a plaintiff need only allege a "short and plain statement of his claim showing that the pleader is entitled to relief," to "give the defendant fair notice of what the … claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). As set forth below, Plaintiffs allege a set of well-pled facts plausibly giving rise to an entitlement to relief against Robinhood.

### A.   The Federal Securities Laws Are to Be Broadly Interpreted to Provide Relief in Market Manipulation Cases

As Robinhood's citation of cases spanning seven decades attests, by their nature, market manipulation cases are relatively uncommon. For this reason, courts often begin their analyses with a statement of Congress's primary objective when §9(a) was enacted: to protect small investors from being exploited by sophisticated actors. In *Baum v. Phillips, Appel & Walden, Inc.*, 648 F. Supp. 1518, 1529–30 (S.D.N.Y. 1986), *aff'd sub nom. Asch v. Philips, Appel & Walden, Inc.*, 867 F.2d 776 (2d Cir. 1989), a case Robinhood cites (MTD at 24), the court explained:

> "The central purpose of section 9(a) is … to keep an open and free market where the natural forces of supply and demand determine a security's price." [Citations] By enacting § 9(a), Congress "sought to protect the small investor by maintaining a market controlled by natural forces rather than by intervention of artificial manipulative devices.…" Id. at 305.

The same reasoning applies in cases alleging violations of §10(b) and Rule 10b-5. In *S.E.C. v. Zandford*, 535 U.S. 813, 819 (2002),[7] the Supreme Court focused on the

---

[7] In the text and quoted sources, we omit parallel citations for Supreme Court cases.

importance of policing the behavior of brokers (such as Robinhood):

> Among Congress' objectives in passing the Act was to "insure honest securities markets and thereby promote investor confidence" after the market crash of 1929. [Citations] More generally, Congress sought " 'to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry.' " *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151 (1972) (quoting *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963)).

> Consequently, we have explained that the statute should be "construed 'not technically and restrictively, but flexibly to effectuate its remedial purposes.' " 406 U.S., at 151 (quoting *Capital Gains Research Bureau, Inc.*, 375 U.S., at 195).

In a similar vein, courts recognize that the application of the securities laws to market manipulation cases must address the ever-changing means by which actors can influence market pricing. In another case cited by Robinhood (MTD at 24), *Crane Co. v. Westinghouse Air Brake Co.*, 419 F.2d 787, 793 (2d Cir. 1969), the court noted:

> We must determine the application of sections 9(a)(2) and 10(b) to the relatively new device of the tender offer, rarely used before 1965, and to the methods here used to combat it. [Citation] ***Manipulative schemes may not be allowed to succeed solely because they are novel***. *A. T. Brod & Co. v. Perlow*, 375 F.2d 393 (2d Cir. 1967).  (Emphasis added.)

In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 202–03 (1976) (MTD at 13), rejecting a negligence standard for scheme liability, the Supreme Court cited the legislative history of the Exchange Act as evidence of intent to ban misconduct yet unknown:

> ...Thomas G. Corcoran, a spokesman for the drafters[,] indicated:

> "Subsection (c) (s 9(c) of H.R. 7852 later s 10(b)) says, '***Thou shalt not devise any other cunning devices.***'

> ***"Of course subsection (c) is a catch-all clause to prevent manipulative devices***. I do not think there is any objection to that kind

of clause. The Commission should have the authority to deal with new manipulative devices." [Citation]8  (Emphasis added.)

*See also Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477 (1977) ("No doubt Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices."). In 1934, no one anticipated that small investors could one day buy and sell stocks on a hand-held device or that a single broker would transact one of every 25 shares traded in the United States (and an even higher percentage of the Affected Stocks), as Robinhood did, so that with the mere flip of a switch that broker could suddenly turn off a significant portion of market demand for a particular stock.

Robinhood asks the Court to find the complaint wanting simply because it does not fit into prior market manipulation fact patterns. *See, e.g.,* MTD at 15, 24. Investors, media outlets, and members of Congress loudly decried Robinhood's blocking of purchases by its 15 million customers as manipulation of the market for the Affected Stocks. Applicable law should not be interpreted to preclude such market interference from its purview simply because no one had dared to do it before.

For this reason, because "[a] claim for manipulation ... can involve facts solely within the defendant's knowledge; ... at the early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim." *Sterne, Agee & Leach, Inc. v. Nat'l. Sec. Clearing Corp.*, No. CV-07-BE-909-S, 2008 WL 11424178, at *11 (N.D. Ala. Sept. 30, 2008); *In re Blech Secs. Litig.*, 928 F. Supp. 1279, 1290 (S.D.N.Y. 1999). Fed. R. Civ. P. 9(b) is satisfied if the complaint "sets forth, to the extent possible, 'what manipulative acts were performed, which defendants performed

---

8 Lest Robinhood suggest that only the SEC, not this Court, has authority to deal with novel cunning devices, it bears noting that this legislative history pre-dated the implied private right of action under §10(b) now embedded in our jurisprudence.

them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue.' " *Blech,* 928 F. Supp. 2d. at 1291.

Finally, Robinhood is incorrect that a failure to state a manipulation claim under §9(a) precludes stating a claim under Rule 10b-5(a)&(c). MTD at 23. On remand, after the Supreme Court vacated *Chemetron Corp. v. Bus. Funds, Inc.*, 682 F.2d 1149 (5th Cir. 1982) ("*Chemetron I*"), even though the "affecting the [sales] price" element of a §9(a)(4) claim had not been proved, the Fifth Circuit reinstated the jury's finding of a Rule 10b-5 violation. 718 F.2d 725, 728 (5th Cir. 1983) ("*Chemetron II*"); *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 206 (3rd Cir 2001) (citing *Chemetron II*).[9]

## B.    Robinhood's Purchase Restrictions Violated Rule 10b-5

Robinhood's efforts to manipulate the Affected Stocks during the class period violated the scheme liability provisions of Rule 10b-5(a) and (c):

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> ***
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. §240.10b-5(a)&(c). To state a claim, a plaintiff must allege "(1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6)

---

[9]  In fact, successful manipulation is not even required. *Koch v. SEC*, 793 F.3d 147, 153-154 (D.C. Cir. 2010)(citing *Kuehnert v. Texstar Corp.*, 412 F.2d 700, 704 (5th Cir. 1969)). For this reason, Robinhood's claim that Plaintiffs "cherry-picked" the stocks to include in the complaint falls particularly flat. MTD at 10.

furthered by the defendant's use of the mails or any facility of a national securities exchange. *Set Capital, LLC. v. Credit Suisse Group AG*, 996 F.3d 64, 75 (2d Cir. 2021). Robinhood only contests the adequacy of two elements: manipulative acts and scienter. MTD at 14.[10] They are well pled; a Rule 10b-5 manipulation claim is adequately alleged.[11]

### 1.      Robinhood engaged in multiple manipulative acts

Stringing together quotations of principles from market manipulation cases, Robinhood argues that pump-and-dump, wash sales, and tender offer cases "illustrate these requirements." MTD at 15-16, 18. They do, but in *Blech,* the court was not perturbed that "classic attributes" of market manipulation were "missing". 928 F. Supp. at 1297-98; *see also SEC v. Resch-Cassin & Co.*, 362 F. Supp. 964, 975 (S.D.N.Y. 1973) ("manipulative activity is not confined to any particular kind of manipulation").

Robinhood's defense boils down to two arguments: (1) only deceptive conduct sending false signals about a stock's true value to unsuspecting traders is actionable; and (2) because Robinhood acted in plain sight, there can be no finding of manipulation. MTD at 15-19. Robinhood cannot prevail on either.

