**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-MD-2989-ALTONAGA/TORRES**

In re:

**JANUARY 2021 SHORT SQUEEZE**
**TRADING LITIGATION**

_____/

This Document Relates to the Federal Securities Tranche

**DEFENDANT ROBINHOOD MARKETS, INC., ROBINHOOD FINANCIAL LLC AND**
**ROBINHOOD SECURITIES, LLC'S REPLY IN SUPPORT OF ITS MOTION TO**
**DISMISS THE FEDERAL SECURITIES TRANCHE COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 3

I.      PLAINTIFFS DO NOT PLEAD MARKET MANIPULATION UNDER EITHER
        SECTION 9(a) OR SECTION 10(b) OF THE SECURITIES EXCHANGE ACT ........... 3

        A.      Plaintiffs Do Not Adequately Plead Manipulative Conduct. ................................... 3

                1.      Plaintiffs Do Not Allege that Robinhood Deceived Investors About Its
                        Purchase Restrictions. ................................................................................... 3

                2.      Plaintiffs Do Not Allege a Violation of Any Subsection of Section 9(a). ... 7

                3.      Plaintiffs' Section 10(b) Market Manipulation Claim Fails. .................... 14

        B.      Plaintiffs Do Not Adequately Plead the Requisite State of Mind. ......................... 15

                1.      Plaintiffs Do Not Adequately Plead Scienter for the Subsection 9(a)(2) and
                        Section 10(b) Market Manipulation Claims. ............................................. 16

                2.      Plaintiffs Do Not Adequately Plead Scienter for the Subsection 9(a)(4)
                        Claim. .......................................................................................................... 18

II.     PLAINTIFFS DO NOT PLEAD A MISREPRESENTATION CLAIM UNDER
        SECTION 10(b) OF THE SECURITIES EXCHANGE ACT. ......................................... 20

III.    PLAINTIFFS' CLAIMS SHOULD BE DISMISSED WITH PREJUDICE. ................... 20

CONCLUSION .................................................................................................................. 20

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ......................4, 16, 19, 20

*In re Barclays Liquidity Cross and High Frequency Trading Litigation*,
    390 F. Supp. 3d 432 (S.D.N.Y 2019)..................................................................................13, 14

*Baum v. Phillips, Appel & Walden, Inc.*, 648 F. Supp. 1518 (S.D.N.Y. 1986) ....................4, 8, 18

*In re Blech Securities Litigation*, 928 F. Supp. 1279 (S.D.N.Y. 1996) .........................................5

*Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307 (11th Cir. 2019).....................................................13

*Chemetron Corp. v. Bus. Funds, Inc.*, 682 F.2d 1149 (5th Cir. 1982)...........................................15

*Chemetron Corp. v. Bus. Funds, Inc.*, 718 F.2d 725 (5th Cir. 1983).......................................14, 15

*City of Providence, R.I. v. Bats Glob. Markets, Inc.*, 878 F.3d 36 (2d Cir. 2017)....................8, 17

*Crane Co. v. Westinghouse Air Brake Co.*, 419 F.2d 787 (2d Cir. 1969)........................................4

*Denny v. Barber*, 574 F.2d 465 (2d Cir. 1978) ..............................................................................13

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005)....................................................................11

*FindWhat Investor Group v. FindWhat.com*, 658 F.3d 1282 (11th Cir. 2011) ......................12, 16

*GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189 (3d Cir. 2001) ..................................3, 14, 15

*Gibbons v. McBride*, 124 F. Supp. 3d 1342 (S.D. Ga. 2015) .......................................................19

*Gurary v. Winehouse*, 190 F.3d 37 (2d Cir. 1999) .........................................................................3

*In re Hamilton Bankcorp., Inc. Securities Litigation*, 194 F. Supp. 2d 1353
    (S.D. Fla. 2002)............................................................................................................................17

*Henningsen v. ADT Corp.*, 161 F. Supp. 3d 1161 (S.D. Fla. 2015)..............................................12

*Hughes v. Santa Fe Int'l Corp.*, 847 F.2d 239 (5th Cir. 1988)....................................................15

*Huls v. Llabona*, 437 Fed. Appx. 830 (11th Cir. 2011) ................................................................19

*I.B. Trading, Inc. v. Tripoint Glob. Equities, LLC*, 280 F. Supp. 3d 524
    (S.D.N.Y. 2017)............................................................................................................................11

*Jones v. Bank of Am., N.A.*, 564 F. App'x 432 (11th Cir. 2014)....................................................20

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011) ........................................................13

*McDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809 (11th Cir. 1989) ......................................19

*In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378
    (S.D.N.Y. 2010) ..........................................................................................................................5

*Ray v. Lehman Bros. Kuhn Loeb*, 624 F. Supp. 16 (N.D. Ga. 1984)............................................18

*Robbins v. Koger Properties, Inc.*, 116 F.3d 1441 (11th Cir. 1997)............................................15

*Santa Fe Indus., Inc. v. Green*, 430 U.S. 462 (1977).....................................................................5

*Schultz v. Applica*, 488 F. Supp. 2d 1219 (S.D. Fla. 2007) ........................................................12

*SEC v. Conaway*, 698 F. Supp. 2d 771 (E.D. Mich. 2010)...........................................................18

*SEC v. Lek Sec. Corp.*, 276 F. Supp. 3d 49 (S.D.N.Y. 2017) ........................................................7

*SEC v. Malenfant*, 784 F. Supp. 141 (S.D.N.Y. 1992) .................................................................4

*SEC v. Masri*, 523 F. Supp. 2d 361 (S.D.N.Y. 2007) ...................................................................6

*SEC v. Resch-Cassin & Co.*, 362 F. Supp. 964 (S.D.N.Y. 1973) ..................................................4

*Set Capital LLC v. Credit Suisse Group AG*, 996 F.3d 64 (2d Cir. 2021).....................................6

*Sharette v. Credit Suisse International*, 127 F. Supp. 3d 60 (S.D.N.Y. 2015) ..................... *passim*

*Skiadas v. Acer Therapeutics Inc.*, 1:19-cv-6137-GHW, 2020 WL 3268495
    (S.D.N.Y. 2020)........................................................................................................................17

*Spicer v. Chicago Bd. Options Exch., Inc.*, No. 88 C 2139, 1990 WL 172712
    (N.D. Ill. Oct. 30, 1990)........................................................................................................4, 8

*In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259 (2d Cir. 1993) ....................................................13

*Wilson v. Merrill Lynch & Co.*, 671 F.3d 120 (2d Cir. 2011).....................................................5, 7

*Zwick Partners, LP v. Quorum Health Corp.*, No. 3:16-cv-2475,
    2018 WL 2933406 (M.D. Tenn. 2018) ...................................................................................17

## Statutes & Rules

15 U.S.C. § 78i.............................................................................................................. *passim*

17 C.F.R. § 240.15c3-1 ......................................................................................................1

**Other Authorities**

Order Dismissing the Antitrust Amended Complaint, *In re January 2021 Short
     Squeeze Trading Litigation*, 21-2989-MDL-ALTONAGA/Torres
     (S.D. Fla. Nov. 17, 2021), Dkt. No. 438 ..................................................................................12

## INTRODUCTION

For Plaintiffs, "at bottom, this is a case about a retail broker that . . . inexcusably found itself grossly undercapitalized." (Opp. at 1.) Plaintiffs return to this theme repeatedly in their Opposition, as they argue that Robinhood's alleged undercapitalization led Robinhood to implement the purchase restrictions to save itself a supposed risk of liquidation and live to carry out its future IPO.[1] (*See, e.g.*, *id.* at 6-7, 28-29, 32, 37.) Plaintiffs' allegations, which are false,[2] have nothing whatsoever to do with whether Robinhood manipulated the market for GameStop, AMC or any of the other so-called "Affected Stocks." Plaintiffs' own theme demonstrates why Plaintiffs have no claim for market manipulation. Plaintiffs allege that Robinhood took the actions it did on January 28 with the intent to save itself from liquidation. Market manipulation under the federal securities laws, however, is concerned with a very different type of intent: an intent to move the price of the relevant securities. Plaintiffs completely fail to allege that any of Robinhood's actions were taken for the purpose of moving the price of the Affected Stocks.

