**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-MD-2989-ALTONAGA/TORRES**

In re:

**JANUARY 2021 SHORT SQUEEZE**
**TRADING LITIGATION**

_____/

This Document Relates to:

ALL ANTITRUST ACTIONS

**DEFENDANTS' MOTION TO DISMISS THE AMENDED ANTITRUST TRANCHE**
**COMPLAINT AND INCORPORATED MEMORANDUM OF LAW**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND .................................................................................................................. 4

I.       The Parties. ............................................................................................................... 4

II.      The Mechanics of a Securities Trade. ...................................................................... 5

III.     The Unprecedented Market Volatility of January 2021. .......................................... 7

IV.      The Events of January 28, 2021 and Onward. .......................................................... 9

ARGUMENT ..................................................................................................................... 11

I.       PLAINTIFFS FAIL TO SUFFICIENTLY PLEAD THAT DEFENDANTS
         AGREED TO CONSPIRE.......................................................................................12

         A.       Plaintiffs Fail To Allege Any Direct Evidence of an Agreement..........14

         B.       Plaintiffs Fail Adequately To Allege Circumstantial Evidence of an
                  Agreement.............................................................................................14

II.      PLAINTIFFS FAIL TO PLEAD THE REMAINING ELEMENTS OF A
         SECTION 1 CLAIM...............................................................................................21

         A.       Plaintiffs' Claim Does Not Qualify for *Per Se* Treatment Under the
                  Antitrust Laws......................................................................................22

         B.       Plaintiffs Fail to State a Claim Under the Rule of Reason. .................23

III.     PLAINTIFFS' ANTITRUST THEORY IS PRECLUDED BY THE FEDERAL
         SECURITIES LAWS...............................................................................................27

         A.       Plaintiffs' Antitrust Claims Are Precluded under *Billing* Because the
                  Conduct at Issue Is Regulated by the Federal Securities Laws. ..........28

         B.       There Is No Applicable Savings Clause. ..............................................34

IV.      PLAINTIFFS' CLAIMS SHOULD BE DISMISSED WITH PREJUDICE....................35

CONCLUSION...................................................................................................................36

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Contractors Supply, LLC v. HD Supply Constr. Supply, Ltd.*,
  989 F.3d 1224 (11th Cir.), *cert. denied*, 142 S. Ct. 339 (2021)................................20

*Am. Dental Ass'n v. Cigna Corp.*,
  605 F.3d 1283 (11th Cir. 2010) ................................................................19

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)................................................................13

*Auto. Alignment & Body Serv., Inc., v. State Farm Mut. Auto Ins. Co.*,
  953 F.3d 707 (11th Cir. 2020) ................................................................13

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)................................................................ passim

*Burtch v. Milberg Factors, Inc.*,
  662 F.3d 212 (3d Cir. 2011)................................................................14

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
  485 U.S. 717 (1988)................................................................23

*Cavero v. Law Offices of Erskine & Fleisher*,
  No. 12-21196-CIV, 2012 WL 13134213 (S.D. Fla. Aug. 28, 2012) ........................................9

*Cont'l T.V., Inc. v. GTE Sylvania Inc.*,
  433 U.S. 36 (1977)................................................................23

*Copperweld Corp. v. Independence Tube Corp.*,
  467 F.3d 752 (1984)................................................................13

*Credit Suisse Sec. (USA) LLC v. Billing*,
  551 U.S. 264 (2007)................................................................ passim

*Dunnivant v. Bi-State Auto Parts*,
  851 F.2d 1575 (11th Cir. 1988) ................................................................13, 19

*Duty Free Americas, Inc. v. Estee Lauder Cos.*,
  797 F.3d 1248 (11th Cir. 2015) ................................................................24

*Elec. Trading Grp., LLC v. Banc of Am. Sec. LLC*,
  588 F.3d 128 (2d Cir. 2009)................................................................29, 33

*Friedman v. Salomon/Smith Barney, Inc.*,
  313 F.3d 796 (2d Cir. 2002)................................................................31, 33

*Gordon v. New York Stock Exchange, Inc.*,
   422 U.S. 659 (1975)................................................................................................33

*In re Credit Default Swaps Antitrust Litig.*,
   No. 13-md-2476, 2014 WL 4379112 (S.D.N.Y. Sept. 4, 2014)..............................34

*In re Farm-Raised Salmon & Salmon Prods. Antitrust Litig.*,
   No. 19-21551-CIV, 2021 WL 1109128 (S.D. Fla. Mar. 23, 2021) .....................11, 12, 14, 15

*In re Fla. Cement & Concrete Antitrust Litig.*,
   746 F. Supp. 2d 1291 (S.D. Fla. 2010) ...................................................................13

*In re Ins. Brokerage Antitrust Litig.*,
   618 F.3d 300 (3rd Cir. 2010) ..................................................................................14

*In re Interest Rate Swaps Antitrust Litig.*,
   261 F. Supp. 3d 430 (S.D.N.Y. 2017)....................................................................34

*In re Loc. TV Advert. Antitrust Litig.*,
   No. 18-C-6785, 2020 WL 6557665 (N.D. Ill. Nov. 6, 2020) .................................14

*In re Stock Exchs. Options Trading Antitrust Litig.*,
   317 F.3d 134 (2d Cir. 2003)...................................................................................33

*Intergraph Corp. v. Intel Corp.*,
   195 F.3d 1346 (Fed. Cir. 1999)........................................................................24, 27

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
   626 F.3d 1327 (11th Cir. 2010) ...................................................................... passim

*Kalmanovitz v. G. Heileman Brewing Co.*,
   769 F.2d 152 (3d Cir. 1985)...................................................................................26

*La Grasta v. First Union Sec., Inc.*,
   358 F.3d 840 (11th Cir. 2004) ..................................................................................7

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007)...................................................................................22, 23, 26

*Levine v. Cent. Fla. Med. Affiliates, Inc.*,
   72 F.3d 1538 (11th Cir. 1996) ...........................................................................22, 24

*Maris Distrib. Co. v. Anheuser-Busch, Inc.*,
   302 F.3d 1207 (11th Cir. 2002) ........................................................................24, 27

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)...............................................................................................19

*Mayor & City Council of Balt. v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013)....................................................................................14, 19

*Mayor & City Council of Balt. v. Citigroup, Inc.*,
    Nos. 08-cv-7746 (BSJ), 08-cv-7747 (BSJ), 2010 WL 430771
    (S.D.N.Y. Jan. 26, 2010), *aff'd on other grounds*, 709 F.3d 129 (2d Cir. 2013)....................32

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984)..........................................................................................12, 14, 15, 25

*Nat'l Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*,
    779 F.2d 592 (11th Cir. 1986) ...........................................................................................22

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018)...........................................................................22, 23, 24, 27

*Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*,
    917 F.3d 1249 (11th Cir. 2019) ................................................................................11, 15, 23

*Retina Assocs., P.A. v. S. Baptist Hosp. of Fla., Inc.*,
    105 F.3d 1376 (11th Cir. 1997) ........................................................................................24

*Sinaltrainal v. Coca-Cola Co.*,
    578 F.3d 1252 (11th Cir. 2009) ........................................................................................12

*Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*,
    376 F.3d 1065 (11th Cir. 2004) ................................................................................23, 24, 27

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993).........................................................................................................24

*Thompson v. Metro. Multi-List, Inc.*,
    934 F.2d 1566 (11th Cir. 1991) ........................................................................................23

*Tidmore Oil Co., Inc. v. BP Oil Co./Gulf Prods. Div., a Div. of BP Oil Co.*,
    932 F.2d 1384 (11th Cir. 1994) ........................................................................................12

*Todorov v. DCH Healthcare Auth.*,
    921 F.2d 1438 (11th Cir. 1991) ........................................................................................16

*United Am. Corp. v. Bitmain, Inc.*,
    530 F. Supp. 3d 1241 (S.D. Fla. 2021) ...........................................................................24

*United Am. Corp. v. Bitmain, Inc.*,
    No. 18-CV-25106, 2021 WL 1807782 (S.D. Fla. Mar. 31, 2021)...........................................20

*Universal Express, Inc. v. SEC*,
    177 F. App'x 52 (11th Cir. 2006) .................................................................................4, 11

*Universal Grading Serv. v. eBay, Inc.*,
　No. C-09-2755-RMW, 2012 WL 70644 (N.D. Cal. Jan. 9, 2012), *aff'd*,
　563 F. Appx. 571 (9th Cir. 2014).................................................................................27

**Statutes & Rules**

17 C.F.R. § 240.10b-5..........................................................................................................31

17 C.F.R. § 240.10b-10..........................................................................................................5

17 C.F.R. §§ 240.15a-1 to 240.15c6-1.................................................................................33

17 C.F.R. §§ 240.15c3-1 to 240.15c3-5...............................................................................31

17 C.F.R. §§ 240.17Ab2-1 to -2...........................................................................................33

17 C.F.R. §§ 240.17Ad-1 to -24...........................................................................................33

17 C.F.R. § 240.17Ad-22......................................................................................................31

17 C.F.R. §§ 240.17h-1T to 240.17h-2T..............................................................................31

17 C.F.R. §§ 242.100 to 242.105....................................................................................31, 33

15 U.S.C. § 1............................................................................................................... passim

15 U.S.C. § 78i...............................................................................................................29, 30

15 U.S.C. § 78j..............................................................................................................29, 30

15 U.S.C. § 78o.............................................................................................................29, 30

15 U.S.C. § 78q.....................................................................................................................30

Dodd–Frank Wall Street Reform and Consumer Protection Act,
　Pub. L. No. 111-203, 124 Stat. 1376 (2010), *codified at* 12 U.S.C. § 5303 ....................34, 35

Fed. R. Civ. P. 12....................................................................................................................1

**Other Authorities**

9 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1702
　(4th ed. 2014 & Supp. 2021)..........................................................................................23

Maggie Fitzgerald, *Robinhood restricts trading in GameStop, other names
　involved in frenzy*, CNBC (Jan. 28, 2021, 9:19 AM EST), *available at*
　https://www.cnbc.com/2021/01/28/ robinhood-interactive-brokers-restrict-
　trading-in-gamestop-s.html..............................................................................................9

SEC Division of Enforcement, 2018 Annual Report (Nov. 2, 2018) ...........................................32

SEC Division of Enforcement, 2019 Annual Report (Nov. 6, 2019) ...........................................32

SEC Division of Enforcement, 2020 Annual Report (Nov. 2, 2020) ...........................................31

SEC, *Staff Report on Equity and Options Market Structure Conditions in Early 2021* (October 14, 2021), *available at* https://www.sec.gov/files/staff-report-equity-options-market-struction-conditions-early-2021.pdf........................................... passim

SEC, *Thinking About Investing in the Latest Hot Stock?* (Jan. 30, 2021) ("SEC Statement"), https://www.sec.gov/oiea/investor-alerts-and-bulletins/risks-short-term-trading-based-social-media-investor-alert .......................................................11, 31

Shortening the Securities Transaction Settlement Cycle, Release No. 34-94196 (issued February 9, 2022) (publication in Federal Register forthcoming) (to be codified at 17 C.F.R. pts. 232, 240, and 275), *available at* https://www.sec.gov/rules/proposed/2022/34-94196.pdf ............................................... passim

Defendants Robinhood Markets, Inc., Robinhood Financial LLC, Robinhood Securities, LLC (collectively, "Robinhood") and Citadel Securities LLC ("Citadel Securities") respectfully submit this memorandum of law in support of their Motion to Dismiss the Amended Consolidated Class Action (the "Amended Antitrust Complaint," or "AAC") filed in the Antitrust Tranche pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

In Plaintiffs' third attempt to plead a viable antitrust claim, they again assert a conspiracy against the backdrop of January 2021's historic market volatility and a $3 billion NSCC collateral call that led to Robinhood's temporary purchasing restrictions. This attempt fares no better than their two prior attempts and should be dismissed accordingly.

Plaintiffs first claimed that 35 defendants—including clearinghouses, market makers, institutional investors, clearing brokers and introducing brokers—executed a "large, overarching conspiracy to prevent the market from operating freely." (*Shane Cheng and Terell Sterling v. Ally Financial Inc., et al.*, 21-cv-00781 (N.D. Cal.) (Complaint, ECF No. 1, at 1).) Plaintiffs then retreated to a slightly narrower claim of a horizontal conspiracy among various clearing and introducing brokers with alleged vertical agreements between at least some of those defendants and a single market-maker (Citadel Securities). Now Plaintiffs have abandoned any allegation that there was a horizontal agreement, and they have reduced their ever-shrinking conspiracy to just two entities: Robinhood and Citadel Securities. But this newly alleged mini-conspiracy is no more plausible than the various failed theories that Plaintiffs left on the cutting room floor or that the Court dismissed as implausible. The Amended Antitrust Complaint should therefore be dismissed with prejudice for the following reasons.

