**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-2989-MDL-ALTONAGA/Torres**

IN RE:

**JANUARY 2021 SHORT SQUEEZE
TRADING LITIGATION**

_____/

This Document Relates to:

ALL ANTITRUST ACTIONS

**ANTITRUST PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

i

# TABLE OF CONTENTS

**Page(s)**

I.    INTRODUCTION ....................................................................................................... 1

II.   FACTUAL BACKGROUND ...................................................................................... 2

    A.    The January 2021 Short Squeeze ................................................................... 3

    B.    Robinhood's Unprecedented Trading Restrictions ........................................ 4

III.  STANDARD OF REVIEW ......................................................................................... 4

IV.   ARGUMENT ............................................................................................................... 5

    A.    Plaintiffs Plausibly Allege an Anticompetitive Agreement ........................... 7

        i.    Defendants' Communications and Conduct Support the Inference of a
            Conspiracy ......................................................................................... 9

        ii.   Defendants' Pattern of Concealment Infers a Conspiracy ....................... 14

        iii.  Additional Circumstantial Evidence of the Scheme ................................ 15

        iv.   Defendants' Proffered Alternative Explanations Create a Factual Dispute
            And Do Not Suggest Plaintiffs' Allegations Are Implausible................... 18

    B.    Plaintiffs Plausibly Plead an Unreasonable Restraint on Trade ......................... 21

        i.    The Court Should Not Determine at the Motion to Dismiss Stage Whether
            to Apply *Per Se* or Rule of Reason Treatment ........................................ 21

        ii.   Alternatively, the Court Should Find that the Agreement Qualifies for *Per
            Se* Treatment ........................................................................................ 22

        iii.  Plaintiffs Have Established a Conspiracy Under the "Quick Look"
            Approach and the Rule of Reason ........................................................... 23

        iv.   Plaintiffs' allegations suffice under the rule of reason ............................. 24

V.    Plaintiffs' Claims Are Not Preempted by the Federal Securities' Law ............................. 32

    A.    Dodd-Frank Act's Antitrust Savings Clause Applies to Plaintiffs' Claims ........... 32

    B.    The *Billing* Factors Weigh Against Preclusion of Plaintiffs' Claims ................... 34

        i.    The Underlying Conduct at Issue Is Not Central to the Functioning of
            Well-Regulated Capital Markets ............................................................. 35

        ii.   The SEC Is Not Authorized to Regulate the Activities in Question .......... 36

        iii.  The SEC Is Not Exercising its Authority over the Conduct at Issue ........ 37

        iv.   There is No Conflict Between Antitrust and Securities Laws .................. 38

VI.   CONCLUSION ......................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*2301 M Cinema LLC v. Silver Cinemas Acquisition Co.*, 342 F. Supp. 3d 126 (D.D.C. 2018) ..........................................................................................................31

*Albrecht v. Herald*, 390 U.S. 145 (1968) .......................................................................13

*Andrx Pharms., Inc. v. Elan Corp.*, 421 F.3d 1227 (11th Cir. 2005).............................5

*Apple, Inc. v. Pepper*, 139 S. Ct. 1514 (2019) ..............................................................27

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)...........................................................................5

*Associated News, Inc. v. Curtis Circulation Co., Inc.,* Civ. A. No. H-80-1201, 1986 WL 13791 (S.D. Tex. Dec. 4, 1986) .....................................................................8

*Battle v. Lubrizol Corp.*, 673 F.2d 984 (8th Cir. 1982) ............................................7, 23

*Belcher v. Atl. Capital Realty, LLC*, 2010 WL 11507399 (M.D. Fla. Sep. 17, 2010) ........................................................................................................................14

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .................................................. *passim*

*In re Blue Cross Blue Shield Antitrust Litig.*, 26 F. Supp. 3d 1172 (N.D. Ala. 2014) ........................................................................................................................21

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717 (1988)......................................22

*Cal. Dental Ass'n v. Fed. Trade Comm'n*, 526 U.S. 756 (1999)..............................23, 24

*ChoiceParts, LLC v. Gen. Motors Corp.*, 203 F. Supp. 2d 905 (N.D. Ill. 2002)...........18

*City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730 (N.D. Ill. 2019) .................9, 21

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962) ..................1, 7

*Costco Wholesale Corp. v. Johnson & Johnson Vision Care, Inc.*, No. 3:15-cv-734-J-20JRK, 2015 WL 9987969 (M.D. Fla. Nov. 4, 2015) ................................ *passim*

*In re Credit Default Swaps Antitrust Litig.*, No. 13md2476 (DLC), 2014 WL 4379112 (S.D.N.Y. Sept. 4, 2014) ..............................................................................34

*Credit Suisse Securities (USA) LLC v. Billing,* 551 U.S. 264 (2007) .................... *passim*

*Dahl v. Bain Capital Partners, LLC*, 589 F. Supp. 2d 112 (D. Mass. 2008)................37

*In re Dealer Mgmt. Sys. Antitrust Litig.*, MDL 2817, 2022 WL 199271 (N.D. Ill. Jan. 21, 2022)..................................................................................................15

*DeLong Equip Co. v. Wash. Mills Abrasive Co.*, 887 F.2d 1499 (11th Cir. 1989).........................7

*In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348 (N.D. Ga. 2010) ..............................................................................................................8, 9, 18

*In re Disposable Contact Lens Antitrust Litig.*, 215 F. Supp. 3d 1272 (M.D. Fla. 2016) .......................................................................................................... *passim*

*Elec. Trading Grp., LLC v. Banc of Am. Sec. LLC*, 588 F.3d 128 (2d Cir. 2009)................ *passim*

*In re EpiPen Direct Purchaser Litig.*, No. 20-cv-0827, 2021 WL 147166 (D. Minn. Jan. 15, 2021) ....................................................................................30

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs., & Antitrust Litig.*, 336 F. Supp. 3d 1256 (D. Kan. 2018)....................................................................22

*Erickson v. Pardus*, 551 U.S. 89 (2007) ..................................................................................4

*ES Dev., Inc. v. RWM Enters., Inc.*, 939 F.2d 547 (8th Cir. 1991)................................................33

*Fed. Trade Comm'n v. Ind. Fed'n of Dentists*, 476 U.S. 447 (1986) ....................................28, 29

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485 (2d Cir. 2004)...........................24

*Gordon v. N.Y. Stock Exch., Inc.*, 422 U.S. 659 (1975) ...............................................................34

*California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118 (9th Cir. 2011)....................................23

*Helicopter Support Sys. Inc., v. Hughes Helicopter, Inc.*, 818 F.2d 1530 (11th Cir. 1987) ..............................................................................................................8

*In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651 (7th Cir. 2002) ..........................17

*In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103 (N.D. Cal. 2012) ...................21, 22

*Hosp. Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738 (1976) .............................................5, 7

*Hunter v. Booz Allen Hamilton, Inc.*, 418 F. Supp. 3d 214 (S.D. Ohio 2019).............................21

*In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430 (S.D.N.Y. 2017).......................34

*Interstate Cir., Inc. v. United States*, 306 U.S. 208 (1939)...........................................................11

*Isaksen v. Vermont Castings, Inc.*, 825 F.2d 1158 (7th Cir. 1987)........................................12, 13

*Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698 (7th Cir. 1984) .......................19

*Jackson v. Wal-Mart Stores, Inc.*, 753 F. App'x 866 (11th Cir. 2018)............................................5

*Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327 (11th Cir. 2010).............................2, 25, 28, 29

*Kalmanovitz v. G. Heilman Brewing Co.*, 769 F.2d 152 (3d Cir. 1985).........................27, 35, 36

*Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit.*, 507
     U.S. 163 (1993).................................................................................................5, 25, 27

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007) .........................21

*Lucasys Inc. v. PowerPlan, Inc.*, No. 20-cv-2987, 2021 WL 5279391 (N.D. Ga.
     Sep. 30, 2021) ...............................................................................................................24

*Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207 (11th Cir. 2002).......................31, 32

*Mayor & City Council of Balt., Md. v. Citigroup, Inc.*, Nos. 08-cv-7746 (BSJ), 08-
     cv-7747 (BSJ), 2010 WL 430771 (S.D.N.Y. Jan. 26, 2010) ...........................................38

*In re: McCormick & Co., Inc.*, 217 F. Supp. 3d 124 (D.D.C. 2016) ...........................................18

*In re Mid-Atl. Toyota Antitrust Litig.*, 560 F. Supp. 760 (D. Md 1983) ...........................................8

*Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984).........................................8, 13

*In re NASDAQ Mkt-Makers Antitrust Litig.*, 172 F.R.D. 119 (S.D.N.Y. 1997) ....................30, 35

*Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038 (9th Cir. 2008).......................................25

*Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) ............................................................24, 26, 28

*Palm Beach Golf Ctr-Boca, Inc. v. Sarris*, 781 F.3d 1245 (11th Cir. 2015) ...............................27

*Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072 (11th Cir. 2016) ............................................21, 22

*Quality Auto Painting Ctr. of Roselle v. State Farm Indem. Co.*, 917 F3d 1249
     (11th Cir. 2019)................................................................................................................6

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995)........................................28

*In re Salmon*, Case No. 19-21551-CIV-ALTONAGA/Louis, 2021 WL 1109128
     (S.D. Fla. Mar. 23, 2021) .................................................................................. *passim*

*Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555 (11th Cir. 1991) ......................................7

*Spain v. Brown & Williamson Tobacco Corp.*, 363 F.3d 1183 (11th Cir. 2004)............................5

*Spanish Broad. Sys. of Fla. v. Clear Channel Commc'ns.*, 376 F.3d 1065 (11th
     Cir. 2004) ..............................................................................................................24, 25

*Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215 (5th Cir. 2001) .................................................................................................................13, 14

*Stewart Glass & Mirror, Inc. v. U.S.A. GLAS, Inc.*, 17 F. Supp. 2d 649 (E.D. Tex. 1998) ..........................................................................................................................15

*Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002)...........................................5, 25, 27

*In re Terazosin Hydrochloride Antitrust Litig.*, 352 F. Supp 2d 1279 (S.D. Fla. 2005) ..........................................................................................................................22

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) ...........................................................25

*Tops Mkts. Inc. v. Quality Mkts. Inc.*, 142 F.3d 90 (2d Cir. 1998) ...............................24

*Toys "R" Us, Inc. v. Fed. Trade Comm'n*, 221 F.3d 928 (7th Cir. 2000) ....................28

*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986 (11th Cir. 1993) ....................25

*United Am. Corp. v. Bitmain, Inc.*, No. 18-CV-25106, 2021 WL 1807782 (S.D. Fla. Mar. 31, 2021) ...........................................................................................................7

*United States v. Alex. Brown & Sons*, 963 F. Supp. 235 (S.D.N.Y. 1997) ....................31

*United States v. Container Corp. of Am.*, 393 U.S. 333 (1969).....................................11

*United States v. Falstaff Brewing Corp.*, 410 U.S. 526 (1973) .......................................7

*United States v. Gacnik*, 50 F.3d 848 (10th Cir. 1995)....................................................14

*United States v. Microsoft Corp.*, 253 F.3d 34 ...............................................................28

*United States. v. Parke, Davis & Co.*, 362 U.S. 29 (1960).......................................11, 13

*United States v. Seigler*, 990 F.3d 331 (4th Cir. 2021)....................................................15

*Univ. Express, Inc. v. U.S. Sec. Exchange Comm'n*, 177 F. App'x 52 (11th Cir. 2006) ..........................................................................................................................38

*Universal Grading Serv. v. eBay, Inc.*, No. C-09-2755-RMW, 2012 WL 70644 (N.D. Cal. Jan. 9, 2012) .............................................................................................32

*In re Urethane Antitrust Litig.*, 2013 WL 2097346 (D. Kan. May 15, 2013) ...............14

*Vernon v. Med. Mgmt. Assocs. of Margate, Inc.*, 912 F. Supp. 1549 (S.D. Fla. 1996) .....................................................................................................................27, 31

*Williamson Oil Co., Inc. v. Phillip Morris, USA*, 346 F.3d 1287 (11th Cir. 2003) ......15

**Statutes**

Clayton Act, 15 U.S.C. § 12 ......................................................................................33, 34

Dodd-Frank Wall Street Reform and Consumer Protection Act, 124 Stat. 1376 ................ *passim*

Securities Exchange Act of 1934, 15 U.S.C. § 78o ............................................... *passim*

Sherman Act, 15 U.S.C. § 1 .................................................................................... *passim*

**Other Authorities**

2 AREEDA & HOVENKAMP, ANTITRUST LAW 264 ¶ 305(e)....................................21, 23

17 C.F.R. §§ 240.15a-1 to 240.15c6-1....................................................................37, 39

17 C.F.R.§§ 242.100 to -105...................................................................................37, 39

156 CONG. REC. E1347-01 (2010) ..............................................................................33

SEC. SEC, *Thinking About Investing in the Latest Hot Stock?* (Jan. 30, 2021),
    https://www.sec.gov/oiea/investor-alerts-and-bulletins/risks-short-term-
    trading-based-socialmedia-investor-alert................................................................39

SEC Staff Report, *SEC, Staff Report on Equity and Options Market Structure
    Conditions in Early 2021* (October 14, 2021), available at
    https://www.sec.gov/files/staff-report-equity-options-market-struction-
    conditions-early-2021.pdf...........................................................................32, 38, 40

*Shortening the Securities Transaction Settlement Cycle*, Release No. 34-94196
    (issued February 9, 2022) (publication in Federal Register forthcoming) (to be
    codified at 17 C.F.R. pts. 232, 240, and 275), available at
    https://www.sec.gov/rules/proposed/2022/34-94196.pdf .......................................37

## I.      INTRODUCTION

Plaintiffs' Amended Consolidated Class Action Complaint (the "Amended Complaint")[1] alleges with requisite specificity that Defendants entered into an agreement, culminating in never-before-seen trading restrictions that eliminated the ability of ordinary Retail Investors' ability to purchase the Relevant Securities. Pursuant to that agreement, Defendants restrained Retail Investors' ability to purchase shares in the Relevant Securities, in a scheme to suppress the stock prices of the Relevant Securities in order to protect Citadel Securities's exposed short position. Defendants' restraint resulted in significant decreases in the price of the Relevant Securities resulting in unfathomable losses to the stock holdings of ordinary Retail Investors.

