**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-MD-2989-ALTONAGA/TORRES**

In re:

**JANUARY 2021 SHORT SQUEEZE
TRADING LITIGATION**

_____/

This Document Relates to the Antitrust Tranche

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS THE
AMENDED ANTITRUST TRANCHE COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT ...................................................................................................................... 3

I.   PLAINTIFFS FAIL TO SUFFICIENTLY PLEAD THAT DEFENDANTS
     AGREED TO CONSPIRE ......................................................................................... 3

     A.   Plaintiffs Do Not Contest That They Fail to Allege Direct Evidence of an
          Agreement. .................................................................................................... 4

     B.   Plaintiffs Do Not Plausibly Allege Circumstantial Evidence of an
          Agreement. .................................................................................................... 4

II.  PLAINTIFFS FAIL TO PLEAD THE REMAINING ELEMENTS OF A
     SECTION ONE CLAIM ........................................................................................... 10

     A.   Plaintiffs' Claim Does Not Qualify for Per Se or "Quick Look" Treatment
          Under the Antitrust Laws. ............................................................................. 11

     B.   Plaintiffs Fail to State a Claim Under the Rule of Reason. ......................... 13

III. PLAINTIFFS' ANTITRUST THEORY IS PRECLUDED BY THE FEDERAL
     SECURITIES LAWS ................................................................................................ 16

     A.   The Dodd-Frank Act Savings Clause Does Not Apply. ............................... 16

     B.   Plaintiffs' Antitrust Claims Are Precluded under Billing Because the
          Conduct at Issue Is Regulated by the Federal Securities Laws. .................. 17

IV.  PLAINTIFFS' CLAIMS SHOULD BE DISMISSED WITH PREJUDICE. ............ 20

CONCLUSION .................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*2301 M Cinema LLC v. Silver Cinemas Acquisition Co.*,
  342 F. Supp. 3d 126 (D.D.C. 2018) ......................................................14

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..............................................................................5

*Associated News, Inc. v. Curtis Circulation Co.*,
  Civ. A. No. H-80-1201, 1986 WL 13791 (S.D. Tex. Dec. 4, 1986) ........6

*Belcher v. Atlantic Capital Realty, LLC.*,
  No. 6:08-cv-1989-Orl-28DAB, 2010 WL 11507399
  (M.D. Fla. Sept. 17, 2010) ...............................................................6, 7

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ...........................................................................3, 6

*In re Blue Cross Blue Shield Antitrust Litig.*,
  26 F. Supp. 3d 1172 (N.D. Ala. 2014) ..................................................12

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993) ...........................................................................14

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962) ..........................................................................2, 13

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
  485 U.S. 717 (1988) ........................................................................12, 13

*Cal. ex rel. Harris v. Safeway Inc.*,
  651 F.3d 1118 (9th Cir. 2011) ............................................................13

*City of Rockford v. Mallinckrodt ARD, Inc.*,
  360 F. Supp. 3d 730 (N.D. Ill. 2019) ..................................................12

*Costco Wholesale Corp. v. Johnson & Johnson Vision Care, Inc.*,
  No. 3:15-CV-734-J-20JRK, 2015 WL 9987969 (M.D. Fla. Nov. 4, 2015)............16

*In re Credit Default Swaps Antitrust Litig.*,
  No. 13-md-2476, 2014 WL 4379112 (S.D.N.Y. Sept. 4, 2014) .............16

*Credit Suisse Sec. (USA) LLC v. Billing*,
  551 U.S. 264 (2007) .............................................................17, 18, 19, 20

*DeLong Equip Co. v. Wash. Mills Abrasive Co.*,
  887 F.2d 1499 (11th Cir. 1989) ............................................................6

*Dunnivant v. Bi-State Auto Parts*,
  851 F.2d 1575 (11th Cir. 1988) ............................................................3

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs., & Antitrust Litig.*,
  336 F. Supp. 3d 1256 (D. Kan. 2018) ....................................................12

*In re Farm-Raised Salmon & Salmon Prods. Antitrust Litig.*,
  No. 19-21551-CIV, 2021 WL 1109128 (S.D. Fla. Mar. 23, 2021) .........................3

*In re Fla. Cement & Concrete Antitrust Litig.*,
  746 F. Supp. 2d 1291 (S.D. Fla. 2010) ...........................................5, 8, 10

*FTC v. Ind. Fed'n of Dentists*,
  476 U.S. 447 (1986) ........................................................................15

*In re High Fructose Corn Syrup Antitrust Litig.*,
  295 F.3d 651 (7th Cir. 2002) .............................................................8, 9

*In re High-Tech Emp. Antitrust Litig.*,
  856 F. Supp. 2d 1103 (N.D. Cal. 2012) ..................................................12

*Hunter v. Booz Allen Hamilton, Inc.*,
  418 F. Supp. 3d 214 (S.D. Ohio 2019) ..................................................12

*In re Interest Rate Swaps Antitrust Litig.*,
  261 F. Supp. 3d 430 (S.D.N.Y. 2017) .....................................................16

*Intergraph Corp. v. Intel Corp.*,
  195 F.3d 1346 (Fed. Cir. 1999) ........................................................14, 15

*Isaksen v. Vermont Casting, Inc.*,
  825 F.2d 1158 (7th Cir. 1987) ............................................................7

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
  626 F.3d 1327 (11th Cir. 2010) .....................................................3, 12, 15

*Kalmanovitz v. G. Heilman Brewing Co.*,
  769 F.2d 152 (3d Cir. 1985) ..............................................................18

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
  465 U.S. 752 (1984) .....................................................................3, 4

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
  172 F.R.D. 119 (S.D.N.Y. 1997) ..........................................................18

*Nat'l Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*,
    779 F.2d 592 (11th Cir. 1986) ................................................................12

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018) .............................................................. passim

*Procaps S.A. v. Patheon, Inc.*,
    845 F.3d 1072 (11th Cir. 2016) ................................................................12

*Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*,
    917 F.3d 1249 (11th Cir. 2019) ................................................................5, 12

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ................................................................16

*Skinner v. Legal Advocacy Center of Central Fla., Inc.*,
    No. 6:11-cv-1760-Orl-37KRS, 2013 WL 5720142 (S.D. Fla. Oct. 21, 2013) ....................4, 5

*Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*,
    376 F.3d 1065 (11th Cir. 2004) ................................................................11

*In re Terzosin Hydrochloride Antitrust Litig.*,
    352 F. Supp. 2d 1279 (S.D. Fla. 2005) ................................................................12

*Toys "R" Us, Inc. v. FTC*,
    221 F.3d 928 (7th Cir. 2000) ................................................................15

*United Am. Corp. v. Bitmain, Inc.*,
    530 F. Supp. 3d 1241 (S.D. Fla. 2021) ................................................................6, 14

*United States v. Gacnik*,
    50 F.3d 848 (10th Cir. 1995) ................................................................6

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ................................................................15

*United States v. Siegler*,
    990 F.3d 331 (4th Cir. 2021) ................................................................6

*In re Urethane Antitrust Litig.*,
    No. 04-1616-JWL, 2013 WL 2097346 (D. Kan. May 15, 2013) ............................................6

*Williamson Oil Co. v. Philip Morris USA*,
    346 F.3d 1287 (11th Cir. 2003) ................................................................8

**Statutes & Rules**

12 U.S.C. § 5303 ................................................................16

15 U.S.C. § 78i ...................................................................................................16, 18, 19

15 U.S.C. § 78j ...................................................................................................16, 18, 19

15 U.S.C. § 78k-1 ............................................................................................................19

15 U.S.C. § 78o ...........................................................................................16, 17, 19, 20

15 U.S.C. § 78q ...............................................................................................................20

15 U.S.C. § 78q-1 ............................................................................................................20

Dodd-Frank Act § 1(a) .....................................................................................................16

Dodd-Frank Act § 6 ..........................................................................................................16

Dodd-Frank Act § 913(g) .................................................................................................17

Dodd-Frank Act § 929X(a) ..............................................................................................17

