# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 21-2989-MDL-ALTONAGA/Torres

IN RE:

**JANUARY 2021 SHORT SQUEEZE**
**TRADING LITIGATION**
_____/

This Document Relates to All Claims Included
In the Other Broker Tranche

## DEFENDANT APEX CLEARING CORPORATION'S RULE 12 MOTION TO DISMISS PLAINTIFFS' (FOURTH) CLASS ACTION COMPLAINT AND INCORPORATED MEMORANDUM OF LAW

## Table of Contents

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND .............................................................................................. 4

ARGUMENT ...................................................................................................................... 9

I.     Plaintiffs' Common Law Claims Must Be Dismissed ............................................ 9

       A.    This Court May Consider Only the Named Plaintiffs' Claims ................. 10

       B.    If Necessary, Choice of Law Considerations Compel Application of Texas Law Where Apex Has Its Headquarters .................................................... 11

       C.    Plaintiffs' Negligence Claim (Count I) Fails as a Matter of Law ............. 12

            1.    It Is Well-Established That a Clearing Broker Such as Apex Owes No Duty of Care to Meme Stock Speculators Such as Plaintiffs .. 14

            2.    Plaintiffs Fail to Allege a Standard of Care That Apex's Conduct Could Have Breached with a Mid-Day, Few Hour Interruption in a Single Day's Trading of Three Meme Stocks ............................... 18

       D.    Plaintiffs Fail to State a Claim for Breach of Fiduciary Duty (Count II) . 23

            1.    Apex, a Clearing Broker, Is Not a Fiduciary of Plaintiffs Chavez and Jang and Owes Them No Fiduciary Duty, as the Courts Universally Hold ................................................................................ 24

            2.    Apex Was Not Plaintiffs' Agent ................................................... 24

            3.    Apex's Status as a Registered Broker-Dealer Does Not Transform Apex's Back-Office Services into a Fiduciary Relationship ........ 25

            4.    Plaintiffs' Arms-Length Contracts with Apex Specifically Permit Apex to Act in Its Own Interest ................................................... 27

            5.    Apex Did Not Breach Any Fiduciary Duty by Refusing to Accept New Trades ................................................................................... 27

       E.    Plaintiffs Fail to State a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing (Count III) .................................................. 28

       F.    Plaintiffs Fail to State a Claim for Tortious Interference (Count IV) ....... 30

            1.    Plaintiffs Fail to Allege "Willful and Intentional" Interference or "Wrongful Conduct" ................................................................... 31

AMERICAS 114542987

2.      Plaintiffs Fail to Allege that Apex's Introducing Brokers Contractually Were Forbidden from Declining to Open New Positions ........................................................................................... 31

3.      Apex Was Permitted, as a Matter of Law, to Decline to Clear New Positions .................................................................................... 32

G.    Apex's Actions Did Not Proximately Cause Plaintiffs' Alleged Injury (All Counts) ........................................................................................................ 33

II.    Plaintiffs Chavez and Jang Lack Article III Standing (All Counts) ..................... 36

A.    Plaintiffs Fail to Allege Injury in Fact Because Their Claims That They Would Have Sold Certain Meme Stocks at a Higher Price Are Speculative and Implausible ............................................................................................ 37

B.    Plaintiffs Fail to Allege They Have a "Legally Protected Interest" in Lost Earnings Due to Plaintiffs' Thwarted Meme Stock Scheme ................... 39

C.    Named Plaintiffs Lack Standing to Bring Claims on Behalf of a Class of Direct Customers Because Named Plaintiffs Are Not Direct Customers of Apex ....................................................................................................... 40

III.   This Action Is Pre-Empted by Federal Securities Laws Because Apex Is Subject to Active and Heavy Federal Regulation and Because the Duty That Plaintiffs Assert Against Apex Would Prove an Obstacle to the Uniform Federal Regulatory Regime in the Interstate Trading of Publicly-Listed Securities ............................ 41

IV.   The Claims of Plaintiffs Whose Brokers Did Not Use Apex as a Clearing Broker Must Be Dismissed ................................................................................................ 44

V.    With 25,000 Pages Produced and Multiple Pleading Opportunities, the Fourth Complaint Should Be Dismissed with Prejudice .................................................. 44

CONCLUSION ................................................................................................................ 45

AMERICAS 114542987

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*,
  96 N.Y.2d 280 (2001) ...........................................................................................14, 17

*7 W. 57th St. Realty Co., LLC. v. Citigroup, Inc.*,
  771 Fed. App'x 498 (2d Cir. 2019).......................................................................33

*Aaron Private Clinic Mgmt. LLC v. Berry*,
  912 F.3d 1330 (11th Cir. 2019) ........................................................36, 37, 38, 39

*Abad v. G4S Secure Sols. (USA), Inc.*,
  293 So. 3d 26 (Fla. Dist. Ct. App. 2020) ..............................................................12

*Ala. Legis. Black Caucus v. Alabama*,
  135 S. Ct. 1257 (2015)...........................................................................................39

*Alvord & Swift v. Stewart M. Muller Constr. Co.*,
  46 N.Y.2d 276 (1978) ............................................................................................32

*AMBAC Assur. Corp. v. U.S. Bank N.A.*,
  328 F. Supp. 3d 141 (S.D.N.Y. 2018)....................................................................17

*Anton v. Merrill Lynch*,
  36 S.W.3d 251 (Tex. App. 2001)...........................................................................27

*Appert v. Morgan Stanley Dean Witter, Inc.*,
  2009 WL 3764120 (N.D. Ill. Nov. 6, 2009) ..........................................................42

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)......................................................................10, 21, 24, 32

*Baker v. Welch*,
  735 S.W.2d 548 (Tex. App. 1987)..........................................................................31

*Banzhaf v. ADT Sec. Sys. Sw., Inc.*,
  28 S.W.3d 180 (Tex. App. 2000)............................................................................22

*Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*,
  590 S.W.3d 471 (Tex. 2019)...................................................................................28

*Beckwith v. Hart*,
  263 F. Supp. 2d 1018 (D. Md. 2003) .....................................................................13

iii

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...........................................................................................................10

*Bly v. Whitehall*,
    120 N.Y. 506 (1890) .........................................................................................................17

*Blyth v. White*,
    49 G.A. App. 738, 832 (1934) .........................................................................................13

*Bodum USA, Inc. v. J.C. Penney Corp., Inc.*,
    2019 Tex. App. LEXIS 9353 (Tex. App. Oct. 23, 2019).....................................................28

*Bos v. Smith*,
    556 S.W.3d 293 (Tex. 2018)............................................................................................23

*Brenner v. Centurion Logistics LLC*,
    2020 Tex. App. LEXIS 9810 (Tex. App. Dec. 14, 2020)....................................................32

*Brink v. James*,
    341 F. Supp. 3d 1314 (S.D. Fla. 2018) ...........................................................................15

*Browning-Ferris, Inc. v. Reyna*,
    865 S.W.2d 925 (Tex. 1993)......................................................................................29, 30

*Bryant v. Dupree*,
    252 F.3d 1161 (11th Cir. 2001) .......................................................................................44

*Buckman Co. v. Plaintiffs' Legal Comm.*,
    531 U.S. 341 (2001)........................................................................................................43

*Busch v. L.F. Rothschild & Co.*,
    23 A.D.2d 189 (N.Y. Sup. Ct. App. Div. 1965) .........................................13, 16, 22, 27, 31

*Cantor Fitzgerald Assocs., L.P. v. Tradition N. Am., Inc.*,
    749 N.Y.S.2d 249 (N.Y. Sup. Ct. App. Div. 2002) ...........................................................32

*Capital Options Invest., Inc. v. Goldberg Bros. Commodities, Inc.*,
    958 F.2d 186 (7th Cir. 1992) ..........................................................................................20

*Capital Options Invs., Inc. v. Goldberg Bros. Commodities*,
    1990 U.S. Dist. LEXIS 14736 (N.D. Ill. Nov. 5, 1990) ...............................................13, 31

*Carvel Corp. v. Noonan*,
    3 N.Y.3d 182 (2004).......................................................................................................30

*Champlain Enterprises, Inc. v. United States*,
    945 F. Supp. 468 (N.D.N.Y. 1996).................................................................................12

iv

*Chapman v. DePuy Orthopedics, Inc.*,
    760 F. Supp. 2d 1310 (M.D. Fla. 2011)................................................................12

*Chase Manhattan Bank v. N.H. Ins. Co.*,
    193 Misc. 2d 580 (N.Y. Sup. Ct., N.Y. Cnty. 2002)..........................................11

*Coleman v. Equitable Real Estate Inv.*,
    971 S.W.2d 611 (Tex. App.—Dallas 1998)..........................................................35

*Costa v. Kerzner Int'l Resorts Inc.*,
    2011 US Dist. LEXIS 66921 (S.D. Fla. June 23, 2011) .......................................12

*Courtland v. Walston & Co., Inc.*,
    340 F. Supp. 1076 (S.D.N.Y. 1972).........................................................13, 16, 22

*Crosby v. Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000)...............................................................................................40

*Dallas v. Maxwell*,
    248 S.W. 667 (Tex. 1923).......................................................................................22

*Day v. Taylor*,
    400 F.3d 1272 (11th Cir. 2005) .............................................................................15

*de Kwiatkowski v. Bear, Stearns & Co.*,
    306 F.3d 1293 (2d Cir. 2002)................................................................24, 25, 26, 27

*Default Proof Credit Card Sys. Inc. v. State Street Bank & Trust Co.*,
    753 F. Supp. 1566 (S.D. Fla. 1990) .......................................................................12

*Dercole v. Divico Fin of Am.*,
    2005 U.S. Dist. LEXIS 59757 (E.D.N.Y. 2005)..............................................23, 39

*Dixon v. Allergan United States*,
    2015 U.S. Dist. LEXIS 198315 (S.D. Fla. Apr. 2, 2015) ......................................24

*Doe v. Boys Clubs*,
    907 S.W.2d 472 (Tex. 1995)...................................................................................22

*Dunn v. Calahan*,
    2008 Tex. App. LEXIS 9498 (Tex. App. Dec. 17, 2008).......................................29

*Dunn v. New York*,
    29 N.Y.2d 313 (1971) .......................................................................................32, 33

*Duradil, L.L.C. v. Dynomax Drilling Tools, Inc.*,
    516 S.W.3d 147 (Tex. App. 2017)....................................................................30, 31

AMERICAS 114542987

*EBC I, Inc. v. Goldman Sachs & Co.*,
   5 N.Y.3d 11 (2005) ....................................................................................................29

*Espinoza v. Countrywide Home Loans Servicing, L.P.*,
   2014 U.S. Dist. LEXIS 107263 (S.D. Fla. Aug. 5, 2014).......................................44

*Fernandez v. Sch. Bd. of Miami-Dade Cnty.*,
   201 F. Supp. 3d 1353 (S.D. Fla. 2016) ..................................................................39

*Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*,
   414 F.3d 325 (2d Cir. 2005)....................................................................................11

*First United Pentecostal Church of Beaumont v. Parker*,
   514 S.W.3d 214 (Tex. 2017)...................................................................................23

*Fox v. Lifemark Sec. Corp.*,
   84 F. Supp. 3d 239 (W.D.N.Y. 2015) ..............................................................14, 24

*French v. Bache Halsey Stuart, Inc.*,
   Comm. Fut. L. Rep. ¶ 20,444 (C.F.T.C. 1977) ......................................................13

*Friendswood Dev. Co. v. McDade & Co.*,
   926 S.W.2d 280 (Tex. 1996)...................................................................................32

*Geier v. Am. Honda Co.*,
   529 U.S. 861 (2000).....................................................................................40, 42, 43

*Glob. Enter. Grp. Holding, S.A. v. Ottimo*,
   2010 U.S. Dist. LEXIS 145126 (E.D.N.Y. June 8, 2010) ......................................24

*Goldberger v. Bear, Stearns & Co.*,
   2000 U.S. Dist. LEXIS 18714 (S.D.N.Y. 2000)....................................................10

*Gonzalez v. Acosta*,
   2001 Tex. App. LEXIS 5623 (Tex. App. Aug. 16, 2001) ......................................20

*Greater Houston Transp. Co. v. Phillips*,
   801 S.W.2d 523 (Tex. 1990)...................................................................................32

*Griffin v. Dugger*,
   823 F.2d 1476 (11th Cir. 1987) ..............................................................................39

*Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*,
   50 N.Y.2d 183 (1980) .............................................................................................29

*Hand v. Dean Witter Reynolds Inc.*,
   889 S.W.2d 483 (Tex. App. 1994)................................................................. passim

*Hill v. Heritage Res., Inc.,*
    964 S.W.2d 89 (Tex. App. 1997)............................................................32

*Holmes v. Newman,*
    2017 Tex. App. LEXIS 6177 (Tex. App. July 6, 2017).................................25, 27

*Horsley v. Feldt,*
    304 F.3d 1125 (11th Cir. 2002) .............................................................6

*Humble Sand & Gravel, Inc. v. Gomez,*
    146 S.W.3d 170 (Tex. 2004)................................................................22

*Hux v. S. Methodist Univ.,*
    819 F.3d 776 (5th Cir. 2016) ..............................................................29

*In re Brinker Data Incident Litig.,*
    2020 U.S. Dist. LEXIS 247918 (M.D. Fla. Jan. 27, 2020).................................10

*In re Cadwallder,*
    2007 Bankr. LEXIS 2260 (Bankr. S.D. Tex. June 28, 2007) ..............................19

*In re Catanella & E.F. Hutton & Co., Inc. Sec. Litig.,*
    583 F. Supp. 1388 (E.D. Pa. 1984) .......................................................34

*In re Series 7 Broker Qualification Exam Scoring Litig.,*
    510 F. Supp. 2d 35 (D.D.C. 2007)......................................................14, 41

*Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund,*
    500 U.S. 72 (1991)........................................................................39

*Jim Walter Homes, Inc. v. Reed,*
    711 S.W.2d 617 (Tex. 1986)...............................................................16

*Kinsey v. N.Y. Times Co.,*
    991 F.3d 171 (2d Cir. 2021)...............................................................11

*La Grasta v. First Union Sec., Inc.,*
    358 F.3d 840 (11th Cir. 2004) ............................................................35

*LAN/STV v. Martin K. Eby Constr. Co.,*
    435 S.W.3d 234 (Tex. 2014)...............................................................16

*Larsen v. Citibank FSB,*
    871 F.3d 1295 (11th Cir. 2017) ...........................................................11

*Laub v. Faessal,*
    297 A.D.2d 28 (N.Y. Sup. Ct. App. Div. 2002) .........................................32

vii

*Levitt v. J.P. Morgan Sec., Inc.*,
   710 F.3d 454 (2d Cir. 2013) ................................................................................23

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) .............................................................................................36

*Md. Cas. Co. v. Cont'l Cas. Co.*,
   332 F.3d 145 (2d Cir. 2003) ................................................................................11

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
   547 U.S. 71 (2006) ................................................................................................4

*Meyer v. Cathey*,
   167 S.W.3d 327 (Tex. 2005) .........................................................................23, 28

*Mintz Fraade Law Firm, P.C. v. Fed. Ins. Co.*,
   193 A.D.3d 654 (N.Y. Sup. Ct. App. Div. 2021) ...............................................31

*Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.)*,
   247 B.R. 51 (Bankr. S.D.N.Y. 1999) ......................................................18, 19, 35

*MM&S Fin., Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*,
   364 F.3d 908 (8th Cir. 2004) ...............................................................................42

*Murphy v. Am. Home Prods. Corp.*,
   58 N.Y.2d 293 (1983) ..........................................................................................28

*Mut. Pharm. Co. v. Bartlett*,
   570 U.S. 472 (2013) .............................................................................................40

*NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*,
   87 N.Y.2d 614 (1996) .....................................................................................30, 31

*New Orleans Emplrs. Int'l Longshoremen's Ass'n v. Mercer Inv. Consultants*,
   635 F. Supp. 2d 1351 (N.D. Ga. 2009) ...............................................................35

*Oddo Asset Mgm't v. Barclays Bank PLC*,
   19 N.Y.3d 584 (2012) ........................................................................23, 26, 31, 32

*Otis Eng'g Corp. v. Clark*,
   668 S.W.2d 307 (Tex. 1983) ...........................................................................17, 22

*Padula v. Lilarn Properties Corp.*,
   84 N.Y.2d 519 (N.Y. 1994) .................................................................................11

*Palsgraf v. Long Island R. Co.*,
   248 N.Y. 339 (1928) ..............................................................................................2

AMERICAS 114542987

*Parm v. Nat'l Bank of Cal., N.A.*,
   242 F. Supp. 3d 1321 (N.D. Ga. 2017) ..........................................................................10, 31

*Perret v. Wyndham Vacation Resorts, Inc.*,
   846 F. Supp. 2d 1327 (S.D. Fla. 2012) ...............................................................................33

*PLIVA, Inc. v. Mensing*,
   564 U.S. 604 (2011) .............................................................................................................42

*Pulka v. Edelman*,
   40 N.Y.2d 781 (N.Y. 1976) .................................................................................................12

*Quiroz v. Alcoa Inc.*,
   416 P.3d 824 (Ariz. 2018) ...................................................................................................12

*Read v. Scott Fetzer Co.*,
   990 S.W.2d 732 (Tex. 1998) ...............................................................................................14

*Riggs v. Schappell*,
   939 F. Supp. 321 (D.N.J. 1996) .......................................................................................5, 12

