# Exhibit 1



SIDLEY AUSTIN LLP
1501 K STREET, N.W.
WASHINGTON, D.C. 20005
+1 202 736 8000
+1 202 736 8711 FAX

+1 202 736 8471
NSULLIVAN@SIDLEY.COM

AMERICA • ASIA PACIFIC • EUROPE

February 9, 2021

**CONFIDENTIAL TREATMENT REQUESTED BY APEX CLEARING CORPORATION AND ANY OF ITS AFFILIATES AND/OR SUBSIDIARIES PURSUANT TO NEW JERSEY OPEN PUBLIC RECORDS ACT, N.J. STAT. § 47:1A ET SEQ. AND N.J. ADMIN. CODE § 13: 47A-14.2**

*By Email (KopletonA@dca.njoag.gov)*

Amy Kopleton
Deputy Bureau Chief
Bureau of Securities
New Jersey Office of the Attorney General
Division of Consumer Affairs
153 Halsey Street
6th Floor
Newark, NJ 07102

Re:   Request Letter of February 4, 2021 re Trading Restrictions

Dear Amy:

This letter responds to your request letter of February 4, 2021 ("Request Letter") to Apex Clearing Corporation (CRD# 13071) ("Apex" or "Firm") seeking certain information and documentation regarding potential trading restrictions and deposit requirements Apex may have recently imposed on its broker-dealer clients related to one or more of the following securities (including option contracts thereon, etc.):

a) AAL: American Airlines Group Inc.;
b) AMC: AMC Entertainment Holdings, Inc.;
c) BB: Blackberry Limited;
d) BBBY: Bed Bath & Beyond Inc.;
e) CTRM: Castor Maritime Inc.;
f) EXPR: Express, Inc.;
g) GME: GamesStop Corp.;
h) KOSS: Koss Corporation;
i) NAKD: Naked Brand Group;
j) NOK: Nokia Corporation;
k) SNDL: Sundial Growers Inc.;
l) TR: Tootsie Roll Industries, Inc.;
m) TRVG: Trivago N.V.

Sidley Austin (DC) LLP is a Delaware limited liability partnership doing business as Sidley Austin LLP and practicing in affiliation with other Sidley Austin partnerships.

# SIDLEY

Amy Kopleton
February 9, 2021
Page 2

The requests in the Request Letter are reproduced below in bold, italicized font. Apex's responses are provided based on information known to Apex at this time. Apex may supplement these responses as additional information is learned. As described below, on January 28, 2021, Apex did temporarily restrict purchases of shares of and the opening of option positions in AMC, GME and KOSS for approximately 3 hours and 25 minutes (*i.e.*, from approximately 10:30 a.m. Eastern until 1:55 p.m. Eastern). These restrictions applied equally to all Apex clients. Sales out of positions were never restricted.

## SUMMARY RESPONSE

In response to requests 1) through 8) in the Request Letter, Apex believes it is helpful to provide relevant background information regarding the Firm's broker-dealer operations, and the clearing broker services the Firm provides to other correspondent introducing broker-dealers and their customers.

### Apex Provides Clearing Broker Services to Certain Correspondent Introducing Broker-Dealers But Does Not Provide Clearing Services To Robinhood Securities, LLC or Any of Its Affiliates.

Apex is a broker-dealer registered with the U.S. Securities and Exchange Commission ("SEC") and a member of the Financial Industry Regulatory Authority ("FINRA"). Under Apex's FINRA membership agreement, the Firm is permitted to provide services to its direct customers, and it is also permitted to provide clearing broker services to correspondent introducing broker-dealers and customers introduced to Apex by those introducing broker-dealers. The primary functions of a correspondent clearing arrangement are that it permits introducing brokers that often have less operational capability and regulatory capital and that also do not have direct access to trading platforms and clearinghouses to rely on a clearing broker like Apex to access those capabilities and services.

