**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-2989-MDL-ALTONAGA/TORRES**

In re:

**JANUARY 2021 SHORT SQUEEZE**

**TRADING LITIGATION**

_____/

This Document Relates to the Other Broker Tranche

**<u>PLAINTIFFS' OPPOSITION TO</u>**
**<u>DEFENDANT'S MOTION TO DISMISS</u>**

> **GROSSMAN ROTH YAFFA**
> **COHEN, P.A**
> 2525 Ponce de Leon Blvd., Ste 1150
> Coral Gables, FL 33134-6040
> Tel: 305-442-8666
> rwf@grossmanroth.com
>
> *Plaintiffs' Liaison Counsel*
>
> **SAFIRSTEIN LAW LLC**
> 45 N. Broad Street, Suite 100
> Ridgewood, NJ 07450
> Tel: (917) 952-9458
> psafirstein@safirsteinlaw.com
>
> *Plaintiffs' Lead Counsel for the*
> *Other Broker Tranche*
>
> **KANTROWITZ, GOLDHAMER**
> **& GRAIFMAN, P.C.**
> 135 Chestnut Ridge Road
> Montvale, New Jersey 07645
> Tel: (201) 391-7000
> ggraifman@kgglaw.com
> dedelman@kgglaw.com
>
> *Additional Plaintiffs' Counsel for the*
> *Other Broker Dealer Tranche*

## **TABLE OF CONTENTS**

I.   INTRODUCTION...............................................................................................................1

II.  FACTUAL BACKGROUND...............................................................................................3

   A.  Apex's Roles As a Broker-Dealer and Clearing Broker-Dealer And Its Attendant
       Duties.......................................................................................................................3

   B.  The Events of January 28, 2021................................................................................6

III. ARGUMENT.....................................................................................................................12

   A.  Standard of Review.................................................................................................13

   B.  Plaintiffs Jang and Chavez Have Article III Standing.............................................13

       1.  Plaintiffs Allege an Injury in Fact Which Apex Attempts to Mischaracterize as
           Speculative......................................................................................................14

       2.  Plaintiffs Allege a "Legally Protected Interest..................................................15

       3.  Plaintiffs Have Standing To Bring Claims on Behalf of Direct Customers........17

   C.  New York Substantive Law Applies........................................................................19

   D.  Plaintiffs Have Stated A Claim For Negligence (Count I).......................................21

       1.  Apex Owes Duties to Both "Introduced" Customers and "Direct" Customers............22

       2.  Apex's Own Customer Agreement Requires Adherence to the Applicable Industry
           Rules and Regulations.....................................................................................27

       3.  Clearing Broker Liability..................................................................................29

       4.  The Economic Loss Rule Does Not Undermine Defendant's Negligence Nor
           Plaintiffs' Ability to Recover in Tort.................................................................32

       5.  Apex Breached its Tort Duty To Plaintiffs.........................................................35

       6.  The Complaint Properly Alleges that Apex's Actions Proximately Caused Plaintiffs'
           Alleged Injury..................................................................................................39

   E.  Plaintiffs State a Claim For Breach of Fiduciary Duty (II)......................................40

F.   Alternatively, Plaintiffs State A Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing (Count III)..................................................................................44

G.   Plaintiffs Have Properly Stated An Alternative Claim for Tortious Interference With Business Relationships (Count IV)......................................................................................45

H.   Plaintiffs State Law Claims Are Not Preempted By Federal Securities Laws................46

I.   Plaintiffs' Claims Are Viable As Pleaded on Behalf of Apex's Shared Customers and Investors Who Were Foreseeably Harmed by Apex........................................................47

IV.   SHOULD THE COURT DISMISS THE COMPLAINT IN WHOLE OR IN PART, LEAVE SHOULD BE GRANTED TO REPLEAD............................................................49

V.   CONCLUSION..............................................................................................................49

## TABLE OF AUTHORITIES

**Cases**                                                                              **Page(s)**

*A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*,
    2002 WL 88226 (S.D.N.Y. Jan. 23, 2002) ............................................................... 31

*Aaron Private Clinic Mgmt. LLC v. Berry*,
    912 F.3d 1330 (11th Cir. 2019) ............................................................................... 15

*AMBAC Assur. Corp. v. U.S. Bank N.A.*,
    328 F. Supp. 3d 141 (S.D.N.Y. 2018) ...................................................................... 33

*Appert v. Morgan Stanley Dean Witter, Inc.*,
    2009 WL 3764120 (N.D. Ill. Nov. 6, 2009) ............................................................. 47

*Arkin v. Innocutis Holdings, L.L.C.*,
    188 F. Supp. 3d 1304 (M.D. Fla. 2016) ................................................................... 17

*Arnold v. Nat'l County Mut Fire Ins. Co.*,
    725 S.W.2d 165 (Tex. 1987) .................................................................................... 45

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................................ 13

*Atkins v. Glen Falls City Dist.*,
    53 N.Y.2d 325 (N.Y. 1981) ...................................................................................... 22

*Beckwith v. Hart*,
    263 F. Supp. 2d 1018 (D. Md. 2003) ....................................................................... 32

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................................ 13

*Berwecky v. Bear Stearns & Co.*,
    197 F.R.D. 65 (S.D.N.Y. 2000) ............................................................................... 30

*Bradley Center, Inc. v. Wessner*,
    250 Ga. 199, 296 S.E.2d 693 (Ga. Supreme Court 1982) ........................................ 48

*Brink v. James*,
    341 F.Supp.3d 1314 (S.D. Fla. 2018) ...................................................................... 25

*Brown v. SCI Funeral Servs. of Fla., Inc.*,
    212 F.R.D. 602 (S.D. Fla. 2003) .............................................................................. 18

*Cannizaro v Bache, Halsey, Stuart, Shields, Inc.*,
   81 F.R.D. 719 (S.D.N.Y. 1979) ............................................... 30

*Carvel Corp. v. Noonan*,
   3 N.Y.3d, 182 (N.Y. 2004) ............................................. 45, 46

*Champlain Enterprises, Inc. v. United States*,
   945 F. Supp. 468 (N.D.N.Y. 1996) ...................................... 20, 21

*Clements v. Withers*,
   437 S.W. 2d 818 (Tex. 1969) .............................................. 46

*Conway v. Icahn & Co., Inc.*,
   16 F.3d 504 (2d Cir. 1994) ............................................ 23, 41

*D. Houston v. Love*,
   92 S.W.3d 450 (Tex. 2002) ................................................ 22

*Davis v. S. Bell Tel. & Tel. Co.*,
   1993 WL 593999 (S.D. Fla. Dec. 23, 1993) ....................... 18, 30, 32

*de Kwiatkowski v. Bear Stearns*,
   126 F. Supp. 2d 672 (S.D.N.Y. 2000) ................................. 28, 42

*de Kwiatkowski v. Bear, Stearns & Co.*,
   306 F.3d 1293 (2d Cir. 2002) ............................... 22, 23, 28, 42

*Dept. of Labor v McConnell*,
   305 Ga. 812, 828 S.E.2d 352 (Ga. 2019) ................................. 48

*Derdiarian v. Felix Contr. Corp.*,
   51 NY2d 308 (N.Y. 1980) ................................................. 39

*EBC I v. Goldman Sachs & Co.*,
   5 N.Y. 3d 11 (N.Y. 2005) ................................................ 41

*ERI Consulting Eng'rs, Inc. v. Swinnea*,
   318 S.W.3d 867 (Tex. 2010) .............................................. 34

*Etzel v. Hooters of America, LLC*,
   2016 WL 8604317 (N.D. Ga. Nov. 15, 2016) .............................. 17

*Eva Rioseco and Nilda Cruz v. Gamco Asset Management, Inc.*,
   2011 N.Y. Misc. LEXIS 7279 (N.Y. Sup. Ct. Sept. 23, 2011) ............. 25

*Fernandez v. Sch. Bd. Of Miami-Dade Cnty.*,
    201 F.Supp.3d 1353 (S.D. Fla 2016) ................................................................ 7

*First Assembly Of God, Inc. v. Texas Utilities Elec. Co.*,
    52 S.W. 482 (Tex. 2001) ................................................................................ 40

*First Nat. Bank of Eagle Pass v. Levine*,
    721 S.W.2d 287 (Tex, 1986) .......................................................................... 46

*Fuller v. SunTrustBanks, Inc.*,
    744 F.3d 685 (11th Cir. 2014) ......................................................................... 7

*Glob. Enter. Grp. Holding, S.A.* v. *Ottimo*,
    2010 WL 11629556 (E.D.N.Y., June 8, 2010) ................................. 30, 31, 43

*Gochnauer v. A.G. Edwards & Sons, Inc.*,
    810 F.2d 1042 (11th Cir. 1987) ..................................................................... 41

*Goldman v. Belden*,
    754 F. 2d 1059 (2d Cir. 1985) ....................................................................... 13

*Goldman v. McMahan, Brafman, Morgan & Co.*,
    1987 WL 12820 (S.D.N.Y. 1987) ............................................................ 31, 43

*Hain v. Jamison*,
    28 N. Y. 3d 524 (N Y. 2016) ................................................................... 39, 40

*King City v. IKB Deutsche Industriebank* AG,
    863 F. Supp. 2d (S.D.N.Y. 2012) ................................................................. 33

*In re Arris Cable Modem Cons. Litig.*,
    327 F.R.D. 334 (N.D. Cal. 2018) .................................................................. 19

*In re Blech Sec. Litig.*,
    961 F. Supp. 569 (S.D.N.Y. 1997) ................................................................ 30

*In re Checking Account Overdraft Litig.*,
    275 F.R.D. 666 (S.D. Fla. 2011) ................................................................... 18

*In re Equifax, Inc. Customer Data Sec. Breach Litig.*,
    362 F.Supp.3d 1295 (N.D. Ga. 2019) ........................................................... 48

*In re Letterman Bros. Energy Securities Litigation*,
    799 F.2d 967 (5th Cir. 1986) ........................................................................ 41

*In re Series 7 Broker Qualification Exam Scoring Litig.*,
   510 F. Supp. 2d 35 (D.D.C. 2007) ................................................................... 47

*In re Worldcom, Inc. Sec. Litig.*,
   219 F.R.D. 267 (S.D.N.Y. 2003) ..................................................................... 19

*Independent Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*,
   157 F. 3d 933 (2d Cir. 1998) ......................................................................... 42

*Jim Walter Homes, Inc. v. Reed*,
   711 S.W.2d 617 (Tex.1986) ........................................................................... 35

*Joy Pipe USA, L.P. v. Fremak Indus. Inc.*,
   CV H-13-2153, 2014 WL 12599328 at *2 (S.D. Tex. Nov. 10, 2014) *report and*
   *recommendation adopted*, CV H-13-2153, 2014 WL 12597848 (S.D. Tex. Dec. 8, 2014) ..... 34

*Kinsey v. N.Y. Times Co.*,
   991 F.3d 171 (2d Cir. 2021) ......................................................................... 19

*Klock v. Lehman Bros. Kuhn Loeb Inc.*,
   584 F. Supp. 210 (S.D.N.Y. 1984) ................................................................. 21

*Kneese v. Pershing, LLC*,
   2012 WL 13019677 (S.D. Tex. 2012) ............................................................. 31

*Knieriemen v. Bache Halsey Stuart Shields, Inc.*,
   74 A.D.2d 290 (N.Y. App. Div. 1980) ............................................................. 21

*Kornberg v. Carnival Cruise Lines, Inc.*,
   741 F.2d 1332 (11th Cir. 1984) ..................................................................... 19

*Krock v. Lipsay*,
   97 F.3d 640, 1996 WL 552453 (2d Cir. 1996) ................................................. 21

*Kuoruga v. Fiserv Correspondent Servs.*,
   183 F. Supp. 2d 1245 (D. Or. 2001) ............................................................... 30

*Kurtzman v. Bergstol*,
   835 N.Y.S. 2d 644 (2nd Dep't 2007) ............................................................. 40

*LAN/STV v. Martin K. Eby Const. Co.*,
   435 S.W.3d 234 (Tex. 2014) ......................................................................... 34

*Lange v. H. Heinze & Co.*,
   418 F. Supp. 1376 (N.D. Tex. 1976) ............................................................. 25

*Levitt v. J.P. Morgan Sec., Inc.*,
  710 F.3d 454 (2d Cir. 2013) ......................................................................... 43

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ....................................................................................... 14

*MacDonald v. Follett*,
  180 S.W. 2d 334 (Tex. 1944) ........................................................................ 41

*Magnum Corp. v. Lehman Bros. Kuhn Loeb, Inc.*,
  794 F.2d 198 (5th Cir. 1986 ) ................................................................... 23, 41

*Mars v. Wedbush Morgan*,
  283 Cal. Rptr. 238 (Cal. Ct. App. 1991) ...................................................... 32

*Martinez Tapia v. Chase Manhattan Bank, NA*,
  149 F.3d 404 (5th Cir. 1998) ........................................................................ 42

*McCarthy v. Dun & Bradstreet Corp.*,
  482 F.3d 184 (2d Cir. 2007) .......................................................................... 13

*McDaniel v. Bear Stearns & Co., Inc.*,
  196 F. Supp. 2d. 343 (S.D.N.Y. 2002) ............................................. 29, 30, 31

*McLean v. Triboro Coach Corp.*,
  302 N.Y. 49 (N.Y. 1950) ............................................................................... 22

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng*,
  697 F. Supp. 1224 (D.D.C. 1988) ........................................................... 23, 24

*Miley v. Oppenheimer & Co., Inc.*,
  637 F. 2d 318 (5th Cir. 1981) ....................................................................... 24

*Mills v. Foremost Ins. Co.*,
  511 F.3d 1300 (11th Cir. 2008) ..................................................................... 17

*MM&S Fin., Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*,
  364 F.3d 908 (8th Cir. 2004) ......................................................................... 47

*Palsgraf v. Long Island R. Co.*,
  248 N.Y. 339 (N.Y. 1928) ............................................................................... 2

*Paris v. Progressive Am. Ins. Co.*,
  2020 WL 7039018 (S.D. Fla. Nov. 13, 2020) ............................................... 19

*Paterson v. Deeb*,
    473 So.2d 1210 (Fla. 1st DCA 1985) ................................................................. 22

*Piazza v. Ebsco Indus., Inc.*,
    273 F.3d 1341 (11th Cir. 2001) ........................................................................ 18

*Pinchinat v. Graco Children's Prod., Inc.*,
    390 F.Supp.2d 1141 (M.D. Fla. 2005)............................................................... 22

*Press v. Chem. Inv. Servs. Corp.*,
    166 F. 3d 529 (2d Cir. 1999) ............................................................................ 42

*Pulka v. Edelman*,
    358 N.E.2d 1019 (N.Y. 1976) .......................................................................... 32

*R2 Investments LDC v. Phillips*,
    401 F. 3d 638,fn. 2 (5th Cir. 2005)..................................................................... 6

*Remington v. Newbridge Sec. Corp.*,
    2013 WL 2444719 (S.D. Fla. June 5, 2013) ............................................... 24, 25

*Riggs v. Schappell*,
    939 F. Supp. 321 (D.N.J. 1996)........................................................................ 32

*Robins Dry Dock & Repair Co. v. Flint*,
    275 U.S. 303 (1927) ......................................................................................... 34

*Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    337 F. Supp. 107 (N.D. Ala. 1971)................................................................... 23

*Ross v. Bolton*,
    904 F.2d 819 (2d Cir. 1990) ............................................................................. 32

*Rozsa v. May Davis Group, Inc.*,
    152 F. Supp. 2d 526 (S.D.N.Y. 2001) .............................................................. 30

*Rozsa v. May Davis Grp., Inc.*,
    187 F. Supp. 2d 123 (S.D.N.Y. 2002) .............................................................. 32

*Schenck v. Bear, Stearns & Co.*,
    484 F. Supp. 937 (S.D.N.Y. 1979) ................................................................... 42

*Scott v. Dime Sav. Bank of New York, FSB*,
    886 F.Supp. 1073 (S.D.N.Y. 1995) .................................................................. 25

*Shahar v. Bowers*,
120 F.3d 211 (11th Cir. 1997) ........................................................................................ 20

*Sierra v City of Hallandale Beach, Florida*,
996 F.3d 1110 (11th Cir. 2021) ...................................................................................... 18

*Spinelli v. Nat'l Football League*,
903 F.3d 185 (2d Cir. 2018) ........................................................................................... 44

*Stern v. Legent Clearing LLC*,
2009 WL 2244616 (N.D. Ill. July 28, 2009) .......................................................... 31, 43

*Stevenson v. Rochdale Investment Management, Inc.*,
2000 U.S. Dist. LEXIS 13110 (N.D. Tex. 2000) ............................................................ 25

*Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*,
305 F.3d 1293 (11th Cir. 2002) ...................................................................................... 32

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007) .................................................................... 20

*Thropp v. Bache Halsey Stuart Shields, Inc.*,
650 F.2d 817 (6th Cir. 1981) .......................................................................................... 41

*Travis v. Mesquite*,
830 S.W.2d 94 (Tex. 1992) ............................................................................................. 39

*Trumpet Vine Investments v. Union Capital Partners*,
92 F.3d 1110 (11th Cir. 1996) ........................................................................................ 19

