**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-2989-MDL-ALTONAGA/Torres**

**IN RE:**

**JANUARY 2021 SHORT SQUEEZE**
**TRADING LITIGATION**
_____/

This Document Relates to All Claims Included
In the Other Broker Tranche

**DEFENDANT APEX CLEARING CORPORATION'S REPLY**
**IN SUPPORT OF ITS RULE 12 MOTION TO DISMISS**
**PLAINTIFFS' (FOURTH) CLASS ACTION COMPLAINT**

**Table of Contents**

INTRODUCTION ............................................................................................................. 1

ARGUMENT ................................................................................................................... 1

I.  Plaintiffs' Negligence and Fiduciary Duty Claims Fail Because Plaintiffs Fail to Show that Apex Owes Plaintiffs an Open-Ended Duty to "Safeguard" Plaintiffs' Investments and Accept All Transactions ........................................................................................... 1

    A.  Whether Evaluated as Clearing Broker or Non-Discretionary Broker, Apex Does Not Owe Plaintiffs an Open-Ended, Ongoing Common Law or Fiduciary Duty... 2

    B.  Plaintiffs' Securities Fraud Cases Do Not Establish that Apex, as a Clearing Broker, Owed Plaintiffs Any General Common Law Tort or Fiduciary Duties..... 9

II.  Even if This Court Were to Find That Apex Owed Some Duty to Named Plaintiffs, Those Duties Do Not Include the Novel Duties Plaintiffs Seek to Create Here ............ 12

    A.  Setting the Record Straight:  Plaintiffs' Complaint in Fact Does Seek to Impose New Duties (i) to Dicker, (ii) to Rush, and (iii) to Maintain Access to Unlimited Capital, But Plaintiffs Do Not Defend These Novel Duties in the Opposition .... 12

    B.  Plaintiffs' Proposed Duties, Including a New Common Law Duty to Follow FINRA Rules Proposed in Plaintiffs' Brief, Are Contrary to Well-Settled Law.. 14

III.  Plaintiffs' Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing Fails Because the Apex Customer Agreement Expressly Permits Apex to Decline to Execute Trades at Any Time and for Any Reason ........................................................ 18

IV.  Plaintiffs' Tortious Interference Claim Fails under Both New York and Texas Law, Particularly Where No Contract Is Alleged..................................................................... 19

V.  Plaintiffs Remaining Arguments Are Meritless ........................................................... 21

    A.  Plaintiffs Fail to Plausibly Plead Causation or Article III Standing ..................... 21

    B.  Plaintiffs' Complaint is Preempted Because it Seeks to Enforce Securities Laws through Conflicting State Tort Law.................................................................... 22

    C.  Absent a "Special Relationship," New York Law Precludes Tort Claims for Purely Economic Losses .................................................................................. 23

    D.  This Court Should Reject Plaintiffs' Invitation to Use New York Tort Law to Create Unlimited Negligence Liability........................................................... 24

CONCLUSION.................................................................................................................. 25

AMERICAS 115002216

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*,
  96 N.Y.2d 280 (N.Y. 2001) ...........................................................................................24

*Alfaro v. Wal-Mart Stores, Inc.*,
  210 F.3d 111 (2d Cir. 2000).......................................................................................9, 11

*Am. Dental Ass'n v. Cigna Corp.*,
  605 F.3d 1283 (11th Cir. 2010) .......................................................................................17

*AMBAC Assur. Corp. v. U.S. Bank N.A*,
  328 F. Supp. 3d 141 (S.D.N.Y. 2018)..............................................................................23

*Anaheim Indus. v. GMC*,
  2007 Tex. App. LEXIS 9950 (Tex. App. Dec. 20, 2007)................................................3, 19

*Appert v. Morgan Stanley Dean Witter, Inc.*,
  2009 WL 3764120 (N.D. Ill. Nov. 6, 2009) .................................................................22, 23

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...........................................................................................................17

*Bank of America, N.A. v. Cartwright*,
  2021 WL 3912563 (N.D. Ind. Sept. 1, 2021) ...................................................................15

*Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*,
  590 S.W.3d 471 (Tex. 2019).................................................................................................2

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...........................................................................................5, 17, 22

*Berwecky v. Bear Stearns & Co.*,
  197 F.R.D. 65 (S.D.N.Y. 2000) .......................................................................................10

*Biscone v. JetBlue Airways*,
  681 F. Supp. 2d 383 (E.D.N.Y. 2010) ...............................................................................8

*Bissell v. Merrill Lynch & Co.*,
  937 F. Supp. 237 (S.D.N.Y. 1996) ...................................................................................6

*Blyth v. White*,
  49 G.A. App. 738 (Ga. Ct. App. 1934)...............................................................................4

ii

*Bobadilla v. Aurora Loan Servs., LLC*,
    478 F. App'x 625 (11th Cir. 2012) ...................................................................8, 12

*Bocre Leasing Corp. v. GMC*,
    84 N.Y.2d 685 (1995) .........................................................................................6

*Burgess v. Religious Tech. Ctr., Inc.*,
    600 F. App'x 657 (11th Cir. 2015) ...................................................................8, 15

*Busch v. L.F. Rothschild & Co.*,
    23 A.D.2d 189 (1st Dept. 1965)...........................................................................4

*Cannizzaro v. Bache, Halsey, Stuart, Shields, Inc.*,
    81 F.R.D. 719 (S.D.N.Y. 1979) .......................................................................9, 10

*Cap. Options Invs., Inc. v. Goldberg Bros. Commodities, Inc.*,
    958 F.2d 186 (7th Cir. 1992) ..............................................................................14

*Capital Options Invs., Inc. v. Goldberg Bros. Commodities*,
    1990 WL 180583 (N.D. Ill. Nov. 5, 1990) ...........................................................4

*Carvel Corp. v. Noonan*,
    3 N.Y.3d 182 (N.Y. 2004) ............................................................................20, 21

*Clements v. Withers*,
    437 S.W.2d 818 (Tex. 1969)...............................................................................19

*Conway v. Icahn & Co., Inc.*,
    16 F.3d 504 (2d Cir. 1994)....................................................................................7

*Courtland v. Walston & Co., Inc.*,
    340 F. Supp. 1076 (S.D.N.Y. 1972)......................................................................4

*de Kwiatkowski v. Bear, Stearns & Co.*,
    306 F.3d 1293 (2d Cir. 2002)...........................................................................3, 14

*Deloitte (Cayman) Corp. Recovery Servs., Ltd. v. Sandalwood Debt Fund A, LP*,
    31 Misc. 3d 1225(A), 929 N.Y.S.2d 199 (Sup. Ct. 2011) ....................................19

*Dep't of Lab. v. McConnell*,
    305 Ga. 812, 828 S.E.2d 352 (2019)...................................................................25

*Dunn v. Calahan*,
    2008 Tex. App. LEXIS 9498 (Tex. App. Dec. 17, 2008).....................................20

*Duradil, L.L.C. v. Dynomax Drilling Tools, Inc.*,
    516 S.W.3d 147 (Tex. App. 2017)..................................................................19, 20

iii

*Erie R.R. Co. v. Tompkins*,
    304 U.S. 64 (1938) ............................................................................................................8

*Eva Rioseco and Nilda Cruz v. Gamco Asset Management, Inc.*,
    2011 N.Y. Misc. LEXIS 7279 (N.Y. Sup. Ct. Sept. 23, 2011) ................................................7

*First Nat'l Bank of Eagle Pass v. Levine*,
    721 S.W.2d 287 (Tex. 1986) ............................................................................................20

*French v. Bache Halsey Stuart, Inc.*,
    Comm. Fut. L. Rep. ¶ 20,444 (CFTC 1977) ...........................................................................4

*Glob. Enter. Grp. Holding, S.A. v. Ottomino*,
     No. 07-CV-4904 (TCP) (WDW), 2010 WL 11629556 (E.D.N.Y. June 8, 2010) ..........8, 9, 10

*Gochnauer v. A.G. Edwards & Sons, Inc.*,
    810 F.2d 1042 (11th Cir. 1987) .........................................................................................7

*Goldberger v. Bear Stearns & Co.*,
    2000 U.S. Dist. LEXIS 18714 (S.D.N.Y. Dec. 28, 2000) .........................................................3

*Griffin v. Dugger*,
    823 F.2d 1476 (11th Cir. 1987) .......................................................................................22

*Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*,
    50 N.Y.2d 183 (N.Y. 1980) .............................................................................................20

*Hamilton v. Beretta U.S.A. Corp.*,
    96 N.Y.2d 222  (2001) ................................................................................................6, 25

*Hand v. Dean Witter Reynolds Inc.*,
    889 S.W.2d 483 (Tex. App. 1994) ......................................................................................4

*Humphrey v. Hollywood Police Dep't*,
    2019 U.S. Dist. LEXIS 35022 (S.D. Fla. Mar. 4, 2019) ......................................................16

*Hux v. S. Methodist Univ.*,
    819 F.3d 776 (5th Cir. 2016) ..........................................................................................19

*In re Blech Sec. Litig.*,
    961 F. Supp. 569 (S.D.N.Y. 1997) ...................................................................................10

*In re Equifax, Inc. Customer Data Sec. Breach Litig.*,
    362 F. Supp. 3d 1295 (N.D. Ga. 2019) .............................................................................24

*In re Letterman Bros. Energy Sec. Litig.*,
    799 F.2d 967 (5th Cir. 1986) ............................................................................................7

iv

*In re Merrill Lynch & Co. Research Reps. Sec. Litig.*,
   568 F. Supp. 2d 349 (S.D.N.Y. 2008) ..................................................................21

*In re Series 7 Broker Qualification Exam Scoring Litig.*,
   510 F. Supp. 2d 35 (D.D.C. 2007) ..............................................................15, 23

*Indep. Ord. of Foresters v. Donald, Lufkin & Jenrette, Inc.*,
   157 F.3d 933 (2d Cir. 1998) ............................................................................3

