**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-2989-MDL-ALTONAGA/Torres**

In re:

**JANUARY 2021 SHORT SQUEEZE**
**TRADING LITIGATION**
_____/

This Document Relates to the Securities Tranche

## ORDER

**THIS CAUSE** came before the Court on Defendants, Robinhood Markets, Inc.; Robinhood Financial, LLC; and Robinhood Securities, LLC's (collectively, "Robinhood['s]") Motion to Dismiss the Federal Securities Tranche Complaint [ECF No. 449], filed on January 7, 2022. Plaintiffs filed a Response [ECF No. 454], to which Defendants filed a Reply [ECF No. 455]. The Court has carefully considered the Consolidated Class Action Complaint ("CCAC") [ECF No. 446], the parties' written submissions, the record, and applicable law. For the following reasons, the Motion is granted in part and denied in part.

## INTRODUCTION

In January 2021, market volatility prompted regulators to raise deposit requirements for clearing brokers, including Robinhood, to ensure that they could cover the costs of unexecuted trades. Robinhood could not afford the new deposit requirements and sought another way to appease regulators. It succeeded after regulators agreed to waive the deposit requirements so long as Robinhood restricted its customers' access to certain stocks.

What followed is disputed, but Plaintiffs characterize it as market manipulation. While Robinhood agreed to restrict access to certain stocks, it did not want knowledge of its lack of liquidity to become widespread because such information might undermine Robinhood's

credibility with customers and investors alike.  To divert the public's attention away from Robinhood's lack of liquidity, Robinhood blamed market volatility for its restrictions and vehemently denied any trouble with its own liquidity.

Now, Robinhood asks the Court to dismiss the pleading setting forth Plaintiffs' market manipulation theory.  It relies on the unconventional nature of the theory, among other reasons, as a basis for dismissal.  Plaintiffs, in contrast, argue that irrespective of the theory's unconventional nature, it is sufficient that Robinhood's alleged actions artificially affected supply and demand, thereby depriving investors of an accurate picture of the market.  The Court agrees with Plaintiffs and explains further below.

## BACKGROUND

### I.    Robinhood's History

In the wake of the Occupy Wall Street protests, Vlad Tenev and Baiju Bhatt came up with an idea to democratize finance: Robinhood.  (*See* CCAC ¶ 31).  The two Robinhood founders set out to create an application-based trading platform that would give anyone with a smart phone access to public markets.  (*See id.* ¶ 2).  Its users joined a growing trend of lay traders, also known as retail investors, who use online brokerage firms to trade securities.  (*See id.* ¶¶ 2, 5, 8, 35, 37).  With Robinhood leading the pack, the online retail trading industry exploded, bringing markets to consumers' fingertips.  (*See id.* ¶ 35).

Democratizing finance proved to be extremely lucrative.  Robinhood earned millions of dollars from a system called "payment for order flow" ("PFOF").  (*Id.* ¶ 32 (quotation marks omitted)).  PFOF is a revenue model whereby customers bid on securities through their brokerage platform, but instead of taking the bid directly to an exchange, like the New York Stock Exchange (NYSE) or NASDAQ, the broker brings the bid to a market maker.  (*See id.*).  Market makers

stand ready to buy or sell securities but typically respond to the bid with an ask price that, if accepted, decreases or increases the return for the customer. (*See* Robinhood Fin., LLC, Securities Act Release No. 10906, Exchange Act Release No. 90694, 2020 WL 7482170, at *3 (Dec. 17, 2020)).[1]   High volume trading makes PFOF extremely lucrative because market makers compensate brokers for routing their customers' orders to them — hence "payment for order flow." (*See* CCAC ¶¶ 32, 49).   For example, in 2020, Citadel Securities, a market maker, paid Robinhood $326 million, up from $80.5 million in 2019. (*See id.* ¶ 49).

Market makers also route the trading data from Robinhood's platform to high-frequency traders ("HFTs").   (*See id.* ¶¶ 3, 33 n.9).   HFTs use algorithms that automatically trade based on existing trends. (*See id.* ¶ 30 n.5).   Upon receiving bid data from market makers, HFTs front-run the bid, anticipating the effect of the bid on the security's price before the transaction is consummated. (*See id.* ¶¶ 3, 30 n.5, 31, 34).

Robinhood's popularity also reflected the growing trend of retail trading during the COVID-19 pandemic. (*See id.* ¶ 35).   Retail investors convened on social media sites, like Reddit and Stockwit, "to discuss investment strategy and the merits of trading in particular stocks." (*Id.*).

By December 2020, Robinhood claimed "to have opened nearly 50% of all retail brokerage accounts in the past five years" and had a total of 12.5 million online accounts. (*Id.* ¶ 5 (footnote call number omitted)).   Before Robinhood would go on to add another 3 million accounts in January 2021, the press reported in December that Robinhood had selected Goldman Sachs to manage Robinhood's initial public offering in 2021. (*See id.* ¶¶ 5, 39 (citation omitted)).

---

[1] Federal Rule of Evidence 201(b)(2) allows the Court to take judicial notice of the Securities & Exchange Commission's ("SEC['s]") cease-and-desist order, as well as other SEC publications.

## II.    The Short-Squeeze Crisis

Several prominent investors planted seeds of crisis in November 2020, when they purchased shares in what became known as "meme stocks" or the "Affected Stocks."[2]  (*Id.* ¶¶ 4, 40 (quotation marks omitted)).  The investments pitted these well-known investors against several hedge funds that took short positions in the meme stocks.  (*See id.* ¶¶ 35, 40, 43).  Melvin Capital was one such hedge fund that took a short position in GameStop.  (*See id.* ¶ 43).

Short positions derive from a belief that the price of a security is overvalued and will eventually fall.  To capitalize on this hunch, investors, known as short sellers, purchase a "short." (*See id.* ¶¶ 40–43, 70–72).  The mechanics of a short are as follows: (1) an investor identifies a security that it wants to short, such as a stock, and deposits capital, or margin, into a brokerage account to cover the risk of loss associated with the short; (2) a lender loans the security to the investor; (3) upon receiving the borrowed security, the investor sells it for a high price; and (4) the investor waits until the anticipated drop in share price occurs and then repurchases the stock for less than she sold it.  (*See* Jan. 26, 2022 Order [ECF No. 453] 3 [hereinafter "Robinhood Tranche Order"]).

Short positions may bear substantial risk.  (*See, e.g.*, CCAC ¶¶ 41–43).  If the stock price rises a little, the short seller loses money.  (*See, e.g.*, *id.* ¶ 41).  If the stock price rises a lot, the broker may issue a margin call, which requires that the short seller deposit more capital into its brokerage account to minimize the risk of the rising stock.  (*See id.* ¶¶ 38, 38 n.18, 42; *see also* SEC, *Staff Report on Equity and Options Market Structure Conditions in Early 2021*, at 26 (Oct. 28, 2021), https://www.sec.gov/files/staff-report-equity-options-market-struction-conditions-

---

[2] The "Affected Stocks" include AMC Entertainment Holdings, Inc. ("AMC"); Bed Bath & Beyond Inc. ("BBBY"); BlackBerry Ltd. ("BB"); Express Inc. ("EXPR"); GameStop Corp. ("GME"); Koss Corp. ("KOSS"); Tootsie Roll Industries Inc. ("TR"); and American Depositary Shares of foreign-issuers Nokia ("NOK") and trivago N.V ("TRVG").  (*See* CCAC ¶¶ 1, 128).

early-2021.pdf ("SEC Staff Report"))).  If the stock price continues to rise with no end in sight, short sellers will capitulate and purchase the stock to cover their losses.  (*See* CCAC ¶ 43).  This pattern results in a vicious cycle known as a short squeeze: (1) a stock's price rises; (2) short sellers purchase the stock to cover their losses; (3) short sellers' capitulation causes the stock price to rise further; (4) and other short sellers are forced to purchase the stock; (5) sending the stock price rising even further, and so on.

After noticing the contest between hedge funds and other investors, retail investors rallied against the hedge funds.  (*See id.* ¶¶ 40–41).  Using a sub-Reddit thread called WallStreetBets as a collective action platform, retail investors purchased millions of shares of GME, sending the stock price soaring.  (*See id.* ¶¶ 35, 40–43).

GME closed at $43.03 on January 21, 2021.  (*See id.* ¶ 41).  Twenty-four hours later, it closed at $65.01.  (*See id.*).  By January 27, the share price reached $347.51.  (*See id.* ¶ 121).  The skyrocketing share price created a short squeeze, which forced hedge funds, like Melvin Capital, to take short positions in GME to quickly cover their losses.  (*See id.* ¶ 43).  Despite receiving two loans for $750 million and $2 billion each, Melvin Capital had to close out its short position.  (*See id.*).

### III.    Robinhood's Reckoning: January 28 – February 2, 2021

Hedge funds were not alone.  The short squeeze forced Robinhood to reckon with its newfound popularity.  Specifically, the short squeeze created volatile market conditions that forced the National Securities Clearing Corporation ("NSCC") to impose higher collateral requirements on Robinhood (*see id.* ¶ 58) — requirements that Robinhood could not meet.

Before delving into how the collateral requirements affected Robinhood, it is worth pausing to explain the NSCC's role in this matter.  The NSCC is a national clearing agency regulated by

the SEC that provides services to its clearinghouse members, including Robinhood Securities.  (*See* Robinhood Tranche Order 3 n.7).  Among its services, the NSCC guarantees that clearinghouses will complete securities transactions.  (*See id.*).  To ensure that it can guarantee the transaction, the NSCC imposes collateral requirements on its members.  (*See id.*).  These collateral requirements create the capital necessary for clearinghouses to complete a trade.  (*See id.*).  The NSCC imposes higher collateral requirements for volatile stocks.  (*See* CCAC ¶¶ 12, 58).

Market volatility affects two components of the collateral requirements: the core clearing fund charge and excess capital premium charge.  (*See id.* ¶¶ 58–59).  The core clearing fund charge also encompasses a value at risk ("VaR") charge, which the NSCC calculates based on the estimated risk in the member's portfolio.  (*See id.* ¶ 58).  The excess capital premium charge is the difference between the member's excess net capital and its core clearing fund charge.  (*See id.*). "The more the core charges exceed the member's capital cushion, the larger the [excess] capital premium charge.  To avoid incurring the latter charge the member must either reduce the level of risk or raise additional capital."  (*Id.* (alteration added; footnote call number omitted)).

Robinhood knew that its collateral requirements would rise.  (*See id.* ¶¶ 44–47).  Not only had it become the most downloaded application on the App Store (*see id.* ¶ 47), it also predicted having to raise margin requirements on its users (*see id.* ¶ 42).  It was right.

Robinhood raised margin requirements for GME to 80% on January 26, 2021.  (*See id.* ¶ 47).  Later that day, Jim Swartwout, Robinhood Securities' President and Chief Operating Officer, told his staff that he "sold [his] AMC today.  FYI — tomorrow morning we are moving GME to 100% — so you are aware."  (*Id.* ¶ 47 n.24 (alteration added; citation and quotation marks omitted)).  Sure enough, on January 27, 2021, Robinhood moved GME to 100% margin.  (*See id.* ¶ 47).  Despite its efforts, Robinhood knew its collateral requirements would still rise.

On January 28, 2021, in anticipation of the NSCC's deposit requirements, Robinhood imposed a position closing only ("PCO") restriction on GME and AMC options with an expiration of January 29, 2021. (*See id.* ¶ 52). This meant that option holders could only sell their options. Despite Robinhood's preemptive attempt to decrease its deposit requirements, the NSCC requested that Robinhood deposit $3.7 billion to ensure that it could complete its unsettled trades. (*See id.* ¶ 58).

