UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  21-2989-MDL-ALTONAGA/Damian

In re:

**JANUARY 2021 SHORT SQUEEZE**
**TRADING LITIGATION**
_____/

This Document Relates to the Actions in the
Other Broker Tranche

<u>**ORDER**</u>

**THIS CAUSE** came before the Court on Defendant, Apex Clearing Corporation's Rule 12

Motion to Dismiss Plaintiffs' (Fourth) Class Action Complaint [ECF No. 491], filed on June 22,

2022.  Plaintiffs, Erik Chavez and Peter Jang, filed a Response [ECF No. 494]; to which Defendant

filed a Reply [ECF No. 496].  The Court has carefully considered the Amended Class Action

Complaint ("Am. CAC") [ECF No. 483], the parties' written submissions, the record, and

applicable law.  For the following reasons, the Motion is granted.

## I.        BACKGROUND

### A.        January 2021 Short Squeeze

In January 2021, three publicly traded companies — Gamestop Corporation (GME), AMC

Entertainment Holdings (AMC), and Koss Corporation (KOSS) — experienced significant

volatility in their publicly traded shares (the "Meme Stocks").  (*See* Am. CAC ¶¶ 3–5).  The chaos

began when Plaintiffs and other retail investors realized that hedge funds, market makers, and

other significant players in the financial markets (the "Short Sellers") had shorted[1] the Meme

---

[1] To "short" a stock means to borrow shares of it with the expectation that its price will decrease within a
given period.  To exit a short position, a short seller buys shares of the stock — hopefully at a decreased
price — and profits from the difference between the stock's price at the outset of the position and the exit.

Stocks, driving their prices down.  (*See id*. ¶¶ 58–59, 61).  Plaintiffs, who liked the Meme Stocks, counterpunched.  They started buying up the cheap shares en masse, defying the Short Sellers' expectations and exerting upward pressure on the stock prices.  (*See id*. ¶¶ 61–62).

The head-on collision between the retail investors and the Short Sellers produced significant turbulence in the financial markets.  Initially, retail appeared to be the more powerful force, as the increased demand for the Meme Stocks created a "short squeeze"[2] that sent their prices parabolic.  (*See id*. ¶¶ 58–65).  For example, between January 26 and January 27, 2021, the prices of GME (134.84%), AMC (301.2%), and KOSS (480.0%) all more than doubled.  (*See id*. ¶¶ 65–66).

### B.    Defendant's Role

Enter Defendant.  Defendant is a broker-dealer, a financial entity that executes securities trades in the financial markets.  (Am. CAC ¶¶ 1, 23–25).  It services two types of customers, in two different roles.  (*See id*. ¶¶ 25, 28).

First are the Shared Customers.  Shared Customers are investors who have already sought out another broker-dealer (an "Introducing Broker-Dealer") to trade securities.  (*See id*. ¶¶ 25–26).  These Introducing Broker-Dealers lack "direct access to trading platforms and clearinghouses," so they require help executing their customers' orders.  (*Id*. ¶ 26).  To plug these gaps, Introducing Broker-Dealers bring their customers to Defendant, which provides clearing broker services for their trades.  (*See id*.).  The two Plaintiffs who filed the Amended Class Action Complaint — Erik

---

However, if the stock price increases, the short position becomes less valuable, and the short seller loses money.  (*See* Am. CAC ¶ 61).

[2] A short squeeze occurs when investors buy significant quantities of a heavily shorted stock, which drives the stock price up.  In response, short sellers — who have borrowed shares of the shorted stock — must buy the shares at the higher price to exit their short position.  These additional purchases can drive the stock price even higher.  (*See id*. ¶¶ 63–64).

CASE NO. 21-2989-MDL-ALTONAGA/Damian

Chavez and Peter Jang — were Shared Customers who used Introducing Broker-Dealers Webull

Financial LLC ("Webull") and Ally Invest Securities ("Ally"), respectively. (*See id.* ¶¶ 3, 13–14,

17–18).

Second are the direct customers. These are customers who, as their name suggests, bypass

the Introducing Broker-Dealers and use Defendant for direct broker-dealer services. (*See id.* ¶ 25).

The following diagram illustrates the difference between the two:



(*See id.* ¶¶ 25–28).

In both roles, Defendant is an important conduit through which its customers' trades pass.

Each role foists certain obligations on Defendant — obligations that can intensify during times of

market volatility. The January 2021 short squeeze was one such time. The Court addresses the

two roles in turn.

    1.   <u>Clearing Broker Obligations</u>

First are the clearinghouse services for which the Shared Customers use Defendant. Clearinghouses guarantee stock trades once buyers and sellers agree on a price. (*See id*. ¶¶ 31–33). This is an inherently risky job. If either the buyer or seller does not perform its obligation on an agreed trade, the clearinghouse is on the hook. (*See id*. ¶ 32). If too many agreed-upon trades fail and the clearinghouse can no longer guarantee them, it places the entire market at risk. (*See id*. ¶ 37).

To help offset this risk, clearinghouses rely on margin. (*See id*. ¶¶ 37–38). Margin is a percentage of the overall value of a stock trade that investors put up — typically through broker-dealers — once the buyer and seller have agreed to trade at a specific price, but before the transaction is completed (the "Gap Period").[3] (*See id*. ¶¶ 32, 37–38). When markets are volatile, the risk that one side of a trade will default during the Gap Period is higher. (*See id*. ¶¶ 37–38). Consequently, the clearinghouse may increase the margin requirements during such periods until the markets calm down. (*See id*. ¶¶ 35, 37–38, 93).

The clearinghouse at issue here is the National Securities Clearing Corporation ("NSCC"), a Securities and Exchange Commission-regulated company that serves as the "central counterparty that clears cash transactions in the U.S. equities markets[.]" (*Id*. ¶ 32 (alteration added)). Once a buyer and seller agree to trade a security at a set price, the NSCC guarantees delivery of the security to the buyer and payment to the seller. (*See id*.).

The NSCC presides over member clearing brokers, like Defendant. (*See id*. ¶ 31). To protect the clearinghouse from defaults, members post collateral for their customers' transactions. (*See id*.). The NSCC collects these funds from members "at the start of each day and intraday in

---

[3] The Gap Period occurs because there is a delay between when a buyer and seller reach agreement and the completion of a transaction.

volatile markets" (*id*. ¶ 38 (alteration added)), and it feeds them into the Depository Trust Clearing Corporation's (the "DTCC['s]") coffers[4] (*see id*. ¶¶ 37–38). Volatility is a significant factor in determining how much collateral a member must post on any given day. (*See id*. ¶¶ 37–38). As one might expect, the more volatile a security is, the higher the collateral requirement. (*See id*.).

During the January 2021 short squeeze, the Meme Stocks were exceedingly volatile. Between Thursday, January 21 and Wednesday, January 27, GME's price shot from $43.03 to $380.00. (*See id*. ¶ 60, 65). AMC and KOSS also saw meteoric price increases. (*See id.* ¶ 65).

It thus should have come as no surprise, Plaintiffs allege, that Defendant's collateral requirement was at risk of increasing on January 28. (*See id*. ¶ 39). According to Plaintiffs, collateral requirements are not a black box, sprung on unsuspecting firms each morning. Rather, they are informed by hard metrics, which Defendant monitors in real time. (*See id*. ¶¶ 36–39). Despite these warnings, Defendant was ill-prepared to meet its collateral requirements on January 28, 2021. (*See id*. ¶ 39).

2.      Broker-Dealer Obligations

Broker-dealer services are a slightly different matter. While clearing brokers are tasked with guaranteeing a trade once the buyer and seller agree on a price, broker-dealers effectuate the trade in the first instance. (*See id*. ¶¶ 33). Two sets of broker-dealer obligations factor into Plaintiffs' Amended Class Action Complaint.

First is the Net Capital Rule, a SEC regulation that "requires broker-dealers to 'at all times have and maintain net capital' no less than the greatest of the minimum requirement applicable to its business." (*Id*. ¶ 40 (quoting 17 C.F.R. § 240.15c3-1(a))). This rule ensures that even in times

---

[4] The DTCC is the NSCC's parent company, and it provides insurance services for NSCC members. (*See id*. ¶ 31).

of volatility, like during a short squeeze, broker-dealers have "sufficient liquid assets to meet all obligations to customers." (*Id.*).

Second are the rules to which registered Financial Industry Regulatory Authority ("FINRA") members must adhere. FINRA is a non-governmental securities regulator, of which Defendant is a registered member. (*See id.* ¶ 43). FINRA regulations require broker-dealers to "observe high standards of commercial honor and just and equitable principles of trade" when dealing with their customers. (*Id.* ¶ 44 (citation and quotation marks omitted)).

