**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-2989-MDL-ALTONAGA/Damian**

| | |
|---|---|
| In re: JANUARY 2021 SHORT SQUEEZE TRADING LITIGATION | This Document Relates to: All Actions Involving the Federal Securities Laws |

**STIPULATION REGARDING**
**FILING OF AMENDED COMPLAINT**

WHEREAS, on October 14, 2021, this Court appointed Blue Laine-Beveridge as Lead Plaintiff on behalf of the Class ("Plaintiffs"), acknowledging in its Order that named plaintiffs could be added to aid Lead Plaintiff in representing the class (Dkt. No. 420 at 10);

WHEREAS, on November 30, 2021, Lead Plaintiff filed the Consolidated Class Action Complaint (the "CCAC") (Dkt. No. 446), adding named Plaintiffs Abraham Huacuja, Ava Bernard, Brandon Martin, Brendan Clarke, Brian Harbison, Cecilia Rivas, Garland Ragland Jr., Joseph Gurney, Santiago Gil Bohórquez, and Trevor Tarvis;

WHEREAS, on January 7, 2022, Defendants Robinhood Markets, Inc., Robinhood Financial LLC, and Robinhood Securities, LLC ("Defendants") filed a motion to dismiss the CCAC (Dkt. No. 449), on January 28, 2022, Plaintiffs filed their brief in opposition to Defendants' motion to dismiss (Dkt. No. 454), and on February 11, 2022, Defendants filed their reply brief in support of their motion to dismiss (Dkt. No. 455);

WHEREAS on August 11, 2022, the Court issued its ruling granting Defendants' motion to dismiss in part and denying Defendants' motion to dismiss in part. (Dkt. No. 503);

WHEREAS on September 12, 2022, Defendants' filed their Answer to the CCAC (Dkt. No. 510) (the "Answer");

1

WHEREAS on October 11, 2022, the Court entered its "Order Setting Trial and Pre-Trial Schedule, Requiring Mediation, and Referring Certain Matters to Magistrate Judge" ("Scheduling Order") (Dkt. No. 517);

WHEREAS the Scheduling Order requires that any motion to add new parties must be made no later than January 17, 2023 (*Id.* at 1);

WHEREAS the Scheduling Order closes class certification discovery on April 28, 2023, the day upon which Plaintiffs' motion for class certification is scheduled to be filed (*Id.* at 2);

WHEREAS, pursuant to the Scheduling Order, class certification discovery of all potential proposed class representatives is ongoing and will be completed by April 28, 2023;

WHEREAS Marcel Poirier, Sandy Ng, Doi Nguyen, and Thomas Cash seek to be added as named plaintiffs in the operative CCAC and may seek to serve as class representatives;

WHEREAS Brandon Martin, Garland Ragland, Jr., and Trevor Tarvis no longer seek to serve in a representative capacity, either as named plaintiffs or as proposed class representatives, and Plaintiffs so informed Defendants;

WHEREAS Defendants, without waiving their rights to oppose any proposed class representative in their response to Plaintiffs' motion for class certification, do not object to the addition of Marcel Poirier, Sandy Ng, Doi Nguyen and Thomas Cash as named plaintiffs and the removal of Brandon Martin, Garland Ragland, Jr., and Trevor Tarvis as named plaintiffs; and

WHEREAS Plaintiffs do not propose any changes to the CCAC other than to the paragraphs setting forth the named plaintiffs;

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED:

1.      Pursuant to Federal Rule of Civil Procedure 15(a)(2), Defendants consent to the filing

of the Amended Consolidated Class Action Complaint, a copy of which is attached as Exhibit A hereto.

2.  Discovery of proposed additional named plaintiffs Marcel Poirier, Sandy Ng, Doi Nguyen and Thomas Cash will proceed immediately and will be completed by April 28, 2023;

3.  Defendants will not file any motion pursuant to Rule 12(b) in response to the filing of the Amended Consolidated Class Action Complaint.

4.  Defendants' Answer will be deemed their answer to the Amended Consolidated Class Action Complaint.

Dated: January 17, 2023

**THE ROSEN LAW FIRM, P.A.**

s/ Laurence M. Rosen
Laurence M. Rosen  FBN # 0182877
275 Madison Avenue  40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Email: lrosen@rosenlegal.com
*Counsel for Plaintiffs*

**CRAVATH, SWAINE & MOORE LLP**

s/ Antony L. Ryan
Antony L. Ryan
Kevin J. Orsini
Brittany L. Sukiennik
825 8th Avenue
New York, NY 10019
Telephone: (212) 474-1596
aryan@cravath.com
korsini@cravath.com
bsukiennik@cravath.com

**HUNTON ANDREWS KURTH LLP**

Samuel A. Danon (FBN 892671)
María Castellanos Alvarado (FBN 116545)
333 S.E. 2 Avenue, Suite 2400
Miami, Florida 33131
Telephone: (305) 810-2500
Facsimile: (305) 810-2460
sdanon@huntonak.com
mcastellanos@hunton.com
*Counsel for Defendants*

# EXHIBIT A

to Stipulation Regarding Filing of Amended Complaint

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-2989-MDL-ALTONAGA/Torres**

In re: JANUARY 2021 SHORT SQUEEZE
TRADING LITIGATION

<u>**This Document Relates to: All Actions Involving the Federal Securities Laws**</u>

**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

Lead Plaintiff Blue Laine-Beveridge, named Plaintiffs Abraham Huacuja, Ava Bernard, Brendan Clarke, Brian Harbison, Cecilia Rivas, Doi Nguyen, Joseph Gurney, Marcel Poirier, Sandy Ng, Santiago Gil Bohórquez, and Thomas Cash  (collectively "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' Consolidated Class Action Complaint against defendants  Robinhood Markets, Inc. and two of its wholly owned subsidiaries, Robinhood Financial, LLC and Robinhood Securities, LLC (unless otherwise noted, collectively "Robinhood" or the "Robinhood Defendants") alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the statements made by defendants and their senior management, SEC filings, court records, Congressional testimony, administrative proceedings, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.      This is a class action on behalf of persons or entities who held common stock in AMC Entertainment Holdings, Inc. ("AMC"), Bed Bath & Beyond Inc. ("BBBY"), BlackBerry Ltd. ("BB"),  Express Inc. ("EXPR"), GameStop Corp. ("GME"), Koss Corp. ("KOSS"), Tootsie Roll Industries Inc. ("TR"), or American Depositary Shares of foreign-issuers Nokia Corp. ("NOK") and trivago N.V. ("TRVG") (collectively "the Affected Stocks") as of the close of trading on January 27, 2021, and sold such shares at a loss between January 28, 2021, and February 4, 2021 (the "Class"). Excluded from the class are the defendants, the officers and directors of defendants, members of their immediate families and their legal representatives, heirs, successors

1

or assigns and any entity in which defendants or any excluded persons have or had a controlling interest.

2.    The heroic outlaw depicted in the legend of Robin Hood stole from the rich to give to the poor. Eager to invoke that "stick it to the Man" allusion, the story that Robinhood repeatedly tells the public is that it is a revolutionary disruptor: By putting the power to trade into the hands – and fingertips – of a new generation of investors via its mobile app, Robinhood claims to have democratized access to financial markets by breaking Wall Street's stranglehold on the means to accumulate wealth. Alas, this too is a fairy tale.

3.    Far from being feisty outsiders enabling ordinary people to build stock portfolios, Robinhood's founders transitioned their business model from selling sophisticated software platforms to hedge funds and other high-frequency traders ("HFTs"), which allowed these automated traders to profit from front-running ahead of other traders, to the much more lucrative business of selling to various HFT market makers the orders placed by a subset of those other traders – the unsuspecting neophytes that represent the majority of Robinhood's customers.

4.    The events of late January and early February 2021 do not tell the story of how disruptive technology empowered investors but, rather, about how a selective denial of access to that technology for more than a week wiped out tens of billions of dollars of investors' equity. As set forth in detail below, Robinhood's actions were unique among retail brokers:

- Robinhood, and only Robinhood, halted trading and/or restricted purchases and/or holdings of multiple stocks for more than a single trading session – January 28th – extending some of its restrictions for six trading sessions, through February 4th
- On January 29th, when other retail brokers had already removed any share purchasing restrictions in force on January 28th, Robinhood increased the number of issuers subject to restrictions – from 13 to 23 to 50 – and did not limit the issuers affected to so-called "meme stocks", ultimately including Starbucks and General Motors

- On January 29th, Robinhood reduced the number of shares a customer could purchase and hold in various issuers multiple times over the course of a single trading session, causing price declines in the market prices of those stocks in the wake of those restrictions

- Even after raising a $3.4 billion capital cushion against the risk of unsettled positions in its portfolio, Robinhood slowly released its restrictions over the course of the trading week to avoid a repeat of the price rebound on January 29th that Robinhood actively tamped down with its additional restrictions

5.      Robinhood's singular actions distorted the prices of the Affected Stocks for more than a week because of its domination of the online retail brokerage industry. Robinhood, which claims to have opened nearly 50% of all retail brokerage accounts in the past five years,[1] boasted an industry-leading 12.5 million online accounts by the end of 2020 and added another 3 million during the month of January 2021. By one estimate, approximately *4% of all shares traded in the U.S. in January 2021* were traded on the Robinhood app.[2]

6.      With its brazen behavior – picking and choosing over six trading sessions not only which stocks its customers could purchase but also the total amount of shares in a particular issuer a customer could hold – Robinhood thumbed its nose at the bedrock principle of our free-market economy: the price of a stock is set by the law of supply and demand, unfettered by external controls.

7.      Only in rare instances of extreme price volatility, and in accordance with a SEC-regulated plan, would all trading be halted in a particular issuer, and even then for only a few minutes at a time. By completely shutting down, initially, and later restricting, the demand side of the equation for the nine Affected Stocks in the accounts of more than 15 million very active

---

[1] Robinhood Markets, Inc. S-1, filed July 1, 2021, at 2.

[2] Caitlin McCabe, "It Isn't Just AMC. Retail Traders Increase Pull in the Stock Market," *The Wall Street Journal* (June 18, 2021).

traders,[3] **for days** rather than just minutes, Robinhood unlawfully manipulated market prices for the Affected Stocks.

8.      Although it was relatively unknown to a national audience before January 28, 2021, Robinhood's name was on everyone's lips after it roiled the markets for the Affected Stocks through the unique and extreme actions it took that day. Not only were there immediate calls for government investigations, and questions raised about whether Robinhood colluded with hedge funds and market makers to stop an alleged short squeeze by retail investors (Robinhood's own customer base), but the impact that this single online broker had on the markets suddenly demonstrated Robinhood's significant market power.

9.       Apparently, the adage "no publicity is bad publicity" is true. Despite being pilloried by many in government and in the press, online, and over the airwaves, Robinhood became a venture capital darling overnight. By February 1st, only four days after its severe undercapitalization almost caused Robinhood to close its doors as a result of a major liquidity crisis, Robinhood had raised $3.4 billion in 96 hours – significantly more that it had raised in the eight years since its founding. One of those lining up to inject capital saw Robinhood's new customer metrics and concluded: "Robinhood is still the only game in town." While the national exposure delivered a critical funding boost that propelled Robinhood to its initial public offering ("IPO") in the summer of 2021, Class period investors, many of whom did not trade on the Robinhood app, were left with staggering losses.

---

[3] In the first quarter of 2020, Robinhood customers traded nine times as many shares as online retail broker E*Trade's customers and 40 times the number of shares traded by the customers of Charles Schwab. *See* Nathaniel Popper, "Robinhood Has Lured Young Traders, Sometimes With Devastating Results," *The New York Times* (July 8, 2020, last updated Sept. 25, 2021). The numbers are even more skewed with respect to risky options trading.

10.     Questions raised in the aftermath of the events described herein – who made money, who lost money, was there collusion, who is to blame, how can we prevent a recurrence – have been (and continue to be) the subject of Congressional hearings, several state investigations, at least one Securities and Exchange Commission Staff investigation, and countless news reports and articles. A spate of lawsuits pending before this Court arising from these events allege state law claims and federal antitrust claims against Robinhood and others. One argument raised by the defendants in the antitrust cases is that the actions complained of come under the purview of the federal securities laws.[4] Indeed they do.

11.     At the 2014 LAUNCH Festival in San Francisco, Robinhood Markets CEO Vladimir Tenev challenged the supposition that "brokerages exist for the purpose of making money," claiming instead: "The purpose of Robinhood is to make buying and selling stocks as frictionless as possible. So, if we make money as a side effect of that, you know, that's great *but it will never be at the cost of introducing frictions between our customers and the markets*." (Emphasis supplied.) From January 28th through February 4th substantial frictions between its customers and the markets were the very cost Robinhood forced its customers, and consequently other investors, to bear so that Robinhood's founders and early investors could make a lot of money in its upcoming IPO. These actions defrauded investors in violation of the Exchange Act of 1934.

12.     Throughout 2020 and in January 2021, Robinhood whipped up a frenzy of trading and then shut it down, unevenly reopening the demand spigot over the course of a week, directly affecting the markets' bid-offer pricing mechanism for the Affected Stocks. As set forth in greater

---

[4] Defs.' Motion to Dismiss the Antitrust Tranche Complaint and Incorporated Memorandum of Law at 33-38. (Dk. 408). Defendants' "either/or" argument is puzzling; multiple laws may be violated by the same course of conduct.

detail below, with a lucrative IPO already being planned, Robinhood manipulated the share prices of the Affected Stocks to avoid liquidation due to an inability to pay its core charges and excess net capital charges to the NSCC:

(a)     On January 28th, only a combination of disabling the "buy" button for eight (soon thereafter, 13) stocks and the NSCC waiving the excess capital premium charge – more than $2.2 billion of the $3.7 billion deposit requested that day – temporarily solved what Robinhood Markets' COO described as a "major liquidity issue". However, the NSCC only used its discretion to waive excess capital premium charges until February 1st, the two days it took transactions from January 27th and January 28th to clear.

(b)     On January 29th, when all other brokers lifted stock purchase restrictions and Robinhood started to do the same, the prices of the Affected Securities rebounded so strongly that Robinhood – which had only raised capital of $1 billion on January 28th – realized that it would be unable to meet an excess capital premium charge on February 2nd for the trading on its platform on January 29th and could once again face a major liquidity issue. For this reason, at several points throughout the trading day Robinhood – the only retail broker still restricting stock purchases – not only tightened the purchase restrictions (with some issuers down to just one share) but increased the number of issuers to which restrictions applied from 13 to 23 to 50.

(c)     Over the weekend, Robinhood raised an additional $2.4 billion of capital, which could prevent the NSCC from assessing steep excess capital premium charges for the January 29th transactions. At that point, Robinhood started the process of easing purchase restrictions, a process it dragged out over several days so that Robinhood could avoid a sharp increase in risk in its unsettled portfolio akin to what it had experienced on

January 29th when its partial lifting of restrictions caused an upward price spike in the share prices of the Affected Stocks.

13.     Robinhood knew the prices of the Affected Stocks would plummet because of its purchase restrictions:

(a)     As early as January 23rd, Robinhood executives were analyzing the impact of making margin calls on its customers with respect to their GameStop positions. They knew that their customers – most of who were just starting on their investment journey – would not have the funds to meet the margin calls, which could force Robinhood to close out their positions potentially exposing Robinhood to financial risk.

(b)     On January 26th, when the President and COO of Robinhood Securities, a 30-year industry veteran, alerted others that Robinhood Securities was moving GameStop to 100% margin the next day, he started his communication with the statement "I sold my AMC today." This seasoned securities industry executive was well aware (and informed the others with his statement) that the result of the Robinhood's introduction of frictions between its customers and the markets – be it a margin call or a total inability to purchase shares – would be a sharp decline in the price of the stocks subjected to the restrictions.

14.     Throughout the week it was artificially distorting the price of the Affected Stocks Robinhood went to great lengths to convince investors that was not what was occurring. On multiple occasions, Robinhood falsely assured investors that the national exchanges were free of manipulation, to wit, that Robinhood's actions were the same as its peers and simply part of any retail broker's "normal operations." Robinhood even went as far as to blame our national markets' failure to implement a real-time settlement system – something the CEO of the Depositary Trust & Clearing Corporation testified would be unworkable and deprive financial markets of liquidity

– rather than its massive undercapitalization for the actions it took to distort the markets. These representations were patently untrue – and Robinhood knew it.

15.     The frictions between its customers and the markets introduced and maintained by Robinhood during the Class period, to ensure that its upcoming IPO was not derailed by a liquidity crisis, are against the law. Tenev later rationalized Robinhood's actions by claiming, during a discussion with Dave Portnoy of Barstool Sports, that "[i]f Robinhood ceases to exist," that would have caused more harm. Thus, Tenev reasoned, "protecting the firm and protecting the system, ultimately, that was the best thing for customers." Even if Tenev were correct, unlawful actions undertaken to ensure the survival of a company do not get a free pass under our nation's federal securities laws.

16.     While our sympathies may lie with a lawbreaker such as the legendary Robin Hood, who acted with a noble purpose, Robinhood's greed must be met with justice for the investors it harmed.

## JURISDICTION AND VENUE

17.     The claims asserted herein arise under and pursuant to Sections 9(a) and 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

19.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) because defendants conduct business in this District and caused damages within this District. In addition, venue is proper in this District because the Judicial Panel for Multidistrict Litigation determined that the actions that are before this Court should be centralized in this District pursuant to 28 U.S.C. § 1407.

20.     In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of national securities exchanges.

## PARTIES

21.     Blue Laine-Beveridge, appointed by the Court as Lead Plaintiff (Dk. 420), owned shares of AMC and NOK at the close of the markets on January 27, 2021, and sold AMC shares on Robinhood's trading platform on February 3, 2021, and was economically damaged thereby.

22.     As set forth in detail in their certifications attached as Exhibit A hereto, plaintiffs Abraham Huacuja, Ava Bernard, Brendan Clarke, Brian Harbison, Cecilia Rivas, Doi Nguyen, Joseph Gurney, Marcel Poirier, Sandy Ng, Santiago Gil Bohórquez, and Thomas Cash each owned shares of one or more of the Affected Stocks at the close of the markets on January 27, 2021, and sold those shares at a loss on one or more days during the period from January 28, 2021, to and including February 4, 2021, and were economically damaged thereby. Many, but not all, of the Named Plaintiffs traded on the Robinhood platform.

23.     Defendant Robinhood Financial, LLC (Robinhood Financial) is a brokerage company providing online and mobile application-based discount stock brokerage services that allow users to invest in publicly traded companies and exchange-traded funds. Robinhood Financial, LLC's business address is 85 Willow Road, Menlo Park, CA 94025.

24.     Defendant Robinhood Securities, LLC (Robinhood Securities) is registered as a broker-dealer with the SEC. Robinhood Securities, LLC acts as a clearing broker and clears trades introduced by its affiliate Defendant Robinhood Financial. Robinhood Securities, LLC's business address is 500 Colonial Center Parkway, Suite 100, Lake Mary, FL 32746.

