**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-2989-MDL-ALTONAGA/Damian**

In re: JANUARY 2021 SHORT SQUEEZE
TRADING LITIGATION

**This Document Relates to: All Actions Involving the Federal Securities Laws**

**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

## <u>TABLE OF CONTENTS</u>

I.   PRELIMINARY STATEMENT ..................................................................................1

II.  SUMMARY OF THE ARGUMENT ........................................................................2

   A.  Plaintiffs Present a Straightforward Case for Certification ...............................2

   B.  Robinhood's Unorthodox, Convoluted Arguments Are a Smokescreen ...................3

III. STATEMENT OF FACTS APPLICABLE TO ALL CLASS MEMBERS ....................5

   A.  Robinhood Disregarded the Liquidity Risk Posed By Its Unbridled Growth .................5

   B.  Robinhood Knew Its Restrictions Would Hurt Investors in the Affected Stocks ...........5

   C.  Robinhood's Restrictions Were Not Required as a Condition of DTCC Relief .............6

   D.  Robinhood's Market Manipulation Damaged Investors ...................................6

IV. THE CLASS SATISFIES RULE 23 AND THE COURT SHOULD CERTIFY IT ...........7

   A.  The Class Meets Rule 23(a)'s Requirements ...........................................7

     1.  Rule 23(a)(1) - Numerosity ..........................................................7

     2.  Rule 23(a)(2) – Commonality..........................................................7

     3.  Rule 23(a)(3) – Typicality ...........................................................7

      a.  The proposed representatives' interests are identical to those of sellers of the Affected Stocks they do not own ........................................................8

      b.  Speculative conflicts cannot render a representative atypical....................8

     4.  Rule 23(a)(4) – Adequacy of Representatives and Counsel ...........................9

   B.  Rule 23(b)(3)'s Two Requirements Are Met .........................................10

     1.  Common issues predominate over individual ones. ..................................10

      a.  Robinhood's manipulative scheme was directed at all class members, ensuring that common issues of fact and law predominate ...................................10

      b.  Market manipulation combines actions with material nondisclosure, *Affiliated Ute* excuses the need for proof of class-wide reliance ...............................11

    c.   **Reliance on an assumption of an efficient market free of manipulation is a merits question; should the Court reach it, class-wide reliance is established for the purposes of this motion**..................................................................................................**14**

    i.   **An "efficient market" is a bona fide market, nothing more.**...................................**14**

    ii.   **Should the Court deem *Basic* market efficiency must be proved, Plaintiffs' expert has made a sufficient showing**...........................................................................**16**

  **2.**  **A class action is the superior method for resolving this controversy.**...........................**21**

  **C.**  **Plaintiffs Provide a Damages Model Tailored to Their Theory of Liability**................**22**

  **1.**  **Robinhood's experts' methodology critiques are not well taken**..................................**23**

  **2.**  **The experts have no substitute for market price to calculate damages.**......................**25**

**V.**  **CONCLUSION**.............................................................................................................................**25**

**VI.** **REQUEST FOR HEARING**.....................................................................................................**26**

## **TABLE OF AUTHORITIES**

**Page(s)**

### **Cases**

*Affiliated Ute Citizens of Utah v. U.S.*,
  406 U.S. 128 (1972) ..................................................................................... 3, 11, 22, 23

*Allapattah Servs., Inc. v. Exxon Corp.*,
  333 F.3d 1248 (11th Cir. 2003) .................................................................................. 10

*Amchem Products, Inc. v. Windsor*,
  521 U.S. 591 (1997) .................................................................................................... 10

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
  568 U.S. 455 (2013) .................................................................................................... 14

*Angley v. UTi Worldwide Inc.*,
  311 F. Supp. 3d 1117 (C.D. Cal. 2018) ..................................................................... 20

*Aranaz v. Catalyst Pharm. Partners Inc.*,
  302 F.R.D. 657 (S.D. Fla. 2014) ............................................................................. 9, 18

*ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) .............................................................................. 3, 12, 14

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ............................................................................................. 11, 16

*Blackie v. Barrack*,
  524 F.2d 891 (9th Cir. 1975) ...................................................................................... 15

*Brown v. China Integrated Energy Inc.*,
  No. CV 11-02559, 2014 WL 12576643 (C.D. Cal. Aug. 4, 2014) ............................ 20

*Bruhl v. Price Waterhousecoopers Int'l*,
  257 F.R.D. 684 (S.D. Fla. 2008) .......................................................................... 10, 11

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989) ...................................................................... 17, 18, 19

*Carpenters Pension Tr. Fund v. Barclays PLC*,
  310 F.R.D. 69 (S.D.N.Y. 2015) ................................................................................... 17

*Chemetron Corp. v. Bus. Funds, Inc.*,
  682 F.2d 1149 (5th Cir. 1982) .................................................................................... 13

*City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*,
  322 F. Supp. 3d 676 (D. Md. 2018) ....................................................................... 16

*City of Providence v. Bats Global Markets, Inc.*,
  878 F.3d 36 (2d Cir. 2017) ................................................................................... 13

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ............................................................................................... 22

*Fezzani v. Bear, Stearns & Co. Inc.*,
  716 F.3d 18 (2d Cir. 2013) ............................................................................ 14, 15

*FindWhat Inv. Grp. v. FindWhat.com*,
  658 F.3d 1282 (11th Cir. 2011) ............................................................................ 19

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) ......................................................................................... 3, 16

*Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*,
  338 F.R.D. 205 (S.D.N.Y. 2021) .......................................................................... 17

*In re Amerifirst Sec. Litig.*,
  139 F.R.D. 423 (S.D. Fla. 1991) .......................................................................... 18

*In re Barclays Liquidity Cross & High Frequency Trading Litig.*,
  390 F. Supp. 3d 432 (S.D.N.Y. 2019) .................................................................. 13

*In re Dreyfus Aggressive Growth Mut. Fund Litig.*,
  No. 98-cv-4318, 2000 WL 1357509 (S.D.N.Y Sept. 20, 2000).............................. 8

*In re HealthSouth Corp. Sec. Litig.*,
  261 F.R.D. 616 (N.D. Ala. 2009) ......................................................................... 11

*In re Initial Pub. Offering Sec. Litig.*,
  227 F.R.D. (S.D.N.Y. 2004)................................................................................... 24

*In re IPO Secs. Litig.*,
  241 F. Supp. 2d 281 (S.D.N.Y. 2003) .................................................................. 12

*In re NII Holdings, Inc. Sec. Litig.*,
  311 F.R.D. 401 (E.D. Va. 2015) ........................................................................... 20

*In re Recoton Corp. Sec. Litig.*,
  248 F.R.D. 606 (M.D. Fla. 2006).......................................................................... 8

iv

*In re UBS Auction Rate Sec. Litig.*,
  No. 08 CIV. 2967 (LMM), 2010 WL 2541166 (S.D.N.Y. June 10, 2010) ............................ 12

*In re Vesta Ins., Grp., Inc. Sec. Litig.*,
  No. 98-AR-1407, 1999 WL 34831475 (N.D. Ala. Oct. 25, 1999) ........................................... 8

*Junge v. Geron Corp.*,
  No. C 20-00547, 2022 WL 1002446 (N.D. Cal. Apr. 2, 2022) ............................................... 23

*KB Partners I, L.P. v. Barbier*,
  No. A-11-CA-1034-SS, 2013 WL 2443217 (W.D. Tex. June 4, 2013) ................................... 16

*Kennedy v. Tallant*,
  710 F.2d 711 (11th Cir. 1983) ............................................................................ 3, 10, 22

*Kirkpatrick v. J.C. Bradford & Co.*,
  827 F.2d 718 (11th Cir. 1987) ............................................................................ 9, 10, 11

*Kraft v. Third Coast Mistream*,
  No. 19-CV-9398 (LJL), 2021 WL 860987 (S.D.N.Y. Mar. 8, 2021) ..................................... 15

*Krogman v. Sterritt*,
  202 F.R.D. 467 (N.D. Tex. 2001) ............................................................... 17, 20, 21

*Krukever v. TD Ameritrade, Futures & Forex LLC*,
  328 F.R.D. 649 (S.D. Fla. 2018) ............................................................... 7, 8, 14, 24

*Krukever v. TD Ameritrade, Inc.*,
  337 F. Supp. 3d 1227 (S.D. Fla. 2018) ............................................................................ 12

*Levie v. Sears, Roebuck & Co.*,
  496 F. Supp. 2d 944 (N.D. Ill. 2007) .............................................................................. 24

*Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*,
  762 F.3d 1248 (11th Cir. 2014) ........................................................................... passim

*Medine v. Washington Mut., FA*,
  185 F.R.D. 366 (S.D. Fla. 1998) ...................................................................................... 11

*Monroe Cnty. Employees' Ret. Sys. v. S. Co.*,
  332 F.R.D. 370 (N.D. Ga. 2019) ..................................................................................... 19

*Pearlstein v. BlackBerry Ltd.*,
  No. 13 CIV. 7060 (CM), 2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) ................................. 17

v

*Puddu v. NYGG (Asia) Ltd.*,
   No. 15cv8061, 2022 WL 2304248 (S.D.N.Y. June 27, 2022) ........................................... 10, 14

*San Antonio Fire & Police Pension Fund v. Dole Food Co., Inc.*,
   177 F. Supp. 3d 838 (D. Del. 2016) ................................................................................. 24

*Set Cap. LLC v. Credit Suisse Grp. AG*,
   996 F.3d 64 (2d Cir. 2021) .............................................................................................. 13

*Spicer v. Chicago Bd. of Options Exch., Inc.*, No. 88 C,
   2139, 1990 WL 16983 (N.D. Ill. Jan. 31, 1990) .............................................................. 13

*Thorpe v. Walter Inv. Mgmt., Corp.*,
   No. 1:14-CV-20880-UU, 2016 WL 4006661 (S.D. Fla. Mar. 16, 2016) ..................... 7, 10, 23

*Underwood v. Lampert*,
   No. 02-21154, 2005 WL 8155010 (S.D. Fla. Sept. 9, 2005) ............................................. 9

*Veleron Holding, B.V. v. Morgan Stanley*,
   117 F. Supp. 3d 404 (S.D.N.Y. 2015) .............................................................................. 15

*Walco Invs., Inc. v. Thenen*,
   168 F.R.D. 315 (S.D. Fla. 1996) .................................................................................. 8, 11

