# EXHIBIT 11



# GAME STOPPED? WHO WINS AND LOSES WHEN SHORT SELLERS, SOCIAL MEDIA, AND RETAIL INVESTORS COLLIDE, PART III

# VIRTUAL HEARING

BEFORE THE

## COMMITTEE ON FINANCIAL SERVICES

## U.S. HOUSE OF REPRESENTATIVES

ONE HUNDRED SEVENTEENTH CONGRESS

FIRST SESSION

———

MAY 6, 2021

———

Printed for the use of the Committee on Financial Services

## Serial No. 117–22



———

U.S. GOVERNMENT PUBLISHING OFFICE

44–837 PDF                    WASHINGTON : 2021

20

parency on the short-selling side. I am encouraged to hear that FINRA, under Robert Cook, is going to be doing some things in that area as well.

Mr. POSEY. Thank you. Mr. Bodson, please share with us how you are working to reduce the settlement cycle to 1 day while preserving the benefits of netting and [inaudible] what the savings proposed on margin funds might be?

Mr. BODSON. Thank you, Congressman, for that question. Shortening the settlement cycle is the big concept of time equals risk. Reducing the period that trades are open and reducing the potential impact of the default of one of our members means that we simply have to collect lower levels of margin or collateral. One of the biggest components of our calculation of margin is volatility-driven, what is happening in the market, how are prices moving, and by shorting that period, we believe we can reduce that charge by 40 percent in a volatile period. That could be $6 billion less capital that firms have to post with us and can use elsewhere. So, it would be a significant amount for our members.

Mr. POSEY. Great. I am really glad to hear that.

Chairman Gensler, tell us about what the SEC is doing to ensure that payment for order flow doesn't mean retail investors are subject to unfair trades?

Mr. GENSLER. I have asked the staff to take a close look at this in the context of the overall market structure, because payment for order flow, which some brokers use and some don't, is, in essence, a payment to the broker for that order flow, and it can be in conflict with the interests of that customer. And that inherent conflict—we found in a case that was settled in December, where there was actually communication between the wholesaler and broker saying, "Look, I can give your customer more or I can give you more." There was a tradeoff between these two.

I think that we need to take a closer look at that, but also in the context of the overall equity market structure, because there is also payment for order flow on exchanges, which is called rebates. So, there are other pieces of this puzzle, not just to wholesalers.

Mr. POSEY. Thank you, Mr. Chairman. Do you believe that cooperation among retail investors in chat rooms, for example, can be undesirable collusion in the equities market?

Mr. GENSLER. I think that we should always be vigorously enforcing our laws and ensuring that there is not fraud and manipulation. But again, we have a free speech right to go and say to a neighbor, whether it is online or in person, "I like this investment," and thoughtfully say why I like this investment. Our laws are about if somebody is trying to defraud another person, mislead another person, manipulate the markets, and that we should root out and vigorously root that out, whether it is a big institution, or an individual. or, frankly, a computer that's controlled by a big institution.

Mr. POSEY. Okay. During your CFTC service, you once said that transparency isn't costly. Would you explain that concept in the context of financial markets?

Mr. GENSLER. Did you say that I had said transparency is a—

Mr. POSEY. Transparency isn't costly. It pays to be transparent.