# EXHIBIT 27

```
[House Hearing, 117 Congress]
[From the U.S. Government Publishing Office]


                  GAME STOPPED? WHO WINS AND LOSES
                   WHEN SHORT SELLERS, SOCIAL MEDIA,
                      AND RETAIL INVESTORS COLLIDE

=======================================================================

                            VIRTUAL HEARING

                               BEFORE THE

                   COMMITTEE ON FINANCIAL SERVICES

                     U.S. HOUSE OF REPRESENTATIVES

                    ONE HUNDRED SEVENTEENTH CONGRESS

                             FIRST SESSION

                             _____

                           FEBRUARY 18, 2021

                             _____

       Printed for the use of the Committee on Financial Services

                           Serial No. 117-3

 [GRAPHIC NOT AVAILABLE IN TIFF FORMAT]

                             _____

                  U.S. GOVERNMENT PUBLISHING OFFICE
43-966 PDF              WASHINGTON : 2022


-----------------------------------------------------------------------------

                HOUSE COMMITTEE ON FINANCIAL SERVICES

                  MAXINE WATERS, California, Chairwoman

CAROLYN B. MALONEY, New York         PATRICK McHENRY, North Carolina,
NYDIA M. VELAZQUEZ, New York             Ranking Member
BRAD SHERMAN, California             FRANK D. LUCAS, Oklahoma
GREGORY W. MEEKS, New York           BILL POSEY, Florida
DAVID SCOTT, Georgia                 BLAINE LUETKEMEYER, Missouri
AL GREEN, Texas                      BILL HUIZENGA, Michigan
EMANUEL CLEAVER, Missouri            STEVE STIVERS, Ohio
ED PERLMUTTER, Colorado              ANN WAGNER, Missouri
JIM A. HIMES, Connecticut            ANDY BARR, Kentucky
BILL FOSTER, Illinois                ROGER WILLIAMS, Texas
JOYCE BEATTY, Ohio                   FRENCH HILL, Arkansas
JUAN VARGAS, California              TOM EMMER, Minnesota
JOSH GOTTHEIMER, New Jersey          LEE M. ZELDIN, New York
VICENTE GONZALEZ, Texas              BARRY LOUDERMILK, Georgia
AL LAWSON, Florida                   ALEXANDER X. MOONEY, West Virginia
MICHAEL SAN NICOLAS, Guam            WARREN DAVIDSON, Ohio
CINDY AXNE, Iowa                     TED BUDD, North Carolina
SEAN CASTEN, Illinois                DAVID KUSTOFF, Tennessee
AYANNA PRESSLEY, Massachusetts       TREY HOLLINGSWORTH, Indiana
RITCHIE TORRES, New York             ANTHONY GONZALEZ, Ohio
```

whole industry will have to adapt.
    Mr. Lawson. I understand that. And I guess from our standpoint, and I don't have much more time, but what do you recommend to us to try to keep this from happening again?
    Mr. Plotkin. I think to some degree, markets are self-correcting, moving forward, stocks--I don't think you're going to see stocks with the kind of short interest levels that we saw prior to this year. I don't think investors like myself want to be susceptible to these type of dynamics. I think there will be a lot closer monitoring of message boards. There will be software providers. We have a data science team that will be looking at that. Whatever regulation that you guys come up with, certainly, we'll abide by. And I look forward to helping, if you guys want to have future conversations about that.
    Mr. Lawson. Okay. Thank you.
    Madam Chairwoman, my time is running out, so I yield back.
    Chairwoman Waters. Thank you very much.
    Mr. Gonzalez of Ohio, you're recognized for 5 minutes.
    Mr. Gonzalez of Ohio. Thank you, Madam Chairwoman. I want to thank Ranking Member McHenry for his leadership in calling for this hearing today, and also you, Madam Chairwoman, for bringing us together.
    Mr. Tenev, I'm going to start my questions with you by walking through a series of events from that day in January, just to make sure we're all on the same page. In your testimony, you mentioned that the automated deposit requirements from DTCC came in at 5:11 a.m. Eastern time, and it showed a $3 billion deficit, correct?
    Mr. Tenev. I believe that's correct, yes.
    Mr. Gonzalez of Ohio. At that point, 5:11 a.m., did you have the liquidity to meet the additional $3 billion deposit requirement?
    Mr. Tenev. As I wrote in detail in my written testimony, there were a series of steps that the Robinhood securities team took to--
    Mr. Gonzalez of Ohio. Reclaiming my time, sir. At that exact moment, did you have the liquidity for $3 billion? At 5:11 a.m.?
    Mr. Tenev. At that moment, we would not have been able to post the $3 billion in collateral.
    Mr. Gonzalez of Ohio. Okay. So when you said, and you've said this multiple times, that you did, in fact, have the liquidity, and you didn't have a liquidity problem, at that moment in time, that is not necessarily true, correct? You had to take steps to get there?
    Mr. Tenev. Congressman, we did have to--the Robinhood Securities team had to work with our relevant clearinghouses to adjust the risk profile of the trading day in order to meet our collateral requirements.
    Mr. Gonzalez of Ohio. Right. And in order to do that, your choice was to throttle trading to prevent your clients from being able to purchase certain shares, correct?
    Mr. Tenev. That's correct. Robinhood Securities had to restrict buying in about 13 securities.
    Mr. Gonzalez of Ohio. Okay. And if you had not been able to de-risk the portfolio, you wouldn't have been able to raise the money and get the bar requirement and the excess capital charge waived to de-risk the portfolio, then DTCC would have stepped in and liquidated the portfolio, correct?
    Mr. Tenev. I'm not sure what exact steps that they would have taken if we weren't in compliance with the deposit requirements, but it would not have been a good situation for the firm or the customers.
    Mr. Gonzalez of Ohio. Reclaiming my time, I would draw everyone's attention to the letter that Ranking Member McHenry