# EXHIBIT 31

In re: INITIAL PUBLIC OFFERING SEC., 2004 WL 3943323 (2004)

2004 WL 3943323 (S.D.N.Y.) (Expert Report and Affidavit)
United States District Court, S.D. New York.

In re: INITIAL PUBLIC OFFERING SEC.

MDL-1554.
No. 21 mc 92.
January 20, 2004.

**Report of Daniel R. Fischel**

**Name of Expert:** Daniel R. Fischel, J.D.
**Area of Expertise:** Legal & Insurance >> Legal Experts
**Area of Expertise:** Accounting & Economics >> Finance
**Area of Expertise:** Accounting & Economics >> Economic Damages
**Area of Expertise:** Legal & Insurance >> Legal Malpractice & Ethics
**Representing:** Unknown
**Jurisdiction:** S.D.N.Y.

## I. QUALIFICATIONS

1. I, Daniel R. Fischel, am Chairman and President of Lexecon Inc., a consulting firm that specializes in the application of economics to a variety of legal and regulatory issues. I am also the Lee and Brena Freeman Professor of Law and Business at The University of Chicago Law School. I have served previously as Dean of The University of Chicago Law School, Director of the Law and Economics Program at The University of Chicago Law School, Professor of Law and Business at The University of Chicago Graduate School of Business, and as the Jack N. Pritzker Distinguished Visiting Professor of Law and Professor of Law at Northwestern University Law School.

2. Both my research and my teaching have concerned the economics of corporate law and financial markets. I have published approximately fifty articles in leading legal and economics journals and am coauthor, with Judge Frank Easterbrook of the Seventh Circuit Court of Appeals, of the book *The Economic Structure of Corporate Law* (Harvard University Press). I have written and lectured on the "fraud on the market theory." Courts of all levels, including the Supreme Court of the United States, have cited my articles as authoritative. *See, e.g., Central Bank v. First Interstate Bank,* 114 S. Ct. 1439 (1994); *Basic Inc. v. Levinson,* 485 U.S. 224, 246 n. 24 (1988); and *Edgar v. MITE Corp.,* 457 U.S. 624, 643 (1982). My curriculum vitae, which contains a list of my publications, is attached hereto as Exhibit A.

3. I have served as a consultant or adviser on economic issues to, among others, the United States Securities and Exchange Commission, The National Association of Securities Dealers, the New York Stock Exchange, the Chicago Board of Trade, the United States Department of Labor, the United States Department of Justice, the Federal Deposit Insurance Corporation, the Resolution Trust Corporation, and the Federal Trade Commission.

4. I am a member of the American Economics Association and the American Finance Association. I am also a member of the Board of Directors of the Center for the Study of the Economy and the State at The University of Chicago, and former Chairman of the American Association of Law Schools' Section on Law and Economics. I have testified as an expert witness in multiple proceedings in federal and state courts across the country, as detailed in Exhibit A.

## II. INTRODUCTION AND SUMMARY OF CONCLUSIONS

5. This coordinated class action litigation is comprised of 310 individual class action cases, each involving the common stock of a different issuer, brought on behalf of a separate class of investors (the "Plaintiffs") asserting claims pursuant to the federal securities laws. Defendants (the "Defendants") are corporations that conducted public offerings during the proposed Class Periods (the "Issuers"), various officers and directors of the Issuers (the "Individual Defendants"), and numerous investment banking firms that served as underwriters in the initial and add-on public offerings (the "Underwriter Defendants"). Generally, the Class Periods begin on the day a stock was offered and end on December 6, 2000.[1] Together, the Class Periods run from 1998 through December 6, 2000 (the "Relevant Time Period"). Master Allegations ¶¶ 1-2.

