# EXHIBIT 34

# EFFICIENT CAPITAL MARKETS, THE CRASH, AND THE FRAUD ON THE MARKET THEORY

*Daniel R. Fischel* †

An individual asserting a common law fraud claim must prove reliance on the challenged misstatement. Proof focuses on the effect of the challenged statement on the individual bringing the claim. The fraud on the market theory, developed in class action litigation under section 10(b) of the Securities Exchange Act of 1934,[1] and its accompanying Rule 10b-5,[2] has shifted the focus from the individual plaintiff to whether a challenged disclosure affected the market as a whole.

The fraud on the market theory has revolutionized securities fraud litigation. It has also been of particular interest to scholars because courts have expressly based their acceptance of the theory not on the legislative history of the securities laws but rather on the academic support for the efficient markets hypothesis.[3] Many believe, however, that the stock market crash of October 1987 has cast doubt on the concept of efficient capital markets. Thus it is useful to examine the relationship between the efficient markets hypothesis and the crash and the continuing validity of the fraud on the market theory after the crash. That is the purpose of this essay.

I begin in Part I with a brief description of the use of the fraud on the market theory in securities fraud litigation and the development of the theory in the courts. In Part II, I analyze the effect of the October 1987 stock market crash on the concept of efficient capital markets and the fraud on the market theory. Finally, in Part III, I analyze certain aspects of the recent Supreme Court decision in *Basic Inc. v. Levinson*[4] where the Court endorsed the theory by a vote of four to two with three Justices not participating.

---

† Lee and Brena Freeman Professor of Law, The University of Chicago; Professor of Law and Business, The University of Chicago Graduate School of Law and Business.

1   15 U.S.C. § 78j(b) (1982).

2   17 C.F.R. § 240.10b-5 (1987).

3   *See, e.g., In re* LTV Sec. Litig., 88 F.R.D. 134, 144 (N.D. Tex. 1980) (citing studies). For academic commentary on the fraud on the market theory, see Black, *Fraud on the Market: A Criticism of Dispensing with Reliance Requirements in Certain Open Market Transactions*, 62 N.C.L. REV. 435 (1984); Fischel, *Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities*, 38 BUS. LAW. 1 (1982); Note, *The Fraud-on-the-Market Theory*, 95 HARV. L. REV. 1143 (1982).

4   108 S. Ct. 978 (1988).

I

THE FRAUD ON THE MARKET THEORY

A.   The Use of the Theory in Securities Fraud Litigation

Plaintiffs in securities fraud litigation initially advanced the fraud on the market theory in seeking to satisfy the reliance requirement for purposes of class certification. The relationship between the theory and the reliance requirement is straightforward. Most investors do not read the documents or hear the speech alleged to contain disclosure defects. Interpreting the reliance requirement to mean that investors actually be familiar with the challenged statement makes it difficult for most investors to satisfy the requirement. Additionally, the need for detailed individual inquiry into which investors relied on the challenged statement decreases the probability that any proposed class will satisfy the commonality requirement necessary for class certification.

The fraud on the market theory avoids these problems by interpreting the reliance requirement to mean reliance on the integrity of the market price rather than reliance on the challenged disclosure. By interpreting the requirement in this manner, lack of familiarity with the challenged disclosure becomes irrelevant. Instead the relevant issue becomes the effect of the challenged disclosure on the market price or, in the jargon of securities litigation, whether the challenged disclosure artificially inflated (deflated) the market price of the particular security. Inquiry into whether the market price was inflated (deflated) replaces individualized inquiry into the extent to which particular investors were aware of a challenged disclosure. Moreover, this new inquiry goes to the merits of the case and is not decided at the class certification stage. Thus, the development of the fraud on the market theory has effectively eliminated the reliance requirement as a barrier to class certification.

The extent to which the fraud on the market theory represents a departure from the common law fraud model, however, should not be exaggerated. Even at common law, a plaintiff must show more than mere reliance on a misstatement; he must show objectively reasonable reliance. The fraud on the market theory can be interpreted as defining whether an individual's reliance was reasonable under the ultimate objective standard—whether investors as a whole were fooled.

