# Exhibit 11

In re: NIO, Inc., Securities Litigation, Docket No. 1:19-cv-01424 (E.D.N.Y. Mar 12, 2019), Court Docket

## Multiple Documents

| Part | Description |
|------|-------------|
| 1 | 122 |
| 2 | Declaration of Laurence Rosen in Further Support of Plaintiffs' Motion for |
| 3 | Exhibit 1 |
| 4 | Exhibit 2 |
| 5 | Exhibit 3 |
| 6 | Exhibit 4 |
| 7 | Exhibit 5 |
| 8 | Exhibit 6 |
| 9 | Exhibit 7 |
| 10 | Exhibit 8 |
| 11 | Exhibit 9 |
| 12 | Exhibit 10 |
| 13 | Exhibit 11 |
| 14 | Exhibit 12 |
| 15 | Exhibit 13 |
| 16 | Exhibit 14 |
| 17 | Exhibit 15 |
| 18 | Exhibit 16 |
| 19 | Exhibit 17 |
| 20 | Exhibit 18 |
| 21 | Exhibit 19 |
| 22 | Exhibit 20 |
| 23 | Exhibit 21 |
| 24 | Exhibit 22 |
| 25 | Exhibit 23 |
| 26 | Exhibit 24 |
| 27 | Exhibit 25 |

© 2023 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

In re: NIO, Inc., Securities Litigation, Docket No. 1:19-cv-01424 (E.D.N.Y. Mar 12, 2019), Court Docket

| 28 | Exhibit 26 |
|----|-----------|
| 29 | Exhibit 27 |
| 30 | Exhibit 28 |
| 31 | Exhibit 29 |
| 32 | Exhibit 30 |
| 33 | Exhibit 31 |
| 34 | Exhibit 32 |
| 35 | Exhibit 33 |

© 2023 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

Bloomberg Law®

# EXHIBIT 9

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| |
|---|
| *In re NIO, Inc. Securities Litigation* |

Case No. 1:19-cv-01424-NGG-JRC

REBUTTAL DECLARATION OF
DR. ADAM WERNER
December 23, 2022

## TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................1

II.    CONCLUSIONS....................................................................................................3

III.   CRITIQUE OF THE SABRY DECLARATION ..................................................3

       A.    Dr. Sabry's Criticisms of My Market Efficiency Analysis are Unfounded
             and Erroneous .........................................................................................6

             1.    The Event Selection Criteria in the Werner Declaration Was
                   Appropriate, and Correcting the Errors in Dr. Sabry's Collective
                   Test Analysis Undermines Her Conclusions .................................8

             2.    Dr. Sabry Mischaracterizes the Results of the Event Study in the
                   Werner Declaration ....................................................................14

             3.    Dr. Sabry Overstates the Results of Her Autocorrelation Analysis...........15

             4.    My Selection of an Industry Index was Appropriate, and Dr. Sabry
                   Failed to Identify a More Appropriate Alternative ......................17

             5.    NIO Possessed the Characteristics Relevant to F-3 Eligibility
                   During the Relevant Period...........................................................19

             6.    Dr. Sabry's Speculation that the Period between the IPO and the
                   Start of the Relevant Period Could be Inefficient is Irrelevant................21

       B.    Dr. Sabry's Price Impact Analysis is Flawed and Does Not Establish a
             Lack of Price Impact ..............................................................................22

             1.    Dr. Sabry Does Not Identify Any Information, Other than the
                   Alleged Corrective Disclosure, that Caused a Statistically
                   Significant Decline in the NIO ADS Price on March 7, 2019................23

             2.    The Termination of the Shanghai Facility Constructions Plans
                   Conveyed Negative Information About NIO to the Market ....................24

             3.    Analysts' Valuation Models Included The Shanghai Facility In
                   Projections of NIO's Profitability ...............................................26

             4.    The January 14, 2019, JPMorgan Analyst Report is Not a
                   Corrective Disclosure....................................................................30

       C.    Dr. Sabry's Criticisms of My Proposed Damages Methodology are
             Misguided and Premature Loss Causation Arguments...........................32

             1.    Dr. Sabry's Challenges to my Damages Methodology Concern
                   Potential Valuation Complexities, Which Can and Will be
                   Addressed in an Analysis of Loss Causation ...............................33

             2.    The Common Damages Methodology Handles All Purported
                   Valuation Complexities Raised by Dr. Sabry .............................35

IV.    LIMITING FACTORS AND OTHER ASSUMPTIONS....................................37

I, Adam Werner, declare and state, under penalty of perjury, that the following is true and correct to the best of my knowledge, information, and belief. If called to testify, I could and would testify competently to the following facts.

## I.    INTRODUCTION

1.    In my declaration dated June 21, 2022 ("June Declaration" or "Werner Declaration"), I examined factors that are generally accepted by courts as indicative of efficiency of the market in which a security trades. Based on my analysis of the factors, I concluded that the American Depositary Shares ("ADSs") of NIO Inc., ("NIO" or the "Company") traded in an efficient market during the period from October 8, 2018, through March 5, 2019, inclusive (the "Relevant Period").[1]

2.    In my June Declaration, I showed that each of the *Cammer* and *Krogman* factors supports a finding that the NIO ADSs traded in an efficient market throughout the Relevant Period.[2] I further demonstrated, through event study analysis, that the NIO ADSs reacted promptly to new Company-specific information as it entered the market.[3] Reacting promptly to new material information is indicative of the efficiency of the market in which the securities traded.

3.    In addition, I explained that a common damages methodology, consistent with Plaintiffs' theory of liability, can be applied to compute Section 10(b) damages for all investors who purchased NIO ADSs during the Relevant Period, and I described that methodology.[4] I

---

[1] Werner Declaration, Section III.

[2] Werner Declaration, ¶8 and Section V.

[3] Werner Declaration, ¶¶42-77.

[4] Werner Declaration, Section VI.A.

further described how Section 11 damages can be computed for investors who purchased certain NIO ADSs issued pursuant to the IPO.[5]

4.     Subsequently, I was asked by counsel for Plaintiffs, The Rosen Law Firm, to consider and evaluate the arguments and conclusions in the Declaration of Faten Sabry, Ph.D., dated October 17, 2022 (the "Sabry Declaration").

5.     In particular, I have evaluated and considered (a) Dr. Sabry's criticisms of the event study I performed, including its design, the regression parameters and my conclusion that the market for NIO's shares was efficient during the Relevant Period, (b) her opinion that the misrepresentations and omissions had no impact on NIO's share price, and (c) her criticisms of my opinion that damages may be calculated on a class-wide basis in this action.

6.     The documents I reviewed and relied upon in the course of this engagement that are in addition to those cited in my June Declaration are listed in Exhibit-2. My credentials and compensation are presented in my June Declaration. My full Vitae including testimony that I have provided since my June Declaration is attached as Exhibit-1 to this report.

7.     I understand that as an expert witness in this proceeding my duty in providing my report is to the Court and that this duty overrides any obligation to the parties who have engaged me, from whom I have received instructions or compensation. I confirm that I have complied with this duty.

---

[5] Werner Declaration, Section VI.B.

## II. CONCLUSIONS

(i)     The Sabry Declaration offers no reason to change my opinion that NIO ADSs traded in an efficient market during the Relevant Period. My regression parameters were properly specified and the event study analysis I performed did demonstrate that NIO ADSs reacted to information during the Relevant Period. Dr Sabry's other criticisms are unfounded and rely on a mischaracterization of my report.

(ii)    Dr. Sabry has failed to establish that the alleged misrepresentations and omissions and later corrective disclosures had no price impact on NIO's share price.

(iii)   The Sabry Declaration offers no reason to change my opinion that damages can be computed using a common class-wide methodology for all members of the Relevant Period. Dr. Sabry does not contest my proposed damage computation for Class members with Section 11 claims. Dr. Sabry's criticisms of my description of the out-of-pocket damages methodology for Class members with Section 10(b) claims does not contest that a common methodology exists and can be used in this case, but rather her criticism expresses concern for potential valuation complexities that may be encountered during the implementation of the out-of-pocket damages model. Dr. Sabry's concerns about the implementation of the damages model are an implicit concession that such a damages model does exist. Moreover, without necessary discovery being completed, it is impossible to engage in analysis of disaggregating fraud from non-fraud factors that may have caused a decline in NIO's share price on March 6 and 7, 2019. I will perform this complex analysis once NIO has produced the necessary documents.

## III. CRITIQUE OF THE SABRY DECLARATION

8.      In my June Declaration, I showed that each of the *Cammer* and *Krogman* factors supports a finding that the NIO ADSs traded in an efficient market throughout the Relevant Period. In particular, I found that:

    a.  The average weekly trading volume of NIO ADSs as a percentage of ADSs outstanding was 45.68%, more than 40 times higher than the 2% required to meet the strong-presumption-of-efficiency benchmark set forth by the court in *Cammer v. Bloom*;[6]

---

[6] *Cammer* v. *Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

b. At least 7 securities analysts covered NIO and there were at least 109 news stories, press releases, and SEC filings published about the Company;

c. NIO ADSs traded on the New York Stock Exchange ("NYSE") and had at least 77 market makers;

d. At least 108 institutional investors owned NIO ADSs, as indicated by public filings;

e. NIO would have been eligible to file an F-3 registration statement with the SEC throughout the Relevant Period, but for the timing of its public filings;

f. Event study analysis indicates that a cause-and-effect relationship existed between the release of new Company-specific information and movements in the price of NIO's ADSs (*i.e.*, the stock price exhibited statistically significant abnormal returns);

g. The market capitalization of the NIO ADSs averaged $1.33 billion over the Relevant Period, which was larger than the total market capitalization of at least 69% of all other publicly traded companies in the U.S.;

h. NIO's float averaged $1.28 billion and was larger than the total market capitalization of at least 68% of all other publicly traded companies in the U.S.;

i. NIO's ADSs had an average bid-ask spread[7] of 0.17% compared to the average bid-ask spread of 0.65% for all stocks in the CRSP database.

9. Dr. Sabry did not perform an independent evaluation of the efficiency of the market for NIO ADSs for the Relevant Period or the Class Period. She does not dispute my analysis

---

[7] A bid-ask spread is the price at which a market maker (intermediary) is willing to buy and sell a security. For example, if one is making a market in Company Y's security, one might be willing to buy (bid) security of Company Y at $10 per share and sell (ask) the same security at $10.15 per share. In this instance, the bid-ask spread would be $0.15, or approximately 1.5%.

of the first three *Cammer* factors (trading volume, analyst coverage, and market making activity) or the three *Krogman* factors (market capitalization, float, and bid-ask spread). Her criticisms of my market efficiency analysis are limited to the fourth (S-3/F-3 eligibility) and fifth (empirical demonstration of cause-and-effect relationship between information and price movements) *Cammer* factors.

10.  Dr. Sabry does not conclude that the NIO ADSs traded in an inefficient market during the Relevant Period.[8]

11.  Dr. Sabry also does not dispute that damages for investors who have Section 11 claims can be measured using the statutory formulas described in the Werner Declaration.

12.  In the Sabry Declaration, Dr. Sabry states that counsel for Defendants asked her to: "review and respond to certain opinions expressed in the Declaration of Dr. Adam Werner, dated June 21, 2022 ('Werner Declaration') and to opine on the price impact, if any, of the alleged misstatements."[9] With respect to the opinions presented in my June Declaration, Dr. Sabry was asked to focus on my "opinions regarding the market efficiency of trading in NIO's American Depository Shares ('ADS'), and [my] proposed method of computing damages using a common methodology for all class members."[10]

13.  Dr. Sabry presents three primary conclusions: (i) "Dr. Werner's event study failed to establish a cause-and-effect relation between the release of new information and the reaction of NIO's ADS during the Relevant Period, which means the event study failed to

---

[8] Sabry Deposition, at 6:15-19.

[9] Sabry Declaration, ¶1.

[10] Sabry Declaration, ¶1.

provide a reliable basis for determining market efficiency";[11] (ii) "There is no evidence of a price impact from the alleged misstatements in NIO's Offering Documents about the status of the construction of the Shanghai Facility";[12] and (iii) "Dr. Werner fails to offer a viable model or methodology for calculating damages on a class-wide basis in this case."[13,14]

14.  I address Dr. Sabry's market efficiency arguments in Section III.A below. I address her price impact arguments in Section III.B, and her damage methodology arguments in Section III.C.

   **A.   Dr. Sabry's Criticisms of My Market Efficiency Analysis are Unfounded and Erroneous**

15.  In her declaration, Dr. Sabry takes issue with my analysis of the fifth *Cammer* factor – an empirical demonstration of the relationship between the release of new information and changes in the price of NIO's ADSs. Dr. Sabry discusses four purported "conceptual flaws" with my event study analysis to support her opinion:

   First, Dr. Werner arbitrarily selected news dates for his event study and did not provide a rationale for excluding various dates on which NIO filed 6-K forms with the SEC, including sales updates.[15]

   Second, Dr. Werner's conclusion that NIO's ADSs had statistically significant responses to new information relied on one event out of three events that took place during the Relevant Period, as he selectively excluded certain news days of announcements during the Relevant Period without providing any rationale. A

---

[11] Sabry Declaration, ¶8a.

[12] Sabry Declaration, ¶8b.

[13] Sabry Declaration, ¶8c.

[14] Dr. Sabry also presents analysis related to Plaintiff Huang's trading records. I do not address that analysis in this reply report. *See*, Sabry Declaration, ¶8d.

