# Exhibit 26

In re: NIO, Inc., Securities Litigation, Docket No. 1:19-cv-01424 (E.D.N.Y. Mar 12, 2019), Court Docket

## Multiple Documents

| Part | Description |
| --- | --- |
| 1 | 121 |
| 2 | Declaration of Faten Sabry, Ph.D |
| 3 | Declaration of Robert A. Fumerton in Support of Defendants' Joint Memorandu |
| 4 | Exhibit A |
| 5 | Exhibit B |
| 6 | Exhibit C |
| 7 | Exhibit D |
| 8 | Exhibit E |
| 9 | Exhibit F |
| 10 | Exhibit G |
| 11 | Exhibit H |
| 12 | Exhibit I |
| 13 | Exhibit J |
| 14 | Exhibit K |
| 15 | Exhibit L |
| 16 | Exhibit M |
| 17 | Exhibit N |
| 18 | Exhibit O |
| 19 | Exhibit P |
| 20 | Exhibit Q |
| 21 | Exhibit R |
| 22 | Exhibit S |
| 23 | Exhibit T |
| 24 | Exhibit U |
| 25 | Exhibit V |
| 26 | Exhibit W |
| 27 | Exhibit X |

© 2023 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

In re: NIO, Inc., Securities Litigation, Docket No. 1:19-cv-01424 (E.D.N.Y. Mar 12, 2019), Court Docket

| 28 | Exhibit Y |
|----|-----------|

© 2023 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

# Exhibit S

**In the Matter Of:**

*In Re: NIO Inc. Securities Litigation*

---

*DR. ADAM WERNER*

*September 13, 2022*

---



1

```
 1

 2              UNITED STATES DISTRICT COURT

 3              EASTERN DISTRICT OF NEW YORK

 4              CASE NO. 19-cv-1424 (NGG) (JRC)

 5    ----------------------------------------X

 6    IN RE:

 7    NIO, INC. SECURITIES LITIGATION

 8    ----------------------------------------X

 9

10

11

12

13        REMOTE DEPOSITION OF DR. ADAM WERNER

14

15

16

17

18            Tuesday, September 13, 2022

19                 8:39 a.m. (PT)

20

21

22

23    Reported by:

24    Joan Ferrara, RMR, FCRR

25    Job No. 2022-858476
```

2

<pre>
 1

 2

 3

 4                        September 13, 2022

 5                        8:39 a.m. (PT)

 6

 7

 8

 9            Videotaped Deposition of DR. ADAM

10   WERNER, held remotely via Zoom, before Joan

11   Ferrara, a Registered Merit Reporter,

12   Federal Certified Realtime Reporter and

13   Notary Public.

14

15

16

17

18

19

20

21

22

23

24

25
</pre>

Case 1:21-cv-02984-CAG-JRK Document 566-2 Filed 11/13/23 Page 8 of
In Re: NIO Inc. Securities Litigation
Dr. Adam Werner
September 13, 2022

3

```
 1
 2    REMOTE APPEARANCES:
 3
 4    THE ROSEN LAW FIRM, P.A.
 5    Attorneys for Plaintiff and The Witness
 6            270 Madison Avenue
 7            40th Floor
 8            New York, New York 10016
 9    BY:     YU SHI, ESQ.
10
11
12    SKADDEN ARPS SLATE MEAGHER & FLOM LLP
13    Attorneys for Defendants NIO, Inc., Padmasree
14    Warrior, Bin Li, Louis Hsieh, Lihong Qin,
15    Yaqin Zhang, Tian Cheng, Hai Wu and Xiang Li
16            One Manhattan West
17            New York, New York 10001
18    BY:     MICHAEL C. GRIFFIN, ESQ.
19            JUDITH A. FLUMENBAUM, ESQ.
20            ROBERT A. FUMERTON, ESQ.
21
22
23
24                    (Continued)
25
```

```
 1

 2    REMOTE APPEARANCES:   (Continued)

 3

 4    PAUL WEISS RIFKIND WHARTON & GARRISON LLP

 5    Attorneys for Defendants Xianping Zhong and

 6    Zhaohui Li

 7              1285 Avenue of the Americas

 8              New York, New York 10019-6064

 9    BY:       XINSHU SYLVIA SUI, ESQ.

10

11    MILBANK LLP

12    Attorneys for Defendants Morgan Stanley & Co.

13    LLC, Goldman Sachs (Asia) L.L.C., JPMorgan

14    Securities LLC, Merrill Lynch, Pierce, Fenner

15    & Smith Inc., Deutsche Bank Securities Inc.,

16    Citigroup Global Markets Inc., Credit Suisse

17    Securities (USA) LLC, UBS Securities LLC, and

18    WR Securities, LLC

19              55 Hudson Yards

20              New York, New York 10001-2163

21    BY:       ELVIRA RAZZANO, ESQ.

22

23    ALSO PRESENT:

24              ADRIEL OLVERA, Videographer

25
```

5

```
 1

 2    --------------- I N D E X ---------------

 3    WITNESS              EXAMINATION BY         PAGE

 4    DR. ADAM WERNER   MR. GRIFFIN                8

 5                      MR. SHI                  287

 6                      MR. GRIFFIN              287

 7

 8

 9    --------------- EXHIBITS ----------------

10    DEFENDANTS'                        FOR ID.

11       (PROVIDED ELECTRONICALLY TO REPORTER)

12    Exhibit 22   Declaration of Dr. Adam

13                 Werner, June 21, 2022        11

14    Exhibit 23   Fourth Quarter and Full Year

15                 2018 Financial Results Press

16                 Release                     168

17    Exhibit 24   Transcript from the 3/6/19

18                 Company's fourth quarter full

19                 year 2018 earnings          189

20    Exhibit 25   Article, "Chinese Electric

21                 Car Maker NIO Plunges Most

22                 Since Its IPO"              210

23

24

25                            (Continued)
```

6

```
 1

 2    --------------- EXHIBITS ---------------

 3    DEFENDANTS'                          FOR ID.

 4        (PROVIDED ELECTRONICALLY TO REPORTER)

 5

 6    Exhibit 26   Article, "Why Shares of

 7                 Chinese Electric Car Maker

 8                 NIO Fell 47 Percent in

 9                 March"                        218

10    Exhibit 27   3/6/19 analyst report from

11                 JPMorgan                      220

12    Exhibit 28   3/7/19 analyst report from

13                 JPMorgan                      226

14    Exhibit 29   3/7/19 analyst report from

15                 Deutsche Bank report     228

16

17

18

19

20

21

22

23

24

25
```

7

```
 1

 2        MR. SHI:  Are we taking

 3   transcript orders now?

 4        THE COURT REPORTER:  Sure.

 5        MR. SHI:  Okay.  So we represent

 6   the Plaintiffs and we are going to

 7   order a standard transcript.

 8        THE COURT REPORTER:  Okay.

 9        MR. GRIFFIN:  Joan, we'll take

10   the expedited, like with the others.

11        THE COURT REPORTER:  Yes, we have

12   that noted, Michael.  Thank you.

13        THE VIDEOGRAPHER:  We are now on

14   the record.  Today's date is September

15   13, 2022 and the time is 8:39 a.m.

16   Pacific Time.

17        This is the video deposition of

18   Dr. Adam Werner, in the matter of In

19   Re:  NIO Inc. Securities Litigation,

20   filed in the United States District

21   Court, Eastern District of New York,

22   Case No. 19-CV-1424.

23        This deposition is taking place

24   via web videoconference with all

25   participants attending remotely.
```

8

```
 1
 2          My name is Adriel Olvera.  I am
 3      the videographer representing Lexitas.
 4          All counsel will be listed on the
 5      stenographic record.
 6          Our court reporter today is Joan
 7      Ferrara representing Lexitas.
 8          The court reporter will now swear
 9      in the witness.
10  DR. ADAM WERNER,
11      called as a witness, having been duly
12      sworn by a Notary Public, was examined
13      and testified as follows:
14  EXAMINATION BY
15  MR. GRIFFIN:
16      Q.    Good morning, Doctor.
17      A.    Good morning.
18      Q.    Dr. Werner, is that your
19  preferred, how you prefer I address you?
20      A.    Sure, that would be fine.
21      Q.    Excellent.
22          Can you state your full name for
23  the record?
24      A.    Adam Davis Werner.
25      Q.    And home or business address?
```

18

```
 1              DR. A. WERNER
 2      Q.    And what did you mean by your
 3   obligations to the parties who have engaged
 4   you in paragraph 3?
 5      A.    Well, I don't -- to the best of
 6   my knowledge, I mean, I don't have any
 7   specific obligations to the parties who
 8   have engaged me, but I suppose someone more
 9   cynical than myself could say that experts
10   are sometimes hired to give opinions that
11   are -- what's the right term -- shaded
12   towards their client's best interests.
13           Again, this isn't -- I mean,
14   look, I submit my report, it's an
15   independently prepared report, no
16   discussions with outside parties or the
17   parties that have retained me have in any
18   way affected the opinion that is presented
19   here in my declaration.
20      Q.    Okay.  So to be clear, sitting
21   here, you don't think you have any
22   obligation to Plaintiff's counsel who hired
23   you, correct?
24      A.    That is correct.
25      Q.    And you don't view any conflict
```

In Re: NIO Inc. Securities Litigation

Dr. Adam Werner
September 13, 2022

19

```
 1              DR. A. WERNER

 2    between your duty to the Court and any

 3    obligations you would have to any other

 4    party?

 5         A.    Well, what other obligations

 6    would I have to other parties?

 7         Q.    That's what I'm asking you,

 8    Doctor, any obligation you have to any

 9    other party.

10         A.    Right, and I guess to the extent

11    that I can't think of any obligation that I

12    have to another party, the answer to your

13    question is -- well, could you reask the

14    question?

15         Q.    Let me ask it differently.

16              If you don't believe you have any

17    obligation to Plaintiff's counsel that

18    engaged you, why did you include paragraph

19    3 in your declaration?

20         A.    It's typically what I would

21    include in my reports.

22         Q.    Did you personally write

23    paragraph 3?

24         A.    At some point in my life, yes.

25         Q.    You didn't personally write
```

20

```
 1              DR. A. WERNER

 2    paragraph 3 for this case in particular?

 3         A.    Well, I may have cut and pasted

 4    this from a previous report into this

 5    paragraph.

 6         Q.    Do you --

 7         A.    I don't know if that falls under

 8    the guise of preparing it separately for

 9    this report.

10         Q.    Do you recall when you first

11    drafted the language in paragraph 3?

12         A.    I do not.

13         Q.    Do you recall from what report

14    you copied it for this declaration?

15         A.    I do not.

16         Q.    Are there other portions of your

17    declaration in this case that are copied

18    from prior reports or declarations?

19         A.    Well, maybe "copied" is the wrong

20    term, but yes, there are other sections

21    such as -- if you look at paragraph 4,

22    right, I don't write that paragraph from

23    scratch every time I prepare a report.

24    It's just the common description of my

25    background.
```

21

DR. A. WERNER

1

2      Q.    Are there any paragraphs

3  pertaining to your opinions in this case

4  that were copied from prior reports or

5  declarations?

6      A.    I'm sure there were.

7      Q.    Can you identify any?

8      A.    Well, certainly to the extent

9  that I'm discussing a general methodology

10 at the end of my report, that's probably

11 been presented in other reports.  I may

12 have tweaked it a little bit for this

13 report.

14          Some might have discussions

15 about, you know, the tenets of market

16 efficiency, how courts have thought about

17 market efficiency in the past, those have

18 probably been use in other reports.

19     Q.    Did you receive assistance in

20 preparing this report?

21     A.    I did.

22     Q.    Who assisted you in the

23 preparation of this report?

