**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-MD-2989-ALTONAGA/DAMIAN**

In re:

**JANUARY 2021 SHORT SQUEEZE**
**TRADING LITIGATION**

_____/

This Document Relates to the Federal Securities Tranche


**DEFENDANTS ROBINHOOD MARKETS, INC., ROBINHOOD FINANCIAL LLC AND
ROBINHOOD SECURITIES, LLC'S MEMORANDUM OF POINTS AND
AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS ..................................................................................................... 3

I.      Robinhood and Retail Trading .......................................................................... 3

II.     Meme Stocks, Retail Investors Coordinating on Social Media and Short Squeezes ........... 3

III.    Collateral Requirements and Trading Restrictions Imposed by Robinhood and
Other Retail Brokerages .................................................................................. 6

IV.    Named Plaintiffs' Trading Prior to And During the Proposed Class Period ....................... 9

      A.    Named Plaintiffs Were Aware of Co-ordinated Trading on Social Media
and Possible Short Squeezes. ............................................................. 9

      B.    Named Plaintiffs' Investment Strategies (or Lack Thereof). .............................. 100

      C.    Named Plaintiffs Were Aware of the Robinhood Restrictions When They
Sold Their Shares. ........................................................................ 111

      D.    Several Named Plaintiffs Profited on Their Trades During the Class
Period. ...................................................................................... 12

LEGAL STANDARD ......................................................................................................... 13

ARGUMENT ................................................................................................................. 144

I.      Plaintiffs Will Be Required To Prove Reliance on an Individualized Basis,
Precluding Certification Under Rule 23(b)(3). ..................................................... 15

      A.    Plaintiffs Do Not Satisfy the *Basic* Presumption of Reliance .............................. 155

      B.    The "Common Scheme" Exception Does Not Apply. ...................................... 222

      C.    The *Affiliated Ute* Presumption Does Not Apply. ........................................ 255

II.     Plaintiffs Will Be Forced To Litigate Damages on an Individualized Basis,
Precluding Certification Under Rule 23(b)(3). ..................................................... 266

III.    Because Plaintiffs Lack Standing or Are Atypical and Subject to Unique
Defenses, They Cannot Satisfy Rule 23(a)(3). ..................................................... 29

      A.    A Class Cannot Be Certified with Laine-Beveridge as Lead Plaintiff. ..................... 29

      B.    Named Plaintiffs Did Not Rely on the Integrity of the Market. ........................... 311

      C.    Named Plaintiffs Lack Standing To Represent Class Members Who
Traded in BBBY, KOSS, TR or TRVG. ................................................... 333

IV.    Plaintiffs Cannot Satisfy Rule 23(a)(4) Because They Will Not Adequately
Prosecute the Action and Substantial Conflicts of Interest Exist. ................................ 344

CONCLUSION ................................................................................................................ 355

REQUEST FOR HEARING ................................................................................................. 366

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affiliated Ute Citizens of Utah v. United States*,
   406 U.S. 128 (1972) .................................................................................................... *passim*

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) ................................................................................................................13

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013) ................................................................................................................16

*Applestein v. Medivation, Inc.*,
   No. C 10–00998 MHP, 2010 WL 3749406 (N.D. Cal. Sept. 20, 2010) ...............................33

*Appleyard v. Wallace*,
   754 F.2d 955 (11th Cir. 1985) ...............................................................................................30

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) ..............................................................................................15, 16

*Bang v. Acura Pharm. Inc.*,
   No. 10 C 5757, 2011 WL 91099 (N.D. Ill. Jan. 11, 2011) ....................................................32

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ........................................................................................................ *passim*

*Baum v. Phillips, Appel & Walden, Inc.*,
   648 F. Supp. 1518 (S.D.N.Y. 1986) .......................................................................................15

*Bruhl v. Price Waterhousecoopers Int'l*,
   257 F.R.D. 684 (S.D. Fla. 2008) ............................................................................................23

*Bussey v. Macon Cnty. Greyhound Park, Inc.*,
   562 F. App'x 782 (11th Cir. 2014) .........................................................................................13

*Cardenas v. Toyota Motor Corp.*,
   No. 18-CV-22798, 2021 WL 6926418 (S.D. Fla. Aug. 12, 2021) .........................................28

*Cavalier Carpets, Inc. v. Caylor*,
   746 F.2d 749 (11th Cir. 1984) ...............................................................................................25

*City of Providence v. BATS Global Mkts., Inc.*,
   878 F.3d 36 (2d Cir. 2017) .....................................................................................................25

*City Pension Fund for Firefighters & Police Officers in the City of Miami Beach v. Aracruz Cellulose S.A.*,
  No. 08-cv-23317, 2009 WL 10664427 (S.D. Fla. Aug. 7, 2009) ...........................................30

*Comcast Corporation v. Behrend*,
  569 U.S. 27 (2013) ................................................................................................ *passim*

*Cuban Am. Bar Ass'n, Inc. v. Christopher*,
  43 F.3d 1412 (11th Cir. 1995) .........................................................................................29

*Desai v. Deutsche Bank Securities Ltd.*,
  573 F.3d 931 (9th Cir. 2009) ................................................................................. *passim*

*Dodona I, LLC v. Goldman, Sachs & Co.*,
  847 F. Supp. 2d 624 (S.D.N.Y. 2012)..............................................................................16

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011) (*Halliburton I*).................................................................................15

*Fezzani v. Bear, Stearns & Co.*,
  716 F.3d 18 (2d Cir. 2013) (*Fezzani I*) .......................................................................17, 18

*Fezzani v. Bear, Stearns & Co.*,
  777 F.3d 566 (2d Cir. 2015) (*Fezzani II*)....................................................................17, 18

*FindWhat Inv. Grp. v. FindWhat.com*,
  658 F.3d 1282 (11th Cir. 2011) ...........................................................................16, 17, 21

*Gen. Tel. Co. of Sw. v. Falcon*,
  457 U.S. 147 (1982)..........................................................................................................13

*Grayson v. K Mart Corp.*,
  79 F.3d 1086 (11th Cir. 1996) .........................................................................................36

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) (*Halliburton II*)..........................................................................18, 22

*Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*,
  338 F.R.D. 205 (S.D.N.Y. 2021) .....................................................................................19

*Helfand v. Cenco*,
  80 F.R.D. 1 (N.D. Ill. 1977)............................................................................................34

*Hudson v. Delta Air Lines, Inc.*,
  90 F.3d 451 (11th Cir. 1996) ...........................................................................................36

*In re Allergan PLC Sec. Litig.*,
  No. 18-Civ-12089-CMG-WG, 2021 WL 4077942 (S.D.N.Y. Sept. 8, 2021)........................30

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
    265 F.R.D. 157 (S.D.N.Y. 2010) ...................................................................21

*In re Barclays Liquidity Cross & High Frequency Trading Litig.*,
    390 F. Supp. 3d 432 (S.D.N.Y. 2019) .................................................25, 26

*In re Comdisco Sec. Litig.*,
    150 F. Supp. 2d 943 (N.D. Ill. 2001) ...........................................................31

*In re Domestic Air Transp. Antitrust Litig.*,
    137 F.R.D. 677 (N.D. Ga. 1991) ....................................................................36

*In re Dreyfus Aggressive Growth Mut. Fund Litig.*,
    No. 98-cv-4318, 2000 WL 1357509 (S.D.N.Y Sept. 20, 2000) .................34

*In re GenesisIntermedia, Inc. Sec. Litig.*,
    No. CV 01-9024-SVW VBKX, 2007 WL 1953475 (C.D. Cal. June 28, 2007), *aff'd
    sub nom. Desai v. Deutsche Bank Securities Ltd.*, 573 F.3d 931 (9th Cir. 2009)...................17

*In re GenesisIntermedia, Inc. Sec. Litig.*,
    232 F.R.D. 321 (D. Minn. 2005).............................................................24, 31

*In re Merrill Lynch Auction Rate Sec. Litig.*,
    704 F. Supp. 2d 378 (S.D.N.Y. 2010) ....................................................17, 22

*In re Photochromic Lens Antitrust Litig.*,
    No. 8:10-cv-00984-T-27EAJ, 2014 WL 1338605 (M.D. Fla. Apr. 3, 2014) .........................35

*In re Safeguard Scientifics*,
    216 F.R.D. 577 (E.D. Pa. 2003).............................................................32, 33

*Katz v. Comdisco, Inc.*,
    117 F.R.D. 403 (N.D. Ill. 1987).......................................................................31

*Kennedy v. Tallant*,
    710 F.2d 711 ....................................................................................................23

*Kirkpatrick v. J.C. Bradford & Co.*,
    827 F.2d 718 (11th Cir. 1987) .............................................................. *passim*

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001) ..................................................................36

*Krukever v. TD Ameritrade, Futures & Forex LLC*,
    328 F.R.D. 649 (S.D. Fla. 2018).............................................................27, 34

*Landry v. Price Waterhouse Chartered Accountants*,
    123 F.R.D. 474 (S.D.N.Y. 1989) ...........................................................32, 33

*Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*,
    762 F.3d 1248 (11th Cir. 2014) ...............................................................................18, 31

*Luczak v. Nat'l Beverage Corp.*,
    548 F. Supp. 3d 1256 (S.D. Fla. 2021) ................................................................32, 33, 34

*Montgomery v. New Piper Aircraft, Inc.*,
    209 F.R.D. 221, 226-27 (S.D. Fla. 2002)....................................................................35

*O'Shea v. Littleton*,
    414 U.S. 488 (1974)....................................................................................................29

*Pearlstein v. BlackBerry Ltd.*,
    No. 13 Civ. 7060 (CM), 2021 WL 253453 (S.D.N.Y. Jan. 26, 2021).....................19

*Rabin v. Nasdaq OMX PHLX LLC*,
    182 F. Supp. 3d 220 (E.D. Pa. 2016) *aff'd*, 712 F. App'x 188 (3d Cir. 2017) .......26

*Rabin v. Nasdaq OMX PHLX LLC*,
    712 F. App'x 188 (3d Cir. 2017) ..........................................................................25, 26

*Randolph v. J.M. Smucker Co.*,
    303 F.R.D. 679 (S.D. Fla. 2014)................................................................................27

*Spicer v. Chicago Bd. of Options Exch., Inc.*,
    1990 WL 16983 (N.D. Ill. Jan. 31, 1990)..............................................................25, 26

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
    No. 05 Civ. 1898, 2005 WL 2148919 (S.D.N.Y. Sept. 6, 2005)............................33

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016).....................................................................................................13

*Ulysse v. Waste Mgmt. Inc.*,
    No. 11-CV-80723, 2013 WL 11327137 (S.D. Fla. Sept. 13, 2013) .......................28

*Underwood v. Lampert*,
    No. 02-cv-21154, 2005 WL 8155010 (S.D. Fla. Sept. 9, 2005) .............................32

*Valley Drug Co. v. Geneva Pharmaceuticals*,
    350 F.3d 1181 (11th Cir. 2003) .................................................................................14

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011).....................................................................................................13

*Welling v. Alexy*,
    155 F.R.D. 654 (N.D. Cal. 1994)..............................................................................35

**Statutes & Rules**

Fed. R. Civ. P. 23 ............................................................................................... *passim*

Securities Exchange Act Section 9(a)(2), 15 U.S.C. § 78*i*(a)(2) .............................................14, 15

Securities Exchange Act Section 10(b), 15 U.S.C. § 78j(b) ....................................................14, 15

SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ...................................................................................17

**Other Authorities**

Caitlin McCabe, *Robinhood, Other Brokerages Restrict Trading on GameStop, AMC*, WALL ST. J. (Jan. 28, 2021, 9:05 P.M.) ..........................................................................................8

## INTRODUCTION

Plaintiffs accuse Robinhood of manipulating the markets for certain "meme stocks." In reality, it was retail investors like the Named Plaintiffs who drove up the price of the specified stocks in a social media frenzy that created a bubble doomed to burst. During that frenzy, the prices for those stocks were completely untethered from the actual value of the underlying companies. This inescapable fact makes this case unsuitable for resolution as a class action. Unlike in a typical securities fraud case for exchange-traded stocks, in which a defendant makes a common misrepresentation and the court can presume class members relied on it, Plaintiffs here cannot show that members of the putative class, including investors who did not trade on (and may never have heard of) Robinhood, relied on any statement Robinhood made regarding the reasons for its trading restrictions in deciding whether to hold or sell their shares of *other companies'* stock. Nor can Plaintiffs establish that they relied on the integrity of the market.

Instead, the evidence—including the sworn testimony of numerous Named Plaintiffs—establishes that many of the putative class members traded with full knowledge of black swan market events, attempting to take advantage of real or perceived short squeezes driving these stocks to their breathtaking prices. Predictably, the bubble burst and the stocks returned to their true prices. This coincided with Robinhood's imposition of the purchasing restrictions, which all but one Named Plaintiff admit they knew about when they sold their shares. As with any bubble, some people made money and, depending on timing, others lost money. Plaintiffs now seek to certify a class of individuals who purportedly lost on their trades when the bubble burst. (Dkt. No. 559 (the "Mot.").) Their motion should be rejected on four independent grounds.

