# Exhibit 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:21-MD-2989-CMA

-----------------------------x

In Re: JANUARY 2021 SHORT SQUEEZE TRADING LITIGATION

-----------------------------x

** CONFIDENTIAL **

VIDEOTAPE DEPOSITION OF
JOSEPH GURNEY
VIA ZOOM VIDEOCONFERENCE
April 14, 2023
10:04 a.m.

Reported by:
Maureen Ratto, RPR, CCR

* * *

Videotape deposition of Joseph Gurney held virtually via Zoom Teleconference, hosted from Veritext Legal Solutions, pursuant to notice, before Maureen Ratto, Certified Court Reporter, License No. XI01165, Registered Professional Reporter, License No. 817125, and Notary Public.

* * *

A P P E A R A N C E S:

Counsel for Plaintiffs:

THE ROSEN LAW FIRM
275 Madison Avenue
New York, New York 10016
BY: PHILLIP KIM, ESQ.
pkim@rosenlegal.com
MICHAEL COHEN, ESQ.
mcohen@rosenlegal.com

Counsel for Defendants:

CRAVATH SWAINE & MOORE, LLP
825 Eighth Avenue
New York, New York 10019
BY: KATHLEEN E. YOUNG, ESQ.
keyoung@cravath.com
MEGAN ELOISE VINCENT, ESQ.
mvincent@cravath.com

ALSO PRESENT:

LEE BOWRY, Legal Video Specialist

VIDEOGRAPHER: Good morning. We are going on the record at 10:04 a.m. on April 14, 2023.

Please note that this deposition is being conducted remotely using virtual technology. Quality of recording depends on the quality of camera and internet connection of participants.

What is seen from the witness and heard on screen is what will be recorded.

Audio and video recording will continue to take place unless all parties agree to go off the record. This is Media Unit 1 of the video-recorded deposition of Joseph Gurney, in the matter of In Re: January 2021 Short Squeeze Trading Litigation, filed in the United States District Court, Southern District of Florida, Case No. 1-21-MD-2189-CMA.

My name is Lee Bowry representing Veritext New York and

I am the videographer. The court reporter is Maureen Ratto, also with Veritext. I am not related to any party in this action, nor am I financially interested in the outcome.

If there are any objections to proceeding, please state them at the time of your appearance. Counsel attending remotely will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MS. YOUNG: Kathleen Young, from Cravath, Swaine & Moore on behalf of Robinhood, with me is also Megan Vincent from Cravath.

MR. KIM: Philip Kim for Mr. Gurney, Rosen Law Firm. I see also online is Michael Cohen.

VIDEOGRAPHER: Will the court reporter please swear in the witness, and then counsel may proceed.

GURNEY - CONFIDENTIAL

* * *

J O S E P H G U R N E Y, having been first duly sworn according to law by the Officer, testifies as follows:

DIRECT EXAMINATION BY MS. YOUNG:

Q. Good morning, Mr. Gurney. My name is Kathleen Young. I'm an attorney from Cravath and we represent Robinhood in this matter.

Could you please state your full name for the record?

A. Joseph Edward Gurney.

Q. What is your current address?

A. [redacted]

Q. Thank you. And where are you right now?

A. In Pooler, Georgia.

Q. And you're in a vehicle, right?

A. That's correct.

Q. And you're driving?

A. I am.

Q. Is the -- are you going to be

at all distracted during today's deposition while you're driving?

A. No.

Q. And you have no concerns about, you know, your safety as you drive during the deposition?

A. No.

Q. Okay. I'll go over some basics before we begin. You understand that you've been sworn in and your testimony today is given under oath?

A. I do.

Q. And is there any reason why you cannot give complete and truthful testimony today?

A. No.

Q. You don't have any condition that would prohibit you or prevent you from having an accurate recollection or from giving true and complete testimony today?

A. No.

Q. So the court reporter is taking down everything we say, so it's

important that you provide verbal responses to any questions you're asked rather than shaking your head or nodding, things like that. Does that make sense?

A. Yes.

Q. And during the course of the deposition your counsel may object to the form of a question that's asked. That objection is just for the record and you can proceed to answer the question if you can, unless your counsel instructs you specifically not to answer. And if you don't understand a question, you know, you can just let me know and I'll try to clarify it and if you don't hear any question fully just let me know and I'll repeat it. Make sense?

A. Yes.

Q. And if you also allow me to finish each question before answering I'll try to let you answer before asking another question. That will help the court reporter as well. And if you need to take a break at any point just let me

know and I'll find a good place to stop. The only exception to that is we can't stop, you know, if a question is still pending.

Does that make sense? Mr. Gurney, does that make sense?

A. Yes.

Q. Thank you. Did you take any steps to prepare for your deposition today?

A. I reviewed information.

Q. Did you meet with counsel?

A. I did.

Q. With whom did you meet?

A. The Rosen attorneys that are present.

Q. Mr. Cohen and Mr. Kim; is that right?

A. That's correct.

Q. Was anybody else present?

A. I can't recall.

Q. When did you meet with counsel?

A. When was the last time I met

GURNEY - CONFIDENTIAL

with counsel?

Q. When did you meet with counsel in preparation for your deposition?

A. Yesterday.

Q. And you don't recall who else was there during the meeting that you had with counsel yesterday?

A. Like I said, the Rosen Law attorneys that are present.

Q. But you don't recall if anybody else besides Mr. Kim and Mr. Cohen were present?

A. I don't recall.

Q. And how long was that meeting you had with counsel yesterday?

A. I don't recall.

Q. You don't have any approximate sense of how long that meeting lasted?

A. No.

Q. Was it less than an hour?

A. I don't want to speculate. I don't recall.

Q. Did you speak with anyone else in preparation for this deposition?

A. No.

Q. Did you review any documents in preparation for this deposition?

A. Yes.

Q. Did any of those documents that you reviewed help refresh your recollection about past events?

A. No.

Q. Have you discussed this lawsuit with anybody other than your lawyers?

A. No.

Q. Mr. Gurney, have you been deposed before?

A. Yes.

Q. On how many occasions?

A. I don't recall.

Q. What kinds of actions were those in which you've been previously deposed?

A. What's that again?

Q. I said what kind of actions were they in which you were previously deposed?

GURNEY - CONFIDENTIAL

A. Criminal complaints.

Q. Brought against whom?

A. I'm sorry. What was the question?

Q. Against whom were those criminal complaints brought?

A. Different people.

Q. Were any of them brought against you?

A. No.

Q. And so in what capacity were you providing deposition testimony?

A. I was an investigator in law enforcement.

Q. Have you ever been involved in legal proceedings in which you were a party?

A. I don't recall.

Q. You don't recall whether or not you've ever been a party in a lawsuit before?

A. Not offhand, I don't recall.

Q. Have you ever been class representative before?

A. No.

Q. Have you ever participated otherwise in a class action lawsuit?

A. No.

Q. What's the highest level of education that you've obtained?

A. Bachelor's degree.

Q. From what school?

A. East Carolina University.

Q. In what year did you earn that degree?

A. '97.

Q. Thank you. Do you have any other educational credentials like licenses or certifications?

A. Yes, I have.

Q. And what kinds of licenses are those?

A. Sworn law enforcement officer PPSB license, state trainer, those are the ones that I can recollect.

Q. Did you say PPSB license?

A. That's correct.

Q. And what is that?

GURNEY - CONFIDENTIAL

A. Private Protective Services.

Q. So are these all law enforcement related types of certifications?

A. Law enforcement safety services, that's correct.

Q. Thank you. Do you have any education in finance or economics or accounting?

A. No.

Q. Okay. We're going to look at a document now. I'm not sure how you'll be able to access that.

Are you in a place where you can look at documents?

A. I am. I'm stopped currently.

MS. YOUNG: Megan, let's go ahead and mark tab 12. I think this will be Exhibit 113. If you can see if it's available now.

(Exhibit 113, resumé of Joseph Gurney, Bates P000001106 was received and marked on this date for identification.)

GURNEY - CONFIDENTIAL

Q. It should be available now. Do you see the document, Mr. Gurney?

A. I don't.

Q. Are you logged into Exhibit Share?

MR. KIM: I mean, I could screen share it maybe. Is my screen share working? Maybe I'll screen share.

MS. YOUNG: I think we can do that.

MR. KIM: Or you guys can screen share it.

MS. YOUNG: Yeah. One second.

MR. KIM: Mr. Gurney, they're going to screen share it and bring it up.

THE WITNESS: All right.

MS. YOUNG: Can you zoom in a little bit, Megan?

Q. Do you see the document, Mr. Gurney?

A. I do.

Q. Can you identify this?

GURNEY - CONFIDENTIAL

A. That's correct.

Q. What's correct?

A. You asked if I could identify this.

Q. Right.

A. And I said yes.

Q. So can you identify it? What is this document?

A. It's a resumé.

Q. And this is your resumé, right?

A. That's correct.

Q. And the document notes that from March 2022 to the present you've been employed by DSI Security Service in Savannah, Georgia. Is that still correct?

A. That's correct.

Q. And what is your job title in this role?

A. Client services management, essentially.

Q. Can you describe your role, your responsibilities?

GURNEY - CONFIDENTIAL

A. Yeah. I'm over safety contracts for a security company.

Q. What do you mean you're "over safety contracts"?

A. I'm over clients services for those contracts. Meaning, I meet with clients for contractual obligations.

Q. Got it. From 2021 until March of 2022 it looks like from your resumé that you were employed by HCA Healthcare as a public safety and security management for a hospital in Savannah?

A. That's correct. Yes.

Q. Describe those duties?

A. Management in a healthcare system over safety and security.

Q. So it sounds like a similar type of role but maybe a different industry; is that accurate?

A. No.

Q. Were your responsibilities meaningfully different from your current role?

A. Yes.

Q. Can you describe how?

A. Again, currently I do client services for contractual agreements. In that role I was facilitating safety and service for a hospital.

Q. Part of this document notes that from 2014 to 2021 you were employed as a Novant Health Public Safety Coordinator (armed); is that right?

A. That's correct.

Q. And looking at the resumé is the information under this bullet an accurate description of your duties in that role?

A. That's correct.

Q. And you left that position in 2021, right?

A. That's correct.

Q. Did you file a lawsuit against that former employer?

A. What is that?

Q. Did you file suit against Novant Health, your former employer?

A. I did.

Q. A few minutes ago I believe that you testified that you didn't recall whether or not you were a party to any -- you've ever been a party in any lawsuit, right?

