# Exhibit 17



Page 1

1

2    UNITED STATES DISTRICT COURT

     SOUTHERN DISTRICT OF NEW YORK

3    No. 12-cv-08557 (CM)

4    ----------------------------------------X

5    IN RE:   HI-CRUSH PARTNERS L.P.

6            SECURITIES LITIGATION

7    ----------------------------------------X

8

9

10                      April 24, 2014

11                      10:09 a.m.

12

13

14        Deposition of DR. ADAM WERNER,

15   held at the offices of Vinson & Elkins,

16   666 Fifth Avenue, New York, New York,

17   pursuant to Notice and Agreement, before

18   Wendy D. Boskind, a Registered

19   Professional Reporter and Notary Public

20   of the State of New York.

21

22

23                                              EXHIBIT
                                                  283
24

25

Page 2

```
 1
 2 A P P E A R A N C E S:
 3
 4 KIRBY McINERNEY LLP
 5 Attorneys for Plaintiffs
 6    825 Third Avenue
 7    New York, New York 10022
 8 BY: MARK A. STRAUSS, ESQ.
 9    (212) 371-6600
10    mstrauss@kmllp.com
11
12
13 VINSON & ELKINS LLP
14 Attorneys for Defendants
15    666 Fifth Avenue
16    26th Floor
17    New York, New York 10103-0040
18 BY: STEVEN R. PARADISE, ESQ.
19       -and-
20    ELIZABETH C. BRANDON, ESQ.
21    (212) 237-0016
22    (214) 220-7929
23    sparadise@velaw.com
24    ebrandon@velaw.com
25
```

Page 3

```
 1
 2 A P P E A R A N C E S: (Cont'd)
 3
 4 ALSO PRESENT:
 5       MICHAEL A. KEABLE,
 6       Executive Vice President
 7       Compass Lexecon
 8       332 South Michigan Avenue
 9       Chicago, Illinois 60604
10       (312) 322-0200
11       mkeable@compasslexecon.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1
 2 DR. ADAM WERNER,
 3    business address at 2550 Ninth
 4    Street, Suite 210 A, Berkeley,
 5    California 94710, having been first
 6    duly sworn by a notary public of the
 7    State of New York, (Wendy D. Boskind,
 8    RPR), was examined and testified as
 9    follows:
10
11 EXAMINATION
12 BY MR. PARADISE:
13    Q.  Good morning, Dr. Werner.
14    A.  Good morning.
15    Q.  We just introduced ourselves,
16 but I'll do it on the record. I'm Steven
17 Paradise, along with my colleague,
18 Elizabeth Brandon, we represent the
19 Defendants in this securities litigation
20 lawsuit.
21       It appears that you've
22 testified by deposition previously; am I
23 right?
24    A.  That is correct.
25    Q.  I won't spend a lot of time
```

Page 5

```
 1          Dr. Adam Werner
 2 going over any ground rules, just a
 3 couple.
 4    A.  Okay.
 5    Q.  One, I tend to sometimes
 6 speak quickly. So if I speak too
 7 quickly, or you don't understand anything
 8 I say, or you don't understand my
 9 question, please let me know and I'll do
10 my best to rephrase it so that you
11 understand it.
12    A.  Okay.
13    Q.  Second one is, you have to
14 answer questions with yes, no, or, beyond
15 that, you can't just nod your head.
16    A.  (Nodding.)
17    Q.  The court reporter can't take
18 down nods of the head.
19    A.  Right.
20    Q.  Please try to remember that.
21       Third one is, please try to
22 wait until I finish my questions and --
23 before you answer. I will try to wait to
24 ask another question before you finish
25 your answer. If I don't do that, and I
```

2 (Pages 2 - 5)

Page 6

1        Dr. Adam Werner
2   accidentally cut you off, please let me
3   know. I want to get a complete answer
4   from you and not cut you off.
5        A.   Okay.
6        Q.   Last is, if you need a break,
7   just let me know. The only thing I ask
8   is that, if there's a question pending,
9   you complete your answer to the question
10  before we take a break.
11       A.   Sure.
12       Q.   Thank you.
13            MR. PARADISE: Let's mark, as
14       Exhibit 1, a copy of your
15       declaration.
16            (Whereupon Deposition Exhibit
17       1, Declaration of Dr. Adam Werner
18       April 15, 2014, was marked for
19       identification, as of this date.)
20       Q.   The court reporter has handed
21  you what's been marked as Exhibit 1. I
22  ask you to please take a look at Exhibit
23  1 and, when you're ready, to identify it
24  for the record, if you can.
25       A.   (Pause.)

Page 7

1        Dr. Adam Werner
2        Yeah, I believe it's the
3   report I submitted in this case.
4        Q.   I want to start by just going
5   through -- briefly going through your
6   employment history and background, which
7   I believe is set forth in your Curriculum
8   Vitae, Exhibit 1.
9        So if you can turn to --
10  unfortunately, we don't have exhibit tabs
11  in there, but can you find Exhibit 1?
12       A.   Yeah.
13       Q.   Okay. Am I right that Gnarus
14  Advisors is your current — is where you
15  are currently employed?
16       A.   I believe that's correct.
17       Q.   I'm sorry, you say you
18  "believe that's" --
19       A.   Well, I mean, I'm not a -- I
20  don't get a W-2, so....
21       Q.   You're working in some
22  capacity for Gnarus Advisors.
23       A.   Correct.
24       Q.   Am I also correct that Gnarus
25  Advisors acquired your -- a firm that you

Page 8

1        Dr. Adam Werner
2   previously owned, called Berkeley
3   Economic Consulting?
4        A.   Uh -- that's accurate.
5        Q.   Is there some reason why
6   you're hesitating?
7        A.   Again, I wasn't paid any
8   money --
9        Q.   Okay.
10       A.   -- in the acquisition. I
11  just was subsumed by them.
12       Q.   Why did -- withdrawn.
13       What were the circumstances
14  behind Gnarus acquiring Berkeley?
15       A.   I just wanted to go with a
16  larger firm -- (gesturing) -- and -- you
17  know.
18       Q.   How large -- I'm sorry.
19       A.   They take care of things like
20  accounting and bookkeeping.
21       I don't have to do that
22  anymore.
23       Q.   And, when you were with
24  Berkeley, were you the sole owuer of
25  Berkeley?

Page 9

1        Dr. Adam Werner
2        A.   Yes.
3        Q.   How many employees did
4   Berkeley have?
5        A.   Define "employees"?
6        Q.   Well, how many people worked
7   for Berkeley?
8        A.   Worked in some capacity?
9        Q.   Yes.
10       A.   Between four and five.
11       Q.   And how many people work at
12  Gnarus?
13       A.   I think probably 40, 45?
14       Q.   Other than reporting to an
15  employer with a different -- or, a
16  company with a different name, have your
17  responsibilities changed at all from
18  Berkeley to what you're doing now, at
19  Gnarus?
20            MR. STRAUSS: Objection.
21            Go ahead.
22       A.   I don't believe so.
23       Q.   Going back to your time
24  before Berkeley -- well, first, when did
25  you form Berkeley?

3 (Pages 6 - 9)

Page 10

1    Dr. Adam Werner
2    A.   You know, I don't know the
3 exact year Berkeley Economics was formed.
4 It was formed by two other gentlemen who
5 subsequently went to the Brattle Group,
6 so I took over the firm.
7    Q.   So when did you join
8 Berkeley?
9    A.   My memory's not that good --
10 hold on -- I want to say 2008.
11    Q.   There's a list on page 4 of
12 your CV that's next to the heading:
13 Previous employment.
14      Do you see that?
15    A.   Right.
16    Q.   Is that -- are those listed
17 chronologically in reverse order from the
18 dates that you worked with these various
19 companies?
20    A.   That is correct.
21    Q.   Okay. So let's start with
22 the beginning. After you left the
23 Kellogg Graduate School of Management,
24 you joined Cornerstone Research; is that
25 correct?

Page 11

1    Dr. Adam Werner
2    A.   That is correct.
3    Q.   In what capacity did you join
4 Cornerstone?
5    A.   I don't remember my title, it
6 was probably associate.
7    Q.   What were your job functions
8 at that time?
9    A.   Prepare expert reports -- I
10 mean, basically litigation consulting
11 stuff.
12      Basically, I did mostly
13 securities work, and there were a bunch
14 of Windstar cases, which are these
15 lawsuits against the federal government
16 by savings and loans -- or were -- I
17 think, actually, they're still going on,
18 so I worked on those, as well.
19    Q.   Were you -- is it fair to
20 describe your role at Cornerstone as more
21 of a support role, as opposed to the
22 person who's actually providing the
23 testimony?
24    A.   I don't believe I ever
25 testified at Cornerstone.

Page 12

1    Dr. Adam Werner
2    Q.   When did you -- and I
3 understand your memory on dates, it
4 sounds like, is not terrific, so
5 approximations are fine, but
6 approximately when did you leave
7 Cornerstone?
8    A.   I believe 2000.
9    Q.   And did you then join NERA,
10 at that time?
11    A.   That is correct.
12    Q.   Did you have a different --
13 withdrawn.
14      Were your responsibilities,
15 at NERA, different than what your
16 responsibilities had been at Cornerstone?
17    A.   I don't believe so.
18      I did some additional work in
19 intellectual property, which I didn't do
20 at Cornerstone, I was strictly in the
21 finance practice at Cornerstone.
22    Q.   Why did you leave
23 Cornerstone?
24    A.   Money.
25    Q.   So you had a better financial

Page 13

1    Dr. Adam Werner
2 deal at NERA than you had gotten at
3 Cornerstone?
4    A.   Yeah.
5      I had actually originally
6 gone to Cornerstone, and taken less
7 money, and NERA kept offering me more
8 money. So, eventually, I took them up on
9 their offer.
10    Q.   How long did you remain at
11 NERA?
12    A.   I believe three years.
13    Q.   So that brings us to 2007,
14 or --
15    A.   2003?
16    Q.   Oh, wait, I'm sorry, I'm
17 sorry.
18      You left Cornerstone in 2000
19 and joined NERA, okay.
20      How long did you work for
21 NERA?
22    A.   I believe I said three years.
23    Q.   So -- okay, sorry, getting
24 lost here on chronologic -- got it. So
25 you left NERA in 2003 to join CRA

4 (Pages 10 - 13)

Page 14

1          Dr. Adam Werner
2 International?
3      A.  No.
4      Q.  What did you do --
5      A.  I --
6      Q.  I'm sorry, go ahead.
7      A.  I took a year off to bartend
8 and sell wine.
9      Q.  And then you joined CRA?
10     A.  That is correct.
11     Q.  Why did you leave NERA to
12 bartend and sell wine?
13         Although, I think I can
14 imagine the answer to that.
15     A.  Is NERA on -- is NERA
16 supporting you in this case?
17     Q.  No.
18     A.  I did not like people at
19 NERA.
20     Q.  Fair enough.
21         Were you asked to leave NERA?
22     A.  No.
23     Q.  Were you working at NERA and
24 at Cornerstone on the West Coast?
25     A.  Yes.

Page 15

1          Dr. Adam Werner
2      Q.  So, in the San Francisco
3 area?
4      A.  Right.
5          Actually, I did some work for
6 NERA in New York, as well, I maybe spent
7 six months here.
8      Q.  So you took a year off to
9 bartend and to sell wine, and then you
10 decided to go back into the business of
11 economics consulting, and you joined CRA
12 International in -- I guess my --
13 hopefully, my math's better now -- is
14 that around 2005?
15     A.  2004.
16     Q.  Okay, so I guess my math's
17 not better yet.
18         And what were your job
19 responsibilities, at CRA International?
20     A.  Same as my job
21 responsibilities at NERA and
22 Cornerstone -- prepare expert reports,
23 support other experts, testify -- things
24 of that nature.
25     Q.  How long did you work for CRA

Page 16

1          Dr. Adam Werner
2 International?
3      A.  Between four and five years.
4      Q.  So that brings us to around
5 2008, 2009; correct?
6      A.  Correct.
7      Q.  Okay. And what did you do
8 then.
9      A.  So, when I was at CRA, they
10 moved me down to Los Angeles, because
11 that's where their finance practice was
12 based out of, and on the West Coast. I
13 then moved back to the Bay area.
14         So that's when I went to
15 LitiNomics. And that was a group of
16 former CRA people who had started another
17 firm.
18     Q.  So the reason was -- the
19 reason why you decided to leave CRA is
20 because you wanted to return to the Bay
21 area?
22     A.  Correct.
23     Q.  How long did you work with
24 LitiNomics?
25     A.  I believe about a year.

Page 17

1          Dr. Adam Werner
2      Q.  Did you want to change that?
3      A.  No.
4          I was going to say that I
5 wasn't an employee of LitiNomics.
6      Q.  You were working as a --
7      A.  As a --
8      Q.  -- 1099?
9      A.  Exactly.
10     Q.  As a consultant?
11         Why did you stop working as a
12 consultant for LitiNomics, after about a
13 year?
14     A.  Travel.
15     Q.  Well, can you --
16     A.  They were --
17     Q.  -- elaborate?
18     A.  They were located in Menlo
19 Park -- or, actually, it was Mountaiu
20 View. And, so, the commute was an hour
21 each way every day, so....
22     Q.  It wasn't working out for
23 you?
24     A.  I didn't enjoy it.
25     Q.  Okay.

5 (Pages 14 - 17)

Page 18

1          Dr. Adam Werner
2      A.   Driving, two hours a day.
3      Q.   So, after you left
4   LitiNomics, you joined Berkeley Economic
5   Consulting, you had mentioned earlier
6   that, at the time, it had been started by
7   two other gentlemen?
8      A.   Correct.
9      Q.   So you went there as a --
10  what type of capacity did you go there?
11     A.   Same, 1099.
12     Q.   So this is -- I'm being awful
13  today with my years, but this is around
14  2009, 2010?
15     A.   Correct.
16     Q.   When you -- when Berkeley was
17  subsumed by Gnarus, did the other
18  employees of Berkeley go along with you,
19  to join Gnarus?
20     A.   Define "employees".
21     Q.   Well, the other people that
22  worked with you at Berkeley.
23     A.   I believe that is correct.
24     Q.   So Berkeley ceases to exist
25  today?

Page 19

1          Dr. Adam Werner
2      A.   I believe that is correct.
3      Q.   Okay. And you left each of
4   these positions that we've been
5   discussing of your own volition; is that
6   correct?
7      A.   That is correct.
8      Q.   Okay. I'm going to ask you a
9   general question, if it's too general let
10  me know and I'll be more specific, but
11  during the time you worked at these other
12  firms, before you -- sorry -- before you
13  joined Berkeley, were you working
14  primarily on behalf of plaintiffs,
15  primarily on behalf of defendants, or
16  both?
17         MR. STRAUSS: Objection.
18         Go ahead.
19     A.   Of both.
20     Q.   Did that continue to be the
21  case when you joined Berkeley, that you
22  worked for both plaintiffs and defendants
23  in securities litigation matters?
24     A.   In securities litigation
25  matters, I believe that's correct.

Page 20

1          Dr. Adam Werner
2      Q.   And how about today, how
3   about since you've joined Gnarus, have
4   you continued to rep-- to work on behalf
5   of both plaintiffs and defendants in
6   securities litigation matters?
7      A.   I'm not sure I've done any
8   defendant work at Gnarus.
9      Q.   Is there any reason for that?
10         I mean on your side of the
11  equation --
12     A.   No.
13     Q.   -- or is it that this is
14  where the work has been coming from, the
15  plaintiffs' side?
16     A.   That is correct.
17     Q.   So it's not that you have an
18  aversion to representing defendants.
19     A.   No, not at all.
20         In fact, you're welcome to
21  hire me on your cases.
22     Q.   I'll keep that in mind, thank
23  you.
24         Turning back, for a moment,
25  to Exhibit 1 to your -- Exhibit 1 to

Page 21

1          Dr. Adam Werner
2   Exhibit 1, your declaration. You have an
3   extensive list of the matters that you've
4   been retained in, beginning on page 1,
5   continuing through I guess page 6 --
6   approximately, page 6.
7         Have your -- has your
8   testimony, or any declaration that you've
9   submitted in any of these cases, ever
10  been excluded by a court?
11     A.   No.
12     Q.   You list on page 1, under the
13  heading: Expert reports and testimony, a
14  series of cases, and on page 3 you have a
15  heading called: Experience.
16         Can you explain the
17  difference between the matters that are
18  listed under: Expert reports and
19  testimony and the matters that are listed
20  under: Experience?
21     A.   Well, I mean, the things that
22  I've done expert testimony and reports
23  in, and I think that's self-explanatory.
24         And, in the other cases, I
25  didn't submit reports on my behalf.

6 (Pages 18 - 21)

Page 22

```
 1                Dr. Adam Werner
 2     Q.    These are cases where you
 3   either supported someone, another expert
 4   who was submitting a report or testimony,
 5   or you never were asked to submit a
 6   report or testimony; is that fair to say?
 7     A.    I think that's correct.
 8     Q.    Is there any additional --
 9   are there any additional matters on which
10   you've been engaged as an expert that are
11   not listed in your CV, that you can think
12   of as you sit here today?
13     A.    I'm sure there are but, as I
14   sit here today, I can't think of any.
15     Q.    Today, you know, this time,
16   where you're working at Gnarus,
17   approximately how much of your work is
18   involved in the securities litigation
19   matters?
20     A.    Define "securities litigation
21   matters"?
22     Q.    Any lawsuits that are --
23   arise under the federal securities laws.
24     A.    Probably, 90 percent.
25     Q.    And I know you testified
```

Page 23

```
 1                Dr. Adam Werner
 2   earlier that, at Gnarus, you have been
 3   working, to the best of your knowledge,
 4   you said, exclusively for plaintiffs.
 5          Before joining Gnarus --
 6     A.    I --
 7     Q.    -- in securities
 8   litigation -- in securities litigation
 9   matters, I thought that's what you
10   testified to.
11     A.    I believe in securities
12   litigation matters, that is correct.
13     Q.    Right. And, just for the --
14   make it simpler, when I'm asking you
15   these questions, when I don't specify,
16   I'm asking for your work in securities
17   litigation matters.
18     A.    Okay.
19     Q.    Prior to joining Gnarus, can
20   you give me an estimation as to the
21   percentage of work you had done for
22   plaintiffs, as opposed to defendants?
23   Just --
24     A.    In my entire history?
25     Q.    Yes.
```

Page 24

```
 1                Dr. Adam Werner
 2     A.    I mean, I'd be speculating.
 3     Q.    You can speculate.
 4          I mean, I understand you're
 5   estimating, and I'm not -- you know, I'm
 6   not holding you to an exact number.
 7     A.    Okay.
 8     Q.    I just want to get a sense.
 9     A.    Okay, I would guess 50/50.
10     Q.    And I'm not sure if I asked
11   you before, but did you work for both
12   plaintiffs and defendants at Berkeley?
13     A.    I believe that is correct.
14          But, again, you're specifying
15   in securities litigation?
16     Q.    I am, thank you.
17     A.    I believe that is correct.
18     Q.    What opinion were you asked
19   to provide in this case, this litigation,
20   Hi-Crush litigation?
21     A.    I think, if you turn to my
22   report -- (pause) -- I don't know if
23   that's paragraph 2: My opinions address
24   the following matter: whether the market
25   for Hi-Crush's common units was efficient
```

Page 25

```
 1                Dr. Adam Werner
 2   during the class period.
 3          MR. PARADISE: And, just for
 4     the record, the witness is
 5     referring to I guess paragraph 2 of
 6     Exhibit 1, his declaration.
 7     Q.    It says "opinions", plural.
 8   Is that a typo? Because that appears to
 9   me to be just one subject matter of your
10   opinion.
11     A.    (Pause.)
12          I believe that is correct.
13     Q.    Have you been -- were you
14   asked to provide any other opinion that
15   you were not able to provide?
16     A.    No.
17     Q.    And is it fair to say that
18   this Exhibit 1, your declaration,
19   contains your opinion and the support for
20   your opinion?
21     A.    I believe that is correct.
22     Q.    So, as you just answered, the
23   opinion you've been asked to express in
24   this case is whether the market for
25   Hi-Crush's common units were efficient --
```

7 (Pages 22 - 25)

Page 26

1 Dr. Adam Werner
2 or, was efficient, during the class
3 period; is that -- that's correct?
4 A. I believe that is correct.
5 Q. Have you previously been
6 retained to testify on the issue of
7 whether or not the market for a publicly-
8 traded security was efficient?
9 A. Yes.
10 Q. Can we just take a quick look
11 at Exhibit 1 and, just, if you could
12 identify, for the record, which of these
13 cases involved that -- you know, that
14 opinion, and it could have been more than
15 just that opinion, but at least the
16 opinion as to whether or not the market
17 was efficient for the subject security.
18     MR. STRAUSS: You mean
19 Exhibit 1 to Exhibit 1?
20     MR. PARADISE: Exactly.
21 A. Okay.
22     MR. STRAUSS: I just want to
23 be clear.
24     MR. PARADISE: No. Thank
25 you.

Page 27

1 Dr. Adam Werner
2 A. Okay. (Pause.)
3     The Ebix case; Eric Poole and
4 William Rhody versus Alange Energy Corp.;
5 the Orient Paper case; the China Expert
6 case; the China Agritech case --
7 Q. I'm sorry, could you just
8 hold on one second? Oh, I'm sorry.
9     Orient Paper, you said, China
10 Expert --
11     MR. PARADISE: Do you want to
12 see a copy of this, so you can see
13 the names?
14     THE COURT REPORTER: I'll
15 have the exhibit, I'll work with
16 that. Thank you so much.
17 Q. Sorry. So China Agritech.
18 A. The National Australia Bank
19 case, I don't know if I -- I did not
20 submit a report in that matter -- or, no,
21 I did -- I don't recall.
22 Q. I'm sorry, where is the
23 National Australia Bank case?
24 A. Pathway Investments.
25 Q. Oh, okay.

Page 28

1 Dr. Adam Werner
2 A. The Armtec case. (Pause.)
3     I believe that's it.
4 Q. Was -- is it fair to say that
5 each of those cases, and I count seven, I
6 think you've mentioned, was it your
7 opinion in each of those cases that the
8 market was efficient?
9 A. I believe that is correct.
10 Q. And was your opinion rejected
11 in any of those cases?
12     In other words, did the court
13 or the finder of fact disagree with your
14 opinion.
15 A. I believe in the China
16 Agritech case.
17 Q. Was your work, or your
18 opinion, criticized by the court in any
19 of those cases?
20     MR. STRAUSS: Objection.
21 A. Define "criticize".
22 Q. Did the court take issue with
23 your methodology, your conclusion, or any
24 other aspect of your opinion?
25     MR. STRAUSS: Objection.

Page 29

1 Dr. Adam Werner
2     Go ahead.
3 A. I don't know how to answer
4 that question.
5 Q. Why not?
6 A. It's too broad.
7 Q. What's too broad about it?
8 A. I mean, you're asking me for
9 an opinion about a court. I don't
10 know -- I can't interpret what the court
11 has said.
12 Q. You didn't read the -- if
13 there was a decision issued -- well,
14 let's do it that way. Did the court in
15 any of those cases issue a decision which
16 criticized or took issue with your
17 opinion?
18     MR. STRAUSS: Objection.
19 Q. That you're aware of.
20 A. I don't believe so.
21 Q. Do you know why -- why the --
22 was it the court that rejected the market
23 efficiency opinion in China Agritech or
24 was it a jury?
25     MR. STRAUSS: Objection.

8 (Pages 26 - 29)

Page 30

Dr. Adam Werner

1          Dr. Adam Werner
2     A.   I believe it was the court.
3     Q.   Do you know what the basis of
4  the court's decision was?
5     A.   I believe the court was
6  confused over the fact that two expert
7  reports were submitted on market
8  efficiency, and we looked at different
9  events and, for whatever reason, they
10  couldn't reconcile that you can look at
11  different events and -- to determine
12  market efficiency.
13     Q.   Was the second expert report
14  offered on behalf of the defendants?
15     A.   No.
16     Q.   Are there -- two plaintiffs'
17  expert reports were offered.
18     A.   Correct.
19     Q.   Did the -- so, other than
20  looking at different events, did the
21  other expert in that case apply a --
22  apply the same methodology that you had
23  applied to evaluate whether or not the
24  market was efficient?
25     A.   I believe that is correct.

Page 32

1          Dr. Adam Werner
2  expressing uncertainty.
3     A.   Well, to the extent that you
4  measure inflation using event study
5  methodology, I am aware of what the
6  inflation might be in the alleged stock
7  as a result of the alleged bad act by
8  your client.
9     Q.   Okay, but that's a slightly
10  different question than what I'm asking,
11  so let me try it again.
12         I'm asking whether or not
13  you've been asked by Plaintiffs' counsel
14  in this case to do any work to form an
15  opinion as to what the alleged inflation
16  per share of Hi-Crush was during the
17  class period.
18         THE WITNESS: I'm sorry,
19     could you read back the question?
20         (The record was read.)
21     A.   I don't believe so.
22     Q.   In the past, when you've been
23  asked and have rendered an opinion as to
24  inflation per share, have you done that
25  both on behalf of plaintiffs and

Page 31

1          Dr. Adam Werner
2     Q.   You've also -- as I read your
3  CV, it appears that you've also been
4  retained in the past to estimate the
5  alleged inflation per share in certain
6  securities litigation matters; is that
7  correct?
8     A.   I believe that is correct.
9     Q.   Just for the sake of
10  completeness, you have not been asked to
11  render that opinion in this case; right?
12         MR. STRAUSS: Objection.
13         THE WITNESS: Could you read
14     back the question, please.
15         (The record was read.)
16         MR. PARADISE: And I think
17     there was a second question.
18         (A portion of the record was
19     read.)
20     A.   I don't recall.
21     Q.   Earlier, I had asked you
22  whether you had been asked to render any
23  opinions beyond that which you express in
24  paragraph 2, and you said you don't
25  believe you have, but now you're

Page 33

1          Dr. Adam Werner
2  defendants?
3         MR. STRAUSS: Objection. You
4     mean in other cases?
5         MR. PARADISE: Yes, I said
6     "in the past".
7         MR. STRAUSS: Fine.
8     A.   Define "render an opinion"?
9     Q.   Submit either a declaration
10  or testify.
11     A.   Um -- as I sit here, I don't
12  recall.
13     Q.   Let's take a look at your CV,
14  which is Exhibit 1 to Exhibit 1.
15         Starting with -- I'm just
16  going to ask you, in the Hecla Mining,
17  the Hecla Mining Securities Litigation
18  matter, where you issued a declaration on
19  investor losses, did that involve
20  rendering an opinion as to inflation per
21  share of the subject security?
22     A.   I don't believe so.
23     Q.   Okay. Were you -- which side
24  did you represent in -- I'm sorry --
25  which side did you appear as an expert

9 (Pages 30 - 33)

Page 34

```
 1            Dr. Adam Werner
 2  for in the Hecla Mining case?
 3      A.  Plaintiff.
 4      Q.  The next one that appears to
 5  involve some testimony as to damages is
 6  the Shenk case?
 7            Looks like this was a
 8  derivative action?
 9            Okay.
10      Q.  Do you see that?
11            Was there any work in that
12  case where you were required to express
13  an opinion as to alleged inflation per
14  share?
15      A.  I don't believe so.
16      Q.  Did you also represent the
17  Plaintiff in that case?
18      A.  I did.
19      Q.  I'm just going to ask the
20  same question, just go down the list for
21  a second.
22      A.  Okay.
23      Q.  How about the BP case?
24      A.  I don't recall.
25      Q.  The Tripath Technology case?
```

Page 35

```
 1            Dr. Adam Werner
 2      A.  That -- on share inflation,
 3  no.
 4      Q.  How about Ainslie and Muriel
 5  Marentette versus CV Technologies?
 6      A.  I believe so.
 7      Q.  And who did you represent --
 8  I'm sorry.
 9            On whose side did you appear
10  as an expert in that case?
11      A.  The Plaintiffs.
12      Q.  Let me see if I can cut
13  through this, because you said you
14  weren't sure if you testified on behalf
15  of defendants as to inflation per share,
16  so I take it you looked at this list, are
17  any of the cases on this list ones in
18  which you appeared on behalf of
19  defendants in the situation where you
20  were asked -- where you rendered an
21  opinion as to inflation per share?
22      A.  "This list" being --
23      Q.  The list --
24      A.  -- the list that's defined
25  under: Expert reports and testimony?
```

Page 36

```
 1            Dr. Adam Werner
 2      Q.  Correct.
 3      A.  I don't believe so.
 4      Q.  Okay.
 5            THE WITNESS:  But could you
 6  read back the question, please?
 7  Make sure I've answered it
 8  correctly.
 9            (The record was read.)
10      A.  I don't believe so.
11      Q.  In those cases where you did
12  render an opinion as to the alleged
13  inflation per share, how did you go about
14  coming up with the number, you know, the
15  alleged inflation.
16            MR. STRAUSS:  Objection to
17  form.
18      A.  I did an event study.
19      Q.  Anything beyond doing an
20  event study?
21      A.  I don't know how to answer
22  that question.
23      Q.  Okay.  Well, let's take it --
24  let's break that down a little bit.
25            So you do an event study, and
```

Page 37

```
 1            Dr. Adam Werner
 2  then how do you apply the results of an
 3  event study to determine what the alleged
 4  inflation per share is?
 5      A.  Well, I usually measure the
 6  abnormal return around the alleged -- I
 7  don't know, I don't know what you want to
 8  call it -- the alleged date, for want of
 9  a better term.
10      Q.  The date of disclosure?
11      A.  The date of disclosure, there
12  we go, and use that as a measure of
13  inflation.
14      Q.  And then what do you -- let
15  me help you out.
16            Do you take that alleged
17  inflation and back it -- take it back to
18  the date of the alleged fraud?
19      A.  What do you mean by "take
20  back"?
21      Q.  Well, how do you -- well, let
22  me ask a different question, actually.
23            What do you -- so you
24  determine the alleged inflation as of the
25  date of the -- what's called the
```

10 (Pages 34 - 37)

Page 38

1        Dr. Adam Werner
2    "corrective disclosure"; is that fair to
3    say?
4        A.   Okay.
5        Q.   And then, what do you do with
6    that inflation?  Do you apply it to the
7    shares that were acquired at the
8    beginning of the class period to the
9    shares that were acquired throughout the
10   class period?
11            How do you come up with a
12   damages number?
13       A.   Are you talking about a case
14   with one disclosure?
15       Q.   We'll start with that.
16       A.   Yeah, I'd estimate the number
17   of damage shares and apply that inflation
18   to the -- to the damage shares.
19       Q.   And what -- do you do
20   something differently when there's more
21   than one disclosure?
22       A.   Not necessarily, but then you
23   have -- you know, you have different
24   types of people who are damaged.
25            You'll have -- so, if you

Page 39

1        Dr. Adam Werner
2    have multiple disclosures, you'll have
3    what we call in-and-out damages as well
4    as buy-and-hold damages.
5        Q.   How many -- do you have an
6    opinion as to how many corrective
7    disclosures there were in the Hi-Crush
8    case, this case?
9        A.   I do not.
10       Q.   Have you not looked at that?
11   Is that --
12       A.   What do you mean, "not looked
13   at" it?
14       Q.   In other words, have you not
15   looked at what disclosures were involved
16   and not rendered -- or, not come to an
17   opinion as to how many were corrective
18   disclosures, or is there some other
19   reason why you don't have an opinion?
20       A.   I mean, I don't believe I
21   have formed an opinion on that, but I
22   believe there -- according to the filings
23   in this case, there appears to be one
24   corrective disclosure at issue.
25       Q.   Is that the information that

Page 40

1        Dr. Adam Werner
2    was -- and you can refer to your
3    declaration, if you would like, but, if
4    you remember, is that the information
5    that was revealed iu a press release that
6    was issued on November 13th, 2012?
7        A.   I believe that is correct.
8        Q.   We'll take a look at that
9    press release a little bit later, and
10   I'll ask some more questions about it,
11   but I'm going to move on, for the time
12   being.
13            Coming back to your answer to
14   my question before, about how you go
15   about applying the inflation to determine
16   the amount of damages, you said that you
17   have to look at the number of damage
18   shares?
19       A.   You have to estimate the
20   number of damage shares.
21       Q.   How do you go about doing
22   that?
23       A.   Using a trading model.
24       Q.   Is that a trading model that
25   you construct?

Page 41

1        Dr. Adam Werner
2        A.   I "construct" meaning?
3        Q.   You put the model together or
4    is there a model that's used in the
5    industry.
6        A.   I don't know how to answer
7    that question.
8        Q.   Well, what trading model do
9    you use to estimate the number of damage
10   shares?
11       A.   A trading model --
12   (gesturing).
13       Q.   Any?
14            So where do you find this
15   trading model?
16       A.   It's the same trading model I
17   used at Cornerstone, NERA, and even my
18   past employers.
19            I mean, I don't -- I don't
20   know how to answer this question.
21            It's the trading -- it's
22   the trading -- the standard trading model
23   in the industry.
24       Q.   That's what I'm asking, okay,
25   it's --

11 (Pages 38 - 41)

Page 42

1         Dr. Adam Werner
2     A.   But there are different
3  inputs that people put into those models.
4     Q.   Okay, no, I understand that,
5  that's what I was getting at.
6         It's a model that is used in
7  the industry, you decide what inputs go
8  into the model to come up with your
9  estimate.
10    A.   I believe that is correct.
11    Q.   If you are asked to render an
12 opinion in this case as to the alleged
13 damages that were suffered as a result of
14 the alleged omission in this case, would
15 you apply that same model that you've
16 used in other cases?
17        MR. STRAUSS: Objection.
18        Go ahead.
19    A.   Again, when you say "same
20 model", how do you define the "same
21 model"?
22    Q.   Well, I guess the model will
23 change depending on the inputs. Is that
24 your point?
25    A.   Correct.

Page 43

1         Dr. Adam Werner
2     Q.   So maybe we'll call it a
3  "formula", and then you put inputs into a
4  formula to come up with the model -- the
5  answer?
6         MR. STRAUSS: Objection.
7     A.   I believe that's a fair
8  statement.
9     Q.   Generally, when you've done
10 this type of work in the past, and I
11 understand you have not done it in this
12 case, what inputs do you use to populate
13 your model?
14    A.   This is just for damage
15 shares -- my estimation of damage shares.
16    Q.   Correct.
17    A.   Share volume, float, shares
18 outstanding.
19        I believe those would be
20 the -- well, I mean, you'd also have to
21 make different assumptions based on what
22 market the stock has traded in -- um --
23    Q.   Anything else?
24    A.   I believe that's it.
25    Q.   Okay.

Page 44

1         Dr. Adam Werner
2     A.   But I may have left something
3  out.
4     Q.   Has your -- in those cases in
5  which you have done this type of work,
6  prepared this type of model, and then
7  expressed an opinion, has your opinion
8  been rejected by any courts?
9     A.   No.
10    Q.   As you sit here today, do you
11 have any intention of developing and
12 expressing any opinions beyond those that
13 are contained in your declaration -- in
14 your declaration, which is Exhibit 1?
15        MR. STRAUSS: Objection.
16    A.   As I sit here today, I mean,
17 I don't know what the future holds --
18    Q.   Okay.
19    A.   -- so -- (gesturing) -- it's
20 possible I will express different
21 opinions in the future.
22    Q.   But you haven't been -- well,
23 let me ask it this way. Have you been
24 asked or told that you will be asked to
25 express additional or different

Page 45

1         Dr. Adam Werner
2  opinions --
3         MR. STRAUSS: Objection.
4     Q.   -- in the future, in this
5  case?
6     A.   I don't --
7         THE WITNESS: I'm sorry, can
8  you re-read the question?
9         (The record was read.)
10        MR. PARADISE: Than -- there
11 was a little bit more than that --
12 than what's contained in --
13        (A portion of the record was
14 read.)
15        MR. STRAUSS: Objection,
16 again.
17        THE WITNESS: I apologize,
18 I'm going to have to -- could you
19 re-read it, one more time.
20        (A portion of the record was
21 read.)
22    A.   I don't believe so.
23    Q.   Have you been engaged by
24 Kirby McInerney in prior securities
25 litigation lawsuits?

12 (Pages 42 - 45)

Page 46

1          Dr. Adam Werner
2    A.   Yes.
3    Q.   How many?
4    A.   Just one.
5    Q.   Which case -- is that case
6  identified in your CV?
7    A.   It is.
8    Q.   Which one is that?
9    A.   Under: Experience,
10 Securities and Finance, Citigroup
11 litigation.
12   Q.   And it says -- if I'm reading
13 this correctly, it says:  Testified as to
14 damages and inflation in a securities
15 class action; is that right?
16   A.   That is correct, but I was
17 not sworn in.
18   Q.   Can you explain?
19   A.   Yeah.  The -- the judge had
20 some questions about -- about settlements
21 and damage figures and, so, I was --
22 while there was a public hearing, I was
23 on it by phone, so the judge asked me
24 questions by phone, but I was never
25 formally sworn in.

Page 47

1          Dr. Adam Werner
2    Q.   Did that case -- is that case
3  pending, currently pending?
4    A.   I don't believe so.  I don't
5  know.
6        MR. STRAUSS:  The settlement
7  is still --
8        MR. PARADISE:  I'll --
9        MR. STRAUSS:  -- in process.
10       MR. PARADISE:  Fair, thank
11 you.
12   Q.   But your -- and let me ask
13 you this way, is your work on that case
14 concluded.
15   A.   I believe that is correct.
16   Q.   Have you worked previously
17 with any of the lawyers from Kirby
18 McInerney who are working on this matter
19 when they were -- if they were and when
20 they were -- at any other law firms?
21   A.   I don't believe so.
22   Q.   Have you ever been retained
23 to testify on behalf of the Plaintiffs --
24 not the Plaintiffs' counsel, but the
25 Plaintiffs in this lawsuit?

Page 48

1          Dr. Adam Werner
2        MR. STRAUSS:  Objection.
3        You mean in any other cases.
4        MR. PARADISE:  Yes.
5    A.   I don't believe so.
6        Just so we're clear, would
7  you --
8    Q.   Yeah.
9    A.   -- redefine --
10   Q.   Sure.
11   A.   -- who Plaintiffs are?
12   Q.   It's Hite -- H-I-T-E, all
13 caps -- Hedge L.P., and HITE -- all
14 caps -- MLP L.P.
15   A.   Yeah, I don't believe so.
16   Q.   And for future reference,
17 during the course of the deposition, if
18 it's okay with you and Mr. Strauss, I'm
19 going to refer to them as "Plaintiffs".
20   A.   Okay.
21   Q.   And for the Defendants,
22 because there are numerous Defendants in
23 the case, I'm just going to refer to them
24 collectively as "Defendants", unless
25 there is a reason for me to be specific.

Page 49

1          Dr. Adam Werner
2  Is that okay?
3    A.   That's fine.
4        MR. STRAUSS:  And can I ask,
5  if you're referring to the class,
6  if you could just say "the class".
7        MR. PARADISE:  Fair enough.
8        THE WITNESS:  Right.
9        MR. STRAUSS:  "The
10 Plaintiffs" means just for the
11 Plaintiffs.
12       MR. PARADISE:  Fair enough.
13   Q.   So let's talk about the
14 specifics of your engagement in this
15 case.
16       When were you first contacted
17 by attorneys from Kirby McInerney to
18 potentially work as an expert in this
19 case?
20   A.   Maybe two or three months
21 ago.
22   Q.   And what -- at that time,
23 what did they ask you to do?
24   A.   I believe they asked me to
25 render an opinion on market efficiency.

13 (Pages 46 - 49)

Page 50

```
 1          Dr. Adam Werner
 2     Q.  Was there any discussion, at
 3  that time, as to any other potential
 4  opinions you may be -- you might be asked
 5  to render?
 6          MR. STRAUSS: Objection.
 7     A.  Not that I recall.
 8          MR. STRAUSS: All right if we
 9  take a break?
10          MR. PARADISE: Sure.
11          Off the record.
12          (Recess taken: 10:55 a.m. -
13  11:09 a.m.)
14          MR. PARADISE: Are we back
15  on?
16  BY MR. PARADISE:
17     Q.  Do you have -- do you need to
18  change any answers that you gave before
19  the break?
20     A.  I don't believe so.
21     Q.  So, coming back to your work
22  on this engagement, you told me that you
23  were contacted about two or three months
24  ago and asked to render an opinion as to
25  market efficiency.
```

Page 51

```
 1          Dr. Adam Werner
 2          What did you do next, after
 3  that call?
 4     A.  With regards to?
 5     Q.  To perform your work on this
 6  case.
 7     A.  I believe I ran a conflict
 8  check. I had our general counsel draft
 9  an engagement letter, which I believe was
10  transmitted somehow, either
11  electronically or through the mail,
12  to -- I believe Mr. Strauss. Then I
13  started doing research.
14     Q.  Well, let's go to the
15  research part.
16          So what steps did you take to
17  be able to render the opinion that you
18  were asked to render?
19     A.  I mean, that's an overly
20  broad question.
21          Can you compartmentalize it
22  somehow?
23     Q.  Well, you just said you did
24  some research, so we'll start with that.
25          What type of research did you
```

Page 52

```
 1          Dr. Adam Werner
 2  do?
 3     A.  I mean, I looked at -- read
 4  some newspaper reports, some articles,
 5  read some academic articles, I gathered
 6  some data, or people gathered data at my
 7  behest, performed some analysis on that
 8  data, then put that analysis into this
 9  (indicating) report.
10     Q.  The people that gathered data
11  for you, are those people that were
12  also -- I'm using the word "working for"
13  but not in the W-2 sense.
14     A.  I understand.
15     Q.  But there's also people who
16  came to work at Gnarus every day?
17     A.  Every day?
18     Q.  That were consulting with
19  Gnarus?
20          I'm trying to ask it in a way
21  to not make them W-2 employees.
22     A.  Right.
23     Q.  I don't want to get them in
24  any trouble.
25     A.  I don't believe they came to
```

Page 53

```
 1          Dr. Adam Werner
 2  work every day, but yes.
 3     Q.  Did you also -- were you also
 4  assisted in the gathering of data that
 5  you needed to do your work, were you
 6  assisted by Plaintiffs' counsel at all?
 7     A.  I don't believe so.
 8     Q.  Who drafted your declaration?
 9     A.  I did.
10     Q.  Did anybody else participate
11  in drafting your declaration?
12     A.  Define "participate"?
13     Q.  Did anybody else put pen to
14  paper to write any of the words that are
15  contained in your declaration.
16     A.  I believe counsel may have
17  made some grammatical changes.
18     Q.  By "counsel", you're
19  referring to Kirby McInerney?
20     A.  Correct.
21     Q.  But, as far as people at
22  Gnarus, it was primarily or solely you?
23     A.  I believe that is correct --
24  oh, no. Someone may have drafted the
25  section on the background.
```

14 (Pages 50 - 53)

Page 54

Dr. Adam Werner

1
2    Q.   I take it you reviewed it and
3    edited it to your satisfaction?
4    A.   Correct.
5    Q.   How many -- well, withdrawn.
6         Did you submit any drafts for
7    the declaration to Kirby McInerney before
8    finalizing the declaration that has been
9    marked as Exhibit 1?
10   A.   Define "submitted"?
11   Q.   Send to them, transmit to
12   them, e-mail to them?
13        MR. STRAUSS: I'm going to
14   object to that.
15        I mean, you're asking for
16   communications between the expert
17   and counsel that aren't within
18   the -- you know, within the scope
19   of the rule about what you can ask
20   about.
21        If you want to ask him what
22   opinion he was asked to render,
23   what facts or data he was provided,
24   that's all fair game but, you know,
25   you're sort of intruding on other

Page 55

Dr. Adam Werner

1
2    types of communications, and I'm
3    going to object to that, and ask
4    him not to answer it.
5         MR. PARADISE: Well, I don't
6    agree with you.
7         I think that if the expert
8    prepared earlier drafts of his
9    declaration and they were submitted
10   to counsel and then they were
11   changed, I'm entitled to know that,
12   so I'm not asking him any
13   communications you've had, I'm
14   asking him did he submit other
15   drafts to Kirby McInerney. If we
16   get into communications, we'll slow
17   down a little bit.
18        MR. STRAUSS: If you start
19   asking about the contents of those
20   or what counsel said about those,
21   that's going to be -- that's off-
22   limits, and I think that's where
23   you're going.
24        MR. PARADISE: Oh, okay, we
25   can agree to disagree on that, but

Page 56

Dr. Adam Werner

1
2    if you're instructing him not to
3    answer, instruct him not to answer.
4         Well, let's take it -- let's
5    first find out whether or not there
6    were -- I don't even know if there
7    were other drafts.
8    Q.   So were there any other
9    drafts of your declaration prior to
10   Exhibit 1, (indicating)?
11   A.   Define "drafts".
12   Q.   A version of what is Exhibit
13   1 that's different from Exhibit 1.
14        MR. STRAUSS: Objection.
15   A.   "Different" how?
16   Q.   Dr. Werner, you don't know
17   what "drafts" mean? I mean, are you for
18   real? You really don't know what a
19   "draft" is?
20        A "draft" is a document that
21   you put together as a piece of work, you
22   submit it to somebody, and then someone
23   says: I don't like the way this reads,
24   or: I don't like the way that reads, and
25   you revise it and you have a second

Page 57

Dr. Adam Werner

1
2    draft, and then you go through the same
3    process again, and you have a third
4    draft.
5         I'm just asking, were there
6    numerous drafts of what ultimately became
7    Exhibit 1. That's all I'm asking.
8         It's really not a difficult
9    question.
10        MR. STRAUSS: Can I help?
11        MR. PARADISE: Sure.
12        MR. STRAUSS: If someone
13   corrects a citation or inserts a
14   page number or a reference to a
15   paragraph of a complaint, does that
16   make it a different draft?
17        MR. PARADISE: Yes --
18        MR. STRAUSS: Let's say, are
19   you talking about material changes,
20   materially-different drafts? Do
21   you want to ask him if there was a
22   materially-different draft that was
23   submitted?
24        MR. PARADISE: I understand.
25   He --

15 (Pages 54 - 57)

Page 58

1         Dr. Adam Werner
2     Q.   You've already said that you
3   think that counsel may have corrected
4   some typos.
5     A.   I believe that is correct.
6     Q.   Okay, so I'm not concerned
7   with typos.
8         I'm asking substantively
9   different -- you know, a substantively-
10  different draft that had a different
11  opinion or didn't express something that
12  is now contained in this opinion, that's
13  what I'm getting at.
14    A.   No.
15    Q.   Okay.
16    A.   And that's why I needed to
17  clarify --
18    Q.   No, I --
19    A.   -- "draft".
20    Q.   -- understand. Okay.
21        You don't mean -- you weren't
22  really asking me what "drafts" means,
23  you're really more asking me what am I
24  asking you about in terms of different
25  drafts.

Page 59

1         Dr. Adam Werner
2     A.   Right, if you're talking
3   about content or --
4     Q.   Understood.
5         Have you had any discussions
6   with any representatives of Plaintiffs,
7   and as we discussed earlier that means
8   the two HITE entities, concerning your
9   work on this matter?
10    A.   I don't believe so.
11    Q.   You mentioned that your
12  general counsel, or Gnarus's general
13  counsel, prepared an engagement letter
14  that was submitted or transmitted to
15  Kirby McInerney, and then I assume it was
16  ultimately signed; is that --
17    A.   I believe that is correct.
18        MR. PARADISE: I don't know
19    if we have received a copy of that
20    but, if we haven't, I request that
21    we be provided a copy of that
22    engagement letter.
23        (REQUEST.)
24    Q.   But you mentioned in here
25  that your rate -- your hourly rate is I

Page 60

1         Dr. Adam Werner
2   think $475 an hour for this engagement?
3     A.   I believe that is correct.
4     Q.   Have you -- are you being
5   paid on an ongoing basis or is the
6   payment deferred until the end of the
7   matter?
8     A.   Ongoing.
9     Q.   How much have you been paid
10  to date, if you know, or how much has
11  Gnarus been paid to date, if you know?
12    A.   Somewhere between twenty and
13  thirty thousand dollars.
14    Q.   Again, I know this may be
15  difficult, but I'm asking you to
16  estimate, how much time would you
17  estimate you put into drafting your
18  declaration, including the work you did
19  up until the time when you started
20  drafting it?
21    A.   Did I personally --
22    Q.   Yes.
23    A.   -- spend?
24        Maybe 40 hours? 50 hours?
25    Q.   Is that --

Page 61

1         Dr. Adam Werner
2     A.   I'm speculating, I honestly
3   don't know.
4     Q.   I understand.
5         Let me ask it this way. Is
6   the amount of time that you put into this
7   project, or this engagement,
8   substantively different than the amount
9   of time you've put into other
10  engagements, where you've been asked to
11  render an opinion as to market
12  efficiency?
13        MR. STRAUSS: Objection.
14    A.   I don't know.
15    Q.   Is any portion of your -- of
16  Gnarus's compensation for this matter
17  contingent on the outcome of this matter?
18    A.   No.
19        MR. PARADISE: Off the
20    record.
21        (Discussion off the record.)
22    Q.   What -- I'm going to start
23  broadly, and if you can't answer the
24  broad question I'll try to be more
25  specific but, just to move it along, did

16 (Pages 58 - 61)

Page 62

```
1          Dr. Adam Werner
2   you do any research or slash due
3   diligence on Hi-Crush to learn about its
4   business in connection with the work that
5   you did to express an opinion in this
6   matter?
7       A.  I believe so.
8       Q.  Can you generally describe
9   for me what you did?
10      A.  I reviewed press releases,
11  news stories, financials, SEC documents.
12      Q.  Did you review the
13  prospectus, the final prospectus that was
14  issued, in connection with the initial
15  public offering?
16      A.  I don't recall.
17      Q.  Did you come to any
18  understanding, in connection with that
19  research, as to what the trends were in
20  Hi-Crush's business in the 2012 -- you
21  know, mid-2012 time --
22          MR. STRAUSS:  Objection.
23      Q.  -- period?
24      A.  Define "trends".
25      Q.  "Trends" meaning demand for
```

Page 63

```
1          Dr. Adam Werner
2   the product.
3          And you know what their
4   product is, I assume; correct?
5       A.  I believe that is correct.
6       Q.  Fracking sand --
7       A.  Correct.
8       Q.  -- for proppants?  Okay.
9          THE REPORTER:  I'm sorry,
10  what did you say?
11          MR. PARADISE:  It's called
12  fracking sand -- frac sand for
13  proppants -- P-R-O-P-P-A-N-T-S.
14          MR. STRAUSS:  Could you redo
15  the question, because that was an
16  exceedingly long question,
17  interrupted by a number of things.
18          MR. PARADISE:  Yes.
19          MR. STRAUSS:  Could you just
20  rephrase it?
21          MR. PARADISE:  Yes.
22      Q.  Did you -- well, the question
23  was about whether you did any research
24  into trends in Hi-Crush's business in the
25  mid-2012 -- you know, beginning in the
```

Page 64

```
1          Dr. Adam Werner
2   mid-2012 time period, that was the
3   question.
4          MR. STRAUSS:  Well,
5      objection.
6       Q.  And you asked me to define
7   "trends".
8          MR. STRAUSS:  I'm going to
9      object because that's beyond the
10     scope of the opinions that he was
11     asked to render, and that's the
12     subject matter of this deposition.
13         But go ahead, and ask if you
14     want.
15      A.  I mean, to the extent that I
16  knew what was going on with Hi-Crush, I
17  mean, I understood what was going on with
18  their business, I don't know if that
19  would be industry trends or, really, that
20  would be under your purview of "trend".
21      Q.  You mentioned that you read
22  SEC filings, and I think that's also
23  contained in your list of documents on
24  which you relied, Exhibit 2.
25         Can you be more specific, and
```

Page 65

```
1          Dr. Adam Werner
2   feel -- Exhibit 2 to Exhibit 1, on page
3   2, you just say:  Hi-Crush financials,
4   but I don't -- you don't identify any
5   specific ones.
6          We talked about the
7   prospectus.  Are there any others that
8   you can think of?
9       A.  There are 10-K's, there are
10  8-K's.
11      Q.  And for what time period, if
12  you remember?
13      A.  So, I believe it would be
14  2012, 2013.
15      Q.  Can you be specific as to
16  which press releases because, again, you
17  referred generally to "press releases",
18  on page 2 of Exhibit 2 of Exhibit 1.
19      A.  I believe any of them that
20  are listed in my Appendix A.
21      Q.  As you sit here today, are
22  you aware of who Hi-Crush considers to be
23  its main competitors?
24          MR. STRAUSS:  Objection.
25      A.  Not that I recall.
```

17 (Pages 62 - 65)

Page 66

Dr. Adam Werner

1
2 Q. Did you have any
3 communications with any of the market
4 makers for Hi-Crush in connection with
5 the work that you did to express your
6 opinion in this case?
7 A. "Market makers" defined as?
8 Q. Entities that make markets
9 for Hi-Crush.
10 A. So not in a securities --
11 like a NASDAQ market maker.
12 MR. STRAUSS: Are you talking
13 about profit market makers?
14 MR. PARADISE: No, no, I'm
15 sorry.
16 Q. I'm talking about a
17 designated market maker from the New York
18 Stock Exchange or anybody else that
19 trades in Hi-Crush's security, on a
20 market-making basis.
21 A. I don't believe so.
22 Q. Did you review any analyst
23 reports issued for Hi-Crush during the
24 2012, 2013 time period?
25 A. I believe so.

Page 67

Dr. Adam Werner

1
2 Q. As you sit here today, can
3 you tell us which analyst reports you
4 reviewed?
5 A. I remember reading the Baird
6 downgrade. I believe that was on
7 October -- either the 14th or the 15th.
8 Q. November? I think November.
9 A. November, yes, November 2012.
10 I believe that's it.
11 I mean, I may have read other
12 ones, I don't recall as I sit here. That
13 one sticks out in my mind.
14 Q. There are other -- I think
15 there are other analyst reports
16 referenced in Appendix A, so feel free to
17 look at that to see if it refreshes your
18 memory.
19 A. Well, I think --
20 Q. That, you know, refreshes
21 your memory that you might have looked at
22 others.
23 A. (Pause.)
24 As I sit here, I don't
25 recall.

Page 68

Dr. Adam Werner

1
2 Q. In Exhibit 6, you have a list
3 of the market makers that covered
4 Hi-Crush during the period from -- well,
5 you have two separate periods --
6 A. I want to stop you, because I
7 don't think you're using the terminology
8 correctly.
9 Q. I'm sorry.
10 A. It's not "market makers".
11 Q. You're right, I've made -- I
12 used the wrong term. "Analysts" -- let
13 me withdraw that question, start again.
14 In Exhibit 6, you have a list
15 of analysts who issued reports or
16 otherwise followed Hi-Crush during two
17 different time periods. The first time
18 period I see is August 15, 2012 to
19 September 18th.
20 Do you see that?
21 A. Correct.
22 Q. And then the second is
23 September 19th through November 12th; is
24 that correct?
25 A. I believe it's through

Page 69

Dr. Adam Werner

1
2 November 12th --
3 Q. Right.
4 A. -- 2013.
5 Q. 2013, correct.
6 How many analysts were
7 following Hi-Crush during the class
8 period? And, by "the class period", I'm
9 referring to the period from September
10 19th, 2012 through November 12th, 2012.
11 A. I believe it was either seven
12 or eight.
13 Let me look at my report
14 here.
15 Q. Sure. Just make sure you
16 understood me correctly.
17 I'm only asking now for the
18 class period, not this extended test
19 period.
20 A. Ah, well, okay.
21 Going back to Exhibit 6 --
22 Q. I think -- go ahead.
23 A. Do you have a pen?
24 Q. Sure.
25 A. I know I can't mark this.

18 (Pages 66 - 69)

Page 70

1          Dr. Adam Werner
2  Can I borrow a pad of paper, too?  Thank
3  you.  (Writing.)
4          Okay.  Going back to your
5  question, define "covering".
6      Q.   Well, "covering" meaning
7  issuing research reports on Hi-Crush.
8      A.   Do you have a pen?
9          (Discussion off the record.)
10     A.   Can we go back to the
11 question?
12         THE WITNESS:  Can you read
13     the question?
14     Q.   I'll just say it again.
15         You asked me how do I define
16 "covering", and I said issuing --
17 analysts that were issuing research
18 reports.
19     A.   On Hi-Crush.
20     Q.   Correct.
21     A.   (Pause.)
22         Define "the class period"?
23     Q.   It's November -- I'm sorry --
24 September 19th, 2012 through November
25 12th, 2012.

Page 71

1          Dr. Adam Werner
2          And that's also in your
3  report, so --
4      A.   I believe that is correct.
5      Q.   Well --
6      A.   And I wanted to make sure
7  that you weren't talking about the 14th.
8      Q.   No, no, no.  Look at -- if
9  you look at Footnote 1, on page 1 of your
10 report, you mention, that is the same
11 class period.
12     A.   Right.
13         So I will dispute your
14 definition of "analyst coverage".  If
15 you're asking me how many reports were
16 released by analysts during that time
17 period, I believe three.
18     Q.   And the three that you're
19 referring to are -- three reports that
20 you're referring to are Raymond James, on
21 October 9, 2012, RBC on October 16th,
22 2012, and then Credit Suisse on October
23 17th, 2012?
24     A.   I believe that's correct.
25     Q.   So what is -- you said you

Page 72

1          Dr. Adam Werner
2  don't agree with my or you dispute my
3  definition of "covering", so how do you
4  define "covering"?
5          How do you define an analyst
6  covering Hi-Crush?
7      A.   Well, an analyst certainly
8  can be following the stock and not issue
9  actual reports.
10     Q.   So how many -- under your
11 definition, then, how many analysts do
12 you believe were covering Hi-Crush during
13 the class period?
14     A.   (Pause.)
15         Eight.
16     Q.   Who are the other five,
17 besides the three we just identified?
18     A.   (Pause.)
19         Barclays, UBS, Robert W.
20 Baird -- (pause) -- I don't know if EVA
21 Dimensions was covering it during the
22 class period -- William Blair & Company.
23 I think that's it.
24     Q.   That's -- I think that's
25 seven, if I counted right -- Barclays,

Page 73

1          Dr. Adam Werner
2  UBS, Robert Baird, William Blair, and the
3  three that we had previously discussed.
4      A.   Well, I did mention UBS.
5      Q.   Okay, so those would be the
6  eight.
7          And what's your basis for
8  concluding that those other -- even
9  though they were not issuing research
10 reports, that those other firms were
11 covering Hi-Crush during that time?
12         MR. STRAUSS:  Objection.
13     A.   I don't know whether they
14 were or were not covering Hi-Crush during
15 that time.
16         I'm just saying it's possible
17 that they covered those for Hi-Crush
18 during that time, as I define "coverage".
19     Q.   You are familiar with the
20 Cammer factors for measuring market
21 efficiency; correct?
22     A.   I believe I am.
23     Q.   What is the -- if you know,
24 what is the standard that's applied to
25 determining whether or not an analyst is

19 (Pages 70 - 73)

Page 74

1        Dr. Adam Werner
2   following or covering a company under
3   Cammer?
4        Is it that they're issuing
5   reports or is it just that they're doing
6   something else?
7        A.   I don't think Cammer defines
8   that.
9        Q.   If they're not issuing
10  reports, is there some other way that you
11  believe these analysts are communicating
12  information that's being absorbed into
13  the market for the price of the stock?
14       A.   Sure.   They could be telling
15  their salespeople what their opinions are
16  of the stock.   They could be going on TV
17  shows.
18       There is a whole host of ways
19  they could be communicating information.
20       Q.   Let's assume, for the sake of
21  this question, that my definition is
22  correct, and it means that they're
23  actually issuing reports, and that there
24  are only three during the class period.
25  Are you aware of any federal court

Page 75

1        Dr. Adam Werner
2   decisions that have held that three
3   analysts covering a stock is a sufficient
4   number to prove market efficiency under
5   the Cammer factors?
6        MR. STRAUSS:   Objection.
7        A.   I don't know, one way or the
8   other.
9        Q.   Why not?
10       MR. STRAUSS:   Objection.
11       A.   If you want to show me a
12  court opinion, I'm happy to look at it.
13       Q.   Oh, I'm sorry, you are just
14  not aware of any reports; is that what
15  you mean?
16       A.   Yeah.
17       Q.   Okay.   Have you ever
18  expressed an opinion in a case, other
19  than Hi-Crush, that three analysts
20  covering the security is enough to
21  demonstrate market efficiency for that
22  Cammer factor?
23       MR. STRAUSS:   Objection.
24       A.   As you -- I'm sorry -- as you
25  define "coverage" or as I define

Page 76

1        Dr. Adam Werner
2   "coverage"?
3        Q.   Oh, no, I said three analysts
4   who are issuing reports.
5        A.   Ah, okay.   I don't know, one
6   way or the other.
7        Q.   No, my question is whether
8   you've ever expressed an opinion that
9   three is enough to satisfy the Cammer
10  factor.
11       A.   I don't recall.
12       Q.   Turning back, for a moment,
13  to Exhibit 2, the list of the academic
14  articles and books that begins on page 1
15  and then continues over to page 2.
16       Did you read each of the
17  items that are listed there in connection
18  with the work that you did on this
19  matter?
20       MR. STRAUSS:   Objection.
21       A.   At some point.
22       Q.   Did anyone at -- anyone other
23  than you, at Gnarus review and then
24  prepare summaries of any of these
25  materials for you?

Page 77

1        Dr. Adam Werner
2        MR. STRAUSS:   Objection.
3        A.   The academic articles?
4        Q.   Correct.
5        A.   No.
6        Q.   And turning to Appendix A,
7   for a minute, the -- there are -- you
8   know, there are various reports, data,
9   articles, SEC filings, and press releases
10  listed throughout Appendix A.
11       Did you read each of those
12  items in connection with the work that
13  you performed on this matter?
14       MR. STRAUSS:   Objection.
15       A.   Each of those items
16  separately?
17       Q.   Yes.
18       MR. STRAUSS:   Can you repeat
19  the question, please?
20       (The record was read.)
21       A.   Each of the items?   No --
22  well, again, define "item".
23       I only ask because, you know,
24  there are things about lawsuits being
25  filed, I didn't read the -- all the

20 (Pages 74 - 77)

Page 78

Dr. Adam Werner

1
2 lawsuits. You know, did I read -- have I
3 read this press release summary? Yeah.
4 So I'm not really understanding the
5 question.
6        Q.   Is it fair to say that you
7 read the items that you believe were
8 considered news for the company?
9        A.   That I considered news?
10       Q.   Yes, in connection with your
11 event study.
12       A.   "News", as defined by?
13       Q.   Well, how do you define
14 "news"?
15           You talk about news in
16 connection with your declaration; don't
17 you?
18       A.   I do.
19       Q.   Right.
20       A.   So one type of news is press
21 releases.
22           If I'm defining "news" as
23 that, did I review those? Yes.
24       Q.   Take a look at page 12 of
25 your declaration, for a moment, Exhibit

Page 79

Dr. Adam Werner

1
2 1, paragraph 29.
3           The first sentence of
4 paragraph 29 says, from your declaration:
5 The second factor under Cammer is that --
6 quote -- it would be persuasive if a
7 significant number of securities analysts
8 followed and reported on a company's
9 stock -- closed quotes.
10          Do you agree with that
11 statement?
12       A.   Do I agree with that that's
13 what Cammer says? Yes.
14       Q.   Well, do you also agree that
15 that's what's persuasive?
16          MR. STRAUSS: Objection.
17       A.   Persuasive to what?
18       Q.   Persuasive to determining
19 whether or not there's a sufficient
20 number of analysts to satisfy the analyst
21 coverage factor of Cammer.
22          You told me before it didn't
23 matter if they were issuing reports or
24 not, they could still be relevant and, in
25 your definition, you saw there were seven

Page 80

Dr. Adam Werner

1
2 analysts, and I asked you -- I told you
3 my definition was issuing reports, you
4 told me that you don't accept that
5 definition.
6           In your report, you're saying
7 that Cammer says -- followed a report, so
8 I'm trying to get an understanding as to
9 where you stand on all this, but now
10 you've told me you don't think they have
11 to be reporting on it.
12          MR. STRAUSS: Objection.
13       You're asking him for a legal
14       opinion, and that's not what he's
15       here to testify about, and that's
16       not what he testified about in his
17       report, so -- but I object to your
18       question.
19          MR. PARADISE: I don't agree
20       that I'm asking for a legal
21       opinion.
22          He expressed the opinion that
23       the second factor of Cammer's been
24       satisfied here by what I believe to
25       be three analysts issuing reports

Page 81

Dr. Adam Werner

1
2 during the relevant time period.
3 Dr. Werner has told me now that he
4 doesn't agree with that definition.
5 He thinks that other analysts
6 talking to their customers on the
7 phone, or their salespeople, can
8 also be relevant, and I'm trying to
9 understand how he can reconcile
10 that with Cammer, because Cammer
11 seems to say they have to also be
12 reporting on it.
13       Q.   So I'm trying to understand
14 if there's some explanation you can give
15 me as to how you differentiate what
16 you've come to the conclusion of and what
17 Cammer says.
18          MR. STRAUSS: Right.
19       A.   I don't --
20          MR. STRAUSS: Objection,
21       that's a legal argument, that's not
22       a question about his opinion or his
23       analysis.
24          Go ahead.
25       A.   Cammer doesn't define

21 (Pages 78 - 81)

Page 82

1          Dr. Adam Werner
2    "reported" for us, so I don't know what
3    Cammer means by "reported" --
4        Q.   Well, do you think --
5        A.   -- or "following".
6        Q.   Again, if the number is
7    three, you know, assuming for the sake of
8    this question that the number is three,
9    do you consider that a significant
10   number -- a sufficiently-significant
11   number of analysts to satisfy the second
12   Cammer factor?
13           MR. STRAUSS: Objection.
14       Once again, you're asking him for a
15       legal opinion and not for his
16       expert opinion or what analysis he
17       conducted to get to his expert
18       opinion, it's beyond the scope of
19       the deposition.
20       Go ahead.
21       A.   I defer to counsel on this
22   one.
23       Q.   In what sense?
24       A.   In the sense that I believe
25   you are asking me for a legal opinion.

Page 83

1          Dr. Adam Werner
2        Q.   Look at paragraph 30, the
3    last sentence of paragraph 30: As a
4    result of my opinion that, while analysts
5    coverage implies there is interest in a
6    company and securities, significant
7    analyst coverage is not necessary to show
8    that a security is traded in an efficient
9    market.
10           Is that a legal opinion?
11       A.   I don't believe so.
12       Q.   So what makes that not a
13   legal opinion and the question I'm asking
14   you a legal opinion, besides that your --
15   besides that Mr. Strauss said it was.
16           THE WITNESS: Could you
17       re-read the question, please?
18           MR. STRAUSS: Because this is
19       asking -- is about market
20       efficiency, and he's testifying
21       about market efficiency.
22           The prior question was about
23       whether something satisfies a legal
24       requirement.
25           MR. PARADISE: (Indicating.)

Page 84

1          Dr. Adam Werner
2           MR. STRAUSS: And I don't
3    know whether he's able to --
4    whether he knows about that.
5    Go ahead.
6    A.   I --
7           MR. STRAUSS: Do you want her
8    to repeat the question? Hone in on
9    what it was you asked?
10          MS. BRANDON: I think you
11   want to go back to the question
12   where he reads from paragraph 30,
13   and from there.
14          (A portion of the record was
15   read.)
16       A.   I believe it's paragraph 29.
17          MS. BRANDON: The last
18   question was started with paragraph
19   30 and then --
20       Q.   The last sentence of
21   paragraph 30.
22       A.   Oh, theu I'm asking about the
23   question before that.
24          THE WITNESS: Or, just read
25   the last question.

Page 85

1          Dr. Adam Werner
2           (A portion of the read was
3       read.)
4       A.   I really don't understand the
5   question.
6       Q.   Well, you did need to hear
7   the prior question.
8           The prior question was asking
9   about whether you needed -- essentially,
10  I'm going to summarize it -- essentially,
11  I was asking you about whether coverage
12  was required to make an analyst relevant
13  for purposes of the Cammer factor; right?
14  Meaning that they were issuing reports.
15          That's how we got off onto
16  this tangent in the first place, and you
17  said you didn't think that was -- you
18  didn't agree with that definition. You
19  thought they don't necessarily have to be
20  issuing a report to be determined to be
21  covering it, the security.
22          Did I get that right?
23      A.   I believe that is correct.
24      Q.   Okay. And then I read to you
25  paragraph 29, the first sentence, and you

22 (Pages 82 - 85)

Dr. Adam Werner

said, if I understood you correctly, that you don't believe that Cammer defined "reported", so you're -- I think what you're saying is you don't think it has to be actually a written published report to be reported; is that right?

A. I believe that is correct.

Q. Okay. I got it. I think we can move on, you know, we agree to disagree, I guess.

But, my next question is, let's assume that I'm right, and "reported" means issuing a written report.

A. Okay.

Q. And that there are three analysts doing so during the class period, which is what you testified to earlier, meaning there were three analysts issuing reports about Hi-Crush.

A. Okay.

Q. Is that a sufficient number of analysts for purposes of establishing the second Cammer factor, in your

Dr. Adam Werner

opinion?

MR. STRAUSS: Objection. Again, you're asking for a legal opinion.

If you're asking him whether it's sufficient to establish market efficiency from an economic point of view, I think that would be a valid question, but you're asking him for a legal opinion, and I think that's beyond the scope of a proper question in the deposition.

MR. PARADISE: Okay, I think I understand your objection, I think I'm short-circuiting it a little bit.

So let me, to satisfy you, I'll add to the question.

Q. Is three a sufficient number to prove that the second Cammer factor has been established and, therefore, there is market efficiency.

MR. STRAUSS: Objection.

A. So, first of all, I need you

Dr. Adam Werner

to define "sufficient".

Q. Well, how many analysts is it that you need to be covering a stock, in your opinion, to conclude from that that there is market efficiency?

MR. STRAUSS: Objection.

A. It's possible I could have no analyst coverage and the stock would be traded in an efficient market.

Q. Agreed, because you don't need to satisfy all the Cammer factors. That's why I'm asking to satisfy the second Cammer factor, that was the whole thing I'm getting at, to satisfy that specific factor.

A. If you want --

MR. STRAUSS: That's why your question is a legal question and not an expert question.

MR. PARADISE: I disagree.

A. If you want to show me the Cammer opinion, and show me where they talk about the number of analysts that are sufficient, I'll be happy to discuss

Dr. Adam Werner

that with you, but I don't believe Cammer states definitively that there have to be a certain number of analysts, it just says sufficient.

Again, you can define "sufficient" any way you want to.

Q. Okay. So, in your opinion, "sufficient" can be three or fewer than three, I think is what you are saying.

A. I'm saying it's possible for a stock to trade in an efficient market and not have any analyst coverage or it could have a million analysts covering it.

Market efficiency, in and of itself, is not going to be established by the number of analysts following a stock.

Q. Turning to your opinion that you express at the end of paragraph 30, that I read into the record earlier?

A. Mm-hmm -- okay.

Q. I'm looking specifically at the second clause, which says: Significant analyst coverage is not

Page 90

```
1          Dr. Adam Werner
2   necessary to show that a security is
3   traded in a sufficient market.
4          Is that a acceptable -- is
5   that a peer-reviewed accepted opinion, to
6   your knowledge?
7      A.   "Peer-reviewed"?
8      Q.   In other words, is there any
9   literature out there that shares that
10  opinion, that you're aware of.
11     A.   As I sit here, I don't know.
12     Q.   If I understood you
13  correctly, and we'll move off of this, I
14  apologize for belaboring it, you're
15  saying is -- analyst coverage is or can
16  be irrelevant to determining market
17  efficiency; right?
18     A.   Determining under what?
19     Q.   Determining under the
20  analysis that you performed and type of
21  analysis that you performed in this case.
22         THE WITNESS: I'm sorry,
23     could you read back the question?
24         (A portion of the read was
25     read.)
```

Page 91

```
1          Dr. Adam Werner
2          MR. STRAUSS: Objection.
3      A.   I mean, look, this is a
4   Cammer factor, I have to respond to that
5   in this report.
6          To me, like I said, you can
7   have infinite analyst coverage or no
8   analyst coverage, the stock is still
9   trading in an efficiency market.
10         Going back to your question
11  about peer-reviewed articles, I can think
12  of numerous event study articles that
13  don't mention anything about analyst --
14  or, market efficiency studies, that don't
15  mention anything about analyst coverage.
16     Q.   So you said you had to
17  analyze this because it's one of the
18  Cammer factors, but if it can be
19  efficient with zero market makers, why
20  was it necessary for you to --
21         MR. STRAUSS: Objection, you
22     mean "analysts".
23         MR. PARADISE: I'm sorry,
24     you're right.
25     Q.   Let's start over. Withdraw
```

Page 92

```
1          Dr. Adam Werner
2   that question.
3          You said that a market can be
4   efficient with zero analysts covering it
5   and it could also have -- I can't
6   remember the number you used, it was a
7   very large number, analysts covering it
8   and it can be efficient, but if it can be
9   efficient or, in your opinion, can be
10  proven to be efficient with zero analyst
11  coverage, why did you bother even
12  including this in your analysis, this
13  Cammer factor two in your analysis?
14     A.   Because the court demands
15  that I do it.
16     Q.   "The court" being Cammer, or
17  Judge McMahon in the Southern District of
18  New York?
19     A.   Right.
20         MR. STRAUSS: Objection.
21     A.   I believe Cammer.
22     Q.   All right. What is your
23  definition of an "efficient market"?
24         In other words, what does
25  that mean, when you say "a market is
```

Page 93

```
1          Dr. Adam Werner
2   efficient"?
3      A.   I assume that it's semi-
4   strong form-efficient.
5      Q.   Can you explain what that
6   means, please?
7      A.   Turning to my report,
8   paragraph 15, under the: Semi-strong
9   form of efficiency: Prices reflect not
10  just past prices but all other public
11  information, for example from the
12  internet or financial press.
13     Q.   What does it mean to say that
14  "a market is not efficient", in your
15  opinion, or your understanding?
16     A.   Prices do not reflect past
17  prices or public information.
18     Q.   You also used the term
19  throughout -- and I can give you some
20  examples, you have used the term, or some
21  derivation of the term, "informationally
22  efficient"?
23         Do you remember using that
24  term?
25     A.   I believe so.
```

24 (Pages 90 - 93)

Page 94

```
 1          Dr. Adam Werner
 2      Q.  If you take a look at -- do
 3  you want me to show you, just so we're on
 4  the same page?
 5      A.  Sure.
 6      Q.  Take paragraph 4 E, on page
 7  2.
 8          These are informational
 9  efficiencies?
10      A.  Okay.
11      Q.  And then there are other
12  places where you'll say something is
13  informationally efficient, et cetera.
14          Can you just explain what you
15  mean by "informationally efficient"?
16      A.  It means that the information
17  that is reflected in the stock price.
18      Q.  Okay.  So it's similar to the
19  definition of what an "efficient market"
20  is?
21      A.  I believe that's correct.
22      Q.  Outside of work you've done
23  in connection with either testifying or
24  preparing a report as an expert, so, in
25  other words, in your academic life, have
```

Page 95

```
 1          Dr. Adam Werner
 2  you ever studied or done research into
 3  market efficiency?
 4      A.  That's an overbroad -- overly
 5  broad question.  I believe the answer is
 6  yes.
 7      Q.  Have you ever concluded that
 8  a market for a particular security was
 9  not efficient?
10      A.  Yes.
11      Q.  And have you ever done that
12  in any litigation, securities litigation?
13      A.  I believe so.
14      Q.  Can you tell us which cases,
15  as you sit here?
16      A.  Not as I sit here.
17          I mean, I'd have to -- when I
18  was at Cornerstone and NERA and CRA, I
19  must have done, I don't know, multiple
20  cases in which the expert found that the
21  market for the stock was inefficient.
22          I've certainly found -- been
23  brought cases currently where I'm asked
24  to determine market efficiency, and I
25  will say: Based on my determination, the
```

Page 96

```
 1          Dr. Adam Werner
 2  market for this stock is inefficient.
 3  Amazingly enough, the plaintiffs don't
 4  want me to submit a report in those
 5  instances.
 6      Q.  But do they pay you?
 7      A.  They pay me.
 8      Q.  Okay, fair enough.
 9          Do you remember what -- in
10  those other cases to which you're
11  referring, or these other instances to
12  which you're referring, do you recall
13  what led you to conclude that the market
14  was inefficient?
15      A.  The stock -- or, the stock or
16  bond price would not respond to
17  information, that I would expect it to
18  respond to.
19          And, when I say
20  "information", I should qualify that by
21  saying "new information".
22      Q.  And was that conclusion
23  reached after conducting -- if you
24  remember -- was that conclusion reached
25  after conducting an event study?
```

Page 97

```
 1          Dr. Adam Werner
 2      A.  It could have been.
 3          I mean, I could also eyeball
 4  it.
 5      Q.  In your opinion, is it
 6  possible for the market -- for a security
 7  to be efficient during one time period
 8  but inefficient during another time
 9  period?
10          MR. STRAUSS:  Objection.
11      A.  Is it possible?  Anything's
12  possible.
13      Q.  Have you ever encountered
14  that situation, where you looked at
15  trading over different time periods for
16  the same security and determined that in
17  one time period it wasn't sufficient and
18  in another it was?
19      A.  Not that I recall.
20      Q.  We talked earlier about the
21  class period, and I just wanted to
22  confirm that, to your knowledge, the
23  class period still starts or begins in
24  this case on September 19th, 2012?
25      A.  That's my understanding.
```

25 (Pages 94 - 97)

Page 98

Dr. Adam Werner

1  Dr. Adam Werner
2  based on the judge's opinion.
3       Q.  What -- if you know, what
4  happened on September 19th, 2012 to make
5  that the start date for the class period?
6  Or what didn't happen, I should say.
7       A.  Well, other than the judge
8  determining that that was the start of
9  the class period?
10      Q.  She hasn't determined that
11  yet, it's --
12      A.  Well, then, I -- again, I'm
13  not a lawyer, so that my reading of her
14  opinion was that she thought that the
15  class period started on --
16      Q.  I'm going to --
17      A.  -- September 19th.
18      Q.  Let me try it this way.
19          Your -- not "your" -- the
20  Plaintiffs' counsel has alleged the class
21  period that begins on September 19th. Is
22  it fair to say that you've accepted that
23  for purposes of your analysis and haven't
24  done any independent determination as to
25  when the class period should or should

Page 99

1  Dr. Adam Werner
2  not start?
3       A.  That is correct, but --
4       Q.  I'm sorry, go ahead.
5       A.  Well, I was just going back
6  to your question on September 19th.
7          If you go to paragraph 11,
8  which is page 5 of Exhibit 1 to this
9  deposition: Then, on September 19, 2012,
10  Baker Hughes notified Hi-Crush that it
11  was terminating its supply contract.
12  According to Baker Hughes --
13          THE WITNESS: Am I going too
14  fast?
15      Q.  No.
16          THE COURT REPORTER: I'm
17  there.
18      A.  Not for you.
19          -- Hi-Crush had breached the
20  confidentiality clause of the supply
21  contract by attaching a version of the
22  contract to its IPO registration
23  statement. Hi-Crush, however, did not
24  publicly disclose Baker Hughes'
25  determination until November. In fact,

Page 100

1  Dr. Adam Werner
2  during a presentation at an industry
3  meeting, on September 25th, 2012,
4  Hi-Crush continued to promote Baker
5  Hughes as an important long-term buyer of
6  its frac sand.
7       Q.  Okay.  So coming back to my
8  question.
9          Then, what occurred or did
10  not occur on September 19 -- what
11  occurred on September 19th, based on your
12  opinion, is that Hi-Crush received a
13  letter from Baker Hughes, notifying them
14  that Baker Hughes was terminating the
15  contract; is that correct?
16      A.  I don't believe that's my
17  opinion.
18      Q.  I said in your opinion, it's
19  expressed in this paragraph you just
20  read.
21          MR. STRAUSS:  Objection.
22      Q.  You just read me this
23  paragraph.
24      A.  Correct.
25      Q.  Okay, so that's what I'm

Page 101

1  Dr. Adam Werner
2  asking.
3          Is that the event that
4  occurred on that date that makes that the
5  start of the class period.
6       A.  Well, you're --
7          MR. STRAUSS:  I don't think
8  it's alleged.
9          THE WITNESS:  Right.
10      A.  That's not my determination
11  to make.
12      Q.  Do you know, or have you
13  done, any independent research to
14  determine when, during the day on
15  September 19th, Hi-Crush received a
16  letter from Baker Hughes?
17      A.  I don't believe so.
18      Q.  Are you familiar with -- you
19  mentioned earlier Form 8-K, are you
20  familiar with the instructions for Form
21  8-K?
22      A.  Not as I sit here.
23      Q.  So if I was to ask you how
24  many days after an event that requires
25  disclosure, under Form 8-K, a registrant

26 (Pages 98 - 101)

Page 102

```
 1              Dr. Adam Werner
 2  is obligated to file its Form 8-K, you
 3  wouldn't know the answer to that; would
 4  you?
 5          MR. STRAUSS: Objection.
 6      A.   I don't believe so.
 7      Q.   Is it still your
 8  understanding, as you sit here today,
 9  that the class period ends on November
10  12th, 2012?
11          MR. STRAUSS: Objection.
12      Q.   If you look at Footnote 1 on
13  page 1.
14      A.   I believe that is correct.
15      Q.   So, again, like I asked you
16  before, that date, you're taking that
17  from what's been alleged in this lawsuit
18  rather than any independent determination
19  of your own; is that right?
20      A.   Well, I guess.
21      Q.   Well, you seem puzzled.
22      A.   You know, again, I don't
23  think -- you're asking me to make a legal
24  determination, which is not anything I've
25  thought about.
```

Page 103

```
 1              Dr. Adam Werner
 2          It's not my job to determine
 3  when and -- the class period should start
 4  and end.
 5      Q.   No, that's exactly what I
 6  asked you. I didn't ask you to make a
 7  legal determination.
 8          I said, you're accepting the
 9  period that's been set forth in this
10  lawsuit rather than having done anything
11  independent to determine when the class
12  period should end.
13          MR. STRAUSS: Objection.
14      What do you mean by "accepting"?
15      You mean that he's accepting as an
16      assumption?
17          MR. PARADISE: Yes.
18          MR. STRAUSS: Okay.
19      A.   I believe that's correct.
20          I mean, the only thing
21  that -- the only confusion I have about
22  this point is that, you know, you see the
23  stock price reaction on November 13th, so
24  do I consider that part of the class
25  period? Not as formally defined in
```

Page 104

```
 1              Dr. Adam Werner
 2  this -- in their complaint, but that was
 3  when the information was reflected in the
 4  stock price.
 5      Q.   And what -- do you know, or
 6  are you aware -- and you can certainly
 7  refer to your report -- are you aware of
 8  what happened on November 12th with
 9  respect to Hi-Crush that -- well, what
10  occurred with respect to Hi-Crush on
11  November 12th, 2012?
12      A.   (Pause.)
13          I don't specifically recall.
14  If I could look at the complaint.
15          MR. PARADISE: Do we have a
16      copy of the complaint?
17          MS. BRANDON: I think we do.
18      Q.   While we're looking for that,
19  let me see if this helps.
20          Look at paragraph 12 of your
21  declaration.
22      A.   Right.
23      Q.   You have a reference in there
24  to November 12.
25      A.   Oh.
```

Page 105

```
 1              Dr. Adam Werner
 2      Q.   I can represent to you that,
 3  what happened, that you recite in here,
 4  is Hi-Crush formally terminated the
 5  supply agreement.
 6          Do you see that?
 7      A.   Yes.
 8      Q.   Do you want to still see the
 9  complaint?
10      A.   And its suit, filed suit,
11  against Baker Hughes.
12      Q.   Right, do you still need to
13  see that, (indicating)?
14      A.   No.
15      Q.   Turning to page 2 of your
16  declaration, Footnote 2.
17          You discuss, in this
18  Footnote, the -- what you call, or
19  define, as the "test period", which is
20  from September 19th, 2012 until November
21  13th, 2013.
22          Do you see that?
23      A.   Yes.
24      Q.   Okay. And you say, in
25  parenthetical, after November 13th, 2013
```

27 (Pages 102 - 105)

Page 106

1        Dr. Adam Werner
2   a -- and this is the parenthetical: A
3   year after the impact of the corrective
4   disclosure on Hi-Crush's stock price,
5   which I define as the "test period", you
6   continue on from there but for my
7   purposes I'm going to stop there.
8       A.   Okay.
9       Q.   What do you mean by
10  "corrective disclosure", as you use it in
11  Footnote 2?
12      A.   I guess corrective of the
13  alleged fraud.
14      Q.   And what was the disclosure
15  that you believe was corrective of the
16  alleged fraud, for purposes of your
17  (indicating) opinion?
18      MR. STRAUSS:   Objection.
19      A.   Well, going back to the
20  paragraph you pointed out --
21      Q.   12?
22      A.   Yeah. Hi-Crush formally
23  terminated its supply agreement on
24  November 12th, 2012 but, at the same
25  time, it filed suit against Baker Hughes,

Page 107

1        Dr. Adam Werner
2   seeking damages --
3       THE WITNESS:   Sorry.
4       A.   -- over the contract
5   termination.
6       Q.   And what misrepresentation or
7   omission do you believe this corrective
8   disclosure corrected?
9       MR. STRAUSS:   Objection.
10  Once again, you're asking him for
11  legal conclusions, you're not
12  asking him for -- or, to recite the
13  allegations, you're not asking him
14  for his opinion or the analysis
15  that led him to his opinion and, as
16  such, it's not the proper scope of
17  the deposition.
18      MR. PARADISE:   Okay, I
19  disagree.
20      Q.   But you can answer.
21      If you don't have an opinion,
22  you can say: I don't have an opinion,
23  but you -- I'll just say, the reason I
24  don't agree with Mark is because you say
25  you've created this test period that runs

Page 108

1        Dr. Adam Werner
2   from a year from the corrective
3   disclosure, so I'm assuming, from that,
4   that the corrective disclosure has some
5   significance to you, so I want to have
6   your understanding as to what you
7   consider to be the corrective disclosure,
8   to see if that's a valid time period that
9   you're using.
10      MR. STRAUSS:   He testified
11  he's using that date as an
12  assumption, not that he rendered an
13  opinion on the corrective
14  disclosure period.
15      MR. PARADISE:   Well, I don't
16  think so.
17      I asked about on the class
18  period, he said he accepted it, but
19  I don't think I asked him why he
20  used November 13th, so I can ask
21  him that question.
22      Q.   Why did you use November
23  13th? What was the reason for using that
24  date?
25      A.   It's corrective of the

Page 109

1        Dr. Adam Werner
2   omission of information.
3       Q.   Right, and what was the
4   omission that occurred?
5       A.   That Baker Hughes had
6   terminated its contract.
7       But let me -- hold on one
8   second.
9       MR. STRAUSS:   Are you asking
10  him what happened on November 13th
11  or why he selected November 13th,
12  as opposed to any other date, to
13  start this test period? Is that
14  what you're asking?
15      MR. PARADISE:   Well, he said
16  he used November 13th in his
17  opinion as -- because that's one
18  year from the corrective
19  disclosure, so I'm trying to
20  understand what makes him think
21  that was the corrective disclosure,
22  why was that the right date to
23  start from.
24      MR. STRAUSS:   November 13th,
25  2013?

28 (Pages 106 - 109)

Case 1:21-md-02989-CMA   Document 567-17   Entered on FLSD Docket 06/07/2023   Page 30 of
114
Case 1:12-cv-08557-CM   Document 147-1   Filed 06/17/14   Page 30 of 114

Page 110

1          Dr. Adam Werner
2          MR. PARADISE:  12, he said
3    one year from that date, he said.
4          He's in the middle of
5    answering, so....
6    A.   No, I'll stick with my
7    answer.
8    Q.   Okay.  Why do you -- did you
9    feel it was necessary to use this test
10   period, which, as you point out, runs
11   from a year -- you know, a year following
12   the class period, to establish or
13   determine whether the market for Hi-Crush
14   was efficient?
15   A.   Because there was very little
16   information disclosed about Hi-Crush
17   during the class period.
18         Now, that having been said, I
19   would have been more than happy to just
20   look at the class period, where we have
21   one significant disclosure that moves the
22   stock price, but I'm sure your experts
23   would then complain about the fact that I
24   was only looking at a one- or two-month
25   period of time, and I was only looking at

Page 111

1          Dr. Adam Werner
2    one disclosure.
3          So, I mean, I'd be happy to
4    do it.  The problem is, if I do it, you
5    guys are going to complain about it, or
6    your -- the people you hire are going to
7    complain about it.  That's why I did it.
8    Q.   Well, but, are you saying --
9    or was that a hypothetical, are you
10   saying there was a significant disclosure
11   during the class period, that's defined
12   as September 19th, 2012 to November 12th,
13   2012?
14   A.   I'm saying there was one
15   significant piece of information released
16   to the market during that time period.
17   Q.   And what was that?
18   A.   The -- Hi-Crush formally
19   terminated its supply agreement on
20   November 12th, 2012 while, at the same
21   time, it filed suit against Baker Hughes
22   seeking damages over the contract
23   termination.
24   Q.   You're referring to paragraph
25   12 again?

Page 112

1          Dr. Adam Werner
2    A.   Yes.
3    Q.   But that was released on
4    November 13th, 2012.
5          That's outside the class
6    period.
7    A.   No, I believe -- I mean --
8    okay, now we're getting into semantics.
9          The termin-- the information
10   was released either post-closing of the
11   market on the 12th versus -- or prior to
12   the opening of the market on the 13th.
13   Q.   I'll represent to you that it
14   was the latter, it was prior to the
15   opening on the 13th.
16         And I'm going to show you the
17   press release in a second.
18   A.   Okay.  I don't under-- for
19   me, I don't understand the legal
20   distinction of why the class period ends
21   on the 12th versus the 13th and how, if
22   legally, whether you determine that if
23   information is released prior to a market
24   opening it should be reflected, the
25   correct proper date that you need to look

Page 113

1          Dr. Adam Werner
2    at for the class period is the prior day,
3    I don't know.
4    Q.   Okay, fair enough.
5    A.   That's nothing I understand
6    or -- but that's it.
7    Q.   Okay, so, but, just for the
8    record, the disclosure to which you are
9    referring, to which you referred earlier
10   as having occurred during the class
11   period, is the disclosure that you
12   discuss in paragraph 12 (indicating) of
13   your declaration.
14   A.   It's -- disclosure,
15   conveyance of information, whatever you
16   want to call it.
17         It's -- so, yes, a press
18   release was issued, they filed a lawsuit
19   I believe on the prior day, I don't --
20   Q.   I'm just trying to establish
21   that there's no other disclosure that you
22   were referring to.  That's all.  You were
23   referring to this disclosure, whether it
24   happened on the 13th or at the end of the
25   12th, that's the disclosure that you're

29 (Pages 110 - 113)

Page 114

1        Dr. Adam Werner
2 talking about.
3     A.   I believe that is correct.
4     Q.   Okay. Let me just hand you
5 the press release, just to show it to
6 you, so can see the date on it, and all
7 that.
8        MR. PARADISE: Can you please
9 mark this as Exhibit 2?
10       (Whereupon Deposition Exhibit
11 2, Press release, dated November
12 13th, was marked for
13 identification, as of this date.)
14    A.   Actually, you know what, can
15 I take a break?
16    Q.   Sure.
17       (Recess taken: 12:09 p.m. -
18 12:19 p.m.)
19 BY MR. PARADISE:
20    Q.   Before we broke, I handed you
21 what the court reporter has marked as
22 Exhibit 2, just so we have it on the
23 record.
24       And uow you've advised me
25 that you'd like to clarify one of your

Page 115

1        Dr. Adam Werner
2 previous answers, I believe?
3     A.   Correct.
4     Q.   Go ahead.
5     A.   So, when we were talking
6 about analyst coverage and analyst
7 following, I do want to point out that,
8 in terms of companies that were following
9 Hi-Crush, as opposed to -- as I define
10 it, part of that was based on the idea
11 that they had previously issued reports
12 on Hi-Crush, prior to the class period,
13 so that's, to me, evidence that -- or,
14 additional evidence that they were, in
15 fact, following Hi-Crush.
16    Q.   Just for the record, you're
17 referring to Exhibit 6 of Exhibit 1, and
18 you're referring to the -- some of the
19 brokerage firms that are listed as having
20 issued reports prior to the class period;
21 is that right?
22    A.   Correct.
23    Q.   Okay. Is there anything
24 else?
25    A.   No.

Page 116

1        Dr. Adam Werner
2     Q.   During this last break, did
3 you and Mr. Strauss discuss anything that
4 bears upon any of my prior questions or
5 any of your prior answers?
6     A.   I believe we discussed
7 analyst coverage.
8     Q.   Anything else?
9     A.   Not that I can think of.
10    Q.   Let's come back, for a
11 moment, to the test period that we were
12 discussing.
13       I don't have any questions on
14 the press release, just -- on Exhibit 2,
15 but I wanted to show it to you just to
16 show you that it's dated November 13th,
17 if you see at the beginning of the press
18 release there's a date, (indicating),
19 that was the only purpose of me showing
20 that to you at this point.
21    A.   Right. But, in this press
22 release that is issued on November 13th,
23 it specifies: On November 12th, 2012,
24 Hi-Crush formally terminated the supply
25 agreement and filed suit in the State

Page 117

1        Dr. Adam Werner
2 District Court of the Harris County, that
3 in and of itself is information.
4     Q.   I'm not disagreeing with you.
5 The only question is when was that
6 information released to the market, and
7 the date of the press release is November
8 13th.
9        That's -- that was the only
10 thing --
11    A.   But the lawsuit was filed on
12 the 12th.
13    Q.   Correct.
14    A.   That information -- the fact
15 that the lawsuit was filed on the 12th
16 would be conveyed to the market on the
17 12th, if the market was still open, or in
18 terms of the calendar day, which seems to
19 be what you're focusing on here, that was
20 released on the 12th, that information
21 about the lawsuit, the fact that a
22 lawsuit had been filed would have been
23 information on the 12th.
24    Q.   Is it your opinion, or -- I
25 mean -- I mean, because I want to make

30 (Pages 114 - 117)

Page 118

1          Dr. Adam Werner
2     sure I'm understanding you now, is it
3     your opinion that the market was aware
4     that the lawsuit had been filed on
5     November 12th?
6          A.   Define "the market".
7          Q.   You used the word "market" in
8     your answer.
9          A.   Well -- uh -- during -- I
10    defined "the market" as during trading
11    hours, I do not believe that the market
12    was aware of it on the 12th --
13         Q.   Okay.
14         A.   -- during trading hours.
15              Anyone who owned shares in a
16    stock, who lives 24 hours a day, though,
17    may have seen this information after the
18    market closed.
19         Q.   Are you aware of any
20    published information on the internet --
21    analyst reports, news reports, Motley
22    Fool, Seeking Alpha -- any other source
23    of information, that reported, on
24    November 12th, whether it be during or
25    after market hours, that Hi-Crush had

Page 119

1          Dr. Adam Werner
2     filed a lawsuit against Baker Hughes.
3          A.   I don't believe so, but hold
4     on a second, let me review Appendix A.
5     (Pause.)
6              I don't believe so.
7          Q.   And stay with Appendix A for
8     a moment, if you don't mind.
9              So, looking at the date of
10    November 12th, did the -- in your event
11    study, did your -- I'm sorry, this is
12    your event study; right?
13         A.   Yes.
14         Q.   Okay.   Did the price of the
15    stock move on November 12th in a manner
16    that suggests to you that the market
17    absorbed the news of the filing of that
18    lawsuit?
19         A.   Did it move in a way --
20         Q.   In a -- let me use your
21    lingo, if you don't mind, so I'm using it
22    right -- did it move in a statistically-
23    significant way on November 12th, 2012?
24         A.   It did not.
25         Q.   Okay. So let's stay -- well,

Page 120

1          Dr. Adam Werner
2     let's talk about -- I want to talk more
3     about the test period, because you
4     explained that there -- that you didn't
5     feel there was -- well, you said you
6     thought that if you had used the period
7     of September 19th to -- September 9th,
8     2012, through November 12th, 2012, that
9     our experts would have criticized you as
10    using an insufficient period of time; is
11    that right?  Is that fair?
12         A.   Well, with regards to the
13    release --
14         Q.   Right.
15         A.   -- of information.
16         Q.   So, that's why you said you
17    used an extended period of time.
18              Is there anything about the
19    one-year period, is there any reason why
20    you went one year out from November -- I
21    guess November 13th, 2012, to November
22    13th, 2013?
23         A.   I mean, most -- many event
24    studies use a one-year window to measure
25    as a measurement of time.

Page 121

1          Dr. Adam Werner
2         Q.   So you didn't look at a
3     different period of time and then, you
4     know, sort of cherry pick that one-year
5     period, because that was a favorable time
6     period; did you?
7         A.   No.
8         Q.   Now, when you look at the
9     period outside of the class period,
10    right, so you're looking at that November
11    13, 2012 to November 12th, 2013, is it
12    your opinion that if the market for the
13    stock was efficient during that time
14    period or some, you know, time period
15    other than the class period that's at
16    issue, that means that the market was
17    also efficient during the class period?
18              MR. STRAUSS:  Objection.
19         Q.   That was a bad question.  Let
20    me rephrase the question.
21         A.   Okay, I was going to say --
22         Q.   Let me ask it more generally,
23    and then we'll get specific.
24              What I'm trying to get at is,
25    in your opinion, if the market for the

31 (Pages 118 - 121)

Page 122

1        Dr. Adam Werner
2   stock is efficient in one time period,
3   does that mean it is always efficient?
4        MR. STRAUSS: Objection.
5    A.  I don't know how to answer
6   that.
7    Q.  Why?
8    A.  I mean, I don't know how to
9   answer it.
10       That's my answer.
11   Q.  Okay, then let's talk
12  specifically.
13       Do you agree with me that, in
14  your event study, Appendix A to Exhibit
15  1, there are no statistically-significant
16  dates during the class period?
17       So that's September 19, 2012
18  through November 12, 2012.
19       And let me just further say
20  that I'm drawing that conclusion because
21  I don't see any asterisks during the
22  during the -- during that time period, on
23  any of the dates, and I do see numerous
24  asterisks for the subsequent period of
25  November 13th, 2012 through November

Page 123

1        Dr. Adam Werner
2   13th, 2013, so I'm assuming -- sorry,
3   it's very long -- but I'm assuming that
4   the asterisks signify a statistically-
5   significant date. Is that a fair
6   assumption?
7    A.  That is a fair assumption.
8    Q.  Now, after that long-winded
9   question, my question to you is, are
10  there any statistically-significant dates
11  during the class period.
12   A.  During the class period,
13  again, I'm using your definition, or
14  everyone's definition --
15   Q.  Right.
16   A.  -- of September 19th through
17  November 12th, no.
18   Q.  Okay. So is it fair to say
19  that your opinion in this case, that the
20  market is efficient -- was efficient
21  during the class period, is based on your
22  observation of efficiency during the
23  subsequent period of November -- you
24  know, when I say "subsequent period",
25  it's part of your test period, but it's

Page 124

1        Dr. Adam Werner
2   outside the class period, that's what I'm
3   trying to say by "subsequent period".
4    A.  That informs my opinion.
5    Q.  And, now, coming back to my
6   original question, that you said you
7   didn't know how to answer it, can you
8   explain to me how you're able to
9   conclude, based on the presence of
10  statistically-significant events during
11  this subsequent period -- can we just
12  have an understanding that that means
13  November 13, 2012 through November 13,
14  2013?
15   A.  Okay.
16   Q.  How does that form your
17  opinion that the market was efficient
18  during the class period?
19   A.  Well, there are no -- I mean,
20  I don't -- you're right, I don't see any
21  statistically-significant price
22  movements, but there was also no
23  significant news issued during that
24  period.
25       So, I mean, if I saw all

Page 125

1        Dr. Adam Werner
2   sorts of crazy stock price movements on
3   no information, that might inform me that
4   the stock wasn't efficient.
5    Q.  So, I understand -- I think I
6   understand what you're saying -- so is it
7   fair to say that you're drawing an
8   inference based upon your observation of
9   the subsequent time period that the
10  market was also efficient during the
11  class period?
12   A.  That's part of it. Again, it
13  informs my opinion.
14   Q.  What else informs your
15  opinion, besides that?
16   A.  Well, I can look at the
17  analyst coverage during the class period,
18  trading volume during the class period,
19  the fact that it was traded on the NYSE,
20  it had a designated market maker, a $290
21  million company, the bid/ask spread was
22  less than I believe -- I believe it was
23  .49 percent, but I don't recall off the
24  top of my head, which is less than the 2
25  percent threshold established in other

32 (Pages 122 - 125)

Page 126

Dr. Adam Werner

1
2 court cases -- um -- (pause) -- let's
3 see -- we can go -- well, those are
4 certainly examples of things that inform
5 my opinion, the absence of auto-
6 correlation --
7       THE WITNESS: And this one is
8 a tough one, "autocorrelation" --
9 A-U-T-O-C-O-R-R-E-L-A-T-I-O-N.
10     Q.   So, essentially, the
11 other -- and, again, I take it you are
12 referring or -- referring to or
13 consulting your opinion, your
14 declaration, paragraph 4, for those items
15 you just listed to me, they're listed
16 here among the letters under the
17 paragraph 4; is that right?
18     A.   I believe so.
19     Q.   Okay.
20     A.   I mean, I was doing it off
21 the top of my head at the time, but I
22 believe that was correct.
23     Q.   All right. We're going to
24 come to -- we're going to talk about a
25 bunch of those as we move forward, but

Page 127

Dr. Adam Werner

1
2 it's fair to say -- so I just wanted to
3 make an understanding, though, that the
4 event study itself, though, is being used
5 as an inference, that piece of your
6 analysis is being used as an inference
7 for the class period.
8     A.   I don't -- I guess I don't
9 understand the question because the
10 event -- the event study is the time
11 period that you look at with regards to
12 information.
13          What you're defining is the
14 "event window" in which you estimate the
15 event study, but you then use that, those
16 results, to look at -- you can look at a
17 broader period.
18          So I'm not quite under-
19 standing what you're talking about.
20     Q.   The "event window", is that
21 the -- what do you consider the "event
22 window" in this case?
23     A.   November 13th, 2012 to
24 November 13th, 2013.
25          That's the time that the --

Page 128

Dr. Adam Werner

1
2 I'll leave it at that.
3     Q.   Let's stay with Appendix A
4 for a moment.
5          Just looking at the first
6 four entries, I notice that the data on
7 the first four trading -- you know, the
8 first four trading dates that you list
9 there: September 19th, September 20th,
10 September 21, and September 24, is all
11 identical, and that strikes me as maybe
12 an error; is that --
13     A.   I believe that is an error.
14     Q.   Okay.
15     A.   But I also -- I do know there
16 was no statistically-significant price
17 movements on those dates.
18     Q.   But the data was not
19 replicated like this on those four days;
20 was it? The trading day, the volume, the
21 price, the return?
22     A.   As I sit here, I don't know,
23 but I believe that you are correct.
24     Q.   Just -- and just coming back
25 to your definition of "event window", for

Page 129

Dr. Adam Werner

1
2 purposes of looking at Exhibit 7 --
3     A.   Oh.
4     Q.   -- my --
5     A.   I just marked this, I'm
6 sorry.
7     Q.   That's okay.
8          MR. PARADISE: For the
9 record, we'll note that the witness
10 marked --
11     Q.   What is that? What page is
12 that?
13     A.   Appendix A, the first page of
14 Appendix A.
15          MR. PARADISE: Off the
16 record.
17          (Discussion off the record.)
18     Q.   Take a look at Exhibit 7 for
19 a moment.
20          I just want -- on this event
21 study time period -- I mean -- sorry, the
22 "event window", on Exhibit 7, the period
23 that you put down there is November 14,
24 2012 to November 13th. I don't know if
25 that's also just a typo?

33 (Pages 126 - 129)

Page 130

1        Dr. Adam Werner
2    A.   No, that is November 4th -- I
3  did not include the price reaction on
4  November 13th in my analysis.
5    Q.   I'm looking at yours. Does
6  yours say November 14? Oh, okay.
7        So the reason why you used
8  that is -- could you just explain that
9  again, why you didn't look at November
10  13th?
11    A.   I did look at November
12  13th in my -- I guess my confusion is, is
13  you -- I'm not understanding your
14  definition of an "event study".
15        Could you define what you
16  mean by "event study"?
17    Q.   Well, the only thing I mean
18  by "event study" is whatever you mean,
19  quite frankly, your event study.
20    A.   Well, okay. So I did
21  estimate it -- I did some regression
22  analysis over this time period, but the
23  event study encapsulates the class
24  period.
25    Q.   Yes, I understand that.

Page 131

1        Dr. Adam Werner
2        You mentioned "event window"
3  before, and you said -- the period you
4  told me was November 13th, 2012 to
5  November --
6    A.   That was -
7    Q.   -- 12th, 2013.
8        I'm just trying to understand
9  why here it's November 14th.
10    A.   It is No-- because I should
11  have said November 14th.
12    Q.   That's what I'm getting at,
13  okay.
14        And, just so I understand,
15  why don't you start with November 13th --
16    A.   Because --
17    Q.   -- 2012.
18    A.   Right.
19        Because that was the day
20  where large information was released to
21  the market. Including that day would
22  probably -- I don't want to say "mess
23  up" --
24    Q.   Skew?
25    A.   It might skew my analysis --

Page 132

1        Dr. Adam Werner
2  (gesturing).
3    Q.   Back to Appendix A for a
4  second.
5        So, with respect to the dates
6  that are asterisked, my -- from reading
7  your declaration and observing or
8  reviewing your event study, my
9  observation is that you starred those
10  days and have a t-stat of greater or --
11  greater -- equal to or greater than one
12  absent value of 1.96; is that --
13    A.   I believe that is --
14    Q.   -- correct?
15    A.   -- correct.
16    Q.   And that's -- if I'm reading
17  your report correctly, that corresponds
18  to a confidence level of 95 percent; is
19  that right?
20    A.   Correct.
21    Q.   Okay. Why do you -- why is
22  that the confidence level that you chose
23  to use?
24    A.   Oftentimes, that's the
25  confidence level that an economist will

Page 133

1        Dr. Adam Werner
2  use in doing an econometric analysis.
3    Q.   Other times, in your report,
4  I see references to a 99 percent
5  confidence level and I also saw some
6  references to a 90 percent confidence
7  level.
8        99 percent, obviously, is
9  higher than 95 percent, but do you also
10  consider, in certain circumstances, in
11  this report -- in this declaration, I
12  keep calling it a "report" -- in this
13  declaration, do you consider some of the
14  events that had a statistical
15  significance of -- I'm sorry -- the
16  confidence level of 90 percent, to be
17  statistically-significant?
18    A.   "The events"?
19    Q.   Or -- let me -- maybe I
20  should show you specifically what I'm
21  talking about. It may be easier that
22  way.
23        For example, look at
24  paragraph 49 for a moment.
25    A.   (Pause.)

34 (Pages 130 - 133)

Page 134

1        Dr. Adam Werner
2        Okay.
3        Q.    Please read as much of it as
4   you would like, but the sentence to which
5   I was referring, or am referring, is the
6   fourth sentence, beginning with: The
7   coefficient?
8        A.    Right.
9        Q.    So there you see a
10  statistically-- it says: Statistically-
11  significant at a 90 percent confidence
12  level.
13        I'm just curious as to how
14  you would -- how you reconcile the 95
15  percent confidence level with the 90
16  percent confidence level for purposes of
17  determining how something is
18  statistically-significant.
19        MR. STRAUSS: Objection.
20        Q.    If you do.
21        A.    It's what the confidence
22  level is, it's 90 percent for this
23  observation, or in this analysis. I
24  don't know what else to tell you about
25  that.

Page 135

1        Dr. Adam Werner
2        I mean, by definition, it's
3   statistically significant that a 90
4   percent confidence level.
5        Q.    What does that mean with
6   respect to your opinion about the
7   efficiency of the market? I.e. that it's
8   statistically significant at a 90 percent
9   level versus being statistically
10  significant at a 95 percent confidence
11  level, if anything?
12        MR. STRAUSS: Objection.
13        Which -- what are you specifically
14        referring to?
15        MR. PARADISE: Paragraph 49,
16        where it refers to the t-stat of
17        1.67 being statistically
18        significant at 90 percent
19        confidence level and then, later
20        on, in that same paragraph, Dr.
21        Werner says that the common stock
22        returns are -- I'm going to just
23        read it: highly sensitive to
24        movements in the market index and
25        fairly sensitive -- parenthetical --

Page 136

1        Dr. Adam Werner
2        at a 90 percent confidence level --
3        closed parentheses -- to the
4        net-of-market industry index over
5        the event window.
6        Q.    I'm just trying to understand
7   if it has any meaning with respect to
8   your overall opinion about the efficiency
9   of the market.
10        MR. STRAUSS: Objection.
11        A.    I believe it informs my
12  opinion.
13        Q.    And does it support your
14  opinion?
15        A.    I don't think that one piece
16  of information supports or does not
17  support my opinion.
18        Q.    Do you remember, is 90
19  percent rounded? Is that a rounded
20  number there?
21        And if you take a look at
22  Exhibit 7, because --
23        A.    I believe it might have been.
24        Q.    Okay. Is that acceptable, to
25  round up like that? Because I think,

Page 137

1        Dr. Adam Werner
2   technically, it was at 89.6 percent. If
3   you look at Exhibit 7, you have this peak
4   greater than an absolute value of T of
5   .104, so --
6        A.    I'm sorry, what exhibit?
7        Q.    Exhibit 7.
8        MR. PARADISE: Off the
9        record.
10        Q.    If I'm doing my math correct,
11  it's actually a .89 -- .896, and I just
12  want to make sure that you're rounding up
13  to 90?
14        A.    You are correct.
15        Q.    And just because I'm not the
16  expert, that's acceptable, in your
17  experience, to round up to 90 percent?
18        A.    I don't -- I've never
19  seen -- I don't know whether it's
20  acceptable or unacceptable.
21        I mean, tech-- you're more
22  than welcome to change that to 89.6.
23        Q.    That wouldn't change your
24  opinion; is that --
25        A.    No.

35 (Pages 134 - 137)

Page 138

1          Dr. Adam Werner
2     Q.   Okay. In terms of the five
3   Cammer factors that you analyzed, do you
4   consider any one of the five factors to
5   be more important than any other?
6     A.   'More important" from what
7   perspective?
8     Q.   More important or more
9   valuable in determining market
10  efficiency.
11    A.   I believe factor five is more
12  informative than the other factors.
13    Q.   In factor five -- let's just
14  turn to your declaration for a moment.
15  It is discussed at the beginning on page
16  24, am I right, paragraph 61?
17    A.   I think it started earlier.
18    MS. BRANDON:  Page 16.
19    MR. KEABLE:  Page 16.
20    Q.   You're right, I apologize,
21  page 16.
22    A.   Right.
23    Q.   Okay. All right. I'm
24  looking at the exhibits that I think
25  correspond to your analysis of factor

Page 139

1          Dr. Adam Werner
2   five, which I believe are Exhibits 7 and
3   8.
4          Is that -- am I right about
5   that?
6     A.   There are many exhibits,
7   there's more exhibits than that, I
8   believe.
9          Exhibit 7 through -- I
10  believe, Exhibit 13 -- through Exhibit
11  13, speaks to factor five.
12    Q.   I'm just looking -- I'm
13  trying to get an understanding as to the
14  time periods that you used for these
15  various analyses that you performed.
16         So I see that in Exhibit 7
17  and Exhibit 8 you use the period of
18  November 14th through November 13th,
19  which is a portion of your test period,
20  but for Exhibits 9, 10, 11, 12, and 13
21  you used the entire test period -- and
22  14, I apologize, and 14.
23         I'm just trying to get an
24  understanding as to why it is that you
25  used the different periods for these --

Page 140

1          Dr. Adam Werner
2   for Exhibits 7 and 8 than you did for the
3   remainder of the exhibits.
4     A.   I think this goes to the
5   question that we discussed earlier, about
6   the definition of an "event study".
7     Q.   Could you enlighten me again,
8   if you don't mind?
9     A.   The control period is from
10  November 14, 2012 to November 13, 2013.
11  That's where I performed my regression
12  analysis.
13    Q.   And that's the control
14  period, because you -- I think, if I
15  understood you earlier, you wanted to
16  eliminate the 13th because you thought
17  that might skew the results, and this is
18  a period that doesn't have an event that
19  would skew the results. Is that the
20  idea?
21    A.   I don't know if this has an
22  event that would skew the results or not,
23  but as this -- as the 13th is the largest
24  stock price movement, at least during
25  this entire period, I chose not to

Page 141

1          Dr. Adam Werner
2   include that.
3          Alternatively, I could have
4   used -- I could have included that date
5   and used the dummy variable to correct
6   for that large fluctuation in price.
7     Q.   And excuse my naivete here
8   but, with respect to the exhibits beyond
9   Exhibits 7 and 8, so Exhibits 9 through
10  14, the reason that you were able to use
11  the entire test period, because you were
12  not performing your regression analysis
13  in those exhibits? Is that -- am I
14  understanding you?
15         I'm just trying to understand
16  why it's okay to use the longer period
17  for those other exhibits but, the shorter
18  period, you felt it was important to use
19  the shorter period for the Exhibits 7 and
20  8.
21    A.   I mean, I'm look-- I use the
22  longer periods because I'm interested in
23  how the stock price reacts to information
24  during those periods.
25    Q.   But for Exhibits 7 and 8,

36 (Pages 138 - 141)

Page 142

1         Dr. Adam Werner
2  you're not interested in that?
3         That's what I'm trying to
4  understand.
5     A.   So, the nature of an event
6  study is to test whether a stock responds
7  to news; right? And normally what you
8  want to do is you want to use a clean
9  period, which isn't -- which does not
10 have some kind of -- you know, I'm not
11 even quite sure how to explain it.
12        What I did was the standard
13 event study methodology. It is what it
14 is.
15    Q.   And is this like an outlier
16 event? You're trying to eliminate like
17 an outlier event?
18        Is that the idea?
19    A.   Well, I don't want to use the
20 term "outlier", but you --
21    Q.   In other words --
22    A.   You try to --
23    Q.   -- an aberrational --
24    A.   It's like any statistical
25 test that you do; right?

Page 143

1         Dr. Adam Werner
2         I want a control period and
3  then I look at my sample period. I used
4  the control period, so it doesn't --
5  whatever happens in the other period
6  doesn't influence my control period.
7     Q.   Okay. And your control
8  period --
9     A.   But it's like any scientific
10 experiment.
11        MR. PARADISE: Off the
12    record.
13        (Discussion off the record.)
14    Q.   I just want to ask you, just
15 the two terms you used there, I want to
16 make sure that I understand what you mean
17 by it.
18        So the "control period", for
19 these purposes, means the period of
20 November 14th, 2012 to November 13th,
21 2013; correct?
22    A.   I --
23        MR. STRAUSS: I think it's
24    November 14th.
25        MR. PARADISE: Right, I said

Page 144

1         Dr. Adam Werner
2  November 14th, 2012 to November
3  13th, 2013.
4     A.   I believe that is correct.
5     Q.   And the sample -- and you
6  also mentioned a sample period.
7         So --
8     A.   Well --
9     Q.   -- what period is that?
10    A.   That was my misuse of the
11 language.
12    Q.   Okay.
13    A.   That, I should have said the
14 period in which I want a study how
15 information impacts the stock price.
16    Q.   And is that the test period,
17 the full test period?
18    A.   That is the full test period.
19    Q.   Got it, okay.
20        MR. PARADISE: Take a break?
21        MR. STRAUSS: Yes.
22        MR. PARADISE: Do you want to
23    break for lunch?
24        (Luncheon recess: 12:50 p.m.)
25

Page 145

1         Dr. Adam Werner
2  AFTERNOON SESSION
3         (1:43 p.m.)
4
5  DR. ADAM WERNER,
6  resumed, having been previously duly
7  sworn, was examined and testified as
8  follows:
9
10        MR. PARADISE: Dr. Werner has
11    indicated that he'd like to
12    clarify, or attempt to clarify, a
13    prior answer.
14 CONTINUED EXAMINATION
15 BY MR. PARADISE:
16    Q.   Go ahead, please.
17    A.   Yeah, I think I was just --
18 before the break, my blood sugar was
19 crashing, I think I was fairly
20 inarticulate with regards to how one
21 conducts an event study.
22        So I just wanted to point to
23 something like -- I mean, the methodology
24 I use is very similar to that used in
25 the -- this St. John Law Review article,

37 (Pages 142 - 145)

Page 146

1        Dr. Adam Werner
2  by Ferrillo, Tabak, and Dunbar, that I
3  cited in my report.
4           There are other examples that
5  I can point to that mirror discussions of
6  this type of methodology.
7        Q.  And, just to be clear, the
8  type of methodology you mean is the --
9  what you described as the use of a
10  control period, as opposed to the --
11       A.  Okay, can I have the article?
12       Q.  Yeah, sure, I want to make
13  sure I understand what you're clarifying,
14  because I thought I understood your
15  answer.
16       A.  Oh.
17       Q.  So you talked about a control
18  period and then another period, which is
19  the period that you're evaluating, which
20  I guess here would be the class period.
21  Is that --
22       A.  Well, that would be the test
23  period.
24       Q.  Right.
25       A.  I evaluate the test period --

Page 147

1        Dr. Adam Werner
2        Q.  Okay.
3        A.  -- which includes the class
4  period.
5        Q.  Got it. Thank you.
6           I want to come back to your
7  declaration and some of the other Cammer
8  factors, because we spent a lot -- a
9  bunch of time on factor five, which I
10  want to come back to, as well, but I want
11  to just get some of these other ones on
12  the record, for a second, and make sure
13  that I understand what's going on with
14  these other exhibits, if you will.
15          So starting with -- Exhibit
16  3.
17       A.  Is it Exhibit 3 to Exhibit 1?
18       Q.  Yes.
19          If you could just explain
20  what Exhibit 3 is showing or what
21  conclusions you reached based on Exhibit
22  3 or --
23       A.  It's just more support with
24  regards to the efficiency of the market
25  for Hi-Crush.

Page 148

1        Dr. Adam Werner
2        Q.  Does it apply to any one of
3  the five Cammer factors?
4        A.  Well, you have volume, which
5  Cammer factor one I believe is average
6  weekly volume. Bid/ask spread deals
7  with -- that's a Krogman factor, I
8  believe.
9        Q.  Could you spell that?
10       A.  Yeah, K-R-O-G-M-A-N.
11          Market capitalization, that
12  goes to factor four as well as I believe
13  that's another -- I should say Cammer
14  factor four -- as well as a Krogman
15  factor.
16       Q.  Is Krogman a court decision
17  or is that an academic person?
18       A.  Oh, it's a court decision.
19          Here, I can --
20       Q.  Look at -- if you would, look
21  at the second page of Exhibit 3, on the
22  back -- I don't know if it's double-
23  sided -- yeah, it's double-sided -- the
24  line that's dated October 31, 2012,
25  there's a couple of places in there where

Page 149

1        Dr. Adam Werner
2  you have no data, and I just want to make
3  sure, is that an error, is that a
4  mistake?
5        A.  No, Bloomberg did not have
6  data.
7        Q.  Oh, couldn't you compute
8  the -- for example, couldn't you compute
9  the day's average bid/ask spread based on
10  the information that you do have?
11       A.  No. We get all the bid/ask
12  spread data from Bloomberg.
13       Q.  Okay. So when it says: No
14  data, across October 31, in three places,
15  that just meant that there's no data
16  available from Bloomberg.
17       A.  Correct.
18       Q.  So, I'm sorry, look at the
19  column that's headed: Percentage of
20  outstanding shares sold short. And
21  there's a formula there: C equals A
22  divided by B.
23          So, that one, you could have
24  just divided A by B; right?
25       A.  I believe, technically, that

38 (Pages 146 - 149)

Page 150

1           Dr. Adam Werner
2 is correct.
3           I -- yeah, we get those
4 numbers from Bloomberg, as well. I
5 mean -- yes, I --
6      Q.   I just want to make --
7      A.   -- could have calculated.
8      Q.   Again, just for the purpose
9 of making sure I understand why it said
10 no data.
11     A.   As I sit here now, it's going
12 to be 1.25 percent.
13     Q.   Exhibit 4 is just a
14 straight -- is that just a straight
15 computation that's made based upon data
16 that you obtained from some other source
17 or is that --
18     A.   Correct.
19     Q.   Okay. Let's look at Exhibit
20 5 for a second.
21         The number that you have for
22 the line: Average traded volume per
23 year, I went back with my trusty old
24 HP 12C, and did some math here, and I
25 believe that I found a mistake, and I

Page 151

1           Dr. Adam Werner
2 just want to make sure you agree with me.
3          Do you have a calculator? I
4 think we have --
5      A.   I can't use that thing.
6      Q.   Do you want to use this,
7 (indicating)?
8      A.   I can get my computer out and
9 use it itself, that's --
10     Q.   Sure.
11         MR. PARADISE: Off the
12 record.
13         (Discussion off the record.)
14     Q.   Just look at: Average traded
15 volume per year, F equals E divided by D.
16         And, when I ran that
17 calculation, I came up with a much
18 different number. I came up with
19 36,674,570. So I'm wanting to just make
20 sure, is that an error or is that -- am I
21 doing something wrong?
22     A.   Class period -- (pause) --
23 (using calculator) -- no, you -- that is
24 an error.
25     Q.   Does that -- just speed this

Page 152

1           Dr. Adam Werner
2 along, I'll tell you that, rerunning the
3 rest of the calculations, I came up with
4 a turnover -- analyzed turnover, of 269
5 percent.
6      A.   I believe -- that looks like
7 it would be in the ballpark.
8      Q.   Would that have any impact on
9 your ultimate opinion in this case?
10     A.   No. It's still part of the
11 NYSE average, of 67 percent.
12     Q.   I meant to ask you earlier,
13 have you -- in reviewing this, have you
14 reviewed the declaration, Exhibit 1,
15 since you've submitted it?
16         Like, for example, did you
17 review it in preparing for today?
18     A.   "This" (indicating) being
19 Exhibit 1?
20     Q.   Yes.
21     A.   I believe so.
22     Q.   Did you discover any errors
23 or mistakes that needed to be corrected?
24     A.   Obviously not.
25     Q.   I just wanted to get an

Page 153

1           Dr. Adam Werner
2 understanding as to whether there are any
3 others that I might not have seen.
4          Okay. Turning to page 2 of
5 your Exhibit 1, page 2 of Exhibit 1,
6 where you list the various bases for your
7 finding of market efficiency, I want to
8 talk for a moment about the letter E,
9 which is the strong correlation between
10 Hi-Crush's common unit price and the
11 movement in the market and the industry
12 indices.
13         You chose -- for the industry
14 indice that you compared Hi-Crush to, you
15 chose the Dow Jones -- if I'm
16 understanding correctly, you chose the
17 Dow Jones Mining Industry --
18     A.   I believe --
19     Q.   -- Index?
20     A.   -- that is correct.
21     Q.   Why did you choose the Mining
22 Industry Index?
23     A.   I believe that was -- one of
24 the reasons was Hi-Crush was included in
25 it.

39 (Pages 150 - 153)

Page 154

1        Dr. Adam Werner
2        I should say that, in doing
3  my analysis, I excluded Hi-Crush from the
4  index.
5        Q.  Do you know what the date of
6  the -- withdrawn.
7           The companies that are
8  included in indexes change over time, so
9  I'm trying to get an understanding as to
10 what date, you know, of the index you
11 looked at or examined, because the
12 indexes that I pulled up did not indicate
13 that Hi-Crush is part of the index.  And
14 we can show it to you, but I don't know
15 if this is the one that you used, and you
16 might have used something different, I
17 don't know.
18        MR. PARADISE:  Let's mark
19    this as Exhibit 3.
20        (Whereupon Deposition Exhibit
21    3, Document, DJUSMG Index, as of
22    January 18th, 2013, was marked for
23    identification, as of this date.)
24 A.  Yeah -- no, this isn't.
25        Q.  This is -- I'm going to try

Page 155

1        Dr. Adam Werner
2  to find a date for you here, this is --
3  this is as of January 18th, 2013, so it's
4  during your test period.
5        A.  Right, no, this is not the
6  index we used.
7           It was much larger, it was a
8  more general -- I'll have to check with
9  my analyst, but I know there was
10 something like 200 components in the
11 index --
12        Q.  Okay.
13        A.  -- we used.
14        Q.  I appreciate it.
15        MR. PARADISE:  Mark, if you
16    could, I don't know if that's
17    been -- I don't think that's been
18    produced.  If so --
19        MR. STRAUSS:  We'll identify
20    it.
21        MR. PARADISE:  I appreciate
22    that.
23        Q.  But, as best -- as you sit
24 here today, the best of your
25 recollection, Hi-Crush was one of the

Page 156

1        Dr. Adam Werner
2  companies within this index.
3        A.  Correct.
4        Q.  Okay.
5        A.  Correct.
6        Q.  You mentioned that you
7  excluded Hi-Crush from the index that you
8  used, but did you exclude any other
9  companies or is it just --
10        A.  Just Hi-Crush.
11        MR. PARADISE:  So we'll
12    need -- just for the record, we'll
13    need to see what the index was, I
14    guess, and then we can make the
15    assumption that Hi-Crush was
16    eliminated.
17        MR. STRAUSS:  Sure.
18        Q.  And then I guess the
19 weighting, was this a weighted index?
20        A.  Equally weighted.
21        Q.  Oh, it was equally weighted,
22 so it's not like --
23        A.  Like I said, it was like 200
24 companies --
25        Q.  Right, right, right.  I got

Page 157

1        Dr. Adam Werner
2  you.
3        A.  It was not like a small
4  sample.
5        Q.  Okay.
6        A.  In fact, I mean, I can e-mail
7  someone in my office, if you want.
8        Q.  Oh, that would be great, if
9  you could.  You can do that on a break,
10 too, if you want.
11           I'm just trying to find in
12 your report where you discuss this index,
13 because I thought --
14        MR. KEABLE:  Paragraph 44,
15    page 17.
16        Q.  Okay, just paragraph 44, you
17 call it the Dow Jones U.S. Mining Index,
18 which is what I thought this was, but
19 perhaps there's another version of it, or
20 something, because this is clearly a
21 weighted index.
22        A.  Right.
23        Q.  All right, we'll come back to
24 that.  If you're able to get it, we'll
25 come back to that.

40 (Pages 154 - 157)

Page 158

1           Dr. Adam Werner
2       Maybe this might be it.
3 Let's see if this is it.
4       MR. PARADISE: Will you
5   please mark this as Exhibit 4.
6       (Whereupon Deposition Exhibit
7   4, Document, Dow Jones U.S. Mining
8   Index, with a list of the
9   companies, was marked for
10   identification, as of this date.)
11   Q.   So the court reporter has
12 handed you what's been marked as Exhibit
13 4.
14       Is this the index?
15   A.   I believe so.
16   Q.   So, obviously, this is --
17 Exhibit 4 is a list of the companies.
18       And I take it, then, that you
19 have some other information that shows
20 you the performance of these stocks? In
21 other words, that you're comparing the
22 performance of these stock to Hi-Crush
23 stock.
24   A.   I believe that's what a
25 regression analysis does.

Page 159

1           Dr. Adam Werner
2   Q.   Right. So, what I'm saying
3 is, do you have something that gave you
4 the performance of this -- of these -- of
5 this basket of companies over that period
6 of time?
7   A.   I believe so.
8   Q.   I mean, is that something
9 that you had to create or is that
10 something that you were able to go to
11 Bloomberg or to some other source?
12   A.   To the extent that I could
13 use Bloomberg but then I had to remove
14 Hi-Crush.
15   Q.   What I mean, though, is does
16 Bloomberg like report --
17   A.   Yes.
18   Q.   -- as in the aggregate the
19 performance of that basket of stocks or
20 did you have to go and manually do that
21 to come up with your measurement?
22   A.   I believe Bloomberg includes
23 them.
24   Q.   No, it's not a trick
25 question.

Page 160

1           Dr. Adam Werner
2   A.   I know.
3   Q.   What I'm trying to understand
4 is, because Exhibit 3, you know, clearly,
5 you can see that this is some sort of a
6 basket that was created by Dow Jones, and
7 its easy to see that they must have
8 some -- the stock price movement of
9 these, of this index. I wasn't sure if
10 there was a similar thing for this longer
11 list.
12   A.   Oh, yeah.
13   Q.   Okay.
14   A.   Yes, I should say.
15   Q.   I'm just going to keep these
16 here. If you need to refer back, here
17 they are, (indicating).
18   A.   Okay.
19   Q.   In letter F, the speed -- you
20 say: The speed at which Hi-Crush's
21 common unit price reacted to news during
22 the test period.
23       Is that -- when you say
24 "news" there, are you referring to
25 Hi-Crush-specific news or any news?

Page 161

1           Dr. Adam Werner
2   A.   I believe, in this instance,
3 I'm talking about Hi-Crush-specific news.
4   Q.   And then the same question
5 for G. When you refer to "news days", as
6 compared to "non-news days", is that news
7 days reflecting Hi-Crush-specific news?
8   A.   Presumably.
9       I mean, it's possible that
10 there's some market news that included
11 Hi-Crush -- (gesturing).
12   Q.   Turning to paragraph 9, did
13 you write this paragraph?
14   A.   I believe this was drafted
15 for me.
16   Q.   By whom?
17   A.   Haley --
18   Q.   Somebody --
19   A.   -- Johnson.
20   Q.   Somebody at the firm?
21   A.   Yes.
22   Q.   Okay. The second -- I'm
23 sorry, the last sentence of paragraph 9
24 says, and I'll read it into the record:
25 This case arises in response to

41 (Pages 158 - 161)

Page 162

1        Dr. Adam Werner
2  information Hi-Crush failed to publicly
3  disclose during the third quarter of
4  2012.
5        Just to make sure we're
6  complete, what information are you
7  referring to there, that Hi-Crush failed
8  to publicly disclose?
9        A.   If you give me the
10 Consolidated Complaint, I'll be happy to
11 tell you.
12       Q.   Is it fair to say it's based
13 upon information that you took out of the
14 Amended Consolidated Complaint?
15       A.   I believe so.
16            MR. PARADISE: Let's mark
17 this as Exhibit 5.
18            (Whereupon Deposition Exhibit
19 5, Amended consolidated class
20 action complaint for violations of
21 the federal Securities Laws, was
22 marked for identification, as of
23 this date.)
24       Q.   To speed this along, you
25 reference -- in your footnote, you give a

Page 163

1        Dr. Adam Werner
2  citation to page 1 to 5 of the complaint.
3        A.   (Pause.)
4             Okay.
5        Q.   Can you tell me what
6  information you're referring to?
7        A.   Oh, the termination of the
8  Baker Hughes contract.
9        Q.   Which paragraph of the
10 Amended Consolidated Complaint are you
11 looking at?
12       A.   Well, I think it's discussed
13 throughout -- (pause) -- paragraph 7,
14 paragraph 8, paragraph 10, paragraph 9 --
15       Q.   I'm sorry, just slow down for
16 a second.
17            7, 8, 9, and 10.
18            So is it your testimony that
19 all of the information that's referred to
20 in those paragraphs, of the Amended
21 Complaint, should have been publicly
22 disclosed during the third quarter of
23 2012?
24            MR. STRAUSS: Objection.
25       A.   I don't know whether it

Page 164

1        Dr. Adam Werner
2  should or should not have been publicly
3  disclosed.
4        Q.   So you're essentially
5  accepting the allegations as set forth in
6  the Amended Complaint for purposes of
7  your analysis without making any
8  independent determination as to whether
9  those -- that information should or
10 should not have been disclosed; is that
11 fair to say?
12            MR. STRAUSS: Objection.
13       A.   I don't think I've --
14            MR. STRAUSS: So you're
15 asking him whether he's taking the
16 allegations as an assumption?
17            MR. PARADISE: Yes.
18            MR. STRAUSS: Are you taking
19 the allegations as an assumption?
20            THE WITNESS: I don't know.
21       A.   I'm not sure if -- I guess
22 so -- (gesturing) -- I mean, it doesn't
23 affect my -- it's an exclusion, so it
24 doesn't affect my analysis, either way.
25       Q.   What do you mean, by "it's an

Page 165

1        Dr. Adam Werner
2  exclusion"?
3        A.   They failed to --
4        Q.   Oh.
5        A.   -- make the announcement.
6        Q.   You mean an "omission"?
7        A.   An omission -- exclusion,
8  omission.
9        Q.   We looked at paragraph 12 a
10 little bit earlier, and I showed you the
11 press release, but we never looked at
12 them in conjunction with each other.  So
13 I'm going to ask you to take a look at
14 the press release for a moment.
15            In paragraph 12, as you
16 testified to earlier, and as it's
17 reflected in your declaration, you say
18 that: Hi-Crush disclosed the termination
19 of the supply agreement with Baker
20 Hughes, and then you go on from there to
21 say that: Hi-Crush said it had --
22 quote -- engaged in discussions with
23 Baker Hughes, but the parties were unable
24 to reach a mutually-satisfactory
25 resolution.

42 (Pages 162 - 165)

Case 1:21-md-02989-CMA   Document 567-17   Entered on FLSD Docket 06/07/2023   Page 44 of
114
Case 1:12-cv-08557-CM   Document 97-1   Filed 06/17/14   Page 44 of 114

Page 166

1          Dr. Adam Werner
2      Are you aware of there being
3  any other information disclosed in the
4  November 13th press release that's not
5  reflected in paragraph 12 of your
6  declaration?
7          THE WITNESS: Could you
8  repeat the question, please?
9          (The record was read.)
10         MR. STRAUSS: Objection.
11     A.  I mean, was there additional
12 information released on that day?
13 Yeah -- they -- yes.
14     Q.  Did you do anything or make
15 any attempt to quantify the impact, if
16 any, of the disclosure of the additional
17 news on the stock price of Hi-Crush on
18 November 13th, 2012?
19     A.  "Quantify"? I don't believe
20 so.
21     Q.  Now, I had asked you earlier
22 if you had --
23     A.  But --
24     Q.  I'm sorry, go ahead.
25     A.  That having been said, there

Page 167

1          Dr. Adam Werner
2  was multiple news reports the next day
3  about people talking about the stock
4  tanking because of their failure to --
5  or, their agreement with Baker Hughes
6  having fallen apart, and there wasn't
7  very much other talk or discussion of the
8  financial results. That was the main
9  thing that people focused on.
10         So to the extent that there
11 was any effect, I'm not sure -- it might
12 very well be negligible.
13     Q.  Now, you had testified
14 earlier, you have not been asked to
15 express an opinion or do any work to
16 enable you to express an opinion as to
17 the loss that was suffered as a result of
18 the alleged fraud in this case; is that
19 correct?
20         MR. STRAUSS: Objection. I'm
21 sorry, could you repeat the
22 question?
23         (The record was read.)
24         MR. STRAUSS: What's your
25 question? That's not a question,

Page 168

1          Dr. Adam Werner
2  that's just a --
3     Q.  Is that -- is that correct?
4     A.  Um -- I'm not sure.
5          THE WITNESS: Can you -- I'm
6  sorry.
7     Q.  Let me -- this is -- what I'm
8  getting to here is damages.
9          You know, you -- as we went
10 through your CV earlier, there were a
11 number of cases where you've testified
12 about damages and a number of cases where
13 you've testified about market efficiency
14 and, of course, there are other cases.
15 And I had asked you earlier whether or
16 not you have been asked to do any work in
17 connection with damages in this case, and
18 I believe your answer was no.
19         So I'm just trying to make
20 sure that I'm right about that.
21     A.  I have not been asked to
22 opine on damages in this case.
23     Q.  But you have done on other
24 cases and you feel that you are capable
25 of doing so, if you were asked; correct?

Page 169

1          Dr. Adam Werner
2     A.  Correct.
3     Q.  If you were asked to express
4  an opinion about damages, would you feel
5  it's necessary to isolate the damage
6  that's caused by the alleged omission
7  from any other -- I'm sorry, withdrawn.
8          If you were asked to express
9  an opinion about damages in this case,
10 would you feel it necessary to separate
11 the loss caused by the alleged omission,
12 which was revealed on November 13th, from
13 other information that was revealed to
14 the market on November 13th?
15         MR. STRAUSS: Objection.
16     A.  I believe that's correct, but
17 that can go both ways. It could be
18 positive or negative.
19         Like if people thought that
20 the earnings were good, or if there was a
21 pleasant surprise, but for the
22 disclosure, you know, it's possible
23 damages would have been higher, if I
24 adjust for the fact that there is also
25 earnings --

43 (Pages 166 - 169)

Page 170

1       Dr. Adam Werner
2       Q.   Yeah, my question wasn't
3   meant to suggest higher or lower, it was
4   just that you would try to isolate the
5   harm caused by the alleged -- by the
6   revelation of the alleged truth.
7       A.   I believe that's correct.
8       Q.   Okay. Now, let's go back to
9   the -- now I want to come back to the
10  fifth Cammer factor exhibit that we have
11  been going through this morning.
12      A.   Okay.
13      Q.   So starting -- I think we
14  covered -- we covered 7 and 8, so I
15  wanted to start for a second with 9 and
16  10, to make sure I understand them.
17      So looking at Exhibit 9,
18  which is the analysis of the speed --
19  sorry, let me start with 14.
20      A.   Exhibit 14?
21      Q.   Yes, please.
22      So -- and part of the reason
23  for this question is just to make sure
24  that this is accurate, because we've seen
25  a couple of -- and, by the way, nobody's

Page 171

1       Dr. Adam Werner
2   perfect, but we've seen a couple of
3   mistakes, and I just want to make sure
4   that this is accurate.
5       And the part that I'm asking
6   about is that there is a typo of
7   September, but I want to make sure that
8   the data you considered, in Exhibit 14,
9   is for that time period that's revealed
10  there, which is September 19th, 2012 to
11  November 12th, 2012.
12      Is that right?
13      A.   I read that as correct.
14      Q.   And that is the class period
15  as we've --
16      A.   As we've --
17      Q.   -- been discussing today.
18      A.   -- defined it, yes.
19      Q.   So why in this exhibit
20  (indicating) did you only look at the
21  class period and not your test period?
22      A.   Because, when I was looking
23  at my test period, I was -- that only
24  dealt with information.
25      Q.   By "information", you mean

Page 172

1       Dr. Adam Werner
2   market information, like news?
3       A.   Correct.
4       Q.   And you had mentioned earlier
5   that the September 19 to November 12
6   period, you felt if you had only used
7   that for your event study for Appendix A,
8   that you would have been criticized --
9   potentially criticized by Defendants'
10  experts.
11      Why do you not have the same
12  concern about Exhibit 14?
13      And, again, I'm not that
14  familiar with this stuff, so I'm not
15  asking as a trick, I'm just trying to
16  really understand the distinction.
17      A.   Well, this is the class
18  period, it's the period I looked at.
19      The problem is, when you're
20  doing an event study, you need events to
21  occur. There was a lack of events during
22  the class period. As a result, I --
23  again, I'd be happy to do an event study
24  just on the class period, but your --
25  someone might accuse me of cherry picking

Page 173

1       Dr. Adam Werner
2   my results.
3       Q.   And the number of
4   observations that's listed as 36, that
5   corresponds I believe to the -- is that
6   the number of trading days within that
7   period of September 19 through November
8   12, 2012?
9       A.   I believe it's either 36 or
10  37.
11      Q.   And, as far as you're
12  concerned -- I'm sorry, go ahead.
13      A.   In order to calculate
14  autocorrelation, you need two days of
15  prices.
16      Q.   So anything greater than two
17  is sufficient for this --
18      A.   No, that's not what I'm
19  saying.
20      Q.   Okay, I'm sorry. Go ahead.
21      A.   I'm just -- it's strictly an
22  accounting thing --
23      Q.   But --
24      A.   -- I don't think we should
25  get hung up on.

44 (Pages 170 - 173)

Page 174

```
 1              Dr. Adam Werner
 2      Q.   No, but 36 is a sufficient
 3   number of days to use to draw a
 4   conclusion from an autocorrelation
 5   analysis like this, (indicating)?
 6      A.   I don't know if it's
 7   sufficient or not.
 8      Q.   Well, did you feel it was
 9   sufficient in this instance?
10      A.   I feel that -- I felt that I
11   looked at whether or not there was
12   autocorrelation during the class period.
13   This suggests -- or, this shows that
14   there was no autocorrelation during the
15   class period.
16          I should also say that the
17   absence or inclusion of autocorrelation
18   does not necessarily -- if there is
19   autocorrelation in a stock price, it
20   doesn't necessarily mean that the stock
21   is inefficient.
22      Q.   But here, just to be clear,
23   it was -- you did not find any auto-
24   correlation; correct?
25      A.   During the class period,
```

Page 175

```
 1              Dr. Adam Werner
 2   correct.
 3      Q.   Does the fact that the
 4   adjusted R-squared is negative suggest
 5   that the results are not conclusive?
 6      A.   I'm sorry, I don't understand
 7   the question.
 8      Q.   Explain, if you would, what
 9   "adjusted R-squared" means.
10      A.   It's the R-squared adjusted
11   for the number of variables.
12      Q.   And here, am I right, that
13   it's a negative -- that resulted in a
14   negative number, negative 0 -- negative
15   0.025?
16      A.   That is correct.
17      Q.   Does that indicate anything
18   to you about the meaningfulness of this
19   test, (indicating)?
20      A.   Define "meaningfulness".
21      Q.   Its relevance to determine
22   whether the market was efficient.
23      A.   I'm not sure I understand the
24   question.
25      Q.   Okay. The bottom line is, as
```

Page 176

```
 1              Dr. Adam Werner
 2   far as you're concerned, this
 3   (indicating) test that you conducted,
 4   that's reflected in Exhibit 14, supports
 5   your opinion that the market was
 6   efficient during the class period;
 7   correct?
 8      A.   It informs upon my opinion.
 9      Q.   Is there a difference between
10   "informs upon" and "supports", in your
11   mind?
12      A.   Possibly.
13      Q.   What would that difference
14   be?
15      A.   Well, again, as I said, the
16   presence or non-presence of auto-
17   correlation of, many people have argued,
18   is a test for market efficiency, has been
19   shown that even stocks that are auto-
20   correlated are efficient necessarily,
21   necessarily render a stock inefficient,
22   if there is autocorrelation present.
23      Q.   Turn to page -- please turn
24   to page 29 of Exhibit 1, paragraph 73.
25      A.   Paragraph 73, okay.
```

Page 177

```
 1              Dr. Adam Werner
 2      Q.   Just read the last sentence,
 3   and see if that changes your answer to my
 4   question, whether it supports your
 5   opinion.
 6      A.   (Pause.)
 7          I don't believe I said it
 8   didn't support my opinion.
 9      Q.   Well, you said it informs
10   your opinion, I asked you -- I don't want
11   to, you know, duel with you here, that's
12   not the intention.
13      A.   Right.
14      Q.   I really thought that you
15   answered that to my question, that's why
16   I'm wondering why you didn't say yes,
17   because right here you say that Exhibit
18   14 supports your opinion, and you said:
19   It informs my opinion, but I don't know
20   if it supports my opinion, so I'm just
21   trying to understand, does this support
22   your opinion or not?
23      A.   You are correct --
24      Q.   Okay.
25      A.   -- it supports my opinion.
```

45 (Pages 174 - 177)

Page 178

1          Dr. Adam Werner
2     Q.   Thank you.
3          All right. Now, let's go
4   back to Exhibit 9 of Exhibit 1.
5          Here, you use the entire test
6   period; is that correct?
7     A.   That is correct.
8     Q.   And you -- if I'm reading
9   this correctly, you found seven days in
10  the test period with statistically-
11  significant returns of the 99 percent
12  significance level on event day, which
13  you described or define as (day T); is
14  that correct?
15    A.   That is correct.
16    Q.   If you remember -- and if you
17  don't remember please feel free to refer
18  to the rest of your report, or your
19  declaration, did any of those seven days
20  occur during the class period, because
21  that would be September 19th through
22  November 12th, 2012.
23    A.   I don't believe so.
24    Q.   And I take it, then, that
25  Number 6 -- you know, the number 6, which

Page 179

1          Dr. Adam Werner
2   is essentially T plus 1, that none of
3   those days occurred within the class
4   period, by definition; correct?
5     A.   I believe that is correct.
6     Q.   So is it fair to say that,
7   effectively, the class period is not
8   included within the analysis that's
9   reflected in Exhibit 9.
10    A.   I --
11         MR. STRAUSS: Objection.
12    A.   I don't believe that's
13  correct.
14    Q.   Let me ask you a different
15  way.
16         Is it -- it's fair to say
17  that there were no days that reflect the
18  speed or reaction to the news at the --
19  you know, the 99 percent significance
20  level within the class period?
21         THE WITNESS: Could you read
22  back the question, please?
23         (The record was read.)
24    A.   I'm not trying to be obtuse
25  here, I don't understand the question.

Page 180

1          Dr. Adam Werner
2     Q.   That's okay.
3          MR. PARADISE: Take a short
4   break.
5          (Recess taken: 2:20 p.m. -
6   2:23 p.m.)
7   BY MR. PARADISE:
8     Q.   Let's look at Exhibit 10.
9     A.   Okay.
10    Q.   Again, this is the -- this
11  test, that's reflected in Exhibit 10 to
12  your declaration, is for the entire test
13  period; correct?
14    A.   I believe that is correct.
15    Q.   And here you have, if I'm
16  reading it correctly, there are four days
17  where -- wait, I'm sorry, let me make
18  sure I'm reading this correctly.
19         Okay. There are four days
20  during the test period where there were
21  significant -- what you call significant
22  news days; is that right?
23         Or maybe I'm misreading this
24  or misunderstanding it.
25    A.   Um -- I don't know if I said

Page 181

1          Dr. Adam Werner
2   there's significant Hi-Crush price
3   movement days.
4     Q.   Okay, so "significant" there
5   refers to price movement, not news?
6     A.   At one point in the exhibit,
7   "significant" deals with the news, or
8   refers to the news.
9     Q.   Okay, but I'm looking at
10  under the column where it says: Number
11  of days, and then, underneath: Number of
12  days, it says: Significant and not
13  significant.
14    A.   That's statistically-
15  significant at a 95 percent confidence
16  number.
17    Q.   Price movement.
18    A.   Correct.
19    Q.   Okay, in other words, that's
20  not news, that's price movement.
21         And then there were 25 days
22  where there was not a significant price
23  movement within the 95 percent confidence
24  level.
25    A.   When the press release was

46 (Pages 178 - 181)

Page 182

1          Dr. Adam Werner
2 reported.
3      Q.   Do you remember how many of
4 these days where there was a press
5 release issued occurred during the class
6 period?
7      A.   I believe it's three, but I
8 don't -- I have to check.
9          Let me go to the appendix
10 here. (Pause.)
11         So, one --
12     Q.   Could you just identify
13 the --
14     A.   Oh, I'm looking at Appendix
15 A.
16     Q.   Right, and the date.
17         So the first one is October
18 11, am I reading that right?
19     A.   I don't -- as I sit here, I
20 don't recall whether or not Hi-Crush
21 released a press release on 9-21-2012
22 about presenting at the Energy Prospectus
23 Group but, yes, certainly October 11,
24 2012 would be one of those days.
25     Q.   Okay, I'm sorry, keep going.

Page 183

1          Dr. Adam Werner
2      A.   I believe October 19th, 2012,
3 October 22nd, 2012, and here we need to
4 delineate between "new news" and "news".
5          On 11-1-2012, I don't think
6 they had any -- yeah, that was not a
7 Hi-Crush release. 11-6-2012, I believe
8 there was a press release. And I believe
9 that's it.
10     Q.   The one that you referred to,
11 where you have to distinguish between
12 "news" and "new news", you said that was
13 the -- did you say that was the October
14 22 -- is that the news that came out on
15 October 22?
16     A.   Correct.
17     Q.   How do you -- in your
18 parlance, how do you distinguish between
19 "news" and "new news"?
20     A.   Well, on the 19th Hi-Crush
21 filed their Form 8-K. It was reported ou
22 the U.S. Fed news service on 10-20-2012,
23 it would be respect--
24     Q.   Understood, okay.
25         And you mentioned -- you

Page 184

1          Dr. Adam Werner
2 included November 6th, as well; right?
3      A.   I believe so.
4      Q.   Turning to Exhibit 11, which
5 I think is another analysis or test of
6 the response of the price to news, if
7 I'm -- am I right about that?
8      A.   I believe that is correct.
9      Q.   So -- and the number of
10 observations I see is 29, which I think
11 corresponds to the sum of the first line
12 of Exhibit 10, four plus 25 is 29, so is
13 this -- would it be the same answers on
14 Exhibit 11, that either three or four of
15 the days occurred during the class
16 period?
17     A.   Of the press release days?
18     Q.   Yes.
19     A.   I believe that is correct.
20         THE WITNESS:  Can we go off
21 the record for a second?  I'm just
22 going to go get some more water.
23         MR. PARADISE:  Oh, go ahead.
24         (Pause in proceedings.)
25     A.   Thank you.

Page 185

1          Dr. Adam Werner
2      Q.   On those days within the
3 class period, when there was news that
4 you've just gone through with us, did you
5 observe any statistically-significant
6 price movements?
7      A.   "News" as I defined it, in
8 this report?  I don't believe so.
9      Q.   Turning back -- I'm sorry,
10 but going back for one second to Exhibit
11 9.
12     A.   Exhibit 9.
13     Q.   Yes, the one with the speed
14 reaction to the news.
15         As you testified, none of the
16 days -- none of the seven days reported
17 in Exhibit 9 occurred during the class
18 period; is that right?
19     A.   I believe that is correct.
20     Q.   How, then, does Exhibit 9
21 inform your opinion as to the efficiency
22 of the market for Hi-Crush stock units
23 during the class period?
24     A.   It informs it because it's --
25 any analysis I did related to news I did

47 (Pages 182 - 185)

Page 186

1          Dr. Adam Werner
2 over this longer period, because there's
3 a lack of news during the class period.
4     Q.   Does that -- in your expert
5 opinion, does that allow you to draw any
6 conclusion as to how the price of the
7 stock would react during the class period
8 to the issuance of news?
9     A.   I believe so.
10         I believe there was a lack of
11 issuance of news during the class period,
12 and there were no price reductions.
13    Q.   Oh, you're doing the
14 inverse -- is that the inverse analysis,
15 rather than measuring how the price moves
16 in response to news, you're looking at
17 how the price reacts to the absence of
18 news, is that what you're saying?
19    A.   I believe that is correct.
20    Q.   Take a look at Exhibit 12,
21 please.
22    A.   Okay.
23    Q.   For this -- I don't know if
24 it's a test or an analysis, is it one or
25 the other?

Page 187

1          Dr. Adam Werner
2          What would you call this?
3     A.   Analysis.
4     Q.   For the purposes of this
5 analysis, I just want to confirm that you
6 used the entire test period; is that
7 right?
8     A.   I believe that is correct.
9     Q.   Does this enable you to
10 draw -- this analysis, that's reflected
11 in Exhibit 12, does it enable you to draw
12 any conclusions as to the relationship
13 between returns and volume during the
14 class period, just the class period?
15    A.   I believe so.
16    Q.   Can you explain?
17    A.   Well, there were no -- if I
18 remember correctly, there were no volume
19 spikes during the class period, and there
20 was a lack of information during the
21 class period, so that would agree with
22 these (indicating) results.
23    Q.   And Exhibit 13, which I
24 think, if I'm understanding you
25 correctly, is -- well, what is the

Page 188

1          Dr. Adam Werner
2 difference between the analysis that's in
3 Exhibit 12 and the analysis that's in
4 Exhibit 13?
5     A.   In 12, the dependent variable
6 is stock returns.  In the -- or, I should
7 say, the absolute value of stock returns.
8 In Exhibit 13, it's excess -- absolute
9 value of the excess stock returns.
10    Q.   And, by "stock returns",
11 you're referring to the returns for
12 Hi-Crush?
13    A.   Correct.
14    Q.   And, for my edification, what
15 is meant by "returns", as opposed to
16 "excess returns"?
17    A.   Excess or abnormal returns,
18 it's just I use my regression analysis in
19 the same way -- I guess instead of
20 "excess" you could say "abnormal
21 returns".
22    Q.   And abnormal when measured
23 against what?
24    A.   Against my regression
25 analysis.

Page 189

1          Dr. Adam Werner
2     Q.   Coming back to the Dow Jones
3 Index, which was Exhibit 4, I believe,
4 did you consider -- here -- as you
5 yourself said earlier, this is quite a
6 broad grouping of companies, that is, the
7 companies that are listed in Exhibit 4.
8          And they run the gamut, as
9 best I can tell, from mineral mining
10 companies, gold -- you know, gold mining
11 companies, nickel, copper, silica,
12 et cetera.
13         Did you consider creating
14 your own index that would more accurately
15 replicate a company that competes or is
16 in the same business as Hi-Crush, or is
17 that not necessary to do?
18    A.   May I take exception with
19 your term "accurate" --
20    Q.   Go ahead.
21    A.   -- or "more accurate".
22    Q.   Yeah.
23    A.   I considered other indices
24 and possibly creating an index, a custom
25 index.

48 (Pages 186 - 189)

Case 1:21-md-02989-CMA   Document 567-17   Entered on FLSD Docket 06/07/2023   Page 50 of
114
Case 1:12-cv-08557-CM   Document 147-1   Filed 06/17/14   Page 50 of 114

Page 190

1        Dr. Adam Werner
2    Q.   And why did you not create a
3 custom index?
4    A.   Well, I find that,
5 oftentimes, when you create a custom
6 index, defense expert will criticize one
7 for being subjective in their choice of
8 companies.
9    Q.   Under-inclusive, in other
10 words?
11   A.   Under-inclusive, right.
12   Q.   Or, I guess over-.
13   A.   Or over-.
14        That having been said, if
15 you've looked at -- I did look at other
16 indices, it didn't change my results.
17   Q.   Okay, that's a good answer.
18 But did you actually go about creating
19 your own -- you know, your own index?
20   A.   I don't believe so.
21   Q.   Here's where we're going to
22 go back in time to my class in
23 undergraduate. I just want to get an
24 understanding of some of the terms that
25 you used in your test.

Page 191

1        Dr. Adam Werner
2        So going back to Exhibit 7.
3    A.   Okay.
4    Q.   Can you just explain the
5 different abbreviated terms that are used
6 in the chart.
7        So at the bottom where you
8 have on the top co-- I think that means
9 coefficient, standard error, t, P greater
10 than absolute value of t.
11        MR. PARADISE:  Absolute value
12 of t is (indicating) two lines with
13 a t in the middle.
14   Q.   And then we already discussed
15 95 percent confidence interval, but could
16 you just explain the first four, what is
17 meant by each of those?
18   A.   The coefficient, coefficient
19 is the regression coefficient.  Standard
20 error is the standard error of the
21 regression, or for that observ-- or for
22 that variable.  T statistic is just the
23 coefficient divided by the standard
24 error.  And the P value is -- gives us
25 basically the same thing as the 95

Page 192

1        Dr. Adam Werner
2 percent conf-- it tells us the level of
3 significance.
4    Q.   Are all of the numbers --
5 under the Coefficient, are all of the
6 numbers that are in that chart, under
7 coefficient, and that means standard
8 error -- Std.Err?
9    A.   Correct.
10   Q.   Are all these numbers the
11 product of your regression analysis?
12   A.   I believe that's correct.
13   Q.   And what are the inputs that
14 led to the numbers that appear under:
15 Coefficient?
16        What data do you input to
17 come up with the coefficient?
18   A.   Hi-Crush's stock price, the
19 S&P 500 returns -- or, I should say --
20 yeah, S&P 500 returns, and Dow Jones
21 returns.
22        And then I ran the second
23 regression, to control for the fact that
24 there's -- the S&P 500 Mining Index is
25 highly correlated with the market index,

Page 193

1        Dr. Adam Werner
2 so, to exclude that combined effect, I
3 included an error term as part of my
4 regression from a different regression I
5 ran.
6    Q.   So, that, in other words, the
7 error term essentially backs out the -- I
8 don't know if that's the right term, but
9 backs out the S&P 500 return?
10   A.   It backs out the impact of
11 the S&P 500 on the index -- the company
12 index, the industry index.
13   Q.   And just turning to the table
14 or chart that appears above that one, the
15 "SS", capital "SS", does that mean
16 statistically-significant?
17   A.   No, sum of squares.
18   Q.   What does "DF" mean?
19   A.   Degrees of freedom.
20   Q.   And "MS"?
21   A.   You know, as the -- as I sit
22 here, I don't remember.
23   Q.   But these are all statistical
24 terms?
25   A.   Yeah.

49 (Pages 190 - 193)

Page 194

1        Dr. Adam Werner
2        Q.   These are all -- they're
3    typical --
4        A.   Yeah.
5        Q.   The number of observations is
6    252.
7            Is that -- to the best of
8    your recollection, does that correspond
9    to the number of trading days in this
10   period?
11       A.   I believe that is correct.
12       Q.   What does: Stata 9 mean,
13   which appears under Footnote 2?
14       A.   It's a computer program.
15       Q.   Turn to page -- I'm sorry --
16   turn to paragraph 10 of Exhibit 1.
17           If you look at the next page,
18   the spillover of the paragraph, where it
19   continues onto page 5?
20       A.   Okay.
21       Q.   You state here that: Sales
22   to Baker Hughes represented 18.2 percent
23   of Hi-Crush's expected contract revenue
24   in 2012.
25           Do you see that?

Page 195

1        Dr. Adam Werner
2        A.   I do.
3        Q.   And according to your report,
4    or declaration, you took that from
5    Hi-Crush's Form S-1 registration
6    statement.
7        A.   Right.
8        Q.   In paragraph 12, further down
9    the page, which we've covered a few times
10   today, you report, or state, that the
11   units -- the value of the units dropped,
12   from looking at the top of page 6, over
13   26 percent when the -- what you've called
14   "corrective disclosure", was made on
15   November 13th.
16           Am I reading that correctly?
17       A.   I believe that's correct.
18       Q.   If the value of the Baker
19   Hughes contract, or if the -- I should
20   say the percentage of the revenue that
21   was supposed to be provided by the Baker
22   Hughes contract, was 18 percent -- looks
23   like you're ready for this one --
24       A.   Well, I didn't think about it
25   beforehand, but I see where you're going.

Page 196

1        Dr. Adam Werner
2        Q.   Let me ask -- I'm not sure I
3    know where I'm going, but let me get
4    there.
5            But you see that the
6    percentage of revenue reported by
7    Hi-Crush was -- you know, from the Baker
8    Hughes contract, was 18 percent, but the
9    stock price went down by 26 percent.
10           Does that suggest that the
11   market was inefficient?
12       A.   No.
13       Q.   Why not?
14       A.   "Why not?"
15       Q.   Yeah.
16       A.   It doesn't -- I mean, if you
17   can give me an example of why it would be
18   inefficient, by all means, go ahead,
19   but --
20       Q.   Well, if the market --
21   assuming the market was efficient, and
22   was taking into account the value of the
23   Baker Hughes contract, and being about 18
24   percent, and then the market goes down by
25   26 percent --

Page 197

1        Dr. Adam Werner
2        A.   18 percent of revenue.
3        Q.   Right -- seems like the
4    market overreacted to the news -- well,
5    and by where I'm sitting.
6            I mean, I --
7        A.   Your drawing a correlation
8    between the 18 percent and the 26.2
9    percent is not, necessarily, a linear
10   correlation.
11       Q.   And what do you mean by that?
12       A.   Well, I mean revenue may have
13   changed by 18-- or, what they, people,
14   believe was 18.2 percent and, again, this
15   was 18.2 percent as of July of 2012,
16   whereas now we're in --
17       Q.   November.
18       A.   -- November 2012.
19           It's not clear -- there's
20   just no clear delineation between market
21   value and revenue. I mean, there's not a
22   one-- there's not, necessarily, a
23   one-for-one relationship, I guess is what
24   I'm saying. There are other factors that
25   goes into a firm's market value beyond

50 (Pages 194 - 197)

Page 198

1          Dr. Adam Werner
2 revenue.
3          MR. PARADISE: Off the
4     record.
5          (Discussion off the record.)
6          MR. PARADISE: Back on the
7     record.
8     Q.   In Appendix A, if you look at
9 the news from November 13th -- November
10 13th, 2012, that is, you see the --
11 towards the bottom of 5 or 6 up from the
12 bottom for that day, Hi-Crush plunges 35
13 percent below IPO price, and then it says
14 U.S. Silica falls 11 percent.
15          Do you see that?
16     A.   Yes.
17     Q.   Do you know what U.S.
18 Silica -- what they do, what business
19 they're in?
20     A.   I assume that they are a
21 competitor of Hi-Crush's.
22     Q.   Do you have any -- did you do
23 anything to determine what may have
24 caused U.S. Silica's stock price to go
25 down by 11 percent on that same day?

Page 199

1          Dr. Adam Werner
2     A.   I believe so.
3     Q.   What did you conclude?
4     A.   I concluded that there was
5 some correlation between the two price
6 movements, which is why U.S. Silica is
7 also in my Dow Jones U.S. Mining Index,
8 which is in Exhibit 4.
9     Q.   Was there -- was that -- did
10 you conclude that that was an industry
11 effect or did something happen that day,
12 was there some news that affected U.S.
13 Silica, that caused its price to go down
14 that same day?
15     A.   As I sit here, I don't know,
16 but to the extent it was an industrywide
17 effect, it's reflected in my regression
18 analysis by controlling for an industry
19 index, or using an industry index.
20     Q.   With the errors or without
21 the errors, in either case; right?
22     A.   Errors?
23     Q.   What you called the
24 "error" -- what you called the "error",
25 "error" term, on Dow Jones U.S. Mining

Page 200

1          Dr. Adam Werner
2 Index returns?
3     A.   Ah, ah.
4     Q.   You know, I meant with the
5 adjusted --
6     A.   With the adjusted --
7     Q.   -- for or without the S&P
8 movement.
9          Did you look at any other
10 specific competitors of Hi-Crush and the
11 movement in their stock price on November
12 13, 2012 in connection with the work that
13 you did?
14          THE WITNESS: Could you
15     re-read the question?
16     Q.   That was a bad question, let
17 me try again.
18          Did you look specifically at
19 the stock price of any of Hi-Crush's
20 other competitors, on November 13th, to
21 see whether there was any movements in
22 those stock prices that correlated to the
23 movement you saw in Hi-Crush and
24 Silica's -- U.S. Silica's?
25     A.   I believe so, by looking at

Page 201

1          Dr. Adam Werner
2 the movement of the industry index I
3 used.
4          If you're asking me did I
5 specifically look at the stock
6 performance of individual companies?
7     Q.   That's what I meant, yes.
8     A.   Or individual competitors? I
9 don't believe so.
10     Q.   I assume you feel that wasn't
11 necessary for your work?
12     A.   Well, to the extent that
13 there was any industry effect, I adjusted
14 for that.
15     Q.   Through the index of the
16 roughly -- I don't know if we talked
17 about how many companies, but I think the
18 exhibit said roughly 200 companies.
19     A.   Correct, including Hi-Crush
20 and U.S. Silica, which was mentioned in
21 Appendix A.
22          Actually, can we take a short
23 break?
24     Q.   Yes.
25     A.   Thank you.

51 (Pages 198 - 201)

Page 202

```
 1           Dr. Adam Werner
 2      Q.   Go ahead.
 3           (Recess taken: 2:51 p.m. -
 4      3:23 p.m.)
 5           MR. PARADISE: Back on the
 6      record.
 7 BY MR. PARADISE:
 8      Q.   You had said earlier that you
 9  were going to send an e-mail to see if
10  you could get a copy of your --
11      A.   Oh, I completely forgot.
12      Q.   Okay.
13      A.   But now remind me what I was
14  supposed to get a copy of?
15      Q.   The index that you used.  You
16  thought that might be what I handed to
17  you as Exhibit 4.
18      A.   Oh, it is.
19      Q.   A hundred percent?
20      A.   99.99 percent.
21      Q.   Okay.
22      A.   I mean, that was definitely
23  the index I saw.
24      Q.   But I think, if I'm not
25  mistaken, that you also -- there was also
```

Page 203

```
 1           Dr. Adam Werner
 2  a part of it, maybe something additional
 3  to what is on that list, that showed the
 4  movement of those -- the price movement
 5  of those 200 --
 6      A.   That --
 7      Q.   -- companies?
 8      A.   That should have been
 9  produced.
10      Q.   We haven't --
11      A.   Not -- yeah, didn't you get
12  all the Bloomberg data?
13           MS. BRANDON: We have the
14      separate Bloomberg -- no, we don't
15      have all of that.
16           THE WITNESS: You didn't get
17      like the returns on -- I thought
18      that -- okay.
19           MS. BRANDON: No.
20           THE WITNESS: I was under the
21      impression that you had already
22      received that.
23           (Discussion off the record.)
24           MR. PARADISE: All right,
25      back on.
```

Page 204

```
 1           Dr. Adam Werner
 2 BY MR. PARADISE:
 3      Q.   There is a number of court
 4  filings that you describe as "court
 5  filings" listed in Exhibit 2 that you
 6  relied upon, and some of these are
 7  reported decisions.
 8           How did you choose which
 9  reported decisions to rely upon?
10      A.   Well, some of them are
11  standard, like Cammer and Krogman, Basic,
12  I believe, was it --
13      Q.   Mm-hmm.
14      A.   -- was in there.  Hold on,
15  let me --
16      Q.   It was Exhibit 2.
17      A.   Okay. (Pause.)
18           Yeah.  So the ones I'm
19  familiar with, I just -- in general, is
20  Basic -v- Levinson --
21           THE WITNESS: It's under:
22      Court filings, on Exhibit 2, you'll
23      find it, they're all there.
24      A.   -- Cammer versus Bloom,
25  Cheney versus CyberGuard, Krogman versus
```

Page 205

```
 1           Dr. Adam Werner
 2  Sterritt.
 3           The other ones were cases
 4  like I learned about from discussions
 5  with other economists.
 6      Q.   And these are cases that you
 7  relied upon for what purpose?  The other
 8  ones that you mentioned, not the standard
 9  ones.
10      A.   They support the analysis
11  that I used.  They were cases in which
12  the analysis that I've used have been
13  found to be sufficient by the court to
14  establish market efficiency.  And I
15  should mention that it -- the analysis in
16  these cases are both by plaintiff and
17  defendant.
18           So I believe in the
19  Polymedica Corporation was a case that
20  Fred Dunbar did in which he did the same
21  type of analysis that I did, in
22  arguing -- I mean, I don't know what
23  he -- right, he was arguing against
24  market efficiency, but he was using the
25  same analysis.
```

52 (Pages 202 - 205)

Page 206

1          Dr. Adam Werner
2     Q.   And in that case, he, Mr.
3  Dunbar, found that -- or, Dr. Dunbar
4  found that the market was inefficient?
5     A.   I don't recall, as I sit
6  here.
7     Q.   Did you consider -- are you
8  familiar with a case, at the United
9  States Supreme Court from last year,
10  called Comcast?
11     A.   I believe I'm familiar with
12  it.
13          I've certainly heard of it, I
14  don't know why.
15     Q.   It was a ruling involving a
16  class cert-- you know, it went to class
17  certification. It was an antitrust
18  case --
19     A.   I was going to say, it was an
20  antitrust case, yeah, I'm definitely --
21  I'm familiar with it.
22     Q.   You didn't consider it in
23  connection with the work you did here; is
24  that right?
25     A.   No.

Page 207

1          Dr. Adam Werner
2     Q.   Are you familiar with a case
3  out of your neighborhood, Northern
4  District of California, called Diamond
5  Foods?
6     A.   Again, I've heard of it, but
7  I don't....
8     Q.   You didn't consider it in
9  connection with the work that you did
10  here.
11     A.   I don't believe so.
12     Q.   Okay. I want to turn now to
13  paragraph 77 of your declaration, where
14  you discuss -- I think the pronunciation
15  is, "arbitrageurs"?
16     A.   Right.
17     Q.   A-R-B-I-T-R-A-G-E-U-R-S.
18     A.   And that is -- I should say
19  that that is a term of art and not a
20  term -- not a technical economic
21  definition of what an arbitrageur should
22  be.
23          MR. STRAUSS: Which
24  paragraph?
25          MR. PARADISE: Paragraph 77.

Page 208

1          Dr. Adam Werner
2          THE WITNESS: Paragraph 77.
3     Q.   In your own words, can you
4  explain what it is that arbitrageurs do
5  and -- well, leave it at that.
6     A.   Okay. Theoretically, an
7  arbitrageur, or someone who engages in
8  arbitrage, is supposed to be able to earn
9  a profit without enduring any risk.
10          So people will talk about an
11  arbitrage opportunity. Like if I know --
12          (Discussion off the record.)
13     Q.   You had said that they should
14  be -- or, they try to earn a profit
15  without incurring any risk.
16     A.   That's, theoretically, what
17  someone engaging in arbitrage should be
18  doing, but that's not what people who're
19  called "arbitrageurs" are actually
20  performing.
21          I mean, they do incur risk in
22  trying to make a profit.
23     Q.   So --
24     A.   But --
25     Q.   Go ahead, sorry.

Page 209

1          Dr. Adam Werner
2     A.   So, again, that's more a term
3  of art as opposed to -- or, an
4  industry -- a financial industry term, as
5  opposed to an economic definition of an
6  "arbitrageur".
7     Q.   And, for purposes of your
8  opinion, and the way you used the term, I
9  take it you're referring to the second
10  (indicating) category, rather than the
11  first, meaning the ones that do actually
12  incur risk?
13     A.   That is correct.
14     Q.   -- profit.
15          How, in your opinion, do
16  arbitrageurs, and the activities in which
17  they engage, contribute or fail to
18  contribute to market efficiency?
19     A.   Well --
20          THE WITNESS: I'm sorry,
21  could you read the question back,
22  please?
23          (The record was read.)
24     A.   To the extent that there
25  are -- there might be pricing

53 (Pages 206 - 209)

Page 210

1          Dr. Adam Werner
2 discrepancies in a security, or that the
3 arbitrageurs believe the securities are
4 mispriced, they can -- they will try
5 to -- they will attempt to exploit that
6 mispricing such as, you know, if they
7 believe the stock is too high, the value
8 of the stock is too high, and again,
9 that's their belief, it's not a statement
10 of fact, they will oftentimes sell those
11 shares in an attempt to drive the price
12 down to what they believe the true value
13 of the company is.
14          So to the extent that these
15 people are more informed than other
16 individuals -- and, again, I put
17 "informed" in quotation marks -- they
18 will attempt to exploit what they believe
19 are mispricings in equities, or other
20 securities.
21          That's my Corporate Finance
22 101 description.
23     Q.   Is it fair to say, in your
24 opinion, that arbitrageurs ferret out or
25 do more work to obtain -- and information

Page 211

1          Dr. Adam Werner
2 that research companies -- and obtain
3 information that enables them to engage
4 in the activity that you just described?
5          MR. STRAUSS: Objection.
6     A.   Is it fair? Define "fair".
7     Q.   Well, do you agree with that
8 statement?
9     A.   I don't know if I formed an
10 opinion, one way or the other.
11     Q.   And, again, if you don't have
12 an opinion, please just say so, but you
13 described, I thought very ably, the
14 activities that arbitrageurs supposedly
15 engage in to exploit mispricing of
16 securities, and you yourself said --
17     A.   And they --
18     Q.   I'm sorry, I didn't mean to
19 interrupt.
20     A.   They do engage in these
21 activities.
22          It's a question of whether or
23 not they're more informed.
24     Q.   No, that's what I was going
25 to get to, because you had said to the

Page 212

1          Dr. Adam Werner
2 extent that they are more informed, which
3 I took to mean that you don't,
4 necessarily, believe that they always are
5 more informed; is that right?
6     A.   I believe that is accurate.
7     Q.   But they're -- to the extent
8 that they are successful and good
9 arbitrageurs and are able to be more
10 informed, what is your understanding as
11 to how they obtain that additional
12 infor-- you know, that better
13 information, you know, i.e. how do they
14 become more informed?
15          MR. STRAUSS: Objection.
16     Q.   If you know.
17     A.   I mean, there's all sorts of
18 ways. You know, they may talk to company
19 executives.
20          I have, actually, a pump-
21 and-dump case now where, you know, this
22 guy, like: Oh, I'm a great trader, you
23 should invest with me, he talks about
24 hanging out with the CFO's of the
25 corporations that he's touting for

Page 213

1          Dr. Adam Werner
2 investment. That would be one form of
3 information. You know, general research.
4 I don't -- I mean, there are multiple
5 ways --
6     Q.   That's fair.
7     A.   -- that people can attempt to
8 be more informed.
9     Q.   And, again, in your
10 experience, or in your opinion, is one
11 way or one method that they use to go
12 out -- and, for example, let's use
13 Hi-Crush as an example, and this is a
14 hypothetical but we'll use Hi-Crush to
15 form the hypothetical.
16          So Hi-Crush sells fracking
17 sand. Would you expect that
18 arbitrageurs, if they were engaged in
19 arbitrageur activity, for Hi-Crush, might
20 go and do research on the customers of
21 Hi-Crush to analyze potential demand for
22 Hi-Crush's product?
23     A.   I'm --
24          MR. STRAUSS: Objection.
25          Go ahead.

54 (Pages 210 - 213)

Page 214

Dr. Adam Werner

1
2   A.   That sounds reasonable.
3   Q.   You talk about the -- in
4   paragraph 77, the last sentence, you say:
5   If the price is -- this is a quote:  If
6   the price is too high, however, the
7   arbitrageur might attempt to -- quote --
8   short -- closed quote -- the stock.
9        How would an arbitrageur know
10  if the price is too high in that
11  circumstance?
12  A.   It would be their opinion.
13  Q.   And do you know -- well, have
14  you ever engaged in arbitrage activity on
15  your own?
16  A.   (Gesturing) -- have I
17  ever --
18       MR. STRAUSS:  Objection.
19  A.   I'm not sure --
20       MR. STRAUSS:  Yeah, I mean,
21  come on, that's -- you're asking
22  about his personal investments?
23  It's, you know --
24  Q.   Well, do you know --
25       MR. STRAUSS:  Has he ever

Page 215

Dr. Adam Werner

1
2   been employed at an investment firm
3   and engaged professionally in
4   trading?  You can ask him that,
5   but --
6        MR. PARADISE:  Okay.
7        MR. STRAUSS:  -- I don't
8   think it's fair to --
9        MR. PARADISE:  That's fine.
10       MR. STRAUSS:  -- ask him
11  about his personal finances.
12  Q.   I'll accept Mr. Strauss's
13  comment -- question.
14  A.   Have I ever worked for an
15  investment firm?
16  Q.   And engaged in arbitrage
17  activity.
18  A.   Again, I'm uncomfortable with
19  this definition of "arbitrage" because
20  it's a huge umbrella.
21       All sorts of things can be
22  termed as "arbitrage".
23  Q.   I'm sorry --
24  A.   So in terms of the academic
25  sense?  No.

Page 216

Dr. Adam Werner

1
2   Q.   Okay.  By the way, just
3   for -- just to -- when you say you are
4   uncomfortable with the definition, I'm
5   trying to use the definition that you
6   used before, not any other definition.
7   So, you know, exploiting, mispricing
8   securities, essentially, is the
9   definition I'm working off of.
10  A.   Is there a belief that those
11  securities are mispriced, or you could --
12  I guess there are forms of arbitrage, if
13  you think about this flash trading
14  phenomenon, if I know the price of the
15  stock on one exchange and I see that it's
16  being traded at another price on another
17  exchange -- well, you know, I take back.
18  I guess there is still risk involved
19  there.
20       There is a possibility that I
21  won't get -- my trades won't get
22  executed, so --
23  Q.   Right.
24       Turning to paragraph 78, for
25  a moment, of Exhibit 1.  Here, if I'm

Page 217

Dr. Adam Werner

1
2   understanding this correctly, you're
3   comparing the amount of the short
4   interest in Hi-Crush's stock -- I'm
5   sorry -- in Hi-Crush's units, to the
6   average for all New York Stock Exchange-
7   listed stocks during the class period; is
8   that correct?
9   A.   I believe that is correct.
10  Q.   And, according to your
11  calculation, the shortages for Hi-Crush
12  was .47 percent as compared with --
13  A.   Between --
14  Q.   Wait, I'm sorry -- I'm sorry,
15  between .47 percent and 1.53 percent, and
16  the average shortages for the New York
17  Stock Exchange, during the comparable New
18  York Stock Exchange-listed stocks --
19  during the comparable -- during the class
20  period of 3.1 percent; is that right?
21  A.   That is correct.
22  Q.   Okay.  So, turning to -- so
23  turning to Exhibit 3, I just want to make
24  sure I'm seeing where these numbers
25  appear on there.

55 (Pages 214 - 217)

Page 218

1          Dr. Adam Werner
2      These -- first off, so
3 Exhibit 3, just to make sure, is for the
4 class period; right? It goes from
5 September 19, 2012 through November 12th,
6 2012; right?
7      A. I believe that is correct.
8      Q. So the New York Stock
9 Exchange average is -- you say, is 3.1
10 percent.
11      Is that -- where is that
12 found on here? Is that --
13      A. That's just taken from the
14 NYSE.
15      Q. No, I mean, where -- is
16 that -- I'm going to point to the exhibit
17 for a minute -- (indicating) -- is that
18 this number?
19      Again, I'm pointing to the
20 second page of Exhibit 3.
21      A. Ah -- you mean the column to
22 the one over from the right?
23      Q. Right.
24      A. I believe that is correct.
25      Q. And where on Exhibit 3 do you

Page 219

1          Dr. Adam Werner
2 find that -- the corresponding numbers
3 for the Hi-Crush, the .47 percent to the
4 1.53 percent? Could you just point me to
5 the column?
6      Is that this column,
7 (indicating)? I'm pointing to the --
8      A. I can't see it.
9      Q. I'm sorry, I'm pointing to
10 the fifth (indicating) from the right.
11      A. I believe that is correct.
12      Q. And then the average of 1.07
13 percent, is that at the bottom of the
14 second page under that same column, the
15 column that's headed: Percentage of
16 outstanding shares sold short?
17      A. Right.
18      Technically, it's 1.068 but I
19 rounded up.
20      Q. Do you consider the
21 difference between the average for
22 Hi-Crush, of 1.068, and the average for
23 all New York Stock Exchange-listed
24 companies, at 3.1, do you consider that
25 to be a large gap, a large difference, in

Page 220

1          Dr. Adam Werner
2 percentage?
3      A. I haven't formed an opinion,
4 one way or the other.
5      Q. In any event, what is the
6 basis for your opinion that -- and I'm
7 reading from paragraph 78 -- that the
8 level of short interest in relation to
9 common units outstanding provides no
10 indication of any constraint on short-
11 selling activities during the class
12 period, such as the inability to locate
13 or borrow the necessary common units to
14 initiate a short position. And that's
15 from paragraph 78.
16      A. Right. I don't believe that
17 there were --
18      THE WITNESS: Could you re-
19 read the question, please?
20      (The record was read.)
21      Q. And it's just the last
22 sentence of paragraph 78.
23      A. So what's the question?
24      Q. I want to understand your
25 basis for your opinion that you expressed

Page 221

1          Dr. Adam Werner
2 there.
3      A. I didn't see any indication
4 that people were -- could not short stock
5 in Hi-Crush.
6      I believe there were
7 stoppages. There may have been two
8 during the entire test period, where Rule
9 202 went into effect.
10      Q. That's during the entire test
11 period, so that's the class period plus
12 the supplemental period that we talked
13 about.
14      A. Correct, but I don't -- that
15 did not occur during the class period.
16      Q. You don't know, though,
17 whether or not anyone during that -- we
18 talked first about the class period,
19 whether anyone who wanted to sell
20 Hi-Crush stock units short was unable to
21 borrow the units necessary to complete
22 that transaction; do you?
23      MR. STRAUSS: Objection.
24      A. I don't personally know of
25 anyone who was unable to short the stock.

56 (Pages 218 - 221)

Page 222

Dr. Adam Werner

1
2 Q. Is there any way to -- that
3 you know of, to find out that
4 information, any, you know, publicly-
5 available means to find out that
6 information.
7 A. I'd have to think about that.
8 Q. Please do, and let me know if
9 you come up with an answer.
10 (REQUEST.)
11 Is it true that shares --
12 withdrawn. Is it true that -- if you
13 know, that institutional holders of stock
14 are often -- or, stock or units, are
15 often the parties that loan stocks or
16 units for short sales?
17 MR. STRAUSS: Objection.
18 A. I don't know, one way or the
19 other.
20 I mean, I know I certainly
21 had seen examples of people's brokerage
22 accounts having loaned out shares.
23 Q. You mean individuals?
24 A. Yeah.
25 Q. Does the presence of

Page 223

Dr. Adam Werner

1
2 institutional unit holders for Hi-Crush
3 units suggest that there were units
4 available to borrow -- suggest to you
5 that there were units available to
6 borrow?
7 A. It's possible.
8 That having been said,
9 Hi-Crush isn't the type of stock that
10 most institutions would hold, because
11 it's a dividend-paying stock, and
12 dividends are treated different for tax
13 purposes.
14 Q. So -- okay, that's a good
15 segue into my next line of questioning,
16 which is about institutional holders,
17 because you speak about that in your
18 report, as well.
19 A. Correct.
20 Q. And let me ask you a general
21 question first, before we get to the
22 specifics, but why is the presence of
23 institutional holders, or investors, if
24 you will -- and these are units, so I may
25 be --

Page 224

Dr. Adam Werner

1
2 A. I understand.
3 Q. -- I may be mistakenly
4 referring to stock or shares, and what
5 have you, but --
6 MR. STRAUSS: No problem.
7 Q. -- for all intents and
8 purposes I'm talking about units, but why
9 is the presence of institutional
10 investors important for market
11 efficiency?
12 Generally speaking, not
13 specific to Hi-Crush.
14 A. Quoting, in paragraph 74 of
15 my report, this is I believe quoting
16 Barbara Griffin and Lev -- L-E-V: The
17 institutional investors e.g. mutual
18 funds, money managers, banks, are
19 presumed to be better informed about the
20 securities they hold and better able to
21 interpret new information than individual
22 investors.
23 Q. So is it fair to say that
24 their better information or better
25 knowledge enables them to trade the stock

Page 225

Dr. Adam Werner

1
2 so that it gets to its true value? Is
3 that what you're saying?
4 MR. STRAUSS: Objection.
5 Q. I'm just trying to get an
6 understanding as to why that means that
7 the market is more efficient.
8 A. I'm sorry, I don't understand
9 the question.
10 Q. Well, you, in response to my
11 question as to why the presence of
12 institutional investors makes a market
13 more efficient, you just read from your
14 report, or your declaration, you quoted
15 from this resource that you relied upon,
16 and I'm just not understanding why that
17 means that the market is more efficient
18 or why that makes the market more
19 efficient.
20 A. Well, if one believes the
21 premise that these people are better
22 informed than other market participants,
23 then their presence would suggest that
24 more information, possibly information
25 that uninformed investors, or

57 (Pages 222 - 225)

Page 226

Dr. Adam Werner

1
2  individuals, could not receive, would be
3  incorporated into the stock price.
4      Q.  Because of their trading;
5  right?
6      A.  Because of their trading.
7      Q.  Okay, that's what I thought
8  you were saying, maybe I didn't
9  articulate it that way.
10      In that same paragraph, you
11  actually refer, two sentences later, to
12  an arbitrageur again -- actually, an
13  arbitrageur, groups among institutional
14  investors, in the first sentence, and
15  then you talk about arbitrageurs again in
16  the last sentence.
17      Are you distinguishing, in
18  this paragraph, between an "arbitrageur"
19  and "institutional investor" or could
20  this be one -- could this also be one and
21  the same?
22      Do you understand my
23  question?
24      A.  Not really.
25      Q.  Are you suggesting that an

Page 227

Dr. Adam Werner

1
2  "institutional investor" is one category
3  of investor and an "arbitrageur" is
4  another separate, or might there be some
5  arbitrageurs who are also institutional
6  investors?
7      A.  That's certainly a
8  possibility.
9      Q.  But, by distinguishing, or
10  using both terms here, you're not trying
11  to suggest that it's either one or the
12  other.
13      A.  I don't believe so.
14      Q.  Let's look at paragraph 76,
15  for a moment, where you provide some data
16  about the institutional investors holding
17  units of Hi-Crush.
18      Do you see that, in the first
19  sentence of paragraph 76?
20      A.  Yes.
21      Q.  And you -- the numbers that
22  you include there is roughly 15 percent
23  to 33 percent.
24      Is that during the -- that's
25  during the class period, right, as

Page 228

Dr. Adam Werner

1
2  opposed to the test period?
3      A.  Correct.
4      Q.  Look at Exhibit -- if you
5  would, please look at Exhibit 15 for a
6  moment.
7      Would this be the backup for
8  those -- for the numbers that appear in
9  paragraph 76?
10      A.  Yes.
11      Q.  Why do you say, in paragraph
12  76, that the level of ownership is 15.4
13  percent to 32.6 percent, and I'm reading
14  from your declaration, paragraph 76:
15  provides no additional support to my
16  opinion that the market for Hi-Crush was
17  informationally-efficient during the
18  class period.
19      A.  Why do I state that?
20      Q.  Yes.
21      A.  Well, I believe the courts
22  have found that -- and this is off the
23  top of my head -- I believe you need
24  something like 80 institutional investors
25  to be deemed as being sufficient for the

Page 229

Dr. Adam Werner

1
2  finding of market efficiency.
3      But, again, that's one
4  standard. I'm sure other courts will
5  have had different findings.
6      Q.  Understood. No, I just
7  wanted to come -- understand why you
8  didn't feel that those numbers provided
9  you additional support, but you talked
10  about the number, the absolute number, of
11  institutional investors rather than a
12  percentage.
13      Do you know what the number
14  of institutional investors was during the
15  class period that corresponds to these
16  percentages?
17      A.  I believe it was between one
18  and ten.
19      Q.  How did you go about
20  determining what the number of
21  institutional investors was during that
22  period of time?
23      A.  I looked up the data on
24  Bloomberg, or someone did that at my
25  behest.

58 (Pages 226 - 229)

Page 230

1           Dr. Adam Werner
2      Q.   Did you -- does Bloomberg
3  provide that, you know, wrapped in a bow,
4  or did you have to go to like the
5  Schedule 13 aps and actually compute the
6  numbers yourself?
7      A.   I'm not sure "wrapped in a
8  bow" is a technical term, but --
9      Q.   It's not.
10     A.   -- I believe that is correct,
11 it is wrapped in a bow.
12     Q.   Bloomberg provides the number
13 for you rather than you having to go and
14 compute it yourself?
15     A.   Correct.
16     Q.   That being said, did you, or
17 anyone on your -- at your behest, look at
18 any of the SEC forms, 13-F, for Hi-Crush
19 during this period of time, during the
20 class period?
21     A.   Yes.
22     Q.   You did.
23     A.   Yes.
24     Q.   Was that done as a check, to
25 verify that the information you obtained

Page 231

1           Dr. Adam Werner
2  from Bloomberg was accurate?
3      A.   Yes.
4      Q.   And did you find that
5  anything was not accurate in the
6  Bloomberg information?
7      A.   Not that I'm aware of.
8      Q.   And turning back to Exhibit
9  15 for a moment, you will see that --
10 well, let me take it one step back.
11          So my understanding is that
12 Schedule 13 -- Schedules 13-F -- or Forms
13 13-F, are filed on a quarterly basis. Is
14 that your understanding, as well?
15     A.   I believe that's correct, but
16 I don't think there's any limitation on
17 when -- on how many you can file. I
18 mean, you could file them weekly, if one
19 chose to -- (gesturing).
20     Q.   Looking at the data in
21 Exhibit 15, you'll see that the
22 institutional holdings remains unchanged
23 from September -- I guess you're listing
24 it here on a weekly basis, it looks like;
25 is that right?

Page 232

1           Dr. Adam Werner
2      A.   That is correct.
3      Q.   So it looks like the data
4  remains unchanged from September 16th
5  through October 14th.
6          So, am I reading that
7  correctly?
8      A.   I believe so.
9      Q.   So, if that's correct, that
10 would mean that, at the end of the third
11 quarter of 2012, the number of
12 institutional units held was 2,097,326.
13     A.   Approximately.
14     Q.   And then, a week later, which
15 is now into the fourth quarter of 2012,
16 it remains at that same number, and it
17 remains at that same number the following
18 week, as well.
19          Does that strike you as
20 unusual, that the institutional holdings
21 would not change after a quarter ends?
22     A.   I didn't say the
23 institutional holdings didn't change.
24     Q.   Okay.
25     A.   I'm saying the data is what

Page 233

1           Dr. Adam Werner
2  it is.
3      Q.   Oh.
4      A.   And you alluded previously to
5  the fact that these things are often
6  filed quarterly. I believe that
7  that -- this phenomenon that you're
8  discussing is a result of data being
9  filed quarterly.
10     Q.   I guess what I'm really
11 getting at is, is this possibly another
12 error or mistake in the report, or your
13 declaration, I should say.
14     A.   No, it's an estimation.
15          I could have just said
16 between September 16, 2012 and
17 10-21-2012, there were approximately
18 2.097326 shares held, based on
19 Bloomberg's review of the 13-F filings
20 for these companies that held shares in
21 Hi-Crush.
22          I don't know their exact
23 number of holdings each day, nor do they
24 have to report them.
25     Q.   Okay. But, as far as you

59 (Pages 230 - 233)

Page 234

1           Dr. Adam Werner
2   know, Bloomberg reported the same number
3   on September 30th as it did on October
4   7th.
5       A.   I believe that is correct.
6       Again, I'm more than happy to
7   change that to a date range, in which
8   case I know for sure that that represents
9   the average number of shares held by
10  institutional investors during that time
11  period.
12      Q.   No, I'm not quibbling with
13  that.
14      I just want to make sure that
15  this is -- that these numbers are right,
16  that's all.
17      A.   (Gesturing) -- okay.
18      Q.   So, as far as you know, they
19  are, that's your testimony.
20      A.   Correct.
21      Q.   And I have no reason to doubt
22  that.
23      Just seemed odd that they did
24  not change, that's all.
25          MR. PARADISE: I'm sorry, off

Page 235

1           Dr. Adam Werner
2   the record for one second.
3       (Recess taken: 3:59 p.m. -
4   4:10 p.m.)
5   BY MR. PARADISE:
6       Q.   So let me hand you what I'm
7   asking Wendy to mark as I believe Exhibit
8   6.
9           MR. PARADISE: Is that right?
10      (Whereupon Deposition Exhibit
11      6, Document, represented to be a
12      compilation of information
13      retrieved from Thomson Reuters of
14      13-F filings as of September 30th,
15      2012, was marked for
16      identification, as of this date.)
17      Q.   This is -- Wendy's just
18  handed you -- the court reporter's just
19  handed you what is marked as Exhibit 6,
20  which I'll represent to you is a
21  compilation of information that we
22  retrieved from Thomson Reuters of 13-F
23  filings as of September 30th, 2012.
24      And I just wanted to show
25  this to you and see if we can reconcile

Page 236

1           Dr. Adam Werner
2   your numbers in Exhibit 15 to these
3   numbers, because they are vastly
4   different.
5       So you see that your number
6   is 2,097,326, and you also see, I think
7   on line 12, that one institutional holder
8   has that exact number of shares -- or,
9   units, but the total units held by
10  institutional investors, as of September
11  30, is actually 7,838,548. And that
12  makes the percentage of shares
13  outstanding actually 57 -- percentage of
14  shares held by institutional investors
15  outstanding, as 57 -- rounded down to 57
16  percent.
17      Do you have any explanation
18  for this discrepancy?
19      A.   Yeah.
20      Q.   What's that?
21      A.   Thomson Reuters is terrible
22  at collecting data.
23      Q.   Okay.
24      A.   I mean, I've found that,
25  especially when it comes to these type of

Page 237

1           Dr. Adam Werner
2   filings, they're oftentimes -- it's like
3   significantly off, but -- and to the
4   point where I've called them before, when
5   I used to use Thomson Reuters, and said,
6   like: Oh, look, you know, this -- here,
7   I'm looking at the filing, it's not --
8   you know, whatever it is, these numbers
9   not right. And they'll be like: Oh, you
10  know what, you're right.
11      Now, that having been said,
12  if you want me to take these numbers on
13  face value, these numbers would only
14  boost my opinion that the market for
15  Hi-Crush was inefficient, but I will tell
16  you that data garnered on -- from 13-F
17  filings, is terribly inconsistent across
18  all data providers, and Thomson Reuters
19  is one of the worst in providing that
20  data.
21      Q.   Perhaps not now, but perhaps
22  when you go back to San Francisco, you
23  can take a -- have somebody take another
24  look, and if it turns out, in this
25  instance, that Thomson Reuters is right,

60 (Pages 234 - 237)

Page 238

1           Dr. Adam Werner
2   or perhaps somebody at Gnarus, other
3   than you, I'm sure, might have made a
4   mistake, you could let us know and we
5   can -- you know.
6           (REQUEST.)
7       A.   Well, I can tell you that
8   this data was taken from Bloomberg, this
9   is what Bloomberg represents as
10  institutional holders.  So I wouldn't say
11  anyone made a mistake.  (Indicating) --
12  someone else looked at Thomson Reuters
13  and took these numbers off the Thomson
14  Reuters.
15          Did they make a mistake?  I
16  don't know.
17      Q.   Okay.
18      A.   I assume they accurately
19  entered this data onto this page.
20      Q.   Well, you had said earlier --
21  it's your declaration so, obviously, you
22  don't have to do any of this, but you had
23  said earlier that you verified the
24  Bloomberg data by reviewing the 13-F.
25  So, obviously, if you go to the 13-F's --

Page 239

1           Dr. Adam Werner
2   you don't have to go to all of them, if
3   you even went to just a few of them,
4   because there's 29 institutional
5   iuvestors on this list, and you had I
6   think said there were ten so, obviously,
7   that would be pretty easy to see, if
8   there was a mistake by either Thomson
9   Reuters or perhaps Bloomberg or perhaps
10  someone at Gnarus, but that's all I'll
11  say on that.  It is what it is.
12          If -- you said this
13  strengthens your opinion on market
14  efficiency, anyway, "this" being the data
15  in Exhibit 6.
16      A.   That is correct.  But, again,
17  I'd be very suspect of delineating that
18  data -- trusting that data.
19      Q.   Understood.
20          We were able to find the
21  spreadsheets -- or, the Excel
22  spreadsheet, that you said you thought
23  you had provided regarding the Dow Jones
24  Index, so I want to show it, if I have
25  a -- do I have a copy of that?  And I

Page 240

1           Dr. Adam Werner
2   think -- I should say, I think we were
3   able to find it, but you will have to
4   tell us if I'm right or wrong.
5           MR. PARADISE:  So let's mark
6   this as Exhibit 7.
7           (Whereupon Deposition Exhibit
8   7, Document, which says Dow Jones
9   U.S. Mining Index (Index DJUSMG),
10  was marked for identification, as
11  of this date.)
12      Q.   So the court reporter has
13  handed you what's been marked as Exhibit
14  7, which I can represent to you came from
15  the documents that were provided by
16  Plaintiffs' counsel in connection with
17  your deposition.
18          Can you identify this for the
19  record?
20      A.   As I sit here, no.
21      Q.   Okay.
22      A.   I mean, if I'm reading it, it
23  says Dow Jones U.S. Mining Index (Index
24  DJUSMG).
25          MR. PARADISE:  Off the record

Page 241

1           Dr. Adam Werner
2   for one second.
3           (Discussion off the record.)
4       Q.   You're not disputing that
5   this came from your --
6       A.   I believe you.
7       Q.   Okay.  You said earlier that
8   you had accounted for -- I believe you
9   testified earlier, that you had accounted
10  for U.S. Silica in your event study; is
11  that correct?
12      A.   I said I adjusted for the
13  industry -- industry effects of my
14  analysis.
15      Q.   And the reason -- and we were
16  looking at U.S. Silica, because they --
17  there was some news about U.S. Silica
18  reported in that same headline in your
19  event study in Appendix A on November
20  13th.
21          Do you remember that, that we
22  talked about that?
23      A.   I remember discussing that,
24  yes.
25      Q.   Well, let me ask you, did you

61 (Pages 238 - 241)

Page 242

1        Dr. Adam Werner
2  account for the price movement in U.S.
3  Silica on November 13th in your event
4  study?
5        MR. STRAUSS: Objection.
6     A.  "Objection", asked and
7  answered?
8     Q.  You can answer.
9     A.  To the extent that U.S.
10 Silica is part of this industry index, I
11 would say yes.
12    Q.  And to the extent that U.S.
13 Silica is not part of this industry
14 index, would that have any impact on your
15 event study, in your opinion?
16       MR. STRAUSS: Objection.
17       MR. PARADISE: Okay.
18       MR. STRAUSS: Are you sure
19    that's the question you want to
20    ask, you're assuming that it's not?
21       MR. PARADISE: I said to the
22    extent that it is not.  He said to
23    the extent that it is that he
24    accounted for it.
25    Q.  I'm asking to the extent that

Page 243

1        Dr. Adam Werner
2  it's not, would that have any impact on
3  your event study.
4        MR. STRAUSS: Objection. I
5     don't understand your question.
6        You mean did he evaluate it
7     individually into that study? Do
8     you want to ask that?
9        MR. PARADISE: My question
10    stands.
11    Q.  Do you understand my
12 question?
13    A.  I do not.
14    Q.  Okay, let's do this again.
15       You testified earlier that
16 you accounted for U.S. Silica -- and you
17 just said it again, just now -- in your
18 event study to the extent that it was
19 part of the index, the Dow Jones Index --
20 I probably should have -- the Dow Jones
21 Industry Index to which you relied;
22 correct?
23    A.  I believe that is correct.
24    Q.  If it was not part of that
25 index, would that have any effect on your

Page 244

1        Dr. Adam Werner
2  event study, in your opinion, if U.S.
3  Silica was not part of the index?
4     A.  I have no -- it's a
5  hypothetical, I have no way of being able
6  to answer it.
7     Q.  Well, do you think it's
8  important, for the purpose of your event
9  study, to account for a competitor like
10 U.S. Silica?
11    A.  I think --
12       MR. STRAUSS: Objection.
13       Go ahead.
14    A.  I think it's important to
15 account for market- and industry-specific
16 factors in my analysis.
17    Q.  Turning back to Exhibit 7 for
18 a moment and, again, this came from
19 your -- I mean, either your files or
20 Kirby McInerney files, but it was
21 represented to us that this was an
22 information or data that was relied upon
23 in connection with you're -- the
24 preparation of your declaration. Okay?
25    A.  Okay.

Page 245

1        Dr. Adam Werner
2     Q.  So, if you look at the top
3  line, number 1, you see at the top of the
4  page, line 1, there's a reference to an
5  index DJX:DJUSMG.
6        Do you see that?
7     A.  Yes.
8     Q.  Now turn back to -- I think
9  it was Exhibit 3.
10       Do you know what that symbol
11 is, the DJUSMG?
12    A.  Exhibit 3 -- I'm sorry, where
13 is Exhibit 3?
14    Q.  Well, the first -- the
15 reference to the DJUSMG, on Exhibit 7,
16 that I just read to you.
17       Do you know what that
18 represents, DJUSMG?
19    A.  This is irrelevant to Exhibit
20 3.
21    Q.  No, I'm asking you, do you
22 know what DJUSMG, from Exhibit 7, means?
23    A.  It could be the index symbol,
24 it could be the Bloomberg code for the
25 symbol.

62 (Pages 242 - 245)

Case 1:21-md-02989-CMA   Document 567-17   Entered on FLSD Docket 06/07/2023   Page 64 of
114
Case 1:12-cv-08557-CM   Document 147-1   Filed 06/17/14   Page 64 of 114

Page 246

1          Dr. Adam Werner
2      As I sit here today, I don't
3 know.
4      Q.   So, here's Exhibit 3. And if
5 you look at the upper left side, in
6 black, it says: DJUSMG Index.
7          Do you see that?
8      A.   I see that.
9      Q.   And you said to us earlier
10 that this was not the index that you
11 relied upon.
12     A.   I believe that is correct.
13     Q.   Okay. So, even though the
14 index that's identified on your document,
15 Exhibit 7, is DJUSMG, and even though
16 this Bloomberg screen shot is of the
17 DJUSMG index, it's your testimony that
18 these are not the same index -- the same
19 indices.
20     A.   (Pause.)
21         As I sit here today, I don't
22 know.
23     Q.   Okay. Let's see if we can do
24 it this way.
25         Let's take a look at the

Page 247

1          Dr. Adam Werner
2 Exhibit 7 for a moment, and if you need
3 to get your computer out, that's fine,
4 but if you can use the more simple
5 calculator, I'll give you that again, but
6 if you need to do it, I'm going to ask
7 you to do a calculation with me, so if
8 you need to get your computer -- I know
9 you don't like the HP 12C, but -- oh, you
10 have a calculator right in front of you.
11 If you need to get your computer, please
12 feel free to do so.
13     A.   I'm going to hold off.
14     Q.   Okay. I want you to look at
15 line 63 and line 64, and I wanted you to
16 compute with me the percentage change in
17 the price from the 12th to the 13th.
18         So --
19     A.   Okay, I'll need it.
20     Q.   Yeah. And, if you don't
21 mind, can you just tell me out loud how
22 you're doing that, just to make sure that
23 I'm doing it the same way?
24     A.   (Using computer.)
25         Okay, you want me to do the

Page 248

1          Dr. Adam Werner
2 price change from the 12th to the 13th?
3      Q.   Correct.
4      A.   Okay. So I'm taking the
5 quantity of 140.07 minus 141.72 and
6 dividing that by 141.72.
7      Q.   (Using calculator.)
8      A.   Oops, I forgot the equal
9 sign.
10         So negative 1.2 percent,
11 that's with rounding.
12     Q.   Right. And I have the
13 HP 12C, so going all the way, four
14 decimal places, I got negative 1.16.
15     A.   Negative 1.16?
16     Q.   Well, because it went down,
17 the price went down.
18     A.   Oh, you've converted into
19 percentages.
20     Q.   Well, you had -- I thought
21 you had 1.2; didn't you?
22     A.   Percent.
23     Q.   Right.
24     A.   Yeah, I thought you were
25 reading off the screen.

Page 249

1          Dr. Adam Werner
2      Q.   Oh, oh, oh. No, I'm sorry, I
3 have negative 1.16 percent, okay.
4         Turn now to your Appendix A,
5 and tell me what the industry return was
6 on November 13th, 2012.
7      A.   (Pause.)
8         Minus 1.16.
9      Q.   Yes, okay.
10         So do you find it odd that
11 that's the same number that is on your
12 report, even though you didn't -- you say
13 you didn't use -- well, withdrawn.
14 withdrawn.
15     A.   I'm sorry, I don't understand
16 the question.
17     Q.   It's okay.
18         There's no question, I
19 withdrew it.
20     A.   May I put away my computer?
21     Q.   Yes, thank you.
22         Just for the record, if you'd
23 take a look at Exhibit 3 for one moment.
24 I just want you to agree or disagree with
25 me.

63 (Pages 246 - 249)

Case 1:21-md-02989-CMA   Document 567-17   Entered on FLSD Docket 06/07/2023   Page 65 of
114
Case 1:12-cv-08557-CM   Document 97-1   Filed 06/17/14   Page 65 of 114

Page 250

1       Dr. Adam Werner
2       I do not see U.S. Silica on
3   this list, or this index, if that's
4   represented by Exhibit 3. Do you agree
5   with me on that?
6       A.   I do.
7       Q.   Okay.
8       A.   Maybe you can represent for
9   me why these numbers start on 11 and go
10  through 23?
11      Q.   I actually asked that same
12  question. And the answer is that's the
13  Bloomberg thing, I think, because it says
14  13 members.
15      If you look at the line below
16  alert, where it says: 7 alert, on the
17  top of the page, (indicating).
18      A.   Right, okay.
19      Q.   It says 13 members --
20      A.   Okay.
21      Q.   -- and even though it starts
22  at 11 it still has 13 members.
23      Look, all we're trying to get
24  at is, we're trying to figure out
25  what -- we're trying to just figure

Page 251

1       Dr. Adam Werner
2   out -- we think, no surprise, that this
3   (indicating) is this, and we think this
4   is the index this represents, and you're
5   telling us it's not, so perhaps you can
6   give us the backup to show what companies
7   are -- comprise this DJUSMG Index that's
8   represented in this spreadsheet, if you
9   know, if you have an employee to do that,
10  so that's -- we're just trying to get --
11  to make sure that we're all on the same
12  page here.
13      A.   I understand.
14      Q.   So, that's all. I mean, we
15  just -- you know, we have this,
16  (indicating), we have Exhibit 7, but we
17  don't have -- and I had asked you earlier
18  if you had a list of the companies, you
19  said you think you do, and you're going
20  to ask to get that but, you know, we
21  don't have it.
22      We have what we gave you, you
23  said it was the list, but we don't think
24  that's right, frankly. So that's it.
25      A.   Okay.

Page 252

1       Dr. Adam Werner
2       MS. BRANDON: Off the record.
3       (Discussion off the record.)
4   BY MR. PARADISE:
5       Q.   Now, let's go back to
6   paragraph -- our favorite paragraph on
7   your declaration, paragraph 12, the one
8   we spent the most time talking about
9   today, I think.
10      I want to just make sure --
11  I'm not asking you to answer, I just want
12  to make sure I understand what you
13  answered earlier, that I'm on the right
14  track.
15      When I asked you earlier
16  about what the corrected disclosure was,
17  you directed us to paragraph 12 and to
18  the Amended Complaint, but I think we
19  were able to do it in paragraph 12, and
20  you pointed to the information that you
21  quote here, which was that Hi-Crush
22  terminated the contract with Baker
23  Hughes -- Hi-Crush terminated the supply
24  agreement -- I'm paraphrasing now, but if
25  anything I say is not accurate you'll

Page 253

1       Dr. Adam Werner
2   correct me -- that Hi-Crush terminated
3   the supply agreement with Baker Hughes --
4   full stop.
5       Is that --
6       A.   I believe that's correct.
7       Q.   Okay. Would you agree with
8   me that Hi-Crush could not have disclosed
9   the fact that it had terminated the
10  contract with Baker Hughes any earlier
11  than November 12th, 2012?
12      MR. STRAUSS: Objection,
13  that's not an expert -- I don't
14  understand, you're asking him
15  whether they had a legal obligation
16  to do it?
17      MR. PARADISE: No, not a
18  legal obligation, I'm asking him a
19  factual question.
20      Q.   Could you disclose something
21  that hasn't happened yet?
22      MR. STRAUSS: Can you re-read
23  the question, please?
24      And you're making a legal
25  argument, you're not making a --

64 (Pages 250 - 253)

Case 1:21-md-02989-CMA   Document 567-17   Entered on FLSD Docket 06/07/2023   Page 66 of
114
Case 1:12-cv-08557-CM   Document 197-1   Filed 06/17/14   Page 66 of 114

Page 254

1           Dr. Adam Werner
2    you're not asking for an expert
3    opinion.
4        But go ahead, what was the
5    question again?
6        (The record was read.)
7        MR. STRAUSS: That's not an
8    expert question -- that's not a
9    proper expert question for the
10   scope of this deposition.
11       You want to ask him about his
12   opinion, did he render an opinion
13   about when they could or would have
14   disclosed something, then you can
15   ask him, but he didn't render an
16   opinion about that.
17   Q.  Can you answer my question?
18   A.  No.
19   Q.  Okay, why not?
20   A.  I don't understand it.
21   Q.  Okay, let me try to do it
22   this way.
23       If something happens, occurs,
24   tomorrow, can I tell you that it happened
25   today?

Page 255

1           Dr. Adam Werner
2        MR. STRAUSS: Objection. Is
3    this a metaphysics class or an
4    expert deposition?
5    A.  I'm sorry, I didn't follow
6    that.
7    Q.  If something happens
8    tomorrow, can I disclose to you that it
9    happened, that it occurred today?
10       MR. STRAUSS: Objection,
11   nonsense.
12   A.  I have no idea.
13       I honestly don't understand
14   the question.
15   Q.  Let's go -- you've testified
16   numerous times as an expert on damages,
17   correct, in securities litigation cases.
18   A.  I believe that's correct.
19   Q.  And we talked earlier
20   about -- we touched upon earlier, a
21   situation where -- we didn't call it
22   this, but are you familiar with the
23   concept of an overdisclosure?
24       Have you heard that term
25   before?

Page 256

1           Dr. Adam Werner
2    A.  I don't believe so.
3    Q.  You know, you are familiar
4    with, and you cite to, an article by -- I
5    think it's Brad Cornell, and I'm not sure
6    of Morgan's first name, but it's somebody
7    Morgan.
8        Do you know -- are you
9    familiar with that article?
10   A.  Yes.
11   Q.  You cite to them on page 10,
12   Footnote 31.
13   A.  Oh, I'm sorry, page 10.
14   Q.  Yes, paragraph -- I'm
15   sorry -- Footnote 31, which appears at
16   the top of the page.
17   A.  Okay.
18   Q.  And you say that that --
19   well, you cite them as one source of
20   support for the use of event studies. I
21   believe you're saying that they are one
22   source of -- withdrawn.
23       You cite -- why do you
24   cite -- let me just ask you, why do you
25   cite to Mr. Cornell and Mr. Morgan's

Page 257

1           Dr. Adam Werner
2    article there?
3    A.  Can you hand me the article?
4    Q.  Oh, yeah.
5        MR. PARADISE: Do you have a
6    copy?
7    Q.  While she's looking for that,
8    did you work with Brad Cornell at
9    Charles -- was it Charles River?
10   A.  I did.
11   Q.  Do you respect him as an
12   economist?
13   A.  I believe so.
14   Q.  Okay.
15       MR. PARADISE: Let's have
16   this marked as Exhibit 8.
17       (Whereupon Deposition Exhibit
18   8, Article, HeinOnline, was marked
19   for identification, as of this
20   date.)
21   A.  Okay. So what did you want
22   to ask me about this?
23   Q.  I'm just asking you what --
24   for what purpose you cited to Cornell's
25   and Brad -- and Morgan's article.

65 (Pages 254 - 257)

Page 258

Dr. Adam Werner

1
2    A.   I suppose to back up the idea
3    that damage experts have used event
4    studies to calculate losses and under the
5    efficient market hypothesis.
6    Q.   Have you read this article in
7    its entirety at some point?
8    A.   At some point.
9    Q.   Do you recall -- and it's a
10   difficult question, so if you don't you
11   don't, but I'm going to ask it, anyway --
12   do you recall if there's anything in this
13   article that you disagree with?
14   A.   I don't recall.
15   Q.   I asked you earlier, are you
16   familiar with the term "overdisclosure",
17   and I don't remember what your answer
18   was.
19   A.   My answer was I don't believe
20   so.
21   Q.   Okay.  Well, let me tell you
22   what I understand.
23        They used the term
24   "overdisclosure" in here, I can't find it
25   at the moment, but my understanding of

Page 259

Dr. Adam Werner

1
2    what it means, and maybe you understand
3    the concept and you call it something
4    else, is when there is a corrective
5    disclosure that reveals more than what is
6    necessary to correct a prior
7    misrepresentation or omission.
8        So, in other words, if you
9    had a press release, we talked about
10   earlier the November 13th press release
11   disclosed the termination of the contract
12   by -- the termination of the Baker Hughes
13   contract -- by Hi-Crush, but it also
14   disclosed earnings.  So the earnings is
15   not necessary to cor-- you know, the
16   earnings that were described, or
17   discussed, in that press release, was
18   more information than was necessary to
19   correct what was allegedly a prior
20   omission.  So that's what they determined
21   "overdisclosure."
22        So does that concept --
23   A.   I understand what you're
24   talking about, but I don't know why you
25   would -- why they term it an

Page 260

Dr. Adam Werner

1
2    "overdisclosure".
3    Q.   Well, they don't term it an
4    "overdisclosure" in this case.
5        They talk about, generically,
6    that something like that would be an
7    "overdisclosure".  They weren't speaking
8    of the Hi-Crush case.  They're saying
9    it's an "over"-- they're calling it an
10   "overdisclosure", because they're saying
11   it is more information than is necessary
12   to correct the prior misrepresentation or
13   omission, so that's why they're saying
14   "overdisclosure".
15   A.   I don't know if that's more
16   or less information.
17   Q.   Okay.  In any event, turn to
18   page 897 for a moment.
19        And I'm looking at this
20   paragraph that begins with: In summary,
21   and it says -- I'll read it into the
22   record:  In summary, one can
23   unambiguously define the disclosure date
24   and the associated disclosure price only
25   in simple situations.  In most

Page 261

Dr. Adam Werner

1
2    circumstances, the parties must conduct
3    financial analysis to determine the price
4    at which the security would have traded
5    had the misrepresented or omitted
6    information, and only that information,
7    been disclosed.
8        Do you see that?
9    A.   I do.
10   Q.   Do you agree with that
11   statement?
12   A.   I don't know, as I sit here
13   today.
14   Q.   If you were -- and we touched
15   upon this a little bit earlier, but just
16   to come back to it for a second -- if you
17   were asked by Mr. Strauss, or someone
18   else with Kirby McInerney, to construct a
19   damages model for this case, what would
20   you do?  How would you go about doing
21   that?
22        MR. STRAUSS:  Objection.
23   A.   Use an event study to measure
24   the abnormal return, I'd investigate what
25   other news was released on that day, how

66 (Pages 258 - 261)

Page 262

1          Dr. Adam Werner
2 the market viewed that news, all the news
3 that was released. Um -- if it turned
4 out that, you know, something was --
5 there was a compounding factor in what we
6 were -- in the announcement, I'd take
7 that into account.
8     Q.   When you say "all" -- when
9 you refer to "all the news", are you
10 referring to the company's specific news
11 or all the news in the market at large?
12          MR. STRAUSS: Objection.
13     A.   I'm speaking of the company-
14 specific news --
15     Q.   Okay.
16     A.   -- on the disclosure date.
17     Q.   So -- and the reason for
18 that, the reason for doing that, where
19 you said you'd try to -- let me withdraw
20 that.
21          So would your -- would you be
22 trying or attempting to kind of isolate
23 the drop in the stock price that was
24 attributable to the corrective
25 disclosure?

Page 263

1          Dr. Adam Werner
2          Would that be your objective?
3          MR. STRAUSS: Objection.
4 Once again, you're talking about a
5 hypothetical --
6          MR. PARADISE: Yes.
7          MR. STRAUSS: -- a
8 hypothetical exercise.
9          MR. PARADISE: Yes, one that
10 he's done numerous times.
11          THE WITNESS: Could you read
12 back the question, please?
13          (The record was read.)
14     A.   It depends on what I would be
15 tasked with.
16     Q.   Tasked with determining the
17 damages caused by the alleged fraud.
18          MR. STRAUSS: Objection.
19     A.   Again, it would depend upon
20 what someone asked me to do.
21     Q.   So you can't -- you are
22 unable to answer the question, based on
23 these -- this hypothetical?
24     A.   Based on the way you've
25 described the situation, that is correct.

Page 264

1          Dr. Adam Werner
2          Put another way, I believe it
3 is an incomplete hypothetical.
4     Q.   Let's look at another part of
5 Morgan and Cornell's article, on page
6 891.
7          The first full paragraph, and
8 for the record I'll just read: Yet cases
9 in which a company announces A and then
10 announces strictly A is not true are
11 rare.
12          Do you agree with that
13 statement?
14          MR. STRAUSS: Objection.
15          Go ahead.
16     A.   In which a company
17 announces -- are you asking do companies
18 try to hide bad news with other news
19 so -- to have these compounding effects,
20 so they --
21     Q.   I'm --
22     A.   -- confuse the situation
23 about whether or not a disclosure is a
24 clear disclosure or not?
25     Q.   I'm asking simply do you

Page 265

1          Dr. Adam Werner
2 agree with the statement that -- I'm not
3 being pejorative, you put a pejorative
4 description in there, but I'm just simply
5 asking, in your experience, whether you
6 think it's for the purpose of hiding, or
7 whatever, is it your opinion, if you have
8 one, that it's rare for companies to
9 simply say A and then announce later on
10 that A is not true.
11          MR. STRAUSS: Objection.
12     A.   I don't understand what Brad
13 means -- or, Dr. Cornell means, in
14 this -- by simply -- maybe you're adding
15 "simply" --
16     Q.   "Strictly."
17     A.   "Strictly", yes, I'm sorry.
18 "Strictly".
19     Q.   He said "strictly", I didn't;
20 right?
21     A.   Correct, he did, he said
22 "strictly", I'm not sure --
23     Q.   Okay.
24     A.   -- in what context he's using
25 that term.

67 (Pages 262 - 265)

Page 266

Dr. Adam Werner

1
2    Q.   If I said "simply", then I
3    misspoke, and I meant to say "strictly",
4    but I don't know.
5        MR. PARADISE: Did I say --
6        (The record was read.)
7        MR. PARADISE: Okay, it
8    sounds like either I garbled it or
9    you didn't get it all down.
10    Q.   But, the bottom line is, I
11   think the substance is the same, but I
12   can correct it in the record.
13       It's -- what it should say
14   is: Yet cases in which a company
15   announces A and then announces strictly A
16   is not true are rare. That's what I
17   meant to quote.
18    A.   Okay.
19    Q.   The bottom line is, you can't
20   agree or disagree because you're not sure
21   of the context in which he's saying it;
22   is that right?
23    A.   Correct.
24    Q.   Okay.
25       MR. PARADISE: All right,

Page 267

Dr. Adam Werner

1
2    let's take two minutes.
3        (Recess taken: 4:48 p.m. -
4        5:05 p.m.)
5        MR. PARADISE: Back on the
6    record.
7    BY MR. PARADISE:
8    Q.   I want to take you back to
9    the "halcyon" days, when you worked for
10   Defendants.
11       Do you remember those days?
12    A.   I would say that that
13   mischaracterizes who I work for
14   currently.
15    Q.   Who you work for currently?
16    A.   Well, I mean, I will do
17   defense work.
18    Q.   I'm sorry, I was being
19   tongue-in-cheek, and I shouldn't have.
20   Okay.
21       But you testified that in
22   your -- in the past, you have worked for
23   defendants; is that correct?
24    A.   Correct.
25    Q.   And have you been asked in

Page 268

Dr. Adam Werner

1
2    any of those matters -- were you ever
3    asked to calculate the share price
4    inflation at the time of the disclosure
5    that's supposedly, you know, revealed the
6    truth to the market?
7        MR. STRAUSS: Objection.
8        Go ahead.
9    A.   "Asked", do you mean as when
10   I have been an expert, or are you
11   speaking to when I've supported other
12   individuals?
13    Q.   If it's a different answer,
14   then we can break it out like that, but I
15   would say either/or.
16    A.   I believe, yes.
17    Q.   Okay.
18    A.   That has been the case.
19    Q.   In those -- in any of those
20   matters, either as an expert or a --
21   supporting an expert, did you ever
22   conclude that what was disclosed at the
23   end of the class period could not have
24   been disclosed at the beginning of the
25   class period?

Page 269

Dr. Adam Werner

1
2        MR. STRAUSS: Objection.
3        I don't understand the
4    question.
5    A.   Well -- I don't understand
6    the question, but I don't believe I've
7    ever been asked to do that.
8    Q.   Well --
9    A.   To the extent that I
10   understand what you're saying.
11    Q.   Well, let me try it this way.
12       What I'm asking is, that
13   information that was revealed at the end
14   of the class period -- okay?
15    A.   Okay.
16    Q.   -- could not have been
17   disclosed at the beginning of the class
18   period, for whatever reason, be it that
19   that information wasn't available at the
20   beginning of the class period, that some
21   event hadn't occurred at the beginning of
22   the class period that had occurred at the
23   end of the class period and it was
24   disclosed at the class period, but
25   couldn't have been disclosed earlier

68 (Pages 266 - 269)

Case 1:21-md-02989-CMA   Document 567-17   Entered on FLSD Docket 06/07/2023   Page 70 of
114
Case 1:12-cv-08557-CM   Document 147-1   Filed 06/17/14   Page 70 of 114

Page 270

1        Dr. Adam Werner
2 because it had not yet occurred, that's
3 what I'm getting at.
4        MR. STRAUSS: Objection.
5     A.  I'm just -- I'm very confused
6 about this notion of has not yet occurred
7 but has occurred or will occur -- I'm
8 sorry, I'm trying to be --
9     Q.  No --
10    A.  -- as honest as I can with
11 you, but I just -- I can't wrap my head
12 around what you're trying to get at.
13        MR. STRAUSS: You're trying
14    to back into a factual argument
15    that really has nothing to do with
16    his opinion on market efficiency.
17        And, you know, if you want to
18    make your factual argument in your
19    papers, that's great, and I think
20    you already did but lost on that,
21    on the motion to dismiss, but it's
22    just not really appropriate for
23    market --
24    Q.  Oh, is that why you can't --
25        MR. STRAUSS: -- efficiency

Page 271

1        Dr. Adam Werner
2    examination.
3    Q.  -- answer it, or you can't
4 answer it because you don't understand
5 it?
6    A.  I can't answer it because I
7 don't understand it.
8    Q.  Okay, I'm trying to come up
9 with a hypothetical to try to see if it
10 helps you understand it.
11        So let's take this as an
12 example. You have a company that is
13 engaged in merger negotiations on day
14 one, okay?
15    A.  Okay.
16    Q.  And it tells the market: We
17 are not engaged in merger negotiations,
18 okay? On day one.
19        On day 30, the company
20 announces that it has completed a merger,
21 okay?
22    A.  Okay.
23    Q.  So day 30 they complete the
24 merger, day one they deny being involved
25 in any merger negotiations.

Page 272

1        Dr. Adam Werner
2        On day 30, in addition to
3 saying that: We've completed the merger,
4 they also disclose that: We've been
5 involved in merger negotiations since day
6 one. Okay?
7    A.  Okay.
8    Q.  What I'm trying to get at is,
9 could they have disclosed on day one that
10 they had completed a merger?
11        MR. STRAUSS: Objection.
12    Q.  That's the whole -- that's
13 what I'm getting at with all of these
14 questions I've been trying to ask you.
15        MR. STRAUSS: You're making a
16    factual argument, you're not asking
17    an expert opinion question or
18    anything about his expert opinion
19    or any of the analyses or
20    assumptions that he offers expert
21    opinion.
22        This has nothing to do with
23    his expert opinion or market
24    efficiency.
25        How does this relate to

Page 273

1        Dr. Adam Werner
2 market efficiency?
3        MR. PARADISE: In fairness,
4    I'm trying to get to the answer of
5    the question I asked previously,
6    which he said he couldn't answer,
7    because he doesn't understand my
8    question, because he doesn't
9    understand the has occurred/has not
10    occurred. So I'm trying to give an
11    example of why I'm using that term,
12    something that has occurred/has not
13    occurred.
14        That's just an example of
15    that.
16        MR. STRAUSS: What does this
17    have to do with market efficiency
18    or his opinion on market
19    efficiency?
20        MR. PARADISE: Well, he's
21    testified in here that he completed
22    an event study, he testified that
23    there was a corrective disclosure,
24    that these are relevant to his
25    analysis of market efficiency.

69 (Pages 270 - 273)

Page 274

1  Dr. Adam Werner
2  But if you'll represent to
3  us, on the record, that Dr. Werner
4  is not going to be asked to do any
5  other work on this case in
6  connection with the class
7  certification motion, including
8  calculating damages, then I'll
9  withdraw the question.
10  MR. STRAUSS: I'm not going
11  to represent that.
12  MR. PARADISE: I didn't think
13  you would.
14  BY MR. PARADISE:
15  Q.  So does that help you
16  understand --
17  MR. PARADISE: And again --
18  MR. STRAUSS: If you ask him
19  if he's been asked to calculate
20  damages or if he has an opinion on
21  damages, and he's said no, so I
22  don't understand why that's not the
23  end of the analysis.
24  If he renders an additional
25  opinion on damages, you'll have the

Page 275

1  Dr. Adam Werner
2  opportunity to depose him on that.
3  MR. PARADISE: Will we? I
4  don't know.  Not with the schedule
5  we have right now, I don't know
6  that we will.
7  So, but let me just answer
8  your other objection.
9  The hypothetical was only for
10  the purpose of trying to explain to
11  him what my question was about.
12  Q.  And, I don't know, did
13  that -- putting aside Mr. Strauss's
14  objections, for the moment, did that --
15  do you at least now understand where I'm
16  coming from or what I'm getting at, with
17  that question?
18  A.  It just -- it doesn't make --
19  I understand, I think, what you're trying
20  to say.
21  It's like you're saying if
22  something didn't occur, or something is
23  going to occur in the future, can I --
24  and I don't know whether it's going to
25  occur, can I talk about it today -- it's

Page 276

1  Dr. Adam Werner
2  just -- it seems like some kind of
3  time-travel thing that I'm not quite
4  wrapping my head around.
5  Q.  I assure you, it's not the
6  "time-travel thing".
7  The bottom line is, you
8  never -- you said you've never been asked
9  to express an opinion -- at least as far
10  as you understand my question -- you've
11  not been asked to express that opinion in
12  any of these other matters that you've
13  worked on in the past for other
14  defendants.
15  A.  I have no idea.
16  Q.  All right.
17  MR. STRAUSS: Yes, no
18  opinions on time travel.
19  THE WITNESS: Could be cool,
20  certainly go back and fix some
21  errors in my life.
22  Q.  You list, in Exhibit 2, one
23  of the documents that you relied upon,
24  the decision and order granting, in part,
25  and denying in part, Defendants' motion

Page 277

1  Dr. Adam Werner
2  to dismiss in this case.  Is that right?
3  It's -- I think it's Document
4  Number 2.
5  A.  Okay.  You know what?  Let me
6  amend Exhibit 2.
7  I believe that it should say:
8  Documents reviewed.
9  Q.  Okay, as opposed to:
10  Documents relied on?
11  A.  Yes.
12  Q.  And what's that -- what's the
13  distinction, in your mind?
14  A.  These are all things that I
15  have looked at.  I'm not sure that every
16  little thing on this page has formed my
17  opinion -- or, helped form my opinion.
18  Q.  Well, let me ask you
19  specifically about that document, Number
20  two.  And if it's okay with Mr. Strauss,
21  I'll just refer to it as a decision and
22  order on the motion to dismiss.
23  Is that a document that you
24  relied upon, as opposed to reviewed?
25  A.  Can I -- I think you've

70 (Pages 274 - 277)

Page 278

1          Dr. Adam Werner
2  already entered it as an exhibit.
3      Q.   Not the Decision and order.
4      A.   Oh.
5      Q.   But I can give it to you.
6      A.   Yeah, I would like to take a
7  look at it.
8      Q.   Sure.  Always ask that, if
9  you like.
10     A.   I guess you gave me the
11 Amended complaint over there.
12     Q.   Right.
13         MR. PARADISE:  This would be
14 Exhibit 9.
15         (Whereupon Deposition Exhibit
16     9, Decisiou and order granting in
17     part and denying in part
18     Defendants' motion to dismiss, was
19     marked for identification, as of
20     this date.)
21         THE WITNESS:  Okay, now that
22     I have it in front of me, could you
23     re-ask the question?
24     Q.   The question is, using the
25 distinction that you just drew, is this

Page 279

1          Dr. Adam Werner
2  something that you reviewed and relied
3  upon or just reviewed for the purposes of
4  your opinion.
5      A.   Well, to the extent that I
6  believe this document informed my
7  understanding of what the class period
8  was, I believe -- to that extent I relied
9  upon it and, in relying upon it, I
10 reviewed it.
11     Q.   Okay.  There is -- let me ask
12 you about some other things, besides
13 that, and ask quickly if you have an
14 opinion about them or you even are
15 familiar with them.
16         The court ruled in this
17 decision -- or this Decision and order,
18 that -- well, she didn't rule, she
19 stated, in this Decision and order, that
20 the letter that Baker Hughes sent to
21 Hi-Crush on September 19, 2012 did not --
22 was not an effective termination of the
23 supply agreement.
24         MR. STRAUSS:  Objection.
25     A.   I don't know what that means.

Page 280

1          Dr. Adam Werner
2      Q.   Okay, so do you have -- you
3  don't agree or disagree with that
4  statement; is that fair to say?
5      A.   I'll stick with my answer --
6         MR. STRAUSS:  Objection.
7      A.   -- I don't know what that
8  means.
9      Q.   Wheu you say you don't know
10 what it means, what -- you don't know
11 what what means?
12     A.   I don't know what the judge
13 meant by that.
14     Q.   Okay, I'm sorry, you don't
15 know what you meant -- what I meant by
16 what I said, okay.
17         Let's look at -- maybe this
18 will help, let's look -- sometimes it's
19 easier to understand things in writing
20 than oral, look at page 27, this first --
21 second full paragraph.
22         Read the first sentence of
23 that paragraph.
24     A.   (Pause.)
25         Yeah, I don't know what the

Page 281

1          Dr. Adam Werner
2  judge was --
3      Q.   So you don't agree or
4  disagree with her statement there.
5         MR. STRAUSS:  Which
6  statement?
7         MR. PARADISE:  The first --
8  the one I just asked about, the
9  first sentence of -- the first --
10 second full paragraph on page 27.
11         Do you want me to read it
12 into the record?
13         MR. STRAUSS:  No, I see the
14 first sentence.
15     A.   Just the first sentence?
16         MR. STRAUSS:  Of the second
17 paragraph on page 27.
18     A.   I would turn the question
19 over to you, did you counter the Baker
20 Hughes purported termination was invalid?
21     Q.   I don't usually answer
22 questions at depositions but, I'm
23 curious, I don't know what you mean by
24 that.
25     A.   Maybe I'm looking at the

71 (Pages 278 - 281)

Page 282

```
 1        Dr. Adam Werner
 2 wrong thing.
 3        My thing says:  The 10 B
 4 Defendants countered the Baker Hughes
 5 purported --
 6        MR. STRAUSS:  No, the second
 7 paragraph.
 8        MS. BRANDON:  Why don't you
 9 read it into the record.
10    A.  I'm sorry.
11        MR. STRAUSS:  Why don't you
12 read the second paragraph,
13 please --
14        THE WITNESS:  Okay.
15        MR. STRAUSS:  -- and then you
16 can --
17    A.  Should I point out the typo?
18    Q.  Yeah, I see it, too.
19        You don't point out typos to
20 judges.
21    A.  Yeah, that's a bad idea.
22 (Pause.)
23        I don't understand that.
24    Q.  You don't understand the
25 first sentence or did you read more than
```

Page 283

```
 1        Dr. Adam Werner
 2 just the first sentence?
 3    A.  I continued on.
 4    Q.  Okay, let's take a look at
 5 page 29 of the decision.
 6        The second full paragraph,
 7 so -- and I'll just read it, to make this
 8 easier, the one that begins, at the
 9 bottom of the page:  The 10 B Defendants
10 are correct that Baker Hughes violated
11 the agreement's termination provision by
12 sending a termination notice prior to the
13 occurrence of four serial uncured
14 breaches.  Thus, Hi-Crush did not --
15 quote -- receive a notice of termination
16 pursuant to the terms of the agreement,
17 and the agreement was not terminated
18 within the meaning of item 1.02.
19 Accordingly, this rule did not require
20 Hi-Crush to disclose Baker Hughes'
21 repudiation via Form 8-K.
22        Do you see that?
23    A.  I do see it.
24    Q.  Okay.  The letter in which --
25 and we talked about this this morning,
```

Page 284

```
 1        Dr. Adam Werner
 2 it's been a while but we talked about
 3 this morning what happened on September
 4 19th, and you've answered, after we
 5 looked at your declaration, and some
 6 other documents, that that was the date
 7 on which Baker Hughes sent the letter to
 8 Hi-Crush.
 9    A.  Yeah, I believe that's
10 correct.
11    Q.  Okay.  So, what the judge is
12 saying here is the receipt of that letter
13 by itself did not require disclosure by
14 Hi-Crush.
15        Do you have any reason to
16 disagree with that?
17        MR. STRAUSS:  Objection.
18    A.  Well, first, that's what
19 you're representing the judge is saying.
20 I personally don't read this and say
21 that's the conclusion I come to.  I don't
22 understand it.
23    Q.  Okay.
24    A.  I'm not a lawyer.
25    Q.  Okay.  Fair to say that
```

Page 285

```
 1        Dr. Adam Werner
 2 this -- the reasoning and the language
 3 that the judge used in her decision, was
 4 not something you relied upon in coming
 5 to your opinion in this case, that you've
 6 expressed in this case?
 7        MR. STRAUSS:  Objection.
 8        Which part of the language or which
 9        part of the decision?
10        MR. PARADISE:  Well, this
11 language about whether Hi-Crush was
12 required to file an 8-K on -- upon
13 receipt of the repudiation letter.
14        THE WITNESS:  Can you re-read
15 the question, please.
16        (A portion of the record was
17 read.)
18    A.  I don't know the answer to
19 that question.
20    Q.  You don't know whether you
21 relied on it or not?
22    A.  I don't believe -- I don't
23 know, as I sit here today, only because,
24 again, I don't understand the language.
25    Q.  Well, does it have any
```

72 (Pages 282 - 285)

Page 286

```
 1           Dr. Adam Werner
 2  bearing on whether the market for
 3  Hi-Crush was efficient or not efficient
 4  during the class period?
 5      A.  As I sit here today, I don't
 6  know.
 7      Q.  Okay.
 8          MR. PARADISE:  Thank you, no
 9  further questions.
10          (Time noted:  5:21 p.m.)
11          MR. STRAUSS:  Okay.  I'll
12  just ask a few questions.
13  EXAMINATION
14  BY MR. STRAUSS:
15      Q.  I'd just like to ask you a
16  couple of follow-up questions about the
17  methodology that you used for your event
18  study.
19          Was the methodology that you
20  used the methodology that's recognized in
21  the literature in the field?
22      A.  Yes, by numerous people.
23          I can turn to the articles by
24  Tabak, Ferrillo, and Dunbar, and the St.
25  John's Law Review.  I believe they have
```

Page 287

```
 1           Dr. Adam Werner
 2  another article -- not Ferrillo, just
 3  Dunbar and Tabak, in the -- it's -- I'll
 4  have to get it, the exhibit here -- oh,
 5  so turning to Exhibit 1 -- well, Exhibit
 6  2 and Exhibit 1 -- right, in here, Number
 7  27: The Tabak and Dunbar materiality
 8  magnitude event studies in the courtroom
 9  in the litigation service handbook, that
10  was what I was looking for, the role of
11  the financial expert, so yes, it's
12  recognized, and by other individuals.
13  Those are just two examples of....
14      Q.  And is the methodology the
15  same methodology that you used when you
16  were at Cornerstone?
17      A.  Yes.
18      Q.  And is it the same
19  methodology that you used when you were
20  at NERA?
21      A.  Yes.
22      Q.  Okay.  I'd like to turn back
23  to there were some questions earlier
24  about the control period that you used
25  and whether or not you -- and about the
```

Page 288

```
 1           Dr. Adam Werner
 2  control period that you used and the fact
 3  that you excluded November 12th, 2012
 4  from the control period.
 5          Could you explain why you
 6  excluded November 12th, 2012 from the
 7  control period?
 8          MR. PARADISE:  Objection.
 9      A.  I believe -- well, typically,
10  when you do this type of analysis, you
11  want to correct -- or, not "correct", you
12  want to make sure that your sample is
13  neutral, for want of a better term, such
14  that I could have included it in my
15  analysis, I could have run the event
16  study over a different time period.  I
17  just would have used a dummy variable to
18  account for this disclosure.
19      Q.  And is it -- is either
20  method -- are you describing two
21  different methods, there is one method
22  where you would use a dummy variable and
23  include the event that you're evaluating,
24  and another method where you would not
25  include the event that you are evaluating
```

Page 289

```
 1           Dr. Adam Werner
 2  and then you don't have to use a dummy
 3  variable to explain?
 4      A.  Well, no, I mean, it's all
 5  part and parcel of an event study.  So
 6  when people do event studies, they can
 7  look at -- you know, they determine what
 8  their measurement period is.
 9          Oftentimes, people do that
10  over a class period, and in doing -- but,
11  when doing so, use dummy variables to
12  correct for the fact you have these
13  disclosures during the event period --
14  or, during the class period.  Otherwise,
15  people will use what's called a "neutral
16  period" or period that is untainted by,
17  in this case, the alleged fraud and
18  estimate their event study over that
19  period.
20      Q.  And that's what you did here.
21      A.  Correct.
22          MR. STRAUSS:  Okay, that's
23  it, I don't have anything else.
24          MR. PARADISE:  I have no
25  questions, no further questions.
```

73 (Pages 286 - 289)

Page 290

```
 1          Dr. Adam Werner
 2      Thank you.
 3          THE WITNESS:  Thank you.
 4      (Time noted:  5:26 p.m.)
 5
 6
 7      DR. ADAM WERNER
 8
 9
10  Subscribed and sworn to before me
11  this _____ day of _____, 2014.
12
13
14      Notary Public
15
16
17
18
19
20
21
22
23
24
25
```

Page 291

```
 1
 2          C E R T I F I C A T E
 3
    STATE OF NEW YORK )
 4                    : ss.
    COUNTY OF NEW YORK)
 5
 6      I, Wendy D. Boskind, an RPR
 7  and Notary Public within and for the
 8  State of New York, do hereby certify:
 9      That DR. ADAM WERNER, the
10  witness whose deposition is
11  hereinbefore set forth, was duly
12  sworn by me, and that such deposition
13  is a true and accurate record of the
14  testimony given by the witness.
15      I further certify that I am
16  not related to any of the parties to
17  this action by blood or marriage, and
18  that I am in no way interested in the
19  outcome of this matter.
20      IN WITNESS WHEREOF, I have
21  hereunto set my hand this 28th day
22  of April, 2014.
23
24      _____
        WENDY D. BOSKIND, RPR
25
```

Page 292

```
 1
 2  April 24, 2014
            INDEX
 3                         PAGE
 4  WITNESS:
 5  DR. ADAM WERNER
 6
 7  EXAMINATION
 8  BY MR. PARADISE          4
    BY MR. STRAUSS:          286
 9
10
11          EXHIBITS
12  Exhibit 1  Declaration of Dr.   6
            Adam Werner April
13          15, 2014
14  Exhibit 2  Press release, dated  114
            November 13th
15
    Exhibit 3  Document, DJUSMG     154
16          Index, as of January
            18th, 2013
17
    Exhibit 4  Document, Dow Jones  158
18          U.S. Mining Index,
            with a list of the
19          companies
20  Exhibit 5  Amended consolidated 162
            class action
21          complaint for
            violations of the
22          federal Securities
            Laws
23
24
25
```

Page 293

```
 1
 2  Exhibit 6  Document,            235
            represented to be a
 3          compilation of
            information
 4          retrieved from
            Thomson Reuters of
 5          13-F filings as of
            September 30th, 2012
 6
    Exhibit 7  Document, which says  240
 7          Dow Jones U.S.
            Mining Index (Index
 8          DJUSMG)
 9  Exhibit 8  Article, HeinOnline   257
10  Exhibit 9  Decision and order    278
            granting in part and
11          denying in part
            Defendants' motion
12          to dismiss
13
14
15
16  (REQUEST.)               59
    (REQUEST.)               222
17  (REQUEST.)               238
18
19
20
21
22
23
24
25
```

74 (Pages 290 - 293)

```
                                                    Page 294
1          ERRATA SHEET
           VERITEXT REPORTING COMPANY
2              1250 BROADWAY
           NEW YORK, NEW YORK 10001
3             800-362-2520
4  CASE: HI-CRUSH PARTNERS L.P. SECURITIES LITIGATION
   DEPOSITION DATE: 4/24/14
5  DEPONENT: DR. ADAM WERNER
6  PAGE LINE(S)  CHANGE      REASON
7  ___|___|_____|_____
8  ___|___|_____|_____
9  ___|___|_____|_____
10 ___|___|_____|_____
11 ___|___|_____|_____
12 ___|___|_____|_____
13 ___|___|_____|_____
14 ___|___|_____|_____
15 ___|___|_____|_____
16 ___|___|_____|_____
17 ___|___|_____|_____
18 ___|___|_____|_____
19 ___|___|_____|_____
20
21
         _____
         DR. ADAM WERNER
22
   SUBSCRIBED AND SWORN TO BEFORE ME
23 THIS ____ DAY OF _____, 20 ___.
24
   _____  _____
25 (NOTARY PUBLIC)   MY COMMISSION EXPIRES:
```

75 (Page 294)

[& - 2005]

Page 1

**&**

**&** 1:15 2:13 72:22

**0**

**0** 175:14
**0.025** 175:15
**08557** 1:3

**1**

**1** 6:14,17,21,23 7:8
7:11 20:25,25 21:2
21:4,12 25:6,18
26:11,19,19 33:14
33:14 44:14 54:9
56:10,13,13 57:7
65:2,18 71:9,9
76:14 79:2 99:8
102:12,13 115:17
122:15 147:17
152:14,19 153:5,5
163:2 176:24 178:4
179:2 194:16 195:5
216:25 245:3,4
287:5,6 292:12
**1.02.** 283:18
**1.068** 219:18,22
**1.07** 219:12
**1.16** 248:15 249:3
**1.16.** 248:14 249:8
**1.2** 248:10,21
**1.25** 150:12
**1.53** 217:15 219:4
**1.67** 135:17
**1.96** 132:12
**10** 65:9 139:20
163:14,17 170:16
180:8,11 184:12
194:16 256:11,13
282:3 283:9
**10-20-2012** 183:22
**10-21-2012** 233:17
**10001** 294:2
**10022** 2:7
**101** 210:22

**10103-0040** 2:17
**104** 137:5
**1099** 17:8 18:11
**10:09** 1:11
**10:55** 50:12
**11** 99:7 139:20
182:18,23 184:4,11
198:14,25 250:9,22
**11-1-2012** 183:5
**11-6-2012** 183:7
**114** 292:14
**11:09** 50:13
**12** 1:3 78:24 104:20
104:24 106:21
110:2 111:25
113:12 122:18
139:20 165:9,15
166:5 172:5 173:8
186:20 187:11
188:3,5 195:8 236:7
252:7,17,19
**1250** 294:2
**12:09** 114:17
**12:19** 114:18
**12:50** 144:24
**12c** 150:24 247:9
248:13
**12th** 68:23 69:2,10
70:25 102:10 104:8
104:11 106:24
111:12,20 112:11
112:21 113:25
116:23 117:12,15
117:17,20,23 118:5
118:12,24 119:10
119:15,23 120:8
121:11 123:17
131:7 171:11
178:22 218:5
247:17 248:2
253:11 288:3,6
**13** 121:11 124:13,13
139:10,11,20
140:10 187:23
188:4,8 200:12

230:5,18 231:12,12
231:13 233:19
235:14,22 237:16
238:24,25 250:14
250:19,22 293:5
**13th** 40:6 103:23
105:21,25 108:20
108:23 109:10,11
109:16,24 112:4,12
112:15,21 113:24
114:12 116:16,22
117:8 120:21,22
122:25 123:2
127:23,24 129:24
130:4,10,12 131:4
131:15 139:18
140:16,23 143:20
144:3 166:4,18
169:12,14 195:15
198:9,10 200:20
241:20 242:3
247:17 248:2 249:6
259:10 292:14
**14** 129:23 130:6
139:22,22 140:10
141:10 170:19,20
171:8 172:12 176:4
177:18
**140.07** 248:5
**141.72** 248:5
**141.72.** 248:6
**14th** 67:7 71:7 131:9
131:11 139:18
143:20,24 144:2
232:5
**15** 6:18 68:18 93:8
227:22 228:5 231:9
231:21 236:2
292:13
**15.4** 228:12
**154** 292:15
**158** 292:17
**15th** 67:7
**16** 138:18,19,21
233:16

**162** 292:20
**16th** 71:21 232:4
**17** 157:15
**17th** 71:23
**18** 195:22 196:8,23
197:2,8,13
**18.2** 194:22 197:14
197:15
**18th** 68:19 154:22
155:3 292:16
**19** 99:9 100:10
122:17 172:5 173:7
218:5 279:21
**19th** 68:23 69:10
70:24 97:24 98:4,17
98:21 99:6 100:11
101:15 105:20
111:12 120:7
123:16 128:9
171:10 178:21
183:2,20 284:4
**1:43** 145:3

**2**

**2** 7:20 24:23 25:5
31:24 52:13,21
64:24 65:2,3,18,18
76:13,15 94:7
105:15,16 106:11
114:9,11,22 116:14
125:24 153:4,5
194:13 204:5,16,22
276:22 277:4,6
287:6 292:14
**2,097,326** 232:12
236:6
**2.097326** 233:18
**20** 294:23
**200** 155:10 156:23
201:18 203:5
**2000** 12:8 13:18
**2003** 13:15,25
**2004** 15:15
**2005** 15:14

[2007 - 78]                                                                    Page 2

| | | | |
|---|---|---|---|
| 2007 13:13 | 21 128:10 | 246:4 249:23 250:4 | 292:20 |
| 2008 10:10 16:5 | 210 4:4 | 292:15 | 50 60:24 |
| 2009 16:5 18:14 | 212 2:9,21 | 3.1 217:20 218:9 | 50/50 24:9 |
| 2010 18:14 | 214 2:22 | 219:24 | 500 192:19,20,24 |
| 2012 40:6 62:20,21 | 22 183:14,15 | 30 83:2,3 84:12,19 | 193:9,11 |
| 63:25 64:2 65:14 | 220-7929 2:22 | 84:21 89:20 236:11 | 57 236:13,15,15 |
| 66:24 67:9 68:18 | 222 293:16 | 271:19,23 272:2 | 59 293:16 |
| 69:10,10 70:24,25 | 22nd 183:3 | 30th 234:3 235:14 | 5:05 267:4 |
| 71:21,22,23 97:24 | 23 250:10 | 235:23 293:5 | 5:21 286:10 |
| 98:4 99:9 100:3 | 235 293:2 | 31 148:24 149:14 | 5:26 290:4 |
| 102:10 104:11 | 237-0016 2:21 | 256:12,15 | |
| 105:20 106:24 | 238 293:17 | 312 3:10 | **6** |
| 111:12,13,20 112:4 | 24 1:10 118:16 | 32.6 228:13 | |
| 116:23 119:23 | 128:10 138:16 | 322-0200 3:10 | 6 21:5,6 68:2,14 |
| 120:8,8,21 121:11 | 292:2 | 33 227:23 | 69:21 115:17 |
| 122:17,18,25 | 240 293:6 | 332 3:8 | 178:25,25 195:12 |
| 124:13 127:23 | 25 181:21 184:12 | 35 198:12 | 198:11 235:8,11,19 |
| 129:24 131:4,17 | 252 194:6 | 36 173:4,9 174:2 | 239:15 292:12 |
| 140:10 143:20 | 2550 4:3 | 36,674,570 151:19 | 293:2 |
| 144:2 148:24 162:4 | 257 293:9 | 37 173:10 | 60604 3:9 |
| 163:23 166:18 | 25th 100:3 | 371-6600 2:9 | 61 138:16 |
| 171:10,11 173:8 | 26 195:13 196:9,25 | 3:23 202:4 | 63 247:15 |
| 178:22 182:24 | 26.2 197:8 | 3:59 235:3 | 64 247:15 |
| 183:2,3 194:24 | 269 152:4 | | 666 1:16 2:15 |
| 197:15,18 198:10 | 26th 2:16 | **4** | 67 152:11 |
| 200:12 218:5,6 | 27 280:20 281:10,17 | 4 10:11 94:6 126:14 | 6th 184:2 |
| 232:11,15 233:16 | 287:7 | 126:17 150:13 | |
| 235:15,23 249:6 | 278 293:10 | 158:5,7,13,17 189:3 | **7** |
| 253:11 279:21 | 286 292:8 | 189:7 199:8 202:17 | |
| 288:3,6 293:5 | 28th 291:21 | 292:8,17 | 7 129:2,18,22 |
| 2013 65:14 66:24 | 29 79:2,4 84:16 | 4/24/14 294:4 | 136:22 137:3,7 |
| 69:4,5 105:21,25 | 85:25 176:24 | 40 9:13 60:24 | 139:2,9,16 140:2 |
| 109:25 120:22 | 184:10,12 239:4 | 44 157:14,16 | 141:9,19,25 163:13 |
| 121:11 123:2 | 283:5 | 45 9:13 | 163:17 170:14 |
| 124:14 127:24 | 290 125:20 | 47 217:12,15 219:3 | 191:2 240:6,8,14 |
| 131:7 140:10 | 2:20 180:5 | 475 60:2 | 244:17 245:15,22 |
| 143:21 144:3 | 2:23 180:6 | 49 125:23 133:24 | 246:15 247:2 |
| 154:22 155:3 | 2:51 202:3 | 135:15 | 250:16 251:16 |
| 292:16 | | 4:10 235:4 | 293:6 |
| 2014 1:10 6:18 | **3** | 4:48 267:3 | 7,838,548 236:11 |
| 290:11 291:22 | 3 21:14 147:16,17 | 4th 130:2 | 73 176:24,25 |
| 292:2,13 | 147:20,22 148:21 | | 74 224:14 |
| 202 221:9 | 154:19,21 160:4 | **5** | 76 227:14,19 228:9 |
| 20th 128:9 | 217:23 218:3,20,25 | 5 99:8 150:20 | 228:12,14 |
| | 245:9,12,13,20 | 162:17,19 163:2 | 77 207:13,25 208:2 |
| | | 194:19 198:11 | 214:4 |
| | | | 78 216:24 220:7,15 |
| | | | 220:22 |

[7th - adam]  Page 3

| 7th 234:4 | a | 252:25 291:13 | 107:1 108:1 109:1 |
|---|---|---|---|
| **8** | a.m. 1:11 50:12,13 | accurately 189:14 | 110:1 111:1 112:1 |
| 8 65:10 101:19,21 | abbreviated 191:5 | 238:18 | 113:1 114:1 115:1 |
| 101:25 102:2 139:3 | aberrational 142:23 | accuse 172:25 | 116:1 117:1 118:1 |
| 139:17 140:2 141:9 | able 25:15 51:17 | acquired 7:25 38:7 | 119:1 120:1 121:1 |
| 141:20,25 163:14 | 84:3 124:8 141:10 | 38:9 | 122:1 123:1 124:1 |
| 163:17 170:14 | 157:24 159:10 | acquiring 8:14 | 125:1 126:1 127:1 |
| 183:21 257:16,18 | 208:8 212:9 224:20 | acquisition 8:10 | 128:1 129:1 130:1 |
| 283:21 285:12 | 239:20 240:3 244:5 | act 32:7 | 131:1 132:1 133:1 |
| 293:9 | 252:19 | action 34:8 46:15 | 134:1 135:1 136:1 |
| 80 228:24 | ably 211:13 | 162:20 291:17 | 137:1 138:1 139:1 |
| 800-362-2520 294:3 | abnormal 37:6 | 292:20 | 140:1 141:1 142:1 |
| 825 2:6 | 188:17,20,22 | activities 209:16 | 143:1 144:1 145:1 |
| 89 137:11 | 261:24 | 211:14,21 220:11 | 146:1 147:1 148:1 |
| 89.6 137:2 | absence 126:5 | activity 211:4 | 149:1 150:1 151:1 |
| 89.6. 137:22 | 174:17 186:17 | 213:19 214:14 | 152:1 153:1 154:1 |
| 891 264:6 | absent 132:12 | 215:17 | 155:1 156:1 157:1 |
| 896 137:11 | absolute 137:4 | actual 72:9 | 158:1 159:1 160:1 |
| 897 260:18 | 188:7,8 191:10,11 | adam 1:14 5:1 6:1 | 161:1 162:1 163:1 |
| **9** | 229:11 | 6:17 7:1 8:1 9:1 | 164:1 165:1 166:1 |
| 9 71:21 139:20 | absorbed 74:12 | 10:1 11:1 12:1 13:1 | 167:1 168:1 169:1 |
| 141:9 161:12,23 | 119:17 | 14:1 15:1 16:1 17:1 | 170:1 171:1 172:1 |
| 163:14,17 170:15 | academic 52:5 | 18:1 19:1 20:1 21:1 | 173:1 174:1 175:1 |
| 170:17 178:4 179:9 | 76:13 77:3 94:25 | 22:1 23:1 24:1 25:1 | 176:1 177:1 178:1 |
| 185:11,12,17,20 | 148:17 215:24 | 26:1 27:1 28:1 29:1 | 179:1 180:1 181:1 |
| 194:12 278:14,16 | accept 80:4 215:12 | 30:1 31:1 32:1 33:1 | 182:1 183:1 184:1 |
| 293:10 | acceptable 90:4 | 34:1 35:1 36:1 37:1 | 185:1 186:1 187:1 |
| 9-21-2012 182:21 | 136:24 137:16,20 | 38:1 39:1 40:1 41:1 | 188:1 189:1 190:1 |
| 90 22:24 133:6,16 | accepted 90:5 98:22 | 42:1 43:1 44:1 45:1 | 191:1 192:1 193:1 |
| 134:11,15,22 135:3 | 108:18 | 46:1 47:1 48:1 49:1 | 194:1 195:1 196:1 |
| 135:8,18 136:2,18 | accepting 103:8,14 | 50:1 51:1 52:1 53:1 | 197:1 198:1 199:1 |
| 137:13,17 | 103:15 164:5 | 54:1 55:1 56:1 57:1 | 200:1 201:1 202:1 |
| 94710 4:5 | accidentally 6:2 | 58:1 59:1 60:1 61:1 | 203:1 204:1 205:1 |
| 95 132:18 133:9 | account 196:22 | 62:1 63:1 64:1 65:1 | 206:1 207:1 208:1 |
| 134:14 135:10 | 242:2 244:9,15 | 66:1 67:1 68:1 69:1 | 209:1 210:1 211:1 |
| 181:15,23 191:15 | 262:7 288:18 | 70:1 71:1 72:1 73:1 | 212:1 213:1 214:1 |
| 191:25 | accounted 241:8,9 | 74:1 75:1 76:1 77:1 | 215:1 216:1 217:1 |
| 99 133:4,8 178:11 | 242:24 243:16 | 78:1 79:1 80:1 81:1 | 218:1 219:1 220:1 |
| 179:19 | accounting 8:20 | 82:1 83:1 84:1 85:1 | 221:1 222:1 223:1 |
| 99.99 202:20 | 173:22 | 86:1 87:1 88:1 89:1 | 224:1 225:1 226:1 |
| 9th 120:7 | accounts 222:22 | 90:1 91:1 92:1 93:1 | 227:1 228:1 229:1 |
|  | accurate 8:4 170:24 | 94:1 95:1 96:1 97:1 | 230:1 231:1 232:1 |
|  | 171:4 189:19,21 | 98:1 99:1 100:1 | 233:1 234:1 235:1 |
|  | 212:6 231:2,5 | 101:1 102:1 103:1 | 236:1 237:1 238:1 |
|  |  | 104:1 105:1 106:1 | 239:1 240:1 241:1 |

[adam - appeared]

242:1 243:1 244:1
245:1 246:1 247:1
248:1 249:1 250:1
251:1 252:1 253:1
254:1 255:1 256:1
257:1 258:1 259:1
260:1 261:1 262:1
263:1 264:1 265:1
266:1 267:1 268:1
269:1 270:1 271:1
272:1 273:1 274:1
275:1 276:1 277:1
278:1 279:1 280:1
281:1 282:1 283:1
284:1 285:1 286:1
287:1 288:1 289:1
290:1,7 291:9 292:5
292:12 294:5,21
add  87:19
adding  265:14
addition  272:2
additional  12:18
  22:8,9 44:25 115:14
  166:11,16 203:2
  212:11 228:15
  229:9 274:24
address  4:3 24:23
adjust  169:24
adjusted  175:4,9,10
  200:5,6 201:13
  241:12
advised  114:24
advisors  7:14,22,25
affect  164:23,24
aggregate  159:18
ago  49:21 50:24
agree  55:6,25 72:2
  79:10,12,14 80:19
  81:4 85:18 86:10
  107:24 122:13
  151:2 187:21 211:7
  249:24 250:4 253:7
  261:10 264:12
  265:2 266:20 280:3
  281:3

agreed  88:11
agreement  1:17
  105:5 106:23
  111:19 116:25
  165:19 167:5
  252:24 253:3
  279:23 283:16,17
agreement's  283:11
agritech  27:6,17
  28:16 29:23
ah  69:20 76:5 200:3
  200:3 218:21
ahead  9:21 14:6
  19:18 29:2 42:18
  64:13 69:22 81:24
  82:20 84:5 99:4
  115:4 145:16
  166:24 173:12,20
  184:23 189:20
  196:18 202:2
  208:25 213:25
  244:13 254:4
  264:15 268:8
ainslie  35:4
alange  27:4
alert  250:16,16
allegations  107:13
  164:5,16,19
alleged  31:5 32:6,7
  32:15 34:13 36:12
  36:15 37:3,6,8,16
  37:18,24 42:12,14
  98:20 101:8 102:17
  106:13,16 167:18
  169:6,11 170:5,6
  263:17 289:17
allegedly  259:19
allow  186:5
alluded  233:4
alpha  118:22
alternatively  141:3
amazingly  96:3
amend  277:6
amended  162:14,19
  163:10,20 164:6

252:18 278:11
  292:20
amount  40:16 61:6
  61:8 217:3
analyses  139:15
  272:19
analysis  52:7,8
  81:23 82:16 90:20
  90:21 92:12,13
  98:23 107:14 127:6
  130:4,22 131:25
  133:2 134:23
  138:25 140:12
  141:12 154:3
  158:25 164:7,24
  170:18 174:5 179:8
  184:5 185:25
  186:14,24 187:3,5
  187:10 188:2,3,18
  188:25 192:11
  199:18 205:10,12
  205:15,21,25
  241:14 244:16
  261:3 273:25
  274:23 288:10,15
analyst  66:22 67:3
  67:15 71:14 72:5,7
  73:25 79:20 83:7
  85:12 88:9 89:13,25
  90:15 91:7,8,13,15
  92:10 115:6,6 116:7
  118:21 125:17
  155:9
analysts  68:12,15
  69:6 70:17 71:16
  72:11 74:11 75:3,19
  76:3 79:7,20 80:2
  80:25 81:5 82:11
  83:4 86:18,21,24
  88:3,24 89:4,14,18
  91:22 92:4,7
analyze  91:17
  213:21
analyzed  138:3
  152:4

angeles  16:10
announce  265:9
announcement
  165:5 262:6
announces  264:9,10
  264:17 266:15,15
  271:20
answer  5:14,23,25
  6:3,9 14:14 29:3
  36:21 40:13 41:6,20
  43:5 55:4 56:3,3
  61:23 95:5 102:3
  107:20 110:7 118:8
  122:5,9,10 124:7
  145:13 146:15
  168:18 177:3
  190:17 222:9 242:8
  244:6 250:12
  252:11 254:17
  258:17,19 263:22
  268:13 271:3,4,6
  273:4,6 275:7 280:5
  281:21 285:18
answered  25:22
  36:7 177:15 242:7
  252:13 284:4
answering  110:5
answers  50:18 115:2
  116:5 184:13
antitrust  206:17,20
anybody  53:10,13
  66:18
anymore  8:22
anything's  97:11
anyway  239:14
  258:11
apart  167:6
apologize  45:17
  90:14 138:20
  139:22
appear  33:25 35:9
  192:14 217:25
  228:8
appeared  35:18

[appears - background]

appears 4:21 25:8
31:3 34:4 39:23
193:14 194:13
256:15
appendix 65:20
67:16 77:6,10 119:4
119:7 122:14 128:3
129:13,14 132:3
172:7 182:9,14
198:8 201:21
241:19 249:4
applied 30:23 73:24
apply 30:21,22 37:2
38:6,17 42:15 148:2
applying 40:15
appreciate 155:14
155:21
appropriate 270:22
approximately 12:6
21:6 22:17 232:13
233:17
approximations
12:5
april 1:10 6:18
291:22 292:2,12
aps 230:5
arbitrage 208:8,11
208:17 214:14
215:16,19,22
216:12
arbitrageur 207:21
208:7 209:6 213:19
214:7,9 226:12,13
226:18 227:3
arbitrageurs 207:15
208:4,19 209:16
210:3,24 211:14
212:9 213:18
226:15 227:5
area 15:3 16:13,21
argued 176:17
arguing 205:22,23
argument 81:21
253:25 270:14,18
272:16

arises 161:25
armtec 28:2
art 207:19 209:3
article 145:25
146:11 256:4,9
257:2,3,18,25 258:6
258:13 264:5 287:2
293:9
articles 52:4,5 76:14
77:3,9 91:11,12
286:23
articulate 226:9
aside 275:13
asked 14:21 22:5
24:10,18 25:14,23
31:10,21,22 32:13
32:23 35:20 42:11
44:24,24 46:23
49:24 50:4,24 51:18
54:22 61:10 64:6,11
70:15 80:2 84:9
95:23 102:15 103:6
108:17,19 166:21
167:14 168:15,16
168:21,25 169:3,8
177:10 242:6
250:11 251:17
252:15 258:15
261:17 263:20
267:25 268:3,9
269:7 273:5 274:4
274:19 276:8,11
281:8
asking 23:14,16
29:8 32:10,12 41:24
54:15 55:12,14,19
57:5,7 58:8,22,23
58:24 60:15 69:17
71:15 80:13,20
82:14,25 83:13,19
84:22 85:8,11 87:4
87:6,10 88:13 101:2
102:23 107:10,12
107:13 109:9,14
164:15 171:5

172:15 201:4
214:21 235:7
242:25 245:21
252:11 253:14,18
254:2 257:23
264:17,25 265:5
269:12 272:16
aspect 28:24
assisted 53:4,6
associate 11:6
associated 260:24
assume 59:15 63:4
74:20 86:13 93:3
198:20 201:10
238:18
assuming 82:7
108:3 123:2,3
196:21 242:20
assumption 103:16
108:12 123:6,7
156:15 164:16,19
assumptions 43:21
272:20
assure 276:5
asterisked 132:6
asterisks 122:21,24
123:4
attaching 99:21
attempt 145:12
166:15 210:5,11,18
213:7 214:7
attempting 262:22
attorneys 2:5,14
49:17
attributable 262:24
august 68:18
australia 27:18,23
auto 126:5 174:23
176:16,19
autocorrelation
126:8 173:14 174:4
174:12,14,17,19
176:22
available 149:16
222:5 223:4,5

269:19
avenue 1:16 2:6,15
3:8
average 148:5 149:9
150:22 151:14
152:11 217:6,16
218:9 219:12,21,22
234:9
aversion 20:18
aware 29:19 32:5
65:22 74:25 75:14
90:10 104:6,7 118:3
118:12,19 166:2
231:7
awful 18:12

**b**

b 149:22,24 207:17
282:3 283:9
back 9:23 15:10
16:13 20:24 31:14
32:19 36:6 37:17,17
37:20 40:13 50:14
50:21 69:21 70:4,10
76:12 84:11 90:23
91:10 99:5 100:7
106:19 116:10
124:5 128:24 132:3
147:6,10 148:22
150:23 157:23,25
160:16 170:8,9
178:4 179:22 185:9
185:10 189:2
190:22 191:2 198:6
202:5 203:25
209:21 216:17
231:8,10 237:22
244:17 245:8 252:5
258:2 261:16
263:12 267:5,8
270:14 276:20
287:22
background 7:6
53:25

[backs - bp]

**backs** 193:7,9,10
**backup** 228:7 251:6
**bad** 32:7 121:19
  200:16 264:18
  282:21
**baird** 67:5 72:20
  73:2
**baker** 99:10,12,24
  100:4,13,14 101:16
  105:11 106:25
  109:5 111:21 119:2
  163:8 165:19,23
  167:5 194:22
  195:18,21 196:7,23
  252:22 253:3,10
  259:12 279:20
  281:19 282:4
  283:10,20 284:7
**ballpark** 152:7
**bank** 27:18,23
**banks** 224:18
**barbara** 224:16
**barclays** 72:19,25
**bartend** 14:7,12
  15:9
**based** 16:12 43:21
  95:25 98:2 100:11
  115:10 123:21
  124:9 125:8 147:21
  149:9 150:15
  162:12 233:18
  263:22,24
**bases** 153:6
**basic** 204:11,20
**basically** 11:10,12
  191:25
**basis** 30:3 60:5
  66:20 73:7 220:6,25
  231:13,24
**basket** 159:5,19
  160:6
**bay** 16:13,20
**bearing** 286:2
**bears** 116:4

**beginning** 10:22
  21:4 38:8 63:25
  116:17 134:6
  138:15 268:24
  269:17,20,21
**begins** 76:14 97:23
  98:21 260:20 283:8
**behalf** 19:14,15 20:4
  21:25 30:14 32:25
  35:14,18 47:23
**behest** 52:7 229:25
  230:17
**belaboring** 90:14
**belief** 210:9 216:10
**believe** 7:2,7,16,18
  9:22 11:24 12:8,17
  13:12,22 16:25
  18:23 19:2,25 23:11
  24:13,17 25:12,21
  26:4 28:3,9,15
  29:20 30:2,5,25
  31:8,25 32:21 33:22
  34:15 35:6 36:3,10
  39:20,22 40:7 42:10
  43:7,19,24 45:22
  47:4,15,21 48:5,15
  49:24 50:20 51:7,9
  51:12 52:25 53:7,16
  53:23 58:5 59:10,17
  60:3 62:7 63:5
  65:13,19 66:21,25
  67:6,10 68:25 69:11
  71:4,17,24 72:12
  73:22 74:11 78:7
  80:24 82:24 83:11
  84:16 85:23 86:3,8
  89:2 92:21 93:25
  94:21 95:5,13
  100:16 101:17
  102:6,14 103:19
  106:15 107:7 112:7
  113:19 114:3 115:2
  116:6 118:11 119:3
  119:6 125:22,22
  126:18,22 128:13

  128:23 132:13
  136:11,23 138:11
  139:2,8,10 144:4
  148:5,8,12 149:25
  150:25 152:6,21
  153:18,23 158:15
  158:24 159:7,22
  161:2,14 162:15
  166:19 168:18
  169:16 170:7 173:5
  173:9 177:7 178:23
  179:5,12 180:14
  182:7 183:2,7,8
  184:3,8,19 185:8,19
  186:9,10,19 187:8
  187:15 189:3
  190:20 192:12
  194:11 195:17
  197:14 199:2
  200:25 201:9
  204:12 205:18
  206:11 207:11
  210:3,7,12,18 212:4
  212:6 217:9 218:7
  218:24 219:11
  220:16 221:6
  224:15 227:13
  228:21,23 229:17
  230:10 231:15
  232:8 233:6 234:5
  235:7 241:6,8
  243:23 246:12
  253:6 255:18 256:2
  256:21 257:13
  258:19 264:2
  268:16 269:6 277:7
  279:6,8 284:9
  285:22 286:25
  288:9
**believes** 225:20
**berkeley** 4:4 8:2,14
  8:24,25 9:4,7,18,24
  9:25 10:3,8 18:4,16
  18:18,22,24 19:13
  19:21 24:12

**best** 5:10 23:3
  155:23,24 189:9
  194:7
**better** 12:25 15:13
  15:17 37:9 212:12
  224:19,20,24,24
  225:21 288:13
**beyond** 5:14 31:23
  36:19 44:12 64:9
  82:18 87:12 141:8
  197:25
**bid** 125:21 148:6
  149:9,11
**bit** 36:24 40:9 45:11
  55:17 87:17 165:10
  261:15
**black** 246:6
**blair** 72:22 73:2
**blood** 145:18 291:17
**bloom** 204:24
**bloomberg** 149:5,12
  149:16 150:4
  159:11,13,16,22
  203:12,14 229:24
  230:2,12 231:2,6
  234:2 238:8,9,24
  239:9 245:24
  246:16 250:13
**bloomberg's** 233:19
**bond** 96:16
**bookkeeping** 8:20
**books** 76:14
**boost** 237:14
**borrow** 70:2 220:13
  221:21 223:4,6
**boskind** 1:18 4:7
  291:6,24
**bother** 92:11
**bottom** 175:25
  191:7 198:11,12
  219:13 266:10,19
  276:7 283:9
**bow** 230:3,8,11
**bp** 34:23

**brad** 256:5 257:8,25
265:12
**brandon** 2:20 4:18
84:10,17 104:17
138:18 203:13,19
252:2 282:8
**brattle** 10:5
**breached** 99:19
**breaches** 283:14
**break** 6:6,10 36:24
50:9,19 114:15
116:2 144:20,23
145:18 157:9 180:4
201:23 268:14
**briefly** 7:5
**brings** 13:13 16:4
**broad** 29:6,7 51:20
61:24 95:5 189:6
**broader** 127:17
**broadly** 61:23
**broadway** 294:2
**broke** 114:20
**brokerage** 115:19
222:21
**brought** 95:23
**bunch** 11:13 126:25
147:9
**business** 4:3 15:10
62:4,20 63:24 64:18
189:16 198:18
**buy** 39:4
**buyer** 100:5

**c**

**c** 2:2,20 3:2 126:9
149:21 291:2,2
**calculate** 173:13
258:4 268:3 274:19
**calculated** 150:7
**calculating** 274:8
**calculation** 151:17
217:11 247:7
**calculations** 152:3
**calculator** 151:3,23
247:5,10 248:7

**calendar** 117:18
**california** 4:5 207:4
**call** 37:8 39:3 43:2
51:3 105:18 113:16
157:17 180:21
187:2 255:21 259:3
**called** 8:2 21:15
37:25 63:11 195:13
199:23,24 206:10
207:4 208:19 237:4
289:15
**calling** 133:12 260:9
**cammer** 73:20 74:3
74:7 75:5,22 76:9
79:5,13,21 80:7
81:10,10,17,25 82:3
82:12 85:13 86:3,25
87:21 88:12,14,23
89:2 91:4,18 92:13
92:16,21 138:3
147:7 148:3,5,13
170:10 204:11,24
**cammer's** 80:23
**capable** 168:24
**capacity** 7:22 9:8
11:3 18:10
**capital** 193:15
**capitalization**
148:11
**caps** 48:13,14
**care** 8:19
**case** 7:3 14:16 19:21
24:19 25:24 27:3,5
27:6,6,19,23 28:2
28:16 30:21 31:11
32:14 34:2,6,12,17
34:23,25 35:10
38:13 39:8,8,23
42:12,14 43:12 45:5
46:5,5 47:2,2,13
48:23 49:15,19 51:6
66:6 75:18 90:21
97:24 123:19
127:22 152:9
161:25 167:18

168:17,22 169:9
199:21 205:19
206:2,8,18,20 207:2
212:21 234:8 260:4
260:8 261:19
268:18 274:5 277:2
285:5,6 289:17
294:4
**cases** 11:14 20:21
21:9,14,24 22:2
26:13 28:5,7,11,19
29:15 33:4 35:17
36:11 42:16 44:4
48:3 95:14,20,23
96:10 126:2 168:11
168:12,14,24 205:3
205:6,11,16 255:17
264:8 266:14
**category** 209:10
227:2
**caused** 169:6,11
170:5 198:24
199:13 263:17
**ceases** 18:24
**cert** 206:16
**certain** 31:5 89:4
133:10
**certainly** 72:7 95:22
104:6 126:4 182:23
206:13 222:20
227:7 276:20
**certification** 206:17
274:7
**certify** 291:8,15
**cetera** 94:13 189:12
**cfo's** 212:24
**change** 17:2 42:23
50:18 137:22,23
154:8 190:16
232:21,23 234:7,24
247:16 248:2 294:6
**changed** 9:17 55:11
197:13
**changes** 53:17 57:19
177:3

**charles** 257:9,9
**chart** 191:6 192:6
193:14
**check** 51:8 155:8
182:8 230:24
**cheek** 267:19
**cheney** 204:25
**cherry** 121:4 172:25
**chicago** 3:9
**china** 27:5,6,9,17
28:15 29:23
**choice** 190:7
**choose** 153:21 204:8
**chose** 132:22 140:25
153:13,15,16
231:19
**chronologic** 13:24
**chronologically**
10:17
**circuiting** 87:16
**circumstance**
214:11
**circumstances** 8:13
133:10 261:2
**citation** 57:13 163:2
**cite** 256:4,11,19,23
256:24,25
**cited** 146:3 257:24
**citigroup** 46:10
**clarify** 58:17 114:25
145:12,12
**clarifying** 146:13
**class** 25:2 26:2
32:17 38:8,10 46:15
49:5,6 69:7,8,18
70:22 71:11 72:13
72:22 74:24 86:18
97:21,23 98:5,9,15
98:20,25 101:5
102:9 103:3,11,24
108:17 110:12,17
110:20 111:11
112:5,20 113:2,10
115:12,20 121:9,15
121:17 122:16

[class - connection]                                                                            Page 8

123:11,12,21 124:2
124:18 125:11,17
125:18 127:7
130:23 146:20
147:3 151:22
162:19 171:14,21
172:17,22,24
174:12,15,25 176:6
178:20 179:3,7,20
182:5 184:15 185:3
185:17,23 186:3,7
186:11 187:14,14
187:19,21 190:22
206:16,16 217:7,19
218:4 220:11
221:11,15,18
227:25 228:18
229:15 230:20
255:3 268:23,25
269:14,17,20,22,23
269:24 274:6 279:7
286:4 289:10,14
292:20
clause  89:24 99:20
clean  142:8
clear  26:23 48:6
146:7 174:22
197:19,20 264:24
clearly  157:20 160:4
client  32:8
closed  79:9 118:18
136:3 214:8
closing  112:10
cm  1:3
coast  14:24 16:12
code  245:24
coefficient  134:7
191:9,18,18,19,23
192:5,7,15,17
colleague  4:17
collecting  236:22
collectively  48:24
eolumn  149:19
181:10 218:21
219:5,6,14,15

combined  193:2
comcast  206:10
come  38:11 39:16
42:8 43:4 62:17
81:16 116:10
126:24 147:6,10
157:23,25 159:21
170:9 192:17
214:21 222:9 229:7
261:16 271:8
284:21
comes  236:25
coming  20:14 36:14
40:13 50:21 100:7
124:5 128:24 189:2
275:16 285:4
comment  215:13
commission  294:25
common  24:25
25:25 135:21
153:10 160:21
220:9,13
communicating
74:11,19
communications
54:16 55:2,13,16
66:3
commute  17:20
companies  10:19
115:8 154:7 156:2,9
156:24 158:9,17
159:5 189:6,7,10,11
190:8 201:6,17,18
203:7 211:2 219:24
233:20 251:6,18
264:17 265:8
292:19
company  9:16 72:22
74:2 78:8 83:6
125:21 189:15
193:11 210:13
212:18 262:13
264:9,16 266:14
271:12,19 294:1

company's  79:8
262:10
comparable  217:17
217:19
compared  153:14
161:6 217:12
comparing  158:21
217:3
compartmentalize
51:21
compass  3:7
compasslexecon.c...
3:11
compensation  61:16
competes  189:15
competitor  198:21
244:9
competitors  65:23
200:10,20 201:8
compilation  235:12
235:21 293:3
complain  110:23
111:5,7
complaint  57:15
104:2,14,16 105:9
162:10,14,20 163:2
163:10,21 164:6
252:18 278:11
292:21
complete  6:3,9
162:6 221:21
271:23
completed  271:20
272:3,10 273:21
completely  202:11
completeness  31:10
components  155:10
compounding  262:5
264:19
comprise  251:7
computation  150:15
compute  149:7,8
230:5,14 247:16
computer  151:8
194:14 247:3,8,11

247:24 249:20
concept  255:23
259:3,22
concern  172:12
concerned  58:6
173:12 176:2
concerning  59:8
conclude  88:5 96:13
124:9 199:3,10
268:22
concluded  47:14
95:7 199:4
concluding  73:8
conclusion  28:23
81:16 96:22,24
122:20 174:4 186:6
284:21
conclusions  107:11
147:21 187:12
conclusive  175:5
conduct  261:2
conducted  82:17
176:3
conducting  96:23,25
conducts  145:21
conf  192:2
confidence  132:18
132:22,25 133:5,6
133:16 134:11,15
134:16,21 135:4,10
135:19 136:2
181:15,23 191:15
confidentiality
99:20
confirm  97:22 187:5
conflict  51:7
confuse  264:22
confused  30:6 270:5
confusion  103:21
130:12
conjunction  165:12
connection  62:4,14
62:18 66:4 76:17
77:12 78:10,16
94:23 168:17

[connection - court]
Page 9

200:12 206:23
207:9 240:16
244:23 274:6
consider 82:9
103:24 108:7
127:21 133:10,13
138:4 189:4,13
206:7,22 207:8
219:20,24
considered 78:8,9
171:8 189:23
considers 65:22
consolidated 162:10
162:14,19 163:10
292:20
constraint 220:10
construct 40:25
41:2 261:18
consultant 17:10,12
consulting 8:3 11:10
15:11 18:5 52:18
126:13
cont'd 3:2
contacted 49:16
50:23
contained 44:13
45:12 53:15 58:12
64:23
contains 25:19
content 59:3
contents 55:19
context 265:24
266:21
contingent 61:17
continue 19:20
106:6
continued 20:4
100:4 145:14 283:3
continues 76:15
194:19
continuing 21:5
contract 99:11,21
99:22 100:15 107:4
109:6 111:22 163:8
194:23 195:19,22

196:8,23 252:22
253:10 259:11,13
contribute 209:17
209:18
control 140:9,13
143:2,4,6,7,18
146:10,17 192:23
287:24 288:2,4,7
controlling 199:18
converted 248:18
conveyance 113:15
conveyed 117:16
cool 276:19
copper 189:11
copy 6:14 27:12
59:19,21 104:16
202:10,14 239:25
257:6
cor 259:15
cornell 256:5,25
257:8 265:13
cornell's 257:24
264:5
cornerstone 10:24
11:4,20,25 12:7,16
12:20,21,23 13:3,6
13:18 14:24 15:22
41:17 95:18 287:16
corp 27:4
corporate 210:21
corporation 205:19
corporations 212:25
correct 4:24 7:16,23
7:24 10:20,25 11:2
12:11 14:10 16:5,6
16:22 18:8,15,23
19:2,6,7,25 20:16
22:7 23:12 24:13,17
25:12,21 26:3,4
28:9 30:18,25 31:7
31:8 36:2 40:7
42:10,25 43:16
46:16 47:15 53:20
53:23 54:4 58:5
59:17 60:3 63:4,5,7

68:21,24 69:5 70:20
71:4,24 73:21 74:22
77:4 85:23 86:8
94:21 99:3 100:15
100:24 102:14
103:19 112:25
114:3 115:3,22
117:13 126:22
128:23 132:14,15
132:20 137:10,14
141:5 143:21 144:4
149:17 150:2,18
153:20 156:3,5
167:19 168:3,25
169:2,16 170:7
171:13 172:3
174:24 175:2,16
176:7 177:23 178:6
178:7,14,15 179:4,5
179:13 180:13,14
181:18 183:16
184:8,19 185:19
186:19 187:8
188:13 192:9,12
194:11 195:17
201:19 209:13
217:8,9,21 218:7,24
219:11 221:14
223:19 228:3
230:10,15 231:15
232:2,9 234:5,20
239:16 241:11
243:22,23 246:12
248:3 253:2,6
255:17,18 259:6,19
260:12 263:25
265:21 266:12,23
267:23,24 283:10
284:10 288:11,11
289:12,21
corrected 58:3
107:8 152:23
252:16
corrective 38:2 39:6
39:17,24 106:3,10

106:12,15 107:7
108:2,4,7,13,25
109:18,21 195:14
259:4 262:24
273:23
correctly 36:8 46:13
68:8 69:16 86:2
90:13 132:17
153:16 178:9
180:16,18 187:18
187:25 195:16
217:2 232:7
corrects 57:13
correlated 176:20
192:25 200:22
correlation 126:6
153:9 174:24
176:17 197:7,10
199:5
correspond 138:25
194:8
corresponding
219:2
corresponds 132:17
173:5 184:11
229:15
counsel 32:13 47:24
51:8 53:6,16,18
54:17 55:10,20 58:3
59:12,13 82:21
98:20 240:16
count 28:5
counted 72:25
counter 281:19
countered 282:4
county 117:2 291:4
couple 5:3 148:25
170:25 171:2
286:16
course 48:17 168:14
court 1:2 5:17 6:20
21:10 27:14 28:12
28:18,22 29:9,10,14
29:22 30:2,5 74:25
75:12 92:14,16

[court - decisions]

99:16 114:21 117:2
126:2 148:16,18
158:11 204:3,4,22
205:13 206:9
235:18 240:12
279:16
**court's** 30:4
**courtroom** 287:8
**courts** 44:8 228:21
229:4
**coverage** 71:14
73:18 75:25 76:2
79:21 83:5,7 85:11
88:9 89:13,25 90:15
91:7,8,15 92:11
115:6 116:7 125:17
**covered** 68:3 73:17
170:14,14 195:9
**covering** 70:5,6,16
72:3,4,6,12,21
73:11,14 74:2 75:3
75:20 85:21 88:4
89:14 92:4,7
**cra** 13:25 14:9 15:11
15:19,25 16:9,16,19
95:18
**crashing** 145:19
**crazy** 125:2
**create** 159:9 190:2,5
**created** 107:25
160:6
**creating** 189:13,24
190:18
**credit** 71:22
**criticize** 28:21 190:6
**criticized** 28:18
29:16 120:9 172:8,9
**crush** 1:5 24:20
32:16 39:7 62:3
64:16 65:3,22 66:4
66:9,23 68:4,16
69:7 70:7,19 72:6
72:12 73:11,14,17
75:19 86:21 99:10
99:19,23 100:4,12

101:15 104:9,10
105:4 106:22
110:13,16 111:18
115:9,12,15 116:24
118:25 147:25
153:14,24 154:3,13
155:25 156:7,10,15
158:22 159:14
160:25 161:3,7,11
162:2,7 165:18,21
166:17 181:2
182:20 183:7,20
185:22 188:12
189:16 196:7
198:12 200:10,23
201:19 213:13,14
213:16,19,21
217:11 219:3,22
221:5,20 223:2,9
224:13 227:17
228:16 230:18
233:21 237:15
252:21,23 253:2,8
259:13 260:8
279:21 283:14,20
284:8,14 285:11
286:3 294:4
**crush's** 24:25 25:25
62:20 63:24 66:19
106:4 153:10
160:20 192:18
194:23 195:5
198:21 200:19
213:22 217:4,5
**curious** 134:13
281:23
**current** 7:14
**currently** 7:15 47:3
95:23 267:14,15
**curriculum** 7:7
**custom** 189:24
190:3,5
**customers** 81:6
213:20

**cut** 6:2,4 35:12
**cv** 1:3 10:12 22:11
31:3 33:13 35:5
46:6 168:10
**cyberguard** 204:25

**d**

**d** 1:18 4:2,2,7 145:5
145:5 151:15 291:6
291:24
**damage** 38:17,18
40:17,20 41:9 43:14
43:15 46:21 169:5
258:3
**damaged** 38:24
**damages** 34:5 38:12
39:3,4 40:16 42:13
46:14 107:2 111:22
168:8,12,17,22
169:4,9,23 255:16
261:19 263:17
274:8,20,21,25
**data** 52:6,6,8,10
53:4 54:23 77:8
128:6,18 149:2,6,12
149:14,15 150:10
150:15 171:8
192:16 203:12
227:15 229:23
231:20 232:3,25
233:8 236:22
237:16,18,20 238:8
238:19,24 239:14
239:18,18 244:22
**date** 6:19 37:8,10,11
37:18,25 60:10,11
98:5 101:4 102:16
108:11,24 109:12
109:22 110:3
112:25 114:6,13
116:18 117:7 119:9
123:5 141:4 154:5
154:10,23 155:2
158:10 162:23
182:16 234:7

235:16 240:11
257:20 260:23
262:16 278:20
284:6 294:4
**dated** 114:11 116:16
148:24 292:14
**dates** 10:18 12:3
122:16,23 123:10
128:8,17 132:5
**day** 17:21 18:2
52:16,17 53:2
101:14 113:2,19
117:18 118:16
128:20 131:19,21
166:12 167:2
178:12,13 198:12
198:25 199:11,14
233:23 261:25
271:13,18,19,23,24
272:2,5,9 290:11
291:21 294:23
**day's** 149:9
**days** 101:24 128:19
132:10 161:5,6,7
173:6,14 174:3
178:9,19 179:3,17
180:16,19,22 181:3
181:11,12,21 182:4
182:24 184:15,17
185:2,16,16 194:9
267:9,11
**deal** 13:2
**deals** 148:6 181:7
**dealt** 171:24
**decide** 42:7
**decided** 15:10 16:19
**decimal** 248:14
**decision** 29:13,15
30:4 148:16,18
276:24 277:21
278:3,16 279:17,17
279:19 283:5 285:3
285:9 293:10
**decisions** 75:2 204:7
204:9

[declaration - discuss]                                                          Page 11

declaration 6:15,17
21:2,8 25:6,18 33:9
33:18 40:3 44:13,14
53:8,11,15 54:7,8
55:9 56:9 60:18
78:16,25 79:4
104:21 105:16
113:13 126:14
132:7 133:11,13
138:14 147:7
152:14 165:17
166:6 178:19
180:12 195:4
207:13 225:14
228:14 233:13
238:21 244:24
252:7 284:5 292:12
deemed 228:25
defendant 20:8
205:17
defendants 2:14
4:19 19:15,22 20:5
20:18 23:22 24:12
30:14 33:2 35:15,19
48:21,22,24 172:9
267:10,23 276:14
276:25 278:18
282:4 283:9 293:11
defense 190:6
267:17
defer 82:21
deferred 60:6
define 9:5 18:20
22:20 28:21 33:8
42:20 53:12 54:10
56:11 62:24 64:6
70:5,15,22 72:4,5
73:18 75:25,25
77:22 78:13 81:25
88:2 89:6 105:19
106:5 115:9 118:6
130:15 175:20
178:13 211:6
260:23

defined 35:24 66:7
78:12 86:3 103:25
111:11 118:10
171:18 185:7
defines 74:7
defining 78:22
127:13
definitely 202:22
206:20
definition 71:14
72:3,11 74:21 79:25
80:3,5 81:4 85:18
92:23 94:19 123:13
123:14 128:25
130:14 135:2 140:6
179:4 207:21 209:5
215:19 216:4,5,6,9
definitively 89:3
degrees 193:19
delineate 183:4
delineating 239:17
delineation 197:20
demand 62:25
213:21
demands 92:14
demonstrate 75:21
deny 271:24
denying 276:25
278:17 293:11
depend 263:19
dependent 188:5
depending 42:23
depends 263:14
deponent 294:5
depose 275:2
deposition 1:14 4:22
6:16 48:17 64:12
82:19 87:13 99:9
107:17 114:10
154:20 158:6
162:18 235:10
240:7,17 254:10
255:4 257:17
278:15 291:10,12
294:4

depositions 281:22
derivation 93:21
derivative 34:8
describe 11:20 62:8
204:4
described 146:9
178:13 211:4,13
259:16 263:25
describing 288:20
description 210:22
265:4
designated 66:17
125:20
determination
95:25 98:24 99:25
101:10 102:18,24
103:7 164:8
determine 30:11
37:3,24 40:15 95:24
101:14 103:2,11
110:13 112:22
175:21 198:23
261:3 289:7
determined 85:20
97:16 98:10 259:20
determining 73:25
79:18 90:16,18,19
98:8 134:17 138:9
229:20 263:16
developing 44:11
df 193:18
diamond 207:4
difference 21:17
176:9,13 188:2
219:21,25
different 9:15,16
12:12,15 30:8,11,20
32:10 37:22 38:23
42:2 43:21 44:20,25
56:13,15 57:16,20
57:22 58:9,10,10,24
61:8 68:17 97:15
121:3 139:25
151:18 154:16
179:14 191:5 193:4

223:12 229:5 236:4
268:13 288:16,21
differentiate 81:15
differently 38:20
difficult 57:8 60:15
258:10
diligence 62:3
dimensions 72:21
directed 252:17
disagree 28:13
55:25 86:11 88:21
107:19 249:24
258:13 266:20
280:3 281:4 284:16
disagreeing 117:4
disclose 99:24 162:3
162:8 253:20 255:8
272:4 283:20
disclosed 110:16
163:22 164:3,10
165:18 166:3 253:8
254:14 259:11,14
261:7 268:22,24
269:17,24,25 272:9
disclosure 37:10,11
38:2,14,21 39:24
101:25 106:4,10,14
107:8 108:3,4,7,14
109:19,21 110:21
111:2,10 113:8,11
113:14,21,23,25
166:16 169:22
195:14 252:16
259:5 260:23,24
262:16,25 264:23
264:24 268:4
273:23 284:13
288:18
disclosures 39:2,7
39:15,18 289:13
discover 152:22
discrepancies 210:2
discrepancy 236:18
discuss 88:25
105:17 113:12

[discuss - drop] Page 12

| | | | |
|---|---|---|---|
| 116:3 157:12 | 279:6 292:15,17 | 81:1,3 82:1 83:1 | 218:1 219:1 220:1 |
| 207:14 | 293:2,6 | 84:1 85:1 86:1 87:1 | 221:1 222:1 223:1 |
| discussed 59:7 73:3 | documents 62:11 | 88:1 89:1 90:1 91:1 | 224:1 225:1 226:1 |
| 116:6 138:15 140:5 | 64:23 240:15 | 92:1 93:1 94:1 95:1 | 227:1 228:1 229:1 |
| 163:12 191:14 | 276:23 277:8,10 | 96:1 97:1 98:1 99:1 | 230:1 231:1 232:1 |
| 259:17 | 284:6 | 100:1 101:1 102:1 | 233:1 234:1 235:1 |
| discussing 19:5 | doing 9:18 36:19 | 103:1 104:1 105:1 | 236:1 237:1 238:1 |
| 116:12 171:17 | 40:21 51:13 74:5 | 106:1 107:1 108:1 | 239:1 240:1 241:1 |
| 233:8 241:23 | 86:18 126:20 133:2 | 109:1 110:1 111:1 | 242:1 243:1 244:1 |
| discussiou 50:2 | 137:10 151:21 | 112:1 113:1 114:1 | 245:1 246:1 247:1 |
| 61:21 70:9 129:17 | 154:2 168:25 | 115:1 116:1 117:1 | 248:1 249:1 250:1 |
| 143:13 151:13 | 172:20 186:13 | 118:1 119:1 120:1 | 251:1 252:1 253:1 |
| 167:7 198:5 203:23 | 208:18 247:22,23 | 121:1 122:1 123:1 | 254:1 255:1 256:1 |
| 208:12 241:3 252:3 | 261:20 262:18 | 124:1 125:1 126:1 | 257:1 258:1 259:1 |
| discussions 59:5 | 289:10,11 | 127:1 128:1 129:1 | 260:1 261:1 262:1 |
| 146:5 165:22 205:4 | dollars 60:13 | 130:1 131:1 132:1 | 263:1 264:1 265:1 |
| dismiss 270:21 | double 148:22,23 | 133:1 134:1 135:1 | 265:13 266:1 267:1 |
| 277:2,22 278:18 | doubt 234:21 | 135:20 136:1 137:1 | 268:1 269:1 270:1 |
| 293:12 | dow 153:15,17 | 138:1 139:1 140:1 | 271:1 272:1 273:1 |
| dispute 71:13 72:2 | 157:17 158:7 160:6 | 141:1 142:1 143:1 | 274:1,3 275:1 276:1 |
| disputing 241:4 | 189:2 192:20 199:7 | 144:1 145:1,10 | 277:1 278:1 279:1 |
| distinction 112:20 | 199:25 239:23 | 146:1 147:1 148:1 | 280:1 281:1 282:1 |
| 172:16 277:13 | 240:8,23 243:19,20 | 149:1 150:1 151:1 | 283:1 284:1 285:1 |
| 278:25 | 292:17 293:7 | 152:1 153:1 154:1 | 286:1 287:1 288:1 |
| distinguish 183:11 | downgrade 67:6 | 155:1 156:1 157:1 | 289:1 290:1,7 291:9 |
| 183:18 | dr 1:14 4:13 5:1 6:1 | 158:1 159:1 160:1 | 292:5,12 294:5,21 |
| distinguishing | 6:17 7:1 8:1 9:1 | 161:1 162:1 163:1 | draft 51:8 56:19,20 |
| 226:17 227:9 | 10:1 11:1 12:1 13:1 | 164:1 165:1 166:1 | 57:2,4,16,22 58:10 |
| district 1:2,2 92:17 | 14:1 15:1 16:1 17:1 | 167:1 168:1 169:1 | 58:19 |
| 117:2 207:4 | 18:1 19:1 20:1 21:1 | 170:1 171:1 172:1 | drafted 53:8,24 |
| divided 149:22,24 | 22:1 23:1 24:1 25:1 | 173:1 174:1 175:1 | 161:14 |
| 151:15 191:23 | 26:1 27:1 28:1 29:1 | 176:1 177:1 178:1 | drafting 53:11 |
| dividend 223:11 | 30:1 31:1 32:1 33:1 | 179:1 180:1 181:1 | 60:17,20 |
| dividends 223:12 | 34:1 35:1 36:1 37:1 | 182:1 183:1 184:1 | drafts 54:6 55:8,15 |
| dividing 248:6 | 38:1 39:1 40:1 41:1 | 185:1 186:1 187:1 | 56:7,9,11,17 57:6 |
| djusmg 154:21 | 42:1 43:1 44:1 45:1 | 188:1 189:1 190:1 | 57:20 58:22,25 |
| 240:9,24 245:5,11 | 46:1 47:1 48:1 49:1 | 191:1 192:1 193:1 | draw 174:3 186:5 |
| 245:15,18,22 246:6 | 50:1 51:1 52:1 53:1 | 194:1 195:1 196:1 | 187:10,11 |
| 246:15,17 251:7 | 54:1 55:1 56:1,16 | 197:1 198:1 199:1 | drawing 122:20 |
| 292:15 293:8 | 57:1 58:1 59:1 60:1 | 200:1 201:1 202:1 | 125:7 197:7 |
| djx 245:5 | 61:1 62:1 63:1 64:1 | 203:1 204:1 205:1 | drew 278:25 |
| document 56:20 | 65:1 66:1 67:1 68:1 | 206:1,3 207:1 208:1 | drive 210:11 |
| 154:21 158:7 | 69:1 70:1 71:1 72:1 | 209:1 210:1 211:1 | driving 18:2 |
| 235:11 240:8 | 73:1 74:1 75:1 76:1 | 212:1 213:1 214:1 | drop 262:23 |
| 246:14 277:3,19,23 | 77:1 78:1 79:1 80:1 | 215:1 216:1 217:1 | |

[dropped - established]

dropped 195:11
due 62:2
duel 177:11
duly 4:6 145:6
  291:11
dummy 141:5
  288:17,22 289:2,11
dump 212:21
dunbar 146:2
  205:20 206:3,3
  286:24 287:3,7

**e**

e 2:2,2 3:2,2 4:2,2
  48:12 54:12 94:6
  126:9 145:2,2,5,5
  151:15 153:8 157:6
  202:9 207:17
  224:16 291:2,2
e.g. 224:17
earlier 18:5 23:2
  31:21 55:8 59:7
  86:20 89:21 97:20
  101:19 113:9
  138:17 140:5,15
  152:12 165:10,16
  166:21 167:14
  168:10,15 172:4
  189:5 202:8 238:20
  238:23 241:7,9
  243:15 246:9
  251:17 252:13,15
  253:10 255:19,20
  258:15 259:10
  261:15 269:25
  287:23
earn 208:8,14
earnings 169:20,25
  259:14,14,16
easier 133:21
  280:19 283:8
easy 160:7 239:7
ebix 27:3
ebrandon 2:24

econometric 133:2
economic 8:3 18:4
  87:8 207:20 209:5
economics 10:3
  15:11
economist 132:25
  257:12
economists 205:5
edification 188:14
edited 54:3
effect 167:11 193:2
  199:11,17 201:13
  221:9 243:25
effective 279:22
effectively 179:7
effects 241:13
  264:19
efficiencies 94:9
efficiency 29:23
  30:8,12 49:25 50:25
  61:12 73:21 75:4,21
  83:20,21 87:8,23
  88:6 89:16 90:17
  91:9,14 93:9 95:3
  95:24 123:22 135:7
  136:8 138:10
  147:24 153:7
  168:13 176:18
  185:21 205:14,24
  209:18 224:11
  229:2 239:14
  270:16,25 272:24
  273:2,17,19,25
efficient 24:25 25:25
  26:2,8,17 28:8
  30:24 83:8 88:10
  89:12 91:19 92:4,8
  92:9,10,23 93:2,4
  93:14,22 94:13,15
  94:19 95:9 97:7
  110:14 121:13,17
  122:2,3 123:20,20
  124:17 125:4,10
  175:22 176:6,20
  196:21 225:7,13,17

225:19 228:17
  258:5 286:3,3
eight 69:12 72:15
  73:6
either 22:3 33:9
  51:10 67:7 69:11
  94:23 112:10
  164:24 173:9
  184:14 199:21
  227:11 239:8
  244:19 266:8
  268:15,20 288:19
elaborate 17:17
electronically 51:11
eliminate 140:16
  142:16
eliminated 156:16
elizabeth 2:20 4:18
elkins 1:15 2:13
employed 7:15
  215:2
employee 17:5
  251:9
employees 9:3,5
  18:18,20 52:21
employer 9:15
employers 41:18
employment 7:6
  10:13
enable 167:16 187:9
  187:11
enables 211:3
  224:25
encapsulates 130:23
encountered 97:13
ends 102:9 112:20
  232:21
enduring 208:9
energy 27:4 182:22
engage 209:17 211:3
  211:15,20
engaged 22:10
  45:23 165:22
  213:18 214:14
  215:3,16 271:13,17

engagement 49:14
  50:22 51:9 59:13,22
  60:2 61:7
engagements 61:10
engages 208:7
engaging 208:17
enjoy 17:24
enlighten 140:7
entered 238:19
  278:2
entire 23:24 139:21
  140:25 141:11
  178:5 180:12 187:6
  221:8,10
entirety 258:7
entities 59:8 66:8
entitled 55:11
entries 128:6
equal 132:11 248:8
equally 156:20,21
equals 149:21
  151:15
equation 20:11
equities 210:19
eric 27:3
errata 294:1
error 128:12,13
  149:3 151:20,24
  191:9,20,20,24
  192:8 193:3,7
  199:24,24,25
  233:12
errors 152:22
  199:20,21,22
  276:21
especially 236:25
esq 2:8,18,20
essentially 85:9,10
  126:10 164:4 179:2
  193:7 216:8
establish 87:7
  110:12 113:20
  205:14
established 87:22
  89:17 125:25

establishing 86:24
estimate 31:4 38:16
  40:19 41:9 42:9
  60:16,17 127:14
  130:21 289:18
estimating 24:5
estimation 23:20
  43:15 233:14
et 94:13 189:12
eva 72:20
evaluate 30:23
  146:25 243:6
evaluating 146:19
  288:23,25
event 32:4 36:18,20
  36:25 37:3 78:11
  91:12 96:25 101:3
  101:24 119:10,12
  120:23 122:14
  127:4,10,10,14,15
  127:20,21 128:25
  129:20,22 130:14
  130:16,18,19,23
  131:2 132:8 136:5
  140:6,18,22 142:5
  142:13,16,17
  145:21 172:7,20,23
  178:12 220:5
  241:10,19 242:3,15
  243:3,18 244:2,8
  256:20 258:3
  260:17 261:23
  269:21 273:22
  286:17 287:8
  288:15,23,25 289:5
  289:6,13,18
events 30:9,11,20
  124:10 133:14,18
  172:20,21
eventually 13:8
everyone's 123:14
evidence 115:13,14
exact 10:3 24:6
  233:22 236:8

exactly 17:9 26:20
  103:5
examination 4:11
  145:14 271:2
  286:13 292:7
examined 4:8 145:7
  154:11
example 93:11
  133:23 149:8
  152:16 196:17
  213:12,13 271:12
  273:11,14
examples 93:20
  126:4 146:4 222:21
  287:13
exceedingly 63:16
excel 239:21
exception 189:18
excess 188:8,9,16,17
  188:20
exchange 66:18
  216:15,17 217:6,17
  217:18 218:9
  219:23
exclude 156:8 193:2
excluded 21:10
  154:3 156:7 288:3,6
exclusion 164:23
  165:2,7
exclusively 23:4
excuse 141:7
executed 216:22
executive 3:6
executives 212:19
exercise 263:8
exhibit 6:14,16,21
  6:22 7:8,10,11
  20:25,25 21:2 25:6
  25:18 26:11,19,19
  27:15 33:14,14
  44:14 54:9 56:10,12
  56:13 57:7 64:24
  65:2,2,18,18 68:2
  68:14 69:21 76:13
  78:25 99:8 114:9,10

114:22 115:17,17
  116:14 122:14
  129:2,18,22 136:22
  137:3,6,7 139:9,10
  139:10,16,17
  147:15,17,17,20,21
  148:21 150:13,19
  152:14,19 153:5,5
  154:19,20 158:5,6
  158:12,17 160:4
  162:17,18 170:10
  170:17,20 171:8,19
  172:12 176:4,24
  177:17 178:4,4
  179:9 180:8,11
  181:6 184:4,12,14
  185:10,12,17,20
  186:20 187:11,23
  188:3,4,8 189:3,7
  191:2 194:16 199:8
  201:18 202:17
  204:5,16,22 216:25
  217:23 218:3,16,20
  218:25 228:4,5
  231:8,21 235:7,10
  235:19 236:2
  239:15 240:6,7,13
  244:17 245:9,12,13
  245:15,19,22 246:4
  246:15 247:2
  249:23 250:4
  251:16 257:16,17
  276:22 277:6 278:2
  278:14,15 287:4,5,5
  287:6 292:12,14,15
  292:17,20 293:2,6,9
  293:10
exhibits 138:24
  139:2,6,7,20 140:2
  140:3 141:8,9,9,13
  141:17,19,25
  147:14 292:11
exist 18:24
expect 96:17 213:17

expected 194:23
experience 21:15,20
  46:9 137:17 213:10
  265:5
experiment 143:10
expert 11:9 15:22
  21:13,18,22 22:3,10
  27:5,10 30:6,13,17
  30:21 33:25 35:10
  35:25 49:18 54:16
  55:7 82:16,17 88:20
  94:24 95:20 137:16
  186:4 190:6 253:13
  254:2,8,9 255:4,16
  268:10,20,21
  272:17,18,20,23
  287:11
experts 15:23
  110:22 120:9
  172:10 258:3
expires 294:25
explain 21:16 46:16
  93:5 94:14 124:8
  130:8 142:11
  147:19 175:8
  187:16 191:4,16
  208:4 275:10 288:5
  289:3
explained 120:4
explanation 81:14
  236:17
explanatory 21:23
exploit 210:5,18
  211:15
exploiting 216:7
express 25:23 31:23
  34:12 44:20,25
  58:11 62:5 66:5
  89:20 167:15,16
  169:3,8 276:9,11
expressed 44:7
  75:18 76:8 80:22
  100:19 220:25
  285:6

[expressing - form]                                                                                Page 15

**expressing** 32:2
  44:12
**extended** 69:18
  120:17
**extensive** 21:3
**extent** 32:3 64:15
  159:12 167:10
  199:16 201:12
  209:24 210:14
  212:2,7 242:9,12,22
  242:23,25 243:18
  269:9 279:5,8
**eyeball** 97:3

**f**

**f** 145:2 151:15
  160:19 230:18
  231:12,13 233:19
  235:14,22 237:16
  238:24 291:2 293:5
**f's** 238:25
**face** 237:13
**fact** 20:20 28:13
  30:6 99:25 110:23
  115:15 117:14,21
  125:19 157:6
  169:24 175:3
  192:23 210:10
  233:5 253:9 288:2
  289:12
**factor** 75:22 76:10
  79:5,21 80:23 82:12
  85:13 86:25 87:21
  88:14,16 91:4 92:13
  138:11,13,25
  139:11 147:9 148:5
  148:7,12,14,15
  170:10 262:5
**factors** 73:20 75:5
  88:12 91:18 138:3,4
  138:12 147:8 148:3
  197:24 244:16
**facts** 54:23
**factual** 253:19
  270:14,18 272:16

**fail** 209:17
**failed** 162:2,7 165:3
**failure** 167:4
**fair** 11:19 14:20
  22:6 25:17 28:4
  38:2 43:7 47:10
  49:7,12 54:24 78:6
  96:8 98:22 113:4
  120:11 123:5,7,18
  125:7 127:2 162:12
  164:11 179:6,16
  210:23 211:6,6
  213:6 215:8 224:23
  280:4 284:25
**fairly** 135:25 145:19
**fairness** 273:3
**fallen** 167:6
**falls** 198:14
**familiar** 73:19
  101:18,20 172:14
  204:19 206:8,11,21
  207:2 255:22 256:3
  256:9 258:16
  279:15
**far** 53:21 173:11
  176:2 233:25
  234:18 276:9
**fast** 99:14
**favorable** 121:5
**favorite** 252:6
**fed** 183:22
**federal** 11:15 22:23
  74:25 162:21
  292:22
**feel** 65:2 67:16
  110:9 120:5 168:24
  169:4,10 174:8,10
  178:17 201:10
  229:8 247:12
**felt** 141:18 172:6
  174:10
**ferret** 210:24
**ferrillo** 146:2
  286:24 287:2

**fewer** 89:9
**field** 286:21
**fifth** 1:16 2:15
  170:10 219:10
**figure** 250:24,25
**figures** 46:21
**file** 102:2 231:17,18
  285:12
**filed** 77:25 105:10
  106:25 111:21
  113:18 116:25
  117:11,15,22 118:4
  119:2 183:21
  231:13 233:6,9
**files** 244:19,20
**filing** 119:17 237:7
**filings** 39:22 64:22
  77:9 204:4,5,22
  233:19 235:14,23
  237:2,17 293:5
**final** 62:13
**finalizing** 54:8
**finance** 12:21 16:11
  46:10 210:21
**finances** 215:11
**financial** 12:25
  93:12 167:8 209:4
  261:3 287:11
**financials** 62:11
  65:3
**find** 7:11 41:14 56:5
  155:2 157:11
  174:23 190:4
  204:23 219:2 222:3
  222:5 231:4 239:20
  240:3 249:10
  258:24
**finder** 28:13
**finding** 153:7 229:2
**findings** 229:5
**fine** 12:5 33:7 49:3
  215:9 247:3
**finish** 5:22,24
**firm** 7:25 8:16 10:6
  16:17 161:20 215:2

  215:15
**firm's** 197:25
**firms** 19:12 47:20
  73:10 115:19
**first** 4:5 9:24 49:16
  56:5 68:17 79:3
  85:16,25 87:25
  128:5,7,8 129:13
  182:17 184:11
  191:16 209:11
  218:2 221:18
  223:21 226:14
  227:18 245:14
  256:6 264:7 280:20
  280:22 281:7,9,9,14
  281:15 282:25
  283:2 284:18
**five** 9:10 16:3 72:16
  138:2,4,11,13 139:2
  139:11 147:9 148:3
**fix** 276:20
**flash** 216:13
**float** 43:17
**floor** 2:16
**fluctuation** 141:6
**focused** 167:9
**focusing** 117:19
**follow** 255:5 286:16
**followed** 68:16 79:8
  80:7
**following** 24:24 69:7
  72:8 74:2 82:5
  89:18 110:11 115:7
  115:8,15 232:17
**follows** 4:9 145:8
**foods** 207:5
**fool** 118:22
**footnote** 71:9
  102:12 105:16,18
  106:11 162:25
  194:13 256:12,15
**forgot** 202:11 248:8
**form** 9:25 32:14
  36:17 93:4,9 101:19
  101:20,25 102:2

[form - guess]

Page 16

124:16 183:21
195:5 213:2,15
277:17 283:21
**formally** 46:25
103:25 105:4
106:22 111:18
116:24
**formed** 10:3,4 39:21
211:9 220:3 277:16
**former** 16:16
**forms** 216:12
230:18 231:12
**formula** 43:3,4
149:21
**forth** 7:7 103:9
164:5 291:11
**forward** 126:25
**found** 95:20,22
150:25 178:16
205:13 206:3,4
218:12 228:22
236:24
**four** 9:10 16:3 128:6
128:7,8,19 148:12
148:14 180:16,19
184:12,14 191:16
248:13 283:13
**fourth** 134:6 232:15
**frac** 63:12 100:6
**fracking** 63:6,12
213:16
**francisco** 15:2
237:22
**frankly** 130:19
251:24
**fraud** 37:18 106:13
106:16 167:18
263:17 289:17
**fred** 205:20
**free** 67:16 178:17
247:12
**freedom** 193:19
**front** 247:10 278:22
**full** 144:17,18 253:4
264:7 280:21

281:10 283:6
**functions** 11:7
**funds** 224:18
**further** 122:19
195:8 286:9 289:25
291:15
**future** 44:17,21 45:4
48:16 275:23

**g**

**g** 148:10 161:5
207:17
**game** 54:24
**gamut** 189:8
**gap** 219:25
**garbled** 266:8
**garnered** 237:16
**gatbered** 52:5,6,10
**gathering** 53:4
**general** 19:9,9 51:8
59:12,12 155:8
204:19 213:3
223:20
**generally** 43:9 62:8
65:17 121:22
224:12
**generically** 260:5
**gentlemen** 10:4 18:7
**gesturing** 8:16
41:12 44:19 132:2
161:11 164:22
214:16 231:19
234:17
**getting** 13:23 42:5
58:13 88:15 112:8
131:12 168:8
233:11 270:3
272:13 275:16
**give** 23:20 81:14
93:19 162:9,25
196:17 247:5 251:6
273:10 278:5
**given** 291:14
**gives** 191:24

**gnarus** 7:13,22,24
8:14 9:12,19 18:17
18:19 20:3,8 22:16
23:2,5,19 52:16,19
53:22 60:11 76:23
238:2 239:10
**gnarus's** 59:12
61:16
**go** 8:15 9:21 14:6
15:10 18:10,18
19:18 29:2 34:20
36:13 37:12 40:14
40:21 42:7,18 51:14
57:2 64:13 69:22
70:10 81:24 82:20
84:5,11 99:4,7
115:4 126:3 145:16
159:10,20 165:20
166:24 169:17
170:8 173:12,20
178:3 182:9 184:20
184:22,23 189:20
190:18,22 196:18
198:24 199:13
202:2 208:25
213:11,20,25
229:19 230:4,13
237:22 238:25
239:2 244:13 250:9
252:5 254:4 255:15
261:20 264:15
268:8 276:20
**goes** 140:4 148:12
196:24 197:25
218:4
**going** 5:2 7:4,5 9:23
11:17 17:4 19:8
33:16 34:19 40:11
45:18 48:19,23
54:13 55:3,21,23
61:22 64:8,16,17
69:21 70:4 74:16
85:10 89:17 91:10
98:16 99:5,13 106:7
106:19 111:5,6

112:16 121:21
126:23,24 135:22
147:13 150:11
154:25 160:15
165:13 170:11
182:25 184:22
185:10 190:21
191:24 195:25 196:3
202:9 206:19
211:24 218:16
247:6,13 248:13
251:19 258:11
274:4,10 275:23,24
**gold** 189:10,10
**good** 4:13,14 10:9
169:20 190:17
212:8 223:14
**gotten** 13:2
**government** 11:15
**graduate** 10:23
**grammatical** 53:17
**granting** 276:24
278:16 293:10
**great** 157:8 212:22
270:19
**greater** 132:10,11
132:11 137:4
173:16 191:9
**griffin** 224:16
**ground** 5:2
**group** 10:5 16:15
182:23
**grouping** 189:6
**groups** 226:13
**guess** 15:12,16 21:5
24:9 25:5 42:22
86:11 102:20
106:12 120:21
127:8 130:12
146:20 156:14,18
164:21 188:19
190:12 197:23
216:12,18 231:23
233:10 278:10

[guy - included]                                                                                      Page 17

guy 212:22
guys 111:5

**h**

h 48:12
halcyon 267:9
haley 161:17
hand 114:4 235:6
  257:3 291:21
handbook 287:9
handed 6:20 114:20
  158:12 202:16
  235:18,19 240:13
hanging 212:24
happen 98:6 199:11
happened 98:4
  104:8 105:3 109:10
  113:24 253:21
  254:24 255:9 284:3
happens 143:5
  254:23 255:7
happy 75:12 88:25
  110:19 111:3
  162:10 172:23
  234:6
harm 170:5
harris 117:2
head 5:15,18 125:24
  126:21 228:23
  270:11 276:4
headed 149:19
  219:15
heading 10:12 21:13
  21:15
headline 241:18
hear 85:6
heard 206:13 207:6
  255:24
hearing 46:22
hecla 33:16,17 34:2
hedge 48:13
heinonline 257:18
  293:9
held 1:15 75:2
  232:12 233:18,20

234:9 236:9,14
help 37:15 57:10
  274:15 280:18
helped 277:17
helps 104:19 271:10
hereinbefore 291:11
hereunto 291:21
hesitating 8:6
hi 1:5 24:20,25
  25:25 32:16 39:7
  62:3,20 63:24 64:16
  65:3,22 66:4,9,19
  66:23 68:4,16 69:7
  70:7,19 72:6,12
  73:11,14,17 75:19
  86:21 99:10,19,23
  100:4,12 101:15
  104:9,10 105:4
  106:4,22 110:13,16
  111:18 115:9,12,15
  116:24 118:25
  147:25 153:10,14
  153:24 154:3,13
  155:25 156:7,10,15
  158:22 159:14
  160:20,25 161:3,7
  161:11 162:2,7
  165:18,21 166:17
  181:2 182:20 183:7
  183:20 185:22
  188:12 189:16
  192:18 194:23
  195:5 196:7 198:12
  198:21 200:10,19
  200:23 201:19
  213:13,14,16,19,21
  213:22 217:4,5,11
  219:3,22 221:5,20
  223:2,9 224:13
  227:17 228:16
  230:18 233:21
  237:15 252:21,23
  253:2,8 259:13
  260:8 279:21
  283:14,20 284:8,14

285:11 286:3 294:4
hide 264:18
hiding 265:6
high 210:7,8 214:6
  214:10
higher 133:9 169:23
  170:3
highly 135:23
  192:25
hire 20:21 111:6
history 7:6 23:24
hite 48:12,13 59:8
hmm 89:22 204:13
hold 10:10 27:8 39:4
  109:7 119:3 204:14
  223:10 224:20
  247:13
holder 236:7
holders 222:13
  223:2,16,23 238:10
holding 24:6 227:16
holdings 231:22
  232:20,23 233:23
holds 44:17
hone 84:8
honest 270:10
honestly 61:2
  255:13
hopefully 15:13
host 74:18
hour 17:20 60:2
hourly 59:25
hours 18:2 60:24,24
  118:11,14,16,25
hp 150:24 247:9
  248:13
huge 215:20
hughes 99:10,12,24
  100:5,13,14 101:16
  105:11 106:25
  109:5 111:21 119:2
  163:8 165:20,23
  167:5 194:22
  195:19,22 196:8,23
  252:23 253:3,10

259:12 279:20
  281:20 282:4
  283:10,20 284:7
hundred 202:19
hung 173:25
hypothesis 258:5
hypothetical 111:9
  213:14,15 244:5
  263:5,8,23 264:3
  271:9 275:9

**i**

i.e. 135:7 212:13
idea 115:10 140:20
  142:18 255:12
  258:2 276:15
  282:21
identical 128:11
identification 6:19
  114:13 154:23
  158:10 162:22
  235:16 240:10
  257:19 278:19
identified 46:6
  72:17 246:14
identify 6:23 26:12
  65:4 155:19 182:12
  240:18
illinois 3:9
imagine 14:14
impact 106:3 152:8
  166:15 193:10
  242:14 243:2
impacts 144:15
implies 83:5
important 100:5
  138:5,6,8 141:18
  224:10 244:8,14
impression 203:21
inability 220:12
inarticulate 145:20
include 130:3 141:2
  227:22 288:23,25
included 141:4
  153:24 154:8

[included - investment]                                                                    Page 18

161:10 179:8 184:2
193:3 288:14
**includes** 147:3
159:22
**including** 60:18
92:12 131:21
201:19 274:7
**inclusion** 174:17
**inclusive** 190:9,11
**incomplete** 264:3
**inconsistent** 237:17
**incorporated** 226:3
**incur** 208:21 209:12
**incnrring** 208:15
**independent** 98:24
101:13 102:18
103:11 164:8
**index** 135:24 136:4
153:19,22 154:4,10
154:13,21 155:6,11
156:2,7,13,19
157:12,17,21 158:8
158:14 160:9 189:3
189:14,24,25 190:3
190:6,19 192:24,25
193:11,12,12 199:7
199:19,19 200:2
201:2,15 202:15,23
239:24 240:9,9,23
240:23 242:10,14
243:19,19,21,25
244:3 245:5,23
246:6,10,14,17,18
250:3 251:4,7 292:2
292:16,18 293:7,7
**indexes** 154:8,12
**indicate** 154:12
175:17
**indicated** 145:11
**indicating** 52:9
56:10 83:25 105:13
106:17 113:12
116:18 151:7
152:18 160:17
171:20 174:5

175:19 176:3
187:22 191:12
209:10 218:17
219:7,10 238:11
250:17 251:3,16
**indication** 220:10
221:3
**indice** 153:14
**indices** 153:12
189:23 190:16
246:19
**individual** 201:6,8
224:21
**individually** 243:7
**individuals** 210:16
222:23 226:2
268:12 287:12
**industry** 41:5,23
42:7 64:19 100:2
136:4 153:11,13,17
153:22 193:12
199:10,18,19 201:2
201:13 209:4,4
241:13,13 242:10
242:13 243:21
244:15 249:5
**industrywide**
199:16
**inefficient** 95:21
96:2,14 97:8 174:21
176:21 196:11,18
206:4 237:15
**inference** 125:8
127:5,6
**infinite** 91:7
**inflation** 31:5 32:4,6
32:15,24 33:20
34:13 35:2,15,21
36:13,15 37:4,13,17
37:24 38:6,17 40:15
46:14 268:4
**influence** 143:6
**infor** 212:12
**inform** 125:3 126:4
185:21

**information** 39:25
40:4 74:12,19 93:11
93:17 94:16 96:17
96:20,21 104:3
109:2 110:16
111:15 112:9,23
113:15 117:3,6,14
117:20,23 118:17
118:20,23 120:15
125:3 127:12
131:20 136:16
141:23 144:15
149:10 158:19
162:2,6,13 163:6,19
164:9 166:3,12
169:13 171:24,25
172:2 187:20
210:25 211:3
212:13 213:3 222:4
222:6 224:21,24
225:24,24 230:25
231:6 235:12,21
244:22 252:20
259:18 260:11,16
261:6,6 269:13,19
293:3
**informational** 94:8
**informationally**
93:21 94:13,15
228:17
**informative** 138:12
**informed** 210:15,17
211:23 212:2,5,10
212:14 213:8
224:19 225:22
279:6
**inforins** 124:4
125:13,14 136:11
176:8,10 177:9,19
185:24
**initial** 62:14
**initiate** 220:14
**input** 192:16
**inputs** 42:3,7,23
43:3,12 192:13

**inserts** 57:13
**instance** 161:2
174:9 237:25
**instances** 96:5,11
**institutional** 222:13
223:2,16,23 224:9
224:17 225:12
226:13,19 227:2,5
227:16 228:24
229:11,14,21
231:22 232:12,20
232:23 234:10
236:7,10,14 238:10
239:4
**institutions** 223:10
**instruct** 56:3
**instructing** 56:2
**instructions** 101:20
**insufficient** 120:10
**intellectual** 12:19
**intention** 44:11
177:12
**intents** 224:7
**interest** 83:5 217:4
220:8
**interested** 141:22
142:2 291:18
**international** 14:2
15:12,19 16:2
**internet** 93:12
118:20
**interpret** 29:10
224:21
**interrupt** 211:19
**interrupted** 63:17
**interval** 191:15
**introduced** 4:15
**intruding** 54:25
**invalid** 281:20
**inverse** 186:14,14
**invest** 212:23
**investigate** 261:24
**investment** 213:2
215:2,15

[investments - lawyers]                                                                 Page 19

investments  27:24
  214:22
investor  33:19
  226:19 227:2,3
investors  223:23
  224:10,17,22
  225:12,25 226:14
  227:6,16 228:24
  229:11,14,21
  234:10 236:10,14
  239:5
involve  33:19 34:5
involved  22:18
  26:13 39:15 216:18
  271:24 272:5
involving  206:15
ipo  99:22 198:13
irrelevant  90:16
  245:19
isolate  169:5 170:4
  262:22
issuance  186:8,11
issue  26:6 28:22
  29:15,16 39:24 72:8
  121:16
issued  29:13 33:18
  40:6 62:14 66:23
  68:15 113:18
  115:11,20 116:22
  124:23 182:5
issuing  70:7,16,17
  73:9 74:4,9,23 76:4
  79:23 80:3,25 85:14
  85:20 86:14,21
item  77:22 283:18
items  76:17 77:12
  77:15,21 78:7
  126:14

j

james  71:20
january  154:22
  155:3 292:16
job  11:7 15:18,20
  103:2

john  145:25
john's  286:25
johnson  161:19
join  10:7 11:3 12:9
  13:25 18:19
joined  10:24 13:19
  14:9 15:11 18:4
  19:13,21 20:3
joining  23:5,19
jones  153:15,17
  157:17 158:7 160:6
  189:2 192:20 199:7
  199:25 239:23
  240:8,23 243:19,20
  292:17 293:7
judge  46:19,23
  92:17 98:7 280:12
  281:2 284:11,19
  285:3
judge's  98:2
judges  282:20
july  197:15
jury  29:24

k

k  101:19,21,25
  102:2 148:10
  183:21 283:21
  285:12
k's  65:9,10
keable  3:5 138:19
  157:14
keep  20:22 133:12
  160:15 182:25
kellogg  10:23
kept  13:7
kind  142:10 262:22
  276:2
kirby  2:4 45:24
  47:17 49:17 53:19
  54:7 55:15 59:15
  244:20 261:18
kmllp.com  2:10
knew  64:16

know  5:9 6:3,7 8:17
  10:2,2 19:10 22:15
  22:25 24:5,22 26:13
  27:19 29:3,10,21
  30:3 36:14,21 37:7
  37:7 38:23 41:6,20
  44:17 47:5 54:18,24
  55:11 56:6,16,18
  58:9 59:18 60:10,11
  60:14 61:3,14 62:21
  63:3,25 64:18 67:20
  69:25 72:20 73:13
  73:23 75:7 76:5
  77:8,23 78:2 82:2,7
  84:3 86:10 90:11
  95:19 98:3 101:12
  102:3,22 103:22
  104:5 110:11 113:3
  114:14 121:4,14
  122:5,8 123:24
  124:7 128:7,15,22
  129:24 134:24
  137:19 140:21
  142:10 148:22
  154:5,10,14,17
  155:9,16 160:2,4
  163:25 164:20
  168:9 169:22 174:6
  177:11,19 178:25
  179:19 180:25
  186:23 189:10
  190:19 193:8,21
  196:3,7 198:17
  199:15 200:4
  201:16 205:22
  206:14,16 208:11
  210:6 211:9 212:12
  212:13,16,18,21
  213:3 214:9,13,23
  214:24 216:7,14,17
  221:16,24 222:3,4,8
  222:13,18,20
  229:13 230:3
  233:22 234:2,8,18
  237:6,8,10 238:4,5

238:16 245:10,17
  245:22 246:3,22
  247:3 251:9,15,20
  256:3,8 259:15,24
  260:15 261:12
  262:4 266:4 268:5
  270:17 275:4,5,12
  275:24 277:5
  279:25 280:7,9,10
  280:12,15,25
  281:23 285:18,20
  285:23 286:6 289:7
knowledge  23:3
  90:6 97:22 224:25
knows  84:4
krogman  148:7,14
  148:16 204:11,25

l

l  126:9 224:16
l.p.  1:5 48:13,14
  294:4
lack  172:21 186:3
  186:10 187:20
language  144:11
  285:2,8,11,24
large  8:18 92:7
  131:20 141:6
  219:25,25 262:11
larger  8:16 155:7
largest  140:23
law  47:20 145:25
  286:25
laws  22:23 162:21
  292:22
lawsuit  4:20 47:25
  102:17 103:10
  113:18 117:11,15
  117:21,22 118:4
  119:2,18
lawsuits  11:15 22:22
  45:25 77:24 78:2
lawyer  98:13 284:24
lawyers  47:17

[learn - market]

learn 62:3
learned 205:4
leave 12:6,22 14:11
  14:21 16:19 128:2
  208:5
led 96:13 107:15
  192:14
left 10:22 13:18,25
  18:3 19:3 44:2
  246:5
legal 80:13,20 81:21
  82:15,25 83:10,13
  83:14,23 87:4,11
  88:19 102:23 103:7
  107:11 112:19
  253:15,18,24
legally 112:22
letter 51:9 59:13,22
  100:13 101:16
  153:8 160:19
  279:20 283:24
  284:7,12 285:13
letters 126:16
lev 224:16
level 132:18,22,25
  133:5,7,16 134:12
  134:15,16,22 135:4
  135:9,11,19 136:2
  178:12 179:20
  181:24 192:2 220:8
  228:12
levinson 204:20
lexecon 3:7
life 94:25 276:21
limitation 231:16
limits 55:22
line 148:24 150:22
  175:25 184:11
  223:15 236:7 245:3
  245:4 247:15,15
  250:15 266:10,19
  276:7 294:6
linear 197:9
lines 191:12

lingo 119:21
list 10:11 21:3,12
  34:20 35:16,17,22
  35:23,24 64:23 68:2
  68:14 76:13 128:8
  153:6 158:8,17
  160:11 203:3 239:5
  250:3 251:18,23
  276:22 292:18
listed 10:16 21:18
  21:19 22:11 65:20
  76:17 77:10 115:19
  126:15,15 173:4
  189:7 204:5 217:7
  217:18 219:23
listing 231:23
literature 90:9
  286:21
litigation 1:6 4:19
  11:10 19:23,24 20:6
  22:18,20 23:8,8,12
  23:17 24:15,19,20
  31:6 33:17 45:25
  46:11 95:12,12
  255:17 287:9 294:4
litinomics 16:15,24
  17:5,12 18:4
little 36:24 40:9
  45:11 55:17 87:17
  110:15 165:10
  261:15 277:16
lives 118:16
llp 2:4,13
loan 222:15
loaned 222:22
loans 11:16
locate 220:12
located 17:18
long 13:10,20 15:25
  16:23 63:16 100:5
  123:3,8
longer 141:16,22
  160:10 186:2
look 6:22 26:10
  30:10 33:13 40:8,17

67:17 69:13 71:8,9
75:12 78:24 83:2
91:3 94:2 102:12
104:14,20 110:20
112:25 121:2,8
125:16 127:11,16
127:16 129:18
130:9,11 133:23
136:21 137:3
141:21 143:3
148:20,20 149:18
150:19 151:14
165:13 171:20
180:8 186:20
190:15 194:17
198:8 200:9,18
201:5 227:14 228:4
228:5 230:17 237:6
237:24 245:2 246:5
246:25 247:14
249:23 250:15,23
264:4 278:7 280:17
280:18,20 283:4
289:7
looked 30:8 35:16
  39:10,12,15 52:3
  67:21 97:14 154:11
  165:9,11 172:18
  174:11 190:15
  229:23 238:12
  277:15 284:5
looking 30:20 89:23
  104:18 110:24,25
  119:9 121:10 128:5
  129:2 130:5 138:24
  139:12 163:11
  170:17 171:22
  181:9 182:14
  186:16 195:12
  200:25 231:20
  237:7 241:16 257:7
  260:19 281:25
  287:10
looks 34:7 152:6
  195:22 231:24

232:3
los 16:10
loss 167:17 169:11
losses 33:19 258:4
lost 13:24 270:20
lot 4:25 147:8
loud 247:21
lower 170:3
lunch 144:23
luncheon 144:24

m

m 4:2 145:5 148:10
magnitude 287:8
mail 51:11 54:12
  157:6 202:9
main 65:23 167:8
maker 66:11,17
  125:20
makers 66:4,7,13
  68:3,10 91:19
making 66:20 150:9
  164:7 253:24,25
  272:15
management 10:23
managers 224:18
manner 119:15
manually 159:20
marentette 35:5
mark 2:8 6:13 69:25
  107:24 114:9
  154:18 155:15
  158:5 162:16 235:7
  240:5
marked 6:18,21
  54:9 114:12,21
  129:5,10 154:22
  158:9,12 162:22
  235:15,19 240:10
  240:13 257:16,18
  278:19
market 24:24 25:24
  26:7,16 28:8 29:22
  30:7,12,24 43:22
  49:25 50:25 61:11

[market - mischaracterizes]

66:3,7,11,13,17,20
68:3,10 73:20 74:13
75:4,21 83:9,19,21
87:7,23 88:6,10
89:12,16 90:3,16
91:9,14,19 92:3,23
92:25 93:14 94:19
95:3,8,21,24 96:2
96:13 97:6 110:13
111:16 112:11,12
112:23 117:6,16,17
118:3,6,7,10,11,18
118:25 119:16
121:12,16,25
123:20 124:17
125:10,20 131:21
135:7,24 136:4,9
138:9 147:24
148:11 153:7,11
161:10 168:13
169:14 172:2
175:22 176:5,18
185:22 192:25
196:11,20,21,24
197:4,20,25 205:14
205:24 206:4
209:18 224:10
225:7,12,17,18,22
228:16 229:2
237:14 239:13
244:15 258:5 262:2
262:11 268:6
270:16,23 271:16
272:23 273:2,17,18
273:25 286:2
**markets** 66:8
**marks** 210:17
**marriage** 291:17
**material** 57:19
**materiality** 287:7
**materially** 57:20,22
**materials** 76:25
**math** 137:10 150:24
**math's** 15:13,16

**matter** 24:24 25:9
27:20 33:18 47:18
59:9 60:7 61:16,17
62:6 64:12 76:19
77:13 79:23 291:19
**matters** 19:23,25
20:6 21:3,17,19
22:9,19,21 23:9,12
23:17 31:6 268:2,20
276:12
**mcinerney** 2:4
45:24 47:18 49:17
53:19 54:7 55:15
59:15 244:20
261:18
**mcmahon** 92:17
**mean** 7:19 11:10
20:10 21:21 24:2,4
26:18 29:8 33:4
37:19 39:12,20
41:19 43:20 44:16
48:3 51:19 52:3
54:15 56:17,17
58:21 64:15,17
67:11 75:15 91:3,22
92:25 93:13 94:15
95:17 97:3 103:14
103:15,20 106:9
111:3 112:7 117:25
117:25 120:23
122:3,8 124:19,25
126:20 129:21
130:16,17,18 135:2
135:5 137:21
141:21 143:16
145:23 146:8 150:5
157:6 159:8,15
161:9 164:22,25
165:6 166:11
171:25 174:20
193:15,18 194:12
196:16 197:6,11,12
197:21 202:22
205:22 208:21
211:18 212:3,17

213:4 214:20
218:15,21 222:20
222:23 231:18
232:10 236:24
240:22 243:6
244:19 251:14
267:16 268:9
281:23 289:4
**meaning** 41:2 62:25
70:6 85:14 86:20
136:7 209:11
283:18
**meaningfulness**
175:18,20
**means** 49:10 58:22
59:7 74:22 82:3
86:14 93:6 94:16
121:16 124:12
143:19 175:9 191:8
192:7 196:18 222:5
225:6,17 245:22
259:2 265:13,13
279:25 280:8,10,11
**meant** 149:15
152:12 170:3
188:15 191:17
200:4 201:7 266:3
266:17 280:13,15
280:15
**measure** 32:4 37:5
37:12 120:24
261:23
**measured** 188:22
**measurement**
120:25 159:21
289:8
**measuring** 73:20
186:15
**meeting** 100:3
**members** 250:14,19
250:22
**memory** 12:3 67:18
67:21
**memory's** 10:9

**menlo** 17:18
**mention** 71:10 73:4
91:13,15 205:15
**mentioned** 18:5
28:6 59:11,24 64:21
101:19 131:2 144:6
156:6 172:4 183:25
201:20 205:8
**merger** 271:13,17
271:20,24,25 272:3
272:5,10
**mess** 131:22
**metaphysics** 255:3
**method** 213:11
288:20,21,24
**methodology** 28:23
30:22 32:5 142:13
145:23 146:6,8
286:17,19,20
287:14,15,19
**methods** 288:21
**michael** 3:5
**michigan** 3:8
**mid** 62:21 63:25
64:2
**middle** 110:4 191:13
**million** 89:14
125:21
**mind** 20:22 67:13
119:8,21 140:8
176:11 247:21
277:13
**mineral** 189:9
**mining** 33:16,17
34:2 153:17,21
157:17 158:7 189:9
189:10 192:24
199:7,25 240:9,23
292:18 293:7
**minus** 248:5 249:8
**minute** 77:7 218:17
**minutes** 267:2
**mirror** 146:5
**mischaracterizes**
267:13

mispriced  210:4
  216:11
mispricing  210:6
  211:15 216:7
mispricings  210:19
misreading  180:23
misrepresentation
  107:6 259:7 260:12
misrepresented
  261:5
misspoke  266:3
mistake  149:4
  150:25 233:12
  238:4,11,15 239:8
mistaken  202:25
mistakenly  224:3
mistakes  152:23
  171:3
misunderstanding
  180:24
misuse  144:10
mkeable  3:11
mlp  48:14
mm  89:22 204:13
model  40:23,24 41:3
  41:4,8,11,15,16,22
  42:6,8,15,20,21,22
  43:4,13 44:6 261:19
models  42:3
moment  20:24 76:12
  78:25 116:11 119:8
  128:4 129:19
  133:24 138:14
  153:8 165:14
  216:25 227:15
  228:6 231:9 244:18
  247:2 249:23
  258:25 260:18
  275:14
money  8:8 12:24
  13:7,8 224:18
month  110:24
months  15:7 49:20
  50:23

morgan  256:7 264:5
morgan's  256:6,25
  257:25
morning  4:13,14
  170:11 283:25
  284:3
motion  270:21
  274:7 276:25
  277:22 278:18
  293:11
motley  118:21
mountain  17:19
move  40:11 61:25
  86:10 90:13 119:15
  119:19,22 126:25
moved  16:10,13
movement  140:24
  153:11 160:8 181:3
  181:5,17,20,23
  200:8,11,23 201:2
  203:4,4 242:2
movements  124:22
  125:2 128:17
  135:24 185:6 199:6
  200:21
moves  110:21
  186:15
mstrauss  2:10
multiple  39:2 95:19
  167:2 213:4
muriel  35:4
mutual  224:17
mutually  165:24

## n

n  2:2 3:2 4:2 63:13
  126:9 145:2,2,2,5
  148:10
naivete  141:7
name  9:16 256:6
names  27:13
nasdaq  66:11
national  27:18,23
nature  15:24 142:5

necessarily  38:22
  85:19 174:18,20
  176:21 197:9,22
  212:4
necessary  83:7 90:2
  91:20 110:9 169:5
  169:10 189:17
  201:11 220:13
  221:21 259:6,15,18
  260:11
need  6:6 50:17 85:6
  87:25 88:4,12
  105:12 112:25
  156:12,13 160:16
  172:20 173:14
  183:3 228:23 247:2
  247:6,8,11,19
needed  53:5 58:16
  85:9 152:23
negative  169:18
  175:4,13,14,14,14
  248:10,14,15 249:3
negligible  167:12
negotiations  271:13
  271:17,25 272:5
neighborhood  207:3
nera  12:9,15 13:2,7
  13:11,19,21,25
  14:11,15,15,19,21
  14:23 15:6,21 41:17
  95:18 287:20
net  136:4
neutral  288:13
  289:15
never  22:5 46:24
  137:18 165:11
  276:8,8
new  1:2,16,16,20
  2:7,7,17,17 4:7 15:6
  66:17 92:18 96:21
  183:4,12,19 217:6
  217:16,17 218:8
  219:23 224:21
  291:3,4,8 294:2,2

news  62:11 78:8,9
  78:12,14,15,20,22
  118:21 119:17
  124:23 142:7
  160:21,24,25,25
  161:3,5,6,6,7,10
  166:17 167:2 172:2
  179:18 180:22
  181:5,7,8,20 183:4
  183:4,12,12,14,19
  183:19,22 184:6
  185:3,7,14,25 186:3
  186:8,11,16,18
  197:4 198:9 199:12
  241:17 261:25
  262:2,2,9,10,11,14
  264:18,18
newspaper  52:4
nickel  189:11
ninth  4:3
nobody's  170:25
nod  5:15
nodding  5:16
nods  5:18
non  161:6 176:16
nonsense  255:11
normally  142:7
northern  207:3
notary  1:19 4:6
  290:14 291:7
  294:25
note  129:9
noted  286:10 290:4
notice  1:17 128:6
  283:12,15
notified  99:10
notifying  100:13
notion  270:6
november  40:6 67:8
  67:8,9,9 68:23 69:2
  69:10 70:23,24
  99:25 102:9 103:23
  104:8,11,24 105:20
  105:25 106:24
  108:20,22 109:10

[november - okay]                                           Page 23

| | | | |
|---|---|---|---|
| 109:11,16,24 | numbers 150:4 | 262:12 263:3,18 | offer 13:9 |
| 111:12,20 112:4 | 192:4,6,10,14 | 264:14 265:11 | offered 30:14,17 |
| 114:11 116:16,22 | 217:24 219:2 | 268:7 269:2 270:4 | offering 13:7 62:15 |
| 116:23 117:7 118:5 | 227:21 228:8 229:8 | 272:11 275:8 | offers 272:20 |
| 118:24 119:10,15 | 230:6 234:15 236:2 | 279:24 280:6 | office 157:7 |
| 119:23 120:8,20,21 | 236:3 237:8,12,13 | 284:17 285:7 288:8 | offices 1:15 |
| 120:21 121:10,11 | 238:13 250:9 | objections 275:14 | oftentimes 132:24 |
| 122:18,25,25 | numerous 48:22 | objective 263:2 | 190:5 210:10 237:2 |
| 123:17,23 124:13 | 57:6 91:12 122:23 | obligated 102:2 | 289:9 |
| 124:13 127:23,24 | 255:16 263:10 | obligation 253:15 | oh 13:16 27:8,25 |
| 129:23,24 130:2,4,6 | 286:22 | 253:18 | 53:24 55:24 75:13 |
| 130:9,11 131:4,5,9 | nyse 125:19 152:11 | observ 191:21 | 76:3 84:22 104:25 |
| 131:11,15 139:18 | 218:14 | observation 123:22 | 129:3 130:6 146:16 |
| 139:18 140:10,10 | | 125:8 132:9 134:23 | 148:18 149:7 |
| 143:20,20,24 144:2 | **o** | observations 173:4 | 156:21 157:8 |
| 144:2 166:4,18 | o 63:13 126:9,9,9 | 184:10 194:5 | 160:12 163:7 165:4 |
| 169:12,14 171:11 | 145:2,2,2 148:10 | observe 185:5 | 182:14 184:23 |
| 172:5 173:7 178:22 | object 54:14 55:3 | observing 132:7 | 186:13 202:11,18 |
| 184:2 195:15 | 64:9 80:17 | obtain 210:25 211:2 | 212:22 233:3 237:6 |
| 197:17,18 198:9,9 | objection 9:20 19:17 | 212:11 | 237:9 247:9 248:18 |
| 200:11,20 218:5 | 28:20,25 29:18,25 | obtained 150:16 | 249:2,2,2 256:13 |
| 241:19 242:3 249:6 | 31:12 33:3 36:16 | 230:25 | 257:4 270:24 278:4 |
| 253:11 259:10 | 42:17 43:6 44:15 | obtuse 179:24 | 287:4 |
| 288:3,6 292:14 | 45:3,15 48:2 50:6 | obviously 133:8 | okay 5:4,12 6:5 7:13 |
| number 24:6 36:14 | 56:14 61:13 62:22 | 152:24 158:16 | 8:9 10:21 13:19,23 |
| 38:12,16 40:17,20 | 64:5 65:24 73:12 | 238:21,25 239:6 | 15:16 16:7 17:25 |
| 41:9 57:14 63:17 | 75:6,10,23 76:20 | occur 100:10 172:21 | 19:3,8 23:18 24:7,9 |
| 75:4 79:7,20 82:6,8 | 77:2,14 79:16 80:12 | 178:20 221:15 | 26:21 27:2,25 32:9 |
| 82:10,11 86:23 | 81:20 82:13 87:3,15 | 270:7 275:22,23,25 | 33:23 34:9,22 36:4 |
| 87:20 88:24 89:4,18 | 87:24 88:7 91:2,21 | occurred 100:9,11 | 36:23 38:4 41:24 |
| 92:6,7 136:20 | 92:20 97:10 100:21 | 101:4 104:10 109:4 | 42:4 43:25 44:18 |
| 150:21 151:18 | 102:5,11 103:13 | 113:10 179:3 182:5 | 48:18,20 49:2 55:24 |
| 168:11,12 173:3,6 | 106:18 107:9 | 184:15 185:17 | 58:6,15,20 63:8 |
| 174:3 175:11,14 | 121:18 122:4 | 255:9 269:21,22 | 69:20 70:4 73:5 |
| 178:25,25 181:10 | 134:19 135:12 | 270:2,6,7 273:9,10 | 75:17 76:5 85:24 |
| 181:11,16 184:9 | 136:10 163:24 | 273:12,13 | 86:9,16,22 87:14 |
| 194:5,9 204:3 | 164:12 166:10 | occurrence 283:13 | 89:8,22 94:10,18 |
| 218:18 229:10,10 | 167:20 169:15 | occurs 254:23 | 96:8 100:7,25 |
| 229:13,20 230:12 | 179:11 211:5 | october 67:7 71:21 | 103:18 105:24 |
| 232:11,16,17 | 212:15 213:24 | 71:21,22 148:24 | 106:8 107:18 110:8 |
| 233:23 234:2,9 | 214:18 221:23 | 149:14 182:17,23 | 112:8,18 113:4,7 |
| 236:5,8 245:3 | 222:17 225:4 242:5 | 183:2,3,13,15 232:5 | 114:4 115:23 |
| 249:11 277:4,19 | 242:6,16 243:4 | 234:3 | 118:13 119:14,25 |
| 287:6 | 244:12 253:12 | odd 234:23 249:10 | 121:21 122:11 |
| | 255:2,10 261:22 | | 123:18 124:15 |

Case 1:21-md-02989-CMA Document 567-17 Entered on FLSD Docket 06/07/2023 Page 100
Case 1:12-cv-08557-CM Document 114 Filed 06/17/14 Page 100 of 114
of 114

[okay - paradise]

Page 24

| | | | |
|---|---|---|---|
| 126:19 128:14<br>129:7 130:6,20<br>131:13 132:21<br>134:2 136:24 138:2<br>138:23 141:16<br>143:7 144:12,19<br>146:11 147:2<br>149:13 150:19<br>153:4 155:12 156:4<br>157:5,16 160:13,18<br>161:22 163:4 170:8<br>170:12 173:20<br>175:25 176:25<br>177:24 180:2,9,19<br>181:4,9,19 182:25<br>183:24 186:22<br>190:17 191:3<br>194:20 202:12,21<br>203:18 204:17<br>207:12 208:6 215:6<br>216:2 217:22<br>223:14 226:7<br>232:24 233:25<br>234:17 236:23<br>238:17 240:21<br>241:7 242:17<br>243:14 244:24,25<br>246:13,23 247:14<br>247:19,25 248:4<br>249:3,9,17 250:7,18<br>250:20 251:25<br>253:7 254:19,21<br>256:17 257:14,21<br>258:21 260:17<br>262:15 265:23<br>266:7,18,24 267:20<br>268:17 269:14,15<br>271:8,14,15,18,21<br>271:22 272:6,7<br>277:5,9,20 278:21<br>279:11 280:2,14,16<br>282:14 283:4,24<br>284:11,23,25 286:7<br>286:11 287:22<br>289:22 | **old** 150:23<br>**omission** 42:14<br>107:7 109:2,4 165:6<br>165:7,8 169:6,11<br>259:7,20 260:13<br>**omitted** 261:5<br>**once** 82:14 107:10<br>263:4<br>**ones** 35:17 65:5<br>67:12 147:11<br>204:18 205:3,8,9<br>209:11<br>**ongoing** 60:5,8<br>**oops** 248:8<br>**open** 117:17<br>**opening** 112:12,15<br>112:24<br>**opine** 168:22<br>**opinion** 24:18 25:10<br>25:14,19,20,23<br>26:14,15,16 28:7,10<br>28:14,18,24 29:9,17<br>29:23 31:11 32:15<br>32:23 33:8,20 34:13<br>35:21 36:12 39:6,17<br>39:19,21 42:12 44:7<br>44:7 49:25 50:24<br>51:17 54:22 58:11<br>58:12 61:11 62:5<br>66:6 75:12,18 76:8<br>80:14,21,22 81:22<br>82:15,16,18,25 83:4<br>83:10,13,14 87:2,5<br>87:11 88:5,23 89:8<br>89:19 90:5,10 92:9<br>93:15 97:5 98:2,14<br>100:12,17,18<br>106:17 107:14,15<br>107:21,22 108:13<br>109:17 117:24<br>118:3 121:12,25<br>123:19 124:4,17<br>125:13,15 126:5,13<br>135:6 136:8,12,14<br>136:17 137:24 | 152:9 167:15,16<br>169:4,9 176:5,8<br>177:5,8,10,18,19,20<br>177:22,25 185:21<br>186:5 209:8,15<br>210:24 211:10,12<br>213:10 214:12<br>220:3,6,25 228:16<br>237:14 239:13<br>242:15 244:2 254:3<br>254:12,12,16 265:7<br>270:16 272:17,18<br>272:21,23 273:18<br>274:20,25 276:9,11<br>277:17,17 279:4,14<br>285:5<br>**opinions** 24:23 25:7<br>31:23 44:12,21 45:2<br>50:4 64:10 74:15<br>276:18<br>**opportunity** 208:11<br>275:2<br>**opposed** 11:21<br>23:22 109:12 115:9<br>146:10 188:15<br>209:3,5 228:2 277:9<br>277:24<br>**oral** 280:20<br>**order** 10:17 173:13<br>276:24 277:22<br>278:3,16 279:17,19<br>293:10<br>**orient** 27:5,9<br>**original** 124:6<br>**originally** 13:5<br>**outcome** 61:17<br>291:19<br>**outlier** 142:15,17,20<br>**outside** 94:22 112:5<br>121:9 124:2<br>**outstanding** 43:18<br>149:20 219:16<br>220:9 236:13,15<br>**overall** 136:8 | **overbroad** 95:4<br>**overdisclosure**<br>255:23 258:16,24<br>259:21 260:2,4,7,10<br>260:14<br>**overly** 51:19 95:4<br>**overreacted** 197:4<br>**owned** 8:2 118:15<br>**owner** 8:24<br>**ownership** 228:12<br><br>**p**<br>**p** 2:2,2 3:2,2 63:13<br>63:13,13 191:9,24<br>**p.m.** 114:17,18<br>144:24 145:3 180:5<br>180:6 202:3,4 235:3<br>235:4 267:3,4<br>286:10 290:4<br>**pad** 70:2<br>**page** 10:11 21:4,5,6<br>21:12,14 57:14 65:2<br>65:18 71:9 76:14,15<br>78:24 94:4,6 99:8<br>102:13 105:15<br>129:11,13 138:15<br>138:18,19,21<br>148:21 153:4,5<br>157:15 163:2<br>176:23,24 194:15<br>194:17,19 195:9,12<br>218:20 219:14<br>238:19 245:4<br>250:17 251:12<br>256:11,13,16<br>260:18 264:5<br>277:16 280:20<br>281:10,17 283:5,9<br>292:3 294:6<br>**paid** 8:7 60:5,9,11<br>**paper** 27:5,9 53:14<br>70:2<br>**papers** 270:19<br>**paradise** 2:18 4:12<br>4:17 6:13 25:3 |

[paradise - period]

26:20,24 27:11
31:16 33:5 45:10
47:8,10 48:4 49:7
49:12 50:10,14,16
55:5,24 57:11,17,24
59:18 61:19 63:11
63:18,21 66:14
80:19 83:25 87:14
88:21 91:23 103:17
104:15 107:18
108:15 109:15
110:2 114:8,19
129:8,15 135:15
137:8 143:11,25
144:20,22 145:10
145:15 151:11
154:18 155:15,21
156:11 158:4
162:16 164:17
180:3,7 184:23
191:11 198:3,6
202:5,7 203:24
204:2 207:25 215:6
215:9 234:25 235:5
235:9 240:5,25
242:17,21 243:9
252:4 253:17 257:5
257:15 263:6,9
266:5,7,25 267:5,7
273:3,20 274:12,14
274:17 275:3
278:13 281:7
285:10 286:8 288:8
289:24 292:8
**paragraph** 24:23
25:5 31:24 57:15
79:2,4 83:2,3 84:12
84:16,18,21 85:25
89:20 93:8 94:6
99:7 100:19,23
104:20 106:20
111:24 113:12
126:14,17 133:24
135:15,20 138:16
157:14,16 161:12

161:13,23 163:9,13
163:14,14,14 165:9
165:15 166:5
176:24,25 194:16
194:18 195:8
207:13,24,25 208:2
214:4 216:24 220:7
220:15,22 224:14
226:10,18 227:14
227:19 228:9,11,14
252:6,6,7,17,19
256:14 260:20
264:7 280:21,23
281:10,17 282:7,12
283:6
**paragraphs** 163:20
**paraphrasing**
252:24
**parcel** 289:5
**parentheses** 136:3
**parenthetical**
105:25 106:2
135:25
**park** 17:19
**parlance** 183:18
**part** 51:15 103:24
115:10 123:25
125:12 152:10
154:13 170:22
171:5 193:3 203:2
242:10,13 243:19
243:24 244:3 264:4
276:24,25 278:17
278:17 285:8,9
289:5 293:10,11
**participants** 225:22
**participate** 53:10,12
**particular** 95:8
**parties** 165:23
222:15 261:2
291:16
**partners** 1:5 294:4
**pathway** 27:24
**pause** 6:25 24:22
25:11 27:2 28:2

67:23 70:21 72:14
72:18,20 104:12
119:5 126:2 133:25
151:22 163:3,13
177:6 182:10
184:24 204:17
246:20 249:7
280:24 282:22
**pay** 96:6,7
**paying** 223:11
**payment** 60:6
**peak** 137:3
**peer** 90:5,7 91:11
**pejorative** 265:3,3
**pen** 53:13 69:23
70:8
**pending** 6:8 47:3,3
**people** 9:6,11 14:18
16:16 18:21 38:24
42:3 52:6,10,11,15
53:21 111:6 167:3,9
169:19 176:17
197:13 208:10,18
210:15 213:7 221:4
225:21 286:22
289:6,9,15
**people's** 222:21
**percent** 22:24
125:23,25 132:18
133:4,6,8,9,16
134:11,15,16,22
135:4,8,10,18 136:2
136:19 137:2,17
150:12 152:5,11
178:11 179:19
181:15,23 191:15
192:2 194:22
195:13,22 196:8,9
196:24,25 197:2,8,9
197:14,15 198:13
198:14,25 202:19
202:20 217:12,15
217:15,20 218:10
219:3,4,13 227:22
227:23 228:13,13

236:16 248:10,22
249:3
**percentage** 23:21
149:19 195:20
196:6 219:15 220:2
229:12 236:12,13
247:16
**percentages** 229:16
248:19
**perfect** 171:2
**perform** 51:5
**performance** 158:20
158:22 159:4,19
201:6
**performed** 52:7
77:13 90:20,21
139:15 140:11
**performing** 141:12
208:20
**period** 25:2 26:3
32:17 38:8,10 62:23
64:2 65:11 66:24
68:4,18 69:8,8,9,18
69:19 70:22 71:11
71:17 72:13,22
74:24 81:2 86:19
97:7,9,17,21,23
98:5,9,15,21,25
101:5 102:9 103:3,9
103:12,25 105:19
106:5 107:25 108:8
108:14,18 109:13
110:10,12,17,20,25
111:11,16 112:6,20
113:2,11 115:12,20
116:11 120:3,6,10
120:17,19 121:3,5,6
121:9,9,14,14,15,17
122:2,16,22,24
123:11,12,21,23,24
123:25 124:2,3,11
124:18,24 125:9,11
125:17,18 127:7,11
127:17 129:21,22
130:22,24 131:3

[period - prior]

139:17,19,21 140:9
140:14,18,25
141:11,16,18,19
142:9 143:2,3,4,5,6
143:8,18,19 144:6,9
144:14,16,17,18
146:10,18,18,19,20
146:23,25 147:4
151:22 155:4 159:5
160:22 171:9,14,21
171:21,23 172:6,18
172:18,22,24 173:7
174:12,15,25 176:6
178:6,10,20 179:4,7
179:20 180:13,20
182:6 184:16 185:3
185:18,23 186:2,3,7
186:11 187:6,14,14
187:19,21 194:10
217:7,20 218:4
220:12 221:8,11,11
221:12,15,18
227:25 228:2,18
229:15,22 230:19
230:20 234:11
268:23,25 269:14
269:18,20,22,23,24
279:7 286:4 287:24
288:2,4,7,16 289:8
289:10,13,14,16,16
289:19
**periods** 68:5,17
97:15 139:14,25
141:22,24
**person** 11:22 148:17
**personal** 214:22
215:11
**personally** 60:21
221:24 284:20
**perspective** 138:7
**persuasive** 79:6,15
79:17,18
**phenomenon** 216:14
233:7

**phone** 46:23,24 81:7
**pick** 121:4
**picking** 172:25
**piece** 56:21 111:15
127:5 136:15
**place** 85:16
**places** 94:12 148:25
149:14 248:14
**plaintiff** 34:3,17
205:16
**plaintiffs** 2:5 19:14
19:22 20:5,15 23:4
23:22 24:12 30:16
32:13,25 35:11
47:23,24,25 48:11
48:19 49:10,11 53:6
59:6 96:3 98:20
240:16
**pleasant** 169:21
**please** 5:9,20,21 6:2
6:22 31:14 36:6
77:19 83:17 93:6
114:8 134:3 145:16
158:5 166:8 170:21
176:23 178:17
179:22 186:21
209:22 211:12
220:19 222:8 228:5
247:11 253:23
263:12 282:13
285:15
**plunges** 198:12
**plural** 25:7
**plus** 179:2 184:12
221:11
**point** 42:24 76:21
87:8 103:22 110:10
115:7 116:20
145:22 146:5 181:6
218:16 219:4 237:4
258:7,8 282:17,19
**pointed** 106:20
252:20
**pointing** 218:19
219:7,9

**polymedica** 205:19
**poole** 27:3
**populate** 43:12
**portion** 31:18 45:13
45:20 61:15 84:14
85:2 90:24 139:19
285:16
**position** 220:14
**positions** 19:4
**positive** 169:18
**possibility** 216:20
227:8
**possible** 44:20 73:16
88:8 89:11 97:6,11
97:12 161:9 169:22
223:7
**possibly** 176:12
189:24 225:24
233:11
**post** 112:10
**potential** 50:3
213:21
**potentially** 49:18
172:9
**practice** 12:21 16:11
**premise** 225:21
**preparation** 244:24
**prepare** 11:9 15:22
76:24
**prepared** 44:6 55:8
59:13
**preparing** 94:24
152:17
**presence** 124:9
176:16,16 222:25
223:22 224:9
225:11,23
**present** 3:4 176:22
**presentation** 100:2
**presenting** 182:22
**president** 3:6
**press** 40:5,9 62:10
65:16,17 77:9 78:3
78:20 93:12 112:17
113:17 114:5,11

116:14,17,21 117:7
165:11,14 166:4
181:25 182:4,21
183:8 184:17 259:9
259:10,17 292:14
**presumably** 161:8
**presumed** 224:19
**pretty** 239:7
**previous** 10:13
115:2
**previously** 4:22 8:2
26:5 47:16 73:3
115:11 145:6 233:4
273:5
**price** 74:13 94:17
96:16 103:23 104:4
106:4 110:22
119:14 124:21
125:2 128:16,21
130:3 140:24 141:6
141:23 144:15
153:10 160:8,21
166:17 174:19
181:2,5,17,20,22
184:6 185:6 186:6
186:12,15,17
192:18 196:9
198:13,24 199:5,13
200:11,19 203:4
210:11 214:5,6,10
216:14,16 226:3
242:2 247:17 248:2
248:17 260:24
261:3 262:23 268:3
**prices** 93:9,10,16,17
173:15 200:22
**pricing** 209:25
**primarily** 19:14,15
53:22
**prior** 23:19 45:24
56:9 83:22 85:7,8
112:11,14,23 113:2
113:19 115:12,20
116:4,5 145:13
259:6,19 260:12

[prior - read]

Page 27

283:12
probably 9:13 11:6
22:24 131:22
243:20
problem 111:4
172:19 224:6
proceedings 184:24
process 47:9 57:3
produced 155:18
203:9
product 63:2,4
192:11 213:22
professional 1:19
professionally 215:3
profit 66:13 208:9
208:14,22 209:14
program 194:14
project 61:7
promote 100:4
pronunciation
207:14
proper 87:13 107:16
112:25 254:9
property 12:19
proppants 63:8,13
prospectus 62:13,13
65:7 182:22
prove 75:4 87:21
proven 92:10
provide 24:19 25:14
25:15 227:15 230:3
provided 54:23
59:21 195:21 229:8
239:23 240:15
providers 237:18
provides 220:9
228:15 230:12
providing 11:22
237:19
provision 283:11
public 1:19 4:6
46:22 62:15 93:10
93:17 290:14 291:7
294:25

publicly 26:7 99:24
162:2,8 163:21
164:2 222:4
published 86:6
118:20
pulled 154:12
pump 212:20
purported 281:20
282:5
purpose 116:19
150:8 205:7 244:8
257:24 265:6
275:10
purposes 85:13
86:24 98:23 106:7
106:16 129:2
134:16 143:19
164:6 187:4 209:7
223:13 224:8 279:3
pursuant 1:17
283:16
purview 64:20
put 41:3 42:3 43:3
52:8 53:13 56:21
60:17 61:6,9 129:23
210:16 249:20
264:2 265:3
putting 275:13
puzzled 102:21

q

qualify 96:20
quantify 166:15,19
quantity 248:5
quarter 162:3
163:22 232:11,15
232:21
quarterly 231:13
233:6,9
question 5:9,24 6:8
6:9 19:9 29:4 31:14
31:17 32:10,19
34:20 36:6,22 37:22
40:14 41:7,20 45:8
51:20 57:9 61:24

63:15,16,22 64:3
68:13 70:5,11,13
74:21 76:7 77:19
78:5 80:18 81:22
82:8 83:13,17,22
84:8,11,18,23,25
85:5,7,8 86:12
87:10,13,19 88:19
88:19,20 90:23
91:10 92:2 95:5
99:6 100:8 108:21
117:5 121:19,20
123:9,9 124:6 127:9
140:5 159:25 161:4
166:8 167:22,25,25
170:2,23 175:7,24
177:4,15 179:22,25
200:15,16 209:21
211:22 215:13
220:19,23 223:21
225:9,11 226:23
242:19 243:5,9,12
249:16,18 250:12
253:19,23 254:5,8,9
254:17 255:14
258:10 263:12,22
269:4,6 272:17
273:5,8 274:9
275:11,17 276:10
278:23,24 281:18
285:15,19
questioning 223:15
questions 5:14,22
23:15 40:10 46:20
46:24 116:4,13
272:14 281:22
286:9,12,16 287:23
289:25,25
quibbling 234:12
quick 26:10
quickly 5:6,7 279:13
quite 127:18 130:19
142:11 189:5 276:3
quotation 210:17

quote 79:6 165:22
214:5,7,8 252:21
266:17 283:15
quoted 225:14
quotes 79:9
quoting 224:14,15

r

r 2:2,18 3:2 4:2,2,2
63:13 126:9,9 145:2
145:5,5,5 148:10
175:4,9,10 207:17
207:17,17 291:2
ran 51:7 151:16
192:22 193:5
range 234:7
rare 264:11 265:8
266:16
rate 59:25,25
raymond 71:20
rbc 71:21
reach 165:24
reached 96:23,24
147:21
react 186:7
reacted 160:21
reaction 103:23
130:3 179:18
185:14
reacts 141:23
186:17
read 29:12 31:2,13
31:15,19 32:19,20
36:6,9 45:8,9,14,19
45:21 52:3,5 64:21
67:11 70:12 76:16
77:11,20,25 78:2,3
78:7 83:17 84:15,24
85:2,3,24 89:21
90:23,24,25 100:20
100:22 134:3
135:23 161:24
166:9 167:23
171:13 177:2
179:21,23 200:15

[read - remember]

209:21,23 220:19
220:20 225:13
245:16 253:22
254:6 258:6 260:21
263:11,13 264:8
266:6 280:22
281:11 282:9,12,25
283:7 284:20
285:14,17
reading 46:12 67:5
98:13 132:6,16
178:8 180:16,18
182:18 195:16
220:7 228:13 232:6
240:22 248:25
reads 56:23,24
84:12
ready 6:23 195:23
real 56:18
really 56:18 57:8
58:22,23 64:19 78:4
85:4 172:16 177:14
226:24 233:10
270:15,22
reason 8:5 16:18,19
20:9 30:9 39:19
48:25 107:23
108:23 120:19
130:7 141:10
170:22 234:21
241:15 262:17,18
269:18 284:15
294:6
reasonable 214:2
reasoning 285:2
reasons 153:24
recall 27:21 31:20
33:12 34:24 50:7
62:16 65:25 67:12
67:25 76:11 96:12
97:19 104:13
125:23 182:20
206:5 258:9,12,14
receipt 284:12
285:13

receive 226:2
283:15
received 59:19
100:12 101:15
203:22
recess 50:12 114:17
144:24 180:5 202:3
235:3 267:3
recite 105:3 107:12
recognized 286:20
287:12
recollection 155:25
194:8
reconcile 30:10 81:9
134:14 235:25
record 4:16 6:24
25:4 26:12 31:15,18
32:20 36:9 45:9,13
45:20 50:11 61:20
61:21 70:9 77:20
84:14 89:21 113:8
114:23 115:16
129:9,16,17 137:9
143:12,13 147:12
151:12,13 156:12
161:24 166:9
167:23 179:23
184:21 198:4,5,7
202:6 203:23
208:12 209:23
220:20 235:2
240:19,25 241:3
249:22 252:2,3
254:6 260:22
263:13 264:8 266:6
266:12 267:6 274:3
281:12 282:9
285:16 291:13
redefine 48:9
redo 63:14
reductions 186:12
refer 40:2 48:19,23
104:7 160:16 161:5
178:17 226:11
262:9 277:21

reference 48:16
57:14 104:23
162:25 245:4,15
referenced 67:16
references 133:4,6
referred 65:17
113:9 163:19
183:10
referring 25:5 49:5
53:19 69:9 71:19,20
96:11,12 111:24
113:9,22,23 115:17
115:18 126:12,12
134:5,5 135:14
160:24 162:7 163:6
188:11 209:9 224:4
262:10
refers 135:16 181:5
181:8
reflect 93:9,16
179:17
reflected 94:17
104:3 112:24
165:17 166:5 176:4
179:9 180:11
187:10 199:17
reflecting 161:7
refreshes 67:17,20
regarding 239:23
regards 51:4 120:12
127:11 145:20
147:24
registered 1:18
registrant 101:25
registration 99:22
195:5
regression 130:21
140:11 141:12
158:25 188:18,24
191:19,21 192:11
192:23 193:4,4
199:17
rejected 28:10 29:22
44:8

relate 272:25
related 185:25
291:16
relation 220:8
relationship 187:12
197:23
release 40:5,9 78:3
112:17 113:18
114:5,11 116:14,18
116:22 117:7
120:13 165:11,14
166:4 181:25 182:5
182:21 183:7,8
184:17 259:9,10,17
292:14
released 71:16
111:15 112:3,10,23
117:6,20 131:20
166:12 182:21
261:25 262:3
releases 62:10 65:16
65:17 77:9 78:21
relevance 175:21
relevant 79:24 81:2
81:8 85:12 273:24
relied 64:24 204:6
205:7 225:15
243:21 244:22
246:11 276:23
277:10,24 279:2,8
285:4,21
rely 204:9
relying 279:9
remain 13:10
remainder 140:3
remains 231:22
232:4,16,17
remember 5:20 11:5
40:4 65:12 67:5
92:6 93:23 96:9,24
136:18 178:16,17
182:3 187:18
193:22 241:21,23
258:17 267:11

[remind - right]                                                                      Page 29

remind  202:13
remove  159:13
render  31:11,22
  33:8 36:12 42:11
  49:25 50:5,24 51:17
  51:18 54:22 61:11
  64:11 176:21
  254:12,15
rendered  32:23
  35:20 39:16 108:12
rendering  33:20
renders  274:24
rep  20:4
repeat  77:18 84:8
  166:8 167:21
rephrase  5:10 63:20
  121:20
replicate  189:15
replicated  128:19
report  7:3 22:4,6
  24:22 27:20 30:13
  52:9 69:13 71:3,10
  80:6,7,17 85:20
  86:6,15 91:5 93:7
  94:24 96:4 104:7
  132:17 133:3,11,12
  146:3 157:12
  159:16 178:18
  185:8 195:3,10
  223:18 224:15
  225:14 233:12,24
  249:12
reported  79:8 82:2,3
  86:4,7,14 118:23
  182:2 183:21
  185:16 196:6 204:7
  204:9 234:2 241:18
reporter  1:19 5:17
  6:20 27:14 63:9
  99:16 114:21
  158:11 240:12
reporter's  235:18
reporting  9:14
  80:11 81:12 294:1

reports  11:9 15:22
  21:13,18,22,25 30:7
  30:17 35:25 52:4
  66:23 67:3,15 68:15
  70:7,18 71:15,19
  72:9 73:10 74:5,10
  74:23 75:14 76:4
  77:8 79:23 80:3,25
  85:14 86:21 115:11
  115:20 118:21,21
  167:2
represent  4:18
  33:24 34:16 35:7
  105:2 112:13
  235:20 240:14
  250:8 274:2,11
representatives  59:6
represented  194:22
  235:11 244:21
  250:4 251:8 293:2
representing  20:18
  284:19
represents  234:8
  238:9 245:18 251:4
repudiation  283:21
  285:13
request  59:20,23
  222:10 238:6
  293:16,16,17
require  283:19
  284:13
required  34:12
  85:12 285:12
requirement  83:24
requires  101:24
rerunning  152:2
research  10:24
  51:13,15,24,25 62:2
  62:19 63:23 70:7,17
  73:9 95:2 101:13
  211:2 213:3,20
resolution  165:25
resource  225:15
respect  104:9,10
  132:5 135:6 136:7

141:8 183:23
  257:11
respond  91:4 96:16
  96:18
responds  142:6
response  161:25
  184:6 186:16
  225:10
responsibilities  9:17
  12:14,16 15:19,21
rest  152:3 178:18
result  32:7 42:13
  83:4 167:17 172:22
  233:8
resulted  175:13
results  37:2 127:16
  140:17,19,22 167:8
  173:2 175:5 187:22
  190:16
resumed  145:6
retained  21:4 26:6
  31:4 47:22
retrieved  235:13,22
  293:4
return  16:20 37:6
  128:21 193:9 249:5
  261:24
returns  135:22
  178:11 187:13
  188:6,7,9,10,11,15
  188:16,17,21
  192:19,20,21 200:2
  203:17
reuters  235:13,22
  236:21 237:5,18,25
  238:12,14 239:9
  293:4
revealed  40:5
  169:12,13 171:9
  268:5 269:13
reveals  259:5
revelation  170:6
revenue  194:23
  195:20 196:6 197:2
  197:12,21 198:2

reverse  10:17
review  62:12 66:22
  76:23 78:23 119:4
  145:25 152:17
  233:19 286:25
reviewed  54:2 62:10
  67:4 90:5,7 91:11
  152:14 277:8,24
  279:2,3,10
reviewing  132:8
  152:13 238:24
revise  56:25
rhody  27:4
right  4:23 5:19 7:13
  10:15 15:4 23:13
  31:11 46:15 49:8
  50:8 52:22 59:2
  68:11 69:3 71:12
  72:25 78:19 81:18
  85:13,22 86:7,13
  90:17 91:24 92:19
  92:22 101:9 102:19
  104:22 105:12
  109:3,22 115:21
  116:21 119:12,22
  120:11,14 121:10
  123:15 124:20
  126:17,23 131:18
  132:19 134:8
  138:16,20,22,23
  139:4 142:7,25
  143:25 146:24
  149:24 155:5
  156:25,25,25
  157:22,23 159:2
  168:20 171:12
  175:12 177:13,17
  178:3 180:22
  182:16,18 184:2,7
  185:18 187:7
  190:11 193:8 195:7
  197:3 199:21
  203:24 205:23
  206:24 207:16
  212:5 216:23

[right - september]

217:20 218:4,6,22 218:23 219:10,17 220:16 226:5 227:25 231:25 234:15 235:9 237:9 237:10,25 240:4 247:10 248:12,23 250:18 251:24 252:13 265:20 266:22,25 275:5 276:16 277:2 278:12 287:6

risk 208:9,15,21 209:12 216:18

river 257:9

robert 72:19 73:2

role 11:20,21 287:10 227:22

round 136:25 137:17

rounded 136:19,19 219:19 236:15

rounding 137:12 248:11

rpr 4:8 291:6,24

rule 54:19 221:8 279:18 283:19

ruled 279:16

rules 5:2

ruling 206:15

run 189:8 288:15

runs 107:25 110:10

**s**

s 2:2 3:2 63:13 145:2 145:2,2 195:5 207:17 294:6

s&p 192:19,20,24 193:9,11 200:7

sake 31:9 74:20 82:7

sales 194:21 222:16

salespeople 74:15 81:7

sample 143:3 144:5 144:6 157:4 288:12

san 15:2 237:22

sand 63:6,12,12 100:6 213:17

satisfaction 54:3

satisfactory 165:4

satisfied 80:24

satisfies 83:23

satisfy 76:9 79:20 82:11 87:18 88:12 88:13,15

savings 11:16

saw 79:25 124:25 133:5 200:23 202:23

saying 73:16 80:6 86:5 89:10,11 90:15 96:21 111:8,10,14 186:18 197:24 225:3 226:8 232:25 256:21 260:8,10,13 266:21 269:10 272:3 275:21 284:12,19

says 25:7 46:12,13 56:23 79:4,13 80:7 81:17 89:5,24 134:10 135:21 149:13 161:24 181:10,12 198:13 240:8,23 246:6 250:13,16,19 260:21 282:3 293:6

schedule 230:5 231:12 275:4

schedules 231:12

school 10:23

scientific 143:9

scope 54:18 64:10 82:18 87:12 107:16 254:10

screen 246:16 248:25

sec 62:11 64:22 77:9 230:18

second 5:13 27:8 30:13 31:17 34:21 56:25 68:22 79:5 80:23 82:11 86:25 87:21 88:14 89:24 109:8 112:17 119:4 132:4 147:12 148:21 150:20 161:22 163:16 170:15 184:21 185:10 192:22 209:9 218:20 219:14 235:2 241:2 261:16 280:21 281:10,16 282:6,12 283:6

section 53:25

securities 1:6 4:19 11:13 19:23,24 20:6 22:18,20,23 23:7,8 23:11,16 24:15 31:6 33:17 45:24 46:10 46:14 66:10 79:7 83:6 95:12 162:21 210:3,20 211:16 216:8,11 224:20 255:17 292:22 294:4

security 26:8,17 33:21 66:19 75:20 83:8 85:21 90:2 95:8 97:6,16 210:2 261:4

see 10:14 27:12,12 34:10 35:12 67:17 68:18,20 103:22 104:19 105:6,8,13 105:22 108:8 114:6 116:17 122:21,23 124:20 126:3 133:4 134:9 139:16 156:13 158:3 160:5 160:7 177:3 184:10

194:25 195:25 196:5 198:10,15 200:21 202:9 216:15 219:8 221:3 227:18 231:9,21 235:25 236:5,6 239:7 245:3,6 246:7 246:8,23 250:2 261:8 271:9 281:13 282:18 283:22,23

seeing 217:24

seeking 107:2 111:22 118:22

seen 118:17 137:19 153:3 170:24 171:2 222:21

segue 223:15

selected 109:11

self 21:23

sell 14:8,12 15:9 210:10 221:19

selling 220:11

sells 213:16

semantics 112:8

semi 93:3,8

send 54:11 202:9

sending 283:12

sense 24:8 52:13 82:23,24 215:25

sensitive 135:23,25

sent 279:20 284:7

sentence 79:3 83:3 84:20 85:25 134:4,6 161:23 177:2 214:4 220:22 226:14,16 227:19 280:22 281:9,14,15 282:25 283:2

sentences 226:11

separate 68:5 169:10 203:14 227:4

separately 77:16

september 68:19,23 69:9 70:24 97:24

98:4,17,21 99:6,9
100:3,10,11 101:15
105:20 111:12
120:7,7 122:17
123:16 128:9,9,10
128:10 171:7,10
172:5 173:7 178:21
218:5 231:23 232:4
233:16 234:3
235:14,23 236:10
279:21 284:3 293:5
serial 283:13
series 21:14
service 183:22 287:9
set 7:7 103:9 164:5
291:11,21
settlement 47:6
settlements 46:20
seven 28:5 69:11
72:25 79:25 178:9
178:19 185:16
share 31:5 32:16,24
33:21 34:14 35:2,15
35:21 36:13 37:4
43:17 268:3
shares 38:7,9,17,18
40:18,20 41:10
43:15,15,17 90:9
118:15 149:20
210:11 219:16
222:11,22 224:4
233:18,20 234:9
236:8,12,14
sheet 294:1
shenk 34:6
short 87:16 149:20
180:3 201:22 214:8
217:3 219:16 220:8
220:10,14 221:4,20
221:25 222:16
shortages 217:11,16
shorter 141:17,19
shot 246:16
show 75:11 83:7
88:22,23 90:2 94:3

112:16 114:5
116:15,16 133:20
154:14 235:24
239:24 251:6
showed 165:10
203:3
showing 116:19
147:20
shown 176:19
shows 74:17 158:19
174:13
side 20:10,15 33:23
33:25 35:9 246:5
sided 148:23,23
sign 248:9
signed 59:16
significance 108:5
133:15 178:12
179:19 192:3
significant 79:7 82:9
82:10 83:6 89:25
110:21 111:10,15
119:23 122:15
123:5,10 124:10,21
124:23 128:16
133:17 134:11,18
135:3,8,10,18
178:11 180:21,21
181:2,4,7,12,13,15
181:22 185:5
193:16
significantly 237:3
signify 123:4
silica 189:11 198:14
198:18 199:6,13
201:20 241:10,16
241:17 242:3,10,13
243:16 244:3,10
250:2
silica's 198:24
200:24,24
similar 94:18
145:24 160:10
simple 247:4 260:25

simpler 23:14
simply 264:25 265:4
265:9,14,15 266:2
sit 22:12,14 33:11
44:10,16 65:21 67:2
67:12,24 90:11
95:15,16 101:22
102:8 128:22
150:11 155:23
182:19 193:21
199:15 206:5
240:20 246:2,21
261:12 285:23
286:5
sitting 197:5
situation 35:19
97:14 255:21
263:25 264:22
situations 260:25
six 15:7
skew 131:24,25
140:17,19,22
slash 62:2
slightly 32:9
slow 55:16 163:15
small 157:3
sold 149:20 219:16
sole 8:24
solely 53:22
somebody 56:22
161:18,20 237:23
238:2 256:6
sorry 7:17 8:18
13:16,17,23 14:6
19:12 27:7,8,17,22
32:18 33:24 35:8
45:7 63:9 66:15
68:9 70:23 75:13,24
90:22 91:23 99:4
107:3 119:11 123:2
129:6,21 133:15
137:6 149:18
161:23 163:15
166:24 167:21
168:6 169:7 170:19

173:12,20 175:6
180:17 182:25
185:9 194:15
208:25 209:20
211:18 215:23
217:5,14,14 219:9
225:8 234:25
245:12 249:2,15
255:5 256:13,15
265:17 267:18
270:8 280:14
282:10
sort 54:25 121:4
160:5
sorts 125:2 212:17
215:21
sounds 12:4 214:2
266:8
source 118:22
150:16 159:11
256:19,22
south 3:8
southern 1:2 92:17
sparadise 2:23
speak 5:6,6 223:17
speaking 224:12
260:7 262:13
268:11
speaks 139:11
specific 19:10 48:25
61:25 64:25 65:5,15
88:16 121:23
160:25 161:3,7
200:10 224:13
244:15 262:10,14
specifically 89:23
104:13 122:12
133:20 135:13
200:18 201:5
277:19
specifics 49:14
223:22
specifies 116:23
specify 23:15

[specifying - study]

specifying  24:14
speculate  24:3
speculating  24:2
  61:2
speed  151:25 160:19
  160:20 162:24
  170:18 179:18
  185:13
spell  148:9
spend  4:25 60:23
spent  15:6 147:8
  252:8
spikes  187:19
spillover  194:18
spread  125:21 148:6
  149:9,12
spreadsheet  239:22
  251:8
spreadsheets  239:21
squared  175:4,9,10
squares  193:17
ss  193:15,15 291:4
st  145:25 286:24
stand  80:9
standard  41:22
  73:24 142:12 191:9
  191:19,20,23 192:7
  204:11 205:8 229:4
standing  127:19
stands  243:10
starred  132:9
start  7:4 10:21
  38:15 51:24 55:18
  61:22 68:13 91:25
  98:5,8 99:2 101:5
  103:3 109:13,23
  131:15 170:15,19
  250:9
started  16:16 18:6
  51:13 60:19 84:18
  98:15 138:17
starting  33:15
  147:15 170:13
starts  97:23 250:21

stat  132:10 135:16
stata  194:12
state  1:20 4:7
  116:25 194:21
  195:10 228:19
  291:3,8
stated  279:19
statement  43:8
  79:11 99:23 195:6
  210:9 211:8 261:11
  264:13 265:2 280:4
  281:4,6
states  1:2 89:3 206:9
statistic  191:22
statistical  133:14
  142:24 193:23
statistically  119:22
  122:15 123:4,10
  124:10,21 128:16
  133:17 134:10,10
  134:18 135:3,8,9,17
  178:10 181:14
  185:5 193:16
stay  119:7,25 128:3
std.err  192:8
step  231:10
steps  51:16
sterritt  205:2
steven  2:18 4:16
stick  110:6 280:5
sticks  67:13
stock  32:6 43:22
  66:18 72:8 74:13,16
  75:3 79:9 88:4,9
  89:12,18 91:8 94:17
  95:21 96:2,15,15
  103:23 104:4 106:4
  110:22 118:16
  119:15 121:13
  122:2 125:2,4
  135:21 140:24
  141:23 142:6
  144:15 158:22,23
  160:8 166:17 167:3
  174:19,20 176:21

185:22 186:7 188:6
  188:7,9,10 192:18
  196:9 198:24
  200:11,19,22 201:5
  210:7,8 214:8
  216:15 217:4,6,17
  217:18 218:8
  219:23 221:4,20,25
  222:13,14 223:9,11
  224:4,25 226:3
  262:23
stocks  158:20
  159:19 176:19
  217:7,18 222:15
stop  17:11 68:6
  106:7 253:4
stoppages  221:7
stories  62:11
straight  150:14,14
strauss  2:8 9:20
  19:17 26:18,22
  28:20,25 29:18,25
  31:12 33:3,7 36:16
  42:17 43:6 44:15
  45:3,15 47:6,9 48:2
  48:18 49:4,9 50:6,8
  51:12 54:13 55:18
  56:14 57:10,12,18
  61:13 62:22 63:14
  63:19 64:4,8 65:24
  66:12 73:12 75:6,10
  75:23 76:20 77:2,14
  77:18 79:16 80:12
  81:18,20 82:13
  83:15,18 84:2,7
  87:3,24 88:7,18
  91:2,21 92:20 97:10
  100:21 101:7 102:5
  102:11 103:13,18
  106:18 107:9
  108:10 109:9,24
  116:3 121:18 122:4
  134:19 135:12
  136:10 143:23
  144:21 155:19

156:17 163:24
  164:12,14,18
  166:10 167:20,24
  169:15 179:11
  207:23 211:5
  212:15 213:24
  214:18,20,25 215:7
  215:10 221:23
  222:17 224:6 225:4
  242:5,16,18 243:4
  244:12 253:12,22
  254:7 255:2,10
  261:17,22 262:12
  263:3,7,18 264:14
  265:11 268:7 269:2
  270:4,13,25 272:11
  272:15 273:16
  274:10,18 276:17
  277:20 279:24
  280:6 281:5,13,16
  282:6,11,15 284:17
  285:7 286:11,14
  289:22 292:8
strauss's  215:12
  275:13
street  4:4
strengthens  239:13
strictly  12:20
  173:21 264:10
  265:16,17,18,19,22
  266:3,15
strike  232:19
strikes  128:11
strong  93:4,8 153:9
studied  95:2
studies  91:14 120:24
  256:20 258:4 287:8
  289:6
study  32:4 36:18,20
  36:25 37:3 78:11
  91:12 96:25 119:11
  119:12 122:14
  127:4,10,15 129:21
  130:14,16,18,19,23
  132:8 140:6 142:6

[study - tell]                                                                      Page 33

142:13 144:14
145:21 172:7,20,23
241:10,19 242:4,15
243:3,7,18 244:2,9
261:23 273:22
286:18 288:16
289:5,18
**stuff** 11:11 172:14
**subject** 25:9 26:17
33:21 64:12
**subjective** 190:7
**submit** 21:25 22:5
27:20 33:9 54:6
55:14 56:22 96:4
**submitted** 7:3 21:9
30:7 54:10 55:9
57:23 59:14 152:15
**submitting** 22:4
**subscribed** 290:10
294:22
**subsequent** 122:24
123:23,24 124:3,11
125:9
**subsequently** 10:5
**substance** 266:11
**substantively** 58:8,9
61:8
**subsumed** 8:11
18:17
**successful** 212:8
**suffered** 42:13
167:17
**sufficient** 75:3 79:19
86:23 87:7,20 88:2
88:25 89:5,7,9 90:3
97:17 173:17 174:2
174:7,9 205:13
228:25
**sufficiently** 82:10
**sugar** 145:18
**suggest** 170:3 175:4
196:10 223:3,4
225:23 227:11
**suggesting** 226:25

**suggests** 119:16
174:13
**suisse** 71:22
**suit** 105:10,10
106:25 111:21
116:25
**suite** 4:4
**sum** 184:11 193:17
**summaries** 76:24
**summarize** 85:10
**summary** 78:3
260:20,22
**supplemental**
221:12
**supply** 99:11,20
105:5 106:23
111:19 116:24
165:19 252:23
253:3 279:23
**support** 11:21 15:23
25:19 136:13,17
147:23 177:8,21
205:10 228:15
229:9 256:20
**supported** 22:3
268:11
**supporting** 14:16
268:21
**supports** 136:16
176:4,10 177:4,18
177:20,25
**suppose** 258:2
**supposed** 195:21
202:14 208:8
**supposedly** 211:14
268:5
**supreme** 206:9
**sure** 6:11 20:7 22:13
24:10 35:14 36:7
48:10 50:10 57:11
69:15,15,24 71:6
74:14 94:5 110:22
114:16 118:2
137:12 142:11
143:16 146:12,13

147:12 149:3 150:9
151:2,10,20 156:17
160:9 162:5 164:21
167:11 168:4,20
170:16,23 171:3,7
175:23 180:18
196:2 214:19
217:24 218:3 229:4
230:7 234:8,14
238:3 242:18
247:22 251:11
252:10,12 256:5
265:22 266:20
277:15 278:8
288:12
**surprise** 169:21
251:2
**suspect** 239:17
**sworn** 4:6 46:17,25
145:7 290:10
291:12 294:22
**symbol** 245:10,23
245:25

---

**t**

**t** 48:12 63:13 126:9
126:9 132:10
135:16 137:4 145:2
178:13 179:2 191:9
191:10,12,13,22
207:17 291:2,2
**tabak** 146:2 286:24
287:3,7
**table** 193:13
**tabs** 7:10
**take** 5:17 6:10,22
8:19 26:10 28:22
33:13 35:16 36:23
37:16,17,19 40:8
50:9 51:16 54:2
56:4 78:24 94:2,6
114:15 126:11
129:18 136:21
144:20 158:18
165:13 178:24

180:3 186:20
189:18 201:22
209:9 216:17
231:10 237:12,23
237:23 246:25
249:23 262:6 267:2
267:8 271:11 278:6
283:4
**taken** 13:6 50:12
114:17 180:5 202:3
218:13 235:3 238:8
267:3
**talk** 49:13 78:15
88:24 120:2,2
122:11 126:24
153:8 167:7 208:10
212:18 214:3
226:15 260:5
275:25
**talked** 65:6 97:20
146:17 201:16
221:12,18 229:9
241:22 255:19
259:9 283:25 284:2
**talking** 38:13 57:19
59:2 66:12,16 71:7
81:6 114:2 115:5
127:19 133:21
161:3 167:3 224:8
252:8 259:24 263:4
**talks** 212:23
**tangent** 85:16
**tanking** 167:4
**tasked** 263:15,16
**tax** 223:12
**tech** 137:21
**technical** 207:20
230:8
**technically** 137:2
149:25 219:18
**technologies** 35:5
**technology** 34:25
**tell** 67:3 95:14
134:24 152:2
162:11 163:5 189:9

[tell - title]

237:15 238:7 240:4
247:21 249:5
254:24 258:21
**telling** 74:14 251:5
**tells** 192:2 271:16
**ten** 229:18 239:6
**tend** 5:5
**term** 37:9 68:12
93:18,20,21,24
100:5 142:20
189:19 193:3,7,8
199:25 207:19,20
209:2,4,8 230:8
255:24 258:16,23
259:25 260:3
265:25 273:11
288:13
**termed** 215:22
**termin** 112:9
**terminated** 105:4
106:23 109:6
111:19 116:24
252:22,23 253:2,9
283:17
**terminating** 99:11
100:14
**termination** 107:5
111:23 163:7
165:18 259:11,12
279:22 281:20
283:11,12,15
**terminology** 68:7
**terms** 58:24 115:8
117:18 138:2
143:15 190:24
191:5 193:24
215:24 227:10
283:16
**terrible** 236:21
**terribly** 237:17
**terrific** 12:4
**test** 69:18 105:19
106:5 107:25
109:13 110:9
116:11 120:3

123:25 139:19,21
141:11 142:6,25
144:16,17,18
146:22,25 155:4
160:22 171:21,23
175:19 176:3,18
178:5,10 180:11,12
180:20 184:5
186:24 187:6
190:25 221:8,10
228:2
**testified** 4:8,22
11:25 22:25 23:10
35:14 46:13 80:16
86:19 108:10 145:7
165:16 167:13
168:11,13 185:15
241:9 243:15
255:15 267:21
273:21,22
**testify** 15:23 26:6
33:10 47:23 80:15
**testifying** 83:20
94:23
**testimony** 11:23
21:8,13,19,22 22:4
22:6 34:5 35:25
163:18 234:19
246:17 291:14
**thank** 6:12 20:22
24:16 26:24 27:16
47:10 70:2 147:5
178:2 184:25
201:25 249:21
286:8 290:2,3
**theoretically** 208:6
208:16
**thing** 6:7 88:15
103:20 117:10
130:17 151:5
160:10 167:9
173:22 191:25
250:13 276:3,6
277:16 282:2,3

**things** 8:19 15:23
21:21 63:17 77:24
126:4 215:21 233:5
277:14 279:12
280:19
**think** 9:13 11:17
14:13 21:23 22:7,11
22:14 24:21 28:6
31:16 55:7,22 58:3
60:2 64:22 65:8
67:8,14,19 68:7
69:22 72:23,24 74:7
80:10 82:4 84:10
85:17 86:4,5,9 87:9
87:12,14,16 89:10
91:11 101:7 102:23
104:17 108:16,19
109:20 116:9 125:5
136:15,25 138:17
138:24 140:4,14
143:23 145:17,19
151:4 155:17
163:12 164:13
170:13 173:24
183:5 184:5,10
187:24 191:8
195:24 201:17
202:24 207:14
215:8 216:13 222:7
231:16 236:6 239:6
240:2,2 244:7,11,14
245:8 250:13 251:2
251:3,19,23 252:9
252:18 256:5 265:6
266:11 270:19
274:12 275:19
277:3,25
**thinks** 81:5
**third** 2:6 5:21 57:3
162:3 163:22
232:10
**thirty** 60:13
**thomson** 235:13,22
236:21 237:5,18,25
238:12,13 239:8

293:4
**thought** 23:9 85:19
98:14 102:25 120:6
140:16 146:14
157:13,18 169:19
177:14 202:16
203:17 211:13
226:7 239:22
248:20,24
**thousand** 60:13
**three** 13:12,22 49:20
50:23 71:17,18,19
72:17 73:3 74:24
75:2,19 76:3,9
80:25 82:7,8 86:17
86:20 87:20 89:9,10
149:14 182:7
184:14
**threshold** 125:25
**time** 4:25 9:23 11:8
12:10 18:6 19:11
22:15 40:11 45:19
49:22 50:3 60:16,19
61:6,9 62:21 64:2
65:11 66:24 68:17
68:17 71:16 73:11
73:15,18 81:2 97:7
97:8,15,17 106:25
108:8 110:25
111:16,21 120:10
120:17,25 121:3,5
121:13,14 122:2,22
125:9 126:21
127:10,25 129:21
130:22 139:14
147:9 154:8 159:6
171:9 190:22
229:22 230:19
234:10 252:8 268:4
276:3,6,18 286:10
288:16 290:4
**times** 133:3 195:9
255:16 263:10
**title** 11:5

[today – understand]          Page 35

**today** 18:13,25 20:2
  22:12,14,15 44:10
  44:16 65:21 67:2
  102:8 152:17
  155:24 171:17
  195:10 246:2,21
  252:9 254:25 255:9
  261:13 275:25
  285:23 286:5
**told** 44:24 50:22
  79:22 80:2,4,10
  81:3 131:4
**tomorrow** 254:24
  255:8
**tongue** 267:19
**top** 125:24 126:21
  191:8 195:12
  228:23 245:2,3
  250:17 256:16
**total** 236:9
**touched** 255:20
  261:14
**tough** 126:8
**touting** 212:25
**track** 252:14
**trade** 89:12 224:25
**traded** 26:8 43:22
  83:8 88:10 90:3
  125:19 150:22
  151:14 216:16
  261:4
**trader** 212:22
**trades** 66:19 216:21
**trading** 40:23,24
  41:8,11,15,16,21,22
  41:22 91:9 97:15
  118:10,14 125:18
  128:7,8,20 173:6
  194:9 215:4 216:13
  226:4,6
**transaction** 221:22
**transmit** 54:11
**transmitted** 51:10
  59:14

**travel** 17:14 276:3,6
  276:18
**treated** 223:12
**trend** 64:20
**trends** 62:19,24,25
  63:24 64:7,19
**trick** 159:24 172:15
**tripath** 34:25
**trouble** 52:24
**true** 210:12 222:11
  222:12 225:2
  264:10 265:10
  266:16 291:13
**trusting** 239:18
**trusty** 150:23
**truth** 170:6 268:6
**try** 5:20,21,23 32:11
  61:24 98:18 142:22
  154:25 170:4
  200:17 208:14
  210:4 254:21
  262:19 264:18
  269:11 271:9
**trying** 52:20 80:8
  81:8,13 109:19
  113:20 121:24
  124:3 131:8 136:6
  139:13,23 141:15
  142:3,16 154:9
  157:11 160:3
  168:19 172:15
  177:21 179:24
  208:22 216:5 225:5
  227:10 250:23,24
  250:25 251:10
  262:22 270:8,12,13
  271:8 272:8,14
  273:4,10 275:10,19
**turn** 7:9 24:21
  138:14 176:23,23
  194:15,16 207:12
  245:8 249:4 260:17
  281:18 286:23
  287:22

**turned** 262:3
**turning** 20:24 76:12
  77:6 89:19 93:7
  105:15 153:4
  161:12 184:4 185:9
  193:13 216:24
  217:22,23 231:8
  244:17 287:5
**turnover** 152:4,4
**turns** 237:24
**tv** 74:16
**twenty** 60:12
**two** 10:4 18:2,7 30:6
  30:16 49:20 50:23
  59:8 68:5,16 92:13
  110:24 143:15
  173:14,16 191:12
  199:5 221:7 226:11
  267:2 277:20
  287:13 288:20
**type** 18:10 43:10
  44:5,6 51:25 78:20
  90:20 146:6,8
  205:21 223:9
  236:25 288:10
**types** 38:24 55:2
**typical** 194:3
**typically** 288:9
**typo** 25:8 129:25
  171:6 282:17
**typos** 58:4,7 282:19

**u**

**u** 126:9 207:17
**u.s.** 157:17 158:7
  183:22 198:14,17
  198:24 199:6,7,12
  199:25 200:24
  201:20 240:9,23
  241:10,16,17 242:2
  242:9,12 243:16
  244:2,10 250:2
  292:18 293:7
**ubs** 72:19 73:2,4

**ub** 8:4 118:9
**ultimate** 152:9
**ultimately** 57:6
  59:16
**um** 33:11 43:22
  126:2 168:4 180:25
  262:3
**umbrella** 215:20
**unable** 165:23
  221:20,25 263:22
**unacceptable**
  137:20
**unambiguously**
  260:23
**uncertainty** 32:2
**unchanged** 231:22
  232:4
**uncomfortable**
  215:18 216:4
**uncured** 283:13
**undergraduate**
  190:23
**underneath** 181:11
**understand** 5:7,8,11
  12:3 24:4 42:4
  43:11 52:14 57:24
  58:20 61:4 81:9,13
  85:4 87:15 109:20
  112:19 113:5 125:5
  125:6 127:9 130:25
  131:8,14 136:6
  141:15 142:4
  143:16 146:13
  147:13 150:9 160:3
  170:16 172:16
  175:6,23 177:21
  179:25 220:24
  224:2 225:8 226:22
  229:7 243:5,11
  249:15 251:13
  252:12 253:14
  254:20 255:13
  258:22 259:2,23
  265:12 269:3,5,10
  271:4,7,10 273:7,9

[understand - werner]

274:16,22 275:15
275:19 276:10
280:19 282:23,24
284:22 285:24
**understanding**
62:18 78:4 80:8
93:15 97:25 102:8
108:6 118:2 124:12
127:3 130:13
139:13,24 141:14
153:2,16 154:9
187:24 190:24
212:10 217:2 225:6
225:16 231:11,14
258:25 279:7
**understood** 59:4
64:17 69:16 86:2
90:12 140:15
146:14 183:24
229:6 239:19
**unfortunately** 7:10
**uninformed** 225:25
**unit** 153:10 160:21
223:2
**united** 1:2 206:8
**units** 24:25 25:25
185:22 195:11,11
217:5 220:9,13
221:20,21 222:14
222:16 223:3,3,5,24
224:8 227:17
232:12 236:9,9
**untainted** 289:16
**unusual** 232:20
**upper** 246:5
**use** 37:12 41:9 43:12
106:10 108:22
110:9 119:20
120:24 127:15
132:23 133:2
139:17 141:10,16
141:18,21 142:8,19
145:24 146:9 151:5
151:6,9 159:13
174:3 178:5 188:18

213:11,12,14 216:5
237:5 247:4 249:13
256:20 261:23
288:22 289:2,11,15
**usually** 37:5 281:21

**v**

**v** 204:20 224:16
**valid** 87:10 108:8
**valuable** 138:9
**value** 132:12 137:4
188:7,9 191:10,11
191:24 195:11,18
196:22 197:21,25
210:7,12 225:2
237:13
**variable** 141:5
188:5 191:22
288:17,22 289:3
**variables** 175:11
289:11
**various** 10:18 77:8
139:15 153:6
**vastly** 236:3
**velaw.com** 2:23,24
**verified** 238:23
**verify** 230:25
**veritext** 294:1
**version** 56:12 99:21
157:19
**versus** 27:4 35:5
112:11,21 135:9
204:24,25,25
**vice** 3:6
**view** 17:20 87:9
**viewed** 262:2
**vinson** 1:15 2:13
**violated** 283:10
**violations** 162:20
292:21
**vitae** 7:8
**volition** 19:5
**volume** 43:17
125:18 128:20
148:4,6 150:22

151:15 187:13,18

**w**

**w** 4:2 7:20 52:13,21
72:19 145:5
**wait** 5:22,23 13:16
180:17 217:14
**want** 6:3 7:4 10:10
17:2 24:8 26:22
27:11 37:7,8 52:23
54:21 57:21 64:11
68:6 75:11 84:7,11
88:17,22 89:7 94:3
96:4 105:8 108:5
113:16 115:7
117:25 120:2
129:20 131:22
137:12 142:8,8,19
143:2,14,15 144:14
144:22 146:12
147:6,10,10 149:2
150:6 151:2,6 153:7
157:7,10 170:9
171:3,7 177:10
187:5 190:23
207:12 217:23
220:24 234:14
237:12 239:24
242:19 243:8
247:14,25 249:24
252:10,11 254:11
257:21 267:8
270:17 281:11
288:11,12,13
**wanted** 8:15 16:20
71:6 97:21 116:15
127:2 140:15
145:22 152:25
170:15 221:19
229:7 235:24
247:15
**wanting** 151:19
**water** 184:22
**way** 17:21 29:14
44:23 47:13 52:20

56:23,24 61:5 74:10
75:7 76:6 89:7
98:18 119:19,23
133:22 164:24
170:25 179:15
188:19 209:8
211:10 213:11
216:2 220:4 222:2
222:18 226:9 244:5
246:24 247:23
248:13 254:22
263:24 264:2
269:11 291:18
**ways** 74:18 169:17
212:18 213:5
**we've** 19:4 170:24
171:2,15,16 195:9
272:3,4
**week** 232:14,18
**weekly** 148:6 231:18
231:24
**weighted** 156:19,20
156:21 157:21
**weighting** 156:19
**welcome** 20:20
137:22
**wendy** 1:18 4:7
235:7 291:6,24
**wendy's** 235:17
**went** 10:5 16:14
18:9 120:20 150:23
168:9 196:9 206:16
221:9 239:3 248:16
248:17
**werner** 1:14 4:13
5:1 6:1,17 7:1 8:1
9:1 10:1 11:1 12:1
13:1 14:1 15:1 16:1
17:1 18:1 19:1 20:1
21:1 22:1 23:1 24:1
25:1 26:1 27:1 28:1
29:1 30:1 31:1 32:1
33:1 34:1 35:1 36:1
37:1 38:1 39:1 40:1
41:1 42:1 43:1 44:1

[werner - year]

Page 37

| | | | |
|---|---|---|---|
| 45:1 46:1 47:1 48:1 | 189:1 190:1 191:1 | 131:2 136:5 | 200:12 201:11 |
| 49:1 50:1 51:1 52:1 | 192:1 193:1 194:1 | **windstar** 11:14 | 206:23 207:9 |
| 53:1 54:1 55:1 56:1 | 195:1 196:1 197:1 | **wine** 14:8,12 15:9 | 210:25 257:8 |
| 56:16 57:1 58:1 | 198:1 199:1 200:1 | **withdraw** 68:13 | 267:13,15,17 274:5 |
| 59:1 60:1 61:1 62:1 | 201:1 202:1 203:1 | 91:25 262:19 274:9 | **worked** 9:6,8 10:18 |
| 63:1 64:1 65:1 66:1 | 204:1 205:1 206:1 | **withdrawn** 8:12 | 11:18 18:22 19:11 |
| 67:1 68:1 69:1 70:1 | 207:1 208:1 209:1 | 12:13 54:5 154:6 | 19:22 47:16 215:14 |
| 71:1 72:1 73:1 74:1 | 210:1 211:1 212:1 | 169:7 222:12 | 267:9,22 276:13 |
| 75:1 76:1 77:1 78:1 | 213:1 214:1 215:1 | 249:13,14 256:22 | **working** 7:21 14:23 |
| 79:1 80:1 81:1,3 | 216:1 217:1 218:1 | **withdrew** 249:19 | 17:6,11,22 19:13 |
| 82:1 83:1 84:1 85:1 | 219:1 220:1 221:1 | **witness** 25:4 31:13 | 22:16 23:3 47:18 |
| 86:1 87:1 88:1 89:1 | 222:1 223:1 224:1 | 32:18 36:5 45:7,17 | 52:12 216:9 |
| 90:1 91:1 92:1 93:1 | 225:1 226:1 227:1 | 49:8 70:12 83:16 | **worst** 237:19 |
| 94:1 95:1 96:1 97:1 | 228:1 229:1 230:1 | 84:24 90:22 99:13 | **wrap** 270:11 |
| 98:1 99:1 100:1 | 231:1 232:1 233:1 | 101:9 107:3 126:7 | **wrapped** 230:3,7,11 |
| 101:1 102:1 103:1 | 234:1 235:1 236:1 | 129:9 164:20 166:7 | **wrapping** 276:4 |
| 104:1 105:1 106:1 | 237:1 238:1 239:1 | 168:5 179:21 | **write** 53:14 161:13 |
| 107:1 108:1 109:1 | 240:1 241:1 242:1 | 184:20 200:14 | **writing** 70:3 280:19 |
| 110:1 111:1 112:1 | 243:1 244:1 245:1 | 203:16,20 204:21 | **written** 86:6,14 |
| 113:1 114:1 115:1 | 246:1 247:1 248:1 | 208:2 209:20 | **wrong** 68:12 151:21 |
| 116:1 117:1 118:1 | 249:1 250:1 251:1 | 220:18 263:11 | 240:4 282:2 |
| 119:1 120:1 121:1 | 252:1 253:1 254:1 | 276:19 278:21 | **x** |
| 122:1 123:1 124:1 | 255:1 256:1 257:1 | 282:14 285:14 | **x** 1:4,7 |
| 125:1 126:1 127:1 | 258:1 259:1 260:1 | 290:3 291:10,14,20 | **y** |
| 128:1 129:1 130:1 | 261:1 262:1 263:1 | 292:4 | **yeah** 7:2,12 13:4 |
| 131:1 132:1 133:1 | 264:1 265:1 266:1 | **wondering** 177:16 | 38:16 46:19 48:8,15 |
| 134:1 135:1,21 | 267:1 268:1 269:1 | **word** 52:12 118:7 | 75:16 78:3 106:22 |
| 136:1 137:1 138:1 | 270:1 271:1 272:1 | **words** 28:12 39:14 | 145:17 146:12 |
| 139:1 140:1 141:1 | 273:1 274:1,3 275:1 | 53:14 90:8 92:24 | 148:10,23 150:3 |
| 142:1 143:1 144:1 | 276:1 277:1 278:1 | 94:25 142:21 | 154:24 160:12 |
| 145:1,10 146:1 | 279:1 280:1 281:1 | 158:21 181:19 | 166:13 170:2 183:6 |
| 147:1 148:1 149:1 | 282:1 283:1 284:1 | 190:10 193:6 208:3 | 189:22 192:20 |
| 150:1 151:1 152:1 | 285:1 286:1 287:1 | 259:8 | 193:25 194:4 |
| 153:1 154:1 155:1 | 288:1 289:1 290:1,7 | **work** 9:11 11:13 | 196:15 203:11 |
| 156:1 157:1 158:1 | 291:9 292:5,12 | 12:18 13:20 15:5,25 | 204:18 206:20 |
| 159:1 160:1 161:1 | 294:5,21 | 16:23 20:4,8,14 | 214:20 222:24 |
| 162:1 163:1 164:1 | **west** 14:24 16:12 | 22:17 23:16,21 | 236:19 247:20 |
| 165:1 166:1 167:1 | **whereof** 291:20 | 24:11 27:15 28:17 | 248:24 257:4 278:6 |
| 168:1 169:1 170:1 | **who're** 208:18 | 32:14 34:11 43:10 | 280:25 282:18,21 |
| 171:1 172:1 173:1 | **william** 27:4 72:22 | 44:5 47:13 49:18 | 284:9 |
| 174:1 175:1 176:1 | 73:2 | 50:21 51:5 52:16 | **year** 10:3 14:7 15:8 |
| 177:1 178:1 179:1 | **winded** 123:8 | 53:2,5 56:21 59:9 | 16:25 17:13 106:3 |
| 180:1 181:1 182:1 | **window** 120:24 | 60:18 62:4 66:5 | 108:2 109:18 110:3 |
| 183:1 184:1 185:1 | 127:14,20,22 | 76:18 77:12 94:22 | 110:11,11 120:19 |
| 186:1 187:1 188:1 | 128:25 129:22 | 167:15 168:16 | |

[year - zero]

120:20,24 121:4
150:23 151:15
206:9
**years** 13:12,22 16:3
18:13
**york** 1:2,16,16,20
2:7,7,17,17 4:7 15:6
66:17 92:18 217:6
217:16,18 218:8
219:23 291:3,4,8
294:2,2

**z**

**zero** 91:19 92:4,10