# Exhibit 6

Page 1

1      UNITED STATES DISTRICT COURT

2       SOUTHERN DISTRICT OF FLORIDA

3

4    Case No. 1:21-MD-2989-CMA

5    ------------------------------x

6    In Re: JANUARY 2021 SHORT

7    SQUEEZE TRADING LITIGATION

8    ------------------------------x

9              ** CONFIDENTIAL **

10          VIDEOTAPE DEPOSITION OF

11              JOSEPH GURNEY

12       VIA ZOOM VIDEOCONFERENCE

13              April 14, 2023

14               10:04 a.m.

15

16

17

18

19

20

21

22

23

24    Reported by:

25    Maureen Ratto, RPR, CCR

Page 2

1                    *  *  *

2

3          Videotape deposition of Joseph

4    Gurney held virtually via Zoom

5    Teleconference, hosted from Veritext

6    Legal Solutions, pursuant to notice,

7    before Maureen Ratto, Certified Court

8    Reporter, License No. XI01165,

9    Registered Professional Reporter,

10   License No. 817125, and Notary Public.

11

12                    *  *  *

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

```
 1   A P P E A R A N C E S:
 2   Counsel for Plaintiffs:
 3      THE ROSEN LAW FIRM
 4      275 Madison Avenue
 5      New York, New York 10016
 6      BY:  PHILLIP KIM, ESQ.
 7           pkim@rosenlegal.com
 8           MICHAEL COHEN, ESQ.
 9           mcohen@rosenlegal.com
10
11   Counsel for Defendants:
12      CRAVATH SWAINE & MOORE, LLP
13      825 Eighth Avenue
14      New York, New York 10019
15      BY: KATHLEEN E. YOUNG, ESQ.
16           keyoung@cravath.com
17           MEGAN ELOISE VINCENT, ESQ.
18           mvincent@cravath.com
19
20   ALSO PRESENT:
21   LEE BOWRY, Legal Video Specialist
22
23
24
25
```

Page 4

1            VIDEOGRAPHER:  Good

2      morning. We are going on the record

3      at 10:04 a.m. on April 14, 2023.

4            Please note that this

5      deposition is being conducted

6      remotely using virtual technology.

7      Quality of recording depends on the

8      quality of camera and internet

9      connection of participants.

10            What is seen from the witness

11      and heard on screen is what will be

12      recorded.

13            Audio and video recording will

14      continue to take place unless all

15      parties agree to go off the record.

16      This is Media Unit 1 of the

17      video-recorded deposition of Joseph

18      Gurney, in the matter of In Re:

19      January 2021 Short Squeeze Trading

20      Litigation, filed in the United

21      States District Court, Southern

22      District of Florida, Case No.

23      1-21-MD-2189-CMA.

24            My name is Lee Bowry

25      representing Veritext New York and

Page 5

1      I am the videographer. The court

2      reporter is Maureen Ratto, also

3      with Veritext. I am not related to

4      any party in this action, nor am I

5      financially interested in the

6      outcome.

7           If there are any objections to

8      proceeding, please state them at

9      the time of your appearance.

10      Counsel attending remotely will now

11      state their appearances and

12      affiliations for the record,

13      beginning with the noticing

14      attorney.

15           MS. YOUNG:  Kathleen Young,

16      from Cravath, Swaine & Moore on

17      behalf of Robinhood, with me is

18      also Megan Vincent from Cravath.

19           MR. KIM:  Philip Kim for

20      Mr. Gurney, Rosen Law Firm.  I see

21      also online is Michael Cohen.

22           VIDEOGRAPHER:  Will the court

23      reporter please swear in the

24      witness, and then counsel may

25      proceed.

```
                                          Page 6
 1              GURNEY - CONFIDENTIAL
 2                    * * *
 3   J O S E P H   G U R N E Y, having been
 4   first duly sworn according to law by
 5   the Officer, testifies as follows:
 6   DIRECT EXAMINATION BY MS. YOUNG:
 7        Q.    Good morning, Mr. Gurney. My
 8   name is Kathleen Young.  I'm an attorney
 9   from Cravath and we represent Robinhood
10   in this matter.
11              Could you please state your
12   full name for the record?
13        A.    Joseph Edward Gurney.
14        Q.    What is your current address?
15        A.    ██████████████████████████
16   ████████████████████
17        Q.    Thank you. And where are you
18   right now?
19        A.    In Pooler, Georgia.
20        Q.    And you're in a vehicle,
21   right?
22        A.    That's correct.
23        Q.    And you're driving?
24        A.    I am.
25        Q.    Is the -- are you going to be
```

1              GURNEY - CONFIDENTIAL

2    at all distracted during today's

3    deposition while you're driving?

4         A.    No.

5         Q.    And you have no concerns

6    about, you know, your safety as you drive

7    during the deposition?

8         A.    No.

9         Q.    Okay. I'll go over some basics

10   before we begin. You understand that

11   you've been sworn in and your testimony

12   today is given under oath?

13        A.    I do.

14        Q.    And is there any reason why

15   you cannot give complete and truthful

16   testimony today?

17        A.    No.

18        Q.    You don't have any condition

19   that would prohibit you or prevent you

20   from having an accurate recollection or

21   from giving true and complete testimony

22   today?

23        A.    No.

24        Q.    So the court reporter is

25   taking down everything we say, so it's

1              GURNEY - CONFIDENTIAL

2    important that you provide verbal

3    responses to any questions you're asked

4    rather than shaking your head or nodding,

5    things like that. Does that make sense?

6         A.    Yes.

7         Q.    And during the course of the

8    deposition your counsel may object to the

9    form of a question that's asked. That

10   objection is just for the record and you

11   can proceed to answer the question if you

12   can, unless your counsel instructs you

13   specifically not to answer. And if you

14   don't understand a question, you know,

15   you can just let me know and I'll try to

16   clarify it and if you don't hear any

17   question fully just let me know and I'll

18   repeat it. Make sense?

19        A.    Yes.

20        Q.    And if you also allow me to

21   finish each question before answering

22   I'll try to let you answer before asking

23   another question. That will help the

24   court reporter as well. And if you need

25   to take a break at any point just let me

```
 1              GURNEY - CONFIDENTIAL
 2   know and I'll find a good place to stop.
 3   The only exception to that is we can't
 4   stop, you know, if a question is still
 5   pending.
 6              Does that make sense? Mr.
 7   Gurney, does that make sense?
 8      A.    Yes.
 9      Q.    Thank you. Did you take any
10   steps to prepare for your deposition
11   today?
12      A.    I reviewed information.
13      Q.    Did you meet with counsel?
14      A.    I did.
15      Q.    With whom did you meet?
16      A.    The Rosen attorneys that are
17   present.
18      Q.    Mr. Cohen and Mr. Kim; is that
19   right?
20      A.    That's correct.
21      Q.    Was anybody else present?
22      A.    I can't recall.
23      Q.    When did you meet with
24   counsel?
25      A.    When was the last time I met
```

```
                                      Page 10

 1              GURNEY - CONFIDENTIAL
 2   with counsel?
 3         Q.    When did you meet with counsel
 4   in preparation for your deposition?
 5         A.    Yesterday.
 6         Q.    And you don't recall who else
 7   was there during the meeting that you had
 8   with counsel yesterday?
 9         A.    Like I said, the Rosen Law
10   attorneys that are present.
11         Q.    But you don't recall if
12   anybody else besides Mr. Kim and
13   Mr. Cohen were present?
14         A.    I don't recall.
15         Q.    And how long was that meeting
16   you had with counsel yesterday?
17         A.    I don't recall.
18         Q.    You don't have any approximate
19   sense of how long that meeting lasted?
20         A.    No.
21         Q.    Was it less than an hour?
22         A.    I don't want to speculate. I
23   don't recall.
24         Q.    Did you speak with anyone else
25   in preparation for this deposition?
```

```
 1              GURNEY - CONFIDENTIAL
 2       A.    No.
 3       Q.    Did you review any documents
 4  in preparation for this deposition?
 5       A.    Yes.
 6       Q.    Did any of those documents
 7  that you reviewed help refresh your
 8  recollection about past events?
 9       A.    No.
10       Q.    Have you discussed this
11  lawsuit with anybody other than your
12  lawyers?
13       A.    No.
14       Q.    Mr. Gurney, have you been
15  deposed before?
16       A.    Yes.
17       Q.    On how many occasions?
18       A.    I don't recall.
19       Q.    What kinds of actions were
20  those in which you've been previously
21  deposed?
22       A.    What's that again?
23       Q.    I said what kind of actions
24  were they in which you were previously
25  deposed?
```

```
                                    Page 12
 1              GURNEY - CONFIDENTIAL
 2       A.     Criminal complaints.
 3       Q.     Brought against whom?
 4       A.     I'm sorry. What was the
 5  question?
 6       Q.     Against whom were those
 7  criminal complaints brought?
 8       A.     Different people.
 9       Q.     Were any of them brought
10  against you?
11       A.     No.
12       Q.     And so in what capacity were
13  you providing deposition testimony?
14       A.     I was an investigator in law
15  enforcement.
16       Q.     Have you ever been involved in
17  legal proceedings in which you were a
18  party?
19       A.     I don't recall.
20       Q.     You don't recall whether or
21  not you've ever been a party in a lawsuit
22  before?
23       A.     Not offhand, I don't recall.
24       Q.     Have you ever been class
25  representative before?
```

```
                                              Page 13
 1              GURNEY - CONFIDENTIAL
 2         A.     No.
 3         Q.     Have you ever participated
 4    otherwise in a class action lawsuit?
 5         A.     No.
 6         Q.     What's the highest level of
 7    education that you've obtained?
 8         A.     Bachelor's degree.
 9         Q.     From what school?
10         A.     East Carolina University.
11         Q.     In what year did you earn that
12    degree?
13         A.     '97.
14         Q.     Thank you. Do you have any
15    other educational credentials like
16    licenses or certifications?
17         A.     Yes, I have.
18         Q.     And what kinds of licenses are
19    those?
20         A.     Sworn law enforcement officer
21    PPSB license, state trainer, those are
22    the ones that I can recollect.
23         Q.     Did you say PPSB license?
24         A.     That's correct.
25         Q.     And what is that?
```

```
                                           Page 14
 1                GURNEY - CONFIDENTIAL
 2        A.      Private Protective Services.
 3        Q.      So are these all law
 4   enforcement related types of
 5   certifications?
 6        A.      Law enforcement safety
 7   services, that's correct.
 8        Q.      Thank you. Do you have any
 9   education in finance or economics or
10   accounting?
11        A.      No.
12        Q.      Okay. We're going to look at a
13   document now. I'm not sure how you'll be
14   able to access that.
15                Are you in a place where you
16   can look at documents?
17        A.      I am. I'm stopped currently.
18                MS. YOUNG:  Megan, let's go
19        ahead and mark tab 12.  I think
20        this will be Exhibit 113. If you
21        can see if it's available now.
22                (Exhibit 113, resumé of Joseph
23        Gurney, Bates P000001106 was
24        received and marked on this date
25        for identification.)
```

```
                                     Page 15
 1              GURNEY - CONFIDENTIAL
 2      Q.    It should be available now. Do
 3  you see the document, Mr. Gurney?
 4      A.    I don't.
 5      Q.    Are you logged into Exhibit
 6  Share?
 7              MR. KIM:  I mean, I could
 8        screen share it maybe. Is my screen
 9        share working?  Maybe I'll screen
10        share.
11              MS. YOUNG:  I think we can do
12        that.
13              MR. KIM:  Or you guys can
14        screen share it.
15              MS. YOUNG:  Yeah. One second.
16              MR. KIM:  Mr. Gurney, they're
17        going to screen share it and bring
18        it up.
19              THE WITNESS:  All right.
20              MS. YOUNG:  Can you zoom in a
21        little bit, Megan?
22      Q.    Do you see the document, Mr.
23  Gurney?
24      A.    I do.
25      Q.    Can you identify this?
```

1                    GURNEY - CONFIDENTIAL

2          A.      That's correct.

3          Q.      What's correct?

4          A.      You asked if I could identify

5    this.

6          Q.      Right.

7          A.      And I said yes.

8          Q.      So can you identify it?  What

9    is this document?

10         A.      It's a resumé.

11         Q.      And this is your resumé,

12   right?

13         A.      That's correct.

14         Q.      And the document notes that

15   from March 2022 to the present you've

16   been employed by DSI Security Service in

17   Savannah, Georgia.  Is that still

18   correct?

19         A.      That's correct.

20         Q.      And what is your job title in

21   this role?

22         A.      Client services management,

23   essentially.

24         Q.      Can you describe your role,

25   your responsibilities?

1                   GURNEY - CONFIDENTIAL

2          A.      Yeah.  I'm over safety

3     contracts for a security company.

4          Q.      What do you mean you're "over

5     safety contracts"?

6          A.      I'm over clients services for

7     those contracts.  Meaning, I meet with

8     clients for contractual obligations.

9          Q.      Got it. From 2021 until March

10    of 2022 it looks like from your resumé

11    that you were employed by HCA Healthcare

12    as a public safety and security

13    management for a hospital in Savannah?

14         A.      That's correct. Yes.

15         Q.      Describe those duties?

16         A.      Management in a healthcare

17    system over safety and security.

18         Q.      So it sounds like a similar

19    type of role but maybe a different

20    industry; is that accurate?

21         A.      No.

22         Q.      Were your responsibilities

23    meaningfully different from your current

24    role?

