# Exhibit 15

Page 1

1

2   IN THE UNITED STATES DISTRICT COURT

3   FOR THE SOUTHERN DISTRICT OF FLORIDA

4   Case No. 1:21-MD-2989-CMA

5   ------------------------------------x

6   IN RE JANUARY 2021 SHORT SQUEEZE

7   TRADING LITIGATION

8

    ------------------------------------x

9                May 3, 2023

              10:06 a.m.

10

11

12        Videotaped Deposition of ADAM WERNER,

13   Ph.D., taken by Defendants, pursuant to

14   Notice, held at the offices of Cravath

15   Swaine & Moore LLP, 825 Eighth Avenue, New

16   York, New York, before Todd DeSimone, a

17   Registered Professional Reporter and Notary

18   Public of the State of New York.

19

20

21

22

23

24

25

Page 2

```
 1
 2  A P P E A R A N C E S :
 3  THE ROSEN LAW FIRM
      275 Madison Avenue
 4  40th Floor
      New York, New York 10016
 5     Attorneys for Plaintiffs
      BY:  LAURENCE ROSEN, ESQ.
 6       lrosen@rosenlegal.com
 7
 8
      CRAVATH, SWAINE & MOORE LLP
 9  825 Eighth Avenue
      New York, New York 10019
10     Attorneys for Defendants
      BY:  ANTONY L. RYAN, ESQ.
11       aryan@cravath.com
      ROBERT DeNUNZIO, ESQ.
12     rdenunzio@cravath.com
      CHARLOTTE LEPIC, ESQ.
13       clepic@cravath.com
14
15
16  ALSO PRESENT:
17    PHIL GLAUBERSON, Videographer
18
19
20
21
22
23
24
25
```

Page 3

```
 1              WERNER
 2          THE VIDEOGRAPHER: Good morning.
 3   We are going on the record at 10:06
 4   a.m., 5-3-23.
 5          Please note that microphones
 6   are sensitive and may pick up
 7   whispering and private conversations.
 8   Please mute your phones at this time
 9   and please place your phones away from
10   the microphones as they can interfere
11   with the audio.  Audio and video
12   recording will continue to take place
13   unless all parties agree to go off the
14   record.
15          This is media unit one of the
16   video-recorded deposition of Dr. Adam
17   Werner in the matter of In Re January
18   2021 Short Squeeze Trading Litigation,
19   filed in the United States District
20   Court, Southern District of Florida,
21   21-MD-2989-CMA.  The location of this
22   deposition is Cravath Swaine & Moore,
23   825 Eighth Avenue, New York, New York.
24          My name is Phil Glauberson
25   representing Veritext and I am the
```

Page 4

```
 1              WERNER
 2   videographer.  The court reporter is
 3   Todd DeSimone from Veritext.  I am not
 4   authorized to administer an oath, I am
 5   not related to any party in this
 6   action, nor am I financially interested
 7   in the outcome.
 8          If there are any objections to
 9   proceeding, please state them at the
10   time of your appearance.  Counsel will
11   now state their appearances and
12   affiliations for the record, beginning
13   with the noticing attorney.
14          MR. RYAN:  Antony Ryan, Cravath
15   Swaine & Moore LLP, representing the
16   Robinhood defendants, and I'm joined
17   here today by my colleagues Robert
18   DeNunzio and Charlotte Lepic.
19          MR. ROSEN:  Laurence Rosen on
20   behalf of the securities class action
21   plaintiffs and the class, and also here
22   to defend the deposition of Dr. Werner.
23          THE VIDEOGRAPHER:  Will the
24   court reporter please swear in the
25   witness.
```

Page 5

```
 1              WERNER
 2              *   *   *
 3   A D A M   W E R N E R, Ph.D.,
 4   called as a witness, having been first
 5   duly sworn, was examined and testified
 6   as follows:
 7  EXAMINATION BY MR. RYAN:
 8    Q.    Good morning, Dr. Werner.
 9    A.    Good morning.
10    Q.    Could you please state your
11   full name for the record.
12    A.    Legally it is Dr. Adam Davis
13   Werner.  If you look at my license, it goes
14   back to when I was 16 years old, someone
15   mistyped it at the DMV, so I have always
16   been Adam David Werner.
17    Q.    Got it.  What is your
18   educational background, Dr. Werner?
19    A.    I got my undergraduate degree
20   with honors in economics at Oberlin
21   College.  I got my Ph.D. in finance from
22   Northwestern University.  I believe I also
23   have a master's in finance or MS in
24   finance, but I think that is just like give
25   it to you sort of as part of the process.
```

2 (Pages 2 - 5)

WERNER
Page 6

1          WERNER
2     Q.    Do you understand that you are
3  appearing here today as an expert in this
4  litigation?
5     A.    I do.
6     Q.    What is your area of expertise?
7     A.    Economics and finance.
8     Q.    Now, am I right that after you
9  graduated from Oberlin, you worked for a
10  year as a research assistant for the
11  Federal Reserve Bank in Cleveland?
12     A.    I did that for six months.
13  Immediately after college I actually worked
14  as a secretary at the New York Public
15  Library, but I didn't feel, that was
16  probably not relevant to my expert opinion.
17     Q.    All right.  And then after
18  those six months at the New York Public
19  Library, did you work as a research
20  assistant for the Federal Reserve Bank in
21  Cleveland?
22     A.    I did.
23     Q.    And then you went to graduate
24  school at Northwestern?
25     A.    Correct.

WERNER
Page 7

1          WERNER
2     Q.    And then am I right that since
3  then you have been affiliated with a
4  variety of economic consulting firms?
5     A.    I think that's accurate.
6     Q.    And those include Cornerstone,
7  NERA, CRA, LitiNomics, Gnarus, and the
8  Berkeley Economic Consulting Group; is that
9  right?
10     A.    Correct.
11     Q.    Were you employed by those
12  organizations?
13     A.    The first three.  Since then I
14  think I have been a 1099 employee.  I don't
15  recall at Berkeley Economic Consulting, I
16  think I was still a 1099 employee.  But, I
17  mean, at one point I subsumed the firm
18  because the principals went to the Brattle
19  Group.  So I don't know technically what
20  status I was, whether I was paying myself
21  as a 1099 employee or a W-2 employee.
22     Q.    Am I right that you are
23  presently a lecturer in economics at Cal
24  Poly San Luis Obispo?
25     A.    You actually are incorrect.

WERNER
Page 8

1          WERNER
2     Q.    All right.  Why don't you
3  correct me then.
4     A.    I recently retired from
5  teaching at Cal Poly.
6     Q.    Got it.  And when did you
7  retire from teaching at Cal Poly?
8     A.    I believe it was April 4th,
9  April 3rd, something like that.
10     Q.    And is that the end of a term
11  at Cal Poly?
12     A.    I think it was the beginning of
13  a quarter, the day prior to the beginning
14  of a quarter.
15     Q.    Understood.  So that school
16  operates on a quarter system and you
17  retired at the end of -- approximately the
18  end of March of 2023?
19     A.    Correct.
20     Q.    All right.  And am I right,
21  then, that for some period of years up
22  until recently you were a lecturer in
23  economics at Cal Poly San Luis Obispo?
24     A.    Correct.
25     Q.    What is your association with

WERNER
Page 9

1          WERNER
2  Crowninshield Financial Research?
3     A.    Again, I mean, I think the
4  title is affiliated expert, but I'm a 1099
5  employee.  So I don't know if that makes me
6  a consultant.
7     Q.    Okay.  And for the last --
8  well, strike that.
9          Am I right that you have been
10  affiliated with Crowninshield since around
11  2015?
12     A.    I think that's correct.  I can
13  check my vitae if it makes it easier.
14     Q.    Sure.
15     A.    So just to be accurate.  So, I
16  don't know, is this an exhibit?
17          MR. ROSEN:  I brought those.
18          THE WITNESS:  Oh, you brought
19     these, sorry.  Okay.
20          MR. ROSEN:  Those are what I
21     thought were the relevant reports.
22     Q.    We will make it an exhibit in a
23  moment.
24     A.    Yes, 2015.
25     Q.    All right.  And then from 2015

WERNER

1
2 until you recently retired from Cal Poly
3 San Luis Obispo, how much of your
4 professional time was spent teaching at the
5 school versus consulting with
6 Crowninshield?
7    A.    Time?
8    Q.    Yes.
9    A.    Probably 50/50.
10    Q.    Okay.  And did the majority of
11 your compensation during that time frame
12 come from Crowninshield?
13    A.    I would say about 65 percent of
14 my compensation came from Crowninshield.
15    Q.    Do you know Steven Feinstein?
16    A.    I do, as does Dr. Grenadier,
17 Professor Grenadier I believe.
18    Q.    And did Dr. Feinstein hire you
19 originally at Crowninshield?
20    A.    I don't know the answer to that
21 question.  Again, I'm a 1099 employee, so
22 as an affiliate, I don't know if I was ever
23 technically hired by Crowninshield.
24    Q.    Did you meet with Dr. Feinstein
25 before you began your affiliation at

WERNER

1
2 Crowninshield?
3    A.    I certainly spoke with him
4 numerous times on the phone.  I don't think
5 I physically met -- I don't recall
6 physically meeting him.
7    Q.    All right.  And did
8 Dr. Feinstein encourage you to become
9 affiliated with Crowninshield?
10    A.    I don't think so.  I think I
11 reached out to him.
12    Q.    I see.  He is somebody who you
13 knew beforehand?
14    A.    No.
15    Q.    How did it come about that you
16 reached out to Dr. Feinstein?
17    A.    I was familiar with his work
18 and I needed more support than I had at the
19 time.
20    Q.    Now, am I right that you have
21 worked with The Rosen Law Firm before this
22 lawsuit?
23    A.    That is correct.
24    Q.    And approximately how many
25 times have you provided an expert report in

WERNER

1
2 cases for The Rosen Law Firm?
3    A.    I mean, I would be speculating.
4 If you want me to go through it, I can try
5 to figure it out.
6    Q.    Is it more than ten?
7    A.    Oh, I'm sure it is more than
8 ten.  Let me ask a clarifying question, so
9 when you say reports, would a rebuttal
10 report and an initial -- so, for example,
11 in this case, right, I have submitted two
12 reports, is that one engagement or would
13 you consider that two reports?
14    Q.    I would consider that two
15 reports in one case.  So let me ask -- let
16 me reask the question so we have a clear
17 record.
18       Am I right that you have
19 submitted expert reports or declarations in
20 more than ten cases in which you have
21 worked with The Rosen Law Firm?
22    A.    I believe that is correct.
23    Q.    And are there other occasions
24 beyond the cases in which you have
25 submitted expert reports or declarations in

WERNER

1
2 which you have consulted with The Rosen Law
3 Firm?
4    A.    Yes.
5    Q.    Have you ever submitted an
6 expert report or declaration on behalf of a
7 defendant in a securities case?
8    A.    Maybe once or twice.
9    Q.    Okay.  And what cases are
10 those?
11    A.    So I'm going to start -- so I'm
12 looking, again, here, this is my initial
13 report -- this is my original declaration
14 here.
15    Q.    Right.
16    A.    So now I'm looking at Exhibit 1
17 to my initial declaration.  So I believe
18 that this case, and this is on page 50 of
19 my initial declaration, and this is Exhibit
20 1 to my initial declaration, Securities and
21 Exchange Commission versus Bradley Davis.
22 I believe that was a civil securities class
23 action.  Oh, was it a securities class
24 action?  You know, I don't know.  It dealt
25 with securities, but, I mean, I think

Page 14

1              WERNER
2 technically, was it a securities class
3 action?  It was a securities case.  As a
4 legal matter, I don't think -- I mean, it
5 wasn't a class action, right?  It was a
6 suit brought by the SEC.  So maybe that
7 doesn't count.
8     Q.    All right.  So let me just ask
9 you a follow-up question about that case.
10 So that was a case that is captioned
11 Securities and Exchange Commission v.
12 Bradley C. Davis, right?
13     A.    Correct.
14     Q.    And were you retained on behalf
15 of Mr. Davis?
16     A.    I was.
17     Q.    All right.  Okay.  So assuming
18 for a moment that that was a case brought
19 by the SEC and not a securities class
20 action, are there any matters in which you
21 have submitted an expert report or
22 declaration on behalf of a defendant in a
23 securities class action?
24     A.    I don't -- well, let me just go
25 through here and make sure, let's be as

Page 15

1              WERNER
2 accurate as possible.
3          So I'm pretty sure this is not
4 a securities class action, but Gwyn Hartman
5 Revocable Living Trust v. Southern Michigan
6 Bancorp.  So I believe the answer to your
7 question is no, for securities class
8 actions.
9     Q.    So I asked you just now if
10 there were any matters in which you
11 submitted an expert report on declaration
12 on behalf of a defendant in a securities
13 class action.  Let me ask you now, is it
14 also the case that you have never testified
15 in court on behalf of a defendant in a
16 securities class action?
17     A.    So have I testified without
18 submitting a report?
19     Q.    Yes.  I'm just trying to be
20 careful and cover all my bases here.
21     A.    I'm just trying to be careful
22 too.  I'm trying to figure out how that
23 might occur.  State court maybe?  I don't
24 believe so.
25     Q.    Have you ever submitted an

Page 16

1              WERNER
2 expert report or declaration with the
3 opinion that a market for a security was
4 inefficient?
5     A.    Inefficient?
6     Q.    Yes.
7     A.    I don't believe so, but let
8 me -- with the caveat that oftentimes when
9 I'm retained, I render an opinion that I
10 don't believe a stock is efficient or I
11 can't claim that a stock is efficient,
12 oftentimes my opinions aren't used by
13 potential clients.
14     Q.    All right.  But in matters
15 where you submitted an expert report or a
16 declaration, you can't think of one where
17 you have provided the opinion that the
18 market for a security was inefficient,
19 right?
20     A.    Right.  Well, so in this case I
21 opined that I couldn't prove or I didn't
22 have enough evidence to show that two
23 stocks were efficient.  I don't think
24 that's the same as rendering an opinion
25 that those two stocks are inefficient.  So

Page 17

1              WERNER
2 I believe the answer to your question is
3 no.
4     Q.    All right.  Meaning that it is
5 right that you can't think of a matter
6 where you submitted an expert report or
7 declaration and provided the opinion that
8 the market for a security was inefficient,
9 right?
10     A.    Again, with the caveat that
11 when I have found that, my reports haven't
12 been submitted, but yes.
13     Q.    All right.  And is it then also
14 the case that you haven't provided
15 testimony in court that the market for a
16 security was inefficient in your opinion?
17     A.    I'm just trying to be careful.
18 I'm going back to this logic game that
19 we're doing here.  I think, again, I
20 believe -- wait, could you -- I'm sorry,
21 could you reask the question?
22     Q.    Sure, no problem.  Is it also
23 the case that you have not provided
24 testimony in court that the market for a
25 security was inefficient in your opinion?

5 (Pages 14 - 17)

Page 18

WERNER

1
2    A.    I believe that is correct.
3    Q.    Have you ever provided an
4    opinion that the market for a security was
5    efficient at one time but not at another?
6    A.    I don't recall as I sit here
7    today.
8    Q.    Now, your CV includes a list of
9    certain publications; is that right?
10   A.    Correct.
11   Q.    Am I right that you have not
12   published any articles in a peer-reviewed
13   economics or finance journal?
14   A.    Well, okay, so let me -- let me
15   ask a clarifying question here, because I
16   was reading Dr. Fischel's report the other
17   day and he alluded to academic literature
18   and then he cited to the Wall Street
19   Journal.  Would that -- would something
20   appearing in the Wall Street Journal count
21   as academic literature?
22   Q.    Well, I'm asking you, sir,
23   about peer-reviewed journals.  Do you
24   understand that phrase, a peer-reviewed
25   journal?

Page 19

WERNER

1
2    A.    Yeah, I understand that
3    academic literature is peer-reviewed, so
4    I'm asking a clarifying question, is the
5    Wall Street Journal considered
6    peer-reviewed literature?
7    Q.    I certainly don't consider the
8    Wall Street Journal to be peer-reviewed,
9    no.  So let me ask you the question.
10        Have you ever published an
11   article in a peer-reviewed journal of
12   economics or finance?
13   A.    I don't believe so.  I believe
14   my commentary at the Federal Reserve was
15   peer-reviewed by other economists and the
16   Federal Reserve Board, but other than that,
17   I don't believe so.
18   Q.    All right.  And that's an
19   article that you published jointly with an
20   economist at the Federal Reserve Bank of
21   Cleveland when you were a research
22   assistant there in 1993; is that right?
23   A.    That is correct.
24   Q.    And am I right that while you
25   were teaching at Cal Poly San Luis Obispo,

Page 20

WERNER

1
2    you were not on the tenure track?
3    A.    I was not, correct.
4    Q.    And is it the case that you
5    have never held the position of professor
6    at Cal Poly San Luis Obispo or any other
7    university?
8    A.    Yeah.  I mean, well, so at the
9    two places I have taught, at the Kellogg
10   Graduate School of Management where I
11   taught MBA courses and at Cal Poly where I
12   taught economics courses, and we will just
13   say a portfolio of economics courses, I was
14   not in a tenure track position.
15   Q.    All right.  And while you were
16   teaching at the Kellogg Graduate School of
17   Management at Northwestern, were you a
18   graduate teaching assistant?
19   A.    Well, I was a graduate teaching
20   assistant for some courses, and then for
21   some courses I taught MBA courses, I myself
22   taught the MBA courses.
23   Q.    Okay.
24   A.    So not as a graduate assistant,
25   as I guess -- I don't know what the title

Page 21

WERNER

1
2    is.  I mean, when was that?  So maybe 25
3    years ago.  I don't remember what the title
4    was, maybe like lecturer, adjunct.
5    Q.    All right.  But you didn't have
6    a title as a professor at Northwestern
7    University, right?
8    A.    That is correct.
9    Q.    All right.  And you have never
10   had the title of professor at Cal Poly San
11   Luis Obispo either, right?
12   A.    I think I have answered that
13   already, so the answer hasn't changed.
14   Q.    All right.  The answer being
15   that you have never held that title at Cal
16   Poly San Luis Obispo, right?
17   A.    Correct.
18   Q.    Okay.  Why don't we mark the
19   two exhibits.  So these will be Exhibits
20   281 and 282.  Exhibit 281 will be the
21   Declaration of Dr. Adam Werner and Exhibit
22   282 will be the Rebuttal Report of Dr. Adam
23   Werner.  And I'm happy for you to use the
24   copies you brought with you if that is
25   easier.

6 (Pages 18 - 21)

Page 22

WERNER

1
2    A.   I assume the copies are the
3 same.
4    Q.   They should be exactly the
5 same.  Why don't I give you the ones that
6 will have exhibit stickers on them.
7    A.   Okay.
8         (Defendant's Exhibit 281 marked
9 for identification.)
10        (Defendant's Exhibit 282 marked
11 for identification.)
12   Q.   So here is 281, and now I'm
13 handing you 282.
14   A.   Okay, thank you.
15   Q.   All right.  And is Exhibit 281
16 your initial declaration that you submitted
17 in this action?  I'm trying to find a date
18 here, but I'm not seeing one.
19   A.   Well, I'm going to guess it is
20 February 16th, 2023.
21   Q.   It was certainly sometime in
22 February.
23   A.   Looking at Mr. Fischel's
24 initial report.
25   Q.   Sounds right.  Let me reask the

Page 23

WERNER

1
2 question so we have a clear record.
3        Is Exhibit 281 your initial
4 declaration that you submitted in this
5 action in February of 2023?
6    A.   I believe it is, but let me
7 just go through it quickly.
8         (Witness perusing document.)
9    A.   It appears to be.
10   Q.   Thank you.  And is Exhibit 282
11 your rebuttal report that you submitted in
12 this action on or about March 28th, 2023?
13   A.   It appears to be.
14   Q.   And is there anything contained
15 in either of these reports that you wish to
16 change, amend or withdraw?
17   A.   Substantively, no.
18   Q.   How about nonsubstantively?
19   A.   I may have found one or two
20 grammatical errors in my review of these,
21 but I don't recall where they were.  So,
22 again, substantively, no.
23   Q.   All right.  So am I right that
24 you are unaware of any errors in either of
25 your reports beyond the one or two

Page 24

WERNER

1
2 grammatical errors you were just referring
3 to?
4    A.   That is correct.
5    Q.   Have you been asked to consider
6 any supplementation to these reports?
7    A.   Supplementation by your
8 reports?  So do the reports by your experts
9 count as supplemental material?  To the
10 extent I would refer to them in my rebuttal
11 report, I would assume that is encompassed,
12 so is that correct?
13   Q.   Yes. I meant that to be
14 encompassed, so let me ask the question
15 again.
16        Apart from the opinions that
17 are set forth in your two reports you
18 submitted in this action, is there any
19 additional analysis that you have done
20 since submitting your second report?
21   A.   I have not done any additional
22 analysis.  Oh, I should also clarify, I
23 have read the depositions of both of
24 your -- of the two defense experts.  That
25 wasn't obviously encompassed in my rebuttal

Page 25

WERNER

1
2 report, so that may have informed my
3 opinion.  But I personally, no, I have not
4 performed any additional work since
5 submitting these two reports.
6    Q.   All right.  Have you asked
7 anybody at Crowninshield to perform any
8 additional work since you submitted these
9 two reports?
10   A.   I don't believe so.
11   Q.   Have you been asked by counsel
12 at The Rosen Law Firm to consider
13 performing any additional work since
14 submitting your second report?
15   A.   Not that I recall.
16   Q.   All right.  Let me ask you in
17 your opening report, sir, Exhibit 281, if
18 you could look with me, please, at
19 paragraph 1.
20   A.   Okay.
21   Q.   Sir, do you see that in the
22 first paragraph there, there is a list of
23 nine companies that are then defined as the
24 affected companies or affected stocks?
25   A.   I do.

7 (Pages 22 - 25)

Page 26

WERNER

1
2    Q.    All right.  And so then is it
3 right that you were asked by The Rosen Law
4 Firm to determine whether the common stock
5 of those nine affected companies traded in
6 efficient markets prior to the class
7 period?
8    A.    In efficient markets, plural?
9    Q.    Yes, traded in efficient
10 markets, plural.
11    A.    I believe that's correct.
12    Q.    So was the limitation on this
13 assignment that you were asked about
14 whether the stocks traded in efficient
15 markets prior to the class period, was that
16 prior to the class period limitation part
17 of the assignment you were given by The
18 Rosen Law Firm?
19    A.    It was.
20    Q.    And so another way of putting
21 that would be The Rosen Law Firm did not
22 ask you to evaluate whether the common
23 stock of these nine affected companies
24 traded in efficient markets during the
25 class period; isn't that right?

Page 27

WERNER

1
2    A.    I believe that's correct.
3    Q.    And is it the case, then, that
4 the suitability for the case of evaluating
5 the efficiency of the markets prior to the
6 class period and not during the class
7 period, that's not something that you're
8 opining on yourself, is it?
9    A.    I'm just -- I'm slightly
10 confused by the word "suitability."  Could
11 you expand upon that?
12    Q.    Sure.  Let me try to ask it a
13 better way.
14    A.    Okay.
15    Q.    Are you offering any opinion in
16 this case as to whether the right analysis
17 for analyzing efficiency of markets for the
18 nine affected stocks is to analyze their
19 efficiency prior to the class period and
20 not during the class period?
21        MR. ROSEN:  Objection to the
22    extent it calls for a legal conclusion.
23    A.    So what do you mean by "right
24 analysis"?  I don't -- I mean, my
25 assignment was to determine whether these

Page 28

WERNER

1
2 things were efficient prior to the class
3 period.  I don't know whether that's the
4 right analysis.  It was the analysis I was
5 asked to perform.
6    Q.    Got it, okay.  So you took the
7 assignment you got from The Rosen Law Firm
8 as a given in determining the scope of the
9 work you did; is that right?
10    A.    Could you reread the question,
11 please?
12        (The record was read.)
13    A.    I mean, there is a lot of words
14 there.  I mean, I was asked to -- I was
15 asked to do what I was asked to do and I
16 did it.  I don't know, you know, whether
17 there was some --
18        MR. ROSEN:  Are you asking
19    whether we limited the scope of what
20    work he could do?
21        MR. RYAN:  No.
22    Q.    So let me try to ask the
23 question a better way.
24        So you understand that there
25 may be a legal question in this case as to

Page 29

WERNER

1
2 what the right period is over which to
3 analyze efficiency, right?
4    A.    I mean, I assume so.  I don't
5 know one way or the other.
6    Q.    Okay.
7    A.    That seems to make sense to me.
8    Q.    And am I right that you as an
9 expert in economics and finance are not
10 offering any opinion as to what the right
11 period is over which to analyze market
12 efficiency in this case?
13        MR. ROSEN:  Objection.  In this
14    line of questioning, are you asking him
15    just about this opening report or are
16    you also asking him about the rebuttal
17    report?
18        MR. RYAN:  I'm asking him about
19    all of his opinions in this case.
20        MR. ROSEN:  Okay.  Just reread
21    the question.
22        MR. RYAN:  Sure.
23    Q.    Am I right that you as an
24 expert in economics and finance are not
25 offering any opinion in this case as to

8 (Pages 26 - 29)

WERNER

1
2 what the right period is over which to
3 analyze market efficiency in this case?
4     A.    I mean, I'm sorry, I'm not
5 trying to be difficult, I just have a
6 problem with this description of the right
7 period.  I was asked to determine whether
8 or not, at least in my initial report,
9 whether these stocks were efficient prior
10 to the class period, that's what I did.
11        I was asked to opine whether or
12 not class-wide damages could be measured in
13 this matter in my initial report and that's
14 what I did.  I don't know if that was the
15 right thing to do or the wrong thing to do;
16 it was my assignment and that's what I did.
17     Q.    Understood.  And so let me just
18 follow up since in your answer just now you
19 said --
20     A.    Well, I mean, look, if we want
21 to get into it exactly, I can read to you
22 exactly what my assignment was on the off
23 chance there was something inaccurate about
24 what I said, but that's my remembrance of
25 what my assignment was.

WERNER

1
2     Q.    Understood.  I'm not -- I'm not
3 trying to change any of the words.  Am I
4 right that your assignment is set forth --
5 strike that.
6        Am I right that your assignment
7 for your opening report is set forth in
8 paragraphs 1 and 2 of your opening report
9 that we have marked as Exhibit 281?
10     A.    That is correct.
11     Q.    Okay.  And am I right that
12 neither in your opening report nor in your
13 rebuttal report have you analyzed whether
14 the common stock of any of these nine
15 companies traded in efficient markets
16 during the class period?
17     A.    I believe that is correct.
18     Q.    All right.  And is the reason
19 that you haven't performed that analysis
20 that that was not part of your assignment
21 from The Rosen Law Firm with respect to
22 either the opening or the rebuttal report?
23     A.    I believe that's correct.
24     Q.    All right.  Now, one of the
25 attachments to your opening report, Exhibit

WERNER

1
2 281, and this is specifically called
3 Exhibit 2, is a list of documents and other
4 information considered; is that right?
5     A.    I'm sorry, could you reread the
6 question?
7     Q.    Yes.  Am I right that Exhibit 2
8 to your opening report, which is Deposition
9 Exhibit 281, is a list of documents and
10 other information considered?
11     A.    That is correct.
12     Q.    And then similarly for your
13 rebuttal report which we have marked as
14 Deposition Exhibit 282, you similarly have
15 an exhibit, again, called Exhibit 2, which
16 this time lists documents considered in
17 addition to those cited in your opening
18 report?
19     A.    Yeah, documents considered in
20 addition to those cited in the Werner
21 declaration.  That's Exhibit 2 to Exhibit
22 282, yeah.
23     Q.    Right.  And are there any
24 documents that you considered in forming
25 your opinions in this lawsuit that are not

WERNER

1
2 set forth in one of the two Exhibit 2's
3 that we just looked at?
4     A.    Up until the submittal of this
5 second report?
6     Q.    Yes, sir.
7     A.    That is correct.
8     Q.    All right.  Since the submittal
9 of the second report, are there any
10 documents that you have considered in
11 forming your opinions in this lawsuit that
12 are not set forth in one of the two Exhibit
13 2's that we just looked at?
14     A.    Well, I believe the depositions
15 of your two experts informed --
16 subsequently informed my opinion, as well
17 as a few academic articles I have looked at
18 with regards to estimating demand for
19 securities.  I don't recall off the top of
20 my head what those articles were, but I
21 distinctly remember looking at two
22 articles.
23     Q.    Anything other than the two
24 deposition transcripts and the two academic
25 articles you just referred to?

9 (Pages 30 - 33)

Page 34

WERNER

1
2    A.    I don't believe so.
3    Q.    What do you mean by estimating
4  demand for securities?
5    A.    Well, so something similar to
6  what Dr. Fischel, sorry, similar to what
7  Mr. Fischel did in the IPO litigation, so
8  trying to determine how changes in order
9  flow affect demand for securities.
10   Q.    All right.  And do you
11 recall --
12   A.    As in like individual
13 securities.  So the supply and demand for,
14 let's say, Apple Computer, that would be --
15 that's what I mean.
16   Q.    What were those two academic
17 articles?
18   A.    I don't recall.
19   Q.    Do you have them somewhere?
20   A.    I do, somewhere.
21   Q.    Okay.
22   A.    Not on me.
23   Q.    Understood.  Would you be able
24 to send them after this deposition to
25 Mr. Rosen?

Page 35

WERNER

1
2    A.    Sure.
3    Q.    Thank you.  All right, now --
4    A.    Actually, can we take a quick
5  break?
6    Q.    Sure.
7        MR. RYAN:  Let's go off the
8    record.
9        THE VIDEOGRAPHER:  This will
10   end media unit one.  We are going off
11   the record at 10:46.
12       (Recess taken.)
13       THE VIDEOGRAPHER:  We are back
14   on the record at 10:50.  This will
15   begin media unit two.
16 BY MR. RYAN:
17   Q.    Did you have some item that you
18 thought of on the break that you wanted to
19 clarify, Dr. Werner?
20   A.    I did.  Thanks.  Well, I think
21 when I was talking about the demand, I'm
22 not sure whether I talked about -- the
23 articles dealt with how the change in
24 demand affects the price of the underlying
25 stock.  I don't know if I was clear about

Page 36

WERNER

1
2  that in my initial recitation.
3    Q.    Thank you, all right.  And you
4  will provide those two articles to counsel,
5  right?
6    A.    I will.
7    Q.    Thank you.  All right, now,
8  turning now to your rebuttal report which
9  we have marked as Exhibit 282, do you see
10 that there is a series of intraday stock
11 price charts at the back of your rebuttal
12 report that are labeled Exhibit 6A through
13 Exhibit 6I?
14   A.    6A through Exhibit 6I, do you
15 have a page number there?
16   Q.    Yes, 96 until the end.  I
17 didn't even notice the page numbers.
18   A.    I figured that would be
19 quicker.
20   Q.    That is quicker.
21   A.    Okay.  I am there.
22   Q.    Okay.  And am I right that
23 Exhibit 6A through 6I are intraday stock
24 price graphs, one for each of the nine
25 affected stocks?

Page 37

WERNER

1
2    A.    That is correct.  Intraday, to
3  the extent we are also talking about
4  periods when the markets -- after the
5  markets closed.
6    Q.    There are periods here --
7    A.    I'm sorry -- my bad, go ahead.
8    Q.    There are periods here before
9  the market opens, right?
10   A.    Correct.
11   Q.    All right.  And were these
12 graphs generated using a program called
13 Stata?
14   A.    I believe that's correct.
15   Q.    So we have asked your counsel
16 if we could receive the backup stat
17 accompanied for these nine exhibits.  Is
18 that something that you could provide to us
19 after this deposition?
20       MR. ROSEN:  Objection.  So we
21   have an outstanding objection to that
22   request, and that still stands.  So it
23   is not up to Dr. Werner, you know.
24       MR. RYAN:  I actually didn't
25   realize, to be honest, Larry, that you

10 (Pages 34 - 37)

Page 38

WERNER

1
2  had an objection.  I just thought you
3  hadn't responded.  Again, I'm not
4  saying in sort of a snide way, I just
5  actually didn't realize you had an
6  objection.
7      A.    Can I say one thing about these
8  graphs?
9      Q.    Yes.
10     A.    I mean, you can use any program
11 to generate these graphs, right.  I can put
12 this data in Excel and the problem is
13 putting in these vertical lines, so, you
14 know, if I printed this out in Excel and
15 just drew in lines, that would be the
16 equivalent of what my Stata code did just
17 for clarification.  There is not some
18 rocket science going on here that I needed
19 a powerful computing code to do this graph.
20     Q.    All right.  But you or folks
21 working with you at Crowninshield used the
22 Stata program to generate the stock price
23 graphs in Exhibit 6A through 6I, right?
24     A.    I believe that is correct.
25     Q.    And so there would be some

Page 39

WERNER

1
2  Stata code that underlies these graphs,
3  right?
4      A.    I think by definition the
5  answer is yes.
6      Q.    Okay.  So now let me ask you
7  about Table 12 to your rebuttal report,
8  which is on page 44.
9      A.    Okay, here we go, Table 12,
10 right.
11     Q.    And I'm looking now at the
12 first sentence in paragraph 102 in Table
13 12.  Am I right that Table 12 is an
14 intraday price chart of an equal weighted
15 index of the affected companies on January
16 28th, 2021?
17     A.    That is correct.
18     Q.    And by equal weighted, you mean
19 that you counted each of the companies the
20 same even though, for example, the market
21 capitalization of BlackBerry may be 100
22 times the market capitalization of Koss?
23     A.    Counted them same?  I mean,
24 I guess that's right.  It is just an equal
25 -- yeah, there is not some sophistry going

Page 40

WERNER

1
2  on here, it is just an equal weighted index
3  as opposed to a value weighted index.
4      Q.    So equal weighted means it is
5  simply an average of the nine stocks where
6  each of the stocks counts to the same
7  extent?
8      A.    Correct, correct.
9      Q.    All right.  And was this Table
10 12 similarly generated using Stata code in
11 the way we just talked about?
12     A.    I believe so, yes.
13     Q.    All right.  Now let me ask you
14 about Table 7 to your rebuttal report which
15 appears on page 21, and do you see that
16 there is a column here in your Table 7
17 called Statistically Significant News Days?
18     A.    I do.
19     Q.    Whose regression analysis did
20 you use to determine statistical
21 significance for purposes of Table 7 to
22 your rebuttal report?
23     A.    My regression analysis that I
24 used in my first report, which if I
25 remember correctly is Exhibit 281.

Page 41

WERNER

1
2      Q.    Got it, okay.  So let's go
3  back, please, to your opening report, which
4  as you just mentioned is Exhibit 281, and
5  I'm now looking at Opinion 1 which appears
6  in the middle of page 3.
7          MR. ROSEN:  What page are you
8  on?
9          MR. RYAN:  Page 3.
10     A.    Okay.
11     Q.    All right.  And do you see
12 there that Opinion 1 reads "Seven of the
13 nine Affected Companies traded in an
14 efficient market during the relevant
15 period.  Those seven companies are AMC,
16 BlackBerry, Bed Bath & Beyond, Express,
17 GameStop, Nokia and Trivago"?
18     A.    Do I see it?
19     Q.    Yes.
20     A.    Yes.  You expounded upon the
21 ticker symbols, but that's in essence what
22 this says.
23     Q.    All right.  And am I right,
24 then, in your opening report your opinion
25 for seven of the affected companies is that

11 (Pages 38 - 41)

Page 42

```
            WERNER
1
2  they traded in an efficient market during a
3  one-year period that ended on January 27th,
4  2021?
5      A.    In this report?
6      Q.    Yes.
7      A.    That is correct.  Subsequently
8  in my rebuttal report I looked at the
9  period -- well, let's be exact.  Oh, we
10 were just looking at this.
11         MR. ROSEN:  Table 7 on 22.
12      A.    Well, Table 7, but in terms
13 of -- I looked at the market efficiency for
14 those seven stocks from I want to say --
15 well, again -- well, I will just say
16 January 2021.
17      Q.    All right.  It might be helpful
18 if we look at paragraph 17 of your rebuttal
19 report, Exhibit 282.
20      A.    Oh, I now realize when I say
21 January 2021, that includes part of the
22 class period.  So that was inaccurate.
23      Q.    All right.  So I'm hoping that
24 maybe we can get this precise by looking at
25 paragraph 17.  Do you see that midway
```

Page 43

```
            WERNER
1
2  through paragraph 17 of your rebuttal
3  report there is a sentence that reads
4  "Therefore, for purposes of the Cammer and
5  Krogman analysis I perform herein, I focus
6  on the period from January 4th, 2021
7  through January 27th, 2021," and you then
8  define that period as the immediate
9  pre-class period, and you go on, "which is
10 Mr. Fischel's period of choice and
11 encompasses Dr. Grenadier's pre-class
12 period"?
13      A.    Correct.
14      Q.    All right.  So am I right,
15 then, that in your rebuttal report you
16 performed an additional analysis for seven
17 of the nine stocks for the period that you
18 defined here as the immediate pre-class
19 period?
20      A.    Well, a couple of
21 clarifications.  So additional analyses I
22 believe probably would be the right way to
23 describe it, and then, I mean, I chose that
24 because that's what -- that's what
25 Mr. Fischel used.
```

Page 44

```
            WERNER
1
2      Q.    So is it the case that in your
3  rebuttal report you performed additional
4  analyses regarding market efficiency for
5  seven of the nine stocks over the period
6  that Mr. Fischel used and that you define
7  as the immediate pre-class period?
8      A.    That is correct.
9      Q.    And am I right that you do not
10 perform those additional analyses regarding
11 market efficiency in your rebuttal report
12 for the other two stocks at issue in this
13 case?
14      A.    So for Koss and Tootsie Roll, I
15 believe that is correct.
16      Q.    Okay.  So now let's go back to
17 your opening report, Exhibit 281, and we
18 were looking at Opinion 1 on page 3.  Are
19 you there?
20      A.    Opinion 1 on page 3, yup.
21      Q.    All right.  And so you express
22 here an opinion that seven of the nine
23 affected companies traded in an efficient
24 market during what you called the relevant
25 period, right?
```

Page 45

```
            WERNER
1
2      A.    Correct.
3      Q.    And, again, that means the full
4  year up to and through January 27th, 2021,
5  right?
6      A.    Correct.
7      Q.    All right. And am I right that
8  you express no opinion regarding whether
9  the other two companies, namely Koss and
10 Tootsie Roll, traded in an efficient market
11 during any period?
12      A.    Could you reread the question,
13 please?
14         (The record was read.)
15      A.    I believe that's correct.  I
16 mean, there were indicators of efficiency
17 for those two stocks -- different
18 indicators of efficiency, but I don't opine
19 that they traded in an efficient market.
20      Q.    All right.  You were unable to
21 reach what you believed was a reliable
22 conclusion that those two stocks did trade
23 in an efficient market, right?
24      A.    I mean, I don't -- "reliable"
25 is your word.  I just -- again, there was
```

12 (Pages 42 - 45)

Page 46

WERNER

1
2 indications of efficiency. I just didn't
3 conclude that they traded in an efficient
4 market.
5    Q.    All right. Are all of your
6 opinions in your view based on reliable
7 conclusions that you reached?
8    A.    I think -- I believe the answer
9 to that question is yes.
10    Q.    Okay. And am I right, then,
11 that you were unable to reach a reliable
12 conclusion as to whether either Koss or
13 Tootsie Roll traded in an efficient market?
14    A.    So based on the prior
15 statement, I believe that would logically
16 follow.
17    Q.    Okay. Now, do you see Opinion
18 2 which appears on the top of page 5 of
19 your opening report, Exhibit 281?
20    A.    I do.
21    Q.    And do you see that opinion
22 reads "With expert assistance, the finder
23 of fact in this matter will be able to
24 compute damages using a common class-wide
25 methodology that applies to the calculation

Page 47

WERNER

1
2 of damages for each and every class
3 member"?
4        Did I read that right?
5    A.    You did.
6    Q.    What do you mean by the phrase
7 "with expert assistance"?
8    A.    With the assistance of an
9 expert, I mean, I guess as opposed to a
10 layman.
11    Q.    All right. So do you mean,
12 then, in your Opinion 2 that an expert
13 would be able to compute damages using a
14 common class-wide methodology?
15    A.    That's what I mean, yes.
16    Q.    And when you refer there to
17 damages, do you have per-share damages in
18 mind?
19    A.    I believe that is correct.
20    Q.    All right. You are not
21 referring there to aggregate damages, are
22 you?
23    A.    One could calculate aggregate
24 damages, but no, I'm referring to per-share
25 damages. I mean, you would need to make

Page 48

WERNER

1
2 additional assumptions like trading models,
3 etc.
4    Q.    When you say that you would
5 need to make additional assumptions like
6 trading models, etc., are those additional
7 assumptions you would need to make only to
8 calculate aggregate damages?
9    A.    Not necessarily. I guess, I
10 mean, I'm thinking about aggregate damages,
11 and so I'm thinking about a single versus
12 multi-trader model. I mean, again, I
13 talked about a demand model. It showed how
14 stock price changes as demand changes. I
15 don't know if you call that a trading model
16 or not. I don't know if that falls under
17 the umbrella of what you consider a trading
18 model.
19    Q.    I see. So you are, I think, if
20 I understood you right in your answer just
21 now, referring back to some of the
22 testimony you gave previously when you were
23 talking about the two articles that you
24 recall looking at since your second report,
25 you are talking about constructing a model

Page 49

WERNER

1
2 of how a change in demand for a stock might
3 affect that stock price; is that right?
4    A.    I believe that's correct.
5    Q.    Okay. Have you constructed
6 such a model?
7    A.    I have not.
8    Q.    Okay. So you haven't
9 constructed such a model for any of the
10 nine stocks in this case, right?
11    A.    I have not.
12    Q.    Have you ever constructed such
13 a model for any security?
14    A.    Have I ever constructed a model
15 such as these models that I have discussed
16 with regards to these two academic papers?
17 I don't believe so. But that doesn't
18 mean -- I mean, I could just follow the
19 instructions in the papers.
20    Q.    Okay.
21    A.    Do it that way.
22    Q.    And since I haven't seen the
23 papers --
24    A.    But I should say, I haven't
25 been asked to calculate damages.

13 (Pages 46 - 49)

Page 50

WERNER

1
2    Q.    Okay.  I will ask you that in
3  just a moment.
4        So since I haven't seen the
5  papers yet, let me ask you what might be
6  the same question, but what might be
7  somewhat broader.  Have you ever
8  constructed a model regarding how a change
9  in demand and/or supply for a security may
10  affect the market price for that security?
11    A.    Well, I mean, I'm sure I have
12  derived theoretical models on that.  Based
13  on actual trading data, as I sit here, I
14  don't recall, but I don't believe so.
15    Q.    Okay.  And when you say that an
16  expert could in your opinion calculate
17  per-share damages in that way, what type of
18  expert do you have in mind?
19    A.    An expert in finance.
20    Q.    All right.  Do you believe --
21    A.    Finance and/or economics.
22    Q.    Do you believe that you would
23  be qualified to perform such a damages
24  calculation?
25    A.    I believe so, but, again, I

Page 51

WERNER

1
2  haven't been asked to do so.
3    Q.    All right.  And you haven't
4  ever done so at any time during your
5  career, right?
6    A.    I believe, from an empirical
7  standpoint, I believe that is correct.
8  Wait, let's see.  I'm trying to think about
9  the market microstructure class I took and
10  whether we looked at it.
11        MR. ROSEN:  You are just
12    focusing on this demand-based model?
13    You are not talking about the other
14    model?  Because I kind of lost --
15        MR. RYAN:  So I was asking
16    about a demand and/or supply-based
17    model.
18    A.    Okay.  So now we are adding
19  supply-based model.  I mean, if I have
20  empirically looked at that, over the last
21  25 years, certainly when I took a market
22  microstructure course I probably did, but
23  that was 20 years ago.  I don't recall.
24    Q.    Who did you take market
25  microstructure with?

Page 52

WERNER

1
2    A.    Michael Fishman and Kathleen
3  Hagerty.
4    Q.    What is market microstructure?
5    A.    Basically how stocks are
6  traded, or I should say assets are traded
7  maybe.  Stocks may be a little too broad --
8  or a little too specific, not too broad.
9    Q.    Have you ever published in
10  market microstructure?
11    A.    I have not.
12    Q.    Have you ever taught a course
13  on market microstructure?
14    A.    I don't believe so.
15    Q.    Do you believe that market
16  microstructure may be relevant to the type
17  of demand and/or supply models that we were
18  just talking about?
19    A.    For those specific models, I
20  think that that would certainly inform
21  one's opinion.
22    Q.    Do you have any other model in
23  mind that could be used to compute damages
24  in this case using a common class-wide
25  methodology?

Page 53

WERNER

1
2    A.    Now I'm looking at my initial
3  report.  So one such example, and let me
4  underline example, because that seemed to
5  be missed by your experts, so one way to do
6  it, and this, again, I'm not a lawyer, but
7  based on my understanding of Affiliated
8  Ute, so I'm looking at paragraph 93, and,
9  again, this is an example, one of at least
10  three methodologies that I can think of to
11  calculate damages, one of them being this
12  demand-based model, I have been informed by
13  counsel for plaintiffs that under Section
14  9(a)(2) and 10(b) of the Exchange Act in a
15  case where class members are defrauded,
16  sorry, defrauded sellers, the measure of
17  damages, and here is beginning the quote
18  citing to Affiliated Ute, is the difference
19  between the fair value of all that the
20  seller received and the fair value of what
21  he would have received had there been no
22  fraudulent conduct.
23        And let's be specific that when
24  we talk about fair value, we are not
25  talking about some valuation model, we are

14 (Pages 50 - 53)

Page 54

WERNER

1          WERNER
2 talking about dollar value.  When I say
3 valuation model, I mean let's just say a
4 discounted cash flow model.  I mean, that
5 could be one way to measure it, but that's
6 not what they are talking about here.
7          So, you know, I go on to look
8 about how one could look at the difference,
9 and now I'm reading from subpoint (b) of
10 paragraph 96 on page 39.  Well, I mean, I
11 guess I could start at (a).  Well, we will
12 just go with (b).  One way to possibly do
13 it is look at the price at the end of
14 trading or the close of trading on January
15 27th and subtract off the seller's -- or
16 the investor's sales price.  That could be
17 one potential measure of damages.
18     Q.     All right.  So you said just
19 now that the difference between the market
20 price at the close of trading on January
21 27th, 2021 and the investor's sale price
22 during the class period could in your
23 opinion be a way of calculating class-wide
24 damages; is that right?
25     A.     That would be -- that is

Page 55

WERNER

1          WERNER
2 correct.
3     Q.     Do you have other ways to
4 perform such a calculation in mind other
5 than that method based on the market price
6 at the close of trading on January 27th,
7 2021?
8     A.     Sure.  I mean, and this now
9 goes -- we're in my rebuttal report, right?
10 No.
11     Q.     I think we are in your opening
12 report, Exhibit 281.
13     A.     So let's go to Exhibit 282, and
14 I just want to use this for example
15 purposes, or at least for illustrative
16 purposes.  So we are back to Table 12 here.
17 I could certainly run a regression on
18 intraday data looking at the impact of the
19 PCO restrictions -- the imposition of the
20 PCO restrictions, and I should say because
21 we are dealing with Robinhood, the
22 Robinhood specific PCO restrictions, and
23 determine the impact that they had on the
24 price of the underlying securities.
25     Q.     All right.  And when you refer

Page 56

WERNER

1          WERNER
2 to a regression on intraday data, you are
3 talking about a correlation between the
4 timing of Robinhood's PCO restrictions and
5 stock price movements in the nine stocks;
6 is that right?
7     A.     Am I talking about a
8 correlation between -- I mean, I don't --
9 I'm not -- I don't know if that's the right
10 way to generalize.  It would measure the
11 impact of the Robinhood PCO restrictions on
12 the stock price, or the price of the
13 underlying stocks.
14     Q.     And when you say would measure
15 the impact, that's because one of your
16 variables would be the time when Robinhood
17 put PCO restrictions in place?
18     A.     I'm not sure that that would be
19 one of the variables.  One of the
20 dependent, independent variables?  Could
21 you be more specific?
22     Q.     What would the inputs in the
23 regression that you were just referring to
24 be?
25     A.     Well, again, I haven't been

Page 57

WERNER

1          WERNER
2 asked to do this, so this is -- this is not
3 like some complete model I would have done.
4 I mean, I could put in -- the dependent
5 variable could be -- I mean, yeah, I would
6 want to look at the stock price.
7          I guess I could use dummy
8 variables to indicate when the PCO
9 restrictions were indicated or were
10 installed.  I mean, that's an extremely
11 simplistic model.  Again, this is not
12 something I have been asked to do at this
13 point in time, but, you know, that might be
14 one way to do it.  I'm sure I could come up
15 with additional variables I would want to
16 take into consideration, but that could be
17 one simple way to do it.
18     Q.     All right.  So when you
19 referred just now to a dummy variable, you
20 mean something like zero if there is no PCO
21 restriction in place and 1 if there is a
22 PCO restriction in place, right?
23     A.     That would be one example.  I
24 actually hadn't thought about it in those
25 specific terms, but sure.

15 (Pages 54 - 57)

Page 58

WERNER

1
2   Q.   Okay.  And so the regression
3   that you have in mind just now is whether
4   Robinhood had a PCO restriction in place
5   correlated with the stock price movement?
6   A.   Again, I don't -- correlated, I
7   don't -- maybe, again, like look, this is
8   just an extremely simplistic model.  I
9   haven't been asked to measure damages.  You
10  asked me how I might go about doing it.
11  That would be one way I might go about
12  doing it.  I haven't, you know, sat down
13  and said all right, this is the exact model
14  I want to use and this is how I would
15  implement it.  But, again, it is something
16  an economist certainly could do.
17  Q.   All right.  So is it the case
18  that you have not tried to implement a
19  model of the type you have just described
20  based on the stock price movements and
21  whether Robinhood had a PCO restriction in
22  place?
23  A.   For this specific case?
24  Q.   Yes.
25  A.   I mean, other than the visual

Page 59

WERNER

1
2   presentations, which, you know, are you
3   going to believe me or your lying eyes?
4   You know, it appears to me that they had
5   impact.
6        Have I, you know, beyond the
7   surface observations, no, I have not gone
8   ahead and estimated a model that shows the
9   exact impact of the PCO restrictions by
10  Robinhood on the underlying securities.
11  Q.   Okay.  And nor have you
12  constructed a model for how changes in
13  demand might affect the stock price, right?
14  A.   I believe that's what I stated
15  previously.
16  Q.   Okay.  And when you a few
17  answers ago referred to, I believe you said
18  three types of models that you had in
19  mind --
20  A.   Three, maybe three types of
21  damage measurements, three different ways
22  to damage -- but yeah, if you want to
23  describe those as models, by all means go
24  ahead.
25  Q.   Okay.  And so were those three

Page 60

WERNER

1
2   the demand-based model, the model using the
3   price at the close on January 27th, 2021,
4   and the regression along the lines of Table
5   12 to your rebuttal report?
6   A.   I believe that's correct.
7   Q.   Okay.  And am I right that
8   counsel for the class plaintiffs has not
9   asked you to calculate damages?
10  A.   That is correct, in this
11  matter, that is correct.
12  Q.   Am I right that counsel for the
13  class plaintiffs has not asked you to
14  calculate loss causation or to determine
15  loss causation in this matter?
16  A.   So now you are asking me a
17  different question?
18  Q.   Yeah.  Let me ask the question
19  again.
20       Am I right that counsel for the
21  class plaintiffs has not asked you to give
22  an opinion on loss causation in this
23  matter?
24  A.   That is correct.  When you said
25  "calculate," I appreciate the

Page 61

WERNER

1
2   clarification, yes.
3   Q.   All right.  And there are
4   components of the damages calculations you
5   were just going through that would relate
6   to loss causation, right?
7   A.   That is correct.  I mean, I
8   would only want to include the components
9   that are attributable to the alleged
10  actions of Robinhood when calculating
11  damages.
12  Q.   All right.  So back in your
13  opening report, Exhibit 281, if you could
14  go with me, please, to page 4, I'm in
15  paragraph 8(f).
16  A.   Hold on, easy.  Page 4, okay,
17  I'm there.
18  Q.   Do you see that in paragraph
19  8(f) you refer to empirical analyses that
20  study the relationship between information
21  flow and security price movement, and you
22  state that those analyses demonstrate that
23  a cause and effect relationship existed
24  between news flow and movements in the
25  security price of the seven companies?  Do

16 (Pages 58 - 61)

Page 62

```
 1            WERNER
 2 you see that?
 3     A.    I do.
 4     Q.    All right.  And when you refer
 5 there in paragraph 8(f) to a cause and
 6 effect relationship, is the news flow the
 7 cause?
 8     A.    Is the news flow the cause?
 9     Q.    I'm trying to understand which
10 is the cause and which is the effect.  Are
11 you stating here in paragraph 8(f) of your
12 opening report that the news flow is the
13 cause and the security price movements are
14 the effect?
15     A.    I believe that the information
16 contained in the news flow is what is
17 affecting the underlying stock price.
18     Q.    All right.  So you would agree
19 that the information in the news flow is
20 the cause in the cause and effect
21 relationship that you are describing in
22 paragraph 8(f)?
23     A.    I think that's a little --
24 that's a little -- I mean, there are other
25 factors that could cause the price changes
```

Page 63

```
 1            WERNER
 2 beyond the information flow.
 3     Q.    Right.  But when in paragraph
 4 8(f) you describe a cause and effect
 5 relationship, is the cause that you are
 6 describing there the information in the
 7 news flow?
 8     A.    It is the information in the
 9 market.
10     Q.    All right.  And so you are
11 performing an analysis, if I understand you
12 right, of whether information that reaches
13 the market affects the stock price?
14     A.    That is correct.
15     Q.    And you're not studying the
16 inverse of that relationship, that is,
17 you're not studying whether changes in the
18 stock price affect the news flow; is that
19 right?
20     A.    I don't know.  I mean, they
21 could certainly be correlated.  To the
22 extent that I'm looking at news flow as a
23 proxy of news, I'm not sure.
24     Q.    Okay.  So this is something
25 that I'm very interested in, right?  So I'm
```

Page 64

```
 1            WERNER
 2 interested in trying to understand this
 3 cause and effect relationship, and so we
 4 started off by saying that it was the
 5 information in the news flow that was the
 6 cause, and you are trying to measure
 7 whether there is an effect in the security
 8 price, right?
 9     A.    Well, the information in all of
10 the news flow is the cause, yes.
11     Q.    Okay.  So am I right, then,
12 that you are not studying a cause and
13 effect relationship in the reverse
14 direction, that is, you are not studying
15 whether security price movements cause a
16 change in the information flow?
17     A.    I mean, they could.  Is that
18 what I'm studying?  No.
19     Q.    All right.  And you are
20 interested, in terms of market efficiency,
21 you are interested just in the first cause
22 and effect relationship, right?
23     A.    Yeah.  I want to understand
24 whether or not the information out in the
25 market is incorporated in the stock price.
```

Page 65

```
 1            WERNER
 2 In other words, are these stocks
 3 informationally efficient.
 4     Q.    Okay.
 5     A.    That is my understanding under
 6 Halliburton II.
 7     Q.    Could you please turn to page
 8 10 of your opening report, paragraph 21.
 9     A.    Page 10, okay.
10     Q.    I take it you agree that the
11 efficient market hypothesis is the
12 foundation of modern finance theory?
13     A.    Well, it is certainly one of
14 the foundations of modern finance theory.
15 I mean, are the Miller-Modigliani
16 principles also foundations of the modern
17 finance theory?  They are in the pantheon,
18 how about that?
19     Q.    All right.  And you wrote here
20 in paragraph 21 of your opening report that
21 "A security trades in an efficient market
22 when all publicly available information is
23 incorporated in the security price and any
24 new information that impacts the economic
25 outlook of the firm gets quickly reflected
```

17 (Pages 62 - 65)

Page 66

```
1            WERNER
2  in its security price," right?
3      A.    That is correct.
4      Q.    What do you mean by the
5  economic outlook of the firm?
6      A.    Well, how people -- what people
7  expect the firm to be worth in the future.
8      Q.    Do you agree that finance
9  theory holds that the market price of a
10 stock reflects the discounted value of
11 expected future cash flows to the
12 stockholder?
13     A.    I believe that people who --
14 that that is a definition of fundamental
15 value market efficiency.  But I'm not
16 sure that -- so academically that's what my
17 statement is.  I'm not sure -- my
18 understanding is the courts are looking for
19 informational efficiency.  And so to the
20 extent that you may have -- well, let's use
21 the exact words so I don't screw it up.
22 Actually, let's look at my rebuttal report.
23        So I'm looking at paragraph 82,
24 page 35, of what is Exhibit 282 for this
25 deposition, and I think what you're talking
```

Page 67

```
1            WERNER
2  about, and I will just read the sentence.
3  "While neither expert explicitly admits
4  this, Dr. Grenadier's and Mr. Fischel's
5  analyses inappropriately require that all
6  of the Affected Companies' stocks be
7  fundamentally efficient in order to
8  establish the market prices of the Affected
9  Companies' stocks were reasonable proxies
10 for information.  Fundamentally,
11 efficiency" -- and this is what you were
12 describing -- "means that a market is only
13 considered efficient if an asset's price
14 is, at all times, a perfect representation
15 of the present value of the asset's
16 expected future cash flows.  That is, using
17 fundamental efficiency as a standard means
18 the market for a security is inefficient
19 unless that security prices matches a
20 specific target price derived from one
21 specific valuation model.  This is not the
22 correct standard for evaluating market
23 efficiency."
24        And when I say this is not the
25 correct standard for evaluating market
```

Page 68

```
1            WERNER
2  efficiency, I mean this is not the correct
3  standard for evaluating market efficiency
4  in a securities class action.  And, again,
5  that's based on my understanding of what
6  the Supreme Court said in Halliburton II.
7      Q.    Okay.  So you are not a lawyer,
8  sir, are you?
9      A.    Not today.
10     Q.    Not ever, right?
11     A.    Not ever, not ever.  I don't
12 know, maybe in traffic court.
13     Q.    And you don't have any legal
14 training, do you?
15     A.    Other than dealing with
16 securities law over the last 25 years, no.
17     Q.    All right.  And you don't hold
18 yourself out as an expert in securities
19 law, do you?
20     A.    I do not.
21     Q.    Okay.  All right, so let's go
22 back to my question.  Do you agree as an
23 economist that finance theory holds that
24 the market price of a stock reflects the
25 discounted value of expected future cash
```

Page 69

```
1            WERNER
2  flows to the stockholder?
3      A.    And I would just give the same
4  answer, that is a definition of fundamental
5  market efficiency.
6      Q.    Is that a definition that you
7  as an economist agree with?
8      A.    As the definition of
9  fundamental -- if you are asking me is that
10 the correct definition of fundamental
11 market efficiency?  Yes, that is the
12 correct definition of fundamental market
13 efficiency.
14     Q.    I see.  And when you use the
15 term "fundamental market efficiency," do
16 you mean, as stated in paragraph 82 of your
17 rebuttal report --
18     A.    Hold on, I've got to go back
19 there, I'm sorry, I closed off.  Paragraph
20 82, right?
21     Q.    Yes.
22     A.    Do you have a page number?  It
23 is just easier.
24     Q.    It is page 35.
25     A.    All right, 35.  Okay, go ahead.
```

18 (Pages 66 - 69)

Page 70

WERNER

1
2    Q.    When you use the term
3  "fundamental market efficiency," do you
4  mean, as stated in paragraph 82 of your
5  rebuttal report, that the market for a
6  security is inefficient unless that
7  security price matches a specific target
8  price derived from one specific valuation
9  model?
10    A.    Well, I mean, I don't -- I
11  would encompass the entire part that I read
12  previously.  I think that gives a fuller
13  explanation.  I don't know if that one
14  sentence by itself encompasses the entire
15  definition.
16    Q.    And when you write in the last
17  sentence of paragraph 82 of your rebuttal
18  report that "this is not the correct
19  standard for evaluating market efficiency,"
20  that's just a statement of your
21  understanding of what securities law is,
22  right?
23    A.    Well, I mean, it is based on my
24  understanding of what my clients have told
25  me over the last -- well, I don't know,

Page 71

WERNER

1
2  when was Halliburton II?  2014.  So the
3  last nine years.
4    Q.    Your clients being plaintiffs
5  securities class action lawyers, right?
6    A.    Well, my clients being lawyers.
7  They are not all plaintiffs securities
8  class action lawyers.
9    Q.    Okay.  So you are not opining
10  as an expert here today whether what you
11  define in paragraph 82 of your rebuttal
12  report as fundamental efficiency is or is
13  not the correct standard for evaluating
14  market efficiency in a securities class
15  action, are you?
16    A.    Am I opining about whether or
17  not that is the correct standard?  I mean,
18  I say it is the incorrect standard.  I
19  don't know, is that opining that it is not
20  the correct standard?
21    Q.    Okay.  So then are you, I guess
22  I'm just -- I'm quite surprised to hear
23  that, so are you opining here today --
24    A.    Well, I'm asking you.  I don't
25  know whether that is considered opinion.

Page 72

WERNER

1
2  I'm just stating what I stated in my
3  report.
4    Q.    I'm asking you what you are
5  opining, sir.  Are you opining that what
6  you in paragraph 82 of your rebuttal report
7  call fundamental efficiency is not the
8  correct standard for evaluating market
9  efficiency in a securities class action?
10    A.    That is my understanding.
11    Q.    Is it an opinion that you are
12  rendering as an expert?
13    A.    I don't believe so.
14    Q.    You are merely repeating what
15  lawyers have told you they believe the law
16  is, right?
17    A.    Well, as well as my reading,
18  but as a layman.  To be specific, as an
19  economist, that's my understanding.  So
20  based on, yes, based on conversations with
21  lawyers, both plaintiff and defense
22  lawyers, as well as my conversations I
23  guess with my colleagues and my reading of
24  academic articles, Supreme Court decisions.
25        I mean, look, economists make a

Page 73

WERNER

1
2  distinction between fundamental efficiency
3  and informational efficiency.  I mean,
4  Dr. Fischel -- fuck -- sorry -- can we
5  strike -- can we strike that?  No.
6        Mr. Fischel, right, delineates
7  between, and he did this in the IPO case as
8  well as some of his academic work,
9  delineates between fundamental efficiency
10  and informational efficiency.  So, I mean,
11  is there a difference?  Yeah, there is a
12  difference.
13    Q.    All right.
14    A.    But, I mean, it is not like
15  economists just say oh, stocks must be --
16  it is not like all economists or all
17  financial economists have determined that
18  all stocks might be fundamentally
19  efficient.  Again, I mean, I cite to
20  Fischel in his -- well, I guess since I'm
21  citing to Fischel, we should go to the
22  cite.  Where are we here?  Again, I'm back
23  at 282, Exhibit 282 to this deposition.
24        So among other things that he
25  said, I'm looking at paragraph 84, page 36,

19 (Pages 70 - 73)

Page 74

WERNER

1
2 "Unfortunately, no direct method exists for
3 testing how closely prices reflect value
4 because the value of an asset cannot be
5 measured apart from its price."
6        And then he goes on to say --
7 now I'm reading from Halliburton, sorry.
8 Oh, all right, yeah, so here, paragraph 86,
9 page 37, this is quoting from Mr. Fischel's
10 Cornell Law Review article in '89.
11 "Indeed, the constant search for market
12 professionals for mispriced securities is
13 the mechanism whereby price reflects
14 information about underlying values, and to
15 emphasize, again, the critical question is
16 not whether market prices are always a
17 perfect proxy for the underlying value of
18 the asset, but whether a better proxy
19 exists on a consistent basis.  Thus far,
20 the answer to this critical question is
21 no."
22        And to the best of my
23 knowledge, even though this was written in
24 '89, the answer to that question continues
25 to be no today.

Page 75

WERNER

1
2    Q.   Do you understand, sir, that
3 the judge in this case will determine what
4 the law is?
5    A.   I think that's true in every
6 case, right?  But as opposed to other
7 cases?
8    Q.   Do you understand that it is
9 true in this case?
10   A.   I believe that's true.  I have
11 no reason not to.
12   Q.   All right.  And so am I right
13 that you are not purporting to opine as to
14 what the legal standard for market
15 efficiency in this case should be?
16   A.   Oh, that is correct.  That is
17 correct, yes.
18   Q.   All right.
19   A.   Is now a good time to take a
20 break?
21   Q.   Let me just ask you this
22 question again, because I'm trying to
23 finish this question about what finance
24 theory holds.
25        Do you agree as an economist

Page 76

WERNER

1
2 that in an efficient market finance theory
3 holds that the market price of a stock
4 reflects the discounted value of expected
5 future cash flows to the stockholder?
6    A.   And, again, I refer to you,
7 that is the definition of fundamental
8 market efficiency.  Does finance theory
9 hold that fundamental market efficiency is
10 exactly what you wrote?  The answer is yes.
11   Q.   Okay.  And do you agree, then,
12 that as a result new information that
13 causes the market to significantly alter
14 its expectations of future cash flows will
15 cause a quick repricing of the security to
16 reflect these new expectations?
17   A.   Oh, I would certainly expect
18 that to be the case, yes, whether it is
19 fundamentally efficient or informationally
20 efficient.
21        MR. RYAN:  Okay.  Why don't we
22 take a quick break.
23        THE VIDEOGRAPHER:  This will
24 end media unit two.  We are going off
25 the record at 11:41.

Page 77

WERNER

1
2 (Recess taken.)
3        THE VIDEOGRAPHER:  We are back
4 on the record at 11:49.  This will
5 begin media unit three.
6 BY MR. RYAN:
7    Q.   All right.  So did I understand
8 you before, Dr. Werner, correctly that
9 based on discussions you have had with
10 lawyers, your understanding is that what
11 you call fundamental efficiency does not
12 apply in a securities class action?
13   A.   I don't know if that's
14 accurate.  I mean, I don't know, there
15 could be instances where it does apply.
16   Q.   Let me ask a better question.
17 Let me ask a better question, since I think
18 I may have asked a bad one.
19   A.   Sure, sure.
20   Q.   Did I understand you correctly
21 before, Dr. Werner, that based on
22 discussions you've had with lawyers your
23 understanding is that what you call
24 fundamental efficiency is not required for
25 a finding of market efficiency in a

20 (Pages 74 - 77)

Page 78

```
1           WERNER
2  securities class action?
3      A.   My understanding, and it's not
4  just on my discussions with lawyers, it is
5  also discussions with my colleagues,
6  reading of case law, and, again, I'm not a
7  lawyer, review of academic literature, that
8  the basis under Halliburton II is that
9  stocks must be informationally efficient.
10 That's the impression I'm under.  If that's
11 wrong, then I'm incorrect or my
12 understanding is incorrect.
13     Q.   All right.  So you are under
14 the impression that only what you call
15 informational efficiency is required in a
16 securities class action, right?
17     A.   I believe that -- I believe
18 that is incorrect.
19     Q.   All right.  And so the flip
20 side of that, then, would be that you are
21 under the impression that in a securities
22 class action, what you call fundamental
23 efficiency is not required, right?
24     A.   I guess the question, is it
25 necessary or sufficient?  I think as
```

Page 79

```
1  long -- so it might be -- I don't know.
2  Let's not get into logic.
3      Q.   Right.  I was asking you
4  whether it was necessary, not whether it
5  was sufficient.
6      A.   I guess the answer to that
7  question is yes, that is my understanding.
8      Q.   Okay.  And so when you
9  approached your assignment in this matter
10 and the opinions on market efficiency that
11 you gave in this matter, am I right that
12 you did not attempt to apply the
13 proposition from finance theory that holds
14 that in an efficient market the market
15 price of a stock reflects the discounted
16 value of expected future cash flows to the
17 stockholder?
18     A.   So, I mean, do we want to
19 stipulate that that's the definition of
20 foundational market efficiency?  I don't
21 know why you keep reading that particular
22 statement rather than just say fundamental
23 market efficiency.  But you are asking the
24 questions.
```

Page 80

```
1           WERNER
2      Could you repeat the question,
3  please?
4      Q.   Sure.  When you approached your
5  assignment in this matter and the opinions
6  on market efficiency that you gave in this
7  matter, am I right that you did not attempt
8  to apply the proposition from finance
9  theory that holds that in an efficient
10 market the market price of a stock reflects
11 the discounted value of expected future
12 cash flows to the stockholder?
13     A.   I did not apply the standard of
14 foundational market efficiency.
15     Q.   All right.
16         MR. ROSEN:  He misspoke.  He
17 used the word "foundational."
18         THE WITNESS:  Oh, foundational,
19 you are right.  I should have said
20 fundamental market efficiency.  You
21 used the word "foundational," so it
22 obviously stuck in my brain.
23     Q.   Okay.  And so when you say that
24 you did not render in your opinions in this
25 case attempt to apply what you call
```

Page 81

```
1           WERNER
2  fundamental market efficiency, you are
3  saying that you did not attempt to apply
4  the proposition that the market price of a
5  stock reflects the discounted value of
6  expected future cash flows to the
7  stockholder, right?
8      A.   My answer hasn't changed.
9      Q.   And so is your answer that you
10 did not attempt to apply that because that
11 is what you believe fundamental market
12 efficiency is?
13     A.   Again, it's the same answer I
14 gave you five, ten minutes ago.  It hasn't
15 changed.
16     Q.   So I don't know what the answer
17 is, sir.  So I'm entitled to understand
18 whether the answer is yes or no.
19     A.   So can you go back to the part
20 where he last asked me that question?  It
21 has been like five or six times.  So
22 whenever you find it, you can just read my
23 response to him.
24     Q.   I'm entitled to an answer to
25 this question.  So let me ask again.  It is
```

21 (Pages 78 - 81)

Page 82

WERNER

1    a quite simple question.  My question is
2    this:
3
4         In your work on this case and
5    in the opinions that you rendered in this
6    case, am I right that you did not attempt
7    to apply the proposition from finance
8    theory that the market price of a stock
9    reflects the discounted value of expected
10   future cash flows to the stockholder?
11       A.    I did not use fundamental --
12   the fundamental -- the definition of
13   fundamental market efficiency as the
14   standard in my work in this case.
15       Q.    All right.  And you believe
16   that the proposition that I read out in my
17   immediately preceding question is the
18   definition of fundamental market efficiency
19   which you did not apply?
20       A.    I believe it is the definition
21   of fundamental market efficiency.
22       Q.    Okay.  Do you agree that an
23   efficient capital market rapidly and
24   efficiently digests all available
25   information and translates that information

Page 83

WERNER

1
2    into the processed form of a market price?
3        A.    Okay, so that sounds like
4    something I may have said.  Is that
5    something you want me to look at or do you
6    want to reread it?
7        Q.    I'm happy to ask the question
8    again.
9        A.    You can let him reread it.  It
10   is fine.
11           MR. RYAN:  Sure.  Go ahead.
12           (The record was read.)
13       A.    I mean, could you read it
14   again?  I mean, if you want me to look at
15   something, I'm happy to look at it, but let
16   me just -- let me process all of the
17   information incorporated in that question.
18           (The record was read.)
19       A.    In the processed form of a
20   market price?  What do you mean by
21   processed form?
22       Q.    Well, let me ask the question
23   more simply then.
24           Do you agree that an efficient
25   capital market rapidly and efficiently

Page 84

WERNER

1
2    digests all available information and
3    translates that information into a market
4    price?
5        A.    I believe that statement is
6    accurate.  But, again, I mean, I can cite
7    to Mr. Fischel, I'm not sure if it was in
8    the IPO litigation or other litigation,
9    that he defined fast and quickly as an
10   18-hour period.  You know, one's definition
11   of fast is definitely possibly subjective.
12       Q.    Do you agree that a corollary
13   of the efficient market hypothesis is that
14   disclosure of confirmatory information, or
15   information already known by the market,
16   will not cause a change in the stock price?
17           MR. ROSEN:  Could you reread
18       that question.
19           (The record was read.)
20       A.    I think under the definition of
21   fundamental market efficiency, that
22   statement is correct.
23       Q.    Do you believe that that
24   statement is incorrect under the definition
25   of what you call informational market

Page 85

WERNER

1
2    efficiency?
3        A.    Well, it could be incorrect.
4        Q.    So you believe that that
5    statement is not necessarily correct under
6    what you call informational market
7    efficiency?
8        A.    I believe your statement is
9    correct.
10       Q.    Okay.  And so in providing your
11   opinions on market efficiency in this
12   matter, am I right that you did not attempt
13   to apply the proposition that disclosure of
14   confirmatory information or information
15   already known by the market will not cause
16   a change in the stock price?
17       A.    Could you repeat that, please?
18           (The record was read.)
19       A.    There is one word I missed
20   there.  Sorry, can you reread it again?
21   And I will stop you when I reach the word
22   that I was focused on and forgot.
23           (The record was read.)
24       A.    So it's the word "proposition."
25   I don't know if I applied that proposition

22 (Pages 82 - 85)

Page 86

WERNER

1
2 or not.
3     Q.    All right.  You didn't set out
4 to apply that proposition I take it that?
5     A.    I didn't, I mean, I didn't do
6 it one way or the other.  I didn't set out,
7 I didn't not set out.
8     Q.    Okay.
9     A.    I mean -- well, we -- I'm sure
10 we will get into it more later.  Go ahead.
11    Q.    Do you agree that if you saw
12 all sorts of crazy stock price movements on
13 no information, that might inform you that
14 the stock was not efficient?
15    A.    Crazy stock price movements, so
16 I'm sure you have examples of what you mean
17 by crazy stock price movements.  So would
18 you like to give me some examples?  I mean,
19 you --
20    Q.    I will, but let me -- let me
21 ask you -- let me ask you the general
22 question first.
23          So do you agree that if you saw
24 what you considered crazy stock price
25 movements on no information that might

Page 87

WERNER

1 inform you that the stock wasn't efficient?
2     A.    So things that I thought were
3 crazy?
4     Q.    Yes.
5     A.    Could that inform my opinion?
6 It certainly could inform my opinion as to
7 whether or not the stock was fundamentally
8 efficient.
9     Q.    Could it inform your opinion as
10 to whether or not the stock was, to use
11 your term, informationally efficient?
12    A.    I don't, as I sit here today, I
13 don't know.  It is not anything I have
14 thought about.  I mean, in your
15 hypothetical you are talking about crazy
16 stock price movements.
17    Q.    I am.
18    A.    I don't know what you mean by
19 crazy stock price movements.  So it is not
20 anything -- I haven't sat down with anyone
21 and said hey, let's think about crazy stock
22 price movements without defining what crazy
23 stock price movements are and then how does
24 that affect my opinion about market

Page 88

WERNER

1
2 efficiency.
3     Q.    Well, how would you define
4 crazy stock price movements?
5     A.    It's your -- it's your term.  I
6 don't know.  It's not -- it's not anything
7 I have thought about.  I don't sit around
8 thinking, you know what, this is a crazy
9 stock price movement or this is not a crazy
10 stock price movement.  That's why I'm
11 asking, go ahead, show me what you mean.  I
12 mean, I'm sure you have examples.  I'm
13 happy to render an opinion about those.
14    Q.    Right.  I do certainly have
15 examples in this case of crazy stock price
16 movements, that's for sure.
17    A.    I should say what you believe
18 are examples of crazy stock price
19 movements.
20    Q.    Were you an expert in a case
21 called Hi-Crush Partners?
22    A.    Evidently.
23    Q.    Do you remember being an expert
24 in that case?
25    A.    I do not recall being an expert

Page 89

WERNER

1
2 in that case.  But I was -- I mean, it's on
3 my vitae.
4     Q.    All right.  Let me hand you
5 what we have marked as Deposition Exhibit
6 283, which is a transcript of the
7 deposition of Dr. Adam Werner in the case
8 captioned In Re Hi-Crush Partners LP
9 Securities Litigation held on April 24th,
10 2014.
11          (Defendant's Exhibit 283 marked
12 for identification.)
13    A.    April 24th, so over nine years
14 ago.  All right, go ahead.
15    Q.    So if I could ask you, please,
16 to look at page 124 of this deposition,
17 line 25.
18    A.    Page 124.  Hold on.  124.
19    Q.    Do you see that you said at
20 page 124, line 25, to page 125, line 4 "So,
21 I mean, if I saw all sorts of crazy stock
22 price movements on no information, that
23 might inform me that the stock wasn't
24 efficient"?
25          Do you see that?

23 (Pages 86 - 89)

Page 90

WERNER

1          WERNER
2    A.   I do see that.
3    Q.   All right.  And that is
4 testimony that you gave in the Hi-Crush
5 case, right?
6    A.   Right, or, I'm sorry, correct.
7    Q.   And the reason that you gave
8 that testimony is that if you saw all sorts
9 of crazy stock price movements without any
10 new information coming to the market, that
11 might inform you that the stock was not
12 trading in an efficient market, right?
13    A.   Well, let me -- let me read
14 around this so I know exactly.  I mean,
15 look, I don't even -- I don't have this
16 report.  I don't remember this case at all.
17 So let me -- let me read some of the
18 context in which -- and I will figure out
19 whether the facts and circumstances are
20 similar to this case and what exactly I
21 meant.
22          (Witness perusing document.)
23    Q.   So if you have read pages 122
24 to 125 I think you have all the context
25 that we need to understand this.

Page 91

1          WERNER
2    A.   Oh, well, I don't want to
3 disagree with you, but, again, this is --
4 when was this deposition?  Over nine years
5 ago.  And I believe it was before -- I
6 don't know, when did the Halliburton II
7 decision come out?  Anyway, I mean, I need
8 to read what I need to read to answer your
9 question properly, right?
10    Q.   All right.  So let me try to --
11 let me ask you a question --
12    A.   So do you want to rescind that
13 question?  Or do you want me to continue to
14 try to answer it?
15    Q.   Why don't I withdraw my
16 previous question and ask you this
17 question:
18          Do you see on page 122 of this
19 transcript from the Hi-Crush case that you
20 had -- that you were analyzing a class
21 period in this case from September 19th
22 through November 12th, 2012?
23    A.   I do see that that's what I was
24 doing, yes, or at least that's what the
25 lawyers -- again, I don't recall this.

Page 92

WERNER

1          WERNER
2 That's what the --
3          MR. ROSEN:  Are you saying the
4    class period or the stock period?
5          MR. RYAN:  I'm asking the class
6    period.
7          MR. ROSEN:  Where does the
8    class period say that?  I saw study
9    period.  I didn't see class period.
10    A.   Wait, hold on.  So this is just
11 a question the lawyer is asking, so I have
12 no idea what we are talking about.
13    Q.   Okay.
14    A.   Like I said, I barely remember
15 this case.  So yeah, I don't know what was
16 going on here.  But if you want me to read
17 it and try to get context so I can answer
18 your questions, I'm happy to do that.
19    Q.   Do you see on page 122 on lines
20 13 to 18 the lawyer who is questioning you
21 asks you whether you agree with him that in
22 your event study in that case there were no
23 statistically significant dates during the
24 class period, and he explains that the
25 class period was from September 19th

Page 93

1          WERNER
2 through November 12th of 2012?
3    A.   I mean, yeah, that's the way I
4 would read it as I sit here today.
5    Q.   And then do you see that the
6 lawyer goes on to ask you about how there
7 is a subsequent event period that you study
8 for one year after the class period in the
9 Hi-Crush case from November 13th, 2012
10 through November 13th, 2013 where there are
11 a number of statistically significant dates
12 in your regression analysis?
13    A.   Well, again, in order to answer
14 these questions, I really need to put these
15 statements that I made into context.  So
16 I'm happy to read this and let that inform
17 my opinion of exactly what I said if you
18 would like me to.  But I would like that
19 opportunity so I can answer the question as
20 accurately as possible.  Again, I don't
21 remember this case at all.
22    Q.   Right.  So what I'm asking you
23 right now is whether you see on pages 122
24 to 123 that that is what the lawyer is
25 asking you, whether you agree that in this

Page 94

WERNER

1
2  case, the Hi-Crush case, you analyzed an
3  event period for one year subsequent to the
4  class period and there were statistically
5  significant dates during that period?
6      A.    So if you are just asking if
7  you are reading that statement correctly,
8  the answer is yes, you are reading the
9  statement correctly.  But I have no context
10 for what that guy was asking or why he was
11 asking it without reading more of my
12 deposition.
13     Q.    Okay.  And then do you see on
14 page 123 at lines 8 through 17 you are
15 asked to confirm that there were no
16 statistically significant dates during the
17 class period in Hi-Crush, and you confirmed
18 that that's accurate?  Do you see that?
19     A.    Where?
20     Q.    On page 123, lines 8 through
21 17.
22     A.    Wait, I'm sorry, so it seems
23 like -- my reading of this is that there
24 were some disagreement over what the class
25 period was.  Was that the case?

Page 95

WERNER

1
2      Q.    That's not my understanding.
3  My understanding is these questions are
4  just distinguishing between the class
5  period and a one-year period that you also
6  analyzed in the Hi-Crush case following the
7  class period.
8      A.    Okay.  So during the class
9  period, and this is me asking it, I'm using
10 your definition or everyone's definition,
11 so that to me suggests that there was some
12 conflict over what the proper class period
13 was.
14         I certainly want more
15 information about that so that I can -- I
16 mean, again, if you want to ask me if you
17 are just reading it correctly, the answer
18 is yes.  If you want me to give a
19 substantive answer, I need to understand
20 what was going on here.
21         Again, to the extent that there
22 was some -- I don't know if part of this
23 conflict leaked into this additional period
24 that I was looking at.  I have no idea as I
25 sit here today.

Page 96

WERNER

1
2      Q.    And then do you see on page
3  124, beginning at line 5, the lawyer asks
4  you to explain how you were able to
5  conclude based on the presence of
6  statistically significant events during the
7  subsequent period, the subsequent one-year
8  period, how that forms your opinion that
9  the market was efficient during the class
10 period, and then do you see your answer
11 that begins at line 19 that reads "Answer:
12 Well, there are no -- I mean, I don't --
13 you are right, I don't see any
14 statistically significant price movements,
15 but there was also no material news
16 issue during that time.  So, I mean, if I
17 saw all sorts of crazy stock price
18 movements on no information, that might
19 inform me that the stock wasn't efficient"?
20         Do you see that?
21     A.    I see your reading of that,
22 yes.  I mean, you read it correctly, not
23 that I see your reading, you are obviously
24 reading.  I'm not seeing words in front of
25 me.

Page 97

WERNER

1
2      Q.    And so what you are saying
3  there was that even though there were no
4  statistically significant stock price
5  movements during the class period in the
6  Hi-Crush case, that wasn't inconsistent
7  with efficiency, because there was also no
8  material information that was coming out
9  about the company during the period, and so
10 you didn't expect to see statistically
11 significant stock price movements, right?
12     A.    I'm sorry, where are you
13 reading from?  Where are we talking about
14 material information?  I missed that part.
15         Again, if you want me to answer
16 these questions and you are going to talk
17 about material information, I definitely
18 need to read more of this.  I will point
19 out -- see, I don't remember the facts of
20 this case.  Was there a corrective
21 disclosure at the end of the class period?
22 Like is this one of these cases where, you
23 know, the class period ended on the 26th
24 and the corrective disclosure came after
25 the market closed on the 26th, and so that

25 (Pages 94 - 97)

Page 98

WERNER

1
2 we observed the stock price movement on the
3 27th?
4          I don't -- I mean, I would say
5 that I need, in order to answer your
6 questions, I need to understand the facts
7 and circumstances surrounding this case,
8 and my guess is the facts and circumstances
9 surrounding this case, to the extent that I
10 recall it, which I don't, are different
11 than the facts and circumstances associated
12 with this case.
13     Q.    So do you see that the phrase
14 that you used in your answer that I just
15 read out beginning at page 124, line 19,
16 was "no significant news"?
17     A.    I'm sorry, where are we?
18     Q.    Do you see that in the answer I
19 just read out from page 124, line 19,
20 through page 125, line 4, you used the
21 phrase, on lines 22 to 23, "no significant
22 news"?
23     A.    I do see that.
24     Q.    All right.  So isn't it the
25 case that what you are testifying here was

Page 99

WERNER

1
2 that during the class period in the
3 Hi-Crush case you didn't see any
4 statistically significant price movements,
5 but there was also no significant news
6 issued during that period, and therefore
7 the lack of statistically significant stock
8 price movements was not inconsistent with
9 market efficiency?
10     A.    Again, I don't know what I was
11 saying in this case.  This is nine years
12 ago.  Again, I'm happy to read more of this
13 so I understand exactly what was going on
14 in this case to accurately answer your
15 question.
16          I mean, I guess I -- I assume
17 what I meant there was fundamental market.
18 I mean, do I even mention market
19 efficiency?  I probably -- yeah, again, I
20 don't recall this at all, but I'm happy to
21 read and refresh my recollection and give
22 you the best answer I can.  So I don't
23 understand -- I don't know the facts and
24 circumstances of this case.  I don't know
25 why there wouldn't have been any

Page 100

WERNER

1
2 information during the class period.
3          MR. ROSEN:  Do you have his
4 report so --
5     A.    There you go.  I can look at my
6 report and tell you.
7     Q.    Let me ask you the question
8 this way:  As you sit here today, do you
9 agree that if during a particular time
10 period you see all sorts of crazy stock
11 price movements on no information, that
12 might inform you that the stock wasn't
13 efficient?
14     A.    Do I agree today -- I think
15 if -- and, again, this is nine years ago,
16 and, again, I believe before Halliburton II
17 came out, I believe if I put in the term
18 "fundamental market efficiency," your
19 statement is correct.
20          But, well, I mean, to the
21 extent I can answer the question, that's my
22 answer.  But, again, I mean, this was -- I
23 don't recall this case at all.  I mean, I
24 can't even -- I couldn't even find a
25 report.  You presumably have the report.

Page 101

WERNER

1
2 I'm happy to take a look at it if you want
3 me to.  Maybe that will reflect -- refresh
4 my memory as to it.
5     Q.    So in the work that you are
6 doing in this litigation that brings us
7 here today, in the short squeeze trading
8 litigation, am I right that you are not
9 applying the principle that if you see all
10 sorts of crazy stock price movements on no
11 information, that might inform you that the
12 stock wasn't trading in an efficient
13 market?
14     A.    I think, again, I don't recall
15 this case at all.
16     Q.    I'm not asking you about the
17 case.
18     A.    No, no, no.  I'm speculating
19 that what I was talking about here was
20 fundamental market efficiency.  What I am
21 talking about and what I have realized over
22 the last nine years based on literature,
23 based on discussions, based on case law, is
24 that the standard is informational market
25 efficiency.  That is the standard I'm

26 (Pages 98 - 101)

WERNER

1
2 applying for this case.
3    Q.    So regardless of the specifics
4 of the Hi-Crush case, is it the case that
5 at some earlier point in time during your
6 career as a testifying expert, you were
7 applying a standard that you now consider
8 to be fundamental market efficiency?
9    A.    I think from an academic
10 perspective, to the extent I was thinking
11 like an academic and thinking about a
12 theoretical world, that is correct.
13    Q.    And so am I understanding you
14 right, then, that over time in your career
15 as a testifying expert you have consciously
16 changed the standard that you are applying
17 and you are no longer applying a
18 fundamental efficiency standard, you are
19 now applying what you call an informational
20 efficiency standard?
21    A.    Well, I mean, it's not just me
22 who calls it informational market
23 efficiency.  I mean, Mr. Fischel calls it
24 informational market efficiency, thousands
25 of economists call it informational market

WERNER

1
2 efficiency.  It is an accepted term within
3 the finance world.
4         So am I applying the standard
5 of informational market efficiency which is
6 accepted throughout academia?  Yeah, that's
7 what I'm applying.  I'm sorry, whoa, did I
8 say fundamental or informational?
9    Q.    You said informational.
10    A.    I'm sorry, this is just --
11 again, I'm just confused by this case.
12    Q.    So let me get back to my
13 question.  Is it the case, then, that over
14 time in your career as a testifying expert
15 you have consciously changed the standard
16 that you are applying and you are no longer
17 applying a fundamental efficiency standard,
18 you are now applying an informational
19 efficiency standard?
20    A.    I believe that is correct.  I
21 believe my understanding is that the
22 standard, and, again, based on everything I
23 have stated, that in this, I don't know,
24 realm, the world of securities class
25 actions, that the standard of efficiency is

WERNER

1
2 informational market efficiency.
3    Q.    All right.  And so if in this
4 case you believe that there were crazy
5 stock price movements on no information, am
6 I right that you would not draw any
7 conclusion from that one way or the other
8 as to whether the markets for those stocks
9 were informationally efficient?
10    A.    Again, I don't know what I
11 meant by "crazy" nine years ago.
12    Q.    I'm not asking you that, sir.
13 I'm not asking you anything about --
14    A.    But you are.  You are asking me
15 about crazy stock price movements, right?
16 Was that not in the question?
17    Q.    Hi-Crush was not in the
18 question.
19    A.    No, no, but the word "crazy"
20 was in the question, correct?
21    Q.    Let me ask you the question
22 again.
23         If in this case you believed
24 that there were crazy stock price movements
25 on no information, am I right that you

WERNER

1
2 would not draw any conclusion from that one
3 way or the other as to whether the markets
4 for those stocks were informationally
5 efficient?
6    A.    Again, I don't know what you
7 mean by "crazy."
8    Q.    All right.  So that term "crazy
9 stock price movements" is one that you
10 agree that you used under oath, right?
11    A.    Nine years ago, right.  Do you
12 want me to reread this so I get an
13 understanding and context of "crazy"?
14 Because I'm happy to do it so I have a
15 better understanding of what I meant by
16 "crazy" nine years ago.  But if you have a
17 definition today of "crazy" that you would
18 like me to use in this matter, define it
19 for me and I will try to apply it to this
20 matter.
21    Q.    Okay.
22    A.    Does that make sense?  I mean,
23 I think I'm being reasonable here.  I'm
24 just trying to answer the question to the
25 best of my ability, and you are using a

27 (Pages 102 - 105)

Page 106

WERNER

1        WERNER
2 subjective term that I guess I used in a
3 deposition nine years ago. Who knows what
4 was going on in my life at that point in
5 time.
6        So is there a corollary to what
7 "crazy" means today? I honestly -- I don't
8 know what you mean, so give me some
9 examples, I'm happy to take a look at them.
10 But it's a subjective term, so I need to
11 understand what it means, or what you think
12 it means. I think that's reasonable.
13   Q.   All right. And you understand
14 that in the Hi-Crush case itself there in
15 fact were no statistically significant
16 stock price movements during the class
17 period, and so you were introducing a
18 counterfactual of the crazy stock price
19 movements, right? You understand that,
20 don't you?
21   A.   No, I don't understand it. I
22 don't remember the case. But, again,
23 either -- here, I will give you the best
24 answer I can. If you give me the report
25 and allow me to look at it, or allow me to

Page 107

1        WERNER
2 read my deposition testimony so I have a
3 clear understanding of what was happening
4 in this case.
5   Q.   All right. Could you turn,
6 please, to Exhibit 7A.
7        So we're going off of this? We
8 are going off "crazy"?
9   Q.   We are going off the Hi-Crush
10 case. I'm taking you up on your invitation
11 for me to give you some facts of this case
12 so we can see whether the stock price
13 movements are crazy.
14   A.   Okay. Hold on. Hold on. What
15 is this? Did you give me the whole
16 deposition?
17   Q.   Yes, sir.
18        MR. ROSEN: You just turned
19   around the front page.
20   A.   Do I need this anymore?
21   Q.   No.
22   A.   Okay, we are fine.
23   Q.   Do you have your opening
24 report, marked as Exhibit 281 to this
25 deposition?

Page 108

WERNER

1        WERNER
2   A.   I do. Whoa, all right, I do.
3   Q.   Could you please turn to page
4 132.
5   A.   132. Okay.
6   Q.   All right. Are you with me
7 here on the last page of your Exhibit 7A?
8   A.   I am here, yeah.
9   Q.   And these are the day-by-day
10 results of your AMC event study, right?
11   A.   Oh, okay, yeah. I just saw
12 this one page in a vacuum and I thought I
13 couldn't figure out why I would just put
14 one, you know, point on a page.
15        MR. ROSEN: Which exhibit are
16   you on?
17        THE WITNESS: 7A, so page 132.
18   And for context you may want to look at
19   131 before that.
20   Q.   Right. So Exhibit 7A begins on
21 page 125, right?
22   A.   Yeah.
23   Q.   And on --
24   A.   Yes.
25   Q.   And on pages 125 to 132 there

Page 109

WERNER

1        WERNER
2 is an entry for each day during your
3 one-year period, right?
4   A.   Correct.
5   Q.   And you found that in your
6 event study on January 27th, 2021 the
7 residual return for AMC was 138.05 percent,
8 right?
9   A.   Well, oh, yeah, I'm sorry. I'm
10 looking at the wrong page. On a
11 logarithmic -- on a logarithmic basis, yes,
12 that is correct, the abnormal return.
13   Q.   And if we look, for example, at
14 Koss, this is now page 172 in Exhibit 7F.
15   A.   Okay, hold on. Okay.
16   Q.   You found that the residual
17 return for Koss on January 27th, 2021 was
18 176.03 percent, right?
19   A.   Correct, again, on a
20 logarithmic basis, but yes.
21   Q.   And I will do one more. If we
22 look at Express, this is now on page 156,
23 Exhibit 7D to your opening report --
24   A.   Oh, I'm sorry, what page?
25   Q.   156.

28 (Pages 106 - 109)

Page 110

WERNER

2    A.    156.
3    Q.    You found that the residual
4  return for Express on January 27th, 2021
5  was 118.43 percent, right?
6    A.    Correct.
7    Q.    All right.  And so do you agree
8  with me that at least for AMC, Koss and
9  Express, those were crazy stock price
10  movements on January 27th, 2021?
11    A.    No, I don't think I will ever
12  use the term "crazy stock price movements"
13  again.  I would say they are large.
14    Q.    They are each over 100 percent
15  residual return on one day, right?
16    A.    That is correct.
17    Q.    And by residual return, we mean
18  adjusted for market and industry index
19  returns, right?
20    A.    Correct.
21    Q.    So this is, in effect, a
22  company-specific return for each of these
23  stocks was each over 100 percent on that
24  day, right?
25    A.    That is correct.

Page 111

WERNER

2    Q.    That is highly abnormal, isn't
3  it?
4    A.    It is large.
5    Q.    Do you agree with me that it is
6  highly abnormal?
7    A.    I haven't performed a study to
8  determine whether or not it is highly
9  abnormal.  It is large.
10    Q.    You have performed a day-by-day
11  study of the returns over a full year for
12  each of those three stocks as well as other
13  stocks, right?
14    A.    Correct.
15    Q.    And so that study informs you
16  as to whether those one-day returns are
17  highly abnormal, doesn't it?
18    A.    Again, what do you mean by
19  highly abnormal?  They are large.  Highly
20  abnormal relative to what?  Is there some
21  statistical standard you are trying to put
22  into place here?
23    Q.    Okay.  So you are unable to
24  apply the eyeball test to determine those
25  are highly abnormal; is that right?

Page 112

WERNER

2    A.    They are large.
3    Q.    Do you agree that they are the
4  largest for any day during your study?
5    A.    Oh, as I sit here, I don't
6  recall.  I'm happy to look through all of
7  these exhibits and let you know if that's
8  the case.
9    Q.    That is not something you
10  thought about before I just asked you that
11  question?
12    A.    That these are the largest
13  stock price movements?
14    Q.    Yes, sir.
15    A.    These three companies?
16    Q.    On January 27th, 2021, yes,
17  sir.
18    A.    I mean, I have thought about
19  the stock price movements.  I haven't
20  thought about whether they are the largest
21  stock price movements throughout the seven
22  companies I studied, or nine companies I
23  studied.  So, I mean, no, I haven't thought
24  about the fact that these are the largest
25  stock price movements among the nine

Page 113

WERNER

2  companies.
3    Q.    That wasn't the question I
4  meant to ask, so let me ask a better
5  question.
6    A.    All right, sure.
7    Q.    You have noticed before this
8  line of questioning at your deposition,
9  haven't you, that January 27th, 2021 was
10  the largest stock price movement during
11  your one-year period for AMC, right?
12    A.    I believe that's correct, but I
13  can look through it and verify that for
14  you.
15    Q.    And you have noticed --
16    A.    Wait, do you want me to look
17  for it?
18    Q.    No, I'm asking you whether
19  you -- whether you observed that fact
20  before your deposition here today.
21    A.    So --
22    Q.    Did you observe that fact?
23    A.    I'm sure I did.  But I don't
24  know that what you are saying is correct.
25  If you want me to let you know that what in

29 (Pages 110 - 113)

Page 114

WERNER

1
2 fact you are saying is correct, let me look
3 through --
4    Q.    That is not my question, sir.
5    A.    Well, it is your question.
6    Q.    No, my question is not --
7    A.    Could you reread the question,
8 please?
9        (The record was read.)
10    A.    Did I observe that fact?
11 Right, so I don't recall.
12    Q.    Okay.
13    A.    If that fact as you stated is
14 in fact a fact.  So let me look through --
15    Q.    That means that you didn't --
16    A.    No.
17        MR. ROSEN:  Hold on, don't
18    argue with him.  Your question, what
19    you just said, that means if he didn't
20    observe it, therefore he never saw it.
21    That's not true.  He may not remember,
22    right?
23        So he may not have memorized
24    all the stock price movements for the
25    nine stocks over that one-year period.

Page 115

WERNER

1
2    When you ask him a question whether
3    that is the largest, he just wants to
4    look to see if that is true because he
5    may not be remembering.
6    Q.    My question is not whether it
7 is the largest.  My question, sir, is
8 before today's deposition did you observe
9 whether the stock price movement in AMC on
10 January 27th, 2021 was the largest of any
11 of the daily stock price movements for AMC
12 during your one-year period?
13    A.    Again, if you want to stipulate
14 to the fact that that is the largest stock
15 price movement along that one-year period,
16 then I'll say yes, I observed it.  But if
17 you want me to answer that question without
18 that stipulation, I need to look at daily
19 stock price.
20    Q.    Okay.
21    A.    I mean, this isn't a memory
22 test, right?  Like I can't tell you well,
23 you know, Dr. Werner, can you tell me what
24 the price of Tootsie Roll was on December
25 12th, 2020 and what the abnormal return is,

Page 116

WERNER

1
2 I can't.  I gotta look at the report, or,
3 I'm sorry, I should use proper English.  I
4 have to look at the report.
5    Q.    So am I right, then, that it
6 was not important for any of your opinions
7 in this case whether the residual returns
8 on January 27th, 2021 were the highest of
9 any day during your one-year period for any
10 of these nine stocks?
11    A.    Again, are we stipulating to
12 the fact that it is the highest day?
13    Q.    No.  I'm asking you was it
14 important for any of your opinions in this
15 case whether the residual returns on
16 January 27th, 2021 were the highest of any
17 day during your one-year period for any of
18 these nine stocks?  Was that important to
19 any of your opinions or not?
20    A.    So, again, I don't know if -- I
21 don't remember if this is the largest stock
22 price movement during that period.  If you
23 want me to look and tell you and verify
24 that it is in fact the largest stock price
25 movement, I will be happy to answer your

Page 117

WERNER

1
2 question.
3    Q.    That's not my question.
4    A.    Or do you want to stipulate --
5    Q.    Let me try to ask the question
6 again.
7    A.    There seems to be a fundamental
8 misunderstanding here, because when you say
9 "observe," at some point I observed it.
10 Did I mentally note that it was the largest
11 stock price movement?  I may have at one
12 point, but I can't be expected to sit here
13 today, I've got what, nine stocks,
14 basically 253 days, so nine times 253, can
15 I borrow this pen here?
16    Q.    Dr. Werner, "observe" was many
17 questions ago.  Please try to focus on this
18 question I'm asking.  Here is my question:
19        Was it important to any of your
20 opinions whether or not the stock price
21 movements on January 27th, 2021 were the
22 highest of any day during your one-year
23 period for any of the nine stocks you
24 studied?  Was that important to any of your
25 opinions, sir?

30 (Pages 114 - 117)

Page 118

WERNER

2   A.   So, okay, why don't you want me
3 to look at the data and verify that what
4 you are saying is correct?
5   Q.   Because that's not my question.
6   A.   Well, you are making a
7 statement in your --
8   Q.   Respectfully, I'm not.
9       MR. ROSEN:  Objection.  You
10   want him to answer two questions, one
11   of which assumes the truth of the
12   question -- of the stock prices.
13       MR. RYAN:  It doesn't.
14       MR. ROSEN:  Before he answers
15   it, he just wants to check if those
16   really were the largest.  Now, there is
17   a way to get to what you want
18   without --
19       MR. RYAN:  Let me ask -- let me
20   try to make very clear now.
21   Q.   I am not making any statement
22 about the fact of whether January 27th was
23 the largest stock price movement or not.
24 I'm not making any statement about that.
25 I'm asking you this question --

Page 119

WERNER

2   A.   But you have been, correct?
3   Q.   No.  I am asking you the
4 following question, sir --
5   A.   All right, so we are going to
6 agree to disagree.
7       MR. ROSEN:  Why don't you just
8   ask him if there were large stock price
9   movements?
10       MR. RYAN:  Not my question.
11   Larry, let me ask my question.
12       MR. ROSEN:  I'm just trying to
13   solve this --
14       MR. RYAN:  Let me ask my
15   question, please.
16   Q.   Was it important for you in
17 reaching your opinions to know whether
18 January 27th, 2021 was or was not the
19 largest stock price movement of any day
20 during the one-year period for any of these
21 stocks?
22   A.   I don't know how to answer that
23 question without verifying.  I mean, was it
24 large?  Yes.  I don't know why you are
25 stuck on the largest.  Like does that have

Page 120

WERNER

2 some significance?  Okay, then -- I mean,
3 we have been talking about this for ten
4 minutes.  I could have just looked through
5 this exhibit in one minute and verified
6 that what you are saying is accurate.
7   Q.   Are you able to identify any of
8 your opinions for me that would change
9 based on whether or not the stock price
10 movements on January 27th were the largest
11 during the one-year period?
12   A.   Okay, so now you are asking me
13 a different question.
14   Q.   That is the same question I
15 have been trying to ask you, worded
16 slightly differently.  I'm getting at the
17 importance of your opinions.
18   A.   Can you read the question
19 again, please?
20       (The record was read.)
21   A.   With regards to this report, I
22 don't know without verifying that what you
23 are saying is accurate, but no, my opinions
24 would not change.
25   Q.   Could you turn, please, to

Page 121

WERNER

2 paragraph 62, which is on page 26 of your
3 opening report, Exhibit 281.
4   A.   Paragraph 62.  Paragraph, not
5 page, right?
6   Q.   Yes.  The bottom of page 26.
7   A.   Did you say rebuttal or --
8   Q.   Opening report.
9   A.   Opening report, okay.  What am
10 I in here?  Oh, okay.  Okay.
11   Q.   And do you see you wrote there
12 "Prior to running a regression, one must
13 decide on an estimation period over which
14 to measure the relationship between the
15 security at issue and the corresponding
16 market and industry indices"?
17       Do you see that?
18   A.   Is the question do I see it?
19   Q.   Yes.
20   A.   Yes, you read that correctly.
21   Q.   And was your estimation period
22 here the one year through January 27th,
23 2021?
24   A.   Well, I mean, we might as well
25 be as accurate as possible.  So I'm reading

31 (Pages 118 - 121)

Page 122

WERNER

1
2 from paragraph 1 of my -- of Exhibit 281 to
3 this exhibit, the time period I looked at
4 was January 28th, 2020 through January
5 27th, 2021.
6     Q.    All right.  So that was --
7     A.    And that is what I have defined
8 as the relevant period.  So if we just want
9 to refer to it as the relevant period, we
10 can do that.
11     Q.    And so that one year through
12 January 27th, 2021 is what you used as the
13 estimation period for your regression,
14 correct?
15     A.    That is correct.
16     Q.    All right.  Now, do you see,
17 then, in the sentence that spans the pages
18 from pages 26 to 27 of your opening report,
19 you write "In event study analysis, the
20 choice of using the period preceding the
21 event window, here the year prior to
22 Robinhood's challenged actions, as the
23 regression estimation period is a widely
24 used and generally accepted methodology"?
25     A.    Correct.

Page 123

WERNER

1
2     Q.    Okay.  And by the event period,
3 do you mean the period of time during which
4 Robinhood's challenged actions were in
5 place?
6     A.    Well, I mean, the class, event
7 period is analogous to the class period.
8     Q.    All right.  And in this case is
9 the proposed class period the period of
10 time during which at least some of
11 Robinhood's challenged actions were in
12 place?
13     A.    I mean, I believe that's
14 correct.  But if you want to give me the
15 complaint, I can verify that that is
16 exactly what it is.
17     Q.    Now, do you see in paragraph
18 63, do you see that you write "For each
19 Affected Company, I also used dummy
20 variables in the regression model to
21 control for the potentially abnormal
22 returns on each Affected Company's earnings
23 announcement dates and on January 27th,
24 2021"?
25     A.    I do, yes.

Page 124

WERNER

1
2     Q.    All right.  And am I right that
3 you used dummy variables for January 27th,
4 2021 because of the potentially abnormal
5 returns on that date?
6     A.    I'm sorry, could you reread the
7 question?
8         (The record was read.)
9     A.    Well, I used it because it was
10 the -- my understanding was it was the
11 mitigating factor to the beginning of
12 Robinhood's actions, which is akin to
13 something I would do if I was looking at a
14 corrective disclosure.
15         That having been said, if I had
16 known that -- well, I believe what I did
17 was correct from a theoretical standpoint.
18 My analysis, and when I say my analysis, I
19 mean my news/no news test, do not change if
20 I don't dummy out the 27th.
21     Q.    When you referred just now to
22 the beginning of Robinhood's actions, do
23 you mean the time when Robinhood first put
24 the so-called PCO restrictions in place?
25     A.    Well, the actions at issue in

Page 125

WERNER

1
2 this case.
3     Q.    All right.
4     A.    So all of the actions.
5     Q.    And do you understand that that
6 began on the morning of January 28th, 2021?
7     A.    I believe that's correct, but
8 let me just look at my report to refresh my
9 memory.
10     Q.    And I would refer you, again,
11 to what we were looking at before, Table 12
12 in your rebuttal report.
13     A.    Do you have a page number for
14 Table 12?
15     Q.    Page 44.
16     A.    Okay.
17     Q.    And then I would also refer you
18 to paragraph 103, the text of which is
19 beneath that, carrying on to the following
20 page, page 45 of your rebuttal report.  Do
21 you see that?
22     A.    Yeah.  I'm just reading it.
23         (Witness perusing document.)
24     A.    Okay, so this is a subset of
25 the -- the PCO restrictions are a subset of

32 (Pages 122 - 125)

Page 126

WERNER
1
2 the restrictions at issue in this case.
3     Q.   All right.  So is it your
4 understanding that the first Robinhood
5 restrictions at issue in this case were
6 imposed starting 8:03 a.m. eastern time on
7 January 28th, 2021?
8     A.   I'm sorry, can you repeat the
9 question?
10     Q.   Is it your understanding that
11 the first Robinhood restrictions at issue
12 in this case were imposed starting 8:03
13 a.m. eastern time on January 28th, 2021?
14     A.   For AMC, BlackBerry, Bed Bath &
15 Beyond, Express, Koss, Nokia and Trivago,
16 that is correct.
17     Q.   And that is all the stocks
18 except Tootsie Roll, right?
19     A.   Correct.  All of the affected
20 -- I believe what I called the affected
21 stocks, the nine stocks at issue in this
22 case.
23     Q.   And for Tootsie Roll as stated
24 on page 45 of your rebuttal report, the
25 first Robinhood restrictions at issue in

Page 127

WERNER
1
2 this case were imposed a little under two
3 hours later, at 9:54 a.m. eastern time,
4 right?
5     A.   I'm sorry, could you reread the
6 question?
7     Q.   And for Tootsie Roll as stated
8 on page 45 of your rebuttal report, the
9 first Robinhood restrictions at issue in
10 this case were imposed a little under two
11 hours later, at 9:54 a.m. Eastern time,
12 right?
13     A.   That's my understanding.
14     Q.   Okay.  So going back to my
15 original question, you agree then that the
16 first Robinhood restrictions for any of the
17 stocks that are at issue in this case were
18 put in place starting at 8:03 a.m. eastern
19 time on January 28th, 2021, right?
20     A.   The PCO restrictions.
21     Q.   All right.  And you are not
22 aware of there being any restrictions at
23 issue in this case that were imposed before
24 the PCO restrictions, are you?
25     A.   Well, okay, now I would want to

Page 128

WERNER
1
2 look at the -- I don't recall, but if you
3 showed me the complaint, I would be happy
4 to give you the most accurate answer I can.
5     Q.   All right.  I will take the
6 answer that you don't recall now.
7         So your understanding, then, is
8 that the full day of January 27th, 2021 was
9 unaffected by Robinhood PCO restrictions,
10 right?
11     A.   When you say the entire day, do
12 you mean the entire trading day?  And when
13 I mean trading day, ending at 4:00 p.m.
14 eastern time?
15     Q.   Well, why don't I start with
16 that question.  Do you -- strike that.
17         Is it your understanding, then,
18 that the full trading day of January 27th,
19 2021 ending at 4:00 p.m. eastern time was
20 unaffected by Robinhood PCO restrictions?
21     A.   To the best of my recollection,
22 I believe that is correct.
23     Q.   All right.  And is it similarly
24 your understanding that aftermarket trading
25 on January 27th, 2021 was unaffected by

Page 129

WERNER
1
2 Robinhood PCO restrictions?
3     A.   I'm sorry, can you repeat the
4 question?
5     Q.   Is it similarly your
6 understanding that aftermarket trading,
7 after 4:00 p.m. eastern time on January
8 27th, 2021, was unaffected by Robinhood PCO
9 restrictions?
10     A.   And so we're just talking about
11 the 27th now, we are not talking about the
12 premarket on the 28th?
13     Q.   Just on January 27th, 2021
14 eastern time.
15     A.   Yeah, let me refresh my memory.
16         (Witness perusing document.)
17     A.   Okay, yeah, so I think the PCO
18 -- the first PCO restrictions, as you
19 stated earlier, were on the 28th at 8:03.
20     Q.   Okay.  Why then in your
21 regression analysis did you use a dummy
22 variable for January 27th, 2021 when that
23 day was unaffected by any Robinhood PCO
24 restrictions?
25     A.   Again, my understanding was

33 (Pages 126 - 129)

Page 130

WERNER

1          WERNER
2  those stock price movements were the
3  mitigating factor in Robinhood's actions.
4  That having been said, if I left the dummy
5  variables out, I knew it would cause such
6  consternation.  My answers don't -- my
7  answers don't change if I don't dummy out
8  the 27th.
9      Q.    What do you mean by the
10 mitigating factor?  I'm not following you.
11     A.    Well, maybe mitigating is the
12 wrong term.  It was -- it was the price
13 changes on the 27th that Robinhood's
14 actions were a reaction to.  So in the same
15 way that if I was looking at a corrective
16 disclosure in a case I would often dummy
17 that -- I wouldn't often -- I would dummy
18 that out, because -- I mean, yeah, that's
19 it.
20     Q.    I see.  So your understanding
21 is that Robinhood's PCO actions were a
22 reaction to the stock price movements on
23 January 27th?
24     A.    Among other things, yes.
25     Q.    Okay.  And among what other

Page 131

1          WERNER
2  things?
3      A.    Well, I mean, they couldn't
4  essentially meet their margin calls, so
5  they needed to put those restrictions in
6  place.  And, I mean, margin call is a
7  euphemism, but I can give you the exact
8  term.  But for you and I, it would be the
9  equivalent of a margin call.
10     Q.    All right.  Are you referring
11 to the collateral call from the NSCC?
12     A.    Correct.
13     Q.    Okay.  Do you agree with me
14 that a dummy variable is used to indicate
15 the absence or presence of some non-model
16 explained event that may be expected to
17 shift the model's outcome?
18          MR. ROSEN:  Objection.  Could
19     you reread the question?
20          (The record was read.)
21          MR. ROSEN:  Objection.  But you
22     can answer it if you understand the
23     question.
24     A.    It could.  I mean, people use
25 dummy variables for all sorts of reasons.

Page 132

1          WERNER
2      Q.    All right.  And isn't that why
3  you use a dummy variable for January 27th,
4  2021 here?
5      A.    I have stated why I used the
6  dummy variable.  I'm sorry, January 27th,
7  2021?
8      Q.    Yes.
9      A.    Right, yeah, I mean, I have
10 stated why I have done that, and I have
11 also stated if I hadn't done it, my results
12 wouldn't have changed.
13     Q.    And did you do it because of
14 the presence of a non-model explained event
15 that may be expected to shift the model's
16 outcome?
17     A.    No, I did it because of what I
18 said before.
19     Q.    Okay.  In your report on page
20 27 of your opening report in paragraph 71,
21 you cite to two academic articles for your
22 use of --
23     A.    I'm sorry, what page are we on
24 now?
25     Q.    Page 27, same page we were on

Page 133

1          WERNER
2  before, of your opening report.
3      A.    Of my opening report.  Sorry,
4  we are going back and forth.  Okay.
5      Q.    Do you see that in note 71 you
6  cite to two academic articles to support
7  your use of dummy variables?
8      A.    I do.
9      Q.    And the first article is
10 entitled Event Studies with a Contaminated
11 Estimation Period, and it is authored by
12 Nihat Aktas and others.  Do you see that?
13     A.    I do.
14     Q.    All right.  And it's your
15 understanding, isn't it, that what these
16 authors are discussing is the use of
17 contaminating events in the estimation
18 window?
19     A.    I'm happy to look at -- I mean,
20 if you want me to go based on the title,
21 that seems accurate.  But I would want to
22 refresh my memory to know exactly what they
23 did here.
24     Q.    All right.
25     A.    Do you have -- do you have

34 (Pages 130 - 133)

Page 134

WERNER

1           WERNER
2 their paper?
3     Q.    Yes, I do.  And isn't it your
4 understanding that January 27th, 2021 was a
5 contaminating event during the estimation
6 period in the sense that Nihat Aktas and
7 co-authors used that term?
8     A.    Well, now I would need to look
9 at the paper to answer that question.
10    Q.    Well, let me ask it more
11 generally.
12          It's your understanding, isn't
13 it, that January 27th, 2021 was a
14 contaminating event during your estimation
15 period?
16    A.    No, that's not necessarily my
17 understanding.
18    Q.    I'm not sure what you meant by
19 "necessarily" there.  Is it your belief
20 that it was a contaminating event or not?
21    A.    Well, what do you mean by
22 "contaminating event"?  Do you mean
23 contaminating event in the context of what
24 they are talking about?  Because if that's
25 what you are talking about I would like to

Page 135

1           WERNER
2 see their definition of contaminating
3 event.
4     Q.    All right.  So I'm using the
5 term "contaminating event" to mean a
6 firm-specific event that will most likely
7 affect the return-generating process.  Okay?
8     A.    Okay.  All right, can you
9 reread that definition for me?
10          (The record was read.)
11    A.    Okay.
12    Q.    All right.  With that
13 definition in mind, do you agree that
14 January 27th, 2021 was a contaminating
15 event in your estimation window?
16    A.    Based on my understanding of
17 that statement, I don't know if that would
18 fall under the rubric or the umbrella of a
19 contaminating event as stated by you.
20    Q.    Okay.  But you did decide to
21 cite this Aktas article as support for your
22 use of the dummy variable described in
23 paragraph 63 of your opening report, right?
24    A.    I did cite to that article.

Page 136

1           WERNER
2 Again, I'm more than happy to look at that
3 article and refresh my memory.
4          Is now a good time for lunch?
5     Q.    Sure.  Why don't we take a
6 break.
7          THE VIDEOGRAPHER:  This will
8 end media unit three.  We are going off
9 the record at 12:56.
10         (Luncheon recess:  12:56 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 137

1           WERNER
2    A F T E R N O O N   S E S S I O N
3          1:38 p.m.
4 A D A M   W E R N E R, Ph.D., resumed.
5          THE VIDEOGRAPHER:  We are back
6 on the record at 1:38.  This will begin
7 media unit four.
8 CONTINUED EXAMINATION
9 BY MR. RYAN:
10    Q.    Good afternoon, Dr. Werner.
11    A.    Good afternoon.
12    Q.    Could you turn, please, in your
13 opening report, Deposition Exhibit 281, to
14 page 11, paragraph 23 on the top of the
15 page.
16    A.    Page 11, paragraph 23, okay.
17    Q.    And do you see you wrote there
18 that "While financial economists rely on
19 event study analysis as direct evidence
20 demonstrating security price response to
21 new information, they accept other factors
22 as tending to support the existence of an
23 efficient market for a security"?
24          Do you see that?
25    A.    I do.

35 (Pages 134 - 137)

Page 138

WERNER

1
2    Q.    And Cammer factor five often
3 uses event study analysis, right?
4    A.    That is correct.
5    Q.    And do you agree that Cammer
6 factor five is a direct test of market
7 efficiency?
8    A.    I think in academia that is
9 correct.  I think for legal matters, and,
10 again, I'm not a lawyer, you look at all
11 Cammer and Krogman factors.  You know, I
12 have seen cases, I can't think of any off
13 the top of my head, but I have certainly
14 seen cases in the Second Circuit where, you
15 know, they just ignore factor five and they
16 determine efficiency based on the other
17 Cammer and Krogman factors.
18    Q.    Do you agree that in academia
19 Cammer factor five, the event study
20 analysis, is the only direct test of market
21 efficiency?
22    A.    Let me think about that.
23        MR. ROSEN:  Are you trying to
24 turn that off the screen?
25        MR. DeNUNZIO:  Correct.

Page 139

WERNER

1
2        MR. ROSEN:  It will probably
3 turn off itself.
4    A.    Why don't we just wait for
5 that.  Could you reread the question?
6    Q.    Yes.  Do you agree in academia,
7 Cammer factor five, the event study
8 analysis, is the only direct test of market
9 efficiency?
10    A.    So it is certainly a test -- a
11 direct test of market efficiency.  I don't
12 know if it is the only test of market
13 efficiency.
14    Q.    All right.  So you wrote here
15 in paragraph 23 of your opening report that
16 financial economists would rely on event
17 study analysis as direct evidence, right?
18    A.    That is correct.
19    Q.    And then you wrote that
20 financial economists accept other factors,
21 not that they rely on them, right?
22    A.    In terms of the Cammer and
23 Krogman factors?
24    Q.    Yes, sir.
25    A.    That is correct.

Page 140

WERNER

1
2    Q.    And you agree that these other
3 Cammer and Krogman factors are ones that
4 tend to support the existence of an
5 efficient market for a security, right?
6    A.    Well, I mean, so it's
7 ultimately up to the court to decide
8 whether or not a stock is efficient, right?
9 I'm just asked to do these analyses, and so
10 that's what I present.
11        So, you know, I think it's true
12 to say that academics, you know, would
13 tend, as you used the word, term, "direct
14 evidence," would say -- then say is direct
15 evidence.
16        You know, have I seen people
17 talk about market efficiency in terms of
18 let's say firm size or analyst coverage?
19 You know, so, for example, if I look here
20 at footnote 35 of my report, or 34, this is
21 on page 11, this paper by Brad Barber, et
22 al, The Fraud on the Market Theory and the
23 Indicators of a Common Stock's Efficiency.
24 So, you know, economists have looked at
25 other factors as well.

Page 141

WERNER

1
2    Q.    All right.  But you would
3 agree, wouldn't you, that financial
4 economists accept the other Cammer and
5 Krogman factors as tending to support the
6 existence of an efficient market but not as
7 often direct evidence as the way Cammer
8 factor five does?
9    A.    I'm sorry, are you reading
10 somewhere from my reports?
11    Q.    Yes, from the first sentence of
12 paragraph 23.
13        You would agree, wouldn't you,
14 that financial economists accept the other
15 Cammer and Krogman factors as tending to
16 support the existence of an efficient
17 market but not as direct evidence the way
18 Cammer factor five does?
19    A.    I think for the most part
20 that's an accurate statement.  But, again,
21 there are other things beyond the Cammer
22 and Krogman factors that academicians look
23 at when they discuss market efficiency.
24 But within the context of securities class
25 action, I think that to the extent that

36 (Pages 138 - 141)

WERNER

1
2 academics look at this stuff, I think
3 that's probably accurate.
4     Q.    Do you agree as a financial
5 economist that Cammer factor five is more
6 informative than the other factors in
7 determining market efficiency?
8     A.    So as a financial economist and
9 not as a court, again, I'm not a lawyer, I
10 certainly find it informative.  You know,
11 having done this now for 20, 25 years, I
12 don't know if I would adopt the other
13 Cammer and Krogman factors if I was trying
14 to show market efficiency.  That's not
15 really anything I thought about.
16     Q.    All right.  Well, let me ask
17 you to think about it now.  Do you agree
18 sitting here as a financial economist that
19 Cammer factor five is more informative than
20 the other factors in determining market
21 efficiency?
22     A.    Well, again, so it's not
23 ultimately up to me to make that decision.
24 It is up to the court to decide which
25 factors are important and not important.

WERNER

1
2 So I'm just presenting the information.  It
3 is up to them to determine, you know,
4 interpret.
5     Q.    Absolutely it is.  And so I'm
6 merely asking for your opinions as a
7 financial economist, which is all I can do,
8 since a financial economist is what you
9 are, not a court, and all I can do is ask
10 you questions in that role.
11         So my question is do you agree
12 sitting here as a financial economist that
13 Cammer factor five is more informative than
14 the other factors in determining market
15 efficiency?
16     A.    As a financial economist, I
17 think that's an accurate statement.
18     Q.    Now, let me ask you about
19 paragraph 67 of your opening report, this
20 is on page 28.
21     A.    67, okay.
22     Q.    And do you see about halfway
23 through there is a sentence there where you
24 wrote "In order to test this proposition,
25 one must first examine whether or not a

WERNER

1
2 stock's price reacted differently on days
3 in which new information was revealed
4 ('news days') versus all other days
5 ('non-news days')"?
6         Do you see that?
7     A.    I do see that, yes.
8     Q.    All right.  And is this
9 sometimes described as a news/no news test?
10     A.    Yes.
11     Q.    All right.  What is a news/no
12 news test?
13     A.    You know, basically it's run an
14 event study, you define, come up with a
15 definition of what news is, you look at the
16 frequency under which there are
17 statistically significant changes on news
18 days versus non-news days, and then usually
19 you perform some kind of statistical
20 analysis.  Often I will use a Fisher's
21 exact test to determine whether these
22 reactions -- or the frequency of reactions
23 to news is significantly different between
24 the two subsamples, the subsamples being
25 defined as what is the news days and the

WERNER

1
2 non-news days.
3     Q.    All right.  So one part of this
4 test is to determine how the stock price
5 reacts on the so-called news days, right?
6     A.    What do you mean, "determine"?
7 Determine, I mean, you look -- you
8 calculate the abnormal return and then you
9 look at the abnormal returns relative to
10 the news days versus the non-news days.
11     Q.    Okay.  So one part of this test
12 is to observe how the stock price reacts on
13 the so-called news days, right?
14     A.    What you have defined as news
15 days, yes, that is correct.
16     Q.    Okay.  Why is it important to
17 then compare that result, namely the result
18 of how the stock price reacted to news on
19 the so-called news days, to the second set
20 of results, which is how the stock price
21 reacted on the so-called non-news days?
22     A.    Why is it important?
23     Q.    Yes, sir.
24     A.    Because you are trying to
25 determine whether or not the stock price

Page 146

WERNER

1
2 reacts differently to news days as opposed
3 to non-news days, that's why it is
4 important.
5     Q.    And if the stock price does
6 react statistically significantly
7 differently on the news days from how it
8 reacts on the non-news days, what can you
9 conclude from that, if anything?
10    A.    I'm sorry, so let me -- so if
11 the stock -- could you reread the question,
12 please?
13    Q.    Sure.
14    A.    I'm not sure it is completely
15 accurate, that's why I would like it
16 reread.
17        (The record was read.)
18    A.    I mean, one of the conclusions
19 people draw is that the stock price reacts
20 to news.
21    Q.    And that would tend to support
22 a finding of market efficiency?
23    A.    Correct.
24    Q.    All right.  And so then if the
25 stock price does not react statistically

Page 147

WERNER

1
2 significantly differently on the news days
3 from how it reacts on the non-news days,
4 what can you conclude from that, if
5 anything?
6     A.    Well, it could depend upon how
7 you define news days.
8     Q.    Sure.  So news days are defined
9 however the person carrying out this
10 analysis has defined the news days, right?
11    A.    Okay.
12    Q.    And you were able to answer for
13 me what one could conclude if there was a
14 statistically significant difference in how
15 the stock price reacted on what were the
16 news days as defined by the person carrying
17 out the study as compared to the non-news
18 days, right?
19    A.    Yes.
20    Q.    So my question now is about the
21 inverse of that.  If the stock price does
22 not react statistically significantly
23 differently on the news days from how it
24 reacts on the non-news days, what can you
25 conclude from that, if anything?

Page 148

WERNER

1
2     A.    Nothing.  I mean, it is going
3 to depend upon -- let me give you an
4 example.  And I don't mean to say "nothing"
5 like I'm being flippant.  But let's say
6 that I'm looking at earnings announcements.
7 So I'm looking at a one-year period, there
8 is four earnings announcements, each
9 earnings announcement meets expectations.
10 I have defined news days as earnings days.
11        So I observe no statistically
12 significant stock price reaction on those
13 four days because the earnings meet
14 expectations.  Now, the news/no news test
15 is going to fail.  I'm not going to see a
16 statistically significant difference
17 between those two subsamples, but it
18 doesn't then render the stock inefficient.
19    Q.    All right.  But it is an
20 absence of evidence to support efficiency,
21 right, on that test?
22    A.    Is it an absence of evidence to
23 support -- I don't understand.
24    Q.    All right.  So you earlier
25 testified that if you find a statistically

Page 149

WERNER

1
2 significant difference and the stock price
3 is reacting more on the news days than on
4 the non-news days, you testified that was
5 evidence in support of market efficiency,
6 right?
7     A.    Well, I don't think -- I don't
8 think I said anything about the stock
9 reacting more on news days versus non-news
10 days.
11    Q.    All right.  Let me ask the
12 question differently then.
13        You testified before that if
14 the stock price reacts differently to a
15 statistically significant extent on news
16 days as compared to non-news days, that in
17 your opinion would be evidence in support
18 of market efficiency, right?
19    A.    That is correct.
20    Q.    And so if the finding is the
21 opposite, that there is no statistically
22 significant difference in how the stock
23 price reacts on the news days as compared
24 to the non-news days, wouldn't you agree
25 with me that that is a lack of evidence on

38 (Pages 146 - 149)

Page 150

WERNER

2 that test in support of market efficiency?
3    A.    And I repeat, no.
4    Q.    You don't agree with me that is
5 a lack of evidence in support of market
6 efficiency?
7    A.    No, because, again, look at the
8 example I gave you, right?  The stock price
9 didn't react on news that was expected.  To
10 me that means that that's an indicator the
11 stock is efficient.  Just because it fails
12 the news/no news test, under that guise,
13 under my definition of what news is in that
14 case, doesn't then render the stock -- it
15 is not necessarily an indicator that the
16 stock is traded in an inefficient market.
17    Q.    All right.  But you have
18 answered a different question from what I
19 asked.  I never asked you whether it is
20 evidence of inefficiency.  What I asked
21 you, sir, was don't you agree with me that
22 it is a lack of evidence in support of
23 market efficiency?
24    A.    And I said no.
25    Q.    All right.  And so it is your

Page 151

WERNER

2 testimony, then, that if you run this test
3 of news/no news test, if it has a certain
4 result, that would be evidence in support
5 of market efficiency, and if it has a
6 different result, it is just no evidence
7 showing anything either way at all?
8    A.    No.
9    Q.    Is that your testimony?
10    A.    No.  Again, it would depend
11 upon what you defined as news.  I mean,
12 again, I mean, I don't -- I can't -- off
13 the top of my head I can't give you another
14 example other than the earnings example,
15 but it is a perfectly valid one.
16        The earnings come in as they
17 are expected to come in, I mean, I guess I
18 would be disturbed if there -- I don't know
19 if you would call it a false positive, but
20 if earnings met expectations on each one of
21 those days, and that was the only
22 information that came out, they met
23 expectations, there was no other news that
24 we are talking about in a vacuum, if there
25 were statistically significant stock price

Page 152

WERNER

2 movements on each one of those days, would
3 that then indicate to me that the stock was
4 not traded in an efficient market?  I don't
5 know.  I would have to think about it.
6        But I think in terms of what
7 you're asking, I'm comfortable with the
8 first assertion you are making.  It is not
9 clear to me that the corollary, by taking
10 the other side of the coin, is necessarily
11 correct.
12    Q.    Okay.  So it's your testimony
13 that if somebody runs a properly designed
14 news/no news study --
15    A.    Okay, so let me stop you,
16 because now you have said a properly run
17 news/no news study.  So that means that the
18 news is defined properly.
19    Q.    Uh-huh.
20    A.    I just want to make that
21 clarifying statement.
22    Q.    Okay.
23    A.    Okay, go ahead.
24    Q.    So is it your opinion, then,
25 that if somebody runs a properly designed

Page 153

WERNER

2 news/no news study and there is no
3 statistically significant difference in the
4 stock price reaction on the news days as
5 compared to the non-news days, that that
6 shows nothing?
7    A.    I would have to know more about
8 the test to answer that question, beyond
9 properly run.
10    Q.    Okay.  Now, looking at
11 paragraph 68 of your opening report, am I
12 right that you designed your news/no news
13 test to isolate a test sample of news days
14 that would be more likely than not to
15 contain valuation relevant information?
16    A.    Are you reading from somewhere
17 in my report?
18    Q.    Yes, sir.
19    A.    Okay.  So where are we reading
20 from?
21    Q.    Three lines down from the
22 bottom of the page on page 28.
23        Let me ask the question this
24 way: Do you agree with me that the right
25 way to design a news/no news test is, and

39 (Pages 150 - 153)

Page 154

WERNER

1           WERNER
2  I'm now quoting from your words, "to
3  isolate a test sample of news days that
4  would be more likely than not to contain
5  valuation relevant information"?
6      A.    Right.  So that's certainly one
7  example.
8      Q.    Did you attempt in your work on
9  this case to design a news/no news test to
10 isolate a test sample of news days that
11 would be more likely than not to contain
12 valuation relevant information?
13     A.    Well, to the extent I was
14 looking at informational efficiency, that's
15 what I focused on.  Does that mean that I
16 looked at events that contained value
17 relevant information?  It is certainly
18 possible.  I mean, I believe I did.  But
19 that might not be the entire set of news
20 days that I looked at.
21     Q.    All right.  Let me -- I got
22 confused there, so let me try to ask the
23 question this way:  In performing the
24 news/no news test that is set forth in your
25 opening report in this case, was it your

Page 155

1           WERNER
2  objective to isolate a test sample of news
3  days that would be more likely than not to
4  contain valuation relevant information?
5      A.    That was an example of one of
6  the things that I attempted to look at.
7      Q.    Sir, I don't know what you mean
8  when you say it was an example.
9      A.    Well, so, again, I mean, we are
10 making the distinctions between value
11 relevant and informationally relevant.  So
12 yes, this is certainly one of the things
13 that I would have looked at.  But I also
14 look at things that are informationally
15 relevant.
16     Q.    What you wrote in your report
17 was "In order to isolate a test sample of
18 news days that would be more likely than
19 not to contain valuation relevant
20 information, I focused on the frequency of
21 news releases on each day during the
22 relevant period for each Affected Company,"
23 right?
24     A.    I'm sorry, where are you at?
25     Q.    I'm on the last full sentence

Page 156

1           WERNER
2  that begins three lines from the bottom of
3  page 28 of your opening report.  You wrote
4  "In order to isolate a test sample of news
5  days that would be more likely than not to
6  contain valuation relevant information, I
7  focused on the frequency of news releases
8  on each day during the relevant period for
9  each Affected Company," right?
10     A.    That's what I said, yes.
11     Q.    You didn't write anything about
12 finding news that was informationally
13 relevant as opposed to valuation relevant,
14 did you?
15     A.    No.  But I'm giving an overview
16 of a news/no news analysis, so, I mean, I
17 guess I should have said "for example."
18     Q.    Okay.  So is it your testimony
19 now that the news/no news test that you
20 actually ran in this case did not isolate a
21 test sample of news days that would be more
22 likely than not to contain valuation
23 relevant information?
24     A.    The news, I mean, I have
25 defined the news days as they are defined

Page 157

1           WERNER
2  in my report.
3      Q.    And did your news/no news test
4  isolate a test sample of news days that
5  would be more likely than not to contain
6  valuation relevant information?
7      A.    Oh, is it more likely to
8  contain valuation relevant information?
9  That is certainly a possibility.
10     Q.    Well, I'm asking you as the
11 person who performed the news/no news test
12 and who wrote these words to tell me
13 whether in fact the test that you ran
14 isolated a test sample of news days that
15 would be more likely than not to contain
16 valuation relevant information.
17     A.    And I will give you the same
18 answer.
19     Q.    Which is that it is possible,
20 it is certainly a possibility?
21     A.    Well, I mean --
22     Q.    That's your answer?
23     A.    Yeah, that's my answer.
24     Q.    Okay.  In running a news/no
25 news test, is it appropriate -- is it

40 (Pages 154 - 157)

Page 158

WERNER

2 appropriate to use a specific and objective
3 criterion to identify news events that
4 contain new valuation relevant information
5 such that one would, ex ante, reasonably
6 expect a security price reaction?
7     A.    So where are you looking at?
8     Q.    I'm not reading from your
9 report, I'm asking you a question, sir.  In
10 running a news/no news test, in your
11 opinion, is it appropriate to use a
12 specific and objective criterion to
13 identify news events that contain new
14 valuation relevant information such that
15 one would, ex ante, reasonably expect a
16 security price reaction?
17     A.    I certainly agree with the
18 statement that you would want to use an
19 objective criterion.  Are you reading from
20 the Ferrillo, Tabak and Dunbar paper?
21     Q.    I am not.  I will get to that
22 paper shortly.
23     A.    So where -- I mean, do you want
24 to -- well, you are asking the questions.
25     Q.    I'm asking you a question.  As

Page 159

WERNER

2 somebody -- so you -- let me ask this
3 foundational question:  As a testifying
4 expert, you have run news/no news tests in
5 application of Cammer factor five on
6 multiple occasions, right?
7     A.    That is correct.
8     Q.    All right.  And so do you
9 believe that in running such a news/no news
10 test for Cammer factor five purposes it is
11 appropriate to identify news events that
12 contain new valuation relevant information
13 such that one would, ex ante, reasonably
14 expect a security price reaction?
15     A.    If I'm testing for fundamental
16 efficiency, yeah, I definitely want to do
17 that.
18     Q.    All right.  Is it your
19 testimony you would not want to do that if
20 you are testing for informational
21 efficiency?
22     A.    No.  You are now making -- you
23 are making a distinction between a type 1
24 and type 2 error.  I'm saying that if I was
25 looking for fundamental efficiency, I would

Page 160

WERNER

2 definitely want to do that.  I'm not saying
3 then I wouldn't want to do that if I was
4 looking at informational efficiency.
5     Q.    That's why I asked you the
6 follow-up question.  So is it your
7 testimony that you would not want to do
8 that if you are testing for informational
9 efficiency?
10     A.    Right, and I'm saying that, I
11 mean, I don't know how to answer the
12 question other than what I have given you
13 as an answer.
14     Q.    Let me try to rephrase my
15 question this way:  If you are running a
16 news/no news test for Cammer factor five
17 purposes in order to test informational
18 efficiency, do you believe it would be
19 appropriate to use a specific and objective
20 criterion to identify news events that
21 contain new valuation relevant information
22 such that one would, ex ante, reasonably
23 expect a security price reaction?
24     A.    Well, so now you are saying
25 informationally efficient.  If I was

Page 161

WERNER

2 looking at informational efficiency, I
3 might -- I might, and there is no -- there
4 is not necessarily a problem looking at
5 value relevant information, but if I'm just
6 talking about the definition of
7 informational efficiency, I might, and,
8 again, I'm not -- I don't have these words
9 in front of me, so this is off the top of
10 my head, I might want to exclude the term
11 "value" from that statement.
12     Q.    Were you an expert in a case
13 called Omega Healthcare Investors?
14     A.    I was.
15     Q.    Do you recall that in that case
16 you ran a news/no news test using the
17 criteria for a news day that I just read
18 out?
19     A.    No, I don't recall.
20     Q.    Okay.  Why don't I show you
21 your report.
22         (Defendant's Exhibit 284 marked
23 for identification.)
24     Q.    All right, so I will hand you
25 in just a moment here what we have marked

41 (Pages 158 - 161)

Page 162

WERNER

1
2 as Exhibit 284. It is a document entitled
3 Declaration of Dr. Adam Werner, March 16th,
4 2022, in a case called In Re Omega
5 Healthcare Investors, Inc. Securities
6 Litigation in the Southern District of New
7 York.
8     A.    Thank you.
9     Q.    And is this your signature on
10 page 41 of Exhibit 284, sir?
11     A.    Page 41?
12     Q.    Yes, sir.
13     A.    Yes.
14     Q.    And is this an expert report
15 you submitted just about one year ago?
16     A.    Yeah, that looks about right.
17     Q.    All right. So if you could
18 turn, please, with me to paragraph 77.
19     A.    77, okay. Before we do that,
20 let me just refresh my memory. I want to
21 make sure -- right, okay. I have done
22 that. What page do you want me to look at?
23     Q.    Page 30.
24     A.    Page 30.
25     Q.    So let me just ask you first to

Page 163

WERNER

1
2 read paragraphs 75 and 76 to yourself.
3     A.    Oh, page 30?
4     Q.    Yeah, page 30.
5     A.    I'm sorry. Okay.
6     Q.    So if you just read, please, to
7 yourself paragraphs 75 to 76, which are the
8 beginning two paragraphs of this section.
9         (Witness perusing document.)
10     A.    Okay, so it was coming from one
11 of my reports. All right, I have read it.
12     Q.    This is a case where you
13 applied a news/no news test and then
14 conducted a Fisher's exact test to compare
15 the price reaction on the news days to that
16 on the non-news days, right?
17     A.    I did.
18     Q.    And in defining what
19 constitutes a news days for the Omega case,
20 you wrote "Using a specific and objective
21 criterion to identify news events that
22 contain new valuation relevant information
23 such that one would, ex ante, reasonably
24 expect a security price reaction," right?
25     A.    Correct.

Page 164

WERNER

1
2     Q.    All right. And you believed
3 that that was an appropriate way to conduct
4 the news/no news case in the Omega case?
5     A.    In this specific case, given
6 the facts and circumstances surrounding
7 this case, yes, that was appropriate.
8     Q.    All right. In this case were
9 you testing for informational or
10 fundamental efficiency?
11     A.    Well, I don't -- I'm not sure I
12 distinguished. I don't know. That's an
13 interesting question. I have to think
14 about it. But the facts and circumstances
15 of this case are much different than the
16 facts and circumstances of the case we're
17 dealing with now.
18     Q.    Okay. But let me go on my
19 question though. So am I right that you
20 are uncertain whether you were testing for
21 informational or fundamental efficiency in
22 this Omega case?
23     A.    Well, I mean, to the extent
24 that we are talking about a REIT, basically
25 I think I'm testing for both. That's why

Page 165

WERNER

1
2 I'm saying it is fact and case specific.
3 So -- well, go ahead, why don't you ask the
4 questions. I don't want to explain to you
5 what a REIT is and how it trades.
6     Q.    Do you then apply different
7 tests, either fundamental or informational
8 efficiency, as an expert on class
9 certification in different cases?
10     A.    No, not necessarily. But I
11 think my opinions have evolved over time.
12 My understanding of what courts find needed
13 with regards to market efficiency, and it
14 is now clear to me that what they demand is
15 informational efficiency, or I should say
16 that's my opinion. Those are the tests I
17 run.
18         But it is not inconsistent to
19 say that this thing is fundamentally
20 efficient and informationally efficient,
21 because if we are talking about a REIT
22 where the news days, if I looked at
23 frequency of news days and ran the same
24 test I did, I'm sure they are going to be
25 highly correlated with the days I have

Page 166

WERNER

1
2 identified here as earnings days.
3    Q.    All right.  So I just have to
4 follow up on this.  You said just now that
5 it was your opinion that courts demand only
6 informational efficiency.  That's not your
7 expert opinion as an expert in finance or
8 economics, is it?  That is simply your
9 understanding of what the lawyers have told
10 you and what you have read about the law as
11 somebody who has no legal training; isn't
12 that right?
13    A.    That is correct.
14    Q.    Okay.  Now, this report was
15 submitted one year ago, in March of 2022,
16 right?
17    A.    Correct.
18    Q.    Okay.  Has your understanding
19 of the law changed within the past year?
20    A.    Yes.  But, again, because of
21 this particular -- again, the facts and
22 circumstances surrounding this case were
23 the basis for the tests I performed here.
24    Q.    What happened in the past year
25 to change your understanding of what the

Page 167

WERNER

1
2 law requires in terms of market efficiency
3 in class actions?
4    A.    I mean, among other things,
5 more thorough reading of Halliburton II.
6 But, again, this isn't like those stocks in
7 this case.  This is a completely different
8 stock.  The circumstances of this case are
9 completely different.  This is not a market
10 manipulation case.  And so anything that I
11 have done here is not necessarily
12 appropriate for this particular case.
13    Q.    Okay.  So I just want to make
14 sure I have a complete answer.  I asked
15 what happened in the past that changed your
16 understanding of what the law requires in
17 terms of market efficiency in class
18 actions, and you said, among other things,
19 a more thorough reading of Halliburton II.
20        Is there anything else that has
21 happened in the past that would change your
22 understanding of what the law requires in
23 terms of market efficiency in class
24 actions?
25    A.    Well, yeah, sure, reading of

Page 168

WERNER

1
2 academic work, discussion with colleagues.
3 What else?  Off the top of my head, that
4 would certainly fall under that umbrella.
5    Q.    And this reading of academic
6 work, again, would be legal academic work
7 in which you're not an expert, right?
8    A.    No.
9    Q.    All right.  Is there any
10 article in a finance or economics journal
11 published within the past year that you can
12 point me to that has changed your
13 understanding of what the law requires in
14 terms of market efficiency in class
15 actions?
16    A.    All right, so let's cut up your
17 question there.  First of all, the article
18 doesn't have to be written in the last
19 year, right?  I don't have a universal
20 knowledge of every finance article ever
21 written.  Is that fair?
22    Q.    You testified, sir, that your
23 understanding changed over the past year
24 and you have now said a number of things on
25 the basis of which it changed.  So I'm

Page 169

WERNER

1
2 following up.
3    A.    Okay.
4    Q.    And you said that it changed
5 based on a rereading of Halliburton II,
6 talking to colleagues, and some academic
7 work.  And I'm asking you, you are not
8 saying, are you, that whatever the academic
9 work is that you have read in the past year
10 that has changed your understanding of what
11 the law requires for market efficiency in
12 securities class actions was published in
13 an economics or finance journal, are you?
14    A.    So could you go back?  Because
15 I think your original question, you said
16 written in the last year, and this was my
17 cause for confusion.  If you are asking if
18 I have read academic papers outside of the
19 realm of securities litigation that talks
20 about informational efficiency in the last
21 year, absolutely.
22    Q.    All right.  And what articles
23 are those?
24    A.    I don't recall off the top of
25 my head.

43 (Pages 166 - 169)

Page 170

```
1              WERNER
2     Q.    You are not able to name a
3  single one as you sit here today?
4     A.    Well, I think I referenced some
5  of them here.  I mean, I hadn't read -- let
6  me find the reference to Mr. Fischel's
7  paper, because I hadn't read that prior to
8  this year.  This is his '89 Cornell Law
9  Review article.  Well, we will just go with
10 that.  That would be one such example.
11    Q.    Okay.  Are there any others
12 that you can think of that have changed
13 your understanding of the law over the past
14 year other than Mr. Fischel's 1989 Cornell
15 Law Review article?
16    A.    Off the top of my head, no.
17 But as I said, I have read numerous
18 articles, it is just I don't recall what
19 they were.  In the same way that I recently
20 read two articles that look at how demand
21 changes the price of an underlying stock, I
22 read those extremely recently, but I don't
23 remember the names of the authors or the
24 names of the papers.  That's not certainly
25 anything that I focus on.
```

Page 171

```
1              WERNER
2     Q.    All right.  Now, you have used
3  this formulation that we just looked at in
4  paragraph 77 of the Omega report from March
5  of 2022, you have used that formulation in
6  expert reports that are outside the context
7  of REITs, haven't you?
8     A.    What do you mean, formulation?
9     Q.    That group of words put
10 together as a sentence, that sentence
11 appears in expert reports that you have
12 submitted recently that do not involve
13 REITs; isn't that right?
14    A.    Oh, it is certainly possible.
15    Q.    Okay.
16    A.    I mean, I don't recall off the
17 top of my head, but I would not be
18 surprised if that were in fact the case.
19    Q.    Okay.  And if I'm following you
20 right, you believe that that standard for
21 identifying news days that is set forth in
22 paragraph 77 of the Omega report is one
23 that goes to fundamental efficiency and is
24 therefore stricter than the one you have
25 applied here; is that right?
```

Page 172

```
1              WERNER
2     A.    I don't know how to answer that
3  question.  Stricter to the extent that
4  fundamental efficiency requires a specific
5  definition?  I mean, at this point you have
6  read the definition numerous times prior to
7  this morning, so I don't feel like I need
8  to repeat them.  Is that a stricter
9  definition than the definition of
10 informational efficiency?  I think that's
11 correct.  But I don't know, if you are
12 asking me are the tests stricter, I'm not
13 sure.
14    Q.    All right.  So in other cases
15 in which you are a class certification
16 expert in recent years, you have applied
17 the selection criteria in paragraph 77 of
18 the Omega report for your news/no news
19 test, right?
20    A.    I'm sorry, I have used the
21 selection criteria?  You said page 77?
22    Q.    No, I said paragraph 77, so
23 that was on page 30 as I recall.
24    A.    Okay.
25    Q.    And in this Omega case, for
```

Page 173

```
1              WERNER
2  your news/no news test, you identified news
3  events that contain new valuation relevant
4  information such that one would, ex ante,
5  reasonably expect a security price
6  reaction, right?
7     A.    Well, to the extent that I was
8  talking about earnings announcements, yes,
9  that earnings announcements usually contain
10 value relevant information.
11    Q.    And you applied this test I
12 have just read out from paragraph 77 of the
13 Omega report in other recent expert reports
14 you have submitted in securities class
15 actions on class certification, right?
16    A.    Well, I don't -- I'm not sure
17 if I used that exact wording in my more
18 recent reports.  So maybe you want to -- so
19 the test I used or my definition of news
20 that I used in this case, every market
21 efficiency report I have done since then
22 has utilized the specific news/no news test
23 that I used in this matter.
24    Q.    You can't point to a single
25 report that you submitted before you
```

44 (Pages 170 - 173)

Page 174

WERNER

1
2 submitted your opening report in this
3 matter where you applied this version of
4 the news/no news test; isn't that right,
5 sir?
6      A.   I believe that's correct.  But,
7 I mean, maybe you will understand it better
8 if I explain the evolution.
9          So when we had our discussion
10 earlier about earnings days, right, and so
11 it could be the case that, you know, each
12 earnings day met expectations and there was
13 no stock price movement.  So what I was
14 doing in this case was trying to find a
15 consistent methodology that would work
16 across all companies.  So, you know,
17 earnings announcements are extremely
18 restrictive.  I have stopped using that at
19 least at this point.
20          In terms of looking at 8-Ks or
21 news releases, in the NEO case I discovered
22 that when I looked at the underlying
23 information, there were discussions of
24 things like moving stock, like a CEO moving
25 from his personal account to a trust.  So

Page 175

WERNER

1
2 it became obvious to me that using 8-Ks or
3 press releases could be over or
4 under-inclusive with regards to news that
5 investors might find material.  And then
6 based on court acceptance of these tests
7 that I ran in this case as well -- as well
8 as reports that I've seen by other experts,
9 it seemed to me that this was the most
10 objective way to measure news.
11          And, by way of example, you
12 know, you have two experts who arrive at
13 different conclusions with regards to which
14 days contained material information over a
15 five or six-day period.  So it seemed to me
16 that I wanted to be as objective as
17 possible, and so I have adopted this
18 current methodology on this report and
19 every report since.
20      Q.   All right.  So let me follow
21 up, because there was a lot of information
22 in the answer.
23          So if I understood you right,
24 there are a number of expert reports that
25 you previously submitted in other matters

Page 176

WERNER

1
2 on class certification where for the
3 news/no news test you applied earnings
4 announcements; is that right?
5      A.   I mean, I don't know the
6 frequency, the number, but yes, I have
7 certainly done that in the past.  And, I
8 mean -- I will just leave it at that.
9      Q.   And you describe that criterion
10 for selection of news days just now as
11 extremely restrictive; is that right?
12      A.   Well, if I said "extremely," I
13 misspoke.  It is restrictive to the extent
14 that, again, if earnings are meeting
15 expectations, the fact that the news/no
16 news test doesn't pass doesn't then
17 render -- I can't -- it doesn't necessarily
18 mean that I should arrive at the conclusion
19 that the stock trades in an inefficient
20 market, or, put another way, the stock does
21 not trade in an efficient market.
22      Q.   You continue to believe that
23 the use of earnings announcements as the
24 selection criterion for news days in
25 running a news/no news test for Cammer

Page 177

WERNER

1
2 factor five on class certification is an
3 appropriate methodology, right?
4      A.   I'm sorry, could you read -- at
5 some point I believed it was an appropriate
6 methodology.
7      Q.   Sure.  So let's start with
8 that.  At the time you submitted the
9 reports in which you used earnings
10 announcements as the selection criteria for
11 news days, you believed that was an
12 appropriate methodology, right?
13      A.   I assume that that was one
14 possible definition of news that one could
15 use.
16      Q.   And as you sit here today on
17 May 3rd, 2023, do you continue to believe
18 that the use of earnings announcements as
19 the selection criterion for news days in
20 running a news/no news test for Cammer
21 factor five on class certification is an
22 appropriate methodology?
23      A.   Again, it would depend upon the
24 facts and circumstances of the case.  So,
25 you know, for instance, you know, I have

45 (Pages 174 - 177)

Page 178

WERNER

1          WERNER
2  done a lot of efficiency studies on drug
3  manufacturers.
4      Q.   I have noticed that.
5      A.   Drug manufacturers don't -- it
6  is not necessarily earnings releases that
7  tend to move the stock price of the drug
8  manufacturers, oftentimes it has to deal
9  with the efficacy or FDA approval process.
10  And so to the extent that if I'm looking at
11  a pharmaceutical company and I do a news/no
12  news test based on earnings, it is very
13  possible, very likely that it is going to
14  fail the news/no news test, but that does
15  not necessarily mean that that trades --
16  does not trade in an efficient market.
17      Q.   Do you have in the stack that
18  Mr. Rosen kindly provided at the outset of
19  the day, do you have the rebuttal expert
20  report of Professor Steven Grenadier?
21      A.   I believe so.  Oh, the
22  rebuttal?
23          MR. ROSEN:  I don't have the
24  rebuttal, I just brought the opening
25  report.

Page 179

1          WERNER
2      Q.   Okay.  Why don't we give you --
3      A.   Can I just get something to
4  drink?
5      Q.   Absolutely.
6          MR. RYAN:  Let's go off the
7  record.
8          THE VIDEOGRAPHER:  This will
9  end media unit four.  We are going off
10  the record at 2:24.
11          (Recess taken.)
12          THE VIDEOGRAPHER:  We are back
13  on the record at 2:29.  This will begin
14  media unit five.
15  BY MR. RYAN:
16      Q.   All right.  So during the break
17  I have handed you what we have previously
18  marked as Exhibit 176, which is the
19  rebuttal expert report of Professor Steven
20  Grenadier in this case dated March 28th,
21  2023.  Have you seen this report before,
22  sir?
23      A.   I believe so.
24      Q.   All right.  If you could look
25  to the very back of the report, the last

Page 180

1          WERNER
2  three pages, do you see with me --
3      A.   The last three pages?
4      Q.   Yes.  Do you see a set of three
5  charts that are headed Exhibit 1A, Exhibit
6  1B and Exhibit 1C?
7      A.   I do.
8      Q.   All right.  And do you see that
9  Exhibit 1A states that it applies
10  Dr. Werner's news versus no news test using
11  earnings and guidance releases?
12      A.   Correct.
13      Q.   Do you see that in the heading?
14      A.   Yes, correct.
15      Q.   And then I know the type is a
16  little bit small, but do you see in
17  footnote 1, Professor Grenadier says that
18  he has identified five publicly available
19  reports where you used earnings or guidance
20  announcements to define news days, and then
21  he lists five matters that includes the
22  Omega Healthcare Investors matter that we
23  just looked at just now?  Do you see that?
24      A.   I do.
25      Q.   All right.  And do you have any

Page 181

1          WERNER
2  basis to disagree with Professor Grenadier
3  when he says that you used earnings and
4  guidance announcements in the five cases in
5  his footnote 1 to his Exhibit 1A?
6      A.   I have no reason to disagree
7  with -- I haven't looked at each one -- I
8  haven't looked at each one since I received
9  this report, but I have no reason to doubt
10  that what he is saying is accurate.
11      Q.   All right.  And that's in part
12  because you know that there are multiple
13  expert reports, these are all from 2019 to
14  present, there are multiple expert reports
15  within the last four or five years where
16  you have used this earnings and guidance
17  release criterion for news days, right?
18      A.   There are certainly five, yes.
19      Q.   Okay.  And you earlier
20  testified that using earnings and guidance
21  releases as opposed to the methodology that
22  you used in this case was a more
23  restrictive methodology, right?
24      A.   I don't, again, I don't think I
25  said the methodology is more restrictive.

46 (Pages 178 - 181)

Page 182

WERNER

1
2 I don't quite remember what I said was more
3 restrictive.  But, again, I don't think I
4 said the methodology was more restrictive.
5 But, I mean, I don't want to quibble with
6 you.  Maybe that's what I did say.
7     Q.    Well, so let me ask you, you
8 said that using earnings announcements was
9 extremely restrictive.  What did you mean
10 by "restrictive"?
11     A.    Well, you are going to get
12 these false negatives that I have
13 discussed.
14     Q.    Certain valuation relevant news
15 that is not included among the news days?
16     A.    I'm sorry, what?
17     Q.    By false negatives, do you mean
18 certain valuation relevant news that is not
19 included among the news days?
20     A.    Certain value -- I don't -- I
21 don't understand that sentence.  What do
22 you mean?
23     Q.    Okay.  So you introduced the
24 concept of false negatives as opposed to
25 false positives, right?

Page 183

WERNER

1
2     A.    Maybe I should make a
3 clarification.  When I say false negatives,
4 I mean that it will identify -- it is
5 possible that it will identify a stock that
6 actually trades in an efficient market as
7 one that, at least based on this particular
8 criterion, appears to not trade in an
9 efficient market.
10     Q.    I see.  Thank you, that is
11 helpful.
12          So when you said that using
13 earnings and guidance releases as the
14 criterion for news days was more
15 restrictive, what you were saying was it
16 would lead more often to a negative result
17 on the news/no news test for market
18 efficiency, right?
19     A.    A negative result, meaning --
20     Q.    No finding of efficiency.
21     A.    Based on that particular
22 factor?
23     Q.    Yes, sir.
24     A.    Yes.  I believe what you have
25 said is correct.

Page 184

WERNER

1
2     Q.    Okay.  And indeed if we look
3 here in Professor Grenadier's Exhibit 1A,
4 he finds that only three of the nine stocks
5 meet the Fisher's exact test using your
6 news versus no news test, but with earnings
7 and guidance releases as the news, right?
8     A.    Could you reread that question,
9 please?
10          (The record was read.)
11     A.    So what do you mean by meets
12 the Fisher's exact test?  I'm not familiar
13 with that phrase.
14     Q.    Okay.  So you see then in the
15 far right column of Exhibit 1A there are
16 p-values?
17     A.    Correct.
18     Q.    And the p-values below 5
19 percent indicate statistical significance
20 at the 95 percent confidence level, right?
21     A.    That is correct.
22     Q.    Okay.  And so am I right, then,
23 that in Professor Grenadier's Exhibit 1A,
24 he finds that only three of the nine stocks
25 have a statistically significant difference

Page 185

WERNER

1
2 between the news days and the non-news days
3 using your news versus no news test, but
4 with earnings and guidance releases as the
5 news?
6     A.    There is a lot packed in there,
7 but I believe that is correct.
8     Q.    Okay.  And you don't have any
9 reason to dispute Professor Grenadier's
10 calculations here, do you?
11     A.    The actual calculations?
12     Q.    Yes.
13     A.    No.
14     Q.    Okay.  Now if we look at
15 Exhibit 1B, the following page to
16 Deposition Exhibit 176, Professor
17 Grenadier's rebuttal report, we see now he
18 has a table that applies your news versus
19 no news test but this time uses Forms 8-K
20 and 6-K for the news days, right?
21     A.    Correct.
22     Q.    And you understand that a Form
23 6-K is essentially the equivalent of a
24 current event filing on Form 8-K if the
25 issuer is foreign, right?

47 (Pages 182 - 185)

Page 186

WERNER

1
2     A.    Correct, correct.
3     Q.    Okay.  So in footnote 1 to
4  Exhibit 1B Professor Grenadier states that
5  he has identified seven publicly available
6  reports where you used the filing of a Form
7  8-K or 6-K to define the news days, right?
8     A.    Correct.
9     Q.    And do you see there are seven
10  reports listed which have dates from 2016
11  to 2021?
12     A.    I haven't counted them.  I have
13  no reason to doubt your calculation.
14     Q.    Okay.  And do you have any
15  reason to dispute what Professor Grenadier
16  says in footnote 1 to his Exhibit 1B of his
17  rebuttal report, namely that you used this
18  Form 8-K or Form 6-K criterion to define
19  news days in at least these seven reports?
20     A.    Without looking at -- I mean,
21  again, I haven't looked at these reports
22  even since Professor Grenadier submitted
23  his report, but I have no reason to doubt
24  that what you are saying is accurate.
25     Q.    Okay.  And one reason why you

Page 187

WERNER

1
2  say that, I take it, is you agree, even if
3  you don't have the exact number of reports
4  in mind, that there are a number of expert
5  reports over the past five years where you
6  have used a Form 8-K or 6-K criterion for
7  news day selection in performing a news
8  versus no news test for Cammer factor five
9  for market efficiency, right?
10     A.    Absolutely.  But I want to
11  point out that since the NEO report I have
12  not used any of these methodologies to
13  define my news/no news test.
14     Q.    Okay.  And you see here that in
15  Exhibit 1B, Professor Grenadier reports
16  that the Fisher's exact test showed
17  statistical significance for only two of
18  the nine stocks using the Form 8-K or 6-K
19  news day selection criterion?
20     A.    That is correct.
21     Q.    All right.  And you don't have
22  any basis to dispute that calculation, do
23  you?
24     A.    I have not checked.  I have not
25  personally checked his calculation.  I have

Page 188

WERNER

1
2  no reason to think it is incorrect.
3     Q.    Okay.  And NEO, is that a
4  Chinese electric car company?
5     A.    To the best of my recollection,
6  yes.
7     Q.    And I do apologize if you
8  explained this in greater detail in that
9  very long answer you gave, but I didn't
10  manage to write that down.  Was there
11  something that occurred as you were working
12  on the NEO case that led you to decide not
13  to use this approach any longer?
14     A.    Yes.
15     Q.    What was that?
16     A.    Well, I mean, there is a couple
17  of things.  With regards to NEO, right, I
18  found news, I don't remember if it was in a
19  press release or an 8-K, it is a foreign
20  company, so it is a 6-K, that dealt with
21  news that I thought would not be material
22  to investors.
23          So the test would quantify
24  those days as news days, but in fact there
25  is no reason to think that that information

Page 189

WERNER

1
2  would have any impact on the stock price.
3  And so to that extent, some firms, and I
4  mean, you know, it is a case-by-case basis,
5  some firms are going to be over-inclusive
6  in terms of what they report.
7          So, for instance, this guy,
8  again, reports that he changed his -- he
9  moved his stock, his company stock, and I
10  think it was the CEO, from his personal
11  account to a trust account, and there is no
12  reason for me as a financial economist to
13  think that that would have any
14  informational value to investors.
15          And the flip side of that,
16  right, is that oftentimes firms will
17  under-report news, so it is basically, to
18  the extent that they are either filing
19  press releases or 8 or 6-Ks, right, there
20  is some decision made on the part of the
21  corporation that this news is material to
22  the market, and so they are making that
23  choice, it is an objective criterion,
24  where -- I'm sorry, subjective criteria,
25  right.  Whereas what I have done -- so if

48 (Pages 186 - 189)

WERNER

1  you think about this as a, you know, a
2  sliding scale of most objective to most
3  subjective, right, these methodologies are
4  going to be somewhere in here.
5
6         In terms of what I've done,
7  I've gone to this extreme point of the most
8  objective test that one could do in
9  performing those news/no news tests.  And
10 as I have stated previously, it has been
11 accepted by courts, well, beyond its being
12 accepted by courts, it has also been
13 utilized by one of the authors of the
14 Ferrillo paper written in I believe 2004.
15       So it has got, even though the
16 Ferrillo paper doesn't deal specifically
17 with that methodology, obviously if one of
18 the co-authors of the paper deemed it
19 sufficient to run a news/no news test, it
20 should be sufficient for me as well as the
21 fact that courts have accepted it.
22    Q.    And when you say you have gone
23 to this extreme point of the most objective
24 test that one could do in performing these
25 news/no news tests, you are referring to

WERNER

1
2  the Factiva headline approach that you used
3  in this case, right?
4     A.    Right, correct.  Well, I
5  don't -- that might be -- in general,
6  that's correct.
7     Q.    And when you refer to one of
8  the co-authors of the Ferrillo paper, you
9  are referring to Dr. Tabak, right?
10    A.    That is correct.
11    Q.    Have you discussed news/no news
12 selection criteria with Dr. Tabak?
13    A.    It is possible.  I worked with
14 him at NERA.  I don't recall.
15    Q.    Okay.  Have you discussed it
16 within the last two years with him?
17    A.    No.
18    Q.    All right.  When you said
19 earlier that you believed that there are
20 some courts that have accepted your current
21 approach, this Factiva headline approach,
22 the news/no news test, you are not
23 referring to opinions you have rendered,
24 are you?
25    A.    Oh, that is correct.  When you

WERNER

1
2  call it the Factiva news approach, I'm not
3  sure that that's a fully accurate
4  description.  But if you are saying what I
5  have done -- if you are describing what I
6  have done and you want to call it the
7  Factiva news/no news approach, I'm more
8  than happy to accept that definition.
9     Q.    Okay, all right.  So when you
10 are talking about courts accepting this
11 Factiva headline approach, are you
12 referring to reports from Dr. Tabak or from
13 others?
14    A.    Certainly I believe Dr. Tabak.
15 I believe I have seen others, but off the
16 top of my head, I don't recall.
17    Q.    Okay.  Is it just one court
18 opinion or more than one that you have in
19 mind as accepting Dr. Tabak's use of this
20 more recent news/no news approach?
21    A.    Well, I don't know how many
22 times Dr. Tabak has used it, so I can't
23 tell you if there is more than one court
24 who has accepted it or not.
25    Q.    Okay.

WERNER

1
2     A.    I don't know, off the top of my
3  head, I don't know the frequency with which
4  other experts have used this definition of
5  news/no news.  So I can't tell you, you
6  know, how many times courts have accepted
7  it.
8     Q.    Okay.  But if I understood you
9  right, you were saying that you personally
10 have read a court opinion that accepted
11 Dr. Tabak's use of an approach similar to
12 your Factiva headline approach for the
13 news/no news test?
14    A.    Well, I'm not sure that the
15 courts necessarily discussed the news/no
16 news test specifically, but to the best of
17 my recollection, I believe some courts have
18 found -- have certified classes where this
19 methodology was used.
20    Q.    Okay.  So if you didn't learn
21 this from speaking to Dr. Tabak, because
22 you say you haven't spoken to him about
23 news/no news test in the past two years,
24 and if you didn't learn this from reading a
25 court opinion yourself because you said you

49 (Pages 190 - 193)

Page 194

WERNER

1
2 don't know whether the court necessarily
3 discussed the no news test, what is the
4 basis for your belief that some courts have
5 found this news/no news test using the
6 Factiva headline approach to be acceptable?
7     A.    So you've said that I didn't
8 read court opinions.  I have said I have
9 read court opinions.  I don't recall what
10 court opinions.
11    Q.    Okay.  So I believe you said
12 that you are not sure that the courts
13 necessarily discussed the news/no news test
14 specifically, but to the best of your
15 recollection you believe some courts
16 certified classes where this methodology
17 was used?
18    A.    That's a correct statement.
19    Q.    And so my question is if the
20 court opinion doesn't talk about the
21 news/no news test, how do you know that any
22 court has certified a class using this
23 methodology?
24    A.    Oh, okay, now I think I
25 understand.  It is certainly possible that

Page 195

WERNER

1
2 the court discussed the news/no news test.
3 It is also possible that I saw the report
4 written by the expert in which this
5 methodology was used.
6     Q.    And as you sit here today, you
7 don't know which of the two it is?
8     A.    Which of the two it is?  It
9 could be both.
10    Q.    Okay.  But you're not telling
11 me that there is a court case out there
12 that you're aware of that accepts this
13 broad of a news/no news test where it is
14 just every headline result from Factiva,
15 right?
16    A.    I mean, I don't know how else
17 to answer the question.  I mean, I have
18 answered the question to the best of my
19 ability.
20    Q.    Okay.
21    A.    I don't know that -- I mean, I
22 did the best I could.
23    Q.    Okay.  Let's turn to Exhibit
24 1C.  This is in Professor Grenadier's
25 rebuttal report previously marked as

Page 196

WERNER

1
2 Deposition Exhibit 176.
3         So do you see that Exhibit 1C
4 states that it is an application of your
5 news/no news test but this time using press
6 releases as the news day selection
7 criterion?
8     A.    Correct.
9     Q.    And do you see that Professor
10 Grenadier in footnote 1 to Exhibit 1C
11 states that he identified two reports where
12 you did that, the Ebix report from 2012 and
13 the Hi-Crush report from 2014?  Do you see
14 that?
15    A.    Yes.  Yes, I do.
16    Q.    And do you have any reason to
17 dispute Professor Grenadier's statement
18 here in footnote 1 that you did indeed use
19 a press release, news day selection
20 criterion in at least those two reports?
21    A.    I believe that prior to 2014 I
22 definitely so, nine years ago, I definitely
23 used this methodology.  I don't recall --
24 my guess is if I had used it since then,
25 Dr. Grenadier may have highlighted it.  So

Page 197

WERNER

1
2 based on what I'm seeing here, yeah, I have
3 used it twice, not since 2014.
4     Q.    All right.  And do you see in
5 Exhibit 1C Professor Grenadier calculates
6 that using the Fisher's exact test there is
7 statistical significance to the comparison
8 of the high information flow days to the
9 low information flow days for only one of
10 the nine stocks?
11    A.    I don't think what you've said
12 is correct.
13    Q.    I may have bolloxed that, so
14 let me try again.
15    A.    Okay.
16    Q.    Do you see in Exhibit 1C that
17 Professor Grenadier calculates Fisher exact
18 test p-values using the press release
19 method for each of the nine stocks?
20    A.    Yes, I do see that.
21    Q.    And do you see that he finds
22 statistical significance at the 95 percent
23 confidence level for only one of the nine
24 stocks using the press release method,
25 namely Bed Bath & Beyond?

50 (Pages 194 - 197)

Page 198

WERNER

2    A.    Well, statistical significance,
3  to the extent that you are looking at a
4  difference between news and no news, yes.
5    Q.    Okay.  And --
6    A.    Or as defined here by using
7  press releases.
8    Q.    Okay.  So let me just make
9  sure.  Running a Fisher's exact test to
10  calculate statistical significance of the
11  difference between news and no news days is
12  the same methodology that you used in your
13  opening report in this case, right?
14    A.    I believe that is correct.
15    Q.    All right.
16    A.    But we haven't said anything
17  about the definition of news.
18    Q.    Understood.  We have alluded to
19  it several times.  We are going to get into
20  it in more detail, worry not.  All right.
21        So now if you could turn,
22  please, with me in Professor Grenadier's
23  rebuttal report, this same document we have
24  been looking at, to page 26.
25        MR. ROSEN:  This is Grenadier's

Page 199

WERNER

2  report again?
3        MR. RYAN:  Yes.
4    Q.    You see in paragraph 53 he goes
5  through his findings for three exhibits
6  that you and I just looked at together for
7  the last half hour, Exhibits 1A, 1B and 1C,
8  right?
9    A.    Correct.
10    Q.    And then in footnote 96,
11  Professor Grenadier reports that
12  "Additionally, when news days, or high
13  information flow days, are defined as the
14  combination of earnings releases, Form 8-K
15  and Form 6-K filings, and press releases,
16  his results," meaning your, Dr. Werner's
17  results, "are reversed for all but two
18  stocks, namely AMC and Bed Bath & Beyond."
19    A.    Hold on a second.
20    Q.    Uh-huh.
21    A.    I'm sorry, maybe I
22  misunderstood you.  Did you say he combined
23  those definitions into one news day?
24    Q.    Yes.  So what he is saying as I
25  understand it in 96, we saw how he did the

Page 200

WERNER

2  three different recalculations in Exhibits
3  1A, 1B and 1C, and here he is saying if he
4  instead defines in effect a combined set of
5  news days that meet any of those three
6  criteria, and he defines that as the news
7  day set, then his result is that there is
8  statistical significance for only two
9  stocks, namely AMC and Bed Bath & Beyond,
10  right?
11    A.    Correct.
12        MR. ROSEN:  What paragraph are
13    you referring to?
14        MR. RYAN:  Footnote 96, which
15    is off of paragraph 53 on page 26 of
16    Professor Grenadier's rebuttal report.
17    Q.    And you don't have any basis to
18  disagree, do you, Dr. Werner, with the
19  calculations in Professor Grenadier's note
20  96?
21    A.    I have no reason to disagree
22  that the calculations are accurate.
23    Q.    Okay.  And you haven't done
24  anything for any of the cases that are
25  still ongoing that are cited here in

Page 201

WERNER

2  footnotes 1 to Exhibit 1A or 1B of
3  Professor Grenadier's rebuttal report, you
4  haven't done anything to somehow withdraw
5  the news/no news test that you ran in any
6  of those cases, have you?
7    A.    No, not to my knowledge.  I
8  mean, you said ongoing.  I mean, if you
9  really want me to look at it, I'm pretty
10  sure none of those cases are ongoing, but
11  it is possible they are.
12    Q.    Okay.
13    A.    Obviously, you know, the
14  Hi-Crush case and the case from -- the Ebix
15  case are not ongoing to the best of my
16  knowledge.
17    Q.    Understood.
18    A.    But that caveat aside, yeah.
19    Q.    Okay.  All right.  Now, you
20  cite in your report, so let's try to find
21  this now, this would be your opening
22  report, Exhibit 281, on page 31 --
23    A.    I think I mixed up some stuff
24  here.  Oh.
25        MR. ROSEN:  You are talking

51 (Pages 198 - 201)

Page 202

WERNER

1
2  about the opening report?
3       MR. RYAN:  Yes.
4       MR. ROSEN:  Page 31?
5       MR. RYAN:  Yes.
6  A.   So this only goes up to page
7  28, which suggests to me that I may have
8  combined some documents.
9       MR. ROSEN:  I think the problem
10  is they are not stapled, so you are
11  mixing everything together.
12       THE WITNESS:  Do you want to
13  give me your copy, Larry, or Mr. Rosen?
14       MR. ROSEN:  Which report are we
15  talking about?
16       THE WITNESS:  So my initial
17  report.
18       MR. ROSEN:  Your initial
19  report, that should be here.  Oh, I
20  have it here.  Hang on.  Your initial
21  report is this one, 284, right?
22       MR. RYAN:  No, it is 281.  It
23  is the thick document.
24       THE WITNESS:  This is the Omega
25  document.  Yeah, the big one.

Page 203

WERNER

1
2       MR. ROSEN:  I'm sorry.
3       THE WITNESS:  No worries.
4  Q.   All right.  So we are looking
5  at page 31, note 74.
6  A.   Okay, page 31, note 74.
7  Q.   Right.
8  A.   Footnote 74.
9  Q.   Yes.
10  A.   Okay.
11  Q.   And do you see the citation to
12  Ferrillo, et al, from the St. John's Law
13  Review in 2004?
14  A.   I do.
15  Q.   And is this the Ferrillo
16  article that you were referring to
17  previously in your testimony?
18  A.   Correct.
19  Q.   Okay.  And do you consider this
20  article to be a reputable authority in how
21  to conduct event studies for market
22  efficiency purposes?
23  A.   Reputable?  It is informative.
24  But, as I've said, the underlying authors'
25  opinions of how one defines news and what

Page 204

WERNER

1
2  one looks at may have changed since they
3  read this report, or, sorry, report, paper
4  back in 2004.
5  Q.   Maybe.  I mean, you can't ask
6  Fred Dunbar, can you, unfortunately?
7  A.   No, I'm sure you could depose
8  David Tabak, but the evidence is that he
9  has adopted possibly a different criterion
10  than what was strictly said in this report.
11  His opinions may have evolved over time I
12  guess is what I'm saying.  In fact, all
13  indications are that they have evolved over
14  time.
15  Q.   All right.  So let me go back
16  to my question.  Do you consider the
17  Ferrillo article to be a reputable
18  authority in how to conduct event studies
19  for market efficiency purposes?
20  A.   I think it is a reputable study
21  with regards to how to conduct -- I
22  don't -- again, reputable study?  It is --
23  it is informative.  It has met the
24  methodology of looking at a news/no news
25  test is certainly something that has been

Page 205

WERNER

1
2  adopted by many economists, many courts.  I
3  don't know if that makes it a reliable
4  source.  That's your term, reliable source.
5  I think you said reliable source.
6  Q.   Reputable.
7  A.   Reputable, reputable.  So I
8  don't know how to necessarily define that.
9  But to the extent that they present an
10  analysis, a news/no news analysis that
11  people have since adopted or at least the
12  methodology that people have still -- have
13  since adopted, again, I don't know if that
14  renders it reputable.  It certainly renders
15  it informative.
16  Q.   All right.  You chose to cite
17  the Ferrillo article in your opening
18  report, right?
19  A.   That is correct.
20  Q.   And I assume that is because
21  you hold the article in high esteem?
22  A.   It informs my opinion about how
23  to run a news/no news test.
24  Q.   Has the article been
25  influential in terms of a methodology for

52 (Pages 202 - 205)

Page 206

WERNER

1    running a news/no news test?
2    A.    When you say influential,
3  influential to who?
4    Q.    Has it had influence on other
5  people, readers?
6    A.    Readers?
7    Q.    Yes.
8    A.    Well, I mean, I don't remember
9  if it is cited in Halliburton I or in
10  Halliburton II, the amicus brief.  I mean,
11  people certainly have cited it.  I don't
12  know -- what was the specific word he used?
13    MR. ROSEN:  Reliable.
14    THE WITNESS:  No, we are past
15    "reliable."
16    Q.    Has it had influence on other
17  people, namely readers?
18    MR. ROSEN:  Objection, calls
19    for speculation.
20    A.    Again, I don't know.  Like I
21  said, people have seemed to adopt the
22  general methodology that these people used
23  in this report.
24    Q.    All right.  Do you believe that

Page 207

WERNER

1    the Ferrillo, et al, methodology is
2  reliable?
3    A.    Do I believe that running a
4  news/no news test can inform one about
5  whether or not a security trades in an
6  efficient market?  I do.
7    Q.    All right.  My question,
8  though, is a little different.  Do you
9  believe that the methodology for running a
10  news/no news test set forth in Ferrillo, et
11  al, is reliable?
12    A.    I would have to look -- if you
13  want to give me the paper, I'm happy to
14  look at it.  I have given you the best
15  answer that I can without actually looking
16  at the report.
17    Q.    Okay.  So am I understanding
18  you right that without looking at the
19  report you cannot tell me one way or the
20  other whether you believe that the
21  methodology in Ferrillo, et al, for running
22  a news/no news test is reliable?
23    A.    Well, let's see the full
24  methodology and then I will tell you.  I

Page 208

WERNER

1    mean, I don't -- I haven't perfectly
2  memorized the entire methodology as
3  described in this report.  So if you want
4  me to look how they describe it, again,
5  even Dr. Tabak has changed some of his
6  opinions.  So I don't know how that might
7  or might not be reflected in the
8  methodology that they describe in this
9  paper.  Now, I do know, again, courts have
10  accepted the news/no news analysis in
11  general.  Again, I don't know if that makes
12  it reputable, reliable, whatever.
13    Q.    I am going to show you the
14  report.  I'm going to show it to you in just
15  a minute.  But I do want to see whether you
16  can answer this question:  Are you able to
17  answer my question before we look at the
18  report whether you considered the
19  methodology for running the news/no news
20  test in Ferrillo, et al, to be reliable?
21    THE WITNESS:  Do you want to
22    object?
23    MR. ROSEN:  I already objected.
24    You know, it is up to you to answer the

Page 209

WERNER

1    question.
2    THE WITNESS:  You didn't
3    technically object, that's why I was
4    waiting.
5    A.    I mean, I don't know how to
6  give you a different answer than I have
7  previously given.  That's my answer.
8    Q.    You won't know if it is
9  reliable until you have looked at it?
10    A.    I defer to what I said
11  previously.
12    Q.    That's the best answer you are
13  able to give me to that question?
14    A.    Well, I mean, there has been --
15  I don't know, you keep asking me the
16  question.
17    MR. ROSEN:  You want an answer
18    to a question that specifically refers
19    to a specific -- to the specific model
20    in that specific academic paper, and he
21    is saying well, let me look at the
22    academic paper so I can better answer
23    your question.  So you said you have
24    the paper, so just show it to him and

53 (Pages 206 - 209)

Page 210

WERNER

2  he will answer your questions.  It
3  seems that that will get us through
4  this.
5          MR. RYAN:  I will.
6      Q.   So you're not able to answer
7  the question unless I show you the paper,
8  right?  Is that right?
9      A.   I believe that in order to give
10  you the most accurate answer possible I
11  would need to see the paper.  As my
12  understanding, at the deposition, my job is
13  to give the most accurate testimony
14  possible.  It doesn't seem odd that I
15  should ask to see the underlying paper for
16  which you are asking me this question.
17      Q.   All right.  Why don't we look
18  at the paper.  So this will be Exhibit 285
19  I believe.
20          (Defendant's Exhibit 285 marked
21  for identification.)
22      Q.   All right.  So why don't we
23  turn to page 119.
24      A.   119.
25      Q.   Let me just ask you a

Page 211

WERNER

2  foundational question first, which I meant
3  to do.  Is Exhibit 285 the Ferrillo, et al,
4  paper that we have been talking about?
5      A.   I believe so, yes.
6      Q.   All right.  So if you could
7  turn, please, to page 119.  Do you see a
8  heading there number 2, Price Reaction to
9  News?
10      A.   I do.
11          MR. ROSEN:  What page are you
12  on?
13          MR. RYAN:  119.
14      Q.   And so if you could maybe just
15  read to yourself from that heading in the
16  middle of page 119 to the very top of page
17  121 before the table about Metro Global
18  Media and then I will ask you some
19  questions.
20      A.   I want to first go to -- I
21  don't recall what their -- what type of
22  definition they are using for the efficient
23  market hypothesis, so I would like to go to
24  the beginning and just refresh my memory
25  about the exact standard they were using.

Page 212

WERNER

2  This was -- this is 2004, so ten years
3  before Halliburton II.
4          (Witness perusing document.)
5      Q.   So I believe that discussion
6  you are looking for begins at the very
7  bottom of page 102 under the heading
8  Efficient Markets in Theory.  That also
9  defines the term EMH.
10          MR. ROSEN:  It is also on page
11  117 there is a discussion.  You said
12  102 or 112?
13          MR. RYAN:  102.
14          (Witness perusing document.)
15          MR. ROSEN:  The beginning of
16  page 14 and the middle of page 14 --
17          MR. RYAN:  I don't think we
18  need this commentary.
19          MR. ROSEN:  Well, all right,
20  then we can go through the whole thing.
21          (Witness perusing document.)
22      Q.   All right.  Have you had the
23  chance now to read pages 119 to 121?
24      A.   No, I haven't.
25          (Witness perusing document.)

Page 213

WERNER

2          MR. ROSEN:  Go to page 117.
3          THE WITNESS:  Do you want me to
4  move ahead to page 117?
5      Q.   I would like you to read pages
6  119 to 121 and then I'm going to ask you
7  some specific questions.  You asked where
8  efficient market hypothesis was defined in
9  the document.  I have shown you where it
10  was defined.  There is no need for you
11  waste time on the record reading 20 pages
12  of this article, which is an article that
13  you are quite familiar with.
14          MR. ROSEN:  Look, he is
15  entitled to read the article if you are
16  going to ask him questions about it.
17      Q.   Well, let me start asking you
18  questions.  So, Dr. Werner, do you agree,
19  and I'm reading from -- five lines from the
20  bottom of page 119 --
21      A.   I'm like ten pages -- yeah, I'm
22  on 109, so let's slow your roll there.
23      Q.   Do you agree that because stock
24  prices move all the time one must compare
25  the movements in response to news stories

54 (Pages 210 - 213)

Page 214

WERNER

1
2 with a control group of prices?
3     A.    I haven't read that yet.
4     Q.    So you can't tell me if you
5 agree or disagree with that?
6     A.    I would like to read it in the
7 context in which it was written.
8     Q.    Well, I have given you about
9 ten minutes already to read portions of
10 this article, and I directed you to a full
11 two pages and you apparently have been
12 reading other pages of the article.  I just
13 want the record to clearly reflect that.
14 So you are not able to answer that
15 question?
16    A.    I will be able to answer that
17 question when I read that sentences or
18 sentence and put it in the context of what
19 the authors are saying.
20    Q.    Okay.  Let me ask you then the
21 top of page 120, you see that Ferrillo, et
22 al, write "Using whatever sample is chosen,
23 one could then separate out those days on
24 which the company is mentioned in the news
25 from those on which it is not.  Of course

Page 215

WERNER

1
2 there are various ways to implement this
3 procedure."
4         Do you agree with the authors
5 that there are various ways to implement
6 this procedure?
7     A.    You are on page 120 now?
8     Q.    Yes, sir.
9     A.    That is what they wrote.
10    Q.    All right.  And do you agree
11 with them as an expert in finance and
12 economics who yourself apply the news/no
13 news test regularly, do you agree with them
14 that there are various ways to implement
15 this procedure?
16    A.    Well, I don't know exactly what
17 procedure they are talking about, so, I
18 mean, if you would let me -- I still
19 haven't read 119 through 121.  So, I mean,
20 I guess you want me to skip ahead and
21 ignore what is written with regards to the
22 efficient market hypothesis and what needs
23 to be shown.
24        MR. ROSEN:  Well, before you
25    answer the question, read what you want

Page 216

WERNER

1
2 to read.  You should start at least at
3 117, because the whole context --
4        MR. RYAN:  I'm going to
5 continue.
6        MR. ROSEN:  He is allowed to
7 read it if you ask him about it.
8        THE WITNESS:  I can't read
9 while you are asking questions.
10        MR. ROSEN:  This is a long,
11 complicated academic paper and you want
12 to ask him is it true what is written
13 in this long, complicated academic
14 paper.  He has to read it.  He hasn't
15 looked at it in -- even if he hasn't
16 looked at it in three weeks, it is
17 still three weeks ago.  So he is
18 entitled to read it.
19        MR. RYAN:  I gave the witness
20 plenty of time to read it.
21    Q.    Now, do you see here now on
22 line 5 of page 120, the authors say that
23 "There is the choice of news sources to be
24 searched (for example, major newspapers and
25 presswires versus all available news

Page 217

WERNER

1
2 sources) and whether to limit the search to
3 those stories where the company name and/or
4 ticker is mentioned in the headline, the
5 headline or lead paragraph, or anywhere in
6 the story"?
7     A.    What paragraph are you on?
8     Q.    I'm on page 120, beginning five
9 lines from the top.  And do you agree with
10 the authors that there are these choices of
11 what news sources to be searched and
12 whether to limit the search to stories
13 where the company name or ticker is in the
14 headline or the headline and lead paragraph
15 or anywhere in the story?
16    A.    I agree that that's what they
17 wrote.
18    Q.    And do you agree that those are
19 all reasonable methodological choices to
20 make in conducting a news/no news test for
21 the purpose of testing market efficiency?
22    A.    Is it a reasonable assumption?
23 It is certainly one that one could use.
24    Q.    Do you see the next sentence
25 then reads "One could also refine the

55 (Pages 214 - 217)

Page 218

WERNER

1    WERNER
2 search to only focus on particular types of
3 news stories, for example, earnings
4 announcements"?
5    A.    You have read that correctly.
6    Q.    Okay.  And that's a
7 methodological choice that you have made in
8 multiple previous expert reports as we went
9 over, right?
10    A.    Yes, prior to my submission of
11 the NEO report, correct.
12    Q.    All right.  So your submission
13 of the NEO report I think had to do with
14 not using Form 8-K or 6-K, right?
15    A.    No.  It had to deal with the
16 problems under any definition -- under any
17 subjective definition of news.  I don't
18 recall -- I mean, if you want to show me
19 the NEO report, I don't remember whether I
20 was looking at 8-Ks or press releases.
21    Q.    Didn't you tell me 15 minutes
22 ago that in the NEO case you were looking
23 at a Form 8-K and you found that an
24 executive, you believed it was the CEO, was
25 making a disclosure in the Form 8-K about

Page 219

1    WERNER
2 moving a certain investment from a personal
3 account to a trust account, and you said
4 that it was your experience in looking at
5 Forms 8-K and 6-K that companies used
6 different standards in how often they
7 reported items and that you concluded that
8 the Form 8-K and 6-K approach was both over
9 and under-inclusive, isn't that what you
10 testified to 20 minutes ago?
11    A.    Well, let's be specific,
12 because when we were talking about NEO, I
13 wasn't talking about 8-Ks, I was talking
14 about 6-Ks.  So if you go to the beginning
15 of your statement there, it is incorrect.
16 Now, whether I was looking at press
17 releases or 6-Ks at the time, I don't
18 recall.
19    Q.    And you agree that a 6-K is
20 basically the same as an 8-K except for a
21 foreign issuer, right?
22    A.    That is correct.
23    Q.    And I guess because you're not
24 a lawyer, you are unfamiliar with the SEC
25 regulations for when companies are required

Page 220

1    WERNER
2 to make 8-K and 6-K filings; is that right?
3    A.    I don't know if that's
4 accurate.  I mean, if you want to show
5 me -- just show me an 8-K or show me the
6 SEC rules about when a firm needs to issue
7 an 8 or 6-K, I'm happy to review it.  I
8 have a general understanding.
9    Q.    All right.  What is your
10 general understanding of the SEC rules for
11 when a firm needs to issue an 8-K or a 6-K?
12    A.    Again, I don't want to give an
13 inaccurate answer.  So if you want to show
14 me where that's written, I'm happy to
15 review that and then give you an answer.
16    Q.    Okay.  Without reviewing SEC
17 regulations or other documents, am I right
18 that you are unable to provide any general
19 understanding of what the SEC rules are
20 about when a firm needs to issue an 8-K or
21 a 6-K?
22    A.    See, my problem is I don't
23 remember if it specifically states that it
24 has to include -- that it must be written
25 or published when they have material

Page 221

1    WERNER
2 information.  That's the only distinction.
3 I'm not positive that that's exactly what
4 they say, and that's why I would want to
5 refresh my memory as to whether or not that
6 is the exact wording used by the SEC.
7    Q.    Because that would be relevant
8 to you in assessing the suitability of that
9 news day selection criterion for purposes
10 of testing market efficiency, right?
11    A.    Well, again, it would -- it
12 goes to what -- assuming that my definition
13 is correct, right, it goes to what the
14 company believes is material, and that is
15 necessarily a subjective view of what news
16 is or what material news is.
17        So to the extent that the
18 company has to determine, and, again, I
19 don't recall it off the top of my head, but
20 if you want to stipulate that in fact what
21 it discusses is material news, it then --
22 it rests on how -- what a company believes
23 is material, and as I've said, and as
24 you've stated, those two things could be
25 over or under-inclusive with regards to

Page 222

WERNER

1
2 news.
3     Q.     Okay.  Help me understand what
4 you are saying better.  You are saying your
5 criticism of the use of 8-K or 6-K as a
6 news day selection criterion as you used to
7 do in running the news/no news test is that
8 materiality is in the eye of the beholder?
9     A.     Well, again, that's to the best
10 of my recollection.
11     Q.     Okay.
12     A.     With regards to the
13 definition -- the definition being
14 materiality.  That being the benchmark
15 under 8 or 6-K.  That's my recollection,
16 but I could be wrong.
17     Q.     Do you agree that it is
18 reasonable to refine the search to only
19 focus on particular types of news stories,
20 for example, earnings announcements, as
21 discussed by Ferrillo, et al?
22     A.     Well, see, now here is where
23 this paper that was written in 2004, where
24 people's opinions about things have
25 evolved.  Like I said before, Dr. Tabak has

Page 223

WERNER

1
2 used the exact same analysis I have used in
3 this report in determining market
4 efficiency.  So he is one of the co-authors
5 of the report.  He obviously doesn't think
6 that you have to do that exact type of
7 screening.
8     Q.     Sure.  I didn't ask you whether
9 anybody believed that you had to do that
10 exact type of screening.  My question is do
11 you agree it is reasonable to refine the
12 search to only focus on particular types of
13 news stories, for example, earnings
14 announcements, as discussed by Ferrillo, et
15 al?
16     A.     Oh, I don't know whether it is
17 reasonable or not.  I think if you want to
18 be as objective as possible, you should use
19 my methodology.  There is some subjectivity
20 in that type of screening.
21     Q.     All right.  Do you see the
22 authors of the Ferrillo article continue
23 "In any case, one would still have to be
24 careful to assign stories to the proper
25 dates, that is stories after a market

Page 224

WERNER

1
2 closed could only affect the next day's
3 stock price movements"?
4         Do you see that?
5     A.     Oh, right.  I do see that.
6     Q.     All right.  And do you agree
7 with them that whether one uses all news
8 stories or whether one refines the search
9 to focus on particular types of news
10 stories, one would still have to be careful
11 to assign stories to the proper dates?
12     A.     The proper dates?
13     Q.     Yes.
14     A.     Yes, you would definitely have
15 to assign them to the proper dates.
16     Q.     All right.  You see they also
17 state in this sentence "In any case, one
18 would still have to be careful to remove
19 any stories that exist because they report
20 on a price movement"?
21         Do you see that?
22     A.     I do see that, yes.
23     Q.     And do you agree with the
24 authors of the Ferrillo, et al, paper that
25 regardless of whether one includes all news

Page 225

WERNER

1
2 articles or instead refines the search to
3 only focus on particular types of news
4 stories, one would still have to be careful
5 to remove any stories that exist because
6 they report on a price movement?
7     A.     So here I defer to Dr. Tabak.
8 He doesn't -- he runs this test without
9 removing information that has to deal with
10 price movement.  So evidently he doesn't
11 currently agree with this statement that he
12 made 20 years ago, so I'm going to defer to
13 him and disagree with that statement.
14     Q.     All right.  So you disagree
15 with the statement in the Ferrillo, et al,
16 paper that one has to be careful to remove
17 any stories that exist because they report
18 on a price movement; is that right?
19     A.     In order to be as objective as
20 possible, yes, that is correct.
21     Q.     Okay.  And have you discussed
22 with Dr. Tabak why he no longer follows
23 this methodology if indeed he does no
24 longer follow it?
25     A.     I have not discussed it with

57 (Pages 222 - 225)

Page 226

WERNER

1                    WERNER
2   him.
3        Q.    All right.  Have you seen
4   anything in writing from Dr. Tabak where he
5   has explained why he no longer follows this
6   aspect of the methodology set forth in the
7   Ferrillo, et al, article, if indeed he does
8   no longer follow it?
9        A.    I have not.
10       Q.    Okay.  So if I understand you
11   right, you are simply observing that you've
12   seen expert reports Dr. Tabak has submitted
13   at some point since 2004 in which you
14   didn't notice him removing any stories that
15   existed because they reported on a price
16   movement and you are inferring that
17   Dr. Tabak must have changed his mind about
18   the need to do that; is that right?
19       A.    Among other things.  I mean,
20   look, your client, Robinhood, and I haven't
21   seen this personally, but they published I
22   think on the website, you know, they would
23   show the ten biggest stock price movers
24   every day, throughout the day, right?  So
25   that is reporting on stock price movements.

Page 227

1   I assume they put it up there because they
2   think it is relevant to investors and that
3   investors possibly use that information.
4        So I think that this is, going
5   back to 2004, it is oversimplified.  It is
6   not accounting for things like Chartis, who
7   might possibly use stock price as an
8   indicator.  I think momentum traders would
9   be an example.  I think Professor Grenadier
10   worked or advised on a hedge fund that used
11   momentum trading.
12        So I think it is overly
13   simplistic, and, again, we are talking
14   about a different period of time, to say
15   that price is not informative.
16       Q.    Am I right that in conducting
17   your news/no news test in your opening
18   report in this case, you did not remove any
19   stories that exist because they report on a
20   price movement?
21       A.    That is correct.
22       Q.    And in fact you are aware that
23   in that last week before the class period
24   at the end of January 2021, there were many

Page 228

WERNER

1                    WERNER
2   stories that existed because they reported
3   on a price movement, right?
4        A.    Well, you say -- what do you
5   mean by "many"?
6        Q.    I mean a very high proportion
7   of the news articles about these nine
8   stocks in the week before the class period
9   begins at the end of January 2021 are news
10   stories that exist because they report on a
11   price movement, right?
12       A.    I don't know if it is a high
13   frequency.  Did you use the term "high
14   frequency"?
15       Q.    High proportion.
16       A.    High proportion, right.  Yeah,
17   as I sit here, I mean, certainly there were
18   discussions about price movements.  I
19   won't -- I don't disagree with that.
20   Whether or not it was a high proportion, I
21   don't know as I sit here today.
22       Q.    Okay.
23       A.    As you have defined a high
24   proportion, I don't know what you mean by a
25   high proportion.

Page 229

1                    WERNER
2        Q.    Okay.  So do you know anything
3   about what proportion of the news stories
4   in that week before the class period exist
5   because they report on a price movement?
6        A.    I do not.
7        Q.    All right.  That's not
8   something that you thought was important to
9   look into in connection with rendering your
10   opinion, right?
11       A.    No.  Look, so, you know, I'm
12   damned if I do, I'm damned if I don't.
13   What I initially did was I started to look
14   through the information and then I started
15   to ask the question, okay, well, is each
16   one of these news articles material?  In
17   other words, is it something that an
18   investor might find informative?  And in
19   doing so, it became more and more apparent
20   that whatever decisions I made as to what
21   was material and what was not, which was
22   what was immaterial, was going to be
23   criticized.
24        So it has been this seven and a
25   half hours discussing Dr. Werner, how did

Page 230

WERNER

1
2 you decide that this information is
3 material or that information is material?
4 What I decided then based on my initial
5 review of documents is that look, I'm going
6 to use the most objective criterion
7 possible, and so that is exactly what I did
8 here.
9         So, you know, does it matter
10 that prices -- that there was a reporting
11 on prices? Look, again, people seem to
12 find that information informative. There
13 are people who trade based on the stock
14 price. Again, Dr. Grenadier, or Professor
15 Grenadier, was a consultant to a hedge fund
16 that based some of its trading strategy on
17 momentum trading. All right, what is
18 momentum trading based on? Stock prices.
19         So is it relevant to investors?
20 It appears that some investors find it
21 relevant. So rather than suss out,
22 Dr. Werner, you included this, but you
23 didn't include that, why is this relevant,
24 why is that not relevant, I used the most
25 objective criterion I could use in looking

Page 231

WERNER

1
2 at nine separate companies across a year.
3     Q.    All right. And this case, I
4 think you testified earlier, is the first
5 case in which you have submitted a report
6 in which you used this inclusive method of
7 using every single Factiva hit, right?
8     A.    That is true. But this is also
9 the first case where I have needed to look
10 at nine different companies in order to
11 render an opinion.
12    Q.    All right. And did I
13 understand your answer two answers ago that
14 what you initially did when you started
15 your work on this case was to ask the
16 question of how you could weed out the
17 articles that didn't contain material
18 information?
19    A.    I don't know if I said that I
20 was trying to weed out. I was trying to
21 determine what information was material,
22 and it occurred to me that any
23 decision I made was going to be criticized
24 as being subjective. So I used the most
25 objective criterion I could use.

Page 232

WERNER

1
2         And, I mean, look, you have two
3 experts who used what I would consider an
4 objective, I'm sorry, subjective criterion,
5 and they couldn't agree over a five or
6 six-day period which days, and this is
7 their definition, had value relevant
8 information.
9         So, look, if I go ahead and did
10 that, if I did that, and granted, I mean, I
11 recreated, I used a super set of their
12 information to show that those stocks
13 traded in an efficient market over that
14 week, I'm going to be criticized for being
15 subjective. So I'm trying to be as
16 objective and scientific as possible. That
17 was how I arrived at that decision.
18    Q.    And so am I understanding your
19 testimony right, I think you have now said
20 twice that when you began work on this
21 matter, you began on some process of trying
22 to subjectively sort through the articles,
23 and then you abandoned that; is that right?
24    A.    Did I abandon it?
25    Q.    Well, you didn't use that --

Page 233

WERNER

1
2 you didn't complete your work using that
3 approach and include it in your report, did
4 you?
5     A.    That is correct. I did a
6 cost/benefit analysis of what would be the
7 most appropriate thing to do looking at
8 nine companies over a one-year period. I
9 determined based on how I wanted to deal
10 with criticisms, in other words, did I want
11 to deal with people criticizing me for
12 being subjective or criticizing me for
13 being too objective, I thought that it was
14 better to be too objective as opposed to
15 being too subjective.
16    Q.    All right. And this conscious
17 decision you made to be too objective
18 rather than too subjective, that's a
19 decision that you didn't make at the
20 outset, you made it after having begun work
21 on trying to sort through the articles
22 using value relevance criteria, right?
23        MR. ROSEN: Objection,
24 mischaracterizes his prior testimony.
25    A.    I shouldn't say too -- if I

59 (Pages 230 - 233)

Page 234

WERNER

1
2 said too objective, I misspoke.
3       MR. ROSEN:  He said criticized
4    for being too objective.
5    A.    Right.  I believe that is
6 correct.  I was worried about being
7 criticized.  Oh, if I had to be worried
8 about criticism, I was going to err on the
9 side of being criticized for being too
10 objective, which is how we ended up here
11 right now, as opposed to too subjective.
12    Q.    All right.  So at some point
13 you made a decision that you were going to
14 err on the side of being criticized for
15 being too objective rather than being
16 criticized for being too subjective, right?
17    A.    That certainly was something
18 that informed my opinion, informed my
19 opinion as to what I would do in this case.
20    Q.    Okay.  And that was a decision
21 you made after you began work undertaking
22 what you are describing as the more
23 subjective process to sort through the news
24 articles, right?
25    A.    I believe that's a fair

Page 235

WERNER

1
2 characterization.
3    Q.    Okay.  Now let's return to the
4 Ferrillo, et al, article that we have
5 marked as Deposition Exhibit 285 and we are
6 still on page 120.
7       Do you see the last paragraph
8 in this page begins with the sentence "The
9 final step involved comparing the
10 percentage of days with news that have a
11 statistically significant price movement to
12 the percentage of days without news that
13 have a statistically significant price
14 movement"?
15       Do you see that?
16    A.    I do.
17    Q.    And you agree with that
18 statement of methodology?
19    A.    I don't know if that's
20 technically the final step, but that's
21 certainly something one would do.
22    Q.    Okay.  And that's something you
23 did in your news/no news test in your
24 opening report, right?
25    A.    Yes.  I did do that.

Page 236

WERNER

1
2    Q.    Ferrillo, et al, then give an
3 example.  They say "For example, if 7
4 percent of the days with news have
5 statistically significant price movements
6 and 4 percent of the days without news have
7 statistically significant price movements,
8 then the analyst would test whether the
9 difference between the 7 percent and the 4
10 percent is statistically significant."
11       That makes sense so far to you,
12 right?
13    A.    Yes.
14    Q.    They then write "If it is, then
15 the evidence would show that on average the
16 defendant's stock price reacts to news
17 announcements."
18       Do you agree that that's what
19 the comparison of the news days to the no
20 news days would show in their example?
21    A.    I believe that that would be
22 the conclusion that the person writing this
23 statistical methodology would arrive at.
24    Q.    All right.  And then do you see
25 that Ferrillo, et al, continue in the same

Page 237

WERNER

1
2 sentence beginning at the very bottom of
3 page 120 and going over to the top of page
4 121 by saying "If the difference is not
5 statistically significant, then there would
6 be no basis for saying that the defendant's
7 stock price is affected by news"?
8       And you agree with them that in
9 comparing the news days with the no news
10 days, if the difference is not
11 statistically significant then there would
12 be no basis for saying that the defendant's
13 stock price is affected by news?
14    A.    So here, I mean, I don't want
15 to keep rehashing this, here I go back to
16 my earnings example.  And so to the extent
17 that we're looking at earnings
18 announcements and the firm continually
19 meets expectations, the fact that it
20 consistently meets expectations and fails
21 the news/no news test would not necessarily
22 mean that I don't have a basis for saying
23 that the defendant's stock price was
24 affected by news.  I could come to the
25 conclusion that the stock price is reacting

Page 238

WERNER
1
2 in exactly the way one would expect it to
3 react to news.
4     Q.   All right.  So am I right,
5 then, that you disagree with what Ferrillo,
6 et al, write about what they would conclude
7 if the difference is not statistically
8 significant?
9     A.   I think that they are being
10 overly broad in what they have stated
11 there.
12     Q.   Okay.  Do you believe that
13 there are instances where, as Ferrillo, et
14 al, write in a comparison of the news days
15 with the non-news days, if the difference
16 is not statistically significant, then
17 there would be no basis for saying that the
18 defendant's stock price is affected by
19 news?
20     A.   Again, I'm not going -- the
21 answer I'm going to give is the same.  The
22 fact that -- in the example I have given,
23 the fact that there was no difference
24 between the news and no news days certainly
25 informed my opinion that the stock may have

Page 239

WERNER
1
2 traded in an efficient market.  I mean,
3 again, I would have to look at it on a
4 case-by-case basis.
5     Q.   So I don't understand that
6 response.  So what I believe you have said
7 is that you can think of some instances,
8 like your earnings release example, where
9 the earnings releases come in as expected,
10 where you believe that the Ferrillo, et al,
11 conclusion in the event of no statistical
12 significant difference does not follow, and
13 I understand your response, and so what I'm
14 asking you as a follow-up question is can
15 you also think of any instances where you
16 believe that the Ferrillo, et al,
17 conclusion does follow, or do you believe
18 that they are just flat wrong always?
19     A.   Of course what they are saying
20 is possibly correct.  I'm just thinking of
21 specific examples where it may not be
22 correct, and it would still inform my
23 opinion with regards to market efficiency.
24     So, I mean, I can't even
25 remember what we were talking about,

Page 240

WERNER
1
2 Hi-Crush, so Hi-Crush, I looked at
3 earnings, right?  If all the earnings came
4 in as expected and there was no -- and it
5 failed the news/no news test based on
6 earnings being the indicator, that might
7 inform my opinion as to whether or not that
8 stock traded in an efficient market.  How
9 it would affect my opinion?  I don't know
10 as I sit here today, but it would certainly
11 inform my opinion.
12     Q.   All right.  So you agree that
13 there are instances when the Ferrillo, et
14 al, conclusion would follow?
15     A.   Yes.
16     Q.   How did you go about reviewing
17 the results of your Factiva search?
18     A.   What do you mean, how did I go
19 about reviewing --
20     Q.   I'm just trying to understand
21 in a very granular methodological basis,
22 were you looking a computer monitor, were
23 you looking at printouts, did somebody else
24 read you results over the phone?  I'm just
25 trying to understand really granularly, how

Page 241

WERNER
1
2 did you receive and review the results of
3 this Factiva test?
4     A.   I would say printouts.  They
5 weren't literally printed out, right?  I
6 didn't put them out on a printer.  So if
7 you want to, I don't know, maybe it was a
8 PDF, and I looked through the documents.  I
9 definitely did not print them out.
10     Q.   All right.  So you didn't print
11 hundreds or thousands of pages?
12     A.   No, I did not.
13     Q.   All right.  Am I right that the
14 PDF files, I will just use that term, I'm
15 not implying it was necessarily that
16 format, but are you saying the PDF file was
17 the headlines and the first few words of
18 the article or was it the entirety of every
19 article?
20     A.   In some cases it was just the
21 headlines, in some cases it was the content
22 of the article.  But, I mean, again, I have
23 made a very specific explanation of what I
24 did in this case, and I relied on the idea
25 of content analysis to arrive at what I

61 (Pages 238 - 241)

Page 242

WERNER

1         WERNER
2  defined as news days.
3      Q.    Okay.  So why don't we look at
4  an example of this to see how this worked.
5  So I'm going to mark now as Exhibit 286 a
6  document that The Rosen Law Firm produced
7  to us as part of the backup to your work,
8  Dr. Werner.
9          (Defendant's Exhibit 286 marked
10  for identification.)
11     A.    Okay.  Let's not get these
12  confused.  Do you have a bigger binder
13  clip?
14         MR. ROSEN:  Take this one.
15         THE WITNESS:  Thank you.
16     Q.    And just for the record, this
17  is a printout from Dow Jones, it says
18  Factiva on the bottom, it relates to
19  BlackBerry, there are 143 pages.
20     A.    You know what, it occurs to me
21  since you are going to ask me about this, I
22  should probably review the appendix in my
23  initial report where I discuss exactly what
24  I did in looking at these news articles.
25     Q.    That's a great idea.  So that

Page 243

WERNER

1         WERNER
2  was I think Exhibit A to your opening
3  report, Deposition Exhibit 281, and that is
4  found on, sorry, it was Exhibit B, so it
5  was found on pages 44 to 46.
6      A.    Okay.  Do you mind if I just
7  read this quickly?
8      Q.    No, please.
9          (Witness perusing document.)
10     A.    Okay, I'm done, thank you.
11     Q.    Now we are looking at Exhibit
12  286.  Is this the format in which you
13  reviewed the Factiva results?
14     A.    To the extent I reviewed them,
15  yes, and I also saw -- I believe I have
16  seen some more -- some longer articles.
17  I'm pretty sure this is just the first
18  paragraph or first couple of lines.  There
19  are certainly other -- other formats I've
20  seen.
21     Q.    All right.  So for what
22  articles did you go and look at the entire
23  article as opposed to just looking at the
24  headline and the first few lines as shown
25  here in Exhibit 286?

Page 244

WERNER

1         WERNER
2      A.    As I sit here, I don't recall.
3  There was no -- I don't recall.
4      Q.    You didn't do that in any
5  systematic way; is that right?
6      A.    I think that's accurate.
7      Q.    Okay.  So let's just look at an
8  example here.  Let's turn to page 118.
9      A.    Okay.
10     Q.    And do you see the second
11  article there is "Batavia man charged with
12  DUI after crashing into Con Ed pole"?
13     A.    I do.
14     Q.    And do you see that this is a
15  drunken driving report from the Kane County
16  Chronicle?
17     A.    I do.
18     Q.    Do you see that this appears to
19  be included because the drunk driver was in
20  Blackberry Township in Pennsylvania?
21     A.    I do.
22     Q.    Okay.  And you would agree that
23  that's a false positive, the inclusion of
24  this article in a set of articles about
25  BlackBerry, the company, right?

Page 245

WERNER

1         WERNER
2      A.    Yeah.  Let me -- let me just
3  look at BlackBerry's results here.
4          (Witness perusing document.)
5      A.    Okay.
6      Q.    All right.  So my question --
7      A.    I'm sorry, hold on -- hold on
8  one more second.
9          (Witness perusing document.)
10     A.    Right, so this is outside the
11  range of my study, so this wasn't included
12  in my study.
13     Q.    So this article we have just
14  been looking at --
15     A.    Oh, December 28th, 2020, sorry,
16  my bad, my mistake.  Hold on.
17     Q.    Just so we have a clear record,
18  the article that we have been talking about
19  on page 118 of Deposition Exhibit 286 is
20  from December 28th, 2020, about one month
21  before the end of your one-year period,
22  right?
23     A.    Correct.
24     Q.    And so my question about this
25  is do you agree with me that the inclusion

Page 246

WERNER

1
2  of this article about drunken driving in
3  Blackberry Township is a false positive for
4  your set of articles about BlackBerry, the
5  company?
6      A.   I would agree.  But to the
7  extent that -- so, first of all, that was
8  not in the top 10 percent news days.  To
9  the extent that that would be included, and
10  I wouldn't expect that to move the stock
11  price, it would -- it would lead me, if it
12  was -- if it happened to be a news day, you
13  know, let's say there were 20 articles
14  about this drunk driving accident, that
15  would lead me to -- that would bias my
16  results towards a finding of -- a finding
17  of nonefficiency.
18      Q.   Do you know whether there are
19  articles included in your set about
20  blackberries, the fruit, the edible fruit
21  that is grown on bushes?
22      A.   I do not as I sit here today.
23      Q.   And you would agree with me
24  that articles about blackberries, the
25  edible fruit that grow on bushes, are not

Page 247

WERNER

1
2  relevant to investment in BlackBerry, the
3  company, right?
4      A.   Yeah, in a vacuum, that is
5  correct.
6      Q.   Are you aware that your set of
7  articles about the company Express include
8  articles about the restaurant chain Panda
9  Express?
10      A.   It is certainly possible.
11      Q.   All right.  And you would agree
12  with me that articles about the restaurant
13  chain Panda Express are not relevant to
14  investment in the company Express, right?
15      A.   Look, I mean, these questions
16  are based on -- I mean, you are perfectly
17  reasonable to ask these questions.  The
18  question is should that impact my results.
19  If by chance there happened to be 50 news
20  articles on BlackBerry the day where there
21  is a discussion of blackberry the fruit,
22  that would then show up in the news days.
23  Does that mean that I think this article
24  about blackberries was informational?  No.
25  But that's part of what this methodology

Page 248

WERNER

1
2  does.
3      It is based on the theory, and,
4  again, let's look at what I have said about
5  content analysis here --
6      Q.   All right, I do think we are
7  getting very far away from my question,
8  sir, which is do you agree with me that
9  articles about the restaurant chain Panda
10  Express are not relevant to investment in
11  the company Express?
12      A.   Right.  You are right.  I'm
13  taking it a step further and saying okay,
14  let's say that there are false positives,
15  will this have any impact on our results?
16  You are right, I'm going beyond that.
17  Because based on my understanding, I would
18  be shocked if any of these false positives
19  actually had an impact on my results.
20  Look, to me, that is --
21      MR. ROSEN:  Let him finish.  He
22  is not done.
23      MR. RYAN:  He is not done
24  answering something that has nothing to
25  do with my question.

Page 249

WERNER

1
2      MR. ROSEN:  But if he wants to
3  respond to your question, he is
4  entitled to respond.
5      MR. RYAN:  Not in a way that
6  has nothing to do with my question,
7  Larry.
8      MR. ROSEN:  He can answer the
9  question as he sees fit.
10      A.   Look, ultimately, I mean, you
11  want to ask, does that -- I mean, okay, so
12  there are these false positives.  Does it
13  have any impact on my results?  And the
14  probability that it would have any impact
15  on my results is minuscule.
16      Q.   All right.  Have you done any
17  study to determine how many false positives
18  there are and whether they have an impact
19  on your results?
20      A.   Well, okay, I have not.  But I
21  imagine that if they did have a significant
22  impact on my results, one of your two
23  experts would have done so.  So based on
24  the absence of any analysis that looks at
25  that, my guess is it doesn't have any

63 (Pages 246 - 249)

Page 250

WERNER

1        WERNER
2 impact on my results.
3    Q.    Do you know whether there are
4 articles in your set about the rapper
5 Princess Nokia?
6    A.    Who?
7    Q.    The rapper, Princess Nokia.
8    A.    It is certainly possible.
9 Again, there is absolutely no reason -- are
10 you familiar with her music? I'm sorry, I
11 know I'm not supposed to ask you questions.
12    Q.    I gather you're not familiar
13 with Princess Nokia?
14    A.    I am not familiar with her
15 music. Again --
16    Q.    Do you agree that articles
17 about the rapper Princess Nokia are not
18 relevant to investment in Nokia, the
19 company?
20    A.    I agree, and yet I also agree
21 that the probability of that having any
22 impact on the results of my study are
23 minuscule.
24        THE WITNESS: What time did we
25 start or go back on?

Page 251

1        WERNER
2        MR. ROSEN: 2:29 I think.
3        THE WITNESS: Can we take a
4 break, a five-minute break? Is that
5 okay?
6        MR. RYAN: Do you want to do it
7 right now?
8        THE WITNESS: Yeah, yeah, yeah.
9        THE VIDEOGRAPHER: This will
10 end media unit five. We are going off
11 the record at 3:51.
12        (Recess taken.)
13        THE VIDEOGRAPHER: We are back
14 on the record at 4:02. This will begin
15 media unit six.
16 BY MR. RYAN:
17    Q.    Were there individuals at
18 Crowninshield who worked with you,
19 Dr. Werner, on your reports in this matter?
20    A.    There were.
21    Q.    Who were they?
22    A.    And forgive me with regards to
23 spelling, we may have to go to a website,
24 there is Alex Huang, that is with an
25 H-u-a-n-g. There is Alex Zhang, Z-h-a-n-g.

Page 252

1        WERNER
2 There is Dylan McCabe. There is Rashi, I
3 believe the last name is Agarwal, Miguel
4 Villanueva, Dan Bettencourt may have
5 tangentially worked on this, but I don't
6 know, not in any significant way. I think
7 off the top of my head, those would be the
8 individuals.
9    Q.    Okay. So at least four or five
10 individuals from Crowninshield?
11    A.    Correct.
12    Q.    How many hours did you work on
13 this engagement through submission of your
14 rebuttal report?
15    A.    I have no idea.
16    Q.    Do you have an approximation?
17    A.    More than 150, less than 500.
18    Q.    Okay.
19    A.    But, I mean, that's a guess.
20 I'm not sure that's -- I mean, I
21 would -- I would be very surprised if I
22 worked under 150. I gave you an upper
23 estimate that I would be surprised that I
24 worked more than, but it is possible.
25    Q.    Do you know how many hours the

Page 253

1        WERNER
2 Crowninshield team worked on this?
3    A.    I do not.
4    Q.    But presumably several hundred
5 hours?
6    A.    I think that is a pretty safe
7 assumption.
8    Q.    Now, I have seen two
9 publications that you are a co-author of in
10 Law 360 with an individual named Narinder
11 Walia; is that right?
12    A.    Correct, yes.
13    Q.    And is he affiliated with
14 Crowninshield?
15    A.    He was at the time those
16 articles were submitted. He is now, I'm
17 trying to remember the name of the firm, I
18 think the firm -- he worked at a firm
19 called StoneTurn, TurnStone.
20    Q.    I'm familiar with StoneTurn.
21    A.    Oh, you are. It is StoneTurn,
22 okay.
23    Q.    Yes, I actually know an expert
24 that works now at StoneTurn.
25        All right. At the time you

64 (Pages 250 - 253)

Page 254

```
1            WERNER
2  co-authored these articles about securities
3  damages with Mr. Walia, was he affiliated
4  with Crowninshield?
5     A.   He was.  I don't know if
6  technically he was an employee or he was a
7  1099.  What's the right term?  1099
8  employee, I don't know, consultant.
9     Q.   Okay, sure.  And have you
10 worked with Mr. Walia on a number of expert
11 reports?
12    A.   Over the years, certainly.  I
13 mean, we worked together at CRA.
14    Q.   Oh, I see.
15    A.   If you mean my expert reports,
16 we have certainly worked on some together.
17    Q.   All right.  And did he work at
18 all with you on this engagement for the
19 Robinhood matter?
20    A.   He did not.
21    Q.   Okay.  And do you consider
22 Mr. Walia to be a capable financial
23 economist?
24    A.   He is a capable financial
25 economist, yes.
```

Page 255

```
1            WERNER
2     Q.   Okay.  Now, back in your
3  opening report, this was Exhibit 281.
4     A.   I'm sorry, I shouldn't
5  anticipate questions.  I'm pretty sure I
6  know where you were going with that.  Okay,
7  281?
8     Q.   Yes, sir.
9     A.   Why don't you just tell me
10 which one that is.
11    Q.   It is your original report.
12         MR. ROSEN:  What page of it?
13         MR. RYAN:  Page 23.
14    Q.   I'm at the top of the page,
15 which is the carryover of paragraph 52.
16    A.   Page 23?
17    Q.   Yes, sir.
18    A.   Okay, all right, yup.
19    Q.   And do you see there, there is
20 a sentence that reads "To demonstrate this
21 cause and effect relationship, I conducted
22 collective event study tests investigating
23 whether the market for each of the nine
24 Affected Companies' common stock was
25 efficient"?
```

Page 256

```
1            WERNER
2     A.   I'm sorry, I don't see that
3  particular -- is it on 22 or 23?
4     Q.   The first full sentence on 23.
5     A.   Okay, there we go.
6     Q.   And my question really is quite
7  simple, which is what does the word
8  "collective" mean in that sentence?
9     A.   A collection of information.  I
10 mean, that's what a -- people always -- not
11 always -- often refer to a news/no news
12 test as a collective test.
13    Q.   I see.  You are not saying that
14 you studied the nine stocks in a collective
15 way?
16    A.   I don't know the answer.
17 That's not anything I thought about.  I
18 don't know the answer to that.
19    Q.   You ran separate regression
20 analyses for the nine stocks, right?
21    A.   That is correct.
22    Q.   Okay.  Now, there is a citation
23 here in paragraph 52, I'm looking at Note
24 64.
25    A.   Okay, hold on.  I shouldn't
```

Page 257

```
1            WERNER
2  have shut it.  I apologize.  Note 64, yes.
3     Q.   There is a citation to an
4  article by Eugene Fama.  Do you see that?
5     A.   I do.
6     Q.   And is Professor Fama
7  considered to be a foremost authority on
8  the efficient market theory?
9     A.   I believe he has -- he won a
10 Nobel Prize.  He is certainly knowledgeable
11 about it.
12    Q.   All right.  He won a Nobel
13 Prize in large part for his work --
14    A.   Is that correct?
15    Q.   That is my understanding.  He
16 won a Nobel Prize in large part for his
17 work on the efficient market theory, right?
18    A.   Right, as an academic, but
19 yeah.
20    Q.   Sure.  Now, let me ask you to
21 turn to paragraph 96 of your rebuttal
22 report.
23    A.   All right.
24    Q.   So this is what we marked as
25 Deposition Exhibit 282, and we are on page
```

65 (Pages 254 - 257)

WERNER

1
2 41.
3     A.    Page 41, okay, I'm there.
4     Q.    All right.  Do you see you have
5 a discussion here in your paragraph 96 that
6 Dr. Grenadier, in your words, presents a
7 contradictory opinion in Section 7 of his
8 report?
9     A.    Yes, I do.
10     Q.    And then you have a quotation
11 in the middle of the paragraph where you
12 write "Dr. Grenadier writes 'I see no
13 reasons why a restriction on a subset of
14 retail investors that account for a
15 fraction of the overall market would have
16 artificially distorted the stock price
17 throughout the proposed class period.'"
18     Do you see that?
19     A.    I do.
20     Q.    And you read Dr. Grenadier's
21 deposition, right?
22     A.    I did.
23     Q.    All right.  And you saw that he
24 explained that you had misquoted him, that
25 the sentence in his report, that you left

WERNER

1
2 out a material portion of the sentence in
3 his report, do you remember that?
4     A.    I remember him saying that I
5 misquoted him, but I don't remember -- I'm
6 happy to look at his deposition to know
7 exactly what he said.
8     Q.    Okay.
9     A.    I mean, other than the fact
10 that -- I mean, I don't know why he thought
11 that I misquoted him.  Like I don't
12 remember any of that.
13     Q.    All right.  So after you read
14 Dr. Grenadier's testimony that you had
15 misquoted him, what did you do to see
16 whether you had in fact misquoted him?
17     A.    Nothing.
18     Q.    Nothing at all?
19     A.    Correct.
20     Q.    Okay.  So you don't dispute
21 that you in fact left out a material
22 portion of the sentence in paragraph 149 of
23 Dr. Grenadier's report, because you
24 apparently haven't checked, right?
25     A.    Well, I mean, I can look at it

WERNER

1
2 right now.  So this is paragraph 149 of his
3 initial report or his rebuttal?  It must be
4 his initial report, right?
5     Q.    It was his initial report.  But
6 that wasn't important enough to you, having
7 read his testimony that he misquoted him,
8 you just didn't bother to look it up to see
9 whether he was right; is that right?
10     A.    Let's just see what he said.
11     Q.    Well, I'm asking you a
12 different question first.  Am I right that
13 you read --
14     MR. ROSEN:  You asked him two
15     questions.  You asked him one question.
16     He was about to give you an answer to
17     the first question and then you asked
18     him a second question before he could
19     answer.  So let him answer the first
20     question and then go to the second
21     question.
22     Q.    Here is the question that is on
23 the record:  It wasn't important enough to
24 you that after you read his testimony that
25 you had misquoted him, that you took the

WERNER

1
2 time to look it up to see whether he was
3 right, I'm right about that, aren't I?
4     A.    I did not look it up, that is
5 correct.  I'm looking at it now.
6     Q.    So you are now looking at
7 paragraph 96 of Dr. --
8     A.    Oh, 96?  I'm sorry, I'm looking
9 at the wrong thing.
10     Q.    I misspoke, paragraph 149, I
11 apologize.  And you see the first full
12 sentence on page 76 of Dr. Grenadier's
13 opening report reads "Conversely, if the
14 markets for the at-issue stocks were
15 efficient, contrary to the evidence I have
16 discussed in Section 6, I see no reason why
17 restrictions on a subset of retail
18 investors that account for a fraction of
19 the overall market would have artificially
20 distorted the stock price throughout the
21 proposed class period"?
22     A.    I do see that.
23     Q.    And you didn't quote the
24 portion of the sentence that reads
25 "Conversely, if the market for the at-issue

66 (Pages 258 - 261)

Page 262

WERNER

1           WERNER
2 stocks were efficient, contrary to the
3 evidence I have discussed in Section 6,"
4 right?
5     A.    That is true.
6     Q.    And you agree that that removes
7 the supposed contradiction that you
8 discussed in paragraph 96 of your report,
9 that is the only reason you thought that he
10 presented a contradictory opinion is you
11 are leaving out a material portion of his
12 sentence, right?
13    A.    That is incorrect.
14    Q.    Okay.  Do you agree that a
15 bubble typically will not last forever?
16    A.    In what context?
17    Q.    Financial markets.
18        MR. ROSEN:  I thought you were
19    talking about like blowing bubbles.
20        MR. RYAN:  I'm not talking
21    about blowing bubbles.
22    Q.    Do you agree with the statement
23 that a bubble typically will not last
24 forever?
25    A.    I think that is generally true,

Page 263

WERNER

1                   WERNER
2 to the extent that there are bubbles.
3     Q.    And there are from time to time
4 bubbles in financial markets, right?
5     A.    I'm certainly familiar with the
6 fact that people have talked about bubbles.
7 I don't know if there are periods of time
8 that officially have been defined as
9 bubbles.  Certainly people have discussed
10 it.
11    Q.    All right.  Well, do you
12 believe that there are bubbles from time to
13 time in financial markets?
14    A.    Is it possible?  It is
15 certainly possible.
16    Q.    I guess I'm asking an empirical
17 question.  As a financial economist as you
18 sit here today, do you believe that from
19 time to time there are bubbles in financial
20 markets?
21    A.    Why is that an empirical
22 question?
23    Q.    It is something that one could
24 study.  That's what I mean by an empirical
25 question.

Page 264

WERNER

1                   WERNER
2     A.    Well, I'm sorry, then I don't
3 understand what you mean by an empirical
4 question.  I mean, if, you know, I said you
5 could study my intake of Coke Zero, I don't
6 think of that as an empirical question.
7     Q.    I do.  We could measure it.  We
8 could track it.  We could say two cans
9 today, three cans tomorrow, right, that
10 would be five cans over two days, we could
11 do that, couldn't we?
12    A.    Okay, maybe you and I have
13 different understanding or definitions of
14 what empirical is.  To me, that's
15 observational.
16    Q.    Fine, observational.  As an
17 observational matter, do you believe that
18 from time to time there are bubbles in
19 financial markets?
20    A.    It is certainly possible.
21    Q.    That's not my question, sir.
22 Do you believe that in fact, in the real
23 world, as an observational matter from time
24 to time there are bubbles in the financial
25 markets?

Page 265

WERNER

1                   WERNER
2     A.    Okay.  Can you show me -- can
3 you show me exactly what you mean by
4 bubble?  I don't believe that I have used
5 it in any of my writings here, so if you
6 would like to point me to a definition, I
7 will give you a clear answer.
8     Q.    Do you have an understanding of
9 what the term "bubble" means?
10    A.    I have a notion, but I don't
11 know what your definition of a bubble is,
12 since we are arguing about empiricism.
13    Q.    So how would you define the
14 term "bubble"?
15    A.    In a stock market, I don't
16 know.  I mean, I would turn to Brealey and
17 Myers or I would turn to Shleifer and quote
18 him, or quote Brealey and Myers.  It is not
19 something I think about, like oh, the
20 definition of a bubble is X.
21    Q.    All right.  So you agree that
22 Brealey and Myers, I guess it is now
23 Brealey, Myers and Allen are a leading
24 authority on corporate finance, right?
25    A.    Well, no.

67 (Pages 262 - 265)

WERNER

1
2    Q.    Really?
3    A.    I believe that they write a
4  textbook that is frequently used.
5    Q.    Okay.
6    A.    But I don't know if they
7  discuss -- I mean, I used that as an
8  example.  I don't know if they discussed
9  bubbles in their textbook.
10   Q.    All right.  And you agree that
11 Andre Shleifer is a leading authority on
12 corporate finance, right?
13   A.    I believe that's accurate.
14   Q.    Okay.  So to go back to my
15 question about bubbles, if I'm
16 understanding you right, you are unable to
17 give me with any precision a definition of
18 what you believe a bubble in financial
19 markets is, right?
20   A.    Yeah.  Again, I have a vague
21 notion, and, you know, if someone asked me
22 to define a bubble I would go to, off
23 the -- I would refer them to Shleifer or
24 someone else and then I would say oh, okay,
25 well then specifically Shleifer means this

WERNER

1
2  is a bubble, this is what he is discussing.
3    Q.    Okay.  Do you know what a short
4  squeeze is?
5    A.    I do know what a short squeeze
6  is.
7    Q.    What is a short squeeze?
8    A.    Oh, wait, I'm sorry, do I know
9  what a short squeeze is?  I don't know --
10 you know, that's actually a very vague
11 term, and so it is at least the concept, I
12 don't know if it is an actuality, where
13 people short a stock, as a response to the
14 stock price going up they are squeezed out
15 of their positions.  Now, again, that is
16 not a formal definition of a short squeeze.
17 Yeah, that's not a formal definition of a
18 short squeeze.  But it gets at the -- kind
19 of the idea.
20   Q.    All right.  So using that
21 definition of a short squeeze, do you agree
22 that from time to time short squeezes take
23 place in financial markets?
24   A.    Oh, is it possible?  It is
25 certainly possible.

WERNER

1
2    Q.    Do you believe that
3  observationally they occasionally take
4  place?
5    A.    Well, I believe that some
6  people believe, I mean, you have mentioned
7  Mr. Allen -- oh, no, I'm sorry, not
8  Mr. Allen.  I mean, so this is really where
9  I got confused, right?  So if I look at
10 Mr. Fischel's initial report, he talks
11 about a short squeeze as in that's exactly
12 what happened, and then I read his
13 deposition, and he said I never said that.
14 So I guess let's go to Mr. Fischel's
15 report.
16   Q.    This is very far afield from my
17 question, sir.
18   A.    Well, I'm trying to give you --
19   Q.    My question is not about
20 Mr. Fischel.
21   A.    Well, right, but I'm trying to
22 make sure that I have an accurate
23 description of what a short squeeze is, so
24 I can tell you when one has occurred.
25   Q.    I'm using your definition.  You

WERNER

1
2  gave me a definition.  I'm happy to take
3  it.  So now do you believe that, using your
4  definition, that from time to time short
5  squeezes take place in the financial
6  markets?
7    A.    And I said it is possible.
8    Q.    And so observationally do they
9  in fact happen, perhaps rarely, but
10 sometimes, do they happen, ever?
11   A.    Well, I guess by saying it is
12 possible, it is possible they have
13 occurred.
14   Q.    Okay.  Do you have any
15 understanding as you sit here today as to
16 whether they in fact have occurred let's
17 say in the last hundred years in financial
18 markets?
19   A.    Again, I haven't memorized when
20 they occurred, but I'm happy to look at
21 people like Mr. Fischel who said the short
22 squeeze happened here, and I'm sure he has
23 cites to examples of short squeezes.  I'm
24 more than happy to discuss them with you.
25   Q.    All right.  Without looking at

Page 270

WERNER

2 Mr. Fischel's report, you are unable to
3 tell me whether you believe short squeezes
4 in fact occur in the financial markets; is
5 that right?
6     A.    I'm not sure that's what I
7 said.
8     Q.    Well, I think the record will
9 reflect that you haven't answered that
10 question.
11        Do you agree that short
12 squeezes, when they do occur, are typically
13 short-lived?
14     A.    Define short-lived.
15     Q.    A relatively short duration.
16     A.    Okay.  Could you be more
17 specific?  And I only ask because, you
18 know, in economics, oftentimes when we talk
19 about short term, you could be talking
20 about a year, right?  If I talk about
21 short-term macroeconomic events, I could be
22 talking about one or two years.  So if you
23 want to give me a specific description of
24 what you consider to be short-lived or a
25 definition of short, I'm happy to do it.

Page 271

WERNER

2     Q.    Fine.  Do you agree that short
3 squeezes, when they do occur, typically
4 last only a matter of days?
5     A.    Do I agree?  So, again, why not
6 just let me look at Mr. Fischel's report?
7 Because I'm pretty sure that's what he
8 said.  If you want me -- I believe --
9 evidently that's what he believes.  I
10 haven't done a comprehensive study on short
11 squeezes.  Off the top of my head, I don't
12 know how long they do or do not last.
13     Q.    I see, okay.  Is there any way
14 of knowing when a bubble in the financial
15 markets will burst?
16     A.    To the extent that there are
17 bubbles, is there a way of knowing when
18 they will end?  That's not anything I have
19 ever thought about.
20     Q.    Okay.  Do you have an opinion
21 as to whether the market for a security is
22 efficient when a bubble is taking place?
23     A.    So you are asking a yes or no
24 question, so that's a binary question.
25 There are different degrees of efficiency.

Page 272

WERNER

2 So I'm not quite sure, is it possible?  I
3 don't -- I don't know as I sit here today.
4        Again, I mean, I quibble with
5 what you define as a bubble.  So you want
6 to give me an example of a bubble, I will
7 be happy to look at it and then tell you
8 whether or not it is possible that a stock
9 is trading in an efficient market during a
10 period which you've defined as a bubble.
11     Q.    All right.  So I take it, then,
12 that you have no opinion as to whether the
13 market for a security is efficient when a
14 bubble is taking place?
15     A.    I defer to my last answer.
16     Q.    Okay.  Do you have an opinion
17 as to whether the market for a security is
18 efficient when a short squeeze is taking
19 place?
20     A.    To the extent a short squeeze
21 is taking place, well, since -- my
22 understanding now is that no one believes a
23 short squeeze took place, even though this
24 is called short squeeze litigation.  I
25 don't know that that's anything that I have

Page 273

WERNER

2 thought about.
3        If you want to point me to a
4 period in time where people uniformly agree
5 that a short squeeze occurred, I'm happy to
6 look at that and then render an opinion or
7 render you my opinion of what I think about
8 whether or not the stock at issue could be
9 efficient.
10     Q.    So I was asking you a question
11 that wasn't tethered to the facts of this
12 case.  It was a general question about
13 financial economics.  My question is do you
14 have an opinion as to whether the market
15 for a security is efficient while a short
16 squeeze is taking place?
17     A.    Well, again, so you are
18 assuming a short squeeze has taken place.
19 So show me an example where a short
20 squeeze, people have agreed that a short --
21 excuse me, sorry, too many Diet Cokes or
22 Coke Zeros -- where a short squeeze has
23 taken place and I will be happy to give you
24 the best answer I possibly can.
25     Q.    All right.  But you have got no

69 (Pages 270 - 273)

WERNER

opinion as a general matter on that question on the efficiency of financial markets for a security while a short squeeze is taking place?

A. Well, so when you say a short squeeze is taking place, define exactly what you mean by it is taking place.

Q. I was using your definition of a short squeeze from before.

A. Right, and I gave you a very broad, a lay -- not a layman's understanding -- but a broad definition of what a short squeeze could be. So if there is something -- look, I mean, throughout all of this work, right, people disagree about what a short squeeze is.

So some people think a short squeeze has occurred. Your two experts, despite what they have suggested, or at least written in one of their original reports, now say that a short squeeze did not occur, at least that's my understanding based on my reading of their depositions.

So to the extent that you want

WERNER

me to look at an exact period of time where people agree, people, economists, agree that a short -- a short squeeze occurred, right, not people talking about a short squeeze, a short squeeze occurred, I will take a look at it and let you know if I think that affects the efficiency of the stock at issue.

Q. So my question is assume with me that all economists agree that in a particular case a short squeeze is taking place. Do you have an opinion about the efficiency of the market for that security while the short squeeze is taking place?

A. So in your hypothetical example, all economists believe that a short squeeze can occur?

Q. No, is occurring.

A. Oh, so, again, let me restate it, in your hypothetical, the assumption is that all economists believe that a short squeeze is occurring?

Q. Correct. And my question is do you, in that hypothetical, do you have an

WERNER

opinion about the efficiency of the market for that security while the short squeeze is taking place?

A. So that's an incomplete hypothetical. I would need much more information to answer that.

Q. All right. So you are not able to answer that either yes or no?

A. Again, if you want to show me where economists say -- why make it a hypothetical? Show me some actual evidence where people say a short squeeze occurred, and we can look at it. Where you people universally agree that a short squeeze occurred, 90 percent of the 100 people who looked at it believe a short squeeze occurred, yeah, I will take a look at it.

Q. As I'm sure you know, it is common to ask experts, whether in financial economics or something else, hypothetical questions to see what expertise they have and whether they actually have expertise in this area. So I take it you, though, have no expertise in short squeezes, right?

WERNER

A. My opinion is you have asked an incomplete hypothetical question.

Q. Okay. Have you ever calculated damages in a securities class action?

A. Per-share damages or aggregate damages?

Q. Per-share damages.

A. I have.

Q. And have you typically used a regression analysis as part of your damages calculation?

A. Typically, yes.

Q. Have you ever calculated per-share damages in a securities case where the market was inefficient during the class period?

A. Not to my knowledge as I sit here today.

Q. All right. Are you aware of any case where someone has done that?

A. I'm not, but that doesn't mean it hasn't happened. Again, I mean, it is a question of how you define efficiency.

I mean, obviously I have been

Page 278

WERNER

1
2 spending a lot of time reading about
3 Halliburton II and what people think about
4 efficiency. So that certainly informs my
5 opinion now.
6         So I don't know exactly what
7 you are referring to. Is it possible that
8 you could measure damages for a stock that
9 trades in an inefficient market? I
10 believe, one, I believe you could do it,
11 and, two, I believe that -- well, first of
12 all, when you say efficient, you are
13 talking informationally efficient or
14 value -- value relevant efficient? Are we
15 talking about, let's say, Dr. Fischel --
16 Dr. Fischel, sorry -- Mr. Fischel's example
17 of arbitrage efficiency?
18     Q.   I take it you are unaware of
19 any case where someone has calculated
20 damages in a securities class action for a
21 stock that traded in an inefficient market
22 during the class period, right?
23     A.   I have no knowledge one way or
24 the other about that.
25     Q.   Okay. Is it your understanding

Page 279

WERNER

1
2 that in a securities class action the
3 question of whether a stock trades in an
4 efficient market goes to the issue of
5 reliance?
6     A.   Well, it kind of sounds like a
7 legal conclusion.
8     Q.   I agree. So I'm asking you
9 whether that's your understanding. That's
10 why I did not ask you whether it was your
11 opinion.
12         Is it your understanding that
13 in a securities class action the question
14 of whether a stock trades in an efficient
15 market goes to the issue of reliance?
16     A.   That's my general
17 understanding, as a layperson.
18     Q.   Is it also your understanding
19 that the question of whether a stock trades
20 in an efficient market goes to whether one
21 can have a reasonably certain proof of
22 damages?
23     A.   Reasonably certain proof of
24 damages? That sounds like you are reading
25 from something. I don't recall having ever

Page 280

WERNER

1
2 seen that. So I don't -- I don't know.
3     Q.   Okay. Have you given any
4 thought before this deposition to the
5 question of whether one can have a
6 reasonably certain proof of damages in a
7 securities class action where the security
8 trades in an inefficient market during the
9 class period?
10     A.   Again, what do you mean by
11 reasonable certainty?
12     Q.   Are you familiar with the
13 concept that damages in the law need to be
14 proved to a reasonable certainty?
15     A.   Oh, is there a law you want me
16 to look at or a specific cite that you want
17 me to look at?
18     Q.   Are you familiar with the legal
19 concept that in calculating damages,
20 damages should be proved, should be
21 calculated, to a reasonable certainty? Is
22 that a principle that you are familiar
23 with?
24     A.   I don't believe -- I don't
25 believe that's anything I have ever read or

Page 281

WERNER

1
2 seen.
3     Q.   I see, okay. So since you are
4 unfamiliar with that term, I will remove
5 those words from my question.
6         So is it your understanding
7 that whether a stock trades in an efficient
8 market goes not just to the issue of
9 reliance, but also to whether one can prove
10 damages?
11     A.   So one can prove damages? It's
12 possible.
13     Q.   Okay. You don't have a view on
14 that one way or the other?
15     A.   I haven't been asked to render
16 an opinion about that here.
17     Q.   Okay. So let me ask you, in
18 your opening report, if we go toward the
19 back -- sorry, I think it was the rebuttal
20 report. Bear with me one moment.
21         All right. So I'm in your
22 rebuttal report which we marked as
23 Deposition Exhibit 282.
24     A.   Okay, hold on one second.
25 Okay, sorry, go ahead.

71 (Pages 278 - 281)

Page 282

```
1            WERNER
2    Q.   I'm on page 51 and I'm looking
3 at paragraph 115.  So do you see that the
4 first sentence of that paragraph reads
5 "Because these markets were efficient
6 during the immediate pre-class period,
7 there is no need to deviate from using
8 market prices to establish the appropriate
9 but-for price absent the alleged market
10 manipulation"?
11    A.   I do see that.
12    Q.   And you hold that view in terms
13 of calculating class-wide damages in this
14 case, right?
15    A.   Under my understanding of
16 Affiliated Ute, but I have given you two
17 additional damage -- possible damage
18 analyses that would be done that I don't
19 necessarily think -- well, I don't know.
20        Okay, so yeah, again, I think I
21 refer back to Affiliated Ute with regards
22 to that particular sentence.  I think that
23 the other -- the two additional damage
24 analyses I look at don't necessarily use
25 market prices as the but-for price.  It may
```

Page 283

```
1 influence or bear upon the but-for price,
2 but I don't think that it's the exact same
3 thing.
4    Q.   You understand that Affiliated
5 Ute is a case that does not depend on a
6 showing of market efficiency, right?
7    A.   That is correct.
8    Q.   So your first sentence in
9 paragraph 115 says "Because these markets
10 were efficient during the immediate
11 pre-class period, there is no need to
12 deviate from using market prices to
13 establish the appropriate but-for price
14 absent the alleged market manipulation,"
15 right?
16    A.   Okay, I mean, yes, that's what
17 I said.  But I don't know how that's
18 inconsistent with my statement that there
19 are two additional analyses that one could
20 do.
21    Q.   Do you agree with me that if,
22 contrary to your opinion, these markets
23 were inefficient during the immediate
24 pre-class period, there may be a need to
```

Page 284

```
1            WERNER
2 deviate from using market prices to
3 establish the appropriate but-for price
4 absent the alleged market manipulation?
5    A.   Is it possible?  It is
6 certainly possible.
7    Q.   And I take it that's not
8 something you have looked into because you
9 concluded the other way, that these markets
10 were efficient during the immediate
11 pre-class period, right?
12    A.   I don't think that that was
13 necessarily my thought process.  Again, I
14 gave -- this is -- this is not absurd, but,
15 you know, I say in my report for example,
16 this is one way you could measure damages.
17 It doesn't necessarily then mean that all
18 my damage theories are based solely on a
19 market price.
20    Q.   All right.  So I'm asking you
21 about the first sentence in paragraph 115
22 of your rebuttal report, sir.  And am I
23 right that the first clause of this
24 sentence is linked causally, because of the
25 word "because," to the second clause,
```

Page 285

```
1            WERNER
2 right?
3    A.   That is correct.
4    Q.   And so if we remove the
5 premise, the first clause, that is if we,
6 hypothetically now, since I understand it
7 is not your opinion, if we remove the
8 premise that markets were efficient during
9 the immediate pre-class period, do you
10 agree with me that it no longer necessarily
11 follows that there was no need to deviate
12 from using market prices to establish the
13 appropriate but-for price absent the
14 alleged market manipulation?
15    A.   So that is an extremely long
16 question.  I believe in there somewhere you
17 said something -- there wasn't a discussion
18 of assumptions, but there was certainly
19 some qualifications that you made in that
20 statement.  Without rehearing those
21 qualifications, I can't answer that
22 question.
23    Q.   Okay.  Why don't we read it
24 back.
25    A.   Can you read it slowly, please?
```

72 (Pages 282 - 285)

Page 286

WERNER
1
2 I can write it down.
3        (The record was read.)
4    A.    I'm sorry, I don't know how to
5 answer that question.  Do you want to break
6 it into like small chunks so we can walk
7 through it?
8    Q.    Sure.
9    A.    There seems like there was a
10 lot of qualifying statements in there that
11 I need to kind of sequentially go through
12 to accurately answer your question.
13    Q.    I will do this in little bites.
14    A.    Okay, thank you.
15    Q.    So I'm looking now at the first
16 sentence of paragraph 115.
17    A.    Hold on while I go back.  So we
18 are in my rebuttal report, right?
19    Q.    Yes, page 51 of your rebuttal
20 report, Deposition Exhibit 282.
21    A.    Oh, paragraph 115, not page
22 115, right?
23    Q.    Yes.
24    A.    Hold on, hold on, almost there.
25 Okay.

Page 287

WERNER
1
2    Q.    All right.  It is your opinion
3 that the markets for some of the affected
4 stocks were efficient during the immediate
5 pre-class period, right?
6    A.    It is -- oh, is it my opinion
7 that the market for some of these stocks
8 was efficient during the pre-class period?
9    Q.    Yes.
10    A.    Yes.
11    Q.    All right.  And what you are
12 writing here in the first sentence of
13 paragraph 115 is because that is your
14 opinion it follows, you believe, that there
15 is no need to deviate from using market
16 prices to establish the appropriate but-for
17 price absent the alleged market
18 manipulation, right?
19    A.    So I see what you are saying.
20 I'm not sure I completely agree with it.
21 Because, I mean, you would have to make
22 adjustment for mitigating factors.  I mean,
23 I don't want to attribute damages to
24 actions by E*Trade.  Again, I mean, I could
25 be put in a situation where I may have to

Page 288

WERNER
1
2 make adjustments to that.  So this is just
3 an example of what one could do.
4    Q.    So I agree one would need to
5 make adjustments for E*Trade and so forth.
6 But I'm just looking at what you wrote.
7 You wrote "Because these markets were
8 efficient during the immediate pre-class
9 period," it followed for you logically that
10 there was no need to deviate from using
11 market prices to establish the appropriate
12 but-for price absent the alleged market
13 manipulation, right?
14    A.    I don't think -- see, you are
15 making a causal connection between those
16 two statements and I'm not sure that that
17 was my intention.
18    Q.    I see.  So you used the word
19 "because," but you can't say whether you
20 believed there was a causal relationship
21 between the two clauses of the sentence?
22    A.    Well, I'm saying that this is
23 an example, one example of how one might
24 calculate damages.  Now, I referred you to
25 at least two other methodologies.

Page 289

WERNER
1
2    Q.    I'm asking you about this
3 sentence though, sir.  So let me ask you
4 this hypothetical --
5    A.    So I have answered the question
6 to the best of my ability.
7    Q.    I'm going to make one more
8 attempt.
9    A.    Sure.
10    Q.    Which is this attempt:  So do
11 you have the hypothetical in mind that you
12 found that the markets were inefficient for
13 each of the nine stocks during the
14 immediate pre-class period?
15    A.    Okay, so in your hypothetical,
16 I find that the stock price is inefficient
17 as defined by what?
18    Q.    As defined by you.  You used
19 the word "efficient" and "inefficient"
20 throughout your entire report.  So as you
21 used those terms, I'm asking you to assume
22 the hypothetical that you find that the
23 markets were inefficient during the
24 immediate pre-class period, okay?
25    A.    Okay.  So I'm just trying to

73 (Pages 286 - 289)

Page 290

WERNER

1
2  understand your hypothetical, and let's be
3  clear, it is a hypothetical.  So you want
4  me to assume the stocks trade in an
5  inefficient market or that I cannot prove
6  that these stocks trade in an efficient
7  market?  Which one are we talking about
8  here?
9     Q.    The first.
10    A.    So I'm supposed to assume that
11  the stock trades in an inefficient market?
12    Q.    During the immediate pre-class
13  period.
14    A.    All right, we are on the same
15  page.
16    Q.    With that hypothetical in mind,
17  do you agree that it no longer necessarily
18  follows that there is no need to deviate
19  from using market prices to establish the
20  appropriate but-for price absent the
21  alleged market manipulation?
22    A.    Right.  So no longer
23  necessarily follows, this is where I was
24  getting stuck, I don't have an opinion one
25  way or the other.

Page 291

WERNER

1
2     Q.    Okay.  That's not something you
3  have thought about?
4     A.    Well, you have used specific
5  wording in your hypothetical example, "no
6  longer applies," so that is open to
7  interpretation.  So to the extent that your
8  hypothetical at least to me appears to be
9  incomplete, and maybe it is just, you know,
10  I'm dense and it is the end of the day, or
11  it is late in the day, I don't -- I think
12  it is an incomplete hypothetical that I
13  cannot answer as I sit here today.
14    Q.    Okay.  So, all right, now you
15  have mentioned several times that since
16  submitting your rebuttal report, you read a
17  couple of academic articles about building
18  a demand-based model to predict stock price
19  movements, right?
20    A.    To changes in demand, correct.
21    Q.    And you don't say anything
22  about that in either of your reports, do
23  you?
24    A.    Oh, I do not, right.  I just
25  gave a general -- an example of a general

Page 292

WERNER

1
2  damage methodology that could be used in
3  calculating damages.
4     Q.    All right.  So I just want to
5  make sure, of these three damages
6  methodologies that you have talked about,
7  one, namely this demand-based model, is
8  found nowhere in either your opening or
9  rebuttal report, right?
10    A.    That is correct.
11    Q.    Do you agree that in the week
12  leading up to the class period, the price
13  of the affected stocks increased
14  substantially?
15    A.    Well, I don't want to quibble
16  with you with regards to the definition of
17  "substantially," but yes, they certainly
18  increased.
19    Q.    Do you recall that Professor
20  Grenadier described an analysis he ran
21  where he put together a million different
22  portfolios composed of randomly chosen
23  stocks to see how those portfolios
24  performed?
25    A.    I do recall that, yes.

Page 293

WERNER

1
2     Q.    And do you recall that these
3  stocks in the week we are talking about
4  before the class period had a higher return
5  than any of these million different
6  portfolios that he created?
7     A.    Well, right, that is certainly
8  the conclusion he came to, right, but that
9  doesn't -- yes, that's the conclusion he
10  came to.
11    Q.    So you would agree that these
12  are pretty abnormal returns, right?
13    A.    Well, okay, so "abnormal
14  return" has a very specific definition in
15  finance.  So what do you mean by "abnormal
16  return"?
17    Q.    What do you mean by "abnormal
18  return"?
19    A.    The abnormal return was
20  measured as the, I mean, the difference
21  between the actual price and the predicted
22  price of the stock.  That's how I would
23  normally use the term "abnormal return" in
24  the context of a securities class action.
25    Q.    Okay.  So you are using it

74 (Pages 290 - 293)

WERNER

1            WERNER
2  synonymously with the residual return in an
3  event study?
4      A.   Correct.
5      Q.   Okay.  Have you done anything
6  to analyze why these stocks had such
7  extraordinary run-ups in the week before
8  the class period?
9      A.   Why these stocks had such
10 extraordinary run-ups?  Well, certainly
11 they responded to information during those
12 periods.  As to the exact magnitude of
13 those price changes, I have not.
14     Q.   You have not worked on a case
15 before where a stock rose 700 percent in a
16 week, have you?
17     A.   I don't know.  As I sit here
18 today, I don't know.
19     Q.   You certainly haven't worked on
20 a case before where a stock rose 1,000
21 percent in a week, have you?
22     A.   Well, if I don't recall the 700
23 percent, I don't recall the 1,000 percent.
24 It doesn't mean it didn't happen.
25     Q.   And you are aware that that did

WERNER

1            WERNER
2  happen here, right?
3      A.   I mean, if you want me to go
4  through it and refresh my memory, if you
5  want to stipulate to those facts, I will
6  agree with you, but if you want me to
7  verify that that in fact is an accurate
8  statement, I'm happy to do that as well.
9      Q.   All right.  Did you see
10 Professor Grenadier's testimony about the
11 700 percent increase for one stock and the
12 1,000 percent increase for another stock in
13 the week before the class period?
14     A.   His testimony being his report
15 or his deposition?
16     Q.   His deposition testimony.
17     A.   Okay, so now that we are
18 talking about -- I don't recall every word
19 of his deposition, so if you want to give
20 me his deposition and show me where he said
21 that, I'm happy to look at it.
22     Q.   You agree with me that a lot of
23 the news articles that are included in your
24 news/no news study for the week before the
25 class period are articles about the unusual

WERNER

1            WERNER
2  stock price movements?
3      A.   What do you mean by a large
4  amount?
5      Q.   A large proportion of the
6  articles that you include in your news/no
7  news test in the week before the class
8  period are articles about the unusual stock
9  price movements, right?
10     A.   Okay.  Define "large
11 proportion."
12     Q.   Well, do you have any idea what
13 the proportion is?
14     A.   As I sit here today, I don't.
15     Q.   Okay.  So you don't know one
16 way or the other whether, let's say, more
17 than 50 percent of the articles in your
18 news/no news test in the week preceding the
19 class period are articles about the unusual
20 stock price movements?
21     A.   That is correct.  To the extent
22 that these articles talked about unusual
23 stock price movements, that is correct.
24     Q.   Okay.  Are you able to point to
25 any valuation relevant news about any of

WERNER

1            WERNER
2  these nine companies that would explain the
3  stock price movement in the week before the
4  class period?
5      A.   Well, I mean, I defer to what
6  Dr. -- Mr. Fischel and Professor Grenadier
7  determined were value relevant news.
8  Again, they don't agree, so it goes to the
9  subjectivity of their definition.
10     So, I mean, there certainly was
11 what they determined was value relevant
12 news that came out during that period.  So,
13 you know, from a point of view of
14 informational efficiency, my concern is
15 whether or not that information is
16 incorporated in the stock price, and to the
17 best of my knowledge, it was incorporated
18 in the stock price, or the stock prices of
19 these firms.
20     Q.   Dr. Grenadier concluded that he
21 did not find any valuation relevant news
22 about any of these nine companies that
23 would explain the stock price movement in
24 the week before the class period, right?
25     A.   Well, when you say "find," he

75 (Pages 294 - 297)

Page 298

WERNER

1    WERNER
2 didn't do any type of study.  This was all
3 based on observations.  For instance, he
4 didn't do any DCF analysis and said the
5 stock price should be $10 and it is trading
6 at 30.
7        So what you are talking about
8 with regards to both Professor Grenadier
9 and Mr. Fischel is they present
10 observations and say, you know, I can't
11 explain it, but they make no effort to show
12 what caused these stock prices, or that in
13 fact these stock prices weren't
14 completely -- well, I will leave it at
15 that.
16        I just disagree with your
17 assertion that they proved or they
18 demonstrated that these stock prices
19 somehow changed in such a way that cannot
20 be explained, because all of their
21 analyses, or the majority of their analyses
22 certainly in their initial reports is all
23 observation.
24    Q.    So I didn't ask you any
25 question about demonstration or proof.

Page 299

1    WERNER
2 What I asked you, and I will ask you again,
3 is do you agree that Dr. Grenadier
4 concluded that he did not find any value
5 relevant news for any of the nine companies
6 at issue that would explain the stock price
7 movement in the week before the class
8 period?
9    A.    I believe that that is what he
10 stated.  I have not seen any evidence that
11 allows me to understand how he reached
12 those conclusions.
13    Q.    All right.  Do you agree that
14 Mr. Fischel similarly concluded that he did
15 not find any value relevant news for any of
16 the nine companies at issue that would
17 explain the stock price movement in the
18 week before the class period?
19    A.    Well, so now -- so before, I'm
20 sorry, I thought you said the magnitude of
21 the stock price movement, and now you are
22 asking --
23    Q.    No, I never used the word --
24    A.    All right, so then let me --
25 ask the question about Grenadier again and

Page 300

1    WERNER
2 I will try to answer it.  That was my
3 misunderstanding.
4    Q.    So my question was, do you
5 agree that Dr. Grenadier concluded that he
6 did not find any value relevant news for
7 any of the nine companies at issue that
8 would explain the stock price movement in
9 the week before the class period, and you
10 answered that you believed that that is
11 what he had stated, right?
12    A.    So he has demonstrated -- I
13 mean, he has included news that changed the
14 stock price of the stock.  So I guess I
15 don't understand your premise.  I mean, you
16 know, let's look at a discussion of AMC.
17    Q.    So I'm not asking you whether
18 you have a criticism --
19        MR. ROSEN:  Are you withdrawing
20    the question?
21        MR. RYAN:  He in fact has
22    answered the question.  He is now
23    moving on to something else he wants to
24    say and using up my time.
25    Q.    So my question is you

Page 301

1    WERNER
2 understand that Dr. Grenadier's conclusion,
3 whether you agree with it or not, you
4 understand that his conclusion is that he
5 did not find any value relevant news for
6 any of the nine companies at issue that
7 would explain the stock price movement in
8 the week before the class period?
9    A.    I don't think what you are
10 saying is accurate.
11    Q.    All right.  Let me ask you the
12 same question about Mr. Fischel.  Do you
13 understand that Mr. Fischel's conclusion,
14 again, whether you agree with it or not, do
15 you understand that his conclusion is that
16 he did not find any value relevant news for
17 any of the nine companies at issue that
18 would explain the stock price movement in
19 the week before the class period?
20    A.    Again, based on the way you
21 have phrased the question, I don't believe
22 what you have said is correct.
23    Q.    Okay.  Did you do any analysis
24 yourself to try to understand why the nine
25 stocks at issue had such an extraordinary

76 (Pages 298 - 301)

Page 302

WERNER

1
2  run-up in the week before the class period?
3      A.    Okay, so, first of all, you are
4  using a pejorative term, "extraordinary."
5      Q.    I didn't mean to be pejorative,
6  so let me back up and ask you the question.
7  Let me ask the question.
8          Do you agree that these nine
9  stocks had an extraordinary run-up in the
10  week before the class period?
11      A.    Define "extraordinary."
12      Q.    You are not able to answer that
13  question either way?
14      A.    Do you want me to point to a
15  definition of extraordinary so I --
16      Q.    Out of the ordinary and highly
17  unusual is my definition.
18      A.    Can I -- look, I'm just trying
19  to answer your questions as accurately as
20  possible.
21      Q.    Do you have my definition of
22  "extraordinary" in mind?
23      A.    Whoa, whoa, whoa.  Again, I'm
24  trying to be as accurate as possible in my
25  responses, so when you use terms like

Page 303

WERNER

1
2  "extraordinary" or "significant," those
3  have specific meanings in different
4  situations.  I'm just trying to understand
5  exactly what you are talking about.
6          So I don't -- I don't know why
7  you define -- why can't you define
8  "extraordinary"?  Go ahead, ask me the
9  question, give me a description, a
10  definition of "extraordinary," and I will
11  try to answer your question as accurately
12  as possible.
13      Q.    Do you have in mind the
14  definition of "extraordinary" that I have
15  given you twice now?  Do you have that in
16  mind, sir?
17      A.    Could you read his definition?
18      Q.    I can repeat it if you don't
19  have it in mind.
20      A.    I'm asking him, because you
21  maintain you have defined it twice, I'm
22  asking him to read your definition of
23  "extraordinary," because you have said you
24  have done it twice.
25      Q.    I will give it to you now --

Page 304

WERNER

1
2  you are wasting time, sir.  You are wasting
3  time, and I'm going to give you the
4  definition now.  Do you understand that I'm
5  defining "extraordinary" to mean out of the
6  ordinary and highly unusual?
7      A.    Out of the ordinary and highly
8  unusual, okay, those are all vague terms.
9  But, okay, out of the ordinary, so let's go
10  first, out of the ordinary, what would be
11  the ordinary?
12      Q.    So my question is with this
13  definition of "extraordinary" in mind, are
14  you able to answer whether or not these
15  stocks had an extraordinary run-up in the
16  week before the class period?
17      A.    In order to answer your
18  question as precisely as I can, I would
19  need your definition of "ordinary."  So
20  would you like to give me a definition of
21  "ordinary" and then we can go to your
22  definition of "extraordinary"?  Because it
23  seems to me that it is based on your
24  definition of what "ordinary" is.
25      Q.    All right.  So am I right that

Page 305

WERNER

1
2  based on my definition, you find that too
3  vague and you can't answer; is that right?
4      A.    Your definition of what?
5      Q.    "Extraordinary."  Am I right
6  that you can't answer the question because
7  you think my definition is too vague and
8  you don't understand what I mean by
9  "extraordinary," right?
10      A.    You are giving me no context
11  into exactly what you mean by "ordinary,"
12  and thus I am unable to determine what you
13  believe is extraordinary.  You are defining
14  the term, so tell me what you mean.  Point
15  to a definition.
16      Q.    I did.  If you can't answer the
17  question, that's fine.  Let me ask another
18  question.
19      A.    Whoa, whoa, whoa.  So we will
20  agree to disagree.  I don't believe -- I
21  don't believe that using the term
22  "ordinary" -- not "ordinary" -- is a
23  definition of "extraordinary."  It follows
24  tautologically, right, but it is not any
25  more descriptive than saying

77 (Pages 302 - 305)

Page 306

WERNER

1
2  "extraordinary" or "ordinary."
3      Q.   Let me ask my next question.
4      A.   By all means.
5      Q.   Am I right that you conducted
6  regression analyses for these nine stocks
7  for one year before the class period?
8      A.   That is correct.
9      Q.   And so you studied their
10  volatility, right?
11     A.   Correct. Well, I mean, to the
12  extent we are looking at things like
13  standard errors and R-squared, yeah, I
14  studied its volatility.
15     Q.   Okay. So having studied the
16  volatility of each of these nine stocks for
17  the year before the class period, do you
18  agree that they had extraordinary run-ups
19  during the week before the class period?
20     A.   Well, now you are asking about
21  volatility during this entire one-year
22  period.
23     Q.   Yes, sir.
24     A.   And now you are -- and then you
25  are trying to draw some parallel, to,

Page 307

WERNER

1
2  again, a term that you have not described,
3  an extraordinary stock price. So can you
4  make the connection for me between the
5  volatility during that one-year period and
6  whether or not these things had, as you
7  define it, an extraordinary price run-up?
8      Q.   You are not able to answer the
9  question; is that right?
10     A.   I would like -- I would like
11  clarification before answering the
12  question. Because, again, my job here is
13  to give the most accurate answers I can.
14  So if I need things to inform my opinion,
15  if you are using vague terms, I can ask for
16  clarification. If you don't want to give
17  me the clarifications, that's fine, right,
18  but until I receive such a clarification, I
19  can't answer the question.
20          And now, again, now you are
21  throwing in a whole other thing about
22  volatility. I'm not -- are you making a
23  connection between the volatility over my
24  estimation period and what you define as
25  extraordinary stock price movements?

Page 308

WERNER

1
2      Q.   So I think the record will show
3  that you are avoiding answering my
4  question, so I will move to a different
5  topic.
6      A.   I'm sorry, what? I didn't hear
7  that.
8      Q.   I will move to a different
9  topic.
10     A.   Okay, sure.
11     Q.   Have you studied at all the
12  cause of the increases in stock price for
13  these nine companies during the week before
14  the proposed class period?
15     A.   Certainly part of the
16  increases, yes.
17     Q.   Okay.
18     A.   I mean, again, to the extent
19  that your experts found that there was
20  value relevant information that came out
21  during those periods, that would impact the
22  stock price.
23     Q.   What part of the increase in
24  stock price for these nine companies during
25  the week before the proposed class period

Page 309

WERNER

1
2  did you study?
3      A.   What part did I study?
4      Q.   I asked you whether you studied
5  the cause and you said part of the
6  increases. So my follow-up is what part of
7  the increases did you study?
8      A.   I'm sorry, you lost me there.
9      Q.   All right. Do you recall that
10  I asked you "Have you studied at all the
11  cause of the increases in stock price for
12  these nine companies during the week before
13  the proposed class period?" And you
14  answered "Certainly part of the increases,
15  yes"?
16     A.   Okay.
17     Q.   All right. My follow-up
18  question is which part of the increases
19  were you referring to just now in your
20  answer?
21     A.   Oh, I'm not referring to any
22  particular. The size of -- again, you are
23  asking about magnitude versus increase.
24  Well, I mean, whatever, if you -- you are
25  allowed --

78 (Pages 306 - 309)

WERNER

1       WERNER
2   Q.   Your answer was "Certainly part
3 of the increases" and I'm simply asking you
4 what part of the increases are you
5 referring to? Can you tell me? What did
6 your answer mean?
7   A.   That's not anything I have been
8 asked to opine on for this matter at this
9 point in time.
10   Q.   Okay. So is it in fact the
11 case that you have not studied at all the
12 cause of the increases for any of the nine
13 affected stocks during the week before the
14 proposed class period?
15   A.   That is incorrect.
16   Q.   Is it the case that you have
17 expressed no opinion on the cause of the
18 increases for any of the nine affected
19 stocks during the week before the proposed
20 class period?
21   A.   Certainly some of it was based
22 on information incorporated in the stock
23 price. I mean, again, I found that these
24 stocks were informationally efficient, so
25 whatever information was out there affected

1       WERNER
2 those prices.
3   Q.   When you answered just now
4 "That's not anything I have been asked to
5 opine on for this matter at this point in
6 time," what specifically have you not been
7 asked to opine on that you were referring
8 to in that response?
9   A.   I guess I misspoke. I'm sorry,
10 you are coming at me with all sorts of
11 stuff. You seem to be agitated. I'm
12 trying to focus on what I'm saying. So if
13 I misspoke, I apologize. Maybe now would
14 be a good time to take a break.
15   Q.   I would like an answer to this
16 question. So let me ask this question
17 again, since you're now saying you don't
18 stand by your answer.
19     I'm asking you what part of the
20 increases are you referring to, can you
21 tell me what did your answer mean?
22   A.   Well, according to your
23 experts, and, again, I'm just focusing on
24 what your experts said, there is value
25 relevant information that occurred during

1       WERNER
2 that period that altered the stock prices.
3 Now, that's what their definition of value
4 relevant is. Value relevant is an
5 extremely broad term. We have discussed
6 people, Chartis, we have discussed momentum
7 traders. These people take into things --
8 these things -- these people or these
9 individuals find things like stock prices
10 material, right? So is that reflected in
11 the stock prices of all of these stocks?
12 Absolutely.
13     Now can I take a break?
14   Q.   You are avoiding answering my
15 question. You can take a break. This is
16 not a torture chamber. You can have a
17 break. But I'm going to follow up with
18 this when you get back. You are evading my
19 questions.
20   A.   Fantastic.
21     THE VIDEOGRAPHER: This will
22 end media unit six. We are going off
23 the record at 5:03.
24     (Recess taken.)
25     (Defendant's Exhibit 287 marked

1       WERNER
2 for identification.)
3     THE VIDEOGRAPHER: We are back
4 on the record at 5:09. This will begin
5 media unit seven.
6 BY MR. RYAN:
7   Q.   All right. During the break I
8 marked as Exhibit 287 the Factiva headline
9 results we received from plaintiff's
10 counsel related to Bed Bath & Beyond. Do
11 you have that exhibit in front of you, sir?
12   A.   I do.
13   Q.   And does this look like the
14 results that you would have received from
15 your Factiva search for Bed Bath & Beyond?
16   A.   It is certainly possible.
17   Q.   And do you see the very first
18 article that is listed there is an article
19 about Beyond Burger, right?
20   A.   That is correct.
21   Q.   And you don't believe that that
22 contains any relevant information to Bed
23 Bath & Beyond, do you?
24   A.   I have no reason to think it
25 does. But, I mean, look, we went over this

Page 314

WERNER

1
2 issue before.  What I have stated
3 previously with regards to things like
4 Princess Nokia would apply here as well.
5    Q.    So let's look then at page 316
6 of this exhibit, Deposition Exhibit 287.
7    A.    Okay.
8    Q.    Do you see there that the third
9 article down is an article about the NFL
10 quarterback Aaron Rodgers and why in his
11 own words he is on a journey of
12 self-actualization?
13    A.    I do see that.
14    Q.    And then do you see that there
15 is perhaps an identical article, I'm
16 looking at the first few lines of text,
17 from the Capitol Times and Wisconsin State
18 Journal that same day entitled "Finding his
19 peace:  Aaron Rodgers details journey that
20 changes his outlook towards life, NFC
21 championship"?
22    A.    Okay, so is this my production?
23    Q.    Yes, sir.
24    A.    Okay, all right.  Because,
25 yeah, that, I mean, it seems that that --

Page 315

WERNER

1
2 there are multiple -- well, I'm sorry, go
3 ahead and ask your question.
4    Q.    All right. So you have
5 anticipated my next question.  Do you see
6 in fact this article appears multiple
7 times, one, two, three, four, five, six
8 times from the Capitol Times and Wisconsin
9 State Journal on the 24th of January 2021
10 and then another time from the Crossville
11 Chronicle that same day, right?
12    A.    Correct.
13    Q.    All right.  And your
14 methodology intended to eliminate
15 duplicates, right?
16    A.    That is correct.  I mean, we
17 checked that box in Factiva, in Factiva,
18 yes.
19    Q.    And in this instance, it
20 appears that the duplicates were not
21 eliminated, right?
22    A.    That's what it appears, yes.
23    Q.    And so this is an article on
24 the 24th of January, which is right in the
25 middle of that week before the class

Page 316

WERNER

1
2 period, right?
3    A.    That is correct.
4    Q.    And so we now have seven
5 articles on that day that are actually
6 about Aaron Rodgers and his journey of
7 self-actualization, not about Bed Bath &
8 Beyond, right?
9    A.    I don't know if it is seven.  I
10 can count them. I believe that's correct.
11    Q.    Okay. We can put that aside,
12 sir. Now, in your rebuttal report that we
13 have marked as Exhibit 282 to this
14 deposition --
15    A.    Okay, hold on a minute.  Yeah,
16 okay.
17    Q.    You conducted a test that you
18 referred to as a binomial test that relates
19 to news for seven of the companies at issue
20 in the week before the proposed class
21 period; is that right?
22    A.    Well, what your experts defined
23 as news.
24    Q.    Okay.  And I'm looking here at
25 Table 7 on page 21 of your rebuttal report.

Page 317

WERNER

1
2    A.    Okay, I'm there.
3    Q.    And so this is the table that
4 presents the results of your binomial test,
5 right?
6    A.    Based on your experts'
7 definition of "value relevant news."
8    Q.    And is the period at issue here
9 January 21st through 27th, 2021?  And I'm
10 looking at paragraph 46 and 47.
11    A.    That is correct.
12    Q.    Okay.  And the second column
13 here headed News Dates, am I right that you
14 took any date where either Mr. Fischel or
15 Professor Grenadier in his report analyzed
16 potentially value relevant news?
17    A.    I don't know if I would say
18 they analyzed.  They said that there was
19 value relevant news on those dates.
20    Q.    Okay.  You and I may disagree
21 about the words here, but am I right that
22 this column headed News Dates is a
23 combination of dates either from
24 Mr. Fischel or Professor Grenadier?
25    A.    That is correct.

Page 318

WERNER

1
2    Q.    All right.  And then the next
3  column which is headed Statistically
4  Significant News Days, does that present
5  the number of the news dates in the
6  previous column that in your regression
7  analysis based on your one-year estimation
8  period had a statistically significant
9  return?
10    A.    That is correct.
11    Q.    All right.  And then the final
12  column calculates a p-value for the
13  statistical significance of the binomial
14  test, right?
15    A.    Correct.
16    Q.    All right.  And this was a test
17  of whether the return was statistically
18  significant on the news dates as used in
19  this table, right?
20    A.    Well, I think I would say
21  "returns," plural.
22    Q.    Okay.
23    A.    But that sounds correct.
24    Q.    All right.  And you got a
25  p-value of 5 percent or less for six of the

Page 319

WERNER

1
2  seven stocks you studied, right?
3    A.    That is right.
4    Q.    Am I right that you did not
5  study the two stocks from the original
6  report here, Koss and Tootsie Roll?
7    A.    That is correct.
8    Q.    And for Trivago you found no
9  statistical significance, right?
10    A.    That is correct.
11    Q.    So you say in paragraph 52, in
12  the first sentence, "while the test results
13  for Trivago were inconclusive."  Do you see
14  that?
15    A.    I do.
16    Q.    All right.  And so the finding
17  of your binomial test was that that
18  binomial test as set forth in Table 7 did
19  not establish market efficiency for Trivago
20  during that week immediately before the
21  class period, right?
22    A.    That is correct.  But to the
23  extent that I was only looking at one
24  observation, that's how I arrived at the
25  statement that it was inconclusive.  But

Page 320

WERNER

1
2  you are correct, it does not pass the
3  news/no news test.
4    Q.    So do you have an opinion one
5  way or the other if the question is whether
6  Trivago was efficient during that one-week
7  period, as opposed to the question you
8  answered in your opening report, which was
9  whether Trivago was efficient during the
10  full-year period, if the question instead
11  is whether Trivago traded in an efficient
12  market during the one-week period leading
13  up to January 27th, 2021, do you have an
14  opinion on that question?
15    A.    I believe that based on my
16  review of all the information, so all
17  Cammer and Krogman factors, my conclusion
18  was that it did trade in an efficient
19  market during that week.
20    Q.    But you would agree that you
21  have less certainty about Trivago for that
22  week than the other six stocks?
23    A.    Do I have less certainty?
24    Q.    Let me ask a better question.
25          Do you agree that you have less

Page 321

WERNER

1
2  confidence in the results as to Trivago for
3  that week than for the other six stocks?
4    A.    Do I have less confidence?
5  That's not anything I have really thought
6  about.  I don't know.  It's not something I
7  considered.  I mean, I looked at the
8  totality of the information and determined
9  it was efficient.  I didn't think about it
10  in terms of how confident I was or
11  unconfident I was about my findings.
12    Q.    So you say at the end of
13  paragraph 52 on page 22 of your rebuttal
14  report "I am inclined to place more weight
15  on the results of the more robust study
16  performed in the Werner Declaration."
17          Do you see that?
18    A.    I'm sorry, paragraph 52?
19    Q.    Yes, the very end of that.
20    A.    Correct.
21    Q.    And when you say that you are
22  inclined to place more weight on the
23  results of the full-year study in your
24  opening report than on the results of the
25  one-week study in your rebuttal report, are

Page 322

WERNER

2 you indicating that you think a finding of
3 efficiency for Trivago is a closer call?
4     A.    I'm sorry, what do you -- so a
5 finding of efficiency for Trivago is a
6 closer call?
7     Q.    Than for the other six stocks.
8     A.    Okay.  Again, I don't -- I
9 don't think that's anything I considered.
10 I didn't think about degrees of separation.
11 So as I sit here today, I don't know one
12 way or the other.
13     Q.    Okay.  Now let me go back to
14 Table 7 on page 21.  You don't present any
15 analysis here of the statistical
16 significance or not of the returns on
17 non-news dates during this one-week period,
18 do you?
19     A.    I believe that's correct.  But
20 can you reread the question?
21         (The record was read.)
22     A.    Well, I mean, they are baked
23 into the analysis, but I don't -- to the
24 extent here I have got a column that says
25 Statistically Significant News Days, right,

Page 323

WERNER

2 I haven't put a column that says
3 Statistically Insignificant News Days.
4     Q.    All right.  So that's not my
5 question.  So let me do a better job of
6 asking my question.
7         So do you see that for
8 BlackBerry, for example, you say that there
9 are three news dates, as we defined that
10 term a moment ago, taking either
11 Mr. Fischel's or Professor Grenadier's
12 study potentially of value relevant news,
13 and then you find that on two of those
14 three dates there is a statistically
15 significant return based on your regression
16 for the one-year period before the proposed
17 class period, right?
18     A.    That is correct.
19     Q.    All right.  If there were three
20 news dates during this period of five
21 trading dates, there also must have been
22 two non-news dates, right?
23     A.    There must have been two
24 non-news dates, as defined by your experts?
25     Q.    Yes, sir.

Page 324

WERNER

2     A.    I think logically that follows.
3     Q.    Okay.
4     A.    Unless -- maybe I'm missing
5 something.
6     Q.    No, I don't believe you are.
7     A.    Isn't it tautologically
8 correct?
9     Q.    I believe it is.
10     A.    Okay, all right.
11     Q.    So your Table 7 does not
12 present any results as to the statistical
13 significance or not of the returns on those
14 two non-news dates, correct?
15     A.    That is correct.  That is
16 correct.
17     Q.    So there is therefore, in your
18 binomial test as set forth in your rebuttal
19 report, there is no comparison between the
20 statistical significance of the returns on
21 the news dates on the one hand and the
22 statistical significance of the returns on
23 the non-news dates on the other hand,
24 correct?
25     A.    I believe that is correct.

Page 325

WERNER

2     Q.    Okay. If we just keep this
3 open, please, and look back to your opening
4 report, which we have marked as Deposition
5 Exhibit 281, and I'm interested in
6 particular on Table 9 which appears on the
7 top of page 34.
8     A.    You said Table 9, right?
9     Q.    Yes, sir, on the top of page
10 34.
11     A.    I'm sorry, I didn't mean to
12 interrupt you.
13     Q.    No.  So am I right that Table 9
14 presents the collective test results for
15 the one-year period through January 27,
16 2021 using your definition of news dates,
17 namely the top 10 percent of articles
18 appearing on those days?
19     A.    That is correct.
20     Q.    And these are -- this is a
21 summary of the results of the news/no news
22 test in your opening report, right?
23     A.    That is correct.
24     Q.    And here you did compare the
25 statistical significance on the news dates

82 (Pages 322 - 325)

WERNER

1
2 to the statistical significance of the
3 returns on the non-news dates and from that
4 comparison you calculated a p-value using
5 Fisher's exact test that you presented in
6 the far right column, right?
7    A.   That is correct.
8    Q.   Okay.  Now, have you seen the
9 information Professor Grenadier prepared in
10 response to your binomial test in Table 7?
11    A.   So I don't remember seeing that
12 in any of his reports.
13        MR. ROSEN:  Objection.  If you
14    are going to show him something that
15    was produced after the rebuttal reports
16    were submitted to each firm, then I
17    object to you using it in litigation
18    because that is an impermissible
19    sur-reply report, and so we object to
20    the use of anything that any expert
21    prepared after the cutoff date for the
22    rebuttal reports.
23        MR. RYAN:  All right.  So I'm
24    providing now analysis that was
25    provided to you in response to your

WERNER

1
2    subpoena before Professor Grenadier's
3    deposition.  So I have marked this
4    three-page document as Exhibit 288.
5        MR. ROSEN:  So we object to the
6    admission of 288 as an impermissible
7    sur-reply and for other reasons.
8        (Defendant's Exhibit 288 marked
9    for identification.)
10    Q.   All right.  Have you seen
11 Exhibit 288 before, Dr. Werner?
12    A.   It looks familiar.
13    Q.   Okay.
14    A.   I believe I have.
15    Q.   And do you see that it is
16 headed Analysis and Response to Werner
17 Rebuttal Report Table 7?
18    A.   I do.  I do, yes.
19    Q.   And so do you understand that
20 on the first page of Exhibit 288, what
21 Professor Grenadier presents is a version
22 of the binomial test in your Table 7 that
23 shows the days that he, Professor
24 Grenadier, considered to have new
25 potentially value relevant information and

WERNER

1
2 whether the stock price return on those
3 dates was statistically significant using
4 his regression analysis?
5    A.   That is my understanding of
6 what this is, yes.
7    Q.   All right.  And then if we look
8 at page 2 of Exhibit 288, is it your
9 understanding that this table presents the
10 days that Professor Grenadier did not
11 consider to have new potentially value
12 relevant information during this period and
13 then whether the stock price return on
14 those dates was statistically significant
15 using his regression analysis?
16    A.   But, again, so this goes to the
17 problem with your subjective definition of
18 news.  He completely ignores Dr. Fischel's
19 analysis.  So does that mean I should
20 ignore Dr. Fischel's analysis in doing my
21 experiments?
22        I mean, he found that some days
23 were statistically -- were value relevant
24 and Grenadier found other days were value
25 relevant.  So why should I ignore that

WERNER

1
2 data?  Or maybe -- let me ask it a
3 different way.  Do you know why Professor
4 Grenadier ignored that information?  Did he
5 think that what Mr. Fischel did was wrong?
6 Or his findings were incorrect?
7    Q.   So I'm asking you a much more
8 limited question.  I certainly know why he
9 did what he did.  But my question is quite
10 different.
11        My question is, is it your
12 understanding that page 2 of Exhibit 288
13 presents the days that Professor Grenadier
14 did not consider to have new potentially
15 value relevant information during this
16 period and then whether the stock price
17 return on those dates was statistically
18 significant using his regression analysis?
19    A.   That is my understanding, but I
20 didn't -- the numbers look all screwed up.
21 Like I don't -- the binomial test p-values
22 look incorrect, or at least I couldn't make
23 sense of them when I looked at it, nor the
24 cumulative distribution p-value.
25        So I have, as I sit here today,

Page 330

WERNER

1                    WERNER
2 other than being perplexed by exactly what
3 was done here and whether or not the
4 analysis was done properly, I have no
5 additional opinion about what that is. I
6 mean, sure, if you want to ask me, I mean,
7 obviously you can ask me whatever you want,
8 I just have no idea whether what's been
9 done here is accurate or not.
10     Q.    Okay. So you see that in your
11 Table 7 when you had zero out of one --
12     A.    Hold on.
13          MR. ROSEN: It is page 21 of
14 your rebuttal report.
15     A.    Here we go. I'm sorry, what
16 page?
17     Q.    Page 21 of your rebuttal
18 report, Table 7, and paragraph 50. Do you
19 see that when you have zero observations
20 out of one, you have a binomial test
21 p-value of 95 percent?
22     A.    Right.
23     Q.    And do you see that that is the
24 same when Professor Grenadier, for
25 different stocks, has zero observations out

Page 331

1                    WERNER
2 of one? Do you see that equivalence in the
3 p-values that I'm pointing out to you?
4     A.    I see that some of them are
5 equivalent.
6     Q.    Right. Do you see that
7 similarly when you have two statistically
8 significant days out of three, you have a
9 p-value of 0.71 percent and when Professor
10 Grenadier has two statistically significant
11 days out of three, he has a binomial test
12 p-value of 0.71 percent?
13     A.    Yes, I now see that.
14     Q.    Okay. Do you still believe
15 that anything looks off with respect to the
16 binomial test p-value column in the chart
17 on page 2 of Deposition Exhibit 288?
18     A.    I mean, I have no opinion one
19 way or the other, given that I haven't been
20 able to examine this document in an
21 academically rigorous way. On the surface,
22 yeah, I would need to -- I would need to
23 hear how he explained what he did here to
24 fully -- I don't know one way or the
25 other --

Page 332

1                    WERNER
2          MR. ROSEN: He never explained
3 it, because I didn't depose him on it.
4     Q.    All right. So let me ask you
5 about page 3 of Deposition Exhibit 288. Do
6 you see that Professor Grenadier reports
7 here that for the seven stocks combined,
8 for 14 total days with news with new
9 potentially value relevant information,
10 there were statistically significant
11 returns on eight of those 14 days?
12     A.    Well, and, again, so let's be
13 very specific here. These are days where
14 Dr. Grenadier determined that there was
15 potentially value relevant information. It
16 is not --
17     Q.    Yes, sir.
18     A.    It is not, to the best of my
19 understanding, the days that your experts
20 collectively determined there was value
21 relevant information. So I understand why
22 he is recreating what he did. I don't know
23 why he would then choose to ignore
24 information that is relevant to the
25 question that he is trying to address.

Page 333

1                    WERNER
2     Q.    All right. Do you see, though,
3 that on the left part of page 3 of Exhibit
4 288, he reports that there are 14
5 observations for days with news with new
6 potentially value relevant information --
7     A.    I'm sorry, I apologize, are we
8 looking at Table 3?
9     Q.    Yes.
10     A.    Okay, go ahead, sorry.
11     Q.    Do you see that on the left
12 part of page 3 of Exhibit 288, he reports
13 that there are 14 days with news with new
14 potentially value relevant information and
15 eight of those 14 days have statistically
16 significant returns?
17     A.    Yes, I do see that.
18     Q.    And then do you see that he
19 reports on the right-hand side that there
20 are 21 days without news with new
21 potentially value relevant information
22 during this one-week period before the
23 beginning of the proposed class period, and
24 13 of those 21 days have statistically
25 significant returns?

84 (Pages 330 - 333)

WERNER

1
2    A.    According to Dr. Grenadier.
3    Q.    Yes.
4    A.    Professor Grenadier.
5    Q.    Yes.  And do you see that he
6  then runs a Fisher's exact test and finds
7  there is no statistically significant
8  difference on the days with news and the
9  days without news, right?
10   A.    Based on his definition of
11 news, again, I haven't had a -- I haven't
12 examined this thoroughly, but on the
13 surface that appears to be what it is.
14   Q.    Okay.  And when you conducted
15 your binomial test results for your
16 rebuttal report you did not do this kind of
17 comparison between the news dates and the
18 non-news dates during the one-week period
19 before the proposed class period, did you?
20   A.    Right, based on the small
21 sample size, that is correct.
22   Q.    And your second sentence in
23 paragraph 51 of your rebuttal report states
24 that "Based on Table 7, we can reject the
25 null hypothesis that the companies'

WERNER

1
2  securities prices behave no differently on
3  days with company specific news than on
4  days without company specific news."
5        Do you see that?
6    A.    I do.
7    Q.    But your Table 7 has no
8  analysis of days without company specific
9  news, right?
10   A.    No, but, I mean, that's what
11 the binomial test is testing for.  So based
12 on these results of the binomial test, that
13 statement is correct.
14   Q.    All right.  Isn't it the case
15 that this sentence is wrong, and that your
16 binomial test in Table 7 of your rebuttal
17 report does not allow one to reject the
18 null hypothesis that the companies'
19 securities prices behave no differently on
20 days with company specific news than on
21 days without company specific news?
22   A.    I don't believe that's correct.
23 I determined -- I determined that I should
24 use a binomial test based on the small
25 sample size that we were looking at.

WERNER

1
2  That's how I arrived at the decision to use
3  this, and I believe that that, based on,
4  again, both experts' collective definition
5  of value relevant information, this shows
6  that the stock prices reacted to news
7  during that one-week period.
8    Q.    Do you agree that the apparent
9  mispricing of GameStop's stock appears to
10 be an intentional manipulation by a group
11 of investors who all agreed to act
12 irrationally by buying at prices untethered
13 to fundamental value?
14        MR. ROSEN:  Objection.
15   A.    I'm sorry, where are you
16 reading from?  It sounds like Professor
17 Grenadier's report.
18   Q.    I'm asking you a question.  Do
19 you agree with that statement?
20   A.    I would like to see the
21 statement and then I will tell you whether
22 or not I agree with it.
23   Q.    So I'm just asking you the
24 question regardless of who said it.  Do you
25 agree that the apparent mispricing of

WERNER

1
2  GameStop stock appears to be an intentional
3  manipulation by a group of investors who
4  all agreed to act irrationally by buying at
5  prices untethered to fundamental value?
6        MR. ROSEN:  Objection.  It is a
7  compound question.
8    A.    Right, it is a compound
9  question.  To the extent you are talking
10 about manipulation, that's a legal term to
11 the best of my understanding.  I have no
12 idea how to answer that question.
13   Q.    So are you able to either agree
14 or disagree with that statement?
15   A.    Can you read it one more time?
16   Q.    Sure.
17   A.    Please, I'm sorry, please.
18   Q.    The apparent mispricing of
19 GameStop's stock appears to be an
20 intentional manipulation by a group of
21 investors who all agreed to act
22 irrationally by buying at prices untethered
23 to fundamental value.
24   A.    "Fundamental value" defined as
25 what?  What we have talked about in terms

Page 338

WERNER

1
2 of DCF analysis?
3    Q.    How you would define
4 "fundamental value"?
5    A.    Could you reread the question,
6 please?
7    Q.    Do you agree that the apparent
8 mispricing of GameStop's stock appears to
9 be an intentional manipulation by a group
10 of investors who all agreed to act
11 irrationally by buying at prices untethered
12 to fundamental value?
13    A.    I have a lot of problems with
14 that. But "apparent," you used the term
15 "apparent mispricing." Apparent to who? I
16 mean, someone, whoever wrote that, I don't
17 know, maybe it was an analyst or something,
18 believed that the stock was mispriced. I
19 guess I would want to see their
20 justification or what evidence they cite to
21 suggest in fact that it was mispriced.
22    Q.    Do you agree that GameStop's
23 stock was mispriced?
24    A.    Do I believe that GameStop's
25 price was mispriced?

Page 339

WERNER

1
2    Q.    Yes, sir.
3    A.    No.
4    Q.    Do you agree that financial
5 markets have a long history of temporarily
6 mispriced individual stocks?
7    A.    Mispriced according to who?
8 Mispriced relative to fundamental value or
9 informational efficiency? I don't -- I
10 mean, there is all sorts of -- first, so I
11 don't have these statements in front of me
12 that you are reading, and I don't know the
13 context in which these individuals made
14 these statements. So I don't want to say
15 yes, I agree with that and then ah, case
16 closed, right? So they are very general
17 statements. I would need much more
18 information to give you a proper response
19 to those questions.
20    Q.    Okay. So you're not able to
21 agree or disagree with the proposition that
22 financial markets have a long history of
23 temporarily mispriced individual stocks?
24    A.    Again, I don't know what you
25 mean by "mispriced." So, you know, I'm

Page 340

WERNER

1
2 happy -- if you want to show me where this
3 person has written that and the context in
4 which they wrote that, I'm happy to look at
5 it and give you an answer. But just on the
6 face of it, I can't commit one way or the
7 other to whether or not that question is --
8 or that statement is correct.
9    Q.    Do you agree that GameStop is a
10 clear case where for a short period of time
11 the market was inefficient?
12    A.    Do I agree with that statement?
13    Q.    Yes.
14    A.    "A short period of time" being
15 what?
16    Q.    A number of days.
17    A.    How many days?
18    Q.    Any number of days that you're
19 able to answer.
20       MR. ROSEN:  What time period
21    are you referring to?
22    Q.    I'm talking about the period
23 right before the proposed class period.
24    A.    So right before the proposed
25 class period?

Page 341

WERNER

1
2    Q.    Right.
3    A.    Right. I determined that -- we
4 are talking about GameStop, right?
5    Q.    Yes.
6    A.    That it traded in an efficient
7 market from -- oh, well, all right, let's
8 make it easier, based on Dr. --
9 Mr. Fischel's and Professor Grenadier's
10 definition of material news, I determined
11 that the stock traded in a, I'm sorry,
12 value relevant news, that the stock traded
13 in an efficient market over that period.
14    Q.    So you believe that somebody
15 who thinks it is a clear case that for a
16 couple of days before the proposed class
17 period here the market for GameStop stock
18 was inefficient is wrong?
19    A.    I have no reason to -- I mean,
20 I'm sure that's their opinion. Is it right
21 or wrong?  That's their opinion, right?
22    Q.    You hold a contrary opinion; am
23 I right?
24    A.    Is that the logical conclusion,
25 is that the conclusion you are reaching --

86 (Pages 338 - 341)

Page 342

WERNER

1
2   Q.   Well, do you?
3   A.   Let's go back to the question
4   you asked me, did it trade in an efficient
5   market during that period.  I said it did,
6   informationally efficient.  Now, I don't
7   know what whoever is making that statement
8   means with regards to efficiency.
9       So I have, again, based on what
10  Mr. Fischel and Dr. Grenadier did,
11  determined were value relevant days, it
12  appears that the stock was efficient during
13  that four or five-day period, or six-day
14  period, whatever it was.  But, yeah, I have
15  nothing else to add.
16  Q.   All right.  Do you agree that
17  securities differ from most products that
18  economists study in that they are highly
19  substitutable?
20  A.   I have no idea what you mean by
21  that.
22  Q.   Okay.  Are you aware of
23  academic literature about the
24  substitutability of stocks?
25  A.   It is possible.  Off the top of

Page 343

WERNER

1
2   my head, I can't think of, what do you mean
3   by substitutability?  You tell me and I
4   will tell you whether or not I'm familiar
5   with the idea.
6   Q.   That if somebody wants to make
7   an investment, the stock of one company is
8   often a very good substitute for the stock
9   of another company.
10  A.   Well, I mean, to the extent
11  that you are talking about idiosyncratic
12  risk, it doesn't -- I don't know.  I mean,
13  I would have to know a lot more before I
14  could answer that question.  Because each
15  company is going to have its own
16  firm-specific risk.  I mean, so I don't
17  know whether the firms face the same risk,
18  whether they are in the same industry.
19  There is all sorts of factors that go in.
20  So as a general proposition, I can't answer
21  that question.
22  Q.   So are you familiar with the
23  academic literature on substitutability of
24  stocks?
25  A.   Not as I sit here today.

Page 344

WERNER

1
2   Q.   Do you agree that under the
3   efficient market hypothesis, stocks have a
4   nearly horizontal demand curve?
5   A.   Again, how are you defining
6   efficiency?  So that is probably going to
7   influence whether or not the demand curve
8   for any individual stock is horizontal.
9   Q.   All right.  Under what you call
10  fundamental efficiency, do you agree that
11  stocks have a nearly horizontal demand
12  curve?
13  A.   What I have defined, and so
14  when I have defined it, because -- as your
15  experts have defined fundamental
16  efficiency, is the demand curve for any
17  individual stock horizontal?
18  Q.   Horizontal or nearly so, yes,
19  that's my question.
20  A.   Yeah, that's not anything I
21  have ever thought about.
22  Q.   Okay.  Let me try to ask the
23  question a different way.
24      Do you agree that under the
25  efficient market hypothesis the demand for

Page 345

WERNER

1
2   any individual stock is highly elastic?
3   A.   I mean, same answer.
4   Q.   Okay.  That isn't something
5   that you have ever thought about?
6   A.   Again, based on whatever
7   definition of market efficiency that these
8   people are using, which I don't know, yeah,
9   no, that's not anything I have thought
10  about.
11  Q.   Okay.  Do you agree that since
12  a securities price must be equal to its
13  value, prices should not move without any
14  news about the value of the security?
15      MR. ROSEN:  Could you reread
16  the question?
17  A.   Could you reread that question?
18      (The record was read.)
19  A.   Well, I mean, there is all --
20  go ahead, Larry.
21      MR. ROSEN:  I'm not going to
22  say anything.
23  A.   I mean, there is all sorts of
24  things that go into the valuation of a
25  security, right?  We have talked about your

87 (Pages 342 - 345)

WERNER

1 client posting price changes of stocks in
2 an effort presumably to encourage people to
3 buy and sell stock. So I don't know what
4 exact -- what exact information you are
5 talking about here, right? So I have no
6 idea how to answer that question.
7    Q.    Okay. So you're not able to
8 state whether you agree or disagree with
9 that sentence?
10    A.    Reread the sentence. I believe
11 the answer is no, I cannot agree or
12 disagree with that sentence, because there
13 is way too many variables. But go ahead and
14 reread the question.
15    Q.    Fine. The question is do you
16 agree that since a securities price must be
17 equal to its value, prices should not move
18 without any news about the value of the
19 security?
20    A.    Okay. So define "value" for
21 me.
22    Q.    How much a security is worth.
23    A.    Oh, so how much a security is
24 worth? So what goes into determining that

WERNER

1 value?
2    Q.    You are the finance expert, not
3 me.
4    A.    Well, you are using the term
5 "value," or whoever is --
6    Q.    I told you what I meant by it.
7    A.    What?
8    Q.    I told you what I meant by it.
9    A.    Oh, I'm sorry, go ahead, repeat
10 what you meant by it.
11    Q.    Right. So are you able to
12 agree or disagree with the proposition that
13 under the efficient market hypothesis,
14 since a securities price must be equal to
15 its value, prices should not move without
16 any news about the value of the security?
17    A.    Oh, so the value in question is
18 the price of the security, so let's get --
19 again, I mean, we have to go into what
20 determines the value of the security and
21 how you are specifically -- you seem to
22 have some vision in your mind of what
23 determines value, and that that value could
24 somehow deviate from price, at least that's

WERNER

1 what your question implies. So without
2 knowing exactly what you mean by things
3 that influence or determine value, I can't
4 answer that question.
5    Q.    Okay.
6       MR. RYAN: Why don't we go off
7 the record and I will see how much more
8 I have.
9       THE VIDEOGRAPHER: This will
10 end media unit seven. We are going off
11 the record at 5:48.
12       (Recess taken.)
13       THE VIDEOGRAPHER: We are back
14 on the record at 6:07. This will begin
15 media unit eight.
16 BY MR. RYAN:
17    Q.    All right, Dr. Werner, do you
18 recall that you gave some testimony earlier
19 in the day about your belief that there was
20 a potential way to calculate class-wide
21 damages based on a regression analysis on
22 intraday stock price movements?
23    A.    I do.
24    Q.    And I believe what you were

WERNER

1 describing there was a regression analysis
2 where the independent variable would be the
3 presence of Robinhood PCO restrictions or
4 not --
5    A.    I'm sorry, dependent or
6 independent?
7    Q.    Independent.
8    A.    Independent variable, okay.
9    Q.    -- and the dependent variable
10 would be the stock price; is that right?
11    A.    That was, again, I haven't
12 thoroughly thought through this, but that
13 was one such example that one may -- I
14 mean, I would have to, again, until
15 discovery is complete, I can't give you
16 exactly the regression I would run if I was
17 asked to do so, but as a simple model, that
18 is descriptive of what I said earlier.
19    Q.    All right. And that regression
20 analysis that I just described would not by
21 itself account for confounding factors that
22 might affect the price of these nine
23 stocks, right?
24    A.    Well, I mean, I guess it would

Page 350

WERNER

1
2  depend upon when -- again, I haven't gone
3  into a lot of detail about this.  It might
4  be dependent upon when one looked -- I
5  don't -- I don't know.  I haven't, yeah, I
6  haven't thought about it to that extent.  I
7  mean, if you are asking, would you need to
8  adjust for non-Robinhood-related actions?
9  Absolutely.
10     Q.   All right.  So that's part of
11  what I am asking.  So let me ask the
12  question this way:  Do you agree that that
13  regression analysis we have described where
14  the independent variable would be the
15  presence of Robinhood PCO restrictions and
16  the dependent variable would be the stock
17  price --
18     A.   Oh, I'm sorry.
19     Q.   -- that would not account for
20  potential causality from restrictions by
21  other brokers, right?
22     A.   Well, so, I'm not -- maybe
23  we're at -- I guess I wasn't thinking about
24  it in terms of the independent variable
25  having a value of 1 whenever Robinhood's

Page 351

WERNER

1
2  restrictions were in effect.  So I would
3  need to do more, if I'm asked to do so, I
4  think that I would need to do a more
5  targeted analysis.
6         So I don't -- I guess what I
7  had in mind when we talked about this
8  earlier wasn't necessarily a long indicator
9  variable that would be in effect for, you
10  know, like two days, or one day.  That's
11  not what I had in mind.
12     Q.   Okay.  So I'm confused, because
13  I thought I asked you earlier today whether
14  the independent variable was going to be
15  the time from imposition of the Robinhood
16  restriction, and you said no, that's not
17  what you had in mind, what you had in mind
18  was a dummy variable for the presence of
19  the PCO restriction.
20     A.   Yeah, right, and I'm saying
21  that, I'm correcting what I said, right?
22     Q.   I see.
23     A.   As you and I talk about it now,
24  I now realize that what I said could be
25  taken to mean that the indicator variable

Page 352

WERNER

1
2  would take on a value of 1 whenever
3  Robinhood's stock -- or whenever there were
4  PCO restrictions imposed by Robinhood, and
5  I guess -- I mean, yeah, I would not
6  necessarily -- I mean, that's not what I
7  meant.
8     Q.   Okay.  So I'm glad I asked you
9  this question.  So how, then, are you
10  envisioning the independent variable would
11  work in this regression analysis?
12     A.   Again, look, this is all
13  theoretical.  I haven't been asked to do
14  this.  But it occurs to me that someone
15  should be able to do it.  And I'm not even
16  sure that an indicator variable is the
17  right way to go about doing it.  It is just
18  one possible way to go about doing it.  But
19  specifically let's look at -- am I looking
20  at my report here?  Rebuttal report, yeah.
21         So, for instance, and, again,
22  this is all theoretical, I don't have the
23  complete fact pattern in this case, I could
24  look at the imposition, and, I'm sorry, I'm
25  looking at Table 12 in my rebuttal report.

Page 353

WERNER

1
2     Q.   Right.
3     A.   I could look at a time period
4  for the imposition of the Robinhood
5  restrictions for, let's say, 10 minutes, 15
6  minutes, 20 minutes, and see whether or not
7  the price changed over that period.
8         So, for instance, I mean, if
9  I'm just eyeballing it, right, the
10  restrictions, PCO restrictions come into
11  effect and the stock prices go down.  If I
12  were to conclude that what caused these
13  stock price declines were simply
14  Robinhood's alleged misconduct, I would
15  want to capture that decline as a measure
16  of damage.  But, again, this is all
17  theoretical.  But off the top of my head,
18  that might be one way to do it.
19     Q.   All right.  And what if there
20  are other factors such as the end of a
21  short squeeze or the bursting of a price
22  bubble, you wouldn't be able to account for
23  those confounding factors, would you?
24     A.   Well, I'm sorry, are you
25  telling me to assume that a short squeeze

89 (Pages 350 - 353)

Page 354

WERNER
1
2 occurred or a bubble ended?  I don't -- I
3 don't -- I mean, look --
4     Q.    Let me ask the question a
5 better way.
6     A.    Sure.
7     Q.    So using the regression
8 analysis you just described, am I right
9 that if the finder of fact finds that there
10 were other factors such as the end of a
11 short squeeze or the bursting of a price
12 bubble, the regression analysis that you
13 just described would be unable to account
14 for those confounding factors, right?
15     A.    No, not necessarily.  I don't
16 know -- I mean, when -- when are these
17 events occurring?  When is the bubble
18 bursting?  I mean, there is all sorts of --
19 I guess your question is too general.  I
20 would need to know more about this alleged
21 short squeeze or bubble bursting in order
22 to think about how that might affect such a
23 model.
24     Q.    And you have not studied a
25 short squeeze or burst of a price bubble to

Page 355

WERNER
1
2 see how that would affect a loss causation
3 or damages model, have you?
4     A.    That's not something I have
5 been asked to do at this point, right.  I
6 have just been asked to provide the damage
7 methodology framework, if you will.  I
8 haven't actually been asked to calculate
9 damages or opine on loss causation.
10     Q.    And you haven't begun to do any
11 work on a damages model in using an
12 intraday regression model, correct?
13     A.    That is correct.
14     Q.    And even just as you have sat
15 here today, you changed your mind now about
16 how you might go about constructing the
17 independent variable, right, and that shows
18 that this is all very theoretical for you
19 at this point, right?
20     A.    Well, look, I mean, I don't
21 know if I would agree with your statement
22 that it is very theoretical.  I mean, this
23 shows it all.
24        MR. ROSEN:  What are you
25     pointing to?

Page 356

WERNER
1
2        THE WITNESS:  I'm sorry, I'm
3     looking at Table 12 here.
4     A.    Sure, until I do -- until I
5 look and see what else was happening during
6 this time period when the stock price, or
7 the average of this index fell, right, I
8 have no reason to think that that --
9 measuring that price drop wouldn't at least
10 in some way encompass the impact of
11 Robinhood's PCO restrictions on the
12 underlying stocks at issue in this case.
13     Q.    All right.
14     A.    But, again, this is all
15 theoretical, right?
16     Q.    Right.
17     A.    You know, let's say, like you
18 said, let's say the Court determines that
19 there was a short squeeze or a bubble,
20 right, that would then be something that
21 you would need to take into consideration,
22 or one would need to take into
23 consideration in measuring damages.
24     Q.    All right.  And am I right that
25 you haven't given any thought yet as to how

Page 357

WERNER
1
2 you would go about taking such a finding
3 into account?
4     A.    That's definitely not anything
5 I have been asked to do at this point in
6 time.
7     Q.    All right.  And you would agree
8 with me that the simple two-variable
9 regression model, the intraday regression
10 model that you have described that you have
11 thought about theoretically doesn't provide
12 a means to account for those potential
13 other factors, right?
14     A.    Well, again, you are assuming
15 that to the extent -- if you are making
16 assumptions about those other factors, so
17 in your hypothetical, we are going to
18 assume that these things occurred.  Does my
19 simple model take into consideration
20 hypothetical things that might occur or
21 someone might find occurs?  I don't think
22 so.  But that -- again, it doesn't -- well,
23 we will leave it at that.
24     Q.    Okay.  You cited a report from
25 the SEC staff; is that right?

90 (Pages 354 - 357)

Page 358

WERNER

1
2    A.    I believe that's correct.
3    Q.    All right.  Let me hand you
4  what I have just marked as Deposition
5  Exhibit 289, a document entitled Staff
6  Report on Equity and Options Market
7  Structure Conditions in Early 2021 dated
8  October 14th, 2021.
9            (Defendant's Exhibit 289 marked
10  for identification.)
11    A.    Okay.
12            MR. ROSEN:  What exhibit is
13    this?
14            MR. RYAN:  289.
15    Q.    And is this the SEC staff
16  report that you cite in your expert report?
17    A.    I believe so, but let's just
18  look at my expert report here.  I think I'm
19  looking at the wrong report here.
20    Q.    Let me direct you to page 30 of
21  your rebuttal report marked as Exhibit 282
22  to this deposition.
23    A.    Page 30, okay.
24    Q.    Page 31.
25    A.    Oh, 31, sorry.

Page 359

WERNER

1
2    Q.    Do you see on page 31 the
3  beginning of Note 50, you cite to the Staff
4  Report on Equity and Options Market
5  Structure Conditions in Early 2021 dated
6  October 14th, 2021?
7    A.    Correct.
8    Q.    All right.  So does it look to
9  you as though Exhibit 289 is the same SEC
10  staff report that you cited in your
11  rebuttal report?
12    A.    It does, yes.
13    Q.    So if you could turn, please,
14  to the bottom of page 30 of Exhibit 289.
15  Do you see that the last paragraph on this
16  page begins "The price surge in GME also
17  raises questions of market efficiency that
18  relate to short selling"?
19    A.    I do, yes.
20    Q.    And do you agree that the price
21  surge in GameStop raises questions of
22  market efficiency that relate to short
23  selling?
24    A.    I'm sorry, could you reread the
25  question?

Page 360

WERNER

1
2    Q.    Do you agree that the price
3  surge in GameStop raises questions of
4  market efficiency that relate to short
5  selling?
6    A.    Well, I'm trying to remember,
7  maybe I'm thinking --
8            MR. ROSEN:  What paragraph are
9    you reading from?
10            MR. RYAN:  The bottom paragraph
11    on page 30.
12    A.    Okay.  So could you repeat your
13  question?
14    Q.    Yes.  Do you agree that the
15  price surge in GameStop raises questions of
16  market efficiency that relate to short
17  selling?
18    A.    It could.
19    Q.    Okay.
20    A.    I mean, again, but yes, it
21  certainly could.
22    Q.    Do you see that the next
23  sentence reads "Staff have observed that it
24  was unusually costly to borrow shares in
25  GME"?

Page 361

WERNER

1
2    A.    I do see that.
3    Q.    In connection with your work in
4  this case, did you look into whether it was
5  unusually costly to borrow shares in
6  GameStop?
7    A.    Did I look into it?  I mean, I
8  don't -- look, I mean, there was a ton of
9  short interest in the stock, so people were
10  obviously shorting the stock regardless of
11  how expensive it was.
12    Q.    Right.  But I'm asking you
13  about the cost to borrow.  Did you look
14  into --
15    A.    Well, I mean, the cost of
16  borrowing would be included in the cost of
17  putting on a short position, correct?
18    Q.    Did you look into whether it
19  was unusually costly at this time to borrow
20  shares in GameStop?
21    A.    I do not believe so.
22    Q.    Okay.  Do you see the next
23  sentence reads "Academic research
24  implicates constraints on short selling as
25  a possible contributor to bubbles where

91 (Pages 358 - 361)

Page 362

WERNER

1  stock prices rise above what may be
2  justified by fundamentals"?
3  A.   Oh, yes, I do see that.
4  Q.   All right.  Do you --
5  A.   And, sorry, it cites to a paper
6  from 1978.
7  Q.   Uh-huh.
8  A.   Okay.
9  Q.   A fairly well-known paper,
10 right?
11 A.   Speculative Investor Behavior
12 in a Stock Market with Heterogeneous
13 Expectations.  I have heard of Kreps.
14 Fairly well known?  I mean, maybe I read it
15 at some point in my life.  I don't know --
16 I don't know how to determine whether or
17 not it was well known or not.
18 Q.   As you sit here today I gather
19 you don't have that paper in mind?
20 A.   Oh, you mean in terms of my
21 familiarity with it?
22 Q.   Yes.
23 A.   Oh, yes, I do not, without
24 looking at it, I can't tell you exactly
25

Page 363

WERNER

1  what was written in that report, or that
2  academic work.
3  Q.   Do you agree, though, with the
4  general proposition as stated by the SEC
5  staff that academic research implicates
6  constraints on short selling as a possible
7  contributor to bubbles where stock prices
8  rise above what may be justified by
9  fundamentals?
10 A.   Well, again, I mean, there is a
11 lot of statements in there.  So I don't
12 know what the -- what the SEC meant by
13 fundamentals.  Again, are we talking about
14 fundamental efficiency or informational
15 efficiency?  I mean, that is certainly
16 going to impact my answer to that question.
17 So without knowing exactly what the SEC was
18 talking about, I have -- I have a difficult
19 time answering that question.
20 Q.   Okay.  So is it the case, then,
21 that as a financial economist you are
22 unable to agree or disagree with the
23 statement by the SEC staff that academic
24 research implicates constraints on short
25

Page 364

WERNER

1  selling as a possible contributor to
2  bubbles where stock prices rise above what
3  may be justified by fundamentals?
4  A.   I mean, I will defer -- I mean
5  refer to my previous answer.
6  Q.   Do you see then the SEC staff
7  writes "To the extent that GameStop was
8  costly and risky to short, the reluctance
9  to sell short could have contributed to the
10 run-up in prices and the subsequent steep
11 decline"?
12 A.   I do, and then see -- I also
13 see "While a short squeeze did not appear
14 to be the main driver of events, and a
15 gamma squeeze less likely, the episode
16 highlights the role and potential impact of
17 short selling and short cover."
18 Q.   So do you agree with the SEC
19 staff that to the extent GameStop was
20 costly and risky to short, the reluctance
21 to sell short could have contributed to the
22 run-up in prices and the subsequent steep
23 decline?
24 A.   I'm sorry, where are you
25

Page 365

WERNER

1  looking?
2  Q.   The last full sentence of page
3  30 on Deposition Exhibit 289.
4  A.   Oh, sure, that is information
5  that would impact -- I mean, that possibly
6  could impact the stock price.  I mean,
7  those are -- those are certainly things
8  that investors would take into
9  consideration when trying to value in this
10 case GameStop.
11 Q.   All right.  And am I right that
12 you have not performed any analysis to
13 study whether or not the reluctance to sell
14 short in fact contributed to the run-up in
15 prices for GameStop and the subsequent
16 steep decline?
17 A.   Well, I mean, other than what I
18 have read, that it is not a short squeeze,
19 there was not a short squeeze, is that a
20 possible factor?  It is a possible factor
21 that could have contributed to stock price
22 changes.
23 Q.   Okay.  And you say that it is a
24 possible factor that could have contributed
25

92 (Pages 362 - 365)

Page 366

WERNER
2 to the run-up in prices for GameStop and
3 the subsequent steep decline.
4        MR. ROSEN:  Mischaracterizes
5    his testimony.
6    Q.   I take it you haven't studied
7 whether it did or not, right?
8    A.   I didn't study whether it did?
9 I believe --
10       MR. ROSEN:  Could you reread
11    the question?
12       THE WITNESS:  Thank you.
13       (The record was read.)
14       MR. ROSEN:  Objection to the
15    question.
16    A.    My belief is that the price of
17 GameStop and all of these stocks
18 incorporated all information that was out
19 in the public sphere.  So to the extent
20 that people may have said there was a short
21 squeeze, that would be incorporated in the
22 stock price.  I guess none of this was
23 unknown to the market.  Could it have
24 affected the price?  Absolutely.  Because
25 that would -- people might take into

Page 367

WERNER
2 consideration how that might affect their
3 opinion about value.
4    Q.   Okay.  And did you study
5 whether an actual short squeeze, as opposed
6 to discussion about a potential short
7 squeeze, affected the run-up in price of
8 GameStop and subsequent steep decline here?
9    A.    Well, so I haven't seen --
10 other than Mr. Fischel and to some extent
11 Mr. -- or Professor Grenadier suggesting a
12 short squeeze may have caused the stock
13 price run-up, I haven't seen anyone say
14 that a short squeeze actually occurred.  So
15 what you are asking me is a hypothetical
16 question.
17    Q.   No, because my question is did
18 you study this question.  That's my
19 question.  It is not hypothetical.  It is
20 actual -- either you did study it or you
21 didn't.  So my question is did you actually
22 study whether there was an actual short
23 squeeze?
24    A.    I relied on everyone's opinion,
25 including your -- including the deposition

Page 368

WERNER
2 of your two experts that a short squeeze
3 did not occur.  So you are asking me to
4 assume -- did I do any searching into
5 whether or not a short squeeze occurred?  I
6 read people's testimony.  I read people's
7 reports.  I read what the SEC said.  I
8 don't know.  Is that under your umbrella of
9 investigation?  You tell me.
10    Q.   All right.  I take it other
11 than the things you just talked about, you
12 didn't do any separate analysis of whether
13 there was actually a short squeeze, right?
14    A.    Did I do any additional
15 analysis?  I believe that's correct.
16    Q.    Could you turn, then, please to
17 page 28 in Deposition Exhibit 289.
18       MR. ROSEN:  So we have about
19    ten minutes left before we are at seven
20    hours, just so you know.  I'm giving
21    you the ten-minute warning on the
22    clock.
23    Q.    And I'm focused here on
24 footnote 78 which is a footnote about the
25 SEC staff's methodology.  Do you see that

Page 369

WERNER
2 footnote, sir?
3    A.    I do see the footnote, yes.
4    Q.    Okay.  And do you see that their
5 figure, and they are referring to Figure 6
6 above on this page, shows the total buy
7 volume during half-hour intervals from
8 January 19th to February 5th, 2021 of
9 traders identified as having a large short
10 position in GME using data from CAT.  Do
11 you see that?
12    A.    Well, along with total buy
13 volume and value-weighted average stock
14 price, I do see that.
15       Look, if you want to ask me
16 about this, I'm going to have to look --
17 I'm going to have to refresh my memory as
18 to exactly what was being stated here.
19    Q.    And you understand that CAT is
20 the consolidated audit trail?
21    A.    I believe that's correct.  But,
22 again, since you are asking about a
23 specific footnote, usually footnotes are
24 extremely specific, and so they deal
25 with -- they need to be looked at in the

Page 370

WERNER

1              WERNER
2  context of which they're being used.  So
3  let me look here.
4      Q.    Now, do you see that four lines
5  from the bottom of the page, the SEC staff
6  writes "Note that since the CAT" --
7      A.    I'm sorry, I'm not -- I'm going
8  forward to get some perspective on exactly
9  what's going on here since I don't remember
10  it.  You are now -- now we are talking
11  about footnote 78 again?
12      Q.    Yes, we are talking about
13  footnote 78.
14      A.    Okay.
15      Q.    So do you see that four lines
16  from the bottom the SEC staff wrote that
17  "Note that since the CAT sample only begins
18  on December 24th, 2020 we are not able to
19  include FDIDs' inventory positions
20  accumulated prior to this date"?
21      A.    I see that statement, yes.
22      Q.    And do you see that the FDIDs
23  are the firm designated identifications?
24      A.    Correct.
25      Q.    All right.  And so do you have

Page 371

1              WERNER
2  the understanding in looking at this SEC
3  staff report that because of limitations in
4  the consolidated audit trail sample, they
5  were not able to include short inventory
6  positions accumulated prior to December
7  24th, 2020?
8      A.    That's what it states.  I have
9  no reason to think that's not correct.
10      Q.    Okay.  Let me show you another
11  another article which you discuss in your
12  report.  This will be Exhibit 290.  This is
13  a working paper by Charles M. Jones and
14  co-authors.
15          (Defendant's Exhibit 290 marked
16  for identification.)
17      A.    Okay.  I should point out, as
18  Professor Grenadier did, Charles M. Jones
19  is no longer with us.
20      Q.    So I gather.  That's
21  unfortunate obviously.
22          All right.  So is this the
23  Jones, et al, working paper that you cite
24  in your rebuttal report?
25      A.    I believe it is.  Let's just

Page 372

WERNER

1              WERNER
2  look at my documents relied upon.
3      Q.    So this is page 71 of your
4  rebuttal report marked as Deposition
5  Exhibit 282.  Do you see there the Jones,
6  et al, working paper?
7      A.    Yes, I do see it.
8      Q.    All right.  And do you see in
9  the abstract on the first page of Exhibit
10  290 that the authors studied a set of
11  trading restrictions in 38 stocks,
12  including GameStop?
13      A.    Yeah, that's what they said
14  they did.
15      Q.    All right.  So the group of
16  stocks that they study is not limited to
17  the nine at-issue stocks in this case,
18  right?
19      A.    That is correct, yes.
20      Q.    Did you note in fact that only
21  six of the nine stocks at issue in this
22  case are included in the group of 38 stocks
23  studied in Jones, et al?
24      A.    I believe that's correct.
25      Q.    All right.  And then if you

Page 373

1              WERNER
2  could look with me, please, at Table 9,
3  which begins on page 61 and is entitled
4  Individual Firm Regressions and continues
5  on to page 62.
6      A.    Okay.
7      Q.    And do you see here that we see
8  in the left-hand column the list of 38
9  stocks that are studied by Jones, et al?
10      A.    Oh, maybe I'm on the wrong
11  page.  What page are you on?
12      Q.    Page 62.
13      A.    Oh, I'm on page 60, I
14  apologize.  Okay.
15      Q.    And do you see we see AMC in
16  the second row?
17      A.    I do.
18      Q.    And I'm looking at what they
19  call the S1 estimated return.  Do you see
20  that that is not statistically significant
21  for AMC?
22      A.    I do, yes.
23      Q.    And do you see that the same is
24  true for Bed Bath & Beyond?
25      A.    That is correct.

94 (Pages 370 - 373)

Page 374

WERNER

2 Q. And it is correct for Express
3 as well, right?
4 A. Let me -- let me refresh my
5 memory as to exactly what S1 is.
6 Q. S1 are the PCO restrictions
7 such as were imposed by Robinhood.
8 A. Can you point me to where it
9 says that in the report?
10 Q. If you look at page 15, do you
11 see about eight lines down it says "The
12 first set of restrictions (set 1) are
13 trading restrictions put in place by
14 Robinhood Interactive Brokers and a few
15 other brokerage firms. These begin before
16 trading opens on January 28th"?
17 Do you see that?
18 A. I do see that.
19 Q. I want to show you one other
20 thing.
21 A. Go ahead.
22 Q. I think this would be genuinely
23 helpful.
24 A. Genuinely helpful?
25 Q. Yes. If you just look a few

Page 375

WERNER

2 lines down on page 15 do you see the
3 authors say "Increases on margin are
4 imposed by a second set of brokerage firms
5 (set 2), notably TD Ameritrade"?
6 So that's my understanding of
7 what S1 and S2 mean in the Jones, et al,
8 working paper.
9 A. Okay, all right.
10 Q. So back on page 62, in Table 9,
11 we looked at the first three of the stocks
12 in the Jones, et al, group that are at
13 issue in this case. So I'm now looking at
14 the fourth one, GME. Do you see there the
15 S1 return is not statistically significant?
16 A. Sorry, I'm just looking at
17 the -- I mean, I assume that's correct. I
18 don't -- do you see a discussion as to what
19 the asterisks mean?
20 Q. Yes. The asterisk as described
21 on page 61 in the sort of explanatory note
22 to Table 9, three lines from the bottom,
23 one, two and three asterisks denote
24 significance at the 10 percent, 5 percent
25 and 1 percent levels respectively.

Page 376

WERNER

2 A. Okay, all right. So it is what
3 I thought they were.
4 Q. Okay. So now with respect to
5 the fifth stock at issue in this case,
6 Koss, once again, the S1 return is not
7 statistically significant according to
8 Jones, et al, on page 62, right?
9 A. That is correct.
10 Q. And for the sixth stock at
11 issue in this case that's in their group,
12 do you see that for Tootsie Roll the S1
13 return again is not statistically
14 significant?
15 A. Well, so, I'm sorry, I'm
16 forgetting, what is S -- so those returns,
17 I don't recall what -- there is a column
18 one, two, three, essentially four things
19 over that say IV-RV S1 Estimate, and those
20 things all appear to be statistically
21 significant. So I'm trying to remember, do
22 you know where the description of IV-RV in
23 the context of S1 estimates are?
24 Q. Yes. It's on page 61.
25 A. Oh, well -- oh, on page 61, I'm

Page 377

WERNER

2 sorry.
3 Q. Right. The sort of explanatory
4 paragraph that explains the table on the
5 following page, page 62.
6 A. Oh, I've got this backwards.
7 I'm sorry. Okay, all right, thank you.
8 Q. So I think I was in the middle
9 of asking for Tootsie Roll, the sixth of
10 the stocks at issue that are in the
11 Jones --
12 MR. RYAN: I have one more
13 minute. One more minute.
14 Q. For Tootsie Roll, the final one
15 of the six stocks that are in the Jones, et
16 al, group the S1 return, again, is not
17 statistically significant as shown in Table
18 9, right?
19 A. That is correct.
20 Q. And so it's the case, then,
21 that the Jones, et al, working paper for
22 the individual firm regressions in Table 9,
23 the S1 returns, which are the returns in
24 response to Robinhood PCO restrictions, are
25 not statistically significant for any of

95 (Pages 374 - 377)

Page 378

WERNER

1        WERNER
2 the six stocks at issue in this case
3 included in their group, right?
4     A.    Well, again, without going
5 through the entire paper and refreshing my
6 memory as to exactly what period S1 was
7 measured over, so I don't, as I sit here
8 today, at the end of seven hours of
9 deposition, I don't recall what S1 is.  As
10 a practical matter, just looking at this
11 table, right, all six of those things that
12 you mentioned are statistically
13 insignificant.
14     Q.    All right.
15     A.    What that means, I don't
16 remember.
17        MR. RYAN:  Okay.  Thank you for
18    your time, Dr. Werner.
19        MR. ROSEN:  I have got a couple
20    of questions for the witness.
21 EXAMINATION BY MR. ROSEN:
22     Q.    Do you have your opening
23 report, Dr. Werner?
24     A.    Declaration, here we go.
25     Q.    Could you please go to

Page 379

1        WERNER
2 paragraph 68, page 28.
3     A.    Paragraph 68.
4     Q.    Yeah.
5     A.    Okay, I'm there.
6     Q.    Now, earlier you were asked
7 questions about this paragraph, and
8 specifically there was a sentence in it, I
9 believe it was the second sentence, it
10 reads "To remain as objective as reasonably
11 possible, I broadly defined 'news days' as
12 any day with news releases about a subject
13 company that can be identified through the
14 news aggregating database, Factiva."  I'm
15 sorry, it continues on, "In order to" --
16 then it continues on to the sentence that
17 reads "In order to isolate a test sample of
18 news days that would be more likely than
19 not to contain value relevant information,
20 I focused on the frequency of news releases
21 on each day during the relevant period for
22 each Affected Company."
23        So the sentence I just read,
24 "In order to isolate a test sample of news
25 days that would be more likely than not to

Page 380

1        WERNER
2 contain value relevant information, I
3 focused on the frequency of news releases
4 on each day during the relevant period for
5 each Affected Company," so the term "value
6 relevant information," what did you mean by
7 that?
8        MR. RYAN:  Objection to form.
9     A.    I didn't mean that in the sense
10 of fundamental efficiency, I meant it in
11 terms of information that would be material
12 to investors, and so as we've seen, you
13 know, throughout the day, lots of different
14 information that is potentially material to
15 investors, among things, including things
16 like stock prices.
17        Again, we are talking about
18 people who might be momentum traders or
19 Chartis.  So it might be different for
20 different -- different people might value
21 things differently, but in terms of what I
22 meant, I didn't mean in terms of -- I
23 didn't mean valuation in terms of the
24 fundamental valuation that the two defense
25 experts talk about market efficiency.  I

Page 381

1        WERNER
2 meant it in terms of what is important to
3 investors.
4     Q.    Okay.  Let's go to your
5 rebuttal report, paragraph 115.  It says --
6     A.    I'm sorry, I'm not there yet.
7 I apologize.
8     Q.    Tell me when you're there.
9     A.    Okay.
10     Q.    The first sentence says
11 "Because these markets were efficient
12 during the immediate pre-class period,
13 there is no need to deviate from using
14 market prices to establish the appropriate
15 but-for price absent the alleged market
16 manipulation."
17        Now, did you mean by that
18 sentence that if it were determined by a
19 factfinder that the markets for these
20 stocks, nine stocks, were inefficient, that
21 the January 7th price would not, market
22 price, would not be an appropriate but-for
23 price?
24        MR. RYAN:  Objection, leading.
25     A.    I think you said January 7th.

96 (Pages 378 - 381)

Page 382

WERNER

2    Q.    January 27th.
3    A.    January 27th. So no, you could
4 still use it. I mean, it would be an
5 appropriate price.
6    Q.    Okay. My last question, this
7 exhibit, the last exhibit, the Jones paper.
8 What exhibit number is that? Do you have
9 the Jones paper in front of you? Why don't
10 you grab it.
11    A.    I have already screwed that up.
12    Q.    So I want to ask you about
13 Table 9. Mr. Ryan just showed you Table 9,
14 and there is a regression, some individual
15 firm regressions on page 62.
16    A.    Yes, I see that.
17    Q.    So I don't -- I mean, it is a
18 complicated table. But is it -- for each
19 individual stock that is being studied, are
20 the options and the equity and all these
21 other variables, in other words, does this
22 regression include both stock options and
23 other securities other than the stock
24 itself in the regression so that it is
25 capturing effects to more than just the

Page 383

WERNER

2 stock but effects to option prices as well?
3    MR. RYAN: Objection to form.
4    A.    Right. So it incorporates all
5 these additional variables, and to the
6 extent that these things might be
7 correlated, it can -- it is certainly going
8 to affect the statistical significance as
9 well as the actual returns calculated here.
10    Q.    All right. So if a financial
11 economist wanted to do a regression
12 analysis just to see how the restrictions,
13 the PCO restrictions, affected these stock
14 prices, these nine stock prices, they would
15 not include all of this data about options
16 volume and bid/ask spreads, they would just
17 focus on the stock and they would have
18 different results than this regression; is
19 that right?
20    MR. RYAN: Objection, leading.
21    A.    I believe the initial step one
22 would take -- would be a univariate
23 analysis as you described it, so just
24 looking at the S1.
25    Q.    But is there any reason to

Page 384

WERNER

2 believe that the results would be identical
3 to the results here if you eliminated these
4 variables that are irrelevant to the
5 question at hand, which would be how the
6 equity -- how the stock prices changed upon
7 the implementation of the restrictions on
8 January 28th?
9    MR. RYAN: Objection to form.
10    A.    Could you reread the question,
11 please?
12    (The record was read.)
13    A.    There is no reason to believe
14 that they would be identical.
15    MR. ROSEN: Okay. I have no
16 further questions.
17    You can redirect on those three
18 issues if you would like.
19    MR. RYAN: That's fine. I have
20 no questions.
21    MR. ROSEN: All right, thank
22 you.
23    THE VIDEOGRAPHER: This will
24 end media unit eight and conclude the
25 deposition of Dr. Adam Werner. We are

Page 385

WERNER

2 going off the record at 6:52, 5-3-23.
3
4    [TIME NOTED: 6:52 p.m.]
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

97 (Pages 382 - 385)

Page 386

1  IN RE JANUARY 2021 SHORT SQUEEZE
     TRADING LITIGATION
2  5/3/2023 - ADAM WERNER, Ph.D.
3       ACKNOWLEDGEMENT OF DEPONENT
4    I, ADAM WERNER, Ph.D., do hereby declare
5  that I have read the foregoing transcript,
6  I have made any corrections, additions, or
7  changes I deemed necessary as noted on the
8  Errata to be appended hereto, and that the
9  same is a true, correct and complete
10  transcript of the testimony given by me.
11
12  _____  _____
13  ADAM WERNER, Ph.D.        Date
14  *If notary is required
15
16       SUBSCRIBED AND SWORN TO BEFORE ME THIS
17  _____ DAY OF _____, 20___.
18
19
20  _____
21  NOTARY PUBLIC
22
23
24
25

Page 387

1
2       I N D E X
3
   WITNESS    EXAMINATION BY       PAGE
4
   WERNER       RYAN            5
5       ROSEN         378
6
       E X H I B I T S
7
   DEFENDANT'S  DESCRIPTION       PAGE
8  Exhibit 281 Declaration of Dr. Adam  22
           Werner
9  Exhibit 282 Rebuttal Report of       22
           Dr. Adam Werner
10  Exhibit 283 Deposition of Dr. Adam  89
           Werner dated 4/24/14
11  Exhibit 284 Declaration of Dr. Adam  161
           Werner
12  Exhibit 285 Paper by Ferrillo    210
     Exhibit 286 Printout from Factiva  242
13  Exhibit 287 Printout from Factiva  312
     Exhibit 288 Analysis in Response to  327
14       Werner Rebuttal Report
           Table 7
15  Exhibit 289 Staff Report on Equity  358
           and Options Market
16       Structure Conditions in
           Early 2021
17  Exhibit 290 Paper by Jones    371
18
   DIRECTIONS NOT TO ANSWER
19
     Page    Line
20    (NONE)
21
22
   REQUESTS
23
     Page    Line
24    (NONE)
25

Page 388

1
2       CERTIFICATION
3
4    I,  TODD DeSIMONE, a Notary Public for
5  and within the State of New York, do hereby
6  certify:
7    That the witness whose testimony as
8  herein set forth, was duly sworn by me; and
9  that the within transcript is a true record
10  of the testimony given by said witness.
11    I further certify that I am not related
12  to any of the parties to this action by
13  blood or marriage, and that I am in no way
14  interested in the outcome of this matter.
15    IN WITNESS WHEREOF, I have hereunto set
16  my hand this 3rd day of May, 2023.
17
18  _____
19
20       TODD DESIMONE
21       *   *   *
22
23
24
25

Page 389

1  IN RE JANUARY 2021 SHORT SQUEEZE
     TRADING LITIGATION
2  5/3/2023 - ADAM WERNER, Ph.D.
3       E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  ADAM WERNER, Ph.D.        Date
25

98 (Pages 386 - 389)

**[& - 1c]**

| & | | | |
|---|---|---|---|
| **&** 1:15 2:8 3:22 4:15 41:16 126:14 197:25 199:18 200:9 313:10,15,23 316:7 373:24 | **103** 125:18<br>**109** 213:22<br>**1099** 7:14,16,21 9:4 10:21 254:7,7<br>**10:46** 35:11<br>**10:50** 35:14<br>**11** 137:14,16 140:21<br>**112** 212:12<br>**115** 282:3 283:10 284:21 286:16,21,22 287:13 381:5<br>**117** 212:11 213:2,4 216:3<br>**118** 244:8 245:19<br>**118.43** 110:5<br>**119** 210:23,24 211:7,13,16 212:23 213:6 213:20 215:19<br>**11:41** 76:25<br>**11:49** 77:4<br>**12** 39:7,9,13,13 40:10 55:16 60:5 125:11,14 352:25 356:3<br>**120** 214:21 215:7 216:22 217:8 235:6 237:3<br>**121** 211:17 212:23 213:6 | 215:19 237:4<br>**122** 90:23 91:18 92:19 93:23<br>**123** 93:24 94:14,20<br>**124** 89:16,18,18 89:20 96:3 98:15,19<br>**125** 89:20 90:24 98:20 108:21,25<br>**12:56** 136:9,10<br>**12th** 91:22 93:2 115:25<br>**13** 92:20 333:24<br>**131** 108:19<br>**132** 108:4,5,17 108:25<br>**138.05** 109:7<br>**13th** 93:9,10<br>**14** 212:16,16 332:8,11 333:4 333:13,15<br>**143** 242:19<br>**149** 259:22 260:2 261:10<br>**14th** 358:8 359:6<br>**15** 218:21 353:5 374:10 375:2<br>**150** 252:17,22 | **156** 109:22,25 110:2<br>**16** 5:14<br>**161** 387:11<br>**16th** 22:20 162:3<br>**17** 42:18,25 43:2 94:14,21<br>**172** 109:14<br>**176** 179:18 185:16 196:2<br>**176.03** 109:18<br>**18** 84:10 92:20<br>**19** 96:11 98:15 98:19<br>**1978** 362:7<br>**1989** 170:14<br>**1993** 19:22<br>**19th** 91:21 92:25 369:8<br>**1:21** 1:4<br>**1:38** 137:3,6<br>**1a** 180:5,9 181:5 184:3,15 184:23 199:7 200:3 201:2<br>**1b** 180:6 185:15 186:4 186:16 187:15 199:7 200:3 201:2<br>**1c** 180:6 195:24 196:3,10 197:5 197:16 199:7 200:3 |
| **0** | | | |
| **0.71** 331:9,12 | | | |
| **1** | | | |
| **1** 13:16,20 25:19 31:8 41:5,12 44:18 44:20 57:21 122:2 159:23 180:17 181:5 186:3,16 196:10,18 201:2 350:25 352:2 374:12 375:25<br>**1,000** 294:20,23 295:12<br>**10** 53:14 65:8,9 246:8 298:5 325:17 353:5 375:24<br>**100** 39:21 110:14,23 276:16<br>**10016** 2:4<br>**10019** 2:9<br>**102** 39:12 212:7,12,13 | | | |

**[2 - 282]**

| 2 | | | |
|---|---|---|---|
| **2**  7:21 31:8 | 55:7 60:3 | **21st**  317:9 | 122:12 123:23 |
| 32:3,7,15,21 | 109:6,17 110:4 | **22**  42:11 98:21 | 124:3,20 128:8 |
| 46:18 47:12 | 110:10 112:16 | 256:3 321:13 | 128:18,25 |
| 53:14 159:24 | 113:9 115:10 | 387:8,9 | 129:8,11,13,22 |
| 211:8 328:8 | 116:8,16 | **23**  98:21 | 130:8,13,23 |
| 329:12 331:17 | 117:21 119:18 | 137:14,16 | 132:3,6 134:4 |
| 375:5 | 121:23 122:5 | 139:15 141:12 | 134:13 135:15 |
| **2's**  33:2,13 | 122:12 123:24 | 255:13,16 | 317:9 320:13 |
| **20**  51:23 | 124:4 125:6 | 256:3,4 | 382:2,3 |
| 142:11 213:11 | 126:7,13 | **242**  387:12 | **28**  143:20 |
| 219:10 225:12 | 127:19 128:8 | **24th**  89:9,13 | 153:22 156:3 |
| 246:13 353:6 | 128:19,25 | 315:9,24 | 202:7 368:17 |
| 386:17 | 129:8,13,22 | 370:18 371:7 | 379:2 |
| **2004**  190:14 | 132:4,7 134:4 | **25**  21:2 51:21 | **281**  21:20,20 |
| 203:13 204:4 | 134:13 135:15 | 68:16 89:17,20 | 22:8,12,15 |
| 212:2 222:23 | 186:11 227:25 | 142:11 | 23:3 25:17 |
| 226:13 227:6 | 228:9 315:9 | **253**  117:14,14 | 31:9 32:2,9 |
| **2012**  91:22 | 317:9 320:13 | **26**  121:2,6 | 40:25 41:4 |
| 93:2,9 196:12 | 325:16 358:7,8 | 122:18 198:24 | 44:17 46:19 |
| **2013**  93:10 | 359:5,6 369:8 | 200:15 | 55:12 61:13 |
| **2014**  71:2 | 386:1 387:16 | **26th**  97:23,25 | 107:24 121:3 |
| 89:10 196:13 | 389:1 | **27**  122:18 | 122:2 137:13 |
| 196:21 197:3 | **2022**  162:4 | 132:20,25 | 201:22 202:22 |
| **2015**  9:11,24,25 | 166:15 171:5 | 325:15 | 243:3 255:3,7 |
| **2016**  186:10 | **2023**  1:9 8:18 | **275**  2:3 | 325:5 387:8 |
| **2019**  181:13 | 22:20 23:5,12 | **27th**  42:3 43:7 | **282**  21:20,22 |
| **2020**  115:25 | 177:17 179:21 | 45:4 54:15,21 | 22:10,13 23:10 |
| 122:4 245:15 | 388:16 | 55:6 60:3 98:3 | 32:14,22 36:9 |
| 245:20 370:18 | **21**  3:21 40:15 | 109:6,17 110:4 | 42:19 55:13 |
| 371:7 | 65:8,20 316:25 | 110:10 112:16 | 66:24 73:23,23 |
| **2021**  1:6 3:18 | 322:14 330:13 | 113:9 115:10 | 257:25 281:23 |
| 39:16 42:4,16 | 330:17 333:20 | 116:8,16 | 286:20 316:13 |
| 42:21 43:6,7 | 333:24 | 117:21 118:22 | 358:21 372:5 |
| 45:4 54:21 | **210**  387:12 | 119:18 120:10 | 387:9 |
| | | 121:22 122:5 | |

**[283 - 67]**

**283** 89:6,11
387:10
**284** 161:22
162:2,10
202:21 387:11
**285** 210:18,20
211:3 235:5
387:12
**286** 242:5,9
243:12,25
245:19 387:12
**287** 312:25
313:8 314:6
387:13
**288** 327:4,6,8
327:11,20
328:8 329:12
331:17 332:5
333:4,12
387:13
**289** 358:5,9,14
359:9,14 365:4
368:17 387:15
**28th** 23:12
39:16 122:4
125:6 126:7,13
127:19 129:12
129:19 179:20
245:15,20
374:16 384:8
**290** 371:12,15
372:10 387:17
**2989** 1:4 3:21
**2:24** 179:10

**2:29** 179:13
251:2

**3**

**3** 1:9 41:6,9
44:18,20 332:5
333:3,8,12
**30** 162:23,24
163:3,4 172:23
298:6 358:20
358:23 359:14
360:11 365:4
**31** 201:22
202:4 203:5,6
358:24,25
359:2
**312** 387:13
**316** 314:5
**327** 387:13
**34** 140:20
325:7,10
**35** 66:24 69:24
69:25 140:20
**358** 387:15
**36** 73:25
**360** 253:10
**37** 74:9
**371** 387:17
**378** 387:5
**38** 372:11,22
373:8
**3879** 388:18
**39** 54:10
**3:51** 251:11
**3rd** 8:9 177:17
388:16

**4**

**4** 61:14,16
89:20 98:20
236:6,9
**4/24/14** 387:10
**40th** 2:4
**41** 162:10,11
258:2,3
**44** 39:8 125:15
243:5
**45** 125:20
126:24 127:8
**46** 243:5
317:10
**47** 317:10
**4:00** 128:13,19
129:7
**4:02** 251:14
**4th** 8:8 43:6

**5**

**5** 46:18 96:3
184:18 216:22
318:25 375:24
387:4
**5-3-23** 3:4
385:2
**5/3/2023** 386:2
389:2
**50** 13:18
247:19 296:17
330:18 359:3
**50/50** 10:9
**500** 252:17
**51** 282:2
286:19 334:23

**52** 255:15
256:23 319:11
321:13,18
**53** 199:4
200:15
**5:03** 312:23
**5:09** 313:4
**5:48** 348:12
**5th** 369:8

**6**

**6** 185:20,23
186:7,18 187:6
187:18 188:20
189:19 199:15
218:14 219:5,8
219:14,17,19
220:2,7,11,21
222:5,15
261:16 262:3
369:5
**60** 373:13
**61** 373:3
375:21 376:24
376:25
**62** 121:2,4
373:5,12
375:10 376:8
377:5 382:15
**63** 123:18
135:24
**64** 256:24
257:2
**65** 10:13
**67** 143:19,21

**[68 - academic]**

**68** 153:11
379:2,3
**6:07** 348:15
**6:52** 385:2,4
**6a** 36:12,14,23
38:23
**6i** 36:13,14,23
38:23

**7**

**7** 40:14,16,21
42:11,12 236:3
236:9 258:7
316:25 319:18
322:14 324:11
326:10 327:17
327:22 330:11
330:18 334:24
335:7,16
387:14
**700** 294:15,22
295:11
**71** 132:20
133:5 372:3
**74** 203:5,6,8
**75** 163:2,7
**76** 163:2,7
261:12
**77** 162:18,19
171:4,22
172:17,21,22
173:12
**78** 368:24
370:11,13
**7a** 107:6 108:7
108:17,20

**7d** 109:23
**7f** 109:14
**7th** 381:21,25

**8**

**8** 61:15,19 62:5
62:11,22 63:4
94:14,20
174:20 175:2
185:19,24
186:7,18 187:6
187:18 188:19
189:19 199:14
218:14,20,23
218:25 219:5,8
219:13,20
220:2,5,7,11,20
222:5,15
**82** 66:23 69:16
69:20 70:4,17
71:11 72:6
**825** 1:15 2:9
3:23
**84** 73:25
**86** 74:8
**89** 74:10,24
170:8 387:10

**9**

**9** 53:14 325:6,8
325:13 373:2
375:10,22
377:18,22
382:13,13
**90** 276:16

**93** 53:8
**95** 184:20
197:22 330:21
**96** 36:16 54:10
199:10,25
200:14,20
257:21 258:5
261:7,8 262:8
**9:54** 127:3,11

**a**

**a.m.** 1:9 3:4
126:6,13 127:3
127:11,18
**aaron** 314:10
314:19 316:6
**abandon**
232:24
**abandoned**
232:23
**ability** 105:25
195:19 289:6
**able** 34:23
46:23 47:13
96:4 120:7
147:12 170:2
208:17 209:14
210:6 214:14
214:16 276:8
296:24 302:12
304:14 307:8
331:20 337:13
339:20 340:19
346:8 347:12
352:15 353:22
370:18 371:5

**abnormal**
109:12 111:2,6
111:9,17,19,20
111:25 115:25
123:21 124:4
145:8,9 293:12
293:13,15,17
293:19,23
**above** 362:2
363:9 364:3
369:6
**absence** 131:15
148:20,22
249:24
**absent** 282:9
283:15 284:4
285:13 287:17
288:12 290:20
381:15
**absolutely**
143:5 169:21
179:5 187:10
250:9 312:12
350:9 366:24
**abstract** 372:9
**absurd** 284:14
**academia**
103:6 138:8,18
139:6
**academic** 18:17
18:21 19:3
33:17,24 34:16
49:16 72:24
73:8 78:7
102:9,11

132:21 133:6
168:2,5,6
169:6,8,18
209:21,23
216:11,13
257:18 291:17
342:23 343:23
361:23 363:3,6
363:24
**academically**
66:16 331:21
**academicians**
141:22
**academics**
140:12 142:2
**accept** 137:21
139:20 141:4
141:14 192:8
**acceptable**
194:6
**acceptance**
175:6
**accepted** 103:2
103:6 122:24
190:11,12,21
191:20 192:24
193:6,10
208:11
**accepting**
192:10,19
**accepts** 195:12
**accident**
246:14
**accompanied**
37:17

**account** 174:25
189:11,11
219:3,3 258:14
261:18 349:22
350:19 353:22
354:13 357:3
357:12
**accounting**
227:7
**accumulated**
370:20 371:6
**accurate** 7:5
9:15 15:2
77:14 84:6
94:18 120:6,23
121:25 128:4
133:21 141:20
142:3 143:17
146:15 181:10
186:24 192:3
200:22 210:10
210:13 220:4
244:6 266:13
268:22 295:7
301:10 302:24
307:13 330:9
**accurately**
93:20 99:14
286:12 302:19
303:11
**acknowledge...**
386:3
**act** 53:14
336:11 337:4
337:21 338:10

**action** 4:6,20
13:23,24 14:3
14:5,20,23
15:4,13,16
22:17 23:5,12
24:18 68:4
71:5,8,15 72:9
77:12 78:2,16
78:22 141:25
277:5 278:20
279:2,13 280:7
293:24 388:12
**actions** 15:8
61:10 103:25
122:22 123:4
123:11 124:12
124:22,25
125:4 130:3,14
130:21 167:3
167:18,24
168:15 169:12
173:15 287:24
350:8
**actual** 50:13
185:11 276:12
293:21 367:5
367:20,22
383:9
**actuality**
267:12
**actualization**
314:12 316:7
**actually** 6:13
7:25 35:4
37:24 38:5

57:24 66:22
156:20 183:6
207:16 248:19
253:23 267:10
276:23 316:5
355:8 367:14
367:21 368:13
**adam** 1:12 3:16
5:12,16 21:21
21:22 89:7
162:3 384:25
386:2,4,13
387:8,9,10,11
389:2,24
**add** 342:15
**adding** 51:18
**addition** 32:17
32:20
**additional**
24:19,21 25:4
25:8,13 43:16
43:21 44:3,10
48:2,5,6 57:15
95:23 282:17
282:23 283:20
330:5 368:14
383:5
**additionally**
199:12
**additions** 386:6
**address** 332:25
**adjunct** 21:4
**adjust** 350:8
**adjusted**
110:18

**adjustment**
  287:22
**adjustments**
  288:2,5
**administer**  4:4
**admission**
  327:6
**admits**  67:3
**adopt**  142:12
  206:22
**adopted**  175:17
  204:9 205:2,11
  205:13
**advised**  227:11
**affect**  34:9 49:3
  50:10 59:13
  63:18 87:25
  135:7 224:2
  240:9 349:23
  354:22 355:2
  367:2 383:8
**affected**  25:24
  25:24 26:5,23
  27:18 36:25
  39:15 41:13,25
  44:23 67:6,8
  123:19,22
  126:19,20
  155:22 156:9
  237:7,13,24
  238:18 255:24
  287:3 292:13
  310:13,18,25
  366:24 367:7
  379:22 380:5

  383:13
**affecting**  62:17
**affects**  35:24
  63:13 275:8
**affiliate**  10:22
**affiliated**  7:3
  9:4,10 11:9
  53:7,18 253:13
  254:3 282:16
  282:21 283:5
**affiliation**
  10:25
**affiliations**
  4:12
**afield**  268:16
**aftermarket**
  128:24 129:6
**afternoon**
  137:10,11
**agarwal**  252:3
**aggregate**
  47:21,23 48:8
  48:10 277:6
**aggregating**
  379:14
**agitated**  311:11
**ago**  21:3 51:23
  59:17 81:14
  89:14 91:5
  99:12 100:15
  104:11 105:11
  105:16 106:3
  117:17 162:15
  166:15 196:22
  216:17 218:22

  219:10 225:12
  231:13 323:10
**agree**  3:13
  62:18 65:10
  66:8 68:22
  69:7 75:25
  76:11 82:22
  83:24 84:12
  86:11,23 92:21
  93:25 100:9,14
  105:10 110:7
  111:5 112:3
  119:6 127:15
  131:13 135:14
  138:5,18 139:6
  140:2 141:3,13
  142:4,17
  143:11 149:24
  150:4,21
  153:24 158:17
  187:2 213:18
  213:23 214:5
  215:4,10,13
  217:9,16,18
  219:19 222:17
  223:11 224:6
  224:23 225:11
  232:5 235:17
  236:18 237:8
  240:12 244:22
  245:25 246:6
  246:23 247:11
  248:8 250:16
  250:20,20
  262:6,14,22

  265:21 266:10
  267:21 270:11
  271:2,5 273:4
  275:3,3,11
  276:15 279:8
  283:22 285:10
  287:20 288:4
  290:17 292:11
  293:11 295:6
  295:22 297:8
  299:3,13 300:5
  301:3,14 302:8
  305:20 306:18
  320:20,25
  336:8,19,22,25
  337:13 338:7
  338:22 339:4
  339:15,21
  340:9,12
  342:16 344:2
  344:10,24
  345:11 346:9
  346:12,17
  347:13 350:12
  355:21 357:7
  359:20 360:2
  360:14 363:4
  363:23 364:19
**agreed**  273:20
  336:11 337:4
  337:21 338:10
**ah**  339:15
**ahead**  37:7
  59:8,24 69:25
  83:11 86:10

[ahead - answer]

88:11 89:14
152:23 165:3
213:4 215:20
232:9 281:25
303:8 315:3
333:10 345:20
346:14 347:10
374:21
**akin** 124:12
**aktas** 133:12
134:6 135:22
**al** 140:22
203:12 207:2
207:12,22
208:21 211:3
214:22 222:21
223:15 224:24
225:15 226:7
235:4 236:2,25
238:6,14
239:10,16
240:14 371:23
372:6,23 373:9
375:7,12 376:8
377:16,21
**alex** 251:24,25
**alleged** 61:9
282:9 283:15
284:4 285:14
287:17 288:12
290:21 353:14
354:20 381:15
**allen** 265:23
268:7,8

**allow** 106:25
106:25 335:17
**allowed** 216:6
309:25
**allows** 299:11
**alluded** 18:17
198:18
**alter** 76:13
**altered** 312:2
**amc** 41:15
108:10 109:7
110:8 113:11
115:9,11
126:14 199:18
200:9 300:16
373:15,21
**amend** 23:16
**ameritrade**
375:5
**amicus** 206:11
**amount** 296:4
**analogous**
123:7
**analyses** 43:21
44:4,10 61:19
61:22 67:5
140:9 256:20
282:18,24
283:20 298:21
298:21 306:6
**analysis** 24:19
24:22 27:16,24
28:4,4 31:19
40:19,23 43:5
43:16 63:11

93:12 122:19
124:18,18
129:21 137:19
138:3,20 139:8
139:17 144:20
147:10 156:16
205:10,10
208:11 223:2
233:6 241:25
248:5 249:24
277:11 292:20
298:4 301:23
318:7 322:15
322:23 326:24
327:16 328:4
328:15,19,20
329:18 330:4
335:8 338:2
348:22 349:2
349:21 350:13
351:5 352:11
354:8,12
365:13 368:12
368:15 383:12
383:23 387:13
**analyst** 140:18
236:8 338:17
**analyze** 27:18
29:3,11 30:3
294:6
**analyzed** 31:13
94:2 95:6
317:15,18
**analyzing**
27:17 91:20

**andre** 266:11
**announcement**
123:23 148:9
**announcements**
148:6,8 173:8
173:9 174:17
176:4,23
177:10,18
180:20 181:4
182:8 218:4
222:20 223:14
236:17 237:18
**answer** 10:20
15:6 17:2
21:13,14 30:18
39:5 46:8
48:20 69:4
74:20,24 76:10
79:7 81:8,9,13
81:16,18,24
91:8,14 92:17
93:13,19 94:8
95:17,19 96:10
96:11 97:15
98:5,14,18
99:14,22
100:21,22
105:24 106:24
115:17 116:25
118:10 119:22
128:4,6 131:22
134:9 147:12
153:8 157:18
157:22,23
160:11,13

167:14 172:2
175:22 188:9
195:17 207:16
208:17,18,25
209:7,8,13,18
209:23 210:2,6
210:10 214:14
214:16 215:25
220:13,15
231:13 238:21
249:8 256:16
256:18 260:16
260:19,19
265:7 272:15
273:24 276:7,9
285:21 286:5
286:12 291:13
300:2 302:12
302:19 303:11
304:14,17
305:3,6,16
307:8,19
309:20 310:2,6
311:15,18,21
337:12 340:5
340:19 343:14
343:20 345:3
346:7,12 348:5
363:17 364:6
387:18
**answered**
  21:12 150:18
  195:18 270:9
  289:5 300:10
  300:22 309:14

311:3 320:8
**answering**
  248:24 307:11
  308:3 312:14
  363:20
**answers**  59:17
  118:14 130:6,7
  231:13 307:13
**ante**  158:5,15
  159:13 160:22
  163:23 173:4
**anticipate**
  255:5
**anticipated**
  315:5
**antony**  2:10
  4:14
**anybody**  25:7
  223:9
**anymore**
  107:20
**anyway**  91:7
**apart**  24:16
  74:5
**apologize**  188:7
  257:2 261:11
  311:13 333:7
  373:14 381:7
**apparent**
  229:19 336:8
  336:25 337:18
  338:7,14,15,15
**apparently**
  214:11 259:24

**appear**  364:14
  376:20
**appearance**
  4:10
**appearances**
  4:11
**appearing**  6:3
  18:20 325:18
**appears**  23:9
  23:13 40:15
  41:5 46:18
  59:4 171:11
  183:8 230:20
  244:18 291:8
  315:6,20,22
  325:6 334:13
  336:9 337:2,19
  338:8 342:12
**appended**
  386:8
**appendix**
  242:22
**apple**  34:14
**application**
  159:5 196:4
**applied**  85:25
  163:13 171:25
  172:16 173:11
  174:3 176:3
**applies**  46:25
  180:9 185:18
  291:6
**apply**  77:12,15
  79:13 80:8,13
  80:25 81:3,10

82:7,19 85:13
  86:4 105:19
  111:24 165:6
  215:12 314:4
**applying**  101:9
  102:2,7,16,17
  102:19 103:4,7
  103:16,17,18
**appreciate**
  60:25
**approach**
  188:13 191:2
  191:21,21
  192:2,7,11,20
  193:11,12
  194:6 219:8
  233:3
**approached**
  79:10 80:4
**appropriate**
  157:25 158:2
  158:11 159:11
  160:19 164:3,7
  167:12 177:3,5
  177:12,22
  233:7 282:8
  283:14 284:3
  285:13 287:16
  288:11 290:20
  381:14,22
  382:5
**approval**  178:9
**approximately**
  8:17 11:24

**approximation**
252:16
**april** 8:8,9 89:9
89:13
**arbitrage**
278:17
**area** 6:6 276:24
**argue** 114:18
**arguing** 265:12
**arrive** 175:12
176:18 236:23
241:25
**arrived** 232:17
319:24 336:2
**article** 19:11,19
74:10 133:9
135:22,25
136:3 168:10
168:17,20
170:9,15
203:16,20
204:17 205:17
205:21,24
213:12,12,15
214:10,12
223:22 226:7
235:4 241:18
241:19,22
243:23 244:11
244:24 245:13
245:18 246:2
247:23 257:4
313:18,18
314:9,9,15
315:6,23

371:11
**articles** 18:12
33:17,20,22,25
34:17 35:23
36:4 48:23
72:24 132:21
133:6 169:22
170:18,20
225:2 228:7
229:16 231:17
232:22 233:21
234:24 242:24
243:16,22
244:24 246:4
246:13,19,24
247:7,8,12,20
248:9 250:4,16
253:16 254:2
291:17 295:23
295:25 296:6,8
296:17,19,22
316:5 325:17
**artificially**
258:16 261:19
**aryan** 2:11
**aside** 201:18
316:11
**asked** 15:9 24:5
25:6,11 26:3
26:13 28:5,14
28:15,15 30:7
30:11 37:15
49:25 51:2
57:2,12 58:9
58:10 60:9,13

60:21 77:18
81:20 94:15
112:10 140:9
150:19,19,20
160:5 167:14
213:7 260:14
260:15,17
266:21 277:2
281:15 299:2
309:4,10 310:8
311:4,7 342:4
349:18 351:3
351:13 352:8
352:13 355:5,6
355:8 357:5
379:6
**asking** 18:22
19:4 28:18
29:14,16,18
51:15 60:16
69:9 71:24
72:4 79:4,24
88:11 92:5,11
93:22,25 94:6
94:10,11 95:9
101:16 104:12
104:13,14
113:18 116:13
117:18 118:25
119:3 120:12
143:6 152:7
157:10 158:9
158:24,25
169:7,17
172:12 209:16

210:16 213:17
216:9 239:14
260:11 263:16
271:23 273:10
279:8 284:20
289:2,21
299:22 300:17
303:20,22
306:20 309:23
310:3 311:19
323:6 329:7
336:18,23
350:7,11
361:12 367:15
368:3 369:22
377:9
**asks** 92:21 96:3
**aspect** 226:6
**assertion** 152:8
298:17
**assessing** 221:8
**asset** 74:4,18
**asset's** 67:13,15
**assets** 52:6
**assign** 223:24
224:11,15
**assignment**
26:13,17 27:25
28:7 30:16,22
30:25 31:4,6
31:20 79:10
80:5
**assistance**
46:22 47:7,8

[assistant - based]

**assistant** 6:10
6:20 19:22
20:18,20,24
**associated**
98:11
**association**
8:25
**assume** 22:2
24:11 29:4
99:16 177:13
205:20 227:2
275:10 289:21
290:4,10
353:25 357:18
368:4 375:17
**assumes** 118:11
**assuming** 14:17
221:12 273:18
357:14
**assumption**
217:22 253:7
275:21
**assumptions**
48:2,5,7
285:18 357:16
**asterisk** 375:20
**asterisks**
375:19,23
**attachments**
31:25
**attempt** 79:13
80:7,25 81:3
81:10 82:6
85:12 154:8
289:8,10

**attempted**
155:6
**attorney** 4:13
**attorneys** 2:5
2:10
**attributable**
61:9
**attribute**
287:23
**audio** 3:11,11
**audit** 369:20
371:4
**author** 253:9
**authored**
133:11 254:2
**authority**
203:20 204:18
257:7 265:24
266:11
**authorized** 4:4
**authors** 133:16
134:7 170:23
190:13,18
191:8 203:24
214:19 215:4
216:22 217:10
223:4,22
224:24 371:14
372:10 375:3
**available** 65:22
82:24 84:2
180:18 186:5
216:25
**avenue** 1:15 2:3
2:9 3:23

**average** 40:5
236:15 356:7
369:13
**avoiding** 308:3
312:14
**aware** 127:22
195:12 227:23
247:6 277:20
294:25 342:22

**b**

**b** 53:14 54:9,12
243:4 387:6
**back** 5:14
17:18 35:13
36:11 41:3
44:16 48:21
55:16 61:12
68:22 69:18
73:22 77:3
81:19 103:12
127:14 133:4
137:5 169:14
179:12,25
204:4,15 227:6
237:15 250:25
251:13 255:2
266:14 281:19
282:21 285:24
286:17 302:6
312:18 313:3
322:13 325:3
342:3 348:14
375:10
**background**
5:18

**backup** 37:16
242:7
**backwards**
377:6
**bad** 37:7 77:18
245:16
**baked** 322:22
**bancorp** 15:6
**bank** 6:11,20
19:20
**barber** 140:21
**barely** 92:14
**based** 46:6,14
50:12 51:12,16
51:19 53:7,12
55:5 58:20
60:2 68:5
70:23 72:20,20
77:9,21 96:5
101:22,23,23
103:22 120:9
133:20 135:17
138:16 169:5
175:6 178:12
183:7,21 197:2
230:4,13,16,18
233:9 240:5
247:16 248:3
248:17 249:23
274:24 284:18
291:18 292:7
298:3 301:20
304:23 305:2
310:21 317:6
318:7 320:15

**[based - believed]**                                Page 11

323:15 334:10
334:20,24
335:11,24
336:3 341:8
342:9 345:6
348:22
**bases**  15:20
**basically**  52:5
117:14 144:13
164:24 189:17
219:20
**basis**  74:19
78:8 109:11,20
166:23 168:25
181:2 187:22
189:4 194:4
200:17 237:6
237:12,22
238:17 239:4
240:21
**batavia**  244:11
**bath**  41:16
126:14 197:25
199:18 200:9
313:10,15,23
316:7 373:24
**bear**  281:20
283:2
**bed**  41:16
126:14 197:25
199:18 200:9
313:10,15,22
316:7 373:24
**began**  10:25
125:6 232:20

232:21 234:21
**beginning**  4:12
8:12,13 53:17
96:3 98:15
124:11,22
163:8 211:24
212:15 217:8
219:14 237:2
333:23 359:3
**begins**  96:11
108:20 156:2
212:6 228:9
235:8 359:16
370:17 373:3
**begun**  233:20
355:10
**behalf**  4:20
13:6 14:14,22
15:12,15
**behave**  335:2
335:19
**behavior**
362:12
**beholder**  222:8
**belief**  134:19
194:4 348:20
366:16
**believe**  5:22 8:8
10:17 12:22
13:17,22 15:6
15:24 16:7,10
17:2,20 18:2
19:13,13,17
23:6 25:10
26:11 27:2

31:17,23 33:14
34:2 37:14
38:24 40:12
43:22 44:15
45:15 46:8,15
47:19 49:4,17
50:14,20,22,25
51:6,7 52:14
52:15 59:3,14
59:17 60:6
62:15 66:13
72:13,15 75:10
78:17,17 81:11
82:15,20 84:5
84:23 85:4,8
88:17 91:5
100:16,17
103:20,21
104:4 113:12
123:13 124:16
125:7 126:20
128:22 154:18
159:9 160:18
171:20 174:6
176:22 177:17
178:21 179:23
183:24 185:7
190:14 192:14
192:15 193:17
194:11,15
196:21 198:14
206:25 207:4
207:10,21
210:9,19 211:5
212:5 234:5,25

236:21 238:12
239:6,10,16,17
243:15 252:3
257:9 263:12
263:18 264:17
264:22 265:4
266:3,13,18
268:2,5,6
269:3 270:3
271:8 275:17
275:22 276:17
278:10,10,11
280:24,25
285:16 287:14
299:9 301:21
305:13,20,21
313:21 316:10
320:15 322:19
324:6,9,25
327:14 331:14
335:22 336:3
338:24 341:14
346:11 348:25
358:2,17
361:21 366:9
368:15 369:21
371:25 372:24
379:9 383:21
384:2,13
**believed**  45:21
104:23 164:2
177:5,11
191:19 218:24
223:9 288:20
300:10 338:18

[believes - burger]                                                    Page 12

believes   221:14
  221:22 271:9
  272:22
benchmark
  222:14
beneath   125:19
benefit   233:6
berkeley   7:8,15
best   74:22
  99:22 105:25
  106:23 128:21
  188:5 193:16
  194:14 195:18
  195:22 201:15
  207:15 209:13
  222:9 273:24
  289:6 297:17
  332:18 337:11
bettencourt
  252:4
better   27:13
  28:23 74:18
  77:16,17
  105:15 113:4
  174:7 209:23
  222:4 233:14
  320:24 323:5
  354:5
beyond   12:24
  23:25 41:16
  59:6 63:2
  126:15 141:21
  153:8 190:11
  197:25 199:18
  200:9 248:16

313:10,15,19
  313:23 316:8
  373:24
bias   246:15
bid   383:16
big   202:25
bigger   242:12
biggest   226:23
binary   271:24
binder   242:12
binomial
  316:18 317:4
  318:13 319:17
  319:18 324:18
  326:10 327:22
  329:21 330:20
  331:11,16
  334:15 335:11
  335:12,16,24
bit   180:16
bites   286:13
blackberries
  246:20,24
  247:24
blackberry
  39:21 41:16
  126:14 242:19
  244:20,25
  246:3,4 247:2
  247:20,21
  323:8
blackberry's
  245:3
blood   388:13

blowing   262:19
  262:21
board   19:16
bolloxed
  197:13
borrow   117:15
  360:24 361:5
  361:13,19
borrowing
  361:16
bother   260:8
bottom   121:6
  153:22 156:2
  212:7 213:20
  237:2 242:18
  359:14 360:10
  370:5,16
  375:22
box   315:17
brad   140:21
bradley   13:21
  14:12
brain   80:22
brattle   7:18
break   35:5,18
  75:20 76:22
  136:6 179:16
  251:4,4 286:5
  311:14 312:13
  312:15,17
  313:7
brealey   265:16
  265:18,22,23
brief   206:11

brings   101:6
broad   52:7,8
  195:13 238:10
  274:12,13
  312:5
broader   50:7
broadly   379:11
brokerage
  374:15 375:4
brokers   350:21
  374:14
brought   9:17
  9:18 14:6,18
  21:24 178:24
bubble   262:15
  262:23 265:4,9
  265:11,14,20
  266:18,22
  267:2 271:14
  271:22 272:5,6
  272:10,14
  353:22 354:2
  354:12,17,21
  354:25 356:19
bubbles   262:19
  262:21 263:2,4
  263:6,9,12,19
  264:18,24
  266:9,15
  271:17 361:25
  363:8 364:3
building
  291:17
burger   313:19

[burst - case]                                                                      Page 13

**burst** 271:15
354:25
**bursting**
353:21 354:11
354:18,21
**bushes** 246:21
246:25
**buy** 346:4
369:6,12
**buying** 336:12
337:4,22
338:11

**c**

**c** 2:2 14:12
**cal** 7:23 8:5,7
8:11,23 10:2
19:25 20:6,11
21:10,15
**calculate** 47:23
48:8 49:25
50:16 53:11
60:9,14,25
145:8 198:10
288:24 348:21
355:8
**calculated**
277:4,14
278:19 280:21
326:4 383:9
**calculates**
197:5,17
318:12
**calculating**
54:23 61:10
280:19 282:13

292:3
**calculation**
46:25 50:24
55:4 186:13
187:22,25
277:12
**calculations**
61:4 185:10,11
200:19,22
**call** 48:15 72:7
77:11,23 78:14
78:22 80:25
84:25 85:6
102:19,25
131:6,9,11
151:19 192:2,6
322:3,6 344:9
373:19
**called** 5:4 32:2
32:15 37:12
40:17 44:24
88:21 124:24
126:20 145:5
145:13,19,21
161:13 162:4
253:19 272:24
**calls** 27:22
102:22,23
131:4 206:19
**cammer** 43:4
138:2,5,11,17
138:19 139:7
139:22 140:3
141:4,7,15,18
141:21 142:5

142:13,19
143:13 159:5
159:10 160:16
176:25 177:20
187:8 320:17
**cans** 264:8,9,10
**capable** 254:22
254:24
**capital** 82:23
83:25
**capitalization**
39:21,22
**capitol** 314:17
315:8
**captioned**
14:10 89:8
**capture** 353:15
**capturing**
382:25
**car** 188:4
**career** 51:5
102:6,14
103:14
**careful** 15:20
15:21 17:17
223:24 224:10
224:18 225:4
225:16
**carrying**
125:19 147:9
147:16
**carryover**
255:15
**case** 1:4 12:11
12:15 13:7,18

14:3,9,10,18
15:14 16:20
17:14,23 20:4
27:3,4,16
28:25 29:12,19
29:25 30:3
44:2,13 49:10
52:24 53:15
58:17,23 73:7
75:3,6,9,15
76:18 78:6
80:25 82:4,6
82:14 88:15,20
88:24 89:2,7
90:5,16,20
91:19,21 92:15
92:22 93:9,21
94:2,2,25 95:6
97:6,20 98:7,9
98:12,25 99:3
99:11,14,24
100:23 101:15
101:17,23
102:2,4,4
103:11,13
104:4,23
106:14,22
107:4,10,11
112:8 116:7,15
123:8 125:2
126:2,5,12,22
127:2,10,17,23
130:16 150:14
154:9,25
156:20 161:12

**[case - change]**                                                      Page 14

| | | | |
|---|---|---|---|
| 161:15 162:4 | 75:7 97:22 | **causes**   76:13 | 284:6 285:18 |
| 163:12,19 | 138:12,14 | **caveat**   16:8 | 292:17 293:7 |
| 164:4,4,5,7,8 | 165:9 172:14 | 17:10 201:18 | 294:10,19 |
| 164:15,16,22 | 181:4 200:24 | **ceo**   174:24 | 297:10 298:22 |
| 165:2 166:22 | 201:6,10 | 189:10 218:24 | 308:15 309:14 |
| 167:7,8,10,12 | 241:20,21 | **certain**   18:9 | 310:2,21 |
| 171:18 172:25 | **cash**   54:4 66:11 | 151:3 182:14 | 313:16 329:8 |
| 173:20 174:11 | 67:16 68:25 | 182:18,20 | 360:21 363:16 |
| 174:14,21 | 76:5,14 79:17 | 219:2 279:21 | 365:8 383:7 |
| 175:7 177:24 | 80:12 81:6 | 279:23 280:6 | **certainty** |
| 179:20 181:22 | 82:10 | **certainly**   11:3 | 280:11,14,21 |
| 188:12 189:4,4 | **cat**   369:10,19 | 19:7 22:21 | 320:21,23 |
| 191:3 195:11 | 370:6,17 | 51:21 52:20 | **certification** |
| 198:13 201:14 | **causal**   288:15 | 55:17 58:16 | 165:9 172:15 |
| 201:14,15 | 288:20 | 63:21 65:13 | 173:15 176:2 |
| 218:22 223:23 | **causality** | 76:17 87:7 | 177:2,21 388:2 |
| 224:17 227:19 | 350:20 | 88:14 95:14 | **certified** |
| 231:3,5,9,15 | **causally**   284:24 | 138:13 139:10 | 193:18 194:16 |
| 234:19 239:4,4 | **causation** | 142:10 154:6 | 194:22 |
| 241:24 273:12 | 60:14,15,22 | 154:17 155:12 | **certify**   388:6,11 |
| 275:12 277:15 | 61:6 355:2,9 | 157:9,20 | **chain**   247:8,13 |
| 277:21 278:19 | **cause**   61:23 | 158:17 168:4 | 248:9 |
| 282:14 283:6 | 62:5,7,8,10,13 | 170:24 171:14 | **challenged** |
| 294:14,20 | 62:20,20,25 | 176:7 181:18 | 122:22 123:4 |
| 310:11,16 | 63:4,5 64:3,6 | 192:14 194:25 | 123:11 |
| 335:14 339:15 | 64:10,12,15,21 | 204:25 205:14 | **chamber** |
| 340:10 341:15 | 76:15 84:16 | 206:12 217:23 | 312:16 |
| 352:23 356:12 | 85:15 130:5 | 228:17 234:17 | **championship** |
| 361:4 363:21 | 169:17 255:21 | 235:21 238:24 | 314:21 |
| 365:11 372:17 | 308:12 309:5 | 240:10 243:19 | **chance**   30:23 |
| 372:22 375:13 | 309:11 310:12 | 247:10 250:8 | 212:23 247:19 |
| 376:5,11 | 310:17 | 254:12,16 | **change**   23:16 |
| 377:20 378:2 | **caused**   298:12 | 257:10 263:5,9 | 31:3 35:23 |
| **cases**   12:2,20 | 353:12 367:12 | 263:15 264:20 | 49:2 50:8 |
| 12:24 13:9 | | 267:25 278:4 | 64:16 84:16 |

[change - class]

85:16 120:8,24
124:19 130:7
166:25 167:21
389:4,7,10,13
389:16,19
**changed** 21:13
81:8,15 102:16
103:15 132:12
166:19 167:15
168:12,23,25
169:4,10
170:12 189:8
204:2 208:6
226:17 298:19
300:13 353:7
355:15 384:6
**changes** 34:8
48:14,14 59:12
62:25 63:17
130:13 144:17
170:21 291:20
294:13 314:20
346:2 365:23
386:7
**characterizati...**
235:2
**charged** 244:11
**charles** 371:13
371:18
**charlotte** 2:12
4:18
**chart** 39:14
331:16
**chartis** 227:7
312:6 380:19

**charts** 36:11
180:5
**check** 9:13
118:15
**checked** 187:24
187:25 259:24
315:17
**chinese** 188:4
**choice** 43:10
122:20 189:23
216:23 218:7
**choices** 217:10
217:19
**choose** 332:23
**chose** 43:23
205:16
**chosen** 214:22
292:22
**chronicle**
244:16 315:11
**chunks** 286:6
**circuit** 138:14
**circumstances**
90:19 98:7,8
98:11 99:24
164:6,14,16
166:22 167:8
177:24
**citation** 203:11
256:22 257:3
**cite** 73:19,22
84:6 132:21
133:6 135:22
135:25 201:20
205:16 280:16

338:20 358:16
359:3 371:23
**cited** 18:18
32:17,20
200:25 206:10
206:12 357:24
359:10
**cites** 269:23
362:6
**citing** 53:18
73:21
**civil** 13:22
**claim** 16:11
**clarification**
38:17 61:2
183:3 307:11
307:16,18
**clarifications**
43:21 307:17
**clarify** 24:22
35:19
**clarifying** 12:8
18:15 19:4
152:21
**class** 4:20,21
13:22,23 14:2
14:5,19,23
15:4,7,13,16
26:6,15,16,25
27:6,6,19,20
28:2 30:10,12
31:16 42:22
43:9,11,18
44:7 46:24
47:2,14 51:9

52:24 53:15
54:22,23 60:8
60:13,21 68:4
71:5,8,14 72:9
77:12 78:2,16
78:22 91:20
92:4,5,8,9,24
92:25 93:8
94:4,17,24
95:4,7,8,12
96:9 97:5,21
97:23 99:2
100:2 103:24
106:16 123:6,7
123:9 141:24
165:8 167:3,17
167:23 168:14
169:12 172:15
173:14,15
176:2 177:2,21
194:22 227:24
228:8 229:4
258:17 261:21
277:5,17
278:20,22
279:2,13 280:7
280:9 282:6,13
283:12,25
284:11 285:9
287:5,8 288:8
289:14,24
290:12 292:12
293:4,24 294:8
295:13,25
296:7,19 297:4

**[class - compared]**

297:24 299:7
299:18 300:9
301:8,19 302:2
302:10 304:16
306:7,17,19
308:14,25
309:13 310:14
310:20 315:25
316:20 319:21
323:17 333:23
334:19 340:23
340:25 341:16
348:21 381:12
**classes** 193:18
194:16
**clause** 284:23
284:25 285:5
**clauses** 288:21
**clear** 12:16
23:2 35:25
107:3 118:20
152:9 165:14
245:17 265:7
290:3 340:10
341:15
**clearly** 214:13
**clepic** 2:13
**cleveland** 6:11
6:21 19:21
**client** 226:20
346:2
**clients** 16:13
70:24 71:4,6
**clip** 242:13

**clock** 368:22
**close** 54:14,20
55:6 60:3
**closed** 37:5
69:19 97:25
224:2 339:16
**closely** 74:3
**closer** 322:3,6
**cma** 1:4 3:21
**code** 38:16,19
39:2 40:10
**coin** 152:10
**coke** 264:5
273:22
**cokes** 273:21
**collateral**
131:11
**colleagues** 4:17
72:23 78:5
168:2 169:6
**collection**
256:9
**collective**
255:22 256:8
256:12,14
325:14 336:4
**collectively**
332:20
**college** 5:21
6:13
**column** 40:16
184:15 317:12
317:22 318:3,6
318:12 322:24
323:2 326:6

331:16 373:8
376:17
**combination**
199:14 317:23
**combined**
199:22 200:4
202:8 332:7
**come** 10:12
11:15 57:14
91:7 144:14
151:16,17
237:24 239:9
353:10
**comfortable**
152:7
**coming** 90:10
97:8 163:10
311:10
**commentary**
19:14 212:18
**commission**
13:21 14:11
**commit** 340:6
**common** 26:4
26:22 31:14
46:24 47:14
52:24 140:23
255:24 276:20
**companies**
25:23,24 26:5
26:23 31:15
39:15,19 41:13
41:15,25 44:23
45:9 61:25
67:6,9 112:15

112:22,22
113:2 174:16
219:5,25 231:2
231:10 233:8
255:24 297:2
297:22 299:5
299:16 300:7
301:6,17
308:13,24
309:12 316:19
334:25 335:18
**company** 97:9
110:22 123:19
155:22 156:9
178:11 188:4
188:20 189:9
214:24 217:3
217:13 221:14
221:18,22
244:25 246:5
247:3,7,14
248:11 250:19
335:3,4,8,20,21
343:7,9,15
379:13,22
380:5
**company's**
123:22
**compare**
145:17 163:14
213:24 325:24
**compared**
147:17 149:16
149:23 153:5

[comparing - constraints]                                            Page 17

comparing
  235:9 237:9
comparison
  197:7 236:19
  238:14 324:19
  326:4 334:17
compensation
  10:11,14
complaint
  123:15 128:3
complete  57:3
  167:14 233:2
  349:16 352:23
  386:9
completely
  146:14 167:7,9
  287:20 298:14
  328:18
complicated
  216:11,13
  382:18
components
  61:4,8
composed
  292:22
compound
  337:7,8
comprehensive
  271:10
compute  46:24
  47:13 52:23
computer
  34:14 240:22
computing
  38:19

con  244:12
concept  182:24
  267:11 280:13
  280:19
concern  297:14
conclude  46:3
  96:5 146:9
  147:4,13,25
  238:6 353:12
  384:24
concluded
  219:7 284:9
  297:20 299:4
  299:14 300:5
conclusion
  27:22 45:22
  46:12 104:7
  105:2 176:18
  236:22 237:25
  239:11,17
  240:14 279:7
  293:8,9 301:2
  301:4,13,15
  320:17 341:24
  341:25
conclusions
  46:7 146:18
  175:13 299:12
conditions
  358:7 359:5
  387:16
conduct  53:22
  164:3 203:21
  204:18,21

conducted
  163:14 255:21
  306:5 316:17
  334:14
conducting
  217:20 227:17
confidence
  184:20 197:23
  321:2,4
confident
  321:10
confirm  94:15
confirmatory
  84:14 85:14
confirmed
  94:17
conflict  95:12
  95:23
confounding
  349:22 353:23
  354:14
confused  27:10
  103:11 154:22
  242:12 268:9
  351:12
confusion
  169:17
connection
  229:9 288:15
  307:4,23 361:3
conscious
  233:16
consciously
  102:15 103:15

consider  12:13
  12:14 19:7
  24:5 25:12
  48:17 102:7
  203:19 204:16
  232:3 254:21
  270:24 328:11
  329:14
consideration
  57:16 356:21
  356:23 357:19
  365:10 367:2
considered
  19:5 32:4,10
  32:16,19,24
  33:10 67:13
  71:25 86:24
  208:19 257:7
  321:7 322:9
  327:24
consistent
  74:19 174:15
consistently
  237:20
consolidated
  369:20 371:4
constant  74:11
consternation
  130:6
constitutes
  163:19
constraints
  361:24 363:7
  363:25

**[constructed - correct]**                                      Page 18

**constructed**
49:5,9,12,14
50:8 59:12
**constructing**
48:25 355:16
**consultant** 9:6
230:15 254:8
**consulted** 13:2
**consulting** 7:4
7:8,15 10:5
**contain** 153:15
154:4,11 155:4
155:19 156:6
156:22 157:5,8
157:15 158:4
158:13 159:12
160:21 163:22
173:3,9 231:17
379:19 380:2
**contained**
23:14 62:16
154:16 175:14
**contains**
313:22
**contaminated**
133:10
**contaminating**
133:17 134:5
134:14,20,22
134:23 135:2,5
135:15,20
**content** 241:21
241:25 248:5
**context** 90:18
90:24 92:17

93:15 94:9
105:13 108:18
134:23 141:24
171:6 214:7,18
216:3 262:16
293:24 305:10
339:13 340:3
370:2 376:23
**continually**
237:18
**continue** 3:12
91:13 176:22
177:17 216:5
223:22 236:25
**continued**
137:8
**continues**
74:24 373:4
379:15,16
**contradiction**
262:7
**contradictory**
258:7 262:10
**contrary**
261:15 262:2
283:23 341:22
**contributed**
364:10,22
365:15,22,25
**contributor**
361:25 363:8
364:2
**control** 123:21
214:2

**conversations**
3:7 72:20,22
**conversely**
261:13,25
**copies** 21:24
22:2
**copy** 202:13
**cornell** 74:10
170:8,14
**cornerstone**
7:6
**corollary** 84:12
106:6 152:9
**corporate**
265:24 266:12
**corporation**
189:21
**correct** 6:25
7:10 8:3,19,24
9:12 11:23
12:22 14:13
18:2,10 19:23
20:3 21:8,17
24:4,12 26:11
27:2 31:10,17
31:23 32:11
33:7 37:2,10
37:14 38:24
39:17 40:8,8
42:7 43:13
44:8,15 45:2,6
45:15 47:19
49:4 51:7 55:2
60:6,10,11,24
61:7 63:14

66:3 67:22,25
68:2 69:10,12
70:18 71:13,17
71:20 72:8
75:16,17 78:18
84:22 85:5,9
90:6 100:19
102:12 103:20
104:20 109:4
109:12,19
110:6,16,20,25
111:14 113:12
113:24 114:2
118:4 119:2
122:14,15,25
123:14 124:17
125:7 126:16
126:19 128:22
131:12 138:4,9
138:25 139:18
139:25 145:15
146:23 149:19
152:11 159:7
163:25 166:13
166:17 172:11
174:6 180:12
180:14 183:25
184:17,21
185:7,21 186:2
186:2,8 187:20
191:4,6,10,25
194:18 196:8
197:12 198:14
199:9 200:11
203:18 205:19

[correct - criterion]                                                    Page 19

| | | | |
|---|---|---|---|
| 218:11 219:22 | 377:19 386:9 | **counterfactual** | **coverage** |
| 221:13 225:20 | **correcting** | 106:18 | 140:18 |
| 227:22 233:5 | 351:21 | **counts** 40:6 | **cra** 7:7 254:13 |
| 234:6 239:20 | **corrections** | **county** 244:15 | **crashing** |
| 239:22 245:23 | 386:6 | **couple** 43:20 | 244:12 |
| 247:5 252:11 | **corrective** | 188:16 243:18 | **cravath** 1:14 |
| 253:12 256:21 | 97:20,24 | 291:17 341:16 | 2:8 3:22 4:14 |
| 257:14 259:19 | 124:14 130:15 | 378:19 | **cravath.com** |
| 261:5 275:24 | **correctly** 40:25 | **course** 51:22 | 2:11,12,13 |
| 283:8 285:3 | 77:8,20 94:7,9 | 52:12 214:25 | **crazy** 86:12,15 |
| 291:20 292:10 | 95:17 96:22 | 239:19 | 86:17,24 87:4 |
| 294:4 296:21 | 121:20 218:5 | **courses** 20:11 | 87:16,20,22,23 |
| 296:23 301:22 | **correlated** 58:5 | 20:12,13,20,21 | 88:4,8,9,15,18 |
| 306:8,11 | 58:6 63:21 | 20:21,22 | 89:21 90:9 |
| 313:20 315:12 | 165:25 383:7 | **court** 1:2 3:20 | 96:17 100:10 |
| 315:16 316:3 | **correlation** | 4:2,24 15:15 | 101:10 104:4 |
| 316:10 317:11 | 56:3,8 | 15:23 17:15,24 | 104:11,15,19 |
| 317:25 318:10 | **corresponding** | 68:6,12 72:24 | 104:24 105:7,8 |
| 318:15,23 | 121:15 | 140:7 142:9,24 | 105:13,16,17 |
| 319:7,10,22 | **cost** 233:6 | 143:9 175:6 | 106:7,18 107:8 |
| 320:2 321:20 | 361:13,15,16 | 192:17,23 | 107:13 110:9 |
| 322:19 323:18 | **costly** 360:24 | 193:10,25 | 110:12 |
| 324:8,14,15,16 | 361:5,19 364:9 | 194:2,8,9,10,20 | **created** 293:6 |
| 324:24,25 | 364:21 | 194:22 195:2 | **criteria** 161:17 |
| 325:19,23 | **counsel** 4:10 | 195:11 356:18 | 172:17,21 |
| 326:7 334:21 | 25:11 36:4 | **courts** 66:18 | 177:10 189:24 |
| 335:13,22 | 37:15 53:13 | 165:12 166:5 | 191:12 200:6 |
| 340:8 355:12 | 60:8,12,20 | 190:11,12,21 | 233:22 |
| 355:13 358:2 | 313:10 | 191:20 192:10 | **criterion** 158:3 |
| 359:7 361:17 | **count** 14:7 | 193:6,15,17 | 158:12,19 |
| 368:15 369:21 | 18:20 24:9 | 194:4,12,15 | 160:20 163:21 |
| 370:24 371:9 | 316:10 | 205:2 208:10 | 176:9,24 |
| 372:19,24 | **counted** 39:19 | **cover** 15:20 | 177:19 181:17 |
| 373:25 374:2 | 39:23 186:12 | 364:18 | 183:8,14 |
| 375:17 376:9 | | | 186:18 187:6 |

[criterion - days]

187:19 189:23
196:7,20 204:9
221:9 222:6
230:6,25
231:25 232:4
**critical**  74:15
74:20
**criticism**  222:5
234:8 300:18
**criticisms**
233:10
**criticized**
229:23 231:23
232:14 234:3,7
234:9,14,16
**criticizing**
233:11,12
**crossville**
315:10
**crowninshield**
9:2,10 10:6,12
10:14,19,23
11:2,9 25:7
38:21 251:18
252:10 253:2
253:14 254:4
**crush**  88:21
89:8 90:4
91:19 93:9
94:2,17 95:6
97:6 99:3
102:4 104:17
106:14 107:9
196:13 201:14
240:2,2

**cumulative**
329:24
**current**  175:18
185:24 191:20
**currently**
225:11
**curve**  344:4,7
344:12,16
**cut**  168:16
**cutoff**  326:21
**cv**  18:8

**d**

**d**  5:3 137:4
387:2
**daily**  115:11,18
**damage**  59:21
59:22 282:17
282:17,23
284:18 292:2
353:16 355:6
**damages**  30:12
46:24 47:2,13
47:17,17,21,24
47:25 48:8,10
49:25 50:17,23
52:23 53:11,17
54:17,24 58:9
60:9 61:4,11
254:3 277:5,6
277:7,8,11,15
278:8,20
279:22,24
280:6,13,19,20
281:10,11
282:13 284:16

287:23 288:24
292:3,5 348:22
355:3,9,11
356:23
**damned**  229:12
229:12
**dan**  252:4
**data**  38:12
50:13 55:18
56:2 118:3
329:2 369:10
383:15
**database**
379:14
**date**  22:17
124:5 317:14
326:21 370:20
386:13 389:24
**dated**  179:20
358:7 359:5
387:10
**dates**  92:23
93:11 94:5,16
123:23 186:10
223:25 224:11
224:12,15
317:13,19,22
317:23 318:5
318:18 322:17
323:9,14,20,21
323:22,24
324:14,21,23
325:16,25
326:3 328:3,14
329:17 334:17

334:18
**david**  5:16
204:8
**davis**  5:12
13:21 14:12,15
**day**  8:13 18:17
108:9,9 109:2
110:15,24
111:10,10,16
112:4 116:9,12
116:17 117:22
119:19 128:8
128:11,12,13
128:18 129:23
155:21 156:8
161:17 174:12
175:15 178:19
187:7,19 196:6
196:19 199:23
200:7 221:9
222:6 226:24
226:24 232:6
246:12 247:20
291:10,11
314:18 315:11
316:5 342:13
342:13 348:20
351:10 379:12
379:21 380:4
380:13 386:17
388:16
**day's**  224:2
**days**  40:17
117:14 144:2,4
144:4,5,18,18

[days - defined]                                                    Page 21

| | | | |
|---|---|---|---|
| 144:25 145:2,5 | 242:2 246:8 | **decision** 91:7 | 238:18 242:9 |
| 145:10,10,13 | 247:22 264:10 | 142:23 189:20 | 312:25 327:8 |
| 145:15,19,21 | 271:4 318:4 | 231:23 232:17 | 358:9 371:15 |
| 146:2,3,7,8 | 322:25 323:3 | 233:17,19 | 387:7 |
| 147:2,3,7,8,10 | 325:18 327:23 | 234:13,20 | **defendants** |
| 147:16,18,23 | 328:10,22,24 | 336:2 | 1:13 2:10 4:16 |
| 147:24 148:10 | 329:13 331:8 | **decisions** 72:24 | **defense** 24:24 |
| 148:10,13 | 331:11 332:8 | 229:20 | 72:21 380:24 |
| 149:3,4,9,10,16 | 332:11,13,19 | **declaration** | **defer** 209:11 |
| 149:16,23,24 | 333:5,13,15,20 | 13:6,13,17,19 | 225:7,12 |
| 151:21 152:2 | 333:24 334:8,9 | 13:20 14:22 | 272:15 297:5 |
| 153:4,5,13 | 335:3,4,8,20,21 | 15:11 16:2,16 | 364:5 |
| 154:3,10,20 | 340:16,17,18 | 17:7 21:21 | **define** 43:8 |
| 155:3,18 156:5 | 341:16 342:11 | 22:16 23:4 | 44:6 71:11 |
| 156:21,25 | 351:10 379:11 | 32:21 162:3 | 88:3 105:18 |
| 157:4,14 | 379:18,25 | 321:16 378:24 | 144:14 147:7 |
| 163:15,16,19 | **dcf** 298:4 338:2 | 387:8,11 | 180:20 186:7 |
| 165:22,23,25 | **deal** 178:8 | **declarations** | 186:18 187:13 |
| 166:2 171:21 | 190:16 218:15 | 12:19,25 | 205:8 265:13 |
| 174:10 175:14 | 225:9 233:9,11 | **declare** 386:4 | 266:22 270:14 |
| 176:10,24 | 369:24 | **decline** 353:15 | 272:5 274:7 |
| 177:11,19 | **dealing** 55:21 | 364:12,24 | 277:24 296:10 |
| 180:20 181:17 | 68:15 164:17 | 365:17 366:3 | 302:11 303:7,7 |
| 182:15,19 | **dealt** 13:24 | 367:8 | 307:7,24 338:3 |
| 183:14 185:2,2 | 35:23 188:20 | **declines** 353:13 | 346:21 |
| 185:20 186:7 | **december** | **deemed** 190:18 | **defined** 25:23 |
| 186:19 188:24 | 115:24 245:15 | 386:7 | 43:18 84:9 |
| 188:24 197:8,9 | 245:20 370:18 | **defend** 4:22 | 122:7 144:25 |
| 198:11 199:12 | 371:6 | **defendant** 13:7 | 145:14 147:8 |
| 199:13 200:5 | **decide** 121:13 | 14:22 15:12,15 | 147:10,16 |
| 214:23 232:6 | 135:21 140:7 | **defendant's** | 148:10 151:11 |
| 235:10,12 | 142:24 188:12 | 22:8,10 89:11 | 152:18 156:25 |
| 236:4,6,19,20 | 230:2 | 161:22 210:20 | 156:25 198:6 |
| 237:9,10 | **decided** 230:4 | 236:16 237:6 | 199:13 213:8 |
| 238:14,15,24 | | 237:12,23 | 213:10 228:23 |

**[defined - describing]** Page 22

| | | | |
|---|---|---|---|
| 242:2 263:8 | 265:20 266:17 | 344:4,7,11,16 | 196:2 210:12 |
| 272:10 289:17 | 267:16,17,21 | 344:25 | 235:5 243:3 |
| 289:18 303:21 | 268:25 269:2,4 | **demonstrate** | 245:19 257:25 |
| 316:22 323:9 | 270:25 274:9 | 61:22 255:20 | 258:21 259:6 |
| 323:24 337:24 | 274:13 292:16 | **demonstrated** | 268:13 280:4 |
| 344:13,14,15 | 293:14 297:9 | 298:18 300:12 | 281:23 286:20 |
| 379:11 | 302:15,17,21 | **demonstrating** | 295:15,16,19 |
| **defines** 200:4,6 | 303:10,14,17 | 137:20 | 295:20 314:6 |
| 203:25 212:9 | 303:22 304:4 | **demonstration** | 316:14 325:4 |
| **defining** 87:23 | 304:13,19,20 | 298:25 | 327:3 331:17 |
| 163:18 304:5 | 304:22,24 | **denote** 375:23 | 332:5 358:4,22 |
| 305:13 344:5 | 305:2,4,7,15,23 | **dense** 291:10 | 365:4 367:25 |
| **definitely** 84:11 | 312:3 317:7 | **denunzio** 2:11 | 368:17 372:4 |
| 97:17 159:16 | 325:16 328:17 | 4:18 138:25 | 378:9 384:25 |
| 160:2 196:22 | 334:10 336:4 | **depend** 147:6 | 387:10 |
| 196:22 224:14 | 341:10 345:7 | 148:3 151:10 | **depositions** |
| 241:9 357:4 | **definitions** | 177:23 283:6 | 24:23 33:14 |
| **definition** 39:4 | 199:23 264:13 | 350:2 | 274:24 |
| 66:14 69:4,6,8 | **defrauded** | **dependent** | **derived** 50:12 |
| 69:10,12 70:15 | 53:15,16 | 56:20 57:4 | 67:20 70:8 |
| 76:7 79:20 | **degree** 5:19 | 349:6,10 350:4 | **describe** 43:23 |
| 82:12,18,20 | **degrees** 271:25 | 350:16 | 59:23 63:4 |
| 84:10,20,24 | 322:10 | **deponent** 386:3 | 176:9 208:5,9 |
| 95:10,10 | **delineates** 73:6 | **depose** 204:7 | **described** |
| 105:17 135:2 | 73:9 | 332:3 | 58:19 135:23 |
| 135:10,14 | **demand** 33:18 | **deposition** 1:12 | 144:9 208:4 |
| 144:15 150:13 | 34:4,9,13 | 3:16,22 4:22 | 292:20 307:2 |
| 161:6 172:5,6 | 35:21,24 48:13 | 32:8,14 33:24 | 349:21 350:13 |
| 172:9,9 173:19 | 48:14 49:2 | 34:24 37:19 | 354:8,13 |
| 177:14 192:8 | 50:9 51:12,16 | 66:25 73:23 | 357:10 375:20 |
| 193:4 198:17 | 52:17 53:12 | 89:5,7,16 91:4 | 383:23 |
| 211:22 218:16 | 59:13 60:2 | 94:12 106:3 | **describing** |
| 218:17 221:12 | 165:14 166:5 | 107:2,16,25 | 62:21 63:6 |
| 222:13,13 | 170:20 291:18 | 113:8,20 115:8 | 67:12 192:5 |
| 232:7 265:6,11 | 291:20 292:7 | 137:13 185:16 | 234:22 349:2 |

**[description - discussed]**

**description**
30:6 192:4
268:23 270:23
303:9 376:22
387:7
**descriptive**
305:25 349:19
**design** 153:25
154:9
**designated**
370:23
**designed**
152:13,25
153:12
**desimone** 1:16
4:3 388:4,20
**despite** 274:20
**detail** 188:8
198:20 350:3
**details** 314:19
**determine** 26:4
27:25 30:7
34:8 40:20
55:23 60:14
75:3 111:8,24
138:16 143:3
144:21 145:4,6
145:7,25
221:18 231:21
249:17 305:12
348:4 362:17
**determined**
73:17 233:9
297:7,11 321:8
332:14,20

335:23,23
341:3,10
342:11 381:18
**determines**
347:21,24
356:18
**determining**
28:8 142:7,20
143:14 223:3
346:25
**deviate** 282:7
283:13 284:2
285:11 287:15
288:10 290:18
347:25 381:13
**diet** 273:21
**differ** 342:17
**difference**
53:18 54:8,19
73:11,12
147:14 148:16
149:2,22 153:3
184:25 198:4
198:11 236:9
237:4,10 238:7
238:15,23
239:12 293:20
334:8
**different** 45:17
59:21 60:17
98:10 120:13
144:23 150:18
151:6 164:15
165:6,9 167:7
167:9 175:13

200:2 204:9
207:9 209:7
219:6 227:15
231:10 260:12
264:13 271:25
292:21 293:5
303:3 308:4,8
329:3,10
330:25 344:23
380:13,19,20
380:20 383:18
**differently**
120:16 144:2
146:2,7 147:2
147:23 149:12
149:14 335:2
335:19 380:21
**difficult** 30:5
363:19
**digests** 82:24
84:2
**direct** 74:2
137:19 138:6
138:20 139:8
139:11,17
140:13,14
141:7,17
358:20
**directed** 214:10
**direction** 64:14
**directions**
387:18
**disagree** 91:3
119:6 181:2,6
200:18,21

214:5 225:13
225:14 228:19
238:5 274:16
298:16 305:20
317:20 337:14
339:21 346:9
346:13 347:13
363:23
**disagreement**
94:24
**disclosure**
84:14 85:13
97:21,24
124:14 130:16
218:25
**discounted**
54:4 66:10
68:25 76:4
79:16 80:11
81:5 82:9
**discovered**
174:21
**discovery**
349:16
**discuss** 141:23
242:23 266:7
269:24 371:11
**discussed** 49:15
182:13 191:11
191:15 193:15
194:3,13 195:2
222:21 223:14
225:21,25
261:16 262:3,8
263:9 266:8

[discussed - earlier]                                              Page 24

312:5,6
**discusses**
  221:21
**discussing**
  133:16 229:25
  267:2
**discussion**
  168:2 174:9
  212:5,11
  247:21 258:5
  285:17 300:16
  367:6 375:18
**discussions**
  77:9,22 78:4,5
  101:23 174:23
  228:18
**dispute** 185:9
  186:15 187:22
  196:17 259:20
**distinction** 73:2
  159:23 221:2
**distinctions**
  155:10
**distinctly** 33:21
**distinguished**
  164:12
**distinguishing**
  95:4
**distorted**
  258:16 261:20
**distribution**
  329:24
**district** 1:2,3
  3:19,20 162:6

**disturbed**
  151:18
**dmv** 5:15
**document** 23:8
  90:22 125:23
  129:16 162:2
  163:9 198:23
  202:23,25
  212:4,14,21,25
  213:9 242:6
  243:9 245:4,9
  327:4 331:20
  358:5
**documents**
  32:3,9,16,19,24
  33:10 202:8
  220:17 230:5
  241:8 372:2
**doing** 17:19
  58:10,12 91:24
  101:6 174:14
  229:19 328:20
  352:17,18
**dollar** 54:2
**doubt** 181:9
  186:13,23
**dow** 242:17
**dr** 3:16 4:22
  5:8,12,18
  10:16,18,24
  11:8,16 18:16
  21:21,22 34:6
  35:19 37:23
  43:11 67:4
  73:4 77:8,21

89:7 115:23
117:16 137:10
162:3 180:10
191:9,12
192:12,14,19
192:22 193:11
193:21 196:25
199:16 200:18
208:6 213:18
222:25 225:7
225:22 226:4
226:12,17
229:25 230:14
230:22 242:8
251:19 258:6
258:12,20
259:14,23
261:7,12
278:15,16
297:6,20 299:3
300:5 301:2
327:11 328:18
328:20 332:14
334:2 341:8
342:10 348:18
378:18,23
384:25 387:8,9
387:10,11
**draw** 104:6
  105:2 146:19
  306:25
**drew** 38:15
**drink** 179:4
**driver** 244:19
  364:15

**driving** 244:15
  246:2,14
**drop** 356:9
**drug** 178:2,5,7
**drunk** 244:19
  246:14
**drunken**
  244:15 246:2
**dui** 244:12
**duly** 5:5 388:8
**dummy** 57:7,19
  123:19 124:3
  124:20 129:21
  130:4,7,16,17
  131:14,25
  132:3,6 133:7
  135:23 351:18
**dunbar** 158:20
  204:6
**duplicates**
  315:15,20
**duration**
  270:15
**dylan** 252:2

                e

**e** 2:2,2 5:3,3
  137:2,2,4,4
  287:24 288:5
  387:2,6 389:3
  389:3,3
**earlier** 102:5
  129:19 148:24
  174:10 181:19
  191:19 231:4
  348:19 349:19

351:8,13 379:6
**early**  358:7
359:5 387:16
**earnings**
123:22 148:6,8
148:9,10,13
151:14,16,20
166:2 173:8,9
174:10,12,17
176:3,14,23
177:9,18 178:6
178:12 180:11
180:19 181:3
181:16,20
182:8 183:13
184:6 185:4
199:14 218:3
222:20 223:13
237:16,17
239:8,9 240:3
240:3,6
**easier**  9:13
21:25 69:23
341:8
**eastern**  126:6
126:13 127:3
127:11,18
128:14,19
129:7,14
**easy**  61:16
**ebix**  196:12
201:14
**economic**  7:4,8
7:15 65:24
66:5

**economics**  5:20
6:7 7:23 8:23
18:13 19:12
20:12,13 29:9
29:24 50:21
166:8 168:10
169:13 215:12
270:18 273:13
276:21
**economist**
19:20 58:16
68:23 69:7
72:19 75:25
142:5,8,18
143:7,8,12,16
189:12 254:23
254:25 263:17
363:22 383:11
**economists**
19:15 72:25
73:15,16,17
102:25 137:18
139:16,20
140:24 141:4
141:14 205:2
275:3,11,17,22
276:11 342:18
**ed**  244:12
**edible**  246:20
246:25
**educational**
5:18
**effect**  61:23
62:6,10,14,20
63:4 64:3,7,13

64:22 110:21
200:4 255:21
351:2,9 353:11
**effects**  382:25
383:2
**efficacy**  178:9
**efficiency**  27:5
27:17,19 29:3
29:12 30:3
42:13 44:4,11
45:16,18 46:2
64:20 66:15,19
67:11,17,23
68:2,3 69:5,11
69:13,15 70:3
70:19 71:12,14
72:7,9 73:2,3,9
73:10 75:15
76:8,9 77:11
77:24,25 78:15
78:23 79:11,21
79:24 80:6,14
80:20 81:2,12
82:13,18,21
84:21 85:2,7
85:11 88:2
97:7 99:9,19
100:18 101:20
101:25 102:8
102:18,20,23
102:24 103:2,5
103:17,19,25
104:2 138:7,16
138:21 139:9
139:11,13

140:17,23
141:23 142:7
142:14,21
143:15 146:22
148:20 149:5
149:18 150:2,6
150:23 151:5
154:14 159:16
159:21,25
160:4,9,18
161:2,7 164:10
164:21 165:8
165:13,15
166:6 167:2,17
167:23 168:14
169:11,20
171:23 172:4
172:10 173:21
178:2 183:18
183:20 187:9
203:22 204:19
217:21 221:10
223:4 239:23
271:25 274:3
275:8,14 276:2
277:24 278:4
278:17 283:7
297:14 319:19
322:3,5 339:9
342:8 344:6,10
344:16 345:7
359:17,22
360:4,16
363:15,16
380:10,25

**efficient** 16:10
16:11,23 18:5
26:6,8,9,14,24
28:2 30:9
31:15 41:14
42:2 44:23
45:10,19,23
46:3,13 65:3
65:11,21 67:7
67:13 73:19
76:2,19,20
78:9 79:15
80:9 82:23
83:24 84:13
86:14 87:2,9
87:12 89:24
90:12 96:9,19
100:13 101:12
104:9 105:5
137:23 140:5,8
141:6,16
150:11 152:4
160:25 165:20
165:20 176:21
178:16 183:6,9
207:7 211:22
212:8 213:8
215:22 232:13
239:2 240:8
255:25 257:8
257:17 261:15
262:2 271:22
272:9,13,18
273:9,15
278:12,13,14

279:4,14,20
281:7 282:5
283:11 284:10
285:8 287:4,8
288:8 289:19
290:6 310:24
320:6,9,11,18
321:9 341:6,13
342:4,6,12
344:3,25
347:14 381:11
**efficiently**
82:24 83:25
**effort** 298:11
346:3
**eight** 332:11
333:15 348:16
374:11 384:24
**eighth** 1:15 2:9
3:23
**either** 21:11
23:15,24 31:22
46:12 106:23
151:7 165:7
189:18 276:9
291:22 292:8
302:13 317:14
317:23 323:10
337:13 367:20
**elastic** 345:2
**electric** 188:4
**eliminate**
315:14
**eliminated**
315:21 384:3

**emh** 212:9
**emphasize**
74:15
**empirical** 51:6
61:19 263:16
263:21,24
264:3,6,14
**empirically**
51:20
**empiricism**
265:12
**employed** 7:11
**employee** 7:14
7:16,21,21 9:5
10:21 254:6,8
**encompass**
70:11 356:10
**encompassed**
24:11,14,25
**encompasses**
43:11 70:14
**encourage** 11:8
346:3
**ended** 42:3
97:23 234:10
354:2
**engagement**
12:12 252:13
254:18
**english** 116:3
**entire** 70:11,14
128:11,12
154:19 208:3
243:22 289:20
306:21 378:5

**entirety** 241:18
**entitled** 81:17
81:24 133:10
162:2 213:15
216:18 249:4
314:18 358:5
373:3
**entry** 109:2
**envisioning**
352:10
**episode** 364:16
**equal** 39:14,18
39:24 40:2,4
345:12 346:18
347:15
**equity** 358:6
359:4 382:20
384:6 387:15
**equivalence**
331:2
**equivalent**
38:16 131:9
185:23 331:5
**err** 234:8,14
**errata** 386:8
**error** 159:24
**errors** 23:20,24
24:2 306:13
**esq** 2:5,10,11
2:12
**essence** 41:21
**essentially**
131:4 185:23
376:18

**[establish - example]**                                    Page 27

| | | | |
|---|---|---|---|
| **establish** 67:8 | 377:15,21 | **evidence** 16:22 | 90:14,20 93:17 |
| 282:8 283:14 | **eugene** 257:4 | 137:19 139:17 | 99:13 123:16 |
| 284:3 285:12 | **euphemism** | 140:14,15 | 133:22 215:16 |
| 287:16 288:11 | 131:7 | 141:7,17 | 221:3 230:7 |
| 290:19 319:19 | **evading** 312:18 | 148:20,22 | 238:2 242:23 |
| 381:14 | **evaluate** 26:22 | 149:5,17,25 | 259:7 265:3 |
| **esteem** 205:21 | **evaluating** 27:4 | 150:5,20,22 | 268:11 274:7 |
| **estimate** | 67:22,25 68:3 | 151:4,6 204:8 | 278:6 303:5 |
| 252:23 376:19 | 70:19 71:13 | 236:15 261:15 | 305:11 330:2 |
| **estimated** 59:8 | 72:8 | 262:3 276:12 | 348:3 349:17 |
| 373:19 | **event** 92:22 | 299:10 338:20 | 362:25 363:18 |
| **estimates** | 93:7 94:3 | **evidently** 88:22 | 369:18 370:8 |
| 376:23 | 108:10 109:6 | 225:10 271:9 | 374:5 378:6 |
| **estimating** | 122:19,21 | **evolution** 174:8 | **examination** |
| 33:18 34:3 | 123:2,6 131:16 | **evolved** 165:11 | 5:7 137:8 |
| **estimation** | 132:14 133:10 | 204:11,13 | 378:21 387:3 |
| 121:13,21 | 134:5,14,20,22 | 222:25 | **examine** |
| 122:13,23 | 134:23 135:3,5 | **ex** 158:5,15 | 143:25 331:20 |
| 133:11,17 | 135:6,16,20 | 159:13 160:22 | **examined** 5:5 |
| 134:5,14 135:7 | 137:19 138:3 | 163:23 173:4 | 334:12 |
| 135:16 307:24 | 138:19 139:7 | **exact** 42:9 | **example** 12:10 |
| 318:7 | 139:16 144:14 | 58:13 59:9 | 39:20 53:3,4,9 |
| **et** 140:21 | 185:24 203:21 | 66:21 131:7 | 55:14 57:23 |
| 203:12 207:2 | 204:18 239:11 | 144:21 163:14 | 109:13 140:19 |
| 207:11,22 | 255:22 294:3 | 173:17 184:5 | 148:4 150:8 |
| 208:21 211:3 | **events** 96:6 | 184:12 187:3 | 151:14,14 |
| 214:21 222:21 | 133:17 154:16 | 187:16 197:6 | 154:7 155:5,8 |
| 223:14 224:24 | 158:3,13 | 197:17 198:9 | 156:17 170:10 |
| 225:15 226:7 | 159:11 160:20 | 211:25 221:6 | 175:11 216:24 |
| 235:4 236:2,25 | 163:21 173:3 | 223:2,6,10 | 218:3 222:20 |
| 238:6,13 | 270:21 354:17 | 275:2 283:3 | 223:13 227:10 |
| 239:10,16 | 364:15 | 294:12 326:5 | 236:3,3,20 |
| 240:13 371:23 | **everyone's** | 334:6 346:5,5 | 237:16 238:22 |
| 372:6,23 373:9 | 95:10 367:24 | **exactly** 22:4 | 239:8 242:4 |
| 375:7,12 376:8 | | 30:21,22 76:10 | 244:8 266:8 |

**[example - expert]**                                                  Page 28

| | | | |
|---|---|---|---|
| 272:6 273:19 | 107:24 108:7 | 387:12,12,13 | 150:9 151:17 |
| 275:17 278:16 | 108:15,20 | 387:13,15,17 | 239:9 240:4 |
| 284:15 288:3 | 109:14,23 | **exhibits** 21:19 | **expensive** |
| 288:23,23 | 120:5 121:3 | 21:19 37:17 | 361:11 |
| 291:5,25 323:8 | 122:2,3 137:13 | 112:7 199:5,7 | **experience** |
| 349:14 | 161:22 162:2 | 200:2 | 219:4 |
| **examples** 86:16 | 162:10 179:18 | **exist** 224:19 | **experiments** |
| 86:18 88:12,15 | 180:5,5,6,9 | 225:5,17 | 328:21 |
| 88:18 106:9 | 181:5 184:3,15 | 227:20 228:10 | **expert** 6:3,16 |
| 239:21 269:23 | 184:23 185:15 | 229:4 | 9:4 11:25 |
| **excel** 38:12,14 | 185:16 186:4 | **existed** 61:23 | 12:19,25 13:6 |
| **except** 126:18 | 186:16 187:15 | 226:15 228:2 | 14:21 15:11 |
| 219:20 | 195:23 196:2,3 | **existence** | 16:2,15 17:6 |
| **exchange** 13:21 | 196:10 197:5 | 137:22 140:4 | 29:9,24 46:22 |
| 14:11 53:14 | 197:16 201:2 | 141:6,16 | 47:7,9,12 |
| **exclude** 161:10 | 201:22 210:18 | **exists** 74:2,19 | 50:16,18,19 |
| **excuse** 273:21 | 210:20 211:3 | **expand** 27:11 | 67:3 68:18 |
| **executive** | 235:5 242:5,9 | **expect** 66:7 | 71:10 72:12 |
| 218:24 | 243:2,3,4,11,25 | 76:17 97:10 | 88:20,23,25 |
| **exhibit** 9:16,22 | 245:19 255:3 | 158:6,15 | 102:6,15 |
| 13:16,19 21:20 | 257:25 281:23 | 159:14 160:23 | 103:14 159:4 |
| 21:21 22:6,8 | 286:20 312:25 | 163:24 173:5 | 161:12 162:14 |
| 22:10,15 23:3 | 313:8,11 314:6 | 238:2 246:10 | 165:8 166:7,7 |
| 23:10 25:17 | 314:6 316:13 | **expectations** | 168:7 171:6,11 |
| 31:9,25 32:3,7 | 325:5 327:4,8 | 76:14,16 148:9 | 172:16 173:13 |
| 32:9,14,15,15 | 327:11,20 | 148:14 151:20 | 175:24 178:19 |
| 32:21,21 33:2 | 328:8 329:12 | 151:23 174:12 | 179:19 181:13 |
| 33:12 36:9,12 | 331:17 332:5 | 176:15 237:19 | 181:14 187:4 |
| 36:13,14,23 | 333:3,12 358:5 | 237:20 362:14 | 195:4 215:11 |
| 38:23 40:25 | 358:9,12,21 | **expected** 66:11 | 218:8 226:12 |
| 41:4 42:19 | 359:9,14 365:4 | 67:16 68:25 | 253:23 254:10 |
| 44:17 46:19 | 368:17 371:12 | 76:4 79:17 | 254:15 326:20 |
| 55:12,13 61:13 | 371:15 372:5,9 | 80:11 81:6 | 347:3 358:16 |
| 66:24 73:23 | 382:7,7,8 | 82:9 117:12 | 358:18 |
| 89:5,11 107:6 | 387:8,9,10,11 | 131:16 132:15 | |

[expertise - factors]                                          Page 29

**expertise** 6:6
  276:22,23,25
**experts** 24:8,24
  33:15 53:5
  175:8,12 193:4
  232:3 249:23
  274:19 276:20
  308:19 311:23
  311:24 316:22
  317:6 323:24
  332:19 336:4
  344:15 368:2
  380:25
**explain** 96:4
  165:4 174:8
  297:2,23
  298:11 299:6
  299:17 300:8
  301:7,18
**explained**
  131:16 132:14
  188:8 226:5
  258:24 298:20
  331:23 332:2
**explains** 92:24
  377:4
**explanation**
  70:13 241:23
**explanatory**
  375:21 377:3
**explicitly** 67:3
**expounded**
  41:20
**express** 41:16
  44:21 45:8

  109:22 110:4,9
  126:15 247:7,9
  247:13,14
  248:10,11
  374:2
**expressed**
  310:17
**extent** 24:10
  27:22 37:3
  40:7 63:22
  66:20 95:21
  98:9 100:21
  102:10 141:25
  149:15 154:13
  164:23 172:3
  173:7 176:13
  178:10 189:3
  189:18 198:3
  205:9 221:17
  237:16 243:14
  246:7,9 263:2
  271:16 272:20
  274:25 291:7
  296:21 306:12
  308:18 319:23
  322:24 337:9
  343:10 350:6
  357:15 364:8
  364:20 366:19
  367:10 383:6
**extraordinary**
  294:7,10
  301:25 302:4,9
  302:11,15,22
  303:2,8,10,14

  303:23 304:5
  304:13,15,22
  305:5,9,13,23
  306:2,18 307:3
  307:7,25
**extreme** 190:7
  190:23
**extremely**
  57:10 58:8
  170:22 174:17
  176:11,12
  182:9 285:15
  312:5 369:24
**eye** 222:8
**eyeball** 111:24
**eyeballing**
  353:9
**eyes** 59:3

                    **f**

**f** 61:15,19 62:5
  62:11,22 63:4
  137:2
**face** 340:6
  343:17
**fact** 46:23
  106:15 112:24
  113:19,22
  114:2,10,13,14
  114:14 115:14
  116:12,24
  118:22 157:13
  165:2 171:18
  176:15 188:24
  190:21 204:12
  221:20 227:23

  237:19 238:22
  238:23 259:9
  259:16,21
  263:6 264:22
  269:9,16 270:4
  295:7 298:13
  300:21 310:10
  315:6 338:21
  352:23 354:9
  365:15 372:20
**factfinder**
  381:19
**factiva** 191:2
  191:21 192:2,7
  192:11 193:12
  194:6 195:14
  231:7 240:17
  241:3 242:18
  243:13 313:8
  313:15 315:17
  315:17 379:14
  387:12,13
**factor** 124:11
  130:3,10 138:2
  138:6,15,19
  139:7 141:8,18
  142:5,19
  143:13 159:5
  159:10 160:16
  177:2,21
  183:22 187:8
  365:21,21,25
**factors** 62:25
  137:21 138:11
  138:17 139:20

139:23 140:3
140:25 141:5
141:15,22
142:6,13,20,25
143:14 287:22
320:17 343:19
349:22 353:20
353:23 354:10
354:14 357:13
357:16
**facts**  90:19
97:19 98:6,8
98:11 99:23
107:11 164:6
164:14,16
166:21 177:24
273:11 295:5
**fail**  148:15
178:14
**failed**  240:5
**fails**  150:11
237:20
**fair**  53:19,20
53:24 168:21
234:25
**fairly**  362:10
362:15
**fall**  135:19
168:4
**falls**  48:16
**false**  151:19
182:12,17,24
182:25 183:3
244:23 246:3
248:14,18

249:12,17
**fama**  257:4,6
**familiar**  11:17
184:12 213:13
250:10,12,14
253:20 263:5
280:12,18,22
327:12 343:4
343:22
**familiarity**
362:22
**fantastic**
312:20
**far**  74:19
184:15 236:11
248:7 268:16
326:6
**fast**  84:9,11
**fda**  178:9
**fdids**  370:19,22
**february**  22:20
22:22 23:5
369:8
**federal**  6:11,20
19:14,16,20
**feel**  6:15 172:7
**feinstein**  10:15
10:18,24 11:8
11:16
**fell**  356:7
**ferrillo**  158:20
190:14,16
191:8 203:12
203:15 204:17
205:17 207:2

207:11,22
208:21 211:3
214:21 222:21
223:14,22
224:24 225:15
226:7 235:4
236:2,25 238:5
238:13 239:10
239:16 240:13
387:12
**fifth**  376:5
**figure**  12:5
15:22 90:18
108:13 369:5,5
**figured**  36:18
**file**  241:16
**filed**  3:19
**files**  241:14
**filing**  185:24
186:6 189:18
**filings**  199:15
220:2
**final**  235:9,20
318:11 377:14
**finance**  5:21,23
5:24 6:7 18:13
19:12 29:9,24
50:19,21 65:12
65:14,17 66:8
68:23 75:23
76:2,8 79:14
80:8 82:7
103:3 166:7
168:10,20
169:13 215:11

265:24 266:12
293:15 347:3
**financial**  9:2
73:17 137:18
139:16,20
141:3,14 142:4
142:8,18 143:7
143:8,12,16
189:12 254:22
254:24 262:17
263:4,13,17,19
264:19,24
266:18 267:23
269:5,17 270:4
271:14 273:13
274:3 276:20
339:4,22
363:22 383:10
**financially**  4:6
**find**  22:17
81:22 100:24
142:10 148:25
165:12 170:6
174:14 175:5
201:20 229:18
230:12,20
289:16,22
297:21,25
299:4,15 300:6
301:5,16 305:2
312:9 323:13
357:21
**finder**  46:22
354:9

**[finding - follow]**                                                  Page 31

**finding** 77:25
146:22 149:20
156:12 183:20
246:16,16
314:18 319:16
322:2,5 357:2
**findings** 199:5
321:11 329:6
**finds** 184:4,24
197:21 334:6
354:9
**fine** 83:10
107:22 264:16
271:2 305:17
307:17 346:16
384:19
**finish** 75:23
248:21
**firm** 2:3 7:17
11:21 12:2,21
13:3 25:12
26:4,18,21
28:7 31:21
65:25 66:5,7
135:6 140:18
220:6,11,20
237:18 242:6
253:17,18,18
326:16 343:16
370:23 373:4
377:22 382:15
**firms** 7:4 189:3
189:5,16
297:19 343:17
374:15 375:4

**first** 5:4 7:13
25:22 39:12
40:24 64:21
86:22 124:23
126:4,11,25
127:9,16
129:18 133:9
141:11 143:25
152:8 162:25
168:17 211:2
211:20 231:4,9
241:17 243:17
243:18,24
246:7 256:4
260:12,17,19
261:11 278:11
282:4 283:9
284:21,23
285:5 286:15
287:12 290:9
302:3 304:10
313:17 314:16
319:12 327:20
339:10 372:9
374:12 375:11
381:10
**fischel** 34:6,7
43:25 44:6
73:4,6,20,21
84:7 102:23
268:20 269:21
278:15,16
297:6 298:9
299:14 301:12
317:14,24

329:5 342:10
367:10
**fischel's** 18:16
22:23 43:10
67:4 74:9
170:6,14
268:10,14
270:2 271:6
278:16 301:13
323:11 328:18
328:20 341:9
**fisher** 197:17
**fisher's** 144:20
163:14 184:5
184:12 187:16
197:6 198:9
326:5 334:6
**fishman** 52:2
**fit** 249:9
**five** 81:14,21
138:2,6,15,19
139:7 141:8,18
142:5,19
143:13 159:5
159:10 160:16
175:15 177:2
177:21 179:14
180:18,21
181:4,15,18
187:5,8 213:19
217:8 232:5
251:4,10 252:9
264:10 315:7
323:20 342:13

**flat** 239:18
**flip** 78:19
189:15
**flippant** 148:5
**floor** 2:4
**florida** 1:3 3:20
**flow** 34:9 54:4
61:21,24 62:6
62:8,12,16,19
63:2,7,18,22
64:5,10,16
197:8,9 199:13
**flows** 66:11
67:16 69:2
76:5,14 79:17
80:12 81:6
82:10
**focus** 43:5
117:17 170:25
218:2 222:19
223:12 224:9
225:3 311:12
383:17
**focused** 85:22
154:15 155:20
156:7 368:23
379:20 380:3
**focusing** 51:12
311:23
**folks** 38:20
**follow** 14:9
30:18 46:16
49:18 160:6
166:4 175:20
225:24 226:8

239:12,14,17
240:14 309:6
309:17 312:17
**followed** 288:9
**following** 95:6
119:4 125:19
130:10 169:2
171:19 185:15
377:5
**follows** 5:6
225:22 226:5
285:11 287:14
290:18,23
305:23 324:2
**footnote** 140:20
180:17 181:5
186:3,16
196:10,18
199:10 200:14
203:8 368:24
368:24 369:2,3
369:23 370:11
370:13
**footnotes** 201:2
369:23
**foregoing**
386:5
**foreign** 185:25
188:19 219:21
**foremost** 257:7
**forever** 262:15
262:24
**forgetting**
376:16

**forgive** 251:22
**forgot** 85:22
**form** 83:2,19
83:21 185:22
185:24 186:6
186:18,18
187:6,18
199:14,15
218:14,23,25
219:8 380:8
383:3 384:9
**formal** 267:16
267:17
**format** 241:16
243:12
**formats** 243:19
**forming** 32:24
33:11
**forms** 96:8
185:19 219:5
**formulation**
171:3,5,8
**forth** 24:17
31:4,7 33:2,12
133:4 154:24
171:21 207:11
226:6 288:5
319:18 324:18
388:8
**forward** 370:8
**found** 17:11
23:19 109:5,16
110:3 188:18
193:18 194:5
218:23 243:4,5

289:12 292:8
308:19 310:23
319:8 328:22
328:24
**foundation**
65:12
**foundational**
79:21 80:14,17
80:18,21 159:3
211:2
**foundations**
65:14,16
**four** 137:7
148:8,13 179:9
181:15 252:9
315:7 342:13
370:4,15
376:18
**fourth** 375:14
**fraction** 258:15
261:18
**frame** 10:11
**framework**
355:7
**fraud** 140:22
**fraudulent**
53:22
**fred** 204:6
**frequency**
144:16,22
155:20 156:7
165:23 176:6
193:3 228:13
228:14 379:20
380:3

**frequently**
266:4
**front** 96:24
107:19 161:9
313:11 339:11
382:9
**fruit** 246:20,20
246:25 247:21
**fuck** 73:4
**full** 5:11 45:3
111:11 128:8
128:18 155:25
207:24 214:10
256:4 261:11
320:10 321:23
365:3
**fuller** 70:12
**fully** 192:3
331:24
**fund** 227:11
230:15
**fundamental**
66:14 67:17
69:4,9,10,12,15
70:3 71:12
72:7 73:2,9
76:7,9 77:11
77:24 78:22
79:23 80:20
81:2,11 82:11
82:12,13,18,21
84:21 99:17
100:18 101:20
102:8,18 103:8
103:17 117:7

[fundamental - go]                                                    Page 33

159:15,25
164:10,21
165:7 171:23
172:4 336:13
337:5,23,24
338:4,12 339:8
344:10,15
363:15 380:10
380:24
**fundamentally**
67:7,10 73:18
76:19 87:8
165:19
**fundamentals**
362:3 363:10
363:14 364:4
**further** 248:13
384:16 388:11
**future** 66:7,11
67:16 68:25
76:5,14 79:17
80:11 81:6
82:10

**g**

**g** 251:25,25
**game** 17:18
**gamestop**
41:17 337:2
340:9 341:4,17
359:21 360:3
360:15 361:6
361:20 364:8
364:20 365:11
365:16 366:2
366:17 367:8

372:12
**gamestop's**
336:9 337:19
338:8,22,24
**gamma** 364:16
**gather** 250:12
362:19 371:20
**general** 86:21
191:5 206:23
208:12 220:8
220:10,18
273:12 274:2
279:16 291:25
291:25 339:16
343:20 354:19
363:5
**generalize**
56:10
**generally**
122:24 134:11
262:25
**generate** 38:11
38:22
**generated**
37:12 40:10
**generating**
135:8
**genuinely**
374:22,24
**getting** 120:16
248:7 290:24
**give** 5:24 22:5
60:21 69:3
86:18 95:18
99:21 106:8,23

106:24 107:11
107:15 123:14
128:4 131:7
148:3 151:13
157:17 179:2
202:13 207:14
209:7,14 210:9
210:13 220:12
220:15 236:2
238:21 260:16
265:7 266:17
268:18 270:23
272:6 273:23
295:19 303:9
303:25 304:3
304:20 307:13
307:16 339:18
340:5 349:16
**given** 26:17
28:8 160:12
164:5 207:15
209:8 214:8
238:22 280:3
282:16 303:15
331:19 356:25
386:10 388:10
**gives** 70:12
**giving** 156:15
305:10 368:20
**glad** 352:8
**glauberson**
2:17 3:24
**global** 211:17
**gme** 359:16
360:25 369:10

375:14
**gnarus** 7:7
**go** 3:13 12:4
14:24 23:7
35:7 37:7 39:9
41:2 43:9
44:16 54:7,12
55:13 58:10,11
59:23 61:14
68:21 69:18,25
73:21 81:19
83:11 86:10
88:11 89:14
100:5 133:20
152:23 164:18
165:3 169:14
170:9 179:6
204:15 211:20
211:23 212:20
213:2 219:14
232:9 237:15
240:16,18
243:22 250:25
251:23 256:5
260:20 266:14
266:22 268:14
281:18,25
286:11,17
295:3 303:8
304:9,21 315:2
322:13 330:15
333:10 342:3
343:19 345:20
345:24 346:14
347:10,20

**[go - guise]**                                                          Page 34

348:7 352:17
352:18 353:11
355:16 357:2
374:21 378:24
378:25 381:4
**goes** 5:13 55:9
74:6 93:6
171:23 199:4
202:6 221:12
221:13 279:4
279:15,20
281:8 297:8
328:16 346:25
**going** 3:3 13:11
17:18 22:19
35:10 38:18
39:25 59:3
61:5 76:24
92:16 95:20
97:16 99:13
106:4 107:7,8
107:9 119:5
127:14 133:4
136:8 148:2,15
148:15 165:24
178:13 179:9
182:11 189:5
190:5 198:19
208:14,15
213:6,16 216:4
225:12 227:5
229:22 230:5
231:23 232:14
234:8,13 237:3
238:20,21

242:5,21
248:16 251:10
255:6 267:14
289:7 304:3
312:17,22
326:14 343:15
344:6 345:21
348:11 351:14
357:17 363:17
369:16,17
370:7,9 378:4
383:7 385:2
**good** 3:2 5:8,9
75:19 136:4
137:10,11
311:14 343:8
**gotta** 116:2
**grab** 382:10
**graduate** 6:23
20:10,16,18,19
20:24
**graduated** 6:9
**grammatical**
23:20 24:2
**granted** 232:10
**granular**
240:21
**granularly**
240:25
**graph** 38:19
**graphs** 36:24
37:12 38:8,11
38:23 39:2
**great** 242:25

**greater** 188:8
**grenadier**
10:16,17
178:20 179:20
180:17 181:2
186:4,15,22
187:15 196:10
196:25 197:5
197:17 199:11
227:10 230:14
230:15 258:6
258:12 292:20
297:6,20 298:8
299:3,25 300:5
317:15,24
326:9 327:21
327:24 328:10
328:24 329:4
329:13 330:24
331:10 332:6
332:14 334:2,4
342:10 367:11
371:18
**grenadier's**
43:11 67:4
184:3,23 185:9
185:17 195:24
196:17 198:22
198:25 200:16
200:19 201:3
258:20 259:14
259:23 261:12
295:10 301:2
323:11 327:2
336:17 341:9

**group** 7:8,19
171:9 214:2
336:10 337:3
337:20 338:9
372:15,22
375:12 376:11
377:16 378:3
**grow** 246:25
**grown** 246:21
**guess** 20:25
22:19 39:24
47:9 48:9
54:11 57:7
71:21 72:23
73:20 78:24
79:7 98:8
99:16 106:2
151:17 156:17
196:24 204:12
215:20 219:23
249:25 252:19
263:16 265:22
268:14 269:11
300:14 311:9
338:19 349:25
350:23 351:6
352:5 354:19
366:22
**guidance**
180:11,19
181:4,16,20
183:13 184:7
185:4
**guise** 150:12

**[guy - holds]**

Page 35

guy 94:10
189:7
gwyn 15:4

**h**

h 251:25,25
387:6 389:3
hagerty 52:3
half 199:7
229:25 369:7
halfway 143:22
halliburton
65:6 68:6 71:2
74:7 78:8 91:6
100:16 167:5
167:19 169:5
206:10,11
212:3 278:3
hand 89:4
161:24 324:21
324:23 333:19
358:3 373:8
384:5 388:16
handed 179:17
handing 22:13
hang 202:20
happen 269:9
269:10 294:24
295:2
happened
166:24 167:15
167:21 246:12
247:19 268:12
269:22 277:23
happening
107:3 356:5

happy 21:23
83:7,15 88:13
92:18 93:16
99:12,20 101:2
105:14 106:9
112:6 116:25
128:3 133:19
136:2 192:8
207:14 220:7
220:14 259:6
269:2,20,24
270:25 272:7
273:5,23 295:8
295:21 340:2,4
hartman 15:4
head 33:20
138:13 151:13
161:10 168:3
169:25 170:16
171:17 192:16
193:3 221:19
252:7 271:11
343:2 353:17
headed 180:5
317:13,22
318:3 327:16
heading 180:13
211:8,15 212:7
headline 191:2
191:21 192:11
193:12 194:6
195:14 217:4,5
217:14,14
243:24 313:8

headlines
241:17,21
healthcare
161:13 162:5
180:22
hear 71:22
308:6 331:23
heard 362:14
hedge 227:11
230:15
held 1:14 20:5
21:15 89:9
help 222:3
helpful 42:17
183:11 374:23
374:24
hereto 386:8
hereunto
388:15
heterogeneous
362:13
hey 87:22
hi 88:21 89:8
90:4 91:19
93:9 94:2,17
95:6 97:6 99:3
102:4 104:17
106:14 107:9
196:13 201:14
240:2,2
high 197:8
199:12 205:21
228:6,12,13,15
228:16,20,23
228:25

higher 293:4
highest 116:8
116:12,16
117:22
highlighted
196:25
highlights
364:17
highly 111:2,6
111:8,17,19,19
111:25 165:25
302:16 304:6,7
342:18 345:2
hire 10:18
hired 10:23
history 339:5
339:22
hit 231:7
hold 61:16
68:17 69:18
76:9 89:18
92:10 107:14
107:14 109:15
114:17 199:19
205:21 245:7,7
245:16 256:25
281:24 282:12
286:17,24,24
316:15 330:12
341:22
holds 66:9
68:23 75:24
76:3 79:14
80:9

[honest - imposition]                                                    Page 36

honest 37:25
honestly 106:7
honors 5:20
hoping 42:23
horizontal
  344:4,8,11,17
  344:18
hour 84:10
  199:7 369:7
hours 127:3,11
  229:25 252:12
  252:25 253:5
  368:20 378:8
huang 251:24
huh 152:19
  199:20 362:8
hundred 253:4
  269:17
hundreds
  241:11
hypothesis
  65:11 84:13
  211:23 213:8
  215:22 334:25
  335:18 344:3
  344:25 347:14
hypothetical
  87:16 275:16
  275:21,25
  276:6,12,21
  277:3 289:4,11
  289:15,22
  290:2,3,16
  291:5,8,12
  357:17,20

  367:15,19
hypothetically
  285:6

        i

idea 92:12
  95:24 241:24
  242:25 252:15
  267:19 296:12
  330:8 337:12
  342:20 343:5
  346:7
identical
  314:15 384:2
  384:14
identification
  22:9,11 89:12
  161:23 210:21
  242:10 313:2
  327:9 358:10
  371:16
identifications
  370:23
identified
  166:2 173:2
  180:18 186:5
  196:11 369:9
  379:13
identify 120:7
  158:3,13
  159:11 160:20
  163:21 183:4,5
identifying
  171:21
idiosyncratic
  343:11

ignore 138:15
  215:21 328:20
  328:25 332:23
ignored 329:4
ignores 328:18
ii 65:6 68:6
  71:2 78:8 91:6
  100:16 167:5
  167:19 169:5
  206:11 212:3
  278:3
illustrative
  55:15
imagine 249:21
immaterial
  229:22
immediate 43:8
  43:18 44:7
  282:6 283:11
  283:24 284:10
  285:9 287:4
  288:8 289:14
  289:24 290:12
  381:12
immediately
  6:13 82:17
  319:20
impact 55:18
  55:23 56:11,15
  59:5,9 189:2
  247:18 248:15
  248:19 249:13
  249:14,18,22
  250:2,22
  308:21 356:10

  363:17 364:17
  365:6,7
impacts 65:24
impermissible
  326:18 327:6
implement
  58:15,18 215:2
  215:5,14
implementati...
  384:7
implicates
  361:24 363:6
  363:25
implies 348:2
implying
  241:15
importance
  120:17
important
  116:6,14,18
  117:19,24
  119:16 142:25
  142:25 145:16
  145:22 146:4
  229:8 260:6,23
  381:2
imposed 126:6
  126:12 127:2
  127:10,23
  352:4 374:7
  375:4
imposition
  55:19 351:15
  352:24 353:4

impression
  78:10,14,21
inaccurate
  30:23 42:22
  220:13
inappropriately
  67:5
inclined   321:14
  321:22
include   7:6
  61:8 220:24
  230:23 233:3
  247:7 296:6
  370:19 371:5
  382:22 383:15
included
  182:15,19
  230:22 244:19
  245:11 246:9
  246:19 295:23
  300:13 361:16
  372:22 378:3
includes   18:8
  42:21 180:21
  224:25
including
  367:25,25
  372:12 380:15
inclusion
  244:23 245:25
inclusive   175:4
  189:5 219:9
  221:25 231:6
incomplete
  276:5 277:3

291:9,12
inconclusive
  319:13,25
inconsistent
  97:6 99:8
  165:18 283:19
incorporated
  64:25 65:23
  83:17 297:16
  297:17 310:22
  366:18,21
incorporates
  383:4
incorrect   7:25
  71:18 78:11,12
  84:24 85:3
  188:2 219:15
  262:13 310:15
  329:6,22
increase   295:11
  295:12 308:23
  309:23
increased
  292:13,18
increases
  308:12,16
  309:6,7,11,14
  309:18 310:3,4
  310:12,18
  311:20 375:3
independent
  56:20 349:3,7
  349:8,9 350:14
  350:24 351:14
  352:10 355:17

index   39:15
  40:2,3 110:18
  356:7
indicate   57:8
  131:14 152:3
  184:19
indicated   57:9
indicating
  322:2
indications
  46:2 204:13
indicator
  150:10,15
  227:9 240:6
  351:8,25
  352:16
indicators
  45:16,18
  140:23
indices   121:16
individual
  34:12 253:10
  339:6,23 344:8
  344:17 345:2
  373:4 377:22
  382:14,19
individuals
  251:17 252:8
  252:10 312:9
  339:13
industry
  110:18 121:16
  343:18
inefficiency
  150:20

inefficient   16:4
  16:5,18,25
  17:8,16,25
  67:18 70:6
  148:18 150:16
  176:19 277:16
  278:9,21 280:8
  283:24 289:12
  289:16,19,23
  290:5,11
  340:11 341:18
  381:20
inferring
  226:16
influence   206:5
  206:17 283:2
  344:7 348:4
influential
  205:25 206:3,4
inform   52:20
  86:13 87:2,6,7
  87:10 89:23
  90:11 93:16
  96:19 100:12
  101:11 207:5
  239:22 240:7
  240:11 307:14
information
  32:4,10 61:20
  62:15,19 63:2
  63:6,8,12 64:5
  64:9,16,24
  65:22,24 67:10
  74:14 76:12
  82:25,25 83:17

84:2,3,14,15
85:14,14 86:13
86:25 89:22
90:10 95:15
96:18 97:8,14
97:17 100:2,11
101:11 104:5
104:25 137:21
143:2 144:3
151:22 153:15
154:5,12,17
155:4,20 156:6
156:23 157:6,8
157:16 158:4
158:14 159:12
160:21 161:5
163:22 173:4
173:10 174:23
175:14,21
188:25 197:8,9
199:13 221:2
225:9 227:4
229:14 230:2,3
230:12 231:18
231:21 232:8
232:12 256:9
276:7 294:11
297:15 308:20
310:22,25
311:25 313:22
320:16 321:8
326:9 327:25
328:12 329:4
329:15 332:9
332:15,21,24

333:6,14,21
336:5 339:18
346:5 365:5
366:18 379:19
380:2,6,11,14
**informational**
66:19 73:3,10
78:15 84:25
85:6 101:24
102:19,22,24
102:25 103:5,8
103:9,18 104:2
154:14 159:20
160:4,8,17
161:2,7 164:9
164:21 165:7
165:15 166:6
169:20 172:10
189:14 247:24
297:14 339:9
363:15
**informational...**
65:3 76:19
78:9 87:12
104:9 105:4
155:11,14
156:12 160:25
165:20 278:13
310:24 342:6
**informative**
142:6,10,19
143:13 203:23
204:23 205:15
227:16 229:18
230:12

**informed**  25:2
33:15,16 53:12
234:18,18
238:25
**informs**  111:15
205:22 278:4
**initial**  12:10
13:12,17,19,20
22:16,24 23:3
30:8,13 36:2
53:2 202:16,18
202:20 230:4
242:23 260:3,4
260:5 268:10
298:22 383:21
**initially**  229:13
231:14
**inputs**  56:22
**insignificant**
323:3 378:13
**installed**  57:10
**instance**  177:25
189:7 298:3
315:19 352:21
353:8
**instances**  77:15
238:13 239:7
239:15 240:13
**instructions**
49:19
**intake**  264:5
**intended**
315:14
**intention**
288:17

**intentional**
336:10 337:2
337:20 338:9
**interactive**
374:14
**interest**  361:9
**interested**  4:6
63:25 64:2,20
64:21 325:5
388:14
**interesting**
164:13
**interfere**  3:10
**interpret**  143:4
**interpretation**
291:7
**interrupt**
325:12
**intervals**  369:7
**intraday**  36:10
36:23 37:2
39:14 55:18
56:2 348:23
355:12 357:9
**introduced**
182:23
**introducing**
106:17
**inventory**
370:19 371:5
**inverse**  63:16
147:21
**investigating**
255:22

**investigation**
  368:9
**investment**
  219:2 247:2,14
  248:10 250:18
  343:7
**investor** 229:18
  362:12
**investor's**
  54:16,21
**investors**
  161:13 162:5
  175:5 180:22
  188:22 189:14
  227:3,4 230:19
  230:20 258:14
  261:18 336:11
  337:3,21
  338:10 365:9
  380:12,15
  381:3
**invitation**
  107:10
**involve** 171:12
**involved** 235:9
**ipo** 34:7 73:7
  84:8
**irrationally**
  336:12 337:4
  337:22 338:11
**irrelevant**
  384:4
**isolate** 153:13
  154:3,10 155:2
  155:17 156:4

156:20 157:4
  379:17,24
**isolated** 157:14
**issue** 44:12
  96:16 121:15
  124:25 126:2,5
  126:11,21,25
  127:9,17,23
  220:6,11,20
  261:14,25
  273:8 275:9
  279:4,15 281:8
  299:6,16 300:7
  301:6,17,25
  314:2 316:19
  317:8 356:12
  372:17,21
  375:13 376:5
  376:11 377:10
  378:2
**issued** 99:6
**issuer** 185:25
  219:21
**issues** 384:18
**item** 35:17
**items** 219:7
**iv** 376:19,22

**j**

**january** 1:6
  3:17 39:15
  42:3,16,21
  43:6,7 45:4
  54:14,20 55:6
  60:3 109:6,17
  110:4,10

112:16 113:9
  115:10 116:8
  116:16 117:21
  118:22 119:18
  120:10 121:22
  122:4,4,12
  123:23 124:3
  125:6 126:7,13
  127:19 128:8
  128:18,25
  129:7,13,22
  130:23 132:3,6
  134:4,13
  135:15 227:25
  228:9 315:9,24
  317:9 320:13
  325:15 369:8
  374:16 381:21
  381:25 382:2,3
  384:8 386:1
  389:1
**job** 210:12
  307:12 323:5
**john's** 203:12
**joined** 4:16
**jointly** 19:19
**jones** 242:17
  371:13,18,23
  372:5,23 373:9
  375:7,12 376:8
  377:11,15,21
  382:7,9 387:17
**journal** 18:13
  18:19,20,25
  19:5,8,11

168:10 169:13
  314:18 315:9
**journals** 18:23
**journey** 314:11
  314:19 316:6
**judge** 75:3
**justification**
  338:20
**justified** 362:3
  363:9 364:4

**k**

**k** 185:19,20,23
  185:24 186:7,7
  186:18,18
  187:6,6,18,18
  188:19,20
  199:14,15
  218:14,14,23
  218:25 219:5,5
  219:8,8,19,20
  220:2,2,5,7,11
  220:11,20,21
  222:5,5,15
**kane** 244:15
**kathleen** 52:2
**keep** 79:22
  209:16 237:15
  325:2
**kellogg** 20:9,16
**kind** 51:14
  144:19 267:18
  279:6 286:11
  334:16
**kindly** 178:18

**knew** 11:13
130:5
**know** 7:19 9:5
9:16 10:15,20
10:22 13:24,24
20:25 28:3,16
28:16 29:5
30:14 35:25
37:23 38:14
48:15,16 54:7
56:9 57:13
58:12 59:2,4,6
63:20 68:12
70:13,25 71:19
71:25 77:13,14
79:2,22 81:16
84:10 85:25
87:14,19 88:6
88:8 90:14
91:6 92:15
95:22 97:23
99:10,23,24
103:23 104:10
105:6 106:8
108:14 112:7
113:24,25
115:23 116:20
119:17,22,24
120:22 133:22
135:18 138:11
138:15 139:12
140:11,12,16
140:19,24
142:10,12
143:3 144:13

151:18 152:5
153:7 155:7
160:11 164:12
172:2,11
174:11,16
175:12 176:5
177:25,25
180:15 181:12
189:4 190:2
192:21 193:2,3
193:6 194:2,21
195:7,16,21
201:13 205:3,8
205:13 206:13
206:21 208:7
208:10,12,25
209:6,9,16
215:16 220:3
223:16 226:22
228:12,21,24
229:2,11 230:9
231:19 235:19
240:9 241:7
242:20 246:13
246:18 250:3
250:11 252:6
252:25 253:23
254:5,8 255:6
256:16,18
259:6,10 263:7
264:4 265:11
265:16 266:6,8
266:21 267:3,5
267:8,9,10,12
270:18 271:12

272:3,25 275:7
276:19 278:6
280:2 282:19
283:18 284:15
286:4 291:9
294:17,18
296:15 297:13
298:10 300:16
303:6 316:9
317:17 321:6
322:11 329:3,8
331:24 332:22
338:17 339:12
339:24,25
342:7 343:12
343:13,17
345:8 346:4
350:5 351:10
354:16,20
355:21 356:17
362:16,17
363:13 368:8
368:20 376:22
380:13
**knowing**
271:14,17
348:3 363:18
**knowledge**
74:23 168:20
201:7,16
277:18 278:23
297:17
**knowledgeable**
257:10

**known** 84:15
85:15 124:16
362:10,15,18
**knows** 106:3
**koss** 39:22
44:14 45:9
46:12 109:14
109:17 110:8
126:15 319:6
376:6
**kreps** 362:14
**krogman** 43:5
138:11,17
139:23 140:3
141:5,15,22
142:13 320:17
**ks** 174:20 175:2
189:19 218:20
219:13,14,17

**l**

**l** 2:10
**labeled** 36:12
**lack** 99:7
149:25 150:5
150:22
**large** 110:13
111:4,9,19
112:2 119:8,24
257:13,16
296:3,5,10
369:9
**largest** 112:4
112:12,20,24
113:10 115:3,7
115:10,14

116:21,24
117:10 118:16
118:23 119:19
119:25 120:10
**larry** 37:25
119:11 202:13
249:7 345:20
**late** 291:11
**laurence** 2:5
4:19
**law** 2:3 11:21
12:2,21 13:2
25:12 26:3,18
26:21 28:7
31:21 68:16,19
70:21 72:15
74:10 75:4
78:6 101:23
166:10,19
167:2,16,22
168:13 169:11
170:8,13,15
203:12 242:6
253:10 280:13
280:15
**lawsuit** 11:22
32:25 33:11
**lawyer** 53:6
68:7 78:7
92:11,20 93:6
93:24 96:3
138:10 142:9
219:24
**lawyers** 71:5,6
71:8 72:15,21

72:22 77:10,22
78:4 91:25
166:9
**lay** 274:12
**layman** 47:10
72:18
**layman's**
274:12
**layperson**
279:17
**lead** 183:16
217:5,14
246:11,15
**leading** 265:23
266:11 292:12
320:12 381:24
383:20
**leaked** 95:23
**learn** 193:20,24
**leave** 176:8
298:14 357:23
**leaving** 262:11
**lecturer** 7:23
8:22 21:4
**led** 188:12
**left** 130:4
258:25 259:21
333:3,11
368:19 373:8
**legal** 14:4
27:22 28:25
68:13 75:14
138:9 166:11
168:6 279:7
280:18 337:10

**legally** 5:12
**lepic** 2:12 4:18
**level** 184:20
197:23
**levels** 375:25
**library** 6:15,19
**license** 5:13
**life** 106:4
314:20 362:16
**likely** 135:6
153:14 154:4
154:11 155:3
155:18 156:5
156:22 157:5,7
157:15 178:13
364:16 379:18
379:25
**limit** 217:2,12
**limitation**
26:12,16
**limitations**
371:3
**limited** 28:19
329:8 372:16
**line** 29:14
89:17,20,20
96:3,11 98:15
98:19,20 113:8
216:22 387:19
387:23 389:4,7
389:10,13,16
389:19
**lines** 38:13,15
60:4 92:19
94:14,20 98:21

153:21 156:2
213:19 217:9
243:18,24
314:16 370:4
370:15 374:11
375:2,22
**linked** 284:24
**list** 18:8 25:22
32:3,9 373:8
**listed** 186:10
313:18
**lists** 32:16
180:21
**literally** 241:5
**literature**
18:17,21 19:3
19:6 78:7
101:22 342:23
343:23
**litigation** 1:7
3:18 6:4 34:7
84:8,8 89:9
101:6,8 162:6
169:19 272:24
326:17 386:1
389:1
**litinomics** 7:7
**little** 52:7,8
62:23,24 127:2
127:10 180:16
207:9 286:13
**lived** 270:13,14
270:24
**living** 15:5

[llp - lost]                                                        Page 42

| | | | |
|---|---|---|---|
| **llp**   1:15 2:8 | 125:8 128:2 | 353:3 354:3 | 159:25 160:4 |
| 4:15 | 133:19 134:8 | 355:20 356:5 | 161:2,4 174:20 |
| **location**   3:21 | 136:2 138:10 | 358:18 359:8 | 178:10 186:20 |
| **logarithmic** | 140:19 141:22 | 361:4,7,8,13,18 | 198:3,24 203:4 |
| 109:11,11,20 | 142:2 144:15 | 369:15,16 | 204:24 207:16 |
| **logic**   17:18 | 145:7,9 150:7 | 370:3 372:2 | 207:19 212:6 |
| 79:3 | 155:6,14 | 373:2 374:10 | 218:20,22 |
| **logical**   341:24 | 162:22 170:20 | 374:25 | 219:4,16 |
| **logically**   46:15 | 179:24 184:2 | **looked**   33:3,13 | 230:25 233:7 |
| 288:9 324:2 | 185:14 201:9 | 33:17 42:8,13 | 237:17 240:22 |
| **long**   79:2 188:9 | 207:13,15 | 51:10,20 120:4 | 240:23 242:24 |
| 216:10,13 | 208:5,18 | 122:3 140:24 | 243:11,23 |
| 271:12 285:15 | 209:22 210:17 | 154:16,20 | 245:14 256:23 |
| 339:5,22 351:8 | 213:14 226:20 | 155:13 165:22 | 261:5,6,8 |
| **longer**   102:17 | 229:9,11,13 | 171:3 174:22 | 269:25 282:2 |
| 103:16 188:13 | 230:5,11 231:9 | 180:23 181:7,8 | 286:15 288:6 |
| 225:22,24 | 232:2,9 239:3 | 186:21 199:6 | 306:12 314:16 |
| 226:5,8 243:16 | 242:3 243:22 | 209:10 216:15 | 316:24 317:10 |
| 285:10 290:17 | 244:7 245:3 | 216:16 240:2 | 319:23 333:8 |
| 290:22 291:6 | 247:15 248:4 | 241:8 276:17 | 335:25 352:19 |
| 371:19 | 248:20 249:10 | 284:8 321:7 | 352:25 356:3 |
| **look**   5:13 25:18 | 259:6,25 260:8 | 329:23 350:4 | 358:19 362:25 |
| 30:20 42:18 | 261:2,4 268:9 | 369:25 375:11 | 365:2 371:2 |
| 54:8,13 57:6 | 269:20 271:6 | **looking**   13:12 | 373:18 375:13 |
| 58:7 66:22 | 272:7 273:6 | 13:16 22:23 | 375:16 378:10 |
| 72:25 83:5,14 | 274:15 275:2,7 | 33:21 39:11 | 383:24 |
| 83:15 89:16 | 276:14,18 | 41:5 42:10,24 | **looks**   162:16 |
| 90:15 100:5 | 280:16,17 | 44:18 48:24 | 204:2 249:24 |
| 101:2 106:9,25 | 282:24 295:21 | 53:2,8 55:18 | 327:12 331:15 |
| 108:18 109:13 | 300:16 302:18 | 63:22 66:18,23 | **loss**   60:14,15 |
| 109:22 112:6 | 313:13,25 | 73:25 95:24 | 60:22 61:6 |
| 113:13,16 | 314:5 325:3 | 109:10 124:13 | 355:2,9 |
| 114:2,14 115:4 | 328:7 329:20 | 125:11 130:15 | **lost**   51:14 |
| 115:18 116:2,4 | 329:22 340:4 | 148:6,7 153:10 | 309:8 |
| 116:23 118:3 | 352:12,19,24 | 154:14 158:7 | |

**[lot - market]**

**lot**  28:13
  175:21 178:2
  185:6 278:2
  286:10 295:22
  338:13 343:13
  350:3 363:12
**lots**  380:13
**low**  197:9
**lp**  89:8
**lrosen**  2:6
**luis**  7:24 8:23
  10:3 19:25
  20:6 21:11,16
**lunch**  136:4
**luncheon**
  136:10
**lying**  59:3

**m**

**m**  5:3 137:4
  371:13,18
**macroecono...**
  270:21
**made**  93:15
  189:20 218:7
  225:12 229:20
  231:23 233:17
  233:20 234:13
  234:21 241:23
  285:19 339:13
  386:6
**madison**  2:3
**magnitude**
  294:12 299:20
  309:23

**main**  364:15
**maintain**
  303:21
**major**  216:24
**majority**  10:10
  298:21
**make**  9:22
  14:25 29:7
  47:25 48:5,7
  72:25 105:22
  118:20 142:23
  152:20 162:21
  167:13 183:2
  198:8 217:20
  220:2 233:19
  268:22 276:11
  287:21 288:2,5
  289:7 292:5
  298:11 307:4
  329:22 341:8
  343:6
**makes**  9:5,13
  205:3 208:12
  236:11
**making**  118:6
  118:21,24
  152:8 155:10
  159:22,23
  189:22 218:25
  288:15 307:22
  342:7 357:15
**man**  244:11
**manage**  188:10
**management**
  20:10,17

**manipulation**
  167:10 282:10
  283:15 284:4
  285:14 287:18
  288:13 290:21
  336:10 337:3
  337:10,20
  338:9 381:16
**manufacturers**
  178:3,5,8
**march**  8:18
  23:12 162:3
  166:15 171:4
  179:20
**margin**  131:4,6
  131:9 375:3
**mark**  21:18
  242:5
**marked**  22:8
  22:10 31:9
  32:13 36:9
  89:5,11 107:24
  161:22,25
  179:18 195:25
  210:20 235:5
  242:9 257:24
  281:22 312:25
  313:8 316:13
  325:4 327:3,8
  358:4,9,21
  371:15 372:4
**market**  16:3,18
  17:8,15,24
  18:4 29:11
  30:3 37:9

**manipulation**
  39:20,22 41:14
  42:2,13 44:4
  44:11,24 45:10
  45:19,23 46:4
  46:13 50:10
  51:9,21,24
  52:4,10,13,15
  54:19 55:5
  63:9,13 64:20
  64:25 65:11,21
  66:9,15 67:8
  67:12,18,22,25
  68:3,24 69:5
  69:11,12,15
  70:3,5,19
  71:14 72:8
  74:11,16 75:14
  76:2,3,8,9,13
  77:25 79:11,15
  79:15,21,24
  80:6,10,10,14
  80:20 81:2,4
  81:11 82:8,13
  82:18,21,23
  83:2,20,25
  84:3,13,15,21
  84:25 85:6,11
  85:15 87:25
  90:10,12 96:9
  97:25 99:9,17
  99:18 100:18
  101:13,20,24
  102:8,22,24,25
  103:5 104:2
  110:18 121:16

**[market - mean]**

137:23 138:6
138:20 139:8
139:11,12
140:5,17,22
141:6,17,23
142:7,14,20
143:14 146:22
149:5,18 150:2
150:5,16,23
151:5 152:4
165:13 167:2,9
167:17,23
168:14 169:11
173:20 176:20
176:21 178:16
183:6,9,17
187:9 189:22
203:21 204:19
207:7 211:23
213:8 215:22
217:21 221:10
223:3,25
232:13 239:2
239:23 240:8
255:23 257:8
257:17 258:15
261:19,25
265:15 271:21
272:9,13,17
273:14 275:14
276:2 277:16
278:9,21 279:4
279:15,20
280:8 281:8
282:8,9,25

283:7,13,15
284:2,4,19
285:12,14
287:7,15,17
288:11,12
290:5,7,11,19
290:21 319:19
320:12,19
340:11 341:7
341:13,17
342:5 344:3,25
345:7 347:14
358:6 359:4,17
359:22 360:4
360:16 362:13
366:23 380:25
381:14,15,21
387:15
**markets**   26:6,8
26:10,15,24
27:5,17 31:15
37:4,5 104:8
105:3 212:8
261:14 262:17
263:4,13,20
264:19,25
266:19 267:23
269:6,18 270:4
271:15 274:4
282:5 283:10
283:23 284:9
285:8 287:3
288:7 289:12
289:23 339:5
339:22 381:11

381:19
**marriage**
388:13
**master's**   5:23
**matches**   67:19
70:7
**material**   24:9
97:8,14,17
175:5,14
188:21 189:21
220:25 221:14
221:16,21,23
229:16,21
230:3,3 231:17
231:22 259:2
259:21 262:11
312:10 341:10
380:11,14
**materiality**
222:8,14
**matter**   3:17
14:4 17:5
30:13 46:23
60:11,15,23
79:10,12 80:5
80:7 85:12
105:18,20
173:23 174:3
180:22 230:9
232:21 251:19
254:19 264:17
264:23 271:4
274:2 310:8
311:5 378:10
388:14

**matters**   14:20
15:10 16:14
138:9 175:25
180:21
**mba**   20:11,21
20:22
**mccabe**   252:2
**md**   1:4 3:21
**mean**   7:17 9:3
12:3 13:25
14:4 20:8 21:2
27:23,24 28:13
28:14 29:4
30:4,20 34:3
34:15 38:10
39:18,23 43:23
45:16,24 47:6
47:9,11,15,25
48:10,12 49:18
49:18 50:11
51:19 54:3,4
54:10 55:8
56:8 57:4,5,10
57:20 58:25
61:7 62:24
63:20 64:17
65:15 66:4
68:2 69:16
70:4,10,23
71:17 72:25
73:3,10,14,19
77:14 79:19
83:13,14,20
84:6 86:5,9,16
86:18 87:15,19

88:11,12 89:2
89:21 90:14
91:7 93:3
95:16 96:12,16
96:22 98:4
99:16,18
100:20,22,23
102:21,23
105:7,22 106:8
110:17 111:18
112:18,23
115:21 119:23
120:2 121:24
123:3,6,13
124:19,23
128:12,13
130:9,18 131:3
131:6,24 132:9
133:19 134:21
134:22 135:5
140:6 145:6,7
146:18 148:2,4
151:11,12,17
154:15,18
155:7,9 156:16
156:24 157:21
158:23 160:11
164:23 167:4
170:5 171:8,16
172:5 174:7
176:5,8,18
178:15 182:5,9
182:17,22
183:4 184:11
186:20 188:16

189:4 195:16
195:17,21
201:8,8 204:5
206:9,11 208:2
209:6,15
215:18,19
218:18 220:4
226:19 228:5,6
228:17,24
232:2,10
237:14,22
239:2,24
240:18 241:22
247:15,16,23
249:10,11
252:19,20
254:13,15
256:8,10 259:9
259:10,25
263:24 264:3,4
265:3,16 266:7
268:6,8 272:4
274:8,15
277:22,23,25
280:10 283:17
284:17 287:21
287:22,24
293:15,17,20
294:24 295:3
296:3 297:5,10
300:13,15
302:5 304:5
305:8,11,14
306:11 308:18
309:24 310:6

310:23 311:21
313:25 314:25
315:16 321:7
322:22 325:11
328:19,22
330:6,6 331:18
335:10 338:16
339:10,25
341:19 342:20
343:2,10,12,16
345:3,19,23
347:20 348:3
349:15,25
350:7 351:25
352:5,6 353:8
354:3,16,18
355:20,22
360:20 361:7,8
361:15 362:15
362:21 363:11
363:16 364:5,5
365:6,7,18
375:7,17,19
380:6,9,22,23
381:17 382:4
382:17
**meaning** 17:4
183:19 199:16
**meanings**
303:3
**means** 40:4
45:3 59:23
67:12,17 106:7
106:11,12
114:15,19

150:10 152:17
265:9 266:25
306:4 342:8
357:12 378:15
**meant** 24:13
90:21 99:17
104:11 105:15
113:4 134:18
211:2 347:7,9
347:11 352:7
363:13 380:10
380:22 381:2
**measure** 53:16
54:5,17 56:10
56:14 58:9
64:6 121:14
175:10 264:7
278:8 284:16
353:15
**measured**
30:12 74:5
293:20 378:7
**measurements**
59:21
**measuring**
356:9,23
**mechanism**
74:13
**media** 3:15
35:10,15 76:24
77:5 136:8
137:7 179:9,14
211:18 251:10
251:15 312:22
313:5 348:11

[media - model]                                                    Page 46

348:16 384:24
**meet**  10:24
131:4 148:13
184:5 200:5
**meeting**  11:6
176:14
**meets**  148:9
184:11 237:19
237:20
**member**  47:3
**members**  53:15
**memorized**
114:23 208:3
269:19
**memory**  101:4
115:21 125:9
129:15 133:22
136:3 162:20
211:24 221:5
295:4 369:17
374:5 378:6
**mentally**
117:10
**mention**  99:18
**mentioned**  41:4
214:24 217:4
268:6 291:15
378:12
**merely**  72:14
143:6
**met**  11:5
151:20,22
174:12 204:23
**method**  55:5
74:2 197:19,24

231:6
**methodologi...**
217:19 218:7
240:21
**methodologies**
53:10 187:12
190:4 288:25
292:6
**methodology**
46:25 47:14
52:25 122:24
174:15 175:18
177:3,6,12,22
181:21,23,25
182:4 190:17
193:19 194:16
194:23 195:5
196:23 198:12
204:24 205:12
205:25 206:23
207:2,10,22,25
208:3,9,20
223:19 225:23
226:6 235:18
236:23 247:25
292:2 315:14
355:7 368:25
**metro**  211:17
**michael**  52:2
**michigan**  15:5
**microphones**
3:5,10
**microstructure**
51:9,22,25
52:4,10,13,16

**middle**  41:6
211:16 212:16
258:11 315:25
377:8
**midway**  42:25
**miguel**  252:3
**miller**  65:15
**million**  292:21
293:5
**mind**  47:18
50:18 52:23
55:4 58:3
59:19 135:14
187:4 192:19
226:17 243:6
289:11 290:16
302:22 303:13
303:16,19
304:13 347:23
351:7,11,17,17
355:15 362:20
**minuscule**
249:15 250:23
**minute**  120:5
208:16 251:4
316:15 368:21
377:13,13
**minutes**  81:14
120:4 214:9
218:21 219:10
353:5,6,6
368:19
**mischaracteri...**
233:24 366:4

**misconduct**
353:14
**mispriced**
74:12 338:18
338:21,23,25
339:6,7,8,23,25
**mispricing**
336:9,25
337:18 338:8
338:15
**misquoted**
258:24 259:5
259:11,15,16
260:7,25
**missed**  53:5
85:19 97:14
**missing**  324:4
**misspoke**  80:16
176:13 234:2
261:10 311:9
311:13
**mistake**  245:16
**mistyped**  5:15
**misunderstan...**
117:8 300:3
**misunderstood**
199:22
**mitigating**
124:11 130:3
130:10,11
287:22
**mixed**  201:23
**mixing**  202:11
**model**  48:12,13
48:15,18,25

**[model - need]** Page 47

49:6,9,13,14
50:8 51:12,14
51:17,19 52:22
53:12,25 54:3
54:4 57:3,11
58:8,13,19
59:8,12 60:2,2
67:21 70:9
123:20 131:15
132:14 209:20
291:18 292:7
349:18 354:23
355:3,11,12
357:9,10,19
**model's** 131:17
132:15
**models** 48:2,6
49:15 50:12
52:17,19 59:18
59:23
**modern** 65:12
65:14,16
**modigliani**
65:15
**moment** 9:23
14:18 50:3
161:25 281:20
323:10
**momentum**
227:9,12
230:17,18
312:6 380:18
**monitor** 240:22
**month** 245:20

**months** 6:12,18
**moore** 1:15 2:8
3:22 4:15
**morning** 3:2
5:8,9 125:6
172:7
**move** 178:7
213:4,24
246:10 308:4,8
345:13 346:18
347:16
**moved** 189:9
**movement** 58:5
61:21 88:9,10
98:2 113:10
115:9,15
116:22,25
117:11 118:23
119:19 174:13
224:20 225:6
225:10,18
226:16 227:21
228:3,11 229:5
235:11,14
297:3,23 299:7
299:17,21
300:8 301:7,18
**movements**
56:5 58:20
61:24 62:13
64:15 86:12,15
86:17,25 87:17
87:20,23,24
88:4,16,19
89:22 90:9

96:14,18 97:5
97:11 99:4,8
100:11 101:10
104:5,15,24
105:9 106:16
106:19 107:13
110:10,12
112:13,19,21
112:25 114:24
115:11 117:21
119:9 120:10
130:2,22 152:2
213:25 224:3
226:25 228:18
236:5,7 291:19
296:2,9,20,23
307:25 348:23
**movers** 226:23
**moving** 174:24
174:24 219:2
300:23
**multi** 48:12
**multiple** 159:6
181:12,14
218:8 315:2,6
**music** 250:10
250:15
**mute** 3:8
**myers** 265:17
265:18,22,23

**n**

**n** 2:2 5:3 137:2
137:2,2,4
251:25,25
387:2

**name** 3:24 5:11
170:2 217:3,13
252:3 253:17
**named** 253:10
**names** 170:23
170:24
**narinder**
253:10
**nearly** 344:4,11
344:18
**necessarily**
48:9 85:5
134:16,19
150:15 152:10
161:4 165:10
167:11 176:17
178:6,15
193:15 194:2
194:13 205:8
221:15 237:21
241:15 282:19
282:24 284:13
284:17 285:10
290:17,23
351:8 352:6
354:15
**necessary**
78:25 79:5
386:7
**need** 47:25 48:5
48:7 90:25
91:7,8 93:14
95:19 97:18
98:5,6 106:10
107:20 115:18

**[need - news]** Page 48

| | | | |
|---|---|---|---|
| 134:8 172:7 | 114:20 150:19 | 150:9,12,12,13 | 181:17 182:14 |
| 210:11 212:18 | 268:13 299:23 | 151:3,3,11,23 | 182:15,18,19 |
| 213:10 226:18 | 332:2 | 152:14,14,17 | 183:14,17,17 |
| 276:6 280:13 | **new** 1:15,16,18 | 152:17,18 | 184:6,6,7 |
| 282:7 283:12 | 2:4,4,9,9 3:23 | 153:2,2,4,5,12 | 185:2,2,3,3,5 |
| 283:25 285:11 | 3:23 6:14,18 | 153:12,13,25 | 185:18,19,20 |
| 286:11 287:15 | 65:24 76:12,16 | 153:25 154:3,9 | 186:7,19 187:7 |
| 288:4,10 | 90:10 137:21 | 154:9,10,19,24 | 187:7,8,13,13 |
| 290:18 304:19 | 144:3 158:4,13 | 154:24 155:2 | 187:19 188:18 |
| 307:14 331:22 | 159:12 160:21 | 155:18,21 | 188:21,24 |
| 331:22 339:17 | 162:6 163:22 | 156:4,7,12,16 | 189:17,21 |
| 350:7 351:3,4 | 173:3 327:24 | 156:16,19,19 | 190:9,9,19,19 |
| 354:20 356:21 | 328:11 329:14 | 156:21,24,25 | 190:25,25 |
| 356:22 369:25 | 332:8 333:5,13 | 157:3,3,4,11,11 | 191:11,11,22 |
| 381:13 | 333:20 388:5 | 157:14,24,25 | 191:22 192:2,7 |
| **needed** 11:18 | **news** 40:17 | 158:3,10,10,13 | 192:7,20,20 |
| 38:18 131:5 | 61:24 62:6,8 | 159:4,4,9,9,11 | 193:5,5,13,13 |
| 165:12 231:9 | 62:12,16,19 | 160:16,16,20 | 193:15,16,23 |
| **needs** 215:22 | 63:7,18,22,23 | 161:16,16,17 | 193:23 194:3,5 |
| 220:6,11,20 | 64:5,10 96:15 | 163:13,13,15 | 194:5,13,13,21 |
| **negative** | 98:16,22 99:5 | 163:16,19,21 | 194:21 195:2,2 |
| 183:16,19 | 124:19,19 | 164:4,4 165:22 | 195:13,13 |
| **negatives** | 144:4,5,9,9,11 | 165:23 171:21 | 196:5,5,6,19 |
| 182:12,17,24 | 144:12,15,17 | 172:18,18 | 198:4,4,11,11 |
| 183:3 | 144:18,23,25 | 173:2,2,2,19,22 | 198:17 199:12 |
| **neither** 31:12 | 145:2,5,10,10 | 173:22 174:4,4 | 199:23 200:5,6 |
| 67:3 | 145:13,14,18 | 174:21 175:4 | 201:5,5 203:25 |
| **neo** 174:21 | 145:19,21 | 175:10 176:3,3 | 204:24,24 |
| 187:11 188:3 | 146:2,3,7,8,20 | 176:10,15,16 | 205:10,10,23 |
| 188:12,17 | 147:2,3,7,8,10 | 176:24,25,25 | 205:23 206:2,2 |
| 218:11,13,19 | 147:16,17,23 | 177:11,14,19 | 207:5,5,11,11 |
| 218:22 219:12 | 147:24 148:10 | 177:20,20 | 207:23,23 |
| **nera** 7:7 191:14 | 148:14,14 | 178:11,12,14 | 208:11,11,20 |
| **never** 15:14 | 149:3,4,9,9,15 | 178:14 180:10 | 208:20 211:9 |
| 20:5 21:9,15 | 149:16,23,24 | 180:10,20 | 213:25 214:24 |

**[news - november]**                                                  Page 49

| | | | |
|---|---|---|---|
| 215:12,13 | 323:3,9,12,20 | 116:10,18 | 323:24 324:14 |
| 216:23,25 | 323:22,24 | 117:13,14,23 | 324:23 326:3 |
| 217:11,20,20 | 324:14,21,23 | 126:21 184:4 | 334:18 350:8 |
| 218:3,17 221:9 | 325:16,21,21 | 184:24 187:18 | **nonefficiency** |
| 221:15,16,21 | 325:25 326:3 | 196:22 197:10 | 246:17 |
| 222:2,6,7,7,19 | 328:18 332:8 | 197:19,23 | **nonsubstanti...** |
| 223:13 224:7,9 | 333:5,13,20 | 228:7 231:2,10 | 23:18 |
| 224:25 225:3 | 334:8,9,11,17 | 233:8 255:23 | **normally** |
| 227:18,18 | 334:18 335:3,4 | 256:14,20 | 293:23 |
| 228:7,9 229:3 | 335:9,20,21 | 289:13 297:2 | **northwestern** |
| 229:16 234:23 | 336:6 341:10 | 297:22 299:5 | 5:22 6:24 |
| 235:10,12,23 | 341:12 345:14 | 299:16 300:7 | 20:17 21:6 |
| 235:23 236:4,6 | 346:19 347:17 | 301:6,17,24 | **notably** 375:5 |
| 236:16,19,20 | 379:11,12,14 | 302:8 306:6,16 | **notary** 1:17 |
| 237:7,9,9,13,21 | 379:18,20,24 | 308:13,24 | 386:14,21 |
| 237:21,24 | 380:3 | 309:12 310:12 | 388:4 |
| 238:3,14,15,19 | **newspapers** | 310:18 349:23 | **note** 3:5 117:10 |
| 238:24,24 | 216:24 | 372:17,21 | 133:5 200:19 |
| 240:5,5 242:2 | **nfc** 314:20 | 381:20 383:14 | 203:5,6 256:23 |
| 242:24 246:8 | **nfl** 314:9 | **nobel** 257:10 | 257:2 359:3 |
| 246:12 247:19 | **nihat** 133:12 | 257:12,16 | 370:6,17 |
| 247:22 256:11 | 134:6 | **nokia** 41:17 | 372:20 375:21 |
| 256:11 295:23 | **nine** 25:23 26:5 | 126:15 250:5,7 | **noted** 385:4 |
| 295:24,24 | 26:23 27:18 | 250:13,17,18 | 386:7 |
| 296:6,7,18,18 | 31:14 36:24 | 314:4 | **notice** 1:14 |
| 296:25 297:7 | 37:17 40:5 | **non** 131:15 | 36:17 226:14 |
| 297:12,21 | 41:13 43:17 | 132:14 144:5 | **noticed** 113:7 |
| 299:5,15 300:6 | 44:5,22 49:10 | 144:18 145:2 | 113:15 178:4 |
| 300:13 301:5 | 56:5 71:3 | 145:10,21 | **noticing** 4:13 |
| 301:16 316:19 | 89:13 91:4 | 146:3,8 147:3 | **notion** 265:10 |
| 316:23 317:7 | 99:11 100:15 | 147:17,24 | 266:21 |
| 317:13,16,19 | 101:22 104:11 | 149:4,9,16,24 | **november** |
| 317:22 318:4,5 | 105:11,16 | 153:5 163:16 | 91:22 93:2,9 |
| 318:18 320:3,3 | 106:3 112:22 | 185:2 238:15 | 93:10 |
| 322:17,25 | 112:25 114:25 | 322:17 323:22 | |

nscc   131:11
null   334:25
  335:18
number   36:15
  69:22 93:11
  125:13 168:24
  175:24 176:6
  187:3,4 211:8
  254:10 318:5
  340:16,18
  382:8
numbers   36:17
  329:20
numerous   11:4
  170:17 172:6

**o**

o   137:2,2,2
oath   4:4 105:10
oberlin   5:20
  6:9
obispo   7:24
  8:23 10:3
  19:25 20:6
  21:11,16
object   208:23
  209:4 326:17
  326:19 327:5
objected
  208:24
objection   27:21
  29:13 37:20,21
  38:2,6 118:9
  131:18,21
  206:19 233:23
  326:13 336:14

337:6 366:14
380:8 381:24
383:3,20 384:9
objections   4:8
objective   155:2
  158:2,12,19
  160:19 163:20
  175:10,16
  189:23 190:3,8
  190:23 223:18
  225:19 230:6
  230:25 231:25
  232:4,16
  233:13,14,17
  234:2,4,10,15
  379:10
observation
  298:23 319:24
observational
  264:15,16,17
  264:23
observationally
  268:3 269:8
observations
  59:7 298:3,10
  330:19,25
  333:5
observe   113:22
  114:10,20
  115:8 117:9,16
  145:12 148:11
observed   98:2
  113:19 115:16
  117:9 360:23

observing
  226:11
obvious   175:2
obviously
  24:25 80:22
  96:23 190:17
  201:13 223:5
  277:25 330:7
  361:10 371:21
occasionally
  268:3
occasions   12:23
  159:6
occur   15:23
  270:4,12 271:3
  274:23 275:18
  357:20 368:3
occurred
  188:11 231:22
  268:24 269:13
  269:16,20
  273:5 274:19
  275:4,6 276:13
  276:16,18
  311:25 354:2
  357:18 367:14
  368:5
occurring
  275:19,23
  354:17
occurs   242:20
  352:14 357:21
october   358:8
  359:6

odd   210:14
offering   27:15
  29:10,25
offices   1:14
officially   263:8
oftentimes   16:8
  16:12 178:8
  189:16 270:18
oh   9:18 12:7
  13:23 24:22
  42:9,20 73:15
  74:8 75:16
  76:17 80:18
  91:2 108:11
  109:9,24 112:5
  121:10 157:7
  163:3 171:14
  178:21 191:25
  194:24 201:24
  202:19 223:16
  224:5 234:7
  245:15 253:21
  254:14 261:8
  265:19 266:24
  267:8,24 268:7
  275:20 280:15
  286:21 287:6
  291:24 309:21
  341:7 346:24
  347:10,18
  350:18 358:25
  362:4,21,24
  365:5 373:10
  373:13 376:25
  376:25 377:6

**[okay - omega]**

Page 51

| | | | |
|---|---|---|---|
| **okay** 9:7,19 | 133:4 135:8,9 | 229:15 234:20 | 316:11,15,16 |
| 10:10 13:9 | 135:12,21 | 235:3,22 | 316:24 317:2 |
| 14:17 18:14 | 137:16 143:21 | 238:12 242:3 | 317:12,20 |
| 20:23 21:18 | 145:11,16 | 242:11 243:6 | 318:22 322:8 |
| 22:7,14 25:20 | 147:11 152:12 | 243:10 244:7,9 | 322:13 324:3 |
| 27:14 28:6 | 152:15,22,23 | 244:22 245:5 | 324:10 325:2 |
| 29:6,20 31:11 | 153:10,19 | 248:13 249:11 | 326:8 327:13 |
| 34:21 36:21,22 | 156:18 157:24 | 249:20 251:5 | 330:10 331:14 |
| 39:6,9 41:2,10 | 161:20 162:19 | 252:9,18 | 333:10 334:14 |
| 44:16 46:10,17 | 162:21 163:5 | 253:22 254:9 | 339:20 342:22 |
| 49:5,8,20 50:2 | 163:10 164:18 | 254:21 255:2,6 | 344:22 345:4 |
| 50:15 51:18 | 166:14,18 | 255:18 256:5 | 345:11 346:8 |
| 58:2 59:11,16 | 167:13 169:3 | 256:22,25 | 346:21 348:6 |
| 59:25 60:7 | 170:11 171:15 | 258:3 259:8,20 | 349:9 351:12 |
| 61:16 63:24 | 171:19 172:24 | 262:14 264:12 | 352:8 357:24 |
| 64:11 65:4,9 | 179:2 181:19 | 265:2 266:5,14 | 358:11,23 |
| 68:7,21 69:25 | 182:23 184:2 | 266:24 267:3 | 360:12,19 |
| 71:9,21 76:11 | 184:14,22 | 269:14 270:16 | 361:22 362:9 |
| 76:21 79:9 | 185:8,14 186:3 | 271:13,20 | 363:21 365:24 |
| 80:23 82:22 | 186:14,25 | 272:16 277:4 | 367:4 369:4 |
| 83:3 85:10 | 187:14 188:3 | 278:25 280:3 | 370:14 371:10 |
| 86:8 92:13 | 191:15 192:9 | 281:3,13,17,24 | 371:17 373:6 |
| 94:13 95:8 | 192:17,25 | 281:25 282:20 | 373:14 375:9 |
| 105:21 107:14 | 193:8,20 | 283:17 285:23 | 376:2,4 377:7 |
| 107:22 108:5 | 194:11,24 | 286:14,25 | 378:17 379:5 |
| 108:11 109:15 | 195:10,20,23 | 289:15,24,25 | 381:4,9 382:6 |
| 109:15 111:23 | 197:15 198:5,8 | 291:2,14 | 384:15 |
| 114:12 115:20 | 200:23 201:12 | 293:13,25 | **old** 5:14 |
| 118:2 120:2,12 | 201:19 203:6 | 294:5 295:17 | **omega** 161:13 |
| 121:9,10,10 | 203:10,19 | 296:10,15,24 | 162:4 163:19 |
| 123:2 125:16 | 207:18 214:20 | 301:23 302:3 | 164:4,22 171:4 |
| 125:24 127:14 | 218:6 220:16 | 304:8,9 306:15 | 171:22 172:18 |
| 127:25 129:17 | 222:3,11 | 308:10,17 | 172:25 173:13 |
| 129:20 130:25 | 225:21 226:10 | 309:16 310:10 | 180:22 202:24 |
| 131:13 132:19 | 228:22 229:2 | 314:7,22,24 | |

**once** 13:8 376:6
**one's** 52:21
  84:10
**ones** 22:5 140:3
**ongoing** 200:25
  201:8,10,15
**open** 291:6
  325:3
**opening** 25:17
  29:15 31:7,8
  31:12,22,25
  32:8,17 41:3
  41:24 44:17
  46:19 55:11
  61:13 62:12
  65:8,20 107:23
  109:23 121:3,8
  121:9 122:18
  132:20 133:2,3
  135:24 137:13
  139:15 143:19
  153:11 154:25
  156:3 174:2
  178:24 198:13
  201:21 202:2
  205:17 227:18
  235:24 243:2
  255:3 261:13
  281:18 292:8
  320:8 321:24
  325:3,22
  378:22
**opens** 37:9
  374:16

**operates** 8:16
**opine** 30:11
  45:18 75:13
  310:8 311:5,7
  355:9
**opined** 16:21
**opining** 27:8
  71:9,16,19,23
  72:5,5
**opinion** 6:16
  16:3,9,17,24
  17:7,16,25
  18:4 25:3
  27:15 29:10,25
  33:16 41:5,12
  41:24 44:18,20
  44:22 45:8
  46:17,21 47:12
  50:16 52:21
  54:23 60:22
  71:25 72:11
  87:6,7,10,25
  88:13 93:17
  96:8 149:17
  152:24 158:11
  165:16 166:5,7
  192:18 193:10
  193:25 194:20
  205:22 229:10
  231:11 234:18
  234:19 238:25
  239:23 240:7,9
  240:11 258:7
  262:10 271:20
  272:12,16

273:6,7,14
274:2 275:13
276:2 277:2
278:5 279:11
281:16 283:23
285:7 287:2,6
287:14 290:24
307:14 310:17
320:4,14 330:5
331:18 341:20
341:21,22
367:3,24
**opinions** 16:12
  24:16 29:19
  32:25 33:11
  46:6 79:11
  80:5,24 82:5
  85:11 116:6,14
  116:19 117:20
  117:25 119:17
  120:8,17,23
  143:6 165:11
  191:23 194:8,9
  194:10 203:25
  204:11 208:7
  222:24
**opportunity**
  93:19
**opposed** 40:3
  47:9 75:6
  146:2 156:13
  181:21 182:24
  233:14 234:11
  243:23 320:7
  367:5

**opposite**
  149:21
**option** 383:2
**options** 358:6
  359:4 382:20
  382:22 383:15
  387:15
**order** 34:8 67:7
  93:13 98:5
  143:24 155:17
  156:4 160:17
  210:9 225:19
  231:10 304:17
  354:21 379:15
  379:17,24
**ordinary**
  302:16 304:6,7
  304:9,10,11,19
  304:21,24
  305:11,22,22
  306:2
**organizations**
  7:12
**original** 13:13
  127:15 169:15
  255:11 274:21
  319:5
**originally**
  10:19
**outcome** 4:7
  131:17 132:16
  388:14
**outlook** 65:25
  66:5 314:20

[outset - paragraph]                                                    Page 53

**outset** 178:18
233:20
**outside** 169:18
171:6 245:10
**outstanding**
37:21
**overall** 258:15
261:19
**overly** 227:13
238:10
**oversimplified**
227:6
**overview**
156:15
**own** 314:11
343:15

**p**

**p** 2:2,2 184:16
184:18 197:18
318:12,25
326:4 329:21
329:24 330:21
331:3,9,12,16
**p.m.** 128:13,19
129:7 136:10
137:3 385:4
**packed** 185:6
**page** 13:18
36:15,17 39:8
40:15 41:6,7,9
44:18,20 46:18
54:10 61:14,16
65:7,9 66:24
69:22,24 73:25
74:9 89:16,18

89:20,20 91:18
92:19 94:14,20
96:2 98:15,19
98:20 107:19
108:3,7,12,14
108:17,21
109:10,14,22
109:24 121:2,5
121:6 125:13
125:15,20,20
126:24 127:8
132:19,23,25
132:25 137:14
137:15,16
140:21 143:20
153:22,22
156:3 162:10
162:11,22,23
162:24 163:3,4
172:21,23
185:15 198:24
200:15 201:22
202:4,6 203:5
203:6 210:23
211:7,11,16,16
212:7,10,16,16
213:2,4,20
214:21 215:7
216:22 217:8
235:6,8 237:3
237:3 244:8
245:19 255:12
255:13,14,16
257:25 258:3
261:12 282:2

286:19,21
290:15 314:5
316:25 321:13
322:14 325:7,9
327:4,20 328:8
329:12 330:13
330:16,17
331:17 332:5
333:3,12
358:20,23,24
359:2,14,16
360:11 365:3
368:17 369:6
370:5 372:3,9
373:3,5,11,11
373:12,13
374:10 375:2
375:10,21
376:8,24,25
377:5,5 379:2
382:15 387:3,7
387:19,23
389:4,7,10,13
389:16,19
**pages** 90:23
93:23 108:25
122:17,18
180:2,3 212:23
213:5,11,21
214:11,12
241:11 242:19
243:5
**panda** 247:8,13
248:9

**pantheon** 65:17
**paper** 134:2,9
140:21 158:20
158:22 170:7
190:14,16,18
191:8 204:3
207:14 208:10
209:21,23,25
210:7,11,15,18
211:4 216:11
216:14 222:23
224:24 225:16
362:6,10,20
371:13,23
372:6 375:8
377:21 378:5
382:7,9 387:12
387:17
**papers** 49:16
49:19,23 50:5
169:18 170:24
**paragraph**
25:19,22 39:12
42:18,25 43:2
53:8 54:10
61:15,18 62:5
62:11,22 63:3
65:8,20 66:23
69:16,19 70:4
70:17 71:11
72:6 73:25
74:8 121:2,4,4
122:2 123:17
125:18 132:20
135:24 137:14

**[paragraph - performing]**                                    Page 54

137:16 139:15
141:12 143:19
153:11 162:18
171:4,22
172:17,22
173:12 199:4
200:12,15
217:5,7,14
235:7 243:18
255:15 256:23
257:21 258:5
258:11 259:22
260:2 261:7,10
262:8 282:3,4
283:10 284:21
286:16,21
287:13 317:10
319:11 321:13
321:18 330:18
334:23 359:15
360:8,10 377:4
379:2,3,7
381:5
**paragraphs**
31:8 163:2,7,8
**parallel**   306:25
**part**   5:25 26:16
31:20 42:21
70:11 81:19
95:22 97:14
141:19 145:3
145:11 181:11
189:20 242:7
247:25 257:13
257:16 277:11

308:15,23
309:3,5,6,14,18
310:2,4 311:19
333:3,12
350:10
**particular**
79:22 100:9
166:21 167:12
183:7,21 218:2
222:19 223:12
224:9 225:3
256:3 275:12
282:22 309:22
325:6
**parties**   3:13
388:12
**partners**   88:21
89:8
**party**   4:5
**pass**   176:16
320:2
**past**   166:19,24
167:15,21
168:11,23
169:9 170:13
176:7 187:5
193:23 206:15
**pattern**   352:23
**paying**   7:20
**pco**   55:19,20,22
56:4,11,17
57:8,20,22
58:4,21 59:9
124:24 125:25
127:20,24

128:9,20 129:2
129:8,17,18,23
130:21 349:4
350:15 351:19
352:4 353:10
356:11 374:6
377:24 383:13
**pdf**   241:8,14,16
**peace**   314:19
**peer**   18:12,23
18:24 19:3,6,8
19:11,15
**pejorative**
302:4,5
**pen**   117:15
**pennsylvania**
244:20
**people**   66:6,6
66:13 131:24
140:16 146:19
205:11,12
206:6,12,18,22
206:23 230:11
230:13 233:11
256:10 263:6,9
267:13 268:6
269:21 273:4
273:20 274:16
274:18 275:3,3
275:5 276:13
276:14,16
278:3 312:6,7
312:8 345:8
346:3 361:9
366:20,25

380:18,20
**people's**   222:24
368:6,6
**percent**   10:13
109:7,18 110:5
110:14,23
184:19,20
197:22 236:4,6
236:9,10 246:8
276:16 294:15
294:21,23,23
295:11,12
296:17 318:25
325:17 330:21
331:9,12
375:24,24,25
**percentage**
235:10,12
**perfect**   67:14
74:17
**perfectly**
151:15 208:2
247:16
**perform**   25:7
28:5 43:5
44:10 50:23
55:4 144:19
**performed**   25:4
31:19 43:16
44:3 111:7,10
157:11 166:23
292:24 321:16
365:13
**performing**
25:13 63:11

**[performing - please]**

154:23 187:7
190:9,24
**period**   8:21
26:7,15,16,25
27:6,7,19,20
28:3 29:2,11
30:2,7,10
31:16 41:15
42:3,9,22 43:6
43:8,9,10,12,17
43:19 44:5,7
44:25 45:11
54:22 84:10
91:21 92:4,4,6
92:8,9,9,24,25
93:7,8 94:3,4,5
94:17,25 95:5
95:5,7,9,12,23
96:7,8,10 97:5
97:9,21,23
99:2,6 100:2
100:10 106:17
109:3 113:11
114:25 115:12
115:15 116:9
116:17,22
117:23 119:20
120:11 121:13
121:21 122:3,8
122:9,13,20,23
123:2,3,7,7,9,9
133:11 134:6
134:15 148:7
155:22 156:8
175:15 227:15

227:24 228:8
229:4 232:6
233:8 245:21
258:17 261:21
272:10 273:4
275:2 277:17
278:22 280:9
282:6 283:12
283:25 284:11
285:9 287:5,8
288:9 289:14
289:24 290:13
292:12 293:4
294:8 295:13
295:25 296:8
296:19 297:4
297:12,24
299:8,18 300:9
301:8,19 302:2
302:10 304:16
306:7,17,19,22
307:5,24
308:14,25
309:13 310:14
310:20 312:2
316:2,21 317:8
318:8 319:21
320:7,10,12
322:17 323:16
323:17,20
325:15 328:12
329:16 333:22
333:23 334:18
334:19 336:7
340:10,14,20

340:22,23,25
341:13,17
342:5,13,14
353:3,7 356:6
378:6 379:21
380:4 381:12
**periods**   37:4,6
37:8 263:7
294:12 308:21
**perplexed**
330:2
**person**   147:9
147:16 157:11
236:22 340:3
**personal**
174:25 189:10
219:2
**personally**   25:3
187:25 193:9
226:21
**perspective**
102:10 370:8
**perusing**   23:8
90:22 125:23
129:16 163:9
212:4,14,21,25
243:9 245:4,9
**ph.d.**   1:13 5:3
5:21 137:4
386:2,4,13
389:2,24
**pharmaceutical**
178:11
**phil**   2:17 3:24

**phone**   11:4
240:24
**phones**   3:8,9
**phrase**   18:24
47:6 98:13,21
184:13
**phrased**   301:21
**physically**   11:5
11:6
**pick**   3:6
**place**   3:9,12
56:17 57:21,22
58:4,22 111:22
123:5,12
124:24 127:18
131:6 267:23
268:4 269:5
271:22 272:14
272:19,21,23
273:16,18,23
274:5,7,8
275:13,15
276:4 321:14
321:22 374:13
**places**   20:9
**plaintiff**   72:21
**plaintiff's**
313:9
**plaintiffs**   2:5
4:21 53:13
60:8,13,21
71:4,7
**please**   3:5,8,9
4:9,24 5:10
25:18 28:11

[please - present]                                                           Page 56

| | | | |
|---|---|---|---|
| 41:3 45:13 | **pointing**  331:3 | 183:5 191:13 | 333:14,21 |
| 61:14 65:7 | 355:25 | 194:25 195:3 | 380:14 |
| 80:3 85:17 | **pole**  244:12 | 201:11 210:10 | **powerful**  38:19 |
| 89:15 107:6 | **poly**  7:24 8:5,7 | 210:14 223:18 | **practical** |
| 108:3 114:8 | 8:11,23 10:2 | 225:20 230:7 | 378:10 |
| 117:17 119:15 | 19:25 20:6,11 | 232:16 247:10 | **pre**  43:9,11,18 |
| 120:19,25 | 21:10,16 | 250:8 252:24 | 44:7 282:6 |
| 137:12 146:12 | **portfolio**  20:13 | 263:14,15 | 283:12,25 |
| 162:18 163:6 | **portfolios** | 264:20 267:24 | 284:11 285:9 |
| 184:9 198:22 | 292:22,23 | 267:25 269:7 | 287:5,8 288:8 |
| 211:7 243:8 | 293:6 | 269:12,12 | 289:14,24 |
| 285:25 325:3 | **portion**  259:2 | 272:2,8 278:7 | 290:12 381:12 |
| 337:17,17 | 259:22 261:24 | 281:12 282:17 | **preceding** |
| 338:6 359:13 | 262:11 | 284:5,6 302:20 | 82:17 122:20 |
| 368:16 373:2 | **portions**  214:9 | 302:24 303:12 | 296:18 |
| 378:25 384:11 | **position**  20:5 | 313:16 342:25 | **precise**  42:24 |
| **plenty**  216:20 | 20:14 361:17 | 352:18 361:25 | **precisely** |
| **plural**  26:8,10 | 369:10 | 363:7 364:2 | 304:18 |
| 318:21 | **positions** | 365:21,21,25 | **precision** |
| **point**  7:17 | 267:15 370:19 | 379:11 | 266:17 |
| 57:13 97:18 | 371:6 | **possibly**  54:12 | **predict**  291:18 |
| 102:5 106:4 | **positive**  151:19 | 84:11 204:9 | **predicted** |
| 108:14 117:9 | 221:3 244:23 | 227:4,8 239:20 | 293:21 |
| 117:12 168:12 | 246:3 | 273:24 365:6 | **premarket** |
| 172:5 173:24 | **positives** | **posting**  346:2 | 129:12 |
| 174:19 177:5 | 182:25 248:14 | **potential**  16:13 | **premise**  285:5 |
| 187:11 190:7 | 248:18 249:12 | 54:17 348:21 | 285:8 300:15 |
| 190:23 226:13 | 249:17 | 350:20 357:12 | **prepared**  326:9 |
| 234:12 265:6 | **possibility** | 364:17 367:6 | 326:21 |
| 273:3 296:24 | 157:9,20 | **potentially** | **presence**  96:5 |
| 297:13 302:14 | **possible**  15:2 | 123:21 124:4 | 131:15 132:14 |
| 305:14 310:9 | 93:20 121:25 | 317:16 323:12 | 349:4 350:15 |
| 311:5 355:5,19 | 154:18 157:19 | 327:25 328:11 | 351:18 |
| 357:5 362:16 | 171:14 175:17 | 329:14 332:9 | **present**  2:16 |
| 371:17 374:8 | 177:14 178:13 | 332:15 333:6 | 67:15 140:10 |

| | | | |
|---|---|---|---|
| 181:14 205:9 | 179:17 190:10 | 112:25 113:10 | 283:14 284:3 |
| 298:9 318:4 | 195:25 203:17 | 114:24 115:9 | 284:19 285:13 |
| 322:14 324:12 | 209:8,12 314:3 | 115:11,15,19 | 287:17 288:12 |
| **presentations** | **price** 35:24 | 115:24 116:22 | 289:16 290:20 |
| 59:2 | 36:11,24 38:22 | 116:24 117:11 | 291:18 292:12 |
| **presented** | 39:14 48:14 | 117:20 118:23 | 293:21,22 |
| 262:10 326:5 | 49:3 50:10 | 119:8,19 120:9 | 294:13 296:2,9 |
| **presenting** | 54:13,16,20,21 | 130:2,12,22 | 296:20,23 |
| 143:2 | 55:5,24 56:5 | 137:20 144:2 | 297:3,16,18,23 |
| **presently** 7:23 | 56:12,12 57:6 | 145:4,12,18,20 | 298:5 299:6,17 |
| **presents** 258:6 | 58:5,20 59:13 | 145:25 146:5 | 299:21 300:8 |
| 317:4 325:14 | 60:3 61:21,25 | 146:19,25 | 300:14 301:7 |
| 327:21 328:9 | 62:13,17,25 | 147:15,21 | 301:18 307:3,7 |
| 329:13 | 63:13,18 64:8 | 148:12 149:2 | 307:25 308:12 |
| **press** 175:3 | 64:15,25 65:23 | 149:14,23 | 308:22,24 |
| 188:19 189:19 | 66:2,9 67:13 | 150:8 151:25 | 309:11 310:23 |
| 196:5,19 | 67:20 68:24 | 153:4 158:6,16 | 328:2,13 |
| 197:18,24 | 70:7,8 74:5,13 | 159:14 160:23 | 329:16 338:25 |
| 198:7 199:15 | 76:3 79:16 | 163:15,24 | 345:12 346:2 |
| 218:20 219:16 | 80:10 81:4 | 170:21 173:5 | 346:17 347:15 |
| **presswires** | 82:8 83:2,20 | 174:13 178:7 | 347:19,25 |
| 216:25 | 84:4,16 85:16 | 189:2 211:8 | 348:23 349:11 |
| **presumably** | 86:12,15,17,24 | 224:3,20 225:6 | 349:23 350:17 |
| 100:25 253:4 | 87:17,20,23,24 | 225:10,18 | 353:7,13,21 |
| 346:3 | 88:4,9,10,15,18 | 226:15,23,25 | 354:11,25 |
| **pretty** 15:3 | 89:22 90:9 | 227:8,16,21 | 356:6,9 359:16 |
| 201:9 243:17 | 96:14,17 97:4 | 228:3,11,18 | 359:20 360:2 |
| 253:6 255:5 | 97:11 98:2 | 229:5 230:14 | 360:15 365:7 |
| 271:7 293:12 | 99:4,8 100:11 | 235:11,13 | 365:22 366:16 |
| **previous** 91:16 | 101:10 104:5 | 236:5,7,16 | 366:22,24 |
| 218:8 318:6 | 104:15,24 | 237:7,13,23,25 | 367:7,13 |
| 364:6 | 105:9 106:16 | 238:18 246:11 | 369:14 381:15 |
| **previously** | 106:18 107:12 | 258:16 261:20 | 381:21,22,23 |
| 48:22 59:15 | 110:9,12 | 267:14 282:9 | 382:5 |
| 70:12 175:25 | 112:13,19,21 | 282:25 283:2 | |

**[prices - proposition]** Page 58

prices 67:8,19
74:3,16 118:12
213:24 214:2
230:10,11,18
282:8,25
283:13 284:2
285:12 287:16
288:11 290:19
297:18 298:12
298:13,18
311:2 312:2,9
312:11 335:2
335:19 336:6
336:12 337:5
337:22 338:11
345:13 346:18
347:16 353:11
362:2 363:8
364:3,11,23
365:16 366:2
380:16 381:14
383:2,14,14
384:6
princess 250:5
250:7,13,17
314:4
principals 7:18
principle 101:9
280:22
principles
65:16
print 241:9,10
printed 38:14
241:5

printer 241:6
printout
242:17 387:12
387:13
printouts
240:23 241:4
prior 8:13 26:6
26:15,16 27:5
27:19 28:2
30:9 46:14
121:12 122:21
170:7 172:6
196:21 218:10
233:24 370:20
371:6
private 3:7
prize 257:10,13
257:16
probability
249:14 250:21
probably 6:16
10:9 43:22
51:22 99:19
139:2 142:3
242:22 344:6
problem 17:22
30:6 38:12
161:4 202:9
220:22 328:17
problems
218:16 338:13
procedure
215:3,6,15,17
proceeding 4:9

process 5:25
83:16 135:8
178:9 232:21
234:23 284:13
processed 83:2
83:19,21
produced
242:6 326:15
production
314:22
products
342:17
professional
1:17 10:4
professionals
74:12
professor 10:17
20:5 21:6,10
178:20 179:19
180:17 181:2
184:3,23 185:9
185:16 186:4
186:15,22
187:15 195:24
196:9,17 197:5
197:17 198:22
199:11 200:16
200:19 201:3
227:10 230:14
257:6 292:19
295:10 297:6
298:8 317:15
317:24 323:11
326:9 327:2,21
327:23 328:10

329:3,13
330:24 331:9
332:6 334:4
336:16 341:9
367:11 371:18
program 37:12
38:10,22
proof 279:21
279:23 280:6
298:25
proper 95:12
116:3 223:24
224:11,12,15
339:18
properly 91:9
152:13,16,18
152:25 153:9
330:4
proportion
228:6,15,16,20
228:24,25
229:3 296:5,11
296:13
proposed 123:9
258:17 261:21
308:14,25
309:13 310:14
310:19 316:20
323:16 333:23
334:19 340:23
340:24 341:16
proposition
79:14 80:8
81:4 82:7,16
85:13,24,25

[proposition - question]                                    Page 59

86:4 143:24
339:21 343:20
347:13 363:5
**prove**  16:21
281:9,11 290:5
**proved**  280:14
280:20 298:17
**provide**  36:4
37:18 220:18
355:6 357:11
**provided**  11:25
16:17 17:7,14
17:23 18:3
178:18 326:25
**providing**
85:10 326:24
**proxies**  67:9
**proxy**  63:23
74:17,18
**public**  1:18
6:14,18 366:19
386:21 388:4
**publications**
18:9 253:9
**publicly**  65:22
180:18 186:5
**published**
18:12 19:10,19
52:9 168:11
169:12 220:25
226:21
**purporting**
75:13
**purpose**  217:21

**purposes**  40:21
43:4 55:15,16
159:10 160:17
203:22 204:19
221:9
**pursuant**  1:13
**put**  38:11 56:17
57:4 93:14
100:17 108:13
111:21 124:23
127:18 131:5
171:9 176:20
214:18 227:2
241:6 287:25
292:21 316:11
323:2 374:13
**putting**  26:20
38:13 361:17

q

**qualifications**
285:19,21
**qualified**  50:23
**qualifying**
286:10
**quantify**
188:23
**quarter**  8:13,14
8:16
**quarterback**
314:10
**question**  10:21
12:8,16 14:9
15:7 17:2,21
18:15 19:4,9
23:2 24:14

28:10,23,25
29:21 32:6
45:12 46:9
50:6 60:17,18
68:22 74:15,20
74:24 75:22,23
77:16,17 78:24
79:8 80:2
81:20,25 82:2
82:2,17 83:7
83:17,22 84:18
86:22 91:9,11
91:13,16,17
92:11 93:19
99:15 100:7,21
103:13 104:16
104:18,20,21
105:24 112:11
113:3,5 114:4
114:5,6,7,18
115:2,6,7,17
117:2,3,5,18,18
118:5,12,25
119:4,10,11,15
119:23 120:13
120:14,18
121:18 124:7
126:9 127:6,15
128:16 129:4
131:19,23
134:9 139:5
143:11 146:11
147:20 149:12
150:18 153:8
153:23 154:23

158:9,25 159:3
160:6,12,15
164:13,19
168:17 169:15
172:3 184:8
194:19 195:17
195:18 204:16
207:8 208:17
208:18 209:2
209:14,17,19
209:24 210:7
210:16 211:2
214:15,17
215:25 223:10
229:15 231:16
239:14 245:6
245:24 247:18
248:7,25 249:3
249:6,9 256:6
260:12,15,17
260:18,20,21
260:22 263:17
263:22,25
264:4,6,21
266:15 268:17
268:19 270:10
271:24,24
273:10,12,13
274:3 275:10
275:24 277:3
277:24 279:3
279:13,19
280:5 281:5
285:16,22
286:5,12 289:5

**[question - read]**

298:25 299:25
300:4,20,22,25
301:12,21
302:6,7,13
303:9,11
304:12,18
305:6,17,18
306:3 307:9,12
307:19 308:4
309:18 311:16
311:16 312:15
315:3,5 320:5
320:7,10,14,24
322:20 323:5,6
329:8,9,11
332:25 336:18
336:24 337:7,9
337:12 338:5
340:7 342:3
343:14,21
344:19,23
345:16,17
346:7,15,16
347:18 348:2,5
350:12 352:9
354:4,19
359:25 360:13
363:17,20
366:11,15
367:16,17,18
367:19,21
382:6 384:5,10
**questioning**
29:14 92:20
113:8

**questions** 79:25
92:18 93:14
95:3 97:16
98:6 117:17
118:10 143:10
158:24 165:4
210:2 211:19
213:7,16,18
216:9 247:15
247:17 250:11
255:5 260:15
276:22 302:19
312:19 339:19
359:17,21
360:3,15
378:20 379:7
384:16,20
**quibble** 182:5
272:4 292:15
**quick** 35:4
76:15,22
**quicker** 36:19
36:20
**quickly** 23:7
65:25 84:9
243:7
**quite** 71:22
82:2 182:2
213:13 256:6
272:2 329:9
**quotation**
258:10
**quote** 53:17
261:23 265:17
265:18

**quoting** 74:9
154:2

**r**

**r** 2:2 5:3,3
137:2,4,4
306:13 389:3,3
**raises** 359:17
359:21 360:3
360:15
**ran** 156:20
157:13 161:16
165:23 175:7
201:5 256:19
292:20
**randomly**
292:22
**range** 245:11
**rapidly** 82:23
83:25
**rapper** 250:4,7
250:17
**rarely** 269:9
**rashi** 252:2
**rather** 79:23
230:21 233:18
234:15
**rdenunzio** 2:12
**reach** 45:21
46:11 85:21
**reached** 11:11
11:16 46:7
299:11
**reaches** 63:12
**reaching**
119:17 341:25

**react** 146:6,25
147:22 150:9
238:3
**reacted** 144:2
145:18,21
147:15 336:6
**reacting** 149:3
149:9 237:25
**reaction** 130:14
130:22 148:12
153:4 158:6,16
159:14 160:23
163:15,24
173:6 211:8
**reactions**
144:22,22
**reacts** 145:5,12
146:2,8,19
147:3,24
149:14,23
236:16
**read** 24:23
28:12 30:21
45:14 47:4
67:2 70:11
81:22 82:16
83:12,13,18
84:19 85:18,23
90:13,17,23
91:8,8 92:16
93:4,16 96:22
97:18 98:15,19
99:12,21 107:2
114:9 120:18
120:20 121:20

**[read - recall]**

124:8 131:20
135:11 146:17
161:17 163:2,6
163:11 166:10
169:9,18 170:5
170:7,17,20,22
172:6 173:12
177:4 184:10
193:10 194:8,9
204:3 211:15
212:23 213:5
213:15 214:3,6
214:9,17
215:19,25
216:2,7,8,14,18
216:20 218:5
240:24 243:7
258:20 259:13
260:7,13,24
268:12 280:25
285:23,25
286:3 291:16
303:17,22
322:21 337:15
345:18 362:15
365:19 366:13
368:6,6,7
379:23 384:12
386:5
**readers**   206:6,7
206:18
**reading**   18:16
54:9 72:17,23
74:7 78:6
79:22 94:7,8

94:11,23 95:17
96:21,23,24
97:13 121:25
125:22 141:9
153:16,19
158:8,19 167:5
167:19,25
168:5 193:24
213:11,19
214:12 274:24
278:2 279:24
336:16 339:12
360:9
**reads**   41:12
43:3 46:22
96:11 217:25
255:20 261:13
261:24 282:4
360:23 361:23
379:10,17
**real**   264:22
**realize**   37:25
38:5 42:20
351:24
**realized**   101:21
**really**   93:14
118:16 142:15
201:9 240:25
256:6 266:2
268:8 321:5
**realm**   103:24
169:19
**reask**   12:16
17:21 22:25

**reason**   31:18
75:11 90:7
181:6,9 185:9
186:13,15,23
186:25 188:2
188:25 189:12
196:16 200:21
250:9 261:16
262:9 313:24
341:19 356:8
371:9 383:25
384:13 389:6,9
389:12,15,18
389:21
**reasonable**
67:9 105:23
106:12 217:19
217:22 222:18
223:11,17
247:17 280:11
280:14,21
**reasonably**
158:5,15
159:13 160:22
163:23 173:5
279:21,23
280:6 379:10
**reasons**   131:25
258:13 327:7
**rebuttal**   12:9
21:22 23:11
24:10,25 29:16
31:13,22 32:13
36:8,11 39:7
40:14,22 42:8

42:18 43:2,15
44:3,11 55:9
60:5 66:22
69:17 70:5,17
71:11 72:6
121:7 125:12
125:20 126:24
127:8 178:19
178:22,24
179:19 185:17
186:17 195:25
198:23 200:16
201:3 252:14
257:21 260:3
281:19,22
284:22 286:18
286:19 291:16
292:9 316:12
316:25 321:13
321:25 324:18
326:15,22
327:17 330:14
330:17 334:16
334:23 335:16
352:20,25
358:21 359:11
371:24 372:4
381:5 387:9,14
**recalculations**
200:2
**recall**   7:15 11:5
18:6 23:21
25:15 33:19
34:11,18 48:24
50:14 51:23

88:25 91:25
98:10 99:20
100:23 101:14
112:6 114:11
128:2,6 161:15
161:19 169:24
170:18 171:16
172:23 191:14
192:16 194:9
196:23 211:21
218:18 219:18
221:19 244:2,3
279:25 292:19
292:25 293:2
294:22,23
295:18 309:9
348:19 376:17
378:9
**receive** 37:16
241:2 307:18
**received** 53:20
53:21 181:8
313:9,14
**recent** 172:16
173:13,18
192:20
**recently** 8:4,22
10:2 170:19,22
171:12
**recess** 35:12
77:2 136:10
179:11 251:12
312:24 348:13
**recitation** 36:2

**recollection**
99:21 128:21
188:5 193:17
194:15 222:10
222:15
**record** 3:3,14
4:12 5:11
12:17 23:2
28:12 35:8,11
35:14 45:14
76:25 77:4
83:12,18 84:19
85:18,23 114:9
120:20 124:8
131:20 135:11
136:9 137:6
146:17 179:7
179:10,13
184:10 213:11
214:13 242:16
245:17 251:11
251:14 260:23
270:8 286:3
308:2 312:23
313:4 322:21
345:18 348:8
348:12,15
366:13 384:12
385:2 388:9
**recorded** 3:16
**recording** 3:12
**recreated**
232:11
**recreating**
332:22

**redirect** 384:17
**refer** 24:10
47:16 55:25
61:19 62:4
76:6 122:9
125:10,17
191:7 256:11
266:23 282:21
364:6
**reference** 170:6
**referenced**
170:4
**referred** 33:25
57:19 59:17
124:21 288:24
316:18
**referring** 24:2
47:21,24 48:21
56:23 131:10
190:25 191:9
191:23 192:12
200:13 203:16
278:7 309:19
309:21 310:5
311:7,20
340:21 369:5
**refers** 209:19
**refine** 217:25
222:18 223:11
**refines** 224:8
225:2
**reflect** 74:3
76:16 101:3
214:13 270:9

**reflected** 65:25
208:8 312:10
**reflects** 66:10
68:24 74:13
76:4 79:16
80:10 81:5
82:9
**refresh** 99:21
101:3 125:8
129:15 133:22
136:3 162:20
211:24 221:5
295:4 369:17
374:4
**refreshing**
378:5
**regarding** 44:4
44:10 45:8
50:8
**regardless**
102:3 224:25
336:24 361:10
**regards** 33:18
49:16 120:21
165:13 175:4
175:13 188:17
204:21 215:21
221:25 222:12
239:23 251:22
282:21 292:16
298:8 314:3
342:8
**registered** 1:17
**regression**
40:19,23 55:17

**[regression - remove]**

56:2,23 58:2
60:4 93:12
121:12 122:13
122:23 123:20
129:21 256:19
277:11 306:6
318:6 323:15
328:4,15
329:18 348:22
349:2,17,20
350:13 352:11
354:7,12
355:12 357:9,9
382:14,22,24
383:11,18
**regressions**
373:4 377:22
382:15
**regularly**
215:13
**regulations**
219:25 220:17
**rehashing**
237:15
**rehearing**
285:20
**reit** 164:24
165:5,21
**reits** 171:7,13
**reject** 334:24
335:17
**relate** 61:5
359:18,22
360:4,16

**related** 4:5
313:10 350:8
388:11
**relates** 242:18
316:18
**relationship**
61:20,23 62:6
62:21 63:5,16
64:3,13,22
121:14 255:21
288:20
**relative** 111:20
145:9 339:8
**relatively**
270:15
**release** 181:17
188:19 196:19
197:18,24
239:8
**releases** 155:21
156:7 174:21
175:3 178:6
180:11 181:21
183:13 184:7
185:4 189:19
196:6 198:7
199:14,15
218:20 219:17
239:9 379:12
379:20 380:3
**relevance**
233:22
**relevant** 6:16
9:21 41:14
44:24 52:16

122:8,9 153:15
154:5,12,17
155:4,11,11,15
155:19,22
156:6,8,13,13
156:23 157:6,8
157:16 158:4
158:14 159:12
160:21 161:5
163:22 173:3
173:10 182:14
182:18 221:7
227:3 230:19
230:21,23,24
232:7 247:2,13
248:10 250:18
278:14 296:25
297:7,11,21
299:5,15 300:6
301:5,16
308:20 311:25
312:4,4 313:22
317:7,16,19
323:12 327:25
328:12,23,25
329:15 332:9
332:15,21,24
333:6,14,21
336:5 341:12
342:11 379:19
379:21 380:2,4
380:6
**reliable** 45:21
45:24 46:6,11
205:3,4,5

206:14,16
207:3,12,23
208:13,21
209:10
**reliance** 279:5
279:15 281:9
**relied** 241:24
367:24 372:2
**reluctance**
364:9,21
365:14
**rely** 137:18
139:16,21
**remain** 379:10
**remember** 21:3
33:21 40:25
88:23 90:16
92:14 93:21
97:19 106:22
114:21 116:21
170:23 182:2
188:18 206:9
218:19 220:23
239:25 253:17
259:3,4,5,12
326:11 360:6
370:9 376:21
378:16
**remembering**
115:5
**remembrance**
30:24
**remove** 224:18
225:5,16
227:19 281:4

**[remove - reports]**

| | | | |
|---|---|---|---|
| 285:4,7 | 29:17 30:8,13 | 174:2 175:18 | 281:20,22 |
| **removes** 262:6 | 31:7,8,12,13,22 | 175:19 178:20 | 284:15,22 |
| **removing** | 31:25 32:8,13 | 178:25 179:19 | 286:18,20 |
| 225:9 226:14 | 32:18 33:5,9 | 179:21,25 | 289:20 291:16 |
| **render** 16:9 | 36:8,12 39:7 | 181:9 185:17 | 292:9 295:14 |
| 80:24 88:13 | 40:14,22,24 | 186:17,23 | 316:12,25 |
| 148:18 150:14 | 41:3,24 42:5,8 | 187:11 189:6 | 317:15 319:6 |
| 176:17 231:11 | 42:19 43:3,15 | 189:17 195:3 | 320:8 321:14 |
| 273:6,7 281:15 | 44:3,11,17 | 195:25 196:12 | 321:24,25 |
| **rendered** 82:5 | 46:19 48:24 | 196:13 198:13 | 324:19 325:4 |
| 191:23 | 53:3 55:9,12 | 198:23 199:2 | 325:22 326:19 |
| **rendering** | 60:5 61:13 | 200:16 201:3 | 327:17 330:14 |
| 16:24 72:12 | 62:12 65:8,20 | 201:20,22 | 330:18 334:16 |
| 229:9 | 66:22 69:17 | 202:2,14,17,19 | 334:23 335:17 |
| **renders** 205:14 | 70:5,18 71:12 | 202:21 204:3,3 | 336:17 352:20 |
| 205:14 | 72:3,6 90:16 | 204:10 205:18 | 352:20,25 |
| **repeat** 80:2 | 100:4,6,25,25 | 206:24 207:17 | 357:24 358:6 |
| 85:17 126:8 | 106:24 107:24 | 207:20 208:4 | 358:16,16,18 |
| 129:3 150:3 | 109:23 116:2,4 | 208:15,19 | 358:19,21 |
| 172:8 303:18 | 120:21 121:3,8 | 218:11,13,19 | 359:4,10,11 |
| 347:10 360:12 | 121:9 122:18 | 223:3,5 224:19 | 363:2 371:3,12 |
| **repeating** | 125:8,12,20 | 225:6,17 | 371:24 372:4 |
| 72:14 | 126:24 127:8 | 227:19,20 | 374:9 378:23 |
| **rephrase** | 132:19,20 | 228:10 229:5 | 381:5 387:9,14 |
| 160:14 | 133:2,3 135:24 | 231:5 233:3 | 387:15 |
| **reply** 326:19 | 137:13 139:15 | 235:24 242:23 | **reported** 219:7 |
| 327:7 | 140:20 143:19 | 243:3 244:15 | 226:15 228:2 |
| **report** 11:25 | 153:11,17 | 252:14 255:3 | **reporter** 1:17 |
| 12:10 13:6,13 | 154:25 155:16 | 255:11 257:22 | 4:2,24 |
| 14:21 15:11,18 | 156:3 157:2 | 258:8,25 259:3 | **reporting** |
| 16:2,15 17:6 | 158:9 161:21 | 259:23 260:3,4 | 226:25 230:10 |
| 18:16 21:22 | 162:14 166:14 | 260:5 261:13 | **reports** 9:21 |
| 22:24 23:11 | 171:4,22 | 262:8 268:10 | 12:9,12,13,15 |
| 24:11,20 25:2 | 172:18 173:13 | 268:15 270:2 | 12:19,25 17:11 |
| 25:14,17 29:15 | 173:21,25 | 271:6 281:18 | 23:15,25 24:6 |

24:8,8,17 25:5
25:9 141:10
163:11 171:6
171:11 173:13
173:18 175:8
175:24 177:9
180:19 181:13
181:14 186:6
186:10,19,21
187:3,5,15
189:8 192:12
196:11,20
199:11 218:8
226:12 251:19
254:11,15
274:22 291:22
298:22 326:12
326:15,22
332:6 333:4,12
333:19 368:7
**representation**
67:14
**representing**
3:25 4:15
**repricing** 76:15
**reputable**
203:20,23
204:17,20,22
205:6,7,7,14
208:13
**request** 37:22
**requests**
387:22
**require** 67:5

**required** 77:24
78:15,23
219:25 386:14
**requires** 167:2
167:16,22
168:13 169:11
172:4
**reread** 28:10
29:20 32:5
45:12 83:6,9
84:17 85:20
105:12 114:7
124:6 127:5
131:19 135:10
139:5 146:11
146:16 184:8
322:20 338:5
345:15,17
346:11,15
359:24 366:10
384:10
**rereading**
169:5
**rescind** 91:12
**research** 6:10
6:19 9:2 19:21
361:23 363:6
363:25
**reserve** 6:11,20
19:14,16,20
**residual** 109:7
109:16 110:3
110:15,17
116:7,15 294:2

**respect** 31:21
331:15 376:4
**respectfully**
118:8
**respectively**
375:25
**respond** 249:3
249:4
**responded** 38:3
294:11
**response** 81:23
137:20 213:25
239:6,13
267:13 311:8
326:10,25
327:16 339:18
377:24 387:13
**responses**
302:25
**restate** 275:20
**restaurant**
247:8,12 248:9
**restriction**
57:21,22 58:4
58:21 258:13
351:16,19
**restrictions**
55:19,20,22
56:4,11,17
57:9 59:9
124:24 125:25
126:2,5,11,25
127:9,16,20,22
127:24 128:9
128:20 129:2,9

129:18,24
131:5 261:17
349:4 350:15
350:20 351:2
352:4 353:5,10
353:10 356:11
372:11 374:6
374:12,13
377:24 383:12
383:13 384:7
**restrictive**
174:18 176:11
176:13 181:23
181:25 182:3,4
182:9,10
183:15
**rests** 221:22
**result** 76:12
145:17,17
151:4,6 183:16
183:19 195:14
200:7
**results** 108:10
132:11 145:20
199:16,17
240:17,24
241:2 243:13
245:3 246:16
247:18 248:15
248:19 249:13
249:15,19,22
250:2,22 313:9
313:14 317:4
319:12 321:2
321:15,23,24

**[results - right]**

| | | | |
|---|---|---|---|
| 324:12 325:14 | 377:23 383:9 | 28:4,9 29:2,3,8 | 78:13,16,19,23 |
| 325:21 334:15 | **revealed**  144:3 | 29:10,23 30:2 | 79:4,12 80:7 |
| 335:12 383:18 | **reverse**  64:13 | 30:6,15 31:4,6 | 80:15,19 81:7 |
| 384:2,3 | **reversed** | 31:11,18,24 | 82:6,15 85:12 |
| **resumed**  137:4 | 199:17 | 32:4,7,23 33:8 | 86:3 88:14 |
| **retail**  258:14 | **review**  23:20 | 34:10 35:3 | 89:4,14 90:3,5 |
| 261:17 | 74:10 78:7 | 36:3,5,7,22 | 90:6,12 91:9 |
| **retained**  14:14 | 170:9,15 | 37:9,11 38:11 | 91:10 93:22,23 |
| 16:9 | 203:13 220:7 | 38:20,23 39:3 | 96:13 97:11 |
| **retire**  8:7 | 220:15 230:5 | 39:10,13,24 | 98:24 101:8 |
| **retired**  8:4,17 | 241:2 242:22 | 40:9,13 41:11 | 102:14 104:3,6 |
| 10:2 | 320:16 | 41:23,23 42:17 | 104:15,25 |
| **return**  109:7,12 | **reviewed**  18:12 | 42:23 43:14,14 | 105:8,10,11 |
| 109:17 110:4 | 18:23,24 19:3 | 43:22 44:9,21 | 106:13,19 |
| 110:15,17,22 | 19:6,8,11,15 | 44:25 45:5,7,7 | 107:5 108:2,6 |
| 115:25 135:8 | 243:13,14 | 45:20,23 46:5 | 108:10,20,21 |
| 145:8 235:3 | **reviewing** | 46:10 47:4,11 | 109:3,8,18 |
| 293:4,14,16,18 | 220:16 240:16 | 47:20 48:20 | 110:5,7,15,19 |
| 293:19,23 | 240:19 | 49:3,10 50:20 | 110:24 111:13 |
| 294:2 318:9,17 | **revocable**  15:5 | 51:3,5 54:18 | 111:25 113:6 |
| 323:15 328:2 | **right**  6:8,17 7:2 | 54:24 55:9,25 | 113:11 114:11 |
| 328:13 329:17 | 7:9,22 8:2,20 | 56:6,9 57:18 | 114:22 115:22 |
| 373:19 375:15 | 8:20 9:9,25 | 57:22 58:13,17 | 116:5 119:5 |
| 376:6,13 | 11:7,20 12:11 | 59:13 60:7,12 | 121:5 122:6,16 |
| 377:16 | 12:18 13:15 | 60:20 61:3,6 | 123:8 124:2,2 |
| **returns**  110:19 | 14:5,8,12,17 | 61:12 62:4,18 | 125:3 126:3,18 |
| 111:11,16 | 16:14,19,20 | 63:3,10,12,19 | 127:4,12,19,21 |
| 116:7,15 | 17:4,5,9,13 | 63:25 64:8,11 | 128:5,10,23 |
| 123:22 124:5 | 18:9,11 19:18 | 64:19,22 65:19 | 131:10 132:2,9 |
| 145:9 293:12 | 19:22,24 20:15 | 66:2 68:10,17 | 133:14,24 |
| 318:21 322:16 | 21:5,7,9,11,14 | 68:21 69:20,25 | 135:4,9,13,24 |
| 324:13,20,22 | 21:16 22:15,25 | 70:22 71:5 | 138:3 139:14 |
| 326:3 332:11 | 23:23,23 25:6 | 72:16 73:6,13 | 139:17,21 |
| 333:16,25 | 25:16 26:2,3 | 74:8 75:6,12 | 140:5,8 141:2 |
| 376:16 377:23 | 26:25 27:16,23 | 75:12,18 77:7 | 142:16 144:8 |

**[right - right]**

Page 67

| | | | |
|---|---|---|---|
| 144:11 145:3,5 | 193:9 195:15 | 247:3,11,14 | 295:9 296:9 |
| 145:13 146:24 | 197:4 198:13 | 248:6,12,12,16 | 297:24 299:13 |
| 147:10,18 | 198:15,20 | 249:16 251:7 | 299:24 300:11 |
| 148:19,21,24 | 199:8 200:10 | 253:11,25 | 301:11 304:25 |
| 149:6,11,18 | 201:19 202:21 | 254:7,17 | 304:25 305:3,5 |
| 150:8,17,25 | 203:4,7 204:15 | 255:18 256:20 | 305:9,24 306:5 |
| 153:12,24 | 205:16,18 | 257:12,17,18 | 306:10 307:9 |
| 154:6,21 | 206:25 207:8 | 257:23 258:4 | 307:17 309:9 |
| 155:23 156:9 | 207:19 210:8,8 | 258:21,23 | 309:17 312:10 |
| 159:6,8,18 | 210:17,22 | 259:13,24 | 313:7,19 |
| 160:10 161:24 | 211:6 212:19 | 260:2,4,9,9,12 | 314:24 315:4 |
| 162:16,17,21 | 212:22 215:10 | 261:3,3 262:4 | 315:11,13,15 |
| 163:11,16,24 | 218:9,12,14 | 262:12 263:4 | 315:21,24 |
| 164:2,8,19 | 219:21 220:2,9 | 263:11 264:9 | 316:2,8,21 |
| 166:3,12,16 | 220:17 221:10 | 265:21,24 | 317:5,13,21 |
| 168:7,9,16,19 | 221:13 223:21 | 266:10,12,16 | 318:2,11,14,16 |
| 169:22 171:2 | 224:5,6,16 | 266:19 267:20 | 318:19,24 |
| 171:13,20,25 | 225:14,18 | 268:9,21 | 319:2,3,4,9,16 |
| 172:14,19 | 226:3,11,18,24 | 269:25 270:5 | 319:21 322:25 |
| 173:6,15 174:4 | 227:17 228:3 | 270:20 272:11 | 323:4,17,19,22 |
| 174:10 175:20 | 228:11,16 | 273:25 274:11 | 324:10 325:8 |
| 175:23 176:4 | 229:7,10 | 274:16 275:5 | 325:13,22 |
| 176:11 177:3 | 230:17 231:3,7 | 276:8,25 | 326:6,6,23 |
| 177:12 179:16 | 231:12 232:19 | 277:20 278:22 | 327:10 328:7 |
| 179:24 180:8 | 232:23 233:16 | 281:21 282:14 | 330:22 331:6 |
| 180:25 181:11 | 233:22 234:5 | 283:7,16 | 332:4 333:2,19 |
| 181:17,23 | 234:11,12,16 | 284:11,20,23 | 334:9,20 335:9 |
| 182:25 183:18 | 234:24 235:24 | 285:2 286:18 | 335:14 337:8 |
| 184:7,15,20,22 | 236:12,24 | 286:22 287:2,5 | 339:16 340:23 |
| 185:20,25 | 238:4,4 240:3 | 287:11,18 | 340:24 341:2,3 |
| 186:7 187:9,21 | 240:12 241:5 | 288:13 290:14 | 341:4,7,20,21 |
| 188:17 189:16 | 241:10,13,13 | 290:22 291:14 | 341:23 342:16 |
| 189:19,25 | 243:21 244:5 | 291:19,24 | 344:9 345:25 |
| 190:4 191:3,4 | 244:25 245:6 | 292:4,9 293:7 | 346:6 347:12 |
| 191:9,18 192:9 | 245:10,22 | 293:8,12 295:2 | 348:18 349:11 |

**[right - ryan]**

349:20,24
350:10,21
351:20,21
352:17 353:2,9
353:19 354:8
354:14 355:5
355:17,19
356:7,13,15,16
356:20,24,24
357:7,13,25
358:3 359:8
361:12 362:5
362:11 365:12
365:12 366:7
368:10,13
370:25 371:22
372:8,15,18,25
374:3 375:9
376:2,8 377:3
377:7,18 378:3
378:11,14
383:4,10,19
384:21
**rigorous**
331:21
**rise**  362:2
363:9 364:3
**risk**  343:12,16
343:17
**risky**  364:9,21
**robert**  2:11
4:17
**robinhood**  4:16
55:21,22 56:11
56:16 58:4,21

59:10 61:10
124:23 126:4
126:11,25
127:9,16 128:9
128:20 129:2,8
129:23 226:20
254:19 349:4
350:8,15
351:15 352:4
353:4 374:7,14
377:24
**robinhood's**
56:4 122:22
123:4,11
124:12,22
130:3,13,21
350:25 352:3
353:14 356:11
**robust**  321:15
**rocket**  38:18
**rodgers**  314:10
314:19 316:6
**role**  143:10
364:17
**roll**  44:14
45:10 46:13
115:24 126:18
126:23 127:7
213:22 319:6
376:12 377:9
377:14
**rose**  294:15,20
**rosen**  2:3,5
4:19,19 9:17
9:20 11:21

12:2,21 13:2
25:12 26:3,18
26:21 27:21
28:7,18 29:13
29:20 31:21
34:25 37:20
41:7 42:11
51:11 80:16
84:17 92:3,7
100:3 107:18
108:15 114:17
118:9,14 119:7
119:12 131:18
131:21 138:23
139:2 178:18
178:23 198:25
200:12 201:25
202:4,9,13,14
202:18 203:2
206:14,19
208:24 209:18
211:11 212:10
212:15,19
213:2,14
215:24 216:6
216:10 233:23
234:3 242:6,14
248:21 249:2,8
251:2 255:12
260:14 262:18
300:19 326:13
327:5 330:13
332:2 336:14
337:6 340:20
345:15,21

355:24 358:12
360:8 366:4,10
366:14 368:18
378:19,21
384:15,21
387:5
**rosenlegal.com**
2:6
**row**  373:16
**rubric**  135:19
**rules**  220:6,10
220:19
**run**  55:17
144:13 151:2
152:16 153:9
159:4 165:17
190:19 205:23
294:7,10 302:2
302:9 304:15
306:18 307:7
349:17 364:11
364:23 365:15
366:2 367:7,13
**running**  121:12
157:24 158:10
159:9 160:15
176:25 177:20
198:9 206:2
207:4,10,22
208:20 222:7
**runs**  152:13,25
225:8 334:6
**rv**  376:19,22
**ryan**  2:10 4:14
4:14 5:7 28:21

29:18,22 35:7
35:16 37:24
41:9 51:15
76:21 77:6
83:11 92:5
118:13,19
119:10,14
137:9 179:6,15
199:3 200:14
202:3,5,22
210:5 211:13
212:13,17
216:4,19
248:23 249:5
251:6,16
255:13 262:20
300:21 313:6
326:23 348:7
348:17 358:14
360:10 377:12
378:17 380:8
381:24 382:13
383:3,20 384:9
384:19 387:4

**s**

**s**  2:2 137:2,2,2
376:16 387:6
389:3
**s1**  373:19 374:5
374:6 375:7,15
376:6,12,19,23
377:16,23
378:6,9 383:24
**s2**  375:7

**safe**  253:6
**sale**  54:21
**sales**  54:16
**sample**  153:13
154:3,10 155:2
155:17 156:4
156:21 157:4
157:14 214:22
334:21 335:25
370:17 371:4
379:17,24
**san**  7:24 8:23
10:3 19:25
20:6 21:10,16
**sat**  58:12 87:21
355:14
**saw**  86:11,23
89:21 90:8
92:8 96:17
108:11 114:20
195:3 199:25
243:15 258:23
**saying**  38:4
64:4 81:3 92:3
97:2 99:11
113:24 114:2
118:4 120:6,23
159:24 160:2
160:10,24
165:2 169:8
181:10 183:15
186:24 192:4
193:9 199:24
200:3 204:12
209:22 214:19

222:4,4 237:4
237:6,12,22
238:17 239:19
241:16 248:13
256:13 259:4
269:11 287:19
288:22 301:10
305:25 311:12
311:17 351:20
**says**  41:22
180:17 181:3
186:16 242:17
283:10 322:24
323:2 374:9,11
381:5,10
**scale**  190:3
**school**  6:24
8:15 10:5
20:10,16
**science**  38:18
**scientific**
232:16
**scope**  28:8,19
**screen**  138:24
**screening**
223:7,10,20
**screw**  66:21
**screwed**  329:20
382:11
**search**  74:11
217:2,12 218:2
222:18 223:12
224:8 225:2
240:17 313:15

**searched**
216:24 217:11
**searching**
368:4
**sec**  14:6,19
219:24 220:6
220:10,16,19
221:6 357:25
358:15 359:9
363:5,13,18,24
364:7,19 368:7
368:25 370:5
370:16 371:2
**second**  24:20
25:14 33:5,9
48:24 138:14
145:19 199:19
244:10 245:8
260:18,20
281:24 284:25
317:12 334:22
373:16 375:4
379:9
**secretary**  6:14
**section**  53:13
163:8 258:7
261:16 262:3
**securities**  4:20
13:7,20,22,23
13:25 14:2,3
14:11,19,23
15:4,7,12,16
33:19 34:4,9
34:13 55:24
59:10 68:4,16

68:18 70:21
71:5,7,14 72:9
74:12 77:12
78:2,16,21
89:9 103:24
141:24 162:5
169:12,19
173:14 254:2
277:5,15
278:20 279:2
279:13 280:7
293:24 335:2
335:19 342:17
345:12 346:17
347:15 382:23
**security** 16:3
16:18 17:8,16
17:25 18:4
49:13 50:9,10
61:21,25 62:13
64:7,15 65:21
65:23 66:2
67:18,19 70:6
70:7 76:15
121:15 137:20
137:23 140:5
158:6,16
159:14 160:23
163:24 173:5
207:6 271:21
272:13,17
273:15 274:4
275:14 276:3
280:7 345:14
345:25 346:20

346:23,24
347:17,19,21
**see** 11:12 25:21
36:9 40:15
41:11,18 42:25
46:17,21 48:19
51:8 61:18
62:2 69:14
89:19,25 90:2
91:18,23 92:9
92:19 93:5,23
94:13,18 96:2
96:10,13,20,21
96:23 97:10,19
98:13,18,23
99:3 100:10
101:9 107:12
115:4 121:11
121:17,18
122:16 123:17
123:18 125:21
130:20 133:5
133:12 135:2
137:17,24
143:22 144:6,7
148:15 180:2,4
180:8,13,16,23
183:10 184:14
185:17 186:9
187:14 196:3,9
196:13 197:4
197:16,20,21
199:4 203:11
207:24 208:16
210:11,15

211:7 214:21
216:21 217:24
220:22 222:22
223:21 224:4,5
224:16,21,22
235:7,15
236:24 242:4
244:10,14,18
254:14 255:19
256:2,13 257:4
258:4,12,18
259:15 260:8
260:10 261:2
261:11,16,22
271:13 276:22
281:3 282:3,11
287:19 288:14
288:18 292:23
295:9 313:17
314:8,13,14
315:5 319:13
321:17 323:7
327:15 330:10
330:19,23
331:2,4,6,13
332:6 333:2,11
333:17,18
334:5 335:5
336:20 338:19
348:8 351:22
353:6 355:2
356:5 359:2,15
360:22 361:2
361:22 362:4
364:7,13,14

368:25 369:3,4
369:11,14
370:4,15,21,22
372:5,7,8
373:7,7,15,15
373:19,23
374:11,17,18
375:2,14,18
376:12 382:16
383:12
**seeing** 22:18
96:24 197:2
326:11
**seem** 210:14
230:11 311:11
347:22
**seemed** 53:4
175:9,15
206:22
**seems** 29:7
94:22 117:7
133:21 210:3
286:9 304:23
314:25
**seen** 49:22 50:4
138:12,14
140:16 175:8
179:21 192:15
226:3,12,21
243:16,20
253:8 280:2
281:2 299:10
326:8 327:10
367:9,13
380:12

| | | | |
|---|---|---|---|
| sees 249:9 | 235:8 237:2 | 244:24 246:4 | 270:3,11,13,14 |
| selection | 255:20 256:4,8 | 246:19 247:6 | 270:15,19,21 |
| 172:17,21 | 258:25 259:2 | 250:4 319:18 | 270:24,25 |
| 176:10,24 | 259:22 261:12 | 324:18 372:10 | 271:2,10 |
| 177:10,19 | 261:24 262:12 | 374:12,12 | 272:18,20,23 |
| 187:7,19 | 282:4,22 283:9 | 375:4,5 388:8 | 272:24 273:5 |
| 191:12 196:6 | 284:21,24 | 388:15 | 273:15,18,19 |
| 196:19 221:9 | 286:16 287:12 | seven 41:12,15 | 273:20,22 |
| 222:6 | 288:21 289:3 | 41:25 42:14 | 274:4,6,10,14 |
| self 314:12 | 319:12 334:22 | 43:16 44:5,22 | 274:17,18,22 |
| 316:7 | 335:15 346:10 | 61:25 112:21 | 275:4,4,5,6,12 |
| sell 346:4 | 346:11,13 | 186:5,9,19 | 275:15,18,22 |
| 364:10,22 | 360:23 361:23 | 229:24 313:5 | 276:3,13,15,17 |
| 365:14 | 365:3 379:8,9 | 316:4,9,19 | 276:25 340:10 |
| seller 53:20 | 379:16,23 | 319:2 332:7 | 340:14 353:21 |
| seller's 54:15 | 381:10,18 | 348:11 368:19 | 353:25 354:11 |
| sellers 53:16 | sentences | 378:8 | 354:21,25 |
| selling 359:18 | 214:17 | several 198:19 | 356:19 359:18 |
| 359:23 360:5 | separate | 253:4 291:15 | 359:22 360:4 |
| 360:17 361:24 | 214:23 231:2 | share 47:17,24 | 360:16 361:9 |
| 363:7 364:2,18 | 256:19 368:12 | 50:17 277:6,8 | 361:17,24 |
| send 34:24 | separation | 277:15 | 363:7,25 364:9 |
| sense 29:7 | 322:10 | shares 360:24 | 364:10,14,18 |
| 105:22 134:6 | september | 361:5,20 | 364:18,21,22 |
| 236:11 329:23 | 91:21 92:25 | shift 131:17 | 365:15,19,20 |
| 380:9 | sequentially | 132:15 | 366:20 367:5,6 |
| sensitive 3:6 | 286:11 | shleifer 265:17 | 367:12,14,22 |
| sentence 39:12 | series 36:10 | 266:11,23,25 | 368:2,5,13 |
| 43:3 67:2 | set 24:17 31:4,7 | shocked 248:18 | 369:9 371:5 |
| 70:14,17 | 33:2,12 86:3,6 | short 1:6 3:18 | 386:1 389:1 |
| 122:17 141:11 | 86:7 145:19 | 101:7 267:3,5 | shorting |
| 143:23 155:25 | 154:19,24 | 267:7,9,13,16 | 361:10 |
| 171:10,10 | 171:21 180:4 | 267:18,21,22 | shortly 158:22 |
| 182:21 214:18 | 200:4,7 207:11 | 268:11,23 | show 16:22 |
| 217:24 224:17 | 226:6 232:11 | 269:4,21,23 | 88:11 142:14 |

| | | | |
|---|---|---|---|
| 161:20 208:14 | 198:10 200:8 | 146:6 147:2,22 | 248:8 255:8,17 |
| 208:15 209:25 | 318:13 319:9 | **similar**  34:5,6 | 264:21 268:17 |
| 210:7 218:18 | 322:16 324:13 | 90:20 193:11 | 284:22 289:3 |
| 220:4,5,5,13 | 324:20,22 | **similarly**  32:12 | 303:16 304:2 |
| 226:23 232:12 | 325:25 326:2 | 32:14 40:10 | 306:23 313:11 |
| 236:15,20 | 375:24 383:8 | 128:23 129:5 | 314:23 316:12 |
| 247:22 265:2,3 | **significant** | 299:14 331:7 | 323:25 325:9 |
| 273:19 276:10 | 40:17 92:23 | **simple**  57:17 | 332:17 339:2 |
| 276:12 295:20 | 93:11 94:5,16 | 82:2 256:7 | 369:2 |
| 298:11 308:2 | 96:6,14,15 | 349:18 357:8 | **sit**   18:6 50:13 |
| 326:14 340:2 | 97:4,11 98:16 | 357:19 | 87:13 88:7 |
| 371:10 374:19 | 98:21 99:4,5,7 | **simplistic** | 93:4 95:25 |
| **showed**  48:13 | 106:15 144:17 | 57:11 58:8 | 100:8 112:5 |
| 128:3 187:16 | 147:14 148:12 | 227:14 | 117:12 170:3 |
| 382:13 | 148:16 149:2 | **simply**  40:5 | 177:16 195:6 |
| **showing**  151:7 | 149:15,22 | 83:23 166:8 | 228:17,21 |
| 283:7 | 151:25 153:3 | 226:11 310:3 | 240:10 244:2 |
| **shown**  213:9 | 184:25 235:11 | 353:13 | 246:22 263:18 |
| 215:23 243:24 | 235:13 236:5,7 | **single**  48:11 | 269:15 272:3 |
| 377:17 | 236:10 237:5 | 170:3 173:24 | 277:18 291:13 |
| **shows**  59:8 | 237:11 238:8 | 231:7 | 294:17 296:14 |
| 153:6 327:23 | 238:16 239:12 | **sir**  18:22 25:17 | 322:11 329:25 |
| 336:5 355:17 | 249:21 252:6 | 25:21 33:6 | 343:25 362:19 |
| 355:23 369:6 | 303:2 318:4,8 | 68:8 72:5 75:2 | 378:7 |
| **shut**  257:2 | 318:18 322:25 | 81:17 104:12 | **sitting**  142:18 |
| **side**  78:20 | 323:15 328:3 | 107:17 112:14 | 143:12 |
| 152:10 189:15 | 328:14 329:18 | 112:17 114:4 | **situation** |
| 234:9,14 | 331:8,10 | 115:7 117:25 | 287:25 |
| 333:19 | 332:10 333:16 | 119:4 139:24 | **situations** |
| **signature**  162:9 | 333:25 334:7 | 145:23 150:21 | 303:4 |
| 388:18 | 373:20 375:15 | 153:18 155:7 | **six**   6:12,18 |
| **significance** | 376:7,14,21 | 158:9 162:10 | 81:21 175:15 |
| 40:21 120:2 | 377:17,25 | 162:12 168:22 | 232:6 251:15 |
| 184:19 187:17 | **significantly** | 174:5 179:22 | 312:22 315:7 |
| 197:7,22 198:2 | 76:13 144:23 | 183:23 215:8 | 318:25 320:22 |

**[six - squeeze]**

321:3 322:7
342:13 372:21
377:15 378:2
378:11
**sixth** 376:10
377:9
**size** 140:18
309:22 334:21
335:25
**skip** 215:20
**sliding** 190:3
**slightly** 27:9
120:16
**slow** 213:22
**slowly** 285:25
**small** 180:16
286:6 334:20
335:24
**snide** 38:4
**solely** 284:18
**solve** 119:13
**somebody**
11:12 152:13
152:25 159:2
166:11 240:23
341:14 343:6
**somewhat** 50:7
**sophistry** 39:25
**sorry** 9:19
17:20 30:4
32:5 34:6 37:7
53:16 69:19
73:4 74:7
85:20 90:6
94:22 97:12

98:17 103:7,10
109:9,24 116:3
124:6 126:8
127:5 129:3
132:6,23 133:3
141:9 146:10
155:24 163:5
172:20 177:4
182:16 189:24
199:21 203:2
204:3 232:4
243:4 245:7,15
250:10 255:4
256:2 261:8
264:2 267:8
268:7 273:21
278:16 281:19
281:25 286:4
299:20 308:6
309:8 311:9
315:2 321:18
322:4 325:11
330:15 333:7
333:10 336:15
337:17 341:11
347:10 349:6
350:18 352:24
353:24 356:2
358:25 359:24
362:6 364:25
370:7 375:16
376:15 377:2,7
379:15 381:6
**sort** 5:25 38:4
232:22 233:21

234:23 375:21
377:3
**sorts** 86:12
89:21 90:8
96:17 100:10
101:10 131:25
311:10 339:10
343:19 345:23
354:18
**sounds** 22:25
83:3 279:6,24
318:23 336:16
**source** 205:4,4
205:5
**sources** 216:23
217:2,11
**southern** 1:3
3:20 15:5
162:6
**spans** 122:17
**speaking**
193:21
**specific** 52:8,19
53:23 55:22
56:21 57:25
58:23 67:20,21
70:7,8 72:18
110:22 135:6
158:2,12
160:19 163:20
164:5 165:2
172:4 173:22
206:13 209:20
209:20,21
213:7 219:11

239:21 241:23
270:17,23
280:16 291:4
293:14 303:3
332:13 335:3,4
335:8,20,21
343:16 369:23
369:24
**specifically**
32:2 190:16
193:16 194:14
209:19 220:23
266:25 311:6
347:22 352:19
379:8
**specifics** 102:3
**speculating**
12:3 101:18
**speculation**
206:20
**speculative**
362:12
**spelling** 251:23
**spending** 278:2
**spent** 10:4
**sphere** 366:19
**spoke** 11:3
**spoken** 193:22
**spreads** 383:16
**squared** 306:13
**squeeze** 1:6
3:18 101:7
267:4,5,7,9,16
267:18,21
268:11,23

**[squeeze - statistically]**

Page 74

269:22 272:18
272:20,23,24
273:5,16,18,20
273:22 274:5,7
274:10,14,17
274:19,22
275:4,6,6,12,15
275:18,23
276:3,13,15,17
353:21,25
354:11,21,25
356:19 364:14
364:16 365:19
365:20 366:21
367:5,7,12,14
367:23 368:2,5
368:13 386:1
389:1
**squeezed**
267:14
**squeezes**
267:22 269:5
269:23 270:3
270:12 271:3
271:11 276:25
**st** 203:12
**stack** 178:17
**staff** 357:25
358:5,15 359:3
359:10 360:23
363:6,24 364:7
364:20 370:5
370:16 371:3
387:15

**staff's** 368:25
**stand** 311:18
**standard** 67:17
67:22,25 68:3
70:19 71:13,17
71:18,20 72:8
75:14 80:13
82:14 101:24
101:25 102:7
102:16,18,20
103:4,15,17,19
103:22,25
111:21 171:20
211:25 306:13
**standards**
219:6
**standpoint**
51:7 124:17
**stands** 37:22
**stapled** 202:10
**start** 13:11
54:11 128:15
177:7 213:17
216:2 250:25
**started** 64:4
229:13,14
231:14
**starting** 126:6
126:12 127:18
**stat** 37:16
**stata** 37:13
38:16,22 39:2
40:10
**state** 1:18 4:9
4:11 5:10

15:23 61:22
224:17 314:17
315:9 346:9
388:5
**stated** 59:14
69:16 70:4
72:2 103:23
114:13 126:23
127:7 129:19
132:5,10,11
135:20 190:10
221:24 238:10
299:10 300:11
314:2 363:5
369:18
**statement**
46:15 66:17
70:20 79:23
84:5,22,24
85:5,8 94:7,9
100:19 118:7
118:21,24
135:18 141:20
143:17 152:21
158:18 161:11
194:18 196:17
219:15 225:11
225:13,15
235:18 262:22
283:19 285:20
295:8 319:25
335:13 336:19
336:21 337:14
340:8,12 342:7
355:21 363:24

370:21
**statements**
93:15 286:10
288:16 339:11
339:14,17
363:12
**states** 1:2 3:19
180:9 186:4
196:4,11
220:23 334:23
371:8
**stating** 62:11
72:2
**statistical**
40:20 111:21
144:19 184:19
187:17 197:7
197:22 198:2
198:10 200:8
236:23 239:11
318:13 319:9
322:15 324:12
324:20,22
325:25 326:2
383:8
**statistically**
40:17 92:23
93:11 94:4,16
96:6,14 97:4
97:10 99:4,7
106:15 144:17
146:6,25
147:14,22
148:11,16,25
149:15,21

**[statistically - stockholder]**

| | | | |
|---|---|---|---|
| 151:25 153:3 | 35:25 36:10,23 | 145:25 146:5 | 299:6,17,21 |
| 184:25 235:11 | 38:22 48:14 | 146:11,19,25 | 300:8,14,14 |
| 235:13 236:5,7 | 49:2,3 56:5,12 | 147:15,21 | 301:7,18 307:3 |
| 236:10 237:5 | 57:6 58:5,20 | 148:12,18 | 307:25 308:12 |
| 237:11 238:7 | 59:13 62:17 | 149:2,8,14,22 | 308:22,24 |
| 238:16 318:3,8 | 63:13,18 64:25 | 150:8,11,14,16 | 309:11 310:22 |
| 318:17 322:25 | 66:10 68:24 | 151:25 152:3 | 312:2,9,11 |
| 323:3,14 328:3 | 76:3 79:16 | 153:4 167:8 | 328:2,13 |
| 328:14,23 | 80:10 81:5 | 170:21 174:13 | 329:16 336:6,9 |
| 329:17 331:7 | 82:8 84:16 | 174:24 176:19 | 337:2,19 338:8 |
| 331:10 332:10 | 85:16 86:12,14 | 176:20 178:7 | 338:18,23 |
| 333:15,24 | 86:15,17,24 | 183:5 189:2,9 | 341:11,12,17 |
| 334:7 373:20 | 87:2,8,11,17,20 | 189:9 213:23 | 342:12 343:7,8 |
| 375:15 376:7 | 87:22,24 88:4 | 224:3 226:23 | 344:8,17 345:2 |
| 376:13,20 | 88:9,10,15,18 | 226:25 227:8 | 346:4 348:23 |
| 377:17,25 | 89:21,23 90:9 | 230:13,18 | 349:11 350:16 |
| 378:12 | 90:11 92:4 | 236:16 237:7 | 352:3 353:11 |
| **status**   7:20 | 96:17,19 97:4 | 237:13,23,25 | 353:13 356:6 |
| **steep**   364:11,23 | 97:11 98:2 | 238:18,25 | 361:9,10 362:2 |
| 365:17 366:3 | 99:7 100:10,12 | 240:8 246:10 | 362:13 363:8 |
| 367:8 | 101:10,12 | 255:24 258:16 | 364:3 365:7,22 |
| **step**   235:9,20 | 104:5,15,24 | 261:20 265:15 | 366:22 367:12 |
| 248:13 383:21 | 105:9 106:16 | 267:13,14 | 369:13 376:5 |
| **steven**   10:15 | 106:18 107:12 | 272:8 273:8 | 376:10 380:16 |
| 178:20 179:19 | 110:9,12 | 275:9 278:8,21 | 382:19,22,23 |
| **stickers**   22:6 | 112:13,19,21 | 279:3,14,19 | 383:2,13,14,17 |
| **stipulate**   79:20 | 112:25 113:10 | 281:7 289:16 | 384:6 |
| 115:13 117:4 | 114:24 115:9 | 290:11 291:18 | **stock's**   140:23 |
| 221:20 295:5 | 115:11,14,19 | 293:22 294:15 | 144:2 |
| **stipulating** | 116:21,24 | 294:20 295:11 | **stockholder** |
| 116:11 | 117:11,20 | 295:12 296:2,8 | 66:12 69:2 |
| **stipulation** | 118:12,23 | 296:20,23 | 76:5 79:18 |
| 115:18 | 119:8,19 120:9 | 297:3,16,18,18 | 80:12 81:7 |
| **stock**   16:10,11 | 130:2,22 140:8 | 297:23 298:5 | 82:10 |
| 26:4,23 31:14 | 145:4,12,18,20 | 298:12,13,18 | |

**[stocks - submitted]**

| | | | |
|---|---|---|---|
| **stocks** 16:23,25 | 332:7 339:6,23 | **stuck** 80:22 | 365:14 366:8 |
| 25:24 26:14 | 342:24 343:24 | 119:25 290:24 | 367:4,18,20,22 |
| 27:18 30:9 | 344:3,11 346:2 | **studied** 112:22 | 372:16 |
| 36:25 40:5,6 | 349:24 356:12 | 112:23 117:24 | **studying** 63:15 |
| 42:14 43:17 | 366:17 372:11 | 256:14 306:9 | 63:17 64:12,14 |
| 44:5,12 45:17 | 372:16,17,21 | 306:14,15 | 64:18 |
| 45:22 49:10 | 372:22 373:9 | 308:11 309:4 | **stuff** 142:2 |
| 52:5,7 56:5,13 | 375:11 377:10 | 309:10 310:11 | 201:23 311:11 |
| 65:2 67:6,9 | 377:15 378:2 | 319:2 354:24 | **subject** 379:12 |
| 73:15,18 78:9 | 381:20,20 | 366:6 372:10 | **subjective** |
| 104:8 105:4 | **stoneturn** | 372:23 373:9 | 84:11 106:2,10 |
| 110:23 111:12 | 253:19,20,21 | 382:19 | 189:24 190:4 |
| 111:13 114:25 | 253:24 | **studies** 133:10 | 218:17 221:15 |
| 116:10,18 | **stop** 85:21 | 178:2 203:21 | 231:24 232:4 |
| 117:13,23 | 152:15 | 204:18 | 232:15 233:12 |
| 119:21 126:17 | **stopped** 174:18 | **study** 61:20 | 233:15,18 |
| 126:21,21 | **stories** 213:25 | 92:8,22 93:7 | 234:11,16,23 |
| 127:17 167:6 | 217:3,12 218:3 | 108:10 109:6 | 328:17 |
| 184:4,24 | 222:19 223:13 | 111:7,11,15 | **subjectively** |
| 187:18 197:10 | 223:24,25 | 112:4 122:19 | 232:22 |
| 197:19,24 | 224:8,10,11,19 | 137:19 138:3 | **subjectivity** |
| 199:18 200:9 | 225:4,5,17 | 138:19 139:7 | 223:19 297:9 |
| 228:8 232:12 | 226:14 227:20 | 139:17 144:14 | **submission** |
| 256:14,20 | 228:2,10 229:3 | 147:17 152:14 | 218:10,12 |
| 261:14 262:2 | **story** 217:6,15 | 152:17 153:2 | 252:13 |
| 287:4,7 289:13 | **strategy** 230:16 | 204:20,22 | **submittal** 33:4 |
| 290:4,6 292:13 | **street** 18:18,20 | 245:11,12 | 33:8 |
| 292:23 293:3 | 19:5,8 | 249:17 250:22 | **submitted** |
| 294:6,9 301:25 | **stricter** 171:24 | 255:22 263:24 | 12:11,19,25 |
| 302:9 304:15 | 172:3,8,12 | 264:5 271:10 | 13:5 14:21 |
| 306:6,16 | **strictly** 204:10 | 294:3 295:24 | 15:11,25 16:15 |
| 310:13,19,24 | **strike** 9:8 31:5 | 298:2 309:2,3 | 17:6,12 22:16 |
| 312:11 319:2,5 | 73:5,5 128:16 | 309:7 319:5 | 23:4,11 24:18 |
| 320:22 321:3 | **structure** 358:7 | 321:15,23,25 | 25:8 162:15 |
| 322:7 330:25 | 359:5 387:16 | 323:12 342:18 | 166:15 171:12 |

**[submitted - tabak]**

173:14,25
174:2 175:25
177:8 186:22
226:12 231:5
253:16 326:16
**submitting**
15:18 24:20
25:5,14 291:16
**subpoena**
327:2
**subpoint** 54:9
**subsamples**
144:24,24
148:17
**subscribed**
386:16
**subsequent**
93:7 94:3 96:7
96:7 364:11,23
365:16 366:3
367:8
**subsequently**
33:16 42:7
**subset** 125:24
125:25 258:13
261:17
**substantially**
292:14,17
**substantive**
95:19
**substantively**
23:17,22
**substitutability**
342:24 343:3
343:23

**substitutable**
342:19
**substitute**
343:8
**subsumed** 7:17
**subtract** 54:15
**sufficient** 78:25
79:6 190:19,20
**suggest** 338:21
**suggested**
274:20
**suggesting**
367:11
**suggests** 95:11
202:7
**suit** 14:6
**suitability** 27:4
27:10 221:8
**summary**
325:21
**super** 232:11
**supplemental**
24:9
**supplementat...**
24:6,7
**supply** 34:13
50:9 51:16,19
52:17
**support** 11:18
133:6 135:22
137:22 140:4
141:5,16
146:21 148:20
148:23 149:5
149:17 150:2,5

150:22 151:4
**supposed**
250:11 262:7
290:10
**supreme** 68:6
72:24
**sur** 326:19
327:7
**sure** 9:14 12:7
14:25 15:3
17:22 27:12
29:22 35:2,6
35:22 50:11
55:8 56:18
57:14,25 63:23
66:16,17 77:19
77:19 80:4
83:11 84:7
86:9,16 88:12
88:16 113:6,23
134:18 136:5
146:13,14
147:8 162:21
164:11 165:24
167:14,25
172:13 173:16
177:7 192:3
193:14 194:12
198:9 201:10
204:7 223:8
243:17 252:20
254:9 255:5
257:20 268:22
269:22 270:6
271:7 272:2

276:19 286:8
287:20 288:16
289:9 292:5
308:10 330:6
337:16 341:20
352:16 354:6
356:4 365:5
**surface** 59:7
331:21 334:13
**surge** 359:16
359:21 360:3
360:15
**surprised**
71:22 171:18
252:21,23
**surrounding**
98:7,9 164:6
166:22
**suss** 230:21
**swaine** 1:15 2:8
3:22 4:15
**swear** 4:24
**sworn** 5:5
386:16 388:8
**symbols** 41:21
**synonymously**
294:2
**system** 8:16
**systematic**
244:5

**t**

**t** 137:2 387:6
389:3,3
**tabak** 158:20
191:9,12

**[tabak - tend]**

192:12,14,22
193:21 204:8
208:6 222:25
225:7,22 226:4
226:12,17
**tabak's** 192:19
193:11
**table** 39:7,9,12
39:13 40:9,14
40:16,21 42:11
42:12 55:16
60:4 125:11,14
185:18 211:17
316:25 317:3
318:19 319:18
322:14 324:11
325:6,8,13
326:10 327:17
327:22 328:9
330:11,18
333:8 334:24
335:7,16
352:25 356:3
373:2 375:10
375:22 377:4
377:17,22
378:11 382:13
382:13,18
387:14
**take** 3:12 35:4
51:24 57:16
65:10 75:19
76:22 86:4
101:2 106:9
128:5 136:5

187:2 242:14
251:3 267:22
268:3 269:2,5
272:11 275:7
276:18,24
278:18 284:7
311:14 312:7
312:13,15
352:2 356:21
356:22 357:19
365:9 366:6,25
368:10 383:22
**taken** 1:13
35:12 77:2
179:11 251:12
273:18,23
312:24 348:13
351:25
**talk** 53:24 54:7
97:16 140:17
194:20 270:18
270:20 351:23
380:25
**talked** 35:22
40:11 48:13
263:6 292:6
296:22 337:25
345:25 351:7
368:11
**talking** 35:21
37:3 48:23,25
51:13 52:18
53:25 54:2,6
56:3,7 66:25
87:16 92:12

97:13 101:19
101:21 120:3
129:10,11
134:24,25
151:24 161:6
164:24 165:21
169:6 173:8
192:10 201:25
202:15 211:4
215:17 219:12
219:13,13
227:14 239:25
245:18 262:19
262:20 270:19
270:22 275:5
278:13,15
290:7 293:3
295:18 298:7
303:5 337:9
340:22 341:4
343:11 346:6
363:14,19
370:10,12
380:17
**talks** 169:19
268:10
**tangentially**
252:5
**target** 67:20
70:7
**targeted** 351:5
**taught** 20:9,11
20:12,21,22
52:12

**tautologically**
305:24 324:7
**td** 375:5
**teaching** 8:5,7
10:4 19:25
20:16,18,19
**team** 253:2
**technically**
7:19 10:23
14:2 209:4
235:20 254:6
**tell** 100:6
115:22,23
116:23 157:12
192:23 193:5
207:20,25
214:4 218:21
255:9 268:24
270:3 272:7
305:14 310:5
311:21 336:21
343:3,4 362:25
368:9 381:8
**telling** 195:10
353:25
**temporarily**
339:5,23
**ten** 12:6,8,20
81:14 120:3
212:2 213:21
214:9 226:23
368:19,21
**tend** 140:4,13
146:21 178:7

**[tending - thank]**

| | | | |
|---|---|---|---|
| **tending** 137:22 | 380:21,22,23 | 194:3,5,13,21 | **testimony** |
| 141:5,15 | 381:2 | 195:2,13 196:5 | 17:15,24 48:22 |
| **tenure** 20:2,14 | **test** 111:24 | 197:6,18 198:9 | 90:4,8 107:2 |
| **term** 8:10 | 115:22 124:19 | 201:5 204:25 | 151:2,9 152:12 |
| 69:15 70:2 | 138:6,20 139:8 | 205:23 206:2 | 156:18 159:19 |
| 87:12 88:5 | 139:10,11,12 | 207:5,11,23 | 160:7 203:17 |
| 100:17 103:2 | 143:24 144:9 | 208:21 215:13 | 210:13 232:19 |
| 105:8 106:2,10 | 144:12,21 | 217:20 222:7 | 233:24 259:14 |
| 110:12 130:12 | 145:4,11 | 225:8 227:18 | 260:7,24 |
| 131:8 134:7 | 148:14,21 | 235:23 236:8 | 295:10,14,16 |
| 135:5 140:13 | 150:2,12 151:2 | 237:21 240:5 | 348:19 366:5 |
| 161:10 205:4 | 151:3 153:8,13 | 241:3 256:12 | 368:6 386:10 |
| 212:9 228:13 | 153:13,25 | 256:12 296:7 | 388:7,10 |
| 241:14 254:7 | 154:3,9,10,24 | 296:18 316:17 | **testing** 74:3 |
| 265:9,14 | 155:2,17 156:4 | 316:18 317:4 | 159:15,20 |
| 267:11 270:19 | 156:19,21 | 318:14,16 | 160:8 164:9,20 |
| 270:21 281:4 | 157:3,4,11,13 | 319:12,17,18 | 164:25 217:21 |
| 293:23 302:4 | 157:14,25 | 320:3 324:18 | 221:10 335:11 |
| 305:14,21 | 158:10 159:10 | 325:14,22 | **tests** 159:4 |
| 307:2 312:5 | 160:16,17 | 326:5,10 | 165:7,16 |
| 323:10 337:10 | 161:16 163:13 | 327:22 329:21 | 166:23 172:12 |
| 338:14 347:5 | 163:14 165:24 | 330:20 331:11 | 175:6 190:9,25 |
| 380:5 | 172:19 173:2 | 331:16 334:6 | 255:22 |
| **terms** 42:12 | 173:11,19,22 | 334:15 335:11 | **tethered** |
| 57:25 64:20 | 174:4 176:3,16 | 335:12,16,24 | 273:11 |
| 139:22 140:17 | 176:25 177:20 | 379:17,24 | **text** 125:18 |
| 152:6 167:2,17 | 178:12,14 | **testified** 5:5 | 314:16 |
| 167:23 168:14 | 180:10 183:17 | 15:14,17 | **textbook** 266:4 |
| 174:20 189:6 | 184:5,6,12 | 148:25 149:4 | 266:9 |
| 190:6 205:25 | 185:3,19 187:8 | 149:13 168:22 | **thank** 22:14 |
| 282:12 289:21 | 187:13,16 | 181:20 219:10 | 23:10 35:3 |
| 302:25 304:8 | 188:23 190:8 | 231:4 | 36:3,7 162:8 |
| 307:15 321:10 | 190:19,24 | **testifying** 98:25 | 183:10 242:15 |
| 337:25 350:24 | 191:22 193:13 | 102:6,15 | 243:10 286:14 |
| 362:21 380:11 | 193:16,23 | 103:14 159:3 | 366:12 377:7 |

[thank - three]                                                    Page 80

378:17 384:21
**thanks**   35:20
**theoretical**
    50:12 102:12
    124:17 352:13
    352:22 353:17
    355:18,22
    356:15
**theoretically**
    357:11
**theories**   284:18
**theory**   65:12,14
    65:17 66:9
    68:23 75:24
    76:2,8 79:14
    80:9 82:8
    140:22 212:8
    248:3 257:8,17
**thick**   202:23
**thing**   30:15,15
    38:7 165:19
    212:20 233:7
    261:9 283:4
    307:21 374:20
**things**   28:2
    73:24 87:3
    130:24 131:2
    141:21 155:6
    155:12,14
    167:4,18
    168:24 174:24
    188:17 221:24
    222:24 226:19
    227:7 306:12
    307:6,14 312:7

312:8,9 314:3
345:24 348:3
357:18,20
365:8 368:11
376:18,20
378:11 380:15
380:15,21
383:6
**think**   5:24 7:5
    7:14,16 8:12
    9:3,12 11:4,10
    11:10 13:25
    14:4 16:16,23
    17:5,19 21:12
    35:20 39:4
    46:8 48:19
    51:8 52:20
    53:10 55:11
    62:23 66:25
    70:12 75:5
    77:17 78:25
    84:20 87:22
    90:24 100:14
    101:14 102:9
    105:23 106:11
    106:12 110:11
    129:17 138:8,9
    138:12,22
    140:11 141:19
    141:25 142:2
    142:17 143:17
    149:7,8 152:5
    152:6 164:13
    164:25 165:11
    169:15 170:4

170:12 172:10
181:24 182:3
188:2,25
189:10,13
190:2 194:24
197:11 201:23
202:9 204:20
205:5 212:17
218:13 223:5
223:17 226:22
227:3,5,9,10,13
231:4 232:19
238:9 239:7,15
243:2 244:6
247:23 248:6
251:2 252:6
253:6,18
262:25 264:6
265:19 270:8
273:7 274:18
275:8 278:3
281:19 282:19
282:20,22
283:3 284:12
288:14 291:11
301:9 305:7
308:2 313:24
318:20 321:9
322:2,9,10
324:2 329:5
343:2 351:4
354:22 356:8
357:21 358:18
371:9 374:22
377:8 381:25

**thinking**   48:10
    48:11 88:8
    102:10,11
    239:20 350:23
    360:7
**thinks**   341:15
**third**   314:8
**thorough**   167:5
    167:19
**thoroughly**
    334:12 349:13
**thought**   9:21
    35:18 38:2
    57:24 87:3,15
    88:7 108:12
    112:10,18,20
    112:23 142:15
    188:21 229:8
    233:13 256:17
    259:10 262:9
    262:18 271:19
    273:2 280:4
    284:13 291:3
    299:20 321:5
    344:21 345:5,9
    349:13 350:6
    351:13 356:25
    357:11 376:3
**thousands**
    102:24 241:11
**three**   7:13
    53:10 59:18,20
    59:20,21,25
    77:5 111:12
    112:15 136:8

**[three - traded]**

Page 81

| | | | |
|---|---|---|---|
| 153:21 156:2 | 261:2 263:3,3 | 228:21 240:10 | 170:16 171:17 |
| 180:2,3,4 | 263:7,12,13,19 | 246:22 263:18 | 192:16 193:2 |
| 184:4,24 199:5 | 263:19 264:18 | 264:9 269:15 | 211:16 214:21 |
| 200:2,5 216:16 | 264:18,23,24 | 272:3 277:19 | 217:9 221:19 |
| 216:17 264:9 | 267:22,22 | 291:13 294:18 | 237:3 246:8 |
| 292:5 315:7 | 269:4,4 273:4 | 296:14 322:11 | 252:7 255:14 |
| 323:9,14,19 | 275:2 278:2 | 329:25 343:25 | 271:11 325:7,9 |
| 327:4 331:8,11 | 300:24 304:2,3 | 351:13 355:15 | 325:17 342:25 |
| 375:11,22,23 | 310:9 311:6,14 | 362:19 378:8 | 353:17 |
| 376:18 384:17 | 315:10 337:15 | **today's** 115:8 | **topic** 308:5,9 |
| **throwing** | 340:10,14,20 | **todd** 1:16 4:3 | **torture** 312:16 |
| 307:21 | 351:15 353:3 | 388:4,20 | **total** 332:8 |
| **ticker** 41:21 | 356:6 357:6 | **together** | 369:6,12 |
| 217:4,13 | 361:19 363:20 | 171:10 199:6 | **totality** 321:8 |
| **time** 3:8 4:10 | 378:18 385:4 | 202:11 254:13 | **toward** 281:18 |
| 10:4,7,11 | **times** 11:4,25 | 254:16 292:21 | **towards** 246:16 |
| 11:19 18:5 | 39:22 67:14 | **told** 70:24 | 314:20 |
| 32:16 51:4 | 81:21 117:14 | 72:15 166:9 | **township** |
| 56:16 57:13 | 172:6 192:22 | 347:7,9 | 244:20 246:3 |
| 75:19 96:16 | 193:6 198:19 | **tomorrow** | **track** 20:2,14 |
| 100:9 102:5,14 | 291:15 314:17 | 264:9 | 264:8 |
| 103:14 106:5 | 315:7,8,8 | **ton** 361:8 | **trade** 45:22 |
| 122:3 123:3,10 | **timing** 56:4 | **took** 28:6 51:9 | 176:21 178:16 |
| 124:23 126:6 | **title** 9:4 20:25 | 51:21 260:25 | 183:8 230:13 |
| 126:13 127:3 | 21:3,6,10,15 | 272:23 317:14 | 287:24 288:5 |
| 127:11,19 | 133:20 | **tootsie** 44:14 | 290:4,6 320:18 |
| 128:14,19 | **today** 4:17 6:3 | 45:10 46:13 | 342:4 |
| 129:7,14 136:4 | 18:7 68:9 | 115:24 126:18 | **traded** 26:5,9 |
| 165:11 177:8 | 71:10,23 74:25 | 126:23 127:7 | 26:14,24 31:15 |
| 185:19 196:5 | 87:13 93:4 | 319:6 376:12 | 41:13 42:2 |
| 204:11,14 | 95:25 100:8,14 | 377:9,14 | 44:23 45:10,19 |
| 213:11,24 | 101:7 105:17 | **top** 33:19 46:18 | 46:3,13 52:6,6 |
| 216:20 219:17 | 106:7 113:20 | 137:14 138:13 | 150:16 152:4 |
| 227:15 250:24 | 117:13 170:3 | 151:13 161:9 | 232:13 239:2 |
| 253:15,25 | 177:16 195:6 | 168:3 169:24 | 240:8 278:21 |

320:11 341:6
341:11,12
**trader**  48:12
**traders**  227:9
312:7 369:9
380:18
**trades**  65:21
165:5 176:19
178:15 183:6
207:6 278:9
279:3,14,19
280:8 281:7
290:11
**trading**  1:7
3:18 48:2,6,15
48:17 50:13
54:14,14,20
55:6 90:12
101:7,12
128:12,13,18
128:24 129:6
227:12 230:16
230:17,18
272:9 298:5
323:21 372:11
374:13,16
386:1 389:1
**traffic**  68:12
**trail**  369:20
371:4
**training**  68:14
166:11
**transcript**  89:6
91:19 386:5,10
388:9

**transcripts**
33:24
**translates**
82:25 84:3
**tried**  58:18
**trivago**  41:17
126:15 319:8
319:13,19
320:6,9,11,21
321:2 322:3,5
**true**  75:5,9,10
114:21 115:4
140:11 216:12
231:8 262:5,25
373:24 386:9
388:9
**trust**  15:5
174:25 189:11
219:3
**truth**  118:11
**try**  12:4 27:12
28:22 91:10,14
92:17 105:19
117:5,17
118:20 154:22
160:14 197:14
201:20 300:2
301:24 303:11
344:22
**trying**  15:19,21
15:22 17:17
22:17 30:5
31:3 34:8 51:8
62:9 64:2,6
75:22 105:24

111:21 119:12
120:15 138:23
142:13 145:24
174:14 231:20
231:20 232:15
232:21 233:21
240:20,25
253:17 268:18
268:21 289:25
302:18,24
303:4 306:25
311:12 332:25
360:6 365:10
376:21
**turn**  65:7 107:5
108:3 120:25
137:12 138:24
139:3 162:18
195:23 198:21
210:23 211:7
244:8 257:21
265:16,17
359:13 368:16
**turned**  107:18
**turning**  36:8
**turnstone**
253:19
**twice**  13:8
197:3 232:20
303:15,21,24
**two**  12:11,13
12:14 16:22,25
20:9 21:19
23:19,25 24:17
24:24 25:5,9

33:2,12,15,21
33:23,24 34:16
35:15 36:4
44:12 45:9,17
45:22 48:23
49:16 76:24
118:10 127:2
127:10 132:21
133:6 144:24
148:17 163:8
170:20 175:12
187:17 191:16
193:23 195:7,8
196:11,20
199:17 200:8
214:11 221:24
231:13 232:2
249:22 253:8
260:14 264:8
264:10 270:22
274:19 278:11
282:16,23
283:20 288:16
288:21,25
315:7 319:5
323:13,22,23
324:14 331:7
331:10 351:10
357:8 368:2
375:23 376:18
380:24
**type**  50:17
52:16 58:19
159:23,24
180:15 211:21

**[type - unit]**

223:6,10,20
298:2
**types** 59:18,20
218:2 222:19
223:12 224:9
225:3
**typically**
262:15,23
270:12 271:3
277:10,13

**u**

**u** 251:25
**uh** 152:19
199:20 362:8
**ultimately**
140:7 142:23
249:10
**umbrella** 48:17
135:19 168:4
368:8
**unable** 45:20
46:11 111:23
220:18 266:16
270:2 305:12
354:13 363:23
**unaffected**
128:9,20,25
129:8,23
**unaware** 23:24
278:18
**uncertain**
164:20
**unconfident**
321:11

**under** 48:16
53:13 65:5
78:8,10,13,21
84:20,24 85:5
105:10 127:2
127:10 135:19
144:16 150:12
150:13 168:4
175:4 189:17
212:7 218:16
218:16 219:9
221:25 222:15
252:22 282:15
344:2,9,24
347:14 368:8
**undergraduate**
5:19
**underlies** 39:2
**underline** 53:4
**underlying**
35:24 55:24
56:13 59:10
62:17 74:14,17
170:21 174:22
203:24 210:15
356:12
**understand** 6:2
18:24 19:2
28:24 62:9
63:11 64:2,23
75:2,8 77:7,20
81:17 90:25
95:19 98:6
99:13,23
106:11,13,19

106:21 125:5
131:22 148:23
174:7 182:21
185:22 194:25
199:25 222:3
226:10 231:13
239:5,13
240:20,25
264:3 283:5
285:6 290:2
299:11 300:15
301:2,4,13,15
301:24 303:4
304:4 305:8
327:19 332:21
369:19
**understanding**
53:7 65:5
66:18 68:5
70:21,24 72:10
72:19 77:10,23
78:3,12 79:8
95:2,3 102:13
103:21 105:13
105:15 107:3
124:10 126:4
126:10 127:13
128:7,17,24
129:6,25
130:20 133:15
134:4,12,17
135:17 165:12
166:9,18,25
167:16,22
168:13,23

169:10 170:13
207:18 210:12
220:8,10,19
232:18 248:17
257:15 264:13
265:8 266:16
269:15 272:22
274:13,23
278:25 279:9
279:12,17,18
281:6 282:15
328:5,9 329:12
329:19 332:19
337:11 371:2
375:6
**understood**
8:15 30:17
31:2 34:23
48:20 175:23
193:8 198:18
201:17
**undertaking**
234:21
**unfamiliar**
219:24 281:4
**unfortunate**
371:21
**unfortunately**
74:2 204:6
**uniformly**
273:4
**unit** 3:15 35:10
35:15 76:24
77:5 136:8
137:7 179:9,14

[unit - valuation]                                                    Page 84

251:10,15
312:22 313:5
348:11,16
384:24
**united**  1:2 3:19
**univariate**
383:22
**universal**
168:19
**universally**
276:15
**university**  5:22
20:7 21:7
**unknown**
366:23
**untethered**
336:12 337:5
337:22 338:11
**unusual**  295:25
296:8,19,22
302:17 304:6,8
**unusually**
360:24 361:5
361:19
**upper**  252:22
**ups**  294:7,10
306:18
**use**  21:23 38:10
40:20 55:14
57:7 58:14
66:20 69:14
70:2 82:11
87:11 105:18
110:12 116:3
129:21 131:24

132:3,22 133:7
133:16 135:23
144:20 158:2
158:11,18
160:19 176:23
177:15,18
188:13 192:19
193:11 196:18
217:23 222:5
223:18 227:4,8
228:13 230:6
230:25 231:25
232:25 241:14
282:24 293:23
302:25 326:20
335:24 336:2
382:4
**used**  16:12
38:21 40:24
43:25 44:6
52:23 80:17,21
98:14,20
105:10 106:2
122:12,24
123:19 124:3,9
131:14 132:5
134:7 140:13
171:2,5 172:20
173:17,19,20
173:23 177:9
180:19 181:3
181:16,22
186:6,17 187:6
187:12 191:2
192:22 193:4

193:19 194:17
195:5 196:23
196:24 197:3
198:12 206:13
206:23 219:5
221:6 222:6
223:2,2 227:11
230:24 231:6
231:24 232:3
232:11 265:4
266:4,7 277:10
288:18 289:18
289:21 291:4
292:2 299:23
318:18 338:14
370:2
**uses**  138:3
185:19 224:7
**using**  37:12
40:10 46:24
47:13 52:24
60:2 67:16
95:9 105:25
122:20 135:4
161:16 163:20
174:18 175:2
180:10 181:20
182:8 183:12
184:5 185:3
187:18 194:5
194:22 196:5
197:6,18,24
198:6 211:22
211:25 214:22
218:14 231:7

233:2,22
267:20 268:25
269:3 274:9
282:7 283:13
284:2 285:12
287:15 288:10
290:19 293:25
300:24 302:4
305:21 307:15
325:16 326:4
326:17 328:3
328:15 329:18
345:8 347:5
354:7 355:11
369:10 381:13
**usually**  144:18
173:9 369:23
**ute**  53:8,18
282:16,21
283:6
**utilized**  173:22
190:13

**v**

**v**  14:11 15:5
**vacuum**  108:12
151:24 247:4
**vague**  266:20
267:10 304:8
305:3,7 307:15
**valid**  151:15
**valuation**  53:25
54:3 67:21
70:8 153:15
154:5,12 155:4
155:19 156:6

156:13,22
157:6,8,16
158:4,14
159:12 160:21
163:22 173:3
182:14,18
296:25 297:21
345:24 380:23
380:24
**value** 40:3
53:19,20,24
54:2 66:10,15
67:15 68:25
74:3,4,17 76:4
79:17 80:11
81:5 82:9
154:16 155:10
161:5,11
173:10 182:20
189:14 232:7
233:22 278:14
278:14 297:7
297:11 299:4
299:15 300:6
301:5,16
308:20 311:24
312:3,4 317:7
317:16,19
318:12,25
323:12 326:4
327:25 328:11
328:23,24
329:15,24
330:21 331:9
331:12,16

332:9,15,20
333:6,14,21
336:5,13 337:5
337:23,24
338:4,12 339:8
341:12 342:11
345:13,14
346:18,19,21
347:2,6,16,17
347:18,21,24
347:24 348:4
350:25 352:2
365:10 367:3
369:13 379:19
380:2,5,20
**values** 74:14
184:16,18
197:18 329:21
331:3
**variable** 57:5
57:19 129:22
131:14 132:3,6
135:23 349:3,9
349:10 350:14
350:16,24
351:9,14,18,25
352:10,16
355:17 357:8
**variables** 56:16
56:19,20 57:8
57:15 123:20
124:3 130:5
131:25 133:7
346:14 382:21
383:5 384:4

**variety** 7:4
**various** 215:2,5
215:14
**verified** 120:5
**verify** 113:13
116:23 118:3
123:15 295:7
**verifying**
119:23 120:22
**veritext** 3:25
4:3
**version** 174:3
327:21
**versus** 10:5
13:21 48:11
144:4,18
145:10 149:9
180:10 184:6
185:3,18 187:8
216:25 309:23
**vertical** 38:13
**video** 3:11,16
**videographer**
2:17 3:2 4:2,23
35:9,13 76:23
77:3 136:7
137:5 179:8,12
251:9,13
312:21 313:3
348:10,14
384:23
**videotaped**
1:12
**view** 46:6
221:15 281:13

282:12 297:13
**villanueva**
252:4
**vision** 347:23
**visual** 58:25
**vitae** 9:13 89:3
**volatility**
306:10,14,16
306:21 307:5
307:22,23
**volume** 369:7
369:13 383:16

**w**

**w** 5:3 7:21
137:4
**wait** 17:20 51:8
92:10 94:22
113:16 139:4
267:8
**waiting** 209:5
**walia** 253:11
254:3,10,22
**walk** 286:6
**wall** 18:18,20
19:5,8
**want** 12:4
30:20 42:14
55:14 57:6,15
58:14 59:22
61:8 64:23
79:19 83:5,6
83:14 91:2,12
91:13 92:16
95:14,16,18
97:15 101:2

105:12 108:18
113:16,25
115:13,17
116:23 117:4
118:2,10,17
122:8 123:14
127:25 133:20
133:21 152:20
158:18,23
159:16,19
160:2,3,7
161:10 162:20
162:22 165:4
167:13 173:18
182:5 187:10
192:6 201:9
202:12 207:14
208:4,16,22
209:18 211:20
213:3 214:13
215:20,25
216:11 218:18
220:4,12,13
221:4,20
223:17 233:10
237:14 241:7
249:11 251:6
270:23 271:8
272:5 273:3
274:25 276:10
280:15,16
286:5 287:23
290:3 292:4,15
295:3,5,6,19
302:14 307:16

330:6,7 338:19
339:14 340:2
353:15 369:15
374:19 382:12
**wanted**  35:18
175:16 233:9
383:11
**wants**  115:3
118:15 249:2
300:23 343:6
**warning**
368:21
**waste**  213:11
**wasting**  304:2
304:2
**way**  26:20
27:13 28:23
29:5 38:4
40:11 43:22
49:21 50:17
53:5 54:5,12
54:23 56:10
57:14,17 58:11
86:6 93:3
100:8 104:7
105:3 118:17
130:15 141:7
141:17 151:7
153:24,25
154:23 160:15
164:3 170:19
175:10,11
176:20 207:20
238:2 244:5
249:5 252:6

256:15 271:13
271:17 278:23
281:14 284:9
284:16 290:25
296:16 298:19
301:20 302:13
320:5 322:12
329:3 331:19
331:21,24
340:6 344:23
346:14 348:21
350:12 352:17
352:18 353:18
354:5 356:10
388:13
**ways**  55:3
59:21 215:2,5
215:14
**we've**  380:12
**website**  226:22
251:23
**weed**  231:16,20
**week**  227:24
228:8 229:4
232:14 292:11
293:3 294:7,16
294:21 295:13
295:24 296:7
296:18 297:3
297:24 299:7
299:18 300:9
301:8,19 302:2
302:10 304:16
306:19 308:13
308:25 309:12

310:13,19
315:25 316:20
319:20 320:6
320:12,19,22
321:3,25
322:17 333:22
334:18 336:7
**weeks**  216:16
216:17
**weight**  321:14
321:22
**weighted**  39:14
39:18 40:2,3,4
369:13
**went**  6:23 7:18
218:8 313:25
**werner**  1:12
3:1,17 4:1,22
5:1,8,13,16,18
6:1 7:1 8:1 9:1
10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1
21:21,23 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1,20 33:1
34:1 35:1,19
36:1 37:1,23
38:1 39:1 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1

**[werner - werner]**                                             Page 87

| | | | |
|---|---|---|---|
| 50:1 51:1 52:1 | 135:1 136:1 | 205:1 206:1 | 274:1 275:1 |
| 53:1 54:1 55:1 | 137:1,10 138:1 | 207:1 208:1 | 276:1 277:1 |
| 56:1 57:1 58:1 | 139:1 140:1 | 209:1 210:1 | 278:1 279:1 |
| 59:1 60:1 61:1 | 141:1 142:1 | 211:1 212:1 | 280:1 281:1 |
| 62:1 63:1 64:1 | 143:1 144:1 | 213:1,18 214:1 | 282:1 283:1 |
| 65:1 66:1 67:1 | 145:1 146:1 | 215:1 216:1 | 284:1 285:1 |
| 68:1 69:1 70:1 | 147:1 148:1 | 217:1 218:1 | 286:1 287:1 |
| 71:1 72:1 73:1 | 149:1 150:1 | 219:1 220:1 | 288:1 289:1 |
| 74:1 75:1 76:1 | 151:1 152:1 | 221:1 222:1 | 290:1 291:1 |
| 77:1,8,21 78:1 | 153:1 154:1 | 223:1 224:1 | 292:1 293:1 |
| 79:1 80:1 81:1 | 155:1 156:1 | 225:1 226:1 | 294:1 295:1 |
| 82:1 83:1 84:1 | 157:1 158:1 | 227:1 228:1 | 296:1 297:1 |
| 85:1 86:1 87:1 | 159:1 160:1 | 229:1,25 230:1 | 298:1 299:1 |
| 88:1 89:1,7 | 161:1 162:1,3 | 230:22 231:1 | 300:1 301:1 |
| 90:1 91:1 92:1 | 163:1 164:1 | 232:1 233:1 | 302:1 303:1 |
| 93:1 94:1 95:1 | 165:1 166:1 | 234:1 235:1 | 304:1 305:1 |
| 96:1 97:1 98:1 | 167:1 168:1 | 236:1 237:1 | 306:1 307:1 |
| 99:1 100:1 | 169:1 170:1 | 238:1 239:1 | 308:1 309:1 |
| 101:1 102:1 | 171:1 172:1 | 240:1 241:1 | 310:1 311:1 |
| 103:1 104:1 | 173:1 174:1 | 242:1,8 243:1 | 312:1 313:1 |
| 105:1 106:1 | 175:1 176:1 | 244:1 245:1 | 314:1 315:1 |
| 107:1 108:1 | 177:1 178:1 | 246:1 247:1 | 316:1 317:1 |
| 109:1 110:1 | 179:1 180:1 | 248:1 249:1 | 318:1 319:1 |
| 111:1 112:1 | 181:1 182:1 | 250:1 251:1,19 | 320:1 321:1,16 |
| 113:1 114:1 | 183:1 184:1 | 252:1 253:1 | 322:1 323:1 |
| 115:1,23 116:1 | 185:1 186:1 | 254:1 255:1 | 324:1 325:1 |
| 117:1,16 118:1 | 187:1 188:1 | 256:1 257:1 | 326:1 327:1,11 |
| 119:1 120:1 | 189:1 190:1 | 258:1 259:1 | 327:16 328:1 |
| 121:1 122:1 | 191:1 192:1 | 260:1 261:1 | 329:1 330:1 |
| 123:1 124:1 | 193:1 194:1 | 262:1 263:1 | 331:1 332:1 |
| 125:1 126:1 | 195:1 196:1 | 264:1 265:1 | 333:1 334:1 |
| 127:1 128:1 | 197:1 198:1 | 266:1 267:1 | 335:1 336:1 |
| 129:1 130:1 | 199:1 200:1,18 | 268:1 269:1 | 337:1 338:1 |
| 131:1 132:1 | 201:1 202:1 | 270:1 271:1 | 339:1 340:1 |
| 133:1 134:1 | 203:1 204:1 | 272:1 273:1 | 341:1 342:1 |

**[werner - writings]**

343:1 344:1
345:1 346:1
347:1 348:1,18
349:1 350:1
351:1 352:1
353:1 354:1
355:1 356:1
357:1 358:1
359:1 360:1
361:1 362:1
363:1 364:1
365:1 366:1
367:1 368:1
369:1 370:1
371:1 372:1
373:1 374:1
375:1 376:1
377:1 378:1,18
378:23 379:1
380:1 381:1
382:1 383:1
384:1,25 385:1
386:2,4,13
387:4,8,9,10,11
387:14 389:2
389:24
**werner's**
180:10 199:16
**whereof** 388:15
**whispering** 3:7
**whoa** 103:7
108:2 302:23
302:23,23
305:19,19,19

**wide** 30:12
46:24 47:14
52:24 54:23
282:13 348:21
**widely** 122:23
**window** 122:21
133:18 135:16
**wisconsin**
314:17 315:8
**wish** 23:15
**withdraw**
23:16 91:15
201:4
**withdrawing**
300:19
**witness** 4:25
5:4 9:18 23:8
80:18 90:22
108:17 125:23
129:16 163:9
202:12,16,24
203:3 206:15
208:22 209:3
212:4,14,21,25
213:3 216:8,19
242:15 243:9
245:4,9 250:24
251:3,8 356:2
366:12 378:20
387:3 388:7,10
388:15
**won** 257:9,12
257:16
**word** 27:10
45:25 80:17,21

85:19,21,24
104:19 140:13
206:13 256:7
284:25 288:18
289:19 295:18
299:23
**worded** 120:15
**wording**
173:17 221:6
291:5
**words** 28:13
31:3 65:2
66:21 96:24
154:2 157:12
161:8 171:9
229:17 233:10
241:17 258:6
281:5 314:11
317:21 382:21
**work** 6:19
11:17 25:4,8
25:13 28:9,20
73:8 82:4,14
101:5 154:8
168:2,6,6
169:7,9 174:15
231:15 232:20
233:2,20
234:21 242:7
252:12 254:17
257:13,17
274:16 352:11
355:11 361:3
363:3

**worked** 6:9,13
11:21 12:21
191:13 227:11
242:4 251:18
252:5,22,24
253:2,18
254:10,13,16
294:14,19
**working** 38:21
188:11 371:13
371:23 372:6
375:8 377:21
**works** 253:24
**world** 102:12
103:3,24
264:23
**worried** 234:6
234:7
**worries** 203:3
**worry** 198:20
**worth** 66:7
346:23,25
**write** 70:16
122:19 123:18
156:11 188:10
214:22 236:14
238:6,14
258:12 266:3
286:2
**writes** 258:12
364:8 370:6
**writing** 226:4
236:22 287:12
**writings** 265:5

**written** 74:23
168:18,21
169:16 190:14
195:4 214:7
215:21 216:12
220:14,24
222:23 274:21
340:3 363:2
**wrong** 30:15
78:11 109:10
130:12 222:16
239:18 261:9
329:5 335:15
341:18,21
358:19 373:10
**wrote** 65:19
76:10 121:11
137:17 139:14
139:19 143:24
155:16 156:3
157:12 163:20
215:9 217:17
288:6,7 338:16
340:4 370:16

**x**

**x** 1:5,8 265:20
387:2,6

**y**

**yeah** 19:2 20:8
32:19,22 39:25
57:5 59:22
60:18 64:23
73:11 74:8
92:15 93:3

99:19 103:6
108:8,11,22
109:9 125:22
129:15,17
130:18 132:9
157:23 159:16
162:16 163:4
167:25 197:2
201:18 202:25
213:21 228:16
245:2 247:4
251:8,8,8
257:19 266:20
267:17 276:18
282:20 306:13
314:25 316:15
331:22 342:14
344:20 345:8
350:5 351:20
352:5,20
372:13 379:4
**year** 6:10 42:3
45:4 93:8 94:3
95:5 96:7
109:3 111:11
113:11 114:25
115:12,15
116:9,17
117:22 119:20
120:11 121:22
122:11,21
148:7 162:15
166:15,19,24
168:11,19,23
169:9,16,21

170:8,14 231:2
233:8 245:21
270:20 306:7
306:17,21
307:5 318:7
320:10 321:23
323:16 325:15
**years** 5:14 8:21
21:3 51:21,23
68:16 71:3
89:13 91:4
99:11 100:15
101:22 104:11
105:11,16
106:3 142:11
172:16 181:15
187:5 191:16
193:23 196:22
212:2 225:12
254:12 269:17
270:22
**york** 1:16,16,18
2:4,4,9,9 3:23
3:23 6:14,18
162:7 388:5
**yup** 44:20
255:18

**z**

**z** 251:25
**zero** 57:20
264:5 330:11
330:19,25
**zeros** 273:22
**zhang** 251:25

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.