# Exhibit 16

In re Global Brokerage, Inc. f/k/a FXCM Inc. Securities Litigation, Docket No. 1:17-cv-00916 (S.D.N.Y. Feb 07,

## Multiple Documents

| Part | Description |
| --- | --- |
| 1 | Main Document |
| 2 | Exhibit 1- Hendershott Report |
| 3 | Exhibit 2- Services Agreement as of 5/1/10 |
| 4 | Exhibit 3- FXCM Form S-1 dated 12/1/10 |
| 5 | Exhibit 4- FXCM SEC Form 8-K dated 6/3/13 |
| 6 | Exhibit 5- CFTC Initial Order |
| 7 | Exhibit 6- FXCM SEC Form 8-K dated 2/7/17 |
| 8 | Exhibit 7- Werner Transcript |
| 9 | Exhibit 8- Regukh Transcript |
| 10 | Exhibit 9- Patt Transcript (REDACTED) |
| 11 | Exhibit 10- 683 Transcript |
| 12 | Exhibit 11- E-Global Trade Transcript |

Bloomberg Law®

© 2023 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

# EXHIBIT 7

Page 1

1                UNITED STATES DISTRICT COURT

2                SOUTHERN DISTRICT OF NEW YORK

3

4

                                        )
5                                        )
     IN RE GLOBAL BROKERAGE, INC.  )
6    F/K/A FXCM INC.                     )    MASTER FILE NO.
     SECURITIES LITIGATION          )    1:17-CV-00916-RA
7                                        )
     _____)
8                                        )
     THIS DOCUMENT RELATES TO:     )
9    ALL ACTIONS.                       )
     _____)
10

11

12

13

14      VIDEOTAPED DEPOSITION OF ADAM WERNER, PH.D.

15             FRIDAY, FEBRUARY 28, 2020

16

17

18

19

20

21   REPORTED BY:  REAGAN EVANS, RPR, RMR, CRR, CCRR,

22             CLR, CRC, CA CSR NO. 8176

23

24

25

1  VIDEOTAPED DEPOSITION OF ADAM WERNER, PH.D., TAKEN
2  ON BEHALF OF THE DEFENDANTS AT 9:39 A.M., FRIDAY,
3  FEBRUARY 28, 2020, AT 633 WEST FIFTH STREET,
4  SUITE 1600, LOS ANGELES, CALIFORNIA, BEFORE REAGAN
5  EVANS, CA CSR NO. 8176, RPR, RMR, CRR, CCRR, CLR,
6  CRC.
7
8  APPEARANCES OF COUNSEL
9
10
   FOR THE PLAINTIFFS:
11      THE ROSEN LAW FIRM
        BY:  GONEN HAKLAY, ESQ.
12      BY:  JOSH BAKER, ESQ.
        101 GREENWOOD AVENUE
13      SUITE 440
        JENKINTOWN, PENNSYLVANIA  19046
14      (215) 600-2817
        GHAKLAY@ROSENLEGAL.COM
15      JBAKER@ROSENLEGAL.COM
16
   FOR THE DEFENDANT GLOBAL BROKERAGE, INC., F/K/A
17 FXCM, INC.:
        KING & SPALDING
18      BY:  PETER ISAJIW, ESQ.
        BY:  EVAN C. ENNIS, ESQ.
19      1185 AVENUE OF THE AMERICAS
        NEW YORK, NEW YORK 10036-2601
20      (212) 556-2235
        PISAJIW@KSLAW.COM
21      EENNIS@KSLAW.COM
22
23  ALSO PRESENT:
24      ALEXANDER AGANIN, PH.D., CORNERSTONE RESEARCH
25      JULIO LUEVANO, JR., VIDEOGRAPHER

```
                                                    Page 3
 1                         I N D E X
 2
 3   WITNESS              EXAMINATION                PAGE
 4   ADAM WERNER, PH.D.  BY MR. ISAJIW                5
 5
 6
 7                       E X H I B I T S
 8
 9
     NO.            PAGE      DESCRIPTION
10
     EXHIBIT 1      7       MEMORANDUM OF LAW IN SUPPORT
11                          OF MOTION FOR CLASS
                            CERTIFICATION AND APPOINTMENT
12                          OF CLASS REPRESENTATIVES AND
                            CLASS COUNSEL
13
     EXHIBIT 2      10      OPENING REPORT ON MARKET
14                          EFFICIENCY BY DR. ADAM WERNER,
                            PH.D., DATED JANUARY 6, 2020
15
     EXHIBIT 3      11      NOTICE OF ERRATA
16
     EXHIBIT 4      14      CORRECTED OPENING REPORT ON
17                          MARKET EFFICIENCY BY DR. ADAM
                            WERNER, PH.D., DATED
18                          JANUARY 10, 2020, 214 PAGES
19   EXHIBIT 5      17      CONSOLIDATED SECURITIES
                            CLASS ACTION COMPLAINT,
20                          FILED 6-19-2017
21   EXHIBIT 6      19      SECOND AMENDED CONSOLIDATED
                            SECURITIES CLASS ACTION
22                          COMPLAINT FILED IN THIS MATTER
                            ON APRIL 6, 2018
23
     EXHIBIT 7      20      OPINION & ORDER - CLASS ACTION
24
25
```

```
                                                 Page 4

 1                  LOS ANGELES, CALIFORNIA

 2           FRIDAY, FEBRUARY 28, 2020; 9:39 A.M.

 3

 4              THE VIDEOGRAPHER:  Good morning.  We are on

 5      the record.  The time is 9:39 a.m.

 6              Today's date is February 28th, 2020.

 7              My name is Julio Luevano, Jr.  I am the

 8      notary video technician with Veritext Legal

 9      Solutions, located in Los Angeles, California.

10              We are recording these proceedings at

11      633 West Fifth Street, Los Angeles, California.

12              This is Media 1 for the video deposition of

13      Dr. Adam Werner, M.D., in the action entitled,

14      "Global Brokerage, Inc., F/K/A FXCM, Inc.,

15      Securities Litigation."

16              This deposition is being taken on behalf of

17      Defendants.

18              The case number is 1:17-cv-00916-RA.

19              Now, may I please have an introduction for

20      the record, beginning with counsel.

21              MR. ISAJIW:  Yeah.

22              Peter Isajiw with King & Spalding, counsel

23      for Defendant Global Brokerage, formerly known as

24      FXCM.

25              MS. ENNIS:  Evan Ennis also with
```

1   King & Spalding, counsel for Defendants.

2           DR. ALEXANDER AGANIN:  Alexander Aganin,

3   Cornerstone Research.

4           MR. HAKLAY:  Gonen Haklay from the Rosen

5   Law Firm on behalf of the witness.

6           MR. BAKER:  Josh Baker, the Rosen Law Firm

7   on behalf of the witness.

8           THE VIDEOGRAPHER:  Thank you.

9           Ms. Reporter, please swear in the witness.

10

11                  ADAM WERNER, PH.D.,

12   having been first duly sworn by the reporter, was

13          examined and testified as follows:

14

15          THE WITNESS:  I do.

16

17                     EXAMINATION

18  BY MR. ISAJIW:

19      Q   Hi, Dr. Werner.  We met off the record

20  briefly.

21          But, for the record, I'm Peter Isajiw

22  representing the defendants in this case.  And I

23  wanted to thank you for taking the time to come out

24  here today and talk to us.

25          Just real quick, you were introduced as an

```
                                        Page 6
```

1   M.D. earlier on.  I wanted to correct that.  It's a

2   Ph.D.; correct?

3        A    Correct.

4        Q    Good.

5        A    That was a first, by the way.  I said

6   "Thank you."

7        Q    Just making sure that we're clear.

8             I assume you have been deposed several

9   times before, and you're familiar with the process;

10  is that correct?

11       A    Yes.

12       Q    Okay.

13            So if at any point you don't understand a

14  question that I'm asking, please let me know.  And

15  before we begin, I'm not going to go through all of

16  the normal, kind of, witness instructions because

17  I'm pretty sure you're familiar with them, but is

18  there anything that's preventing you from testifying

19  truthfully and fully today?

20       A    No.

21       Q    Okay.  Great.

22            You're aware that the plaintiffs in this

23  case have sought class certification; is that right?

24       A    I believe that is correct.

25       Q    Okay.

Page 7

```
 1            And you were asked to provide an expert
 2    opinion in support of their motion for class
 3    certification; is that right?
 4        A    I believe so.
 5        Q    Okay.
 6            MR. ISAJIW:  I'm just going to introduce a
 7    couple of exhibits here just for housekeeping
 8    purposes.
 9            The first one is a Memorandum of Law in
10    Support of Class Certification and Appointment of
11    Class Representatives that counsel filed by the
12    plaintiffs in this case.
13            THE REPORTER:  Is that Exhibit 1?
14            MR. ISAJIW:  That's Exhibit 1.
15            (Whereupon Werner Exhibit 1 was
16            marked for identification by the
17            Court Reporter.)
18    BY MR. ISAJIW:
19        Q    Have you seen that Memorandum of Law
20    before?
21        A    As I sit here, I don't recall.
22            If you give me my report, I'm pretty sure I
23    didn't rely on this, but I'm more than happy to
24    refresh my memory by looking at the report and
25    seeing somehow if I looked at this at some point.
```

Page 8

1      Q    Sure.

2           We'll get to your report pretty quickly

3      actually, but just sitting here today right now, do

4      you remember ever seeing that document before?

5      A    Again, I'm happy to refresh my memory by

6      seeing if it's something I saw before.  I guess --

7      so I don't know, as I sit here today.

8      Q    Okay.

9           Can you turn to page 1 of that document.

10          And in the Preliminaries, under the title

11     "Preliminary Statement," there is a block quote.

12     And this block quote represents the class the

13     plaintiffs are asking to certify, which is (as read

14     and/or reflected):

15               All persons and/or entities

16          that purchased or otherwise

17          acquired publicly traded Global

18          Brokerage, Inc., formerly known as

19          FXCM Securities, including FXCM 2.5

20          percent Convertible Senior Notes

21          due 2018, and Class A common stock,

22          during the period March 15, 2012

23          through February 6, 2017, both

24          dates inclusive.

25          Do you see that?

```
                                              Page 9
 1        A    I do.
 2        Q    Is that your understanding of the class
 3   that your testimony and expert report is intended to
 4   assist in certification?
 5        A    Again, I'm happy to look at my report to
 6   refresh my memory.  So without -- just looking at
 7   this and reading this, I would like to look at my
 8   report to know whether or not I cite that.
 9        Q    Sitting here right now, does that sound at
10   all familiar to you?
11        A    I have no reason to disagree with it, as I
12   sit here.
13        Q    Okay.
14             But you don't specifically recall it being
15   part of the class that your report is supporting?
16        A    Again, I'm happy to look at my report to
17   refresh my memory.
18             As I sit here today, it sounds reasonable,
19   but it's not something I remember.  I'm sure --
20   again -- well, let's go with a different document.
21             How about the complaint?
22        Q    Yeah, we'll get to that.
23             I'm just asking you right now, sitting here
24   today, and we'll introduce you to the report in a
25   second, and we'll probably talk about your report
```

```
 1   for most of today.

 2            But so today, you don't have a general

 3   recollection of that being the class?

 4        A   It seems familiar, but I would like to

 5   refresh my memory to give you a complete answer.

 6        Q   Sure.

 7            MR. ISAJIW:  This will be Exhibit 2.

 8            (Whereupon Werner Exhibit 2 was

 9            marked for identification by the

10            Court Reporter.)

11   BY MR. ISAJIW:

12        Q   So what you have been handed as Exhibit 2

13   is a document called the "Opening Report on Market

14   Efficiency" by Dr. Adam Werner, dated January 6,

15   2020.

16            That is the original report you filed in

17   this matter.

18            Do you recognize that document?

19        A   When you say "original report," do you mean

20   the report with the corrections or the report

21   without the corrections?

22        Q   I'm talking about the first one.

23        A   So that's the report without the

24   corrections?

25        Q   That's correct.
```

```
                                              Page 11
 1       A    Yes, I believe I've seen this before.

 2       Q    Does flipping through this document refresh

 3   your recollection on the class?

 4       A    Yes.

 5       Q    Okay.

 6            So is -- going back to the original

 7   question on the class certification motion, the

 8   definition of class is consistent; is that correct?

 9       A    That -- I believe that is correct.

10       Q    You can put that to the side.

11            I'm going to put in front of you what we're

12   marking as Exhibit 3.

13            (Whereupon Werner Exhibit 3 was

14            marked for identification by the

15            Court Reporter.)

16   BY MR. ISAJIW:

17       Q    And this is a Notice of Errata that

18   indicates that (as read and/or reflected):

19                On January 6th, 2020,

20            Plaintiffs inadvertently filed a

21            version of the "Opening Report on

22            Market Efficiency" by Dr. Adam

23            Werner that contained

24            non-substantive errors.

25            And it replaces a corrected copy.
```

```
 1          Do you recognize that document?
 2     A    I don't think I've seen this letter before,
 3  but, otherwise, yes.
 4     Q    Okay.
 5          And so this document has your original
 6  report and your corrected report; correct?
 7     A    Oh, does it?  I don't --
 8     Q    I'm sorry.  I'm sorry.
 9          It has the corrected report and a redline
10  showing the changes from your original report.
11     A    Okay.
12     Q    So you recognize that document as both your
13  corrected report and a redline indicating the
14  changes to your prior report?
15     A    Well, I haven't seen the redlines.  Can you
16  point me to a particular page?
17     Q    Generally speaking, what is your
18  recollection of what you needed to correct in the
19  second report?
20     A    I believe there was some statistics that
21  were slightly off.
22     Q    Okay.
23          Anything else?
24     A    Not that I recall, but, again, if you --
25  I'm happy to go through all of this, if you would
```

```
 1   like me to fully refresh my memory.
 2         Q    I'll get there.
 3              I'm just asking what you remember first.
 4         A    Okay.
 5         Q    So you had to correct some statistics.
 6              Do you remember what the issue was with
 7   those statistics?
 8         A    I believe they were miscalculated.
 9         Q    And who recognized the miscalculation?
10         A    I believe I did.
11         Q    Okay.
12              And what was the context for you to realize
13   that there were miscalculations?
14         A    I had noticed that between drafts the
15   numbers had changed.
16         Q    Okay.
17              After you submitted the first report, so
18   you were just reviewing the report?
19         A    I -- correct.
20         Q    Okay.
21              So we have taken the corrected report,
22   which is an exhibit there, and just bound it so it's
23   easier to deal with today.
24              So I'm going to hand you this as Exhibit 4
25   so that when we flip through, it will just be easier
```

Case 1:21cv-10979-DPW-BCM Document 562-16 Filed 06/12/20 Page 17 of 387

1   to navigate.

2           (Whereupon Werner Exhibit 4 was

3           marked for identification by the

4           Court Reporter.)

5           THE WITNESS:  Do you think you will return

6   to Exhibit 3?

7   BY MR. ISAJIW:

8       Q   I don't think so.  We may, though.

9       A   I'm just going to place it up there.  It's

10  not like I'm going to --

11      Q   We're just using Exhibit 4 to make it

12  easier so that you don't have to deal with that pile

13  of paper.

14      A   Thank you.

15      Q   So that is your corrected report.  Like I

16  said, we just bound it for ease of navigating.

17          Did you write that report?

18      A   I wrote the report and was assisted by

19  people at Crowninshield in writing this report.

20  They helped me draft the report.  But I approved

21  everything that is in this report.

22      Q   Okay.

23          Anyone other than Crowninshield help you

24  draft the report?

25      A   I'm trying to remember.  There may be

Page 15

```
 1    someone who is named Narinder Walia, who I'm not
 2    sure what his relationship with Crowninshield is.
 3         Q    Can you spell that?
 4         A    Sure.  It's "W" as in Werner; "A" as in
 5    Adam; "L" as in Larry; "I" as in imbécil; "A" as in
 6    Adam.
 7         Q    Okay.
 8         A    Do you want his first name?
 9         Q    Sure.
10         A    Sure.  So it's Narinder.  "N" as in Nancy;
11    "A" as in Adam; "R" as in Robert; "I" as in -- we'll
12    deal with something else -- interesting; "N" as in
13    Nancy; "D" as in David; "E" as in eventually; "R" as
14    in Robert.
15         Q    Okay.
16              And you believe that Mr. Walia -- is it
17    Mr. or Mrs.?
18         A    Mr.
19         Q    You think Mr. Walia works for
20    Crowninshield?
21         A    I don't know what his relationship with
22    Crowninshield is.
23         Q    Okay.
24         A    Sorry.
25         Q    Sure.
```

```
                                                    Page 16

 1        A    If anything, he's a 1099 employee.

 2        Q    Okay.

 3        A    So, yeah, he's not -- I don't think he --

 4   he does not receive a W-2 from Crowninshield.

 5        Q    So aside from those people, anybody else

 6   you can think of who assisted you with the report?

 7        A    No.

 8        Q    Okay.

 9             Have you done any more work on this matter

10   since filing that corrected report?

11        A    No.

12        Q    When were you retained?

13        A    I don't recall.

14             So what are we in?  We're in -- it's not --

15        Q    Approximately?

16        A    I probably was contacted in October or

17   November.  That's speculative -- speculating on my

18   part.  I don't have the exact date.

19        Q    Okay.

20             Do you know what year you were retained?

21        A    Last -- oh -- so when you say "retained,"

22   you mean signed a retention agreement?

23        Q    Let's start with that.

24        A    I don't know.

25        Q    Okay.
```

```
 1          Let's start with just contacted to
 2   potentially work on this matter.
 3       A   I believe that would be 2019.
 4       Q   Okay.
 5          Can you keep that in front of you because
 6   we'll talk about it, but I want to have you take a
 7   look at two more documents.
 8       A   Sure.
 9          Can I put Exhibit 1 up here as well?
10       Q   Sure.
11          Just keep Exhibit 4, your corrected report,
12   handy.
13          MR. ISAJIW:  Which one is this?
14          THE REPORTER:  5.
15          (Whereupon Werner Exhibit 5 was
16          marked for identification by the
17          Court Reporter.)
18   BY MR. ISAJIW:
19       Q   I'm handing you what is being marked as
20   Exhibit 5, a Consolidated Securities Class Action
21   Complaint in this matter, which was filed 6-19-2017.
22          Have you seen this document before?
23       A   I have.
24       Q   Okay.
25          And did you review this document in
```

```
 1   connection with your work on this matter?

 2        A   I did.

 3        Q   Okay.

 4            And did you review this document before you

 5   started your analysis on this matter?

 6        A   Define "analysis."

 7        Q   So you were asked to render a couple of

 8   opinions which you put into this report; is that

 9   correct?

10        A   That is correct.

11        Q   Okay.

12            In the process of rendering those opinions,

13   you did some analysis in order to come up with those

14   opinions; is that correct?

15        A   That is correct.

16        Q   Okay.

17            Prior to beginning the analysis to support

18   your opinions, did you review this complaint?

19        A   I don't know the exact timeline.  My guess

20   is yes, but, again, that's a guess.

21        Q   Okay.

22            I'm going to put one more document in front

23   of you.  This is going to be Exhibit 6.

24   ///

25   ///
```

```
                                            Page 19
 1              (Whereupon Werner Exhibit 6 was
 2              marked for identification by the
 3              Court Reporter.)
 4     BY MR. ISAJIW:
 5         Q    And Exhibit 6 is the Second Amended
 6     Consolidated Securities Class Action Complaint filed
 7     in this matter on April 6, 2018.
 8              Do you recognize that document?
 9         A    I do.
10         Q    Okay.
11              And have you reviewed this document before?
12         A    I have.
13         Q    Okay.
14         A    Let me correct my previous testimony now.
15              I'm not sure that I've reviewed the first
16     complaint.
17         Q    Okay.
18         A    I may have just reviewed the second amended
19     complaint.
20         Q    Okay.
21              So did you review the second amended
22     complaint before beginning your analysis in this
23     matter?
24         A    I don't recall.
25         Q    Okay.
```

Page 20

```
 1          So when we were talking about the first
 2   amended complaint, you said you may have reviewed it
 3   before the amended -- before the analysis.
 4          And so does that answer change with the
 5   second amended or --
 6      A   No.
 7      Q   Okay.
 8          So you just don't remember if you reviewed
 9   it before or after?
10      A   Right.
11          As I -- that's what I stated with regards
12   to this first complaint.  It's the same answer.
13      Q   Okay.
14          But you certainly reviewed it during your
15   analysis?
16      A   Yes.
17      Q   And you reviewed it before you finalized
18   your report?
19      A   Yes.
20          (Whereupon Werner Exhibit 7 was
21          marked for identification by the
22          Court Reporter.)
23   BY MR. ISAJIW:
24      Q   And what I've just handed you as Exhibit 7
25   is the Opinion & Order on the motion to dismiss in
```

Page 21

1    the class action in this case, which was decided
2    March 28th, 2019.
3              Have you seen this document before?
4              If you don't mind, I'm just wondering,
5    looking at that document, do you recognize it?
6        A    I mean, it looks like any other legal
7    filing I've seen.
8        Q    Okay.
9        A    So I would like to refresh my memory by
10   seeing if it's something I have seen before.
11       Q    So just to be clear, you're saying that you
12   can't remember if you've ever seen that document
13   before, just sitting here today?
14       A    I believe that is accurate.
15       Q    Okay.
16       A    I don't believe I've seen it before.
17       Q    Okay.
18            Has anyone ever summarized it for you?
19       A    No.
20       Q    Are you aware that there was an order on
21   the motion to dismiss in this matter?
22       A    I believe I was aware.
23       Q    How did you become aware?
24       A    I think I was told by Counsel.
25       Q    Okay.

```
                                                    Page 22

 1             When did you become aware?

 2       A    I don't know.

 3       Q    Did you become aware before you finished

 4    your report?

 5       A    I don't recall.

 6       Q    Were you aware of the result of the order?

 7       A    Can you repeat the question, please.

 8             (The record was read back as

 9             follows:

10                  "Question:  Were you aware of

11             the result of the order?")

12             THE WITNESS:  And so when you mean the

13    "result," you mean the conclusions on page 38 and

14    39?

15    BY MR. ISAJIW:

16       Q    I'm just trying to understand your

17    understanding of the results.

18       A    Right.

19             And I'm just trying to understand your

20    definition of results.

21       Q    Using your best definition of the word

22    "results," are you aware of the results of the

23    motion to dismiss?

24             MR. HAKLAY:  Objection.  He stated that he

25    doesn't know what you mean by it.  He doesn't want
```

```
 1   to give an answer where somebody might one day say,
 2   here's what results mean.
 3              So define what you mean by "results" and
 4   he'll answer it.
 5              MR. ISAJIW:  Okay.
 6              We can limit the speaking -- just objection
 7   to form --
 8              MR. HAKLAY:  I'll limit it to whatever is
 9   necessary.
10              MR. ISAJIW:  -- is the appropriate way to
11   go.
12              MR. HAKLAY:  That's fine.
13              Don't answer it until he does.
14              MR. ISAJIW:  You're instructing him not to
15   answer the question?
16              MR. HAKLAY:  If you don't understand it.
17   BY MR. ISAJIW:
18       Q   So you told me earlier, and correct me if I
19   am wrong, that you were aware that there was a
20   decision on the motion to dismiss.
21       A   Correct.
22       Q   Okay.
23              And you don't remember exactly when you
24   became aware that there was a decision on the motion
25   to dismiss?
```

1      A    That is correct.

2      Q    Whenever you became aware of the decision

3 on the motion to dismiss, what did you understand

4 the decision to be?

5      A    I'm not sure I even thought about it.

6      Q    So in what context did you become aware of

7 it?

8      A    Someone told me they survived a motion to

9 dismiss.

10      Q    Did someone tell you anything else, other

11 than they survived the motion to dismiss?

12      A    I don't believe so.

13      Q    Okay.  Sitting here today, you have no

14 additional context whatsoever for "what survived the

15 motion to dismiss" means?

16      A    In general, or in this matter?

17      Q    Let's start in general.

18      A    Could you repeat the question, please.

19          (The record was read back as

20          follows:

21             "Question:  Sitting here

22          today, you have no additional

23          context whatsoever for "what

24          survived the motion to dismiss"

25          means?")

```
                                                  Page 25
 1            THE WITNESS:  I don't understand the
 2    question.
 3    BY MR. ISAJIW:
 4        Q   In your view, what does "surviving a motion
 5    to dismiss" mean?
 6        A   In practical terms, in general, it means
 7    that the judge has allowed the case to go forward.
 8        Q   Okay.
 9            In context of this case, specifically, what
10    do you understand surviving the motion to dismiss to
11    mean?
12        A   It wouldn't be any different than my
13    general understanding of what it means to survive a
14    motion to dismiss.
15        Q   Do you have any understanding if any claims
16    or allegations were removed from the case in
17    connection with the decision on the motion to
18    dismiss?
19        A   I do not.
20        Q   Okay.
21            So the motion to dismiss came out in March
22    of 2019?
23            MR. HAKLAY:  You mean the opinion?
24            MR. ISAJIW:  I'm sorry.  The order.
25            THE WITNESS:  March of 2019, correct.
```

```
                                              Page 26
 1    That's what it says anyway.  Excuse me.
 2    BY MR. ISAJIW:
 3        Q    And your first report came out in January
 4    of 2020; is that correct?
 5        A    Yes.
 6        Q    Okay.
 7             So to the extent you were notified of the
 8    decision on the motion to dismiss, do you believe it
 9    would have been before or after you started your
10    work on the report?
11        A    Well, I'm just -- and just based on logic,
12    I don't think -- if they hadn't survived the motion
13    to dismiss, my guess is they wouldn't have asked me
14    to submit a report in this matter.
15             So I guess I was probably aware of it
16    before I started working on my report.
17        Q    Okay.
18        A    But that's just based on logic.  I don't
19    recall any specific date.
20        Q    Okay.
21             So the -- you're employed by The Rosen Law
22    Firm here; is that correct?
23             I'm sorry.  Retained by The Rosen Law Firm?
24        A    I believe that's correct.
25        Q    Okay.
```

1      A    But I think formally, Crown- -- I'm not

2    sure how the exact relationship works because they

3    sign the engagement letter with Crowninshield.

4      Q    Okay.

5      A    So I don't know if that means that

6    technically Crowninshield is retained by The Rosen

7    Law Firm.

8      Q    Okay.

9           Are you aware if Rosen -- The Rosen Law

10    Firm is paying Crowninshield for your efforts in

11    this case?

12      A    I believe so.

13      Q    And do you know how much they are paying

14    Crowninshield for your efforts in this case?

15      A    You mean for my work?

16      Q    Yes.

17      A    And I'm referring now to paragraph 7 of my

18    report.

19      Q    Uh-huh.

20      A    $675 per hour.

21      Q    And you mentioned earlier that some

22    additional Crowninshield consultants have assisted.

23           Are you aware of what their rate is?

24      A    Again, referring to paragraph 7, it's

25    between 250 to $500 per hour.

```
                                              Page 28
 1        Q    And do you know how much Crowninshield has
 2   billed for this matter so far?
 3        A    I do not.
 4        Q    Approximately, how many hours have you
 5   spent in connection with this matter so far?
 6        A    Somewhere between 20 and 30 hours.
 7        Q    Do you know if Crowninshield has submitted
 8   invoices to The Rosen Firm for your work in this
 9   matter?
10        A    I believe they have.
11        Q    Do you know if they've been paid?
12        A    I -- well, I believe so.
13        Q    Okay.
14        A    If I could just add.  The Rosen Law Firm is
15   very timely in their payment of bills.  So that's
16   why -- I don't know if we've submitted a bill for
17   January.  I know they've paid their bill through
18   December -- sorry -- on my work through December.
19        Q    Okay.
20             And so going back to your report, you were
21   asked by The Rosen Law Firm to provide an expert
22   opinion on market efficiency as to the FXCM common
23   stock; is that correct?
24        A    Well, again, let's just turn to my report.
25   I was retained (as read and/or reflected:)
```

```
 1              To provide an opinion that
 2         will assist the court in
 3         determining whether the common
 4         stock of -- and this is paragraph 1
 5         in my report -- Global Brokerage,
 6         Inc., formerly known as, and that's
 7         F/K/A/ -- oh, no slash after the
 8         "A," sorry, FXCM Inc., and that's
 9         the abbreviation for incorporated,
10         ("FXCM" or the "Company") and the
11         FXCM 2.25 percent Convertible
12         Senior Notes due 2018 traded in
13         efficient markets during the
14         periods for March 15, 2012, through
15         February 6, 2017 (the "Class
16         Period"), and June 24, 2014,
17         through February 6, 2017 (the
18         "Notes Period"), respectively.
19         Oh, sorry (as read and/or reflected:)
20              In addition -- and this is
21         paragraph 2 -- The Rosen Firm asked
22         me to provide an opinion that will
23         assist the court in understanding
24         and determining whether the trier
25         of fact will be able to measure
```

```
 1              damages in this matter by means of

 2              a common methodology and calculate

 3              them on a class-wide basis for all

 4              Class members in connection with

 5              their claims under Section 10(b) of

 6              the Exchange Act of 1934 (the

 7              "Exchange Act") and the U.S.

 8              Securities & Exchange Commission

 9              ("SEC") Rule 10b-5 adopted

10              thereunder.

11              And we'll just leave it at that.

12      Q    Thank you for that.

13              So my question was:  You were asked to

14    provide an expert opinion on market efficiency

15    concerning the FXCM common stock; is that correct?

16      A    That was your question, correct.

17      Q    Yeah.

18              Did you need to refer to your report to

19    answer that question?

20      A    Well, in any deposition, I try to be as

21    accurate as possible.

22              And so to the extent that this reflects my

23    opinion and full understanding of what I have been

24    asked to do, as well as my opinions on this matter,

25    I would like to refer to my report.  It's just
```

Page 31

1    generally what I like to do.

2         Q    Okay.

3         A    So that is my full understanding of what I

4    was retained.

5              So I guess your question -- the answer to

6    your question is yes, but then I was also hired to

7    determine or opine upon market efficiency for the

8    notes, which was not part of your question.

9         Q    It was going to be my next question.

10        A    Well --

11        Q    But my current question is:  Could you have

12   answered that without reference to your report?

13        A    Is it possible?  It is possible for me to

14   do so.  But, again, in any deposition, I try to be

15   as accurate as possible.

16             And so this fully reflects what I was hired

17   to do in this matter.

18        Q    Okay.

19             Does this corrected report in front of you

20   embody the sum total of your opinions in this

21   matter?

22        A    As of this date, yes.

23        Q    Have there been any other opinions you have

24   been asked to provide in connection with this

25   litigation that are not in that report?

Page 32

```
 1        A    Not at this time.
 2        Q    Are you offering any opinion as to whether
 3   the defendants in this case made any false or
 4   misleading statements?
 5        A    I don't believe so.
 6        Q    Have you done any independent review to
 7   determine whether or not the statements that
 8   Plaintiffs are challenging in their complaint are
 9   accurate or inaccurate?
10        A    What do you mean by "independent review"?
11             And I mean that because I have seen
12   documents, such as the SEC or -- they're not the
13   SEC, the order at the end of the Class Period.  That
14   certainly formed my opinion.
15             But I don't -- so I don't know if that's
16   independent work or work that was done as part of
17   this report.
18        Q    It informs your opinion on what?
19        A    Well, so -- right.
20             So I saw, and I'm referring now to
21   Footnote 126 of my report.
22             I've seen this document from the
23   U.S. Commodities Futurist Trading Commission press
24   release.
25             I don't know if that -- if that, under your
```

Page 33

1    definition, is considered independent research or

2    it's research that I was done -- that was done, you

3    know, in forming my opinions.

4         Q   Okay.

5             The original question that I was asking is

6    whether or not you were asked to form an opinion on

7    the accuracy of the statement that the plaintiffs

8    are challenging in their complaint.

9             And I believe your answer was you were not.

10        A   That is correct.

11        Q   Okay.

12            When I was asking the next question of if

13   you did any independent research to confirm the

14   accuracy of the statements that Plaintiffs are

15   challenging in the complaint, you mentioned the

16   document in the footnote.

17            Is it fair to say that you have not

18   rendered any opinions as to the accuracy of the

19   statements that Plaintiffs are challenging in their

20   complaint?

21        A   That is correct.

22        Q   Okay.

23            Let's flip to Exhibit 1 of your report,

24   which begins on page 65.  And I just want to run

25   through some of your -- it's your curriculum vitae,

Case 1:21-cv-00941-DAE Document 568-16 Filed 06/12/20 Page 37 of 387

```
 1   your C.V.

 2          MR. HAKLAY:  Can we have an understanding

 3   that when he says "my report" or you say "my

 4   report," unless otherwise indicated, we're looking

 5   at the -- at Exhibit 4, the correct reported, just

 6   so --

 7          MR. ISAJIW:  That is an excellent

 8   housekeeping note.

 9      Q   So just looking at this -- I just want to

10   run through your background.

11          You have a BA in economics from Overland

12   College; is that correct?

13      A   Correct.

14      Q   And a Ph.D. in finance from Northwestern?

15      A   As well as a master's in finance, but I

16   don't normally list that.

17      Q   Any other degrees?

18      A   I don't believe so.

19      Q   Any other professional certifications

20   relevant to your work here?

21      A   No.

22      Q   And you're currently a lecturer in finance

23   and economics at Cal Poly, San Luis Obispo; is that

24   correct?

25      A   I think it would be more accurate to say
```

Case 1:21-cv-00916-RA-BCM Document 568-16 Filed 06/12/20 Page 38 of 387

1    I'm a lecturer in economics.  I can't -- I haven't

2    taught a course in finance probably in three or four

3    years.

4        Q    Okay.

5             Have you lectured in economics in the last

6    three or four years?

7        A    Yes.

8        Q    Okay.

9             And where were those lectures?

10            I guess my question was, you were currently

11   a lecturer, and then you made a clarification.  So

12   I'm trying to figure out what's the -- what's the

13   clarification.

14       A    Oh, the clarification is I don't teach -- I

15   can't -- I haven't taught finance in a couple of

16   years.  So it's probably more accurate to say that I

17   am a lecturer in economics at Cal Poly as opposed to

18   a lecturer in economics and finance.

19       Q    I see.  Okay.  Thank you for that.

20            You have been a lecturer since 2014?

21       A    Correct.

22       Q    Okay.

23            Is that a tenured-track position?

24       A    No.

25       Q    And can you just briefly describe your work

Page 36

```
 1   there with Cal Poly?

 2        A    Yeah.

 3             I teach classes almost -- now almost

 4   exclusively in macroeconomics.  There have been

 5   discussions of teaching other courses, but --

 6        Q    And how many classes a year do you teach?

 7        A    When you say, "how many classes," do you

 8   mean how many sections?

 9        Q    I don't know how the curriculum at Cal Poly

10   is cut up.

11             Do you teach one course a year?  Two

12   courses a year?

13        A    Okay.

14             So let me ask a clarifying question, right.

15             So when you say "course," all right, I

16   would consider macroeconomics a course.  All right.

17        Q    Okay.

18        A    Now -- so if that's the definition, I

19   normally teach one course a year.

20             Now, if we're talking about the number of

21   sections I have, because I have multiple sections, I

22   probably teach between eight and nine sections a

23   year.

24             Now, I don't know if you consider each

25   section a course, as you've defined it.  Or --
```

```
                                              Page 37

 1        Q    What is a section?

 2        A    It is a classroom filled with students.

 3        Q    Okay.

 4             So for macroeconomics, a classroom filled

 5   with students meets eight or nine times a year?

 6        A    No.

 7        Q    Okay.

 8        A    I'm not sure what the confusion is on this.

 9   It's no different than any other college or

10   university.

11             I mean, you went to law school and got a

12   BA; right?

13             If you went to an economics class, would

14   you say that was a class or a course?

15        Q    Let's, for the purposes of this

16   conversation, call that a course.

17        A    Okay.

18             And so you take a course in economics, and

19   then you take another course in English.

20             Is that a separate course?

21        Q    Yes.

22        A    Okay.

23             If you had taken the same macroeconomics

24   class again for whatever reason, would that be

25   considered a different course but the same class?
```

Page 38

1      Q   Is that a common phenomenon in your
2   experience?
3      A   Well, I'm -- well, unfortunately, yes.
4   Some students fail the course and then have to
5   retake it.
6           So it's more common than one would like.
7           But I'm just -- I'm really not trying to
8   make this difficult.  I'm just trying to have --
9   understand the question.  I don't understand why you
10  are confused about the difference between a course
11  and a class.
12     Q   I don't believe that I am.  I'm just trying
13  to understand how many -- how many subjects do you
14  teach a year?
15     A   So now we're on subjects.
16     Q   Okay.
17          Students sign up to learn from you in some
18  capacity; is that correct?
19     A   I believe that's correct.
20     Q   Okay.
21          When they sign up, they sign up for what?
22  A class?  A course?  A section?  What do they sign
23  up for?
24     A   I think, in layman's terms, I would call it
25  a class.

Page 39

1      Q    Okay.

2           In those terms, how many classes do you

3    teach?

4      A    Between eight and nine.

5      Q    In what subjects?

6      A    Macroeconomics.

7      Q    All macroeconomics?

8      A    Well, I mean, macroeconomics encompasses a

9    large field, but, yes, all in macroeconomics.

10          Yeah, well, so sometimes I teach survey of

11   economics, which would include macroeconomics.  I

12   have taught managerial economics and international

13   finance.  And this, again, is at Cal Poly, but

14   mostly I just -- now I just teach macroeconomics.

15     Q    Okay.

16     A    Occasionally I will teach another course

17   or -- yes.

18     Q    How many hours a week do you devote to that

19   effort, generally?

20     A    So this is teaching and prep?

21     Q    Yes.

22     A    Somewhere between 15 and 20 hours a week.

23     Q    Okay.

24     A    It varies from quarter.  Some quarters I

25   teach a large lecture class, and so then I have what

```
                                                    Page 40
 1     I consider two sections of my macroeconomics course.

 2     But those lectures also have, like, 230 students in

 3     them.  So ...

 4          Q    Okay.

 5               You also work for Crowninshield; is that

 6     correct?

 7          A    Again, just for accuracy, when you say

 8     "work," do you mean employed?

 9          Q    I mean render services in exchange for

10     money.

11          A    I believe that's accurate.

12          Q    Okay.

13               What is your position at Crowninshield?

14          A    I think they refer to me as -- it's either

15     expert or associated expert.

16               Here on the card it says "expert."  If you

17     want me to look at the website, I can give you the

18     exact title, but -- oh, affiliated expert.  There we

19     go.  I believe I -- if you look at the website, I'm

20     under the title Affiliated Expert.

21               Which is --

22          Q    How long have you been an affiliated expert

23     with Crowninshield, roughly speaking?

24          A    Hold on one second.  I just want to make

25     sure.
```

```
 1       Q   I'm just looking for your best
 2   understanding right now.
 3       A   Yes.  No.  No.  No.
 4       Q   Do you not -- are you not able to answer
 5   the question?
 6       A   No.  I'm trying to refresh my memory about
 7   the previous question.
 8       Q   Which question are you trying to answer?
 9       A   My title at Crowninshield.
10           Yes.  I am also an affiliated expert.  So
11   that is paragraph 4 of my report.  So that is my
12   official title with Crowninshield.
13       Q   How long -- how many years have you
14   rendered services in exchange for money with
15   Crowninshield?
16       A   Since 2015.
17       Q   How many hours a week, on average, do you
18   spend in connection with your services for
19   Crowninshield?
20       A   On average?  Maybe ten.
21       Q   Okay.
22           In terms of proportion of your yearly
23   income, which is larger, the income you derive from
24   your work at Crowninshield or the income you derive
25   from your work at Cal Poly?
```

Page 42

1      A    Crowninshield.  Depending on the year.

2      Q    Let's look at last year.

3      A    Crowninshield.

4      Q    Are you employed by, or work for, in any

5  capacity any entity, other than Cal Poly or

6  Crowninshield?

7      A    Okay.

8           So I work as a planning commissioner for

9  the City of Pismo Beach for which I receive I

10  believe it's $50 per meeting.  So I don't know if

11  that would be considered employment or not.  I think

12  of it more as community service.

13      Q    Focusing on economics.

14      A    Well, part of my job on the planning

15  commission would include my understanding of

16  economics.  So --

17      Q    Okay.

18           Any other jobs?

19      A    No.

20      Q    Taking a look at page 66, starting at 65

21  going over to 66, we were talking about your Papers

22  and Publications.

23           The most recent one under Publications I

24  see is a "Law360" article from 2013 entitled, "More

25  'Dark Pools' Deepen Litigation Issues"; is that

1  correct?

2      A    That's what it states.  I had a "Law360"

3  article, I think, last year.

4      Q    Okay.

5           That "Law360" article is not listed in this

6  list of publications; is that right?

7      A    That is correct.

8      Q    So your most recent one was last year?

9      A    I believe so.

10     Q    And what was the topic of that "Law360"

11 article?

12     A    It had to do with settlements, settlement

13 statistics, looking at -- I think that fairly

14 summarizes it.

15     Q    And under Presentations, I see the most

16 recent one also in September of 2013, "Cause or

17 Effect:  Are Settlement Statistics Driving Down

18 Settlement?"  And it's a presentation to a number of

19 law firms.

20          Do you see that?

21     A    I do.

22     Q    Is that your last and most recent

23 presentation?

24     A    I believe that's accurate.  Other than

25 presenting in a classroom environment.

 1     Q   How many peer-reviewed articles, broadly
 2  speaking on the subject of economics, have you
 3  published?
 4     A   Well, okay.  So this -- it really depends.
 5  I would not -- I mean, one might argue that the
 6  Federal Reserve paper I wrote was peer reviewed.
 7          And what I've seen defendant experts refer
 8  to "Law360" articles as peer-reviewed articles.  I
 9  don't personally consider them as peer-reviewed
10  articles.  So based on that definition, possibly
11  one.
12     Q   Okay.
13     A   I mean, based on my definition.  If you
14  want me to go with the defendant expert's
15  definition, possibly three.
16     Q   Okay.
17          So based on your definition, it's one.  And
18  that the 1993 Federal Reserve Bank of Cleveland
19  Economic Commentary that you're talking about?
20     A   Right.
21          I mean, I suppose you could consider my
22  dissertation peer reviewed, but ...
23     Q   When was that?
24     A   That was completed in 1999.
25     Q   Okay.

Page 45

1          How much of your time is dedicated to
2     research in the area of market efficiency?
3          A   When you say "research," do you mean
4     academic research?
5          Q   I do.
6          A   I mean, to the extent that I discuss market
7     efficiency in my macroeconomics class, a small
8     portion of it.
9          Q   Okay.
10         A   But outside -- outside of that -- I mean, I
11    certainly read about market efficiency and -- I
12    don't know if you -- that would fall under your
13    definition.
14         Q   How much time do you spend reading about
15    market efficiency?
16         A   To the extent I read these reports about
17    market efficiency, I don't know.  Five hours a
18    month.
19         Q   Okay.
20             And in your research on market efficiency,
21    how much time would you spend researching the
22    difference in market efficiency in connection with
23    equity securities versus fixed income securities?
24         A   I don't understand the question.
25         Q   When you research market efficiency --

Page 46

1    A    Well, so -- and I'm sorry.  I don't mean to
2    interrupt you.  I just want to ask a clarifying
3    question so to help move this along.
4           So when you say "research," do you mean
5    reading about market efficiency?  Because I'm not
6    actively, like, writing papers on market efficiency.
7    If that's what you want to consider research.
8    Q    Okay.
9           Before you mentioned academic research when
10   I asked you about how much time you spend
11   researching.
12          Using that same definition of academic
13   research, how much, if any, time do you spend in
14   academic research in connection with market
15   efficiency and differences between equity securities
16   and fixed income securities?
17   A    Okay.
18          So I'm excluding just reading papers.  I
19   would say none.
20   Q    If we turn to the expert reports and
21   testimony section of your report, starting on
22   page 67 and 68.  There are a number of cases listed
23   where you've provided expert reports and testimony.
24          And I'm just wondering if you can tell me
25   whether any of these expert reports or testimony

Page 47

```
 1    were on behalf of a defendant in a federal
 2    securities action.
 3         A    Well, so let me just go through this.
 4              So I'm not sure if you would consider this
 5    a securities matter.
 6              This Gwyn Hartman -- I'm now looking at
 7    page 69 of -- well, just go with page 69 of
 8    Exhibit 4.  "Gwyn Hartman Revocable Living Trust
 9    versus Southern Michigan Bancorp."  That was not a
10    10b-5 case, but I don't know if you would consider
11    that a securities matter.
12         Q    But that was for a defendant in a
13    litigation?
14         A    Correct.
15         Q    Okay.
16              Is it fair to say that the majority of your
17    engagements, expert reports, and testimonies listed
18    here are for plaintiffs --
19         A    So when you --
20         Q    -- in securities litigations?
21         A    When you say "engagements," you mean
22    engaged as an expert?
23         Q    I mean, for each of the lists of expert
24    reports and testimony starting on page 67 and
25    continuing on to page 71.  To the extent they are in
```

Page 48

1   connection with federal securities cases, is it fair
2   to say that the majority are for plaintiff's side?
3        A   And, again, I'm not trying to be difficult.
4   I'm just trying to define what you mean by
5   "experts."
6            So having submitted a report; right?
7   Because I've worked on hundreds of defendant cases
8   at places like Cornerstone and CRA and NERA.  I
9   don't consider myself having been retained as an
10  expert in those cases.
11       Q   I'm just referring to the section of your
12  CV entitled "Expert Reports and Testimony."
13           So I assume those are, based on your CV,
14  matters in which you were retained to submit an
15  expert report or testimony.
16       A   Right.  Which is why I asked the clarifying
17  question when you said "expert," whether you meant
18  retained as an expert to provide an opinion.
19           So as long as that's the definition --
20       Q   Yeah.
21       A   -- yes, your statement would be correct.
22       Q   The statement that the majority is for the
23  plaintiff's side?
24       A   That is correct.
25       Q   Okay.

1          In any of these matters listed on pages 67

2    to 71 of your CV, and we're referring to the same

3    set of expert reports and testimony related to fixed

4    income securities as opposed to equity securities.

5        A    Is there a question?  Could you read

6    that -- I didn't think there was a question.  I

7    think it was a statement.

8              (The record was read back as

9              follows:

10               "Question:  In any of these

11             matters listed on pages 67 to 71 of

12             your CV, and we're referring to the

13             same set of expert reports and

14             testimony related to fixed income

15             securities as opposed to equity

16             securities.")

17             THE WITNESS:  I think it's an incomplete

18    question.  If you're asking me how many reports have

19    I rendered an opinion about efficiency in a fixed

20    income security?  Is that the question?

21    BY MR. ISAJIW:

22        Q    That's not the question.  But let's answer

23    that question.

24        A    A few.

25        Q    Can you give me context for what "a few"

Page 50

1   is?  Is it one?  Five?  Ten?

2        A    I don't recall.  No.  It would certainly be

3   less than ten.

4        Q    Okay.

5        A    And I would be surprised if it was five.

6        Q    And in those approximately five or less

7   matters, were any of them Rule 144A bonds?

8        A    I don't recall.

9             (Reporter clarification.)

10  BY MR. ISAJIW:

11       Q    Have you ever issued a written opinion in

12  any case indicating that a security stock or a bond

13  did not trade in an efficient market?

14       A    Well, so I'm not -- I'm not sure I've

15  actually seen anyone ever render an opinion that a

16  stock or bond has not traded in an efficient market,

17  specifically said -- stated that.

18            To the extent that I have found instances

19  where I believed that the market for these -- for a

20  stock or a bond is inefficient and I relay that to

21  my potential clients, I'm usually then not asked to

22  write a report.

23       Q    Okay.

24            In those situations, what findings led you

25  to conclude that the market for the security would

```
                                            Page 51
 1   not be efficient?
 2            MR. HAKLAY:  Objection.  Vague.
 3            THE WITNESS:  I mean, again, I would look
 4   at the same factors I would look at in providing my
 5   opinion here.
 6            So I would look at the Cammer and Krogman
 7   factors.
 8   BY MR. ISAJIW:
 9       Q   Okay.
10            In those situations where you have made a
11   decision that you cannot issue the report and,
12   therefore, you're not asked to issue the report --
13       A   Well, it's not that I can't issue a report.
14   I could issue a report.  Right?  I mean, I could
15   issue a report with my findings.  So that ...
16       Q   How often have you been asked about whether
17   or not a market is efficient and you've come to the
18   conclusion that it is not?
19       A   I don't recall.
20       Q   Roughly speaking, how often?
21       A   I have no idea.
22       Q   More than five times?
23       A   Maybe.
24       Q   No idea whatsoever?
25       A   I mean, it's less than 20.
```

Page 52

1      Q    Okay.

2      A    Probably less than ten, but beyond that, I

3   would be speculating.

4      Q    The very last time that this situation came

5   up, what were the reasons that led you to believe

6   that the market was not efficient?

7      A    Well, again, it's not that the market was

8   inefficient.

9           It was that I could not opine that the

10   market was efficient.  Those two statements are

11   different.

12      Q    Okay.

13           What was the basis on which you could not

14   opine that the market was in- -- was efficient?

15      A    My review of the Cammer and Krogman

16   factors.

17      Q    Which Cammer and Krogman factors in

18   particular?

19      A    I can't recall.

20      Q    No recollection whatsoever?

21      A    Not as I sit here, no.

22      Q    Have you ever been disqualified by any

23   court from serving as an expert?

24      A    No.

25      Q    Have any of your opinions been subject to a

Page 53

1    Daubert motion?

2         A    Subject to a Daubert motion?

3         Q    Yes.

4         A    As in one was filed against me?

5         Q    Correct.

6         A    I believe so.

7         Q    Have any of your opinions been excluded

8    pursuant to a Daubert motion?

9         A    No.

10        Q    Going back to the documents you considered

11   in connection with this report, were there any

12   materials that you requested as part of your

13   engagement that you did not receive?

14        A    When you say "receive," you mean received

15   from either Plaintiffs' counsel or Crowninshield?

16        Q    In any capacity.

17        A    I don't believe so.

18        Q    And did you conduct any market efficiency

19   analysis that is not reflected in your report?

20        A    I don't believe so.

21        Q    How much time did you spend prepping for

22   this deposition?

23        A    So when you say "prepping," do you mean

24   meeting with counsel, or do you mean prepping on my

25   own, like, reviewing material?

1    Q    Both.

2    A    Both.  Total, probably, I don't know, eight

3  hours, maybe less.

4    Q    And in connection with your prep, I assume,

5  based on your answer, you did meet with counsel?

6    A    I did.

7    Q    How many times?

8    A    Once.

9    Q    And roughly how long?

10    A    Forty-five minutes.  Thirty minutes.

11    Q    And reviewing on your own, how long?

12    A    Well, then the rest would be reviewing on

13  my own.

14    Q    And how much was the total?  I'm sorry.

15    A    Could you read back my answer, please.

16    Q    I think it was eight hours, maybe less.

17    A    Right.  So subtract 30 minutes, 45 minutes

18  from -- possibly an hour.  The rest was spent

19  reviewing on my own.

20         Is now a good time to take a break?

21    Q    Would you like to take a break?

22    A    I mean, I wouldn't mind, but --

23    Q    Sure.

24    A    -- if you're just -- if we're going to go

25  through this in five minutes.

```
                                        Page 55

 1            MR. ISAJIW:  We're about to switch gears,

 2      so now is a great time.

 3            THE WITNESS:  Right.  I assumed we were

 4      about to.  Fantastic.  Thank you.

 5            THE VIDEOGRAPHER:  We're going off the

 6      record.

 7            The time is 10:35 a.m.

 8            (Recess was taken at 10:35 a.m.

 9            until 10:45 a.m.)

10            THE VIDEOGRAPHER:  We are back on the

11      record.

12            The time is 10:45 a.m.

13      BY MR. ISAJIW:

14         Q   Dr. Werner, I want to turn to Appendix A of

15      your report, which is on page 60 and entitled

16      "Primer on Market Efficiency."

17            Are you there?

18         A   I am.

19         Q   Okay.

20            Did you draft this section, this primer?

21         A   Over many years, yes.

22         Q   And do you normally include this type of

23      thing in your reports?

24         A   It's usually in the body of my report.

25      I've been -- I had been thinking about pulling it
```

```
                                            Page 56
 1    out and putting it as an appendix, to make it --
 2         Q    Okay.
 3              In the very first paragraph on paragraph 1
 4    on page 60, it says (as read and/or reflected:)
 5                   The efficient market
 6              hypothesis is the foundation of
 7              modern finance theory.  In essence,
 8              a stock trades in an efficient
 9              market when all publicly available
10              information is incorporated in the
11              stock price.  And any new
12              information that impacts the
13              economic outlook of the firm gets
14              quickly reflected in the stock
15              price.
16              Did I read that correctly?
17         A    You did.
18         Q    How do you define "quickly"?
19         A    I mean, it depends on the situation.
20              I mean, I've seen courts rule that quickly
21    can be a couple days.  So within a reasonable amount
22    of time.
23         Q    In your view as an economist, does that
24    mean the price should both start and finish reacting
25    to news in one day?  Two days?  Three days?
```

Page 57

```
 1        A    Again, it would depend on the situation.  I
 2   think normally what you would see would be within
 3   one day.
 4        Q    Okay.
 5             Would that statement apply to bonds as
 6   well?
 7        A    With the same caveat, yes.
 8        Q    Have you done it --
 9        A    Well -- go ahead.  Sorry.
10        Q    Have you done any test to see if the price
11   reactions for both FXCM common stock and notes meet
12   that definition of quickly here?
13        A    Meet that definition of quickly test.
14   Well, I mean, I performed an event study and a
15   news/no-news analysis.
16        Q    Okay.
17             Did -- I believe you said that the price
18   for quickly, generally speaking, the price would
19   start and finish reacting to the news within a day?
20        A    Correct.
21             I mean, but we see periods of market
22   uncertainty where -- or people -- people -- it takes
23   the market time to fully digest information and the
24   implication of those -- of that information.
25        Q    Okay.
```

```
                                              Page 58
 1            But so for your event study here, you use

 2    one-day returns in your study; is that correct?

 3        A    That is correct.

 4        Q    For both the stock and the bond?

 5        A    Well, let's go -- let's go to what I did

 6    with regards to the bond specifically.

 7        Q    We're going to get there later.

 8             Do you recall right now, sitting here

 9    today?

10        A    I'm trying to answer your question to the

11    best of my ability.  So looking at my report will

12    refresh my recollection.

13             Yeah.  So -- and I'm looking at

14    paragraph 142 of my report.

15             (As read and/or reflected:)

16                  For the notes, the regression

17                  data series included only days on

18                  which there was a trading price for

19                  two consecutive trading days so

20                  that a one-day return could be

21                  computed.

22                  All returns for the Effex --

23             Well, I don't need to read any more.

24        Q    Does that refresh your recollection that

25    you used a one-day return for the bond?
```

1       A    Well, with the caveat that it had to have

2    two consecutive trading days.

3       Q    You mention in the first paragraph there

4    that an efficient market the information that

5    impacts the economic -- sorry.  First paragraph on

6    page 60.

7       A    Hold on.

8            MR. HAKLAY:  He's there.

9            MR. ISAJIW:   Okay.

10      Q    That (as read and/or reflected:)

11               The stock price and any new

12           information that impacts the

13           economic outlook of the firm gets

14           quickly reflected in the price.

15           Correct?

16      A    That is correct.

17      Q    Would you agree that the market, in order

18   to be efficient, must also fully incorporate the new

19   value-relevant news?

20      A    I don't know how to answer that.

21           And what I mean by that is there's no

22   assumption that the market has to be fully correct

23   about -- it is an average of what peoples'

24   expectations are.  And so people may update their

25   beliefs and stock prices may move based on those

Page 60

1    updated beliefs.

2        Q   So the stock price, when it updates based

3    on updated beliefs, do you believe in order for the

4    market to be efficient it must fully reflect those

5    beliefs and the information at the time?

6        A   To the best of the market's ability, yes.

7        Q   So both quickly and fully reflect the

8    available information at the time?

9        A   Well, again, I've suggested cases where --

10   I mean, let's look at the Coronavirus, right.

11           I don't know.  I mean, the market

12   presumably has some expectation of the impact of

13   that and, yet, so if I said to you, well, what's the

14   impact of the Coronavirus on the market?  I wouldn't

15   expect that the market would fully incorporate all

16   of the implications of that on one single day,

17   right.

18           And -- I mean, we've seen -- I didn't look

19   at the market today, but when I did look at it

20   earlier, it continued to go down.

21           I don't -- I'm not sure anyone would argue

22   that the S&P 500 was inefficient based on the fact

23   that we were still talking about the Coronavirus.

24       Q   Okay.

25           You'll agree with me that the Coronavirus

Page 61

1    and the stock price reaction to the Coronavirus has

2    nothing to do with the case that we're here talking

3    about today; correct?

4        A    Well, we're -- you asked me about stock

5    price reactions.  And so that would be one such

6    example; correct?

7            MR. HAKLAY:  Don't ask him questions.

8            MR. ISAJIW:  Yeah.  Thank you.

9            THE WITNESS:  All right.  Correct.  Period.

10   BY MR. ISAJIW:

11       Q    You base your work off of the work of other

12   economics and you've cited a number -- other

13   economists and you've cited a number of them in the

14   footnotes of your report; is that correct?

15       A    I believe that's accurate.

16       Q    Okay.

17            One of those economists is Fama, who

18   drafted a paper in 1970 called the "Efficient

19   Capital Markets: A Review of Theory and Empirical

20   Work" for the "Journal of Finance."

21            And you quote him in Footnote 12 of your

22   report on page 62 of the appendix.

23       A    Right.

24            So Footnote 12 of the appendix, not

25   Footnote 12 of my report.

```
                                                Page 62

  1        Q    Yes.

  2             Are you on page 62?

  3        A    Not yet.

  4        Q    So on Footnote 12, you have -- and towards

  5   the bottom of the footnote -- a citation to, it says

  6   (as read and/or reflected):

  7                  (Quoting Efficient Capital

  8             Markets: A Review of Theory and

  9             Empirical Work, Eugene Fama,

 10             "Journal of Finance," 1970).

 11             And then you quote (as read and/or

 12   reflected:)

 13                  A market in which prices

 14             always, 'fully reflect' available

 15             information is called 'efficient.'

 16             Do you agree with that?

 17        A    I agree with that statement, yeah.

 18             I agree that that's what I wrote or that's

 19   what I quoted from Fama, yes.

 20        Q    Do you agree with the statement that you

 21   quoted, not that you quoted it?

 22        A    Generally, yes.

 23        Q    Are you familiar with the concept of price

 24   overreaction?

 25        A    The concept?  What do you mean by "the
```

Page 63

1   concept"?

2       Q   As an economist, if I was to say "stock

3   price overreaction," what would that mean to you?

4       A   I mean, it would depend upon the context.

5   Do you mean overreact to information?

6       Q   So if a piece of value-relevant information

7   came into the market and the stock price initially

8   increased very quickly, but then reversed in the

9   next few days, would that be consistent with your

10  understanding of an overreaction?

11      A   In your -- I would need to know more in

12  order to answer your hypothetical.

13      Q   What additional facts would you need in

14  order to determine whether or not that would be

15  consistent with your understanding of an

16  overreaction?

17      A   Well, I would need more context in terms of

18  what else -- what was happening during that time

19  period, what was happening to the market, what would

20  happen to comparable companies over that period,

21  what people were saying about the stock at the time.

22      Q   Okay.

23      A   So there's a whole host of factors that I

24  would need to consider when looking at that.

25      Q   Okay.

1          So outside of a specific example, just

2    generally speaking, conceptually, the stock --

3    concept of stock-price overreaction is not something

4    that you're familiar with?

5          A    Are you asking:  Is it possible for a stock

6    price to overreact?

7          Q    No.  I'm asking if you're familiar with the

8    concept of stock-price overreaction.

9          A    If you want to show me a document that

10   defines it.  I'm just not -- it's not clear to me

11   what your definition of --

12         Q    I'm trying to get your definition.

13         A    Well, and, again, so it would -- it would

14   depend upon the context.

15         Q    Okay.

16              What about stock-price underreaction?

17   Conceptually speaking, what does that describe?

18         A    Concept -- in general, I guess the -- I --

19   not fully incorporating the news.  I don't -- I

20   don't know.  I would really need to know more.

21              Again, if you want to put a definition in

22   front of me, I'm happy to answer your question.

23         Q    Okay.

24              But sitting here today, as an expert in

25   economics, who teaches several courses in economics,

Page 65

1   who has drafted a report related to stock-price

2   movement, you have no general definition of either

3   the concept of price overreaction or underreaction

4   in connection with stock prices?

5       A    That's not it.  I just don't want to give

6   an inaccurate answer.

7            So if you want to put a specific definition

8   in front of me, I will be happy to review that

9   definition and give you my understanding.

10           I mean, presumably there have been papers

11  on this -- on under or overreaction.  So I'm just

12  asking that you put it in front of me so we have a

13  common understanding of what you mean.

14      Q    Yeah.  I'm just looking for your

15  understanding of it.

16      A    Well, so, I mean, can a stock overreact to

17  news or underreact to news?  Yeah, it's possible.

18      Q    If a stock overreacts or underreacts to

19  news, is that a suggestion that the market for that

20  stock is inefficient?

21      A    I would need to think more about that.

22           Again, I would need to look at the specific

23  case and the situation around it, or I would need

24  more specifics to answer your hypothetical question.

25           If you want to place a full example in

Page 66

1    front of me, I would be happy to look at it and then

2    answer your question, but as I sit here today, I'd

3    need more information.

4        Q    In connection with your work, sitting here

5    today, did you do any test to confirm whether or not

6    the price of FXCM securities over- or underreacted

7    to value-relevant news?

8        A    I'm not sure I've seen specific -- I'm not

9    sure I've seen -- I would need to refresh my memory

10   with regards to specific academic tests for over-

11   and underreaction.

12       Q    You need to refresh your memory for those

13   tests to determine if you tested in this case for

14   over- and underreaction?

15       A    Well, again, it would inform my opinion --

16   it could be under the context of these tests that

17   you're talking about that I did -- I don't know what

18   these tests do.

19           I'm not sure I -- again, I'm not sure I've

20   specifically seen a test in economics that defines

21   over- or underreaction.  My guess is it's some kind

22   of event study.  And so to the extent I've performed

23   an event study, I suppose that information would

24   inform my opinion of over- or underreaction.

25           But, again, I would need to know more

Page 67

1    information in order to answer that question.

2         Q    So in connection with your event study, did

3    you evaluate whether or not the price of FXCM

4    securities overreacted?

5         A    I found that the -- my findings are that

6    the market for FXCM's equity and notes were

7    efficient during the Class Period.  That was my

8    finding.  That's what I concluded.  That's what I

9    was asked to do.  That's what I concluded.

10             I also concluded that damages could be

11   calculated in this case.

12        Q    Okay.

13             So you did not evaluate whether or not they

14   over- or underreacted?

15        A    Again, I'm not sure what you mean by

16   "evaluate" because I don't know -- I'd need to fully

17   understand these tests that you are describing.

18        Q    I just want to know what test you

19   conducted.

20        A    And I -- I've answered your question.

21        Q    Okay.

22             Generally speaking, is it possible for a

23   market to be efficient at one point in time but not

24   another?

25        A    Is it possible?

Page 68

```
 1       Q    Yes.

 2       A    I mean, I -- yeah, I believe it is

 3   possible.

 4       Q    So if you tested the efficiency of FXCM

 5   securities in 2010, would that tell you whether or

 6   not the market for the same securities would be

 7   efficient today?

 8       A    No.

 9       Q    Okay.

10            And if you tested the efficiency of a

11   security in 2010 and today, would that tell you

12   whether the market for that security would be

13   efficient throughout 2015?

14       A    So I looked at two snapshots in time.

15   That -- is it possible?  It's possible.  My guess is

16   it would not be sufficient to determine -- to opine

17   upon market efficiency.

18       Q    And is that true for both stocks and notes?

19       A    Yes.

20       Q    Okay.

21            Generally speaking, would stocks and bonds

22   react differently to the same types of information?

23       A    It's certainly possible.

24       Q    Okay.

25            Why so?
```

Page 69

1    A   Bondholders are typically more concerned

2  with bankruptcy risks because they're senior

3  securities.  Equityholders, while still probably

4  concerned about a firm's bankruptcy, less so.

5    Q   So if a company's stocks and bond react

6  differently to the same news -- sorry -- strike

7  that.

8        Can a security -- can a company's

9  securities stocks and bonds react differently to the

10  same news in an efficient market?

11   A   When you say "differently," do you mean in

12  different directions?

13   Q   Yes.

14   A   So, like, one went -- goes up and one goes

15  down?

16   Q   That would be one example of differently.

17   A   Okay.

18        So in that example, yes, that's certainly

19  possible.

20   Q   It's possible that they would react in

21  different directions?

22   A   Yeah, I've seen that before.

23   Q   And can that happen in an efficient market?

24   A   Yes.

25   Q   If that happens, could it also be evidence

 1    that either the stock or the bond is trading in an

 2    inefficient market?

 3         A    As I sit here today, I have no reason to

 4    conclude that.

 5         Q    Hypothetically possible?

 6         A    Right.  In your hypothetical -- well, so

 7    hypo- -- in your hypothetical, is it -- so you're

 8    asking me, hypothetically, is it possible that if a

 9    stock and a bond for the same company moved in a

10    different direction, that one of those securities

11    was inefficient?

12              It is possible.

13         Q    Okay.

14              Would that suggest inefficiency?

15         A    As I sit here, I have no reason to believe

16    that it would necessarily suggest inefficiency based

17    on your current hypothetical question.

18         Q    Do you have any basis in your methodology

19    to determine what types of news would cause a stock

20    and a bond to react similarly or differently?

21         A    I don't understand the question.

22         Q    Before actually conducting an event study,

23    would you have a general sense of what type of news

24    would cause stocks and bonds to react differently?

25         A    And I'm trying to -- I have been trying to

Case 1:21-cv-00916-RGA-JLH Document 568-16 Filed 06/12/23 Page 74 of 387
Case 1:21-cv-00916-RGA-BGA Document 568-16 Filed 06/12/23 Page 74 of 387

 1    think about that as we have it -- we've had this

 2    conversation.

 3            I should be able to answer your question.

 4    I need -- but I need to think more about it.  It is

 5    certainly something I have been considering as we

 6    have been having this conversation.

 7        Q    If a piece of news had clear positive

 8    implications for a company's asset value and the

 9    bond was trading substantially below par, would you

10    expect the bond and the stock to be more likely to

11    react to the news that had a positive value for the

12    firm's asset or have a similar reaction?

13        A    Yeah, that's a completely incomplete

14    hypothetical.  Like, I can't answer, as I sit here

15    today.

16        Q    Okay.

17            What additional information would you need?

18        A    I don't know.  If you want to place the

19    question in front of me, I will be happy to look it

20    over and try to opine upon what additional

21    information I would need.

22            But as it is, it's a compound, complex,

23    hypothetical example.

24            And so it would be completely speculative

25    on my part to attempt to answer it without knowing

Page 72

```
 1   more.
 2        Q    Generally speaking, if a bond was a
 3   convertible bond, meaning convertible into equity,
 4   would it be more or less likely to react differently
 5   to news in the market?
 6        A    Differently than the equity?
 7        Q    Yeah.
 8        A    I would have to think more about that, as I
 9   sit here.
10             As I sit here today, I'm not sure.
11        Q    Looking back at your appendix.  In
12   paragraph 3 you say (as read and/or reflected:)
13                  While financial economists
14                  rely on event study analysis as
15                  direct evidence demonstrating stock
16                  price response to new information,
17                  they accept other factors as
18                  tending to support the existence of
19                  an efficient market for security.
20                  For example, financial
21                  economists have argued that trading
22                  volume is correlated with the
23                  market sufficiency, such that the
24                  higher the trading volume, the more
25                  likely it is to be efficient.
```

Page 73

```
 1            Did I read that correctly?
 2     A    That is correct.
 3     Q    What do you mean when you say they -- (as
 4   read and/or reflected):
 5               Financial economists accept
 6            other factors as tending to support
 7            the existence of an efficient
 8            market?
 9     A    Well, I mean off the top of my head,
10   generally, the Cammer and Krogman factors would be
11   included in that.
12            I'm not sure I've actually ever seen any
13   economic study that's looked at S3 eligibility as a
14   function of market efficiency.
15     Q    Okay.
16            And what do you mean by the "Cammer
17   factors"?
18     A    The Cammer and Krogman factors as listed in
19   my report.  I'm happy to --
20     Q    Just wondering if you can summarize them
21   off the top of your head.
22     A    Sure.
23     Q    I think we can probably get on the same
24   page pretty quickly here, but we're talking about
25   average weekly trading volume as one; is that
```

```
                                         Page 74
 1   correct?
 2       A    That is correct.
 3       Q    And analyst coverage as a second?
 4       A    Correct.
 5       Q    Market makers as part of the third?
 6       A    And listing on the NYSE, yes.
 7       Q    Okay.
 8            Eligibility for S3 registration?
 9       A    That is a Cammer factor.
10       Q    And price reaction to new information?
11       A    I believe -- yeah.  I mean, the fifth
12   Cammer specifically says, and I'm reading from
13   page -- paragraph 44 (as read and/or reflected):
14              It would be helpful to have
15          empirical facts showing a cause and
16          effect relationship between
17          unexpected corporate events or
18          financial releases and an immediate
19          response in the stock price.
20       Q    Okay.
21            THE WITNESS:  Can we pause for a second?
22   Or could one of you get me a Diet Coke?
23            MR. HAKLAY:  I think I took the last one.
24            THE WITNESS:  I'm sure King & Spalding has
25   more.
```

```
                                                      Page 75

 1   BY MR. ISAJIW:
 2        Q   So in the paragraph of your appendix, which
 3   I believe is paragraph 3 that I just read.
 4        A   Okay.  So remind me.  We're on page 60
 5   something?
 6            MR. HAKLAY:  61.
 7            THE WITNESS:  61.
 8   BY MR. ISAJIW:
 9        Q   61, paragraph 3 of Appendix A.
10            You said (as read and/or reflected:)
11                 These other factors -- I'm
12            sorry -- financial economists
13            accept these other factors,
14            including the Cammer factors, as
15            tending to support the evidence of
16            an efficient market.
17            What do you mean by "tending to support"?
18        A   I guess just the general definition of
19   tending.
20        Q   Are they direct proof of the market
21   efficiency?
22        A   Well, so yours is a complicated question
23   and this is why.
24            You know, there's -- courts have ruled
25   stocks efficients ignoring, in fact, Factor 5.  And
```

Page 76

```
 1    so, I mean, is it sufficient to just look at the
 2    first four factors?
 3              Certainly courts have found it's sufficient
 4    to look at the first four factors.
 5              I think most academics would agree that you
 6    want to look and see if there's a cause and effect
 7    relationship between a stock and information to
 8    determine whether or not a stock was efficient.  Or
 9    a bond for that matter.
10         Q    Okay.
11              In your view, how many Cammer factors would
12    have to be satisfied to find a market for a security
13    efficient?
14         A    I have no opinion about that.  I've
15    never -- nor have I ever been asked to opine upon
16    that.
17         Q    Okay.
18              For example, if analyst coverage was very
19    high, but trading very low, would that be
20    sufficient?
21         A    Again --
22              MR. HAKLAY:  Objection.  Sufficient to
23    what?
24              MR. ISAJIW:  Determine the market to be
25    efficient.
```

```
 1            MR. HAKLAY:  Thank you.
 2            THE WITNESS:  From an academics perspective
 3    or a court's perspective?
 4    BY MR. ISAJIW:
 5        Q   From an academics perspective.
 6        A   I have no idea.  It's not anything I've
 7    ever thought about.
 8            MR. HAKLAY:  Here's four Diet Cokes for
 9    you.
10            THE WITNESS:  Sorry.  They're trying to get
11    me hopped up on caffeine.  Are we off the record for
12    that?  I know.  I'm joking.  Sorry.  You'll edit the
13    video.
14    BY MR. ISAJIW:
15        Q   When conducting market efficiency analysis
16    in evaluating the Cammer factors, are there any
17    factors that you would feel comfortable excluding in
18    your determination that a market is efficient?
19        A   So now we're just talking about the Cammer
20    factors?
21        Q   Yes.
22        A   I would need to think about it.  I mean,
23    again, I don't think S3 eligibility really plays
24    into market efficiency.
25            I mean, it has to do with firm size, I
```

Case 1:21-cv-00916-RA-BCM Document 568-16 Entered on Filed 06/18/2021 Page 81 of 387

1    suppose, and their ability to file financials.

2            Is there anyone I would ignore?

3            Again, it's not a question I've ever asked

4    myself.  I mean, the court demands that I opine on

5    these factors, or at least case law has suggested I

6    need to opine on the factors and the court will then

7    decide whether or not the market for that stock is

8    efficient.

9            So it's not anything I've thought about

10   other than S3.

11       Q   Okay.

12           What if there was insufficient data to

13   conduct an event study, for instance?

14       A   So, again, so your hypothetical is there's

15   insufficient information to conduct an event study.

16   And I guess my question would be why?  Because

17   that --

18       Q   Say there was not enough trading to conduct

19   an event study over a specific period.

20       A   I'm sorry.  I just -- I don't understand

21   your hypothetical example or your hypothetical

22   question.

23           I'm not -- have I ever seen literature

24   discussing the number of days needed to conduct an

25   event study?

```
 1              I'm not sure I have, as I sit here today.
 2       Q    Do you have a personal opinion -- I'm
 3    sorry.
 4              Do you have a professional opinion?
 5       A    It's not something I've ever thought about.
 6       Q    Let's dig in a little bit more into the
 7    specific Cammer factor.  So No. 1 was average weekly
 8    trading volume.
 9              Why is trading volume an important measure
10    of market efficiency, in your opinion?
11       A    It's -- well, let's go to my report.
12       Q    So --
13       A    I'm trying to read my report.  Hold on one
14    second.
15              Yeah.  I mean, it's -- again, it's not
16    something I've thought about.  It's something that
17    the court demand.
18       Q    What, in your view, would be the
19    implication for market efficiency if a security had
20    high trading volume?
21       A    In general, I think economists believe that
22    higher trading volume is an indicator of efficiency.
23    But, again, it's -- it's not something I've ever
24    considered.
25              I mean, there is a benchmark the courts
```

Page 80

1    have used of 1 and 2 percent.  I don't know if, you
2    know, if it's 50 percent, is it somehow more
3    efficient than a stock that's average weekly trading
4    volume is 30 percent?  It's not something I really
5    thought about.
6        Q    What would be the implication if trading
7    volume was very low in terms of market efficiency?
8            MR. HAKLAY:  Objection.  Vague as to the
9    words "very low."
10           THE WITNESS:  Yeah.  Again, I'm not --
11   there's no -- again, the court asked me to provide
12   my opinion on this or provide my analysis with
13   regards to this factor.  So I've provided this
14   analysis.
15           It -- yours is a question I've never really
16   thought about.
17   BY MR. ISAJIW:
18       Q    If a security had low trading volume or no
19   trading volume, you've never thought about whether
20   or not that would weigh on the efficiency of the
21   market for that security?
22           MR. HAKLAY:  Objection as to the word "low"
23   as being vague.
24           THE WITNESS:  Well, I mean, certainly --
25   for instance, I mean, we've seen bond cases where

```
1   there's no trading volume on a number of days.  And
2   the courts have found the market for those bonds are
3   efficient.
4           So, you know, it's not something that I
5   personally think about.  To the extent that a court
6   might think about it, I don't know.  You could ask
7   the judge or what his or her opinion is about that.
8   BY MR. ISAJIW:
9       Q   I'm asking you for your opinion as an
10  expert who has rendered a report discussing Cammer
11  Factor 1 and the effect of weekly trading volume on
12  inefficiency analysis.
13          And if your answer is you've never thought
14  of it, that's fine, but I'm asking what your opinion
15  is.
16          THE WITNESS:  Could you reread his original
17  question, please.
18          (The record was read back as
19          follows:
20              "Question:  If a security had
21          low trading volume or no trading
22          volume, you've never thought about
23          whether or not that would weigh on
24          the efficiency of the market for
25          that security?")
```

```
                                          Page 82

 1           MR. HAKLAY:  Same objections I rendered

 2   before.

 3           THE WITNESS:  Yeah.  You would need to look

 4   at that on a case-by-case basis.

 5   BY MR. ISAJIW:

 6       Q   So in the case of no trading volume.

 7       A   I refer to my previous answer with

 8   regards --

 9       Q   Which was what?

10       A   I told you, I found that there are --

11   certainly have been bonds with no trading volume or

12   on days which found -- which courts have found to

13   have been traded in an efficient market.

14       Q   And as an economist, do you have a view as

15   to whether or not that is an indication of an

16   efficient market?

17       A   I have no opinion one way or the other.

18       Q   Let's talk about analyst coverage, which is

19   the Cammer Factor 2.

20           Why, in your view, is analyst coverage an

21   indicator for market efficiency?

22       A   Well, I mean, I refer to this quote from

23   the Cammer cover.  And I'm looking at paragraph 26

24   of my report.

25           (As read and/or reflected:)
```

```
                                        Page 83

 1                     When investment professionals

 2               closely monitor a firm's

 3               information subsequently making

 4               buy/sell recommendations to their

 5               clients based on that information,

 6               investors bid up or down the market

 7               price of the stock to reflect the

 8               company's financial information as

 9               interpreted by the securities

10               analyst.

11               So that's what the court finds.

12          Q    So I'm asking about your professional

13     opinion as an expert economist.

14               What would be the implication if a company

15     has very high analyst coverage?

16          A    Well, the implication would be that a lot

17     of analysts follow the company.

18          Q    In terms of whether or not the company

19     trades in an efficient market.

20          A    I think in -- I mean, I'm not quite sure

21     how to answer the question.

22               I know -- again, I think -- let's look

23     for -- yeah.  Right.

24               So, for instance, and I'm reading from

25     paragraph 26 of my report, this suggests that (as
```

Page 84

```
 1   read and/or reflected:)
 2              The more analysts who followed
 3          a stock, the greater the likelihood
 4          that a stock traded in an efficient
 5          market.
 6          I should have started this next sentence
 7   here.  (As read and/or reflected:)
 8              Barber, et al, 1994, found
 9          that coverage by one or two
10          analysts strengthened the
11          presumption of efficiency for a
12          publicly traded stock.
13      Q   So other than quoting from Barber, in your
14   opinion, what is the implication of high analyst
15   coverage?
16      A   What's the implication?  My -- my -- the
17   implication is a lot of analysts follow the stock.
18   Probably a large -- large company.
19      Q   What would be in the implication in a
20   market efficiency analysis if very few analysts
21   covered a stock?
22          MR. HAKLAY:  Okay.  Vague as to what "very
23   few" means.
24          THE WITNESS:  Right.  Again, I mean, the --
25   my best understanding with regards to academic work
```

```
                                          Page 85

 1   is the work by Barber who basically -- Barber,
 2   et al, who found that one or two -- well, let's just
 3   read it again.
 4   BY MR. ISAJIW:
 5        Q   Before you read it, I'm just asking for
 6   your view, sitting here today, as an expert
 7   economist.
 8        A   Right.  My view is informed by their paper.
 9        Q   Do you have a view independent of the
10   paper?
11        A   No.
12        Q   Okay.
13            When you are conducting a market efficiency
14   analysis, how many analysts do you believe are
15   required to cover a company before you believe it is
16   an indicator of an efficient market?
17        A   Again, I would have to look at that on a
18   case-by-case basis.  Clearly in this case, I believe
19   that, as I've found -- let's just go to what I said
20   with regards to my finding.
21            Right.  So I'm reading from, excuse me,
22   paragraph 32 of my report.
23            (As read and/or reflected:)
24                The number of analysts
25                covering FXCM and the wide
```

1          dissemination of information about

2          FXCM from Company press releases

3          and from well-regarded and widely

4          read sources in the news media

5          support a finding of market

6          efficiency for FXCM common stock

7          during the Class Period.

8          And I -- that's for the equity.

9          If you want me to opine on the bonds as

10   well, I'm happy to review my findings.

11   Q    Did you draft that paragraph?

12   A    Yes.

13   Q    If there is a period of a year or two where

14   only three analysts issued reports on FXCM, would

15   you believe that that is sufficient under Cammer

16   Factor 2?

17          MR. HAKLAY:  Objection.  Assumes facts not

18   in evidence.

19          THE WITNESS:  It's not my opinion -- it's

20   not -- or it's not my job to form an opinion on your

21   hypothetical example.

22          I present the information to the courts.

23   In this case, I found that there was sufficient

24   analyst coverage to indicate market efficiency in

25   this specific case.

```
                                              Page 87

 1  BY MR. ISAJIW:

 2      Q   So sitting here today, you can't answer the

 3  question that if there was a period of a year where

 4  only two or three analysts issued reports on FXCM,

 5  whether you would believe that that would be

 6  sufficient under Cammer Factor 2?

 7           MR. HAKLAY:  Objection.  Misstates his

 8  testimony.  It's asked and answered.

 9           THE WITNESS:  It certainly could be

10  efficient -- I mean, sorry.  It certainly could be

11  sufficient.

12  BY MR. ISAJIW:

13      Q   Let's talk about Cammer Factor 3.  This is

14  under your heading "Market Makers and Listing on the

15  NYSE."

16           Why is the existence of market makers an

17  indication of efficiency, in your view?

18      A   Well, I mean, I think it largely agrees

19  with the -- my view coincides with the Cammer

20  court's opinion that (as read and/or reflected:)

21                The existence of market

22           makers -- and I'm reading from

23           paragraph 33 of my report -- and

24           arbitrageurs would ensure

25           completion of the market mechanism;
```

```
                                            Page 88

 1              these individuals would react

 2              swiftly to company news and

 3              reported financial results by

 4              buying or selling stock and driving

 5              it to a changed price level.

 6   BY MR. ISAJIW:

 7       Q    Independent of the report, as an economist,

 8   what would be the -- your view of the implication if

 9   there were no market makers for a security in

10   connection with an efficiency analysis?

11       A    Well, so what do you mean by "market

12   maker"?

13              And I mean that -- do you mean someone who

14   is designated as a market maker whose job title is

15   market maker?

16       Q    In what context did you mean market maker

17   when you wrote it in your report?

18       A    My understanding of the Cammer court --

19       Q    Was it --

20       A    -- opinion.

21       Q    -- somebody who was designated as a market

22   maker?

23       A    Right.  So there is a title of a designated

24   market maker in an NYSE stock.

25              Is that what you're referring to?
```

Case 1:21-cv-00916-JLR-BCM Document 568-16 Entered on FLSD Docket 06/08/2023 Page 92 of 387

1      Q   I'm asking what you were referring to when

2   you used the phrase "market maker" in the report.

3          Were you referring to somebody who was

4   designated as a market maker?

5      A   So I don't know exactly what you mean by

6   "designated."

7          And let me explain why.

8          Because there is a position called a --

9   there is someone called a "designated market maker"

10  for each NYSE stock.  Or at least one for each NYSE

11  stock.

12         So I wouldn't, like, necessarily

13  consider -- I mean, there are NASDAQ market makers.

14  I don't know if you would consider them designated

15  market makers.

16         There are people who are making markets off

17  the floor.  I don't know if you would consider them

18  designated market makers.

19     Q   I'm asking if you consider them designated

20  market makers.

21     A   Again, if you -- I don't believe -- I

22  believe that there are many individuals or companies

23  making markets in a stock that are not -- that do

24  not fall under the definition of a designated market

25  maker as explained or it's laid out by the NYSE.

1     Q   In this case, can you give me any examples
2   of those entities?
3     A   Which entities?
4     Q   The ones you just described who are making
5   a market in a stock but are not designated market
6   makers under your definition.
7     A   Well, it -- well, so I do not know and,
8   again, this is based on a mis- -- a clear definition
9   of a designated market maker.  Certainly Barclays
10   Capital, BNY Mellon Capital Markets, JPMorgan,
11   Morgan Stanley and Wedbush Morgan Securities made a
12   market in this stock.
13          If we want to go to a complete list of
14   market makers who made a market in the stock during
15   the Class Period, we can go to my Exhibit 5.
16          MR. HAKLAY:  Page 114.
17          THE WITNESS:  Right.  So there's multiple
18   firms here.  I don't -- what is it?  180, I believe.
19   No.  I'm sorry.  It goes on to 115.  So 205.  I
20   don't know if any of those are designated market
21   makers as you -- because you have not defined
22   designated market maker for me.
23          Again, if you're talking about the --
24   a designated market maker on the New York Stock
25   Exchange as defined by the New York Stock Exchange,

Page 91

```
 1    as I sit here today, I don't know.
 2    BY MR. ISAJIW:
 3        Q   In paragraph 34, you indicate that there
 4    were at least 205 market makers for FXCM common
 5    stock.
 6            Did I read that correctly?
 7        A   I'm sorry.  What paragraph?
 8        Q   34, page 14.
 9        A   Page 34.  Yes.  That is correct.
10        Q   Okay.
11            In your opinion, does the fact that there
12    were at least 205 market makers for FXCM common
13    stock tend to support the idea that the market for
14    FXCM common stock was efficient?
15        A   I believe that -- and I'm reading from
16    page 38 in my report.  (As read and/or reflected:)
17                The large number of market
18            makers ... supports that FXCM
19            common stock traded in an efficient
20            market.
21            MR. HAKLAY:  Let me just correct it.  You
22    read from paragraph 38, not page 38.
23            THE WITNESS:  Oh, sorry.
24    BY MR. ISAJIW:
25        Q   What would be the implication if there were
```

1  no market makers for FXCM common stock in terms of

2  an analysis of market efficiency?

3      A    I mean, I don't -- I haven't really thought

4  about your hypothetical.

5          I mean, because I'm not clear.  My

6  understanding, I -- sorry.

7          If we're talking about designated market

8  makers defined by the NYSE, it wouldn't have an

9  effect necessarily.

10         I mean, people make markets off the floor.

11  So -- I'm sorry.  Let's --

12     Q    If somebody made a market in any --

13     A    -- what --

14         MR. HAKLAY:  He's still answering.

15         THE WITNESS:  Can you -- can you reread his

16  question, please.

17         (The record was read back as

18         follows:

19             "Question:  What would be the

20         implication if there were no market

21         makers for FXCM common stock in

22         terms of an analysis of market

23         efficiency?")

24         THE WITNESS:  I mean, that's honestly

25  never -- something I've never even thought about.

```
                                              Page 93
 1   BY MR. ISAJIW:

 2       Q   What if there were instead of 205 market

 3   makers, 100 market makers?

 4       A   That's not anything I've considered.

 5       Q   What if there were 50 market makers?

 6       A   Again, not a question I've asked myself.

 7       Q   What if there were less than ten market

 8   makers?

 9       A   Yeah.  It would depend upon the situation.

10       Q   But sitting here today, you can express no

11   view as to whether or not that would have an

12   implication for a market efficiency analysis?

13           MR. HAKLAY:  Objection.  Misstates his

14   testimony.

15           THE WITNESS:  It might have an implication.

16   BY MR. ISAJIW:

17       Q   And if it had an implication, what would

18   your view be on the implication it has?

19           MR. HAKLAY:  Objection.  Assumes facts not

20   in evidence.  Asked and answered.

21           Go ahead.

22           THE WITNESS:  Okay.

23           I would need to look at that on a

24   case-by-case basis.

25   ///
```

1    BY MR. ISAJIW:

2        Q    So currently, you cannot -- you do not have

3    a view of the implication?

4            MR. HAKLAY:  Objection.  Misstates.  Asked

5    and answered.

6            THE WITNESS:  Again, I would need to look

7    at it on a case-by-case basis.

8    BY MR. ISAJIW:

9        Q    You also note in this section of your

10   opinion, you discuss the fact that FXCM's common

11   stock was listed on an exchange; is that correct?

12       A    Where are you reading from?

13       Q    I'm not reading from your report.  I'm

14   just ...

15           Let's take it outside of the context of the

16   report.

17           Do you know whether or not FXCM's common

18   stock was listed on an exchange?

19       A    It was -- yeah.  It was -- yes.

20       Q    Okay.

21           Was the fact that FXCM's common stock was

22   listed on an exchange relevant to your analysis as

23   to whether or not FXCM's common stock traded in an

24   efficient market?

25       A    Well, to the extent that some judges find

Page 95

1   it helpful to be informed upon that question, I
2   included that information.
3       Q   In your view as an economist, is that
4   relevant information to the analysis of whether or
5   not FXCM stock traded in an efficient market?
6       A   I'm not sure it's something I've ever
7   really thought about.
8           So in your hypothetical, the stock doesn't
9   trade on an exchange?
10      Q   I haven't posed a hypothetical.  I'm just
11  asking if whether or not the fact that you cite in
12  your report that FXCM common stock did, in fact,
13  trade on an exchange is relevant to your analysis of
14  whether or not FXCM common stock traded in an
15  efficient market.
16          MR. HAKLAY:  Objection.  That question was
17  asked and answered.
18          THE WITNESS:  It formed my opinion that it
19  traded in an efficient market.
20  BY MR. ISAJIW:
21      Q   Okay.
22          In what way did it inform your opinion --
23  strike that.
24          Let me ask a better question.
25          Is being listed on an exchange an indicator

```
                                              Page 96

 1   of efficiency, in your opinion?

 2        A    In my opinion?  I believe that courts rely

 3   on that information to determine market efficiency.

 4        Q    When you were making a determination of

 5   market efficiency, do you rely on that information?

 6        A    I don't know if I've ever really thought

 7   about it.

 8             I mean, can you give me -- well, I'm not

 9   supposed to ask questions.  I apologize.

10        Q    In your opinion, if a security was not

11   listed on any exchange, would that have a bearing on

12   whether or not it trades in an efficient market?

13             MR. HAKLAY:  Objection.  Asked and

14   answered.

15             THE WITNESS:  It's possible.  I mean, when

16   you say "exchange," what do you mean?

17   BY MR. ISAJIW:

18        Q    When -- have you ever heard the phrase

19   "listed on an exchange" before?

20        A    I have.

21        Q    What is your understanding of the phrase

22   "listed on an exchange"?

23        A    Well, it's going to vary from place to

24   place.  I mean, my -- if I had to guess what your

25   definition of exchange was, you would probably be
```

Page 97

1    talking about the NYSE or the NASDAQ.

2            We're sitting, I don't know -- I don't know

3    actually.  Do they still have the Los Angeles Stock

4    Exchange?

5            Certainly there's a San Francisco Stock

6    Exchange.  I don't know if that would fall under

7    your definition --

8        Q   So if all of --

9        A   I'm trying to answer the question, please.

10           I'm not sure if that would fall under your

11   definition of exchange.

12           And then, of course, stocks are traded off

13   markets between companies.  I don't know if you

14   would consider that an exchange.

15       Q   In this analysis for FXCM common stock, do

16   you have an opinion as to whether or not it would be

17   an indication of market efficiency if FXCM common

18   stock did not trade on the NYSE?

19       A   If it did not -- so the fact alone that it

20   did not trade on the --

21           THE WITNESS:  Could you reread the

22   question, please.

23           (The record was read back as

24           follows:

25               "Question:  In this analysis

Case 1:21md-12989-00926-BAeBoeht 568-16erEnt8887 onFiUSB/D2/20et PagB89028385Page 101 of 387

```
 1              for FXCM common stock, do you have
 2              an opinion as to whether or not it
 3              would be an indication of market
 4              efficiency if FXCM common stock did
 5              not trade on the NYSE?")
 6          MR. HAKLAY:  Objection.  Assumes facts not
 7    in evidence.  Not a hypothetical, but couched as
 8    one.
 9          MR. ISAJIW:  I don't believe I couched that
10    as a hypothetical.  I was just asking about his
11    opinion.
12          MR. HAKLAY:  Okay.
13          Assumes facts not in evidence.  Asks him to
14    consider a situation that doesn't exist in his
15    report.
16          THE WITNESS:  So in your hypothetical
17    example, you're suggesting that if -- if FXCM didn't
18    trade on the NYSE, would that inform my opinion or
19    would that inform my opinion about market
20    efficiency?
21          Probably not.  I mean, it can -- certainly
22    there are all sorts of other exchanges it can trade
23    on.  Like the NASDAQ, which it did.
24          So I don't -- it's a really odd question.
25    I'm not quite sure I --
```

```
                                         Page 99

 1   BY MR. ISAJIW:

 2        Q    What if it traded on no exchanges?

 3             MR. HAKLAY:  Same objection.

 4             THE WITNESS:  Again, it's not something

 5   I've ever thought about.  I mean, what do you --

 6   what's a world with no exchanges?  So it's traded

 7   within -- just between, let's say, institutional

 8   investors?  Is that the world you're imagining?

 9             I think I'm okay in asking this question

10   because I'm clarifying his hypothetical example.

11   BY MR. ISAJIW:

12        Q    Let's take that as an example.

13        A    You know, that's something I would need to

14   think about.  I mean, there's no reason to think

15   that if stocks are traded off exchanges between two

16   parties that the stock is inefficient -- that a

17   stock is not efficient.

18        Q    There's no reason to believe that if a

19   stock is just traded between two parties that it

20   doesn't trade in an inefficient market?

21             MR. HAKLAY:  Objection.  Misstates his

22   answer as to completeness.

23             But go ahead.

24             THE WITNESS:  Again, I -- you would need to

25   look at this type of thing on a case-by-case basis.
```

```
 1              I mean, again, I gave you a hypothetical
 2     example, and I'm not -- I'm not even sure how to
 3     answer my own hypothetical example.
 4              And I clearly -- I'm not quite sure how to
 5     answer your hypothetical example.
 6     BY MR. ISAJIW:
 7         Q   Does listing on an exchange in and of
 8     itself mean that the security trades in an efficient
 9     market?
10         A   Does trading on an exchange --
11              THE WITNESS:  Could you reread the
12     question, please.
13              (The record was read back as
14              follows:
15                 "Question:  Does listing on an
16              exchange in and of itself mean that
17              the security trades in an efficient
18              market?")
19              THE WITNESS:  I think courts have certainly
20     found that to be the case.
21     BY MR. ISAJIW:
22         Q   And what about your professional opinion?
23         A   It's not any -- it's not something I've
24     thought about.
25              I don't think anyone's ever asked me that
```

Case 1:21-cv-02900-CJN Document 568-16 Filed 06/12/2025 Page 104 of 387

1    question before.

2        Q    And when you conduct your market efficiency

3    analysis, do you have a professional opinion as to

4    whether any of the Cammer factors are more important

5    for finding of efficiency than others, generally

6    speaking?

7        A    That's an interesting question.

8             Let's go to my discussion in Factor 5.

9             I mean, I think economists, when they talk

10   about market efficiency, oftentimes discuss event

11   studies.  But as I've stated previously, you know,

12   we're seeing an increasing number of courts find for

13   market efficiency ignoring the fifth Cammer factor.

14       Q    When you say "economists," do you include

15   yourself in that statement?

16       A    I do.

17       Q    Okay.

18            So do you believe that Factor 5 is one of

19   the more important Cammer factors in a market

20   efficiency analysis?

21       A    It's not something I've ever been asked to

22   opine upon.

23            I present the information that courts use

24   to determine market efficiency.  And so I do event

25   studies.

Page 102

1    Q    What is an event study designed to analyze?

2         Let me withdraw that question.

3         Is it fair to say that you use an event

4    study to try to determine whether or not there's a

5    cause and effect relationship between new material

6    information and the reaction in the stock price

7    establishing -- to establish market efficiency?

8    A    Is that stated somewhere in my report?  It

9    sounds like something from my report.

10   Q    I'm asking if you agree with the statement.

11   A    Well, if the statement is in the report, I

12   would like to see the statement.

13   Q    Other than -- I'll point you to the

14   paragraph where you discuss it, but before I do, you

15   can't answer it without reference to the report?

16   A    I just want to be as accurate as possible.

17   We are trying to be as accurate as possible here;

18   right?

19   Q    We are.

20   A    Well, so if you're reading from something

21   from my report, by all means, let me look at it.

22   Q    It's paragraph 52.

23   A    So it is from my report.

24        Okay.

25   Q    Now that you've reviewed paragraph 52, is

Page 103

1    it fair to say that you conduct an event study to

2    determine if there is a cause and effect

3    relationship between new material information and

4    the reaction in the stock price in order to help

5    establish market efficiency?

6         A    I believe that is correct.

7         Q    In your view, if there is information that

8    is new and material but the security price does not

9    react, does that suggest that the market is not

10   efficient?

11        A    No.

12        Q    What if the information is new and material

13   and the security doesn't trade at all, does that

14   suggest that the market is not efficient?

15        A    Not necessarily.

16        Q    Can you -- in the presence of new and

17   material information -- sorry -- strike that.

18             If a security does not react to new and

19   material information in terms of price and does not

20   trade based on new and material information, do you

21   believe that has any bearing on whether or not the

22   security trades in an efficient market?

23             MR. HAKLAY:  Objection.  Vague as to "any

24   bearing."

25             THE WITNESS:  Not necessarily.

 1    BY MR. ISAJIW:

 2        Q    Would you incorporate that into your

 3    analysis of market efficiency?

 4        A    What do you mean by "incorporate"?

 5        Q    Would you incorporate -- sorry.

 6             When you analyze market efficiency, if you

 7    encountered a situation where you believed there was

 8    new and material information but the price did not

 9    react, would that be relevant to your market

10    efficiency analysis?

11        A    Possibly.

12             I mean, if I -- if a firm announces

13    earnings, I would argue that that information was

14    material.  If that earnings announcement was in line

15    with expectations, I wouldn't necessarily expect to

16    see a stock price movement.

17             I mean, that would just be one such

18    example.

19        Q    In that example, if the announcement was in

20    line with expectations, would it be new?

21        A    To the extent that the company is stating

22    it?  I mean, there's all sorts of things in an

23    earnings report.

24             So, I mean, without -- I mean, my guess is,

25    yeah, there's certainly some information in there.

```
 1              I mean, is confirmation of expectations new
 2    information?  I mean, from a philosophical
 3    standpoint?  I would think so.
 4        Q    From an economist's standpoint, do you
 5    agree with that?
 6        A    Well, I think the information -- I think
 7    information -- let's say -- let's go back to my
 8    example.
 9              I believe that that information, even if
10    it's just confirming expectations, is material to
11    investors.
12              I would not nec- -- but, again, even with
13    that being material information and it is new to the
14    fact that it has confirmed previous expectations,
15    that would be something that would interest the
16    investing public.  And all other things equal, in a
17    vacuum, I wouldn't necessarily expect the stock
18    price to move.
19              Is now a good time for a break?
20              MR. HAKLAY:  It's been about 57 minutes.
21              THE WITNESS:  Is that a "yes" or "no"?
22              I would like to take a break.
23              MR. ISAJIW:  Okay.
24              We can go off the record.
25              MR. HAKLAY:  Okay.
```

1          THE VIDEOGRAPHER:  We are going off the
2     record.
3          The time is 11:42 a.m.
4          (At 11:42 a.m., the deposition of
5          ADAM WERNER, Ph.D., was adjourned
6          for noon recess.)
7     ///
8     ///
9          (At 12:37 p.m., the deposition of
10         ADAM WERNER, Ph.D., was
11         reconvened.)
12         THE VIDEOGRAPHER:  We are back on the
13    record.
14         The time is 12:37 p.m.
15
16              EXAMINATION (Continued)
17    BY MR. ISAJIW:
18     Q   Dr. Werner, I want to take you back to
19    Exhibit 4 of your report where you tally the number
20    of reports issued by analysts during the Class
21    Period in this case.  Page 104.
22         Was it important, in your view, that these
23    analysts issued a report as opposed to just
24    attending FXCM's earnings calls in connection with
25    your market efficiency analysis?

1      A    Again, I just present the information that

2   the courts ask for.  So if they want to know about

3   analyst's coverage, that's one of the Cammer

4   factors, that's what I present them with.

5      Q    When you're analyzing the Cammer factors,

6   it's not an important part of your analysis?  You're

7   literally just presenting the facts?

8      A    No.  I mean, I read the analyst reports,

9   review the analyst reports, but if you're asking

10  me --

11          THE WITNESS:  Can you repeat his initial

12  question, please.

13          (The record was read back as

14          follows:

15              "Question:  Dr. Werner, I want

16          to take you back to Exhibit 4 of

17          your report where you tally the

18          number of reports issued by

19          analysts during the Class Period in

20          this case.  Page 104.

21              Was it important, in your

22          view, that these analysts issued a

23          report as opposed to just attending

24          FXCM's earnings calls in connection

25          with your market efficiency

1        analysis?")

2            THE WITNESS:  That's not something I've

3   ever thought about.

4   BY MR. ISAJIW:

5        Q   And there are a number of reports listed

6   here.  Again, in your view, if there was a period of

7   time for a year or two where only one or two

8   analysts covered the report, would that be relevant

9   to your market efficiency analysis?

10       A   It's possible.

11       Q   Okay.

12           Is it something that you considered here?

13       A   I found that based on analyst coverage

14  and -- the analyst coverage for this stock supported

15  my finding on market efficiency.

16       Q   Let's switch back to Cammer Factor 3 in

17  connection with the common stock, which is

18  paragraph 34 of your report.

19       A   I'm sorry.  Does Exhibit 4, doesn't

20  Exhibit 4 deal with Cammer Factor 3 or --

21       Q   Exhibit 4 is analyst coverage; is that

22  right?

23       A   Yeah.

24       Q   In your view, is analyst coverage Cammer

25  Factor 3?

1      A    Well, it says (as read and/or reflected:)

2                Factor 3:   Prominent

3           Underwriters and Market Makers.

4           You suggested it was different the way you

5   posed your question.

6      Q    Maybe we misunderstood.  I was saying, I

7   want to go and focus now on Cammer Factor 3,

8   paragraph 34, of your report.

9           Where am I?

10     A    Paragraph -- oh, sorry.

11          MR. HAKLAY:  The market makers.

12          MR. ISAJIW:  Yes.

13          MR. HAKLAY:  Okay.

14          Analyst coverage is the early one.

15          MR. ISAJIW:  I was trying to move from

16  analyst coverage to market makers --

17          THE WITNESS:  Oh, I'm sorry.

18          MR. ISAJIW:  -- well, to Cammer Factor 3

19  more generally.

20          MR. HAKLAY:  Got you.  Thank you.

21          THE WITNESS:  Okay.

22  BY MR. ISAJIW:

23     Q    So if you look at paragraph -- I'm sorry --

24  33 of your report on page 14, second sentence, it

25  says (as read and/or reflected:)

1          The Cammer court stated,

2     quote, the existence of market

3     makers and arbitrageurs would

4     ensure completion of the market

5     mechanism; these individuals would

6     react swiftly to company news and

7     reported financial results by

8     buying or selling stock and driving

9     it to a changed price level.

10     Did I read that correctly?

11     A    That is correct.

12     Q    Okay.

13          What is your understanding of arbitrageurs,

14     as you use it in that sentence?

15     A    People who are trying to make arbitrage

16     profits.  Not in your common academic definition of

17     arbitrage, but ...

18     Q    What is the common academic definition of

19     arbitrage?

20     A    I think ac- -- and you'll forgive me.  It's

21     been years since I've actually looked at the formal

22     definition.  I believe it is making a riskless

23     profit.

24     Q    Okay.

25          And what do you think it means in

1    connection with how it's used in paragraph 33?

2        A    I think here it's more common understanding

3    of, you know, people trying to make money buying and

4    selling stuff.

5        Q    Okay.

6             Why would arbitrageurs be relevant to your

7    market efficiency analysis?

8        A    Oh, well, to the extent that there might be

9    market inefficiencies, oftentimes, that's how

10   arbitrageurs attempt to make money.

11       Q    How so?

12       A    What do you mean -- well, I mean, what do

13   we say?  Buy low, sell high?  Is that right?  Buy

14   low, sell high.  Yeah.  Sell high, buy low.

15       Q    So if there are inefficiencies, the

16   arbitrageur is attempting to capitalize on those

17   efficiencies; is that -- is that the concept?

18       A    Well, I mean, you call it an inefficiency.

19   They're attempting to -- I guess -- yeah, to the --

20   I believe actually that sentiment is correct.

21            To the extent that there are

22   inefficiencies, an arbitrageur would try to

23   capitalize on them.

24       Q    In connection with this analysis of FXCM

25   common stock, what investigation did you do to

1 determine whether or not there was the existence of
2 arbitrageurs, if any?
3     A   Well, I don't know if you -- I wouldn't
4 necessarily consider institutional investors
5 arbitrageurs.
6         Some institutional investors probably are
7 trying to make arbitrageur profits, so I'm not sure
8 how to answer that question.
9     Q   Sitting here today, do you believe that you
10 did an investigation into arbitrageurs in connection
11 with your analysis?
12     A   I don't think I ever looked at a piece of
13 paper that described any specific individuals or
14 firms, entities, agents as arbitrageurs.
15     Q   Is it fair to say, then, the arbitrageurs
16 did not factor into your analysis in connection with
17 this particular report?
18     A   Is it fair to say?  I don't know if it's
19 fair or unfair.
20     Q   Would you agree with it?
21     A   I don't know.  I mean, again, to the extent
22 that I don't know enough about the institutional
23 investors to know whether or not they're
24 arbitrageurs.
25     Q   Okay.

1    A    So the fact that they were institutional

2    investors certainly informed my opinion.

3    Q    And the fact you don't know enough about

4    them would be evidence that you did not

5    independently analyze them as arbitrageurs in

6    connection with your analysis?

7    A    I did not independently do research on the

8    trading strategies of the institutional investor.

9    That is correct.

10   Q    Okay.

11        Switching back to the selection -- not

12   switching back.

13        Let's switch gears to focus on your event

14   study in connection with Cammer Factor 5.

15   A    So now let me just ask a clarifying

16   question.  When we talk about events studies, for

17   the time being, we're focusing on the equity;

18   correct?

19   Q    Yes, for right now.

20   A    Okay.

21        So I should just assume that any question

22   you ask about an event study, at least during this

23   time period, you're referring to equity.

24   Q    I'll do my best to make sure the questions

25   are clear, but to the extent there's a difference

```
 1    that makes a difference and you believe it's
 2    unclear, please let me know.
 3              MR. HAKLAY:  So you should not assume that
 4    it's one and not the other unless he says so.
 5              THE WITNESS:  Yeah.  I guess -- right.
 6    That is exactly.
 7              MR. ISAJIW:  There's no question pending to
 8    clarify.  So if there is confusion, please let me
 9    know.  That's all I'm asking.
10              THE WITNESS:  No.  I'm just trying to save
11    time.
12    BY MR. ISAJIW:
13         Q   So for your event study -- before you
14    conducted the event study in this case, what did you
15    know about FXCM as a company?
16         A   Before I performed the event study?
17         Q   Correct.
18         A   I mean, I suppose I had probably read the
19    complaint and read some analyst articles before the
20    event study was performed.
21         Q   Anything else?
22         A   Not off the top of my head.
23              I mean, maybe I looked at the website.  I
24    honestly don't recall.
25         Q   Okay.
```

1         And when you're designing an event study,

2    how do you identify which dates to include in -- for

3    testing market efficiency?

4         A    Well, it depends on the situation.

5              I mean, typically, I think I -- with

6    regards to event studies, I almost always -- and I'm

7    now looking at page 25.  So this is paragraph 66 and

8    67.  I always attempt to at least as part of my

9    event study, or an event study, (as read and/or

10   reflected:)

11              Focus on disclosures of

12              information related to the

13              allegations in the Complaint.

14              I'm reading from paragraph 67.

15        Q    Okay.

16              And generally when you're designing an

17   event study, is there anything else that you almost

18   always look at, any other types of events?

19        A    In a litigation setting?

20        Q    In the setting of doing an expert report to

21   determine market efficiency.

22        A    It really depends on the company.

23              In this -- as I said, I always attempt to

24   use this third criterion or this third event that

25   I've highlighted in my last answer.  Beyond that,

```
                                              Page 116

 1   it's really on a case-by-case basis.
 2        Q    And the -- what you highlight, is that
 3   the -- I just want to make sure I understand
 4   correctly -- the allegations in the complaint?
 5        A    Correct.
 6        Q    Okay.
 7             You state in your report --
 8        A    I'm sorry to interrupt you.
 9             Just for clarification, are we making a
10   distinction between the event study and the
11   news/no-news analysis?
12        Q    For right now we're talking about the event
13   study.  I'll have questions about the news/no-news
14   analysis later on.
15        A    Right.  You understand that that is
16   based -- the analysis is based partially on my event
17   study.
18        Q    I don't understand what's in your report.
19   So I'm trying to understand.
20        A    Well, you perform -- in order to do a
21   news/no-news analysis, you have to perform an event
22   study.
23        Q    Okay.
24        A    So if we're talking about the event study
25   section as opposed to my news/no-news analysis,
```

1    that's fine.  I just wanted to make sure when you

2    were talking about event study, you were

3    specifically talking about this section and not an

4    event study in general.

5         Q    I thought that that was clear --

6         A    Well --

7         Q    -- but if it wasn't, I appreciate the

8    qualification.

9              I'm looking for when you were designing

10   your event study, the process by which you chose the

11   events to include in the event study.

12             And I believe that you said one of the

13   things that you always do is look at the events as

14   described in the complaint.

15        A    Well, I believe I said attempt to always

16   do, but, yes, that's accurate.

17        Q    Okay.

18             You state in your report at paragraph 68

19   that (as read and/or reflected:)

20                  An event study testing market

21             efficiency does not require a

22             comprehensive identification of all

23             events during the Class Period,

24             including all of those cited in the

25             Complaint.  An objective screen for

1           a market efficiency event study may

2           capture only some of those events.

3           Did I read that correctly?

4     A    That is correct.

5     Q    What is your objective screen process?

6     A    Again, it depends on the case.

7     Q    What was it here?

8     A    In terms of -- well, there was one

9    corrective disclosure, and I don't believe during

10   the Class Period there were any other -- what was

11   the term I used here?  Allegation-related events

12   during the Class Period.

13    Q    So your objective screen process included

14   looking at the corrective disclosures in the

15   complaint?

16    A    Well, I mean, no, if there was, like, in a

17   case, let's say, where there is some kind of

18   inflationary statement or the allegation is that,

19   let's say, your client in the middle of the Class

20   Period said we're earning a billion dollars in

21   drafts when, in fact, they weren't, that would

22   typically -- and I would typically, or I might look

23   at that.

24           So that wouldn't be a corrective

25   disclosure.  All right.

1       Q   So focusing on this event study for this

2   particular case, you looked at the corrective

3   disclosure and you discussed an objective screen.

4           I'm just asking what else was involved in

5   your objective screen for this case.

6       A   Well, that, to my knowledge, that is the

7   only -- I did not find any inflationary statements

8   made during the class, or I have not seen any

9   allegations, as I sit here today, about inflationary

10  statements or other corrective disclosures.

11          So the screen I used was, as I stated here,

12  focusing on disclosures of information related to

13  the allegations in the complaint.

14      Q   And how many events did you settle on after

15  your objective screen for this event study?

16      A   For this particular event?

17      Q   Correct.  For this particular event study.

18      A   Oh, for the particular event study.  In

19  full, three.

20      Q   Okay.

21          And those three were January 14th, 2012;

22  correct?

23      A   Well, that was one.

24      Q   Okay.

25      A   Wait.  Let me go there before we start

Case 1:21-cv-02900-PAC Document 568-16 Filed 66/12/2024 Page 123 of 387

```
 1    misquoting me.
 2         Q    I don't believe I was misquoting you.
 3         A    No, it's just possible.
 4              All right.  So where are we?  Selection and
 5    selective of acquisition.
 6         Q    Let me withdraw that question.
 7              Do you agree that you chose three event
 8    dates in connection with this event study?
 9         A    That is correct.
10         Q    And only three event dates in connection
11    with this event study?
12         A    I'm sorry.
13              THE WITNESS:  Can you reread the question.
14              (The record was read back as
15              follows:
16                   "Question:  Do you agree that
17              you chose three event dates in
18              connection with this event study?")
19              THE WITNESS:  I chose to look at three
20    events.  I believe there was another acquisition
21    that was small during the Class Period.  So if I was
22    looking at all acquisitions, I suppose I looked at
23    that event.
24              But there was -- I don't remember the exact
25    size, but it was extremely small and it wouldn't be
```

1    something that I would expect to result in a

2    material change in information about the company

3    that would result in a -- be significant enough to

4    result in an abnormal stock return.

5    BY MR. ISAJIW:

6        Q   So you did not include whatever that

7    acquisition was in your event study?

8        A   I -- that is correct.

9        Q   And your event study covers a Class Period

10   that is nearly five years long; is that correct?

11       A   That is correct.

12       Q   Are you comfortable drawing any reasonable

13   conclusions based on analyzing three days over a

14   five-year period?

15       A   Well, with -- in combination with my

16   news/no-news study, yes.

17       Q   What if you excluded the news/no-news study

18   and just looked at an event study three days for a

19   five-year Class Period?

20         MR. HAKLAY:  Objection.  Calls for

21   hypothetical.

22         THE WITNESS:  Right.

23         So in your hypothetical, I didn't do the

24   additional analysis.  I only looked at three days

25   during the Class Period.  It would really depend

1   on -- I would need to look at that on a case-by-case

2   basis.

3   BY MR. ISAJIW:

4       Q   As an economist conducting a market

5   efficiency analysis, would you have concerns

6   conducting an event study for a five-year period

7   based on three events?

8           MR. HAKLAY:  Objection.  Vague.

9           THE WITNESS:  Along with my news/no-news

10  analysis, in combination with those two things, no.

11  I clearly didn't have a concern, as I only looked at

12  three --

13  BY MR. ISAJIW:

14      Q   What about with -- I'm sorry.

15          MR. HAKLAY:  Finish the sentence.

16          THE WITNESS:  I only looked at three days.

17  BY MR. ISAJIW:

18      Q   What about excluding a news/no-news

19  analysis, would you have a concern?

20      A   So that's an incomplete hypothetical and I

21  would need -- it would really -- I would need to

22  determine that on a case-by-case basis.

23      Q   So as an economist, sitting here today, you

24  can't tell me whether or not you would have concerns

25  basing a five-year Class Period conclusion on three

Page 123

1    events without a news/no-news event study?

2            MR. HAKLAY:  Objection.  Vague.

3            I apologize.  I thought you were done.

4            THE WITNESS:  I refer to my previous

5    answer.

6    BY MR. ISAJIW:

7        Q    Okay.

8            In your prior work, have you ever looked at

9    a five-year class study with fewer than -- I'm

10   sorry.

11           Have you ever conducted an event study for

12   a Class Period of five years with fewer than three

13   events?

14       A    In a market efficiency analysis?

15       Q    Yes.

16       A    As I sit here, I don't recall.

17       Q    Sitting here today as an economist, do you

18   have a view on -- for a Class Period of five years

19   how many events would be too few events?

20       A    It's not anything I've thought about.

21           I mean, again, that is the purpose of

22   including a news/no-news analysis is it looks at

23   news over the entire Class Period.

24       Q    Okay.

25           So for the event study if you had two

Page 124

1  events over a five-year Class Period, that would not

2  cause you concern?

3       A   Again, it would have depended upon the

4  situation.

5            I mean, certainly, I looked at two days

6  during the bond event study period.

7            So ...

8       Q   Okay.

9            So the first day in your event study is

10 June 14th, 2012.  And that is the day that FXCM

11 announced the acquisition of Leucadia Markets; is

12 that correct?

13           I'm sorry.  Lucid Markets; is that correct?

14      A   That is correct.

15      Q   Okay.

16           Why did you decide to include this

17 acquisition event?

18      A   Well, in conducting my event study, and I'm

19 reading from paragraph 56 now (as read and/or

20 reflected:)

21                I reviewed the history of the

22           company over the course of the

23           Class Period as presented in news

24           articles, analyst reports, and

25           Company announcements and filings.

```
                                          Page 125

  1              The events during and immediately
  2              following the Class Period that I
  3              determined are appropriate for the
  4              inclusion in the market efficiency
  5              event study are June 14th, 2012;
  6              January 20th, 2015; and
  7              February 7th, 2017.  The events
  8              were selected on the following
  9              basis.
 10              And so if you wanted me to read
 11     paragraphs 57 and 58 as to how I chose that, I would
 12     be happy to do that as well.
 13        Q    We have your report.  So I don't want you
 14     to read it again.  I'm just asking for additional
 15     color, if you have it, on your selection process for
 16     these event studies.
 17        A    I think my report fully lays that out for
 18     you.  So ...
 19        Q    When you conduct event studies, do you
 20     always look for acquisition dates?
 21        A    Not necessarily.
 22        Q    Why did you look for acquisition dates for
 23     this event study?
 24        A    Well, so I'm reading from paragraph 57 (as
 25     read and/or reflected:)
```

1              In 2012, 2013 and 2014, FXCM's

2         business strategy included making

3         acquisitions to expand its customer

4         base -- if I'm going too fast let

5         me know -- in those markets where

6         it has low penetration.  The

7         Company acquired other companies

8         "to expand [its] presence and

9         capabilities in the institutional

10        marketplace."

11             Given FXCM's business

12        strategy, announcements of large

13        acquisitions could be expected to

14        impact the value of the Company.

15        It follows that on certain dates

16        when the Company announced a large

17        acquisition, the value of FXCM

18        common stock would be expected to

19        move.

20   Q    Thank you.

21        How many acquisitions did FXCM make during

22   the Class Period?

23   A    Well, let's see -- as I sit here, I believe

24   it was two.

25   Q    Okay.

Case 1:21-md-02989-RAR Document 568-16 Entered on FLSD Docket 08/12/2025 Page 130 of 387

1         How many did you include in your event

2    study?

3         A    One.

4         Q    On what basis did you exclude the second

5    acquisition that you're aware of?

6         A    It was small.  And as an economist, I

7    wouldn't have expected it to have a statistically

8    significantly impact on the stock price.

9         Q    What is the threshold by which you

10   determined it was small?

11        A    As I sit here, I don't recall.

12        Q    Did you test whether or not it has a

13   statistically significant result on the stock price?

14        A    Well, to the extent that my Event Study

15   Results are presented in -- let's see where it is

16   here.

17        Q    Just before you go in there, does the

18   second acquisition that you did not include in your

19   event study include the -- would that be included in

20   your results?

21        A    Well, the abnormal return on that date

22   would be included in my results.  So yes.

23        Q    Okay.

24             Sitting here today --

25        A    I'm just -- hold on.  Let me just refresh

```
                                         Page 128

 1   my recollection.
 2        Q    I don't believe there's a question pending.
 3        A    Oh, okay.  Go ahead.
 4        Q    Sitting here today, and I -- is there --
 5   can you give me any explanation for why you excluded
 6   this second acquisition?
 7             MR. HAKLAY:  Objection.  Asked and
 8   answered.
 9             You may answer again.
10             THE WITNESS:  Yeah, it was too small.
11   BY MR. ISAJIW:
12        Q    Okay.
13             And do you have any recollection on how
14   small it was?
15        A    I do not.
16        Q    Do you remember if it was half the size of
17   the event -- the acquisition that you included?
18        A    At this point, I would be speculating.  I
19   believe it was smaller than that.  But I do not
20   recall.
21        Q    And is that information included anywhere
22   in your report?
23        A    It -- I don't believe so.
24        Q    Okay.
25             The second event that you chose was the
```

Page 129

1  January 20, 2015; is that correct?

2      A    That is correct.

3      Q    And why did you choose that day?

4           I'm sorry.  I'll withdraw that question.

5           Do you recall that that was the day that

6  the Swiss National Bank had a flash crash?

7      A    I believe that's correct.

8      Q    And that was the day that FXCM announced a

9  $225 million loss and a possible regulatory capital

10  breach?

11     A    Let me just look at the data to fully

12  refresh my memory.

13          Yeah, I believe that's correct.

14     Q    What is your understanding of FXCM's

15  regulatory capital requirements?

16     A    As I sit here today, I don't remember.

17     Q    You don't remember, does that imply that

18  you at one point knew but don't remember now?

19     A    I believe that's correct.

20     Q    Generally speaking, what is your

21  understanding of a regulatory requirement?

22     A    Well, it's usually a requirement stated by

23  a government agency or some kind of -- I don't know,

24  I mean, I suppose if you -- I don't know if you

25  consider things like this CFTC a government

```
                                        Page 130

 1   agency -- requirement with regards to how much

 2   capital they have.

 3        Q    Okay.

 4             In this case, do you know which regulator

 5   was relevant to the regulatory capital requirement

 6   for FXCM?

 7        A    I can refresh my memory by looking at the

 8   press release by the company on January 15th, 2015.

 9             But as I sit here right now -- well, hold

10   on.  I may be able to give you an answer to that

11   question.

12             MR. HAKLAY:  Can you hang on a second while

13   you do that?

14   BY MR. ISAJIW:

15        Q    Let me ask a different question.

16             Are regulatory capital breaches normally

17   something that you would look for when conducting an

18   event study?

19        A    It depends on the situation.

20        Q    What situations would you look for

21   regulatory capital events when conducting an event

22   study?

23        A    Well, I mean, so by way of example, one

24   that would require a 300-million-dollar infusion of

25   cash would certainly be one.
```

Page 131

1      Q   Have you ever used a regulatory capital

2   breach in any other market efficiency event study?

3      A   I believe so.

4      Q   Which ones?

5      A   I don't recall.  Certainly -- I've

6   certainly worked on FDA cases where that's been the

7   case.

8          Yeah, at least some.  Yes.

9      Q   Were you aware of the January 2015

10  regulatory capital breach before you conducted your

11  event study?

12     A   Well, I believe I had read about it prior

13  to conducting my event study.

14     Q   Was that in the complaint?  Meaning, did

15  you read about it in the complaint?

16         I don't think it's -- I don't want to

17  require you to read the entire complaint.

18         Would it be fair to say that you likely

19  found out about the regulatory capital event from

20  the complaint?

21     A   I don't know.

22     Q   Can you think of any other source where you

23  would have found out about it?

24     A   Yeah.  Sure.  In my review of news and

25  analyst reports.

1      Q    And is regulatory capital violations

2    something that you typically review for when

3    designing an event study in connection with a market

4    efficiency analysis?

5      A    As I stated -- yeah.  So I'm going back to

6    paragraph 56.  (As read and/or reflected:)

7                  To identify appropriate event

8             dates for the market efficiencies

9             event study I reviewed the history

10            of the Company over the course of

11            the Class Period, as presented in

12            news articles, analyst reports, and

13            Company announcements and filings.

14     Q    When you start any event study, not

15    necessarily this one, is regulatory capital events

16    one of the things that you look out for when you're

17    looking at a company's reports?

18     A    I typically do the exact same process that

19    I just described.

20            Oftentimes, there are not regulatory

21    capital breaches in some of my cases.  So to the

22    extent that those are not in any news related to an

23    additional company, I don't review them.

24     Q    The third event that you chose was

25    February 6th -- the third date was February 6th,

Page 133

1    2017, and that's the alleged corrective disclosure

2    event.

3              Is that correct?

4         A    Correct.

5         Q    Okay.

6              And I think you testified -- well, sorry.

7    I don't want to -- do you always use alleged

8    corrective disclosure events in your market

9    efficiency studies?

10        A    To the extent that I believe they were

11   material, I attempt to.

12        Q    And how do you determine that they were

13   material before conducting the study?

14        A    Well, I mean, there are certain, you know,

15   there may be things mentioned in a complaint that

16   have nothing to do with the alleged allegations.

17   And so I would typically ignore those.

18        Q    So your process to determine which events

19   to include in the event study come from a review of

20   the complaint and a judgment as to which ones you

21   believe are material to the allegations in the

22   complaint?

23        A    In addition to the process I described

24   previously.

25        Q    Which was what?

```
                                              Page 134

 1         A    Again, reading from paragraph 56 (as read
 2    and/or reflected:)
 3                    To identify --
 4         Q    If that's what you're referring to, you
 5    don't need to reread it.  I wanted to make sure that
 6    when you said what I had described previously that
 7    we were on the same page.
 8         A    Did you -- oh, okay.
 9         Q    In paragraph 8 of your report, you state
10    that (as read and/or reflected:)
11                    FXCM common stock traded in an
12               efficient market during the Class
13               Period.
14               Does that mean that you conducted -- that
15    you concluded that the stock traded in an efficient
16    market on each day during the Class Period?
17         A    My conclusion is that it traded in an
18    efficient market throughout the Class Period.
19         Q    Okay.
20         A    That is my conclusion.
21         Q    And so --
22         A    That is what I was asked to perform.
23    That's what I concluded.
24         Q    And does that conclusion mean that you
25    concluded that it traded in an efficient market on
```

1    each day of the five-year Class Period?

2            MR. HAKLAY:  Objection.  Asked and

3    answered.

4            THE WITNESS:  I've explained to you what I

5    have been asked to do.  That's what I did.

6    BY MR. ISAJIW:

7        Q    Sitting here today, based on the analysis

8    that you did, did you conclude that FXCM common

9    stock, in fact, traded in an efficient market in

10   each day of the five-year Class Period?

11       A    Again, I was asked to determine whether or

12   not the stock traded in an efficient market during

13   the Class Period.  That is what I did -- did an

14   analysis on, and that's what I concluded.

15       Q    Would you agree that over a five-year Class

16   Period a market for a particular security could be

17   efficient at some periods and inefficient during

18   other periods?

19       A    So you're asking me a hypothetical based --

20   the question is could it occur?

21       Q    That's my question.

22       A    Anything -- almost anything can occur.  So

23   based on that definition, it is possible.

24       Q    Okay.

25            Did you do an analysis in this case to

Page 136

1   determine whether it did occur?

2        A    Again, I was asked to determine whether or

3   not the stock was efficient during the Class Period.

4   That is what I looked at.

5        Q    So when you come to the conclusion that it

6   was efficient -- it traded in an efficient market

7   during the Class Period, are you inferring that

8   trading over the whole Class Period for FXCM common

9   stock was efficient based on your sample of -- based

10  on your sample event of three days?

11       A    Again, I performed a news/no-news analysis.

12  I did my event study.  I looked at the other eight

13  Cammer factors or other seven Cammer factors and

14  determined that the stock traded in an efficient

15  market during the Class Period.

16       Q    You also state that (as read and/or

17  reflected:)

18                FXCM Notes traded in an

19           efficient market during the portion

20           of the Class Period when they

21           traded, which is June 24th, 2014,

22           through February 7, 2017.

23           Is that correct?

24       A    That is correct.

25       Q    In your opinion, does that mean that the

1  bond also traded in an efficient market on each day

2  between June 24th, 2014, and February 7th, 2017?

3      A   Again, my finding was that the stock -- I'm

4  sorry -- the bonds traded in an efficient market

5  through June 24th, 2014, through February 7th, 2017.

6          That's what I was asked to opine upon.

7  That's the analysis I performed.  That's the

8  conclusion I reached.

9      Q   And did you do any -- other than what's in

10  your report, did you do any direct testing of the

11  efficiency of markets on a daily basis throughout

12  the Class Period for either the notes or the stock?

13      A   I'm confused.

14          What do you mean by tested for efficiency

15  on a daily basis?  Like explain -- describe one of

16  these tests to me.

17      Q   I'm asking what test you did.

18      A   Well, I told you what I did.  And I told

19  you that I determined the stock traded in an

20  efficient market over the Class Period, and it's

21  traded during an efficient market during those --

22  its period.

23      Q   And my question was:  Other than the test

24  described in your report, did you perform any

25  others?

1      A    Oh, other than the tests performed in my

2  report?  I don't believe so.

3      Q    Okay.

4           When you were designing your event study,

5  did you look at earnings days as potential events?

6      A    Well, to the extent that 8-Ks possibly

7  looked -- talk about earnings, I certainly did my

8  news/no-news analysis.

9      Q    So focusing on the event study portion of

10  your analysis, did you include any earnings days?

11      A    Unless -- I don't know.  I mean, let me

12  look at their 10-Qs.  I don't know if there was an

13  overlap between the event days I used and the

14  issuance of 10-Qs.

15           I assume when you say "earnings days," are

16  we just talking about 10-Qs and 10-Ks?  Is that your

17  definition of an earnings day?

18      Q    Would any other events be included in your

19  definition of earnings days?

20      A    Not typically.  But, again, it's -- it

21  would depend on the situation.  I suppose you could

22  have, I don't know, when you consider -- well, I

23  don't want to speculate.

24           So let's look at their ...

25           Do you have a pen I can borrow?  Do you

```
                                          Page 139

 1   have a piece of paper?

 2            MR. HAKLAY:  I do.

 3            THE WITNESS:  Thank you.

 4            I'm more than happy to turn this over to

 5   you, which I'm obligated to do.

 6            Hold on one second.

 7   BY MR. ISAJIW:

 8       Q    Let me ask a different question.

 9       A    Okay.

10       Q    The three days that we just discussed which

11   were included in your event study, were any of them

12   included because they were an earnings day?

13       A    I stated the reason why I chose them.

14            (Reporter clarification.)

15            THE WITNESS:  I guess the logical

16   conclusion is no.

17            MR. ISAJIW:  Okay.

18            MR. HAKLAY:  He said, "why I chose them."

19   BY MR. ISAJIW:

20       Q    Were there earnings days, during the

21   five-year class periods, available to include in

22   your event study?

23       A    There were certainly earnings days.  I

24   don't recall whether or not those earnings days were

25   earnings surprises.
```

```
                                                      Page 140

 1              I mean, look, that's what -- that's one of

 2      the difficulties in performing an earnings day event

 3      study.

 4              Most of the time when earnings are -- meet

 5      expectations, you don't typically see a

 6      statistically significant stock price movement.

 7              So looking at those days doesn't really

 8      provide you with any information.

 9              Now, in a lot of these classes; right, the

10      end of the Class Period or one of the corrective

11      disclosures might be in an earnings announcement,

12      and so then you'd certainly look at an earnings day.

13              But so over, like, if I were to look at a

14      five-year Class Period, my expectation on how many

15      of those earnings days would contain new material

16      information that would cause -- that were severe

17      enough to cause a statistically significant stock

18      change, or stock decline, stock increase, would be

19      relatively low.

20      Q    What -- did you do an analysis to determine

21      that in this case when you conducted -- when you

22      designed your event study?

23              THE WITNESS:  Can you reread the question,

24      please.

25              (The record was read back as
```

```
                                                    Page 141

 1              follows:

 2                   "Question:  Did you do an

 3              analysis to determine that in this

 4              case when you conducted -- when you

 5              designed your event study?")

 6              THE WITNESS:  I don't understand the

 7     question.

 8     BY MR. ISAJIW:

 9         Q    Did you do an analysis in connection with

10     your event study in this case to determine whether

11     or not earnings days were appropriate to include?

12         A    To the extent that I, again -- well, rather

13     than go there.  I refer you to paragraph 56.  And so

14     to the extent that there were earnings days during

15     the Class Period, yes, certainly would be something

16     I considered.

17         Q    Let me point you to paragraph 76 of your

18     report, page 29.

19              When you were conducting your event study

20     for the stock here, you chose to break the Class

21     Period up into yearly sub periods; is that correct?

22         A    That is correct.

23         Q    Okay.

24              Can you give me an explanation as to why

25     you chose to do that?
```

```
 1        A    Based on my experience.
 2        Q    What in your experience suggested that
 3   breaking it up into sub periods was appropriate?
 4        A    Something I've oftentimes seen based on the
 5   fact that there was a structural break in the
 6   company's stock.  All those things informed my
 7   opinion.
 8        Q    All which things?
 9        A    All the things I just mentioned.
10        Q    It's something you've often seen and based
11   on the fact that there was a structural break in the
12   company's stock.
13             Any other things?
14        A    Oh, it's something that has commonly been
15   accepted by courts, also would be another.
16        Q    What difference in the analysis would there
17   be if you did not break it up into sub periods?
18             MR. HAKLAY:  Objection.
19             In this case or is it a hypothetical?
20             MR. ISAJIW:  In this case.
21             MR. HAKLAY:  Okay.  Thank you.
22             THE WITNESS:  Well, given that there was a
23   structural break, my guess is you would have some
24   weird regression results.
25   ///
```

Page 143

BY MR. ISAJIW:

    Q   And what do you mean by "structural break"?

    A   Well, the stock -- as of the flash crash, the stock traded differently before and after that date.

    Q   Okay.

    In paragraph 76 you say (as read and/or reflected:)

          Prior to running a regression,
          one often decides on an event
          window over which to measure the
          relationship between the security
          at issue and the corresponding
          market and/or industry factors.

          Given that the Class Period in
          the current case for FXCM is
          approximately five years in length,
          and so that the regression
          estimates would be relatively
          contemporaneous for the events I
          [verbatim] tested, I ran
          regressions on a daily returns
          covering the entire Class Period
          broken down into 252 day periods.
          Did I read that correctly?

```
                                        Page 144

 1        A    Where are you reading from?

 2        Q    Paragraph 76.

 3        A    Well, do you want to reread it?

 4        Q    I don't.

 5        A    Will you stipulate that what you read was

 6   from my report?

 7             MR. HAKLAY:  It was.

 8             MR. ISAJIW:  I generally don't stipulate

 9   with witnesses.

10             MR. HAKLAY:  That's fine.  There was one

11   word, whatever, it was not important.

12             THE WITNESS:  He just -- I didn't know that

13   he was reading from my report.

14   BY MR. ISAJIW:

15        Q    I'm not trying to be argumentative.  I'm

16   literally just trying to understand the process

17   here.

18        A    Okay.  But then just point me to the

19   paragraph.  And I'm happy -- if you're reading from

20   the report, just tell me, hey, we're on

21   paragraph 56, or whatever it is.

22        Q    I believe I've pointed you to --

23        A    Paragraph 76.

24        Q    -- 76 a number of times.  But, again, I'm

25   asking you, feel free if you have questions or if
```

Page 145

1    I'm not clear, let me know.

2             What I want to focus you on in this report

3    is in connection with your breaking this down into

4    multiple sub periods, you say, in paragraph 76, that

5    (as read and/or reflected:)

6                  The regression estimates would

7              be relatively contemporaneous for

8              the events being tested.

9              Do you see that?

10   A    Yes, I do.

11   Q    Okay.

12            What do you mean by "relatively

13   contemporaneous"?

14   A    Well, that's when the events are taking

15   place.  So in just, I guess, a common understanding

16   of what contemporaneous means.

17   Q    That's when which events are taking place?

18   A    Well, events throughout the -- I mean,

19   announcements are being made throughout the entire

20   Class Period; right.  There is news being released

21   during the entire Class Period.

22            So when I say "contemporaneous," I mean

23   contemporaneous when the news is being released.

24   Q    Are you talking about the news related to

25   the three dates you chose as the basis of your event

```
                                            Page 146

 1   study?

 2        A    I'm talking about all company news.

 3             So, again, referring to paragraph 56.

 4        Q    So you chose five regression estimation

 5   periods here, March 15th, 2012, to February 1, 2013;

 6   February 4, 2013, to February 3, 2014, et cetera.

 7   This is the last couple of sentences of

 8   paragraph 76; is that right?

 9        A    That is correct.

10        Q    How did you decide how many sub periods to

11   use in connection with this analysis?

12        A    Well, when I decided to use annual trading

13   days -- or annual -- what do I say here?  When I

14   decide to use a full year of data, that's how the

15   sub periods broke up.

16        Q    Is it fair to say that you broke it out --

17   you broke the analysis out into sub periods because

18   stocks may behave differently during the sub periods

19   in connection with your analysis?

20        A    Is it safe to say?

21             I'm not sure I would use that terminology.

22        Q    I believe I said "fair."

23        A    Oh, I'm sorry.

24             THE WITNESS:  Could you reread the

25   question.  Maybe I misunderstood it.
```

Case 1:21-cm-10990-MG-RA-DM-entD568-1 nentFi8ed-d 6iled-L067122020etPa0e0142021 3P5age 150 of 387

1           (The record was read back as
2           follows:
3               "Question:  Is it fair to say
4           that you broke the analysis out
5           into sub periods because stocks may
6           behave differently during the sub
7           periods in connection with your
8           analysis?")
9           THE WITNESS:  I don't know if I would
10  say -- I'm not sure I would use the word "fair."  I
11  mean, it's something I've done before.  It's
12  something I did in this case.
13  BY MR. ISAJIW:
14      Q   Is it true to say that you broke -- that
15  you broke out the analysis into sub periods because
16  stocks may behave differently during the sub periods
17  in connection with your analysis?
18      A   I'm sorry.
19          THE WITNESS:  Can you reread the question,
20  please.
21          (The record was read back as
22          follows:
23              "Question:  Is it true to say
24          that you broke out the analysis
25          into sub periods because stocks may

```
                                              Page 148

 1              behave differently during the sub

 2              periods in connection with your

 3              analysis?")

 4              THE WITNESS:  I don't know if it's true or

 5   not.  I'm not quite sure.

 6              I don't understand the question.

 7   BY MR. ISAJIW:

 8      Q   So other than what's in your report, do you

 9   have -- can you give me any other explanation as to

10   why you broke this out into five sub periods?

11      A   You mean other -- other than what's in my

12   report and what I've stated previously in my

13   deposition?

14      Q   Correct.

15      A   I don't believe so.  I mean -- well, I

16   mean -- yeah.  We'll leave it at that.  That's fine.

17      Q   I'm just trying to get your best answer as

18   to why you conducted the analysis in this way.  And

19   if you believe you've already given me your best

20   answer, that's great.

21              And if not, that's what I'm trying to

22   understand.

23      A   Okay.

24              Let -- let -- well, I don't want to --

25              MR. HAKLAY:  There's no question for you.
```

1            THE WITNESS:  Right.  That's correct.  Yes.

2            MR. HAKLAY:  Don't worry.  He'll ask

3      another one.

4      BY MR. ISAJIW:

5          Q   So let's turn to Exhibit 8a of your report

6      on page 165.

7            Backing up for a second.

8            When you were doing your study in

9      connection with this report, did you find that FXCM

10     financial and market positions changed throughout

11     the Class Period?

12         A   What do you mean by their "market

13     positions"?

14         Q   Let's say financial position.

15         A   That's still vague.  I don't understand the

16     question.

17         Q   As an economist, you don't understand what

18     a financial position of a company would be in

19     connection with an analysis throughout a Class

20     Period in a securities litigation case?

21            MR. HAKLAY:  That's actually not a

22     question.

23            Please ask one.

24            MR. ISAJIW:  I believe it was a question.

25         Q   What do you understand about -- just based

Page 150

1    on your common understanding as an economist -- a

2    company's financial position throughout a Class

3    Period?

4         A    Well, okay.

5              So let me ask a clarifying question.

6              So, I mean, if we're talking about, let's

7    say, Apple, all right.  And we talked about their

8    financial position, I would look at, you know, their

9    market -- not their market structure, sorry, their

10   capital structure.

11             If you're talking about a trading firm and

12   you're talking about -- we certainly -- we could

13   look at a --

14        Q    I'm talking about FXCM.

15        A    Can I -- I'm trying to answer the question

16   to the best of my ability.

17             You have asked a vague question.

18             MR. HAKLAY:  Please continue.

19             THE WITNESS:  So when you say "financial

20   position," do you mean as in the holdings of the

21   company, which oftentimes when you're talking about

22   an investment firm is referred to as a financial

23   position?

24             Or are you referring to the firm's

25   financials, as in the SEC filings?

1    BY MR. ISAJIW:

2         Q    I think I'm referring to both collectively.

3    But what I'm asking you is, do you have a general

4    understanding of the term "a firm's financial

5    position"?

6              MR. HAKLAY:  Objection.  Asked and

7    answered.

8              MR. ISAJIW:  Well, it was asked.

9              MR. HAKLAY:  It was answered.

10             THE WITNESS:  Like I --

11             MR. HAKLAY:  He told you there's more than

12   one -- one possibility.  That's an answer.

13             Go ahead, sir.

14             THE WITNESS:  Like I said, it varies from

15   firm to firm.

16   BY MR. ISAJIW:

17        Q    Okay.

18             Looking at Exhibit 8a, this is (as read

19   and/or reflected:)

20                  FXCM Common Stock Regression

21             Results, Estimation Period:

22             March 15, 2012, through February 1,

23             2013.

24             Can you just explain to me what this

25   exhibit demonstrates at a very high level.

Case 1:21-cv-02900-CJN Document 568-16 Filed 05/12/2025 Page 155 of 387

1      A    Yeah.  It's a market model with the results
2   of my regression.
3      Q    Okay.
4           So what does R squared, for instance, mean?
5      A    I'm not sure -- can I give you a formal
6   definition?
7      Q    Informal is fine.  You asked me a question.
8      A    No.  No.  Sorry.  I was talking out to -- I
9   was speaking out to myself.  I apologize.  It seemed
10  as if it was a question to you.
11          It just -- in some sense, it just explains
12  how -- how much of the model is described -- how
13  much of the data is described by the model.
14     Q    Okay.
15          And what about adjusted R squared?
16     A    That's typically -- it would be the same
17  answer, but it's adjusted for the number of
18  variables included in the model.
19     Q    Standard error.
20     A    Would just be, I don't know, if you want to
21  think of it as a variance of the model.
22     Q    Okay.
23          Jumping down below, we have coefficients.
24  Intercept coefficient.
25          What does that indicate?

Page 153

```
 1        A    It's the coefficient on the intercept.
 2        Q    Market index.
 3        A    The term "market index" or "coefficient on
 4   the market index"?
 5        Q    Coefficient on the index demonstrates what?
 6        A    It's the coefficient on the market index.
 7   Let me -- I'll give you a more formal definition.
 8             It is a measure of the relationship between
 9   how the market moves on a daily basis and how the
10   common stock moves on a daily basis, if we're just
11   talking about this particular regression analysis.
12        Q    I am.
13             And what about peer index?
14        A    Similar to the answer I just gave you, but
15   it's with regards to peers as opposed to the market.
16        Q    Those two index, which measure against the
17   market and the peer, they can change over time; is
18   that correct?
19        A    That is -- when you say "they can change
20   over time," you mean their components can change
21   over time?
22        Q    I mean the coefficients, the calculation.
23        A    So that's -- okay.  So now you're asking
24   can the coefficients change over time?
25             Certainly.
```

1      Q    Okay.

2           And in connection with your analysis, they

3  did change substantially between the different

4  periods that you looked at; is that correct?

5      A    They changed over the different periods I

6  looked at.

7      Q    So, for instance, the one that we're

8  looking at now on page 165, we have a market index

9  of 0.691.

10     A    Yep.

11     Q    And a peer index of 0.357?

12     A    Uh-huh.

13     Q    And a standard error of 2.05?

14     A    Correct.

15     Q    Okay.

16          And if you turn to 8d, which is 168.

17     A    All right.

18          What are we looking at again?  I'm sorry.

19  Can you read back the question.  I need to write

20  these down.

21     Q    I'll try to do this as easy as possible.

22     A    I want to look at them side by side.

23     Q    That's fine.  Look at page 165.

24     A    Yeah.

25     Q    Okay.

1          Grab page 166 in your right hand, flip it

2     over and you will see 8d, 168; right?

3          A    Yeah.   I want to be able to look at the

4     numbers together --

5          Q    I got you.

6          A    -- to compare them.

7               Do you want to give me one of those?  I'm

8     happy to look.   Just give me two.

9               MR. HAKLAY:   Why don't you look at 165 here

10    and he can show you 168, and then you'll have them

11    next to each other.

12              THE WITNESS:   There you go.

13    BY MR. ISAJIW:

14         Q    So for 8a, the market index is 0.691;

15    correct?

16         A    That's what it says, yes, correct.

17         Q    And then 8d, the market index is 0.023?

18         A    Correct.

19         Q    Okay.

20              Would you characterize that as a change

21    over time?

22         A    It's certainly different.

23         Q    Okay.

24              And is it a substantial change over time?

25         A    My guess is if I ran some statistical

Case 1:21-md-02989-RLR Document 568-16 Entered on Filed 06/13/2022 Page 159 of 387

1  analyses, there would be a statistically significant

2  difference between those two coefficients.

3      Q   And then the peer index on 0.357 on 8a.

4  And if you look at 8d, which is for the period of

5  February 6, 2015, through February 5, 2016, we have

6  0.579.

7      A   Correct.

8      Q   Okay.  Again, would you characterize that

9  as a substantial change over time?

10     A   It's certainly different.  I don't -- I --

11 I'm not sure if it would be statistically

12 significantly different.

13     Q   And then the standard error in 8a is 2.05.

14 And the standard error in 8d for this other period

15 is 6.59.

16         Do you see that?

17     A   I do.

18     Q   Okay.

19         Again, would you agree they are

20 substantially different?

21     A   Again, I will -- I agree that they are

22 different.

23     Q   How would you -- you have no

24 characterization for the extent to which they are

25 different?

Case 1:21-md-02989-RAR Document 568-16 Entered on FLSD Docket 08/12/2025 Page 160 of 387

1      A    They're different.  I mean, if I were to --

2    if someone were to ask me to perform statistical

3    tests, I could determine whether or not they were

4    statistically significantly different.

5           And I guess when -- if there's some formal

6    definition of substantial, I mean, we talk about

7    significant in economics and then we talk about

8    statistically significant.  So that has a standard

9    meaning.

10          Substantial, if you're measuring it by

11   differences in coefficients, I don't -- I'm not

12   quite sure how to -- how to answer in economic

13   terms.

14     Q    Would you say it's a de minimis difference

15   between the two?

16     A    I haven't even thought about that.

17     Q    An insignificant difference between the

18   two?

19     A    Is it insignificant?

20          Again, so now you're using formal

21   definitions.  I would need to form -- I would need

22   to perform a statistical test to determine whether

23   or not it's insignificant or significant.

24     Q    What do those differences represent in

25   terms -- just looking at the market index, what does

1    the difference represent?  The market index you

2    described is a relationship between -- I'm sorry.

3    Can -- you can look back.

4          How did you describe the market index and

5    what that means?

6       A   You mean the coefficient on the market

7    index?

8       Q   Yes.

9       A   It's how the underlying stock responds, on

10   average, to changes in the market index.

11      Q   Okay.

12         And so the 0.691, as compared to 0.023, how

13   would you -- what would drive that difference?

14      A   What would drive the difference?

15      Q   What would the difference in the

16   coefficients indicate in terms of the measurement

17   that you're trying to achieve here?

18      A   That during that one-year period in

19   Exhibit A, a 1 percent increase in the market would

20   result in a 0.691 percent increase in the underlying

21   stock.  A 1 percent -- in the second example, a

22   1 percent increase in the market would result in

23   a 0.023 percent change in the stock.

24      Q   Okay.

25         And the same question for the peer index.

```
                                          Page 159

 1        A    I'm sorry.

 2             THE WITNESS:  Can you repeat the question,

 3   please.

 4             (The record was read back as

 5             follows:

 6                  "Question:  What would the

 7             difference in the coefficients

 8             indicate in terms of the

 9             measurement that you're trying to

10             achieve here?")

11   BY MR. ISAJIW:

12        Q    I'm trying to get the same explanation for

13   the peer index.

14        A    So here it looks like a 1 percent -- and

15   this is Exhibit 8a -- a 1 percent change in the peer

16   index would result in a 0.357 percent increase in

17   the underlying stock.

18             And the -- and in the other, this is

19   Exhibit 8d, a 1 percent increase in the peer index

20   would result in a 0.579 percent increase in the

21   underlying stock.

22             Now, I'm just talking about positives.

23   Obviously, it could also be negative.

24             MR. HAKLAY:  Finish your subject.  We're

25   getting close to an hour.  I'm not suggesting we
```

```
                                        Page 160
 1    break right now, but close.
 2              MR. ISAJIW:  You know what, this is as good
 3    a time as any to take a break.
 4              MR. HAKLAY:  Okay.
 5              THE VIDEOGRAPHER:  We are going off the
 6    record.
 7              The time is 1:34 p.m.
 8              (Recess was taken at 1:34 p.m.
 9              until 1:47 p.m.)
10              THE VIDEOGRAPHER:  We are back on the
11    record.
12              The time is 1:47 p.m.
13    BY MR. ISAJIW:
14         Q   Just before we broke, we were discussing
15    your regression analysis for the common stock and
16    the five regression estimate periods you used in
17    connection with that analysis.
18              Correct?
19         A   Correct.
20         Q   Okay.
21              Did you use any regression estimation
22    periods in connection with your analysis of the bond
23    in this case?
24         A   Did I use any -- I'm sorry.  Can you repeat
25    the question?
```

1     Q    Let me ask it, hopefully, better.

2          You broke your analysis for the common

3    stock into five sub periods; correct?  Paragraph 76

4    of your report.

5     A    That is correct.

6     Q    Did you break your analysis of the bond

7    into any sub periods in connection with your

8    analysis?

9     A    No.  The estimation period I used on the

10   bonds or the notes was June 24th, 2014, through

11   August 16, 2016.

12    Q    Why didn't you subdivide that into sub

13   periods?

14    A    It was after the -- well, hold on.  Before

15   I answer that.

16         That's a good question.  I certainly could

17   have.  I don't think it would change my results at

18   all.

19    Q    Was it a conscious decision not to?

20    A    No.

21    Q    Okay.

22         Focus on paragraph 77 of your report,

23   page 29.

24         Do you have paragraph 77?

25    A    Yeah.

```
                                                  Page 162

 1        Q    Great.

 2             In this paragraph you described using (as

 3   read and/or reflected:)

 4                  (Dummy) variables to control

 5             for potential abnormal returns on

 6             news events for which the company

 7             filed a form 8-K with the SEC.

 8             Can you explain to me at a high level

 9   what -- why you used dummy variables and what you

10   were trying to achieve there.

11        A    Well, so if you -- really at least with

12   regards to these specific dummy variables, this goes

13   to my news/no-news test.

14             So -- so to the extent that I define -- and

15   I'm looking at starting at paragraph 96 (as read

16   and/or reflected):

17                  I conducted an empirical test

18             to compare the stock price

19             reactions on a sample of "news

20             days" to all other "non-news days."

21             If the underlying assumption is that those

22   days are news days, I typically want to don't use --

23   I mean, I would want to adjust for them somehow.

24             That having been said, if I exclude the

25   dummy variables, it doesn't change my results.
```

1      Q   So what is the use of the dummy variable

2  designed to achieve?

3      A    What is it designed to achieve?

4          It's designed -- I don't quite understand

5  the question.

6          It's -- yeah.  I don't -- I'm sorry.  I

7  don't understand the question.

8      Q   You are focusing, in this analysis, on what

9  you term as "news days"; is that correct?

10     A   Now, we're looking, again, at that

11  paragraph I was just citing?  What are you -- are we

12  talking about the news/no-news analysis, or are we

13  talking about the event study?

14     Q   So I'm talking about the use of dummy

15  variables.

16         Let's back up.

17         Your use of dummy variables to control for

18  potentially abnormal returns on news events for

19  which the company filed a form 8-K with the SEC, was

20  that in connection with the event study or the

21  news/no-news analysis?

22     A   Well, because I did a news/no-news analysis

23  on days on which Company filed a form 8-K with the

24  SEC, that, I, then, included those dummy variables

25  in the market models I used.

```
                                           Page 164

 1        Q    Okay.  So I'm trying to understand the

 2   process.

 3             You didn't include all 8-K days in your

 4   news/no-news analysis, or did you?

 5        A    I didn't include all 8-K days.

 6             I believe I used all 8-K days during the

 7   Class Period.

 8        Q    For some of the 8-K days, did you use a

 9   dummy variable?

10        A    Oh, for each of the 8-K days, I used a

11   dummy variable.

12        Q    Okay.

13        A    Because under my news/no-news test, I am

14   trying to come up with an objective definition of

15   news.

16             And so I define "news" as 8-K days.  To the

17   extent that the underlying assumption is, is that

18   the stock price would move on those news days, I

19   would usually want to remove that abnormal movement

20   out of my market models.

21             So it's something I commonly do.

22        Q    So is it fair to say you're trying to

23   estimate the volatility of the stock to benchmark

24   whether the price movement is normal or abnormal?

25        A    I'm sorry.
```

```
                                              Page 165

 1              THE WITNESS:  Can you read back that
 2    question, please.
 3              (The record was read back as
 4              follows:
 5                   "Question:  So is it fair to
 6              say you're trying to estimate the
 7              volatility of the stock to
 8              benchmark whether the price
 9              movement is normal or abnormal?")
10              THE WITNESS:  I don't understand that
11    statement.
12    BY MR. ISAJIW:
13       Q   Do you know how many -- just focusing on
14    the common stock, do you know how many days you
15    dummy out of your regression analysis for FXCM
16    common stock?
17       A   107 days.  And I'm looking -- I'm now
18    reading from paragraph 97 of my report.
19       Q   Out of approximately 1,230 days?
20       A   Well, let's go to -- 1,231 days, yes.
21       Q   Okay.
22       A   Sorry.  I'm reading from paragraph 104
23    there.
24       Q   So that's roughly, what, 8 percent or so?
25       A   That sounds right.
```

```
                                        Page 166

1        Q    And for the bond, do you know how many days

2    you dummy out?

3        A    Ten.

4        Q    Okay.

5             And that's out of how many?  Sixty-six, I

6    think?

7        A    I believe that is correct, yes.

8        Q    So that's roughly 15 or so percent?

9        A    Sure.

10       Q    Okay.

11            In your view, when conducting these

12   analysis, is there a threshold of days that would be

13   too high to dummy out and still have a reliable

14   analysis?

15       A    Well, so this is the way I would put this.

16            I have seen courts reject models by

17   economists when they've dummied out, I don't know,

18   maybe 50 percent of the days.  I don't remember the

19   case.

20            But it is the -- in this case, it is --

21   intellectually, it is the proper thing to do.

22            That having been said, if I exclude those

23   dummy variables except for those dummy variables

24   after -- immediately after the break or the stock

25   flash trash, my results do not change at all.
```

```
                                                    Page 167

  1                (Reporter clarification.)

  2      BY MR. ISAJIW:

  3           Q    Okay.

  4                Are you aware of any academic peer-reviewed

  5      literature supporting the use of dummy variables in

  6      connection with this type of analysis?

  7           A    Using dummy variables with an event study?

  8      Sure.

  9                But I can't give you -- I mean, I've seen

 10      hundreds of articles use dummy variables in

 11      performing event studies.  I can't name them off the

 12      top of my head.

 13           Q    Do you cite any in your report?

 14           A    You know, I don't remember if -- where are

 15      we looking?

 16                I don't remember -- I'm happy if you have

 17      them.  So it's possible that "The 'Less Than'

 18      Efficient Capital Markets Hypothesis," in

 19      Footnote 129 might have contained that, as well as

 20      Footnote 131.

 21                Here's another paper.  "Use and Misuse of

 22      Event Studies to Examine Market Efficiency," which

 23      is a NERA working paper.

 24                "The Curious Incident of the Dog That

 25      Didn't Bark and Establishing Cause-and-Effect in
```

1    Class Action Securities Litigation."

2            I don't -- again, without having those

3    papers in front of me, I don't remember if they

4    specifically used dummy variables.

5            But, like I said, I've seen it used

6    numerous times.  I've used it hundreds of times,

7    both in my role as an expert here, and then, you

8    know, when I used to work at places like

9    Cornerstone.

10           So it is a common practice.

11           That having been said, if I exclude those

12   dummy variables, save for the days in which

13   immediate -- that immediately followed the flash

14   crash, it does not alter my regression results at

15   all or my findings at all.

16       Q   Okay.

17       A   Forget the regression results.

18       Q   Again, I'm just looking for the best

19   answers to my questions here.  And when I asked if

20   you were aware of any academic peer-reviewed

21   literature supporting the use of dummy variables in

22   connection with this type of analysis, you looked

23   and read a number of the articles in the footnotes

24   of your paper.

25           Are you telling me specifically that these

Case 1:21-cv-02900-FAB Document 568-1 Filed 06/12/23 Page 172 of 387

1    articles support the use of dummy variables within

2    events -- these are academic peer-reviewed

3    literature supporting the use of dummy variables in

4    connection with this type of analysis?

5         A    As I sit here, again, I don't recall.

6         Q    Okay.

7         A    If you would like to place the articles in

8    front of me, I'll be happy to look at them.

9              It is certainly possible that they -- as I

10   stated before, that they used dummy variables in

11   their analysis.

12             I guess there is an implicit assumption

13   that if they used dummy variables to conduct their

14   analysis that they are suggesting that they are in

15   support of that type of analysis.

16        Q    Okay.

17             You also mention that courts criticize the

18   use of dummy variables at, I think you said,

19   50 percent or more.

20        A    I can think of one case.  I don't recall

21   the case.  I don't recall what happened.  I don't

22   recall -- I don't remember any details.  So, yes,

23   there's at least one case I can think of.

24             I can also think of thousands of cases in

25   which courts have accepted dummy variables in this

```
 1   type of analysis.
 2             So, yes, there's one example I can think of
 3   where they did not accept it and found a flaw with
 4   it.  There are thousands -- probably not thousands;
 5   that might be an exaggeration -- hundreds where they
 6   have been accepted and used.
 7        Q   In your view as an economist and an expert
 8   witness conducting market efficiency analysis, is
 9   there a threshold by percentage that is too high to
10   use for dummy variables in order to get reliable
11   results?
12        A   That's not something I've ever thought
13   about.
14        Q   Okay.
15             Would you -- you mentioned 50 percent
16   before and I recognize that that wasn't from a
17   specific recollection of a specific case, but could
18   you, sitting here today, believe that 50 percent
19   would be too high?
20        A   I have no idea, as I sit here today.  I
21   don't know what happened to that case.
22             I mean, it's complete speculation on my
23   part.
24        Q   Independent of that case, have you ever
25   given any consideration about what level of dummy
```

1    variables would be too high to get reliable results

2    in connection with this type of an analysis?

3        A    What level of dummy variables?

4             I --

5             THE WITNESS:  Could you reread the

6    question, please.

7             (The record was read back as

8             follows:

9                "Question:  Independent of

10            that case, have you ever given any

11            consideration about what level of

12            dummy variables would be too high

13            to get reliable results in

14            connection with this type of an

15            analysis?")

16            THE WITNESS:  I have never thought about

17   levels.  I -- and this analysis and all analysis I

18   attempt to do, I try to do the intellectually honest

19   thing.

20            That having been said, my results are

21   robust to the inclusion or exclusion of the majority

22   of those dummy variables, specifically the exclusion

23   of all of those 8-K dummy variables.

24   BY MR. ISAJIW:

25        Q    Switching gears to your news/no-news

```
                                          Page 172

 1      analysis, which I think you describe in and around

 2      paragraph 49 on page 18.

 3          A    Paragraph 49.

 4               Okay.

 5          Q    So in paragraph 49, you write (as read

 6      and/or reflected:)

 7                    To determine whether the

 8               requisite cause and effect

 9               relationship existed, I performed a

10               collective test of the efficiency

11               of the market for FXCM's stock on a

12               broad set of FXCM news events that

13               occurred over the course of the

14               Class Period.

15               Did I read that correctly?

16          A    That is correct.

17          Q    And the cause-and-effect relationship that

18      you were testing to see whether it existed, that

19      related to Cammer Factor 5, the price impact of new

20      information?

21          A    I believe that's correct.

22          Q    For this -- the paragraph goes on to state

23      (as read and/or reflected:)

24                    For the second empirical test,

25               I examined whether the proportion
```

```
 1              of statistically significant
 2              abnormal returns exhibited by FXCM
 3              common stock on the news dates was
 4              significantly different than the
 5              proportion of statistically
 6              abnormal returns on other dates --
 7              I'm sorry -- on all other dates.
 8              This test is often referred to as a
 9              "news no-news test."
10              What does this test entail mechanically?
11      A    So running the market models.  Typically,
12 you -- again, you would use dummy variables on -- in
13 your market models on those days that you have
14 defined as news.
15              Well, so I guess the first thing you need
16 to do is define what a news day is.
17              So, you know what, let's just go to
18 paragraph 97 because that will give you a better
19 explanation.
20              (As read and/or reflected:)
21                First, one must define what
22              constitutes a "news" day.  It is
23              important to use a specific and
24              objective criteria to identify news
25              events that contain a higher flow
```

```
                                              Page 174

 1              of information.

 2                   For purposes of these tests, I

 3              identify news days as unique days

 4              on which the Company filed an 8-K.

 5        Q    Did you write that paragraph?

 6        A    Yes.

 7        Q    Yourself, from scratch?

 8        A    From scratch?

 9        Q    Uh-huh.

10        A    Certainly at some point I have.

11        Q    In connection with this report?

12        A    I believe so.

13        Q    The very first time you wrote that

14   paragraph was for this report?

15              MR. HAKLAY:  Objection.  Misstates.

16              THE WITNESS:  That's -- that's not what I

17   said.

18   BY MR. ISAJIW:

19        Q    I was asking if you wrote it from scratch

20   in connection with this report, and I think you said

21   "I believe so."  So I was asking for clarity.

22              MR. HAKLAY:  That's a mistake.

23   BY MR. ISAJIW:

24        Q    Let's withdraw those questions.

25        A    What I stated was is that I believe at some
```

1   point in time I have written that -- that sentence.

2        Q    Okay.

3        A    Because this is typically how I would do a

4   news/no-news analysis.

5        Q    Okay.

6        A    Now, did I go ahead and specifically type

7   out this sentence separately as opposed to use --

8   taking it from another report?  I don't recall.

9        Q    Okay.

10            Is it a fair summary of the news/no-news

11  test that you determined that there were news days

12  where FXCM issued 8-Ks and no-news days where there

13  were no 8-Ks, as -- that's the collection of

14  information you were looking at?

15       A    Maybe I'm missing something.

16            THE WITNESS:  Could you reread the

17  question, please.

18            (The record was read back as

19            follows:

20                "Question:  Is it a fair

21            summary of the news/no-news test

22            that you determined that there were

23            news days where FXCM issued 8-Ks

24            and no-news days where there were

25            no 8-Ks, as -- that's the

1      collection of information you were

2      looking at?")

3           THE WITNESS:  I don't believe that that

4  statement is necessarily correct.

5           I refer you to paragraph 97 in my report as

6  to what exactly I did.

7  BY MR. ISAJIW:

8      Q   What do you believe is not correct about

9  that statement that I made?

10     A   Well, I'm not sure how you are necessarily

11  defining news.  And my guess is you mean news as in

12  all-company news.

13          And so I'm not sure -- I don't know what

14  definition of news you're using.

15          So to be specific -- as specific as

16  possible, I would like to rely on paragraph 97 to

17  accurately reflect my opinion in this matter.

18     Q   So I was saying news days were days where

19  FXCM issued 8-Ks.

20          Is that different than the definition

21  you're using in paragraph 97?

22     A   That has -- that is how, in this test, I

23  have defined news days.

24     Q   And I also said that no-news days were

25  where there were no 8-Ks.

```
 1          Is that different than how you defined it
 2   in paragraph 97?
 3       A   That is the underlying assumption in this
 4   model.
 5       Q   Okay.
 6       A   But that having been said, it's possible
 7   that there are news days that aren't captured under
 8   this definition.  I am using this specific
 9   definition as a news day.
10       Q   Okay.
11          So if it counts as a news day for the
12   purpose of your news/no-news analysis, it had to be
13   an 8-K day?
14       A   That is correct.
15       Q   Okay.
16          Do you know of any peer-reviewed academic
17   studies supporting the use of the news/no-news test,
18   as you've set it forth here?
19       A   Well, so I suppose -- I'm not sure that
20   there -- it's something that academicians would
21   normally look at.
22          That having been said, it is certainly --
23   when we talk about a news/no-news analysis, hold on.
24   One second.
25          Certainly the less and efficient capital
```

Page 178

1    market hypothesis.  This is the paper.  Excuse me.

2    In paragraph 127.  I believe they do it -- hold on.

3             And where am I?  Paragraph 130.  Maybe --

4    this may not be considered academic, but another

5    way, and I'm quoting from paragraph 101 (as read

6    and/or reflected:)

7                 Another way to perform an

8             event study is to provide the days

9             of the Class Period ex ante into

10            expected news days and non-news

11            days before examining price

12            movements, and then compare the

13            stock's price movements in the two

14            categories to see if there's a

15            statistically significant

16            difference in price movement

17            between the two categories.

18               If the study finds a

19            difference in price movement

20            between the two sample sets (e.g.,

21            earnings-release dates versus

22            non-earnings-release dates), that

23            is statistical evidence that the

24            market incorporates new public

25            information into the price of the

```
 1            stock.
 2            And that is quoting from the (as read
 3   and/or reflected:)
 4                Brief of Testifying Economists
 5                as Amici Curiae -- I'm sure I
 6                botched that -- in Support of
 7                Respondent, Haliburton,
 8                Incorporated, and David Lesar v.,
 9                Erica P. John Fund, Incorporated,
10                FKA Archdiocese of Milwaukee
11                Supporting Fund, February 5th,
12                2014, page 10.
13            So I don't know if that brief by all those
14   economists would be considered an academic article
15   or not, but they're certainly in favor of it.
16       Q   As an academic, you don't know if a brief
17   filed in connection with a court proceeding would be
18   considered a peer-reviewed academic study?
19       A   Well, I mean, it's -- it's presumably been
20   read by other peers.
21            So I -- it has not appeared -- to my
22   knowledge or to the best of my knowledge, it has not
23   appeared in a journal, but it certainly suggests
24   that the economists support that.
25            If you specifically want peer reviewed, as
```

```
                                                    Page 180
 1    normally defined in academia, at least off the top
 2    of my head, I believe the article I noted in
 3    paragraph 129 suggests this as a use.
 4             MR. HAKLAY:  You mean Footnote 129?
 5             THE WITNESS:  I'm sorry.  Yes.
 6    Footnote 129.
 7             But, again, that's going off the top of my
 8    head.  I'm happy to look through the article if you
 9    have it.
10    BY MR. ISAJIW:
11        Q    Okay.
12             Have you used this news/no-news test when
13    evaluating market efficiency in prior engagements?
14        A    You mean prior to issuing this report?
15        Q    Yes.
16        A    Yes.
17        Q    Okay.
18             Roughly how many times?
19             Maybe it's an easier question to ask.  In
20    what proportion of cases involving market efficiency
21    have you used this test?  Most of them?  Half of
22    them?
23        A    Probably more than 20.  I don't remember
24    exactly.
25        Q    Twenty reports as opposed to 20 percent of
```

1  your reports?

2       A    Yes.

3       Q    Okay.

4       A    But that's, again, that's complete

5  speculation on my part.  I've used it what I would

6  consider to be numerous times.

7       Q    In connection with this test, what would

8  you conclude if a security did not have a

9  significantly higher proportion of significant

10  returns on news days than it did on no-news days?

11       A    That's an interesting question.

12            I would have to think about it.  Do you

13  mean with regards to market efficiency?

14       Q    Yes.

15       A    It would -- obviously, it would depend on

16  the case because in determining market efficiency,

17  I'm looking at all eight factors.

18       Q    Would that kind of finding be inconsistent

19  with the conclusion of market efficiency?

20            MR. HAKLAY:  Objection.  Asked and

21  answered.

22            THE WITNESS:  Would it be inconsistent with

23  the definition of market efficiency?

24  BY MR. ISAJIW:

25       Q    With the conclusion of market efficiency.

1      A    Well, I mean, I can think of all sorts of

2  examples where you could get the wrong answer.  Like

3  you identify, you know, you come up with a bad

4  definition of news days.

5           You know, maybe I decided that a news day

6  would be a Monday and so I dummied out all Mondays,

7  you know, that would give me a spurious result

8  presumably.

9           So it's not -- it's not something I've

10  given a lot of thought to, but I can certainly think

11  of situations where, you know, if the test is

12  misspecified, you're going to get bad results.

13           And so that -- it may -- yeah.  Well,

14  that's it.  I'll leave it at that.

15      Q    Barring testing errors, if a security did

16  not have a significantly higher proportion of

17  significant returns on news days than it did on

18  no-news days, would that be inconsistent with the

19  conclusion of market efficiency?

20           MR. HAKLAY:  Objection.  Asked and

21  answered.

22           THE WITNESS:  It would depend on the case.

23           So beyond testing errors, I mean, the

24  definition of a news day is something that's

25  integral to this process.  And so you need to be

Page 183

1   specific about how you define a news day.

2           So that wouldn't be a testing error.  And

3   so -- I mean, there's all sorts of things.  It's --

4   there's all sorts of things that go into this.

5           And so if you would like to be more

6   specific about your example, certainly I would take

7   under consideration that additional information, but

8   just on its face alone, not necessarily.

9   BY MR. ISAJIW:

10      Q   So in a hypothetical where you do a

11  news/no-news test, you define news days as days with

12  8-Ks; you define no-news days as days without 8-Ks;

13  you run the analysis; and you conclude that the

14  security did not have a significantly higher

15  proportion of significant returns on the news days

16  than it did the no-news days, would that be

17  inconsistent with the conclusion that the security

18  traded in an efficient market?

19          MR. HAKLAY:  Objection.  Asked and

20  answered.

21          THE WITNESS:  Yeah.  I refer to my previous

22  answers.  I don't have anything more I can say on

23  this topic.

24  BY MR. ISAJIW:

25      Q   The only thing I was trying to add was in

Page 184

1    your previous issue I believe you said if there was

2    an issue about defining news days.  I was trying to

3    ask a new question defining news days as 8-K days.

4         A    Ah.  Okay.  Yeah, I refer to my previous

5    answer.

6         Q    I want to flip for a minute to the

7    Unger/Krogman factors in connection with the FXCM

8    common stock.

9              And this is your analysis on paragraphs 108

10   to 111.

11        A    108 to 111.  Okay.

12        Q    And that's paragraphs -- looks like page

13   42.

14             MR. HAKLAY:  I think it's more than -- you

15   can ask him about those.  I think that analysis goes

16   beyond 111.

17             MR. ISAJIW:  I apologize.  It begins on

18   page 42.  Give me one second.

19             Just give me a second.  I have a pretty

20   targeted question.  I'm just trying to find it.

21             THE WITNESS:  Okay.

22   BY MR. ISAJIW:

23        Q    In paragraph 117, on page 44 --

24        A    117.  Okay.

25        Q    -- you've discussed the bid-ask spread.

1   And the bid-ask spread is one of the, to your

2   understanding, that's one of the Unger/Krogman

3   requirements -- sorry, factors; correct?

4       A   Correct.

5       Q   And you state that (as read and/or

6   reflected:)

7               The average bid-ask spread for

8           FXCM's common stock during the

9           Class Period was 0.28 percent.

10          Why is it important, in your view, to study

11  the bid-ask spread?

12      A   Well, it's what the court requires.  That's

13  what the court asks for.  So I presented it.

14      Q   So a number of times you have said that's

15  what the court asked for.  You haven't been retained

16  by the court in this matter; right?

17      A   No.  But I have presented -- I have been

18  retained to present evidence that the court will

19  consider.  And so to the extent that, in forming an

20  opinion about market efficiency, this is one of the

21  factors a court typically undertakes or looks at,

22  I've included it in my report.

23      Q   Okay.

24          And you've been asked by the plaintiffs'

25  counsel to be an expert to submit a report that the

Page 186

1    court will consider in connection with a
2    determination as to whether or not these securities
3    traded in an efficient market; is that correct?
4        A    That sounds right.
5        Q    Okay.
6             So as an expert economist, why as an
7    economist would you -- analyzing the bid-ask spread
8    be important in your determination as to whether or
9    not a market is efficient for FXCM's common stock?
10       A    Well, so as an economist, I'm not sure I
11   would -- undertaking an academic exercise, I'm not
12   sure I would normally look at whether or not FXCM
13   traded in an efficient market.
14            To the extent that this is something that
15   is commonly relied upon by courts and their
16   determination of market efficiency, I have included
17   this analysis.
18       Q    Okay.
19            In your determination as an economist, do
20   you have a belief that a narrow bid-ask spread is --
21   tends to support the concept that a security traded
22   in an efficient market?
23       A    Tends to?
24            I believe it -- some economists -- well,
25   let's see.  I'm pretty sure -- right.  So -- and

```
 1    this is paragraph 7 of my appendix.
 2            MR. HAKLAY:  What page are you on, sir?
 3            THE WITNESS:  Page 62.
 4            MR. HAKLAY:  Thank you.
 5            THE WITNESS:  So (as read and/or
 6    reflected:)
 7                    A narrow bid-ask spread of a
 8            particular security is also often
 9            associated with efficiency.  In
10            academia, a stock's bid-ask spread
11            is frequently used as a measure of
12            liquidity or cost of trading.
13            (Reporter clarification.)
14            THE WITNESS:  So that's my understanding of
15    bid-ask spread in academia and why it's sometimes
16    looked at.
17            I don't know of a specific paper in
18    academia -- well, let me correct that.
19            There might be papers that talk about
20    market efficiency and bid-ask spread.
21            But I personally have presented it here
22    based upon my assignment and what my understanding
23    of what courts like to look at in their
24    determination of market efficiency.
25    ///
```

Page 188

1    BY MR. ISAJIW:

2         Q    Independent of -- if a court did not have

3    an opinion that looked at bid-ask spread, would you

4    view it as an important thing to evaluate in

5    connection with your analysis as to whether or not

6    FXCM securities traded in an efficient market?

7         A    So if I was performing an academic study

8    where I was trying to determine whether an

9    individual stock traded in an efficient market,

10   that's not anything I've ever seen.

11            But given your hypothetical, which, again,

12   I have never seen that I recall anyway in academia,

13   it may be a factor that I would take into

14   consideration, but it's an incomplete hypothetical

15   and not something that most academicians would ever

16   consider or take into consideration.

17            Not the bid-ask spread.  I'm saying most

18   academicians would not perform an event study for a

19   single stock.

20        Q    Just in this same section on Unger/Krogman,

21   you discuss two additional factors, market

22   capitalization and float?

23        A    I'm sorry.  I closed this.  What page are

24   we looking at?

25        Q    42 and 43.

Page 189

```
 1        A    42 and 43.
 2        Q    For market capitalization as an economist
 3   conducting this analysis, do you have an independent
 4   view as to whether or not market capitalization is
 5   relevant to a determination of trading in an
 6   efficient market?
 7        A    Again, I don't think economists --
 8   academicians look at a single company and try to
 9   determine whether or not a single stock trades in an
10   efficient market.
11             Now, that having been said, let me take a
12   look at my appendix here.
13        Q    I'm not asking for support from others.
14   I'm just asking for your view today.
15        A    Right.
16             Well, and so I'm refreshing my memory of
17   what other economists have said and that will, then,
18   help refresh my memory as to how I -- what my
19   position on such things are.
20             Yeah.  So -- yeah.  So Fama -- right.  It
21   says (as read and/or reflected:)
22                  Similarly, financial
23             economists have considered the
24             market value -- I'm reading from
25             paragraph 6 of my appendix -- and
```

```
                                              Page 190
 1              its relationship with market
 2              efficiency.  Larger companies tend
 3              to attract more analysts and news
 4              media coverage and gain the
 5              attention of a greater number of
 6              investors.
 7         MR. HAKLAY:  Slow down.
 8         THE WITNESS:  Oh, sorry.
 9         A little too much Coke.
10         MR. HAKLAY:  Keep going.
11         THE WITNESS:  (As read and/or reflected:)
12              All of these characteristics,
13              which accompany a large market
14              capitalization, promote, and,
15              therefore, tend to support, market
16              efficiency.
17              So I agree with that statement.
18    BY MR. ISAJIW:
19         Q   For float, again, I'm not asking what other
20    economists believe.  I'm asking what you, sitting
21    here today as an economist, believe, does the size
22    of the public float -- is the size of the public
23    float relevant in your professional opinion to
24    whether a security trades in an efficient market?
25         A   Well, so -- okay.
```

1        So you talked about my professional opinion

2   as an academician.  I don't believe I've ever seen

3   any academic articles that discuss float as a factor

4   in market efficiency.  And so that informs my

5   opinion.

6        I mean, look at if no one ever looked at it

7   before, I might say, well, okay, then I probably

8   wouldn't look at it.  Right.  Seems reasonable.

9        So to the extent that I'm not sure I've

10  seen it discussed anywhere, I don't -- I don't think

11  float in and of itself is some kind of magic

12  criterion.

13        But, again, the courts find it informative.

14  That's what -- this is one of the factors that they

15  consider in their analysis.  And so I present it

16  here in my report.

17     Q   Okay.

18        Let's take a look at the note section of

19  your report, starting on page 45.  I just wanted to

20  go through some of the Cammer factors with respect

21  to the notes.

22        Before we start:  Are you aware of any

23  court ruling suggesting that there could be a

24  presumption of efficiency for bonds based on the

25  same analysis that you performed for the common

```
                                    Page 192

 1   stock?

 2       A    I have no idea.

 3       Q    Okay.

 4            In your professional opinion, do you

 5   believe it's appropriate to apply the same Cammer

 6   factors in an analysis of market efficiency to bonds

 7   as it is for common stock?

 8       A    Well, so let's go to my report,

 9   paragraph 119 (as read and/or reflected:)

10                    In assessing bond market

11              efficiency, courts recognize that

12              bond characteristics are distinct

13              from common stock characteristics.

14              And that cites to at least one securities

15   case.  (As read and/or reflected:)

16                    The indicia typically relied

17              upon in assessing market efficiency

18              for equity securities need to

19              therefore be adjusted, when

20              appropriate, for the bond market.

21                  Trading behavior --

22              Now in paragraph 120 (as read and/or

23   reflected:)

24                    Trading behavior in the bond

25              market can differ drastically from
```

```
 1          the stock market.  Because the bond
 2          market is comprised of large
 3          institutional investors, pension
 4          funds, and hedge funds that trade
 5          in much larger volumes per
 6          transaction than typical trades in
 7          the stock market, bonds also trade
 8          less frequently than typical
 9          stocks.
10               Though the trading frequency
11          in the bond market is typically
12          lower, participants in the bond
13          market, being institutions, pension
14          funds, and hedge funds, are
15          nonetheless very well-informed
16          traders.
17               Thus, even if the FXCM notes
18          do not trade every day during the
19          Class Period, this pattern is
20          typical in the bond market, is not
21          unique to FXCM notes and does not
22          indicate an efficient market --
23          MR. HAKLAY:  An inefficient market.
24          THE WITNESS:  -- an inefficient market.
25          Thank you very much.
```

Case 1:21-cv-02900-CM-RWL Document 568-16 Filed 06/12/2024 Page 197 of 387

1    BY MR. ISAJIW:

2        Q    Okay.  Thank you for that.

3            You just mentioned in your response,

4    patterns that are typical for the bond market.

5            What, in your experience, would be the

6    typical trading volume or turnover as a percentage

7    of par for a corporate bond?

8        A    I have no way to answer that.

9            Typical?  I have no idea.

10       Q    Okay.

11           Do you believe that a typical corporate

12   bond would trade in any way that is different from a

13   typical Rule 144A bond?

14       A    Do I think a corporate bond would trade --

15   so what do you mean by "trade"?

16       Q    What does the term "trading bonds" mean to

17   you?

18       A    Well, I'm trying -- I mean, bonds being

19   sold back and forth.

20       Q    Okay.

21           Do you believe a typical corporate bond

22   would be sold back and forth at a higher or lower

23   level than a typical Rule 144A bond?

24       A    That's not something I ever thought about.

25       Q    Do you believe that bonds generally trade

```
                                          Page 195
 1    as frequently as stocks trade?
 2              MR. HAKLAY:  Objection.  Vague.
 3              You can answer.
 4              THE WITNESS:  I think bonds typically trade
 5    less -- normally, if I were to look at one
 6    corporation's equity and its bonds, normally the --
 7    there would be more frequent trading in the equity
 8    than in the bond.  I guess -- so if that's your
 9    definition of frequency, I guess that addresses
10    that.
11        Q   I believe in paragraph 120 where you just
12    read, four lines down, there's a sentence that says
13    (as read and/or reflected:)
14                  Though the trading frequency
15              in the bond market is typically
16              lower, participants in the bond
17              market, being institutions, pension
18              funds, and hedge funds, are
19              nonetheless very well-informed
20              traders.
21              Did I read that correctly?
22        A   That is correct.
23        Q   And when you say "typically lower," what
24    are you comparing it to?
25        A   The equity market.
```

```
                                              Page 196

 1       Q    Okay.

 2            And what is the basis for your statement

 3   that participants in the bond market are nonetheless

 4   very well-informed traders?

 5       A    My understanding of the bond market.

 6       Q    Who are participants in the bond market,

 7   based on your understanding?

 8       A    Well, again, quoting from paragraph 120 (as

 9   read and/or reflected:)

10                 Institutions, pension funds,

11            and hedge funds.

12            Now, obviously that does not -- although

13   those are typically informed traders, that obviously

14   doesn't exclude individuals.

15   BY MR. ISAJIW:

16       Q    Cammer Factor 1, I believe we discussed

17   earlier today, focuses on the volume of trading in

18   connection with the security; is that correct?

19       A    Correct.

20       Q    And generally, higher volume of trading, I

21   think, would be associated with more likely

22   efficient market than lower trading?

23       A    I think courts have found that, what is it?

24   Over 2 percent -- oh, let me go back to my other

25   discussion in Cammer Factor 1.
```

Page 197

1        Q   So regardless of actual percentages, you
2    state in paragraph 120, in the last sentence, that
3    the lower trading frequency of FXCM notes (as read
4    and/or reflected:)
5                      Does not indicate an
6              inefficient market.
7              Why not?
8        A   Because bonds typically trade less
9    frequently than equities.
10       Q   Is there a threshold of trading below which
11   you think would be an indication of an inefficient
12   market?
13       A   Hmm.  That's not something I've thought
14   about.  And to the extent that this met the
15   2 percent threshold that's been specified previously
16   by the Cammer court, that's not something I've
17   really thought about.
18       Q   In paragraph 125, you determine that the
19   (as read and/or reflected:)
20                      Trading volume as a percentage
21             of par value of outstanding notes
22             for the FXCM notes was
23             2.92 percent.
24             Is that correct?
25       A   That is correct.

Case 1:21-md-02989-RAR Document 568-16 Entered on FLSD Docket 08/19/25 Page 201 of 387

```
 1       Q    You go on to say (as read and/or

 2   reflected:)

 3                    This level of average weekly

 4            trading volume exceeded the Cammer

 5            benchmark of 2 percent necessary

 6            for a "strong presumption" of

 7            market efficiency for common stock

 8            securities.

 9            (Reporter clarification.)

10   BY MR. ISAJIW:

11       Q    Did I read that correct?

12       A    You did.

13       Q    Okay.

14            The 2.9 percent based on that sentence

15   there was related to common stock; right?

16       A    You mean the court's -- when the court was

17   discussing Cammer, were they referring to equity?

18   Yes.

19       Q    Okay.

20            And they weren't -- the 2.92 percent

21   threshold was not in connection with the notes;

22   right, with the fixed income or debt security?

23       A    Well, that was -- I don't understand the

24   question.

25            The 2.92 percent was the average weekly
```

Page 199

```
 1    trading volume of the notes.
 2        Q    Okay.
 3             So from your perspective, and you're doing
 4    the analysis, is the analysis equal?
 5             Is 2.92 percent good enough for common
 6    stock; same should be true for notes?  Or do you
 7    need to adjust the analysis in some way when you're
 8    dealing with notes?
 9        A    I'm sorry.  I just don't understand the
10    question.
11             It's -- the court has determined in Cammer
12    that 2 percent is sufficient for equities.  To the
13    extent that I've stated here that bonds trade less
14    frequently than equity, the fact that it meets that
15    2 percent threshold might indicate to the court,
16    probably would be considered by the court in their
17    determination as to whether or not these bonds
18    traded in the efficient market.
19             That's the answer to the best of my
20    ability.  I'm not quite sure I understand the
21    question.
22        Q    So the trading period you used to analyze
23    the notes was January 24th, 2014, to February 6th,
24    2017; correct?
25        A    I'm sorry.  Where are you looking?
```

Page 200

```
 1        Q    I'm sorry.  I said "January."  I meant
 2    "June."
 3        A    Where are you looking?
 4        Q    This is the notes trading period.  I'm not
 5    pointing to a particular part of your report.
 6             It is a part of your report.
 7        A    Right.  So yes.
 8             (As read and/or reflected:)
 9                  The test described herein for
10             the F- -- and I'm reading from
11             paragraph 122 now -- for the FXCM
12             notes were performed over the
13             period during the Class Period when
14             trading data was available,
15             June 24th, 2014, through
16             February 6th, 2017.
17        Q    Would you concede that there was not an
18    efficient market for the notes before they began
19    trading on June 24, 2014?
20        A    I don't know enough about the notes,
21    sitting here, to opine on that.
22             Are you telling me that that's what
23    happened?
24        Q    I'm just asking the question.
25             The notes were issued before June 24th,
```

Page 201

1    2014; correct?

2         A    Let's see what he said.

3              Okay.  Could you reask the question,

4    please.

5         Q    Would you concede that there was not an

6    efficient market for the notes before they began

7    trading on June 24th, 2014?

8         A    That was not something that I was asked to

9    look at.

10        Q    Do you agree that before June 24th, 2014,

11   the notes were issued?

12        A    That's my -- well, I don't -- I believe

13   that is true.

14        Q    Okay.

15             Do you believe that -- strike that.

16             You were not asked to opine on the

17   efficiency of the notes prior to June 24th, 2014?

18        A    That is correct.

19        Q    In connection with your notes analysis, you

20   found an average weekly trading volume of 292 over

21   the entire Notes Period.

22             Sorry.  I said "292."  I meant

23   2.92 percent.

24        A    Correct.

25        Q    Okay.

Page 202

1           Did you calculate a median weekly trading

2    volume over the same period?

3        A   I did not.

4        Q   Would it surprise you to know that the

5    median weekly trading volume for the notes over that

6    same percent was 0.54 percent?

7           MR. HAKLAY:  Objection.  Relevance.

8           THE WITNESS:  Would it surprise me?

9    BY MR. ISAJIW:

10       Q   Yeah.

11       A   Well, I've never seen a court look at

12   median statistics when looking at this -- doing this

13   type of analysis.

14          Would it surprise me?  I guess that's the

15   actual question.  I don't know.  It's not something

16   I really ever thought about.

17       Q   Okay.

18       A   As I said, look, bonds are different than

19   stocks.  They trade less frequently.

20       Q   In your analysis, would the significantly

21   lower median trading of the notes during the time

22   period be relevant to whether or not they traded in

23   an efficient market throughout that entire time

24   period?

25       A   Not necessarily.

1     Q    Would it be irrelevant?

2     A    Would it be irrelevant?

3          Well, I mean, to the extent that any

4     information has value, I suppose it, by definition,

5     would be relevant.  So I -- or would not be

6     irrelevant.  That's a double-negative.

7          So I don't know.  It's a philosophical

8     matter.  I would need to think about that more.

9     Q    Do you have any idea why the weekly trading

10    volume, as you calculated it, and the mean trading

11    volume would be so different?

12         MR. HAKLAY:  You mean "median"?  I thought

13    you said "mean."  That's why.

14         MR. ISAJIW:  Apparently, I did say "mean"

15    and I meant "median."

16         MR. HAKLAY:  It's otherwise the same.

17         THE WITNESS:  You're asking me why the mean

18    and median are different?

19    BY MR. ISAJIW:

20    Q    Yeah.

21    A    Again, bonds tend to trade less frequently

22    than equities, so it wouldn't surprise me that the

23    mean and median are different.

24    Q    If you look at Exhibit 3b on page 101 of

25    your report.

1      A    Exhibit 3b, did you say?

2      Q    I did.

3      A    Okay.

4      Q    I'm sorry.  I said "page 101" and I meant

5  page 100.

6      A    Ah, okay.  Yep.

7      Q    Is one explanation for the difference

8  between the average weekly and the median trading

9  volume the fact that there were small number of a

10  high-volume weeks at the beginning of the trading

11  period for the bond as composed to the rest of the

12  period?

13      A    I'm sorry.  High volume during the

14  beginning of the trading period?

15      Q    Yes.

16      A    I'm not quite sure I would agree with that

17  characterization.  But, I mean, I agree that there's

18  a difference between -- I would expect that there's

19  a difference between the median and the mean.

20      Q    So of --

21      A    I have presented what the court's asked

22  me -- or usually asked experts to present.  So

23  that's what I did.

24      Q    Okay.

25          And other than the fact that the courts

Page 205

1    usually ask experts to present on this information,

2    you have no independent view of the information's

3    meaningfulness?

4         A    Hmm.   Interesting question.

5              THE WITNESS:   Could you repeat the

6    question, please.

7              (The record was read back as

8              follows:

9                   "Question:   And other than the

10              fact that the courts usually ask

11              experts to present on this

12              information, you have no

13              independent view of the

14              information's meaningfulness?")

15              THE WITNESS:   I was asked to opine upon

16   market efficiency for FXCM and their equities and

17   notes.

18              Beyond my -- beyond my job in this case,

19   I'm not sure that's -- your questions are things

20   that I've thought about.

21   BY MR. ISAJIW:

22        Q    Okay.

23             Would it be relevant in your analysis if

24   the notes had, during the entire period, only

25   35 weeks with volume over 2 percent, but 103 weeks

Page 206

1   with volume under 2 percent?

2       A    Would it be relevant to my analysis?

3            Well, again, to the extent that courts look

4   at average trading volume, no, that would not be

5   relevant to my analysis.

6       Q    Did you analyze the notes trading on a

7   quarterly basis?

8       A    Did I analyze the notes traded on a

9   quarterly basis?

10           I'm not sure how to answer that question.

11  I looked at average weekly trading volume.  I

12  don't -- I mean, I suppose I could somehow aggregate

13  these things into quarters.

14      Q    Okay.

15           And you looked at average weekly trading

16  volume because that is what you understand courts to

17  look at as a relevant factor?

18      A    That -- under Cammer, that is correct.

19      Q    If a security had an average weekly trading

20  volume of 0.5 percent over several quarters within a

21  period, would you view that as consistent with an

22  efficient market in connection with Cammer Factor 1?

23      A    It certainly could be, but it wouldn't --

24  yeah, it certainly could be.

25      Q    Is there any situation where it would not

Page 207

1   be?

2       A    So it would not be what?

3       Q    Consistent with an efficient market in

4   connection with Cammer Factor 1.

5       A    Is there a case where it would not be

6   consistent with -- is there a double-negative in

7   there?  I don't know why I'm tripping over this.

8            Could you just restate the question and

9   I'll try to answer it.

10      Q    In your expert -- in your analysis, if you

11  looked at a security whose average weekly trading

12  volume was 0.05 percent over several quarters of a

13  Class Period, would you perceive that to be an

14  indication of it being in an inefficient market

15  pursuant to Cammer Factor 1?

16           MR. HAKLAY:  Objection.  Asked and

17  answered.

18           Go ahead.

19           THE WITNESS:  It would depend on the

20  security.

21           Certainly -- I mean, look, if I present --

22  I don't remember.  Did you say "average"?

23           I'm pretty sure a court would -- well, I'm

24  not going to speculate what a court would do.

25  ///

```
                                          Page 208

 1   BY MR. ISAJIW:

 2       Q    I'm not asking for a court's opinion.  I'm

 3   asking for yours.

 4       A    Yeah.  And so it would depend upon the type

 5   of security.

 6       Q    If the security was a Rule 144A note.

 7       A    And so what happened with the Rule 144A

 8   notes?  The average -- was it the average trading

 9   volume you were talking about?

10       Q    If it had an average weekly trading volume

11   of 0.5 percent over several quarters within a Class

12   Period, would that be consistent with market

13   efficiency pursuant to Cammer Factor 1?

14            MR. HAKLAY:  Objection.  Asked and

15   answered.

16            THE WITNESS:  I don't -- I mean, pursuant

17   to Cammer Factor 1?

18            Cammer Factor 1 gives you a specific

19   benchmark at least for equities.

20            We -- I think we've read paragraph 120

21   numerous times.  Bonds are a different animal.  So I

22   don't know how to answer your question because

23   Cammer Factor 1, at least the Cammer court gave us

24   some thresholds.  So I don't know how to answer your

25   question.
```

1   BY MR. ISAJIW:

2        Q    What were those thresholds?

3        A    2 percent and 1 percent.

4        Q    And 0.5 percent in my hypothetical is below

5   those thresholds; correct?

6        A    In your hypothetical?

7        Q    Yeah.

8        A    Yes.  But it's not -- again, the Cammer

9   court was not ruling on bonds.  This was an analysis

10  of equities.

11       Q    Okay.  Thank you.

12            Let's move to Cammer Factor 2.

13            MR. HAKLAY:  Let's take a -- it's been an

14  hour.  Let's take a break.  The witness has

15  indicated to me he would like to take a break.

16            MR. ISAJIW:  When did he indicate that?

17            MR. HAKLAY:  About ten minutes ago.  I told

18  him it was ten more minutes until the hour goes by.

19            MR. ISAJIW:  I apologize.

20            THE WITNESS:  He is right.  I did.

21            MR. HAKLAY:  He's doing his watch thing and

22  I'm, like, ten more minutes.

23            MR. ISAJIW:  He did not indicate to me.

24            MR. HAKLAY:  No.  No.  No.  He looked at me

25  and I slapped him down.

```
                                                    Page 210

 1            MR. ISAJIW:  All right.  We can go off.

 2            THE VIDEOGRAPHER:  We're going off the

 3    record.

 4            The time is 2:46 p.m.

 5            (Recess was taken at 2:46 p.m.

 6            until 2:59 p.m.)

 7            THE VIDEOGRAPHER:  We are back on the

 8    record.

 9            The time is 2:59 p.m.

10    BY MR. ISAJIW:

11       Q   So, Dr. Werner, I want to focus on Cammer

12    Factor 2 in relation to the notes, which is an

13    analysis that begins on page 47.

14            Are you there?

15       A   I am.  Oh, sorry, yes.

16       Q   Here is an example where you take a

17    slightly different approach for the notes than you

18    do with the stock in connection with analyst reports

19    where you look at, quote, other avenues of

20    information dissemination.

21       A   I'm sorry.  Where are you looking at?

22            Oh, because it -- oh, I see where you're

23    reading.

24            Go ahead.

25       Q   Why did you do that?
```

1      A   I'm not sure -- I mean -- while that is the

2    statement, I'm not sure that that's an accurate

3    statement.  So let's go back to my discussion of

4    equities.

5            Yeah, that's poorly worded on my part.

6      Q   So you did not look at other avenues of

7    information dissemination?

8      A   I looked at analysts following FXCM.  So I

9    did that for equities.

10           I looked at their conference calls in both

11   cases.

12           What -- I'm sorry.  Just let me finish

13   here.

14           And I looked at news articles.  Maybe -- I

15   mean, I believe I -- again, I think I was just

16   inartful in stating that.

17     Q   Okay.

18     A   Oh, wait.  I'm sorry.  It's been a long

19   day.

20     Q   Did you -- let's just go back to your

21   analyst report.

22           Do you remember how many analyst reports

23   were issued over the full Class Period?  It's

24   paragraph 27 of your report.  That's the number.

25     A   I'm sorry.  Paragraph 27?

```
                                      Page 212

 1              Okay.  Now, I understand why I say a

 2     different approach or additional analyses.

 3              So -- right.  During the Class Period,

 4     1,608 stories -- this was for the equity Class

 5     Period.

 6         Q    Uh-huh.

 7              So in paragraph 27, the last sentence, you

 8     say that (as read and/or reflected:)

 9                   These firms and analysts

10              released at least 263 reports and

11              recommendations during the Class

12              Period.

13         A    That is correct.

14         Q    And then in paragraph 126 --

15         A    Let me just write down that number.

16              Are you going to refer back to that number?

17         Q    I am.

18         A    Okay.  So where was that?  263.  Okay.

19         Q    And in paragraph 126 on page 47 --

20     actually, part of 126 that bleeds over to 48.  You

21     say (as read and/or reflected:)

22                   These firms and analysts

23              released at least 89 reports and

24              recommendations during the Notes

25              Period.
```

Page 213

1          Do you see that?

2     A    I do.

3     Q    So that's a significantly fewer number of

4     reports; 263 versus 89?

5     A    Well, I would agree it's fewer.  We're

6     looking at different periods of time.

7          So by definition, yes, 89 is less than 263.

8     Q    Okay.

9          And for the notes, you found that

10    12 analysts followed FXCM during the Note Period?

11    A    That is what is stated in our

12    paragraph 120, yeah.

13    Q    And how did you conduct that analysis to

14    figure out the 12?  Did you actually just add them

15    all up yourself, or did somebody provide you with

16    that information?

17    A    Did I add them all up myself?

18         I believe that information was provided to

19    me.

20    Q    Okay.

21         And of the analysts that covered the

22    company in this period, in paragraph 127, you

23    indicate that three did not issue reports; is that

24    right?

25    A    Well, I believe that, yes, that is the gist

Page 214

1    of what I was saying in that paragraph.

2         Q    In connection with a Cammer Factor 2

3    analysis of analyst coverage, does the fact that an

4    analyst doesn't issue a report weigh in favor of

5    finding market -- an efficient market or against?

6         A    I don't think that's something I've ever

7    seen discussed in discussions of Cammer Factor 2.

8         Q    Regardless of whether or not you've seen it

9    discussed, do you have an opinion, sitting here

10   today?

11        A    No.

12        Q    Of all the analyst reports that you

13   considered in connection with your review, were any

14   of them specifically covering the FXCM notes?

15        A    I remember seeing a couple.

16        Q    Do you remember which ones?

17        A    I do not as I sit here today.

18        Q    And how many is a couple?

19        A    I don't recall.

20             But, again -- I mean, it's not clear to me

21   why the information -- the information would still

22   be firm relevance, so -- but, again, I don't

23   remember.  We'll leave it at that.

24        Q    When you say "a couple," do you mean five?

25   Ten?  A hundred?

```
                                              Page 215

 1        A    Where was that?

 2        Q    We determined that there were 89 reports

 3   and recommendations.

 4        A    Right.  So that's the number I was looking

 5   for.  So, yeah, it would definitely be less than a

 6   hundred.

 7        Q    Okay.

 8        A    But I don't remember.

 9        Q    Would it be 89?

10        A    No.

11        Q    Okay.

12             Would it be 40?

13        A    I don't -- I -- again, a couple.

14        Q    Okay.

15        A    So less than five.

16        Q    Okay.

17        A    Less than ten.  Is that sufficient?

18        Q    That's fine.  I'm just trying to get a

19   gauge.

20             So the analyst reports tended not to refer

21   to the FXCM notes?

22        A    They referred to the economic conditions of

23   the company, which would affect the FXCM notes.

24        Q    Did they also refer to the stock?

25        A    Yes.
```

1   Q   Okay.

2       So they specifically discussed one of the

3   securities at issue in this litigation, but they did

4   not discuss the other?

5       A   To the extent that they were not reports

6   that discuss both, I believe that statement is

7   accurate.

8       Q   And I think what we're getting at is the

9   majority of the reports you looked at were not both,

10  only --

11      A   I -- again, I said "a couple."  Less than

12  five or ten.  That's the answer.

13      Q   Is it relevant in your analysis as to

14  whether or not an analyst discusses the specific

15  security at issue in connection with the market that

16  you're studying?

17      A   Not necessarily.

18      Q   Why not?

19      A   Why?  Because we're worried about firm

20  information and its impact on securities.

21      And so to the extent that an analyst report

22  is talking about the firm's financial condition,

23  that is going to affect both equity and stock.

24      Q   Would it be more likely that a security

25  trades in an efficient market if the analyst

1   discussed the security as opposed to just the

2   company?

3       A    That's an interesting question.  I've never

4   really thought about that.

5            I would need to think about that more.

6       Q    Sitting here today, you have no view on

7   that?

8       A    It's -- well, yeah, I would want to think

9   about that more.

10      Q    One of the things you considered in your

11  analysis for Cammer Factor 2 for your notes that you

12  did not for the common stock is institutional

13  ownership.

14      A    That is correct.

15      Q    Why is that?

16      A    Because these -- as economists, we

17  typically think of these institutions as more

18  informed, and, thus, the fact that they held those

19  would suggest that information was incorporated into

20  the bond prices.

21      Q    Okay.

22           Is it -- what is your understanding as to

23  who -- who is eligible to purchase the FXCM notes at

24  issue in this case?

25      A    Well, I -- I need to refer somewhere else

1    in my report, but looking at paragraph 130, (as read
2    and/or reflected:)
3              Because Rule 144A notes are
4         held and traded solely as by QIBs,
5         the entire issue of the FXCM notes
6         was owned by an institutional
7         investors.
8         I don't remember what -- it's, like,
9    qualified in -- I don't remember exactly what QIB
10   stands for or the exact -- something about qualified
11   investors.  So I think I have that somewhere else in
12   my report.
13        Q    Okay.
14             What is your understanding of what a
15   Rule 144A note is just at a very high level?
16        A    Well, I mean, it's a bond offering
17   obviously.  It can only be -- it can only be held by
18   QIB investors.  But I think --
19        Q    Is that true of all bond offerings, that
20   they can only be held by QIB investors?
21        A    No.
22        Q    What's different at a high level between
23   Rule 144A notes and other bond offerings?
24        A    Well, so these are -- and I'm reading from
25   paragraph 21 (as read and/or reflected:)

```
 1              Notes that are not registered
 2         with the SEC and are exempt from
 3         the typical registration
 4         requirements are commonly referred
 5         to as Rule 144A issues.
 6              Notes issued under Rule 144A
 7         can only be traded by qualified
 8         "investment" buyers, hence QIBs --
 9         MR. HAKLAY:  I think it's "institutional."
10         THE WITNESS:  What did I say?
11         MR. HAKLAY:  "Investors."
12         THE WITNESS:  (As read and/or reflected:)
13              -- qualified institutional
14         buyers, which are entities acting
15         for [their] own account or the
16         accounts of other qualified
17         institutional buyers, that in the
18         aggregate owns and invests on a
19         discretionary basis at least
20         $100 million in security of issuers
21         that are not affiliated with the
22         entity.
23    BY MR. ISAJIW:
24         Q   Other than what's on that paragraph, do you
25    have any other understanding of Rule 144A?
```

Page 220

1      A    I think that gives an accurate description
2   of my understanding of Rule 144A.
3      Q    And that's the entirety of your
4   understanding of Rule 144A as it relates to your
5   opinions in this case?
6      A    I don't know.  It's an overly broad
7   question.  I'm not sure how to answer that.
8      Q    Have you ever done an event -- I'm sorry.
9           Have you ever done a market efficiency
10  analysis in any other matters related to Rule 144A
11  bonds?
12     A    So yes.
13     Q    Which ones?
14     A    I don't know.  I mean, I've done hundreds
15  of cases over my lifetime.
16     Q    How many of those hundreds of cases do you
17  believe had to do with Rule 144A notes?
18     A    I have no idea.
19     Q    Proportionately, do you think it is
20  20 percent?  10 percent?  5 percent?
21     A    In my lifetime, in terms of cases that I've
22  worked on?
23     Q    In the last ten years.
24     A    Okay.
25           Let me ask a clarifying question.  Do you

```
                                          Page 221
 1    mean issued expert reports on?
 2         Q    Let's start there.
 3         A    Okay.
 4              Because that is a different question than
 5    what you asked me.
 6         Q    Okay.
 7              Let's ask that question.
 8         A    I have no idea.
 9         Q    How many times have you issued an expert
10    report on Rule 144A bonds?
11         A    I have no idea.
12         Q    Other than this case, do you remember that
13    you have, in fact, issued an expert report on a
14    Rule 144A bond?
15         A    I'll stick with I have no idea.
16         Q    What about just being engaged as a
17    consultant?  How many times have you been engaged as
18    a consultant in connection with an analysis for an
19    efficient market in a Rule 144A bond?
20         A    Yeah, I don't recall.  When did I start --
21    well, let's go to my ...
22         Q    I'm not looking for exact numbers.  Is it
23    at least once?
24         A    Sure.
25         Q    Okay.
```

Page 222

1           Is it more than 20?

2      A    Again, at this point -- at that point, I

3   would be speculating.

4      Q    Okay.

5      A    I have no idea -- when I say "I have no

6   idea," I mean I have no idea.  If -- I know it's

7   more than one, less than 20.  I have no idea.

8      Q    Okay.

9      A    I'm giving you the best answer I possibly

10   can give you.

11      Q    I appreciate that and I'm trying to make

12   sure we get to there.  So ...

13           In connection with your Cammer Factor 2

14   analysis of the FXCM notes, would you consider

15   coverage by rating agencies to be potentially

16   important?

17      A    With regards to 144A bonds?  I'm sorry.

18           THE WITNESS:  Could you reread the

19   question.

20           (The record was read back as

21           follows:

22               "Question:  In connection with

23           your Cammer Factor 2 analysis of

24           the FXCM notes, would you consider

25           coverage by rating agencies to be

Page 223

```
 1              potentially important?")
 2              THE WITNESS:  So when you say "coverage by
 3     the rating agencies," do you mean of the bonds?
 4     BY MR. ISAJIW:
 5         Q    What is your understanding of what a credit
 6     rating agency does when it covers a fixed income
 7     security?
 8         A    Well, it performs analysis.  It looks at --
 9         Q    What kind of --
10         A    Looks at things like the firm's
11     profitability.
12         Q    To do -- to determine what?
13         A    How "safe" the bonds are for -- well, and I
14     put safe in quotation marks because rating agencies
15     don't always do the best jobs.
16              To help inform people about whether or not
17     the risk associated with holding these securities.
18         Q    Do you have a view as an economist as to
19     whether or not a bond being covered by a rating
20     agency would tend to support it being traded in an
21     efficient market?
22         A    I could certainly see where that would be
23     something that I might take into consideration.
24              And I can think of other cases where I have
25     looked at that.
```

Page 224

```
 1        Q    Okay.
 2             Would the lack of rating agency coverage
 3   for a security tend to be inconsistent with the
 4   conclusion that it traded in an efficient market?
 5        A    Not necessarily.
 6        Q    But possibly?
 7        A    Anything is possible.
 8        Q    Is it more likely that a security trades in
 9   an efficient market if it is covered or not covered
10   by a rating agency?
11        A    That's not any -- that's not a question
12   I've ever been asked to consider, so it's not
13   something I've ever thought about.
14        Q    Okay.
15             Sitting here today, you've never thought of
16   it once?
17        A    No.
18        Q    Okay.
19             Do you know if these FXCM notes were
20   covered by a rating agency?
21        A    I don't believe so, but I don't -- I don't
22   specifically recall.
23        Q    Is it something that you looked into when
24   you were conducting your analysis?
25        A    As I sit here, I don't recall.  I mean --
```

1   here.  I'm sorry.  Let's be more precise.

2          Yeah.  To the best of my recollection, I

3   don't believe they were covered by a ratings agency.

4      Q    Okay.

5          Looking at page 48, under Cammer Factor 2,

6   one of the additional factors you looked at is

7   institutional ownership.

8          Do you know which institutions transacted

9   in the notes during the Notes Period?

10     A    As I sit here today, no.

11     Q    Is it anywhere in your report?

12     A    I don't believe so.

13     Q    Is that information available to you?

14     A    I don't believe so.

15     Q    Did you request it?

16     A    No.

17     Q    So let's move to Cammer Factor 3,

18  "Prominent Underwriters and Market Makers."

19          This is another example where you took a

20  slightly different analysis from the common stock to

21  the notes in that you discuss not only market makers

22  but also underwriters; is that correct?

23     A    Correct.

24     Q    Why is that at a very high level?

25     A    At a very high level?  Well, underwriters

Page 226

1  oftentimes make markets -- well, let's -- yeah.  As

2  I stated here (as read and/or reflected:)

3              Investment banks that

4         underwrite --

5         And I'm looking at paragraph 132. (As read

6  and/or reflected:)

7              Investment banks that

8         underwrite notes typically then

9         serve as market makers for the

10        notes.

11             It would be a mistake to think

12        that once the bonds are all sold,

13        the investment banking firm's ties

14        with the deal are ended.  Those who

15        bought the bonds will look to the

16        investment banking firm to make a

17        market in the issue.  This means

18        that the investment banking firm

19        must be willing to take a principal

20        position in a secondary market

21        transaction.

22    Q   And the footnote to the section of your

23  report you just read references (as read and/or

24  reflected:)

25             "The Primary and Secondary

Page 227

```
 1            Bond Markets," by Frank J. Fabozzi,
 2            F-a-b-o-z-z-i, and Frank J. Jones,
 3            Chapter 3, in "The Handbook of
 4            Fixed Income Securities," 7th
 5            edition, edited by Frank J. Fabozzi
 6            and Steven V. Mann.
 7            Is that correct?
 8       A    That is correct.
 9       Q    Other than that source, what are you basing
10    that statement on?
11            The statement that investment banks
12    underwrite notes -- that investment banks that
13    underwrite notes typically then serve as market
14    makers for the notes.
15       A    I don't know.  Thirty years of experience
16    doing Ph.D., which focused on the role of investment
17    banks in securities offerings.
18       Q    In connection with notes?
19       A    Specifically 144A notes?  No.  But in
20    general, yes.
21       Q    Okay.
22            Does Fabozzi discuss how long an investment
23    bank will act as a market maker after the initial
24    issuance of a note?
25       A    As I sit here, I don't recall.
```

Page 228

1      Q   Do they discuss whether all of the
2   underwriters who are involved in the initial
3   issuance of a note will continue on as market
4   makers?
5      A   As I sit here, I don't recall.
6      Q   Do you know in connection with this
7   analysis how long any of these underwriters operated
8   as a market maker in connection with the FXCM notes?
9      A   I don't -- I need to relook at -- I need to
10  relook at the TRACE data, but as I sit here, no.
11     Q   Would the TRACE data tell you which
12  underwriters operated as a market maker in
13  connection with the 144A notes?
14     A   I don't -- I don't recall as I sit here.
15     Q   Do you have any understanding as to whether
16  the underwriters acted as a market maker throughout
17  the entire notes period at issue here?
18     A   I do not.
19     Q   Did you do any investigation to determine
20  whether or not the underwriters acted as a market
21  maker throughout the entire Notes Period here?
22     A   As I sit here, I don't recall.
23     Q   To the extent -- to the extent these
24  underwriters did not act as a market maker for the
25  notes throughout the Notes Period, would that tend

1    to indicate that the notes did not trade in an
2    efficient market?
3              MR. HAKLAY:  Objection.
4              THE WITNESS:  No.
5    BY MR. ISAJIW:
6        Q   It would at least remove whatever evidence
7    of trading in an efficient market was ascribable to
8    the time period when they did act as a market maker;
9    is that correct?
10       A   I'm sorry.  I don't understand the
11   question.
12       Q   If I understand what you're saying in this
13   report correctly, the fact that underwriters act as
14   market makers for these notes is one -- under Cammer
15   Factor 2, one indicia that the notes traded in an
16   efficient market; is that correct?
17       A   I believe that's accurate.
18       Q   Okay.
19             MR. HAKLAY:  I'm sorry.  I think you meant
20   Cammer Factor 3.  Just so the record is clear.
21             THE WITNESS:  Oh, yeah, sorry.
22             MR. ISAJIW:  Thank you for your
23   clarification.
24             MR. HAKLAY:  You both meant it, I know.
25   ///

Page 230

1    BY MR. ISAJIW:

2        Q   So to the extent that wasn't true for some

3    period of the Notes Period, that would no longer

4    support for the period where it wasn't true that the

5    notes traded in an efficient market; correct?

6        A   Not necessarily.

7        Q   I'm just -- so if it is true that an

8    underwriter acting as a market maker tends to

9    support efficiency, it can't also be true that an

10   underwriter not acting as a market maker would still

11   support the efficiency; it stopped.

12       A   Well, okay.  I guess you then need to

13   discuss or differentiate between efficiency and

14   inefficiency.  Right.

15           Efficiency is not a yes-or-no phenomenon.

16   It's not a bipolar or two tail, whatever you want --

17   however you want to say it.  It is not a yes or no.

18   It is on a sliding scale.

19       Q   So to the extent on that sliding scale that

20   an underwriter acting as a market maker tends

21   towards efficiency, when it stops acting as a market

22   maker, it no longer tends towards efficiency, does

23   it?

24       A   I'm not sure that's correct.  I would need

25   to think about it more.

```
                                                      Page 231

 1        Q    Other than the underwriters for the FXCM
 2   notes, how many market makers were there?
 3             And I'll point you to paragraph 133, which
 4   I believe is where you describe -- paragraph 144 --
 5   no.  Paragraph 133, it says (as read and/or
 6   reflected:)
 7                   Additionally, Barclays,
 8             Sandler O'Neill, and UBS published
 9             a report stating that they made a
10             market in FXCM securities during
11             the Class Period.
12             Did I read that correctly?
13        A    That's correct.
14        Q    The reason I'm asking is:  Do you know as
15   part of your analysis that Barclays, Sandler
16   O'Neill, and UBS made a market in FXCM notes during
17   the Notes Period?
18        A    I'm sorry.
19             THE WITNESS:  Could you reread that,
20   please.
21             (The record was read back as
22             follows:
23                  "Question:  Do you know as
24             part of your analysis that
25             Barclays, Sandler O'Neill, and UBS
```

Page 232

```
 1              made a market in FXCM notes during
 2              the Notes Period?")
 3              THE WITNESS:  I would need to take a
 4      close -- a closer look at these reports to refresh
 5      my memory.
 6      BY MR. ISAJIW:
 7          Q    Would -- which reports are you talking
 8      about?
 9          A    The reports published by Barclays, Sandler
10      O'Neill, and UBS where they state they made a market
11      in FXCM securities during the Class Period.
12          Q    Okay.
13              So this is in the notes section of your
14      analysis; correct?
15          A    That is correct.
16          Q    And you're citing these in connection with
17      FXCM securities, not stock or notes, but securities,
18      the broader term.  And you're citing the Class
19      Period, not the Notes Period.  Again, the broader
20      term.
21              So I'm just trying to determine if you did
22      any analysis in connection with your report to
23      determine that these three entities were market
24      makers in the notes for the subsection of the Class
25      Period that was the Notes Period.
```

Page 233

1          A     Right.

2                And so in order to refresh my memory, I

3    would need to look at the reports in which those

4    statements were made.

5          Q     Did you previously look at the reports in

6    which those statements were made and conclude that

7    they did and now you just don't remember?  Or did

8    you not do the analysis initially?  That's what I'm

9    trying to understand.

10         A     Right.  And I don't recall.

11         Q     Okay.

12               Would you agree that there are

13   significantly few market makers for the notes than

14   there were in your analysis for the class -- for the

15   common stock?

16               MR. HAKLAY:  Objection.  More

17   significantly.

18               THE WITNESS:  Could you reread the

19   question, please.

20   BY MR. ISAJIW:

21         Q     You identified 205 market makers for FXCM

22   common stock; correct?

23         A     That is correct.

24         Q     Okay.

25               At best, based on what I'm reading in your

```
 1    report, there are between 5 and 7 potential market
 2    makers for the notes, although it's unclear, based
 3    on the report, how many of them were actually market
 4    makers for the notes.
 5              So what I'm asking is, did you do anything
 6    in your analysis to account for the fact that there
 7    is a significant difference in the number of market
 8    makers in common stock, 205, versus the notes,
 9    roughly 5 to 7?
10              MR. HAKLAY:  Objection.  Vague.
11              THE WITNESS:  Yeah.  I don't understand the
12    question.
13              What type of analysis are you referring to?
14    BY MR. ISAJIW:
15         Q    You did an analysis on market efficiency.
16         A    Correct.
17         Q    For both the common stock and the notes;
18    correct?
19         A    That is correct.
20         Q    In both of those analysis, you looked at
21    Cammer Factor 3, which deals with, amongst other
22    things, market makers; is that correct?
23         A    That is correct.
24         Q    Is it your view that more market makers
25    tend to support a finding of market efficiency than
```

```
                                            Page 235
 1    less market makers?
 2         A    I don't know how courts rule on that.
 3         Q    I'm not asking how courts rule on it.  I'm
 4    asking how you as an economic expert rendering an
 5    expert report view that factor.
 6         A    Right.  But I'm doing that -- I'm doing
 7    this in the context of litigation in which that -- I
 8    have been asked to provide this information.
 9              My understanding is courts find this
10    information helpful, and so I presented it to them.
11         Q    So sitting here today, as an economist,
12    have you ever thought about whether or not more
13    market makers tend to support efficiency versus
14    fewer market makers?
15         A    Hold on one second.  I just need to look at
16    something here.
17              THE WITNESS:  Could you repeat the
18    question, please.
19              (The record was read back as
20              follows:
21                  "Question:  So sitting here
22              today, as an economist, have you
23              ever thought about whether or not
24              more market makers tend to support
25              efficiency versus fewer market
```

Page 236

1          makers?")

2          THE WITNESS:  I mean, I would need more

3    information to ask that -- answer that question.

4    BY MR. ISAJIW:

5       Q   If a security traded in a market that had

6    205 market makers, in your view, as an economist,

7    would it be more likely that that security is --

8    trades in an efficient market than one that has

9    seven market makers?

10       A   Not necessarily.

11       Q   Is the number of market makers relevant in

12    any way to your analysis of efficient market?

13       A   Could be.

14       Q   In connection with this analysis, was the

15    number of market makers relevant in connection with

16    your conclusion that the common stock traded in an

17    efficient market?

18       A   Well, let's see.

19          It informed my opinion, yes.

20       Q   In your opinion, is there a number of

21    market makers that would be too few to establish an

22    efficient market?

23       A   I -- that's not anything I've ever thought

24    about.

25       Q   If there were no market makers for a

1    security and they traded just between individual

2    buyers and sellers, would that support market

3    efficiency under Cammer Factor 3?

4        A    Well, so now you're asking me about under

5    Cammer Factor 3.  And then you get to court rulings.

6        Q    Are you giving a legal opinion in your

7    report or an economic opinion?

8        A    No.  I am presenting evidence that I

9    believe supports my findings in this report.

10        Q    If the evidence, under Cammer Factor 3 in

11    your analysis, was that there was only one market

12    maker for a security, would that support a

13    conclusion that the security traded in an efficient

14    market?

15            MR. HAKLAY:  Objection.

16            THE WITNESS:  It's possible.

17    BY MR. ISAJIW:

18        Q    If there were no market makers in a

19    security, would that support the conclusion in your

20    analysis that the security traded in an efficient

21    market?

22            MR. HAKLAY:  Objection.  Assumes facts not

23    in evidence.

24            THE WITNESS:  So in your hypothetical

25    example, nobody makes markets in the security.

```
                                         Page 238

 1    Sure.  Something could still about efficient with no

 2    market makers if just traded between individuals.

 3              There's no reason to -- yeah.  That's the

 4    answer.

 5    BY MR. ISAJIW:

 6       Q    Take a look at paragraph 134, page 49.

 7              It says (as read and/or reflected:)

 8                  During the Class Period,

 9              according to the trades reported to

10              TRACE, between 35 percent and

11              40 percent of the trades reported

12              were dealer transactions which

13              results from a large number or

14              dealers facilitating transactions

15              similarly to how Market Makers

16              increase the efficiency of the

17              equity market.

18              Do you see that?

19       A    I do.

20       Q    Did I read that correctly?

21       A    Yeah.

22       Q    Based on your analysis of the TRACE data --

23    I'm sorry.  Let me step back for a second.

24              Why would the proportion of

25    dealer-to-dealer trades be relevant to your
```

1    analysis?

2         A    Well, to the extent that oftentimes in

3    economics people make the argument that dealers are

4    more informed, that would -- that would influence my

5    analysis.

6         Q    Okay.

7              What do you mean by "dealer transactions"?

8         A    Dealer transactions defined by the TRACE

9    data.

10        Q    Okay.

11             And what is that -- is that between one

12   securities broker dealer and another securities

13   broker dealer?

14        A    As I sit here today, I would need to look

15   at the data to refresh my recollection.

16        Q    Do you believe, as you sit here today, that

17   a dealer transaction would -- in the TRACE data be

18   relevant to a dealer trading with a qualified -- a

19   QIB?

20        A    I don't understand the question.

21        Q    You indicated to me that the TRACE data, at

22   least in some way, indicates when it's a dealer

23   transaction.

24        A    That is correct.

25        Q    Does the TRACE data demonstrate any other

```
 1   type of transaction?
 2        A    As I sit here, I don't recall.
 3        Q    Did you review the TRACE data yourself in
 4   connection with your analysis?
 5        A    I did.
 6        Q    Do you know if the TRACE data identifies
 7   which dealers are trading the notes?
 8        A    Well, I -- when you say "which dealers,"
 9   you mean -- I don't believe so, as I sit here today,
10   but, again, I would need to look at the data
11   specifically to refresh my memory.
12        Q    Assuming you're correct that the TRACE data
13   does not identify which dealers were trading in a
14   transaction, how did you determine that there was a
15   large number of dealers?
16        A    Well, based on the fact that 35, 40 percent
17   of the trades were dealer transactions.
18             Maybe I was inartful.
19        Q    Based on the TRACE data, can you tell how
20   many dealers traded during the Notes Period?
21        A    Again, I would need to look at the TRACE
22   data to refresh my recollection.
23             I'm happy -- I'm happy if you have the
24   TRACE dataset, or at least a page of the TRACE
25   dataset to look over that.
```

```
 1          But as I sit here today, I don't
 2   specifically remember the answer to that question.
 3          Q   When you were doing your analysis, do you
 4   remember if you ever tried to determine how many
 5   dealers traded during the Notes Period?
 6          A   Again, I would refer to the same answer.
 7          Q   So you don't recall right now whether or
 8   not you ever tried to determine whether -- how many
 9   dealers traded during the Notes Period?
10          A   Again, looking at the TRACE data will help
11   me refresh my recollection.
12          Q   As to whether or not you tried to determine
13   that initially?
14          A   It will refresh my memory regarding the
15   TRACE data, and so, then, yes, it will refresh my
16   memory with regards to your question.
17          Q   So in connection with the note in Cammer
18   Factor 3, you looked at prominent underwriters,
19   market makers.
20          Cammer Factor 3, as we discussed earlier
21   today, also discusses arbitrageurs; correct?
22          A   I believe that -- so let's look back at ...
23   yes.
24          And I'm reading from paragraph 33 (as read
25   and/or reflected:)
```

```
                                                 Page 242
 1                  The Cammer court stated, "the
 2             existence of market makers and
 3             arbitrageurs would ensure
 4             completion of the market
 5             mechanism"...
 6        Q    So in connection with your analysis of the
 7   FXCM notes, under Cammer Factor 3, did you examine
 8   arbitrageurs?
 9        A    So is your question in the TRACE dataset is
10   there an indicator with regards to whether or not
11   these dealers are arbitrageurs?
12        Q    No.
13             My question is (as read and/or reflected:)
14                  So in connection with your
15             analysis for the FXCM notes, under
16             Cammer Factor 3, did you examine
17             arbitrageurs?
18        A    I don't know how to answer that question.
19        Q    Did you conduct any analysis to determine
20   whether or not arbitrageurs existed in trading for
21   the FXCM notes?
22        A    I do not know -- I have not pulled the
23   market participants and asked them why they bought
24   or sold the notes --
25        Q    Okay.
```

Page 243

1       A    -- which is what I would need to determine
2   whether or not they were arbitrageurs.
3       Q    Okay.
4            So the existence or nonexistence of
5   arbitrageurs is not a factor in your analysis of the
6   FXCM notes?
7            THE WITNESS:  Could you read the question,
8   please.
9            (The record was read back as
10           follows:
11               "Question:  So the existence
12           or nonexistence of arbitrageurs is
13           not a factor in your analysis of
14           the FXCM notes?")
15           THE WITNESS:  Again, I don't know the
16   overlap between what these traders were doing and
17   their purposes in doing it.
18           So to the extent that I was unable to ask
19   them the purposes of their trades, I guess that was
20   accurate.
21  BY MR. ISAJIW:
22       Q    Okay.
23       A    But, again, that's a guess based on
24   speculation.
25       Q    You don't remember incorporating the

Page 244

1    concept of arbitrageurs into your analysis of the

2    FXCM notes, sitting here today?

3            MR. HAKLAY:  Objection.  Asked and

4    answered.

5            THE WITNESS:  Yeah.  I'm -- I'm not sure

6    your question makes sense.

7            MR. HAKLAY:  Peter, before you ask your

8    next question, at the last break the witness ask

9    that we take breaks more frequently than every hour,

10   so I was thinking every 45 minutes, which is not for

11   another seven minutes, but I meant to tell you that

12   before we started again.

13           MR. ISAJIW:  I'm happy to accommodate, but

14   let's discuss that off the record when we get a

15   chance.

16      Q    Let's turn to Cammer Factor 5 as it relates

17   to your FXCM notes analysis.

18           And, again, this is (as read and/or

19   reflected:)

20               Price Reaction to New

21           Information.

22           Let me know when you're there.

23      A    Yep.

24      Q    Okay.

25           Did you include all three of the event days

Page 245

1    we discussed earlier with the common stock analysis

2    in your notes analysis?

3         A    Did I include them?

4              I think they're implicitly included, but

5    that was not one -- I did not look at the first

6    event date that I looked at with regards to the

7    equity when I was looking at the bonds.

8         Q    And why is that?

9         A    Because there's no reason for me to think

10   that the transaction undertaken by the company would

11   have any impact whatsoever on the firm's probability

12   of bankruptcy.

13        Q    Why not?

14        A    Why not?

15        Q    Yeah.

16        A    I -- there's no reason for me to think that

17   buying another company in this -- in which the

18   analyst said it was a positive would necessarily

19   impact the probability of bankruptcy.

20        Q    And that's the reason you've excluded it?

21        A    Yeah.

22             As I state in my report (as read and/or

23   reflected):

24                  Of the three events I selected

25             for testing FXCM common stock

1          market efficiency, only two events

2          occurred following the issuance of

3          the FXCM notes.

4          (Reporter clarification.)

5     BY MR. ISAJIW:

6          Q    So what I heard in your answer just a

7     moment ago is that you also had the view that unless

8     an event relates to the possibility of FXCM's

9     bankruptcy, it wouldn't be relevant to a noteholder?

10         A    No.  Let's -- let's be very specific here.

11              So turning to paragraph 137 of my report.

12              Clearly lays out my belief on this subject

13    matter (as read and/or reflected:)

14                   Because of bonds' seniority in

15              the capital structure of a company,

16              bonds' values and therefore prices

17              are insulated from all but the most

18              extreme news by a common stock

19              valuation cushion.

20                   As a result, bonds are

21              typically the least sensitive of

22              all securities to company-specific

23              news while being the most sensitive

24              to a change in a firm's probability

25              of default.

```
 1                    It follows that not all of the
 2               event study events selected for
 3               FXCM common stock would make
 4               suitable candidates for a bond
 5               market efficiency event study.
 6        Q    I recognize that that's what's written
 7   there.  But I'm talking about what you said earlier,
 8   which is (as read and/or reflected:)
 9                    There was no reason for me to
10               think that buying another company
11               in this -- in which the analyst
12               said it was positive would
13               necessarily impact the probability
14               of bankruptcy.
15               I asked (as read and/or reflected:)
16                    And that's the reason you
17               excluded it?
18               And you said (as read and/or reflected:)
19                    Yeah.
20                    Of the three events I selected
21               for testing FXCM common stock
22               market efficiency, only two events
23               occurred following the issuance of
24               the FXCM notes.
25               So I'm just getting back, not to what you
```

Page 248

1    wrote there, but I'm trying to better understand

2    your answer orally about the relationship to the

3    likelihood of bankruptcy and relevance to efficiency

4    of markets and notes.

5         A    Right.

6              So I didn't think that that particular

7    transaction would change the firm's probability of

8    default would be a more precise way to state what I

9    inarticulately stated before.

10        Q    Generally speaking, if an event would

11   change the firm's probability of default, is it more

12   likely that you would include it in an event study

13   for notes like the FXCM notes?

14        A    I mean, I would need to do -- I would need

15   to do that on a case-by-case basis.

16             I guess it --

17             THE WITNESS:  Could you ask the question

18   again or reread the question.  Sorry.

19             (The record was read back as

20             follows:

21                  "Question:  Generally

22             speaking, if an event would change

23             the firm's probability of default,

24             is it more likely that you would

25             include it in an event study for

```
 1          notes like the FXCM notes?")
 2          THE WITNESS:  It would depend on the
 3     situation.
 4     BY MR. ISAJIW:
 5     Q   The situation is it's more like -- more
 6     likely to result in a bankruptcy.
 7     A   Well, okay.
 8          Oh.
 9          When you say "more likely," 1 percent more
10     likely?  Two percent more likely?
11     Q   I'm trying to get your view of how -- what
12     percentage of likeliness to increase the probability
13     of bankruptcy is the threshold above which you would
14     enter an event into an event study for the FXCM
15     notes.
16          MR. HAKLAY:  For that reason alone?
17          THE WITNESS:  No.  I don't think --
18          MR. HAKLAY:  Objection.  Calls for a
19     hypothetical.
20          THE WITNESS:  That's not a --
21          MR. HAKLAY:  Misstates the facts in
22     evidence.
23          Please.
24          THE WITNESS:  That's not a question that
25     I've ever been asked to address in these types of
```

Page 250

1    analysis.

2    BY MR. ISAJIW:

3        Q   You have been asked just now.

4        A   Not in the context of doing my report.

5        Q   No.  I'm asking you the question now.  I'm

6    asking when you're -- you talked earlier about an

7    objective screening of events to include in the

8    event study.

9            You've just indicated that an event that is

10   increasing the probability of bankruptcy would be an

11   event that you would look at to include in the event

12   study related to the notes.

13           I'm asking:  What percentage of an

14   increased likelihood is required for you to actually

15   include it?

16           MR. HAKLAY:  Objection.  Argumentative.

17           Objection.  Misstates his --

18           MR. ISAJIW:  "Objection" is fine.

19           MR. HAKLAY:  Excuse me?

20           MR. ISAJIW:  "Objection" is fine.  We don't

21   need speaking objections.

22           MR. HAKLAY:  You don't need to tell me what

23   to say.  If I want to give a 50-word objection, I

24   will.  You can tell the judge one day, if you like.

25           Objection.  Argumentative.

```
                                        Page 251

 1              Objection.  Misstates his testimony.
 2              You can answer, sir.
 3              THE WITNESS:  I don't think I've ever
 4    thought about a bright-line test like it has to --
 5    it has to be done on a case-by-case basis.
 6    BY MR. ISAJIW:
 7         Q    Okay.
 8              On --
 9         A    In this --
10         Q    In this case --
11         A    In this case, I did not --
12         Q    -- it was -- I'm sorry.
13              MR. HAKLAY:  Finish your answer.  No, no,
14    just finish your answer, please.
15              THE WITNESS:  In this case, I did not
16    believe it significantly changed the firm's
17    probability of bankruptcy.
18    BY MR. ISAJIW:
19         Q    In this case, if one of the events you
20    reviewed in your objective screen increased the
21    probability of bankruptcy by 1 percent, would that
22    be likely to be included in your analysis or
23    unlikely?
24              MR. HAKLAY:  Objection.  Assumes facts not
25    in evidence.
```

Page 252

1           THE WITNESS:  Right.  It's an incomplete

2    hypothetical.  I mean, I can't do it.

3           Again, you would need -- I need to have the

4    entire context, look at the entire facts associated

5    with the situation in order to arrive at my

6    determination.

7    BY MR. ISAJIW:

8        Q   If an event, as part of your objective

9    screen -- strike that.

10          If in part of your objective screen you

11   reviewed an event that you determined was 87 percent

12   likely to increase the probability of FXCM's

13   bankruptcy, do you think you would include it in

14   your event study?

15          MR. HAKLAY:  Same objections.

16          THE WITNESS:  So in your hypothetical, the

17   probability of bankruptcy would be -- would increase

18   by 87 percent or the -- there would be an 87 percent

19   probability that that event would impact the

20   probability of bankruptcy?

21   BY MR. ISAJIW:

22       Q   I don't know.  I'm asking you.  Which of

23   those two would be relevant for your objective

24   screen?

25       A   Yours is an incomplete hypothetical.  It's

```
                                          Page 253

1    unclear.  I can't answer it, as I sit here today.
2         Q    If an event would increase by 87 percent
3    the likelihood of bankruptcy, would that be
4    something you would probably include in your event
5    study?
6              MR. HAKLAY:  Same objection.
7              THE WITNESS:  So in your incomplete
8    hypothetical example, if an event occurs that
9    increases the probability of a firm defaulting by
10   87 percent.  Again, I can't -- I would need more
11   facts in order to make that determination.
12   BY MR. ISAJIW:
13        Q    Of the events that you reviewed in
14   connection with designing your event study in this
15   case, was your view of probability of increasing
16   bankruptcy relevant to your selection process?
17             MR. HAKLAY:  Objection.  Asked and
18   answered.
19             Please answer it.
20             THE WITNESS:  I don't understand the
21   question.
22             I thought -- I don't understand the
23   question.
24             Can we take a break now?
25             MR. ISAJIW:  One second.
```

Page 254

1      Q   Earlier today you testified that you
2   reviewed a number of possible events for inclusion
3   in your event study; correct?
4      A   That is correct.
5      Q   And that you -- we talked about you have a
6   process where you considered to be an objective
7   screening for selecting amongst those which are the
8   actual events that you include; is that correct?
9      A   Well, we're not discussing my news/no-news
10   analysis, that is correct.
11      Q   Okay.
12          In that or any other context in your
13   analysis here, was probability of bankruptcy a
14   selection criteria?
15      A   I don't know how to answer that question.
16      Q   In the news/no-news context, was
17   probability of bankruptcy a selection criteria?
18      A   No.
19      Q   Okay.
20          In the event study, choosing the three --
21      A   Well, I do not believe so.
22      Q   Okay.
23          In your decision-making process to pick the
24   three days that you ultimately included in your
25   event study, was the probability of bankruptcy a

Page 255

1    selection criteria?

2         A    In my equity analysis?

3         Q    Let's start there.

4         A    I don't know.  It's not something I've ever

5    been asked before.  It's not something I've -- I

6    mean, I thought that those three events were new

7    material information that would result in a

8    statistically significant stock -- that was material

9    enough to result in a statistically significant

10   stock price movement.

11            With regards to the bonds, same answer

12   except I only found two events.

13        Q    Okay.

14            And was the selection process for the bonds

15   of those two events related to your perception of

16   increased likelihood of bankruptcy?

17            MR. HAKLAY:  Objection.  Asked and

18   answered.

19            THE WITNESS:  So is your question:  Do I

20   think the firm losing $220 million increased their

21   probability of bankruptcy?

22   BY MR. ISAJIW:

23        Q    That's not my question.  My question is --

24        A    Well, it is -- sorry.

25            May I please finish my answer?

Page 256

1      Q   You asked me a question --

2      A   No, I'm asking --

3      Q   I'm answering your question.

4          You asked me --

5          MR. HAKLAY:  You know what, it's been

6   almost an hour.  It's time to take a break.

7          THE WITNESS:  Let's take a break.

8   BY MR. ISAJIW:

9      Q   There's a question pending.  I would like

10  you to answer the question pending before we take a

11  break.  It's a relatively simple question.  If the

12  answer is yes or the answer is no, that's fine.

13         I'm just asking if your perception of

14  likelihood of bankruptcy was a selection criteria

15  for the event study in connection with the notes.

16         MR. HAKLAY:  Objection.  Argumentative.

17  Repetitive.  Asked and answered.

18         Please.  You can answer one more time.

19         THE WITNESS:  I believe -- and let me get

20  the number exactly correct.

21         For instance ...

22  BY MR. ISAJIW:

23     Q   Maybe I can reframe the question.

24     A   Well, no.  Let me answer your question as

25  stated.

1      Q    Okay.

2      A    So on paragraph 85, I'm quoting here (as

3  read and/or reflected:)

4           FXCM -- let's see --

5           Their clients owed them approximately $225

6  million.

7           So do I think that having their clients owe

8  them $225 million increases their probility of

9  bankruptcy?

10          Yes, I do believe that, but I did not

11  select that date strictly because it increased the

12  probability of the firm's bankruptcy.

13  BY MR. ISAJIW:

14      Q    Was it a relevant factor?

15      A    That's a question I have not considered, as

16  I sit here.

17      Q    Okay.  Now take a break --

18      A    I'm giving you the best answer I can give

19  you.

20          MR. ISAJIW:  I appreciate that.

21          THE VIDEOGRAPHER:  We are going off the

22  record.

23          The time is 3:52 p.m.

24          (Recess was taken at 3:52 p.m.

25          until 4:07 p.m.}

Page 258

 1          THE VIDEOGRAPHER:  We are back on the
 2   record.
 3          The time is 4:07 p.m.
 4   BY MR. ISAJIW:
 5       Q   Dr. Werner, I want to talk about your --
 6   again, in relation to the notice, your event study
 7   that you conducted under Cammer Factor 5, the
 8   section titled "Cammer Factor 5:  Price Reduction
 9   and New Information."
10          MR. HAKLAY:  Price reaction.
11   BY MR. ISAJIW:
12       Q   "Price Reaction to New Information."
13       A   All right.  Okay.
14          And what page?
15       Q   50.
16       A   Okay.
17       Q   And specifically just to start off, if you
18   turn a couple pages to 53.
19       A   Page 53?
20       Q   Yes.
21          We see "Event Study Results" as a heading
22   for the January 16th, 2015 day and the February 7th,
23   2017 day on 53 and 54, respectively.
24          And my first question is:  Did you perform
25   a news/no-news analysis for the FXCM notes like you

Page 259

1    did for the FXCM common stock?

2        A    I did not.

3        Q    Okay.

4            Why not?

5        A    I mean, I haven't seen it done in the past.

6    Certainly, no one's asked me to do it in the past.

7    I'm not sure I've ever seen a news/no-news analysis

8    for a bond offering.  So I guess I would say, to the

9    best of my understanding, it's not part of industry

10   practice.

11       Q    As an economist, is there a principal

12   difference between the equity and the bond -- the

13   equity security and the bond that would make the

14   news/no-news analysis inappropriate?

15       A    Well, so let's go back to what I -- where I

16   describe bonds.

17            So, again, this is reading from

18   paragraph 137 (as read and/or reflected:)

19                Because of bonds' seniority in

20            the capital structure of a Company,

21            bonds' values and therefore prices

22            are insulated from all but the most

23            extreme news by a common stock

24            valuation cushion.

25                As a result, bonds are

```
 1              typically the least sensitive of
 2              all securities to company-specific
 3              news while being the most sensitive
 4              to a change in a firm's probability
 5              of default.
 6                   It follows that not all of the
 7              event study selected for --
 8              sorry -- all of the event study
 9              events selected for FXCM common
10              stock would make suitable
11              candidates for a bond market
12              efficiency event study.
13        Q    Okay.
14              And so that's why there are few -- fewer
15   events in your event study for the bond, but I'm
16   just talking about the news/no-news analysis that we
17   discussed earlier with the common stock.
18        A    Right.  And that's my answer to your
19   question.
20        Q    What about that answer would indicate that
21   you cannot do a news/no-news study for bonds?
22              MR. HAKLAY:  Objection.  Misstates his
23   testimony.
24              THE WITNESS:  Right.  So you're asking --
25   now you say "cannot."
```

```
1           So is it possible to do one?  It is

2     possible to do one.  I'm not sure I've ever seen one

3     performed.

4     BY MR. ISAJIW:

5          Q    Okay.

6               You mentioned that twice that you haven't

7     seen one performed and that you don't believe that

8     it is part of any kind of industry standard.

9               What are you basing that on?

10         A    As I sit here today, my recollection.

11         Q    Okay.

12              Earlier we talked about how many times you

13    analyzed notes transactions from a market efficiency

14    perspective, as opposed to common stock, and I think

15    the summary of that was notes are a far fewer -- the

16    subject of notes is far fewer times the subject of

17    your analysis -- let me rephrase that.

18              Earlier we discussed your prior work in

19    connection with market efficiency analysis as

20    between common stock and notes.

21              And I believe you testified that you

22    analyzed notes far fewer than you do common stock;

23    is that correct?

24         A    I believe it is correct with regards to --

25    with regards to me acting as an expert.
```

1      In general, there are much fewer bond cases

2  than there are equity cases brought.

3      So I think industrywide, that statement is

4  true as well.

5      Q   Which statement?

6      A   That people analyze bonds less than they do

7  stock.

8      Q   Okay.

9      I'm asking if there's any reason why you --

10  why a news/no-news analysis would not be conducted

11  with a bond, as opposed to a stock.

12      MR. HAKLAY:  Objection.  Asked and

13  answered.

14      Please answer.

15      THE WITNESS:  Again, I refer you to

16  paragraph 137 and not -- I'm speaking not just of my

17  own analysis.  I've seen, obviously, other reports

18  on bond market efficiency.  I've just never -- to

19  the best of my recollection, as I sit here today, I

20  have not seen it done.

21  BY MR. ISAJIW:

22      Q   Which other reports on bond market

23  efficiency are you talking about?

24      A   I don't recall, as I sit here today.

25      Q   Is it possible to do a news/no-news

```
                                              Page 263

 1   analysis on bonds?

 2            MR. HAKLAY:  Objection.  Asked and

 3   answered.

 4            THE WITNESS:  As I stated before, is it

 5   possible?  So in the grand -- in the world of

 6   possibilities, yes, it is possible.

 7            Again, that having been said, I have, to

 8   the best of my recollection, I have never seen one

 9   performed.

10   BY MR. ISAJIW:

11       Q   And at any point in connection with this

12   analysis, did you try to perform one?

13            MR. HAKLAY:  Objection.  Asked and

14   answered.

15            Please answer.

16            THE WITNESS:  I don't believe so.

17   BY MR. ISAJIW:

18       Q   And when you made the decision not to

19   perform one, was that based on anything, other than

20   you just haven't seen them being done before and

21   that you were not asked to do one?

22       A   Asked to do one.

23            So I don't understand the question.

24            Are you suggesting that -- I don't

25   understand the question.
```

Page 264

1          Q    I thought when I asked you earlier about
2      whether or not you did, you said no.
3                And I said, "Why not?"
4                And I believe you said you weren't asked to
5      do one.
6          A    No.
7          Q    Okay.
8          A    That's inaccurate.
9          Q    Okay.
10               Were you asked to do one?
11         A    I'm never asked to do any specific
12     analysis.
13         Q    So at some point during your analysis, you
14     did a news/no-news for the common stock; correct?
15         A    Not at the -- that is correct, but not at
16     the behest of plaintiffs' counsel.
17         Q    I wasn't suggesting it was.  I was just
18     asking if you did it.
19         A    Right.  But your previous question was
20     about had anyone asked me to do an analysis.  And so
21     I'm just trying to be clear about what we're talking
22     about here.
23         Q    Okay.
24               To be clear, at some point during your
25     analysis, you did a news/no-news analysis for the

```
                                              Page 265

 1    common stock.

 2             Yes or no?

 3        A    That is correct.

 4        Q    Okay.

 5             You also, at some point in your analysis,

 6    had to make a decision whether or not to do a

 7    news/no-news analysis with the bond; correct?

 8        A    I -- I'm sorry.  Could you reread the

 9    question?

10             (The record was read back as

11             follows:

12                 "Question:  You also, at some

13             point in your analysis, had to make

14             a decision whether or not to do a

15             news/no-news analysis with the

16             bond; correct?")

17             THE WITNESS:  I'm not sure how to answer

18    that question.

19             I refer you to my previous answers about

20    why I didn't do one.

21    BY MR. ISAJIW:

22        Q    And your previous answer is paragraph which

23    again?  I'm sorry.

24        A    Well, can you read back my answer from

25    before?
```

1    Q    Is it one -- I believe it's 137.

2    A    It is paragraph 137, but I don't -- I don't

3    believe that that was the only reason I stated I did

4    not do it.  And so as to be as accurate as possible,

5    if you would like me to have her read back the exact

6    statement --

7    Q    I don't want her to read back.  I'm just

8    trying to make sure that I get your best answer.

9         You did not do a news/no-news analysis for

10   the bond, partly because of the reasons in 137;

11   correct?

12   A    That is correct.

13   Q    Okay.

14        Were there any other reasons?

15   A    Other than the ones -- the other ones I

16   stated?

17   Q    Which are the other ones that you stated?

18   A    Again, just for accuracy, can you please

19   read back my statement where I discussed my decision

20   initially not to do this type of analysis?

21   Q    I think reading that record would be

22   difficult to do.

23        So let me try to break it down.

24        Of the reasons you did not do a

25   news/no-news analysis, one of them were the reasons

Page 267

1   in paragraph 137; correct?

2       A    That is correct.

3       Q    One of them is you do not believe it is an

4   industry standard to do a news/no-news analysis for

5   bonds; is that correct?

6       A    If that is what I stated, then that is

7   correct.

8       Q    I'm asking you if that's correct now as you

9   sit here today, regardless of whether or not you

10  said that before.

11      A    I don't remember the exact way I phrased

12  it.  At this point, I'm just confused about the

13  question.

14          I'm -- let me say it this way:  I have

15  answered your question to the best of my ability.

16      Q    And I'm trying to make sure I understand

17  your answer.

18          So part of the reason was 137.  Part of the

19  reason was, you don't believe it's an industry

20  standard to do a news/no-news analysis on the bond;

21  correct?

22      A    I'm not sure that that's exactly what I

23  said.

24          I believe I --

25      Q    Would you adopt that statement now

Page 268

1   regardless of whether or not you said it before?

2       A   Oh, so now the statement is it is not an

3   industry standard.

4           I do not believe I have seen a news/no-news

5   analysis performed for bonds before.

6       Q   Okay.

7       A   That is my full understanding.

8       Q   So part of the reason is that you have not

9   seen it done before; correct?

10      A   I'm telling you -- I've answered your

11  question to the best of my ability.

12      Q   Is any part of the reason that it could not

13  be done?

14          MR. HAKLAY:  Objection.  Asked and

15  answered.

16          THE WITNESS:  I'm sorry.  What was the

17  question?

18          (The record was read back as

19          follows:

20              "Question:  Is any part of the

21          reason that it could not be done?")

22          THE WITNESS:  Oh, so, again, I would refer

23  you read my previous answer.  It is possible to do

24  one.

25          That having been said, I have never seen,

```
                                        Page 269
 1    to the best of my knowledge or the best of my
 2    remembrance, as we sit here today, one having been
 3    performed.
 4    BY MR. ISAJIW:
 5         Q   Other than the reasons we've talked about,
 6    can you think of any other reason why you did not
 7    perform a news/no-news event analysis on the bond?
 8         A   Any other reason than what I have
 9    previously stated?
10             I don't believe so, but at this point, I'm
11    not -- I don't believe so.
12         Q   Okay.
13             In your review of the bond, do you note
14    whether or not the bond traded on each day of the
15    Notes Period?
16         A   I'm sorry.  Where are you looking?
17         Q   I'm not looking anywhere.  I'm asking you a
18    question.
19         A   Okay.
20             Sorry.  Then, I don't understand the
21    question.
22         Q   Do you know if the bond traded on each day
23    of the Notes Period?
24         A   Oh, I don't believe so.
25         Q   Okay.
```

1    Would it be appropriate in your analysis to

2  consider trading of the bond that occurred over a

3  weekend?

4    MR. HAKLAY:  Objection.  Vague.

5    THE WITNESS:  I don't understand the

6  question.

7  BY MR. ISAJIW:

8    Q    If a bond traded over a weekend, would you

9  include that in your analysis of market efficiency,

10  pursuant to your report?

11    MR. HAKLAY:  Same objection.

12    THE WITNESS:  So in your hypothetical

13  example, the bond trades over the weekend?

14  BY MR. ISAJIW:

15    Q    Uh-huh.

16    A    So someone buys and sells it over the

17  weekend, like, let's say, Saturday?

18    Q    Yes.

19    A    I'm -- that's not anything I've ever had to

20  consider before.

21    I would need more time to think about that.

22    Q    Do you know if the FXCM bonds at issue in

23  this case that you analyzed ever traded over a

24  weekend in connection with the Notes Period?

25    A    And, again, just for my clarification, when

1   we talk about "traded," we mean bought and sold --

2   and when you say "over a weekend"; right, because

3   over a weekend, when we usually talk about it from

4   the point of view of these types of analysis, it

5   means from, like, Friday to Monday.

6          So you're saying, in your hypothetical

7   example -- and to the best of my knowledge, it is

8   hypothetical -- maybe it did occur?

9          When you say "over the weekend," you're

10  talking about a transaction, just by way of my

11  example, someone bought and sold a bond on a

12  Saturday?

13     Q    In that example, would it be appropriate to

14  consider that trading activity in your analysis?

15     A    That's not something I've ever been asked

16  to think about before.  So I would need more time to

17  think about it.

18          As I sit here today, I can't answer that

19  question.

20     Q    Do you know if that occurred with the FXCM

21  notes during the Notes Period?

22     A    As I sit here today, I do not know.

23     Q    Okay.

24          If it did occur, do you believe you've

25  included those trades in your analysis?

```
 1        A    Again, I don't know.
 2        Q    Do you believe you've included all trades
 3   during the Notes Period in your analysis?
 4        A    To the best of my -- what do you mean by
 5   "all trades"?  I'm not sure I understand the
 6   question.
 7        Q    There's a specific period of time that
 8   we've been referring to as the Notes Period; is that
 9   correct?
10        A    That is correct.
11        Q    You understand that specific period of
12   time; correct?
13        A    I do.
14        Q    Trading of the notes occurred within that
15   window of time?
16        A    That is correct.
17        Q    You studied the trading of the notes within
18   that period of time in connection with your market
19   efficiency study for the notes; correct?
20        A    That is correct.
21        Q    Did you include all trading of the notes in
22   that window of time in your analysis?
23        A    Right.  And so here's where we -- this is
24   where I'm having problems, right.
25             I mean, there could be off-market trades
```

1    that aren't necessarily reported.  And I could think

2    of all sorts of examples where trading occurs.  And

3    when people talk about things like dark pools, when

4    we talk about equity, trading occurs.  It's not

5    necessarily reported.

6            So I'm -- if you want to -- if you want to

7    show me where this has occurred, I may have a better

8    understanding of it.  But given -- given my

9    understanding of how trading is defined, I don't

10   know the answer to your question.

11       Q   Do you believe that Rule 144A bonds trade

12   in dark pools?

13       A   I don't -- I, as I sit here today, have no

14   opinion about that one way or the other.

15       Q   Okay.

16       A   Certainly -- oh.

17       Q   Any of the trading of the bonds in relation

18   to the FXCM notes that you analyzed -- sorry.  Let

19   me rephrase that.

20           Are you aware of any trading in connection

21   with the FXCM notes that you looked at in connection

22   with your market efficiency analysis that occurred

23   through a dark pool?

24       A   Well, so let's just be clear.

25           I was giving you an example of a period of

Page 274

1   time where a trade might occur that it would not

2   necessarily be reported.

3           I was not -- I did not mean to suggest that

4   FXCM's notes were traded in a dark pool.  That was

5   not my intention.

6       Q   Okay.

7           Looking at paragraph 140 of your report, it

8   says (as read and/or reflected:)

9               For the February 7, 2017

10              event, there was no trading price

11              for the FXCM notes in the eight

12              days preceding February 7, 2017.

13              The earliest available price for

14              FXCM notes prior to the February

15              2017 was on January 2016.

16              Consequently, I performed the

17              event study for February 7, 2017,

18              using the FXCM notes' return from

19              January, 26, 2017, to February --

20              February 7th, 2017.

21          MR. HAKLAY:  I'm going to -- just for you

22   at one point in the middle there, unintentionally

23   you said "January 2016."  I know you meant

24   "January 26, 2017," as you later said.

25          MR. ISAJIW:  Thank you for that correction.

1     Q   Did I read that, other than that

2  correction, correctly?

3     A   Yes.

4     Q   Is it -- did you use the return from

5  January 26, 2017, because there was no evidence of

6  trades on January 27, 2017?

7        I'm just trying to understand the import of

8  that paragraph.

9     A   I don't understand the question.

10     Q   Explain to me at a very high level why you

11  performed the event study from -- for February 7,

12  2017, using FXCM notes return from January 26 to

13  February 7, 2017.

14        MR. HAKLAY:  Objection to the term "at a

15  very high level."

16        THE WITNESS:  Right.

17        So my understanding is that the earliest

18  available price for the FXCM notes prior to

19  February 7th, 2017, was on January 26, 2017.  That

20  is the reason why I used it.

21  BY MR. ISAJIW:

22     Q   Okay.

23        So there was no trading -- there was no

24  other trading?  That was the only trading that you

25  could find?

```
                                          Page 276
 1            MR. HAKLAY:  Objection.  Asked and
 2   answered.
 3            THE WITNESS:  Could you read back my
 4   question -- my answer, please.
 5            (The record was read back as
 6            follows:
 7                 "Answer:  Right.
 8                      So my understanding is
 9            that the earliest available price
10            for the FXCM notes prior to
11            February 7th, 2017, was on
12            January 26, 2017.  That is the
13            reason why I used it.")
14            THE WITNESS:  That is correct.  That is my
15   understanding.
16   BY MR. ISAJIW:
17       Q   Okay.
18            And in paragraph 142, one, two, three, four
19   lines down, you say (as read and/or reflected:)
20                 For the Notes, the regression
21            data series included only days on
22            which there was a trading price for
23            two consecutive trading days, so
24            that a one-day return could be
25            computed.
```

```
                                              Page 277

 1            Why is it important to have two consecutive
 2    trading days?
 3        A   Why is it important to have two consecutive
 4    trading days?  It's just -- it's commonly what's
 5    done in the -- in the profession.
 6        Q   Any other reason?
 7        A   No.  That's ...
 8        Q   And when you say (as read and/or
 9    reflected:)
10                It's commonly done within the
11            profession.
12            Which profession are you referring to?
13        A   Profession where anyone tries to -- tries
14    to undertake a market model estimating bond returns.
15        Q   Would that be economists?
16        A   I believe economists might undertake that.
17        Q   Anybody else?
18        A   I'm sure other people undertake that as
19    well.
20        Q   Any other profession that springs to mind
21    when you say "it's common in the profession"?
22        A   I mean -- I mean, if -- I'm sure if I went
23    to some trading firms and they were trying to do
24    models predicting bond returns or trying -- they
25    would commonly use that as well.
```

```
                                            Page 278
 1            So that would be one such example.
 2       Q    Okay.
 3            Do you know how many days have consecutive
 4   trading in the bond during the Notes Period?
 5            MR. HAKLAY:  I'm going to object as vague
 6   because I don't know if you mean both days count as
 7   one or both days count as two, if it's consecutive.
 8            THE WITNESS:  Yeah.  As I sit here today, I
 9   don't recall.
10   BY MR. ISAJIW:
11       Q    Do you believe it was uncommon to have
12   consecutive trading days in the bond during your
13   analysis of the Note Period?
14            MR. HAKLAY:  Objection.  Vague as to the
15   word "uncommon."
16            THE WITNESS:  I was going to ask you to
17   define uncommon.  So I guess I agree with the
18   objection that the term is vague.  I can't answer
19   the question.
20   BY MR. ISAJIW:
21       Q    Do you have -- what is your understanding
22   of the term "uncommon"?
23       A    In what context?
24       Q    In this context.
25       A    I don't know your -- if I use the word
```

1  "uncommon" in my report, I'm happy to have you point

2  it out to me, and then I'll be able to give you a

3  better understanding.

4          But I'm not sure.  You're asking the

5  question.  I don't know.

6      Q   Let me rephrase the question.

7          When you reviewed the trading of the bonds

8  during the Notes Period, how many pairs of

9  consecutive trading days were there?

10     A   I refer to my previous answer.

11     Q   Which is what?

12     A   I don't recall.

13         You asked it about a minute ago, that

14 specific question.

15     Q   So if you look at Exhibit 11.

16         MR. HAKLAY:  11 he said.  Not 12.

17 BY MR. ISAJIW:

18     Q   What is Exhibit 11?

19     A   It's my regression results for the bonds.

20     Q   Is there anything on Exhibit 11 that would

21 refresh your recollection as to how many

22 consecutive -- how many days -- how many pairs of

23 consecutive days the bonds traded?

24     A   As I sit here today, I see the number 66.

25 So my guess is that's probably the right number.

Page 280

1      Q    And that's 66 out of how many days?

2      A    Well, whatever --

3      Q    It's more than two years?

4      A    It is more than two years.  That is

5  correct.

6      Q    So that is a relatively low number of days

7  with consecutive trading.  Would you agree?

8           MR. HAKLAY:  Objection to the term.

9           Please answer.

10           THE WITNESS:  No, I would not agree.

11  BY MR. ISAJIW:

12      Q    Is it more than half of the days?

13      A    That's a different question.  Is it more

14  than half of the days?  More than half of the days

15  during the -- during that period?

16      Q    Yes.

17      A    It is -- so is 66 more than 252 times 2?

18  66 is not more than -- and, again, 252 times 2 is

19  just an estimation on my part.

20      Q    So 66 is under observations.  And that

21  means bond price observations in connection with

22  your regression study; is that correct?

23      A    With my mark -- with my market model, I

24  believe that is correct.

25      Q    Do you know how many bond price

1    observations you excluded from your analysis because

2    the bond price did not occur within a consecutive

3    trading day?

4         A    Do I know how many?

5              THE WITNESS:  Could you repeat the

6    question, please.

7              (The record was read back as

8              follows:

9                   "Question:  Do you know how

10             many bond price observations you

11             excluded from your analysis because

12             the bond price did not occur within

13             a consecutive trading day?")

14             THE WITNESS:  As I sit here today, I do

15   not.

16   BY MR. ISAJIW:

17        Q    But there were some?

18        A    I believe that's an accurate statement.

19        Q    Do you know if there were more than 66?

20        A    As I sit here today, I don't know.

21        Q    Is there anything in your report that you

22   could refer to, to figure that out?

23        A    Possibly.  It looks like I could add up all

24   the observations on Exhibit 12.

25             So one, two --

Page 282

1            MR. HAKLAY:  Hold on.

2   BY MR. ISAJIW:

3       Q   I'm not asking you to add it up.  I'm just

4   asking to see if that's how you would figure it out,

5   Exhibit 12.

6       A   I believe so.

7       Q   Okay.  Thank you.

8           So referring back to paragraph 140 on

9   page 51.

10      A   Okay.  Paragraph 140 on page -- there we

11  go.  140.

12          Yeah.  Okay.

13      Q   So for the February 7th, 2017 event, you

14  used an 11-day window to calculate the return on the

15  bond, meaning from January 26, 2017, to February 7,

16  2017; is that correct?

17      A   What do you mean by "window"?

18      Q   Number of days.

19      A   So could you restate the question with

20  "number of days" instead of "window"?

21      Q   Is there anything particular about the word

22  "window" that is confusing you?

23          MR. HAKLAY:  Objection.  Argumentative.

24          THE WITNESS:  Well, oftentimes window is a

25  term of art in economics.  So I don't know how

```
                                          Page 283

 1   you're using it.
 2   BY MR. ISAJIW:
 3        Q   And what does that term of art refer to in
 4   economics?
 5        A   It would depend on the situation.  But it's
 6   not -- it's not -- there's not a -- necessarily a
 7   common definition of it.
 8        Q   Your calculation here results in an 11-day
 9   return; is that correct?
10        A   I'm not sure that's correct.
11        Q   Okay.
12            In this particular example for this one
13   event, you used an 11-day period to calculate the
14   return on the bond; is that correct?
15        A   I used the price on February 7th and
16   January 26th.  If that's 11 days, then I believe the
17   answer to your question is yes.
18        Q   Okay.
19            And that's to calculate the return in
20   connection with the February 7th event; correct?
21        A   I'm sorry.  The what?
22        Q   The return.
23        A   On which day?
24        Q   February 7, 2017.
25        A   That is correct.
```

```
                                                   Page 284

 1        Q    Okay.

 2             Have you ever seen an 11-day return used to

 3   measure a single-day event in any peer-reviewed

 4   academic study?

 5        A    Have I ever seen -- I have -- as I sit here

 6   today, I have no idea.

 7        Q    Okay.

 8             When you do this type of analysis, is it

 9   often -- is it common for you to use an 11-day

10   period in your calculation for a single-day event?

11        A    Well, to the extent that normally when I

12   perform this analysis, it's on equities, no; that

13   would be uncommon.

14        Q    Okay.

15        A    But to the extent that this is a bond

16   offering, I can't say whether it would be common or

17   uncommon.

18        Q    Okay.

19             In your calculation, are you assuming that

20   the bond price stayed constant between the last

21   trade on January 26th and the first trade on

22   February 7th?

23        A    What do you mean by remain constant?

24        Q    Did not change.

25        A    Am I making the assumption that the price
```

Page 285

1    did not change -- I don't understand the question.

2        Q    If the price changed in the 11-day period,

3    would that affect your calculation?

4        A    Possibly.

5        Q    Are you assuming for the sake of this

6    calculation that the price did not change during

7    those 11 days?

8        A    And, again, I'm just not -- so are you --

9    is the question did another trade occur during that

10   11 days in which the price changed?

11        I don't -- I don't quite understand the

12   question.

13        Q    I'm just trying to think of different ways

14   to phrase it.

15        Are you assuming, for the sake of this

16   calculation, that the bond would have traded at the

17   same price on February 1 as January 26th?

18        A    Am I making the assumption that the bond

19   price would have --

20        THE WITNESS:  Can you reread the question,

21   please.

22        (The record was read back as

23        follows:

24           "Question:  Are you assuming,

25        for the sake of this calculation,

Page 286

1           that the bond would have traded at

2           the same price on February 1 as

3           January 26th?")

4           THE WITNESS:  I don't understand the

5    question.

6    BY MR. ISAJIW:

7        Q   If the bond price could have moved between

8    January 26th and February 7th due to other

9    information occurring within that time period, how

10   can you interpret that return as measuring the

11   impact on the alleged disclosure of the

12   February 7th, 2017 event?

13           Can you?

14       A   Oh, so you're -- wait.

15           Are you assuming that additional events

16   occurred during that window that moved the -- that

17   would have impacted the bond price?

18           Is that what your hypothetical is assuming?

19       Q   I'm asking if that happened.

20       A   To the best of my knowledge.

21           I mean -- well, so information -- I'm sure

22   information came out during that period, but

23   information that affected the bond prices?  Not to

24   my knowledge.

25           Or information that would have affected the

Page 287

1    bond prices?  Not to my knowledge.

2        Q   If it did occur, would that affect this

3    calculation?

4        A   So in your hypothetical, news that would be

5    of such import occurred during that seven-day window

6    that would have been significant enough to change

7    the bond price, would that have moved the bond

8    price?

9            I -- I don't know.  I don't even know how

10   to answer that question.

11       Q   No.  I'm asking, are you assuming for this

12   calculation that that did not occur, that the bond

13   price remained constant between January 26, 2017,

14   and February 7, 2017?

15       A   And, again, I think I've stated, I don't

16   know how to answer that question.

17       Q   Okay.

18           When you were analyzing the corrected --

19   the disclosure event for the common stock, do you

20   use the sub period of February 8, 2016, to

21   February 6, 2017, when you're testing the reaction

22   of the common stock?

23       A   I'm sorry.  Could you repeat the question.

24       Q   In connection with your analysis in common

25   stock for this trading event, the February 7th, 2017

Page 288

1   trading event -- I'm sorry -- disclosure event, you

2   used a sub period, which was February 16 to

3   February 17.

4        A    The sub period?  I'm sorry.  I don't

5   understand the question.

6        Q    You broke down your analysis of the common

7   stock into sub periods; correct?

8        A    Well, so which sub periods are we talking

9   about?  Are we talking about the market model sub

10  periods?

11       Q    Okay.  Yes.

12       A    Well, then yes.  By definition, I broke

13  those down into sub periods.

14       Q    Why didn't you do that with the notes?

15       A    Oh, so we're going -- okay.

16            I -- at this point in time, I would refer

17  to my answer, which I previously gave, with regards

18  to that question.

19       Q    Which answer?

20       A    I don't have anything more to say on that

21  subject.

22            It occurred maybe an hour or two hours ago.

23  That specific question was asked.

24       Q    Was one of the reasons because you did not

25  have enough consecutive trading days for the bond?

1    A    I've answered that question to the best of

2    my ability.  I believe my -- the answer that I gave

3    previously is the best answer I can give at this

4    point in time.

5    Q    When we went through that answer, was one

6    of them that you did not have enough consecutive

7    trading days for the bond?

8    A    I don't recall whether or not that was part

9    of my answer.

10    Q    Sitting here today, do you believe that one

11    of the reasons is because you did not have enough

12    consecutive trading days for the bond?

13    A    I don't have an opinion one way or the

14    other, as I sit here today.

15    Q    For the period of February 8th, 2016, to

16    February 6th, 2017, do you know how many consecutive

17    trading days there are for the bond?

18    A    I'm sorry.  So February 8th?

19    Q    2016.

20    A    Okay.  February 8th, 2016, to when?

21    Q    February 6th, 2017.

22    A    February 6th, 2017.

23         Okay.  Hold on.

24         Based on -- and, again, I'm reviewing

25    Exhibit 12.  I believe the answer to your question

```
                                                Page 290
 1   is zero, but I would have to fully review all the

 2   data to -- I would need to look at each -- my entire

 3   dataset to give you a more accurate answer to that

 4   question.

 5       Q    Okay.

 6            Let's move to the Unger/Krogman factors in

 7   connection with the notes, which is on page 54 and

 8   paragraph 152.

 9            Let me know when you're there.

10       A    Okay.

11       Q    You state (as read and/or reflected:)

12               In addition to evaluating the

13               efficiency of the market for FXCM

14               notes using the Cammer factors, I

15               also analyzed the Unger/Krogman

16               factors that are relevant to the

17               bond market, market capitalization

18               (or total par value) and float.

19       A    Maybe I'm looking at the wrong part.

20            Which paragraph?

21       Q    152.

22       A    Oh, so is that in the beginning of the

23   paragraph?

24            MR. HAKLAY:  Yes.  He's reading from the

25   very beginning of the paragraph.
```

```
                                        Page 291

 1              THE WITNESS:  Oh, okay.  So -- okay.

 2    BY MR. ISAJIW:

 3         Q    The next sentence says (as read and/or

 4    reflected):

 5                   Because bid-ask data are not

 6              reported by TRACE for bond

 7              transactions, this Unger/Krogman

 8              factor was not assessed for the

 9              FXCM note.

10              Did I read that correctly?

11              (Reporter clarification.)

12              THE REPORTER:  Thank you.

13    BY MR. ISAJIW:

14         Q    Did I read that correctly?

15         A    You did.

16         Q    Okay.

17              Are there any other data sources for

18    bid-ask spread quotes, other than TRACE?

19         A    For bonds?

20         Q    Yes.

21         A    As I sit here today, I don't know.

22         Q    Did you endeavor to look for any other

23    sources of bid-ask data, other than TRACE for bonds,

24    in connection with your review of the FXCM notes in

25    this matter?
```

Page 292

1        A    I do not believe so.

2        Q    Why didn't you?

3        A    Why didn't I?  Again, I'm going back to

4    industry standards.  TRACE is the dataset usually

5    used to perform these types of analysis.  It doesn't

6    report bid-ask spread --

7             THE REPORTER:  It doesn't report what?

8             THE WITNESS:  Bid-ask spreads.  So ...

9    BY MR. ISAJIW:

10       Q    Let's look at paragraph 154 on page 55.

11   And this is under the ultimate heading on the top of

12   the page, "Outstanding Par Value (Market

13   Capitalization)."

14            MR. HAKLAY:  He's there.

15            THE WITNESS:  Oh, I'm sorry.  Yes.

16   BY MR. ISAJIW:

17       Q    You state (as read and/or reflected:)

18               Beyond FXCM's large common

19            stock market capitalization, the

20            total par value of the FXCM notes

21            was larger than the market

22            capitalizations of some

23            publicly-traded companies.

24            Is that correct?

25       A    That is correct.

1     Q    Throughout this report, you highlight the

2    differences between how stocks and how bonds trade.

3         So why did you benchmark the bond size to

4    an equity market capitalization?

5     A    Because that was the universe that I had

6    data on.

7     Q    Do you believe that that analysis is an

8    industry standard?

9     A    I don't know one way or the other whether

10   that analysis is an industry standard.

11    Q    Did you look for any other sources of data

12   to benchmark the bond against?

13    A    In this context?

14    Q    Yes.

15    A    For this analysis?  I don't believe so.

16    Q    Are you aware of any peer-reviewed academic

17   literature supporting this methodology?

18    A    I'm not familiar one way or the other.

19        I mean, this typically -- I don't -- I

20   don't think people -- I don't think this is an

21   analysis that's commonly done outside of litigation.

22    Q    Okay.

23        MR. ISAJIW:  How are we on time?

24        MR. HAKLAY:  We started this one at 4:07.

25        THE VIDEOGRAPHER:  Do you need a time?

```
 1              We're at 5 hours and 23 minutes.
 2              MR. HAKLAY:  You meant total time?
 3              MR. ISAJIW:  No.
 4              I'm asking how long have we been since the
 5     last break?
 6              MR. HAKLAY:  43 minutes.  So --
 7              MR. ISAJIW:  Maybe this would be a good
 8     time to stop while we change gears.
 9              MR. HAKLAY:  Thank you.
10              I didn't understand the question.
11              Yes.
12              THE VIDEOGRAPHER:  We are going off the
13     record.
14              The time is 4:50 p.m.
15              (Recess was taken at 4:50 p.m.
16              until 5:02 p.m.}
17              THE VIDEOGRAPHER:  We are back on the
18     record.
19              The time is 5:02 p.m.
20     BY MR. ISAJIW:
21          Q   So, Dr. Werner, I wanted to discuss your
22     damages opinion and damages methodology for a little
23     bit.
24              On page 5 of this report, Opinion 3, you
25     state (as read and/or reflected:)
```

Page 295

1           With expert assistance, the
2           finder of fact in this matter will
3           be able to compute damages using a
4           common class-wide methodology that
5           applies to the calculation of
6           damages for each and every Class
7           member.
8           Is that correct?
9      A    You read that correctly.
10     Q    And then on page 56 you have a heading,
11  "Common Damages Methodology."
12     A    "Common Damage," singular, "Methodology."
13  Maybe it should say "damages."
14     Q    Okay.
15          Did you draft this section of your report?
16     A    At some point in my life, yes.
17     Q    Okay.
18          So this is -- this section or parts of it
19  have been used in prior reports of yours?
20     A    I believe that's correct.
21          So, by way of example, I mean, I would
22  typically use this language (as read and/or
23  reflected):
24               Plaintiffs' counsel -- and
25          this is paragraph 156 -- has asked

Page 296

```
 1            me to opine on whether per share
 2            out-of-pocket damages could be used
 3            for each Class member under Section
 4            10(b) of the Exchange Act using a
 5            common methodology for all Class
 6            members.
 7      Q    Okay.
 8            I was just asking because you said at some
 9   point in your life, and I thought that meant not
10   necessarily for the first time here.
11      A    Well, it -- no.  I mean, if we're going
12   through the entire thing, yes, certain portions of
13   this were specifically drafted for this report.
14      Q    Okay.
15      A    Or this case, I guess.
16      Q    Generally speaking, does one damage model
17   work for all securities litigation cases?
18            MR. HAKLAY:  Objection.
19            THE WITNESS:  Does one -- I don't
20   understand the question.
21   BY MR. ISAJIW:
22      Q    You describe a damages methodology in this
23   report; correct?
24      A    Yes, that is correct.
25      Q    Is part of that damages methodology a
```

```
                                        Page 297

 1   damages model?

 2        A    So a damages model, I think, is slightly

 3   more complex.  I have been asked to opine on whether

 4   or not per-share damages could be measured each --

 5   for each Class member under Section 10(b) of the

 6   Exchange Act using a common methodology for all

 7   Class members.

 8             So I've opined upon that.  I have not --

 9   until the record is complete.  I could not give you

10   a full-blown damage model.

11        Q    Okay.

12             So you haven't created a damage model?

13        A    Created a damage model?

14             I have provided a framework under which one

15   could calculate damages.

16        Q    That framework that you provided, would

17   that work for all securities class action cases?

18        A    I think by definition, no.

19        Q    Okay.

20             Have you ever proposed a different

21   framework in any of the securities cases that you've

22   been a testifying expert for in the past?

23        A    At the market efficiency stage?

24        Q    Yes.

25        A    I don't know.  I would need to think about
```

```
                                        Page 298

 1    that.

 2              Yeah.  I'm just providing a framework under

 3    which to calculate damages.

 4              I don't know.  I'm sorry.  I don't know how

 5    to answer your question.

 6        Q    So you provided a particular framework in

 7    this report, which we'll get into the details of,

 8    but, generally speaking, you provided a framework;

 9    correct?

10        A    What do you mean by "generally speaking"?

11        Q    Let me rephrase it.

12              I believe you just told me that you

13    provided a framework for calculation of damages in

14    this report.

15        A    That is correct.

16        Q    Okay.

17              Have you provided that same framework in

18    prior securities litigation cases in a market

19    efficiency report?

20        A    Have I provided that same framework?

21              I'm not sure how to answer that question.

22        Q    Help me help you -- help me ask a better

23    question.

24              What is confusing about the question?

25        A    I just don't understand it.
```

1     Q   You refer to a framework in this report.

2  I'm asking if you used this framework in prior

3  matters at the market efficiency stage -- I'm

4  sorry -- at the class certification stage.

5     A   I have provided a framework under which one

6  could estimate damages in this specific case.

7     Q   Okay.

8        Have you ever proposed a different

9  framework in another matter?

10     A   I'm sure I have.

11     Q   Have you ever proposed a different

12  framework in a securities class action case?

13     A   Hmm.  I don't know, as I sit here today.

14     Q   You currently cannot think of a time when

15  you proposed a different framework in a securities

16  class action case?

17     A   I think --

18        THE WITNESS:  What was my answer to the

19  previous question?

20        (The record was read back as

21        follows:

22            "Answer:  I don't know, as I

23        sit here today.")

24        THE WITNESS:  Yeah.  Still I don't know, as

25  I sit here today.

Page 300

1    BY MR. ISAJIW:

2         Q    Turning to page 57, paragraph 159,

3    subparagraph "i." You talk about a number of

4    valuation tools including an event study analysis

5    and potentially other empirical analyses, if

6    necessary.

7              Do you see that?

8         A    Yes.

9         Q    Okay.

10             Apart from an event study, what are the

11   other empirical analyses that you're referring to?

12        A    I mean -- again, until I have the full

13   record for this case, I would be -- I would be

14   speculating to talk about other empirical analyses.

15        Q    Can you give me just an idea of what's on

16   the menu for potential other empirical analyses?

17        A    Not until I have a full record of the case.

18        Q    In any other case, have you used other

19   empirical analyses, apart from an event study?

20        A    I believe so.

21        Q    In a securities litigation case?

22        A    I'm sorry.

23             Under market efficiency, or are we talking

24   now about loss causation and damages when we're

25   talking about a securities case?

1    Q   We're talking about damages methodology, as

2   described in paragraph 159, sub "i," where you say

3   that you would use an event study and potentially

4   other empirical analyses, if necessary.

5           I'm just trying to figure out what are the

6   potential other empirical analyses.

7           You've suggesting you've used others in

8   other cases.  So I'm now just asking, which ones?

9    A   Right.  But so when I say "other cases,"

10  I'm talking about at a lost causation or damages

11  stage.

12   Q   Let's start with at the class certification

13  stage.

14   A   So I have not -- I don't think I've ever

15  been asked to calculate damages.

16   Q   Okay.

17   A   Specific damages at the class certification

18  stage.

19   Q   That makes sense.

20          And so then at the damages expert report

21  stage, what types of other empirical analysis have

22  you used in the past to calculate damages?

23   A   Again, and this is to the best of my

24  recollection, I mean, possibly earnings, earnings

25  multiplier -- not earning multiplier.  Sorry.

```
                                              Page 302

 1    Earnings ratios.  I mean, a series of financial

 2    ratios.

 3              Again, it varies from case to case.

 4         Q    Okay.

 5              In the next sentence of the same paragraph

 6    you say (as read and/or reflected:)

 7                   This analysis, after

 8              controlling for potentially

 9              confounding non-fraud-related

10              information, would determine if the

11              alleged misrepresentations and

12              omissions had caused the stock

13              prices to be artificially inflated,

14              and that the corrective

15              disclosure(s) caused the inflation

16              to dissipate, in turn causing

17              investor losses.

18              Did I read that correctly?

19         A    Yes.

20         Q    What do you mean by "potentially

21    confounding non-fraud-related information"?

22         A    Information not related to the fraud.

23         Q    What does "confounding" mean?

24         A    Confounding, different, conflicting with.

25         Q    As you're using it in this sentence, I'm
```

Page 303

1    just trying to understand.

2        A    Information that's not the same as the

3    fraud-related information.

4        Q    What types of information can be

5    confounding information, in your experience?

6        A    It depends on the situation.

7        Q    In the situation of the last time you

8    opined on a damages model in a securities case, what

9    type of confounding information was present there?

10            MR. HAKLAY:  Objection.  Assumes facts not

11   in evidence.

12            You can answer.

13            THE WITNESS:  I don't recall.  I mean, how

14   about if I just give you an example.

15            So I don't know.  Some -- some announcement

16   comes out about the fraud.  If there was no other

17   information on that day, the stock price would go

18   down.  But on that day, at the same time, they

19   announced they had made a billion dollars in

20   profits, which was much more than they had ever

21   earned before, you know, by a magnitude of 10.

22            That might be an example -- so I would

23   expect -- my -- again, in this hypothetical, my

24   expectation is that kind of announcement might, on

25   its own, might lead to a price increase, whereas,

Page 304

1    the information with regarding -- with regards to

2    the alleged fraud might lead to a price decline.

3              And so those two things would be moving in

4    a different direction.

5    BY MR. ISAJIW:

6         Q    Okay.

7              Any other examples you can think of?

8         A    I think that's probably the simplest, as I

9    sit here today.

10             And, again, that was a hypothetical

11   example.  It wasn't an actual example from a case.

12        Q    Okay.

13             Looking at the next subparagraph you state

14   (as read and/or reflected:)

15                  Second, an inflation ribbon

16             would be constructed, indicating

17             how much artificial inflation

18             caused by the alleged

19             misrepresentations and omissions

20             was in the price of FXCM securities

21             on the date -- on each day during

22             the Class Period.

23             What is "inflation," as you use it there?

24        A    I think I define it somewhere else in my

25   report.

```
                                          Page 305

 1              So let's just go to a general case.
 2              Inflation would be the difference between
 3     the actual price and the but-for price assuming some
 4     type of fraud because usually when we talk about
 5     inflation, it's in regards to fraud or alleged
 6     fraud.  Or omissions, misstatements.
 7         Q   Can the level of inflation change over
 8     time?
 9         A   Yes.
10         Q   How would you calculate inflation in your
11     model over time?
12         A   Without -- without all -- full discovery in
13     this case, I can't opine on that.
14         Q   I'm just wondering generally, high level,
15     what are the mechanics?
16         A   Again, it differs on a case-by-case basis.
17         Q   If you would do that, do you believe you
18     would use the same event study analysis that you
19     have used in your current report?
20         A   Unless -- I mean, it would depend on
21     whether or not other facts became apparent during
22     discovery.
23         Q   Sitting here today, do you know of any
24     changes you would need to make to the event study
25     you used in your report?
```

```
 1              MR. HAKLAY:  Objection.  Asked and
 2   answered.
 3              THE WITNESS:  Well, I can't predict what
 4   facts will be discovered throughout the rest of
 5   discovery.  So it would be speculative of me to talk
 6   about any changes that one might make to a
 7   hypothetical inflation area as of this date.
 8   BY MR. ISAJIW:
 9       Q    So just from a mechanics perspective, once
10   you conduct an event study on an alleged corrected
11   disclosure, how do you translate that into damages
12   throughout the Class Period?
13       A    So can -- I'm not quite sure I understand
14   the question.
15              THE WITNESS:  Could you repeat the
16   question, please.
17              (The record was read back as
18              follows:
19                  "Question:  So just from a
20              mechanics perspective, once you
21              conduct an event study on an
22              alleged corrected disclosure, how
23              do you translate that into damages
24              throughout the Class Period?")
25              THE WITNESS:  You would adjust the
```

Page 307

1    inflation ribbon to reflect that corrective

2    disclosure.

3    BY MR. ISAJIW:

4         Q    Would you adjust the inflation ribbon based

5    on the number of corrective disclosures or the time

6    period between the corrective disclosure and the

7    purchase price?

8              I'm just trying -- what's the relationship

9    between the corrective disclosure and adjusting the

10   event ribbon -- I'm sorry, the inflation ribbon?

11        A    At this point in time, it's an incomplete

12   hypothetical.  Again, I'm more than happy to provide

13   an opinion about this if and when this case gets

14   to -- discovery is completed and I am asked to opine

15   upon loss causation and damages.

16        Q    Sitting here today, you don't have an

17   opinion on that then?

18        A    I don't believe I have been asked to form

19   an opinion as of this date.  That was not what I was

20   asked to do at this stage in litigation.

21        Q    Jumping backwards to paragraph 15 of your

22   report.  And this is regarding the February 6, 2017

23   press release announcing the CFTC and NFA

24   settlement.

25              You state (as read and/or reflected:)

```
                                              Page 308

 1                  As a result of this news, the

 2            value of FXCM common stock dropped

 3            over 68 percent (on a logarithmic

 4            basis) from $6.85 to $3.45 on

 5            February 17 -- I'm sorry --

 6            February 7, 2017, on heavy trading

 7            volume (1.9 million shares of

 8            common stock, compared to a Class

 9            Period daily average of 0.15

10            million shares of common stock.)

11            Did I read that correctly?

12      A    That is correct.

13      Q    Can you define for me what a logarithmic

14   basis is?

15      A    So I use a log return as opposed to the

16   normal return.

17      Q    What is a log return?

18      A    It's based on -- it's -- do you want me to

19   write down on a piece of paper what it might look

20   like?

21      Q    I would like you to describe just

22   conceptually what it is.

23      A    Well, okay.  What's your understand --

24   sorry.

25                  If your understanding of a return -- I
```

```
 1    don't -- wait.
 2            I may describe it in my report with more
 3    precision than what I'm going to give you.  I mean,
 4    it's literally just a different way to calculate the
 5    return, but ...
 6            So let's take an example.  Let's do an
 7    example.
 8            So yesterday the price of a stock was $5.
 9    Today it's $10.  So the return over that period --
10    the way people would commonly -- I better write
11    these numbers down just so I --
12            All right.
13            So let's say the price is $10 today -- or
14    yesterday and it's $5 today.
15            So normally what you would do in
16    calculating the return is you would take 5 minus 10
17    and then divide it by 10; whereas, when you're
18    calculating log returns, you would take the natural
19    log of 5 divided by 10.
20        Q   Okay.
21            Going back to paragraph 15, the trading
22    price change that you describe there equates to a
23    drop of about $3.40 per share; is that correct?
24        A   $3.40 -- yeah, it appears that's right.
25        Q   Do you attribute 100 percent of this
```

1    decline to the information that was disclosed in the

2    CFTC press release?

3        A  I'm not sure I have been asked to opine on

4    that at this point.

5        Q  At this point, do you have any opinion on

6    that?

7        A  As I sit here, it certainly was a

8    contributing factor, but beyond that, I don't -- I

9    haven't formed an opinion.

10       Q  So you haven't formed an opinion whether or

11    not 100 percent of this decline was attributable to

12    the information in the CFTC press release?

13           MR. HAKLAY:  Objection.  Asked and

14    answered.

15           THE WITNESS:  I have not been asked to

16    opine on that at this point in time.

17    BY MR. ISAJIW:

18       Q  Is it your opinion that all of this decline

19    would have been caused by the market learning -- the

20    alleged truth about the FXCM's relationship with

21    Effex?

22           MR. HAKLAY:  Objection.  Same question.

23    Asked and answered.

24           THE WITNESS:  Same answer.

25    ///

1  BY MR. ISAJIW:

2      Q   And that answer is you do not -- sitting

3  here today, you have not formed an opinion?

4          THE WITNESS:  Could you read back my answer

5  from the previous question.

6          (The record was read back as

7          follows:

8              "Answer:  As I sit here, it

9          certainly was a contributing

10         factor, but beyond that, I don't --

11         I haven't formed an opinion.")

12         THE WITNESS:  Yeah.  Same answer.

13         I believe was there also something about I

14  have not been asked to provide that opinion at this

15  point in time?

16         THE REPORTER:  (No audible response.)

17         THE WITNESS:  There may have been something

18  about that as well.

19  BY MR. ISAJIW:

20     Q   Would you agree that if some of the decline

21  in FX- -- FXCM's stock on February 6 and 7, 2017,

22  was caused by other factors, that it would not be

23  appropriate to include those losses in your damage

24  calculation?

25     A   I don't understand your incomplete

Page 312

 1    hypothetical.

 2         Q    When conducting a damages analysis, if some

 3    of the decline in the stock price was related to

 4    factors, other than the alleged fraud, would it be

 5    appropriate to include the losses in the damage

 6    calculation?

 7         A    What do you mean by "losses"?

 8              So now you're saying that there are losses?

 9    Do you mean a price decline attributable to

10    non-fraud-related information?

11              I'm sorry.  I don't -- I just don't

12    understand the question.  Let's leave it at that.

13         Q    If a -- if you determine in a damages

14    analysis that a stock price declines and some of the

15    decline is related to the alleged fraud in a case

16    and some of the decline is related to other factors,

17    in your opinion, is it appropriate to include all of

18    the decline in your damages analysis?

19         A    So it would depend upon the situation, but

20    at this stage with regards to this specific

21    litigation, that's not something I have been asked

22    to do.

23         Q    Can you think of a situation where it would

24    be appropriate to attribute the loss -- I'm sorry --

25    the decline in the stock price attributable to

Page 313

```
 1    non-fraud actions in a loss calculation or damages
 2    calculation?
 3        A    Can I think -- wait.
 4             In your hypothetical, there's other
 5    factors, other news comes out on that day.  It's an
 6    incomplete hypothetical.
 7        Q    Let's control for all factors in the
 8    hypothetical, other than -- you know what.
 9             I withdraw the question.
10             What is your understanding of FXCM and its
11    business?
12        A    My understanding is that -- and I'm reading
13    from paragraph 10 now of my report (as read and/or
14    reflected:)
15             FXCM described itself as "an
16             online provider of foreign exchange
17             trading and related services"
18             headquartered in New York, New
19             York.  The Company provided "access
20             to over-the-counter ('OTC') FX
21             markets through [its] proprietary
22             technology platform."  During the
23             Class Period, the Company's
24             platform sought to provide its
25             customers "the best price
```

```
 1              quotations" on currency pairs from

 2              various market makers, global

 3              banks, and financial institutions.

 4       Q    Okay.

 5              Did you draft that section of your report?

 6       A    I believe so.

 7       Q    And what information did you rely on in

 8  drafting that section of your report?

 9       A    Let's see, I believe it was the -- at least

10  one of the 10-Ks.

11              Well, certainly at least some of -- one of

12  the financial statements.

13       Q    What is your understanding of the term "No

14  Dealing Desk"?

15       A    Well, my understanding is that in this type

16  of model a customer executes a trade -- and again,

17  I'm reading now from paragraph 11.  (As read and/or

18  reflected:)

19                  "Customer executes a trade on

20              the best price quotation offered by

21              [FXCM's] FX market makers," with

22              FXCM acting as a credit

23              intermediary while "simultaneously

24              entering into offsetting trades

25              with both the customer and the FX
```

Page 315

1        market maker."

2        Q    Is that your complete understanding of the

3    No Dealing Desk?

4        A    I believe that's an accurate description of

5    my understanding.

6        Q    Looking at the footnotes of your report, is

7    that understanding based on a combination of FXCM

8    form 10-Ks and the second amended consolidated

9    securities class action complaint in this case?

10        (Reporter clarification.)

11        MR. HAKLAY:  Objection.  Misstates what's

12    written in that paragraph, as you're referring to

13    it.

14        THE WITNESS:  I believe that's informed my

15    opinion about it.

16    BY MR. ISAJIW:

17        Q    Okay.

18        Do you have a view as to whether or not

19    FXCM's No Dealing Desk model was viewed as preferred

20    or even relevant to its customers?

21        A    As I sit here today, no.

22        Q    Do you believe FXCM's -- do you have a view

23    as to whether or not FXCM's No Dealing Desk model

24    was relevant to its shareholders?

25        A    As I sit here today, I do not.

1    Q    What about its noteholders?

2    A    Same answer.

3    Q    Do you have any understanding as to whether

4  or not the relationship between FXCM and Effex

5  changed over the Class Period?

6         I'm sorry.  Let me ask -- let me take one

7  step back.

8         What is your understanding of Effex?

9         Effex is -- I want to make sure I spell it

10  correctly.  It's E-F-F-E-X.

11    A    Yeah, I'm trying to ...

12         Right.

13         So my understanding, I guess, is based on

14  my reading of the second amended complaint.

15    Q    Okay.

16         Other than what's in the second amended

17  complaint, did you do any independent analysis about

18  the relationship between FXCM and Effex?

19    A    Again, I don't remember if it was mentioned

20  in some of the press releases around the corrective

21  disclosure.  So that -- if you have those, I would

22  be happy to take a look at those and refresh my

23  memory.

24         But I think to the extent that I've looked

25  at it, it would be this (indicating), and then,

Page 317

1   again, I don't have a recollection of whether or not
2   I've seen it somewhere else.
3           MR. HAKLAY:  Just for the record, when he
4   said "this," he put his hand on the second amended
5   complaint.
6           THE WITNESS:  Second amended complaint,
7   Exhibit 6.
8   BY MR. ISAJIW:
9       Q   Are you familiar with the business model of
10  any other FX brokerage firms?
11      A   What do you mean by "business model"?
12      Q   The way they operate their trading activity
13  in connection with -- in relation to their
14  customers.
15          Let me ask it -- we just discussed a No
16  Dealing Desk and you read from a portion of your
17  report about what you believe the No Dealing Desk
18  is.
19          Are you aware of any other FX trading
20  entities that have a No Dealing Desk model?
21      A   Am I aware?
22          Well, again, I -- I don't know how to
23  answer that question.  I mean, as I sit here today,
24  I can't answer your question.
25      Q   Okay.

Page 318

1          So as you sit here today, you do not know

2     one way or the other whether or not the No Dealing

3     Desk model was employed by other FX trading

4     entities?

5          A    That is correct.

6          Q    I want to just jump back real quick to the

7     damage, singular, section of your report.

8          A    Oh, it may -- it probably should say

9     damages, but you --

10         Q    And this is focusing on paragraph, I

11    believe, 159?

12         A    159.

13         Q    And subsection "ii" where we were

14    discussing earlier about the inflation ribbon.

15         A    Okay.

16         Q    Okay.

17              A few sentences down below when we

18    discussed earlier, it's six sentences down (as read

19    and/or reflected:)

20                   Construction -- construction

21              of the inflation ribbon generally

22              employs event study analysis,

23              combined with widely used and

24              generally accepted valuation tools

25              and models.

Page 319

```
1              Did I read that correctly?
2         A    Yes.
3         Q    Can you describe what the "widely used and
4    generally accepted valuation tools and models" are?
5         A    Yeah.
6              I would refer to my answer before when we
7    were discussing subpoint "i" about (as read and/or
8    reflected):
9                   First, valuation tools, which
10                  would include event study analysis,
11                  such as that described herein, and
12                  potentially other empirical
13                  analyses if necessary, would be
14                  used to establish that the
15                  disclosure(s) correcting the
16                  alleged misrepresentations and
17                  omissions, caused the price of FXCM
18                  securities to fall.
19             So when you asked me that question before,
20   I would refer you to that same answer in respect to
21   this question that you've just asked me.
22             That answer would not change.
23        Q    Okay.
24             So there's no additional valuation tools or
25   models that you can think of that you did not
```

```
                                            Page 320

 1    mention earlier today?

 2         A    I'm not sure that that's correct, but ...

 3         Q    If it's not, please let me know what the

 4    additional tools are.

 5         A    Well, again, let's -- I refer you to my

 6    previous answer.

 7              I believe I said that the tools I would use

 8    are case specific.  I believe I cited one example

 9    for you of a type of analysis that -- what I would

10    do.

11              So I will rely on that answer that I gave

12    previously.

13         Q    Do these valuation tools and models require

14    data?

15         A    It's possible that they do.

16         Q    What sort of data would you need to utilize

17    the valuation tools to calculate the inflation at

18    the start of the Class Period?

19         A    What -- I'm sorry.

20              THE WITNESS:  Could you repeat that

21    question.

22              (The record was read back as

23              follows:

24                   "Question:  What sort of data

25              would you need to utilize the
```

Page 321

```
 1            valuation tools to calculate the
 2            inflation at the start of the Class
 3            Period?")
 4    BY MR. ISAJIW:
 5        Q    And it probably should have been "with the
 6    valuation tools" in that question.
 7        A    Yeah.  At this point, it would be
 8    speculative of me for me to opine upon that or
 9    discuss that.
10        Q    What types of datasets have you relied on
11    in the past?
12        A    It differs from case to case.
13        Q    Can you give me some examples of the
14    datasets in any case?
15        A    Sure.
16             I might use datasets from Compustat or
17    datasets from Bloomberg.  That would be two
18    examples.
19        Q    And what would the Compustat data show you?
20        A    You know, the Compustat, I don't remember.
21    I think Compustat was bought.  Typically, firm
22    financial data.
23             As I sit here today, I'm speculating
24    because I believe that they underwent a transaction.
25             So when I used Compustat 30 years ago, I
```

Page 322

1    probably -- like I said, again, I believe it has

2    been acquired, and so it is not proper for me to say

3    Compustat.

4        Q   And you also mentioned datasets from

5    Bloomberg.

6            What type of data did you receive from

7    Bloomberg?

8        A   Well, data from Bloomberg.  Again, it

9    depends on the case.  I don't remember off the top

10   of my head.

11           You just asked me for examples of what

12   other data I might or what other avenues of data I

13   might look at.  And so I was responding to that

14   question.

15       Q   Do you have any view of what type of data

16   you would want to review in connection with this

17   case if you're asked to do a damage calculation?

18       A   Not as I sit here today.

19           MR. ISAJIW:  I think now would be a good

20   time for us to take a quick break just so I can

21   go -- so I can go see if we can shorten things up.

22           Is that okay with everybody?

23           MR. HAKLAY:  Sure.  It's your deposition.

24           THE VIDEOGRAPHER:  We are going off the

25   record.

```
                                           Page 323

 1              The time is 5:38 p.m.
 2              (Recess was taken at 5:38 p.m.
 3         until 5:47 p.m.}
 4              THE VIDEOGRAPHER:  We are back on the
 5    record.
 6              The time is 5:47 p.m.
 7    BY MR. ISAJIW:
 8         Q    Dr. Werner, earlier when we were talking
 9    about the framework advantages set forth in your
10    report, you -- we were talking about various
11    valuation tools.  And you said it would be
12    speculative as to what data you would need in
13    connection with doing an analysis pursuant to those
14    tools at this point.
15              Sitting here today, can you be sure that
16    the data exists that will allow you to calculate
17    inflation in this case if you were asked to do so?
18         A    I would see no reason why that data
19    wouldn't exist.
20         Q    And what kind of data do you believe that
21    would be?
22         A    Well, again, I just -- I don't know.  It
23    would be speculative of me at this point in time,
24    but I don't -- in doing damage analyses, I can't
25    ever remember coming across a case where I couldn't
```

Page 324

1   get the data I needed.

2           I mean, it can always be subpoenaed.  I

3   don't -- so I don't know.

4           In your -- it's an incomplete hypothetical

5   and not anything I've thought of at this point in

6   the day.

7       Q   So if it's not something you've thought

8   about at this point, you can't be sure one way or

9   the other?

10          MR. HAKLAY:  Objection.  Asked and

11  answered.

12          Please answer.

13          THE WITNESS:  In your hypothetical example,

14  you're asking me do I know as of this date -- it's

15  not anything I've thought about.

16  BY MR. ISAJIW:

17      Q   Okay.

18      A   That's the most accurate answer I can give

19  you at this point in the day.

20      Q   Okay.

21          MR. ISAJIW:  I think with that, I have no

22  more questions.

23          So I thank you for your time.

24          MR. HAKLAY:  I was joking about the

25  59 minutes.

```
                                              Page 325

 1              I have nothing.

 2              MR. ISAJIW:  I figured you were.

 3              THE VIDEOGRAPHER:  This is Media 1.  And

 4   this marks the conclusion of today's deposition of

 5   Dr. Adam Werner, Ph.D.

 6              We're going off the record.

 7              The time is 5:49 p.m.

 8              (Whereupon, at 5:49 p.m., the

 9              deposition of ADAM WERNER, Ph.D.,

10              was concluded.)

11                        ---oOo---

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 326

1                 ACKNOWLEDGMENT OF DEPONENT

2            I, ADAM WERNER, PH.D., do hereby certify

3    that I have read the foregoing transcript of my

4    testimony taken on 2/28/2020, and further certify

5    that it is a true and accurate record of my

6    testimony (with the exception of the corrections

7    listed below):

8    Page    Line                    Correction

9    _____|_____|_____|_____

10   _____|_____|_____|_____

11   _____|_____|_____|_____

12   _____|_____|_____|_____

13   _____|_____|_____|_____

14   _____|_____|_____|_____

15   _____|_____|_____|_____

16   _____|_____|_____|_____

17   _____|_____|_____|_____

18   _____|_____|_____|_____

19   _____|_____|_____|_____

20   _____|_____|_____|_____

21                  _____

                    ADAM WERNER, PH.D.

22

     SUBSCRIBED AND SWORN TO BEFORE ME

23   THIS _____ DAY OF _____, 20___.

24

     _____      _____

25   (NOTARY PUBLIC)             MY COMMISSION EXPIRES:

Page 327

1  STATE OF CALIFORNIA    )

2  COUNTY OF LOS ANGELES )    ss.

3

4      I, Reagan Evans, RPR, RMR, CRR, CCRR, CLR, CRC,

5  CSR No. 8176, in and for the State of California, do

6  hereby certify:

7      That prior to being examined, the witness named

8  in the foregoing deposition was by me duly sworn to

9  testify to the truth, the whole truth, and nothing

10  but the truth;

11      That said deposition was taken down by me in

12  shorthand at the time and place therein named and

13  thereafter reduced to typewriting under my

14  direction, and the same is a true, correct, and

15  complete transcript of said proceedings;

16      That if the foregoing pertains to the original

17  transcript of a deposition in a federal case, before

18  completion of the proceedings, review of the

19  transcript { } was { } was not required.

20      I further certify that I am not interested in

21  the event of the action.

22      Witness my hand this 3rd day of March, 2020.

23

24                        _____

                           Certified Shorthand Reporter

25                           for the State of California

[& - 2.25]                                                                      Page 1

| & |
| --- |
| **&**   2:17 3:23 4:22 5:1 20:25 30:8 74:24 |

| 0 |
| --- |
| **0.023**   155:17 158:12,23 |
| **0.05**   207:12 |
| **0.15**   308:9 |
| **0.28**   185:9 |
| **0.357**   154:11 156:3 159:16 |
| **0.5**   206:20 208:11 209:4 |
| **0.54**   202:6 |
| **0.579**   159:20 |
| **0.579.**   156:6 |
| **0.691**   155:14 158:12,20 |
| **0.691.**   154:9 |
| **00916**   1:6 4:18 |

| 1 |
| --- |
| **1**   3:10 4:12 7:13 7:14,15 8:9 17:9 29:4 33:23 56:3 79:7 80:1 81:11 146:5 151:22 158:19,21,22 159:14,15,19 196:16,25 206:22 207:4,15 208:13 208:17,18,23 209:3 249:9 251:21 285:17 286:2 325:3 |
| **1,230**   165:19 |
| **1,231**   165:20 |
| **1,608**   212:4 |
| **1.9**   308:7 |

**10**   3:13,18 30:5 138:12,14,16,16 179:12 220:20 296:4 297:5 303:21 309:9,13 309:16,17,19 313:13 314:10 315:8
**100**   93:3 204:5 219:20 309:25 310:11
**10036-2601**   2:19
**101**   2:12 178:5 203:24 204:4
**103**   205:25
**104**   106:21 107:20 165:22
**107**   165:17
**108**   184:9,11
**1099**   16:1
**10:35**   55:7,8
**10:45**   55:9,12
**10b**   30:9 47:10
**11**   3:15 279:15,16 279:18,20 282:14 283:8,13,16 284:2 284:9 285:2,7,10 314:17
**111**   184:10,11,16
**114**   90:16
**115**   90:19
**117**   184:23,24
**1185**   2:19
**119**   192:9
**11:42**   106:3,4
**12**   61:21,24,25 62:4 213:10,14 279:16 281:24 282:5 289:25
**120**   192:22 195:11 196:8 197:2

**208:20** 213:12
**122**   200:11
**125**   197:18
**126**   32:21 212:14 212:19,20
**127**   178:2 213:22
**129**   167:19 180:3,4 180:6
**12:37**   106:9,14
**130**   178:3 218:1
**131**   167:20
**132**   226:5
**133**   231:3,5
**134**   238:6
**137**   246:11 259:18 262:16 266:1,2,10 267:1,18
**14**   3:16 91:8 109:24
**140**   274:7 282:8,10 282:11
**142**   58:14 276:18
**144**   231:4
**144a**   50:7 194:13 194:23 208:6,7 218:3,15,23 219:5 219:6,25 220:2,4 220:10,17 221:10 221:14,19 222:17 227:19 228:13 273:11
**14th**   119:21 124:10 125:5
**15**   8:22 29:14 39:22 151:22 166:8 307:21 309:21
**152**   290:8,21
**154**   292:10
**156**   295:25

**159**   300:2 301:2 318:11,12
**15th**   130:8 146:5
**16**   161:11 288:2
**1600**   2:4
**165**   149:6 154:8,23 155:9
**166**   155:1
**168**   154:16 155:2 155:10
**16th**   258:22
**17**   3:19 288:3 308:5
**17012**   327:24
**18**   172:2
**180**   90:18
**19**   3:21
**19046**   2:13
**1934**   30:6
**1970**   61:18 62:10
**1993**   44:18
**1994**   84:8
**1999**   44:24
**1:17**   1:6 4:18
**1:34**   160:7,8
**1:47**   160:9,12

| 2 |
| --- |
| **2**   3:13 10:7,8,12 16:4 29:21 80:1 82:19 86:16 87:6 196:24 197:15 198:5 199:12,15 205:25 206:1 209:3,12 210:12 214:2,7 217:11 222:13,23 225:5 229:15 280:17,18 |
| **2.05**   154:13 |
| **2.05.**   156:13 |
| **2.25**   29:11 |

**2.5** 8:19
**2.9** 198:14
**2.92** 197:23 198:20 198:25 199:5 201:23
**2/28/2020** 326:4
**20** 3:23 28:6 39:22 51:25 129:1 180:23,25 220:20 222:1,7 326:23
**2010** 68:5,11
**2012** 8:22 29:14 119:21 124:10 125:5 126:1 146:5 151:22
**2013** 42:24 43:16 126:1 146:5,6 151:23
**2014** 29:16 35:20 126:1 136:21 137:2,5 146:6 161:10 179:12 199:23 200:15,19 201:1,7,10,17
**2015** 41:16 68:13 125:6 129:1 130:8 131:9 156:5 258:22
**2016** 156:5 161:11 274:15,23 287:20 289:15,19,20
**2017** 8:23 29:15,17 125:7 133:1 136:22 137:2,5 199:24 200:16 258:23 274:9,12 274:15,17,19,20 274:24 275:5,6,12 275:13,19,19 276:11,12 282:13 282:15,16 283:24

**286**:12 287:13,14 287:21,25 289:16 289:21,22 307:22 308:6 311:21
**2018** 3:22 8:21 19:7 29:12
**2019** 17:3 21:2 25:22,25
**2020** 1:15 2:3 3:14 3:18 4:2,6 10:15 11:19 26:4 327:22
**205** 90:19 91:4,12 93:2 233:21 234:8 236:6
**20th** 125:6
**21** 218:25
**212** 2:20
**214** 3:18
**215** 2:14
**220** 255:20
**225** 129:9 257:5,8
**23** 294:1
**230** 40:2
**24** 29:16 200:19
**24th** 136:21 137:2 137:5 161:10 199:23 200:15,25 201:7,10,17
**25** 115:7
**250** 27:25
**252** 143:24 280:17 280:18
**26** 82:23 83:25 274:19,24 275:5 275:12,19 276:12 282:15 287:13
**263** 212:10,18 213:4,7
**26th** 283:16 284:21 285:17 286:3,8

**27** 211:24,25 212:7 275:6
**28** 1:15 2:3 4:2
**28th** 4:6 21:2
**29** 141:18 161:23
**292** 201:20,22
**2:46** 210:4,5
**2:59** 210:6,9

**3**

**3** 3:15 11:12,13 14:6 72:12 75:3,9 87:13 108:16,20 108:25 109:2,7,18 146:6 225:17 227:3 229:20 234:21 237:3,5,10 241:18,20 242:7 242:16 294:24
**3.40** 309:23,24
**3.45** 308:4
**30** 28:6 54:17 80:4 321:25
**300** 130:24
**32** 85:22
**33** 87:23 109:24 111:1 241:24
**34** 91:3,8,9 108:18 109:8
**35** 205:25 238:10 240:16
**38** 22:13 91:16,22 91:22
**39** 22:14
**3:52** 257:23,24
**3b** 203:24 204:1
**3rd** 327:22

**4**

**4** 3:16 13:24 14:2 14:11 17:11 34:5 41:11 47:8 106:19

**107**:16 108:19,20 108:21 146:6
**40** 215:12 238:11 240:16
**42** 184:13,18 188:25 189:1
**43** 188:25 189:1 294:6
**44** 74:13 184:23
**440** 2:13
**45** 54:17 191:19 244:10
**47** 210:13 212:19
**48** 212:20 225:5
**49** 172:2,3,5 238:6
**4:07** 257:25 258:3 293:24
**4:50** 294:14,15

**5**

**5** 3:4,19 17:14,15 17:20 30:9 47:10 75:25 90:15 101:8 101:18 113:14 156:5 172:19 220:20 234:1,9 244:16 258:7,8 294:1,24 309:8,14 309:16,19
**50** 42:10 80:2 93:5 166:18 169:19 170:15,18 250:23 258:15
**500** 27:25 60:22
**51** 282:9
**52** 102:22,25
**53** 258:18,19,23
**54** 258:23 290:7
**55** 292:10
**556-2235** 2:20
**56** 124:19 132:6 134:1 141:13

Case 1:21-cv-02900-CJN Document 68-16 Filed 06/12/23 Page 332 of 385

[56 - acquisition]

144:21 146:3
295:10
**57** 105:20 125:11
125:24 300:2
**58** 125:11
**59** 324:25
**5:02** 294:16,19
**5:38** 323:1,2
**5:47** 323:3,6
**5:49** 325:7,8
**5th** 179:11

**6**

**6** 3:14,21,22 8:23
10:14 18:23 19:1
19:5,7 29:15,17
156:5 189:25
287:21 307:22
311:21 317:7
**6-19-2017** 3:20
17:21
**6.59.** 156:15
**6.85** 308:4
**60** 55:15 56:4 59:6
75:4
**600-2817** 2:14
**61** 75:6,7,9
**62** 61:22 62:2
187:3
**633** 2:3 4:11
**65** 33:24 42:20
**66** 42:20,21 115:7
279:24 280:1,17
280:18,20 281:19
**67** 46:22 47:24
49:1,11 115:8,14
**675** 27:20
**68** 46:22 117:18
308:3
**69** 47:7,7
**6th** 11:19 132:25
132:25 199:23

200:16 289:16,21
289:22

**7**

**7** 3:10,23 20:20,24
27:17,24 136:22
187:1 234:1,9
274:9,12,17
275:11,13 282:15
283:24 287:14
308:6 311:21
**71** 47:25 49:2,11
**76** 141:17 143:7
144:2,23,24 145:4
146:8 161:3
**77** 161:22,24
**7th** 125:7 137:2,5
227:4 258:22
274:20 275:19
276:11 282:13
283:15,20 284:22
286:8,12 287:25

**8**

**8** 134:9 138:6
162:7 163:19,23
164:3,5,6,8,10,16
165:24 171:23
174:4 175:12,13
175:23,25 176:19
176:25 177:13
183:12,12 184:3
287:20
**8176** 1:22 2:5
327:5
**85** 257:2
**87** 252:11,18,18
253:2,10
**89** 212:23 213:4,7
215:2,9
**8a** 149:5 151:18
155:14 156:3,13

159:15
**8d** 154:16 155:2
155:17 156:4,14
159:19
**8th** 289:15,18,20

**9**

**96** 162:15
**97** 165:18 173:18
176:5,16,21 177:2
**9:39** 2:2 4:2,5

**a**

**a.m.** 2:2 4:2,5 55:7
55:8,9,12 106:3,4
**abbreviation** 29:9
**ability** 58:11 60:6
78:1 150:16
199:20 267:15
268:11 289:2
**able** 29:25 41:4
71:3 130:10 155:3
279:2 295:3
**abnormal** 121:4
127:21 162:5
163:18 164:19,24
165:9 173:2,6
**ac** 110:20
**academia** 180:1
187:10,15,18
188:12
**academic** 45:4
46:9,12,14 66:10
84:25 110:16,18
167:4 168:20
169:2 177:16
178:4 179:14,16
179:18 186:11
188:7 191:3 284:4
293:16
**academician**
191:2

**academicians**
177:20 188:15,18
189:8
**academics** 76:5
77:2,5
**accept** 72:17 73:5
75:13 170:3
**accepted** 142:15
169:25 170:6
318:24 319:4
**access** 313:19
**accommodate**
244:13
**accompany**
190:13
**account** 219:15
234:6
**accounts** 219:16
**accuracy** 33:7,14
33:18 40:7 266:18
**accurate** 21:14
30:21 31:15 32:9
34:25 35:16 40:11
43:24 61:15
102:16,17 117:16
211:2 216:7 220:1
229:17 243:20
266:4 281:18
290:3 315:4
324:18 326:5
**accurately** 176:17
**achieve** 158:17
159:10 162:10
163:2,3
**acknowledgment**
326:1
**acquired** 8:17
126:7 322:2
**acquisition** 120:5
120:20 121:7
124:11,17 125:20

125:22 126:17
127:5,18 128:6,17
**acquisitions**
120:22 126:3,13
126:21
**act** 30:6,7 227:23
228:24 229:8,13
296:4 297:6
**acted** 228:16,20
**acting** 219:14
230:8,10,20,21
261:25 314:22
**action** 3:19,21,23
4:13 17:20 19:6
21:1 47:2 168:1
297:17 299:12,16
315:9 327:21
**actions** 1:9 313:1
**actively** 46:6
**activity** 271:14
317:12
**actual** 197:1
202:15 254:8
304:11 305:3
**adam** 1:14 2:1 3:4
3:14,17 4:13 5:11
10:14 11:22 15:5
15:6,11 106:5,10
325:5,9 326:2,21
**add** 28:14 183:25
213:14,17 281:23
282:3
**addition** 29:20
133:23 290:12
**additional** 24:14
24:22 27:22 63:13
71:17,20 121:24
125:14 132:23
183:7 188:21
212:2 225:6
286:15 319:24

320:4
**additionally** 231:7
**address** 249:25
**addresses** 195:9
**adjourned** 106:5
**adjust** 162:23
199:7 306:25
307:4
**adjusted** 152:15
152:17 192:19
**adjusting** 307:9
**adopt** 267:25
**adopted** 30:9
**advantages** 323:9
**affect** 215:23
216:23 285:3
287:2
**affiliated** 40:18,20
40:22 41:10
219:21
**aganin** 2:24 5:2,2
**agencies** 222:15
222:25 223:3,14
**agency** 129:23
130:1 223:6,20
224:2,10,20 225:3
**agents** 112:14
**aggregate** 206:12
219:18
**ago** 209:17 246:7
279:13 288:22
321:25
**agree** 59:17 60:25
62:16,17,18,20
76:5 102:10 105:5
112:20 120:7,16
135:15 156:19,21
190:17 201:10
204:16,17 213:5
233:12 278:17
280:7,10 311:20

**agreement** 16:22
**agrees** 87:18
**ah** 184:4 204:6
**ahead** 57:9 93:21
99:23 128:3
151:13 175:6
207:18 210:24
**al** 84:8 85:2
**alexander** 2:24 5:2
5:2
**allegation** 118:11
118:18
**allegations** 25:16
115:13 116:4
119:9,13 133:16
133:21
**alleged** 133:1,7,16
286:11 302:11
304:2,18 305:5
306:10,22 310:20
312:4,15 319:16
**allow** 323:16
**allowed** 25:7
**alter** 168:14
**amended** 3:21
19:5,18,21 20:2,3
20:5 315:8 316:14
316:16 317:4,6
**americas** 2:19
**amici** 179:5
**amount** 56:21
**analyses** 156:1
212:2 300:5,11,14
300:16,19 301:4,6
319:13 323:24
**analysis** 18:5,6,13
18:17 19:22 20:3
20:15 53:19 57:15
72:14 77:15 80:12
80:14 81:12 84:20
85:14 88:10 92:2

92:22 93:12 94:22
95:4,13 97:15,25
101:3,20 104:3,10
106:25 107:6
108:1,9 111:7,24
112:11,16 113:6
116:11,14,16,21
116:25 121:24
122:5,10,19
123:14,22 132:4
135:7,14,25
136:11 137:7
138:8,10 140:20
141:3,9 142:16
146:11,17,19
147:4,8,15,17,24
148:3,18 149:19
153:11 154:2
160:15,17,22
161:2,6,8 163:8,12
163:21,22 164:4
165:15 166:12,14
167:6 168:22
169:4,11,14,15
170:1,8 171:2,15
171:17,17 172:1
175:4 177:12,23
183:13 184:9,15
186:17 188:5
189:3 191:15,25
192:6 199:4,4,7
201:19 202:13,20
205:23 206:2,5
207:10 209:9
210:13 213:13
214:3 216:13
217:11 220:10
221:18 222:14,23
223:8 224:24
225:20 228:7
231:15,24 232:14

232:22 233:8,14
234:6,13,15,20
236:12,14 237:11
237:20 238:22
239:1,5 240:4
241:3 242:6,15,19
243:5,13 244:1,17
245:1,2 250:1
251:22 254:10,13
255:2 258:25
259:7,14 260:16
261:17,19 262:10
262:17 263:1,12
264:12,13,20,25
264:25 265:5,7,13
265:15 266:9,20
266:25 267:4,20
268:5 269:7 270:1
270:9 271:4,14,25
272:3,22 273:22
278:13 281:1,11
284:8,12 287:24
288:6 292:5 293:7
293:10,15,21
300:4 301:21
302:7 305:18
312:2,14,18
316:17 318:22
319:10 320:9
323:13
**analyst** 74:3 76:18
82:18,20 83:10,15
84:14 86:24 107:8
107:9 108:13,14
108:21,24 109:14
109:16 114:19
124:24 131:25
132:12 210:18
211:21,22 214:3,4
214:12 215:20
216:14,21,25

245:18 247:11
**analyst's** 107:3
**analysts** 83:17
84:2,10,17,20
85:14,24 86:14
87:4 106:20,23
107:19,22 108:8
190:3 211:8 212:9
212:22 213:10,21
**analyze** 102:1
104:6 113:5
199:22 206:6,8
262:6
**analyzed** 261:13
261:22 270:23
273:18 290:15
**analyzing** 107:5
121:13 186:7
287:18
**angeles** 2:4 4:1,9
4:11 97:3 327:2
**animal** 208:21
**announced** 124:11
126:16 129:8
303:19
**announcement**
104:14,19 140:11
303:15,24
**announcements**
124:25 126:12
132:13 145:19
**announces** 104:12
**announcing**
307:23
**annual** 146:12,13
**answer** 10:5 20:4
20:12 23:1,4,13,15
30:19 31:5 33:9
41:4,8 49:22 54:5
54:15 58:10 59:20
63:12 64:22 65:6

65:24 66:2 67:1
71:3,14,25 81:13
82:7 83:21 87:2
97:9 99:22 100:3
100:5 102:15
112:8 115:25
123:5 128:9
130:10 148:17,20
150:15 151:12
152:17 153:14
157:12 161:15
182:2 184:5 194:8
195:3 199:19
206:10 207:9
208:22,24 216:12
220:7 222:9 236:3
238:4 241:2,6
242:18 246:6
248:2 251:2,13,14
253:1,19 254:15
255:11,25 256:10
256:12,12,18,24
257:18 260:18,20
262:14 263:15
265:17,22,24
266:8 267:17
268:23 271:18
273:10 276:4,7
278:18 279:10
280:9 283:17
287:10,16 288:17
288:19 289:2,3,5,9
289:25 290:3
298:5,21 299:18
299:22 303:12
310:24 311:2,4,8
311:12 316:2
317:23,24 319:6
319:20,22 320:6
320:11 324:12,18

**answered** 31:12
67:20 87:8 93:20
94:5 95:17 96:14
128:8 135:3 151:7
151:9 181:21
182:21 183:20
207:17 208:15
244:4 253:18
255:18 256:17
262:13 263:3,14
267:15 268:10,15
276:2 289:1 306:2
310:14,23 324:11
**answering** 92:14
256:3
**answers** 168:19
183:22 265:19
**ante** 178:9
**anybody** 16:5
277:17
**anyone's** 100:25
**anyway** 26:1
188:12
**apart** 300:10,19
**apologize** 96:9
123:3 152:9
184:17 209:19
**apparent** 305:21
**apparently** 203:14
**appearances** 2:8
**appeared** 179:21
179:23
**appears** 309:24
**appendix** 55:14
56:1 61:22,24
72:11 75:2,9
187:1 189:12,25
**apple** 150:7
**applies** 295:5
**apply** 57:5 192:5

Case 1:21-cv-11558-LTS Document 568-16 Filed 06/12/24 Page 336 of 387

**appointment** 3:11
7:10
**appreciate** 117:7
222:11 257:20
**approach** 210:17
212:2
**appropriate** 23:10
125:3 132:7
141:11 142:3
192:5,20 270:1
271:13 311:23
312:5,17,24
**approved** 14:20
**approximately**
16:15 28:4 50:6
143:17 165:19
257:5
**april** 3:22 19:7
**arbitrage** 110:15
110:17,19
**arbitrageur**
111:16,22 112:7
**arbitrageurs**
87:24 110:3,13
111:6,10 112:2,5
112:10,14,15,24
113:5 241:21
242:3,8,11,17,20
243:2,5,12 244:1
**archdiocese**
179:10
**area** 45:2 306:7
**argue** 44:5 60:21
104:13
**argued** 72:21
**argument** 239:3
**argumentative**
144:15 250:16,25
256:16 282:23
**arrive** 252:5

**art** 282:25 283:3
**article** 42:24 43:3
43:5,11 179:14
180:2,8
**articles** 44:1,8,8
44:10 114:19
124:24 132:12
167:10 168:23
169:1,7 191:3
211:14
**artificial** 304:17
**artificially** 302:13
**ascribable** 229:7
**aside** 16:5
**asked** 7:1 18:7
26:13 28:21 29:21
30:13,24 31:24
33:6 46:10 48:16
50:21 51:12,16
61:4 67:9 76:15
78:3 80:11 87:8
93:6,20 94:4
95:17 96:13
100:25 101:21
128:7 134:22
135:2,5,11 136:2
137:6 150:17
151:6,8 152:7
168:19 181:20
182:20 183:19
185:15,24 201:8
201:16 204:21,22
205:15 207:16
208:14 221:5
224:12 235:8
242:23 244:3
247:15 249:25
250:3 253:17
255:5,17 256:1,4
256:17 259:6
262:12 263:2,13

263:21,22 264:1,4
264:10,11,20
268:14 271:15
276:1 279:13
288:23 295:25
297:3 301:15
306:1 307:14,18
307:20 310:3,13
310:15,23 311:14
312:21 319:19,21
322:11,17 323:17
324:10
**asking** 6:14 8:13
9:23 13:3 33:5,12
49:18 64:5,7
65:12 70:8 81:9
81:14 83:12 85:5
89:1,19 95:11
98:10 99:9 102:10
107:9 114:9 119:4
125:14 135:19
137:17 144:25
151:3 153:23
174:19,21 189:13
189:14 190:19,20
200:24 203:17
208:2,3 231:14
234:5 235:3,4
237:4 250:5,6,13
252:22 256:2,13
260:24 262:9
264:18 267:8
269:17 279:4
282:3,4 286:19
287:11 294:4
296:8 299:2 301:8
324:14
**asks** 98:13 185:13
**assessed** 291:8
**assessing** 192:10
192:17

**asset** 71:8,12
**assignment** 187:22
**assist** 9:4 29:2,23
**assistance** 295:1
**assisted** 14:18
16:6 27:22
**associated** 40:15
187:9 196:21
223:17 252:4
**assume** 6:8 48:13
54:4 113:21 114:3
138:15
**assumed** 55:3
**assumes** 86:17
93:19 98:6,13
237:22 251:24
303:10
**assuming** 240:12
284:19 285:5,15
285:24 286:15,18
287:11 305:3
**assumption** 59:22
162:21 164:17
169:12 177:3
284:25 285:18
**attempt** 71:25
111:10 115:8,23
117:15 133:11
171:18
**attempting** 111:16
111:19
**attending** 106:24
107:23
**attention** 190:5
**attract** 190:3
**attributable**
310:11 312:9,25
**attribute** 309:25
312:24
**audible** 311:16

Case 1:21-cd-10990-VM-RWL Document 568-16 Filed 66/12/24 Page 337 of 387

**august** 161:11
**available** 56:9
  60:8 62:14 139:21
  200:14 225:13
  274:13 275:18
  276:9
**avenue** 2:12,19
**avenues** 210:19
  211:6 322:12
**average** 41:17,20
  59:23 73:25 79:7
  80:3 158:10 185:7
  198:3,25 201:20
  204:8 206:4,11,15
  206:19 207:11,22
  208:8,8,10 308:9
**aware** 6:22 21:20
  21:22,23 22:1,3,6
  22:10,22 23:19,24
  24:2,6 26:15 27:9
  27:23 127:5 131:9
  167:4 168:20
  191:22 273:20
  293:16 317:19,21

**b**

**b** 3:7 30:5 227:2
  296:4 297:5
**ba** 34:11 37:12
**back** 11:6 22:8
  24:19 28:20 49:8
  53:10 54:15 55:10
  72:11 81:18 92:17
  97:23 100:13
  105:7 106:12,18
  107:13,16 108:16
  113:11,12 120:14
  132:5 140:25
  147:1,21 154:19
  158:3 159:4
  160:10 163:16
  165:1,3 171:7

175:18 194:19,22
196:24 205:7
210:7 211:3,20
212:16 222:20
231:21 235:19
238:23 241:22
243:9 247:25
248:19 258:1
259:15 265:10,24
266:5,7,19 268:18
276:3,5 281:7
282:8 285:22
292:3 294:17
299:20 306:17
309:21 311:4,6
316:7 318:6
320:22 323:4
**background** 34:10
**backing** 149:7
**backwards** 307:21
**bad** 182:3,12
**baker** 2:12 5:6,6
**bancorp** 47:9
**bank** 44:18 129:6
  227:23
**banking** 226:13,16
  226:18
**bankruptcy** 69:2,4
  245:12,19 246:9
  247:14 248:3
  249:6,13 250:10
  251:17,21 252:13
  252:17,20 253:3
  253:16 254:13,17
  254:25 255:16,21
  256:14 257:9,12
**banks** 226:3,7
  227:11,12,17
  314:3
**barber** 84:8,13
  85:1,1

**barclays** 90:9
  231:7,15,25 232:9
**bark** 167:25
**barring** 182:15
**base** 61:11 126:4
**based** 26:11,18
  44:10,13,17 48:13
  54:5 59:25 60:2
  60:22 70:16 83:5
  90:8 103:20
  108:13 116:16,16
  121:13 122:7
  135:7,19,23 136:9
  136:9 142:1,4,10
  149:25 187:22
  191:24 196:7
  198:14 233:25
  234:2 238:22
  240:16,19 243:23
  263:19 289:24
  307:4 308:18
  315:7 316:13
**basically** 85:1
**basing** 122:25
  227:9 261:9
**basis** 30:3 52:13
  70:18 82:4 85:18
  93:24 94:7 99:25
  116:1 122:2,22
  125:9 127:4
  137:11,15 145:25
  153:9,10 196:2
  206:7,9 219:19
  248:15 251:5
  305:16 308:4,14
**beach** 42:9
**bearing** 96:11
  103:21,24
**began** 200:18
  201:6

**beginning** 4:20
  18:17 19:22
  204:10,14 290:22
  290:25
**begins** 33:24
  184:17 210:13
**behalf** 2:2 4:16 5:5
  5:7 47:1
**behave** 146:18
  147:6,16 148:1
**behavior** 192:21
  192:24
**behest** 264:16
**belief** 186:20
  246:12
**beliefs** 59:25 60:1
  60:3,5
**believe** 6:24 7:4
  11:1,9 12:20 13:8
  13:10 15:16 17:3
  21:14,16,22 24:12
  26:8,24 27:12
  28:10,12 32:5
  33:9 34:18 38:12
  38:19 40:11,19
  42:10 43:9,24
  52:5 53:6,17,20
  57:17 60:3 61:15
  68:2 70:15 74:11
  75:3 79:21 85:14
  85:15,18 86:15
  87:5 89:21,22
  90:18 91:15 96:2
  98:9 99:18 101:18
  103:6,21 105:9
  110:22 111:20
  112:9 114:1
  117:12,15 118:9
  120:2,20 126:23
  128:2,19,23 129:7
  129:13,19 131:3

Case 1:21-cm-02900-CJN Document 168-16 Filed 06/12/24 Page 338 of 387

131:12 133:10,21
138:2 144:22
146:22 148:15,19
149:24 164:6
166:7 170:18
172:21 174:12,21
174:25 176:3,8
178:2 180:2 184:1
186:24 190:20,21
191:2 192:5
194:11,21,25
195:11 196:16
201:12,15 211:15
213:18,25 216:6
220:17 224:21
225:3,12,14
229:17 231:4
237:9 239:16
240:9 241:22
251:16 254:21
256:19 257:10
261:7,21,24
263:16 264:4
266:1,3 267:3,19
267:24 268:4
269:10,11,24
271:24 272:2
273:11 277:16
278:11 280:24
281:18 282:6
283:16 289:2,10
289:25 292:1
293:7,15 295:20
298:12 300:20
305:17 307:18
311:13 314:6,9
315:4,14,22
317:17 318:11
320:7,8 321:24
322:1 323:20

**believed** 50:19
104:7
**benchmark** 79:25
164:23 165:8
198:5 208:19
293:3,12
**best** 22:21 41:1
58:11 60:6 84:25
113:24 148:17,19
150:16 168:18
179:22 199:19
222:9 223:15
225:2 233:25
257:18 259:9
262:19 263:8
266:8 267:15
268:11 269:1,1
271:7 272:4
286:20 289:1,3
301:23 313:25
314:20
**better** 95:24 161:1
173:18 248:1
273:7 279:3
298:22 309:10
**beyond** 52:2
115:25 182:23
184:16 205:18,18
292:18 310:8
311:10
**bid** 83:6 184:25
185:1,7,11 186:7
186:20 187:7,10
187:15,20 188:3
188:17 291:5,18
291:23 292:6,8
**bill** 28:16,17
**billed** 28:2
**billion** 118:20
303:19

**bills** 28:15
**bipolar** 230:16
**bit** 79:6 294:23
**bleeds** 212:20
**block** 8:11,12
**bloomberg** 321:17
322:5,7,8
**blown** 297:10
**bny** 90:10
**body** 55:24
**bond** 50:12,16,20
58:4,6,25 69:5
70:1,9,20 71:9,10
72:2,3 76:9 80:25
124:6 137:1
160:22 161:6
166:1 192:10,12
192:20,24 193:1
193:11,12,20
194:4,7,12,13,14
194:21,23 195:8
195:15,16 196:3,5
196:6 204:11
217:20 218:16,19
218:23 221:14,19
223:19 227:1
247:4 259:8,12,13
260:11,15 262:1
262:11,18,22
265:7,16 266:10
267:20 269:7,13
269:14,22 270:2,8
270:13 271:11
277:14,24 278:4
278:12 280:21,25
281:2,10,12
282:15 283:14
284:15,20 285:16
285:18 286:1,7,17
286:23 287:1,7,7
287:12 288:25

289:7,12,17
290:17 291:6
293:3,12
**bondholders** 69:1
**bonds** 50:7 57:5
68:21 69:9 70:24
81:2 82:11 86:9
137:4 161:10
191:24 192:6
193:7 194:16,18
194:25 195:4,6
197:8 199:13,17
202:18 203:21
208:21 209:9
220:11 221:10
222:17 223:3,13
226:12,15 245:7
246:14,16,20
255:11,14 259:16
259:19,21,25
260:21 262:6
263:1 267:5 268:5
270:22 273:11,17
279:7,19,23
291:19,23 293:2
**borrow** 138:25
**botched** 179:6
**bottom** 62:5
**bought** 226:15
242:23 271:1,11
321:21
**bound** 13:22 14:16
**breach** 129:10
131:2,10
**breaches** 130:16
132:21
**break** 54:20,21
105:19,22 141:20
142:5,11,17,23
143:2 160:1,3
161:6 166:24

Case 1:21-cm-10988-PAC Document 568-16 Filed 06/12/24 Page 339 of 387

209:14,15 244:8
253:24 256:6,7,11
257:17 266:23
294:5 322:20
**breaking** 142:3
145:3
**breaks** 244:9
**brief** 179:4,13,16
**briefly** 5:20 35:25
**bright** 251:4
**broad** 172:12
220:6
**broader** 232:18,19
**broadly** 44:1
**broke** 146:15,16
146:17 147:4,14
147:15,24 148:10
160:14 161:2
288:6,12
**broken** 143:24
**broker** 239:12,13
**brokerage** 1:5
2:16 4:14,23 8:18
29:5 317:10
**brought** 262:2
**business** 126:2,11
313:11 317:9,11
**buy** 83:4 111:13
111:13,14
**buyers** 219:8,14
219:17 237:2
**buying** 88:4 110:8
111:3 245:17
247:10
**buys** 270:16

**c**

**c** 2:18
**c.v.** 34:1
**ca** 1:22 2:5
**caffeine** 77:11

**cal** 34:23 35:17
36:1,9 39:13
41:25 42:5
**calculate** 30:2
202:1 282:14
283:13,19 297:15
298:3 301:15,22
305:10 309:4
320:17 321:1
323:16
**calculated** 67:11
203:10
**calculating** 309:16
309:18
**calculation** 153:22
283:8 284:10,19
285:3,6,16,25
287:3,12 295:5
298:13 311:24
312:6 313:1,2
322:17
**california** 2:4 4:1
4:9,11 327:1,5,25
**call** 37:16 38:24
111:18
**called** 10:13 61:18
62:15 89:8,9
**calls** 106:24
107:24 121:20
211:10 249:18
**cammer** 51:6
52:15,17 73:10,16
73:18 74:9,12
75:14 76:11 77:16
77:19 79:7 81:10
82:19,23 86:15
87:6,13,19 88:18
101:4,13,19 107:3
107:5 108:16,20
108:24 109:7,18
110:1 113:14

136:13,13 172:19
191:20 192:5
196:16,25 197:16
198:4,17 199:11
206:18,22 207:4
207:15 208:13,17
208:18,23,23
209:8,12 210:11
214:2,7 217:11
222:13,23 225:5
225:17 229:14,20
234:21 237:3,5,10
241:17,20 242:1,7
242:16 244:16
258:7,8 290:14
**candidates** 247:4
260:11
**capabilities** 126:9
**capacity** 38:18
42:5 53:16
**capital** 61:19 62:7
90:10,10 129:9,15
130:2,5,16,21
131:1,10,19 132:1
132:15,21 150:10
167:18 177:25
246:15 259:20
**capitalization**
188:22 189:2,4
190:14 290:17
292:13,19 293:4
**capitalizations**
292:22
**capitalize** 111:16
111:23
**capture** 118:2
**captured** 177:7
**card** 40:16
**case** 4:18 5:22
6:23 7:12 21:1
25:7,9,16 27:11,14

32:3 47:10 50:12
61:2 65:23 66:13
67:11 78:5 82:4,4
82:6 85:18,18,18
86:23,25 90:1
93:24,24 94:7,7
99:25,25 100:20
106:21 107:20
114:14 116:1,1
118:6,17 119:2,5
122:1,1,22,22
130:4 131:7
135:25 140:21
141:4,10 142:19
142:21 143:16
147:12 149:20
160:23 166:19,20
169:20,21,23
170:17,21,24
171:10 181:16
182:22 192:15
205:18 207:5
217:24 220:5
221:12 248:15,15
251:5,5,10,11,15
251:19 253:15
270:23 296:15
299:6,12,16
300:13,17,18,21
300:25 302:3,3
303:8 304:11
305:1,13,16,16
307:13 312:15
315:9 320:8
321:12,12,14
322:9,17 323:17
323:25 327:17
**cases** 46:22 48:1,7
48:10 60:9 80:25
131:6 132:21
169:24 180:20

Case 1:21-cv-02900-MKV-RWL Document 568-16 Filed 06/12/24 Page 340 of 387

211:11 220:15,16
220:21 223:24
262:1,2 296:17
297:17,21 298:18
301:8,9
**cash** 130:25
**categories** 178:14
178:17
**causation** 300:24
301:10 307:15
**cause** 43:16 70:19
70:24 74:15 76:6
102:5 103:2 124:2
140:16,17 167:25
172:8,17
**caused** 302:12,15
304:18 310:19
311:22 319:17
**causing** 302:16
**caveat** 57:7 59:1
**ccrr** 1:21 2:5
327:4
**certain** 126:15
133:14 296:12
**certainly** 20:14
32:14 45:11 50:2
68:23 69:18 71:5
76:3 80:24 82:11
87:9,10 90:9 97:5
98:21 100:19
104:25 113:2
124:5 130:25
131:5,6 138:7
139:23 140:12
141:15 150:12
153:25 155:22
156:10 161:16
169:9 174:10
177:22,25 179:15
179:23 182:10
183:6 206:23,24

207:21 223:22
259:6 273:16
310:7 311:9
314:11
**certification** 3:11
6:23 7:3,10 9:4
11:7 299:4 301:12
301:17
**certifications**
34:19
**certified** 327:24
**certify** 8:13 326:2
326:4 327:6,20
**cetera** 146:6
**cftc** 129:25 307:23
310:2,12
**challenging** 32:8
33:8,15,19
**chance** 244:15
**change** 20:4 121:2
140:18 153:17,19
153:20,24 154:3
155:20,24 156:9
158:23 159:15
161:17 162:25
166:25 246:24
248:7,11,22 260:4
284:24 285:1,6
287:6 294:8 305:7
309:22 319:22
**changed** 13:15
88:5 110:9 149:10
154:5 251:16
285:2,10 316:5
**changes** 12:10,14
158:10 305:24
306:6
**chapter** 227:3
**characteristics**
190:12 192:12,13

**characterization**
156:24 204:17
**characterize**
155:20 156:8
**choose** 129:3
**choosing** 254:20
**chose** 117:10
120:7,17,19
125:11 128:25
132:24 139:13,18
141:20,25 145:25
146:4
**citation** 62:5
**cite** 9:8 95:11
167:13
**cited** 61:12,13
117:24 320:8
**cites** 192:14
**citing** 163:11
232:16,18
**city** 42:9
**claims** 25:15 30:5
**clarification** 35:11
35:13,14 50:9
116:9 139:14
167:1 187:13
198:9 229:23
246:4 270:25
291:11 315:10
**clarify** 114:8
**clarifying** 36:14
46:2 48:16 99:10
113:15 150:5
220:25
**clarity** 174:21
**class** 3:11,12,12,19
3:21,23 6:23 7:2
7:10,11 8:12,21
9:2,15 10:3 11:3,7
11:8 17:20 19:6
21:1 29:15 30:3,4

32:13 37:13,14,24
37:25 38:11,22,25
39:25 45:7 67:7
86:7 90:15 106:20
107:19 117:23
118:10,12,19
119:8 120:21
121:9,19,25
122:25 123:9,12
123:18,23 124:1
124:23 125:2
126:22 132:11
134:12,16,18
135:1,10,13,15
136:3,7,8,15,20
137:12,20 139:21
140:10,14 141:15
141:20 143:15,23
145:20,21 149:11
149:19 150:2
164:7 168:1
172:14 178:9
185:9 193:19
200:13 207:13
208:11 211:23
212:3,4,11 231:11
232:11,18,24
233:14 238:8
295:4,6 296:3,5
297:5,7,17 299:4
299:12,16 301:12
301:17 304:22
306:12,24 308:8
313:23 315:9
316:5 320:18
321:2
**classes** 36:3,6,7
39:2 140:9
**classroom** 37:2,4
43:25

Case 1:21-cv-02998-PAC Document 568-16 Filed 06/12/24 Page 341 of 387

**clear** 6:7 21:11 64:10 71:7 90:8 92:5 113:25 117:5 145:1 214:20 229:20 264:21,24 273:24
**clearly** 85:18 100:4 122:11 246:12
**cleveland** 44:18
**client** 118:19
**clients** 50:21 83:5 257:5,7
**close** 159:25 160:1 232:4
**closed** 188:23
**closely** 83:2
**closer** 232:4
**clr** 1:22 2:5 327:4
**coefficient** 152:24 153:1,3,5,6 158:6
**coefficients** 152:23 153:22,24 156:2 157:11 158:16 159:7
**coincides** 87:19
**coke** 74:22 190:9
**cokes** 77:8
**collection** 175:13 176:1
**collective** 172:10
**collectively** 151:2
**college** 34:12 37:9
**color** 125:15
**combination** 121:15 122:10 315:7
**combined** 318:23
**come** 5:23 18:13 51:17 133:19 136:5 164:14

182:3
**comes** 303:16 313:5
**comfortable** 77:17 121:12
**coming** 323:25
**commentary** 44:19
**commission** 30:8 32:23 42:15 326:25
**commissioner** 42:8
**commodities** 32:23
**common** 8:21 28:22 29:3 30:2 30:15 38:1,6 57:11 65:13 86:6 91:4,12,14,19 92:1 92:21 94:10,17,21 94:23 95:12,14 97:15,17 98:1,4 108:17 110:16,18 111:2,25 126:18 134:11 135:8 136:8 145:15 150:1 151:20 153:10 160:15 161:2 165:14,16 168:10 173:3 184:8 185:8 186:9 191:25 192:7,13 198:7,15 199:5 217:12 225:20 233:15,22 234:8 234:17 236:16 245:1,25 246:18 247:3,21 259:1,23 260:9,17 261:14 261:20,22 264:14

265:1 277:21 283:7 284:9,16 287:19,22,24 288:6 292:18 295:4,11,12 296:5 297:6 308:2,8,10
**commonly** 142:14 164:21 186:15 219:4 277:4,10,25 293:21 309:10
**community** 42:12
**companies** 63:20 89:22 97:13 126:7 190:2 292:23
**company** 29:10 70:9 83:14,17,18 84:18 85:15 86:2 88:2 104:21 110:6 114:15 115:22 121:2 124:22,25 126:7,14,16 130:8 132:10,13,23 146:2 149:18 150:21 162:6 163:19,23 174:4 176:12 189:8 213:22 215:23 217:2 245:10,17 246:15,22 247:10 259:20 260:2 313:19
**company's** 69:5,8 71:8 83:8 132:17 142:6,12 150:2 313:23
**comparable** 63:20
**compare** 155:6 162:18 178:12
**compared** 158:12 308:8

**comparing** 195:24
**complaint** 3:19,22 9:21 17:21 18:18 19:6,16,19,22 20:2 20:12 32:8 33:8 33:15,20 114:19 115:13 116:4 117:14,25 118:15 119:13 131:14,15 131:17,20 133:15 133:20,22 315:9 316:14,17 317:5,6
**complete** 10:5 90:13 170:22 181:4 297:9 315:2 327:15
**completed** 44:24 307:14
**completely** 71:13 71:24
**completeness** 99:22
**completion** 87:25 110:4 242:4 327:18
**complex** 71:22 297:3
**complicated** 75:22
**components** 153:20
**composed** 204:11
**compound** 71:22
**comprehensive** 117:22
**comprised** 193:2
**compustat** 321:16 321:19,20,21,25 322:3
**compute** 295:3
**computed** 58:21 276:25

Case 1:21-md-02989-DPG Document 568-16 Entered on FLSD Docket 06/12/2023 Page 342 of 387
Case 1:21-md-02989-RAR Document 568-16 Entered on FLSD Docket 06/12/2023 Page 342 of 387

concede 200:17 201:5
concept 62:23,25 63:1 64:3,8,18 65:3 111:17 186:21 244:1
conceptually 64:2 64:17 308:22
concern 122:11,19 124:2
concerned 69:1,4
concerning 30:15
concerns 122:5,24
conclude 50:25 70:4 135:8 181:8 183:13 233:6
concluded 67:8,9 67:10 134:15,23 134:25 135:14 325:10
conclusion 51:18 122:25 134:17,20 134:24 136:5 137:8 139:16 181:19,25 182:19 183:17 224:4 236:16 237:13,19 325:4
conclusions 22:13 121:13
condition 216:22
conditions 215:22
conduct 53:18 78:13,15,18,24 101:2 103:1 125:19 169:13 213:13 242:19 306:10,21
conducted 67:19 114:14 123:11 131:10 134:14

140:21 141:4 148:18 162:17 258:7 262:10
conducting 70:22 77:15 85:13 122:4 122:6 124:18 130:17,21 131:13 133:13 141:19 166:11 170:8 189:3 224:24 312:2
conference 211:10
confirm 33:13 66:5
confirmation 105:1
confirmed 105:14
confirming 105:10
conflicting 302:24
confounding 302:9,21,23,24 303:5,9
confused 38:10 137:13 267:12
confusing 282:22 298:24
confusion 37:8 114:8
connection 18:1 25:17 28:5 30:4 31:24 41:18 45:22 46:14 48:1 53:11 54:4 65:4 66:4 67:2 88:10 106:24 107:24 108:17 111:1,24 112:10 112:16 113:6,14 120:8,10,18 132:3 141:9 145:3 146:11,19 147:7 147:17 148:2

149:9,19 154:2 160:17,22 161:7 163:20 167:6 168:22 169:4 171:2,14 174:11 174:20 179:17 181:7 184:7 186:1 188:5 196:18 198:21 201:19 206:22 207:4 210:18 214:2,13 216:15 221:18 222:13,22 227:18 228:6,8,13 232:16 232:22 236:14,15 240:4 241:17 242:6,14 253:14 256:15 261:19 263:11 270:24 272:18 273:20,21 280:21 283:20 287:24 290:7 291:24 317:13 322:16 323:13
conscious 161:19
consecutive 58:19 59:2 276:23 277:1 277:3 278:3,7,12 279:9,22,23 280:7 281:2,13 288:25 289:6,12,16
consequently 274:16
consider 36:16,24 40:1 44:9,21 46:7 47:4,10 48:9 63:24 89:13,14,17 89:19 97:14 98:14 112:4 129:25 138:22 181:6 185:19 186:1

188:16 191:15 222:14,24 224:12 270:2,20 271:14
consideration 170:25 171:11 183:7 188:14,16 223:23
considered 33:1 37:25 42:11 53:10 79:24 93:4 108:12 141:16 178:4 179:14,18 189:23 199:16 214:13 217:10 254:6 257:15
considering 71:5
consistent 11:8 63:9,15 206:21 207:3,6 208:12
consolidated 3:19 3:21 17:20 19:6 315:8
constant 284:20 284:23 287:13
constitutes 173:22
constructed 304:16
construction 318:20,20
consultant 221:17 221:18
consultants 27:22
contacted 16:16 17:1
contain 140:15 173:25
contained 11:23 167:19
contemporaneous 143:20 145:7,13 145:16,22,23

| | | | |
|---|---|---|---|
| **context** 13:12 24:6 | 48:21,24 53:5 | 267:5,7,8,21 268:9 | **cost** 187:12 |
| 24:14,23 25:9 | 57:20 58:2,3 | 272:9,10,12,16,19 | **couched** 98:7,9 |
| 49:25 63:4,17 | 59:15,16,22 61:3,6 | 272:20 276:14 | **counsel** 2:8 3:12 |
| 64:14 66:16 88:16 | 61:9,14 73:2 74:1 | 280:5,22,24 | 4:20,22 5:1 7:11 |
| 94:15 235:7 250:4 | 74:2,4 91:9,21 | 282:16 283:9,10 | 21:24 53:15,24 |
| 252:4 254:12,16 | 94:11 103:6 | 283:14,20,25 | 54:5 185:25 |
| 278:23,24 293:13 | 110:11 111:20 | 288:7 292:24,25 | 264:16 295:24 |
| **continue** 150:18 | 113:9,18 114:17 | 295:8,20 296:23 | **count** 278:6,7 |
| 228:3 | 116:5 118:4 | 296:24 298:9,15 | **counter** 313:20 |
| **continued** 60:20 | 119:17,22 120:9 | 308:12 309:23 | **counts** 177:11 |
| 106:16 | 121:8,10,11 | 318:5 320:2 | **county** 327:2 |
| **continuing** 47:25 | 124:12,13,14 | 327:14 | **couple** 7:7 18:7 |
| **contributing** | 129:1,2,7,13,19 | **corrected** 3:16 | 35:15 56:21 146:7 |
| 310:8 311:9 | 133:3,4 136:23,24 | 11:25 12:6,9,13 | 214:15,18,24 |
| **control** 162:4 | 141:21,22 146:9 | 13:21 14:15 16:10 | 215:13 216:11 |
| 163:17 313:7 | 148:14 149:1 | 17:11 31:19 | 258:18 |
| **controlling** 302:8 | 153:18 154:4,14 | 287:18 306:10,22 | **course** 35:2 36:11 |
| **conversation** | 155:15,16,18 | **correcting** 319:15 | 36:15,16,19,25 |
| 37:16 71:2,6 | 156:7 160:18,19 | **correction** 274:25 | 37:14,16,18,19,20 |
| **convertible** 8:20 | 161:3,5 163:9 | 275:2 326:8 | 37:25 38:4,10,22 |
| 29:11 72:3,3 | 166:7 172:16,21 | **corrections** 10:20 | 39:16 40:1 97:12 |
| **copy** 11:25 | 176:4,8 177:14 | 10:21,24 326:6 | 124:22 132:10 |
| **cornerstone** 2:24 | 185:3,4 186:3 | **corrective** 118:9 | 172:13 |
| 5:3 48:8 168:9 | 187:18 195:22 | 118:14,24 119:2 | **courses** 36:5,12 |
| **coronavirus** 60:10 | 196:18,19 197:24 | 119:10 133:1,8 | 64:25 |
| 60:14,23,25 61:1 | 197:25 198:11 | 140:10 302:14 | **court** 1:1 7:17 |
| **corporate** 74:17 | 199:24 201:1,18 | 307:1,5,6,9 316:20 | 10:10 11:15 14:4 |
| 194:7,11,14,21 | 201:24 206:18 | **correctly** 56:16 | 17:17 19:3 20:22 |
| **corporation's** | 209:5 212:13 | 73:1 91:6 110:10 | 29:2,23 52:23 |
| 195:6 | 217:14 225:22,23 | 116:4 118:3 | 78:4,6 79:17 |
| **correct** 6:1,2,3,10 | 227:7,8 229:9,16 | 143:25 172:15 | 80:11 81:5 83:11 |
| 6:24 10:25 11:8,9 | 230:5,24 231:13 | 195:21 229:13 | 88:18 110:1 |
| 12:6,18 13:5,19 | 232:14,15 233:22 | 231:12 238:20 | 179:17 185:12,13 |
| 18:9,10,14,15 | 233:23 234:16,18 | 275:2 291:10,14 | 185:15,16,18,21 |
| 19:14 23:18,21 | 234:19,22,23 | 295:9 302:18 | 186:1 188:2 |
| 24:1 25:25 26:4 | 239:24 240:12 | 308:11 316:10 | 191:23 197:16 |
| 26:22,24 28:23 | 241:21 254:3,4,8 | 319:1 | 198:16 199:11,15 |
| 30:15,16 33:10,21 | 254:10 256:20 | **correlated** 72:22 | 199:16 202:11 |
| 34:5,12,13,24 | 261:23,24 264:14 | **corresponding** | 207:23,24 208:23 |
| 35:21 38:18,19 | 264:15 265:3,7,16 | 143:13 | 209:9 237:5 242:1 |
| 40:6 43:1,7 47:14 | 266:11,12 267:1,2 | | |

**court's** 77:3 87:20
  198:16 204:21
  208:2
**courts** 56:20 75:24
  76:3 79:25 81:2
  82:12 86:22 96:2
  100:19 101:12,23
  107:2 142:15
  166:16 169:17,25
  186:15 187:23
  191:13 192:11
  196:23 204:25
  205:10 206:3,16
  235:2,3,9
**cover** 82:23 85:15
**coverage** 74:3
  76:18 82:18,20
  83:15 84:9,15
  86:24 107:3
  108:13,14,21,24
  109:14,16 190:4
  214:3 222:15,25
  223:2 224:2
**covered** 84:21
  108:8 213:21
  223:19 224:9,9,20
  225:3
**covering** 85:25
  143:23 214:14
**covers** 121:9 223:6
**cra** 48:8
**crash** 129:6 143:3
  168:14
**crc** 1:22 2:6 327:4
**created** 297:12,13
**credit** 223:5
  314:22
**criteria** 173:24
  254:14,17 255:1
  256:14

**criterion** 115:24
  191:12
**criticize** 169:17
**crown** 27:1
**crowninshield**
  14:19,23 15:2,20
  15:22 16:4 27:3,6
  27:10,14,22 28:1,7
  40:5,13,23 41:9,12
  41:15,19,24 42:1,3
  42:6 53:15
**crr** 1:21 2:5 327:4
**csr** 1:22 2:5 327:5
**curiae** 179:5
**curious** 167:24
**currency** 314:1
**current** 31:11
  70:17 143:16
  305:19
**currently** 34:22
  35:10 94:2 299:14
**curriculum** 33:25
  36:9
**cushion** 246:19
  259:24
**customer** 126:3
  314:16,19,25
**customers** 313:25
  315:20 317:14
**cut** 36:10
**cv** 1:6 4:18 48:12
  48:13 49:2,12

  **d**

**d** 3:1 15:13
**daily** 137:11,15
  143:22 153:9,10
  308:9
**damage** 295:12
  296:16 297:10,12
  297:13 311:23
  312:5 318:7

322:17 323:24
**damages** 30:1
  67:10 294:22,22
  295:3,6,11,13
  296:2,22,25 297:1
  297:2,4,15 298:3
  298:13 299:6
  300:24 301:1,10
  301:15,17,20,22
  303:8 306:11,23
  307:15 312:2,13
  312:18 313:1
  318:9
**dark** 42:25 273:3
  273:12,23 274:4
**data** 58:17 78:12
  129:11 146:14
  152:13 200:14
  228:10,11 238:22
  239:9,15,17,21,25
  240:3,6,10,12,19
  240:22 241:10,15
  276:21 290:2
  291:5,17,23 293:6
  293:11 320:14,16
  320:24 321:19,22
  322:6,8,12,12,15
  323:12,16,18,20
  324:1
**dataset** 240:24,25
  242:9 290:3 292:4
**datasets** 321:10,14
  321:16,17 322:4
**date** 4:6 16:18
  26:19 31:22
  127:21 132:25
  143:5 245:6
  257:11 304:21
  306:7 307:19
  324:14

**dated** 3:14,17
  10:14
**dates** 8:24 115:2
  120:8,10,17
  125:20,22 126:15
  132:8 145:25
  173:3,6,7 178:21
  178:22
**daubert** 53:1,2,8
**david** 15:13 179:8
**day** 23:1 56:25
  57:3,19 58:2,20,25
  60:16 124:9,10
  129:3,5,8 134:16
  135:1,10 137:1
  138:17 139:12
  140:2,12 143:24
  173:16,22 177:9
  177:11,13 182:5
  182:24 183:1
  193:18 211:19
  250:24 258:22,23
  269:14,22 276:24
  281:3,13 282:14
  283:8,13,23 284:2
  284:3,9,10 285:2
  287:5 303:17,18
  304:21 313:5
  324:6,19 326:23
  327:22
**days** 56:21,25,25
  58:17,19 59:2
  63:9 78:24 81:1
  82:12 121:13,18
  121:24 122:16
  124:5 136:10
  138:5,10,13,15,19
  139:10,20,23,24
  140:7,15 141:11
  141:14 146:13
  162:20,20,22,22

163:9,23 164:3,5,6
164:8,10,16,18
165:14,17,19,20
166:1,12,18
168:12 173:13
174:3,3 175:11,12
175:23,24 176:18
176:18,23,24
177:7 178:8,10,11
181:10,10 182:4
182:17,18 183:11
183:11,12,12,15
183:16 184:2,3,3
244:25 254:24
274:12 276:21,23
277:2,4 278:3,6,7
278:12 279:9,22
279:23 280:1,6,12
280:14,14 282:18
282:20 283:16
285:7,10 288:25
289:7,12,17
**de** 157:14
**deal** 13:23 14:12
15:12 108:20
226:14
**dealer** 238:12,25
238:25 239:7,8,12
239:13,17,18,22
240:17
**dealers** 238:14
239:3 240:7,8,13
240:15,20 241:5,9
242:11
**dealing** 199:8
314:14 315:3,19
315:23 317:16,17
317:20 318:2
**deals** 234:21
**debt** 198:22

**december** 28:18
28:18
**decide** 78:7 124:16
146:10,14
**decided** 21:1
146:12 182:5
**decides** 143:10
**decision** 23:20,24
24:2,4 25:17 26:8
51:11 161:19
254:23 263:18
265:6,14 266:19
**decline** 140:18
304:2 310:1,11,18
311:20 312:3,9,15
312:16,18,25
**declines** 312:14
**dedicated** 45:1
**deepen** 42:25
**default** 246:25
248:8,11,23 260:5
**defaulting** 253:9
**defendant** 2:16
4:23 44:7,14 47:1
47:12 48:7
**defendants** 2:2
4:17 5:1,22 32:3
**define** 18:6 23:3
48:4 56:18 162:14
164:16 173:16,21
183:1,11,12
278:17 304:24
308:13
**defined** 36:25
90:21,25 92:8
173:14 176:23
177:1 180:1 239:8
273:9
**defines** 64:10
66:20

**defining** 176:11
184:2,3
**definitely** 215:5
**definition** 11:8
22:20,21 33:1
36:18 44:10,13,15
44:17 45:13 46:12
48:19 57:12,13
64:11,12,21 65:2,7
65:9 75:18 89:24
90:6,8 96:25 97:7
97:11 110:16,18
110:22 135:23
138:17,19 152:6
153:7 157:6
164:14 176:14,20
177:8,9 181:23
182:4,24 195:9
203:4 213:7 283:7
288:12 297:18
**definitions** 157:21
**degrees** 34:17
**demand** 79:17
**demands** 78:4
**demonstrate**
239:25
**demonstrates**
151:25 153:5
**demonstrating**
72:15
**depend** 57:1 63:4
64:14 93:9 121:25
138:21 181:15
182:22 207:19
208:4 249:2 283:5
305:20 312:19
**depended** 124:3
**depending** 42:1
**depends** 44:4
56:19 115:4,22
118:6 130:19

303:6 322:9
**deponent** 326:1
**deposed** 6:8
**deposition** 1:14
2:1 4:12,16 30:20
31:14 53:22 106:4
106:9 148:13
322:23 325:4,9
327:8,11,17
**derive** 41:23,24
**describe** 35:25
64:17 137:15
158:4 172:1 231:4
259:16 296:22
308:21 309:2,22
319:3
**described** 90:4
112:13 117:14
132:19 133:23
134:6 137:24
152:12,13 158:2
162:2 200:9 301:2
313:15 319:11
**describing** 67:17
**description** 3:9
220:1 315:4
**designated** 88:14
88:21,23 89:4,6,9
89:14,18,19,24
90:5,9,20,22,24
92:7
**designed** 102:1
140:22 141:5
163:2,3,4
**designing** 115:1
115:16 117:9
132:3 138:4
253:14
**desk** 314:14 315:3
315:19,23 317:16
317:17,20 318:3

**details** 169:22
  298:7
**determination**
  77:18 96:4 186:2
  186:8,16,19
  187:24 189:5
  199:17 252:6
  253:11
**determine** 31:7
  32:7 63:14 66:13
  68:16 70:19 76:8
  76:24 96:3 101:24
  102:4 103:2 112:1
  115:21 122:22
  133:12,18 135:11
  136:1,2 140:20
  141:3,10 157:3,22
  172:7 188:8 189:9
  197:18 223:12
  228:19 232:21,23
  240:14 241:4,8,12
  242:19 243:1
  302:10 312:13
**determined** 125:3
  127:10 136:14
  137:19 175:11,22
  199:11 215:2
  252:11
**determining** 29:3
  29:24 181:16
**devote** 39:18
**diet** 74:22 77:8
**differ** 192:25
**difference** 38:10
  45:22 113:25
  114:1 142:16
  156:2 157:14,17
  158:1,13,14,15
  159:7 178:16,19
  204:7,18,19 234:7
  259:12 305:2

**differences** 46:15
  157:11,24 293:2
**different** 9:20
  25:12 37:9,25
  52:11 69:12,21
  70:10 109:4
  130:15 139:8
  154:3,5 155:22
  156:10,12,20,22
  156:25 157:1,4
  173:4 176:20
  177:1 194:12
  202:18 203:11,18
  203:23 208:21
  210:17 212:2
  213:6 218:22
  221:4 225:20
  280:13 285:13
  297:20 299:8,11
  299:15 302:24
  304:4 309:4
**differentiate**
  230:13
**differently** 68:22
  69:6,9,11,16 70:20
  70:24 72:4,6
  143:4 146:18
  147:6,16 148:1
**differs** 305:16
  321:12
**difficult** 38:8 48:3
  266:22
**difficulties** 140:2
**dig** 79:6
**digest** 57:23
**direct** 72:15 75:20
  137:10
**direction** 70:10
  304:4 327:14
**directions** 69:12
  69:21

**disagree** 9:11
**disclosed** 310:1
**disclosure** 118:9
  118:25 119:3
  133:1,8 286:11
  287:19 288:1
  302:15 306:11,22
  307:2,6,9 316:21
  319:15
**disclosures** 115:11
  118:14 119:10,12
  140:11 307:5
**discovered** 306:4
**discovery** 305:12
  305:22 306:5
  307:14
**discretionary**
  219:19
**discuss** 45:6 94:10
  101:10 102:14
  188:21 191:3
  216:4,6 225:21
  227:22 228:1
  230:13 244:14
  294:21 321:9
**discussed** 119:3
  139:10 184:25
  191:10 196:16
  214:7,9 216:2
  217:1 241:20
  245:1 260:17
  261:18 266:19
  317:15 318:18
**discusses** 216:14
  241:21
**discussing** 78:24
  81:10 160:14
  198:17 254:9
  318:14 319:7
**discussion** 101:8
  196:25 211:3

**discussions** 36:5
  214:7
**dismiss** 20:25
  21:21 22:23 23:20
  23:25 24:3,9,11,15
  24:24 25:5,10,14
  25:18,21 26:8,13
**disqualified** 52:22
**dissemination**
  86:1 210:20 211:7
**dissertation** 44:22
**dissipate** 302:16
**distinct** 192:12
**distinction** 116:10
**district** 1:1,2
**divide** 309:17
**divided** 309:19
**document** 1:8 8:4
  8:9 9:20 10:13,18
  11:2 12:1,5,12
  17:22,25 18:4,22
  19:8,11 21:3,5,12
  32:22 33:16 64:9
**documents** 17:7
  32:12 53:10
**dog** 167:24
**doing** 115:20
  149:8 199:3
  202:12 209:21
  227:16 235:6,6
  241:3 243:16,17
  250:4 323:13,24
**dollar** 130:24
**dollars** 118:20
  303:19
**double** 203:6
  207:6
**dr** 3:14,17 4:13
  5:2,19 10:14
  11:22 55:14
  106:18 107:15

Case 1:21-cv-02900-JMF Document 568-16 Filed 06/12/24 Page 347 of 387

210:11 258:5
294:21 323:8
325:5
**draft** 14:20,24
55:20 86:11
295:15 314:5
**drafted** 61:18 65:1
296:13
**drafting** 314:8
**drafts** 13:14
118:21
**drastically** 192:25
**drawing** 121:12
**drive** 158:13,14
**driving** 43:17 88:4
110:8
**drop** 309:23
**dropped** 308:2
**due** 8:21 29:12
286:8
**duly** 5:12 327:8
**dummied** 166:17
182:6
**dummy** 162:4,9,12
162:25 163:1,14
163:17,24 164:9
164:11 165:15
166:2,13,23,23
167:5,7,10 168:4
168:12,21 169:1,3
169:10,13,18,25
170:10,25 171:3
171:12,22,23
173:12

**e**

**e** 3:1,7 15:13
316:10,10
**e.g.** 178:20
**earlier** 6:1 23:18
27:21 60:20
196:17 241:20

245:1 247:7 250:6
254:1 260:17
261:12,18 264:1
318:14,18 320:1
323:8
**earliest** 274:13
275:17 276:9
**early** 109:14
**earned** 303:21
**earning** 118:20
301:25
**earnings** 104:13
104:14,23 106:24
107:24 138:5,7,10
138:15,17,19
139:12,20,23,24
139:25 140:2,4,11
140:12,15 141:11
141:14 178:21,22
301:24,24 302:1
**ease** 14:16
**easier** 13:23,25
14:12 180:19
**easy** 154:21
**economic** 44:19
56:13 59:5,13
73:13 157:12
215:22 235:4
237:7
**economics** 34:11
34:23 35:1,5,17,18
37:13,18 39:11,12
42:13,16 44:2
61:12 64:25,25
66:20 157:7 239:3
282:25 283:4
**economist** 56:23
63:2 82:14 83:13
85:7 88:7 95:3
122:4,23 123:17
127:6 149:17

150:1 170:7 186:6
186:7,10,19 189:2
190:21 223:18
235:11,22 236:6
259:11
**economist's** 105:4
**economists** 61:13
61:17 72:13,21
73:5 75:12 79:21
101:9,14 166:17
179:4,14,24
186:24 189:7,17
189:23 190:20
217:16 277:15,16
**edit** 77:12
**edited** 227:5
**edition** 227:5
**eennis** 2:21
**effect** 43:17 74:16
76:6 81:11 92:9
102:5 103:2
167:25 172:8,17
**effex** 58:22 310:21
316:4,8,9,18
**efficiencies** 111:17
132:8
**efficiency** 3:14,17
10:14 11:22 28:22
30:14 31:7 45:2,7
45:11,15,17,20,22
45:25 46:5,6,15
49:19 53:18 55:16
68:4,10,17 73:14
75:21 77:15,24
79:10,19,22 80:7
80:20 81:24 82:21
84:11,20 85:13
86:6,24 87:17
88:10 92:2,23
93:12 96:1,3,5
97:17 98:4,20

101:2,5,10,13,20
101:24 102:7
103:5 104:3,6,10
106:25 107:25
108:9,15 111:7
115:3,21 117:21
118:1 122:5
123:14 125:4
131:2 132:4 133:9
137:11,14 167:22
170:8 172:10
180:13,20 181:13
181:16,19,23,25
182:19 185:20
186:16 187:9,20
187:24 190:2,16
191:4,24 192:6,11
192:17 198:7
201:17 205:16
208:13 220:9
230:9,11,13,15,21
230:22 234:15,25
235:13,25 237:3
238:16 246:1
247:5,22 248:3
260:12 261:13,19
262:18,23 270:9
272:19 273:22
290:13 297:23
298:19 299:3
300:23
**efficient** 29:13
50:13,16 51:1,17
52:6,10,14 56:5,8
59:4,18 60:4
61:18 62:7,15
67:7,23 68:7,13
69:10,23 72:19,25
73:7 75:16 76:8
76:13,25 77:18
78:8 80:3 81:3

82:13,16 83:19
84:4 85:16 87:10
91:14,19 94:24
95:5,15,19 96:12
99:17 100:8,17
103:10,14,22
134:12,15,18,25
135:9,12,17 136:3
136:6,6,9,14,19
137:1,4,20,21
167:18 177:25
183:18 186:3,9,13
186:22 188:6,9
189:6,10 190:24
193:22 196:22
199:18 200:18
201:6 202:23
206:22 207:3
214:5 216:25
221:19 223:21
224:4,9 229:2,7,16
230:5 236:8,12,17
236:22 237:13,20
238:1
**efficients** 75:25
**effort** 39:19
**efforts** 27:10,14
**eight** 36:22 37:5
39:4 54:2,16
136:12 181:17
274:11
**either** 40:14 53:15
65:2 70:1 137:12
**eligibility** 73:13
74:8 77:23
**eligible** 217:23
**embody** 31:20
**empirical** 61:19
62:9 74:15 162:17
172:24 300:5,11
300:14,16,19

301:4,6,21 319:12
**employed** 26:21
40:8 42:4 318:3
**employee** 16:1
**employment** 42:11
**employs** 318:22
**encompasses** 39:8
**encountered** 104:7
**endeavor** 291:22
**ended** 226:14
**engaged** 47:22
221:16,17
**engagement** 27:3
53:13
**engagements**
47:17,21 180:13
**english** 37:19
**ennis** 2:18 4:25,25
**ensure** 87:24
110:4 242:3
**entail** 173:10
**enter** 249:14
**entering** 314:24
**entire** 123:23
131:17 143:23
145:19,21 201:21
202:23 205:24
218:5 228:17,21
252:4,4 290:2
296:12
**entirety** 220:3
**entities** 8:15 90:2
90:3 112:14
219:14 232:23
317:20 318:4
**entitled** 4:13 42:24
48:12 55:15
**entity** 42:5 219:22
**environment**
43:25

**equal** 105:16
199:4
**equates** 309:22
**equities** 197:9
199:12 203:22
205:16 208:19
209:10 211:4,9
284:12
**equity** 45:23 46:15
49:4,15 67:6 72:3
72:6 86:8 113:17
113:23 192:18
195:6,7,25 198:17
199:14 212:4
216:23 238:17
245:7 255:2
259:12,13 262:2
273:4 293:4
**equityholders**
69:3
**erica** 179:9
**errata** 3:15 11:17
**error** 152:19
154:13 156:13,14
183:2
**errors** 11:24
182:15,23
**esq** 2:11,12,18,18
**essence** 56:7
**establish** 102:7
103:5 236:21
319:14
**establishing** 102:7
167:25
**estimate** 160:16
164:23 165:6
299:6
**estimates** 143:19
145:6
**estimating** 277:14

**estimation** 146:4
151:21 160:21
161:9 280:19
**et** 84:8 85:2 146:6
**eugene** 62:9
**evaluate** 67:3,13
67:16 188:4
**evaluating** 77:16
180:13 290:12
**evan** 2:18 4:25
**evans** 1:21 2:5
327:4
**event** 57:14 58:1
66:22,23 67:2
70:22 72:14 78:13
78:15,19,25
101:10,24 102:1,3
103:1 113:13,22
114:13,14,16,20
115:1,6,9,9,17,24
116:10,12,16,21
116:24 117:2,4,10
117:11,20 118:1
119:1,15,16,17,18
120:7,8,10,11,17
120:18,23 121:7,9
121:18 122:6
123:1,11,25 124:6
124:9,17,18 125:5
125:16,19,23
127:1,14,19
128:17,25 130:18
130:21 131:2,11
131:13,19 132:3,7
132:9,14,24 133:2
133:19 136:10,12
138:4,9,13 139:11
139:22 140:2,22
141:5,10,19
143:10 145:25
163:13,20 167:7

Case 1:21-cv-02900-DLC Document 568-16 Filed 06/11/24 Page 349 of 387

167:11,22 178:8
188:18 220:8
244:25 245:6
246:8 247:2,5
248:10,12,22,25
249:14,14 250:8,9
250:11,11 252:8
252:11,14,19
253:2,4,8,14 254:3
254:20,25 256:15
258:6,21 260:7,8
260:12,15 269:7
274:10,17 275:11
282:13 283:13,20
284:3,10 286:12
287:19,25 288:1,1
300:4,10,19 301:3
305:18,24 306:10
306:21 307:10
318:22 319:10
327:21
**events** 74:17
113:16 115:18
117:11,13,23
118:2,11 119:14
120:20 122:7
123:1,13,19,19
124:1 125:1,7
130:21 132:15
133:8,18 138:5,18
143:20 145:8,14
145:17,18 162:6
163:18 169:2
172:12 173:25
245:24 246:1
247:2,20,22 250:7
251:19 253:13
254:2,8 255:6,12
255:15 260:9,15
286:15

**eventually** 15:13
**everybody** 322:22
**evidence** 69:25
72:15 75:15 86:18
93:20 98:7,13
113:4 178:23
185:18 229:6
237:8,10,23
249:22 251:25
275:5 303:11
**ex** 178:9
**exact** 16:18 18:19
27:2 40:18 120:24
132:18 218:10
221:22 266:5
267:11
**exactly** 23:23 89:5
114:6 176:6
180:24 218:9
256:20 267:22
**exaggeration**
170:5
**examination** 3:3
5:17 106:16
**examine** 167:22
242:7,16
**examined** 5:13
172:25 327:7
**examining** 178:11
**example** 61:6 64:1
65:25 69:16,18
71:23 72:20 76:18
78:21 86:21 98:17
99:10,12 100:2,3,5
104:18,19 105:8
130:23 158:21
170:2 183:6
210:16 225:19
237:25 253:8
270:13 271:7,11
271:13 273:25

278:1 283:12
295:21 303:14,22
304:11,11 309:6,7
320:8 324:13
**examples** 90:1
182:2 273:2 304:7
321:13,18 322:11
**exceeded** 198:4
**excellent** 34:7
**exception** 326:6
**exchange** 30:6,7,8
40:9 41:14 90:25
90:25 94:11,18,22
95:9,13,25 96:11
96:16,19,22,25
97:4,6,11,14 100:7
100:10,16 296:4
297:6 313:16
**exchanges** 98:22
99:2,6,15
**exclude** 127:4
162:24 166:22
168:11 196:14
**excluded** 53:7
121:17 128:5
245:20 247:17
281:1,11
**excluding** 46:18
77:17 122:18
**exclusion** 171:21
171:22
**exclusively** 36:4
**excuse** 26:1 85:21
178:1 250:19
**executes** 314:16
314:19
**exempt** 219:2
**exercise** 186:11
**exhibit** 3:10,13,15
3:16,19,21,23 7:13
7:14,15 10:7,8,12

11:12,13 13:22,24
14:2,6,11 17:9,11
17:15,20 18:23
19:1,5 20:20,24
33:23 34:5 47:8
90:15 106:19
107:16 108:19,20
108:21 149:5
151:18,25 158:19
159:15,19 203:24
204:1 279:15,18
279:20 281:24
282:5 289:25
317:7
**exhibited** 173:2
**exhibits** 7:7
**exist** 98:14 323:19
**existed** 172:9,18
242:20
**existence** 72:18
73:7 87:16,21
110:2 112:1 242:2
243:4,11
**exists** 323:16
**expand** 126:3,8
**expect** 60:15 71:10
104:15 105:17
121:1 204:18
303:23
**expectation** 60:12
140:14 303:24
**expectations**
59:24 104:15,20
105:1,10,14 140:5
**expected** 126:13
126:18 127:7
178:10
**experience** 38:2
142:1,2 194:5
227:15 303:5

expert 7:1 9:3
28:21 30:14 40:15
40:15,16,18,20,22
41:10 46:20,23,25
47:17,22,23 48:10
48:12,15,17,18
49:3,13 52:23
64:24 81:10 83:13
85:6 115:20 168:7
170:7 185:25
186:6 207:10
221:1,9,13 235:4,5
261:25 295:1
297:22 301:20
expert's 44:14
experts 44:7 48:5
204:22 205:1,11
expires 326:25
explain 89:7
137:15 151:24
162:8 275:10
explained 89:25
135:4
explains 152:11
explanation 128:5
141:24 148:9
159:12 173:19
204:7
express 93:10
extent 26:7 30:22
45:6,16 47:25
50:18 66:22 81:5
94:25 104:21
111:8,21 112:21
113:25 127:14
132:22 133:10
138:6 141:12,14
156:24 162:14
164:17 185:19
186:14 191:9
197:14 199:13

203:3 206:3 216:5
216:21 228:23,23
230:2,19 239:2
243:18 284:11,15
316:24
extreme 246:18
259:23
extremely 120:25

**f**

f 1:6 2:16 4:14
29:7 200:10 227:2
316:10,10
fabozzi 227:1,5,22
face 183:8
facilitating 238:14
fact 29:25 60:22
75:25 91:11 94:10
94:21 95:11,12
97:19 105:14
113:1,3 118:21
135:9 142:5,11
199:14 204:9,25
205:10 214:3
217:18 221:13
229:13 234:6
240:16 295:2
factor 74:9 75:25
79:7 80:13 81:11
82:19 86:16 87:6
87:13 101:8,13,18
108:16,20,25
109:2,7,18 112:16
113:14 172:19
188:13 191:3
196:16,25 206:17
206:22 207:4,15
208:13,17,18,23
209:12 210:12
214:2,7 217:11
222:13,23 225:5
225:17 229:15,20

234:21 235:5
237:3,5,10 241:18
241:20 242:7,16
243:5,13 244:16
257:14 258:7,8
291:8 310:8
311:10
factors 51:4,7
52:16,17 63:23
72:17 73:6,10,17
73:18 75:11,13,14
76:2,4,11 77:16,17
77:20 78:5,6
101:4,19 107:4,5
136:13,13 143:14
181:17 184:7
185:3,21 188:21
191:14,20 192:6
225:6 290:6,14,16
311:22 312:4,16
313:5,7
facts 63:13 74:15
86:17 93:19 98:6
98:13 107:7
237:22 249:21
251:24 252:4
253:11 303:10
305:21 306:4
fail 38:4
fair 33:17 47:16
48:1 102:3 103:1
112:15,18,19
131:18 146:16,22
147:3,10 164:22
165:5 175:10,20
fairly 43:13
fall 45:12 89:24
97:6,10 319:18
false 32:3
fama 61:17 62:9
62:19 189:20

familiar 6:9,17
9:10 10:4 62:23
64:4,7 293:18
317:9
fantastic 55:4
far 28:2,5 261:15
261:16,22
fast 126:4
favor 179:15
214:4
fda 131:6
february 1:15 2:3
4:2,6 8:23 29:15
29:17 125:7
132:25,25 136:22
137:2,5 146:5,6,6
151:22 156:5,5
179:11 199:23
200:16 258:22
274:9,12,14,17,19
274:20 275:11,13
275:19 276:11
282:13,15 283:15
283:20,24 284:22
285:17 286:2,8,12
287:14,20,21,25
288:2,3 289:15,16
289:18,20,21,22
307:22 308:5,6
311:21
federal 44:6,18
47:1 48:1 327:17
feel 77:17 144:25
fewer 123:9,12
213:3,5 235:14,25
260:14 261:15,16
261:22 262:1
field 39:9
fifth 2:3 4:11
74:11 101:13

**figure** 35:12 213:14 281:22 282:4 301:5
**figured** 325:2
**file** 1:6 78:1
**filed** 3:20,22 7:11 10:16 11:20 17:21 19:6 53:4 162:7 163:19,23 174:4 179:17
**filing** 16:10 21:7
**filings** 124:25 132:13 150:25
**filled** 37:2,4
**finalized** 20:17
**finance** 34:14,15 34:22 35:2,15,18 39:13 56:7 61:20 62:10
**financial** 72:13,20 73:5 74:18 75:12 83:8 88:3 110:7 149:10,14,18 150:2,8,19,22 151:4 189:22 216:22 302:1 314:3,12 321:22
**financials** 78:1 150:25
**find** 76:12 94:25 101:12 119:7 149:9 184:20 191:13 235:9 275:25
**finder** 295:2
**finding** 67:8 85:20 86:5 101:5 108:15 137:3 181:18 214:5 234:25
**findings** 50:24 51:15 67:5 86:10

168:15 237:9
**finds** 83:11 178:18
**fine** 23:12 81:14 117:1 144:10 148:16 152:7 154:23 215:18 250:18,20 256:12
**finish** 56:24 57:19 122:15 159:24 211:12 251:13,14 255:25
**finished** 22:3
**firm** 2:11 5:5,6 26:22,23 27:7,10 28:8,14,21 29:21 56:13 59:13 77:25 104:12 150:11,22 151:15,15 214:22 216:19 226:16,18 253:9 255:20 321:21
**firm's** 69:4 71:12 83:2 150:24 151:4 216:22 223:10 226:13 245:11 246:24 248:7,11 248:23 251:16 257:12 260:4
**firms** 43:19 90:18 112:14 212:9,22 277:23 317:10
**first** 5:12 6:5 7:9 10:22 13:3,17 15:8 19:15 20:1 20:12 26:3 56:3 59:3,5 76:2,4 124:9 173:15,21 174:13 245:5 258:24 284:21 296:10 319:9

**five** 45:17 50:1,5,6 51:22 54:10,25 121:10,14,19 122:6,25 123:9,12 123:18 124:1 135:1,10,15 139:21 140:14 143:17 146:4 148:10 160:16 161:3 214:24 215:15 216:12
**fixed** 45:23 46:16 49:3,14,19 198:22 226:3 227:4
**fka** 179:10
**flash** 129:6 143:3 166:25 168:13
**flaw** 170:3
**flip** 13:25 33:23 155:1 184:6
**flipping** 11:2
**float** 188:22 190:19,22,23 191:3,11 290:18
**floor** 89:17 92:10
**flow** 173:25
**focus** 109:7 113:13 115:11 145:2 161:22 210:11
**focused** 227:16
**focuses** 196:17
**focusing** 42:13 113:17 119:1,12 138:9 163:8 165:13 318:10
**follow** 83:17 84:17
**followed** 84:2 168:13 213:10
**following** 125:2,8 211:8 246:2 247:23

**follows** 5:13 22:9 24:20 49:9 81:19 92:18 97:24 100:14 107:14 120:15 126:15 141:1 147:2,22 159:5 165:4 171:8 175:19 205:8 222:21 231:22 235:20 243:10 247:1 248:20 260:6 265:11 268:19 276:6 281:8 285:23 299:21 306:18 311:7 320:23
**footnote** 32:21 33:16 61:21,24,25 62:4,5 167:19,20 180:4,6 226:22
**footnotes** 61:14 168:23 315:6
**foregoing** 326:3 327:8,16
**foreign** 313:16
**forget** 168:17
**forgive** 110:20
**form** 23:7 33:6 86:20 157:21 162:7 163:19,23 307:18 315:8
**formal** 110:21 152:5 153:7 157:5 157:20
**formally** 27:1
**formed** 32:14 95:18 310:9,10 311:3,11
**formerly** 4:23 8:18 29:6

**forming** 33:3
185:19
**forth** 177:18
194:19,22 323:9
**forty** 54:10
**forward** 25:7
**found** 50:18 67:5
76:3 81:2 82:10
82:12,12 84:8
85:2,19 86:23
100:20 108:13
131:19,23 170:3
196:23 201:20
213:9 255:12
**foundation** 56:6
**four** 35:2,6 76:2,4
77:8 195:12
276:18
**framework**
297:14,16,21
298:2,6,8,13,17,20
299:1,2,5,9,12,15
323:9
**francisco** 97:5
**frank** 227:1,2,5
**fraud** 302:9,21,22
303:3,16 304:2
305:4,5,6 312:4,10
312:15 313:1
**free** 144:25
**frequency** 193:10
195:9,14 197:3
**frequent** 195:7
**frequently** 187:11
193:8 195:1 197:9
199:14 202:19
203:21 244:9
**friday** 1:15 2:2 4:2
271:5
**front** 11:11 17:5
18:22 31:19 64:22

65:8,12 66:1
71:19 168:3 169:8
**full** 30:23 31:3
65:25 119:19
146:14 211:23
268:7 297:10
300:12,17 305:12
**fully** 6:19 13:1
31:16 57:23 59:18
59:22 60:4,7,15
62:14 64:19 67:16
125:17 129:11
290:1
**function** 73:14
**fund** 179:9,11
**funds** 193:4,4,14
193:14 195:18,18
196:10,11
**further** 326:4
327:20
**futurist** 32:23
**fx** 311:21 313:20
314:21,25 317:10
317:19 318:3
**fxcm** 1:6 2:17 4:14
4:24 8:19,19
28:22 29:8,10,11
30:15 57:11 66:6
67:3 68:4 85:25
86:2,6,14 87:4
91:4,12,14,18 92:1
92:21 95:5,12,14
97:15,17 98:1,4,17
111:24 114:15
124:10 126:17,21
129:8 130:6
134:11 135:8
136:8,18 143:16
149:9 150:14
151:20 165:15
172:12 173:2

175:12,23 176:19
184:7 186:12
188:6 193:17,21
197:3,22 200:11
205:16 211:8
213:10 214:14
215:21,23 217:23
218:5 222:14,24
224:19 228:8
231:1,10,16 232:1
232:11,17 233:21
242:7,15,21 243:6
243:14 244:2,17
245:25 246:3
247:3,21,24
248:13 249:1,14
257:4 258:25
259:1 260:9
270:22 271:20
273:18,21 274:11
274:14,18 275:12
275:18 276:10
290:13 291:9,24
292:20 304:20
308:2 313:10,15
314:22 315:7
316:4,18 319:17
**fxcm's** 67:6 94:10
94:17,21,23
106:24 107:24
126:1,11 129:14
172:11 185:8
186:9 246:8
252:12 274:4
292:18 310:20
311:21 314:21
315:19,22,23

**g**

**gain** 190:4
**gauge** 215:19

**gears** 55:1 113:13
171:25 294:8
**general** 10:2 24:16
24:17 25:6,13
64:18 65:2 70:23
75:18 79:21 117:4
151:3 227:20
262:1 305:1
**generally** 12:17
31:1 39:19 57:18
62:22 64:2 67:22
68:21 72:2 73:10
101:5 109:19
115:16 129:20
144:8 194:25
196:20 248:10,21
296:16 298:8,10
305:14 318:21,24
319:4
**getting** 159:25
216:8 247:25
**ghaklay** 2:14
**gist** 213:25
**give** 7:22 10:5 23:1
40:17 49:25 65:5
65:9 90:1 96:8
128:5 130:10
141:24 148:9
152:5 153:7 155:7
155:8 167:9
173:18 182:7
184:18,19 222:10
250:23 257:18
279:2 289:3 290:3
297:9 300:15
303:14 309:3
321:13 324:18
**given** 126:11
142:22 143:15
148:19 170:25
171:10 182:10

188:11 273:8,8
**gives** 208:18 220:1
**giving** 222:9 237:6
257:18 273:25
**global** 1:5 2:16
4:14,23 8:17 29:5
314:2
**go** 6:15 9:20 12:25
23:11 25:7 40:19
44:14 47:3,7
54:24 57:9 58:5,5
60:20 79:11 85:19
90:13,15 93:21
99:23 101:8 105:7
105:24 109:7
119:25 127:17
128:3 141:13
151:13 155:12
165:20 173:17
175:6 183:4
191:20 192:8
196:24 198:1
207:18 210:1,24
211:3,20 221:21
259:15 282:11
303:17 305:1
322:21,21
**goes** 69:14,14
90:19 162:12
172:22 184:15
209:18
**going** 6:15 7:6
11:6,11 13:24
14:9,10 18:22,23
28:20 31:9 42:21
53:10 54:24 55:5
58:7 96:23 106:1
126:4 132:5 160:5
180:7 182:12
190:10 207:24
210:2 212:16

216:23 257:21
274:21 278:5,16
288:15 292:3
294:12 296:11
309:3,21 322:24
325:6
**gonen** 2:11 5:4
**good** 4:4 6:4 54:20
105:19 160:2
161:16 199:5
294:7 322:19
**government**
129:23,25
**grab** 155:1
**grand** 263:5
**great** 6:21 55:2
148:20 162:1
**greater** 84:3 190:5
**greenwood** 2:12
**guess** 8:6 18:19,20
26:13,15 31:5
35:10 64:18 66:21
68:15 75:18 78:16
96:24 104:24
111:19 114:5
139:15 142:23
145:15 155:25
157:5 169:12
173:15 176:11
195:8,9 202:14
230:12 243:19,23
248:16 259:8
278:17 279:25
296:15 316:13
**gwyn** 47:6,8

**h**

**h** 3:7
**haklay** 2:11 5:4,4
22:24 23:8,12,16
25:23 34:2 51:2
59:8 61:7 74:23

75:6 76:22 77:1,8
80:8,22 82:1
84:22 86:17 87:7
90:16 91:21 92:14
93:13,19 94:4
95:16 96:13 98:6
98:12 99:3,21
103:23 105:20,25
109:11,13,20
114:3 121:20
122:8,15 123:2
128:7 130:12
135:2 139:2,18
142:18,21 144:7
144:10 148:25
149:2,21 150:18
151:6,9,11 155:9
159:24 160:4
174:15,22 180:4
181:20 182:20
183:19 184:14
187:2,4 190:7,10
193:23 195:2
202:7 203:12,16
207:16 208:14
209:13,17,21,24
219:9,11 229:3,19
229:24 233:16
234:10 237:15,22
244:3,7 249:16,18
249:21 250:16,19
250:22 251:13,24
252:15 253:6,17
255:17 256:5,16
258:10 260:22
262:12 263:2,13
268:14 270:4,11
274:21 275:14
276:1 278:5,14
279:16 280:8
282:1,23 290:24

292:14 293:24
294:2,6,9 296:18
303:10 306:1
310:13,22 315:11
317:3 322:23
324:10,24
**half** 128:16 180:21
280:12,14,14
**haliburton** 179:7
**hand** 13:24 155:1
317:4 327:22
**handbook** 227:3
**handed** 10:12
20:24
**handing** 17:19
**handy** 17:12
**hang** 130:12
**happen** 63:20
69:23
**happened** 169:21
170:21 200:23
208:7 286:19
**happening** 63:18
63:19
**happens** 69:25
**happy** 7:23 8:5 9:5
9:16 12:25 64:22
65:8 66:1 71:19
73:19 86:10
125:12 139:4
144:19 155:8
167:16 169:8
180:8 240:23,23
244:13 279:1
307:12 316:22
**hartman** 47:6,8
**he'll** 23:4 149:2
**head** 73:9,21
114:22 167:12
180:2,8 322:10

Case 1:21-md-02989-RAR Document 568-16 Entered on FLSD Docket 06/12/2024 Page 354 of 387

**heading** 87:14 258:21 292:11 295:10
**headquartered** 313:18
**heard** 96:18 246:6
**heavy** 308:6
**hedge** 193:4,14 195:18 196:11
**held** 217:18 218:4 218:17,20
**help** 14:23 46:3 103:4 189:18 223:16 241:10 298:22,22,22
**helped** 14:20
**helpful** 74:14 95:1 235:10
**hey** 144:20
**hi** 5:19
**high** 76:19 79:20 83:15 84:14 111:13,14,14 151:25 162:8 166:13 170:9,19 171:1,12 204:10 204:13 218:15,22 225:24,25 275:10 275:15 305:14
**higher** 72:24 79:22 173:25 181:9 182:16 183:14 194:22 196:20
**highlight** 116:2 293:1
**highlighted** 115:25
**hired** 31:6,16
**history** 124:21 132:9

**hmm** 197:13 205:4 299:13
**hold** 40:24 59:7 79:13 127:25 130:9 139:6 161:14 177:23 178:2 235:15 282:1 289:23
**holding** 223:17
**holdings** 150:20
**honest** 171:18
**honestly** 92:24 114:24
**hopefully** 161:1
**hopped** 77:11
**host** 63:23
**hour** 27:20,25 54:18 159:25 209:14,18 244:9 256:6 288:22
**hours** 28:4,6 39:18 39:22 41:17 45:17 54:3,16 288:22 294:1
**housekeeping** 7:7 34:8
**huh** 27:19 154:12 174:9 212:6 270:15
**hundred** 214:25 215:6
**hundreds** 48:7 167:10 168:6 170:5 220:14,16
**hypo** 70:7
**hypothesis** 56:6 167:18 178:1
**hypothetical** 63:12 65:24 70:6 70:7,17 71:14,23 78:14,21,21 86:21

92:4 95:8,10 98:7 98:10,16 99:10 100:1,3,5 121:21 121:23 122:20 135:19 142:19 183:10 188:11,14 209:4,6 237:24 249:19 252:2,16 252:25 253:8 270:12 271:6,8 286:18 287:4 303:23 304:10 306:7 307:12 312:1 313:4,6,8 324:4,13
**hypothetically** 70:5,8

**i**

**idea** 51:21,24 77:6 91:13 170:20 192:2 194:9 203:9 220:18 221:8,11 221:15 222:5,6,6,7 284:6 300:15
**identification** 7:16 10:9 11:14 14:3 17:16 19:2 20:21 117:22
**identified** 233:21
**identifies** 240:6
**identify** 115:2 132:7 134:3 173:24 174:3 182:3 240:13
**ignore** 78:2 133:17
**ignoring** 75:25 101:13
**ii** 318:13
**imagining** 99:8
**imbécil** 15:5

**immediate** 74:18 168:13
**immediately** 125:1 166:24 168:13
**impact** 60:12,14 126:14 127:8 172:19 216:20 245:11,19 247:13 252:19 286:11
**impacted** 286:17
**impacts** 56:12 59:5,12
**implication** 57:24 79:19 80:6 83:14 83:16 84:14,16,17 84:19 88:8 91:25 92:20 93:12,15,17 93:18 94:3
**implications** 60:16 71:8
**implicit** 169:12
**implicitly** 245:4
**imply** 129:17
**import** 275:7 287:5
**important** 79:9 101:4,19 106:22 107:6,21 144:11 173:23 185:10 186:8 188:4 222:16 223:1 277:1,3
**inaccurate** 32:9 65:6 264:8
**inadvertently** 11:20
**inappropriate** 259:14
**inartful** 211:16 240:18

inarticulately
248:9
incident 167:24
include 39:11
42:15 55:22
101:14 115:2
117:11 121:6
124:16 127:1,18
127:19 133:19
138:10 139:21
141:11 164:3,5
244:25 245:3
248:12,25 250:7
250:11,15 252:13
253:4 254:8 270:9
272:21 311:23
312:5,17 319:10
included 58:17
73:11 95:2 118:13
126:2 127:19,22
128:17,21 138:18
139:11,12 152:18
163:24 185:22
186:16 245:4
251:22 254:24
271:25 272:2
276:21
including 8:19
75:14 117:24
123:22 300:4
inclusion 125:4
171:21 254:2
inclusive 8:24
income 41:23,23
41:24 45:23 46:16
49:4,14,20 198:22
223:6 227:4
incomplete 49:17
71:13 122:20
188:14 252:1,25
253:7 307:11

311:25 313:6
324:4
inconsistent
181:18,22 182:18
183:17 224:3
incorporate 59:18
60:15 104:2,4,5
incorporated 29:9
56:10 179:8,9
217:19
incorporates
178:24
incorporating
64:19 243:25
increase 140:18
158:19,20,22
159:16,19,20
238:16 249:12
252:12,17 253:2
303:25
increased 63:8
250:14 251:20
255:16,20 257:11
increases 253:9
257:8
increasing 101:12
250:10 253:15
independent 32:6
32:10,16 33:1,13
85:9 88:7 170:24
171:9 188:2 189:3
205:2,13 316:17
independently
113:5,7
index 153:2,3,4,5
153:6,13,16 154:8
154:11 155:14,17
156:3 157:25
158:1,4,7,10,25
159:13,16,19

indicate 86:24
91:3 152:25
158:16 159:8
193:22 197:5
199:15 209:16,23
213:23 229:1
260:20
indicated 34:4
209:15 239:21
250:9
indicates 11:18
239:22
indicating 12:13
50:12 304:16
316:25
indication 82:15
87:17 97:17 98:3
197:11 207:14
indicator 79:22
82:21 85:16 95:25
242:10
indicia 192:16
229:15
individual 188:9
237:1
individuals 88:1
89:22 110:5
112:13 196:14
238:2
industry 143:14
259:9 261:8 267:4
267:19 268:3
292:4 293:8,10
industrywide
262:3
inefficiencies
111:9,15,22
inefficiency 70:14
70:16 81:12
111:18 230:14

inefficient 50:20
52:8 60:22 65:20
70:2,11 99:16,20
135:17 193:23,24
197:6,11 207:14
inferring 136:7
inflated 302:13
inflation 302:15
304:15,17,23
305:2,5,7,10 306:7
307:1,4,10 318:14
318:21 320:17
321:2 323:17
inflationary
118:18 119:7,9
influence 239:4
inform 66:15,24
95:22 98:18,19
223:16
informal 152:7
information 56:10
56:12 57:23,24
59:4,12 60:5,8
62:15 63:5,6 66:3
66:23 67:1 68:22
71:17,21 72:16
74:10 76:7 78:15
83:3,5,8 86:1,22
95:2,4 96:3,5
101:23 102:6
103:3,7,12,17,19
103:20 104:8,13
104:25 105:2,6,7,9
105:13 107:1
115:12 119:12
121:2 128:21
140:8,16 172:20
174:1 175:14
176:1 178:25
183:7 203:4 205:1
205:12 210:20

Case 1:21-cv-02900-OMV-RDA Document 568-16 Entered Filed 06/12/22 on FLSD Docket Page 837421 of 3P5age 356 of 387

211:7 213:16,18
214:21,21 216:20
217:19 225:13
235:8,10 236:3
244:21 255:7
258:9,12 286:9,21
286:22,23,25
302:10,21,22
303:2,3,4,5,9,17
304:1 310:1,12
312:10 314:7
**information's**
205:2,14
**informative**
191:13
**informed** 85:8
95:1 113:2 142:6
193:15 195:19
196:4,13 217:18
236:19 239:4
315:14
**informs** 32:18
191:4
**infusion** 130:24
**initial** 107:11
227:23 228:2
**initially** 63:7
233:8 241:13
266:20
**insignificant**
157:17,19,23
**instance** 78:13
80:25 83:24 152:4
154:7 256:21
**instances** 50:18
**institutional** 99:7
112:4,6,22 113:1,8
126:9 193:3
217:12 218:6
219:9,13,17 225:7

**institutions** 193:13
195:17 196:10
217:17 225:8
314:3
**instructing** 23:14
**instructions** 6:16
**insufficient** 78:12
78:15
**insulated** 246:17
259:22
**integral** 182:25
**intellectually**
166:21 171:18
**intended** 9:3
**intention** 274:5
**intercept** 152:24
153:1
**interest** 105:15
**interested** 327:20
**interesting** 15:12
101:7 181:11
205:4 217:3
**intermediary**
314:23
**international**
39:12
**interpret** 286:10
**interpreted** 83:9
**interrupt** 46:2
116:8
**introduce** 7:6 9:24
**introduced** 5:25
**introduction** 4:19
**investigation**
111:25 112:10
228:19
**investing** 105:16
**investment** 83:1
150:22 219:8
226:3,7,13,16,18
227:11,12,16,22

**investor** 113:8
302:17
**investors** 83:6
99:8 105:11 112:4
112:6,23 113:2
190:6 193:3 218:7
218:11,18,20
219:11
**invests** 219:18
**invoices** 28:8
**involved** 119:4
228:2
**involving** 180:20
**irrelevant** 203:1,2
203:6
**isajiw** 2:18 3:4
4:21,22 5:18,21
7:6,14,18 10:7,11
11:16 14:7 17:13
17:18 19:4 20:23
22:15 23:5,10,14
23:17 25:3,24
26:2 34:7 49:21
50:10 51:8 55:1
55:13 59:9 61:8
61:10 75:1,8
76:24 77:4,14
80:17 81:8 82:5
85:4 87:1,12 88:6
91:2,24 93:1,16
94:1,8 95:20
96:17 98:9 99:1
99:11 100:6,21
104:1 105:23
106:17 108:4
109:12,15,18,22
114:7,12 121:5
122:3,13,17 123:6
128:11 130:14
135:6 139:7,17,19
141:8 142:20

143:1 144:8,14
147:13 148:7
149:4,24 151:1,8
151:16 155:13
159:11 160:2,13
165:12 167:2
171:24 174:18,23
176:7 180:10
181:24 183:9,24
184:17,22 188:1
190:18 194:1
196:15 198:10
202:9 203:14,19
205:21 208:1
209:1,16,19,23
210:1,10 219:23
223:4 229:5,22
230:1 232:6
233:20 234:14
236:4 237:17
238:5 243:21
244:13 246:5
249:4 250:2,18,20
251:6,18 252:7,21
253:12,25 255:22
256:8,22 257:13
257:20 258:4,11
261:4 262:21
263:10,17 265:21
269:4 270:7,14
274:25 275:21
276:16 278:10,20
279:17 280:11
281:16 282:2
283:2 286:6 291:2
291:13 292:19,24
293:23 294:3,7,20
296:21 300:1
304:5 306:8 307:3
310:17 311:1,19
315:16 317:8

Case 1:21-cv-02900-OMA-RBM Document 568-16 Entered Filed 06/12/24 Retrieve Page 357 of 387

321:4 322:19
323:7 324:16,21
325:2
**issuance** 138:14
227:24 228:3
246:2 247:23
**issue** 13:6 51:11
51:12,13,14,15
143:13 184:1,2
213:23 214:4
216:3,15 217:24
218:5 226:17
228:17 270:22
**issued** 50:11 86:14
87:4 106:20,23
107:18,22 175:12
175:23 176:19
200:25 201:11
211:23 219:6
221:1,9,13
**issuers** 219:20
**issues** 42:25 219:5
**issuing** 180:14

**j**

**j** 227:1,2,5
**january** 3:14,18
10:14 11:19 26:3
28:17 119:21
125:6 129:1 130:8
131:9 199:23
200:1 258:22
274:15,19,23,24
275:5,6,12,19
276:12 282:15
283:16 284:21
285:17 286:3,8
287:13
**jbaker** 2:15
**jenkintown** 2:13
**job** 42:14 86:20
88:14 205:18

**jobs** 42:18 223:15
**john** 179:9
**joking** 77:12
324:24
**jones** 227:2
**josh** 2:12 5:6
**journal** 61:20
62:10 179:23
**jpmorgan** 90:10
**jr** 2:25 4:7
**judge** 25:7 81:7
250:24
**judges** 94:25
**judgment** 133:20
**julio** 2:25 4:7
**jump** 318:6
**jumping** 152:23
307:21
**june** 29:16 124:10
125:5 136:21
137:2,5 161:10
200:2,15,19,25
201:7,10,17

**k**

**k** 1:6 2:16 4:14
29:7 162:7 163:19
163:23 164:3,5,6,8
164:10,16 171:23
174:4 177:13
184:3
**keep** 17:5,11
190:10
**kind** 6:16 66:21
118:17 129:23
181:18 191:11
223:9 261:8
303:24 323:20
**king** 2:17 4:22 5:1
74:24
**knew** 129:18

**know** 6:14 8:7 9:8
15:21 16:20,24
18:19 22:2,25
27:5,13 28:1,7,11
28:16,17 32:15,25
33:3 36:9,24
42:10 45:12,17
47:10 54:2 59:20
60:11 63:11 64:20
64:20 66:17,25
67:16,18 71:18
75:24 77:12 80:1
80:2 81:4,6 83:22
89:5,14,17 90:7,20
91:1 94:17 96:6
97:2,2,6,13 99:13
101:11 107:2
111:3 112:3,18,21
112:22,23 113:3
114:2,9,15 126:5
129:23,24 130:4
131:21 133:14
138:11,12,22
144:12 145:1
147:9 148:4 150:8
152:20 160:2
165:13,14 166:1
166:17 167:14
168:8 170:21
173:17 176:13
177:16 179:13,16
182:3,5,7,11
187:17 200:20
202:4,15 203:7
207:7 208:22,24
220:6,14 222:6
224:19 225:8
227:15 228:6
229:24 231:14,23
235:2 240:6
242:18,22 243:15

244:22 252:22
254:15 255:4
256:5 269:22
270:22 271:20,22
272:1 273:10
274:23 278:3,6,25
279:5 280:25
281:4,9,19,20
282:25 287:9,9,16
289:16 290:9
291:21 293:9
297:25 298:4,4
299:13,22,24
303:15,21 305:23
313:8 317:22
318:1 320:3
321:20 323:22
324:3,14
**knowing** 71:25
**knowledge** 119:6
179:22,22 269:1
271:7 286:20,24
287:1
**known** 4:23 8:18
29:6
**krogman** 51:6
52:15,17 73:10,18
184:7 185:2
188:20 290:6,15
291:7
**ks** 138:6,16 175:12
175:13,23,25
176:19,25 183:12
183:12 314:10
315:8
**kslaw.com** 2:20,21

**l**

**l** 15:5
**lack** 224:2
**laid** 89:25

**language** 295:22

**large** 39:9,25
84:18,18 91:17
126:12,16 190:13
193:2 238:13
240:15 292:18

**largely** 87:18

**larger** 41:23 190:2
193:5 292:21

**larry** 15:5

**law** 2:11 3:10 5:5
5:6 7:9,19 26:21
26:23 27:7,9
28:14,21 37:11
43:19 78:5

**law360** 42:24 43:2
43:5,10 44:8

**layman's** 38:24

**lays** 125:17 246:12

**lead** 303:25 304:2

**learn** 38:17

**learning** 310:19

**leave** 30:11 148:16
182:14 214:23
312:12

**lecture** 39:25

**lectured** 35:5

**lecturer** 34:22
35:1,11,17,18,20

**lectures** 35:9 40:2

**led** 50:24 52:5

**legal** 4:8 21:6
237:6

**length** 143:17

**lesar** 179:8

**letter** 12:2 27:3

**leucadia** 124:11

**level** 88:5 110:9
151:25 162:8
170:25 171:3,11
194:23 198:3

218:15,22 225:24
225:25 275:10,15
305:7,14

**levels** 171:17

**life** 295:16 296:9

**lifetime** 220:15,21

**likelihood** 84:3
248:3 250:14
253:3 255:16
256:14

**likeliness** 249:12

**limit** 23:6,8

**line** 104:14,20
251:4 326:8

**lines** 195:12
276:19

**liquidity** 187:12

**list** 34:16 43:6
90:13

**listed** 43:5 46:22
47:17 49:1,11
73:18 94:11,18,22
95:25 96:11,19,22
108:5 326:7

**listing** 74:6 87:14
100:7,15

**lists** 47:23

**literally** 107:7
144:16 309:4

**literature** 78:23
167:5 168:21
169:3 293:17

**litigation** 1:6 4:15
31:25 42:25 47:13
115:19 149:20
168:1 216:3 235:7
293:21 296:17
298:18 300:21
307:20 312:21

**litigations** 47:20

**little** 79:6 190:9
294:22

**living** 47:8

**located** 4:9

**log** 308:15,17
309:18,19

**logarithmic** 308:3
308:13

**logic** 26:11,18

**logical** 139:15

**long** 40:22 41:13
48:19 54:9,11
121:10 211:18
227:22 228:7
294:4

**longer** 230:3,22

**look** 9:5,7,16 17:7
40:17,19 42:2,20
51:3,4,6 60:10,18
60:19 65:22 66:1
71:19 76:1,4,6
82:3 83:22 85:17
93:23 94:6 99:25
102:21 109:23
115:18 117:13
118:22 120:19
122:1 125:20,22
129:11 130:17,20
132:16 138:5,12
138:24 140:1,12
140:13 150:8,13
154:22,23 155:3,8
155:9 156:4 158:3
169:8 177:21
180:8 186:12
187:23 189:8,12
191:6,8,18 195:5
201:9 202:11,18
203:24 206:3,17
207:21 210:19
211:6 226:15

232:4 233:3,5
235:15 238:6
239:14 240:10,21
240:25 241:22
245:5 250:11
252:4 279:15
290:2 291:22
292:10 293:11
308:19 316:22
322:13

**looked** 7:25 68:14
73:13 110:21
112:12 114:23
119:2 120:22
121:18,24 122:11
122:16 123:8
124:5 136:4,12
138:7 154:4,6
168:22 187:16
188:3 191:6
206:11,15 207:11
209:24 211:8,10
211:14 216:9
223:25 224:23
225:6 234:20
241:18 245:6
273:21 316:24

**looking** 7:24 9:6
21:5 34:4,9 41:1
43:13 47:6 58:11
58:13 63:24 65:14
72:11 82:23 115:7
117:9 118:14
120:22 130:7
132:17 140:7
151:18 154:8,18
157:25 162:15
163:10 165:17
167:15 168:18
175:14 176:2
181:17 188:24

Case 1:21-cv-02900-M&-RIMAD&KLIMent1568-Ehtered 64/6/5/1202RetPage833O25 of 3E5 359 of 387

| | | | |
|---|---|---|---|
| 199:25 200:3 | **magic** 191:11 | **mark** 280:23 | 102:7 103:5,9,14 |
| 202:12 210:21 | **magnitude** 303:21 | **marked** 7:16 10:9 | 103:22 104:3,6,9 |
| 213:6 215:4 218:1 | **majority** 47:16 | 11:14 14:3 17:16 | 106:25 107:25 |
| 221:22 225:5 | 48:2,22 171:21 | 17:19 19:2 20:21 | 108:9,15 109:3,11 |
| 226:5 241:10 | 216:9 | **market** 3:13,17 | 109:16 110:2,4 |
| 245:7 269:16,17 | **maker** 88:12,14,15 | 10:13 11:22 28:22 | 111:7,9 115:3,21 |
| 274:7 290:19 | 88:16,22,24 89:2,4 | 30:14 31:7 45:2,6 | 117:20 118:1 |
| 304:13 315:6 | 89:9,25 90:9,22,24 | 45:11,15,17,20,22 | 122:4 123:14 |
| **looks** 21:6 123:22 | 227:23 228:8,12 | 45:25 46:5,6,14 | 125:4 131:2 132:3 |
| 159:14 184:12 | 228:16,21,24 | 50:13,16,19,25 | 132:8 133:8 |
| 185:21 223:8,10 | 229:8 230:8,10,20 | 51:17 52:6,7,10,14 | 134:12,16,18,25 |
| 281:23 | 230:22 237:12 | 53:18 55:16 56:5 | 135:9,12,16 136:6 |
| **los** 2:4 4:1,9,11 | 315:1 | 56:9 57:21,23 | 136:15,19 137:1,4 |
| 97:3 327:2 | **makers** 74:5 87:14 | 59:4,17,22 60:4,11 | 137:20,21 143:14 |
| **losing** 255:20 | 87:16,22 88:9 | 60:14,15,19 62:13 | 149:10,12 150:9,9 |
| **loss** 129:9 300:24 | 89:13,15,18,20 | 63:7,19 65:19 | 152:1 153:2,3,4,6 |
| 307:15 312:24 | 90:6,14,21 91:4,12 | 67:6,23 68:6,12,17 | 153:9,15,17 154:8 |
| 313:1 | 91:18 92:1,8,21 | 69:10,23 70:2 | 155:14,17 157:25 |
| **losses** 302:17 | 93:3,3,5,8 109:3 | 72:5,19,23 73:8,14 | 158:1,4,6,10,19,22 |
| 311:23 312:5,7,8 | 109:11,16 110:3 | 74:5 75:16,20 | 163:25 164:20 |
| **lost** 301:10 | 225:18,21 226:9 | 76:12,24 77:15,18 | 167:22 170:8 |
| **lot** 83:16 84:17 | 227:14 228:4 | 77:24 78:7 79:10 | 172:11 173:11,13 |
| 140:9 182:10 | 229:14 231:2 | 79:19 80:7,21 | 178:1,24 180:13 |
| **low** 76:19 80:7,9 | 232:24 233:13,21 | 81:2,24 82:13,16 | 180:20 181:13,16 |
| 80:18,22 81:21 | 234:2,4,8,22,24 | 82:21 83:6,19 | 181:19,23,25 |
| 111:13,14,14 | 235:1,13,14,24 | 84:5,20 85:13,16 | 182:19 183:18 |
| 126:6 140:19 | 236:1,6,9,11,15,21 | 86:5,24 87:14,16 | 185:20 186:3,9,13 |
| 280:6 | 236:25 237:18 | 87:21,25 88:9,11 | 186:16,22 187:20 |
| **lower** 193:12 | 238:2,15 241:19 | 88:14,15,16,21,24 | 187:24 188:6,9,21 |
| 194:22 195:16,23 | 242:2 314:2,21 | 89:2,4,9,13,15,18 | 189:2,4,6,10,24 |
| 196:22 197:3 | **making** 6:7 83:3 | 89:20,24 90:5,5,9 | 190:1,13,15,24 |
| 202:21 | 89:16,23 90:4 | 90:12,14,14,20,22 | 191:4 192:6,10,17 |
| **lucid** 124:13 | 96:4 110:22 116:9 | 90:24 91:4,12,13 | 192:20,25 193:1,2 |
| **luevano** 2:25 4:7 | 126:2 254:23 | 91:17,20 92:1,2,7 | 193:7,11,13,20,22 |
| **luis** 34:23 | 284:25 285:18 | 92:12,20,22 93:2,3 | 193:23,24 194:4 |
| | **managerial** 39:12 | 93:5,7,12 94:24 | 195:15,17,25 |
| **m** | **mann** 227:6 | 95:5,15,19 96:3,5 | 196:3,5,6,22 197:6 |
| **m.d.** 4:13 6:1 | **march** 8:22 21:2 | 96:12 97:17 98:3 | 197:12 198:7 |
| **macroeconomics** | 25:21,25 29:14 | 98:19 99:20 100:9 | 199:18 200:18 |
| 36:4,16 37:4,23 | 146:5 151:22 | 100:18 101:2,10 | 201:6 202:23 |
| 39:6,7,8,9,11,14 | 327:22 | 101:13,19,24 | 205:16 206:22 |
| 40:1 45:7 | | | |

207:3,14 208:12
214:5,5 216:15,25
220:9 221:19
223:21 224:4,9
225:18,21 226:9
226:17,20 227:13
227:23 228:3,8,12
228:16,20,24
229:2,7,8,14,16
230:5,8,10,20,21
231:2,10,16 232:1
232:10,23 233:13
233:21 234:1,3,7
234:15,22,24,25
235:1,13,14,24,25
236:5,6,8,9,11,12
236:15,17,21,22
236:25 237:2,11
237:14,18,21
238:2,15,17
241:19 242:2,4,23
246:1 247:5,22
260:11 261:13,19
262:18,22 270:9
272:18,25 273:22
277:14 280:23
288:9 290:13,17
290:17 292:12,19
292:21 293:4
297:23 298:18
299:3 300:23
310:19 314:2,21
315:1
**market's** 60:6
**marketplace**
126:10
**markets** 29:13
61:19 62:8 89:16
89:23 90:10 92:10
97:13 124:11,13
126:5 137:11

167:18 226:1
227:1 237:25
248:4 313:21
**marking** 11:12
**marks** 223:14
325:4
**master** 1:6
**master's** 34:15
**material** 53:25
102:5 103:3,8,12
103:17,19,20
104:8,14 105:10
105:13 121:2
133:11,13,21
140:15 255:7,8
**materials** 53:12
**matter** 3:22 10:17
16:9 17:2,21 18:1
18:5 19:7,23
21:21 24:16 26:14
28:2,5,9 30:1,24
31:17,21 47:5,11
76:9 176:17
185:16 203:8
246:13 291:25
295:2 299:9
**matters** 48:14
49:1,11 50:7
220:10 299:3
**mean** 10:19 16:22
21:6 22:12,13,25
23:2,3 25:5,11,23
27:15 32:10,11
36:8 37:11 39:8
40:8,9 44:5,13,21
45:3,6,10 46:1,4
47:21,23 48:4
51:3,14,25 53:14
53:23,24 54:22
56:19,20,24 57:14
57:21 59:21 60:10

60:11,18 62:25
63:3,4,5 65:10,13
65:16 67:15 68:2
69:11 73:3,9,16
74:11 75:17 76:1
77:22,25 78:4
79:15,25 80:24,25
82:22 83:20 84:24
87:10,18 88:11,13
88:13,16 89:5,13
92:3,5,10,24 96:8
96:15,16,24 98:21
99:5,14 100:1,8,16
101:9 104:4,12,17
104:22,24,24
105:1,2 107:8
111:12,12,18
112:21 114:18,23
115:5 118:16
123:21 124:5
129:24 130:23
133:14 134:14,24
136:25 137:14
138:11 140:1
143:2 145:12,18
145:22 147:11
148:11,15,16
149:12 150:6,20
152:4 153:20,22
157:1,6 158:6
162:23 167:9
170:22 176:11
179:19 180:4,14
181:13 182:1,23
183:3 191:6
194:15,16,18
198:16 203:3,10
203:12,13,14,17
203:23 204:17,19
206:12 207:21
208:16 211:1,15

214:20,24 218:16
220:14 221:1
222:6 223:3
224:25 236:2
239:7 240:9
248:14 252:2
255:6 259:5 271:1
272:4,25 274:3
277:22,22 278:6
282:17 284:23
286:21 293:19
295:21 296:11
298:10 300:12
301:24 302:1,20
302:23 303:13
305:20 309:3
312:7,9 317:11,23
324:2
**meaning** 72:3
131:14 157:9
282:15
**meaningfulness**
205:3,14
**means** 24:15,25
25:6,13 27:5 30:1
84:23 102:21
110:25 145:16
158:5 226:17
271:5 280:21
**meant** 48:17 200:1
201:22 203:15
204:4 229:19,24
244:11 274:23
294:2 296:9
**measure** 29:25
79:9 143:11 153:8
153:16 187:11
284:3
**measured** 297:4
**measurement**
158:16 159:9

**measuring** 157:10
286:10
**mechanically**
173:10
**mechanics** 305:15
306:9,20
**mechanism** 87:25
110:5 242:5
**media** 4:12 86:4
190:4 325:3
**median** 202:1,5,12
202:21 203:12,15
203:18,23 204:8
204:19
**meet** 54:5 57:11
57:13 140:4
**meeting** 42:10
53:24
**meets** 37:5 199:14
**mellon** 90:10
**member** 295:7
296:3 297:5
**members** 30:4
296:6 297:7
**memorandum**
3:10 7:9,19
**memory** 7:24 8:5
9:6,17 10:5 13:1
21:9 41:6 66:9,12
129:12 130:7
189:16,18 232:5
233:2 240:11
241:14,16 316:23
**mention** 59:3
169:17 320:1
**mentioned** 27:21
33:15 46:9 133:15
142:9 170:15
194:3 261:6
316:19 322:4

**menu** 300:16
**met** 5:19 197:14
**methodology** 30:2
70:18 293:17
294:22 295:4,11
295:12 296:5,22
296:25 297:6
301:1
**michigan** 47:9
**middle** 118:19
274:22
**million** 129:9
130:24 219:20
255:20 257:6,8
308:7,10
**milwaukee** 179:10
**mind** 21:4 54:22
277:20
**minimis** 157:14
**minus** 309:16
**minute** 184:6
279:13
**minutes** 54:10,10
54:17,17,25
105:20 209:17,18
209:22 244:10,11
294:1,6 324:25
**mis** 90:8
**miscalculated**
13:8
**miscalculation**
13:9
**miscalculations**
13:13
**misleading** 32:4
**misquoting** 120:1
120:2
**misrepresentatio...**
302:11 304:19
319:16

**missing** 175:15
**misspecified**
182:12
**misstatements**
305:6
**misstates** 87:7
93:13 94:4 99:21
174:15 249:21
250:17 251:1
260:22 315:11
**mistake** 174:22
226:11
**misunderstood**
109:6 146:25
**misuse** 167:21
**model** 152:1,12,13
152:18,21 177:4
277:14 280:23
288:9 296:16
297:1,2,10,12,13
303:8 305:11
314:16 315:19,23
317:9,11,20 318:3
**models** 163:25
164:20 166:16
173:11,13 277:24
318:25 319:4,25
320:13
**modern** 56:7
**moment** 246:7
**monday** 182:6
271:5
**mondays** 182:6
**money** 40:10
41:14 111:3,10
**monitor** 83:2
**month** 45:18
**morgan** 90:11,11
**morning** 4:4
**motion** 3:11 7:2
11:7 20:25 21:21

22:23 23:20,24
24:3,8,11,15,24
25:4,10,14,17,21
26:8,12 53:1,2,8
**move** 46:3 59:25
105:18 109:15
126:19 164:18
209:12 225:17
290:6
**moved** 70:9 286:7
286:16 287:7
**movement** 65:2
104:16 140:6
164:19,24 165:9
178:16,19 255:10
**movements**
178:12,13
**moves** 153:9,10
**moving** 304:3
**multiple** 36:21
90:17 145:4
**multiplier** 301:25
301:25

**n**

**n** 3:1 15:10,12
**name** 4:7 15:8
167:11
**named** 15:1 327:7
327:12
**nancy** 15:10,13
**narinder** 15:1,10
**narrow** 186:20
187:7
**nasdaq** 89:13 97:1
98:23
**national** 129:6
**natural** 309:18
**navigate** 14:1
**navigating** 14:16
**nearly** 121:10

Case 1:21-cv-02900-CJN Document 168-16 Filed 06/12/24 Page 362 of 387
Case 1:23-md-03090-WFK-PK Document 568-16 Entered Filed on FLSD Docket 06/2023 Page 362 of 387

nec 105:12
necessarily 70:16
89:12 92:9 103:15
103:25 104:15
105:17 112:4
125:21 132:15
176:4,10 183:8
202:25 216:17
224:5 230:6
236:10 245:18
247:13 273:1,5
274:2 283:6
296:10
necessary 23:9
198:5 300:6 301:4
319:13
need 30:18 58:23
63:11,13,17,24
64:20 65:21,22,23
66:3,9,12,25 67:16
71:4,4,17,21 77:22
78:6 82:3 93:23
94:6 99:13,24
122:1,21,21 134:5
154:19 157:21,21
173:15 182:25
192:18 199:7
203:8 217:5,25
228:9,9 230:12,24
232:3 233:3
235:15 236:2
239:14 240:10,21
243:1 248:14,14
250:21,22 252:3,3
253:10 270:21
271:16 290:2
293:25 297:25
305:24 320:16,25
323:12
needed 12:18
78:24 324:1

negative 159:23
203:6 207:6
nera 48:8 167:23
never 76:15 80:15
80:19 81:13,22
92:25,25 171:16
188:12 202:11
217:3 224:15
262:18 263:8
264:11 268:25
new 1:2 2:19,19
56:11 59:11,18
72:16 74:10 90:24
90:25 102:5 103:3
103:8,12,16,18,20
104:8,20 105:1,13
140:15 172:19
178:24 184:3
244:20 255:6
258:9,12 313:18
313:18
news 56:25 57:15
57:15,19 59:19
64:19 65:17,17,19
66:7 69:6,10
70:19,23 71:7,11
72:5 86:4 88:2
110:6 116:11,11
116:13,13,21,21
116:25,25 121:16
121:16,17,17
122:9,9,18,18
123:1,1,22,22,23
124:23 131:24
132:12,22 136:11
136:11 138:8,8
145:20,23,24
146:2 162:6,13,13
162:19,20,22
163:9,12,12,18,21
163:21,22,22

164:4,4,13,13,15
164:16,18 171:25
171:25 172:12
173:3,9,9,14,16,22
173:24 174:3
175:4,4,10,10,11
175:12,21,21,23
175:24 176:11,11
176:12,14,18,23
176:24 177:7,9,11
177:12,12,17,17
177:23,23 178:10
178:10 180:12,12
181:10,10 182:4,5
182:17,18,24
183:1,11,11,11,12
183:15,16 184:2,3
190:3 211:14
246:18,23 254:9,9
254:16,16 258:25
258:25 259:7,7,14
259:14,23 260:3
260:16,16,21,21
262:10,10,25,25
264:14,14,25,25
265:7,7,15,15
266:9,9,25,25
267:4,4,20,20
268:4,4 269:7,7
287:4 308:1 313:5
nfa 307:23
nine 36:22 37:5
39:4
non 11:24 162:20
178:10,22 302:9
302:21 312:10
313:1
nonexistence
243:4,12
noon 106:6

normal 6:16
164:24 165:9
308:16
normally 34:16
36:19 55:22 57:2
130:16 177:21
180:1 186:12
195:5,6 284:11
309:15
northwestern
34:14
notary 4:8 326:25
note 34:8 94:9
191:18 208:6
213:10 218:15
227:24 228:3
241:17 269:13
278:13 291:9
noted 180:2
noteholder 246:9
noteholders 316:1
notes 8:20 29:12
29:18 31:8 57:11
58:16 67:6 68:18
136:18 137:12
161:10 191:21
193:17,21 197:3
197:21,22 198:21
199:1,6,8,23 200:4
200:12,18,20,25
201:6,11,17,19,21
202:5,21 205:17
205:24 206:6,8
208:8 210:12,17
212:24 213:9
214:14 215:21,23
217:11,23 218:3,5
218:23 219:1,6
220:17 222:14,24
224:19 225:9,9,21
226:8,10 227:12

227:13,14,18,19
228:8,13,17,21,25
228:25 229:1,14
229:15 230:3,5
231:2,16,17 232:1
232:2,13,17,19,24
232:25 233:13
234:2,4,8,17 240:7
240:20 241:5,9
242:7,15,21,24
243:6,14 244:2,17
245:2 246:3
247:24 248:4,13
248:13 249:1,1,15
250:12 256:15
258:25 261:13,15
261:16,20,22
269:15,23 270:24
271:21,21 272:3,8
272:14,17,19,21
273:18,21 274:4
274:11,14,18
275:12,18 276:10
276:20 278:4
279:8 288:14
290:7,14 291:24
292:20
**notice** 3:15 11:17
258:6
**noticed** 13:14
**notified** 26:7
**november** 16:17
**number** 4:18
36:20 43:18 46:22
61:12,13 78:24
81:1 85:24 91:17
101:12 106:19
107:18 108:5
144:24 152:17
168:23 185:14
190:5 204:9

211:24 212:15,16
213:3 215:4 234:7
236:11,15,20
238:13 240:15
254:2 256:20
279:24,25 280:6
282:18,20 300:3
307:5
**numbers** 13:15
155:4 221:22
309:11
**numerous** 168:6
181:6 208:21
**nyse** 74:6 87:15
88:24 89:10,10,25
92:8 97:1,18 98:5
98:18

**o**

**o** 227:2
**o'neill** 231:8,16,25
232:10
**obispo** 34:23
**object** 278:5
**objection** 22:24
23:6 51:2 76:22
80:8,22 86:17
87:7 93:13,19
94:4 95:16 96:13
98:6 99:3,21
103:23 121:20
122:8 123:2 128:7
135:2 142:18
151:6 174:15
181:20 182:20
183:19 195:2
202:7 207:16
208:14 229:3
233:16 234:10
237:15,22 244:3
249:18 250:16,17
250:18,20,23,25

251:1,24 253:6,17
255:17 256:16
260:22 262:12
263:2,13 268:14
270:4,11 275:14
276:1 278:14,18
280:8 282:23
296:18 303:10
306:1 310:13,22
315:11 324:10
**objections** 82:1
250:21 252:15
**objective** 117:25
118:5,13 119:3,5
119:15 164:14
173:24 250:7
251:20 252:8,10
252:23 254:6
**obligated** 139:5
**observations**
280:20,21 281:1
281:10,24
**obviously** 159:23
181:15 196:12,13
218:17 262:17
**occasionally** 39:16
**occur** 135:20,22
136:1 271:8,24
274:1 281:2,12
285:9 287:2,12
**occurred** 172:13
246:2 247:23
270:2 271:20
272:14 273:7,22
286:16 287:5
288:22
**occurring** 286:9
**occurs** 253:8
273:2,4
**october** 16:16

**odd** 98:24
**offered** 314:20
**offering** 32:2
218:16 259:8
284:16
**offerings** 218:19
218:23 227:17
**official** 41:12
**offsetting** 314:24
**oftentimes** 101:10
111:9 132:20
142:4 150:21
226:1 239:2
282:24
**oh** 12:7 16:21 29:7
29:19 35:14 40:18
91:23 109:10,17
111:8 119:18
128:3 134:8 138:1
142:14 146:23
164:10 190:8
196:24 210:15,22
210:22 211:18
229:21 249:8
268:2,22 269:24
273:16 286:14
288:15 290:22
291:1 292:15
318:8
**okay** 6:12,21,25
7:5 8:8 9:13 11:5
12:4,11,22 13:4,11
13:16,20 14:22
15:7,15,23 16:2,8
16:19,25 17:4,24
18:3,11,16,21
19:10,13,17,20,25
20:7,13 21:8,15,17
21:25 23:5,22
24:13 25:8,20
26:6,17,20,25 27:4

[okay - opposed]                                    Page 34

27:8 28:13,19
31:2,18 33:4,11,22
35:4,8,19,22 36:13
36:17 37:3,7,17,22
38:16,20 39:1,15
39:23 40:4,12
41:21 42:7,17
43:4 44:4,12,16,25
45:9,19 46:8,17
47:15 48:25 50:4
50:23 51:9 52:1
52:12 55:19 56:2
57:4,16,25 59:9
60:24 61:16 63:22
63:25 64:15,23
67:12,21 68:9,20
68:24 69:17 70:13
71:16 73:15 74:7
74:20 75:4 76:10
76:17 78:11 84:22
85:12 91:10 93:22
94:20 95:21 98:12
99:9 101:17
102:24 105:23,25
108:11 109:13,21
110:12,24 111:5
112:25 113:10,20
114:25 115:15
116:6,23 117:17
119:20,24 123:7
123:24 124:8,15
126:25 127:23
128:3,12,24 130:3
133:5 134:8,19
135:24 138:3
139:9,17 141:23
142:21 143:6
144:18 145:11
148:23 150:4
151:17 152:3,14
152:22 153:23

154:1,15,25
155:19,23 156:8
156:18 158:11,24
160:4,20 161:21
164:1,12 165:21
166:4,10 167:3
168:16 169:6,16
170:14 172:4
175:2,5,9 177:5,10
177:15 180:11,17
181:3 184:4,11,21
184:24 185:23
186:5,18 190:25
191:7,17 192:3
194:2,10,20 196:1
198:13,19 199:2
201:3,14,25
202:17 204:3,6,24
205:22 206:14
209:11 211:17
212:1,18,18 213:8
213:20 215:7,11
215:14,16 216:1
217:21 218:13
220:24 221:3,6,25
222:4,8 224:1,14
224:18 225:4
227:21 229:18
230:12 232:12
233:11,24 239:6
239:10 242:25
243:3,22 244:24
249:7 251:7
254:11,19,22
255:13 257:1,17
258:13,16 259:3
260:13 261:5,11
262:8 264:7,9,23
265:4 266:13
268:6 269:12,19
269:25 271:23

273:15 274:6
275:22 276:17
278:2 282:7,10,12
283:11,18 284:1,7
284:14,18 287:17
288:11,15 289:20
289:23 290:5,10
291:1,1,16 293:22
295:14,17 296:7
296:14 297:11,19
298:16 299:7
300:9 301:16
302:4 304:6,12
308:23 309:20
314:4 315:17
316:15 317:25
318:15,16 319:23
322:22 324:17,20
**omissions** 302:12
304:19 305:6
319:17
**once** 54:8 221:23
224:16 226:12
306:9,20
**one's** 259:6
**ones** 90:4 131:4
133:20 214:16
220:13 266:15,15
266:17 301:8
**online** 313:16
**ooo** 325:11
**opening** 3:13,16
10:13 11:21
**operate** 317:12
**operated** 228:7,12
**opine** 31:7 52:9,14
68:16 71:20 76:15
78:4,6 86:9
101:22 137:6
200:21 201:16
205:15 296:1

297:3 305:13
307:14 310:3,16
321:8
**opined** 297:8
303:8
**opinion** 3:23 7:2
20:25 25:23 28:22
29:1,22 30:14,23
32:2,14,18 33:6
48:18 49:19 50:11
50:15 51:5 66:15
66:24 76:14 79:2
79:4,10 80:12
81:7,9,14 82:17
83:13 84:14 86:19
86:20 87:20 88:20
91:11 94:10 95:18
95:22 96:1,2,10
97:16 98:2,11,18
98:19 100:22
101:3 113:2
136:25 142:7
176:17 185:20
188:3 190:23
191:1,5 192:4
208:2 214:9
236:19,20 237:6,7
273:14 289:13
294:22,24 307:13
307:17,19 310:5,9
310:10,18 311:3
311:11,14 312:17
315:15
**opinions** 18:8,12
18:14,18 30:24
31:20,23 33:3,18
52:25 53:7 220:5
**opposed** 35:17
49:4,15 106:23
107:23 116:25
153:15 175:7

Case 1:21-md-02989-CMA Document 568-16 Entered on FLSD Docket 06/12/2024 Page 365 of 387

180:25 217:1
261:14 262:11
308:15
**orally** 248:2
**order** 3:23 18:13
20:25 21:20 22:6
22:11 25:24 32:13
59:17 60:3 63:12
63:14 67:1 103:4
116:20 170:10
233:2 252:5
253:11
**original** 10:16,19
11:6 12:5,10 33:5
81:16 327:16
**otc** 313:20
**outlook** 56:13
59:13
**outside** 45:10,10
64:1 94:15 293:21
**outstanding**
197:21 292:12
**overland** 34:11
**overlap** 138:13
243:16
**overly** 220:6
**overreact** 63:5
64:6 65:16
**overreacted** 67:4
**overreaction**
62:24 63:3,10,16
64:3,8 65:3,11
**overreacts** 65:18
**owe** 257:7
**owed** 257:5
**owned** 218:6
**ownership** 217:13
225:7
**owns** 219:18

**p**

**p** 179:9
**p.m.** 106:9,14
160:7,8,9,12 210:4
210:5,6,9 257:23
257:24,25 258:3
294:14,15,16,19
323:1,2,3,6 325:7
325:8
**page** 3:3,9 8:9
12:16 22:13 33:24
42:20 46:22 47:7
47:7,24,25 55:15
56:4 59:6 61:22
62:2 73:24 74:13
75:4 90:16 91:8,9
91:16,22 106:21
107:20 109:24
115:7 134:7
141:18 149:6
154:8,23 155:1
161:23 172:2
179:12 184:12,18
184:23 187:2,3
188:23 191:19
203:24 204:4,5
210:13 212:19
225:5 238:6
240:24 258:14,19
282:9,10 290:7
292:10,12 294:24
295:10 300:2
326:8
**pages** 3:18 49:1,11
258:18
**paid** 28:11,17
**pairs** 279:8,22
314:1
**paper** 14:13 44:6
61:18 85:8,10
112:13 139:1

167:21,23 168:24
178:1 187:17
308:19
**papers** 42:21 46:6
46:18 65:10 168:3
187:19
**par** 71:9 194:7
197:21 290:18
292:12,20
**paragraph** 27:17
27:24 29:4,21
41:11 56:3,3
58:14 59:3,5
72:12 74:13 75:2
75:3,9 82:23
83:25 85:22 86:11
87:23 91:3,7,22
102:14,22,25
108:18 109:8,10
109:23 111:1
115:7,14 117:18
124:19 125:24
132:6 134:1,9
141:13,17 143:7
144:2,19,21,23
145:4 146:3,8
161:3,22,24 162:2
162:15 163:11
165:18,22 172:2,3
172:5,22 173:18
174:5,14 176:5,16
176:21 177:2
178:2,3,5 180:3
184:23 187:1
189:25 192:9,22
195:11 196:8
197:2,18 200:11
208:20 211:24,25
212:7,14,19
213:12,22 214:1
218:1,25 219:24

226:5 231:3,4,5
238:6 241:24
246:11 257:2
259:18 262:16
265:22 266:2
267:1 274:7 275:8
276:18 282:8,10
290:8,20,23,25
292:10 295:25
300:2 301:2 302:5
307:21 309:21
313:13 314:17
315:12 318:10
**paragraphs**
125:11 184:9,12
**part** 9:15 16:18
31:8 32:16 42:14
53:12 71:25 74:5
107:6 115:8
170:23 181:5
200:5,6 211:5
212:20 231:15,24
252:8,10 259:9
261:8 267:18,18
268:8,12,20
280:19 289:8
290:19 296:25
**partially** 116:16
**participants**
193:12 195:16
196:3,6 242:23
**particular** 12:16
52:18 112:17
119:2,16,17,18
135:16 153:11
187:8 200:5 248:6
282:21 283:12
298:6
**parties** 99:16,19
**partly** 266:10

Case 1:21-cv-02900-JMC Document 568-16 Filed 06/12/24 Page 366 of 387
Case 1:21-cv-02900-JMC Document 568-16 Filed 06/12/24 Page 366 of 387

parts 295:18
pattern 193:19
patterns 194:4
pause 74:21
paying 27:10,13
payment 28:15
peer 44:1,6,8,9,22
153:13,17 154:11
156:3 158:25
159:13,15,19
167:4 168:20
169:2 177:16
179:18,25 284:3
293:16
peers 153:15
179:20
pen 138:25
pending 114:7
128:2 256:9,10
penetration 126:6
pennsylvania 2:13
pension 193:3,13
195:17 196:10
people 14:19 16:5
57:22,22 59:24
63:21 89:16 92:10
110:15 111:3
223:16 239:3
262:6 273:3
277:18 293:20
309:10
peoples 59:23
perceive 207:13
percent 8:20 29:11
80:1,2,4 158:19,20
158:21,22,23
159:14,15,16,19
159:20 165:24
166:8,18 169:19
170:15,18 180:25
185:9 196:24

197:15,23 198:5
198:14,20,25
199:5,12,15
201:23 202:6,6
205:25 206:1,20
207:12 208:11
209:3,3,4 220:20
220:20,20 238:10
238:11 240:16
249:9,10 251:21
252:11,18,18
253:2,10 308:3
309:25 310:11
percentage 170:9
194:6 197:20
249:12 250:13
percentages 197:1
perception 255:15
256:13
perform 116:20
116:21 134:22
137:24 157:2,22
178:7 188:18
258:24 263:12,19
269:7 284:12
292:5
performed 57:14
66:22 114:16,20
136:11 137:7
138:1 172:9
191:25 200:12
261:3,7 263:9
268:5 269:3
274:16 275:11
performing 140:2
167:11 188:7
performs 223:8
period 8:22 29:16
29:18 32:13 61:9
63:19,20 67:7
78:19 86:7,13

87:3 90:15 106:21
107:19 108:6
113:23 117:23
118:10,12,20
120:21 121:9,14
121:19,25 122:6
122:25 123:12,18
123:23 124:1,6,23
125:2 126:22
132:11 134:13,16
134:18 135:1,10
135:13,16 136:3,7
136:8,15,20
137:12,20,22
140:10,14 141:15
141:21 143:15,23
145:20,21 149:11
149:20 150:3
151:21 156:4,14
158:18 161:9
164:7 172:14
178:9 185:9
193:19 199:22
200:4,13,13
201:21 202:2,22
202:24 204:11,12
204:14 205:24
206:21 207:13
208:12 211:23
212:3,5,12,25
213:10,22 225:9
228:17,21,25
229:8 230:3,3,4
231:11,17 232:2
232:11,19,19,25
232:25 238:8
240:20 241:5,9
269:15,23 270:24
271:21 272:3,7,8
272:11,18 273:25
278:4,13 279:8

280:15 283:13
284:10 285:2
286:9,22 287:20
288:2,4 289:15
304:22 306:12,24
307:6 308:9 309:9
313:23 316:5
320:18 321:3
periods 29:14
57:21 135:17,18
139:21 141:21
142:3,17 143:24
145:4 146:5,10,15
146:17,18 147:5,7
147:15,16,25
148:2,10 154:4,5
160:16,22 161:3,7
161:13 213:6
288:7,8,10,13
personal 79:2
personally 44:9
81:5 187:21
persons 8:15
perspective 77:2,3
77:5 199:3 261:14
306:9,20
pertains 327:16
peter 2:18 4:22
5:21 244:7
ph.d. 1:14 2:1,24
3:4,14,17 5:11 6:2
34:14 106:5,10
227:16 325:5,9
326:2,21
phenomenon 38:1
230:15
philosophical
105:2 203:7
phrase 89:2 96:18
96:21 285:14

Case 1:21-cv-02900MA6-PDxocBocument568-16enEtledard FFileOSG6/122/2eRetrageR8&f 3P5age 367 of 387

phrased 267:11
pick 254:23
piece 63:6 71:7
  112:12 139:1
  308:19
pile 14:12
pisajiw 2:20
pismo 42:9
place 14:9 65:25
  71:18 96:23,24
  145:15,17 169:7
  327:12
places 48:8 168:8
plaintiff's 48:2,23
plaintiffs 2:10
  6:22 7:12 8:13
  11:20 32:8 33:7
  33:14,19 47:18
  53:15 185:24
  264:16 295:24
planning 42:8,14
platform 313:22
  313:24
plays 77:23
please 4:19 5:9
  6:14 22:7 24:18
  54:15 81:17 92:16
  97:9,22 100:12
  107:12 114:2,8
  140:24 147:20
  149:23 150:18
  159:3 165:2 171:6
  175:17 201:4
  205:6 231:20
  233:19 235:18
  243:8 249:23
  251:14 253:19
  255:25 256:18
  262:14 263:15
  266:18 276:4
  280:9 281:6

285:21 306:16
  320:3 324:12
pocket 296:2
point 6:13 7:25
  12:16 67:23
  102:13 128:18
  129:18 141:17
  144:18 174:10
  175:1 222:2,2
  231:3 263:11
  264:13,24 265:5
  265:13 267:12
  269:10 271:4
  274:22 279:1
  288:16 289:4
  295:16 296:9
  307:11 310:4,5,16
  311:15 321:7
  323:14,23 324:5,8
  324:19
pointed 144:22
pointing 200:5
poly 34:23 35:17
  36:1,9 39:13
  41:25 42:5
pool 273:23 274:4
pools 42:25 273:3
  273:12
poorly 211:5
portion 45:8
  136:19 138:9
  317:16
portions 296:12
posed 95:10 109:5
position 35:23
  40:13 89:8 149:14
  149:18 150:2,8,20
  150:23 151:5
  189:19 226:20
positions 149:10
  149:13

positive 71:7,11
  245:18 247:12
positives 159:22
possibilities 263:6
possibility 151:12
  246:8
possible 30:21
  31:13,13,15 64:5
  65:17 67:22,25
  68:3,15,15,23
  69:19,20 70:5,8,12
  96:15 102:16,17
  108:10 120:3
  129:9 135:23
  154:21 167:17
  169:9 176:16
  177:6 224:7
  237:16 254:2
  261:1,2 262:25
  263:5,6 266:4
  268:23 320:15
possibly 44:10,15
  54:18 104:11
  138:6 222:9 224:6
  281:23 285:4
  301:24
potential 50:21
  138:5 162:5 234:1
  300:16 301:6
potentially 17:2
  163:18 222:15
  223:1 300:5 301:3
  302:8,20 319:12
practical 25:6
practice 168:10
  259:10
preceding 274:12
precise 225:1
  248:8
precision 309:3

predict 306:3
predicting 277:24
preferred 315:19
preliminaries 8:10
preliminary 8:11
prep 39:20 54:4
prepping 53:21,23
  53:24
presence 103:16
  126:8
present 2:23 86:22
  101:23 107:1,4
  185:18 191:15
  204:22 205:1,11
  207:21 303:9
presentation
  43:18,23
presentations
  43:15
presented 124:23
  127:15 132:11
  185:13,17 187:21
  204:21 235:10
presenting 43:25
  107:7 237:8
press 32:23 86:2
  130:8 307:23
  310:2,12 316:20
presumably 60:12
  65:10 179:19
  182:8
presumption
  84:11 191:24
  198:6
pretty 6:17 7:22
  8:2 73:24 184:19
  186:25 207:23
preventing 6:18
previous 19:14
  41:7 82:7 105:14
  123:4 183:21

Case 1:21-cv-02900-DLC Document 568-16 Filed 06/12/24 Page 368 of 387

184:1,4 264:19
265:19,22 268:23
279:10 299:19
311:5 320:6
**previously** 101:11
133:24 134:6
148:12 197:15
233:5 269:9
288:17 289:3
320:12
**price** 56:11,15,24
57:10,17,18 58:18
59:11,14 60:2
61:1,5 62:23 63:3
63:7 64:3,6,8,16
65:1,3 66:6 67:3
72:16 74:10,19
83:7 88:5 102:6
103:4,8,19 104:8
104:16 105:18
110:9 127:8,13
140:6 162:18
164:18,24 165:8
172:19 178:11,13
178:16,19,25
244:20 255:10
258:8,10,12
274:10,13 275:18
276:9,22 280:21
280:25 281:2,10
281:12 283:15
284:20,25 285:2,6
285:10,17,19
286:2,7,17 287:7,8
287:13 303:17,25
304:2,20 305:3,3
307:7 309:8,13,22
312:3,9,14,25
313:25 314:20
319:17

**prices** 59:25 62:13
65:4 217:20
246:16 259:21
286:23 287:1
302:13
**primary** 226:25
**primer** 55:16,20
**principal** 226:19
259:11
**prior** 12:14 18:17
123:8 131:12
143:9 180:13,14
201:17 261:18
274:14 275:18
276:10 295:19
298:18 299:2
327:7
**probability**
245:11,19 246:24
247:13 248:7,11
248:23 249:12
250:10 251:17,21
252:12,17,19,20
253:9,15 254:13
254:17,25 255:21
257:8,12 260:4
**probably** 9:25
16:16 26:15 35:2
35:16 36:22 52:2
54:2 69:3 73:23
84:18 96:25 98:21
112:6 114:18
170:4 180:23
191:7 199:16
253:4 279:25
304:8 318:8 321:5
322:1
**problems** 272:24
**proceeding** 179:17
**proceedings** 4:10
327:15,18

**process** 6:9 18:12
117:10 118:5,13
125:15 132:18
133:18,23 144:16
164:2 182:25
253:16 254:6,23
255:14
**profession** 277:5
277:11,12,13,20
277:21
**professional** 34:19
79:4 83:12 100:22
101:3 190:23
191:1 192:4
**professionals** 83:1
**profit** 110:23
**profitability**
223:11
**profits** 110:16
112:7 303:20
**prominent** 109:2
225:18 241:18
**promote** 190:14
**proof** 75:20
**proper** 166:21
322:2
**proportion** 41:22
172:25 173:5
180:20 181:9
182:16 183:15
238:24
**proportionately**
220:19
**proposed** 297:20
299:8,11,15
**proprietary**
313:21
**provide** 7:1 28:21
29:1,22 30:14
31:24 48:18 80:11
80:12 140:8 178:8

213:15 235:8
307:12 311:14
313:24
**provided** 46:23
80:13 213:18
297:14,16 298:6,8
298:13,17,20
299:5 313:19
**provider** 313:16
**providing** 51:4
298:2
**public** 105:16
178:24 190:22,22
326:25
**publications** 42:22
42:23 43:6
**publicly** 8:17 56:9
84:12 292:23
**published** 44:3
231:8 232:9
**pulled** 242:22
**pulling** 55:25
**purchase** 217:23
307:7
**purchased** 8:16
**purpose** 123:21
177:12
**purposes** 7:8
37:15 174:2
243:17,19
**pursuant** 53:8
207:15 208:13,16
270:10 323:13
**put** 11:10,11 17:9
18:8,22 64:21
65:7,12 166:15
223:14 317:4
**putting** 56:1

Case 1:21-cv-02900-RA Document 568-16 Filed 66/12/24 Page 369 of 387

| q | | | 196:8 257:2 |
|---|---|---|---|

**qib** 218:9,18,20
  239:19
**qibs** 218:4 219:8
**qs** 138:12,14,16
**qualification**
  117:8
**qualified** 218:9,10
  219:7,13,16
  239:18
**quarter** 39:24
**quarterly** 206:7,9
**quarters** 39:24
  206:13,20 207:12
  208:11
**question** 6:14 11:7
  22:7,10 23:15
  24:18,21 25:2
  30:13,16,19 31:5,6
  31:8,9,11 33:5,12
  35:10 36:14 38:9
  41:5,7,8 45:24
  46:3 48:17 49:5,6
  49:10,18,20,22,23
  58:10 64:22 65:24
  66:2 67:1,20
  70:17,21 71:3,19
  75:22 78:3,16,22
  80:15 81:17,20
  83:21 87:3 92:16
  92:19 93:6 95:1
  95:16,24 97:9,22
  97:25 98:24 99:9
  100:12,15 101:1,7
  102:2 107:12,15
  109:5 112:8
  113:16,21 114:7
  120:6,13,16 128:2
  129:4 130:11,15
  135:20,21 137:23
  139:8 140:23

141:2,7 146:25
147:3,19,23 148:6
148:25 149:16,22
149:24 150:5,15
150:17 152:7,10
154:19 158:25
159:2,6 160:25
161:16 163:5,7
165:2,5 171:6,9
175:17,20 180:19
181:11 184:3,20
198:24 199:10,21
200:24 201:3
202:15 205:4,6,9
206:10 207:8
208:22,25 217:3
220:7,25 221:4,7
222:19,22 224:11
229:11 231:23
233:19 234:12
235:18,21 236:3
239:20 241:2,16
242:9,13,18 243:7
243:11 244:6,8
248:17,18,21
249:24 250:5
253:21,23 254:15
255:19,23,23
256:1,3,9,10,11,23
256:24 257:15
258:24 260:19
263:23,25 264:19
265:9,12,18
267:13,15 268:11
268:17,20 269:18
269:21 270:6
271:19 272:6
273:10 275:9
276:4 278:19
279:5,6,14 280:13
281:6,9 282:19

283:17 285:1,9,12
285:20,24 286:5
287:10,16,23
288:5,18,23 289:1
289:25 290:4
294:10 296:20
298:5,21,23,24
299:19 306:14,16
306:19 310:22
311:5 312:12
313:9 317:23,24
319:19,21 320:21
320:24 321:6
322:14
**questions** 61:7
96:9 113:24
116:13 144:25
168:19 174:24
205:19 324:22
**quick** 5:25 318:6
322:20
**quickly** 8:2 56:14
56:18,20 57:12,13
57:18 59:14 60:7
63:8 73:24
**quite** 83:20 98:25
100:4 148:5
157:12 163:4
199:20 204:16
285:11 306:13
**quotation** 223:14
314:20
**quotations** 314:1
**quote** 8:11,12
61:21 62:11 82:22
110:2 210:19
**quoted** 62:19,21
62:21
**quotes** 291:18
**quoting** 62:7
84:13 178:5 179:2

| r | | | |
|---|---|---|---|

**r** 15:11,13 152:4
  152:15
**ra** 1:6 4:18
**ran** 143:21 155:25
**rate** 27:23
**rating** 222:15,25
  223:3,6,14,19
  224:2,10,20
**ratings** 225:3
**ratios** 302:1,2
**reached** 137:8
**react** 68:22 69:5,9
  69:20 70:20,24
  71:11 72:4 88:1
  103:9,18 104:9
  110:6
**reacting** 56:24
  57:19
**reaction** 61:1
  71:12 74:10 102:6
  103:4 244:20
  258:10,12 287:21
**reactions** 57:11
  61:5 162:19
**read** 8:13 11:18
  22:8 24:19 28:25
  29:19 45:11,16
  49:5,8 54:15 56:4
  56:16 58:15,23
  59:10 62:6,11
  72:12 73:1,4
  74:13 75:3,10
  79:13 81:18 82:25
  84:1,7 85:3,5,23
  86:4 87:20 91:6
  91:16,22 92:17
  97:23 100:13
  107:8,13 109:1,25
  110:10 114:18,19

Case 1:21-cv-02900-GHW Document 568-16 Entered on FLSD Docket 06/12/2024 Page 370 of 387

| | | | |
|---|---|---|---|
| 115:9 117:19 | 302:6,18 304:14 | 268:12,21 269:6,8 | 58:12,24 128:1,13 |
| 118:3 120:14 | 306:17 307:25 | 275:20 276:13 | 170:17 225:2 |
| 124:19 125:10,14 | 308:11 311:4,6 | 277:6 323:18 | 239:15 240:22 |
| 125:25 131:12,15 | 313:13 314:17 | **reasonable** 9:18 | 241:11 261:10 |
| 131:17 132:6 | 317:16 318:18 | 56:21 121:12 | 262:19 263:8 |
| 134:1,10 136:16 | 319:1,7 320:22 | 191:8 | 279:21 301:24 |
| 140:25 143:7,25 | 326:3 | **reasons** 52:5 | 317:1 |
| 144:5 145:5 147:1 | **reading** 9:7 45:14 | 266:10,14,24,25 | **recommendations** |
| 147:21 151:18 | 46:5,18 74:12 | 269:5 288:24 | 83:4 212:11,24 |
| 154:19 159:4 | 83:24 85:21 87:22 | 289:11 | 215:3 |
| 162:3,15 165:1,3 | 91:15 94:12,13 | **recall** 7:21 9:14 | **reconvened** |
| 168:23 171:7 | 102:20 115:14 | 12:24 16:13 19:24 | 106:11 |
| 172:5,15,23 | 124:19 125:24 | 22:5 26:19 50:2,8 | **record** 4:5,20 5:19 |
| 173:20 175:18 | 134:1 144:1,13,19 | 51:19 52:19 58:8 | 5:21 22:8 24:19 |
| 178:5 179:2,20 | 165:18,22 189:24 | 114:24 123:16 | 49:8 55:6,11 |
| 185:5 187:5 | 200:10 210:23 | 127:11 128:20 | 77:11 81:18 92:17 |
| 189:21 190:11 | 218:24 233:25 | 129:5 131:5 | 97:23 100:13 |
| 192:9,15,22 | 241:24 259:17 | 139:24 169:5,20 | 105:24 106:2,13 |
| 195:12,13,21 | 266:21 290:24 | 169:21,22 175:8 | 107:13 120:14 |
| 196:9 197:3,19 | 313:12 314:17 | 188:12 214:19 | 140:25 147:1,21 |
| 198:1,11 200:8 | 316:14 | 221:20 224:22,25 | 159:4 160:6,11 |
| 205:7 208:20 | **reagan** 1:21 2:4 | 227:25 228:5,14 | 165:3 171:7 |
| 212:8,21 218:1,25 | 327:4 | 228:22 233:10 | 175:18 205:7 |
| 219:12 222:20 | **real** 5:25 318:6 | 240:2 241:7 | 210:3,8 222:20 |
| 226:2,5,23,23 | **realize** 13:12 | 262:24 278:9 | 229:20 231:21 |
| 231:5,12,21 | **really** 38:7 44:4 | 279:12 289:8 | 235:19 243:9 |
| 235:19 238:7,20 | 64:20 77:23 80:4 | 303:13 | 244:14 248:19 |
| 241:24 242:13 | 80:15 92:3 95:7 | **receive** 16:4 42:9 | 257:22 258:2 |
| 243:7,9 244:18 | 96:6 98:24 115:22 | 53:13,14 322:6 | 265:10 266:21 |
| 245:22 246:13 | 116:1 121:25 | **received** 53:14 | 268:18 276:5 |
| 247:8,15,18 | 122:21 140:7 | **recess** 55:8 106:6 | 281:7 285:22 |
| 248:19 257:3 | 162:11 197:17 | 160:8 210:5 | 294:13,18 297:9 |
| 259:18 265:10,24 | 202:16 217:4 | 257:24 294:15 | 299:20 300:13,17 |
| 266:5,7,19 268:18 | **reask** 201:3 | 323:2 | 306:17 311:6 |
| 268:23 274:8 | **reason** 9:11 37:24 | **recognize** 10:18 | 317:3 320:22 |
| 275:1 276:3,5,19 | 70:3,15 99:14,18 | 12:1,12 19:8 21:5 | 322:25 323:5 |
| 277:8 281:7 | 139:13 231:14 | 170:16 192:11 | 325:6 326:5 |
| 285:22 290:11 | 238:3 245:9,16,20 | 247:6 | **recording** 4:10 |
| 291:3,10,14 | 247:9,16 249:16 | **recognized** 13:9 | **redline** 12:9,13 |
| 292:17 294:25 | 262:9 266:3 | **recollection** 10:3 | **redlines** 12:15 |
| 295:9,22 299:20 | 267:18,19 268:8 | 11:3 12:18 52:20 | |

Case 1:21-cv-02900-CM Document 568-16 Filed 06/12/24 Page 372 of 385
Case 1:21-cv-02900-CM Document 568-16 Filed 06/11/24 Page 371 of 387

**reduced** 327:13
**reduction** 258:8
**refer** 30:18,25
  40:14 44:7 82:7
  82:22 123:4
  141:13 176:5
  183:21 184:4
  212:16 215:20,24
  217:25 241:6
  262:15 265:19
  268:22 279:10
  281:22 283:3
  288:16 299:1
  319:6,20 320:5
**reference** 31:12
  102:15
**references** 226:23
**referred** 150:22
  173:8 215:22
  219:4
**referring** 27:17,24
  32:20 48:11 49:2
  49:12 88:25 89:1
  89:3 113:23 134:4
  146:3 150:24
  151:2 198:17
  234:13 272:8
  277:12 282:8
  300:11 315:12
**reflect** 60:4,7
  62:14 83:7 176:17
  307:1
**reflected** 8:14
  11:18 28:25 29:19
  53:19 56:4,14
  58:15 59:10,14
  62:6,12 72:12
  73:4 74:13 75:10
  82:25 84:1,7
  85:23 87:20 91:16
  109:1,25 115:10

117:19 124:20
125:25 132:6
134:2,10 136:17
143:8 145:5
151:19 162:3,16
172:6,23 173:20
178:6 179:3 185:6
187:6 189:21
190:11 192:9,15
192:23 195:13
196:9 197:4,19
198:2 200:8 212:8
212:21 218:2,25
219:12 226:2,6,24
231:6 238:7
241:25 242:13
244:19 245:23
246:13 247:8,15
247:18 257:3
259:18 274:8
276:19 277:9
290:11 291:4
292:17 294:25
295:23 302:6
304:14 307:25
313:14 314:18
318:19 319:8
**reflects** 30:22
  31:16
**reframe** 256:23
**refresh** 7:24 8:5
  9:6,17 10:5 11:2
  13:1 21:9 41:6
  58:12,24 66:9,12
  127:25 129:12
  130:7 189:18
  232:4 233:2
  239:15 240:11,22
  241:11,14,15
  279:21 316:22

**refreshing** 189:16
**regarded** 86:3
**regarding** 241:14
  304:1 307:22
**regardless** 197:1
  214:8 267:9 268:1
**regards** 20:11
  58:6 66:10 80:13
  82:8 84:25 85:20
  115:6 130:1
  153:15 162:12
  181:13 222:17
  241:16 242:10
  245:6 255:11
  261:24,25 288:17
  304:1 305:5
  312:20
**registered** 219:1
**registration** 74:8
  219:3
**regression** 58:16
  142:24 143:9,18
  145:6 146:4
  151:20 152:2
  153:11 160:15,16
  160:21 165:15
  168:14,17 276:20
  279:19 280:22
**regressions** 143:22
**regulator** 130:4
**regulatory** 129:9
  129:15,21 130:5
  130:16,21 131:1
  131:10,19 132:1
  132:15,20
**reject** 166:16
**related** 49:3,14
  65:1 115:12
  118:11 119:12
  132:22 145:24
  172:19 198:15

220:10 250:12
255:15 302:9,21
302:22 303:3
312:3,10,15,16
313:17
**relates** 1:8 220:4
  244:16 246:8
**relation** 210:12
  258:6 273:17
  317:13
**relationship** 15:2
  15:21 27:2 74:16
  76:7 102:5 103:3
  143:12 153:8
  158:2 172:9,17
  190:1 248:2 307:8
  310:20 316:4,18
**relatively** 140:19
  143:19 145:7,12
  256:11 280:6
**relay** 50:20
**release** 32:24
  130:8 178:21,22
  307:23 310:2,12
**released** 145:20,23
  212:10,23
**releases** 74:18
  86:2 316:20
**relevance** 202:7
  214:22 248:3
**relevant** 34:20
  59:19 63:6 66:7
  94:22 95:4,13
  104:9 108:8 111:6
  130:5 189:5
  190:23 202:22
  203:5 205:23
  206:2,5,17 216:13
  236:11,15 238:25
  239:18 246:9
  252:23 253:16

257:14 290:16
315:20,24
**reliable**  166:13
170:10 171:1,13
**relied**  186:15
192:16 321:10
**relook**  228:9,10
**rely**  7:23 72:14
96:2,5 176:16
314:7 320:11
**remain**  284:23
**remained**  287:13
**remember**  8:4
9:19 13:3,6 14:25
20:8 21:12 23:23
120:24 128:16
129:16,17,18
166:18 167:14,16
168:3 169:22
180:23 207:22
211:22 214:15,16
214:23 215:8
218:8,9 221:12
233:7 241:2,4
243:25 267:11
316:19 321:20
322:9 323:25
**remembrance**
269:2
**remind**  75:4
**remove**  164:19
229:6
**removed**  25:16
**render**  18:7 40:9
50:15
**rendered**  33:18
41:14 49:19 81:10
82:1
**rendering**  18:12
235:4

**repeat**  22:7 24:18
107:11 159:2
160:24 205:5
235:17 281:5
287:23 306:15
320:20
**repetitive**  256:17
**rephrase**  261:17
273:19 279:6
298:11
**replaces**  11:25
**report**  3:13,16
7:22,24 8:2 9:3,5
9:8,15,16,24,25
10:13,16,19,20,20
10:23 11:21 12:6
12:6,9,10,13,14,19
13:17,18,21 14:15
14:17,18,19,20,21
14:24 16:6,10
17:11 18:8 20:18
22:4 26:3,10,14,16
27:18 28:20,24
29:5 30:18,25
31:12,19,25 32:17
32:21 33:23 34:3
34:4 41:11 46:21
48:6,15 50:22
51:11,12,13,14,15
53:11,19 55:15,24
58:11,14 61:14,22
61:25 65:1 73:19
79:11,13 81:10
82:24 83:25 85:22
87:23 88:7,17
89:2 91:16 94:13
94:16 95:12 98:15
102:8,9,11,15,21
102:23 104:23
106:19,23 107:17
107:23 108:8,18

109:8,24 112:17
115:20 116:7,18
117:18 125:13,17
128:22 134:9
137:10,24 138:2
141:18 144:6,13
144:20 145:2
148:8,12 149:5,9
161:4,22 165:18
167:13 174:11,14
174:20 175:8
176:5 180:14
185:22,25 191:16
191:19 192:8
200:5,6 203:25
211:21,24 214:4
216:21 218:1,12
221:10,13 225:11
226:23 229:13
231:9 232:22
234:1,3 235:5
237:7,9 245:22
246:11 250:4
270:10 274:7
279:1 281:21
292:6,7 293:1
294:24 295:15
296:13,23 298:7
298:14,19 299:1
301:20 304:25
305:19,25 307:22
309:2 313:13
314:5,8 315:6
317:17 318:7
323:10
**reported**  1:21 34:5
88:3 110:7 238:9
238:11 273:1,5
274:2 291:6
**reporter**  5:9,12
7:13,17 10:10

11:15 14:4 17:14
17:17 19:3 20:22
50:9 139:14 167:1
187:13 198:9
246:4 291:11,12
292:7 311:16
315:10 327:24
**reports**  45:16
46:20,23,25 47:17
47:24 48:12 49:3
49:13,18 55:23
86:14 87:4 106:20
107:8,9,18 108:5
124:24 131:25
132:12,17 180:25
181:1 210:18
211:22 212:10,23
213:4,23 214:12
215:2,20 216:5,9
221:1 232:4,7,9
233:3,5 262:17,22
295:19
**represent**  157:24
158:1
**representatives**
3:12 7:11
**representing**  5:22
**represents**  8:12
**request**  225:15
**requested**  53:12
**require**  117:21
130:24 131:17
320:13
**required**  85:15
250:14 327:19
**requirement**
129:21,22 130:1,5
**requirements**
129:15 185:3
219:4

Case 1:21-cv-02897-PAC Document 563-16 Filed 06/12/23 Page 373 of 387

| | | | |
|---|---|---|---|
| requires 185:12 | results 22:17,20 | 269:13 290:1 | 185:16 186:4,25 |
| requisite 172:8 | 22:22,22 23:2,3 | 291:24 322:16 | 189:15,20 191:8 |
| reread 81:16 | 88:3 110:7 127:15 | 327:18 | 198:15,22 200:7 |
| 92:15 97:21 | 127:20,22 142:24 | reviewed 19:11,15 | 209:20 210:1 |
| 100:11 120:13 | 151:21 152:1 | 19:18 20:2,8,14,17 | 212:3 213:24 |
| 134:5 140:23 | 161:17 162:25 | 44:1,6,8,9,22 | 215:4 230:14 |
| 144:3 146:24 | 166:25 168:14,17 | 102:25 124:21 | 233:1,10 235:6 |
| 147:19 171:5 | 170:11 171:1,13 | 132:9 167:4 | 241:7 248:5 252:1 |
| 175:16 222:18 | 171:20 182:12 | 168:20 169:2 | 258:13 260:18,24 |
| 231:19 233:18 | 238:13 258:21 | 177:16 179:18,25 | 264:19 271:2 |
| 248:18 265:8 | 279:19 283:8 | 251:20 252:11 | 272:23,24 275:16 |
| 285:20 | retained 16:12,20 | 253:13 254:2 | 276:7 279:25 |
| research 2:24 5:3 | 16:21 26:23 27:6 | 279:7 284:3 | 301:9 309:12,24 |
| 33:1,2,13 45:2,3,4 | 28:25 31:4 48:9 | 293:16 | 316:12 |
| 45:20,25 46:4,7,9 | 48:14,18 185:15 | reviewing 13:18 | risk 223:17 |
| 46:13,14 113:7 | 185:18 | 53:25 54:11,12,19 | riskless 110:22 |
| researching 45:21 | retake 38:5 | 289:24 | risks 69:2 |
| 46:11 | retention 16:22 | revocable 47:8 | rmr 1:21 2:5 327:4 |
| reserve 44:6,18 | return 14:5 58:20 | ribbon 304:15 | robert 15:11,14 |
| respect 191:20 | 58:25 121:4 | 307:1,4,10,10 | robust 171:21 |
| 319:20 | 127:21 274:18 | 318:14,21 | role 168:7 227:16 |
| respectively 29:18 | 275:4,12 276:24 | right 6:23 7:3 8:3 | rosen 2:11 5:4,6 |
| 258:23 | 282:14 283:9,14 | 9:9,23 20:10 | 26:21,23 27:6,9,9 |
| respondent 179:7 | 283:19,22 284:2 | 22:18 32:19 36:14 | 28:8,14,21 29:21 |
| responding 322:13 | 286:10 308:15,16 | 36:15,16 37:12 | rosenlegal.com |
| responds 158:9 | 308:17,25 309:5,9 | 41:2 43:6 44:20 | 2:14,15 |
| response 72:16 | 309:16 | 48:6,16 51:14 | roughly 40:23 |
| 74:19 194:3 | returns 58:2,22 | 54:17 55:3 58:8 | 51:20 54:9 165:24 |
| 311:16 | 143:22 162:5 | 60:10,17 61:9,23 | 166:8 180:18 |
| rest 54:12,18 | 163:18 173:2,6 | 70:6 83:23 84:24 | 234:9 |
| 204:11 306:4 | 181:10 182:17 | 85:8,21 88:23 | rpr 1:21 2:5 327:4 |
| restate 207:8 | 183:15 277:14,24 | 90:17 102:18 | rule 30:9 50:7 |
| 282:19 | 309:18 | 108:22 111:13 | 56:20 194:13,23 |
| result 22:6,11,13 | reversed 63:8 | 113:19 114:5 | 208:6,7 218:3,15 |
| 121:1,3,4 127:13 | review 17:25 18:4 | 116:12,15 118:25 | 218:23 219:5,6,25 |
| 158:20,22 159:16 | 18:18 19:21 32:6 | 120:4 121:22 | 220:2,4,10,17 |
| 159:20 182:7 | 32:10 52:15 61:19 | 130:9 140:9 | 221:10,14,19 |
| 246:20 249:6 | 62:8 65:8 86:10 | 145:20 146:8 | 235:2,3 273:11 |
| 255:7,9 259:25 | 107:9 131:24 | 149:1 150:7 | ruled 75:24 |
| 308:1 | 132:2,23 133:19 | 154:17 155:1,2 | ruling 191:23 |
| | 214:13 240:3 | 160:1 165:25 | 209:9 |

Case 1:21-cv-02900-CM Document 568-16 Filed 06/12/24 Page 374 of 387

**rulings** 237:5
**run** 33:24 34:10
  183:13
**running** 143:9
  173:11

**s**

**s** 3:7 302:15
  319:15
**s&p** 60:22
**s3** 73:13 74:8
  77:23 78:10
**safe** 146:20 223:13
  223:14
**sake** 285:5,15,25
**sample** 136:9,10
  162:19 178:20
**san** 34:23 97:5
**sandler** 231:8,15
  231:25 232:9
**satisfied** 76:12
**saturday** 270:17
  271:12
**save** 114:10
  168:12
**saw** 8:6 32:20
**saying** 21:11 63:21
  109:6 176:18
  188:17 214:1
  229:12 271:6
  312:8
**says** 26:1 34:3
  40:16 56:4 62:5
  74:12 109:1,25
  114:4 155:16
  189:21 195:12
  231:5 238:7 274:8
  291:3
**scale** 230:18,19
**school** 37:11
**scratch** 174:7,8,19

**screen** 117:25
  118:5,13 119:3,5
  119:11,15 251:20
  252:9,10,24
**screening** 250:7
  254:7
**sec** 30:9 32:12,13
  150:25 162:7
  163:19,24 219:2
**second** 3:21 9:25
  12:19 19:5,18,21
  20:5 40:24 74:3
  74:21 79:14
  109:24 127:4,18
  128:6,25 130:12
  139:6 149:7
  158:21 172:24
  177:24 184:18,19
  235:15 238:23
  253:25 304:15
  315:8 316:14,16
  317:4,6
**secondary** 226:20
  226:25
**section** 30:5 36:25
  37:1 38:22 46:21
  48:11 55:20 94:9
  116:25 117:3
  188:20 191:18
  226:22 232:13
  258:8 295:15,18
  296:3 297:5 314:5
  314:8 318:7
**sections** 36:8,21
  36:21,22 40:1
**securities** 1:6 3:19
  3:21 4:15 8:19
  17:20 19:6 30:8
  45:23,23 46:15,16
  47:2,5,11,20 48:1
  49:4,4,15,16 66:6

67:4 68:5,6 69:3,9
  70:10 83:9 90:11
  149:20 168:1
  186:2 188:6
  192:14,18 198:8
  216:3,20 223:17
  227:4,17 231:10
  232:11,17,17
  239:12,12 246:22
  260:2 296:17
  297:17,21 298:18
  299:12,15 300:21
  300:25 303:8
  304:20 315:9
  319:18
**security** 49:20
  50:12,25 68:11,12
  69:8 72:19 76:12
  79:19 80:18,21
  81:20,25 88:9
  96:10 100:8,17
  103:8,13,18,22
  135:16 143:12
  181:8 182:15
  183:14,17 186:21
  187:8 190:24
  196:18 198:22
  206:19 207:11,20
  208:5,6 216:15,24
  217:1 219:20
  223:7 224:3,8
  236:5,7 237:1,12
  237:13,19,20,25
  259:13
**see** 8:25 35:19
  42:24 43:15,20
  57:2,10,21 76:6
  102:12 104:16
  126:23 127:15
  140:5 145:9 155:2
  156:16 172:18

178:14 186:25
  201:2 210:22
  213:1 223:22
  236:18 238:18
  257:4 258:21
  279:24 282:4
  300:7 314:9
  322:21 323:18
**seeing** 7:25 8:4,6
  21:10 101:12
  214:15
**seen** 7:19 11:1
  12:2,15 17:22
  21:3,7,10,12,16
  32:11,22 44:7
  50:15 56:20 60:18
  66:8,9,20 69:22
  73:12 78:23 80:25
  119:8 142:4,10
  166:16 167:9
  168:5 188:10,12
  191:2,10 202:11
  214:7,8 259:5,7
  261:2,7 262:17,20
  263:8,20 268:4,9
  268:25 284:2,5
  317:2
**select** 257:11
**selected** 125:8
  245:24 247:2,20
  260:7,9
**selecting** 254:7
**selection** 113:11
  120:4 125:15
  253:16 254:14,17
  255:1,14 256:14
**selective** 120:5
**sell** 83:4 111:13,14
  111:14
**sellers** 237:2

**selling** 88:4 110:8
  111:4
**sells** 270:16
**senior** 8:20 29:12
  69:2
**seniority** 246:14
  259:19
**sense** 70:23 152:11
  244:6 301:19
**sensitive** 246:21
  246:23 260:1,3
**sentence** 84:6
  109:24 110:14
  122:15 175:1,7
  195:12 197:2
  198:14 212:7
  291:3 302:5,25
**sentences** 146:7
  318:17,18
**sentiment** 111:20
**separate** 37:20
**separately** 175:7
**september** 43:16
**series** 58:17
  276:21 302:1
**serve** 226:9 227:13
**service** 42:12
**services** 40:9
  41:14,18 313:17
**serving** 52:23
**set** 49:3,13 172:12
  177:18 323:9
**sets** 178:20
**setting** 115:19,20
**settle** 119:14
**settlement** 43:12
  43:17,18 307:24
**settlements** 43:12
**seven** 136:13
  236:9 244:11
  287:5

**severe** 140:16
**share** 296:1 297:4
  309:23
**shareholders**
  315:24
**shares** 308:7,10
**shorten** 322:21
**shorthand** 327:12
  327:24
**show** 64:9 155:10
  273:7 321:19
**showing** 12:10
  74:15
**side** 11:10 48:2,23
  154:22,22
**sign** 27:3 38:17,21
  38:21,22
**signature** 327:24
**signed** 16:22
**significant** 121:3
  127:13 140:6,17
  156:1 157:7,8,23
  173:1 178:15
  181:9 182:17
  183:15 234:7
  255:8,9 287:6
**significantly** 127:8
  156:12 157:4
  173:4 181:9
  182:16 183:14
  202:20 213:3
  233:13,17 251:16
**similar** 71:12
  153:14
**similarly** 70:20
  189:22 238:15
**simple** 256:11
**simplest** 304:8
**simultaneously**
  314:23

**single** 60:16
  188:19 189:8,9
  284:3,10
**singular** 295:12
  318:7
**sir** 151:13 187:2
  251:2
**sit** 7:21 8:7 9:12
  9:18 52:21 66:2
  70:3,15 71:14
  72:9,10 79:1 91:1
  119:9 123:16
  126:23 127:11
  129:16 130:9
  169:5 170:20
  214:17 224:25
  225:10 227:25
  228:5,10,14,22
  239:14,16 240:2,9
  241:1 253:1
  257:16 261:10
  262:19,24 267:9
  269:2 271:18,22
  273:13 278:8
  279:24 281:14,20
  284:5 289:14
  291:21 299:13,23
  299:25 304:9
  310:7 311:8
  315:21,25 317:23
  318:1 321:23
  322:18
**sitting** 8:3 9:9,23
  21:13 24:13,21
  58:8 64:24 66:4
  85:6 87:2 93:10
  97:2 112:9 122:23
  123:17 127:24
  128:4 135:7
  170:18 190:20
  200:21 214:9

**217:6** 224:15
  235:11,21 244:2
  289:10 305:23
  307:16 311:2
  323:15
**situation** 52:4
  56:19 57:1 65:23
  93:9 98:14 104:7
  115:4 124:4
  130:19 138:21
  206:25 249:3,5
  252:5 283:5 303:6
  303:7 312:19,23
**situations** 50:24
  51:10 130:20
  182:11
**six** 166:5 318:18
**sixty** 166:5
**size** 77:25 120:25
  128:16 190:21,22
  293:3
**slapped** 209:25
**slash** 29:7
**sliding** 230:18,19
**slightly** 12:21
  210:17 225:20
  297:2
**slow** 190:7
**small** 45:7 120:21
  120:25 127:6,10
  128:10,14 204:9
**smaller** 128:19
**snapshots** 68:14
**sold** 194:19,22
  226:12 242:24
  271:1,11
**solely** 218:4
**solutions** 4:9
**somebody** 23:1
  88:21 89:3 92:12
  213:15

Case 1:21-cv-02990-DLC Document 568-16 Filed 06/12/024 Page 377 of 385
of 387

**sorry**  12:8,8 15:24
25:24 26:23 28:18
29:8,19 46:1
54:14 57:9 59:5
69:6 75:12 77:10
77:12 78:20 79:3
87:10 90:19 91:7
91:23 92:6,11
103:17 104:5
108:19 109:10,17
109:23 116:8
120:12 122:14
123:10 124:13
129:4 133:6 137:4
146:23 147:18
150:9 152:8
154:18 158:2
159:1 160:24
163:6 164:25
165:22 173:7
180:5 185:3
188:23 190:8
199:9,25 200:1
201:22 204:4,13
210:15,21 211:12
211:18,25 220:8
222:17 225:1
229:10,19,21
231:18 238:23
248:18 251:12
255:24 260:8
265:8,23 268:16
269:16,20 273:18
283:21 287:23
288:1,4 289:18
292:15 298:4
299:4 300:22
301:25 307:10
308:5,24 312:11
312:24 316:6
320:19

**sort**  320:16,24
**sorts**  98:22 104:22
182:1 183:3,4
273:2
**sought**  6:23
313:24
**sound**  9:9
**sounds**  9:18 102:9
165:25 186:4
**source**  131:22
227:9
**sources**  86:4
291:17,23 293:11
**southern**  1:2 47:9
**spalding**  2:17 4:22
5:1 74:24
**speaking**  12:17
23:6 40:23 44:2
51:20 57:18 64:2
64:17 67:22 68:21
72:2 101:6 129:20
152:9 248:10,22
250:21 262:16
296:16 298:8,10
**specific**  26:19 64:1
65:7,22 66:8,10
78:19 79:7 86:25
112:13 162:12
170:17,17 173:23
176:15,15 177:8
183:1,6 187:17
208:18 216:14
246:10,22 260:2
264:11 272:7,11
279:14 288:23
299:6 301:17
312:20 320:8
**specifically**  9:14
25:9 50:17 58:6
66:20 74:12 117:3
168:4,25 171:22

175:6 179:25
214:14 216:2
224:22 227:19
240:11 241:2
258:17 296:13
**specifics**  65:24
**specified**  197:15
**speculate**  138:23
207:24
**speculating**  16:17
52:3 128:18 222:3
300:14 321:23
**speculation**
170:22 181:5
243:24
**speculative**  16:17
71:24 306:5 321:8
323:12,23
**spell**  15:3 316:9
**spend**  41:18 45:14
45:21 46:10,13
53:21
**spent**  28:5 54:18
**spread**  184:25
185:1,7,11 186:7
186:20 187:7,10
187:15,20 188:3
188:17 291:18
292:6
**spreads**  292:8
**springs**  277:20
**spurious**  182:7
**squared**  152:4,15
**ss**  327:2
**stage**  297:23 299:3
299:4 301:11,13
301:18,21 307:20
312:20
**standard**  152:19
154:13 156:13,14
157:8 261:8 267:4

267:20 268:3
293:8,10
**standards**  292:4
**standpoint**  105:3
105:4
**stands**  218:10
**stanley**  90:11
**start**  16:23 17:1
24:17 56:24 57:19
119:25 132:14
191:22 221:2,20
255:3 258:17
301:12 320:18
321:2
**started**  18:5 26:9
26:16 84:6 244:12
293:24
**starting**  42:20
46:21 47:24
162:15 191:19
**state**  116:7 117:18
134:9 136:16
172:22 185:5
197:2 232:10
245:22 248:8
290:11 292:17
294:25 304:13
307:25 327:1,5,25
**stated**  20:11 22:24
50:17 101:11
102:8 110:1
119:11 129:22
132:5 139:13
148:12 169:10
174:25 199:13
213:11 226:2
242:1 248:9
256:25 263:4
266:3,16,17 267:6
269:9 287:15

Case 1:21-cv-02900-M-PAX Document 568-16 Entered on FLSD Docket 06/12/2024 Page 377 of 387

**statement** 8:11
33:7 48:21,22
49:7 57:5 62:17
62:20 101:15
102:10,11,12
118:18 165:11
176:4,9 190:17
196:2 211:2,3
216:6 227:10,11
262:3,5 266:6,19
267:25 268:2
281:18
**statements** 32:4,7
33:14,19 52:10
119:7,10 233:4,6
314:12
**states** 1:1 43:2
**stating** 104:21
211:16 231:9
**statistical** 155:25
157:2,22 178:23
**statistically** 127:7
127:13 140:6,17
156:1,11 157:4,8
173:1,5 178:15
255:8,9
**statistics** 12:20
13:5,7 43:13,17
202:12
**stayed** 284:20
**step** 238:23 316:7
**steven** 227:6
**stick** 221:15
**stipulate** 144:5,8
**stock** 8:21 28:23
29:4 30:15 50:12
50:16,20 56:8,11
56:14 57:11 58:4
59:11,25 60:2
61:1,4 63:2,7,21
64:2,3,5,8,16 65:1

65:4,16,18,20 70:1
70:9,19 71:10
72:15 74:19 76:7
76:8 78:7 80:3
83:7 84:3,4,12,17
84:21 86:6 88:4
88:24 89:10,11,23
90:5,12,14,24,25
91:5,13,14,19 92:1
92:21 94:11,18,21
94:23 95:5,8,12,14
97:3,5,15,18 98:1
98:4 99:16,17,19
102:6 103:4
104:16 105:17
108:14,17 110:8
111:25 121:4
126:18 127:8,13
134:11,15 135:9
135:12 136:3,9,14
137:3,12,19 140:6
140:17,18,18
141:20 142:6,12
143:3,4 151:20
153:10 158:9,21
158:23 159:17,21
160:15 161:3
162:18 164:18,23
165:7,14,16
166:24 172:11
173:3 179:1 184:8
185:8 186:9 188:9
188:19 189:9
192:1,7,13 193:1,7
198:7,15 199:6
210:18 215:24
216:23 217:12
225:20 232:17
233:15,22 234:8
234:17 236:16
245:1,25 246:18

247:3,21 255:8,10
259:1,23 260:10
260:17 261:14,20
261:22 262:7,11
264:14 265:1
287:19,22,25
288:7 292:19
302:12 303:17
308:2,8,10 309:8
311:21 312:3,14
312:25
**stock's** 178:13
187:10
**stocks** 68:18,21
69:5,9 70:24
75:25 97:12 99:15
146:18 147:5,16
147:25 193:9
195:1 202:19
293:2
**stop** 294:8
**stopped** 230:11
**stops** 230:21
**stories** 212:4
**strategies** 113:8
**strategy** 126:2,12
**street** 2:3 4:11
**strengthened**
84:10
**strictly** 257:11
**strike** 69:6 95:23
103:17 201:15
252:9
**strong** 198:6
**structural** 142:5
142:11,23 143:2
**structure** 150:9,10
246:15 259:20
**students** 37:2,5
38:4,17 40:2

**studied** 272:17
**studies** 101:11,25
113:16 115:6
125:16,19 133:9
167:11,22 177:17
**study** 57:14 58:1,2
66:22,23 67:2
70:22 72:14 73:13
78:13,15,19,25
102:1,4 103:1
113:14,22 114:13
114:14,16,20
115:1,9,9,17
116:10,13,17,22
116:24 117:2,4,10
117:11,20 118:1
119:1,15,17,18
120:8,11,18 121:7
121:9,16,17,18
122:6 123:1,9,11
123:25 124:6,9,18
125:5,23 127:2,14
127:19 130:18,22
131:2,11,13 132:3
132:9,14 133:13
133:19 136:12
138:4,9 139:11,22
140:3,22 141:5,10
141:19 146:1
149:8 163:13,20
167:7 178:8,18
179:18 185:10
188:7,18 247:2,5
248:12,25 249:14
250:8,12 252:14
253:5,14 254:3,20
254:25 256:15
258:6,21 260:7,8
260:12,15,21
272:19 274:17
275:11 280:22

284:4 300:4,10,19
301:3 305:18,24
306:10,21 318:22
319:10
**studying** 216:16
**stuff** 111:4
**sub** 141:21 142:3
142:17 145:4
146:10,15,17,18
147:5,6,15,16,25
148:1,10 161:3,7
161:12 287:20
288:2,4,7,8,9,13
301:2
**subdivide** 161:12
**subject** 44:2 52:25
53:2 159:24
246:12 261:16,16
288:21
**subjects** 38:13,15
39:5
**submit** 26:14
48:14 185:25
**submitted** 13:17
28:7,16 48:6
**subparagraph**
300:3 304:13
**subpoenaed** 324:2
**subpoint** 319:7
**subscribed** 326:22
**subsection** 232:24
318:13
**subsequently** 83:3
**substantial** 155:24
156:9 157:6,10
**substantially** 71:9
154:3 156:20
**substantive** 11:24
**subtract** 54:17
**sufficiency** 72:23

**sufficient** 68:16
76:1,3,20,22 86:15
86:23 87:6,11
199:12 215:17
**suggest** 70:14,16
103:9,14 217:19
274:3
**suggested** 60:9
78:5 109:4 142:2
**suggesting** 98:17
159:25 169:14
191:23 263:24
264:17 301:7
**suggestion** 65:19
**suggests** 83:25
179:23 180:3
**suitable** 247:4
260:10
**suite** 2:4,13
**sum** 31:20
**summarize** 73:20
**summarized** 21:18
**summarizes** 43:14
**summary** 175:10
175:21 261:15
**support** 3:10 7:2
7:10 18:17 72:18
73:6 75:15,17
86:5 91:13 169:1
169:15 179:6,24
186:21 189:13
190:15 223:20
230:4,9,11 234:25
235:13,24 237:2
237:12,19
**supported** 108:14
**supporting** 9:15
167:5 168:21
169:3 177:17
179:11 293:17

**supports** 91:18
237:9
**suppose** 44:21
66:23 78:1 114:18
120:22 129:24
138:21 177:19
203:4 206:12
**supposed** 96:9
**sure** 6:7,17 7:22
8:1 9:19 10:6 15:2
15:4,9,10,25 17:8
17:10 19:15 24:5
27:2 37:8 40:25
47:4 50:14 54:23
60:21 66:8,9,19,19
67:15 72:10 73:12
73:22 74:24 79:1
83:20 95:6 97:10
98:25 100:2,4
112:7 113:24
116:3 117:1
131:24 134:5
146:21 147:10
148:5 152:5
156:11 157:12
166:9 167:8
176:10,13 177:19
179:5 186:10,12
186:25 191:9
199:20 204:16
205:19 206:10
207:23 211:1,2
220:7 221:24
222:12 230:24
238:1 244:5 259:7
261:2 265:17
266:8 267:16,22
272:5 277:18,22
279:4 283:10
286:21 298:21
299:10 306:13

310:3 316:9 320:2
321:15 322:23
323:15 324:8
**surprise** 202:4,8
202:14 203:22
**surprised** 50:5
**surprises** 139:25
**survey** 39:10
**survive** 25:13
**survived** 24:8,11
24:14,24 26:12
**surviving** 25:4,10
**swear** 5:9
**swiftly** 88:2 110:6
**swiss** 129:6
**switch** 55:1 108:16
113:13
**switching** 113:11
113:12 171:25
**sworn** 5:12 326:22
327:8

**t**

**t** 3:7
**tail** 230:16
**take** 17:6 37:18,19
54:20,21 94:15
99:12 105:22
106:18 107:16
160:3 183:6
188:13,16 189:11
191:18 209:13,14
209:15 210:16
223:23 226:19
232:3 238:6 244:9
253:24 256:6,7,10
257:17 309:6,16
309:18 316:6,22
322:20
**taken** 2:1 4:16
13:21 37:23 55:8
160:8 210:5

Case 1:21-cv-02900-CM-RWL Document 568-16 Filed 06/12/24 Page 379 of 387

257:24 294:15 323:2 326:4 327:11

**takes** 57:22

**talk** 5:24 9:25 17:6 82:18 87:13 101:9 113:16 138:7 157:6,7 177:23 187:19 258:5 271:1,3 273:3,4 300:3,14 305:4 306:5

**talked** 150:7 191:1 250:6 254:5 261:12 269:5

**talking** 10:22 20:1 36:20 42:21 44:19 60:23 61:2 66:17 73:24 77:19 90:23 92:7 97:1 116:12 116:24 117:2,3 138:16 145:24 146:2 150:6,11,12 150:14,21 152:8 153:11 159:22 163:12,13,14 208:9 216:22 232:7 247:7 260:16 262:23 264:21 271:10 288:8,9 300:23,25 301:1,10 323:8,10

**tally** 106:19 107:17

**targeted** 184:20

**taught** 35:2,15 39:12

**teach** 35:14 36:3,6 36:11,19,22 38:14 39:3,10,14,16,25

**teaches** 64:25

**teaching** 36:5 39:20

**technically** 27:6

**technician** 4:8

**technology** 313:22

**tell** 24:10 46:24 68:5,11 122:24 144:20 228:11 240:19 244:11 250:22,24

**telling** 168:25 200:22 268:10

**ten** 41:20 50:1,3 52:2 93:7 166:3 209:17,18,22 214:25 215:17 216:12 220:23

**tend** 91:13 190:2 190:15 203:21 223:20 224:3 228:25 234:25 235:13,24

**tended** 215:20

**tending** 72:18 73:6 75:15,17,19

**tends** 186:21,23 230:8,20,22

**tenured** 35:23

**term** 118:11 151:4 153:3 163:9 194:16 232:18,20 275:14 278:18,22 280:8 282:25 283:3 314:13

**terminology** 146:21

**terms** 25:6 38:24 39:2 41:22 63:17 80:7 83:18 92:1 92:22 103:19

118:8 157:13,25 158:16 159:8 220:21

**test** 57:10,13 66:5 66:20 67:18 127:12 137:17,23 157:22 162:13,17 164:13 172:10,24 173:8,9,10 175:11 175:21 176:22 177:17 180:12,21 181:7 182:11 183:11 200:9 251:4

**tested** 66:13 68:4 68:10 137:14 143:21 145:8

**testified** 5:13 133:6 254:1 261:21

**testify** 327:9

**testifying** 6:18 179:4 297:22

**testimonies** 47:17

**testimony** 9:3 19:14 46:21,23,25 47:24 48:12,15 49:3,14 87:8 93:14 251:1 260:23 326:4,6

**testing** 115:3 117:20 137:10 172:18 182:15,23 183:2 245:25 247:21 287:21

**tests** 66:10,13,16 66:18 67:17 137:16 138:1 157:3 174:2

**thank** 5:8,23 6:6 14:14 30:12 35:19

55:4 61:8 77:1 109:20 126:20 139:3 142:21 187:4 193:25 194:2 209:11 229:22 274:25 282:7 291:12 294:9 324:23

**theory** 56:7 61:19 62:8

**thereunder** 30:10

**thing** 55:23 99:25 166:21 171:19 173:15 183:25 188:4 209:21 296:12

**things** 104:22 105:16 117:13 122:10 129:25 132:16 133:15 142:6,8,9,13 183:3 183:4 189:19 205:19 206:13 217:10 223:10 234:22 273:3 304:3 322:21

**think** 12:2 14:5,8 15:19 16:3,6 21:24 26:12 27:1 34:25 38:24 40:14 42:11 43:3,13 49:6,7,17 54:16 57:2 65:21 71:1,4 72:8 73:23 74:23 76:5 77:22,23 79:21 81:5,6 83:20,22 87:18 99:9,14,14 100:19 100:25 101:9 105:3,6,6 110:20 110:25 111:2

Case 1:21-cv-02900-DLC Document 568-16 Filed 06/12/24 Page 380 of 387

112:12 115:5
125:17 131:16,22
133:6 151:2
152:21 161:17
166:6 169:18,20
169:23,24 170:2
172:1 174:20
181:12 182:1,10
184:14,15 189:7
191:10 194:14
195:4 196:21,23
197:11 203:8
208:20 211:15
214:6 216:8 217:5
217:8,17 218:11
218:18 219:9
220:1,19 223:24
226:11 229:19
230:25 245:4,9,16
247:10 248:6
249:17 251:3
252:13 255:20
257:7 261:14
262:3 266:21
269:6 270:21
271:16,17 273:1
285:13 287:15
293:20,20 297:2
297:18,25 299:14
299:17 301:14
304:7,8,24 312:23
313:3 316:24
319:25 321:21
322:19 324:21
**thinking** 55:25
244:10
**third** 74:5 115:24
115:24 132:24,25
**thirty** 54:10
227:15

**thought** 24:5 77:7
78:9 79:5,16 80:5
80:16,19 81:13,22
92:3,25 95:7 96:6
99:5 100:24 108:3
117:5 123:3,20
157:16 170:12
171:16 182:10
194:24 197:13,17
202:16 203:12
205:20 217:4
224:13,15 235:12
235:23 236:23
251:4 253:22
255:6 264:1 296:9
324:5,7,15
**thousands** 169:24
170:4,4
**three** 35:2,6 44:15
56:25 86:14 87:4
119:19,21 120:7
120:10,17,19
121:13,18,24
122:7,12,16,25
123:12 136:10
139:10 145:25
213:23 232:23
244:25 245:24
247:20 254:20,24
255:6 276:18
**threshold** 127:9
166:12 170:9
197:10,15 198:21
199:15 249:13
**thresholds** 208:24
209:2,5
**ties** 226:13
**time** 4:5 5:23 32:1
45:1,14,21 46:10
46:13 52:4 53:21
54:20 55:2,7,12

56:22 57:23 60:5
60:8 63:18,21
67:23 68:14
105:19 106:3,14
108:7 113:17,23
114:11 140:4
153:17,20,21,24
155:21,24 156:9
160:3,7,12 174:13
175:1 202:21,23
210:4,9 213:6
229:8 256:6,18
257:23 258:3
270:21 271:16
272:7,12,15,18,22
274:1 286:9
288:16 289:4
293:23,25 294:2,8
294:14,19 296:10
299:14 303:7,18
305:8,11 307:5,11
310:16 311:15
322:20 323:1,6,23
324:23 325:7
327:12
**timeline** 18:19
**timely** 28:15
**times** 6:9 37:5
51:22 54:7 144:24
168:6,6 180:18
181:6 185:14
208:21 221:9,17
261:12,16 280:17
280:18
**title** 8:10 40:18,20
41:9,12 88:14,23
**titled** 258:8
**today** 5:24 6:19
8:3,7 9:18,24 10:1
10:2 13:23 21:13
24:13,22 58:9

60:19 61:3 64:24
66:2,5 68:7,11
70:3 71:15 72:10
79:1 85:6 87:2
91:1 93:10 112:9
119:9 122:23
123:17 127:24
128:4 129:16
135:7 170:18,20
189:14 190:21
196:17 214:10,17
217:6 224:15
225:10 235:11,22
239:14,16 240:9
241:1,21 244:2
253:1 254:1
261:10 262:19,24
267:9 269:2
271:18,22 273:13
278:8 279:24
281:14,20 284:6
289:10,14 291:21
299:13,23,25
304:9 305:23
307:16 309:9,13
309:14 311:3
315:21,25 317:23
318:1 320:1
321:23 322:18
323:15
**today's** 4:6 325:4
**told** 21:24 23:18
24:8 82:10 137:18
137:18 151:11
209:17 298:12
**tools** 300:4 318:24
319:4,9,24 320:4,7
320:13,17 321:1,6
323:11,14
**top** 73:9,21 114:22
167:12 180:1,7

Case 1:21-sm-01299-DM-RCL Document 568-16 Filed 06/12/24 Page 382 of 387
Case 1:21-cr-00699-JMF Document 188-7 Filed 06/12/24 Page 381 of 385

292:11 322:9

**topic** 43:10 183:23

**total** 31:20 54:2,14
290:18 292:20
294:2

**trace** 228:10,11
238:10,22 239:8
239:17,21,25
240:3,6,12,19,21
240:24,24 241:10
241:15 242:9
291:6,18,23 292:4

**track** 35:23

**trade** 50:13 95:9
95:13 97:18,20
98:5,18,22 99:20
103:13,20 193:4,7
193:18 194:12,14
194:15,25 195:1,4
197:8 199:13
202:19 203:21
229:1 273:11
274:1 284:21,21
285:9 293:2
314:16,19

**traded** 8:17 29:12
50:16 82:13 84:4
84:12 91:19 94:23
95:5,14,19 97:12
99:2,6,15,19
134:11,15,17,25
135:9,12 136:6,14
136:18,21 137:1,4
137:19,21 143:4
183:18 186:3,13
186:21 188:6,9
199:18 202:22
206:8 218:4 219:7
223:20 224:4
229:15 230:5
236:5,16 237:1,13

237:20 238:2
240:20 241:5,9
269:14,22 270:8
270:23 271:1
274:4 279:23
285:16 286:1
292:23

**traders** 193:16
195:20 196:4,13
243:16

**trades** 56:8 83:19
96:12 100:8,17
103:22 189:9
190:24 193:6
216:15 224:8
236:8 238:9,11,25
240:17 243:19
270:13 271:25
272:2,5,25 275:6
314:24

**trading** 32:23
58:18,19 59:2
70:1 71:9 72:21
72:24 73:25 76:19
78:18 79:8,9,20,22
80:3,6,18,19 81:1
81:11,21,21 82:6
82:11 100:10
113:8 136:8
146:12 150:11
187:12 189:5
192:21,24 193:10
194:6,16 195:7,14
196:17,20,22
197:3,10,20 198:4
199:1,22 200:4,14
200:19 201:7,20
202:1,5,21 203:9
203:10 204:8,10
204:14 206:4,6,11
206:15,19 207:11

208:8,10 229:7
239:18 240:7,13
242:20 270:2
271:14 272:14,17
272:21 273:2,4,9
273:17,20 274:10
275:23,24,24
276:22,23 277:2,4
277:23 278:4,12
279:7,9 280:7
281:3,13 287:25
288:1,25 289:7,12
289:17 308:6
309:21 313:17
317:12,19 318:3

**transacted** 225:8

**transaction** 193:6
226:21 239:17,23
240:1,14 245:10
248:7 271:10
321:24

**transactions**
238:12,14 239:7,8
240:17 261:13
291:7

**transcript** 326:3
327:15,17,19

**translate** 306:11
306:23

**trash** 166:25

**tried** 241:4,8,12

**trier** 29:24

**tries** 277:13,13

**tripping** 207:7

**true** 68:18 147:14
147:23 148:4
199:6 201:13
218:19 230:2,4,7,9
262:4 326:5
327:14

**trust** 47:8

**truth** 310:20 327:9
327:9,10

**truthfully** 6:19

**try** 30:20 31:14
71:20 102:4
111:22 154:21
171:18 189:8
207:9 263:12
266:23

**trying** 14:25 22:16
22:19 35:12 38:7
38:8,12 41:6,8
48:3,4 58:10
64:12 70:25,25
77:10 79:13 97:9
102:17 109:15
110:15 111:3
112:7 114:10
116:19 144:15,16
148:17,21 150:15
158:17 159:9,12
162:10 164:1,14
164:22 165:6
183:25 184:2,20
188:8 194:18
215:18 222:11
232:21 233:9
248:1 249:11
264:21 266:8
267:16 275:7
277:23,24 285:13
301:5 303:1 307:8
316:11

**turn** 8:9 28:24
46:20 55:14 139:4
149:5 154:16
244:16 258:18
302:16

**turning** 246:11
300:2

turnover 194:6
twenty 180:25
twice 261:6
two 17:7 36:11
40:1 52:10 56:25
58:19 59:2 68:14
84:9 85:2 86:13
87:4 99:15,19
108:7,7 122:10
123:25 124:5
126:24 153:16
155:8 156:2
157:15,18 178:13
178:17,20 188:21
230:16 246:1
247:22 249:10
252:23 255:12,15
276:18,23 277:1,3
278:7 280:3,4
281:25 288:22
304:3 321:17
type 55:22 70:23
99:25 167:6
168:22 169:4,15
170:1 171:2,14
175:6 202:13
208:4 234:13
240:1 266:20
284:8 303:9 305:4
314:15 320:9
322:6,15
types 68:22 70:19
115:18 249:25
271:4 292:5
301:21 303:4
321:10
typewriting
327:13
typical 193:6,8,20
194:4,6,9,11,13,21
194:23 219:3

typically 69:1
115:5 118:22,22
132:2,18 133:17
138:20 140:5
152:16 162:22
173:11 175:3
185:21 192:16
193:11 195:4,15
195:23 196:13
197:8 217:17
226:8 227:13
246:21 260:1
293:19 295:22
321:21

**u**

u.s. 30:7 32:23
ubs 231:8,16,25
232:10
uh 27:19 154:12
174:9 212:6
270:15
ultimate 292:11
ultimately 254:24
unable 243:18
uncertainty 57:22
unclear 114:2
234:2 253:1
uncommon 278:11
278:15,17,22
279:1 284:13,17
underlying 158:9
158:20 159:17,21
162:21 164:17
177:3
underreact 65:17
underreacted 66:6
67:14
underreaction
64:16 65:3 66:11
66:14,21,24

underreacts 65:18
understand 6:13
22:16,19 23:16
24:3 25:1,10 38:9
38:9,13 45:24
67:17 70:21 78:20
116:3,15,18,19
141:6 144:16
148:6,22 149:15
149:17,25 163:4,7
164:1 165:10
198:23 199:9,20
206:16 212:1
229:10,12 233:9
234:11 239:20
248:1 253:20,22
263:23,25 267:16
269:20 270:5
272:5,11 275:7,9
285:1,11 286:4
288:5 294:10
296:20 298:25
303:1 306:13
308:23 311:25
312:12
understanding 9:2
22:17 25:13,15
29:23 30:23 31:3
34:2 41:2 42:15
63:10,15 65:9,13
65:15 84:25 88:18
92:6 96:21 110:13
111:2 129:14,21
145:15 150:1
151:4 185:2
187:14,22 196:5,7
217:22 218:14
219:25 220:2,4
223:5 228:15
235:9 259:9 268:7
273:8,9 275:17

276:8,15 278:21
279:3 308:25
313:10,12 314:13
314:15 315:2,5,7
316:3,8,13
undertake 277:14
277:16,18
undertaken
245:10
undertakes 185:21
undertaking
186:11
underwent 321:24
underwrite 226:4
226:8 227:12,13
underwriter 230:8
230:10,20
underwriters
109:3 225:18,22
225:25 228:2,7,12
228:16,20,24
229:13 231:1
241:18
unexpected 74:17
unfair 112:19
unfortunately
38:3
unger 184:7 185:2
188:20 290:6,15
291:7
unintentionally
274:22
unique 174:3
193:21
united 1:1
universe 293:5
university 37:10
update 59:24
updated 60:1,3
updates 60:2

Case 1:21-cv-02900-CJN Document 168-16 Filed 05/12/24 Page 383 of 387

**use** 58:1 101:23
102:3 110:14
115:24 133:7
146:11,12,14,21
147:10 160:21,24
162:22 163:1,14
163:17 164:8
167:5,10,21
168:21 169:1,3,18
170:10 173:12,23
175:7 177:17
180:3 275:4
277:25 278:25
284:9 287:20
295:22 301:3
304:23 305:18
308:15 320:7
321:16
**usually** 50:21
55:24 129:22
164:19 204:22
205:1,10 271:3
292:4 305:4
**utilize** 320:16,25

**v**

**v** 179:8 227:6
**vacuum** 105:17
**vague** 51:2 80:8,23
84:22 103:23
122:8 123:2
149:15 150:17
195:2 234:10
270:4 278:5,14,18
**valuation** 246:19
259:24 300:4
318:24 319:4,9,24
320:13,17 321:1,6
323:11
**value** 59:19 63:6
66:7 71:8,11
126:14,17 189:24

197:21 203:4
290:18 292:12,20
308:2
**values** 246:16
259:21
**variable** 163:1
164:9,11
**variables** 152:18
162:4,9,12,25
163:15,17,24
166:23,23 167:5,7
167:10 168:4,12
168:21 169:1,3,10
169:13,18,25
170:10 171:1,3,12
171:22,23 173:12
**variance** 152:21
**varies** 39:24
151:14 302:3
**various** 314:2
323:10
**vary** 96:23
**verbatim** 143:21
**veritext** 4:8
**version** 11:21
**versus** 45:23 47:9
178:21 213:4
234:8 235:13,25
**video** 4:8,12 77:13
**videographer** 2:25
4:4 5:8 55:5,10
106:1,12 160:5,10
210:2,7 257:21
258:1 293:25
294:12,17 322:24
323:4 325:3
**videotaped** 1:14
2:1
**view** 25:4 56:23
76:11 79:18 82:14
82:20 85:6,8,9

87:17,19 88:8
93:11,18 94:3
95:3 103:7 106:22
107:22 108:6,24
123:18 166:11
170:7 185:10
188:4 189:4,14
205:2,13 206:21
217:6 223:18
234:24 235:5
236:6 246:7
249:11 253:15
271:4 315:18,22
322:15
**viewed** 315:19
**violations** 132:1
**vitae** 33:25
**volatility** 164:23
165:7
**volume** 72:22,24
73:25 79:8,9,20,22
80:4,7,18,19 81:1
81:11,21,22 82:6
82:11 194:6
196:17,20 197:20
198:4 199:1
201:20 202:2,5
203:10,11 204:9
204:10,13 205:25
206:1,4,11,16,20
207:12 208:9,10
308:7
**volumes** 193:5

**w**

**w** 15:4 16:4
**wait** 119:25
211:18 286:14
309:1 313:3
**walia** 15:1,16,19
**want** 15:8 17:6
22:25 33:24 34:9

40:17,24 44:14
46:2,7 55:14 64:9
64:21 65:5,7,25
67:18 71:18 76:6
86:9 90:13 102:16
106:18 107:2,15
109:7 116:3
125:13 131:16
133:7 138:23
144:3 145:2
148:24 152:20
154:22 155:3,7
162:22,23 164:19
179:25 184:6
210:11 217:8
230:16,17 250:23
258:5 266:7 273:6
273:6 308:18
316:9 318:6
322:16
**wanted** 5:23 6:1
117:1 125:10
134:5 191:19
294:21
**watch** 209:21
**way** 6:5 23:10
82:17 95:22 109:4
130:23 148:18
166:15 178:5,7
194:8,12 199:7
236:12 239:22
248:8 267:11,14
271:10 273:14
289:13 293:9,18
295:21 309:4,10
317:12 318:2
324:8
**ways** 285:13
**we've** 28:16 60:18
71:1 80:25 208:20
269:5 272:8

Case 1:21-cv-02900-PAC Document 568-16 Filed 06/12/24 Page 384 of 387

**website** 40:17,19
114:23
**wedbush** 90:11
**week** 39:18,22
41:17
**weekend** 270:3,8
270:13,17,24
271:2,3,9
**weekly** 73:25 79:7
80:3 81:11 198:3
198:25 201:20
202:1,5 203:9
204:8 206:11,15
206:19 207:11
208:10
**weeks** 204:10
205:25,25
**weigh** 80:20 81:23
214:4
**weird** 142:24
**went** 37:11,13
69:14 277:22
289:5
**werner** 1:14 2:1
3:4,14,17 4:13
5:11,19 7:15 10:8
10:14 11:13,23
14:2 15:4 17:15
19:1 20:20 55:14
106:5,10,18
107:15 210:11
258:5 294:21
323:8 325:5,9
326:2,21
**west** 2:3 4:11
**whatsoever** 24:14
24:23 51:24 52:20
245:11
**wide** 30:3 85:25
295:4

**widely** 86:3
318:23 319:3
**willing** 226:19
**window** 143:11
272:15,22 282:14
282:17,20,22,24
286:16 287:5
**withdraw** 102:2
120:6 129:4
174:24 313:9
**witness** 3:3 5:5,7,9
5:15 6:16 14:5
22:12 25:1,25
49:17 51:3 55:3
61:9 74:21,24
75:7 77:2,10
80:10,24 81:16
82:3 84:24 86:19
87:9 90:17 91:23
92:15,24 93:15,22
94:6 95:18 96:15
97:21 98:16 99:4
99:24 100:11,19
103:25 105:21
107:11 108:2
109:17,21 114:5
114:10 120:13,19
121:22 122:9,16
123:4 128:10
135:4 139:3,15
140:23 141:6
142:22 144:12
146:24 147:9,19
148:4 149:1
150:19 151:10,14
155:12 159:2
165:1,10 170:8
171:5,16 174:16
175:16 176:3
180:5 181:22
182:22 183:21

184:21 187:3,5,14
190:8,11 193:24
195:4 202:8
203:17 205:5,15
207:19 208:16
209:14,20 219:10
219:12 222:18
223:2 229:4,21
231:19 232:3
233:18 234:11
235:17 236:2
237:16,24 243:7
243:15 244:5,8
248:17 249:2,17
249:20,24 251:3
251:15 252:1,16
253:7,20 255:19
256:7,19 260:24
262:15 263:4,16
265:17 268:16,22
270:5,12 275:16
276:3,14 278:8,16
280:10 281:5,14
282:24 285:20
286:4 291:1 292:8
292:15 296:19
299:18,24 303:13
306:3,15,25
310:15,24 311:4
311:12,17 315:14
317:6 320:20
324:13 327:7,22
**witnesses** 144:9
**wondering** 21:4
46:24 73:20
305:14
**word** 22:21 80:22
144:11 147:10
250:23 278:15,25
282:21

**worded** 211:5
**words** 80:9
**work** 16:9 17:2
18:1 26:10 27:15
28:8,18 32:16,16
34:20 35:25 40:5
40:8 41:24,25
42:4,8 61:11,11,20
62:9 66:4 84:25
85:1 123:8 168:8
261:18 296:17
297:17
**worked** 48:7 131:6
220:22
**working** 26:16
167:23
**works** 15:19 27:2
**world** 99:6,8
263:5
**worried** 216:19
**worry** 149:2
**write** 14:17 50:22
154:19 172:5
174:5 212:15
308:19 309:10
**writing** 14:19 46:6
**written** 50:11
175:1 247:6
315:12
**wrong** 23:19 182:2
290:19
**wrote** 14:18 44:6
62:18 88:17
174:13,19 248:1

**x**

**x** 3:1,7 316:10

**y**

**yeah** 4:21 9:22
16:3 30:17 36:2
39:10 48:20 58:13

**[yeah - zero]** Page 55

61:8 62:17 65:14
65:17 68:2 69:22
71:13 72:7 74:11
79:15 80:10 82:3
83:23 93:9 94:19
104:25 108:23
111:14,19 114:5
128:10 129:13
131:8,24 132:5
148:16 152:1
154:24 155:3
161:25 163:6
182:13 183:21
184:4 189:20,20
202:10 203:20
206:24 208:4
209:7 211:5
213:12 215:5
217:8 221:20
225:2 226:1
229:21 234:11
238:3,21 244:5
245:15,21 247:19
278:8 282:12
298:2 299:24
309:24 311:12
316:11 319:5
321:7
**year** 16:20 36:6,11
36:12,19,23 37:5
38:14 42:1,2 43:3
43:8 86:13 87:3
108:7 121:14,19
122:6,25 123:9
124:1 135:1,10,15
139:21 140:14
146:14 158:18
**yearly** 41:22
141:21
**years** 35:3,6,16
41:13 55:21

110:21 121:10
123:12,18 143:17
220:23 227:15
280:3,4 321:25
**yep** 154:10 204:6
244:23
**yesterday** 309:8
309:14
**york** 1:2 2:19,19
90:24,25 313:18
313:19

**z**

**z** 227:2,2
**zero** 290:1

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.