---

[10] On reply, Robinhood should be precluded from challenging the adequacy of any element of Plaintiffs' claims not addressed in the opening brief. *See Flamenbaum v. Orient Lines, Inc.*, No. 03-22549-CIV, 2004 WL 1773207, at *14 (S.D. Fla. July 20, 2004) (and cases cited therein).

[11] The remaining elements are adequately alleged: Pleading a presumption of reliance under the fraud-on-the-market doctrine is sufficient to allege this element of Plaintiffs' §9(a), §10(b), and Rule 10b-5(a)&(c) claims. *See Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 434 (S.D.N.Y. 2010). There is also a presumption of reliance under *Affiliated Ute Citizens v. U.S.*, 406 U.S. 128 (1972), for material omissions. Lead Plaintiff and Named Plaintiffs allege they were damaged when they sold the Affected Stocks. Dkt. 366-3 and Complaint at ¶¶1, 22, 142-49 & Ex. A. Contrary to Robinhood's suggestion (MTD at 11), Lead Plaintiff did not profit from Class Period sales. As a broker, Robinhood used securities exchanges to effect its scheme. ¶¶52, 62.

a.   <u>Robinhood sent false pricing signals to the market</u>

Robinhood asks the court to decide whether it "inject[ed] inaccurate information into the marketplace or creat[ed] a false impression of supply and demand for the security ... for the purpose of artificially depressing or inflating the price of the security." MTD at 15 (quoting *GFL Advantage Fund, Ltd. v. Colkitt,* 272 F.3d 189, 207 (3d Cir.2001)). Without conceding that false signaling is required, Plaintiffs allege that Robinhood created a false impression of actual demand for the Affected Stocks through actions taken *outside* of public view, to wit: canceling purchase orders submitted after markets closed on January 27 (¶62)[12] and by preemptively closing out in-the-money options for GME and AMC before customers could decide whether to transfer funds into their accounts to allow for their exercise. ¶¶52-54. Robinhood also artificially increased supply of the Affected Stocks by closing out positions due to an inability to meet new margin requirements. ¶125. These non-public actions misrepresented the desires of Robinhood's millions of customers with respect to both purchases and sales of the Affected Stocks, deceiving Plaintiffs as to their true value.

Robinhood contends that disclosed actions cannot give false signals – that its customers received notice of canceled trades and involuntarily closed option and margin positions, Robinhood announced purchase restrictions on blog posts, and the media reported new margin requirements for Robinhood customers trading GME and AMC. MTD at 16 & n.14 (Jan.27 article not cited in the complaint).  This argument misses the mark: even if customers and the investing public knew that Robinhood *could* engage in these transactions, that is not the same thing as knowing *the extent to which* Robinhood

---

[12] *Cf. SEC v. Lek Securities Corp.,* 276 F. Supp. 3d 49, 62 (S.D.N.Y. 2017) (§9(a)(2)'s reach extends beyond the actual consummation of purchases or sales).

did so, thereby artificially altering the natural forces of supply and demand. *See Blech*, 928 F. Supp. at 1296-97 (rejecting "truth-on-the-market" defense because earlier disclosure of defendants' transactions in the *Wall Street Journal* did not reveal the "whole story" about the manipulative scheme). In *Blech*, the transactions at issue were disclosed; here, only Robinhood knows how many shares were transacted or when.

Indeed, this is precisely the type of information solely within the knowledge of the manipulator. In *Sharette v. Credit Suisse Int'l.*, 127 F. Supp. 3d 60 (S.D.N.Y. 2015), defendant underwriter created a corporate finance vehicle for a company, ECD, that allegedly enabled unnamed hedge funds to sell short massive amounts of borrowed shares of ECD stock and to convert ECD notes to stock to cover the sales; these actions flooded the market with shares, driving ECD's share price below $1 and the company into bankruptcy. *Id.* at 69-70. Noting that Credit Suisse was in possession of those details, the court rejected the underwriter's assertions that it did not trade and that plaintiffs had not alleged any details about the transactions that depressed the price, *e.g.,* the identity of the hedge funds or the dates or amounts of their sales. *Id.* at 84-85.

Through the various actions it took behind the scenes – involuntary margin sales and options and purchase order cancelations – to distort the natural forces of supply and demand, Robinhood engaged in manipulative acts that sent false signals to the market about its customers' valuation of the Affected Stocks.

> b. The fact that manipulative purchase prohibitions and restrictions were disclosed does not shield Robinhood from liability

Robinhood argues that its purchase bans/restrictions, premature closing of option positions, order cancelations, and involuntary margin sales between January 28 and February 4 were not manipulative because they were disclosed and/or contractually

permitted. MTD at 16.[13] That is not the law: Small investors have a legal *right* to trade in a market in which "natural forces of supply and demand" set prices; they cannot be deprived of a legal *remedy* because these forces were openly manipulated. Investors saw the prices of the Affected Stocks falling and sold into declining/depressed markets; while generally aware of Robinhood's actions, they are not barred from recovery.

It is well-established precedent that lawful, fully disclosed conduct *is* actionable if done with manipulative intent. *E.g., Set Capital, supra,* ("scienter is the only factor that distinguishes legitimate trading from improper manipulation"); *Sharette*, 127 F. Supp. 3d at 82; *cf. Cohen, supra*, 722 F. Supp. 2d at 424 (MTD at 17) (naked short selling, alone, is not manipulative).[14] In *SEC v. Masri*, 523 F. Supp. 2d 361 (S.D.N.Y. 2007), after a lengthy analysis of then-existing case law, the court held that manipulative intent *alone* could transform otherwise legitimate activities into impermissible market manipulation. *Id.* at 366-71. Rejecting the *GFL* requirement (cited in Sec. III.B.1.a, above) that other fraudulent conduct or affirmative false signaling must also be alleged, the court found that "[s]uch a requirement would unnecessarily and improperly place conduct that intentionally distorts prices outside the scope of Section 10(b)". *Id.* at 372.

*Set Capital, LLC., supra*, exemplifies the rule that full disclosure will not shield

---

[13]   Robinhood cites in support two cases in which courts declined to convert mismanagement claims into manipulation claims. MTD at 16-17. *Kraft v. Third Coast Midstream*, 19-CV-9398, 2021 WL 860987, at *23 (S.D.N.Y. Mar. 8, 2021) ("[T]he nub of their claim is that the price signal was accurate, but just not what it should have been had AMID made other decisions."); *Brady v. Top Ships, Inc.*, 17-cv-4987, 2019 WL 3553999, at *7 (E.D.N.Y. 2019), *aff'd. sub nom Onel v. Tops Ships, Inc.*, 806 Fed. App'x. 64 (2020) (where agreements were disclosed and stocks splits were approved by shareholders, failure of a last-ditch financing strategy, alone, did not state a claim).

[14] *Trane Co. v. O'Connor Secs.*, 561 F. Supp. 301 (S.D.N.Y. 1983) (MTD at 17) is inapposite. O'Connor's purchase of a 15% stake in Trane, which raised its share price, was not actionable where O'Connor sought only to profit from a buy back. *Id.* at 304.

otherwise lawful activities from judicial scrutiny where manipulative intent is alleged. Plaintiff had purchased "XIV Notes," the value of which moved inversely to the VIX Short-Term Futures Index ("VIX Index"). Not only were various risk disclosures eye-popping,[15] but Credit Suisse also warned that, as a hedging strategy, it could purchase VIX futures contracts that could affect the value of the VIX Index and "may present a conflict" between the bank's interests and the interests of investors. *Id.* at 71-72. After Credit Suisse's hedging purchases of VIX futures contracts caused a liquidity squeeze driving up the VIX Index, the value of the XIV Notes plummeted and plaintiffs filed suit.