Faced with this clear mismatch between their allegations and what the law requires to state a market manipulation claim, Plaintiffs are forced to concede that Robinhood's conduct "does not fit into prior market manipulation fact patterns." (*Id.* at 10.) Nonetheless, absent any legal authority to support the existence of a claim on facts like these, Plaintiffs ask this Court to interpret the law of market manipulation "broadly" to make new law expanding the reach of Sections 9(a) and 10(b) of the Securities Exchange Act ("Exchange Act"). (*Id.* at 8, 10.) They invite the Court to do so because "investors, media outlets, and members of Congress loudly decried" Robinhood's decision, when faced with NSCC deposit requirements, to put in place temporary purchasing restrictions for certain stocks. (*Id.* at 10.) But Plaintiffs' disappointment over the events of January 2021 does not make out a federal securities violation.

---

[1] In their Opposition, Plaintiffs do not distinguish which Robinhood entity imposed the purchase restrictions; as Robinhood explained in its Motion (*see* Mot. at 1-2), it was Robinhood Securities that made the decision to implement the PCO restrictions.

[2] Robinhood's required capitalization is governed by the SEC's Net Capital Rule, 17 C.F.R. § 240.15c3-1, and Plaintiffs do not allege (nor could they) that Robinhood violated this rule at any point in time.

This Court should decline Plaintiffs' invitation to dramatically extend the scope of the Exchange Act and should dismiss Plaintiffs' claims.

The threshold problem with Plaintiffs' claim for market manipulation under either Section 9(a) or Section 10(b) is that they do not adequately plead manipulative conduct. To plead manipulative conduct, Plaintiffs must make specific factual allegations of *deceptive* conduct regarding market transactions. Conceding that investors were "generally aware of Robinhood's actions" (Opp. at 15), Plaintiffs instead put forth the erroneous position that Robinhood's purchasing restrictions can still be manipulative even if they were fully disclosed. This theory is contrary to well-established law which requires that market manipulation claims under either Section 9(a) or Section 10(b) involve deceptive conduct, and there can be no deception where the conduct is publicly disclosed to the market. Further, despite finally identifying in their Opposition the subsections of Section 9(a) that they claim Robinhood violated—9(a)(2) and 9(a)(4)—Plaintiffs fail to plead the elements of a claim under either subsection. Nor do Plaintiffs identify any case in which a Section 10(b) market manipulation claim has survived where the court dismissed an accompanying Section 9(a) claim for failure to plead the required elements. (*See* Section I.A.)

Plaintiffs also fail to plead that Robinhood acted with the requisite state of mind to state a claim under either Section 9(a) or Section 10(b). Plaintiffs' implausible theory that Robinhood implemented the purchasing restrictions to save itself from liquidation does not support a market manipulation claim because Plaintiffs do not allege that Robinhood had anything to gain from depressing the price of the Affected Stocks. Specifically, Plaintiffs do not (and cannot) allege that a decline in the price of GameStop or AMC after Robinhood implemented the purchase restrictions would have helped Robinhood meet its NSCC deposit requirements. Nor do Plaintiffs provide any other particularized facts or even a reason to infer that Robinhood had such an intent (it did not). Thus, Plaintiffs fail to allege that Robinhood acted with the intent to drive up or down the prices of the Affected Stocks—a core requirement for a market manipulation claim. (*See* Section I.B.)

Plaintiffs do not respond to Robinhood's showing that they fail to state a Section 10(b) misrepresentation claim, and have therefore abandoned that claim. (*See* Section II.)

Accordingly, for these reasons and the reasons set forth in Robinhood's Motion to Dismiss ("Motion") and below, Plaintiffs' claims should be dismissed with prejudice.  (*See* Section III.)

## **ARGUMENT**

## I.     **PLAINTIFFS DO NOT PLEAD MARKET MANIPULATION UNDER EITHER SECTION 9(a) OR SECTION 10(b) OF THE SECURITIES EXCHANGE ACT.**

Plaintiffs' market manipulation claims, under both Sections 9(a) and 10(b), are fatally flawed in two key respects:  (1) Plaintiffs do not plead manipulative conduct and (2) Plaintiffs do not plead the requisite state of mind.

A.     Plaintiffs Do Not Adequately Plead Manipulative Conduct.

1.     ***Plaintiffs Do Not Allege that Robinhood Deceived Investors About Its Purchase Restrictions.***

Robinhood never deceived the market about its purchase restrictions.  It is well established that "[t]he gravamen of manipulation is deception of investors."  *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 205 (3d Cir. 2001) (quoting *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999)).  Plaintiffs confusingly oscillate between contending that Robinhood somehow deceived investors by sending "false signals" (Opp. at 13) and acknowledging that Robinhood's conduct was not deceptive but contending that Robinhood is nevertheless liable for market manipulation (*id.* at 14).  These contradictory assertions are both wrong.

i.     Robinhood Did Not Send False Price Signals.

Plaintiffs try to rescue a claim that Robinhood's conduct was deceptive by contending that Robinhood sent various "false signals" to the market.  (Opp. at 13-14.) Specifically, Plaintiffs contend that Robinhood sent false signals about "the desires of Robinhood's millions of customers" and about "its customers' valuation of the Affected Stocks." (*Id.*)  Plaintiffs contend Robinhood did so by "canceling purchase orders submitted after markets closed on January 27" and "preemptively closing out in-the-money options for GME and AMC." (*Id.* at 13.)  Contrary to Plaintiffs' assertion, none of this conduct sent a "false signal" or otherwise constituted deceptive conduct.

*First*, Plaintiffs' "false signal" theory fails as a matter of law because, in considering whether conduct is manipulative, "courts generally ask whether *a transaction* sends

3

a false pricing signal to the market." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 100 (2d Cir. 2007) (emphasis added). An example of a false signal is where "trading engineered to stimulate demand . . . mislead[s] investors into believing that the market has discovered some positive news and seeks to exploit it, . . . [and] the duped investors then transact accordingly." *Id.* at 100. The seminal market manipulation cases that Robinhood described in its Motion (*see* Mot. at 15-16) follow this fact pattern—that is, the defendant sends a false pricing signal *by engaging in some sort of deceptive market transaction* to mislead investors and profit at their expense. *See, e.g.*, *SEC v. Resch-Cassin & Co.*, 362 F. Supp. 964, 978 (S.D.N.Y. 1973) (involving "pump and dump" scheme); *SEC v. Malenfant*, 784 F. Supp. 141, 142 (S.D.N.Y. 1992) (same); *Crane Co. v. Westinghouse Air Brake Co.*, 419 F.2d 787, 795 (2d Cir. 1969) (involving large-scale purchases and secret sell-offs). These cases confirm that to send a "false signal," the defendant must actually itself engage in a transaction. *See ATSI*, 493 F.3d at 100.