*First*, Plaintiffs have alleged no new facts to make their claim plausible. In its order dismissing the prior complaint (the "Dismissed Antitrust Complaint," or "DAC"), the Court held that the alleged communications between Robinhood and Citadel Securities—two entities with an ongoing business relationship—were insufficient to "nudge" Plaintiffs' claims of an unlawful agreement "across the line from conceivable to plausible." (ECF No. 438 (the "Antitrust Decision") at 50.) So what, then, have Plaintiffs done to bolster those allegations in the Amended Antitrust Complaint? Absolutely nothing. Plaintiffs offer no new substantiated allegations or communications, nor do they allege any new substance with respect to the previously-alleged communications.

Plaintiffs also have not alleged new facts to render their newly minted mini-conspiracy plausible.  In dismissing the prior complaint, the Court found that there were "no allegations that Citadel Securities threatened or suggested it would cut off business relationships" if a defendant did not impose trading restrictions, and that Plaintiffs had otherwise failed to "explain why each Defendant would not simply use another market maker in such a scenario." (*Id*. at 37.)  The Court further found that the "mere fact that Citadel Securities is an important business partner . . . does not provide sufficient motive to conspire" and that Plaintiffs' theory was "even less plausible given that the CCAC provides an 'obvious alternative explanation' for imposing trading restrictions":  the increased collateral requirements caused by market volatility. (*Id*.)

These conclusions hold even more force with respect to the Amended Antitrust Complaint.  Plaintiffs abandon any pretense of arguing that any of the brokers besides Robinhood that implemented restrictions substantially similar to those at issue here did so for any unlawful reason.  Plaintiffs provide no additional factual allegations—as distinct from their conclusory say-so—that Citadel Securities offered any inducement or made any threat to Robinhood that led Robinhood to put purchase limits in place.  Nor can Plaintiffs explain why Robinhood would have complied with a hypothetical demand of that kind.  Plaintiffs also do not even try to explain why Citadel Securities would have purportedly conspired with Robinhood, but would not even attempt to conspire with other brokers, such as the now-dismissed Apex Clearing Corporation, which, as Plaintiffs alleged in their prior complaint, also had a substantial PFOF relationship with Citadel Securities.  Finally, they again fail to explain why Robinhood would agree to a week-long conspiracy with shifting restrictions and share limitations without the involvement of any other retail broker-dealer, knowing that its customers could switch accounts during that time—as one of the plaintiffs admittedly did the same day Robinhood PCOed the Restricted Stocks.

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 n.4 (2007), the United States Supreme Court explained that a court assessing a Section 1 conspiracy claim under the Sherman Act must ask whether the factual allegations suffice to create a plausible inference that defendants' conduct makes sense only as part of an unlawful conspiracy, or do those facts instead provide a plausible non-conspiratorial explanation of "independent responses to common stimuli . . . unaided by an advance understanding among the parties?"  Based on this Court's

prior ruling and the facts alleged in the Amended Antitrust Complaint, *Twombly* requires dismissal.  (*See* Section I.)

      *Second*, Plaintiffs also still fail to plead the remaining elements of their claim under Section 1 of the Sherman Act.  The vertical agreement alleged here must be analyzed under the rule of reason.  Under the rule of reason, an antitrust plaintiff must plausibly allege the contours of the relevant market in which the defendants operate and that the challenged conduct has harmed competition *in that market.*  Here, after previously failing to define a market (*see* Antitrust Decision at 49), Plaintiffs allege two different markets in the Amended Antitrust Complaint:  a purported "upstream" market-maker market in which Citadel Securities allegedly competes, and a purported "downstream" "No-Fee Brokerage Trading App Market" in which Robinhood allegedly competes.  Putting aside whether these gerrymandered purported markets are plausible—they are not—the fundamental problem for Plaintiffs under the rule of reason is that they do not actually allege harm to competition in either of those markets.  Indeed, in this newly narrowed Amended Antitrust Complaint, Plaintiffs do not allege that Defendants had any impact on or influence over any other market makers or other retail broker-dealers.  Plaintiffs also admit that other retail broker-dealers imposed restrictions for other, unrelated reasons and do not allege the conspiracy prevented any other market maker from operating its business independently.  Instead, they allege that the harm at issue occurred in a wholly separate market or set of markets for trading the so-called Relevant Securities, in which neither defendant is alleged to compete.  This market-jumping nature of Plaintiffs' claims is fatal to their claim under binding Supreme Court and Eleventh Circuit precedent.  (*See* Section II.)

      *Third*, this case remains nothing more than a "securities complaint in antitrust clothing," *Credit Suisse Sec. (USA) LLC v. Billing*, 551 U.S. 264, 284 (2007), and therefore is implicitly precluded by the federal securities laws.  Congress and the expert regulatory agencies have established a comprehensive statutory and regulatory framework that governs the functioning of the securities markets, including the conduct at issue here.  Thus, Plaintiffs' alleged conspiracy still cannot be pursued as an antitrust claim as a matter of law.  As reflected in the recent SEC Staff Report on Equity and Options Market Structure Conditions in Early 2021

("SEC Staff Report"),[1] and a recently announced proposed rule regarding accelerating the securities transaction settlement period, the SEC is actively regulating the conditions that led to the market volatility that characterized the January 2021 short squeeze.  Plaintiffs' Amended Antitrust Complaint threatens to introduce concurrent securities and antitrust regulation of the same conduct, with significant conflicts certain to follow.  The Court should dismiss Plaintiffs' antitrust claim as implicitly precluded by the securities laws.  (*See* Section III.)

After a year of reviewing tens of thousands of pages of documents produced by defendants, amending their complaints and shifting their theories, Plaintiffs still cannot state a viable claim for one simple reason:  there was no conspiracy, and no violation of the antitrust laws.  This Court should dismiss the Amended Antitrust Complaint with prejudice.

## BACKGROUND

### I.    THE PARTIES.

Plaintiffs have dropped from the Amended Antitrust Complaint numerous other introducing and clearing brokers previously named as defendants and alleged co-conspirators, and now allege a conspiracy between only Robinhood and Citadel Securities.

**Robinhood Financial** is a customer-facing, introducing broker-dealer through which retail investors can place commission-free trade orders.  (AAC ¶¶ 68-69.)  Plaintiffs allege that Robinhood participates in the "No-Fee Brokerage Trading App Market," which "consists of brokerages such as Robinhood, Charles Schwab, E*Trade, TD Ameritrade, WeBull, and others." (*Id.* ¶¶ 312-313.)  Robinhood Financial is affiliated with **Robinhood Securities**, a clearing broker that takes and processes trade orders for Robinhood Financial customers.  (*Id.* ¶ 44.)  Both Robinhood Financial and Robinhood Securities are wholly owned by **Robinhood Markets**.  (*Id.* ¶ 42.)

**Citadel Securities** is a market maker.  A "market maker" is an entity that stands ready to fill orders for a particular security, and upon receiving an order from a broker, fills that order with available inventory or by sourcing liquidity from an exchange or other market venue.

---

[1] SEC, *Staff Report on Equity and Options Market Structure Conditions in Early 2021* (October 14, 2021), *available at* https://www.sec.gov/files/staff-report-equity-options-market-struction-conditions-early-2021.pdf.  The Court may take judicial notice of the SEC Staff Report because it is a public record, the accuracy of which cannot reasonably be questioned.  *See Universal Express, Inc. v. SEC*, 177 F. App'x 52, 53 (11th Cir. 2006) (taking judicial notice of public records at the motion to dismiss stage).

(*Id.* ¶¶ 8-10.)  Citadel Securities is one of many market makers, and has numerous competitors including G1 Execution Services, Global Execution Brokers, Two Sigma Securities, LLC, Wolverine Securities, LLC and Virtu Americas, LLC.  (*Id.* ¶¶ 281, 306-307.)

As is common in the industry, Robinhood has business relationships with multiple market makers, including Citadel Securities, Virtu Americas, Two Sigma Securities, G1 Execution Services and Wolverine Securities, where Robinhood Securities routes customer trade orders to those market makers in exchange for a fee, known as "payment for order flow" ("PFOF").  (*Id.* ¶¶ 78, 84, 319.)[2]  Other retail broker-dealers, such as Charles Schwab, E*Trade, TD Ameritrade and Webull, and clearing brokers such as Apex Clearing Corporation ("Apex"), engage in similar PFOF business relationships with market makers.  (*Id.* ¶ 76; DAC ¶¶ 107, 139.)  The net amount of PFOF revenue that a broker generates is based in part on the volume of order flow it routes to different market makers.  (AAC ¶¶ 75, 221.)  This practice is long-standing and accepted by the SEC, *see* 17 C.F.R. § 240.10b-10; (*see also* AAC ¶¶ 79-80), and enables many brokers, including Robinhood, to offer retail investors the ability to trade without paying commissions.  (AAC ¶¶ 73, 221.)  Indeed, rather than charge its customers commission for each trade, Robinhood generates the majority of its revenue through receipt of PFOF from market makers.  (*Id.* ¶ 75.)  Market makers generate revenue by capturing a portion of the "spread" between the bid and ask prices for securities trade orders.  (*Id.* ¶¶ 74, 85.)

To facilitate its customers' trade orders, Robinhood Securities routes those orders to the market makers with which it has business relationships.  Accordingly, Robinhood has ongoing business relationships with those market makers regarding PFOF arrangements, and those relationships require Robinhood to communicate with those market makers in the ordinary course of business.

## II.    THE MECHANICS OF A SECURITIES TRADE.

Robinhood customers may use Robinhood's mobile or web-based application to place trade orders on their own behalf.  (*Id.* ¶¶ 6, 68.)  Once a trade is placed on Robinhood's platform, and Robinhood accepts the trade order, Robinhood Financial sends the order to Robinhood Securities, which in turn routes the order to a market maker to execute the trade.  (*Id.*

---

[2] *See also* Robinhood Securities LLC SEC Rule 606 Report (Apr. 29, 2021), *available at* https://cdn.robinhood.com/assets/robinhood/legal/RHS%20SEC%20Rule%20606%20and%2060 7%20Disclosure%20Q1%202021.pdf (last accessed Feb. 14, 2022) (identifying venues to which Robinhood Securities directed order flow in January 2021).

¶¶ 83-84.)  To use Robinhood's services, a customer enters into an agreement that "expressly permits [Robinhood] to restrict customer trading 'at *any* time'—including, presumably, during periods of market volatility." (ECF No. 453 ("Robinhood Decision") at 52.)

After receiving a customer trade order from a broker-dealer, such as Robinhood, market makers are responsible for processing and executing the trade order on the customer's behalf.  (AAC ¶¶ 83-84.)  Market makers handle trade orders by filling purchase and sell orders with their inventory, or by routing that order to an exchange or other market venue.  (*Id.* ¶¶ 8-10.)  After a market maker fills the buy or sell order, the trade is sent to a clearing agency, such as the National Securities Clearing Corporation ("NSCC").  (*Id*. ¶ 87.)  The NSCC clears cash transactions by netting securities deliveries and payments among its members and guaranteeing completion of trades even if a party defaults.  (*Id*. ¶ 88.)  At all relevant times, the settlement period for the clearing agency to transfer the stock to the buyer and funds to the seller was two days.  (*Id*. ¶ 87.)

The two-day period between execution and settlement creates a risk that a party to the transaction will be unable to meet its obligations.  (*Id*. ¶¶ 87, 90.)  A number of protections are in place to reduce this risk.  (*Id*.)  One such protection critical to this case is that clearing agencies require brokers, such as Robinhood, to pay a deposit to the clearing agency until the trades are settled.  (*Id*.)  The deposit amount is based largely on risk, which the clearing agencies calculate by looking to, among other things, a firm's customer holdings and market volatility. (*Id*. ¶ 90.)  The purpose of these deposit requirements is to protect all market participants—from retail investors to brokers—from potential defaults during the settlement period.  (*Id*. ¶ 88.)  To clear and settle customer transactions, brokers engaged in clearing services must satisfy the NSCC deposit requirements.  (*Id*. ¶¶ 88-90, 181.)  If Robinhood fails to timely satisfy its deposit requirements, it risks being "shut down" by the NSCC.  (*Id*. ¶¶ 90, 181-182.)