Defendants challenge the sufficiency of the Amended Complaint on three incorrect grounds.[2] ***First***, Defendants argue that the ample allegations of fact contained in the Amended Complaint amount only to ordinary business communications between two business partners and that their conduct was otherwise innocent. This is wrong. Plaintiffs plausibly allege specific actions of Defendants' executives before and after the trading restrictions, a pattern of suspicious communications before and after the imposition of the trading restrictions, and the unprecedented nature of the restraints, which when viewed as a whole, without dismembering it into parts, a jury can support the inference of an anticompetitive agreement. *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (illegal agreement "not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole") (internal quotation marks omitted). As before, Plaintiffs allege facts that show market conditions made the market susceptible to anticompetitive and unlawful collusion; that Defendants had a motive to collude, and that the market behaved in an anticompetitive manner. Plaintiffs also detail Defendants' pretextual explanations and mischaracterizations of their conduct. Defendants' alternative explanations of their conduct with facts outside the Amended Complaint only serve to identify factual disputes, inappropriate to resolve at this juncture.

***Second***, Defendants assert that Plaintiffs have failed to set forth the remaining elements of a Section 1 claim. Defendants' request that the Court determine at this juncture that the rule of

---

[1] "¶ __" citations are to the Amended Complaint unless otherwise indicated.

[2] Defendants' motion to dismiss largely rehashes the arguments levied against Plaintiffs initial consolidated class action complaint. Plaintiffs have heard the Court's concerns and addressed them in the Amended Complaint. *See* ECF No. 438 (the "MTD Order"). Defendants seem to largely ignore Plaintiffs' new allegations.

reason applies to Plaintiffs' claim is premature given the fact-bound nature of the inquiry. Nonetheless, the Amended Complaint sets forth a paradigmatic anticompetitive agreement with the purpose and effect to reduce output and degrade quality—that is a *per se* violation. Even were the rule of reason to apply, Plaintiffs' allegations should be sustained. Plaintiffs allege the anticompetitive effects of the agreements through facts which constitute direct and indirect proof. The Amended Complaint sets forth the geographic market and product features of the market in which Defendants operate. Further, the Amended Complaint sets forth that Defendants have market power in the relevant market and that Defendants wielded that market power to effectuate actual detrimental effects in the relevant market. And Rule 12 dismissals are disfavored when predicated on fact-intensive relevant market grounds. *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1336 (11th Cir. 2010).

*Third*, Defendants argue that regardless of whether the Amended Complaint sets forth a cognizable antitrust claim, the Amended Complaint cannot continue because Plaintiffs' claims are preempted by the securities' law. This argument also falls short. There is no repugnancy between antitrust law and securities law here. Even assuming *arguendo* that there were, Congress has already determined that Plaintiffs' antitrust claims should move forward by embedding into the Dodd-Frank Act an expansive savings clause applicable to Plaintiffs' claims. 12 U.S.C. § 5303 (2012). Further, Defendants mischaracterize what investigation has occurred, and lean heavily on a report prepared by the SEC's staff, which by its own terms, is of limited precedential value and does not purport to be the conclusive results of an investigation.

## II.    FACTUAL BACKGROUND

Robinhood provides commission-free securities trading services for consumers through a commission-free app-based platform. ¶ 43, 68-69, 305. By pioneering commission-free trading and offering an easy-to-use investment mobile app, Robinhood was able to capture millions of Retail Investors. ¶ 324. Instead of receiving a commission, Robinhood earns revenue by routing its customer trade orders to market makers (e.g., Citadel) in exchange for a fee, a process known as payment for order flow ("PFOF").[3]

---

[3] As set forth in the Amended Complaint, this comprises the Relevant Services Market, i.e., the market for securities trading services. ¶ 305. This market is defined by a downstream consumer-facing market comprised of no-fee brokerage trading applications and an upstream market comprised of market makers that pay brokerage firms for order flow. ¶¶ 306-15.

Citadel is a leading market maker; it fills orders it receives from brokers from its available inventory or routes the order to an exchange or off-exchange. ¶¶ 8-10, 48. Indeed, PFOF revenue, particularly the PFOF revenue that Robinhood receives from Citadel, is Robinhood's lifeblood; Robinhood derives as much as 80% of its revenues from PFOF. ¶ 75. In the first quarter of 2021 alone, Citadel was responsible for approximately 43%, or over $141 million, of Robinhood's PFOF revenue. ¶ 80. Robinhood's relationship with Citadel is so close that it has been repeatedly described as a "partnership." ¶ 244-45. Given that Robinhood was planning on an initial public offering ("IPO") in 2021, Citadel's PFOF was critical to Robinhood's growth. ¶¶ 82, 318.

As recognized by the SEC, PFOF creates conflicts of interest because of the tension between maximizing PFOF and routing customer orders to the best markets. ¶ 223. Citadel itself once advocated that PFOF should be "banned" because it was "anti-competitive." ¶ 224.

A.    The January 2021 Short Squeeze

Leading up to January 27, 2021, Retail Investors such as Plaintiffs, based on their research and observations, invested in the Relevant Securities primarily on the Robinhood platform, and, as a result, the price of the Relevant Securities surged resulting in a "short squeeze." ¶¶ 23-41, 92-101, 127-43; *see also* ¶¶ 108-26 (describing short squeezes and gamma squeezes). Meanwhile, Citadel's short positions exposed it to massive losses if the price of the Relevant Securities continued to rise—which is exactly what happened. ¶¶ 12, 199-208.

Rather than allow the market and competitive forces to operate, Defendants hatched an anticompetitive scheme whereby Robinhood would agree to restrain trade and Citadel would protect its short position. In exchange, Citadel would execute trades on the threat of ceasing PFOF to Robinhood. During the same period, Robinhood executives also sold positions in the Relevant Securities In the week prior to restricting trading, Citadel Securities and Robinhood engaged in a series of communications. On Monday, January 25, 2021, in an email exchange between Robinhood executives and Citadel's Head of Execution Services, Robinhood informs Citadel that, "We are on board" and took steps to further the arrangement. ¶ 230-233. On January 26, Robinhood Securities President and COO James Swartwout alerted other high-level Robinhood employees that he had sold his own shares of AMC, one of the Relevant Securities, further evidencing advance knowledge of the restriction on trading. ¶ 234. On January 27, Citadel Securities "requested to speak that evening" with Robinhood. ¶ 237. In internal

messages, Robinhood executives indicated they believed that Citadel Securities would make demands regarding PFOF. *Id.* While no one documented what was said, it is evident that Robinhood and Citadel Securities communicated that evening, and Robinhood's Swartwout described internally that the discussions were a "total mess." ¶ 241. The communications continued into the night. When Robinhood's Swartwout asked for new "numbers," a Citadel employee revealed that those numbers were "[f]irming up" in light of a "follow up" conversation between Robinhood's Chief Legal Officer Dan Gallagher and Citadel. ¶ 242.

### B.   Robinhood's Unprecedented Trading Restrictions

On January 28, 2021, Robinhood implemented a historic and unprecedented restriction on purchasing the Relevant Securities on its platform. Robinhood moved the Relevant Securities to position close only ("PCO"), meaning that Robinhood users could sell, but were foreclosed from purchasing the Relevant Securities. ¶ 179. In public statements, Robinhood attributed this unprecedented move to the NSCC collateral call it received at 3:00 a.m., but made no mention of the communications and understandings between itself and Citadel. ¶ 181. The NSCC, however, *reduced* Robinhood's capital requirements and Robinhood was able to meet its revised deposit requirement shortly after 9:00 a.m., *before the markets opened*. ¶ 181, 185. Nonetheless, Robinhood continued to impose purchasing restrictions on the Relevant Securities for the entirety of the trading day. ¶ 264. Despite raising $3.4 billion in the days to follow, Robinhood continued to limit the number of positions in the Relevant Securities its users could acquire through February 4, 2021. ¶ 261, 264. Notably, throughout this time, Citadel and Robinhood continued to communicate. ¶ 258. On January 30, while Robinhood's trading limitations were still in place, Citadel reached out to Robinhood to "coordinate messaging." *Id.*

Robinhood's unprecedented restrictions had their intended effect. They led to a massive sell-off of the Relevant Securities, causing hundreds of millions of dollars in losses to consumers. ¶¶ 197-208. The restrictions were successful as planned. Citadel Securities was able to cover its short position by purchasing the Relevant Securities at artificially reduced prices. ¶ 209.

### III.   STANDARD OF REVIEW

"[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rule 8(a)(2) requires only a short and plain statement of a claim for relief to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89,

93 (2007) (quoting *Twombly*, 550 U.S. at 555); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'"). There are no "heightened" pleading standards for antitrust cases. *Twombly*, 550 U.S. at 570; *see also Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 513 (2002); *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit.*, 507 U.S. 163, 168 (1993); *Andrx Pharms., Inc. v. Elan Corp.*, 421 F.3d 1227, 1234-35 (11th Cir. 2005) (view that heightened pleading requirements apply to antitrust claims has been rejected in favor of applying Rule 8(a)'s notice pleading standard); *In re Disposable Contact Lens Antitrust Litig.*, 215 F. Supp. 3d 1272, 1300 (M.D. Fla. 2016) ("*Twombly* does not impose a heightened pleading requirement on antitrust complaints.").

Under Rule 12(b)(6) "[w]hen reviewing a motion to dismiss, a court construes the complaint in the light most favorable to the plaintiff and takes the factual allegations as true." *In re Salmon*, Case No. 19-21551-CIV-ALTONAGA/Louis, 2021 WL 1109128, at *9 (S.D. Fla. Mar. 23, 2021) (citing *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997)); *accord Jackson v. Wal-Mart Stores, Inc.*, 753 F. App'x 866, 869 (11th Cir. 2018) ("*Iqbal* tells us we must assume the truth of all well-pleaded allegations except legal conclusions, regardless of whether evidence may ultimately support them."). "A motion to dismiss is granted only when the movant demonstrates 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Spain v. Brown & Williamson Tobacco Corp.*, 363 F.3d 1183, 1187 (11th Cir. 2004) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). In antitrust cases, where "'the proof is largely in the hands of the alleged conspirators,' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hosp. Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746 (1976) (citation omitted). Accordingly, a complaint's allegations need only nudge the conspiracy claims "across the line from conceivable to plausible" and "raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Disposable Contact Lens*, 215 F. Supp. 3d at 1306 (citation omitted).

## IV.    ARGUMENT

Section 1 of the Sherman Act provides "[e]very contract, combination . . . , or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1 (alterations added). Section 1 "prohibits (1) conspiracies that (2)

unreasonably (3) restrain interstate or foreign trade." *Quality Auto Painting Ctr. of Roselle v. State Farm Indem. Co.*, 917 F3d 1249, 1260 (11th Cir. 2019) (citation omitted).

Defendants' fundamental challenge to Plaintiffs' Section 1 claim is that Plaintiffs' have failed to plead an agreement between Citadel Securities and Robinhood in violation of the antitrust laws. ECF No. 456 (the "MTD") at 12. Defendants are wrong. Under *Twombly*, Plaintiffs must provide a complaint "with enough factual matter (taken as true) to suggest that an agreement was made." *Salmon*, 2021WL 1109128 at *10 (quoting *Twombly*, 550 U.S. at 556). Plaintiffs allege facts showing that Robinhood and Citadel Securities entered into an agreement that Robinhood would restrict trading on or about January 28, 2021, and that the restraint was imposed. ¶¶ 14, 185-89. Plaintiffs allege, in copious detail, facts showing an agreement, and Plaintiffs offer ample evidence, when taken together, from which an agreement can be plausibly inferred. As acknowledged by Robinhood and Citadel Securities themselves, the two firms had a close relationship, which they described as a "partnership." ¶¶ 244-45. Further, Robinhood and Citadel Securities engaged in numerous communications immediately before the imposition of the trading restrictions—communications that this Court has already determined are "supportive of a conspiracy" due to their timing and participants. MTD Order at 43. Those communications presaged a complex and historically unprecedented restraint—a broad restriction on Retail Investors' ability to purchase the Relevant Securities.[4] These allegations, along with the ample circumstantial evidence, infer an anticompetitive agreement in violation of the antitrust laws.

Defendants next argue that Plaintiffs fail to allege the necessary elements to plead a Section 1 claim under the rule of reason. MTD at 12. This argument also fails. For the reasons set forth in Part IV.B.i., *infra*, it is premature for the Court to determine whether the *per se* rule or the rule of reason applies at the motion to dismiss stage. Regardless, Plaintiffs have pleaded sufficient facts to sustain their Section 1 claim under the rule of reason – the relevant product market, Defendants' market power and the paradigmatic antitrust injuries that occurred in the relevant market and which

---

[4] In particular, the Amended Complaint sets forth that Robinhood engaged in unprecedented trading restrictions, i.e., broad ranging restrictions on Retail Investors' ability to purchase securities, which was a marked departure from its, or indeed, any broker-dealer's, prior practice. ¶ 143. The actions of Robinhood's executives suggested that this departure was planned. For example, Robinhood's Swartwout sold his shares in AMC, which he would only do if he expected the price of AMC to drop. ¶ 234. Further, there are no facts (nor do Defendants offer any) that Citadel Securities was surprised when Robinhood imposed its unheard-of trading restrictions.

stemmed from Defendants' conspiracy. Finally, Defendants argue that Plaintiffs' antitrust claim is precluded by the federal securities laws. MTD at 27-35. This argument likewise fails. There is no repugnancy between antitrust law and securities law for the conduct at issue here.