**Other Authorities**

17 C.F.R. §§ 240.15a-1 to 240.15c6-1 ............................................................................20

17 C.F.R. § 240.15c3-5 ....................................................................................................19

17 C.F.R. §§ 240.17Ab2-1 to 240.17Ab2-2 ....................................................................20

17 C.F.R. §§ 240.17Ad-1 to 240.17Ad-24 ......................................................................20

Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1508 (4th & 5th Eds., 2015-2021) .................................................................................................................13

SEC, *Staff Report on Equity and Options Market Structure Conditions in Early 2021* (October 15, 2021), *available at* https://www.sec.gov/files/staff-report-equity-options-market-struction-conditions-early-2021.pdf ...................................19

SEC, *Thinking About Investing in the Latest Hot Stock?* (Jan. 30, 2021), https://www.sec.gov/oiea/investor-alerts-and-bulletins/risks-short-term-trading-based-social-media-investor-alert ...................................................18, 20

## PRELIMINARY STATEMENT

For more than a year, Plaintiffs have tried to manufacture an antitrust conspiracy where none exists.  After suing dozens of industry participants, Plaintiffs slowly abandoned their claims against nearly all of them.  What remains is their implausible theory that—despite similar restrictions from many other brokers and a well-documented multi-billion-dollar collateral call from its clearing agency—Robinhood implemented the relevant trading restrictions only because doing so would benefit one of its market-makers, Citadel Securities.  But just as the core of Plaintiffs' theory remains the same, so do the fatal flaws.  Plaintiffs fail to identify any new or different factual allegations in their Amended Antitrust Complaint to render this theory any less implausible than it was when Plaintiffs alleged it in the complaint ("Dismissed Antitrust Complaint" or "DAC") the Court previously dismissed (in the "Antitrust Decision").  Indeed, the Amended Antitrust Complaint contains no new material factual allegations to support Plaintiffs' theory.  It instead reflects a reshuffling of old allegations and the addition of unsubstantiated conclusory assertions that still do not support a plausible inference of an agreement between Citadel Securities and Robinhood.  The Amended Antitrust Complaint also fails for two additional legal reasons:  Plaintiffs fail sufficiently to plead competitive harm under the rule of reason and their antitrust claims are precluded by the federal securities laws.  The Amended Antitrust Complaint should be dismissed.

*First*, Plaintiffs point in the Amended Antitrust Complaint to the very same set of communications that the Court previously concluded are "vague and ambiguous emails between two firms in an otherwise lawful, ongoing business relationship" that are not "enough to nudge Plaintiffs' claims across the line from conceivable to plausible."  (Antitrust Decision at 50.)  Plaintiffs do not contest, or even attempt to address, the fact that they continue to rely on the same communications that the Court has already found insufficient to support an inference of conspiracy (*see* Mot. to Dismiss ("MTD") Exhibit A).  Nor do Plaintiffs provide any reason to conclude that those identical communications somehow support an inference of conspiracy now, even though they did not in the prior complaint.  Plaintiffs also rely on the same circumstantial evidence as before, merely adding conclusory statements in an attempt to bolster the inter-firm communications alleged in the Amended Antitrust Complaint.  In the Antitrust Decision, the Court systematically analyzed those allegations of circumstantial evidence and rejected them as insufficient to further a plausible inference of conspiracy.  This conclusion still holds true.  Most

fundamentally, Plaintiffs cannot overcome the obvious alternative (and actual) explanation for the purchase limitations, which is itself alleged in the Amended Antitrust Complaint:  that Robinhood acted in response to the $3 billion collateral call it received from the NSCC on the morning of January 28, 2021, rather than because of some unlawful agreement with Citadel Securities.  The Court should again dismiss Plaintiffs' claim for failure to plausibly plead the existence of an unlawful agreement.  (*See infra* Section I.)

*Second*, having now alleged a vertical (rather than horizontal) conspiracy in the Amended Antitrust Complaint, Plaintiffs fail to plead the harm to competition that the rule of reason requires for such a Section 1 claim.  Specifically, they fail to plead harm to competition in either of the two product markets that they allege—the alleged "upstream" PFOF Market in which Citadel Securities competes, or the alleged "downstream" No-Fee Brokerage Trading App Market in which Robinhood competes.  (*See* AAC ¶¶ 305-315.)  Plaintiffs' alleged harm—"that the stock prices for the Relevant Securities did not appreciate further" (*id.* ¶ 15)—concerns the trading prices of the Relevant Securities, and thus is felt in ***the supposed market for the Relevant Securities***, not either of the markets in which Plaintiffs allege Defendants compete.  In an effort to avoid application of the rule of reason, Plaintiffs now assert in their Opposition, for the first time, a newly constructed framework in which Citadel Securities and Robinhood are *horizontal* competitors in a combined "market for securities trading services."  (Opp. at 23 n.26, 25.)  This is flatly contrary to the Amended Antitrust Complaint, where Plaintiffs allege that "[m]arket makers and brokerages operate at two different levels," and "Citadel (a market maker) operates in a relevant market upstream of that in which Robinhood (a brokerage) operates."  (AAC ¶ 305.)  Plaintiffs' newfound characterization also makes no sense, as antitrust markets are defined by demand substitutability, *see Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962), and the distinction between Defendants' services is plainly evident here.  A consumer could not go to Citadel Securities to obtain an alternative to Robinhood's brokerage services, nor could a market participant obtain Citadel Securities' market-making services from Robinhood.  Therefore, to the extent that Plaintiffs plead any conspiracy, they plead a *vertical* conspiracy between parties operating in different markets, for which the rule of reason applies.  As the standard of review is a matter of law, the Court can and should apply the rule of reason to the alleged agreement at the motion to dismiss stage.  And because Plaintiffs fail to plead harm to competition in either of the

alleged markets in the Amended Antitrust Complaint (*see* AAC ¶¶ 305-315), Plaintiffs fail to state a claim under the rule of reason.  (*See infra* Section II.)

*Third*, the federal securities laws preclude Plaintiffs' antitrust claim.  In opposition, Plaintiffs argue that the federal securities laws do not address collusive conduct—but as explained in Defendants' Motion and below, the crux of Plaintiffs' claims is purported manipulation of the trading prices of the Relevant Securities, which is in the heartland of federal securities regulation.  Plaintiffs cannot escape the scope of the federal securities laws by labeling their claim as an antitrust conspiracy.  For this independent reason, Plaintiffs' Amended Antitrust Complaint should be dismissed.  (*See infra* Section III.)

After more than a year of litigation, review of thousands of documents from the alleged conspirators and three attempts to plead a cognizable antitrust claim, Plaintiffs still have failed adequately to plead an unlawful agreement in restraint of trade.  Given the ample opportunity this Court has already provided Plaintiffs, the Amended Antitrust Complaint should now be dismissed with prejudice.  (*See infra* Section IV.)

## ARGUMENT

## I.    PLAINTIFFS FAIL TO SUFFICIENTLY PLEAD THAT DEFENDANTS AGREED TO CONSPIRE.

The threshold requirement for pleading a Section 1 claim is "to locate the agreement that restrains trade."  (Antitrust Decision at 26 (internal citations omitted).)  Plaintiffs' conspiracy claim should not survive Defendants' motion to dismiss because the claim is not supported by "direct or circumstantial evidence that reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective."  *In re Farm-Raised Salmon & Salmon Prods. Antitrust Litig.*, No. 19-21551-CIV, 2021 WL 1109128, at *10 (S.D. Fla. Mar. 23, 2021) (alteration in original) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)).  Circumstantial evidence does "not support even an inference of conspiracy" if it is "equally consistent with permissible competition."  *Dunnivant v. Bi-State Auto Parts*, 851 F.2d 1575, 1582 (11th Cir. 1988).  "Plausibility is the key, as the 'well-pled allegations must nudge the claim across the line from conceivable to plausible.'"  *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1333 (11th Cir. 2010) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

In their Opposition, Plaintiffs fail to establish that the Amended Antitrust Complaint alleges the requisite agreement.  (Opp. at 7 & n.5.)  *First*, Plaintiffs concede that they

lack direct evidence of an agreement. *Second*, despite claiming they pleaded "ample circumstantial evidence" to infer an agreement (*id.* at 6), Plaintiffs fail to identify a single new allegation that supports the inference of such an agreement from their Amended Antitrust Complaint. Rather, Plaintiffs rely on the exact same communications and rehash the same already rejected circumstantial evidence arguments this Court already reviewed and found insufficient.