*Ross v. Bolton*,
   904 F.2d 819 (2d Cir. 1990) ...............................................................................................12

*Rozsa v. May Davis Grp., Inc.*,
   187 F. Supp. 2d 123 (S.D.N.Y. 2002) .......................................................................12, 14, 24

*Schlueter v. Latek*,
   683 F.3d 350 (7th Cir. 2012) ..............................................................................................38

*Scott v. Watson*,
   359 A.2d 548 (Md. 1976) ....................................................................................................12

*Secs. & Exch. Comm'n v. Aaron et al.*,
   No. 1:15-cv-05704 (S.D.N.Y. Jul. 21, 2015) ......................................................................38

*SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*,
   600 F.3d 1334 (11th Cir. 2010) ..........................................................................................26

*Solomon v. New York*,
   66 N.Y.2d 1026 (1985) .......................................................................................................12

*Stag Canon Fuel Co. v. Rose*,
   145 S.W. 677 (Tex. App. 1912) ..........................................................................................20

*Sterner v. Marathon Oil Co.*,
   767 S.W.2d 686 (Tex. 1989) ..........................................................................................29, 30

ix

*Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*,
    305 F.3d 1293 (11th Cir. 2002) ...............................................................14, 24, 25, 30

*Suez Water N.Y., Inc. v. E.I. du Pont de Nemours & Co.*,
    2022 U.S. Dist. LEXIS 1483 (S.D.N.Y. 2022) ........................................................33

*Texas Bank & Trust Co. v. Moore*,
    595 S.W.2d 502 (Tex. 1980)................................................................................23, 24

*Tokyo Gwinnett, LLC v. Gwinnett Cty.*,
    940 F.3d 1254 (11th Cir. 2019) ...............................................................................37

*Travis v. Mesquite*,
    830 S.W.2d 94 (Tex. 1992)................................................................................33, 35

*Turk v. Pershing LLC*,
    2014 U.S. Dist. LEXIS 190624 (N.D. Tex. Dec. 8, 2014) .....................................12

*Turk v. Pershing LLC*,
    2014 US Dist. LEXIS 190624 (N.D. Tex. Dec. 8, 2014) ........................................14

*Turman v. POS Partners, LLC*,
    541 S.W.3d 895 (Tex. App. 2018)...........................................................................23

*Union Pac. R.R. Co. v. Nami*,
    498 S.W.3d 890 (Tex. 2016)....................................................................................30

*Union Pump Co. v. Allbritton*,
    898 S.W.2d 773 (Tex. 1995)....................................................................................33

*United Scaffolding, Inc. v. Levine*,
    537 S.W.3d 463 (Tex. 2017)....................................................................................14

*Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
    464 F. Supp. 3d 634 (S.D.N.Y. 2020)........................................................14, 24, 25

*Varghese v. Singh*,
    265 A.D.2d 322 (N.Y. Sup. Ct. App. Div. 1999) ...................................................32

*Ventricelli v. Kinney Sys. Rent A Car, Inc.*,
    45 N.Y.2d 950 (1978) ..............................................................................................32

*W. Invs., Inc. v. Urena*,
    162 S.W.3d 547 (Tex. 2005)....................................................................................32

*Warth v. Seldin*,
    422 U.S. 490 (1975).....................................................................................10, 31, 39

x

*Weatherly v. Pershing*,
  2015 U.S. Dist. LEXIS 197128 (N.D. Tex. June 23, 2015) ............................................. passim

*Wilcox v. Wilcox*,
  2006 Tex. App. LEXIS 11106 (Tex. App. Dec. 28, 2006)......................................................26

## STATUTES AND RULES

17 C.F.R. § 240.15c3-1 ...................................................................................................7, 18, 19, 42

17 C.F.R. § 240.17Ad-22 (2020) ...................................................................................................7, 18

15 U.S.C. § 78q.............................................................................................................................40, 42

15 U.S.C. § 78s(g)........................................................................................................................41, 42

Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 .......................................7

FINRA Rule 4311 ..........................................................................................................................6, 26

Securities Exchange Act of 1934 ..................................................................................................40

U.S. Const., Article VI, cl. 2 .........................................................................................................40

## MISCELLANEOUS

Henry Minnerop, *Clearing Arrangements*, 58 BUS. LAW. 917 (May 2003)..................................24

Henry Minnerop, *Role and Regulation of Clearing Brokers - Revisited*, 75 BUS. LAW. 2201
  (2020).............................................................................................................................. passim

*The Highwayman's Case*, 9 L. Q. Rev. 197 (1983).......................................................................38

Nathaniel Popper, et al., *The Silicon Valley Start-Up That Caused Wall Street Chaos*, The New
  York Times (Jan. 30, 2021) ...................................................................................................18

NSCC Rule 4, § 8.............................................................................................................................8

U.S. Dep't of the Treas., 2012 Annual Rep., Appendix A: Designation of Systemically Important
  Financial Market Utilities (July 18, 2012), https://home.treasury.gov/system/
  files/261/here.pdf ...................................................................................................................7

U.S. House Financial Servs. Comm. Majority Staff, Feb. 18, 2021, *"Game Stopped? Who Wins
  and Loses When Short Sellers, Social Media, and Retail Investors Collide?"* U.S. H. R.
  Comm. on Fin. Servs., at 4 (Feb. 15, 2021), available at https://financialservices.house.gov/
  uploadedfiles/hhrg-117-ba00-20210218-sd002.pdf.................................................................5

xi

U.S. Securities and Exchange Commission, *SEC Suspends Trading in Multiple Issuers Based on Social Media and Trading Activity,* Press Releases, (Feb. 26, 2021) available at https://www.sec.gov/news/press-release/2021-35 ....................................................................2

U.S. Securities and Exchange Commission, *Thinking About Investing in the Latest Hot Stock?: Understand the Significant Risks of Short-Term Trading Based on Social Media*, Investor Alerts and Bulletins (Jan. 30, 2021) available at https://www.sec.gov/oiea/investor-alerts-and-bulletins/risks-short-term-trading-based-social-media-investor-alert ...............................2

AMERICAS 114542987

Plaintiffs Chavez and Jang's Amended Class Action Complaint (the "Fourth Complaint"), Plaintiffs' fourth bite at the apple following an attempted evasion of the MDL, largely mirrors the last complaint Plaintiffs filed in this Court.  But, despite Plaintiffs' additions in this round (adding a new claim for "Breach of the Implied Covenant of Good Faith and Fair Dealing" and finally acknowledging the existence of the parties' binding customer agreements), and even with the benefit of voluminous pre-complaint discovery, Plaintiffs fail to state a claim for the same reasons Plaintiffs' earlier complaints failed.

This Court should dismiss the Fourth Complaint in its entirety for substantially the same reasons that Apex argued Plaintiffs' Consolidated Amended Complaint should be dismissed (ECF No. 422), and for many of the same reasons that this Court dismissed the common law claims against Robinhood (ECF No. 453).  Simply put, Plaintiffs' common law claims should be dismissed because they depend on non-existent duties that would be at odds with the complex and comprehensive federal regulatory scheme governing the securities industry, and because the parties' customer agreements unequivocally authorize Apex to engage in the challenged conduct. This Court also should dismiss Plaintiffs' claims for lack of Article III standing.

The Plaintiffs are speculators in "meme stocks" who helped create and then chased a market bubble.  *See* ECF No. 359 ("Compl."), at ¶ 169.  Plaintiffs admittedly colluded in "online discussions" to create unprecedented market volatility for a group of "meme stocks," which on January 28, 2021 resulted in unprecedented and historic trading volume that led the SEC-regulated clearing agencies (DTCC and NSCC) to increase collateral requirements for Apex, a clearing broker responsible for maintaining sufficient cash to cover the buy and sell obligations of its broker-dealer customers.  4th Compl. ¶¶ 61, 77–79; Compl. ¶ 169.

Plaintiffs allege that Apex's response to the DTCC's unprecedented collateral requirements was somehow negligent.  But Apex's limited trading restriction on new purchases of three of the volatile "meme stocks" (GameStop, AMC, and Koss) for a few hours on a single day (4th Compl. ¶¶ 2, 79, 84), while continuing to allow customers to sell their positions in those stocks, was consistent with—and the direct result of—Apex's obligation to meet its capital requirements.  4th Compl. ¶¶ 6, 105–13; Pace Decl. Ex. 1 at 6 (Feb. 9, 2021, Letter from Apex to the Bureau of Securities, New Jersey Office of the Attorney General ("NJBS" or "N.J. Bureau of Securities"), quoted in 4th Compl. ¶ 79).  State tort law does not impose a separate legal duty that would have required Apex to ignore its federally-mandated collateral requirements.  Nor does state tort law

AMERICAS 114542987

forbid clearing brokers from exercising sound business judgment in deciding whether to accept new orders for highly volatile stocks. Nor does it require clearing brokers like Apex to absorb the risk of continued trading—particularly when the SEC endorsed the use of trading restrictions during the volatility of January 2021 and acknowledged that brokers' customer contracts typically allow such restrictions.[1]

The relief Plaintiffs seek would be unprecedented: No court has imposed the extraordinary duties sought here for clearing brokers to unconditionally cover market events. Far from Plaintiffs' proposed unlimited capital duty, for decades the SEC has supported low capital requirements to encourage entry into the clearing function and lower commissions for investors to pay. Clearing brokers have never been required to provide unlimited capital at times of extreme market volatility.

Plaintiffs seek to impose unreasonable duties on Apex and recover for impossibly speculative harms—caused in fact by their own conduct. This is *Palsgraf*, if the injured bystander not only caused the fireworks explosion, but also alleged that, had the Long Island Railroad not been delayed, she would have reached her destination in time to purchase a winning lottery ticket.[2]

As discussed below, Plaintiffs fail to state a claim against Apex for the following reasons:

*First*, Plaintiffs do not and cannot allege the necessary elements of their common law claims for negligence, breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, and tortious interference. As to negligence, courts universally hold that as a clearing broker Apex owes Plaintiffs no duty of care. And Plaintiffs' allegations about Apex's response to unprecedented collateral requirements fail to support even an inference that Apex breached any standard of care. Plaintiffs allege only that (a) Apex was *too* cautious by restricting trading too quickly in the face of unforeseen risk and should have anticipated Plaintiffs' proposed "duty to dicker" with DTCC, (b) Apex was *too* cautious in removing those restrictions too slowly, and (c)

---

[1] U.S. Securities and Exchange Commission, *Thinking About Investing in the Latest Hot Stock?: Understand the Significant Risks of Short-Term Trading Based on Social Media*, Investor Alerts and Bulletins (Jan. 30, 2021) (hereinafter "SEC Jan. 30, 2021 Investor Bulletin"), https://www.sec.gov/oiea/investor-alerts-and-bulletins/risks-short-term-trading-based-social-media-investor-alert (last visited Oct. 14, 2021); *see also* U.S. Securities and Exchange Commission, *SEC Suspends Trading in Multiple Issuers Based on Social Media and Trading Activity*, Press Releases, (Feb. 26, 2021), https://www.sec.gov/news/press-release/2021-35.

[2] *Palsgraf v. Long Island R. Co.,* 248 N.Y. 339, 341 (1928) (Cardozo, C.J.).

AMERICAS 114542987

Apex should have had on hand effectively limitless capital to cover any and all collateral requirements.  4th Compl. ¶¶ 77, 80–81, 93.

As to breach of fiduciary duty, in addition to Texas and New York courts, the Eleventh Circuit in the *Spear, Leeds* case has held that clearing brokers are not fiduciaries of introducing brokers' customers.  And Plaintiffs fail to allege any facts that Apex's back-office clearing role created the type of trust-based agency relationship between Apex and Erik Chavez or Peter Jang that would impose fiduciary duties on Apex.

As to breach of the implied covenant of good faith and fair dealing, Plaintiffs fail to allege that the Customer Agreements create the "special relationship" required under Texas law to impose a duty.  And Plaintiffs fail to allege Apex breached an implied covenant under New York law because Plaintiffs cannot allege that Apex acted in a manner inconsistent with the Customer Agreements or improperly deprived Plaintiffs of their contracted-for benefits.

As to Plaintiffs' tortious interference claims, pleaded "in the alternative" (4th Compl. ¶ 129), the only conduct alleged is a re-plead of mere negligence—"failing to have a reasonable plan in place," *id.* ¶ 133—which is not the intentional conduct required to plead this tort.  In addition, to survive a motion to dismiss on this claim, Plaintiffs expressly must allege the specific terms of the contract with which Apex supposedly tortiously interfered.  By strategically omitting the specific terms of the contracts that Plaintiffs now acknowledge existed between Plaintiffs and Apex, Plaintiffs defeat their own claim.

Plaintiffs' allegations also fail to support any inference that Plaintiffs suffered any non-speculative injury, let alone that Apex's conduct was the proximate cause.

*Second*, Plaintiffs lack Article III standing.  They do not allege that they would have purchased additional shares of the three meme stocks Apex temporarily suspended mid-day (GME, AMC, and KOSS) in the absence of Apex's temporary restriction.  Instead Plaintiffs' wishful thinking that they would have timed the market correctly and sold their shares for some additional profit is speculative, implausible, and the type of "some day" assertion that is insufficiently concrete and particularized to allege injury in fact and confer Article III standing under the Eleventh Circuit's *Berry* decision.

*Third*, the state common law duty Plaintiffs seek to impose intrudes impermissibly into the heavily enforced and uniform federal regulatory scheme for the interstate trading of publicly-listed securities—with the SEC and SEC-regulated self-regulatory organizations (SROs) providing

AMERICAS 114542987

exclusive, plenary regulation over the trading of securities over stock exchanges.  Plaintiffs' state law claims present an obstacle to federal regulatory objectives as set forth in the Securities Exchange Act of 1934.  "The magnitude of the federal interest in protecting the integrity and efficient operation of the market for nationally traded securities cannot be overstated." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 78 (2006).

*Fourth*, Plaintiffs cannot, as a matter of law, bring claims for tort damages on behalf of meme stock purchasers whose brokers did not use Apex's clearing services.  Apex is not a public utility and has no duty to take on additional risk to protect meme stock purchasers with whom it has no relationship.  Those claims must be dismissed with the rest.

## FACTUAL BACKGROUND[3]

### A. In January 2021, Reddit Posters and Other Meme Stock Purchasers Collectively Executed a Short Squeeze on Meme Stocks

On January 27, 2021, several companies' securities (so-called "meme stocks") were subject to unprecedented "manic buying" due to online forum chats.  4th Compl. ¶¶ 52, 55, 58–68.  These meme stocks included the three stocks for which Apex temporarily suspended clearing purchases—GameStop ("GME"), AMC Theatres ("AMC"), and Koss Corporation ("KOSS").  4th Compl. ¶ 3.  Plaintiffs admit the astronomical increase in trading volume was due to meme stock purchasers themselves engaging in "online discussions" and agreeing to purchase more and more shares in these stocks for the purpose of raising the stock price.  Compl. ¶ 169.  The "online discussions" among meme stock purchasers consisted of public, online forum communications, which the Majority Staff of the U.S. House of Representatives Committee on Financial Services described as follows:

> In January 2021, ***investors collectively established a strategy to achieve what is known as a "short squeeze" on stocks*** that had been heavily shorted . . . .  A short squeeze occurs when the market price of shorted stocks rises above the price at which the stock was borrowed, forcing short sellers to purchase the stock at a higher price.  The short squeeze of GameStop's stock . . . led to a ***600% surge*** in the stock price.  Much of the strategizing occurred on ***WallStreetBets, a Reddit subchannel*** (or "subreddit") where approximately ***8.5 million users*** discuss trading ideas and

---

[3] Apex will not repeat the factual background that Robinhood has included in its Motion to Dismiss the Robinhood Tranche Amended Consolidated Complaint and that is pertinent to both the Robinhood and Other Broker Tranches allegations.  ECF No. 421 at 6–10.

AMERICAS 114542987

investment strategies, including retail investors.[4]

As Plaintiffs further admit, the skyrocketing prices for shares of so-called "meme stocks" continued, *despite* the fact that "hedge funds and market makers were shorting the Suspended Stocks," which "tends to drive the prices down." 4th Compl. ¶¶ 59, 61. The soaring increase in purchases of shares in these stocks thus created unprecedented volatility in the markets. 4th Compl. ¶¶ 58–68. Plaintiffs admit that this "wild ride" resulted in the New York Stock Exchange temporarily halting trading on some of the "meme stocks" on January 28, 2021. 4th Compl. ¶ 55. And the SEC issued an extraordinary statement relating to market volatility in meme stocks. 4th Compl. ¶ 167. Plaintiffs do not allege, nor could they, that they simply happened upon a bargain. Rather, Plaintiffs admit that they sought to exploit artificial market conditions, unforeseeable but to those creating those conditions for financial gain. 4th Compl. ¶¶ 58–68.

### B.  The Role of Clearing Brokers Such as Apex in the Securities Markets

A variety of accounts are available to those who wish to trade in securities. A discretionary account is one in which an investment advisor maintains discretion over an investor's account, and in which the advisor may buy and sell investments without asking the investor first. Pace Decl. Ex. 7 at 1–2 (Apex Form CRS); *Riggs v. Schappell*, 939 F. Supp. 321, 330 (D.N.J. 1996). By contrast, a non-discretionary account is one in which the broker is responsible only for executing an investor's requests to trade.[5] Often, non-discretionary investment accounts are opened through an introducing broker, such as Webull (used by Plaintiff Chavez), which contracts with a clearing broker to provide back-office support and execution of trades. 4th Compl. ¶¶ 3, 14, 25–26.