Currently, Apex provides clearing services to approximately one hundred (100) broker-dealers as introducing broker-dealer clients subject to a clearing agreement. Apex does not provide clearing services to Robinhood Securities, LLC (CRD# 287900) ("Robinhood Securities") or any affiliate of Robinhood Securities. Previously, Apex did provide clearing services to Robinhood Securities, but that clearing arrangement was terminated on approximately December 10, 2018. Therefore, the action that Apex took on January 28, 2021 to temporarily restrict purchases of AMC, GME and KOSS was wholly unrelated to providing any clearing services for Robinhood Securities because Apex does not do so.

### Apex Is Authorized to Restrict Trading Under Agreements and Related Documentation with Introducing Brokers and Their Customers.

Under FINRA Rule 4311, Apex is required to maintain a clearing agreement with each introducing broker-dealer, and the agreement must be reviewed and approved by FINRA.[1] A primary purpose of the clearing agreement and the related regulatory requirements under FINRA Rule 4311 is to allocate responsibilities between the introducing broker-dealer and the clearing broker in a clear manner regarding,

---

[1] FINRA Rule 4311(b)(1).



Amy Kopleton
February 9, 2021
Page 3

among other things: opening and approving accounts, monitoring of accounts, acceptance of orders, execution of orders, and extensions of credit.[2]

In connection with this allocation of responsibilities, each clearing agreement between Apex and its correspondent introducing broker-dealers provides Apex with the following rights to refuse to accept orders and/or refuse to execute or clear transactions:

> "Apex is not obligated to accept for execution any orders placed directly with Apex by a Customer. In addition, Apex is not obligated to (i) accept any orders from Correspondent; (ii) confirm a transaction or cancel a confirmation; or (iii) accept a delivery or receipt of securities or money, in each case if Apex determines in good faith that it should not."

> "During the term of this Agreement, subject to the terms hereof, Apex will clear transactions on a fully disclosed basis for Accounts of Correspondent and the Customers that Correspondent introduces and Apex accepts as provided in Section 2(c); provided, however, that Apex is not obligated to clear any transactions for Correspondent or Correspondent's Customers if Apex reasonably determines that it should not."

In addition to these rights of Apex under the clearing agreement with its introducing broker-dealers, each ultimate customer of its introducing brokers, ("End Customer") agrees to a Customer Agreement with Apex that provides:

> "You [Apex] have the right to refuse to execute securities transactions for the Customer at any time and for any reason."

> "You [Apex] shall not be liable for losses caused directly or indirectly by any events beyond your reasonable control, including without limitation, government restrictions, exchange or market rulings, **suspension of trading or unusually heavy trading in securities,** a general change in economic, political or financial conditions, war or strikes." [emphasis added]

> "You [Apex] are authorized, in your discretion, should you for any reason whatsoever deem it necessary for your protection, without notice, to cancel any outstanding order, to close out the accounts of the Customer, in whole or in part, or to close out any commitment made on behalf of the Customer."

In addition, as part of the new account process, each End Customer is provided with a Customer Information Brochure that provides:

> "We [Apex] reserve the right to withhold acceptance of or to reject, for any reason, any account or any transaction for any account and to terminate any account that we have previously accepted."

> "We may refuse to accept any order if we in good faith determine that we should."

---

[2] FINRA Rule 4311(c)(1).

# SIDLEY

Amy Kopleton
February 9, 2021
Page 4

These rights of Apex to refuse to accept orders and/or refuse to execute or clear transactions that are received from introducing broker-dealers and their customers are industry standard practices in correspondent clearing arrangements. The controls established through these rights are critical because they are necessary for clearing brokers like Apex to be able to effectively manage credit and settlement risks that they face from settlement obligations generated by trading activity of introducing broker-dealers and their customers. For the orders and trades the Firm does accept, Apex in its role as clearing broker must collateralize and settle those obligations with the relevant U.S. clearinghouses. The clearinghouse collateral and settlement obligations applicable to Apex for such trades are described in detail below together with an explanation of the reasons why these obligations caused Apex on January 28, 2021 to impose temporary and uniform trading restrictions on all Apex clients regarding purchases of AMC, GME and KOSS.