*Turk v. Pershing LLC*,
2014 WL 12572906 (N.D. Tex. Dec. 8, 2014) ......................................................... 31, 32

*Venerus v. Avios Budget Car Rental, LLC*,
723 Fed. App'x 807 (11th Cir.2018) ............................................................................... 19

*Walco Invs., Inc. v. Thenen*,
168 F.R.D. (S.D. Fla. 1996).............................................................................................. 18

*Weatherly v. Pershing*,
2015 U.S. Dist. LEXIS 197128 (N.D. Tex. June 23, 2015) ....................................... 25, 32

*West v. Cruz*,
251 P.2d 311 (Ariz. Sup. Ct. 1952) ................................................................................ 32

*Western Investments Inc. v. Urena,*
   162 S.W.3d 547 (Tex. 2005) ................................................................................ 39

**Statutes**

17 C.F.R. § 240.15c3-1 ......................................................................................... 26
Regulatory,
   Notice 21-12 ............................................................................................... 5, 6, 26
Regulatory,
   Notice 21-16 ................................................................................................. 21, 29
Restatement (Second) of Torts § 874 ..................................................................... 41
Restatement, Torts, 2d, § 282 ................................................................................ 49

**Rules**

Fed. R. Civ. P. 12(b)(6) ......................................................................................... 13
Federal Rule of Civil Procedure 23 ....................................................................... 19
Federal Rule of Evidence 201 ........................................................................... 6, 20
FINRA Rule 2010 ........................................................................................ 4, 25, 28
FINRA Rule 2268 .............................................................................................. 21, 29
FINRA Rule 3110 ................................................................................................ 4, 26
FINRA Rule 4370 ................................................................................................ 4, 26
Rule 23(a) ........................................................................................................ 17, 19

## I.    **INTRODUCTION**

Securities brokers have a duty to act in good faith and in the best interest of their customers. On January 28, 2021, Defendant Apex Clearing Corporation ("Apex") violated its fundamental, well-established duties by taking unprecedented action. It prevented its customers from buying certain highly liquid, in-demand stocks for approximately 3-1/2 hours[1] (the "Market Suspension") for their own financial self-interest and to the financial detriment of their customers. This unprecedented Market Suspension was designed to and did cause Apex's own customers to lose money on the very same stocks that Apex had previously sold to those customers.  Apex concedes that if the trading price of AMC, GME and/or KOSS went up, Apex perceived a risk to its ability to meet a potential increased collateral funding obligation.  Even though Apex was advised by regulators on January 28 that its collateral requirements would be within Apex's tolerance, Apex nevertheless took affirmative steps to directly interfere with market forces to the detriment of its customers, and foreseeably impeded the price movement of these stocks in the market for its own self-serving purposes.

Much of Apex's defense rests on the proposition that it is a clearing broker-dealer.  Apex argues that inasmuch as many of its customers, including Plaintiffs, traded through introducing brokers, such as Webull and Ally, Apex is shielded from liability. But Apex is wrong because, as demonstrated below, the law only protects clearing broker-dealers in connection with their ministerial, back-office type functions. Plaintiffs' Amended Complaint alleges that Apex's Market Suspension, which it imposed on all of Apex's direct customers and on its network of captive introducing broker- dealers (including shared customers, such as Plaintiffs), went far beyond the ministerial functions that shield clearing broker-dealers from liability.  Moreover, Apex's customer agreements cannot protect Apex from the misconduct alleged here, as it is black letter law that tortfeasors such as Apex cannot contract themselves out of tort liability.

Apex's purported justification for its unprecedented unilateral Market Suspension is demonstrably false.  Apex claims it acted to avoid a possible regulatory collateral call "if Apex clients were permitted to continue" to purchase the Suspended Stocks. Def. Mem. 8-9.   But even if Apex's purported justification for its unilateral Market Suspension was true (which it is not),

---

[1] Those securities were AMC Entertainment Holdings, Inc. ("AMC"), GameStop Corp. ("GME"), and Koss Corporation ("KOSS") (collectively the "Suspended Stocks").

then Apex improperly failed to prepare itself for the possibility of a regulatory collateral call in violation of industry rules.  However, as Plaintiffs pre-filing investigation has revealed, and as alleged in the Amended Complaint, at or about the time that Apex implemented its unprecedented Market Suspension, it had already been advised by the regulators that no such heightened collateral call would be forthcoming. Moreover, even after Apex confirmed with the regulators that no collateral call would be required on January 28, Apex inexplicably continued to restrict its customers' ability to purchase the Suspended Stocks for hours, artificially driving down prices and ensuring market losses on the part of Plaintiffs and others. AC ¶¶ 79-84. Multitudes of stock transactions occur every second involving multi-millions of dollars.  In this market, particularly with the downward spiraling Suspended Stocks, hours of an unjustified restriction was an eternity.

Plaintiffs and the classes they seek to represent allege that Apex should be accountable for its unprecedented actions.  Accordingly, Plaintiffs allege claims for Negligence, Breach of Fiduciary Duty, and, alternatively, Breach of the Implied Covenant of Good Faith and Fair Dealing and, also, alternatively Tortious Interference.[2]

Contrary to Defendant's strawman argument, Plaintiffs do not allege that broker-dealers have an unlimited duty to sell all securities to all people.  *See, e.g.,* AC ¶ 57.  The industry, the regulators and the courts recognize limiting principles.  For example, broker-dealers are not obligated to sell securities to people suspected of using stolen or laundered funds. But a broker-dealer cannot engage in self-serving affirmative acts such as the Market Suspension knowing that such action is at the direct and immediate financial expense of its customers while at the same time the broker-dealer gains the advantage of its' own customers' losses for its own financial benefit through reduced collateral requirements. Clearing broker-dealers who direct actions designed to cause losses for their customers for the clearing broker-dealer's own financial benefit are not shielded from liability. Apex's Market Suspension was not a mere ministerial function.  Apex's refusal to sell securities is not at issue – they can do that in the abstract.  The fact that Apex sought to limit its collateral exposure is also not improper. What

---

[2] Apex misapplies *Palsgraf v. Long Island R. Co.,* 248 N.Y. 339, 341 (1928) (Cardozo, C.J.), *See* Defendant's Motion To Dismiss…filed June 22, 2022 ("Def. Mem.") at 2. Apex's imposition of the Market Suspension foreseeably caused the price decrease and suppression of those stocks and caused Plaintiffs and other members of the putative class to suffer damages.  Plaintiffs are victims and not remote bystanders harmed by Defendant's innocent action.

2

they cannot do is what Apex did here: refuse to allow its customers to purchase while allowing sales to continue where the purpose of the action is to drive down the price of the securities so as to advantage itself – particularly when those securities are the same stocks that Apex sold to those very same investors. ***This*** is the prism through which Apex's actions must be viewed.

Finally, to the extent that Apex relies on this Court's dismissal of the Robinhood Tranche complaint, such reliance is unwarranted. Apex's conduct differed materially from Robinhood in that, among other distinctions, Apex maintained the Market Suspension for hours despite satisfying itself that it had no reason to maintain the Market Suspension. Beyond that, the law and the facts pled here differ materially from those pled in Robinhood.

As to damages, Apex argues that Plaintiffs and all investors could have sold their stock. True, but saying that a customer can sell stock after Apex had already taken action that was designed to and did force the price of the Suspended Stocks to go down means that those customers suffered damages proximately caused by Apex.

## II.  FACTUAL BACKGROUND

### A.  Apex's Roles As a Broker-Dealer and Clearing Broker-Dealer And Its Attendant Duties

It is important to set the record straight as to Apex's role on January 28, 2021. Apex is charged in connection with its dual role as a broker-dealer and as a clearing broker-dealer.

Its role as a broker-dealer is straightforward. Apex is a broker-dealer[3] that provides broker-dealer services directly to investors that buy and sell securities. AC ¶¶ 23, 25, 43. Various investor customers have broker-dealer accounts with Apex to directly purchase and sell securities through Apex's platform. On January 28th Apex suspended the ability of each of these customers to purchase shares of and call options to buy shares of the Suspended Stocks for three hours and twenty-five minutes. AC ¶¶ 2, 29.

Apex's role as a clearing broker-dealer is also straightforward. Apex provides back-office ministerial services to generally smaller correspondent Introducing Broker-Dealers, such as Webull Financial LLC ("Webull") and Ally Invest ("Ally"). AC ¶¶ 25-26, 28. Customers introduced to Apex by those Introducing Broker-Dealers are shared customers as between Apex

---

[3] Apex as a broker-dealer is registered with and subject to the rules and regulations of industry regulators such as the SEC and FINRA. AC ¶¶23, 43. Apex is also a member of the National Securities Clearing Corporation ("NSCC"). AC ¶27.

and the introducing broker-dealers ("Shared Customers").  Apex services approximately one hundred Introducing Broker-Dealers.  AC ¶ 1. *See also* Declaration of Jack E. Pace III In Support of "Apex" Rule 12 Motion To Dismiss…, ECF 491-1 ("Pace Decl.), Ex. 1 at 2.

When opening accounts with the Introducing Broker-Dealers, investors simultaneously enter into agreements with and become customers of Apex, as the clearing broker-dealer. Typically, these Shared Customers enter their trading orders through the Introducing Broker-Dealer which are then processed through the clearing broker-dealer. AC ¶ 25; Pace Decl. Ex. 2.

Although called a "clearing" broker, Apex itself is not a clearinghouse.  It is the National Securities Clearing Corporation ("NSCC") that is the SEC-regulated clearinghouse that clears and settles transactions in equity securities traded in the United States. The NSCC is a subsidiary of the Depository Trust and Clearing Corporation ("DTCC").  Broker-dealers such as Apex are members of the NSCC. AC ¶¶ 31–32. As a member of NSCC, Apex must abide by certain risk management obligations and must post collateral and meet daily deposit requirements. AC ¶¶ 33 -35. Although Apex knows that DTCC may assign a volatility multiplier on certain securities which it perceives as having more risk, Apex has tools to and is able to "(i) monitor its anticipated DTCC deposit requirements in real time (or near real time); and (ii) monitor its ability to meet anticipated or actual DTCC deposit requirements in real time (or near real time)." AC ¶¶ 35-36. Accordingly, broker-dealers and clearing broker-dealers such as Apex are required to meet industry "net capital" requirements which are "designed to require broker-dealers to maintain sufficient liquid assets to meet all obligations to customers." AC ¶ 40.

Because Apex is a broker-dealer registered with FINRA, it must abide by industry rules governing broker-dealers that are designed primarily for the protection of Plaintiffs and class members who are customers and investors.  AC ¶ 46.  The industry rules are meant to protect "efficient markets." AC ¶¶ 43-44. FINRA broker-dealers, such as Apex, have the duty to establish, maintain, and enforce a supervisory system which includes monitoring its technology and other risks, including credit and other systemic risks (FINRA Rule 3110, "Supervision"), and to engage in continual risk management to ensure continuation of its trading and financial "mission critical systems." (FINRA Rule 4370, "Business Continuity Plans").  But that is not all. FINRA Rule 2010 sets forth the guiding principle that Apex must adhere to, providing that "in the conduct of its business, [brokerages] shall observe high standards of commercial honor and just and equitable principles of trade."  The relevant interpretative material from the securities

regulators states, "[i]Implicit in all member and registered representative relationships with customers and others is the fundamental responsibility for fair dealing. Sales efforts must therefore be undertaken only on a basis that can be judged as being within the ethical standards of [FINRA's] Rules, with particular emphasis on the requirement to deal fairly with the public." AC ¶ 44. Additionally, FINRA reiterates in Regulatory Notice 21-12, "the foundation of the securities industry is fair dealing with customers. . . **even during times of market stress**." (emphasis added). *Id*.

Moreover, Apex, as a broker-dealer, owes Plaintiffs and members of the Class the common law duty of due care and loyalty, including, *inter alia*, a duty to reasonably ensure that they can continue to provide investors access to the securities markets during times of extreme market volatility. AC ¶¶47, 50.  This duty was reiterated by FINRA in Regulatory Notice 21-12, issued on March 18, 2021, directly in response to the events giving rise to this action. FINRA reminded that: "[m]ember firms should maintain strong procedures, thoughtfully crafted in advance, to reasonably ensure that they can continue to provide investors access to the securities markets during times of extreme market volatility, as in the past several months." These include "liquidity management practices to ensure the firm is able to continue to provide customers with access to the markets despite abnormal liquidity demands." *See*, Regulatory Notice 21-12, *available at*  https://www.finra.org/rules-guidance/notices/21-12.  AC ¶51.  Here, Apex is alleged to have undertaken the Market Suspension, an extraordinary measure on January 28, 2021, without a plan reasonably designed to correlate its supposed reduction of risk to its extraordinary action. AC ¶68.

While FINRA member broker-dealers do have discretion to refuse particular trades, broker-dealers do not have the right to refuse all orders to buy certain stocks for hours, while permitting sales with the intent of driving the market price of those stocks down, without facing potential liability.  In instances where there is excess volatility in the marketplace, the regulatory structure has established safeguards. Those safeguards include temporary "circuit breakers" where *all trading* in a particular security is halted for a limited time period.  There are no rules nor industry customs that contemplate allowing any "lone wolf" broker-dealer to shut down one side of the trading for hours, or days, in order to force the price of a stock down, without consequence. AC ¶¶ 52-54, 56.  In short, if the standard applied to Apex is to have "liquidity management practices to ensure the firm is able to continue to provide customers with access to

the markets despite abnormal liquidity demands," the facts demonstrate that Apex miserably failed in its obligations.  *See, supra,* Regulatory Notice 21-12.

## B.   The Events of January 28, 2021

Apex misstates the facts leading up to and occurring on January 28th, misstates the allegations in the Amended Complaint and resorts to a narrative of its own creation, now debunked by the SEC staff itself in its report examining some of the events at issue here.[4]

Plaintiffs allege that there was volatility surrounding the Suspended Stocks in the days leading up to and on January 28th.  Plaintiffs also allege that volatility is not an unusual phenomenon in the securities markets, nor are "short squeezes," and, that Apex knew or had reason to know in advance of January 28th of investor demand for the Suspended Stocks. AC ¶ 58.  As the SEC staff has noted, while there was market volatility on January 28, 2021 and in the immediately preceding days, the cause for such volatility is not known. "The SEC Staff Report noted as to GME [one of the Suspended Stocks] and the increased trading volume in January 2021, '[t]he underlying motivation of such buy volume cannot be determined; perhaps it was motivated by the desire to maintain a short squeeze. Whether driven by a desire to squeeze short sellers and thus to profit from the resultant rise in price, or by belief in the fundamentals of GameStop, it was the positive sentiment, not the buying-to-cover, that sustained the weeks-long price appreciation of GameStop stock.'" AC ¶ 67.  Apex knew, or should have known of the demand for these stocks. AC ¶ 58.

As to the stock price movements, the SEC staff report noted, "[y]et while the swings in GME's [a Suspended Stock] share price and volume attracted significant attention, they were not unusual for January 2021. For instance, single-day price changes on January 27 from the closing prices on January 26 for KOSS (480.0%) [a Suspended Stock], AMC (301.2%) [a Suspended

---

[4] *See,* SEC "Staff Report on Equity and Options Market Structure Conditions in Early 2021" dated October 14, 2021 ("SEC Report") *available at* https://www.sec.gov/files/staff-report-equity-options-market-struction-conditions-early-2021.pdf.  Attached to the Declaration of Peter Safirstein In Opposition to Apex's Rule 12 Motion to Dismiss Filed June 22, 2022, ("Safirstein Decl.") Exh. 1.The Court may take judicial notice of this SEC Report in its entirety, particularly where excerpts are included in the Complaint (as here) pursuant to Federal Rule of Evidence 201. A court may take judicial notice of documents in the public record, including documents filed with the SEC, and may consider such documents in determining a motion to dismiss. *R2 Investments LDC v. Phillips*, 401 F. 3d 638,639-640 fn. 2 (5th Cir. 2005).

Stock], NAKD (252.3%), and Express, Inc. (symbol: EXPR) (214.1%) were larger than any single-day GME price change… **In fact, since 2020 began, 134 common stocks had at least one one-day price increase greater than GME's largest one-day price increase…(internal citations omitted)."** AC ¶ 66 (emphasis added).

Apex attempts to create its own narrative of events that supposedly justified its unjustifiable action despite the uncontested facts that: 1) market volatility is not uncommon; 2) the SEC Report noted that swings in GME's market price "were not unusual for January 2021" and that in the year preceding January 28, 2021, "134 common stocks had at least one one-day price increase greater than GME's largest one-day price increase"; 3) no broker-dealer, including Apex, had ever implemented a purchase-only halt of highly liquid, much in demand stocks despite market volatility greater than here; and 4) no broker-dealer, other than Robinhood, reacted to the events of January 28, 2021 and restricted purchases.  Its "poor Apex – woe is me" defense should be rejected given the facts alleged herein.