*Jim Walter Homes, Inc. v. Reed*,
   711 S.W.2d 617 (Tex. 1986) ............................................................................6

*Kneese v. Pershing LLC*,
   2012 WL 13019677 (N.D. Tex. Nov. 14, 2012) ..........................................9, 10

*Kolbeck v. LIT Am.*,
   923 F. Supp. 557 (S.D.N.Y. 1996) ..................................................................25

*Koruga v. Fiserv Correspondent Servs.*,
   183 F. Supp. 2d 1245 (D. Or. 2001) ..............................................................10

*Lange v. Hentz & Co.*
   418 F. Supp. 1376 (N.D. Tex. 1976) ..............................................................8

*Luxus Aviation, LLC v. Kerwin Media LLC*,
   91 A.D.3d 569 (N.Y. App. Div. 2012) ........................................................3, 19

*Magnum Corp. v. Lehman Bros. Kuhn Loeb, Inc.*,
   794 F.2d 198 (5th Cir. 1986) ....................................................................6, 7, 8

*McDaniel v. Bear Stearns & Co., Inc.*,
   196 F. Supp. 2d 343 (S.D.N.Y. 2002) ....................................................9, 10, 11

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng*,
   697 F. Supp. 1224 (D.D.C. 1988) ..................................................................7

*Miley v. Oppenheimer & Co., Inc.*,
   637 F. 2d 318 (5th Cir. 1981) ........................................................................7

*Murphy v. Am. Home Prods. Corp.*,
   58 N.Y.2d 293 (1983) ..................................................................................18

*Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*,
   392 F.3d 520 (2d Cir. 2004) ..........................................................................18

*Nat'l Union Fire Ins. Co. of Pitt., Pa. v. Xerox Corp.*,
   25 A.D.3d 309 (N.Y. App. Div. 2006) ..........................................................18

v

*NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*,
    87 N.Y.2d 614 (N.Y. 1996) ...................................................................................20

*Norwood v. Raytheon Co.*,
    414 F. Supp. 2d 659 (W.D. Tex. 2006)...................................................................9

*Press v. Chemical Inv. Servs. Corp.*,
    988 F. Supp. 375 (S.D.N.Y. 1997) ...................................................................4, 14

*Remington v. Newbridge Sec. Corp.*,
    2013 WL 2444719 (S.D. Fla. June 5, 2013) ...........................................................7

*Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    337 F. Supp. 107 (N.D. Ala. 1971) .........................................................................7

*Ross v. Bolton*,
    904 F.2d 819 (2d Cir. 1990)....................................................................................2

*Rozsa v. May Davis Group, Inc.*,
    187 F. Supp. 2d 123 (S.D.N.Y. 2002).....................................................................2

*Scott v. Dime Sav. Bank of New York, FSB*,
    886 F. Supp. 1073 (S.D.N.Y. 1995).........................................................................7

*Turk v. Pershing LLC*,
    2014 U.S. Dist. LEXIS 190624 (N.D. Tex. Dec. 8, 2014) ......................................2

*Turk v. Pershing LLC*,
    2014 WL 12572906 (N.D. Tex. Dec. 8, 2014) .....................................9, 10, 11, 12

*Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*
    464 F. 3d 634 (S.D.N.Y. 2020)........................................................................15, 23

*Warth v. Seldin*,
    422 U.S. 490 (1975).........................................................................................3, 22

## FEDERAL REGULATIONS

17 C.F.R. § 240.15c3-1 ...................................................................................................16

FINRA Rule 2010 ...........................................................................................................16

FINRA Rule 3110 ...........................................................................................................16

FINRA Rule 4370 ...........................................................................................................16

AMERICAS 115002216

**MISCELLANEOUS**

U.S. Securities and Exchange Commission, *Thinking About Investing in the Latest Hot Stock?: Understand the Significant Risks of Short-Term Trading Based on Social Media*, Investor Alerts and Bulletins (Jan. 30, 2021), available at https://www.sec.gov/oiea/investor-alerts-and-bulletins/risks-short-term-trading-based-social-media-investor-alert (last accessed Nov. 19, 2021). ...................................................................................................................17

AMERICAS 115002216

## INTRODUCTION

Plaintiffs fail to allege or explain how Apex's brief exercise of its clear right—under decades-old controlling case law and its contract—to refuse to accept new purchase orders for three meme stocks violated any duty owed by Apex to Plaintiffs Chavez or Jang or violated any agreement.  In Plaintiffs' Opposition, Plaintiffs reframe their case as based on a novel duty requiring clearing brokers not to take actions—such as moving a security to a closing-only position—that negatively could affect the value of a security purchased through an introducing broker that uses the clearing broker.  Plaintiffs' latest complaint depends on the new theory that, once an introduced customer purchases a security, and the purchase is cleared through Apex, Apex then owes a duty to that downstream customer to continue to facilitate trades of that security to *other investors*.  Plaintiffs identify no legal authority for their proposed duty because none exists. Plaintiffs' theory would upend the roles of clearing brokers and interfere with the intended functioning of the securities trading system.  Nor do Plaintiffs cite a contract, because the relevant agreement says the opposite of what Plaintiffs propose.

In addition, Plaintiffs continue to argue without support that Apex somehow breached a common law duty (i) by not protesting against the SEC-regulated market utilities responsible for collateral requirements, (ii) by not removing its trading restrictions in some amount of time less than 3 hours and 25 minutes, and (iii) by not having unlimited capital on hand.  But Plaintiffs never identify any authority supporting the existence of a duty Apex could have breached.  Nor do Plaintiffs adequately explain how the trading restriction breached any duty or obligation in the face of Apex's unqualified contractual right to refuse to clear Plaintiffs' trades "*at any time and for any reason*."  This Court should dismiss Plaintiffs' negligence, breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, and tortious interference claims with prejudice.

## ARGUMENT

I.    **Plaintiffs' Negligence and Fiduciary Duty Claims Fail Because Plaintiffs Fail to Show that Apex Owes Plaintiffs an Open-Ended Duty to "Safeguard" Plaintiffs' Investments and Accept All Transactions**

Plaintiffs seek to create sweeping, new, open-ended duties between clearing brokers and introduced customers that simply do not exist, whether viewed under New York or Texas law. Although Apex asserts that Texas law applies to Plaintiffs' claims, Mot. 11–12, New York law

AMERICAS 115002216

also supports dismissal.  Plaintiffs assert that Apex owes Plaintiffs a common law duty of care under New York law that "arises by virtue of the broker-client relationship itself."  Opp. 22.  The duties that Plaintiffs claim Apex owed to named Plaintiffs purportedly include an ongoing duty to comply with FINRA rules and an ongoing duty to "ensure that [Apex] can continue to provide investors access to the securities markets during times of extreme market volatility."  Opp. 26.  But Apex owed no such duties to Plaintiffs.

### A.   Whether Evaluated as Clearing Broker or Non-Discretionary Broker, Apex Does Not Owe Plaintiffs an Open-Ended, Ongoing Common Law or Fiduciary Duty

#### 1.   As the Clearing Broker for Named Plaintiffs' Introducing Brokers, Apex Owed Plaintiffs No Common Law or Fiduciary Duty of Care

Plaintiffs admit that Apex was only their clearing broker.  4th Compl. ¶ 14 ("Plaintiff Chavez is an investor who used Webull Financial LLC ('Webull') as his introducing broker dealer and Apex as his clearing broker dealer."); 4th Compl. ¶ 18 ("Plaintiff Jang is an investor who used Ally Invest Securities ('Ally') as his introducing broker-dealer and Apex as his clearing broker."). As the clearing broker, Apex owed Named Plaintiffs no common law duty of care.  *Ross v. Bolton*, 904 F.2d 819, 824 (2d Cir. 1990); *Rozsa v. May Davis Group, Inc.*, 187 F. Supp. 2d 123, 129 (S.D.N.Y. 2002) ("As a rule, clearing brokers do not have a fiduciary duty to individual investors."); *id.* at 131 ("Courts have determined that clearing brokers do not owe duties to plaintiffs who are customers of their introducing brokers."); *Turk v. Pershing LLC*, 2014 U.S. Dist. LEXIS 190624, at *15 (N.D. Tex. Dec. 8, 2014) (dismissing investor negligence claims because, "as a clearing broker, [defendant] owed no common law duty of care to Plaintiffs that could form the basis of a negligence claim"); *see also* Order Granting Robinhood Tranche Motion to Dismiss, ECF No. 453 at 46–47 (Jan. 27, 2022) ("Under both California and Florida law, a clearing broker does not generally owe fiduciary duties to investors whose transactions it executes.").

That should be the end of the inquiry on all of Plaintiffs' claims, because each claim, including Plaintiffs' claims for breach of the implied covenant of good faith and fair dealing and tortious interference, depends on Apex owing Named Plaintiffs a duty of care.  *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 490 (Tex. 2019) (under Texas law, duty of good faith and fair dealing arises only in "special" relationships, defined as those creating an

AMERICAS 115002216

informal fiduciary duty)[1]; Opp. 45 (arguing that "culpable conduct" requirement of tortious interference claim under N.Y. law is satisfied by negligence and breach of fiduciary claims).

### 2. Even if Evaluated under the Standard for Non-Discretionary Brokers, Apex Did Not Owe Plaintiffs the General, Ongoing Duties Plaintiffs Seek to Impose

Plaintiffs attempt to avoid dismissal by casting Apex as a non-discretionary broker to other customers who are not the Named Plaintiffs, ignoring that this Court must consider the claims of only the Named Plaintiffs on a motion to dismiss. *See Warth v. Seldin*, 422 U.S. 490, 502 (1975); *see also Goldberger v. Bear Stearns & Co.*, 2000 U.S. Dist. LEXIS 18714, at *3 (S.D.N.Y. Dec. 28, 2000) ("If the named plaintiffs have no cause of action in their own right, their [class action] complaint must be dismissed, even though the facts set forth in the complaint may show that others might have a valid claim." (citing *Warth*)). Under the standard for non-discretionary brokers, there is no basis in law for the broad and open-ended duties that Plaintiffs seek to impose here. The Second Circuit was blunt: "We are aware of ***no authority*** for the view that, in the ordinary case, a broker may be held to an ***open-ended duty of reasonable care***, to a nondiscretionary client, that would encompass anything more than limited transaction-by-transaction duties." *de Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293, 1306 (2d Cir. 2002) (emphasis added).