The $3.7 billion deposit proved too much. Robinhood Markets' Chief Operating Officer, Gretchen Howard, sent an email describing the circumstances as a "major liquidity issue" and moved eight stocks — AMC, GME, NOK, BB, NAKD, KOSS, EXPR and BBBY — to PCO; no Robinhood user could purchase these stocks. (*Id.* ¶ 59 (quotation marks omitted)). After Robinhood promised to maintain the PCO restriction on stocks "that had driven the increased deposit requirements," the NSCC waived Robinhood's capital premium charge through February 1, 2021. (*Id.* ¶ 60 (quotation marks and footnote call number omitted)).[3]

Robinhood notified its customers that several stocks had been moved to PCO but failed to apprise investors that it had also closed out existing options (*see id.* ¶ 52)[4] and cancelled orders after markets closed on January 27 (*see id.* ¶ 62). Instead, customers received an abbreviated explanation of Robinhood's actions:

---

[3] According to Michael Bodson, Chief Executive Officer of the Depository Trust and Clearing Corporation ("DTCC") that oversees the NSCC, the NSCC never "instruct[ed] any clearing member to impose restrictions during the market volatility events of late January." (CCAC ¶ 60 n.37 (alteration added; citation and quotation marks omitted)).

[4] The CCAC does not specify whether Robinhood cancelled put or call options. Call options give the buyer the ability to pay a premium to purchase a security at a certain price, known as a strike price. (*See* SEC Staff Report 5 n.5). Put options are the opposite: they give the purchaser the ability to sell the security at the strike price. (*See* SEC, *Investor Bulletin: An Introduction to Options* (Mar. 18, 2015) https://www.sec.gov/oiea/investor-alerts-bulletins/ib_introductionoptions). While the CCAC is silent on this point, the SEC's report suggests that call options contributed to the short squeeze. (*See* SEC Staff Report 29, 43, 43 n.117).

CASE NO. 21-2989-MDL-ALTONAGA/Torres

> Our mission at Robinhood is to democratize finance for all.  We're proud to have created a platform that has helped everyday people, from all backgrounds, shape their financial futures and invest for the long term.
>
> We continuously monitor the markets and make changes where necessary.  In light of recent volatility, we are restricting transactions for certain securities to position closing only, including $AAL, $AMC, $BB, $BBY, $CTRM, $EXPR, $GME, $KOSS, $NAKD, $NOK, $SNDL, $TR, and $TRVG.  We also raised margin requirements for certain securities.
>
> Amid significant market volatility, it's important as ever that we help customers stay informed.  That's why we're committed to providing people with educational resources.  We recently revamped and expanded Robinhood Learn to help people take advantage of the hundreds of financial resources we offer and educate themselves, including how to make sense of a volatile market.  In 2020, more than 3.2 million people read our articles through Robinhood Learn.

(*Id.* ¶ 63 (footnote call number omitted)).

By market close, Robinhood managed to raise $1 billion from existing investors.  (*See id.*

¶ 61).  The Affected Stocks were less fortunate.  After switching the Affected Stocks to PCO, each

stock experienced significant decline:

|  | Closing Price January 27, 2021 | Closing Price January 28, 2021 |
|---|---|---|
| AMC (AMC Entertainment Holdings Inc.) | $19.90 | $8.63 |
| BB (BlackBerry Ltd.) | $25.10 | $14.65 |
| BBBY (Bed Bath & Beyond Inc.) | $52.89 | $33.64 |
| EXPR (Express Inc.) | $9.55 | $4.70 |
| GME (Gamestop Corp.) | $347.51 | $193.60 |
| KOSS (Koss Corp.) | $58.00 | $41.96 |
| NOK (Nokia Oyj) | $6.55 | $4.69 |
| TR (Tootsie Roll Industries Inc.) | $41.25 | $37.33 |
| TRVG (Trivago N.V.) | $3.19 | $2.48 |

8

(*Id.* ¶ 76).

Robinhood's trading restrictions prompted immediate outrage from investors and elected officials alike. (*See id.* ¶ 69). Many speculated that Robinhood had imposed the restrictions to appease hedge funds, including Robinhood's largest source of revenue: Citadel Securities. (*See id.* ¶ 70).

To assuage investors and onlookers, Tenev appeared on several news outlets, where he made two notable statements. (*See id.* ¶¶ 77–80). First, he rejected the theory that Robinhood issued the restrictions "at the direction of any market maker or hedge fund or anyone we route to or any other market participants." (*Id.* ¶ 77 (emphasis and footnote call number omitted)). Second, he stated "[t]here was no liquidity problem" at Robinhood (*id.* ¶ 79 (alteration added; emphasis omitted), instead attributing the restrictions to market volatility (*see id.* ¶ 78).

According to Plaintiffs, Tenev's assurances led to a flurry of premarket trading activity on the morning of January 29, 2021. (*See id.* ¶ 83). Investors believed Robinhood would lift the PCO restrictions soon, a belief bolstered after Robinhood received $1 billion of investor financing. (*See id.*). They were wrong.

Robinhood maintained restrictions on the numbers of shares and option contracts an investor could purchase. (*See id.* ¶¶ 84–85). It continued to impose greater purchase restrictions throughout January 29 as the Affected Stocks rebounded from the previous day's close price. (*See id.* ¶ 85). The Affected Stocks were not alone; Robinhood subjected other issuers, such as Starbucks and General Motors, to purchase restrictions. (*See id.* ¶ 87).

Once again, reactions to the restrictions prompted Tenev to appear on media outlets to pacify outraged investors and onlookers. This time he directed viewers' focus to other brokers and financial institutions, claiming the trade restrictions were commonplace and "just a standard

part of practices in the brokerage industry and the broader financial industry." (*Id.* ¶ 92).   But unlike other institutions, Robinhood imposed broader restrictions that coincided with price dips in the restricted stocks.  (*See id.* ¶¶ 87, 90, 93).

Tenev continued damage control throughout the weekend, on January 30 and 31.   He maintained that Robinhood simply followed standard industry practices and was not in the pocket of institutional investors like Citadel Securities.  (*See id.* ¶¶ 98–100).  When asked by Elon Musk why Robinhood implemented a purchase-only restriction as opposed to a complete purchase-sale restriction, Tenev stated it would be "categorically worse" to restrict both purchases and sales because "[p]eople get really pissed off if they're holding stock and they want to sell it and they can't."  (*Id.* ¶ 101 (alteration added; quotation marks omitted)).   But other Robinhood employees felt the PCO restriction would still result in outrage, noting that Robinhood would "get crucified for pco-ing."  (*Id.* ¶ 102 n.60 (alteration adopted; citations and quotation marks omitted)).

The weekend also gave Robinhood time to build up capital in anticipation of fresh collateral requirements from the NSCC.  Robinhood raised $2.4 billion from venture capital funds and consequently loosened trading restrictions on some, but not all, of the Affected Stocks going into Monday, February 1, 2021.  (*See id.* ¶¶ 107, 109–10).

The purchase restrictions eased further on February 2, 2021; still, some restrictions remained in place.  (*See id.* ¶¶ 112–13).  Robinhood did not lift all restrictions until late in the day on February 4, 2021.  (*See id.* ¶ 121).  Despite the delay and backlash, Robinhood's "IPO [was] full steam ahead."  (*Id.* ¶ 120 (alteration added; footnote call number and quotation marks omitted)).

## IV.    The Aftermath

Robinhood's conduct left investors and onlookers disgruntled and concerned.  (*See id.* ¶¶ 80, 101–03, 119, 126).  On February 23, 2021, the CEO of Barstool Sports, Dave Portnoy, outlined the frustrations during an interview with Tenev.  (*See id.* ¶ 80).

First, Portnoy probed Robinhood's liquidity.  He asked Tenev whether Robinhood would have permitted trading to continue absent the NSCC's initial deposit requirements.  (*See id.*). Tenev conceded that under such circumstances, Robinhood would have allowed trading to continue.  (*See id.*).  Portnoy pointed out that Tenev's answer suggested Robinhood had a liquidity problem (*see id.*) — a problem Tenev had previously denied (*see, e.g.*, *id.* ¶ 79 ("There was no liquidity problem." (emphasis and quotation marks omitted)).  Tenev initially resisted Portnoy's observation but conceded that Robinhood might have experienced a liquidity crisis if it had not restricted trading.  (*See id.* ¶ 80).

Second, Portnoy asked why Robinhood had instituted purchase-only restrictions instead of a complete freeze on meme stock trading.  (*See id.* ¶ 103).  Tenev had previously told Elon Musk that Robinhood implemented PCOs to avoid "piss[ing] off" customers eager to sell (*id.* ¶ 101 (alteration added; quotation marks omitted)); to Portnoy, Tenev changed his answer and conceded that the PCO restrictions allowed Robinhood to mitigate its deposit requirements (*see id.* ¶ 103). In particular, Tenev stated that restricting *sales*, as opposed to *purchases*, would not have decreased Robinhood's VaR charges from the NSCC.  (*See id.* ("The VaR formula was in this case driven by the one-sided long position, so it actually wouldn't help us; wouldn't help the deposit requirements to restrict selling in this case[.]" (alteration added))).

Five months after Tenev's interview with Portnoy, Robinhood went public at $38 per share. (*See id.* ¶ 126).  After the IPO ceremony, Tenev responded to questions about the short squeeze,

stating that Robinhood had "learned a lot" and improved certain services to make it "easier for customers that want to come back to the service[.]" (*Id.* (alteration added)). Tenev also noted that "it's been an amazing six months and it really [sic] 18 months and much, much more than that[.]" (*Id.* (alteration added)).

Plaintiffs filed the CCAC against Defendants on November 30, 2021. (*See generally id.*).[5] Plaintiffs all owned shares of at least one of the Affected Stocks at the close of markets on January 27, 2021 and sold those shares leading up to February 4, 2021. (*See id.* ¶¶ 21–22). Of the Plaintiffs, only some used the Robinhood platform. (*See id.*).

The CCAC contains two claims for relief. Count I alleges that Robinhood manipulated the prices of the Affected Stocks in violation of section 9(a) of the Securities Exchange Act of 1934. (*See id.* ¶¶ 136–41).[6] Count II alleges an identical theory, but it relies on section 10(b) and rule 10b-5 promulgated thereunder. (*See id.* ¶¶ 142–49).

Count I contains two subclaims under sections 9(a)(2) and 9(a)(4), respectively. (*See id.* ¶¶ 137–39; Resp. 32).[7] Plaintiffs allege that Robinhood violated section 9(a)(2) by intentionally manipulating the market to artificially depress the prices of the Affected Stocks. (*See* CCAC ¶ 138; Resp. 32–37). As for section 9(a)(4), Plaintiffs allege that Robinhood misstated or omitted material facts to mislead investors into thinking that it did not have a liquidity problem — a problem that would cause Robinhood to lose investors, customers, money, and relatedly, the

---

[5] The Plaintiffs are Blue Laine-Beveridge, Abraham Huacuja, Ava Bernard, Brandon Martin, Brendan Clarke, Brian Harbison, Cecilia Rivas, Garland Ragland Jr., Joseph Gurney, Santiago Gil Bóhorquez, and Trevor Tarvis. (*See* CCAC ¶¶ 21–22).

[6] Codified in 15 U.S.C. section 78i(a).

[7] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

chance at a lucrative initial public offering. (*See* CCAC ¶ 139; Resp. 37–46).

Count II alleges that Robinhood manipulated the market when it (1) raised margin requirements (2) canceled purchase orders for the Affected Stocks, (3) closed out options in AMC and GME early, and (4) prohibited and restricted purchases of the Affected Stocks on its platform. (*See* CCAC ¶¶ 72, 143; Resp. 20).[8]  These actions allegedly "created a false impression of actual demand for the Affected Stocks" and "artificially increased supply of the Affected Stocks[.]" (Resp. 20 (alteration added)).

Defendants move to dismiss the CCAC for failure to satisfy the requisite pleading requirements.

## LEGAL STANDARDS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* (alteration added; quoting *Twombly*, 550 U.S. at 555).  Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]"  *Twombly*, 550 U.S. at 555 (alteration added).  Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556).

To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678 (alteration added; citing *Twombly*, 550 U.S. at 556).  When reviewing a motion to

---

[8] Although Count II incorporates a claim under rule 10b-5, for brevity, the Court refers to Count II as the "section 10(b) claim."

dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take the factual allegations therein as true.  *See Brooks v. Blue Cross & Blue Shield of Fla., Inc*., 116 F.3d 1364, 1369 (11th Cir. 1997) (citing *SEC v. ESM Grp., Inc.*, 835 F.2d 270, 272 (11th Cir. 1988)).