Plaintiffs allege that FINRA members are subject to a "fundamental responsibility for fair dealing" that applies "*even during times of market stress*." (*Id.* (citations and quotation marks omitted; emphasis adopted)). FINRA regulations further obligate each broker-dealer to "engage in continual risk management of its trading and financial mission critical systems" (*id.* ¶ 45 (citation, emphasis, and quotation marks omitted), which Plaintiffs interpret as requiring "a duty of due care and loyalty" and a duty "to implement . . . risk assessment tools to manage potential operational and credit risks" (*id.* ¶ 47 (alteration added)). According to Plaintiffs, Defendant's response to the short squeeze fell short of these obligations. (*See id.* ¶ 5).

### C.    Defendant's Restrictions on Meme Stock Purchases

When the markets closed on January 27, 2021, the short squeeze appeared to be firing on all cylinders. After an already-strong five-day run (*see id.* ¶ 60), all three Meme Stocks more than doubled in price that day (*see id.* ¶¶ 65–66). Unfortunately for Plaintiffs,[5] these gains would not last.

---

[5] After the January 27 trading day concluded, Chavez held 607 shares of AMC, and Jang held 3,500 shares of GME. (*See id.* ¶¶ 15, 19).

At 9:30 a.m.[6] on January 28, Defendant received an unconfirmed report from the NSCC "showing a projection of a substantially increased clearing deposit for [Defendant]." (*Id*. ¶ 79 (alteration added)).  Defendant knew that Meme Stock volatility was high, but it did not expect a collateral increase of this magnitude. (*See id*. ¶¶ 39, 71, 81).  Still, it did not reach out to the NSCC or the DTCC to confirm the projected amount, which exceeded its initial expectations. (*See id*. ¶¶ 77, 83).  Rather than wait for clarification (*see id*. ¶¶ 77–78), Defendant started restricting Meme Stock trades so that it could avoid a potentially sizable "collateral requirement that NSCC . . . may impose" (*id*. ¶ 80 (alteration added)).

At or around 11:30 a.m., Defendant blocked direct and Shared Customers alike from purchasing more Meme Stock shares. (*See id*. ¶¶ 70, 72, 79).  For direct customers, this was easy to accomplish.  Defendant served as broker-dealer for the direct customers, so it simply refused to execute any of their buy orders. (*See id*. ¶ 70).  Direct customers who held Meme Stock shares could sell their position if they pleased, but Defendant disallowed them any new purchases. (*See id*.).

For Shared Customers, Defendant was merely the clearing broker, so it had to direct the Introducing Broker-Dealers to shut off purchase orders for it. (*See id*.).  At or around 11:30 a.m., Defendant announced to the Introducing Broker-Dealers that the Meme Stock trades were to be "liquidation only" until further notice. (*Id*. ¶ 78).  It also set margin requirements for the Meme Stocks at 100%. (*See id*.).  Introducing Broker-Dealers fell in line and relayed the message to the Shared Customers. (*See id*. ¶¶ 72–75).  Several, including Webull and Ally, deflected blame for the restriction, emphasizing that the decision was Defendant's, not theirs. (*See id*. ¶¶ 71, 73–75).

---

[6] All times are in Eastern Standard Time.

Less than 30 minutes after it implemented the restriction, Defendant realized it had overestimated how much its collateral requirement was set to increase. (*See id.* ¶¶ 81–82). By 11:41 a.m., the DTCC "knew . . . that [Defendant's] collateral exposure was going down." (*Id.* ¶ 82 (alterations added)). It arranged a phone call with Defendant at 11:47 a.m. (*see id.*), and by noon, Defendant understood that the new collateral requirement — while greater than the previous day's amount — "was in fact lower [than projected at 9:30] and in line with its expectations and ability to pay" (*id.* ¶ 81 (alteration added)). The scale of the projected collateral increase then continued to shrink throughout the trading day until it vanished to nothing. (*See id.* ¶¶ 85–86). As it turned out, Defendant was "not required to pay *any* additional collateral on January 28, 2021[.]" (*Id.* ¶ 86 (alteration and emphasis added)).

Plaintiffs allege that even if Defendant's initial collateral projections were accurate — and Defendant's subsequent communications with the DTCC quickly revealed they were not — Defendant never had any reason to worry that it would not be able to make its collateral requirement. (*See id.* ¶¶ 86–87). According to Plaintiffs, Defendant had "headroom in terms of the capital available to [it] on [its] balance sheet" and "lines of credit that [it] c[ould] call on as needed." (*Id.* ¶ 87 (alterations added)). In fact, the very next day, Defendant considered imposing further restrictions and declined to do so because it planned on "rais[ing] a few hundred in capital" over the following weekend. (*Id.* ¶ 90 (alteration added)).

Despite the clarity that began to emerge in the minutes after the January 28 restriction took effect, Defendant continued to bar Meme Stock purchase orders until 2:55 p.m. (*See id.* ¶ 81). Plaintiffs allege that this three-and-a-half-hour kibosh was unreasonably long. (*See id.* ¶¶ 83–84). Plaintiffs acknowledge that temporary trading restrictions on buy and sell orders can sometimes be justified in times of extreme market volatility, but "industry-recognized" stopgap mechanisms

like the circuit breaker[7] are supposed to last "mere minutes[,]" not hours; which amounts to a "figurative lifetime in the multi-trillion-dollar public markets." (*Id*. ¶¶ 52–53 (alteration added)).

In sum, Plaintiffs allege that Defendant effectuated a lengthy and unreasonable ban on buy-side Meme Stock orders, which broke the short squeeze and caused stock prices to "spiral downwards[.]" (*Id*. ¶ 6 (alteration added); *see also id*. ¶ 84). As a result, Plaintiffs had to either sell their shares "at artificially suppressed prices" or grin and bear it as they watched their gains dissipate. (*Id*. ¶ 6). Plaintiffs lay blame for their losses at Defendant's feet. (*See id*. ¶ 97).

D.     **Amended Class Action Complaint**

Plaintiffs Chavez and Jang propose two classes. (*See id*. ¶ 98). First is a Nationwide Investor Class, consisting of all investors in the United States who (1) held Meme Stock shares or call options at the end of the January 27, 2021 trading day; (2) sold their shares or options at a loss between January 28, 2021 and February 23, 2021 (the "Class Period"), or whose options expired as worthless during that period; and (3) who suffered damages. (*See id*.). Next is the Apex Broker-Dealer Class, consisting of all of Defendant's direct customers and Shared Customers who (1) held Meme Stock shares or call options at the end of the January 27, 2021 trading day and had to either sell their shares or options at a loss or whose options expired as worthless during the Class Period; (2) placed a sale order on Meme Stock shares or call options and whose orders were delayed during the Class Period; or (3) placed buy orders for Meme Stock shares or call options that were initially accepted but ultimately rejected by Defendant during the Class Period. (*See id*.).

Plaintiffs bring four claims against Defendant. (*See generally id*.). For all counts, they seek "compensatory damages, punitive damages, restitution, and/or refund of all funds acquired

---

[7] The circuit breaker is a regulatory mechanism that exchanges use to temporarily curb panic selling or manic buying. Circuit breakers differ from Defendant's restriction in that they are shorter in duration and target both *sides* of the trade, not just the buy side. (*See id*. ¶¶ 53–54).

by Defendant from Plaintiffs and the proposed members of the Classes as a result of Defendant's negligence and unlawful actions[.]"  (*Id*. 40 (alteration added)).[8]

Count I is for negligence.  (*See id*. ¶¶ 105–13).  Plaintiffs allege that Defendant owes investors a duty of care "to act in accordance with the standard of care used by other broker-dealer professionals."  (*Id*. ¶ 106).  This duty of care, which allegedly implicates Defendant in both its clearinghouse and broker-dealer service roles (*see id*.), entails duties to make sure the trading platforms it either provides or supports are equipped to handle "reasonably foreseeable customer demands and resulting market conditions" (*id*. ¶ 107), and to protect direct *and* Shared Customers' investments by executing orders lawfully and promptly (*see id*. ¶ 108).  Plaintiffs allege Defendant breached this duty by failing to prepare for increased collateral requirements in the event of market volatility, restricting Meme Stock buy orders during the short squeeze, and keeping the restriction in place after the collateral requirement scare had lapsed.  (*See id*. ¶¶ 110–12).

Count II is for breach of fiduciary duty.  (*See id*. ¶¶ 114–21).  Plaintiffs allege that Defendant is an agent of its direct and Shared Customers and thus owes them "a fiduciary duty of care, loyalty, and good faith[.]"  (*Id*. ¶ 115 (alteration added)).  Defendant allegedly must take "reasonable steps" to refrain from "self-imposed trading restrictions" that give preference to its own "interest over that of its customers."  (*Id*. ¶ 116).  Defendant allegedly breached this duty by restricting Meme Stock purchases in the first instance and then keeping those restrictions in place "for an unjustified period of time."  (*Id*. ¶¶ 117–18).  This restriction allegedly went beyond the "mere ministerial clearing conduct" that is typically the domain of clearing brokers and benefitted Defendant at the expense of its customers.  (*Id*. ¶ 118).