25.     Defendant Robinhood Markets, Inc. is the corporate parent of defendants Robinhood Financial LLC and Robinhood Securities, LLC, both of which are wholly owned subsidiaries of Robinhood Markets. Robinhood Markets, Inc.'s business address is 85 Willow Road, Menlo Park, CA 94025.

26.     Robinhood Markets and its wholly owned subsidiaries operate as one entity, and they are treated as one entity in Robinhood Markets' IPO Registration Statement. *See* S-1, Robinhood Markets, at F-7 ("Robinhood Markets, Inc. ('RHM', together with its subsidiaries, 'Robinhood,' the 'Company,' 'we,' or 'us,')"). The S-1 explains that "[t]he consolidated financial statements include the accounts of RHM and its wholly-owned subsidiaries. All intercompany balances and transactions have been eliminated."). *Id*. at F-8. The S-1 also describes Robinhood Markets and its subsidiaries as a "Vertically Integrated Platform." *Id*. at 6.

27.     Robinhood Financial and Robinhood Securities are single member, limited liability companies, with all tax effects of income or loss included in the tax returns of their parent, Robinhood Markets.

28.     Robinhood Markets, Robinhood Financial and Robinhood Securities acted jointly in the market manipulation that is alleged herein. *See id*. at 41 (explaining that "*we* temporarily prevented our customers from purchasing certain specified securities") (emphasis added).

29.     Unless specified, the named defendants are collectively referred to herein as the "Robinhood".

## SUBSTANTIVE ALLEGATIONS

**Background**

30.     In 2011, Robinhood founders Vlad Tenev and Baiju Bhatt owned and operated Chronos Research, a company that developed backend trading technology which increased the

speed of trade execution. That summer, the company introduced Zardoz, software platforms that lowered tick-to-trade[5] latencies to either five microseconds or fifteen microseconds. Chronos Research's products were created to enable hedge funds and other HFTs to use speed to obtain a trading advantage over those without such high-end technology. In fact, HFTs are known to front-run other traders and to exploit differences in the bid-ask spreads across multiple exchanges.

31.     Several months later, purportedly inspired by the Occupy Wall Street protests, Bhatt and Tenev conceived the idea for Robinhood – a company whose stated mission is to democratize investing by providing access to financial markets at no cost to its customers. In 1973, sculptor and videographer Richard Serra coined the phrase "if something is free, you're the product." Although most of Robinhood's revenues came from selling customer orders to HFT market makers – the same firms for whom Chronos Research's products were designed – for much of its short life, Robinhood had gone to great lengths to hide that fact.

32.     Although it is now widely known that Robinhood's revenues come from routing its customers' orders to a handful of market makers for execution – a practice known as "payment for order flow" ("PFOF") – a December 17, 2020, SEC Cease-and-Desist Order imposing a $65 million civil penalty exposed how Robinhood Financial had methodically altered its public disclosures about PFOF for a number of years, with each adjustment moving farther away from the truth:

        (a)     Before the app launched, Robinhood had disclosed PFOF as a source of

---

[5] For HFTs, whose trades are automated, "tick-to-trade" is the response time between receiving a market "tick" (a price movement in the market, either an uptick or a downtick) presenting the opportunity to the algorithm and processing the buy or sell order.

revenue in its FAQ answer to the question "How does Robinhood make money?";[6]

(b)     Apparently concerned about negative publicity surrounding PFOF and HFTs, by late 2014, PFOF was taken out of the answer to "How does Robinhood make money?", a prominent topic on the Robinhood Help Center webpage, and placed elsewhere. There, Robinhood described PFOF revenue as "indirect" and "negligible" and stated that PFOF would be moved to the "How does Robinhood make money?" page if PFOF became a direct or significant source of revenue.[7]

(c)     Although PFOF made up 80% of Robinhood's income through mid-2016, PFOF was never disclosed as a revenue source, as had been promised, in the answer on the "How does Robinhood make money?" FAQ page. To the contrary, at some point during 2016, Robinhood removed all reference to PFOF from its website and even trained those responding to inquiries that PFOF as a source of revenues was an "incorrect" answer to a question about how Robinhood makes money. This deception continued through late 2018, despite PFOF being Robinhood's largest revenue source.[8]

---

[6] *In the Matter of Robinhood Fin., LLC*, SEC Admin. Proc. File 3-20171, ("SEC C&D Order") Finding of Fact No. 15. https://www.sec.gov/litigation/admin/2020/33-10906.pdf.

[7] *Id.* at Finding of Fact Nos. 16-17. Consistent with the SEC's findings, some time before April 2016, the discussion of PFOF was placed into an article entitled "Order Routing and Exchanges" that one would have to click through to reach on the "Trading with Robinhood" section of the Help Center. Toward the bottom of page is the following statement: "Prior to launching the product, we had some language saying that we intended to generate revenue through PFOF. The reason we removed this was because currently we execute all of our orders through our clearing partner APEX Clearing; as a result, Robinhood does not directly receive PFOF and any revenue we indirectly generate from it is negligible. If we were ever to receive it directly, or if it becomes a significant source of revenue, we will reintroduce that language into the FAQ." (https://web.archive.org/web/20160412113038/https://support.robinhood.com/hc/en-us/articles/204336175-Order-Routing-and-Exchanges, last accessed November 29, 2021).

[8] SEC C&D Order, Finding of Fact Nos. 18, 27, 31-36.

33.     The SEC also found that Robinhood Financial knowingly violated its duty of "best execution" for customer orders by routing trades only to executing brokers that would split the PFOF 80% to Robinhood and only 20% to price reduction for customers, *a reverse of the split paid to large retail broker-dealers*.[9] Not surprisingly, an extensive internal analysis conducted by Robinhood in March 2019 bluntly concluded: " '[n]o matter how we cut the data, our % orders receiving price improvement lags behind that of other retail brokerages by a wide margin.' " The SEC continued: "Robinhood further found that the amount of price improvement obtained for Robinhood customers was far lower than at competing broker-dealers, measured on a per order, per share, and per dollar traded basis. Senior Robinhood personnel were aware of this analysis." Although Robinhood had a Best Execution Committee, from 2016 to 2019 it did nothing to either assess or address whether Robinhood was breaching its duty of best execution.[10]

34.     Even though PFOF is banned in other countries because of the inherent conflicts it poses – including, in addition to a brokerage firm pocketing most of the payment, market maker front-running and broker inducements to increase customers' trading frequency[11] – since 1994,

---

[9] *Id*. at Finding of Fact Nos. 21-23, 27. A September 2018 article on *Seeking Alpha* first noted key differences in PFOF payment reporting in SEC Rule 606 filings. Author Logan Kane queried: "Every other discount broker reports their payments from HFT 'per share,' but Robinhood reports 'per dollar', and when you do the math, they appear to be receiving far more from HFT firms than other brokerages. This raises questions about the quality of execution that Robinhood provides if their true customers are HFT firms." (https://seekingalpha.com/article/4205379-robinhood-is-making-millions-selling-out-millennial-customers-to-high-frequency-traders, last accessed November 29, 2021).

[10] SEC C&D Order, Finding of Fact Nos. 29, 30 & 39.

[11] Robinhood's "gamification" of its app to induce frequent trading is under scrutiny by the SEC. *See* https://www.sec.gov/rules/other/2021/34-92766.pdf.

the SEC has instead opted for full disclosure of PFOF and adherence to a broker's duty of best execution for its customers. As laid out in detail by the SEC, even before the events of late January and early February 2021 unfolded, Robinhood had already failed its customers spectacularly on both measures. But the worst was yet to come.

35.     During the pandemic lockdown, with stimulus checks in one hand and time on both hands, large numbers of Americans started to follow the markets and trade for the first time. The popularity of mobile app-based brokers such as Robinhood exploded among younger, first-time traders.[12] Social media sites such as the WallStreetBets sub-Reddit and Stocktwit provided millions of new investors with a platform to discuss investment strategy and the merits of trading in particular stocks. Not surprisingly, retail trading surged tremendously. On several occasions in 2020, Robinhood's platform crashed due to the steep increase in trading volume, causing millions of dollars in investor losses.[13]

36.     The extent to which novice, retail traders entered the market during the pandemic was detailed in a recent SEC Staff Report. Notable statistics include:

(a)     During 2020, the 60-day moving average of off-exchange market volume, *i.e.,* trades routed through wholesalers instead of being executed on an established

---

[12] Robinhood, whose investors' median age is 31, seeks to drive that figure even lower. In "Robinhood Is Going on a College Tour to Recruit New Customers," the *Wall Street Journal* reported on September 15, 2021, that Robinhood planned to give community college and HBCU students $15 to sign up, with five lucky customers to receive $20,000 for tuition.

[13] Failure to supervise the technology relied upon to provide core broker-dealer services caused multiple outages, including one for 26 hours on March 2-3, 2020. This is one reason Robinhood was fined $70 million by the Financial Industry Regulatory Authority ("FINRA") in June 2021. *See* "FINRA Orders Record Financial Penalties Against Robinhood Financial, LLC," June 30, 2021. ("FINRA Order") (https://www.finra.org/media-center/newsreleases/2021/finra-orders-record-financial-penalties-against-robinhood-financial last accessed November 29, 2021).

exchange (deemed to be a proxy for retail trading), increased from 38.4% on March 23 to 46.5% at the end of the 2020, with the single-day percentage exceeding 50% for the first time on December 23, 2020, at 50.4%.[14]

(b)    Trading in single option contracts in the 50 most-traded stocks rose from 10% to 14% in a matter of months, with number of contracts trading per day increasing from 19.6 million in December 2019 to 34.3 million in December 2020.[15]

(c)    In December 2020, over the counter, non-exchange listed equity volume (including "penny" stocks) surged, with a daily average of nearly 50 billion shares, compared to roughly 14.7 billion shares per day in November 2020, which had been the most active month over the prior two years.[16]

37.    This enormous growth in online retail trading corresponded to the destruction of many of the guardrails established by government entities and by self-regulatory organizations to protect investors. As explained on its website, FINRA is "authorized by Congress to protect America's investors by making sure the broker-dealer industry operates fairly and honestly." One rule enacted to protect investors, Rule 2111, sets standards for investment recommendations to customers, providing, in relevant part:

(a)    A member or an associated person must have a reasonable basis to believe that a recommended transaction or investment strategy involving a security or securities is suitable for the customer, based on the information obtained through the reasonable diligence of the member or associated person to ascertain the customer's

---

[14] SEC "Staff Report on Equity and Options Market Structure Conditions in Early 2021," at 16 n. 51 (Oct. 14, 2021) ("SEC Staff Report")  (https://www.sec.gov/files/staff-report-equity-options-market-struction-conditions-early-2021.pdf)

[15] *Id.* at n.52.

[16] *Id.* at n.51.

investment profile. A customer's investment profile includes, but is not limited to, the customer's age, other investments, financial situation and needs, tax status, investment objectives, investment experience, investment time horizon, liquidity needs, risk tolerance, and any other information the customer may disclose to the member or associated person in connection with such recommendation.

38.     Because customers trading on the Robinhood platform are self-directed, *i.e.,* not receiving portfolio management or investment advice from a licensed advisor, Robinhood insufficiently concerned itself with whether investments were suitable for the customers making them, only providing some basic financial literacy articles free-of-charge on its customer website. This paved the way for many of Robinhood's customers to trade not only in equities, but also in options,[17] for which Robinhood received a higher PFOF rate.[18] For the month of December 2020, Robinhood's Rule 606 report showed PFOF of $1.7 million for trades of S&P 500 stocks and $52.7 million in PFOF for its customers' options trading.[19]

39.     By late 2020, Robinhood was adding new traders at an accelerating pace, increasing its customer base to 12.5 million funded accounts. In early December, news reports surfaced that

---

[17]  FINRA fined Robinhood for relying on "option account approval bots," without oversight by the firm principals, to approve thousands of customers whose inconsistent or illogical responses to the firm's questions should have disqualified them from trading options. *See* FINRA Order.

[18]  S. Kolhatkar, "Robinhood's Big Gamble: In eliminating barriers to investing in the stock market, is the app democratizing finance or encouraging risky behavior?", *The New Yorker* (May 10, 2021) ("At the end of 2017, Robinhood announced options trading on the platform, making it available to all but its most inexperienced users. The company received even higher payment-for-order-flow rates on options than on stocks, and options trading soon became the company's largest source of revenue. In options trading, it is easy to quickly rack up enormous losses, and it has been associated with compulsive behavior.")

[19]   Felix Salmon, "Why people love to hate Robinhood," *Axios* (Feb. 4, 2021) (https://www.axios.com/robinhood-lawsuit-gamestop-stocks-90e13174-e459-4212-8f62-15540b1baf54.html last accessed November 29, 2021).

Robinhood had selected Goldman Sachs to lead its initial public offering in 2021.[20]

**Chronology of Relevant Events**

 The Lead-Up to January 28, 2021

40.     Although purchases by prominent market players sparked retail investor interest in some of the Affected Stocks before January 2021, *e.g.,* by November 2020, the former CEO of online pet-supply giant Chewy.com, Ryan Cohen, had purchased a 9.98% interest in GameStop and Michael Burry's Scion Asset Management held a 5.3% interest, the rise in meme stock prices occurred in mid- to late- January 2021 because posters on social media investment sites had noted that some hedge funds had taken large short interests in certain of the Affected Stocks.

41.     The most-famous exchange between short sellers and retail investors was an online battle over GameStop. On January 19, 2021, Citron Research tweeted that it would livestream an event the next day explaining why GameStop share values would retreat, calling those currently purchasing GameStop – then hovering around $40 per share – "suckers at this poker game." Citing alleged hacks to its Twitter feed on January 20th, Citron's Andrew Left indicated that he would tape and post the message on January 21st. Live on the afternoon of January 21st on Benzinga's ZingerNation Power Hour, Left stated that GameStop's business was in "terminal decline." Retail investors and savvy hedge funds responded by driving up the price of the stock: after closing at $43.03 that day, GameStop's price soared to $65.01 at the close of the markets on January 22, 2021. By January 27th, Citron was forced to cover its position with purchases in the $90-dollar range, according to a Tweet it posted at 6:47 a.m. that day.

42.     As GameStop's share price began to soar as a result of this public feud, on January

---

[20] *See, e.g.,* reports by Reuters and Yahoo! Finance on December 8, 2020.

23, 2021, internal Robinhood communications between Tenev, Robinhood Securities President and COO James Swartwout and others centered around the risk to Robinhood of customers trading GameStop on margin. Specifically, Swartwout asks: (1) How many customers are holding GME on margin, (2) If we move to 100% [margin] -- what are the number of calls generated, and (3) What is our risk exposure?[21] At some point in the planning and analysis for such an event, a Robinhood employee chimed in, recognizing the potential harm to Robinhood's customers should Robinhood require 100% margin for GameStop:

> "It seems that the process outlined above covers firm risk well, but from a public perception POV, we may want to consider the risks our customers face. Is there a comms need or other action we should consider that would provide protection to our customers? I defer to … and … on that point, but something to consider. Although we don't have a straightforward obligation here because our customers are self directed, the perception is that they are relatively inexperienced and our action may well be compared to the actions of other firms  (with other obligations to customers)."[22]

Robinhood was thus acutely aware of the potential exposure its customers would face if forced to liquidate their positions because of a margin call.

43.    Prior to January 25th, hedge fund Melvin Capital had amassed an enormous short position in GameStop shares. As GameStop's share price rapidly increased, Melvin Capital was facing billions of dollars of losses. On January 25th, Melvin Capital announced an infusion of $2.75 billion – hedge funds Point72 and Citadel LLC ("Citadel") lent $750 million and $2 billion, respectively – to stay afloat after its value had declined more than 30% in a matter of weeks, due mainly to its short position in GameStop. Earlier, in November 2020, a post on WallStreetBets

---

[21] Robinhood Tranche Amended Consolidated Class Action Complaint (Dk. 409) ("Robinhood State Law Complaint") at ¶194 (reproducing internal chat).

[22] *Id.* at ¶195.

alerted the sub-reddit's millions of followers of Melvin Capital's short interest in GameStop and subsequent posters vowed to take the fund down. Melvin Capital closed out its GameStop position on January 27th.

44.     On the morning of January 27th, Vlad Tenev had published an opinion piece for CNBC.com entitled "Becoming an investor is the new American dream, just like home ownership was before." Making the case that Robinhood enables "everyday" Americans to trade, Tenev welcomed customers to the platform to take part in the current market rally:

> "In these turbulent times, it gives us tremendous satisfaction that Robinhood has expanded access for many to begin their investment journey during the market rally. Although most of those gains are unrealized, and 2021 is sure to bring its own twists and turns, we are proud to have enabled our customers to begin participating in the markets and allow them to progress towards their own financial independence.
>
> ***
>
> I'd argue that those who question the capability of retail investors do not have the interests of everyday Americans at heart. It's wrong to view the arrival of increasing numbers of retail investors in the market with dismay. It's short-sighted to proclaim that financial instruments integral to investment strategies of the wealthiest Americans should be left exclusively in the hands of the old guard. [23]

45.     When asked during a companion interview on CNBC's "Squawk Box" that same morning how the company planned to handle the massive volume of trading in stocks such as GameStop, Tenev stated:

> "Like many others in the industry, we have processes that respond to increases in volatility in certain names by doing things like raising the margin requirements.

---

[23]     *See*   https://www.cnbc.com/2021/01/27/robinhood-ceo-becoming-an-investor-is-the-new-american-dream-just-like-home-ownership-was-before.html (last accessed November 29, 2021). Even as Robinhood was worried, internally, about being able to handle the trading volume and margin risk, in addition to this opinion piece, Tenev appeared on Yahoo Finance Live on January 27th and made a similar pitch to customers new to investing: "Retail investors and individuals have felt like they've been talked down to. Lots of them felt like they haven't been taken seriously," he said. "There's this term 'sophisticated investor' that's been thrown around, so there's an idea that they're unsophisticated." https://www.yahoo.com/now/robinhood-ceo-retail-investors-have-felt-like-they-have-been-talked-down-to-are-now-empowered-214947293.html (last accessed November 29, 2021).

We've done that in lots of cases. We, we always remain focused on making sure the system is reliable, that we're investing in stability, making sure we're up for customers when they need us the most … There's things happening, different things happening every week. I think we have to avoid running our business as if we're responding to what's in the news on a weekly basis …"

46.     When specifically asked whether Robinhood was raising the margin requirements for GameStop, Tenev refused to directly answer the question, but instead again compared Robinhood's actions to those of its competitors:  "Like other brokerages do, we monitor volatility and take steps as appropriate, like raising the margin requirements." Tenev's answer, which painted Robinhood as a responsible actor in the industry, one that need not specifically react to the meme stock trading phenomenon, was less than candid.