*Wal-Mart Stores, Inc., v. Dukes*,
   564 U.S. 338 (2011) .......................................................................................................... 7

*Williams v. Mohawk Indus., Inc.*,
   568 F.3d 1350 (11th Cir. 2009) ..................................................................................... 7, 8

*Wilson v. Merrill Lynch & Co.*,
   671 F.3d 120 (2d Cir. 2011) ...................................................................................... 11, 12

**Statutes**

15 U.S.C. §78u-4(e)(1) ......................................................................................................... 24

**Rules**

Fed. R. Civ. P. 23 ...................................................................................................... 1, 2, 3, 5

**Other Authorities**

D.R. Fischel, "Efficient Capital Markets, the Crash, and the Fraud on the Market Theory," 74
*Cornell L. Rev.* 907, 913, 915 (1989)……………………………………………………….25

*In re: INITIAL PUBLIC OFFERING SEC.*, 2004 WL 3943323 (Jan. 20, 2004 S.D.N.Y.) ......... 24

vi

## DEFINED TERMS AND OTHER ABBREVIATIONS

| | |
|---|---|
| ¶ | References are to paragraphs of the Amended Consolidated Class Action Complaint, filed January 17, 2023 (ECF No. 527) |
| Dates | Unless a year is noted, the year is 2021 |
| CRSP | The Center for Research in Security Prices |
| Defendants | Robinhood Markets, Inc. and its two wholly-owned subsidiaries, Robinhood Financial, LLC and Robinhood Securities, LLC (also referred to collectively as "Robinhood") |
| DTCC | Depository Trust & Clearing Corporation |
| ECP charge | Excess Capital Premium charge (component of clearinghouse deposit) |
| Fischel Rpt. | Report of Daniel R. Fischel, dated February 16, 2023 |
| Fischel Reb. Rpt. | Rebuttal Report of Daniel R. Fischel, dated March 28, 2023 |
| Fonicello Depo. | Deposition of Joseph Fonicello, taken April 4, 2023 (transcript excerpts) |
| Grenadier Rpt. | Corrected Expert Report of Professor Steven Grenadier, dated February 24, 2023 |
| Grenadier Reb. Rpt. | Rebuttal Expert Report of Professor Steven Grenadier, dated March 28, 2023 |
| HFSC Report | "Game Stopped: How the Meme Stock Market Event Exposed Troubling Business Practices, Inadequate Risk Management, and the Need for Legislative and Regulatory Reform," U.S. House of Representatives, Maj. Staff Report, 117th Congress (2nd Session) (June 2022) |
| Mynar Depo. | Deposition of Michael Mynar, taken April 3, 2022 (transcript excerpts) |
| NSCC | National Securities Clearing Corporation (a DTCC subsidiary) |
| OCC | Options Clearing Corporation |
| Order | Order on Motion to Dismiss, dated Aug. 11, 2022 (ECF No. 503) |
| PCO | Position closing only (restriction whereby customer may only sell, not purchase the security at issue) |
| RHMDL | Prefix used for documents produced in the MDL by Robinhood |
| Robinhood | All three defendant corporations sued in this action |
| SEC Staff Report | "Staff Report on Equities and Options Market Structure and Conditions in Early 2021," Staff of the U.S. Securities and Exchange Commission, dated October 14, 2021 |
| VaR charge | Value at Risk charge (a component of clearinghouse deposit) |
| Werner Rpt. | Declaration of Dr. Adam Werner, dated February 16, 2023 |
| Werner Reb. Rpt. | Rebuttal Report of Dr. Adam Werner, dated March 28, 2023 |

## MOTION

Lead Plaintiff Blue Laine-Beveridge and the plaintiffs named in the Amended Consolidated Class Action Complaint (collectively "Plaintiffs" or "proposed Class Representatives") respectfully move this Court, pursuant to Fed. R. Civ. P. ("Rule") 23(a) & (b)(3) and Local Rule 23.1(c), for an order certifying the following Class:

> All persons or entities who held common stock in AMC Entertainment Holdings, Inc. ("AMC"), Bed Bath & Beyond Inc. ("BBBY"), BlackBerry Ltd. ("BB"), Express Inc. ("EXPR"), GameStop Corp. ("GME"), Koss Corp. ("KOSS"), Tootsie Roll Industries Inc. ("TR"), or American Depository Shares of foreign-issuers Nokia Corp. ("NOK") and trivago N.V. ("TRVG") (collectively "the Affected Stocks") as of the close of trading on January 27, 2021, and sold any such shares between January 28, 2021, and February 4, 2021 ("Class Period"). Excluded from the class are those who suffered no damages, Defendants,[1] the officers and directors of Defendants, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants or any excluded persons have or had a controlling interest;

and appointing: Abraham Huacuja, Ava Bernard, Blue Laine-Beveridge, Brendan Clarke, Brian Harbison, Cecilia Rivas, Doi Nguyen, Joseph Gurney, Marcel Poirier, Sandy Ng, Santiago Gil Bohórquez, and Thomas Cash as Representatives; and The Rosen Law Firm, P.A., as Counsel

## I.    PRELIMINARY STATEMENT

Common issues arising from Robinhood's stock manipulation scheme predominate, warranting class certification. Because Robinhood was the preeminent broker for retail investors in the Affected Stocks, a short statement of the case demonstrates that proof of both the reasons Robinhood imposed various restrictions and their detrimental impact upon the Affected Stocks dwarfs any individual issues Robinhood and its experts strain to inject.

On January 27, upon realizing that it would not have sufficient capital to support its millions of customers' purchases of the Affected Stocks at steeply increasing prices, Robinhood considered various courses of action. With respect to its decision to completely bar purchases but not sales ("PCO"), Robinhood's Head of Data Science explicitly warned: "us PCO will trigger a crash, I am certain."[2] Early the next morning, Robinhood indeed faced a "[h]uge liquidity issue"[3]: It lacked the cash to make a $3 billion deposit to the NSCC before the market opened to secure

---

[1] Capitalized and abbreviated terms are set forth in the preceding "Defined Terms."
[2] HFSC Report at 30-31. (Rosen Decl., Ex. 1)
[3] *Id.* at 54 (text between two of the companies' COOs, Jim Swartwout and Gretchen Howard).

completion of unsettled trades in its portfolio – and faced even higher demands from its clearinghouse in the coming days as prices of the Affected Stocks continued to surge. Without warning, Robinhood abruptly cancelled purchase orders, PCOed the Affected Stocks, and issued a terse blog post, attributing its actions to "market volatility." ¶63. As one author noted in the aftermath of events that shook both the markets and investor confidence in them: "Robinhood simply didn't have the cash to cover requirements from the DTCC ... That message, although frustrating, may have set this whole story on a completely different trajectory – if the company had shared it sooner."[4] Instead, Robinhood concealed its liquidity crunch,[5] and that it had PCOed the Affected Stocks to stop its NSCC deposits from increasing, as CEO Tenev later admitted. ¶103.

A carefully-crafted blog post[6] implied that "declining prices reflected the market's concern about volatility, not Robinhood's inadequate capital cushion, and certainly not an intentional scheme on the part of Robinhood to lower the stocks' value." Order at 46. Investors were faced with a "Hobson's choice: hold shares of Affected Stocks while Robinhood indefinitely blocks its users … from purchasing more shares or sell the shares in anticipation of the inevitable 'tsunami of selling unleashed by Robinhood's disabling of 'buy' buttons…'" *Id.* at 42.

Ruling in the Apex Securities case, the Court articulated Plaintiffs' theory of liability and damages here: "Plaintiffs' shares were worth one amount on January 27, Defendant took action that allegedly suppressed the value of the shares the next day, and Plaintiffs were out the difference. That difference is concrete, not speculative." ECF 525 at 18. In fact, on January 28, Robinhood's PCOs and purchase-order cancellations eliminated its customers' demand, causing prices to tank before Apex and other brokers temporarily PCOed three Affected Stocks hours later.[7] Robinhood kept restrictions in place for *five more* sessions, causing damages to Class Period sellers.

## II.   SUMMARY OF THE ARGUMENT

### A.   Plaintiffs Present a Straightforward Case for Certification

The Court should certify the proposed Class because Rule 23's requirements are all

---

[4] *See* J. Klein, "Why Robinhood Should Have Just Told the Truth," *CEOWorld Magazine* (Feb. 22, 2021) (Rosen Decl., Ex. 2)

[5] HFSC Report at 54-55 (COO Howard texted Chief Marketing & Communications Director a "heads-up" about the liquidity issue "in case it leaks") (Rosen Decl., Ex. 1).

[6] ¶66 ("Is there a level to which we are aiming for?…[T]here is a team working on our response").

[7] Werner Reb. Rpt. ¶103 nn. 73-76 & Table 12 (Rosen Decl., Ex. 3). *See* ECF 525 at 7-8 (Apex's purchase ban on GME, AMC and KOSS lasted from 11:30 a.m. - 2:55 p.m.).

satisfied. Because this case involves Robinhood's actions with respect to nine stocks widely traded on national markets, the Class, its proposed representatives, and its experienced counsel meet Rule 23(a)(1)-(4)'s requirements: numerosity, commonality, typicality, and adequacy of representation. The proposed representatives all sold shares during the Class Period; some did so immediately and others waited a week for Robinhood to take its foot off the necks of the last two Affected Stocks.[8]

The Court can find Rule 23(b)(3) "predominance" under any one of three legal theories. *First*, because Robinhood used "the same method to commit the same unlawful acts against the entire class," key issues of fact and law, *e.g.,* scienter, material omissions, reliance, intent to induce sales, loss causation, and damages will be proved class-wide. *Kennedy v. Tallant*, 710 F.2d 711, 717 (11th Cir. 1983). *Second*, in cases primarily involving a failure to disclose, under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128, 153-54 (1972), proof of reliance is not a prerequisite to recovery. Here, material omissions deprived investors of "the full picture as they debated whether to hold or sell their Affected Stocks." Order at 46. *Third,* the Class is entitled to rely on an "assumption of an efficient market free of manipulation." *ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007). All three doctrines support a finding of predominance.

Securities fraud class actions typically satisfy Rule 23(b)(3)'s second prong, "superiority." This class action is manageable and will provide redress to small retail investors whose interests Robinhood claimed to champion, persons whose claims are too small to pursue individually.