6. Plaintiffs allege that the Defendants engaged in pervasive and industry-wide misconduct that artificially inflated the prices of Issuers' shares. Master Allegations ¶ 3. Among other things, Plaintiffs assert the Underwriter Defendants caused large price increases in aftermarket trading following initial public offerings ("IPOs") by improperly creating artificial aftermarket demand.[2] Allegedly, this was done by making allocations of IPO shares conditional on customer agreements to purchase additional shares of the IPO stock in the aftermarket ("Tie-in Agreements"), in some instances, at pre-arranged, escalating prices. Id. ¶ 14. Further, Plaintiffs assert that the Underwriter Defendants demanded customers share profits from the sale of their IPO shares by: (a) paying inflated brokerage commissions, (b) entering into transactions in otherwise unrelated securities for the primary purpose of generating commissions, and/or (c) purchasing equity offerings underwritten by the Underwriter Defendants, including "add-on" offerings they would not have otherwise purchased. (Collectively, these transactions are referred to as "Undisclosed Compensation"). Id. ¶ 17. Plaintiffs also claim that the Underwriter Defendants used their stock analysts to inflate IPO stock prices by means of favorable analyst recommendations typically made at the end of the "quiet period" (the period ending 25 days after the IPO). Id. ¶ 86.

7. I have been asked by counsel for Plaintiffs to address various issues concerning loss causation in six "Focus Cases" (Corvis Corp., Engage Technologies Inc., FirePond Inc., iXL Enterprises Inc., Sycamore Networks Inc., and VA Linux Systems Inc.) raised in Defendants' interrogatories for the limited purpose of class certification analysis. Thus, the calculation of damages and methods of calculating damages are beyond the scope of this report.

8. For purposes of my analysis, I make the following factual assumptions which are drawn from Plaintiffs' filings in this litigation:

• The Registration Statements and Prospectuses were false and misleading.

• Purchasers of shares sufficient to affect the stock price received allocations of IPO shares in exchange for the promise that they would purchase additional shares of the same stock in the aftermarket, frequently in multiples of the amount of shares allocated to the investor and at prices in excess of the offering price. (These practices are sometimes referred to as "Tie-in Agreements" or "laddering")

• Underwriter firms that allocated IPO shares demanded that a significant number of the investors who received IPO allocations share a portion of their profits from the purchase of their IPO shares with the underwriter. Profit sharing was typically made by payment of excessive commissions on the purchase of other, unrelated securities and constituted a form of "Undisclosed Compensation."

• The foregoing practices were not fully disclosed as of December 6, 2000, which I understand to be the end date of each of the Class Periods proposed by Plaintiffs.

9. Based on these assumptions, I have concluded that the Tie-in Agreements created an appearance of demand for shares of the six Focus Case stocks in the aftermarket that was misleading and that the aftermarket prices for the six Focus Case stocks was likely inflated as a result. The misconduct with respect to the Undisclosed Compensation had a similar effect. Information showing that the underwriters actually received significantly more compensation than disclosed together with information showing the means by which the compensation was received (e.g., through the payment of excessive commissions pursuant to Tie-in Agreements) would have caused investors to question the integrity of the underwriting and due diligence process.

10. The empirical evidence and the relevant disclosures that I have reviewed to date support Plaintiffs' allegations that the prices of the relevant securities were artificially inflated by the alleged misconduct through December 6, 2000, and thereafter.

11. I have reviewed, among other things, public filings, publicly available data on IPOs and stock prices, and relevant academic literature. I have been assisted in my work by the staff at Lexecon Inc. In the remainder of this report, I elaborate on and summarize the bases for the preliminary conclusions discussed above.[3]

### III. THE ALLEGED MISCONDUCT, IF PROVEN, WOULD HAVE LIKELY ARTIFICIALLY INFLATED THE PRICES OF THE RELEVANT SECURITIES, NOT JUST AT THE TIME OF THE ALLEGED MISCONDUCT, BUT THROUGH DECEMBER 6, 2000, AND THEREAFTER

#### A. *The Effect of Defendants' Alleged Misconduct on the Prices of Issuers' Shares*

12. In an efficient market, the price of a security at any point in time reflects investors' unbiased assessments of the value of the future cash flows they will receive from holding the security based on all the information available to them. Investors who receive information that the value of the security exceeds its current price will want to buy the security. Consequently, if market participants observe strong demand for a stock by investors, as alleged in the instant cases, market participants would likely infer that purchasers have positive information about the stock. This would cause market participants to revise their expectations about the value of the stock upwards, causing the price to be higher than it would otherwise be. (A similar analysis applies where investors receive information that the value of a security is lower than its current price.)