Apart from the proper interpretation of the reliance requirement, the fraud on the market theory has other important implications in securities fraud litigation. Market professionals obtain information about particular securities from multiple sources. These sources include disclosures by the firm, analyst reports, and stories in the trade and financial press. For this reason, the extent

to which a challenged disclosure results in an artificial inflation of price—a fraud on the market—cannot be determined solely by reference to the accuracy of the disclosure itself. Market participants may have learned the truth from other sources. Analogously, if financial results are questioned, it is not sufficient to determine whether the results were reported according to conventionally accepted accounting principles. Investors may see through incorrect accounting or again figure out the truth from other sources of information. In this event, no injury occurs because market participants have not been fooled—there has been no fraud on the market.

Thus, the fraud on the market theory has profound implications for securities fraud litigation far beyond reformulation of the reliance requirement. The fundamental question in securities fraud litigation is whether a challenged disclosure has caused investors to suffer an injury and if so, by how much. This question can be recast as whether a fraud on the market has occurred and if so, to what extent. Indeed, inquiry into materiality, causation, and damages, as well as reliance, is subsumed into the question of whether, and to what extent, a fraud on the market has occurred.[5]

The importance of the fraud on the market theory is best illustrated by an example. Suppose that on February 1, 1983, an American company, Waste, Inc., announces that it has entered into a contract with the government of Saudi Arabia for the provision of waste management services. The press release states that Saudi Arabia will pay Waste, Inc. $1 billion over a three year period. The contract also contains a provision allowing the Saudis to terminate for convenience; this provision is not disclosed in the press release. On December 1, 1983, the Saudis terminate the contract. On December 2, Waste, Inc.'s stock price is $20 as compared with $30 before the announcement of the contract on February 1. Plaintiffs file a class action lawsuit under the securities laws alleging that the failure to disclose the termination provision was materially misleading and resulted in Waste, Inc.'s stock price being artificially inflated by $10, the difference between $30 and $20.

The fraud on the market theory enables the plaintiffs to satisfy the reliance requirement without proving that investors read the press release. Instead, plaintiffs need only allege that they relied on the integrity of the market price which was artificially inflated by the materially misleading press release. But, as discussed above, because the theory shifts emphasis to the effect of the challenged disclosure on the market as a whole, rather than on particular plaintiffs,

---

[5]   This point is discussed at length in Fischel, *supra* note 3.

the impact of the theory extends far beyond the reliance requirement.

Plaintiffs in this hypothetical lawsuit contend that investors were fooled by the absence of explicit disclosure of the termination provision in the press release. Whether investors were in fact fooled by the alleged omission—whether the omission was material—can be tested directly, however, by analyzing relevant stock price movements and other information available to investors. If on March 1 a second press release disclosed the termination provision and Waste, Inc.'s stock price fell (did not fall) by a statistically significant amount, then the omission was probably (probably not) material.[6] Analysis of other sources of information also sheds light on the materiality issue. The more (less) widespread the understanding in analysts reports and the financial press that the Saudis had the right to terminate, the less (more) likely the alleged omission was material.

Analysis of stock price movements also makes it possible to test whether the decline in Waste, Inc.'s stock price was caused by the disclosure of the termination provision allegedly withheld in the original process release, or whether other factors were responsible for the decline. Any stock price movement attributable to disclosure of the termination provision can be calculated as damages[7] provided the information could have been disclosed in the original press release and the other requirements of the securities laws are satisfied.[8] Conversely, stock price movements attributable to other factors should be excluded from damages.

## B. The Relationship Between the Fraud on the Market Theory and Efficient Capital Markets

The efficient capital markets hypothesis posits that stock prices quickly reflect information without bias. The three forms of the hy-

---

[6] Note that the price reaction to disclosure of termination of the contract, even if statistically significant, does not establish the materiality of the failure to disclose the termination provision. The reason is that the certainty of cancellation is a different piece of information than the possibility of termination. Even if the market as a whole was fully aware of the possibility of termination, disclosure of actual termination could cause Waste, Inc.'s stock price to decline.