[15] Sabry Declaration, ¶8a.

standard statistical test demonstrates no statistically significant difference between the proportion of significant news days and other days during the Relevant Period.[16]

Third, NIO's returns used in Dr. Werner's event study regression exhibited autocorrelation based on standard statistical tests, which could be a source of profitable trading strategies and evidence of market inefficiency.[17]

Fourth, Dr. Werner's event study used an industry index that consisted of two American car manufacturers (General Motors and Ford) with limited to no presence in the premium EV market in China at the time, which would not be an appropriate measure of the economic conditions facing NIO.[18]

16. Dr. Sabry's criticisms of my event study analysis are unfounded and erroneous. My event study selection criteria was sound, and as explained in my June Declaration, focused on dates where new, valuation-relevant information was disclosed, that based on economic principles, typically elicit large price movements in a company's stock price. Dr. Sabry's criticism of the industry index used in my event study analysis is moot, as she is unable to identify a single alternative index, nor is she able to demonstrate that the selection of an alternative index would have impacted the findings of statistical significance on any day in the Relevant Period. Finally, Dr. Sabry's purported finding of autocorrelation does not apply to the Relevant Period, which, when examined, does not exhibit any autocorrelation.

17. Dr. Sabry also discusses two additional points related to the market efficiency analysis in my June Declaration.

---

[16] Sabry Declaration, ¶8a.

[17] Sabry Declaration, ¶8a.

[18] Sabry Declaration, ¶8a.

Dr. Werner erroneously concluded that NIO was eligible to file F-3 forms during the Relevant Period, even though NIO had not been reporting financial statements for one year, as required to use F-3 forms.[19]

[Dr. Werner] did not provide a rationale for starting his "Relevant Period" on October 8, 2018 and for excluding the period before October 8 in his analysis (the excluded period is from the IPO date September 12 to October 7).[20]

18. Again, Dr. Sabry's critiques are misguided. NIO met all of the characteristics that the *Cammer* court deemed relevant to this factor. In fact, NIO's float – which is the critical metric in evaluating this *Cammer* factor – exceeded the $75 million float requirement by more than 1200%.

19. I also explicitly provided my rationale for examining the Relevant Period in the Werner Declaration. As I explained in my Declaration, I was asked by Lead Counsel to examine the Relevant Period, which began 25 days following NIO's IPO.

     **1.    The Event Selection Criteria in the Werner Declaration Was Appropriate, and Correcting the Errors in Dr. Sabry's Collective Test Analysis Undermines Her Conclusions**

20. In the Werner Declaration, I identified suitable event dates for an event study test of market efficiency as ones on which "important, relevant and material information was disclosed."[21] In the context of a market efficiency analysis, important, relevant, and material information means company-specific information that would be expected to elicit a statistically significant price reaction based on economic principles. A close examination of selected events sometimes reveal unique factors resulting in said causing statistically

---

[19] Sabry Declaration, ¶8a.

[20] Sabry Declaration, ¶8a.

[21] Werner Declaration, ¶52(a)-(d).

insignificant price movements. This occurred in this case. The event selection criteria for my event study are as follows. First, events were selected based on their general economic importance. During the Relevant Period, the events I identified for NIO as generally economically important were two earnings announcements, the announcement of an executive resignation, and the announcement of a major stakeholder change. Notably, Dr. Sabry does not conclude anywhere in her declaration that any of these four event dates were inappropriate candidate events to test for market efficiency, nor does she opine that these four dates failed to contain important, relevant and material information.

21.    In her declaration, Dr. Sabry opines that I *could have* selected additional dates to include in my event study analysis.[22] Dr. Sabry does not opine that these events *should have* been included in my event study analysis, only that they were candidates for consideration. Dr. Sabry does not individually analyze these additional dates to determine if they were appropriate market efficiency candidate events, but rather her selection of these additional events was only based on the fact that these events were reported in the Company's Form 6-K filings.

22.    Using these Form 6-K dates as her selection of "news" events, Dr. Sabry performed a Z-test to examine if the "proportion of statistically significant abnormal returns on 'news days' is statistically significantly greater than on no-news days."[23] She finds that there was "no significant difference between the proportion of abnormal returns on news days and no-news days during the Relevant Period," and suggests that there was not a "cause and effect relation between the release of new information and the reaction of NIO's ADS

---

[22] Sabry Report, ¶33.

[23] Sabry Declaration, ¶35.

during the Relevant Period."[24] However, Dr. Sabry's Z-test contained conceptual and methodological flaws. When these errors are corrected, the Z-test demonstrates that, contrary to Dr. Sabry's findings, there was indeed a statistically significant difference between the proportion of news days and no-news days during the Relevant Period.

23. First, Dr. Sabry erroneously excludes the March 5, 2019 (after the close of trading) news event from her collective test. That day, NIO issued a press release in which it announced its Q4 and FY 2018 financial results, as well as information that it had terminated its plan for constructing the Shanghai Facility.[25] Dr. Sabry makes clear that her selection criteria is the filing of a Form 6-K where the information is made public during the Relevant Period,[26] which is the case here. She further agrees that the appropriate testing date for information that is released after the close of trading, is the following trading day.[27] Had she followed her own test design, Dr. Sabry should have included the March 5, 2019, information event in her collective test.

24. Dr. Sabry's event selection criteria also ignores other "news" dates during the Relevant Period that were not accompanied by the filing of a Form 6-K. For example, on Sunday, February 24, 2019, CBS's 60 Minutes program ran a feature on NIO, in which it described NIO as the "Tesla Killer."[28] The segment was accompanied by a favorable article from

---

[24] Sabry Declaration, ¶35.

[25] "NIO Inc. Reports Unaudited Fourth Quarter and Full Year 2018 Financial Results," Company press release, *GlobeNewswire*, March 5, 2019, 4:14 PM.

[26] Sabry Declaration, ¶33.

[27] Sabry Declaration, FN48 and FN49.

[28] "In China, an Electric Car Lifestyle," by Brit Mccandless Farmer, CBS News February 24, 2019, 6:43 PM. (https://www.cbsnews.com/news/in-china-an-electric-car-lifestyle-60-minutes/); "*60 Minutes Correspondent Refers to NIO as TESLA KILLER," *Bloomberg*, February 22, 2019, 3:50 PM.

CBS.[29] The following day, news media noted that this favorable coverage was a positive development for NIO, and stated that this feature impacted NIO's stock price.[30] Inclusion of this "news" date in Dr. Sabry's, along with the inclusion of the March 5, 2019 news event, would have demonstrated "a cause and effect relation between the release of new information and the reaction of NIO's ADS during the Relevant Period" based on her Z-test (news/no news test).

25.     Correcting for Dr. Sabry's erroneous exclusion of these information events, her Z-test actually does show that there was a "significant difference between the proportion of abnormal returns on news days and no-news days during the Relevant Period." Thus, correcting some of the errors in Dr. Sabry's Z-test provides evidence of "a cause and effect relation between the release of new information and the reaction of NIO's ADS during the Relevant Period." See Table-A below.

**TABLE-A: Dr. Sabry's Z-Test Correcting for Inappropriate Exclusion of News Events**

| Item | Formula | Dr. Sabry's Original Z-Test | Z-Test Including the March 5, 2019 Earnings Event and the February 24, 2019 CBS Interview Event |
|---|---|---|---|
| (1) | (2) | (3) | (4) |
| Total Number of Trading Days in the Class Period | [A] | 101 | 102 |
| Total Number of Statistically Significant Days | [B] | 6 | 7 |
| Proportion of Statistically Significant Days | [C] = [B] / [A] | 5 94% | 6 86% |
| Number of News Days in Class Period | [D] | 13 | 15 |
| Total Number of Statistically Significant News Days | [E] | 1 | 3 |
| Proportion of Statistically Significant News Days | [F] = [E] / [D] | 7 69% | 20 00% |
| Number of Non-News Days in Class Period | [G] = [A] - [D] | 88 | 87 |
| Total Number of Statistically Significant Non-News Days | [H] = [B] - [E] | 5 | 4 |
| Proportion of Statistically Significant Non-News Days | [I] = [H] / [G] | 5 68% | 4 60% |
| **Z-Score for Difference in Proportions** | | 0.2862 | 2.1791 |
| **P-Value** | | 77.49% | 3.02% |
| **Is the Difference in Proportions Statistically Significant?** | | No | Yes |

[29] "In China, an Electric Car Lifestyle," by Brit Mccandless Farmer, CBS News February 24, 2019, 6:43 PM. (https://www.cbsnews.com/news/in-china-an-electric-car-lifestyle-60-minutes/).

[30] "NIO Shares Gain 11% After ES8 SUV Featured on CBS '60 Minutes'," by Gerald Porter Jr., Bloomberg, February 25, 2019, 10:25 am.

26.     Further, there were other dates during the Relevant Period where "news" was released about NIO that reasonably could have been included in Dr. Sabry's test. For example, on November 1, 2018, news media reported on additional information and technical specifications of one of NIO's recently submitted patent applications.[31] Additionally, on November 19, 2018, Citron Research issued a research report on NIO titled "NIO Short is a Tesla Deva Vu – Path to $12 Should Have Little Resistance."[32] That day, news media attributed NIO's stock price reaction to the new information and analysis included in the Citron Research Report.[33] Both of these events, which Dr. Sabry described as containing "no-news", were accompanied by statistically significant price reactions. Had these events been included in the "news" selection of Dr. Sabry's collective test, they similarly would have shown that the NIO ADSs were responding to information during the Relevant Period.

27.     Dr. Sabry also failed to assess whether the events described in the 6-K filings were themselves appropriate events for inclusion in a market efficiency event study. For example, on January 24, 2019, NIO filed its Form 6-K announcing that its CEO was transferring "50 million ordinary shares … to the newly established NIO user trust."[34] Dr. Sabry offers no explanation for why the transfer of NIO shares into a trust would, or should, cause a statistically significant price reaction in NIO stock. On the contrary, based on

---

[31] "Nio Co. Ltd. Researchers Submit Patent Application, "Functional Key Assembly with Symbol Showing Functions and Its Manufacturing Method", for Approval (USPTO 20180297454)," *Politics & Government Week*, November 1, 2018.

[32] "NIO Short is a Tesla Deva Vu – Path to $12 Should Have Little Resistance," Citron Research, analyst report, November 19, 2018, 9:50am.

[33] "09:56 EDT NIO rallies after Citron puts $12 short-target on shares", *theflyonthewall.com*, November 19, 2018.

[34] NIO Inc., Form 6-K, filed January 24, 2019.

economic principles, that NIO stock did not react to such information is itself a demonstration of NIO stock behaving as it should were it to trade in an efficient market.

28.   Furthermore, there is evidence that the CEO's transferring of NIO stock was not new information as of January 24, 2019. In its registration statement filed with the SEC on August 13, 2018, NIO had already made substantially the same disclosure:

> There are uncertainties relating to our chairman's proposed trust arrangement involving a portion of his shareholding in our company.

> Mr. Bin Li, our chairman and chief executive officer, has announced his plan to transfer 50,000,000 shares of our company beneficially owned by him to a trust at an appropriate time after the completion of this offering. He plans to retain the voting rights of these shares and let NIO users discuss and propose how to use the economic interests of these shares, through certain mechanisms to be implemented in the future. Mr. Li hopes this trust arrangement will help deepen our relationship with users. However, there is no specific timeline for the establishment of the trust and the terms of the trust are yet to be determined. Mr. Li may face unforeseen challenges in establishing the trust and determining its terms, which may cause the trust set-up to be delayed or changed. In addition, the mechanisms for letting NIO user discuss on the use of the economic interests of the shares have yet to be implemented. There is no assurance that such mechanisms will be adopted to our users' satisfaction, or at all. Furthermore, depending on the proposed use of the economic interests of the shares in the future, there could be accounting implications to us, which implications we cannot presently ascertain.[35]

29.   Removing inappropriate market efficiency events such as January 24, 2019 from Dr. Sabry's Z-test also corrects the Z-test such that it appropriately identifies a statistically significant difference between news and no-news dates during the Relevant Period.

---

[35] NIO Form F-1, filed August 13, 2018, p. 35.

**TABLE-B: Dr. Sabry's Z-Test Correcting for Inappropriate Event Selection**

| Item | Formula | Dr. Sabry's Original Z-Test | Z-Test Including the March 5, 2019 and February 24, 2019 Events and Excluding the January 24, 2019 Non-News Event |
|---|---|---|---|
| (1) | (2) | (3) | (4) |
| Total Number of Trading Days in the Class Period | [A] | 101 | 102 |
| Total Number of Statistically Significant Days | [B] | 6 | 7 |
| Proportion of Statistically Significant Days | [C] = [B] / [A] | 5 94% | 6 86% |
| Number of News Days in Class Period | [D] | 13 | 14 |
| Total Number of Statistically Significant News Days | [E] | 1 | 3 |
| Proportion of Statistically Significant News Days | [F] = [E] / [D] | 7 69% | 21 43% |
| Number of Non-News Days in Class Period | [G] = [A] - [D] | 88 | 88 |
| Total Number of Statistically Significant Non-News Days | [H] = [B] - [E] | 5 | 4 |
| Proportion of Statistically Significant Non-News Days | [I] = [H] / [G] | 5 68% | 4 55% |
| **Z-Score for Difference in Proportions** | | 0.2862 | 2.3209 |
| **P-Value** | | 77.49% | 2.11% |
| **Is the Difference in Proportions Statistically Significant?** | | No | Yes |

30. Adjusting Dr. Sabry's Z-test for just her inappropriate event selection shows that NIO ADSs did react to information during the Relevant Period. Correcting Dr. Sabry's inappropriate event selection further strengthens these results.