24     A.    Alex Huang -- let me spell that

25 last name for you, H-U-A-N-G.  Drew

22

```
 1              DR. A. WERNER
 2   Guardano -- and I'm not going to try
 3   spelling that, but I believe if you just
 4   sound it out, you should get the spelling
 5   correctly.
 6              And then Miguel Villanueva, again
 7   just to the extent that Villanueva is a
 8   common name, just use the common spelling.
 9        Q.    And who are Alex, Drew and
10   Miguel?
11        A.    They are employees of
12   Crowinshield Financial Research.
13        Q.    Have they assisted you on
14   creating reports and declarations in
15   securities litigations prior to this case?
16        A.    They have.
17        Q.    That's true for all three?
18        A.    Yes.
19        Q.    Did Plaintiff's counsel here
20   review your report before it was submitted?
21        A.    They certainly, to the best of my
22   knowledge, yes.
23        Q.    Did they give you any feedback or
24   comments on it?
25        A.    I believe they made some
```

```
 1              DR. A. WERNER

 2   than the class period that was alleged in

 3   Plaintiff's Complaint?

 4        A.    To the best of my understanding,

 5   yes.

 6        Q.    Do you have any idea why the

 7   relevant period you were asked to use is

 8   different than the class period that was

 9   alleged in the Complaint?

10        A.    I do not.

11        Q.    Do you know what the significance

12   of the starting date for the relevant

13   period, October 8, 2018, is?

14        A.    I do not.

15        Q.    Do you know what the significance

16   of the end date for the relevant period,

17   which is March 5, 2019, is?

18        A.    I believe that was the end of the

19   class period.

20        Q.    And do you know if any

21   significant events are alleged to have

22   occurred at that time?

23        A.    March 5, 2019?

24        Q.    Correct.

25        A.    Right.  So I think what I read
```

```
                                                                30
  1              DR. A. WERNER

  2   from this when I was reading from my

  3   summary when you were asking about

  4   Plaintiff's allegations -- so right,

  5   Plaintiffs allege the truth about NIO's

  6   Shanghai facility was revealed on March 6,

  7   2019.

  8              To the best of my -- best of my

  9   recollection, that is correct.  But the

 10   actual disclosure was on March 5, 2019.

 11   This should have probably said that rather

 12   than revealed on March 6, 2019, it should

 13   have said revealed on March 5, 2019 after

 14   the markets closed and, thus, if you were

 15   looking for a stock price reaction with

 16   respect to whether or not this information

 17   had any impact on the stock, you'd want to

 18   look at the March 6th price change.

 19       Q.    Would you like to amend this

 20   paragraph of your declaration?

 21       A.    If that helps clarify the record,

 22   I'm happy to do it.

 23       Q.    Well, I'm asking you, Doctor.

 24       A.    Well, I guess my question to you

 25   is, is it causing confusion?  Because to me
```

Case 1:19-md-02894-CMA-DCM Document 566-2-2 Entered on FLSD Docket 06/07/2023 Page 21 of
In Re: NIO Inc. Securities Litigation 2913
Dr. Adam Werner
September 13, 2022

31

```
 1              DR. A. WERNER

 2   it's not causing confusion.  If it's

 3   causing confusion for the record, I'm happy

 4   to amend it.

 5       Q.    What disclosure that was issued

 6   aftermarket on March 5th are you referring

 7   to?

 8       A.    I believe it was the -- well,

 9   again, let's be specific.  Right, so

10   looking at paragraph 52 of my report, on

11   March 5th, 2019, after the close of

12   trading, NIO announced its Q4 and fiscal

13   year 2018 financial results press release

14   that it had terminated its plans for

15   constructing the Shanghai facility.

16              During the conference call with

17   investors, NIO explained that the reason

18   for the plan's termination due to new

19   policies introduced by the Chinese --

20   excuse me -- that the reason for the plan's

21   termination -- it should say "was" -- due

22   to new policies introduced by Chinese

23   Government authorities.

24       Q.    So the disclosures that you are

25   referencing are the company's Q4 and fiscal
```

39

```
 1              DR. A. WERNER
 2   situation.  I'm being specific about this
 3   because I've seen companies, let's say in
 4   Brazil, right, and some article comes out
 5   on a chat board in Brazil that no one
 6   really sees and then, you know, a day or
 7   two later that news is translated and
 8   people have a reaction to it.
 9              So it's really a question of
10   dispersion of that information and how vast
11   the dispersion is.
12      Q.   Are you drawing a distinction
13   between information that's publicly
14   available in the U.S. versus other
15   countries?
16      A.   No.  I was just using that as an
17   example of something where it may take time
18   to digest information for the market.
19      Q.   And, similarly, are you drawing
20   any distinction between information that's
21   publicly available in English as opposed to
22   another language?
23      A.   I'm not, no.
24      Q.   So with respect to NIO, for
25   example, NIO is based in China, correct?
```

40

```
 1              DR. A. WERNER
 2       A.    To the best of my knowledge, yes.
 3       Q.    So you would consider information
 4  that is publicly available in China about
 5  NIO to be reflected in its stock price?
 6       A.    A large corporation like that,
 7  yes.
 8       Q.    What about physical information?
 9  Like, for example, a construction site.  Do
10  you consider that to be public?
11       A.    That's something I would have to
12  think about.  I mean, I have no reason to
13  think people wouldn't be aware of
14  construction of a facility, but you know,
15  if you're talking about hypothetical
16  examples or situations -- I mean, can
17  people be building something and people be
18  unaware of it?  Sure.  I mean, if I'm
19  building something in an underground
20  bunker, people may not be aware of my
21  construction.
22       Q.    And if they were building it on
23  Fifth Avenue in Manhattan, they probably
24  would be aware of it, right?
25       A.    I assume that's correct.  Now
```

41

```
 1            DR. A. WERNER

 2   again, to the extent there might be

 3   scaffolding on it, they might not know what

 4   they're constructing, but I think generally

 5   your statement is correct.

 6       Q.    Notwithstanding the scaffolding,

 7   they could see construction underway,

 8   correct?

 9       A.    Correct.

10       Q.    Setting aside the hypotheticals,

11   the issue in this case is whether the

12   Shanghai facility was under construction.

13            Do you believe the status of that

14   construction is publicly available

15   information?

16       A.    Well, clearly, to the best of my

17   understanding, that's what Plaintiffs are

18   alleging, but I have an independent --

19       Q.    Sorry, I didn't mean to cut you

20   off.

21       A.    I haven't independently verified

22   that.

23       Q.    You haven't independently

24   verified whether construction was, in fact,

25   underway?
```

42

```
 1              DR. A. WERNER

 2      A.    To the extent I'm in the U.S. and

 3    I wasn't in China, no, I don't know one way

 4    or the other.

 5      Q.    I understand.  But my question is

 6    slightly different, not whether

 7    construction was, in fact, underway, but

 8    whether the fact of construction being

 9    underway or not was publicly available.

10              Do you have an opinion on that

11    question?

12      A.    I don't believe that's something

13    I've looked at as of today.

14      Q.    Sitting here today, do you have

15    an opinion on it?  I'm now asking you to

16    consider it.

17      A.    Right.

18      Q.    The status of a construction site

19    in Shanghai is publicly available

20    information?

21      A.    I believe that's what Plaintiffs

22    are alleging.  I have not independently

23    verified that.

24      Q.    Again, I just want to be clear,

25    Doctor.  I apologize for belaboring this.
```

43

```
 1                 DR. A. WERNER
 2            I'm not asking you whether or not
 3   construction was underway or whether any
 4   new construction was underway.
 5            My question simply is whether or
 6   not a construction site had begun publicly
 7   available information?
 8       A.   Right, and so again, it's going
 9   to depend on the situation.
10       Q.   Well, I'm asking you about this
11   situation here, in this case.
12       A.   So for this particular -- so
13   you're talking about the Shanghai facility?
14       Q.   Correct.
15       A.   I have no knowledge, one way or
16   the other, whether or not that was publicly
17   available information.
18       Q.   Presumably anyone in Shanghai
19   could have walked past the site and seen
20   whether or not construction was underway,
21   correct?
22            MR. SHI:  Objection.  Form.
23       A.   Right.  I mean, I have no idea
24   where the construction was being done.  So
25   could someone walk by it?  I don't know.  I
```

44

```
 1              DR. A. WERNER

 2   haven't been to Shanghai before.  I'm not

 3   familiar with the terrain and the layout.

 4              So, you know, it's like if you

 5   came to Pismo Beach and I said, hey,

 6   there's some construction going on, you

 7   know, at the tip of some beach that's

 8   cordoned off by the government, people may

 9   not -- people obviously can't walk by there

10   and see the construction, but the

11   construction is occurring.

12       Q.    Do you have any reason to believe

13   that whether or not construction was

14   underway at the Shanghai facility was not

15   publicly available to people physically

16   located in Shanghai?

17       A.    I have no opinion one way or the

18   other.

19       Q.    Okay.  Now as part of your

20   analysis, you address the Cammer factors,

21   correct?

22       A.    That is correct.

23       Q.    And the first Cammer factor deals

24   with average trading volume?

25       A.    Correct.
```

45

```
 1          DR. A. WERNER
 2     Q.    And in your opinion, average
 3  trading volume above 1 or 2 percent of a
 4  stock's total outstanding shares is
 5  indicative of an efficient market, correct?
 6     A.    Well, I think that's the Court's
 7  opinion, yes.
 8     Q.    And do you agree with that
 9  standard?
10     A.    Generally, yes.
11     Q.    Have you ever --
12     A.    It's the one I -- sorry.
13     Q.    Go ahead.
14     A.    It's the one I've adopted for the
15  purposes of testing market efficiency
16  across, you know, hundreds of cases.
17     Q.    And that's the standard you
18  applied in this case, correct?
19     A.    That is correct.
20     Q.    Now, you state that the average
21  trading volume of NIO's ADS during the
22  relevant period was 45.68 percent of total
23  outstanding shares, correct?
24     A.    Let me get to that section of my
25  report.  That sounds accurate.  I'm sorry,
```

Case 1:19-md-02894-CMA-JDC Document 566-2 Entered on FLSD Docket 06/07/2023 Page 29 of 113
In Re: NIO Inc. Securities Litigation

Dr. Adam Werner
September 13, 2022

52

```
 1              DR. A. WERNER
 2   companies?
 3      A.    In this case, yes.
 4      Q.    And analysts gather and
 5   independently generate information about
 6   companies and disseminate such information
 7   to their clients, right?
 8      A.    That sounds like something I've
 9   written.
10      Q.    Good ear.
11           The more analysts covering a
12   security, the more likely it is that the
13   market will timely incorporate any new
14   information, right?
15      A.    Well, so, I'm not quite -- if
16   that's what I've stated, I'm not quite sure
17   that that's correct.  I mean, if you're
18   talking about, you know, 20 versus 30
19   analysts, there's going to be a marginal
20   difference in how quickly the information
21   is incorporated in the stock price -- you
22   know, probably not.
23      Q.    So you're saying that the
24   marginal impact can vary depending on
25   exactly how many analysts we're talking
```

53

```
 1              DR. A. WERNER

 2    about?

 3        A.    Right, as well as the analyst's

 4    reputation.

 5        Q.    Could you take a look at page 8,

 6    paragraph 19 of your report.  That's the

 7    paragraph I was referring to.

 8              In paragraph 19 you state, "Put

 9    another way, the more analysts covering a

10    security, the more likely it is that the

11    market for that security will timely

12    incorporate new information in that

13    security's price."

14              You agree with that statement,

15    right?

16        A.    Again, I mean, I should probably

17    put some qualifiers on that, again using

18    the example that I referred to earlier, but

19    generally that's true.

20        Q.    Do you believe the statement in

21    paragraph 19 is inaccurate?

22        A.    I don't believe it's inaccurate.

23    I just don't think there is necessarily a

24    linear relationship between the market's

25    incorporation of information and the number
```

Case 1:21-md-02989-CMA-Document 566-26 Entered on FLSD Docket 06/07/2023 Page 31 of 113
In Re: NIO Inc. Securities Litigation

Dr. Adam Werner
September 13, 2022

54

```
 1              DR. A. WERNER
 2   of analysts.
 3              And again, so right, if I'm
 4   looking at two versus three analysts, the
 5   marginal contribution of that third analyst
 6   might be different than a marginal
 7   contribution of the 29th analyst.
 8       Q.   Do you believe paragraph 19 is
 9   misleading as currently written without the
10   caveats that you've added today?
11       A.   I don't think so.
12       Q.   Okay.
13       A.   I think generally that's true.
14       Q.   You mentioned the quality of the
15   analysts being relevant, right?
16       A.   I did.
17       Q.   Do you think that, generally
18   speaking, analyst reports are accurate and
19   reliable?
20              MR. SHI:  Objection to form.
21       A.   Generally speaking?
22              MR. SHI:  Objection to form.
23       A.   That's not something I've ever
24   thought about.
25       Q.   Sitting here today, and you could
```