*First*, Plaintiffs cannot satisfy the predominance requirement of Federal Rule of Civil Procedure 23(b)(3) because reliance—an element of each of their claims—cannot be presumed classwide. As a result, each putative class member's reliance (or lack thereof) will be an individualized inquiry. That is because the markets for the Affected Stocks were *not* efficient during the Class Period (or the immediate run-up to the Class Period), precluding Plaintiffs from invoking the presumption of reliance set forth in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) that plaintiffs in securities fraud class actions can typically satisfy. In addition to the fact discovery from Named Plaintiffs and other investors, the accompanying reports of Robinhood's experts, Prof. Steven Grenadier and Prof. Daniel Fischel, set out evidence that the markets for the Affected Stocks were *not* efficient during this unusual time period and explain why the efficient

market theory does not apply.  Plaintiffs' attempts to avoid the *Basic* requirement to show efficient markets fail, as neither the "common scheme" doctrine nor the presumption of reliance under *Affiliated Ute v. United States*, 406 U.S. 128 (1972), applies.  (*See* Part I.)

    *Second*, Plaintiffs cannot satisfy the predominance requirement of Rule 23(b)(3) for the separate reason that they cannot establish that their damages are measurable on a classwide basis using a common methodology that is consistent with their theory of liability, as required under *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).  A reliable damages model must account for the fact that the prices of the Affected Stocks in the pre-Class Period were artificially inflated, and Plaintiffs have not put forward a reliable methodology to determine the but-for price had Robinhood never put the purchase restrictions in place.  Plaintiffs' failure to establish that the markets for the Affected Stocks were efficient on January 27, the day before the Class Period, is fatal to their damages methodology.  (*See* Part II.)

    *Third*, Named Plaintiffs lack standing to bring certain claims and are subject to unique defenses that preclude certification under the typicality requirement of Rule 23(a)(4). Discovery has shown that the proposed lead plaintiff, Blue Laine-Beveridge, is not a class member at all or at a minimum, he is atypical because he profited on his trades.  Without a lead plaintiff, the class cannot be certified.  Moreover, **all** of the Named Plaintiffs testified that they did not rely on the integrity of the market and instead engaged in unusual trading practices—such as not conducting research, trading based on price movements, buying and selling the same security in a single trading day and investing at the recommendation of social media influencers.  These haphazard trading practices, which are not typical of all traders, give rise to unique defenses.  Further, ***none*** of the Named Plaintiffs suffered losses from transactions in four of the Affected Stocks (BBBY, KOSS, TR and TRVG), so they lack standing to sue regarding those stocks.  (*See* Part III.)

    *Fourth*, the Named Plaintiffs will not adequately prosecute the action as required by Rule 23(a)(4).  Named Plaintiffs' deposition testimony demonstrates that they have failed to take an active role in overseeing the case and do not even understand the substance of the action.  In the most egregious display of a named plaintiff's disregard of his obligations, one Named Plaintiff sat for his entire four-hour deposition while he was driving his car.  (*See* Part IV.)

## STATEMENT OF FACTS

### I.      ROBINHOOD AND RETAIL TRADING

Robinhood has democratized finance by providing access to financial markets with its zero-commission trades, no account minimums, and a platform available on a computer or mobile device.  Customer trading on Robinhood is largely self-directed.  (Ex. 58, Robinhood 2021 10-K at 6.)  When a Robinhood customer initiates a trade, Robinhood Financial—the introducing broker—decides whether to accept the order.  If it does, Robinhood Financial sends the order to Robinhood Securities, the clearing broker, which routes the order to a market maker for execution.  (Ex. 60, Robinhood Blog Post, "What happened this week" (Jan. 29, 2021).)

After the trade is executed, Robinhood Securities submits it to a clearinghouse for clearance and settlement.  (*Id.*)  The main clearinghouse for equities traded in the U.S. is the National Securities Clearing Corporation ("NSCC").  (Ex. 20, Grenadier Report ¶ 53.)  To mitigate the risk that market participants will be unable to satisfy their obligations, clearing brokers, including Robinhood Securities, must post collateral (also referred to as deposit requirements) with NSCC to cover the risk until the trade settles.  These deposit requirements fluctuate day to day, and depending on NSCC's calculations, Robinhood may be required to deposit additional funds to meet its obligations.  (*Id.* ¶¶ 53-54.)  In setting deposit requirements, NSCC considers market volatility generally as well as the volatility in specific securities, and, in its discretion, may also apply an excess capital premium ("ECP").  (*Id.* ¶ 54 & n.101.)  If a clearing broker does not meet its deposit requirements, NSCC could liquidate the broker's entire portfolio, inclusive of its customers' positions.  (Ex. 63, HFSC Report at 64.)

### II.     MEME STOCKS, RETAIL INVESTORS COORDINATING ON SOCIAL MEDIA AND SHORT SQUEEZES

In late January 2021, leading up to the proposed Class Period, retail investors banded together through online forums to drive a massive short squeeze involving certain stocks (referred to as "meme stocks") they perceived to be heavily shorted by hedge funds.  (Ex. 18, Fischel Report ¶ 8; Ex. 20, Grenadier Report ¶¶ 113-114.)[1]  While retail investors had various

---

[1] Plaintiffs claim an SEC Staff Report "cast[s] doubt on the short squeeze at the center of Robinhood's experts' narrative" (Mot. at 6), but they ignore that the very paragraph they cite states:  "[t]he price surge in GME [] raises questions of market efficiency that relate to short selling."  (Dkt No. 559-12 at 30.)  Indeed, the report observed that it was "unusually costly to borrow shares in GME," and that "constraints on short selling" can contribute to "bubbles where

motivations for trading, with some seeking to harm hedge funds with short positions, others seeking to profit from possible squeezes and still others seeking entertainment, this spike in retail investor trading activity resulted in extreme market volatility and dramatic run-ups of the nine stocks at issue in this case. (Ex. 18, Fischel Report ¶ 9; Ex. 20, Grenadier Report ¶¶ 114-118.)

One social media forum that retail investors used to gin up enthusiasm for the meme stocks was the WallStreetBets page on Reddit. Certain high-profile retail investors' posts on WallStreetBets and other social media platforms were particularly effective in fueling the fires of the meme stock movement. Keith Gill, for example, known by his social media usernames "Roaring Kitty" or "DeepF***ingValue," posted videos encouraging investment in GME that were widely cited on WallStreetBets and have over a million views.[2] Gill also posted screenshots of his meme stock investments, prompting followers—including Named Plaintiff Sandy Ng—to post comments professing support, such as "IF HE'S STILL IN, I'M STILL IN." (Ex. 45, Dep. Ex. 40 at 1.) Likewise, Alvan Chow authored popular GME posts on WallStreetBets in late 2020 and early 2021 in which he predicted short squeezes would drive up the stock price and reward the WallStreetBets "gamblers" for opposing larger funds. (Ex. 22, Dep. Ex. 207 at 1; Ex. 53, Dep. Ex. 209 at 1; Ex. 54, Dep. Ex. 210 at 1.) At his deposition, Mr. Chow characterized the subreddit as "a community known for very reckless investments, to the point where they're not investments." (Ex. 4, Chow 40:16-21.) As part of the mania, retail investors, including certain Named Plaintiffs, posted or placed joke orders or joke price targets with sexual and drug references including the numbers "69" and "4/20." (*See*, *e.g.*, Ex. 5, Clarke 112:24-113:13; Ex. 14, Rivas 106:14-108:17; Ex. 4, Chow 111:3-19.)

These posts proved effective. The stock prices of the nine meme stocks that are the subject of this litigation—AMC, BBBY, BB, EXPR, GME, KOSS, NOK, TR and TRVG—

---

stock prices rise above what may be justified by fundamentals." (*Id.*) Thus, "the reluctance to sell short could have contributed to the run-up in prices and the subsequent steep decline." (*Id.*)

[2] *See, e.g.*, Roaring Kitty, *100%+ short interest in GameStop stock (GME) – fundamental & technical deep value analysis*, YouTube (July 27, 2020), *available at* https://www.youtube.com/watch?v=GZTr1-Gp74U (last accessed May 24, 2023); *see also* Ex. 53, Dep. Ex. 209 at 1 (WallStreetBets post by Alvan Chow citing Gill's "Roaring Kitty's" video).

experienced a roller-coaster ride up and down in late January 2021.[3]  For example, GME's price rose a remarkable 788% in the five trading days preceding the proposed Class Period (*i.e.*, through January 27, 2021).  (Ex. 20, Grenadier Report, fig. 2.)  KOSS's stock price rose 1,591% over the same period.  (*Id.*)  These price run-ups occurred despite the absence of any news about the value of these companies that could remotely justify the increases.  (*Id.* ¶ 104.)  A number of the companies issued press releases commenting on the unusual events.  For example, on January 25, BlackBerry issued a press release stating that it was "not aware of any material, undisclosed corporate developments and has no material change in its business or affairs that has not been publicly disclosed that would account for the recent increase in the market price or trading volume of its common shares."  (Ex. 42, BlackBerry Press Release, Jan. 25, 2021.)  On January 27, 2021, Nokia issued a similar release.  (Ex. 57, Nokia Press Release, Jan. 27, 2023.)[4]

There is no doubt that these price movements were driven by the social media craze rather than company news.  On January 26, for example, GME's share price increased by over 60% in after-hours trading after Elon Musk tweeted "GameStonk!!" with a link to WallStreetBets.  (Ex. 43, Dep. Ex. 15.)[5]  Similarly, on January 22 the stock price of EXPR increased by 40% after Will Meade, an investment commentator with a significant Twitter following, tweeted that EXPR could be the next GME.  (Ex. 55, Dep. Ex. 301.)  When asked at his deposition about news that might account for the stock price movements, Mr. Meade testified that "the only news was that everyone in the trading community and Wall Street was looking for the next GameStop."  (Ex. 10, Meade 94:8-23, 114:20-23.)  Robinhood's expert, Prof. Grenadier, found that eight of the nine Affected Stocks experienced their highest five-day return over the previous 25 years in the days preceding January 27, 2021.  (Ex. 20, Grenadier Report ¶¶ 19, 78.)  In the five trading days between January 21 and January 27, 2021, the total daily volume for the

---

[3] The nine companies are AMC Entertainment Holdings, Inc.; Bed Bath & Beyond Inc.; BlackBerry Ltd.; Express Inc.; GameStop Corp.; Koss Corp.; Nokia Oyj; Tootsie Roll Industries, Inc.; and trivago N.V.  Plaintiffs call these stocks the "Affected Stocks."  (Dkt. No. 527-0, Am. Compl. ¶ 1.)

[4] After the Class Period, AMC, EXPR, GME and KOSS also included statements in their SEC filings disclaiming knowledge of undisclosed information or changes in their business that would explain the price movements.  (*See* AMC 10-K, March 12, 2021; Express Form 10-K, March 25, 2021; GameStop 10-K, March 23, 2021; Koss Form 10-Q, May 13, 2021.)

[5] Mr. Chow testified that he liquidated his positions after Mr. Musk's tweet because he believed the tweet "signaled the height of the mania."  (Ex. 4, Chow 128:12-24.)

Affected Stocks increased extraordinarily, by almost fifteen-fold. (*See* Market Activity, Nasdaq, https://www.nasdaq.com/market-activity; *see also* Ex. 20, Grenadier Report ¶¶ 92-96.)

## III.   COLLATERAL REQUIREMENTS AND TRADING RESTRICTIONS IMPOSED BY ROBINHOOD AND OTHER RETAIL BROKERAGES

During this period of frenetic trading, Robinhood sought to manage the impact that increasing volatility could have on its NSCC deposit requirements. Robinhood's daily deposit requirements with NSCC steadily increased throughout January, reaching $690 million by the evening of January 27, 2021, an approximately ten-fold increase from the start of the month. (Ex. 20, Grenadier Report ¶ 54 & fig. 1; Ex. 36, RHMDL00020635.) For certain volatile stocks like GME that did not already require 100% initial and maintenance margin requirements, Robinhood increased the margin requirements to 100%, which meant that customers needed funds to pay for those shares in full, rather than being able to buy shares with credit. (*Id.* ¶¶ 46 & 50.) Robinhood implemented these requirements to mitigate the risk that its customers might default on their ability to pay for volatile stocks. In the pre-Class Period, Robinhood also limited the number of options for certain stocks that customers could purchase and increased capital requirements for customers seeking to exercise options. (Ex. 38, RHMDL00047970.)

Before the markets opened on the morning of January 28, 2021, Robinhood Securities received a notice from NSCC stating that its deposit requirements had jumped dramatically, to over $3 billion, now nearly ***20 times*** the deposit requirement from the start of the month and almost 5 times what it had been the day before. (Ex. 18, Fischel Report ¶ 12; Ex. 20, Grenadier Report ¶ 54 & fig. 1; Ex. 36, RHMDL00020635.) The $3 billion deposit requirement included a charge due to market volatility of over $1.2 billion and an additional charge (the excessive capital premium or "ECP") of over $2.2 billion because of the ratio of Robinhood Securities' deposit requirements to its on-hand capital. (Ex. 37, RHMDL00045649.)[6] As a result,

---

[6] Plaintiffs cite to a discussion among three Robinhood employees to suggest that Robinhood was "unaware of" the ECP component of its clearinghouse deposit. (Mot. at 5.) None of those employees' responsibilities, however, has anything to do with the securities clearing processes and procedures, and as Plaintiffs well know from the documents Robinhood has produced in this action, the employees with such responsibilities were aware of the various components of NSCC deposit requirements. (*See, e.g.*, Ex. 35, RHMDL00011594 (NSCC Risk Margin Component Guide, from files of Robinhood Director of Financial Risk & Analytics).) Plaintiffs also ignore the highly unusual nature of the ECP charge. The House Report (which Plaintiffs cite repeatedly) states: "It is worth noting that 3 of the 4 times an Excess

Robinhood decided to temporarily set a number of the meme stocks to "position closing only" ("PCO"), which permitted Robinhood customers to sell positions in those stocks if they wished, but restricted new purchases of those volatile stocks.  The thirteen PCO'ed stocks include the nine at issue in this case, plus four others (AAL, CTRM, NAKD and SNDL).[7]  (Ex. 38, RHMDL00047970.)  Robinhood announced the PCO restrictions in a blog post on the morning of January 28, explaining that they were being implemented because of recent market volatility. (Ex. 34, RHMDL00002200.)  Shortly after Robinhood informed NSCC that it would implement these restrictions, NSCC reduced Robinhood's deposit requirements to roughly $1.4 billion (predominantly the volatility-driven charge), which Robinhood paid so it could continue serving all of its customers.  (*See* Ex. 37, RHMDL00045649; Ex. 20, Grenadier Report ¶ 54 & fig. 1.)