A. I didn't recall the actual Complaint.

Q. I didn't ask you about the Complaint. I asked if you had ever been a party in a lawsuit before and you said that you did not recall, right?

A. I didn't at the time.

Q. But now you recall that you did bring suit against Novant, right?

A. That's correct.

Q. And when did you initiate that suit?

A. I can't recall.

Q. Was it before or after you worked there?

A. I don't recall. Like I said, I did not recall it until you just mentioned it.

Q. What kind of claims did you

GURNEY - CONFIDENTIAL

bring against Novant?

A. I don't recall.

Q. You don't recall anything about the claims that you brought against your former employer?

A. Not currently, not without reviewing information now, I don't.

MS. YOUNG: Okay. Let's go ahead and mark tab 10.

(Exhibit 114, Amended Complaint re: Joseph Gurney v. Novant Health, Inc. was received and marked on this date for identification.)

MS. YOUNG: This will be Exhibit 114.

Q. Mr. Gurney, is this the Amended Complaint you filed in the Gurney versus Novant Health, Inc. lawsuit?

A. I'm not sure. I can't see the document.

Q. You can't see the document?

A. I didn't see all of it.

Q. We can zoom in and scroll

through as much. You can feel free to read as much as you'd like. Please let us know if you us to keep moving down the document.

A. Okay. What's your question?

Q. Can you tell us what claims you filed against Novant?

A. Without sitting there reviewing it, I can't recall.

Q. I'm giving you the opportunity to review it, Mr. Gurney.

MR. KIM: What do you want him to do, read the Complaint? I mean --

THE WITNESS: I'm not --

MR. KIM: He's not a lawyer. Look, listen, he's not a lawyer. We're not sitting here playing, you know, memory, right? He says he doesn't recall.

So if you want him to sit here and read you the Complaint, he can do that but that's not going to be an efficient use of time when this

case has absolutely nothing to do with what we're here for today.

MS. YOUNG: I'm entitled to seven hours on the record with this witness and I will ask him the questions that I want to and if I want him to read the entire Complaint in his other case, we'll do that. But my thanks to the peanut gallery.

If you scroll down, Megan to the bottom of this.

Q. Mr. Gurney, can you tell me what date this is dated, this Amended Complaint?

A. Let me zoom in. The 9th day of September of 2022.

Q. Okay. So you filed this Amended Complaint against Novant last September, right?

A. Yes.

Q. Is that case still currently pending?

A. I haven't heard anything about

GURNEY - CONFIDENTIAL

the case recently. I cannot assume or speculate anything on the matter.

Q. But you don't know of any -- you don't know of this case being resolved, right?

A. I don't know anything further on the case.

Q. And you can't tell me why you brought suit against Novant?

MR. KIM: Objection to form.

A. The complaint is there. You can read it.

Q. No, I'm asking why you decided to bring suit against Novant. I'm not asking you to tell me anything about the Complaint.

MR. KIM: He's already answered the question.

Q. He can answer.

A. I don't recall all the details currently.

Q. You can't tell me why six months ago or back in September of 2022 you filed suit against your former

employer?

A. I can't recall.

MR. KIM: He's already answered he doesn't recall. Don't badger the witness. You're wasting a lot of time.

MS. YOUNG: You know the only person wasting time is you.

MR. KIM: He's not a lawyer, right?

MS. YOUNG: So he brought suit, he can answer this.

MR. KIM: So he doesn't recall. So you keep badgering him about -- he says he doesn't recall and you're like, well, I find it hard to believe you don't recall. I don't recall. So let's just move on.

Q. You can answer the question, Mr. Gurney. Can you tell me anything about your reasons for filing suit against your former employer?

A. I don't recall.

GURNEY - CONFIDENTIAL

Q. Do you recall why you brought suit in this action?

A. What's the question? What action?

Q. This action, In Re: January 2021 Short Squeeze Trading Litigation.

A. Yes.

Q. And why is that?

A. Market manipulation and the company Robinhood hit the stop button.

Q. But don't recall anything about why you filed suit against Novant?

A. I don't recall.

Q. Let's go back to your resumé for a moment. Actually, you were at Novant when you -- during COVID, right, when COVID started?

A. I don't recall.

Q. Let's go back to your resumé then. Do you see it looks like you worked at Novant from 2014 to 2021, right? Is that accurate?

A. Correct.

Q. Okay. So you were working at

GURNEY - CONFIDENTIAL

Novant when COVID, the COVID pandemic hit in March of 2020, right? Did you answer, Mr. Gurney?

A. What's that?

Q. I said you were working at Novant when the COVID pandemic hit in March of 2020, right?

A. Yes.

Q. Was there any disruption to your employment related to the pandemic?

A. I don't recall.

MR. KIM: Objection, vague.

Q. Do you recall whether or not your day-to-day responsibilities changed at all as a result of COVID?

A. I don't recall.

Q. And before Novant you were a sheriff deputy and an investigator, right?

A. That's correct.

Q. And that was -- you held that position from 2009 to 2014?

A. I don't recall specific dates.

Q. Does this resumé say you held

that position from 2009 to 2014?
A. That's correct.
Q. And this is accurate?
A. That's correct.
Q. Can you describe your duties in that role?
A. I was a sworn law enforcement official for the state.
Q. And before that you were a police sergeant from 2001 to 2009?
A. That's correct.
Q. Can you describe the responsibilities associated with that position?
A. I was a sworn law enforcement officer for the state.
Q. So how did that differ from your position as a sheriff deputy investigator?
A. They're different positions.
Q. Can you expand on that? How are they different?
MR. KIM: Objection, vague.
Q. You can answer, Mr. Gurney.

GURNEY - CONFIDENTIAL

A. What was your question again?

Q. How were those positions different, the police sergeant role and the sheriff deputy investigator role?

A. One I was a police sergeant and one I was a sheriff's deputy. They're not the same.

Q. Okay. Can you expand on why they're different, aside from the title?

A. They're different positions.

Q. Okay. So did you have different responsibilities?

A. What was that? I'm sorry.

Q. Did you have different responsibilities in those two roles?

A. Yes.

Q. How did those be responsibilities differ?

A. One, I was a sergeant, one I was a sheriff's deputy, they're different responsibilities.

Q. Right. But you're just telling me the position title. How did -- can you describe the responsibilities associated

GURNEY - CONFIDENTIAL

with those two roles?

A. I don't understand the question. I don't know what you're looking for.

Q. Okay. Let's talk about the police sergeant role. What were your main responsibilities as a police sergeant?

A. To enforce North Carolina law and carry out the roles and duties of a law enforcement official and as a leader in law enforcement.

Q. Okay. And then can you describe your responsibilities as a sheriff deputy and investigator?

A. To carry out the laws and duties, the law enforcement official but working for and under a sheriff in a county in the state and doing other duties required there within.

Q. So just sort of day-to-day, when you go to work, what kind of tasks would you perform?

A. Varies.

Q. Can you give me a couple of

examples?

A. For which?

Q. For both positions. So let's start with maybe the sheriff deputy investigator position.

A. Okay. I would investigate certain actions or complaints. As a police sergeant I would carry out daily duties as the title suggests.

Q. And what about the tasks that you performed day-to-day in the police sergeant role?

A. Oversee officers and officer duties.

Q. Mr. Gurney, are you on social media?

A. No.

Q. Not in any form? Like. Not any platforms?

A. Not that I can recall.

Q. Have you ever had any social media accounts?

A. I can't recall.

Q. Do you recall whether or not

GURNEY - CONFIDENTIAL

you've ever had a Reddit account?

A. I can't recall.

Q. Do you recall whether or not you've had a Twitter account?

A. I can't recall.

Q. Do you recall whether or not you've ever had a Facebook account?

A. I can't recall.

Q. Do you recall whether or not you've had an Instagram account?

A. I can't recall. I don't have anything currently.

Q. And you can't recall whether or not you've ever had any account?

A. I can't.

MS. YOUNG: Megan, let's go to tab 17.

(Exhibit 115, LinkedIn profile of Joseph Gurney was received and marked on this date for identification.)

Q. So this will be 115. Do you recognize this document, Mr. Gurney?

A. I don't recall.

Q. Is this a copy of your LinkedIn profile?

A. I don't recall. I don't have a LinkedIn currently.

Q. Is this a photo of you?

A. It appears so. I don't have a LinkedIn currently.

Q. Do you know if somebody else created a LinkedIn account for you?

A. I can't assume or speculate but I can tell you I don't have one.

Q. Are you representing, Mr. Gurney, that this is not publicly available right now, this profile?

MR. KIM: Objection, mischaracterizes testimony.

Q. You can answer.

A. What's that? What was your question?

Q. Do you recall ever closing your LinkedIn account?

MR. KIM: Objection to form.

A. I can't recall.

Q. Megan, if you scroll down a

little bit.

Mr. Gurney, is the work experience listed here consistent with your own work experience?

A. I don't recall.

Q. You don't recall whether or not you ever worked for Pender County Sheriff's Department?

A. Yes, I worked for the sheriff's office. That is not what was asked.

Q. I asked if this experience was consistent with your actual work experience.

MR. KIM: Objection to form.

Q. Do you recall working for NHRMC Police?

A. I do.

Q. And you do recall working for Pender County Sheriff's Department?

A. Yes, I do.

Q. So the experience listed here is consistent with your own work experience?

GURNEY - CONFIDENTIAL

MR. KIM: That's not -- objection to form. We just went over his resumé. Clearly the last time he worked at Pender was in '14, and this, the LinkedIn, hasn't been updated since. So clearly it's a stale page.

MS. YOUNG: Can we go to previously marked exhibit 2, I think it's tab 14?

(Exhibit 2, letter from Rosen Law Firm Certificate, also marked Exhibit 116, previously marked, is shown to the Deponent.)

THE WITNESS: Hold on for a second. I'm going to take about two minutes here and then I'll jump back on. I got to speak to somebody.

MS. YOUNG: Well, then I guess we need to go off the record.

MR. KIM: We can take a three minute break.

VIDEOGRAPHER: Okay. Going off

GURNEY - CONFIDENTIAL

the record. The time is 10:37 a.m.

(Recess is taken.)

VIDEOGRAPHER: We're back on the record. The time is 10:48 a.m.

MS. YOUNG: I think Megan will pull up the exhibit we were just about to take a look at, which was previously marked Exhibit 2.

Q. While she's pulling that up, Mr. Gurney, did your counsel reach out to you to ask what social media platforms you were on?