25         A.      Yes.

```
 1              GURNEY - CONFIDENTIAL
 2         Q.    Can you describe how?
 3         A.    Again, currently I do client
 4    services for contractual agreements. In
 5    that role I was facilitating safety and
 6    service for a hospital.
 7         Q.    Part of this document notes
 8    that from 2014 to 2021 you were employed
 9    as a Novant Health Public Safety
10    Coordinator (armed); is that right?
11         A.    That's correct.
12         Q.    And looking at the resumé is
13    the information under this bullet an
14    accurate description of your duties in
15    that role?
16         A.    That's correct.
17         Q.    And you left that position in
18    2021, right?
19         A.    That's correct.
20         Q.    Did you file a lawsuit against
21    that former employer?
22         A.    What is that?
23         Q.    Did you file suit against
24    Novant Health, your former employer?
25         A.    I did.
```

```
                                              Page 19
 1              GURNEY - CONFIDENTIAL
 2         Q.    A few minutes ago I believe
 3    that you testified that you didn't recall
 4    whether or not you were a party to any --
 5    you've ever been a party in any lawsuit,
 6    right?
 7         A.    I didn't recall the actual
 8    Complaint.
 9         Q.    I didn't ask you about the
10    Complaint. I asked if you had ever been a
11    party in a lawsuit before and you said
12    that you did not recall, right?
13         A.    I didn't at the time.
14         Q.    But now you recall that you
15    did bring suit against Novant, right?
16         A.    That's correct.
17         Q.    And when did you initiate that
18    suit?
19         A.    I can't recall.
20         Q.    Was it before or after you
21    worked there?
22         A.    I don't recall. Like I said, I
23    did not recall it until you just
24    mentioned it.
25         Q.    What kind of claims did you
```

```
                                        Page 20
 1              GURNEY - CONFIDENTIAL
 2   bring against Novant?
 3        A.    I don't recall.
 4        Q.    You don't recall anything
 5   about the claims that you brought against
 6   your former employer?
 7        A.    Not currently, not without
 8   reviewing information now, I don't.
 9              MS. YOUNG: Okay. Let's go
10        ahead and mark tab 10.
11              (Exhibit 114, Amended
12        Complaint re: Joseph Gurney v.
13        Novant Health, Inc. was received
14        and marked on this date for
15        identification.)
16              MS. YOUNG:  This will be
17        Exhibit 114.
18        Q.    Mr. Gurney, is this the
19   Amended Complaint you filed in the Gurney
20   versus Novant Health, Inc. lawsuit?
21        A.    I'm not sure. I can't see the
22   document.
23        Q.    You can't see the document?
24        A.    I didn't see all of it.
25        Q.    We can zoom in and scroll
```

```
                                              Page 21

 1                GURNEY - CONFIDENTIAL
 2    through as much. You can feel free to
 3    read as much as you'd like.  Please let
 4    us know if you us to keep moving down the
 5    document.
 6          A.    Okay. What's your question?
 7          Q.    Can you tell us what claims
 8    you filed against Novant?
 9          A.    Without sitting there
10    reviewing it, I can't recall.
11          Q.    I'm giving you the opportunity
12    to review it, Mr. Gurney.
13                MR. KIM:  What do you want him
14          to do, read the Complaint? I
15          mean --
16                THE WITNESS:  I'm not --
17                MR. KIM:  He's not a lawyer.
18          Look, listen, he's not a lawyer.
19          We're not sitting here playing, you
20          know, memory, right? He says he
21          doesn't recall.
22                So if you want him to sit here
23          and read you the Complaint, he can
24          do that but that's not going to be
25          an efficient use of time when this
```

Page 22

```
 1              GURNEY - CONFIDENTIAL
 2        case has absolutely nothing to do
 3        with what we're here for today.
 4              MS. YOUNG:  I'm entitled to
 5        seven hours on the record with this
 6        witness and I will ask him the
 7        questions that I want to and if I
 8        want him to read the entire
 9        Complaint in his other case, we'll
10        do that. But my thanks to the
11        peanut gallery.
12              If you scroll down, Megan to
13        the bottom of this.
14        Q.    Mr. Gurney, can you tell me
15   what date this is dated, this Amended
16   Complaint?
17        A.    Let me zoom in. The 9th day of
18   September of 2022.
19        Q.    Okay. So you filed this
20   Amended Complaint against Novant last
21   September, right?
22        A.    Yes.
23        Q.    Is that case still currently
24   pending?
25        A.    I haven't heard anything about
```

```
1              GURNEY - CONFIDENTIAL
2   the case recently. I cannot assume or
3   speculate anything on the matter.
4        Q.    But you don't know of any --
5   you don't know of this case being
6   resolved, right?
7        A.    I don't know anything further
8   on the case.
9        Q.    And you can't tell me why you
10  brought suit against Novant?
11             MR. KIM:  Objection to form.
12       A.    The complaint is there. You
13  can read it.
14       Q.    No, I'm asking why you decided
15  to bring suit against Novant. I'm not
16  asking you to tell me anything about the
17  Complaint.
18             MR. KIM:  He's already
19       answered the question.
20       Q.    He can answer.
21       A.    I don't recall all the details
22  currently.
23       Q.    You can't tell me why six
24  months ago or back in September of 2022
25  you filed suit against your former
```

```
                                        Page 24

 1            GURNEY - CONFIDENTIAL

 2   employer?

 3        A.    I can't recall.

 4            MR. KIM:  He's already

 5        answered he doesn't recall.  Don't

 6        badger the witness. You're wasting

 7        a lot of time.

 8            MS. YOUNG:  You know the only

 9        person wasting time is you.

10            MR. KIM:  He's not a lawyer,

11        right?

12            MS. YOUNG:  So he brought

13        suit, he can answer this.

14            MR. KIM:  So he doesn't

15        recall. So you keep badgering him

16        about -- he says he doesn't recall

17        and you're like, well, I find it

18        hard to believe you don't recall. I

19        don't recall. So let's just move

20        on.

21        Q.    You can answer the question,

22   Mr. Gurney. Can you tell me anything

23   about your reasons for filing suit

24   against your former employer?

25        A.    I don't recall.
```

```
                                              Page 25
 1              GURNEY - CONFIDENTIAL
 2         Q.     Do you recall why you brought
 3    suit in this action?
 4         A.     What's the question? What
 5    action?
 6         Q.     This action, In Re: January
 7    2021 Short Squeeze Trading Litigation.
 8         A.     Yes.
 9         Q.     And why is that?
10         A.     Market manipulation and the
11    company Robinhood hit the stop button.
12         Q.     But don't recall anything
13    about why you filed suit against Novant?
14         A.     I don't recall.
15         Q.     Let's go back to your resumé
16    for a moment. Actually, you were at
17    Novant when you -- during COVID, right,
18    when COVID started?
19         A.     I don't recall.
20         Q.     Let's go back to your resumé
21    then. Do you see it looks like you worked
22    at Novant from 2014 to 2021, right? Is
23    that accurate?
24         A.     Correct.
25         Q.     Okay. So you were working at
```

```
 1             GURNEY - CONFIDENTIAL
 2    Novant when COVID, the COVID pandemic hit
 3    in March of 2020, right? Did you answer,
 4    Mr. Gurney?
 5         A.    What's that?
 6         Q.    I said you were working at
 7    Novant when the COVID pandemic hit in
 8    March of 2020, right?
 9         A.    Yes.
10         Q.    Was there any disruption to
11    your employment related to the pandemic?
12         A.    I don't recall.
13              MR. KIM:  Objection, vague.
14         Q.    Do you recall whether or not
15    your day-to-day responsibilities changed
16    at all as a result of COVID?
17         A.    I don't recall.
18         Q.    And before Novant you were a
19    sheriff deputy and an investigator,
20    right?
21         A.    That's correct.
22         Q.    And that was -- you held that
23    position from 2009 to 2014?
24         A.    I don't recall specific dates.
25         Q.    Does this resumé say you held
```

Page 27

GURNEY - CONFIDENTIAL

1    GURNEY - CONFIDENTIAL
2    that position from 2009 to 2014?
3         A.    That's correct.
4         Q.    And this is accurate?
5         A.    That's correct.
6         Q.    Can you describe your duties
7    in that role?
8         A.    I was a sworn law enforcement
9    official for the state.
10        Q.    And before that you were a
11   police sergeant from 2001 to 2009?
12        A.    That's correct.
13        Q.    Can you describe the
14   responsibilities associated with that
15   position?
16        A.    I was a sworn law enforcement
17   officer for the state.
18        Q.    So how did that differ from
19   your position as a sheriff deputy
20   investigator?
21        A.    They're different positions.
22        Q.    Can you expand on that? How
23   are they different?
24             MR. KIM:  Objection, vague.
25        Q.    You can answer, Mr. Gurney.

```
 1              GURNEY - CONFIDENTIAL
 2        A.     What was your question again?
 3        Q.     How were those positions
 4   different, the police sergeant role and
 5   the sheriff deputy investigator role?
 6        A.     One I was a police sergeant
 7   and one I was a sheriff's deputy. They're
 8   not the same.
 9        Q.     Okay. Can you expand on why
10   they're different, aside from the title?
11        A.     They're different positions.
12        Q.     Okay. So did you have
13   different responsibilities?
14        A.     What was that? I'm sorry.
15        Q.     Did you have different
16   responsibilities in those two roles?
17        A.     Yes.
18        Q.     How did those be
19   responsibilities differ?
20        A.     One, I was a sergeant, one I
21   was a sheriff's deputy, they're different
22   responsibilities.
23        Q.     Right. But you're just telling
24   me the position title. How did -- can you
25   describe the responsibilities associated
```

```
                          GURNEY - CONFIDENTIAL
 1
 2   with those two roles?
 3        A.    I don't understand the
 4   question. I don't know what you're
 5   looking for.
 6        Q.    Okay. Let's talk about the
 7   police sergeant role. What were your main
 8   responsibilities as a police sergeant?
 9        A.    To enforce North Carolina law
10   and carry out the roles and duties of a
11   law enforcement official and as a leader
12   in law enforcement.
13        Q.    Okay. And then can you
14   describe your responsibilities as a
15   sheriff deputy and investigator?
16        A.    To carry out the laws and
17   duties, the law enforcement official but
18   working for and under a sheriff in a
19   county in the state and doing other
20   duties required there within.
21        Q.    So just sort of day-to-day,
22   when you go to work, what kind of tasks
23   would you perform?
24        A.    Varies.
25        Q.    Can you give me a couple of
```

```
                                          Page 30
 1              GURNEY - CONFIDENTIAL
 2   examples?
 3        A.    For which?
 4        Q.    For both positions. So let's
 5   start with maybe the sheriff deputy
 6   investigator position.
 7        A.    Okay. I would investigate
 8   certain actions or complaints. As a
 9   police sergeant I would carry out daily
10   duties as the title suggests.
11        Q.    And what about the tasks that
12   you performed day-to-day in the police
13   sergeant role?
14        A.    Oversee officers and officer
15   duties.
16        Q.    Mr. Gurney, are you on social
17   media?
18        A.    No.
19        Q.    Not in any form? Like.  Not
20   any platforms?
21        A.    Not that I can recall.
22        Q.    Have you ever had any social
23   media accounts?
24        A.    I can't recall.
25        Q.    Do you recall whether or not
```

```
                                        Page 31
 1              GURNEY - CONFIDENTIAL
 2   you've ever had a Reddit account?
 3        A.    I can't recall.
 4        Q.    Do you recall whether or not
 5   you've had a Twitter account?
 6        A.    I can't recall.
 7        Q.    Do you recall whether or not
 8   you've ever had a Facebook account?
 9        A.    I can't recall.
10        Q.    Do you recall whether or not
11   you've had an Instagram account?
12        A.    I can't recall. I don't have
13   anything currently.
14        Q.    And you can't recall whether
15   or not you've ever had any account?
16        A.    I can't.
17              MS. YOUNG:  Megan, let's go to
18        tab 17.
19              (Exhibit 115, LinkedIn profile
20        of Joseph Gurney was received and
21        marked on this date for
22        identification.)
23        Q.    So this will be 115. Do you
24   recognize this document, Mr. Gurney?
25        A.    I don't recall.
```

```
                                              Page 32
 1                GURNEY - CONFIDENTIAL
 2         Q.    Is this a copy of your
 3    LinkedIn profile?
 4         A.    I don't recall. I don't have a
 5    LinkedIn currently.
 6         Q.    Is this a photo of you?
 7         A.    It appears so. I don't have a
 8    LinkedIn currently.
 9         Q.    Do you know if somebody else
10    created a LinkedIn account for you?
11         A.    I can't assume or speculate
12    but I can tell you I don't have one.
13         Q.    Are you representing, Mr.
14    Gurney, that this is not publicly
15    available right now, this profile?
16              MR. KIM:  Objection,
17         mischaracterizes testimony.
18         Q.    You can answer.
19         A.    What's that? What was your
20    question?
21         Q.    Do you recall ever closing
22    your LinkedIn account?
23              MR. KIM:  Objection to form.
24         A.    I can't recall.
25         Q.    Megan, if you scroll down a
```

```
                                    Page 33
 1              GURNEY - CONFIDENTIAL
 2   little bit.
 3              Mr. Gurney, is the work
 4   experience listed here consistent with
 5   your own work experience?
 6        A.    I don't recall.
 7        Q.    You don't recall whether or
 8   not you ever worked for Pender County
 9   Sheriff's Department?
10        A.    Yes, I worked for the
11   sheriff's office.  That is not what was
12   asked.
13        Q.    I asked if this experience was
14   consistent with your actual work
15   experience.
16              MR. KIM:  Objection to form.
17        Q.    Do you recall working for
18   NHRMC Police?
19        A.    I do.
20        Q.    And you do recall working for
21   Pender County Sheriff's Department?
22        A.    Yes, I do.
23        Q.    So the experience listed here
24   is consistent with your own work
25   experience?
```

Page 34

GURNEY - CONFIDENTIAL

1

2          MR. KIM:  That's not --

3      objection to form. We just went

4      over his resumé. Clearly the last

5      time he worked at Pender was in

6      '14, and this, the LinkedIn, hasn't

7      been updated since. So clearly it's

8      a stale page.

9          MS. YOUNG:  Can we go to

10     previously marked exhibit 2, I

11     think it's tab 14?

12         (Exhibit 2, letter from Rosen

13     Law Firm Certificate, also marked

14     Exhibit 116, previously marked, is

15     shown to the Deponent.)

16         THE WITNESS:  Hold on for a

17     second.  I'm going to take about

18     two minutes here and then I'll jump

19     back on. I got to speak to

20     somebody.

21         MS. YOUNG:  Well, then I guess

22     we need to go off the record.

23         MR. KIM:  We can take a three

24     minute break.