Credit Suisse asserted its extensive risk disclosures, including its express right to trade against the interests of its customers, precluded liability. The court rejected the defense because Credit Suisse knew that when it engaged in hedging activities in the past, the value of XIV Notes had declined: "[I]t is no defense that Credit Suisse's transactions were visible to the market and reflected otherwise legal activity. Open-market transactions that are not inherently manipulative may constitute manipulative activity when accompanied by manipulative intent." *Id.* at 77.

Regardless of whether purchase prohibitions and restrictions may be permitted under its customer contracts, the fact that Robinhood publicly imposed them does not immunize Robinhood from liability where, as here, it acted with manipulative intent.[16]

---

[15] Because XIV Notes are "designed as short-term trading vehicles for investors managing their portfolios on a daily basis," "[t]he long term expected value of your ETNs is zero." "If you hold your ETNs as a long term investment, it is likely that you will lose all or a substantial portion of your investment." 996 F.3d at 72.

[16] Robinhood contends that an SEC bulletin "reiterated…that brokers have the authority to restrict trading during periods of volatility and that brokers may reserve that right in their customer agreements" MTD at 17 & n.15. Not quite. The SEC stated, in relevant part:

The national securities exchanges and FINRA have rules designed to address market volatility in stocks listed on a national securities exchange. The "Limit up-Limit Down" rules are designed to prevent trades in these stocks from occurring outside a specified

>    **2.   To save its business, Robinhood intentionally altered the natural forces of supply and demand for the Affected Stocks to reduce its required NSCC deposit**

Under the Private Securities Litigation Reform Act, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2)(A). To determine whether scienter is sufficiently alleged for a Rule 10b-5 violation, "[a] complaint will survive ... only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 324 (2007).

Robinhood admits the most cogent explanation of events is that it "put in place its purchasing restrictions[] in response to the volatility flowing through its platform and the resulting collateral deposit requirements imposed by the NSCC." MTD at 26. Candor does not absolve Robinhood of liability; rather, it proves it. Robinhood has paid an astonishing $135 million in fines in seven years of operation due to the improper ways it operated its platform and dealt with its customers. ¶¶32-34, 35 n.13, 38 n.17. No doubt Robinhood had business reasons for engaging in its prior misconduct. While staving off liquidation

---

price band. This price band is set at a percentage level above and below the average price of the stock over the immediately preceding five-minute trading period. If a stock's price moves outside these price bands for more than 15 seconds, ***trading in the stock will be paused for five minutes*** ...

Also, broker-dealers may reserve the ability to reject or limit customer transactions. This may be done for legal, compliance, or risk management reasons, and is typically discussed in the customer account agreement. In certain circumstances, broker-dealers may determine not to accept orders where a transaction presents certain associated compliance or legal risks. (Emphasis added.)

Contractual rights aside, the SEC *did not* endorse Robinhood acting as its own stock market – basing its determination of "market volatility," in part, on its gross undercapitalization – and then ignoring the Limit up-Limit Down Plan and instead setting its own rules for the Affected Stocks for a week. ¶¶104-106.

explains Robinhood's conduct here, doing so by manipulating the natural forces of supply and demand – driving down the prices of the Affected Stocks to enable Robinhood to meet deposit requirements – violates the securities laws.

> a. Robinhood knew or was severely reckless in not knowing that its actions would distort the natural forces of supply and demand

In this Circuit, "scienter consists of intent to defraud or severe recklessness on the part of the defendant." *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1299 (11th Cir. 2011) (internal citations omitted). With one of 25 shares on all U.S. exchanges in January 2021 trading on Robinhood's platform (¶5), and 2.6 million active users on January 27 (¶47), Plaintiffs allege in detail that Robinhood knew or was severely reckless in not knowing that its actions would preclude the "natural forces of supply and demand" from setting the true prices for the Affected Stocks.

Robinhood *knew* that millions of its customers' ardent interest in purchasing the Affected Stocks was the reason for its predicament. ¶99. ("In a matter of days, our clearinghouse-mandated deposit requirements related to stocks increased ten-fold … They are what led us to put temporary buying restrictions in place on a small number of securities that the clearinghouses had raised their deposit requirements on.") Unlike its well-established competitors which did not resort to the extreme measures taken by Robinhood (¶¶4, 93), on January 28, Robinhood was a private company that, after many rounds of financing, had raised significantly less than the $3.4 billion it needed to procure in the next 96 hours to keep its doors open. ¶9. Robinhood was faced with a choice: reduce risk or raise capital. Inexcusably failing to have properly funded operations *before* receiving the NSCC's $3 billion deposit demand, on the morning of January 28, Robinhood told the NSCC that it would temporarily prohibit purchases of eight of the

Affected Stocks.  ¶¶59-60.

Robinhood *expected* negative customer and regulatory reaction to this damaging decision and started to brace for it. ¶102 n.60 ("we're going to get crucified…for pco'ing", "I think the blowback from this is going to be exponentially worse as time goes on…" "Need to inform FINRA of expectations around plan for pco symbols & expected increase in complaint impact").  Yet when Barstool Sports blogger Dave Portnoy asked why Robinhood had roiled the markets, CEO Tenev feigned ignorance, indicating Robinhood followed "standard procedure":

> Portnoy: When you force people to sell . . . you only allow them to sell but they can't buy, you cratered the stock, like that was the decision that cratered the stock, and I saw your quote, "People get pissed off if they are holding stock, and they can't sell it." Which I guess is true, but I guarantee you, if you polled your customer base, and said, listen, we're just gonna freeze it. Like when the market is tumultuous, they freeze stock, so you can't buy or sell, it's just frozen at that value. And you have your client base, all buying it; they would have rather said, freeze it, just figure out what [Robinhood's] issues are, liquidity, whatever they may be; figure it out, and then turn it back on and let me buy and sell, but you – and when I say you, Robinhood – manipulated that stock price. You cratered it … So how do you rationalize not freezing it? … You cratered the market.

> Tenev: Well, first of all, let me say that we're speculating now …

> Portnoy: There's no speculation that when you only allow somebody to sell a stock and not buy it, you crater it. That's not speculation.

> Tenev: Well, PCO'ing, marking a stock position closing only, is a standard procedure, and it's what the other brokers did in this case as well … It actually comes from the capital requirements. The VaR formula was in this case driven by the one-sided long position, so it actually wouldn't help us; wouldn't help the deposit requirements to restrict selling in this case …. Restricting selling wouldn't help the exponential growth in the deposit requirements …

> Portnoy: I still don't feel like I got a straight answer why you didn't do both [restrict buying and selling]

¶103. It is not plausible that someone who created programs to improve trade speeds by

nanoseconds, ¶30, knows less about the effect of a demand freeze than a sports blogger.[17]

"Severe recklessness" connotes conduct that "represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *South Cherry Street, LLC v. Hennessee Group LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (citations and emphasis omitted). MTD at 23. Here, scienter is also demonstrated by the stark difference between Robinhood's actions and the industry standard for addressing extreme volatility in a stock – imposing a 5-minute pause on all trading. ¶¶104-105.[18] Acting in its own self-interest, Robinhood substituted the industry's fine-tuned volatility-tamping procedure with a "blunt hammer" – barring purchases for an *entire session*. ¶97 (quoting CEO Tenev). Robinhood continued to impose some form of restrictions for *five more* entire trading sessions. ¶121.  Under *South Cherry*, the danger to the markets for the Affected Stocks posed by its extreme departure from the LULD Plan was so obvious, it must have been known to Robinhood.