Here, Plaintiffs do not allege that Robinhood engaged in any market transactions. They do not allege that Robinhood bought, sold or otherwise transacted in any of the Affected Stocks. Instead, they theorize that Robinhood somehow manipulated the market by limiting its *customers'* ability to engage in market transactions. This theory, which lacks the foundational element of a transaction *by the defendant*, has been rejected repeatedly. *See, e.g.*, *Spicer v. Chicago Bd. Options Exch., Inc.*, No. 88 C 2139, 1990 WL 172712, at *2 (N.D. Ill. Oct. 30, 1990) (dismissing market manipulation claim because allegations "might show that [the exchange] affected the price to be paid for options . . . [b]ut the [exchange] did not itself, simply by opening the market, 'effect a series of transactions in any security'"), *aff'd sub nom. Spicer v. Chicago Bd. of Options Exch., Inc.*, 977 F.2d 255 (7th Cir. 1992); *Baum v. Phillips, Appel & Walden, Inc.*, 648 F. Supp. 1518, 1530 (S.D.N.Y. 1986) (dismissing market manipulation claim based on trades the brokerage did not execute rather than on transactions), *aff'd sub nom. Asch v. Philips, Appel & Walden, Inc.*, 867 F.2d 776 (2d Cir. 1989). Plaintiffs have cited no cases holding otherwise.[3]

---

[3] Plaintiffs' contention that Robinhood's failure to disclose "how many shares were transacted or when" constitutes a false pricing signal (Opp. at 14) fails for similar reasons. Plaintiffs do not cite any cases (nor could they) suggesting that a broker must disclose how many shares it transacts in on a given day—or conversely, how many transactions it declines to execute. *In re Blech Securities Litigation*, 928 F. Supp. 1279 (S.D.N.Y. 1996), on which

*Second*, even if Plaintiffs could make out a "false signal" theory without alleging transactions by Robinhood—and they cannot—their deception theory would still fail because none of the alleged signals were actually false. Plaintiffs acknowledge that Robinhood fully disclosed its decisions to cancel purchase orders and close out in-the-money options in real time via messages to customers and Twitter, and Plaintiffs do not allege that Robinhood's description of these actions was inaccurate. (Compl. ¶¶ 52-54, 62.) Plaintiffs also acknowledge that Robinhood told its customers it was taking these actions to "reduce risk" in light of the "current volatile market conditions." (*Id.* ¶¶ 52, 62.) Those statements also are not alleged to have been false. To state the obvious, a defendant cannot send false signals when it tells the truth about its conduct in public statements. *See, e.g.*, *In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 391 (S.D.N.Y. 2010) (finding defendant did not send a "false pricing signal" where defendant disclosed its conduct "in numerous publicly available documents"), *aff'd sub nom. Wilson v. Merrill Lynch & Co.*, 671 F.3d 120 (2d Cir. 2011).[4]

> ii.   <u>Plaintiffs Cannot Avoid Their Obligation to Plead Deceptive Conduct.</u>

Plaintiffs' fallback contention that Robinhood's conduct could constitute market manipulation even absent deceptive conduct also fails. (Opp. at 14.) The Supreme Court and the Courts of Appeals have repeatedly confirmed that the critical threshold question in a market manipulation case is whether the conduct was misrepresented or hidden by the defendant. *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477 (1977) ("[N]ondisclosure is usually essential to the success of a manipulative scheme."); *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir. 2011) ("In order for market activity to be manipulative, that conduct must involve misrepresentation or nondisclosure.").

---

Plaintiffs rely, says nothing about false price signals. In *Blech*, the defendants allegedly engaged in a covert scheme in which they agreed to receive certain securities at nominal prices in exchange for purchasing stock in those same companies at inflated prices after their public offerings. *Id.* at 1287. The conduct in *Blech*—*i.e.*, engaging in deceptive *market transactions* that affect the price of securities for the defendants' pecuniary benefit—constitutes manipulative conduct, not imposing publicly disclosed purchase restrictions during periods of volatility.

[4] As discussed further below, Plaintiffs also cannot explain how any of the alleged false signals relate in any way to the *price* of the Affected Stocks.

Not one case cited by Plaintiffs even suggests otherwise.  (*See* Opp. at 15-16.)  In *Set Capital LLC v. Credit Suisse Group AG*, 996 F.3d 64 (2d Cir. 2021), the court considered the limited question of whether "open market transactions"—that is, transactions that are "visible to the market and reflect[] otherwise legal activity"—can constitute manipulative conduct when accompanied by manipulative intent.[5]  *Id.* at 77.  Specifically, the plaintiffs in *Set Capital* alleged that defendant Credit Suisse engaged in manipulative conduct by selling "millions of XIV Notes before engineering a near-total collapse in their price through just 15 minutes of its own trading." *Id.* at 69.  In assessing this conduct, the *Set Capital* court reaffirmed the core principle that "some misrepresentation or nondisclosure is required" to state a claim for market manipulation, even in cases where the defendant engages in open market transactions.  *Id.* at 76.  As the Second Circuit noted, "[d]eception is the gravamen of a claim for market manipulation, and the market is not misled when a transaction's terms are fully disclosed."  *Id.* (citations and internal quotations omitted).  Even though Credit Suisse's transactions were "done openly," the court found its "undisclosed scheme to profit at [its] investors' expense," which started when Credit Suisse *sold the XIV Notes* (not just when it later hedged and destroyed the value of those notes), stated a claim for market manipulation.  *Id.* at 77-78.  This case is nothing like *Set Capital*; Plaintiffs do not allege that Robinhood sold any of the Affected Stocks for its own account or otherwise engaged in any open market transactions—in other words, Plaintiffs are missing any allegation that Robinhood engaged in a market transaction or did so without disclosure.

Plaintiffs also rely on *Sharette v. Credit Suisse International*, 127 F. Supp. 3d 60, 73 (S.D.N.Y. 2015), but that case similarly fails to advance Plaintiffs' contention that fully disclosed conduct may be actionable as market manipulation.  There, the court found the plaintiffs had stated a claim for market manipulation because they *had* alleged deceptive conduct—specifically, they alleged the underwriter defendants "misled investors" by facilitating transactions that were "contrary to the representations" the defendants had made in the relevant agreement between the parties.  *Id.* at 73.  Additionally, the court in *Sharette* broadly reaffirmed the principle that "[i]n order for market activity to be manipulative, that conduct must involve

---

[5] *SEC v. Masri*, 523 F. Supp. 2d 361, 372 (S.D.N.Y. 2007), on which Plaintiffs also rely, considered the same question.

misrepresentation or nondisclosure." *Id.* at 77 (quoting *Wilson*, 671 F.3d at 130).  Here, the conduct was openly and accurately disclosed and thus could not be deceptive.

In short, to state a claim for market manipulation, Plaintiffs must plead that Robinhood deceived investors.  They cannot do so and thus cannot state a claim under either Section 9(a) or Section 10(b).