The SEC recently proposed a new rule to further mitigate the risks associated with settlement.  *See* Shortening the Securities Transaction Settlement Cycle, Release No. 34-94196 (issued February 9, 2022) (publication in Federal Register forthcoming) (to be codified at 17 C.F.R. pts. 232, 240, and 275), *available at* https://www.sec.gov/rules/proposed/2022/34-94196.pdf (the "Proposed Rule").  In the release for the proposed rule, the SEC noted that the importance of settlement reform had been underscored by the "heightened interest in certain 'meme' stocks" in January 2021.  *Id.* at 9, 29.  The SEC further observed that, in January 2021,

"extreme" volatility under the current settlement rules had led broker-dealers to adopt risk management measures, including preventing customers from trading. *Id.* at 176 & n.337; (*see also* SEC Staff Report, at 31-35.) Notably, following an extensive investigation, the SEC Staff Report and the Proposed Rule provide no support for the conspiracy that Plaintiffs here have manufactured. (SEC Staff Report, at 31-35.)

### III.     THE UNPRECEDENTED MARKET VOLATILITY OF JANUARY 2021.

January 2021 was marked by a series of unprecedented market events. (AAC ¶¶ 135-137, 175-178.) Investors—connected through social media platforms and online forums—banded together to cause "short squeezes" by buying GameStop Corp. ("GME"), AMC Entertainment Holdings, Inc. ("AMC") and other stocks they perceived to be the target of short selling activity by institutional investors (the "Relevant Securities").[3] (*Id.* ¶¶ 95-97, 132.) Their activity resulted in "soar[ing]" prices and, in the words of the SEC, "volatility" in the markets where the Relevant Securities were traded. (*Id.* ¶¶ 137, 144.) For example, on January 27, GME's price closed at $347.51 per share, a 707.6% increase from just five trading days earlier. (*Id.* ¶ 137.) The trading price increase for GME is reflected in the graph below.[4]



[3] The "Relevant Securities" are:  GME, AMC, Bed Bath & Beyond Inc. ("BBBY"), Blackberry Ltd. ("BB"), Express, Inc. ("EXPR"), Koss Corporation ("KOSS"), Nokia Corporation ("NOK"), Tootsie Roll Industries, Inc. ("TR") and Trivago N.V. ("TRVG"). (AAC ¶ 7.)

[4] *See* Nasdaq, *Market Activity*, https://www.nasdaq.com/market-activity (last visited Feb. 18, 2022). The Court may take judicial notice of stock information related to the securities at issue here and in the ensuing charts. *See La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 842 (11th Cir. 2004).

The "skyrocket[ing]" and "epic price surge[s]" in the Relevant Securities were unrelated to factors that securities industry participants traditionally expect would affect stock prices (e.g., earnings reports or public announcements). (*Id.* ¶¶ 136, 137.) On January 27, 2021, U.S. equity markets experienced a record-breaking volume of activity, with 24.5 billion shares traded overall. (*Id.* ¶ 137.) That same day, the SEC released a statement warning of "on-going market volatility in the options and equities markets." (*Id.* ¶ 144.)



As the unprecedented volatility and volume unfolded,[5] Robinhood and other broker-dealers took proactive measures to mitigate their exposure to the market risks. For example, by January 27, 2021, Robinhood Securities increased customer margin requirements to 100% for GME—in other words, a customer was required to have sufficient funds to pay for and hold the shares in full. (*Id.* ¶¶ 194, 234.) On this same day, Charles Schwab and TD Ameritrade, two other broker-dealers, also "adjusted margin requirements for certain securities and restricted certain exotic strategies usually employed by the most advanced traders." (*Id.* ¶ 365.)

During this period, Citadel Securities engaged in conversations with Robinhood regarding Robinhood's PFOF rates. (*Id.* ¶¶ 240-245.) None of the communications between Robinhood and Citadel Securities alleged in the Amended Antitrust Complaint, however, discuss

---

[5] *See* Nasdaq, *Market Activity*, https://www.nasdaq.com/market-activity (last visited Feb. 18, 2022).

or concern imposition of any trading limitations.  Instead, Plaintiffs acknowledge that the "central topic" of the conversations on January 27, 2021 was the "PFOF relationship." (*Id.* ¶ 322.)  Nor do Plaintiffs allege that Citadel Securities imposed any restrictions preventing brokers from routing order flow to Citadel Securities throughout this period.

## IV.      THE EVENTS OF JANUARY 28, 2021 AND ONWARD.

The historic market volume and volatility in the Relevant Securities came to a head on January 28, 2021.  (AAC ¶¶ 198-208.)  Many broker-dealers—including many former defendants—responded to the trading volume and volatility by implementing trading restrictions on equities and options for different stocks, including GME and AMC.  (*See id.* ¶¶ 195, 366.)

On the morning of January 28, the NSCC issued Robinhood Securities a massive collateral call for over $3 billion.  (*Id.* ¶ 178.)  The massive capital call was a tenfold increase over what it had been just days before.  (*Id.* ¶ 262.)  Because deposit requirements are based on market volatility, the capital call was the direct result of the substantial increases in trading volume and price of the Relevant Securities in previous days—in particular, on January 27.  (*Id.* ¶¶ 88, 90, 145-53, 175.)  NSCC assigns higher capital calls to securities that it perceives as having more risk, and this capital call of more than $3 billion was driven in part by the volatility multiplier and the securities at issue.  (*See generally id.* ¶¶ 176-178.)

Robinhood Securities received the capital call of more than $3 billion at 5:11 AM EST on January 28.  (*Id.* ¶ 178.)  After several hours of internal deliberation, Robinhood Securities made the difficult decision to impose temporary purchase restrictions on the limited number of securities driving the volatility.  (*Id.* ¶ 180.)  Robinhood Securities put in place a "position closing only" ("PCO") restriction on stock trades and options contracts for AMC, BB, BBBY, EXPR, GME, KOSS, NOK, TR and TRVG (Plaintiffs' "Relevant Securities") (*id.* ¶ 179), as well as for American Airlines Group, Inc. ("AAL"), Castor Maritime Inc. ("CTRM"), Naked Brand Group, Ltd. ("NAKD") and Sundial Growers, Inc. ("SNDL"),[6] a measure that

---

[6] *See* Maggie Fitzgerald, *Robinhood restricts trading in GameStop, other names involved in frenzy*, CNBC (Jan. 28, 2021, 9:19 AM EST), *available at* https://www.cnbc.com/2021/01/28/ robinhood-interactive-brokers-restrict-trading-in-gamestop-s.html.  Plaintiffs allege that Robinhood's limited restrictions included, "*inter alia*," certain "Relevant Securities."  (AAC ¶ 193.)  For completeness, Defendants identify the full set of restricted equities as reported by the media, which are "generally known" and "whose accuracy cannot reasonably be questioned." *Cavero v. Law Offices of Erskine & Fleisher*, No. 12-21196-CIV, 2012 WL 13134213, at *2 (S.D. Fla. Aug. 28, 2012).

allowed (but did not require) Robinhood customers to exit their positions in those symbols if they wished, but restricted additional purchases.[7]  (*Id.* ¶¶ 186-189.)

Following the imposition of the PCO restrictions, the NSCC revised Robinhood Securities' deposit requirements.  (*Id.* ¶ 183.)  Robinhood Securities then provided the cash to satisfy its revised deposit requirements a little after 9:00 AM EST, enabling Robinhood's customers to continue trading in all other securities.  (*Id.* ¶ 264.)  One of the Named Plaintiffs, Burke Minahan, elected to apply for and fund another brokerage account with Fidelity on the same day, as Fidelity did not adopt a similar restriction.  (*Id.* ¶ 30.)  Mr. Minahan purchased a share of GME on the very same day.  (*Id.*)  Robinhood Securities lifted the PCO restrictions by January 29, 2021 (*id.* ¶ 249), and removed all purchase limitations by market open on February 5, 2021 (*id.* ¶ 264).

Other brokerages, including several previously named as defendants, imposed a variety of similar restrictions the morning of January 28 in response to the unprecedented trading volume and volatility.  (*Id.* ¶¶ 195, 366.)  For example, Ally, Dough, Public.com, SoFi, Stash, Tastyworks and Webull imposed various temporary purchasing restrictions for a number of hours.  (*Id.*)  Similarly, E*Trade and Interactive Brokers imposed restrictions, and ETC required Alpaca to impose restrictions.  (*See* Antitrust Decision at 33.)  Although Plaintiffs had previously alleged at various points in this case that each of those entities imposed their individual restrictions as part of a conspiracy with Robinhood and Citadel Securities, they have now abandoned that allegation.  (*Id.* at 33-34.)

As market volatility continued, on January 30, 2021, the SEC released an investor alert and bulletin warning about the risks of short-term trading based on social media, and acknowledged that "broker-dealers may reserve the ability to reject or limit customer transactions" for "legal, compliance, or risk management reasons," and that the ability to do so

---

[7] Plaintiffs' allegations with respect to the PCO restrictions are unclear and potentially misleading.  Plaintiffs allege that Robinhood's "prohibition on purchasing stock did not apply to all investors" and "Citadel Securities was not restricted from purchasing the Relevant Securities."  (AAC ¶ 209.)  Plaintiffs apparently mean that Robinhood's restrictions did not apply to investors who were customers of other broker-dealers; Robinhood's PCO restrictions applied to all of its customers (*see* AAC ¶ 179).  And Citadel Securities (a market maker) is not, nor is it alleged to have been, a customer of Robinhood's retail brokerage services, so of course Robinhood's restrictions on its customers had no effect (and could not have had any effect) on Citadel Securities' ability to trade in those (or any other) securities.

"is typically discussed in the customer account agreement."[8]  Indeed, as the Court found in dismissing the Robinhood Tranche of this MDL, Robinhood's customer agreement expressly authorized Robinhood Securities to take the actions it did.  (*See* Robinhood Decision at 49.)  In light of the ongoing volatility and to ensure that it could meet any further extraordinary NSCC collateral calls, Robinhood Securities maintained certain stock purchasing limits (but not PCOs) on a variety of stocks between January 29 and February 5, 2021.  (AAC ¶¶ 252-255, 261-264.)

*       *       *

Based on the foregoing events, Plaintiffs claim, for the third time, that the stock purchasing limitations for the Relevant Securities were the product of an antitrust conspiracy in spite of the obvious alternative (and actual) explanation identified in the Amended Antitrust Complaint—the extraordinary market volatility and the resulting NSCC deposit demand.  For the reasons that follow, Plaintiffs' claim remains implausible and should be dismissed with prejudice.

**ARGUMENT**

Pleading a violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, requires a "(1) conspirac[y] that (2) unreasonably (3) restrain[s] interstate or foreign trade," *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1260 (11th Cir. 2019) (en banc).  In considering a motion to dismiss a case brought under Section 1 of the Sherman Act, courts must determine "whether the complaint, in asserting a conspiracy or agreement in restraint of trade, contains 'allegations plausibly suggesting (not merely consistent with) [a conspiracy or] agreement,' that is, whether the complaint 'possess[es] enough heft to show that the pleader is entitled to relief."  *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1332-33 (11th Cir. 2010) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)); *See also In re Farm-Raised Salmon & Salmon Prods. Antitrust Litig.*, No. 19-21551-CIV, 2021 WL 1109128, at *10 (S.D. Fla. Mar. 23, 2021).  A plaintiff must allege "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.  "Plausibility is the key, as the 'well-pled allegations must nudge the

---

[8] SEC, *Thinking About Investing in the Latest Hot Stock?* (Jan. 30, 2021) ("SEC Statement"), https://www.sec.gov/oiea/investor-alerts-and-bulletins/risks-short-term-trading-based-social-media-investor-alert.  The Court may take judicial notice of the SEC statement because it is a public record, the accuracy of which cannot reasonably be questioned.  *See Universal Express*, 177 F. App'x at 53 (taking judicial notice of public records at the motion to dismiss stage).

11

claim across the line from conceivable to plausible.'" *Jacobs*, 626 F.3d at 1333 (quoting *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (abrogated on other grounds)).