### A.      Plaintiffs Plausibly Allege an Anticompetitive Agreement

To allege an antitrust conspiracy, a plaintiff need only "present direct or circumstantial evidence that reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Salmon*, 2021 WL 1109128, at *10 (citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)). Notably, plaintiffs are not required to allege an explicit agreement. *See DeLong Equip Co. v. Wash. Mills Abrasive Co.*, 887 F.2d 1499, 1515 (11th Cir. 1989). Nor are Plaintiffs required to allege the specific discussions participants had. *Costco Wholesale Corp. v. Johnson & Johnson Vision Care, Inc.*, No. 3:15-cv-734-J-20JRK, 2015 WL 9987969, at *14 (M.D. Fla. Nov. 4, 2015) ("At the motion to dismiss stage, '[p]laintiffs need not allege the existence of collusive communications in "smoke filled rooms"' . . . in order to state a § 1 Sherman Act claim.") (quoting *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1360 (N.D. Ga. 2010)). In antitrust cases, where "'the proof is largely in the hands of the alleged conspirators,' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hosp. Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746 (1976) (citation omitted), 425 U.S. 738, 746 (1976) (citation omitted). In fact, "[c]onspiracies are rarely evidenced by explicit agreements and must always be proven by inferences that may be fairly drawn from the behavior of the alleged conspirators."[5] *DeLong*, 887 F.2d at 1515 (citations omitted); *see also United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 536 n.13 (1973) ("circumstantial evidence is the lifeblood of antitrust law.").

"(T)he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Cont'l Ore*, 370 U.S. at 699

---

[5] Courts recognize that direct evidence in antitrust cases is "rare." *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1573 (11th Cir. 1991); *United Am. Corp. v. Bitmain, Inc.*, No. 18-CV-25106, 2021 WL 1807782, at *10 (S.D. Fla. Mar. 31, 2021) (citing *DeLong*, 887 F.2d at 1515) ("Direct evidence of a § 1 conspiracy is rare, and most antitrust conspiracies are proved by circumstantial evidence."); *see also Battle v. Lubrizol Corp.*, 673 F.2d 984, 992 (8th Cir. 1982) ("we think that it is most unlikely that antitrust plaintiffs, like any other plaintiffs alleging conspiracy, will have direct evidence").

(citation omitted, alteration in original); *Associated News, Inc. v. Curtis Circulation Co., Inc.*, Civ. A. No. H-80-1201, 1986 WL 13791, *6 (S.D. Tex. Dec. 4, 1986) (combined weight of circumstantial evidence was "sufficient to raise a genuine issue of fact as to an alleged vertical conspiracy" at summary judgment). Plaintiffs need not rebut legitimate reasons Defendants may offer for their suspicious conduct. *Salmon*, 2021 WL 1109128, at *15; *see also id.* at *9 ("When reviewing a motion to dismiss, a court construes the complaint in the light most favorable to the plaintiff and takes the factual allegations as true."). Plaintiffs' allegations at this juncture need not exclude the possibility of unilateral conduct. *See, e.g.*, *Helicopter Support Sys. Inc., v. Hughes Helicopter, Inc.*, 818 F.2d 1530, 1534 (11th Cir. 1987) (Plaintiffs must "adduce positive evidence which *tends* to exclude the possibility of unilateral action") (italics added). Accordingly, Plaintiffs need only allege facts sufficient to infer the existence of a conspiracy. *See In re Mid-Atl. Toyota Antitrust Litig.*, 560 F. Supp. 760, 780 (D. Md 1983) (holding "that sufficient circumstantial evidence exists to raise a genuine issue about a tacit agreement among defendants"). Plaintiffs have sufficiently done so here.

Plaintiffs have alleged with specificity that Robinhood imposed historically unprecedented trading restrictions on the Relevant Securities, which resulted in a significant decrease in their share prices. That these restrictions were imposed as part of "a common scheme" is well supported by Plaintiffs' allegations. *See Monsanto*, 465 U.S. at 764 ("Circumstances must a reveal 'a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'"). The Amended Complaint is replete with allegations of direct communications between Citadel Securities and Robinhood before and after the imposition of the highly irregular and unprecedented restraint. ¶¶ 227, 230-241. Given the "partnership" between Defendants, these communications are highly revealing in and of themselves. Moreover, the communications' timing, context, and the players involved support a reasonable inference that the restrictions were the result of Defendants' concerted action. *See* MTD Order at 41 (timing and overall context of communications between Defendants' high-level executives could be inferred to relate to January 28 trading restrictions); *id.* at 43 (timing and context of Defendants' communications lends credence to Plaintiffs' conspiracy theory); *see also Delta/AirTran*, 733 F. Supp. 2d at 1360 ("unlawful conspiracies may be inferred when collusive communications among competitors precede changed/responsive business practices").

The Amended Complaint contains additional circumstantial evidence from which collusion may be inferred. It sets forth economic evidence of Defendants' collusion, e.g., Citadel Securities' short positions in the Relevant Securities. ¶¶11, 14, 142, 211, 398. It details how Defendants' executives acted in ways consistent with advanced knowledge of the conspiracy, such as selling their own shares of the Relevant Securities ahead of the purchasing restrictions. ¶ 234. The Amended Complaint contains detailed allegations about how Robinhood relies on the revenue that it receives from Citadel Securities for its survival, and how Robinhood's reliance on Citadel Securities provided motive to collude in light of Robinhood's pending IPO and the fact that Citadel Securities could easily terminate its relationship with Robinhood at any time. ¶¶ 316-23. The Amended Complaint also sets forth structural evidence, including market characteristics that demonstrate that the market is susceptible to collusion. ¶¶ 307-11, 324-46.

These allegations lead to the inference that Robinhood and Citadel Securities colluded—and that is enough at this stage of the litigation. *See City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 749 (N.D. Ill. 2019) ("The court anticipates that further discovery will shed light on [Citadel's] knowledge of and role in the [trading restrictions], if any. But at [motion to dismiss], the court draws all reasonable inferences from the complaint in favor of plaintiffs and taking the [Amended Complaint] as a whole finds that plaintiffs have sufficiently alleged a conspiracy."); *Costco Wholesale Co., v. Johnson & Johnson Vision Care Inc.*, 15-cv-734-J-20JRK, 2015 WL 9987969, at *18 (M.D. Fla. Nov. 4, 2015).

> **i.   Defendants' Communications and Conduct Support the Inference of a Conspiracy**

Plaintiffs have alleged with particularity communications and conduct between Robinhood and Citadel Securities that preceded the January 28, 2021 restriction in trading. These communications strongly suggest the decision to restrict trading was pursuant to a common understanding and course of conduct reached during these communications. *Delta/AirTran*, 733 F. Supp. 2d at 1360. Plaintiffs specifically allege repeated communications between Robinhood and Citadel Securities which resulted in the January 28, 2021 trading restrictions. ¶¶ 227–33. Plaintiffs specifically allege that high level executives of Robinhood and Citadel communicated and made an express agreement to restrict trading. *Id.*

For example, on January 25, 2021, Citadel Securities' Head of Executive Services had discussions with Robinhood's Vice President of Corporate Relations and Communications, Josh Drobnyk. ¶ 227. While the substance of the communications is undisclosed—and Plaintiffs have

not been provided a record of them—Drobnyk wrote afterwards that Robinhood was "on board." ¶ 230. This indicates, at a minimum, a request and Drobynk's communication of assent and agreement to that request. These messages and emails in turn refer to other undocumented private conversations, telephone calls and other written communications, the substance of which have never been revealed. Logically, there are likely many other communications that have not come to light.[6]

Subsequent acts provide further support for the plausible inference that an agreement to restrict trading was reached during those communications. Defendants knew in advance that the trading restriction was going to be imposed, as evidenced by top Robinhood executives—who knew of the discussions with Citadel Securities—sold their own shares of the Relevant Securities to avoid damages to their own stock portfolios that eventually befell class members who were the target of the agreement. ¶ 234. Robinhood's Swartwout sold his shares of AMC in the days leading up to the restrictions and encouraged others at Robinhood to do the same. *Id*. Given the continued excitement around the Relevant Securities, and the continued upward momentum of the share price, Swartwout's choice to sell made little economic sense unless he knew about the unlawful agreements to stop trading and to drive down prices in advance.

Moreover, the evening before Robinhood announced the trading restrictions, Robinhood and Citadel executives again communicated. ¶ 235-41. Robinhood believed Citadel would make demands regarding PFOF. ¶ 321. Robinhood depended on PFOF from Citadel Securities. PFOF was crucial—the life blood—of Robinhood's business model as it provided the revenue necessary to offer commission-free brokerage services to its customers. ¶¶ 4-5, 13, 75, 77-78, 81, 306, 316, 319, 323, 400. It was against Robinhood's economic interest to restrict trading because it would, among other things, cut off a vital source of income. ¶ 237. These contentious conversations were described as a "total mess" and left Robinhood "beyond disappointed,"

---

[6] Defendants continue to criticize the sufficiency of the Amended Complaint on the basis that Plaintiffs had access to some documents that Defendants produced to certain government regulators, only after the Court ordered them to be produced. ECF No. 323. There has been no formal discovery, and indeed the Court has stayed discovery pending resolution of the attacks on the pleadings. That is not the standard under Rule 8—the Amended Complaint should be judged on its face, and it is of no moment that Plaintiffs have obtained access to a smattering of documents, whether through their own investigation and in the context of this case. There has been no formal discovery, and indeed the Court has stayed discovery pending resolution of the attacks on the pleadings.

indicating the discussions were regarding matters against Robinhood's economic self-interest. ¶ 241. Nonetheless, a meeting of the minds was reached because, as confirmed by communications, "numbers" were "[f]irming up" in advance of the trading restrictions. ¶ 242. At a minimum, these conversations demonstrate an "acquiescence or agreement, and that this was sought.'" *Costco*, 2015 WL 9987969, at *14 (quoting *Monsanto*, 465 U.S. at 764 & n.9). This is the essence of a meeting of the minds and proof of agreement under the antitrust laws. *See United States. v. Parke, Davis & Co*., 362 U.S. 29, 43 (1960) ("whether this conspiracy and combination was achieved by agreement or acquiescence . . . is immaterial").[7]

Defendants' conduct after the trading restrictions were imposed provide further evidence of the agreement and bolster the plausibility of Plaintiffs' claims. Citadel Securities was hardly surprised with news of the trading restrictions—nor do Defendants argue to the contrary—even though Robinhood's actions were significant and unprecedented. Far from it. After the trading restrictions were imposed, top executives of Robinhood and Citadel acted in concert to coordinate explanations regarding the restrictions.[8] ¶ 258. These coordinated efforts constitute additional overt acts in furtherance of the conspiracy. Moreover, the explanations themselves were incomplete, misleading, and untrue. *See* Part IV.A.ii., *infra*. They did not reflect or disclose that the decision was the result of communications between Defendants or that it was made to protect Citadel Securities's positions in the Relevant Securities. ¶¶ 14, 185-89. Further, these communications evidence a shared motive to conceal the true nature of the agreement and the cause for the restrictions. The Court has already determined that the communications between Robinhood and Citadel Securities are "supportive of a conspiracy." MTD Order at 43.

Defendants counter these factual allegations with their own explanations and justifications. Defendants say their conduct merely reflects the "normal" course of conduct between them. MTD at 16. This argument is not well taken. As an initial matter, additional arguments regarding Defendants' conduct are improper on a Rule 12 motion; Defendants are

---

[7] *See also Interstate Cir., Inc. v. United States*, 306 U.S. 208, 227 (1939) ("elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators"); *United States v. Container Corp. of Am.*, 393 U.S. 333, 335 (1969) ("[W]hen a defendant requested and received price information it was affirming its willingness to furnish such information").

[8] Notably, the participants copied Citadel Securities' "GCs," i.e., general counsel, and explicitly noted they were doing so "for privilege." ¶ 258. As evidenced in Part IV.A.ii., *infra*, attempts to conceal communications is circumstantial evidence inferring conspiracy and collusion.

bound by the allegations in the complaint—which are presumed to be true—and additional counterfactual assertions merely frame factual disputes to be resolved by the trier of fact. *See*, *e.g.*, *Disposable Contact Lens*, 215 F. Supp. at 1279 (on "motion to dismiss, 'the court is limited to what appears on the face of the complaint.'") (citing *Jacobs*, 626 F.3d at 1340).

Moreover, Defendants' attempt to recharacterize this conduct as "normal" is itself far-fetched and implausible. First, the nature of the restrictions themselves was unprecedented. Never had a broker-dealer enacted such wide-ranging prohibitions on trading. *See Disposable Contact Lens*, 215 F. Supp. 3d at 1295 (complex and historically unprecedented changes may support inference of conspiracy).

Second, the communications themselves indicate they were far from ordinary to those actually involved in them. The participants described these conversations as a "total mess" and were left "beyond disappointed" in how they "went down." ¶¶ 241, 245.

Third, that Defendants' executives were dumping their stock in advance of the imposition of the restrictions is not "normal," and Defendants do not contend otherwise —Robinhood executives would have no reason to sell their own shares of the Relevant Securities unless they had advance knowledge of the trading restrictions. Likewise, Defendants' after-the-fact cooperation to manufacture common pretextual explanations is not normal either.