Plaintiffs also fail to offer any new argument that casts doubt on the plausibility of the alternative (and true) explanation for why Robinhood put purchasing restrictions in place. As before, Plaintiffs themselves continue to allege what is an obvious alternative explanation—the restrictions arose from "increased collateral requirements caused by market volatility." (Antitrust Decision at 37.) If anything, Plaintiffs' conspiracy claim has become *less* plausible than it was when the Court dismissed the previous complaint. Plaintiffs no longer allege that any other brokers were part of the conspiracy, and have thus abandoned any allegations that those brokers imposed restrictions similar to Robinhood's for any improper reasons. In that context, with various other market actors imposing similar restrictions for business reasons entirely unrelated to any alleged conspiracy, that is all the more reason to reject as implausible Plaintiffs' claim that Robinhood imposed the purchasing restrictions only because it agreed to do so to help Citadel Securities.

### A. Plaintiffs Do Not Contest That They Fail to Allege Direct Evidence of an Agreement.

Defendants demonstrated in their Motion that Plaintiffs failed to plead any direct evidence of a purported agreement between Citadel Securities and Robinhood. (MTD at 14.) Plaintiffs do not dispute their failure to plead direct evidence. (*See* Opp. at 8-20.) Plaintiffs have therefore waived any argument that they have pleaded direct evidence of an agreement. *See Skinner v. Legal Advocacy Center of Central Fla., Inc.*, No. 6:11-cv-1760-Orl-37KRS, 2013 WL 5720142, at *2 n.3 (S.D. Fla. Oct. 21, 2013).

### B. Plaintiffs Do Not Plausibly Allege Circumstantial Evidence of an Agreement.

Plaintiffs' lack of direct evidence of an agreement means they must plead a plausible inference of conspiracy through circumstantial evidence to survive dismissal. (MTD at 14-15.) As set out in Defendants' Motion, such circumstantial evidence must demonstrate "a conscious commitment to a common scheme designed to achieve an unlawful objective." (*Id.* at 15 (quoting *Monsanto*, 465 U.S. at 764).) The Court "may infer from the factual allegations in

the complaint obvious alternative explanations, which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1308 (S.D. Fla. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009)). (*See* Antitrust Decision at 37-38.)  None of the supposed circumstantial evidence addressed by Plaintiffs supports a reasonable inference of conspiracy.

        <u>**Inter-Firm Communications.**</u>  Plaintiffs rely on the same communications between Citadel Securities and Robinhood that this Court previously concluded are insufficient to plausibly plead a conspiracy.  (*Id.* at 49-50.)  As noted above, Defendants' Motion demonstrated this fact through a side-by-side comparison chart.  (MTD at 16 & Ex. A.)  Plaintiffs offer *no response* to that comparison, effectively conceding that they have no new allegations or inter-firm communications to support a plausible inference of a conspiracy.[1]

        With no new factual allegations to rely upon, Plaintiffs simply try to add their own spin to the communications the Court already reviewed and found insufficient.[2]  But "[c]onclusory allegations of agreement or conspiracy are insufficient." *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1262 (11th Cir. 2019) (en banc);

---

[1] In their Opposition, Plaintiffs assert that "Defendants' executives acted in ways consistent with advanced knowledge of the conspiracy" and "Defendants' executives were dumping their stock," even though this lacks any support in the Antitrust Amended Complaint.  (Opp. at 9, 12.)  As shown in Exhibit A, the sole new communication is an internal message from Mr. Swartwout to another Robinhood employee on January 26, 2021, which the Court already reviewed in connection with its dismissal of the Robinhood Tranche's Consolidated Amended Complaint (Order, ECF No. 453).  In that message, Mr. Swartwout reported selling his "AMC today," and informed his colleague that Robinhood would set a 100% margin requirement on GME (a different stock) on January 27.  (AAC ¶ 234.)  Mr. Swartwout's message was about margin requirements (not part of the alleged conspiracy), not the purchase limitations imposed *after* Robinhood received the $3 billion collateral call from the NSCC.  (MTD at 16 n.10.)  Indeed, discussing a margin requirement would make little sense if Robinhood intended to prohibit purchases, as initial margin pertains to the amount of cash on hand a customer must have to purchase a stock.  Although Plaintiffs suggest that Mr. Swartwout may have sold his AMC shares in connection with a separate email exchange between a different Robinhood employee, Josh Drobnyk, and a Citadel Securities employee the prior day (Opp. at 9-10; *see also* AAC ¶¶ 229-230), this is rank speculation.  Mr. Swartwout did not receive Mr. Drobnyk's email, and that email does not refer to *any* stocks, let alone a plan to impose purchase limits on any stocks.

[2] Plaintiffs' assertion—which Defendants strongly dispute—that Citadel Securities was unsurprised by Robinhood's purchase restrictions (Opp. at 6 n.4, 11) is unsupported and is contradicted by Citadel Securities' internal emails produced to Plaintiffs and cited in the Robinhood Tranche Amended Complaint.  (ECF No. 409 ¶ 220 ("this may cause some big moves").)

*Twombly*, 550 U.S. at 557.  Put differently, a "complaint must state facts—not conclusions—that plausibly suggest a conspiracy." *United Am. Corp. v. Bitmain, Inc.*, 530 F. Supp. 3d 1241, 1256 (S.D. Fla. 2021).  There are no such facts here, and this case is a far cry from those on which Plaintiffs rely, each of which involved robust factual allegations of inter-firm communications indicative of conspiracy not present here.[3]

 **Pattern of Concealment.**  Plaintiffs argue that Defendants engaged in a "pattern of concealment" because "the written records that Plaintiffs have obtained" allegedly show that Robinhood and Citadel Securities did not document their communications in writing and because some communications occurred over the phone.  (Opp. at 14-15.)  In effect, Plaintiffs ask the Court to infer a conspiracy because (i) the documents they have obtained provide no evidence of a conspiracy and (ii) Citadel Securities and Robinhood (two entities with an ongoing and lawful business relationship) had some oral communications.[4]  Plaintiffs made the exact same arguments concerning the Dismissed Antitrust Complaint (*see* Pls.' Opp. to Defs.' Mot. to Dismiss the DAC, ECF No. 413 at 16), and the Court properly rejected them (Antitrust Decision at 44-45 ("The Court will not infer a conspiracy simply because two business partners chose to use phones to communicate.")).  Plaintiffs have alleged no new facts to alter the Court's conclusion this go-around, and none of the cases they cite support a different outcome.[5]

---

 [3] *See, e.g.*, *DeLong Equip Co. v. Wash. Mills Abrasive Co.*, 887 F.2d 1499, 1511 (11th Cir. 1989) (finding sufficient evidence of agreement on summary judgment in part because defendant made payment to price fixing co-conspirator alleged to be share of inflated profits); *Associated News, Inc. v. Curtis Circulation Co.*, Civ. A. No. H-80-1201, 1986 WL 13791, at *6 (S.D. Tex. Dec. 4, 1986) (finding, on summary judgment, sufficient evidence of conspiracy in part because two witnesses claimed defendant agreed to deal exclusively with co-defendant).

 [4] Try as they might to avoid this characterization of their argument (Opp. at 15 n.13), Plaintiffs cannot escape the fact that they explicitly argue that the Court should infer a conspiracy because "communications between the two companies" were conducted "only in person, via telephone or through lawyers with no written record" (*id*. at 14).