Apex is a clearing broker that provides introducing brokers with access to back-end capabilities and services; introducing brokers do not have the same capital requirements clearing brokers have and may not have direct access to trading platforms and clearinghouses. 4th Compl. ¶¶ 25–26. Clearing brokers take on the settlement risk, and the corresponding collateral and margin requirements, that executing securities trading imposes. 4th Compl. ¶¶ 35–41.

---

[4] U.S. House Financial Servs. Comm., Feb. 18, 2021, "*Game Stopped?  Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide?*," U.S. H. R. Comm. on Fin. Servs., at 4 (Feb. 15, 2021), available at https://financialservices.house.gov/ uploadedfiles/hhrg-117-ba00-20210128-sd002.pdf (https://perma.cc/4NA7-9GZY) (emphasis added).

[5] *See generally Hand v. Dean Witter Reynolds Inc.*, 889 S.W.2d 483, 495 (Tex. App. 1994).

AMERICAS 114542987

Maintaining sufficient margins and remaining in compliance with the SEC's Net Capital Rule is essential to "protect . . . the market as a whole from the systemic risk that highly volatile stocks can produce, especially when a broker's position has significant risk concentration in such stocks." 4th Compl. ¶ 37.[6]

Apex is registered with the SEC and the Financial Regulatory Authority ("FINRA") as a broker-dealer.  4th Compl. ¶ 23.  Under FINRA rules "Apex is required to maintain a clearing agreement with each introducing broker-dealer," a "primary purpose" of which is to "allocate responsibilities between the introducing broker-dealer and the clearing broker in a clear manner regarding, among other things:   opening and approving accounts, monitoring of accounts, acceptance of orders, execution of orders, and extension of credit."  Pace Decl. Ex. 1 at 2–3 (Letter to NJBS); FINRA Rule 4311(c)(1).  As Apex explained to NJBS in a submission relied upon by Plaintiffs,[7] Apex further requires each ultimate customer of any introducing broker that uses Apex to sign a customer agreement giving Apex the unfettered right to "***refuse to execute securities transactions*** for the Customer ***at any time and for any reason***."  Pace Decl. Ex. 1 at 3 (emphasis added); Pace Decl. Ex. 2 ¶ 3 (Customer Agreement quoted in Exhibit 1).[8]

Apex's ability to refuse trades is critical.  As a clearing broker, Apex is required to collateralize and settle any trades that Apex accepts, and so it must have the discretion and ability to reject trades in order to manage the credit and settlement risks Apex takes on from introducing brokers and those introducing brokers' customers.  Pace Decl. Ex. 1 at 3.  If an introduced customer, or introducing broker, defaults on a securities transaction, Apex is still obligated to settle

---

[6] For a fuller explanation of the role of clearing brokers in the securities market, *see* Henry Minnerop, *Role and Regulation of Clearing Brokers—Revisited*, 75 Bus. Law. 2201 (2020).  "Risk management is an essential aspect of the business of a clearing broker.  Virtually all orders a clearing broker processes expose it to some financial risk. . . .  If a customer defaults, the clearing broker remains obligated to settle the executed order 'street-side.'" *Id.* at 2210.

[7] Plaintiffs rely on and quote from Apex's letter to the NJBS to assert when and why Apex restricted trading in AMC, GME, and KOSS stocks.  4th Compl. ¶ 79.  This Court may consider this letter because it is "central to the [Plaintiffs'] claim[s]," and because its "authenticity . . . is not challenged."  *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002).

[8] Given that the Fourth Complaint makes direct allegations about the Customer Agreement, this Court may consider the Customer Agreement because it is "central to the [Plaintiffs'] claim[s]," and its "authenticity . . . is not challenged."  *See, infra,* Section I.D.4; 4th Compl. ¶¶ 96-97.

AMERICAS 114542987

the executed order.[9]  That means that Apex must ensure that it has sufficient capital on hand to meet its regulatory deposit requirements, which in turn depends upon the outstanding orders that Apex has committed to clear and the volatility of those securities, as described below in Section C.  4th Compl. ¶ 35–37.  Plaintiffs would impose limitless liability on clearing brokers.

### C.  The Importance of Collateral Requirements

The National Securities Clearing Corporation ("NSCC") is the SEC-regulated clearing agency (i.e., main clearinghouse) that clears and settles transactions in equity and corporate debt securities traded in the U.S., and is part of the Depository Trust and Clearing Corporation ("DTCC").  4th Compl. ¶¶ 31–32.  These two SEC-regulated clearing agencies have been designated systemically important financial market utilities (SIFMUs) pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010.[10]

As a clearing broker, Apex is a member of the NSCC and is required to post collateral for the trades Apex has agreed to process but which have not yet cleared.  4th Compl. ¶ 31, 35.  When the NSCC calculates its collateral requirements for Apex, the NSCC is required to take into account various factors, including market "volatility" and, in its discretion, apply a "volatility multiplier."  4th Compl. ¶¶ 35, 37.  The NSCC's obligation to collect collateral from its members comes from SEC regulations.  17 C.F.R. § 240.17Ad-22(e)(6) (a clearing agency must, "[c]over . . . its credit exposures to its participants").  Plaintiffs admit that the collateral requirements imposed by the NSCC are not an administrative nicety, but are critical.  "These margin requirements are intended to protect DTCC members and the market as a whole *from the systemic risk* that *highly volatile stocks* can produce, especially when a broker's position has significant risk concentration in such stocks."  4th Compl. ¶ 37 (emphasis added).  Plaintiffs further admit that "margin requirements protect NSCC and all market participants against clearing member defaults."  4th Compl. ¶ 38.  If Apex does not have sufficient capital on hand, then under SEC regulations it cannot agree to clear trades.  *See* 17 C.F.R. § 240.15c3-1.  Notably, as Plaintiffs acknowledge, it is the *volatility*, not the

---

[9] Minnerop, 75 Bus. Law at 2210.

[10] U.S. Dep't of the Treas., 2012 Annual Rep., Appendix A:  Designation of Systemically Important Financial Market Utilities (July 18, 2012), https://home.treasury.gov/system/files/261/here.pdf.

AMERICAS 114542987

price, of securities that has the largest impact on a clearing broker's margin requirement.   4th Compl. ¶¶ 35–37.

When the NSCC informs a clearing broker, such as Apex, of an increase in its collateral requirement, the shortfall must be met on demand.[11]   As Plaintiffs acknowledge here and elsewhere in the MDL, the failure of a broker-dealer like Apex to meet such collateral requirements could result in restrictions on doing business, fines, significant losses, disciplinary actions, and, in a worst-case scenario, liquidation or winding down of Apex's business.   4th Compl. ¶ 34; ECF No. 409 ("RH Tranche Compl.") ¶ 155.

### D. Apex Suspends Opening New Positions on a Single Trading Day for Three Hours and Twenty-Five Minutes to Ensure Compliance with Net Capital Requirements

On January 28, 2021, at 9:30 a.m. ET, Apex received a report from the NSCC increasing Apex's collateral requirement approximately ***ten-fold***.  Pace Decl. Ex. 1 at 6.  Approximately 90% of the new collateral requirement imposed by the NSCC related to trading activity in three meme stocks:  GME, AMC, and KOSS.   *Id.*   Accordingly, at 11:30 a.m. ET, and having received no updated estimate from the NSCC, Apex informed its introducing broker customers that it was pausing all purchasing of new shares of AMC, GME, and KOSS stocks, but that customers would still be permitted to close out (sell) any positions.  4th Compl. ¶ 79.[12]   As Apex explained in its letter to the NJBS, Apex temporarily halted additional purchasing of shares in those three stocks "to manage the risk that it would not be able to meet potential increased NSCC collateral funding

---

[11] NSCC Rule 4, § 8 (August 17, 2021), available at https://www.dtcc.com/~/media/Files/ Downloads/legal/rules/nscc_rules.pdf [https://perma.cc/JYC4-7VQR].

[12] Plaintiffs try to manipulate the time zones in their Fourth Complaint by converting the times of all but one event in Apex's February letter to the NJBS from Eastern Time to Central Time. Specifically, Plaintiffs insinuate that Apex restricted trading *after* it received an updated collateral estimate from the NSCC by expressing the time of the updated collateral notice in Eastern Time (thereby suggesting that the event took place one hour earlier than it did).  4th Compl. ¶ 79; *see also id.* at ¶ 81 (inaccurately pleading that Apex had discussed its collateralization number with the DTCC at 11:00 a.m. ET rather than CT, despite in the very next paragraph alleging contradictory information).  This allegation is directly contradicted by the letters Plaintiffs cite in their Fourth Complaint, which make clear that the times of the events listed in Apex's February letter were expressed in Central Time.  Pace Decl. Ex. 1 (February 2021 NJBS Letter); Pace Decl. Ex. 6 (March 2021 Corrected NJBS Letter).  Given that the Fourth Complaint refers to all times in Eastern Time, we do so here.

AMERICAS 114542987

obligations if Apex clients were permitted to continue to engage in additional purchases of AMC, GME and KOSS." Pace Decl. Ex. 1 at 6; 4th Compl. ¶ 79. At 12:00 p.m. ET, Apex received an updated NSCC report, estimating that its collateral deposit requirement, while still elevated, would be reduced significantly from the NSCC's 9:30 a.m. ET estimate. 4th Compl. ¶ 79; Pace Decl. Ex. 1 at 6. After confirming with the NSCC that the new report was indeed accurate (and had not changed in the interim yet again), Apex informed its customers at 2:55 p.m. ET that it had lifted the restriction of new purchases of AMC, GME, and KOSS stock. 4th Compl. ¶ 79; Pace Decl. Ex. 1 at 6; Pace Decl. Ex. 6 at 1 (correcting time zones). In total, Apex restricted trading of AMC, GME, and KOSS for approximately 3 hours and 25 minutes. *Id.* Apex's action occurred well after the market opened (9:30 a.m. ET) on January 28, 2021 and was lifted with over an hour remaining before the close of that same trading day (4:00 p.m. ET).

Plaintiffs themselves confirm this timeline, and the deficiency of their tort theories, through their attempt to selectively quote and rely upon Apex emails produced during pre-complaint discovery. At Paragraph 76 of the Fourth Complaint, Plaintiffs quote a January 28, 2021 10:01 a.m. ET email to suggest that Apex customers "complained" about the trading restrictions. 4th Compl. ¶ 76. But Plaintiffs omit material information in the email chain confirming, in a later email in the thread sent at 12:20 p.m. ET, that Apex implemented its trading restrictions in response to collateral requirements communicated from NSCC and that Apex actively was working with the DTCC to find "solutions" for customers. Pace Decl. Ex. 10 (APEX-MDL00002375–377 at 376). Far from negligence, the email chain quoted by Plaintiffs confirms Apex's careful and reasonable response to extraordinary market events, as described further herein.

## ARGUMENT

### I.  Plaintiffs' Common Law Claims Must Be Dismissed

The Fourth Complaint asserts four common law claims: negligence, breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, and "tortious interference with business relationship." Plaintiffs fail to state a claim under all four theories of liability, both under Texas or New York law because: (1) as a clearing broker Apex owed no common law duties to named Plaintiffs; (2) the standard of care and duties that Plaintiffs seek to impose are contrary to law; (3) Plaintiffs' implied covenant is not recognized under Texas law and, in any event, directly contradicts the Customer Agreement Plaintiffs now admit they signed; (5) Plaintiffs have failed to allege the basic elements of a tortious interference claim; and (6) Plaintiffs cannot show that

Apex's three hour and twenty-five minute pause in trading proximately caused them injury by speculating what other purchasers would have done, how the prices of meme stocks would have changed, and how Plaintiffs themselves would have timed the market to sell (or not sell) their stocks.

Moreover, this Court already has decided a number of the issues establishing Plaintiffs' failure to state a claim in its January 27, 2022 decision in the Robinhood Tranche of this multidistrict litigation. *See* ECF No. 453 ("RH Dismissal Or."). Citing New York case law, this Court already has found that clearing brokers—such as Apex—do not owe "*fiduciary* duties to the customers of an introducing broker." *Id.* at 47. This Court further held that even if a clearing broker were viewed as an introducing broker to a non-discretionary account—which it is not— then it still would not owe fiduciary duties to Plaintiffs. *Id.* Lastly, citing a case relying on New York case law, this Court dismissed the Robinhood Tranche plaintiffs' claim for the breach of the implied duty of care because the Robinhood Customer Agreement, as here with Apex, entitled Robinhood to "at any time, in [their] sole discretion and without prior notice . . . prohibit or restrict [the customer's] ability to trade securities." *Id.* at 49.

### A. This Court May Consider Only the Named Plaintiffs' Claims

Plaintiffs purport to bring their claims on behalf of both introduced customers and "direct customers," i.e., customers who contracted directly with Apex, in a seemingly last-ditch effort to avoid the unfavorable law cited in Apex's first and second motions to dismiss. 4th Compl. ¶ 98.[13] But "[a]t the motion to dismiss stage, the Court considers the allegations of the named Plaintiffs." *In re Brinker Data Incident Litig.*, 2020 U.S. Dist. LEXIS 247918, at *16 n.5 (M.D. Fla. Jan. 27, 2020); *see also Warth v. Seldin*, 422 U.S. 490, 502 (1975) ("Petitioners must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent."); *Goldberger v. Bear, Stearns & Co.*, 2000 U.S. Dist. LEXIS 18714, at *3 (S.D.N.Y. 2000). Plaintiffs Chavez and Jang are the named Plaintiffs before the Court, and they are both *introduced customers* (i.e., an introducing broker, not Apex, had the customer relationship with them) to whom Apex, as a matter

---

[13] Plaintiffs also purport to represent a class of all investors. Plaintiffs' claims on behalf of investors with no ties to Apex fail for the reasons set forth in Section IV.

of law and as Plaintiffs have already admitted, owes no common law duties.  *See* Sections I.C–D; 4th Compl. ¶¶ 14, 18; ECF No. 422 at 3 ("A Clearing Broker-Dealer typically performs ministerial functions and, therefore, is largely immune from legal liability for any misconduct performed by the Introducing Broker-Dealer").  Thus no claims of any so-called "direct customers" are before this Court.  *Parm v. Nat'l Bank of Cal., N.A.*, 242 F. Supp. 3d 1321, 1342 (N.D. Ga. 2017).

And in any event, Plaintiffs' mere reference to Apex's direct customers (4th Compl. ¶¶ 1–2, 24–25, 29, 70, 98, 117), without more, does not constitute "sufficient factual matter" to state a claim to relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Factual allegations must be enough to raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  Plaintiffs provide no "factual matter" concerning the services Apex provides to its direct customers or the terms under which it agrees to provide such services.  Absent such factual matter, Plaintiffs cannot support claims that Apex owed its direct customers common law duties, much less that Apex owed the novel duties Plaintiffs seek to create here.

## B.  If Necessary, Choice of Law Considerations Compel Application of Texas Law Where Apex Has Its Headquarters

An MDL court applies the choice of law rules of the transferor forum.  *See Larsen v. Citibank FSB*, 871 F.3d 1295, 1303 (11th Cir. 2017).  New York is the transferor forum, and because a "federal court sitting in diversity applies the choice-of-law rules of the forum state," we apply New York choice of law principles here.  *See Md. Cas. Co. v. Cont'l Cas. Co.*, 332 F.3d 145, 151 (2d Cir. 2003) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).

Under New York choice-of-law rules, "the first step in any choice of law inquiry is to determine whether there is an 'actual conflict' between the rules of the relevant jurisdictions." *Kinsey v. N.Y. Times Co.*, 991 F.3d 171, 176 (2d Cir. 2021).  Actual conflict is present where there are "relevant substantive differences that could have a significant impact on the outcome of the case."  *Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 332 (2d Cir. 2005).  Because Plaintiffs' claims fail under both New York and Texas law, no actual conflict exists.  *See id.*; *see* Sections I.C–G.

However, if this Court determines that differences in New York and Texas law are sufficient to constitute an "actual conflict," then Texas law should apply.  First, Plaintiffs' claims are governed by their Customer Agreement because Plaintiffs seek to recoup alleged economic losses based on Plaintiffs' contractual relationship with Apex.  *See* 4th Compl. ¶¶ 96–97; Section

11

I.C.1 (discussing economic loss rule); *see, e.g.*, *Chase Manhattan Bank v. N.H. Ins. Co.*, 193 Misc. 2d 580, 585 n.6 (N.Y. Sup. Ct., N.Y. Cnty. 2002), *aff'd*, 304 A.D.2d 423 (N.Y. Sup. Ct. App. Div. 2003) (observing parties' choice of law provision was "significant" for tort claims arising out of contractual relationship because provision reflected the parties' expectation as to applicable law for their contractual relationship). As such, the choice of law provision in the Customer Agreement governs and requires application of Texas law. Pace Decl. Ex. 2 at ¶ 15.

But even if this Court concludes that Plaintiffs' tort claims are not governed by the choice of law provision in Plaintiffs' Customer Agreements, a New York court would apply Texas law here. Where an actual conflict exists, "[i]n tort cases, New York 'applies the law of the state with the most significant interest in the litigation.'" *Kinsey*, 991 F.3d at 176 (quoting *Lee v. Bankers Trust Co.*, 166 F.3d 540, 545 (2d Cir. 1999)); *see also Padula v. Lilarn Properties Corp.*, 84 N.Y.2d 519, 521 (N.Y. 1994). In determining the state with the greatest interest, New York courts generally focus on the place where the conduct took place and the domicile of the parties. *See Champlain Enterprises, Inc. v. United States*, 945 F. Supp. 468, 472 (N.D.N.Y. 1996).