> Apex Must Meet Its Collateral and Settlement Obligations to Clearinghouses
> for Settlement Obligations Created by Introducing Brokers and Their Customers.

To perform its clearing and settlement functions as a clearing broker, Apex is a member of National Securities Clearing Corporation ("NSCC") and The Depository Trust Company ("DTC"). NSCC and DTC are the two SEC-registered clearing agencies in the U.S. that clear and settle transactions in equity and corporate debt securities. Following the 2008 Financial Crisis and in connection with the Dodd Frank Wall Street Reform and Consumer Protection Act of 2010, NSCC and DTC were designated systemically important financial market utilities by the Financial Stability Oversight Council.[3] In connection with those designations, in 2016 the SEC also adopted heightened regulatory requirements for systemically important clearing agencies like NSCC and DTC.[4]

These requirements under SEC Rule 17Ad-22, known as the "standards for covered clearing agencies," require NSCC and DTC to have detailed written rules, policies and procedures to comprehensively manage risks that arise in or are borne by the clearing agency, including legal, credit, liquidity, operational, general business, investment, and custody risks.[5] As part of these SEC requirements, for example, NSCC must cover its credit exposures to its members, including Apex, using a risk-based margin system that, among other things, considers, and produces margin levels commensurate with, the risk and particular attributes for each relevant product, portfolio and market cleared by NSCC and marks member positions to market and collects margin, including variation margin or equivalent charges if relevant, at least daily and includes authority and operational capacity to make intraday margin collateral calls.[6]

---

[3] Designation of Systemically Important Financial Market Utilities (July 18, 2012), https://home.treasury.gov/system/files/261/here.pdf

[4] Securities Exchange Act Release No. 78961 (September 28, 2016), 81 FR 70786 (October 13, 2016).

[5] 17 C.F.R. § 240.17Ad-22(e)(3).

[6] 17 C.F.R. § 240.17Ad-22(e)(6).

# SIDLEY

Amy Kopleton
February 9, 2021
Page 5

NSCC performs central counterparty clearing services for its members, including Apex, and collects collateral from them to support performance on settlement obligations. DTC is the U.S. central securities depository that holds deposited securities, allocates security ownership among its members and facilitates the movement of securities positions against funds to settle trading obligations.

The reason for the temporary trading restrictions that Apex imposed regarding purchases of AMC, GME and KOSS relates directly to the potential future collateral requirement that NSCC appeared it may impose on Apex as part of the margin system NSCC maintains to comply with the SEC's standards for covered clearing agencies. Therefore, that is the focus of the remainder of this summary response.

NSCC accepts trades for clearing from approved trade sources, like exchanges and alternative trading systems. Upon acceptance, NSCC intermediates the settlement obligations for a trade cleared by its members through a legal novation process. NSCC becomes the counterparty buyer to the selling NSCC member and counterparty seller to the buying NSCC member. In addition to this central counterparty function, NSCC also operates netting systems that compress the settlement obligations of its members in each security to arrive at a single net settlement obligation per member per security (*i.e.*, to either deliver shares to NSCC or receive shares from NSCC). For a clearing broker like Apex, the size of this net settlement obligation to NSCC depends in part, and potentially substantially, on the trading activities of Apex's introducing brokers and their customers. The settlement date for such settlement obligations under NSCC's rules and procedures is the second business day after the trade date ("T+2").[7] NSCC also guarantees settlement with its members. To collateralize the settlement guarantee, NSCC uses the proprietary value at risk margin methodology described above to calculate each business day the size of a member's collateral obligation to NSCC based on the member's outstanding settlement obligations. The parameters of the NSCC methodology include, among other things, sensitivity to volatility, cash settlement obligations, options expirations, and the size of mark-to-market price movements in the securities for which settlement obligations are due.[8] NSCC has authority to collect additional collateral from a member like Apex intraday in addition to NSCC's normal daily margin computation and collection process.[9] NSCC did not collect or demand additional collateral from Apex intraday in this instance.