But Plaintiffs do not plead that there was "unprecedented 'manic buying'" (Def. Mem. at 4) much less admit, that "the astronomical increase in trading volume was due ironically to meme stock purchasers themselves engaging in 'online discussions' and agreeing to purchase more and more shares in these stocks for the purpose of raising the stock price." *Id*.  Apex, in making up its own version of the facts, which do not comport with the AC, cannot cite to any such reference in the Amended Complaint for that proposition.[5]  To the extent that Apex refers to a Congressional Staff Report of February 2021 (Def. Mem. at 4-5), Apex draws conclusions not contained in that report.  Moreover, that Congressional report was submitted without the benefit of a full investigation just days following the events of January 28th.  And, importantly, the SEC

---

[5]Defendant cannot rely on pleadings not contained in the Operative Complaint.  *See, Fuller v. SunTrustBanks, Inc.*, 744 F.3d 685, 695 (11th Cir. 2014) ("In general, [courts] do not consider anything beyond the face of the complaint and documents attached thereto when analyzing a motion to dismiss under Rule 12(b)(6).") Moreover, Paragraph 169 of the Original Complaint contained no admission of responsibility for colluding to drive up the price of the stocks.  It reads "Leading up to January 28, 2021, the Suspended Stocks became increasingly popular as, among other things, investors engaged in online discussions regarding the undervaluation of the Suspended Stocks and began purchasing shares."  Defendants rely on *Fernandez v. Sch. Bd. Of Miami-Dade Cnty.,* 201 F.Supp.3d 1353, 1361, n.1 (S.D. Fla 2016), (Def. Mem. at 15), but that case reinforces Plaintiffs' position that the general rule is to not rely on superseded complaints except in rare circumstances not present here.

Report disagrees with Apex's narrative. *See*, AC ¶ ¶ 66, 67.  But even were it to be true that volatility on January 28th was created by retail investors viewing information online, it is still true that market volatility is common, sometimes even more volatile than on January 28th and that Apex stands uniquely in having taken the unnecessary and unprecedented action it took on January 28th. Apex's statement that "Plaintiffs admit that they sought to exploit artificial market conditions, unforeseeable but to those creating those conditions for financial gain" (Def. Mem. at 5) crystallizes Apex's defense strategy.  Apex makes up facts (there is no such admission of this patently false proposition), never accepts responsibility for its own actions, and always blames the victims, even if the victims are its own customers.

Apex cannot justify its three-and a-half hour trading suspension.  The Amended Complaint sufficiently alleges that Apex should have had adequate risk measures already in place to avoid such market disruption. Moreover, Apex was informed by DTCC no later than 11:47 a.m. Eastern on January 28th that the collateral requirement was lower than previously communicated and within the range found acceptable by Apex. AC ¶82. Apex ignores this communication from the DTCC, but acknowledges that it was informed by the DTCC no later than 12:00 p.m. (noon) Eastern of this information.  Def. Mem. at 9.[6]

But Apex did not lift the Market Suspension until 2:55 p.m. Eastern.  In short, if Apex's then President is to be believed that Apex never faced a cash crisis on January 28th (AC ¶ 87), then Apex's implementation of an approximately three and one half-hour suspension of the ability to purchase the Suspended Stocks was unjustified. If Apex's President was misinformed, and Apex did not have "headroom," Apex still cannot explain why the Market Suspension lasted for approximately three hours *after* the DTCC informed Apex that the collateral requirement was at a level that Apex admittedly found to be acceptable. The supposed thirteen minute discrepancy (11:47 a.m. Eastern when Plaintiffs allege DTCC informed Apex of the acceptable collateral amount in accordance with Apex's expectations (AC ¶82) and 12:00 p.m. Eastern when Apex admits it was so informed) (Def. Mem. at 9) does not affect Plaintiffs' allegation that an approximate three hour Market Suspension (lasting until 2:55 p.m.), knowingly without

---

[6] By Apex's own telling, it was upon learning that the collateral requirement was less than originally communicated that led Apex to lift the Market Suspension. AC ¶80.

justification yet with devastating financial consequences is actionable misconduct as alleged herein.

A review of the critical events of January 28, 2021 is in order.  On that morning, Apex unilaterally and abruptly blocked its direct customers and directed its Introducing Broker-Dealers to block their Shared Customers from purchasing shares of the Suspended Stocks for a time period lasting approximately three hours and twenty-five minutes. Apex's decision to implement this unilateral, one-way Market Suspension—unprecedented in the long history of securities trading in this country for liquid in-demand securities—foreseeably impeded additional price appreciation and decreased and suppressed the prices of the Suspended Stocks, AMC, GME, and KOSS.

Predictably, Apex's unprecedented Market Suspension adversely affected the market prices for shares of the Suspended Stocks. Apex knew of investor demand for those stocks and that such demand was causing the price of those stocks to increase. AC ¶¶ 58-68.  Apex's Market Suspension caused the price of those securities "to go down and to trade at lower prices than they would have traded for absent Apex's misconduct." AC ¶68. The SEC Report observed the market decline as well. ("After peaking in late January, the volume of trading in GME shares and GME's price declined substantially. GME's decline coincided with several brokerages' decision to restrict trading in GME on January 28…"). SEC Report at 21, Safirstein Decl. Ex. 1. Apex did not merely "restrict" trading, they took action deliberately calculated to force the market price of stocks it had sold to go down.

Not only did the unprecedented unilateral Market Suspension cause the price of the Suspended Stocks to go down, the Market Suspension "foreseeably impeded additional price appreciation and suppressed the prices of the Suspended Stocks during and beyond the Class Period causing ascertainable damages and injury."  AC ¶¶ 68, 70.  Apex does not and cannot deny that the action it took to suspend one-way trading in the Suspended Stocks was to adversely affect the price of the Suspended Stocks. In fact, Apex admits it was concerned that the collateral requirement would go up because of the volatility surrounding the Suspended Stocks and that Apex then took action to affect the volatility, suspending all purchases but not sales, so as to decrease the price of the Suspended Stocks.  *See* fn. 31, *infra*.

Apex's claimed reasons for ordering the unprecedented Market Suspension and the timing surrounding such suspension do not comport with the chronology revealed by the pre-filing investigation and by Apex's narrative.

9

On January 28, 2021, at 9:30 a.m. Eastern ("ET"), Apex received a report from the NSCC increasing Apex's collateral requirement. AC ¶ 79. At approximately 11:31 a.m. ET (10:31 a.m. Central), "Apex sent a client communication to all clients instructing them to restrict the purchase of new buy positions in AMC, GME and KOSS… The restrictions were imposed uniformly across all Apex clients." *Id.*  But Apex ignores that record evidence produced in this case by DTCC (and not Apex) shows that DTCC certainly knew by 11:41 a.m. ET that Apex's collateral exposure was going down and that there was a call between DTCC and Apex senior management six minutes later at 11:47 a.m. ET.  AC. ¶ 82, *see also* Safirstein Decl., Exh. 2.  The reasonable inference to be drawn is that DTCC and Apex communicated about the lower collateral exposure at 11:47 a.m., just moments after Apex imposed its Market Suspension. Then, by Apex's admission, "[a]t 12:00 p.m. [ET], Apex received an updated NSCC report, estimating that its collateral deposit requirement, while still elevated, would be reduced significantly from the NSCC's 9:30 a.m. ET estimate.  *See* AC ¶ 79 and Def. Mem. at 9.  In fact, that report indicated more than that the collateral would be "reduced significantly", as Apex's memorandum of law reports, but that the "potential collateral deposit requirement… was elevated **but lower than the 9:30 a.m. report and in line with reports Apex had received from NSCC prior to 9:30 a.m. that day."** *See* AC ¶ 79 and Pace Exh. 1 at 6.[7]

Put differently, Apex knew, by its own admission no later than noon (ET) that the collateral requirements were in line with the collateral requirements it was prepared for prior to receiving the notice from the DTCC that apparently alarmed it into mandating the Market Suspension.  AC ¶ 80.  Despite knowing at noon that there would not be any dramatic collateral increase, Apex nevertheless kept in place its unprecedented and unjustified Market Suspension for nearly three hours – until 2:55 p.m. (ET).  AC ¶ 79, Def. Mem. at 9.

Apex argues that "Plaintiffs omit material information" in an email chain "sent at 12:20 p.m. ET [on January 28, 2021], that Apex implemented its trading restrictions in response to collateral requirements communicated from NSCC and that Apex actively was working with the

---

[7] Apex accuses Plaintiffs' counsel of manipulating time zones as between Central Time and Eastern (fn 12).  That is not true as there is a legitimate ambiguity as to which time zone is at issue as to this particular communication (Compare Pace Ex. 1 reporting the communication at 11:00 a.m. (while reporting all time zones as Eastern with Pace Ex. 6 not correcting the time zone for this particular communication).

DTCC to find "solutions" for customers. Pace Decl. Ex. 10 (APEX-MDL00002375–377 at 376). Two important points in response. First, the email Apex refers to speaks to Apex's talking points – "The message back to the client is…" *Id.* Plaintiffs' allegations do not concern Apex's "talking points" but concern when Apex knew that they had no reason at all to maintain the Market Suspension. To that end, the very next email in the email chain Apex refers to is instructive and troubling. In that email, the same William Brennan (as in the previous email in the chain cited by Apex) writes "[w]e are opening back up shortly…go ahead and give [the selected customer] clearance." *Id.* The time on that email is indicated to be 11:08 a.m. That is presumably not Eastern as the email immediately preceding this email in the chain is at 12:20 p.m. and Apex has confirmed that that 12:20 p.m. time is Eastern time. Def. Mem. 9. Since the time-stamp on the email following the email at 11:08 a.m. is 1:09 p.m., it is reasonable to assume that the 11:08 a.m. email is sent at 1:08 p.m. ET. This means, again by Apex's admission, that Apex knew at 1:08 p.m. Eastern that they were going to be "opening back up shortly," yet delayed until 2:55 p.m. ET (an inexplicable delay of one hour and 47 minutes which equates to many lifetimes in securities market action).

Apex has maintained that "[a]fter confirming with NSCC that the new report was accurate, Apex communicated to all clients the lifting of the restriction of new purchases of AMC, GME and KOSS at approximately [2:55 p.m. ET] 1:55 p.m. [Central Time] on January 28, 2021." AC ¶ 79, Def. Mem. at 9. Not only was the communication to all clients of the lifting of the restrictions unreasonably delayed by hours, this email chain that Apex seeks to exculpate itself demonstrates that Apex apparently gave "clearance" to certain preferred customer's – as no other customer is seen to have received "clearance."[8]

In seeking to provide cover for its inexcusable action, Apex mischaracterizes the SEC Office of Investor Education and Advocacy's January 30, 2021 Investor Alert and Bulletin (the investor "Bulletin") as "endors[ing] trade restrictions during the weeks' volatility," (Def. Mem. 2, n.1), ignoring the fact that the SEC, in the same Bulletin reminded broker-dealers of the approved regulatory procedure for addressing market volatility, which Apex failed to follow. That approved regulatory procedure envisions a full market shutdown as a temporary (typically measured in

---

[8] For argument's sake, it really makes no difference what time zone is reflected in this email. Assuming that the earliest the email was sent was 11:08 a.m. Eastern, and the latest it was sent was 2:08 p.m. Eastern, these emails still show that Apex unreasonable delayed lifting the Market Suspension until 2:55 p.m. Moreover, to the extent there is a dispute as to the timing of these communications, such factual disputes preclude dismissal.

minutes) halting of purchases and sales by all broker-dealers.[9] Importantly, the SEC has never stated that investors cannot sue the brokerage houses for damages for the conduct undertaken by Apex.

 Apex's Market Suspension drew the ire of the Introducing Broker-Dealers. AC ¶ 75.  Apex knew its conduct was wrong. When volatility hit the market just one day later, on January 29th, it opted not to restrict trading, with a senior executive noting, "we can't shut down access to the names. We are getting killed in the press. I told Bill to have Matt raise a few hundred in capital this weekend." AC ¶¶90-91.    Other than Robinhood, no other broker-dealer or clearing broker-dealer suspended one-sided trading in the manner that Apex did.  AC ¶¶ 92-93. Apex asserts, "[f]ar from negligence, the email chain quoted by Plaintiffs confirms Apex's careful and reasonable response to extraordinary market events, as described further herein." Def.  Mem. at 9 citing Pace Ex. 10.  In fact it is just the opposite as a jury could easily find.  As the email chain and other facts evidence, Apex's careless and unreasonable response to market events that Apex should have been well prepared for, but was not, set forth the factual predicate for Plaintiffs' allegations of negligence.

### III.  ARGUMENT

---

[9]  *See* SEC Office of Investor Education and Advocacy, "Thinking About Investing in the Latest Hot Stock? Understand the Significant Risks of Short-Term Trading Based on Social Media, Investor Alerts and Bulletins (Jan. 30, 2021) *available at* https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-alerts/investor-62   (last   visited July 6, 2022) In that Bulletin, under the same heading regarding "Market and broker-dealer protections for volatile stocks," the SEC explains:

> The national securities exchanges and FINRA have rules designed to address market volatility in stocks listed on a national securities exchange. The "Limit up-Limit Down" rules are designed to prevent trades in these stocks from occurring outside a specified price band. This price band is set at a percentage level above and below the average price of the stock over the immediately preceding five-minute trading period. If a stock's price moves outside these price bands for more than 15 seconds, trading in the stock will be paused for five minutes. For additional information on the "Limit Up-Limit Down" rules, read our investor bulletin: "Measure to Address Market Volatility." Nothing in the SEC's Release approved of the comprehensive market shutdown imposed by Apex (and Robinhood).

*Id*.

## A.   <u>Standard of Review</u>

"In reviewing a motion to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted, we accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 191 (2d Cir. 2007).

The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient*." Goldman v. Belden*, 754 F. 2d 1059, 1067 (2d Cir. 1985).  A complaint should not be dismissed if the plaintiffs have stated 'enough facts to state a claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

"A claim has facial plausibility when the plaintiff[s] plead[] factual content that allows the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While factual allegations should be construed in the light most favorable to the plaintiffs, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.*

## B.   <u>Plaintiffs Jang and Chavez Have Article III Standing</u>

Apex's challenge to Plaintiffs' Article III standing arises from a set of facts of its own making, laced with unvarnished contempt for Apex's own customers and investors in general. Plaintiffs' allegations look nothing like the speculation with which Apex attacks them.  Instead, Plaintiffs have pled direct, non-speculative, injury directly resulting from Defendant's action.

Specifically Plaintiffs allege that "[w]hen Apex undertook the extraordinary measure on January 28, 2021 of suspending and directing the suspension of the purchasing of the Suspended Stocks, stocks that were in great demand, Apex caused the price of each of the Suspended Stocks to go down and to trade at lower prices than they would have traded for absent Apex's misconduct." AC ¶ 68.  Moreover, Apex's Market Suspension foreseeably impeded additional price appreciation and suppressed the prices of the Suspended Stocks during and beyond the Class Period causing ascertainable damages and injury." AC ¶ 70.

Not only have Plaintiffs alleged as such, Defendant's Memorandum confirms that Apex's one-sided trading halt was done for the purpose of adversely affecting the price of the stocks. ("As

13

Apex explained in its letter to the N.J. Securities Bureau, Apex temporarily halted additional purchasing of shares in those three stocks 'to manage the risk that it would not be able to meet potential increased NSCC collateral funding obligations if Apex clients were permitted to continue to engage in additional purchases of AMC, GME and KOSS.'") Def. Mem. at 8-9.  In other words, if the trading price of AMC, GME and/or KOSS went up, Apex perceived a risk to its ability to meet a potential increased NSCC collateral funding obligation.  Thus, Apex took affirmative steps to directly interfere with market forces and foreseeably impeded the price movement of these stocks in the market for its own self-serving purposes.  The SEC observed in its Report that the price of  one of the Suspended Stocks went down following the imposition of such action. ("After peaking in late January, the volume of trading in GME shares and GME's price declined substantially. GME's decline coincided with several brokerages' decision to restrict trading in GME on January 28."). SEC Report at 21.

As a consequence of Apex's actions, both Plaintiffs, Chavez and Jang, alleged that the price of the securities they purchased as Shared Customers of Apex and the Introducing Brokers, went down in value such that when they did sell, the price at which they sold was less than it would have been had Apex not engaged in the alleged misconduct. AC ¶¶ 13-16; 21 (Chavez: 607 shares of AMC (purchased through Webull as Shared Customer with Apex); sold on February 2, 2021 "for less than he would have sold for but for the conduct alleged here") AC ¶¶ 17-21; (Jang: 401 shares of GME (purchased through Ally as Shared Customer with Apex); sold on February 4, 2021 "for less than he would have sold for but for the conduct alleged here"). Just as one cannot unring a bell, Apex cannot undo the harm it did to the marketplace. Having contaminated the securities market on January 28th, Apex is accountable for the foreseeable consequences of its action that adversely affected the price of the securities.

### 1. Plaintiffs Allege an Injury in Fact Which Apex Attempts to Mischaracterize as "Speculative"

For Article III standing, a Plaintiff must allege an injury in fact, being an invasion of a legally protected interest, that is (1) concrete, particularized, and actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of (meaning fairly traceable to the defendant's conduct), and (3) it must be likely, as opposed to merely speculative, that a favorable decision will redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Plaintiffs sufficiently plead injury to a

protected, concrete and particularized legal interest in their respective shares of AMC and GME shares. Plaintiffs allege a direct causal connection between Apex's unprecedented, unilateral, unwarranted one-sided market shutdown and the foreseeable decrease in the value of their AMC and GME shares.