On this third round of briefing, Plaintiffs' continued failure to cite any cases recognizing their open-ended, ongoing duty of care that clearing brokers owe to the customers of their introducing brokers is not surprising. "Under New York law, as generally, there is no general fiduciary duty inherent in an ordinary broker/customer relationship. Such a duty can arise only where," unlike here, "the customer has delegated discretionary trading authority to the broker." *Indep. Ord. of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 940–41 (2d Cir. 1998) (citing *Perl v. Smith Barney Inc.,* 230 A.D.2d 664, 666 (1st Dep't 1996), and *Press v. Chemical Inv. Servs. Corp.*, 988 F. Supp. 375, 386–87 (S.D.N.Y. 1997), *aff'd*, 166 F.3d 529 (2d Cir. 1999)). "This is because a broker's fiduciary obligation, if any, 'is *limited to affairs entrusted to the broker*, and [t]he scope of affairs entrusted to the broker is generally limited to the completion of a

---

[1] Texas law should govern, at a minimum, Plaintiffs' claim for breach of the covenant of good faith and fair dealing, because that claim arises out of the Customer Agreement, which includes a Texas choice of law requirement. *See Anaheim Indus. v. GMC*, 2007 Tex. App. LEXIS 9950, at *6, 18ff (Tex. App. Dec. 20, 2007); *Luxus Aviation, LLC v. Kerwin Media LLC*, 91 A.D.3d 569, 570 (N.Y. App. Div. 2012).

AMERICAS 115002216

transaction.'"  *Press*, 988 F. Supp. at 386 (quoting *Bissell v. Merrill Lynch & Co*., 937 F. Supp. 237, 246 (S.D.N.Y. 1996)) (emphasis in original).

Thus, contrary to Plaintiffs' proposed duty to "ensure that [Apex] can continue to provide investors access to the securities markets during times of extreme market volatility," Opp. 26, New York law has in a decades-long, unbroken line of cases made clear that brokers have no obligation to accept new orders.  *See Courtland v. Walston & Co., Inc.*, 340 F. Supp. 1076, 1080 (S.D.N.Y. 1972) ("A stockbroker need not accept the orders of a customer so long as he makes clear at the time the orders are given that he refuses to perform them."); *Busch v. L.F. Rothschild & Co.*, 23 A.D.2d 189, 190 (N.Y. App. Div. 1965) ("A *broker is not obligated to accept an order of a customer for execution*, even if the customer has a credit balance with the broker.") (emphasis added).  This decisional law in New York that a broker has no duty to accept new orders is accepted throughout the United States.  *See, e.g.*, *Capital Options Invs., Inc. v. Goldberg Bros. Commodities*, 1990 WL 180583, at *7 (N.D. Ill. Nov. 5, 1990), *aff'd*, 958 F.2d 186 (7th Cir. 1992) ("*A broker generally has a duty to accept customer orders to liquidate existing positions, but has no duty to accept customer orders for new positions*. . . .  [T]he execution of new contracts exposes the broker, as well as the customer, to new financial risks.  One party should not be able to impose risks on the other without the other's consent.") (emphasis added); *French v. Bache Halsey Stuart, Inc.*, Comm. Fut. L. Rep. ¶ 20,444 at 21,806 (CFTC 1977) (same); *Blyth v. White*, 49 G.A. App. 738, 742 (Ga. Ct. App. 1934) (no cause of action stated for recovery of "speculative damages for loss growing out of the defendants' refusal to further act as his broker").

Texas law is the same.  *See Hand v. Dean Witter Reynolds Inc.*, 889 S.W.2d 483, 493 (Tex. App. 1994) ("the agency or broker/customer relationship does not come into existence until the order has been placed ***and the broker has consented to execute it***"; if the broker refuses to act as agent, the broker "has no duty to act" for the customer) (emphasis added); *id.* at 494 ("Generally, while a broker has a duty to execute a customer's order to liquidate existing positions, ***he has no duty to accept an order to open new positions unless he accepts the agency***.") (emphasis added); Apex Motion to Dismiss (ECF No. 491) ("Mot.") at 11–18 (choice of law, collecting cases).  Thus, while Plaintiffs point to Apex's decision to suspend purchases, but not sales, as evidence of breach, Opp. 15, 17, 27 ("one-sided trading suspension"), in fact Apex was ***required*** to allow customers to liquidate existing positions under decisional law.

4

Recognizing that the duties of non-discretionary brokers are limited to "transaction-by-transaction" duties, Plaintiffs attempt to recast their proposed duty as "transactional" as it "arose in connection with the sale of securities to Plaintiffs and the Class." Opp. 23.[2] But Plaintiffs' attempt to rewrite the duty of care must be rejected for several reasons.

First, there is nothing "transactional" about the duties Plaintiffs seek to impose. In fact, Plaintiffs' Fourth Complaint does not contain a *single allegation* concerning *any transaction* executed by Plaintiffs Chavez or Jang through Apex. Plaintiffs do not even allege that either Plaintiff Chavez or Jang actually purchased any of the meme stocks in transactions cleared by Apex. 4th Compl. ¶¶ 14–15, 18–19 (alleging only that Apex was Plaintiffs' clearing broker, and separately, that Plaintiffs held meme stocks).

Second, the duty Plaintiffs seek to impose is impossibly broad and would upend relationships designed to ensure smooth operation of the nation's securities markets: if Customer A purchases Security X using Apex as his or her clearing broker, then Apex would now owe Customer A an indefinite duty to permit new buy orders for Security X by *other customers* because "the transaction remains open. Opp. 23. As Plaintiffs admit: no court has ever defined the "transaction-by-transaction" duty of a clearing or non-discretionary broker in this far-flung, hollow way. Opp. 26; Opp. 23 (recognizing that there "are no cases" to support their position).

Plaintiffs also attempt to create a common law tort duty to adhere to industry rules and regulations out of Plaintiffs' Customer Agreement with Apex. Opp. 27–29. But the Agreement on which Plaintiffs rely, indicating that *transactions* are subject to the "constitution, rules, regulations, customs and usages of the exchange or market," which separately require "high standards of commercial honor," creates no open-ended duty to accept trades. Opp. 27–28. To the contrary, the imposition of trading restrictions is consistent with the customs and usages of the

---

[2] Plaintiffs' accusation that Apex intended to drive the prices of the meme stocks down by imposing trading restrictions on purchases for three hours and 25 minutes in response to an unprecedented collateral requirement is illogical and implausible. Opp. 26–27. Apex, as a clearing broker, has no economic incentive to halt trading, because Apex earns its revenue by executing trades. *See* Northern Star Inv. Corp. II, Current Report (Form 8-K) (Feb. 21, 2021), Exhibit 99.2 at 10. And in the context of the extraordinary volatility of the markets on January 28, 2021, which provides an "obvious alternative" explanation for Apex's behavior, Plaintiffs' conclusory allegation that Apex had ill-intent is implausible. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007).

exchange or market.  Opp. 27–28; Order Granting Motion to Dismiss Robinhood Tranche, ECF No. 453 at 15 ("[Robinhood] Plaintiffs acknowledge that other broker-dealers imposed trading restrictions during the same week.").  In any event, Plaintiffs ignore that the Customer Agreement expressly permits Apex to decline to execute trades for any reason.  Mot. 6, 17–18, 27, 29. Moreover, Plaintiffs' attempt to create a common law negligence duty to enforce what Plaintiffs claim are contractual obligations is precisely the type of tort claim that the economic loss rule was designed to prohibit. *See Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986); *Bocre Leasing Corp. v. GMC*, 84 N.Y.2d 685, 688–89 (1995).

Plaintiffs never allege that Apex acted negligently in performing its clearing services for accepted trades.  Nor that Apex refused to clear any of Plaintiffs' orders.  Opp. 26–27 ("Apex is not charged with turning down any particular trade from an individual customer . . . .").  Rather, Plaintiffs appear to argue that, because an effect on Named Plaintiffs from a restriction on future trading *by others* allegedly was "foreseeable," Apex owed Named Plaintiffs a duty to "ensure that [Apex] can *continue to provide* [other] investors access to the securities markets during times of extreme market volatility."   Opp. 26 (emphasis added).   But under New York law, "[f]oreseeability, alone, does not define duty—it merely determines the scope of the duty ***once it is determined to exist***."  *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 232 (2001) (emphasis added).  The "injured party must show that a defendant owed not merely a general duty to society but a ***specific duty to him or her***, for '[w]ithout a duty running directly to the injured person there can be no liability in damages, however careless the conduct or foreseeable the harm.'"   *Id.* (emphasis added).  New York courts (and others) repeatedly have held that clearing brokers owe no duty of care to introduced customers.  Even for brokers of non-discretionary accounts, the duty of care is "generally limited to the completion of a transaction."  *Bissell,* 937 F. Supp. at 246.

### 3.  Plaintiffs' Cases Are Inapposite or Support Apex's Arguments

Not one of the cases that Plaintiffs cite under either New York or Texas law holds that a broker of a non-discretionary account (much less a clearing broker) has a duty of care to accept new buy orders.[3]   And none of the non-New York cases Plaintiffs cite—*Remington, Cheng,*

---

[3] Plaintiffs' other cases involve instances where the broker had *accepted the order* or otherwise are simply off-point.  *See Magnum Corp. v. Lehman Bros. Kuhn Loeb, Inc*., 794 F.2d 198, 200

AMERICAS 115002216

*Robinson*, *Magnum*, and *Miley* (Opp. 23–25)—supports the creation of an open-ended duty of a broker to accept all transactions.  In fact, *Robinson* supports Apex's position entirely, because there the court entered judgment in favor of the defendant broker, explaining that, in the absence of an advisory relationship, "[t]he relationship of agent and principal ***only existed*** between plaintiff and defendant ***when an order to buy or sell was placed***, and ***terminated when the transaction was complete***.'" *Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 337 F. Supp. 107, 111 (N.D. Ala. 1971) (emphasis added).  Of course, Plaintiffs do not allege any such advisory relationship with Apex because none exists.