While run-of-the-mill complaints are adequate if they contain "a short and plain statement of the claim showing that the pleader is entitled to relief[,]" Fed. R. Civ. P. 8(a)(2) (alteration added), securities fraud claims are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), *see Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*, 594 F.3d 783, 789 (11th Cir. 2010) (citations omitted).  Securities fraud claims therefore must state "with particularity the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b) (alteration added).  Rule 9(b) is satisfied if the complaint includes:

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008) (quotation marks omitted; quoting *Tello v. Dean Witter Reynolds, Inc.*, 494 F.3d 956, 972 (11th Cir. 2007)).

"[U]nder Rule 9(b), it is sufficient to plead the who, what, when, where, and how of the allegedly false statements and then allege generally that those statements were made with the requisite intent."  *Id*. (alteration added).  The purpose for this degree of particularity is to "alert[] defendants to the precise misconduct with which they are charged and protect[] defendants against spurious charges of immoral and fraudulent behavior."  *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988) (alterations added; citation and quotation marks omitted).

The pleading requirements do not end with those found in Rule 9(b).  Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. No. 104-67, 109 Stat. 737 (1995)

14

(codified as amended in scattered sections of 15 U.S.C.), a complaint must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading," 15 U.S.C. § 78u–4(b)(1)(B).   "[W]ith respect to each act or omission alleged[,]" the complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u–4(b)(2)(A) (alterations added).

A "'strong inference' is one that is 'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1318 (11th Cir. 2019) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).   And the required state of mind, commonly referred to as scienter, "is an 'intent to defraud or severe recklessness on the part of the defendant.'"   *Id.* (quoting *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1299 (11th Cir. 2011)).   Scienter can be inferred from an aggregate of the factual allegations.   *See id.*

## ANALYSIS

Plaintiffs' market manipulation claims under sections 9(a)(2) and 10(b) satisfy the heightened pleading requirements under the PSLRA and Rule 9(b) and thus may proceed.   The same cannot be said for Plaintiffs' misstatement claim under section 9(a)(4).   The Court explains.

### I.   Section 9(a) Claims

Section 9(a) contains six subparts, each of which prohibits a different form of price manipulation.   *See* 15 U.S.C. §§ 78i(a)(1)–(6).   While the CCAC does not identify which of the sections Plaintiffs seek to recover under (*see* CCAC ¶¶ 136–41), the Response narrows the claims to sections 9(a)(2) and 9(a)(4) (*see* Resp. 32).   And while the section 9(a)(2) claim contains a particularized theory of relief, Plaintiffs' section 9(a)(4) claim falls short of demonstrating that

Robinhood misrepresented and omitted material facts for the purpose of inducing retail investors into selling their shares.

### a.  Section 9(a)(2)

Section 9(a)(2) prohibits "any person" from effecting

> alone or with 1 or more other persons, a series of transactions in any security registered on a national securities exchange, any security not so registered, or in connection with any security-based swap or security-based swap agreement with respect to such security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

15 U.S.C. § 78i(a)(2).  The text of the statute reflects Congress's choice to "outlaw every device 'used to persuade the public that activity in a security is the reflection of a genuine demand instead of a mirage.'"  *Crane Co. v. Westinghouse Air Brake Co.*, 419 F.2d 787, 794 (2d Cir. 1969) (quoting 3 Loss, Securities Regulations 1549–55 (2d ed. 1961)).

A section 9(a)(2) cause of action consists of five elements:

> (1) a series of transactions in a security creating actual or apparent trading in that security or raising or depressing the price of that security, (2) carried out with scienter, (3) for the purpose of inducing the security's sale or purchase by others, [that] (4) was relied on by the plaintiff; (5) and affected plaintiff's purchase or selling price.

*Chemetron Corp. v. Bus. Funds, Inc.*, 682 F.2d 1149, 1164 (5th Cir. 1982) (alteration added; footnote call numbers omitted), *vacated on other grounds* 460 U.S. 1007 (1983).

### i.  *Transactions in a Security*

Plaintiffs partially clear the first element.  They allege that canceling purchase orders, closing out options, restricting purchases, and liquidating customers' shares of Affected Stocks after raising capital requirements all constitute "transactions" for purposes of the statute.  (*See* CCAC ¶ 137; *see also* Resp. 33).  Robinhood disagrees that any of its conduct can be characterized

as a "transaction," let alone manipulative.  (*See* Reply 13).   To resolve the parties' competing interpretations, the Court examines the meaning of "transaction" under section 9(a)(2).

"With securities laws, 'as in other contexts, the starting point in construing a statute is the language of the statute itself.'"   *Tello*, 410 F.3d at 1278 (quoting *Randall v. Loftsgaarden*, 478 U.S. 647, 656 (1986)).   "In addition to the 'particular statutory language at issue,' federal courts also must consider 'the language and design of the statute as a whole' to determine 'the plain meaning of the statute.'"   *Id.* (quoting *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988)). Courts cannot simply look to one word in isolation; they must also consider "the statutory scheme for clarification and contextual reference."   *United States v. McLemore*, 28 F.3d 1160, 1162 (11th Cir. 1994) (citation omitted).   "When a statute's language is not unambiguous on its face, [courts] look to the legislative history and the statutory scheme."   *Id.* at 1163 (alteration added; citations omitted).

Dictionaries are an appropriate place to begin in defining a term's ordinary meaning.  *See United States v. Isaac*, 987 F.3d 980, 991–92 (11th Cir. 2021).   A leading authority defines "transaction" as "1. The act or an instance of conducting business or other dealings; esp., the formation, performance, or discharge of a contract.  2. Something performed or carried out; a business agreement or exchange.  3. Any activity involving two or more persons."   *Transaction*, Black's Law Dictionary (11th ed. 2019); *see also United States v. Radley*, 632 F.3d 177, 182–83 (5th Cir. 2011); *Fed. Nat'l Mortg. Ass'n v. City of Chicago*, 874 F.3d 959, 963 (7th Cir. 2017).

Consistent with the dictionary's definition, courts have broadly interpreted "transaction" under section 9(a)(2).   For example, courts have concluded that a "transaction" encompasses "not only completed purchases or sales but also bids and orders to purchase or sell securities."   *Secs. and Exch. Comm'n v. Lek Secs. Corp.*, 276 F. Supp. 3d 49, 62 (S.D.N.Y. 2017) (citations omitted);

*see also Spicer v. Chicago Bd. Options Exch., Inc.*, No. 88 C 2139, 1990 WL 172712, at *2 (N.D. Ill. Oct. 30, 1990), *aff'd*, 977 F.2d 255 (7th Cir. 1992)).  These readings are consistent with the SEC's definition.  *See* 17 C.F.R. § 240.17f-1(a)(5) ("The term securities-related transaction shall mean a purpose, sale or pledge of investment securities, or a custodial arrangement for investment securities.").

One decision, *Securities and Exchange Commission v. Lek Securities Corporation*, highlights another important factor in assessing whether an activity is a "transaction" under section 9(a)(2): the appearance it gives to investors.  *See* 276 F. Supp. 3d at 62.  There, the defendants, a broker-dealer and its principal, engaged in a market manipulation scheme called "layering" and "cross-market manipulation[,]" wherein they submitted bids to drive up the price of a stock, then canceled the bids after taking out shorts against their position.  *Id.* at 55–56 (alteration added). Canceling the bids resulted in a sudden drop in the stock price that benefitted the defendants' short position.  *See id.*  Although the defendants never finalized their bids, the bids created a "false impression of supply or demand for securities and . . . induce[d] other market participants to purchase or sell securities."  *Id.* at 62 (alteration added).  Because the transactions created a false impression of trading, the court permitted the claims to proceed.  *See id.*

***PCO Restriction.***  Turning to the activity at issue here, Plaintiffs cite no decisions supporting their contention that Robinhood's PCO restriction amounts to a transaction under section 9(a)(2).  Nor could they.  The PCO restriction involved no bid, pledge, or other arrangement to consummate a securities transaction.  It *affected* the manner in which customers traded by forcing them to hold or sell their shares, but it did not *effect* an actual or incomplete trade.  *See Spicer*, 1990 WL 172712, at *3.

Even under the dictionary's broad definition, the PCO restriction would not qualify as a transaction because it involved no exchange or activity between two or more persons. *See Transaction*, Black's Law Dictionary (11th ed. 2019). To hold otherwise would equate a transaction with *any* activity and result in prospective liability under section 9(a) for virtually any conduct; at which point, the refrain, "'Everything is securities fraud'" would ring true. Andrew K. Jennings, *Shareholders United?* 95 Notre Dame L. Rev. Reflection 47, 47 n.2 (2019) (quoting Matt Levine, *Exxon Is in Trouble over Climate Change*, Bloomberg (Oct. 25, 2018, 10:40 AM EDT), https://www.bloomberg.com/opinion/articles/2018-10-25/exxon-is-in-trouble-over-climate-change; Matt Levine, *Securities Fraud Was Lurking in the Orca Pool*, Bloomberg (Sept. 21, 2018, 12:00 PM EDT)). Thus, the PCO restriction is not a transaction under section 9(a)(2).

Canceling purchase orders, liquidating customers' shares, and closing out options, however, are a different story.

***Cancelled Purchase Orders.*** As a reminder, Robinhood cancelled its customers' purchase orders for Affected Stocks on January 28, 2021. (*See* CCAC ¶ 62 & n.40 (citing Robinhood Tranche Compl. [ECF No. 409] ¶¶ 243–44)). A review of section 9(a)(2)'s text and precedent supports treating cancelled purchase orders as transactions.

While Robinhood correctly notes that it never "purchased, sold, bid[,] or ordered the purchase or sale of the Affected Stocks" (Reply 13 (alteration added)); the definition of "transaction" encompasses cancelled transactions, *see Transaction*, Black's Law Dictionary (11th ed. 2019) (1. The act . . . of conducting business or other dealings; esp., the formation, performance, or *discharge* of a contract. . . . 3. Any activity involving two or more persons." (alterations and emphasis added)). Thus, courts have treated cancelled bids and other unconsummated broker conduct as transactions under section 9(a)(2) — the former is functionally

the same as a cancelled purchase order.  *See Lek*, 276 F. Supp. 3d at 62 (rejecting defendants' argument that "cancelled bids and offers are not 'transactions'"); *Spicer*, 1990 WL 172712, at *2 ("The [defendant] did not buy or sell, which would be means of effecting a transaction, or even place bids, which would also qualify." (alteration added; citations omitted)); *Secs. and Exch. Comm'n v. Malenfant*, 784 F. Supp. 141, 145 (S.D.N.Y. 1992) (treating unexecuted attempts to match buy and sell orders as a series of transactions).   Even the SEC has concluded that a transaction encompasses unconsummated transactions.  *See Biremis Corp., Peter Beck, and Charles Kim*, 105 S.E.C. 862, 2012 WL 6587520, at *2 (Dec. 18, 2012).

Robinhood cites several cases in arguing that Plaintiffs fail to identify a transaction.  (*See* Reply 9 (citing *Spicer*, 1990 WL 172712, at *2; *Baum v. Phillips, Appel & Walden, Inc.*, 648 F. Supp. 1518, 1530 (S.D.N.Y. 1986), *aff'd sub nom.*, 867 F.2d 776 (2d Cir. 1989))).  But the unique nature of Robinhood's business model distinguishes this case from the decisions Robinhood relies on.

In *Spicer v. Chicago Board Options Exchange, Inc.*, the court rejected a section 9(a)(2) claim against the Chicago Board Options Exchange ("CBOE"), a national securities exchange registered to conduct options trading.  *See* 1990 WL 172712, at *1.  A group of investors alleged that the CBOE opened on the now-infamous Black Monday[9] knowing it could not maintain an orderly market.  *See id.*  Throughout Black Monday, the CBOE took actions that allegedly caused options' prices to fluctuate.  These included: delaying the execution of index options; modifying trading procedures in a confusing manner; failing "to halt or suspend trading"; allowing market makers to engage in transactions at inflated prices; and not enforcing rules on market makers.  *Id.* (citations and quotation marks omitted).