---

[8] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

Count III, which Plaintiffs allege "in the alternative to Counts I and II" (*id.* ¶ 123), is for breach of the implied covenant of good faith and fair dealing (*see id.* ¶¶ 122–27). This claim is not for breach of contract, but it nonetheless centers on the Customer Agreement that Defendant's customers must accept before using its services. (*See id.* ¶ 124). According to Plaintiffs, every agreement creates "a duty of good faith and fair dealing in the performance of the agreement such that neither party shall do anything which will have the effect of destroying or interfering with the right of the other party to receive the benefits of the agreement." (*Id.* ¶ 125). Plaintiffs allege Defendant violated this duty when it restricted Meme Stock purchases on January 28, 2021, "with the intent of causing the trading price . . . to go down[.]" (*Id.* ¶ 126 (alterations added)).

Count IV, also alleged in the alterative to Counts I and II, is for tortious interference with a business relationship. (*See id.* ¶¶ 128–36). Plaintiffs allege that Defendant's restriction tortiously interfered with the customer agreements that Shared Customers had with the Introducing Broker-Dealers. (*See id.* ¶ 129).

### E.    Defendant's Motion

Defendant seeks dismissal of the Amended Class Action Complaint with prejudice. (*See generally* Mot.). To start, Defendant argues that Plaintiffs lack standing to sue. (*See id.* 49– 53, 57). This argument takes two forms. First, Defendant argues that Plaintiffs lack Article III standing to bring any of their claims. (*See id.* 49–53). In the alternative, it maintains Plaintiffs lack standing with respect to the direct customers who use its *broker-dealer services* because Plaintiffs only used Defendant's *clearinghouse services*. (*See id.* 53, 57). Plaintiffs insist that these arguments conflate the standing analysis with the class certification analysis, rendering them premature at this stage. (*See* Resp. 24–30).

Second, Defendant argues that federal securities law preempts Plaintiffs' claims. (*See* Mot. 54–57). It asserts that the duties Plaintiffs would have the Court recognize either contradict federal securities law, or at least would make it more difficult for clearing brokers to comply. (*See id*. 55–56). According to Plaintiffs, this argument erroneously attempts to extend to private clearing brokers legal protections that Congress intended for self-regulatory organizations ("SROs") like the DTCC. (*See* Resp. 58).

Third, Defendant argues that Plaintiffs' claims fail as a matter of law. (*See id*. 22–49). As to the first three counts, Defendant asserts it has no common law duties to Plaintiffs, and even if it did, Plaintiffs have failed to allege a breach of those duties. (*See id*. 25–43). Regarding Count IV, Defendant argues that Plaintiffs do not allege that Defendant employed improper means to interfere with the relationship between Plaintiffs and the Introducing Broker-Dealers. (*See id*. 43–46). Plaintiffs disagree. (*See* Resp. 32–57).

## II.     LEGAL STANDARDS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A pleading withstands a motion to dismiss if it alleges "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (citation omitted), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012). A complaint's "well-pled allegations must nudge the claim 'across the line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 570).

This pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). When considering a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take the factual allegations as true. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (citing *SEC v. ESM Grp., Inc.*, 835 F.2d 270, 272 (11th Cir. 1988)). Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted).

Generally, a court must confine its review of a motion to dismiss to the four corners of the complaint, including any attached exhibits. *See Fin. Sec. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007) (citing *Brooks*, 116 F.3d at 1368). But courts may take judicial notice of matters "not subject to reasonable dispute," including stock prices. *LaGrasta v. First Union Sec., Inc.*, 358 F.3d 840, 842 (11th Cir. 2004) (citations omitted); *see also* Fed. R. Evid. 201(b).

District courts must liberally grant leave to amend pleadings "when justice so requires." Fed. R. Civ. P. 15(a)(2); *see also Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001) (holding that Rule 15(a)(2) limits district court's discretion to dismiss pleadings without leave to amend). Only a "substantial reason" for denying leave to amend will justify the denial. *Fla. Power & Light Co. v. Allis Chalmers Corp.*, 85 F.3d 1514, 1520 (11th Cir. 1996) (quoting *Shipner v. E. Air Lines, Inc.*, 868 F.2d 401, 407 (11th Cir. 1989)). A plaintiff who seeks to amend a complaint under Federal Rule of Civil Procedure 15(a)(2) must request leave by filing a written motion and setting forth the substance of the proposed amendment. *See United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1361–62 (11th Cir. 2006) (citations and footnote call number omitted).

### III.   ANALYSIS

#### A.   Choice of Law

Before proceeding to the parties' substantive arguments, the Court must decide what law governs.  The first step of this analysis is determining which state's choice-of-law rules apply.  On this initial point, there is no dispute.  When multidistrict litigation is "transferred under 28 U.S.C. [section] 1407, the transferee court applies the choice-of-law rules of the state in which the action was filed."  *Larsen v. Citibank FSB*, 871 F.3d 1295, 1303 (11th Cir. 2017) (alteration added; citations omitted).  Plaintiffs initially filed this action in New York (*see* Mot. 11; Resp. 19), so New York's choice-of-law rules control.

While the parties agree New York choice-of-law rules apply, they disagree about which state's law should govern the merits of the dispute.  Plaintiffs argue that New York law applies (*see* Resp. 30–32), while Defendant argues that Texas law applies (*see* Mot. 24–25).  Under New York's choice-of-law rules, the Court must first decide whether the two states' laws "actual[ly] conflict."  *Booking v. Gen. Star Mgmt. Co.*, 254 F.3d 414, 419 (2d Cir. 2001) (alteration added; citation and quotation marks omitted).  If there is no conflict, the Court may dispense with any further choice-of-law analysis and apply New York law.  *See HSA Residential Mortg. Servs. of Texas v. Casuccio*, 350 F. Supp. 2d 352, 362 (E.D.N.Y. 2003) (citing *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998)).  But if the two jurisdictions' laws would yield "relevant substantive differences that could have a significant impact on the outcome of the case[,]" the Court must decide which applies.  *Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 332 (2d Cir. 2005) (alteration added).

Defendant asserts that "no actual conflict exists" because Plaintiffs' claims supposedly "fail under both New York and Texas law[.]"  (Mot. 24 (alteration added; citation omitted)).

14

Plaintiffs are more ambivalent as to whether there is an actual conflict but argue that New York law should control in either case. (*See* Resp. 30–31). Neither side identifies a single dispositive difference in the two bodies of law (*compare* Mot. 24–25 *with* Resp. 30–32), so the Court is inclined to adopt Defendant's suggestion that there is no actual conflict (*see* Mot. 24) and apply New York law, *see Curley*, 153 F.3d at 12.

Even if an actual conflict exists, New York's choice-of-law rules militate in favor of applying New York law. New York rules provide that where an actual conflict exists in a tort case — and the Amended Complaint alleges four tort claims (*see* Am. CAC ¶¶ 105–36) — the tie goes to "the state with the most significant interest in the litigation." *Lee v. Bankers Tr. Co.*, 166 F.3d 540, 545 (2d Cir. 1999) (citation omitted). The relevant contacts that determine which state has the greater interest are "the parties' domiciles and the locus of the tort[.]"[9] *Schultz v. Boy Scouts of Am.*, 65 N.Y.2d 189, 197 (N.Y. 1985) (alteration added; citations omitted). These favor New York law here.

New York's ties to this litigation a re ubiquitous. Defendant is a New York corporation and has offices in New York. (*See* Am. CAC ¶ 10). Its "key personnel are New York based." (*Id*.). GME and AMC are listed on the New York Stock Exchange, which is in New York. (*See* Resp. 31). The DTCC, whose collateral requirements allegedly prompted Defendant to implement the January 28, 2021 trade restriction (*see* Am. CAC ¶ 77–79), is also in New York (*see* Resp. 31).

Notwithstanding these significant contacts, Defendant argues that Texas has the stronger tie. (*See* Mot. 24–25). The Court disagrees.

Defendant first asserts that Plaintiffs' Customer Agreements contain choice-of-law provisions which dictate that Texas law must govern. (*See* Mot. 25). But those provisions do not

---

[9] Plaintiffs' domiciles do not factor here, for Chavez is domiciled in Arizona (*see* Am. CAC ¶ 13), Jang is domiciled in Maryland (*see id*. ¶ 17), and the proposed classes are nationwide (*see id*. ¶ 98).

apply here.   Under New York choice-of-law rules, contractual choice-of-law provisions only govern *contract* disputes.   *See Klock v. Lehman Bros. Kuhn Loeb Inc.*, 584 F. Supp. 210, 215 (S.D.N.Y. 1984) ("[I]t has been held in New York that a contractual choice of law provision governs only a cause of action sounding in contract." (alteration added)).