47.     Internally, the answer to host Andrew Ross Sorkin's question was a resounding "Yes!" According to the SEC Staff Report, Robinhood had already begun to ratchet up purchasing restrictions, raising both initial and maintenance margin requirements, with GameStop at 80% on January 26, 2021, and 100% January 27, 2021.[24] Of course, Tenev's bid for new customers, posting both an op-ed and appearing on CNBC's "Squawk Box" (and on Yahoo Finance Live), would not have fared as well had he publicly announced specific restrictions on margin trading of GameStop, which could have opened up the door to questions about customers' ability to readily purchase the other Affected Stocks.  By side-stepping host Sorkin's question, Tenev enabled the Robinhood app to be downloaded 120,000 times that day and Robinhood to set its own record for active daily users on mobile, at 2.6 million, ultimately catapulting Robinhood to the No. 1 app on the App

---

[24] SEC Staff Report at 33-34. Although Robinhood is not named, the unique actions described were those taken by Robinhood. *See also* Robinhood State Law Complaint at ¶12 (on January 26th, Robinhood Securities President and COO James Swartwout stated in an internal chat: "I sold my AMC today. FYI – tomorrow morning we are moving GME to 100% –  so you are aware.").

Store for the first time.

48.     Despite Tenev's attempt to place Robinhood in the company of other retail online brokerages, such as TD Ameritrade and Charles Schwab, what Robinhood did over the next eight days did not remotely resemble the risk management processes employed by any other brokerage firm. Nor were any two entities in the events that unfolded as tied together in public opinion as Robinhood and Citadel Securities LLC ("Citadel Securities").

49.     On the evening of January 27, 2021, Robinhood senior staff had an important discussion with employees of Citadel Securities, the market maker responsible for the largest portion of Robinhood's revenues. According to Robinhood's IPO Registration Statement, in 2019, PFOF revenue from Citadel Securities represented 29% of Robinhood's total revenues; in 2020, the figure rose to 34%.[25]  In actual dollars, Citadel Securities paid Robinhood nearly $80.5 million for its customers' order flow in 2019 and a whopping $326 million for its customers' order flow in 2020.[26]  Most important, the filing revealed that Robinhood's "***PFOF … arrangements with market makers are not documented under binding contracts***."[27]  In short, the arrangement was terminable by either party at any time. Consequently, the continued growth of Robinhood's business, and most certainly its ability to move forward with an IPO, was very much in the hands of Citadel Securities on the evening of January 27, 2021.

50.     As internal communications at Robinhood and email chains between Robinhood

---

[25] Robinhood  Markets, Inc. Form S-1, filed July 1, 2021, at F-10.

[26] *Id*. at F-4.

[27] *Id.* at 35.

and Citadel Securities indicate,[28] although the initial reason for the discussion appears to have been anticipated "across-the-board" adjustments by Citadel Securities of PFOF payments to Robinhood (according to Robinhood Markets Chief Operating Officer Gretchen Howard), it was apparent that the discussion also included references to the negative impact on Citadel/Citadel Securities and other HFTs of the intense purchasing activity that caused the price of most of the Affected Stocks to skyrocket in a single trading session earlier that day.[29]

51.    Following the phone call, at least one Robinhood executive was unhappy with the way Citadel Securities apparently dictated the new terms of the parties' arrangement. Robinhood Securities President and COO James Swartwout wrote to a counterpart at Citadel Securities: "I have to say I am beyond disappointed in how this went down. It's difficult to have a partnership when these kind of things go down this way."[30] Although Citadel Securities was Robinhood's largest source of revenue, pursuant to an arrangement that is not documented in a binding contract, Robinhood appears to have only found out on the night of January 27, 2021, who had the upper hand in the parties' relationship.[31]

---

[28] Partially redacted reproductions of the communications appear in the Corrected Consolidated Class Action Complaint at ¶¶ 304-313 in the Antitrust Tranche (Dk. 416) ("Antitrust Complaint").

[29] *Id*. at ¶308 (One Robinhood employee noted: "Anecdotal evidence that several 'very large' firms are having really bad nights too". Robinhood Securities President and COO Swartwout replied: "everyone is. you wouldn't believe the convo we had with Citadel. total mess").

[30] Antitrust Complaint at ¶313.

[31] Underscoring this point, Tenev's request to speak to Citadel CEO Ken Griffin that evening appears to have been rebuffed. In another email chain, Tenev asked his team to propose a one-on-one; in response, Citadel Securities offered to have Tenev speak with someone else, indicating arrangements could be made to speak with Griffin in the future. *Id.* at ¶¶307, 311 and 312.

<u>January 28, 2021</u>

52.     In the very early hours of the morning – *after* the unsatisfactory phone call with Citadel Securities and *before* receiving the January 28th deposit requirement from the NSCC that Robinhood blames for its six days of trading restrictions – Robinhood decided that customers holding options for GME and AMC set to expire on January 29th should not be permitted to exercise those options. Robinhood unilaterally acted in the middle of the night to foreclose this possibility by placing all options expiring on January 29th into "position closing only" ("PCO"), sending the following email to customers (posted at 1:03 a.m. on Twitter):

.0.5k ⌄ | ⤬ Robinhood Announces You Can No Longer Open GME/AMC Positions For Friday. ...   **News**
**Thu, Jan 28, 2021, 01:03:42 AM Eastern Standard Time**

Posted by u/vocchiogrosso 10 months ago 🏅 🦍5 🏆4 Ⓢ 🦍 🦅2 🐔

# Robinhood Announces You Can No Longer Open GME/AMC Positions For Friday. 😱

 **News**

### For GME and AMC options expiring Friday



We wanted to reach out to you in light of the unprecedented volatility surrounding GameStop (GME) and AMC Entertainment Holdings (AMC). In an effort to help reduce risk, we've begun implementing certain restrictions for GME and AMC options trading.

**Effective immediately, all GME and AMC options with expirations of January 29th, 2021 will be set to closing transactions only.**

Additionally, our standard sellout procedures on GME and AMC have been adjusted to account for the increased risk. Because of this, your positions are at a higher chance than usual of being closed out if you are unable or choose not to close out the positions yourself.

**How does this affect me?**

If we determine that your option contract is at risk of being in the money and you don't maintain the necessary collateral to support assignment/exercise, we may take proactive measures to help reduce your account risk, including closing at-risk positions prior to expiration date. This may also include, but isn't limited to, spread positions with a theoretical max gain/loss.

Please note that having the collateral to place the trade is different from having the collateral to support exercise/assignment.

**What actions might I consider taking?**

As always, it's important to stay on top of your portfolio and monitor the market closely. You may check out these articles for some best practices on monitoring and exiting your positions: **simple strategies**, **advanced strategies**.

If you have any questions about your account specifically, please reach out to our support team. We're here to help.

As always, thank you for your prompt attention and thank you for being a Robinhood customer.

24

53.     Specifically, customers were told: "If we determine that your option contract *is at risk of being in the money* and you don't maintain the necessary collateral to support assignment/exercise, we may take proactive measures to help reduce your account risk, including closing at-risk positions prior to expiration date." (Emphasis supplied.) Thus, before customers could decide whether to close out the position or deposit funds to exercise their in-the-money options, *i.e.*, to purchase GME and AMC shares at less than their then-current market value, Robinhood unilaterally decided it could proactively close out their positions early should it choose to do so.

54.     By closing out the positions early, Robinhood relieved the sellers on the other side of the option contracts (the "counterparties") of the obligation to sell shares to Robinhood's customers at below market value. Should the counterparties not have had shares of GME and AMC in their accounts, Robinhood's action would further relieve them of having to purchase shares at exorbitant prices to enable them to deliver those shares upon exercise of the option. As the pressure to perform under these contracts was removed from counterparties, Robinhood knew that such a "proactive" measure, indeed one step beyond requiring 100% margin for a share purchase, would cause the price of GME and AMC shares to decline rather than to continue to climb even higher.

55.     Robinhood's use of the phrase "at risk of being in the money" is rather telling. This is a very an odd way to refer to a successful bet on a stock's price movement – unless Robinhood knew for a fact that its customers were new investors who both routinely traded options without the financial means to exercise them *and* were more likely than experienced options traders to exercise their options.[32]

---

[32] In fact, Robinhood Securities President and COO James Swartwout explained that Robinhood customers were so uninformed about options trading that Robinhood took affirmative steps to try

56.     Preemptively taking away decision-making authority from its customers by closing out options early is an action that runs directly contrary to Robinhood's repeated refrain that it is democratizing finance for new investors. Less than 24 hours earlier, Tenev's published opinion on CNBC.com accusatorily proclaimed: "I'd argue that those who question the capability of retail investors do not have the interests of everyday Americans at heart."

57.     The decision to move all GME and AMC options expiring on January 29th to PCO during the early hours of January 28th, potentially closing out early options "at risk of being in the money," also contradicts Robinhood Securities President and COO Jim Swartwout's sworn statement on February 8th:  "At no time on or since January 27, 2021, did Robinhood restrict a customer's ability to exercise ITM [in-the-money]options."[33]

58.     Hours later, at 5:11 a.m. EST on January 28th, Robinhood received a file from the National Securities Clearing Corporation ("NSCC"), of which Robinhood Securities is a member, indicating that Robinhood was required to pay $3 billion dollars (in addition to the nearly $700 million already on deposit) to secure completion of unsettled trades in its customers' accounts. The $3.7 billion charge had two components: the core clearing fund charge, the primary component of which is the value at risk charge ("VaR") which is calculated based upon the estimated risk in the member's unsettled portfolio, and an excess capital premium charge which compares the member's excess net capital to its core charges. The more the core charges exceed

---

to prevent customers from losing money by requiring they speak to a live broker before exercising out-of-the-money options, *i.e.*, to purchase shares at a price higher than available on the open market, they should opt to allow to expire. Decl. of James Swartwout, filed Feb. 8, 2021, in *Cobos v. Robinhood Fin. LLC*, 21-cv-00835, (C.D. Cal.) (Dk. 27-3) ("Swartwout Decl.") at ¶¶ 22-23.

[33] Swartwout Decl. at ¶24.

the member's capital cushion, the larger the capital premium charge. To avoid incurring the latter charge the member must either reduce the level of risk or raise additional capital.[34]

59.     Citing a "major liquidity issue" Robinhood Markets COO Gretchen Howard wrote in an internal chat that eight stocks – AMC, GME, NOK, BB, NAKD, KOSS, EXPR and BBBY – had been moved to position closing only ("PCO") on the Robinhood Financial platform, with all purchases prohibited.[35] According to Shiv Verma, Head of Treasury at Robinhood Markets, because the VaR charge exceeded Robinhood's net capital, a special excess capital premium ("ECP") charge had been assessed in addition to the core VaR charge, and Robinhood was looking for a way to eliminate or significantly reduce the more than $2.2 billion ECP charge.[36]

60.     Following a discussion between Robinhood and the NSCC in which Robinhood "proposed to the NSCC that, as a temporary measure, it would limit customer purchases for certain volatile stocks that had driven the increased deposit requirements,"[37] before the markets opened

---

[34] *See* Written Testimony of Michael C. Bodson, CEO of the Depository Trust & Clearing Corporation, before the Committee on Financial Services of the U.S. House of Representatives, May 6, 2021 ("Bodson Testimony") at 3-4. (https://www.dtcc.com/-/media/Files/PDFs/ Testimony-of-Michael-Bodson-050621.pdf)

[35] Internal Robinhood chats are reproduced at ¶¶ 232 and 233 of the Antitrust Complaint.

[36] Declaration of Shiv Verna, filed Feb. 8, 2021, in *Cobos v. Robinhood Fin. LLC*, 21-cv-00835, (C.D. Cal.) (Dk. 27-2) at ¶13. ("Verna Decl."). For an undercapitalized broker, the ECP could potentially be much greater than the VaR. Tenev testified that Robinhood's was more than $2.2 billion on the morning of January 28th. *See* Written Testimony of Vladimir Tenev, CEO Robinhood Markets, Inc., before the Committee on Financial Services of the U.S. House of Representatives Feb. 18, 2021, at 9-10 (after ECP was waived, $3.7 billion charge was reduced to the core charge amount of approximately $1.4 billion)  Thus, the bulk of the $3 billion requested deposit (in addition to the $700 million already on deposit) was an ECP charge not a core charge.

[37] Verna Decl., *supra, id.* Although Tenev later claimed that Robinhood had been "forced" to prohibit purchases, this was a voluntary proposal made by Robinhood. Bodson testified: "NSCC's role in the market is a neutral one. It does not impose trading restrictions upon its clearing members

on January 28th, the NSCC waived Robinhood's capital premium charge for the day – in fact, the NSCC waived net capital charges through February 1, 2021, to allow the trades from both January 27th and January 28th to work through the system.[38] Only because of its decision to halt stock purchases in eight issuers and the NSCC's waiver of a $2.2 billion charge was Robinhood was able to temporarily solve its "major liquidity issue" and meet the NSCC's greatly-reduced deposit requirement for January 28th with an additional $700 million payment. Had both extraordinary measures not been taken, Robinhood would have faced liquidation of its customers' positions and left the other members of the NSCC to cover the losses.[39]

61.    Apparently, the internal assessment of Robinhood Financial's President and COO, David Dusseault, that Robinhood would "navigate through this nscc issue" because the company was "to [sic] big for them to actually shut us down," proved to be correct. With the liquidity crisis temporarily solved, by 5:30 p.m. on January 28th Reuters reported that Robinhood raised $1 billion from existing investors to provide a desperately needed capital cushion. Alas, Robinhood's

---

or their customers, and it did not instruct any clearing member to impose restrictions during the market volatility events of late January."  Bodson Testimony at 5.

[38] Bodson Testimony at 5 & n.4.

[39] On the evening of January 28th, Thomas Peterffy, the Chairman of Interactive Brokers, viewed Robinhood's announced decision to enable the "buy" button when trading opened on January 29th, even for limited purchases only, a risk to the entire system. The potential liquidation of Robinhood, should it not be able to meet its deposit requirements, would impact "the integrity of the marketplace and the clearing system." He continued: "I'm not comfortable with the current situation because if the brokers go the clearinghouse has to collect from other members…and it's a domino effect." *See* M DeCambre "Peterffy calls Robinhood decision to allow 'limited buys' of GameStop troubling: 'I'm not comfortable'", *Marketwatch.com*, Jan. 28, 2021 (https://www.marketwatch.com/story/peterffy-calls-robinhood-decision-to-allow-limited-buys-of-gamestop-troubling-im-not-comfortable-11611876619, last accessed Nov. 29, 2021)

customers were not too big to fail, these "everyday Americans" were abandoned by Robinhood without even being told why.

62.     After Robinhood took the extraordinary measures of prematurely moving GME and AME options to position closing only, disabling the "buy" button for shares of GME, AMC and six other issuers, and telling customers that trades they already scheduled had been cancelled (either without their consent or, falsely, at their request),[40] on the morning of January 28th, Robinhood first sent a terse, patronizing note to its customers, one that did not inform investors of the purchase prohibitions or why they were instituted:

> We wanted to reach out to you in the midst of the current volatile market conditions. It's as important as ever to be an informed investor.
>
> Whether you're brand new to Robinhood or have been investing with us for years, we have lots of resources to help you navigate the markets, including Investing 101 and our entire Help Center.
>
> Here are some specific articles from Robinhood Learn to help make sense of market volatility:
> -- The stock market has been super volatile – How can I make sense of it?
> -- Volatility explained
>
> As always, thank you for being a Robinhood customer.
>
> Sincerely,
>
> The Robinhood Team[41]

63.     At or near the market open, Robinhood decided to increase the number of stocks for which purchases were barred to 13, adding AAL, CTRM, SNDL, TR and TRVG to the list. In

---

[40] *See* Robinhood State Law Complaint at ¶¶243-244; Antitrust Complaint at ¶237.

[41] This initial message was made public shortly before trading began. *See, e.g.,* "Robinhood sends market volatility warning to brokerage app users," ClickonDetroit.com (online site of WDIV Channel 4 news, Jan. 28, 2021) (https://www.clickondetroit.com/news/2021/01/28/robinhood-sends-market-volatility-warning-to-brokerage-app-users/, last accessed November 29, 2021)

a blog post on its site, stunned customers were provided no information – beyond a reference to

"recent volatility" – about why the "buy" button had been disabled for these stocks:

### Keeping Customers Informed Through Market Volatility

> Our mission at Robinhood is to democratize finance for all. We're proud to have created a platform that has helped everyday people, from all backgrounds, shape their financial futures and invest for the long term.

> We continuously monitor the markets and make changes where necessary. In light of recent volatility, we are restricting transactions for certain securities to position closing only, including $AAL, $AMC, $BB, $BBY, $CTRM, $EXPR, $GME, $KOSS, $NAKD, $NOK, $SNDL, $TR, and $TRVG. We also raised margin requirements for certain securities.

> Amid significant market volatility, it's important as ever that we help customers stay informed. That's why we're committed to providing people with educational resources. We recently revamped and expanded Robinhood Learn to help people take advantage of the hundreds of financial resources we offer and educate themselves, including how to make sense of a volatile market. In 2020, more than 3.2 million people read our articles through Robinhood Learn.[42]

64.     The two public statements issued on the morning of January 28th were hardly a

model of the transparency in which Robinhood purports to take pride. As Tenev admitted two

weeks later, on the February 12th podcast of *All-In with Chamath, Jason, Sacks & Friedberg*: "no

doubt we could have communicated this a little bit better to customers." However, when Tenev

was specifically asked why Robinhood did not just come right out and explain the real reason to

its customers, that the NSCC's initial $3 billion deposit requirement forced its hand, his

explanation of what happened is even more disingenuous.

65.     Tenev deceptively tried to palm off the uninformative communications as ill-

conceived automated messages. Specifically, because Robinhood has an "operationalized process"

---

[42] *Id.* (updated heading added to the article, "Robinhood now 'restricting transactions for certain securities' " republishes the blog post in full).

to switch off the "buy" button for a short period of time for a legitimate reason, *e.g.*, the occurrence of a corporate action such as a reverse stock split, Tenev suggested that when that action is taken, "there's a button in a dashboard you can click and automated emails get sent out. It's an operational process that I think in hindsight we probably should have 'exceptionalized' to make it clear why we were doing this."  Because the three stated reasons (in the Help Center FAQ "Why don't I see a buy button?") were not applicable to the popular stocks Robinhood customers were attempting to purchase, the appearance of these automated messages raised more questions for Robinhood's customers than they answered.