Class-wide damages can be computed using a common methodology based upon Plaintiffs' theory that the share prices of the nine Affected Stocks represented their fair market value at market close on January 27, and Robinhood's restrictions manipulated downward the prices of the Affected Stocks, causing damages to those who sold shares at these artificially lowered prices.

### B.    Robinhood's Unorthodox, Convoluted Arguments Are a Smokescreen

Robinhood's experts do not opine that Robinhood's actions and material omission had no price impact on the Affected Stocks – the very proof *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 269 (2014) ("*Halliburton II*") permits defendants to submit on class certification. Instead, they try to muddy the waters by arguing that class members must each prove what they would have done had Robinhood not manipulated the market. That is not the law. Class members sold their shares at a specific time and price. Damages can be computed as the difference between

---

[8] ECF 446-1, ECF 527-1 & Rosen Decl., ¶5 & Ex. 4 (new certifications and reasons therefor).

the closing price on January 27 and the sales price class members received during the Class Period.

Next, even though only the *sale* decision is relevant to seller class members' reliance, the experts attack *purchase* decisions made prior to the Class Period. They assert that between January 4 and 27 retail investors manipulated upward the prices of the Affected Stocks such that price had become untethered from fundamental value and therefore shares did not trade in efficient markets with price integrity upon which investors could or did rely. (That is a lot of irrelevant and inaccurate information to unpack, but Plaintiffs will do so below and in their reply brief.) However, this scenario relies on: (1) a plethora of contemporaneous commentary to claim that share prices were manipulated above their fair value by a social-media-coordinated short squeeze – a narrative later rejected by an SEC Staff Report, and (2) cherry-picked statistics to fit their narrative.

One expert implies that Robinhood did not kill a stock rally; instead, a predatory short squeeze on some of the Affected Stocks [9] had run its course. *E.g.,* Fischel Rpt. ¶28 & n.64 (citing one *Seeking Alpha* post) (Rosen Decl., Ex. 6). Actual market participants disagree. Had Robinhood not imposed its restrictions, as Interactive Brokers' founder Thomas Peterffy explained, the excessive short interest combined with a large number of outstanding GME call options would have forced brokers to find the shares to settle trades, "*pushing the price into the thousands*."[10]

Most importantly, "[d]eception is the gravamen of a claim for market manipulation." Order at 43. As the multitude of sources cited by Robinhood's experts attest, prior to the Class Period, the market was well aware that the "shorts" and "longs" were very publicly at odds. ¶41. There was *no indication* that the prices of the Affected Stocks were based on anything other than the unfettered interplay of supply and demand; investors made decisions based upon their own assessments of value and risk at prices set in a free and open marketplace – as is always the norm.

Finally, the experts claim damages caused solely by Robinhood cannot be calculated. Not true. Robinhood cancelled after-hours purchases and imposed its PCO restrictions before the market opened on January 28. Other brokers imposed restrictions on only *three* stocks, later in the day, *after* prices had already plummeted.[11] Only Robinhood maintained restrictions for five more

---

[9] Robinhood's experts cited one academic working paper as having found evidence of a short squeeze, but only in five of the Affected Stocks. Grenadier Rpt., ¶26 & n.24 (Rosen Decl., Ex. 5).
[10] https://www.cnbc.com/video/2021/02/17/interactive-brokers-thomas-peterffy-on-gamestop-hearing.html (last accessed April 28, 2023). While its misconduct may have exposed systemic risk and spurred the SEC to consider reforms, *e.g.,* T+1 settlement of trades, Robinhood is no hero.
[11] *Compare* Werner Reb. Rpt., ¶103 & Tables 12, 13 (times of other broker restrictions, stocks

sessions. Moreover, its trading volume in these stocks dwarfed that of other brokers. ¶¶5, 94-95. Thus, damages can be assessed based on the timing of restrictions and relative trading volumes.

Robinhood's efforts to weave an already disproven narrative to defeat predominance and to manufacture legal standards to argue that a class-wide damages model cannot be constructed fall flat. Plaintiffs satisfy all of Rule 23's requirements and the Court should certify the Class.

## III.   STATEMENT OF FACTS APPLICABLE TO ALL CLASS MEMBERS

### A.   Robinhood Disregarded the Liquidity Risk Posed By Its Unbridled Growth

Robinhood added 3,000,000 accounts in January 2021. ¶5. Its clearing operations could not keep up. On January 25, Robinhood barely met an extended OCC reporting deadline, which, if missed, could have resulted in a $1.6+ billion capital call.[12] Regarding its NSCC deposit, only the VaR component was modelled; Robinhood was unaware of and had never used the DTCC tool to model the ECP component.[13] A full page in the HFSC Report (p. 35) is a Slack exchange between employees who were stunned to learn that such a charge existed. Even worse, on January 27, the Head of Data Science proclaimed "the NSCC deposit seems like a black box to me."[14]

### B.   Robinhood Knew Its Restrictions Would Hurt Investors in the Affected Stocks

Although he could not calculate the NSCC deposit, the Head of Data Science was confident about Robinhood's retail market dominance: "us PCO will trigger a crash, I am certain."[15] As Robinhood careened towards the edge of the cliff,[16] other employees concurred. On January 27, the Head of Market Operations explained: "[T]he problem with this is that we're like >10% of the market … so if we PCO we can move the market … that's the argument to not even do position limits, but we have to because of capital concerns." Acknowledging Robinhood's preeminence, the Head of Account Operations replied: "we also move the market by letting them do it :smile:"[17]

In an exchange on January 28, a Surveillance Manager criticized the "market volatility"

---

affected) *with* Grenadier Rpt., ¶48 and Fischel Rpt., ¶40. (Rosen Decl., Exs. 3, 5 & 6).
[12] HFSC Report at 22-26 (when a Clearing Operations manager told COO Swartwout "we don't handle scale well" he responded: "That is probably the biggest understatement of the day"), and at 33 (Product Manager: "we need to keep the growth flywheel running…Webull is right on our tail," the Head of Data Science responds: "haha …we need to survive first") (Rosen Decl., Ex. 1).
[13] *Id.* at 20, 59.
[14] *Id.* at 34.
[15] *Id.* at 30-31.
[16] An employee pictured Robinhood as a truck going over the edge. *Id.* at 58.
[17] *Id.* at 31, 34 and RHMDL00077158 (Rosen Decl., Ex. 7).

blog post: "I am interested to hear more about the rationale behind 'market volatility'…I don't believe we should act as the arbiter of the free market over exchanges and regulators." The manager linked to a tweet claiming that the market was manipulated to benefit hedge funds. The person who tweeted asked "[i]f they are so good why not compete in the free market??"[18] Replying to the Surveillance Manager, a Software Engineer answered the question posed by the tweeter: "By driving the price down, we are doing it for them." RHMDL00048003 (Rosen Decl., Ex. 9).

C.     **Robinhood's Restrictions Were Not Required as a Condition of DTCC Relief**

The HFSC Report revealed that Robinhood did not PCO the Affected Stocks in exchange for the waiver it received of the $2.2 billion ECP charge it could not pay. Robinhood executives told the HFSC that while they informed the DTCC about the PCOs they imposed, they did not ask the DTCC and were not told by the DTCC that the PCO decision played any role in obtaining the waiver.[19] In fact, all six brokerages assessed ECP charges on January 28 received waivers, whether or not they asked for them. HFSC Report at 101 & n. 550 (Rosen Decl., Ex. 1). The other five did not announce PCOs that day. Werner Reb. Rpt., Table 13 (Rosen Decl., Ex. 3).

D.     **Robinhood's Market Manipulation Damaged Investors**

An investigation by SEC, which has access to non-public trading information, cast doubt on the short squeeze at the center of Robinhood's experts' narrative: "[A] short squeeze did not appear to be the main driver of events, and a gamma squeeze less likely…" SEC Staff Report at 30-31. Rosen Decl., Ex. 10. Although "short selling and calls on social media for short squeezes received a great deal of media attention, the interplay between shorting and price dynamics is more complex than these narratives would suggest." *Id.* at 44.[20] Asked about a retail-investor-driven short squeeze, SEC Chair Gensler championed the "free speech right to go and say to a neighbor, whether it is online or in person, 'I like this investment,' and thoughtfully say why I like [it]."[21]

Because social media posters were transparent, the SEC Staff Report did not characterize their behavior as manipulative: "Whether driven by a desire to squeeze short sellers and thus to profit from the resultant rise in price, or by belief in the fundamentals of GameStop, it was the positive sentiment … that sustained the weeks-long price appreciation of GameStop stock." *Id.* at

---

[18] *See* https://twitter.com/APompliano/status/1354787970390372352 (Rosen Decl., Ex. 8).
[19] HFSC Report at 63 (citing interviews with two of the Robinhood COOs) (Rosen Decl., Ex. 1).
[20] "Short squeeze" appears twice in the body of the 138-page HFSC Report (Rosen Decl., Ex.1).
[21] HFSC testimony of Gary Gensler, May 6, 2021. Rosen Decl., Ex. 11. Examples of investor analysis of GME's fundamentals are found in the Werner Rebuttal Report, at App. A.

6

26. In contrast, the SEC, *id.* at 43, rebuked Robinhood's actions:

> There are many different types of investors, and they buy and sell stocks for many different reasons. However, when share prices change rapidly and brokerage firms suddenly suspend trading, investors may lose money…People may disagree about the prospects of GameStop and the other meme stocks, but those disagreements are what should lead to price discovery rather than disruptions.

## IV.    THE CLASS SATISFIES RULE 23 AND THE COURT SHOULD CERTIFY IT

Class-wide adjudication is favored in cases alleging securities fraud. *Thorpe v. Walter Inv. Mgmt., Corp.*, No. 1:14-CV-20880-UU, 2016 WL 4006661, at *4 (S.D. Fla. Mar. 16, 2016) (citing cases). The scope of the harm caused by a single firm that almost broke U.S. markets underscores that only class-wide adjudication can provide across-the-board redress.

### A.    The Class Meets Rule 23(a)'s Requirements

#### 1.    Rule 23(a)(1) - Numerosity

Rule 23(a)(1) requires a showing that "the class is so numerous that joinder of all members is impracticable." As explained in *Thorpe*, 2016 WL 4006661, at *6, in this Circuit, "[t]here is a firm recognition that Rule 23(a)(1) is satisfied in a securities fraud action where securities are traded in a national public exchange." Here, the nine Affected Stocks all traded on the NYSE or the NASDAQ. Werner Rpt., Table 5 (Rosen Decl., Ex. 12); *see also id.* at Table 2 (trading volume).