13. Defendants' alleged misconduct would have likely inflated the prices of Issuers' shares by leading market participants to conclude that certain aftermarket purchasers were acting on positive information about Issuers' shares when, in reality, they had no such information but were instead purchasing pursuant to Tie-in Agreements. Had market participants known the extent to which investors were agreeing to purchase shares in the aftermarket pursuant to Tie-in Agreements, they would have likely drawn different conclusions from the information about aftermarket purchases.

14. The failure to disclose the alleged Undisclosed Compensation also would have likely inflated the prices of the Issuers' stocks. To see why, note that in an unmanipulated offering, the underwriters have an incentive to perform adequate due diligence. However, where an offering is manipulated, as Plaintiffs allege here, so that the underwriters have participated in a scheme to manipulate the stock price to receive Undisclosed Compensation that greatly exceeds the amount of disclosed compensation, this incentive is attenuated. Disclosure of the undisclosed information would likely have caused market participants to question the adequacy of the underwriter's due diligence and reduced confidence in the underwriting process, resulting in lower market prices for Issuers' shares.

#### B. *Artificial Inflation Would Likely Persist after Defendants' Alleged Misconduct Ended*

15. The stock prices of Issuers' shares would continue to be inflated as long as the false and misleading information generated by Defendants' alleged misconduct continued to influence Issuers' share prices. This would be the case as long as market participants continued to misinterpret the reasons for the challenged transactions. To put it another way, stock prices would remain inflated - albeit at a dissipating level - so long as the effect of the alleged misconduct on stock prices was not completely eliminated by subsequent developments. Ongoing misconduct on the part of Defendants was not necessary to maintain inflation.[4] Indeed, as I explain more fully in Part IV below, the economic evidence supports plaintiffs' claim that the artificial inflation persisted through December 6, 2000 and thereafter.

#### C. *The Relationship Between Artificial Inflation and Subsequent Stock Price Fluctuations*

16. As noted above, in an efficient market, the price of a security at any point in time reflects investors' assessments of the value of the future cash flows they will receive from holding the security, where investors' assessments are based on all of the information available to them. Market participants receive a steady stream of information from many sources which can affect the price of a given stock by adding to the information set that investors use to assess the expected future cash flows

from the security. For example, information about the company and the industries in which it operates can be relevant.

17. Nevertheless, inflation due to Defendants' alleged misconduct can persist despite subsequent information that causes an Issuer's stock price to fluctuate. Consider an example where the market price of a company's stock is $100 per share as a result of the alleged misconduct and would have been $50 per share absent the alleged misconduct (i.e., 50 percent of the market price is due to the inflation caused by the misconduct). Suppose unfavorable information reaches the market which causes the market price to fall from $100 to $20. Further suppose that in the absence of the alleged misconduct, the price would have fallen from $50 to $10. Under these circumstances, the price is still inflated by $10 per share after the stock price decline.

18. A similar observation applies to subsequent price increases. Suppose that favorable information reaches market participants and causes the price to increase from $20 to $80. Further suppose that in the absence of the alleged misconduct, the price would have increased from $10 to some amount less than $80. Under these circumstances, the price is still inflated even after the price increase.

19. Inflation will dissipate over time as information that affects stock prices reaches the market which dissipates the false expectations that market participants formed due to the alleged misconduct. For instance, earnings announcements can cause market participants to revise downward prior expectations of future cash flows that were based on information generated by the alleged misconduct. However, subsequent information that affects stock prices need not eliminate the effect of previous information about the stock. When new information is revealed, both the new and the old information will be incorporated into stock prices. Inflation in a stock's price completely dissipates only when the alleged misconduct no longer has any effect on the market price. How much a given Issuer's stock price was inflated and how long the inflation lasted are empirical questions.