[7] Although it is customary to calculate damages in securities fraud cases in this manner, an argument could be made that damages should focus on disgorgement of the gains obtained by those perpetrating the fraud rather than on losses suffered by certain investors. For a discussion of the choice between disgorgement versus loss-based measures of damages, see Easterbrook & Fischel, *Optimal Penalties for Securities Offenses*, 52 U. Chi. L. Rev. 611 (1985).

[8] For example, plaintiffs will have to satisfy the scienter requirement—the requirement that the alleged omission be made with an intent to defraud or with extreme recklessness tantamount to an intent to defraud. *See* Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976).

pothesis differ on what type of information is reflected in prices: the weak form of the hypothesis holds that past price movements are incorporated in prices; the semi-strong form suggests that publicly-available information is reflected in prices; and the strong form posits that all information from whatever source is fully incorporated in prices. The empirical evidence to date (with some exceptions) appears to establish the validity of the weak and semi-strong versions but not the strong form of the efficient capital markets hypothesis.[9]

The link between the concept of efficient capital markets and the fraud on the market theory is clear. The central premise of the fraud on the market theory is that prices of actively-traded securities reflect publicly-available information. This premise is roughly equivalent to the semi-strong version of the efficient capital markets hypothesis. Not surprisingly, courts adopting the fraud on the market theory have alluded to the empirical studies establishing the validity of the semi-strong version of the efficient capital markets hypothesis for support.[10]

To illustrate why the fraud on the market theory depends on prices reflecting publicly-available information, consider a face-to-face transaction where Smith offers to sell a piece of land in another state to Jones for $1000. The potential purchaser, Jones, has no reason to rely on the integrity of the $1000 price offered by Smith. That price may or may not reflect information concerning the value of the land. It is perfectly possible, for example, that market professionals believe the land is worth only $500 but the judgment of these professionals will not be reflected in Smith's offer to Jones.

Now, consider the difference between the above example and a transaction involving actively-traded securities. Market prices of actively-traded securities are much more likely to reflect relevant information about those securities because of the continuous buying and selling decisions of investors. Thus if a consensus among market professionals exists that a particular type of land owned by a publicly-traded real estate company is worth a certain amount, this consensus will be reflected in the company's stock price. Because market prices of actively-traded securities do reflect publicly-available information, it is rational for many investors to accept the market price as given. For the same reason, investors are harmed if they purchase securities at prices which reflect false information as a result of disclosure defects.

---

9    For a useful summary of the theory and evidence, see Gilson & Kraakman, *The Mechanisms of Market Efficiency*, 70 VA. L. REV. 549 (1984) (citing studies).

10    *See, e.g., In re* LTV Sec. Litig., 88 F.R.D. 134, 144 (N.D. Tex. 1980) (citing studies).

The critical difference between face-to-face transactions and transactions involving actively-traded securities, in sum, is the presence or absence of reliable market prices reflecting information possessed by diverse sets of traders. Where such market prices exist, as in the case of actively-traded securities, investors are protected by purchasing (or selling) at the market price. Where such prices do not exist, as in the case of face-to-face transactions, it is not reasonable to rely on the offer price as incorporating relevant information about the value of the underlying asset. While the difference between these two polar cases is fairly clear, there will be many situations that fall somewhere in the middle. No clear answer exists to the question of how much and how quickly information has to be incorporated into prices for the fraud on the market theory to apply.

The most that can be said is that the more rapidly prices reflect publicly-available information, the more sensible it is to apply the theory. Factors which will be relevant in analyzing how rapidly prices reflect information include whether the security is listed on a national exchange, whether it is actively traded, and whether it is followed by analysts and other market professionals. In addition, the speed of price adjustment to new information can be tested directly by use of widely-accepted statistical techniques.[11] Nevertheless, there will inevitably be some marginal cases where the applicability of the fraud on the market theory is unclear.

## II
### The Fraud on the Market Theory After the Crash

A dramatic unanticipated event always causes some reexamination of generally accepted wisdom; the crash is no exception. Thus, it is worthwhile to examine the effect of the crash on the fraud on the market theory. Before doing so, however, it is necessary to analyze the concept of efficient capital markets more carefully.