## 2. Dr. Sabry Mischaracterizes the Results of the Event Study in the Werner Declaration

31. In her declaration, Dr. Sabry writes, "Dr. Werner's event study shows a statistically significant price reaction on only one of the three event days that he tested during the Relevant Period."[36] This is incorrect. My event study showed that NIO ADSs reacted in a statistically significant manner to two out of four events that I identified. Her inappropriate exclusion of the March 5, 2019, news event from her description of my results mischaracterizes the analysis I performed.

32. As discussed above, NIO announced, among other things, its Q4 and FY 2018 financial results in a press release after the close of trading on March 5, 2019.[37] This news event is

---

[36] Sabry Declaration, ¶34.

[37] "NIO Inc. Reports Unaudited Fourth Quarter and Full Year 2018 Financial Results," Company press release, GlobeNewswire, March 5, 2019, 4:14 PM.

during the Relevant Period, which Dr. Sabry acknowledges in her declaration.[38] As the news was released after the close of trading, the appropriate reaction date to test would begin on the following trading session, March 6, 2019. In her declaration, Dr. Sabry agrees that the following trading date is the appropriate test event date for information that is released after the close of trading.[39] Thus, Dr. Sabry has no grounds to exclude this statistically significant price reaction from her description of my event study analysis.

### 3. Dr. Sabry Overstates the Results of Her Autocorrelation Analysis

33. Dr. Sabry writes that "Dr. Werner's event study exhibits autocorrelation over his regression period, which could be a source of profitable trading strategies and evidence of market inefficiency."[40] While Dr. Sabry found that there was autocorrelation during the Estimation Period (October 8, 2018 through October 8, 2019), she does not find, nor does she test, whether that autocorrelation was present during the Relevant Period (October 8, 2018 through March 5, 2019). Essentially, Dr. Sabry only found autocorrelation during the post-Relevant Period portion of the Estimation Period, meaning that there was no autocorrelation during the Relevant Period. Thus, her suggestion that NIO ADSs traded in an inefficient market during the Relevant Period due to autocorrelation is unfounded and moot. Table-C show the results of Dr. Sabry's test of autocorrelation if properly run during the Relevant Period.

---

[38] Sabry Declaration, Exhibit-1.

[39] Sabry Declaration, FN 48.

[40] Sabry Declaration, ¶37.

**Table-C: Dr. Sabry's Tests of Autocorrelation During the Relevant Period**

| Dependent Variable | Independent Variable | Independent Variable | | Nr. Obs. | Root Mean Square Error | R-Squared | Adjusted R-Squared |
|---|---|---|---|---|---|---|---|
| | | Coefficient | *t*-statistic | | | | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| Current Day Return | Prior Day Return | 0 05 | 0 48 | 101 | 0 046 | 0 002 | -0 008 |
| Current Excess Day Return | Prior Day Return | 0 12 | 1 35 | 101 | 0 041 | 0 018 | 0 008 |
| Current Excess Day Return | Prior Day Excess Return | 0 14 | 1 38 | 101 | 0 041 | 0 019 | 0 009 |

34.     Dr. Sabry's flawed autocorrelation analysis provides no reason to revise the conclusions in the Werner Declaration regarding the efficiency of the market for NIO ADSs during the Relevant Period.

35.     However, even if there was autocorrelation during the Relevant Period, such a finding would not prove market inefficiency. While it was once believed that prices had to follow a random walk in an efficient market, the finance literature is now quite clear that this is not the case. Serial correlation is not incompatible with market efficiency.

> Recent econometric advances and empirical evidence seem to suggest that financial asset returns are predictable to some degree. Thirty years ago this would have been tantamount to an outright rejection of market efficiency. However, modern financial economics teaches us that other, perfectly rational, factors may account for such predictability.[41]

> Of course, these results [of significant serial correlation] do not necessarily imply that the stock market is inefficient or that prices are not rational assessments of "fundamental" values. As Leroy (1973) and Lucas (1978) have shown, rational expectations equilibrium prices need not even form a martingale sequence, of which the random walk is a special case.[42]

---

[41] *The Econometrics of Financial Markets*, by John Y. Campbell, Andrew W. Lo, and A. Craig MacKinlay, Princeton University Press, 1997, p. 80.

[42] "Stock Market Prices Do Not Follow Random Walks: Evidence from a Simple Specification Test," by Andrew Lo and A. Craig MacKinlay, *Journal of Financial Studies*, 1988, p. 42.

We shall find, however, that the long-term return anomalies are sensitive to methodology. They tend to become marginal or disappear when exposed to different models for expected (normal) returns or when different statistical approaches are used to measure them. Thus, even viewed one-by-one, most long-term return anomalies can reasonably be attributed to chance.[43]

We should also acknowledge that the apparent predictability of returns may be spurious, the result of data-dredging and chance sample-specific conditions.[44]

Later in the paper Alexander concludes that there is some evidence in his results against the independence assumption of the random walk model. But market efficiency does not require a random walk, and from the viewpoint of the submartingale model, the conclusion that the filters cannot beat buy-and-hold is support for the efficient markets hypothesis.[45]

### 4. My Selection of an Industry Index was Appropriate, and Dr. Sabry Failed to Identify a More Appropriate Alternative

36.     Dr. Sabry criticizes my selection of the S&P 500 Automotive Manufacturers Index to control for NIO's industry sector effects in my event study. She writes that the Industry Index used in the Werner Declaration "does not control for factors affecting the market for premium electric vehicles and market conditions for electric vehicles in China."[46]

37.     My selection of Industry Index was based on the Global Industry Classification Standard ("GICS") designated to NIO during the Relevant Period. According to Bloomberg, NIO's GICS designation, or GICS code, during the Relevant Period was 11011010. That same GICS code, when searched through the Bloomberg database, yields the S&P 500

---

[43] "Market Efficiency, Long-Term Returns, and Behavioral Finance," by Eugene F. Fama, *Journal of Financial Economics*, 1998, p. 284.

[44] "Efficient Capital Markets: II," by Eugene F. Fama, *Journal of Finance*, December 1991, p. 1577.

[45] Efficient Capital Markets: A Review of Theory and Empirical Work," by Eugene F. Fama, *Journal of Finance*, 1970, p. 395.

[46] Sabry Declaration, ¶45.

Automotive Manufacturers Index as an applicable industry benchmark, which is the same index I selected.

38. Dr. Sabry's critique of my selection of Industry Index as potentially lacking in explanatory power is baseless. The purpose of the industry index is to control for the component of NIO's return that was caused by industry sector factors. The industry index does explain a portion of the NIO returns, as shown in Exhibit-8 of the Werner Declaration, and Dr. Sabry does not dispute this. She simply believes that there are other factors (EV and China) in NIO's industry that could also have explanatory power. But her critique would only carry weight if my selection of the Industry Index, as compared to some other hypothetical index choice, changed the findings of statistical significance on any dates during the Relevant Period, or if the selection of an alternative index would change my conclusions. Such an alternative index does not change any findings of statistical significance nor my conclusions, and Dr. Sabry does not opine that it would.

39. In fact, using an alternative industry index to control for the impact of NIO's industry sector on NIO's ADS price shows that the empirical results of the Werner Declaration are robust to the selection of industry index. To demonstrate this, I reran the regression used in the Werner Declaration, replacing the S&P 500 Automobile Manufacturers Index with the Refinitiv Global Automobiles and Auto Parts Index. Exhibit-4 presents the regression results, and Exhibit-5 presents the event study results using this alternative peer index. The daily returns of the Refinitiv Global Automobiles and Auto Parts Index are presented in Exhibit-3.

40. Finally, nowhere in her declaration does Dr. Sabry identify any index that she believes is superior to the S&P 500 Automotive Manufacturers Index for the purposes of controlling

for NIO's industry sector. In her deposition, Dr. Sabry was unable to identify such an index that she believed would have better controlled for these industry sector factors. Finally, in her own price impact and regression analysis, Dr. Sabry uses the same S&P 500 Automotive Manufacturers Index that she criticizes to control for the impact of NIO's industry sector.[47]

41.  Consequently, Dr. Sabry's criticisms of my selection of Industry Index are baseless and moot and provide no reason to revise my efficiency conclusions in the Werner Declaration.

### 5.  NIO Possessed the Characteristics Relevant to F-3 Eligibility During the Relevant Period

42.  Dr. Sabry does not dispute that NIO satisfied the float conditions for F-3 eligibility by wide margins throughout the Relevant Period, or that at least two years of historical financial data was available to investors throughout the Relevant Period, or that NIO made timely financial filings during the Relevant Period. Nonetheless, Dr. Sabry writes that "NIO was not eligible to use Form F-3" because it had "not filed its financial statements publicly for twelve months as of the Relevant Period."[48] Dr. Sabry ignores that NIO possessed the characteristics of SEC registration eligibility that indicate market efficiency. The *Cammer* court stated that a company is deemed to have satisfied this probative factor, if the only reason for S-3 ineligibility was the timing of filed reports, which is the case here.

43.  As explained in my June Declaration, the *Cammer* court noted that S-3 registration eligibility is indicative of market efficiency because the filing requirement ensured that

---

[47] Sabry Declaration, Appendix IV.

[48] Sabry Declaration, ¶50.

financial data are available to market participants, and the public float requirement indicated that many market participants would have examined the information.[49]

Proposed Form S-3 recognizes the applicability of the efficient market theory to the registration statement framework with respect to those registrants which usually provide high quality corporate reports, including Exchange Act reports, and whose corporate information is broadly disseminated, because such companies are widely followed by professional analysts and investors in the market place. … Because of the foregoing observations made by the SEC, the existence of Form S-3 status is an important factor weighing in favor of a finding that a market is efficient.[50]

The 'public float' aspect of the Form S-3 requirements ensures that enough investors have in fact read the previously filed document.[51]

44.   Moreover, the *Cammer* court specifically pointed out that the size requirement was the more important element, and if ineligibility was due to the "timing" of filings then the company at issue would still be considered to have satisfied the S-3 registration eligibility factor indicative of market efficiency.

Fourth, as discussed, it would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.[52]

---

[49] *Cammer*, 711 F. Supp. at 1284-85.

[50] *Cammer*, 711 F. Supp. at 1284-85

[51] *Cammer*, 711 F. Supp. at 1288.

[52] Cammer, 711 F. Supp. at 1288.

45.     In connection with the Company's IPO, NIO filed a Form F-1 registration statement on August 13, 2018.[53] NIO included two years of detailed and audited financial statements for FY2016 and FY2017 in this document, as well as six months of unaudited financial information for Q1 and Q2 2018.[54] Subsequent to their F-1 filing, NIO filed at least five amendments to their Form F-1 registration statement, that included updated information about the Company.[55] Consequently, at the time of the IPO, and throughout the Relevant Period, the public had access to far more financial information about the Company than the F-3 registration minimum requirement.

46.     Thus, notwithstanding any temporary technical ineligibility for F-3 registration during the Relevant Period, NIO most certainly possessed the characteristics of S-3 registration that the Cammer court cited were relevant for market efficiency. As NIO always possessed the F-3 eligibility properties relevant to market efficiency, it satisfied this *Cammer* factor throughout the Relevant Period.

### 6.     Dr. Sabry's Speculation that the Period between the IPO and the Start of the Relevant Period Could be Inefficient is Irrelevant

47.     Dr. Sabry writes that "the Relevant Period excludes the first 25 calendar days following NIO's IPO on September 12, 2018."[56] She suggests that "one possible explanation … is that 'stocks post-IPO or immediately post-IPO might not necessarily be efficient.'" Firstly, market efficiency is irrelevant during this period as it precedes the Relevant Period.

---

[53] NIO Inc., Form F-1, filed August 13, 2018.

[54] NIO Inc., Form F-1, filed August 13, 2018, pp. 10-13, 78-94, and F11-F57.

[55] NIO Inc., Form F-1/A, filed August 13, 2018; NIO Inc., Form F-1/A, filed August 28, 2018; NIO Inc., Form F-1/A, filed August 31, 2018; NIO Inc., Form F-1/A, filed September 7, 2018; NIO Inc., Form F-1/A, filed September 10, 2018; NIO Inc., Form F-1/A, filed September 11, 2018.

[56] Sabry Declaration, ¶51.

Secondly, nowhere in her declaration does Dr. Sabry conduct an independent market efficiency analysis for NIO ADSs, and she certainly conducts no analysis during the 25 calendar day period between NIO's IPO and the start of the Relevant Period. Thus, she presents no evidence either for or against the efficiency of the market for NIO ADS during this period.

**B.      Dr. Sabry's Price Impact Analysis is Flawed and Does Not Establish a Lack of Price Impact**

48.     Dr. Sabry opines that "there is no evidence that the alleged misrepresentations regarding the Shanghai Facility (i.e., that construction was underway as of the IPO) had an impact on NIO's ADS price."[57] Dr. Sabry bases her opinion on three arguments, that: (i) "there is no direct evidence of price impact at the time the alleged misrepresentations were made;"[58] (ii) "no price impact can be inferred from the price decline following the q4/fy18 earnings announcement;"[59] on March 5, 2019 based solely on statements of analysts employed by NIO's Underwriters asserting that termination of the Shanghai Facility was either neutral or positive for NIO and (iii) "NIO's plan to rely on an "asset-light" joint manufacturing model was disclosed in January 2019."[60]

49.     Dr. Sabry's analysis does not prove that the alleged misrepresentations and omissions did not impact the price of NIO ADSs during the Relevant Period. She fails to identify any information other than the corrective disclosure that could have caused the statistically significant NIO ADS price decline on March 7, 2019. She further ignores that there were

---

[57] Sabry Declaration, ¶53.