63

```
 1                 DR. A. WERNER
 2        A.    As I sit here today, I don't
 3   recall.
 4        Q.    You don't recall one way or the
 5   other?
 6        A.    That is correct.
 7        Q.    Would you expect to recall that
 8   information if they did say that?
 9        A.    In this day and age, it's very
10   possible that I -- the answer to that
11   question is no.
12        Q.    Well, whether or not the Shanghai
13   facility is under construction is the
14   central issue in this case, correct?
15        A.    I mean, I don't know if it's the
16   central issue.  It's certainly an issue.
17        Q.    An important issue?
18        A.    Sure.
19        Q.    But you wouldn't remember, one
20   way or the other, if you had read an
21   analyst reporting that, in fact, it was not
22   under construction?
23        A.    Again, as I sit here today, I
24   don't recall.
25        Q.    Do you recall if any of the
```

64

```
 1              DR. A. WERNER
 2   analyst reports you reviewed claimed that
 3   NIO terminated the Shanghai facility
 4   project because it did not have sufficient
 5   revenue or cash flows?
 6       A.    As I sit here today, I don't
 7   recall.
 8       Q.    Did any of the analyst reports
 9   you reviewed claim that NIO did not, in
10   fact, have sufficient revenue or cash flows
11   to complete the Shanghai facility?
12       A.    As I sit here today, I don't
13   recall.
14       Q.    Now, all of the --
15       A.    Actually, so if you're talking
16   about -- so let me make a distinction.
17             So if you're talking about these
18   particular analyst reports, I don't recall.
19             Let's turn to.
20       Q.    Try 50 to 51.  Are you looking
21   for the list of documents you considered?
22       A.    No.
23       Q.    Doctor, let me ask you this.  The
24   26 analyst reports that you listed in
25   Exhibit 4 and reviewed and relied on here,
```

65

```
 1            DR. A. WERNER
 2   all occurred before the alleged corrective
 3   disclosure, correct?
 4       A.    That is correct.
 5       Q.    Did you review any analyst
 6   reports after the alleged corrective
 7   disclosure?
 8       A.    I certainly asked for them.  And
 9   we did not have access to them, so I relied
10   on a news article to garner analyst
11   opinions about that.
12       Q.    Who did you ask for the analyst
13   reports following the corrective
14   disclosure?
15       A.    The people at Crowninshield.
16       Q.    And what did they tell you in
17   response to that request?
18       A.    That they didn't have access to
19   them.
20       Q.    Where did you obtain the 26
21   analyst reports that you did review and
22   rely on?
23       A.    To the best of my knowledge,
24   Thomson Eikon.
25       Q.    And did you discuss with Thomas
```

Case 1:19-cv-02984-CMG-DCC Document 566-2 Filed 11/SD/22 Page 35 of 113
Case 4:21-md-02984-CMG-DCC Document 566-2 Entered on FLSD Docket 06/07/2023 Page 35 of 113
In Re: NIO Inc. Securities Litigation

66

```
 1              DR. A. WERNER
 2    Icon on the additional analyst reports
 3    after the corrective disclosure?
 4         A.    That's where they would have
 5    looked.
 6         Q.    Do you have any idea why the
 7    analyst reports after the corrective
 8    disclosure allegedly were not available?
 9         A.    Well, they may have been
10    available.  Look, to the extent we were
11    talking about your client NIO, I'm sure
12    Plaintiff's counsel could subpoena them.
13    So does that make them available?  I don't
14    know.  They weren't available, to the best
15    of my knowledge, through Thomas Icon.
16              But, since we were talking about,
17    you know, investment bank is talking about
18    things like the construction of the
19    facility, so if I'm looking at paragraph
20    71, we see that analyst and market
21    participants noted that the companies
22    reported financial results were
23    disappointing and that the termination of
24    the plan to construct the Shanghai facility
25    was a negative surprise.
```

67

```
 1              DR. A. WERNER
 2      Q.    I understand, Doctor, and we're
 3  going to get to paragraph 71, but for now I
 4  just want to focus on these analyst
 5  reports.
 6              You said that you asked for the
 7  analyst reports after the corrective
 8  disclosure, right?
 9      A.    Well, from the last report
10  through the corrective disclosure, that is
11  correct.  I believe the last analyst report
12  was for February 15th.
13      Q.    Correct.  And you wanted to
14  review the analyst reports after the
15  corrective disclosure, right?
16              MR. SHI:  Objection.  Form.
17      A.    That is correct.  I'm sorry, I
18  didn't hear the objection.
19              MR. SHI:  Form.
20      Q.    So I'll ask you again.  You
21  wanted to review the analyst reports that
22  followed the alleged corrective disclosure
23  here, right?
24      A.    I asked if we had additional
25  analyst reports that covered that time
```

68

```
 1              DR. A. WERNER

 2    period.

 3         Q.    Did you want to review those

 4    analyst reports?

 5         A.    To the extent we had access to

 6    them, yes.

 7         Q.    Why did you want to review the

 8    analyst reports that followed the

 9    corrective disclosure here, alleged

10    corrective disclosure?

11         A.    Well, again, because I wanted to

12    verify things like these statements in

13    paragraph 71 were accurate.  I have no

14    reason to think they're inaccurate and they

15    come from reliable data sources.  You know,

16    if I can go to source material, I guess

17    normally I'd prefer to go to source

18    material than repetition of source material

19    or analysis of source material.

20         Q.    Was the securities analyst

21    reaction it news regarding NIO relevant to

22    your analysis here?

23         A.    It certainly informed my opinion.

24         Q.    In what way did it inform your

25    opinion?
```

69

```
 1              DR. A. WERNER
 2      A.    Well, again, so we're talking
 3   about -- let's go back to paragraph 71.
 4   The question -- I mean, for market
 5   efficiency, the question is really does
 6   news move the stock.  And so to the extent
 7   that there was news being presented by,
 8   among other people, analysts, that would
 9   inform my opinion as to whether or not the
10   stock was efficient -- or this particular
11   stock traded in an efficient market.
12      Q.    And the opinion of the securities
13   analyst as to the favorability of that news
14   is also relevant to your analysis, right?
15      A.    Well, again, it informs my
16   opinion.
17      Q.    You also mentioned, and I'm
18   looking at paragraph 31 on page 12 --
19      A.    Actually, can we -- so we've been
20   going for about an hour and 15, minutes.
21   Can we take a break?
22      Q.    Sure.
23      A.    I mean, if you're like going to
24   ask me one more question on this, I'm happy
25   to continue, but otherwise --
```

70

1          DR. A. WERNER

2     Q.     Yeah, give me five more minutes.

3     A.     Okay.  All right.  So reask your

4  question, please.

5     Q.     Sure.  Page 12, paragraph 31.

6     A.     Okay.

7     Q.     In paragraph 31 you reference,

8  "Over 109 news stories, press releases and

9  SEC filings featuring NIO."

10          That appeared in financial

11  publications during the relevant period,

12  correct?

13     A.     That is correct.

14     Q.     Did you review all of those 109

15  news stories, press releases and SEC

16  filings?

17     A.     I don't believe I reviewed every

18  single one of those.

19     Q.     Did someone on your team review

20  them?

21     A.     Yes.

22     Q.     So at least one of the three

23  individuals we mentioned earlier would have

24  reviewed all 109 of those press releases,

25  news stories and SEC filings?

83

```
              DR. A. WERNER
```

 1              DR. A. WERNER

 2   that was announced, I would expect to have

 3   an impact on the stock price.  When I say

 4   "expect," I should say ex-ante.

 5        Q.    So you expected ex-ante each of

 6   the four events you chose to have a

 7   statistically significant impact on the

 8   stock price?

 9        A.    No.  Those are pieces of news

10   that often times impact a securities, a

11   stock price.  I had no expectation, one way

12   or the other, whether or not it would

13   actually move the stock price.

14        Q.    Okay.  So walk me through your

15   process for selecting these four particular

16   events.

17        A.    Right.  So we had our 109

18   articles or whatever it was, we had our

19   analyst reports, we went through them and I

20   looked at days where you would normally

21   expect some type of stock price movement.

22              So, for instance, you know, often

23   times we'll look at earnings reports.  So

24   in this case I looked at the earnings

25   announcements associated with November 6th,

                                                                                    84
```
 1              DR. A. WERNER

 2    right.  Often times that is a news -- what

 3    someone would consider a news day.

 4              To the extent that that news met

 5    expectations, the fact that there was not a

 6    statistically significant stock price

 7    movement is consistent with market

 8    efficiency.

 9        Q.    Did you consider using any other

10    events besides the four that you ultimately

11    selected for your study?

12        A.    I did not.

13        Q.    Now, you claim to have focused

14    your event study on disclosures of

15    information related to allegations in the

16    Complaint, and that's in paragraph 50, is

17    that correct?

18        A.    Well, it should say on a

19    disclosure of information related to the

20    allegations in the Complaint is the only

21    event with regards to allegation of

22    Complaint with the alleged corrective

23    disclosure.

24        Q.    Sorry, what should paragraph 50

25    say?
```

85

                    DR. A. WERNER

1

2        A.    By focusing an event study on a

3    disclosure of information related to the

4    allegations in the Complaint, since there

5    was only one disclosure in this case.

6        Q.    And so the other three, the first

7    three events in your event study are not

8    related to the allegations in the

9    Complaint, correct?

10       A.    I believe that's correct.

11       Q.    Now, as part of your event study,

12   you created a regression model, right?

13       A.    Correct.

14       Q.    And part of that model was

15   dependent on what you termed a market

16   model, right?

17       A.    Just let me get there as long as

18   we're going to talk about this.  The answer

19   to your question is that is correct.

20       Q.    And you used a market model to

21   help control for market wide and industry

22   wide factors affecting the stock price,

23   correct?

24       A.    That is correct.

25       Q.    And so to do this you chose a

86

```
 1              DR. A. WERNER
 2    market index and an industry index, right?
 3         A.    That is correct.
 4         Q.    How do you go about choosing a
 5    particular market index?
 6         A.    Generally use the same market
 7    index, what's generally accepted as the
 8    market index in academic literature.
 9         Q.    And that's the index you used
10    here?
11         A.    Correct.
12         Q.    That's referenced in paragraph
13    57?
14         A.    Correct.
15         Q.    And what about for the industry
16    index, how do you go about selecting an
17    appropriate industry index?
18         A.    Well, to the extent that NIO was
19    an automobile manufacturer, its performance
20    was likely affected by sector news -- or
21    maybe more generally electric vehicles.
22         Q.    Well, just stepping back for a
23    second before we get to NIO, just in
24    general when you're conducting an event
25    study you have to choose an industry index,
```

87

```
 1              DR. A. WERNER

 2   what are the factors you're considering

 3   when choosing an industry index, generally

 4   speaking?

 5       A.    What the company does.

 6       Q.    So you're just looking for any

 7   industry index that overlaps with what the

 8   company does?

 9       A.    It's a little bit more involved

10   than that.

11       Q.    How so?

12       A.    Well, so often times companies

13   will, you know, say -- in their financial

14   filings will compare themselves to other

15   companies.  So often times I'll construct

16   an index based on those comparisons or

17   they'll compare their performance to

18   certain indices, so often times I will

19   select those indices.

20       Q.    And here you said you were

21   looking for an industry index that involved

22   automobiles and in particular electric

23   vehicles?

24       A.    Correct.

25       Q.    And the index you chose is the
```

88

```
 1              DR. A. WERNER

 2   S&P 500 Automobile Manufacturers Index,

 3   correct?

 4        A.    Correct.

 5        Q.    As you cite in paragraph 57?

 6        A.    Correct.

 7        Q.    What companies make up the S&P

 8   500 Automobile Manufacturers Index?

 9        A.    As I sit here today, I don't

10   recall.

11        Q.    Did you recall at the time --

12   excuse me, did you know at the time you

13   drafted your report?

14        A.    At some point I reviewed the

15   index.

16        Q.    Do you have any idea what

17   companies are included in that index?

18        A.    I mean, as I sit here today, it

19   would be speculation on my part.

20        Q.    Can you name a single company

21   that's included in that index?

22        A.    Well, I assume like Ford and GM

23   would probably be in it.

24        Q.    Anyone else?

25        A.    Again, beyond that, I'd be
```