As Plaintiffs concede, Robinhood's next public statement concerning the PCO restrictions occurred ***after*** trading closed on January 28 (*i.e.*, ***after*** the end of the first day of the proposed Class Period).  (Mot. at 11.)  That evening, CEO Vlad Tenev gave an interview on CNBC regarding the day's unprecedented events.[8]  Mr. Tenev accurately described the PCO restrictions and truthfully explained that Robinhood "absolutely did not do this at the direction of any market maker, or hedge fund, or anyone we route to, or other market participants" but rather due to Robinhood's financial requirements, including clearinghouse deposits.[9]

---

Capital Premium charge was calculated for Robinhood was during the Meme Stock Market Event."  (Ex. 63, HFSC Report n.577.)

[7] These companies are American Airlines Group Inc., Castor Maritime Inc., Naked Brand Group Ltd. (now known as Cenntro Electric Group Ltd.) and Sundial Growers Inc. (now known as SNDL Inc.).

[8] Fast Money, *Robinhood CEO Vlad Tenev speaks out on decision to restrict trading on GameStop and other stocks*, CNBC (Jan. 28, 2021), https://www.cnbc.com/video/2021/01/28/robinhood-ceo-vlad-tenev-on-decision-to-restrict-trading-on-gamestop.html (last accessed May 24, 2023).

[9] Plaintiffs misleadingly assert that Robinhood employees were dissatisfied with Robinhood's messaging.  Plaintiffs quote an employee telling COO Gretchen Howard that "[Robinhood] should fully lay out our cards" and tell the public "about what's happening behind the scenes" (Mot. at 12-13), but omit Howard's response that a "blog post [was] written" (what became Ex. 59, Robinhood Blog Post, "An update on market volatility" (Jan. 28, 2021)) and "waiting on approval" (Ex. 67, RHMDL00005649-50).  Plaintiffs likewise cherry-pick questions asked about Mr. Tenev's public comments at a January 29 employee Q&A, conveniently ignoring those that are inconsistent with their narrative.  (*See, e.g.*, Ex. 66, RHMDL00044035 at '036 ("There's been a lot of out reach to traditional media to explain what happened.").)

As Mr. Tenev explained, other brokers similarly imposed restrictions on meme stocks during this period of unprecedented volatility.  For example, Apex Clearing Corporation, a clearing broker used by many introducing brokers, imposed restrictions on AMC, GME and KOSS that impacted approximately 13 million customer accounts across Apex's 73 introducing broker partners (including Ally, WeBull and Alpaca).  (Ex. 18, Fischel Report ¶ 40; Ex. 20, Grenadier Report ¶¶ 48-49 & n.71.)  E*TRADE also limited purchases of GME and AMC on January 28, 2021.  (*Id.*)  These brokerages' millions of customers accounted for a significant portion of the trading volume in the Affected Stocks in the run-up to the Class Period.  In fact, contrary to Plaintiffs' assertion (Mot. at 5), on average, *buy volume on Robinhood accounted for only 4.5% of the total market trading volume across the Affected Stocks* during the week prior to the proposed Class Period.  (Ex. 20, Grenadier Report ¶ 150 & Ex. 17.)

The PCO restrictions remained in place for only one day, January 28.  (Ex. 20, Grenadier Report ¶ 50.)  By market open on January 29, Robinhood modified the PCO restrictions to place caps on additional purchases (*i.e.*, a limit on the number of additional shares a customer could purchase in certain stocks) and began lifting purchase limits until all of them were lifted by the end of the day on February 4, 2021.  (Ex. 20, Grenadier Report ¶ 52.)  During this period, Robinhood regularly updated its customers, listing the trading restrictions in effect because of the ongoing volatility.  The restrictions were widely reported and were public knowledge.[10]  While Robinhood's purchase restrictions and limits were in place, the prices of the restricted stocks remained volatile, moving up and down.  (*See* Ex. 20, Grenadier Report Exs. 1, 9 & figs. 6, 7.)  The nine Affected Stocks selected by Plaintiffs experienced declines over the Class Period as a whole, but each saw intermittent increases during the Class Period.  (*Id.* Exs. 1A-1I.)  Other stocks on which Robinhood placed purchase restrictions and limits did ***not*** experience net declines.  (*Id.*)  For example, CTRM, another stock Robinhood PCOed, almost doubled in price during the Class Period.  (*See* Market Activity, Nasdaq, https://www.nasdaq.com/market-activity.)

---

[10] *See, e.g.*, Caitlin McCabe, *Robinhood, Other Brokerages Restrict Trading on GameStop, AMC*, WALL ST. J. (Jan. 28, 2021, 9:05 P.M.), https://www.wsj.com/articles/online-brokeragesrestrict-trading-on-gamestop-amc-amid-frenetic-trading-11611849934.

## IV.   NAMED PLAINTIFFS' TRADING PRIOR TO AND DURING THE PROPOSED CLASS PERIOD

### A.   Named Plaintiffs Were Aware of Co-ordinated Trading on Social Media and Possible Short Squeezes.

All but two Named Plaintiffs bought shares in one or more of the Affected Stocks on January 27, 2021, the final day before the Class Period, at the height of the social media craze. (*See* Dkt. Nos. 366-3, 527-1; Ng 43:21-44:18; Nguyen 66:10-69:22.)  Five Named Plaintiffs bought AMC, four bought each of GME and BB, two bought NOK and one bought EXPR.  (*Id.*) None purchased BBBY, KOSS, TR or TRVG.

Many Named Plaintiffs testified that, rather than believing in the fundamental value of the companies issuing the Affected Stocks, they were aware of potential short squeezes and purchased the Affected Stocks hoping to profit from these short squeezes.  For example, Abraham Huacuja testified that he purchased shares of AMC and NOK on January 27, 2021, without looking into the fundamentals of the companies, because "they were being shorted an incredible amount" and he was "banking" on there being a short squeeze that he hoped would generate a profit on these short-term investments.  (Ex. 8, Huacuja 29:15-30:11, 42:14-46:13, 54:4-13 ; Ex. 25, P00002064 at -2067-2068.)  Brian Harbison likewise admitted that he was aware of and "interested in potentially participating in an attempted short squeeze of AMC." (Ex. 7, Harbison 52:12-57:18.)  Sandy Ng, who is not a Robinhood customer and lives in Canada, testified that he originally bought GME based on the potential for a short squeeze.  (Ex. 11, Ng 25:16-21, 51:24-54:2.)  Cecilia Rivas testified that during this period, she actively followed discussions about short squeezes on WallStreetBets, and "a short squeeze would mean that the price of a stock is driven beyond what it's really worth."  (Ex. 14, Rivas 27:24-28:14, 56:11-17.)  Both Ms. Rivas[11] and Mr. Ng held their shares of GME during the Class Period on the belief that the short squeeze was ongoing and had not yet reached its peak.  (Ex. 23, Dep. Ex. 81 ("The squeeze hasn't squoze yet."); Ex. 11, Ng  71:17-72:3, 83:11-20 (holding out for a "gamma squeeze").).[12]

---

[11] Ms. Rivas also testified that she held her single GME share as a form of "social activism" and because investing is entertaining to her.  (Ex. 14, Rivas 91:15-91:19, 97:9-13; 160:14-19.)

[12] A few Named Plaintiffs, by contrast, denied knowledge of possible short squeezes.  Doi Nguyen, for instance, purported to recall virtually nothing regarding the January and February 2021 timeframe; he testified he did not recall discussions about any possible short squeeze,

Numerous Named Plaintiffs admitted to reading or posting on social media during the meme stock events.  Brendan Clarke, for instance, testified that he checked WallStreetBets multiple times a day during this period.  (Ex. 5, Clarke 107:21-108:6.)  Thomas Cash was also active on WallStreetBets, which he described as a "frat house of degenerate gamblers." (Ex. 3, Cash 150:6-17)  Similarly, Mr. Huacuja and Mr. Nguyen testified that they perused relevant social media posts prior to the Class Period.  (Ex. 8, Huacuja 62:11-19 (discussing review of social media in the weeks before the Class Period); Ex. 12, Nguyen 46:5-47:2 (admitting he saw on social media that AMC stock price was rising prior to the Class Period).)  Mr. Ng testified that he did not conduct any research before investing in GME, and based all of his GME trading decisions on Keith Gil's social media posts.  (Ex. 11, Ng at 44:19-45:5.)

Other Named Plaintiffs tried to distance themselves from their participation in this social media frenzy, even though they engaged repeatedly on various platforms regarding the meme stock events in the days leading up to and during the Class Period.  For instance, Ava Bernard tweeted repeatedly in early 2021 (*see, e.g.*, Ex. 1, Bernard 127:23-128:12), including tweets in which Ms. Bernard stated that retail trading was "speculati[on]" (Ex. 47, Dep. Ex. 110), that she wanted to "send[] a message" with her trading (Ex. 48, Dep. Ex. 111) and that AMC was being heavily shorted (Ex. 46, Dep. Ex. 104), despite testifying that she could not recall what her tweets meant.  Additionally, Marcel Poirier (who lives in Canada and was not a Robinhood customer) testified that he did not create a Reddit account until after Robinhood imposed restrictions and did not know what WallStreetBets was.  (Ex. 13, Poirier 55:6-12.)  According to *Reddit*, however, Mr. Poirier created a Reddit account on January 15, 2021 (Ex. 49, Dep. Ex. 125), and commented on WallStreetBets that day.  (Ex. 50, Dep. Ex. 126.)  Mr. Poirier also denied being aware of possible short squeezes or social media frenzy about BB, despite tweeting about those very issues.  (Ex. 13, Poirier 105:3-9; Ex. 51, Dep. Ex. 133; Ex. 52, Dep. Ex. 145.)

**B.    Named Plaintiffs' Investment Strategies (or Lack Thereof).**

Most Named Plaintiffs testified that they conducted little to no research in connection with their investments, and instead traded on their "gut" or based on "momentum" or "price movements."  (*See, e.g.*, Ex. 14, Rivas  45:12-18 (conceding she did not review SEC filings, earning announcements or cash flow projections before investing, nor did she have any real

---

contemporaneous market conditions or the reasons for his trades in the Affected Stocks.  (Ex. 12, Nguyen 30:20-32:10, 38:20-39:3; 52:17-53:16.)

investing strategy); Ex. 12, Nguyen 28:4-30:8 (testifying he trades at random, based on gut feeling and previous price movements); Ex. 7, Harbison 34:15-35:25 (testifying to trading based on stock price graphs and trend lines); Ex. 6, Gurney 52:22-53:15 (testifying that he does not research potential investments, keep up to date with stock market news or consider earnings); Ex. 11, Ng 54:7-10 (testifying that he did not conduct his own GME research).)  Indeed, Mr. Clarke conceded that he purchased GME on January 27, 2021, based on "momentum" even though he "didn't really think that it was a fair value" for the stock because he did not believe the fundamentals of the company were strong.  (Ex. 5, Clarke 40:18-20, 56:24-57:5, 77:19-22.)

Lead Plaintiff Laine-Beveridge also testified that he makes investment decisions based on "gut" and does not review SEC filings before investing in a company.  (Ex. 9, Laine-Beveridge 59:8-11.)  With respect to his investments in AMC and NOK, he conceded that he did not research the financials or business metrics of either company prior to investing; instead, he traded based on momentum of the Affected Stocks.  (*Id.* 58:12-59:7.)  In Mr. Laine-Beveridge's opinion, any class members who bought shares of the Affected Stocks based on social media (and he assumed some did) were plainly following a different investment strategy than him—one that he believed was "probably not going to work."  (*Id.* 100:23-104:16.)

C.    **Named Plaintiffs Were Aware of the Robinhood Restrictions When They Sold Their Shares.**

All but one of the Named Plaintiffs admit they knew about Robinhood's trading restrictions when they sold their shares during the Class Period.  (*See* Ex. 9, Laine-Beveridge 121:11-17; Ex. 3, Cash 184:18-22; Ex. 8, Huacuja 94:6-19; Ex. 5, Clarke 110:24-111:12; Ex. 7, Harbison 152:5-17; Ex. 6, Gurney 87:22-25; Ex. 13, Poirier 151:19-153:2; Ex. 14, Rivas 99:16-22; Ex. 1, Bernard 154:22-155:5; Ex. 2, Bohórquez 143:13-21; Ex. 12, Nguyen 89:21-23.)  Mr. Ng (a non-Robinhood customer) is the only exception, but he later admitted to learning of trading restrictions imposed by another broker on January 28, days prior to his Class Period sales.  (Ex. 11, Ng 10:12-11:3, 75:22-76:1; *see* Ex. 44, Dep. Ex. 37.)