A. What was the question?

Q. Did your counsel ever reach out to you to ask if you were on any social media platforms?

A. I don't recall.

Q. I'm about to show you a letter dated February 27, 2023 that your counsel provided in this action.

A. Okay.

Q. And if we scroll down, do you see your name about halfway down the page?

GURNEY - CONFIDENTIAL

A. I do.

Q. And it states there are no social media accounts to report?

A. I see that.

Q. Is that information accurate?

A. Yes. I don't have any current social media accounts.

Q. And this letter does not list any sort of LinkedIn profile, right?

A. I don't have a LinkedIn. I haven't had a LinkedIn for a very long time.

Q. And this letter does not include a LinkedIn profile for you, right?

MR. KIM: The letter speaks for itself.

Q. You can answer.

A. What's that?

Q. The letter does not list a LinkedIn profile for you, right?

A. It does not but I did not recall a LinkedIn profile. Again, that was a long time ago.

GURNEY - CONFIDENTIAL

Q. Mr. Gurney, have you ever filed for bankruptcy?

A. I have.

Q. When was that?

A. I don't recall.

Q. Approximately, do you have a sense?

A. I don't.

Q. Can you describe the events that led up to your bankruptcy?

A. I don't recall.

Q. You don't recall anything that contributed to why you filed for bankruptcy?

A. I don't recall.

Q. As part of your bankruptcy did you have to -- did you have to receive any financial management training?

A. I don't recall.

MS. YOUNG: Let's look at tab 1, Megan. And this will be Exhibit 116 -- 117.

(Exhibit 117, Certificate from Abacus Credit Counseling Agency was

received and marked on this date
for identification.)

Q. Do you recognize this document, Mr. Gurney?

A. I see the document.

Q. And do you see where it says, "I certify that on January 18, 2015 Joseph Gurney received from Abacus Credit Counseling Agency approved pursuant to 11 U.S.C. Section 111 to provide credit counseling in the Eastern District of North Carolina." Do you see that?

A. I do.

Q. Does this refresh your recollection that you received any financial management training as part of your bankruptcy proceeding?

MR. KIM: Objection to form. It's a certificate of credit counseling. So --

Q. Mr. Gurney --

MR. KIM: -- it mischaracterizes the document.

Q. -- did you receive any

GURNEY - CONFIDENTIAL

financial management credit counseling in connection with your bankruptcy proceeding?

A. It appears that that certificate says that I did.

Q. But you don't recall anything about that training?

A. I don't recall.

Q. Did you complete a personal financial management training conducted by Sage Personal Finance in connection with your bankruptcy proceeding?

A. What was the question?

Q. Did you complete a personal financial management training that was presented by Sage Financial in connection with your bankruptcy proceeding?

A. That certificate says --

(Connection interruption.)

MS. YOUNG: I think that -- sorry, Mr. Gurney, is he still there?

VIDEOGRAPHER: He's going in and out. He's obviously in a bad

GURNEY - CONFIDENTIAL

reception area. Maybe we should go off the record momentarily.

A. I don't recall.

MR. KIM: He's back.

Q. Sorry. What don't you recall, Mr. Gurney?

MS. YOUNG: He's frozen on my end, at least.

VIDEOGRAPHER: It's a really bad reception area.

(Connection interruption.)

VIDEOGRAPHER: I suggest we go off the record.

MS. YOUNG: I think we have to.

VIDEOGRAPHER: Okay. Going off the record. The time is 10:54 a.m.

(Recess is taken.)

VIDEOGRAPHER: We're back on the record. The time is 11:46 a.m. This is the beginning of Media Unit 2.

Q. So we're going back on the record after taking a break after

GURNEY - CONFIDENTIAL

experiencing some bad connection on the witness' end.

Mr. Gurney, are you now in a location where you'll have stable internet connection?

A. I'm not sure. It's technology. I hope so.

Q. Mr. Gurney, your counsel represented to us that you would be free today on April 14th beginning at 10 a.m. to be deposed in this action, right?

A. Right.

Q. And I believe you testified earlier that you have many places you need to drive today, right?

A. But I'm free to facilitate this deposition, yes, and breaks are generally allowed or allocated under deposition, right?

Q. Of course. Of course. But did you -- but did you schedule actual work to conduct during the middle of this deposition --

A. I don't know what to tell you.

GURNEY - CONFIDENTIAL

What I'm articulating to you is I'm available. Now, you can surmise or deduct what you want from that.

I'm available to answer your questions as best as I can recollect. Right?

Q. Well, you haven't been available, Mr. Gurney. We've had to go off the record several times because --

MR. KIM: Look, he's available now.

MS. YOUNG: Let me finish, Phil.

MR. KIM: Look, you're not arguing with him about whether he's available or not. If you are going to sit here and argue with him about whether he's available or he's not, I'm not going to allow it.

Let's turn to the questions about what we're here for today, not about scheduling issues.

Q. Mr. Gurney, did you tell your

GURNEY - CONFIDENTIAL

counsel that you'd be working today during the deposition?

MR. KIM: Look, that's attorney-client privilege. I am going to direct the witness not to answer the question.

Q. Did you tell your client -- your counsel that you'd be in and out of internet connection today?

MR. KIM: Again, I'm going to direct him not to answer. How can you predict if the internet is going to work or not work. This is ridiculous.

Q. Did you tell your counsel that you would be taking this -- sitting for your deposition while driving?

MR. KIM: Look, I'm going to direct him not to answer these questions. You are asking for communications that he's had with us. So why don't we move on with the deposition. The connection is working fine now, so let's go.

GURNEY - CONFIDENTIAL

Q. You've been deposed before, Mr. Gurney, right?

A. Yes.

Q. Were you driving during those depositions?

MR. KIM: I think you cut out there. What was the question?

Q. Mr. Gurney, in your prior depositions were you driving while you were being deposed? I think he's frozen.

MR. KIM: Mr. Gurney, did you hear the question?

THE WITNESS: I did.

Q. Can you answer the question, Mr. Gurney?

MR. KIM: I don't think we got your answer.

A. Was I driving during each deposition that I've been deposed?

Q. In any other deposition that you've -- where you've been deposed, have you been driving during the deposition?

A. I don't want to assume or speculate. I can't recall.

MS. YOUNG: I don't think his connection is stable right now.

VIDEOGRAPHER: We're getting a bad reception indication from Zoom.

THE WITNESS: I can hear you fine.

MR. KIM: You want to repeat your answer? I think you hit a little bubble of bad connection.

VIDEOGRAPHER: We're still in that bubble. I'm getting a low bandwidth from the witness' Zoom.

THE WITNESS: I answered the question.

MR. KIM: Can you answer it again? There was a bad connection.

A. I don't recall. I don't want to assume or speculate.

MS. YOUNG: Okay. Megan, let's go ahead and mark tab 1, and this will be Exhibit 116.

(Exhibit 116, remarked, Abacus Certificate of Credit Counseling was received and marked on this

date for identification.)

MR. KIM: I think we already have a 116. Last one was 117.

MS. YOUNG: I think that was previously that's just on the file name. The sticker on it is Exhibit 2.

MR. KIM: 116, the file name is wrong. That's Exhibit 2. I gotcha.

MS. YOUNG: Right.

Q. Megan, will pull it up on screen share so you can see it, Mr. Gurney.

I think I asked you a little bit earlier do you recall completing a personal financial management training from Sage Personal Finance?

A. I don't recall.

Q. Okay. This is 118.

(Exhibit 118, Sage Personal Finance certificate was received and marked on this date for identification.)

GURNEY - CONFIDENTIAL

A. I recall you showing me the document.

Q. I think that was for a different training certificate. So this one is titled certificate of debtor education from Sage Personal Finance.

Do you see where it says, "I certify that on" -- sorry -- "I certify that on April 7th, 2015 Joseph Gurney completed a course on personal financial management given by sage personal finance and approved provider of debtor education in the Eastern District of North Carolina?" Do you see that?

A. I do.

Q. And does this refresh your recollection that you completed a course on personal financial management in 2015 in connection with your bankruptcy proceedings?

A. It does not. I don't recall it.

Q. Did the way that you managed your finances change in the aftermath of

GURNEY - CONFIDENTIAL

your bankruptcy?

MR. KIM: Objection, vague.

Q. You can answer, Mr. Gurney.

A. What's the question? Did the management of my finances change?

Q. Did the way that you managed your personal finances change in the aftermath of your bankruptcy?

MR. KIM: Same objection.

Q. You can answer.

A. I don't think so.

Q. Prior to your bankruptcy did you invest in the stock market?

A. I can't recall.

Q. Do you recall when about you started investing in the stock market?

A. I cannot.

Q. Do you recall how you started investing in the stock market, like, what platform you used?

A. I cannot.

Q. You're a Robinhood customer, correct?

A. I used Robinhood, yes.

GURNEY - CONFIDENTIAL

Q. Are you still a Robinhood customer?

A. No.

Q. Do you know when you closed your account?

A. I don't. I haven't had the app or used that platform in some time but I cannot assume or speculate when or how.

Q. When did you first hear about Robinhood?

A. I don't recall.

Q. When you were a Robinhood customer, how frequently would you trade on the app?

A. I don't recall.

Q. Did you often look at things on Robinhood, such as your actual portfolio or company information without actively trading?

A. I don't recall.

Q. Do you recall any features that you used on the Robinhood app?

A. I do not.

Q. Other than Robinhood, have you

ever used any other brokerages to invest in the stock market?

A. I can't recall.

Q. Have you ever invested on behalf of anyone else?

A. I can't recall.

Q. Have you ever hired an investment or financial advisor?

A. I can't recall.

Q. How much time do you devote to investing?

MR. KIM: Objection, vague.

A. Currently?

Q. Yes, currently.

A. How much time do I currently -- what's the question again? How much time do I what?

Q. Devote to investing.

A. I don't want to assume or speculate. Very little to none.

Q. And in the past have you spent -- dedicated more time to investing than you do now?

A. I don't want to assume or

GURNEY - CONFIDENTIAL

speculate on times.

Q. I definitely don't want you to assume or speculate, Mr. Gurney. But do you have any recollection of spending more time --

A. I don't.

Q. -- than you currently spend?

A. I don't.

Q. How would you describe your investment philosophy?

A. I buy stocks at the time that I like.

Q. Can you expand on that? How do you decide what stocks you like?

A. If I like them, I buy them. If it's somebody that I've used or asked that I like I'll buy the stock.

Q. And how do you determine whether or not you like the stock? What sorts of information do you rely upon?

A. What's that? What form of information do I rely on? I don't want to assume or speculate on that. I don't -- I pick a company that I like and I acquire

the stock.