25         VIDEOGRAPHER:  Okay. Going off

Page 35

                    GURNEY - CONFIDENTIAL
1
2        the record. The time is 10:37 a.m.
3              (Recess is taken.)
4              VIDEOGRAPHER:  We're back on
5        the record. The time is 10:48 a.m.
6              MS. YOUNG:  I think Megan will
7        pull up the exhibit we were just
8        about to take a look at, which was
9        previously marked Exhibit 2.
10       Q.    While she's pulling that up,
11  Mr. Gurney, did your counsel reach out to
12  you to ask what social media platforms
13  you were on?
14       A.    What was the question?
15       Q.    Did your counsel ever reach
16  out to you to ask if you were on any
17  social media platforms?
18       A.    I don't recall.
19       Q.    I'm about to show you a letter
20  dated February 27, 2023 that your counsel
21  provided in this action.
22       A.    Okay.
23       Q.    And if we scroll down, do you
24  see your name about halfway down the
25  page?

1                GURNEY - CONFIDENTIAL

2        A.     I do.

3        Q.     And it states there are no

4   social media accounts to report?

5        A.     I see that.

6        Q.     Is that information accurate?

7        A.     Yes. I don't have any current

8   social media accounts.

9        Q.     And this letter does not list

10  any sort of LinkedIn profile, right?

11       A.     I don't have a LinkedIn. I

12  haven't had a LinkedIn for a very long

13  time.

14       Q.     And this letter does not

15  include a LinkedIn profile for you,

16  right?

17              MR. KIM:   The letter speaks

18       for itself.

19       Q.     You can answer.

20       A.     What's that?

21       Q.     The letter does not list a

22  LinkedIn profile for you, right?

23       A.     It does not but I did not

24  recall a LinkedIn profile. Again, that

25  was a long time ago.

```
1              GURNEY - CONFIDENTIAL
2         Q.    Mr. Gurney, have you ever
3    filed for bankruptcy?
4         A.    I have.
5         Q.    When was that?
6         A.    I don't recall.
7         Q.    Approximately, do you have a
8    sense?
9         A.    I don't.
10        Q.    Can you describe the events
11   that led up to your bankruptcy?
12        A.    I don't recall.
13        Q.    You don't recall anything that
14   contributed to why you filed for
15   bankruptcy?
16        A.    I don't recall.
17        Q.    As part of your bankruptcy did
18   you have to -- did you have to receive
19   any financial management training?
20        A.    I don't recall.
21             MS. YOUNG:  Let's look at tab
22        1, Megan. And this will be Exhibit
23        116 -- 117.
24             (Exhibit 117, Certificate from
25        Abacus Credit Counseling Agency was
```

Page 38

```
 1              GURNEY - CONFIDENTIAL
 2         received and marked on this date
 3         for identification.)
 4         Q.    Do you recognize this
 5    document, Mr. Gurney?
 6         A.    I see the document.
 7         Q.    And do you see where it says,
 8    "I certify that on January 18, 2015
 9    Joseph Gurney received from Abacus Credit
10    Counseling Agency approved pursuant to 11
11    U.S.C. Section 111 to provide credit
12    counseling in the Eastern District of
13    North Carolina." Do you see that?
14         A.    I do.
15         Q.    Does this refresh your
16    recollection that you received any
17    financial management training as part of
18    your bankruptcy proceeding?
19              MR. KIM:  Objection to form.
20         It's a certificate of credit
21         counseling. So --
22         Q.    Mr. Gurney --
23              MR. KIM:  -- it
24         mischaracterizes the document.
25         Q.    -- did you receive any
```

```
                                            Page 39
 1                GURNEY - CONFIDENTIAL
 2    financial management credit counseling in
 3    connection with your bankruptcy
 4    proceeding?
 5         A.    It appears that that
 6    certificate says that I did.
 7         Q.    But you don't recall anything
 8    about that training?
 9         A.    I don't recall.
10         Q.    Did you complete a personal
11    financial management training conducted
12    by Sage Personal Finance in connection
13    with your bankruptcy proceeding?
14         A.    What was the question?
15         Q.    Did you complete a personal
16    financial management training that was
17    presented by Sage Financial in connection
18    with your bankruptcy proceeding?
19         A.    That certificate says --
20               (Connection interruption.)
21               MS. YOUNG: I think that --
22          sorry, Mr. Gurney, is he still
23          there?
24               VIDEOGRAPHER:  He's going in
25          and out. He's obviously in a bad
```

```
                                        Page 40
 1              GURNEY - CONFIDENTIAL
 2         reception area. Maybe we should go
 3         off the record momentarily.
 4         A.    I don't recall.
 5              MR. KIM:  He's back.
 6         Q.    Sorry. What don't you recall,
 7    Mr. Gurney?
 8              MS. YOUNG:  He's frozen on my
 9         end, at least.
10              VIDEOGRAPHER:  It's a really
11         bad reception area.
12              (Connection interruption.)
13              VIDEOGRAPHER:  I suggest we go
14         off the record.
15              MS. YOUNG:  I think we have
16         to.
17              VIDEOGRAPHER:  Okay. Going off
18         the record. The time is 10:54 a.m.
19              (Recess is taken.)
20              VIDEOGRAPHER:  We're back on
21         the record. The time is 11:46 a.m.
22         This is the beginning of Media Unit
23         2.
24         Q.    So we're going back on the
25    record after taking a break after
```

Page 41

GURNEY - CONFIDENTIAL

1
2    experiencing some bad connection on the
3    witness' end.
4              Mr. Gurney, are you now in a
5    location where you'll have stable
6    internet connection?
7         A.    I'm not sure. It's technology.
8    I hope so.
9         Q.    Mr. Gurney, your counsel
10   represented to us that you would be free
11   today on April 14th beginning at 10 a.m.
12   to be deposed in this action, right?
13        A.    Right.
14        Q.    And I believe you testified
15   earlier that you have many places you
16   need to drive today, right?
17        A.    But I'm free to facilitate
18   this deposition, yes, and breaks are
19   generally allowed or allocated under
20   deposition, right?
21        Q.    Of course. Of course. But did
22   you -- but did you schedule actual work
23   to conduct during the middle of this
24   deposition --
25        A.    I don't know what to tell you.

Page 42

                    GURNEY - CONFIDENTIAL

1
2    What I'm articulating to you is I'm
3    available. Now, you can surmise or deduct
4    what you want from that.
5              I'm available to answer your
6    questions as best as I can recollect.
7    Right?
8         Q.   Well, you haven't been
9    available, Mr. Gurney. We've had to go
10   off the record several times because --
11             MR. KIM:  Look, he's available
12        now.
13             MS. YOUNG:  Let me finish,
14        Phil.
15             MR. KIM:  Look, you're not
16        arguing with him about whether he's
17        available or not. If you are going
18        to sit here and argue with him
19        about whether he's available or
20        he's not, I'm not going to allow
21        it.
22             Let's turn to the questions
23        about what we're here for today,
24        not about scheduling issues.
25        Q.   Mr. Gurney, did you tell your

Page 43

                    GURNEY - CONFIDENTIAL

1      counsel that you'd be working today

2

3      during the deposition?

4                  MR. KIM:  Look, that's

5          attorney-client privilege. I am

6          going to direct the witness not to

7          answer the question.

8          Q.   Did you tell your client --

9      your counsel that you'd be in and out of

10     internet connection today?

11                 MR. KIM:  Again, I'm going to

12         direct him not to answer. How can

13         you predict if the internet is

14         going to work or not work.  This is

15         ridiculous.

16         Q.   Did you tell your counsel that

17     you would be taking this -- sitting for

18     your deposition while driving?

19                 MR. KIM:  Look, I'm going to

20         direct him not to answer these

21         questions. You are asking for

22         communications that he's had with

23         us. So why don't we move on with

24         the deposition. The connection is

25         working fine now, so let's go.

```
                                          Page 44
 1                 GURNEY - CONFIDENTIAL
 2         Q.     You've been deposed before,
 3    Mr. Gurney, right?
 4         A.     Yes.
 5         Q.     Were you driving during those
 6    depositions?
 7                 MR. KIM:  I think you cut out
 8         there. What was the question?
 9         Q.     Mr. Gurney, in your prior
10    depositions were you driving while you
11    were being deposed? I think he's frozen.
12                 MR. KIM:  Mr. Gurney, did you
13         hear the question?
14                 THE WITNESS:  I did.
15         Q.     Can you answer the question,
16    Mr. Gurney?
17                 MR. KIM:  I don't think we got
18         your answer.
19         A.     Was I driving during each
20    deposition that I've been deposed?
21         Q.     In any other deposition that
22    you've -- where you've been deposed, have
23    you been driving during the deposition?
24         A.     I don't want to assume or
25    speculate. I can't recall.
```

Page 45

```
1              GURNEY - CONFIDENTIAL
2              MS. YOUNG:  I don't think his
3         connection is stable right now.
4              VIDEOGRAPHER:  We're getting a
5         bad reception indication from Zoom.
6              THE WITNESS:  I can hear you
7         fine.
8              MR. KIM:  You want to repeat
9         your answer? I think you hit a
10        little bubble of bad connection.
11             VIDEOGRAPHER:  We're still in
12        that bubble. I'm getting a low
13        bandwidth from the witness' Zoom.
14             THE WITNESS:  I answered the
15        question.
16             MR. KIM:  Can you answer it
17        again? There was a bad connection.
18        A.    I don't recall. I don't want
19   to assume or speculate.
20             MS. YOUNG:  Okay. Megan, let's
21        go ahead and mark tab 1, and this
22        will be Exhibit 116.
23             (Exhibit 116, remarked, Abacus
24        Certificate of Credit Counseling
25        was received and marked on this
```

```
                                              Page 46
 1              GURNEY - CONFIDENTIAL
 2         date for identification.)
 3              MR. KIM:  I think we already
 4         have a 116. Last one was 117.
 5              MS. YOUNG:  I think that was
 6         previously that's just on the file
 7         name.  The sticker on it is Exhibit
 8         2.
 9              MR. KIM:  116, the file name
10         is wrong.  That's Exhibit 2. I
11         gotcha.
12              MS. YOUNG:  Right.
13         Q.    Megan, will pull it up on
14    screen share so you can see it, Mr.
15    Gurney.
16              I think I asked you a little
17    bit earlier do you recall completing a
18    personal financial management training
19    from Sage Personal Finance?
20         A.    I don't recall.
21         Q.    Okay. This is 118.
22              (Exhibit 118, Sage Personal
23         Finance certificate was received
24         and marked on this date for
25         identification.)
```

```
                                        Page 47
 1              GURNEY - CONFIDENTIAL
 2         A.    I recall you showing me the
 3    document.
 4         Q.    I think that was for a
 5    different training certificate. So this
 6    one is titled certificate of debtor
 7    education from Sage Personal Finance.
 8              Do you see where it says, "I
 9    certify that on" -- sorry -- "I certify
10    that on April 7th, 2015 Joseph Gurney
11    completed a course on personal financial
12    management given by sage personal finance
13    and approved provider of debtor education
14    in the Eastern District of North
15    Carolina?"  Do you see that?
16         A.    I do.
17         Q.    And does this refresh your
18    recollection that you completed a course
19    on personal financial management in 2015
20    in connection with your bankruptcy
21    proceedings?
22         A.    It does not. I don't recall
23    it.
24         Q.    Did the way that you managed
25    your finances change in the aftermath of
```

```
                                            Page 48
 1              GURNEY - CONFIDENTIAL
 2    your bankruptcy?
 3              MR. KIM:  Objection, vague.
 4         Q.    You can answer, Mr. Gurney.
 5         A.    What's the question? Did the
 6    management of my finances change?
 7         Q.    Did the way that you managed
 8    your personal finances change in the
 9    aftermath of your bankruptcy?
10              MR. KIM:  Same objection.
11         Q.    You can answer.
12         A.    I don't think so.
13         Q.    Prior to your bankruptcy did
14    you invest in the stock market?
15         A.    I can't recall.
16         Q.    Do you recall when about you
17    started investing in the stock market?
18         A.    I cannot.
19         Q.    Do you recall how you started
20    investing in the stock market, like, what
21    platform you used?
22         A.    I cannot.
23         Q.    You're a Robinhood customer,
24    correct?
25         A.    I used Robinhood, yes.
```

```
                                          Page 49
 1              GURNEY - CONFIDENTIAL
 2         Q.    Are you still a Robinhood
 3    customer?
 4         A.    No.
 5         Q.    Do you know when you closed
 6    your account?
 7         A.    I don't. I haven't had the app
 8    or used that platform in some time but I
 9    cannot assume or speculate when or how.
10         Q.    When did you first hear about
11    Robinhood?
12         A.    I don't recall.
13         Q.    When you were a Robinhood
14    customer, how frequently would you trade
15    on the app?
16         A.    I don't recall.
17         Q.    Did you often look at things
18    on Robinhood, such as your actual
19    portfolio or company information without
20    actively trading?
21         A.    I don't recall.
22         Q.    Do you recall any features
23    that you used on the Robinhood app?
24         A.    I do not.
25         Q.    Other than Robinhood, have you
```

```
                                        Page 50
 1              GURNEY - CONFIDENTIAL
 2   ever used any other brokerages to invest
 3   in the stock market?
 4        A.    I can't recall.
 5        Q.    Have you ever invested on
 6   behalf of anyone else?
 7        A.    I can't recall.
 8        Q.    Have you ever hired an
 9   investment or financial advisor?
10        A.    I can't recall.
11        Q.    How much time do you devote to
12   investing?
13              MR. KIM:  Objection, vague.
14        A.    Currently?
15        Q.    Yes, currently.
16        A.    How much time do I currently
17   -- what's the question again? How much
18   time do I what?
19        Q.    Devote to investing.
20        A.    I don't want to assume or
21   speculate. Very little to none.
22        Q.    And in the past have you spent
23   -- dedicated more time to investing than
24   you do now?
25        A.    I don't want to assume or
```

Page 51

```
 1            GURNEY - CONFIDENTIAL
 2   speculate on times.
 3        Q.    I definitely don't want you to
 4   assume or speculate, Mr. Gurney. But do
 5   you have any recollection of spending
 6   more time --
 7        A.    I don't.
 8        Q.    -- than you currently spend?
 9        A.    I don't.
10        Q.    How would you describe your
11   investment philosophy?
12        A.    I buy stocks at the time that
13   I like.
14        Q.    Can you expand on that? How do
15   you decide what stocks you like?
16        A.    If I like them, I buy them. If
17   it's somebody that I've used or asked
18   that I like I'll buy the stock.
19        Q.    And how do you determine
20   whether or not you like the stock? What
21   sorts of information do you rely upon?
22        A.    What's that? What form of
23   information do I rely on? I don't want to
24   assume or speculate on that. I don't -- I
25   pick a company that I like and I acquire
```

Page 52

                    GURNEY - CONFIDENTIAL

1
2   the stock.
3        Q.    And what factors contribute to
4   whether or not you like a stock?
5        A.    I told you if I'm familiar or
6   used that product or company or have used
7   it in the past.
8        Q.    So experience with the product
9   or service that the company provides,
10  that's how you determine whether or not
11  you like a stock?
12       A.    That's part of it, yes.
13       Q.    What other factors contribute
14  to whether or not you like a stock?
15       A.    If I like what service they
16  provide.
17       Q.    Are there any other
18  considerations --
19       A.    No.
20       Q.    -- that contribute to your
21  decision?
22             Do you research the specific
23  company online before making a -- before
24  purchasing a stock?
25       A.    I wouldn't say that I do.

```
                                        Page 53
```

1                   GURNEY - CONFIDENTIAL

2          Q.     So you don't, for instance,

3    read SEC filings from the company?