> b.  Robinhood's financial desperation is evidence of <u>scienter</u>

Although this Court has held that, "without more," motives generally applicable to all corporations and executives are insufficient to establish scienter,[19] it is well established

---

[17] Tenev's statement to Elon Musk on January 31 about Robinhood allowing sales of the Affected Stocks because "People get really pissed off if they're holding stock and they want to sell it and they can't" (¶101), was a misleading statement, made with scienter, to deflect from Robinhood's manipulative act to depress the prices of the Affected Stocks. *See Conway, supra*. Robinhood provides no evidence (other than its own statements) to show that customers were clamoring to sell the Affected Stocks into a market where a portion of the demand was shut off, distorting the natural forces of supply and demand.  *See* MTD at 33, 39.

[18] Even though there were 19 such pauses with respect to GME on January 28, shares still traded for more than 75% of the session. ¶106.

[19] *E.g., Stevens v. GlobeTel Comm'ns. Corp*., No. 06-21071-CIV, 2007 WL 9701197, at *13

that a company's dire financial condition provides evidence of scienter.[20]

CEO Tenev not only admitted that liquidation was imminent and Robinhood sought to save itself, but also the context in which Robinhood acted underscores the company's precarious position: Having been informed on the evening of January 27 of across-the-board cuts to its largest source of revenue, PFOF from Citadel, Robinhood was even more worried about its undercapitalization. ¶¶49-52.

On February 23, Portnoy objected to CEO Tenev's vehement claim on CNBC on the night of January 28 that Robinhood did not have a liquidity problem – something admitted internally by Robinhood Markets COO Gretchen Howard that very morning (¶59) – because it acted "proactively." ¶79. Portnoy forced CEO Tenev to admit this was untrue: because Robinhood did not have a sufficient capital cushion, it *had been* in danger of liquidation when it manipulated demand for the Affected Stocks:

> Tenev: ***If we had a bunch more headroom, yes, we probably would have let things continue . . .***
>
> Portnoy: Well if you didn't get a call that says, hey, we need this money from you, you wouldn't have shut off buying?
>
> Tenev: Correct. The last thing we would want to do is shut off buying.

---

(S.D. Fla. Apr. 4, 2007); *Underwood v. Lampert*, No. 02-21154-CIV,  2004 WL7332754, at *13 (S.D. Fla. Aug. 30, 2004).

[20] *See, e.g., Skiadas v. Acer Therapeutics Inc.*, 1:19-cv-6137, 2020 WL 3268495, at *11 (S.D.N.Y. June 16, 2020), *recon. denied*, 2020 WL 4208442 (S.D.N.Y. July 21, 2020) ("allegations of motive adequate where the company's needed to fundraise to survive"); *Zwick Partners, LP v. Quorum Health Corp.*, 2018 WL 2933406, at *10 (M.D. Tenn. Apr. 19, 2018) (need to secure $1.2 billion in financing provided a motive to delay impairment charge in violation of GAAP); *Flynn v. Sientra, Inc.*, No. CIV 15-07548, 2016 WL 3360676, at *15 (C.D. Cal. Jun. 9, 2016) (defendants allegedly concealed a plant's contamination to "raise enough money in the SPO to keep Sientra afloat and prevent a default on its loan with Oxford"); *Nguyen v. Radient Pharms. Corp.*, 2011 WL 13141630, at *6 (C.D. Cal. Oct. 26, 2011); *In re Portal Software, Inc. Secs. Litig.*, No. C-03-5138, 2005 WL 1910923, at *12 (N.D. Cal. Aug. 10, 2005) ("Portal's finances were such that the $60 million was absolutely necessary to keep Portal a 'going concern.'").

Portnoy: That is a capital issue, he specifically said, a liquidity issue, you need this much money, you didn't have it, so you acted. Isn't that the essence of liquidity? Like, are you afraid to say liquidity, because of a domino effect with the banks?

Tenev: I think that liquidity issue, and I probably should be careful and call it the "L word," right, the "L word" is a big thing in financial services. Basically, if you say liquidity issue means you can't meet your capital requirements, or your deposit requirements, then you're essentially dead, and that was not the case with Robinhood. We met our capital requirements; we met our deposit requirements...

Portnoy: **But that theoretically could be a technicality, right, if you didn't change the trading of that day you may have had a liquidity issue tomorrow?**

Tenev: **Exactly. I think that's accurate**. (Emphasis added.)

¶80(d)(i)&(ii).

Additionally, CEO Tenev freely admitted that Robinhood barred purchases of the Affected Stocks to save itself. ¶78 (told CNBC it was to "protect the firm"); ¶15 (told Portnoy: "If Robinhood ceases to exist," greater harm would ensue. "Protecting the firm and protecting the system, ultimately, that was the best thing for customers."). CEO Tenev went on national television *and* wrote a column for CNBC *on January 27*, attracting as many as 120,000 new customers that day, at a time the company was worried about the amount of risk in its portfolio and was already spectacularly undercapitalized for the meme stock trading its customers so desired. Having put itself in an undercapitalized position that industry risk experts could not fathom (*see* n. 6, *supra*), Robinhood cannot suddenly ask the Court to forgive it for violating the securities laws to save the firm and its customers.  While it may be true that liquidation would have been a worse result, that fact does not immunize Robinhood from liability. [21]

_____

[21] In its ruling on the motion to dismiss the state law claims alleged in the Robinhood Tranche Amended Consolidated Class Action Complaint (Dkt. 453), the Court discussed

c.    Mischaracterizing Robinhood's actions as "standard
operations" provides additional evidence of intent

Robinhood's January 28 restrictions on purchases of the Affected Stocks were not only unheard of, but they were far more extreme than any other brokers: E*Trade enacted purchase bans on AMC and GME only, for a short period of time; Apex asked its introducing brokers to shut off the buy button for AMC, GME and KOSS for 3 ½ hours; other retail brokers raised margin requirements. ¶93(a)-(d). Therefore, CEO Tenev's repeated efforts to deflect questions about Robinhood's extreme restrictions by pointing to other brokers' restrictions or describing its actions as "standard procedure" (¶¶92, 100, 103) are evidence of Robinhood's intent to deflect attention from its manipulation, as is Robinhood's lashing out at the two-day settlement period (despite DTCC CEO Michael Bodson's testimony that real-time settlement would endanger market liquidity). ¶¶114-116. *See SEC v. Conaway*, 698 F. Supp. 2d 771, 888 (E.D. Mich. 2010) (misleading statements made to deflect attention are evidence of scienter).[22]

Robinhood ignores these well-pled scienter allegations and instead tries to knock down a few straw men. Two arguments focus on Robinhood's IPO; both are red herrings. MTD at 3, 24-25. The first is backward-looking, claiming that the "success" of the July

---

plaintiffs' allegations that Robinhood fueled trading while not sufficiently capitalized "to protect against the known risks associated with concentrated positions in highly volatile [securities]" Order at 56 n.21 (quoting from complaint). Although the Court did not find the state law claims alleged therein suitable for redressing the materialization of the risk arising from Robinhood's severe undercapitalization, the federal securities laws can and do protect investors who are injured when stocks are manipulated so that an irresponsible actor such as Robinhood can climb out of its financial hole.