### 2.    *Plaintiffs Do Not Allege a Violation of Any Subsection of Section 9(a).*

Plaintiffs' claims under Section 9(a) fail for the independent reason that Plaintiffs do not plead facts sufficient to sustain a violation of any subsection of Section 9(a).  In their Opposition, Plaintiffs for the first time identify the subsections of Section 9(a) that Robinhood purportedly violated—namely, Subsections 9(a)(2) and 9(a)(4).  (*See* Opp. at 25.)  As explained in Robinhood's Motion and below, Plaintiffs cannot state a claim under either subsection.[6]

### i.    Plaintiffs Do Not Plead a Claim Under Subsection 9(a)(2).

Plaintiffs' Subsection 9(a)(2) claim must be dismissed because Plaintiffs fail to allege two essential conduct elements:  (1) that Robinhood engaged in a "series of transactions" and (2) that Robinhood acted with a "purpose of inducing the purchase or sale of [a] security." 15 U.S.C. § 78i(a)(2).  (Plaintiffs also fail to plead scienter, discussed in Section I.B, below.)

*First*, Plaintiffs appear to misunderstand the statutory requirements for the first element.  As Robinhood explained in its Motion, engaging in "a series of transactions" for the purpose of a Subsection 9(a)(2) claim involves purchasing, selling, bidding or ordering purchases or sales of any securities.  *See SEC v. Lek Sec. Corp.*, 276 F. Supp. 3d 49, 62 (S.D.N.Y. 2017). Plaintiffs contend that (separate from the purchase restrictions) Robinhood allegedly "distorted supply and demand by prematurely closing out in-the-money options, involuntarily canceling submitted purchase orders, and liquidating shares of the Affected Stocks held in margin accounts."[7]  (Opp. at 26.)  But these types of interactions between a broker and a customer are

---

[6] As Robinhood showed in its Motion, Plaintiffs also cannot state a claim under any of the other subsections of Section 9(a).  (*See* Mot. at 19-23.)  Plaintiffs do not contest this.

[7] Notably, Plaintiffs do not even try to explain how these actions—which affected only a small subset of the Robinhood customers who traded or attempted to trade in the Affected Stocks (*see* Compl. ¶¶ 52-53, 62, 125) and had no effect on non-Robinhood customers (*see id.* ¶ 70)— could have distorted demand in the market for the Affected Stocks and affected the prices of those stocks, and it is entirely implausible that these actions could have done so.

not what Subsection 9(a)(2) covers.  Plaintiffs do not allege that Robinhood purchased, sold, bid or ordered the purchase or sale of the Affected Stocks—either with respect to the purchase restrictions or in these separate actions—and therefore have not alleged that Robinhood engaged in "a series of transactions."  *See Spicer*, 1990 WL 172712 at *2; *Baum*, 648 F. Supp. at 1530.[8]

The cases Plaintiffs cite are inapposite.  (Opp. at 26.)  In both *City of Providence* and *Sharette*, the court addressed only whether the plaintiffs had pleaded a market manipulation claim under Section 10(b), and did not consider whether the defendants engaged in a "series of transactions," as required by Subsection 9(a)(2).[9]  *See City of Providence*, *R.I. v. BATS Glob. Markets, Inc.*, 878 F.3d 36, 40 (2d Cir. 2017); *Sharette*, 127 F. Supp. 3d at 80-86.  *Sharette* is inapposite for the additional reason that the defendants in that case were the lead underwriters in the allegedly manipulative transactions, meaning they actually lent or sold the relevant shares to investors.  *See* 127 F. Supp. 3d at 69.  Here, Plaintiffs do not allege that Robinhood engaged in any transactions, let alone a "series of transactions."

*Second*, Plaintiffs' attempt to satisfy the second element of Subsection 9(a)(2) fares no better.  To satisfy this element, Plaintiffs must plead that Robinhood acted with "the purpose of inducing the purchase or sale of such security by others."  15 U.S.C. § 78i(a)(2).  Plaintiffs contend that "Robinhood's goal was to lower the price of the Affected Stocks so that it could meet its core deposit requirements with the NSCC with respect to its customers' long positions."  (Opp. at 30.)[10]  But Plaintiffs provide no support for this contention and none exists.  Nowhere do Plaintiffs allege that a reduction in the price of the Affected Stocks would have helped Robinhood meet its NSCC deposit requirements.  Rather, Plaintiffs allege that the core deposit requirement "is calculated based upon the estimated risk in [an NSCC] member's

---

[8] Plaintiffs erroneously try to distinguish *Baum* on the ground that the plaintiffs there failed to satisfy the "in connection with" requirement.  (Opp. at 26 n.26.)  The *Baum* plaintiffs' failure to satisfy the "in connection with" requirement was the basis for the court's dismissal of the Section 10(b) and Rule 10b-5 claims, 648 F. Supp. at 1525-26, but the court dismissed the Subsection 9(a)(2) claim because the plaintiffs failed to satisfy the "series of transactions" requirement, *id.* at 1530.

[9] Indeed, in *City of Providence*, the plaintiffs did not even bring a claim under Section 9(a). 878 F.3d at 40.

[10] Plaintiffs do not argue (nor can they) that Robinhood acted with the purpose of inducing the purchase (as opposed to the sale) of the Affected Stocks.

unsettled portfolio" (Compl. ¶ 58) and cite to testimony by the head of the NSCC explaining that the core deposit requirement was driven by "increased volume and price volatility in these securities."[11]   In other words, to manage its NSCC deposit requirements, Robinhood needed to put a temporary halt to additional customer purchases of the Affected Stocks.  That is why Robinhood put the purchasing restrictions in place; indeed, Plaintiffs concede that "Robinhood prohibited purchases . . . of the Affected Stocks to decrease the amount of the core charge it was required to deposit with the NSCC . . . ."  (Compl.  ¶ 71.)  But Robinhood did not benefit from its customers' selling GameStop, AMC or any of the other Affected Stocks, or if customers chose to sell, whether they sold at a reduced price.

In short, Plaintiffs do not allege that Robinhood's deposit requirements would decrease if investors sold the Affected Stocks at a reduced price or that Robinhood stood to benefit in any way from sales of the Affected Stock at a reduced price.[12]  This is contrary to every successful reported market manipulation case, where defendants were trying to *move* the stock price.  (*See* Section I.A.1.)  Because Plaintiffs cannot allege that Robinhood acted with the purpose to induce the sale of the Affected Stocks, Plaintiffs cannot satisfy this element of Subsection 9(a)(2).

### ii.     Plaintiffs Do Not Plead a Claim Under Subsection 9(a)(4).

In the Complaint, Plaintiffs allege that Robinhood made false or misleading statements in violation of both Section 9(a) and Section 10(b) and Rule 10b-5(b).  (Compl. ¶¶ 139, 142-149.)  In their Opposition, Plaintiffs abandon their Section 10(b) and Rule 10b-5 misrepresentation claim entirely, but continue to pursue a misrepresentation claim under

---

[11] *See* Written Testimony of Michael C. Bodson, CEO of the Depository Trust & Clearing Corporation, before the Committee on Financial Services of the U.S. House of Representatives, May 6, 2021, at 5, *available at* https://www.dtcc.com/-/media/Files/PDFs/Testimony-of-Michael-Bodson-050621.pdf (cited in Compl. ¶ 58 n.34).