Plaintiffs assert that Citadel Securities and Robinhood entered into a vertical conspiracy. This claim fails for three independent reasons. *First*, Plaintiffs again fail plausibly to plead the threshold requirement for a conspiracy claim: an actual agreement between the defendants. The alleged conspiracy remains wholly implausible, and the facts conceded in the Amended Antitrust Complaint (that the temporary purchasing restrictions arose from Robinhood Securities' capital call from the NSCC) present a far more likely—and lawful—explanation for the challenged conduct. (*See infra* Section I.) *Second*, Plaintiffs fail to allege the necessary elements to plead a claim under Section 1 of the Sherman Act under the rule of reason, as required for a vertical conspiracy of the kind Plaintiffs assert. Specifically, Plaintiffs fail to allege that they suffered harm in the relevant markets in which Defendants compete. (*See infra* Section II.) *Third*, even if Plaintiffs' claims were taken to plead some kind of antitrust claim (which they do not), such a claim would nonetheless be precluded by the federal securities laws under *Credit Suisse Sec. (USA) LLC v. Billing*, 551 U.S. 264, 285 (2007). (*See infra* Section III.) The Amended Antitrust Complaint should be dismissed with prejudice.

## I.   PLAINTIFFS FAIL TO SUFFICIENTLY PLEAD THAT DEFENDANTS AGREED TO CONSPIRE.

Plaintiffs' claims fail because their allegations of an agreement are insufficient. The "first inquiry [] in any section 1 claim . . . is to locate the agreement that restrains trade." (Antitrust Decision at 26 (quoting *Tidmore Oil Co., Inc. v. BP Oil Co./Gulf Prods. Div., a Div. of BP Oil Co.*, 932 F.2d 1384, 1388 (11th Cir. 1994)).) Thus, the "'crucial question' with regard to a conspiracy claim under section 1 'is whether the challenged anticompetitive conduct stems from independent decision or from an agreement.'" *Salmon Antitrust Litig.*, 2021 WL 1109128 at *10 (quoting *Twombly*, 550 U.S. at 553). Plaintiffs must present "direct or circumstantial evidence that reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.* (alteration in original) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)).

Under *Twombly*, conspiracy allegations "must be placed in a context that raises a suggestion of a preceding agreement," and not merely "conduct that could just as well be independent action." 550 U.S. at 557. "Factual allegations that are 'consistent with conspiracy,

but just as much in line with . . . rational and competitive business strategy' are insufficient." *In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1308 (S.D. Fla. 2010) (quoting *Twombly*, 550 U.S. at 554).  The Court "may infer from the factual allegations in the complaint obvious alternative explanations, which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009)) (internal quotation and alteration omitted).  Additionally, "[m]ere complaints of illegal conspiracy that are equally consistent with permissible competition, without more, do not support even an inference of conspiracy." *Dunnivant v. Bi-State Auto Parts*, 851 F.2d 1575, 1582 (11th Cir. 1988); *see also Auto. Alignment & Body Serv., Inc., v. State Farm Mut. Auto Ins. Co.*, 953 F.3d 707, 728-29 (11th Cir. 2020) (holding that plaintiffs failed plausibly to allege a Section 1 claim when they "offer[ed] no allegations that explain[ed] why the loss in business they allege[ed] [was] plausibly explained by steering instead of other 'obvious alternative explanation[s]'") (quoting *Twombly*, 550 U.S. at 567); *Fla. Cement*, 746 F. Supp. 2d at 1308 ("After *Twombly*, to successfully plead a Section 1 claim based on defendants' conduct alone, plaintiffs must allege facts that make the existence of a preceding unlawful agreement the most plausible explanation for defendants' behavior.").

        As noted above, Plaintiffs have abandoned any allegation of a horizontal conspiracy among competitors and instead allege only a vertical agreement between Robinhood and Citadel Securities to "coordinat[e] a collective shutdown of the stock brokerage market with respect to the Relevant Securities."[9]  (AAC ¶ 407.)  Plaintiffs cannot, however, overcome the problems that doomed their prior complaint simply by narrowing the scope of the alleged conspiracy.  There remains zero direct evidence of a conspiracy.  And whatever circumstantial evidence of a conspiracy Plaintiffs may claim exists still cannot "nudge[] [Plaintiffs'] claims across the line from conceivable to plausible" given the alternative plausible explanation of independent action provided in the complaint itself.  (Antitrust Decision at 50.)  Nowhere in the Amended Antitrust Complaint do Plaintiffs offer new allegations that bolster the plausibility of their alleged conspiracy.  Indeed, the narrowed conspiracy is just as implausible as before.

---

[9] Among the Defendants, members of the same corporate family are considered as a single economic actor and are thus "incapable of conspiring with each other."  *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 777 (1984).  Robinhood Financial and Robinhood Securities are both owned by Robinhood Markets, Inc. ("Robinhood Markets").  No alleged agreement among the Robinhood Defendants could give rise to an actionable conspiracy claim.

**A.    Plaintiffs Fail To Allege Any Direct Evidence of an Agreement.**

As before, Plaintiffs allege no direct evidence of a conspiracy.  In dismissing the prior antitrust complaint, the Court held that the communications between Citadel Securities and Robinhood alleged in the previous complaint were insufficient to establish direct evidence of an agreement to restrict trading.  (*See* Antitrust Decision at 27-31.)  As the Court noted, direct evidence "is explicit and requires no inferences to establish the proposition or conclusion being asserted."  *Salmon Antitrust Litig.*, 2021 WL 1109128 at *10 (quoting *In re Loc. TV Advert. Antitrust Litig.*, No. 18-C-6785, 2020 WL 6557665, at *7 (N.D. Ill. Nov. 6, 2020)).  Such evidence would consist, for example, of a "document or conversation explicitly manifesting the existence of" an agreement.  *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 226 (3d Cir. 2011) (quoting *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 324 n.23 (3rd Cir. 2010)); *see also Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) ("[Direct] evidence would consist, for example, of a recorded phone call in which two competitors agreed to fix prices at a certain level.").

Plaintiffs have done nothing that would alter this Court's prior conclusion.  There are no new factual allegations—nor could there be—that directly establish the existence of the alleged conspiratorial agreement between Robinhood and Citadel Securities.  Specifically, there is still no direct evidence concerning when, where or how the alleged conspiracy was entered into, who was part of it, or what its structure or purpose was.  In sum, Plaintiffs still "fall far short of providing allegations 'explicitly manifesting the existence of the agreement in question.'"  (Antitrust Decision at 31 (quoting *Ins. Brokerage Antitrust Litig.*, 618 F.3d at 324 n.23).)

**B.    Plaintiffs Fail Adequately To Allege Circumstantial Evidence of an Agreement.**

Plaintiffs' alleged circumstantial evidence of a conspiracy remains as inadequate as what this Court previously rejected in the Antitrust Decision.  (Antitrust Decision at 49-50.)  Where, as here, plaintiffs are unable to present direct evidence of an agreement, they must plead "circumstantial evidence that reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective."  *Salmon Antitrust Litig.*, 2021 WL 1109128 at *10 (alteration in original) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984))  Unlike a horizontal conspiracy, however, in which a plaintiff must plead both parallel conduct and "plus factors," a vertical conspiracy

does *not*—by definition—involve parallel conduct among competitors.  Thus, in a case involving a vertical conspiracy, the circumstantial evidence alleged by Plaintiff must demonstrate "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. 752 at 764.  At the pleading stage, that circumstantial evidence must satisfy the *Twombly* plausibility standard.  *Twombly*, 550 U.S. at 556-57.  *See, e.g.*, *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1261 (11th Cir. 2019).

In dismissing the DAC, the Court carefully analyzed the communications between Robinhood and Citadel Securities that Plaintiffs identified as purported evidence of an illegal agreement.  (Antitrust Decision at 16.)  Ultimately, the Court explained:

> "High-level executives at [Robinhood and Citadel] exchanged various vague and ambiguous emails immediately before and after Robinhood imposed trading restrictions on the Relevant Securities on January 28, 2021.  These emails set up telephone discussions between the executives, the substance of which is unknown to Plaintiffs.  Admittedly, these emails may be somewhat suspicious given the participants and their timing.  But are a few vague and ambiguous emails between two firms in an otherwise lawful, ongoing business relationship enough to "nudge[] [Plaintiffs'] claims across the line from conceivable to plausible[?]" *Id.* at 570 (alterations added).  The Court thinks not."  (*Id.* at 50.)

As discussed in the following sections, Plaintiffs have alleged nothing that would change this Court's prior conclusion and have failed to move their claims any closer to that line of plausibility, never mind over it.

### 1.    Plaintiffs Fail to Allege Any New Communications Supporting an Inference of a Conspiracy.

In the Antitrust Decision, the Court found that the various alleged communications between Robinhood and Citadel Securities reflected in the Dismissed Antitrust Complaint gave rise to nothing more than a weak inference of a conspiracy between the two entities.  In doing so, the Court correctly noted that Plaintiffs' allegations were "thin" and "hardly comparable" to the evidence that this Court found sufficient to give rise to a strong inference of a conspiracy in *In re Salmon Antitrust Litigation*, No. 19-21551-CIV, 2021 WL 1109128 (S.D. Fla. Mar. 23, 2021).  (Antitrust Decision at 43-44.)  The same conclusion applies to the Amended Complaint.

In fact, despite having months to amend their complaint and re-review the thousands of documents produced to them by Citadel Securities and Robinhood, Plaintiffs

include *no* additional factual allegations concerning communications between the two firms in the Amended Antitrust Complaint that would support an inference of a conspiracy.  Exhibit A to the Motion compares the allegations of direct communications between Robinhood and Citadel Securities in the Dismissed Antitrust Complaint with those contained in the Amended Antitrust Complaint.  As reflected in that Exhibit, there is literally nothing new.

As before, each of the alleged communications reflects dealings in the normal course of business between Citadel Securities and Robinhood related to the ongoing "'payment for order flow' relationship" between Robinhood and Citadel Securities and had nothing to do with the restrictions Robinhood later imposed.  (AAC ¶¶ 283, 312-313.)[10]  Indeed, Plaintiffs plead no communications establishing that Citadel Securities even had advance notice of the Robinhood restrictions on trading of any of the Relevant Securities, let alone communications establishing that it was part of any conspiracy to impose those restrictions.  *See Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1456 (11th Cir. 1991) ("[T]he mere opportunity to conspire among antitrust defendants does not, standing alone, permit the inference of conspiracy.").[11]

### 2.  Plaintiffs Fail to Put Forward Allegations Plausibly Suggesting an Agreement.

As demonstrated in the preceding section, Plaintiffs have not added any evidence from the communications between Citadel Securities and Robinhood to help push their claim over the line to plausible.  Nor have they made any progress in establishing that their claim of a

---

[10] Plaintiffs' allegation that on January 26, 2021, Robinhood Securities President and COO James Swartwout posted on an internal chat that he sold his AMC stock and that Robinhood was moving GME to 100% margin the following day is of no moment.  (AAC ¶ 234.)  As explained above, margin requirements relate to funds customers must have on hand to purchase or hold certain securities.  There is no allegation that Robinhood's decision to adjust margin requirements—a decision separate from the PCO restrictions imposed two days later that were the alleged product of a conspiracy—were related in any way to Citadel.

[11] Indeed, elements of the alleged communications weigh *against* inferring a conspiracy. Plaintiffs cite to an email from Mr. Swartwout on January 27, 2021—the day before the allegedly agreed-upon restrictions would go into effect. In the email, addressing the parties' PFOF relationship, Swartwout makes a statement wholly at odds with the conspiracy:  "whatever it is we are not going to be able to address it tomorrow given the notice." (AAC ¶ 245.)  This email contradicts an already-implausible conspiracy, as it shows that *whatever the topic* of the email, it would not occur on January 28, when the restrictions took effect.  (*Id.*)  Further, it belies Plaintiffs' unsupported claim that "Robinhood was upset that its PFOF would be limited when Citadel Securities demanded that Robinhood restrict trading to allow Citadel Securities to cover its short positions."  (*Id.* ¶ 246.).

16

conspiracy to drive down the prices of the Relevant Securities is plausible in the face of the alternative plausible explanation of independent action in response to extraordinary NSCC deposit requirements.