Whether or not Robinhood's agreement to restrict trading resulted from coercion by Citadel Securities is of no moment. Even if it were so, this does not defeat an antitrust claim or show there was no meeting of the minds. Agreements obtained through coercion are actionable.[9] *Isaksen v. Vermont Castings, Inc.*, 825 F.2d 1158, 1164 (7th Cir. 1987) (Posner, J.), is instructive. In *Isaksen*, a dealer complained that his supplier coerced him into an agreement to raise the prices for stoves in violation of Section 1 of the Sherman Act. *Id.* at 1161-63. The plaintiff offered proof, consistent with settled antitrust authorities, that the plaintiff had been coerced into the

---

[9] The communications between Defendants on January 27 before purchasing prohibitions were placed strongly suggest Citadel Securities leveraged its relationship with Robinhood. Even before Defendants communicated that day, Robinhood executives already suspected that Citadel Securities was going to make demands regarding PFOF. ¶ 237. Evidently those demands were issued, and it is apparent that Robinhood was left displeased. The discussions between Citadel Securities and Robinhood prompted Vlad Tenev, Robinhood's CEO, to seek to improve the relationship by speaking directly to Ken Griffin at Citadel. Nevertheless, what is clear is that Robinhood and Citadel Securities had a meeting of the minds, and "numbers" were "firmed up" as a result of an unrecorded conversation between them. ¶ 242.

agreement.[10] After the jury returned a verdict in favor of the dealer, the lower court granted the supplier's motion for judgment notwithstanding the verdict. *Id.* at 1161. The Seventh Circuit reversed, finding that there was a vertical agreement between the dealer and the supplier in violation of the antitrust laws. *See id.* at 1163-64.[11]

As the *Isaksen* court explained, "the motives for the dealer's adhering to a suggested list price are irrelevant. If (but only if) he *agrees* to adhere (having been asked to), there is an agreement, no matter how unwilling he is; but it does not follow that his agreement to adhere can never be implicit or signified by conduct in lieu of promissory language." 825 F.2d at 1164. Courts in this Circuit apply and follow this settled authority. *E.g.*, *Costco*, 2015 WL 9987969, at *18 (M.D. Fla. 2015) (citing *Isaksen*, 825 F.2d at 1164, with approval). As in *Isaksen*, the tense conversations between Robinhood and Citadel Securities evidence a similar course of dealings here: Robinhood, who had already suspected Citadel Securities would make demands on PFOF, was asked to restrict trading or Citadel Securities would not route its orders, denying Robinhood the precious profits and revenue from payment for order flow. Robinhood ultimately acquiesced.[12] *See Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 221 (5th Cir. 2001) ("Conspirators who are not competitors of the victim may have no interest in curtailing competition in a market in which they do not compete; nevertheless, when they have been enticed or coerced to share in an anticompetitive scheme, there is still a combination within

---

[10] As Judge Posner recognized, parties "knuckling under to pressure" can be found to violate the antitrust law and explained "[t]he fact that [the plaintiff] may have been coerced into agreeing is of no moment; an agreement procured by threats is still an agreement for purposes of section 1." 825 F.2d at 1163; *see also Albrecht v. Herald*, 390 U.S. 145, 150 n. 6 (1968); *Parke, Davis & Co.*, 362 U.S. at 45. "[A] conspiracy is no less sinister because some its members are intimidated, rather than bribed, into doing it." *Isaksen*, 825 F.2d at 1163.

[11] In doing so, the Seventh Circuit analyzed the Supreme Court's precedent in *Monsanto*, 465 U.S. 752 (1984) and exclaimed: "[W]e do not think the [*Monsanto*] Court intended to go so far as to rule that if a supplier telephones a dealer and tells him, 'Raise your price by next Thursday, or I'll ship you defectives goods,' and the dealer merely grunts, but complies, this is not actionable as an agreement to fix the dealer's resale price. If it were not, there would be very little left of the rule against vertical price-fixing, which the Court in *Monsanto* decided not to reexamine." *Isaksen*, 825 F.2d at 1164 (citing *Monsanto*, 465 U.S. at 761, n.7).

[12] This is apparent as Robinhood's Chief Legal Officer Dan Gallagher had further unrecorded conversations with Citadel Securities's executives which resulted in the two firms firming up numbers. ¶ 242. Citadel Securities also continued to route orders on January 28, 2021 in the symbols that Robinhood did not restrict, evidencing that whatever threats that may have been made need not have been carried out.

the meaning of the Sherman Act."); *see also id.* at 220 ("even reluctant participants have been held liable for conspiracy [under the antitrust law]").

ii.      **Defendants' Pattern of Concealment Infers a Conspiracy**

The steps Defendants took to conceal the facts of the agreement and their communications regarding it constitute additional circumstantial evidence of agreement. "[A]cts of concealment are circumstantial evidence of a conspiracy's existence." *In re Urethane Antitrust Litig.*, 2013 WL 2097346, at *11 (D. Kan. May 15, 2013) (citing *United States v. Curtis*, 635 F.3d 704, 717 (5th Cir. 2011)); *see also United States v. Gacnik*, 50 F.3d 848, 852 (10th Cir. 1995) ("the act of concealment may be taken as evidence of a conspiracy"). Courts routinely rely on such acts as evidence of a conspiracy even at later stages of litigation. *See, e.g.*, *Belcher v. Atl. Capital Realty, LLC*, 2010 WL 11507399, at *5 (M.D. Fla. Sep. 17, 2010) ("Although this is merely circumstantial evidence of a conspiracy, such evidence is sufficient to *avoid summary judgment* so long as it "reasonably support[s] an inference [of a] shared . . . conspiratorial objective.") (citation omitted, italics added).

The written records that Plaintiffs have obtained indicate that the executives and corporate representatives involved in the communications between Robinhood and Citadel Securities did not accurately report or record—at least in writing—the communications regarding the decisions to restrict trading. Drobynk's indication of assent is vague—purposefully so—as to the specific discussions which produced that agreement. ¶ 230. Robinhood also was careful to make clear that communications were to be channeled through Lucas Moskowitz, Robinhood's general counsel. *Id.* Indeed, the Amended Complaint alleges with specificity affirmative steps Defendants' executives undertook to cloak their suspicious communications through the use of attorneys as intermediaries, hoping to take advantage of the attorney client privilege. As alleged, Citadel Securities emails sent to Robinhood specifically indicate that they were sent with Citadel's "GC's" copied for "privilege." ¶ 258. The emails make clear that inside counsel were purposefully included to protect the communication from subsequent disclosure.

The fact that communications between the two companies, involving many hundreds of millions of dollars, were conducted only in person, via telephone, or through lawyers with no written record indicates a lack of transparency and reveals an effort to conceal the nature and

14

scope of the agreement reached.[13] *See United States v. Seigler,* 990 F.3d 331, 339 (4th Cir. 2021) (jury may infer existence of vertical conspiracy based on circumstantial evidence including "familiarity" of conversation among defendants where they used "coded and circumlocutory language").

### iii.   Additional Circumstantial Evidence of the Scheme

Plaintiffs also plead additional circumstantial evidence that "tends to exclude the possibility of independent action."[14] *Williamson Oil Co., Inc. v. Phillip Morris, USA*, 346 F.3d 1287, 1301 (11th Cir. 2003).

*Motive to Collude.* The motive to collude is additional circumstantial evidence sufficient to infer an agreement. *See Disposable Contacts Lens*, 215 F. Supp. 3d at 1298 (finding anticompetitive agreement where conspirator had motive to "make more money" and "worked closely" with coconspirator). Plaintiffs have alleged facts that demonstrate Defendants' strong motive to collude. Defendants' lucrative self-styled PFOF "partnership" (*see* ¶ 244) provided ample motive for Defendants to collude.

Robinhood bases its entire business model on payments for order flow from Citadel Securities. Robinhood derives 80% of its revenues from payment for order flow in general. ¶ 316. Indeed, without Citadel's payment for order flow, Robinhood would not be able to economically support providing no fee brokerage transactions. ¶¶ 324-329. Moreover, Citadel Securities was the single largest contributor to Robinhood's payment for order flow revenue. *See*, *e.g.*, ¶ 5. (43% of Robinhood's PFOF revenue in the first quarter of 2021 alone). Citadel

---

[13] Plaintiffs do not ask the Court to infer conspiracy merely because Defendants communicated over the phone. *See* MTD Order at 44-45. Rather, the Amended Complaint sets forth a pattern of concealment between Robinhood and Citadel Securities that leads to an inference of conspiracy.
[14] "Plus factors" refer to an organizational framework of understanding circumstantial evidence that supports an inference of a conspiracy; it is of no moment whether the conspiracy is horizontal or vertical. *See In re Dealer Mgmt. Sys. Antitrust Litig.*, MDL 2817, 2022 WL 199271, at *14 (N.D. Ill. Jan. 21, 2022) ("A plus-factor analysis provides a way to organize circumstantial evidence that, in the plaintiff's view, reduces the probability that defendants were acting independently."). Such plus factors can be relied on for a plausible inference of a conspiracy, regardless of whether the agreement is between horizontal competitors, suppliers and distributors, or other market participants. *See Stewart Glass & Mirror, Inc. v. U.S.A. GLAS, Inc.*, 17 F. Supp. 2d 649, 653 (E.D. Tex. 1998) ("Whether the plaintiff alleges a horizontal conspiracy among competitors, or a vertical conspiracy between a manufacturer/seller and a distributor/buyer, the focus remains the same: is there sufficient evidence to create a reasonable inference of concerted action to engage in illegal conduct?").

Securities recognized how valuable Robinhood's order flow was, and pays a premium for Robinhood's order flow as compared with other brokerages who sold their order flows. ¶ 76. Citadel Securities was (and is) Robinhood's most important market maker—Robinhood's revenue from Citadel Securities more than doubles that of its next highest revenue source.[15]

Critically, the payment for order flow relationship was terminable by either party at any time. ¶ 317. In other words, Citadel Securities, Robinhood's single biggest commercial partner, possessed the ability turn off its most important source of income and thereby possessed the power to make or break the company. This was particularly true the week of January 25, 2021, the week of the trading restrictions, shortly before Robinhood's IPO. During that time, Citadel Securities constituted the great majority of Robinhood's trading activity.[16] ¶ 281. By cooperating with Citadel, Robinhood protected the *sine qua non* of its business model, and avoided the existential threat posed by Citadel Securities if Citadel had not been able to avoid the short squeeze. Preserving its PFOF relationship with Citadel Securities provided Robinhood ample motive to collude.[17]

In addition, as of January 2021, Citadel Securities had accrued massive short positions. ¶¶ 276, 280, 283-84. As the Court previously recognized, "[t]hat Citadel Securities held short interests in the Relevant Securities is a reasonable inference to be drawn in Plaintiffs' favor." MTD Order at 36. Citadel had the economic incentive to obtain Robinhood's agreement to stop trading in the Relevant Securities in order to exit its short positions, thereby avoiding a short

---

[15] Employees of both firms recognized the strength and significance of the relationship. For example, Citadel's Head of Execution Services stated to Robinhood's Moskowitz that the two firms "obviously have a strong relationship." ¶ 232.

[16] During the week of January 25, 2021, according to FINRA OTC transparency data, Citadel Securities's trading activity was more than double that of Virtu Americas's, the next most active institutional participant. ¶ 281 (Citadel Securities accounted for 50% of trading by volume in GME as compared to 12% for Virtu Americas, and 56% of trading activity in AMC as compared to 25% for Virtu Americas).

[17] The claim that Robinhood could have routed orders to the public exchanges in the event Citadel Securities terminated its relationship with Robinhood, ignores the fundamental nature of its business. Had Robinhood done so, Robinhood would have received no payment for order flow. Indeed, its public offering was based on the maintenance of this structure. ¶318. Given Citadel Securities's position as Robinhood's foremost PFOF partner by far, preserving that relationship was paramount. Additionally, as trading activity volume indicates, other market makers were *not* handling orders to the extent Citadel Securities was, Citadel Securities handled more than double the transactions as the next market maker. ¶307. This left Robinhood with few, if any, actual alternatives.

squeeze and the hundreds of millions of dollars in losses that would have resulted. By driving the prices of the Relevant Securities down, Citadel stood to benefit by recouping the shares it sold short, avoiding or mitigating its losses. ¶ 396. Citadel was acutely aware that it possessed leverage over Robinhood to obtain agreement, even if Robinhood faced business losses as a result.

Further the executives, officers, and managers of Citadel and Robinhood also possessed their own motive to collude because they were also exposed to financial ruin in the event of a short squeeze. Indeed, they acted in accord, selling stock in advance of the restriction. ¶ 234.

*The Structure of the Market Render It Susceptible to Collusion.* Plaintiffs have provided extensive detailed allegations regarding the characteristics that made it possible for Robinhood and Citadel Securities to collude. *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655 (7th Cir. 2002) (recognizing that economic evidence of the structure of market making collusion feasible can be relied on to infer existence of an agreement). As the Court has previously acknowledged, Plaintiffs have identified "the existence of several characteristics that each tend to make a market susceptible to anticompetitive conduct and unlawful collusion[.]" MTD Order at 48. These allegations include that the market in which Defendants operate is defined by high barriers to entry, high fixed costs, and low variable costs. ¶¶ 370-84. Additionally, consumers using no-fee trading apps such as Robinhood's platform are locked-in in the short run.[18] ¶¶385-92. These market characteristics render the market ripe for collusion.[19]

*Evidence that the Market Behaved in a Noncompetitive Manner*. Plaintiffs' allegations show that the market behaved in a noncompetitive manner. *See High Fructose Corn Syrup*, 295 F.3d at 655 (recognizing that economic evidence that market behaved in a noncompetitive manner can be relied on to infer existence of an agreement). Plaintiffs allege that the trading restriction stopped, suspending the operation of supply and demand, and driving prices down. *See* Part IV.B.iv.b.2., *infra*. If Robinhood had not intervened, its customers would have been able

---

[18] Consumer lock-in was particularly pronounced because Robinhood makes withdrawing or transferring funds difficult, typically requiring days-long waiting periods and restricting users from selling securities they already own if they initiated a withdrawal. ¶¶ 389-90. These delays were exacerbated for Robinhood users during the time Robinhood maintained the restrictions on purchasing the Relevant Securities. ¶ 391.

[19] Plaintiffs have acknowledged the Court's prior criticism and have now provided a clearer picture of the relevant market, i.e., the market for securities trading services. *See* Part IV.B.iv.a., *infra*.

to increase their positions in the Relevant Securities, prices would have continued to rise, and the prospect of the nascent short squeeze would become more likely. As Citadel itself long ago recognized when it sought to have payment for order flow banned, the practice is rife with conflicts of interest and "anti-competitive." ¶ 224. Now, Citadel seeks to capitalize from the noncompetitive market conditions it caused. *Id.*

*Defendants' Pretextual Explanations.* Defendants offer dubious pretextual explanation and mischaracterizations for their conduct. Such pretextual statements support an inference of an illegal conspiracy. *See In re: McCormick & Co., Inc.*, 217 F. Supp. 3d 124, 132 (D.D.C. 2016) (considering pretext as supporting evidence); *ChoiceParts, LLC v. Gen. Motors Corp.*, 203 F. Supp. 2d 905, 910 (N.D. Ill. 2002) (same); *see also Delta/AirTran*, 733 F. Supp. 2d at 1360 (N.D. Ga. 2017) ("unlawful conspiracies may be inferred when collusive communications among competitors precede changed/responsive business practices"). Defendants assert that it was necessary for Robinhood to meet its capital requirements as set by the NSCC. That the trading restrictions were the result of regulatory order or fiat is untrue. As alleged, even before there was any margin call, Robinhood and Citadel were engaged in heated discussions regarding the degrading market conditions. Meanwhile, Robinhood's executives were selling their own shares of the Relevant Securities—well before Robinhood received any notification from the NSCC regarding its capital requirements. ¶¶ 234-46. In fact, Robinhood was quickly able to negotiate down its $3 billion dollar margin call from the NSCC to $1.4 billion. ¶¶ 178, 181, 183. Robinhood met its capital requirements before the markets opened and trading restrictions imposed on January 28, 2021. ¶ 185. Even afterwards, Robinhood continued to satisfy its capital requirements by accessing credit and raising capital, while continuing the trading restrictions. Nonetheless, Robinhood maintains the capital requirements as the reason for the unprecedented trading restrictions.[20] ¶¶ 194, 262.