 [5] The concealment cases to which Plaintiffs cite include detailed allegations of attempts to obscure the defendants' activities, which are not present here.  *See, e.g.*, *United States v. Siegler*, 990 F.3d 331, 339 (4th Cir. 2021) (upholding conspiracy verdict in part because familiarity of defendants and use of coded language provided evidence defendant acted as middleman); *In re Urethane Antitrust Litig.*, No. 04-1616-JWL, 2013 WL 2097346, at *11 (D. Kan. May 15, 2013) (holding destruction of documents may be evidence of conspiracy); *United States v. Gacnik*, 50 F.3d 848, 852 (10th Cir. 1995) (hiding explosives in basement and denying knowledge of them was evidence of conspiracy).  One of Plaintiffs' cited cases, *Belcher v. Atlantic Capital Realty*,

**Motive to Collude.**  Plaintiffs claim that Robinhood's PFOF business relationship with Citadel Securities gave it a motive to implement the relevant restrictions to benefit Citadel Securities.  (Opp. at 9, 15-17.)  This Court already considered those very allegations and found them insufficient to support an inference of conspiracy.  (*See* Antitrust Decision at 37 ("The mere fact that Citadel Securities is an important business partner of the other Defendants does not provide sufficient motive to conspire.").)  In doing so, the Court noted that there were "no allegations that Citadel Securities threatened or suggested it would cut off business relationships with [Robinhood] if [it] did not impose trading restrictions."  (*Id.*)  Plaintiffs have added no new substantiated allegations in the Amended Antitrust Complaint to warrant a different conclusion.  Instead, they suggest in opposition that the Court's prior analysis was incorrect by claiming that whether Citadel Securities coerced Robinhood "is of no moment."  (Opp. at 12.)  But that entirely misses the point.  As the Court previously held, a pre-existing business relationship itself cannot give rise to a motive to collude.  It is implausible to believe that, with no allegation of coercion, Robinhood would act against its own interest simply to benefit Citadel Securities.[6]

Plaintiffs also fail to explain why, even if Citadel Securities *had* coerced Robinhood, Robinhood would not "simply use another market maker in such a scenario." (Antitrust Decision at 37.)  As Plaintiffs themselves allege, Robinhood had existing relationships with other market makers.  (AAC ¶¶ 78, 84.)  While Plaintiffs baldly assert in opposition that, "[h]ad Robinhood availed itself of alternatives to Citadel, Robinhood would have foregone PFOF revenue" (Opp. at 20), Plaintiffs concede in their Amended Antitrust Complaint that Robinhood earns PFOF revenue from *all* market makers to which it routes orders (AAC ¶¶ 76, 78).  Nowhere do Plaintiffs allege that Citadel Securities paid higher PFOF fees to Robinhood than any other market makers.  Thus, as the Court noted in the Antitrust Decision, the economically rational response on Robinhood's part to a hypothetical demand from Citadel Securities to impose purchase limitations would be to route order flow to other market makers

---

*LLC*, does not address concealment at all.  No. 6:08-cv-1989-Orl-28DAB, 2010 WL 11507399, at *5 (M.D. Fla. Sep. 17, 2010).

[6] Plaintiffs' reliance on *Isaksen v. Vermont Casting, Inc.*, 825 F.2d 1158 (7th Cir. 1987), is misplaced.  *Isaksen* actually involved a threat by a supplier to a retailer to coerce the retailer into agreeing to fix prices.  *See id.* at 1163.  No evidence—or allegation—of a threat is present here.

and continue earning PFOF.[7]  Plaintiffs therefore fail to offer a plausible argument that Robinhood had any motive to collude with Citadel Securities to impose the purchase limits.

**Market Structure.**  Plaintiffs claim that certain characteristics of the "market in which Defendants operate" support an inference of conspiracy.  (Opp. at 17.)  But Plaintiffs misunderstand how market structure can provide circumstantial evidence of a conspiracy—market structure does so only when its features facilitate anticompetitive coordination, such as price-fixing among competitors.  *See Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1317 (11th Cir. 2003).  Where a market's structure is equally consistent with legal activities, it provides no evidence of an agreement.  *See id*. at 1317 & n.18 (holding allegations of market's high barriers to entry, inelastic demand and fungible product were not "probative of collusive behavior").

As Judge Posner explained in *High Fructose Corn Syrup*—the only case on which Plaintiffs rely—the market structure factors that gave rise to the inference of a conspiracy there included the presence of few sellers, a uniform product (due to standardization) and a lack of product substitutes.  295 F.3d 651, 655-57 (7th Cir. 2002).  Here, by contrast, there are numerous brokers from which customers can choose, and the retail brokerage market (if such a market exists) is not one with a uniform, undifferentiated product.  Indeed, Plaintiffs themselves allege that Robinhood "offer[s] an easy to use" "investment mobile app experience."  (AAC ¶ 324.)  And, while Plaintiffs allege high barriers to entry, they fail to explain how those factors could support an inference of the vertical conspiracy that they allege, nor do they cite any authority supporting how such barriers could do so.  (*Id.* ¶¶ 372-378.)  Nor could they.  As a legal matter, allegations of high barriers to entry are insufficient to constitute circumstantial evidence of an agreement.  *See Williamson*, 346 U.S. at 1317; *Fla. Cement*, 746 F. Supp. 2d at 1317 ("[N]one of these features [including high barriers to entry] make conspiracy a more plausible explanation . . . .").  As a factual matter, the alleged barriers to entry provide no support for the existence of an agreement because customers could open accounts with other retail brokers (alleged to operate in the same product market as Robinhood) and continue purchasing the

---

[7] Plaintiffs' assertion that "other alternative market makers did not have the capacity to route orders had Citadel Securities refused" (Opp. at 20) has no support and does not appear as an allegation in the Amended Antitrust Complaint.  Plaintiffs' assertion that Robinhood would not go to a public exchange is entirely a *non sequitur* distracting from the evident presence of other market makers.  (*See id.*; *see also* MTD at 20 n.15.)

Relevant Securities.  Indeed, at least one named plaintiff—Plaintiff Minahan—opened an account with Fidelity during the putative class period.  (AAC ¶ 30.)

**Market Effects.**  Plaintiffs allege that the Court may infer a conspiracy because, after brokers imposed the trading restrictions, "the market behaved in a noncompetitive manner" and the prices of the Relevant Securities fell.  (Opp. at 17-18.)  But the fact that Robinhood (and other brokers not alleged to have been part of any agreement) imposed restrictions provides no evidence whatsoever that the restrictions were the result of an agreement between Robinhood and Citadel Securities.  (AAC ¶¶ 195, 366.)[8]  Indeed, the fact that many other brokers that are not alleged to be part of any conspiracy, such as WeBull, E*Trade and others, imposed similar restrictions directly ***undermines*** Plaintiffs' assertion that the market effects must demonstrate conspiratorial behavior.  (*See* Antitrust Decision at 38.)

**Pretextual Explanations.**  Finally, Plaintiffs argue that the Court should infer a conspiracy because Robinhood made allegedly pretextual statements explaining that it imposed the purchase restrictions due to the market volatility and collateral requirements.  (Opp. at 18.)  Once again, the Court has already rejected Plaintiffs' pretext argument and Plaintiffs offer no justification for reaching a different conclusion now.  (*See* Antitrust Decision at 45-47.)  As Plaintiffs (correctly) allege, the NSCC increased Robinhood's deposit requirements to over $3 billion on the morning of January 28 and Robinhood put the purchase restrictions in place shortly thereafter.  (AAC ¶¶ 178-179.)  Robinhood continued the restrictions after meeting its deposit requirements that morning because, as the Court found plausible, doing so "reduce[d] the volatility multiplier on the collateral that Robinhood Securities was required to post with the NSCC."  (Antitrust Decision at 46.)  In short, there was no pretext, and none of the challenged statements proves otherwise, let alone gives rise to any inference of a conspiracy.