These choice of law factors support Texas law governing the Plaintiffs' common law claims. First, Apex's Customer Agreement requires that Texas law govern any disputes. Pace Decl. Ex. 2 at ¶ 15. Second, the locus of the conduct Plaintiffs' allege to be negligent (among other things) is centered in Dallas, Texas, which is where Apex maintains its headquarters. *See Costa*, 2011 U.S. Dist. LEXIS 66921, at *13; 4th Compl. ¶ 22. Third, Apex is domiciled in Texas. 4th Compl. ¶ 22. Fourth, Plaintiffs' respective domiciles are different, 4th Compl. ¶¶ 14, 18, so their locations should be given little weight. *Default Proof Credit Card Sys. Inc. v. State Street Bank & Trust Co.*, 753 F. Supp. 1566, 1571 (S.D. Fla. 1990). Finally, the relationship between Plaintiffs and Apex—to the extent there is any relationship—is centered in Texas, given that Apex has customers nationwide. *Chapman v. DePuy Orthopedics, Inc.*, 760 F. Supp. 2d 1310, 1313–14 (M.D. Fla. 2011); 4th Compl. ¶¶ 13, 17.

### C. Plaintiffs' Negligence Claim (Count I) Fails as a Matter of Law

Under Texas (and New York) law, "[t]o state a claim for negligence, a plaintiff must allege three elements: (1) the existence of a legal duty; (2) a breach of that duty; and (3) damages proximately resulting from that breach. The existence of a legal duty is a threshold question and is a question of law for the Court to resolve. If no duty exists, then the negligence claim is not viable, and the Court need not consider the remaining elements." *Turk v. Pershing LLC*, 2014

U.S. Dist. LEXIS 190624, at *14 (N.D. Tex. Dec. 8, 2014) (Texas law); *Solomon v. New York*, 66 N.Y.2d 1026, 1027–28 (1985) (New York law).[14]

Courts nationwide have disclaimed any common law or general duty of clearing brokers to investors to accept trades or to guard against unforeseeable events. *See, e.g.*, *Ross v. Bolton*, 904 F.2d 819, 824 (2d Cir. 1990); *Rozsa v. May Davis Grp., Inc.*, 187 F. Supp. 2d 123, 131–32 (S.D.N.Y. 2002); *Riggs*, 939 F. Supp. at 329–30; *Pulka v. Edelman*, 40 N.Y.2d 781, 784–86 (1976); *West v. Cruz*, 251 P.2d 311, 315 (Ariz. 1952); *Beckwith v. Hart*, 263 F. Supp. 2d 1018, 1023 (D. Md. 2003).

Even as to broker-dealers who manage non-discretionary accounts, Texas courts do not impose a common law duty to *agree* to execute trades. *Hand v. Dean Witter Reynolds Inc.*, 889 S.W.2d 483, 495 (Tex. App. 1994). New York courts similarly recognize that brokers owe no duty to accept orders. *See Courtland v. Walston & Co., Inc.*, 340 F. Supp. 1076, 1080 (S.D.N.Y. 1972); *Busch v. L.F. Rothschild & Co.*, 23 A.D.2d 189, 190 (NY. Sup. Ct. App. Div. 1965). This commonsense rule is recognized nationwide. *See, e.g.*, *Capital Options Invs., Inc. v. Goldberg Bros. Commodities*, 1990 U.S. Dist. LEXIS 14736, at *20 (N.D. Ill. Nov. 5, 1990), *aff'd*, 958 F.2d 186 (7th Cir. 1992); *French v. Bache Halsey Stuart, Inc.*, Comm. Fut. L. Rep. ¶ 20,444 at ¶ 21,806 (C.F.T.C. 1977) (see Pace Decl. Ex. 9); *Blyth v. White*, 49 G.A. App. 738, 832 (1934).

Even if Apex owed some form of duty to Plaintiffs, Plaintiffs fail to allege any conduct that amounts to negligence. *First*, Plaintiffs contend that Apex acted *too quickly* when it took emergency action to restrict its clearing of trades in three highly volatile stocks—i.e., that Apex had a "duty to dicker" rather than take decisive action. 4th Compl. ¶¶ 77, 83, 110. *Second*, Plaintiffs claim that Apex acted *too slowly* in lifting its emergency restrictions after receiving a reduced collateral requirement from NSCC—i.e., that Apex had a "duty to rush" rather than take the time to understand the facts and exercise due caution. 4th Compl. ¶ 111. And *third*, Plaintiffs argue that it was negligent for Apex to not have immediately on hand the amount of capital the

---

[14] However, even if another state's laws govern, the standard for negligence is effectively identical in all states that could be at issue here. *Scott v. Watson*, 359 A.2d 548, 552 (Md. 1976) (law of Maryland, home to Plaintiff Jang); *Quiroz v. Alcoa Inc.*, 416 P.3d 824, 827–28 (Ariz. 2018) (Arizona, home to Plaintiff Chavez); *Abad v. G4S Secure Sols. (USA), Inc.*, 293 So. 3d 26, 29 (Fla. Dist. Ct. App. 2020).

AMERICAS 114542987

NSCC demanded in response to unprecedented market volatility and risk—i.e., that Apex had a duty to tap unlimited funds.[15]  Each of Plaintiffs' novel purported duties has never been imposed by a court and must be rejected.

### 1. It Is Well-Established That a Clearing Broker Such as Apex Owes No Duty of Care to Meme Stock Speculators Such as Plaintiffs

This Court should dismiss Plaintiffs' negligence claims because courts consistently have held that clearing brokers like Apex do not have a duty of care to investors.

"Whether a duty exists is a question of law for the court . . . ."  *United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 473 (Tex. 2017).  To determine the existence of a duty, courts in Texas apply a "straightforward common-law duty analysis, balancing the risk, foreseeability, and likelihood of injury against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant."  *Read v. Scott Fetzer Co.*, 990 S.W.2d 732, 736 (Tex. 1998).  New York courts apply a similar analysis. *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 288-89 (2001).

Here, Apex owed no duty to Plaintiffs Chavez and Jang because, as a clearing broker, Apex did not undertake to act on behalf of investors and because, more fundamentally, brokers (whether clearing brokers or not) are not public utilities and owe no duty to accept new orders.  Moreover, Texas law does not impose a general duty of care to prevent economic injury.  Applying New York law to Plaintiffs' claims would not change this result.  *532 Madison Ave.*, 96 N.Y.2d at 288-89.

***Clearing Brokers Owe No Duties to Introduced Customers.***  Clearing brokers owe no duty to investors who use brokerages that in turn use the clearing broker's services.  *See, e.g.*, *Weatherly v. Pershing*, 2015 U.S. Dist. LEXIS 197128, at *11 (N.D. Tex. June 23, 2015) (dismissing investor negligence claims against clearing broker because "a clearing broker owes no common law duty of care to an investor"); *Turk*, 2014 U.S. Dist. LEXIS 190624, at *14–16 (same);

---

[15] Pace Decl. Ex. 1 (NJBS Letter); Pace Decl. Ex. 10 (APEX-MDL00002375–377) (quoted in 4th Compl. at ¶ 76).  Plaintiffs selectively quote this email chain at Paragraph 76 of the Fourth Complaint.  Despite Plaintiffs' best efforts to mischaracterize Apex's response to the collateral requirements discussed with the DTCC as having ended "minutes" after Apex implemented the alleged trading restrictions at 11:30 a.m. ET, *see* 4th Compl. at ¶ 82, this email chain reveals that at 12:20 p.m. ET, Apex executives "have been on with senior folks at DTC and are working through potential solutions."  Pace Decl. Ex. 10 (APEX-MDL00002375–377 at 376).

*Ross*, 904 F.2d at 824; *Rozsa*, 187 F. Supp. 2d at 131; Minnerop, 75 Bus. Law at 2241.  The Eleventh Circuit has also recognized the "general rule that clearing firms have no fiduciary relationship with the customers of introducing brokers."  *Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1296 n.12 (11th Cir. 2002).  Plaintiffs Chavez and Jang admit that Apex's only connection to them was solely as a clearing broker.  4th Compl. ¶¶ 14, 18. Therefore, Apex owed Plaintiffs no duty of care.

That Apex is subject to various rules and regulations of the SEC, FINRA, DTCC, and NSCC does not change this outcome.  As courts repeatedly have held, those rules and regulations do not provide a private right of action, and Plaintiffs may not create such private rights of action out of state common law.  *See Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 464 F. Supp. 3d 634, 645 (S.D.N.Y. 2020); *Rozsa*, 187 F. Supp. 2d at 132; *Fox v. Lifemark Sec. Corp.*, 84 F. Supp. 3d 239, 245 (W.D.N.Y. 2015); *see also In re Series 7 Broker Qualification Exam Scoring Litig.*, 510 F. Supp. 2d 35, 47 (D.D.C. 2007), *aff'd*, 548 F.3d 110 (D.C. Cir. 2008).  Thus, Plaintiffs' citation to *Brink v. James* for the unremarkable proposition that "[v]iolations of FINRA rules by broker-dealers can be used as evidence of negligence" is beside the point.  *See* 4th Compl. ¶ 49 (citing *Brink v. James*, 892 F.3d 1142 (11th Cir. 2018)).[16]   The overwhelming authority concludes—as did the court in *Brink*—that FINRA rules do not *create* a duty, common law or otherwise, to Plaintiffs.  *Brink v. James*, 341 F. Supp. 3d 1314, 1325 (S.D. Fla. 2018); *Weatherly*, 2015 U.S. Dist. LEXIS 197128, at *10–11 ("Plaintiffs fail to establish that the NASD/FINRA conduct rules *create* a duty of care owed by clearing brokers to investors; rather, the rules may be used to determine whether a breach has occurred once it has been established that a duty of care existed.") (emphasis added).

***Contracts Gave Apex the Right to Refuse Trades***.  Plaintiffs acknowledge that "Apex required each of its Direct Customers and each of its Shared Customers to enter into Customer Agreements."  4th Compl. ¶ 96.  But as in *Weatherly*, in which the Court refused to recognize a duty of care arising from a clearing broker's agreements with its brokers, nowhere in the Fourth Complaint do Plaintiffs allege "that [Apex] agreed to perform any services for investors," let alone

---

[16] Based on the substance of the decision and the assertion it purports to support in the Fourth Complaint, Plaintiffs appear mistakenly to have cited the wrong case, which ostensibly should be *Brink v. James*, 341 F. Supp. 3d 1314 (S.D. Fla. 2018).

AMERICAS 114542987

that Apex had agreed to perform any services for Plaintiffs Jang or Chavez in particular. *Weatherly*, 2015 U.S. Dist. LEXIS 197128, at *11.  Rather, Apex's Customer Agreements provide that Apex has an absolute right to refuse to execute a customer's transactions and that Apex "shall not be liable for losses caused directly or indirectly by any events beyond your reasonable control, including without limitation, . . . *suspension of trading or unusually heavy trading in securities* . . . ." Pace Decl. Ex. 1, at 3 (emphasis added); Pace Decl. Ex. 2, at ¶ 3 (emphasis added).[17]

> ***Clearing Brokers Are Not Public Utilities and Owe No Duty of Constant Availability.***
Even if Apex owed some duty of care to Plaintiffs, Plaintiffs fail to allege anything to support their proposed duty to *continue to open new positions for Plaintiffs in the meme stocks, provide unlimited capital and assure constant availability*.  Apex is not an exchange or a public utility, required to accept all orders and continue operating its clearing services all day, every day, without interruption, even when doing so would create hazards to its business.  As one court in Texas noted with respect to brokers (i.e., a step *closer* to Plaintiffs than Apex):

> A customer's right to sue a broker for refusing to open a new position in the market must be considered in light of countervailing concerns, particularly the consequences of placing that requirement on a broker.  ***To impose this duty on broker or brokerage houses would be to require them to act as a public utility and would deny them the right to exercise business judgment in the acceptance of customers and customers' orders.  There are no Texas cases imposing such a duty***, and the authorities in other jurisdictions have refused to impose it.  Lastly, an analysis under the risk-utility balancing test supports our decision not to impose this duty on brokers.

*Hand*, 889 S.W.2d at 495 (emphasis added); *see also id.* at 495 ("[T]he execution of new contracts exposes the broker, as well as the customer, to new financial risks.  One party should not be able to impose risks on the other without the other's consent."); *Busch*, 23 A.D.2d at 190; *Courtland*, 340 F. Supp. at 1080.  Thus, Plaintiffs' negligence claim—purportedly on behalf of Apex's direct customers—also must fail on this ground:  neither Texas nor New York law recognizes a general duty on broker-dealers to open new positions for their customers on request.  *Id.*

---

[17] This Court may consider the full terms of the Customer Agreement because its terms are selectively discussed in the Fourth Complaint, it is the basis of the Parties' relationship, and because Plaintiffs rely on the Customer Agreement.  *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005).  Moreover, the standard language from the Customer Agreement is quoted at length in the letter from Apex to the NJBS relied upon in Plaintiffs' Fourth Complaint.  4th Compl. ¶¶ 79–80.

AMERICAS 114542987

Indeed, Plaintiffs' original Complaint admitted that moving to "position closing only" (clearing trades only for sales and not purchases) is entirely appropriate in certain circumstances. Compl. ¶ 15 n.3 (ECF No. 359). Plaintiffs also admit that it is acceptable to stop selling stocks for a period of time due to events that might cause damage to Apex or the markets. 4th Compl. ¶ 52.

**Plaintiffs Cannot Recover in Negligence for Purely Economic Losses.** Apex does not owe Plaintiffs (or its direct customers) a general duty of care to prevent economic losses, particularly when those losses are governed by contract. Plaintiffs now admit that they each signed a customer agreement with Apex. 4th Compl. ¶ 97. And Plaintiffs' only allegations of injury are that they held shares of GME and AMC stock and sold the shares "for less than [they] would have sold for but for the negligence alleged herein." *Id.* ¶¶ 15, 16, 19, 20. Texas follows the "economic loss rule," which disallows "purely economic damages unaccompanied by injury to the plaintiff or his property" for actions in negligence. *LAN/STV v. Martin K. Eby Constr. Co.*, 435 S.W.3d 234, 235, 243 (Tex. 2014) ("Texas courts of appeals have uniformly applied the economic loss rule to deny recovery of purely economic losses in actions for negligent performance of services."). The economic loss rule regularly is applied in the context of a claim for negligent performance under a contract and disallows tort claims for purely economic injury that is the subject of a contract. *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986).

New York courts follow a similar rule: "[u]nder the economic loss doctrine, a defendant is not liable in tort for purely economic loss ***unless*** the plaintiff demonstrates that the defendant owed a duty, which 'may arise from a special relationship[.] . . . to protect against the risk of harm to plaintiff.'" *AMBAC Assur. Corp. v. U.S. Bank N.A.*, 328 F. Supp. 3d 141, 159 (S.D.N.Y. 2018) (emphasis added). The court in *AMBAC* explained that "the economic loss doctrine centers on whether the defendant owed a duty to protect against the risk of harm to the plaintiff." *Id.* As discussed above and herein, Apex simply does not owe any ongoing fiduciary or other common law duties to Plaintiffs. *See* Sections I.C–D. Moreover, Plaintiffs have not alleged any facts describing a "special relationship" that would "define[] the class of potential plaintiffs to whom the duty is owed." *See 532 Madison Ave.*, 96 N.Y.2d at 289, 292. To the contrary, Plaintiffs would have their proposed duties apply to every investor in meme stocks, regardless of whether such investors had any connection to Apex.

Here, Plaintiffs' relationship with Apex is governed by Plaintiffs' customer agreement, which expressly gives Apex "the right to refuse to execute securities transactions for the Customer

AMERICAS 114542987

at any time and for any reason."  Pace Decl. Ex. 1, at 3; Pace Decl. Ex. 2, ¶ 3.  Plaintiffs cannot now seek to recover in tort what they would be precluded from recovering in contract.

### 2. Plaintiffs Fail to Allege a Standard of Care That Apex's Conduct Could Have Breached with a Mid-Day, Few Hour Interruption in a Single Day's Trading of Three Meme Stocks

Even if the Court does not dismiss the claims for failure to allege a duty owed by Apex, Plaintiffs fail to state a claim for negligence.

#### a. Plaintiffs' First Alleged Negligent Act (the Duty to Dicker with DTCC).

Plaintiffs complain that Apex acted too carefully when it took emergency action to pause purchases of three meme stocks.  4th Compl. ¶¶ 4, 110.  But Plaintiffs have it backwards.  Plaintiffs allege that they were harmed by a surplus of care, not a lack of care.  Plaintiffs' theory is that Apex was too careful in taking emergency action to ensure it remained in compliance with its capital requirements.  State tort law simply does not punish actors in negligence for using too much care.  *See Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex. 1983); *Bly v. Whitehall*, 120 N.Y. 506, 509-10 (1890) (per curiam).  In other words, Plaintiffs believe Apex should have lollygagged.