This settlement structure means that even though a customer places a trade on trade date, she or he is not obligated to make the cash or securities available for settlement until T+2. During this period, Apex bears the risk that the customer may not do so, and, as described above, NSCC monitors the credit risk posed by Apex to NSCC in respect of these settlement obligations and requires a regularly resized collateral

---

[7] See NSCC Procedure II. (Trade Comparison and Recording Service) and Procedure VII. (CNS Accounting Operation); *see also* SEC Rule 15c6-1 (providing generally that a broker or dealer shall not effect or enter a contract for the purchase or sale of a security that provides for payment of funds and delivery of securities later than the second business day after the date of the contract).

[8] NSCC Procedure XV. (Clearing Fund Formula and Other Matters).

[9] Id.

# SIDLEY

Amy Kopleton
February 9, 2021
Page 6

deposit from Apex to help manage the default risk. Customer funds may not be used to fund this deposit. Any shortfall in a member's required collateral deposit reported by NSCC must be met on demand.[10]

### Apex Temporarily Restricted Purchases of AMC, GME and KOSS Due to Increased Collateral Requirements at NSCC.

On January 28, 2021 at approximately 9:30 a.m. Eastern time, Apex received from NSCC a report showing a projection of a substantially increased clearing deposit requirement for Apex. To put this in context, the NSCC report showed an increase of approximately ten times the deposit requirement from 15 minutes earlier. Approximately 90% of the overall deposit requirement was attributable to pending settlement obligations of Apex to NSCC in AMC, GME and KOSS.

At approximately 10:31 a.m. Eastern time, Apex sent a client communication to all clients instructing them to restrict the purchases of new buy positions in AMC, GME and KOSS, as described above. The restrictions were imposed uniformly across all Apex clients.[11] Apex took these steps to manage the risk that it would not be able to meet potential increased NSCC collateral funding obligations if Apex clients were permitted to continue to engage in additional purchases of AMC, GME and KOSS – thereby potentially further increasing Apex's clearing deposit requirement to NSCC. NSCC intraday margin increase as of 10:00 a.m. Eastern time on AMC and GME alone went from 25% and 0% of market value to 118% and 78.3% of market value, respectively. Meaning that for every $1.00 of AMC purchased by an end customer, Apex was required to deposit $1.18 with NSCC. Sales in any security, including AMC, GME and KOSS, were never restricted. At approximately 11:00 a.m., Apex received an updated NSCC report showing a potential collateral deposit requirement that was elevated but lower than the 9:30 a.m. report and in line with reports Apex had received from NSCC prior to 9:30 a.m. that day. After confirming with NSCC that the new report was accurate, Apex communicated to all clients the lifting of the restriction of new purchases of AMC, GME and KOSS at approximately 1:55 p.m. on January 28, 2021. No restriction has been in place since.

Apex later learned that the reason for the potentially higher NSCC collateral deposit in the 9:30 a.m. report on January 28 was an imbalance in trading activity by one Apex client in AMC that was intended to include purchases and sales, but, due to an error, only included substantial purchases. Once the offsetting sales in the same securities were submitted to NSCC for clearing by Apex, this lowered Apex's net settlement obligation in the securities and therefore caused Apex's required NSCC collateral deposit to return to lower levels.

As described above, the temporary and uniform purchase restrictions that were imposed for approximately 3 hours and 25 minutes were consistent with Apex's contractual and regulatory responsibilities and the Firm took these steps to prudently manage the potential risk that it would not be able to meet increased collateral obligations to NSCC. Once the potential NSCC collateral deposit requirements decreased, Apex uniformly lifted the restrictions.