Plaintiffs' claims do not require, or rest upon, any speculative or hypothetical conduct as Apex argues. The conduct which caused the harm, as alleged, has already occurred and the losses have already been suffered and are unconcerned with future events or intentions or plans of future conduct (such as was the case in *Aaron Private Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1336 (11th Cir. 2019) referred to by Apex. Def. Mem. at 38). [10]

Apex mischaracterizes Plaintiffs' Amended Complaint. Their claimed injury is not based upon any allegation that Mr. Chavez and Mr. Jang had a plan, which was thwarted, to have sold at the top of the market. Rather, they owned shares of a certain value in a free and open market, and Apex's Market Suspension foreseeably caused a drop in share values and market suppression, causing Plaintiffs' losses.   The fact that both Mr. Chavez and Mr. Jang could have sold their shares is irrelevant to legal damages.  The market price of the relevant securities was adversely affected when Apex acted in its impermissible way to force the price of the securities down.  As to the measure of damages, that is to be determined at a later time with the use of experts.

### 2.  Plaintiffs Allege a "Legally Protected Interest"

Plaintiffs satisfy the "injury-in-fact" prong of Article III in alleging, for example, that "Apex caused the price of each of the Suspended Stocks to go down and to trade at lower prices than they would have traded for absent Apex's misconduct." AC . ¶ 68.  Yet Apex argues against the "straw person" of a non-existent, never pled, "scheme" supposedly contrived by Plaintiffs to manipulate the market.  Not only was no such scheme alleged, the SEC Report of the events of January 28, 2021 does not even hint at such a "scheme."  From this false premise, Apex argues that Plaintiffs should not benefit from their wrongdoing. Def. Mem. at 39-40.  True to form, Apex makes up facts, shirks all responsibility for its own

---

[10] See Def. Mem. at 13. Apex's Article III standing argument is similar to the argument Robinhood advanced, and the Court rejected in the Robinhood "Outage" case. See, *In re Robinhood Outage Litigation*, 3:20-cv-01626-JD, Minute Order (N.D.Cal Feb. 18, 2021).

actions and castigates its customers, the victims of its misconduct.

Apex engages in fabrication of facts which are not in the Amended Complaint and deliberately excerpts snippets from the Superseded Complaint in a disingenuous attempt to suggest that the Plaintiffs were involved in illegal market manipulation. For example, Apex puts the following falsity before the Court: "The Plaintiffs unabashedly admitted in their original complaint that this litigation arises from the Plaintiff purchasers own coordinated 'short squeeze' working collusively as a group to purchase stocks to pump up 'the value of the stock they purchased." Def. Mem. at 39.  Despite citing to the "original complaint," Apex cites to ¶ 64 of the Amended Complaint for support for this proposition.  Paragraph 64 alleges nothing of the sort.[11]  Then, compounding their misstatement, Apex states, "Plaintiffs admitted that the increase in value of the meme stocks was the product of online discussions that resulted in unprecedented and coordinated purchasing of shares of those stocks." Original Complaint ¶ 169." Not only is it improper for Apex to rely on the Superseded Complaint[12], they misstate the pleading.[13]  It is from these threads of a false reading of Plaintiffs' allegations that Apex preposterously concludes, "[s]imply put, Plaintiffs cannot allege the invasion of a legally protected interest in

---

[11] Paragraph 64 reads: "In a 'short squeeze,' individual investors like Plaintiffs and the Class stand to benefit (absent one-sided market restrictions) as the value of the stocks they purchased increases. Short sellers, on the other hand, risk further losses, as stock prices rise as a natural consequence of market forces." This pleading makes economic sense and reflects market reality. It does not "unabashedly admit" that Plaintiffs participated in an illegal conspiracy.

[12] It is well established law that Defendants must contest the operative complaint and not cite to earlier superseded pleadings. *See* fn 5.  Apex seeks to avoid the plain reading of the law by suggesting that Plaintiffs are engaging in a transparent attempt to manipulate the allegations to avoid a dispositive defense. Plaintiffs' pleadings do not and have never admitted of any participation by any plaintiff in any market manipulation scheme.  Such insinuation is just a continuation of Apex's attempt to misdirect the Court from its own actions, while casting contempt on its own customers and investors generally.

[13] Paragraph 169 of the Superseded Complaint reads, under the rubric, "Price Volatility Ahead of January 28, 2021 Was Well Known To Defendants" "Leading up to January 28, 2021, the Suspended Stocks became increasingly popular as, among other things, investors engaged in online discussions regarding the undervaluation of the Suspended Stocks and began purchasing shares." That is not an allegation of a nefarious scheme orchestrated by Plaintiffs to engage in a market manipulation.  In fact, in the next Paragraph of the Superseded Complaint, Plaintiffs further described the market forces by reflecting that "[s]ome institutional investors also increased demand for the Suspended Stocks." Superseded Compl. ¶ 170.  The same allegation is in the Amended Complaint, at ¶ 59.

their lost profits from a partially-blunted market manipulation scheme." Def. Mem. at 39. They even go so far as to improperly infer that Plaintiffs are participating in a pump and dump scheme.

These arguments result from a misreading of both the operative complaint and a now superseded complaint. There are no allegations in the Amended Complaint (or the Superseded Complaint) which allege, or even support any inference, that Plaintiffs were engaged in, or admitted to coordinating or working as a group to "pump" up stock values as part of a market manipulation scheme to achieve ill-gotten gains. There are no allegations in the Amended Complaint that allege, or even support an inference, that Plaintiffs were engaged in anything other than legal free market activity. [14]

### 3.   Plaintiffs Have Standing To Bring Claims on Behalf of Direct Customers

Apex mistakenly argues that Plaintiffs lack Article III standing to bring claims on behalf of Apex's direct customers." Def. Mem. at 40.   However, Defendant improperly conflates "standing" with the class action Rule 23(a) elements of commonality, typicality and adequacy. The reason Defendant attempts to frame the issue as "standing" is obvious—Courts are usually hesitant to dismiss class allegations at the motion to dismiss stage and generally find such attempt premature. [15]   Thus, Defendant instead attempts to improperly recast its argument as a standing issue. However, given that Plaintiffs have clearly asserted a tangible injury to support standing to assert their claims on behalf of the class of those similarly injured purchasers of the Suspended Stocks— be they direct Apex customers or Shared Apex customers— they have

---

[14] Reprehensibly, and without any basis, Apex sinks to the level of trying to defend its own unlawful conduct by suggesting that the retail investors it harmed are a modern example of the litigating thieves in *The Highwayman's Case*, 9 L. Q. Rev. 197 (1893) who the Court determined were unworthy of resort to the courts but were worthy of being hanged. Def. Mem. at 39.

[15] As the Eleventh Circuit in *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1309 (11th Cir. 2008) noted with approval, "[s]everal of our sister circuits have reversed denials of class certification that were made without the opportuntiy for discovery, when the pleadings on their face did not show non-compliance with Rule 23 or when the satisfaction of the Rule 23 requirements may have depended on factual matters within the knowledge or possession of the defendant." *Id.* at n.1;  *See also, Etzel v. Hooters of America, LLC*, 2016 WL 8604317 (N.D. Ga. Nov. 15, 2016); *Arkin v. Innocutis Holdings, L.L.C.*, 188 F. Supp. 3d 1304 (M.D. Fla. 2016).

satisfied the threshold issue of standing to bring suit.[16]

As the Eleventh Circuit observed in *Sierra v City of Hallandale Beach, Florida*, 996 F.3d 1110, 1112-13 (11th Cir 2021), there are three elements the Court looks at to determine "whether a plaintiff has standing to sue: (1) injury in fact, (2) causation, and (3) redressability. To establish an injury-in-fact, the plaintiff must demonstrate that he or she suffered 'an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical.' [quoting *Lujan,* 504 U.S. at 560]."  Putting aside the fact that Plaintiffs have pled a concrete and particularized injury here, none of these three elements (*i.e.*, injury, causation and redressability) are implicated in whether they are *typical* of a class that may include direct and Shared Customers.

"Typicality" merely "requires that 'the claims or defenses of the representative parties [be] typical of the claims or defenses of the class.'" [internal citations omitted]. *In re Checking Account Overdraft Litig.*, 275 F.R.D. 666, 674 (S.D. Fla. 2011).

As the *In re Checking Account Overdraft* court held:

> Like the commonality requirement, the typicality requirement is permissive: representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical. *Brown v. SCI Funeral Servs. of Fla., Inc.,* 212 F.R.D. 602, 605 (S.D. Fla. 2003). Moreover, if "the same unlawful conduct was directed at or affected both the class representatives and the class itself, the typicality requirement is usually met irrespective of varying fact patterns which underlie the individual claims." *Davis v. S. Bell Tel. & Tel. Co.,* No. 89–2839, 1993 WL 593999, *4 (S.D. Fla. Dec. 23, 1993). **To defeat typicality, a defendant must show that conflict between the named representative and the class members is "such that the interests of the class are placed in significant jeopardy."** *Walco,* 168 F.R.D. at 326. (emphasis added).[17]

*Id.* at 674. *See also Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341, 1346 (11th Cir. 2001) ("**Typicality**, along with the related requirement of **commonality**, focuses on whether a sufficient nexus exists between the legal claims of the named class representatives and those of individual class members to warranty class certification.") (emphasis added).

---

[16] The existence of Plaintiffs' tangible injuries is addressed elsewhere in this brief, *supra* at Point III. Subd. B., Subparts 1 and 2.

[17] *Id*. at 674

Relevant to Plaintiffs representing both direct and Shared Customers, the Eleventh Circuit held in *Kornberg v. Carnival Cruise Lines, Inc.,* 741 F.2d 1332, 1337 (11th Cir, 1984), that "[a] sufficient nexus is established if the claims or defenses of the class and the class representatives arise from the same event or pattern or practice and are based on the same legal theory. Typicality, however, does not require identical claims or defenses. A factual variation will not render a class representative's claim atypical unless the factual position of the representative markedly differs from that of other members of the class. [citations omitted]."

Courts have admonished defendants for conflating constitutional "standing" arguments with class action Rule 23 elements or even merits challenges. *Venerus v. Avios Budget Car Rental, LLC,* 723 Fed. App'x 807, 813-14 (11th Cir.2018) (finding error where "the district court conflated Article III standing with the Federal Rule of Civil Procedure 23 requirements for class certification."); *Paris v. Progressive Am. Ins. Co*., 19-21761-civ, 2020 WL 7039018, at * 4 (S.D. Fla. Nov., 13, 2020) ("Defendant's arguments as to Paris's standing to bring his individual claim are really arguments contesting Paris's adequacy to represent the interests of the class, which the Court addresses below*.")*; *In re Arris Cable Modem Cons. Litig.*, 327 F.R.D. 334, 351 (N.D. Cal. 2018) (defendant erroneously conflates standing with challenges to the merits of plaintiff's claim); *In re Worldcom, Inc. Sec. Litig.,* 219 F.R.D. 267, 283 (S.D.N.Y. 2003) (injured bond purchaser claim analyzed under Rule 23(a) requirements, whether characterized as adequacy or typicality concerns).

Accordingly, this Court should reject Defendant's misbegotten "standing" argument which concerns whether Plaintiffs can later, at the motion for class certification stage, demonstrate typicality, commonality and adequacy, all of which are properly pled.

## C.  New York Substantive Law Applies

There is no dispute that New York is the transferor forum. Plaintiffs agree with Defendant that this MDL Court is to apply New York's choice of law rules. Def. Mem. at 11. *See also, Trumpet Vine Investments v. Union Capital Partners*, 92 F.3d 1110, 1115 (11th Cir. 1996). "Under New York choice-of-law rules, 'the first step in any choice of law inquiry is to determine whether there is an 'actual conflict'" between the rules of the relevant jurisdictions." *Kinsey v. N.Y. Times Co.,* 991 F.3d 171, 176 (2d Cir. 2021).

Here, substantive New York law applies whether or not there is an actual conflict between New York law or Texas law. If there is no conflict, as here, where Apex is liable under both New

19

York and Texas law, New York law applies. If there is arguably a conflict, New York law would still apply because in tort cases, such as here, New York "applies the law of the state with the most significant interest in the litigation." *Kinsey.,* 991 F.3d at 176.[18] That state is New York.

Under New York law, an examination of the state with the most significant interest focuses on where the parties are domiciled as well as the locus of the tort. *See, Champlain Enterprises, Inc. v. United States,* 945 F. Supp. 468, 472-473 (N.D.N.Y. 1996).

Here, the domicile and the locus of the tort is New York. Apex is a New York corporation, with offices in Manhattan. AC ¶ 22. Its parent is headquartered in New York (Manhattan). *Id.* "Many of the acts complained of, on information and belief, were directed from New York. Apex's key personnel are New York based. Apex CEO William Capuzzi identifies his "Contact info" on his Linked-In page under "New York City Metropolitan Area." Apex Chief Administrative Officer William Brennan lists a "Summit, New Jersey" location and lists work locations as both Dallas (May 2016 - Present) and Greater New York City Area (September 2019-Present). And an Apex Chief Compliance Officer recent job posting is listed for an Apex New York office at 28 Liberty Street, New York, NY." AC ¶ 10. Two of the Suspended Stocks, AMC and GME, are listed on the New York Stock Exchange which is in New York. The third Suspended Stock, KOSS, is listed on Nasdaq. Nasdaq's principal executive offices are in New York. And, DTCC is headquartered in New York. Safirstein Decl. at ¶¶ 5-7.[19] Thus, New York law satisfies New York's most significant relationship test.

---

[18] New York's choice-of-law methodology requires that "the law of the jurisdiction having the greatest interest in the litigation . . . be applied." This is a change from the earlier traditional choice of law rule for torts which had been *lex loci delicti,* which mandates that a court apply the law of the state where the tort occurred. See discussion in *Champlain Enterprises, Inc. v. United States,* 945 F. Supp. 468, 471-472 (N.D.N.Y. 1996).

[19] The court can take judicial notice under Federal Rule of Evidence 201 of such facts that are not subject to reasonable dispute because the fact is either generally known within the territorial jurisdiction of the Court or capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. *Shahar v. Bowers,* 120 F.3d 211, 214 (11th Cir. 1997). In particular, the Eleventh Circuit has noted that the types of facts a court can take judicial notice of are things like scientific facts, matters of geography, or matters of political history. I*d.* Here, Plaintiffs submit that the Court can take judicial notice of listings on various securities exchanges and geographical matters. In addition, the Court may consider matters of which it takes judicial notice of in considering a motion to dismiss. See, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551. U.S. 308, 322, 127 S. Ct. 2499, 2509, 168 L. Ed. 2d 179 (2007).

In comparison, Apex notes that its headquarters are in Texas (Def. Mem. at 12), even though none of the events that are at issue are said to have taken place in Texas.  In reality, the Texas physical connection is to what was then a likely empty headquarters building during the midst of an international health crises.   To the extent Apex relies on a customer agreement as a basis for enforcing Texas law, the law Apex cites makes clear that the customer agreement does not compel the application of Texas law. For example, in *Champlain Enterprises, Inc. v. United States,* 945 F. Supp. 468, 472 (N.D.N.Y. 1996), cited by Apex (Def. Mem at 12), the Court held, "[u]nder New York law, a choice-of-law provision indicating that a contract will be governed by a certain body of law does not dictate the law that will govern non-contract based claims. See *Krock v. Lipsay,* 97 F.3d 640, 1996 WL 552453, at *4 (2d Cir. 1996); *Klock v. Lehman Bros. Kuhn Loeb Inc.,* 584 F. Supp. 210, 215 (S.D.N.Y. 1984) ("It has been held in New York that a contractual choice of law provision governs only a cause of action sounding in contract.") (citing *Knieriemen v. Bache Halsey Stuart Shields, Inc.*, 74 A.D.2d 290, 427 [**6] N.Y.S.2d 10, 12-13 (1st Dep't 1980), lv. denied, 50 N.Y.2d 1021, 431 N.Y.S.2d 812, 410 N.E.2d 745 (1980))." Here, the claims that do not sound in contract are governed by New York law.  Moreover, as to the content of Apex's customer agreement, the reference to Texas law only applies with regard to the agreement and an action seeking to enforce the customer agreement.  See Pace Decl., Ex. 2 at Par. 15; That is not this action. *See, Champlain Enterprises, Inc.,* 945 F. Supp. at 472. Also, importantly, FINRA rules prohibit member firms such as Apex from using "choice of law" provisions in customer agreements to "[include] a choice of law or governing law clause in a customer agreement without an adequate nexus, which suggests an intent to limit an award, or otherwise including provisions that attempt to limit the ability of a customer to file a claim or the authority of arbitrators to make an award, is a prohibited condition under FINRA Rule 2268(d)." *See,* Regulatory Notice 21-16, p. 4, *available at* https://www.finra.org/sites/default/files/2021-04/Regulatory-Notice-21-16.pdf. Here, the "customer agreement" is a predispute arbitration agreement and Apex cannot use a "choice of law" clause to limit the ability of its customers to recover under the law.

Weighing the two choices, it is clear that New York is more central to and has a more significant relationship to this action.