In *Remington*, while the court considered the plaintiffs' allegation of unauthorized handling fees in light of a FINRA rule about brokers' fees, the court ***dismissed the plaintiffs' negligence claim***.  *Remington v. Newbridge Sec. Corp.*, 2013 WL 2444719, at *5–7 (S.D. Fla. June 5, 2013). Nor can the decisions in *Cheng* and *Miley*—discussing NASD and NYSE rules in evaluating the reasonableness of a stockbroker's unauthorized, high-risk trades—be contorted into an open-ended duty of perpetual availability.  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng*, 697 F. Supp. 1224, 1228 (D.D.C. 1988); *Miley v. Oppenheimer & Co., Inc.*, 637 F. 2d 318, 333 (5th Cir. 1981) ("Rather than creating a private right of action for a violation of the NYSE and NASD rules, [the district court judge] merely allowed the jury to consider a violation of such rules as one of six factors in determining whether Miley's account had been excessively traded.").

Plaintiffs' reliance on *Magnum Corp. v. Lehman Bros. Kuhn Loeb, Inc.* (Opp. 23) is also unavailing.  794 F.2d 198 (5th Cir. 1986).  In that case, the defendant Lehman Brothers was held liable for failing to advise its client that it would be delayed in executing orders *it already had accepted to trade* because of massive market moves.  *Id.* at 199 ("*stockbroker took orders from*

---

(5th Cir. 1986) (broker *already agreed* to accept trade); *Scott v. Dime Sav. Bank of New York, FSB*, 886 F. Supp. 1073, 1080–81 (S.D.N.Y. 1995) (case concerning creditor-debtor fiduciary relationship); *Conway v. Icahn & Co., Inc.*, 16 F.3d 504 (2d Cir. 1994) (non-discretionary broker failed to inform customer of margin call and engaged in an unauthorized sell-off of customer's assets); *In re Letterman Bros. Energy Sec. Litig.*, 799 F.2d 967, 972 (5th Cir. 1986) (finding no fiduciary duty; Plaintiffs cite dicta in securities analysis summarizing a case addressing broker misrepresentations in advice to investor clients); *Eva Rioseco and Nilda Cruz v. Gamco Asset Management, Inc.,* 2011 N.Y. Misc. LEXIS 7279 (N.Y. Sup. Ct. Sept. 23, 2011) (holding ***investment advisor*** owed fiduciary duty to investor, and distinguishing *Rozsa* because "a clearing broker had no fiduciary duties owed"); *Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d 1042, 1050 (11th Cir. 1987) (case concerning failure to advise customers of risks of options trading).

7

*plaintiffs* to buy stock at a time when it was trading in the over the counter market at $13.375";

trades were executed at a higher price of $15.75) (emphasis added).   In upholding the district

court's judgment, the Fifth Circuit made the uncontroversial observation that "when a *dealer*

*accepts* a market order from a customer, 'it must make every reasonable effort to execute . . .

promptly and fully." *Id.* at 200 (citation omitted).  And *Lange v. Hentz & Co.* holds that there is

*no civil liability* for a broker under "Texas securities, fraud, fiduciary and negligence law," for

failure to abide by [FINRA] rules because "the special class of persons sought to be benefitted or

protected by [FINRA] rules is in reality the class of [FINRA] members themselves and generally

not the public at large."  418 F. Supp. 1376, 1383 (N.D. Tex. 1976) (Opp. 25).

Plaintiffs cite *Ottimo* (Opp. 30) to assert that a fiduciary duty "may arise" where an

agreement exists between the clearing agent and the investor.   But *Ottimo* held that the clearing

broker defendant did ***not*** owe any fiduciary duties to the introduced customer, and that a clearing

broker could be held liable only in "extenuating circumstances," such as active participation in a

fraud. 2010 WL 11629556, at *5 (E.D.N.Y. June 8, 2010).   Plaintiffs allege no facts in their

original or amended complaints[4] that would support the imposition of a fiduciary relationship on

the basis of any "extenuating circumstances."[5]  To the extent that Plaintiffs are now attempting to

add new allegations in their opposition briefing, the Eleventh Circuit repeatedly has held that such

tactics are improper.  *E.g.*, *Burgess v. Religious Tech. Ctr., Inc.,* 600 F. App'x 657, 665 (11th Cir.

2015) ("We repeatedly have held that plaintiffs cannot amend their complaint through a response

to a motion to dismiss.").

*       *       *

Plaintiffs ask this Court to expand the duties of securities brokers and clearing brokers

beyond the clear decisional law of both New York and Texas—something this Court, as a federal

court applying state law for the rule of decision, lacks the constitutional authority to do.  *Erie R.R.*

---

[4] This court may take judicial notice of prior filings at any stage of this proceeding.  *Bobadilla v. Aurora Loan Servs., LLC*, 478 F. App'x 625, 627 (11th Cir. 2012).

[5] Plaintiffs attempt to muddy the water by arguing that Apex owes a duty "to both its direct customers and to its Shared Customers."  Opp. 22.  At the motion to dismiss stage, however, this Court must evaluate only the *Named Plaintiffs'* claims in this proposed class action.  *Biscone v. JetBlue Airways*, 681 F. Supp. 2d 383, 386 (E.D.N.Y. 2010) ("As a general rule, until a class action is certified pursuant to Rule 23 of the Federal Rules of Civil Procedure, the claims of potential class members cannot be considered.").

AMERICAS 115002216

*Co. v. Tompkins*, 304 U.S. 64, 79 (1938) (overturning the doctrine of *Swift v. Tyson* of a federal common law trumping state law as "an unconstitutional assumption of powers by courts of the United States"); *see also Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 115 (2d Cir. 2000) (where the "applicable duty relationship is well established" a district court lacks authority to expand its scope on an *ad hoc* basis); *Norwood v. Raytheon Co.,* 414 F. Supp. 2d 659, 663 (W.D. Tex. 2006) ("[A] federal court should not 'expand state law beyond its presently existing boundaries.'") (citing to *Barfield v. Madison County*, 212 F.3d 269, 272 (5th Cir. 2000) ("Nor is it the function of the federal court to expand the existing scope of state law.")).[6]  Nor should this Court accept Plaintiffs' invitation (Opp. 23 n.21) to extend this litigation and request certification to the New York or Texas appellate courts, where the decisional law on this issue is already well-established.

**B. Plaintiffs' Securities Fraud Cases Do Not Establish that Apex, as a Clearing Broker, Owed Plaintiffs Any General Common Law Tort or Fiduciary Duties**

Plaintiffs argue that a clearing firm "exposes itself to liability" when it "moves beyond performing mere ministerial or routine clearing functions."  Opp. 30.  But Plaintiffs use the term "liability" (rather than "duty" or "negligence") to gloss over the fact that Plaintiffs rely on a line of inapposite cases that address liability for brokers *aiding and abetting fraud*.  Opp. 29–32.  Those cases simply do not hold that a clearing broker owes open-ended common law duties of care to its introduced customers.  Rather, those cases address when a clearing firm's failure to prevent an *introducing* broker's security fraud can be found to constitute aiding and abetting.  *E.g.*, *McDaniel v. Bear Stearns & Co., Inc.,* 196 F. Supp. 2d 343, 346 (S.D.N.Y. 2002) (aiding and abetting fraudulent conduct of introducing broker-dealer); *Cannizzaro v. Bache, Halsey, Stuart, Shields, Inc.*, 81 F.R.D. 719, 721 (S.D.N.Y. 1979) (same); *Ottimo*, 2010 WL 11629556, at *3–4 (same); *Kneese v. Pershing LLC*, 2012 WL 13019677, at *2–3 (N.D. Tex. Nov. 14, 2012) (same); *Turk v. Pershing LLC*, 2014 WL 12572906, at *5 (N.D. Tex. Dec. 8, 2014) (evaluating claims against clearing broker for (1) participation in breach of fiduciary duty, (2) aiding and abetting breach of state fraud laws, and (3) negligence, and dismissing negligence claim for lack of duty).

---

[6] Plaintiffs also point to the fact that their complaint "allege[s] that Apex owed them a common law duty of care," but that is immaterial.  Opp. 25.  "The question of the existence and scope of an alleged tortfeasor's duty 'is, in the first instance, a legal issue for the court to resolve.'"  *Alfaro*, 210 F.3d at 114 (quoting *Waters v. New York City Hous. Auth.*, 69 N.Y.2d 225, 229 (1987)).

9

The distinction between aiding and abetting liability and tort duties is crucial, and the court in *McDaniel*, on which Plaintiffs rely, explained the issue well.  To state a claim for aiding and abetting fraud under New York law, one element a plaintiff must allege is "substantial assistance to advance the fraud's commission." *McDaniel*, 196 F. Supp. 2d at 352.  Substantial assistance requires a showing that the defendant "affirmatively assists, helps conceal, or by virtue of *failing to act when required to do so* enables the fraud to proceed." *Id.* (emphasis added).  But where a defendant does not owe a fiduciary duty directly to the plaintiffs, a defendant's alleged "failing to act" cannot constitute actionable aiding and abetting.  *Id.*  In the case of clearing broker liability, the court in *McDaniel* explained that, because clearing brokers do not owe fiduciary duties to introduced customers, New York courts require a showing that the clearing broker did more than simply fail to act—the clearing broker must have "move[d] beyond performing mere ministerial or routine clearing functions" and instead have become "actively and directly involved" in the introducing broker's fraudulent scheme.  *Id.* at 353.