_____

[9] "Black Monday" refers to the stock market crash that occurred on Monday, October 19, 1987.  *See Spicer*, 1990 WL 172712, at *1.

In dismissing the complaint, the court highlighted the distinction between "*affecting*" and "*effecting*" transactions and determined that the CBOE's conduct may have affected securities transactions, but it did not effect, or bring about, the transactions by simply opening the market and modifying trading procedures. *See id.* at *2. Rather, the CBOE's conduct simply changed the manner by which others effected transactions. *See id.*

*Spicer* is distinguishable because Robinhood, as a vertically integrated trading platform, has a fundamentally different role from that of an exchange, like the CBOE. Robinhood provides online and app-based brokerage services that allow investors to trade in the market (*see* CCAC ¶ 23), and it executes and clears the trades introduced by its brokerage platform (*see id.* ¶¶ 24, 58). The CBOE was much more hands-off when it came to the actual transactions. It was a marketplace that controlled the way investors traded, *see Spicer*, 1990 WL 172712, at *1; but it did not facilitate investors' trades, route investors' orders to market makers, or cancel requested transactions.

By contrast, when Robinhood's customers submitted their purchase requests to Robinhood, they engaged in transactions whereby Robinhood could accept or reject the customers' requests to facilitate the purchase of securities. That Robinhood chose the latter does not yield the conclusion that no transaction occurred. To the contrary, refusing to provide a product or service falls within the meaning of a transaction. *See, e.g.*, *Radley*, 632 F.3d at 184 (refusing to buy propane constituted a transaction for purposes of the commodities price manipulation statute); *Thomas v. Duralite Co., Inc.*, 524 F.2d 577, 587 (3d Cir. 1975) (treating an "incomplete transaction" as a transaction).[10]

---

[10] Robinhood's reliance on *Baum v. Phillips, Appel & Walden, Inc.*, 648 F. Supp. 1518, fares no better. There, "[n]either the Complaint nor plaintiffs' answering papers address[ed] the elements of a [section] 9(a)(2) claim." *Id.* at 1530 (alterations added). The court ultimately rejected the claim because the plaintiffs did not allege any transactions occurred, let alone that they relied on the missing transactions. *See id.* The apparent basis for the dismissal rested on the plaintiffs' pleading deficiencies rather than a determination that unexecuted trades do not constitute a series of transactions. *See id.*

***Liquidating shares.*** The foregoing analysis also helps illuminate how Robinhood conducted a "series of transactions" when it liquidated its customers' shares after raising margin requirements. 15 U.S.C. § 78i(a)(2). Raising margin requirements itself is not a transaction; after all, it affects the way customers effect transactions. *See Spicer*, 1990 WL 172712, at *2. But what happens next, *i.e.*, when the customer fails to meet the margin call, does constitute a transaction.

The margin calls pitted customers between two choices: covering the new margins or liquidating their stocks. (*See* CCAC ¶ 125 & n.63). Some customers, however, did not have an opportunity to decide because Robinhood liquidated the stocks before they could satisfy the new margin requirements. (*See id.* ¶¶ 52–53, 125 & n.63; *see also* Resp. 20, 33). In liquidating the Affected Stocks, Robinhood necessarily had to reach into its customers' margin accounts and sell or otherwise convert the Affected Stocks to cash. Such conduct is emblematic of a transaction. *See, e.g.*, *Trane v. O'Connor Secs.*, 561 F. Supp. 301, 302 (S.D.N.Y. 1983) (noting that transactions include "reorganizations, liquidations, mergers and tender offers").[11]

***Closing out options.*** Robinhood's premature closing of customers' AMC and GME options required the same mechanics as its forced liquidation. (*See* CCAC ¶¶ 52–53). Closing an option requires the broker, *i.e.*, Robinhood, to sell the option to another individual or entity. (*See* Reply 21 n.20). Such a sale constitutes a transaction under section 9(a)(2). *See Lek*, 276 F. Supp.

---

[11] Even the SEC treats a forced liquidation as a transaction. *See, e.g.*, *Goldman, Sachs & Co.*, 1999 WL 123998 (S.E.C. No-Action Letter, Feb. 22, 1999) ("Upon notification of a margin call, a . . . client usually will transfer cash or securities into its margin account. If the client needs to liquidate securities to meet a margin call, it may place the order with a broker. . . . In the event that a client does not respond to a margin call by increasing its equity in the margin account, [the broker] is required by law to exercise its rights as a creditor and liquidate assets in the account ('*liquidation transaction*')." (alterations and emphasis added; footnote call number omitted)).

3d at 56, 62 (treating the sale of options in a cross-market trading scheme as a transaction under section 9(a)(2)).

In sum, cancelling purchase orders, liquidating shares, and closing out options each comports with the plain meaning of "transaction," section 9(a)(2)'s statutory history, and existing decisions. The Court agrees with Robinhood that the transactions occurred in a context that hardly mirrors run-of-the-mill market manipulation claims, but the unique context is also attributable to the avant-garde nature of Robinhood's trading platform, the likes of which no court has encountered when evaluating market manipulation claims. Robinhood's cutting edge platform cannot defeat the principle that "[n]ovel or atypical methods should not provide immunity from the securities laws." *A.T. Brod & Co. v. Perlow*, 375 F.2d 393, 397 (2d Cir. 1967) (alteration added).

### ii.  Scienter

Counts I and II both allege market manipulation claims; Count I utilizes section 9(a)(2), and Count II utilizes section 10(b) and rule 10b-5. (*See* CCAC ¶¶ 136–49; Resp. 18–32). Both sections 9(a) and 10(b) contain a scienter element; if scienter is absent or insufficiently pleaded, the claims must be dismissed.

Interpreting section 10(b), the Eleventh Circuit has held that "scienter consists of intent to defraud or severe recklessness on the part of the defendant." *FindWhat Inv'r Grp.*, 658 F.3d at 1299–300 (quotation marks omitted; quoting *Edward J. Goodman Life Income Tr.*, 594 F.3d at 790). Courts in the Eleventh Circuit have not yet weighed in on section 9(a)(2)'s scienter element, and courts outside the Eleventh Circuit appear divided as to whether section 9(a)(2)'s scienter element only encompasses an intent to defraud, as opposed to severe recklessness.[12] Fortunately,

---

[12] *Compare Chemetron Corp.*, 682 F.2d at 1165 ("[R]ecklessness may not be used to fulfill section 9's scienter requirement[.]" (alterations added)) *with S.E.C. v. Competitive Techs., Inc.*, No. 3:04cv1331, 2005

the Court need not wade into the split because, as elaborated below, Plaintiffs allege with particularity that Robinhood acted willfully.[13]

Viewing scienter through the lens of market manipulation, as opposed to misrepresentation, the Court must determine whether Robinhood allegedly "intended to deceive investors by artificially affecting the market price of securities." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007) (citations omitted). Scienter is particularly important in market manipulation claims because "in some cases scienter is the only factor that distinguishes legitimate trading from improper manipulation." *Id.* Courts can infer scienter when the defendants "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (citation and quotation marks omitted); *see also MAZ Partners LP v. First Choice Healthcare Sols., Inc.*, No: 6:19-cv-619, 2019 WL 5394011, at *16 (M.D. Fla. Oct. 16, 2019).

Here, two alleged facts create a particularized inference of scienter. First, Robinhood benefitted concretely through its survival, increased financing, and planned IPO. (*See* CCAC ¶¶ 9, 12, 15, 39, 49, 60 & n.39, 71, 75, 97, 107, 119, 120, 126). Second, its employees, including

_____

WL 1719725, at *6 n.7 (D. Conn. July 21, 2005) ("The standard for scienter in securities fraud cases has generally been stated in relation to section 10(b) manipulation claims rather than section 9(b) manipulation claims; however courts have consistently applied the same standard to both sets of claims." (collecting cases)).

[13] Because, at a minimum, market manipulation claims under sections 9(a)(2) and 10(b) both require an intent to defraud, the parties agree that decisions evaluating an intent to defraud under section 10(b) generally can be applied in the context of section 9(a), and vice versa. (*See* Mot. 29 ("Courts customarily analyze market manipulation claims under the two sections together[.]" (alteration added)); Resp. 35 (incorporating Plaintiffs' section 10(b) scienter arguments into the scienter argument under section 9(a)(2))).

Tenev, knew that its statements were inaccurate and harmful, yet made them anyway.  (*See id.* ¶¶ 42, 45–52, 56–57, 59, 62–64, 67–68, 71–72, 74, 80, 99, 102 n.60).

As for the benefits, Plaintiffs allege with particularity that Robinhood could not afford the NSCC's rising collateral requirements and faced liquidation unless it somehow found a way to either raise enough capital or reduce the collateral requirements.  (*See id.* ¶¶ 12, 59–60, 60 n.39, 118, 122).  It pursued both options.  It raised capital from investors while simultaneously implementing restrictions to lower the Affected Stocks' share prices.  (*See id.* ¶ 12).  As share prices fell, so did Robinhood's collateral requirements.  (*See id.* ¶¶ 12, 60, 72, 74, 80, 91, 103).  Without cancelling purchase orders, closing out options, and liquidating shares, Robinhood would have been forced to liquidate its customers' positions, ending Robinhood (*see id.* ¶¶ 15, 78, 80) and leaving other members of the NSCC to cover its losses (*see id.* ¶¶ 12, 60, 67, 80).

For its part, Robinhood maintains that Plaintiffs' theory boils down to an unactionable general motive to profit.  (*See* Mot. 43 (citing *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996))).  Specifically, Robinhood contends that "[a] desire to protect Robinhood's own financial condition cannot support an inference of intent to depress the stock price of unrelated companies." (Reply 22 (alteration added)).  Not so.

Robinhood relies on unpersuasive authority.  *Chill v. General Electric Company*, 101 F.3d 263, utilizes the Second Circuit's "motive and opportunity" test that the Eleventh Circuit has rejected as a dispositive test in establishing scienter.  *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1283 (11th Cir. 1999) ("[T]he Reform Act does not codify the 'motive and opportunity' test formulated by the Second Circuit." (alteration added)); *Waterford Twp. Gen. Emps. Ret. Sys. v. BankUnited Fin. Corp.*, No. 08-Civ-22572, 2010 WL 1332574, at *13 (S.D. Fla. Mar. 30, 2010) ("Motive and opportunity alone . . . are insufficient to support a finding of scienter." (alteration

added; citing *Bryant*, 187 F.3d at 1285)).  To the extent courts in the Eleventh Circuit rely on motive as a relevant factor in evaluating scienter, they limit the weight of common motives that apply to all defendants.  *See Holmes v. Baker*, 166 F. Supp. 2d 1362, 1377 (S.D. Fla. 2001) (concluding that motive and opportunity allegations deserved limited weight "because such motives can be ascribed to virtually all corporate officers and directors" (alteration adopted; citation and quotation marks omitted)).

Examples of common corporate motives that enjoy limited weight include the motive to maintain a high credit rating, the motive to maintain the appearance of corporate profitability, the desire to maintain a high stock price to increase compensation, and the desire to protect a company's viability.  *See In re PXRE Grp., Ltd., Secs. Litig.*, 600 F. Supp. 2d 510, 530 (S.D.N.Y. 2009) (collecting cases); *see also Coronel v. Quanta Cap. Holdings Ltd.*, No. 07 Civ. 1405, 2009 WL 174656, at *16 (S.D.N.Y. Jan. 26, 2009) (finding that the defendant's motive to maintain a financial rating to protect the viability of the company was insufficient, under the law of the Second Circuit, to establish a motive to commit fraud).