This is not a contract dispute.   Plaintiffs bring four *tort* claims that arise from allegedly *independently existing duties*, not contractual obligations.   (*See* Am. CAC ¶¶ 105–36).   These tort claims are not transformed into contract claims merely because they arise out of a contractual relationship.   *See Hamlet at Willow Creek Dev. Co., LLC v. Ne. Land Dev. Corp.*, 64 A.D.3d 85, 113 (N.Y. Sup. Ct. App. Div. 2009) (observing that "a contracting party may be charged with a separate tort liability arising from a breach of a duty *distinct from, or in addition to*, the breach of contract" (alteration and emphasis added; citations and quotation marks omitted)).   The Customer Agreements' choice-of-law provisions are inapt here.

Defendant next stresses Texas law should apply because its headquarters — and thus, its domicile — are in Dallas, Texas.   (*See* Mot. 25).   This argument initially appears stronger than the first, for a party's domicile weighs heavily in New York's choice-of-law considerations.   *See Padula v. Lilarn Props. Corp.*, 84 N.Y.2d 519, 521 (N.Y. 1994).   It does not move the needle for Defendant, however.

Perhaps Dallas is Defendant's nominal principal place of business.   Yet, Defendant does not identify a single corporate officer who works out of the Dallas office, nor does it state that any decisions relevant to the January 2021 short squeeze — or anything else, for that matter — were made in Texas.   (*See* Mot. 25; Reply 9–11).   Contrast that with the number of Defendant's officers who work in New York, as well as the high-level decision-making that occurs there.   (*See* Am. CAC ¶ 10).   Notwithstanding the "headquarters" designation that Defendant gives its Dallas office,

it may *functionally* "be said that [Defendant's] corporate presence is much more pronounced in" New York, which is what matters for choice-of-law purposes. *Weisberg v. Layne-New York Co*., 132 A.D.2d 550, 552 (N.Y. Sup. Ct. App. Div. 1987) (alteration added; citations omitted).

Because New York has a stronger interest in the litigation than Texas, New York law applies, regardless of whether New York and Texas law conflict. *See Lee*, 166 F.3d at 545.

## B.   Standing

There is another hurdle to clear before proceeding to the substance of Plaintiffs' claims. The Court must evaluate whether Plaintiffs have standing to bring their claims in the first instance. Defendant makes three arguments that they do not. The first two concern Plaintiffs' Article III standing generally, while the third concerns the claims of direct customers only. (*See* Mot. 49–53).

### 1.   Article III Standing

To establish Article III standing, Plaintiffs must demonstrate (1) they have suffered an "injury in fact — an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical[;]" (2) a "causal connection" between the injury and Defendant's conduct; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Aaron Priv. Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1336 (11th Cir. 2019) (alteration added; citations and quotation marks omitted). Defendant argues that Plaintiffs fall short in two ways. First, Defendant states their alleged injury is too speculative. (*See* Mot. 50–52). Second, Defendant insists that Plaintiffs lack a legally protected interest in this litigation because the short squeeze they helped facilitate was an unlawful market manipulation conspiracy. (*See id*. 52–53).

CASE NO. 21-2989-MDL-ALTONAGA/Damian

The Court starts with the argument that Plaintiffs' alleged injury is too speculative.  An alleged injury does not confer standing unless it "actually exist[s]."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) (alteration added; citation omitted).  "[W]holly abstract" claims of injury do not suffice.  *Tokyo Gwinnett, LLC v. Gwinnett Cnty.*, 940 F.3d 1254, 1263 (11th Cir. 2019) (alteration added).

Plaintiffs easily clear this hurdle.  They allege that by shutting off buy-side Meme Stock orders, Defendant caused prices to "spiral downward[,]" at which point Plaintiffs had to either watch their gains dissipate or sell their shares at "artificially suppressed prices[.]"  (Am. CAC ¶¶ 6–7 (alteration added)).  In other words, Plaintiffs' shares were worth one amount on January 27, Defendant took action that allegedly suppressed the value of the shares the next day, and Plaintiffs were out the difference.  That difference is concrete, not speculative.

Defendant tries to blur the lines between concrete and speculative by likening Plaintiffs' allegation to one the Eleventh Circuit rejected in *Aaron Private Clinic Management LLC*. (*See* Mot. 51).  There, the plaintiff aspired to open a methadone clinic "someday" and sued Georgia officials for lost profits when the state stopped issuing licenses for narcotic treatment facilities. *Aaron Priv. Clinic Mgmt. LLC*, 912 F.3d at 1336–37.  The court found plaintiff had taken no concrete steps toward opening the clinic when Georgia instituted the suspension, nor did the complaint suggest the plaintiff had anything "more than a bare intention" to open a clinic "at some unspecified time in the future[.]"  *Id.* at 1337 (alteration added).  The lost profits plaintiff alleged were insufficiently concrete to confer standing because plaintiff failed to allege any facts "suggesting a likelihood that its business would have come about absent the challenged action." *Id.* at 1338.

CASE NO. 21-2989-MDL-ALTONAGA/Damian

The contrast between Plaintiffs and the would-be clinic proprietor in *Aaron Private Clinic Management LLC* is stark.  Here, when the alleged violations of law occurred, Plaintiffs had already purchased securities, *the measurable value of which* decreased precipitously during the Class Period allegedly because of Defendant's actions.  (*See* Am. CAC ¶¶ 6–7).  Defendant is free to dispute the causal connection Plaintiffs illustrate between the Meme Stock price dive and the restriction it imposed, but that factual issue is distinct from the preliminary question of whether Plaintiffs have alleged an injury concrete enough to confer standing.  That question is easily answered in the affirmative.  *See Felzen v. Andreas*, 134 F.3d 873, 876 (7th Cir. 1998) (stating that "a reduction in the market price of one's stock is injury" for standing purposes).

Defendant also argues Plaintiffs' apparent role in facilitating the short squeeze bars the Court from considering the decline in the value of Plaintiffs' Meme Stock shares to be a legally protected interest.  That is the subject of Defendant's second standing argument.  (*See* Mot. 52–53).

Without damage to a legally protected interest, there is no Article III standing.  *See Aaron Priv. Clinic Mgmt. LLC*, 912 F.3d at 1336.  Plaintiffs do not shy away from acknowledging that the drop in the price of Meme Stock shares is their proffered legally protected interest.  (*See* Resp. 26).  According to Defendant, this decline cannot be legally protected if the gains that precipitated the decline were ill-gotten.  (*See* Mot. 52).

In *Schlueter v. Latek* — the case upon which Defendant builds this argument (*see* Mot. 52) — the Seventh Circuit held that courts will not reward a plaintiff's wrongdoing by adjudicating a loss predicated on its own wrongful behavior.  *See* 683 F.3d 350, 355 (7th Cir. 2012).  The archetypical example occurs when a plaintiff sues an accomplice for his cut of funds the two stole

together.  *See id*.  In such cases, courts adhere to the principle that there is no honor among thieves and decline to find a legally protected interest in the plaintiff's share of the loot.  *See id*.

Defendant argues that the Court should find similarly with respect to Plaintiffs.  (*See* Mot. 52–53).  Defendant states that the short squeeze that drove Meme Stock prices up in the days preceding January 28 was the product of a vast Internet conspiracy in which Plaintiffs colluded with other online retail investors to effectuate an illegal "market manipulation scheme[,]" the fruits of which are not entitled to legal protection.  (*Id*. 52 (alteration added)).  This argument, while creative, is weak.  Even if the short squeeze was the product of an unlawful market manipulation conspiracy in which Plaintiffs were participants — and the Court certainly does not prejudge that issue here — Defendant's assertions at best raise a question of fact, inappropriate for resolution on a motion to dismiss.  The Court thus rejects Defendant's two arguments that Plaintiffs lack Article III standing generally.

### 2.   Standing for Direct Customers' Claims

Defendant's final standing argument does not concern Plaintiffs Chavez and Jang's standing to assert their *own* claims, but rather the claims of *direct customers*, for whom Defendant was not just a clearing broker but the broker-dealer.  (*See id*. 53).  Recall that Jang and Chavez are Shared Customers, which means they receive broker-dealer services from Introducing Broker-Dealers and only use Defendant for its clearing broker services.  (*See* Am. CAC ¶¶ 25–28).  In the Background section, *see supra* Section I.B., the Court distinguished between broker-dealers, who effectuate trades between buyers and sellers (*see* Am. CAC ¶ 33); and clearing brokers, who work with the clearinghouse to help guarantee stock trades during the Gap Period — after a buyer and a seller have agreed on price and quantity but before the transaction is consummated (*see id*. ¶¶ 31–33, 35–36).  The Amended Class Action Complaint proposes to lump Shared Customers and direct

customers together in the same putative classes (*see id*. ¶ 98), but by Plaintiffs' own admission, Defendant performs one role for the Shared Customers and another for direct customers (*see id*. ¶¶ 24–25).