66.     Although Tenev only referenced inapposite automated messages when he retrospectively indicated that Robinhood should have "ma[de] it clear why we were doing this," the vague communications concerning "market volatility" quoted in ¶¶62 and 63, were carefully crafted before being sent to customers to specifically address the situation at hand. Internal Robinhood communications reveal that at 8:13 a.m. EST on January 28th, Robinhood was fashioning just the right message to not lose credibility with its current and future customer base: "Is there a level to which we are aiming for? . . . Not sure where the line is as a brand . . . not sure yet – *I know there is a team working on our response here and we'll know more shortly*." (Emphasis supplied.)[43]

67.     As the crisis was unfolding, the image that Robinhood was trying to project in advance of its IPO was not one of a company saved from liquidation by *both* the grace of an NSCC deposit waiver *and* Robinhood taking the extreme action – taken by no other retail brokers – to entirely shut down purchases of 13 different stocks. On the February 12th podcast, however, *after*

---

[43] Robinhood State Law Complaint at ¶205.

Robinhood raised $3.4 billion and shored up its balance sheet, Tenev concluded, in retrospect, that communications to customers should have been more forthright about the actions Robinhood took to respond to the NSCC's deposit demand.[44]

68.    Whether or not *that* explanation is entirely truthful, the deliberate decision not to provide it to the public in real time caused retail investors to reach their own conclusions, exacerbating the market volatility. Robinhood's precisely worded messages, that intentionally kept investors in the dark to save face, further drove down the share prices of the Affected Stocks. Specifically, Tenev explained that because Robinhood withheld information about the NSCC's deposit requirement, investors immediately jumped to the conclusion that Robinhood was on the side of the hedge funds the WallStreetBets investors were trying to take down.

69.    As the share prices of the Affected Stocks plummeted because of Robinhood's unexplained decision to prohibit all share purchases,[45] Robinhood's actions were immediately and universally decried as market manipulation – and not just by the followers of the WallStreetBets sub-Reddit. Robinhood was sharply criticized by members of Congress from both sides of the aisle, with Representatives Rashida Tlaib and Alexandria Ocasio-Cortez and Senators Ted Cruz and Marsha Blackburn all weighing in against its restrictions. (The next morning, as noted in a

---

[44] During a podcast on February 23rd with Dave Portnoy of Barstool Sports, Tenev again admitted that the vague communications about "market volatility" were insufficient: "[W]e we sent some emails that were like, hey, there's some market volatility going on, and we basically sent a link that said: What is market volatility? I think in that one, in hindsight, we should have said, hey, some things can happen that restrict certain aspects of your trading …"

[45] Price graphs of the nine Affected Stocks, GME, NOK, AMC, KOSS, TRVG, BBBY, EXPR, TR, and BB appear, respectively, at ¶¶ 258-266 of the Antitrust Complaint. Each shows a sharp price decline as between January 27th and January 28th. A chart of the prices of these stocks throughout the Class period is set forth below at ¶76.

tweet by U.S. Rep. Jamaal Bowman, Robinhood added a job posting for a new position based in Washington, D.C. for a "Federal Affairs Manager", *i.e.*, a lobbyist.)

70.      Many were disillusioned that the alleged disruptor, Robinhood, suddenly made it impossible for its customers to freely purchase the Affected Stocks while institutional investors and those on more-established online platforms could still do so. Some accused Robinhood of acting to benefit hedge funds, including Citadel LLC, and Citadel Securities, the market maker which provided Robinhood 36% of its 2020 revenues and had flexed its power the night before. Specifically, many theorized that Robinhood knowingly acted to slash the price of the Affected Stocks so that the hedge funds and market makers could cover their short positions in various meme stocks, as Melvin Capital and Citron Capital had been forced to do.[46]

71.      Robinhood prohibited purchases, but not sales, of the Affected Stocks to decrease the amount of the core charge it was required to deposit with the NSCC, which would enable the company to withstand the financial impact of the volume of its customers' trades – business it actively recruited and recklessly stoked during the market rally – so that it could survive until its IPO. Additionally, cutting off demand from 15 million active traders, a large percentage of which traded in one or more of the Affected Stocks, could also assist Citadel, Citadel Securities, other market makers who generate PFOF revenue, and/or hedge funds – many of which Robinhood executives believed were negatively impacted by the explosion in the price of the Affected Stocks on January 27th – by causing a price decline that would permit these powerful market players to cover, and/or profit from, short positions they held.

---

[46]  A chart in the SEC Staff Report showed that purchases to cover short sales were more prevalent during the period January 22 -27, 2021, than they were on January 28, 2021. However, the data presented appeared to expressly exclude trading by market makers and other HFTs. SEC Staff Report at 28, Fig. 6 and n.78.

72.     Regardless of its motive(s) on January 28th, when it closed out AMC and GME options early, disabled multiple "buy" buttons, and cancelled purchase orders for the Affected Stocks, Robinhood was certain of one thing: its actions would harm its customers and others who held the Affected Stocks by driving down their share prices. Not only were customers who would be harmed *not* protected or warned, as suggested should occur in a Robinhood January 23rd internal communication (¶42, above), but a senior Robinhood official *did* sell his shares of one of the Affected Stocks and warned his own colleagues before the restrictions were imposed.

73.     Robinhood Securities President and COO James Swartwout attested to being the person at Robinhood who made the PCO decisions.[47] According to his candidate statement in a 2020 FINRA Regional Committee Election:

> James Swartwout is a 30 year veteran of the securities industry who has held leadership roles at many of the top discount brokerage firms in the nation. His career encompasses roles in customer support, back office operations, trading and order management, clearing operations as well as branch operations. Currently the President and COO of Robinhood Securities LLC based in Lake Mary, Florida, he has also held Senior Leadership positions at AmSouth Investment Services, E*TRADE Securities and E*TRADE Clearing, Scottrade and was the President of tradeMONSTER until its merger with Optionshouse

74.     Thus, when Swartwout stated in an internal communication on January 26th: "I sold my AMC today. FYI – tomorrow morning we are moving GME to 100% [margin] - so you are aware," both Swartwout and all of the Robinhood personnel who were on the internal chat (or were told of its contents) knew that the prices of the Affected Stocks would be driven down should Robinhood make it more difficult to purchase and hold shares in the Affected Stocks by imposing a 100% purchase and maintenance margin requirement on its 15 million customers. These same

---

[47] Swartwout Decl. at ¶34 ("This was a decision I made on behalf of RHS and in consultation with my operations team at RHS and others at Robinhood.")

Robinhood executives understood very well that making the Affected Stocks impossible for their customers to purchase would have an even greater impact on Robinhood's customers and on the prices of the stocks subject to the purchase prohibition. After all, it was the very propensity of Robinhood's customers to purchase these very stocks in such high concentration that was the basis for the initial $3 billion deposit demand.

75.     Indeed, before the markets opened that morning, one Robinhood employee looking at the big picture questioned how detrimental Robinhood's actions could be – and how that would affect Robinhood (a company planning an IPO) in the long term:  "I think the blowback from this is going to be exponentially worse as time goes on . . . Just worried about the long term affects [sic] of this."[48] As Tenev later admitted: "We knew this was a bad outcome for customers."

76.     Not only Robinhood's customers were negatively affected by the tsunami of selling unleashed by Robinhood's disabling of  "buy" buttons for the very stocks that were the most popular with its customer base. By the close of the markets on January 28th, each of the Affected Stocks saw significant declines from the previous close:

---

[48] Robinhood State Law Complaint at ¶205 (the remainder of the quoted message appears in ¶66).

|  | Closing price January 27, 2021 | Closing price January 28, 2021 |
|---|---|---|
| AMC (AMC Entertainment Holdings Inc.) | $19.90 | $8.63 |
| BB (BlackBerry Ltd.) | $25.10 | $14.65 |
| BBBY (Bed Bath & Beyond Inc.) | $52.89 | $33.64 |
| EXPR (Express Inc.) | $9.55 | $4.70 |
| GME (GameStop Corp.) | $347.51 | $193.60 |
| KOSS (Koss Corp.) | $58.00 | $41.96 |
| NOK (Nokia Oyj) | $6.55 | $4.69 |
| TR (Tootsie Roll Industries Inc.) | $41.25 | $37.33 |
| TRVG (Trivago N.V.) | $3.19 | $2.48 |

77.     That evening, Tenev hit the airwaves to do damage control. Again appearing with Andrew Ross Sorkin on CNBC, Tenev stated that Robinhood had to make a "very difficult decision" to halt customer purchases of the stock of multiple issuers "as part of normal operations." Rejecting the suggestion that Robinhood shut off its customers' ability to purchase these stocks to aid hedge funds and market makers by depressing share prices for those needing to cover short positions, Tenev stated: "We absolutely did not do this *at the direction* of any market maker or

36

hedge fund or anyone we route to or any other market participants." (Emphasis supplied.)[49]

78.     Instead, Tenev explained the various regulatory capital requirements at play that morning and how they had sharply increased due to volatility concentrated in the Affected Stocks, ultimately leading to the determination that "to protect the firm and protect our customers we had to limit buying in these stocks." Customers unable to freely trade disagreed with Tenev's paternalistic attitude; they felt betrayed, not protected, by Robinhood's self-serving actions.

79.     Host Sorkin followed up by asking whether Tenev's explanation suggested Robinhood had a liquidity problem, raising "all sorts of new questions" about whether there is a systemic issue underneath the company itself. Seeking to squelch questions about Robinhood's financial stability, and directly contradicting Robinhood Markets COO Gretchen Howard's internal comment that morning that a "major liquidity issue" led to the decision to PCO eight stocks before the market opened, Tenev flatly denied it, claiming:

> "***There was no liquidity problem***. And to be clear this was done pre-emptively, so we did this proactively … And we're doing what we can to allow buying and to remove these restrictions in the morning." (Emphasis supplied.)

80.     Tenev's false statement – that Robinhood did not have a liquidity problem on the morning of January 28th – was made with scienter because:

(a)     Tenev knew that Robinhood's COO internally attributed its decision to PCO eight stocks to Robinhood's having a "major liquidity issue," to wit, an inability to otherwise meet the additional $3 billion deposit demanded by the NSCC in the ordinary course of business;

---

[49] The denial is very precise: Tenev did not state that the decision was *not* made to benefit market makers or hedge funds or that it was made regardless of its impact on market makers and hedge funds, just not "at the direction" of these powerful players.

(b)     Were Tenev to admit to the liquidity crisis Robinhood faced that morning, it would reveal that Robinhood was ill-prepared to handle the volume of trading generated by the extraordinary popularity of its app, potentially endangering the planned IPO;

(c)     When given a do-over on this very question during the February 12th podcast, Tenev doubled down on his misstatement, underscoring his motivation for making it on January 28th – to make it appear Robinhood's actions were akin to those taken by other brokers and that it was never on the brink of liquidation. Specifically, Tenev was told that people thought he was "obfuscating or lying" to host Sorkin when he denied there had been a liquidity problem. When Tenev was asked whether he would now respond "Yes, we had a liquidity issue, and here's why," Tenev stuck by his earlier denial:

> "I stand by what I said and I'll explain it . . . Restricting the buying of securities is something that every, pretty much every broker did to some degree during this week. When you say the "L" word in financial services it reminds you of Lehman Brothers where you literally are not able to operate your business. We met all our deposit requirements."

Of course, what Tenev left out was that the NSCC exercised its discretion to waive the more than $2.2 billion excess capital payment which had dwarfed the core charge that morning, and that the deposit amount that was required had only been reduced because of Robinhood's suggestion that it would temporarily limit purchases of certain volatile stocks. Without these actions, Robinhood most certainly had a "major liquidity issue." Tenev, who wanted potential investors in Robinhood's IPO to hear that Robinhood's actions were "part of normal operations" and that it had acted as "pretty much every other broker did," would not admit to Robinhood's liquidity problem for fear of endangering the planned IPO.

(d)     On February 23, 2021, Tenev appeared on a podcast hosted by one of Robinhood's biggest critics, Dave Portnoy of Barstool Sports. Asking the liquidity

question in different ways, Portnoy obtained several admissions from Tenev:

    (i)    Portnoy: If you don't get a call at three in the morning, do you regulate trading?

            Tenev: Well, no, we did this because we had to comply with our capital requirements . . .

            Portnoy: But you found that out at like three in the morning . . .

            Tenev: ***If we had a bunch more headroom, yes, we probably would have let things continue . . .***

            Portnoy: Well if you didn't get a call that says, hey, we need this money from you, you wouldn't  have shut off buying?

            Tenev: Correct. The last thing we would want to do is shut off buying

    (ii)   Portnoy: That is a capital issue, he specifically said, a liquidity issue, you need this much money, you didn't have it, so you acted. Isn't that the essence of liquidity? Like, are you afraid to say liquidity, because of a domino effect with the banks?

            Tenev: I think that liquidity issue, and I probably should be careful and call it the "L word," right, the "L word" is a big thing in financial services. ***Basically, if you say liquidity issue means you can't meet your capital requirements, or your deposit requirements, then you're essentially dead,*** and that was not the case with Robinhood. We met our capital requirements; we met our deposit requirements …

            Portnoy: But, that theoretically could be a technicality, right, if you didn't change the trading of that day, you may have had a liquidity issue tomorrow?

            Tenev: Exactly. I think that's accurate. (Emphasis supplied.)[50]

Even though Tenev finally admitted that had Robinhood been better capitalized on the morning of January 28th it would have not disabled any "buy" buttons, he clung to the

---

[50] The podcast can be found at https://www.youtube.com/watch?v=LqoJApzkaPU, last accessed November. 29, 2021.

"proactive"/"pre-emptive" measures argument by explaining that the liquidity problem was not at hand, but a day away. To make that hair-splitting distinction, Tenev conveniently omitted that Robinhood only got to live to see another day because, in addition to its decision to PCO various stocks, the NSCC waived a $2.2 billion ECP charge.

81.     Avoiding host Sorkin's question of what he would tell investors who lost money because they were unable to buy the Affected Stocks or had to sell them at a loss, Tenev inaptly analogized Robinhood to Clorox and Lysol running out of inventory early in the pandemic: "We just have not seen this level of concentrated interest market-wide in a small number of names before … We're doing what we can to re-enable buying in these names and we stand with our customers."

82.     Later that evening, in an interview on CNN with Chris Cuomo, Tenev was again asked whether the need to restrict purchasing to meet regulatory capital requirements evidenced a liquidity problem at Robinhood. Repeating the same talking points used on CNBC, Tenev stressed that Robinhood did not have a liquidity problem. Stating "we feel pretty good about the situation," Tenev instead claimed that Robinhood imposed the restrictions "pre-emptively" and "proactively." He added:  "We feel good about being able to re-enable these things."

January 29, 2021

83.     Believing Tenev's statements that the prohibition on purchases of 13 stocks was not evidence of a liquidity problem and that Robinhood was working hard to "re-enable" purchases, premarket trading activity on January 29th was very high as investors looked forward to purchasing these stocks when Robinhood lifted its restrictions. This belief was bolstered when CNBC reported that Robinhood was able to increase its net capital by securing financing of $1 billion, adding to the $500 million credit line it already tapped.

84.     Early in the trading day, SlashGear.com reported that Robinhood had lifted its complete prohibition but had imposed restrictions on the number of shares and option contracts a customer could purchase in the companies whose shares it had PCOed the day before:

| Symbol | Shares | Options contracts |
|--------|--------|-------------------|
| AAL | 55 | 50 |
| AMC | 115 | 100 |
| BB | 65 | 100 |
| BBBY | 30 | 50 |
| CTRM | 1650 | N/A |
| EXPR | 200 | 100 |
| GME | 5 | 10 |
| KOSS | 25 | N/A |
| NAKD | 750 | N/A |
| NOK | 110 | 100 |
| SNDL | 1200 | 100 |
| TR | 25 | 50 |
| TRVG | 400 | 100 |

Source: Robinhood (Screenshot at 10:20am EST 01/29/2020)

85.     Several hours into the trading day, as the price of the 13 stocks PCOed the previous day had quickly rebounded from their steep declines, Robinhood significantly ratcheted up the share purchase restrictions it had put in place at the start of trading (as reported by SlashGear.com):

| Symbol | Shares | Options contracts |
|--------|--------|-------------------|
| AAL | 55 | 50 |
| AMC | 25 | 100 |
| BB | 25 | 100 |
| BBBY | 30 | 50 |
| CTRM | 1650 | N/A |
| EXPR | 200 | 100 |
| GME | 2 | 10 |
| KOSS | 10 | N/A |
| NAKD | 300 | N/A |
| NOK | 50 | 100 |
| SNDL | 1200 | 100 |
| TR | 25 | 50 |
| TRVG | 400 | 100 |

Source: Robinhood (Screenshot at 12:38pm EST 01/29/2021)

41

86.     Several hours later, ShashGear.com reported that even greater restrictions were imposed on the purchase of shares and/or options of the original 13 PCOed stocks, and new restrictions were imposed on 10 additional issuers, *for the first time*:

| Symbol | Shares | Options contracts |
|--------|--------|-------------------|
| AAL | 5 | 10 |
| AG | 5 | Standard limits apply |
| AMC | 10 | 10 |
| AMD | 1 | Standard limits apply |
| BB | 5 | 10 |
| BBBY | 2 | 10 |
| CTRM | 100 | N/A |
| EXPR | 5 | 10 |
| GME | 1 | 5 |
| GTE | 150 | Standard limits apply |
| JAGX | 30 | Standard limits apply |
| KOSS | 1 | N/A |
| MRNA | 1 | Standard limits apply |
| NAKD | 50 | N/A |
| NCITY | 5 | N/A |
| NOK | 20 | 10 |
| RYCEY | 75 | Standard limits apply |
| SLV | 5 | Standard limits apply |
| SNDL | 600 | 10 |
| TR | 25 | 10 |
| TRVG | 400 | 10 |
| WKHS | 3 | Standard limits apply |
| XM | 2 | Standard limits apply |

Source: Robinhood (Screenshot 2:29pm EST 01/29/2021)

87.     As the day wore on, the number of stocks subject to purchase restrictions more than doubled – from 23 mid-afternoon to 50 during the last half hour of trading for the week. No longer limited to volatile meme stocks, the list now included issuers such as Starbucks and GM. As CNBC reported that afternoon:

Restrictions on Robinhood traders got tighter throughout the day on Friday, only allowing clients to buy a single share of GameStop.

The stock trading app also expanded its list of restricted stocks from 13 earlier in the day to 50.