#### 2.    Rule 23(a)(2) – Commonality

"The Eleventh Circuit has noted that the Rule 23(a)(2) commonality requirement is a 'low hurdle.'" *Krukever v. TD Ameritrade, Futures & Forex LLC*, 328 F.R.D. 649, 657 (S.D. Fla. 2018) (citations omitted). "Plaintiffs must merely demonstrate 'the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation.'" *Id.* (citing *Wal-Mart Stores, Inc., v. Dukes,* 564 U.S. 338, 350 (2011)). The materiality of Robinhood's omissions, whether it acted with scienter and an intent to induce sales of the Affected Stocks, and whether its restrictions caused price declines and damages are all questions as to which common answers will drive the resolution of the action. Rule 23(a)(2) is satisfied here.

#### 3.    Rule 23(a)(3) – Typicality

"The claim of a class representative is typical if 'the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory.'" *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1357 (11th Cir. 2009). Typicality "'may be satisfied despite substantial factual differences ... when there is a strong similarity of

legal theories.'" *Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1259 (11th Cir. 2014) (citing *Williams*). For this reason, "[l]ike commonality, the test for typicality is not demanding." *Krukever*, 328 F.R.D. at 658. Here, the proposed representatives' claims are typical of the class's claims: Each held shares in the Affected Stocks and, as a result of Robinhood's manipulation, suffered damages on their Class Period sales.

a.   The proposed representatives' interests are identical to those of <u>sellers of the Affected Stocks they do not own</u>

The Court recently ruled that the ability of indirect clients injured by Apex to represent its direct customers is a class certification issue. ECF 525 at 22. Appointing Laine-Beveridge as Lead Plaintiff, the Court held that because his losses and "the class's losses arise from a 'common course of conduct, [he] ha[s] a sufficient incentive to fully develop the facts[.]'" ECF 420 at 11 (citing *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98-cv-4318, 2000 WL 1357509, at *10 (S.D.N.Y Sept. 20, 2000), which certified a class where representatives had not purchased all funds at issue). Robinhood's omissions and changing Class Period restrictions were aimed at saving Robinhood from liquidation by lowering the prices of the stocks on which the NSCC raised deposit requirements. *See* ¶99. Thus, the same conduct was aimed at all Affected Stocks.[22]

In *Krukever*, several customers sought to represent investors injured by after-market liquidation of 45,000 "short put" option contracts in 888 different options. 328 F.R.D. at 659. The proposed representatives did not claim to have owned all 888 options. Typicality was satisfied because the representative plaintiffs' claim "'arise[s] from the same event or pattern or practice and [is] based on the same legal theory' as the claims of putative class members." *Id.* at 658. Similarly, the reason Robinhood imposed restrictions and induced sales of the Affected Stocks is uniform, as were the PCOs and associated material omissions. *See id.* at 659.

b.   <u>Speculative conflicts cannot render a representative atypical.</u>

Class members will only be put at risk if unique defenses against a proposed representative will become the focus of the litigation, *In re Vesta Ins., Grp., Inc. Sec. Litig.*, No. 98-AR-1407, 1999 WL 34831475, at *4 (N.D. Ala. Oct. 25, 1999), placing the class's interests in "significant jeopardy." *See Walco Invs., Inc. v. Thenen*, 168 F.R.D. 315, 326 (S.D. Fla. 1996). "As long as

---

[22] Robinhood's experts' overarching narrative does not distinguish among the Affected Stocks, only noting that damages will differ because the restrictions were not uniform. *See* Grenadier ¶¶171-72. Rosen Decl., Ex. 5. But "individualized determinations of damages do not defeat class certification." *In re Recoton Corp. Sec. Litig.*, 248 F.R.D. 606, 622 (M.D. Fla. 2006) (citing cases).

Plaintiffs assert … that Defendants committed the same wrongful acts in the same manner against all members of the class, they establish the necessary typicality. The alleged conduct of Defendants, rather than the subjective investments strategy of individual Plaintiffs, is determinative for the purpose of demonstrating typicality." *Underwood v. Lampert*, No. 02-21154, 2005 WL 8155010 at *3 (S.D. Fla. Sept. 9, 2005) (citation omitted). This is particularly true for a seller class; the reasons for the representatives' purchases are irrelevant.

4.      Rule 23(a)(4) – Adequacy of Representatives and Counsel

Rule 23(a)(4)'s "requirement encompasses two separate inquiries: '(1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action.'" *Aranaz v. Catalyst Pharm. Partners Inc.*, 302 F.R.D. 657, 666 (S.D. Fla. 2014) (citation omitted). All class members held shares at the close of the market on January 27 and all sold some of those shares during one of the next six trading sessions,[23] at a time Robinhood imposed some form of restrictions on the Affected Stocks (while not disclosing the liquidity crunch that occasioned its behavior); there are no intra-class conflicts.

In securities cases, only plaintiffs whose "participation is so minimal that they virtually have abdicated to their attorneys the conduct of the case…" should be deemed "inadequate." *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 728 (11th Cir. 1987). Because "to require more could well prevent the vindication of the legal rights…under the guise of protecting those rights," *id.*, the "complete abdication" standard imposes a "necessarily high burden" for disqualification. *Underwood*, 2005 WL 8155010, at *4. Here, far from abdicating prosecution of the case to counsel, Plaintiffs are engaged with counsel and each other, satisfying Rule 23(a)'s "adequacy" standard.

As set forth in their declarations, Plaintiffs have actively participated in the case: All initially contacted counsel to join the action, reviewed before filing and approved the complaint in which they were named, reviewed case documents and monitored developments in consultation with counsel, searched their files to produce documents in response to discovery, attended periodic group status-update calls, and sat for deposition. Rosen Decl., Exs. 13-24.

The Rosen Law Firm, counsel selected by Lead Plaintiff Laine-Beveridge in 2021, is fully-prepared to prosecute this action. To date, counsel has drafted a complaint that withstood a motion to dismiss, communicated with clients on a regular basis, extensively engaged with Robinhood's

---

[23] *See* n. 8, *supra*.

counsel on written and documentary discovery, taken and defended depositions, engaged experts, and served third-party discovery. Rosen Decl., ¶3. As the Court noted in its Lead Counsel appointment: "The Rosen Law Firm has extensive experience in prosecuting securities actions." ECF 420 at 12 (citing cases). The Rosen Law Firm satisfies Rule 23(a)(4).[24]

**B.      Rule 23(b)(3)'s Two Requirements Are Met**

Rule 23(b)(3) asks if "questions of law or fact common to class members predominate over any questions affecting only individual members, and [if] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Both answers are "Yes."

1.      <u>Common issues predominate over individual ones.</u>

The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997). The *Amchem* court noted that "[p]redominance is a test readily met" in securities fraud cases. *Id.* at 625. In this market manipulation case, Robinhood's material omissions, scienter and intent to induce sales of the Affected Stocks entail uniform proof, and its impact on share prices will be proved class-wide with expert evidence.[25] Additionally, pursuant to *any one* of three legal theories, the Court can find that individual reliance issues will not swamp proof of common issues.

a.      Robinhood's manipulative scheme was directed at all class members, <u>ensuring that common issues of fact and law predominate</u>

In *Kennedy v. Tallant*, 710 F.2d 711, 718 (11th Cir. 1983), the Eleventh Circuit held that a securities fraud case "involving a single … scheme against a large number of individuals is particularly appropriate for class action." This is because the fraudulent scheme and material omissions are common issues. *Id.* at 717. Accordingly, predominance is satisfied where the defendant allegedly "committed the same unlawful acts in the same method against an entire class." *Id*; *Kirkpatrick*, 827 F.2d at 724 (same).

In *Bruhl v. Price Waterhousecoopers Int'l*, 257 F.R.D. 684 (S.D. Fla. 2008), the court noted that pursuant to *Kennedy* and *Kirpatrick*, a number of courts within this District have found that

---

[24] For these same reasons, the Rosen Law Firm satisfies Rule 23(g). *See Puddu v. NYGG (Asia) Ltd.,* No. 15cv8061, 2022 WL 2304248, at *5 (S.D.N.Y. June 27, 2022) (so holding).

[25] That individual damages calculations will be made based upon the damages analysis developed for trial does not defeat predominance. *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003). *Comcast* "did not hold that proponents of class certification must rely upon a class-wide damages model to demonstrate predominance." *Thorpe,* 2016 WL 4006661 at *15.

where a common scheme is alleged, Rule 23(b)(3) is satisfied separate and apart from whether plaintiffs may rely on *Affiliated Ute* or *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). *Bruhl*, 257 F.R.D. at 695 (citing *Medine v. Washington Mut., FA*, 185 F.R.D. 366, 371 (S.D. Fla. 1998) and *Walco, supra,* 168 F.R.D. at 334); *see also In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 645 (N.D. Ala. 2009) (finding predominance under *Kennedy* separate from fraud-on-the-market and fraud-created-the-market class-wide reliance analyses). In such cases, the *Bruhl* court explained: "[a] prominent factor in determining if reliance can be presumed from the circumstances in each case is whether all the plaintiffs received the same or substantially the same message from the defendants." *Id.* at 696. If so, the existence of some differences among plaintiffs will not defeat predominance. *E.g., Kirkpatrick,* 827 F.2d at 725 (potential defenses against some class members); *Walco*, 168 F.R.D. at 334 (reliance differences).