20. These points can be illustrated by reference to price movements in the stock of FirePond Inc. ("FirePond"). Exhibit B displays stock prices for FirePond in the months after its IPO. FirePond stock was offered at $22 per share, but closed at $100.25 per share on the first day of trading, February 4, 2000. As discussed below, FirePond's return on the first day was unusually high. This price increase is consistent with Plaintiffs' claim that the alleged misconduct artificially inflated FirePond's stock price. Price charts for the other five Focus Cases are collected in Exhibit C. The price movements of those stocks are also consistent with Plaintiffs' claims.

21. Between February 4, 2000 and February 16, 2000, FirePond's stock price declined to $70.875. FirePond's stock price also declined from $97.438 on February 29, 2000 to $15.75 on May 23, 2000, and from $40.688 on June 29, 2000 to $6.688 on December 6, 2000. These declines in FirePond's stock price are consistent with dissipation of some of the inflation.... Investors who purchased shares of FirePond at inflated prices and subsequently sold them when the price was less inflated suffered losses due to the inflation and subsequent dissipation. These losses would be directly attributable to the alleged misconduct since it was the alleged misconduct that caused the inflation and it was the dissipation of the inflation that caused at least some of the investors' losses. However, as discussed above, these price declines do not establish that the stock price was no longer inflated as of December 6, 2000. Indeed, as discussed below, the long-run performance of the company's stock supports the conclusion that its price was artificially inflated by the alleged misconduct through December 6, 2000, and thereafter.[5]

22. FirePond's stock price increased from $70.875 at the close of trading on February 16, 2000 to $97.438 on February 29, 2000. FirePond's stock price also increased from $15.75 on May 23, 2000 to $40.688 on June 29, 2000. There is no reason to believe that the inflation of FirePond's stock price was eliminated during these periods, and, as discussed below, the evidence supports Plaintiffs' allegations that the inflation continued through December 6, 2000 and beyond.

### IV. THE EMPIRICAL EVIDENCE SUPPORTS PLAINTIFFS' ALLEGATIONS THAT THE PRICES OF THE RELEVANT SECURITIES WERE ARTIFICIALLY INFLATED BY THE ALLEGED MISCONDUCT THROUGH DECEMBER 6, 2000, AND THEREAFTER

**A.** *The Price Movements of the Focus Case Stocks around the Time of Their IPOs Support Plaintiffs' Allegations*

23. Based on the allegations made by Plaintiffs, one would expect that Issuers' stocks would experience unusually large price increases around the time of their IPOs. This is exactly what happened. Exhibit D displays the initial returns experienced by each of the six Focus Case stocks at their IPOs. (An "initial return" is the return measured from a stock's issue price at the IPO to the price as of the close of trading on the first day for which data are available.) The initial returns for the six Focus Case stocks were unusually high. The initial return on shares of FirePond was 356 percent. Shares of VA Linux Systems Inc. experienced an initial return of 698 percent. The other Focus Case stocks also had unusually high initial returns, ranging from 49 percent (iXL Enterprises Inc.) to 386 percent (Sycamore Networks Inc.). The initial return to each of the six Focus Case stocks was far higher than the historical average. As the exhibit shows, the average initial return for stocks that had an IPO in the years before the Relevant Time Period, from 1980 through 1997, was only 12 percent.

### B. *The Long-Run Price Performance of the Focus Case Stocks Supports Plaintiffs' Allegations*

24. Plaintiffs' allegations also imply that Issuers' stock prices should have declined relative to the prices of otherwise comparable stocks as information about Defendants' alleged misconduct and information about the true value of Issuers' shares was revealed over time. Again, this is exactly what happened.

25. The six Focus Case stocks substantially underperformed the market and various indices after their IPOs. Exhibits E through J display the returns on the six Focus Case stocks beginning with the close of trading on the first day for which data are available and extending over the period for which data are available. (CRSP stock price data are currently available through December 31, 2002.) Also shown are the returns on various indices over the same period. Included are a broad market index (a value-weighted index of NYSE, AMEX, and NASDAQ stocks), an index of NASDAQ stocks, and four indices of technology stocks.