### A. The Meaning of an Efficient Capital Market

Much of the discussion of efficient capital markets suffers from ambiguity concerning what characteristics capital markets must satisfy to be considered "efficient." At least two definitions of "efficient" capital markets exist. The first, as discussed in Part I, focuses on the speed with which market prices reflect publicly-available in-

---

[11]   For illustrative studies using statistical techniques to measure the speed of price adjustment, see Dann, Mayers & Raab, Jr., *Trading Rules, Large Blocks and the Speed of Price Adjustment*, 4 J. Fin. Econ. 3 (1977); Jennings & Stark, *Information Content and the Speed of Stock Price Adjustment*, 23 J. Acct. Res. 336 (1985); Patell & Wolfson, *The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Announcements*, 13 J. Fin. Econ. 223 (1984).

formation and whether the price reaction to new information is without bias. Under this definition, a market is efficient if it is impossible to devise a trading rule that systematically outperforms the market (net of transaction costs) absent possession of inside information. In this essay, I refer to this definition as "trading-rule efficiency." There is general consensus that capital markets that list actively-traded securities are trading-rule efficient.[12]

The second definition of efficient capital markets focuses on the extent to which security prices reflect the present value of the net cash flows generated by a firm's assets. I refer to this definition of efficiency as "value efficiency."

John Maynard Keynes originated the view that stock markets are not value efficient because factors other than judgments concerning the value of underlying assets influence security prices.[13] Keynes analogized the stock market to a beauty contest where traders, like those trying to predict the winner of a beauty contest, base their decisions not only on what they think, but also on what they believe others are thinking. Just as someone trying to predict the winner of a beauty contest will consider his judgment of relative beauty as well as his belief concerning how others will assess relative beauty, Keynes argued, so too will traders consider their judgment about the value of the asset and their beliefs about how others will value the asset. This model of security prices as driven by the expectations of other traders has gained adherents in recent years.[14]

Adherents of the expectations model face several logical difficulties. First, why should the expectations of other traders be based on anything other than their judgments concerning the present value of future net cash flows? Second, why shouldn't it be assumed that beliefs of traders who base their judgments on other factors are random, thus cancelling each other out? As a response to these conundrums, some economists have posited the existence of a class of uninformed and unsophisticated traders who are influenced by fads, mob psychology, and similar factors.[15] These uninformed or noise traders who are motivated by factors other than the present value of

---

[12]   Some studies suggest that certain anomalous situations exist where it may be possible to devise a trading rule and outperform the market. Examples of these anomalies include the small firm effect, the low price earnings ratio effect, and the January effect. Many of these anomalies seem to disappear, however, when risk and transactions costs are taken into account. For a summary of the evidence, see T. COPELAND & J. WESTON, FINANCIAL THEORY AND CORPORATE POLICY 221-48 (1983).

[13]   *See* J. KEYNES, THE GENERAL THEORY OF EMPLOYMENT, INTEREST AND MONEY (1936).

[14]   For a summary of the literature in this area see C. CAMERER, BUBBLES AND FADS IN ASSET PRICES: A REVIEW OF THEORY AND EVIDENCE (University of Pennsylvania Working Paper No. 87-09-03 1987).

[15]   *Id.*

future net cash flows create the possibility of speculative bubbles and other departures from pricing based on the underlying value of assets. Additionally, because of these noise traders, prices can change dramatically with a change in expectations—even with no change in the value of the underlying assets. For these reasons, the argument runs, noise traders prevent financial markets from being value efficient.

Unfortunately, no direct method exists for testing how closely prices reflect value because the "value" of an asset cannot be measured apart from its price. As a result, researchers have relied on indirect tests such as attempting to determine whether the variability of prices is greater than the variability of dividends over time. If prices are more variable than dividends, it might be argued that changes in prices cannot be explained by changes in underlying values and thus must be caused by noise traders. Thus far the results and the interpretation of these studies have been extremely controversial.[16]

For the sake of argument, assume that noise traders affect prices. The implications of this assumption for the concept of efficient capital markets, however, and value efficiency in particular, are still unclear. Value efficiency means that prices are typically the best indicators of underlying values (at least absent inside information). No evidence demonstrates that a better model exists for ascertaining the value of a publicly-traded firm's assets than looking at the prices of its securities.