[58] Sabry Declaration, Section V.A.

[59] Sabry Declaration, Section V.B.

[60] Sabry Declaration, Section V.C.

market participants that considered the termination of the Shanghai Facility construction to be negative information and explicitly linked NIO's ADS price declines to this news.

50.     Additionally, Dr. Sabry's contention that NIO's decision to wholly abandon the construction of the Shanghai Facility was already previously disclosed in January 2019 is untenable with the facts that she relies on to levy this argument. That is, the January 14, 2019, JPMorgan analyst report in no way establishes NIO had already planned to abandon the Shanghai facility. At most, the JPMorgan analysts' opinion implied that NIO was not in a rush to construct the Shanghai facility; this does not equal a decision to abandon the facility altogether.

51.     Finally, Dr. Sabry ignores the fact that analysts' revenue estimates prior to the corrective disclosure were directly tied to the production of automobiles expected to be manufactured in the Shanghai Facility. To the extent that the production of those automobiles would either not occur, or at the very least, be delayed, would have a direct impact on NIO's revenue projection as well as its stock price.

1.     **Dr. Sabry Does Not Identify Any Information, Other than the Alleged Corrective Disclosure, that Caused a Statistically Significant Decline in the NIO ADS Price on March 7, 2019**

52.     Dr. Sabry does not dispute that the NIO ADS price return on March 7, 2019, was statistically significant at the 95% confidence level. In fact, her own regression results demonstrate as much.[61] Dr. Sabry also states that statistical significance demonstrates "a cause-and-effect relationship between the release of new information and excess returns of

---

[61] Sabry Declaration, Appendix III.

the stock price."[62] Thus, Dr. Sabry has no grounds to dispute that NIO-specific information caused the NIO ADS statistically significant price declines on March 7, 2019.

53.     While Dr. Sabry suggests that the March 6, 2019, ADS price decline was caused by "the reduced sales outlook due to the 'greater than anticipated slowdown in monthly deliveries,'"[63] she makes no attempt to identify the information that caused the March 7, 2019, ADS price decline. Based on the authorities she cites, Patell and Wolfson [1984],[64] the earnings-related information would have been impounded into the NIO ADS price on March 6, 2019, and would not have impacted the ADS price on March 7, 2019. Patell and Wolfson acknowledge that while earnings information anticipated by analysts would be expected to impact the NIO ADS price quickly, "less regular announcements" such as the Shanghai Facility construction termination, may have a more protracted impact on the NIO ADS price.

First, the price reaction to earnings and dividend announcements begins very quickly. … It is possible that the adjustment intervals would be significantly longer for smaller firms, or for other, less regular announcements made by our sample firms.[65]

### 2. The Termination of the Shanghai Facility Constructions Plans Conveyed Negative Information About NIO to the Market

54.     While Dr. Sabry reviewed sell-side analyst reports for commentary on the termination of the Shanghai Facility construction plans, she did not review commentary from the financial

---

[62] Sabry Declaration, ¶35.

[63] Sabry Declaration, ¶86.

[64] Sabry Declaration, ¶23.

[65] Patell, James M., and Mark A. Wolfson. "The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Announcements." *Journal of Financial Economics* 13, June 1984, p. 249–250.

press. Had she performed a more comprehensive review, Dr. Sabry would have observed that there were many members of the financial press who considered the Shanghai Facility news a negative development and linked the resulting NIO ADS price declines to that news.

55. On March 6, 2019, Seeking Alpha analyst, Henrik Alex noted that NIO "surprisingly cancelled its plans for building its own manufacturing plant in Shanghai," resulting in the Company losing "potential benefits."[66]

> Adding insult to injury, the company surprisingly cancelled its plans for building its own manufacturing plant in Shanghai … Obviously, management's projection for the ramp up of the company's business have changed pretty dramatically over the past couple of weeks as otherwise NIO wouldn't have dropped its plans from their own manufacturing plant. While the surprise move will save the company hundreds of millions of capex dollars, it will also result in NIO not obtaining its own EV manufacturing license for the foreseeable future. As a consequence, the company might not enjoy potential benefits from China's new energy vehicle credit score system for the time being.[67]

56. Also, on March 6, 2019, a Bloomberg journalist linked the decline in NIO ADS price to a "weak delivery outlook" and "scrapped plant."[68] That same day, a Business Insider journalist also attributed the "crashing" prices to the same.[69]

---

[66] "NIO - Chinese EV Shooting Star Shocks Investors with Weak Outlook, Cancels Shanghai Factory Plans," by Henrik Alex, *Seeking Alpha*, March 6, 2019, 7:39 AM.

[67] "NIO - Chinese EV Shooting Star Shocks Investors with Weak Outlook, Cancels Shanghai Factory Plans," by Henrik Alex, *Seeking Alpha*, March 6, 2019, 7:39 AM.

[68] "NIO Sinks by Record on Weak Delivery Outlook, Scrapped Plant," by Esha Dey and Ryan Vlastelica, *Bloomberg News*, March 6, 2019, 9:20 PM.

[69] "Chinese Tesla rival Nio is crashing after slashing its delivery outlook and calling off plans for a Shanghai factory (NIO)," *Business Insider*, March 6, 2019, 2:08 PM.

NIO Inc. plunged the most on record after the Chinese electric-vehicle maker lowered its first-quarter delivery outlook and canceled its plan to build a manufacturing plant in Shanghai.[70]

Nio, widely seen as the Tesla of China, on Tuesday cut its delivery guidance and canceled its plans to build a manufacturing plant in Shanghai. Shares tanked 20% Wednesday, and were on track for their worst trading day since going public in September of 2018.[71]

57.     Further, on March 7, 2019, a Dow Jones journalist linked the two-day NIO ADS price decline to "the company's decision to halt construction of a factory in Shanghai and expectations that China will make cuts to electric-vehicle subsidies this year."[72]

American depository receipts of Chinese electric vehicle maker NIO Inc. (NIO) are declining for a second straight day. At 3:07 p.m. ET, the company's ADRs were down 11.42% at $7.09. Volume was heavy, with over 45 million ADRs trading. The 65-day average volume is just over 18 million. The move downward began on Wednesday, after the company said a slowdown in deliveries this year was greater than expected. The ADRs could be impacted by the company's decision to halt construction of a factory in Shanghai and expectations that China will make cuts to electric-vehicle subsidies this year.[73]

### 3.    Analysts' Valuation Models Included The Shanghai Facility In Projections of NIO's Profitability

58.     Just as Dr. Sabry did not consider market commentary in her price impact analysis, neither did she consider how sell-side analysts incorporated the Shanghai Facility in their revenue

---

[70] "NIO Sinks by Record on Weak Delivery Outlook, Scrapped Plant," by Esha Dey and Ryan Vlastelica, *Bloomberg News*, March 6, 2019, 9:20 PM.

[71] "Chinese Tesla rival Nio is crashing after slashing its delivery outlook and calling off plans for a Shanghai factory (NIO)," *Business Insider*, March 6, 2019, 2:08 PM.

[72] "NIO ADRs Falling for Second Straight Day," by Stephen Nakrosis, *Dow Jones Institutional News*, March 7, 2019, 3:13 PM.

[73] "NIO ADRs Falling for Second Straight Day," by Stephen Nakrosis, *Dow Jones Institutional News*, March 7, 2019, 3:13 PM.

and cash flow projections for NIO prior to the March 2019 corrective disclosure. As valuation, at its most basic, is a measure of the present value of future anticipated cash flows, that the Shanghai Facility was included in analysts' revenue and cash flow projections for NIO proves that the expected construction of the facility had economic impact on the Company's valuation. Thus, when construction of the Shanghai Facility was abandoned, so too were the expected future cash flows associated with the Facility and the price of NIO stock fell accordingly.

59.     An example of the Shanghai Facility's import in analysts' valuation models can be observed in JPMorgan's initiating coverage report published on October 9, 2018.[74] In this report, JPMorgan analysts provided their valuation of NIO stock based on revenue outlook projections from 2018-2023.[75] These revenue projections were broken out by vehicle model, such that a total of four vehicle models were expected to be generating revenue by 2021: the ES8, the ES6, the ET7, and an unnamed "4th model".[76] JPMorgan's revenue projections are presented in Table-D Below:

---

[74] "Blue Sky Future, But Unproven path There: Initiate with Neutral," by Nick Lai, et al., JPMorgan, analyst report, October 9, 2018. JPMorgan analysts were selected for this example as they were the only analyst whose initiating coverage report broke-out NIO's revenue projections by vehicle model and thus provides the opportunity for more detailed analysis.

[75] "Blue Sky Future, But Unproven path There: Initiate with Neutral," by Nick Lai, et al., JPMorgan, analyst report, October 9, 2018, p. 39.

[76] "Blue Sky Future, But Unproven path There: Initiate with Neutral," by Nick Lai, et al., JPMorgan, analyst report, October 9, 2018, p. 39.

**Table-D: JPMorgan October 9, 2018 Analyst Report – NIO Revenue Projections**

Units, RMB, millions of RMB

| Vehicle Volume by Model (Units) | 3Q18E | 4Q18E | 2018E | 2019E | 2020E | 2021E | 2022E | 2023E |
|---|---|---|---|---|---|---|---|---|
| ES8 | 5,000 | 6,000 | 11,000 | 27,154 | 34,272 | 40,902 | 45,380 | 51,075 |
| ES6 | - | - | - | 23,000 | 58,117 | 83,672 | 89,037 | 96,377 |
| ET7 | - | - | - | - | 19,000 | 40,216 | 70,182 | 86,216 |
| 4th model | - | - | - | - | - | 20,000 | 45,091 | 70,640 |
| **Total sales volume** | **5,000** | **6,000** | **11,000** | **50,154** | **111,389** | **184,789** | **249,690** | **304,308** |

| MSRP by Model (RMB) | 3Q18E | 4Q18E | 2018E | 2019E | 2020E | 2021E | 2022E | 2023E |
|---|---|---|---|---|---|---|---|---|
| ES8 | 509,500 | 509,500 | 509,500 | 499,310 | 489,324 | 479,537 | 469,947 | 455,848 |
| ES6 | 462,500 | 462,500 | 462,500 | 457,875 | 453,296 | 448,763 | 444,276 | 435,390 |
| ET7 | 461,500 | 461,500 | 461,500 | 456,885 | 452,316 | 447,793 | 443,315 | 434,449 |
| 4th model | 500,000 | 500,000 | 500,000 | 495,000 | 490,050 | 485,150 | 480,298 | 470,692 |

| Value-Added Tax by Model (% and RMB) | 3Q18E | 4Q18E | 2018E | 2019E | 2020E | 2021E | 2022E | 2023E |
|---|---|---|---|---|---|---|---|---|
| memo: VAT rate | 16% | 16% | 16% | 16% | 16% | 16% | 16% | 16% |
| ES8 | 81,520 | 81,520 | 81,520 | 79,890 | 78,292 | 76,726 | 75,191 | 72,936 |
| ES6 | - | - | - | 73,260 | 72,527 | 71,802 | 71,084 | 69,662 |
| ET7 | - | - | - | - | 72,371 | 71,647 | 70,930 | 69,512 |
| 4th model | - | - | - | - | - | 77,624 | 76,848 | 75,311 |

| Net Revenue Per Unit by Model (RMB) | 3Q18E | 4Q18E | 2018E | 2019E | 2020E | 2021E | 2022E | 2023E |
|---|---|---|---|---|---|---|---|---|
| ES8 | 427,980 | 427,980 | 427,980 | 419,420 | 411,032 | 402,811 | 394,755 | 382,912 |
| ES6 | - | - | - | 384,615 | 380,769 | 376,961 | 373,192 | 365,728 |
| ET7 | - | - | - | - | 379,946 | 376,146 | 372,385 | 364,937 |
| 4th model | - | - | - | - | - | 407,526 | 403,450 | 395,381 |

| Net Revenue by Model (millions of RMB) | 3Q18E | 4Q18E | 2018E | 2019E | 2020E | 2021E | 2022E | 2023E |
|---|---|---|---|---|---|---|---|---|
| ES8 | 2,140 | 2,568 | 4,708 | 11,389 | 14,087 | 16,476 | 17,914 | 19,557 |
| ES6 | - | - | - | 8,846 | 22,129 | 31,541 | 33,228 | 35,248 |
| ET7 | - | - | - | - | 7,219 | 15,127 | 26,135 | 31,463 |
| 4th model | - | - | - | - | - | 8,151 | 18,192 | 27,930 |
| **Total Vehicle Revenue** | **2,140** | **2,568** | **4,708** | **20,235** | **43,435** | **71,294** | **95,469** | **114,198** |

Source: J.P. Morgan estimates.

60. Importantly, of these four models, both the ET7 and the yet-unnamed 4th model were expected to be constructed at the Shanghai Facility:

> **ET7:** The ET7 is an upcoming 5-passenger sedan expected to be launched in 2020. We expected that the ET7 will be manufactured in NIO's own manufacturing facility expected to be constructed in Shanghai.[77]

> **4th As Yet Unnamed Model:** The unnamed 4th model, another passenger sedan, is expected to launch in 2021. We expect that the vehicle will be produced alongside the ET7 at NIO's planned wholly-owned final assembly plant in Shanghai.[78]

61. According to JPMorgan's estimates, the ET7 and the 4th model were expected to contribute 21% and 11%, respectively, to NIO's net revenue by 2021 and 28% and 24%, respectively,

---

[77] "Blue Sky Future, But Unproven path There: Initiate with Neutral," by Nick Lai, et al., JPMorgan, analyst report, October 9, 2018, p. 25.