89

```
 1              DR. A. WERNER
 2   speculating.
 3      Q.    Do you know if the composition of
 4   that index has changed over time?
 5      A.    I would not be surprised if the
 6   composition of that index has changed over
 7   time.
 8      Q.    Well, I guess more specifically,
 9   do you know if it's different today than it
10   was during of the relevant period?
11      A.    It's personally possible that
12   it's different today than it was during the
13   relevant period.
14      Q.    You don't know, one way or the
15   other?
16      A.    No.
17      Q.    And you mentioned you selected
18   this index because it was related first to
19   automobile, right, is that correct?
20      A.    Well, electric vehicles, yes.
21      Q.    Which electric vehicle companies
22   are included in this index?
23      A.    As I sit here today, I don't
24   recall.
25      Q.    But for purposes of your model it
```

90

```
 1              DR. A. WERNER
 2   was important to you that electric vehicle
 3   companies were included in this index,
 4   right?
 5       A.    Was it important that electric
 6   vehicles as opposed to gas-powered
 7   automobiles?
 8       Q.    Right.
 9       A.    It was certainly a factor that I
10   took into consideration.
11       Q.    What other factors did you take
12   into consideration?
13       A.    Well, that we're dealing with a
14   billion dollar automobile manufacturer.
15       Q.    Did the geographic market factor
16   into your selection of industry index?
17       A.    It did not.
18       Q.    Why not?
19       A.    No reason.  I doubt -- well, I
20   would be shocked if adding a
21   country-specific component to this, to my
22   model would alter the model results
23   significantly.
24       Q.    Why?
25       A.    Based on experience.
```

```
 1              DR. A. WERNER
 2       Q.    What experience?
 3       A.    Well, let's see, I'm 52.  So
 4   running event studies since, about 30
 5   years.
 6       Q.    What, specifically, Doctor, in
 7   your 30 years of experience leads you to
 8   believe that adding a geographic market
 9   specific index would not change the results
10   of your analysis in this case?
11       A.    Well, I didn't say it wouldn't
12   change my results.  I said it would not
13   change my results significantly.  Correct?
14       Q.    Okay.  What in your 30 years of
15   experience leads you to believe that adding
16   a geographic market specific index in this
17   case would not significantly change your
18   results?
19       A.    Again, if you're looking at a
20   billion dollar corporation with a global
21   company, it's selling cars all over the
22   world, generally that's not going to have a
23   big impact on a market model based on
24   looking at -- look, I've looked at, I don't
25   know how many Chinese corporations I've
```

92

```
1              DR. A. WERNER
2   looked at with regards to this and
3   generally with the larger companies --
4   again, we're talking about a billion dollar
5   company -- a country-specific index doesn't
6   normally have a large impact on -- a
7   significant impact on a market model.
8              I mean, if you want me to -- I'm
9   happy to look at it if your expert is going
10  to go ahead and add an industry index, I'm
11  happy to review it and say, you know what,
12  this actually does make a significant
13  difference.  But, you know, as I sit here
14  today, you know, I did what I did, I
15  believe what I did is correct.
16      Q.    When you reference a billion
17  dollar company, what metric are you
18  referring to there?
19      A.    Market cap.
20      Q.    Is it your understanding that NIO
21  sells its electric vehicles globally?
22      A.    Well, I certainly know they sell
23  them in the U.S.
24      Q.    And would you expect the U.S.
25  auto industry to affect sales of NIO's
```

93

```
 1              DR. A. WERNER

 2   vehicles in China?

 3        A.    Would I expect -- well, to the

 4   extent that U.S. automobile manufacturers

 5   sell cars in China, yes.

 6        Q.    Do you know if any of the

 7   companies in the S&P 500 automobile

 8   manufacturers index sold electric vehicles

 9   in China?

10        A.    Sold electric vehicles in China?

11   Not as I sit here today.

12        Q.    How about sold any vehicles in

13   China?

14        A.    Again, I mean, general knowledge,

15   my understanding is companies like Ford and

16   GM sell vehicles in China.  But do I

17   specifically know that for a fact, no, not

18   as I sit here today.

19        Q.    But in general, you would expect

20   industry factors that affect GM and Ford to

21   also affect NIO?

22        A.    To the extent they sell

23   automobiles in the U.S., yes -- well, in

24   general, yes.

25        Q.    Did you consider using any other
```

108

```
 1              DR. A. WERNER
 2   the trading day and right before the
 3   trading day.  As I sit here, I don't
 4   recall.  And the stock price moved.
 5       Q.    And so any subsequent movements
 6   on future days were not relevant to this
 7   particular announcement?
 8       A.    To this particular announcement?
 9   For the purposes of market efficiency?  No.
10       Q.    Okay.  That's all I'm trying to
11   understand.
12              Here you used a single day to
13   gauge the price reaction to this particular
14   event, right?
15       A.    That is correct.
16       Q.    Okay.  Can we flip to page 65?
17   It's Exhibit 9 of your report.
18       A.    I'm there.
19       Q.    Exhibit 9 of your declaration
20   presents the results of your event study,
21   correct?
22       A.    That is correct.
23       Q.    And it lists the residual return,
24   among other things, and T-statistic for
25   each day during the relevant period, is
```

109

```
 1              DR. A. WERNER
 2  that right?
 3      A.    That is correct.
 4      Q.    So if we look at the second line
 5  of your chart, for October 9th, that's the
 6  date of the Bailey Gifford announcement,
 7  correct?
 8      A.    Correct.
 9      Q.    We see the 20.17 percent
10  logarithmic return, right?
11      A.    Correct.
12      Q.    And the T-statistic there is
13  5.13, right?
14      A.    Correct.
15      Q.    Because that is greater than
16  1.96, you deem this to be statistically
17  significant, right?
18      A.    Correct.
19      Q.    And that's what that little
20  asterisk at the end of the row indicates,
21  right?
22      A.    Correct.
23      Q.    The line right below that for
24  October 10th also indicates that there was
25  a statistically significant abnormal
```

110

```
 1              DR. A. WERNER
 2   return, correct?
 3        A.    It does.
 4        Q.    Do you have any idea what caused
 5   that statistically significant abnormal
 6   return?
 7        A.    As I sit here today, no.
 8        Q.    But the fact that there was a
 9   statistically significant abnormal return
10   based on your model indicates to you that
11   there was some company-specific news that
12   day, is that right?
13        A.    95 percent of the time, yes.  I
14   mean, 5 percent of -- we're going to
15   observe 5 percent statistically significant
16   days.  But as I sit here today, I don't
17   know one way or the other.
18        Q.    If you look midway down the page,
19   November 1st also indicates a statistically
20   significant abnormal return, correct?
21        A.    That is correct.
22        Q.    Are you aware of any significant
23   company news regarding NIO on November 1st?
24        A.    I don't believe that -- well, let
25   me --
```

Case 1:19-md-02989-CMA-DPG Document 566-21 Entered on FLSD Docket 06/07/2023 Page 54 of 113
In Re: NIO Inc. Securities Litigation
Dr. Adam Werner
September 13, 2022

111

                DR. A. WERNER

1

2      Q.    It's not one of the four event

3   dates that you chose, I could tell you.

4      A.    Okay.  So then no, as I sit here

5   today, no.

6      Q.    Same for November 19th, which

7   also indicates a statistically significant

8   abnormal return?

9      A.    November 19th.  Can we agree that

10  if you're going to do this, we can

11  stipulate where you tell me whether or not

12  these are days I reviewed?

13     Q.    Yes.  The four you reviewed are

14  October 9th, November 6th for the Q3

15  earnings, November 30th for the

16  resignation, and then March 6th for the

17  alleged corrective disclosure.

18     A.    Thank you.

19     Q.    It's not a memory test.

20     A.    Okay.  I appreciate that.  You'd

21  be surprised how many lawyers think it is.

22     Q.    Fair enough.

23           Let me ask you the question this

24  way:  Other than those four days, are you

25  aware of any company-specific information

112

```
 1              DR. A. WERNER

 2    that caused any statistically significant

 3    abnormal returns on any other date?

 4         A.    During the relevant period?

 5         Q.    Correct.

 6         A.    I am not.

 7         Q.    Okay.  All right.  Let's talk

 8    about the second event then that you chose.

 9    That was the Q3 -- excuse me, third quarter

10    earnings announcement on November 6th,

11    2018, correct?

12         A.    I'm sorry, I need to just correct

13    what page are we on?

14         Q.    Paragraph 65.

15         A.    Paragraph 65.  Okay.

16         Q.    Are you there?

17         A.    I am.

18         Q.    And you deemed this to be neutral

19    news for the company, right?

20         A.    Ex-post, yes.

21         Q.    And that was based on the

22    securities analyst's reactions to the

23    results, in particular their

24    characterization that the results were in

25    line with expectations?
```

113

1              DR. A. WERNER

2      A.     That certainly informed my

3  opinion, yes.

4      Q.     Did anything else inform your

5  opinion?

6      A.     I'm sure I looked at some

7  additional news articles around that period

8  of time that expressed similar sentiment,

9  but these were the things that stuck out.

10     Q.     And so the three sources that you

11  cite in this paragraph are the Deutsche

12  Bank analyst report, JP Morgan analyst

13  report, and Morgan Stanley analyst report,

14  correct?

15     A.     That is correct.

16     Q.     And again, you deemed the

17  reaction of these analysts to be relevant

18  to determining the significance of that

19  quarterly announcement, whether it was

20  positive, negative or neutral?

21     A.     I don't think the statement as

22  you've -- the question as you've stated it

23  is correct.

24     Q.     What do you disagree with in what

25  I asked?

114

```
 1              DR. A. WERNER

 2      A.    Reread the -- could you have the

 3   question reread, please?

 4      Q.    Sure.

 5            You deemed the reaction of these

 6   analysts to be relevant to determining the

 7   significance of that quarterly

 8   announcement, will it was positive,

 9   negative or neutral?

10      A.    Ex-post, that is correct.

11   Ex-ante that is incorrect.

12      Q.    And why is that incorrect

13   ex-ante?

14      A.    Because I didn't -- you know, I

15   commonly look at news earnings days.  So

16   it's an earnings announcement, so I looked

17   at it.  Oftentimes that's something that

18   will move a stock price.

19      Q.    And setting aside the securities

20   analyst's reports, do you have any

21   independent view of whether the third

22   quarter earnings were a positive, negative

23   or neutral development?

24      A.    Beyond those reports and

25   presumably additional news articles I may
```

119

```
1                DR. A. WERNER

2           Do you see that?

3      A.    I do see that.

4      Q.    What is your basis for that

5  assertion?

6      A.    Well, among other things, the

7  Deutsche Bank report.

8      Q.    Again, you looked to one of the

9  analysts reports' characterization of this

10 event to judge whether it was significant?

11     A.    So when you use the word

12 "significant," that has a loaded meaning.

13     Q.    What do you understand it to mean

14 when I say "significant"?

15     A.    Well, so normally when we talk

16 about significance in a securities class

17 action context, we're usually talking about

18 statistically significant.

19     Q.    Okay.

20     A.    I'm sorry, I'm uncomfortable

21 using the term "significant."  If you want

22 to say important, something people normally

23 pay attention to, what might change the

24 overall information.

25     Q.    I'll ask the question again more
```

Case 1:21-md-02989-CMA-DPG Document 566-2 Entered on FLSD Docket 06/07/2023 Page 59 of 113

Case 1:19-cv-02984-CMA-DPG Document 566-2 Entered on FLSD Docket 06/07/2023 Page 59 of 113
In Re: NIO Inc. Securities Litigation

Dr. Adam Werner
September 13, 2022

120

DR. A. WERNER

1   specifically.  But in general, what I'm

2   trying to get at is good, bad, or neutral.

3   So we're getting hung up on the word.  I'm

4   not trying to trick you.  I don't know of a

5   better word to describe that inquiry, but

6   I'll just ask it that way.

7          You relied on the Deutsche Bank

8   analyst report to gauge whether

9   Ms. Warrior's resignation was a positive,

10  negative, or neutral news event for the

11  company?

12     A.    That certainly informed my

13  opinion, yes.

14     Q.    Okay.  I'll try and stick with

15  that going forward, that formulation.

16     A.    Okay.

17     Q.    Sorry, so you also write here

18  that it did not affect the market's

19  perception of the company's ability to

20  operate and deliver on its goals.

21          Is that a general standard that

22  you would apply to evaluating

23  company-specific news?