In its order denying Robinhood's motion to dismiss, the Court relied repeatedly on Plaintiffs' allegations—which had to be taken as true at the pleading stage, but must now be supported by evidence—that "Plaintiffs sought to understand why Robinhood imposed the restrictions", (Dkt. No. 503 at 30-31), and that "[b]elieving that the restrictions were the byproduct of market volatility as opposed to Robinhood's self -interest, Plaintiffs sold their shares", (*id., see also id.* at 43-47).  Few of the Named Plaintiffs, however, were even aware of

the reasons Robinhood gave for the restrictions at the time they sold (nor are they even aware now).  Mr. Huacuja, Mr. Clarke, Mr. Harbison, Mr. Gurney and Ms. Bernard testified that they had ***no recollection of any reason*** that Robinhood might have given for imposing the restrictions.  (Ex. 8, Huacuja 94:15-98:16; Ex. 5, Clarke 110:24-111:12; Ex. 7, Harbison 153:13-18; Ex. 6, Gurney 93:22-25; Ex. 1, Bernard 163:14-167:1.)  While Mr. Laine-Beveridge—the individual appointed by the Court as Lead Plaintiff—knew that Robinhood stated that it implemented the restrictions in light of the ongoing market volatility, he admitted that he did not believe that any reason Robinhood gave ***affected stock prices***.  (Ex. 9, Laine-Beveridge 19:16-20:3, 169:14-19.)  And, although Plaintiffs claim that Robinhood's restrictions induced them to sell at deflated prices, six Named Plaintiffs ***bought*** shares of Affected Stocks during the Class Period.  (Ex. 61, Ng Certification, Dkt. No. 527-1 at 18; Ex. 32, Dep. Ex. 265 at 5; Ex. 39, Dep. Ex. 105; Ex. 65, P00002863; Ex. 13, Poirier 191:17-192:18; Ex. 12, Nguyen 102:20-104:10.)

**D.**      **Several Named Plaintiffs Profited on Their Trades During the Class Period.**

Several Named Plaintiffs, including the Lead Plaintiff, profited from their sales of the Affected Stocks.  As discussed below (*see infra* Section III.A), Mr. Laine-Beveridge has provided three PSLRA certifications; the first, filed in July 2021 with his motion for appointment as lead plaintiff, listed AMC and NOK trades.  (*See* Dkt. No. 366-3 at 3.)  This Court certified Mr. Laine-Beveridge as lead plaintiff based on his claim to have suffered the greatest net loss, as his losses on NOK outweighed his gains on AMC.  (*See* Dkt. No. 420 at 5.)  However, nearly two years later, Mr. Laine-Beveridge provided a second certification, which no longer includes any trades in NOK.  (*Compare* Dkt. No. 366-3 at 2 *with* Dkt. No. 559-6 at 5.)  When asked about this change, Mr. Laine-Beveridge testified that he is not a member of the proposed class as it relates to NOK because "one of the issues is that I didn't lose money on Nokia during the Class Period."  (Ex. 9, Laine-Beveridge 164:4-165:21, 135:10-24, 147:19-148:2.)  Mr. Laine-Beveridge similarly made money on his AMC trades.  (*See* Ex. 41, Dep. Ex. 274.)

Other Named Plaintiffs, specifically Messrs. Cash, Gurney and Poirier, sold for a gain during the Class Period.  (*See, e.g.*, Ex. 3, Cash 199:4-205:20; Ex. 6, Gurney 67:23-69:2; Ex. 26, Dep. Ex. 131; Ex. 27, Dep Ex. 132; Ex. 28, P00002304; Ex. 29, P0002324; Ex. 30, P00002339; Ex. 31, Dep. Ex. 246; Ex. 40, RHMDL00097432; Ex. 72, Dep. Ex. 141.)  Mr. Ng did not time his sale as fortuitously.  As of January 31, 2021, after the PCO had been lifted and Robinhood was gradually loosening restrictions, Mr. Ng had an unrealized gain of over 200% on his GME

trades, yet he continued to hold based on Keith Gill's advice, and as a result lost money.  (Ex. 11, Ng 44:19-45:5, 52:7-19.)[13]

## LEGAL STANDARD

Plaintiffs "seeking to maintain a class action 'must affirmatively demonstrate [their] compliance' with Rule 23." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).  To do so, a plaintiff must prove by a preponderance of the evidence "that there are *in fact* sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a)." *Id.* (internal quotation marks and citation omitted).

In addition, a plaintiff must demonstrate "through evidentiary proof at least one of the provisions of Rule 23(b)." *Id.* "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997) (noting the predominance requirement "is far more demanding" than Rule 23(a)'s commonality requirement). "[W]here members of a proposed class will need to present evidence that varies from member to member," individual questions predominate over common questions, precluding certification. *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (internal quotation marks and citation omitted).

To determine whether plaintiffs have satisfied Rule 23's requirements, courts must conduct a "rigorous analysis" of the motion and the evidence upon which it relies. *Wal-Mart*, 564 U.S. at 351.  The Eleventh Circuit has explained that "class certification is an *evidentiary* question, not just an analysis of the pleadings." *Bussey v. Macon Cnty. Greyhound Park, Inc.*, 562 F. App'x 782, 790 (11th Cir. 2014).  As both the Supreme Court and Eleventh Circuit have instructed, district courts must "probe behind the pleadings," which may require consideration of the merits. *Comcast*, 569 U.S. at 33, 35 (*quoting Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982)) (explaining that courts must "determin[e] that Rule 23 is satisfied, even when that requires inquiry into the merits of the claim"); *see, e.g.*, *Wal-Mart*, 564 U.S. at 351 ("[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues

---

[13] Other Named Plaintiffs profited from sales of the Affected Stocks in the days just before the Class Period. (*See* Ex. 7, Harbison 140:15-142:6; 187:14-188:9; 120:20-22; Ex. 14, Rivas 67:3-11, 71:2-5.)  That includes Santiago Gil Bohórquez, a resident of Colombia who is not a Robinhood customer, and who asked on Twitter whether he could "get into trouble" for his conduct.  (*See* Ex. 24, Dep. Ex. 275 (asking about "legality of what is happening").)

comprising the plaintiff's cause of action.") (internal quotation marks and citation omitted); *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1188 n.15 (11th Cir. 2003) ("[T]he trial court can and should consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied."); *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 722-23 (11th Cir. 1987) (explaining that courts look beyond the pleadings "in determining whether a motion for class certification should be granted" and noting that "it is often necessary for a district court to consider, for example, a deposition of a named plaintiff").

Plaintiffs assert market manipulation claims under Sections 9(a)(2) and 10(b) of the Securities Exchange Act.  Under Section 9(a)(2), a plaintiff must prove that "(1) a series of transactions in a security creating actual or apparent trading in that security or raising or depressing the price of that security, (2) carried out with scienter, (3) for the purpose of inducing the security's sale or purchase by others, (4) that was relied on by the plaintiff, (5) and affected plaintiff's purchase or selling price."  (Dkt. 503 (the "MTD Order") at 16.)  Section 10(b) "requires a plaintiff to allege (1) manipulative acts; (2) damage[;] (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange."  (*Id.* at 38.)

## ARGUMENT

Class certification should be denied for four reasons.  Because the markets for the Affected Stocks were inefficient during the Class Period, Plaintiffs will be required to prove reliance on an individualized basis and do not satisfy predominance under Rule 23(b)(3).  (*See* Part I.)  Because the markets were inefficient, Plaintiffs also do not satisfy the *Comcast* requirement under Rule 23(b)(3) of showing that damages can be calculated on a classwide basis consistent with their theory of liability.  (*See* Part II.)  Further, Plaintiffs lack standing to bring certain claims, and because they are open to unique defenses, they cannot satisfy the Rule 23(b)(3) typicality requirement.  (*See* Part III.)  Finally, the Named Plaintiffs will not adequately prosecute the action and substantial conflicts exist.  (*See* Part IV.)[14]

---

[14] Robinhood does not dispute that Plaintiffs satisfy Rule 23(a)(1) and 23(a)(2).

I.    **PLAINTIFFS WILL BE REQUIRED TO PROVE RELIANCE ON AN INDIVIDUALIZED BASIS, PRECLUDING CERTIFICATION UNDER RULE 23(b)(3).**

Reliance is an element of Plaintiffs' Section 9(a) and 10(b) claims.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007) (Section 10(b) claims); *Baum v. Phillips, Appel & Walden, Inc.*, 648 F. Supp. 1518, 1530 (S.D.N.Y. 1986) (Section 9(a) claims). Plaintiffs cannot establish classwide reliance and thus will have to prove reliance on an individualized basis, precluding class certification.

In a leading case about class actions for market manipulation claims, *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931 (9th Cir. 2009), the Ninth Circuit held that the plaintiffs could not invoke a presumption of reliance and affirmed the denial of class certification.  The court explained that reliance "establishes the causal connection between the alleged fraud and the securities transaction."  *Id.* at 939.  Accordingly, "[w]hether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance."  *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) (*Halliburton I*).  "Whether or not [Plaintiffs] can rely on a presumption of reliance determines whether their putative class can meet the requirements of Rule 23(b)(3).  For without a class-wide presumption, [Plaintiffs] would have to prove reliance as to each class member individually."  *Desai*, 573 F.3d at 940.

The only potentially applicable path for proving reliance on a classwide basis is the presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).  Plaintiffs in this case cannot invoke the *Basic* presumption because the markets for the Affected Stocks were not efficient during the relevant time period.  Presumably because Plaintiffs know they cannot rely on *Basic*, they argue in the alternative that they do not need to show reliance at all or, if they do, that they can rely upon the presumption of reliance in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).  (Mot. at 11-14, 16-21.)  Plaintiffs' arguments lack merit. They *are* required to demonstrate reliance, and they cannot invoke the "common scheme" doctrine or the *Affiliated Ute* presumption in a market manipulation case.

A.    **Plaintiffs Do Not Satisfy the *Basic* Presumption of Reliance.**

Securities fraud class actions for exchange-traded stocks normally satisfy the predominance requirement because reliance can be presumed based on the existence of an efficient market.  But this is not a normal case.  To qualify for the classwide presumption of reliance under *Basic*, Plaintiffs must prove that the markets for the Affected Stocks were

efficient during the Class Period notwithstanding the social-media-driven frenzy of high prices and extreme volatility that was unrelated to the release of company-specific value-relevant information. They cannot do so.

> ### 1. Plaintiffs Need To Meet the *Basic* Requirement of Efficient Markets To Satisfy Reliance on a Classwide Basis.

In *Basic*, the Supreme Court recognized a rebuttable presumption of reliance where "the market price of shares traded on well-developed markets reflect[] all publicly available information." 485 U.S. at 246; *see ATSI*, 493 F.3d at 100 n.4 (applying the presumption in the context of a market manipulation claim); *Dodona I, LLC v. Goldman, Sachs & Co*., 847 F. Supp. 2d 624, 651 (S.D.N.Y. 2012) (explaining that "[i]n *ATSI* the Second Circuit essentially incorporated 'fraud on the market' into the standard for market manipulation by requiring that plaintiffs show 'reliance on an assumption of an efficient market'") (quoting *ATSI*, 493 F.3d at 99-103). Thus, "the presumption depends upon the efficiency of the market in which the security trades." *Desai*, 573 F.3d at 942. Accordingly, a plaintiff must show that the stock at issue traded in an efficient market to invoke the presumption, a presumption that the defendant can then rebut as to particular plaintiffs. *See FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1310 (11th Cir. 2011). As the Eleventh Circuit explained in *FindWhat*, an efficient market "rapidly and efficiently translates public information into the security's price." *Id.* A corollary is that a company's stock price typically does *not* move significantly (after accounting for market and industry returns) without new, value-relevant information regarding the company and its business. *See id.*

Plaintiffs first try to duck this issue by arguing that "whether the markets for the Affected Stocks were efficient" is "a merits question not ripe for decision at class certification." (Mot. at 14.) But this conflates reliance on the integrity of the markets, which is an element of their market manipulation claims, with the *Basic* "fraud on the market presumption," which is a means of establishing *classwide* reliance under Rule 23(b)(3). 485 U.S. at 247. To certify a class, Plaintiffs must qualify for a classwide presumption of reliance, and whether the markets for the Affected Stocks were efficient determines whether Plaintiffs can invoke the *Basic* presumption. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 473-74 (2013).

Plaintiffs then strain to argue that because this is a market manipulation case, "*Basic* market efficiency . . . is [not] required to prove classwide reliance." (Mot. at 15.) That also is not the law. No case cited by Plaintiffs even suggests otherwise. To the contrary, courts have

rejected any proposed exception for market manipulation cases.  In the *Desai* case, the district court rejected a proposed exception to the *Basic* theory of reliance because "[c]ourt[s] may not presume reliance in a manipulation case if the market is not efficient."  *In re GenesisIntermedia, Inc. Sec. Litig.*, No. 01-CV-9024, 2007 WL 1953475, at *8 (C.D. Cal. June 28, 2007), *aff'd sub nom. Desai*, 573 F.3d 931.  The court explained that a so-called "integrity of the market" theory of reliance was "logically flawed because the inference of reliance is broken if the market price of a security does not reflect the manipulative activity."  *Id.* at *8; *see also Desai*, 573 F.3d at 942 (noting that "[w]e are chary" of the proposed exception).  Other courts agree that the requirement of showing market efficiency under *Basic* to satisfy classwide reliance applies to "misrepresentation and manipulation claims alike."  *See Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 394 (S.D.N.Y. 2010) (citing cases).