Q. And what factors contribute to whether or not you like a stock?

A. I told you if I'm familiar or used that product or company or have used it in the past.

Q. So experience with the product or service that the company provides, that's how you determine whether or not you like a stock?

A. That's part of it, yes.

Q. What other factors contribute to whether or not you like a stock?

A. If I like what service they provide.

Q. Are there any other considerations --

A. No.

Q. -- that contribute to your decision?

Do you research the specific company online before making a -- before purchasing a stock?

A. I wouldn't say that I do.

Q. So you don't, for instance, read SEC filings from the company?

A. Not that I can recall.

Q. Do you consider things like earnings announcements?

A. No.

Q. Did you ever research the stock on social media?

A. No.

Q. Can you walk me through how you make a decision about when to sell a stock?

A. When I feel like I want to sell it.

Q. And what contributes to that decision? Besides -- when do you feel like you want to sell it?

MR. KIM: Objection, vague.

A. I don't want to assume or speculate why I choose to sell a stock. I can't tell you. I just choose to make a purchase or choose to sell when I feel like it.

Q. And you can't tell me or

GURNEY - CONFIDENTIAL

provide any color on why you feel like you want to sell a stock at a certain time?

A. No.

Q. Do you keep up-to-date on news about the stock market?

A. No.

Q. Are there any particular news segments or programs that you follow for investing?

A. No.

Q. Do you subscribe to any newsletters about investing?

A. No.

Q. Do you listen to any podcasts about the market or investing?

A. No.

Q. Do you watch any television show about the market or investing?

A. No.

Q. Do you follow any social media sources for advice about the market or investing?

A. No.

GURNEY - CONFIDENTIAL

Q. Do you consider yourself an experienced investor?

MR. KIM: Objection, vague.

Q. Mr. Gurney, you can answer.

A. What's that?

Q. Do you consider yourself an experienced investor?

MR. KIM: Same objection.

A. Have I invested? Yes.

Q. Do you consider yourself an experienced investor?

MR. KIM: Same objection.

A. I think that's perception. I don't know what each person's perception is. My perception is I invest on how I see fit. I don't assume or speculate my knowledge or expertise on that. That's what I can say.

Q. When you opened your Robinhood account you described yourself as having a high risk tolerance when you invest, right?

MR. KIM: Objection to form.

Q. You can answer, Mr. Gurney,

I'm not sure I heard you.

A. I can't recall.

Q. Let's take a look at a document.

Megan, will you pull up tab 11? And this will be Exhibit 119. And I believe it's on Exhibit Share now and Megan is going to screen share it.

(Exhibit 119, Account Master from Robinhood re: Joseph Gurney information, Bates RHMDL00097255 was received and marked on this date for identification.)

MR. KIM: I see it.

Q. So I put in front of you a document called an Account Master that Robinhood produced in connection with this action. That's your name at the top, right?

A. That's the name Joseph Gurney, yes.

Q. Is the email address that's listed here your email?

A. It appears so, yes.

Q. Now, if you look to the third page, do you see under Brokerage, "likelihood to withdraw" -- excuse me -- under Brokerage the risk tolerance where it says "higher"?

A. I do.

Q. Does this refresh your recollection that when you opened your Robinhood account you described yourself as having a high risk -- a higher risk tolerance?

A. I see what it says but I don't recall opening that account or anything that I did leading up to that account. I do not recall.

Q. Sitting --

A. I see what you're showing me, yes.

Q. Sitting here today, would you characterize your risk tolerance as being high when it comes to investing?

A. Currently?

Q. Yeah.

A. No.

GURNEY - CONFIDENTIAL

Q. And has that changed?

A. I'm not investing currently.

Q. Do you believe -- in the past would you consider your risk tolerance with respect to investing to have been higher than it is today?

A. I can't say with any certainty.

Q. What factors do you consider when you analyze the riskiness of a particular investment?

A. Again, I don't. I look at an item to acquire. If I like it I buy it.

Q. And by "item" do you mean any product or service that the company provides?

A. I mean the stock or investment at that time.

Q. And so you don't consider whether or not it's a high risk investment or not?

MR. KIM: Objection to form.

Q. You can answer.

A. I look at an investment. If I

like the investment I buy it.

Q. Are you familiar with a company called GameStop?

A. Yes.

Q. What kind of company is it?

A. It's -- it's a retail outlet.

Q. Have you ever done any research into GameStop as a potential investment?

A. I can't recall.

Q. Are you familiar with a company called AMC?

A. Yes.

Q. What kind of company is it?

A. Movie theatres, I believe.

Q. And have you done any research into AMC as a potential investment?

A. I can't recall.

Q. You can't recall ever researching AMC as a potential investment, right?

A. No. I bought the stock because I take my kids there and I enjoy the experience.

GURNEY - CONFIDENTIAL

Q. You don't know anything about the finances or profits of AMC?

A. Currently? No.

Q. Did you ever?

A. I can't recall.

Q. Have you ever looked at AMC's SEC filings?

A. I can't recall.

Q. Have you ever looked at AMC's earnings announcements?

A. I can't recall.

Q. Have you ever looked at AMC's press releases?

A. I can't recall.

Q. Have you ever looked at AMC's company financials?

A. I can't recall.

Q. In January 2021 do you recall any company announcements from AMC?

A. I can't recall.

Q. Do you recall any news about AMC in January 2021?

A. Excuse me. I can't recall.

Q. Are you aware of AMC doing

anything differently as a business in 2021?

A. I can't recall.

Q. Do you recall any news about new products or developments at AMC?

A. I can't recall.

Q. Did you hear any news that would impact the value of the company in January 2021?

A. I can't recall.

Q. Did you consume any media about AMC in January 2021?

A. I can't recall.

Q. So you can't recall, you know, hearing or reading anything about AMC in January 2021?

A. I can't recall.

Q. Did you hear about a potential short squeeze in AMC in January 2021?

A. I can't recall.

Q. Did you see any retail investors posting about AMC on social media in January 2021?

A. I can't recall.

GURNEY - CONFIDENTIAL

Q. Are you familiar with a company called Blackberry?
A. I am.
Q. What kind of company is it?
A. It's a retailer that does phones.
Q. What kind of phone do you have, Mr. Gurney?
MR. KIM: Right now?
A. Right now?
Q. A-hum.
A. What, personal phone? Work phones? House phones?
Q. Work phones.
A. What are you talking about?
Q. What phone are you using right now for this deposition?
A. What phone am I on currently, is your question?
Q. Right. Is it an iPhone?
A. It is.
Q. Do you have any other cellphones?
A. I do.

GURNEY - CONFIDENTIAL

Q. What kind of cellphones are those?

A. Umm, to be honest, I don't know all the phones that I have. I've got five or six phones.

Q. What are all those phones for?

A. My kids have phones. You mean that I pay for?

Q. I don't mean -- I mean phones that you use, not your kids use.

A. How many phones do I have? Currently I have two and they're iPhones.

Q. And in January of 2021 were you also using an iPhone?

A. I can't recall.

Q. Do you have a Blackberry?

A. Currently?

Q. Yes.

A. No.

Q. Have you ever had a Blackberry?

A. I can't recall.

Q. I think you testified earlier that the main factor that you consider in

GURNEY - CONFIDENTIAL

whether or not to invest in a company is whether or not you like its -- the products or services that it provides; is that right?

A. Right. Right. That's correct.

Q. Have you ever done any research into Blackberry as a potential investment?

A. I can't recall.

Q. Do you know anything about the finances or profits of Blackberry?

A. I can't recall.

Q. Have you ever looked at Blackberry's SEC filings?

A. I can't recall.

Q. In January 2021 do you recall any company announcements from Blackberry?

A. I can't recall.

Q. Can you describe any news that you heard about Blackberry in January 2021?

A. I can't recall.

Q. Are you aware of anything

GURNEY - CONFIDENTIAL

Blackberry was doing differently as a company in January 2021?

A. I can't recall.

Q. Are you aware of any new products or developments that Blackberry announced in January 2021?

A. I can't recall.

Q. Did you hear any news that would impact the value of the company in January 2021?

A. I can't recall.

Q. Did you hear about a potential short squeeze in Blackberry in January 2021?

A. I can't recall.

Q. Did you see any retail investors posting about Blackberry on social media in January 2021?

A. I can't recall.

Q. Do you recall hearing about any possible short squeezes in January 2021?

A. I can't recall.

Q. Have you heard the term meme

stock before, Mr. Gurney?

A. What's the question?

Q. Have you heard the term meme stock before?

A. I don't recall it.

Q. So to the best of your recollection, you've never heard the term meme stock before?

A. Not that I can recall.

Q. Do you know what a meme is?

A. I don't, not specifically.

Q. Have you ever visited Wallstreetbets on Reddit?

A. I can't recall.

Q. Have you ever gone on Reddit, Mr. Gurney?

A. I can't recall.

Q. You can't recall whether or not you've ever looked at Reddit before?

A. I can't. I can't recall.

Q. Do you know what Wallstreetbets is?

A. I can't recall. Is it -- what is it?

GURNEY - CONFIDENTIAL

Q. It's a sub-Reddit but I gather that if you've never been on Reddit or don't recall ever being on Reddit before then I assume you're not familiar with it?

A. I don't recall.

MS. YOUNG: Megan, let's do tab 9. And this will be 120.

(Exhibit 120, certification with attached Schedule A re: Joseph Gurney was received and marked on this date for identification.)

Q. Can you identify this document, Mr. Gurney?

A. Yes, a-hum.

Q. What is it?

A. Certification.

Q. This is the certification you signed authorizing the Rosen Law Firm to file this action on your behalf, right?

A. Correct.

Q. And the certification lists all of the purchases and sales that plaintiff has made in the affected

GURNEY - CONFIDENTIAL

securities for which plaintiff seeks redress pursuant to the claims set forth in the consolidated Complaint.

And Megan, if you can scroll down.

Does this accurately display your trading information at issue in this action?

MR. KIM: Objection, vague.

Q. You can answer, Mr. Gurney.

A. What's your question? These Blackberry purchases? Did I make them, is what your question is?

Q. I'm asking whether this accurately displays the trades that you are suing on in this action?

MR. KIM: Objection, vague.

A. Yes. A-hum.

Q. So you're only seeking redress for purchases of Blackberry?

MR. KIM: Objection.