4          A.     Not that I can recall.

5          Q.     Do you consider things like

6    earnings announcements?

7          A.     No.

8          Q.     Did you ever research the

9    stock on social media?

10         A.     No.

11         Q.     Can you walk me through how

12   you make a decision about when to sell a

13   stock?

14         A.     When I feel like I want to

15   sell it.

16         Q.     And what contributes to that

17   decision? Besides -- when do you feel

18   like you want to sell it?

19              MR. KIM:   Objection, vague.

20         A.     I don't want to assume or

21   speculate why I choose to sell a stock. I

22   can't tell you. I just choose to make a

23   purchase or choose to sell when I feel

24   like it.

25         Q.     And you can't tell me or

```
                                        Page 54
```

 1              GURNEY - CONFIDENTIAL
 2    provide any color on why you feel like
 3    you want to sell a stock at a certain
 4    time?
 5         A.    No.
 6         Q.    Do you keep up-to-date on news
 7    about the stock market?
 8         A.    No.
 9         Q.    Are there any particular news
10    segments or programs that you follow for
11    investing?
12         A.    No.
13         Q.    Do you subscribe to any
14    newsletters about investing?
15         A.    No.
16         Q.    Do you listen to any podcasts
17    about the market or investing?
18         A.    No.
19         Q.    Do you watch any television
20    show about the market or investing?
21         A.    No.
22         Q.    Do you follow any social media
23    sources for advice about the market or
24    investing?
25         A.    No.

Page 55

```
 1              GURNEY - CONFIDENTIAL
 2      Q.    Do you consider yourself an
 3  experienced investor?
 4            MR. KIM:  Objection, vague.
 5      Q.    Mr. Gurney, you can answer.
 6      A.    What's that?
 7      Q.    Do you consider yourself an
 8  experienced investor?
 9            MR. KIM:  Same objection.
10      A.    Have I invested? Yes.
11      Q.    Do you consider yourself an
12  experienced investor?
13            MR. KIM:  Same objection.
14      A.    I think that's perception. I
15  don't know what each person's perception
16  is. My perception is I invest on how I
17  see fit. I don't assume or speculate my
18  knowledge or expertise on that. That's
19  what I can say.
20      Q.    When you opened your Robinhood
21  account you described yourself as having
22  a high risk tolerance when you invest,
23  right?
24            MR. KIM:  Objection to form.
25      Q.    You can answer, Mr. Gurney,
```

Page 56

```
 1            GURNEY - CONFIDENTIAL
 2   I'm not sure I heard you.
 3        A.    I can't recall.
 4        Q.    Let's take a look at a
 5   document.
 6              Megan, will you pull up tab
 7   11? And this will be Exhibit 119. And I
 8   believe it's on Exhibit Share now and
 9   Megan is going to screen share it.
10              (Exhibit 119, Account Master
11        from Robinhood re: Joseph Gurney
12        information, Bates RHMDL00097255
13        was received and marked on this
14        date for identification.)
15              MR. KIM:  I see it.
16        Q.    So I put in front of you a
17   document called an Account Master that
18   Robinhood produced in connection with
19   this action. That's your name at the top,
20   right?
21        A.    That's the name Joseph Gurney,
22   yes.
23        Q.    Is the email address that's
24   listed here your email?
25        A.    It appears so, yes.
```

```
                                        Page 57

 1              GURNEY - CONFIDENTIAL
 2        Q.      Now, if you look to the third
 3   page, do you see under Brokerage,
 4   "likelihood to withdraw" -- excuse me --
 5   under Brokerage the risk tolerance where
 6   it says "higher"?
 7        A.      I do.
 8        Q.      Does this refresh your
 9   recollection that when you opened your
10   Robinhood account you described yourself
11   as having a high risk -- a higher risk
12   tolerance?
13        A.      I see what it says but I don't
14   recall opening that account or anything
15   that I did leading up to that account. I
16   do not recall.
17        Q.      Sitting --
18        A.      I see what you're showing me,
19   yes.
20        Q.      Sitting here today, would you
21   characterize your risk tolerance as being
22   high when it comes to investing?
23        A.      Currently?
24        Q.      Yeah.
25        A.      No.
```

Page 58

1                     GURNEY - CONFIDENTIAL

2          Q.     And has that changed?

3          A.     I'm not investing currently.

4          Q.     Do you believe -- in the past

5    would you consider your risk tolerance

6    with respect to investing to have been

7    higher than it is today?

8          A.     I can't say with any

9    certainty.

10         Q.     What factors do you consider

11   when you analyze the riskiness of a

12   particular investment?

13         A.     Again, I don't.  I look at an

14   item to acquire. If I like it I buy it.

15         Q.     And by "item" do you mean any

16   product or service that the company

17   provides?

18         A.     I mean the stock or investment

19   at that time.

20         Q.     And so you don't consider

21   whether or not it's a high risk

22   investment or not?

23                MR. KIM:  Objection to form.

24         Q.     You can answer.

25         A.     I look at an investment. If I

```
                                        Page 59
```

1           GURNEY - CONFIDENTIAL

2    like the investment I buy it.

3           Q.    Are you familiar with a

4    company called GameStop?

5           A.    Yes.

6           Q.    What kind of company is it?

7           A.    It's -- it's a retail outlet.

8           Q.    Have you ever done any

9    research into GameStop as a potential

10   investment?

11          A.    I can't recall.

12          Q.    Are you familiar with a

13   company called AMC?

14          A.    Yes.

15          Q.    What kind of company is it?

16          A.    Movie theatres, I believe.

17          Q.    And have you done any research

18   into AMC as a potential investment?

19          A.    I can't recall.

20          Q.    You can't recall ever

21   researching AMC as a potential

22   investment, right?

23          A.    No. I bought the stock because

24   I take my kids there and I enjoy the

25   experience.

```
                                                Page 60
 1              GURNEY - CONFIDENTIAL
 2      Q.     You don't know anything about
 3  the finances or profits of AMC?
 4      A.     Currently? No.
 5      Q.     Did you ever?
 6      A.     I can't recall.
 7      Q.     Have you ever looked at AMC's
 8  SEC filings?
 9      A.     I can't recall.
10      Q.     Have you ever looked at AMC's
11  earnings announcements?
12      A.     I can't recall.
13      Q.     Have you ever looked at AMC's
14  press releases?
15      A.     I can't recall.
16      Q.     Have you ever looked at AMC's
17  company financials?
18      A.     I can't recall.
19      Q.     In January 2021 do you recall
20  any company announcements from AMC?
21      A.     I can't recall.
22      Q.     Do you recall any news about
23  AMC in January 2021?
24      A.     Excuse me. I can't recall.
25      Q.     Are you aware of AMC doing
```

```
                                    Page 61
 1              GURNEY - CONFIDENTIAL
 2   anything differently as a business in
 3   2021?
 4         A.    I can't recall.
 5         Q.    Do you recall any news about
 6   new products or developments at AMC?
 7         A.    I can't recall.
 8         Q.    Did you hear any news that
 9   would impact the value of the company in
10   January 2021?
11         A.    I can't recall.
12         Q.    Did you consume any media
13   about AMC in January 2021?
14         A.    I can't recall.
15         Q.    So you can't recall, you know,
16   hearing or reading anything about AMC in
17   January 2021?
18         A.    I can't recall.
19         Q.    Did you hear about a potential
20   short squeeze in AMC in January 2021?
21         A.    I can't recall.
22         Q.    Did you see any retail
23   investors posting about AMC on social
24   media in January 2021?
25         A.    I can't recall.
```

Page 62

1                    GURNEY - CONFIDENTIAL

2          Q.     Are you familiar with a

3    company called Blackberry?

4          A.     I am.

5          Q.     What kind of company is it?

6          A.     It's a retailer that does

7    phones.

8          Q.     What kind of phone do you

9    have, Mr. Gurney?

10                 MR. KIM:   Right now?

11         A.     Right now?

12         Q.     A-hum.

13         A.     What, personal phone? Work

14   phones? House phones?

15         Q.     Work phones.

16         A.     What are you talking about?

17         Q.     What phone are you using right

18   now for this deposition?

19         A.     What phone am I on currently,

20   is your question?

21         Q.     Right. Is it an iPhone?

22         A.     It is.

23         Q.     Do you have any other

24   cellphones?

25         A.     I do.

```
                                              Page 63
```

 1            GURNEY - CONFIDENTIAL
 2        Q.      What kind of cellphones are
 3    those?
 4        A.      Umm, to be honest, I don't
 5    know all the phones that I have. I've got
 6    five or six phones.
 7        Q.      What are all those phones for?
 8        A.      My kids have phones. You mean
 9    that I pay for?
10        Q.      I don't mean -- I mean phones
11    that you use, not your kids use.
12        A.      How many phones do I have?
13    Currently I have two and they're iPhones.
14        Q.      And in January of 2021 were
15    you also using an iPhone?
16        A.      I can't recall.
17        Q.      Do you have a Blackberry?
18        A.      Currently?
19        Q.      Yes.
20        A.      No.
21        Q.      Have you ever had a
22    Blackberry?
23        A.      I can't recall.
24        Q.      I think you testified earlier
25    that the main factor that you consider in

Page 64

1                GURNEY - CONFIDENTIAL
2    whether or not to invest in a company is
3    whether or not you like its -- the
4    products or services that it provides; is
5    that right?
6          A.    Right. Right. That's correct.
7          Q.    Have you ever done any
8    research into Blackberry as a potential
9    investment?
10         A.    I can't recall.
11         Q.    Do you know anything about the
12   finances or profits of Blackberry?
13         A.    I can't recall.
14         Q.    Have you ever looked at
15   Blackberry's SEC filings?
16         A.    I can't recall.
17         Q.    In January 2021 do you recall
18   any company announcements from
19   Blackberry?
20         A.    I can't recall.
21         Q.    Can you describe any news that
22   you heard about Blackberry in January
23   2021?
24         A.    I can't recall.
25         Q.    Are you aware of anything

Page 65

                    GURNEY - CONFIDENTIAL
1
2   Blackberry was doing differently as a
3   company in January 2021?
4         A.    I can't recall.
5         Q.    Are you aware of any new
6   products or developments that Blackberry
7   announced in January 2021?
8         A.    I can't recall.
9         Q.    Did you hear any news that
10  would impact the value of the company in
11  January 2021?
12        A.    I can't recall.
13        Q.    Did you hear about a potential
14  short squeeze in Blackberry in January
15  2021?
16        A.    I can't recall.
17        Q.    Did you see any retail
18  investors posting about Blackberry on
19  social media in January 2021?
20        A.    I can't recall.
21        Q.    Do you recall hearing about
22  any possible short squeezes in January
23  2021?
24        A.    I can't recall.
25        Q.    Have you heard the term meme

Page 66

1

2    stock before, Mr. Gurney?

3        A.    What's the question?

4        Q.    Have you heard the term meme

5    stock before?

6        A.    I don't recall it.

7        Q.    So to the best of your

8    recollection, you've never heard the term

9    meme stock before?

10       A.    Not that I can recall.

11       Q.    Do you know what a meme is?

12       A.    I don't, not specifically.

13       Q.    Have you ever visited

14   Wallstreetbets on Reddit?

15       A.    I can't recall.

16       Q.    Have you ever gone on Reddit,

17   Mr. Gurney?

18       A.    I can't recall.

19       Q.    You can't recall whether or

20   not you've ever looked at Reddit before?

21       A.    I can't. I can't recall.

22       Q.    Do you know what

23   Wallstreetbets is?

24       A.    I can't recall. Is it -- what

25   is it?

Page 67

1          GURNEY - CONFIDENTIAL

2       Q.     It's a sub-Reddit but I gather

3   that if you've never been on Reddit or

4   don't recall ever being on Reddit before

5   then I assume you're not familiar with

6   it?

7       A.     I don't recall.

8              MS. YOUNG:  Megan, let's do

9       tab 9. And this will be 120.

10             (Exhibit 120, certification

11       with attached Schedule A re: Joseph

12       Gurney was received and marked on

13       this date for identification.)

14      Q.     Can you identify this

15   document, Mr. Gurney?

16      A.     Yes, a-hum.

17      Q.     What is it?

18      A.     Certification.

19      Q.     This is the certification you

20   signed authorizing the Rosen Law Firm to

21   file this action on your behalf, right?