[22] Robinhood quibbles with whether the statements are false or made with scienter because CEO Tenev did not say Robinhood's restrictions were exactly the same as other brokers and, in any event, all restrictions were public and no one could have been misled. MTD at 32-33; 38-39. Plaintiffs' allegations show intent to manipulate. Whether or not anyone was taken in is not relevant, as it is not an element of the claim. *See* n. 9.

IPO had nothing to do with the prices of the Affected Stocks six months earlier. But, as CEO Tenev explained, "if you can't meet your capital requirements, or your deposit requirements, then you're essentially dead." ¶80(d)(ii). A dead company does not conduct an IPO. Moreover, during a February 12 podcast, CEO Tenev admitted to having the brass ring as motivation during the Class period, sharing advice received from an early investor in Robinhood: "[N]avigating a crisis successfully unlocks the next level of value creation for the company … I've had that in mind the entire time." ¶96.

Robinhood next characterizes the goal of going public as too general a motive. MTD at 25. In addition to the other facts alleged, the desire to complete the IPO already being planned with Goldman Sachs (¶39), supports a finding of scienter. *In re Hamilton Bankcorp, Inc. Secs. Litig.*, 194 F. Supp. 2d 1353, 1358 (S.D. Fla. 2002).

Robinhood's weakest argument is that it had no financial reason to manipulate the prices of the Affected Stocks because it did not trade them. MTD at 24. That argument was squarely rejected in *City of Providence v. BATS Global Markets, Inc.*, 878 F.3d 36, 49-50 (2d Cir. 2017), where a manipulation claim was stated against national markets that did not themselves trade because they sold services to high-frequency traders ("HFTs") that allowed HFTs to gain pricing advantages over plaintiffs. *See also, Sharette, supra*, 127 F. Supp. 3d 98-101 (underwriter that did not itself trade created a financing structure for its corporate client that enabled hedge funds to profit). The further claim that "Robinhood did not 'st[and] to gain anything from artificially driving [down] the price,'" of the Affected Stocks (MTD at 24), ignores CEO Tenev's admission that Robinhood did not have "headroom" to continue to allow its customers to take long

positions in the Affected Stocks at the astronomical highs they were reaching each day.[23]

Plaintiffs having adequately pled both manipulative acts and scienter, Robinhood's challenge to their Rule 10b-5(a)&(c) manipulation claim fails.

### C.   Robinhood Violated §9(a) of the Exchange Act

Sections 9(a)(1)-(6) prohibit manipulation of securities prices by a variety of actors, using a variety of means. Section 9(f) extends liability for §9(a) violations to "[a]ny person who willfully participates in any [such] act or transaction."[24] The two subsections of the statute that apply to Robinhood's misconduct are §9(a)(2) and (4). Specifically, Robinhood's intentional actions to depress prices of the Affected Stocks and its admitted materially misleading statements – omitting that its purchase prohibitions stemmed from an inability to meet a specific NSCC deposit demand and a flat denial of its liquidity problem – create liability under §9(a)(2) and (4), respectively.

### 1.   Plaintiffs' state a claim pursuant to §9(a)(2)

The elements of a §9(a)(2) claim are: (1) a series of transactions in a security creating actual or apparent trading in that security or raising or depressing the price of that security, (2) carried out with scienter (3) for the purpose of inducing the security's sale or purchase by others, (4) was relied on by the plaintiff (5) and affected plaintiff's purchase or selling price. *Chemetron I*, *supra*, 682 F.2d at 1164. Robinhood only contests

---

[23] Proof that Robinhood acted to help Citadel – information in Robinhood's possession pending discovery – is not an element of Plaintiffs manipulation claims. MTD at 25-26. It is enough to plead that Robinhood manipulated stock prices to help itself.  ¶¶71-72.

[24] Cases addressing §9(f)'s "willful participation" standard have not set too a high pleading burden. *SEC v. Resch-Cassin & Co., Inc.*, 362 F. Supp. 964 (S.D.N.Y. 1973), a case Robinhood cites twice, held that willful participation was pled where a defendant had a duty to investigate the reason for postponements of an IPO closing and failed to do so. In *Rooney Pace, Inc. v. Reid*, 605 F. Supp. 158 (S.D.N.Y. 1985), where defendant in an alleged larger scheme placed a single trade for which he only intended to pay if the share price rose, plaintiff adequately alleged "willful" participation.  *Id.* at 162-63.

the first three elements. MTD 20-21, 23-26. The complaint pleads a claim.[25]

a.  Robinhood engaged in a series of transactions that
    <u>depressed the price of the Affected Stocks</u>

It is the "central purpose of section 9(a) ... to keep an open and free market where the natural forces of supply and demand determine a security's price." *Baum,* 648 F. Supp at 305. Robinhood distorted supply and demand by prematurely closing out in-the-money options, involuntarily canceling submitted purchase orders, and liquidating shares of the Affected Stocks held in margin accounts. ¶¶52-53, 62, 125. In so doing, Robinhood affected a series of transactions that depressed the prices of the Affected Stocks. *See Lek,* 276 F. Supp. 3d at 62.[26] As stated above, Robinhood's assertion that it did not trade in its own account fails under *City of Providence* and *Sharette*.

The complaint alleges that Robinhood was able to interfere with natural market forces through these transactions because it was *the* dominant retail brokerage – and Robinhood knew it. On the morning of January 28, Robinhood Financial's President and COO, David Dusseault, was confident they would "navigate through this nscc issue" because Robinhood was "to [sic] big for them to actually shut us down". ¶61. Dusseault was correct. Bloomberg found that transactions on the Robinhood platform accounted for *4% of all U.S. trading volume in January 2021*. ¶95. Because Robinhood's market share vastly exceeded all retail competitors – boasting 15 million traders, and, even more

---

[25] With respect to the fourth element, Plaintiffs allege reliance based upon the fraud-on-the-market presumption and *Affiliated Ute, supra. See* n. 11. With respect to the fifth element, Lead Plaintiff and the Named Plaintiffs, as set forth in their certifications, all sold shares of the Affected Stocks specified therein while Robinhood's restrictions on those stocks were in place, depressing the share values. ¶22 and Exhibit A.

[26] Robinhood's citation of *Baum* (MTD at 20) is inapposite. The plaintiffs in *Baum* failed to meet the "in connection with" requirement because the broker did not carry out their repeated requests to sell their shares. 648 F. Supp. at 1525-26.

26

important, more daily active traders, 2.7 million, than all competitors *combined* (¶¶5, 7 & n.3, 39, 47, 94, 119) – Robinhood's distortion of both supply and demand caused prices of the Affected Stocks to sharply decline. ¶¶13 and 76.[27]

Indeed, Robinhood's singular power to move markets in either direction by imposing or loosening restrictions was acknowledged by CNBC and the *Wall Street Journal*. ¶¶83, 108, 113 (up); ¶87 (at p.45) (both up and down),[28] and is evidenced in the price movements for the Affected Stocks on January 29, a day during which only Robinhood imposed any share purchase restrictions. ¶¶4, 93. Robinhood had lifted its total bans but ratcheted up purchase caps twice during the afternoon, causing prices to fall each time. ¶89 (and charts).[29]

Robinhood's oversized footprint and industry-leading position was the very reason that investors quickly shored up its capital position, with $3.4 billion pouring in over the course of 96 hours as Robinhood's notoriety shone a spotlight on its power over markets.