[12] In their opposition, Plaintiffs misleadingly cite paragraph 71 of the Complaint for the proposition that "Robinhood's goal was to lower the price of the Affected Stocks so that it could meet its core deposit requirements with the NSCC."  (Opp. at 30.)  But paragraph 71 does not contain such an allegation.  Paragraph 71 alleges that Robinhood imposed *purchase* restrictions "to decrease the amount of the core charge it was required to deposit with the NSCC."  (Compl. ¶ 71.)  That is entirely different from whether the NSCC deposit requirements gave Robinhood a purpose to induce the sale of the Affected Stocks at a reduced price.

Subsection 9(a)(4).[13]  (Opp. at 30-39.)  However, as Robinhood explained in its Motion (Mot. at 21-22), Plaintiffs' Subsection 9(a)(4) claim fails for many of the same reasons as the Section 10(b) misrepresentation claim that Plaintiffs have abandoned.

In their Opposition, Plaintiffs try to support their Subsection 9(a)(4) claim by focusing on one alleged misstatement and one alleged omission.  (*See* Opp. at 30-39.)  The alleged misstatement is Mr. Tenev's statement on the evening of January 28, 2021 that "[t]here was no liquidity problem."  (Compl. ¶ 79; Opp. 36-39.)[14]  The alleged omission is that Robinhood purportedly waited too long in the day on January 28, 2021, to disclose that the NSCC's deposit requirement was a reason for the purchasing restrictions.  (Opp. at 31-35.)  The alleged misstatement and alleged omission cannot support a violation of Subsection 9(a)(4) for at least four reasons (one of which is state of mind and is discussed below in Section I.B).

*First*, Plaintiffs fail to plead that Robinhood made the supposed misstatements "for the purpose of inducing the purchase or sale of [a] security."  15 U.S.C. § 78i(a)(4). Plaintiffs do not even try to explain how they meet this element of Subsection 9(a)(4) and instead simply refer back to their discussion of Subsection 9(a)(2).  (*See* Opp. at 31 n.34 (incorporating their Subsection 9(a)(2) argument by reference).)  But that ignores the distinction between their claims under Subsections 9(a)(2) and 9(a)(4).  Under Subsection 9(a)(2), the question is whether Robinhood acted with the requisite purpose in imposing the purchasing restrictions.  As described above, Plaintiffs fail to allege that it was.  Under Subsection 9(a)(4), the relevant question is whether Robinhood's alleged *misstatements* (as opposed to the underlying *purchasing restrictions*) had the purpose of inducing customers to sell the Affected Stocks.  *See* 15 U.S.C. § 78i(a)(4) (prohibited conduct is making a "false or misleading" "statement" for the purpose of inducing purchase or sale).  Plaintiffs offer no explanation—and there is none—for

---

[13] Because Plaintiffs do not defend their Section 10(b) and Rule 10b-5 misrepresentation claim in their Opposition, that claim should be dismissed.  (*See infra* Section II.)

[14] In their Opposition, Plaintiffs abandon the allegations in their Complaint that three additional Robinhood statements were false or misleading:  (1) Mr. Tenev's statement on January 29 that temporary trading restrictions on certain symbols are common; (2) Mr. Tenev's statement on January 31 that "other brokers basically restricted the same activity"; and (3) Mr. Tenev's statement that Robinhood implemented PCO restrictions because of customer preferences.  (*See* Compl. ¶¶ 92, 100, 101.)  These allegations cannot, therefore, support Plaintiffs' Subsection 9(a)(4) claim.  (*See infra* Section II.)

how Mr. Tenev's statement that there was no liquidity problem, or the fact that Robinhood did not refer to the NSCC deposit requirement in its initial customer communications the morning of January 28, could possibly have had the purpose of inducing Robinhood customers to sell GameStop, AMC or any of the other Affected Stocks.  Any such argument would defy logic.  This alone requires dismissal of Plaintiffs' Subsection 9(a)(4) claim.

*Second*, Plaintiffs fail to plead loss causation, *i.e.*, that Robinhood's statements (as opposed to the purchasing restrictions or some other factor) affected the price of the Affected Stocks.  (Mot. at 34-36.)[15]  The Section 9(f) private right of action requires Plaintiffs to allege they bought or sold a security at a price "which was affected" by the underlying violation of Subsection 9(a)(4), 15 U.S.C. § 78i(f).  Courts have construed this price effect element to be coextensive with the loss causation element of a Section 10(b) claim.  *See I.B. Trading, Inc. v. Tripoint Glob. Equities, LLC*, 280 F. Supp. 3d 524, 540 (S.D.N.Y. 2017); *Sharette*, 127 F. Supp. 3d at 80.  Critically, the price effect must come from Robinhood's alleged misstatements (as opposed to the purchasing restrictions or anything else), as Section 9(f) requires that the security price be affected by the "act or transaction in violation of subsection[] (a)," 15 U.S.C. § 78i(f), and the predicate act that violates Subsection 9(a)(4) is making a false or misleading statement, *id.* § 78i(a)(4).  Plaintiffs do not even address this issue in their Opposition.  Perhaps that is because Plaintiffs have not alleged, as they must, that the prices of the Affected Stocks ever increased after the market learned the full facts.  *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005); (Mot. at 35-36).  Plaintiffs' failure to plead loss causation is an independent reason why their Subsection 9(a)(4) claim should be dismissed.

*Third*, Plaintiffs fail to plead adequately that either the alleged misstatement or the alleged omission was false or misleading.

**The "no liquidity problem" alleged misstatement.**  Plaintiffs allege in their Complaint that Mr. Tenev's statement on the evening of January 28, 2021 that "there was no liquidity problem" that morning was false because it was supposedly inconsistent with an earlier statement made by Gretchen Howard.  (Compl. ¶ 79.)  Plaintiffs now concede, as this Court has already found, that "the statements are consistent."  (Opp. at 38; *see also* Antitrust Tranche

---

[15] Robinhood argued specifically that dismissal of a Section 9(a)(4) claim is appropriate when a plaintiff fails to plead any element of a Rule 10b-5 violation.  (Mot. at 21-22.)

Decision at 46-47, Dkt. No. 438 (concluding the statements "are not conflicting").)  Plaintiffs also concede that the statement may have been "literally true on the evening of January 28," when Mr. Tenev made the statement.  (Opp. at 38.)  Plaintiffs nonetheless contend that the statement was misleading based on their speculation that Robinhood "could have [had] a liquidity problem" at some point after Mr. Tenev made the statement if its deposit requirements increased again.  (*Id.* at 37-38.)  However,  a "statement is misleading if in light of the facts existing at the time of the statement a reasonable investor, in the exercise of due care, would have been misled by it." *Henningsen v. ADT Corp.*, 161 F. Supp. 3d 1161, 1181-82 (S.D. Fla. 2015) (citing *FindWhat Investor Group v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011)).  When Mr. Tenev said "there *was*" no liquidity problem when asked about the events of that morning (Compl. ¶ 79 (emphasis added)), no reasonable investor could have heard that statement as a guarantee that Robinhood would never have a liquidity problem *in the future*. Instead, as Plaintiffs themselves allege, the statement would have been understood to mean "that Robinhood did not have a liquidity problem on the morning of January 28."  (*Id.* ¶ 80.) Plaintiffs' reliance on *Schultz v. Applica*, 488 F. Supp. 2d 1219, 1229 n.6 (S.D. Fla. 2007) (*see* Opp. at 38), is misplaced because the defendants there omitted material information about existing facts known to them at the time they made the statement.  Here, by contrast, Plaintiffs do not and cannot allege that Robinhood in fact had a liquidity problem on the morning (or evening) of January 28.  Plaintiffs' Subsection 9(a)(4) claim with respect to Mr. Tenev's "no liquidity problem" statement therefore fails for this additional reason.