In the Antitrust Decision, the Court noted that Plaintiffs had conceded that the decision to PCO was against Robinhood's general financial interest to earn revenue from trading volume.  (Antitrust Decision at 18-19, 37.)  That concession remains in the Amended Antitrust Complaint.  (*See* AAC ¶¶ 352, 358.)  And once again, the Antitrust Plaintiffs provide the factual allegations establishing the "obvious alternative explanation" (rather than a conspiracy with Citadel Securities) for Robinhood's conduct.  *Twombly*, 550 U.S. at 567.  Specifically, Plaintiffs allege (accurately) that the NSCC—the clearing agency for securities transactions—imposes "clearing fund contributions" at the "start of each day and intraday in volatile markets" to further its mission of reducing the "settlement risk, and operational risk of clearing and settling multiple transactions among multiple parties."  (AAC ¶ 88, 90.)[12]  Plaintiffs also allege (correctly) that trading in the Relevant Securities was extraordinarily volatile on the days in question and that the trading volume was unprecedented.  (*Id.* ¶¶ 137, 144-153.)  According to Plaintiffs' own allegations, Robinhood faced a deficit of more than $3 billion on January 28 as a result of the NSCC's collateral call given the ongoing market volatility.  (*Id.* ¶ 178.)  Again, according to Plaintiffs themselves, these "margin requirements must be met by clearing members on a timely basis," and the "NSCC collects clearing fund contributions, or margin, at the start of each day and intraday in volatile markets."  (*Id.* ¶ 90.)  The internal messages cited by Plaintiffs confirm that Robinhood decided to implement the PCO restrictions in response to the NSCC's early-morning collateral call.  (*Id.* ¶¶ 180, 182.)[13]

---

[12] Notably, Plaintiffs' DAC contained additional factual allegations concerning NSCC's deposit requirements for clearing brokers, including that the NSCC "demanded that its member clearing agents supply additional collateral to support" trades in the so-called meme stocks on January 28 (the day of the alleged conspiracy).  (DAC ¶ 414.)  Plaintiffs cannot run from those previous admissions by deleting them from the Amended Antitrust Complaint.

[13] Still other internal communications previously cited by Plaintiffs in the DAC (which they now omit) also provide that the PCOs were in response to the NSCC's extraordinary collateral call on January 28, 2021.  (*See, e.g.*, DAC ¶¶ 243-244 (January 28, 2021 Slack message stating, "Did we make amc gme only PCO?" "yeah.  [Robinhood Securities] received a very large [collateral] call – confidentially.").)

The SEC's newly proposed rule in response to the market events in January 2021 acknowledges how existing settlement rules and the extreme market volatility drove NSCC's collateral calls and the resulting broker-dealer actions.  *See* Proposed Rule at 176 n.337.  Further, in the SEC Staff Report, the SEC Staff noted that there was "[o]ne narrative" that "attributed the broker-dealer trading restrictions to pressure from hedge funds and their commercial partners." (SEC Staff Report at 32-33.)  But the SEC Staff found otherwise, concluding:  "A number of clearing brokers experienced intraday margin calls from a clearinghouse.  In reaction, some broker-dealers decided to restrict trading in a limited number of individual stocks in a way that some investors may not have anticipated."  (*Id.* at 43; *see also id.* at 3 ("[V]olatility combined with settlement risks led some firms to temporarily restrict trading."); *id.* at 31 ("The risk management mechanism of these clearing agencies effectively led others in the transaction chain—such as retail broker dealers—to pause and manage risk exposure that arose as the rate of transactions accelerated."); *id.* at 32 ("[S]ome broker dealers restricted activities in a limited number of individual stocks in reaction to margin calls and capital charges imposed by NSCC.").)

The independent, non-conspiratorial rationale for the challenged conduct is again reinforced by the fact that a significant number of brokers that are no longer alleged to have been conspirators also enacted trading restrictions in a number of the Relevant Securities in response to the market volatility and volume.  These brokerages include Charles Schwab, TD Ameritrade, and eight other brokerages that Plaintiffs voluntarily dismissed with the filing of the DAC (*see* DAC ¶ 246), as well as Cash App Investing LLC, eToro USA Securities, Inc. and Barclays Bank PLC, which Plaintiffs identified in their original, pre-MDL complaint (*see Shane Cheng and Terell Sterling v. Ally Financial Inc. et al.*, 21-cv-00781 (N.D. Cal.) (Complaint, ECF No. 1, at 1)).  Plaintiffs have now also abandoned their previous claim in the DAC that Apex, E*Trade, Interactive Brokers, ETC, and PEAK6 were alleged conspirators alongside Citadel Securities and Robinhood by also imposing certain trading restrictions on some of the Relevant Securities on January 28, 2021.

In short, by Plaintiffs' own concessions in the various complaints they have filed in this action, nearly the entire retail brokerage industry imposed restrictions similar to those implemented by Robinhood, yet Plaintiffs claim that only Robinhood did so because it was part of some nefarious conspiracy with Citadel Securities.  (*Compare* AAC ¶ 313 (naming E*Trade,

18

Webull "and others" in "No-Fee Brokerage Trading App Market"), *with* DAC ¶¶ 42-63
(identifying now-dismissed E*Trade, Webull and others as broker-dealer antitrust conspirators).)
However, "Plaintiffs cannot credibly argue that 'no reasonable firm' would have restricted
trading" in the circumstances that existed during late January 2021 when they abandoned their
claims against virtually every other prominent retail broker dealer that engaged in such
restrictions.  (*See* Antitrust Decision at 39); *see also Dunnivant v. Bi-State Auto Parts*, 851 F.2d
1575, 1583 (11th Cir. 1988) (rejecting inference of vertical conspiracy where defendant had
"legitimate business interest" in dealing exclusively with certain retailers).  "[C]onduct as
consistent with permissible competition as with illegal conspiracy does not, standing alone,
support an inference of an antitrust conspiracy."  *Id.* at 1581 (quoting *Matsushita Elec. Indus.
Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)); *see also Twombly*, 550 U.S. at 556 n.4
(rejecting allegations of conspiracy given plausible explanation that conduct reflected
"independent responses to common stimuli . . . unaided by an advance understanding among the
parties" (internal citation omitted)).[14]

Plaintiffs offer only their own unsupported assertions that Robinhood
implemented restrictions similar to virtually the entire retail brokerage industry (*cf.* AAC ¶¶ 365-
367; DAC ¶¶ 198-199, 247-253) because Citadel Securities somehow made Robinhood do so.
But there continue to be no factual allegations that Citadel Securities "bribed" Robinhood into
implementing the restrictions.  There are no facts alleged to support the conclusory assertion that
Citadel Securities threatened to cut off its PFOF relationship with Robinhood if Robinhood did
not PCO the Relevant Securities.  There is no allegation that Citadel Securities itself stopped its
market-making activity with respect to trading in any of the Relevant Securities with *any* broker-
dealer.  There is no explanation as to why Citadel Securities—which also had a PFOF
relationship with numerous other retail brokers no longer alleged to be part of the conspiracy
(DAC ¶ 418)—would leverage only its PFOF relationship with Robinhood to stop trading,

---

[14] *See also Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1295 (11th Cir. 2010) (noting that
"[t]he complaint does not plausibly suggest that by using similar methods to downcode and
bundle claims, Defendants have acted in any way inconsistent with the independent pursuit of
their own economic self-interest," and "[a]ccordingly, Defendants' parallel conduct is equally
indicative of rational independent action as it is concerted, illegitimate conduct"); *Mayor & City
Council of Balt.*, 709 F.3d at 138 (noting that "Defendants' alleged actions—their en masse flight
from a collapsing market in which they had significant downside exposure—made perfect
business sense").

knowing that virtually every other broker would be free to continue such trading activity.  And there is no plausible theory as to why Robinhood would comply with Citadel Securities' alleged wishes to restrict trading, rather than simply re-direct trades to competing market makers that Plaintiffs concede exist and already had relationships with Robinhood.[15]  Rather than supply any of these missing factual allegations to even begin to allege a plausible conspiracy, Plaintiffs spend paragraphs of the Amended Complaint emphasizing the importance of Robinhood's business relationship with Citadel Securities and the PFOF revenue it paid to Robinhood.  (*See* AAC ¶¶ 316-23, 352.)  But this Court already rejected the mere fact of the parties' ongoing business relationship as a motive to conspire in the Antitrust Decision.  (*See* Antitrust Decision at 37.)

     *American Contractors Supply v. HD Supply* is instructive.  In *American Contractors Supply*, a distributor alleged that a manufacturer and competing distributor conspired to cause the manufacturer to terminate further business with the plaintiff distributor. *Am. Contractors Supply, LLC v. HD Supply Constr. Supply, Ltd.*, 989 F.3d 1224, 1237 (11th Cir.), *cert. denied*, 142 S. Ct. 339 (2021).  The plaintiff argued that the competing distributor possessed sufficient market power to force the manufacturer to "cut off" the plaintiff, and that there was evidence that the competing distributor made complaints and threatened to stop purchasing from the manufacturer. *Id*. at 1235.  Rejecting these arguments, the Eleventh Circuit affirmed the grant of summary judgment for the defendant because "the evidence [was] at least equally consistent with an inference" that the manufacturer independently decided it was in its best interest to terminate business with the plaintiff. *Id*. at 1235-37 (rejecting claim where conduct was "equally consistent with permissible competition as it is with an illegal conspiracy") (citation omitted).  The Eleventh Circuit's holding applies here:  even if Plaintiffs could put forth "an inference that there might have been an agreement," which they have not, Defendants'

---

[15] Although Plaintiffs assert in conclusory terms that "[Robinhood] could not rely on the possibility that other market makers, such as Virtu Americas, were standing by willing and able to pay Robinhood for order flow that Citadel [Securities] would have otherwise accepted" (AAC ¶ 319), Plaintiffs cannot carry the day with mere "[p]ure speculation," especially where other market makers are responsible for most of Robinhood's payment for order flow and where there is no allegation that Citadel Securities paid Robinhood more for order flow. *United Am. Corp. v. Bitmain, Inc.*, No. 18-CV-25106, 2021 WL 1807782, at *13 (S.D. Fla. Mar. 31, 2021); *see also* Robinhood Securities LLC Rule 606 Report, *supra* note 2.

conduct is "equally consistent" with non-conspiratorial actions.[16]  Here, the obvious alternative explanation is that Robinhood's conduct was caused by the NSCC deposit requirement.

In sum, Plaintiffs ask this Court to infer that Robinhood decided to introduce varying versions of trading restrictions (at the same time that more than a dozen alleged non-conspirators were also implementing a variety of similar trading restrictions) because of an unsubstantiated allegation that Citadel Securities threatened to cut off Robinhood's PFOF relationship, rather than because Robinhood faced unprecedented challenges, including *billions of dollars in unexpected collateral requirements* in the middle of one of the most volatile market moments in history.  And with only two parties left in the conspiracy, Plaintiffs ask the Court to infer such a motive despite the facts that:  (1) Robinhood's customers could have left the platform for other broker dealers (as did Plaintiff Minahan) if they were unhappy with Robinhood's restrictions, (2) Robinhood could have shifted order flow to other market makers, if Citadel Securities had actually made any purported threats, and (3) Citadel Securities could have asked other retail broker dealers with which it had a similar PFOF relationship to restrict trading—instead of just Robinhood—if it had wanted to halt all retail trading activity, as alleged.  That inference of motive is even less plausible now than it was when the Court dismissed the prior complaint.  The Amended Antitrust Complaint should therefore be dismissed as well.

## II.  PLAINTIFFS FAIL TO PLEAD THE REMAINING ELEMENTS OF A SECTION 1 CLAIM.

Even if Plaintiffs had alleged facts sufficient to give rise to an inference of an agreement between Robinhood and Citadel Securities—and they have not—their claim would

---

[16] Further undermining the plausibility of Plaintiffs' conspiracy allegations is their garbled theory for the timing of the agreement.  Plaintiffs allege that Citadel Securities "extended a proposition" to Robinhood on January 20, and that Robinhood entered into the alleged conspiracy on January 25, 2021.  (AAC ¶¶ 228-230.)  However, it defies logic that the parties would enter into a conspiracy on January 25, presumably to halt the meme stocks' price appreciation and Citadel's allegedly mounting losses, only to wait until January 28 to have Robinhood put in place the PCO restrictions.  A much more plausible interpretation of these emails is that they evince the introduction of two Robinhood employees who both took on new roles, and separately sought to meet their respective business contacts at Citadel Securities.  (*Id.* ¶¶ 229, 232.)  There is also no basis for the conspiracy to extend through February 4.  Plaintiffs' own charts show that the prices of the Relevant Securities declined after January 29.  There was no reason for the restrictions to be in effect under Plaintiffs' theory, or for Robinhood to agree to extend the restrictions knowing it could lose customers.

still fail because they have not pleaded facts that could support an antitrust claim under either the *per se* standard or the rule of reason.