### iv.   Defendants' Proffered Alternative Explanations Create a Factual Dispute And Do Not Suggest Plaintiffs' Allegations Are Implausible

Defendants hang their hat on three counterfactual allegations that they claim defeat an inference of motive for conspiracy: (1) Robinhood's customers could have left Robinhood's

---

[20] As set forth in the Amended Complaint, the decision to implement restrictions on purchasing only was arbitrary. Robinhood through its PFOF relationship, stood to earn larger profits from increased market volatility. ¶¶ 358-59. Volatility is caused by both increases *and* decreases in a stock price. The latter certainly occurred as a result of the trading restrictions. ¶¶ 199-208.

platform for another broker dealer; (2) Robinhood could have shifted order flow to other market makers; and (3) Citadel Securities could have asked other retail broker dealers with which it had a similar PFOF relationship to restrict trading. MTD at 21. Reliance on additional facts outside the four corners the complaint is contrary to hornbook pleading principles and Rules 8 and 12. Plaintiffs "need not rebut [Defendants' asserted] reasons to defeat a motion to dismiss." *Salmon*, 2021 WL 1109128, at *15. In any event, each of Defendants' proffered alternative explanations are speculative and without factual support. Moreover, they fly in the face of Plaintiffs' well pleaded facts, which the Court must take as true. *Id.*, at *9.[21]

The assertion that Retail Investors could have avoided the losses by trading on other brokerages is at odds with allegations that the vast majority of Robinhood users were unable to switch brokerages and locked in.[22] ¶¶ 344-45. As Robinhood acknowledges, even if a customer had set up another trading account—which is unrealistic and rare—funds transfers take days to complete. ¶ 344. In addition, during the period in which the trading restrictions were imposed, Robinhood users were able to deposit money into their Robinhood accounts, but were prohibited from selling the securities they held in their Robinhood accounts and transfer the proceeds to other platforms, further exacerbating the anticompetitive effects. ¶ 345. Robinhood customers who had an account with another brokerage company and were able to transfer funds were the rare exception.[23]

---

[21] Whether the restraint was innocent or not is a question of fact for the trier of fact to decide—otherwise regular activity can still run afoul of the antitrust laws if done for an anticompetitive result. *See Disposable Contact Lens*, 215 F. Supp. 3d at 1300 (*Twombly* does not "create a presumption in favor of defendants acting in their lawful economic self-interest which Plaintiffs' allegations must overcome in order to survive a motion to dismiss"); *see also Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 709-10 (7th Cir. 1984) (conspiracies are unlawful "if the conspirators used unlawful means to a lawful end *or* lawful means to an unlawful end") (citation omitted, italics added).

[22] Indeed, Defendants' first claim is at odds with their own arguments. Defendants assert that other broker-dealers also "imposed similar restrictions" but now claim consumers could have gone elsewhere to avoid the trading restrictions. In reversing themselves, Defendants at least recognize that Robinhood's restrictions were different and far more wide-ranging than those imposed by other brokerages; indeed, Robinhood solely prohibited purchases for the full day on January 28, 2021, and continued restrictions for days afterwards. ¶¶ 195, 368.

[23] Retail Investors who were able to switch from Robinhood to another brokerage trading platform (like Plaintiff Minahan) were only able to do so because of their remarkably high credit

The assertion that Robinhood could have routed transactions away from Citadel to other market makers—found nowhere in the Amended Complaint—fares no better. There is no claim—and no allegation in the Amended Complaint—that Robinhood attempted to do so or did so. Moreover, this claim disregards other allegations that Citadel Securities is the dominant market maker, accounting for a significant portion of all trades, thereby reducing the possibility of alternatives. ¶¶ 48, 307-10. As demonstrated by publicly available data from the week of January 25, 2021, the majority of dark pool transactions during the week of the restrictions were attributable solely to Citadel Securities. ¶ 281. Simply put, other alternative market makers did not have the capacity to route orders had Citadel Securities refused. Further, as discussed above, routing away to other sources made little economic sense. Had Robinhood availed itself of alternatives to Citadel, Robinhood would have foregone PFOF revenue, jeopardized its "partnership" with Citadel Securities, and threatened the success of its impending IPO. ¶¶ 75, 82, 318.

Third, Defendants make the hypothetical assertion that Citadel Securities could have coerced other broker dealers with similar PFOF relationships. This allegation—also not found anywhere in the Amended Complaint—is grasping at straws. It is entirely speculative, and again, it discounts and ignores the fact that Robinhood was particularly vulnerable to Citadel Securities's demands.[24] ¶ 75 (Robinhood relied on PFOF to sustain its business model). It is far more plausible that Citadel Securities would be more effectively able to leverage its relationship with Robinhood as opposed to other broker dealers than the reverse, upon which Defendants rely.[25]

---

scores and their liquidity which enabled them to transfer thousands of dollars to their new accounts. ¶ 342. As noted, the median Robinhood user has $240 in her account, ¶ 343, a far cry from the amounts needed to switch platforms rapidly enough to avoid or mitigate the damages caused by the trading restrictions.

[24] This was particularly true during the time in question as Robinhood was preparing for a highly publicized initial public offering. A decrease in revenue would likely impact its IPO. ¶ 401.

[25] Defendants' claim also goes too far. Plaintiffs never claimed Citadel Securities wanted to restrict *all* trading. Nor did Citadel Securities need to; it would (and did) substantially benefit by reducing trading from Robinhood.

**B.      Plaintiffs Plausibly Plead an Unreasonable Restraint on Trade**

**i.      The Court Should Not Determine at the Motion to Dismiss Stage Whether to Apply *Per Se* or Rule of Reason Treatment**

The rule of reason is the basic standard for determining violations of the Sherman Act's restraint of trade provision. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007). (citation omitted). Under this rule, the factfinder, considering such factors as the restraint's history, nature and effect, "weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Id.* at 885-86 (citations omitted). But the "rule of reason does not govern all restraints," *id*. at 886, some types of agreements are "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Procaps S.A. v. Patheon, Inc*., 845 F.3d 1072, 1083 (11th Cir. 2016) (citation omitted). These agreements "'are deemed unlawful *per se*.'" *Leegin*, 551 U.S. at 886 (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1957)).

Determination of the standard to be applied to a restraint depends on the facts. Sometimes, there are "numerous factual questions underpinning that purely legal decision." *In re Blue Cross Blue Shield Antitrust Litig*., 26 F. Supp. 3d 1172, 1186 (N.D. Ala. 2014). To decide upon "[t]he true test of legality . . . the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable." *Id.*, citing *Cont'l T.V., Inc. v. GTE Sylvania, Inc*., 433 U.S. 36, 49 n. 15 (1977). No "bright line separates *per se* from rule of reason analysis." *Id. at* 1185 (citing *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 104, n.26 (1984)) (internal punctuations omitted); *see also In re High-Tech Emp. Antitrust Litig*., 856 F. Supp. 2d 1103, 1115 n.16, 1122 (N.D. Cal. 2012) ("the court need not decide now whether *per se* or rule of reason analysis applies. Indeed, that decision is more appropriate on a motion for summary judgment."); 2 Areeda & Hovenkamp, Antitrust Law 264 ¶ 305(e) ("Often, however, the decision about which rule is to be employed will await facts that are discovered only in discovery."). "Discovery will elucidate whether the purported conspiracy as a whole is patently anticompetitive 'such as would always or almost always tend to restrict competition and decrease output.'" *Mallinckrodt ARD*, 360 F. Supp. 3d at 754 (citations omitted).

Therefore, the issue of whether the *per se* rule or rule of reason treatment will apply is not ripe for consideration on a Rule 12(b)(6) motion. *See*, *e.g.*, *Hunter v. Booz Allen Hamilton, Inc*., 418 F. Supp. 3d 214, 222 (S.D. Ohio 2019) (declining to determine which standard applies at

motion to dismiss stage). Indeed, "the court just needs to determine whether the class plaintiffs have alleged a plausible conspiracy under the antitrust laws." *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs., & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1297, n.8 (D. Kan. 2018). "[T]he court need not decide what rule to apply to analyze the reasonableness of the alleged restraints of trade supporting the class plaintiffs' conspiracy claims" at the pleading stage. *Id.* Plaintiffs have alleged a plausible conspiracy under the antitrust laws. At this early stage of litigation, the Court should defer making a determination as to whether the *per se* rule or the rule of reason standard applies to the instant claim until after the facts can be more fully developed in discovery. *See High-Tech Emp*, 856 F. Supp. 2d at 1115 n.9, 1122 (application of *per se* or rule of reason standard more appropriate at summary judgment).

> ii.  **Alternatively, the Court Should Find that the Agreement Qualifies for** *Per Se* **Treatment**

Under Section 1 of the Sherman Act, the *per se* rule applies to agreements "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Procaps*, 845 F.3d at 1083 (quoting *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978)). To evaluate whether conduct is properly analyzed under the *per se* framework, the court "must inquire into whether the restraint, on its face, is a naked restraint of trade that always or almost always tends to restrict output, or an ancillary restraint that results in an efficiency enhancing integration among the parties to the agreement." *In re Terazosin Hydrochloride Antitrust Litig.*, 352 F. Supp 2d 1279, 1314 (S.D. Fla. 2005) (citations omitted). Here, the agreement between Citadel Securities and Robinhood was a naked restraint that, *inter alia*, reduced output and a degradation of brokerage services. "By colluding to prohibit Retail Investors from purchasing (but not selling) the Relevant Securities, Defendants harmed the very competitive mechanism that sets the market price through the forces of supply and demand . . . ." ¶ 354. This is a textbook restriction on output susceptible to *per se* treatment.

"Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints." *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988). "With limited exceptions, horizontal agreements are per se unlawful, whereas vertical restraints are unlawful only if an assessment of market effects, known as the

'rule of reason' analysis, reveals that the vertical agreements unreasonably restrain trade." [26]

*Disposable Contact Lens*, 215 F. Supp. at 1291 (citing *Leegin*, 551 U.S. at 885-86, 907).

iii.   **Plaintiffs Have Established a Conspiracy Under the "Quick Look" Approach and the Rule of Reason**

Even if the Court were to find that the restraint here is not illegal *per se*, Plaintiffs' claims should be evaluated under the "quick look" approach. Under the "quick look" approach the court inquires whether defendants' conduct is of the type that, while not *per se* illegal, appears so likely to have anticompetitive effects that it is unnecessary for a court to apply the full rule of reason analysis.[27] An alleged restraint, "while not unambiguously in the per se category, may require no more than cursory examination to establish that their principal or only effect is anticompetitive." *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1134 (9th Cir. 2011) (en banc) (quoting *Cal. Dental Ass'n*, 526 U.S. at 763) (the rule of reason analysis can be applied "'in the twinkling on an eye'"). Here, Plaintiffs allege that Defendants entered into an unprecedented agreement to restrict Retail Investors from purchasing shares of the Relevant Securities resulting in, *inter alia*, a reduction in output and a degradation in quality in brokerage services. ¶¶ 350-56. Plaintiffs have alleged in detail the anticompetitive effects of this restraint with specificity in the no-commission securities services market. On the other hand, Defendants' motion is devoid of any contention that the trading restrictions were procompetitive. Even if Defendants' agreement to foreclose Retail Investors from purchasing the Relevant Securities is

---

[26] Citadel Securities is in the business of taking routed orders and settling them. Citadel Securities is therefore on the same horizontal level of distribution as clearing entities such as Robinhood Securities (Robinhood's clearing entity). This horizontal relationship is of equal-or-greater significance than other aspects which may be considered vertical in nature. In any event, the difficulty of classifying the relationships as one or the other—or both—reinforces Plaintiffs' position that it is premature to determine whether the *per se* rule or rule of reason applies. *Cf. Battle,* 673 F.2d at 990 ("(H)orizantal plurality is not the real determinant of per se unreasonableness. The essence of a violation of section 1 of the Sherman Act is agreement to pursue illegal conduct. A combination to cut a retailer off from a source of supply is not any less an illegal agreement because only one, rather than a plurality, of the parties is on the affected level.") (citation omitted).

[27] *See Cal. Dental Ass'n v. Fed. Trade Comm'n*, 526 U.S. 756, 770 (1999) ("[A]n observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets"); *see also* Areeda & Hovenkamp, ¶ 1911a ("What [the 'quick-look'] term is intended to connote is that a certain class of restraints, while not unambiguously in the per se category, may require no more than cursory examination to establish that their principal or only effect is anticompetitive.").

not *per se* unlawful, it can readily be determined unlawful under the "quick look" analysis. *Cal. Dental Ass'n*, 526 U.S. at 770.

### iv.    Plaintiffs' allegations suffice under the rule of reason

Even if the Court were to determine that the restraint should be evaluated under the rule of reason, Plaintiffs' allegations are sufficient to state a claim. In the Eleventh Circuit, in addition to the proof of agreement, causation and damages, a plaintiff must ordinarily prove "(1) the anticompetitive effect of the defendant's conduct on the relevant market, and (2) that the defendant's conduct has no pro-competitive benefit or justification."[28] *Spanish Broad. Sys. of Fla. v. Clear Channel Commc'ns.*, 376 F.3d 1065, 1071 (11th Cir. 2004) (citing *Levine*, 72 F.3d at 1551). Once a plaintiff shows anticompetitive effect, the burden shirts to the defendant to show procompetitive justifications. *Lucasys Inc. v. PowerPlan, Inc.*, No. 20-cv-2987, 2021 WL 5279391, at *11 (N.D. Ga. Sep. 30, 2021) (citing *Amex*, 138 S. Ct. at 2284). At the pleading stage, however, it is typically sufficient that the plaintiff plausibly alleges anticompetitive effects—pleading the lack of procompetitive benefits is not required. *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.,* 386 F.3d 485, 506-507 (2d Cir. 2004) Plaintiffs do not bear the burden of pleading the absence of defenses to their claims.