\*     \*     \*

---

[8] Plaintiffs again cite only to *High Fructose Corn Syrup*, 295 F.3d at 655.  But Plaintiffs' allegations concerning market effects are entirely different from those held sufficient to demonstrate circumstantial evidence of a conspiracy in that case.  There, the defendants' uniform, synchronous and industry-wide price increases were evidence of agreement.  *Id*.  Here, Plaintiffs have abandoned any allegation that Robinhood acted in tandem with other brokers and instead allege (implausibly) that the institution of trading restrictions—including by other brokers not part of the alleged conspiracy—may serve as circumstantial evidence of a vertical conspiracy between Robinhood and Citadel Securities.

As discussed above, none of the factual allegations in the Amended Antitrust Complaint gives rise to a plausible inference of a conspiracy. That alone is fatal to Plaintiffs' claim. But their continued insistence that the challenged purchase restrictions must have been the result of an illegal conspiracy also remains "even less plausible given that the [Amended Complaint] provides an 'obvious alternative explanation' for imposing trading restrictions"—the increased collateral requirements during heightened market volatility. (*Id.* at 37.)[9] Plaintiffs' counterargument—that Robinhood Securities maintained the purchase restrictions after meeting its deposit requirements on the morning of January 28, 2021—fails to acknowledge that "the trading restrictions reduced the volatility multiplier on the collateral that Robinhood was required to post with the NSCC." (*Id.* at 46.) If Robinhood had removed the restrictions, it follows that the volatility multiplier would have again increased. Nothing here has changed, except that Plaintiffs now have abandoned any conspiracy allegation against other brokers that *also* implemented various purchase limits concerning a number of the Relevant Securities. (MTD at 18-19.) Plaintiffs cannot explain why Robinhood supposedly imposed restrictions for illegitimate reasons while other brokers (who Plaintiffs no longer allege were part of a conspiracy) did so due to market volatility. (*Id.*) Having failed to plead any direct evidence of an agreement, and having failed to adequately plead circumstantial evidence of agreement, Plaintiffs fail to state a claim under Section 1 of the Sherman Act.

## II.   PLAINTIFFS FAIL TO PLEAD THE REMAINING ELEMENTS OF A SECTION ONE CLAIM.

In addition to failing to plausibly allege the existence of an agreement, Plaintiffs also fail to address the other fundamental flaw in their Section 1 claim. As Defendants explained, Plaintiffs fail to plead anticompetitive harm in either of their two alleged markets: the "upstream" PFOF Market (in which Citadel Securities is alleged to compete) or the "downstream" No-Fee Brokerage Trading App Market (in which Robinhood is alleged to compete). (MTD at 25.) Instead, they allege harm in the trading prices of the Relevant

---

[9] Plaintiffs erroneously suggest that it is improper for the Court to consider alternative explanations for Robinhood's conduct on a motion to dismiss. (Opp. at 11-12.) But the Court may "infer from the factual allegations in the complaint obvious alternative explanations, which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Fla. Cement*, 746 F. Supp. 2d at 1308 (citation, internal quotations and alteration omitted). Indeed, the Court properly applied this reasoning to dismiss the DAC. (*See, e.g.*, Antitrust Decision at 37.)

Securities, which are in a third, wholly separate (and undefined) market.  (*Id.* at 25-27.)  Thus, Plaintiffs fail to plead anticompetitive harm in any relevant product market.  *See Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1073 (11th Cir. 2004) (noting that "specific allegations linking market power to harm to competition *in that market*" are required) (emphasis added).

Rather than respond directly to this argument in opposition, Plaintiffs devote five pages of briefing to arguing issues, including market definition and market power, that were *not* the basis of Defendants' Motion.  (Opp. at 25-30.)  This is a red herring because, while Defendants dispute Plaintiffs' flawed market definition and allegations of market power, for purposes of this Rule 12(b)(6) Motion, Defendants have already accepted those allegations as true.  (MTD at 25-27.)  Plaintiffs' long preliminary discussions about market definition and market power thus serve only to obscure that they have no response to Defendants' showing that Plaintiffs fail to plead anticompetitive harm in either of the markets defined in the Amended Antitrust Complaint.  (*Id.*)  Indeed, Plaintiffs' response to Defendants' argument is essentially relegated to three short paragraphs at the conclusion of Section IV of the Opposition, in which Plaintiffs cite no authorities that support their argument and—fatally to their claim—simply reiterate that the alleged harm to competition is that, "[w]hen the prices of the Relevant Securities dropped due to Defendants' scheme, Retail Investors sold the Relevant Securities at lower prices."  (Opp. at 31.)

As a result, under the rule of reason, the standard of review in a vertical restraint case such as this (*see infra* Section II.A), Plaintiffs fail to plead a Section 1 claim because they fail to allege harm to competition in a relevant product market (*see infra* Section II.B).  For this independent reason, Plaintiffs' claim should be dismissed with prejudice.

### A. Plaintiffs' Claim Does Not Qualify for *Per Se* or "Quick Look" Treatment Under the Antitrust Laws.

As explained in Defendants' Motion, the Court may determine at the motion to dismiss stage whether the *per se* or rule of reason standard applies to a Section 1 claim.  (MTD at 22-23.)  This holds particularly true where, as here, the plaintiff alleges that the defendants entered into a vertical agreement.  That is because courts emphasize that only "'horizontal restraints'—restraints 'imposed by agreement between *competitors*'—qualify as unreasonable *per se*."  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283-84 (2018).  Vertical agreements (other than tying arrangements not alleged here) are assessed under the rule of reason.  *See id.* at 2284.

Plaintiffs' cases underscore this basic statement of law.  (Opp. at 22-23 (citing *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988)).)

Here, Plaintiffs allege that Citadel Securities operates in an "upstream" market and Robinhood operates in a "downstream" market.  (AAC ¶ 305.)  Indeed, Plaintiffs' theory is predicated on a vertical relationship:  Plaintiffs allege that Citadel Securities leveraged its market-maker services relationship with Robinhood to pressure Robinhood into enacting purchasing limits on its brokerage customers.  (AAC ¶¶ 233, 236, 246.)  Therefore, the Court should apply the rule of reason to Plaintiffs' claim.  *See, e.g.*, *Nat'l Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*, 779 F.2d 592, 596 (11th Cir. 1986).  Plaintiffs' arguments are unavailing.

*First*, Plaintiffs urge the Court to defer any ruling on whether to apply the *per se* standard of review, calling for a fact-intensive inquiry.  (Opp. at 21-22.)  Plaintiffs' position is contrary to Eleventh Circuit law, which authorizes determining, on a motion to dismiss, whether a claim is subject to *per se* liability.  *Tempur-Pedic*, 626 F.3d at 1334-36; *Quality Auto*, 917 F.3d at 1271-72.  A fact-intensive inquiry is inappropriate and not required for a vertical agreement as alleged here, which cannot be subject to a *per se* standard.  *See Am. Express*, 138 S. Ct. at 2284.  Indeed, nearly all of the authorities on which Plaintiffs rely involve types of agreements where the *per se* standard *may* apply (depending on the facts):  horizontal agreements and tying arrangements.[10]

*Second*, Plaintiffs attempt to recast their claim as a horizontal agreement between Citadel Securities and Robinhood, perplexingly arguing that Citadel Securities and Robinhood Securities are "on the same horizontal level of distribution."  (Opp. at 23 n.26.)  This new

---

[10] *See Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072 (11th Cir. 2016) (alleging a horizontal market allocation agreement); *In re Blue Cross Blue Shield Antitrust Litig.*, 26 F. Supp. 3d 1172, 1186 (N.D. Ala. 2014) (alleging a horizontal market allocation agreement among health insurers); *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103 (N.D. Cal. 2012) (alleging a horizontal "Do Not Cold Call" agreement between employers); *Hunter v. Booz Allen Hamilton, Inc.*, 418 F. Supp. 3d 214 (S.D. Ohio 2019) (alleging a horizontal agreement between employers); *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs., & Antitrust Litig.*, 336 F. Supp. 3d 1256 (D. Kan. 2018) (alleging illegal tying practices); *In re Terzosin Hydrochloride Antitrust Litig.*, 352 F. Supp. 2d 1279 (S.D. Fla. 2005) (alleging a horizontal pay-for-delay agreement between pharmaceutical companies).  And the district court in *City of Rockford v. Mallinckrodt ARD, Inc.* noted that vertical agreements are ordinarily analyzed under the rule of reason, but deferred doing so because of a separate transaction in the case subject to a Section 2 monopolization claim.  360 F. Supp. 3d 730, 753-54 (N.D. Ill. 2019).