Plaintiffs' first theory of negligence highlights the backwards nature of Plaintiffs' claims.  Plaintiffs allege that Apex acted too decisively to limit risk in response to DTCC's collateral requirements, "without even trying to confirm the collateralization number received from DTCC at approximately 9:30 a.m. on January 28, 2021, *or seeking to negotiate it down*."  4th Compl. ¶ 110 (emphasis added); *see also* 4th Compl. ¶¶ 77–79.  But, as Plaintiffs know, the DTCC's collateral requirements are not subject to negotiation.  As the New York Times reported in the aftermath of the January 28, 2021 volatility, "[t]he D.T.C.C.'s demand is *not negotiable*.  A firm that can't meet its margin call is *effectively out of the stock trading business* because D.T.C.C. won't clear its trades any more."  Nathaniel Popper, et al., *The Silicon Valley Start-Up That Caused Wall Street Chaos*, The New York Times (Jan. 30, 2021), https://www.nytimes.com/2021/01/30/business/robinhood-wall-street-gamestop.html (emphasis added).

The social utility of clearing brokers like Apex taking these precautions and halting trading to ensure that they continue to meet their net capital and other regulatory requirements cannot be overstated.  *See, e.g.*, *Bear, Stearns Sec. Corp.*, Exchange Act Release No. 41,707, 70 SEC No. 710 (Aug. 5, 1999).  Negligence law does not require clearing brokers to risk violating regulatory requirements simply to economically benefit a class of investors.  In fact, the law requires the

AMERICAS 114542987

opposite. *See, e.g.*, *Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.)*, 247 B.R. 51, 64 (Bankr. S.D.N.Y. 1999) (introducing broker was "**obligated** by law **to cease trading**" when it was "operating in violation of its net capital requirements") (emphasis added).

Even if it could be considered negligence to take decisive action (one hour after receiving NSCC's notice) to limit risk in response to unprecedented market conditions, Plaintiffs allege that what Apex should have done instead was "negotiate" with the NSCC regarding the collateral requirements. 4th Compl. ¶ 110. But Plaintiffs badly misunderstand these requirements; they are not, as the Fourth Complaint supposes, an opening offer to a negotiation about how much collateral may be required under SEC regulations and FINRA rules. 17 C.F.R. § 240.15c3-1(a) ("Every broker or dealer **must** at all times have and maintain net capital . . . .") (emphasis added); *see also* 17 C.F.R. § 240.17Ad-22 (2020) (standard for clearing agencies).

The Fourth Complaint summarizes the Net Capital Rule as a duty "to maintain sufficient liquid assets to meet all *obligations* to customers." 4th Compl. ¶ 40 (emphasis added). But nowhere do the rules force clearing brokers to take on *more* obligations. The Rule requires only that the existing "obligations" be covered. The suspension of trading was to ensure Apex could meet the obligations of existing Apex customers. The Plaintiffs turn the Net Capital Rule on its head to read it as a duty to provide unlimited capital to cover unlimited future obligations. The Rule nowhere imposes such a draconian duty, the imposition of which would discourage firms from becoming clearing brokers in the first place, at war with the democratization efforts of the SEC in 1975 and beyond. *See, e.g.*, Minnerop, 75 Bus. Law, at 2212–13.

The NSCC's communications are a real-time estimate of the necessary capital under the SEC's and FINRA's requirements. A company has no duty to disobey capital requirements in the hopes that the NSCC might calculate different ones. *In re Cadwallder*, 2007 Bankr. LEXIS 2260, at *45 (Bankr. S.D. Tex. June 28, 2007) ("The law does not require the impossible.").

Plaintiffs admit, however, that the NSCC's collateral requirements are not some administrative nicety, lightly to be disregarded by clearing brokers. "These margin requirements are intended to protect DTCC members and the market as a whole from the systemic risk that highly volatile stocks can produce, especially when a broker's position has significant risk concentration in such stocks." 4th Compl. ¶ 37. As Plaintiffs admit, "margin requirements protect NSCC and all market participants against clearing member defaults." 4th Compl. ¶ 38.

Notably, if Apex had continued to permit purchases, if the 9:30 a.m. ET collateralization

19

demand had been correct, and if demand had continued to grow at the same exponential pace as it had from the prior day, then Apex very easily could have violated the SEC's Net Capital Rule—effectively promising to settle trades that it lacked the capital to cover.  *See* 4th Compl. ¶ 40 (describing 17 C.F.R. § 240.15c3-1); *see also* 4th Compl. ¶¶ 31–35 (describing capital requirements).  State negligence law cannot force a firm to violate federal securities law.  *See, e.g.*, *In re Adler, Coleman Clearing Corp.*, 247 B.R. at 64.

Plaintiffs urge the Court to create out of thin air a brand new "duty to dicker" rather than take decisive action in the face of potential threats from market volatility.  But such a duty not only does not exist, it also could well be deleterious to future investors.  If clearing brokers were not permitted to decide to discontinue clearing for a period of time in response to collateral requirements, but rather were required to continue clearing at ever-increasing levels of risk while trying to get the NSCC on the phone to "negotiate," then clearing brokers could be at greater risk of failing to maintain adequate collateral, and even greater harm to Plaintiffs and others would occur.  *See* 4th Compl. ¶¶ 36–40.  There is not and has never been a duty to delay decisive action and "negotiate" with the DTCC.

### b.  Plaintiffs' Second Alleged Negligent Act (the Duty to Rush).

Plaintiffs' second theory of negligence is that Apex acted too cautiously in re-opening its clearing services for the three meme stocks at issue.  4th Compl. ¶¶ 4, 110.  Plaintiffs blame Apex again for its *abundance* of care during extraordinary market activities.  Plaintiffs allege that, having received at 12:00 p.m. Eastern on January 28, 2021 a new, lower collateral requirement from the NSCC, Apex "confirm[ed] with NSCC that the new report was accurate" before lifting the restriction on purchasing.  4th Compl. ¶¶ 79, 81.  While the Fourth Complaint alleges that Apex communicated with the DTCC at 11:47 a.m. Eastern, it does not allege when the NSCC confirmed that the 12:00 p.m. Eastern collateral requirement was correct.  4th Compl. ¶ 81–82.  Moreover, an email chain Plaintiffs selectively quote at Paragraph 76 reveals that as of 12:20 p.m. Eastern, far from being in a position to lift the alleged trading restriction, Apex was still in the process of "working through potential solutions" with the DTCC.  Pace Decl. Ex. 10 (APEX-MDL00002375–377 at 376).  In any event, as shown in Apex's letter to the NJBS relied upon in Plaintiffs' Fourth Complaint, Apex lifted its restriction on purchases at 2:55 p.m. Eastern that day—approximately 3 hours and 25 minutes after receiving the NSCC's revised collateral requirement, and prior to market-close.  4th Compl. ¶ 81.

Plaintiffs' negligence claim ignores that, had Apex miscalculated and re-opened trading only to receive a collateral demand it could not cover, then Apex might have violated the SEC's Net Capital Rule (and other regulations).   *See* 4th Compl. ¶¶ 31–38 (describing these requirements).   Plaintiffs ask this Court to second-guess, minute-by-minute, Apex's effort to manage the risks of unprecedented volatility in trading and shifting capital requirements.   But "[c]ourts are not equipped to second-guess the business judgments of professional traders and brokers when it comes to risk assessments," such as the risk here of re-opening trading on stocks with unprecedented volatility.   *Capital Options Invest., Inc. v. Goldberg Bros. Commodities, Inc.*, 958 F.2d 186, 191 (7th Cir. 1992) (reasoning adopted in *Hand*, 889 S.W.2d at 495).   The duty of care is not a Goldilocks question requiring the exercise of *just enough* care, and an overabundance of care to ensure compliance with the law is not negligence.   *See, e.g., Gonzalez v. Acosta*, 2001 Tex. App. LEXIS 5623, at *4 (Tex. App. Aug. 16, 2001); *see also Stag Canon Fuel Co. v. Rose*, 145 S.W. 677, 680 (Tex. App. 1912).   Indeed, the Antitrust Plaintiffs recognized this reality and the reasonableness of Apex's actions.   ECF No. 451 ¶ 195.

Plaintiffs' new "duty to rush" is at odds with hornbook negligence law and demonstrates the conflicting obligations that ad hoc, litigation-driven duties can produce.   Plaintiffs' proposed duty to rush is at odds with their duty to dicker.

### c.  *Plaintiffs' Third Alleged Negligent Act (the Duty to Provide Unlimited Capital).*

Plaintiffs' third theory of negligence—the purported duty of clearing brokers to provide unlimited capital—is also unprecedented. 4th Compl. ¶ 112. Plaintiffs admit that the short squeeze they created was a "rare," unprecedented event, caused by a group of coordinated actors exploiting market vulnerabilities to artificially inflate the price of a stock.   4th Compl. ¶ 76 ("rare"); 4th Compl. ¶ 3 ("Leading up to January 28, 2021, [the Suspended Stocks] experienced increased trading volume concentrated in portfolios of firms that, among other activities, support individual investors"); Compl. ¶ 136 ("Robinhood continued to drive explosive growth and volume").   Elsewhere in this MDL, Plaintiffs have alleged that these actions created "theoretically limitless loss[es]" that Apex and other clearing brokers would have needed to be capable of covering.   ECF No. 416 ("Antitrust Compl.") ¶ 12.

Yet Plaintiffs nonetheless claim not only that Apex should have anticipated that Plaintiffs would engage in such conduct driving the meme stocks ever higher through Reddit forums, but also that Apex should have responded simply by "raising additional capital."   4th Compl. ¶ 112.

21

This claim fails for multiple reasons.

*First*, Plaintiffs do not, and cannot, allege ***how*** Apex was supposed to simply create "additional capital," nor do Plaintiffs allege ***how much*** capital would have been enough to have on hand for this unprecedented event.  *See* 4th Compl. ¶ 112.  Simply alleging that Apex should have somehow "rais[ed] additional capital" does not suffice to state a claim that Apex was negligent—i.e., that it departed from the standard of care—by having on hand the amount of capital it did.  *Iqbal*, 556 U.S. at 679.  Plaintiffs are not merely suggesting that Apex should have had *additional* capital, but rather that Apex somehow should have had *unlimited* capital, given that plaintiffs in this MDL have characterized the potential losses Apex needed to cover as "theoretically limitless."  Antitrust Compl. ¶ 12.  Tort law does not impose a duty for such heroics.

*Second*, this alleged new duty conflicts with the federal securities law regulatory structure.  Nowhere does Plaintiffs' Fourth Complaint find any such duty to supply endless capital in the SEC Net Capital Rule.  Money does not grow on trees.  The duty Plaintiffs seek to impose on clearing brokers has no precedent.  And, in Plaintiffs' imagined world of clearing brokers having to take unlimited risks with unlimited capital, undoubtedly the SEC's democratization reforms would be impacted adversely.  *See, e.g.*, Minnerop, 75 BUS. LAW at 2212–13.

*Third*, Texas law is clear that brokers are not public utilities and are not required to continue taking *new orders* along with the corresponding unlimited risk associated with such new orders.  *Hand*, 889 S.W.2d at 495.  New York similarly recognizes no such duty exists.  *See Courtland*, 340 F. Supp. at 1080 ("A stockbroker need not accept the orders of a customer so long as he makes clear at the time the orders are given that he refuses to perform them."); *Busch*, 23 A.D.2d at 190 ("A *broker is not obligated to accept an order of a customer for execution*, even if the customer has a credit balance with the broker.") (emphasis added).  There is simply no duty in the law for a broker—let alone a clearing broker—to have unlimited resources to facilitate investors' demands.  *See Hand*, 889 S.W.2d at 495; *Busch*, 23 A.D.2d at 190.

*Fourth*, no duty of reasonable care requires Apex to guard against illegal market manipulation.  "As a general rule, a defendant has no legal duty to protect another from the criminal acts of a third person . . . ."  *Banzhaf v. ADT Sec. Sys. Sw., Inc.*, 28 S.W.3d 180, 186 (Tex. App. 2000).  Here, Plaintiffs admit that they and others like them engaged in a collusive short squeeze, and their complaint is that—having joined a group of people jointly manipulating the market—they then failed to enjoy the full fruits of their manipulation.  4th Compl. ¶¶ 58–64.  But there is

22

no duty for Apex to have on hand sufficient capital to grease the skids for Plaintiffs' market manipulation; even if Plaintiffs are free to manipulate the market, they are not entitled to force others to take on unlimited risk so that they may do so. *See Otis*, 668 S.W.2d at 309 (When imposing a common law duty of care, courts must weigh the social utility of the actor's conduct and "the magnitude of the burden of guarding against the injury and consequences of placing that burden on the employer.").

*Fifth*, it was unforeseeable as a matter of law that Plaintiffs would engage in the social-media-based market manipulation scheme to drive up the prices of meme stocks, which in turn led to the "market volatility brought on by increased demand" that is the subject of this litigation. *See* 4th Compl. ¶ 61; RH Tranche Compl. ¶ 10; *see also Humble Sand & Gravel, Inc. v. Gomez*, 146 S.W.3d 170, 181 (Tex. 2004) ("It is firmly established in Texas that the existence and elements of a common law duty are ordinarily legal issues for the court to decide" and identifying foreseeability as an element of duty). A duty of care does not require Apex to guard against the unforeseeable. "It is quite generally held that . . . duty . . . excludes liability for those consequences which arise from ***unusual or extraordinary occurrences***." *Dallas v. Maxwell*, 248 S.W. 667, 670 (Tex. 1923) (emphasis added); *Doe v. Boys Clubs*, 907 S.W.2d 472, 478 (Tex. 1995).

### D.  Plaintiffs Fail to State a Claim for Breach of Fiduciary Duty (Count II)

Plaintiffs bring a claim of breach of fiduciary duty on two grounds:  (1) that Apex should be deemed to be an "agent" of Plaintiffs and (2) that, by virtue of Apex's status as a registered securities broker-dealer, Apex owed Plaintiffs fiduciary duties. 4th Compl. ¶¶ 114–21. Plaintiffs contend that Apex had a duty to (1) provide an open trading platform, and (2) not prefer its self-interest over Plaintiffs' interests. Plaintiffs allege Apex breached those duties by suspending trading and instructing its introducing brokers to suspend purchases of the meme stocks subject to the extreme market volatility. Plaintiffs' claim fails for two fundamental reasons. First, courts nationwide have held that clearing brokers do not owe any fiduciary duties to introduced customers such as Chavez and Jang. And second, Texas and New York courts have held that brokers are not public utilities who owe a duty to accept any and all orders of individual investors.

To state a claim for breach of fiduciary duty under Texas law, a Plaintiff plausibly must allege (1) a fiduciary relationship; (2) breach of the fiduciary duty; and (3) injury to the plaintiff, or benefit to the defendant, proximately caused by defendant's breach. *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017); *Bos v. Smith*, 556 S.W.3d 293,

AMERICAS 114542987

303 (Tex. 2018). "[W]hether the parties have a formal fiduciary relationship is generally a question of law for the court." *Turman v. POS Partners, LLC*, 541 S.W.3d 895, 904 (Tex. App. 2018). The Texas Supreme Court has explained that "a fiduciary relationship exists when the parties are 'under a duty to act for or give advice for the benefit of another upon matters within the scope of the relation[ship].'" *Texas Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 507 (Tex. 1980) (citing Restatement Torts, § 874). "[A]rms-length transactions entered into for the parties' mutual benefit . . . do not establish a basis for a fiduciary relationship." *Meyer v. Cathey*, 167 S.W.3d 327, 331 (Tex. 2005). New York imposes a similar rule. *See Oddo Asset Mgm't v. Barclays Bank PLC*, 19 N.Y.3d 584, 592–93 (2012).

### 1.   Apex, a Clearing Broker, Is Not a Fiduciary of Plaintiffs Chavez and Jang and Owes Them No Fiduciary Duty, as Courts Universally Hold

"[C]learing brokers, as opposed to introducing brokers, do not owe common law duties to investors." *Weatherly*, 2015 U.S. Dist. LEXIS 197128, at \*11; *see also Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 465 (2d Cir. 2013); *Dercole v. Divico Fin of Am.*, 2005 U.S. Dist. LEXIS 59757, at \*5 (E.D.N.Y. 2005); RH Dismissal Or. at 47.

Plaintiffs Chavez and Jang admit that they each interacted with introducing brokers and used Apex solely as their clearing broker. 4th Compl. ¶¶ 14, 18. Plaintiffs do not allege they entered into any agreement with Apex in which Apex agreed to act as Plaintiffs' fiduciary. Plaintiffs do not allege they relied upon Apex for any services other than back-office clearing and settlement services. *See* 4th Compl. ¶¶ 25–26. Indeed, under the parties' Customer Agreement, Plaintiffs expressly recognized that they were relying "solely on [their] Introducing Broker" "for any advice concerning [their] accounts." *See, e.g.*, Pace Decl. Ex. 2, at ¶ 6. Plaintiffs do not allege they had a "special relationship" with Apex that predates their Customer Agreement. Thus Plaintiffs fail to allege any facts from which this Court may infer that Apex acted as Plaintiffs' fiduciary. *Weatherly*, 2015 U.S. Dist. LEXIS 197128, at \*11; *Rozsa*, 152 F. Supp. 2d at 531.

### 2.   Apex Was Not Plaintiffs' Agent

Plaintiffs' assertion, with no factual support, that Apex was their "agent" (4th Compl. ¶¶ 115, 116) is nothing more than a naked legal conclusion and therefore insufficient under *Spear, Leeds* to survive a motion to dismiss. *Spear, Leeds*, 305 F.3d at 1297; *see also Iqbal*, 556 U.S. at 678; *Dixon v. Allergan U.S.*, 2015 U.S. Dist. LEXIS 198315, at \*7 (S.D. Fla. Apr. 2, 2015).