---

[10] NSCC Rule 4, Section 8.

[11] As noted above, Robinhood Securities is not an Apex client.

# SIDLEY

Amy Kopleton
February 9, 2021
Page 7

1) *Provide the names of any other securities for which APEX has notified broker-dealers they were subject to Trading Restrictions.*

    None. See Summary Response above.

2) *Provide an explanation as to why these securities were identified as requiring the Trading restrictions.*

    See Summary Response above.

3) *Provide the names and Central Registration Depository numbers for the broker-dealers who were notified they were subject to Trading Restrictions.*

    Please see the Excel file bearing Bates number APEX-NJBS-01-00000001.

4) *Explain the Trading Restrictions and the dates of the trading restrictions APEX placed on customer trading in the securities identified above, and in response to Item 1. Provide a detailed explanation and attach copies of any relevant documentation.*

    See Summary Response above.

5) *Provide copies of any APEX communications notifying broker-dealers of APEX's trading restrictions.*

    Please see communications bearing Bates numbers APEX-NJBS-01-00000002 through APEX-NJBS-01-00000005.

6) *Provide APEX's legal and/or contractual basis/justification APEX is relying on for the Trading Restrictions and provide copies of the relevant documentation. Be sure to include any contracts, agreements etc. with broker-dealers.*

    See Summary Response above.

7) *Provide APEX's rationale for placing the Trading Restrictions. Provide a detailed explanation and attach copies of any relevant documentation.*

    See Summary Response above.

8) *State whether Apex's trading restrictions apply to all broker-dealers or a subset of broker-dealers. If APEX's trading restrictions do not apply to all broker-dealers, explain in detail how APEX decided which broker-dealers to impose the Restricted Trading.*

    See Summary Response above.

# SIDLEY

Amy Kopleton
February 9, 2021
Page 8

    This letter and the enclosures are being provided to the New Jersey Attorney General's Office, Bureau of Securities ("Securities Bureau") as part of the Securities Bureau's investigation of this matter, with the understanding that Apex believes that business confidentiality pertains to this letter and all of the enclosures hereto. Apex requests confidential treatment for these documents under N.J. Stat. § 47:1A *et seq.*, N.J. Admin. Code § 13: 47A-14.2, and other applicable provisions of law governing the non-disclosure of information. Such materials are considered to be confidential and/or private documents that are commercially valuable, and, as such, constitute or contain trade secrets, the disclosure of which may violate proprietary rights and would grant our competitors an unfair advantage. In addition, Apex believes some or all of this information is confidential, personal, and/or private information, the disclosure of which may represent an invasion of personal privacy. If the Securities Bureau is not satisfied that the enclosed materials are exempt from disclosure, Apex stands ready to supply further particulars, and request the opportunity to do so.

    The information is produced with the further request that:

(i) you will keep it strictly confidential and will not disclose or provide it to any other party, unless (a) you determine that disclosure should be made to the SEC or another governmental or self-regulatory organization ("SRO"), in which case you will immediately notify us prior to initiating such disclosure and will use your best efforts to obtain confirmation from the SEC or SRO that the information will be afforded confidential treatment; or (b) you receive a subpoena or other compulsory order seeking production of the information, in which case you will notify us immediately and provide us an opportunity to prove that this letter and the enclosures qualify for an exemption from public disclosure;

(ii) Apex will be immediately notified of any other requests for the provided information and be given an opportunity to object to such disclosure; and

(iii) providing the above information does not constitute any authorization, consent or waiver by us, express or implied, entitling the Securities Bureau or any other agency or person to have access to any additional documents or information in our possession or a waiver of any objections to a subpoena or other process.

    This letter and the enclosed materials are submitted with the further request that they be kept in a non-public file and that access to them by any third party that is not a member of the Securities Bureau or its staff be denied.

Sincerely,

Neal E. Sullivan