**D.   Plaintiffs Have Stated A Claim For Negligence (Count I)**

Plaintiffs allege that Apex was negligent because it was not properly prepared to address market volatility on January 28, 2021 with regard to its DTCC requirements; that it was negligent

in addressing the communications from DTCC on January 28th by implementing the Market Suspension for nearly three and one-half hours when it did not need to, and then was negligent in persisting in the Market Suspension for hours after DTCC informed Apex that the increased collateral deposit that prompted the trading halt was not required.  Apex undertook such draconian steps designed to force down the price of the securities it had sold to its customers when there were other reasonable steps available to it to mitigate its risk (such as raise additional capital).  *See* AC ¶¶ 105-113.

The New York Court of Appeals describes negligence as the "failure to employ reasonable care – the care which the law's reasonably prudent [person] should use under the circumstances of a particular case." *McLean v. Triboro Coach Corp*., 302 N.Y. 49, 51 (1950). To establish a claim for negligence under New York law, a plaintiff must show: (1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof. *Atkins v. Glen Falls City Dist.,* 53 N.Y.2d 325,333 (1981).

As Defendant concedes, the elements of a negligence claim are substantially similar in other states. Def. Mem. at 12-13.   For example, to establish a claim for negligence under Texas law, a plaintiff must similarly show: (1) a legal duty owed by one person to another, (2) a breach of that duty, and (3) damages proximately caused by the breach. *D. Houston v. Love*, 92 S.W.3d 450, 454 (Tex. 2002). [20]

### 1. Apex Owes Duties to Both "Introduced" Customers and "Direct" Customers.

Apex owed and owes duties as a broker-dealer to both its direct customers and to its Shared Customers.   Apex's duty of care that it owed to its customers is grounded in common law.  As courts in New York and elsewhere have recognized, a duty of care arises by virtue of the broker-client relationship itself.  *de Kwiatkowski v. Bear, Stearns & Co.,* 306 F.3d 1293, 1305 (2d Cir. 2002) ("No doubt, a duty of reasonable care applies to the broker's performance of its obligations to customers with nondiscretionary accounts.").  This standard of care is recognized to be a duty to act in accordance with the standard of care used by other professionals in the community, and the professional duty brokers have to act in the best interests of the client

---

[20] *See also, Pinchinat v. Graco Children's Prod., Inc.*, 390 F.Supp.2d 1141, 1149 (M.D. Fla. 2005) (citing to *Paterson v. Deeb,* 473 So.2d 1210, 1214 (Fla. 1st DCA 1985).

and not put its own financial interests first. *Conway v. Icahn & Co., Inc.* 16 F.3d 504, 510 (2d Cir. 1994) ("the relationship between a stock-broker and its customer is that of principal and agent and is fiduciary in nature, according to New York law (internal cites omitted)."); As the Second Circuit has noted, this broker-dealer duty to nondiscretionary accounts is limited. It is transactional based ("transaction-by-transaction duties"). *de Kwiatkowski*, 306 F.3d at 1305. Here, the duties alleged are transactional in that the duties arose in connection with the sale of securities to Plaintiffs and the Class.  Apex had a duty in connection with those sales to not then turn around and force the price of those very same securities down for its own financial benefit. There are no cases that cite to the specific misconduct alleged here because no broker-dealer (other than Robinhood) had ever taken such brazen, unthinking and harmful action before (or since). To the extent the broker's duty can be read as ending with the consummation of the transaction, that reading only applies because no one has contemplated before that a securities broker could sell a security and then subsequently take action adverse to its customer in connection with the very sale that the broker has participated in. To that extent, the transaction remains open until the broker has concluded its actions in connection with the sale of securities. In reversing the judgment of the District Court, the Second Circuit in *de Kwiatkowski* noted that it was error to hold that a reasonable duty of care in connection with a nondiscretionary account "entailed the rendering of market advice and the issuance of risk warnings on an ongoing basis." *Id.* at 1302. No such open ended duty is alleged here, the duty of care here is limited to the sale of securities to Plaintiff.[21]

Texas law is consistent with this finding.  *See, Magnum Corp. v. Lehman Bros. Kuhn Loeb, Inc.,* 794 F.2d 198, 200 (5th Cir. 1986) ("The relationship between a securities broker and its customer is that of principal and agent," *see, e.g., Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 337 F. Supp. 107, 110 (N.D. Ala. 1971*), aff'd*, 453 F.2d 417 (5th Cir. 1972)).

Apex contests Plaintiffs' negligence allegations based on its own rewriting of the Amended Complaint.  Apex argues, "[c]ourts nationwide have disclaimed any common law or general duty of clearing brokers to investors to accept trades or to guard against unforeseeable

---

[21] To the extent that the pleadings raise one or more issues of first impression under New York or Texas law, Plaintiffs respectfully request that this MDL court certify the issue(s) to the Eleventh Circuit Court of Appeals for resolution by the highest court in New York or Texas.

events." Def. Mem. 13. But that is not what Plaintiffs allege. Broker-dealers and clearing broker-dealers, such as Apex violate their duties of care to their customers when, as here, they sell securities to their customers and then take action contrary to those very sales, as done here by imposing the Market Suspension with the intent to harm those customers by forcing the price of those very same securities down for Apex's own financial benefit.  This is particularly so when not only are the events that supposedly caused the Market Suspension, foreseeable, as they were here, but Apex had specific information from the regulators that the Market Shutdown was unnecessary as there was no dramatic collateral increase.  Despite knowing that the Market Suspension was unnecessary, Apex negligently persisted in maintaining the Market Suspension for a prolonged period of time causing harm to Plaintiffs.[22]

FINRA Rules set out general standards of industry conduct that Apex has agreed to abide by and are evidence of the standard of care governing brokers conduct in dealing with their clients. *See, e.g.*, *Remington v. Newbridge Sec. Corp.*, 2013 WL 2444719, at \*5–6 (S.D. Fla. June 5, 2013) (finding that failure to comply with a FINRA Rule is evidence of a breach of duty to comply with applicable standard of care).   In *Remington*, defendants argued, as Apex does here, that the violation of FINRA rules do not create a private right of action for negligence.  The court, in rejecting this analysis, found that "even if the [FINRA] Rules did not provide a private cause of action, the negligence claim was nonetheless properly brought because 'violation by [the defendant] of the rule will not automatically result in his being held liable for negligence; it would simply be a factor for consideration by the jury as to whether he acted as a `reasonable' person in his conduct toward [the plaintiffs] and their account. . . .'" (*citing, Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng*, 697 F. Supp. 1224,1228 (D.D.C. 1988).  Following *Cheng*, the *Remington* court held, "[w]hile there may not be a private right of action for violation of Rule 2430, Plaintiffs are not suing merely for a violation of Rule 2430. Rather, they allege that Newbridge's failure to comply with the rule is evidence that they breached their duty of care, which includes a duty to act in accordance with the standard of care used by other professionals in the community." *Id.*

The *Remington* court agreed with the salient reasoning of the Fifth Circuit, governing Texas.  *See, Miley v. Oppenheimer & Co., Inc.* 637 F. 2d 318, 333 (5th Cir. 1981) (finding that

---

[22]  Revealingly, the one thing Apex *does not* contest, is that it was a foreseeable result of its actions that the price of its customer's stock holdings in the Suspended Stocks would drop immediately and precipitously.

"NYSE and NASD rules are excellent tools against which to assess in part the reasonableness or excessiveness of a broker's handling of an investor's account."). *Remington at *5-6.*

Courts applying New York law and Texas law have agreed with the analysis expressed in *Remington et al. See, Eva Rioseco and Nilda Cruz v. Gamco Asset Management, Inc.,* 2011 N.Y. Misc. LEXIS 7279 at *79-*80 (N.Y. Sup. Ct. Sept. 23, 2011); *Scott v. Dime Sav. Bank of New York, FSB*, 886 F.Supp. 1073, 1080-81 (S.D.N.Y. 1995) (violations of industry rules and practices give rise to common law claims of negligence); *Lange v. H. Heinze & Co.,* 418 F. Supp. 1376, 1384 (N.D. Tex. 1976) (NASD rules can be used as evidence as to standard of care in the industry and holding "[i]t is therefore the decision of this Court that the NASD Rules may be used as evidence of the present standard of care which the NASD member should achieve."); *Stevenson v. Rochdale Investment Management, Inc.,* 2000 U.S. Dist. LEXIS 13110 at *29 (N.D. Tex. 2000) (violation of the rules may be evidence of standard of care).

Nonetheless, Apex persists in arguing that violations of industry rules do not create a private right of action,[23] thus ignoring that the allegations pled here are based in common law tort, which may nonetheless be informed by the industry rules which set a uniform industry-accepted standard of care. In fact, Defendant cites case law agreeing with Plaintiffs' proposition that "the [FINRA] rules may be used to determine whether a breach has occurred once it has been established that a duty of care existed." *Weatherly v. Pershing,* 2015 U.S. Dist. LEXIS 197128 at *10–11 (N.D. Tex. June 23, 2015). *See also*, *Brink v. James*, 341 F.Supp.3d 1314, 1325 (S.D. Fla. 2018) (FINRA rules may be used as evidence to establish negligence in that plaintiff may proffer expert testimony on the standard of care owed by similar professionals in the community of broker-dealers to customer/account holders such as Plaintiff.). Def. Mem. at 15.

Here, Plaintiffs allege that Apex owed them a common law duty of care "in accordance with the standard of care used by other broker-dealer professionals." (AC ¶ 47, 106). In considering whether Apex breached its common law duty of care, the Court can look to, *inter alia,* the duties that Apex as a member of FINRA has undertaken to abide by including the duty to: "observe high standards of commercial honor and just and equitable principles of trade" (FINRA Rule 2010, AC ¶ 44). As FINRA has reiterated, and as Plaintiffs have alleged, Rule 2010 is the foundation of a

---

[23] Def Mem. at 15.

broker-dealer's relationship with its customers, to wit, "[i]mplicit in all member and registered representative relationships with customers and others is the fundamental responsibility for fair dealing. Sales efforts must therefore be undertaken only on a basis that can be judged as being within the ethical standards of [FINRA's] Rules, with particular emphasis on the requirement to deal fairly with the public." FINRA reiterates in Regulatory Notice 21-12, "the foundation of the securities industry is fair dealing with customers. . . even during times of market stress." (emphasis added); see also FINRA By-Laws, Article XI (authorizing the Board to adopt rules or amendments to, among other things, "protect investors and the public interest, . . . promot[e] [] fair practices . . ."). AC ¶ 44.

Moreover, FINRA rules provide that member broker-dealers must "establish, maintain, and enforce a supervisory system, which includes monitoring its technology and other risks, including credit and other systemic risks" (FINRA Rule 3110, AC ¶ 45); and, "engage in continual risk management to ensure continuation of its trading and financial 'mission critical systems'" (FINRA Rule 4370, AC ¶ 45).

In addition, Apex owed Plaintiffs the duty in common law tort to comply with FINRA rules and to "maintain strong procedures, thoughtfully crafted in advance, to reasonably ensure that they can continue to provide investors access to the securities markets during times of extreme market volatility, as in the past several months" including "liquidity management practices to ensure the firm is able to continue to provide customers with access to the markets despite abnormal liquidity demands." (FINRA Regulatory Notice 21-12; AC ¶ 51).

Moreover, Apex was statutorily required, pursuant to 17 C.F.R. § 240.15c3-1 (the "Net Capital Rule"), to maintain an appropriate level of "net capital" such as to maintain sufficient liquid assets to meet all obligations to customers. AC ¶ 40.  These are, *inter alia*, standards Apex is alleged to have violated.

Apex argues that it had no duty to trade securities for Plaintiffs, citing to its standard customer agreement. Def. Mem. at 15-16.[24] Apex is not charged with turning down any particular

---

[24] Apex' argument, that it is not a "public utility" under Texas law, is irrelevant to this matter. Its argument that it has no duty of "constant availability" is similarly irrelevant and misses the mark entirely.  Def. Mem. at 16. Plaintiffs' allegations that Apex should not have shut down its customers' ability to purchase the Suspended Stocks for hours on January 28th, when only one other broker-dealer acted similarly, cannot be fairly read as an alleged duty of "constant availability." No such duty is pled. Moreover, Apex' supposed defense that had it allowed for

trade from an individual customer for a particular reason.  Apex is charged with breaching its duty of care to customers to whom it had sold securities by taking action in connection with those sales, to directly drive the price of those securities down for Apex's own financial benefit.  Apex accomplished this breach of care by shutting down its entire platform, for hours, to prohibit all of its customers (direct and introduced) from purchasing in-demand stocks and options with the foreseeable consequence that the price of those stocks would go down.  No client, or customer agreement, ever authorized Apex to do that.

In any event, Apex misapplies its own customer agreement.  Apex argues essentially that it contractually has the right to do whatever it wants, to any customer whenever it wants to.  And without consequence.  In particular, Apex claims that it "has an absolute right to refuse to execute a customer's transactions." Def. Mem at 16.   But that is not Plaintiffs' complaint.  Here, Apex did execute Plaintiffs' transactions to purchase shares of stock that Apex later restricted.  It is the execution of those purchase orders that triggers Apex's duty of care to Plaintiff purchasers.  Apex breached that duty of care by taking affirmative steps in connection with those same purchases to drive the price of those securities down for its own financial benefit and to the financial detriment of Plaintiffs. As alleged, Apex's Market Suspension was designed to and did drive down the price of the securities at issue here.  Plaintiffs do not dispute that in the abstract Apex was under no obligation to sell securities to all customers at all times. But having sold securities to Plaintiffs, Apex could not harm those investor customers as it did here.  Apex's actions are inconsistent with its duties as a broker-dealer to act ethically, fairly, consistently with comparable broker-dealer professionals and, in a manner that put its clients' interests first. Apex had no contractual permission to affirmatively act and directly hurt its own customers in connection with Apex's sale of securities to those customers.

## 2. Apex' Own Customer Agreement Requires Adherence to the Applicable Industry Rules and Regulations.

In fact, what Apex ignores in its argument is that Apex's standard customer agreement contractually binds Apex to the duty of care in its dealings with Plaintiffs that it now pretends it does not have.  Paragraph 1 to the standard customer agreement provides, "1. Applicable Rules and Regulations. All transactions for the Account shall be subject to the constitution, rules,

---

ordinary business operations it would have been hazardous to its business has no support in the record and is contrary to Plaintiffs' allegations.

regulations, customs and usages of the exchange or market and its clearinghouse, if any, upon which such transactions are executed, except as otherwise specifically provided in this Agreement." Pace Decl. Ex. 2, at ¶1. Suspended Stocks GMC and AMC are traded on the New York Stock Exchange.  The rules of the New York Stock Exchange, explicitly incorporated into the customer agreement that is referenced by both Plaintiffs and Defendant, provides for in Rule 2010 (same as FINRA Rule 2010), that "[a] member or member organization, in the conduct of its business, shall observe high standards of commercial honor and just and equitable principles of trade."  Apex is a member of the New York Stock Exchange. Safirstein Decl. at ¶4;  Suspended Stock KOSS is traded on the Nasdaq Exchange.  This exchange has a similar rule as FINRA and the New York Stock Exchange in establishing a duty of care owed by member broker-dealers. Specifically, Nasdaq Conduct Rule 2110 provides that, "[a] member, in the conduct of his business, shall observe high standards of commercial honor and just and equitable principles of trade."  Apex is a member of Nasdaq. Safirstein Decl. at ¶4.

Apex also argues that its standard customer agreement shields it from financial liability to Plaintiffs.  Apex points to language in the agreement that states, in relevant part that Apex, "shall not be liable for losses caused directly or indirectly by any events beyond your reasonable control, including without limitation, . . . suspension of trading or unusually heavy trading in securities . . . ." Pace Decl. Ex. 1, at 3 (emphasis added); Pace Decl. Ex. 2, at ¶ 3. Def. Mem. at 16. But Apex's actions render this language irrelevant. The decision to impose the unprecedented, unilateral one-sided trading restriction was Apex's decision that it then maintained for hours despite knowing that it had no obligation to meet any significantly increased collateral obligation.  The events that caused Plaintiffs' losses were far from "events beyond [Apex's] reasonable control."  It was Apex that made an affirmative decision that harmed Plaintiffs and that decision, was fully within Apex's "reasonable control."

Moreover, and importantly, Apex as a broker-dealer that owes a duty of care, cannot contract itself out of liability for its own actions.  The law provides that "[C]ontractual commitments cannot serve to excuse carelessness or shield a defendant from liability for injury that a breach of the duty of due care may engender. *See* Restatement (Second) of Torts § 4c." *De Kwiatkowski v. Bear Stearns,* 126 F. Supp. 2d 672, 694 (S.D.N.Y. 2000), *rev'd on other grounds*, *De Kwiatkowski v. Bear Stearns,* 306 F.3d 1293 (2d Cir. 2002).  Apex is also prohibited from contracting itself out of liability by virtue of its membership in FINRA.  What Apex

characterizes as a "Customer Account Agreement" is a predispute arbitration agreement. *See,* Pace Decl. Ex. 2 at Par. 8. "FINRA Rule 2268 prohibits any predispute arbitration agreement from including any condition that: (1) limits or contradicts the rules of any self-regulatory organization (SRO);4 (2) limits the ability of a party to file any claim in arbitration; (3) limits the ability of a party to file any claim in court permitted to be filed in court under the rules of the forums in which a claim may be filed under the agreement; or (4) limits the ability of arbitrators to make any award … These requirements make clear that predispute arbitration agreements must preserve customers' rights under FINRA rules." See, FINRA Regulatory Notice 21-16, p. 2, *available at* https://www.finra.org/sites/default/files/2021-04/Regulatory-Notice-21-16.pdf.