Each and every case Plaintiffs cite (Opp. 29–31) that involved a clearing broker has, consistent with *McDaniel*, required that the clearing broker be an active participant in a *fraudulent* scheme with the introducing broker to be liable—which is not alleged.  *McDaniel*, 196 F. Supp. 2d at 343 (addressing aiding and abetting fraudulent conduct of introducing broker-dealer); *Berwecky v. Bear Stearns & Co.,* 197 F.R.D. 65, 67 (S.D.N.Y. 2000) (clearing broker "shed their role as a mere clearing broker" and participated in introducing broker's "***scheme to defraud*** investors of certain publicly-traded securities.") (emphasis added); *Koruga v. Fiserv Correspondent Servs.*, 183 F. Supp. 2d 1245, 1246 (D. Or. 2001) (material aid in securities fraud); *In re Blech Sec. Litig.*, 961 F. Supp. 569, 578–79 (S.D.N.Y. 1997) (fraud claims against clearing broker for "knowingly execut[ing] manipulative sham transactions" on behalf of introducing broker.); *Cannizzaro*, 81 F.R.D. at 721 (addressing clearing broker aiding and abetting securities fraud for "churning" account); *Ottimo*, 2010 WL 11629556, at *3–4 (denying leave to amend claims of clearing broker fraud and aiding and abetting fraud of introducing broker); *Turk*, 2014 WL 12572906, at *15 (addressing participation in breach of fiduciary duty, aiding and abetting securities fraud, and negligence claims against clearing broker; dismissing negligence claims); *Kneese*, 2012 WL 13019677, at *2 (addressing clearing broker aiding and abetting securities fraud).

10

Far from holding that clearing brokers owe introduced customers ongoing common law duties of care, the securities fraud cases Plaintiffs cite are *premised* on the foundation that clearing brokers owe *no duty* of care to introduced customers.  As the *McDaniel* court put it, "courts have refused to hold clearing firms liable for the practices of introducing brokers even where the clearing firm continued to provide clearing services *after it knew or should have known* of the introducing broker's fraudulent scheme."  *McDaniel*, 196 F. Supp. 2d at 352 (emphasis added).  Thus, Plaintiffs' claim that the cases Apex cites "do not address the liability of clearing brokers for their own misconduct" misses the point.  Opp. 31–32.  "The existence of a duty is thus a *sine qua non* of a negligence claim:  'In the absence of a duty, as a matter of law, no liability can ensue.'"  *Alfaro*, 210 F.3d at 114.

The court's analysis in *Turk v. Pershing* is instructive, though Plaintiffs misstate the court's holding.  Opp. 32 n.27 (claiming *Turk* held a "viable negligence claim pled against clearing firm when allegation is that its conduct went beyond mere ministerial role").[7]  Contrary to Plaintiffs' assertion, the *Turk* court ***dismissed*** the plaintiffs' negligence claim against the clearing broker and rejected the same argument Plaintiffs make here.  *Turk*, 2014 WL 12572906, at *5.  In *Turk*, the plaintiffs argued that the clearing broker was liable for negligence (as well as for aiding and abetting securities fraud) because it moved beyond ministerial clearing services.  The plaintiffs in *Turk* listed "a series of cases in which courts permitted claims to go forward against clearing brokers where it was alleged the clearing broker went beyond the provision of merely ministerial services."  *Turk*, 2014 WL 12572906, at *5.  But *Turk* rejected the plaintiffs' reasoning and dismissed the negligence claim (while maintaining the aiding and abetting claim):

> [E]ach of Plaintiffs' proffered cases pertains to the maintenance of claims based on violations of various securities laws, not on the existence of a duty of care supporting a negligence claim.  In other words, there is a ***meaningful distinction*** between a clearing broker's amenability to suit for ***statutory violations*** on one hand, and the existence of an ***independent duty supporting a negligence claim*** on the other.  As previously discussed, providing services that are more than ministerial may indeed expose a clearing broker to statutory liability.  But ***Plaintiffs' cited cases do not support their contention that provision of such services also creates an independent duty of care***.

---

[7] Apex alerted Plaintiffs to this error in its last reply brief, ECF No. 440 at 11–12, but in their renewed briefing on this motion, the Plaintiffs' have failed to correct the error.

AMERICAS 115002216

*Turk*, 2014 WL 12572906, at *5.

Whether evaluated under New York or Texas law, Plaintiffs cite no authority on which this Court could create a common law duty of care sufficient to support Plaintiffs' claims.

## II.    Even if this Court Were to Find that Apex Owed Some Duty to Named Plaintiffs, Those Duties Do Not Include the Novel Duties Plaintiffs Seek to Create Here

In their Opposition, Plaintiffs claim to have backed away from the allegations in their earlier complaint, ECF No. 410 (¶¶ 105–07)[8] that Apex had duties to dicker, to rush to resume purchases of meme stocks, and to maintain unlimited capital.  Opp. 39.  In their Opposition, Plaintiffs recast their case as an even broader common law action to enforce FINRA rules.  Opp. 26.  This Court should reject Plaintiffs' attempt to use their Opposition to amend their complaint. More fundamentally, this Court should reject Plaintiffs' attempt to circumvent the lack of a private right of action to enforce FINRA rules by alleging Apex breached some sort of common law FINRA duty.

### A.    Setting the Record Straight:  Plaintiffs' Complaint in Fact Does Seek to Impose New Duties (i) to Dicker, (ii) to Rush, and (iii) to Maintain Access to Unlimited Capital, But Plaintiffs Do Not Defend These Novel Duties in the Opposition

Likely recognizing that there is no support in law for Plaintiffs' proposed duties, Plaintiffs retreat from their Fourth Complaint and disclaim their effort to impose a duty to negotiate with the DTCC and NSCC (a duty to dicker), a duty to rush to resume trading, or a duty to maintain unlimited capital.  Opp. 39.  Although couched in terms of "breach" language, those duties are exactly what the Plaintiffs allege in their latest Fourth Complaint, 4th Compl. ¶¶ 110–12, and propose at 36 of their Opposition:

- **Duty to Dicker.**  "Apex *did not bother to even attempt to confirm* the higher number with DTCC."

- **Duty to Rush.**  Plaintiffs complain that Apex chose not to "not lift the self-imposed trading restriction *without confirming the lower number* with DTCC."

- **Duty of Unlimited Capital**.  Plaintiffs complain that Apex allegedly did not "*explor[e] an alternative mechanism by which it could satisfy its collateral requirement*."

Opp. 36 (emphasis added).

---

[8] This court may take judicial notice of prior filings at any stage of this proceeding.  *Bobadilla v. Aurora Loan Servs., LLC*, 478 F. App'x 625, 627 (11th Cir. 2012).

12

Plaintiffs also disclaim that they have pleaded a duty of constant availability, or a duty to act as a public utility.  Opp. 26 n.24 ("No such duty is pled.").  But Plaintiffs plead precisely that, in a "Heads I Win, Tails You Lose" argument that effectively holds clearing brokers liable any time they suspend trading due to volatility.  Opp. 36.  Specifically, Plaintiffs argue that either Apex had sufficient capital on hand to meet the DTCC's astronomical collateral demand (in which case they claim Apex breached its duties to Plaintiffs in not agreeing to clear all meme stock purchases at all times) or Apex did not have sufficient capital on hand to meet the DTCC's collateral demand (in which case Plaintiffs claim Apex breached its duty to have unlimited capital).

First, Plaintiffs' allegation depends on a misleading, selective citation to Ms. Rothschild's interview, which Plaintiffs depict as showing that Apex "was not concerned" that it would be able to satisfy an increased collateral requirement.  Opp. 35 (citing 4th Compl. ¶ 87).  Ms. Rothschild made no such statement.  The full text of Ms. Rothschild's answer is provided below, and the full interview is provided at Pace Decl. Ex. 8 (ECF No. 491-9).

> We restricted the trading for approximately three hours on one day due to anomalous information that we got.  We were fine *by the end of the day*.  We have headroom in terms of the capital available to us on our balance sheet.  We have lines of credit that we can call on as needed.  We did stop the trading for three hours, and *then it was resolved* and we moved forward, and have not had any issues and have not looked back.  So I would say it was not a similar situation to Robinhood.

Pace Decl. Ex. 8 (emphasis added).

According to Plaintiffs, Apex owed a common law duty to Named Plaintiffs to organize its business to ensure that it would be in a position to agree to *every single trade* its introducing brokers sought to clear through it.  Such a duty amounts to a duty of ongoing and constant availability—a duty that is unsupported in law and counter to industry norms and the customer agreements.  *See supra* Section I.  Plaintiffs admit as much.  *See* Opp. 5 ("member broker-dealers do have discretion to refuse particular trades").

But even if this Court were to conclude Apex owed a common law duty to some investors, Named Plaintiffs do *not* allege that they themselves sought to, but were prevented from, trading.  *See* 4th Compl. ¶¶ 13–21, 104–113 (no allegations concerning attempts to trade); *see* Mot. §§ I.G (Causation), II (Article III Standing).  Plaintiffs seek to impose an even broader duty than the courts in *Courtland* and *Busch* rejected:  a duty to Named Plaintiffs that clearing brokers will accept *other investor's* trades.  Opp. 26–27 ("Apex is charged with breaching its duty of care to

customers . . . . by shutting down its entire platform, for hours, to prohibit all of its customers (direct and introduced) from purchasing in-demand stocks and options. . . .").  Such a duty to *Named Plaintiffs* to permit *others* to continue trading is plainly contrary to established New York and Texas law.