But as courts and commentators have acknowledged, defining an impermissible corporate motive is borderline unworkable.  *See, e.g.*, Ann Morales Olazabal & Patricia Sanchez Abril, *The Ubiquity of Greed: A Contextual Model for Analysis of Scienter*, 60 Fla. L. Rev. 401, 405 & n.21, 429–431 (2008) ("[J]udicial opinions of the last decade have muddled the issue to the point of obscurity." (alteration added; citing *Phillips v. LCI Int'l., Inc.*, 190 F.3d 609, 620 (4th Cir. 1999))). At their base, all fraudulent motives boil down to a desire to be profitable.  *See In re Barclays Liquidity Cross & High Frequency Trading Litig.*, 390 F. Supp. 3d 432, 451–52 (S.D.N.Y. 2019). And courts do not consistently agree on what motives are sufficiently concrete to strengthen an inference of scienter.  *See Bryant*, 187 F.3d at 1286 ("[E]ven within the Second Circuit, the

wellspring of the analysis, the status of the motive and opportunity test was somewhat uncertain, having been applied in a seemingly inconsistent fashion." (alteration added; citing *In re Time Warner Inc. Secs. Litig.*, 9 F.3d 259 (2d Cir. 1993); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994))).

So, as it pertains to the alleged facts, the Court takes a holistic approach, consistent with the Eleventh Circuit's precedent, as shared by other courts. First, motive and opportunity are probative, but not sufficient to establish scienter. *See Bryant*, 187 F.3d at 1286 ("[M]otive and opportunity are specific kinds of evidence, which along with other evidence might contribute to an inference of recklessness or willfulness." (alteration added)). Second, to the extent motive is probative, ubiquitous motives are less probative than individualized ones. *See Holmes*, 166 F. Supp. 2d at 1377. Third, in addition to evaluating motive, the Court relies on "published statements when [defendants] knew facts suggesting the statements were inaccurate or misleadingly incomplete" because such statements are "classic evidence of scienter." *U.S. Secs. Exch. Comm'n v. Revolutionary Concepts, Inc.*, No. 21-10984, 2022 WL 386085, at *10 (11th Cir. Feb. 9, 2022) (alteration added; citation and quotation marks omitted).

Turning to the allegations, the Court agrees that Robinhood's financial desperation, alone, is too generalized to *create* a particularized inference of scienter, but it does "contribute to a finding of scienter . . . [and] must be considered together with other allegations to determine if they rise to a strong inference of scienter." *Owens v. Jastrow*, 789 F.3d 529, 539–40 (5th Cir. 2015)) (concluding that the threat of ceasing operations contributed to a finding of scienter (alterations added; citation and footnote call number omitted)); *see also Skiadas v. Acer Therapeutics Inc.*, 1:19-cv-6137, 2020 WL 3268495, at *11 (S.D.N.Y. June 16, 2020) (concluding that plaintiffs bolstered the inference of scienter after alleging defendants needed to fundraise "to remain

viable"); *Zwick Partners, LP v. Quorum Health Corp.*, No. 3:16-cv-2475, 2018 WL 2933406, at *10 (M.D. Tenn. Apr. 19, 2018) (treating defendants' need for financing as a factor in inferring scienter).

But the Complaint does more than simply rely on Robinhood's financial desperation as a basis to infer scienter. When combined with Robinhood's employees' statements, *see Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1017 (11th Cir. 2004) ("[T]he PSLRA . . . permit[s] the aggregation of facts to infer scienter." (alterations added; citations omitted)), the Complaint alleges with particularity that Robinhood knew its restrictions would artificially depress the Affected Stocks, sought to do so, and benefitted from its efforts.

Tenev hinted to this in a statement on January 31, 2021: "In a matter of days, our clearinghouse-mandated deposit requirements related to stocks increased ten-fold. . . . They are what led us to put temporary buying restrictions in place on a small number of securities that the clearinghouses had raised their deposit requirements on." (CCAC ¶ 99 (alteration added)). And in selling his AMC shares before imposing restrictions, including the margin calls, Jim Swartwout, Robinhood Securities' President and COO, implicitly acknowledged that he knew Robinhood's restrictions would lower the price for Affected Stocks. (*See id.* ¶ 74 ("I sold my AMC today. FYI — tomorrow morning we are moving GME to 100% margin — so you are aware[.]" (alteration adopted; other alteration added; quotation marks omitted)); *see also id.* ¶¶ 52, 62, 72).[14]

_____

[14] According to Plaintiffs, Swartwout also lied under oath when he stated: "At no time on or since January 27, 2021, did Robinhood restrict a customer's ability to exercise . . . in-the-money options." (CCAC ¶ 57 (alteration added; other alteration adopted; footnote call number omitted)). Robinhood insists that Plaintiffs' characterization fundamentally misunderstands how options work "because to exercise a call option, a customer must have the cash on hand to purchase 100 shares of the underlying security," and many of Robinhood's customers did not have the cash on hand to do so. (Reply 21 n.20). But Plaintiffs' factual allegations suggest the opposite, *i.e.*, that customers did have cash on hand to exercise their options, but Robinhood prevented them from doing so. (*See* CCAC ¶¶ 53–57). Either way, Plaintiffs' factual allegations, which the Court must accept as true, support a reasonable inference that Swartwout's statement

CASE NO. 21-2989-MDL-ALTONAGA/Torres

Robinhood's staff's observations that Robinhood would "get crucified for pco'ing" and "the blowback from this is going to be exponentially worse as time goes on" further demonstrate that Robinhood expected the Affected Stocks' price to drop. (*Id.* ¶ 102 n.60 (citations and quotation marks omitted)).

Tenev's statements also show not only what Robinhood stood to gain, or rather avoid losing, but the deception used to protect these interests. Tenev admitted that if Robinhood could not meet its "capital requirements, or [its] deposit requirements, then [it was] essentially dead[.]" (*Id.* ¶ 80 (alterations added; emphasis omitted)). When the media interviewed Tenev, he categorically denied any liquidity problem and insisted that Robinhood implemented restrictions to combat market volatility. (*See id.* ¶¶ 45–46, 79, 99). He repeated the same line to Robinhood's customers. (*See id.* ¶¶ 62–63).

These statements boil down to a rhetorical sleight of hand, if not an outright lie. Plaintiffs allege that Robinhood implemented the restrictions because it did not have capital to pay the collateral requirements spawned by the volatile market. (*See id*. ¶¶ 80, 99). Even Gretchen Howard, Robinhood Markets's COO, conceded on January 28, 2021, that Robinhood had a "major liquidity issue[.]" (*Id.* ¶ 59 (alteration added; quotation marks omitted)). Yet Tenev outright denied the problem until confronted by Portnoy:

> Portnoy: If you don't get a call at three in the morning, do you regulate trading?
>
> Tenev: Well, no, we did this because we had to comply with our capital requirements[.]
>
> Portnoy: But you found that out at like three in the morning[.]
>
> Tenev: If we had a bunch more headroom, yes, we probably would have let things continue[.]

---

was misleading. *See Brooks*, 116 F.3d at 1369. And Swartwout's alleged lie lends support to Plaintiffs' theory of scienter.

> Portnoy: Well if you didn't get a call that says, hey, we need this money from you, you wouldn't have shut off buying?
>
> Tenev: Correct.  The last thing we would want to do is shut off buying[.]
>
> Portnoy: That is a capital issue, he specifically said, a liquidity issue, you need this much money, you didn't have it, so you acted.  Isn't that the essence of liquidity?  Like, are you afraid to say liquidity, because of a domino effect with the banks?
>
> Tenev: I think that liquidity issue, and I probably should be careful and call it the "L word," right, the "L word" is a big thing in financial services.  Basically, if you say liquidity issue means [sic] you can't meet your capital requirements, or your deposit requirements, then you're essentially dead, and that was not the case with Robinhood.  We met our capital requirements; we met our deposit requirements[.]
>
> Portnoy: But, that theoretically could be a technicality, right, if you didn't change the trading of that day, you may have had a liquidity issue tomorrow?
>
> Tenev: Exactly. I think that's accurate.

(*Id.* ¶ 80 (alterations added; emphases and footnote call number omitted)).

The back-and-forth begins with Tenev first contradicting his earlier statements that Robinhood did not have a liquidity problem.  Before the interview, Tenev used the NSCC's rising collateral requirements as justification for imposing the restrictions without acknowledging Robinhood's capital concerns.  (*See id.* ¶ 99).  This justification deflected the proximate cause of Robinhood's restrictions: Robinhood lacked the "headroom," *i.e.*, liquidity, to continue trading. Period.  Indeed, Tenev admitted to Portnoy that but-for the lack of capital, he would have allowed buying to continue, regardless of the market volatility.  (*See id.* ¶ 80).  Tenev's admission to Portnoy directly conflicted with Tenev's previous statements to Andrew Ross Sorkin, among others, that "[t]here was no liquidity problem." (*Id.* ¶ 79 (alteration added; emphasis and quotation marks omitted); *see also id.* ¶ 80).

The conflicting statements are important in the context of Rule 9(b)'s heightened pleading standard because they underscore the "manner in which" Plaintiffs were misled.  *Tello*, 794 F.3d at 972 (citation and quotation marks omitted).  Plaintiffs sought to understand why Robinhood

imposed the restrictions, but instead of being forthright, Robinhood blamed market volatility while outright denying its own liquidity concerns. (*See* CCAC ¶ 99). Tenev even conceded to Portnoy on another podcast that Robinhood "could have communicated this a little better to customers." (*Id.* ¶ 64; *see also id.* ¶ 67 n.44). Believing that the restrictions were the byproduct of market volatility as opposed to Robinhood's self-interest, Plaintiffs sold their shares. (*See id.* ¶¶ 1, 21–22, 125, 134, 140). Thus, in citing Tenev's statements, coupled with Robinhood's restrictions and motive to lower the price of the securities, Plaintiffs allege with particularity the "who, what, when, where, and how" necessary to allege fraud under Rule 9(b).

Turning back to scienter, the interview with Portnoy, when aggregated with other statements of Robinhood employees, "create a strong inference" that Robinhood acted with the intent to artificially depress the price of the Affected Stocks. 15 U.S.C. § 78u–4(b)(2); *see also ATSI Commc'ns, Inc.*, 493 F.3d at 102. Above all, Portnoy got Tenev to effectively admit that widespread knowledge of Robinhood's liquidity problem would be its end. (*See* CCAC ¶ 80). This admission provides a window into Tenev's mindset as the short squeeze events unfolded. And the most compelling inference to draw from Tenev's statement is that he lied, or at least told half-truths, about the status of Robinhood's liquidity to stave off its potential demise. *See Mizzaro*, 544 F.3d at 1238 ("[Plaintiff] must . . . plead 'with particularity facts giving rise to a strong inference' that the defendants . . . intended to defraud investors . . . when they made the allegedly materially false or incomplete statements. (alterations added)). In other words, without the restrictions, the short-squeeze jeopardized Robinhood's planned IPO (*see id.* ¶¶ 39, 49, 71, 126); venture funding (*see id.* ¶¶ 9, 97, 107); and overall existence (*see id.* ¶¶ 15, 60 & n.39).

Tenev's subtle admission that Robinhood sought to avoid a major liquidity issue (*see id.* ¶¶ 15, 78, 80, 99), coupled with Robinhood's employees' conflicting statements, misdirections,

and admissions that they intended the Affected Stocks' prices to fall (*id.* ¶¶ 12–14, 42, 44 n.23, 52, 71–75, 102 & n.60), generate a particularized inference that Robinhood acted willfully to lower the prices of the Affected Stocks. Such an inference satisfies the heightened pleading requirements of Rule 9(b) and the PSLRA. Robinhood allegedly knew that its transactions would cause the Affected Stocks' price to drop and engaged in those transactions anyway to serve its own interests over those of its customers.

### iii. *Purpose of Inducing the Sale of Securities*

In its final attempt to achieve the dismissal of Plaintiffs' section 9(a)(2) claim, Robinhood asserts that the CCAC fails to allege that Robinhood "acted with 'the purpose of inducing the purchase or sale of such security by others.'" (Reply 13 (quoting 15 U.S.C. § 78i(a)(2))). According to Robinhood, the CCAC does not allege "that a reduction in the price of the Affected Stocks would have helped Robinhood meet its NSCC deposit requirements." (*Id.*). The Court disagrees.