The Supreme Court has long been clear that "the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *Allen v. Wright*, 468 U.S. 737, 752 (1984). Because Defendant has different duties when it services Shared Customers and direct customers, Defendant casts doubt as to whether Shared Customers like Plaintiffs can allege claims on behalf of direct customers. (*See* Mot. 53). Yes, the direct customers Plaintiffs wish to include in their two classes may have standing to sue Defendant on their own. But as Defendant stresses (*see id*.), Plaintiffs may not use putative class members to shirk their independent obligation to "establish a case or controversy between [themselves] and [Defendant]" for "each claim" they wish to assert, including those on behalf of the direct purchasers, *Griffin v. Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1987) (alterations added).

Defendant's argument may ultimately prove persuasive, but it has little sway in consideration of a motion to dismiss. On a motion to dismiss, all the Court needs to determine is that Plaintiffs have standing to assert their *own* claims. *See Blessing v. Sirius XM Radio Inc.*, 756 F. Supp. 2d 445, 452 (S.D.N.Y. 2010) ("[W]hile there is no question that plaintiffs in a proposed class action must have standing to sue the defendant on at least some claims . . .[,] whether they may bring each claim asserted on behalf of the proposed class is properly determined after class certification is decided." (alterations added; citation and quotation marks omitted)). Here, they do. Defendant imposed restrictions on Meme Stock purchases that allegedly caused the prices of Plaintiffs' Meme Stock shares to fall — a concrete injury. (*See* Am. CAC ¶¶ 6–7, 21). That

satisfies the minimum requirement for Plaintiffs to seek redress against Defendant — at least for their own injuries. *See Aaron Priv. Clinic Mgmt. L.L.C.*, 912 F.3d at 1336.

As to the direct customers, the Court acknowledges their theories of liability may differ from Plaintiffs'. But these differences are best explored *at or after the class certification stage*, not on a Rule 12(b)(6) motion to dismiss. *See Venerus v. Avis Budget Car Rental, LLC*, 723 F. App'x 807, 813–14 (11th Cir. 2018) (admonishing district courts against conflating the commonality and typicality analysis, which is the purview of class certification motions, with a standing analysis). Where, as here, "the issue is not whether [] Plaintiffs have standing to sue Defendant[] — they most certainly do — but whether their injuries are sufficiently similar to those of the purported Class to justify the prosecution of a nationwide class action," the "growing consensus among district courts" is to defer resolution until "the class certification stage, when this Court may consider commonality and typicality issues with respect to the named plaintiffs and other putative class members." *In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 213–14 (S.D.N.Y. 2012) (alterations added; citations and quotation marks omitted). The Court joins this growing consensus and defers judgment on Defendant's final standing argument.[10]

---

[10] Defendant's argument may be premature as to standing, but the Court acknowledges that it raises an important point concerning the *viability* of Plaintiffs' four claims. While Plaintiffs purport to sue on behalf of direct purchasers (*see* Am. CAC ¶ 98), no direct purchasers are parties to this litigation (*see generally id.*). The direct purchasers referenced in the Amended Class Action Complaint are unnamed members of two putative classes — not Plaintiffs. *See In re Cox Enters., Inc. Set-Top Cable TV Box Antitrust Litig.*, 835 F.3d 1195, 1203 (10th Cir. 2016) (citing *Smith v. Bayer Corp.*, 564 U.S. 299, 313 (2011)). Accordingly, if the sufficiency of any claim in the Amended Class Action Complaint depends on the *nature* of Plaintiffs' relationship with Defendant, the Court must hold Plaintiffs to their allegations that they are Shared Customers, not direct customers. (*See* Am. CAC ¶¶ 14, 18, 29).

CASE NO. 21-2989-MDL-ALTONAGA/Damian

### C.     Preemption

The final preliminary question the Court must resolve before proceeding to an examination of the sufficiency of Plaintiffs' claims is whether federal securities law preempts them.  Defendant argues that it does.  (*See* Mot. 54–57).  The Court disagrees.

The Supremacy Clause of the Constitution provides that "the Constitution and the laws of the United States 'shall be the supreme Law of the Land.'"  *Estrada v. Becker*, 917 F.3d 1298, 1302 (11th Cir. 2019) (quoting U.S. Const. art. VI, cl. 2.).  If federal law is supreme, it follows that state law must give way when the two conflict.  Thus, "any state law that 'interferes with, or is contrary to,' federal law is preempted."  *Id*. (alterations adopted; quoting *Gibbons v. Ogden*, 22 U.S. 1, 211 (1824)).

Courts have delineated three categories of preemption: (1) express preemption; (2) field preemption; and (3) conflict preemption.  *See Smith v. Teva Pharm. USA, Inc.*, 437 F. Supp. 3d 1159, 1163 (S.D. Fla. 2020) (citation omitted).  Defendant asserts the third applies here.  (*See* Mot. 54).  Conflict preemption occurs when a state law either renders it "impossible for a private party to comply with both state and federal requirements," or when it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 899 (2000) (Stevens, J., dissenting; citation and quotation marks omitted).  Critically, courts may not *presume* a conflict exists merely because the state law in question concerns some activity that federal law also regulates; there must be "an 'actual conflict'" between the two.  *English v. Gen. Elec. Co.*, 496 U.S. 72, 90 (1990) (citation omitted).  There is no such conflict here.

Defendant asserts that imposing tort liability on clearing brokers who struggle to meet the DTCC and NSCC's collateral requirements would somehow interfere with federal clearinghouse

regulations. (*See* Mot. 54–57). The Court understands that as self-regulatory organizations ("SROs"), the DTCC and NSCC are regulated entities. They take their cues from 15 U.S.C. section 78q-1, which lays the groundwork for "the development of uniform standards and procedures for clearance and settlement" of securities transactions. 15 U.S.C. § 78q-1(a)(1)(D). Congress's desire for uniformity would almost certainly come under threat if plaintiffs could assert tort claims against the DTCC and NSCC for failing to guarantee trades in accordance with *each state's* prescribed common law duty of care. Consequently, if Plaintiffs had named either SRO as a defendant in this litigation, those claims would be preempted — as other courts have held with virtual unanimity every time a plaintiff tries to assert common law claims against a securities market SRO. *See In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110, 114–15 (D.C. Cir. 2008) (collecting cases holding that state law claims against securities market SROs are preempted).

But Plaintiffs did not sue the DTCC or NSCC. They sued Defendant, a private clearing broker that — while *subject to* SROs' rules and regulations — is *not* an SRO. (*See* Am. CAC ¶ 5). And while Defendant argues persuasively that common law claims against SROs are preempted, nowhere in the three-and-a-half pages the Motion devotes to the subject of preemption does Defendant cite a single case preempting state-law claims against a clearing broker.[11] (*See* Mot. 54–57).

---

[11] The closest Defendant comes is *Appert v. Morgan Stanley Dean Witter, Inc.*, No. 08-cv-7130, 2009 WL 3764120 (N.D. Ill. Nov. 6, 2009), which Defendant asserts is "directly on point" (Reply 30). This misstates things somewhat. In *Appert*, the court dismissed a breach of contract claim against a financial firm that was regulated by two SROs. *See* 2009 WL 3764120, at *2. The contract in question purported to adopt the SROs' rules and regulations. *See id.* In its order granting the defendant's motion to dismiss, the court held that the Securities Exchange Act did not provide a private right of action for violations of the SROs' rules, which the plaintiff tried to smuggle in through a breach of contract claim. *See id.* at *2–4. The court *did not* hold that the Securities Exchange Act, or any other federal law, preempted all contract claims against the defendant, nor did it even mention tort claims, *see generally id.*, such as the ones Plaintiffs bring here (*see* Am. CAC ¶¶ 105–36). The case is thus distinguishable.

This is unsurprising.  Neither reason nor precedent compels the conclusion that Plaintiffs' tort claims "actual[ly] conflict" with any federal statute or regulation.  *English*, 496 U.S. at 90 (alteration added; citations and quotation marks omitted).  The pleading does not allege that the DTCC and NSCC should have done anything differently, nor does it purport to impose liability on the SROs.  (*See generally* Am. CAC).

Instead, it alleges that Defendant should have been better prepared to respond to the prospect of an increased collateral requirement.  (*See id.* ¶¶ 39, 57).  And if the SROs had increased the requirement beyond what Defendant was prepared to pay — a prospect that, again, never materialized (*see id.* ¶¶ 84–85) — Plaintiffs allege that Defendant should have responded by raising money or tapping into existing lines of credit, not by shutting off purchase orders (*see id.* ¶¶ 87, 90).  If any federal law compels Defendant to be unprepared for collateral increases, or to shut off purchase orders in response to one, neither the Motion nor Reply identifies it.