"The table below shows the maximum number of shares and options contracts to which you can increase your positions," Robinhood wrote. [Although CNBC

42

recreated the table, below is a copy of the original posting on Robinhood's website[51]]

| Symbol | Shares | Options contracts |
|--------|--------|-------------------|
| AAL | 1 | 10 |
| ACB | 1 | Standard limits apply |
| AG | 1 | Standard limits apply |
| AMC | 1 | 10 |
| AMD | 1 | Standard limits apply |
| BB | 1 | 10 |
| BBBY | 1 | 10 |
| BYDDY | 1 | N/A |
| BYND | 1 | Standard limits apply |
| CCIV | 1 | Standard limits apply |
| CLOV | 1 | Standard limits apply |
| CRIS | 1 | Standard limits apply |
| CTRM | 5 | N/A |
| EXPR | 5 | 10 |
| EZGO | 5 | N/A |
| GM | 1 | Standard limits apply |
| GME | 1 | 5 |
| GTE | 5 | Standard limits apply |

---

[51]https://web.archive.org/web/20210129203511/https://robinhood.com/us/en/support/articles/changes-due-to-recent-market-volatility/  (This archived page from the Robinhood site on January 29th was last accessed on November 29, 2021.)

| Symbol | Shares | Options contracts |
| --- | --- | --- |
| HIMS | 1 | Standard limits apply |
| INO | 1 | Standard limits apply |
| IPOE | 1 | Standard limits apply |
| IPOF | 1 | Standard limits apply |
| JAGX | 5 | Standard limits apply |
| KOSS | 1 | N/A |
| LLIT | 5 | N/A |
| MRNA | 1 | Standard limits apply |
| MUX | 5 | Standard limits apply |
| NAKD | 5 | N/A |
| NCTY | 1 | Standard limits apply |
| NOK | 5 | 10 |
| NVAX | 1 | Standard limits apply |
| OPEN | 1 | Standard limits apply |
| RKT | 1 | Standard limits apply |
| RLX | 1 | Standard limits apply |
| RYCEY | 5 | Standard limits apply |
| SBUX | 1 | Standard limits apply |
| SHLS | 1 | N/A |
| SIEB | 1 | Standard limits apply |
| SLV | 1 | Standard limits apply |
| SNDL | 5 | 10 |
| SOXL | 1 | Standard limits apply |

44

| Symbol | Shares | Options contracts |
| --- | --- | --- |
| SRNE | 1 | Standard limits apply |
| STPK | 1 | Standard limits apply |
| TGC | 5 | N/A |
| TIRX | 1 | N/A |
| TR | 1 | 10 |
| TRVG | 5 | 10 |
| WKHS | 1 | Standard limits apply |
| XM | 1 | Standard limits apply |
| ZOM | 5 | N/A |

The restricted list tells clients how many shares and options contracts they can buy pertaining to a particular security. Robinhood customers can only buy one share and up to five options contracts of GameStop; however, if a customer already owns one or more share of GameStop, they are not able to buy any more shares.

Robinhood's restrictions could take the wind out of point-and-click traders trying to jack up the price of GameStop. Robinhood, however, will not sell any client's shares of GameStop that are already over the one-share limit from a previous position.

***The stock, which closed up 67%, was off its highs of the session as the new more severe limits were implemented. Earlier in the day, clients could buy five shares of GameStop.***

***The most shares clients could buy of any of the 50 stocks was five. Clients without existing shares can only buy one share and 10 options contracts in AMC Entertainment, which is down from an earlier 115 shares. Shares of AMC Entertainment closed up 53% but also well off their highs of the day.*** Clients can only buy one share of American Airlines, Bed Bath & Beyond and Koss.

The stock trading app has also expanded its list of restricted stocks. Some of the new names include Advanced Micro Devices, Starbucks, Novavax, General Motors and Beyond Meat.

On Thursday, Robinhood told clients it was only allowed to sell shares, not buy new ones, in certain securities that were garnering social media attention from Reddit crowds. The firm also raised margin requirements, or the amount of money in a client's account when they will be using leverage to buy a security. Robinhood's decision was met with outrage, with many users taking their grievance to Twitter.

Robinhood said the trading restrictions were risk management decisions to protect Robinhood and its clearinghouses, but touted that the restrictions would be eased on Friday.

The free trading pioneer raised $1 billion in investor money and tapped more credit lines overnight for its clients to be able to trade names like GameStop and AMC Entertainment on Friday.

However, the restrictions got tighter throughout the trading day, as the list of limited securities grew and the number of shares clients could buy shrunk for certain stocks. (Emphasis supplied.)

88.    Rather than working to ease restrictions on January 29th as repeatedly suggested by Tenev the night before, as the trading day progressed Robinhood once again panicked about not having sufficient excess capital to satisfy a deposit requirement for the January 29th trades. For this reason, Robinhood, on several occasions during the trading day, placed greater restrictions on free trading. And each time new restrictions were imposed, the prices of the Affected Stocks declined.

89.    As noted in italicized portions of the CNBC report reproduced above, as they did on January 28th, Robinhood's new restrictions had an oversized, detrimental impact on the market price of the Affected Stocks. On several occasions when Robinhood increased restrictions on share purchases during the day – just after 12:30 p.m. and before 2:30 p.m. – there was an immediate decline in the market price of the Affected Stocks:[52]

---

[52] A chart in the Antitrust Complaint appears to correlate GameStop price and trading volume declines to Robinhood's two-share and one-share limits on the afternoon of January 29th. *Id.* at ¶325 and chart (text inadvertently refers to the date as January 30th, a Saturday).

### AMC US Equity (AMC Entertainment Holdings Inc)
AMC US Equity (AMC Entertainment Holdings Inc)



### BB US Equity (BlackBerry Ltd)
BB US Equity (BlackBerry Ltd)



**BBBY US Equity (Bed Bath & Beyond Inc)**
BBBY US Equity (Bed Bath & Beyond Inc)



**EXPR US Equity (Express Inc)**
EXPR US Equity (Express Inc)



**GME US Equity (GameStop Corp)**
GME US Equity (GameStop Corp)



**KOSS US Equity (Koss Corp)**
KOSS US Equity (Koss Corp)



**NOK US Equity (Nokia Oyj)**
NOK US Equity (Nokia Oyj)



**TR US Equity (Tootsie Roll Industries Inc)**
TR US Equity (Tootsie Roll Industries Inc)





90.     Most significantly, this distortion of the stock prices that occurred at various points during the trading day is directly attributed to Robinhood's manipulative actions because *Robinhood was the only retail broker that not only continued the stock purchase restrictions imposed on January 28th but actually increased purchasing restrictions over the course of the January 29th trading day.*[53]

91.     Although the NSCC had exercised its discretion to waive the excess capital charges for Robinhood through the close of business on February 1st, to allow the trades from January 27th

---

[53] On January 29th, Apex Clearing Corporation ("Apex") informed Robinhood of a post on WallStreetBets instructing how to evade purchase restrictions on the Affected Stocks. *See* Antitrust Complaint at ¶¶328-330 (reproduced internal chats between Robinhood's Miles Wellesley, David Dusseault and/or Jim Swartwout) ("FYI Apex pinged me on this to make sure we are aware of it."). Robinhood's chats about Apex's warning appear to have occurred between the first and second intraday imposition of more-severe purchase limits for the Affected Stocks.

and January 28th to work their way through the system, having only raised $1 billion as a capital cushion at that point, Robinhood could have faced another liquidity crisis on February 2nd if the trading volume on January 29th – as share prices began to rebound sharply – was so great that the amount of the unsettled trades again resulted in a core charge that greatly exceeded Robinhood's net capital. (This is precisely the scenario that Thomas Peterffy, the Chairman of Interactive Brokers had feared when interviewed the prior evening.) The $1 billion raised in the past 24 hours might not be enough to meet an ECP of several billion, as Robinhood had initially faced on the morning of January 28th.

92.     To whitewash its unique, drastic, and seemingly random restrictions, *i.e.*, on issuers that were not heavily-shorted, WallStreetBets meme stocks, Tenev appeared on Yahoo Finance Live on January 29th – as Robinhood was imposing new restrictions and manipulating market pricing – to spread the false message that Robinhood's actions were, in fact, commonplace:

> Brokerages and other financial institutions do this all the time. They've been doing this throughout the week and it's just part of day-to-day, normal operations. Now, sure, Robinhood gets a lot of attention for it, but this is just a standard part of practices in the brokerage industry and the broader financial industry.
>
> ***
>
> Well, again, what we've done is something that other brokerages have done. It's not unique to Robinhood to place restrictions on purchasing certain things at certain times. Other brokers have done it.[54]

93.     Tenev's claim was patently untrue. No other online retail broker took as extreme measures to restrict customers' ability to freely trade as Robinhood did on January 28-29, 2021. For example:

---

[54] https://www.yahoo.com/lifestyle/robinhood-ceo-made-decision-response-204254105.html , last accessed on November 29, 2021.

(a)      Charles Schwab, Fidelity, and TD Ameritrade did not prohibit equity purchases on January 28, 2021;

(b)      Apex is alleged to have required eight introducing brokers (including the very popular Webull) to turn off the "buy" button for only three of the Affected Stocks, AMC, GME and KOSS, for 3 ½ hours, until just before 3:00 p.m. on January 28, 2021;[55]

(c)      Interactive Brokers raised margins on equity trades and placed options on AMC, BB, EXPR, GME and KOSS into liquidation only on January 28, 2021, removing the options restrictions after the close of trading on January 29, 2021; and

(d)      E*Trade limited purchases of GME and AMC for part of the day on January 28, 2021, but allowed trading to resume on January 29, 2021. [56]

94.      As Robinhood's increasingly severe restrictions on January 29th distorted the prices of the Affected Stocks, the public began to recognize Robinhood's power to move the markets. As reported by *The New York Times* on January 30, 2021, Robinhood is far and away the app of choice for active retail traders:

> The app was downloaded more than 177,000 times on Thursday [January 28th], twice the daily download rate over the previous week, according to Apptopia, a data provider, and it had 2.7 million daily active users on its mobile app that day, its highest ever. That's more than its rivals — Schwab, TD Ameritrade, E*Trade, Fidelity and Webull — combined.[57]

---

[55] Amended Consolidated Class Action Complaint (Other Broker Tranche) at ¶ 2 (Dkt. 410).

[56] E*Trade's purchase halt was explained: "Amid the extraordinary volumes in GME and AMC, we chose to limit client activity in these names late in the trading day in order to ensure that we could continue to serve our broader client base. We take actions like this seriously, and only initiate them in rare circumstances. We expect to resume normal trading operations tomorrow."

[57] N. Popper, M. Phillips, K. Kelly and T. Siegel Bernard, "The Silicon Valley Start-Up That Caused Wall Street Chaos," *The New York Times*, Jan. 30, 2021 (last accessed on November 29, 2021, at https://www.nytimes.com/2021/01/30/business/robinhood-wall-street-gamestop.html).

95.     A review of trading data from January 2021 not only confirms the *New York Times*'s assessment that Robinhood was the 800-pound gorilla in the industry of online retail brokers but also reveals that it was a dominant force, overall, in U.S. equity markets. In June 2021, the *Wall Street Journal* reported that Larry Tabb, the head of market-structure research at Bloomberg Intelligence, estimated: "Activity from individual investors ***trading on Robinhood Markets Inc. accounted for roughly 4% of total U.S. share volume in January*** …"[58] Given the fact that one of every 25 shares traded on all U.S. markets in January 2021 traded on the Robinhood platform, when Robinhood halted, partially-restored, and then severely restricted purchases of the Affected Stocks, Robinhood manipulated the market prices of the Affected Stocks.

96.     What is most appalling about Robinhood's improper actions on January 29th – restricting 50 issuers by late in the trading day with no apparent rhyme or reason – is that Robinhood doubled down on its manipulations from the prior day because Robinhood appeared to not only have survived the firestorm but thrived, raising $1 billion from investors in a single day. During the February 12th podcast, Tenev revealingly admitted:  "When an early investor called me throughout this and said, hey, chin up, you know, navigating a crisis successfully unlocks the next level of value creation for the company, [ ] I've had that in mind the entire time."

97.     Temporary restrictions due to volatility are imposed across entire exchanges for minutes at a time, not indefinitely, and most certainly not on the demand side only across a wide swath of issuers by a single firm desperate to manage, on the fly, its deposit requirements with the NSCC for the next few days. With the benefit of having raised another $2.4 billion over the

---

[58] Caitlin McCabe, "It Isn't Just AMC. Retail Traders Increase Pull in the Stock Market," *The Wall Street Journal* (June 18, 2021).

weekend quelling the fear Robinhood must have experienced on January 29th, during the February 12th podcast, Robinhood's CEO tried to normalize its outrageous price manipulations during trading on January 29th:

> "I'm very proud of the transition that we made between Thursday and Friday, so Thursday we had the blunt hammer of PCO'ing these stocks, which obviously was not ideal. By Friday, we had moved to a much more sophisticated system where intraday we adjust the position limits in, it was up to 50 stocks, and we published that on our website, so that gave us a lot more granular control over it, and is a better system, and we're going to only improve that, and take the learnings to other parts of the business."

<u>January 30 and 31, 2021</u>

98.     Over the weekend, to combat public perception that Robinhood imposed purchase restrictions because it was beholden to Citadel Securities, the source of 36% ($326 million) of Robinhood's 2020 revenues, the companies discussed how they could "generally coordinate messaging, in particular some of the narrative around Ken [Griffin, Citadel Securities' CEO] owning Robinhood."   Citadel Securities informed Robinhood's Vice President for Corporate Communications, Josh Drobnyk, who at Citadel Securities was "running point on this narrative for us," noting that members of its General Counsel office were also copied, in part, "for privilege."[59]

---

[59] Antitrust Complaint at ¶335 (reproducing partially redacted email chain). The companies' messaging on the subject has been in sync: Both Tenev and Griffin denied coordinated action in their testimony before Congress on February 18, 2021. (https://www.c-span.org/video/?508545-1/gamestop-hearing-part-1&event=508545&playEvent). On September 28, 2021, after complaints in the other tranches in this MDL revealed communications between Robinhood and Citadel during the last week of January 2021, in response to the trending hashtag, #KenGriffinLied, Griffin surprisingly tweeted: "It must frustrate the conspiracy theorists to no end that Vlad and I have never texted, called, or met each other." (Perhaps Tenev's request to speak with Griffin on January 27th was turned down to allow Griffin to later make this very denial.) For its part, Robinhood issued a statement claiming: "At no point did Citadel or any other market maker pressure the business to move any securities to position-close only." When the legitimate business reason for the meeting

99.     The next day, Vlad Tenev penned an op-ed in *USA Today* to repeat Robinhood's nothing-to-see-here-folks message, *to wit*, we were forced to restrict buying due to unprecedented regulatory requirements, not to help Citadel, Citadel Securities, or other HTFs. Under the caption "Robinhood CEO: We're helping those left behind by Wall Street, not hedge funds," Tenev sought to reassure ordinary investors on Main Streets across the country that Robinhood had their backs, stating, in relevant part:

> We built Robinhood for our customers. For millions of people who have felt left behind by America's financial system. For people who felt turned away by the big Wall Street financial institutions. For those who are making their voices heard through the markets and showing the world that investing is for everyone.
>
> Last week, we witnessed something the stock market has never quite experienced before. Short squeezes on a small number of stocks triggered wild gyrations in prices, massive volatility that prompted clearinghouses to take swift action to protect the plumbing that handles stock trading every day.
>
> In a matter of days, our clearinghouse-mandated deposit requirements related to stocks increased ten-fold. These deposits are the collateral we post to ensure our access to clearinghouse services on behalf of our customers. They are what led us to put temporary buying restrictions in place on a small number of securities that the clearinghouses had raised their deposit requirements on. As we noted in a blog on Friday, it was not because we wanted to stop people from buying these or any stocks — we built Robinhood to provide access to investing for all. And it certainly wasn't because we were trying to help hedge funds.

100.     Also on January 31, 2021, Elon Musk interviewed Vlad Tenev on the audio-based social-network site Clubhouse. As he did during his discussions on CNBC on January 27th and Yahoo Finance Live on January 29th,  Tenev disingenuously compared Robinhood's actions to those of other retail brokers. Specifically, Tenev claimed that while Robinhood's name was all

---

on the evening of January 27th was a discussion of an across-the-board reduction of Robinhood's largest source of revenue, PFOF payments from Citadel, is any pressure necessary? While the claims asserted in this case require no proof of coordination, it does appear that Griffin and Tenev doth protest too much.

over the press, "other brokers basically restricted the same exact activity." This was not true. As set forth in ¶93(a)-(d), above, other brokers did not completely shut down purchasing, either at all, as long, and/or in as many issuers as did Robinhood. Tenev's misrepresentation was made with scienter because the specific restrictions imposed by different brokerages on January 28th and January 29th were widely reported in the financial press and Tenev knew (or should have known on a matter of such critical importance), that Robinhood's actions were out of step with all other brokerages, especially on January 29th when Robinhood, alone, restricted stock purchases on up to 50 issuers.

101.    After walking Musk through Robinhood's interactions with the NSCC on the morning of January 28th, to reduce and ultimately be able to meet deposit requirements by prohibiting new purchases of volatile stocks, Tenev candidly admitted: "We knew this was a bad outcome for customers." But, trying to limit the damage, Tenev stated that the reason that both buying and selling were not restricted was that Robinhood concluded that it would be "categorically worse" to restrict both purchases and sales at the same time, explaining:  "People get really pissed off if they're holding stock and they want to sell it and they can't."

102.    Tenev's explanation for the one-sided trading halt does not appear in the internal chats on the subject. While several expressly discussed the dire fallout of moving numerous issuers to PCO,[60] and correctly anticipated the fury of frustrated purchasers, nowhere was it suggested that continuing to permit sales of the Affected Stocks would at least avoid an even greater level of ire from customers desperate to sell.

_____

[60] *See, e.g.,* Robinhood State Law Complaint at ¶7 ("we're going to get crucified … for pco'ing"), ¶205 ("I think the blowback from this is going to be exponentially worse as time goes on. Not sure where the line is as a brand …), ¶219 ("Need to inform FINRA of expectations around plan for pco symbols & expected increase in complaint impact").

103.    Three weeks later, when speaking to Dave Portnoy, Tenev admitted that the demand-side only trading halt was not implemented to avoid "piss[ing] off" customers eager to sell, as he had misrepresented to Elon Musk on January 31st. Instead, Tenev rather bluntly admitted that a complete freeze of trading – which would have been fair to all market participants – would not have helped Robinhood meet its NSCC deposit requirements:

> Portnoy: When you force people to sell . . . you only allow them to sell but they can't buy, you cratered the stock, like that was the decision that cratered the stock, and I saw your quote, "People get pissed off if they are holding stock, and they can't sell it." Which I guess is true, but I guarantee you, if you polled your customer base, and said, listen, we're just gonna freeze it. Like when the market is tumultuous, they freeze stock, so you can't buy or sell, it's just frozen at that value. And you have your client base, all buying it; they would have rather said, freeze it, just figure out what you're [Robinhood's] issues are, liquidity, whatever they may be; figure it out, and then turn it back on and let me buy and sell, but you – and when I say you, Robinhood – manipulated that stock price. You cratered it . . . So how do you rationalize not freezing it? . . . You cratered the market.

> Tenev: Well, first of all, let me say that we're speculating now . . .

> Portnoy: There's no speculation that when you only allow somebody to sell a stock and not buy it, you crater it. That's not speculation.