On the morning of January 28, after Robinhood imposed various restrictions, it announced in a blog post that it had placed the Affected Stocks into PCO, "in light of recent market volatility" (¶63) – intentionally concealing its liquidity crunch.[26] Thereafter, Robinhood remained silent until after the market closed. That night and in the following days, as various restrictions continued to be imposed, CEO Tenev never revealed, during multiple media appearances, that a lack of liquidity was the reason for the restrictions, nor provided investors a yardstick for determining when they would be lifted (*e.g.,* when Robinhood secured a certain amount of funding). ¶¶79, 82, 92 & 100. As Robinhood exposed class members to a single scheme of manipulation and omissions, common issues – reliance, materiality, scienter, inducing sales, loss causation, and damages – predominate.

   b.   Market manipulation combines actions with material nondisclosure, *Affiliated Ute* excuses the need for proof of class-wide reliance

In a scheme liability case where the defendant omitted material facts, the Supreme Court in *Affiliated Ute*, 406 U.S. at 153, held that "positive proof of reliance is not a prerequisite to recovery." Reliance on omitted facts is presumed from their materiality, which is proved class-wide. *Id.* at 154. Rejecting Robinhood's Rule 12(b)(6) argument that its Class Period restrictions were publicly announced, and therefore could not be manipulative, the Court held that the key distinction between legitimate activities and market manipulation is that the latter "must involve misrepresentation or nondisclosure." Order at 43-44 (quoting *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir. 2011)). Market activity is manipulative when combined with material

---

[26] *See* n.5, *supra* (COO Howard provides a "heads-up" about the liquidity issue "in case it leaks").

omissions to "send[ ] a false pricing signal to the market." *Id.* at 41, 46 (quoting *ATSI*, 493 F.3d at 100). Because Robinhood attributed its restrictions solely to "market volatility," the Court held that three "material nondisclosures" (Order at 43 n.16) rendered the restrictions manipulative:

> [M]arket volatility prompted the NSCC to impose higher collateral requirements — collateral requirements that Robinhood could not meet — but as Tenev admitted, if Robinhood had "more headroom," *i.e.*, more capital, it "would have let things continue[.]" (*Id.* ¶ 80 (alteration added; emphasis omitted)). Robinhood did not share these facts with its customers, nor did it disclose that the restrictions would depress the Affected Stocks' share prices (*see id.* ¶¶ 13, 59, 103)

Order at 45. These material omissions "deprived Robinhood users of the full picture as they debated whether to hold or sell their Affected Stocks. To them, the Affected Stocks' declining prices reflected the market's concern about volatility." *Id.* at 46.

The Court's earlier ruling recognizes that in a manipulation case, a market free from foul play is the assumed default state. ECF 503 at 38. As it should be. "[P]articipants in the securities markets are entitled to presume that all of the actors are behaving legally," *In re UBS Auction Rate Sec. Litig.*, No. 08 CIV. 2967 (LMM), 2010 WL 2541166, at *27 (S.D.N.Y. June 10, 2010), such that market prices are determined by "the natural interplay of supply and demand, not rigged by manipulators." *Wilson, supra, id*. For this reason, "[w]here a defendant has engaged in conduct that amounts to 'market manipulation' under Rule 10b–5(a) or (c), that misconduct creates an independent duty to disclose," *UBS, supra, id.* (citing *In re IPO Secs. Litig.*, 241 F. Supp. 2d 281, 381-82 (S.D.N.Y. 2003). "[R]eliance may be presumed when the plaintiffs could justifiably expect that the defendants would have disclosed the material information." *Krukever v. TD Ameritrade, Inc.*, 337 F. Supp. 3d 1227, 1239 (S.D. Fla. 2018) (citation omitted).

As the sell-off began in the face of Robinhood's restrictions, faced with a "Hobson's choice," Order at 42, investors were induced to sell in droves because the market was unaware that Robinhood had experienced a temporary liquidity issue because it had insufficient capital to cover the unsettled trades in its portfolio.[27] During the trading day, as prices of the Affected Stocks tanked – and Robinhood was silent, after its "market volatility" blog post – many of Robinhood's employees pressed for complete transparency. A senior manager told COO Howard: "I think we should fully lay out our cards, nothing short of that would do." The manager further explained: "My Slack is full of messages like this …. 'A lot of the hate we are getting is because nobody has

---

[27] By Jan. 29, $1 billion was raised and PCOs lifted. By Feb. 1, $3.5 billion was raised. ¶¶83, 107.

accurate information about what's happening behind the scenes and I don't see any reason why they shouldn't know.'" Rosen Decl., Ex. 25 (RHMDL 5649-50).[28] Its own employees recognized the need for Robinhood to have told the truth from the outset. Reliance is presumed under *Krukever* because Plaintiffs could have justifiably expected Robinhood to have done so.

A §10(b) manipulation claim is not transformed into a "more quotidian misrepresentation claim" (Order at 38) where the nondisclosure accompanying the market activity is in the form of a materially misleading, half-true statement. *Id.* at 44-45 (discussing *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64 (2d Cir. 2021), where culpability for manipulation was predicated upon omissions from defendant's disclosures). Similarly, on remand, after the decision in *City of Providence v. Bats Global Markets, Inc.*, 878 F.3d 36, 50 (2d Cir. 2017) – in which the "omissions bear marked similarities" to Robinhood's (Order at 46-47) – the district court held that *Affiliated Ute* applied to the markets' manipulative sale of sophisticated, highly-expensive products. The existence of these products was disclosed, but the description of them omitted the material fact that their purchase and use by HFTs would harm other traders' ability to obtain fair prices. *In re Barclays Liquidity Cross & High Frequency Trading Litig.*, 390 F. Supp. 3d 432, 449 (S.D.N.Y. 2019). Robinhood's restrictions were accompanied by only "half of the truth." Order at 43. Under *Affiliated Ute*, the material omissions obviate proof of class-wide reliance for the §10(b) claim.

The statutory language of §9(a)(2) does not contain any reliance requirement, although one has been implied since *Chemetron Corp. v. Bus. Funds, Inc.*, 682 F.2d 1149, 1164 (5th Cir. 1982), *vacated on other grounds* 460 U.S. 1007 (1983). *See Spicer v. Chicago Bd. of Options Exch., Inc.*, No. 88 C 2139, 1990 WL 16983, at *15 (N.D. Ill. Jan. 31, 1990) (so noting). *Spicer* certified a §9(a)(2) class against an exchange and market makers alleging manipulation on the day after Black Monday, holding: "The defense that plaintiffs did not rely on CBOE's allegedly manipulative actions in deciding to trade would necessarily have to apply to *all* class members. We find it unlikely that such a reliance defense, if it exists, would require individual adjudication, particularly since the class members may well have been unaware of some or all of those actions." *Id.*[29] For the same reason, *Affiliated Ute* applies here because only Robinhood knew how many shares were

---

[28] Employees believed CEO Tenev's public comments on January 28 after the market close were deficient. *See* RHMDL00044035-36 (Jan. 29 meeting Q&A questions: "… I am worried that our extreme lack of transparency has caused serious damage to Robinhood's reputation;" "Why are we only able to speak so vaguely and opaquely to the finance shows…") (Rosen Decl., Ex. 26).
[29] Although certified, the §9(a)(2) claim was later dismissed under Rule 12(b)(6). Order at 18.

involuntarily sold, purchases canceled, and in-the-money call options closed out early. As the shares of the Affected Stocks' prices sank, class members detrimentally relied on the false pricing signals Robinhood injected into the market and were induced to sell to cut their losses.

Because *Affiliated Ute* applies to both claims, Robinhood's experts' assertion of market inefficiency is irrelevant. As explained in *Puddu*, efficiency is "relevant to a 'fraud-on-the-market' theory … But the *Affiliated Ute* presumption does not depend on an efficient market, because it does not infer reliance from a change in a share's market price." 2022 WL 2304248, at \*4.

c.    Reliance on an assumption of an efficient market free of manipulation is a merits question; should the Court reach it, class-wide reliance is established for the purposes of this motion.

As the Court explained, a §10(b) manipulation claim is different from one based upon misrepresentations: "Market manipulation permits the plaintiff to plead that it relied on an *assumption* of an efficient market free of manipulation, whereas a misrepresentation claim requires the plaintiff to allege reliance upon a misrepresentation or omission." Order at 38-39 (emphasis in original, internal quotation marks omitted). Unlike a traditional misstatement case, where plaintiffs utilize the *Basic* fraud-on-the-market presumption to prove class-wide reliance, in a manipulation case, whether the markets for the Affected Stocks were efficient and free of manipulation is an element of the claim – a merits question not ripe for decision at class certification. *Cf. Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 459-60 (2013) (materiality is a merits question).

Plaintiffs recognize that "'[a]lthough the trial court should not determine the merits of the plaintiffs' claim at the class certification stage, the trial court can and should consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied." *Krukever*, 328 F.R.D. at 655-56. As set forth below, should Robinhood persuade the Court to consider this element now, Plaintiffs demonstrate that reliance can be proven class-wide.

i.    An "efficient market" is a bona fide market, nothing more.

In *Fezzani v. Bear, Stearns & Co. Inc.*, 716 F.3d 18 (2d Cir. 2013) (cited in the Order at 38-39), the Second Circuit explained that this element of a manipulation claim, set forth in *ATSI*, 493 F.3d at 101, only requires "a misplaced belief in the price of the security as being set by arms-length, *bona fide* trading." 716 F.3d at 22-23. Specifically, "[w]e do not read *ATSI*'s reference to 'reliance on an assumption of an efficient market free of manipulation' as referring to a liquid, efficient market with prices publicly reported in real time. We read ATSI's reference to an

14

'efficient' market to mean only a *bona fide* 'market free of manipulation.'" *Id.* at 23 n.3.[30]

Robinhood's restrictions sent false signals to class members who had a misplaced belief that prices were being set by the free interplay of supply and demand: "To them, the Affected Stocks' declining prices reflected the market's concern about volatility." … "Believing that the restrictions were the byproduct of market volatility as opposed to Robinhood's self-interest, Plaintiffs sold their shares." Order at 46 and 31. Proof that hundreds of millions of shares exchanged hands in national markets, *see* p. 17-18, below, is evidence of *bona fide* trading, with Class Period seller*s* unaware of both the impact Robinhood's various restrictions had on overall supply and demand and the reasons for Robinhood's actions.[31] *ATSI* reliance has been satisfied.

Incorrectly believing that *Basic* market efficiency, under the standards applied by the Eleventh Circuit in *Regions*, 762 F.3d at 1254-58 (discussed below), is required to prove class-wide reliance, Robinhood's experts attack market efficiency by telling an elaborate story instead of conducting a scientific study. Alas, each segment is factually and/or legally deficient. First, they claim that starting in early January, coordinated retail trading led to a short squeeze and/or a gamma squeeze that manipulated upwards the prices of the Affected Stocks. But this theory was rejected by the SEC.[32] Second, even though this is January 28 – February 4 *seller* class, Robinhood attacks class-wide reliance on price integrity at the time of *purchase* decisions (even ones made months or years earlier) because Plaintiffs and other investors may have been aware that prices had risen sharply from January 4-27 because of the so-called "meme stock" frenzy.[33] So what? Even for those who bought in that period, it is "common sense that a stock purchaser does not ordinarily seek to purchase a loss in the form of artificially inflated stock." *Blackie v. Barrack*, 524

---

[30] *See also, Kraft v. Third Coast Mistream*, No. 19-CV-9398 (LJL), 2021 WL 860987, at *22 (S.D.N.Y. Mar. 8, 2021) ("Plaintiff must allege ''a misplaced belief in the price of the security as being set by arms-length, bona fide trading.'"); *Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 458-59 (S.D.N.Y. 2015) (same).