26. The exhibits show that each of the six Focus Case stocks performed more poorly than each of the indices over the various periods. The stock of FirePond lost almost 100 percent of its value over the period while the return on the broad market index over the same period was -37 percent. The NASDAQ index and the technology stock indices had returns ranging from -68 percent to -73 percent over the same period. Hence, the stock of FirePond underperformed the various benchmarks by 27 percentage points to 63 percentage points. The other Focus Case stocks underperformed the benchmarks by similar amounts. Corvis Corp. underperformed by 27 to 64 percentage points, Engage Technologies Inc. by 35 to 72 percentage points, iXL Enterprises Inc. by 63 to 99 percentage points, Sycamore Networks Inc. by 32 to 68 percentage points, and VA Linux Systems Inc. by 30 to 66 percentage points.

### C. *The Empirical Evidence Supports Plaintiffs' Allegations of Continued Price Inflation in the Six Focus Case Stocks after December 6, 2000*

27. The publication of the Wall Street Journal article on December 6, 2000 (and other similar articles on other dates) does not establish that inflation in the Issuers' stock prices ended on or before December 6, 2000. The Wall Street Journal article of December 6, 2000 did not discuss all of the 310 stocks that are the subject of this litigation and did not mention any of the six Focus Case stocks. Indeed, the December 6, 2000 article mentioned only a handful of IPO stocks by name. Further, the article did not disclose the full extent of the Tie-in Agreements and the Undisclosed Compensation. See Exhibit K.

28. Moreover, numerous investigations into Defendants' alleged misconduct were conducted after December 6, 2000. For instance, the SEC, the U.S. attorney's office in Manhattan, and the NASD had investigations that extended well beyond December 6, 2000.[6] Indeed, as late as October 16, 2003, the SEC was reportedly investigating wrongdoing in the allocation of shares in the IPO of Corvis Inc.[7]

29. The empirical evidence is consistent with ongoing inflation in the six Focus Case stocks after December 6, 2000. Exhibits L through Q show returns of the six Focus Case stocks after December 6, 2000. The exhibits display the return on each of the six stocks beginning with the close of trading on December 6, 2000 and continuing through December 31, 2002 or the last day for which stock price data are available. The returns on various indices over comparable periods are also shown for each stock. The exhibits show that each of the six Focus Case stocks underperformed each of the indices by a wide margin after

In re: INITIAL POBLIC OFFERING SEC., 2004 WL 3943323 (2004)

December 6, 2000. The stock of FirePond had a return of-96 percent while the return on the broad market index over the same period was -31 percent. The NASDAQ index and the technology stock indices had returns of-52 to -63 percent over the same period. Hence, the stock of FirePond underperformed the various benchmarks by 33 to 65 percentage points. The other Focus Case stocks underperformed the indices by similar amounts. Corvis Corp. underperformed by 35 to 67 percentage points, Engage Technologies Inc. by 34 to 68 percentage points, iXL Enterprises Inc. by 36 to 62 percentage points, Sycamore Networks Inc. by 32 to 64 percentage points, and VA Linux Systems Inc. by 26 to 58 percentage points.

**Footnotes**

[1] I understand that not all Class Periods begin at the IPO. For example, I understand that DoubleClick's proposed Class Period begins after its IPO.

[2] I understand that Plaintiffs also challenge the pricing of the IPOs.

[3] My work in this case is ongoing and I expect to supplement my analysis as relevant information becomes available.

[4] Although ongoing misconduct is not necessary to maintain inflation, I understand that Plaintiffs allege that the Defendants' failure to disclose constituted wrongdoing that persisted beyond December 6, 2000.

[5] As explained below, the analysis of long-run performance takes into account the performance of the overall stock market as well as the performance of technology stocks during the relevant periods.

[6] *See e.g.,* Susan Pulliam & Randall Smith, "Linux Deal Is Focus of IPO-Commission Probe," Wall Street Journal, December 12, 2000; Susan Pulliam & Randall Smith, "CSFB's Defense: We Didn't Break IPO Rules," Wall Street Journal, June 12, 2001.

[7] *See e.g.,* Gary McWilliams & Deborah Solomon, "Executives on Trial: SEC Looks at Corvis IPO Allocation," Wall Street Journal, October 16, 2003.

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.