The existence of noise traders who affect price does not imply that such a model exists. Noise traders cause prices to reflect factors such as mob psychology as well as underlying values. But so long as market participants cannot determine how much noise is contained in prices, knowing that prices reflect the expectations of noise traders will not lead to any superior method for ascertaining the underlying value of assets. In other words, the existence of noise traders increases volatility but does not create any detectable upward or downward bias in pricing. Prices are still the best indicators of value even assuming that they are noisier signals because of psychologically motivated traders.

The existence of noise traders implies nothing about the validity of trading-rule efficiency. Unless market participants can determine how much noise is contained in price, and can predict how the

---

16   *Compare* Shiller, *Do Stock Prices Move Too Much to be Justified by Subsequent Changes in Dividends?*, 71 AM. ECON. REV. 421 (1981) *with* Kleidon, *Bias in Small Sample Tests of Stock Price Rationality*, 59 J. BUS. 237 (1986); Kleidon, *Variance Bounds Tests and Stock Price Valuation Models*, 94 J. POL. ECON. 953 (1986) *and* Marsh & Merton, *Dividend Variability and Variance Bounds Tests for Rationality of Stock Market Prices*, 76 AM. ECON. REV. 483 (1986).

expectations of noise traders will change in the future, the existence of noise traders does not create a profitable trading rule. It is one thing to believe in speculative bubbles after prices have fallen; it is quite another to recognize one at the time.

In sum, the current debate over the relationship between noise traders and the concept of efficient capital markets is really a variant of the familiar Nirvana fallacy of comparing the imperfect to the ideal and concluding that the ideal dominates. The relevant question in determining whether capital markets are value efficient is not whether noise traders exist but rather whether there is a better proxy than market prices for the underlying value of a publicly-traded firm's assets. Or, to put the point differently, it takes a theory to beat a theory and thus far none exists.

One final caveat. I do not mean to suggest that prices are *always* the best predictor of underlying values or that there is never any role for other methods of valuation such as discounted cash flow analysis. Analysts and other market professionals constantly search for mispriced securities where prices do not reflect information concerning value. It is even possible that the premium paid in some takeovers or going private transactions occurs because prices do not reflect underlying values and this is discovered by resort to other valuation techniques.[17] That these valuation techniques are profitably used, however, is in no way inconsistent with the critical role of market prices as a proxy for underlying values. Indeed, the constant search by market professionals for mispriced securities is the mechanism whereby prices reflect information about underlying values. And, to emphasize again, the critical question is not whether market prices are always a perfect proxy for the underlying value of assets but whether a better proxy exists on a consistent basis. Thus far the answer to this critical question is no.

B. The Crash and Efficient Capital Markets

On October 19, 1987, the Dow Jones Industrial Average fell by 508 points or 22 percent. For the slightly longer period between the close of trading on October 13, 1987, and the close on October 19, 1987, the Dow fell 769 points or 31 percent. To date, no convincing explanations of this dramatic decline exist. The dramatic nature of the decline, coupled with the absence of any convincing explanation for it, has led many to suggest that the crash calls into question the continuing validity of the efficient capital markets hypothesis.

---

[17]   The evidence demonstrates, however, that undervaluation is not a convincing explanation for most corporate control transactions. *See* Bradley, Desai & Kim, *The Rationale Behind Interfirm Tender Offers: Information or Synergy*, 11 J. FIN. ECON. 185 (1983).

It is not obvious, however, why this should be true. Consider the first type of efficiency, trading rule efficiency. Nobody has argued that the crash created a profitable trading rule that did not exist before. Both before and after the crash, prices appeared to incorporate publicly-available information, making it highly unlikely that a profitable trading rule would exist.

Now consider value efficiency. Admittedly, the absence of any new information concerning the value of assets in the economy that can plausibly explain the stock market crash is frustrating.[18] On the other hand, economists are still arguing about why the stock market crashed in 1929, so it is hardly surprising that no obvious explanation exists for the crash of 1987. Moreover, the mystery of what caused the 1987 crash poses the same problem for those who hold the expectation-driven Keynesian view of the stock market. Just as there does not appear to be any new information concerning the value of assets that can plausibly explain the stock price decline, nor does there appear to be any new information concerning the psychology or expectations of other traders. Finally, and most importantly, the crash does not imply that any better model exists for determining security prices than the present value of future cash flows generated by a firm's assets. For this reason, the crash, properly interpreted, has no implications for value efficiency, or, more generally, for the concept of efficient capital markets.