[78] "Blue Sky Future, But Unproven path There: Initiate with Neutral," by Nick Lai, et al., JPMorgan, analyst report, October 9, 2018, p. 25.

by 2023. That is, by 2023, JPMorgan was expecting vehicles produced by the Shanghai Facility to comprise more than 50% of NIO's net revenues. To suggest that abandoning the construction of a facility that is anticipated to produce more than half of a firm's revenue generating potential would have no price impact is untenable with financial economic principles.

62. The import of the Shanghai Facility is not limited to only NIO's revenue projections. In fact, according to JPMorgan's estimates, the timing of the Shanghai Facility coming online in 2021 coincided with major projection changes across all financial metrics, for example:





63. Construction of the Shanghai Facility was expected to reduce manufacturing costs because NIO no longer had to pay JAC Motors a fixed price for each vehicle produced.

64. Observably, the Shanghai Facility's construction was anticipated to increase revenues, EBITDA, net income, free cash flow, EBITDA margin, and net income margin across the board. Major structural changes to financial projections coinciding with the Shanghai Facility coming online is a demonstration of the import and relevance of the Shanghai Facility to NIO's valuation. This, in turn, is evidence of price impact.

**4.** **The January 14, 2019, JPMorgan Analyst Report is Not a Corrective Disclosure**

65. Dr. Sabry argues that because there was no statistically significant price response following JPMorgan's January 14, 2019, report that "discussed NIO's goal of using an 'asset-light'

manufacturing model",[79] there can be no price impact from the March 2019 disclosures as the allegation-related information had already previously been disclosed. Effectively, Dr. Sabry contends that NIO's decision to deprioritize the construction of the Shanghai Facility is akin to total abandonment of the project. This is untenable.

66.    From a valuation perspective, de-prioritization of the Shanghai Facility would imply pushing out the additional cash flows and cost savings that would be generated by the Shanghai Facility to a later point in time. However, these cash flows would still very much be within the valuation consideration. On the other hand, total abandonment of the Shanghai Facility means that all cash flows expected from the Shanghai Facility would be removed from valuation consideration entirely. The latter choice, abandonment of the facility, would have a much larger valuation impact than the former.

67.    Dr. Sabry also did not consider that NIO's ability to deprioritize the construction of the Shanghai Facility was itself motivated by a "recent rules change means it now no longer needs to have a plant first in order to apply for a license for permission to manufacture new vehicles."[80] This is the same rule change cited by Dr. Sabry to support her argument that the news on March 6, 2019 of NIO's decision to abandon the Shanghai Facility was somehow a positive development.[81] Dr. Sabry's price impact analysis did not take into account the information she contends was a new, positive development (that a self-operated facility was not required for NIO to obtain its manufacturing license) on March 6, 2019 had already been disclosed on January 14, 2019 and therefore could not have had any price

---

[79] Sabry Declaration, ¶91.

[80] "Takeaways from JPM's CES Auto Tech Conference for Aptiv, NIO, & Veneoneer," by Ryan Brinkman et al., JP Morgan, analyst report, January 14, 2019.

[81] Sabry Declaration, ¶72.

impact on March 6, 2019. Thus, the only information that could have caused the protracted price declines on March 6-7, 2019, was the decision to abandon the Shanghai Facility.

### C. Dr. Sabry's Criticisms of My Proposed Damages Methodology are Misguided and Premature Loss Causation Arguments

68.  In the Werner Declaration, I was asked to describe how a common damages methodology, consistent with the Plaintiffs' theory of liability, can be applied to compute Section 10(b) damages for all investors who purchased NIO ADSs during the Relevant Period. I concluded that Section 10(b) damages could be computed on a class-wide basis for each of the NIO ADSs and for all Class Members using a common methodology that is consistent with the Plaintiffs' allegations of liability.

69.  As I explained in my declaration, the first step to calculate damages would be to determine whether the disclosure(s) caused the price of the NIO ADS to fall significantly. Event study results and valuation tools would be applied to determine the magnitude of the price decline attributable to the corrective disclosures. I further explained that an inflation ribbon would be constructed, using generally accepted empirical analyses and valuation tools, to indicate how much artificial inflation caused by the alleged misrepresentations and omissions was in the price of the NIO ADS on each day during the Relevant Period.

70.  Dr. Sabry claims that the common damages methodology that I proposed in the Werner Declaration is not "a reliable economic approach to how damages would be estimated."[82] Dr. Sabry presents two criticisms to support her opinion: (i) "first, his description of a damages approach is generic and does not address any of the specific factors in this litigation"; and (ii) "second, his description of the hypothetical damages does not account

---

[82] Sabry Declaration, ¶96.

for the fact that NIO's interest in maintaining an asset-light business model was previously known, and the termination of the Shanghai Facility was viewed as a positive to neutral factor by equity analysts, and equity analysts attributed downgrades or price target reduction to the simultaneously released earnings news, rather than the termination of the Shanghai Facility."[83] Dr. Sabry also opines that "there is no evidence that NIO's ADS price was inflated."[84]

71.    Dr. Sabry's criticisms relate to the granularity of my description, and the hypothetical implementation, of my proposed damages methodology, and not to the methodology or the appropriateness of the model itself. Each of the valuation complexities that Dr. Sabry raises are appropriately addressed in an analysis of loss causation and damages, and none are insurmountable. Consequently, the Sabry Report gives me no reason to revise my conclusion that a common methodology exists to calculate Section 10(b) damages for Class Members.

      **1.     Dr. Sabry's Challenges to my Damages Methodology Concern Potential Valuation Complexities, Which Can and Will be Addressed in an Analysis of Loss Causation**

72.    Dr. Sabry does not dispute that a common methodology exists that can measure damages class-wide for the NIO ADS. Further, Dr. Sabry does not dispute that event study results and valuation tools can be used to construct an inflation ribbon, or that an inflation ribbon can serve as the basis of a damages methodology, such that per-share damages would take into account the change in artificial inflation over each investor's holding period. In fact,

---

[83] Sabry Declaration, ¶96. I note that while these two criticisms are functionally the same – that Dr. Sabry does not believe my description of the damage methodology addresses case specific issues that could complicate the measure of inflation – Dr. Sabry does identify them as two distinct issues in her report.

[84] Sabry Declaration, ¶96.

Dr. Sabry concedes that the out-of-pocket damage methodology presented in Werner Declaration is the appropriate damage methodology for this case, that it is commonly applied in securities litigation, and that it will provide an accurate measure of damages, so long as the valuation and empirical drivers used within the damage methodology account for the impacts of potentially confounding information that she identifies.

Damages are often estimated by using corrective disclosures to estimate the artificial price inflation in a security. This approach is based on the ability of efficient markets to quickly incorporate the value of information as it is disseminated to the market. The corrective disclosure must change the market's understanding of the misstatements or omissions. For the approach to work properly, the news during the interval that the price change is estimated must be related only to the alleged corrective disclosures.[85]

This is a generic description that could be applied to almost any securities litigation.[86]

For example, any estimate of inflation attributable to the alleged misstatements would need to account for at least two confounding factors.[87]

73.     Rather than dispute that my damages methodology is appropriate in this case, Dr. Sabry focuses on the granularity of the description of that damages model. Her concern with my damages methodology is that valuation complexities *may* arise during the process of constructing an inflation ribbon, and that I have not explicitly stated *how* and with what specific "valuation tools" and "other empirical analyses" I would deal with every single potential complexity that *may or may not* arise.

---

[85] Sabry Declaration, ¶98.

[86] Sabry Declaration, ¶97.

[87] Sabry Declaration, ¶100.

74.   Dr. Sabry argues that my damages methodology is inadequate because I have not concretely stated with precision how I would address every potential valuation complexity that could arise in the process of constructing an inflation ribbon. If it is Dr. Sabry's contention that an inflation ribbon needs to be constructed prior to class certification, then she is wrong. The construction of an inflation ribbon, and any subsequent adjustments necessary for case-specific valuation complexities, are properly addressed in an analysis of loss causation, which I have not yet been asked to perform. Consequently, Dr. Sabry's contention that each of these potential valuation issues must be accounted for at the current stage of this litigation is moot.

75.   If I am asked to perform a loss causation analysis, I will take special care to ensure that an inflation ribbon is constructed such that it properly controls for potential valuation complexities. Further, Dr. Sabry's concerns regarding adjustments to the inflation ribbon for purported valuation complexities is an implicit concession that such an inflation ribbon can be constructed and can be applied to compute damages in the current case.

76.   Importantly, it is my understanding that discovery has not yet been completed in this case and counsel has informed me that there are still pending discovery requests for documents pertaining exactly to the allegation-related information in this case. Absent the completion of discovery, any construction of an inflation ribbon would be premature and potentially inappropriate. The construction of the inflation ribbon should consider all relevant information that may impact the measure of damages.

2.   **The Common Damages Methodology Handles All Purported Valuation Complexities Raised by Dr. Sabry**

77.   Dr. Sabry's criticisms are directed at a hypothetical inflation ribbon that I have not yet constructed. She is essentially arguing that the damages model must be flawed simply

because it *may be* executed incorrectly. Dr. Sabry's critique is not a condemnation of the damages model, but rather a caution that it should be implemented carefully and correctly. Moreover, Dr. Sabry has no basis at this juncture, without full development of the record and without conducting any empirical analysis, to determine what may or may not be confounding information. The opinion she offers now is purely speculative and therefore unreliable.

78. The careful and correct implementation of the inflation ribbon and damages model utilizes valuation tools routinely used for virtually every publicly traded security. The analysis aims to ascertain the price at which informed market participants would trade any particular security. In an efficient market, traders and investors update their valuations continuously to reflect changes in information and forensic analysts seek to replicate market participants' valuations.

79. The forensic analyst has at their employ a variety of valuation tools designed to accommodate the potential valuation complexities identified by Dr. Sabry. Among the commonly used valuation tools that are available are valuation multiple models, such as those based on earnings, EBITDA, revenue, book value, and cash flow; discounted cash flow models (DCF); return attribution analysis; and the literature regarding valuation effects of factors such as reputation and quality of accounting. In addition, forensic analysts have the added benefit of event study analysis. The valuation analysis necessary to compute inflation and damages is clearly feasible and routinely implemented in securities litigation.

80. The construction of the inflation ribbon is an application of standard valuation analysis. If asked by Counsel, and upon the completion of discovery, I will construct, carefully and correctly, an inflation ribbon that will serve as the basis of per-share damages calculations

for the NIO ADSs. The Sabry Declaration provides me no reason to revise my conclusion that a common damages methodology, consistent with Plaintiffs' theory of liability, can be applied to compute Section 10(b) damages for all investors who purchased NIO ADSs during the Relevant Period.

## IV.    LIMITING FACTORS AND OTHER ASSUMPTIONS

81.    My analyses and opinions are based on the information available as of the date of this declaration. Should any additional data or information become available subsequent to the submission of this declaration, I reserve the right to supplement or amend this declaration based on this new information.


Dated:      December 23, 2022

Adam Werner, PhD
Affiliated Expert,
Crowninshield Financial Research

**Exhibit-1**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

**EDUCATION**

1998        Northwestern University, Kellogg Graduate School of Management
            Ph.D. in Finance

1992        Oberlin College
            B.A. in Economics

**TEACHING EXPERIENCE**

2014 – Present        Cal Poly San Luis Obispo
                      Orfalea College of Business
                      San Luis Obispo, CA
                      Lecturer in Economics

**BUSINESS EXPERIENCE**

2015 – Present        Crowninshield Financial Research

2018 – 2021           Pismo Beach Planning Commission

2009 – 2015           Gnarus Advisors/Berkeley Economic Consulting

2008 – 2009           LitiNomics

2004 – 2008           CRA International

2000 – 2003           National Economic Research Associates, Inc.

1998 – 2000           Cornerstone Research

1992 – 1993           Federal Reserve Bank

**PAPERS AND PUBLICATIONS**

"The Impact of Underwriter Reputation on Equity Offering: An Empirical Study."
Thesis, 1999.

"The Long-Run Performance of Underwriters and its Impact on Seasoned Equity
Offerings." 1999.

"Dynamic Measures of Underwriter Reputation: A Study of IPO's." 1999.

"CAFE Economics: A Note on the Limits and Effectiveness of Fuel Economy
Regulation." With Stephen Sheppard, 1992.

**Exhibit-1**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

"Trading Models Underestimate Securities Class Damages." with Narinder Walia, Law360, 2019.

"More 'Dark Pools" Deepen Litigation Issues." Law360, 2013.

"Recent Trends in Securities Class Action Litigation: Will Enron and Sarbanes-Oxley Change the Tides." with Elaine Buckberg, Todd Foster and Ronald Miller, 2003.

"The Effects of the PSLRA and Subsequent Events on Securities Litigation." With Fred Dunbar and Todd Foster, prepared for the New York City Bar Association, 2003.

"The Energy Tax: Who Pays?" joint with Mark Schweitzer, in Federal Reserve Bank of Cleveland's Economic Commentary, 1993.

## PRESENTATIONS

"Cause or Effect: Are Settlement Statistics Driving Down Settlements?" Presentation to Robbins Geller Rudman & Dowd, LLP in San Diego, CA on October 10, 2013, Wolf Popper, LLP in New York, NY on September 18, 2013, Abraham, Fruchter & Twersky, LLP in New York, NY on September 17, 2013, Robbins Geller Rudman & Dowd, LLP in Melville, NY on September 11, 2013, Entwistle & Cappucci, LLP in New York, NY on September 10, 2013, and Faruqi & Faruqi, LLP in New York, NY on September 10, 2013.