24          Let me ask it this way:  Would

DR. A. WERNER

1

2     you consider events that do not affect the

3     company's ability to operate and deliver on

4     its goals to be neutral?

5          A.    Not necessarily.

6          Q.    Why not?

7          A.    Well, it's going to depend on the

8     situation.  Again, I have no understanding

9     whatsoever about the, you know, Tim Cook's

10    individual or Apple's ability to continue

11    to manufacture its products, but I would

12    not be surprised that if Tim Cook resigns

13    out of nowhere, Apple's stock price is

14    going to move.

15         Q.    How about this way, would you

16    consider an event that hinders the

17    company's ability to operate and deliver on

18    its goals to be a negative news event?

19         A.    Negative, but not necessarily

20    statistically significant.

21         Q.    Sure.  No numbers here, so can't

22    possibly gauge statistical significance.

23    I'm just trying to understand why you use

24    that particular phrase here.

25         A.    That's just what I chose to use.

124

1                 DR. A. WERNER

2     A.     Correct.

3     Q.     And this was not statistically

4  significant in your opinion, correct?

5     A.     Correct.

6     Q.     All right.

7           MR. GRIFFIN:  I think we've been

8        going for about an hour.  Do you want

9        to take another break before we go to

10       the next event?

11           THE WITNESS:  Yeah, actually

12       thank you so much for asking.  That's

13       very kind of you.

14           MR. GRIFFIN:  Yep, sure.  Ten

15       minutes again?

16           THE WITNESS:  Yeah, 10 minutes

17       would be good.  Works for us.  So

18       we'll be back around 2:10.

19           MR. GRIFFIN:  Yep.

20           THE VIDEOGRAPHER:  We are off the

21       record at 10:59 a.m.

22           (Recess taken from 10:59 a.m.

23       11:12 a.m. PT)

24           THE VIDEOGRAPHER:  We are back on

25       the record at 11:12 a.m.

125

```
 1              DR. A. WERNER

 2   BY MR. GRIFFIN:

 3       Q.    Dr. Werner, turning to the fourth

 4   and final event in your event study, that

 5   was the March 5, 2019 disclosure of NIO's

 6   fourth quarter and fiscal year 2018

 7   earnings results, correct?

 8       A.    Correct.

 9       Q.    And it was in connection with

10   this earnings announcement that NIO also

11   announced that it was terminating the

12   Shanghai facility project, correct?

13       A.    Correct.

14       Q.    Now, looking at paragraph 71,

15   which you referenced earlier, you state

16   that, "Analysts and market participants

17   noted that the company's reported financial

18   results were disappointing and that the

19   termination of the plan to construct the

20   Shanghai facility was a negative surprise."

21            Do you see that?

22       A.    I do.

23       Q.    Who are the analysts that you're

24   referring to in that sentence?

25       A.    Again, so these -- you know, I
```

126

```
 1              DR. A. WERNER
 2   should have been -- I agree, I should have
 3   been more accurate -- these were analysts
 4   that showed up in terms of quotations from
 5   our literature review through the
 6   Lexis-Nexis search.  So things like --
 7   before we looked at flyonthewall, so that
 8   would be one such source.
 9        Q.    So when you refer to analysts in
10   paragraph 71, you're not referring to the
11   investment bank coverage analysts like
12   Deutsche Bank and JPMorgan, Morgan Stanley,
13   et cetera?
14        A.    Well, they may very well have
15   been the sources of those.  The problem is,
16   again, we, for whatever reason, Eikon,
17   Thomson Eikon didn't supply us with --
18   analyst reports after that, after February
19   15th were not available on Thomson Eikon.
20   And I don't know, I've asked my staff, they
21   don't know.
22        Q.    So the sentence that you write,
23   though, in paragraph 71 is not referring to
24   those securities analysts that publish
25   regular coverage after earnings
```

127

```
1              DR. A. WERNER

2   announcements by Deutsche Bank, JPMorgan,

3   et cetera, that we discussed earlier,

4   right?

5        A.    No.  What I'm saying is, as I sit

6   here, I don't recall.  It very well could

7   have, right.  But to the extent that I

8   didn't have access to the source, the

9   actual reports, I didn't cite to the actual

10  reports.

11       Q.    Okay, sorry.  I'm not sure I'm

12  following entirely.  But are you saying

13  that you may have reviewed sources,

14  articles, news media, et cetera, that

15  referenced the analyst coverage reports

16  expressing these opinions and that's the

17  basis for your sentence in 71?

18       A.    Correct.

19       Q.    But sitting here today, you don't

20  recall any specific articles or any other

21  source that you reviewed that referenced

22  securities analysts describing the

23  termination of the plan to construct the

24  Shanghai facility as a negative surprise,

25  right?
```

128

|  |  |
|--|--|
| 1 | DR. A. WERNER |
| 2 | A.    I do not specifically remember |
| 3 | that. |
| 4 | Q.    Do you recall generally that you |
| 5 | saw that, even if you don't recall the |
| 6 | particular source? |
| 7 | A.    Well, I wouldn't have written |
| 8 | that sentence if I hadn't seen that. |
| 9 | Q.    All right.  But it's not a |
| 10 | hypothetical or a conditional, Doctor.  You |
| 11 | did write the sentence.  So I'm just trying |
| 12 | to understand what your basis was for that |
| 13 | sentence. |
| 14 | A.    Right.  And again, as I say, I |
| 15 | should have been more specific.  I'll be |
| 16 | happy to provide you with sources |
| 17 | afterwards.  But news articles that I |
| 18 | reviewed that quoted analysts. |
| 19 | Q.    Okay. |
| 20 | A.    Among other things. |
| 21 | Q.    What are the other things? |
| 22 | A.    As I sit here, I don't know.  I'm |
| 23 | just trying to be as general as possible. |
| 24 | Q.    I would like you to be specific, |
| 25 | if you can. |

129

```
 1              DR. A. WERNER
 2      A.    Right.  What I meant to say
 3   was --
 4      Q.    I'm just asking --
 5      A.    Right, no, I meant to say -- I
 6   was trying to be as specific as possible
 7   and as accurate as possible.  So I know
 8   that I remember reading analyst, quotes
 9   from analysts.  You know, I don't have a
10   full recollection of everything I saw.  So
11   I'm trying to be as accurate as possible,
12   how about that.
13      Q.    Okay.
14            Now, as before, right, setting
15   aside the stuff that you reviewed, did you
16   have -- well, let me strike it.  Let me
17   reask the question.
18            Do you agree with the opinions
19   that you read in the sources that you
20   reviewed that the termination of the plan
21   to construct the Shanghai facility was a
22   negative surprise?
23      A.    For the purposes of market
24   efficiency, that wasn't something I was
25   asked to do.
```

157

```
 1              DR. A. WERNER

 2      Q.    And generally speaking --

 3      A.    And you're -- sorry.  Usually in

 4   the context of price impact and loss

 5   causation, you're trying to measure the

 6   impact of that information.

 7      Q.    And generally speaking, there is

 8   two ways you could go about measuring the

 9   price impact of an alleged

10   misrepresentation, you could try and do it

11   on the front end or on the back end, right?

12      A.    Those are certainly -- that just

13   seems overly specific.  I mean, you can

14   have price impact throughout a class

15   period, right, so...

16      Q.    I could be more specific.  One

17   way to measure price impact is to look at

18   the amount by which the stock price

19   increased when the alleged

20   misrepresentation was made, right?

21      A.    Well, again, to the extent that

22   there was an alleged misrepresentation,

23   right, it could be an omissions case in

24   which case I wouldn't necessarily expect

25   any price impact.
```

158

```
 1              DR. A. WERNER

 2       Q.    Okay.  Let's focus --

 3       A.    At the front end, the front end.

 4       Q.    Yeah.  So for a misrepresentation

 5  case, one way to measure price impact would

 6  be to look at the change in stock price

 7  when the alleged misrepresentation was

 8  made, right?

 9       A.    I've certainly seen people do

10  that before.  That's certainly one way one

11  could look at it.

12       Q.    Have you ever used that approach

13  before?

14       A.    As I sit here today, I don't

15  recall.

16       Q.    In any event, you couldn't do

17  that in this case, right?

18       A.    You couldn't do that in this

19  case -- I believe that statement is

20  correct.

21       Q.    It's impossible to show any

22  front-end impact at the time the alleged

23  misrepresentation was made because it was

24  contained in the company's IPO offering

25  documents before the stock was publicly
```

159

```
 1              DR. A. WERNER

 2   traded, right?

 3       A.    I'm not sure.  That question

 4   doesn't make sense to me.

 5       Q.    I'll take a step back.

 6       A.    I guess you're now making a

 7   distinction between misrepresentation and

 8   an omission.  An omission can be a

 9   misrepresentation.

10       Q.    What if I say an affirmative

11   misrepresentation as to distinguish it from

12   an omission, does that help clarify the

13   question?

14       A.    No.

15       Q.    How about the alleged or false or

16   misleading statements in this case?

17       A.    Again, I haven't looked at price

18   impact or loss causation in this case.  If

19   your expert decides to make a price impact

20   argument, that's something I will address

21   in a rebuttal report.  But for the purposes

22   of this report it's not something I looked

23   at.

24       Q.    Do you have any view, one way or

25   another, as to whether you could determine
```

192

```
 1              DR. A. WERNER

 2    in there.

 3         A.    Yes, yes.

 4         Q.    But that's the gist of it, right?

 5              That wasn't the only reason that

 6    the company cited for terminating the

 7    Shanghai facility project, right?

 8         A.    As I sit here, I don't recall.

 9         Q.    All right.  Let's take a look at

10    the transcript again, Defendants' Exhibit

11    24.  If we look at page 4, at the bottom

12    paragraph starts, "On a separate note," do

13    you see that?

14         A.    Yes.

15         Q.    It says, "On a separate note we

16    would like to give you an update on our

17    plan for building the manufacturing

18    facilities in Jia Ding, Shanghai.  In 2017,

19    we signed a framework agreement and

20    memorandum with the government and related

21    NDs in Jia Ding, Shanghai to building a

22    manufacturing plant for NIO.  Recently, we

23    have agreed in principal that these

24    contractual counterparties, with our

25    contractual counterparties, to terminate
```

193

```
 1              DR. A. WERNER

 2    the plan of this manufacturing plant.

 3    These decisions are made based on two

 4    reasons."

 5              Do you see where I've read so

 6    far?

 7         A.   I do.

 8         Q.   So during the conference call,

 9    the company actually explained there were

10    two separate reasons for their decision to

11    terminate the factory, correct?

12         A.   At least in this portion of the

13    conference call, yes.

14         Q.   So continuing with the bottom

15    paragraph on page 4, it says, "First, in

16    2018, a new policy was issued by government

17    authorities which allow and encourage the

18    entities that operate its vehicle research

19    and development and design to work with

20    vehicle manufacturing companies to

21    manufacture vehicles cooperatively.  This

22    joint" --

23         A.   I'm sorry, hold on.  Where are

24    you reading from?  I assume it's just the

25    next sentence, but for whatever reason I'm
```

194

```
 1              DR. A. WERNER
 2   not seeing it.
 3       Q.    It was just the next sentence
 4   after, it says, "These decisions are made
 5   based on two reasons" -- and then it says
 6   "First."
 7             Do you see that?
 8       A.    First, yeah, okay.  Yep.  Do you
 9   want me to just go to "Secondly"?
10       Q.    Well, before we get to
11   "Secondly," the first reason listed there
12   designated first is the one you were
13   referring to in your declaration, right?
14       A.    Yes, correct.
15       Q.    This is the new government policy
16   that was introduced, right?
17       A.    Correct.
18       Q.    Okay.  So now you see where it
19   says "Secondly" in the earnings transcript?
20       A.    I do.
21       Q.    And it says, "Secondly, through
22   an efficiency perspective, we can leverage
23   the existing capacity of NIO's JAC plant
24   and enjoy the flexibility to expand the
25   capacity to support NIO's market
```

```
 1              DR. A. WERNER

 2   penetration and growth plans for the next

 3   two or three years.  In the long run, we

 4   will still focus on the joint manufacturing

 5   model and continue improving the

 6   effectiveness of capital investments in

 7   manufacturing."

 8            Do you see that?

 9       A.    I do.

10       Q.    Why did you omit that second

11   reason for terminating the plan from your

12   declaration?

13       A.    I can't think of any specific

14   reason as I sit here today.

15       Q.    Do you think it should have been

16   included?

17       A.    Well, I mean, to the extent that

18   this thing doesn't have to be comprehensive

19   -- I mean, I'm just trying to determine

20   whether or not this aggregate information

21   with the stock price, right, for the

22   purposes of this report should it have been

23   included or not been included -- I don't

24   have an opinion one way or the other.

25       Q.    Do you think --
```