Plaintiffs then misstate the applicable standard for evaluating market efficiency, incorrectly arguing that efficiency requires "a *bona fide* market, nothing more."  (Mot. at 14.)  In support of this proposition, Plaintiffs cite *Fezzani v. Bear, Stearns & Co.*, 716 F.3d 18, 23 n.3 (2d Cir. 2013) ("*Fezzani I*"), *reh'g denied*, 777 F.3d 566 (2d Cir. 2015) ("*Fezzani II*").  (Mot. at 14.)  But that case does not support Plaintiffs' claim that the mere existence of public trading is sufficient to establish efficiency for *Basic* purposes.  In *Fezzani*, as in *ATSI*, the plaintiffs brought market manipulation claims on an individual basis, not as a class.  *Fezzani I*, 716 F.3d at 20; *see ATSI*, 493 F.3d at 101.  Because there were no class claims, the plaintiffs were not required to show that they could prove reliance on a classwide basis.  As such, fraud on the market and the *Basic* presumption were not at issue.  *See Fezzani II*, 777 F.3d at 572.  *Fezzani* thus expressed no opinion on the fraud on the market presumption in a class action.  Instead, the court's statement that "an efficient market free of manipulation" referred to "a *bona fide* market 'free of manipulation'" described the element of reliance for an *individual* investor to state a Rule 10b-5 manipulation claim.  *Fezzani I*, 716 F.3d at 23 & n.3.[15]

*Basic* sets a higher bar for class actions.  In order for a fraud *on the market* to be possible, the *market* must incorporate all information that is relevant to the company's value.  *FindWhat*,

---

[15] Regardless, as Robinhood establishes below, Named Plaintiffs did **not** rely upon any belief that the markets for the Affected Stocks were bona fide markets free of manipulation due to the extraordinary run-up of the stock prices in the days leading up to the Class Period.

658 F.3d at 1310.[16]  Even if some investors may be able to testify on an individualized basis to a belief in "a *bona fide* market 'free of manipulation,'" the court cannot presume reliance on a classwide basis on those facts alone.  Fraud on the market under *Basic* requires not merely a *bona fide* market, but an efficient one, meaning a market in which stock-price movements have a logical relationship to news about the company's value.  Put simply, the burden of showing reliance for every class member is higher than the burden of showing reliance for one.  *Fezzani* thus does not bear on the standard Plaintiffs must meet to show classwide reliance.

### 2.  Plaintiffs Fail To Meet the *Basic* Requirement of Efficient Markets.

Plaintiffs have failed to establish market efficiency under the standard articulated in *Basic*.  While markets for exchange-traded stocks, such as the ones at issue here, may be "generally efficient," there can be aberrational periods when the markets are temporarily inefficient.  *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1255 (11th Cir. 2014); (*see* Ex. 16, Werner FXCM 67:22-68:3 (Plaintiffs' expert agrees that it is "possible for a market to be efficient at one point in time but not another")).  That temporary inefficiency precluding a presumption of reliance is what happened here.  To be clear, Robinhood does not argue that the markets for the Affected Stocks were never efficient, but rather that the expert analysis and facts establish that they were inefficient immediately preceding the Class Period as well as during the Class Period.

*First*, Plaintiffs' claim of efficiency turns entirely on the opinions of their proposed expert, Dr. Adam Werner.  But his opinions on efficiency are of no help to class certification because Dr. Werner's primary opinion is that the markets for seven of the nine Affected Stocks were efficient during the full year *before* the Class Period.[17]  But that is beside the point.

---

[16] Plaintiffs also contend that the Court in *Halliburton Co. v. Erica P. John Fund, Inc*., 573 U.S. 258 (2014) (*Halliburton II*) rejected the existence of a relationship between efficiency and value-relevant news.  (Mot. at 16 n.34.)  They claim that such a relationship is necessary only under "fundamental" efficiency.  That is incorrect.  *Halliburton II* affirmed the efficient market hypothesis as articulated in the academic literature, under which a stock's price should move in response to news about a company's value.  *See Halliburton II*, 573 U.S. at 269-73; (*see* Daubert Mot. at 10-12).

[17] Dr. Werner does *not* opine that the markets for the other two Affected Stocks (KOSS and TR), which were lightly-traded, small-cap stocks not followed by analysts, were efficient even for the year leading up the Class Period.  (*See* Mot. at 21.)  Accordingly, Plaintiffs have failed to meet their burden to certify a class that includes people who transacted in those two stocks.

Dr. Werner does *not* analyze whether the markets were efficient during the Class Period *at all*. (*See* Mot. at 16.)[18] Plaintiffs assert that "only the *sale* decision is relevant to seller class members' reliance," yet their expert examines the markets for the Affected Stocks *only* "in the year just *before* the Class Period" (*i.e.*, when the Named Plaintiffs *purchased* the Affected Stocks, and before the sales at issue). (*Id.* at 4, 17 (emphasis added).)[19] Robinhood's expert, Prof. Grenadier, *did* analyze the Class Period, and concluded that the markets for the Affected Stocks were inefficient (*see* Ex. 20, Grenadier Report § VI)—a point Dr. Werner does not contest. (Ex. 21, Werner Rebuttal ¶ 17; Ex. 15, Werner 31:11-17.)

Dr. Werner's efficiency opinions are also unreliable under *Daubert* even aside from the fact that he analyzes the wrong time period.[20] Dr. Werner performed a "news/no-news" test to determine whether there are more statistically significant price movements on days with news than days without news. (Mot. at 19.) This methodology defined the "news" days as those with the most articles mentioning the companies at issue, regardless of whether the articles contained value-relevant news. (*See* Daubert Mot. at 10-15.) Dr. Werner's definition of "news," therefore, improperly includes articles—common on the unusual facts of this case—about price movements, bubbles and squeezes, and even articles pointing out the *absence* of news. (*See id.* at 13.) For example, Dr. Werner classified news articles about press releases from companies that felt compelled to note publicly that there was *no* company news to support the stock-price or volume increases at this time, as "news" that Dr. Werner would expect would impact their stock price. (*See* Ex. 70 (Jan. 25, 2021 article about BlackBerry's statement); Ex. 71 (Jan. 27, 2021

---

[18] Plaintiffs contend that "[c]ourts recently held that two stocks at issue had traded in efficient markets" (Mot. at 17 n.36), but fail to mention that the courts were analyzing efficiency several years *prior* to the period at issue here. *See Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Entm't Holdings, Inc.*, 338 F.R.D. 205, 210, 217 (S.D.N.Y. 2021) (examining December 2016 through August 2017); *Pearlstein v. BlackBerry Ltd.*, No. 13-cv-7060, 2021 WL 253453, at *1, *15 (S.D.N.Y. Jan. 26, 2021) (examining March through September 2013).

[19] Dr. Werner testified that Plaintiffs' counsel specifically instructed him to study market efficiency prior to, and not during, the Class Period. (*See* Ex. 15, Werner 31:11-23.)

[20] It is no wonder that Dr. Werner admitted that in more than a dozen prior cases as a class certification "expert," he used a different "news/no-news" test; that he had never applied the methodology for the "news/no-news" test he used here; and that he began his work here using a different methodology and changed midstream. (Ex. 15, Werner 173:16-174:8, 227:17-22.)

article about Nokia's statement).)  This methodology is circular, and wholly deficient under *Daubert* for the reasons articulated in Robinhood's *Daubert* motion.

*Second,* Robinhood's experts have shown that information about the value of the nine companies at issue cannot explain the large stock-price run-up observed during this period, a paradigmatic example of an inefficient market.  (*See* Ex. 20, Grenadier Report § VI.)  These price run-ups were unprecedented; for example, GME rose from its opening price of $19 on January 4, 2021, to as high as $380 on January 27, 2021, an increase of approximately 1,900%.  (*See* Ex. 18, Fischel Report ¶¶ 9, 32.)  Prof. Grenadier showed that the returns on the Affected Stocks were so large that an investor who held the Affected Stocks from January 21 to 27, 2021, would have outperformed every portfolio out of a million randomly selected portfolios held for five trading days in the past 25 years.  (*See* Ex. 20, Grenadier Report ¶ 80.)  He also found that the extreme price movements were accompanied by significant increases in trading volume and volatility.  For example, on three days during the week starting January 21, 2021, GME had a daily turnover ratio of more than 200%, indicating that the number of shares bought and sold in a single day was more than twice the number of GME shares outstanding.  (*Id.* ¶ 94.)

Prof. Grenadier and Prof. Fischel found that these extreme price movements were not associated with company-specific, value-relevant information that could explain such dramatic movements.  (*See id.* § VI.B.2; Ex. 18, Fischel Report ¶ 24.)  Indeed, more than half of the companies at issue stated publicly that they were unaware of undisclosed information or changes in their business conditions that would account for the price movements.  (*See* Ex. 20, Grenadier Report ¶¶ 98-99.)  Many of the days on which the large run-ups occurred directly prior to the Class Period did not contain any company news, with the only news concerning retail investor coordination and short squeezes, which is not value-relevant information that moves prices in an efficient market.  (*Id.* ¶¶ 100-104.)  Moreover, as market participants at the time recognized, the price increases in the Affected Stocks occurred in connection with short squeezes and coordinated trading, and prices were thus artificial.  (*See* Ex. 18, Fischel Report ¶¶ 25-28.)

As Prof. Grenadier further explains, short-sale constraints can impede market efficiency and exacerbate this market distortion, preventing informed investors with capital resources (arbitrageurs) from trading to correct mispricing, as they would in an efficient market.  (Ex. 20, Grenadier Report ¶¶ 101, 107-111.)  When arbitrageurs face coordinated trading by less sophisticated investors, their ability to correct mispricing can be limited in the short term,

20

causing the market to be temporarily inefficient.  (*Id.* ¶ 110.)  Consistent with established finance theory, Prof. Grenadier notes that academic research has found that short squeezes impacted at least five of the Affected Stocks (GME, AMC, BBBY, EXPR and TR), with analysts and market observers attributing the price movements in the remaining stocks to short squeezes or attempted short squeezes, which are inconsistent with an efficient market.  (*Id.* ¶¶ 133-136.)

The absence of a relationship between price movements in the Affected Stocks and disclosure of new, value-relevant information disproves market efficiency.  *See FindWhat*, 658 F.3d at 1310 ("A corollary of the efficient market hypothesis is that disclosure of confirmatory information—or information already known by the market—will not cause a change in the stock price."); *In re Am. Int'l Grp., Inc. Sec. Litig.,* 265 F.R.D. 157, 180-81 (S.D.N.Y. 2010) (denying class certification for failure to prove an efficient market under *Basic* when "the price of [the relevant] bonds [was not] responsive to company-specific news"); (*see* Ex. 20, Grenadier Report ¶ 13; Ex. 17, Werner Hi-Crush 124:25-125:4 (where Dr. Werner previously testified that "if [he] saw all sorts of crazy stock price movements on no information, that might inform [him] that the stock wasn't efficient.")).  Here, where the stock-price movements bear no relationship to news about the value of the at-issue companies, Plaintiffs cannot establish *Basic* market efficiency.

*Third,* many Named Plaintiffs conceded at deposition that they believed some Affected Stocks were impacted by short squeezes and admitted that some Affected Stocks were mispriced prior to any alleged market manipulation by Robinhood.  (*See* Statement of Facts IV.A-IV.B.) Mr. Clarke, for example, testified that he bought GME on January 27, 2021, at a price that he "didn't really think . . . was a fair value" because he did not believe the fundamentals of the company were strong.  (Ex. 5, Clarke 40:18-20, 124:23-125-12.)  Similarly, Mr. Huacuja bought GME "banking on there being a short squeeze," from which he hoped to profit.  (Ex. 8, Huacuja 29:15-30:11.)[21]  For these Plaintiffs, who understood the markets for the Affected Stocks were inefficient immediately prior to the Class Period, it strains credulity to believe that they suddenly assumed the markets became efficient on January 28 when Robinhood implemented its PCO

---

[21] As one third-party investor explained when asked about news that might explain the price movements in the Affected Stocks:  "Again, the only news was that everyone in the trading community and Wall Street was looking for the next GameStop," adding "you couldn't miss the news . . . every article every day from the sources I followed was about GameStop, short squeezes, et cetera."  (Ex. 10, Meade 94:8-23, 114:20-23.)

restrictions.  Even if class members could invoke such an outlandish and illogical assumption, all but one Named Plaintiff testified that they knew about Robinhood's restrictions when they sold their shares of the Affected Stocks during the Class Period.  (*See* Statement of Facts IV.C.)  Thus, even on Plaintiffs' theory that these restrictions manipulated the market, Plaintiffs willingly traded on an understanding that the market was *not* efficient at this time.