A. No.

Q. Why no?

A. I'd like time to consult with

GURNEY - CONFIDENTIAL

my counsel.

Q. Well, you can't do that while a question is pending, Mr. Gurney.

A. I don't -- I can't recall currently. I'd have to look at all the documents. I don't -- I don't currently have all of those in front of me, so I can't speculate.

Q. You also traded AMC between January 28th, 2021 and February 4th, 2021, correct?

A. I can't recall.

Q. Did these purchases of Blackberry that are listed here begin on January 26th of 2021 -- January 27th, 2021, right?

A. That's what it says there.

Q. Did you previously ever trade Blackberry prior to this time?

A. Hang on for me for one second. Okay? Hang on.

(Pause in the proceedings.)

VIDEOGRAPHER: Did you want to go off the record, counsel, or just

GURNEY - CONFIDENTIAL

stay on for the moment?

MS. YOUNG: Let's just stay until he gets back.

VIDEOGRAPHER: Okay.

Q. Are you back?

A. I am back.

Q. Okay. Mr. Gurney, did you ever trade Blackberry prior to January 2021?

A. I can't recall.

Q. Did you ever trade AMC prior to January 2021?

A. I can't recall.

Q. Did you trade actively on your Robinhood account prior to January 2021?

A. I can't recall.

Q. Okay. Let's go ahead and look at 13. I can preview for you, Mr. Gurney, the document I'm about to show you includes your trading information from your Robinhood account from December 2020 through beginning the March 2021. It has your account number on it. If you want to verify that for yourself I can pull up an account statement but I will represent to

you that --

MR. KIM: We'll accept your representation that the account number is the same.

Q. This is a little bit confusing so I'll try to walk you through this. But you can see these transactions are recorded in Universal Time Coordinated UTC, if you look at maybe the fifth or sixth column at the top. And that's five hours ahead of Eastern Standard Time.

At this point in time were you in January 2021 you were living in Georgia, right?

A. What's that, in January of 2021?

Q. Of 2021.

A. January of 2021 I'm trying to think back here when I moved. I don't recall. I really don't.

Q. Where did you live before Georgia?

A. In North Carolina.

Q. Okay. So in either Georgia --

both Georgia and North Carolina are in the Eastern Time zone?

A. Right. Right.

Q. Okay. Thank you.

Let's look to the purchases of AMC. If you look at the very first row, do you see where it's a January 26th, 2021 trade where you purchased 20 shares of AMC for $5 a share and that was at 3:23 UTC, which is 11 p.m. Eastern?

A. I see the document, yes.

Q. Was this the first time you ever bought AMC?

A. I don't recall.

Q. Why did you decide to buy AMC at this time?

A. I liked the stock.

Q. And why did you like the stock?

A. As I said numerous times to you --

Q. A-hum.

A. -- I like the company.

Q. Why didn't you purchase shares

of AMC prior to January 26th?

MR. KIM: Objection, vague.

A. I have no idea.

Q. So you can't talk us through your thinking about why you decided to buy AMC at this time aside from the fact that you liked the stock?

A. No, I did. I liked the stock. I bought it.

Q. Was there anything in particular that prompted this trade?

A. Not that I can recall.

Q. So you don't recall learning anything new about the company, for instance?

MR. KIM: Objection, asked and answered.

A. I don't recall.

Q. Did you consider this a long-term investment in AMC?

A. I buy a stock that I like and I sell it when I like.

Q. How often do you usually hold onto stocks that you acquire?

GURNEY - CONFIDENTIAL

MR. KIM: Objection, vague.

A. Various.

Q. So typically do you hold stocks for hours? Days? Weeks? Months? Years?

A. It varies, different.

Q. What determines, you know, whether or not you hold onto a stock for a long period of time or a shorter period of time?

A. If I like a stock and I want to buy it at that time, I buy it. If I choose at that time to sell it, I choose to sell it.

Q. Had you heard anything about a possible short squeeze in AMC stock around this time?

MR. KIM: Objection, asked and answered.

Q. You can answer, Mr. Gurney.

A. I don't recall.

Q. Later in that day, you know, you can see that you placed and then cancel a number of other AMC orders. So,

GURNEY - CONFIDENTIAL

for instance, in the third row at 22:43 UTC you place an order and then you cancel it. You can see the cancellation and the order cancelled at UTC column.

Do you see those cancellations?

A. I see the document, yes.

Q. Do you often cancel orders after placing -- do you often cancel purchase orders you place for certain stocks?

MR. KIM: Objection, vague.

A. I buy a stock when I want to buy it and I sell it when I think that I want to sell it.

Q. Do you recall ever cancelling purchase orders for stocks?

A. I don't recall.

Q. Do you recall why you cancelled any of these orders of AMC stock?

A. I don't recall.

Q. Do you recall the price of AMC rising at the end of January 2021?

A. I don't recall.

Q. On January 27th at 18:03 UTC, which I think is 2 p.m. Eastern, you purchase 1.2 shares of AMC for $15.73. It's about two-thirds of the way down the page. Do you see that?

A. Yes, I see the document.

Q. So AMC had gone up in price by about $10 a share from your purchase the day before on the 26th when you purchased AMC for about $5.19 a share, right?

A. I don't recall.

Q. Well, do you see -- do you see the price differential here?

A. I do. I do, yes.

Q. Okay. So that was roughly a three times increase in the price that you purchased the shares of AMC for on January 26th, right?

A. I see what the document says, yes.

Q. Do you consider that a significant price increase?

MR. KIM: Objection, vague.

Q. You can answer it.

A. What's the question? Do I consider that significant?

Q. Do you consider --

A. No.

Q. So what would you consider a significant increase in the price of the share?

A. I don't -- the terminology is vague.

Q. Do you have any understanding why the share price of AMC increased so significantly between January 26 and January 27, 2021?

MR. KIM: Objection.

A. I don't know.

Q. Did you think that the price of AMC's shares was justified by the underlying fundamentals of the company?

MR. KIM: Objection, calls for speculation.

Q. You can answer.

A. I can't -- I can't recall.

Q. Why did you decide to purchase

GURNEY - CONFIDENTIAL

more shares of AMC on January 27th?

A. I don't recall.

Q. Did you think that the price of AMC was going to increase further after this point in time on January 27th, 2021?

A. I don't recall.

Q. Let's look at the trades of Blackberry. So three rows from the bottom at 15:25 you purchased 2.14 shares of Blackberry for $22.41 a share. Do you see that?

A. I do see the sheet, yes.

Q. Is this the first time you ever bought Blackberry?

A. I don't recall.

Q. Why did you decide to buy Blackberry at this time?

MR. KIM: Objection, asked and answered.

A. I don't recall.

Q. Is there anything in particular that prompted you to make this trade in Blackberry?

GURNEY - CONFIDENTIAL

A. I don't recall.

Q. Did you hear any company announcements at this time in January 2021 related to Blackberry?

A. I don't recall.

Q. If you scroll, I guess it's at the top of the next page, in the second row it looks like 45 minutes after this, your first Blackberry trade, you purchase another 2.25 shares of Blackberry at $23.31 a share -- or 23.12 a share.

A. Where are you? I'm having trouble following along.

Q. 2.25.

A. Order quantity, I see that.

Q. Do you see that, for $23.31 a share?

A. I see the sheet, yes.

Q. So why did you decide to buy more shares of Blackberry at this time?

A. I don't recall.

Q. Did you learn any new information about Blackberry that made you believe that the company was

undervalued?

A. I don't recall.

Q. And roughly two hours after that, at 18:04 you purchase 4.41 at $28.27 cents a share?

A. I see the sheet.

MR. KIM: Those are the order prices. I think the execution prices -- I don't know the difference between the two, so I don't -- is there a difference?

MS. YOUNG: I think that the order price is what he paid.

MR. KIM: And what's execution price?

MS. YOUNG: Let's just say -- let's just say, you know, purchases between 22 and 23 dollars per share.

MR. KIM: Oh, I see that's the delta that Robinhood makes, probably, right?

MS. YOUNG: Right.

MR. KIM: I gotcha.

GURNEY - CONFIDENTIAL

Q. So the share price was continuing to increase since you made purchases of Blackberry earlier in the day, right?

A. I don't recall.

Q. Well, just looking at the actual prices of these trades, right, so, you know, you've got order prices for 22.41 and then you've got -- they're increasing throughout the day when you're purchasing more shares later at $23 per share, right?

A. I see the sheet.

Q. But is there any reason you bought more shares of Blackberry at this point in time specifically?

A. I don't recall.

Q. Now, at 18:57 you buy I think it's 7.4 more shares of Blackberry for about $28 a share, right?

A. I see the sheet.

Q. Do you have any recollection of why you made this trade at this time?

A. I don't recall.

Q. And two minutes after that at 18:59 you buy 24 shares at $28.22 a share. Do you see that? This is three rows from the bottom.

A. I see the sheet.

Q. Do you know why you placed this trade?

A. I don't recall.

Q. Do you often trade the same security multiple times during the -- during a single day?

MR. KIM: Objection, vague.

A. I buy a stock when I choose to buy it and I sell it when I want to sell it.

Q. Do you ever trade the same security multiple times during the same day?

A. I don't recall.

Q. But will you acknowledge that you did so on this day, on January 27th, 2021, you traded -- you made multiple trades in Blackberry on the same day?

A. I see the paper and what it

GURNEY - CONFIDENTIAL

says, yes.

Q. And nobody else was trading in your Robinhood account at that time, right?

A. No.

Q. You were placing these trades, right?

A. Yes.

Q. And you continued to buy the stock throughout the day, right?

A. What's that?

Q. You continued to buy Blackberry throughout the day?

A. What does it say there?

Q. I'm not sure I understand your question.

A. Well, you said I continued to buy throughout the day.

Q. You continued to buy throughout the day on January 27th, 2021, right?

A. That's what the sheet says, yes.

Q. Is that because you thought

GURNEY - CONFIDENTIAL

that the price of Blackberry would increase?

A. I don't recall.

Q. Why didn't you just execute a single order for Blackberry, like, one trade?

A. I don't recall.

Q. Other than the stocks that we've discussed, AMC and Blackberry, did you consider trading any other stocks around this time?

A. I don't recall.

Q. Mr. Gurney, you're aware that Robinhood implemented certain purchases restrictions on its platform on January 28, 2021, right?

A. I don't recall.

Q. I think earlier today you testified that you brought suit against Robinhood because Robinhood suspended I think you referred to it as the buy button, right?