22      A.     Correct.

23      Q.     And the certification lists

24   all of the purchases and sales that

25   plaintiff has made in the affected

Page 68

```
 1              GURNEY - CONFIDENTIAL
 2   securities for which plaintiff seeks
 3   redress pursuant to the claims set forth
 4   in the consolidated Complaint.
 5              And Megan, if you can scroll
 6   down.
 7              Does this accurately display
 8   your trading information at issue in this
 9   action?
10         MR. KIM:  Objection, vague.
11      Q.    You can answer, Mr. Gurney.
12      A.    What's your question? These
13   Blackberry purchases? Did I make them, is
14   what your question is?
15      Q.    I'm asking whether this
16   accurately displays the trades that you
17   are suing on in this action?
18         MR. KIM:  Objection, vague.
19      A.    Yes. A-hum.
20      Q.    So you're only seeking redress
21   for purchases of Blackberry?
22         MR. KIM:  Objection.
23      A.    No.
24      Q.    Why no?
25      A.    I'd like time to consult with
```

Page 69

GURNEY - CONFIDENTIAL

1
2    my counsel.
3         Q.    Well, you can't do that while
4    a question is pending, Mr. Gurney.
5         A.    I don't -- I can't recall
6    currently. I'd have to look at all the
7    documents. I don't -- I don't currently
8    have all of those in front of me, so I
9    can't speculate.
10         Q.    You also traded AMC between
11    January 28th, 2021 and February 4th,
12    2021, correct?
13         A.    I can't recall.
14         Q.    Did these purchases of
15    Blackberry that are listed here begin on
16    January 26th of 2021 -- January 27th,
17    2021, right?
18         A.    That's what it says there.
19         Q.    Did you previously ever trade
20    Blackberry prior to this time?
21         A.    Hang on for me for one second.
22    Okay? Hang on.
23              (Pause in the proceedings.)
24              VIDEOGRAPHER:  Did you want to
25         go off the record, counsel, or just

```
 1              GURNEY - CONFIDENTIAL
 2        stay on for the moment?
 3                MS. YOUNG:  Let's just stay
 4        until he gets back.
 5                VIDEOGRAPHER:  Okay.
 6        Q.    Are you back?
 7        A.    I am back.
 8        Q.    Okay. Mr. Gurney, did you ever
 9   trade Blackberry prior to January 2021?
10        A.    I can't recall.
11        Q.    Did you ever trade AMC prior
12   to January 2021?
13        A.    I can't recall.
14        Q.    Did you trade actively on your
15   Robinhood account prior to January 2021?
16        A.    I can't recall.
17        Q.    Okay. Let's go ahead and look
18   at 13. I can preview for you, Mr. Gurney,
19   the document I'm about to show you
20   includes your trading information from
21   your Robinhood account from December 2020
22   through beginning the March 2021. It has
23   your account number on it. If you want to
24   verify that for yourself I can pull up an
25   account statement but I will represent to
```

```
                                    Page 71
 1              GURNEY - CONFIDENTIAL
 2   you that --
 3              MR. KIM:  We'll accept your
 4        representation that the account
 5        number is the same.
 6        Q.    This is a little bit confusing
 7   so I'll try to walk you through this. But
 8   you can see these transactions are
 9   recorded in Universal Time Coordinated
10   UTC, if you look at maybe the fifth or
11   sixth column at the top. And that's five
12   hours ahead of Eastern Standard Time.
13              At this point in time were you
14   in January 2021 you were living in
15   Georgia, right?
16        A.    What's that, in January of
17   2021?
18        Q.    Of 2021.
19        A.    January of 2021 I'm trying to
20   think back here when I moved. I don't
21   recall. I really don't.
22        Q.    Where did you live before
23   Georgia?
24        A.    In North Carolina.
25        Q.    Okay. So in either Georgia --
```

Page 72

                    GURNEY - CONFIDENTIAL
1    both Georgia and North Carolina are in
2    the Eastern Time zone?
3         A.    Right. Right.
4         Q.    Okay. Thank you.
5               Let's look to the purchases of
6    AMC. If you look at the very first row,
7    do you see where it's a January 26th,
8    2021 trade where you purchased 20 shares
9    of AMC for $5 a share and that was at
10   3:23 UTC, which is 11 p.m. Eastern?
11        A.    I see the document, yes.
12        Q.    Was this the first time you
13   ever bought AMC?
14        A.    I don't recall.
15        Q.    Why did you decide to buy AMC
16   at this time?
17        A.    I liked the stock.
18        Q.    And why did you like the
19   stock?
20        A.    As I said numerous times to
21   you --
22        Q.    A-hum.
23        A.    -- I like the company.
24        Q.    Why didn't you purchase shares

```
                                              Page 73

 1              GURNEY - CONFIDENTIAL

 2    of AMC prior to January 26th?

 3              MR. KIM:  Objection, vague.

 4        A.    I have no idea.

 5        Q.    So you can't talk us through

 6    your thinking about why you decided to

 7    buy AMC at this time aside from the fact

 8    that you liked the stock?

 9        A.    No, I did. I liked the stock.

10    I bought it.

11        Q.    Was there anything in

12    particular that prompted this trade?

13        A.    Not that I can recall.

14        Q.    So you don't recall learning

15    anything new about the company, for

16    instance?

17              MR. KIM:  Objection, asked and

18        answered.

19        A.    I don't recall.

20        Q.    Did you consider this a

21    long-term investment in AMC?

22        A.    I buy a stock that I like and

23    I sell it when I like.

24        Q.    How often do you usually hold

25    onto stocks that you acquire?
```

```
                                              Page 74
 1              GURNEY - CONFIDENTIAL
 2              MR. KIM:  Objection, vague.
 3       A.     Various.
 4       Q.     So typically do you hold
 5  stocks for hours? Days? Weeks? Months?
 6  Years?
 7       A.     It varies, different.
 8       Q.     What determines, you know,
 9  whether or not you hold onto a stock for
10  a long period of time or a shorter period
11  of time?
12       A.     If I like a stock and I want
13  to buy it at that time, I buy it. If I
14  choose at that time to sell it, I choose
15  to sell it.
16       Q.     Had you heard anything about a
17  possible short squeeze in AMC stock
18  around this time?
19              MR. KIM:  Objection, asked and
20       answered.
21       Q.     You can answer, Mr. Gurney.
22       A.     I don't recall.
23       Q.     Later in that day, you know,
24  you can see that you placed and then
25  cancel a number of other AMC orders. So,
```

```
                                            Page 75
 1              GURNEY - CONFIDENTIAL
 2    for instance, in the third row at 22:43
 3    UTC you place an order and then you
 4    cancel it.  You can see the cancellation
 5    and the order cancelled at UTC column.
 6              Do you see those
 7    cancellations?
 8         A.    I see the document, yes.
 9         Q.    Do you often cancel orders
10    after placing -- do you often cancel
11    purchase orders you place for certain
12    stocks?
13              MR. KIM:  Objection, vague.
14         A.    I buy a stock when I want to
15    buy it and I sell it when I think that I
16    want to sell it.
17         Q.    Do you recall ever cancelling
18    purchase orders for stocks?
19         A.    I don't recall.
20         Q.    Do you recall why you
21    cancelled any of these orders of AMC
22    stock?
23         A.    I don't recall.
24         Q.    Do you recall the price of AMC
25    rising at the end of January 2021?
```

Page 76

1                 GURNEY - CONFIDENTIAL

2        A.     I don't recall.

3        Q.     On January 27th at 18:03 UTC,

4   which I think is 2 p.m. Eastern, you

5   purchase 1.2 shares of AMC for $15.73.

6   It's about two-thirds of the way down the

7   page. Do you see that?

8        A.     Yes, I see the document.

9        Q.     So AMC had gone up in price by

10  about $10 a share from your purchase the

11  day before on the 26th when you purchased

12  AMC for about $5.19 a share, right?

13       A.     I don't recall.

14       Q.     Well, do you see -- do you see

15  the price differential here?

16       A.     I do. I do, yes.

17       Q.     Okay. So that was roughly a

18  three times increase in the price that

19  you purchased the shares of AMC for on

20  January 26th, right?

21       A.     I see what the document says,

22  yes.

23       Q.     Do you consider that a

24  significant price increase?

25                 MR. KIM:  Objection, vague.

1                GURNEY - CONFIDENTIAL

2        Q.     You can answer it.

3        A.     What's the question? Do I

4   consider that significant?

5        Q.     Do you consider --

6        A.     No.

7        Q.     So what would you consider a

8   significant increase in the price of the

9   share?

10       A.     I don't -- the terminology is

11  vague.

12       Q.     Do you have any understanding

13  why the share price of AMC increased so

14  significantly between January 26 and

15  January 27, 2021?

16              MR. KIM:  Objection.

17       A.     I don't know.

18       Q.     Did you think that the price

19  of AMC's shares was justified by the

20  underlying fundamentals of the company?

21              MR. KIM:  Objection, calls for

22       speculation.

23       Q.     You can answer.

24       A.     I can't -- I can't recall.

25       Q.     Why did you decide to purchase

```
 1              GURNEY - CONFIDENTIAL
 2   more shares of AMC on January 27th?
 3        A.    I don't recall.
 4        Q.    Did you think that the price
 5   of AMC was going to increase further
 6   after this point in time on January 27th,
 7   2021?
 8        A.    I don't recall.
 9        Q.    Let's look at the trades of
10   Blackberry. So three rows from the bottom
11   at 15:25 you purchased 2.14 shares of
12   Blackberry for $22.41 a share. Do you see
13   that?
14        A.    I do see the sheet, yes.
15        Q.    Is this the first time you
16   ever bought Blackberry?
17        A.    I don't recall.
18        Q.    Why did you decide to buy
19   Blackberry at this time?
20              MR. KIM:  Objection, asked and
21        answered.
22        A.    I don't recall.
23        Q.    Is there anything in
24   particular that prompted you to make this
25   trade in Blackberry?
```

```
                                              Page 79
```

1                   GURNEY - CONFIDENTIAL

2          A.      I don't recall.

3          Q.      Did you hear any company

4    announcements at this time in January

5    2021 related to Blackberry?

6          A.      I don't recall.

7          Q.      If you scroll, I guess it's at

8    the top of the next page, in the second

9    row it looks like 45 minutes after this,

10   your first Blackberry trade, you purchase

11   another 2.25 shares of Blackberry at

12   $23.31 a share -- or 23.12 a share.

13         A.      Where are you? I'm having

14   trouble following along.

15         Q.      2.25.

16         A.      Order quantity, I see that.

17         Q.      Do you see that, for $23.31 a

18   share?

19         A.      I see the sheet, yes.

20         Q.      So why did you decide to buy

21   more shares of Blackberry at this time?

22         A.      I don't recall.

23         Q.      Did you learn any new

24   information about Blackberry that made

25   you believe that the company was

```
                                    Page 80
 1           GURNEY - CONFIDENTIAL
 2    undervalued?
 3         A.    I don't recall.
 4         Q.    And roughly two hours after
 5    that, at 18:04 you purchase 4.41 at
 6    $28.27 cents a share?
 7         A.    I see the sheet.
 8              MR. KIM:  Those are the order
 9         prices. I think the execution
10         prices -- I don't know the
11         difference between the two, so I
12         don't -- is there a difference?
13              MS. YOUNG:  I think that the
14         order price is what he paid.
15              MR. KIM:  And what's execution
16         price?
17              MS. YOUNG:  Let's just say --
18         let's just say, you know, purchases
19         between 22 and 23 dollars per
20         share.
21              MR. KIM:  Oh, I see that's the
22         delta that Robinhood makes,
23         probably, right?
24              MS. YOUNG:  Right.
25              MR. KIM:  I gotcha.
```

```
                                      Page 81

 1              GURNEY - CONFIDENTIAL
 2        Q.    So the share price was
 3   continuing to increase since you made
 4   purchases of Blackberry earlier in the
 5   day, right?
 6        A.    I don't recall.
 7        Q.    Well, just looking at the
 8   actual prices of these trades, right, so,
 9   you know, you've got order prices for
10   22.41 and then you've got -- they're
11   increasing throughout the day when you're
12   purchasing more shares later at $23 per
13   share, right?
14        A.    I see the sheet.
15        Q.    But is there any reason you
16   bought more shares of Blackberry at this
17   point in time specifically?
18        A.    I don't recall.
19        Q.    Now, at 18:57 you buy I think
20   it's 7.4 more shares of Blackberry for
21   about $28 a share, right?
22        A.    I see the sheet.
23        Q.    Do you have any recollection
24   of why you made this trade at this time?
25        A.    I don't recall.
```

Page 82

                    GURNEY - CONFIDENTIAL

1

2       Q.    And two minutes after that at

3    18:59 you buy 24 shares at $28.22 a

4    share. Do you see that? This is three

5    rows from the bottom.

6       A.    I see the sheet.

7       Q.    Do you know why you placed

8    this trade?

9       A.    I don't recall.

10      Q.    Do you often trade the same

11   security multiple times during the --

12   during a single day?

13              MR. KIM:  Objection, vague.

14      A.    I buy a stock when I choose to

15   buy it and I sell it when I want to sell

16   it.

17      Q.    Do you ever trade the same

18   security multiple times during the same

19   day?

20      A.    I don't recall.

21      Q.    But will you acknowledge that

22   you did so on this day, on January 27th,

23   2021, you traded -- you made multiple

24   trades in Blackberry on the same day?

25      A.    I see the paper and what it

GURNEY - CONFIDENTIAL

1

2    says, yes.

3         Q.    And nobody else was trading in

4    your Robinhood account at that time,

5    right?

6         A.    No.

7         Q.    You were placing these trades,

8    right?

9         A.    Yes.

10        Q.    And you continued to buy the

11   stock throughout the day, right?

12        A.    What's that?

13        Q.    You continued to buy

14   Blackberry throughout the day?

15        A.    What does it say there?

16        Q.    I'm not sure I understand your

17   question.

18        A.    Well, you said I continued to

19   buy throughout the day.

20        Q.    You continued to buy

21   throughout the day on January 27th, 2021,

22   right?

23        A.    That's what the sheet says,

24   yes.

25        Q.    Is that because you thought

                                          Page 84

1                    GURNEY - CONFIDENTIAL

2      that the price of Blackberry would

3      increase?

4           A.    I don't recall.

5           Q.    Why didn't you just execute a

6      single order for Blackberry, like, one

7      trade?

8           A.    I don't recall.

9           Q.    Other than the stocks that

10     we've discussed, AMC and Blackberry, did

11     you consider trading any other stocks

12     around this time?

13          A.    I don't recall.

14          Q.    Mr. Gurney, you're aware that

15     Robinhood implemented certain purchases

16     restrictions on its platform on January

17     28, 2021, right?