---

[27] Robinhood argues that a failure to include all 51 stocks upon which Robinhood placed restrictions during the Class Period "cast[s] doubt on a fundamental premise of Plaintiffs' 'market manipulation' theory, *i.e.*, that Robinhood's PCO caused the price decline in the nine Affected Stocks."  MTD at 9-10. The fact that Robinhood might not have been able to distort the market for all 51 stocks is not dispositive: taking away its customers' ability to buy GameStop had a more pronounced effect on price than doing the same for American Airlines. Robinhood's denial that its purchase restrictions affected the price of the Affected Stocks is surprising in light of CEO Tenev's admission that the PCO was designed to rein in the long positions – *i.e.,* control the upside of the Affected stock prices – that were driving up Robinhood's capital requirements. ¶103.

[28] *See, e.g.,* ¶87 (1/29 CNBC: "[GME], which closed up 67%, was off its highs of the session as the new more severe limits were implemented.... Clients without existing shares can only buy one share … in AMC[ ], which is down from an earlier 115 shares. Shares of AMC [ ] closed up 53% but also well off their highs of the day"); ¶108 (2/1 *Wall Street Journal* article noted that Robinhood had relaxed restrictions in the overnight hours and, by 6:00 a.m., "[t]welve of the 13 stocks that Robinhood Markets had restricting trading in last week jumped premarket.").

[29] The Amended and Consolidated Class Action Complaint-Antitrust Tranche (Dkt. 451) ("AT Complaint"), at ¶¶325-336, cites additional evidence of Robinhood's market power.

¶¶8, 9, 12(b)&(c), 39, 94, 119 ("[T]he metrics suggest retail trading is exploding and Robinhood is still the only game in town."). Consequently, on February 3, it was reported that Robinhood's IPO was "full steam ahead." ¶120.

b.  Robinhood intended to reduce its NSCC requirements
by driving down share prices

Robinhood graphically depicts a steep rise in the price (GME) and the volume of sales in the Affected Stocks, particularly on January 27, 2021. MTD at 5-7. Because a significant portion of that purchase volume was attributable to Robinhood customers, on January 28, Robinhood received a deposit demand that was "nearly 5 times the deposit requirement from the preceding day." MTD at 8. The requested deposit to cover its customers' long positions in the Affected Stocks "presented significant challenges to Robinhood's ability to satisfy its initial collateral deposit requirements to NSCC on January 28." MTD at 5. Due to Robinhood's undercapitalization, according to CEO Tenev, Robinhood barred purchases but not sales of the Affected Stocks because: "The VaR formula was in this case driven by the one-sided long position, so it actually wouldn't help us …. Restricting selling wouldn't help the exponential growth in the deposit requirements." ¶103. But depressing prices by stifling demand brought Robinhood's deposit requirement down. ¶71.

In addition to the scienter arguments set forth in Sec. III.B.2, above, the complaint pleads additional evidence of willful conduct. First, Robinhood knew its actions would depress the prices of the Affected Stocks. On January 26, before Robinhood imposed increased purchase and maintenance margin requirements on GME and AMC,[30] 30-year

---

[30] According to the article cited by Robinhood (MTD at 16 n.14), the increased margins for GME and AMC were made public on January 27.

industry veteran Robinhood Securities President and COO James Swartwout told other executives in a company chat: "I sold my AMC today. FYI – tomorrow morning we are moving GME to 100% – so you are aware." ¶74. A top executive told others at Robinhood that he sold AMC shares before he imposed higher margin requirements (¶73 n.47). If Swartwout feared the negative impact of a higher obstacle to purchase, a complete purchase ban would cause even more harm.

Second, Robinhood's uniquely manipulative conduct on January 29 was willful. On the night of January 28, CEO Tenev announced on CNBC and CNN that Robinhood would reopen trading in the Affected Stocks the next day. ¶¶81-82. In the morning, there was high premarket trading, bolstered by a CNBC report that Robinhood had secured $1 billion in financing to improve its liquidity to enable purchases. ¶83. Although Robinhood imposed purchase limits at the market open (¶84), by several hours into the trading day, prices of the Affected Stocks had significantly rebounded. Suddenly, Robinhood was again in danger of not being able to meet its NSCC deposit requirements on February 2, after the two-day NSCC waiver of the excess premium charge expired. ¶¶12(a), 91. Fearful that the trades from January 29 could cause a liquidity problem if billions of dollars more were not raised to provide capital headroom, Robinhood imposed tighter purchase limits twice during afternoon trading. ¶¶84-88.[31] On each occasion, trades were suddenly canceled as customers' total holdings reached a newly imposed cap or a new restriction caused a submitted trade to suddenly exceed a new, even lower, purchase limit.[32] After the 12:30 and 2:30 restrictions went into effect, the prices of the Affected Stocks declined. ¶89 (and

---

[31] Interactive Brokers' Thomas Peterffy similarly feared that even limited trading by an undercapitalized Robinhood on January 29 posed a risk.  CC at ¶60 n.39.

[32] *See, e.g.,* CC at ¶¶125, 137(c); AT Complaint at ¶254 (screenshots of rejections).

charts). Robinhood halted the price rebound to prevent its NSCC deposit requirement from ballooning out of reach yet again. ¶91.

c.    <u>Robinhood induced Plaintiffs to sell their shares</u>

Robinhood's goal was to lower the price of the Affected Stocks so that it could meet its core deposit requirements with the NSCC with respect to its customers' long positions. ¶71. To do so, Robinhood successfully induced panic selling by Plaintiffs as the price for the Affected Stocks plummeted. ¶¶69, 125, 140. For this reason, Robinhood's citation of *Spencer Cos. v. Agency Rent-A-Car, Inc.*, No. 81-2097-S, 1981 WL 1680 (D. Mass. Sept. 21, 1981) (MTD at 20-21) is particularly inapposite. The court held that it was not manipulative for Agency to publicly amass a significant stake in Spencer, causing the latter's share price to rise, because Spencer was in the best position to decide whether the corporation's value justified payment of a buy-back premium. *Id.* at *4. Here, the opposite was true: Robinhood's so-called "temporary"[33] restrictions caused prices to both fall and rise as they were imposed and loosened; Plaintiffs were not only unable to assess the true value of the Affected Stocks while restrictions were in effect but no one knew when they would end. As prices fell, worried investors sold to cut their losses, further depressing the price.

Having satisfied each element, Plaintiffs have stated a claim under §9(a)(2).

**2.    Plaintiffs state a claim pursuant to §9(a)(4)**

The elements of a §9(a)(4) claim are: (1) misstatement or omission (2) of material fact (3) made with scienter (4) for the purpose of inducing a sale or purchase of a security

---

[33] Robinhood called the restrictions "temporary" on both January 28 and 31, and in a February 4 blog post when they were lifted. CC at ¶¶60, 99 and 121. A LULD five-minute freeze of buying and selling is "temporary", one-sided caps lasting days are not.

30

(5) on which the plaintiff relied (6) that affected plaintiff's purchase or selling price. *Chemetron I*, 682 F. 2d at 1161-62.  Each of these elements is properly alleged.[34]

Pursuant to the PSLRA, falsity is pled when Plaintiffs "'specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading ...' 15 U.S.C. § 78u-4(b)(1)." The element of scienter is satisfied by pleading an "aggregation of" "particular facts giving rise to a strong inference that the defendant acted 'in a severely reckless manner." *Stevens, supra*, 2007 WL 9701197 at *9-10.