   <u>**The alleged omission on the morning of January 28, 2021.**</u>  Even though they do not allege this in their Complaint, Plaintiffs contend in their Opposition that there was a material omission in two communications that Robinhood sent to customers in close succession on the morning of January 28.  The first statement advised customers of the importance of being informed during periods of market volatility and directed them to articles discussing market volatility.  The second informed customers of Robinhood's decision to PCO thirteen identified securities due to the market volatility.  (Compl. ¶¶ 62-63; Opp. at 32-33.)  There was nothing false about these communications, and Plaintiffs do not contend otherwise.  Instead, Plaintiffs contend that these true statements were "hardly a model of [ ] transparency" (Compl. ¶ 64) and were rendered misleading because Robinhood did not also say at the same time that the NSCC deposits were a reason that Robinhood put the PCO restrictions in place.  (Opp. at 31-34.)

While Robinhood *did* discuss the NSCC deposit requirements later that day, it is of no moment that the communications on the morning of January 28 did not include a similar reference.[16]  The alleged omission of a fact is not actionable "merely because a reasonable investor would very much like to know that fact."  *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993).  Instead, "[d]isclosure is required . . . only when necessary to make . . . statements made, in light of the circumstances under which they were made, not misleading."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011).  Omissions are also immaterial as a matter of law when "no reasonable investor would have considered them in making investment decisions."  *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1322 (11th Cir. 2019).  Here, there is no allegation—nor could there be—that a reasonable investor on January 28, 2021—knowing already of Robinhood's purchasing restrictions and Robinhood's statement that they were caused by market volatility—would have considered making different decisions in buying or selling GameStop, AMC or other Affected Stocks based on the additional detail about the NSCC deposit requirements.  And even if some Robinhood customers may have wanted to know this specific information about the NSCC deposit requirements as *Robinhood brokerage customers*, the additional information has nothing whatsoever to do with trading in the Affected Stocks.  In other words, whether Robinhood was imposing the purchase restrictions because of the NSCC deposit requirements is irrelevant to the price of a share in GameStop, AMC or any of the other Affected Stocks.  Because it is utterly implausible that a reasonable investor would have considered this additional piece of information in making trading decisions in the *Affected Stocks*, the information is immaterial as a matter of law.[17]

---

[16] Plaintiffs acknowledge that Mr. Tenev disclosed the role that the NSCC deposit requirements played that same evening of January 28.  (Compl. ¶¶ 77-78.)  Even if this information had been relevant to anyone making a decision about trading in the Affected Stocks—and it was not—Plaintiffs cannot sustain an omission theory simply because the allegedly omitted facts are later disclosed.  *See, e.g.*, *Denny v. Barber*, 574 F.2d 465, 470 (2d Cir. 1978) (rejecting misrepresentation claims alleging "fraud by hindsight" where plaintiff "seized upon disclosures made" later and alleged "that they should have been made" earlier).

[17] Comparing the situation here to a case like *In re Barclays Liquidity Cross and High Frequency Trading Litigation*, on which Plaintiffs rely (Opp. at 33-34), only underscores that Robinhood's alleged delay in identifying the NSCC deposit requirements was not materially misleading.  In *Barclays*, the defendant exchanges disclosed that they provided certain services to high-frequency trading firms, but did not disclose how those services could be used to the

Plaintiffs also suggest that the customer communications on the morning of January 28 were misleading because of Mr. Tenev's later statement that "no doubt we could have communicated this a little better to customers." (Compl. ¶ 64; Opp. at 34.) This argument misses the mark. Mr. Tenev was simply making the point that Robinhood could have provided a "little better" customer service on the hectic morning of January 28. This moment of self-reflection does not change the fact, described in the preceding paragraph, that not referring to the deposit requirements was completely immaterial to the prices of the Affected Stocks and not misleading. The securities laws do not hold companies to a standard of perfection in customer communications.

### 3.     Plaintiffs' Section 10(b) Market Manipulation Claim Fails.

Plaintiffs assert the same market manipulation claim under both Sections 9(a) and 10(b). As Robinhood explained in its Motion, courts analyze market manipulation claims under the two sections together, and dismissal of one claim leads to dismissal of the other. (Mot. at 23 (citing cases).) Plaintiffs cannot escape that conclusion. In fact, Plaintiffs do not cite a single case in which a market manipulation claim was dismissed for failure to state a claim under Section 9(a), but nevertheless sustained under Section 10(b). Instead, Plaintiffs cite two cases—*Chemetron Corp. v. Business Funds, Inc.*, 718 F.2d 725 (5th Cir. 1983) and *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189 (3rd Cir. 2001) (Opp. at 11)—but neither supports Plaintiffs' position.

*First*, as described above, the threshold reason that Plaintiffs' Section 9(a) claims must be dismissed is that there are no allegations of deception. And, as noted above (*see* Section I.A.1), deception is also a threshold element of a Section 10(b) market manipulation claim. *Chemetron* and *GLF* both confirm this requirement, which leads to dismissal here. *See Chemetron*, 718 F.2d at 727 (noting that jury had found there was a misstatement or omission); *GFL*, 272 F.3d at 204 (noting that courts considering manipulation claims look to whether the

---

detriment of investors. 390 F. Supp. 3d 432, 449 (S.D.N.Y. 2019). In other words, the defendants denied investors the key information that would allow them to realize they were being duped. That is nothing like the situation here, where Robinhood disclosed to investors that it was imposing purchase restrictions and that it was doing so because of market volatility.

"manipulator injected inaccurate information into the market or created a false impression of market activity").

Second, neither case involved a claim under Subsection 9(a)(2), so neither case can support the proposition that a Section 10(b) market manipulation claim can stand where a Subsection 9(a)(2) case cannot. *Chemetron* involved a Subsection 9(a)(4) claim and a Section 10(b) claim, 718 F.2d at 727, and *GFL* did not involve any claim under Section 9(a), 272 F.3d at 207.

Third, with respect to the interplay between Subsection 9(a)(4) and Section 10(b), Robinhood explains that Plaintiffs' Subsection 9(a)(4) claim fails for four specific reasons in addition to the lack of deceptive conduct: (1) the alleged misstatements or omissions were not made for the purpose of inducing a purchase or sale; (2) there is no loss causation; (3) there were no misleading statements; and (4) Robinhood did not act with scienter. In *Chemetron*, elements 1, 3 and 4 were present for the Subsection 9(a)(4) claim. *See Chemetron Corp. v. Bus. Funds, Inc.*, 682 F.2d 1149, 1157 (5th Cir. 1982). *Chemetron* does not, therefore, support the proposition that a Section 10(b) claim can stand where those elements are missing. Instead, the only relevant issue that *Chemetron* even arguably touches on is whether a Section 10(b) market manipulation claim can stand where there is no loss causation. Here, *Chemetron* seems to suggest the answer is yes. But that is incorrect; loss causation *is* an element of Section 10(b). *See, e.g.*, *Robbins v. Koger Properties, Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997).[18]

In short, the reasons that preclude Plaintiffs' Section 9(a) claims also require dismissal of Plaintiffs' Section 10(b) claim, and Plaintiffs can offer no authority to the contrary.