Despite conceding that there was no conspiracy among competitors, Plaintiffs nonetheless assert that the alleged vertical conspiracy between Citadel Securities and Robinhood "is per se illegal."  (AAC ¶ 413.)  That is wrong as a matter of law; courts analyze vertical agreements (with one narrow exception regarding tying arrangements not pleaded here) under the rule of reason.  *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283-84 (2018); *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,* 551 U.S. 877, 893 (2007).  (*See infra* Section II.A.)

Having retreated to pleading a narrow, vertical agreement between Citadel Securities and Robinhood, Plaintiffs are required, under the rule of reason, to plead an "anticompetitive effect of the defendant's conduct on the relevant market."  *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1551 (11th Cir. 1996).  To satisfy this standard, a plaintiff can either allege "that the defendants' behavior had an 'actual detrimental effect' on competition, or that the behavior had 'the potential for genuine adverse effects on competition,'" (the latter of which also requires a showing of substantial market power).  *Id.*  There is an obvious flaw in Plaintiffs' rule of reason claim that requires dismissal:  they allege that they suffered harm in a market that is separate from the markets in which they allege Defendants held market power and engaged in unlawful conduct.  *See Jacobs*, 626 F.3d at 1336 ("Regardless of whether the plaintiff alleges actual or potential harm to competition, however, he must identify the relevant market in which the harm occurs.").  Under binding Supreme Court and Eleventh Circuit precedent, that is fatal to their claim.  (*See infra* Section II.B.)[17]

### A.    Plaintiffs' Claim Does Not Qualify for *Per Se* Treatment Under the Antitrust Laws.

Plaintiffs' alleged vertical agreement must be analyzed under the rule of reason. Whether an antitrust claim is governed by the *per se* standard or the rule of reason is properly decided on a motion to dismiss.  "Whether to apply a *per se* or rule of reason analysis is a question of law."  *Nat'l Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*, 779 F.2d 592, 596 (11th Cir. 1986).  Accordingly, courts routinely address at the motion to dismiss stage whether a

---

[17] Were this case to proceed past the motion to dismiss stage, Plaintiffs would be unable to support their arbitrarily narrow alleged markets, their claims of market power by either Citadel Securities or Robinhood in their respective markets, or their claim that there was any actual harm to competition that resulted in their suffering a cognizable antitrust injury.

plaintiff has adequately pleaded an agreement that would be subject to *per se* treatment.  *See, e.g.*, *Tempur-Pedic*, 626 F.3d at 1334-36 (affirming holding that alleged anticompetitive conduct was not a *per se* violation at the motion to dismiss stage); *Quality Auto*, 917 F.3d at 1271-72 (same).

   The Supreme Court has emphasized that typically only "'horizontal restraints'— restraints 'imposed by agreement between competitors'—qualify as unreasonable *per se*."  *Am. Express*, 138 S. Ct. at 2283-84 (quoting *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988).  By contrast, "vertical restraints—*i.e.*, restraints 'imposed by agreement between firms at different levels of distribution,'" *id.* at 2284 (quoting *Bus. Elecs.*, 485 U.S. at 730)—are generally assessed under the rule of reason.  *See Leegin*, 551 U.S. 877, 907 (2007) ("Vertical price restraints are to be judged according to the rule of reason.");  *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 47-49, 59 (1977) (rule of reason governs vertical nonprice restraints). The only exception are certain tying arrangements, which while vertical in nature are sometimes assessed using the *per se* standard.  *See* 9 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1702 (4th ed. 2014 & Supp. 2021).[18]

   Here, Plaintiffs allege that Robinhood and Citadel Securities "operate at two different levels within the distribution of securities trading services" and operate in two different markets, an "upstream" market-maker market and a "downstream" retail-broker market.  (AAC ¶ 305.)  The alleged agreement is therefore vertical.  There is no allegation—nor could there be—that the challenged conduct constitutes a tying arrangement.  As a result, this Court must evaluate Plaintiffs' claim under the rule of reason.  *See Am. Express*, 128 S. Ct. at 2283-84; *Tempur-Pedic*, 626 F.3d at 1336.

  **B.**  **Plaintiffs Fail to State a Claim Under the Rule of Reason.**

   Since Plaintiffs have not alleged an agreement that fits within any of the categories warranting *per se* condemnation, their current complaint can survive only if they state a claim for a violation of the Sherman Act under the rule of reason.  It does not.  Plaintiffs fail to allege harm to competition in a "relevant market."  *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1071 (11th Cir. 2004).  In an apparent effort to avoid

---

[18] In a tying arrangement, a seller requires a customer who wants to purchase its "tying" product also to purchase a "tied" product.  *See, e.g.*, *Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566, 1574 (11th Cir. 1991).

the obvious flaws in their prior attempts to define a market harmed by the Defendants, Plaintiffs have gerrymandered segregated markets in which Plaintiffs allege Citadel Securities operates (the "PFOF Market") and Robinhood separately operates (the "No-Fee Brokerage Trading App Market"). (AAC ¶¶ 305-315.)  The only harm Plaintiffs allege, however, is in a *third* market, different from these other two markets.  Accordingly, Plaintiffs fail to state a claim under the rule of reason, which requires a showing of harm to competition in a "relevant market" in which one of the defendants operates and has market power.

The Sherman Act proscribes conduct that "unfairly tends to destroy competition." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993).  In a case such as this one, which involves an alleged vertical agreement subject to the rule of reason, the critical first step in any antitrust analysis is the definition of the relevant market.  That is because "'[w]ithout a definition of the market there is no way to measure the defendants' ability to lessen or destroy competition.'"  *Am. Express*, 138 S. Ct. at 2285 (citation omitted); *see also Duty Free Americas, Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1263 (11th Cir. 2015) ("To show that [a] defendant's conduct caused harm to competition, 'the plaintiff must define the relevant market and establish that the defendants possessed power in that market.'") (quoting *Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1213 (11th Cir. 2002)).

Once the relevant market is defined, the antitrust plaintiff has the "initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers *in the relevant market*."  *Am. Express*, 138 S. Ct. at 2284; *see also Spanish Broad. Sys. of Fla.*, 376 F.3d at 1071 ("Under Eleventh Circuit case law, alleged Section One agreements analyzed under the rule of reason require a plaintiff to prove [] the anticompetitive effect of the defendant's conduct *on the relevant market* . . . .") (emphasis added); *see also Retina Assocs., P.A. v. S. Baptist Hosp. of Fla., Inc.*, 105 F.3d 1376, 1383 (11th Cir. 1997) (same); *Levine*, 72 F.3d at 1551 (same).  In other words, "the prohibited conduct . . . . must affect the relevant product market, that is, the area of effective competition between the defendant and plaintiff."  *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1353 (Fed. Cir. 1999) (internal quotations omitted).  *See also United Am. Corp. v. Bitmain, Inc.*, 530 F. Supp. 3d 1241, 1266 (S.D. Fla. 2021) ("Before the Court can evaluate harm to competition, it must know the market where this alleged harm has taken place.").

The relevant markets for the purpose of this Motion are those alleged by Plaintiffs in their complaint: the "PFOF Market" and the "No-Fee Brokerage Trading App Market." (AAC ¶¶ 305-315.) First, Plaintiffs define an upstream "PFOF Market," which they allege consists of "market makers that pay brokerage firms to route their clients' trades to that market maker." (*Id.* ¶ 306.) Plaintiffs allege that Citadel Securities, among others, competes in this market. (*Id.*) Plaintiffs then define a purported downstream "No-Fee Brokerage Trading App Market," which they allege consists of "zero account-minimum, no-fee brokerages that 1) offer a user-friendly mobile app to Retail Investors to place orders to buy and sell stocks, exchange-traded funds (ETFs), and other securities or investments strategies such as trading on margin or using options strategies, and 2) receive payment for order flow from market makers instead of fees from Retail Investors." (*Id.* ¶ 312.) Plaintiffs allege that Robinhood, among others, competes in this market. (*Id.* ¶ 313.)[19]

The legal deficiency on the face of the complaint, however, is that Plaintiffs fail to allege harm in ***either*** of these defined markets. There is, for example, no allegation that any of the relevant conduct reduced competition between Robinhood and other brokerage services for customers in the alleged "No-Fee Brokerage Trading App Market." There is also no allegation, for example, that the relevant conduct reduced competition between Citadel Securities and other market makers for the business referred to them by clearing brokers in the alleged "PFOF Market." In fact, there are none of the allegations that would typically arise—and are required—in a case that involved a cognizable (even at the pleading stage) vertical conspiracy. *See, e.g., Monsanto*, 465 U.S. at 766 (allegation that defendant published a newsletter that conveyed "an agreement or understanding that distributors and retailers would maintain prices, and [defendant]

---

[19] Plaintiffs manufacture these two defined "markets" in a transparent attempt to buttress their specious allegations that Citadel Securities and Robinhood have sufficient market share in their respective markets, such that Plaintiffs can contend that the two Defendants each have market power. An appropriate antitrust market, however, should be defined with reference to interchangeability and cross-elasticity of demand. *See Tempur-Pedic*, 626 F.3d at 1337-38. Here, Plaintiffs do not (and cannot) contend that market makers who do not pay PFOF do not compete with those in Plaintiffs' purported "PFOF Market," or that retail brokers who do not have "a user-friendly mobile app" (however that would be determined), have account minimums or charge commissions do not compete with those in Plaintiffs' "No-Fee Brokerage Trading App Market." (*See* AAC ¶¶ 305-315.)

would not undercut those prices on the retail level and would terminate competitors who sold at prices below those of complying distributors"); *Leegin*, 551 U.S. at 882-84 (allegation that manufacturer entered into vertical resale price agreements to fix prices for products at retail level).

Instead, Plaintiffs allege that the harm—a decrease in the price of the Relevant Securities—occurred in a ***third, wholly separate*** and undefined product market for the Relevant Securities. Specifically, Plaintiffs' theory of harm is that Defendants' alleged conspiracy "artificially constricted the price appreciation of the Relevant Securities and reduced the price of the Relevant Securities that Retail Investors either sold or held below the prices they would have otherwise obtained in a competitive market free of collusion." (*Id.* ¶ 16.) This is an allegation of harm in the market (or markets) for trading the Relevant Securities. Plaintiffs allege that Defendants harmed the "Plaintiffs and members of the Class" "[b]y forcing the Retail Investors to sell their Relevant Securities at lower prices than they otherwise would have sold." (*Id.*) This is an allegation that Plaintiffs were injured by their participation in the market (or markets) for trading the Relevant Securities. Plaintiffs further allege that "Defendants coordinated a collective shutdown of the stock brokerage market with respect to the Relevant Securities" and "[p]ursuant to the conspiracy, the restriction of stock purchases resulted in a sell-off of stocks, driving down prices in the Relevant Securities to levels that would not have been obtained, but for the conspiracy." (*Id.* ¶ 407.) This too is an allegation of harm allegedly suffered by Plaintiffs in the market (or markets) for the Relevant Securities.

None of the harm that Plaintiffs claim they suffered—all premised on a decline in the price of the Relevant Securities—relates at all to the relevant product markets in which Defendants are alleged to compete. Citadel Securities, as a market maker in the "PFOF Market," competes in the provision of market making services. Robinhood, as a retail broker in the "No-Fee Brokerage Trading App Market," competes in the provision of retail brokerage services.[20]

---

[20] As noted in the prior round of briefing, it is unsurprising that Plaintiffs do not actually plead that the relevant market is one for trading the Relevant Securities: "the purchase or sale of stock by investors" does not constitute a cognizable product market under the Sherman Act. *Kalmanovitz v. G. Heileman Brewing Co.*, 769 F.2d 152, 156 (3d Cir. 1985) (emphasis removed) (transactions "concerning the stock of a single company" do not "constitute[] trade or commerce within the meaning of § 1 of the Sherman Act").