Plaintiffs have satisfied their pleading burden of anticompetitive effects by pleading facts which constitute both direct and indirect proof of anticompetitive effects. It is settled law that Plaintiffs can show anticompetitive effects by either means. *Amex*, 138 S. Ct. at 2284 ("The plaintiffs can make this showing directly or indirectly.") (citations omitted). Direct proof of anticompetitive effects includes "proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market." *Id.* Plaintiffs may also establish anticompetitive effects indirectly by showing that the defendant has "sufficient market power to cause an adverse effect on competition." *Tops Mkts. Inc. v. Quality Mkts. Inc.*, 142 F.3d 90, 96 (2d Cir. 1998). Plaintiffs plead sufficient facts as to both.

---

[28] While Plaintiffs dispute that the relationship between Defendants is a vertical restraint. Such a restraint "imposed by agreement between firms at different levels of distribution" are typically assessed under the rule of reason. *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) ("*Amex*") (quoting *Bus. Elecs. Corp.*, 485 U.S. at 730).

### a. The Amended Complaint Defines a Relevant Market

Generally, establishing the parameters of a relevant market requires a fact intensive analysis unsuitable for resolution on a Rule 12(b)(6) motion. *Id.*; *see also Spanish Broad. Sys.*, 376 F.3d at 1070 ("Rule 12(b)(6) dismissals are particularly disfavored in fact-intensive antitrust cases."); *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001) ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market."). There is no requirement that the market definition elements of an antitrust claim be pled with specificity. *See Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008); *see also Swierkiewicz*, 534 U.S. at 513 (Rule 8 does not require heightened pleading standard); *Leatherman*, 507 U.S. at 168 (same).

Plaintiffs plead sufficient facts regarding the relevant market in which the anticompetitive harm occurred. *See Jacobs*, 626 F.3d at 1336. Under *Twombly*, a plaintiff must simply allege enough information to "plausibly suggest the contours of the relevant geographic and product markets." *Id.* (citations omitted). Plaintiffs have alleged the relevant geography and features with requisite specificity.[29] Plaintiffs allege—and Defendants do not challenge—that the relevant geographic market is the United States. *See* ¶¶ 310–311, 315. Plaintiffs allege that the relevant product market is the market for securities trading services. ¶¶ 305–15. The Amended Complaint provides ample detail of the features of the market which plausibly suggest its contours.

The business relationships and economic intentions of participants in the market for securities trading services is complex. It has two significant features, as understood by

---

[29] Defendants challenge the relevant market by contending that it fails to consider interchangeability. MTD at 25, n.19 (citing *Jacobs*, 626 F.3d at 1337-38). Specifically, Defendants argue that Plaintiffs cannot contend that "retail brokers who do not have a 'user-friendly' mobile app[,]' […] have account minimums or charge commissions do not compete with those in [the] "No-Fee Brokerage Trading App Market." *Id.* But the unique characteristics of the relevant market and the type of users it attracts speaks volumes. *See U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 995 (11th Cir. 1993) (relevant product market can exist as distinct subset of larger product market, the boundaries of which may be determined by product's characteristics and distinct customers). Given the fact that the "median Robinhood customer holds an account balance of approximately $240 (¶ 314), a brokerage firm with a desktop-only application that charges a transaction fee per trade and that requires a $2,000 account minimum is no substitute for a brokerage firm that requires no account minimum and that allows users to trade for free by simply tapping a button on their cell phone.

economists. There is a market which consumers directly experience, which for ease of reference Plaintiffs refer to as the "No-Fee Brokerage Trading App Market"[30] *See* ¶¶ 312-14.

Brokerages, like Robinhood, compete to attract customers to their platform. The No-Fee Brokerage Trading App Market can be considered a "downstream" market because it is the one where products are sold or consumed by consumers and which they experience directly. *See* ¶ 312. It is the market in which Robinhood promotes its commission-free trading services and where it competes for customers with other firms which promote and sell similar services.[31] As Plaintiffs allege, Defendants caused anticompetitive harm in two distinct ways. First, Defendants, through the restraint, eliminated trading with respect to the Relevant Securities and thereby reduced output of trading services. Second, they thereby caused a reduction in quality of those services.[32] *See* Part IV.B.iv.b., *infra*. Reduction in output and reduction in quality are each classic paradigmatic types of anticompetitive harm. *See Amex*, 138 S. Ct. at 2284.

The No-Fee Brokerage Trading App Market is linked to and directly influenced by the PFOF Market controlled by Citadel Securities. ¶ 305. This can be considered an "upstream" market because it operates apart from consumers without consumer visibility and serves to facilitate the No-Fee Brokerage Trade App Market. It is integral to Plaintiffs' claims because Robinhood's business model and ability to offer no-fee trades is contingent on PFOF, and Citadel Securities is Robinhood's most important business partner with respect to PFOF. ¶ 5. Citadel Securities, the largest market maker, provides revenue to Robinhood for directing order flow to

---

[30] Particularly today, consumers buying or selling securities rely on brokerages and other market participants to conduct securities transactions and to provide related services. Consumers directly buy and sell publicly traded securities from other consumers through brokerages like Robinhood. When securities are traded electronically, brokerages and other firms like Citadel deal with each other to accomplish such transactions.

[31] Indeed, Defendants admit to this market when they—wrongly—argue that Plaintiffs could have avoided the anticompetitive harm they caused by using other brokers.

[32] This is supported by Defendants' own characterizations. *See*, *e.g.*, MTD at 4 ("Robinhood Financial is a customer-facing, introducing broker-dealer through which retail investors can place commission-free trade orders").

Citadel Securities. ¶¶ 313, 316, 318. Functionally, these upstream and downstream markets operate together with respect to the trading of securities.[33] *See* ¶ 305.

Defendants' contention that Plaintiffs "gerrymandered segregated markets" is not a proper basis for a Rule 12 motion. At most, it amounts to a factual dispute, which will be the subject of discovery, expert analysis and resolution by the trier of fact. Moreover, Defendants' characterization is wrong. It ignores the facts plaintiffs allege. The two aspects of the market Plaintiffs describe are consistent with Defendants' own description of their respective business models. *See* MTD at 5. Far from being "manufacture[d]" as Defendants suggest (MTD at 25, n.19), the allegations accurately reflect the market and Defendants' roles in it.[34]

Defendants counter Plaintiffs' allegations regarding the relevant market with allegations of their own. Defendants assert the existence of another market, the "market for the Relevant Securities." MTD at 26. Here too Defendants' allegations are untethered to the Amended Complaint, and are therefore improper. *Vernon v. Med. Mgmt. Assocs. of Margate, Inc.*, 912 F. Supp. 1549, 1553 (S.D. Fla. 1996) ("analysis of a 12(b)(6) motion is limited primarily to the face of the complaint and attachments thereto"). In any event, Defendants misconstrue the concepts of "upstream" and "downstream" markets in economics and antitrust law. The fact that there are downstream features of the market, which consumers directly experience, and upstream features, which they do not, does not diminish the sufficiency of the allegations for pleadings purposes. Consumers never deal directly with market makers such as Citadel Securities but must transact through consumer-facing brokerages such as Robinhood. *Cf. Apple, Inc. v. Pepper*, 139 S. Ct. 1514, 1521-24 (2019) (direct purchaser standing for downstream purchasers of apps from app store). Together, they facilitate consumer transactions in securities, and as explained *infra*, their

---

[33] These detailed allegations are sufficient for pleading purpose. They set forth in more than adequate detail the nature of the business relationships. Pleading requirements for relevant antitrust markets are generalized. Requiring plaintiffs to plead more detail would incorrectly raise the pleading requirements akin to the particularized requirements under Rule 9. There is no particularized pleading requirement for antitrust cases. *Leatherman*, 507 U.S. at 168 ("Rule 8(a)(2) requires only a 'short and plain statement of the claim showing that the pleader is entitled to relief.'"); *Palm Beach Golf Ctr-Boca, Inc. v. Sarris*, 781 F.3d 1245, 1260 (11th Cir. 2015) (concluding *Twombly* did not overrule *Swierkiewicz* and *Leatherman*).

[34] Defendants' citation to *Kalmanovitz v. G. Heilman Brewing Co.*, 769 F.2d 152, 156 (3d Cir. 1985) is unavailing. MTD at 26, n.20. As *Kalmanovitz* recognized, "system-wide abuses in the securities industry have been held to have antitrust implications." *Id.* at 157, n.5.

interplay enabled the injury to competition. Plaintiffs' allegations not only inform the relevant market, they demonstrate their plausibility.

### b.     Plaintiffs Sufficiently Plead Anticompetitive Effects in the Relevant Market

Anticompetitive effects can be shown in two ways. They can be shown directly by "proof of actual detrimental effects on competition." *Amex*, 138 S. Ct. at 2284 (internal quotation marks and citations omitted). They can also be shown indirectly, by "proof of market power plus some evidence that the challenged restraint harms competition." *Id.* (citations omitted); *see also Levine*, 72 F.3d at 1551 ("plaintiff may either prove that the defendants' behavior had an 'actual detrimental effect' on competition, or that the behavior had 'the potential for genuine adverse effects on competition.'") (citations omitted). Plaintiffs plead sufficient facts as to each.

Proof of actual detrimental effects on competition includes, but is not limited to, "reduced output, increased prices, or decreased quality in the relevant market[.]" *Amex*, 138 S. Ct. at 2284 (citations omitted); *Jacobs*, 626 F.3d at 1339 (same). Plaintiffs have adequately pled paradigmatic detrimental effects. Evidence of restricted output is "direct proof of the injury to competition which a competitor with market power may inflict, and thus, of the actual exercise of market power." *Rebel Oil Co., Inc. v. Atl. Richfield Co*., 51 F.3d 1421, 1434 (9th Cir. 1995); *see Toys "R" Us, Inc. v. Fed. Trade Comm'n*, 221 F.3d 928, 937 (7th Cir. 2000) (defendant's ability to restrict output proof of market power).[35] First, Robinhood, pursuant to its agreement with Citadel, reduced output. ¶¶ 254, 264. Indeed, that was the very purpose—and actual result—of the agreement. It was Robinhood's business to provide brokerage services free of commissions. ¶ 8. By restricting trading, the agreement denied customers those services.[36] ¶ 354. Second, it also subverted consumer choice by inhibiting consumers' ability to trade the Relevant Securities, thereby diminishing the quality of the transactions. ¶ 350. Third, Defendants' actions

---

[35] *See also Fed. Trade Comm'n v. Ind. Fed'n of Dentists*, 476 U.S. 447, 456-57 (1986) (using direct evidence to conclude challenged conduct "impairs the ability of the market to advance social welfare by ensuring the provision of desired goods and services to consumers at a price approximating the marginal cost of providing them"); *United States v. Microsoft Corp.*, 253 F.3d 34, 57 (stating that if "evidence indicates that a firm has in fact" profitably raised prices substantially above competitive level, "the existence of monopoly power is clear").

[36] This meant that the price at which the Relevant Securities could be sold no longer reflected the actual, competitive market price set through supply and demand. ¶ 354. By restricting output (brokerage services), there was a reduced supply of willing buyers of the Relevant Securities, resulting in reduced prices in the Relevant Securities.

distorted the pricing of the Relevant Securities. Rather than permitting the price discovery that would have occurred through the operation of supply and demand, Defendants interfered with the functioning of the market. In addition to benefiting them directly—by allowing Citadel Securities exit their short positions—this was a detriment to both competition and consumers. ¶¶ 350–56. These are actual detrimental effects on competition that the antitrust law prohibits. *See Ind. Fed'n of Dentists*, 476 U.S. at 460 ("'proof of actual detrimental effects, such as a reduction of output,' can obviate the need for an inquiry into market power") (quoting 7 Areeda, Antitrust Law ¶ 1511, p.429 (1986)); *Costco*, 2015 WL 9987969, at *11 (actual competitive effects include but are not limited to reduction of output, increase in price, or deterioration in quality) (citing *Jacobs*, 626 F.3d at 1339).

> ### 1.    Robinhood and Citadel Securities Possess Power in the Relevant Market

Plaintiffs adequately allege market power in the relevant market.[37] ¶¶ 307–10, 324–36. Plaintiffs allege Robinhood possesses a high market share. Robinhood pioneered the No-Fee Brokerage Trading App Market and it remains the market leader in terms of market share. ¶ 324. Robinhood maintains 18 million online accounts that are part of the No-Fee Trading App Market, and Robinhood boasts a 50% market share of all new brokerage accounts. ¶¶ 325, 327. *See Jacobs*, 626 F.3d at 1339 (market share frequently used interchangeably with market power.); *see also Costco*, 2015 WL 9987969, at *13 (43% control of market sufficient market power for rule of reason analysis). Indeed, Robinhood reports more daily online trades and more daily active users than any of its largest rivals combined. ¶¶ 328–30. Further, few Robinhood users defected even after Robinhood implemented the trading restrictions, underscoring its market power. ¶ 336.

Robinhood's market power is also apparent due to the lock-in that consumers faced. Indeed, it should be obvious that, if Robinhood did not have such power, the prohibition on selling would have been unsuccessful, as consumers could have evaded it by trading elsewhere. As Plaintiffs allege, many consumers, with few exceptions, were unable to switch brokerages during the trading restrictions is strong evidence of Robinhood's market power. *See* ¶¶ 337-42.

---

[37] Tellingly, Defendants do not directly challenge Plaintiffs' allegations of market power. Defendants only make the conclusory claim that should Plaintiffs' claims proceed beyond the pleadings—and they should—that Plaintiffs will be unable to prove market power. MTD at 22, n.17. Ultimately, that is a question for the trier of fact, not Defendants.