argument flatly contradicts the complaint, where Plaintiffs clearly allege two markets (AAC ¶¶ 305-315) and allege expressly that "[m]arket makers and brokerages operate at two different levels" (*id.* ¶ 305).  It is also plainly incorrect.  An alleged conspiracy is "horizontal" only when the actors are competitors in the same market.  *Am. Express*, 138 S. Ct. at 2283-84.  By contrast, an alleged conspiracy is "vertical" when the actors operate in different markets and instead are in a chain of distribution with each another (for example, a supplier and a manufacturer, or a manufacturer and a distributor).  *See Bus. Elecs.*, 485 U.S. at 730.  Under the antitrust laws, a market is defined to mean that participants offer reasonably interchangeable substitutes.  *See Brown Shoe*, 370 U.S. at 325.  The brokerage services that Robinhood offers and the market-maker services that Citadel Securities offers are not substitutes.  (*Compare* AAC ¶¶ 43-44, 68, 83 (Robinhood's retail brokerage services), *with id.* ¶¶ 84-85 (Citadel Securities' market-making services to brokerages).)  A consumer who wants brokerage services cannot obtain them from Citadel Securities; a brokerage (*e.g.*, a Robinhood competitor) seeking market-maker services for execution of a trade cannot obtain such services from Robinhood.  The conspiracy that Plaintiffs allege can only be vertical.

    *Third*, Plaintiffs suggest in the alternative that the "quick look" standard of review should apply.  (Opp. at 23.)  But Plaintiffs cite no cases applying "quick look" review to a vertical agreement.  Indeed, "[m]ost of the antitrust cases that have explicitly considered a 'quick look' approach involved restraints within the context of a joint venture, professional association, network, or other joint association whose legitimacy was not in question."  Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1508 (4th & 5th Eds., 2015-2021) (last updated Sept. 2021).  No such arrangement is alleged here.[11]

    For these reasons, the Court should apply the rule of reason to Plaintiffs' claim.

   **B.**  **Plaintiffs Fail to State a Claim Under the Rule of Reason.**

    Plaintiffs' Section 1 claim fails because they do not plead harm to competition.  An antitrust plaintiff has the "initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers *in the relevant market*."  *Am. Express*,

---

[11] Moreover, Plaintiffs' own cases reject applying "quick look" review.  *See Cal. ex rel. Harris v. Safeway Inc.*, 651 F.3d 1118, 1137 (9th Cir. 2011) (en banc) (rejecting "quick look" analysis because the "limited duration" of the restraint and "the existence of other significant external competitors in the market" rendered any anticompetitive effects "not obvious").

138 S. Ct. at 2284 (emphasis added).  To be in the relevant market, the harm must be in "the area of effective competition" where the defendant operates and the "prohibited conduct must be directed towards competitors and must be intended to injure competition." *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1353 (Fed. Cir. 1999) (internal quotations omitted); *see also Bitmain*, 530 F. Supp. 3d at 1266 ("Before the Court can evaluate harm to competition, it must know the market where this alleged harm has taken place.").

In their Motion, Defendants demonstrated that Plaintiffs fail to plead anticompetitive harm in either of their alleged product markets:  the No-Fee Brokerage Trading App Market or the PFOF Market.  (MTD at 25-27.)  Instead, the harm Plaintiffs assert occurs in a distinct (and undefined) market, the ***market for the Relevant Securities***, and results from the "supply and demand" forces for trading securities.  (AAC ¶¶ 99, 354-355.)  Indeed, Plaintiffs' Opposition repeats the same theory, contending that "Defendants harmed competition by restraining consumer choice and artificially influencing the price of the Relevant Securities.  In so doing, they divorced the price of the Relevant Securities from the fundamental economics of supply and demand."  (Opp. at 30; *see also id.* at 6, 8, 28, 31.)  The alleged harm to competition is in the supposed market for the Relevant Securities, and is ***not*** felt in either the PFOF Market or the No-Fee Brokerage Trading App Market.

Plaintiffs' response misses the mark.  (*Id.* at 31-32.)  *First*, Plaintiffs contend that "Defendants attempt to misdirect the focus . . . on competition between Robinhood and the other brokerage services for customers or between Citadel Securities and other market makers."  (*Id.* at 31.)  But this is not misdirection.  Plaintiffs rightly observe the first part of the formulation that the "basic focus of the antitrust laws" is "the 'protection of *competition*, not *competitors*.'"  (*Id.* (citing *2301 M Cinema LLC v. Silver Cinemas Acquisition Co.*, 342 F. Supp. 3d 126, 137 (D.D.C. 2018).)  But the focus of the antitrust laws is on competition *in the alleged product markets*, which here (according to Plaintiffs' Amended Antitrust Complaint) are the No-Fee Brokerage Trading App Market and the PFOF Market.

*Second*, Plaintiffs try to mask the market jumping nature of their asserted harm by arguing "reduced output" of Robinhood's brokerage services.  (Opp. at 28.)  This argument makes no sense.  In antitrust law, a "reduction in output" refers to a reduction in product volume to create an artificially high price for that product. *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 233 (1993) ("Supracompetitive pricing entails a

restriction in output.").  Nothing of the sort occurred in the brokerage market here, where Robinhood continued to offer commission-free retail brokerage accounts to any member of the public (there was no reduction in output) and Robinhood's brokerage services remained free of charge to customers (there was no increase in price).  Plaintiffs do not allege otherwise.  (*See, e.g.*, AAC ¶¶ 8, 69, 73.)  The supposed "reduction in output" is merely a reduction in the number of purchase orders for the Relevant Securities, which has nothing to do with harm to competition in the alleged markets.

In any event, Plaintiffs quickly pivot back to the real focus of their theory:  that the harm to competition is felt in "the pricing of the Relevant Securities" and Defendants' alleged interference with "the price discovery that would have occurred through the operation of supply and demand."  (Opp. at 28-29; *see also id.* at 31 ("When the prices of the Relevant Securities dropped due to Defendants' scheme, Retail Investors sold the Relevant Securities at lower prices—the precise result Defendants desired."); *id.* at 31 n.38 ("The harm can be estimated by the amount lost when Plaintiffs were unable to sell the Relevant Securities due to the trading restrictions.").)  As explained above, this alleged harm is in a market for the Relevant Securities, not in either the PFOF Market (in which Citadel Securities allegedly competes) or the No-Fee Brokerage Trading App Market (in which Robinhood allegedly competes).  Plaintiffs do not, and cannot, plead that competitors were foreclosed from either of the alleged markets or that prices rose in either of those markets.  Accordingly, the anticompetitive harm Plaintiffs assert is outside "the area[s] of effective competition" in which Defendants operate—*i.e.*, it occurs in the unalleged market for the Relevant Securities—and for this reason, Plaintiffs' Section 1 claim fails.  *Intergraph*, 195 F.3d at 1353.[12]

---

[12] None of Plaintiffs' cited authorities supports their theory of harm because in each case the anticompetitive effects arose in the market in which the defendant operated.  *See Am. Express*, 138 S. Ct. at 2284 ("[T]he plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market."); *Tempur-Pedic*, 626 F.3d at 1339 (same); *United States v. Microsoft Corp.*, 253 F.3d 34, 52 (D.C. Cir. 2001) (en banc) (holding harm in market for operating systems for Intel compatible PCs, in which defendant operated, was sufficient); *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000) (affirming finding that horizontal agreement between toy manufacturers resulted in anticompetitive harm in toy retailer market, in which defendant operated); *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 456-57 (1986) (affirming finding that alleged agreement among dentists to withhold x-rays harmed market for dentistry insurance, in which defendants participated);

### III.    PLAINTIFFS' ANTITRUST THEORY IS PRECLUDED BY THE FEDERAL SECURITIES LAWS.

Plaintiffs' antitrust claims are also precluded by federal securities law.