To survive a motion to dismiss, Plaintiffs must do more than merely assert an agency

24

relationship; they must allege facts that *demonstrate* that Apex was "under a duty to act for or give advice for the benefit of another upon matters within the scope of the relation[ship].'" *See Texas Bank*, 595 S.W.2d at 507; *de Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293, 1308 (2d Cir. 2002); *see also Glob. Enter. Grp. Holding, S.A. v. Ottimo*, 2010 U.S. Dist. LEXIS 145126, at *16-19 (E.D.N.Y. June 8, 2010) (clearing broker owed no fiduciary duty to introduced customer absent "extenuating circumstances"). Absent any factual basis to assume the existence of an agency relationship, this Court is not required to take as true Plaintiffs' legal conclusion that Apex acted as Chavez's or Jang's agent. *Spear, Leeds*, 305 F.3d at 1297. This is particularly true where Apex has specifically disclaimed agency relationship in the Customer Agreement Plaintiffs now acknowledge they signed. Pace Decl. Ex. 2 at ¶ 6.

### 3. Apex's Status as a Registered Broker-Dealer Does Not Transform Apex's Back-Office Services into a Fiduciary Relationship

Plaintiffs next attempt to circumvent *Spear, Leeds* by conjuring a fiduciary relationship between Apex and Plaintiffs on the basis that Apex provides "financial services" and is a registered broker-dealer. 4th Compl. ¶¶ 47, 115. Countless entities provide "financial services," but providing financial services alone does not create fiduciary relationships. And Plaintiffs confuse Apex's registration with the SEC and FINRA as a "broker-dealer"—a regulatory requirement of *all clearing brokers*[18]—with the type of ongoing, agency-based relationship that a financial advisor or manager of a discretionary account takes on with individual investor customers. *See, e.g.*, *Texas Bank*, 595 S.W.2d at 507; *de Kwiatkowski*, 306 F.3d at 1306.

Moreover, as discussed above (Section I.C.1), SEC, FINRA, DTCC, and NSCC rules create no private right of action. *See Valelly*, 464 F. Supp. 3d at 645; *Fox*, 84 F. Supp. 3d at 245. Plaintiffs may not use state common law claims to circumvent this rule. *Valelly*, 464 F. Supp. 3d at 645. Plaintiffs' assertion that "[v]iolations of FINRA rules by broker-dealers can be used as evidence of negligence" (4th Compl. ¶ 49) adds nothing because registration as a broker-dealer does not *create* fiduciary duties. *See Weatherly*, 2015 U.S. Dist. LEXIS 197128, at *10–11.

As Plaintiffs acknowledge, Apex "provides *clearing* broker services to correspondent introducing broker-dealers and customers introduced to Apex by those introducing broker-

---

[18] *See* Henry Minnerop, *Clearing Arrangements*, 58 BUS. LAW. 917, 924 (May 2003).

dealers." 4th Compl. ¶ 25 (emphasis added). In other words, Apex had an even smaller role than that of a broker of a non-discretionary account, in which "[a] broker's duty is usually restricted to executing the investor's order when the investor controls [the] account and retains the ability to make investment decisions." *See Holmes v. Newman*, 2017 Tex. App. LEXIS 6177, at *17–18 (Tex. App. Jul. 6, 2017); *see also Spear, Leeds*, 305 F.3d at 1296 n.12. Thus, just as in *de Kwiatkowski*, Plaintiffs' assertion that Apex "had an ongoing duty to exercise 'due care' or 'behave like a reasonable broker,' breach of which could be evidenced by noncompliance with internal rules, cannot be squared with the cases holding that a broker's obligations to a nondiscretionary client arise and are satisfied transaction-by-transaction." *de Kwiatkowski*, 306 F.3d at 1311.

Plaintiffs' addition of broker-dealers who are "direct" customers of Apex to their class definition—in a transparent effort to "avoid the rule's consequences," *Spear, Leeds*, 305 F.3d at 1296 n.12, that is, to avoid the law governing the duties of clearing brokers—does not change this result.[19] First, Plaintiffs' fail to allege any facts that "detail the exact nature of the relationship" (*id.* at 1297) indicating: (1) the types of accounts that such "direct customers" hold with Apex, (2) whether Apex acts as an investment advisor (it does not), (3) the nature of any agreements between Apex and such customers, or (4) the services that Apex provides to such customers. Absent such allegations, this Court is not equipped with "sufficient factual material" to determine whether a fiduciary relationship exists at all, let alone the scope of that relationship. *Spear, Leeds*, at 1297. Second, even if the Court could conclude that Apex serves as a broker-dealer for its direct customers, the "agency or broker/customer relationship does not come into existence until the order has been placed *and the broker has consented to execute it* . . . . If a party refuses to act as an agent for the 'principal,' no relationship between the parties arises and the 'agent' has no duty to act for the 'principal.'" *Hand*, 889 S.W.2d at 493 (emphasis added); *see also de Kwiatkowski*, 306 F.3d at 1311. Accordingly, "each new order is a new request that the proposed agent consents to act for the principal [and] there is no on-going agency relationship as there would be with a financial advisor or manager of a discretionary account." *Hand*, 889 S.W.2d at 494.

---

[19] As discussed in Section II.C, named Plaintiffs lack standing to assert any claims unique to direct customers, so this Court may not rely on any duties that Apex may owe to its direct customers to sustain Plaintiffs' Fourth Complaint.

AMERICAS 114542987

4.      **Plaintiffs' Arms-Length Contracts with Apex Specifically Permit Apex to Act in Its Own Interest**

Despite having signed agreements with Apex, the named Plaintiffs attempt to plead around the existence of both the contracts between Apex and its introducing brokers and the contracts between Apex and the named Plaintiffs.  But Plaintiffs do allege the existence of a relationship among Apex, Plaintiffs, and Plaintiffs' introducing brokers.  Therefore, this court may consider those contracts, which definitively disprove Plaintiffs' fiduciary duty theory.  *See SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010) (extrinsic contract between the plaintiff and defendant clearing broker properly considered where the contract "determined the terms of the relationship between [plaintiff] and [defendant]," and where plaintiffs referred vaguely to account opening documents in their complaint).

The existence of a contract governing the relationship between Apex and its introducing brokers is not in question:  FINRA Rule 4311 requires Apex to maintain a clearing agreement with each introducing broker, in which the parties allocate responsibilities.   *See* FINRA Rule 4311(c)(1).  Those agreements specifically state that Apex is not required to accept any orders from any introducing brokers.  Pace Decl. Ex. 1 at 3.

Moreover, Apex's agreements with the end customer (including Plaintiffs Chavez and Jang) specifically provide that Apex has an absolute ***right to refuse*** to execute securities transactions for customers ***at any time and for any reason***.  *See supra* Section I.C.1.  Far from creating a fiduciary relationship, the end-customer agreement specifically disclaims any obligation on the part of Apex to subordinate its own self-interest to that of the end customer.  Pace Decl. Ex. 1 at 3; Pace Decl. Ex 2 at ¶¶ 3–4.  Such terms are incompatible with a fiduciary relationship, which by definition requires a fiduciary "to subvert his own interest to those of his principal."  *Wilcox v. Wilcox*, 2006 Tex. App. LEXIS 11106, at *9 (Tex. App. Dec. 28, 2006); *see also Oddo Asset Mgm't*, 19 N.Y.3d at 592–93.

5.      **Apex Did Not Breach Any Fiduciary Duty by Refusing to Accept New Trades**

Even if this Court were to conclude that Apex owed some duty of care to named Plaintiffs or Apex's direct customers, that duty did not include a duty to operate like a public utility regardless of the harm to Apex's business.  The scope and nature of fiduciary duties is limited by the nature of the relationship.  *Holmes*, 2017 Tex. App. LEXIS 6177, at *17–18.

Texas law distinguishes between brokers who manage discretionary and non-discretionary

27

accounts.  Brokers who manage discretionary accounts are given *discretion* to trade without their clients' prior approval and offer their clients financial and investment advisory services and, consequently, are held to higher fiduciary standards.  *See Anton v. Merrill Lynch*, 36 S.W.3d 251, 257 (Tex. App. 2001).  By contrast, for brokers who manage non-discretionary accounts, "each new order is a new request that the proposed agent consents to act for the principal [and] there is no on-going agency relationship as there would be with a financial advisor or manager of a discretionary account."  *Hand*, 889 S.W.2d at 493.  If the broker of a non-discretionary account "refuses to act as an agent for the 'principal,' no relationship between the parties arises and the 'agent' has no duty to act for the 'principal.'"  *Id*.  New York courts recognize a similar distinction. *de Kwiatkowski*, 306 F.3d at 1311.

Here, Apex, as a clearing broker, is alleged to have performed only back-office clearing services for named Plaintiffs.  4th Compl. ¶¶ 14, 18, 25–26.  Plaintiffs make no allegations concerning the services that Apex provided to, or the nature of its relationship with, its direct customers.  And Plaintiffs Chavez and Jang do not allege that they (or Apex's direct customers) relied on Apex for investment or financial advice; nor do they allege that Apex agreed to subordinate its interest to theirs (or its direct customers').  Neither New York nor Texas law imposes a general duty on Apex to accept any and all customer orders that come its way.  *See Hand,* 889 S.W.2d at 495; *Busch*, 23 A.D.2d at 190.  Thus, at most, any duty that Apex owed to Plaintiffs and/or Apex's direct customers would arise only once the order has been placed and Apex ***consented*** to execute it.  *Hand*, 889 S.W.2d at 493.  Apex had no duty to consent to *future* trades.

### E.  Plaintiffs Fail to State a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing (Count III)

Plaintiffs' Fourth Complaint adds a claim for breach of the implied covenant of good faith and fair dealing based on the same facts as alleged in Plaintiffs' earlier complaints.  *See* 4th Compl. Count III.  To bolster their claim, Plaintiffs allege—without a single supporting fact—that Apex had the "intent of causing the trading price of the Suspended Stocks to go down."  4th Compl. ¶ 127.  Not only is that conclusory allegation unsupported by any *facts*, but Plaintiffs also fail to establish any breach of the implied covenant under either Texas or New York law.

Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing must be governed by Texas law, as required by the clear terms of the Apex Customer Agreement.  *See,*

28

*e.g.*, Pace Decl. Ex. 2 ("This Agreement and its enforcement shall be governed by the laws of the state of Texas and shall cover individually and collectively all accounts which the Customer has previously opened, now has open or may open or reopen with you, or any introducing broker, and any and all previous, current and future transactions in such accounts.").  Under Texas law, "[a] duty of good faith and fair dealing may arise when the contract governs or creates a *special relationship*."  *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 490 (Tex. 2019) (emphasis added).  That is, "[t]he duty of good faith and fair dealing stems from the relationship of the parties and not from the contract."  *Id.*  The Supreme Court of Texas "has been clear that absent a special relationship, parties to a contract have no duty to act in good faith."  *Id.* Such "special relationships" are limited to relationships creating an informal fiduciary duty.  *See Bodum USA, Inc. v. J.C. Penney Corp., Inc.*, 2019 Tex. App. LEXIS 9353, at *22 n.10 (Tex. App. Oct. 23, 2019) (collecting cases).  "To impose an informal fiduciary duty in a business transaction, the special relationship of trust and confidence must exist prior to, and apart from, the agreement made the basis of the suit."  *Meyer*, 167 S.W.3d at 331.  The Fifth Circuit has remarked that "Texas Courts of Appeals have restricted the special-relationship doctrine to narrow and carefully circumscribed situations," and in fact, "recognize only one special relationship—that between an insurer and an insured."  *Hux v. S. Methodist Univ.*, 819 F.3d 776, 781 (5th Cir. 2016) (collecting cases denying existence of a special relationship).  As discussed in Section I.D (breach of fiduciary duty), Plaintiffs fail to allege any facts giving rise to a fiduciary duty or any "special relationship." Plaintiffs' claim for a breach of the implied covenant of good faith and fair dealing must fail under Texas law.

But, even if this Court were to evaluate Plaintiffs' claim under New York law, Plaintiffs' claim still fails.  While "New York does recognize that in appropriate circumstances an obligation of good faith and fair dealing on the part of a party to a contract may be implied . . . '[n]o obligation can be implied, . . . which would be inconsistent with other terms of the contractual relationship.'" *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 304 (1983).  Plaintiffs' conclusory allegations notwithstanding, *see* 4th Compl. ¶ 126, the covenant Plaintiffs would have this Court impose— i.e., not to restrict trading—directly would contradict the clear terms of the parties' agreement, which grants Apex the right to refuse to execute transactions for Plaintiffs ***at any time and for any reason***.  *See supra* Section I.C.1.  Further, the governing Customer Agreement provides that Apex "shall not be liable for losses caused directly or indirectly by any events beyond your reasonable

AMERICAS 114542987

control, including without limitation, . . . suspension of trading or unusually heavy trading in securities." *Id.*  The agreement is silent as to Plaintiffs' proposed right of an investor to demand that Apex clear all trades, particularly when doing so would be unreasonable for Apex.  As such, Apex's alleged conduct could not have deprived Plaintiffs of their contracted-for benefits from the Customer Agreement.  *See EBC I, Inc. v. Goldman Sachs & Co.*, 5 N.Y.3d 11, 22-23 (2005).

### F.  Plaintiffs Fail to State a Claim for Tortious Interference (Count IV)

Plaintiffs' claim for "tortious interference with [a] business relationship," which Plaintiffs state they allege "in the alternative" (4th Compl. ¶ 129), fails on multiple grounds, whether evaluated under Texas or New York law.

In Texas, "[t]he theory of tortious interference with business relations by a third person includes two causes of action:  (1) tortious interference with existing contracts, and (2) tortious interference with prospective contractual relations."[20]  *Dunn v. Calahan,* 2008 Tex. App. LEXIS 9498, at *8 (Tex. App. Dec. 17, 2008) (citing *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 689 (Tex. 1989)).  The elements of a cause of action for tortious interference with a contract are:  (1) the existence of a contract subject to interference; (2) the act of interference that is willful and intentional; and (3) actual damages or loss proximately caused by the intentional act.  *Id.*; *see also Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 926 (Tex. 1993).  Plaintiffs' claim fails under Texas law, as Plaintiffs simply re-hash their negligence claim:  "failing to have a reasonable plan." *Marathon Oil Co.,* 767 S.W.2d at 689.

With respect to New York law, when the New York Court of Appeals first recognized the existence of a claim for tortious interference with economic relations (as distinct from the tort of tortious interference with *contract*), the court held that, to state a claim where no breach of contract is alleged, a plaintiff must prove that the defendant used "wrongful means" to interfere with plaintiffs' business relationship.  *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 191 (1980) (holding that "persuasion alone" is insufficient).  Plaintiffs fail to state a claim under New York law because Plaintiffs fail to allege that Apex used "wrongful means" to interfere with Plaintiffs' business relationship.

---

[20] Plaintiffs' Fourth Complaint does not address a theory of tortious interference with *prospective* contractual relations, so we do not address it here.

AMERICAS 114542987

1.      **Plaintiffs Fail to Allege "Willful and Intentional" Interference or "Wrongful Conduct"**

Plaintiffs state that Count IV is "alleged in the alternative" (4th Compl. ¶ 129), but in fact it reiterates Plaintiffs' negligence allegations:  complaining of Apex's "*failing* to have a *reasonable* plan in place to control its risk exposure." 4th Compl. ¶ 133 (emphasis added).  Far from an "alternative" to Count I, terms such as "failing" and "reasonable" are terms of mere negligence. *See Union Pac. R.R. Co. v. Nami*, 498 S.W.3d 890, 896 (Tex. 2016) ("[N]egligence means . . . failing to do what a reasonable person like the defendant would have done . . . .").

Texas law requires "a willful and international act of interference" for a tortious interference claim. *Browning-Ferris*, 865 S.W.2d at 926; *see also Marathon Oil Co.,* 767 S.W.2d at 689.  "[T]o establish the element of a willful and intentional act of interference, the plaintiff must produce evidence that the defendant was *a more-than-willing participant and knowingly induced* one of the contracting parties *to breach* its obligations under the contract." *Duradil, L.L.C. v. Dynomax Drilling Tools, Inc.,* 516 S.W.3d 147, 168 (Tex. App. 2017) (emphasis added).  This in turn requires Plaintiffs to "present evidence that an obligatory provision of the contract was breached." *Id.*  Plaintiffs plead no facts that Apex willfully induced a breach of an introducing broker's contract, and the Count IV must be dismissed. *Spear, Leeds*, 305 F.3d at 1297.

Plaintiffs' claim fares no better under New York law because, without alleging Apex induced a breach of contract, Plaintiffs fail to allege the "wrongful conduct" necessary to sustain their claim.   The "wrongful means" the court identified in *Guard-life* were "'physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure.'" *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 87 N.Y.2d 614, 624 (1996) (quoting *Guard-Life*, 50 N.Y.2d at 191).  The New York Court of Appeals later reiterated that "[t]he sort of 'more culpable' conduct we had in mind in *NBT* was described in *Guard-Life*." *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 189 (2004).  Negligence, breach of fiduciary duty, and breach of the implied covenant of good faith and fair dealing are not among the litany of crimes and torts enumerated in *Guard-Life*.  But that is all Plaintiffs allege. *See, e.g.*, 4th Compl. ¶ 133.