In any event, any interpretation of Apex's customer agreement is disputed and not ripe for adjudication on a motion to dismiss.

### 3.   Clearing Broker Liability

Neither New York nor Texas law exempt clearing brokers from liability when they, as alleged here, play a non-ministerial role and directly interfere with the trading of their customers.

Apex persists in the charade that it has no liability to Plaintiffs as a "clearing broker" in that clearing brokerage firms perform largely ministerial functions.[25]  But that is not this case.  No allegations are made charging Apex in connection with any ministerial functions.  The allegations are that Apex processed the purchases of Plaintiffs' shares of the Suspended Stocks through the Introducing Brokers (pursuant to the three-way customer agreement by which the Plaintiffs are Shared Customers with the Introducing Brokers and Apex) and then, in connection with those same purchases, Apex undertook for itself and directed the Introducing Brokers under its control to take steps that would force the price of the shares down.  Those steps that Apex undertook for itself and commanded its captive Introducing Brokers to undertake shut down the ability of the 100 plus Introducing Brokers (and their Shared Customers such as the Plaintiffs) to allow

---

[25] "In a typical clearing arrangement, a clearing firm provides many backroom and administrative functions for another broker-dealer's customer accounts. *See* Gerald B. Cline and Raymond L. Moss, Liability of Clearing Firms: Traditional and Developing Perspectives, 1062 *PLI/Corp.* 139, 143 (1998). Generally, the clearing firm is responsible for maintaining records and mailing customer account documentation, as well as receiving, maintaining and delivering customers' securities and funds. *See id.;* Henry F. Minnerop, The Role and Regulation of Clearing Brokers, 48 *Bus. Law.* 841, 841 (1993)." *McDaniel v. Bear Stearns & Co., Inc.,* 196 F. Supp. 2d. 343, 347 (S.D.N.Y. 2002).

purchases of the three Suspended Stocks for hours.  The foreseeable consequence was the decrease and suppression of the price of those securities to the detriment of Apex's Shared Customers and for its own financial benefit. In taking affirmative steps to deliberately harm Plaintiffs' investments and forcing its captive Introducing Brokers to unilaterally close their trading platforms to purchases only while allowing for sales, Apex stepped outside the role of performing traditional clearing functions and shed the protections against liability reserved for clearing brokers performing ministerial functions.

To state the obvious: The law is clear that where a clearing firm, as Apex here, moves beyond performing mere ministerial or routine clearing functions (such as acting as a mere conduit) and becomes actively and directly involved in the introducing broker's actions, it exposes itself to liability.  *McDaniel v. Bear Stearns & Co., Inc.,* 196 F. Supp. 2d 343, 347 (S.D.N.Y. 2002). *See also, Berwecky v. Bear Stearns & Co.,* 197 F.R.D. 65 (S.D.N.Y. 2000) (complaint against clearing broker Bear Stearns viable where allegation is that Bear Stearns  "shed [its] role as a mere clearing broker for and with actual knowledge, directly participated in described scheme."); *Kuoruga v. Fiserv Correspondent Servs.*, 183 F. Supp. 2d 1245, 1247 (D. Or. 2001) (arbitration award confirmed where panel made specific factual findings that clearing firm and introducing broker were directly involved in the challenged transaction and materially participated in the wrongdoing.); *In re Blech Sec. Litig.*, 961 F. Supp. 569, 585 (S.D.N.Y. 1997)(complaint against clearing firm viable where plaintiffs alleged that Bear engaged in activities that did not "reflect ... the standard practice of [a] clearing broker."); *Cannizaro v Bache, Halsey, Stuart, Shields, Inc.,* 81 F.R.D. 719, 721 (S.D.N.Y. 1979) (denying motion to dismiss aiding and abetting claim against clearing firm where facts might show that clearing firm performed more than mere mechanical functions for introducing broker).[26]

Moreover, in those instances, as here, where the clearing broker is part of a three-way written brokerage agreement, it exposes itself to liability to the brokerage customer. See *Glob. Enter. Grp. Holding, S.A.* v. *Ottimo*, No. 07-CV-4904-TCP-WDW, 2010 WL 11629556 at *5

---

[26] Clearing firms, only "when acting within the scope of their traditional clearing functions" owe no fiduciary duties to securities purchasers. *Rozsa v. May Davis Group, Inc.*, 152 F. Supp. 2d 526, 531 (S.D.N.Y. 2001); *See also, Stern v Legent Clearing LLC*, 09 C 794, 2009 WL 2244616, at *3 (N.D. Ill. July 28, 2009).
.

(E.D.N.Y., June 8, 2010) (holding that "where an agreement exists between the clearing agent and investor, fiduciary duties may arise.").

The court's analysis in *Global Enter. Grp.* is on point:

> In 'extenuating circumstances,' where clearing firms act beyond traditional ministerial clearing functions, 'fiduciary duties may exist where a clearing broker asserts control over the introducing broker's business, or becomes actively and directly involved in an introductory broker's actions.' *See Stern v. Legent Clearing LLC*, No. 09-CV-0794, 2009 U.S. Dist. LEXIS 65053, 2009 WL 2244616, at *3 (N.D. Ill. July 28, 2009)…. Extenuating circumstances were found in *Goldman*, where the court determined that there were sufficient allegations because the clearing agent 'actively engaged' with an investment company to create fraudulent trading losses. *Goldman*, 1987 U.S. Dist. LEXIS 5356, 1987 WL 12820, at *22. Moreover, the Southern District held that where there were allegations that a clearing broker undertook more than mere clearing duties, and became aware of the investment broker's fraud, then it could be held liable for a breach of its fiduciary duties. *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.,* No. 97-CV-4978, 2002 U.S. Dist. LEXIS 980, 2002 WL 88226, at *4 (S.D.N.Y. Jan. 23, 2002). Furthermore, where a clearing firm moves beyond performing mere ministerial or routine clearing functions and becomes actively and directly involved in the introductory broker's actions, it may expose itself to liability with respect to the introductory broker's misdeeds. *McDaniel,* 196 F. Supp. 2d at 353.

*Glob. Enter. Grp Holding, S.A.*, 2010 WL 11629556 at *5.

Texas courts similarly hold that clearing firms may be liable where the alleged activity of the clearing broker "went beyond the provision of mere ministerial or clerical services." *Turk v. Pershing LLC,* No. 3:09-CV-2199-N, 2014 WL 12572906 at *3 (N.D. Tex. Dec. 8, 2014); *see also*, *Kneese v. Pershing, LLC*, No. 3:10-CV-1908-N, 2012 WL 13019677, at *5 (N.D. Tex, Nov. 14, 2012 (dismissal inappropriate where Plaintiffs alleged that clearing broker performed "more than routine financing" including "ensuring that that the introducing broker was meeting net capital and other regulatory requirements.").

Apex relies on inapplicable case law that generally stands for the proposition that investors have no recourse against clearing brokers for the misconduct of introducing brokers. *See, e.g.*, Def. Mem. at 12-15. Those cases do not address the liability of clearing brokers for their own

misconduct. Apex tries to hide behind a line of cases where a clearing firm merely performs ministerial functions.[27]

### 4. The Economic Loss Rule Does Not Undermine Defendant's Negligence Nor Plaintiffs' Ability to Recover in Tort

The economic loss rule does not apply to the instant situation under either New York or Texas law.

Apex argues that it does not owe Plaintiffs (or its direct customers) a general duty of care to prevent economic losses, particularly when those losses are governed by contract, citing to the economic loss doctrine in New York and the economic loss rule in Texas. Def. Mem. at 17. Apex misses the mark in both instances.

Apex's own citations to New York law undermine its attempt to escape liability in that Apex acknowledges that the touchstone of its argument centers on the issue of whether Apex owes a duty to Plaintiffs. As to New York law Apex proclaims, "[u]nder the economic loss doctrine, a defendant is not liable in tort for purely economic loss **unless** the plaintiff demonstrates that the defendant owed a duty, which 'may arise from a special relationship[.] . . . to protect against the

---

[27] All of the cases Apex cites in support of the proposition that clearing firms owe no duty to Plaintiffs are in the context of investors seeking to hold clearing firms liable for the acts of the Introducing Broker. These cases are factually distinguishable to the situation here where the clearing firm is charged with misconduct. *See Riggs v. Schappell*, 939 F. Supp. 321,326 (D.N.J. 1996) (vicarious liability of clearing firm denied on allegations that clearing firm "provided plaintiffs the impression" that clearing firm backed the wrongdoing introducing broker); *Mars v. Wedbush Morgan Sec.*,283 Cal. Rptr. 238, 241–42 (Cal Ct. App. 1991) (no liability when allegations against clearing broker are no more than simply transmitting reports of trade); *Ross v. Bolton,* 904 F.2d 819, 824 (2d Cir. 1990), (no liability for clearing firm for wrongs committed by the introducing broker); *Rozsa v. May Davis Grp., Inc.*, 187 F. Supp. 2d 123, 131–32 (S.D.N.Y. 2002) (clearing broker not liable for misdeeds of introducing broker). Similarly, Apex cites to irrelevant cases as to foreseeability. All of its cases are factually distinguishable. *Pulka v. Edelman,* 358 N.E.2d 1019, 1022–23 (N.Y. 1976) (no clearing firm at issue, no liability in vehicular accident where "regardless of the measures taken, there is little expectation that the one made responsible could prevent the negligent conduct."); *Beckwith v. Hart*, 263 F. Supp. 2d 1018, 1023 (D. Md. 2003)(no clearing firm at issue, not foreseeable that prisoner would be injured "by the simple act of closing a door"); *West v. Cruz*, 251 P.2d 311, 315 (Ariz. 1952 ( no clearing firm at issue in this automobile accident case); *Weatherly v. Pershing,* 2015 U.S. Dist. LEXIS 197128 (N.D. Tex. June 23, 2015) (No liability against clearing broker for misdeeds of introducing broker); *Turk v. Pershing LLC*,  2014 WL 12572906 (viable negligence claim pled against clearing firm where allegation is that its conduct went beyond mere ministerial role); *Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1296 n.12 (11th Cir. 2002)(clearing firm not liable for alleged misdeeds of bankrupt introducing firm).

risk of harm to plaintiff.'" *AMBAC Assur. Corp. v. U.S. Bank N.A.*, 328 F. Supp. 3d 141, 159 (S.D.N.Y. 2018) (emphasis added). The court in *AMBAC* explained that "the economic loss doctrine centers on whether the defendant owed a duty to protect against the risk of harm to the plaintiff." *Id.* Def. Mem. at 17. Apex's emphasis on the exception is well placed, the exception to the doctrine is present here where Apex owes a duty to Plaintiffs and the putative class (including its direct customers).

Judge Pauley's thoughtful analysis in *AMBAC* well explains the inapplicability of the economic loss rule under New York law.  The law stands for the proposition that "the economic loss rule limits the end-purchaser of a product to contract remedies and precludes a recovery in tort for purely economic losses — without personal injury or property damage — against a manufacturer." *Id.* at 158-59. (internal citations omitted) "The rule reflects the premise that 'damages arising from the failure of the bargained-for consideration to meet the expectations of the parties are recoverable in contract, not tort, unless a legal duty independent of the contract itself has been violated.'" *Id.* at 159. (internal citations omitted).

Judge Pauley explains the distinction between the "economic loss rule" and the "economic loss doctrine" in New York.  "Under the economic loss doctrine, a defendant is not liable in tort for purely economic loss unless the plaintiff demonstrates that the defendant owed a duty, which "may arise from a special relationship[,] ... to protect against the risk of harm to plaintiff." *Id.* (internal citations omitted). "Like the economic loss rule, this doctrine rests on the principle that economic losses arising from injury to expectancy interests created by contract ought to be brought as contract claims, but also 'reflects a policy interest in protecting defendants from disproportionate, and potentially limitless, liability.'" *Id.* (internal citations omitted).

Judge Pauley concluded, "[h]ere, Ambac's breach of fiduciary duty claim survives U.S. Bank's motion to dismiss regardless of which principle is applied. As discussed, the economic loss doctrine centers on whether the defendant owed a duty to protect against the risk of harm to the plaintiff. Ambac has sufficiently alleged that U.S. Bank owes a fiduciary duty of undivided loyalty to the Trusts and their beneficiaries.... As for the economic loss rule, this Court notes as an initial matter that the applicability of the economic loss rule outside the product-liability context from which it originated is doubtful... *See, IKB Deutsche Industriebank* AG, 863 F. Supp. 2d at 301 (observing that in *Finlandia*, "the New York Court of Appeals cautioned that the `economic

loss rule' has no application outside the product-liability context"). (additional internal citations omitted)." *Id.* at 159-160.

Plaintiffs' ability to recover for economic loss under their tort claims are also not foreclosed under Texas' view of the "economic loss rule." In Texas, the "economic loss doctrine" is premised on the notion that a challenged loss arises "only through their contract." *LAN/STV v. Martin K. Eby Const. Co.,* 435 S.W.3d 234, 238 (Tex. 2014) quoting *Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303, 308 (1927).  Moreover, the Texas Supreme Court has recognized, "[t]he underlying purpose of the economic loss rule is to preserve the distinction between contract and tort theories in circumstances where both theories could apply.*"  LAN/STV,* 435 S.W.3d at 240 (internal citations omitted), and that the economic loss doctrine is "not generally applicable in every situation; it allows recovery of economic damages in tort, or not, according to its underlying principles" *LAN/STV*, 435 S.W.3d at 235-36.  This rule has historically only been applied in cases involving strict product liability and failure to perform a contract.  In interpreting both the "economic loss rule" and Texas precedent, the Texas federal district court noted; "…*LAN/STV* and *Sharyland* expressly confirm that the economic loss rule is applicable in two situations: (1) where the loss is the subject of a contract; **and** (2) where the only damage from a defective product is to the product itself.*" Joy Pipe USA, L.P. v Fremak Indus., Inc.*, CV H-13-2153, 2014 WL 12599328, at *2 (S.D. Tex. Nov. 10, 2014), *report and recommendation adopted*, CV H-13-2153, 2014 WL 12597848 (S.D. Tex. Dec. 8, 2014).

Importantly "pure economic loss" is still recoverable under Texas law for breach of fiduciary duty, *ERI Consulting Eng'rs, Inc. v. Swinnea,* 318 S.W.3d 867, 873–74 (Tex. 2010). Moreover, under Texas law, the "economic loss rule" "reflects a preference for allocating some economic risks by contract rather than by law." *LAN/STV*, *supra*.  Here, because Plaintiffs' alleged breach of duties, including breach of fiduciary duty, and, because there is no contract that Plaintiffs could have enforced, Texas law does not bar economic recovery.

Here, Plaintiffs only allege a breach of the implied covenant of good faith and fair dealing as an alternative pleading to Plaintiffs' Negligence Claim and Claim for Breach of Fiduciary Duty. AC ¶ 123. In any event, even as to Plaintiffs' alternative pleading, Plaintiffs do not (and cannot) seek to enforce any contract.  In fact, the "customer agreement" Apex cites to is not the type of

contract for goods or services to which Defendant cites. In each case cited by Apex in support of its argument, there existed, unlike here, an underlying contract amenable to performance.[28]

Moreover, as a FINRA member, Apex is barred, by rule, from utilizing its customer agreement to contract itself out of liability. (Section D1 *infra*).  And, notably, Apex did not provide any examples of the economic loss rule barring claims against broker dealers in Texas (or New York) for misdeeds amounting even remotely related to Apex's alleged misdeeds.

### 5.   Apex Breached its Tort Duty To Plaintiffs

Having sold shares of the stocks to Plaintiffs, pursuant to its three-way customer agreement, rendering the Plaintiffs Shared Customers as between itself and the Introducing Brokers, Apex breached its duty of care to Plaintiffs by taking the draconian and unprecedented action of suspending purchases, but not sales, of those very same securities for hours with the express purpose of driving down the price of those securities.

What makes this breach even more devastating is that Apex knew up front that there was no reason that could possibly justify the Market Suspension, and then persisted in maintaining the Market Suspension for hours despite being specifically informed by the regulators that there would be no large collateral increase, which was the ostensible reason for Apex's implementation of the Market Suspension.

The events of January 28th place Apex on the horns of a dilemma, the response to which only support Plaintiffs' allegations.  Either Apex was concerned or was not concerned that it would be able to satisfy an increased collateral requirement on January 28th.

If it did not have such concern, as its President claimed, stating that Apex had "headroom in terms of the capital available to us on our balance sheet" and "lines of credit that we can call on as needed," (AC ¶87) then Apex had no justification for engaging in the unprecedented, unilateral, one-way trading halt.  Such an unjustified trading halt was in violation of Apex's duty of care as reflected by the rules and customs of the securities industry described herein and pled.

---

[28] Def. Mem. at 24 *LAN/STV,* 435 S.W.3d at 236, 248 ("The issue in this case is whether the rule permits a general contractor to recover the increased costs of performing its construction contract"; "In fact, construction disputes ... are good candidates for precluding recovery under the 'economic loss' rule, because the parties are in a position to protect themselves through bargaining.); *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex.1986) (case involves the sale and construction of a house).