Nor can Plaintiffs avoid dismissal based on a broad claim that Apex owed a duty to "ensure that the trading platforms it provided and/or supported were sufficiently equipped to reliably deliver such services," and to "safeguard[] the investments of Plaintiffs and Class members by providing a platform and/or supporting a platform to execute trades."  4th Compl. ¶¶ 107–08. Clearing brokers and brokers for non-discretionary accounts do not owe such broad, ongoing common law duties to individual investors for unaccepted orders, because any such duties begin and end with accepted transactions.  *See* Sections I, II.B.  And "[c]ourts are not equipped to second-guess the business judgments of professional traders and brokers when it comes to risk assessments."  *Cap. Options Invs., Inc. v. Goldberg Bros. Commodities, Inc.*, 958 F.2d 186, 191 (7th Cir. 1992); *de Kwiatkowski*, 306 F.3d at 1306 (fiduciary duties begin only with accepted trades); *see also Press*, 988 F. Supp. at 386 (same).

### B. Plaintiffs' Proposed Duties, Including a New Common Law Duty to Follow FINRA Rules Proposed in Plaintiffs' Brief, Are Contrary to Well-Settled Law

#### 1. This Court Cannot Create a Novel Private Right of Action to Enforce FINRA Rules through State Law

Plaintiffs now claim that "Apex owed Plaintiffs the duty in common law tort to comply with FINRA rules" and that this Court may look to FINRA rules to establish whether Apex breached those FINRA-established duties.  Opp. 25–26.  Plaintiffs seek to enforce FINRA rules, and collect private damages, using state tort law.  *See, e.g.*, Opp. 49 ("In the case of Apex, the ***regulatory duty*** to put sufficient measures in place to continue to maintain an orderly market is undisputed . . . .  Apex had a ***duty of care as a registered broker-dealer*** and 'Apex failed to take reasonable steps to protect its customers and investors in times of market volatility[.]'") (emphasis added).[9]  Plaintiffs implicitly acknowledge that industry rules do not create a private right of action but insist that their proposed duty comes from New York common law.  Opp. 26.  As discussed

---

[9] Plaintiffs' assertion that their characterization of Apex's regulatory duties is "undisputed" mischaracterizes Apex's position.  This is the pleading stage.  Respectfully, until Plaintiffs state a claim, Apex will not have occasion to "dispute" Plaintiffs' many unfounded claims.

14

above, however, neither New York nor Texas law recognizes an ongoing duty of care that clearing brokers (or non-discretionary brokers) owe to introduced customers.  *See supra* Section I. Moreover, as discussed below, FINRA rules actually support the actions that Apex take, as FINRA acknowledge in a release after the events of January 2021.  For that reason alone, regardless of whether FINRA rules inform any standard of reasonableness, Plaintiffs' negligence claim fails.

Moreover, New York courts expressly have rejected Plaintiffs' theory of common law negligence liability for failure to abide by industry regulations (such as the FINRA rules on which Plaintiffs rely).  In *Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, the Southern District of New York dismissed the plaintiff's negligence claim that the defendant securities broker failed to act reasonably by failing to adhere to FINRA rules, on the ground that plaintiffs "cannot circumvent the lack of a private right of action for violations of industry rules merely by recasting [their] claim as a violation of a common law duty."  464 F. Supp. 3d 634, 645–46 (S.D.N.Y. 2020). In dismissing the plaintiffs' claims, the court relied upon *In re Series 7 Broker Qualification Exam Scoring Litig.*, in which the D.C. Circuit rejected a nearly identical argument:

> [Plaintiffs] insist their state law claims based on negligence and breach of contract are permissible. . . .  Whether analyzed under preemption doctrine or a theory of regulatory immunity, the result is the same:  ***plaintiffs cannot raise a common law complaint against defendants based on duties arising under the Exchange Act***.

548 F.3d 110, 113 (D.C. Cir. 2008) (emphasis added); *see also Bank of America, N.A. v. Cartwright*, 2021 WL 3912563, at *9 (N.D. Ind. Sept. 1, 2021) ("Mr. Cartwright can't circumvent this law by disguising his FINRA claim as a negligence claim.").  Plaintiffs do not cite a single case under New York law—the law they argue governs here—that supports their argument that New York common law imposes a general duty to abide by FINRA rules.

### 2.   Plaintiffs Fail to Allege in Their Fourth Complaint that Apex Owes a Duty to Plaintiffs to Follow FINRA Rules or that Apex Violated Any Such Rules

Even if FINRA rules may be used to inform the standard of reasonableness, and even if this Court were to conclude that Apex owed Named Plaintiffs a duty of care to abide by FINRA rules, Plaintiffs fail to allege any *facts* that would support an inference that Apex violated any such rules.  *See* Mot. 25–32 (summarizing failure to allege breach of reasonable duty of care).

The Eleventh Circuit has made clear that plaintiffs cannot use an opposition brief to amend a complaint.  *Burgess*, 600 F. App'x at 665 ("We repeatedly have held that plaintiffs cannot amend their complaint through a response to a motion to dismiss."); *see also Humphrey v. Hollywood*

15

*Police Dep't*, 2019 U.S. Dist. LEXIS 35022, at *5 (S.D. Fla. Mar. 4, 2019) ("'[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.'").

Plaintiffs do not allege in the Fourth Complaint that Apex owed a common law duty to Plaintiffs to abide by FINRA rules, as they now claim; rather, the complaint paragraphs on which Plaintiffs rely merely recite the existence of FINRA rules.  Opp. 25–26 (citing 4th Compl. ¶¶ 40, 44–45, 51).  In particular, Plaintiffs recite in their Fourth Complaint the following FINRA rules and notices, which generally deal with disaster recovery and information technology (IT) issues, or generalized risk management:

- **Rule 2010:**  "[I]n the conduct of its business, [a brokerage] shall observe high standards of commercial honor and just and equitable principles of trade."

- **Rule 3110**, which Plaintiffs allege requires brokers to "establish, maintain, and enforce a supervisory system, which includes monitoring its technology and other risks, including credit and other systemic risks."

- **Rule 4370**, which Plaintiffs allege requires brokers to "engage in continual risk management to ensure continuation of its trading and financial 'mission critical systems.'"

- **Regulatory Notice 21-12**, which states, "Member firms should maintain ***strong procedures***, thoughtfully crafted in advance, to ***reasonably*** ensure that they can continue to provide investors access to the securities markets during times of extreme market volatility," which include "liquidity management practices."

4th Compl. ¶¶ 44–46 (emphasis added).  Not one of the FINRA rules Plaintiffs cite, nor the Net Capital Rule, 17 C.F.R. § 240.15c3-1, imposes an open-ended duty of a broker to accept all trades.

In fact, Plaintiffs omit the relevant passage of the FINRA Regulatory Notice 21-12 (March 18, 2021), which even after the January 28, 2021 events confirms the long-standing common law rule that brokers *do not* have an open-ended duty to accept customer orders to buy stock:

> Member firms are ***not obligated to receive or accept orders from customers*** where the firms believe that the associated compliance or legal risks are unacceptable and there may be situations where firms determine they must change their order handling procedures ***to restrict the entry or acceptance of customer orders to limit the firm's exposure to extraordinary market risk***.

AMERICAS 115002216

FINRA, Regulatory Notice 21-12 at 3 (March 18, 2021) (emphasis added).[10]

The actual FINRA guidance, that brokers can reject customer orders, is very similar to the SEC's 2021 guidance that brokers may reject customer orders:

> *[B]roker-dealers may reserve the ability to reject or limit customer transactions*. This may be done for legal, compliance, *or risk management reasons*, and is typically discussed in the customer account agreement.  In certain circumstances, broker-dealers may determine not to accept orders where a transaction presents certain associated compliance or legal risks.[11]

The actual FINRA and SEC guidance is entirely consistent with the conduct Plaintiffs challenge.

Moreover, Plaintiffs fail to plead any facts plausibly suggesting that Apex violated any rule.  *Twombly*, 550 U.S. at 555.  Plaintiffs' allegation that "Apex undertook the extraordinary measures on January 28, 2021 of suspending trading in the Suspended Stocks without a plan reasonably designed to correlate its supposed reduction of risk to its extraordinary action," 4th Compl. ¶ 68, is exactly the type of conclusion the Supreme Court has held cannot survive a motion to dismiss.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Twombly*, 550 U.S. at 555–56.

Similarly, the Fourth Complaint does not contain any factual allegations that Apex did not "establish, maintain, and enforce a supervisory system," nor that Apex failed to "engage in continual risk management," nor that Apex failed to "maintain strong procedures" or "liquidity management practices."  And Plaintiffs do not allege any facts that Apex actually violated the Net Capital Rule; to the contrary, the trading restrictions Apex put into place were designed to ensure that Apex would be able to comply with the Net Capital Rule.  Plaintiffs' bare assertion that violations of such rules "can be used as evidence of negligence," without any factual matter that Apex actually violated such rules, cannot state a claim.  4th Compl. ¶ 49; *Twombly*, 550 U.S. at 556.  Nor does Plaintiffs' allegation that Apex temporarily halted purchases of three of the meme stocks for three and a half hours plausibly plead a violation of these rules.  *Iqbal*, 556 U.S. at 682 (allegations not plausible in light of "obvious alternative explanation"); *see also Am. Dental Ass'n*

---

[10]  Available  at  https://www.finra.org/sites/default/files/2021-03/Regulatory-Notice-21-12.pdf (last accessed Nov. 19, 2021).

[11] U.S. Securities and Exchange Commission, *Thinking About Investing in the Latest Hot Stock?: Understand the Significant Risks of Short-Term Trading Based on Social Media*, Investor Alerts and  Bulletins  (Jan.  30,  2021),  available  at  https://www.sec.gov/oiea/investor-alerts-and-bulletins/risks-short-term-trading-based-social-media-investor-alert (last accessed Nov. 19, 2021).

AMERICAS 115002216

*v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) ("[C]ourts may infer from the factual allegations in the complaint 'obvious alternative explanation[s],' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer.").