Even Tenev acknowledged that a selloff of the Affected Stocks would lower the VaR charge, a component of NSCC's deposit requirements. (*See, e.g.*, CCAC ¶ 103 ("The VaR formula was in this case driven by *the one-sided long position*, so it actually wouldn't help us; wouldn't help the deposit requirements to restrict selling in this case[.] Restricting selling wouldn't help the exponential growth in the deposit requirements[.]" (alterations and emphasis added)); *see also id.* ¶¶ 59, 106). When Portnoy asked Tenev why Robinhood did not restrict purchases *and* sales of Affected Stocks, Tenev conceded that "the VaR charge, which drives our deposit requirements, was driven by the size of the long position." (*Id.* ¶ 103). In other words, "Robinhood[] unilateral[ly] manipulat[ed] . . . demand . . . because only purchase risk affects the VaR charge Robinhood sought desperately to reduce[.]" (*Id.* ¶ 106 (alterations added)).

The CCAC, including Tenev's statements, create a particularized inference that Robinhood sought to induce its customers into selling their shares of the Affected Stocks in an effort to lower the Affected Stocks' share prices.  (*See, e.g.*, *id.* ¶ 101 ("We knew this was a bad outcome for customers." (quotation marks omitted))).  Certainly, Robinhood's "distorti[on] [of] the demand side of the market" (*id.* ¶ 138 (alterations added)) is probative of its efforts to decrease share prices, thereby decreasing its VaR charges.  Without any arguments from Robinhood remaining, Plaintiffs' section 9(a)(2) claim may proceed.

### b.  Section 9(a)(4)

The same cannot be said for Plaintiffs' section 9(a)(4) claim.  Section 9(a)(4) states:

(a) It shall be unlawful for any person, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange—

. . . .

> (4) If a dealer, broker, security-based swap dealer, major security-based swap participant, or other person selling or offering for sale or purchasing or offering to purchase the security, a security-based swap, or security-based swap agreement with respect to such security, to make, regarding any security registered on a national securities exchange, any security not so registered, any security-based swap, or any security-based swap agreement with respect to such security, for the purpose of inducing the purchase or sale of such security, such security-based swap, or such security-based swap agreement any statement which was at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, and which that person knew or had reasonable ground to believe was so false or misleading.

15 U.S.C. § 78i(a)(4).

Courts simplify this dense provision to require a "(1) misstatement or omission (2) of material fact (3) made with scienter (4) for the purpose of inducing a sale or purchase of a security (5) on which the plaintiff relied (6) that affected plaintiff's purchase or selling price."  *Chemetron Corp.*, 682 F.2d at 1161–62 (footnote call numbers omitted).  "[T]he 'intent to induce' requirement creates a higher burden of proof for the plaintiff under section 9(a)(4) than that borne under Rule

10b-5(b)." *Id.* at 1162 (alteration added); *see also Salvani v. ADVFN PLC*, 50 F. Supp. 3d 459, 477 (S.D.N.Y. 2014).  While a general intent to commit fraud may satisfy the intent element under rule 10b-5, it will not suffice under section 9(a)(4) unless the intent specifically seeks to induce the sale or purchase of securities.  *See Chemetron Corp.*, 682 F.2d at 1162.

Evaluating intent invokes the PSLRA's heightened pleading requirements, *see* 15 U.S.C. § 78u-4(b)(2)(A), which mandate consideration of "any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324 (footnote call number omitted).  From there, the Court must answer the question: How likely is it that Plaintiffs' alleged inference, as compared to alternatives, flows from the allegations?  *See id.* at 323.

Plaintiffs cite two categories of misstatements and omissions: (1) Robinhood's failure to inform investors that it could not meet the NSCC's collateral requirements (*see* Resp. 38–42), and (2) Robinhood's misleading statements to the public about its liquidity concerns (*see id.* 43–46). Neither category, however, supports Plaintiffs' theory.

To begin, the text of the statute requires that the allegedly misleading statements or omissions be made "regarding any security registered on a national securities exchange," 15 U.S.C. § 78i(a)(4), yet none of Robinhood's alleged misstatements or omissions directly pertain to the Affected Stocks.  Instead, the omissions and misleading statements reflect Robinhood's corporate wellbeing.  (*See, e.g.*, Resp. 38 ("Robinhood was severely reckless in failing to inform customers of the NSCC deposit requirement in its statements on the morning of January 28[.]" (alteration added; emphasis omitted); *id.* 43 ("Robinhood publicly dissembled about its liquidity crisis while it privately searched for capital to keep the doors open[.]" (alteration added; emphasis omitted)).

In the section 9(a)(2) analysis, the Court treated Robinhood's misstatements and omissions as circumstantial evidence of Robinhood's deception and motivation for engaging in transactions

that artificially depressed the Affected Stocks' price.  But it does not necessarily follow that Robinhood misstated and omitted information for the purpose of inducing investors to sell their shares.  Rather, the more compelling explanation is that Robinhood sought to bamboozle investors as to the basis for its restrictions so investors would not flee its platform.  Plaintiffs allege as much. (*See, e.g.*, CCAC ¶ 66 ("Internal Robinhood communications reveal that at 8:13 a.m. EST on January 28th, Robinhood was fashioning just the right message to not lose credibility with its current and future customer base[.]" (alteration added)); Resp. 44 ("[Robinhood] did not want to lose customers and wanted to make it appear that this was a short-term problem." (alteration added))).

If investors knew the true reason for Robinhood's restrictions — *i.e.*, that they were imposed to satisfy capital requirements — they would have turned to other trading platforms.  (*See, e.g.*, CCAC ¶ 42 ("[F]rom a public perception POV, we may want to consider the risks our customers face. . . . Although we don't have a straightforward obligation here because our customers are self directed . . . our action[s] may well be compared to the actions of other firms (with other obligations to customers)." (alterations added; quotation marks and footnote call number omitted))).  And they did.  Robinhood lost customers but managed to cauterize the bleeding and simultaneously attract thousands of new users.  (*See id.* ¶ 119 ("[T]he flood of new investors 'far outweighed' any attrition.  Robinhood was the top app in the iOS app store for multiple days.  It also led the industry in app downloads by a wide margin with 600,000 people downloading the free-trading app[.]" (alterations added))).

Putting aside the more compelling inference to focus on Plaintiffs' proposed inference fares no better.  Plaintiffs strain to argue that the various categories of misstatements and omissions occurred with the purpose of causing investors to sell their shares.  In their Response, Plaintiffs

simply state, "Not knowing the truth about Robinhood's reason for its actions induced panic selling." (Resp. 41 (citing CCAC ¶¶ 68–69)). But this assertion says nothing about Robinhood's intent.

Indeed, nowhere in the Response do Plaintiffs bridge Robinhood's various statements, or lack of statements, about collateral requirements to its intent to cause a selloff. To the contrary, Plaintiffs acknowledge that Robinhood made those statements to protect its image and prevent the mass exodus of its customers. (*See, e.g.*, Resp. 42 ("Robinhood's motive for not being truthful was that it would hurt the company's image, with an IPO in the works, to admit that it was so undercapitalized[.]" (alteration added; citation omitted); *id.* 44 ("Robinhood dissembled because it did not want to lose customers and wanted to make it appear that this was a short-term problem.")). And while misstating facts to protect Robinhood's public image may satisfy the scienter element under rule 10b-5, the same cannot be said for section 9(a)(4). After all, "the 'intent to induce' requirement of subsection 9(a)(4) is distinct from the scienter requirement of Rule 10b-5(b)" in that intending to commit a fraudulent act, alone, is insufficient to establish intent under section 9(a)(4), unless the fraud is to induce the purchase or sale of securities. *Chemetron Corp.*, 682 F.2d at 1162.

Plaintiffs thus fail to explain how Robinhood's omissions and misstatements were designed to induce investors to sell their shares. Sure, Robinhood allegedly acted dishonestly, and that dishonesty serves as circumstantial evidence that its *restrictions* were manipulative; but nowhere in the CCAC or Response do Plaintiffs articulate why it is "at least as compelling" that Robinhood omitted material information to induce customers to sell their shares, as opposed to prevent customers from fleeing its application. *Tellabs*, 551 U.S. at 324 (footnote call number omitted). The distinction is important because the former is prohibited under section 9(a)(4), and the latter

is not.  Because the latter is more compelling than Plaintiffs' purported inference, Plaintiffs'

section 9(a)(4) claim fails.

## II.     Section 10(b) Claim

Section 10(b) makes it unlawful

> [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C.  § 78j(b) (alteration added; footnote call number omitted).  Rule 10b-5, promulgated

under section 10(b), encompasses the same "conduct already prohibited by [section] 10(b)[,]"

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008) (alterations added;

citing *United States v. O'Hagan*, 521 U.S. 642, 651 (1997)), and provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> > (a) To employ any device, scheme, or artifice to defraud,
> >
> > (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> >
> > (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

Section 10(b) and rule 10b-5 "capture a wide range of conduct" and are designed "to root

out all manner of fraud in the securities industry."  *Lorenzo v. Secs. Exch. Comm'n*, 139 S. Ct.

1094, 1101, 1104 (2019).  Such conduct includes "the making of a material misstatement (or

omission) or the commission of a manipulative act."  *Cent. Bank of Denver, N.A. v. First Interstate*

*Bank of Denver, N.A.*, 511 U.S. 164, 177 (1994) (citation omitted).

"Manipulation . . . . refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *Santa Fe Indus.*, 430 U.S. at 476 (alteration added; citations omitted). These practices are referred to as "market manipulation." *In re Galectin Therapeutics, Inc. Secs. Litig.*, 843 F.3d 1257, 1273 (11th Cir. 2016) (citation omitted).

To assert a market manipulation claim, Plaintiffs must "allege (1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." *ATSI Commc'ns*, 493 F.3d at 101 (citations omitted). By contrast, a more quotidian misrepresentation claim requires Plaintiffs to allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners*, 552 U.S. at 157 (citation omitted).

Market manipulation and misrepresentation claims differ from one another in several respects. First, a market manipulation claim arises from market *activity*, rather than a *misrepresentation*, that injects false information into the market. *See ATSI Commc'ns*, 493 F.3d at 101. Second, a plaintiff "need not plead manipulation to the same degree of specificity as a plain misrepresentation claim" because a market manipulation claim "can involve facts solely within the defendant's knowledge[.]" *Id.* at 102 (alteration added; citations omitted). Third, market manipulation "permits the plaintiff to plead that it relied on an *assumption* of an efficient market free of manipulation, whereas a misrepresentation claim requires the plaintiff to allege

38

reliance upon a misrepresentation or omission." *Fezzani v. Bear, Stearns & Co.*, 716 F.3d 18, 27 (2d Cir. 2013) (Lohier, J., concurring in part and dissenting in part) (citations omitted).

The first two distinctions prove to be important in assessing Robinhood's argument that Plaintiffs fail to satisfy the first element, "manipulative acts[.]" *ATSI Commc'ns*, 493 F.3d at 101 (alteration added). The argument contains two parts: (1) Robinhood could not have sent false pricing signals to the market because it did not trade any of the Affected Stocks (*see* Reply 8–9); and (2) Robinhood's conduct cannot be characterized as manipulative since it disclosed the restrictions (*see id.* 10–12, 19). In addition to conflating principles distinguishing market manipulation from misrepresentation claims, Robinhood's argument fails because it mischaracterizes or ignores the allegations. The Court explains.

### a. Section 10(b) is Not Limited to Transactions.

To repeat, section 10(b) prohibits the use of "any manipulative or deceptive device[.]" 15 U.S.C. § 78j(b) (alteration added). Court have interpreted the statute's use of "manipulative or deceptive device" to refer "generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *Santa Fe Indus.*, 430 U.S. at 476 (citations omitted).

While wash sales, matched orders, or rigged prices are not at issue here, Plaintiffs point to the following restrictions as examples of manipulative conduct:

> (a) canceling purchase orders for the Affected Stocks placed before the markets opened for trading on January 28, 2021; (b) closing out options positions in AMC and GME early; (c) prohibiting and later restricting purchases of the Affected Stocks on the Robinhood trading platform and (d) abruptly raising margin requirements for Robinhood's customers, forcing those who could not meet the margin calls for the Affected Stocks to sell some or all of their holdings.