In short, Plaintiffs' four tort claims neither make it "impossible" for Defendant to comply with state and federal law, nor do they generate any "obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Am. Honda Motor Co.*, 529 U.S. at 899 (citation omitted).  The Court thus finds no conflict and rejects Defendant's preemption argument.

**D.     Plaintiffs' Four Claims**

Having rejected Defendant's two preliminary arguments, the Court now turns to Plaintiffs' four tort claims on the merits.  (*See* Mot. 25–46).  These fare less well.

1.     <u>Count I: Negligence</u>

Plaintiffs' first claim is negligence.  (*See* Am. CAC ¶¶ 105–13).  "To establish a prima facie case of negligence" under New York law, "a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom."

*Solomon v. City of New York*, 66 N.Y.2d 1026, 1027 (N.Y. 1985) (citations omitted). The first element proves insurmountable to Plaintiffs.

According to the Amended Complaint, Defendant "owes a duty of care to investors to act in accordance with the standard of care used by other broker-dealer professionals." (Am. CAC ¶ 106). This entails duties to both "ensure that the trading platforms it provide[s] and/or support[s are] sufficiently equipped to reliably deliver such services under reasonably foreseeable increasing customer demands and resulting market conditions at issue in this case" (*id*. ¶ 107 (alterations added)), and to "exercise reasonable care in safeguarding the investments of Plaintiffs and Class members by providing a platform and/or supporting a platform to execute trades that is fair and promptly provides execution of customers trade orders in a lawful manner" (*id*. ¶ 108). New York law provides scant basis for these supposed duties.

To begin, New York tort law imposes no general duty to protect against purely economic losses. In fact, the "economic loss doctrine" suggests the opposite is true. *AMBAC Assurance Corp. v. U.S. Bank Nat'l Ass'n*, 328 F. Supp. 3d 141, 159 (S.D.N.Y. 2018) (citations and quotation marks omitted). Under that doctrine, a defendant cannot be held "liable in tort for purely economic loss unless the plaintiff demonstrates that the defendant owed a duty, which may arise from a special relationship, to protect against the risk of harm to plaintiff."[12]   *Id*. (alterations adopted; citation and quotation marks omitted).

---

[12] The case law applying New York's economic loss doctrine is messy because courts sometimes conflate the economic loss *doctrine*, which requires a special economic relationship before plaintiffs can seek damages in tort for purely economic losses, with the similarly named economic loss *rule*, a "related but distinct" principle that "limits the end-purchaser of a product to contract remedies and precludes a recovery in tort for purely economic losses — without personal injury or property damage — against a manufacturer." *AMBAC Assurance Corp.*, 328 F. Supp. 3d at 158–59 (citations omitted). The latter's application has been confined to products-liability cases, *see Travelers Cas. & Sur. Co. v. Dormitory Auth.- State of New York*, 734 F. Supp. 2d 368, 378 n.15 (S.D.N.Y. 2010) (collecting cases), so the Court only considers the former here.

CASE NO. 21-2989-MDL-ALTONAGA/Damian

Pure economic loss, unaccompanied by property damage or physical harm, has traditionally been the purview of contract law. *See id*. New York courts prefer to keep it there. *See id*. The rationale for the partition is twofold. First, allowing tort claims for purely economic losses would invite tort law to run roughshod over contract law. *See King County, Wash. v. IKB Deutsche Industriebank AG*, 863 F. Supp. 2d 288, 302 (S.D.N.Y. 2012) (citation omitted). Second, the economic loss doctrine protects defendants from "disproportionate, and potentially limitless, liability[.]" *Id*. (alteration added; citation, footnote call number, and quotation marks omitted).

Plaintiffs do not contest that their loss was purely economic. (*See* Resp. 43–46). To get around the economic loss rule, they must demonstrate that they enjoyed a "special relationship" with Defendant. *AMBAC Assurance Corp.*, 328 F. Supp. 3d at 159 (alteration added). Plaintiffs assert such a relationship exists here. (*See* Resp. 44 (arguing that the special relationship "exception to the doctrine is present here where [Defendant] owes a duty to Plaintiffs and the putative class") (alteration added)).

Courts have been scattershot in defining the contours of the special relationship exception, but in *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Center, Inc.*, the New York Court of Appeals identified the key baseline: for a relationship to qualify, it must "require[] the defendant to protect against the risk of harm to plaintiff." 96 N.Y.2d 280, 289 (N.Y. 2001) (alteration added; citation omitted); *see also AMBAC Assurance Corp.*, 328 F. Supp. 3d at 159 (observing that "the economic loss doctrine centers on whether the defendant owed a duty to protect against the risk of harm to the plaintiff"). So far, courts have applied the exception to landowners and tenants, *see Finlandia Ctr., Inc.*, 96 N.Y.2d at 289 (citing *Nallan v. Helmsley-Spear, Inc.*, 50 N.Y.2d 507, 518–19 (N.Y. 1980)); a "limited" set of professionals[13] dealing with clients, *Hydro Inv'rs, Inc. v.*

---

[13] Attorneys, *see 17 Vista Fee Assocs. v. Teachers Ins. & Annuity Ass'n of Am.*, 259 A.D.2d 75, 83 (N.Y. Sup. Ct. App. Div. 1999); accountants, *see id*.; and architects, *see Robinson Redevelopment Co. v.*

*Trafalgar Power, Inc.*, 227 F.3d 8, 18 (2d Cir. 2000); and relationships in which one party owes a fiduciary duty to the other, *see Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 329 (S.D.N.Y. 2011) (citations omitted).  The first two categories are inapt here, but the third presents a closer question.

Courts applying New York law have held that when the defendant "owes a fiduciary duty of undivided loyalty" to the plaintiff, a special relationship exists.  *AMBAC Assurance Corp.*, 328 F. Supp. 3d at 159 (citations omitted).  Plaintiffs allege Defendant owes its customers a fiduciary duty.  (*See* Am. CAC ¶ 115).  New York law instructs otherwise.

In most cases, clearing brokers like Defendant "do not owe a fiduciary duty to the customers of an introducing broker."  *Greenfield v. Tassinari*, 8 A.D.3d 529, 530–31 (N.Y. Sup. Ct. App. Div. 2004) (collecting cases).[14]  That statement describes the present situation, for the Introducing Broker-Dealers introduced Plaintiffs and the other Shared Customers to Defendant.  (*See* Am. CAC ¶¶ 1, 14, 18).  Consequently, Defendant argues that no fiduciary duty applies, which in turn bars application of the "special relationship" exception to the economic loss doctrine.  (*See* Reply 31–32).

Plaintiffs insist there is an exception to New York's general rule, which purportedly rescues their claim.  (*See* Mot. 54–55).  The exception, which applies only under "certain extenuating circumstances[,]" *Rozsa v. May Davis Grp., Inc.*, 152 F. Supp. 2d 526, 531 (S.D.N.Y. 2001) (alteration added; citation omitted), has two requirements.  First, the clearing broker must go

---

*Anderson*, 155 A.D.2d 755, 756 (N.Y. Sup. Ct. App. Div. 1989); may be subject to the exception when they violate their professional duties.  No court has extended the exception to clearing brokers.

[14] While direct customers rely on Defendant for broker-dealer services, no direct customers are party to this lawsuit.  Plaintiffs are Shared Customers, who only use Defendant's clearing broker services.  (*See* Am. CAC ¶¶ 14, 18, 29).  The Court thus limits its analysis of Plaintiffs' relationship with Defendant to the duties a clearing broker owes its clients.

beyond its traditionally ministerial role of the "conduit" and become "actively engaged" in trades. *Goldman v. McMahan, Brafman, Morgan & Co.*, No. 85-2236-Civ, 1987 WL 12820, at *22 (S.D.N.Y. June 18, 1987); *see also Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 466 (2d Cir. 2013) (observing that fiduciary duties may arise where "a clearing broker is alleged effectively to have shed its role as clearing broker and assumed direct control of the introducing firm's operations and its manipulative scheme"); *Glob. Enter. Grp. Holding, S.A. v. Ottimo*, No. 07-cv-4904, 2010 WL 11629556, at *5 (E.D.N.Y. June 8, 2010) (same). Plaintiffs allege as much here. Indeed, the Introducing Broker-Dealers had no desire to halt Meme Stock purchase orders and did so only at Defendant's behest. (*See* Am. CAC ¶¶ 71, 73–75.)