> Tenev: Let me explain the reason why that's kind of standard procedure.

> Portnoy: Have you done that before? Standard procedure?

> Tenev: Well, PCO'ing, marking a stock position closing only, is a standard procedure, and it's what the other brokers did in this case as well . . . It actually comes from the capital requirements. The VaR formula was in this case driven by the one-sided long position, so it actually wouldn't help us; wouldn't help the deposit requirements to restrict selling in this case …. Restricting selling wouldn't help the exponential growth in the deposit requirements …

> Portnoy: I still don't feel like I got a straight answer why you didn't do both [restrict buying and selling], except you're saying it's standard procedure?

> Tenev: Because the VaR charge, which drives our deposit requirements, was driven by the size of the long position.

104.     When discussing a "freeze" on all stock transactions during a "tumultuous" period, Portnoy was referencing an industry-wide protocol. Since 2012, when it was initially approved as a pilot program, there has been in place a National Market System Plan, known as the Limit Up/Limit Down Plan ("LULD Plan"), to address extreme market volatility. The LULD Plan, which became a permanent rule in 2019, is administered by the LULD Operating Committee, an entity that includes numerous exchanges and FINRA. The Plan and all amendments are filed with and approved by the SEC in accordance with the Securities Exchange Act of 1934. Periodic monitoring and performance reports are filed with the SEC and made available to the public.

105.     The LULD Plan sets forth specific rules to be followed to rein in extreme intraday price movements while ensuring that trading remains fair for all. As explained on investor.gov, a SEC site, depending upon the issuer, time of day, and market price (for some stocks), if shares trade for too long at the upper or lower limit of a trading band, a five-minute pause will ensue:

**Limit Up-Limit Down Circuit Breaker (Single Stock Circuit Breaker)** – The Limit Up-Limit Down circuit breaker ("LULD") is a market volatility moderator designed to prevent large, sudden price moves in a stock. In particular, it prevents trades in individual securities from occurring outside of a specified price band. This price band is set at a percentage level above and below the average price of the stock over the immediately preceding five-minute trading period. If the stock's price moves to the price band and does not move back within the price bands within 15 seconds, trading in the stock will pause for five minutes. These price bands are 5%, 10%, 20%, or the lesser of $.15 or 75%, depending on the price of the stock and whether the stock is designated as a Tier 1 or Tier 2 NMS stock. Tier 1 NMS stocks include all securities in the S&P 500, the Russell 1000 and select Exchange Traded Products. Tier 2 NMS stocks include all other NMS securities, except for rights and warrants, which are specifically excluded from coverage. The LULD applies during regular trading hours from 9:30 am ET – 4:00 pm ET. The LULD's price bands double during the last 25 minutes of the regular trading day for (i) all Tier 1 NMS stocks and (ii) Tier 2 NMS stocks at or below $3.00.

106.     According to the SEC Staff's investigation, there were 19 LULD trading pauses for GameStop on January 28, 2021 – 13 at the lower bound and 6 at the upper bound of the price

band.[61] As the LULD Plan demonstrates, our national exchanges have acted together for almost a decade to both limit and fine-tune restrictions on the freedom to trade. Robinhood's unilateral manipulation of demand – not, as initially claimed, because those of its customers wanting to sell would be "pissed off," but because only purchase risk affects the VaR charge Robinhood sought desperately to reduce – disrupted and distorted free-market pricing for the Affected Stocks that would otherwise only be limited (when necessary) by orderly operation of this circuit-breaker mechanism to briefly halt all trading.

<u>February 1, 2021</u>

107.    On Monday, February 1, 2021, having raised $2.4 billion over the weekend, Robinhood loosened the restrictions it imposed on Friday, January 29, 2021. Shrinking the list back down from 50, Robinhood still enforced restrictions on trading for seven of the 13 issuers it PCOed on January 28th. Brazenly, having gotten away with it for two trading sessions, Robinhood added one issuer to the list for the first time, Genius Brands (GNUS), a children's media company. As reported by CNBC, the issuers and the newly imposed limits were as follows:

---

[61] SEC Staff Report at 39 & n. 113.

| Symbol | Shares | Options contracts |
|--------|--------|-------------------|
| AMC | 350 | 350 |
| BB | 700 | 700 |
| EXPR | 1,000 | 1,000 |
| GME | 20 | 20 |
| GNUS | 5,000 | 1,000 |
| KOSS | 150 | N/A |
| NAKD | 6,500 | N/A |
| NOK | 2,000 | 1,000 |

108.    The disproportionate impact Robinhood's actions had on the markets for the Affected Stocks while its restrictions were in place was acknowledged in the financial press. In an article published by the *Wall Street Journal* at 6:05 a.m. on February 1st, entitled "Robinhood Stocks Rise Premarket," author Caitlin Ostroff noted that after Robinhood relaxed restrictions in the overnight hours, by 6:00 a.m., "[t]welve of the 13 stocks that Robinhood Markets had restricting trading in last week jumped premarket."  More broadly, at 5:51 a.m. that day, a popular online investment site, *The Motley Fool*, published an article entitled "The Top 50 Robinhood Stocks of February." This is a recurring article, published at the beginning of each month, listing the 50 most-held stocks of Robinhood investors in the prior month. No similar articles are published about the stocks held by customers of any other online retail broker.

109.    Also on Monday, February 1, 2021, Robinhood posted a blog on its site informing customers that a group of investors – led by Ribbit Capital and including ICONIQ Capital, Sequoia Capital, Index Ventures and New Enterprise Associates – had infused Robinhood with an additional $2.4 billion in capital. Robinhood stated: "With this funding, we'll build and enhance our products that give more people access to the financial system."

110.    As for increasing its current customers' access to purchase all stocks free of restrictions, having survived the maelstrom of January 28th and January 29th, Robinhood appeared unwilling to risk another upward spike in meme stock prices that would require it to deposit much of the capital it had just raised with the NSCC. Restrictions on eight issuers remained in place.

111.    Before trading closed on February 1, 2021, *Politico* reported that Tenev was going to deliver Robinhood's message to its biggest audience yet:  On February 18, 2021, he would likely be called to testify before the U.S. House of Representatives Financial Services Committee.

<u>February 2, 2021</u>

112.    On February 2, 2021, Robinhood again eased but did not lift all restrictions it had put in place five days earlier. CNBC again reproduced Robinhood's restricted securities chart:

| Symbol | Shares | Options contracts |
| --- | --- | --- |
| AMC | 1,250 | 1,250 |
| EXPR | 3,000 | 3,000 |
| GME | 100 | 100 |
| NAKD | 12,000 | N/A |
| NOK | 2,000 | 2,000 |

113.    CNBC specifically noted that an immediate difference in GameStop's stock price appeared to be triggered by a five-fold increase in the upper limit of GameStop shares Robinhood customers could purchase and hold, *i.e.*, customers could purchase 100 shares or increase their total holdings to 100 shares: "Robinhood on Tuesday rolled back more of its trading limitations, now allowing clients to buy up to 100 shares of GameStop. GameStop climbed off the lows as the Robinhood changes were announced."

114.    On February 2, 2021, to get out of the hot seat, Robinhood decided to go on the offensive against the existing trade settlement rules. As reported by Reuters, Tenev posted a blog

on Robinhood's website blaming the initial $3 billion demand by the NSCC on January 28th on the uncertainties injected into the market by the fact that it takes two days to settle a trade, *i.e.*, exchange money for shares, during which time deposits are required by clearinghouses to ensure the trade settles regardless of whether either side of the transaction defaults (referred to as "T+2"). Tenev wrote: "There is no reason why the greatest financial system the world has ever seen cannot settle trades in real time. Doing so would greatly mitigate the risk that such processing poses."

115.    Tenev's comments were designed to redirect customers' and the public's anger from Robinhood to the "system," attacking Wall Street's manner of doing business to reclaim Robinhood's disrupter status. Tenev would repeat this strategy in his testimony before the House Committee on Financial Services, with a section of his prepared remarks entitled: "Real-Time Settlement: Big Changes Could Protect Small Investors." While such a move might relieve the strain on Robinhood's liquidity, it would greatly damage the overall liquidity of the financial markets.

116.    DTCC CEO Bodson's testimony before Congress provided many reasons why moving to T+0 or Real Time Gross Settlement ("RTGS") was not within the capability or the desire of various stakeholders in the financial markets:

> Substantial procedural hurdles remain for a move to T+0. Beyond T+0, a move to RTGS would eliminate the substantial efficiencies of netting, which currently compresses the amount of cash required to fund daily transactions at NSCC by over 98%. RTGS could require that transactions be funded on a trade-by-trade basis. While this could eliminate most margin component charges for clearing members if customers fully prefunded all trading activity, that prefunding would be difficult to forecast as settlement obligations change in real-time. The heightened costs of the substantial liquidity buffers required to support this approach could erode market liquidity. Additionally, the real-time reconciliation and real-time stock records required for either T+0 or RTGS would be difficult for the industry to implement. There would be negative impacts to processing for short sales, the use of securities lending as a financing tool, and institutional trade processing operations. For these reasons, while NSCC is fully supportive of a shorter settlement cycle, NSCC does

not believe the industry is ready to support shortening the settlement cycle beyond T+1 at this time.

<u>February 3, 2021</u>

117.    On February 3, 2021, Robinhood finally lifted restrictions on Express, Naked and Nokia, and lifted the prohibition on purchases of fractions of a share of GameStop and AMC. However, customers were still limited to purchases (and total holdings) of 500 shares of GameStop and 5,500 shares of AMC.

118.    Before the markets opened, CNBC.com reported "Robinhood moves forward with first Super Bowl ad as brand crisis mounts." With its balance sheet flush, Robinhood stated that the Super Bowl spot "will kick off what the company says is its largest ever brand campaign." For yet another day, Robinhood would not remove all trading restrictions – which could require it to deposit with the NSCC a portion of the billions of dollars it just raised should prices for those issuers' shares quickly rise. Instead, Robinhood spent its new funding on an ad campaign – including a Super Bowl spot, one of the most expensive ad buys of the year. Barely avoiding liquidation by the grace of the NSCC waiving the ECP charge through February 1st, which gave Robinhood time to regroup and raise capital over the weekend, Robinhood dared to risk roiling the markets yet again with an appeal for new customers during one of the country's most-watched broadcasts of the year.

119.    That day, CNBC.com published a story entitled "Why investors were willing to write Robinhood a $3 billion check during the GameStop chaos." This story explained Robinhood's cocky behavior over the past three days. Author Kate Rooney interviewed three of Robinhood's investors, one of whom explained: "In spite of the trouble last week, the metrics suggest retail trading is exploding and Robinhood is still the only game in town."  Even with the

loss of customers who were injured or dismayed by Robinhood's actions, shoring up Robinhood's balance sheet in the short term would reap big results down the road:

> Robinhood's ability to add hundreds of thousands of new customers during a week of chaos, along with its IPO prospects, convinced Silicon Valley backers that a multi-billion-dollar cash infusion was worth it.
>
> ***
>
> One venture capital investor who saw the internal growth metrics last week said the flood of new investors "far outweighed" any attrition. Robinhood was the top app in the iOS app store for multiple days. It also led the industry in app downloads by a wide margin with 600,000 people downloading the free-trading app, according to JMP Securities analysis.

The explosive customer growth during the pandemic that culminated in adding 600,000 customers in a matter of days might have gone unnoticed had Robinhood not used its market power to manipulate and depress stock prices. Robinhood's national PR disaster showed investors that Robinhood stood alone as the app used by an overwhelming majority of retail traders.

120.    Because hedge funds and venture capitalists saw Robinhood as "the only game in town," when asked whether the backlash against Robinhood would delay its IPO plans, one unnamed banker said: "The [Robinhood] IPO is full steam ahead."[62]

<u>February 4, 2021</u>

121.    As the markets opened on February 4, 2021, Robinhood continued to impose the same restrictions on purchases and total holdings of GameStop and AMC, 500 and 5,500 shares, respectively. By the end of the day, GameStop shares fell to $53.50, the lowest close since January 21st, a whopping $294 less than the January 27th closing price of $347.51 Similarly, AMC shares closed at $7.09, the lowest closing price since January 26th's close of $4.96, and a greater than

---

[62] Luisa Beltran, "Robinhood to Push Forward With IPO Despite Backlash Over GameStop Trading," *Barron's* (Feb. 2, 2021).

64% drop from the closing price of $19.90 on January 27th. Late in the day on February 4th, after *six days* of limiting stock purchases, Robinhood posted a message on its website announcing: "There are currently no temporary limits to increasing your positions."

122.    When Robinhood Securities told the NSCC that it would impose "temporary" purchasing restrictions on the morning of January 28, 2021, to avoid payment of an excess capital premium charge so large that Robinhood would be forced to liquidate (a charge that was instead completely waived through February 1st), no one could have ever imagined that such restrictions would have lasted, in one form or another, for six entire trading sessions. After all, on the occasions when they are triggered, legitimate LULD trading halts last only for a matter of minutes.

123.    Apparently, Robinhood has a very fluid perception of time: Its founders developed trading technology that reduced tick-to-trade latency time for hedge funds and market makers down to as low as five microseconds – the more infinitesimal the better, or else you will lose the opportunity to an even faster trader. Yet, somehow, Robinhood told its customers with a straight face that restrictions that lasted from the morning of January 28th through the close of trade on February 4th were only "temporary".

124.    After Robinhood prohibited purchases (January 28th), then loosened and retightened restrictions (January 29th), only to gradually lift the restrictions on its trading platform over the course of the next week (February 1st – 5th), the price of the Affected Stocks were depressed by Robinhood artificially restricting demand:

| | Closing price Jan. 27, 2021 | Closing price Jan. 28, 2021 | Closing price Jan. 29, 2021 | Closing price Feb. 1, 2021 | Closing price Feb. 2, 2021 | Closing price Feb. 3, 2021 | Closing price Feb. 4, 2021 |
|---|---|---|---|---|---|---|---|
| AMC (AMC Entertainment Holdings Inc.) | $19.90 | $8.63 | $13.26 | $13.30 | $7.82 | $8.97 | $7.09 |
| BB (BlackBerry Ltd.) | $25.10 | $14.65 | $14.10 | $14.63 | $11.55 | $12.00 | $12.15 |
| BBBY (Bed Bath & Beyond Inc.) | $52.89 | $33.64 | $35.33 | $30.26 | $25.38 | $28.02 | $27.01 |
| EXPR (Express Inc.) | $9.55 | $4.70 | $6.00 | $5.00 | $3.38 | $3.56 | $3.28 |
| GME (GameStop Corp.) | $347.51 | $193.60 | $325.00 | $225.00 | $90.00 | $92.41 | $53.50 |
| KOSS (Koss Corp.) | $58.00 | $41.96 | $64.00 | $35.00 | $20.00 | $25.59 | $18.80 |
| NOK (Nokia Oyj) | $6.55 | $4.69 | $4.56 | $4.89 | $4.53 | $4.70 | $4.37 |
| TR (Tootsie Roll Industries Inc.) | $41.25 | $37.33 | $38.10 | $35.87 | $29.84 | $30.84 | $30.25 |
| TRVG (Trivago N.V.) | $3.19 | $2.48 | $2.52 | $2.38 | $2.33 | $2.51 | $2.40 |

125.    For an entire week, Robinhood manipulated the market prices of the Affected

Stocks by restricting the extraordinarily high trading frequency of its 15 million customers. Those

who sold or were forced to sell[63] during the trading days in which Robinhood's manipulative actions depressed the market prices of the Affected Stocks lost tens of billions of dollars.

**Post-Class Period Events**

126.     On July 29, 2021, Robinhood Markets, Inc. conducted its initial public offering of shares on the NASDAQ exchange and raised $2 billion. Following the IPO debut at $38 per share, Robinhood's balance sheet was significantly strengthened; its market value was $32 billion. Speaking that day on CNBC, Tenev initially avoided answering questions about any lessons Robinhood learned following the events of late January and early February. When he finally did, his comments showed a callous lack of concern about the market chaos and financial damages Robinhood's actions caused its customers and others who sold the Affected Stocks at a loss:

> MORGAN BRENNAN: Vlad, it's Morgan. Congratulations today.
>
> TENEV: Thank you.
>
> BRENNAN: I asked this question, though hindsight is 20/20, but if you could, could go back to January, would you have done things differently?
>
> TENEV: I would say it's, you know, there's always things we could have done better and I'm the, I'm the first to say that but it's, it's been an amazing six months and it really 18 months and much, much more than that …
>
> ***
>
> DAVID FABER: Vlad, it's David Faber. Final question from us here at the NYSE. You know, Morgan had asked you about that January period I mean, what did you take away from that? You know, you're a technology company but you're a financial technology company and when those peak margin calls were coming in with big volume, you know, what did you learn about being the financial part of a technology

---

[63] By increasing the margin requirement on the Affected Stocks, some who had purchased the securities on a margin loan were forced to sell or face a margin call.

company and all the regulations and all the things that come along with that and how are you going to apply it now?

TENEV: I think in those, in those short few weeks around end of January, early February, we certainly learned a lot. We got a whole lot of work done strengthening everything across the board not just the balance sheet but customer support. We made it a lot easier for customers that want to come back to the service …

127.     Closer to the events, appearing before the House of Representatives Committee on Financial Services on February 18th, Tenev more contritely testified: "[A]t the end of the day, what happened is unacceptable to us. For our customers, I'm sorry and I apologize. Please know that we are doing everything we can to make sure this won't happen again." A company valued at tens of billions of dollars is required to do more in response to the financial damages it caused than promise to do better next time. Instead, Robinhood needs to emulate its namesake and give to the poor, to wit, provide redress to injured investors made poorer by Robinhood's actions.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

128.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of persons or entities who held common stock in AMC Entertainment Holdings, Inc. ("AMC"), Bed Bath & Beyond Inc. ("BBBY"), BlackBerry Ltd. ("BB"),   Express Inc. ("EXPR"), GameStop Corp. ("GME"), Koss Corp. ("KOSS"), Tootsie Roll Industries Inc. ("TR"),  or American Depositary Shares of foreign-issuers Nokia ("NOK") and trivago N.V ("TRVG") (collectively "the Affected Stocks") as of the close of trading on January 27, 2021, and sold at a loss between January 28, 2021, and February 4, 2021 (the "Class"). Excluded from the class are the defendants, the officers and directors of defendants, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants or any excluded persons have or had a controlling interest.

129.    The members of the Class are so numerous that joinder of all members is impracticable. The Affected Stocks were actively traded on the Robinhood trading platform via the NASDAQ and NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands of members in the proposed Class.

130.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

131.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

132.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether defendants engaged in manipulative acts as alleged herein;

- whether defendants' acts distorted the price of the Affected Stocks;

- whether defendants misrepresented material facts or mislead due to their omission;

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

133.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress

the wrongs done to them. There will be no difficulty in the management of this action as a class action.