[31] Robinhood cannot prove an absence of false signals because class members were not aware of Robinhood's temporary liquidity problem – until CEO Tenev finally admitted it when button-holed by Rep. Gonzalez (R-OH) in his February 18 HFSC testimony. Rosen Decl., Ex. 27. Investors sold to cut their losses; this is what Robinhood sought to induce them to do. Order at 33.

[32] *Compare, e.g.,* Fischel ¶¶ 27-30 and Grenadier ¶¶106-114 (asserting market inefficiency due to a short squeeze) and Grenadier ¶¶131-32 (asserting gamma squeeze contributed to market inefficiency) *with* SEC Staff Report at 30-31 ("a short squeeze did not appear to be the main driver of events, and a gamma squeeze less likely") and 26 ("positive sentiment…sustained the weeks-long price appreciation") (Rosen Decl., Exs. 5, 6 and 10).

[33] *See* Fischel Rpt., ¶¶21-22, 26 (Rosen Decl., Ex. 6).

F.2d 891, 908 (9th Cir. 1975). Moreover, "it is hard to imagine that there ever is a buyer or seller who does not rely on market integrity. Who would knowingly roll the dice in a crooked crap game?" *Basic*, 485 U.S. at 246–47. Short squeeze play or long-term position, not one class member knowingly invested in a rigged market prior to January 28 expecting to lose money.

Third, Robinhood's experts incorrectly define *Basic* efficiency as "fundamental value" efficiency, a concept rejected in *Halliburton II*.[34] They leverage that error to argue that there can be no class-wide reliance if prices do not reflect *only* "value-relevant" information.[35] But, as Prof. Grenadier conceded, many investors trade on information unrelated to an issuer's financial metrics, such as momentum, trends, timing, and environmental and social responsibility. Grenadier Depo at 27:9-32:14 (Rosen Decl., Ex. 32). Indeed, the SEC expressly noted "quantitative and high-frequency hedge funds, joined the market rally to trade profitably." Rosen Decl., Ex. 10 at 22. Even were the Court to look at the merits of the reliance element of the manipulation claim now, no part of Robinhood's market inefficiency story rings true.

ii.      Should the Court deem *Basic* market efficiency must be proved, Plaintiffs' expert has made a sufficient showing.

The fraud-on-the-market presumption – "in an open and developed securities market the price of a company's stock is determined by the available material information regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock" (*Basic*, 485 U.S. at 241-22) – furthers Congress's goal in enacting Exchange Act. "Congress expressly relied on the premise that securities markets are affected by information, and enacted legislation to facilitate an investor's reliance on the integrity of those markets." *Id.* at 246.

As explained above, the traditional analysis used to justify a *Basic* presumption of class-wide reliance in a misrepresentation case is not needed in a manipulation/material omissions case. That said, because this case presents "interesting legal questions" (Order at 51-52), should the Court deem such proof necessary now, in an abundance of caution, Plaintiffs provide evidence – based upon robust testing, not commentary and disproved theories – that the markets for seven of the Affected Stocks were efficient in the one-year period prior to the Class Period.

---

[34] *See Halliburton II*, 573 U.S. at 272-73 (*Basic*'s "fairly modest presumption" is informational efficiency); *City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 3d 676, 688 (D. Md. 2018) (proof of value efficiency not required); *KB Partners I, L.P. v. Barbier*, No. A-11-CA-1034-SS, 2013 WL 2443217, at *5 (W.D. Tex. June 4, 2013) (same)
[35] Grenadier Rpt., ¶13; Fischel Rpt., ¶¶34-35; Fischel Reb. Rpt., ¶14. Rosen Decl., Exs. 5, 6 & 30.

One year after *Basic*, in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989), a court set out five factors often used to prove that the market for an issuer's stock is open and developed, *i.e.* efficient. Declining to adopt the *Cammer* factors in favor of a flexible, case-by-case approach, in *Regions*, 762 F.3d at 1254-55, the Eleventh Circuit noted that efficient markets exhibit "high-volume trading activity facilitated by people who analyze information about the stock or who make trades based upon that information." *Id.* at 1255. Recognizing that a district court could use *Cammer* to "guide its analysis," *id.*, the *Regions* court affirmed the trial court's finding a presumption of efficiency was proper, citing several of the *Cammer* factors. *Id.* at 1258.

As the Affected Stocks are household names, market efficiency is readily established.[36] Indeed, "[i]n the usual case of common or other highly traded and analyzed stock, there is no reason to burden the court with review of an event study and the opposing expert's attack of it." *Carpenters Pension Tr. Fund v. Barclays PLC*, 310 F.R.D. 69, 86 (S.D.N.Y. 2015). Plaintiffs engaged an expert financial economist, Dr. Adam Werner. He conducted event studies and found, based upon eight indicia of market efficiency (*Cammer* and *Krogman*[37] factors), that in the year just before the Class Period, the markets for seven of the nine Affected Stocks were efficient. Rosen Decl. Ex. 12 (findings summarized in Table 1).[38] The results stood up when Dr. Werner applied his methodology to the 23-day period studied by Mr. Fischel. Werner Reb. Rpt. at ¶¶17-60. (Rosen Decl., Ex. 3).[39] Thus, entering the Class Period, investors could rely on the prices of the Affected Stocks as reflecting available information when deciding to buy or sell shares.

***Cammer* Factor One: Average Weekly Trading Volume on a National Exchange:** "[H]igh trading volume [on a national exchange] strongly suggests an efficient market." *Regions*, 762 F.3d at 1258 (millions of shares traded on NYSE daily). Specifically, an average weekly trading volume of 2% of outstanding shares justifies a strong presumption of market efficiency.

---

[36] Courts recently held that two stocks at issue had traded in efficient markets. *Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*, 338 F.R.D. 205 (S.D.N.Y. 2021); *Pearlstein v. BlackBerry Ltd.*, No. 13 CIV. 7060 (CM), 2021 WL 253453 (S.D.N.Y. Jan. 26, 2021).
[37] Three additional factors indicative of market efficiency sometimes relied upon by courts were articulated in *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001).
[38] Two stocks, TR and KOSS, satisfied certain *Regions* factors, 762 F.3d at 1255 n.4, 1258, to wit, major market listing, Werner Rpt. ¶43 & Table 5, high trading volume, *id.* at ¶¶32-34 & Table 2, institutional investors, *id.* ¶¶45-47 & Table 6, and many market makers. *Id.* at ¶¶41-42 & Table 5. The Court is empowered to find their markets informationally efficient. Rosen Decl., Ex. 12.
[39] For each factor, the results can be found in footnotes following the reported results.

*Cammer*, 711 F. Supp. at 1286. In the year prior to the Class Period, the nine Affected Stocks all traded on the NYSE or NASDAQ with average weekly trading volumes from 2.9% to 112.3%, demonstrating efficiency. Werner Rpt. Tables 2 & 5 (Rosen Decl., Ex. 12).[40]

*Cammer* **Factor Two: Analyst Coverage:** This factor ensures that professionals review information pertinent to an issuer's business, making recommendations upon which investors rely to bid prices up and down. *Cammer, supra*; *see also Regions*, 762 F.3d at 1258. Coverage by a handful of analysts will satisfy this standard. *See Aranaz*, 302 F.R.D. at 669 (four analysts); *In re Amerifirst Sec. Litig.*, 139 F.R.D. 423, 431 (S.D. Fla. 1991) (six analysts). In the year before the Class Period, Dr. Werner found that seven of Affected Stocks (excluding KOSS and TR) had a minimum of seven covering analysts, demonstrating efficiency. Werner Rpt. Table 3 (Rosen Decl., Ex. 12).[41]

*Cammer* **Factor Three: Existence of Market Markers/Institutional Investors:**

Market makers standing ready to buy and sell a stock provide liquidity and, thus, "ensure completion of the market mechanism … buying or selling stock and driving it to a changed price level." *Cammer*, 711 F. Supp. at 1287; *Aranaz*, 302 F.R.D. at 668 (market makers "generally render the market efficient"); Werner Rpt., ¶40 (Rosen Decl., Ex. 12). Where a stock does *not* trade on a national exchange that reports trading volume, 10 market makers for a security would justify a "substantial presumption" of market efficiency. *Cammer*, 711 F. Supp. at 1293. In the year prior to the Class Period, the Affected Stocks (all NYSE- and NASDAQ-traded) had a low of 51 and a high of 117 market makers. Werner Rpt. Table 5 (Rosen Decl., Ex. 12).[42]

"Informed investors closely watching the value of their investments generally serve as a good proxy for market makers…." *Regions* 762 F.3d at 1255 n.4. A sizable number of institutional investors can contribute to a finding of efficiency. *Id.* at 1258; *Aranaz*, 302 F.R.D. at 665 (24 institutional investors). In the year before the Class Period, seven of nine issuers had hundreds of institutional investors; KOSS had the fewest, at 23. Werner Rpt. Table 6 (Rosen Decl., Ex. 12).[43]

---

[40] During Mr. Fischel's January 4 - 27 pre-Class period, the weekly trading range for seven of the Affected Stocks increased to 26.36% to 500.83%. Werner Reb. Rpt., Table 1 (Rosen Decl., Ex. 3).
[41] During Mr. Fischel's abbreviated January 4 - 27 pre-Class period, one or more reports were issued for all seven stocks with analyst coverage. Werner Reb. Rpt., Table 2 (Rosen Decl., Ex. 3).
[42] In January 2021, there were between 62 and 111 market makers for the Affected Stocks Dr. Werner found to have traded in efficient markets. Werner Reb. Rpt., Table 4 (Rosen Decl., Ex. 3).
[43] Before and after Mr. Fischel's January 4 - 27 pre-Class period, the seven Affected Stocks Dr. Werner found were traded in efficient markets had 27 - 441 unique institutional investors. Werner