Several other points about the crash should also be made. First, as documented by Richard Roll,[19] the worldwide nature of the crash is inconsistent with various popular explanations which attribute the crash to program trading, futures markets, portfolio insurance, and similar institutional arrangements that exist only in a few markets. Second, the fact that prices fluctuated around the post-crash level for an extended period of time suggests that the crash was not an overreaction but a movement to a new equilibrium level. This is desirable whether the crash was caused by a change in fundamentals or a bursting of a speculative bubble. Thus, regulatory policies designed to prevent prices from falling in a similar manner in the future appear to be misguided. Indeed, under the speculative bubble theory, the problem is the gradual price rise during 1987[20]

---

[18]   For an argument that the crash is consistent with the traditional understanding of efficient capital markets even if the cause of the crash cannot be identified, see Fama, *Perspectives on October 1987, or, What Did We Learn From the Crash,* in BLACK MONDAY AND THE FUTURE OF FINANCIAL MARKETS 71 (R. Kamphuis, R. Kormendie and J.W. Watson eds. 1989).

[19]   *See* Roll, *The International Crash of October 1987,* in BLACK MONDAY AND THE FUTURE OF FINANCIAL MARKETS 35 (R. Kamphuis, R. Kormendie and J.W. Watson eds. 1989).

[20]   On August 25, 1987, the Dow Jones Industrial Average reached a record high close of 2,722, having risen by more than 40% during the year.

before the crash, not the crash itself. I am unaware of any regulatory proposals, however, that have as their goal the elimination of gradual price rises in the future.

## C.   The Crash and the Fraud on the Market Theory

The above discussion of market efficiency and the crash shows that the crash does not provide a basis for rejecting the fraud on the market theory. That American capital markets where publicly-traded securities are listed are trading-rule efficient is a proposition that was generally accepted before the crash and has not been questioned since. This means that before and after the crash, publicly-available information, including false information, is incorporated in stock prices with the corollary that investors who purchase (sell) at artificially inflated (deflated) prices are injured. This is true whether or not prices reflect noise created by the expectations of other traders.

The implications of the theory for materiality, causation, and damages are also unaffected by the crash. The reason is that the effect of an alleged disclosure defect on price can be analyzed without having to resolve the extent to which noise traders affect price. For example, one could confidently conclude that the stock price decline on October 18, 1987 of any particular security was in all probability not caused by the revelation of a fraud, but rather by the collapse of the market as a whole, without having to resolve whether the crash was caused by new information concerning fundamentals or the bursting of a speculative bubble. The same would be true in cases involving other alleged speculative bubbles. Thus it would be relevant in a hypothetical securities suit against a hula-hoop company, which first sold at significant multiples of earnings and then went bankrupt, that other hula-hoop companies also cratered when the public lost its taste for the companies' product. In short, by analyzing the timing of stock price movements both in response to particular pieces of information and in comparison with those of other firms, it is possible to identify factors influencing stock price movements other than alleged disclosure defects even if the factors themselves are not understood completely.

## III

### BASIC INC. V. LEVINSON

In *Basic Inc. v. Levinson*,[21] a plurality of the United States Supreme Court in an opinion written by Justice Blackmun held that courts should apply a rebuttable presumption that investors in pub-

---

[21]   108 S. Ct. 978 (1988).

lic securities markets rely on the integrity of the market price.[22] Justice White, joined by Justice O'Connor, dissented;[23] three Justices did not participate.[24] Thus, a majority of the Court has not yet passed on the validity of the fraud on the market theory creating the possibility that the Court might consider the issue again in the near future. For this reason, it is particularly appropriate to examine the arguments of the two dissenting Justices who criticized application of the theory in securities cases. The dissent's three principal arguments are discussed below.