"The Economics of Securities Litigation." Sidley & Austin in Los Angeles, CA on March 14, 2007.

"The Global Cost of Capital." Panel discussion on valuing assets in foreign countries at the University of Texas School of Law VALCON conference in Las Vegas on February 8, 2007.

"Economic Damages in Securities Fraud Matters." NERA Luncheon Seminars with Alan Cox given at the Fifth Avenue Suites Hotel in Portland, OR on November 19, 2002 and at the W Hotel in Seattle, WA on November 20, 2002.

"Shareholder Class Actions: Calculation of Damages." Presentation to Skadden, Arps, Slate, Meagher & Flom, LLP in San Francisco, CA on October 30, 2002, Marsh FINPRO in San Francisco, CA on September 18, 2002, Marsh Risk & Insurance Services in San Diego, CA on September 17, 2002 and Marsh FINPRO in Los Angeles, CA on September 13, 2002.

"Capital Formation: Class Action Litigation and Prevention." Speech and panel discussion focusing on securities class action litigation, which sometimes arise from

**Exhibit-1**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

initial public offerings and/or market volatility in the aftermarket. Presented at the 2002 CALBIO Summit in San Diego, CA on April 23, 2002.

"Shareholder Class Actions after the NASDAQ Bubble." Speech given to the Securities Litigation Sub-Committee of the Colorado Bar Association at Holland & Hart, LLP in Denver, CO on April 17, 2002.

"Trends in Litigation: How Claims and Losses Are Valued." Speech at the American Bankers Association Insurance Risk Management Annual Conference in San Diego, CA on February 4, 2002.

"Recent Trends in Securities Litigation." "Basic Economic Analysis in Securities Class Action" and "Challenging the Efficient Market Assumption in Securities Class Action Matters." presented to Cooley Godward in San Diego, CA on November 28, 2001. "Recent Trends in Securities Litigation." presentation with Marcia Mayer given at Howard, Rice, Nemerovski, Canady, Falk & Rabkin in San Francisco, CA on November 27, 2001.

"Recent Trends in Securities Litigation." presentation given to Marsh USA in Denver, CO on November 8, 2001, and Thelen, Reid & Priest in Los Angeles, CA on November 6, 2001.

"Financial Economics in Litigation." speech presented to Simpson, Thacher & Bartlett in Palo Alto, CA on July 31, 2001, Baker & McKenzie in San Diego, CA on July 18, 2001, Brobeck, Phleger & Harrison in San Francisco, CA on June 25, 2001 and to Latham & Watkins in San Francisco, CA on June 26, 2001.

"Economic Analysis in Securities Fraud Cases." Speech with Alan Cox delivered to Morrison & Forester, San Francisco, CA on July 25, 2001.

"Recent Trends: Shareholder Class Actions Five Years After the PSLRA." speech presented to Shearman & Sterling in San Francisco, CA on May 23, 2001, O'Melveny & Myers in Los Angeles, CA on May 30, 2001 and Gray, Cary, Ware & Freidenrich in San Diego, CA on June 6, 2001.

## EXPERT REPORTS AND TESTIMONY

*Gelt Trading LTD. v. Co-Diagnostics, Inc., et al.* Issued a declaration (2022) on market efficiency and issued a rebuttal declaration (2022) on price impact in a securities class action. " (District of Utah, Central Division).

*6D Global Technologies, Inc. Securities Litigation.* Issued a declaration (2022) on loss causation and damages in a securities class action. (Southern District of New York).

**Exhibit-1**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

*In Re: NIO, Inc. Securities Litigation*. Issued a declaration (2022) and provided deposition testimony (2022) on market efficiency in a securities class action. (Eastern District of New York).

*Securities and Exchange Commission v. Bradley C. Davis.* Issued a report (2021), a rebuttal report (2021), provided deposition testimony (2021), and provided trial testimony (2022) on materiality in a case brought by the SEC (U.S.D.C. Central District of California).

*In Re: Omega Healthcare Investors, Inc. Securities Litigation*. Issued a declaration (2022), provided deposition testimony (2022), and issued a rebuttal declaration (2022) on market efficiency in a securities class action. (Southern District of New York).

*Andrew Trampe v. CD Projekt S.A.* Issued a declaration (2022) on aggregate damages in a securities class action. (Central District of California).

*In re Global Brokerage, Inc. f/k/a/ FXCM Inc.* Issued a report (2020), a rebuttal report (2020), provided deposition testimony (2020) and testified (2020) on market efficiency in a securities class action. Issued a report (2021), a rebuttal report (2021) and provided deposition testimony (2021) on loss causation and damages (U.S.D.C. Southern District of New York).

*George Barney, et al. v. Nova Lifestyle, Inc., et al.* Issued a report on market efficiency in a securities class action (U.S.D.C. Central District of California, 2021).

*Peter Voulgaris, et al. v. Array Biopharma Inc., et al.* Issued a declaration on market efficient in a securities class action (District of Colorado, 2021).

*In re Innocoll Holdings Public Limited Company Securities Litigation.* Issued a report (2020), provided deposition testimony (2020) on market efficiency, and issued a rebuttal report (2020) in a securities class action (U.S.D.C. Eastern District of Pennsylvania).

*Michael Tietz, et al. v. Crytobloc Technologies Corp., et al.* Issued a report on price impact in a securities class action (Supreme Court of British Columbia, 2020).

*In re Horsehead Holding Corp. Securities Litigation.* Issues a report (2020) and provided deposition testimony (2020) on market efficiency in a securities class action (U.S.D.C. District of Delaware).

*Bing Li, et al. v. Aeterna Zentaris, Inc., et al.* Issued a declaration (2016), a report (2017), and provided deposition testimony (2017) on market efficiency in a securities class action. Issued a declaration (2019) a reply report (2019), and provided deposition testimony (2020) on loss causation and damages (U.S.D.C. District of New Jersey).

**Exhibit-1**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

*In re Patriot National Inc. Securities Litigation.* Issued a declaration (2019) and a supplemental declaration (2019) on damages in a securities class action (U.S.D.C. Southern District of New York).

*Hamza Ramzan, et al. v. GDS Holdings Limited, et al.* Issued a declaration on NASDAQ microstructure in a securities class action (U.S.D.C. Eastern District of Texas, Marshall Division, 2019).

*Ivan Nibur, et al. v. SandRidge Mississippian Trust I, et al.* Issued a declaration (2018), a reply declaration (2018), a supplemental reply declaration (2018), and provided deposition testimony (2018) on market efficiency in a securities class action. Issued a declaration (2019) a rebuttal declaration (2019), and provided deposition testimony (2019) on loss causation and damages (U.S.D.C. Western District of Oklahoma).

*In Re Insys Theraputics, Inc. Securities Litigation.* Issued a report on market efficiency in a securities class action (U.S.D.C. Southern District of New York, 2019).

*In Re Spectrum Pharmaceuticals, Inc. Securities Litigation.* Issued a declaration (2019) and provided deposition testimony (2019) on market efficiency in a securities class action (U.S.D.C. District of Nevada).

*Amanda Beezley et al. v. Fenix Parts, Inc., et al.* Issued a declaration on market efficiency in a securities class action (U.S.D.C. Northern District of Illinois, Eastern Division, 2019).

*Michael Desta, et al. v. Volkswagen Aktiengesellschaft, et al.* Issued a declaration regarding benefits to firms that have ADRs listed in a securities class action (U.S.D.C. Eastern District of New York, 2018).

*Michael Desta, et al. v. Wins Finance Holdings Inc., et al.* Issued a declaration (2018) and provided deposition testimony (2018) on market efficiency in a securities class action (U.S.D.C. Central District of California).

*Andrew Meyer, et al. v. Concordia International Corp., et al.* Issued a declaration (2018), a reply declaration (2018), and provided deposition testimony (2018) on market efficiency in a securities class action. Issued a declaration (2018), a reply declaration (2018), and provided deposition testimony (2018) on loss causation and damages (U.S.D.C. Southern District of New York).

*In re: K12 Securities Litigation.* Issued a declaration (2018) and provided deposition testimony (2018) on market efficiency in a securities class action (U.S.D.C. Northern District of California).

**Exhibit-1**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

*Robert Colman, et al. v. Theranos, Inc., et al.* Issued a declaration on damage methodology and price impact in a securities class action (U.S.D.C. Northern District of California, San Jose Division, 2018).

*In re: CytRx Corporation Securities Litigation.* Issued a declaration (2017) and provided deposition testimony (2018) regarding market efficiency in a securities class action (U.S.D.C. Central District of California).

*Lord Abbett Affiliated Fund, Inc., et al. v. American International Group, Inc.* Issued a report regarding market efficiency, loss causation, and damages in a securities case (U.S.D.C. Southern District of New York, 2017).

*Xiaolin Chi, et al. v. Qiao Xing Universal Resources, Inc., et al.* Issued a report on damages in a securities class action (District Court of the Virgin Islands, St. Croix Division, 2017).

*John Hosey v. Twitter, Inc., et al.* Issued a declaration (2017) and provided deposition testimony (2017) regarding rebuttal to Defendants' Motion for Summary Judgement in a securities class action (Superior Court of the State of California, County of San Mateo).

*Gwyn R. Hartman Revocable Living Trust v. Southern Michigan Bancorp, Inc. et al.* Issued a report on damages arising from alleged exclusions in a proxy solicitation (U.S.D.C. Western District of Michigan, 2017).

*Fred Kelsey, et al. v. Textura Corporation, et al.* Issued a declaration (2017) and provided deposition testimony (2017) on market efficiency in a securities class action (U.S.D.C. Northern District of Illinois).

*Dave Carlton, et al. v. Fred Cannon.* Issued a declaration on market efficiency in a securities class action (U.S.D.C. Southern District of Texas, Houston Division, 2016).

*James Middlemiss v. Penn West Petroleum LTD., et al.* Issued a report on damages in a securities class action (Superior Court of Justice Ontario, Canada, 2016).

*David Loritz, et al. v. Exide Technologies, et al.* Issued a report on damages and loss causation in a securities class action (U.S.D.C. Central District of California, 2015)

*Manishkumar Khunt, et al. v. Alibaba Group Holding Limited, et al.* Issued a declaration on potential investor damages in a securities class action (U.S.D.C. Southern District of New York, 2015).

*Biotechnology Value Fund, L.P. et al. v. Celera Corporation et al.* Issued a report (2014), a reply report (2014), a supplemental report (2014), and provided deposition

**Exhibit-1**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

testimony (2014) on damages arising from a merger (U.S.D.C. Northern District of California).

*In re: Hi-Crush Partners L.P. Securities Litigation.* Issued a declaration (2014), a supplemental declaration (2014), and provided deposition testimony (2014) regarding market efficiency in a securities class action (U.S.D.C. Southern District of New York).

*Ian Mausner v. MarketByte LLC, et al.* Issued a declaration about investment advisor incentives and liquidity needs in a securities class action (U.S.D.C. Southern District of California, 2014).

*Artes Medical, Inc. v. Lemperle et al.* Provided deposition testimony on behalf of defendants about alleged damages caused by a proxy contest (Superior Court of the State of California, County of San Diego, Central District, 2013).

*In re: Ebix Inc. Securities Litigation.* Issued a declaration (2012) and provided deposition testimony (2013) regarding market efficiency in a securities class action (U.S.D.C. Northern District of Georgia, Atlanta Division).

*Erik Poole and William Rhody v. Alange Energy Corp., et al.* Issued a report (2012) and a reply report (2013) on market efficiency and damages in a securities class action (Superior Court of Justice Ontario, Canada).

*In re: Hecla Mining Securities Litigation.* Issued a declaration on investor losses in a securities class action (U.S.D.C. District of Idaho, 2012).

*Mark Henning, Roman Zaretski and Chrisitan Stillmark v. Orient Paper, Inc. et al.* Issued a declaration (2011), a supplemental declaration (2012) and provided deposition testimony (2012) regarding market efficiency in a securities class action (U.S.D.C. Central District of California).

*Carlos Munoz et al. v. China Expert Technology, Inc., et al.* Issued a declaration (2012), a supplemental declaration (2012) and provided deposition testimony (2012) in a securities class action regarding market efficiency (U.S.D.C. Southern District of New York).

*Theodore Dean, et al. v. China Agritech, Inc., et al.* Issued a declaration (2012), a supplemental declaration (2012) and provided deposition testimony (2012) in a case regarding market efficiency in a securities class action (U.S.D.C. Central District of California).

*Robert Michael Shenk, Derivatively on Behalf of Sirius XM Radio Inc. v. Melvin Alan Karmazin, et al.* Issued an expert report (2011), a supplemental expert report (2012) and provided deposition testimony (2012) in a case involving damages in a shareholder derivative matter (U.S.D.C. Southern District of New York).

**Exhibit-1**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

*Pathway Investments Pty Ltd and Doystoy Pty Ltd v. National Australia Bank Ltd.*
Submitted a report on survey techniques, the efficient market hypothesis and liquidity in
a securities class action (Supreme Court of Victoria at Melbourne, Australia, Commercial
and Equity Division, Commercial Court, 2012).

*Bruce Simmonds, Robert Grant and Gordon Moore v. Armtec Infrastructure Inc. et al.*
Issued a report on market efficiency and damages in a securities class action (Superior
Court of Justice Ontario, Canada, 2011).

*In re: BP plc. Securities Litigation*. Issued a declaration regarding damages and
materiality in a securities class action (U.S.D.C. Southern District of Texas, Houston
Division, 2010).