Case 1:19-md-02894-CMA-JJO Document 566-26 Entered on FLSD Docket 06/07/2023 Page 74 of 113
In Re: NIO Inc. Securities Litigation

Dr. Adam Werner
September 13, 2022

196

```
 1              DR. A. WERNER

 2      A.    Let me put it another way.

 3  Reading that second sentence doesn't alter

 4  my opinions with regards to market

 5  efficiency and damages in this case.

 6      Q.    Do you think it was inaccurate to

 7  state that NIO explained the reason for the

 8  plan's termination when there were, in

 9  fact, multiple reasons?

10      A.    I agree it should say "a" reason

11  and not "the" reason.

12      Q.    I think we discussed earlier that

13  after the company's prepared remarks on the

14  earnings call there is often Q&A, right?

15      A.    Correct.

16      Q.    And that was the case for this

17  particular earnings call, right?

18      A.    Yeah.  I don't remember that

19  we've actually spoken directly about this

20  topic, but generally that is the case.

21      Q.    We had talked earlier that

22  securities analysts participated in

23  earnings calls by asking questions

24  sometimes.

25              You recall that?
```

197

```
1                 DR. A. WERNER
2        A.    I do recall that.
3        Q.    That's what I was referring to.
4              So anyway, here there were
5    questions by the securities analysts during
6    this call, right?
7        A.    That is correct.
8        Q.    And so if we go to page 6, that's
9    where the question and answer session
10   begins.
11             Do you see that towards the
12   bottom of page 6?
13       A.    I do.
14       Q.    And the first question there was
15   from Daniel Galves, G-A-L-V-E-S, from Wolfe
16   Research.
17             Do you see that?
18       A.    I do.
19       Q.    And that was about the plan
20   government reduction in subsidies for
21   electric vehicles, right?
22       A.    That is correct.
23       Q.    All right.  Let's jump ahead to
24   the next question, which is on page 8 of
25   the transcript.  So if you go to page 8 and
```

215

```
 1              DR. A. WERNER
 2    Shanghai facility was a negative surprise.
 3              Can you show me where in this
 4    article they describe that announcement as
 5    a negative surprise?
 6        A.   As I sit here today, I don't
 7    recall.  I think it may have had something
 8    to do with the deliveries, but I don't
 9    recall as I sit here today.
10        Q.   Doctor, I'm not asking you for
11    your recollection.  You just read the
12    article.
13              Does it describe the termination
14    of the plan to construct the Shanghai
15    facility as a negative surprise?
16        A.   Well, they talk about lower
17    utilization.  I don't remember if at the
18    point when I wrote this I was thinking
19    there was a connection between the
20    non-construction of the factory and their
21    ability to produce more cars.
22        Q.   Sitting here today, do you have
23    any basis to claim that there is such a
24    connection?
25        A.   As I sit here today, no.
```

216

                    DR. A. WERNER

1

2        Q.    Okay.  So just to be clear,

3   nothing in this article actually says that

4   the termination of the plan to construct

5   the facility was a negative surprise?

6        A.    I mean, I think my answer speaks

7   for itself.  I don't know if your summary

8   is correct.

9        Q.    Well, I'm not trying to summarize

10   the document or your answer.  I'm just

11   asking the question.  Does this article say

12   that?

13        A.    Yeah, I refer to my previous

14   answer about how I arrived at my opinion

15   regarding this.

16        Q.    Well, this isn't an opinion.

17   This is a factual assertion about what was

18   said or wasn't said.

19        A.    Okay.

20        Q.    So does the article say that the

21   termination of the plan to construct the

22   Shanghai facility was a negative surprise?

23        A.    Again, I can't, as I sit here

24   today, I don't recall if I made a

25   connection between those two things.  If

Case 1:19-md-02894-CMA-JB Document 566-26 2 Entered on FLSD Docket 06/05/2023 Page 78 of
113
In Re: NIO Inc. Securities Litigation                                    Dr. Adam Werner
                                                                 September 13, 2022

217

```
 1              DR. A. WERNER

 2    you're asking about it as my reading today,

 3    and I think I stated this, the answer to

 4    your question is no.

 5        Q.    Okay.  And then if we look at the

 6    next sentence in subparagraph D of your

 7    declaration, same sentence that was in

 8    paragraph 71 where you say that reactions

 9    from the market participants continued on

10    to the next trading day, right, and you

11    cite another article here?

12        A.    I did.

13        Q.    And this is from the Motley Fool?

14        A.    It is.

15        Q.    And are you familiar with that

16    publication, that website?

17        A.    Yes, I am.

18        Q.    Can you describe that website?

19        A.    It's a website -- it's a website

20    that publishes opinions about stocks and

21    stock performance.

22        Q.    Okay.  I just sent around that

23    article.  So let me know when it comes

24    through.  I'll send it in the chat as well.

25    This will be DX-26.
```

218

```
 1            DR. A. WERNER
 2            (Defendants' Exhibit 26, Article,
 3       "Why Shares of Chinese Electric Car
 4       Maker NIO Fell 47 Percent in March",
 5       remotely introduced and provided
 6       electronically to the reporter, as of
 7       this date.)
 8   Q.    As always, Dr. Werner, just let
 9  me know when you get it and it's open.
10   A.    Sure.
11            Okay.
12   Q.    So Defendants' Exhibit 26 is an
13  article from the Motley Fool titled, "Why
14  Shares of Chinese Electric Car Maker NIO
15  Fell 47 Percent in March."
16            Do you see that?
17   A.    I do.
18   Q.    Do you recognize this article?
19   A.    I do.
20   Q.    You've reviewed it before?
21   A.    At some point, yes.
22   Q.    And this is the article that is
23  referenced in Footnote 74 of your report,
24  right?
25   A.    That is correct.
```

219

```
 1              DR. A. WERNER
 2       Q.    Now, this article is several
 3   pages long.  At the risk of drawing this
 4   out, I'd like you to read that article and
 5   point me to where it discusses the Shanghai
 6   facility.
 7       A.    Before reading it, I can stop you
 8   right there.  When I was talking about this
 9   additional news, I wasn't specifically
10   referring to the Shanghai facility.  I was
11   referring to the conference call on the
12   earnings release.
13       Q.    So when you say they continued,
14   you weren't talking about the reactions to
15   the termination of the plant to construct
16   the Shanghai facility from the prior
17   sentence in D, right?
18       A.    Correct.  I was inarticulate.  I
19   apologize.
20       Q.    You were just referring broadly
21   to reactions to the quarterly press release
22   and conference call?
23       A.    Correct.
24       Q.    Okay.  All right.  Then you don't
25   have to read that.  You can put that one
```

220

```
 1              DR. A. WERNER

 2    away.

 3              Now, give me a minute.  We're

 4    going to look at a few documents and I'm

 5    just going to send them to you all at once

 6    to hopefully speed this up.

 7              All right.  It just went through

 8    on my end.  Give it a minute and it should

 9    come through on yours.  It should be three

10    attachments?

11         MR. SHI:  Should be how many

12      attachments?

13         MR. GRIFFIN:  Three.

14         This is going to be Exhibit 27

15      which is going to be labeled Tab 67 in

16      the e-mail that you receive.

17         (Defendants' Exhibit 27, 3/6/19

18      analyst report from JPMorgan, remotely

19      introduced and provided electronically

20      to the reporter, as of this date.)

21         MR. SHI:  Did you say Tab 6?

22         MR. GRIFFIN:  Yes, it should be a

23      JP Morgan analyst report.

24    A.    Okay, I've got it.

25    Q.    Open that up.  Defendants'
```

221

```
 1              DR. A. WERNER

 2   Exhibit 27 is an analyst report from

 3   JPMorgan dated March 6, 2019.

 4              Dr. Werner, you've never seen

 5   this particular analyst report before, is

 6   that right?

 7        A.    That is correct.

 8        Q.    This is one of the reports

 9   following the alleged corrective disclosure

10   that you were not able to obtain, is that

11   right?

12        A.    People at my direction were not

13   able to obtain it.

14        Q.    I'll represent to you that this

15   is one of those analyst reports following

16   the alleged corrective disclosure on March

17   5th.

18              So I'd like to direct your

19   attention to the first paragraph there that

20   starts "NIO's 2018 result."

21              Do you see that?

22        A.    I do.

23        Q.    It says, "NIO's 2018 result was

24   broadly in line with expectations."  Then

25   there's a semicolon.
```

222

```
 1              DR. A. WERNER

 2         Do you see that?

 3    A.    Why do I not see the semicolon.

 4  Maybe because I'm going blind.

 5    Q.    It's small.  You might want to

 6  zoom in there.  It's the small print.

 7    A.    After "profitability"?

 8    Q.    No.  Why don't I throw this one

 9  up.  It may be easier for you to follow

10  along.

11         All right.  Can you see this?

12    A.    I can.

13    Q.    Is it big enough?  It doesn't

14  look the same to me as it does to you, so

15  let me know.

16    A.    It's plenty big.

17    Q.    Good.  I'm just going to go ahead

18  and highlight the portion that I'm looking

19  at here.

20         So it says, "NIO's 2018 result

21  was broadly in line with expectations; we

22  see two important developments per MGMT

23  guidance in 2019 that will lead to the

24  company's stock performance and

25  profitability:  1, on the positive side,
```

223

```
 1              DR. A. WERNER
 2   potential termination of building a new
 3   wholly owned Shanghai plant and simply
 4   leveraging JAC's existing capacity.  This
 5   implies cost savings and better investment
 6   returns."
 7           Do you see that?
 8      A.    I do.
 9      Q.    So JPMorgan actually
10   characterized the termination of the
11   Shanghai facility as a positive event, is
12   that right?
13      A.    In this sentence, yes.
14      Q.    And then if we look down --
15   sorry, I started too early, there I just
16   want to scroll.
17           If we scroll down here to the
18   first bullet, it again discusses the
19   Shanghai plants and it says, "On the
20   Shanghai plant, we welcome the move to
21   terminate the Greenfield expansion plan and
22   simply utilize/expand existing capacity at
23   JAC, subject to final regulatory approval
24   in June.  If it materializes, we believe
25   this will save Capex requirements by 20 to
```

224

```
 1              DR. A. WERNER
 2    30 percent and drive better ROIC and cash
 3    flow."
 4              Do you see that?
 5         A.    I do.
 6         Q.    But once again, JPMorgan is
 7    expressing a positive opinion of the
 8    announcement regarding the Shanghai plant,
 9    correct?
10         A.    In this sentence, yes.
11         Q.    And as you mentioned before, you
12    did not take into account this analyst
13    report in your event study because you
14    didn't have it, right?
15         A.    That is correct.
16         Q.    Would this have had any impact on
17    your analysis?
18         A.    Well, again, to the extent that
19    I'm looking at market efficiency and not
20    loss causation or price impact, I don't
21    believe it would have any impact on my
22    conclusions.
23         Q.    Does this suggest that the
24    information about the Shanghai plant was
25    countervailing news, positive news, as
```

225

```
 1              DR. A. WERNER

 2   opposed to the negative news about the

 3   company's financial results and projections

 4   for demand?

 5       A.    Just looking at these two

 6   statements without reading the entire

 7   report, it seems to suggest that they might

 8   be a positive impact on the company's stock

 9   price.

10              But again, this is why I made

11   that distinction earlier when I was talking

12   about the choice of event studies for

13   marketed efficiency.  Generally you try to

14   use clean events, but to the extent you're

15   talking about corrective disclosures you

16   obviously can't just use clean events,

17   you've got to use the corrective

18   disclosures.

19       Q.    Let's look at the next of those

20   analyst reports.  I'll send it in the chat.

21   We're going to mark this one as Defendants'

22   Exhibit 29, and I'll pull it up on the

23   screen since that seems to be easier for

24   you doctor but it's in your e-mail if you

25   want to open it up.
```