In sum, Plaintiffs quote *Basic*, asking, "Who would knowingly roll the dice in a crooked crap game?"  (Mot. at 16.)  But that is precisely what Named Plaintiffs and other retail investors did here.  They bought shares in the Affected Stocks, ***knowing*** the prices were distorted by a social media craze and attempted short squeezes.  All twelve Named Plaintiffs bought on January 27, 2021, at the peak of the market distortion, hoping to make money from timing their trades before the bubble burst.  It is hard to imagine a group of investors who relied on the efficiency of the market ***less*** than the putative class here.  This not only precludes Plaintiffs from invoking the *Basic* presumption as to the class, but also establishes that Robinhood has rebutted the *Basic* presumption with respect to each Named Plaintiff.  *See Halliburton II*, 573 U.S. at 276 (holding defendants may, under *Basic*, "rebut the presumption of reliance with respect to an individual plaintiff by showing that he did not rely on the integrity of the market price in trading stock.").  Robinhood's evidence "severs the link between the alleged" manipulation and Plaintiffs' trading decisions, and thus "rebut[s] the presumption of reliance."  *Basic*, 485 U.S. at 248.

For each of these reasons, Plaintiffs cannot rely on the *Basic* presumption, individual issues of reliance predominate, and a class cannot be certified under Rule 23(b)(3).

**B.      The "Common Scheme" Exception Does Not Apply.**

Plaintiffs also assert that they do not need to show reliance because they alleged "a common scheme."  (Mot. at 11.)  Plaintiffs contend this so-called "common scheme" exception applies because Robinhood communicated the same message to the public as part of a "common scheme."  (*Id*.)  Plaintiffs are wrong.  This doctrine does not relieve a plaintiff's burden of establishing reliance in a market manipulation case, nor would it apply on the facts of this case.

*First*, Plaintiffs cite no case in which a court has applied the so-called "common scheme" exception to a market manipulation claim; Plaintiffs' only cases involved misrepresentation claims.  Even when a plaintiff alleges a "comprehensive scheme to manipulate that include[s] collateral omissions and misrepresentations in furtherance of the scheme," courts have refused to apply this doctrine in market manipulation cases.  For example, in *In re Merrill Lynch Auction*

*Rate Securities Litigation*, the court rejected the argument "that reliance need not be shown" in a case alleging a comprehensive scheme to defraud because "reliance is a required element of a market manipulation claim." 704 F. Supp. 2d at 393, 398 (internal quotations omitted).

 *Second*, even where this supposed doctrine has been applied in misrepresentation cases, "it must be demonstrated that the same or substantially the same misrepresentations were made to the putative class." *Bruhl v. Price Waterhousecoopers Int'l*, 257 F.R.D. 684, 696 (S.D. Fla. 2008) (where all class members received monthly statements showing the investment fund's net asset value ("NAV")). Here, Plaintiffs cite alleged misrepresentations in a Robinhood blog post, as well as statements made by Mr. Tenev (*after* the market closed on January 28, which was the first full day of the proposed class period). (Mot. at 11.) But the record refutes the notion that all class members should be presumed to have seen these statements. To the contrary, many of the Named Plaintiffs testified that they had no idea why Robinhood imposed the PCO restrictions. (Ex. 8, Huacuja 94:15-98:16; Ex. 5, Clarke 110:24-111:12; Ex. 7, Harbison 153:13-18; Ex. 6, Gurney 93:22-25; Ex. 1, Bernard 163:14-167:1.) It is also unlikely that the tens of thousands of putative class members who were not Robinhood customers—many of whom might never have heard of Robinhood—were any more likely than the Named Plaintiffs to have seen the alleged misrepresentations. This is not a case in which all class members received documents containing the same alleged misstatements, and Plaintiffs must do more than merely argue that any such statements were publicly available—otherwise this supposed exception would eliminate the reliance element from almost all Section 10(b) cases. *Cf. Kennedy v. Tallant*, 710 F.2d 711, 715, 717 (11th Cir. 1983) (applying common scheme doctrine when defendants failed "to disclose material facts in the [relevant] prospectuses," which every class member received (as prospectus delivery was legally required before a purchase)).

 *Third*, to qualify for the "common scheme" exception, Plaintiffs must establish that the alleged misstatements "were *of such a nature* that it can be presumed that all members of the class relied upon them either to invest in the first instance, to remain in the investment, or to redeem their interest in the investment." *Bruhl*, 257 F.R.D. at 696 (emphasis added). Plaintiffs cannot possibly demonstrate that the alleged misstatements regarding *the reasons* for Robinhood's restrictions are "of such a nature that it can be presumed that all class members relied upon them" in making their investment decisions (such as the funds' NAV in *Bruhl*) (*id.*), when the Named Plaintiffs' testimony demonstrates that even they did not rely on Robinhood's

23

stated reasons for the restrictions in deciding whether to trade or were completely unaware of the reasons.  (*See* Statement of Facts IV.C, IV.D (recounting Lead Plaintiff's testimony that the reasons did not matter and Named Plaintiffs' lack of awareness of the reasons).)

*Fourth*, courts only apply this doctrine in misrepresentations cases where—unlike here— the securities at issue are "*not* traded on the open market." *Kirkpatrick*, 827 F.2d at 723 (emphasis added).  When "securities . . . are openly traded," a plaintiff can attempt to leverage the "traditional fraud-on-the-market" theory, in which "plaintiffs[] rel[y] on the integrity of an open and developed market to set a price accurately reflecting the security's value." *Id.*  In the absence of a public market, plaintiffs may be able to satisfy reliance when the defendant "engaged in a common course of conduct" of fraudulent misrepresentation "by affirmative acts and by omission." *Id.* at 724.  Here, however, the Affected Stocks were traded on "an open and developed market," and thus the common scheme exception does not apply.  *Id.* at 723.

*Fifth*, as discussed above, many of the Named Plaintiffs—as well as other putative class members—affirmatively "disclaim[ed] th[e] notion" that they relied on an assumption of market efficiency in the days leading up to the Class Period, when they purchased their shares of the Affected Stocks.  *In re GenesisIntermedia, Inc. Sec. Litig.*, 232 F.R.D. 321, 333 (D. Minn. 2005) (denying class certification where plaintiffs alleging market manipulation bought shares knowing the stock was mispriced, reasoning this was "at odds with Plaintiffs' theory of reliance").[22] Many Named Plaintiffs purchased the Affected Stocks on January 27, 2021, for reasons completely divorced from the fundamental value of the underlying companies, including because they wanted to profit from short squeezes or thought the stocks were mispriced due to the social media craze.  (*See, e.g.*, Ex. 8, Huacuja 44:18-19; Ex. 5, Clarke 40:18-20.)  These class members did not rely on the integrity of the market price when they purchased, and it blinks at reality to suggest that they began to assume the market had suddenly become efficient the following day and relied on it.  (*See, e.g.*, Ex. 23, Dep. Ex. 81 (Rivas continued to hold her share of GME during the Class Period when she posted: "The squeeze hasn't squoze [*sic*] yet."); Ex. 11, Ng 71:17-72:3, 83:11-20 (Ng continued holding GME in the hopes of a "gamma squeeze").)

---

[22] The Eighth Circuit denied leave to appeal the denial of class certification.  On remand, the court transferred the case to the Central District of California, where the district court likewise denied class certification on the grounds that "the market for Genesis stock was not efficient," and plaintiffs could not create any exception thereto.  *GenesisIntermedia*, 2007 WL 1953475, at *6.  The Ninth Circuit affirmed.  *Desai*, 573 F.3d at 931.

### C.       The *Affiliated Ute* Presumption Does Not Apply.

Plaintiffs' final argument to satisfy predominance is that they can rely upon the presumption of reliance under *Affiliated Ute*.  (Mot. at 11.)  But this presumption does not apply to market manipulation claims.  *See Desai*, 573 F.3d at 940 (plaintiffs alleging market manipulation "cannot avail themselves of the *Affiliated Ute* presumption" permitted in omission cases).  That is because "manipulative conduct has always been distinct from actionable omissions":  omission claims "stem from the failure to disclose accurate information relating to the value of a security where one has a duty to disclose it," whereas manipulation involves "activities designed to affect the price of a security artificially by simulating market activity that does not reflect genuine investor demand."  *Id.* at 940-41.  For this reason, "[i]f such nondisclosure of a defendant's fraud was an actionable omission, then every manipulative conduct case would become an omissions case."  *Id.* at 941; *see Rabin v. Nasdaq OMX PHLX LLC*, 712 F. App'x 188, 194 (3d Cir. 2017) (explaining that "if nondisclosure of manipulation itself justified a presumption under *Affiliated Ute*," it "would expand the reach of the securities laws beyond their intended boundaries").

Plaintiffs cite *In re Barclays Liquidity Cross & High Frequency Trading Litigation*, 390 F. Supp. 3d 432, 449 (S.D.N.Y. 2019), in which a district court permitted the use of the *Affiliated Ute* presumption.  (Mot. at 13.)  That case does not apply because the manipulative scheme there "involve[d] primarily omissions," rather than misrepresentations.  *See Barclays*, 390 F. Supp. 3d at 448 & n.10 (discussing defendant stock exchanges' failure to disclose information regarding their co-location services and proprietary feeds in required SEC filings); *City of Providence v. BATS Glob. Mkts., Inc.*, 878 F.3d 36, 49-52 (2d Cir. 2017) (earlier decision in same case establishing that it primarily involved omissions).  Here, by contrast, Plaintiffs have alleged misrepresentations (the Robinhood blog post and Mr. Tenev's CNBC interview) to support their manipulation claims, and the Eleventh Circuit has held the *Affiliated Ute* presumption does not apply in this context.  *See*, *e.g.*, *Cavalier Carpets, Inc. v. Caylor*, 746 F.2d 749, 756 (11th Cir. 1984) ("This Circuit has recognized the limited reach of the [*Affiliated*] *Ute* presumption, applying it only in primarily omission cases in which a duty to disclose existed.").[23]

---

[23] Plaintiffs' reliance on *Spicer v. Chicago Bd. Options Exch., Inc.*—which did not even discuss *Affiliated Ute*—is misplaced.  No. 88-cv-2139, 1990 WL 16983 (N.D. Ill. Jan. 31, 1990).  In *Spicer*, the claims were "based on alleged omissions" by the Chicago Board Options

Although Plaintiffs try to recast the alleged deceptive conduct here as involving omissions so as to try to fit under *Affiliated Ute* (*see* Mot. at 12), they cannot get around the fact that their central allegations concern Robinhood's purported misrepresentation that its restrictions were attributed "solely to 'market volatility'" (*id.* at 11-12 (Robinhood "announced in a blog post that it had placed the Affected Stocks into PCO, 'in light of recent market volatility'")).  Indeed, in concluding that Plaintiffs plausibly pleaded manipulative conduct sufficient to withstand a motion to dismiss, the Court focused on the alleged misstatement that "Robinhood outright denied having a liquidity issue and blamed market volatility exclusively." (MTD Order at 45.)  As such, the alleged manipulation here depends primarily on misrepresentations, and the *Affiliated Ute* presumption does not apply.[24]

In any event, like all presumptions, the *Affiliated Ute* presumption is rebuttable, and Robinhood has done so with overwhelming evidence that "Plaintiffs did not rely on the omissions at issue in making their investment decisions."  *Barclays*, 390 F. Supp. 3d at 449 (internal quotations omitted).  As described above, most of the Named Plaintiffs did not recall any reason Robinhood provided for its restrictions.  And Lead Plaintiff Blue Laine-Beveridge testified he did not believe the reasons Robinhood gave affected the price.  (*See* Statement of Facts IV.C.)  As such, they could not have relied on the alleged omission—that Robinhood imposed the restrictions because of liquidity issues—in making their investment decisions.

For the foregoing reasons, Plaintiffs are not entitled to a classwide presumption of reliance on any of their legal theories, and class certification must be denied.

## II.  PLAINTIFFS WILL BE FORCED TO LITIGATE DAMAGES ON AN INDIVIDUALIZED BASIS, PRECLUDING CERTIFICATION UNDER RULE 23(b)(3).

The Court should deny class certification for the independent reason that Plaintiffs have not shown that they will be able to offer a damages model that can withstand scrutiny under

---

Exchange ("CBOE").  *Id.* at *14.  Moreover, the class in *Spicer* was limited to individuals who traded on the CBOE.  *Id.* at *16.  Here, the majority of putative class members did not trade on Robinhood, making it even more farfetched to presume that they relied on any purported omission regarding the reasons for restrictions implemented on that platform.

[24] Plaintiffs assert that *Affiliated Ute* applies because they should be able to assume that a market is free from manipulation.  (Mot. at 12.)  However, such an approach would "very nearly render the reliance element of private 10(b) claims a nullity."  *Rabin v. Nasdaq OMX PHLX LLC*, 182 F. Supp. 3d 220, 246 (E.D. Pa. 2016), *aff'd*, 712 F. App'x 188 (3d Cir. 2017).

*Comcast*.  To satisfy Rule 23(b)(3)'s predominance requirement, Plaintiffs must establish that their damages are measurable on a classwide basis using a common methodology that is consistent with their liability theory and measures only damages attributable to that theory. *Comcast*, 569 U.S. at 35.  "If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)."  *Id.*  Further, the proposed methodology cannot be based on "speculative" inferences because "[s]uch a proposition would reduce Rule 23(b)(3)'s predominance requirement to a nullity."  *Id.* at 35-36.

As courts in this Circuit have explained, *Comcast* "instructed lower courts to conduct a 'rigorous analysis' to determine whether the purported damages model fits the liability case." *Randolph v. J.M. Smucker Co.*, 303 F.R.D. 679, 696-97 (S.D. Fla. 2014); *see Krukever v. TD Ameritrade, Futures & Forex LLC*, 328 F.R.D. 649, 662 (S.D. Fla. 2018) (denying class certification when it was "simply impossible" to "[c]alculat[e] damages using 'readily available' data and a plug-and-chug formula, as Plaintiffs suggest[ed] . . . without conducting complex and fact specific inquiries to determine the proper and accurate data to plug into the formula").  Without such an analysis, a plaintiff's "bald, unsupported assertion that [their] method will work" is insufficient.  *Randolph*, 303 F.R.D. at 698.