A. Right.

Q. But you don't recall whether

GURNEY - CONFIDENTIAL

or not Robinhood implemented certain purchase restrictions around this time?

A. I don't know what restrictions they implemented. I know that I could not complete actions at that time, yes.

Q. Okay. So you're aware that Robinhood implemented those restrictions on its platform on January 28th, right?

A. I don't know what they implemented. I don't want to assume or speculate. I know that I could not complete those transactions and those obvious restrictions were in place that I could not facilitate that action.

Q. What actions were you trying to take?

A. I was trying to buy and sell stocks.

Q. Buy what? What stocks were you trying to buy?

A. I can't recall specifics.

Q. But your testimony is today that you tried to place orders on Robinhood's platform on January 28th and

you were unable to place those orders?

MR. KIM: That's not what he said. But objection to form.

Q. What were you unable to sell on Robinhood?

A. Robinhood hit the stop button on those transactions. I can't recall what each transaction was.

Q. What do you mean by "the stop button"?

A. Market manipulation.

Q. Can you explain again what actions you were trying to take on Robinhood's platform that you were unable to?

A. I can't recall each specific transaction.

Q. Were there orders that you wanted to place to purchase certain shares that you were unable to purchase on Robinhood's platform?

A. Yes.

Q. What stocks?

A. I can't recall.

GURNEY - CONFIDENTIAL

Q. And when were you unable to do this?

A. I can't recall.

Q. And did you testify you were also unable to sell certain securities on Robinhood's platform around this time?

A. I would have to -- to go back and look and see. I can't recall each transaction or those transactions that I was -- each one of that time period.

Q. So for the stop button that you described, how did you become aware of that?

A. Umm, I became aware of it, umm, a few days later from, umm, or sometime later from a friend.

Q. I thought you testified that you wanted to purchase certain shares and were unable to do that at the time?

A. Right.

Q. So were you not aware of issues or with a restriction on Robinhood's platform at that time?

A. I was but I didn't know why.

GURNEY - CONFIDENTIAL

Q. So what is it that you heard from a friend later?

A. That there was market manipulation, that they hit the stop button.

Q. But you were previously aware that they had hit the stop button, as you described it, right?

A. I was aware that I was unable to complete those transactions, that's correct.

Q. Right. So when you tried to trade, you didn't see the purchase button? You weren't able to complete that trade, right?

A. Right. I was not able to trade that stock, yes.

Q. So what is it you're -- more precisely that your friend told you a few days after about those restrictions?

A. That's what he said.

Q. And what was that again?

A. That it was market manipulation and they hit the stop

button.

Q. Who is this friend?

A. What's that?

Q. Who is the friend that you were speaking with about this?

A. His name was David. I don't recall his last name.

Q. Do you recall reviewing any information on the Robinhood app regarding the restrictions?

A. I don't recall.

Q. Do you recall --

A. Hang on for me for one second. Give me about two minutes.

MR. KIM: Maybe we take five minutes.

MS. YOUNG: Yeah. Can we actually do ten?

MR. KIM: Ten? All right.

VIDEOGRAPHER: All right. Going off the record. The time is 12:43 p.m. This is the end of Media Unit 2.

(Recess is taken.)

GURNEY - CONFIDENTIAL

VIDEOGRAPHER: We're back on the record. The time is 1:01 p.m. This is the beginning of Media Unit 3.

Q. Mr. Gurney, right before the break we were talking about issues or an issue you had trying to trade on Robinhood's app in January 2021, right?

A. Right.

Q. I know you don't recall the stocks you were trying to trade but can you just explain to me what issue you had trying to trade on Robinhood's app in January 2021?

A. It would not allow me to trade.

Q. Were there orders that you wanted to place to sell certain shares that you were unable to sell on Robinhood's platform?

A. The attempts that I made at that time were not allowed. They were restricted in scope.

Q. And were the attempts that you

were trying to make, were those to purchase or sell shares?

A. I can't recall -- what's that?

Q. I said, and were those attempts that you were trying to make, were those to purchase or sell shares?

A. I can't recall the specifics.

MS. YOUNG: Megan, let's look at previously marked Exhibit 6. We're going to pull up a document for you, Mr. Gurney.

(Exhibit 6, Robinhood document entitled Keeping Customers Informed Through Market Volatility, Bates RHMDL0002200, having been previously marked, is shown to the Deponent.)

Q. I think it should be available in Exhibit Share but we'll also screen share it.

Mr. Gurney, does this look familiar to you?

A. No, it doesn't.

Q. So now, if we go to the text,

GURNEY - CONFIDENTIAL

Megan, if you can scroll a little bit, do you see there's this paragraph, this is the second paragraph about "restricting transactions for certain securities to position closing only including AMC, Blackberry", and a couple of other stocks? Do you see that?

A. I do see the paper.

Q. And did you understand -- do you understand position closing only to refer to the buy button that I think you mentioned earlier?

A. What's your question?

Q. The issues that you were having with the buy button, does that refer -- is it your understanding that refers to the position closing only change that was made at this time on January 28th, 2021?

A. I don't know about the verbiage or, excuse me, the vernacular that you're using. I can say that I was unable to complete transactions. I see this paperwork in front of me. I don't

GURNEY - CONFIDENTIAL

recall it. I do not recall it.

Q. And you don't recall what securities you were trying to trade that you weren't able to at this time, right?

MR. KIM: Objection to form.

Q. Do you recall what securities you were trying to trade that you weren't able to trade at that time, Mr. Gurney?

A. Yes. Blackberry and AMC were the transactions I believe that I was unable to facilitate.

Q. But you don't recall whether or not you were trying to buy or sell shares of Blackberry or AMC at this time?

A. Yes, I was -- I can't recall in detail what those specifics of the transactions were, but I knew that I was trying to make attempts to trade the stock and was not allowed to trade the stock.

Q. Around this time do you recall hearing anything about the reason that Robinhood implemented any restrictions?

A. I do not recall.

MS. YOUNG: Let's go back to the pdf Excel that we were just looking at earlier with your trades. Megan, can pull it up. What exhibit number is that? 121? So we'll pull that back up.

(Exhibit 121, pdf spreadsheet of trades by Joseph Gurney, Bates RHMDL00097432.001 was received and marked on this date for identification.)

Q. And now, we'll look at your trades from January 28th and let's look first at Blackberry. So if we look at the second page, two rows up from the bottom, here we can see that you placed an order to sell 41.01 shares of Blackberry for $17 on January 28th, right?

A. I see the paper, yes.

Q. Why did you decide to sell these shares of Blackberry at this time?

A. I buy stock when I want to buy and I sell it when I want to sell it.

Q. So what influenced your

decision to sell Blackberry at this time on January 28th?

A. I just wanted to sell the stock.

Q. Why did you want to sell the stock?

A. I don't recall.

Q. Did you read any news about the company around this time?

A. I don't recall.

Q. Did you discuss your decision to sell with anybody?

A. I don't recall.

Q. Do you recall learning or hearing about anything indicating the stock price may decline?

A. I don't recall.

Q. You don't recall why you decided to sell your shares of Blackberry just one day after you bought them?

A. I don't --

MR. KIM: Objection, asked and answered.

A. I don't -- I don't recall.

GURNEY - CONFIDENTIAL

MS. YOUNG: Let's look the your trades of AMC on January 28th.

Megan, if you can scroll to the first page.

Q. You can see that on January 28th you sold 21.27 shares of AMC for $8.01 a share. Do you see that? Do you see that, Mr. Gurney?

A. I see the sheet, yes.

Q. Now, in the time associated with it is 15:31 UTC on January 28. And if we look back at the Blackberry sale that we just looked at, that's the exact time that you sold your shares of Blackberry too, right?

A. I see the sheet.

Q. Why did you sell your shares of AMC and Blackberry at the same time?

A. I don't recall.

Q. Did you consider your AMC and Blackberry investments related?

A. I don't recall.

Q. Do you recall making the sale of AMC?

MR. KIM: Objection, vague.

Q. You can answer, Mr. Gurney.

A. What's that?

Q. Do you recall making this AMC trade on January 28th?

A. I don't recall.

Q. So you don't recall any, you know, what motivated you to sell AMC on January 28th?

A. I don't recall.

Q. You don't recall learning anything about AMC indicating that the stock price may decline?

A. I don't recall.

Q. If you look back up to the top row your first purchase of 20 shares of AMC on January 26 was for $5.19 a share and you sold on January 28th for more than $8 a share, right?

A. I see the sheet.

Q. So you made a profit selling AMC at this time, right?

MR. KIM: Objection to form.

Q. Mr. Gurney?

GURNEY - CONFIDENTIAL

A. What's that?

Q. So you made a profit selling AMC at this time, right?

MR. KIM: Same objection.

MS. YOUNG: Is he frozen?

MR. KIM: I think so.

VIDEOGRAPHER: Yes, we have a connection issue again.

A. It would appear so.

MR. KIM: I think he said it appears so.

MS. YOUNG: Can I just ask it again so we have it?

Q. So you made a profit trading AMC at this time, right, in January 2021?

A. I see the sheet. It appears so.

Q. Thank you. Megan, let's pull up tab 8. I think this will be Exhibit 122.

(Exhibit 122, Robinhood account statement from January 1st, 2021 to January 31st, 2021, Bates RHMDL00093680 was received and

GURNEY - CONFIDENTIAL

marked on this date for identification.)

Q. It should be available on Exhibit Share now and we'll pull it up. I can represent to you, Mr. Gurney, that this is a copy of a Robinhood account statement from January 1st, 2021 to January 31st, 2021.

I think you can see your name and that was probably your address in North Carolina up at the top. Do you see that?

A. I do see the sheet.

Q. Thank you. If we go to the section titled Portfolio Summary, so this chart indicates at the end of January 2021 a little over 30% of your portfolio was in AMC stocks and that 63% of your portfolio was Blackberry stock, right?

A. I see the sheet, yes.

Q. I think you testified today that you don't currently have any investments in the stock market; is that right?

A. Not that I'm aware of.

Q. You don't currently own any shares, any stocks?

MR. KIM: Objection, asked and answered.

A. No, I don't.

Q. When did you stop investing in the stock market?

A. I don't recall.

Q. Is it correct that in January 2021 you didn't buy or sell any shares of Bed Bath & Beyond?

A. I don't recall.

Q. Do you recall buying or selling any shares of Nokia in January 2021?

A. I don't recall.

Q. Did you buy or sell any shares of Express in January 2021?

A. I don't recall.

Q. Did you buy or sell any shares of KOF (ph)?

A. I don't recall.

Q. In January 2021, did you buy

GURNEY - CONFIDENTIAL

or sell any shares of GameStop?