18          A.    I don't recall.

19          Q.    I think earlier today you

20     testified that you brought suit against

21     Robinhood because Robinhood suspended I

22     think you referred to it as the buy

23     button, right?

24          A.    Right.

25          Q.    But you don't recall whether

```
 1              GURNEY - CONFIDENTIAL
 2    or not Robinhood implemented certain
 3    purchase restrictions around this time?
 4         A.    I don't know what restrictions
 5    they implemented. I know that I could not
 6    complete actions at that time, yes.
 7         Q.    Okay. So you're aware that
 8    Robinhood implemented those restrictions
 9    on its platform on January 28th, right?
10         A.    I don't know what they
11    implemented. I don't want to assume or
12    speculate. I know that I could not
13    complete those transactions and those
14    obvious restrictions were in place that I
15    could not facilitate that action.
16         Q.    What actions were you trying
17    to take?
18         A.    I was trying to buy and sell
19    stocks.
20         Q.    Buy what? What stocks were you
21    trying to buy?
22         A.    I can't recall specifics.
23         Q.    But your testimony is today
24    that you tried to place orders on
25    Robinhood's platform on January 28th and
```

```
                                              Page 86
 1              GURNEY - CONFIDENTIAL
 2    you were unable to place those orders?
 3              MR. KIM:  That's not what he
 4        said. But objection to form.
 5        Q.    What were you unable to sell
 6    on Robinhood?
 7        A.    Robinhood hit the stop button
 8    on those transactions. I can't recall
 9    what each transaction was.
10        Q.    What do you mean by "the stop
11    button"?
12        A.    Market manipulation.
13        Q.    Can you explain again what
14    actions you were trying to take on
15    Robinhood's platform that you were unable
16    to?
17        A.    I can't recall each specific
18    transaction.
19        Q.    Were there orders that you
20    wanted to place to purchase certain
21    shares that you were unable to purchase
22    on Robinhood's platform?
23        A.    Yes.
24        Q.    What stocks?
25        A.    I can't recall.
```

Page 87

                    GURNEY - CONFIDENTIAL

1  
2       Q.     And when were you unable to do
3  this?
4       A.     I can't recall.
5       Q.     And did you testify you were
6  also unable to sell certain securities on
7  Robinhood's platform around this time?
8       A.     I would have to -- to go back
9  and look and see. I can't recall each
10  transaction or those transactions that I
11  was -- each one of that time period.
12      Q.     So for the stop button that
13  you described, how did you become aware
14  of that?
15      A.     Umm, I became aware of it,
16  umm, a few days later from, umm, or
17  sometime later from a friend.
18      Q.     I thought you testified that
19  you wanted to purchase certain shares and
20  were unable to do that at the time?
21      A.     Right.
22      Q.     So were you not aware of
23  issues or with a restriction on
24  Robinhood's platform at that time?
25      A.     I was but I didn't know why.

```
                                           Page 88
```

1                GURNEY - CONFIDENTIAL

2        Q.    So what is it that you heard

3    from a friend later?

4        A.    That there was market

5    manipulation, that they hit the stop

6    button.

7        Q.    But you were previously aware

8    that they had hit the stop button, as you

9    described it, right?

10       A.    I was aware that I was unable

11   to complete those transactions, that's

12   correct.

13       Q.    Right. So when you tried to

14   trade, you didn't see the purchase

15   button? You weren't able to complete that

16   trade, right?

17       A.    Right. I was not able to trade

18   that stock, yes.

19       Q.    So what is it you're -- more

20   precisely that your friend told you a few

21   days after about those restrictions?

22       A.    That's what he said.

23       Q.    And what was that again?

24       A.    That it was market

25   manipulation and they hit the stop

```
                                          Page 89
 1              GURNEY - CONFIDENTIAL
 2    button.
 3         Q.    Who is this friend?
 4         A.    What's that?
 5         Q.    Who is the friend that you
 6    were speaking with about this?
 7         A.    His name was David.  I don't
 8    recall his last name.
 9         Q.    Do you recall reviewing any
10    information on the Robinhood app
11    regarding the restrictions?
12         A.    I don't recall.
13         Q.    Do you recall --
14         A.    Hang on for me for one second.
15    Give me about two minutes.
16              MR. KIM:  Maybe we take five
17         minutes.
18              MS. YOUNG:  Yeah. Can we
19         actually do ten?
20              MR. KIM:  Ten? All right.
21              VIDEOGRAPHER:  All right.
22         Going off the record. The time is
23         12:43 p.m.  This is the end of
24         Media Unit 2.
25              (Recess is taken.)
```

Page 90

1          GURNEY - CONFIDENTIAL

2               VIDEOGRAPHER:  We're back on

3          the record. The time is 1:01 p.m.

4          This is the beginning of Media Unit

5          3.

6          Q.    Mr. Gurney, right before the

7     break we were talking about issues or an

8     issue you had trying to trade on

9     Robinhood's app in January 2021, right?

10         A.    Right.

11         Q.    I know you don't recall the

12    stocks you were trying to trade but can

13    you just explain to me what issue you had

14    trying to trade on Robinhood's app in

15    January 2021?

16         A.    It would not allow me to

17    trade.

18         Q.    Were there orders that you

19    wanted to place to sell certain shares

20    that you were unable to sell on

21    Robinhood's platform?

22         A.    The attempts that I made at

23    that time were not allowed. They were

24    restricted in scope.

25         Q.    And were the attempts that you

Page 91

1                    GURNEY - CONFIDENTIAL

2    were trying to make, were those to

3    purchase or sell shares?

4         A.    I can't recall -- what's that?

5         Q.    I said, and were those

6    attempts that you were trying to make,

7    were those to purchase or sell shares?

8         A.    I can't recall the specifics.

9               MS. YOUNG:  Megan, let's look

10        at previously marked Exhibit 6.

11        We're going to pull up a document

12        for you, Mr. Gurney.

13               (Exhibit 6, Robinhood document

14        entitled Keeping Customers Informed

15        Through Market Volatility, Bates

16        RHMDL0002200, having been

17        previously marked, is shown to the

18        Deponent.)

19        Q.    I think it should be available

20    in Exhibit Share but we'll also screen

21    share it.

22               Mr. Gurney, does this look

23    familiar to you?

24        A.    No, it doesn't.

25        Q.    So now, if we go to the text,

```
                                              Page 92
 1              GURNEY - CONFIDENTIAL
 2    Megan, if you can scroll a little bit, do
 3    you see there's this paragraph, this is
 4    the second paragraph about "restricting
 5    transactions for certain securities to
 6    position closing only including AMC,
 7    Blackberry", and a couple of other
 8    stocks? Do you see that?
 9         A.    I do see the paper.
10         Q.    And did you understand -- do
11    you understand position closing only to
12    refer to the buy button that I think you
13    mentioned earlier?
14         A.    What's your question?
15         Q.    The issues that you were
16    having with the buy button, does that
17    refer -- is it your understanding that
18    refers to the position closing only
19    change that was made at this time on
20    January 28th, 2021?
21         A.    I don't know about the
22    verbiage or, excuse me, the vernacular
23    that you're using. I can say that I was
24    unable to complete transactions. I see
25    this paperwork in front of me. I don't
```

Page 93

                    GURNEY - CONFIDENTIAL
 1
 2   recall it. I do not recall it.
 3        Q.     And you don't recall what
 4   securities you were trying to trade that
 5   you weren't able to at this time, right?
 6             MR. KIM:  Objection to form.
 7        Q.     Do you recall what securities
 8   you were trying to trade that you weren't
 9   able to trade at that time, Mr. Gurney?
10        A.     Yes. Blackberry and AMC were
11   the transactions I believe that I was
12   unable to facilitate.
13        Q.     But you don't recall whether
14   or not you were trying to buy or sell
15   shares of Blackberry or AMC at this time?
16        A.     Yes, I was -- I can't recall
17   in detail what those specifics of the
18   transactions were, but I knew that I was
19   trying to make attempts to trade the
20   stock and was not allowed to trade the
21   stock.
22        Q.     Around this time do you recall
23   hearing anything about the reason that
24   Robinhood implemented any restrictions?
25        A.     I do not recall.

Page 94

```
 1              GURNEY - CONFIDENTIAL
 2              MS. YOUNG:  Let's go back to
 3         the pdf Excel that we were just
 4         looking at earlier with your
 5         trades. Megan, can pull it up.
 6         What exhibit number is that?  121?
 7         So we'll pull that back up.
 8              (Exhibit 121, pdf spreadsheet
 9         of trades by Joseph Gurney, Bates
10         RHMDL00097432.001 was received and
11         marked on this date for
12         identification.)
13         Q.   And now, we'll look at your
14    trades from January 28th and let's look
15    first at Blackberry. So if we look at the
16    second page, two rows up from the bottom,
17    here we can see that you placed an order
18    to sell 41.01 shares of Blackberry for
19    $17 on January 28th, right?
20         A.   I see the paper, yes.
21         Q.   Why did you decide to sell
22    these shares of Blackberry at this time?
23         A.   I buy stock when I want to buy
24    and I sell it when I want to sell it.
25         Q.   So what influenced your
```

Page 95

                    GURNEY - CONFIDENTIAL

1

2  decision to sell Blackberry at this time

3  on January 28th?

4        A.    I just wanted to sell the

5  stock.

6        Q.    Why did you want to sell the

7  stock?

8        A.    I don't recall.

9        Q.    Did you read any news about

10  the company around this time?

11        A.    I don't recall.

12        Q.    Did you discuss your decision

13  to sell with anybody?

14        A.    I don't recall.

15        Q.    Do you recall learning or

16  hearing about anything indicating the

17  stock price may decline?

18        A.    I don't recall.

19        Q.    You don't recall why you

20  decided to sell your shares of Blackberry

21  just one day after you bought them?

22        A.    I don't --

23              MR. KIM:  Objection, asked and

24        answered.

25        A.    I don't -- I don't recall.

```
                                            Page 96
 1            GURNEY - CONFIDENTIAL
 2              MS. YOUNG: Let's look the your
 3       trades of AMC on January 28th.
 4       Megan, if you can scroll to the
 5       first page.
 6       Q.    You can see that on January
 7  28th you sold 21.27 shares of AMC for
 8  $8.01 a share. Do you see that? Do you
 9  see that, Mr. Gurney?
10       A.    I see the sheet, yes.
11       Q.    Now, in the time associated
12  with it is 15:31 UTC on January 28. And
13  if we look back at the Blackberry sale
14  that we just looked at, that's the exact
15  time that you sold your shares of
16  Blackberry too, right?
17       A.    I see the sheet.
18       Q.    Why did you sell your shares
19  of AMC and Blackberry at the same time?
20       A.    I don't recall.
21       Q.    Did you consider your AMC and
22  Blackberry investments related?
23       A.    I don't recall.
24       Q.    Do you recall making the sale
25  of AMC?
```

```
                                        Page 97
 1              GURNEY - CONFIDENTIAL
 2              MR. KIM:  Objection, vague.
 3        Q.    You can answer, Mr. Gurney.
 4        A.    What's that?
 5        Q.    Do you recall making this AMC
 6   trade on January 28th?
 7        A.    I don't recall.
 8        Q.    So you don't recall any, you
 9   know, what motivated you to sell AMC on
10   January 28th?
11        A.    I don't recall.
12        Q.    You don't recall learning
13   anything about AMC indicating that the
14   stock price may decline?
15        A.    I don't recall.
16        Q.    If you look back up to the top
17   row your first purchase of 20 shares of
18   AMC on January 26 was for $5.19 a share
19   and you sold on January 28th for more
20   than $8 a share, right?
21        A.    I see the sheet.
22        Q.    So you made a profit selling
23   AMC at this time, right?
24              MR. KIM:  Objection to form.
25        Q.    Mr. Gurney?
```

1              GURNEY - CONFIDENTIAL

2       A.    What's that?

3       Q.    So you made a profit selling

4    AMC at this time, right?

5             MR. KIM:  Same objection.

6             MS. YOUNG:  Is he frozen?

7             MR. KIM:  I think so.

8             VIDEOGRAPHER:  Yes, we have a

9         connection issue again.

10      A.    It would appear so.

11            MR. KIM:  I think he said it

12        appears so.

13            MS. YOUNG:  Can I just ask it

14        again so we have it?

15      Q.    So you made a profit trading

16   AMC at this time, right, in January 2021?

17      A.    I see the sheet. It appears

18   so.

19      Q.    Thank you.  Megan, let's pull

20   up tab 8. I think this will be Exhibit

21   122.