Robinhood cannot disavow CEO Tenev's frank admissions about the misleading nature of its initial statements to customers about why it prohibited purchases of the Affected Stocks or the fact that he admitted to Robinhood's liquidity crisis less than a month after denying it twice on national television.

> a.   Robinhood was severely reckless in failing to inform customers of the NSCC deposit requirement in its <u>statements on the morning of January 28</u>

Robinhood freely admits that on the morning of January 28, it had insufficient capital to meet the NSCC's initial deposit demand and that the NSCC lowered Robinhood's required deposit after Robinhood told the NSCC that it would halt purchases of eight of the Affected Stocks. MTD at 5, 8-9. These facts were first revealed, however, only after investors, the media, and legislators spent the day excoriating Robinhood for the detrimental effect of its actions on the prices of the Affected Stocks. ¶¶69-70, 76. In full damage-control mode – with accusations flying that Robinhood sold out small investors to Wall Street predators – on the *evening* of January 28, CEO Tenev took to the

---

[34] The elements of affecting the sales price and inducing the sale are the same as a §9(a)(2) claim and Plaintiffs incorporate their argument in Secs. III.C.1.a and III.C.1.c herein. Although Robinhood does not attack the pleading of reliance, it is adequately alleged. *See* n. 11, *supra*.

airwaves to tell a less scandalous story: Robinhood's actions stemmed from the receipt of an NSCC deposit demand that Robinhood could not meet. ¶¶77-79, 82.

On the *morning* of January 28, however, Robinhood did not want these facts to be made public.  With an IPO in the works, Robinhood did not wish to broadcast that serious undercapitalization was the reason it took the drastic measure of shutting off the "buy" button for the popular Affected Stocks (as well as canceling purchase orders, selling shares bought on margin, and PCOing in-the-money options[35]). For this reason, Robinhood's communications to customers that morning *mentioned nothing* about its deposit requirements with the NSCC. The first "market volatility" statement said nothing about either the decision to PCO eight stocks or the NSCC deposit requirement:

> We wanted to reach out to you in the midst of the current volatile market conditions. It's as important as ever to be an informed investor. Whether you're brand new to Robinhood or have been investing with us for years, we have lots of resources to help you navigate the markets, including Investing 101 and our entire Help Center.
>
> Here are some specific articles from Robinhood Learn to help make sense of market volatility:
> -- The stock market has been super volatile – How can I make sense of it?
> --Volatility explained
>
> As always, thank you for being a Robinhood customer.
> Sincerely,
> The Robinhood Team

---

[35] Robinhood asks the Court to ignore Robinhood Securities President and COO James Swartwout's February 8 statement under oath that Robinhood did not close out in-the-money options on or after January 27, *but see* ¶¶52-57, because it was made after the Class Period. MTD at 31 n.20. Where, as here the Court must weigh plausible inferences to determine whether Robinhood acted with manipulative intent, an apparent misstatement made just days after an event is relevant to determining scienter.

¶62.  Shortly thereafter, Robinhood's team issued another statement, announcing that it would set 13 stocks to PCO. Again, Robinhood referred customers to resources discussing "market volatility" but did not mention the NSCC deposit requirement:

### Keeping Customers Informed Through Market Volatility

Our mission at Robinhood is to democratize finance for all. We're proud to have created a platform that has helped everyday people, from all backgrounds, shape their financial futures and invest for the long term. We continuously monitor the markets and make changes where necessary. In light of recent volatility, we are restricting transactions for certain securities to position closing only, including $AAL, $AMC, $BB, $BBY, $CTRM, $EXPR, $GME, $KOSS, $NAKD, $NOK, $SNDL, $TR, and $TRVG. We also raised margin requirements for certain securities.

Amid significant market volatility, it's important as ever that we help customers stay informed. That's why we're committed to providing people with educational resources. We recently revamped and expanded Robinhood Learn to help people take advantage of the hundreds of financial resources we offer and educate themselves, including how to make sense of a volatile market. In 2020, more than 3.2 million people read our articles through Robinhood Learn.

¶63.

Customers wanted to know why they could not purchase the Affected Stocks. Robinhood's website explained conditions under which a "buy" button would be turned off, but they *did not apply* to the Affected Stocks. ¶65. Robinhood telling them to read articles about market volatility rather than admit that that it imposed these trading restrictions to meet capital requirements was materially misleading. Robinhood may not have had a duty to disclose its interactions with the NSCC, but once it chose to speak to customers about prohibiting purchases due to "market volatility," it had a duty to be accurate and complete. *See In re Barclays Liquidity Cross and High Frequency Trading Litig.*, 390 F. Supp. 3d 432, 449 (S.D.N.Y 2019)  (by advertising the availability of costly special services, stock exchanges were obligated to explain how high-frequency traders

could purchase and use them to disadvantage other traders).

We know these statements were materially misleading for failing to disclose the NSCC deposit requirement because CEO Tenev himself admitted the statements were deficient. ¶64 ("no doubt we could have communicated this a little better to customers"). When asked why he did not give the NSCC deposit explanation he provided on CNBC from the outset, CEO Tenev conceded Robinhood erred. On a February 12 podcast, he indicated it was wrong to have initially sent a form email usually, sent when a "buy" button is turned off: "[T]here's a button in a dashboard you can click and automated emails get sent out. It's an operational process that I think in hindsight we probably should have 'exceptionalized' to make it clear why we were doing this." CC at ¶65.

When Robinhood provided information beyond the automated email, to wit, the two statements quoted above, statements carefully crafted by a team (¶66), they still omitted any reference to the NSCC deposit demand. CEO Tenev later admitted that *those* communications fell short: "[W]e we sent some emails that were like, hey, there's some market volatility going on, and we basically sent a link that said: What is market volatility? I think in that one, in hindsight, we should have said, hey, some things can happen that restrict certain aspects of your trading ..." *Id*. at ¶67 n. 44.

CEO Tenev also explained why the messages were materially misleading: in the absence of full disclosure, it was assumed Robinhood chose a side in the "retail investors versus hedge funds" battle that had been very publicly playing out in recent weeks. ¶¶40-41, 43. CEO Tenev indicated that in the information vacuum Robinhood created that morning, conspiracy theories swirled. Not knowing the truth about Robinhood's reason for its actions induced panic selling. *Id*. at ¶¶68-69.

Although CEO Tenev carefully framed his admissions using the word "hindsight," Robinhood acted with scienter. On the morning of January 28, Robinhood was acutely aware of the context in which its unexplained actions would be viewed: As the $3 billion NSCC deposit demand attests, Robinhood traders were prominent in the public David-versus-Goliath battle; moreover, Robinhood executives privately knew some hedge funds had been seriously wounded in that battle. ¶50 n.29 (Robinhood employee wrote on January 27: "Anecdotal evidence that several 'very large' firms are having really bad nights too". Robinhood Securities President and COO Swartwout replied: "everyone is. you wouldn't believe the convo we had with Citadel. total mess" ). Against this backdrop, Robinhood's materially misleading statements, on top of its actions, were the match that lit the fire of the sell-off. Pursuant to *South Cherry, supra,* the danger was so obvious that Robinhood must have been aware of it.

In addition to being severely reckless, Robinhood's motive for not being truthful was that it would hurt the company's image, with an IPO in the works, to admit that it was so undercapitalized that it had to take an action CEO Tenev knew "would be a bad outcome for our customers." *Id*. at ¶75 (chat from that morning: "I think the blowback from this is going to be exponentially worse as time goes on...Just worried about the long term affects[sic] of this."). In drafting its statements, the Robinhood team made the calculated decision to be intentionally vague to save face. However, in light of its knowledge that the alleged "short squeeze" battle appeared to have turned into all-out war as prices for the Affected Stocks skyrocketed, Robinhood was severely reckless when it failed to include the need to meet its NSCC requirement in the "market volatility" statements accompanying its purchase prohibitions on the morning of January 28.