B.     Plaintiffs Do Not Adequately Plead the Requisite State of Mind.

Plaintiffs' market manipulation claims also fail for the independent reason that Plaintiffs do not plead with particularity that Robinhood had the requisite state of mind (or scienter) under either Section 9(a) or Section 10(b). To state a claim under Section 10(b) and

---

[18] Moreover, the *Chemetron* decision on which Plaintiffs rely for a potentially contrary holding has no precedential value because it was vacated pending rehearing *en banc* and the parties settled before the rehearing. 718 F.2d at 730; *see also Hughes v. Santa Fe Int'l Corp.*, 847 F.2d 239, 242 (5th Cir. 1988) (noting *Chemetron* has no precedential force). While *GFL* cites to that decision, it does so without recognizing that it lacks precedential value and does so in dicta given that no Section 9(a) claim was even asserted in *GFL*. 272 F.3d at 207.

Rule 10b-5, Plaintiffs must plead specific facts supporting a "strong inference" that Robinhood acted intentionally or with severe recklessness.  *See FindWhat*, 658 F.3d at 1299-1300.  To state a claim for a violation of Section 9(a), Plaintiffs must satisfy an even higher standard by alleging intentional and "willful" conduct.  *See* 15 U.S.C. § 78i(f).

### 1. Plaintiffs Do Not Adequately Plead Scienter for the Subsection 9(a)(2) and Section 10(b) Market Manipulation Claims.

With respect to Plaintiffs' Subsection 9(a)(2) and Section 10(b) market manipulation claims, Plaintiffs' only remaining theory of motive is that Robinhood was trying to avoid defaulting on its deposit requirements to avoid liquidation and survive until the company's "lucrative IPO."[19]  (Compl. ¶¶ 12, 15, 67, 71.)  They describe this theory as Robinhood's supposed "financial desperation."  (Opp. at 20-22.)  This theory cannot support an inference of manipulative intent under either Subsection 9(a)(2) or Section 10(b) for a variety of reasons.

*First,* the potential success (or lack thereof) of Robinhood's then-hypothetical IPO had absolutely nothing to do with the price of the Affected Stocks.  As noted above, Robinhood had no pecuniary interest in the price of the Affected Stocks.  Plaintiffs do not allege that Robinhood held any positions in those securities, and, as explained in Section I.A.2.i above, Robinhood would not benefit from its customers' selling those securities at a reduced price.  As a result, even if Robinhood had acted to protect its own possible IPO—and it did not—that does nothing to establish "a strong inference that [Robinhood] intended to deceive investors by artificially affecting the market price of [the Affected Stocks]."  *ATSI*, 493 F. 3d at 102.  Instead, this "financial desperation" theory essentially boils down to a general motive to profit, which is inadequate to plead scienter as a matter of law.  (*See* Mot. at 37.)[20]

---

[19] In their Complaint, Plaintiffs also allege that Robinhood wanted to assist Citadel LLC and Citadel Securities by driving down the price of the Affected Stocks to help them cover alleged proprietary short positions in those stocks.  (*Id.* ¶ 71.)  Plaintiffs abandon this theory in their Opposition.  (*See* Opp. at 25 n.23.)

[20] Plaintiffs argue that Mr. Swartwout's statement on February 8, 2021, after the class period, that Robinhood did not restrict customers' ability to exercise in-the-money options is evidence of scienter because Plaintiffs wrongly believe Mr. Swartwout's statement was false. (Opp. at 32 n.35.)  Plaintiffs' arguments reflect a basic misunderstanding of how options work. Robinhood's PCO on options on GameStop and AMC stock (Compl. ¶ 52) restricted customers from buying more options; it had no effect on customers' ability to exercise existing in-the-

None of the cases Plaintiffs cite compels a different conclusion.  Most of the cases on which Plaintiffs rely (Opp. at 21 n.20) are not even market manipulation cases.  *Skiadas v. Acer Therapeutics Inc.*, 1:19-cv-6137-GHW, 2020 WL 3268495, at *11 (S.D.N.Y. 2020), involved claims by Acer stockholders who claimed the company had made misleading statements to inflate its own stock price.  Similarly, *Zwick Partners, LP v. Quorum Health Corp.*, No. 3:16-cv-2475, 2018 WL 2933406, at *10 (M.D. Tenn. 2018), involved claims by Quorom stockholders that the company failed to comply with accounting standards to inflate its own stock price in advance of a spin-off.  Here, by contrast, Plaintiffs allege that Robinhood made misleading statements about its own business to manipulate the price of the *Affected Stocks*, but they fail to allege any reason to believe Robinhood actually cared about the price of the Affected Stocks.  A desire to protect Robinhood's own financial condition cannot support an inference of intent to depress the stock price of unrelated companies.

The same flaw characterizes the market manipulation cases that Plaintiffs do cite.  In *Sharette*, the plaintiffs alleged that scienter could be inferred because the underwriter defendants acted with a "goal of securing a specific, highly profitable new business opportunity" and "benefitted in [a] concrete and personal way from the purported fraud."  127 F. Supp. 3d at 96.  Likewise, in *In re Hamilton Bankcorp., Inc. Securities Litigation*, where the fraud was motivated to complete an IPO, the defendants had a direct pecuniary interest in the price of the allegedly manipulated stock and had allegedly engaged in insider sales.  194 F. Supp. 2d 1353, 1359 (S.D. Fla. 2002).[21]  Again, neither of these cases supports Plaintiffs' allegations, as each involved circumstances in which the defendants had a direct pecuniary interest in the price of whatever stock they were alleged to have manipulated.  Those allegations are missing here.

---

money options.  Separately, Robinhood acted proactively in the normal course of business to protect certain customers who held options that were about to expire in the money, where the customer did not have the funds to exercise the option; instead of allowing the option to expire without value, Robinhood reserved the right sell the option for the customer before expiring to ensure that the customer received a return.  (*Id*. ¶ 53.)  This is because to exercise a call option, a customer must have the cash on hand to purchase 100 shares of the underlying security.  Neither of these measures is in any way inconsistent with Mr. Swartwout's truthful statement on February 8 that Robinhood did not restrict customers' ability to exercise in-the-money options.

[21] In *City of Providence*, the court explicitly declined to address whether plaintiffs adequately pleaded scienter because the district court did not reach the question.  878 F.3d at 52.

*Second*, Plaintiffs argue that scienter can be inferred because Robinhood knew (or was severely reckless in not knowing) that its actions would affect the price of the Affected Stocks.  (Opp. at 18-20.)  But again, Robinhood would not benefit from its customers' selling those securities at a reduced price, and Plaintiffs' factual allegations—that Robinhood employees were concerned about "blowback" from the purchasing restrictions (Compl. ¶ 102 n.60; Opp. at 19)—show awareness of how Robinhood customers might react as brokerage customers, not that the price of the Affected Stocks would decline.  *See Baum*, 648 F. Supp. at 1531 (finding no manipulative intent where the defendant broker did not "st[and] to gain anything from artificially driving [down] the price" of the securities); *Ray v. Lehman Bros. Kuhn Loeb*, 624 F. Supp. 16, 22 (N.D. Ga. 1984) (finding no manipulative intent where defendant did not hold the stock "for his own account" at the relevant time and therefore had no pecuniary interest in the stock).