This mismatch between the defined markets (in which Plaintiffs allege Defendants have market power) and the market in which the alleged harm occurs is fatal to Plaintiffs' claim because Plaintiffs must allege harm to competition *in the relevant market*.  *See Am. Express*, 138 S. Ct. at 2284; *Spanish Broad. Sys. of Fla.*, 376 F.3d at 1071.  In *Maris Distrib. Co. v. Anheuser-Busch, Inc.,* 302 F.3d 1207 (11th Cir. 2002), the Eleventh Circuit faced a similar mismatch between the alleged relevant market and the claimed market power and harm.  There, the Eleventh Circuit held that a beer distributor did not establish a rule of reason claim where the defendant, Anheuser-Busch, had a 48% market share in the manufacture of beer, but the plaintiff alleged the anticompetitive harm was suffered in the market for the purchase and sale of equity interests in beer distributorships, in which Anheuser-Busch had only a 1% to 3% market share. *See id.* at 1211.  The court held that the "relevant market" was the purchase and sale of equity interests in beer distributorships, *id.* at 1213-14, and "a defendant's market share in a market other than the alleged relevant market is irrelevant," *id.* at 1215.  The same holds true here; Citadel Securities' market share in the alleged PFOF Market and Robinhood's market share in the alleged No-Fee Brokerage Trading App Market are irrelevant to the market for trading the Relevant Securities, which is the market where Plaintiffs allege the harm occurred.  *See also Universal Grading Serv. v. eBay, Inc.*, No. C-09-2755-RMW, 2012 WL 70644 (N.D. Cal. Jan. 9, 2012) (dismissing Section 2 claim against company that operated in the "market for online auction services" where plaintiff alleged harm in markets for coin grading services and non-certified and certified coins), *aff'd*, 563 F. Appx. 571 (9th Cir. 2014).

Since Plaintiffs do not allege that either Citadel Securities or Robinhood competes in any market for the Relevant Securities, the markets in which Citadel Securities and Robinhood operate are not within "the area of effective competition between the defendant and plaintiff." *Intergraph*, 195 F.3d at 1353 (internal quotations omitted).  There are, therefore, no allegations that the conduct at issue here harmed competition in either of the relevant markets, and Plaintiffs' claims must be dismissed for this independent reason.

## III.   PLAINTIFFS' ANTITRUST THEORY IS PRECLUDED BY THE FEDERAL SECURITIES LAWS.

Even if Plaintiffs could plead a cognizable antitrust claim—and they cannot—federal securities laws would preclude any such claim.  The Securities Exchange Act of 1934 (the "Exchange Act") extensively regulates the conduct Plaintiffs allege in the Amended Antitrust Complaint.  As a result, the Supreme Court has held that where securities and antitrust

law are "clearly incompatible," the securities law implicitly precludes an antitrust claim.  *Billing*, 551 U.S. at 285.  Such incompatibility is particularly likely where the conduct at issue "lie[s] squarely within an area of financial market activity that the securities law seeks to regulate," *i.e.*, "an area of conduct squarely within the heartland of securities regulations."  *Id.* at 264, 285.

Here, Plaintiffs challenge trading restrictions that Robinhood implemented to comply with capital requirements or otherwise to address unprecedented volume and volatility (*see supra* Section I.B.2), and allege an underlying agreement for the purpose of manipulating the market price of certain securities (*see* AAC ¶ 404 (alleging that "Defendants conspired and entered into an anticompetitive scheme to fix, raise, stabilize, maintain or suppress the price of the Relevant Securities")).  Regardless of whether one considers the actual reason for the restrictions, which is plausibly provided by the facts alleged in the Amended Antitrust Complaint, or the implausible version asserted by Plaintiffs, the conduct at issue falls squarely within the heartland of federal securities law, and the regulatory authority of the SEC, which actively regulates electronic broker platforms, brokers, market makers and clearing agencies.  As the SEC Staff observed, "some broker-dealers restricted activities in a limited number of individual stocks in reaction to margin calls and capital charges imposed by NSCC," which the SEC authorizes to act as clearing agency for the U.S. equities markets.  (SEC Staff Report at 15, 32, 43-44.)  Plaintiffs in this MDL have also brought federal securities claims against Robinhood on the same set of facts alleged here (*see* Federal Securities Tranche Consolidated Complaint, ECF No. 446), and Defendants may not be liable under the antitrust statutes where Plaintiffs' claims are "securities complaint[s] in antitrust clothing."  *Billing*, 551 U.S. at 284.

**A.**     **Plaintiffs' Antitrust Claims Are Precluded under *Billing* Because the Conduct at Issue Is Regulated by the Federal Securities Laws.**

Plaintiffs' antitrust claims are precluded because the conduct at issue is "squarely" within the realm of the federal securities laws.  *See Billing*, 551 U.S. at 285.  In *Billing*, the Supreme Court reaffirmed that application of the antitrust laws may be implicitly precluded by another federal regulatory regime, such as the Exchange Act—even where the plaintiffs allege an unlawful conspiracy under the Sherman Act.  *See id.* at 267-68.  The Court held that "the securities laws [were] clearly incompatible with the application of the antitrust laws" in the case.  *Id.* at 285 (internal quotation marks omitted).  In so holding, the Court noted that "the fact that the SEC is . . . required to take account of competitive considerations when it creates securities-related policy and embodies it in rules and regulations" makes it "somewhat

less necessary to rely upon antitrust actions to address anticompetitive behavior." *Id.* at 283. Specifically, the Court observed that "evidence tending to show unlawful antitrust activity and evidence tending to show lawful securities marketing activity may overlap, or prove identical," and antitrust suits and the "risk of treble damages" could therefore cause market participants to avoid conduct that "securities law permits or encourages." *Id.* at 281-82. The Court concluded that the "threat of antitrust lawsuits, through error and disincentive, could seriously alter . . . conduct in undesirable ways," and "to allow an antitrust lawsuit would threaten serious harm to the efficient functioning of the securities markets." *Id.* at 283.

The Court in *Billing* identified four factors that determine when the antitrust laws are implicitly precluded:  (1) whether the action involves "an area of conduct squarely within the heartland of securities regulations; (2) clear and adequate SEC authority to regulate; (3) active and ongoing agency regulation; and (4) a serious conflict between the antitrust and regulatory regimes." *Id.* at 285.  All four factors point strongly in favor of implicit preclusion here.

## 1.    The Conduct at Issue Lies at the Very Heart of the Securities Market.

The first *Billing* factor considers whether the alleged practices "lie squarely within an area of financial market activity that the securities law seeks to regulate." *Billing*, 551 U.S. at 276.  The focus for the first factor is not just on the specific anticompetitive conduct that is alleged, but rather the "broad underlying market activity." *Elec. Trading Grp., LLC v. Banc of Am. Sec. LLC*, 588 F.3d 128, 133-34 (2d Cir. 2009) (citing *Billing*, 551 U.S. at 276).  Here, the underlying market activities are restrictions on customer trades on electronic broker platforms and, from Plaintiffs' perspective, alleged manipulation of market prices for exchange-traded stocks.  Brokers provide access to the securities exchanges and, without them, investors like Plaintiffs would be unable to participate in the securities markets.  For this reason, brokers and dealers must register with the SEC.  Exchange Act § 15, 15 U.S.C. § 78o.  Market integrity for stock prices is a vital aspect of securities regulation and lies at the core of the securities laws. Exchange Act §§ 9-10, 15 U.S.C. §§ 78i-78j.  And Robinhood's decision to restrict purchases of certain volatile stocks permitted them to meet clearing agency collateral calls and continue to serve all customers trading all securities (beyond the volatile stocks).  This conduct is "central to the proper functioning of well-regulated capital markets" and this case "concern[s] practices that lie at the very heart of the securities" market. *Billing*, 551 U.S. at 276.

2.      **The SEC Is Authorized To Regulate All of the Activities Here in Question.**

The second *Billing* factor considers "the existence of regulatory authority under the securities law to supervise the activities in question." *Billing*, 551 U.S. at 275.  As in *Billing*, "the law grants the SEC authority to supervise all of the activities here in question," and "the SEC possesses considerable power to forbid, permit, encourage, discourage, tolerate, limit, and otherwise regulate virtually every aspect of the practices in which [brokers] engage." *Id.* at 276. Congress has granted the SEC authority to regulate brokers under Sections 15 and 17 of the Exchange Act.  *See* 15 U.S.C. §§ 78o, 78q.  As a result, no broker may transact in securities unless such broker complies with SEC rules and regulations, Exchange Act § 15(b)(7), 15 U.S.C. § 78o(b)(7), and the SEC has specific authority to enact rules and regulations to define acts and practices by brokers that "are fraudulent, deceptive, or manipulative," Exchange Act § 15(c)(2)(D), 15 U.S.C. § 78o(c)(2)(D).  Similarly, Congress gave the SEC rulemaking authority to define "any manipulative or deceptive device or contrivance" in connection with the purchase or sale of exchange-traded securities, Exchange Act § 10(b), 15 U.S.C. § 78j(b), and made it unlawful:

> To effect either alone or with one or more other persons any series of transactions for the purchase and/or sale of any security . . . for the purpose of pegging, fixing, or stabilizing the price of such security in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Exchange Act § 9(a)(6), 15 U.S.C. § 78i(a)(6).  Therefore, the SEC has ample "regulatory authority under the securities law to supervise the activities in question." *Billing*, 551 U.S. at 275; *see also Friedman v. Salomon/Smith Barney, Inc.*, 313 F.3d 796, 803 (2d Cir. 2002) (holding that "implied immunity bars plaintiffs' claim" regarding stock price-fixing scheme based on the SEC's authority under Section 9(a)(6)).  The newly proposed rules regarding the settlement period for securities transactions that the SEC is currently considering in light of the market volatility of January 2021 provide ample evidence of the SEC's regulatory authority in this area. *See* Proposed Rule at 34-53 (discussing existing SEC authority regarding settlement).

Moreover, the SEC has considered this issue of brokerage trading restrictions in the related context of requiring brokers with "market access" to have risk management controls and supervisory procedures in place "to systematically limit the financial exposure of the broker

or dealer that could arise as a result of [customer] market access."  17 C.F.R. § 240.15c3-5(c).

Specifically, such brokers must "prevent the entry of orders," and "reject[] orders," if such orders

would "exceed appropriate pre-set credit or capital thresholds in the aggregate for each customer

and the broker or dealer."  *Id.* § 240.15c3-5(c)(1).  Indeed, the SEC has explicitly stated that

broker-dealers "may reserve the ability to reject or limit customer transactions."[21]  "Limit[ing]

financial exposure" by implementing trading restrictions when necessary is a practice that "lie[s]

squarely within an area of financial market activity that the securities law seeks to regulate."

*Billing*, 551 U.S. at 276.  As the SEC Staff found, the events of January 2021 presented an

opportunity to "identify additional areas for potential study and further consideration in the

interests of protecting investors, maintaining fair, orderly, and efficient markets, and facilitating

capital formation."  (SEC Staff Report at 43.)

> ### 3.     There Is Substantial Evidence That the SEC Is Exercising Its Authority.

The third *Billing* factor considers "evidence that the responsible regulatory

entities exercise [their] authority."  *Billing*, 551 U.S. at 275.  Here, there is ample evidence of the

SEC's exercise of its authority.  Under Section 15(c) of the Exchange Act, the SEC has enacted

extensive regulations covering brokers.  *See* 17 C.F.R. §§ 240.15c3-1 to -5.  The SEC has also

implemented a risk assessment program under Section 17 of the Exchange Act that monitors

brokers and requires them to participate in monthly risk assessment meetings with the SEC.  17

C.F.R. §§ 240.17h-1T to -2T.  The SEC has also enacted regulations that specifically address the

conduct of clearing agencies, including the calculation of and requirements for collateral calls.

17 C.F.R. § 240.17Ad-22.  Finally, the SEC has enacted regulations relating to manipulative or

deceptive devices under Section 10(b) of the Exchange Act, 17 C.F.R. § 240.10b-5, and relating

to market manipulation under Section 9(a) of the Exchange Act, Regulation M, 17 C.F.R.

§§ 242.100 to -105.  Notably, neither the Exchange Act nor SEC regulations prohibit all forms of

market manipulation.  *See Friedman*, 313 F.3d at 803.

Furthermore, the SEC has an enforcement program for violations of its

regulations concerning both brokers and market manipulation:  out of the 405 standalone

enforcement actions brought in 2020, 10% related to broker-dealers and 5% related to market

manipulation.  *See* SEC Division of Enforcement, 2020 Annual Report at 16 (Nov. 2, 2020); *see*

---

[21] *See* SEC Statement, *supra* note 8.