Robinhood's market power was further buttressed by Citadel Securities's market power in the upstream market. Citadel Securities pays more to brokers for PFOF than any other market maker. ¶ 308-10. Citadel Securities accounts for 27% of all U.S. equities volume and executing nearly 37% of all U.S. listed retail securities trading volume (resulting in almost 40% of all PFOF transactions in the United States) and transacts more PFOF orders than Robinhood's three other largest market maker competitors combined. ¶ 307. The fact that Citadel Securities accounted for over half of the dark pool activity in the Relevant Securities during the week of January 25, 2021 is further support for these allegations. ¶ 282.

### 2. Plaintiffs Have Shown Defendants Harmed Competition in the Relevant Market

Plaintiffs further allege that Defendants' conduct caused harm to competition. Through their conduct, enabled by the market power they possessed and wielded, Defendants harmed competition by restraining consumer choice and artificially influencing the price of the Relevant Securities. In so doing, they divorced the price of the Relevant Securities from the fundamental economics of supply and demand. As described above, under conditions of competition, absent collusion, the laws of supply and demand would have operated, allowing prices to rise. As a result of Defendants' collusion, these laws were distorted, supply from willing sellers was reduced, and prices went down. Further, the scheme also had the detrimental effect of reducing the output of trades and reducing the quality of transactions. ¶¶ 350–56; *see* Part IV.B.iv.b, *supra*.

In addition, as Plaintiffs allege, Robinhood relied on PFOF from Citadel Securities, and Robinhood could not jeopardize that revenue stream, particularly given the imminent deadlines associated with its IPO. Exercising such leverage to obtain a restriction in trading is a form of bribery, prohibited by the antitrust laws. *See In re EpiPen Direct Purchaser Litig.*, No. 20-cv-0827, 2021 WL 147166, at *24-25 (D. Minn. Jan. 15, 2021). Harm resulting from such bribery is harm to competition. Bribery can reduce or eliminate market functions and thereby cause anticompetitive harm. In particular, "bribery can be anticompetitive when it 'rob[s] the ultimate purchaser of the opportunity to choose [a] product.'" *Id.* (citation omitted); *see also id.* (collecting cases). Here, as Plaintiffs allege, Citadel Securities used its market power and control of Robinhood's PFOF to pressure Robinhood into acting against both its own interest and the interest of consumers. This conduct by Defendants was inherently anticompetitive. ¶ 352.

Plaintiffs further allege that Defendants' conduct led to a rise in transaction costs, even if the underlying security's value went down in price, ¶ 353. *In re NASDAQ Mkt-Makers Antitrust*

*Litig.*, 172 F.R.D. 119, 125-26 (S.D.N.Y. 1997) ("common proof that the conspiracy" "did have a general effect on the transactions costs borne by institutional investors."); *see also United States v. Alex. Brown & Sons*, 963 F. Supp. 235, 237 (S.D.N.Y. 1997) (higher transaction costs for investors due to Defendants' collusion).

Defendants do not dispute that these allegations plausibly allege harm to competition. In fact, Defendants appear to concede that Plaintiffs' allegations constitute competitive harm. *See, e.g.,* MTD at 26 (allegations that Retail Investors sold below prices they would have otherwise obtained "is an allegation of harm in the market [ ] for trading the Relevant Securities.").

Instead, Defendants attempt to misdirect the focus instead on competition between Robinhood and the other brokerage services for customers or between Citadel Securities and other market makers. MTD at 25. First, this is inconsistent with the basic focus of the antitrust laws. *See 2301 M Cinema LLC v. Silver Cinemas Acquisition Co.*, 342 F. Supp. 3d 126, 137 (D.D.C. 2018) ("the antitrust laws 'were enacted for the "protection of *competition*, not *competitors*"'") (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 4298 U.S. 477, 489 (1977)) (italics in original).

Second, Defendants do so based on a third, entirely separate product market divorced from the allegations. MTD at 26. This is improper for pleading purposes. *See Vernon*, 912 F. Supp. at 1553. It ignores Plaintiffs' specific allegations of the relevant market. *See* Part IV,B.iv.a, *supra*. Defendants' attempt to analyze anticompetitive harm in a third market is of their own design is an attempt to muddy the waters. Defendants wrongfully contend that Plaintiffs alleged harm is "all premised on a decline in the price of the Relevant Securities." MTD 26. As explained above, this is incorrect.[38] *See* Part IV.B.iv.b., *supra*; *see also* ¶¶ 350–356. When the prices of the Relevant Securities dropped due to Defendants' scheme, Retail Investors sold the Relevant Securities at lower prices—the precise result Defendants desired.[39] ¶¶ 27, 32, 37, 41.

---

[38] The harm Plaintiffs incurred took the form of reduced brokerage services which is what Robinhood offered to consumers. The harm can be estimated by the amount lost when Plaintiffs were unable to sell the Relevant Securities due to the trading restrictions.

[39] Defendants' reliance on *Maris* misses the mark. MTD at 27 (citing *Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207 (11th Cir. 2002). In *Maris*, the Eleventh Circuit upheld the district court's decision that Anheuser-Busch's market share in beer manufacturing (a separate market) could not imputed to the relevant market. *Id.* at 1210, 1224. But nowhere in the *Maris*

Defendants finally contend that "the markets in which Citadel Securities and Robinhood operate are not within the area of effective competition between the defendant and plaintiff'" such that there are "no allegations that the conduct at issue here harmed competition in either of the relevant markets." MTD at 27 (citing *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1353 (Fed. Cir. 1999)). Defendants' argument is puzzling. Plaintiffs are purchasers of securities trading services. They do not contend they compete with Defendants, nor do they need to.

## V.      Plaintiffs' Claims Are Not Preempted by the Federal Securities' Law

Plaintiffs' antitrust claims are not preempted, *see Credit Suisse Securities (USA) LLC v. Billing,* 551 U.S. 264 (2007), because the Dodd-Frank Act's Antitrust Savings Clause applies to Plaintiffs' claims. All of Defendants' citations to support preclusion predate Dodd-Frank's passage into law. Further, Defendants' reliance on the SEC Staff Report[40] is misplaced.

### A.      Dodd-Frank Act's Antitrust Savings Clause Applies to Plaintiffs' Claims

In passing the Dodd-Frank Act, Congress amended the Securities Exchange Act of 1934 by adding provisions regarding, *inter alia*, short sales. Congress included an expansive Antitrust Savings Clause making clear that antitrust claims with respect to the matters addressed in the legislation were not precluded. Section 6 of the Dodd-Frank Act, 12 U.S.C. § 5303, states that "nothing in this Act, or any amendment made by this Act, shall be construed to modify, impair, or supersede the operation of any of the antitrust laws, unless otherwise specified" (the "Antirust Savings Clause"). This is fatal to Defendants' preclusion argument.[41]

---

opinion is a discussion or analysis of an antitrust injury occurring ***in*** the defined market. Further, *Maris* recognized that market power only as a means to "indirectly" show proof of anticompetitive effects—the plaintiff was permitted to show a jury "direct[ ]" proof of *actual* anticompetitive effects. *Id.* at 1212. Here, Plaintiffs adequately allege proof of anticompetitive effects both directly and indirectly. ¶¶ 307–11, 324–46, 350–56. Defendants' citation to *Universal Grading Serv. v. eBay, Inc.*, No. C-09-2755-RMW, 2012 WL 70644 (N.D. Cal. Jan. 9, 2012), is likewise off target. MTD at 27. The section on which Defendants rely involves a Section 2 claim against a noncompetitor. *Id.*, at *8-9. No such issue is before the Court.
[40] *SEC, Staff Report on Equity and Options Market Structure Conditions in Early 2021* (October 14, 2021), available at https://www.sec.gov/files/staff-report-equity-options-market-struction-conditions-early-2021.pdf. (the "SEC Staff Report").
[41] "In attempting to elaborate on the effect of an antitrust savings clause, it does not create a different rule, but merely reaffirms the general rule. Moreover, an antitrust savings clause is itself merely a reinforcement of the well-established principle that, because the antitrust laws are 'a

Dodd-Frank implemented broad provisions that directly touch upon issues alleged in the Amended Complaint. Section 929X of Dodd-Frank empowered the SEC to promulgate rules related to public disclosure of short positions, albeit the SEC has not promulgated any such rules. ¶¶ 302-03. Dodd-Frank amended the Exchange Act regarding certain transactions related to short sales. 1242 Stat. 1870. Dodd-Frank also has specific provisions related to market making. *E.g.*, 1242 Stat. at 1624, 1632. Defendants' conduct falls squarely within Dodd-Frank's ambit.[42] That the statute did not preclude antitrust is confirmed by the legislative history. As Representative Conyers, the Chairman of the House Judiciary Committee, stated:

> The final bill contains a number of provisions to ensure that the antitrust laws remain fully in effect. . . . First and foremost is the antitrust savings clause in section 6 of the bill. It is the standard antitrust savings clause found in other statutes. It applies to the entire Act, and all amendments made by the Act to other laws.

156 CONG. REC. E1347-01 (2010), 2010 WL 2788137 ("Conyers Remarks").

Defendants assert that the Dodd-Frank Act did not amend Section 15 of the Exchange Act. MTD at 34, n.24. Not so. Section 913(g) of the Dodd-Frank act modified "Section 15 of the Securities Exchange Act of 1934 (15 U.S.C. 78o)" by adding additional language that permits the SEC to promulgate rules regarding fiduciary standards and disclosure requirements for brokers. *See* Dodd-Frank Act § 913(g), 124 Stat. at 1828.

Moreover, Dodd-Frank preserved the applicability of the antitrust laws to matters within the scope of the Act except where "otherwise specified" and Congress expressly indicated where the antitrust laws were modified. "Dodd-Frank never mentions the Sherman Act . . . , and it explicitly modifies the Clayton Act in four provisions, none of which is relevant here. *See* 12 U.S.C. §§ 1843(k)(6)(B)(iii), 5363(b)(5), 5390(a)(1)(G)(ii), 5390(h)(11). These are the four provisions captured by the 'unless otherwise specified' exception to the antitrust savings

---

comprehensive charter of economic liberty aimed at preserving free and unfettered competition,' there is a strong presumption against their normal operation being superseded by some other statutory scheme." 156 CONG. REC. E1347-01 (2010), 2010 WL 2788137 (citations and internal quotations marks omitted).

[42] Whether the underlying conduct, here short sales, are permitted under Dodd-Frank is of no concern for antitrust purposes. *See ES Dev., Inc. v. RWM Enters., Inc.*, 939 F.2d 547, 555 (8th Cir. 1991) ("The present case provides a further example of the antitrust maxim that 'even an otherwise lawful device may be used as a weapon in restraint of trade.'") (quoting *Schine Chain Theatres, Inc. v. United States*, 334 U.S. 110, 119 (1948)).

clause."[43] *In re Credit Default Swaps Antitrust Litig.*, No. 13md2476 (DLC), 2014 WL 4379112, at *16 (S.D.N.Y. Sept. 4, 2014); *accord In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 497 (S.D.N.Y. 2017) (same). The legislative history indicates that Congress intended Dodd-Frank to only modify those specific provisions of the antitrust law. Conyers Remarks, at E1347 ("The phrase 'unless otherwise specified' refers only to those four specific provisions that explicitly modify the operation of those specified provisions of the antitrust laws in specified ways and is not a basis for courts to consider whether any other provision in the bill might be intended as an implicit modification of how the antitrust laws operate. The savings clause is intended to make clear that it is not."). The conclusion is inescapable that Congress intended for the antitrust laws to apply to short sales. *See Interest Rate Swaps*, 261 F. Supp. 3d at 497 ("As a matter of plain language, the exception to Dodd-Frank's clause preserving plaintiffs' right to bring antitrust claims is not implicated here.").

    *Billing* is inapposite here. *Billing* applies "[w]here regulatory statutes are silent with respect to antitrust." 551 U.S. 264 at 271 (2007) (emphasis added). Here, however, the statute is not silent. It addresses the commerce giving rise to Plaintiffs' claims and, in addition, it provides that the reach of the antitrust laws with respect to them is preserved. Further, none of the cases Defendants cite in support of preemption post-date Dodd-Frank. "When Congress has spoken, the Supreme Court stated, a court is to apply Congress's command as to the extent, if any, to which antitrust laws are abrogated." *See In re Interest Rate Swaps,* 261 F. Supp. 3d at 496-97 (citing *Verizon Commc'ns, Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 406–07 (2004) (analyzing the antitrust savings clause of the Telecommunications Act)). As such, the Antirust Savings Clause applies, and Plaintiffs' claims under the Sherman Act are not precluded.

    **B.**    **The *Billing* Factors Weigh Against Preclusion of Plaintiffs' Claims**

    Even if *Billing* applies—and it does not—Plaintiffs' claims are not precluded by the Exchange Act. The "repeal of the antitrust laws by implication is not favored and not casually to be allowed. Only where there is a '*plain repugnancy between antitrust and regulatory provisions will repeal be implied.*'" *Gordon v. N.Y. Stock Exch., Inc.,* 422 U.S. 659, 682 (1975) (citations omitted, emphasis added). Courts should only find the antitrust laws are precluded in narrow specific circumstances. "Repeal of the antitrust laws is to be regarded as implied only if

---

[43] The specified provisions relate to Hart-Scott-Rodino premerger review under the Clayton Act.

necessary to make the [ ] Exchange Act work, and *even then only to the minimum extent necessary*."[44] *Billing*, 551 U.S. at 271 (emphasis added, brackets and citation omitted). In *Billing*, the Supreme Court identified four factors to determine whether antitrust claims are implicitly precluded: (1) whether the action involves an area of conduct squarely within the heartland of securities regulations; (2) clear and adequate SEC authority to regulate; (3) active and ongoing agency regulation; and (4) a serious conflict between the antitrust and regulatory regimes. *Id.* at 285. Here, there is no "clear repugnancy" between antitrust laws and securities laws. The fact that anticompetitive conduct occurred with respect to the buying and selling of securities is insufficient to warrant preclusion. Each of the *Billing* factors weighs *against* preclusion here.