### A.    The Dodd-Frank Act Savings Clause Does Not Apply.

Plaintiffs try to avoid preclusion of their claims by relying on the Dodd-Frank Act's antitrust savings clause.  As Defendants showed in their Motion, that reliance is misplaced. (MTD at 34-35.)  Section 6 of the Dodd-Frank Act states that "*[n]othing in this Act, or any amendment made by this Act*, shall be construed to modify, impair, or supersede the operation of any of the antitrust laws, unless otherwise specified."  12 U.S.C. § 5303 (emphasis added). "[T]his Act" refers to the Dodd-Frank Act, not the Exchange Act, *see* Dodd-Frank Act §§ 1(a), 6, 124 Stat. 1376, 1390 (2010), and the savings clause is codified in title 12 (banks and banking), not title 15 (where the securities laws appear).  *See* 12 U.S.C. § 5303.

The savings clause in the Dodd-Frank Act thus applies to conduct covered by the Dodd-Frank Act or amendments made by that Act—concerning security-based swap agreements (MTD at 34)—but *not* conduct covered by pre-existing provisions of the Exchange Act or other statutes otherwise unamended by the Dodd-Frank Act.  *See In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 495-98 (S.D.N.Y. 2017) (holding the Dodd-Frank Act savings clause applied to alleged conspiracy among interest rate swap dealers, where Act regulated swap markets); *In re Credit Default Swaps Antitrust Litig.*, No. 13-md-2476, 2014 WL 4379112, at *16-17 (S.D.N.Y. Sept. 4, 2014) (same for credit default swaps).

The conduct that Plaintiffs allege was unlawful is *not* conduct the Dodd-Frank Act covers.  Rather, pre-existing market manipulation provisions of the Exchange Act, which the Dodd-Frank Act did *not* amend, cover the "manipulation of the prices of the Relevant Securities" that Plaintiffs allege (AAC ¶ 354).  *See* Exchange Act § 15(c)(2)(D), 15 U.S.C. § 78o(c)(2)(D); Exchange Act § 9(a)(6), 15 U.S.C. § 78i(a)(6); Exchange Act § 10(b), 15 U.S.C. § 78j(b).  Nor did the Dodd-Frank Act amend the Exchange Act provisions concerning broker risk mitigation and management.  (*See infra* Section III.B.)  Plaintiffs try to shoehorn their claims into the Dodd-

---

*Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1444 (9th Cir. 1995) (alleged agreement to fix predatory prices harmed the retail gasoline market, in which defendants operated); *Costco Wholesale Corp. v. Johnson & Johnson Vision Care, Inc.*, No. 3:15-CV-734-J-20JRK, 2015 WL 9987969 (M.D. Fla. Nov. 4, 2015) (holding allegations of vertical resale price maintenance agreement adequately alleged harm in market for contact lenses, in which defendants operated).

Frank Act's savings clause by asserting that provisions of the Dodd-Frank Act "touch upon issues alleged in the Amended Complaint," namely short-selling.  (Opp. at 33.)  But the unlawful conduct that Plaintiffs allege in this case concerns purchase restrictions that Robinhood imposed on its stock trading platform, *not* any short-selling activity.  (*See id.* at 1.)  Plaintiffs' (unsupported) suggestion that Citadel Securities' alleged short sales provided a *motive* for the alleged conspiracy does not make short sales an object of the conspiracy or bring this action within the ambit of the Dodd-Frank Act.  Indeed, Plaintiffs acknowledge that their claims "do not attack or seek to prohibit short selling generally."  (*Id.* at 40.)[13]

Plaintiffs' reliance on Section 929X(a) of the Dodd-Frank Act is equally misplaced.  That section authorizes the SEC to issue rules regarding the public disclosure of short positions on a monthly basis.  124 Stat. at 1870.  To date, the SEC has not issued regulations under the provision, and if the SEC had done so by late January 2021, they would have been limited to monthly disclosure of short positions, which would have had no impact on Plaintiffs' claims, and could not have prohibited short selling.[14]

As a result, Plaintiffs do not—and, as set out in Defendants' Motion, cannot—show that the Dodd-Frank Act or any of the amendments it made cover the trading restrictions at issue in this action.  (MTD at 34-35.)  Therefore, the Act's antitrust savings clause does not apply.[15]  And, as the Supreme Court held in *Credit Suisse Sec. (USA) LLC v. Billing*, 551 U.S. 264, 275 (2007), the general savings clause in the Exchange Act is not "so broad as to preserve all antitrust actions" and does not prevent implied preclusion of Sherman Act claims.

### B.   Plaintiffs' Antitrust Claims Are Precluded under *Billing* Because the Conduct at Issue Is Regulated by the Federal Securities Laws.

The conduct underlying Plaintiffs' claims is regulated by the securities laws, and

---

[13] Plaintiffs note that "Dodd-Frank also has specific provisions related to market making" without explaining how this statement relates to the alleged antitrust conspiracy.  (*Id.* at 33.)  In any event, as with short sales, Plaintiffs do not allege that Citadel Securities' market-making activities were unlawful.

[14] The SEC recently proposed regulations under Section 929X, requiring institutional investment managers to make monthly disclosure of short positions.  SEC Release No. 34-94313, 87 Fed. Reg. 14,950, 15,015-16 (Mar. 16, 2022) (proposed 17 C.F.R. § 240.13f-2).

[15] Plaintiffs also argue that the Dodd-Frank Act modified portions of "Section 15 of the Securities Exchange Act" without providing any explanation as to how this relates to their case. (Opp. at 33.)  In fact, these amendments, *see* Dodd-Frank Act § 913(g), 124 Stat. at 1828 (adding 15 U.S.C. § 78o(k)-(*l*)), have nothing to with the Exchange Act provisions relevant to this action.

Plaintiffs' antitrust claims are accordingly precluded—regardless of whether the Securities Tranche Plaintiffs state a claim.[16]   Each of the four *Billing* factors weighs in favor of preclusion.

### i.      The Conduct at Issue Lies at the Very Heart of the Securities Market.

Plaintiffs argue that the first *Billing* factor weighs against preclusion because "Defendants do not—and—cannot demonstrate how cutting off retail investors' access to the securities market by restricting trading" is "central to the proper functioning of well-regulated markets."  (Opp. at 35-36.)  Plaintiffs' argument fails for two reasons.  *First*, Defendants showed in their Motion that market integrity for stock prices, and the prohibition on market manipulation of the kind Plaintiffs allege here, lie at the core of the securities laws.  *See* Exchange Act §§ 9-10, 15 U.S.C. §§ 78i-78j; (MTD at 29).  Plaintiffs allege that the object of the purported conspiracy was "to manipulate and artificially suppress the price of stock."  (AAC ¶ 405.)  *Second*, Defendants explained in their Motion how restrictions on purchasing volatile stocks permitted Robinhood to meet clearing agency collateral calls and continue to serve all customers trading all securities (beyond the volatile stocks).  (MTD at 17.)  That was central to the proper functioning of well-regulated securities markets.  Indeed, an SEC investor alert and bulletin has explicitly stated that broker-dealers "may reserve the ability to reject or limit customer transactions."[17]   Accordingly, "limit[ing] financial exposure" by implementing trading restrictions when necessary is a practice that "lie[s] squarely within an area of financial market activity that the securities law seeks to regulate."  *Billing*, 551 U.S. at 276.