2.      **Plaintiffs Fail to Allege that Apex's Introducing Brokers Contractually Were Forbidden from Declining to Open New Positions**

Plaintiffs' failure to plead the terms of any contracts with their introducing brokers defeats their tortious interference claim because Plaintiffs cannot allege that Apex's actions caused their

31

introducing brokers to breach a term of any contract.

To survive a motion to dismiss, Plaintiffs must allege "that an obligatory provision of [a] contract was breached" as a result of Apex's conduct. *Duradil*, 516 S.W.3d at 168. In light of Plaintiffs' theory of tortious interference, Plaintiffs must therefore allege that their introducing brokers were contractually required to execute any and all trades Plaintiffs requested. Plaintiffs fail to do so. First, Plaintiffs have not alleged that they asked their introducing brokers to place orders to purchase the meme stocks during the time when Apex temporarily paused purchases of those stocks. Thus, Plaintiffs cannot claim that Apex induced their introducing brokers to breach their contract or that Plaintiffs were injured in any way by their introducing brokers' breach of any contract. *See Warth*, 422 U.S. at 502 (1975); *Parm*, 242 F. Supp. 3d at 1342; *see also Oddo Asset Mgm't*, 19 N.Y.3d at 594–95.

Second, Plaintiffs have not alleged a specific provision that Apex allegedly caused the introducing brokers to breach. This is not surprising, given that broker-dealers (even introducing brokers) are not required to accept new positions; rather, they are required only to close out existing positions when requested to do so. *See, e.g.*, *Hand*, 889 S.W.2d at 493–94; *Busch*, 23 A.D.2d at 190; *Capital Options Inves.*, 1990 U.S. Dist. LEXIS 14736, at *20. Absent allegations that the introducing brokers had an obligation to accept new orders, and that the named Plaintiffs intended to, but were prevented from, purchasing the meme stocks, Plaintiffs fail to state a claim for tortious interference with business relations, whether evaluated under New York or Texas law. *See NBT Bancorp*, 87 N.Y.2d at 620–21 (requiring a third-party breach of contract for tortious interference of contractual relations); *Mintz Fraade Law Firm, P.C. v. Fed. Ins. Co.*, 193 A.D.3d 654, 655 (N.Y. Sup. Ct. App. Div. 2021) (same for tortious interference with business relations); *see also Duradil*, 516 S.W.3d at 168.

### 3. Apex Was Permitted, as a Matter of Law, to Decline to Clear New Positions

Plaintiffs' tortious interference claim also fails because Apex had a legal right to refuse to consent to opening new positions. "It is well settled that interference with contractual relations or future business relations is privileged where it results from the exercise of a party's own rights." *Baker v. Welch*, 735 S.W.2d 548, 549 (Tex. App. 1987); *see also Oddo Asset Mgm't*, 19 N.Y.3d at 595. In a case dealing with a broker and its client, the Texas Supreme Court ruled that a "party is justified in interfering with another's contract if it exercises (1) its own legal rights or (2) a good faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken."

AMERICAS 114542987

*Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 282 (Tex. 1996).

Apex had a right not to open new positions.  *Hand*, 889 S.W.2d at 493; Pace Decl. Ex. 1 (NJBS Letter).  Therefore, Apex's instruction to its introducing brokers that it would not accept new orders for three of the meme stocks was privileged and cannot constitute tortious interference with contractual relations.  Apex's justification in refusing to execute trades in meme stocks similarly precludes Plaintiffs' claim under New York law.  *Oddo Asset Mgm't*, 19 N.Y.3d at 594 (requiring intentional and *unjustified* interference); *see also Alvord & Swift v. Stewart M. Muller Constr. Co.*, 46 N.Y.2d 276, 281 (1978) (dismissing tortious interference claim because "[t]here has never been any indication that an intentional tort was committed in the sense of an intention to harm plaintiffs without economic or other lawful excuse or justification").

### G.  Apex's Actions Did Not Proximately Cause Plaintiffs' Alleged Injury (All Counts)

Plaintiffs' common law claims against Apex must be dismissed because Plaintiffs fail to plausibly allege that Apex's decision to halt trading proximately caused Plaintiffs' alleged injuries.

Under Texas law, Plaintiffs plausibly must allege damages proximately resulting from Defendant's conduct.  *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990) (negligence); *Brenner v. Centurion Logistics LLC*, 2020 Tex. App. LEXIS 9810 at *22 (Tex. App. Dec. 14, 2020) (breach of fiduciary duty); *Hill v. Heritage Res., Inc.*, 964 S.W.2d 89, 126 (Tex. App. 1997) (tortious interference).  New York courts also require proof of proximate causation. *Dunn v. New York*, 29 N.Y.2d 313, 318 (1971) (negligence); *Laub v. Faessal*, 297 A.D.2d 28, 30–31 (N.Y. Sup. Ct. App. Div. 2002) (breach of fiduciary duty); *Cantor Fitzgerald Assocs., L.P. v. Tradition N. Am., Inc.*, 749 N.Y.S.2d 249, 249 (N.Y. Sup. Ct. App. Div. 2002) (tortious interference).

"Proximate cause has two elements:  cause in fact and foreseeability."  *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 551 (Tex. 2005); *see also Ventricelli v. Kinney Sys. Rent A Car, Inc.*, 45 N.Y.2d 950, 951 (1978).  "These elements cannot be established by mere conjecture, guess, or speculation."  *Urena*, 162 S.W.3d at 551.  That standard is consistent with *Iqbal*'s instruction that the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678.  "The test for cause in fact is whether the act or omission was a substantial factor in causing the injury without which the harm would not have occurred."  *Urena*, 162 S.W.3d at 551; *see also Varghese v. Singh*, 265 A.D.2d 322, 322 (N.Y. Sup. Ct. App. Div. 1999).  Causation "is not established if the defendant's conduct or product does no more than

33

furnish the condition that makes the plaintiff's injury possible." *Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 776 (Tex. 1995), *abrogated on other grounds by Ford Motor Co. v. Ledesma*, 242 S.W.3d 32 (Tex. 2007); *see also Dunn*, 29 N.Y.2d at 318. "'Foreseeability' means that the actor, as a person of ordinary intelligence, should have anticipated the dangers that his negligent act created for others." *Travis v. Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992).

*The intervening trading days doom the Fourth Complaint*.   Here, Plaintiffs make no plausible, non-speculative allegation that Apex's decision to halt trading for a few hours on January 28, 2021 in fact caused Plaintiffs to sell their shares for less than they otherwise would have, and for significantly less than they could have sold their shares on January 28, days after the alleged conduct.  *See* 4th Compl. ¶ 16 (Chavez sold his shares *three days* later on February 2); 4th Compl. ¶ 20 (Jang sold his shares *five days* later on February 4).  Such delay means that intervening market factors separate the alleged harm from the alleged conduct.  *See 7 W. 57th St. Realty Co., LLC. v. Citigroup, Inc.*, 771 Fed. App'x 498, 503–04 (2d Cir. 2019) (intervening market factors precluded proximate causation where alleged market event at best indirectly caused portfolio to decline in value); *see also Union Pump*, 898 S.W.2d at 776 (no proximate causation where allegedly negligent conduct had ceased and plaintiff was "walking away from the scene" before being injured); *Dunn*, 29 N.Y.2d at 318 (alleged harm occurred hours after the alleged negligent conduct).

*Plaintiffs' failure to allege sufficient control over meme stocks to affect price dooms the Fourth Complaint*.  Plaintiffs fail to allege how much trading of the memes stocks would have been routed through Apex, as opposed to other brokers, such as Robinhood.  Absent any factual allegation that Apex controlled a sufficient piece of the market to affect the price of meme stocks during its three hour and 25 minute trading pause, Plaintiffs cannot plausibly allege that Apex's actions affected the price of Plaintiffs' meme stocks.  *See Suez Water N.Y., Inc. v. E.I. du Pont de Nemours & Co.*, 2022 U.S. Dist. LEXIS 1483, at *56 (S.D.N.Y. 2022).

*Plaintiffs' speculative causal links doom the Fourth Complaint*.  Plaintiffs' claims are speculative because they require a crystal ball and depend upon too many causal links.  *See Perret v. Wyndham Vacation Resorts, Inc.*, 846 F. Supp. 2d 1327, 1331 (S.D. Fla. 2012).  Finding for Plaintiffs requires speculating that (1) prices would have continued to rise, and (2) named Plaintiffs would have timed the market perfectly and sold at a peak, when in reality they sold in a dip.  *See 7 W. 57th St. Realty Co.*, 771 Fed. App'x at 504.  Plaintiffs have offered no *facts* to convert their

34

optimistic speculation into plausible allegations.

First, Plaintiffs offer no explanation in their Fourth Complaint for why this Court should simply assume that prices in the meme stocks at issue here simply would have continued to rise indefinitely. *See* 4th Compl. ¶¶ 58–68. For example, Plaintiffs offer no factual allegations as to the strength of the fundamental data supporting the meme stock purchasers' decision-making. And, in fact, Plaintiffs admit that "[d]uring this time, certain hedge funds and market makers were shorting the Suspended Stocks," and that short selling "tends to drive the prices down." 4th Compl. ¶¶ 59–61. Plaintiffs instead rely on their bare-bones allegation that "individual investors increased demand," and offer as an example that the price of one meme stock, GME, sharply increased in price by 78.46%. 4th Compl. ¶¶ 58, 60. But, as the SEC warned investors in the wake of the January 2021 events, "the rapid rise in the price of an investment, reflecting a high degree of collective enthusiasm" for the investment's prospects, is a "financial 'mania[]' or 'bubble,'" and the "*rapid rise is usually followed by a contraction in the investment's price . . .* when there is wide-scale selling of the investment that causes a *sharp decline in the investment's price*." SEC Jan. 30, 2021 Investor Bulletin (emphasis added). Plaintiffs offer only speculation, and no facts, to allege that the meme stocks at issue here would have deviated from the usual course of events and continued to rise in value.

Second, Plaintiffs offer no facts from which this Court could infer that, despite the fact that Plaintiffs chose to sell in a dip, Plaintiffs would have timed the market better in their "but for" world and sold at a peak. Again, Plaintiffs have not alleged that they purchased the meme stocks based on their review of "fundamental data (that is, economic, financial, and other qualitative or quantitative data that can affect the value of the investment)." *Id.* Rather, they point to what other investors were doing at the time. But, as the SEC also warned in its Investor Bulletin, traders who trade without the use of fundamental data "generally have poor timing, follow trends, and overreact to good and bad news in the market." *Id.* Plaintiffs offer no facts from which this Court could infer that they would have behaved differently in the but-for world than they did in the real world (i.e., they would have had *good* timing, they would not have relied on trends, and they would not have overreacted to news in the market). *See In re Catanella & E.F. Hutton & Co., Inc. Sec. Litig.*, 583 F. Supp. 1388, 1417 (E.D. Pa. 1984) (ebbs and flows of market are intervening cause of Plaintiffs' losses).

Third, Plaintiffs' allegations that, "but for" Apex's conduct, 4th Compl. ¶¶ 16, 20, Plaintiffs

AMERICAS 114542987

would have sold their shares at a higher price than they did are further speculative in that the allegations would require the fact finder to assume that the prices of GME and KOSS stock simply would have continued to rise higher than those prices had ever risen before, and that AMC stock would have continued to rise, despite the fact that the stock made no significant upward price movements in the following 4 months after Apex's restrictions were lifted.  Pace Decl. Exs. 3–5.[21] Finally, Plaintiffs' conclusory allegations about foreseeability—that Apex "should have known" that its decision to pause new purchases to ensure compliance with capital requirements would have caused injury to investors—do not substitute for *facts* from which this Court could infer that Apex should have foreseen Plaintiffs' alleged injury. 830 S.W.2d at 98.  For example, courts have held that clearing brokers are entitled to cancel trades made when a broker is in violation of its net capital requirements. *In re Adler, Coleman Clearing Corp.*, 247 B.R. at 64.

Texas courts repeatedly have held that intervening actors' misconduct, if unforeseeable, negates causation. *Coleman v. Equitable Real Estate Inv.*, 971 S.W.2d 611, 618 (Tex. App. 1998) (employee's breach of security policies was unforeseeable and therefore independent cause). Plaintiffs' alleged injury was caused by unprecedented, widespread, online-forum-driven market activity, not Apex's decision to halt trading, nor the timing of Apex's decision to resume trading, nor Apex's decision not to maintain infinite capital.

## II.     Plaintiffs Chavez and Jang Lack Article III Standing (All Counts)

Plaintiffs seek tort damages from Apex to recover additional profits they speculate they would have made in the stock market had the price of certain stocks increased.  But the basis for Plaintiffs' belief that those stocks would have increased in value is the widespread coordination in online forums that led to unprecedented buying of those depreciating stocks.  And Plaintiffs (who are not direct customers of clearing broker Apex) seek to have Apex indemnify them for their stock market losses, in part, on the basis that they claim Apex owed certain duties to downstream investors.  Article III does not permit such vicarious claims.

Article III requires that a plaintiff plausibly "allege injury in fact," which requires (1) that

---

[21] Courts are permitted to take judicial notice of stock prices. *See La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 842 (11th Cir. 2004) ("Those [stock] prices are not subject to reasonable dispute, and are a proper subject for judicial notice."); *New Orleans Emplrs. Int'l Longshoremen's Ass'n v. Mercer Inv. Consultants*, 635 F. Supp. 2d 1351, 1362 n.7 (N.D. Ga. 2009).

AMERICAS 114542987

the injury be concrete, particularized, and not conjectural or hypothetical, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992), and (2) the invasion of a legally protected interest, *Aaron Private Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1336 (11th Cir. 2019).

### A.  Plaintiffs Fail to Allege Injury in Fact Because Their Claims That They Would Have Sold Certain Meme Stocks at a Higher Price Are Speculative and Implausible

Plaintiffs do not allege that Mr. Chavez or Mr. Jang would have purchased or even *wanted* to purchase additional shares of any of the meme stocks, much less that they *tried* to do so and were prevented by Apex's actions.  Instead, Plaintiffs allege that Mr. Chavez held 607 shares of AMC stock on January 27 (4th Compl. ¶ 17) and *sold* that AMC stock on February 2 "for less than he would have sold for but for the conduct alleged herein." *Id.* ¶ 17.  Likewise, Plaintiffs allege that Mr. Jang held 3,500 shares of GME stock on January 27 and that on February 4 he "sold 401 shares of GME stock for less than he would have sold for but for the conduct alleged herein." *Id.* ¶¶ 21.  But Plaintiffs admit that neither Mr. Chavez nor Mr. Jang was prevented from selling his shares on January 27, 28, or any other day.  4th Compl. ¶ 72.  Nor did Apex's alleged actions prevent Plaintiffs from buying more of the three meme stocks at the open or close of the market trading day on January 28, 2021.

Plaintiffs theorize that, but for Apex's conduct, some number of ***other investors***, who allegedly were unable to make purchases with brokers who used Apex for three hours and twenty-five minutes, would have made more net purchases than they actually did even after Apex removed all restrictions, driving up prices even higher.  Plaintiffs then speculate that Mr. Chavez and Mr. Jang would have used their savvy and clairvoyance to time the market and sell at the speculated and unspecified inflated price, rather than holding the stocks for either too little or too much time. 4th Compl. ¶¶ 15, 16, 19, 20.

Any such claim depends on assuming that Messrs. Chavez and Jang correctly would have called the top of the market and sold their meme stocks at that tip-top point—even though in the real world they did not.  On January 28, GameStop shares—which previously had traded at $20–40 a share—instead were trading for $483 a share, an astonishing run up.[22]  *Nothing prevented Mr.*

---

[22] Yahoo Finance, Historical Data: GameStop Corp. (GME), https://finance.yahoo.com/quote/GME/history/ (last visited Aug. 30, 2021) ("Yahoo GME Price Data").

AMERICAS 114542987

*Jang from selling his shares at $483; sales were never restricted on these or any other securities.* Plaintiff Jang was free to sell all day long.  Yet instead of selling at $483—or holding longer term—Mr. Jang chose to sell his GME stock on February 4 when the stock price was between $53.33 and $91.50.[23]  4th Compl. ¶¶ 19–20.  Likewise, *nothing prevented Mr. Chavez from selling his AMC stock at $16.50 on January 28*, or holding until the stock hit $64.96 on June 18, but instead he sold on February 2 for between $6 and $10.10.  4th Compl. ¶¶ 15–16.  Mr. Chavez and Mr. Jang each sold in a dip—but ask this Court to allow them to recover on the theory that (a) the stock price could have gone even higher, and, if it had, then (b) they definitely would have perceived the top of the market and sold at that point, even though in the real world they missed the top entirely.

Allegations that a plaintiff would have taken certain steps at an unspecified future date on which it would have been most advantageous are inherently speculative and insufficient to allege injury-in-fact.  In that vein, the Eleventh Circuit has made clear that injury stemming from a "some day" intention to do something in the future is not sufficient to confer Article III standing.

> Because Aaron has alleged only that it intends to found a clinic at some unspecified time in the future, its "some day" intention []—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do[es] not support a finding of . . . "actual or imminent" injury. . . .  A plaintiff alleging that it would have opened a business absent the challenged action must point to at least some facts suggesting a likelihood that its business would have come about absent the challenged action.