If Apex was concerned about satisfying its collateral requirements on January 28th, as it told regulators (AC ¶¶ 4, 80), and as it argues here (Def. Mem. at 1) then Apex breached its duties to Plaintiffs in several ways.   As Plaintiffs allege, Apex had no plan in place to address DTCC's request for additional collateral on January 28th (AC ¶ 68) despite its obligation to maintain sufficient liquidity to satisfy its regulatory "net capital" requirement (AC ¶ 40) and despite it being foreseeable that Apex's collateral requirement would increase as the events leading up to January 28th unfolded. AC ¶¶ 34-39.  Defendant's Memorandum does not reference or explain any plan to address its collateral requirements that week.  This was a breach of Apex's duties.

Then, assuming that Apex learned for the first time of an increased collateral requirement on the morning of January 28th, it was a breach of Apex's duty of care to implement the consequential, unprecedented, unilateral one-way trading halt without at least exploring an alternative mechanism by which it could satisfy its collateral requirement.  Moreover, Apex itself provides the impetus for the accusation of misconduct by taking the position that once it was informed by DTCC that the collateral requirement was lower, and at an acceptable amount that would not require it to suspend trading, it could not lift the self-imposed trading restriction without confirming the lower number with DTCC. AC ¶ 79; Def. Mem. at 9. This position, of course, begs the question as to why Apex needed to confirm the lower number with DTCC before lifting the suspension, but Apex did not bother to even attempt to confirm the higher number with DTCC, which Apex supposedly did not anticipate, before implementing the Market Suspension. *Id*.  This failure on Apex's part to confirm the higher number and at least attempt to first negotiate with DTCC is striking in light of the fact that brokers such as Apex should have known that the regulators had the rules-based power to waive the additional collateral that was indicated as a result of market volatility, as in fact was done here.  See fn. 30, *infra.* Under Apex's own reasoning, a reasonable response to the higher collateral number DTCC initially demanded would have been to confirm that higher number, first received at 9:30 a.m. (ET) before taking the unprecedented, unilateral action of halting one-sided trading two hours later at 11:31 a.m. (ET) that caused tremendous damage to Plaintiffs and the class. AC ¶¶ 77-79, 110.  Then**,** as Plaintiffs allege, even after Apex did confirm the lower collateral number with DTCC at 11:47 a.m. ET/10:47 a.m. Central (AC ¶ 82, and Safirstein Decl, Ex. 2) as demonstrated by documents produced by DTCC, Apex continued to impose its unprecedented, unilateral one-sided traded halt until 2:55 p.m. ET/ 1:55 p.m. Central. The trading halt continued for approximately three hours with no justification

whatsoever.  Apex breached its duties of care to Plaintiffs with its unprecedented, unilateral, one-sided, foreseeably harmful and unjustified Market Suspension.

Apex disputes Plaintiffs timeline by offering an email plucked from a larger chain ostensibly showing that "at 12:20 p.m. ET, that Apex implemented its trading restrictions in response to collateral requirements communicated from NSCC and that Apex actively was working with the DTCC to find "solutions" for customers. Pace Decl. Ex. 10 (APEX-MDL00002375–377 at 376)." Def. Mem. at 9, 20.  However, read contextually within the string of emails now referenced by Apex, those emails not only are harmful to Apex's defense, they are devastating. First, with regard to the email Apex cites, it selectively quotes from an email that refers to internal talking points ("The message back to the client is…)."  But, for argument's sake, let's afford Apex every affirmative inference that can be drawn from this email (although, as a matter of law Apex is entitled to no such inference). While these emails refer to a customer's complaint regarding Apex's Market Suspension, referenced in the Amended Complaint at Paragraph 76, Apex senior Executive William Brennan (AC ¶¶ 10, 90) states in the email immediately following the email that Apex cites to in the chain, "[w]e are opening back up shortly..go ahead and give them clearance." (Opening up email") Pace Decl. Ex. 10 (APEX-MDL00002375–377 at 375-376). The plain meaning of this email is that at the time it was sent, Apex already knew that it was going to lift the Market Suspension – and – it was giving preferential treatment to the customer in question as they were apparently to be given clearance prior to the lifting of the suspension. The Apex exhibit (10) shows a time sent of 11:08 a.m.  Since Apex regularly conflates time zones in its production, (*see* Pace Decl. Ex. 6 compared with Pace Decl. Ex. 2; see also Pace Decl. Ex. 10), but blames Plaintiffs for any confusion, one is left to use best estimates as to which time zone is reflected in the email chain produced as Apex Exhibit 10.  Based on the two emails following the Opening up email, and the preceding email, it appears likely that the Opening up email was sent at 1:08 p.m. ET.  Given Apex's representation that they in fact lifted the Market Suspension at 2:55 pm. ET (AC ¶ 79; Def. Mem. at 20), this would mean that Apex dithered for at least one hour and forty seven minutes between knowing that it was going to lift the Market Suspension and lifting the Market Suspension.  We say "at least" because Apex obviously knew before Mr. Brennan sent his email that Apex would lift the Market Suspension.  Such dithering by a major market player such as Apex with one hundred captive Introducing Broker-Dealers strangled by its unprecedented one-way Market Suspension, and thousands of

customers, direct and Shared, adversely affected by its actions, is the definition of negligence. If, in the event Apex replies with evidence that it has yet failed to produce that the 11:08 a.m. time on the Opening up email translates into 2:08 p.m. E.T., then taking into account that the Apex learned earlier that it was going to lift the Market Suspension, it still negligently dithered for approximately one hour – multiple lifetimes in the world of securities trading.

Moreover, contrary to Apex's protestations, there is nothing ministerial about shutting down a controlled trading platform so that thousands of investors (if not more) could not purchase certain securities as evidenced by the communication Apex sent to its Introducing Broker-Dealers at 10:30:40 a.m. Central:

> EMERGENCY NOTICE: GME, AMC, and KOSS Liquidations Only
> Apex would like to inform you that the below listed stocks should be liquidation only on your systems whether proprietary or through a 3rd party. This would include both equities and all option series, most importantly the January 29th 2021 expiration. These positions have been previously set at 100% margin and will continue for the foreseeable future. GME: GameStop AMC: AMC Entertainment KOSS: Koss Corp. Please note that there might be additional securities added to this restriction list before market close today, additional messages may follow. If you have any questions please contact our Risk Department (risk@apexclearing.com), or your Client Partner/Relationship Manager. Thank you, Apex Clearing Corporation

AC at ¶ 78.

Apex's breach of its duties of care is further confirmed by the facts that: 1) its own captive Introducing Brokers criticized Apex for the Market Suspension (AC ¶ 75); 2) other than Robinhood, no other broker-dealer, or clearing broker-dealer, engaged in a similar one-sided trading halt, even though the SEC confirms that 18 brokerage houses received similar special DTCC charges (AC ¶¶ 92-93)[29]; 3) facing similar market circumstances the very next day, Apex

---

[29] As the SEC confirmed, "[o]n January 27, 2021, in response to market activity during the trading session, NSCC made intraday margin calls from 36 clearing members totaling $6.9 billion, bringing the total required margin across all members to $25.5 billion. Of the $6.9 billion, $2.1 billion were intraday mark-to-market calls, while the remaining $4.8 billion was a special ECP charge. Specifically, NSCC observed unusual volatility in certain securities, including GME, which presented heightened risk to the clearinghouse and its members.86 As a result, it calculated and assessed against certain affected members the remaining $4.8 billion as an additional special charge pursuant to its established rules. PPP NSCC imposed this charge on 18 members, all of whom provided the additional margin. NSCC subjected one additional member to the special charge, but that member ultimately did not have to meet that charge after offsetting its exposure

opted to avoid imposing the unprecedented, unilateral one-sided trading halt (AC ¶ 90); 4) there was a specific industry practice in place to address market volatility such as existed on January 28th that did not countenance the extreme actions taken by Apex, (AC ¶¶ 52-56); and 5) Apex could have employed numerous mitigation strategies to minimize any perceived risk that did not involve the Market Suspension such as tapping into available capital. (AC¶¶ 88-89).

To distract from Apex's appalling misconduct, Apex invents "straw person" pleadings suggesting that Plaintiffs have pled "duties" that Apex could not and did not breach.  But Plaintiffs do not allege any duty to "dicker," "rush" or "supply infinite capital" and Apex's entire analysis on these points is irrelevant (Def. Mem. at 18-23) that Plaintiffs have already addressed.  Plaintiffs, as described above, have set forth Apex's common law duty of care and how its unpreparedness and dithering led Apex to take steps in breach of such duty. Apex's limited duty here was to not affirmatively harm Plaintiffs for its own financial benefit. *See, supra,* at Point III, Subd. D, subparts 1 through 4.

### 6. The Complaint Properly Alleges that Apex's Actions Proximately Caused Plaintiffs' Alleged Injury

Whether under New York or Texas law, Plaintiffs satisfy the "proximate cause" element of their negligence claim by plausibly alleging that Defendant's conduct was a substantial factor in bringing about the harm or injury and that the harm was foreseeable . *Hain v. Jamison*, 28 N. Y.3d 524, 528-29 ( 2016); *Derdiarian v. Felix Contr. Corp.*, 51 NY2d 308, 315 (1980):*Western Investments Inc. v. Urena*, 162 S.W.3d 547, 551 (Tex. 2005); *Travis v. Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992).  Plaintiffs need not exclude all possibilities, and need only demonstrate that the greater probability is that the defendant's conduct, either alone or together with the conduct of

---

with a transfer from an affiliate. In addition, several NSCC members were subject to an ECP charge based on the ratio of the excess risk in their portfolios relative to their capital. **Because these members' ratios of excess risk versus capital were not driven by individual clearing member actions, but by extreme volatility in individual cleared equities, NSCC exercised its rules-based discretion to waive the ECP charge for all members on January 28, 2021.** Absent this waiver, one retail broker-dealer would have had an additional ECP charge of more than double its margin requirement of $1.4 billion on January 28, 2021…" SEC Report at 31. (emphasis added)

others, was the cause of the harm. *First Assembly Of God, Inc. v. Texas Utilities Elec. Co.*, 52 S.W. 482, 493 (Tex. 2001).

While a defendant will not be held liable as the proximate cause of the injury if the damage caused by the defendant's act was not foreseeable, foreseeability does not require anticipation of the precise manner in which the injury will occur. *Travis*, 830 S.W.2d 94, 98; *First Assembly Of God, Inc.*, 52 S.W. 482, 493. The determination of proximate cause is generally left to the trier of fact if a prime facie case is made, and is not decided as a matter of law unless only one conclusion can be drawn from the established facts. *Hain*, 28 N.Y.3d at 528.

Here, the Amended Complaint alleges that "Apex caused the price of each of the Suspended Stocks to go down and to trade at lower prices than they would have traded for absent Apex's misconduct," and that "Apex's decision to implement this unilateral one-way trading suspension (halting of the buying, but not the selling) foreseeably impeded additional price appreciation and suppressed the prices of the Suspended Stocks during and beyond the Class Period causing ascertainable damages and injury." AC ¶¶ 68, 70. Nothing more is required to satisfy Plaintiffs' pleading of proximate cause.

Apex argues that Plaintiffs fail to show more than what is required in pleadings. Def. Mem. at 33-36. Evidence as to how Apex's actions caused losses as compared with other actions taken by other brokers, among other market factors is precisely the type of evidence that will be developed with the assistance of experts. Contrary to Apex's argument, Plaintiffs' allegations are not speculative and do not rely on clairvoyance or guessing. Def. Mem. at 34. The allegations plainly state that Plaintiffs purchased securities and sold them on a date certain and at an amount certain that was less than what Plaintiffs would have sold the securities for but for Apex's misconduct which foreseeably caused the harm. (AC ¶¶ 13-21; 68, 70). These allegations are text-book proximate causation.

**E.   Plaintiffs State A Claim For Breach of Fiduciary Duty (Count II)**

Plaintiffs have alleged in Count II that Apex breached fiduciary duties to both its Shared Customers and to its direct broker-dealer customers. AC ¶¶ 114-121. In New York, "[i]n order to establish a breach of fiduciary duties, a plaintiff must prove the existence of a fiduciary relationship, misconduct by the defendant, and damages that were directly caused by the defendant's misconduct." *Kurtzman v. Bergstol*, 835 N.Y.S. 2d 644 (2nd Dep't 2007). A claim for breach of fiduciary duty under Texas law requires the plaintiff to plead "(1) the existence of a

40

fiduciary duty, (2) breach of the duty, (3) causation, and (4) damages." *First United Pentacostal Church of Beaumont v. Parker*, 514 kS.W.3d 214, 220 (Tex. 2017)."  The existence of a fiduciary relationship is a question of fact under both New York law, (*see, EBC I v.* Goldman Sachs & Co., 5 N.Y. 3d 11, 19 (2005) and Texas law, (*see, MacDonald v. Follett*, 180 S.W. 2d 334 (1944)).

Plaintiffs have already set forth the facts and the law supporting the breach of fiduciary claim as part of the duties owed by Apex that were breached as part of the negligence claim.  *See supra* Point III, Subd. D.

In short, Plaintiffs have alleged that Apex provided broker-dealer services to its direct customers and clearing broker-dealer services to its Shared Customers. Apex, in breach of its fiduciary duties took action against Plaintiffs and its other customers by implementing the Market Suspension without valid justification and then persisted in the Market Suspension for a prolonged period of time despite knowing that there was no justification for the Market Suspension.  These facts support an allegation of breach of fiduciary duty.

"A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation."). Restatement (Second) of Torts § 874 cmt. a.  Securities brokers stand in a fiduciary relationship with their customers.  *Conway v. Icahn & Co., Inc.* 16 F.3d 504, 510 (2d Cir. 1994) ("the relationship between a stock-broker and its customer is that of principal and agent and is fiduciary in nature, according to New York law (internal cites omitted).");  *Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d 1042, 1049 (11th Cir. 1987) ("The law is clear that a broker owes a fiduciary duty of care and loyalty to a securities investor."). Texas law is similar.  *See In re Letterman Bros. Energy Securities Litigation*, 799 F.2d 967, 972 (5th Cir. 1986) ("A broker is within the category of those who owe a special fiduciary duty to one who purchases securities from the broker or upon the broker's advice.");  *Magnum Corp. v. Lehman Bros. Kuhn Loeb, Inc.*, 794 F. 2d 198, 200 (5th Cir. 1986) ("The relationship between a securities broker and its customer is that of principal and agent.").

An agent breaches a fiduciary duty to the principal and is liable for damages when the agent's lack of due professional care leads to the loss of his principal's money. *Thropp v. Bache Halsey Stuart Shields, Inc.*, 650 F.2d 817 (6th Cir. 1981). "Since the fiduciary duties of a broker [or financial advisor] include the duty to use the skill and diligence necessary to protect his customer's interests, negligent conduct may be a breach of fiduciary duty. In this regard, it is

normally not sufficient for a broker to exercise ordinary care and judgment in discharging his duties; he must employ such care, skill, prudence, diligence, and judgment as might be reasonably expected of persons skilled in his calling." Norman S. Poser, Broker Dealer Law and Regulation (3rd Ed. 2002 Supplement).  "From this quality follows that certain duties deemed fiduciary may be associated with the broker's obligation to the client. These obligations may arise from and be defined by agreements, by course of conduct or business dealings reflecting matters entrusted to the broker, or by laws that specifically govern the relationship." *de Kwiatkowski v. Bear Stearns & Co., Inc.*, 126 F. Supp. 2d 672, 693 (S.D.N.Y. 2000).

New York recognizes that brokers and customers may be in a fiduciary relationship even if the account is nondiscretionary (meaning that the customer does not rely upon the broker to make the securities trade on the customer's behalf). *See, e.g., de Kwiatkowski v. Bear, Stearns & Co.,* 306 F. 3d 1293, 1302, 1305 (2d Cir. 2002) ("On a transaction-by-transaction basis, the broker owes duties of diligence and competence in executing the client's trade orders…. No doubt, a duty of reasonable care applies to the broker's performance of its obligations to customers with nondiscretionary accounts."); *Press v. Chem. Inv. Servs. Corp.,* 166 F. 3d 529, 536 (2d Cir. 1999) (broker's fiduciary duty is limited to the "narrow task of consummating the transaction requested"); *Independent Order of Foresters v. Donald, Lufkin & Jenrette, Inc.,* 157 F. 3d 933, 940-41 (2d Cir. 1998) (in a nondiscretionary account, "the broker's duties are quite limited," including the duty to obtain client's authorization before making trades and to execute requested trades); *Schenck v. Bear, Stearns & Co.*, 484 F. Supp. 937, 947 (S.D.N.Y. 1979) (noting that the "scope of affairs entrusted to a broker is generally limited to the completion of a transaction").

Texas also recognizes that fiduciary duties extend to holders of non-discretionary brokerage accounts. *See, Martinez Tapia v. Chase Manhattan Bank, NA*, 149 F.3d 404, 412 (5th Cir. 1998) ("While the nature of the duty owed by a broker will vary depending on the relationship between the broker and the investor, where the investor controls a nondiscretionary account and retains the ability to make investment decisions, the scope of any duties owed by the broker will generally be confined to executing the investor's order.").

Apex's unprecedented, unilateral, one-sided, consequentially harmful and unjustified shut down qualifies as a breach of fiduciary duty.