### III.   Plaintiffs' Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing Fails Because the Apex Customer Agreement Expressly Permits Apex to Decline to Execute Trades at Any Time and for Any Reason

To defend their claim for breach of the implied covenant of good faith and fair dealing, Plaintiffs do little more than repeat the allegations in their Fourth Complaint that the Customer Agreement imposes an implied covenant not to "do anything which will have the effect of destroying or interfering with the right of the other party to receive the benefits of the agreement." Opp. 44. But Plaintiffs never address Apex's argument that Plaintiffs' proposed implied covenant directly contradicts the express provision in the Customer Agreement that permits Apex to "refuse to execute securities transactions" for Plaintiffs "at any time and for any reason." Pace Decl. Ex. 1 (ECF No. 491-2) at 3; *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 304 (1983); *see also Nat'l Union Fire Ins. Co. of Pitt., Pa. v. Xerox Corp.*, 25 A.D.3d 309, 310 (N.Y. App. Div. 2006) (ordering dismissal because "[t]he covenant of good faith and fair dealing cannot be construed so broadly as to effectively nullify other express terms of the contract, or to create independent contractual rights"). And Plaintiffs' theory that an implied covenant exists because Apex "directly interfered with the rights of Plaintiffs by selling them securities . . . [and then] imposing and then maintaining the Market Shutdown" ignores that, even if that theory were viable, Plaintiffs never allege that Apex actually sold Named Plaintiffs any of the at-issue meme stocks—through introducing brokers or otherwise. *See* 4th Compl. ¶¶ 14–20. Thus, even under Plaintiffs' own reading of New York law, this claim fails.[12]

Because a claim for breach of the implied covenant of good faith and fair dealing is based in contract, that claim should be governed by laws chosen by the parties to the Customer

---

[12] Plaintiffs also argue that the Fourth Complaint does not allege an enforceable contract. *See* Opp. 35, 46. While the Customer Agreement alleged in the Fourth Complaint and forming the basis for Plaintiffs' claims is very much an enforceable contract, *see* 4th Compl. ¶¶ 96–97, 124, such an argument is self-defeating for Plaintiffs' claim for breach of the implied covenant under New York law, which requires an underlying contract for a viable claim. *See Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004) ("In New York, breach of the implied duty of good faith and fair dealing is merely a breach of the underlying contract." (internal quotations omitted)).

AMERICAS 115002216

Agreement, which in this case is Texas law. *See Anaheim Indus.*, 2007 Tex. App. LEXIS 9950, at *6, 18 (applying contract's choice of law provision for analysis of breach of implied covenant of good faith and fair dealing claim); *Luxus Aviation*, 91 A.D.3d at 570 (same); *Deloitte (Cayman) Corp. Recovery Servs., Ltd. v. Sandalwood Debt Fund A, LP*, 31 Misc. 3d 1225(A), at *3 (N.Y. Sup. Ct. 2011) (same); Pace Decl. Ex. 2 (ECF No. 491-3) at ¶ 15. Plaintiffs admit that Texas law does not recognize an implied covenant claim absent a "special relationship," which Plaintiffs simply assert exists without factual support. Opp. 44–45. That is unsurprising, as Texas courts "recognize only one special relationship—that between an insurer and an insured." *See Hux v. S. Methodist Univ.*, 819 F.3d 776, 781 (5th Cir. 2016).

## IV.   Plaintiffs' Tortious Interference Claim Fails under Both New York and Texas Law, Particularly Where No Contract Is Alleged

Plaintiffs argue that Apex tortiously interfered with their "business relationship" with their introducing brokers by "shuttering the Introducing Brokers' trading platform for hours so as to prohibit purchases of the Suspended Stocks." Opp. 45. While Plaintiffs claim to "recogn[ize] . . . the fact that Plaintiffs had customer agreements with the Introducing Brokers," Fourth Compl. ¶ 129, the only agreement Plaintiffs cite is the agreement between Apex and Named Plaintiffs. *See* Opp. 46, citing Pace Decl. Ex. 2 (ECF No. 491-3). Plaintiffs do not provide the actual customer agreements with their introducing brokers Webull and Ally, nor do they summarize the terms of those agreements. Absent any indication of what "legal rights" Plaintiffs claim their agreements with Webull and Ally provide, Plaintiffs fail to plausibly allege that Apex's conduct interfered with those rights. Opp. 46 (citing 4th Compl. ¶¶ 129–30).

Moreover, Plaintiffs have failed to plead elements essential to their claims, both under Texas and New York law. Under Texas law, Plaintiffs must allege that an "obligatory provision of [a] contract was breached" to state a claim for tortious interference with an existing contract. *See Duradil, L.L.C. v. Dynomax Drilling Tools, Inc.*, 516 S.W.3d 147, 168 (Tex. App. 2017). But as discussed above, they fail to do so.

Plaintiffs attempt to rewrite Texas tort law to include an amorphous cause of action that imposes liability based on an "unjust act by 'someone' getting in the way of business dealing with another party," by citing two Texas cases: *First National Bank* and *Clements*. Opp. 46, citing *First Nat'l Bank of Eagle Pass v. Levine*, 721 S.W.2d 287 (Tex. 1986); *Clements v. Withers*, 437 S.W.2d 818, 821 (Tex. 1969). But those cases do not recognize such an amorphous cause of action under

AMERICAS 115002216

Texas law.  *First National Bank* addresses only the statute of limitations (using the analogy to claims for trespass to identify the proper limitations period), and *Clements* was about a tortious interference with an oral contract that did not meet the statute of frauds' written instrument requirement, where the specific terms of the oral agreement were evaluated by the court.  Neither applies here.  Moreover, since *First National Bank* and *Clements*, Texas courts have observed that "[t]he theory of tortious interference with business relations by a third person includes two causes of action:  (1) tortious interference with existing contracts, and (2) tortious interference with prospective contractual relations."  *Dunn v. Calahan,* 2008 Tex. App. LEXIS 9498, at *8 (Tex. App. Dec. 17, 2008) (citing *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 689 (Tex. 1989)).  Plaintiffs do not allege tortious interference with prospective contractual relations.  Thus, Plaintiffs' claim must be evaluated as a claim for "tortious interference with existing contracts," *id.*, and so their failure to allege an obligatory term that Apex induced Introducing Brokers to breach is fatal to their claim. *Duradil*, 516 S.W.3d at 168.

Plaintiffs also argue they have stated a claim under New York law because "Plaintiffs have pled that by directing the shutdown of the Introducing Broker's trading platform, Apex engaged in 'wrongful conduct' by preventing Plaintiffs and members of the Class from being able to purchase the Suspended Stocks from the Introducing Brokers."  Opp. 45.

Putting aside Plaintiffs' mischaracterization of the allegations in their complaint, Plaintiffs' claim that they meet the "wrongful conduct" element for tortious interference with an ongoing business relationship under New York law is simply incorrect.  Opp. 45–46.  In the New York Court of Appeals' landmark case on tortious interference with economic relations, *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, the court held that a plaintiff must prove that the defendant used "***wrongful means***" to interfere with plaintiffs' business relationship.  50 N.Y.2d 183, 191 (1980).  The "wrongful means" in *Guard-life* were "'physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure.'" *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 87 N.Y.2d 614, 624 (1996) (quoting *Guard-Life*, 50 N.Y.2d at 191).

Plaintiffs represent to this Court that their "claim has been found to be viable under New York law by the New York Court of Appeals in *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 189 (2004)," and that their allegations that Apex committed two independent torts—negligence and breach of fiduciary duty—are sufficient to constitute "wrongful conduct."  Opp. 46.  So Plaintiffs

AMERICAS 115002216

concede that their tortious interference claims depend upon the success of their negligence and breach of fiduciary claims.  Plaintiffs also concede in a footnote that their theory has no support in the case law; it is just that it has not been explicitly rejected yet.  Opp. 46 n.32 ("The Court of Appeals explicitly left open the question as to whether the type of conduct engaged in by Apex rises to the level of culpable conduct.").  Indeed, Plaintiffs do not cite a single case that has held that breach of fiduciary duty or mere negligence constitutes sufficiently "culpable conduct" to sustain a claim for tortious interference with economic relations.  And the New York Court of Appeals stated in *Carvel* that "[t]he sort of 'more culpable' conduct we had in mind in *NBT* was described in *Guard-Life*," which does not include in its litany of crimes and torts either negligence or breach of fiduciary duty.  *Carvel*, 3 N.Y.3d at 191.  Thus, the court's statement in *Carvel* precludes this Court from holding that mere negligence or breach of fiduciary duty is the sort of "wrongful conduct" necessary to sustain a tortious interference claim under New York law.

## V.    Plaintiffs Remaining Arguments Are Meritless

### A.   Plaintiffs Fail to Plausibly Plead Causation or Article III Standing

Plaintiffs disclaim their earlier pleading describing coordinated trading in online discussions intended to pump up the prices of meme stocks to create a short squeeze (the Plaintiffs' chosen name for this litigation).  Mot. 4–6, 21.  But in the absence of such coordinated trading, Plaintiffs cannot plausibly allege that the price of the meme stocks would have continued to rise. Predicting the price path of stocks in times of unprecedented market volatility is an exercise in pure speculation.  Mot. 33–35.  Moreover, Plaintiffs' claims are based on alleged lost value in the meme stocks named Plaintiffs held, which requires speculation as to when, and at what price, Plaintiffs would have sold their stock in the but-for world.  Plaintiffs make no non-speculative allegations as to what they would have done in the but-for world.  *See* 4th Compl. ¶¶ 16, 20.  Absent plausible, non-speculative allegations that the Named Plaintiffs would have timed the market correctly and sold their stock at a greater profit, Plaintiffs have failed to allege any injury in fact and thus lack Article III standing.  *See In re Merrill Lynch & Co. Research Reps. Sec. Litig.*, 568 F. Supp. 2d 349, 363 (S.D.N.Y. 2008) (dismissing for lack of causation where plaintiffs failed to untangle loss due to defendant's behavior from losses caused by overall economic conditions unrelated to defendant's behavior).