(CCAC ¶ 137). The Court has already concluded that (a), (b), and (d) constitute transactions under section 9(a)(2); and thus, would fall within Robinhood's narrow interpretation of manipulative acts

under section 10(b).  This leaves (c): Robinhood's PCO restriction.  So, as a threshold issue, the Court must determine whether Robinhood's PCO restriction constitutes a "device or contrivance[.]"  15 U.S.C. § 78j(b) (alteration added).

Robinhood does not address section 10(b)'s use of "manipulative or deceptive device or contrivance" (*id.*); instead, it interprets several section 10(b) cases to require a defendant to "engag[e] in some sort of deceptive market transaction[,]" such as the purchase or sale of a stock. (Reply 9 (alterations added; emphasis omitted; collecting cases)).  But without any analysis of the text, Robinhood's argument lacks legs.  *See Tello*, 410 F.3d at 1278 ("With securities laws, 'as in other contexts, the starting point in construing a statute is the language of the statute itself.'" (quoting *Randall*, 478 U.S. at 656)).

Section 10(b)'s use of "device or contrivance" as opposed to "transaction" ensures that claims brought under section 10(b) need not allege a market transaction to plead a market manipulation claim.  *Compare* 15 U.S.C. § 78j(b) *with* 15 U.S.C. § 78i(a)(2).  "A standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning[,]" *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007) (alteration added), and any "material variation in terms suggests a variation in meaning," Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012).  Commentators generally refer to this as the "presumption of consistent usage" canon of statutory interpretation.  *Id.*  The canon plays an important role when comparing sections 10(b) and 9(a)(2): Section 10(b) prohibits the use of "any manipulative or deceptive device or contrivance[,]" 15 U.S.C. § 78j(b) (alteration added), whereas section 9(a)(2) prohibits "a series of *transactions* in any security . . . creating actual or apparent active trading in such security," 15 U.S.C. § 78i(a)(2) (alterations and emphasis added).

If section 10(b) only applied to market transactions, it would say so.  Instead, Congress drafted section 10(b) broadly to encompass acts affecting the prices of securities, as opposed to limiting claims to transactions.  *See Chemetron Corp.*, 682 F.2d at 1166 (comparing section 10(b) to section 9(a) and concluding that "[f]rom its inception through various amendments and into its final form, section 10(b) was always intended as a 'catchall' provision to reach activities not covered or anticipated in other provisions of the Acts" (alteration added)); *see also Spicer*, 1990 WL 172712, at *3 ("Section 9(a)(2) is not a catch-all section . . . . There is a provision of the securities laws which achieves roughly that.  *See* Rule 10b–5(1)."  (alteration added; footnote call number omitted)).

The cases Robinhood cites do not suggest otherwise.  *ATSI Communications, Inc. v. Shaar Fund, Ltd.* involved market transactions, but the court never limited section 10(b) claims to market transactions exclusively.  *See* 493 F.3d at 100.  Robinhood reads too far into the court's statement that "courts generally ask whether a *transaction* sends a false pricing signal to the market[,]" *id.* (alteration and emphasis added), particularly since the court went on to refer to "*practices* that impair the function of stock markets[,]" *id.* (alteration and emphasis added; citation, footnote call number, and quotation marks omitted), and ultimately concluded that prohibited conduct encompasses "some *market activity*," *id.* at 101 (emphasis added; citation omitted).[15]

In contrast, decisions that address the scope of section 10(b) support the Court's reading. In *City of Providence v. Bats Global Markets, Inc.*, the Second Circuit considered whether a group of securities exchanges, including the NASDAQ and NYSE, engaged in manipulative conduct

---

[15] The other decisions Robinhood relies on fare no better.  (*See* Reply 9 (citing *Spicer*, 1990 WL 172712, at *2; *Baum*, 648 F. Supp. at 1530)).  As stated, *Spicer* acknowledged that rule 10b-5 encompasses broader conduct than section 9(a)(2).  *See* 1990 WL 172712, at *3.  And *Baum* did not involve a market manipulation claim under section 10(b) or rule 10b-5.  *See* 648 F. Supp. at 1524–26 (addressing plaintiffs' misrepresentation claim under section 10(b)).

CASE NO. 21-2989-MDL-ALTONAGA/Torres

when they "created products and services for HFT firms that illicitly 'rigged the market' in the firms' favor in exchange for hundreds of millions of dollars in fees"; "failed to disclose the full impact that such products and services would have on market activity"; and "knowingly created a false appearance of market liquidity that, unbeknownst to plaintiffs, resulted in their bids and orders not being filled at the best available prices."   878 F.3d 36, 49 (2d Cir. 2017) (citation omitted).

The exchanges argued that their conduct could not qualify as "manipulative" because they never engaged in any "trading activity."  *Id.* at 50 (citation and quotation marks omitted).  Noting the dearth of authority supporting the exchanges' argument, the court disagreed.  *See id.*  Even if the exchanges did not trade securities, they "engaged in conduct that manipulated market activity, including by deceiving investors into 'believing that prices at which they purchased and sold securities [were] determined by the natural interplay of supply and demand, not rigged by manipulators.'"  *Id.* (alterations adopted; other alteration added; quoting *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999); other citation omitted).

The reasoning in *Bats Global Markets* applies equally here.  Robinhood may not have traded securities when it disabled the buy button, but this restriction misled investors into thinking that the Affected Stocks' value reflected the "natural interplay of supply and demand[.]"  *Id.* (alteration added; citations and quotation marks omitted).  In reality, the value reflected a Hobson's choice: hold shares of Affected Stocks while Robinhood indefinitely blocks its users — who by the way, traded "4% of all shares traded in the U.S. in January 2021" (CCAC ¶ 5 (emphasis omitted)) — from purchasing more shares *or* sell the shares in anticipation of the inevitable "tsunami of selling unleashed by Robinhood's disabling of 'buy' buttons for the very stocks that were the most popular with its customer base" (*id.* ¶ 76).

Just as the exchanges altered the natural interplay of supply and demand when they sold products that gave firms the "ability to access market data at a faster rate, obtain non-public information, and take priority over ordinary investors' trades," *Bats Global Markets, Inc.*, 878 F.3d at 49, Robinhood placed its thumb on the scale of supply and demand when it restricted the sales of the Affected Stocks.  This conduct, irrespective of whether Robinhood purchased the Affected Stocks, constitutes a "device or contrivance[.]"  15 U.S.C. § 78j(b) (alteration added).

In sum, Plaintiffs need not allege that Robinhood engaged in a market transaction to state a claim for market manipulation under section 10(b).  To hold Plaintiffs to such a burden would undermine the text and purpose of the statute, in addition to erasing a noteworthy distinction between sections 9(a)(2) and 10(b).

### b.   Robinhood Only Disclosed Half of the Truth.

Next, Robinhood argues that its conduct cannot be characterized as manipulative because it disclosed each restriction.  (*See* Mot. 22 ("Because the challenged conduct was fully disclosed, there can be no manipulation." (citations omitted)); Reply 10–12).[16]  In principle, Robinhood is correct: "Deception is the gravamen of a claim for market manipulation, and the market is not misled when a transaction's terms are fully disclosed."  *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 76 (2d Cir. 2021) (quotation marks and footnote call number omitted)); *see also Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 130 (2d Cir. 2011) ("In order for market activity

---

[16] As a notable aside, Plaintiffs allege that Robinhood did not disclose each restriction.  (*See* CCAC ¶¶ 52–54, 62).  Instead of informing investors of its intention to cancel purchase orders submitted after markets closed, Robinhood allegedly cancelled the orders and then disclosed the cancellations to customers after the fact.  (*See id.* ¶ 62).  It made the same post-hoc disclosure after it preemptively closed in-the-money options of GME and AMC.  (*See id.* ¶¶ 52–54).  Plaintiffs argue that even if market manipulation claims require nondisclosure, such nondisclosure exists because Robinhood did not disclose the cancelled transactions until after the fact.  (*See* Resp. 20).  The Court need not address this argument because Robinhood's alleged failure to disclose its reason for implementing the restrictions, in addition to the anticipated effects of such restrictions, also constitute material nondisclosures.

to be manipulative, that conduct must involve misrepresentation or nondisclosure." (citations omitted)).  But there's more: even if the terms are fully disclosed, "'half-truths' — literally true statements that create a materially misleading impression — will support claims for securities fraud."  *Wilson*, 671 F.3d at 130–31 (quotation marks omitted; quoting *SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir.2011); other citation omitted); *see also Set Cap. LLC*, 996 F.3d at 85.  Such is the case here.

Set Capital LLC v. Credit Suisse Group AG is instructive.  *See* 996 F.3d 64.  There, Credit Suisse entered into an agreement with Set Capital under which Credit Suisse issued XIV Notes that increased in value during steady periods in the market and decreased in value with volatility. *See id.* at 69–70.  When the parties entered into the agreement, Credit Suisse disclosed that it would hedge its exposure by investing in VIX futures contracts — mirror securities that became more valuable with volatility and less valuable when the market was steady.  *See id.* at 71.  Later, it qualified this disclosure: "Although we . . . have no reason to believe that our . . . hedging activities will have a material impact on the level of the applicable underlying VIX Futures Index, there can be no assurance that the level of the applicable underlying Index will not be affected." *Id.* at 72 (alterations added; other alteration adopted; footnote call number and quotation marks omitted).

After entering into the agreement, Credit Suisse discovered that it could artificially depress the price of the XIV Notes by purchasing large amounts of VIX futures contracts.  *See id.* at 71. Armed with this information, Credit Suisse used a period of market volatility to purchase a large position in VIX futures contracts, simultaneously causing the value of XIV Notes to plummet.  *See id.* at 73.  Once the XIV Notes' price reached a low of $5.99 per note, Credit Suisse issued a call

notice to XIV Notes' purchasers and terminated all notes, resulting in a $1.8 billion loss to investors and roughly half-a-billion-dollar profit for Credit Suisse. *See id.* at 74.

The Second Circuit relied on Credit Suisse's disclosure to infer its culpability. The disclosure misled investors into believing that Credit Suisse would not hedge its position in a manner that materially affected the XIV Notes, even though Credit Suisse intended just the opposite. *See id.* at 79, 84–86. Credit Suisse knew that market volatility could be utilized to depress the value of the XIV Notes and "used this knowledge as part of an *undisclosed* scheme to profit at their investors' expense." *Id.* at 77 (emphasis added). In other words, Credit Suisse bought VIX futures knowing it would induce a liquidity squeeze on XIV Notes, thereby causing XIV Notes to become virtually worthless, and it hid this plan from investors. *See id.* at 79.

The omissions and half-truths in *Set Capital LLC* are similar to Robinhood's alleged conduct here. Just as Credit Suisse misled investors into thinking that it would not materially affect the value of the XIV Notes, Robinhood misled users into thinking that only market volatility — not its lack of capital — played a role in its decision to raise margin requirements, impose purchase restrictions, close out option positions early, and cancel purchase orders. Despite knowing that it lacked sufficient liquidity to meet the NSCC's capital requirements, Robinhood outright denied having a liquidity issue and blamed market volatility exclusively. (*See* CCAC ¶¶ 78–80). Yes, market volatility prompted the NSCC to impose higher collateral requirements — collateral requirements that Robinhood could not meet — but as Tenev admitted, if Robinhood had "more headroom," *i.e.*, more capital, it "would have let things continue[.]" (*Id.* ¶ 80 (alteration added; emphasis omitted)).

Robinhood did not share these facts with its customers, nor did it disclose that the restrictions would depress the Affected Stocks' share prices (*see id.* ¶¶ 13, 59, 103) — a critical

omission that mirrors Credit Suisse's undisclosed scheme to tank the price of XIV Notes.  *See Set Cap. LLC*, 996 F.3d at 77.  The omissions consequently deprived Robinhood users of the full picture as they debated whether to hold or sell their Affected Stocks.  To them, the Affected Stocks' declining prices reflected the market's concern about volatility, not Robinhood's inadequate capital cushion, and certainly not an intentional scheme on the part of Robinhood to lower the stocks' value.  (*See id.* ¶ 80).  In allegedly failing to disclose these concerns, Robinhood coupled its restrictions with half-truths that collectively "sen[t] a false pricing signal to the market."  *ATSI Commc'ns*, 493 F.3d at 100 (alteration added).