The second requirement is that the clearing broker must have been actively involved in fraud. *See Glob. Enter. Grp. Holding, S.A.*, 2010 WL 11629556, at *5 (declining to impose fiduciary duties where the clearing broker lacked the requisite scienter to participate in the introducing broker-dealer's fraud); *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*, No. 97-4978-Civ, 2002 WL 88226, at *3 (S.D.N.Y. Jan. 23, 2002) (distinguishing between the general rule, which does not impose fiduciary duties on clearing brokers, and the exception, which applies when the broker has "actively engaged in a fraud" (citation omitted)); *In re Blech Sec. Litig.*, 961 F. Supp. 569, 584 (S.D.N.Y. 1997) (imposing fiduciary duties where a clearing broker acted "with scienter" to "direct[] or contrive[] certain allegedly fraudulent trades" (alterations added; quotation marks omitted)); *Goldman*, 1987 WL 12820, at *22 (imposing fiduciary duties where the clearing broker was "actively engaged . . . in creating fraudulent trading losses" (alteration added)). This is where Plaintiffs miss the mark. They insist that Defendant exceeded its traditionally ministerial role of guaranteeing trades by actively shutting down buy-side trades. (*See* Resp. 54). The Court does

not disagree.  But Plaintiffs never allege that Defendant, or anyone else for that matter, engaged in fraud.  (*See generally* Am. CAC).

This omission is fatal.  Plaintiffs cite no New York cases — and the Court is aware of none — holding that a clearing broker owed its investors a fiduciary duty outside the fraud context.  (*See generally* Resp.).  Notably, every single case that Plaintiffs cite in support of applying New York law's extenuating circumstances exception involved fraud allegations.[15]  (*See id*. 54).  Because Plaintiffs do not allege this crucial element, the extenuating circumstances exception does not apply here.

From here, the journey back to the economic loss doctrine — the starting point for the duty analysis — is straightforward.  If there are no allegations of fraud, the extenuating circumstances exception to the general rule that clearing brokers owe no fiduciary duty to investors does not apply.  *See A.I.A. Holdings, S.A.*, 2002 WL 88226, at *3.  If the extenuating circumstances exception does not apply, Defendant owes Plaintiffs no fiduciary duty.  *Rozsa*, 152 F. Supp. 2d at 531.  If there is no fiduciary duty, Plaintiffs lack the special relationship required to bypass New York's economic loss doctrine.  *See AMBAC Assurance Corp.*, 328 F. Supp. 3d at 159.  Therefore, the economic loss doctrine applies, barring Plaintiffs' negligence claim.  *See Cnty. of Suffolk v. Long Island Lighting Co.*, 728 F.2d 52, 62 (2d Cir. 1984) ("New York law holds that a negligence action seeking recovery for economic loss will not lie." (citations omitted)).

---

[15] *See Levitt*, 710 F.3d at 467–68 (declining to apply the extenuating circumstances exception in the context of section 10(b) securities fraud); *Glob. Enter. Grp. Holding, S.A.*, No. 2010 WL 11629556, at *5 (declining to impose fiduciary duties where the clearing broker lacked the requisite scienter to participate in the introducing broker-dealer's fraud); *Stern v. Legent Clearing LLC*, No. 09-cv-794, 2009 WL 2244616, at *3 (N.D. Ill. July 28, 2009) (applying the extenuating circumstances exception where the clearing broker had "actual knowledge that it was aiding and abetting . . . fraud" (alteration added)).

CASE NO. 21-2989-MDL-ALTONAGA/Damian

Even if the economic loss doctrine did not apply, Plaintiffs' negligence claim would fail on the first prong. "It is axiomatic to note . . . that before a party may be held liable" for negligence, "it must first be established that the party in fact owed a duty to act in a certain manner." *Riggs v. Schappell*, 939 F. Supp. 321, 329 (D.N.J. 1996) (alteration added). Plaintiffs allege that Defendant has duties to "ensure that the trading platforms it provide[s] and/or support[s are] sufficiently equipped to reliably deliver such services under reasonably foreseeable increasing customer demands and resulting market conditions at issue in this case" (Am. CAC ¶ 107 (alterations added)), and to "exercise reasonable care in safeguarding the investments of Plaintiffs and Class members by providing a platform and/or supporting a platform to execute trades that is fair and promptly provides execution of customers [sic] trade orders in a lawful manner" (*id*. ¶ 108). These allegations run contrary to New York law.

A negligence theory holds defendants liable for their "failure to employ reasonable care — the care which the law's reasonably prudent man should use under the circumstances of a particular case." *McLean v. Triboro Coach Corp.*, 302 N.Y. 49, 51 (N.Y. 1950). In many cases, New York law imposes a duty of reasonable care on broker-dealers. *See de Kwiatkowski v. Bear, Stearns & Co., Inc.*, 306 F.3d 1293, 1305 (2d Cir. 2002) (collecting cases). But while Defendant is a broker-dealer for direct customers, Shared Customers like Plaintiffs only use Defendant as a clearing broker. (*See* Am. CAC ¶¶ 14, 18). The distinction is crucial, for "clearing brokers" simply "do not owe duties to plaintiffs who are customers of their introducing brokers." *Rozsa*, 187 F. Supp. 2d at 131 (citations omitted); *see also Glob. Enter. Grp. Holding, S.A.*, 2010 WL 11629556, at *4 (observing that "a clearing broker owes no duty to individual investors" (citations omitted)). That fact suffices to stop Count I in its tracks.

CASE NO. 21-2989-MDL-ALTONAGA/Damian

To circumvent this obstacle, Plaintiffs turn to FINRA, whose rules and regulations allegedly impose upon Defendant a "responsibility for fair dealing" that persists "even during times of market stress."  (Am. CAC. ¶ 44 (citation and emphasis omitted)).  They assert that Defendant has a "duty in common law tort to comply with" these rules.  (Resp. 37).  It is unclear what basis they have for so asserting.

To start, FINRA violations do not give rise to a private cause of action, and Plaintiffs may not use a negligence claim as a trojan horse to smuggle one in.  *See Fox v. Lifemark Sec. Corp.*, 84 F. Supp. 3d 239, 245 (W.D.N.Y. 2015) ("FINRA does not provide a private right of action, thus even if defendants violated FINRA rules, plaintiff cannot recover for negligence based on the alleged violation of FINRA Rule 2310(b)(2)(B)." (citation omitted)).  FINRA violations can, in limited circumstances, help inform whether a defendant violated the industry standard of care that applies to financial advisors and broker-dealers in tort actions.  *See, e.g.*, *Rioseco v. Gamco Asset Management, Inc.*, No. 15862/10, 2011 WL 4552544 (N.Y. Sup. Ct. Sep. 23, 2011).  But that does *not* hold true in suits against clearing brokers.[16]  *See Rozsa*, 187 F. Supp. 2d at 131.

Plaintiffs cite no cases applying New York law that purport to hold otherwise.  The closest they come is *Rioseco v. Gamco Asset Management, Inc.*, a trial court case in which plaintiffs sued their broker-dealer and investment advisor for negligence and breach of "fiduciary duties of care, loyalty, candor and good faith."  2011 WL 4552544.  The court agreed that FINRA's Suitability Rule could be "considered as evidence of industry standards for purposes of a common law malpractice claim."  *Id*.  Crucially, however, the defendant was a broker-dealer and investment advisor to the plaintiffs, *not* their clearing broker.  *See id*.  In fact, the court explicitly distinguished

---

[16] And even if it did, evidence of a breach does Plaintiffs little good unless the breached duty of care is one that negligence law recognizes in the first place.  *See Gesell v. First Nat'l City Bank of N.Y.*, 24 A.D.2d 424, 425 (N.Y. Sup. Ct. App. Div. 1965) ("Before there can be a breach of a duty, such duty must be shown to exist.").

between clearing brokers, for whom no duty attached, and broker-dealers.  *See id*. n.22.  The Court thus finds *Rioseco* inapposite.

The other cases Plaintiffs cite also fail to persuade.  Plaintiffs cite *Remington v. Newbridge Sec. Corp.* for the proposition that FINRA violations can be used to inform the proper standard of care in negligence actions.  (*See* Resp. 35–36 (citing 2013 WL 2444719, at *5–6 (S.D. Fla. June 5, 2013)).  *Remington* is inapposite for the same reason *Rioseco* is: it involved a broker-dealer defendant, not a clearing broker.  *See Remington*, 2013 WL 2444719, at *1.  So, too, for *Scott v. Dime Sav. Bank of New York, FSB*, the only other case applying New York law that Plaintiffs cite for this proposition.[17]  (*See* Resp. 36 (citing 886 F. Supp. 1073, 1080–81 (S.D.N.Y. 1995))).

In sum, Plaintiffs have failed to allege that Defendant owed them a common law duty of care.  Moreover, New York's economic loss doctrine forecloses finding such a duty.  Without a recognized duty of care, there is nothing for Defendant to breach.  *See Gesell*, 24 A.D.2d at 425.  Count I is thus due to be dismissed.