134.    Investors will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose facts during the Class period;

- the omissions and misrepresentations were material;

- the Affected Stocks were traded in efficient markets;

- the Affected Stocks were liquid and traded with moderate to heavy volume during the Class Period;

- the Affected Stocks were traded on national exchanges such as the NASDAQ and NYSE, and were covered by analysts;

- Investors and members of the Class sold the Affected Stocks during the Class period without knowledge of the omitted or misrepresented facts; and

- unexpected material news about the Affected Stocks was rapidly reflected in and incorporated into each company's stock price during the Class period.

135.    Based upon the foregoing, members of the Class are entitled to a presumption of reliance upon the integrity of the market for the Affected Stocks.

## **COUNT I**
### **Violations of Section 9(a) of the Exchange Act**
### **Against Defendants**

136.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

137.    The Robinhood Defendants affected and distorted the normal market dynamics for the Affected Stocks by: (a) canceling purchase orders for the Affected Stocks placed before the markets opened for trading on January 28, 2021; (b) closing out options positions in AMC and GME early; (c) prohibiting and later restricting purchases of the Affected Stocks on the Robinhood trading platform and (d) abruptly raising margin requirements for Robinhood's customers, forcing those who could not meet the margin calls for the Affected Stocks to sell some or all of their holdings.

138.    By preventing Robinhood customers from purchasing the Affected Stocks, Robinhood sought to ensure that it could meet its deposit requirements with the NSCC. Robinhood knew that distorting the demand side of the market for the Affected Stocks in this manner would depress the prices of those shares.

139.    While engaging in these manipulative acts that depressed the prices of the Affected Stocks, Robinhood intentionally omitted and/or misrepresented material facts to give the false impression to Class members that the markets for the Affected Stocks were free of manipulation.

140.    Plaintiffs would not have sold their Affected Stocks at a loss if not for defendants' manipulation of the prices of the Affected Stocks.

141.    As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Class suffered damages in connection with their sales of the Affected Stocks.

### COUNT II
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

142.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

143.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the

statements not misleading; and/or (c) engaged in acts, practices, and a course of conduct which operated as a fraud and deceit upon the owners of the Affected Stocks in violation of §10(b) of the Exchange Act and Rule 10b-5. Defendants are sued as primary participants in the wrongful and unlawful conduct charged herein.

144.    Defendants' actions with respect to all restrictions placed on purchases of the Affected Stocks on the Robinhood platform during the Class Period constitutes a scheme to defraud and/or a course of conduct that operates as a fraud.

145.    Defendants' malfeasance included the dissemination of information which they knew or recklessly disregarded was materially false and/or misleading to induce the investing public to believe that the market for the Affected Stocks was free of manipulation.

146.    Defendants knew and/or recklessly disregarded that their actions to manipulate the price of the Affected Stocks would cause damages to Plaintiffs and members of the Class.

147.    As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and members of the Class suffered damages in connection with their sales of the Affected Stocks.

148.    Defendants, individually and in concert, furthered their scheme directly and indirectly, by the use, means or instrumentalities of interstate commerce, the mails, and/or the facilities of a national securities exchange.

149.    By virtue of the foregoing, defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

(a)     declaring this action to be a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     awarding damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)     awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: November 30, 2021                     Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, FBN# 0182877
Robin Bronzaft Howald
Michael A. Cohen

By: /s/Laurence M. Rosen
Laurence M. Rosen, Esq.
275 Madison Avenue  40th Floor
New York, New York  10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com

*Counsel for Lead Plaintiff Blue Laine-Beveridge and Named Plaintiffs Abraham Huacuja, Ava Bernard, Brendan Clarke, Brian Harbison, Cecilia Rivas, Doi Nguyen, Joseph Gurney, Marcel Poirier, Sandy Ng, Santiago Gil Bohórquez, and Thomas Cash*

74

# EXHIBIT A

to Amended Consolidated Class Action
Complaint

DocuSign Envelope ID: 73438056-245A-4C70-8C98-ACA796928465

## CERTIFICATION

Abraham Huacuja (the "Plaintiff") authorizes The Rosen Law Firm, P.A. to file an action or amend a current action under the federal securities laws to recover damages and to seek other relief against ROBINHOOD FINANCIAL, LLC, ROBINHOOD SECURITIES LLC, ROBINHOOD MARKETS, INC. (collectively "RH") and others in connection with the purchase and sale of one or more of the Affected Securities which include American Airlines Group Inc. (NASDAQ: AAL), AMC Entertainment Holdings Inc. (NYSE: AMC), BlackBerry Limited (NYSE: BB), Bed Bath & Beyond Inc. (NASDAQ: BBBY), GameStop Corp. (NYSE: GME), Express (NYSE: EXPR), Koss Corporation (NASDAQ: KOSS), Naked Brand Group (NASDAQ: NAKD), Nokia Corporation (NYSE: NOK), Sundial Growers, Inc. (NASDAQ: SNDL), Tootsie Roll Industries (NYSE: TR), and Trivago NV (NASDAQ: TRVG).

Plaintiff declares, as to the claims asserted under the federal securities laws, that:

1.     Plaintiff has reviewed a complaint against RH and retained The Rosen Law Firm, P.A..

2.     Plaintiff did not engage in transactions in the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this or any other litigation under the securities laws of the United States.

3.     Plaintiff is willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.     The following is a list of all of the purchases and sales Plaintiff has made in the Affected Securities for which Plaintiff seeks redress pursuant to the claims set forth in the consolidated complaint:

See Schedule A

5.     Plaintiff has not, within the three years preceding the date of this certification, sought to serve or served as a representative party on behalf of a class in an action involving alleged violations of the federal securities laws, except: for the following company(ies):

6.     Plaintiff will not accept any payment for serving as a representative party beyond Plaintiff's pro rata share of any recovery, except reasonable costs and expenses, such as travel expenses and lost wages directly related to the class representation, as ordered or approved by the court pursuant to law.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _____     _____
           11/29/2021                            Abraham Huacuja

## SCHEDULE A

### ABRAHAM HUACUJA

| PURCHASES | | | | SALES | | | |
|---|---|---|---|---|---|---|---|
| | DATE | SHARES | PRICE | | DATE | SHARES | PRICE |
| AMC | 1/27/2021 | 1,000 | ($19.09) | AMC | 1/28/2021 | 71 | $13.00 |
| AMC | 1/27/2021 | 15 | ($18.24) | AMC | 1/28/2021 | 100 | $13.00 |
| AMC | 1/27/2021 | 105 | ($17.86) | AMC | 1/28/2021 | 45 | $13.00 |
| AMC | 1/27/2021 | 100 | ($17.85) | AMC | 1/28/2021 | 100 | $13.00 |
| AMC | 1/27/2021 | 100 | ($17.85) | AMC | 1/28/2021 | 30 | $13.00 |
| AMC | 1/27/2021 | 100 | ($17.85) | AMC | 1/28/2021 | 40 | $13.00 |
| AMC | 1/27/2021 | 100 | ($17.85) | AMC | 1/28/2021 | 25 | $13.00 |
| AMC | 1/27/2021 | 300 | ($17.85) | AMC | 1/28/2021 | 6 | $13.00 |
| AMC | 1/27/2021 | 95 | ($17.85) | AMC | 1/28/2021 | 6 | $13.00 |
| AMC | 1/27/2021 | 150 | ($16.35) | AMC | 1/28/2021 | 600 | $13.00 |
| AMC | 1/27/2021 | 5 | ($16.25) | AMC | 1/28/2021 | 15 | $13.00 |
| AMC | 1/27/2021 | 50 | ($16.35) | AMC | 1/28/2021 | 12 | $13.00 |
| AMC | 1/27/2021 | 1 | ($15.25) | AMC | 1/28/2021 | 250 | $13.00 |
| AMC | 1/27/2021 | 9 | ($15.39) | AMC | 1/28/2021 | 25 | $13.00 |
| AMC | 1/27/2021 | 70 | ($15.15) | AMC | 1/28/2021 | 22 | $13.00 |
| NOK | 1/27/2021 | 100 | ($7.68) | AMC | 1/28/2021 | 15 | $13.00 |
| NOK | 1/27/2021 | 100 | ($7.68) | AMC | 1/28/2021 | 27 | $13.00 |
| NOK | 1/27/2021 | 1,000 | ($7.53) | AMC | 1/28/2021 | 100 | $13.00 |
| NOK | 1/27/2021 | 774 | ($7.27) | AMC | 1/28/2021 | 3 | $13.00 |
| NOK | 1/27/2021 | 100 | ($7.27) | AMC | 1/28/2021 | 708 | $13.00 |
| NOK | 1/27/2021 | 51 | ($7.27) | NOK | 1/28/2021 | 43 | $4.86 |
| NOK | 1/27/2021 | 75 | ($7.27) | NOK | 1/28/2021 | 288 | $4.86 |
| NOK | 1/27/2021 | 900 | ($7.18) | NOK | 1/28/2021 | 200 | $4.86 |
| NOK | 1/27/2021 | 100 | ($7.18) | NOK | 1/28/2021 | 100 | $4.86 |
| NOK | 1/27/2021 | 60 | ($6.73) | NOK | 1/28/2021 | 85 | $4.86 |
| NOK | 1/27/2021 | 50 | ($6.73) | NOK | 1/28/2021 | 100 | $4.86 |
| NOK | 1/27/2021 | 26 | ($6.73) | NOK | 1/28/2021 | 115 | $4.86 |
| NOK | 1/27/2021 | 100 | ($6.73) | NOK | 1/28/2021 | 100 | $4.86 |
| NOK | 1/27/2021 | 64 | ($6.73) | NOK | 1/28/2021 | 100 | $4.86 |
| NOK | 1/27/2021 | 25 | ($6.73) | NOK | 1/28/2021 | 100 | $4.86 |
| NOK | 1/27/2021 | 100 | ($6.73) | NOK | 1/28/2021 | 100 | $4.86 |
| NOK | 1/27/2021 | 18 | ($6.73) | NOK | 1/28/2021 | 15 | $4.86 |
| NOK | 1/27/2021 | 41 | ($6.73) | NOK | 1/28/2021 | 35 | $4.86 |
| NOK | 1/27/2021 | 16 | ($6.73) | NOK | 1/28/2021 | 75 | $4.86 |
| | | | | NOK | 1/28/2021 | 5 | $4.86 |
| | | | | NOK | 1/28/2021 | 10 | $4.86 |
| | | | | NOK | 1/28/2021 | 1,000 | $4.86 |
| | | | | NOK | 1/28/2021 | 1,229 | $4.86 |

DocuSign Envelope ID: 15E9497C-4331-4936-91C5-32C6CB0A80A2

## CERTIFICATION

Ava Bernard (the "Plaintiff") authorizes The Rosen Law Firm, P.A. to file an action or amend a current action under the federal securities laws to recover damages and to seek other relief against ROBINHOOD FINANCIAL, LLC, ROBINHOOD SECURITIES LLC, ROBINHOOD MARKETS, INC. (collectively "RH") and others in connection with the purchase and sale of one or more of the Affected Securities which include American Airlines Group Inc. (NASDAQ: AAL), AMC Entertainment Holdings Inc. (NYSE: AMC), BlackBerry Limited (NYSE: BB), Bed Bath & Beyond Inc. (NASDAQ: BBBY), GameStop Corp. (NYSE: GME), Express (NYSE: EXPR), Koss Corporation (NASDAQ: KOSS), Naked Brand Group (NASDAQ: NAKD), Nokia Corporation (NYSE: NOK), Sundial Growers, Inc. (NASDAQ: SNDL), Tootsie Roll Industries (NYSE: TR), and Trivago NV (NASDAQ: TRVG).

Plaintiff declares, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed a complaint against RH and retained The Rosen Law Firm, P.A..

2.      Plaintiff did not engage in transactions in the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this or any other litigation under the securities laws of the United States.

3.      Plaintiff is willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.      The following is a list of all of the purchases and sales Plaintiff has made in the Affected Securities for which Plaintiff seeks redress pursuant to the claims set forth in the consolidated complaint:

See Schedule A

5.      Plaintiff has not, within the three years preceding the date of this certification, sought to serve or served as a representative party on behalf of a class in an action involving alleged violations of the federal securities laws, except: for the following company(ies):

6.      Plaintiff will not accept any payment for serving as a representative party beyond Plaintiff's pro rata share of any recovery, except reasonable costs and expenses, such as travel expenses and lost wages directly related to the class representation, as ordered or approved by the court pursuant to law.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _____11/29/2021_____        _____
                                                          Ava Bernard

DocuSign Envelope ID: 15E9407C-4381-4936-91C5-32C6CB0A80A2

## SCHEDULE A

### AVA BERNARD (ASSIGNED FROM COLLEEN COOKE)

| | PURCHASES | | | | SALES | | |
|---|---|---|---|---|---|---|---|
| | DATE | SHARES | PRICE | | DATE | SHARES | PRICE |
| AMC | 1/27/2021 | 500 | ($16.29) | AMC | 2/02/2021 | 500 | $8.90 |
| AMC | 1/27/2021 | 500 | ($16.10) | AMC | 2/03/2021 | 500 | $9.32 |

## CERTIFICATION

Brendan Clarke (the "Plaintiff") authorizes The Rosen Law Firm, P.A. to file an action or amend a current action under the federal securities laws to recover damages and to seek other relief against ROBINHOOD FINANCIAL, LLC, ROBINHOOD SECURITIES LLC, ROBINHOOD MARKETS, INC. (collectively "RH") and others in connection with the purchase and sale of one or more of the Affected Securities which include American Airlines Group Inc. (NASDAQ: AAL), AMC Entertainment Holdings Inc. (NYSE: AMC), BlackBerry Limited (NYSE: BB), Bed Bath & Beyond Inc. (NASDAQ: BBBY), GameStop Corp. (NYSE: GME), Express (NYSE: EXPR), Koss Corporation (NASDAQ: KOSS), Naked Brand Group (NASDAQ: NAKD), Nokia Corporation (NYSE: NOK), Sundial Growers, Inc. (NASDAQ: SNDL), Tootsie Roll Industries (NYSE: TR), and Trivago NV (NASDAQ: TRVG).

Plaintiff declares, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed a complaint against RH and retained The Rosen Law Firm, P.A.

2.      Plaintiff did not engage in transactions in the securities that are the subject of this action at the direction of Plaintiff's counsel or in order to participate in this or any other litigation under the securities laws of the United States.

3.      Plaintiff is willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.      The following is a list of all of the purchases and sales Plaintiff has made in the Affected Securities for which Plaintiff seeks redress pursuant to the claims set forth in the consolidated complaint:

See Schedule A

5.      Plaintiff has not, within the three years preceding the date of this certification, sought to serve or served as a representative party on behalf of a class in an action involving alleged violations of the federal securities laws, except: for the following company(ies):

6.      Plaintiff will not accept any payment for serving as a representative party beyond Plaintiff's pro rata share of any recovery, except reasonable costs and expenses, such as travel expenses and lost wages directly related to the class representation, as ordered or approved by the court pursuant to law.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _____   11/30/2021

_____
Brendan Clarke

## SCHEDULE A

### BRENDAN CLARKE

| PURCHASES | | | | SALES | | | |
|---|---|---|---|---|---|---|---|
| | **DATE** | **SHARES** | **PRICE** | | **DATE** | **SHARES** | **PRICE** |
| GME | 1/27/2021 | 3.584445 | ($306.88) | GME | 2/2/2021 | 6.642439 | $103.59 |
| GME | 1/27/2021 | 1.139977 | ($368.43) | | | | |
| GME | 1/27/2021 | 0.97842 | ($367.94) | | | | |
| GME | 1/27/2021 | 0.939597 | ($329.93) | | | | |

## CERTIFICATION

Brian Harbison (the "Plaintiff") authorizes The Rosen Law Firm, P.A. to file an action or amend a current action under the federal securities laws to recover damages and to seek other relief against ROBINHOOD FINANCIAL, LLC, ROBINHOOD SECURITIES LLC, ROBINHOOD MARKETS, INC. (collectively "RH") and others in connection with the purchase and sale of one or more of the Affected Securities which include American Airlines Group Inc. (NASDAQ: AAL), AMC Entertainment Holdings Inc. (NYSE: AMC), BlackBerry Limited (NYSE: BB), Bed Bath & Beyond Inc. (NASDAQ: BBBY), GameStop Corp. (NYSE: GME), Express (NYSE: EXPR), Koss Corporation (NASDAQ: KOSS), Naked Brand Group (NASDAQ: NAKD), Nokia Corporation (NYSE: NOK), Sundial Growers, Inc. (NASDAQ: SNDL), Tootsie Roll Industries (NYSE: TR), and Trivago NV (NASDAQ: TRVG).

Plaintiff declares, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed a complaint against RH and retained The Rosen Law Firm, P.A.

2.    Plaintiff did not engage in transactions in the securities that are the subject of this action at the direction of Plaintiff's counsel or in order to participate in this or any other litigation under the securities laws of the United States.

3.    Plaintiff is willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.    The following is a list of all of the purchases and sales Plaintiff has made in the Affected Securities for which Plaintiff seeks redress pursuant to the claims set forth in the consolidated complaint:

See Schedule A

5.    Plaintiff has not, within the three years preceding the date of this certification, sought to serve or served as a representative party on behalf of a class in an action involving alleged violations of the federal securities laws, except: for the following company(ies):

6.    Plaintiff will not accept any payment for serving as a representative party beyond Plaintiff's pro rata share of any recovery, except reasonable costs and expenses, such as travel expenses and lost wages directly related to the class representation, as ordered or approved by the court pursuant to law.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _____   11/29/2021

_____
Brian Harbison

DocuSign Envelope ID: E9048351-5511-4114-883A-022C73EF49B6

## SCHEDULE A

**BRIAN HARBISON**

| PURCHASES | | | | SALES | | | |
|---|---|---|---|---|---|---|---|
| | **DATE** | **SHARES** | **PRICE** | | **DATE** | **SHARES** | **PRICE** |
| AMC | 1/27/2021 | 200 | ($15.98) | AMC | 1/28/2021 | 200 | $12.99 |

DocuSign Envelope ID: F997DB97-05F6-4BC4-B186-040942EF9B61

## CERTIFICATION

Cecilia Rivas (the "Plaintiff") authorizes The Rosen Law Firm, P.A. to file an action or amend a current action under the federal securities laws to recover damages and to seek other relief against ROBINHOOD FINANCIAL, LLC, ROBINHOOD SECURITIES LLC, ROBINHOOD MARKETS, INC. (collectively "RH") and others in connection with the purchase and sale of one or more of the Affected Securities which include American Airlines Group Inc. (NASDAQ: AAL), AMC Entertainment Holdings Inc. (NYSE: AMC), BlackBerry Limited (NYSE: BB), Bed Bath & Beyond Inc. (NASDAQ: BBBY), GameStop Corp. (NYSE: GME), Express (NYSE: EXPR), Koss Corporation (NASDAQ: KOSS), Naked Brand Group (NASDAQ: NAKD), Nokia Corporation (NYSE: NOK), Sundial Growers, Inc. (NASDAQ: SNDL), Tootsie Roll Industries (NYSE: TR), and Trivago NV (NASDAQ: TRVG).