*Cammer* **Factor Four: Ability to File an S-3/F-3:** The ability of an issuer to file a simplified Form S-3 for stock offerings is afforded to companies that have filed SEC period reports for 12 months and have a public float of $75 million.[44] Form S-3 filing status demonstrates market efficiency because it is indicative of "high quality corporate reports, including Exchange Act reports," and the float requirement "ensures that enough investors have in fact read the previously filed document[s]." *Cammer*, 711 F. Supp. at 1285; *Regions* 762 F.3d at 1258. Dr. Werner found that three of the Affected Stocks filed on Form S-3 in the year prior to the Class Period, all nine had 12 months of financial information on file with the SEC, and eight of the nine had a public float above $75 million. Werner Rpt. Table 7 (Rosen Decl., Ex. 12).[45]

*Cammer* **Factor Five: Cause-and-Effect Relationship Between Unexpected Events and Issuer Stock Price:** To determine whether information is incorporated into stock price, experts will perform an event study, "a statistical regression analysis that examines the effect of an event[, such as the release of information,] on a dependent variable, such as a corporation's stock price. *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1313 (11th Cir. 2011). Although Dr. Grenadier refers to this factor as the "most important" (Grenadier Reb. Rpt., ¶24 (Rosen Decl., Ex. 28)), *Regions* rejected such an "unwavering evidentiary requirement," noting that even *Cammer* only held that proof of this factor "'would be helpful' to the efficiency analysis." 762 F.3d 1256.[46]

Here, Dr. Werner performed an event study using a regression analysis on the one-year period prior to the Class Period to isolate days on which the Affected Stocks experienced price movements not explained by market and industry indices, followed by a t-test to determine whether those movements were statistically significant. Werner Rpt., ¶¶ 54-66 & Exs. 6a-6i & 7a-7i. (Rosen Decl., Ex. 12). Dr. Werner then performed a "news/no-news" test to determine if there are more statistically-significant price movements on "high-news" days, *i.e.*, the top 10% of days for each

---

Reb. Rpt., Table 5 (holdings as of 12/31/2020 and 3/31/2021) (Rosen Decl., Ex. 3).

[44] As noted by Dr. Werner, since 2007, companies with a public float of less than $75 million also qualify to file an S-3/F-3 under certain circumstances. Werner Rpt. ¶48 (Rosen Decl., Ex. 12).

[45] During Mr. Fischel's abbreviated January 4 - 27 pre-Class period, all seven of the Affected Stocks Dr. Werner found to have traded in efficient markets satisfied the requirements for filing a Form S-3. Werner Reb. Rpt., Table 6 (Rosen Decl., Ex. 3).

[46] "The Eleventh Circuit is not alone in its determination that the fifth *Cammer* factor is not a prerequisite to a finding of market efficiency – a substantially similar approach has been taken by the First, Second, Third, Fourth, and Fifth Circuits." *Monroe Cnty. Employees' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 384 (N.D. Ga. 2019). District courts around the country have followed suit because *Halliburton II* does not set such an exacting standard. *Id.* at 385 & n.8 (citing 12 cases).

stock – measured by the number of pieces of news published by Factiva for each day of the year prior to the Class Period – than on the remaining 90%, "low news" days, using a Fisher's exact test. Dr. Werner found evidence of cause-and-effect at the 99% confidence level for all stocks except TR, demonstrating price reaction to information. *Id.* at ¶¶69-79 & Table 9.

Dr. Grenadier criticizes this methodology because Dr. Werner did not weed out, *ex ante*, "non-value-relevant" news. Grenadier Reb. Rpt., ¶¶24, 44-47. (Rosen Decl. Ex. 28). However, "courts have found that engaging in such *ex ante* determinations [as to what is news and what is not news] as proposed by Defendants would be subjective." *Angley v. UTi Worldwide Inc.*, 311 F. Supp. 3d 1117, 1124 (C.D. Cal. 2018) (approving news search in *Bloomberg* archive); *In re NII Holdings, Inc. Sec. Litig.*, 311 F.R.D. 401, 412 (E.D. Va. 2015) ("an expert report relying on a study containing cherry-picked event dates is far less persuasive than one in which objective criteria were used"); *Brown v. China Integrated Energy Inc.*, No. CV 11-02559, 2014 WL 12576643, at *7 (C.D. Cal. Aug. 4, 2014) (excluding expert report that subjectively chose dates with "financial press releases, business updates and [ ] analyst reports" while excluding dates with news articles). Proof of why subjective "news" criteria are unwise is provided by Robinhood's experts, who cannot agree on the dates on which there was "value-relevant" news during the *one-week* overlapping period of their reports. Werner Reb. Rpt., ¶47 (Rosen Decl., Ex. 3).[47]

***Krogman* Factor One: Market Capitalization:** "Market capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations." *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001). Certain investors, *e.g.,* pension funds, are restricted to holding such securities. Werner Rpt., ¶82 (Rosen Decl., Ex. 12). Here, with the exception of KOSS, the Affected Stocks' market capitalizations ranged from $100 million to $3 billion, which provides further evidence of efficiency. *Id.*[48]

***Krogman* Factor Two: Float:** Because the price of stocks heavily held by insiders may

---

[47] Using all news days identified by both experts from January 21-27, Dr. Werner demonstrated cause-and-effect price movement with statistical significance as to six of the nine Affected Stocks he initially found efficient during the one-year pre-Class Period; he attributed TRVG's failure to the extremely small sample size. Werner Reb. Rpt., ¶¶49-52 & Table 7 (Rosen Decl., Ex. 3).

[48] During Mr. Fischel's January 4 - 27 period, the market capitalization of all seven of the Stocks Dr. Werner found to have traded in efficient markets ranged from larger than 27% - 86% of other U.S. stocks. The smallest, EXPR, had a $125 million market capitalization. This contributes to a finding of market efficiency. Werner Reb. Rpt., ¶¶53-55 & Table 8 (Rosen Decl., Ex. 3).

reflect information not known to the public, *Krogman*, *supra, id.*, public floats above $75 million contribute to a finding of market efficiency. With the exception of KOSS (a mostly family-owned company), the Affected Stocks' public floats ranged from $92 million to $3 billion, providing additional evidence of market efficiency. Werner Rpt., ¶86 & Table 11 (Rosen Decl., Ex. 12).[49]

***Krogman* Factor Three: Bid-Ask Spread:** A large bid-ask spread could be evidence of market inefficiency because it suggests the stock is too expensive to trade. *Krogman*, *supra, id.* Here, all but two of the nine Affected Stocks had lower average bid-ask spreads, by percentage, than all CRSP reported issuers, and for one of the two that did not, the $0.02 spread was equal to the overall CRSP average price spread. Werner Rpt., ¶90 & Table 12 (Rosen Decl., Ex. 12).[50]

Because seven of the Affected Stocks met indicia of efficiency during both study periods, their markets were efficient under the *ATSI* and *Basic* tests. Although two stocks met the *ATSI* test and exhibited *Basic* efficiency, *i.e.,* "high-volume trading activity facilitated by people who analyze information about the stock or who make trades based upon that information" (*Regions*, 762 F.3d at 1255), neither satisfied all *Cammer/Krogman* factors. TR met six of eight, and KOSS met the cause-and-effect test, had high trading volume, and had a large number of market makers and institutional investors. The Court can find TR and KOSS traded in *Basic*-efficient markets.

Plaintiffs have demonstrated how proof of class-wide issues of fact and law, including reliance, will predominate. Rule 23(b)(3)'s first prong is satisfied.

2.   A class action is the superior method for resolving this controversy.

The case meets Rule 23(b)(3)'s "superiority" requirement.[51] Robinhood's actions injured geographically-dispersed owners of nine stocks. Pursuing individual litigation for less than seven-figure losses in complex securities cases against well-financed adversaries is not feasible. Under such circumstances, there will be no recourse for most investors. Moreover, separate cases "would

---

[49] Werner Reb. Rpt., ¶¶56-57 & Table 9 (Rosen Decl., Ex. 3) shows that all seven stocks initially found efficient by Dr. Werner had public floats of $75 million or more during Mr. Fischel's pre-Class Period, ranging from $117 million to $6.2 billion, additional evidence of efficiency.

[50] In Jan. 2021, the average CRSP spread was $0.25 and 0.50% (Werner Reb. Rpt., Table 10 (Rosen Decl., Ex. 3)), with the seven of the stocks Dr. Werner initially found to have traded in efficient markets having spreads of $0.01. GME's spread ($0.07) was a fraction of the CRSP average. *Id.*

[51] The factors to be considered are: (a) The interest of members of the class individually controlling …separate actions; (b) The extent and nature of any litigation concerning the controversy already commenced by…members of the class; (c) The desirability…of concentrating the litigation of the claims in a particular forum; and (d) The difficulties…in the management of a class action.

be repetitive, wasteful, and an extraordinary burden on the courts." *Kennedy*, 710 F.2d at 718.

Eleven securities cases filed in districts across the country were transferred to this Court as part of the MDL proceedings and thereafter consolidated. *See* ECF 420 at 2. Lead Counsel is unaware of individual litigation commenced by any opt-out investors. Rosen Decl., ¶4. As Robinhood is the only defendant, no case management difficulties are anticipated.

**C.    Plaintiffs Provide a Damages Model Tailored to Their Theory of Liability**

On January 27, the Affected Stocks' closing prices were set by the free interchange of supply and demand – with, as the SEC found, both hedge funds and retail investors among the buyers and the sellers. Thereafter, Robinhood's restrictions caused those prices to decline. As the Supreme Court held in *Affiliated Ute*, the measure of damages in an artificial deflation case is the difference between "the fair value [the] seller received and the fair value of what he would have received had there been no fraudulent conduct." 406 U.S. at 155. We know what sellers actually received. At minimum, the closing price on January 27 is what class members would have received had Robinhood's restrictions not abruptly ended a rally and caused prices to plummet. Werner Rpt. ¶95. The amount of the price deflation attributed to Robinhood will be shown by expert analysis of the impact caused when Robinhood restrictions' reduced demand, subtracting out the amount, if any, linked to other actors. Werner Rpt. ¶¶95-97; Werner Reb. Rpt.¶¶102-19, Tables 12 & 13, Exs. 6a-6i (its own experts show *only* Robinhood PCOed six of the Affected Stocks on January 28 and *only* Robinhood imposed full-day restrictions thereafter). Rosen Decl., Exs. 3 & 12.