## A. The Claim that the Fraud on the Market Theory is an Investor Insurance Scheme

The plurality opinion emphasized that courts should apply a rebuttable, not conclusive, presumption that investors relied on the integrity of the market price: "Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance."[25] The plurality discussed situations where the market price was not artificially inflated because the truth was available from other sources, and situations where investors would have traded anyway regardless of price as examples where the link would be severed and the presumption of reliance rebutted.[26]

The two dissenting Justices agreed with the plurality that the presumption of reliance should be rebuttable, but argued that "such rebuttal is virtually impossible in all but the most extraordinary case."[27] Since the presumption will for all practical purposes be non-rebuttable, the dissent concluded that the plurality's endorsement of the fraud on the market theory would operate as "an investor insurance scheme."[28]

The dissent correctly doubted the probability of rebutting the presumption of reliance. Consider the two situations where the plurality stated the presumption would be rebutted. In the first situation where the market price is not artificially inflated because the truth becomes known from other sources, it is inaccurate to suggest that the presumption of reliance is rebutted. In fact, the example has nothing to do with reliance. Investors do not rely any less on the market price because that price has not been artificially inflated.

---

22   *Id.* at 991.
23   *Id.* at 993 (White, J., concurring in part and dissenting in part).
24   *Id.*
25   *Id.* at 992.
26   *Id.*
27   *Id.* at 996 n.7 (White, J., concurring in part and dissenting in part).
28   *Id.* at 996.

It would be more accurate to characterize this situation as one where no fraud on the market occurred.

The second example used by the plurality—investors believe the market price is artificially inflated but transact anyway—is conceivable but extremely unlikely. Purchasing (selling) securities at artificially inflated (deflated) prices means that the investment has a negative expected return. The number of situations where investors expect to lose money but transact anyway notwithstanding the plethora of alternative investments is surely going to be trivial.[29] Thus the presumption of reliance, as the dissent claimed, is for all practical purposes non-rebuttable.

Nevertheless, it does not follow that an effectively non-rebuttable presumption of reliance creates investor insurance. Investors' ability to claim that they relied on the integrity of the market price helps to obtain class certification but in no way establishes the merits of the underlying claim. Plaintiffs must still establish that the alleged disclosure defect artificially inflated the market price and, if so, by how much. Given the multiple alternative sources of information and the sophistication of market professionals, this task will frequently be difficult even if plaintiffs can establish that less than a model disclosure was made. Thus, the fraud on the market theory in no way creates an investor insurance scheme when all of the theory's implications are considered.

## B. The Claim that the Fraud on the Market Theory is Logically Inconsistent

The dissent further argued that the fraud on the market theory's reliance on the integrity of the market price as a reflection of value is logically flawed. The difficulty with this concept, according to the dissent, is that "it implicitly suggests that stocks have some 'true value' that is measurable by a standard other than their market price."[30] Moreover, the dissent argued that even if securities have some "value" apart from market price, investors do not always assume that a stock's price is a reflection of this value. Rather, the dissent stressed, investors frequently base their investment decision on a belief that stock prices do not reflect value perfectly.[31] Other-

---

[29]  For purposes of this point, it is useful to distinguish between purchases at inflated prices and sales at depressed prices. It is for all practical purposes inconceivable that an investor would knowingly pay too much for a security given the infinite number of alternative investments. In the sale situation, by contrast, it is conceivable that an investor with limited access to capital markets might be forced to sell at too low a price for liquidity reasons.

[30]  108 S. Ct. at 996 (White, J., concurring in part and dissenting in part).

[31]  *Id.*

wise, in many cases particular stocks would not have been purchased or sold.

These points are correct but have nothing to do with the fraud on the market theory. The theory does not posit that there is some "true value" of an asset other than its price. On the contrary, the theory assumes that market price is the best indicia of value which makes it all the more important that this price not be distorted by fraudulent information. For this reason, the theory is far superior to other valuation methods sometimes used by courts in corporate and securities litigation that ignore the critical role of market prices.[32]

Similarly, the theory does not depend on the assumption that all investors accept the market price as a perfect predictor of value or, more accurately, future prices. Some investors search for mispriced securities. But any such search necessarily involves a comparison between current prices and expected future prices. For this reason, these investors, like passive investors, rely on the integrity of the market price as not distorted by fraud. Indeed, one of the main economic justifications for antifraud rules is that such rules minimize wasteful search.[33] Thus there is no tension between the existence of investors who do not accept the market price as a perfect predictor of future prices and the fraud on the market theory.