*In re: Tripath Technology Inc., Debtor*. Issued a report (2009) and provided deposition
testimony (2010) regarding damages arising from Directors' and Officers' breach of
fiduciary duty in bankruptcy court (U.S.D.C. Northern District of California, San Jose
Division).

*David Ainslie and Muriel Marentette v. CV Technologies et al*. Issued a report estimating
damages in a securities class action (Superior Court of Justice, Ontario, Canada, 2010).

*Harry Stackhouse, on Behalf of Himself and All Others Similarly Situated v. Toyota
Motor Corporation, et al.* Issued a declaration regarding the relationship between
Toyota's U.S. stock price and Japanese stock price in a securities class action (U.S.D.C.
Central District of California, 2010).

*Phillip Elliot and William Kormos v. NovaGold Resources Inc., et al.* Issued a declaration
in a securities class action regarding trading volume in the U.S. versus Canada. (Superior
Court of Justice, Ontario, Canada, 2010).

*International Arbitration between a private equity firm and Chinese biotech company.*
Issued a report (2008) and testified (2009) before an International Arbitration Committee
regarding the value of a private equity investment.

*Arbitration between Albert Richards and Old Republic Title Insurance.* Deposed
regarding estimated damages incurred by plaintiff as a result of a forced sale of Russian
securities due to Old Republic's breach of contract (2008).

*Californians United for a Responsible Budget, et al., v. California State Public Works
Board, et al.* Issued a report on the cost of issuing revenue bonds to fund California
prison expansion (The Superior Court for the State of California, County of Sacramento,
2008).

**Exhibit-1**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

*Arbitration between Daniel Lyons and Morgan Lyons, and Chinese Hospital Association and Sam English.* Deposed regarding plaintiffs' calculated damages arising from asbestos exposure for plaintiff (2003).

## ENGAGEMENTS

### Securities and Finance

In re: China Medicine Corporation Securities Litigation. Retained by class counsel to estimate damages and determine market efficiency in a securities class action.

In re: Citigroup Inc. Securities Litigation. Testified as to damages and inflation in a securities class action.

In re: Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation. Retained by class counsel as damages expert in a derivative securities class action.

Government of Guam Retirement Fund et al. v Countrywide Financial Corp, et al. Retained by class counsel to estimate damages in a securities class action.

Keith Cohn v. Sanford C. Bernstein & Co., LLC and Alliance Bernstein LP. Retained by client to testify on portfolio risk in a FINRA arbitration.

In re: Semgroup Energy Partners, L.P., Securities Litigation. Retained by Plaintiffs to estimate damages in a securities class action.

Asbestos Workers Philadelphia Pension Fund v. Merix Corporation, et al. Retained by Plaintiffs to evaluate fairness of merger between Merix and Viasystems.

Retained by Goldman Sachs to provide consulting on the IPO process, the valuation of securities at IPO and the possible impact of "tie-in" agreements on the pricing of IPOs for the purpose of analyzing class certification and damages.

Joseph Phelps Vineyards, Inc., et al., v Craig Williams, et al. Retained by Joseph Phelps Vineyards to estimate the value of the winery as part of arbitration.

UnitedHealth Group Option Backdating Investigation. Retained by a Special Litigation Committee formed by UnitedHealth Group's board of directors to estimate harm caused by company's decision to backdate options.

**Exhibit-1**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

SEC v. Henry Nicholas, et al. Retained by founder of Broadcom to estimated harm caused by company's decision to backdate options.

Enrico Bondi on behalf of Parmalat S.p.A. v. Bank of America et al. Hired by Bank of America to rebut damage arguments regarding Bank of America's role in Parmalat's eventual bankruptcy.

Capital Trading Co. v. Conor Medsystems. Retained to analyze a fairness opinion issued by Citigroup regarding the price offered by Johnson & Johnson to acquire Conor.

Enron Solvency. Retained by the surviving Enron Corporation to estimate the value of its assets for litigation purposes.

SEC v. Spear Leeds Kellogg (Goldman Sachs.) et al. Estimated damages associated with trading ahead allegations made by the SEC on behalf of Goldman market makers on the New York Stock Exchange, American Stock Exchange, Philadelphia Stock Exchange and the Chicago Board of Options Exchange.

General Fire and Casualty co. et al. v. Guy Carpenter and Co., Inc. Hired by defendant to rebut allegations that it had given incorrect advice to the plaintiff regarding reinsurance contracts.

R.D. Hubbard v. Pinnacle Entertainment, Inc. Analyzed the value of options granted and later rescinded on behalf of our client, the defendant.

Thomas Slemmer, et al. v. Cucamonga Valley Water District, et al. Estimated the value of restricted stock in a mutual water company.

Department of Labor v. Genuity (investigation). Assisted Genuity in an investigation by the Department of Labor as to whether or not Genuity stock was a safe investment for Genuity's pension fund. Investigation was dismissed.

Jason Stanley, et al. v. Safeskin Corporation, et al. Estimated damages and consulted on materiality for defendant in a securities class action.

Nanogen, Inc. v. Donald D. Montgomery and CombiMatrix Corporation. Estimated damages for defendant in cross complaint over a failed IPO resulting from plaintiff's claims of patent infringement in genomic industry.

Conseco, Inc. Securities Litigation. Retained by defendants to calculate damages in a securities class action matter.

**Exhibit-1**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

Madison/OHI Liquidity Investors, LLC v. Omega Healthcare Investors. Estimated damages to Madison's investment funds as a result of the early termination of a debt facility.

Barbara Rosen, et al. v. Macromedia, Inc., et al. Prepared rebuttal analyses in securities class action suit on behalf of Macromedia.

Karen Yarborough v. PeopleSoft, Inc. and Does 1-20. Calculated value of stock option package in wrongful termination suit on behalf of PeopleSoft.

Michael Carabetta v. Novadigm, Inc., et al. Did analysis of damages to a former company insider on behalf of Novadigm. Estimated value of lost options and salary.

Allen T. Gilliland Trust, et al. v. H&F MobileMedia Partners, LLC, et al. Engaged by auditors to analyze plaintiffs' decision to affirm a prior transaction.

California Federal Bank v. United States. Estimated damages caused by government in breach of contract case on behalf of Cal Fed.

LaSalle Talman v. United States. Estimated damages caused by government in breach of contract case on behalf of LaSalle Talman.

### Intellectual Property

Transocean v. Maersk. Retained by Maersk to defend claims of patent infringement in case involving oil drilling technology.

Abbott Laboratories, et al. v. Sandoz, Inc. Retained on behalf of Abbott to estimate patent infringement damages as a result of Sandoz's decision to introduce a generic drug prior to the expiration of a patent.

LG Phillips LCD Co., LTD v. Tatung, Chunghwa Picture Tubes, et al. Provided rebuttal analysis for defendants in a patent infringement case dealing with LCD technology.

PostX Corporation v. Secure Data in Motion, Inc. d/b/a/ Sigaba Corporation. Calculated damages arising from tortuous interference and patent infringement in the secure document delivery market. Client was victorious on both complaint and cross-complaint.

Larkspur Data Resources, Inc. v. Trust Administrators, et al. Assisted plaintiff in calculating damages in trademark and copyright infringement case involving proprietary databases.

**Exhibit-1**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

Dioptics Medical Products, Inc. v. The Cooper Companies, Inc.; CooperVision, Inc.; A. Thomas Bender; and Does 1-15. Retained by plaintiff to calculate damages in a copyright infringement case over naming of eyewear.

Intel Corporation v. Broadcom Corporation. Retained by Broadcom to estimate damages alleged by Intel based on charges of patent infringement.

Australia Vision Services Pty. Ltd. v. Dioptics Medical Products, Inc., Henry Lane, and individual, and Does 1-10. Estimated profits lost by Dioptics as a result of a competitor's allegations of patent infringement.

American Booksellers Association, Inc. v. Barnes & Noble, et al. Worked on analysis of publisher discounts and analysis of openings and closings of bookstores on behalf of Borders.

**Exhibit-2**
**Documents Considered**
**In Addition to Those Cited in My June Declaration**

**CASE DOCUMENTS**
- Declaration of Dr. Adam Werner, dated June 21, 2022
- Declaration of Dr. Faten Sabry, dated June 21, 2022
- Deposition of Dr. Faten Sabry, dated November 11, 2022

**NEWS ARTICLES AND PRESS RELEASES**
- "Nio Co. Ltd. Researchers Submit Patent Application," Functional Key Assembly with Symbol Showing Functions and Its Manufacturing Method", for Approval (USPTO 20180297454)," *Politics & Government Week*, November 19,2018.
- "09:56 EDT NIO rallies after Citron puts $12 short-target on shares", *theflyonthewall.com*, November 19, 2018.
- "*60 Minutes Correspondent Refers to NIO as TESLA KILLER," *Bloomberg*, February 22, 2019, 3:50 PM.
- "In China, an Electric Car Lifestyle," by Brit Mccandless Farmer, CBS New, February 24, 2019, 6:43 PM. (https://www.cbsnews.com/news/in-china-an-electric-car-lifestyle-60-minutes/).
- "NIO Shares Gain 11% After ES8 SUV Featured on CBS '60 Minutes'," by Gerald Porter Jr., *Bloomberg*, February 25, 2019, 10:25 am.
- "NIO Inc. Reports Unaudited Fourth Quarter and Full Year 2018 Financial Results," Company press release, *GlobeNewswire*, March 5, 2019, 4:14 PM.
- "NIO Sinks by Record on Weak Delivery Outlook, Scrapped Plant," by Esha Dey and Ryan Vlastelica, *Bloomberg News*, March 6, 2019, 9:20 PM.
- "Chinese Tesla rival Nio is crashing after slashing its delivery outlook and calling off plans for a Shanghai factory (NIO)," *Business Insider*, March 6, 2019, 2:08 PM.
- "NIO ADRs Falling for Second Straight Day," by Stephen Nakrosis, *Dow Jones Institutional News*, March 7, 2019, 3:13 PM.

**ANALYST REPORTS**
- Citron Research, November 19, 2018.
- JPMorgan, January 14, 2019.

**SEC FILINGS**
- NIO Inc., Form F-1, filed August 13, 2018.
- NIO Inc., Form F-1/A, filed August 28, 2018.
- NIO Inc., Form F-1/A, filed August 31, 2018.
- NIO Inc., Form F-1/A, filed September 7, 2018.
- NIO Inc., Form F-1/A, filed September 10, 2018.
- NIO Inc., Form F-1/A, filed September 11, 2018.

**ACADEMIC AND PROFESSIONAL LITERATURE**

- Fama, Eugene F., "Market Efficiency, Long-Term Returns, and Behavioral Finance," *Journal of Financial Economics*, 1998.
- Lo, Andrew A., and Craig MacKinlay, "Stock Market Prices Do Not Follow Random Walks: Evidence from a Simple Specification Test," *Journal of Financial Studies*, 1988.
- Patell, James M., and Mark A. Wolfson, "The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Announcements." *Journal of Financial Economics* 13, June 1984.

**OTHER**

- All analyst and news reports cited and produced by Dr. Sabry.
- "NIO - Chinese EV Shooting Star Shocks Investors with Weak Outlook, Cancels Shanghai Factory Plans," by Henrik Alex, *Seeking Alpha*, March 6, 2019, 7:39 AM.

**Exhibit-3**

## NIO Alternative Peer Index Returns

8 October 2018 through 7 March 2019

| Date | Alternative Peer Index Return |
|---|---|
| 10/8/2018 | -0.28% |
| 10/9/2018 | -1.69% |
| 10/10/2018 | -1.16% |
| 10/11/2018 | -1.99% |
| 10/12/2018 | 0.22% |
| 10/15/2018 | -0.54% |
| 10/16/2018 | 1.33% |
| 10/17/2018 | -0.64% |
| 10/18/2018 | -0.97% |
| 10/19/2018 | -1.15% |
| 10/22/2018 | 0.00% |
| 10/23/2018 | -0.36% |
| 10/24/2018 | -1.41% |
| 10/25/2018 | -0.07% |
| 10/26/2018 | 0.81% |
| 10/29/2018 | 0.29% |
| 10/30/2018 | 0.41% |
| 10/31/2018 | 1.92% |
| 11/1/2018 | 0.62% |
| 11/2/2018 | 0.90% |
| 11/5/2018 | -0.97% |
| 11/6/2018 | 0.74% |
| 11/7/2018 | 0.13% |
| 11/8/2018 | -0.42% |
| 11/9/2018 | -0.92% |
| 11/12/2018 | -1.16% |
| 11/13/2018 | -0.06% |
| 11/14/2018 | 1.08% |
| 11/15/2018 | -0.26% |
| 11/16/2018 | -0.06% |
| 11/19/2018 | 0.25% |
| 11/20/2018 | -0.99% |
| 11/21/2018 | 0.53% |
| 11/23/2018 | -0.21% |
| 11/26/2018 | 1.26% |
| 11/27/2018 | -0.28% |
| 11/28/2018 | 0.24% |