226

```
 1              DR. A. WERNER

 2      A.    This is Exhibit 7, right?

 3      Q.    Tab 7 is going to be Defendants'

 4 Exhibit 28.

 5      A.    This is the JPMorgan, or no?

 6      Q.    This should be Morgan Stanley.

 7            So again, I will share this with

 8 you so we are all on the same page.

 9            (Defendants' Exhibit 28, 3/7/19

10      analyst report from JPMorgan, remotely

11      introduced and provided electronically

12      to the reporter, as of this date.)

13      Q.    All right.  So we've marked as

14 Defendants' Exhibit 28 an analyst report

15 from Morgan Stanley dated March 7, 2019.

16            Again, you do not recognize this

17 analyst report, right?

18      A.    It is not something I reviewed

19 prior to seeing it now.

20      Q.    Okay.  I'm going to zoom out here

21 slightly.  Can you still read what's over

22 here?

23      A.    I'm looking at a Morgan Stanley

24 or JPMorgan -- let me focus on the screen

25 over here.
```

Case 1:19-md-02989-CMA-JCG Document 566-22 Entered on FLSD Docket 06/07/2023 Page 88 of
2987
Case 1:21-md-02989-CMA Document 566-22 Entered on FLSD Docket 06/07/2023 Page 88 of
2987
In Re: NIO Inc. Securities Litigation

Dr. Adam Werner
September 13, 2022

227

```
 1              DR. A. WERNER

 2      Q.    Fair enough.

 3            Tab 7, if you open it up on your

 4  own but you can also just look on the

 5  screen here.

 6      A.    Right.

 7      Q.    So midway through the page, I'll

 8  highlight it again for you, it talks about

 9  the Shanghai factors.

10            Do you see that where I've

11  highlighted?

12      A.    I do.

13      Q.    It says, "NIO has suspended its

14  plan to build its own factory in Jia Ding,

15  Shanghai.  Recent government policy

16  encourages cooperation with JAC Motors.

17  NIO plans to stick with the cooperation

18  model for manufacturing and is open to

19  seeking other partners.  Its current

20  production base with JAC has 100K units of

21  annual capacity and would be expanded to

22  150K after upgrades satisfying the need for

23  its first three models in the next two to

24  three years.  NIO believes it might still

25  need to pay a small compensation to JAC in
```

Case 1:19-md-02894-CMA-JGG Document 566-26 Entered on FLSD Docket 06/07/2023 Page 89 of
Case 1:21-cv-09894-CMA-JGG Document 566-26 Entered on FLSD Docket 06/07/2023 Page 89 of
113
In Re: NIO Inc. Securities Litigation                                    Dr. Adam Werner
September 13, 2022

228

```
 1              DR. A. WERNER
 2   1H-19 with relatively low delivery period.
 3   We view the joint manufacturing mode as
 4   positive.  It could save on Capex while
 5   keeping sufficient capacity."
 6          Do you see that?
 7      A.    I do.
 8      Q.    So like the JPMorgan analyst, the
 9   Morgan Stanley analyst also viewed the
10   termination of the Shanghai facility plant
11   as a positive, correct?
12      A.    Well, again, without reading the
13   entire document, certainly that seems to be
14   the case with this particular sentence,
15   this particular paragraph.
16      Q.    Fair enough.  In this particular
17   paragraph they expressly say it was a
18   positive, right?
19      A.    Right.
20      Q.    All right.  We can put that one
21   down.  We've got one more here for you.
22   It's in the chat now labeled Tab 8,
23   Defendants' Exhibit 29.
24          (Defendants' Exhibit 29, 3/7/19
25      analyst report from Deutsche Bank
```

229

```
 1              DR. A. WERNER

 2       report, remotely introduced and

 3       provided electronically to the

 4       reporter, as of this date.)

 5       A.    This is the Deutsche Bank report,

 6  correct?

 7       Q.    Exactly.  I have don't have to

 8  share it if it's easier for you it look on

 9  your screen, but I'm happy to.

10       A.    I think I'm okay.

11       Q.    Okay.  Then I will stop doing

12  that.  So Defendants' Exhibit 29 is an

13  analyst report from Deutsche Bank that's

14  dated March 7, 2019.  You do not recognize

15  this document, right?

16       A.    Correct, I have not seen this

17  document before.

18       Q.    Okay.  I'd like to direct your

19  attention to the second paragraph on the

20  first page that's titled, "Sticking To

21  Joint Manufacturing Model Will Help Cash

22  Flow."

23              Do you see that?

24       A.    I do.

25       Q.    Deutsche Bank writes, "In the
```

230

```
1              DR. A. WERNER
2   results announcement, NIO said it will no
3   longer seek to build its own manufacturing
4   plant in Shanghai and will further rely on
5   the joint manufacturing operation with Jing
6   Wei.  Considering the successful ramp-up of
7   ESH production in FY-18, we think that
8   NIO's current production business model
9   will not hinder the original sales outlook.
10  Indeed, we view this more flexible option
11  with potentially lower Capex outlay for the
12  company in the next few years."
13          Do you see that?
14      A.   I do.
15      Q.   So, again, this paragraph seems
16  to indicate that Deutsche Bank viewed the
17  termination of the Shanghai facility plan
18  as a positive development, right?
19      A.   Well, at a minimum, it's
20  expressing the opinion that it's not going
21  to pose an impediment to previous
22  estimates.
23      Q.   And, in fact, it says that it
24  will be more flexible, will have lower
25  potential Capex, capital expenditure, and
```

1          DR. A. WERNER

2    will help cash flow, right?

3        A.    That is what it says, yes,

4    correct.

5        Q.    And all else being equal, those

6    would generally be positive developments,

7    right?

8        A.    Generally, for corporate -- I

9    mean, I can't speak to this particular

10   example, but generally I think that could

11   be thought of as a positive.

12       Q.    Okay.  You could put that one

13   down as well.

14             Now, in addition to the Cammer

15   factors, you also analyzed the so-called

16   Unger/Krogman factors, correct?

17       A.    Correct.

18       Q.    U-N-G-E-R/K-R-O-G-M-A-N, correct?

19       A.    Correct.

20       Q.    What are the three Unger/Krogman

21   factors?

22       A.    So it's bid/ask spread, the float

23   and market capitalization.

24       Q.    And you indicated that -- or

25   strike that.

232

```
  1            DR. A. WERNER
  2            It's your opinion in this case
  3    that each of those factors supports a
  4    finding of market efficiency for NIO's ADS,
  5    correct?
  6       A.    That is correct.
  7       Q.    Are any one of those factors
  8    independently sufficient to establish
  9    market efficiency?
 10       A.    Independently sufficient?
 11       Q.    Correct.
 12       A.    So if I just -- if I knew nothing
 13    about a company and I saw that it was big,
 14    would that be sufficient to determine
 15    market efficiency?
 16            MR. SHI:  Let me interpose an
 17        objection.  Objection to the extent
 18        that it calls for a legal conclusion.
 19            Go ahead.
 20       A.    Again, with all the caveats that
 21    I gave before, that's not something -- I
 22    mean, no one's actually ever asked me that
 23    question.  In general, do I see large
 24    corporations trading in efficient markets?
 25    Yeah, generally.  But again, it's not
```

236

```
 1              DR. A. WERNER
 2          What is your understanding of an
 3   autocorrelation test in connection with
 4   assessing market efficiency?
 5       A.    I would say it's something I've
 6   seen used before, but not in a long time.
 7       Q.    But what is it?
 8       A.    Well, it's basically asking the
 9   question if past stock price movements are
10   correlated with future stock price
11   movement.
12       Q.    And how is that relevant to the
13   market efficiency assessment?
14       A.    How is that relevant or
15   irrelevant?
16       Q.    Either.
17       A.    Which question do you want me to
18   answer?
19       Q.    What effect, if any, does it have
20   on your opinion as to whether a market is
21   efficient?
22       A.    Well, again, so we see cases
23   where stocks are efficient, but there is
24   autocorrelation between -- or
25   autocorrelation is found and often occurs
```

237

```
 1              DR. A. WERNER
 2   when you have multiple days with large
 3   stock price movements.  That's generally
 4   why people stopped looking at
 5   autocorrelation coefficients in determining
 6   market efficiency.
 7        Q.    Have you ever looked at
 8   autocorrelation to assess market
 9   efficiency?
10        A.    Many years ago.
11        Q.    And you did not conduct an
12   autocorrelation test in this case, right?
13        A.    I did not.
14        Q.    Why not?
15        A.    For the reasons I just explained.
16        Q.    Can you explain them again
17   specifically why you didn't apply that test
18   in this case?
19        A.    Yeah, because autocorrelation is
20   not necessarily an indicator of
21   inefficiency.  And I'll refer back to the
22   other examples I gave you where a stock can
23   be efficient, but you'll have
24   autocorrelation.
25        Q.    Do you have any idea if there was
```

238

```
 1              DR. A. WERNER
 2   autocorrelation for NIO's ADS here?
 3       A.    I do not.
 4            MR. GRIFFIN:  All right.  I've
 5       got a bit more.  Do you want to take
 6       another break here?
 7            THE WITNESS:  Sure.  Do you want
 8       to come back at, I guess, 5:05 your
 9       time?
10            MR. GRIFFIN:  Yeah, that works.
11            THE WITNESS:  All right.
12            MR. GRIFFIN:  Great.  Thank you.
13            THE VIDEOGRAPHER:  We are off the
14       record at 1:55 p.m.
15            (Recess taken from 1:55 p.m. 2:10
16       p.m. PT)
17            THE VIDEOGRAPHER:  We are back on
18       the record at 2:10 p.m.
19   BY MR. GRIFFIN:
20       Q.    All right.  Dr. Werner, let's
21   turn to your second opinion.  You mentioned
22   that your second opinion in this case, and
23   I'm looking at paragraph 99 on page 37 of
24   your report, your second opinion was that,
25   "With expert assistance the finder of fact
```

239

```
 1              DR. A. WERNER
 2    in this matter will be able to compute
 3    damages using a common class-wide
 4    methodology that applies to the calculation
 5    of damages for each and every class
 6    member."  Correct?
 7         A.    I just got there, but it sounds
 8    like what I wrote.
 9         Q.    And that is your opinion, right?
10         A.    Well, okay.  Now that I have it
11    in front of me, why don't you reread it
12    so -- just to make sure we're on the same
13    page.
14         Q.    Sure.  You say in paragraph 99,
15    "I also --"
16         A.    Hold on.
17         Q.    Page 37, not paragraph 37.  It's
18    the very end of your -- it's your
19    conclusions.
20         A.    Okay, yes, yeah.
21         Q.    So you list your second
22    conclusion in '99 as I also conclude that
23    with expert assistance the finder of fact
24    in this matter will be able to compute
25    damages using a common class-wide
```

```
 1              DR. A. WERNER

 2   methodology that applies to the calculation

 3   of damages for each and every member --

 4   each and every class member, excuse me.

 5   Correct?

 6       A.    Correct.

 7       Q.    And that opinion applies to

 8   damages under Section 10b as well as

 9   Section 11, correct?

10       A.    Correct.

11       Q.    Now, if you turn to page 32, just

12   a few back, your analysis of class-wide

13   damages with respect to the 10b claim

14   starts in paragraph 91, correct?

15       A.    That is correct.

16       Q.    And you start by saying,

17   "Nonetheless, the methodology of financial

18   economists can employ to calculate

19   individual and class-wide damages stemming

20   from various alleged misrepresentations and

21   omissions will accommodate alternative

22   potential determinations of liability."

23              Do you see that?

24       A.    I do.

25       Q.    What does "nonetheless" refer to
```

Case 1:19-md-02989-CMA-DPG Document 566-26 Entered on FLSD Docket 06/07/2023 Page 99 of 113
In Re: NIO Inc. Securities Litigation

Dr. Adam Werner
September 13, 2022

241

```
 1              DR. A. WERNER
 2   at the start of that paragraph?
 3      A.    Yeah, that's an excellent
 4   question.  That should probably not -- as I
 5   sit here today, I don't know.  Probably
 6   shouldn't be there.
 7      Q.    Is this one of those paragraphs
 8   that you would copy from a prior report or
 9   declaration?
10      A.    It's certainly similar to some of
11   the things that appeared in my previous
12   reports.
13      Q.    Do you know, one way or another,
14   if you drafted this paragraph for this
15   declaration or copied it from a prior?
16      A.    I don't.  I only say that because
17   of the word "nonetheless."  So no, I don't
18   know one way or the other.
19      Q.    Okay.  What do you mean when you
20   reference alternative potential
21   determinations of liability here?
22      A.    Well, I mean, I haven't looked
23   at -- fact discovery is still ongoing in
24   this case.  So, you know, if someone says
25   or the Court finds that 100 percent of the
```