Plaintiffs' damages theory is founded on the premise that the "closing price on January 27" is "the fair value of what [class members] would have received" absent Robinhood's restrictions, and that consequently "[d]amages can be computed as the difference between the closing price on January 27 and the sales price class members received during the Class Period." (Mot. at 22, 3-4.)  There is no evidentiary support for that premise.  In the week leading up to the Class Period, the Affected Stocks experienced price increases of up to 1,591%.  (Ex. 20, Grenadier Report, fig. 2.)  As explained by Prof. Grenadier and Prof. Fischel, the Affected Companies' price movements during that week could not be explained by value-relevant news. (*Id.* App'x E; Ex. 18, Fischel Report App'x D.)  The closing price on January 27 for the Affected Stocks was therefore completely untethered from any "fair value"—a fact to which Named Plaintiffs testified at deposition (*see, e.g.*, Ex. 5, Clarke 40:18-20 (testifying that the price of GME at this time did not reflect the company's fundamentals))—and to which some of the companies issuing the Affected Stocks agreed (*see, e.g.*, Ex. 42, BlackBerry Press Release, Jan. 25, 2021; Ex. 57, Nokia Press Release, Jan. 27, 2023).

Plaintiffs attempt to rescue their damages methodology by arguing that "price is the best proxy for value." (Mot. at 25.)  But the sources they cite make clear that price is a proxy for value only *in an efficient market*.  As Plaintiffs quote, "*if markets are informationally efficient*, . . . professional active managers should do no better at picking stock portfolios than monkeys with darts" (Mot. at 25 (quoting Ex. 68, Cochrane, Eugene Fama, Efficient Markets, and the Nobel Prize) (emphasis added)), because prices *in an efficient market* are a good indicator of a stock's fair value.  (*See also* Plf. Ex. 34, Fischel, Efficient Capital Markets 914-15 (tying the use of price as a proxy for value to the existence of efficiency).)

As discussed, Robinhood has provided ample evidence that the markets for the Affected Stocks were *not* efficient on January 27, 2021.  Plaintiffs, by contrast, have proffered *no* evidence that the closing prices on January 27, 2021, were the result of efficient markets.  As explained above and in Robinhood's *Daubert* motion, Dr. Werner applies the wrong efficiency standard and tests for that standard using two unreliable analyses that neither he nor anyone in his field has used before.  (Daubert Mot. at 10-14, 16-17.)  Moreover, his full-year analysis is so overbroad as to provide no information on the question at hand for *Comcast* purposes—the efficiency of the market on the last day of that year, which Dr. Werner excluded from his regression model because of "potentially abnormal returns" on January 27.  (*See id.* at 9.)  His opinions are inadmissible under *Daubert*.  (*Id.* at 7-10.)  Because Plaintiffs have provided no admissible—much less convincing—evidence that the markets for the Affected Stocks were efficient on January 27, 2021, they have failed to support the premise of their supposed classwide damages methodology, and so "have not satisfied their burden to show that this method of calculating damages for this class is reliable or an appropriate fit to the theory of injury here." *Cardenas v. Toyota Motor Corp.*, No. 18-CV-22798, 2021 WL 6926418, at *21 (S.D. Fla. Aug. 12, 2021).[25]

Moreover, Plaintiffs have not offered a damages model that could show but-for prices (where the Affected Stocks would have traded absent Robinhood's restrictions) during the Class Period because they have not even attempted to show efficiency during the Class Period. (Ex. 15, Werner 31:11-17.)  In an inefficient market, stock-price movement may have no relation

---

[25] While Plaintiffs complain that Robinhood "provide[s] no viable alternative" of measuring damages (Mot. at 25), it is their burden, not Robinhood's.  *See, e.g.*, *Ulysse v. Waste Mgmt. Inc.*, No. 11-CV-80723, 2013 WL 11327137, at *3 (S.D. Fla. Sept. 13, 2013).

—

to new information.  (*See*  Ex. 20, Grenadier Report ¶¶ 167-168; Ex. 18, Fischel Report ¶ 38.)
And in an ongoing short squeeze, it is inevitable that prices will fall at some point.  (Ex. 18,
Fischel Report ¶¶ 27-28.)  Plaintiffs' assertion that "[a]t minimum, the closing price on January
27 is what class members would have received" during the Class Period lacks any foundation
because there is no reasonable or reliable means to measure what might have happened, and
when the bubble would inevitably have burst, in their "but for" world.  (Mot. at 22.)  Without an
efficient market, there can be no "reasonably certain proof of damages" (*see* Ex. 56, Ferrillo *et
al.* 122-23), and Plaintiffs cannot proffer a classwide damages methodology.

## III.    BECAUSE PLAINTIFFS LACK STANDING OR ARE ATYPICAL AND SUBJECT TO UNIQUE DEFENSES, THEY CANNOT SATISFY RULE 23(a)(3).

Class certification should also be denied for three further independent reasons because
the claims and defenses are not typical as required under Rule 23(a)(3).

### A.    A Class Cannot Be Certified with Laine-Beveridge as Lead Plaintiff.

To assert claims on behalf of a class, a proposed representative must have standing to
assert individual claims.  *O'Shea v. Littleton*, 414 U.S. 488, 493-94 (1974); *see also Cuban Am.
Bar Ass'n, Inc. v. Christopher*, 43 F.3d 1412, 1423 (11th Cir. 1995).  Mr. Laine-Beveridge lacks
standing to assert securities claims against Robinhood.

The Court appointed Mr. Laine-Beveridge as lead plaintiff based on his claimed losses in
NOK.  His original PSLRA certification, filed with his motion for appointment as lead plaintiff,
listed AMC and NOK trades.  (Dkt. No. 366-3 at 2.)  In ruling on the lead plaintiff motion, this
Court noted that Mr. Laine-Beveridge lacked standing to pursue claims related to his AMC
transactions because he profited on them.  (Dkt. No. 420 at 9.)  The Court nevertheless appointed
Mr. Laine-Beveridge as lead plaintiff on the basis that he claimed to have suffered the greatest
net loss among the applicants to be lead plaintiff due to his transactions in NOK.  (*Id.* at 5.)

After the Court's appointment Order, however, Plaintiffs' counsel amended the class
definition to include only individuals who sold the Affected Stocks at a loss "between January 28
to February 4, 2021."  (*See* Dkt. No. 527 at 1.)[26]  This amendment meant Mr. Laine-Beveridge
was no longer a class member with respect to his transactions in NOK, as all of his NOK sales

---

[26] In the lead plaintiff motion, The Rosen Law Firm defined the proposed class as persons
"who sold any of the Affected Securities . . . via the Robinhood trading platform on or after
January 28, 2021 as a result of Robinhood's restrictions."  (Dkt. No. 366-0 at 1.)

occurred on or after February 22, 2021.  (Dkt. No. 366-3 at 2.)  As a result, Plaintiffs' counsel produced a second PSLRA certification from Mr. Laine-Beveridge dated April 14, 2023, days before his deposition, which no longer included any transactions in NOK, and also revised his reported transactions in AMC.  (*See* Ex. 33, P00002834.)  When asked at his deposition, Mr. Laine-Beveridge could not confirm which certification was accurate.  (*See* Ex. 9, Laine-Beveridge 164:4-165:21.)  He was able to confirm however, that under the amended class definition he is not a member of the proposed class as it relates to NOK because "one of the issues is that I didn't lose money on Nokia during the Class Period."  (*Id.* 135:10-24.)

Thus, the basis for the Court's appointment of Mr. Laine-Beveridge as lead plaintiff—his NOK transactions—has evaporated.  Nor can he serve as lead plaintiff based on his AMC transactions, from which he profited.  (Dkt. No. 420 at 9.)  While Plaintiffs' counsel may now contend that Mr. Laine-Beveridge lost money if the Court examines only his AMC sales during the Class Period, any such loss is relatively small.  (*Compare* Dkt. No. 366-3 (reporting overall AMC gain of $12,443.51) *with* Dkt. No. 559-6 (reporting loss of $2,960.17 by omitting sales on June 15, 2021).)  Other lead plaintiff applicants claimed greater losses in the Affected Stocks.  (*See* Dkt. No. 365 at 8-9 (competing movants alleging total losses of $16,239.70).)  Before certifying a class, the Court would therefore need to reopen the lead plaintiff process.  *See, e.g.*, *In re Allergan PLC Sec. Litig.*, No. 18-cv-12089, 2021 WL 4077942, at *1, *5 (S.D.N.Y. Sept. 8, 2021) (appointing new lead plaintiff and new lead counsel after having denied class certification on the basis of original lead plaintiff's inadequacy).

Moreover, even if, contrary to the Court's prior ruling, Mr. Laine-Beveridge had standing due to his AMC transactions during the Class Period, he would nevertheless be an atypical class representative because his overall profit on his AMC transactions subjects him to unique defenses.  Rule 23(a)(3) precludes class certification where a putative class representative is subject to unique defenses that threaten to become the focus of the litigation.[27]  *See City Pension Fund for Firefighters & Police Officers in Miami Beach v. Aracruz Cellulose S.A.*, No. 08-cv-23317, 2009 WL 10664427, at *5 (S.D. Fla. Aug. 7, 2009).  That an investor has "suffer[ed] no

---

[27] Because the typicality and adequacy analyses "tend to overlap," many of the arguments articulated regarding typicality apply with equal force with respect to adequacy.  *Appleyard v. Wallace*, 754 F.2d 955, 958 (11th Cir. 1985).

net losses" is one such defense.[28]  *Regions*, 762 F.3d at 1259 (citing *In re Comdisco Sec. Litig.*, 150 F. Supp. 2d 943, 945-46 (N.D. Ill. 2001)).

**B.    Named Plaintiffs Did Not Rely on the Integrity of the Market.**

Where a putative class representative's reliance on the integrity of the market may be challenged, that also renders them atypical.  There is substantial evidence that Named Plaintiffs did not rely on the integrity of the market.  *First*, Named Plaintiffs have conceded facts showing that they did not rely on the integrity of the market when they purchased the Affected Stocks.  *Second*, the Court may infer from Named Plaintiffs' trading strategies that they did not rely on an assumption of market efficiency.  A class cannot be certified with these Named Plaintiffs.

Plaintiffs alleging market manipulation "may be subject to unique defenses regarding their reliance on the integrity of the market" when they traded "in reliance on [their] understanding that the market did *not* accurately price the stock at the time," as this directly "calls into question their suitability as class representatives."  *GenesisIntermedia*, 232 F.R.D. at 329; *see Kirkpatrick*, 827 F.2d at 723 (noting that "district courts have denied class certification for fraud-on-the-market claims where evidence indicates that the named plaintiffs may in fact have relied on factors other than the market's integrity").  Here, as explained in Statement of Facts IV.C, the Named Plaintiffs admitted they knew about brokerage trading restrictions at the time they sold their shares of the Affected Stocks during the Class Period.  Thus, Plaintiffs willingly traded "in reliance on [their] understanding that the market did *not* accurately price the stock at the time."  *GenesisIntermedia*, 232 F.R.D. at 329.

Nor can Plaintiffs claim they relied on Robinhood's statements regarding the *reasons* for the restriction:  few of the Named Plaintiffs even recalled receiving or viewing any statement regarding *why* Robinhood imposed the restrictions.  (*See* Statement of Facts IV.C.)  One of the few who did, Mr. Laine-Beveridge, testified that he did not think Robinhood's reasons had anything to do with the stock-price decline.  (Ex. 9, Laine-Beveridge at 169:14-20.)  Because Named Plaintiffs did not rely on Robinhood's statements about the reasons for the restrictions in deciding to sell their shares, they are atypical of any class that could pursue viable claims.  *See*

---

[28] Two other Named Plaintiffs—Cash and Poirier—profited on their sales of Affected Stocks during the Class Period.  *See supra* at 12-13.  Those Named Plaintiffs are therefore also atypical. *See Katz v. Comdisco, Inc.*, 117 F.R.D. 403, 407-08 (N.D. Ill. 1987) (holding atypical claims of class representative who profited on transactions during class period).

*Underwood v. Lampert*, No. 02-cv-21154, 2005 WL 8155010, at *4 (S.D. Fla. Sept. 9, 2005)
(plaintiff atypical when he "did not believe that the market was defrauded during the class
period," as this "strike[s] at the core of the 'fraud on the market' theory and threaten[s] the
common claim of the class").

Unusual trading strategies and habits separately indicate that a plaintiff will "face[] []
unique defenses concerning their lack of reliance on . . . the integrity of the market." *Landry v.
Price Waterhouse Chartered Accountants*, 123 F.R.D. 474, 475-76 (S.D.N.Y. 1989). Plaintiffs
argue that Named Plaintiffs' investment strategies and reasons for their trades in the Affected
Stocks are irrelevant. (*See* Mot. at 9.)[29] This is not so. *See, e.g.*, *Luczak v. Nat'l Beverage
Corp.*, 548 F. Supp. 3d 1256, 1267-68 (S.D. Fla. 2021) ("Plaintiff's haphazard and highly
unusual trading practices—which are anything but typical—give rise to unique defenses . . . .");
*Bang v. Acura Pharm. Inc.*, No. 10-cv-5757, 2011 WL 91099, at *6 (N.D. Ill. Jan. 11, 2011)
("unusually high-volume and high frequency trading can raise challenges to typicality").