A. I don't recall.

Q. In January, 2021 did you buy or sell any shares of Travago?

A. I don't recall.

Q. And in that same period January 2021 did you buy or sell any shares of Tootsie Roll?

A. I don't recall.

Q. Did you consider buying any of these -- buying shares of any of those stocks in January 2021?

A. I don't recall.

Q. And to confirm, you don't hold any of these stocks today, right?

A. Not to my knowledge.

Q. Mr. Gurney, what is your role in this lawsuit?

A. I'm a plaintiff in a class action lawsuit.

Q. And what does it mean to be a named plaintiff?

A. A plaintiff in the case.

Q. Do you know what a class

GURNEY - CONFIDENTIAL

representative is?

A. Yes.

Q. What's your understanding of what a class representative is?

A. That you're in a group in an action that is being taken and you're part of that.

Q. Are you seeking to be a class representative in this action?

A. That's correct.

Q. And what do you understand your responsibilities to be in this role?

A. To look out for the best interests of all people involved.

Q. How did you first hear about this lawsuit?

A. How did -- what's the question? I'm sorry.

Q. How did you first hear about this lawsuit?

A. I contacted the -- my attorneys that are here, the legal team that currently represents me.

Q. When did you become aware of

the Rosen firm?

A. I don't recall.

Q. Why did you reach out to them about this action?

A. I don't recall.

Q. Why do you want to be a named plaintiff?

A. Why do I want to be a named plaintiff?

Q. A-hum.

A. Because there was market manipulation and Robinhood did not allow me to complete trade transactions.

Q. You've mentioned market manipulation a couple of times.

What does market manipulation mean to you?

A. Exactly that.

Q. Can you expand on that, Mr. Gurney?

A. It means there were attempts to manipulate the market nefariously.

Q. Who was manipulating the market?

GURNEY - CONFIDENTIAL

A. What's that?

Q. Who was manipulating the market?

A. The defendant.

Q. Mr. Gurney, a few moments ago we looked at your trades of AMC and Blackberry on January 28th, right?

A. I believe so.

Q. And you were able to sell shares of AMC and Blackberry on January 28th, 2021, right?

A. I believe that's correct.

Q. And were you forced to sell those shares?

MR. KIM: Objection, vague.

A. What's that? Am I forced? Define "forced" first.

Q. Did Robinhood require you to sell those shares?

MR. KIM: Same objection.

A. Did Robinhood require me to sell shares of a stock, is what your question is? Is that your question?

Q. To sell your shares of AMC or

Blackberry that you sold on January 28th, 2021.

A. I'm just making sure I hear the question.

Q. Right.

MR. KIM: Same objection.

A. No, they did not require me to.

Q. Because you decided to sell because you wanted to sell at that time, right, on January 28th, 2021?

A. I buy stock --

MR. KIM: Objection asked and answered.

A. I buy a stock when I want to buy a stock and I sell it when I want to sell it.

Q. And you wanted to sell your shares of AMC and Blackberry on January 28th, 2021, right?

MR. KIM: Same objection.

Q. You can answer, Mr. Gurney.

MR. KIM: Same objection.

A. Yeah. I wanted to complete

GURNEY - CONFIDENTIAL

transactions.

Q. And you were able to. You were able to sell your shares of Blackberry and AMC on January 28th, 2021; isn't that right?

MR. KIM: Objection, asked and answered.

Q. You can answer, Mr. Gurney.

A. Was I able to sell at that time those stated stocks as the sheet shows that was presented, is what your question is? I'm just trying to be specific. Is that what you're asking?

Q. Is it --

A. On the date and time that you say you stated, for the record, did -- was I able to execute a sale of that -- those stocks on the date that the sales were issued? Is that your questions?

Q. Yes. My question is, were you able to sell your shares of AMC and Blackberry on January 28th, 2021?

A. Yes.

Q. And you decided to sell those

GURNEY - CONFIDENTIAL

shares because you wanted to?

MR. KIM: How many times are we going to go over this?

Q. Right?

MR. KIM: How many times -- I mean this is ridiculous.

Q. You can answer, Mr. Gurney.

MR. KIM: You're asking him the same question.

A. What is the question again? Yes. What was the question? What is the question?

Q. You wanted to sell your shares of Blackberry and AMC on January 28th, 2021, right?

MR. KIM: Objection, asked and answered.

A. Yes.

Q. And you sold those shares at that time because you felt like it, right?

MR. KIM: No, he looked into a crystal ball. Like,come on. You ask him the same question over and

over again.

Q. You can answer, Mr. Gurney.

A. Yes.

Q. And you profited on your AMC trades, right?

MR. KIM: Objection, asked and answered.

A. I saw the paper. It appears so, at that time.

Q. Excluding your deposition today, how much time have you spent on things related to this lawsuit?

A. I don't want to assume or speculate on specifics.

Q. It doesn't need to be a specific answer, even just an approximate sense of how much time you dedicated to this action, aside from preparing for your deposition?

A. I'd say a substantial amount.

Q. A substantial amount, is that what you said?

A. Yes.

Q. So have you read the Complaint

or other filings?

A. I've read the Complaint.

Q. Have you read any of the other filings in this case?

A. I have.

Q. Have you reviewed other documents related to the case in this action?

A. Hang on one second. What's the question? Sorry. I'm looking for something.

Go ahead. What was your question? I've reviewed documents on this case, yes.

Q. How frequently have you had meetings or phone calls with counsel?

A. I've met with counsel.

Q. How frequently have you met with counsel or spoken with counsel in this action?

A. I've spoken with counsel during this process, yes.

Q. How frequently have you spoken with counsel in this action?

GURNEY - CONFIDENTIAL

A. I don't want to assume or speculate how frequent. It's been a long time. It's been a long increment of time, right? I don't want to make an assumption.

Q. Would you say that you speak with counsel on this action on a weekly basis? A monthly basis?

A. I've spoken to them frequently, I'd say.

Q. I think you testified that you've dedicated a substantial amount of time to this action, right?

A. Right. Right.

Q. What is most of that time -- what have you been doing for most of that time?

A. Explain, what's your -- what do you mean?

Q. You said that you dedicated a substantial amount of time to this action.

A. Right.

Q. What has taken so much time?

GURNEY - CONFIDENTIAL

A. Reviewing documents, speaking to counsel, looking at the Complaint, a substantial amount of time.

Q. Do you know, do you understand what the class is in this lawsuit?

A. Explain.

Q. This is a class action, right?

A. Right.

Q. So who makes up the class in this case?

A. The plaintiffs in the case.

Q. Right. So who are the plaintiffs in this case?

(Connection interruption.)

A. That would be -- what's that?

MR. KIM: I think you got to start your answer again. You kind of cut out there.

A. Okay. What was the question? I'm a plaintiff in the case, yes. There are other plaintiffs in the case that are listed in the Complaint that you have a copy of.

Q. What is your understanding of

GURNEY - CONFIDENTIAL

Robinhood's business?

A. Explain. What's your question? What do you mean? What? I'm confused about the question. Clarify.

Q. Is there a latency issue?

A. What's that?

Q. I think there's a latency issue? Is your internet stable right now?

A. It is. My internet is stable.

MR. KIM: It looks good here.

Q. What do you understand Robinhood's business to be? What is their app? What service do they offer?

A. It's a trade platform.

Q. And what are you alleging that Robinhood did wrong?

A. It hit the stop button. I've said that.

Q. And why is that wrong?

A. Because it's -- it doesn't allow me to trade freely of those specific actions.

Q. And why is that unlawful?

GURNEY - CONFIDENTIAL

A. Because it's -- it is. It's illegal. You can't do it.

Q. Are you alleging that Robinhood's trading restrictions caused you to lose money on Blackberry, on your Blackberry shares?

MR. KIM: Objection, calls for a legal conclusion.

A. I buy a stock when I want to buy a stock, I sell it when I want to sell it. It did not allow me, as you know, right, to facilitate those needs, okay? It was market manipulation and that's...

Q. So what trade were you unable to make?

MR. KIM: Objection, asked and answered.

A. I've stated that.

Q. You can answer.

A. I have.

Q. Okay. What trades were you unable to make? What trade were you unable to make?

MR. KIM: Same objection.

A. I was unable to make those actions and trades on that -- on that period of time.

Q. Just to clarify, Mr. Gurney, are you saying that you wanted to purchase shares of AMC or Blackberry around that time and you were unable to do so?

MR. KIM: Objection to form. Asked and answered. Go ahead.

A. I was not allowed to facilitate trades on the Robinhood platform. They put restrictions on the platform. That's correct, yes.

Q. Do you recall anything more specific about what you wanted to do on the platform that you couldn't do?

MR. KIM: Objection, asked and answered.

A. Complete trades, transactions. I just stated that for the record.

Q. So did you want to purchase shares of AMC or Blackberry on January

28th?

MR. KIM: Objection, asked and answered.

A. I wanted to complete transactions. I was not allowed to complete transactions, yes.

Q. To confirm my understanding, were the transactions that you wanted to complete purchases of shares of AMC or Blackberry?

A. I wanted to complete transactions. I was not allowed to complete transactions. Those transactions could be buy or sell of those stocks or trades were not allowed.

Q. But we just --

A. I've explained that and articulated that clearly.

Q. Mr. Gurney, you were able to sell your shares of Blackberry and AMC on January 28th, right?

MR. KIM: Objection, asked and answered.

A. I've answered that.

Q. And what was your answer?

MR. KIM: I mean, how many times do we have to go over this?

A. This is --

Q. You can answer, Mr. Gurney.

A. I know I can. Yes.

Q. Okay. So are you also claiming that in addition to selling those shares on January 28th, you also wanted to purchase shares of Blackberry and AMC on January 28th?

A. I'm saying that I attempted transactions, okay, and you have that information there. I attempted transactions. I was not allowed to complete transactions because Robinhood hit the stop button.

Q. And those transactions that you wanted to complete were purchases of those stocks, right?

A. I was not allowed to complete transactions on the Robinhood app that I was attempting to complete.

Q. The friend David that you

GURNEY - CONFIDENTIAL

mentioned earlier, Mr. Gurney, I think that you said you didn't recall his surname. How did you know David?