22            (Exhibit 122, Robinhood

23        account statement from January 1st,

24        2021 to January 31st, 2021, Bates

25        RHMDL00093680 was received and

```
                                    Page 99
 1              GURNEY - CONFIDENTIAL
 2         marked on this date for
 3         identification.)
 4         Q.     It should be available on
 5    Exhibit Share now and we'll pull it up. I
 6    can represent to you, Mr. Gurney, that
 7    this is a copy of a Robinhood account
 8    statement from January 1st, 2021 to
 9    January 31st, 2021.
10              I think you can see your name
11    and that was probably your address in
12    North Carolina up at the top.  Do you see
13    that?
14         A.     I do see the sheet.
15         Q.     Thank you. If we go to the
16    section titled Portfolio Summary, so this
17    chart indicates at the end of January
18    2021 a little over 30% of your portfolio
19    was in AMC stocks and that 63% of your
20    portfolio was Blackberry stock, right?
21         A.     I see the sheet, yes.
22         Q.     I think you testified today
23    that you don't currently have any
24    investments in the stock market; is that
25    right?
```

```
                                              Page 100

 1               GURNEY - CONFIDENTIAL
 2        A.     Not that I'm aware of.
 3        Q.     You don't currently own any
 4   shares, any stocks?
 5               MR. KIM:  Objection, asked and
 6        answered.
 7        A.     No, I don't.
 8        Q.     When did you stop investing in
 9   the stock market?
10        A.     I don't recall.
11        Q.     Is it correct that in January
12   2021 you didn't buy or sell any shares of
13   Bed Bath & Beyond?
14        A.     I don't recall.
15        Q.     Do you recall buying or
16   selling any shares of Nokia in January
17   2021?
18        A.     I don't recall.
19        Q.     Did you buy or sell any shares
20   of Express in January 2021?
21        A.     I don't recall.
22        Q.     Did you buy or sell any shares
23   of KOF (ph)?
24        A.     I don't recall.
25        Q.     In January 2021, did you buy
```

```
                                          Page 101

 1            GURNEY - CONFIDENTIAL

 2   or sell any shares of GameStop?

 3        A.    I don't recall.

 4        Q.    In January, 2021 did you buy

 5   or sell any shares of Travago?

 6        A.    I don't recall.

 7        Q.    And in that same period

 8   January 2021 did you buy or sell any

 9   shares of Tootsie Roll?

10        A.    I don't recall.

11        Q.    Did you consider buying any of

12   these -- buying shares of any of those

13   stocks in January 2021?

14        A.    I don't recall.

15        Q.    And to confirm, you don't hold

16   any of these stocks today, right?

17        A.    Not to my knowledge.

18        Q.    Mr. Gurney, what is your role

19   in this lawsuit?

20        A.    I'm a plaintiff in a class

21   action lawsuit.

22        Q.    And what does it mean to be a

23   named plaintiff?

24        A.    A plaintiff in the case.

25        Q.    Do you know what a class
```

```
 1              GURNEY - CONFIDENTIAL
 2   representative is?
 3        A.     Yes.
 4        Q.     What's your understanding of
 5   what a class representative is?
 6        A.     That you're in a group in an
 7   action that is being taken and you're
 8   part of that.
 9        Q.     Are you seeking to be a class
10   representative in this action?
11        A.     That's correct.
12        Q.     And what do you understand
13   your responsibilities to be in this role?
14        A.     To look out for the best
15   interests of all people involved.
16        Q.     How did you first hear about
17   this lawsuit?
18        A.     How did -- what's the
19   question? I'm sorry.
20        Q.     How did you first hear about
21   this lawsuit?
22        A.     I contacted the -- my
23   attorneys that are here, the legal team
24   that currently represents me.
25        Q.     When did you become aware of
```

```
                                          Page 103
```

1              GURNEY - CONFIDENTIAL

2     the Rosen firm?

3          A.    I don't recall.

4          Q.    Why did you reach out to them

5     about this action?

6          A.    I don't recall.

7          Q.    Why do you want to be a named

8     plaintiff?

9          A.    Why do I want to be a named

10    plaintiff?

11         Q.    A-hum.

12         A.    Because there was market

13    manipulation and Robinhood did not allow

14    me to complete trade transactions.

15         Q.    You've mentioned market

16    manipulation a couple of times.

17               What does market

18    manipulation mean to you?

19         A.    Exactly that.

20         Q.    Can you expand on that, Mr.

21    Gurney?

22         A.    It means there were attempts

23    to manipulate the market nefariously.

24         Q.    Who was manipulating the

25    market?

```
1              GURNEY - CONFIDENTIAL
2       A.    What's that?
3       Q.    Who was manipulating the
4   market?
5       A.    The defendant.
6       Q.    Mr. Gurney, a few moments ago
7   we looked at your trades of AMC and
8   Blackberry on January 28th, right?
9       A.    I believe so.
10      Q.    And you were able to sell
11  shares of AMC and Blackberry on January
12  28th, 2021, right?
13      A.    I believe that's correct.
14      Q.    And were you forced to sell
15  those shares?
16            MR. KIM:  Objection, vague.
17      A.    What's that? Am I forced?
18  Define "forced" first.
19      Q.    Did Robinhood require you to
20  sell those shares?
21            MR. KIM:  Same objection.
22      A.    Did Robinhood require me to
23  sell shares of a stock, is what your
24  question is? Is that your question?
25      Q.    To sell your shares of AMC or
```

Page 105

```
 1              GURNEY - CONFIDENTIAL
 2   Blackberry that you sold on January 28th,
 3   2021.
 4        A.    I'm just making sure I hear
 5   the question.
 6        Q.    Right.
 7              MR. KIM:  Same objection.
 8        A.    No, they did not require me
 9   to.
10        Q.    Because you decided to sell
11   because you wanted to sell at that time,
12   right, on January 28th, 2021?
13        A.    I buy stock --
14              MR. KIM:  Objection asked and
15        answered.
16        A.    I buy a stock when I want to
17   buy a stock and I sell it when I want to
18   sell it.
19        Q.    And you wanted to sell your
20   shares of AMC and Blackberry on January
21   28th, 2021, right?
22              MR. KIM:  Same objection.
23        Q.    You can answer, Mr. Gurney.
24              MR. KIM:  Same objection.
25        A.    Yeah. I wanted to complete
```

Page 106

```
 1              GURNEY - CONFIDENTIAL
 2    transactions.
 3         Q.    And you were able to.  You
 4    were able to sell your shares of
 5    Blackberry and AMC on January 28th, 2021;
 6    isn't that right?
 7              MR. KIM:  Objection, asked and
 8         answered.
 9         Q.    You can answer, Mr. Gurney.
10         A.    Was I able to sell at that
11    time those stated stocks as the sheet
12    shows that was presented, is what your
13    question is? I'm just trying to be
14    specific. Is that what you're asking?
15         Q.    Is it --
16         A.    On the date and time that you
17    say you stated, for the record, did --
18    was I able to execute a sale of that --
19    those stocks on the date that the sales
20    were issued? Is that your questions?
21         Q.    Yes. My question is, were you
22    able to sell your shares of AMC and
23    Blackberry on January 28th, 2021?
24         A.    Yes.
25         Q.    And you decided to sell those
```

```
 1              GURNEY - CONFIDENTIAL
 2   shares because you wanted to?
 3              MR. KIM:  How many times are
 4        we going to go over this?
 5        Q.    Right?
 6              MR. KIM:  How many times -- I
 7        mean this is ridiculous.
 8        Q.    You can answer, Mr. Gurney.
 9              MR. KIM:  You're asking him
10        the same question.
11        A.    What is the question again?
12   Yes.  What was the question? What is the
13   question?
14        Q.    You wanted to sell your shares
15   of Blackberry and AMC on January 28th,
16   2021, right?
17              MR. KIM:  Objection, asked and
18        answered.
19        A.    Yes.
20        Q.    And you sold those shares at
21   that time because you felt like it,
22   right?
23              MR. KIM:  No, he looked into a
24        crystal ball. Like,come on.  You
25        ask him the same question over and
```

Page 108

1                GURNEY - CONFIDENTIAL

2         over again.

3         Q.    You can answer, Mr. Gurney.

4         A.    Yes.

5         Q.    And you profited on your AMC

6    trades, right?

7               MR. KIM:  Objection, asked and

8         answered.

9         A.    I saw the paper. It appears

10   so, at that time.

11        Q.    Excluding your deposition

12   today, how much time have you spent on

13   things related to this lawsuit?

14        A.    I don't want to assume or

15   speculate on specifics.

16        Q.    It doesn't need to be a

17   specific answer, even just an approximate

18   sense of how much time you dedicated to

19   this action, aside from preparing for

20   your deposition?

21        A.    I'd say a substantial amount.

22        Q.    A substantial amount, is that

23   what you said?

24        A.    Yes.

25        Q.    So have you read the Complaint

Page 109

1                    GURNEY - CONFIDENTIAL
2    or other filings?
3         A.    I've read the Complaint.
4         Q.    Have you read any of the other
5    filings in this case?
6         A.    I have.
7         Q.    Have you reviewed other
8    documents related to the case in this
9    action?
10        A.    Hang on one second. What's the
11   question? Sorry. I'm looking for
12   something.
13              Go ahead. What was your
14   question? I've reviewed documents on this
15   case, yes.
16        Q.    How frequently have you had
17   meetings or phone calls with counsel?
18        A.    I've met with counsel.
19        Q.    How frequently have you met
20   with counsel or spoken with counsel in
21   this action?
22        A.    I've spoken with counsel
23   during this process, yes.
24        Q.    How frequently have you spoken
25   with counsel in this action?

1                GURNEY - CONFIDENTIAL

2        A.     I don't want to assume or

3    speculate how frequent. It's been a long

4    time. It's been a long increment of time,

5    right? I don't want to make an

6    assumption.

7        Q.     Would you say that you speak

8    with counsel on this action on a weekly

9    basis? A monthly basis?

10        A.     I've spoken to them

11    frequently, I'd say.

12        Q.     I think you testified that

13    you've dedicated a substantial amount of

14    time to this action, right?

15        A.     Right. Right.

16        Q.     What is most of that time --

17    what have you been doing for most of that

18    time?

19        A.     Explain, what's your -- what

20    do you mean?

21        Q.     You said that you dedicated a

22    substantial amount of time to this

23    action.

24        A.     Right.

25        Q.     What has taken so much time?

Page 111

1          GURNEY - CONFIDENTIAL

2          A.      Reviewing documents, speaking

3     to counsel, looking at the Complaint, a

4     substantial amount of time.

5          Q.      Do you know, do you understand

6     what the class is in this lawsuit?

7          A.      Explain.

8          Q.      This is a class action, right?

9          A.      Right.

10         Q.      So who makes up the class in

11    this case?

12         A.      The plaintiffs in the case.

13         Q.      Right. So who are the

14    plaintiffs in this case?

15              (Connection interruption.)

16         A.      That would be -- what's that?

17              MR. KIM:  I think you got to

18         start your answer again. You kind

19         of cut out there.

20         A.      Okay. What was the question?

21    I'm a plaintiff in the case, yes. There

22    are other plaintiffs in the case that are

23    listed in the Complaint that you have a

24    copy of.

25         Q.      What is your understanding of

```
 1            GURNEY - CONFIDENTIAL
 2    Robinhood's business?
 3         A.    Explain. What's your question?
 4    What do you mean? What? I'm confused
 5    about the question. Clarify.
 6         Q.    Is there a latency issue?
 7         A.    What's that?
 8         Q.    I think there's a latency
 9    issue?  Is your internet stable right
10    now?
11         A.    It is. My internet is stable.
12               MR. KIM:  It looks good here.
13         Q.    What do you understand
14    Robinhood's business to be? What is their
15    app? What service do they offer?
16         A.    It's a trade platform.
17         Q.    And what are you alleging that
18    Robinhood did wrong?
19         A.    It hit the stop button. I've
20    said that.
21         Q.    And why is that wrong?
22         A.    Because it's -- it doesn't
23    allow me to trade freely of those
24    specific actions.
25         Q.    And why is that unlawful?
```

```
                                         Page 113
 1              GURNEY - CONFIDENTIAL
 2        A.     Because it's -- it is. It's
 3   illegal. You can't do it.
 4        Q.     Are you alleging that
 5   Robinhood's trading restrictions caused
 6   you to lose money on Blackberry, on your
 7   Blackberry shares?
 8              MR. KIM:  Objection, calls for
 9        a legal conclusion.
10        A.     I buy a stock when I want to
11   buy a stock, I sell it when I want to
12   sell it. It did not allow me, as you
13   know, right, to facilitate those needs,
14   okay? It was market manipulation and
15   that's...
16        Q.     So what trade were you unable
17   to make?
18              MR. KIM:  Objection, asked and
19        answered.
20        A.     I've stated that.
21        Q.     You can answer.
22        A.     I have.
23        Q.     Okay. What trades were you
24   unable to make? What trade were you
25   unable to make?
```

```
 1              GURNEY - CONFIDENTIAL
 2              MR. KIM:  Same objection.
 3      A.    I was unable to make those
 4   actions and trades on that -- on that
 5   period of time.
 6      Q.    Just to clarify, Mr. Gurney,
 7   are you saying that you wanted to
 8   purchase shares of AMC or Blackberry
 9   around that time and you were unable to
10   do so?
11              MR. KIM:  Objection to form.
12      Asked and answered. Go ahead.
13      A.    I was not allowed to
14   facilitate trades on the Robinhood
15   platform. They put restrictions on the
16   platform. That's correct, yes.
17      Q.    Do you recall anything more
18   specific about what you wanted to do on
19   the platform that you couldn't do?
20              MR. KIM:  Objection, asked and
21      answered.
22      A.    Complete trades, transactions.
23   I just stated that for the record.
24      Q.    So did you want to purchase
25   shares of AMC or Blackberry on January
```

Page 115

1              GURNEY - CONFIDENTIAL

2    28th?

3              MR. KIM:  Objection, asked and

4         answered.

5         A.    I wanted to complete

6    transactions. I was not allowed to

7    complete transactions, yes.

8         Q.    To confirm my understanding,

9    were the transactions that you wanted to

10   complete purchases of shares of AMC or

11   Blackberry?

12        A.    I wanted to complete

13   transactions. I was not allowed to

14   complete transactions. Those transactions

15   could be buy or sell of those stocks or

16   trades were not allowed.

17        Q.    But we just --

18        A.    I've explained that and

19   articulated that clearly.

20        Q.    Mr. Gurney, you were able to

21   sell your shares of Blackberry and AMC on

22   January 28th, right?

23             MR. KIM:  Objection, asked and

24        answered.

25        A.    I've answered that.

```
1              GURNEY - CONFIDENTIAL
2       Q.    And what was your answer?
3             MR. KIM:  I mean, how many
4       times do we have to go over this?
5       A.    This is --
6       Q.    You can answer, Mr. Gurney.
7       A.    I know I can. Yes.
8       Q.    Okay. So are you also claiming
9    that in addition to selling those shares
10   on January 28th, you also wanted to
11   purchase shares of Blackberry and AMC on
12   January 28th?
13      A.    I'm saying that I attempted
14   transactions, okay, and you have that
15   information there. I attempted
16   transactions. I was not allowed to
17   complete transactions because Robinhood
18   hit the stop button.
19      Q.    And those transactions that
20   you wanted to complete were purchases of
21   those stocks, right?
22      A.    I was not allowed to complete
23   transactions on the Robinhood app that I
24   was attempting to complete.
25      Q.    The friend David that you
```

```
                    GURNEY - CONFIDENTIAL
 1
 2    mentioned earlier, Mr. Gurney, I think
 3    that you said you didn't recall his
 4    surname. How did you know David?
 5         A.    He worked out at the gym that
 6    I was working out at at the time.
 7         Q.    Okay. How long did you know
 8    him?
 9         A.    I can't recall.
10         Q.    Can you just tell me again
11    what it is that he told you --
12              MR. KIM:  Objection, asked and
13         answered.
14         Q.    -- around this time related to
15    the --
16              MR. KIM:  Objection.
17         Q.    -- period we've been asking?
18              MR. KIM:  Objection to the
19         form of the question.
20         Q.    Let me just ask a better
21    question.
22              Can you tell me again --
23         A.    What's that?
24         Q.    -- about this
25    conversation with David and--
```

Page 118

GURNEY - CONFIDENTIAL

1

2          MR. KIM:  Objection, asked and

3      answered.