> **b.** Robinhood publicly dissembled about its liquidity
> crisis while it privately searched for capital to keep the
> <u>doors open</u>

When CEO Tenev appeared on CNBC to say that the NSCC deposit requirement, not assisting hedge funds, was the reason Robinhood blocked purchases of the Affected Stocks, CNBC's Aaron Ross Sorkin commented that CEO Tenev raised "all sorts of new questions" about whether there is a systemic issue under the company itself. ¶79. CEO Tenev vehemently denied to host Sorkin and later to Chris Cuomo on CNN that Robinhood had a liquidity problem ¶¶79 and 82. As explained in Sec. III.B.2.b, months before Robinhood Markets COO Gretchen Howard's "major liquidity issue," email, ¶12(a), came to light, CEO Tenev had already conceded to Dave Portnoy that Robinhood shut down purchases because it had no capital "headroom" and would have a liquidity problem next day if it had not.[36]

Also as set forth in Sec. III.B.2.c and III.C.2.a, above, the statement was made with scienter because Robinhood was in the process of planning an IPO and feared how it would look bad to discuss its liquidity problem on national television. ¶¶80(b); 80(d)(ii) (CEO Tenev: "I probably should be careful and call it the "L word," right, the "L word" is a big thing in financial services. Basically, if you say liquidity issue means you can't meet your capital requirements, or your deposit requirements, then you're essentially dead.")

---

[36] In another portion of the discussion with Dave Portnoy (not quoted in the complaint) discussing the CNBC interview, Tenev admits he was not clear the night of January 28:
  Portnoy: OK, so to me, that is very much a liquidity issue. . . .
  Tenev: I think what you're saying is fair, right, and I'll take it. I was kind of running on fumes on Thursday, like trying to raise the 3.4 billion dollars so that we could unrestrict the stocks . . . I'll take the feedback that I could have been a little bit more clear in the short-form interviews.
  https://www.youtube.com/watch?v=LqoJApzkaPU, last accessed Nov. 29, 2021.

Additionally, Robinhood dissembled because it did not want to lose customers and wanted to make it appear that this was a short-term problem. In reality, the $1 billion raised on January 28 was not the $3.4 billion Robinhood ultimately needed to maintain liquidity. *See* n. 41. Thus, when CEO Tenev denied having a liquidity problem on the night of January 28, Robinhood knew it was not out of the woods and could have a liquidity problem on February 2 should the prices of the Affected Stocks rebound at a time the NSCC no longer waived the ECP (which was $2.2 billion on January 28). ¶91.[37] In fact, CEO Tenev not having told the truth, when Robinhood permitted purchases of the Affected Stocks during the first three hours of trading on January 29, ¶84, investors were lulled into believing the extreme actions of January 28 were an aberration. Thus, the market was stunned when, around 12:30 and 2:30, after prices rebounded to the point that it could once again be faced with a NSCC deposit demand it could not pay, Robinhood imposed successively tighter purchase caps on the Affected Stocks, again depressing their prices. ¶¶85-89 (and charts).[38]

 Robinhood relies on the Court's November 17, 2021, Order on the motion to dismiss the complaint in the Antitrust Tranche (Dkt. 438) to contend that Robinhood's liquidity statements were not false because they were consistent with the earlier "market volatility" statements.  MTD at 32. The argument is misplaced because the elements of a

---

[37] The chairman of Interactive Brokers, Thomas Peterffy, believed Robinhood was taking a dangerous risk by reopening trading before shoring up its capitalization. *See* ¶60 n. 39. *See* M. DeCambre, "Peterffy calls Robinhood decision to allow 'limited' buys of GameStop troubling: 'I'm not comfortable'", *Marketwatch.com*, Jan. 28, 2021 (https://www.marketwatch.com/story/peterffy-calls-robinhood-decision-to-allow-limited-buysof-gamestop-troubling-im-not-comfortable-11611876619, last accessed Jan. 28, 2021)

[38] Given the risk to all clearinghouses posed by a Robinhood liquidation, when Apex discovered that purchasers found a way to avoid Robinhood's first set of harsh purchase limits on the afternoon of January 29, it immediately informed Robinhood. ¶90 n.53.

securities claim are not the same as an antitrust claim. The issue being addressed in the cited portion of the Order was whether two statements could be deemed changing pretextual explanations for Robinhood's conduct which could be indicative of an intent to conceal a conspiracy. Order at 45-46 (Dkt. 438).

Here, although the statements are consistent, the question is whether a denial of a liquidity problem on the evening of January 28 when Robinhood alone knew it still needed to raise $2.4 billion to have a sufficient capital cushion *for the next day's trades* when the ECP waiver expired on February 2, is a false statement or materially misleading. Even if, as Robinhood argues, the claim was literally true on the evening of January 28 because its negotiations with the NSCC that morning allowed Robinhood to live another day, "[t]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead..." *Schultz v. Applica Inc.*, 488 F. Supp. 2d 1219, 1229 n.6 (S.D. Fla. 2007)

Robinhood's arguments against a finding of scienter are equally unavailing. The suggestion that there is no reasonable inference of scienter because CEO Tenev repeated his "no liquidity problem" statement on more than one occasion – thereby giving rise to an inference that he believed it (MTD at 37-38) – is belied by the two admissions in his discussion with Dave Portnoy that Robinhood did face a liquidity issue and, specifically, that Portnoy's criticism of Tenev's denial of it to CNBC host Sorkin was "fair". ¶80(d)(ii) and n. 36. Similarly, the claim that a desire to conduct an IPO is too general a profit motive (MTD at 38), fails for the same reasons stated in Sec. III.B.2.c, above, especially because it is not the sole basis for scienter alleged.

Plaintiffs have alleged Robinhood made materially misleading statements with scienter both in the morning and the evening of January 28, which statements distorted

the markets and affected the price at which Plaintiffs sold their shares of the Affected Stocks.  A claim is stated for market manipulation pursuant to §9(a)(4).

## IV.    CONCLUSION

The federal securities laws proscribing market manipulation were enacted to protect small investors. Grossly undercapitalized and desperate, Robinhood saved its business and its ability to conduct a public offering of its shares by employing audacious and cunning tactics at Plaintiffs' expense. Robinhood claims to be a market disrupter. Now, however, it asks the Court to fully excuse its extreme action – shutting down or restricting purchases of as many as 51 stocks during all or part of six trading sessions – by claiming it was simply following "standard procedure" in the brokerage industry. It was not. Markets were roiled and billions of dollars lost because Robinhood "had no respect for the existing guardrails."  Having survived and thrived, Robinhood must provide redress to those who were injured by its manipulation of stock prices.

For the reasons stated above, and at any oral argument that may be scheduled, Plaintiffs respectfully request that Robinhood's motion to dismiss be denied in its entirety or, in the alternative, that Plaintiffs be granted leave to amend their pleading.

Dated: January 28, 2022                Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, FBN# 0182877
Robin Bronzaft Howald
Michael A. Cohen
By: /s/Laurence M. Rosen
Laurence M. Rosen, Esq.
275 Madison Avenue  40th Floor
New York, New York  10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 28, 2022, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

<u>/s/Laurence M. Rosen</u>