*Third*, Plaintiffs contend that scienter can be inferred because Robinhood allegedly mischaracterized its actions as "standard operations," and Plaintiffs contend this attempt "to deflect attention" is evidence of manipulation.  (Opp. at 23.)  But the case on which Plaintiffs rely, *SEC v. Conaway*, 698 F. Supp. 2d 771, 887-88 (E.D. Mich. 2010), involved a CEO's alleged deflecting statements to distract from the company's *own financial condition* with the desire to boost *the company's own stock price*.  Robinhood's explanation that other brokers engaged in similar activity—which in any event was a truthful statement (*see* Mot. at 32)— cannot support an inference of intent to manipulate the stock prices of unrelated companies.

Accordingly, Plaintiffs fail to plead specific facts to support a strong inference of scienter as to their Subsection 9(a)(2) and Section 10(b) market manipulation claims.

### 2.    *Plaintiffs Do Not Adequately Plead Scienter for the Subsection 9(a)(4) Claim.*

With respect to Plaintiffs' claim under Subsection 9(a)(4), Plaintiffs also fail to allege that Robinhood acted with the requisite scienter when making either the alleged misstatement or the alleged omission.

**The "no liquidity problem" alleged misstatement.**  Plaintiffs contend that Mr. Tenev admitted that Robinhood had a liquidity crisis in an interview with Dave Portnoy on February 23, 2021, and therefore the Court should infer he was acting with scienter when he stated on January 28 that Robinhood did not have a liquidity problem.  But there is no inconsistency between the Portnoy interview and Mr. Tenev's January 28 statement.

Mr. Tenev's statement in the Portnoy interview that "if [Robinhood] had a bunch more headroom, yes, we probably would have let things continue" (Compl. ¶ 80(d); Opp. at 21, 36) simply reiterates Mr. Tenev's point in his January 28 statement that the NSCC deposit requirements led Robinhood to impose the purchasing restrictions.  Mr. Tenev's statement in the Portnoy interview that he "could have been a little bit more clear in the short-form interviews" (Opp. at 36 n.36)[22] simply acknowledges that, in hindsight, Robinhood could have done an even better job of communicating on the hectic day of January 28.  (*See* Section I.A.2.ii.)

**The alleged omission on the morning of January 28, 2021.**  Plaintiffs contend that Robinhood was "severely reckless" in not specifying the NSCC deposit requirements as a cause of the purchasing restrictions on the morning of January 28 because it should have known that omission would cause investors to sell the Affected Stocks.  (Opp. at 35.)  As an initial matter, the internal Robinhood communications that "several 'very large' firms are having really bad nights too" (Compl. ¶ 50 n.29; Opp. at 35) simply shows awareness of market volatility, not awareness of an intent to affect the price of the Affected Stocks.  *See ATSI*, 493 F.3d at 102 (requiring such intent for scienter on a market manipulation claim).  Further, Plaintiffs concede that Robinhood disclosed the market volatility and its PCO decision on the morning of January 28 (Opp. at 32-33), and consequently any delay in providing additional detail cannot rise to the level of "highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care," as required for severe recklessness.  *McDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809, 814 (11th Cir. 1989).  Moreover, allegations of severe recklessness are inadequate to state a claim under Subsection 9(a)(4) as a matter of law.  15 U.S.C. § 78i(f) (requiring willful conduct).

Accordingly, Plaintiffs fail to plead specific facts to support a strong inference of scienter as to their Subsection 9(a)(4) claim.

*   *   *

Plaintiffs fail to plead a plausible inference of scienter sufficient to state a claim under either Section 9(a) or Section 10(b).  Where "there is a 'plausible nonculpable

---

[22] As Plaintiffs acknowledge (Opp. at 36 n.36), this statement is not in the Complaint. Therefore, even if the statement helped Plaintiffs' case—and it does not—the Court may not consider it in ruling on Robinhood's Motion.  *See Huls v. Llabona*, 437 Fed. Appx. 830, 832 n.5 (11th Cir. 2011); *see also Gibbons v. McBride*, 124 F. Supp. 3d 1342, 1381 (S.D. Ga. 2015).

explanation[] for the defendants' actions that is more likely than any inference that the defendants intended to manipulate the market," a court should not infer scienter. *ATSI*, 493 F.3d at 104. That is precisely the situation here. Robinhood imposed the purchase restrictions to control the risk related to its deposit requirements and to avoid liquidation of all of its customers' positions during a period of unprecedented market volatility. (Compl. ¶¶ 12, 58-60.) Robinhood's conduct had nothing to do with a desire to affect the price of any Affected Stocks.

## II.     PLAINTIFFS DO NOT PLEAD A MISREPRESENTATION CLAIM UNDER SECTION 10(b) OF THE SECURITIES EXCHANGE ACT.

Robinhood showed in its Motion that Plaintiffs do not plead a Section 10(b) misrepresentation claim. (*See* Mot. at 26-39.) Plaintiffs offer no response and the claim should be dismissed for that reason alone. *See Jones v. Bank of Am., N.A.*, 564 F. App'x 432, 434 (11th Cir. 2014) ("[W]hen a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned.") (citation omitted).

## III.    PLAINTIFFS' CLAIMS SHOULD BE DISMISSED WITH PREJUDICE.

Plaintiffs' claims should be dismissed with prejudice. Plaintiffs' claims have fundamental defects that cannot be cured through amendment, including that (1) Robinhood's purchase restrictions were fully disclosed, and therefore not manipulative, and (2) Robinhood had no pecuniary interest in the value of any of the Affected Stocks. Plaintiffs' recognition that their claims are viable only if the Court significantly expands the definition of market manipulation and creates new law simply underscores the futility of allowing Plaintiffs to amend.

It has now been over a year since the first actions related to the events of January 28, 2021 were filed. Plaintiffs have had the benefit of seeing two other plaintiff groups in this MDL test myriad (unsuccessful) legal theories as well as several decisions by this Court. (*See, e.g.*, Dkt. Nos. 438, 453.) Plaintiffs still have not come close to stating a claim. Their claims should be dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, Robinhood respectfully submits that the Consolidated Class Action Complaint for the Federal Securities Tranche should be dismissed with prejudice.

Dated:  February 11, 2022

/s/ Samuel A. Danon

**HUNTON ANDREWS KURTH LLP**
Samuel A. Danon (FBN 892671)
Gustavo Javier Membiela (FBN 513555)
María Castellanos Alvarado (FBN 116545)
333 S.E. 2 Avenue, Suite 2400
Miami, FL 33131
Telephone: (305) 810-2500
Facsimile: (305) 810-2460
sdanon@huntonak.com
gmembiela@huntonak.com
mcastellanos@hunton.com

**CRAVATH, SWAINE & MOORE LLP**
Antony L. Ryan
Kevin J. Orsini
Brittany L. Sukiennik
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700
aryan@cravath.com
korsini@cravath.com
bsukiennik@cravath.com

*Counsel for Defendants Robinhood Markets, Inc., Robinhood Financial LLC and Robinhood Securities, LLC*

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on February 11, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I further certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive Notices of Electronic Filing.


Dated:  February 11, 2022                       */s/ Samuel A. Danon*
                                                Samuel A. Danon (FBN 892671)