*also* SEC Division of Enforcement, 2019 Annual Report at 15 (Nov. 6, 2019) (out of 526 standalone cases, 7% broker-dealer actions and 6% market manipulation actions); SEC Division of Enforcement, 2018 Annual Report at 19 (Nov. 2, 2018) (out of 490 standalone cases, 13% broker-dealer actions and 7% market manipulation actions).[22]

 The SEC investigation concerning the January 2021 short squeeze events, alleged in the Amended Antitrust Complaint, demonstrates that the SEC has actively exercised its authority to regulate in this area.  (*See* DAC ¶¶ 490-491); *see also Mayor & City Council of Balt. v. Citigroup, Inc.*, Nos. 08-cv-7746 (BSJ), 08-cv-7747 (BSJ), 2010 WL 430771, at *5 (S.D.N.Y. Jan. 26, 2010) (finding that the SEC had "actively exercised its authority" by "undertak[ing] an ongoing investigation into the specific events at issue in this case"), *aff'd on other grounds*, 709 F.3d 129 (2d Cir. 2013).  Further, the SEC Staff reviewed the facts at issue and concluded that broker-dealers decided to restrict trading in certain stocks as a result of intraday margin calls from a clearinghouse.  (*See* SEC Staff Report at 31-34, 43.)  The SEC Staff also flagged that the SEC was considering what, if any, new regulations are appropriate to help address what occurred.  In fact, the SEC's recently proposed regulation was explicitly in response to the market events of late January 2021 and is intended to reduce risks in the clearance and settlement of securities, including by shortening the standard settlement cycle from two business days after the trade date to one business day.  *See* Proposed Rule at 9, 159.  These are all exercises of the SEC's authority in this area.

 **4.  Allowing This Claim To Proceed Would Create a Conflict Between the Antitrust and Securities Laws.**

 The fourth *Billing* factor considers whether there is "a resulting risk that the securities and antitrust laws, if both applicable, would produce conflicting guidance, requirements, duties, privileges, or standards of conduct."  *Billing*, 551 U.S. at 275-76.  In *Billing*, the Supreme Court engaged in a practical analysis of the "likely consequences" of allowing antitrust litigation in heavily regulated areas, including whether evidence put forward to support claims of conspiracy would "overlap" or "prove identical" with evidence showing agency-permitted conduct.  *Id.* at 275, 281.  The Court also recognized the potential for conflict between generalist judges and juries and expert regulators in drawing "a fine, complex, detailed line separat[ing] activity that the SEC permits or encourages (for which [plaintiffs] must concede

---

[22] *See* SEC Division of Enforcement Annual Reports, *available at* https://www.sec.gov/reports.

antitrust immunity)" and conduct that it "forbid[s]." *Id.* at 279.  In addition, "actual and immediate" conflict is not required; "potential conflict" is sufficient.  *See Elec. Trading Grp.*, 588 F.3d at 138 (holding that implied preclusion may be based on potential conflict, for which "the proper focus is not on the Commission's current regulatory position but rather on the Commission's authority to permit conduct that the antitrust laws would prohibit" (quoting *In re Stock Exchs. Options Trading Antitrust Litig.*, 317 F.3d 134, 149 (2d Cir. 2003))).

   Here, the enforcement of Plaintiffs' claims would create both an actual and a potential conflict between the Exchange Act and the Sherman Act if a jury in this MDL action were to find that conduct that is otherwise lawful under the securities laws is unlawful under the antitrust laws.  Most acutely, an actual conflict exists because the conduct at issue in this case is permitted by the SEC.  *See Elec. Trading Grp.*, 588 F.3d at 137 (holding that an "actual conflict arises [between antitrust liability and the securities regime] because antitrust liability would inhibit the prime brokers (and other brokers) from engaging in other conduct that the SEC currently permits").  Specifically, the SEC Staff did not find that the trading restrictions at issue violated any federal securities laws.  (SEC Staff Report at 32-35.)  The SEC has comprehensive regulations for broker-dealers (including net capital requirements), *see* 17 C.F.R. §§ 240.15a-1 to 240.15c6-1, and for clearing agencies (including collateral call requirements), *see id.* §§ 240.17Ab2-1 to -2, 240.17Ad-1 to -24.  Indeed, the SEC has explicitly stated that broker-dealers "may reserve the ability to reject or limit customer transactions,"[23] and SEC regulations on market manipulation do not prohibit the alleged conduct, *see id.* §§ 242.100 to -105 (Regulation M only applies to activities "in connection with a distribution of securities"), *see also Friedman*, 313 F.3d at 803.

   In addition to this actual conflict with SEC regulations, there is the potential for conflict with the SEC's enforcement program because the SEC Staff is currently investigating the January 2021 short squeeze events.  (*See* DAC ¶¶ 490-491.)  *See Billing*, 551 U.S. at 273 (explaining that in *Gordon v. New York Stock Exchange, Inc.*, 422 U.S. 659 (1975), "in light of potential future conflict, the Court found that the securities law precluded antitrust liability even in respect to a practice that both antitrust law and securities law might forbid").  This potential conflict is sufficient for preclusion.

---

[23] SEC Statement, *supra* note 8.

The antitrust claims in this case are precluded because "a fine, complex, detailed line separates that activity the SEC permits or encourages" from activity it forbids, and that "line-drawing" must be done by the SEC, not by judges and juries under the rubric of antitrust claims. *Billing*, 551 U.S. at 279.

**B.     There Is No Applicable Savings Clause.**

In *Billing*, the Supreme Court found that the general savings clauses in the Exchange Act are not "so broad as to preserve all antitrust actions" and do not prevent implied preclusion of Sherman Act claims. 551 U.S. at 275. Instead, the Court found that the "securities law and antitrust law are clearly incompatible." *Id.* at 279. Apparently conscious of the implied preclusion problem, Plaintiffs cite in the Amended Antitrust Complaint to the antitrust savings clause in the Dodd-Frank Act. (AAC ¶ 304.) But that savings clause does not apply to Plaintiffs' claims.

The Dodd-Frank Act includes a provision that "[n]othing in this Act, or any amendment made by this Act, shall be construed to modify, impair, or supersede the operation of any of the antitrust laws, unless otherwise specified." Pub. L. No. 111-203, § 6, 124 Stat. 1376, 1390 (2010), *codified at* 12 U.S.C. § 5303. The "Act" referred to in this savings clause is the Dodd-Frank Act (not the Exchange Act). Dodd-Frank Act §§ 1(a), 6, 124 Stat. at 1376, 1390. But nothing in the Dodd-Frank Act is at issue in this case: its amendments to the Exchange Act relate to security-based swap agreements. *See* Dodd-Frank Act §§ 761-774, 124 Stat. at 1754-1802.[24] Further, the savings clause is codified in title 12 (banks and banking), not title 15 (where the securities laws appear). *See* 12 U.S.C. § 5303. Accordingly, the Dodd-Frank Act and its antitrust savings clause do not apply to Section 15 of the Exchange Act at all, and apply to Sections 9(a) and 10(b) of the Exchange Act only insofar as those sections were expanded to cover security-based swap agreements. *See, e.g.*, *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 495-98 (S.D.N.Y. 2017) (holding that Dodd-Frank Act savings clause applied to alleged conspiracy among interest rate swap dealers, where Act regulated swap markets); *In re*

---

[24] The Dodd-Frank Act did not amend the substance of Section 15(c). *See* Dodd-Frank Act §§ 713(a), 762(d)(4), 766(d), 929L, 975(g), 124 Stat. at 1646, 1761, 1799, 1861, 1923. Nor did it amend the substance of 10(b) of the Exchange Act. *See* Dodd-Frank Act §§ 762(d)(3), 929L, 124 Stat. at 1761, 1861. The only amendments the Act made to Section 9(a) were to cover security-based swap agreements. *See* Dodd-Frank Act § 762(d)(2), 124 Stat. at 1760-61.

*Credit Default Swaps Antitrust Litig.*, No. 13-md-2476, 2014 WL 4379112, at *16-17 (S.D.N.Y. Sept. 4, 2014) (same for credit default swaps).

Plaintiffs' claims do not, however, relate in any way to security-based swap agreements. (*See, e.g.*, AAC ¶¶ 300-304.) Plaintiffs define the Relevant Securities at issue to consist only of "certain stocks"—not swaps. (*Id.* ¶ 7.) While the Amended Antitrust Complaint refers to Section 929X of the Dodd-Frank Act, titled "Short Sale Reforms", *see id.* ¶¶ 302-303, short sales are not an object of the alleged conspiracy. Moreover, Section 929X(a) authorizes the SEC to issue rules regarding the public disclosure of short positions on a monthly basis. 124 Stat. at 1870. The SEC has not issued any regulations under the provision, and even if it had done so, they would have nothing to do with the alleged conduct because they would not have prohibited short selling, nor would such monthly disclosures have had any impact on Plaintiffs' claims. For these reasons, Plaintiffs cannot show that the Dodd-Frank Act or any of the amendments it made cover the trading restrictions at issue in this action; therefore, the Act's antitrust savings clause does not apply.

## IV.    PLAINTIFFS' CLAIMS SHOULD BE DISMISSED WITH PREJUDICE.

This is the third round of antitrust complaints filed in this action—and, as the Court indicated in its Antitrust MTD Order, the "final amended complaint." (Antitrust Decision at 50.) Like the Robinhood Tranche Plaintiffs, Plaintiffs here have had months to consider their arguments and legal theories against Defendants since the first complaints were filed at the end of January 2021. Unlike the vast majority of plaintiffs at the pleading stage, Plaintiffs had the opportunity to review tens of thousands of pages of internal communications and documents regarding the allegations and issues in this case and received a two-week extension of the deadline to file the Consolidated Complaint (ECF No. 358) so they could have even more time to review and incorporate those documents. (*See* ECF No. 335.) Following the Court's dismissal of Plaintiffs' Consolidated Complaint (ECF No. 438), Plaintiffs received an additional one-month extension, and therefore had two months to amend their pleadings. (ECF No. 444.) Nevertheless—and despite the fact that Plaintiffs now claim that they were allegedly harmed by a completely new purported conspiracy—Plaintiffs have failed to cure the deficiencies that the Court previously identified in its Antitrust MTD Order and that Defendants raised in their prior Motion to Dismiss. There is no reason to believe that Plaintiffs could do so now if given another opportunity. Time has not cured, and will not cure, the lack of any evidence or plausible

allegation of a conspiracy.  Simply put, there is no cure for the many ailments that plague the Amended Antitrust Complaint, and further amendment would be futile.  The Court should dismiss the Amended Antitrust Complaint with prejudice.

## CONCLUSION

For the foregoing reasons, Defendants respectfully submit that the Amended Antitrust Complaint should be dismissed for failure to state a claim, with prejudice.

Dated:  February 18, 2022

*/s/ Samuel A. Danon*

**HUNTON ANDREWS KURTH LLP**
Samuel A. Danon (FBN 892671)
Gustavo Javier Membiela (FBN 513555)
María Castellanos Alvarado (FBN 116545)
333 S.E. 2 Avenue, Suite 2400
Miami, FL 33131
Telephone: (305) 810-2500
Facsimile: (305) 810-2460
sdanon@huntonak.com
gmembiela@huntonak.com
mcastellanos@hunton.com

**CRAVATH, SWAINE & MOORE LLP**
Antony L. Ryan
Kevin J. Orsini
Brittany L. Sukiennik
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700
aryan@cravath.com
korsini@cravath.com
bsukiennik@cravath.com

*Counsel for Defendants Robinhood Financial LLC, Robinhood Securities, LLC and Robinhood Markets, Inc.*

/s/ Adam L. Hoeflich (with consent)
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Christopher D. Kercher
Peter H. Fountain
51 Madison Avenue, 22nd Floor,
New York, New York, 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
christopherkercher@quinnemanuel.com
peterfountain@quinnemanuel.com

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
William A. Burck
1300 I Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100
williamburck@quinnemanuel.com

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
John F. O'Sullivan (FBN 143154)
2601 South Bayshore Drive, Suite 1550
Miami, FL 33133
Telephone: (305) 439-5008
johnosullivan@quinnemanuel.com

**BARTLIT BECK LLP**
Adam L. Hoeflich
Dawson Robinson
54 W. Hubbard St., Ste. 300
Chicago, IL 60654
Telephone: (312) 494-4400
Facsimile: (312) 494-4440
adam.hoeflich@bartlitbeck.com
dawson.robinson@bartlitbeck.com

*Counsel for Defendant Citadel Securities LLC*

**CERTIFICATE OF SERVICE**

   I HEREBY CERTIFY that on February 18, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I further certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive Notices of Electronic Filing.

Dated:  February 18, 2022         */s/ Samuel A. Danon*
              Samuel A. Danon (FBN 892671)