### i. The Underlying Conduct at Issue Is Not Central to the Functioning of Well-Regulated Capital Markets

"To ascertain whether 'the possible conflict' between securities law and antitrust law affects 'practices that lie squarely within an area of financial market activity that the securities law seeks to regulate,' the Supreme Court looked to the broad underlying market activity." *Elec. Trading Grp., LLC v. Banc of Am. Sec. LLC*, 588 F.3d 128, 133 (2d Cir. 2009) (citing *Billing*, 551 U.S. at 276). In *Billing*, the Supreme Court considered how the IPO process (the underlying market activity) was "central to the proper functioning of well-regulated capital markets." *Id.*, at 276. In concluding that it was, the Supreme Court addressed numerous benefits of the IPO process, including how it "supports new firms that seek to raise capital," "helps spread ownership," and "directs capital flow." *Id.* The Court also noted that many financial experts considered the joint underwriting activity at issue "essential to the successful marketing of an IPO." *Id.* Similarly, in determining that short selling (the underlying market activity) was an "area of conduct squarely within the heartland of securities regulations," the court in *Elec. Trading Grp.*, considered the "liquidity and pricing benefit created by short sales." 588 F.3d at 133-34 (citation omitted).

Defendants argue that the underlying activity here lies at the very heart of the securities market because "[m]arket integrity" is "vital" and because brokers 0must "register with the SEC" (MTD at 29), but Defendants do not—and cannot—demonstrate how cutting off retail investors' access to the securities market by restricting trading (let alone doing so in an

---

[44] Antitrust laws have long been enforced with respect to wrongdoers in the securities market. *See, e.g.*, *NASDAQ Mkt-Makers*, 894 F. Supp. 703 (S.D.N.Y. 1995); *see also Kalmanovitz*, 769 F.2d at 157 (collecting cases where "antitrust laws have been applied to the securities industry").

unlawfully coordinated fashion) is "central to the proper functioning of well-regulated markets." *Billing*, 551 U.S. at 276. Thus, this factor weighs against preclusion. *See Kalmanovitz*, 769 F.2d at 156, n.5 ("abuses in the securities industry have been held to have antitrust implications").

### ii.     The SEC Is Not Authorized to Regulate the Activities in Question

The second *Billing* factor considers whether there is "clear and adequate SEC authority" to regulate the activities in question. 551 U.S. at 285. In ascertaining "'the existence of regulatory authority under the securities law to supervise the activities in question . . . the Supreme Court looked to the role of the [defendants] in the [underlying market activity].'" *Elec. Trading Grp.*, 588 F.3d at 134 (quoting *Billing*, 551 U.S. at 275-77).

The SEC does not have authority to supervise "all of the activities in question here," and in particular Robinhood's imposed limitations on trading. Defendants' reliance on general regulations concerning fraudulent practices is insufficient to close that gap. *See* MTD at 30-31 (citing *Billing*, 551 U.S. at 276). To argue otherwise is entirely misleading. In *Billing*, the Supreme Court first looked to whether the SEC possessed the power to supervise the activity in question. *Billing*, 551 U.S. at 276-77. In finding that it did, the Supreme Court cited to specific regulatory statutes governing the underwriter-defendants' acts during the IPO process (the underlying market activity), including book-building, solicitations of indications of interest, and communications between underwriting participants and their customers. *Billing*, 551 U.S. at 276-77 (citing 15 U.S.C. §§ 77(b)(a)(3), 77j, 77z-2). Only *after* the Supreme Court found that SEC regulated the activity in question did it look to buttress the conclusion.

Here, Defendants refers to several regulations which provide no evidence that the SEC has the authority to regulate the conduct at issue (i.e., Defendants' collusive agreement to restrict Retail Investors from purchasing the Relevant Securities). *See* MTD at 30 (citing 15 U.S.C. § 78o(c)(2) and 15 U.S.C. § 78j(b)).[45] The referenced regulations concern, *inter alia*, over-the-

---

[45] Defendants' citation to 15 U.S.C.§ 78o(b)(7) is also misplaced as this statute addresses registration, training and qualification requirements for brokers, all of which are irrelevant here. *See* MTD at 30.

counter markets rules, record keeping requirements,[46] standards for clearing agencies and securities offerings (i.e., IPOs). These are beside the point and irrelevant here.

Further, Defendants' reliance on the SEC's newly proposed rule regarding the settlement period[47] is misplaced. MTD at 30. The proposed rule, at best, shows the SEC has authority to supervise and mitigate risks associated with trade settlement. This is a far cry from showing the SEC has the authority to supervise all of the activities in question here, and in particular has no direct relationship with Robinhood's trading restrictions or related concerted activity.

### iii.    The SEC Is Not Exercising its Authority over the Conduct at Issue

The third *Billing* factor considers "evidence that the responsible regulatory entities exercise [their] authority." *Billing*, 551 U.S. at 275. There is no such evidence. Defendants instead refer to a handful of SEC regulations. MTD at 31. But these regulations, which are more appropriately analyzed under the second *Billing* factor as described above, provide no evidence that the SEC has been investigating or regulating the conduct at issue here (i.e., the Defendants' collusive agreement to restrict Retail Investors from purchasing the Relevant Securities). As mentioned in Part V.B.ii., *supra*, these are beside the point and irrelevant here. *See* MTD at 31; *see also* 17 C.F.R. §§ 240.15c3-1 to -5; 17 C.F.R. §§ 240.17h-1T to -2T; Regulation M, 17 C.F.R. §§ 242.100 to -105. As addressed above, Defendants' reliance on provisions of the Exchange Act is also misplaced. *See* MTD at 31.

Defendants' general reference to SEC enforcement programs (MTD at 31-32) is of no moment. These programs were not created to address the conduct at issue. Defendants have not been the target of such programs either. Defendants do not contend to the contrary. And, while true that the SEC investigated the events concerning the market activities of January 28, 2021, there is simply no evidence to suggest that the SEC investigated the claims of concerted activity

---

[46] Disclosure-like oversight does not rise to the level of exercise of authority to satisfy the elements in *Billing*. *See Dahl v. Bain Capital Partners, LLC*, 589 F. Supp. 2d 112, 116-17 (D. Mass. 2008) ("seeing that the SEC only required certain disclosures here, and that it did not substantively regulate the behavior in question, the second factor is not met.").

[47] *See Shortening the Securities Transaction Settlement Cycle*, Release No. 34-94196 (issued February 9, 2022) (publication in Federal Register forthcoming) (to be codified at 17 C.F.R. pts. 232, 240, and 275), available at https://www.sec.gov/rules/proposed/2022/34-94196.pdf (the "Proposed Rule").

at issue here.[48] *See Mayor & City Council of Balt., Md. v. Citigroup, Inc.*, Nos. 08-cv-7746 (BSJ), 08-cv-7747 (BSJ), 2010 WL 430771, at *5 (S.D.N.Y. Jan. 26, 2010) (finding that the SEC had "actively exercised its authority" by "undertak[ing] an ongoing investigation into *the specific events at issue in this case*") (emphasis added).

Not only do Defendants mischaracterize the target of the SEC's investigation, but they intentionally gloss over the fact that the Staff Report has no precedential value. By its terms, the Staff Report expressly disclaims any legal or factual effect on its cover page:

> DISCLAIMER: This is a report of the Staff of the U.S. Securities and Exchange Commission. Staff Reports, Investor Bulletins, and other staff documents (including those cited herein) represent the views of Commission staff and ***are not a rule, regulation, or statement of the Commission***. The Commission has neither approved nor disapproved the content of these documents and, like all staff statements, ***they have no legal force or effect***, ***do not alter or amend applicable law***, and create no new or additional obligations for any person. ***The Commission has expressed no view regarding the analysis, findings, or conclusions contained herein.***

Staff Report at 1 (emphasis added). Thus, no legal conclusions can be drawn from the Staff Report, and it has no preclusive effect with respect to any factual matter at issue here.[49]

### iv.   There is No Conflict Between Antitrust and Securities Laws

The fourth *Billing* factor considers whether there is a "serious conflict between the antitrust and regulatory regimes," such that allowing "an antitrust lawsuit would threaten serious harm to the efficient functioning of the securities market." *Billing*, 551 U.S. at 283, 385. A conflict may occur when there is either an actual conflict or a potential conflict between antitrust law and securities regulations. *Elec. Trading Grp.*, 588 F.3d at 137-38.

---

[48] SEC Chair Gary Gensler alluded to the SEC's investigative focus in his Congressional testimony. Notably, absent from Gensler's testimony was any refence to Defendants' alleged conspiratorial conduct. *Virtual Hearing – Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Part III*, 117th Cong. (May 6, 2021) (statement of Gary Gensler, SEC Chairman), *available at* https://financialservices.house.gov/uploadedfiles/hhrg-117-ba00-wstate-genslerg-20210506.pdf. The Court may take judicial notice of SEC statement because it is a public record, the accuracy of which cannot be questioned. *See Univ. Express, Inc. v. U.S. Sec. Exchange Comm'n*, 177 F. App'x 52, 53 (11th Cir. 2006).

[49] To the extent that Defendants attempt to introduce the Staff Report as a means to show conflict between the Securities Exchange Act and the Sherman Act, the Staff Report does no such thing as, by its terms, it has "no legal force or effect." *Id.*

Far from creating sufficient harm, this antitrust lawsuit would create no harm at all. Defendants cite to no law that would be in conflict with or undermined were Plaintiffs' claims to succeed. In ascertaining whether an actual conflict exists, the court in *Elec. Trading Grp.* examined whether "[a]ntitrust liability would inhibit conduct that the SEC permits and that assists the efficient functioning of the [securities'] market." *Id.* at 137. No such concern pertains here. The assertion that Defendants' concerted activity is not prohibited in fact proves the reverse, namely that the conduct is not subject to regulation. Further, there is no showing that such conduct is permitted, authorized or encouraged by the SEC. Far from it.

To support their argument that an actual conflict exists because the "conduct at issue" is "permitted by the SEC," Defendants rely on an excerpted portion of an SEC investor alert, which when read in full states:

> Also, broker-dealers may reserve the ability to reject or limit customer transactions. This may be done for legal, compliance, or risk management reasons, and is typically discussed in the customer account agreement. In certain circumstances, broker-dealers may determine not to accept orders where a transaction presents certain associated compliance or legal risks.

MTD at 10. Defendants do not explain how these generalized descriptions authorize their concerted activity. Moreover, the above language "is not a rule, regulation, or statement of the [SEC]," but rather an "investor bulletin," that has not been "approved" by the SEC. SEC, *Thinking About Investing in the Latest Hot Stock?* (Jan. 30, 2021), https://www.sec.gov/oiea/investor-alerts-and-bulletins/risks-short-term-trading-based-socialmedia-investor-alert. Such a bulletin "has no legal force or effect: it does not alter or amend applicable law, and it creates no new or additional obligations for any persons."[50] *Id.*

"In evaluating conflict, [ ] the proper focus is on the alleged anticompetitive conduct." *Elec. Trading Grp.*, 588 F.3d at 137. In *Billing*, the Court addressed the "*manner*" in which

---

[50] 17 C.F.R. §§ 240.15a-1 to 240.15c6-1 govern "Exemption of Certain OTC Derivatives Dealers (§ 240.15a-1); "Exemption of Certain Securities From Section 15(a) (§§ 240.15a-2 - 240.15a-5)"; "Registration of Brokers and Dealers (§§ 240.15a-6 - 240.15b11-1)" and "Rules Relating to Over-the-Counter Markets (§§ 240.15c1-1 - 240.15c6-1)"; 17 C.F.R. §§ 240.17Ab2-1 to -2 relate to "Registration of clearing agencies" and "Determinations affecting covered clearing agencies" respectively; §§ 240.17Ad-1 to -24 regulate clearing agencies' collateral call requirements; and Regulation M and §§ 242.100 to -105 only apply to distribution of stock as part of the IPO process. Likewise, these statutes describe permitted practices with respect to certain securities transactions, but do not concern those at issue here.

defendants effectuated their alleged anticompetitive conduct through practices such as laddering and tying. *Id.* (citing *Billing*, 551 U.S. at 278). In analyzing these practices, the Court determined that in relation to laddering and tying, only a fine line separated activity that the SEC permitted from that the SEC disallowed. *Billing*, 551 U.S. at 279-80. Relying on *Billing*, the court in *Elec. Trading Grp.*, reasoned that "[i]t is a lot to expect a broker 'to distinguish what is forbidden from what is allowed,'" such that it would "curb" permittable conduct. 588 F.3d at 137-38. The claims at issue here do not attack or seek to prohibit short selling generally.

There is no potential conflict either. A potential conflict exists when there is a possibility that the SEC will act upon its authority to regulate the conduct. *Id.* at 137. To support their argument that a "potential conflict" exists, Defendants refer to the SEC Staff Report. MTD at 33. But, once again, there is no evidence that the SEC investigated or plans to investigate Defendants' collusive behavior. And here, unlike in *Billing*, there is no fine "line-drawing" that needs to be done to distinguish permittable from permissible conduct as Defendants' actions were entirely outside the realm of the SEC's regulatory authority. *See Billing*, 551 U.S. at 279.

## VI.   CONCLUSION

For the foregoing reasons, Defendants' MTD should be denied.

Dated: March 11, 2022

By: _____ /s/ *Joseph R. Saveri*
          Joseph R. Saveri

By: _____ /s/ *Frank R. Schirripa*
          Frank R. Schirripa

Joseph R. Saveri (CA SBN 130064)
Steven N. Williams (CA SBN 175489)
Christopher K.L. Young (CA SBN 318371)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
cyoung@saverilawfirm.com

Frank R. Schirripa (NY SBN 4103750)
Kathryn Hettler (NY SBN 5126065)
Seth Pavsner (NY SBN 4969689)
**HACH ROSE SCHIRRIPA & CHEVERIE LLP**
112 Madison Ave, 10th Floor
New York, New York 10016
Tel: (212) 213-8311
fschirripa@hrsclaw.com
khettler@hrsclaw.com
spavsner@hrsclaw.com

*Co-Lead Counsel for the Antitrust Tranche*