### ii.     The SEC Is Authorized To Regulate All of the Activities in Question.

Plaintiffs further argue that the second *Billing* factor weighs against preclusion because the "SEC does not have authority to supervise 'all of the activities in question here,' in particular Robinhood's imposed limitations on trading."  (Opp. at 36.)  Again, this is simply

---

[16] Plaintiffs erroneously rely on *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 172 F.R.D. 119 (S.D.N.Y. 1997), and *Kalmanovitz v. G. Heilman Brewing Co.*, 769 F.2d 152, 157 (3d Cir. 1985), to argue that "[a]ntitrust laws have long been enforced with respect to wrongdoers in the securities market."  (Opp. at 35 n.44.)  Both cases predate *Billing*.  The *NASDAQ* court did not consider any preclusion arguments, 894 F. Supp. 703, 710-15 (S.D.N.Y. 1995), and the *Kalmanovitz* court recognized that the securities laws may preempt the antitrust laws where "necessary to make [the securities laws] work," 769 F.2d at 157.  Neither case is in tension with applying *Billing* preclusion to the claims here.

[17] SEC, *Thinking About Investing in the Latest Hot Stock?* (Jan. 30, 2021) ("SEC Statement"), https://www.sec.gov/oiea/investor-alerts-and-bulletins/risks-short-term-trading-based-social-media-investor-alert.

untrue.  The SEC has the authority to promulgate rules to prevent fraudulent, deceptive or manipulative conduct by broker-dealers, which is fundamentally what Plaintiffs allege here.  15 U.S.C. § 78o(c)(2)(D); (AAC ¶ 405 (alleging conspiracy "to manipulate and artificially suppress the price of stock"); *see also* 15 U.S.C. § 78k-1 (authorizing SEC to promulgate rules relating to the national market system for securities).  For example, in a related context, the SEC requires brokers with "market access" to have risk management controls and supervisory procedures in place to "prevent the entry of orders," and "reject[] orders," if such orders would "exceed appropriate pre-set credit or capital thresholds in the aggregate for each customer and the broker or dealer."  17 C.F.R. § 240.15c3-5(c)(1).  Moreover, as set forth in Defendants' Motion, the SEC has the authority to enact regulations governing the market manipulation that Plaintiffs allege here.  *See* Exchange Act §§ 9(a)(6) & 10(b), 15 U.S.C. §§ 78i(a)(6) & 78j(b); (MTD at 30-31).  Thus, the SEC clearly has the "regulatory authority under the securities law to supervise the activities in question."  *Billing*, 551 U.S. at 275.[18]

### iii. There Is Substantial Evidence That the SEC Exercises Its Authority.

Although Plaintiffs concede that "the SEC investigated the events concerning the market activities of January 28, 2021," they still contend "there is simply no evidence to suggest that the SEC investigated the claims of concerted activity at issue here."  (Opp. at 37-38.)  But as discussed in Defendants' Motion, the SEC Staff reviewed the facts at issue and concluded that broker-dealers decided to restrict trading in certain stocks as a result of intraday margin calls from a clearinghouse.  (MTD at 32.)  Indeed, Plaintiffs' contention that the SEC did not investigate the alleged concerted activity is belied by the SEC Staff's Report, which expressly addressed the "narrative at the time," which "attributed the broker-dealer trading restrictions to pressure from hedge funds and their commercial partners."  (SEC Staff Report at 32-33.)  Furthermore, as set out in Defendants' Motion, the SEC is exercising its authority to enforce the federal securities laws through various enforcement programs, as demonstrated by the SEC's ongoing investigation into the market events of January 2021.  (MTD at 31-32.)  The SEC may

---

[18] Plaintiffs apparently misread 15 U.S.C. § 78o(c)(2) and 15 U.S.C. § 78j(b).  (Opp. at 36-37.)  These statutes expressly grant authority to the SEC to promulgate rules and regulations defining acts and practices that are fraudulent, deceptive, or manipulative.  *See* 15 U.S.C. § 78o(c)(2)(D) (for broker-dealers); 15 U.S.C. § 78j(b) (for all market participants).  That the SEC has chosen not to prohibit the imposition of purchase restrictions here shows that Defendants' conduct is lawful, not that the SEC lacks authority to regulate it.

conclude that Plaintiffs' claims of a conspiracy to manipulate the securities markets are baseless, but that would be an entirely appropriate exercise of the SEC's authority.

### iv. Allowing This Claim To Proceed Would Create a Conflict Between the Antitrust and Securities Laws.

Plaintiffs assert that "Defendants cite to no law that would be in conflict with or undermined were Plaintiffs['] claims to succeed." (Opp. at 39.) That is untrue. Defendants cited to the SEC's comprehensive regulations for broker-dealers (including net capital requirements), *see* 17 C.F.R. §§ 240.15a-1 to 240.15c6-1, and for clearing agencies (including collateral call requirements), *see id.* §§ 240.17Ab2-1 to -2, 240.17Ad-1 to -24. (*See* MTD at 37.) There is an actual conflict because Congress has expressly authorized these regulations. *See* Exchange Act §§ 15, 17 & 17A, 15 U.S.C. §§ 78o, 78q & 78q-1. In any event, *Billing* does not require an *actual* conflict. *See Billing*, 551 U.S. at 273, 276. As Plaintiffs correctly note, a "conflict may occur when there is either an actual conflict *or* a potential conflict between antitrust law and securities regulations." (Opp. at 38.) Here, despite extensive SEC regulation in this area, the SEC's rules do not prohibit the purchase restrictions at issue, and an SEC investor alert has stated that broker-dealers "may reserve the ability to reject or limit customer transactions."[19] Accordingly, there is an actual conflict between the securities laws and the application of federal antitrust law in this action, and Plaintiffs' antitrust claims are precluded.

## IV. PLAINTIFFS' CLAIMS SHOULD BE DISMISSED WITH PREJUDICE.

Plaintiffs have now had three opportunities to state a claim against Defendants, to no avail. Plaintiffs do not even argue that they could remedy the deficiencies in their complaint and therefore should not be afforded any further leave to amend. Plaintiffs' claims should be dismissed with prejudice.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should dismiss the Amended Complaint with prejudice.

---

[19] SEC Statement, *supra* note 17.

Dated:  March 25, 2022

_/s/ Samuel A. Danon_

**HUNTON ANDREWS KURTH LLP**
Samuel A. Danon (FBN 892671)
Gustavo Javier Membiela (FBN 513555)
María Castellanos Alvarado (FBN 116545)
333 S.E. 2 Avenue, Suite 2400
Miami, FL 33131
Telephone: (305) 810-2500
Facsimile: (305) 810-2460
sdanon@huntonak.com
gmembiela@huntonak.com
mcastellanos@hunton.com

**CRAVATH, SWAINE & MOORE LLP**
Antony L. Ryan
Kevin J. Orsini
Brittany L. Sukiennik
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700
aryan@cravath.com
korsini@cravath.com
bsukiennik@cravath.com

_Counsel for Defendants Robinhood Financial
LLC, Robinhood Securities, LLC and
Robinhood Markets, Inc._

*/s/ Adam L. Hoeflich* (with consent)

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Christopher D. Kercher
Peter H. Fountain
51 Madison Avenue, 22nd Floor,
New York, New York, 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
christopherkercher@quinnemanuel.com
peterfountain@quinnemanuel.com

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
William A. Burck
1300 I Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100
williamburck@quinnemanuel.com

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
John F. O'Sullivan (FBN 143154)
2601 South Bayshore Drive, Suite 1550
Miami, FL 33133
Telephone: (305) 439-5008
johnosullivan@quinnemanuel.com

**BARTLIT BECK LLP**
Adam L. Hoeflich
Dawson Robinson
54 W. Hubbard St., Ste. 300
Chicago, IL 60654
Telephone: (312) 494-4400
Facsimile: (312) 494-4440
adam.hoeflich@bartlitbeck.com
dawson.robinson@bartlitbeck.com

*Counsel for Defendant Citadel Securities LLC*

22

**CERTIFICATE OF SERVICE**

   I HEREBY CERTIFY that on March 25, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I further certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive Notices of Electronic Filing.

Dated:  March 25, 2022         _/s/ Samuel A. Danon_
                 Samuel A. Danon (FBN 892671)