*Aaron Private Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1337–38 (11th Cir. 2019) (internal citation omitted); *see also Tokyo Gwinnett, LLC v. Gwinnett Cty.,* 940 F.3d 1254, 1263–64 (11th Cir. 2019) ("[A] plaintiff does not meet this burden by merely outlining in a complaint 'facts from which we could *imagine* an injury sufficient to satisfy Article III's standing requirements,' since 'we should not speculate concerning the existence of standing, nor should we imagine or piece together an injury sufficient to give plaintiff standing when it has demonstrated none.'") (emphasis added) (internal citations omitted).

Nothing in the Fourth Complaint asserts a concrete plan that would suggest that Mr. Chavez or Mr. Jang actually would have earned even greater returns or that they suffered any injury as a

---

[23] Yahoo GME Price Data (*supra* at n.22).

AMERICAS 114542987

result of Apex's 3.5 hour trading pause.  And no harm resulting from this sort of hypothetical "some day" actions, as *Lujan* and *Berry* teach, can be redressed by a favorable decision of this Court.  Plaintiffs' conclusory allegations of injury are insufficient to confer Article III standing.

### B.   Plaintiffs Fail to Allege They Have a "Legally Protected Interest" in Lost Earnings Due to Plaintiffs' Thwarted Meme Stock Scheme

The injury-in-fact prong of Article III standing requires the "invasion of a legally protected interest." *See Berry*, 912 F.3d at 1336.  But here, Plaintiffs are in effect suing to recover the greater ill-gotten gains that they hoped to receive as a result of a thwarted market manipulation scheme. However, it has long been understood that courts will not allow a plaintiff to recover profits that would result from improper or illegal conduct.  *See The Highwayman's Case*, 9 L. Q. Rev. 197 (1893).  The Seventh Circuit succinctly has described this commonsense rule:

> [I]f awarding relief to the plaintiff would reward wrongdoing—courts will not adjudicate their dispute.  The classic illustration is *Everet v. Williams* (Ex. 1725), better known as The Highwayman's Case and reported (long afterward) in a note by that name in 9 L.Q. Rev. 197 (1893).  A highwayman sued his partner in crime for an accounting of the illegal profits of their criminal activity.  The court refused to adjudicate the case, and both parties were hanged.  A modern example would be a suit by the owner of a misleading trademark for infringement of the mark.

*Schlueter v. Latek*, 683 F.3d 350, 355 (7th Cir. 2012).

The Plaintiffs unabashedly admitted in their original complaint that this litigation arises from the Plaintiff purchasers' own coordinated "short squeeze" working collusively as a group to purchase stocks to pump up "the value of the stock they purchased."  4th Compl. ¶ 64.  Plaintiffs admitted that the increase in value of the meme stocks was the product of their collusive online discussions that resulted in coordinated and unprecedented purchasing of shares of those stocks. Compl. ¶ 169 ("[T]he Suspended Stocks became increasingly popular as, among other things, investors engaged in online discussions regarding the undervaluation of the Suspended Stocks and began purchasing shares.").  Simply put, Plaintiffs cannot allege the invasion of a legally protected interest in their lost profits from a partially-blunted market manipulation scheme.  *See* Complaint, *Secs. & Exch. Comm'n v. Aaron et al.*, No. 1:15-cv-05704 (S.D.N.Y. Jul. 21, 2015) (action alleging "multiple 'pump-and-dump' schemes dating back to at least mid-2011").  That Plaintiffs now omit such earlier admissions from their Fourth Complaint does not erase the admissions.  This Court may consider Plaintiffs' previous judicial admissions in a pleading filed before this Court.  *See Fernandez v. Sch. Bd. of Miami-Dade Cnty.*, 201 F. Supp. 3d 1353, 1361, n.1 (S.D. Fla. 2016)

AMERICAS 114542987

(courts may accept "the facts as alleged in the plaintiff's original complaint as true for the purposes of a motion to dismiss" where the plaintiff has made a "transparent attempt" to "manipulat[e] the allegations in their pleadings to avoid a dispositive defense.").

### C. Named Plaintiffs Lack Standing to Bring Claims on Behalf of a Class of Direct Customers Because Named Plaintiffs Are Not Direct Customers of Apex

Plaintiffs seek to assert claims on behalf of not only individual investors but also broker-dealers who are direct customers of Apex. *See* 4th Compl. ¶¶ 98, 112–13, 116–17, 121, 123–24, 127. But the named Plaintiffs, who are not broker-dealer direct customers of Apex, lack Article III standing, and therefore, their claims fail, regardless of whether some other class of Plaintiffs, such as broker-dealer direct customers, may have standing. *Warth*, 422 U.S. at 502. Standing is an "indispensable part of the plaintiff's case," and so "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Ala. Legis. Black Caucus v. Alabama*, 135 S. Ct. 1257, 1276 (2015) (internal quotations omitted). And "standing is gauged by the specific common-law, statutory, or constitutional claims that a party presents," and thus "whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72, 77 (1991). In a class action, the named plaintiffs must possess the same claims as those of the class members they represent. *Warth*, 422 U.S. at 502. And even where a named Plaintiff has standing to assert one claim, that Plaintiff may not use the class mechanism to circumvent the requirements of Article III standing to assert additional claims for which it lacks an entitlement to relief. *Griffin v. Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1987).

Here, the named Plaintiffs are not direct customers but *introduced* customers, and Apex owed the named Plaintiffs no duty of care, nor any fiduciary duties. As such, Plaintiffs Chavez and Jang have suffered no legally cognizable injury. *See* Section III; *see, e.g.*, *Dercole*, 2005 U.S. Dist. LEXIS 59757, at *5; *Weatherly*, 2015 U.S. Dist. LEXIS 197128, at *10–11; RH Dismissal Or. at 47. Even if this Court were to give credit to Plaintiffs' bare-bones allegations concerning Apex's direct customers, and even if this Court were to conclude that Apex owed some form of duty to those *direct* customers, as *introduced* customers the named Plaintiffs lack standing to assert claims on behalf of direct customers. *See Berry*, 912 F.3d at 1336.

AMERICAS 114542987

III.    **This Action Is Pre-Empted by Federal Securities Laws Because Apex Is Subject to Active and Heavy Federal Regulation and Because the Duty That Plaintiffs Assert Against Apex Would Prove an Obstacle to the Uniform Federal Regulatory Regime in the Interstate Trading of Publicly-Listed Securities**

Plaintiffs' state common law claims conflict with and are preempted by the federal securities laws.  The Supremacy Clause provides that the laws and treaties of the United States "shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const., Art. VI, cl. 2.  Accordingly, it has long been settled that state laws that conflict with federal law are 'without effect.'"  *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 479–80 (2013) (internal citation omitted).  "[S]tate law is naturally preempted to the extent of any conflict with a federal statute."  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000); *see also Geier v. Am. Honda Co.*, 529 U.S. 861, 865 (2000).  "[A court] will find preemption where it is impossible for a private party to comply with both state and federal law . . . . and where 'under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  *Crosby*, 530 U.S. at 372–73 (emphasis added).

It comes as no surprise that the purchase and sale of publicly-listed securities in interstate commerce is and has been regulated extensively at the federal level since the Securities Exchange Act of 1934.  The DTCC and its subsidiary NSCC are self-regulatory organizations (SROs) that are required to promulgate rules and procedures for their members pursuant to the 1934 Act.  *See, e.g.*, 4th Compl. ¶ 33 (CEO NSCC testimony); ¶ 35 (Apex's "deposit requirements required by the DTCC"); ¶ 37 ("NSCC's volatility-based margin requirements stipulate the capital charges that should be borne by firms"); ¶ 37 (describing NSCC's "'Gap Risk' measure for firms that have high concentrations in volatile stocks").  The authorizing statute, 15 U.S.C. § 78q-1, states the purpose of both SRO entities, including "prompt and accurate clearance and settlement of securities transactions" and "the development of uniform standards and procedures for clearance and settlement."  Plaintiffs devote an entire section of their Fourth Complaint to the federal securities regulatory landscape, acknowledging that its purpose is to "manage risk to the markets." 4th Compl. ¶¶ 31–57.

The original Complaint admitted that federal regulators were active in the events of January 28, 2021.  "SEC/FINRA are very interested in our move to restrict trading in this way . . . ." Compl. ¶ 257.  And the Fourth Complaint cites SEC investigations and FINRA supervision throughout.

AMERICAS 114542987

*See, e.g.*, 4th Compl. ¶¶ 51, 95.

Clearing brokerage in particular has a unique federal history. As one commentator describes, the national clearing system was the subject of Congress's 1975 amendments to the 1934 Act. The Congressional reforms were part of federal legislative efforts to democratize stock ownership and grow the number of broker dealers—a process in which Congress exercised its powers under the Commerce Clause to federalize the clearance and settlement of securities transactions, taking this responsibility away from the States:

> In 1975, Congress responded to the Paper Crunch crisis by amending the Securities Exchange Act of 1934. Congress determined that "the prompt and accurate clearance and settlement of securities transactions . . . are necessary for the protection of investors" and directed the SEC to "facilitate the establishment of a national system for the prompt and accurate clearance and settlement of transactions in securities." *The 1975 amendments marked the first time that Congress invoked its powers under the Commerce Clause, charging the SEC with "regulating the securities transfer and clearing processes, a subject previously left to state law."*

Minnerop, 75 Bus. Law. at 2212 (emphasis added). Congressional reforms included steps that led to the creation of the discount brokerage market with commissions deregulated on "May Day"— May 1, 1975. *See id.* at 2213. The SEC implemented the Congressional mandate leading to "the development of the national clearance and settlement system as well as the regulatory framework governing clearing brokers." *Id.*

Yet Plaintiffs ask this Court, through state tort law, to impose a duty on clearing brokers to do what federal law disallows. *See id.* at 2245 n.215. Plaintiffs chastise Apex, for example, for being too hasty to comply with its increased collateral requirements—"that it did not even try to confirm the high number or seek to negotiate it down." 4th Compl. ¶ 77. Plaintiffs' newly created duties impose capital demands beyond those Congress had in mind.

As the District Court for the District of Columbia has held with regard to SROs, and as the D.C. Circuit affirmed, "the Exchange Act displaces common-law actions that seek damages arising from the breach of an SRO's Exchange Act duties," and therefore "the Exchange Act preempts common-law claims that are nothing more than disguised actions to enforce regulatory duties." *In re Series 7 Broker Qualification Exam Scoring Litig.*, 510 F. Supp. 2d at 47.

Indeed, "it is well-established that no private right of action exists with respect to the Exchange Act's requirement, found in 15 U.S.C. § 78s(g), that SROs comply with the Act and

42

their own rules." *Id.* (collecting cases).  And as the court in *MM&S Financial* concluded, "[g]iven Congress's grant of exclusive jurisdiction to federal courts to hear all claims for breach of duties created under the Exchange Act, we doubt Congress intended to allow MM&S to avoid Congress's decision not to provide an express right of action and pursue instead a common-law" claim. *MM&S Fin., Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 364 F.3d 908, 911 (8th Cir. 2004).  This rule applies equally to Apex and disallows common law claims to enforce regulatory obligations imposed on it through an SRO.  *Appert v. Morgan Stanley Dean Witter, Inc.*, 2009 U.S. Dist. LEXIS 104594, at *6–11 (N.D. Ill. Nov. 6, 2009), *aff'd*, 673 F.3d 609 (7th Cir. 2012).

Complying with Plaintiffs' proposed standard of care while complying with Apex's regulatory obligations—put in place "to protect DTCC members and the market as a whole from the systemic risk that highly volatile stocks can produce" (4th Compl. ¶ 37)—would be impossible. *See PLIVA, Inc. v. Mensing*, 564 U.S. 604, 620 (2011) ("The question for 'impossibility' is whether the private party could independently do under federal law what state law requires of it.").  Plaintiffs' common law claims are preempted.  *Id.* at 623–24.

Even if simultaneous compliance with both federal regulations and state common law as proposed by Plaintiffs were not impossible, doing so would still present an *obstacle* to the purposes and objectives of Congress, as described by the Supreme Court in *American Honda* and *Crosby*. Uniformity is the touchstone of federal securities regulation.  Congress, along with the SEC and a host of self-regulatory organizations, has designed a regulatory scheme aimed at "the development of uniform standards and procedures for clearance and settlement."  15 U.S.C. § 78q-1(a)(1)(D). The SEC has never imposed any of the three duties the Plaintiffs seek to impose for the first time on clearing brokers, and this despite the very detailed and often-amended Net Capital Rule that the SEC oversees.  Minnerop, 75 BUS. LAW at 2213.  In fact, the SEC has implemented Congress's will expressed in 1975 and in subsequent actions to maintain low barriers to entry for clearing services, with low capital requirements.  *Id.* at 2204–05; 17 C.F.R. § 240.15c3-1 (2019) (Net Capital Rule).

Once conduct is exposed to liability under the tort laws of 50 states and the District of Columbia, uniformity is destroyed.  *See Am. Honda*, 529 U.S. at 865 ("[P]reemption . . . reflects a desire to subject the industry to a single, uniform set of federal [] standards [and] an intent to avoid the conflict, uncertainty, cost, and occasional risk to safety itself that too many different [] cooks might otherwise create.").  If Plaintiffs' proposed duties were the law, then clearing brokers would

AMERICAS 114542987

be subject to varying jury outcomes in various states as to whether and to what extent they should have ignored collateral requirements, kept unlimited capital on hand, or taken some other action based on the short or long positions of downstream investors.

Finally, Plaintiffs' state common law claims contain another fatal flaw: they intrude on a uniquely federal relationship. When Plaintiffs challenge Apex's management of risk in response to the NSCC's estimate of collateral requirements, Plaintiffs effectively challenge the discretion of the federally-supervised NSCC SRO regime. *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001). Plaintiffs may not be directly alleging wrongdoing or negligence on NSCC's part, but allowing Plaintiffs' claim to go forward would have the practical effect of using state tort law to regulate a federal entity. Not only would Plaintiffs' claims be disruptive to the uniformity desired through federal regulation, but subjecting clearing firms to potentially 50+ different standards of liability in 50+ different states, districts, and territories would impose an unfair and serious burden on those firms. *See, e.g., Am. Honda.*, 529 U.S. at 871.

## IV.     The Claims of Plaintiffs Whose Brokers Did Not Use Apex as a Clearing Broker Must Be Dismissed

Plaintiffs purport to bring their claims against Apex on behalf of a "Nationwide Investor Class," which includes all investors in the securities markets who held or sold certain stocks, regardless of whether those investors' brokers used Apex's clearing services. 4th Compl. ¶¶ 98–100. Claims by customers of introducing brokers who have not used Apex's clearing services—which are even further attenuated from Apex's alleged conduct than the named Plaintiffs' claims—fail to state a claim for the same reasons that the named Plaintiffs' claims fail. *See* Sections I.C – G. As a clearing broker, Apex owes no duty of care to individual meme stock speculators and certainly owes no duty of care to customers of brokers who did not even use Apex's services. And, for the reasons articulated in Section I.G, Plaintiffs (or members of the Nationwide Investor Class) whose trades were not routed through Apex can show no injury that proximately was caused by Apex's decision to halt trading for a few hours on January 28, 2021. Indeed, Plaintiffs make no effort to allege any facts that would support a plausible inference that Apex's conduct harmed customers whose brokers did not use Apex as a clearing broker.

## V.     With 25,000 Pages Produced and Multiple Pleading Opportunities, the Fourth Complaint Should Be Dismissed with Prejudice

This Court should dismiss Plaintiffs' Fourth Complaint with prejudice. Plaintiffs have had

the opportunity to review Apex's two prior motions to dismiss (ECF Nos. 405 & 422), to review numerous agencies' extensive discovery to craft their Fourth Complaint, and to plead their claims several times, and nonetheless Plaintiffs fail to allege any facts that state a claim upon which relief can be granted.  Consequently, permitting further amendment to the now Fourth Complaint would be futile.  *See Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001); *Espinoza v. Countrywide Home Loans Servicing*, L.P., 2014 U.S. Dist. LEXIS 107263, at *21 (S.D. Fla. Aug. 5, 2014) (Altonaga, J.).  This Court should dismiss Plaintiffs' Fourth Complaint with prejudice.

## CONCLUSION

For the foregoing reasons, Defendant Apex respectfully requests that the Court dismiss the Fourth Complaint with prejudice for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

Dated:  June 22, 2022

By: */s/ Jack E. Pace III*

Jack E. Pace III
Bryan D. Gant
**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, NY  10020
Tel:  (212) 819-8200
Fax:  (212) 354-8113
jpace@whitecase.com
bgant@whitecase.com

J. Mark Gidley
**WHITE & CASE LLP**
701 Thirteenth Street, N.W.
Washington, D.C.  20005
Tel:  (202) 626-3600
Fax:  (202) 639-9355
mgidley@whitecase.com

Angela Daker
**WHITE & CASE LLP**
200 South Biscayne Blvd.
Suite 4900
Miami, FL  33131
Tel:  (305) 371-2700
Fax:  (305) 358-5744

45

adaker@whitecase.com

*Counsel for Defendant*
*Apex Clearing Corporation*

AMERICAS 114542987

**Certificate of Service**

I HEREBY CERTIFY that, on June 22, 2022, I electronically filed the foregoing

document with the Clerk of the Court using the CM/ECF filing system.  I further certify that this

motion was served on all counsel of record via transmission of the Notice of Electronic Filing

generated by the Court's CF/ECF System.

*/s/ Jack E. Pace III* _____

Jack E. Pace III

47