As discussed previously, clearing brokers may owe fiduciary duties to their customers as well. *See, Glob. Enterp. Grp. Holding, S.A.,* 2010 WL 11629556, at *5 ("where an agreement exists between the clearing agent and investor, fiduciary duties may arise.").

As the court noted in *Global Enterp Group*, in "extenuating circumstances," where clearing firms act beyond traditional ministerial clearing functions, "fiduciary duties may exist where a clearing broker asserts control over the introducing broker's business, or becomes actively and directly involved in an introductory broker's actions." *Id.*; *see also Stern v. Legent Clearing LLC,* No. 09-CV-0794, 2009 WL 2244616, at *3 (N.D. Ill. July 28, 2009).

Apex argues that as the Clearing Broker-Dealer it does not owe fiduciary duties to Plaintiffs. Def. Mem. at 25-26.  But Plaintiffs have shown otherwise and Apex largely repeats its earlier arguments and badly misstates the law. Apex notes that clearing firms are generally not liable for the misdeeds of the introducing brokers, but Apex ignores that clearing firms are liable for their own misdeeds. Their own legal citations say so.  For example, Apex cites to *Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 465 (2d Cir. 2013) for the proposition that clearing brokers do not owe common law duties to investors. Def. Mem. at 24. But *Levitt* fully supports clearing firm liability here.  Apex ignores the remainder of the *Levitt* opinion where the Court notes: "district courts in this Circuit have distinguished two categories of cases.  First, in cases where a clearing broker was simply providing normal clearing services, district courts have declined to 'impose [] liability on the clearing broker for the transgressions of the introducing broker.'…. In the second, much more limited category of cases, district courts have found plaintiffs' allegations to be adequate – and so have permitted claims to proceed – where a clearing broker is alleged effectively to have shed its role as clearing broker and assumed direct control of the introducing firm's operations and its manipulative scheme. (internal citations omitted)." *Levitt,* 710 F. 3d at 466.

Curiously, Apex argues that Apex was not Plaintiffs' agent, Def. Mem. at 24-25, but Apex, as alleged, facilitated each and every trade placed by Plaintiffs and Apex's direct and Shared Customers.   AC ¶¶ 14, 18, 115, 116.  Moreover, Apex itself supplied the standard Customer Agreement which states that the customers' transactions are cleared through Apex. *See,* Pace Decl, Ex. 2.

Apex also cites Texas law for the proposition that Apex is not a public utility and does not owe a duty of "constant availability. Def. Mem. at 16. But the relevant law is New York law, and Apex once again makes up its own pleadings to suit its argument.  There is no pleading of a

generalized duty to accept any and all orders.  Apex persists in ignoring that Plaintiffs' allegations are contextual, not general.  The pleading is that under the circumstances, Apex breached its duties to its direct and Shared Customers to whom it sold stock by its unprecedented, unilateral, unwarranted, consequentially harmful one-sided shut down designed to financially harm its direct and Shared Customers for its own financial gain.  Such conduct was in breach of Apex's fiduciary duties to its direct and Shared customers.

**F.   Alternatively, Plaintiffs State A Claim For Breach of the**
      **Implied Covenant of Good Faith and Fair Dealing (Count III)**

Plaintiffs alternatively allege that Apex compelled Plaintiffs to enter into 3-way customer agreements making each clearing customer a customer of the Introducing Broker and Apex in connection with each transaction entered.  AC ¶¶ 123-24.  The customer agreement, in keeping with all customer agreements, "imposes upon each party a duty of good faith and fair dealing in the performance of the agreement such that neither party shall do anything which will have the effect of destroying or interfering with the right of the other party to receive the benefits of the agreement." AC ¶ 125. Here, Apex directly interfered with the rights of Plaintiffs by selling them securities (each purchase, by Apex's admission, is made pursuant to the Customer Agreement) and then taking steps to directly ensure that the price of those securities would go down by imposing and then maintaining the Market Shutdown without justification.  AC ¶ 127. As Plaintiffs further allege, "[t]he implied covenant of good faith and fair dealing herein were not in conflict with the express terms of the agreement and, in fact, were wholly consistent with both the terms of the agreement and the intent of the agreement." AC ¶ 126. Plaintiffs do not contest Apex's ability to refuse to sell shares in the abstract, but challenge the specific conduct employed here under these limited circumstances.

Under New York law, "implicit in every contract is a covenant of good faith and fair dealing…which encompasses any promises that a reasonable promisee would understand to be included." *Spinelli v. Nat'l Football League*, 903 F.3d 185, 205 (2d Cir. 2018) (internal quotation marks  omitted). The implied covenant of good faith and fair dealing includes  a  promise  that "neither party to a contract shall do anything that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract, or to violate the party's presumed intentions or  reasonable  expectations." *Id.* (internal  quotation  marks and brackets omitted). Texas law generally does not recognize an implied covenant of good faith and fair dealing in every contract,

but does recognize that a duty of good faith and fair dealing may arise as a result of "a special relationship between the parties." *Arnold v. Nat'l County Mut Fire Ins. Co.,* 725 S.W.2d 165, 167 (Tex. 1987). The circumstances here present just such a "special relationship." Moreover, under conflict of law principles, New York law applies here to this supposed "contract" claim – although a tort claim – in that FINRA members such as Apex are prohibited from using contractual choice of law provisions to the detriment of its customers (cite from above).

In contesting Plaintiffs' allegations, Apex challenges Plaintiffs supposedly conclusory allegation "that Apex had the 'intent of causing the trading price of the Suspended Stocks to go down.'" AC ¶ 127[30]. Def. Mem. at 28. But Apex itself admitted to the regulators (and to this Court) that it engaged in the Market Suspension to suppress the price of the Suspended Stocks. See, Pace Decl. Ex. 1 at p. 7[31]

### G.  Plaintiffs Have Properly Stated An Alternative Claim for Tortious Interference With Business Relationship (Count IV)

Plaintiffs allege, alternatively, that Apex tortiously interfered with Plaintiffs' business relationship with the Introducing Brokers in shuttering the Introducing Brokers' trading platform for hours so as to prohibit purchases of the Suspended Stocks. AC ¶¶ 128-136. Plaintiffs satisfy the elements required to plead such claims by alleging the existence of an ongoing business relationship, tortious interference with said relationship, causation and damages.

Plaintiffs have pled that by directing the shutdown of the Introducing Broker's trading platform, Apex engaged in "wrongful conduct" by preventing Plaintiffs and members of the Class from being able to purchase the Suspended Stocks from the Introducing Brokers. That claim has been found to be viable under New York law by the New York Court of Appeals in *Carvel Corp. v. Noonan*, 3 N.Y.3d, 182, 189 (2004). ("We have recognized that inducing breach of a binding agreement and interfering with a nonbinding "economic relation" can both be torts."). In considering a tortious interference claim, alleging unlawful interference with the relationships

---

[30] See also AC ¶¶ 68,70

[31] "Apex took these steps to manage the risk that it would not be able to meet potential increased NSCC collateral funding obligations if Apex clients were permitted to continue to engage in additional purchases of AMC, GME and KOSS - thereby potentially further increasing Apex's clearing deposit requirement to NSCC. NSCC intraday margin increase as of 10:00 a.m. ET on AMC and GME alone went from 25% and 0% of market value to 118% and 78.3% of market value, respectively. Meaning that for every $1.00 of AMC purchased by an end customer, Apex was required to deposit $1.18 with NSCC."

between franchisees and their customers, the *Carvel* Court found in responding to a certified question from the Second Circuit, following a jury trial, that "Carvel's conduct, which did not constitute a crime or an independent tort and was not aimed solely at harming franchisees, was also not the sort of egregious wrongdoing that might support a tortious interference claim in the absence of such an independently unlawful act or evil motive." *Carvel Corp.*, 3 N.Y.3d at 188.

However, here Apex is charged with not one, but two independent torts – negligence and breach of fiduciary duty.  Accordingly, a jury could find liability for tortious interference.[32]

Texas also recognizes a cause of action for tortious interference with business relations. This tortious interference occurs when there is an unjust act by "someone" getting in the way of business dealings with another party.  *First Nat. Bank of Eagle Pass v. Levine*, 721 S.W.2d 287 (1986) (explaining that the tort is rooted in common law "trespass" jurisprudence).  While Texas law is more developed for tortious interference with contractual rights, Texas law also recognizes that tortious interference can occur with an unenforceable contract (as Plaintiffs allege, AC ¶ 116). *Clements v. Withers*, 437 S.W. 2d 818, 821 (Tex. 1969) ("the unenforceability of a contract is no defense to an action for tortious interference with its performance.").  Here, Plaintiffs do not allege that the "customer agreement" is an enforceable contract, but it does set out "legal rights" (AC ¶¶ 129-130; Pace Decl. Ex. 2) that form the basis of a relationship between the Introducing Brokers and Plaintiffs that Apex tortiously interfered with by instructing them to shut down trading on one side for an improper motive.

Apex, in its defense, harps on the fact that liability for this tort is predicated on "willful and intentional" interference.  Def. Mem. at 31.  But Plaintiffs' alternative pleading alleges that Apex acted "willfully and intentionally" in connection with the Market Suspension "forcing those stock prices to diminish. AC ¶133.  This is actionable interference.

### H.   Plaintiffs State Law Claims Are Not Preempted By Federal Securities Laws

---

[32] The Court of Appeals explicitly left open the question as to whether the type of conduct engaged in by Apex rises to the level of culpable conduct. ("We did not decide in *Guard-Life* or *NBT,* and we do not decide today, whether any other exception to the general rule exists — whether there can ever be other instances of conduct which, though not a crime or tort in itself, was so "culpable," to use *NBT*'s word, that it could be the basis for a claim of tortious interference with economic relations. That is a question we leave for another day, because no such egregious conduct was shown here." *Carvel Corp.*, 3 N.Y.3d at 190-91.

Apex's preemption claims arise from yet another mischaracterization of its role.  Apex is a clearing broker-dealer, not a clearinghouse, and it is named as a defendant as a broker-dealer. Apex is not DTCC and Apex is not a self-regulatory organization ("SRO") that serves as a "quasi –governmental agency" in the exercise of "delegated government power" that would be entitled to preemption.[33] Apex itself never claims to be an SRO.  Apex's attempt to bootstrap itself into the legal protections afforded to an SRO is an overreach[34] and its bottom-line proposition that "complying with Plaintiffs' proposed standard of care while complying with Apex's regulatory obligations…would be impossible"[35] is simply wrong.

As alleged, Apex was unprepared to address its collateral requirements on January 28, 2021 and wrongfully implemented and persisted in the Market Suspension despite knowing there was no settlement risk. This litigation does not challenge DTCC's ability to set collateral requirements. No other broker-dealer on January 28th (clearing or otherwise, except for Robinhood) found it "impossible" to balance its duties of complying with their regulatory obligations and protect the interests of investors. (AC ¶¶ 92-93; *See,* SEC Report at 31).

Moreover, any protections that are afforded to SRO's do not extend to broker-dealers that abuse their roles and commit misconduct.  That is why clearing broker-dealers are historically liable for their own misdeeds.

**I.    Plaintiffs' Claims Are Viable As Pleaded on Behalf of Apex's Shared Customers and Investors Who Were Foreseeably Harmed by Apex**

---

[33] Apex's reliance on *In re Series 7 Broker Qualification Exam Scoring Litig.*, 510 F. Supp. 2d 35, 47 (D.D.C. 2007), *aff'd,* 548 F.3d 110 (D.C. Cir. 2008) is misplaced.  That case stands for the inapplicable proposition that SRO's such as NASD (now FINRA) and DTCC have immunity. Def. Mem. at 47. See also, *MM&S Fin., Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 364 F.3d 908, 911 (8th Cir. 2004) (same).

[34] Apex wrongly argues that SRO preemption "applies equally to Apex and disallows common law claims to enforce regulatory obligations imposed on it through an SRO" citing to *Appert v. Morgan Stanley Dean Witter, Inc.*, 2009 WL 3764120, at *4 (N.D. Ill. Nov. 6, 2009), *aff'd,* 673 F.3d 609 (7th Cir. 2012). Def. Mem. at 43. But Apex cannot step into the shoes of an SRO and *Appert* does not even address preemption other than in the context of SLUSA, irrelevant here, and is otherwise limited to the unremarkable and irrelevant holding that an investor cannot sustain a breach of contract claim against a broker-dealer for a violation of an exchange rule.

[35] Def. Mem. at 43.

Defendant asserts that the tort claims of Plaintiffs can only be asserted for those investors whose introducing brokers cleared through Apex. However, Plaintiffs' have plausibly pled that Defendant's misconduct that gives rise to recovery under common law tort also proximately caused harm to Apex's direct customers and to all investors nationwide who fit within the proposed class definition. AC ¶ 98. Apex's misconduct was not limited in scope and foreseeably caused harm to all members of the putative class. While Plaintiffs have already demonstrated that Apex owed duties to its customers, Apex was not and should not be free to cause consequential damage to all investors as a result of its appalling misconduct that foreseeably affected the price of the Suspended Stocks – no matter who held them.

The law is clear that a corporation owes duties to and may be held accountable for its misconduct to non-customers. *See, In re Equifax, Inc. Customer Data Sec. Breach Litig.*, 362 F.Supp.3d 1295, 1325 (N.D. Ga. 2019) (non-customer consumers, in putative class action, sufficiently alleged that consumer reporting agency owed a legal duty to them to take reasonable precautions to safeguard the personal information in its custody, as required to state negligence claim against the agency and affiliated entities, arising from data breach in which personal and financial information of millions of Americans was potentially stolen where consumers alleged that agency knew of a foreseeable risk to its data security systems but failed to implement reasonable security measures).

Apex's Market Suspension foreseeably caused the Suspended Stocks to decrease in value, causing injury to investors in those Suspended Stocks, not limited to the direct customers and Shared Customers.

In *Equifax*, the Court relied, in part, on *Bradley Center, Inc. v. Wessner.*[36] In *Wessner*, a man who voluntarily committed himself to a psychiatric hospital made statements to the hospital's staff that he desired to harm his wife. Despite these statements, the man was issued a weekend pass by the staff, and he subsequently obtained a gun, confronted his wife and another man, and killed them both. The Georgia Supreme Court concluded that the hospital owed a duty of care to the man's wife. The court explained that "[t]he legal duty in this case arises out of the general duty one owes to all the world not to subject them to an unreasonable risk of harm. This has been

---

[36] *Bradley Center, Inc. v. Wessner*, 250 Ga. 199, 200-201, 296 S.E.2d 693, 695 (Ga. Supreme Court 1982), *disapproved of in Dept. of Labor v McConnell*, 305 Ga. 812, 828 S.E.2d 352 (2019).

expressed as follows: '... negligence is conduct which falls below the standard established by law for the protection of others against unreasonable risk of harm.' Restatement, Torts, 2d, § 282." *Wessner* at 200-201.

In the case of Apex, the regulatory duty to put sufficient measures in place to continue to maintain an orderly market is undisputed and affected more than just customers of Apex and the Apex Introducing Broker-Dealers.  As set forth in the Complaint, "contrary to governing industry rules and regulations aimed at addressing market volatility," Apex had a duty of care as a registered broker-dealer and "Apex failed to take reasonable steps to protect its customers and investors in times of market volatility. As alleged herein, Apex failed to adequately mitigate risk and knew or should have known that the abruptly implemented, one-way trading suspension it imposed directly and through its Introducing Broker-Dealers would and did harm Apex customers and investors." AC ¶ 5.

## IV.  SHOULD THE COURT DISMISS THE COMPLAINT IN WHOLE OR IN PART, LEAVE SHOULD BE GRANTED TO REPLEAD

While Plaintiffs believe that their well-pled Complaint should be sustained, should the Court disagree, Plaintiffs seek an opportunity to amend.

## V.  CONCLUSION

For all of the reasons stated herein, Apex's Motion To Dismiss should be denied.

Dated:  July 6, 2022

/s/*Rachel W. Furst*

**GROSSMAN ROTH YAFFA COHEN, P.A.**
Rachel W. Furst (FBN 45155)
2525 Ponce de Leon Blvd., Ste 1150
Coral Gables, FL 33134-6040
Tel: 305-442-8666
rwf@grossmanroth.com

***Plaintiffs' Liaison Counsel***

/s/ *Peter Safirstein*
**SAFIRSTEIN LAW LLC**
Peter Safirstein (NY SBN 2044550)

45 N. Broad Street
Suite 100
Ridgewood, NJ 07450
Tel: (917) 952-9458
psafirstein@safirsteinlaw.com

***Plaintiffs' Lead Counsel for the
Other Broker Tranche***

s/ *Gary S. Graifman*
**KANTROWITZ, GOLDHAMER
& GRAIFMAN, P.C.**
By: Gary S. Graifman
Daniel E. Edelman
135 Chestnut Ridge Road
Montvale, New Jersey 07645
Tel:      (201) 391-7000
ggraifman@kgglaw.com
dedelman@kgglaw.com

***Additional Plaintiffs' Counsel for the
Other Broker Dealer Tranche***

**Certificate of Service**

I HEREBY CERTIFY that, on July 6, 2022, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF filing system. I further certify that Plaintiffs' opposition to Defendant's motion was served on all counsel of record via transmission of the Notice of Electronic Filing generated by the Court's CM/ECF System.


/s/ Gary S. Graifman
Gary S. Graifman