Plaintiffs contrive an argument that Apex's temporary trading restriction was designed to depress the price of the meme stocks.  Opp. 3, 27.  But, even by Plaintiffs' own admission, Apex's

21

three-and-a-half hour trading restriction was caused by the unprecedented *volatility* in the market. 4th Compl. ¶¶ 5, 37, 61, 69, 109.  Plaintiffs offer no facts in support of their wild accusation that Apex intended to affect the price of the at-issue meme stocks, and a claim based on such conclusory and speculative allegations cannot survive a motion to dismiss.  *Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level."); *see also id.* (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235–36 (3d ed. 2004) ("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action.")).

Plaintiffs attempt to muddy the water by arguing that Apex's standing argument is better addressed at the class certification stage.  Opp. 17–19.  But the applicable rule here is simple:  This Court may consider the claims of only the *named plaintiffs* when considering whether the Plaintiffs have Article III standing to assert their claims.  *Warth*, 422 U.S. at 502.  Plaintiffs Chavez and Jang are introduced customers, to whom Apex owes no duties outside of any given transaction, and who have not alleged that they intended to purchase additional meme stocks but were prevented from doing so by Apex.  The Fourth Complaint must rise and fall with the fate of the *named plaintiffs'* claims. *Griffin v. Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1987) ("a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim").  Therefore, whether other potential class members (such as direct customers of Apex) potentially could assert injury or a claim for negligence, breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, or tortious interference is simply not something that this Court need consider.  Lacking Article III standing to bring their own claims, Plaintiffs Chavez and Jang may not bootstrap their claims using the potential standing of unnamed and unidentified absent class members.

## B. Plaintiffs' Complaint is Preempted Because it Seeks to Enforce Securities Laws through Conflicting State Tort Law

Plaintiffs assert that the holding in *Appert* cited by Apex—that "an investor cannot sustain a breach of contract claim against a broker-dealer for violation of an exchange rule"—is "unremarkable and irrelevant."  Opp. 47 n.34, discussing *Appert v. Morgan Stanley Dean Witter, Inc.*, 2009 WL 3764120, at *4 (N.D. Ill. Nov. 6, 2009)).  But *Appert* is directly on point, because it rejects the plaintiffs' common law breach of contract action on the precise ground at issue here: "Because Plaintiff may not bring **a common law cause of action** based on the violation of

22

exchange rules, for which Congress had not intended to create a private right of action, her breach of contract claim must be dismissed." *Appert*, 2009 WL 3764120, at \*4.  The same is true here. Plaintiffs seek to enforce a "***regulatory duty*** to put sufficient measures in place to continue to maintain an orderly market" through their common law negligence, breach of fiduciary duty, implied covenant of good faith and fair dealing, and tortious interference claims.  Opp. 49 (emphasis added).  But those rules and regulations do not create a private right of action, and as such, Plaintiffs' claims are preempted and must be dismissed.  *See* Mot. 15, 25.

Plaintiffs incorrectly claim that Apex seeks to "bootstrap itself into the legal protections afforded to an SRO," Opp. 47, but Plaintiffs mischaracterize Apex's argument.  Apex does not claim that it should be afforded immunity akin to an SRO.  Rather, Apex merely asks this Court to apply the same rule that the court in *Valelly* applied with respect to a securities broker, namely, that Plaintiffs "cannot circumvent the lack of a private right of action for violations of industry rules merely by recasting her claim as a violation of a common law duty."  *Valelly*, 464 F. Supp. 3d at 645–46.  In dismissing the Plaintiff's negligence claim, the court in *Valelly* relied on the holding in *In re Series 7 Broker Qualification Exam Scoring Litig.* that Plaintiffs could not maintain claims "derived from duties created at common law" where the claims were "nothing more than disguised actions to enforce regulatory duties" because such actions are preempted by the Exchange Act.  *Id.* (citing *In re Series 7 Broker Qualification Exam Scoring Litig.*, 510 F. Supp. 2d 35, 47 (D.D.C. 2007), aff'd, 548 F.3d 110 (D.C. Cir. 2008)).  The same rule applies here. Plaintiffs' common law claims to enforce their interpretation of Apex's "regulatory dut[ies]" (Opp. 49) under FINRA rules—which they purport to bring on behalf of any and all investors in meme stocks—are preempted.

## C. Absent a "Special Relationship," New York Law Precludes Tort Claims for Purely Economic Losses

Plaintiffs argue that, with respect to the rule barring recovery for purely "economic losses," New York law applies.  Opp. 32.  Even assuming New York law applies, Plaintiffs admit that under New York law "the touchstone" is "whether Apex owes a duty to Plaintiffs."  Opp. 32.  In *AMBAC Assur. Corp. v. U.S. Bank N.A.*, the court stated that "[u]nder the economic loss doctrine, a defendant is not liable in tort for purely economic loss ***unless*** the plaintiff demonstrates that the ***defendant owed a duty, which 'may arise from a special relationship***[.] . . . to protect against the risk of harm to plaintiff.'"  328 F. Supp. 3d 141, 159 (S.D.N.Y. 2018) (emphasis added).  But

23

Plaintiffs offer no explanation as to why Apex's role as Plaintiffs' clearing broker creates the type of "special relationship" that would create a duty to protect speculators from the risk of loss in value of their investments.  The reasons are simple:  as discussed above, Apex simply does not owe any ongoing fiduciary or other common law duties to Plaintiffs, and certainly no duty to protect the value of Plaintiffs' investments.  *See supra* Sections I–II.  Consequently, Plaintiffs have not alleged any facts describing any "special relationship" that would "define[] the class of potential plaintiffs to whom the duty is owed."  *See 532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 289, 292 (2001) (dismissing negligence claims for economic loss alone, where such claims "fall beyond the scope of the duty owed them by defendants").  Quite to the contrary, Plaintiffs would have their proposed duties apply to every investor in meme stocks, regardless of whether such investors had any connection to Apex.  Opp. 47–49.  Because Plaintiffs fail to allege any "special relationship" between Apex and Plaintiffs Chavez and Jang, Plaintiffs may not recover for purely economic losses, and their negligence and breach of fiduciary duty claims must fail.  *See 532 Madison Ave.*, 96 N.Y.2d at 292.

### D.  This Court Should Reject Plaintiffs' Invitation to Use New York Tort Law to Create Unlimited Negligence Liability

Plaintiffs take the extraordinary position that this Court should make law and create a New York state common law cause of action for negligence against a clearing broker by *any investor* in the stock market, regardless of whether that investor used that clearing broker.  Opp. 47–49. Indeed, Plaintiffs advocate, without any New York precedent, that this Court should expand tort liability under New York law to virtually limitless claimants:  "Apex was not and should not be free to cause consequential damage to all investors as a result of its appalling misconduct that foreseeably affected the price of the Suspended Stocks—no matter who held them."  Opp. 48.

Instead of citing relevant and good law, Plaintiffs cite Georgia law that has been overruled by the Georgia Supreme Court on this exact issue.  *See* Opp. 48, citing *Bradley Center, Inc. v. Wessner*, 250 Ga. 199, 200–201 (1982), and *In re Equifax, Inc. Customer Data Sec. Breach Litig.*, 362 F. Supp. 3d 1295, 1325 (N.D. Ga. 2019).  In 2019, the Georgia Supreme Court held:

> [T]he language in *Bradley Center* on which McConnell relies was not a holding concurred in by a majority of this Court, was not supported by the only authority that the lead opinion cited, was not a correct statement of the law, did not control the result in that case (which was based on a "special relationship" between the plaintiff and the defendant), and has never been endorsed in a decision of this Court that qualifies as precedent.  Accordingly, we hereby disapprove *Bradley Center* to

24

the extent that it created a general legal duty "to all the world not to subject [others] to an unreasonable risk of harm."

*Dep't of Lab. v. McConnell*, 305 Ga. 812, 816 (2019); *see also Purvis v. Aveanna Healthcare, LLC*, 563 F. Supp. 3d 1360, 1368 (N.D. Ga. 2021) (noting that *Equifax* "relied significantly on *Bradley Center*—and specifically the statement that, under Georgia law, one owes a general duty "to all the world not to subject [others] to an unreasonable risk of harm"—to find that a duty existed under Georgia law in the data breach context).

The New York Court of Appeals rejected a similar argument in *Hamilton*:

The injured party must show that a defendant owed ***not merely a general duty to society*** but a ***specific duty to him or her***, for "[w]ithout a duty running directly to the injured person there can be no liability in damages, however careless the conduct or foreseeable the harm."

96 N.Y.2d at 232 (internal citations omitted).  Plaintiffs' claim that these duties arise out of Apex's status "as a broker-dealer" is similarly misplaced, because it is well-established that "[s]ecurities brokers do not owe a general duty of care or disclosure to the public simply because they are market professionals."  *Kolbeck v. LIT Am.*, 923 F. Supp. 557, 571–72 (S.D.N.Y. 1996).

## CONCLUSION

For the reasons set forth above and those stated in support of Apex's Motion to Dismiss, this Court should GRANT Apex's Motion to Dismiss with Prejudice.

Dated:  July 13, 2022

By:  */s/* Jack E. Pace III

Jack E. Pace III
Bryan D. Gant
**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, NY  10020
Tel:  (212) 819-8200
Fax:  (212) 354-8113
jpace@whitecase.com
bgant@whitecase.com

J. Mark Gidley
**WHITE & CASE LLP**
701 Thirteenth Street, N.W.
Washington, D.C.  20005

AMERICAS 115002216

Tel:  (202) 626-3600
Fax:  (202) 639-9355
mgidley@whitecase.com

Angela Daker
**WHITE & CASE LLP**
200 South Biscayne Blvd.
Suite 4900
Miami, FL  33131
Tel:  (305) 371-2700
Fax:  (305) 358-5744
adaker@whitecase.com

*Counsel for Defendant*
*Apex Clearing Corporation*

26

**Certificate of Service**

I HEREBY CERTIFY that, on July 13, 2022, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF filing system.  I further certify that this motion was served on all counsel of record via transmission of the Notice of Electronic Filing generated by the Court's CF/ECF System.

*/s/* Jack E. Pace III
Jack E. Pace III

AMERICAS 115002216