Robinhood insists that *Set Capital LLC* is distinguishable because "Plaintiffs are missing any allegation that Robinhood engaged in a market transaction or did so without disclosure." (Reply 11).  Without these allegations, argues Robinhood, Plaintiffs cannot show that Robinhood acted deceptively.  (*See id.*).

Not only does Robinhood mischaracterize the pleading, but *Bats Global Markets* also demonstrates why Robinhood's argument is legally flawed.  There, the Second Circuit held that a defendant need not engage in market transactions to be liable for market manipulation.  *See Bats Glob. Mkts.*, 878 F.3d at 49.  It relied on the exchanges' failure to disclose the range and effects of their products to infer manipulative conduct.  *See id.* at 50.

One such product, the "complex order type," enabled HFTs to submit "hide and light" orders that remained hidden from ordinary listings until the "stock reache[d] a particular price, at which point the hidden orders emerge[d] and jump[ed] the queue ahead of other investors' orders." *Id.* (alterations added).  These orders created a façade of market liquidity that resulted in the investors' bids "not being filled at the best available prices."  *Id.* at 49.  Had the exchanges disclosed the scope and effects of the complex order, investors could have avoided "increased

opportunity costs from unexecuted fill orders, adverse selection and price movement bias on executed fill orders, and increased execution costs." *Id.* at 43.

Robinhood does not address *Bats Global Markets* as it applies to Plaintiffs' market manipulation claim.  It is a curious oversight on Robinhood's part, considering its alleged omissions bear marked similarities to those of the exchanges.  Both Robinhood and the defendant in *Bats Global Markets* allegedly did not disclose the scope, purpose, and effect of their conduct/products, thereby sending false signals to the market.

At the risk of sounding like a broken record, the CCAC describes how the undisclosed information impacted Plaintiffs and the market as a whole.  Plaintiffs had no idea that their submitted orders would be cancelled, nor did they receive any warning that their in-the-money options would be preemptively closed.  (*See* CCAC ¶¶ 52–54, 62).  Robinhood hid its personal stake in the restrictions, letting the market believe that volatility acted as the only impetus for the restrictions.  (*See id.* ¶ 80).  Meanwhile, days before notifying customers of the new margin requirements, Robinhood's own executive sold his stake in AMC and warned Robinhood employees that the planned margin hikes would cause the Affected Stocks' price decline.  (*See id.* ¶¶ 72–74).  Plaintiffs did not receive the same benefit.

To summarize, the Court disagrees with Robinhood that its "conduct was openly and accurately disclosed and thus could not be deceptive." (Reply 12).  Even if Robinhood disclosed the restrictions — a premise that Plaintiffs dispute (*see* Resp. 20) — the disclosures were allegedly incomplete and misleading.  Regurgitating "market volatility" as the basis for restrictions, while simultaneously denying any concerns about liquidity despite internal and subsequent statements to the contrary (*see* CCAC ¶¶ 12, 79–80, 103), can hardly be characterized as an "open[]" and "accurate[] disclos[ure,]" (Reply 12 (alterations added)).  Robinhood's selective disclosures

allegedly misled investors, the market, and Plaintiffs, and thus, they constitute manipulative conduct under section 10(b) and rule 10b-5.

### III.    Impact on Other Tranches

Before concluding, the Court pauses to address the parties' arguments that the conclusions contained in this Order may somehow be in tension with the Court's past decisions in the Antitrust and Robinhood Tranches. (*See* Mot. 37; Resp. 29 n.21, Reply 16–17). Such is not the case.

#### a.  Antitrust Tranche

Robinhood points to the November 17, 2021 Order [ECF No. 438] ("Antitrust Order") in arguing that Tenev's statements denying Robinhood's liquidity problem did not conflict with Howard's statement that Robinhood had a "major liquidity issue[.]"  (CCAC ¶ 59 (alteration added; quotation markets omitted); *see* Mot. 42–44; Reply 17–18). Robinhood is mistaken.

First, the interview with Portnoy puts Tenev's and Howard's statements in a different light. Admittedly, the Antitrust Order concluded that blaming market volatility was not inconsistent with blaming Robinhood's liquidity problem.  But it is significant that neither iteration of the Antitrust Tranche Complaints [ECF Nos. 416, 451] included Tenev's interview with Portnoy.  *Cf. Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009) ("A court's review on a motion to dismiss is limited to the four corners of the complaint." (citations and quotation marks omitted)).  The interview is important because it explored Tenev's intent as it pertained to the explanations for the restrictions; the Antitrust Tranche Complaints lacked the same insight into Tenev's internal deliberations.

Take Tenev's explanation to Portnoy for why he was so squirrelly around the term "liquidity."  (*See* CCAC ¶ 80).  "I think that liquidity issue, and I probably should be careful and call it the 'L word,' right, the 'L word' is a big thing in financial services.  Basically, if you say

liquidity issue means you can't meet your capital requirements, or your deposit requirements, then you're essentially dead[.]  (*Id.* (alteration added; emphasis omitted)).  Likening the term "liquidity" to a swear word displays Tenev's, and by consequence Robinhood's, fear that the public would rightfully believe Robinhood lacked sufficient capital.  This alleged fact, combined with Tenev's concession that Robinhood could not afford the NSCC's collateral requirements without imposing the restrictions (*see id.*), create a particularized inference that Robinhood steered the public spotlight toward market volatility to avoid scrutiny.

Second, the legal contexts are different.  Section 1 of the Sherman Act, 15 U.S.C. section 1, relies on plus factors, including evidence of pretext, to create an inference of a conspiracy to restrain trade.  *See In re: McCormick & Co., Inc.*, 217 F. Supp. 3d 124, 132 (D.D.C. 2016).  Sections 9(a)(2) and 10(b) of the Securities Exchange Act of 1934 rely on a defendant's misleading or false statements to infer its intent.  *See U.S. S.E.C. v. Weintraub*, No. 11-21549-Civ, 2011 WL 6935280, at *7 (S.D. Fla. Dec. 30, 2011).

The Antitrust Order scrutinized Howard's statements to ascertain whether the reasons underlying Robinhood's conduct were pretextual and thus, probative of an antitrust *conspiracy*, not *scienter* in a market manipulation scheme.  (*See* Antitrust Order 46–47).  Ultimately, in the Antitrust Order, the Court concluded that blaming market volatility was not pretext to steer onlookers away from the alleged conspiracy with market makers and clearing brokers; rather, the more compelling explanation for Howard's statement was that she simply misspoke and conflated market volatility and liquidity.  (*See id.* 47 ("Howard was likely referring to Robinhood's ability to pay the increased collateral requirements caused by the market volatility[.]" (alteration added)).  Here, the more compelling inference is that Howard's statement accurately identified the proximate cause of the restriction — lack of liquidity — a cause that Tenev did not want the public

to know about because widespread knowledge would make Robinhood "essentially dead[.]" (CCAC ¶ 80 (alteration added)).

### b. Robinhood Tranche

As for the Robinhood Tranche, the Court's conclusion that Plaintiffs plausibly allege that Robinhood intended to artificially depress the Affected Stocks is entirely consistent with the Robinhood Tranche Order. There, the Court concluded that no special relationship under California law existed between Robinhood and the plaintiffs that would give rise to liability for economic losses. (*See* Robinhood Tranche Order 22–23, 30–34). As an initial matter, the question of whether a tort duty exists under California law calls for an exacting, policy-driven judicial inquiry, while the question of whether a complaint adequately alleges liability and causation turns on textbook pleading principles. Moreover, in concluding that no tort duties under California law existed, the Court evaluated six factors, two of which merit discussion: (1) "the closeness of the connection between [plaintiffs'] injury and [Robinhood's] conduct" and (2) Robinhood's "moral blameworthiness[.]" (*Id.* 31–32 (alterations added)).

First, the undersigned concluded that "the link between th[e] decline [of the meme stocks' value] and [Robinhood's] conduct [was] attenuated at best." (*Id.* 31 (alterations added)). Theoretically, this conclusion could implicate the causation element under federal securities laws, but Robinhood does not challenge causation as it applies to Plaintiffs' market manipulation claims. It challenges causation only in the context of Plaintiffs' misstatement claim. (*See* Mot. 40–42; Reply 16). But Plaintiffs abandoned their section 10(b) misstatement claim (*see generally* Resp.), and their misstatement claim under section 9(a)(4) fails for other reasons.

Second, the Court's moral blameworthiness analysis focused solely on whether the SEC and the customer agreement permitted Robinhood's conduct. (*See* Robinhood Tranche Order 32).

And while "the Customer Agreement and the SEC expressly permitted the types of trading restrictions that [Robinhood] implemented[,]" (*id.* (alterations added; citations omitted)), federal securities laws do not permit restrictions if they are "accompanied by manipulative intent[,]" *Set Cap. LLC*, 996 F.3d at 77 & n.49 (alteration added; citing *ATSI*, 493 F.3d at 100).   Courts have permitted federal securities claims premised on conduct approved by regulators if the extent of the approval is unclear.  *See Bats Global Mkts., Inc.*, 878 F.3d at 50.  Even if Robinhood argued that the NSCC's approval of the restrictions immunized Robinhood from Plaintiffs' claims, it would need to identify some sort of good faith conformity defense, akin to that prescribed by 15 U.S.C. section 80b-11(d), or an extension of the self-regulated organization immunity doctrine, *see Weissman v. Nat'l Ass'n of Secs. Dealers, Inc.*, 500 F.3d 1293, 1296 (11th Cir. 2007).  If such a defense exists, it is not apparent from the pleading or from any information the Court may take judicial notice of.

* * *

The short squeeze stretched Robinhood thin, straining its ability to simultaneously provide unconstrained access to markets and comply with regulators.  In the end, balancing the two proved too much for Robinhood, so it imposed restrictions that hampered its customers' access to markets.  These restrictions, of course, impacted the natural state of supply and demand for the Affected Stocks, but they alone did not amount to market manipulation.  Rather, Robinhood's allegedly opaque and conflicting statements made to hide its lack of capital, coupled with its restrictions, evince an intent on the part of Robinhood to artificially depress share prices for its personal benefit.

At this stage, the Court's task is to assess whether the well-pleaded allegations, taken as true, are sufficiently particularized to satisfy heightened pleading requirements.  *See* Fed. R. Civ. P. 9(b); 15 U.S.C. § 78u–4(b)(2)(A).  The task presented interesting legal questions, convoluted

by the novelty of Robinhood's platform, but at the end of the day, Plaintiffs' market manipulation claims clear the particularized threshold.[17]

## CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that the Motion to Dismiss the Securities Tranche Complaint **[ECF No. 449]** is **GRANTED in part**.  Count I's misrepresentation claim under 15 U.S.C. section 78i(a)(4) is **DISMISSED**.  The remaining market manipulation claims under Counts I and II may proceed.  On or before August 22, 2022, Plaintiffs shall file a notice indicating whether they would like to proceed with their Motion Requesting Entry of a Scheduling Order Re: Amendment of Complaint **[ECF No. 495]**.

**DONE AND ORDERED** in Miami, Florida, this 10th day of August, 2022.

_Cecilia M. Altonaga_
**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:    counsel of record

---

[17] As is, the CCAC may constitute a shotgun complaint because Count II "repeat[s] and reallege[s] each and every allegation contained in the foregoing paragraphs as if fully set forth herein."  (CCAC ¶ 142 (alterations added)); *see Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295 (11th Cir. 2002) ("[A] shotgun complaint contains several counts, each one incorporating by reference the allegations of its predecessors, leading to a situation where most of the counts (i.e., all but the first) contain irrelevant factual allegations and legal conclusions." (alteration added)).  The Court opts not to dismiss the CCAC as a shotgun complaint given the substantial overlap between Counts I and II.  Both rely on the same set of factual allegations and virtually identical legal theories, thus satisfying the need to "know which allegations of fact are intended to support which claim(s) for relief."  *Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996).