2.  Count II: Breach of Fiduciary Duty

Plaintiffs' second claim is for breach of fiduciary duty.  (*See* Am. CAC ¶¶ 114–21).  Here, Plaintiffs allege that Defendant acts as its customers' agent, which gives rise to "a fiduciary duty of care, loyalty, and good faith[.]"  (*Id*. ¶ 115 (alteration added)).  Defendant allegedly breached its fiduciary duty by imposing the Meme Stock purchase restrictions, which served its interests to the detriment of its customers.  (*See id*. ¶¶ 117–18).

The Court disagrees.  Defendant cannot breach a fiduciary duty to Plaintiffs if it does not owe Plaintiffs a fiduciary duty in the first place.  *See Sleppin v. Thinkscan.com, LLC*, 55 F. Supp.

---

[17] The other cases Plaintiffs cite for the proposition that FINRA rules impose a common law duty on Defendant apply other states' laws.  (*See* Resp. 35–38).  They have little bearing on whether the alleged duty exists under New York law.

3d 366, 374 (E.D.N.Y. 2014) ("Under New York law, a breach of fiduciary duty claim requires that the defendant owe the plaintiff a fiduciary duty and breached that duty." (citation omitted)). The Court already examined New York's economic loss doctrine to determine whether Defendant owed Plaintiffs a fiduciary duty and answered that question in the negative.

Under New York law, clearing brokers do not have a fiduciary duty to investors that broker-dealers have introduced to them unless the "extenuating circumstances" exception applies. *Rozsa*, 152 F. Supp. 2d at 531 (citation omitted). That exception requires that the clearing broker transcend its ordinary ministerial duties and become actively involved in fraud. *See A.I.A. Holdings, S.A.*, 2002 WL 88226, at *3. Plaintiffs allege no fraud here (*see generally* Am. CAC), so the exception does not apply. Because Defendant owes Plaintiffs no fiduciary duty, Count II is due to be dismissed.

3.    Count III: Breach of Good Faith and Fair Dealing

In Count III, Plaintiffs allege the Meme Stock restriction violated the implied covenant of good faith and fair dealing. (*See* Am. CAC ¶¶ 122–27). This claim arises from the Customer Agreement Defendant enters with customers. (*See id.* ¶ 124). Plaintiffs allege that agreement generates a corresponding "duty of good faith and fair dealing in the performance of the agreement such that neither party shall do anything which will have the effect of destroying or interfering with the right of the other party to receive the benefits of the agreement." (*Id.* ¶ 125).

New York law provides that every contract implies "a covenant of good faith and fair dealing" that "encompasses any promises that a reasonable promisee would understand to be included[.]" *N.Y.U. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 318 (1995) (citations omitted). It prevents any party to the contract from doing anything that would restrict the other's ability to reap the fruits of the contract, or to undermine the other party's "presumed intentions or reasonable

expectations." *Spinelli v. NFL*, 903 F.3d 185, 205 (2d Cir. 2018) (citations and quotation marks omitted).

The implied covenant of good faith and fair dealing has not been applied broadly. And New York courts have held that it does not "nullify other express terms of the contract, or . . . create independent contractual rights." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Xerox Corp.*, 25 A.D.3d 309, 310 (N.Y. Sup. Ct. App. Div. 2006) (alteration added; citing *Fesseha v. TD Waterhouse Inv'r Servs.*, 305 A.D.2d 268, 268 (N.Y. Sup. Ct. App. Div. 2003)). Accordingly, courts must defer to the express terms of the contract when a purportedly implied duty conflicts. *See id.*

Here, all parties acknowledge that the Customer Agreement afforded Defendant the "right to refuse to execute transactions for Plaintiffs at any time and for any reason." (Mot. 42; *see also* Resp. 55). Plaintiffs would have the Court amend this provision and impose new conditions governing when and why Defendant is allowed to refuse to execute transactions. (*See* Am. CAC ¶ 127). But the implied covenant of good faith and fair dealing may not be used to restrict parties' rights under a contract when doing so would be "inconsistent with other terms of the contractual relationship." *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 304 (N.Y. 1983).[18] The Court will not read new restrictions into a Customer Agreement that conflict with the broad rights it affords Defendant. Accordingly, Count III is due to be dismissed.

---

[18] *Murphy* is particularly analogous because it illustrates that New York courts regard implied limitations on express grants of discretion as inconsistent. In *Murphy*, the contract in question afforded the defendant — an employer — "an unfettered right" to terminate its employees "at any time." 58 N.Y.2d at 304. The court held that the implied covenant of good faith and fair dealing did not impose any limits or restrictions on the defendant's right to terminate employees because it "would be internally inconsistent" to restrict a right intended to be unrestricted. *Id.* So, too, here. It would be similarly inconsistent for the Court to imply restrictions on Defendant's expressly unrestricted right under the Customer Agreement to "refuse to execute transactions for Plaintiffs at any time and for any reason[.]" (Mot. 42 (alteration added)).

CASE NO. 21-2989-MDL-ALTONAGA/Damian

4.      Count IV: Tortious Interference with Business Relationship

The final claim alleges that Defendant tortiously interfered with Plaintiffs and the Introducing Broker-Dealers' business relationships.  (*See* Am. CAC ¶¶ 128–36).  To state a claim for tortious interference under New York law, a plaintiff must allege that "the defendant's sole motive was to inflict injury and that the defendant employed unlawful[19] means to do so."  *Nifty Foods Corp. v. Great Atl. & Pac. Tea Co.*, 614 F.2d 832, 838 (2d Cir. 1980) (citations omitted).  The latter requirement is satisfied by "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure[.]"  *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 87 N.Y.2d 614, 624 (N.Y. 1996) (alteration added; citation and quotation marks omitted).

Plaintiffs do not allege any of these means.   (*See* Am. CAC ¶¶ 128–36).  Plaintiffs merely allege that Defendant "unjustifiably, without privilege, and in bad faith, tortiously interfered with the business relationship between Plaintiffs and the Introducing Broker-Dealers." (*Id*. ¶ 132).  That does not suffice.  *See Guard-Life Corp.*, 50 N.Y.2d at 191 (observing that "persuasion alone although it is knowingly directed at interference with the contract" does not satisfy the wrongful means requirement (citation omitted)).

Plaintiffs attempt to salvage the claim by citing *Carvel Corp. v. Noonan* (*see* Resp. 56–57), a New York Court of Appeals case that held open the question of whether "conduct which, though not a crime or tort in itself, [is] so culpable . . . that it could be the basis for a claim of tortious interference with economic relations."  3 N.Y.3d 182, 190–91 (2004) (alterations added; quotation marks omitted).  Plaintiffs assert that because they have alleged "not one, but two independent

---

[19] New York courts typically use the word "wrongful" instead of "unlawful" when describing the required means.  *See, e.g.*, *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 191 (N.Y. 1980).

torts — negligence and breach of fiduciary duty" — Defendant's action is sufficiently "culpable" to warrant a finding of wrongful means here.  (Resp. 57).

This argument fails for two reasons.  First, it depends on the success of the negligence and breach of fiduciary duty claims, both of which fail.  Second, even if those claims succeeded, no court applying New York law has ever held that negligence and breach of fiduciary duty independently constitute "wrongful means" for tortious interference purposes.  *See Noonan*, 3 N.Y.3d at 190–91.  Federal courts applying a state's laws must proceed with modesty and avoid "creat[ing] or expand[ing] that State's public policy." *St. Paul Fire & Marine Ins. Co. v. Jacobson*, 48 F.3d 778, 783 (4th Cir. 1995) (alterations added; citations omitted).  The Court declines to extend New York law beyond its established contours here.  Accordingly, Count IV is due to be dismissed.

## IV.    CONCLUSION

In sum, Plaintiffs' four claims fail as a matter of law.  Counts I and II each fail to allege a duty that Defendant — a clearing broker — owed to Plaintiffs.  Count III asks the Court to imply a restriction on Defendant's contractual right to refuse to execute trades that is inconsistent with the Customer Agreement Plaintiffs signed.  And Count IV fails to allege that Defendant employed wrongful means in its interference with Plaintiffs' business relations, which is a requirement under New York law.

On January 10, 2022, the Court issued an Order [ECF No. 450] dismissing Plaintiffs' Amended Consolidated Class Action Complaint [ECF No. 422].  That Order advised Plaintiffs Chavez and Jang that their next amended complaint — this pleading — would be their last.  (*See* Jan. 10, 2022 Order 17).  The Court sees no reason to give Plaintiffs another opportunity to amend.  Accordingly, it is

CASE NO. 21-2989-MDL-ALTONAGA/Damian

**ORDERED AND ADJUDGED** that Defendant, Apex Clearing Corporation's Rule 12 Motion to Dismiss Plaintiffs' (Fourth) Class Action Complaint **[ECF No. 491]** is **GRANTED**. Plaintiffs' Amended Class Action Complaint **[ECF No. 483]** is **DISMISSED**.

**DONE AND ORDERED** in Miami, Florida, this 9th day of January, 2023.

**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:     counsel of record