Plaintiff declares, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed a complaint against RH and retained The Rosen Law Firm, P.A.

2.      Plaintiff did not engage in transactions in the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this or any other litigation under the securities laws of the United States.

3.      Plaintiff is willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.      The following is a list of all of the purchases and sales Plaintiff has made in the Affected Securities for which Plaintiff seeks redress pursuant to the claims set forth in the consolidated complaint:

See Schedule A

5.      Plaintiff has not, within the three years preceding the date of this certification, sought to serve or served as a representative party on behalf of a class in an action involving alleged violations of the federal securities laws, except: for the following company(ies):

6.      Plaintiff will not accept any payment for serving as a representative party beyond Plaintiff's pro rata share of any recovery, except reasonable costs and expenses, such as travel expenses and lost wages directly related to the class representation, as ordered or approved by the court pursuant to law.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on ___11/23/2021_____          _____
                                                                              Cecilia Rivas

## SCHEDULE A

## CECILIA RIVAS

| PURCHASES | | | | | SALES | | | |
|---|---|---|---|---|---|---|---|---|
| | DATE | SHARES | PRICE | | | DATE | SHARES | PRICE |
| GME | 1/27/2021 | 1 | ($290.00) | | GME | 1/27/2021 | 1 | $345.00 |
| GME | 1/27/2021 | 1 | ($305.00) | | GME | 2/4/2021 | 1 | $57.22 |

## CERTIFICATION

Doi Nguyen (the "Plaintiff") authorizes The Rosen Law Firm, P.A. to file an action or amend a current action under the federal securities laws to recover damages and to seek other relief against ROBINHOOD FINANCIAL, LLC, ROBINHOOD SECURITIES LLC, ROBINHOOD MARKETS, INC. (collectively "RH") and others in connection with the purchase and sale of one or more of the common stock of AMC Entertainment Holdings, Inc. (NYSE: AMC), Bed Bath & Beyond Inc. (NASDAQ: BBBY), BlackBerry Ltd. (NYSE BB), Express Inc. (NYSE: EXPR), GameStop Corp. (NYSE: GME), Koss Corp. (NASDAQ: KOSS), Tootsie Roll Industries Inc. (NYSE: TR), or the American Depositary Shares of foreign-issuers Nokia Corp. (NYSE: NOK) and Trivago N.V. (NASDAQ: TRVG) (collectively "the Affected Stocks").

Plaintiff declares, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed a complaint against RH and retained The Rosen Law Firm, P.A.

2.      Plaintiff did not engage in transactions in the securities that are the subject of this action at the direction of Plaintiff's counsel or in order to participate in this or any other litigation under the securities laws of the United States.

3.      Plaintiff is willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.      The following is a list of all of the transactions Plaintiff has made in the Affected Stocks during the class period set forth in the consolidated complaint:

See Schedule A

5.      Plaintiff has not, within the three years preceding the date of this certification, sought to serve or served as a representative party on behalf of a class in an action involving alleged violations of the federal securities laws, except: for the following company(ies):

6.      Plaintiff will not accept any payment for serving as a representative party beyond Plaintiff's pro rata share of any recovery, except reasonable costs and expenses, such as travel expenses and lost wages directly related to the class representation, as ordered or approved by the court pursuant to law.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on __1/13/2023_____     DocuSigned by:

A8678EE17E8A416...

_____

Doi Nguyen

DocuSign Envelope ID: 7F041DA5-5E73-4DF9-9715-581235ACE984

## SCHEDULE A

### DOI NGUYEN

| PURCHASES | | | | SALES | | | |
|---|---|---|---|---|---|---|---|
| | **DATE** | **SHARES** | **PRICE** | | **DATE** | **SHARES** | **PRICE** |
| | AMC Minimum opening position 30 shares | | | AMC | 2/1/2021 | 79 | $15.02 |
| | | | | AMC | 2/1/2021 | 3 | $15.02 |
| | | | | BB | 1/29/2021 | 929.8394 | $16.04 |
| | BB minimum opening position 929.8394 | | | | | | |
| AMC | 1/29/2021 | 52 | ($14.51) | | | | |

*Share totals rounded to the fourth decimal.

## CERTIFICATION

Joseph Gurney (the "Plaintiff") authorizes The Rosen Law Firm, P.A. to file an action or amend a current action under the federal securities laws to recover damages and to seek other relief against ROBINHOOD FINANCIAL, LLC, ROBINHOOD SECURITIES LLC, ROBINHOOD MARKETS, INC. (collectively "RH") and others in connection with the purchase and sale of one or more of the Affected Securities which include American Airlines Group Inc. (NASDAQ: AAL), AMC Entertainment Holdings Inc. (NYSE: AMC), BlackBerry Limited (NYSE: BB), Bed Bath & Beyond Inc. (NASDAQ: BBBY), GameStop Corp. (NYSE: GME), Express (NYSE: EXPR), Koss Corporation (NASDAQ: KOSS), Naked Brand Group (NASDAQ: NAKD), Nokia Corporation (NYSE: NOK), Sundial Growers, Inc. (NASDAQ: SNDL), Tootsie Roll Industries (NYSE: TR), and Trivago NV (NASDAQ: TRVG).

Plaintiff declares, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed a complaint against RH and retained The Rosen Law Firm, P.A..

2.      Plaintiff did not engage in transactions in the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this or any other litigation under the securities laws of the United States.

3.      Plaintiff is willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.      The following is a list of all of the purchases and sales Plaintiff has made in the Affected Securities for which Plaintiff seeks redress pursuant to the claims set forth in the consolidated complaint:

See Schedule A

5.      Plaintiff has not, within the three years preceding the date of this certification, sought to serve or served as a representative party on behalf of a class in an action involving alleged violations of the federal securities laws, except: for the following company(ies):

6.      Plaintiff will not accept any payment for serving as a representative party beyond Plaintiff's pro rata share of any recovery, except reasonable costs and expenses, such as travel expenses and lost wages directly related to the class representation, as ordered or approved by the court pursuant to law.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _____     11/23/2021

_____
Joseph Gurney

**SCHEDULE A**

**JOSEPH GURNEY**

| | | PURCHASES | | | | | SALES | |
|---|---|---|---|---|---|---|---|---|
| | **DATE** | **SHARES** | **PRICE** | | | **DATE** | **SHARES** | **PRICE** |
| BB | 1/27/2021 | 24.83321 | ($26.98) | | BB | 1/28/2021 | 41 | $17.00 |
| BB | 1/27/2021 | 7 | ($26.83) | | BB | 1/28/2021 | 0.0936681 | $17.00 |
| BB | 1/27/2021 | 0.076022 | ($26.83) | | | | | |
| BB | 1/27/2021 | 0.377351 | ($26.82) | | | | | |
| BB | 1/27/2021 | 4 | ($23.12) | | | | | |
| BB | 1/27/2021 | 0.411764 | ($23.12) | | | | | |
| BB | 1/27/2021 | 1.999684 | ($22.19) | | | | | |
| BB | 1/27/2021 | 0.253775 | ($22.15) | | | | | |
| BB | 1/27/2021 | 1.995353 | ($21.48) | | | | | |
| BB | 1/27/2021 | 0.036962 | ($21.43) | | | | | |
| BB | 1/27/2021 | 0.096552 | ($21.43) | | | | | |
| BB | 1/27/2021 | 0.013001 | ($21.43) | | | | | |

## CERTIFICATION

Marcel Poirier (the "Plaintiff") authorizes The Rosen Law Firm, P.A. to file an action or amend a current action under the federal securities laws to recover damages and to seek other relief against ROBINHOOD FINANCIAL, LLC, ROBINHOOD SECURITIES LLC, ROBINHOOD MARKETS, INC. (collectively "RH") and others in connection with the purchase and sale of one or more of the common stock of AMC Entertainment Holdings, Inc. (NYSE: AMC), Bed Bath & Beyond Inc. (NASDAQ: BBBY), BlackBerry Ltd. (NYSE BB), Express Inc. (NYSE: EXPR), GameStop Corp. (NYSE: GME), Koss Corp. (NASDAQ: KOSS), Tootsie Roll Industries Inc. (NYSE: TR), or the American Depositary Shares of foreign-issuers Nokia Corp. (NYSE: NOK) and Trivago N.V. (NASDAQ: TRVG) (collectively "the Affected Stocks").

Plaintiff declares, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed a complaint against RH and retained The Rosen Law Firm, P.A.

2.      Plaintiff did not engage in transactions in the securities that are the subject of this action at the direction of Plaintiff's counsel or in order to participate in this or any other litigation under the securities laws of the United States.

3.      Plaintiff is willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.      The following is a list of all of the transactions Plaintiff has made in the Affected Stocks during the class period set forth in the consolidated complaint:

See Schedule A

5.      Plaintiff has not, within the three years preceding the date of this certification, sought to serve or served as a representative party on behalf of a class in an action involving alleged violations of the federal securities laws, except: for the following company(ies):

6.      Plaintiff will not accept any payment for serving as a representative party beyond Plaintiff's pro rata share of any recovery, except reasonable costs and expenses, such as travel expenses and lost wages directly related to the class representation, as ordered or approved by the court pursuant to law.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on ___1/9/2023_____          _____
                                                         Marcel Poirier

DocuSign Envelope ID: 6FB5FBD9-E54A-4F5D-B876-2182F172DF3E

## SCHEDULE A

### MARCEL POIRIER

| PURCHASES | | | | SALES | | | |
|---|---|---|---|---|---|---|---|
| | **DATE** | **SHARES** | **PRICE** | | **DATE** | **SHARES** | **PRICE** |
| | Minimum opening position 15,000 shares | | | BB | 1/28/2021 | 5,000 | $16.03 |
| | | | | BB | 1/29/2021 | 3,000 | $14.21 |
| | | | | BB | 2/1/2021 | 5,000 | $14.77 |
| BB | 1/28/2021 | 8,000 | ($19.49) | BB | 2/2/2021 | 4,000 | $11.58 |

*Rounded to the nearest cent.
**May include averaged prices.

DocuSign Envelope ID: E0533049-A99F-485G-9093-360D621624F3

# CERTIFICATION

Sandy Ng (the "Plaintiff") authorizes The Rosen Law Firm, P.A. to file an action or amend a current action under the federal securities laws to recover damages and to seek other relief against ROBINHOOD FINANCIAL, LLC, ROBINHOOD SECURITIES LLC, ROBINHOOD MARKETS, INC. (collectively "RH") and others in connection with the purchase and sale of one or more of the common stock of AMC Entertainment Holdings, Inc. (NYSE: AMC), Bed Bath & Beyond Inc. (NASDAQ: BBBY), BlackBerry Ltd. (NYSE BB), Express Inc. (NYSE: EXPR), GameStop Corp. (NYSE: GME), Koss Corp. (NASDAQ: KOSS), Tootsie Roll Industries Inc. (NYSE: TR), or the American Depositary Shares of foreign-issuers Nokia Corp. (NYSE: NOK) and Trivago N.V. (NASDAQ: TRVG) (collectively "the Affected Stocks").

Plaintiff declares, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed a complaint against RH and retained The Rosen Law Firm, P.A.

2.      Plaintiff did not engage in transactions in the securities that are the subject of this action at the direction of Plaintiff's counsel or in order to participate in this or any other litigation under the securities laws of the United States.

3.      Plaintiff is willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.      The following is a list of all of the transactions Plaintiff has made in the Affected Stocks during the class period set forth in the consolidated complaint:

See Schedule A

5.      Plaintiff has not, within the three years preceding the date of this certification, sought to serve or served as a representative party on behalf of a class in an action involving alleged violations of the federal securities laws, except: for the following company(ies):

6.      Plaintiff will not accept any payment for serving as a representative party beyond Plaintiff's pro rata share of any recovery, except reasonable costs and expenses, such as travel expenses and lost wages directly related to the class representation, as ordered or approved by the court pursuant to law.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on ___1/11/2023___

DocuSigned by:

_Sandy Ng_
15AE5246C691475...

Sandy Ng

## SCHEDULE A

### SANDY NG
### ACCOUNT 1

| PURCHASES | | | | | SALES | | | |
|---|---|---|---|---|---|---|---|---|
| | DATE | SHARES | PRICE | | | DATE | SHARES | PRICE |
| | Minimum opening position 75 shares | | | | GME | 2/4/2021 | 55 | *Transfer Out* |
| | | | | | GME | 2/4/2021 | 75 | *Transfer Out* |
| GME | 1/28/2021 | 55 | ($264.00) | | | | | |

### ACCOUNT 2

| PURCHASES | | | | | SALES | | | |
|---|---|---|---|---|---|---|---|---|
| | DATE | SHARES | PRICE | | | DATE | SHARES | PRICE |
| | Minimum opening position 1,560 shares | | | | GME | 2/4/2021 | 1,633 | $56.89 |
| GME | 2/4/2021 | 18 | ($78.50) | | | | | |
| GME | 2/4/2021 | 55 | *Transfer In* | | | | | |
| GME | 2/4/2021 | 75 | *Transfer In* | | | | | |

*Rounded to the nearest cent.
**Does not account for the July 22, 2022 4:1 stock split.

## CERTIFICATION

Santiago Gil Bohórquez (the "Plaintiff") authorizes The Rosen Law Firm, P.A. to file an action or amend a current action under the federal securities laws to recover damages and to seek other relief against ROBINHOOD FINANCIAL, LLC, ROBINHOOD SECURITIES LLC, ROBINHOOD MARKETS, INC. (collectively "RH") and others in connection with the purchase and sale of one or more of the Affected Securities which include American Airlines Group Inc. (NASDAQ: AAL), AMC Entertainment Holdings Inc. (NYSE: AMC), BlackBerry Limited (NYSE: BB), Bed Bath & Beyond Inc. (NASDAQ: BBBY), GameStop Corp. (NYSE: GME), Express (NYSE: EXPR), Koss Corporation (NASDAQ: KOSS), Naked Brand Group (NASDAQ: NAKD), Nokia Corporation (NYSE: NOK), Sundial Growers, Inc. (NASDAQ: SNDL), Tootsie Roll Industries (NYSE: TR), and Trivago NV (NASDAQ: TRVG).

Plaintiff declares, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed a complaint against RH and retained The Rosen Law Firm, P.A..

2.      Plaintiff did not engage in transactions in the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this or any other litigation under the securities laws of the United States.

3.      Plaintiff is willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.      The following is a list of all of the purchases and sales Plaintiff has made in the Affected Securities for which Plaintiff seeks redress pursuant to the claims set forth in the consolidated complaint:

See Schedule A

5.      Plaintiff has not, within the three years preceding the date of this certification, sought to serve or served as a representative party on behalf of a class in an action involving alleged violations of the federal securities laws, except: for the following company(ies):

6.      Plaintiff will not accept any payment for serving as a representative party beyond Plaintiff's pro rata share of any recovery, except reasonable costs and expenses, such as travel expenses and lost wages directly related to the class representation, as ordered or approved by the court pursuant to law.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _____11/29/2021_____

_____
DocuSigned by:
*Santiago Gil*
92B08210D54A4CC...
Santiago Gil Bohórquez

DocuSign Envelope ID: 5482FE6D-G8FC-47R1-8B98-C2B8615122AF

## SCHEDULE A

### SANTIAGO GIL BOHÓRQUEZ

| PURCHASES | | | | SALES | | | |
|---|---|---|---|---|---|---|---|
| | DATE | SHARES | PRICE | | DATE | SHARES | PRICE |
| EXPR | 1/27/2021 | 300 | ($9.9481) | EXPR | 1/28/2021 | 200 | $6.1100 |
| EXPR | 1/27/2021 | 312 | ($9.6862) | EXPR | 1/29/2021 | 173 | $6.2219 |
| EXPR | 1/27/2021 | 176 | ($8.3000) | EXPR | 1/29/2021 | 229 | $5.6000 |
| EXPR | 1/28/2021 | 14 | ($4.8790) | EXPR | 2/1/2021 | 200 | $5.1619 |
| NOK | 1/27/2021 | 200 | ($5.1137) | NOK | 1/28/2021 | 200 | $4.9300 |
| BB | 1/27/2021 | 200 | ($20.8998) | BB | 1/28/2021 | 100 | $16.9100 |
| | | | | BB | 1/29/2021 | 100 | $14.0501 |

## CERTIFICATION

Thomas Cash (the "Plaintiff") authorizes The Rosen Law Firm, P.A. to file an action or amend a current action under the federal securities laws to recover damages and to seek other relief against ROBINHOOD FINANCIAL, LLC, ROBINHOOD SECURITIES LLC, ROBINHOOD MARKETS, INC. (collectively "RH") and others in connection with the purchase and sale of one or more of the common stock of AMC Entertainment Holdings, Inc. (NYSE: AMC), Bed Bath & Beyond Inc. (NASDAQ: BBBY), BlackBerry Ltd. (NYSE BB), Express Inc. (NYSE: EXPR), GameStop Corp. (NYSE: GME), Koss Corp. (NASDAQ: KOSS), Tootsie Roll Industries Inc. (NYSE: TR), or the American Depositary Shares of foreign-issuers Nokia Corp. (NYSE: NOK) and Trivago N.V. (NASDAQ: TRVG) (collectively "the Affected Stocks").

Plaintiff declares, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed a complaint against RH and retained The Rosen Law Firm, P.A.

2.      Plaintiff did not engage in transactions in the securities that are the subject of this action at the direction of Plaintiff's counsel or in order to participate in this or any other litigation under the securities laws of the United States.

3.      Plaintiff is willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.      The following is a list of all of the transactions Plaintiff has made in the Affected Stocks during the class period set forth in the consolidated complaint:

See Schedule A

5.      Plaintiff has not, within the three years preceding the date of this certification, sought to serve or served as a representative party on behalf of a class in an action involving alleged violations of the federal securities laws, except: for the following company(ies):

6.      Plaintiff will not accept any payment for serving as a representative party beyond Plaintiff's pro rata share of any recovery, except reasonable costs and expenses, such as travel expenses and lost wages directly related to the class representation, as ordered or approved by the court pursuant to law.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _____  1/12/2023

_____
Thomas Cash

# SCHEDULE A

## THOMAS CASH

| PURCHASES | | | | SALES | | | |
|---|---|---|---|---|---|---|---|
| **DATE** | **SHARES** | **PRICE** | | | **DATE** | **SHARES** | **PRICE** |
| Minimum opening position 500 shares | | | | GME | 1/28/2021 | 500 | $132.00 |

*Rounded to the nearest cent.
**Does not account for the July 22, 2022 4:1 stock split.