In *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), an antitrust case, the court dismissed three of four types of anti-competitive conduct, but the plaintiff's damages model estimated what prices would have been had *none* of the four types of misconduct occurred. The Supreme Court held that a methodology that did not isolate damages based on the one remaining theory of liability in the case could not be the basis of a class-wide damages model. 569 U.S. at 36-37. Here, Plaintiffs' theory of liability is that starting on January 28, Robinhood imposed restrictions and artificially reduced demand for the Affected Stocks; this caused their prices to decline from the January 27 closing prices, causing damages to investors who sold their shares while various restrictions were in place. Nothing more is required before the completion of discovery and expert analysis of causation.

While it is true that there are nine Affected Stocks and some restrictions changed over the course of the one-week Class Period, a straightforward damages methodology will apply to the

determination of out-of-pocket damages for class members who sold shares of each of the Affected Stocks while Robinhood's restrictions were in place. As explained below, Robinhood's experts' arguments to the contrary are neither novel nor meritorious. This Court should reject them – as have scores of courts when presented with *Comcast* challenges in a securities fraud case.[52]

Robinhood's experts' primary criticism of the damages model reiterates the incorrect stance that because the Affected Stocks did not reflect only "value-relevant information," class-wide damages cannot be based on their "artificially high closing price[s] on January 27, 2021." Fischel Reb. Rpt., ¶24. (Rosen Decl., Ex. 30).[53] Untrue. *Halliburton II* rejected a "fundamental efficiency" requirement. Moreover, in *Affiliated Ute* class-wide, fair-value damages were calculated and upheld with respect to thinly-traded shares in a private market. 406 U.S. 155.

1. Robinhood's experts' methodology critiques are not well taken.

Robinhood's experts' attacks on Plaintiffs' damages model are ill-conceived. For example, Dr. Grenadier asserts that the model must explain the impact of Robinhood's actions on all 50 stocks it restricted. Grenadier Reb. Rpt. ¶78. (Rosen Decl. Ex. 28). But Plaintiffs liability theory pertains to nine stocks; requiring a damages model to address matters *outside* of Plaintiffs' theory of liability runs afoul of *Comcast*. Moreover, Dr. Grenadier seeks a "level of detail that…is not required to show a tether between liability and damages at class certification." *Junge v. Geron Corp.*, No. C 20-00547, 2022 WL 1002446 at *9 (N.D. Cal. Apr. 2, 2022).

Further, Dr. Grenadier's assertion that the damages model does not segregate damages,[54] was rejected in *Thorpe* as inapposite at class certification because loss causation is a merits issue. 2016 WL 4006661 at *16. In any event, because restrictions were announced and lifted at different times, with Robinhood's being the most draconian, Dr. Werner shows, just for January 28 (Robinhood acts *alone* thereafter), that declines due to Robinhood's restrictions are easily separated from those of other brokers. Werner Reb. Rpt. at Tables 12 and 13. (Rosen Decl., Ex. 3)

Mr. Fischel asserts that a class-wide damages model cannot be constructed because there is no way of knowing the prices investors would have traded at in a "but for" world where

---

[52] Defendants in 75 securities fraud cases have unsuccessfully argued that plaintiffs' damages model is not tailored to all factual contours of the case. *See* Rosen Decl., Ex. 29 (list of cases).
[53] Grenadier Reb. Rpt., ¶¶69, 73 (damages model cannot use January 27 prices as a base if markets inefficient because prices do not only reflect "value-relevant" information) (Rosen Decl., Ex. 28).
[54] Grenadier Reb. Rpt., ¶77 (Rosen Decl., Ex. 28).

Robinhood had not enacted its restrictions. Fischel Reb. Rpt. ¶25 (Rosen Decl., Ex. 30).[55] Nonsense. Mr. Fischel is well aware of scholarship concerning the impact of changed demand on pricing. In *IPO*, a case alleging that IPO allocants' large aftermarket purchases artificially inflated stock prices in connection with hundreds of IPOs, serving as plaintiffs' expert, Mr. Fischel relied, in part, on research finding that "a buyer-initiated trade of only 0.16 percent of a company's outstanding stock is associated with a *permanent* price increase of 4.7 percent." 227 F.R.D. at 65, 113 (S.D.N.Y. 2004), *rev'd. on other grounds,* 471 F.3d 24 (2d Cir. 2006) (emphasis in original). Dr. Werner cited research that calculated price declines caused by Robinhood removing demand for the Affected Stocks. Werner Reb. Rpt., ¶¶97-98 & nn. 70-71. (Rosen Decl., Ex. 3).

Mr. Fischel also claims that Plaintiffs' damages theory fails because if prices were artificially depressed, they should have immediately rebounded the day after Robinhood lifted its final restrictions, but did not. Fischel Reb. Rpt., ¶26 n. 38 & Table 3. (Rosen Decl., Ex. 30). Mr. Fischel's immediate bounce-back standard flatly contradicts not only the PSLRA[56] but one of the expert reports he submitted in *IPO*, opining that artificial price impact can persist for many months after the manipulative conduct ends. See 2004 WL 3943323 (Jan. 20, 2004) (Rosen Decl., Ex. 31).

Mr. Fischel also misstates the proper measure of damages to contest ascertainability. Fischel Rpt., ¶39 (Rosen Decl., Ex. 6). In a price-deflation case, out-of-pocket damages are not measured by the difference between one's purchase price and one's sale price. *See Levie v. Sears, Roebuck & Co.*, 496 F. Supp. 2d 944, 948 (N.D. Ill. 2007) (a deflation class member incurs injuries by selling at a price that "was artificially lower than the investor should have received[, r]egardless of the price such an investor paid for the stock"); *San Antonio Fire & Police Pension Fund v. Dole Food Co., Inc.*, 177 F. Supp. 3d 838, 840 (D. Del. 2016) (that lead plaintiff did not "suffer a loss in the traditional sense is not dispositive, given that the underlying basis for recovery is the sale of

---

[55] Robinhood is trying to shoehorn the facts of this case into *Krukever*, where damages stemming from after-market-hours sales would be based upon hypothetical market-hours sale prices for *888* unique options – a task "so complex, fact-specific, and difficult that the burden on the court system would be simply intolerable.'" *Krukever*, 328 F.R.D. at 661 (citations omitted). Here, Dr. Werner's class-wide model explains how sellers of nine widely-traded stocks class can prove deflationary damages for real-world sales. Werner Reb. Rpt., ¶¶113, 116 (Rosen Decl., Ex. 3).

[56] The PSLRA does not measure price inflation by looking only at the price reaction the day of/after a corrective disclosure. 15 U.S.C. §78u-4(e)(1) (damages based upon 90-day mean trading price). Mr. Fischel's claim that Plaintiffs' damages model fails if the Affected Stocks did not return to January 27 prices *the day after* the last restriction runs contrary to the rationale for this provision.

shares at an artificially depressed price."). Here, those who held shares of the Affected Stocks after the market close on January 27 and sold for a lower price in the next six days were damaged.

2.   The experts have no substitute for market price to calculate damages.

Both experts argue that a "fair value" measure of damages cannot be based on the January 27 closing prices, *e.g.,* Fischel Reb. Rpt., ¶¶26; Grenadier Reb. Rpt., ¶71 (Rosen Decl., Exs. 28 & 30, but provide no viable alternative. Dr. Grenadier conceded that stocks do not have one "true value" (Grenadier Depo. at 22-24), and that he only opined the January 27 prices were not based on "value-relevant" information – not that they were too high. *Id.* at 34-37. (Rosen Decl., Ex. 32). Mr. Fischel criticized January 27 prices as much higher than analysts' *future* price targets. Fischel Rpt., ¶¶31-32. (Rosen Decl., Ex. 6).[57] This ignores Eugene Fama's key premise that efficiency makes it impossible for even market analysts to construct a trading rule to outperform the market:

> …if markets are informationally efficient…professional active managers should do no better at picking stock portfolios than monkeys with darts. This is a remarkable proposition. In any other field of human endeavor, seasoned professionals systematically outperform amateurs. But other fields are not so ruthlessly competitive as financial markets.[58]

Indeed, Mr. Fischel had earlier concluded that market price *is* the best proxy for value, *despite* the presence in the market of noise traders, "who are influenced by fads [and] mob psychology":

> The relevant question in determining whether capital markets are value efficient is not whether noise traders exist but rather whether there is a better proxy than market prices for the underlying value of a publicly traded firm's assets. Or, to put the point differently, it takes a theory to beat a theory and thus far none exists.[59]

Class members held shares in the Affected Stocks that had an ascertainable value at the close of the market on January 27 and sold those shares for much less because of Robinhood's restrictions. Damages can be determined class-wide.

**V.   CONCLUSION**

For the reasons stated above, Plaintiffs' motion should be granted in its entirety.

---

[57] The targets were 6-18 months away. Werner Reb. Rpt. ¶¶89-90 & Ex. 5 (Rosen Decl., Ex. 3).

[58] J. H. Cochrane, "Eugene Fama, Efficient Markets and the Nobel Prize," *Chicago Booth Review* (May 20, 2014) (Rosen Decl., Ex. 33).

[59] D.R. Fischel, "Efficient Capital Markets, the Crash, and the Fraud on the Market Theory," 74 *Cornell L. Rev.* 907, 913, 915 (1989) (Rosen Decl., Ex. 34)

## VI.     REQUEST FOR HEARING

Plaintiffs respectfully request the Court allow for oral argument on Plaintiffs' Motion for Class Certification for the following reasons:

1.  Oral argument will provide an opportunity for the Court to pose questions to counsel in a case that raises a number of interesting legal issues.

2.  Oral argument will allow counsel to field questions about the extensive evidentiary record. Defendants have taken the deposition of the twelve proposed class representatives and multiple third-party witnesses. The parties have taken three expert depositions and exchanged six reports.

3.  There is public interest in the progress and outcome of the case.

4.  Plaintiffs estimate the time required for oral argument is 75 minutes.

Dated: April 28, 2023

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, FBN# 0182877
Robin Bronzaft Howald
Michael A. Cohen
By: /s/Laurence M. Rosen
Laurence M. Rosen, Esq.
275 Madison Avenue 40th Floor
New York, New York 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com

*Counsel for Lead Plaintiff Blue Laine-Beveridge and Named Plaintiffs Abraham Huacuja, Ava Bernard, Brendan Clarke, Brian Harbison, Cecilia Rivas, Doi Nguyen, Joseph Gurney, Marcel Poirier, Sandy Ng, Santiago Gil Bohórquez, and Thomas Cash*

## CERTIFICATE OF SERVICE

26

I hereby certify that on April 28, 2023, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/Laurence M. Rosen