## C. The Claim that the Fraud on the Market Theory is Judicial Legislation Inconsistent with Congressional Intent

Finally, the dissent argued that the fraud on the market theory represents an attempt "to reconfigure the securities laws, based on recent economic theories,"[34] particularly the efficient capital markets hypothesis. Moreover, the dissent stressed that the plurality's willingness "to embrace novel constructions of a statute based on contemporary microeconomic theory"[35] was particularly unfortunate because the fraud on the market theory "is at odds with the federal policy favoring disclosure"[36] embodied in the mandatory disclosure system. Thus, the dissent concluded, the fraud on the market theory should be adopted, if at all, by Congress and not the federal courts.

This claim is misguided as well. Congress did not provide any express private right of action under either section 10(b) or Rule

---

[32] For a fuller discussion of this point, see, e.g., Fischel, *The Business Judgment Rule and the Trans-Union Case*, 40 Bus. Law. 1437 (1985); Fischel, *The Appraisal Remedy in Corporate Law*, 1983 Am. Bar. Found. Res. J. 875 (1983).

[33] *See* Easterbrook & Fischel, *Mandatory Disclosure and the Protection of Investors*, 70 Va. L. Rev. 669 (1984).

[34] 108 S. Ct. 995 (White, J., concurring in part and dissenting in part).

[35] *Id.* at 994.

[36] *Id.* at 997.

10b-5; courts have implied one. Thus, courts must decide what the contours of this private right of action will be. Because Rule 10b-5 is an antifraud provision, courts have looked to the common law of fraud for guidance. As discussed above, the fraud on the market theory can be understood as an embodiment of the common law requirement of reasonable reliance where reasonableness is defined by the ultimate objective standard—whether the market as a whole was fooled. All courts of appeals that have faced the question have adopted some version of the fraud on the market theory.[37] Thus, it is inaccurate to characterize the theory as a radical change in the securities laws. The theory is judicial legislation only in the sense that all interpretation of Rule 10b-5 is judicial legislation.

Nor is it accurate to suggest that federal courts should refuse to embrace the theory because it is based on untested economic principles and assumptions. First, there is nothing unusual about economic theories influencing legal doctrines. For example, the legal understanding of the range of anticompetitive practices under the antitrust laws is very much influenced by economic principles. Indeed, it is hard to understand how antitrust law could be given any content without reliance on economic theories. Moreover, the economic premises underlying the fraud on the market theory are not novel or untested. The opposite is true. As discussed above, there is widespread consensus that the prices of actively-traded securities quickly reflect publicly-available information. Whatever debate exists concerning the concept of efficient markets does not undermine the logic of the theory.

Finally, the theory is not inconsistent with the federal policy favoring disclosure embodied in the mandatory disclosure system. The justification for the mandatory disclosure system is that firms are the lowest cost producers of information about themselves and may have inadequate incentives to disclose relevant information voluntarily.[38] The fraud on the market theory does not weaken firms' incentive to disclose accurate information to investors. Rather, the theory penalizes fraudulent disclosures to the marketplace regardless of investors' familiarity with the particular challenged disclosure. Moreover, the theory does not weaken investors' incentives to search for mispriced securities for reasons other than detecting fraud. Finally, to the extent that the theory eliminates the need to become informed to be eligible for recovery if fraud is demonstrated, this is desirable. No reason exists why investors should be given incentives to invest resources to become informed solely for

---

[37]  *Id.* at 991 n.25 (collecting cases).
[38]  For a discussion of the costs and benefits of the mandatory disclosure system see Easterbrook & Fischel, *supra* note 33.

the purpose of being able to sue for securities fraud. On the contrary, the elimination of such incentives with the resulting avoidance of expenditures is one of the benefits of the fraud on the market theory.

## CONCLUSION

The fraud on the market theory, explicitly premised on the concept of efficient capital markets, has revolutionized securities fraud litigation. The crash, properly understood, provides no basis for rejecting the fraud on the market theory.