## Exhibit-3

## NIO Alternative Peer Index Returns

8 October 2018 through 7 March 2019

| Date | Alternative Peer Index Return |
|------|-------------------------------|
| 11/29/2018 | 0.42% |
| 11/30/2018 | 0.12% |
| 12/3/2018 | 2.14% |
| 12/4/2018 | -1.91% |
| 12/6/2018 | -1.71% |
| 12/7/2018 | -0.40% |
| 12/10/2018 | -2.04% |
| 12/11/2018 | -0.05% |
| 12/12/2018 | 2.25% |
| 12/13/2018 | 0.25% |
| 12/14/2018 | -1.21% |
| 12/17/2018 | -0.23% |
| 12/18/2018 | -0.23% |
| 12/19/2018 | 0.23% |
| 12/20/2018 | -1.01% |
| 12/21/2018 | -1.72% |
| 12/24/2018 | -0.30% |
| 12/26/2018 | 1.28% |
| 12/27/2018 | 0.85% |
| 12/28/2018 | 0.84% |
| 12/31/2018 | 0.38% |
| 1/2/2019 | -0.88% |
| 1/3/2019 | -0.26% |
| 1/4/2019 | 0.95% |
| 1/7/2019 | 2.09% |
| 1/8/2019 | 0.88% |
| 1/9/2019 | 2.28% |
| 1/10/2019 | -0.30% |
| 1/11/2019 | 0.45% |
| 1/14/2019 | 0.21% |
| 1/15/2019 | 0.42% |
| 1/16/2019 | -0.22% |
| 1/17/2019 | -0.10% |
| 1/18/2019 | 0.64% |
| 1/22/2019 | -0.76% |
| 1/23/2019 | -0.76% |
| 1/24/2019 | 0.82% |

## Exhibit-3

### NIO Alternative Peer Index Returns

8 October 2018 through 7 March 2019

| Date | Alternative Peer Index Return |
|------|-------------------------------|
| 1/25/2019 | 1.63% |
| 1/28/2019 | -0.77% |
| 1/29/2019 | -0.25% |
| 1/30/2019 | 0.34% |
| 1/31/2019 | 0.81% |
| 2/1/2019 | -0.03% |
| 2/4/2019 | -0.34% |
| 2/5/2019 | 0.46% |
| 2/6/2019 | -0.38% |
| 2/7/2019 | -2.30% |
| 2/8/2019 | -1.80% |
| 2/11/2019 | -0.05% |
| 2/12/2019 | 2.17% |
| 2/13/2019 | 0.13% |
| 2/14/2019 | -0.24% |
| 2/15/2019 | 0.37% |
| 2/19/2019 | 0.23% |
| 2/20/2019 | 1.10% |
| 2/21/2019 | -0.27% |
| 2/22/2019 | 0.38% |
| 2/25/2019 | 1.01% |
| 2/26/2019 | 0.16% |
| 2/27/2019 | -0.19% |
| 2/28/2019 | -0.87% |
| 3/1/2019 | 0.18% |
| 3/4/2019 | -0.34% |
| 3/5/2019 | -0.60% |
| 3/6/2019 | -0.59% |
| 3/7/2019 | -1.46% |

**Sources**: Refinitiv Eikon.
**Note:** All returns are logarithmic returns.

**Exhibit-4**

**NIO Regression Results Using Alternative Peer Index**

Estimation Period: October 8, 2018 through October 8, 2019

| Regression Statistics | |
|---|---|
| R Squared | 0.350 |
| Adjusted R Squared | 0.326 |
| Standard Error | 4.26% |
| Observations | 252 |

| | Coefficients | Standard Error | *t*- statistic |
|---|---|---|---|
| Intercept | -0.38% | 0.27% | -1.39 |
| Market Index | 1.38 | 0.312 | 4.42 |
| Peer Index | 0.54 | 0.365 | 1.49 |
| 10/9/2018 | 0.22 | 0.043 | 5.04 |
| 11/6/2018 | -5.09% | 4.28% | -1.19 |
| 11/30/2018 | -1.65% | 4.28% | -0.39 |
| 3/6/2019 | -22.00% | 4.28% | -5.14 |
| 3/7/2019 | -10.00% | 4.30% | -2.33 |
| 5/28/2019 | 4.69% | 4.29% | 1.09 |
| 9/24/2019 | -20.69% | 4.28% | -4.83 |

**Exhibit-5**

**NIO Event Study Results Using Alternative Peer Index**

October 8, 2018 through March 7, 2019

| Date | NIO LN Return | NIO Explained Return | NIO Residual Return | $t$-statistic[1] | |
|---|---|---|---|---|---|
| 10/8/2018 | -3.58% | -0.71% | -2.86% | -0.67 | |
| 10/9/2018 | 20.17% | -1.54% | 21.71% | 5.09 | * |
| 10/10/2018 | 4.76% | -5.40% | 10.15% | 2.38 | * |
| 10/11/2018 | -7.64% | -4.07% | -3.57% | -0.84 | |
| 10/12/2018 | 3.83% | 1.43% | 2.40% | 0.56 | |
| 10/15/2018 | 4.71% | -1.18% | 5.89% | 1.38 | |
| 10/16/2018 | 2.77% | 3.27% | -0.50% | -0.12 | |
| 10/17/2018 | -3.42% | -0.92% | -2.50% | -0.59 | |
| 10/18/2018 | -3.54% | -2.93% | -0.60% | -0.14 | |
| 10/19/2018 | -2.43% | -1.25% | -1.18% | -0.28 | |
| 10/22/2018 | -4.04% | -0.91% | -3.13% | -0.73 | |
| 10/23/2018 | -3.18% | -1.40% | -1.78% | -0.42 | |
| 10/24/2018 | -9.87% | -5.43% | -4.44% | -1.04 | |
| 10/25/2018 | 4.44% | 1.97% | 2.47% | 0.58 | |
| 10/26/2018 | -1.56% | -2.10% | 0.53% | 0.13 | |
| 10/29/2018 | -2.55% | -1.19% | -1.36% | -0.32 | |
| 10/30/2018 | -3.95% | 1.98% | -5.93% | -1.39 | |
| 10/31/2018 | -0.84% | 2.10% | -2.94% | -0.69 | |
| 11/1/2018 | 11.51% | 1.74% | 9.78% | 2.29 | * |
| 11/2/2018 | -1.98% | -0.55% | -1.43% | -0.34 | |
| 11/5/2018 | 2.89% | -0.29% | 3.18% | 0.75 | |
| 11/6/2018 | -4.28% | 0.81% | -5.09% | -1.19 | |
| 11/7/2018 | 5.18% | 2.33% | 2.85% | 0.67 | |
| 11/8/2018 | -0.74% | -1.01% | 0.26% | 0.06 | |
| 11/9/2018 | 1.19% | -2.22% | 3.41% | 0.80 | |
| 11/12/2018 | -1.79% | -3.63% | 1.84% | 0.43 | |
| 11/13/2018 | 1.94% | -0.57% | 2.51% | 0.59 | |
| 11/14/2018 | 4.61% | -0.70% | 5.31% | 1.25 | |
| 11/15/2018 | 3.32% | 0.96% | 2.36% | 0.55 | |
| 11/16/2018 | -2.06% | -0.12% | -1.94% | -0.46 | |
| 11/19/2018 | 8.65% | -2.55% | 11.20% | 2.63 | * |
| 11/20/2018 | -2.19% | -3.42% | 1.22% | 0.29 | |
| 11/21/2018 | 0.52% | 0.76% | -0.24% | -0.06 | |
| 11/23/2018 | -3.30% | -1.26% | -2.04% | -0.48 | |
| 11/26/2018 | -1.21% | 2.30% | -3.52% | -0.83 | |
| 11/27/2018 | 1.48% | -0.46% | 1.94% | 0.45 | |

**Exhibit-5**

**NIO Event Study Results Using Alternative Peer Index**

October 8, 2018 through March 7, 2019

| Date | NIO LN Return | NIO Explained Return | NIO Residual Return | t-statistic[1] |
|---|---|---|---|---|
| 11/28/2018 | 8.21% | 2.79% | 5.42% | 1.27 |
| 11/29/2018 | -4.15% | -0.39% | -3.75% | -0.88 |
| 11/30/2018 | -1.03% | 0.62% | -1.65% | -0.39 |
| 12/3/2018 | -1.70% | 2.35% | -4.05% | -0.95 |
| 12/4/2018 | -6.82% | -5.86% | -0.96% | -0.23 |
| 12/6/2018 | 4.01% | -1.56% | 5.58% | 1.31 |
| 12/7/2018 | -5.29% | -3.53% | -1.76% | -0.41 |
| 12/10/2018 | 0.57% | -1.52% | 2.09% | 0.49 |
| 12/11/2018 | 0.71% | -0.50% | 1.21% | 0.28 |
| 12/12/2018 | 6.29% | 1.71% | 4.58% | 1.07 |
| 12/13/2018 | 2.75% | -0.54% | 3.29% | 0.77 |
| 12/14/2018 | -0.65% | -3.41% | 2.77% | 0.65 |
| 12/17/2018 | -9.10% | -3.42% | -5.69% | -1.33 |
| 12/18/2018 | 0.57% | -0.53% | 1.10% | 0.26 |
| 12/19/2018 | -3.45% | -2.31% | -1.14% | -0.27 |
| 12/20/2018 | -4.65% | -3.06% | -1.58% | -0.37 |
| 12/21/2018 | -7.15% | -4.18% | -2.97% | -0.70 |
| 12/24/2018 | -2.50% | -3.91% | 1.41% | 0.33 |
| 12/26/2018 | 7.17% | 6.63% | 0.54% | 0.13 |
| 12/27/2018 | 1.09% | 1.02% | 0.07% | 0.02 |
| 12/28/2018 | 0.62% | 0.10% | 0.52% | 0.12 |
| 12/31/2018 | -1.56% | 0.97% | -2.53% | -0.59 |
| 1/2/2019 | -2.71% | -0.61% | -2.10% | -0.49 |
| 1/3/2019 | -2.45% | -3.45% | 1.00% | 0.23 |
| 1/4/2019 | 5.00% | 4.67% | 0.33% | 0.08 |
| 1/7/2019 | 2.18% | 2.02% | 0.16% | 0.04 |
| 1/8/2019 | -1.55% | 1.51% | -3.06% | -0.72 |
| 1/9/2019 | 3.53% | 1.71% | 1.82% | 0.43 |
| 1/10/2019 | 0.45% | 0.08% | 0.38% | 0.09 |
| 1/11/2019 | -1.06% | -0.15% | -0.90% | -0.21 |
| 1/14/2019 | 3.14% | -1.02% | 4.16% | 0.98 |
| 1/15/2019 | 0.29% | 1.20% | -0.91% | -0.21 |
| 1/16/2019 | -1.63% | -0.06% | -1.57% | -0.37 |
| 1/17/2019 | 1.48% | 0.54% | 0.93% | 0.22 |
| 1/18/2019 | -1.48% | 1.62% | -3.10% | -0.73 |
| 1/22/2019 | -2.11% | -2.76% | 0.65% | 0.15 |

**Exhibit-5**

**NIO Event Study Results Using Alternative Peer Index**

October 8, 2018 through March 7, 2019

| Date | NIO LN Return | NIO Explained Return | NIO Residual Return | t-statistic[1] | |
|---|---|---|---|---|---|
| 1/23/2019 | -0.30% | -0.61% | 0.30% | 0.07 | |
| 1/24/2019 | 0.46% | 0.45% | 0.00% | 0.00 | |
| 1/25/2019 | 1.06% | 1.82% | -0.76% | -0.18 | |
| 1/28/2019 | 0.30% | -1.69% | 1.99% | 0.47 | |
| 1/29/2019 | 3.97% | -0.64% | 4.61% | 1.08 | |
| 1/30/2019 | 7.23% | 1.77% | 5.45% | 1.28 | |
| 1/31/2019 | 5.48% | 1.22% | 4.25% | 1.00 | |
| 2/1/2019 | 0.25% | -0.20% | 0.45% | 0.11 | |
| 2/4/2019 | -0.63% | 0.36% | -1.00% | -0.23 | |
| 2/5/2019 | 0.38% | 0.47% | -0.09% | -0.02 | |
| 2/6/2019 | 6.39% | -0.94% | 7.33% | 1.72 | |
| 2/7/2019 | -4.38% | -2.84% | -1.54% | -0.36 | |
| 2/8/2019 | -4.71% | -1.26% | -3.45% | -0.81 | |
| 2/11/2019 | -2.78% | -0.23% | -2.54% | -0.60 | |
| 2/12/2019 | -0.27% | 2.49% | -2.76% | -0.65 | |
| 2/13/2019 | 0.67% | 0.07% | 0.60% | 0.14 | |
| 2/14/2019 | -0.13% | -0.70% | 0.57% | 0.13 | |
| 2/15/2019 | -0.94% | 1.31% | -2.25% | -0.53 | |
| 2/19/2019 | -2.05% | 0.07% | -2.12% | -0.50 | |
| 2/20/2019 | 4.84% | 0.51% | 4.33% | 1.02 | |
| 2/21/2019 | 0.26% | -1.01% | 1.27% | 0.30 | |
| 2/22/2019 | 6.71% | 0.70% | 6.01% | 1.41 | |
| 2/25/2019 | 9.68% | 0.36% | 9.32% | 2.19 | * |
| 2/26/2019 | 8.41% | -0.49% | 8.91% | 2.09 | * |
| 2/27/2019 | 0.61% | -0.41% | 1.02% | 0.24 | |
| 2/28/2019 | -2.88% | -1.24% | -1.64% | -0.39 | |
| 3/1/2019 | 4.99% | 0.56% | 4.44% | 1.04 | |
| 3/4/2019 | -2.82% | -1.15% | -1.67% | -0.39 | |
| 3/5/2019 | 3.81% | -0.88% | 4.70% | 1.10 | |
| 3/6/2019 | -23.78% | -1.77% | -22.00% | -5.16 | * |
| 3/7/2019 | -12.20% | -2.20% | -10.00% | -2.34 | * |

**Note:**
[1] t-statistics marked with a "*" are significant at the 95% confidence level.
[2] All returns are logarithmic returns.