242

```
 1              DR. A. WERNER
 2   abnormal return is a result of the alleged
 3   fraud or 50 percent based on the
 4   information -- so that's -- I mean, I guess
 5   that's what I mean by alternative potential
 6   determination liability, the extent --
 7   among other things, the extent of the
 8   liability.
 9        Q.    Okay.  And then if we look at --
10   same paragraph, but on the next page.  Do
11   you see the second line from the top begins
12   as such?
13        A.    Yes.
14        Q.    And you say, "Class-Wide damages
15   in response to the specific
16   misrepresentations and omissions ultimately
17   established by the Plaintiffs can be
18   calculated in a straightforward manner
19   common to all class members."  Correct?
20        A.    That's a correct reading, yes.
21        Q.    And it's your opinion that
22   calculating damages would be
23   straightforward in this case?
24        A.    I believe there's a framework
25   that's commonly used in these types of
```

245

```
 1              DR. A. WERNER
 2      A.    It's similar to the methodology
 3  that I've used in hundreds of cases to
 4  estimate damages in a securities class
 5  action.
 6      Q.    Okay.  And you --
 7      A.    I mean.
 8      Q.    Go ahead.
 9      A.    I mean, go to paragraph 92.  That
10  lays out what I believe is a
11  straightforward methodology in calculating
12  10b5 damages.
13      Q.    Okay.  And so the first step of
14  this straightforward calculation is to
15  determine whether the alleged
16  misrepresentations and omissions had caused
17  the security price to be artificially
18  inflated, right?
19      A.    Where are you reading from?
20      Q.    Where you say first in little
21  Romanette 1 in paragraph 92.
22      A.    Valuation tools, which would
23  include an event study analysis such as
24  that described herein, and potentially
25  other empirical analyses, if necessary,
```

246

```
 1              DR. A. WERNER

 2    would be used to establish if the

 3    disclosures correcting the alleged

 4    misrepresentations and omissions caused the

 5    price of NIO's ADS to fall.

 6         Q.    So step one is determining

 7    whether or not the disclosures correcting

 8    the alleged misrepresentations and

 9    omissions caused the price of NIO's ADS to

10    fall, correct?

11         A.    Generally -- again, generally

12    that is true.

13         Q.    And in order to do that, as you

14    note here, you would have to control for

15    potentially confounding non-fraud-related

16    information, right?

17         A.    That is correct.

18         Q.    How would you do that in this

19    case?

20         A.    That's not something as of this

21    point in time I've been asked to do.  I

22    mean certainly that's why you look at

23    things like -- that's why I include an

24    industry index, that's why I include a

25    market index.  So that's certainly one way,
```

247

```
 1              DR. A. WERNER
 2   in general, that we do this type of thing.
 3              But more specifically, that's not
 4   something I've been asked to opine upon or
 5   do at this point in time.
 6       Q.    But this, generally, would
 7   involve disaggregating, you know, potential
 8   price impacts from various causes, right?
 9       A.    That certainly could be one of
10   the things you might have to do.
11       Q.    For example, you know, we
12   discussed earlier that the alleged
13   corrective disclosures here that press
14   release and earnings call contained a
15   variety of information that had nothing to
16   do with the Shanghai facility, correct?
17       A.    I'm sorry, could you repeat the
18   question?
19       Q.    Sure.  The two alleged corrective
20   disclosures that we discussed earlier in
21   this case are that press release and the
22   conference call in connection with the
23   fourth quarter full year 2018 earnings,
24   right?
25       A.    I believe that's year.
```

248

1              DR. A. WERNER

2       Q.    And as we discussed earlier, both

3   of those documents -- or excuse me, the

4   transcript for the call and the press

5   release discussed a variety of topics and

6   information in addition to the Shanghai

7   facility, right?

8       A.    I believe that's accurate.

9       Q.    And Plaintiffs in this case don't

10  currently contend that any of that other

11  information not pertaining to the Shanghai

12  facility was a corrective disclosure,

13  right?

14      A.    Again, for the purposes of this

15  market efficiency report and providing a

16  general damage methodology, that's not

17  anything I've thought about up until this

18  point.

19      Q.    Given your familiarity with

20  Plaintiff's allegations in this case, you

21  don't know, sitting here right now, whether

22  they contend that any information in the

23  fourth quarter 2018 press release and

24  accompanying earnings call was a corrective

25  disclosure other than that regarding the

272

```
 1              DR. A. WERNER
 2   What are you asking me about?
 3        Q.    Have you reviewed Plaintiff's
 4   Motion for Class Certification?
 5        A.    I refer to my previous answer and
 6   as of today, since the writing of this
 7   report, I don't know one way or the other.
 8        Q.    You don't know if you have
 9   reviewed the motion for class certification
10   since you wrote your report?
11        A.    That is correct.
12        Q.    Okay.  The next category of
13   documents you list here are news articles
14   and press releases, right, in Exhibit 2 to
15   your declaration?
16        A.    Correct.
17        Q.    And this references 494 articles
18   from September 12, 2018 to March 5, 2020,
19   correct?
20        A.    That is correct.
21        Q.    That's a broader date range than
22   the relevant period, right?
23        A.    That is correct.
24        Q.    And why did you use that
25   particular time period?
```

273

```
 1              DR. A. WERNER

 2         A.    Well, typically regardless of

 3    what period or relevant period I'm looking

 4    at, I'll look at all articles,

 5    documentation from the beginning of the

 6    class period to the end of the class

 7    period.

 8              So I guess the easier way to put

 9    it is what I commonly do.

10         Q.    Why you stop at March 5, 2020?

11         A.    If I remember correctly -- hold

12    on one second, that's typically what I

13    would do in this type of case.

14         Q.    You would always stop on March 5,

15    2020?

16         A.    No.

17         Q.    Sorry.  When you say this is what

18    you would typically do, what did you mean

19    by that?

20         A.    Well, typically, I'd go out a

21    year out from the end of the class period

22    in doing my news article search.

23         Q.    Okay, I understand.

24              Then, in the second bullet point

25    you reference a particular Bloomberg news
```

274

```
 1              DR. A. WERNER

 2    article.  That's the article that we looked

 3    at earlier today, right?

 4         A.    That is correct.

 5         Q.    Why did you list that particular

 6    article by name here and no others?

 7         A.    Because I referenced it in the

 8    report.

 9         Q.    You referenced other articles

10    directly in the report as well, right?

11         A.    I believe so.  Okay, so maybe the

12    more accurate -- I don't recall as I sit

13    here today.

14         Q.    Okay.  And then you list all of

15    the analyst reports that you reviewed,

16    which we discussed earlier, right?

17         A.    Correct.

18         Q.    And then you list SEC filings

19    from NIO that you reviewed, right?

20         A.    Correct.

21         Q.    The Form 6K from March 6, 2019

22    that we reviewed earlier is not in this

23    list, is that right?

24         A.    Let's see.  I don't see it, which

25    is why I always include this other category
```

275

```
 1              DR. A. WERNER

 2   at the end of this exhibit, which says

 3   other documents cited in my report.  So

 4   obviously I've cited to that in my report.

 5   So it's something that I considered.

 6        Q.   So it was just an oversight to

 7   not list it specifically in the SEC filings

 8   list?

 9        A.   Correct.

10        Q.   Okay.  Can you turn back to page

11   2 of your declaration?

12        A.   I'm sorry, page 2, correct?

13        Q.   Page 2, correct, paragraph 7,

14   bottom of the page, talking about your

15   comp.

16        A.   Okay.

17        Q.   You write that, "Crowninshield is

18   currently being compensated at $675 per

19   hour for my ongoing work on this matter."

20   Correct?

21        A.   Correct.

22        Q.   How much are you being

23   compensated for your work on this matter?

24        A.   Based on that rate I think it's

25   around 82 percent of that rate.  I don't
```

276

```
 1              DR. A. WERNER
 2    know the exact proportion.
 3         Q.    Why did you list what
 4    Crowninshield is being compensated as
 5    opposed to what your being compensated?
 6         A.    What I commonly do.
 7         Q.    Did anyone instruct you to do
 8    that?
 9         A.    Fifteen years ago did someone
10    instruct me to do that?  I don't recall.
11         Q.    No one instructed you to do that?
12         A.    I'm sorry, what?
13         Q.    No one instructed you in this
14    case specifically to list Crowninshield's
15    compensation as opposed to your own, right?
16         A.    That is correct.
17         Q.    Okay.  And then you reference
18    additional Crowninshield consultants.  Is
19    that the three individuals we discussed
20    earlier?
21         A.    It is.
22         Q.    Okay.  Do you know how much
23    Crowninshield has been paid to date in
24    connection with this matter?
25         A.    I do not.
```

```
 1          DR. A. WERNER
 2   that okay with you?
 3          MR. GRIFFIN:  Yeah, whatever
 4   works for you.  Whatever you need to
 5   do, that's fine.
 6          THE WITNESS:  Okay.  All right.
 7          MR. GRIFFIN:  Thank you.
 8          THE VIDEOGRAPHER:  We are off the
 9   record at 3:03 p.m.
10          (Recess taken from 3:03 p.m. to
11   3:13 p.m. PT)
12          THE VIDEOGRAPHER:  We are back on
13   the record at 3:13 p.m.
14          MR. GRIFFIN:  We have no further
15   questions at this time.
16          MR. SHI:  Okay.  So let us -- let
17   me caucus with folks on my side for a
18   bit and let's -- can you guys hear me?
19          MR. GRIFFIN:  Yes.
20          MR. SHI:  Yeah.  So give us five
21   minutes or so and we'll be back.
22          MR. GRIFFIN:  Okay.
23          THE VIDEOGRAPHER:  One moment.
24   We are off the record at 3:13 p.m.
25          (Recess taken from 3:13 p.m. to
```

287

```
 1              DR. A. WERNER

 2        3:19 p.m. PT)

 3              THE VIDEOGRAPHER:  We are back on

 4        the record at 3:19 p.m.

 5   EXAMINATION BY

 6   MR. SHI:

 7        Q.   Dr. Werner, I believe earlier

 8   today you testified that NIO sells cars in

 9   the U.S?

10              Do you remember that?

11        A.   I do believe I said that, yes.  I

12   should have said my understanding is they

13   intend to sell cars in the U.S.

14              MR. SHI:  Okay.  We have no

15        further questions.

16   FURTHER EXAMINATION

17   BY MR. GRIFFIN:

18        Q.   Very briefly, Dr. Werner, it's

19   your understanding that NIO did not sell

20   any cars in the U.S. during the relevant

21   period, is that right?

22        A.   That is correct.

23        Q.   Does that change at all your

24   opinion as to whether the S&P 500

25   Automobile Manufacturers Index was an
```

288

```
 1              DR. A. WERNER

 2    appropriate industry index in this case?

 3        A.    It does not.

 4              MR. GRIFFIN:  Okay.  We have

 5        nothing further.

 6              MR. SHI:  We don't have anything

 7        further either.

 8              THE VIDEOGRAPHER:  Okay.  This

 9        concludes the video deposition of Adam

10        Werner.  Going off the record at 3:20

11        p.m. Pacific Time.

12              (Time noted:  3:20 p.m. PT)

13

14

15              _____

16              DR. ADAM WERNER

17

18    Subscribed and sworn to before me

19    this ___ day of _____, 2022.

20

21    _____

22

23

24

25
```

```
 1

 2                   C E R T I F I C A T E

 3     STATE OF NEW YORK      )

 4                            : ss.

 5     COUNTY OF NEW YORK     )

 6

 7             I, Joan Ferrara, a Notary Public

 8     within and for the State of New York,

 9     do hereby certify:

10             That DR. ADAM WERNER, the witness

11     whose deposition is hereinbefore set

12     forth, was duly sworn by me and that

13     such deposition was taken remotely and

14     is a true record of the testimony given

15     by the witness.

16             I further certify that I am not

17     related to any of the parties to this

18     action by blood or marriage, and that I

19     am in no way interested in the outcome

20     of this matter.

21             IN WITNESS WHEREOF, I have

22     hereunto set my hand this 13th day of

23     September, 2022.

24                        _____

25                             Joan Ferrara
```