In *Luczak*, the court concluded the plaintiff's trading practices rendered him atypical
when he testified at deposition that "he [did] not consider himself a sophisticated investor," "he
[did] not consider himself a long-term investor and [did] not recall any instance in which he held
a stock for more than one year," he "did not[] look at or read SEC filings of [defendant] or any
other company in which he has invested," and "he b[ought] and s[old] hundreds of thousands of
dollars' worth" of stock that he held "for periods as short as a single day, and d[id] not recall
why he chose to buy and sell so quickly." 548 F. Supp. 3d at 1267-68. Likewise, a plaintiff's
strategy to focus on "technical price movements rather than price" may render that plaintiff
atypical, as this "rebut[s] the reliance presumption," "even under a fraud-on-the-market theory."
*In re Safeguard Scientifics*, 216 F.R.D. 577, 582 (E.D. Pa. 2003). As summarized below, Named
Plaintiffs exhibit these same unusual trading practices, subjecting them to unique defenses:

- **Lack of Investing Experience and Research**: Ms. Rivas and Ms. Bernard testified that they
did not have any real investment strategy or investing experience. (Ex. 14, Rivas 43:16-20,
120:18-20; Ex. 1, Bernard 102:20-103:18, 110:22-111:17.) Further, five of the Named
Plaintiffs admitted that they did not research the financials or business metrics of the
Affected Stocks in advance of trading. (*See* Ex. 8, Huacuja 54:4-17; Ex. 12, Nguyen 33:21-
36:9; Ex. 14, Rivas 50:11-20; Ex. 11, Ng 54:7-10; Ex. 9, Laine-Beveridge 57-59.) Two
Named Plaintiffs claimed they do not recall why they decided to trade. (*See* Ex. 12, Nguyen

---

[29] Plaintiffs' conclusory assertion that the supposed irrelevance of investment strategies and
reasons for trading "is particularly true for a seller class" (Mot. at 9) is entirely without support.

83:21-24, 107:4-16; Ex. 1, Bernard 149:5-151:13.)  Taken together, the lack of research, investing experience and real trading strategy across the Named Plaintiffs renders them atypical.  *See, e.g.*, *Luczak*, 548 F. Supp. 3d at 1267-68.

- **Trading Based on Price Movements and Momentum**:  Three Named Plaintiffs testified that they traded the Affected Stocks based on momentum.  (Ex. 5, Clarke 73:15-74:9; Ex. 12, Nguyen 73:13-20; Ex. 9, Laine-Beveridge 107:25-108:5.)  Mr. Harbison also testified that he generally trades based off momentum, selling stocks when he sees a trendline declining and buying when he sees a trendline increasing.  (Ex. 7, Harbison 34:15-35:25.)  Accordingly, these Named Plaintiffs are atypical of the putative class.  *See, e.g.*, *Safeguard Scientifics*, 216 F.R.D. at 582 (plaintiff atypical when he traded based on "technical price movements").

- **Buying and Selling on the Same Day**:  Four Named Plaintiffs each bought and sold shares of the Affected Stocks on the same day during the Class Period.  (*See* Ex. 64, P00002781 (Ms. Bernard bought and sold shares of AMC on February 3); Ex. 65, P00002863 (Mr. Bohórquez bought and sold shares of AMC on January 28, January 29 and February 1 and also bought and sold shares of EXPR on January 28); Ex. 62, Jan. 9, 2023 Poirier Certification (Mr. Poirier bought and sold shares of BB on January 28); Ex. 61, Jan. 11, 2023 Ng Certification (Mr. Ng bought and sold shares of GME on February 4.)  This renders these Named Plaintiffs atypical.  *See Applestein v. Medivation, Inc.*, No. 10-cv-998, 2010 WL 3749406, at *3 (N.D. Cal. Sept. 20, 2010) (plaintiff atypical when he "bought and sold [the relevant] stock on the same day" during the class period and "his trading ranged from a single trade to as many as 44 trades in a single day").

- **Investing Based on Recommendations**:  Mr. Ng testified that he made GME trading decisions based on the advice of social media influencer Keith Gill, buying GME "[b]ecause [he] saw a post on Reddit [by Gill] that interested him" and that he continued to hold because "[i]f DFV [wa]s holding, . . . I was holding."  (Ex. 11, Ng 43:12-21, 83:11-20.)[30]  Courts have found plaintiffs like Mr. Ng atypical when they made investment decisions based on "recommendations from friends and associates [and] not on the statements of [the defendant] or the integrity of the market."  *See, e.g.*, *Landry*, 123 F.R.D. at 476.

    C.    **Named Plaintiffs Lack Standing To Represent Class Members Who Traded in BBBY, KOSS, TR or TRVG.**

Named Plaintiffs lack standing to prosecute claims for class members who traded in four of the nine Affected Stocks—BBBY, KOSS, TR and TRVG—because *none* of the Named Plaintiffs suffered losses from sales of those stocks, or traded in them at all.  *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, No. 05 Civ. 1898, 2005 WL 2148919 at *4 (S.D.N.Y. Sept. 6, 2005) ("A named plaintiff in a class action that purchased securities

---

[30] Lead Plaintiff Laine-Beveridge has disclaimed the wisdom of this trading strategy.  In his opinion, any class members who bought shares of the Affected Stocks based on social media were following a different investment strategy.  (Ex. 9, Laine-Beveridge 100:23-104:16.)

from one issuer does not have standing to bring claims on behalf of purchasers of securities from a *different issuer*."); *Luczak*, 548 F. Supp. 3d at 1262-63, 1265, 1268 (same).  Accordingly, to the extent the Court certifies a class, it cannot include these Affected Stocks.[31]

The Court appointed Mr. Laine-Beveridge as lead plaintiff even though he traded in only two of the nine Affected Stocks.  (Dkt. No. 420 at 9.)  In doing so, the Court expressly noted that, in this situation, "the proper solution is to simply add additional named plaintiffs."  (*Id.*)  Plaintiffs failed to follow the Court's direction, and therefore these Named Plaintiffs lack standing to bring claims relating to BBBY, KOSS, TR and TRVG.

The cases cited by Plaintiffs (Mot. at 8) are inapposite.  In *In re Dreyfus Aggressive Growth Mutual Fund Litigation*, No. 98-cv-4318, 2000 WL 1357509, at *10 (S.D.N.Y Sept. 20, 2000), the court certified a class where representatives had invested in all but one of the defendant's mutual funds at issue.  Here, however, Plaintiffs seek to represent a class of investors in nine Affected Stocks issued by companies *other than* Robinhood, all of which are differently situated from one another.  *Dreyfus* does not stand for the proposition that Plaintiffs can group all nine Affected Stocks as if they are a nearly fungible set of nine securities from a single issuer and simply conclude that "by proving their claims" as to GME that they will "necessarily prove the claims" as to KOSS, an entirely different stock.  *Id.* at *5.  And in *Krukever*, 328 F.R.D. at 655, the plaintiffs held options on "S&P Emini futures contracts," known as "ES options."  Importantly, these 888 types of ES options were not 888 different securities, but rather 888 different put option contracts on futures of *one* underlying securities basket (the S&P 500).[32]

## IV.   PLAINTIFFS CANNOT SATISFY RULE 23(a)(4) BECAUSE THEY WILL NOT ADEQUATELY PROSECUTE THE ACTION AND SUBSTANTIAL CONFLICTS OF INTEREST EXIST.

The adequacy prong of Rule 23(a)(4) requires that named plaintiffs have sufficient "participation in and awareness of the litigation."  *Kirkpatrick*, 827 F.2d at 727.  A class may not be maintained where named plaintiffs "have abdicated their role in the case beyond that of furnishing their names as plaintiffs."  *Id.* (quoting *Helfand v. Cenco*, 80 F.R.D. 1, 7-8 (N.D. Ill.

---

[31] As noted in Part I.A, a class cannot be certified as to KOSS or TR for the independent reason that Plaintiffs do not even contend that those markets were efficient.  (*See* Mot. at 18.)

[32] Further, in *Krukever*, the plaintiffs brought a best execution claim for the alleged liquidation of options at a poor price.  Unlike a best-execution claim, a securities fraud claim turns on price movements for *each security* during the class period, which will vary by security.

1977)).  Adequacy is also defeated when interests are actually or potentially antagonistic to, or in conflict with, the interests and objectives of other class members.  *In re Photochromic Lens Antitrust Litig.*, No. 8:10-cv-984, 2014 WL 1338605, at *14 (M.D. Fla. Apr. 3, 2014).  The "existence of both economic winners and economic losers within the potential class" can "create[] a fundamental conflict precluding adequate representation of the class."  *Id.*

Named Plaintiffs admit they have played virtually no role in directing the litigation.  Lead Plaintiff Laine-Beveridge testified that he did not review the motion to dismiss briefing or the Court's opinion on that motion.  (Ex. 9, Laine-Beveridge 25:12-27:10.)  Nor had he communicated with Plaintiffs' counsel about the class certification motion (which Plaintiffs' counsel filed two days after the deposition) or reviewed the expert reports (which had been exchanged previously).  (*Id.* 30:5-31:9.)  This is inadequate as a matter of law.  *See Welling v. Alexy*, 155 F.R.D. 654, 659 (N.D. Cal. 1994) (proposed representative who "ceded control to his lawyers" inadequate).

Other Named Plaintiffs showed a complete lack of interest in the litigation.  Mr. Gurney, for example, struggled to provide even basic knowledge about this case.  When asked to describe the putative class he seeks to represent, Mr. Gurney testified that the class is comprised of "human beings who have a complaint."  (Ex. 6, Gurney 128:16-130:4.)  Nor could he confirm whether he is suing on his AMC sales (on which he earned a profit).  (*Id.* 67:23-69:2, 97:22-98:18.)  In flagrant disregard of his obligation to dedicate attention to this case, Mr. Gurney sat for his deposition from the driver's seat of his car—while driving.  (*Id.* 6:20-7:8.)

Named Plaintiffs' trades in the Affected Stocks during the Class Period also establish substantial conflicts of interest.  Mr. Cash sues on his sale of GME on January 28, the same day that Mr. Ng *bought* shares of GME.  Further, despite attempting to represent a putative class of investors that *sold* shares of the Affected Stocks during the Class Period, six of the Named Plaintiffs *bought* shares of the Affected Stocks during this time.  (*See* Statement of Facts IV.C.)  These variations establish intraclass conflicts.  *See Montgomery v. New Piper Aircraft, Inc.*, 209 F.R.D. 221, 226-27 (S.D. Fla. 2002) (recognizing intraclass conflict between buyers and sellers).

## <u>CONCLUSION</u>

For the foregoing reasons, Robinhood respectfully requests that the Court deny Plaintiffs' motion for class certification.

**REQUEST FOR HEARING**

Pursuant to Local Rule 7.1(b)(2), Robinhood requests an evidentiary hearing due to the complexity of the legal questions raised by Plaintiffs' motion for class certification.  *See* Local Rule 7.1(b)(2) ("The Court in its discretion may grant or deny a hearing as requested, upon consideration of both the request and any response thereto by an opposing party.")  "Although a hearing is not required prior to granting or denying a motion for class certification . . . such a procedure may, in an appropriate case, aid the court in deciding the issue."  *Hudson v. Delta Air Lines, Inc.*, 90 F.3d 451, 458 n.15 (11th Cir. 1996) (citing *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1099 (11th Cir. 1996)); *see also In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677, 700 (N.D. Ga. 1991) (court held "limited evidentiary hearing" regarding "appropriateness of class certification").  A hearing on class certification in this case would assist the Court in assessing the numerous legal theories concerning reliance set forth by Plaintiffs.  In particular, an evidentiary hearing with live expert testimony concerning market efficiency would aid the Court in determining whether Plaintiffs may rely on the presumption of reliance established by *Basic*.  Courts routinely grant class certification hearings to address these issues.  *See, e.g.*, *Krogman v. Sterritt*, 202 F.R.D. 467, 470, 478 (N.D. Tex. 2001) (rejecting *Basic* presumption based on market inefficiency after class certification hearing).

If the Court also grants a hearing on Robinhood's *Daubert* motion, Robinhood requests the hearings be held in conjunction.  The parties' arguments with respect to the two motions are closely intertwined.  Accordingly, a joint hearing will provide further clarification on these issues and promote judicial efficiency.

Dated:  June 7, 2023

/s/ *Samuel A. Danon*

**HUNTON ANDREWS KURTH LLP**
Samuel A. Danon (FBN 892671)
Tom K. Schulte (FBN 1025692)
María Castellanos Alvarado (FBN 116545)
333 S.E. 2 Avenue, Suite 2400
Miami, FL 33131
Telephone: (305) 810-2500
Facsimile: (305) 810-2460
sdanon@huntonak.com
tschulte@huntonak.com
mcastellanos@hunton.com

**CRAVATH, SWAINE & MOORE LLP**
Antony L. Ryan
Kevin J. Orsini
Brittany L. Sukiennik
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700
aryan@cravath.com
korsini@cravath.com
bsukiennik@cravath.com

*Counsel for Defendants Robinhood Markets, Inc., Robinhood Financial LLC and Robinhood Securities, LLC*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on June 7, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I further certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive Notices of Electronic Filing.

Dated:  June 7, 2023                                    */s/ Samuel A. Danon*
                                                Samuel A. Danon (FBN 892671)