A. He worked out at the gym that I was working out at at the time.

Q. Okay. How long did you know him?

A. I can't recall.

Q. Can you just tell me again what it is that he told you --

MR. KIM: Objection, asked and answered.

Q. -- around this time related to the --

MR. KIM: Objection.

Q. -- period we've been asking?

MR. KIM: Objection to the form of the question.

Q. Let me just ask a better question.

Can you tell me again --

A. What's that?

Q. -- about this conversation with David and--

GURNEY - CONFIDENTIAL

MR. KIM: Objection, asked and answered.

A. Market -- somebody has a -- somebody has a dog in the background. I just want to say that for the record.

MR. KIM: Not me. Do you hear barking?

A. Does somebody got a canine available?

(Reporter clarification.)

THE WITNESS: Okay.

Q. I'm sorry.

Can you tell me what you recall about this conversation with David concerning Robinhood?

MR. KIM: Objection, asked and answered.

Q. You can answer.

A. It was market manipulation and that Robinhood hit the stop button.

Q. I'm not sure I caught that last bit.

(Connection interruption.)

A. -- for the record.

GURNEY - CONFIDENTIAL

Q. I think your --

MR. KIM: You cut out for a second, Joe. Can you just repeat the answer yet again?

A. The market manipulation and that Robinhood hit the stop button. I've stated that previous for the record again.

Q. Is it your position that there are no other events that could have caused the stock price of Blackberry to decline on January 28, 2021?

A. I don't recall.

Q. I think you said this earlier but you don't still use Robinhood; is that right?

A. I don't use the platform. I don't trade any stocks currently.

Q. Did you trade stocks prior to January 2021?

MR. KIM: Objection.

A. I don't recall.

Q. Mr. Gurney, are you aware that a request for the production of documents

was served on you through your counsel?

THE REPORTER: He might be frozen.

MS. YOUNG: Yeah.

VIDEOGRAPHER: Would you like to go off the record?

MS. YOUNG: Maybe we need -- should we take a break now?

MR. KIM: I mean maybe, like, five minutes? How much more do you think you have?

MS. YOUNG: Not a ton, but if we keep having these issues then it will take longer, obviously.

I think we hear him. Joe, can you hear us?

THE WITNESS: Yes.

MR. KIM: Your video is not moving.

MS. YOUNG: Let's just take ten.

THE WITNESS: Yeah, I can hear you fine. I'm hearing everything.

MR. KIM: Here you go. We're

back.

Q. Mr. Gurney, are you aware that a request for the production of documents was served on you, that a request for the production of documents was served on you through your counsel?

A. Yes.

Q. Have you seen those document requests?

A. I have those documents.

Q. When were you first informed of those requests?

A. I don't recall.

Q. Do you understand that you had obligations related to those requests?

A. I don't -- I don't recall.

Q. Did you preserve documents that relate to the events that you are alleging in this lawsuit?

A. I presented my documents to my attorneys.

Q. And did you take steps to preserve documents?

A. I acquired the documents and

GURNEY - CONFIDENTIAL

sent them to my attorney.

Q. Have you discarded any documents that relate to Blackberry?

A. No.

Q. Or AMC?

A. No.

Q. Or Robinhood?

A. No.

Q. So upon learning about these document requests, where did you search for potentially responsive documents?

A. The documents I had already.

Q. What documents? What documents are you referring to?

A. Is that a question for me or someone else?

Q. I think you said --

A. There is a lot of people talking and I don't know who's talking to who.

Q. I'm talking to you.

A. Okay.

Q. I asked where you searched for potentially responsive documents.

GURNEY - CONFIDENTIAL

A. I don't recall.

Q. Did you have a personal computer?

A. Do I have a personal computer? Yes.

Q. Did you check any electronic files for it on that computer?

A. I don't recall.

Q. You don't recall whether or not you searched your computer for potentially responsive documents?

A. I -- I don't recall if I searched my personal computer for documents related to this case. I don't recall.

Q. Did you search any of your email accounts for emails to be responsive to these requests?

A. I don't recall.

Q. Do you have any hardcopy files that might have responsive information?

A. I don't recall.

Q. Have you communicated with anybody regarding, aside from your

counsel, regarding your investments in Blackberry or AMC?

A. Have I talked to anybody about investing in AMC or Blackberry or anything else? Have I spoken to anyone about it?

Q. Yes. Have you communicated with anybody regarding your investments in Blackberry or AMC?

A. I don't recall.

Q. I think you said earlier that you have an iPhone, right?

A. I do.

Q. Did you search your text messages for any that might be relevant to this case?

A. I don't recall.

Q. You don't recall whether or not you searched your phone for responsive material?

A. I don't recall, no.

Q. Did you provide any documents to your counsel in connection with those discovery requests?

GURNEY - CONFIDENTIAL

A. I did present documents to my legal counsel.

Q. And what documents were those?

A. I don't recall.

Q. Do you recall providing any documents aside from the resumé that we looked over earlier today?

A. I don't recall.

MS. YOUNG: Let's take a break.

MR. KIM: How long, like five, ten minutes?

MS. YOUNG: Let's do 15 minutes.

MR. KIM: 15?

MS. YOUNG: A-hum.

VIDEOGRAPHER: All right. Going off the record. The time is 1:44 p.m. This is the end of Media Unit 3.

(Recess is taken.)

VIDEOGRAPHER: We're back on the record. The time is 2:04 p.m. This is the beginning of Media Unit

4.

Q. Mr. Gurney, you're walking around right now, right?

A. I'm stagnant at the moment. I just stopped.

Q. Okay. Mr. Gurney, who is the group of plaintiffs that you are seeking to represent in this lawsuit?

A. They're listed in the Complaint. You should have a copy.

Q. Aside from the people that are specifically named in the Complaint, what -- who are -- who is the class of people you are trying to represent?

A. The group of individuals in the Complaint.

Q. Sorry. Just to confirm, are you saying that you are just trying to represent the individuals that are specifically named in the Complaint?

A. I'm sorry. What did you say?

Q. I said to clarify, are you saying that you are just trying to represent the individuals that are

GURNEY - CONFIDENTIAL

specifically named in the Complaint?

A. I'm trying to represent the individuals brought in this class action suit.

Q. Right. So can you describe the actual class?

A. You have the information of the Complaint in front of you with the individuals there. I'm not -- you know, I had it in front of me earlier. You know, I don't have it in front of me currently, each specific.

Q. Right. I'm just asking you to describe more generally the group of people that you are trying to represent, not their specific names.

A. Okay. The individuals in that group, right? So there is a list of names under the class action, the certification.

Q. Right. But who is the group? What are those -- what do those individuals have in common?

A. A Complaint.

GURNEY - CONFIDENTIAL

Q. So is it your understanding that the group is just the individual names listed in the Amended Complaint?

A. I don't want to assume or speculate on those specifics. I mean, you can speak to the attorney on those matters. He can articulate those things further.

Again, I don't have the paperwork in front of me currently. I did earlier, but I don't currently.

Q. I don't think you need to have the document in front of you.

A. Okay.

Q. I'm asking you to just to describe the class of people that you are trying to represent in this litigation. I don't think --

A. Humans.

Q. -- I don't think you need paperwork for that.

A. Human beings.

Q. Just any humans? That's the class of people you are trying to

GURNEY - CONFIDENTIAL

represent?

A. No. You said describe them. I gave a description. They're human beings that have a Complaint. You are aware of the Complaint and I'm sure you've reviewed it in detail.

Q. Okay.

A. I answered the question.

Q. So you are seeking to represent a class of humans that have a Complaint?

A. I'm seeking to represent the people listed in the Complaint there in the documents presented.

Q. And you can't describe anything that those plaintiffs all have in common?

MR. KIM: Objection, asked and answered.

A. They're humans.

MR. KIM: He already said what they have in common is the Complaint. So, you know, how many times do we have to go over this?

A. Humans with the Complaint. I've said that I believe three times if the record could show.

Q. Okay. Noted.

And you sold your shares of AMC and Blackberry after being unable to trade on Robinhood's platform on January 28th, right?

MR. KIM: Objection to form.

Q. Mr. Gurney, can you answer the question?

A. What was it again?

Q. Sure. You sold your shares of AMC and Blackberry after being unable to trade on Robinhood's platform on January 28th, right?

A. That's correct.

Q. Mr. Gurney, have you had any criminal charges brought against you?

A. Ever or currently?

Q. Ever.

A. Umm, yes.

Q. What kind of charges were brought against you?

GURNEY - CONFIDENTIAL

A. I had an assault charge brought against me as a 16-year-old, I believe, I don't -- I don't want to say for certain, okay, so I don't want to say for speculation, as a young adult an assault charge brought before me at that time. I want to say it was, I don't know, early '90s.

Q. Got it. And how were those charges resolved?

A. I don't recall. It was almost 30 years ago. I don't know. It was a long time ago.

Q. And what were the underlying circumstances that led to the assault charge?

A. I was in a fray. What I can recall -- I don't recall. I don't want to speak when speculation. I don't recall.

Q. Was there a physical altercation with someone?

A. I don't recall the specifics of it. Like I said, it was, you know, over two decades ago or longer.

Q. You don't recall anything about the events that led to that charge?

A. I don't. I don't.

Q. And you're aware that the testimony you are giving today is under oath, right?

A. I do.

Q. And everything that you've said today is truthful and accurate, right?

A. Yes.

Q. And every time that you've said that you don't recall something, that's your truthful testimony, you know, given under penalty of perjury, right?

A. Correct.

Q. And you don't recall seeing anything in the news or on social media regarding any of these stocks that we've discussed today, right?

A. I don't -- I don't recall.

Q. And you don't recall ever having a Blackberry device, right?

A. I don't recall.

Hello. Are you there?

Q. Sorry. I'm just looking over my notes.

A. Okay.

Q. Do you follow the news more generally, Mr. Gurney?

MR. KIM: Objection, vague.

A. Do I follow the news? Not regularly, no.

Q. You don't watch any news channels regularly?

A. No.

Q. And was that true in January 2021?

A. I don't recall.

MS. YOUNG: Okay. I think we're done.

MR. KIM: All right. I would just like to note for the record we're going to designate the transcript Confidential per the Protective Order.

VIDEOGRAPHER: Okay. We are off the record at 2:13 p.m. and

GURNEY - CONFIDENTIAL

this concludes today's testimony given by Joseph Gurney. The total number of media used was four and will be retained by Veritext.

(The proceedings were adjourned at 2:13 p.m.)