4      A.    Market -- somebody has a --

5  somebody has a dog in the background. I

6  just want to say that for the record.

7          MR. KIM:  Not me. Do you hear

8      barking?

9      A.    Does somebody got a canine

10  available?

11          (Reporter clarification.)

12          THE WITNESS:  Okay.

13      Q.    I'm sorry.

14          Can you tell me what you

15  recall about this conversation with David

16  concerning Robinhood?

17          MR. KIM:  Objection, asked and

18      answered.

19      Q.    You can answer.

20      A.    It was market manipulation and

21  that Robinhood hit the stop button.

22      Q.    I'm not sure I caught that

23  last bit.

24          (Connection interruption.)

25      A.    -- for the record.

Page 119

GURNEY - CONFIDENTIAL

1

2      Q.     I think your --

3             MR. KIM:  You cut out for a

4      second, Joe. Can you just repeat

5      the answer yet again?

6      A.     The market manipulation and

7  that Robinhood hit the stop button.  I've

8  stated that previous for the record

9  again.

10     Q.     Is it your position that there

11  are no other events that could have

12  caused the stock price of Blackberry to

13  decline on January 28, 2021?

14     A.     I don't recall.

15     Q.     I think you said this earlier

16  but you don't still use Robinhood; is

17  that right?

18     A.     I don't use the platform. I

19  don't trade any stocks currently.

20     Q.     Did you trade stocks prior to

21  January 2021?

22            MR. KIM:  Objection.

23     A.     I don't recall.

24     Q.     Mr. Gurney, are you aware that

25  a request for the production of documents

Page 120

```
 1              GURNEY - CONFIDENTIAL
 2  was served on you through your counsel?
 3              THE REPORTER:  He might be
 4       frozen.
 5              MS. YOUNG:  Yeah.
 6              VIDEOGRAPHER:  Would you like
 7       to go off the record?
 8              MS. YOUNG:  Maybe we need --
 9       should we take a break now?
10              MR. KIM:  I mean maybe, like,
11       five minutes? How much more do you
12       think you have?
13              MS. YOUNG:  Not a ton, but if
14       we keep having these issues then it
15       will take longer, obviously.
16              I think we hear him. Joe, can
17       you hear us?
18              THE WITNESS:  Yes.
19              MR. KIM:  Your video is not
20       moving.
21              MS. YOUNG:  Let's just take
22       ten.
23              THE WITNESS:  Yeah, I can hear
24       you fine. I'm hearing everything.
25              MR. KIM:  Here you go. We're
```

Page 121

GURNEY - CONFIDENTIAL

1
2       back.

3           Q.    Mr. Gurney, are you aware that

4    a request for the production of documents

5    was served on you, that a request for the

6    production of documents was served on you

7    through your counsel?

8           A.    Yes.

9           Q.    Have you seen those document

10   requests?

11          A.    I have those documents.

12          Q.    When were you first informed

13   of those requests?

14          A.    I don't recall.

15          Q.    Do you understand that you had

16   obligations related to those requests?

17          A.    I don't -- I don't recall.

18          Q.    Did you preserve documents

19   that relate to the events that you are

20   alleging in this lawsuit?

21          A.    I presented my documents to my

22   attorneys.

23          Q.    And did you take steps to

24   preserve documents?

25          A.    I acquired the documents and

```
                                              Page 122

 1                GURNEY - CONFIDENTIAL
 2      sent them to my attorney.
 3           Q.    Have you discarded any
 4      documents that relate to Blackberry?
 5           A.    No.
 6           Q.    Or AMC?
 7           A.    No.
 8           Q.    Or Robinhood?
 9           A.    No.
10           Q.    So upon learning about these
11      document requests, where did you search
12      for potentially responsive documents?
13           A.    The documents I had already.
14           Q.    What documents? What documents
15      are you referring to?
16           A.    Is that a question for me or
17      someone else?
18           Q.    I think you said --
19           A.    There is a lot of people
20      talking and I don't know who's talking to
21      who.
22           Q.    I'm talking to you.
23           A.    Okay.
24           Q.    I asked where you searched for
25      potentially responsive documents.
```

Page 123

```
1              GURNEY - CONFIDENTIAL
2       A.    I don't recall.
3       Q.    Did you have a personal
4  computer?
5       A.    Do I have a personal computer?
6  Yes.
7       Q.    Did you check any electronic
8  files for it on that computer?
9       A.    I don't recall.
10       Q.    You don't recall whether or
11  not you searched your computer for
12  potentially responsive documents?
13       A.    I -- I don't recall if I
14  searched my personal computer for
15  documents related to this case. I don't
16  recall.
17       Q.    Did you search any of your
18  email accounts for emails to be
19  responsive to these requests?
20       A.    I don't recall.
21       Q.    Do you have any hardcopy files
22  that might have responsive information?
23       A.    I don't recall.
24       Q.    Have you communicated with
25  anybody regarding, aside from your
```

```
                                    Page 124
 1              GURNEY - CONFIDENTIAL
 2    counsel, regarding your investments in
 3    Blackberry or AMC?
 4         A.    Have I talked to anybody about
 5    investing in AMC or Blackberry or
 6    anything else? Have I spoken to anyone
 7    about it?
 8         Q.    Yes. Have you communicated
 9    with anybody regarding your investments
10    in Blackberry or AMC?
11         A.    I don't recall.
12         Q.    I think you said earlier that
13    you have an iPhone, right?
14         A.    I do.
15         Q.    Did you search your text
16    messages for any that might be relevant
17    to this case?
18         A.    I don't recall.
19         Q.    You don't recall whether or
20    not you searched your phone for
21    responsive material?
22         A.    I don't recall, no.
23         Q.    Did you provide any documents
24    to your counsel in connection with those
25    discovery requests?
```

Page 125

1                GURNEY - CONFIDENTIAL

2        A.     I did present documents to my

3   legal counsel.

4        Q.     And what documents were those?

5        A.     I don't recall.

6        Q.     Do you recall providing any

7   documents aside from the resumé that we

8   looked over earlier today?

9        A.     I don't recall.

10              MS. YOUNG:  Let's take a

11        break.

12              MR. KIM:  How long, like five,

13        ten minutes?

14              MS. YOUNG:  Let's do 15

15        minutes.

16              MR. KIM:  15?

17              MS. YOUNG:  A-hum.

18              VIDEOGRAPHER:  All right.

19        Going off the record.  The time is

20        1:44 p.m.  This is the end of Media

21        Unit 3.

22              (Recess is taken.)

23              VIDEOGRAPHER:  We're back on

24        the record. The time is 2:04 p.m.

25        This is the beginning of Media Unit

```
                                              Page 126
 1              GURNEY - CONFIDENTIAL
 2       4.
 3       Q.    Mr. Gurney, you're walking
 4   around right now, right?
 5       A.    I'm stagnant at the moment. I
 6   just stopped.
 7       Q.    Okay. Mr. Gurney, who is the
 8   group of plaintiffs that you are seeking
 9   to represent in this lawsuit?
10       A.    They're listed in the
11   Complaint. You should have a copy.
12       Q.    Aside from the people that are
13   specifically named in the Complaint, what
14   -- who are -- who is the class of people
15   you are trying to represent?
16       A.    The group of individuals in
17   the Complaint.
18       Q.    Sorry. Just to confirm, are
19   you saying that you are just trying to
20   represent the individuals that are
21   specifically named in the Complaint?
22       A.    I'm sorry. What did you say?
23       Q.    I said to clarify, are you
24   saying that you are just trying to
25   represent the individuals that are
```

```
                                            Page 127
 1              GURNEY - CONFIDENTIAL
 2    specifically named in the Complaint?
 3         A.    I'm trying to represent the
 4    individuals brought in this class action
 5    suit.
 6         Q.    Right. So can you describe the
 7    actual class?
 8         A.    You have the information of
 9    the Complaint in front of you with the
10    individuals there. I'm not -- you know, I
11    had it in front of me earlier.  You know,
12    I don't have it in front of me currently,
13    each specific.
14         Q.    Right. I'm just asking you to
15    describe more generally the group of
16    people that you are trying to represent,
17    not their specific names.
18         A.    Okay. The individuals in that
19    group, right? So there is a list of names
20    under the class action, the
21    certification.
22         Q.    Right. But who is the group?
23    What are those -- what do those
24    individuals have in common?
25         A.    A Complaint.
```

1          GURNEY - CONFIDENTIAL

2      Q.    So is it your understanding

3  that the group is just the individual

4  names listed in the Amended Complaint?

5      A.    I don't want to assume or

6  speculate on those specifics. I mean, you

7  can speak to the attorney on those

8  matters. He can articulate those things

9  further.

10          Again, I don't have the

11  paperwork in front of me currently. I did

12  earlier, but I don't currently.

13      Q.    I don't think you need to have

14  the document in front of you.

15      A.    Okay.

16      Q.    I'm asking you to just to

17  describe the class of people that you are

18  trying to represent in this litigation. I

19  don't think --

20      A.    Humans.

21      Q.    -- I don't think you need

22  paperwork for that.

23      A.    Human beings.

24      Q.    Just any humans? That's the

25  class of people you are trying to

Page 129

GURNEY - CONFIDENTIAL

1
2     represent?

3           A.     No. You said describe them. I

4     gave a description. They're human beings

5     that have a Complaint. You are aware of

6     the Complaint and I'm sure you've

7     reviewed it in detail.

8           Q.     Okay.

9           A.     I answered the question.

10          Q.     So you are seeking to

11    represent a class of humans that have a

12    Complaint?

13          A.     I'm seeking to represent the

14    people listed in the Complaint there in

15    the documents presented.

16          Q.     And you can't describe

17    anything that those plaintiffs all have

18    in common?

19               MR. KIM:  Objection, asked and

20         answered.

21          A.     They're humans.

22               MR. KIM:  He already said what

23         they have in common is the

24         Complaint.  So, you know, how many

25         times do we have to go over this?

```
 1              GURNEY - CONFIDENTIAL
 2         A.      Humans with the Complaint.
 3    I've said that I believe three times if
 4    the record could show.
 5         Q.      Okay. Noted.
 6                 And you sold your shares of
 7    AMC and Blackberry after being unable to
 8    trade on Robinhood's platform on January
 9    28th, right?
10                 MR. KIM:  Objection to form.
11         Q.     Mr. Gurney, can you answer the
12    question?
13         A.      What was it again?
14         Q.      Sure. You sold your shares of
15    AMC and Blackberry after being unable to
16    trade on Robinhood's platform on January
17    28th, right?
18         A.      That's correct.
19         Q.      Mr. Gurney, have you had any
20    criminal charges brought against you?
21         A.      Ever or currently?
22         Q.      Ever.
23         A.      Umm, yes.
24         Q.      What kind of charges were
25    brought against you?
```

```
 1              GURNEY - CONFIDENTIAL
 2        A.    I had an assault charge
 3   brought against me as a 16-year-old, I
 4   believe, I don't -- I don't want to say
 5   for certain, okay, so I don't want to say
 6   for speculation, as a young adult an
 7   assault charge brought before me at that
 8   time. I want to say it was, I don't know,
 9   early '90s.
10        Q.    Got it. And how were those
11   charges resolved?
12        A.    I don't recall. It was almost
13   30 years ago.  I don't know. It was a
14   long time ago.
15        Q.    And what were the underlying
16   circumstances that led to the assault
17   charge?
18        A.    I was in a fray. What I can
19   recall -- I don't recall. I don't want to
20   speak when speculation. I don't recall.
21        Q.    Was there a physical
22   altercation with someone?
23        A.    I don't recall the specifics
24   of it. Like I said, it was, you know,
25   over two decades ago or longer.
```

Page 132

```
GURNEY - CONFIDENTIAL
 1
 2        Q.      You don't recall anything
 3    about the events that led to that charge?
 4        A.      I don't. I don't.
 5        Q.      And you're aware that the
 6    testimony you are giving today is under
 7    oath, right?
 8        A.      I do.
 9        Q.      And everything that you've
10    said today is truthful and accurate,
11    right?
12        A.      Yes.
13        Q.      And every time that you've
14    said that you don't recall something,
15    that's your truthful testimony, you know,
16    given under penalty of perjury, right?
17        A.      Correct.
18        Q.      And you don't recall seeing
19    anything in the news or on social media
20    regarding any of these stocks that we've
21    discussed today, right?
22        A.      I don't -- I don't recall.
23        Q.      And you don't recall ever
24    having a Blackberry device, right?
25        A.      I don't recall.
```

Page 133

GURNEY - CONFIDENTIAL

2            Hello.  Are you there?

3      Q.    Sorry.  I'm just looking over

4   my notes.

5      A.    Okay.

6      Q.    Do you follow the news more

7   generally, Mr. Gurney?

8            MR. KIM:  Objection, vague.

9      A.    Do I follow the news?  Not

10  regularly, no.

11     Q.    You don't watch any news

12  channels regularly?

13     A.    No.

14     Q.    And was that true in January

15  2021?

16     A.    I don't recall.

17           MS. YOUNG:  Okay.  I think

18        we're done.

19           MR. KIM:  All right.  I would

20        just like to note for the record

21        we're going to designate the

22        transcript Confidential per the

23        Protective Order.

24           VIDEOGRAPHER:  Okay.  We are

25        off the record at 2:13 p.m. and

Page 134

1              GURNEY - CONFIDENTIAL

2          this concludes today's testimony

3          given by Joseph Gurney.  The total

4          number of media used was four and

5          will be retained by Veritext.

6               (The proceedings were

7     adjourned at 2:13 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25