# Exhibit 17



Page 1

1

2      UNITED STATES DISTRICT COURT

       SOUTHERN DISTRICT OF NEW YORK

3      No. 12-cv-08557 (CM)

4      ---------------------------------------X

5      IN RE:   HI-CRUSH PARTNERS L.P.

6              SECURITIES LITIGATION

7      ---------------------------------------X

8

9

10                      April 24, 2014

11                      10:09 a.m.

12

13

14         Deposition of DR. ADAM WERNER,

15     held at the offices of Vinson & Elkins,

16     666 Fifth Avenue, New York, New York,

17     pursuant to Notice and Agreement, before

18     Wendy D. Boskind, a Registered

19     Professional Reporter and Notary Public

20     of the State of New York.

21

22

23

24

25

**EXHIBIT**
**283**

Page 2

```
 1
 2 APPEARANCES:
 3
 4 KIRBY McINERNEY LLP
 5 Attorneys for Plaintiffs
 6      825 Third Avenue
 7      New York, New York 10022
 8 BY: MARK A. STRAUSS, ESQ.
 9      (212) 371-6600
10      mstrauss@kmllp.com
11
12
13 VINSON & ELKINS LLP
14 Attorneys for Defendants
15      666 Fifth Avenue
16      26th Floor
17      New York, New York 10103-0040
18 BY: STEVEN R. PARADISE, ESQ.
19      -and-
20      ELIZABETH C. BRANDON, ESQ.
21      (212) 237-0016
22      (214) 220-7929
23      sparadise@velaw.com
24      ebrandon@velaw.com
25
```

Page 3

```
 1
 2 APPEARANCES: (Cont'd)
 3
 4 ALSO PRESENT:
 5           MICHAEL A. KEABLE,
 6           Executive Vice President
 7           Compass Lexecon
 8           332 South Michigan Avenue
 9           Chicago, Illinois 60604
10           (312) 322-0200
11           mkeable@compasslexecon.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1
 2 DR. ADAM WERNER,
 3      business address at 2550 Ninth
 4      Street, Suite 210 A, Berkeley,
 5      California 94710, having been first
 6      duly sworn by a notary public of the
 7      State of New York, (Wendy D. Boskind,
 8      RPR), was examined and testified as
 9      follows:
10
11 EXAMINATION
12 BY MR. PARADISE:
13      Q.  Good morning, Dr. Werner.
14      A.  Good morning.
15      Q.  We just introduced ourselves,
16 but I'll do it on the record. I'm Steven
17 Paradise, along with my colleague,
18 Elizabeth Brandon, we represent the
19 Defendants in this securities litigation
20 lawsuit.
21          It appears that you've
22 testified by deposition previously; am I
23 right?
24      A.  That is correct.
25      Q.  I won't spend a lot of time
```

Page 5

```
 1           Dr. Adam Werner
 2 going over any ground rules, just a
 3 couple.
 4      A.  Okay.
 5      Q.  One, I tend to sometimes
 6 speak quickly. So if I speak too
 7 quickly, or you don't understand anything
 8 I say, or you don't understand my
 9 question, please let me know and I'll do
10 my best to rephrase it so that you
11 understand it.
12      A.  Okay.
13      Q.  Second one is, you have to
14 answer questions with yes, no, or, beyond
15 that, you can't just nod your head.
16      A.  (Nodding.)
17      Q.  The court reporter can't take
18 down nods of the head.
19      A.  Right.
20      Q.  Please try to remember that.
21          Third one is, please try to
22 wait until I finish my questions and --
23 before you answer. I will try to wait to
24 ask another question before you finish
25 your answer. If I don't do that, and I
```

2 (Pages 2 - 5)

Page 6

1           Dr. Adam Werner
2 accidentally cut you off, please let me
3 know. I want to get a complete answer
4 from you and not cut you off.
5     A.   Okay.
6     Q.   Last is, if you need a break,
7 just let me know. The only thing I ask
8 is that, if there's a question pending,
9 you complete your answer to the question
10 before we take a break.
11    A.   Sure.
12    Q.   Thank you.
13         MR. PARADISE: Let's mark, as
14    Exhibit 1, a copy of your
15    declaration.
16         (Whereupon Deposition Exhibit
17    1, Declaration of Dr. Adam Werner
18    April 15, 2014, was marked for
19    identification, as of this date.)
20    Q.   The court reporter has handed
21 you what's been marked as Exhibit 1. I
22 ask you to please take a look at Exhibit
23 1 and, when you're ready, to identify it
24 for the record, if you can.
25    A.   (Pause.)

Page 7

1           Dr. Adam Werner
2     Yeah, I believe it's the
3 report I submitted in this case.
4     Q.   I want to start by just going
5 through -- briefly going through your
6 employment history and background, which
7 I believe is set forth in your Curriculum
8 Vitae, Exhibit 1.
9         So if you can turn to --
10 unfortunately, we don't have exhibit tabs
11 in there, but can you find Exhibit 1?
12    A.   Yeah.
13    Q.   Okay. Am I right that Gnarus
14 Advisors is your current -- is where you
15 are currently employed?
16    A.   I believe that's correct.
17    Q.   I'm sorry, you say you
18 "believe that's" --
19    A.   Well, I mean, I'm not a -- I
20 don't get a W-2, so....
21    Q.   You're working in some
22 capacity for Gnarus Advisors.
23    A.   Correct.
24    Q.   Am I also correct that Gnarus
25 Advisors acquired your -- a firm that you

Page 8

1           Dr. Adam Werner
2 previously owned, called Berkeley
3 Economic Consulting?
4     A.   Uh -- that's accurate.
5     Q.   Is there some reason why
6 you're hesitating?
7     A.   Again, I wasn't paid any
8 money --
9     Q.   Okay.
10    A.   -- in the acquisition. I
11 just was subsumed by them.
12    Q.   Why did -- withdrawn.
13         What were the circumstances
14 behind Gnarus acquiring Berkeley?
15    A.   I just wanted to go with a
16 larger firm -- (gesturing) -- and -- you
17 know.
18    Q.   How large -- I'm sorry.
19    A.   They take care of things like
20 accounting and bookkeeping.
21         I don't have to do that
22 anymore.
23    Q.   And, when you were with
24 Berkeley, were you the sole owner of
25 Berkeley?

Page 9

1           Dr. Adam Werner
2     A.   Yes.
3     Q.   How many employees did
4 Berkeley have?
5     A.   Define "employees"?
6     Q.   Well, how many people worked
7 for Berkeley?
8     A.   Worked in some capacity?
9     Q.   Yes.
10    A.   Between four and five.
11    Q.   And how many people work at
12 Gnarus?
13    A.   I think probably 40, 45?
14    Q.   Other than reporting to an
15 employer with a different -- or, a
16 company with a different name, have your
17 responsibilities changed at all from
18 Berkeley to what you're doing now, at
19 Gnarus?
20         MR. STRAUSS: Objection.
21         Go ahead.
22    A.   I don't believe so.
23    Q.   Going back to your time
24 before Berkeley -- well, first, when did
25 you form Berkeley?

3 (Pages 6 - 9)

Page 10

Dr. Adam Werner

1
2    A.   You know, I don't know the
3 exact year Berkeley Economics was formed.
4 It was formed by two other gentlemen who
5 subsequently went to the Brattle Group,
6 so I took over the firm.
7    Q.   So when did you join
8 Berkeley?
9    A.   My memory's not that good --
10 hold on -- I want to say 2008.
11    Q.   There's a list on page 4 of
12 your CV that's next to the heading:
13 Previous employment.
14       Do you see that?
15    A.   Right.
16    Q.   Is that -- are those listed
17 chronologically in reverse order from the
18 dates that you worked with these various
19 companies?
20    A.   That is correct.
21    Q.   Okay.  So let's start with
22 the beginning.  After you left the
23 Kellogg Graduate School of Management,
24 you joined Cornerstone Research; is that
25 correct?

Page 11

Dr. Adam Werner

1
2    A.   That is correct.
3    Q.   In what capacity did you join
4 Cornerstone?
5    A.   I don't remember my title, it
6 was probably associate.
7    Q.   What were your job functions
8 at that time?
9    A.   Prepare expert reports -- I
10 mean, basically litigation consulting
11 stuff.
12       Basically, I did mostly
13 securities work, and there were a bunch
14 of Windstar cases, which are these
15 lawsuits against the federal government
16 by savings and loans -- or were -- I
17 think, actually, they're still going on,
18 so I worked on those, as well.
19    Q.   Were you -- is it fair to
20 describe your role at Cornerstone as more
21 of a support role, as opposed to the
22 person who's actually providing the
23 testimony?
24    A.   I don't believe I ever
25 testified at Cornerstone.

Page 12

Dr. Adam Werner

1
2    Q.   When did you -- and I
3 understand your memory on dates, it
4 sounds like, is not terrific, so
5 approximations are fine, but
6 approximately when did you leave
7 Cornerstone?
8    A.   I believe 2000.
9    Q.   And did you then join NERA,
10 at that time?
11    A.   That is correct.
12    Q.   Did you have a different --
13 withdrawn.
14       Were your responsibilities,
15 at NERA, different than what your
16 responsibilities had been at Cornerstone?
17    A.   I don't believe so.
18       I did some additional work in
19 intellectual property, which I didn't do
20 at Cornerstone, I was strictly in the
21 finance practice at Cornerstone.
22    Q.   Why did you leave
23 Cornerstone?
24    A.   Money.
25    Q.   So you had a better financial

Page 13

Dr. Adam Werner

1
2 deal at NERA than you had gotten at
3 Cornerstone?
4    A.   Yeah.
5       I had actually originally
6 gone to Cornerstone, and taken less
7 money, and NERA kept offering me more
8 money.  So, eventually, I took them up on
9 their offer.
10    Q.   How long did you remain at
11 NERA?
12    A.   I believe three years.
13    Q.   So that brings us to 2007,
14 or --
15    A.   2003?
16    Q.   Oh, wait, I'm sorry, I'm
17 sorry.
18       You left Cornerstone in 2000
19 and joined NERA, okay.
20       How long did you work for
21 NERA?
22    A.   I believe I said three years.
23    Q.   So -- okay, sorry, getting
24 lost here on chronologic -- got it.  So
25 you left NERA in 2003 to join CRA

4 (Pages 10 - 13)

Page 14

```
1           Dr. Adam Werner
2  International?
3      A.  No.
4      Q.  What did you do --
5      A.  I --
6      Q.  I'm sorry, go ahead.
7      A.  I took a year off to bartend
8  and sell wine.
9      Q.  And then you joined CRA?
10     A.  That is correct.
11     Q.  Why did you leave NERA to
12 bartend and sell wine?
13         Although, I think I can
14 imagine the answer to that.
15     A.  Is NERA on -- is NERA
16 supporting you in this case?
17     Q.  No.
18     A.  I did not like people at
19 NERA.
20     Q.  Fair enough.
21         Were you asked to leave NERA?
22     A.  No.
23     Q.  Were you working at NERA and
24 at Cornerstone on the West Coast?
25     A.  Yes.
```

Page 15

```
1           Dr. Adam Werner
2      Q.  So, in the San Francisco
3  area?
4      A.  Right.
5          Actually, I did some work for
6  NERA in New York, as well, I maybe spent
7  six months here.
8      Q.  So you took a year off to
9  bartend and to sell wine, and then you
10 decided to go back into the business of
11 economics consulting, and you joined CRA
12 International in -- I guess my --
13 hopefully, my math's better now -- is
14 that around 2005?
15     A.  2004.
16     Q.  Okay, so I guess my math's
17 not better yet.
18         And what were your job
19 responsibilities, at CRA International?
20     A.  Same as my job
21 responsibilities at NERA and
22 Cornerstone -- prepare expert reports,
23 support other experts, testify -- things
24 of that nature.
25     Q.  How long did you work for CRA
```

Page 16

```
1           Dr. Adam Werner
2  International?
3      A.  Between four and five years.
4      Q.  So that brings us to around
5  2008, 2009; correct?
6      A.  Correct.
7      Q.  Okay. And what did you do
8  then.
9      A.  So, when I was at CRA, they
10 moved me down to Los Angeles, because
11 that's where their finance practice was
12 based out of, and on the West Coast. I
13 then moved back to the Bay area.
14         So that's when I went to
15 LitiNomics. And that was a group of
16 former CRA people who had started another
17 firm.
18     Q.  So the reason was -- the
19 reason why you decided to leave CRA is
20 because you wanted to return to the Bay
21 area?
22     A.  Correct.
23     Q.  How long did you work with
24 LitiNomics?
25     A.  I believe about a year.
```

Page 17

```
1           Dr. Adam Werner
2      Q.  Did you want to change that?
3      A.  No.
4          I was going to say that I
5  wasn't an employee of LitiNomics.
6      Q.  You were working as a --
7      A.  As a --
8      Q.  -- 1099?
9      A.  Exactly.
10     Q.  As a consultant?
11         Why did you stop working as a
12 consultant for LitiNomics, after about a
13 year?
14     A.  Travel.
15     Q.  Well, can you --
16     A.  They were --
17     Q.  -- elaborate?
18     A.  They were located in Menlo
19 Park -- or, actually, it was Mountaiu
20 View. And, so, the commute was an hour
21 each way every day, so....
22     Q.  It wasn't working out for
23 you?
24     A.  I didn't enjoy it.
25     Q.  Okay.
```

5 (Pages 14 - 17)

Page 18

```
 1              Dr. Adam Werner
 2      A.   Driving, two hours a day.
 3      Q.   So, after you left
 4  LitiNomics, you joined Berkeley Economic
 5  Consulting, you had mentioned earlier
 6  that, at the time, it had been started by
 7  two other gentlemen?
 8      A.   Correct.
 9      Q.   So you went there as a --
10  what type of capacity did you go there?
11      A.   Same, 1099.
12      Q.   So this is -- I'm being awful
13  today with my years, but this is around
14  2009, 2010?
15      A.   Correct.
16      Q.   When you -- when Berkeley was
17  subsumed by Gnarus, did the other
18  employees of Berkeley go along with you,
19  to join Gnarus?
20      A.   Define "employees".
21      Q.   Well, the other people that
22  worked with you at Berkeley.
23      A.   I believe that is correct.
24      Q.   So Berkeley ceases to exist
25  today?
```

Page 19

```
 1              Dr. Adam Werner
 2      A.   I believe that is correct.
 3      Q.   Okay. And you left each of
 4  these positions that we've been
 5  discussing of your own volition; is that
 6  correct?
 7      A.   That is correct.
 8      Q.   Okay. I'm going to ask you a
 9  general question, if it's too general let
10  me know and I'll be more specific, but
11  during the time you worked at these other
12  firms, before you -- sorry -- before you
13  joined Berkeley, were you working
14  primarily on behalf of plaintiffs,
15  primarily on behalf of defendants, or
16  both?
17          MR. STRAUSS: Objection.
18          Go ahead.
19      A.   Of both.
20      Q.   Did that continue to be the
21  case when you joined Berkeley, that you
22  worked for both plaintiffs and defendants
23  in securities litigation matters?
24      A.   In securities litigation
25  matters, I believe that's correct.
```

Page 20

```
 1              Dr. Adam Werner
 2      Q.   And how about today, how
 3  about since you've joined Gnarus, have
 4  you continued to rep-- to work on behalf
 5  of both plaintiffs and defendants in
 6  securities litigation matters?
 7      A.   I'm not sure I've done any
 8  defendant work at Gnarus.
 9      Q.   Is there any reason for that?
10          I mean on your side of the
11  equation --
12      A.   No.
13      Q.   -- or is it that this is
14  where the work has been coming from, the
15  plaintiffs' side?
16      A.   That is correct.
17      Q.   So it's not that you have an
18  aversion to representing defendants.
19      A.   No, not at all.
20          In fact, you're welcome to
21  hire me on your cases.
22      Q.   I'll keep that in mind, thank
23  you.
24          Turning back, for a moment,
25  to Exhibit 1 to your -- Exhibit 1 to
```

Page 21

```
 1              Dr. Adam Werner
 2  Exhibit 1, your declaration. You have an
 3  extensive list of the matters that you've
 4  been retained in, beginning on page 1,
 5  continuing through I guess page 6 --
 6  approximately, page 6.
 7          Have your -- has your
 8  testimony, or any declaration that you've
 9  submitted in any of these cases, ever
10  been excluded by a court?
11      A.   No.
12      Q.   You list on page 1, under the
13  heading: Expert reports and testimony, a
14  series of cases, and on page 3 you have a
15  heading called: Experience.
16          Can you explain the
17  difference between the matters that are
18  listed under: Expert reports and
19  testimony and the matters that are listed
20  under: Experience?
21      A.   Well, I mean, the things that
22  I've done expert testimony and reports
23  in, and I think that's self-explanatory.
24          And, in the other cases, I
25  didn't submit reports on my behalf.
```

6 (Pages 18 - 21)

Page 22

Dr. Adam Werner

1
2    Q.   These are cases where you
3  either supported someone, another expert
4  who was submitting a report or testimony,
5  or you never were asked to submit a
6  report or testimony; is that fair to say?
7    A.   I think that's correct.
8    Q.   Is there any additional --
9  are there any additional matters on which
10 you've been engaged as an expert that are
11 not listed in your CV, that you can think
12 of as you sit here today?
13   A.   I'm sure there are but, as I
14 sit here today, I can't think of any.
15   Q.   Today, you know, this time,
16 where you're working at Gnarus,
17 approximately how much of your work is
18 involved in the securities litigation
19 matters?
20   A.   Define "securities litigation
21 matters"?
22   Q.   Any lawsuits that are --
23 arise under the federal securities laws.
24   A.   Probably, 90 percent.
25   Q.   And I know you testified

Page 23

Dr. Adam Werner

1
2  earlier that, at Gnarus, you have been
3  working, to the best of your knowledge,
4  you said, exclusively for plaintiffs.
5       Before joining Gnarus --
6    A.   I --
7    Q.   -- in securities
8  litigation -- in securities litigation
9  matters, I thought that's what you
10 testified to.
11   A.   I believe in securities
12 litigation matters, that is correct.
13   Q.   Right. And, just for the --
14 make it simpler, when I'm asking you
15 these questions, when I don't specify,
16 I'm asking for your work in securities
17 litigation matters.
18   A.   Okay.
19   Q.   Prior to joining Gnarus, can
20 you give me an estimation as to the
21 percentage of work you had done for
22 plaintiffs, as opposed to defendants?
23 Just --
24   A.   In my entire history?
25   Q.   Yes.

Page 24

Dr. Adam Werner

1
2    A.   I mean, I'd be speculating.
3    Q.   You can speculate.
4       I mean, I understand you're
5  estimating, and I'm not -- you know, I'm
6  not holding you to an exact number.
7    A.   Okay.
8    Q.   I just want to get a sense.
9    A.   Okay, I would guess 50/50.
10   Q.   And I'm not sure if I asked
11 you before, but did you work for both
12 plaintiffs and defendants at Berkeley?
13   A.   I believe that is correct.
14      But, again, you're specifying
15 in securities litigation?
16   Q.   I am, thank you.
17   A.   I believe that is correct.
18   Q.   What opinion were you asked
19 to provide in this case, this litigation,
20 Hi-Crush litigation?
21   A.   I think, if you turn to my
22 report -- (pause) -- I don't know if
23 that's paragraph 2: My opinions address
24 the following matter: whether the market
25 for Hi-Crush's common units was efficient

Page 25

Dr. Adam Werner

1
2  during the class period.
3       MR. PARADISE: And, just for
4    the record, the witness is
5    referring to I guess paragraph 2 of
6    Exhibit 1, his declaration.
7    Q.   It says "opinions", plural.
8  Is that a typo? Because that appears to
9  me to be just one subject matter of your
10 opinion.
11   A.   (Pause.)
12      I believe that is correct.
13   Q.   Have you been -- were you
14 asked to provide any other opinion that
15 you were not able to provide?
16   A.   No.
17   Q.   And is it fair to say that
18 this Exhibit 1, your declaration,
19 contains your opinion and the support for
20 your opinion?
21   A.   I believe that is correct.
22   Q.   So, as you just answered, the
23 opinion you've been asked to express in
24 this case is whether the market for
25 Hi-Crush's common units were efficient --

7 (Pages 22 - 25)

Case 1:21-md-02989-CMA   Document 568-17   Entered on FLSD Docket 06/08/2023   Page 9 of
114
Case 1:12-cv-08557-CM   Document 97-1   Filed 06/17/14   Page 9 of 114

Page 26

```
 1          Dr. Adam Werner
 2  or, was efficient, during the class
 3  period; is that -- that's correct?
 4      A.  I believe that is correct.
 5      Q.  Have you previously been
 6  retained to testify on the issue of
 7  whether or not the market for a publicly-
 8  traded security was efficient?
 9      A.  Yes.
10      Q.  Can we just take a quick look
11  at Exhibit 1 and, just, if you could
12  identify, for the record, which of these
13  cases involved that -- you know, that
14  opinion, and it could have been more than
15  just that opinion, but at least the
16  opinion as to whether or not the market
17  was efficient for the subject security.
18          MR. STRAUSS:  You mean
19  Exhibit 1 to Exhibit 1?
20          MR. PARADISE:  Exactly.
21      A.  Okay.
22          MR. STRAUSS:  I just want to
23  be clear.
24          MR. PARADISE:  No.  Thank
25  you.
```

Page 27

```
 1          Dr. Adam Werner
 2      A.  Okay.  (Pause.)
 3          The Ebix case; Eric Poole and
 4  William Rhody versus Alange Energy Corp.;
 5  the Orient Paper case; the China Expert
 6  case; the China Agritech case --
 7      Q.  I'm sorry, could you just
 8  hold on one second?  Oh, I'm sorry.
 9          Orient Paper, you said, China
10  Expert --
11          MR. PARADISE:  Do you want to
12  see a copy of this, so you can see
13  the names?
14          THE COURT REPORTER:  I'll
15  have the exhibit, I'll work with
16  that.  Thank you so much.
17      Q.  Sorry.  So China Agritech.
18      A.  The National Australia Bank
19  case, I don't know if I -- I did not
20  submit a report in that matter -- or, no,
21  I did -- I don't recall.
22      Q.  I'm sorry, where is the
23  National Australia Bank case?
24      A.  Pathway Investments.
25      Q.  Oh, okay.
```

Page 28

```
 1          Dr. Adam Werner
 2      A.  The Armtec case.  (Pause.)
 3          I believe that's it.
 4      Q.  Was -- is it fair to say that
 5  each of those cases, and I count seven, I
 6  think you've mentioned, was it your
 7  opinion in each of those cases that the
 8  market was efficient?
 9      A.  I believe that is correct.
10      Q.  And was your opinion rejected
11  in any of those cases?
12          In other words, did the court
13  or the finder of fact disagree with your
14  opinion.
15      A.  I believe in the China
16  Agritech case.
17      Q.  Was your work, or your
18  opinion, criticized by the court in any
19  of those cases?
20          MR. STRAUSS:  Objection.
21      A.  Define "criticize".
22      Q.  Did the court take issue with
23  your methodology, your conclusion, or any
24  other aspect of your opinion?
25          MR. STRAUSS:  Objection.
```

Page 29

```
 1          Dr. Adam Werner
 2          Go ahead.
 3      A.  I don't know how to answer
 4  that question.
 5      Q.  Why not?
 6      A.  It's too broad.
 7      Q.  What's too broad about it?
 8      A.  I mean, you're asking me for
 9  an opinion about a court.  I don't
10  know -- I can't interpret what the court
11  has said.
12      Q.  You didn't read the -- if
13  there was a decision issued -- well,
14  let's do it that way.  Did the court in
15  any of those cases issue a decision which
16  criticized or took issue with your
17  opinion?
18          MR. STRAUSS:  Objection.
19      Q.  That you're aware of.
20      A.  I don't believe so.
21      Q.  Do you know why -- why the --
22  was it the court that rejected the market
23  efficiency opinion in China Agritech or
24  was it a jury?
25          MR. STRAUSS:  Objection.
```

8 (Pages 26 - 29)

Page 30

1           Dr. Adam Werner
2    A.   I believe it was the court.
3    Q.   Do you know what the basis of
4  the court's decision was?
5    A.   I believe the court was
6  confused over the fact that two expert
7  reports were submitted on market
8  efficiency, and we looked at different
9  events and, for whatever reason, they
10 couldn't reconcile that you can look at
11 different events and -- to determine
12 market efficiency.
13   Q.   Was the second expert report
14 offered on behalf of the defendants?
15   A.   No.
16   Q.   Are there -- two plaintiffs'
17 expert reports were offered.
18   A.   Correct.
19   Q.   Did the -- so, other than
20 looking at different events, did the
21 other expert in that case apply a --
22 apply the same methodology that you had
23 applied to evaluate whether or not the
24 market was efficient?
25   A.   I believe that is correct.

Page 32

1           Dr. Adam Werner
2  expressing uncertainty.
3    A.   Well, to the extent that you
4  measure inflation using event study
5  methodology, I am aware of what the
6  inflation might be in the alleged stock
7  as a result of the alleged bad act by
8  your client.
9    Q.   Okay, but that's a slightly
10 different question than what I'm asking,
11 so let me try it again.
12        I'm asking whether or not
13 you've been asked by Plaintiffs' counsel
14 in this case to do any work to form an
15 opinion as to what the alleged inflation
16 per share of Hi-Crush was during the
17 class period.
18        THE WITNESS: I'm sorry,
19   could you read back the question?
20        (The record was read.)
21   A.   I don't believe so.
22   Q.   In the past, when you've been
23 asked and have rendered an opinion as to
24 inflation per share, have you done that
25 both on behalf of plaintiffs and

Page 31

1           Dr. Adam Werner
2    Q.   You've also -- as I read your
3  CV, it appears that you've also been
4  retained in the past to estimate the
5  alleged inflation per share in certain
6  securities litigation matters; is that
7  correct?
8    A.   I believe that is correct.
9    Q.   Just for the sake of
10 completeness, you have not been asked to
11 render that opinion in this case; right?
12        MR. STRAUSS: Objection.
13        THE WITNESS: Could you read
14   back the question, please.
15        (The record was read.)
16        MR. PARADISE: And I think
17   there was a second question.
18        (A portion of the record was
19   read.)
20   A.   I don't recall.
21   Q.   Earlier, I had asked you
22 whether you had been asked to render any
23 opinions beyond that which you express in
24 paragraph 2, and you said you don't
25 believe you have, but now you're

Page 33

1           Dr. Adam Werner
2  defendants?
3        MR. STRAUSS: Objection. You
4    mean in other cases?
5        MR. PARADISE: Yes, I said
6    "in the past".
7        MR. STRAUSS: Fine.
8    A.   Define "render an opinion"?
9    Q.   Submit either a declaration
10 or testify.
11   A.   Um -- as I sit here, I don't
12 recall.
13   Q.   Let's take a look at your CV,
14 which is Exhibit 1 to Exhibit 1.
15        Starting with -- I'm just
16 going to ask you, in the Hecla Mining,
17 the Hecla Mining Securities Litigation
18 matter, where you issued a declaration on
19 investor losses, did that involve
20 rendering an opinion as to inflation per
21 share of the subject security?
22   A.   I don't believe so.
23   Q.   Okay. Were you -- which side
24 did you represent in -- I'm sorry --
25 which side did you appear as an expert

9 (Pages 30 - 33)

Page 34

1      Dr. Adam Werner
2  for in the Hecla Mining case?
3      A.  Plaintiff.
4      Q.  The next one that appears to
5  involve some testimony as to damages is
6  the Shenk case?
7          Looks like this was a
8  derivative action?
9      A.  Okay.
10      Q.  Do you see that?
11          Was there any work in that
12  case where you were required to express
13  an opinion as to alleged inflation per
14  share?
15      A.  I don't believe so.
16      Q.  Did you also represent the
17  Plaintiff in that case?
18      A.  I did.
19      Q.  I'm just going to ask the
20  same question, just go down the list for
21  a second.
22      A.  Okay.
23      Q.  How about the BP case?
24      A.  I don't recall.
25      Q.  The Tripath Technology case?

Page 35

1      Dr. Adam Werner
2      A.  That -- on share inflation,
3  no.
4      Q.  How about Ainslie and Muriel
5  Marenette versus CV Technologies?
6      A.  I believe so.
7      Q.  And who did you represent --
8  I'm sorry.
9          On whose side did you appear
10  as an expert in that case?
11      A.  The Plaintiffs.
12      Q.  Let me see if I can cut
13  through this, because you said you
14  weren't sure if you testified on behalf
15  of defendants as to inflation per share,
16  so I take it you looked at this list, are
17  any of the cases on this list ones in
18  which you appeared on behalf of
19  defendants in the situation where you
20  were asked -- where you rendered an
21  opinion as to inflation per share?
22      A.  "This list" being --
23      Q.  The list --
24      A.  -- the list that's defined
25  under:  Expert reports and testimony?

Page 36

1      Dr. Adam Werner
2      Q.  Correct.
3      A.  I don't believe so.
4      Q.  Okay.
5          THE WITNESS:  But could you
6      read back the question, please?
7      Make sure I've answered it
8      correctly.
9          (The record was read.)
10      A.  I don't believe so.
11      Q.  In those cases where you did
12  render an opinion as to the alleged
13  inflation per share, how did you go about
14  coming up with the number, you know, the
15  alleged inflation.
16          MR. STRAUSS:  Objection to
17      form.
18      A.  I did an event study.
19      Q.  Anything beyond doing an
20  event study?
21      A.  I don't know how to answer
22  that question.
23      Q.  Okay.  Well, let's take it --
24  let's break that down a little bit.
25          So you do an event study, and

Page 37

1      Dr. Adam Werner
2  then how do you apply the results of an
3  event study to determine what the alleged
4  inflation per share is?
5      A.  Well, I usually measure the
6  abnormal return around the alleged -- I
7  don't know, I don't know what you want to
8  call it -- the alleged date, for want of
9  a better term.
10      Q.  The date of disclosure?
11      A.  The date of disclosure, there
12  we go, and use that as a measure of
13  inflation.
14      Q.  And then what do you -- let
15  me help you out.
16          Do you take that alleged
17  inflation and back it -- take it back to
18  the date of the alleged fraud?
19      A.  What do you mean by "take
20  back"?
21      Q.  Well, how do you -- well, let
22  me ask a different question, actually.
23          What do you -- so you
24  determine the alleged inflation as of the
25  date of the -- what's called the

10 (Pages 34 - 37)

Page 38

1        Dr. Adam Werner
2  "corrective disclosure"; is that fair to
3  say?
4      A.   Okay.
5      Q.   And then, what do you do with
6  that inflation? Do you apply it to the
7  shares that were acquired at the
8  beginning of the class period to the
9  shares that were acquired throughout the
10  class period?
11        How do you come up with a
12  damages number?
13      A.   Are you talking about a case
14  with one disclosure?
15      Q.   We'll start with that.
16      A.   Yeah, I'd estimate the number
17  of damage shares and apply that inflation
18  to the -- to the damage shares.
19      Q.   And what -- do you do
20  something differently when there's more
21  than one disclosure?
22      A.   Not necessarily, but then you
23  have -- you know, you have different
24  types of people who are damaged.
25        You'll have -- so, if you

Page 39

1        Dr. Adam Werner
2  have multiple disclosures, you'll have
3  what we call in-and-out damages as well
4  as buy-and-hold damages.
5      Q.   How many -- do you have an
6  opinion as to how many corrective
7  disclosures there were in the Hi-Crush
8  case, this case?
9      A.   I do not.
10      Q.   Have you not looked at that?
11  Is that --
12      A.   What do you mean, "not looked
13  at" it?
14      Q.   In other words, have you not
15  looked at what disclosures were involved
16  and not rendered -- or, not come to an
17  opinion as to how many were corrective
18  disclosures, or is there some other
19  reason why you don't have an opinion?
20      A.   I mean, I don't believe I
21  have formed an opinion on that, but I
22  believe there -- according to the filings
23  in this case, there appears to be one
24  corrective disclosure at issue.
25      Q.   Is that the information that

Page 40

1        Dr. Adam Werner
2  was -- and you can refer to your
3  declaration, if you would like, but, if
4  you remember, is that the information
5  that was revealed iu a press release that
6  was issued on November 13th, 2012?
7      A.   I believe that is correct.
8      Q.   We'll take a look at that
9  press release a little bit later, and
10  I'll ask some more questions about it,
11  but I'm going to move on, for the time
12  being.
13        Coming back to your answer to
14  my question before, about how you go
15  about applying the inflation to determine
16  the amount of damages, you said that you
17  have to look at the number of damage
18  shares?
19      A.   You have to estimate the
20  number of damage shares.
21      Q.   How do you go about doing
22  that?
23      A.   Using a trading model.
24      Q.   Is that a trading model that
25  you construct?

Page 41

1        Dr. Adam Werner
2      A.   I "construct" meaning?
3      Q.   You put the model together or
4  is there a model that's used in the
5  industry.
6      A.   I don't know how to answer
7  that question.
8      Q.   Well, what trading model do
9  you use to estimate the number of damage
10  shares?
11      A.   A trading model --
12  (gesturing).
13      Q.   Any?
14        So where do you find this
15  trading model?
16      A.   It's the same trading model I
17  used at Cornerstone, NERA, and even my
18  past employers.
19        I mean, I don't -- I don't
20  know how to answer this question.
21        It's the trading -- it's
22  the trading -- the standard trading model
23  in the industry.
24      Q.   That's what I'm asking, okay,
25  it's --

11 (Pages 38 - 41)

Case 1:21-md-02989-CMA   Document 568-17   Entered on FLSD Docket 06/08/2023   Page 13 of
114
Case 1:12-cv-08557-CM   Document 97-1   Filed 06/17/14   Page 13 of 114

Page 42

1          Dr. Adam Werner
2     A.   But there are different
3   inputs that people put into those models.
4     Q.   Okay, no, I understand that,
5   that's what I was getting at.
6          It's a model that is used in
7   the industry, you decide what inputs go
8   into the model to come up with your
9   estimate.
10    A.   I believe that is correct.
11    Q.   If you are asked to render an
12  opinion in this case as to the alleged
13  damages that were suffered as a result of
14  the alleged omission in this case, would
15  you apply that same model that you've
16  used in other cases?
17         MR. STRAUSS: Objection.
18         Go ahead.
19    A.   Again, when you say "same
20  model", how do you define the "same
21  model"?
22    Q.   Well, I guess the model will
23  change depending on the inputs. Is that
24  your point?
25    A.   Correct.

Page 43

1          Dr. Adam Werner
2     Q.   So maybe we'll call it a
3   "formula", and then you put inputs into a
4   formula to come up with the model -- the
5   answer?
6          MR. STRAUSS: Objection.
7     A.   I believe that's a fair
8   statement.
9     Q.   Generally, when you've done
10  this type of work in the past, and I
11  understand you have not done it in this
12  case, what inputs do you use to populate
13  your model?
14    A.   This is just for damage
15  shares -- my estimation of damage shares.
16    Q.   Correct.
17    A.   Share volume, float, shares
18  outstanding.
19         I believe those would be
20  the -- well, I mean, you'd also have to
21  make different assumptions based on what
22  market the stock has traded in -- um --
23    Q.   Anything else?
24    A.   I believe that's it.
25    Q.   Okay.

Page 44

1          Dr. Adam Werner
2     A.   But I may have left something
3   out.
4     Q.   Has your -- in those cases in
5   which you have done this type of work,
6   prepared this type of model, and then
7   expressed an opinion, has your opinion
8   been rejected by any courts?
9     A.   No.
10    Q.   As you sit here today, do you
11  have any intention of developing and
12  expressing any opinions beyond those that
13  are contained in your declaration -- in
14  your declaration, which is Exhibit 1?
15         MR. STRAUSS: Objection.
16    A.   As I sit here today, I mean,
17  I don't know what the future holds --
18    Q.   Okay.
19    A.   -- so -- (gesturing) -- it's
20  possible I will express different
21  opinions in the future.
22    Q.   But you haven't been -- well,
23  let me ask it this way. Have you been
24  asked or told that you will be asked to
25  express additional or different

Page 45

1          Dr. Adam Werner
2   opinions --
3          MR. STRAUSS: Objection.
4     Q.   -- in the future, in this
5   case?
6     A.   I don't --
7          THE WITNESS: I'm sorry, can
8   you re-read the question?
9          (The record was read.)
10         MR. PARADISE: Than -- there
11  was a little bit more than that --
12  than what's contained in --
13         (A portion of the record was
14  read.)
15         MR. STRAUSS: Objection,
16  again.
17         THE WITNESS: I apologize,
18  I'm going to have to -- could you
19  re-read it, one more time.
20         (A portion of the record was
21  read.)
22    A.   I don't believe so.
23    Q.   Have you been engaged by
24  Kirby McInerney in prior securities
25  litigation lawsuits?

12 (Pages 42 - 45)

Page 46

```
 1              Dr. Adam Werner
 2    A.   Yes.
 3    Q.   How many?
 4    A.   Just one.
 5    Q.   Which case -- is that case
 6  identified in your CV?
 7    A.   It is.
 8    Q.   Which one is that?
 9    A.   Under: Experience,
10  Securities and Finance, Citigroup
11  litigation.
12    Q.   And it says -- if I'm reading
13  this correctly, it says:  Testified as to
14  damages and inflation in a securities
15  class action; is that right?
16    A.   That is correct, but I was
17  not sworn in.
18    Q.   Can you explain?
19    A.   Yeah.  The -- the judge had
20  some questions about -- about settlements
21  and damage figures and, so, I was --
22  while there was a public hearing, I was
23  on it by phone, so the judge asked me
24  questions by phone, but I was never
25  formally sworn in.
```

Page 47

```
 1              Dr. Adam Werner
 2    Q.   Did that case -- is that case
 3  pending, currently pending?
 4    A.   I don't believe so.  I don't
 5  know.
 6         MR. STRAUSS:  The settlement
 7  is still --
 8         MR. PARADISE:  I'll --
 9         MR. STRAUSS:  -- in process.
10         MR. PARADISE:  Fair, thank
11  you.
12    Q.   But your -- and let me ask
13  you this way, is your work on that case
14  concluded.
15    A.   I believe that is correct.
16    Q.   Have you worked previously
17  with any of the lawyers from Kirby
18  McInerney who are working on this matter
19  when they were -- if they were and when
20  they were -- at any other law firms?
21    A.   I don't believe so.
22    Q.   Have you ever been retained
23  to testify on behalf of the Plaintiffs --
24  not the Plaintiffs' counsel, but the
25  Plaintiffs in this lawsuit?
```

Page 48

```
 1              Dr. Adam Werner
 2         MR. STRAUSS:  Objection.
 3         You mean in any other cases.
 4         MR. PARADISE:  Yes.
 5    A.   I don't believe so.
 6         Just so we're clear, would
 7  you --
 8    Q.   Yeah.
 9    A.   -- redefine --
10    Q.   Sure.
11    A.   -- who Plaintiffs are?
12    Q.   It's Hite -- H-I-T-E, all
13  caps -- Hedge L.P., and HITE -- all
14  caps -- MLP L.P.
15    A.   Yeah, I don't believe so.
16    Q.   And for future reference,
17  during the course of the deposition, if
18  it's okay with you and Mr. Strauss, I'm
19  going to refer to them as "Plaintiffs".
20    A.   Okay.
21    Q.   And for the Defendants,
22  because there are numerous Defendants in
23  the case, I'm just going to refer to them
24  collectively as "Defendants", unless
25  there is a reason for me to be specific.
```

Page 49

```
 1              Dr. Adam Werner
 2  Is that okay?
 3    A.   That's fine.
 4         MR. STRAUSS:  And can I ask,
 5  if you're referring to the class,
 6  if you could just say "the class".
 7         MR. PARADISE:  Fair enough.
 8         THE WITNESS:  Right.
 9         MR. STRAUSS:  "The
10  Plaintiffs" means just for the
11  Plaintiffs.
12         MR. PARADISE:  Fair enough.
13    Q.   So let's talk about the
14  specifics of your engagement in this
15  case.
16         When were you first contacted
17  by attorneys from Kirby McInerney to
18  potentially work as an expert in this
19  case?
20    A.   Maybe two or three months
21  ago.
22    Q.   And what -- at that time,
23  what did they ask you to do?
24    A.   I believe they asked me to
25  render an opinion on market efficiency.
```

13 (Pages 46 - 49)

Page 50

```
 1          Dr. Adam Werner
 2    Q.   Was there any discussion, at
 3  that time, as to any other potential
 4  opinions you may be -- you might be asked
 5  to render?
 6          MR. STRAUSS: Objection.
 7    A.   Not that I recall.
 8          MR. STRAUSS: All right if we
 9  take a break?
10          MR. PARADISE: Sure.
11          Off the record.
12          (Recess taken: 10:55 a.m. -
13    11:09 a.m.)
14          MR. PARADISE: Are we back
15  on?
16  BY MR. PARADISE:
17    Q.   Do you have -- do you need to
18  change any answers that you gave before
19  the break?
20    A.   I don't believe so.
21    Q.   So, coming back to your work
22  on this engagement, you told me that you
23  were contacted about two or three months
24  ago and asked to render an opinion as to
25  market efficiency.
```

Page 51

```
 1          Dr. Adam Werner
 2          What did you do next, after
 3  that call?
 4    A.   With regards to?
 5    Q.   To perform your work on this
 6  case.
 7    A.   I believe I ran a conflict
 8  check. I had our general counsel draft
 9  an engagement letter, which I believe was
10  transmitted somehow, either
11  electronically or through the mail,
12  to -- I believe Mr. Strauss. Then I
13  started doing research.
14    Q.   Well, let's go to the
15  research part.
16          So what steps did you take to
17  be able to render the opinion that you
18  were asked to render?
19    A.   I mean, that's an overly
20  broad question.
21          Can you compartmentalize it
22  somehow?
23    Q.   Well, you just said you did
24  some research, so we'll start with that.
25          What type of research did you
```

Page 52

```
 1          Dr. Adam Werner
 2  do?
 3    A.   I mean, I looked at -- read
 4  some newspaper reports, some articles,
 5  read some academic articles, I gathered
 6  some data, or people gathered data at my
 7  behest, performed some analysis on that
 8  data, then put that analysis into this
 9  (indicating) report.
10    Q.   The people that gathered data
11  for you, are those people that were
12  also -- I'm using the word "working for"
13  but not in the W-2 sense.
14    A.   I understand.
15    Q.   But there's also people who
16  came to work at Gnarus every day?
17    A.   Every day?
18    Q.   That were consulting with
19  Gnarus?
20          I'm trying to ask it in a way
21  to not make them W-2 employees.
22    A.   Right.
23    Q.   I don't want to get them in
24  any trouble.
25    A.   I don't believe they came to
```

Page 53

```
 1          Dr. Adam Werner
 2  work every day, but yes.
 3    Q.   Did you also -- were you also
 4  assisted in the gathering of data that
 5  you needed to do your work, were you
 6  assisted by Plaintiffs' counsel at all?
 7    A.   I don't believe so.
 8    Q.   Who drafted your declaration?
 9    A.   I did.
10    Q.   Did anybody else participate
11  in drafting your declaration?
12    A.   Define "participate"?
13    Q.   Did anybody else put pen to
14  paper to write any of the words that are
15  contained in your declaration.
16    A.   I believe counsel may have
17  made some grammatical changes.
18    Q.   By "counsel", you're
19  referring to Kirby McInerney?
20    A.   Correct.
21    Q.   But, as far as people at
22  Gnarus, it was primarily or solely you?
23    A.   I believe that is correct --
24  oh, no. Someone may have drafted the
25  section on the background.
```

14 (Pages 50 - 53)

Page 54

Dr. Adam Werner

1
2  Q.  I take it you reviewed it and
3  edited it to your satisfaction?
4  A.  Correct.
5  Q.  How many -- well, withdrawn.
6      Did you submit any drafts for
7  the declaration to Kirby McInerney before
8  finalizing the declaration that has been
9  marked as Exhibit 1?
10 A.  Define "submitted"?
11 Q.  Send to them, transmit to
12 them, e-mail to them?
13     MR. STRAUSS:  I'm going to
14 object to that.
15     I mean, you're asking for
16 communications between the expert
17 and counsel that aren't within
18 the -- you know, within the scope
19 of the rule about what you can ask
20 about.
21     If you want to ask him what
22 opinion he was asked to render,
23 what facts or data he was provided,
24 that's all fair game but, you know,
25 you're sort of intruding on other

Page 55

Dr. Adam Werner

1
2  types of communications, and I'm
3  going to object to that, and ask
4  him not to answer it.
5      MR. PARADISE:  Well, I don't
6  agree with you.
7      I think that if the expert
8  prepared earlier drafts of his
9  declaration and they were submitted
10 to counsel and then they were
11 changed, I'm entitled to know that,
12 so I'm not asking him any
13 communications you've had, I'm
14 asking him did he submit other
15 drafts to Kirby McInerney.  If we
16 get into communications, we'll slow
17 down a little bit.
18     MR. STRAUSS:  If you start
19 asking about the contents of those
20 or what counsel said about those,
21 that's going to be -- that's off-
22 limits, and I think that's where
23 you're going.
24     MR. PARADISE:  Oh, okay, we
25 can agree to disagree on that, but

Page 56

Dr. Adam Werner

1
2  if you're instructing him not to
3  answer, instruct him not to answer.
4      Well, let's take it -- let's
5  first find out whether or not there
6  were -- I don't even know if there
7  were other drafts.
8  Q.  So were there any other
9  drafts of your declaration prior to
10 Exhibit 1, (indicating)?
11 A.  Define "drafts".
12 Q.  A version of what is Exhibit
13 1 that's different from Exhibit 1.
14     MR. STRAUSS:  Objection.
15 A.  "Different" how?
16 Q.  Dr. Werner, you don't know
17 what "drafts" mean?  I mean, are you for
18 real?  You really don't know what a
19 "draft" is?
20     A "draft" is a document that
21 you put together as a piece of work, you
22 submit it to somebody, and then someone
23 says:  I don't like the way this reads,
24 or:  I don't like the way that reads, and
25 you revise it and you have a second

Page 57

Dr. Adam Werner

1
2  draft, and then you go through the same
3  process again, and you have a third
4  draft.
5      I'm just asking, were there
6  numerous drafts of what ultimately became
7  Exhibit 1.  That's all I'm asking.
8      It's really not a difficult
9  question.
10     MR. STRAUSS:  Can I help?
11     MR. PARADISE:  Sure.
12     MR. STRAUSS:  If someone
13 corrects a citation or inserts a
14 page number or a reference to a
15 paragraph of a complaint, does that
16 make it a different draft?
17     MR. PARADISE:  Yes --
18     MR. STRAUSS:  Let's say, are
19 you talking about material changes,
20 materially-different drafts?  Do
21 you want to ask him if there was a
22 materially-different draft that was
23 submitted?
24     MR. PARADISE:  I understand.
25 He --

15 (Pages 54 - 57)

Page 58

Dr. Adam Werner

1
2    Q.    You've already said that you
3    think that counsel may have corrected
4    some typos.
5        A.    I believe that is correct.
6        Q.    Okay, so I'm not concerned
7    with typos.
8            I'm asking substantively
9    different -- you know, a substantively-
10   different draft that had a different
11   opinion or didn't express something that
12   is now contained in this opinion, that's
13   what I'm getting at.
14       A.    No.
15       Q.    Okay.
16       A.    And that's why I needed to
17   clarify --
18       Q.    No, I --
19       A.    -- "draft".
20       Q.    -- understand. Okay.
21           You don't mean -- you weren't
22   really asking me what "drafts" means,
23   you're really more asking me what am I
24   asking you about in terms of different
25   drafts.

Page 59

Dr. Adam Werner

1
2        A.    Right, if you're talking
3    about content or --
4        Q.    Understood.
5            Have you had any discussions
6    with any representatives of Plaintiffs,
7    and as we discussed earlier that means
8    the two HITE entities, concerning your
9    work on this matter?
10       A.    I don't believe so.
11       Q.    You mentioned that your
12   general counsel, or Gnarus's general
13   counsel, prepared an engagement letter
14   that was submitted or transmitted to
15   Kirby McInerney, and then I assume it was
16   ultimately signed; is that --
17       A.    I believe that is correct.
18           MR. PARADISE: I don't know
19       if we have received a copy of that
20       but, if we haven't, I request that
21       we be provided a copy of that
22       engagement letter.
23           (REQUEST.)
24       Q.    But you mentioned in here
25   that your rate -- your hourly rate is I

Page 60

Dr. Adam Werner

1
2    think $475 an hour for this engagement?
3        A.    I believe that is correct.
4        Q.    Have you -- are you being
5    paid on an ongoing basis or is the
6    payment deferred until the end of the
7    matter?
8        A.    Ongoing.
9        Q.    How much have you been paid
10   to date, if you know, or how much has
11   Gnarus been paid to date, if you know?
12       A.    Somewhere between twenty and
13   thirty thousand dollars.
14       Q.    Again, I know this may be
15   difficult, but I'm asking you to
16   estimate, how much time would you
17   estimate you put into drafting your
18   declaration, including the work you did
19   up until the time when you started
20   drafting it?
21       A.    Did I personally --
22       Q.    Yes.
23       A.    -- spend?
24           Maybe 40 hours? 50 hours?
25       Q.    Is that --

Page 61

Dr. Adam Werner

1
2        A.    I'm speculating, I honestly
3    don't know.
4        Q.    I understand.
5            Let me ask it this way. Is
6    the amount of time that you put into this
7    project, or this engagement,
8    substantively different than the amount
9    of time you've put into other
10   engagements, where you've been asked to
11   render an opinion as to market
12   efficiency?
13           MR. STRAUSS: Objection.
14       A.    I don't know.
15       Q.    Is any portion of your -- of
16   Gnarus's compensation for this matter
17   contingent on the outcome of the matter?
18       A.    No.
19           MR. PARADISE: Off the
20       record.
21           (Discussion off the record.)
22       Q.    What -- I'm going to start
23   broadly, and if you can't answer the
24   broad question I'll try to be more
25   specific but, just to move it along, did

16 (Pages 58 - 61)

Page 62

1          Dr. Adam Werner
2    you do any research or slash due
3    diligence on Hi-Crush to learn about its
4    business in connection with the work that
5    you did to express an opinion in this
6    matter?
7        A.   I believe so.
8        Q.   Can you generally describe
9    for me what you did?
10       A.   I reviewed press releases,
11   news stories, financials, SEC documents.
12       Q.   Did you review the
13   prospectus, the final prospectus that was
14   issued, in connection with the initial
15   public offering?
16       A.   I don't recall.
17       Q.   Did you come to any
18   understanding, in connection with that
19   research, as to what the trends were in
20   Hi-Crush's business in the 2012 -- you
21   know, mid-2012 time --
22          MR. STRAUSS: Objection.
23       Q.   -- period?
24       A.   Define "trends".
25       Q.   "Trends" meaning demand for

Page 63

1          Dr. Adam Werner
2    the product.
3          And you know what their
4    product is, I assume; correct?
5        A.   I believe that is correct.
6        Q.   Fracking sand --
7        A.   Correct.
8        Q.   -- for proppants? Okay.
9          THE REPORTER: I'm sorry,
10   what did you say?
11         MR. PARADISE: It's called
12   fracking sand -- frac sand for
13   proppants -- P-R-O-P-P-A-N-T-S.
14         MR. STRAUSS: Could you redo
15   the question, because that was an
16   exceedingly long question,
17   interrupted by a number of things.
18         MR. PARADISE: Yes.
19         MR. STRAUSS: Could you just
20   rephrase it?
21         MR. PARADISE: Yes.
22       Q.   Did you -- well; the question
23   was about whether you did any research
24   into trends in Hi-Crush's business in the
25   mid-2012 -- you know, beginning in the

Page 64

1          Dr. Adam Werner
2    mid-2012 time period, that was the
3    question.
4          MR. STRAUSS: Well,
5    objection.
6        Q.   And you asked me to define
7    "trends".
8          MR. STRAUSS: I'm going to
9    object because that's beyond the
10   scope of the opinions that he was
11   asked to render, and that's the
12   subject matter of this deposition.
13         But go ahead, and ask if you
14   want.
15       A.   I mean, to the extent that I
16   knew what was going on with Hi-Crush, I
17   mean, I understood what was going on with
18   their business, I don't know if that
19   would be industry trends or, really, that
20   would be under your purview of "trend".
21       Q.   You mentioned that you read
22   SEC filings, and I think that's also
23   contained in your list of documents on
24   which you relied, Exhibit 2.
25          Can you be more specific, and

Page 65

1          Dr. Adam Werner
2    feel -- Exhibit 2 to Exhibit 1, on page
3    2, you just say: Hi-Crush financials,
4    but I don't -- you don't identify any
5    specific ones.
6          We talked about the
7    prospectus. Are there any others that
8    you can think of?
9        A.   There are 10-K's, there are
10   8-K's.
11       Q.   And for what time period, if
12   you remember?
13       A.   So, I believe it would be
14   2012, 2013.
15       Q.   Can you be specific as to
16   which press releases because, again, you
17   referred generally to "press releases",
18   on page 2 of Exhibit 2 of Exhibit 1.
19       A.   I believe any of them that
20   are listed in my Appendix A.
21       Q.   As you sit here today, are
22   you aware of who Hi-Crush considers to be
23   its main competitors?
24          MR. STRAUSS: Objection.
25       A.   Not that I recall.

17 (Pages 62 - 65)

Case 1:21-md-02989-CMA   Document 568-17   Entered on FLSD Docket 06/08/2023   Page 19 of
114
Case 1:12-cv-08557-CM   Document 97-1   Filed 06/17/14   Page 19 of 114

Page 66

1         Dr. Adam Werner
2     Q.   Did you have any
3 communications with any of the market
4 makers for Hi-Crush in connection with
5 the work that you did to express your
6 opinion in this case?
7     A.   "Market makers" defined as?
8     Q.   Entities that make markets
9 for Hi-Crush.
10    A.   So not in a securities --
11 like a NASDAQ market maker.
12         MR. STRAUSS: Are you talking
13 about profit market makers?
14         MR. PARADISE: No, no, I'm
15 sorry.
16    Q.   I'm talking about a
17 designated market maker from the New York
18 Stock Exchange or anybody else that
19 trades in Hi-Crush's security, on a
20 market-making basis.
21    A.   I don't believe so.
22    Q.   Did you review any analyst
23 reports issued for Hi-Crush during the
24 2012, 2013 time period?
25    A.   I believe so.

Page 67

1         Dr. Adam Werner
2     Q.   As you sit here today, can
3 you tell us which analyst reports you
4 reviewed?
5     A.   I remember reading the Baird
6 downgrade. I believe that was on
7 October -- either the 14th or the 15th.
8     Q.   November? I think November.
9     A.   November, yes, November 2012.
10 I believe that's it.
11         I mean, I may have read other
12 ones, I don't recall as I sit here. That
13 one sticks out in my mind.
14    Q.   There are other -- I think
15 there are other analyst reports
16 referenced in Appendix A, so feel free to
17 look at that to see if it refreshes your
18 memory.
19    A.   Well, I think --
20    Q.   That, you know, refreshes
21 your memory that you might have looked at
22 others.
23    A.   (Pause.)
24         As I sit here, I don't
25 recall.

Page 68

1         Dr. Adam Werner
2     Q.   In Exhibit 6, you have a list
3 of the market makers that covered
4 Hi-Crush during the period from -- well,
5 you have two separate periods --
6     A.   I want to stop you, because I
7 don't think you're using the terminology
8 correctly.
9     Q.   I'm sorry.
10    A.   It's not "market makers".
11    Q.   You're right, I've made -- I
12 used the wrong term. "Analysts" -- let
13 me withdraw that question, start again.
14         In Exhibit 6, you have a list
15 of analysts who issued reports or
16 otherwise followed Hi-Crush during two
17 different time periods. The first time
18 period I see is August 15, 2012 to
19 September 18th.
20         Do you see that?
21    A.   Correct.
22    Q.   And then the second is
23 September 19th through November 12th; is
24 that correct?
25    A.   I believe it's through

Page 69

1         Dr. Adam Werner
2 November 12th --
3     Q.   Right.
4     A.   -- 2013.
5     Q.   2013, correct.
6         How many analysts were
7 following Hi-Crush during the class
8 period? And, by "the class period", I'm
9 referring to the period from September
10 19th, 2012 through November 12th, 2012.
11    A.   I believe it was either seven
12 or eight.
13         Let me look at my report
14 here.
15    Q.   Sure. Just make sure you
16 understood me correctly.
17         I'm only asking now for the
18 class period, not this extended test
19 period.
20    A.   Ah, well, okay.
21         Going back to Exhibit 6 --
22    Q.   I think -- go ahead.
23    A.   Do you have a pen?
24    Q.   Sure.
25    A.   I know I can't mark this.

18 (Pages 66 - 69)

Page 70

1          Dr. Adam Werner
2  Can I borrow a pad of paper, too? Thank
3  you. (Writing.)
4          Okay. Going back to your
5  question, define "covering".
6      Q. Well, "covering" meaning
7  issuing research reports on Hi-Crush.
8      A. Do you have a pen?
9          (Discussion off the record.)
10     A. Can we go back to the
11 question?
12         THE WITNESS: Can you read
13  the question?
14     Q. I'll just say it again.
15         You asked me how do I define
16 "covering", and I said issuing --
17 analysts that were issuing research
18 reports.
19     A. On Hi-Crush.
20     Q. Correct.
21     A. (Pause.)
22         Define "the class period"?
23     Q. It's November -- I'm sorry --
24 September 19th, 2012 through November
25 12th, 2012.

Page 71

1          Dr. Adam Werner
2          And that's also in your
3  report, so --
4      A. I believe that is correct.
5      Q. Well --
6      A. And I wanted to make sure
7  that you weren't talking about the 14th.
8      Q. No, no, no. Look at -- if
9  you look at Footnote 1, on page 1 of your
10 report, you mention, that is the same
11 class period.
12     A. Right.
13         So I will dispute your
14 definition of "analyst coverage". If
15 you're asking me how many reports were
16 released by analysts during that time
17 period, I believe three.
18     Q. And the three that you're
19 referring to are -- three reports that
20 you're referring to are Raymond James, on
21 October 9, 2012, RBC on October 16th,
22 2012, and then Credit Suisse on October
23 17th, 2012?
24     A. I believe that's correct.
25     Q. So what is -- you said you

Page 72

1          Dr. Adam Werner
2  don't agree with my or you dispute my
3  definition of "covering", so how do you
4  define "covering"?
5          How do you define an analyst
6  covering Hi-Crush?
7      A. Well, an analyst certainly
8  can be following the stock and not issue
9  actual reports.
10     Q. So how many -- under your
11 definition, then, how many analysts do
12 you believe were covering Hi-Crush during
13 the class period?
14     A. (Pause.)
15         Eight.
16     Q. Who are the other five,
17 besides the three we just identified?
18     A. (Pause.)
19         Barclays, UBS, Robert W.
20 Baird -- (pause) -- I don't know if EVA
21 Dimensions was covering it during the
22 class period -- William Blair & Company.
23 I think that's it.
24     Q. That's -- I think that's
25 seven, if I counted right -- Barclays,

Page 73

1          Dr. Adam Werner
2  UBS, Robert Baird, William Blair, and the
3  three that we had previously discussed.
4      A. Well, I did mention UBS.
5      Q. Okay, so those would be the
6  eight.
7          And what's your basis for
8  concluding that those other -- even
9  though they were not issuing research
10 reports, that those other firms were
11 covering Hi-Crush during that time?
12         MR. STRAUSS: Objection.
13     A. I don't know whether they
14 were or were not covering Hi-Crush during
15 that time.
16         I'm just saying it's possible
17 that they covered those for Hi-Crush
18 during that time, as I define "coverage".
19     Q. You are familiar with the
20 Cammer factors for measuring market
21 efficiency; correct?
22     A. I believe I am.
23     Q. What is the -- if you know,
24 what is the standard that's applied to
25 determining whether or not an analyst is

19 (Pages 70 - 73)

Page 74

1        Dr. Adam Werner
2  following or covering a company under
3  Cammer?
4        Is it that they're issuing
5  reports or is it just that they're doing
6  something else?
7     A.  I don't think Cammer defines
8  that.
9     Q.  If they're not issuing
10 reports, is there some other way that you
11 believe these analysts are communicating
12 information that's being absorbed into
13 the market for the price of the stock?
14    A.  Sure.  They could be telling
15 their salespeople what their opinions are
16 of the stock.  They could be going on TV
17 shows.
18       There is a whole host of ways
19 they could be communicating information.
20    Q.  Let's assume, for the sake of
21 this question, that my definition is
22 correct, and it means that they're
23 actually issuing reports, and that there
24 are only three during the class period.
25 Are you aware of any federal court

Page 75

1        Dr. Adam Werner
2  decisions that have held that three
3  analysts covering a stock is a sufficient
4  number to prove market efficiency under
5  the Cammer factors?
6        MR. STRAUSS:  Objection.
7     A.  I don't know, one way or the
8  other.
9     Q.  Why not?
10       MR. STRAUSS:  Objection.
11    A.  If you want to show me a
12 court opinion, I'm happy to look at it.
13    Q.  Oh, I'm sorry, you are just
14 not aware of any reports; is that what
15 you mean?
16    A.  Yeah.
17    Q.  Okay.  Have you ever
18 expressed an opinion in a case, other
19 than Hi-Crush, that three analysts
20 covering the security is enough to
21 demonstrate market efficiency for that
22 Cammer factor?
23       MR. STRAUSS:  Objection.
24    A.  As you -- I'm sorry -- as you
25 define "coverage" or as I define

Page 76

1        Dr. Adam Werner
2  "coverage"?
3     Q.  Oh, no, I said three analysts
4  who are issuing reports.
5     A.  Ah, okay.  I don't know, one
6  way or the other.
7     Q.  No, my question is whether
8  you've ever expressed an opinion that
9  three is enough to satisfy the Cammer
10 factor.
11    A.  I don't recall.
12    Q.  Turning back, for a moment,
13 to Exhibit 2, the list of the academic
14 articles and books that begins on page 1
15 and then continues over to page 2.
16       Did you read each of the
17 items that are listed there in connection
18 with the work that you did on this
19 matter?
20       MR. STRAUSS:  Objection.
21    A.  At some point.
22    Q.  Did anyone at -- anyone other
23 than you, at Gnarus review and then
24 prepare summaries of any of these
25 materials for you?

Page 77

1        Dr. Adam Werner
2        MR. STRAUSS:  Objection.
3     A.  The academic articles?
4     Q.  Correct.
5     A.  No.
6     Q.  And turning to Appendix A,
7  for a minute, the -- there are -- you
8  know, there are various reports, data,
9  articles, SEC filings, and press releases
10 listed throughout Appendix A.
11       Did you read each of those
12 items in connection with the work that
13 you performed on this matter?
14       MR. STRAUSS:  Objection.
15    A.  Each of those items
16 separately?
17    Q.  Yes.
18       MR. STRAUSS:  Can you repeat
19 the question, please?
20       (The record was read.)
21    A.  Each of the items?  No --
22 well, again, define "item".
23       I only ask because, you know,
24 there are things about lawsuits being
25 filed, I didn't read the -- all the

20 (Pages 74 - 77)

Page 78

Dr. Adam Werner

1 lawsuits. You know, did I read -- have I
2 read this press release summary? Yeah.
3 So I'm not really understanding the
4 question.
5
6       Q.  Is it fair to say that you
7 read the items that you believe were
8 considered news for the company?
9       A.  That I considered news?
10      Q.  Yes, in connection with your
11 event study.
12      A.  "News", as defined by?
13      Q.  Well, how do you define
14 "news"?
15          You talk about news in
16 connection with your declaration; don't
17 you?
18      A.  I do.
19      Q.  Right.
20      A.  So one type of news is press
21 releases.
22          If I'm defining "news" as
23 that, did I review those? Yes.
24      Q.  Take a look at page 12 of
25 your declaration, for a moment, Exhibit

Page 79

Dr. Adam Werner

1 1, paragraph 29.
2          The first sentence of
3 paragraph 29 says, from your declaration:
4 The second factor under Cammer is that --
5 quote -- it would be persuasive if a
6 significant number of securities analysts
7 followed and reported on a company's
8 stock -- closed quotes.
9          Do you agree with that
10 statement?
11      A.  Do I agree with that that's
12 what Cammer says? Yes.
13      Q.  Well, do you also agree that
14 that's what's persuasive?
15          MR. STRAUSS: Objection.
16      A.  Persuasive to what?
17      Q.  Persuasive to determining
18 whether or not there's a sufficient
19 number of analysts to satisfy the analyst
20 coverage factor of Cammer.
21          You told me before it didn't
22 matter if they were issuing reports or
23 not, they could still be relevant and, in
24 your definition, you saw there were seven

Page 80

Dr. Adam Werner

1 analysts, and I asked you -- I told you
2 my definition was issuing reports, you
3 told me that you don't accept that
4 definition.
5          In your report, you're saying
6 that Cammer says -- followed a report, so
7 I'm trying to get an understanding as to
8 where you stand on all this, but now
9 you've told me you don't think they have
10 to be reporting on it.
11          MR. STRAUSS: Objection.
12      You're asking him for a legal
13      opinion, and that's not what he's
14      here to testify about, and that's
15      not what he testified about in his
16      report, so -- but I object to your
17      question.
18          MR. PARADISE: I don't agree
19      that I'm asking for a legal
20      opinion.
21          He expressed the opinion that
22      the second factor of Cammer's been
23      satisfied here by what I believe to
24      be three analysts issuing reports

Page 81

Dr. Adam Werner

1 during the relevant time period.
2 Dr. Werner has told me now that he
3 doesn't agree with that definition.
4 He thinks that other analysts
5 talking to their customers on the
6 phone, or their salespeople, can
7 also be relevant, and I'm trying to
8 understand how he can reconcile
9 that with Cammer, because Cammer
10 seems to say they have to also be
11 reporting on it.
12      Q.  So I'm trying to understand
13 if there's some explanation you can give
14 me as to how you differentiate what
15 you've come to the conclusion of and what
16 Cammer says.
17          MR. STRAUSS: Right.
18      A.  I don't --
19          MR. STRAUSS: Objection,
20      that's a legal argument, that's not
21      a question about his opinion or his
22      analysis.
23          Go ahead.
24      A.  Cammer doesn't define

21 (Pages 78 - 81)

Page 82

Dr. Adam Werner

1  "reported" for us, so I don't know what
2  Cammer means by "reported" --
3
4     Q.  Well, do you think --
5     A.  -- or "following".
6     Q.  Again, if the number is
7  three, you know, assuming for the sake of
8  this question that the number is three,
9  do you consider that a significant
10  number -- a sufficiently-significant
11  number of analysts to satisfy the second
12  Cammer factor?
13        MR. STRAUSS: Objection.
14     Once again, you're asking him for a
15     legal opinion and not for his
16     expert opinion or what analysis he
17     conducted to get to his expert
18     opinion, it's beyond the scope of
19     the deposition.
20     Go ahead.
21     A.  I defer to counsel on this
22  one.
23     Q.  In what sense?
24     A.  In the sense that I believe
25  you are asking me for a legal opinion.

Page 83

Dr. Adam Werner

1
2     Q.  Look at paragraph 30, the
3  last sentence of paragraph 30: As a
4  result of my opinion that, while analysts
5  coverage implies there is interest in a
6  company and securities, significant
7  analyst coverage is not necessary to show
8  that a security is traded in an efficient
9  market.
10     Is that a legal opinion?
11     A.  I don't believe so.
12     Q.  So what makes that not a
13  legal opinion and the question I'm asking
14  you a legal opinion, besides that your --
15  besides that Mr. Strauss said it was.
16        THE WITNESS: Could you
17     re-read the question, please?
18        MR. STRAUSS: Because this is
19     asking -- is about market
20     efficiency, and he's testifying
21     about market efficiency.
22        The prior question was about
23     whether something satisfies a legal
24     requirement.
25        MR. PARADISE: (Indicating.)

Page 84

Dr. Adam Werner

1
2        MR. STRAUSS: And I don't
3  know whether he's able to --
4  whether he knows about that.
5     Go ahead.
6     A.  I --
7        MR. STRAUSS: Do you want her
8  to repeat the question? Hone in on
9  what it was you asked?
10        MS. BRANDON: I think you
11  want to go back to the question
12  where he reads from paragraph 30,
13  and from there.
14     (A portion of the record was
15     read.)
16     A.  I believe it's paragraph 29.
17        MS. BRANDON: The last
18  question was started with paragraph
19  30 and then --
20     Q.  The last sentence of
21  paragraph 30.
22     A.  Oh, then I'm asking about the
23  question before that.
24        THE WITNESS: Or, just read
25     the last question.

Page 85

Dr. Adam Werner

1
2     (A portion of the read was
3     read.)
4     A.  I really don't understand the
5  question.
6     Q.  Well, you did need to hear
7  the prior question.
8        The prior question was asking
9  about whether you needed -- essentially,
10  I'm going to summarize it -- essentially,
11  I was asking you about whether coverage
12  was required to make an analyst relevant
13  for purposes of the Cammer factor; right?
14  Meaning that they were issuing reports.
15        That's how we got off onto
16  this tangent in the first place, and you
17  said you didn't think that was -- you
18  didn't agree with that definition. You
19  thought they don't necessarily have to be
20  issuing a report to be determined to be
21  covering it, the security.
22        Did I get that right?
23     A.  I believe that is correct.
24     Q.  Okay. And then I read to you
25  paragraph 29, the first sentence, and you

22 (Pages 82 - 85)

Page 86

Dr. Adam Werner

2 said, if I understood you correctly, that
3 you don't believe that Cammer defined
4 "reported", so you're -- I think what
5 you're saying is you don't think it has
6 to be actually a written published report
7 to be reported; is that right?
8    A.   I believe that is correct.
9    Q.   Okay. I got it. I think we
10 can move on, you know, we agree to
11 disagree, I guess.
12       But, my next question is,
13 let's assume that I'm right, and
14 "reported" means issuing a written
15 report.
16   A.   Okay.
17   Q.   And that there are three
18 analysts doing so during the class
19 period, which is what you testified to
20 earlier, meaning there were three
21 analysts issuing reports about Hi-Crush.
22   A.   Okay.
23   Q.   Is that a sufficient number
24 of analysts for purposes of establishing
25 the second Cammer factor, in your

Page 87

Dr. Adam Werner

2 opinion?
3       MR. STRAUSS: Objection.
4    Again, you're asking for a legal
5    opinion.
6       If you're asking him whether
7    it's sufficient to establish market
8    efficiency from an economic point
9    of view, I think that would be a
10   valid question, but you're asking
11   him for a legal opinion, and I
12   think that's beyond the scope of a
13   proper question in the deposition.
14      MR. PARADISE: Okay, I think
15   I understand your objection, I
16   think I'm short-circuiting it a
17   little bit.
18      So let me, to satisfy you,
19   I'll add to the question.
20   Q.   Is three a sufficient number
21 to prove that the second Cammer factor
22 has been established and, therefore,
23 there is market efficiency.
24      MR. STRAUSS: Objection.
25   A.   So, first of all, I need you

Page 88

Dr. Adam Werner

2 to define "sufficient".
3    Q.   Well, how many analysts is it
4 that you need to be covering a stock, in
5 your opinion, to conclude from that that
6 there is market efficiency?
7       MR. STRAUSS: Objection.
8    A.   It's possible I could have no
9 analyst coverage and the stock would be
10 traded in an efficient market.
11   Q.   Agreed, because you don't
12 need to satisfy all the Cammer factors.
13 That's why I'm asking to satisfy the
14 second Cammer factor, that was the whole
15 thing I'm getting at, to satisfy that
16 specific factor.
17   A.   If you want --
18      MR. STRAUSS: That's why your
19   question is a legal question and
20   not an expert question.
21      MR. PARADISE: I disagree.
22   A.   If you want to show me the
23 Cammer opinion, and show me where they
24 talk about the number of analysts that
25 are sufficient, I'll be happy to discuss

Page 89

Dr. Adam Werner

2 that with you, but I don't believe Cammer
3 states definitively that there have to be
4 a certain number of analysts, it just
5 says sufficient.
6       Again, you can define
7 "sufficient" any way you want to.
8    Q.   Okay. So, in your opinion,
9 "sufficient" can be three or fewer than
10 three, I think is what you are saying.
11   A.   I'm saying it's possible for
12 a stock to trade in an efficient market
13 and not have any analyst coverage or it
14 could have a million analysts covering
15 it.
16      Market efficiency, in and of
17 itself, is not going to be established by
18 the number of analysts following a stock.
19   Q.   Turning to your opinion that
20 you express at the end of paragraph 30,
21 that I read into the record earlier?
22   A.   Mm-hmm -- okay.
23   Q.   I'm looking specifically at
24 the second clause, which says:
25 Significant analyst coverage is not

23 (Pages 86 - 89)

Page 90

1      Dr. Adam Werner
2  necessary to show that a security is
3  traded in a sufficient market.
4      Is that a acceptable -- is
5  that a peer-reviewed accepted opinion, to
6  your knowledge?
7      A.  "Peer-reviewed"?
8      Q.  In other words, is there any
9  literature out there that shares that
10 opinion, that you're aware of.
11     A.  As I sit here, I don't know.
12     Q.  If I understood you
13 correctly, and we'll move off of this, I
14 apologize for belaboring it, you're
15 saying is -- analyst coverage is or can
16 be irrelevant to determining market
17 efficiency; right?
18     A.  Determining under what?
19     Q.  Determining under the
20 analysis that you performed and type of
21 analysis that you performed in this case.
22     THE WITNESS:  I'm sorry,
23     could you read back the question?
24     (A portion of the read was
25     read.)

Page 91

1      Dr. Adam Werner
2      MR. STRAUSS:  Objection.
3      A.  I mean, look, this is a
4  Cammer factor, I have to respond to that
5  in this report.
6      To me, like I said, you can
7  have infinite analyst coverage or no
8  analyst coverage, the stock is still
9  trading in an efficiency market.
10     Going back to your question
11 about peer-reviewed articles, I can think
12 of numerous event study articles that
13 don't mention anything about analyst --
14 or, market efficiency studies, that don't
15 mention anything about analyst coverage.
16     Q.  So you said you had to
17 analyze this because it's one of the
18 Cammer factors, but if it can be
19 efficient with zero market makers, why
20 was it necessary for you to --
21     MR. STRAUSS:  Objection, you
22     mean "analysts".
23     MR. PARADISE:  I'm sorry,
24     you're right.
25     Q.  Let's start over. Withdraw

Page 92

1      Dr. Adam Werner
2  that question.
3      You said that a market can be
4  efficient with zero analysts covering it
5  and it could also have -- I can't
6  remember the number you used, it was a
7  very large number, analysts covering it
8  and it can be efficient, but if it can be
9  efficient or, in your opinion, can be
10 proven to be efficient with zero analyst
11 coverage, why did you bother even
12 including this in your analysis, this
13 Cammer factor two in your analysis?
14     A.  Because the court demands
15 that I do it.
16     Q.  "The court" being Cammer, or
17 Judge McMahon in the Southern District of
18 New York?
19     A.  Right.
20     MR. STRAUSS:  Objection.
21     A.  I believe Cammer.
22     Q.  All right.  What is your
23 definition of an "efficient market"?
24     In other words, what does
25 that mean, when you say "a market is

Page 93

1      Dr. Adam Werner
2  efficient"?
3      A.  I assume that it's semi-
4  strong form-efficient.
5      Q.  Can you explain what that
6  means, please?
7      A.  Turning to my report,
8  paragraph 15, under the:  Semi-strong
9  form of efficiency:  Prices reflect not
10 just past prices but all other public
11 information, for example from the
12 internet or financial press.
13     Q.  What does it mean to say that
14 "a market is not efficient", in your
15 opinion, or your understanding?
16     A.  Prices do not reflect past
17 prices or public information.
18     Q.  You also used the term
19 throughout -- and I can give you some
20 examples, you have used the term, or some
21 derivation of the term, "informationally
22 efficient"?
23     Do you remember using that
24 term?
25     A.  I believe so.

24 (Pages 90 - 93)

Page 94

Dr. Adam Werner

Q. If you take a look at -- do you want me to show you, just so we're on the same page?
A. Sure.
Q. Take paragraph 4 E, on page 2.
These are informational efficiencies?
A. Okay.
Q. And then there are other places where you'll say something is informationally efficient, et cetera.
Can you just explain what you mean by "informatioually efficient"?
A. It means that the information that is reflected in the stock price.
Q. Okay. So it's similar to the definition of what an "efficient market" is?
A. I believe that's correct.
Q. Outside of work you've done in connection with either testifying or preparing a report as an expert, so, in other words, in your academic life, have

Page 95

Dr. Adam Werner

you ever studied or done research into market efficiency?
A. That's an overbroad -- overly broad question. I believe the answer is yes.
Q. Have you ever concluded that a market for a particular security was not efficient?
A. Yes.
Q. Aud have you ever done that in any litigation, securities litigation?
A. I believe so.
Q. Can you tell us which cases, as you sit here?
A. Not as I sit here.
I mean, I'd have to -- when I was at Cornerstone and NERA and CRA, I must have done, I don't know, multiple cases in which the expert found that the market for the stock was inefficient.
I've certainly found -- been brought cases currently where I'm asked to determine market efficiency, and I will say: Based on my determination, the

Page 96

Dr. Adam Werner

market for this stock is inefficient. Amazingly enough, the plaintiffs don't want me to submit a report in those instances.
Q. But do they pay you?
A. They pay me.
Q. Okay, fair enough.
Do you remember what -- in those other cases to which you're referring, or these other instances to which you're referring, do you recall what led you to conclude that the market was inefficient?
A. The stock -- or, the stock or bond price would not respond to information, that I would expect it to respond to.
And, when I say "information", I should qualify that by saying "new information".
Q. And was that conclusion reached after conducting -- if you remember -- was that conclusion reached after conducting an event study?

Page 97

Dr. Adam Werner

A. It could have been.
I mean, I could also eyeball it.
Q. In your opinion, is it possible for the market -- for a security to be efficient during one time period but inefficient during another time period?
MR. STRAUSS: Objection.
A. Is it possible? Anything's possible.
Q. Have you ever encountered that situation, where you looked at trading over different time periods for the same security and determined that in one time period it wasn't sufficient and in another it was?
A. Not that I recall.
Q. We talked earlier about the class period, and I just wanted to confirm that, to your knowledge, the class period still starts or begins in this case on September 19th, 2012?
A. That's my understanding.

Page 98

1    Dr. Adam Werner
2  based on the judge's opinion.
3      Q.  What -- if you know, what
4  happened on September 19th, 2012 to make
5  that the start date for the class period?
6  Or what didn't happen, I should say.
7      A.  Well, other than the judge
8  determining that that was the start of
9  the class period?
10     Q.  She hasn't determined that
11  yet, it's --
12     A.  Well, then, I -- again, I'm
13  not a lawyer, so that my reading of her
14  opinion was that she thought that the
15  class period started on --
16     Q.  I'm going to --
17     A.  -- September 19th.
18     Q.  Let me try it this way.
19         Your -- not "your" -- the
20  Plaintiffs' counsel has alleged the class
21  period that begins on September 19th.  Is
22  it fair to say that you've accepted that
23  for purposes of your analysis and haven't
24  done any independent determination as to
25  when the class period should or should

Page 99

1    Dr. Adam Werner
2  not start?
3      A.  That is correct, but --
4      Q.  I'm sorry, go ahead.
5      A.  Well, I was just going back
6  to your question on September 19th.
7         If you go to paragraph 11,
8  which is page 5 of Exhibit 1 to this
9  deposition:  Then, on September 19, 2012,
10  Baker Hughes notified Hi-Crush that it
11  was terminating its supply contract.
12  According to Baker Hughes --
13         THE WITNESS:  Am I going too
14  fast?
15     Q.  No.
16         THE COURT REPORTER:  I'm
17  there.
18     A.  Not for you.
19         -- Hi-Crush had breached the
20  confidentiality clause of the supply
21  contract by attaching a version of the
22  contract to its IPO registration
23  statement.  Hi-Crush, however, did not
24  publicly disclose Baker Hughes'
25  determination until November.  In fact,

Page 100

1    Dr. Adam Werner
2  during a presentation at an industry
3  meeting, on September 25th, 2012,
4  Hi-Crush continued to promote Baker
5  Hughes as an important long-term buyer of
6  its frac sand.
7      Q.  Okay.  So coming back to my
8  question.
9         Then, what occurred or did
10  not occur on September 19 -- what
11  occurred on September 19th, based on your
12  opinion, is that Hi-Crush received a
13  letter from Baker Hughes, notifying them
14  that Baker Hughes was terminating the
15  contract; is that correct?
16     A.  I don't believe that's my
17  opinion.
18     Q.  I said in your opinion, it's
19  expressed in this paragraph you just
20  read.
21         MR. STRAUSS:  Objection.
22     Q.  You just read me this
23  paragraph.
24     A.  Correct.
25     Q.  Okay, so that's what I'm

Page 101

1    Dr. Adam Werner
2  asking.
3         Is that the event that
4  occurred on that date that makes that the
5  start of the class period.
6      A.  Well, you're --
7         MR. STRAUSS:  I don't think
8  it's alleged.
9         THE WITNESS:  Right.
10     A.  That's not my determination
11  to make.
12     Q.  Do you know, or have you
13  done, any independent research to
14  determine when, during the day on
15  September 19th, Hi-Crush received a
16  letter from Baker Hughes?
17     A.  I don't believe so.
18     Q.  Are you familiar with -- you
19  mentioned earlier Form 8-K, are you
20  familiar with the instructions for Form
21  8-K?
22     A.  Not as I sit here.
23     Q.  So if I was to ask you how
24  many days after an event that requires
25  disclosure, under Form 8-K, a registrant

26 (Pages 98 - 101)

Page 102

1          Dr. Adam Werner
2  is obligated to file its Form 8-K, you
3  wouldn't know the answer to that; would
4  you?
5          MR. STRAUSS: Objection.
6      A.  I don't believe so.
7      Q.  Is it still your
8  understanding, as you sit here today,
9  that the class period ends on November
10  12th, 2012?
11          MR. STRAUSS: Objection.
12      Q.  If you look at Footnote 1 on
13  page 1.
14      A.  I believe that is correct.
15      Q.  So, again, like I asked you
16  before, that date, you're taking that
17  from what's been alleged in this lawsuit
18  rather than any independent determination
19  of your own; is that right?
20      A.  Well, I guess.
21      Q.  Well, you seem puzzled.
22      A.  You know, again, I don't
23  think -- you're asking me to make a legal
24  determination, which is not anything I've
25  thought about.

Page 103

1          Dr. Adam Werner
2          It's not my job to determine
3  when and -- the class period should start
4  and end.
5      Q.  No, that's exactly what I
6  asked you. I didn't ask you to make a
7  legal determination.
8          I said, you're accepting the
9  period that's been set forth in this
10  lawsuit rather than having done anything
11  independent to determine when the class
12  period should end.
13          MR. STRAUSS: Objection.
14          What do you mean by "accepting"?
15          You mean that he's accepting as an
16  assumption?
17          MR. PARADISE: Yes.
18          MR. STRAUSS: Okay.
19      A.  I believe that's correct.
20          I mean, the only thing
21  that -- the only confusion I have about
22  this point is that, you know, you see the
23  stock price reaction on November 13th, so
24  do I consider that part of the class
25  period? Not as formally defined in

Page 104

1          Dr. Adam Werner
2  this -- in their complaint, but that was
3  when the information was reflected in the
4  stock price.
5      Q.  And what -- do you know, or
6  are you aware -- and you can certainly
7  refer to your report -- are you aware of
8  what happened on November 12th with
9  respect to Hi-Crush that -- well, what
10  occurred with respect to Hi-Crush on
11  November 12th, 2012?
12      A.  (Pause.)
13          I don't specifically recall.
14  If I could look at the complaint.
15          MR. PARADISE: Do we have a
16      copy of the complaint?
17          MS. BRANDON: I think we do.
18      Q.  While we're looking for that,
19  let me see if this helps.
20          Look at paragraph 12 of your
21  declaration.
22      A.  Right.
23      Q.  You have a reference in there
24  to November 12.
25      A.  Oh.

Page 105

1          Dr. Adam Werner
2      Q.  I can represent to you that,
3  what happened, that you recite in here,
4  is Hi-Crush formally terminated the
5  supply agreement.
6          Do you see that?
7      A.  Yes.
8      Q.  Do you want to still see the
9  complaint?
10      A.  And its suit, filed suit,
11  against Baker Hughes.
12      Q.  Right, do you still need to
13  see that, (indicating)?
14      A.  No.
15      Q.  Turning to page 2 of your
16  declaration, Footnote 2.
17          You discuss, in this
18  Footnote, the -- what you call, or
19  define, as the "test period", which is
20  from September 19th, 2012 until November
21  13th, 2013.
22          Do you see that?
23      A.  Yes.
24      Q.  Okay. And you say, in
25  parenthetical, after November 13th, 2013

27 (Pages 102 - 105)

Page 106

1      Dr. Adam Werner
2  a -- and this is the parenthetical: A
3  year after the impact of the corrective
4  disclosure on Hi-Crush's stock price,
5  which I define as the "test period", you
6  continue on from there but for my
7  purposes I'm going to stop there.
8      A.  Okay.
9      Q.  What do you mean by
10 "corrective disclosure", as you use it in
11 Footnote 2?
12     A.  I guess corrective of the
13 alleged fraud.
14     Q.  And what was the disclosure
15 that you believe was corrective of the
16 alleged fraud, for purposes of your
17 (indicating) opinion?
18         MR. STRAUSS:  Objection.
19     A.  Well, going back to the
20 paragraph you pointed out --
21     Q.  12?
22     A.  Yeah.  Hi-Crush formally
23 terminated its supply agreement on
24 November 12th, 2012 but, at the same
25 time, it filed suit against Baker Hughes,

Page 107

1      Dr. Adam Werner
2  seeking damages --
3         THE WITNESS:  Sorry.
4      A.  -- over the contract
5  termination.
6      Q.  And what misrepresentation or
7  omission do you believe this corrective
8  disclosure corrected?
9         MR. STRAUSS:  Objection.
10 Once again, you're asking him for
11 legal conclusions, you're not
12 asking him for -- or, to recite the
13 allegations, you're not asking him
14 for his opinion or the analysis
15 that led him to his opinion and, as
16 such, it's not the proper scope of
17 the deposition.
18         MR. PARADISE:  Okay, I
19 disagree.
20     Q.  But you can answer.
21         If you don't have an opinion,
22 you can say: I don't have an opinion,
23 but you -- I'll just say, the reason I
24 don't agree with Mark is because you say
25 you've created this test period that runs

Page 108

1      Dr. Adam Werner
2  from a year from the corrective
3  disclosure, so I'm assuming, from that,
4  that the corrective disclosure has some
5  significance to you, so I want to have
6  your understanding as to what you
7  consider to be the corrective disclosure,
8  to see if that's a valid time period that
9  you're using.
10         MR. STRAUSS:  He testified
11 he's using that date as an
12 assumption, not that he rendered an
13 opinion on the corrective
14 disclosure period.
15         MR. PARADISE:  Well, I don't
16 think so.
17         I asked about on the class
18 period, he said he accepted it, but
19 I don't think I asked him why he
20 used November 13th, so I can ask
21 him that question.
22     Q.  Why did you use November
23 13th?  What was the reason for using that
24 date?
25     A.  It's corrective of the

Page 109

1      Dr. Adam Werner
2  omission of information.
3      Q.  Right, and what was the
4  omission that occurred?
5      A.  That Baker Hughes had
6  terminated its contract.
7         But let me -- hold on one
8  second.
9         MR. STRAUSS:  Are you asking
10 him what happened on November 13th
11 or why he selected November 13th,
12 as opposed to any other date, to
13 start this test period?  Is that
14 what you're asking?
15         MR. PARADISE:  Well, he said
16 he used November 13th in his
17 opinion as -- because that's one
18 year from the corrective
19 disclosure, so I'm trying to
20 understand what makes him think
21 that was the corrective disclosure,
22 why was that the right date to
23 start from.
24         MR. STRAUSS:  November 13th,
25 2013?

28 (Pages 106 - 109)

Case 1:21-md-02989-CMA   Document 568-17   Entered on FLSD Docket 06/08/2023   Page 30 of
114
Case 1:12-cv-08557-CM   Document 147-1   Filed 06/17/14   Page 30 of 114

Page 110

```
 1            Dr. Adam Werner
 2        MR. PARADISE:  12, he said
 3  one year from that date, he said.
 4        He's in the middle of
 5  answering, so....
 6    A.  No, I'll stick with my
 7  answer.
 8    Q.  Okay.  Why do you -- did you
 9  feel it was necessary to use this test
10  period, which, as you point out, runs
11  from a year -- you know, a year following
12  the class period, to establish or
13  determine whether the market for Hi-Crush
14  was efficient?
15    A.  Because there was very little
16  information disclosed about Hi-Crush
17  during the class period.
18        Now, that having been said, I
19  would have been more than happy to just
20  look at the class period, where we have
21  one significant disclosure that moves the
22  stock price, but I'm sure your experts
23  would then complain about the fact that I
24  was only looking at a one- or two-month
25  period of time, and I was only looking at
```

Page 111

```
 1            Dr. Adam Werner
 2  one disclosure.
 3        So, I mean, I'd be happy to
 4  do it.  The problem is, if I do it, you
 5  guys are going to complain about it, or
 6  your -- the people you hire are going to
 7  complain about it.  That's why I did it.
 8    Q.  Well, but, are you saying --
 9  or was that a hypothetical, are you
10  saying there was a significant disclosure
11  during the class period, that's defined
12  as September 19th, 2012 to November 12th,
13  2012?
14    A.  I'm saying there was one
15  significant piece of information released
16  to the market during that time period.
17    Q.  And what was that?
18    A.  The -- Hi-Crush formally
19  terminated its supply agreement on
20  November 12th, 2012 while, at the same
21  time, it filed suit against Baker Hughes
22  seeking damages over the contract
23  termination.
24    Q.  You're referring to paragraph
25  12 again?
```

Page 112

```
 1            Dr. Adam Werner
 2    A.  Yes.
 3    Q.  But that was released on
 4  November 13th, 2012.
 5        That's outside the class
 6  period.
 7    A.  No, I believe -- I mean --
 8  okay, now we're getting into semantics.
 9        The termin-- the information
10  was released either post-closing of the
11  market on the 12th versus -- or prior to
12  the opening of the market on the 13th.
13    Q.  I'll represent to you that it
14  was the latter, it was prior to the
15  opening on the 13th.
16        And I'm going to show you the
17  press release in a second.
18    A.  Okay.  I don't under-- for
19  me, I don't understand the legal
20  distinction of why the class period ends
21  on the 12th versus the 13th and how, if
22  legally, whether you determine that if
23  information is released prior to a market
24  opening it should be reflected, the
25  correct proper date that you need to look
```

Page 113

```
 1            Dr. Adam Werner
 2  at for the class period is the prior day,
 3  I don't know.
 4    Q.  Okay, fair enough.
 5    A.  That's nothing I understand
 6  or -- but that's it.
 7    Q.  Okay, so, but, just for the
 8  record, the disclosure to which you are
 9  referring, to which you referred earlier
10  as having occurred during the class
11  period, is the disclosure that you
12  discuss in paragraph 12 (indicating) of
13  your declaration.
14    A.  It's -- disclosure,
15  conveyance of information, whatever you
16  want to call it.
17        It's -- so, yes, a press
18  release was issued, they filed a lawsuit
19  I believe on the prior day, I don't --
20    Q.  I'm just trying to establish
21  that there's no other disclosure that you
22  were referring to.  That's all.  You were
23  referring to this disclosure, whether it
24  happened on the 13th or at the end of the
25  12th, that's the disclosure that you're
```

29 (Pages 110 - 113)

Page 114

```
 1          Dr. Adam Werner
 2  talking about.
 3     A.  I believe that is correct.
 4     Q.  Okay. Let me just hand you
 5  the press release, just to show it to
 6  you, so can see the date on it, and all
 7  that.
 8          MR. PARADISE: Can you please
 9  mark this as Exhibit 2?
10          (Whereupon Deposition Exhibit
11      2, Press release, dated November
12      13th, was marked for
13      identification, as of this date.)
14     A.  Actually, you know what, can
15  I take a break?
16     Q.  Sure.
17          (Recess taken: 12:09 p.m. -
18      12:19 p.m.)
19  BY MR. PARADISE:
20     Q.  Before we broke, I handed you
21  what the court reporter has marked as
22  Exhibit 2, just so we have it on the
23  record.
24          And uow you've advised me
25  that you'd like to clarify one of your
```

Page 115

```
 1          Dr. Adam Werner
 2  previous answers, I believe?
 3     A.  Correct.
 4     Q.  Go ahead.
 5     A.  So, when we were talking
 6  about analyst coverage and analyst
 7  following, I do want to point out that,
 8  in terms of companies that were following
 9  Hi-Crush, as opposed to -- as I define
10  it, part of that was based on the idea
11  that they had previously issued reports
12  on Hi-Crush, prior to the class period,
13  so that's, to me, evidence that -- or,
14  additional evidence that they were, in
15  fact, following Hi-Crush.
16     Q.  Just for the record, you're
17  referring to Exhibit 6 of Exhibit 1, and
18  you're referring to the -- some of the
19  brokerage firms that are listed as having
20  issued reports prior to the class period;
21  is that right?
22     A.  Correct.
23     Q.  Okay. Is there anything
24  else?
25     A.  No.
```

Page 116

```
 1          Dr. Adam Werner
 2     Q.  During this last break, did
 3  you and Mr. Strauss discuss anything that
 4  bears upon any of my prior questions or
 5  any of your prior answers?
 6     A.  I believe we discussed
 7  analyst coverage.
 8     Q.  Anything else?
 9     A.  Not that I can think of.
10     Q.  Let's come back, for a
11  moment, to the test period that we were
12  discussing.
13          I don't have any questions on
14  the press release, just -- on Exhibit 2,
15  but I wanted to show it to you just to
16  show you that it's dated November 13th,
17  if you see at the beginning of the press
18  release there's a date, (indicating),
19  that was the only purpose of me showing
20  that to you at this point.
21     A.  Right. But, in this press
22  release that is issued on November 13th,
23  it specifies: On November 12th, 2012,
24  Hi-Crush formally terminated the supply
25  agreement and filed suit in the State
```

Page 117

```
 1          Dr. Adam Werner
 2  District Court of the Harris County, that
 3  in and of itself is information.
 4     Q.  I'm not disagreeing with you.
 5  The only question is when was that
 6  information released to the market, and
 7  the date of the press release is November
 8  13th.
 9          That's -- that was the only
10  thing --
11     A.  But the lawsuit was filed on
12  the 12th.
13     Q.  Correct.
14     A.  That information -- the fact
15  that the lawsuit was filed on the 12th
16  would be conveyed to the market on the
17  12th, if the market was still open, or in
18  terms of the calendar day, which seems to
19  be what you're focusing on here, that was
20  released on the 12th, that information
21  about the lawsuit, the fact that a
22  lawsuit had been filed would have been
23  information on the 12th.
24     Q.  Is it your opinion, or -- I
25  mean -- I mean, because I want to make
```

30 (Pages 114 - 117)

Page 118

```
 1           Dr. Adam Werner
 2  sure I'm understanding you now, is it
 3  your opinion that the market was aware
 4  that the lawsuit had been filed on
 5  November 12th?
 6     A.   Define "the market".
 7     Q.   You used the word "market" in
 8  your answer.
 9     A.   Well -- uh -- during -- I
10  defined "the market" as during trading
11  hours, and I do not believe that the market
12  was aware of it on the 12th --
13     Q.   Okay.
14     A.   -- during trading hours.
15           Anyone who owned shares in a
16  stock, who lives 24 hours a day, though,
17  may have seen this information after the
18  market closed.
19     Q.   Are you aware of any
20  published information on the internet --
21  analyst reports, news reports, Motley
22  Fool, Seeking Alpha -- any other source
23  of information, that reported, on
24  November 12th, whether it be during or
25  after market hours, that Hi-Crush had
```

Page 119

```
 1           Dr. Adam Werner
 2  filed a lawsuit against Baker Hughes.
 3     A.   I don't believe so, but hold
 4  on a second, let me review Appendix A.
 5  (Pause.)
 6           I don't believe so.
 7     Q.   And stay with Appendix A for
 8  a moment, if you don't mind.
 9           So, looking at the date of
10  November 12th, did the -- in your event
11  study, did your -- I'm sorry, this is
12  your event study; right?
13     A.   Yes.
14     Q.   Okay.  Did the price of the
15  stock move on November 12th in a manner
16  that suggests to you that the market
17  absorbed the news of the filing of that
18  lawsuit?
19     A.   Did it move in a way --
20     Q.   In a -- let me use your
21  lingo, if you don't mind, so I'm using it
22  right -- did it move in a statistically-
23  significant way on November 12th, 2012?
24     A.   It did not.
25     Q.   Okay.  So let's stay -- well,
```

Page 120

```
 1           Dr. Adam Werner
 2  let's talk about -- I want to talk more
 3  about the test period, because you
 4  explained that there -- that you didn't
 5  feel there was -- well, you said you
 6  thought that if you had used the period
 7  of September 19th to -- September 9th,
 8  2012, through November 12th, 2012, that
 9  our experts would have criticized you as
10  using an insufficient period of time; is
11  that right?  Is that fair?
12     A.   Well, with regards to the
13  release --
14     Q.   Right.
15     A.   -- of information.
16     Q.   So, that's why you said you
17  used an extended period of time.
18           Is there anything about the
19  one-year period, is there any reason why
20  you went one year out from November -- I
21  guess November 13th, 2012, to November
22  13th, 2013?
23     A.   I mean, most -- many event
24  studies use a one-year window to measure
25  as a measurement of time.
```

Page 121

```
 1           Dr. Adam Werner
 2     Q.   So you didn't look at a
 3  different period of time and then, you
 4  know, sort of cherry pick that one-year
 5  period, because that was a favorable time
 6  period; did you?
 7     A.   No.
 8     Q.   Now, when you look at the
 9  period outside of the class period,
10  right, so you're looking at that November
11  13, 2012 to November 12th, 2013, is it
12  your opinion that if the market for the
13  stock was efficient during that time
14  period or some, you know, time period
15  other than the class period that's at
16  issue, that means that the market was
17  also efficient during the class period?
18           MR. STRAUSS:  Objection.
19     Q.   That was a bad question.  Let
20  me rephrase the question.
21     A.   Okay, I was going to say --
22     Q.   Let me ask it more generally,
23  and then we'll get specific.
24           What I'm trying to get at is,
25  in your opinion, if the market for the
```

31 (Pages 118 - 121)

Page 122

Dr. Adam Werner

1
2  stock is efficient in one time period,
3  does that mean it is always efficient?
4        MR. STRAUSS: Objection.
5    A.  I don't know how to answer
6  that.
7    Q.  Why?
8    A.  I mean, I don't know how to
9  answer it.
10       That's my answer.
11   Q.  Okay, then let's talk
12  specifically.
13       Do you agree with me that, in
14  your event study, Appendix A to Exhibit
15  1, there are no statistically-significant
16  dates during the class period?
17       So that's September 19, 2012
18  through November 12, 2012.
19       And let me just further say
20  that I'm drawing that conclusion because
21  I don't see any asterisks during the
22  during the -- during that time period, on
23  any of the dates, and I do see numerous
24  asterisks for the subsequent period of
25  November 13th, 2012 through November

Page 123

Dr. Adam Werner

1
2  13th, 2013, so I'm assuming -- sorry,
3  it's very long -- but I'm assuming that
4  the asterisks signify a statistically-
5  significant date.  Is that a fair
6  assumption?
7    A.  That is a fair assumption.
8    Q.  Now, after that long-winded
9  question, my question to you is, are
10  there any statistically-significant dates
11  during the class period.
12   A.  During the class period,
13  again, I'm using your definition, or
14  everyone's definition --
15   Q.  Right.
16   A.  -- of September 19th through
17  November 12th, no.
18   Q.  Okay.  So is it fair to say
19  that your opinion in this case, that the
20  market is efficient -- was efficient
21  during the class period, is based on your
22  observation of efficiency during the
23  subsequent period of November -- you
24  know, when I say "subsequent period",
25  it's part of your test period, but it's

Page 124

Dr. Adam Werner

1
2  outside the class period, that's what I'm
3  trying to say by "subsequent period".
4    A.  That informs my opinion.
5    Q.  And, now, coming back to my
6  original question, that you said you
7  didn't know how to answer it, can you
8  explain to me how you're able to
9  conclude, based on the presence of
10  statistically-significant events during
11  this subsequent period -- can we just
12  have an understanding that that means
13  November 13, 2012 through November 13,
14  2013?
15   A.  Okay.
16   Q.  How does that form your
17  opinion that the market was efficient
18  during the class period?
19   A.  Well, there are no -- I mean,
20  I don't -- you're right, I don't see any
21  statistically-significant price
22  movements, but there was also no
23  significant news issued during that
24  period.
25       So, I mean, if I saw all

Page 125

Dr. Adam Werner

1
2  sorts of crazy stock price movements on
3  no information, that might inform me that
4  the stock wasn't efficient.
5    Q.  So, I understand -- I think I
6  understand what you're saying -- so is it
7  fair to say that you're drawing an
8  inference based upon your observation of
9  the subsequent time period that the
10  market was also efficient during the
11  class period?
12   A.  That's part of it.  Again, it
13  informs my opinion.
14   Q.  What else informs your
15  opinion, besides that?
16   A.  Well, I can look at the
17  analyst coverage during the class period,
18  trading volume during the class period,
19  the fact that it was traded on the NYSE,
20  it had a designated market maker, a $290
21  million company, the bid/ask spread was
22  less than I believe -- I believe it was
23  .49 percent, but I don't recall off the
24  top of my head, which is less than the 2
25  percent threshold established in other

32 (Pages 122 - 125)

Page 126

1    Dr. Adam Werner
2 court cases -- um -- (pause) -- let's
3 see -- we can go -- well, those are
4 certainly examples of things that inform
5 my opinion, the absence of auto-
6 correlation --
7    THE WITNESS: And this one is
8 a tough one, "autocorrelation" --
9 A-U-T-O-C-O-R-R-E-L-A-T-I-O-N.
10    Q. So, essentially, the
11 other -- and, again, I take it you are
12 referring or -- referring to or
13 consulting your opinion, your
14 declaration, paragraph 4, for those items
15 you just listed to me, they're listed
16 here among the letters under the
17 paragraph 4; is that right?
18    A. I believe so.
19    Q. Okay.
20    A. I mean, I was doing it off
21 the top of my head at the time, but I
22 believe that was correct.
23    Q. All right. We're going to
24 come to -- we're going to talk about a
25 bunch of those as we move forward, but

Page 127

1    Dr. Adam Werner
2 it's fair to say -- so I just wanted to
3 make an understanding, though, that the
4 event study itself, though, is being used
5 as an inference, that piece of your
6 analysis is being used as an inference
7 for the class period.
8    A. I don't -- I guess I don't
9 understand the question because the
10 event -- the event study is the time
11 period that you look at with regards to
12 information.
13    What you're defining is the
14 "event window" in which you estimate the
15 event study, but you then use that, those
16 results, to look at -- you can look at a
17 broader period.
18    So I'm not quite under-
19 standing what you're talking about.
20    Q. The "event window", is that
21 the -- what do you consider the "event
22 window" in this case?
23    A. November 13th, 2012 to
24 November 13th, 2013.
25    That's the time that the --

Page 128

1    Dr. Adam Werner
2 I'll leave it at that.
3    Q. Let's stay with Appendix A
4 for a moment.
5    Just looking at the first
6 four entries, I notice that the data on
7 the first four trading -- you know, the
8 first four trading dates that you list
9 there: September 19th, September 20th,
10 September 21, and September 24, is all
11 identical, and that strikes me as maybe
12 an error; is that --
13    A. I believe that is an error.
14    Q. Okay.
15    A. But I also -- I do know there
16 was no statistically-significant price
17 movements on those dates.
18    Q. But the data was not
19 replicated like this on those four days;
20 was it? The trading day, the volume, the
21 price, the return?
22    A. As I sit here, I don't know,
23 but I believe that you are correct.
24    Q. Just -- and just coming back
25 to your definition of "event window", for

Page 129

1    Dr. Adam Werner
2 purposes of looking at Exhibit 7 --
3    A. Oh.
4    Q. -- my --
5    A. I just marked this, I'm
6 sorry.
7    Q. That's okay.
8    MR. PARADISE: For the
9 record, we'll note that the witness
10 marked --
11    Q. What is that? What page is
12 that?
13    A. Appendix A, the first page of
14 Appendix A.
15    MR. PARADISE: Off the
16 record.
17    (Discussion off the record.)
18    Q. Take a look at Exhibit 7 for
19 a moment.
20    I just want -- on this event
21 study time period -- I mean -- sorry, the
22 "event window", on Exhibit 7, the period
23 that you put down there is November 14,
24 2012 to November 13th. I don't know if
25 that's also just a typo?

33 (Pages 126 - 129)

Page 130

```
 1          Dr. Adam Werner
 2    A.  No, that is November 4th -- I
 3 did not include the price reaction on
 4 November 13th in my analysis.
 5    Q.  I'm looking at yours. Does
 6 yours say November 14? Oh, okay.
 7          So the reason why you used
 8 that is -- could you just explain that
 9 again, why you didn't look at November
10 13th?
11    A.  I did look at November
12 13th in my -- I guess my confusion is, is
13 you -- I'm not understanding your
14 definition of an "event study".
15          Could you define what you
16 mean by "event study"?
17    Q.  Well, the only thing I mean
18 by "event study" is whatever you mean,
19 quite frankly, your event study.
20    A.  Well, okay. So I did
21 estimate it -- I did some regression
22 analysis over this time period, but the
23 event study encapsulates the class
24 period.
25    Q.  Yes, I understand that.
```

Page 131

```
 1          Dr. Adam Werner
 2          You mentioned "event window"
 3 before, and you said -- the period you
 4 told me was November 13th, 2012 to
 5 November --
 6    A.  That was -
 7    Q.  -- 12th, 2013.
 8          I'm just trying to understand
 9 why here it's November 14th.
10    A.  It is No-- because I should
11 have said November 14th.
12    Q.  That's what I'm getting at,
13 okay.
14          And, just so I understand,
15 why don't you start with November 13th --
16    A.  Because --
17    Q.  -- 2012.
18    A.  Right.
19          Because that was the day
20 where large information was released to
21 the market. Including that day would
22 probably -- I don't want to say "mess
23 up" --
24    Q.  Skew?
25    A.  It might skew my analysis --
```

Page 132

```
 1          Dr. Adam Werner
 2 (gesturing).
 3    Q.  Back to Appendix A for a
 4 second.
 5          So, with respect to the dates
 6 that are asterisked, my -- from reading
 7 your declaration and observing or
 8 reviewing your event study, my
 9 observation is that you starred those
10 days and have a t-stat of greater or --
11 greater -- equal to or greater than one
12 absent value of 1.96; is that --
13    A.  I believe that is --
14    Q.  -- correct?
15    A.  -- correct.
16    Q.  And that's -- if I'm reading
17 your report correctly, that corresponds
18 to a confidence level of 95 percent; is
19 that right?
20    A.  Correct.
21    Q.  Okay. Why do you -- why is
22 that the confidence level that you chose
23 to use?
24    A.  Oftentimes, that's the
25 confidence level that an economist will
```

Page 133

```
 1          Dr. Adam Werner
 2 use in doing an econometric analysis.
 3    Q.  Other times, in your report,
 4 I see references to a 99 percent
 5 confidence level and I also saw some
 6 references to a 90 percent confidence
 7 level.
 8          99 percent, obviously, is
 9 higher than 95 percent, but do you also
10 consider, in certain circumstances, in
11 this report -- in this declaration, I
12 keep calling it a "report" -- in this
13 declaration, do you consider some of the
14 events that had a statistical
15 significance of -- I'm sorry -- the
16 confidence level of 90 percent, to be
17 statistically-significant?
18    A.  "The events"?
19    Q.  Or -- let me -- maybe I
20 should show you specifically what I'm
21 talking about. It may be easier that
22 way.
23          For example, look at
24 paragraph 49 for a moment.
25    A.  (Pause.)
```

34 (Pages 130 - 133)

Page 134

1        Dr. Adam Werner
2        Okay.
3        Q.   Please read as much of it as
4   you would like, but the sentence to which
5   I was referring, or am referring, is the
6   fourth sentence, beginning with: The
7   coefficient?
8        A.   Right.
9        Q.   So there you see a
10  statistically-- it says: Statistically-
11  significant at a 90 percent confidence
12  level.
13          I'm just curious as to how
14  you would -- how you reconcile the 95
15  percent confidence level with the 90
16  percent confidence level for purposes of
17  determining how something is
18  statistically-significant.
19          MR. STRAUSS: Objection.
20       Q.   If you do.
21       A.   It's what the confidence
22  level is, it's 90 percent for this
23  observation, or in this analysis. I
24  don't know what else to tell you about
25  that.

Page 135

1        Dr. Adam Werner
2          I mean, by definition, it's
3   statistically significant that a 90
4   percent confidence level.
5        Q.   What does that mean with
6   respect to your opinion about the
7   efficiency of the market? I.e. that it's
8   statistically significant at a 90 percent
9   level versus being statistically
10  significant at a 95 percent confidence
11  level, if anything?
12          MR. STRAUSS: Objection.
13       Which -- what are you specifically
14       referring to?
15          MR. PARADISE: Paragraph 49,
16       where it refers to the t-stat of
17       1.67 being statistically
18       significant at 90 percent
19       confidence level and then, later
20       on, in that same paragraph, Dr.
21       Werner says that the common stock
22       returns are -- I'm going to just
23       read it: highly sensitive to
24       movements in the market index and
25       fairly sensitive -- parenthetical --

Page 136

1        Dr. Adam Werner
2   at a 90 percent confidence level --
3   closed parentheses -- to the
4   net-of-market industry index over
5   the event window.
6        Q.   I'm just trying to understand
7   if it has any meaning with respect to
8   your overall opinion about the efficiency
9   of the market.
10          MR. STRAUSS: Objection.
11       A.   I believe it informs my
12  opinion.
13       Q.   And does it support your
14  opinion?
15       A.   I don't think that one piece
16  of information supports or does not
17  support my opinion.
18       Q.   Do you remember, is 90
19  percent rounded? Is that a rounded
20  number there?
21          And if you take a look at
22  Exhibit 7, because --
23       A.   I believe it might have been.
24       Q.   Okay. Is that acceptable, to
25  round up like that? Because I think,

Page 137

1        Dr. Adam Werner
2   technically, it was at 89.6 percent. If
3   you look at Exhibit 7, you have this peak
4   greater than an absolute value of T of
5   .104, so --
6        A.   I'm sorry, what exhibit?
7        Q.   Exhibit 7.
8          MR. PARADISE: Off the
9       record.
10       Q.   If I'm doing my math correct,
11  it's actually a .89 -- .896, and I just
12  want to make sure that you're rounding up
13  to 90?
14       A.   You are correct.
15       Q.   And just because I'm not the
16  expert, that's acceptable, in your
17  experience, to round up to 90 percent?
18       A.   I don't -- I've never
19  seen -- I don't know whether it's
20  acceptable or unacceptable.
21          I mean, tech-- you're more
22  than welcome to change that to 89.6.
23       Q.   That wouldn't change your
24  opinion; is that --
25       A.   No.

35 (Pages 134 - 137)

Page 138

Dr. Adam Werner

1
2  Q. Okay. In terms of the five
3  Cammer factors that you analyzed, do you
4  consider any one of the five factors to
5  be more important than any other?
6  A. "More important" from what
7  perspective?
8  Q. More important or more
9  valuable in determining market
10  efficiency.
11  A. I believe factor five is more
12  informative than the other factors.
13  Q. In factor five -- let's just
14  turn to your declaration for a moment.
15  It is discussed at the beginning on page
16  24, am I right, paragraph 61?
17  A. I think it started earlier.
18  MS. BRANDON: Page 16.
19  MR. KEABLE: Page 16.
20  Q. You're right, I apologize,
21  page 16.
22  A. Right.
23  Q. Okay. All right. I'm
24  looking at the exhibits that I think
25  correspond to your analysis of factor

Page 139

Dr. Adam Werner

1
2  five, which I believe are Exhibits 7 and
3  8.
4  Is that -- am I right about
5  that?
6  A. There are many exhibits,
7  there's more exhibits than that, I
8  believe.
9  Exhibit 7 through -- I
10  believe, Exhibit 13 -- through Exhibit
11  13, speaks to factor five.
12  Q. I'm just looking -- I'm
13  trying to get an understanding as to the
14  time periods that you used for these
15  various analyses that you performed.
16  So I see that in Exhibit 7
17  and Exhibit 8 you use the period of
18  November 14th through November 13th,
19  which is a portion of your test period,
20  but for Exhibits 9, 10, 11, 12, and 13
21  you used the entire test period -- and
22  14, I apologize, and 14.
23  I'm just trying to get an
24  understanding as to why it is that you
25  used the different periods for these --

Page 140

Dr. Adam Werner

1
2  for Exhibits 7 and 8 than you did for the
3  remainder of the exhibits.
4  A. I think this goes to the
5  question that we discussed earlier, about
6  the definition of an "event study".
7  Q. Could you enlighten me again,
8  if you don't mind?
9  A. The control period is from
10  November 14, 2012 to November 13, 2013.
11  That's where I performed my regression
12  analysis.
13  Q. And that's the control
14  period, because you -- I think, if I
15  understood you earlier, you wanted to
16  eliminate the 13th because you thought
17  that might skew the results, and this is
18  a period that doesn't have an event that
19  would skew the results. Is that the
20  idea?
21  A. I don't know if this has an
22  event that would skew the results or not,
23  but as this -- as the 13th is the largest
24  stock price movement, at least during
25  this entire period, I chose not to

Page 141

Dr. Adam Werner

1
2  include that.
3  Alternatively, I could have
4  used -- I could have included that date
5  and used the dummy variable to correct
6  for that large fluctuation in price.
7  Q. And excuse my naivete here
8  but, with respect to the exhibits beyond
9  Exhibits 7 and 8, so Exhibits 9 through
10  14, the reason that you were able to use
11  the entire test period, because you were
12  not performing your regression analysis
13  in those exhibits? Is that -- am I
14  understanding you?
15  I'm just trying to understand
16  why it's okay to use the longer period
17  for those other exhibits but, the shorter
18  period, you felt it was important to use
19  the shorter period for the Exhibits 7 and
20  8.
21  A. I mean, I'm look-- I use the
22  longer periods because I'm interested in
23  how the stock price reacts to information
24  during those periods.
25  Q. But for Exhibits 7 and 8,

36 (Pages 138 - 141)

Page 142

1          Dr. Adam Werner
2  you're not interested in that?
3          That's what I'm trying to
4  understand.
5      A.   So, the nature of an event
6  study is to test whether a stock responds
7  to news; right? And normally what you
8  want to do is you want to use a clean
9  period, which isn't -- which does not
10 have some kind of -- you know, I'm not
11 even quite sure how to explain it.
12         What I did was the standard
13 event study methodology. It is what it
14 is.
15     Q.   And is this like an outlier
16 event? You're trying to eliminate like
17 an outlier event?
18         Is that the idea?
19     A.   Well, I don't want to use the
20 term "outlier", but you --
21     Q.   In other words --
22     A.   You try to --
23     Q.   -- an aberrational --
24     A.   It's like any statistical
25 test that you do; right?

Page 143

1          Dr. Adam Werner
2          I want a control period and
3  then I look at my sample period. I used
4  the control period, so it doesn't --
5  whatever happens in the other period
6  doesn't influence my control period.
7      Q.   Okay. And your control
8  period --
9      A.   But it's like any scientific
10 experiment.
11         MR. PARADISE: Off the
12     record.
13         (Discussion off the record.)
14     Q.   I just want to ask you, just
15 the two terms you used there, I want to
16 make sure that I understand what you mean
17 by it.
18         So the "control period", for
19 these purposes, means the period of
20 November 14th, 2012 to November 13th,
21 2013; correct?
22     A.   I --
23         MR. STRAUSS: I think it's
24     November 14th.
25         MR. PARADISE: Right, I said

Page 144

1          Dr. Adam Werner
2  November 14th, 2012 to November
3  13th, 2013.
4      A.   I believe that is correct.
5      Q.   And the sample -- and you
6  also mentioned a sample period.
7          So --
8      A.   Well --
9      Q.   -- what period is that?
10     A.   That was my misuse of the
11 language.
12     Q.   Okay.
13     A.   That, I should have said the
14 period in which I want a study how
15 information impacts the stock price.
16     Q.   And is that the test period,
17 the full test period?
18     A.   That is the full test period.
19     Q.   Got it, okay.
20         MR. PARADISE: Take a break?
21         MR. STRAUSS: Yes.
22         MR. PARADISE: Do you want to
23     break for lunch?
24         (Luncheon recess: 12:50 p.m.)
25

Page 145

1          Dr. Adam Werner
2    A F T E R N O O N   S E S S I O N
3          (1:43 p.m.)
4
5  DR. ADAM WERNER,
6  resumed, having been previously duly
7  sworn, was examined and testified as
8  follows:
9
10         MR. PARADISE: Dr. Werner has
11     indicated that he'd like to
12     clarify, or attempt to clarify, a
13     prior answer.
14 CONTINUED EXAMINATION
15 BY MR. PARADISE:
16     Q.   Go ahead, please.
17     A.   Yeah, I think I was just --
18 before the break, my blood sugar was
19 crashing, I think I was fairly
20 inarticulate with regards to how one
21 conducts an event study.
22         So I just wanted to point to
23 something like -- I mean, the methodology
24 I use is very similar to that used in
25 the -- this St. John Law Review article,

37 (Pages 142 - 145)

Page 146

```
1              Dr. Adam Werner
2  by Ferrillo, Tabak, and Dunbar, that I
3  cited in my report.
4              There are other examples that
5  I can point to that mirror discussions of
6  this type of methodology.
7      Q.  And, just to be clear, the
8  type of methodology you mean is the --
9  what you described as the use of a
10 control period, as opposed to the --
11     A.  Okay, can I have the article?
12     Q.  Yeah, sure, I want to make
13 sure I understand what you're clarifying,
14 because I thought I understood your
15 answer.
16     A.  Oh.
17     Q.  So you talked about a control
18 period and then another period, which is
19 the period that you're evaluating, which
20 I guess here would be the class period.
21 Is that --
22     A.  Well, that would be the test
23 period.
24     Q.  Right.
25     A.  I evaluate the test period --
```

Page 147

```
1              Dr. Adam Werner
2      Q.  Okay.
3      A.  -- which includes the class
4  period.
5      Q.  Got it. Thank you.
6              I want to come back to your
7  declaration and some of the other Cammer
8  factors, because we spent a lot -- a
9  bunch of time on factor five, which I
10 want to come back to, as well, but I want
11 to just get some of these other ones on
12 the record, for a second, and make sure
13 that I understand what's going on with
14 these other exhibits, if you will.
15             So starting with -- Exhibit
16 3.
17     A.  Is it Exhibit 3 to Exhibit 1?
18     Q.  Yes.
19             If you could just explain
20 what Exhibit 3 is showing or what
21 conclusions you reached based on Exhibit
22 3 or --
23     A.  It's just more support with
24 regards to the efficiency of the market
25 for Hi-Crush.
```

Page 148

```
1              Dr. Adam Werner
2      Q.  Does it apply to any one of
3  the five Cammer factors?
4      A.  Well, you have volume, which
5  Cammer factor one I believe is average
6  weekly volume. Bid/ask spread deals
7  with -- that's a Krogman factor, I
8  believe.
9      Q.  Could you spell that?
10     A.  Yeah, K-R-O-G-M-A-N.
11             Market capitalization, that
12 goes to factor four as well as I believe
13 that's another -- I should say Cammer
14 factor four -- as well as a Krogman
15 factor.
16     Q.  Is Krogman a court decision
17 or is that an academic person?
18     A.  Oh, it's a court decision.
19             Here, I can --
20     Q.  Look at -- if you would, look
21 at the second page of Exhibit 3, on the
22 back -- I don't know if it's double-
23 sided -- yeah, it's double-sided -- the
24 line that's dated October 31, 2012,
25 there's a couple of places in there where
```

Page 149

```
1              Dr. Adam Werner
2  you have no data, and I just want to make
3  sure, is that an error, is that a
4  mistake?
5      A.  No, Bloomberg did not have
6  data.
7      Q.  Oh, couldn't you compute
8  the -- for example, couldn't you compute
9  the day's average bid/ask spread based on
10 the information that you do have?
11     A.  No. We get all the bid/ask
12 spread data from Bloomberg.
13     Q.  Okay. So when it says: No
14 data, across October 31, in three places,
15 that just meant that there's no data
16 available from Bloomberg.
17     A.  Correct.
18     Q.  So, I'm sorry, look at the
19 column that's headed: Percentage of
20 outstanding shares sold short. And
21 there's a formula there: C equals A
22 divided by B.
23             So, that one, you could have
24 just divided A by B; right?
25     A.  I believe, technically, that
```

38 (Pages 146 - 149)

Page 150

1          Dr. Adam Werner
2   is correct.
3          I -- yeah, we get those
4   numbers from Bloomberg, as well. I
5   mean -- yes, I --
6      Q.   I just want to make --
7      A.   -- could have calculated.
8      Q.   Again, just for the purpose
9   of making sure I understand why it said
10  no data.
11     A.   As I sit here now, it's going
12  to be 1.25 percent.
13     Q.   Exhibit 4 is just a
14  straight -- is that just a straight
15  computation that's made based upon data
16  that you obtained from some other source
17  or is that --
18     A.   Correct.
19     Q.   Okay. Let's look at Exhibit
20  5 for a second.
21          The number that you have for
22  the line: Average traded volume per
23  year, I went back with my trusty old
24  HP 12C, and did some math here, and I
25  believe that I found a mistake, and I

Page 151

1          Dr. Adam Werner
2   just want to make sure you agree with me.
3          Do you have a calculator? I
4   think we have --
5      A.   I can't use that thing.
6      Q.   Do you want to use this,
7   (indicating)?
8      A.   I can get my computer out and
9   use it itself, that's --
10     Q.   Sure.
11          MR. PARADISE: Off the
12  record.
13          (Discussion off the record.)
14     Q.   Just look at: Average traded
15  volume per year, F equals E divided by D.
16          And, when I ran that
17  calculation, I came up with a much
18  different number. I came up with
19  36,674,570. So I'm wanting to just make
20  sure, is that an error or is that -- am I
21  doing something wrong?
22     A.   Class period -- (pause) --
23  (using calculator) -- no, you -- that is
24  an error.
25     Q.   Does that -- just speed this

Page 152

1          Dr. Adam Werner
2   along, I'll tell you that, rerunning the
3   rest of the calculations, I came up with
4   a turnover -- analyzed turnover, of 269
5   percent.
6      A.   I believe -- that looks like
7   it would be in the ballpark.
8      Q.   Would that have any impact on
9   your ultimate opinion in this case?
10     A.   No. It's still part of the
11  NYSE average, of 67 percent.
12     Q.   I meant to ask you earlier,
13  have you -- in reviewing this, have you
14  reviewed the declaration, Exhibit 1,
15  since you've submitted it?
16          Like, for example, did you
17  review it in preparing for today?
18     A.   "This" (indicating) being
19  Exhibit 1?
20     Q.   Yes.
21     A.   I believe so.
22     Q.   Did you discover any errors
23  or mistakes that needed to be corrected?
24     A.   Obviously not.
25     Q.   I just wanted to get an

Page 153

1          Dr. Adam Werner
2   understanding as to whether there are any
3   others that I might not have seen.
4          Okay. Turning to page 2 of
5   your Exhibit 1, page 2 of Exhibit 1,
6   where you list the various bases for your
7   finding of market efficiency, I want to
8   talk for a moment about the letter E,
9   which is the strong correlation between
10  Hi-Crush's common unit price and the
11  movement in the market and the industry
12  indices.
13          You chose -- for the industry
14  indice that you compared Hi-Crush to, you
15  chose the Dow Jones -- if I'm
16  understanding correctly, you chose the
17  Dow Jones Mining Industry --
18     A.   I believe --
19     Q.   -- Index?
20     A.   -- that is correct.
21     Q.   Why did you choose the Mining
22  Industry Index?
23     A.   I believe that was -- one of
24  the reasons was Hi-Crush was included in
25  it.

39 (Pages 150 - 153)

Page 154

Dr. Adam Werner

1        Dr. Adam Werner
2        I should say that, in doing
3   my analysis, I excluded Hi-Crush from the
4   index.
5     Q.   Do you know what the date of
6   the -- withdrawn.
7        The companies that are
8   included in indexes change over time, so
9   I'm trying to get an understanding as to
10  what date, you know, of the index you
11  looked at or examined, because the
12  indexes that I pulled up did not indicate
13  that Hi-Crush is part of the index.  And
14  we can show it to you, but I don't know
15  if this is the one that you used, and you
16  might have used something different, I
17  don't know.
18      MR. PARADISE: Let's mark
19  this as Exhibit 3.
20      (Whereupon Deposition Exhibit
21    3, Document, DJUSMG Index, as of
22    January 18th, 2013, was marked for
23    identification, as of this date.)
24    A.   Yeah -- no, this isn't.
25    Q.   This is -- I'm going to try

Page 155

Dr. Adam Werner

1
2   to find a date for you here, this is --
3   this is as of January 18th, 2013, so it's
4   during your test period.
5     A.   Right, no, this is not the
6   index we used.
7       It was much larger, it was a
8   more general -- I'll have to check with
9   my analyst, but I know there was
10  something like 200 components in the
11  index --
12    Q.   Okay.
13    A.   -- we used.
14    Q.   I appreciate it.
15      MR. PARADISE: Mark, if you
16  could, I don't know if that's
17  been -- I don't think that's been
18  produced. If so --
19      MR. STRAUSS: We'll identify
20    it.
21      MR. PARADISE: I appreciate
22    that.
23    Q.   But, as best -- as you sit
24  here today, the best of your
25  recollection, Hi-Crush was one of the

Page 156

Dr. Adam Werner

1        Dr. Adam Werner
2   companies within this index.
3     A.   Correct.
4     Q.   Okay.
5     A.   Correct.
6     Q.   You mentioned that you
7   excluded Hi-Crush from the index that you
8   used, but did you exclude any other
9   companies or is it just --
10    A.   Just Hi-Crush.
11      MR. PARADISE: So we'll
12    need -- just for the record, we'll
13    need to see what the index was, I
14    guess, and then we can make the
15    assumption that Hi-Crush was
16    eliminated.
17      MR. STRAUSS: Sure.
18    Q.   And then I guess the
19  weighting, was this a weighted index?
20    A.   Equally weighted.
21    Q.   Oh, it was equally weighted,
22  so it's not like --
23    A.   Like I said, it was like 200
24  companies --
25    Q.   Right, right, right.  I got

Page 157

Dr. Adam Werner

1        Dr. Adam Werner
2   you.
3     A.   It was not like a small
4   sample.
5     Q.   Okay.
6     A.   In fact, I mean, I can e-mail
7   someone in my office, if you want.
8     Q.   Oh, that would be great, if
9   you could.  You can do that on a break,
10  too, if you want.
11      I'm just trying to find in
12  your report where you discuss this index,
13  because I thought --
14      MR. KEABLE: Paragraph 44,
15    page 17.
16    Q.   Okay, just paragraph 44, you
17  call it the Dow Jones U.S. Mining Index,
18  which is what I thought this was, but
19  perhaps there's another version of it, or
20  something, because this is clearly a
21  weighted index.
22    A.   Right.
23    Q.   All right, we'll come back to
24  that.  If you're able to get it, we'll
25  come back to that.

40 (Pages 154 - 157)

Page 158

1         Dr. Adam Werner
2         Maybe this might be it.
3    Let's see if this is it.
4         MR. PARADISE: Will you
5    please mark this as Exhibit 4.
6         (Whereupon Deposition Exhibit
7    4, Document, Dow Jones U.S. Mining
8    Index, with a list of the
9    companies, was marked for
10   identification, as of this date.)
11   Q.   So the court reporter has
12   handed you what's been marked as Exhibit
13   4.
14        Is this the index?
15   A.   I believe so.
16   Q.   So, obviously, this is --
17   Exhibit 4 is a list of the companies.
18        And I take it, then, that you
19   have some other information that shows
20   you the performance of these stocks? In
21   other words, that you're comparing the
22   performance of these stock to Hi-Crush
23   stock.
24   A.   I believe that's what a
25   regression analysis does.

Page 159

1         Dr. Adam Werner
2    Q.   Right. So, what I'm saying
3    is, do you have something that gave you
4    the performance of this -- of these -- of
5    this basket of companies over that period
6    of time?
7    A.   I believe so.
8    Q.   I mean, is that something
9    that you had to create or is that
10   something that you were able to go to
11   Bloomberg or to some other source?
12   A.   To the extent that I could
13   use Bloomberg but then I had to remove
14   Hi-Crush.
15   Q.   What I mean, though, is does
16   Bloomberg like report --
17   A.   Yes.
18   Q.   -- as in the aggregate the
19   performance of that basket of stocks or
20   did you have to go and manually do that
21   to come up with your measurement?
22   A.   I believe Bloomberg includes
23   them.
24   Q.   No, it's not a trick
25   question.

Page 160

1         Dr. Adam Werner
2    A.   I know.
3    Q.   What I'm trying to understand
4    is, because Exhibit 3, you know, clearly,
5    you can see that this is some sort of a
6    basket that was created by Dow Jones, and
7    its easy to see that they must have
8    some -- the stock price movement of
9    these, of this index. I wasn't sure if
10   there was a similar thing for this longer
11   list.
12   A.   Oh, yeah.
13   Q.   Okay.
14   A.   Yes, I should say.
15   Q.   I'm just going to keep these
16   here. If you need to refer back, here
17   they are, (indicating).
18   A.   Okay.
19   Q.   In letter F, the speed -- you
20   say: The speed at which Hi-Crush's
21   common unit price reacted to news during
22   the test period.
23        Is that -- when you say
24   "news" there, are you referring to
25   Hi-Crush-specific news or any news?

Page 161

1         Dr. Adam Werner
2    A.   I believe, in this instance,
3    I'm talking about Hi-Crush-specific news.
4    Q.   And then the same question
5    for G. When you refer to "news days", as
6    compared to "non-news days", is that news
7    days reflecting Hi-Crush-specific news?
8    A.   Presumably.
9         I mean, it's possible that
10   there's some market news that included
11   Hi-Crush -- (gesturing).
12   Q.   Turning to paragraph 9, did
13   you write this paragraph?
14   A.   I believe this was drafted
15   for me.
16   Q.   By whom?
17   A.   Haley --
18   Q.   Somebody --
19   A.   -- Johnson.
20   Q.   Somebody at the firm?
21   A.   Yes.
22   Q.   Okay. The second -- I'm
23   sorry, the last sentence of paragraph 9
24   says, and I'll read it into the record:
25   This case arises in response to

41 (Pages 158 - 161)

Page 162

Dr. Adam Werner

1  information Hi-Crush failed to publicly
2  disclose during the third quarter of
3  2012.
4        Just to make sure we're
5  complete, what information are you
6  referring to there, that Hi-Crush failed
7  to publicly disclose?
8     A.   If you give me the
9  Consolidated Complaint, I'll be happy to
10 tell you.
11    Q.   Is it fair to say it's based
12 upon information that you took out of the
13 Amended Consolidated Complaint?
14    A.   I believe so.
15       MR. PARADISE: Let's mark
16    this as Exhibit 5.
17       (Whereupon Deposition Exhibit
18    5, Amended consolidated class
19    action complaint for violations of
20    the federal Securities Laws, was
21    marked for identification, as of
22    this date.)
23    Q.   To speed this along, you
24 reference -- in your footnote, you give a

Page 163

Dr. Adam Werner

1  citation to page 1 to 5 of the complaint.
2     A.   (Pause.)
3        Okay.
4     Q.   Can you tell me what
5  information you're referring to?
6     A.   Oh, the termination of the
7  Baker Hughes contract.
8     Q.   Which paragraph of the
9  Amended Consolidated Complaint are you
10 looking at?
11    A.   Well, I think it's discussed
12 throughout -- (pause) -- paragraph 7,
13 paragraph 8, paragraph 10, paragraph 9 --
14    Q.   I'm sorry, just slow down for
15 a second.
16       7, 8, 9, and 10.
17       So is it your testimony that
18 all of the information that's referred to
19 in those paragraphs, of the Amended
20 Complaint, should have been publicly
21 disclosed during the third quarter of
22 2012?
23       MR. STRAUSS: Objection.
24    A.   I don't know whether it

Page 164

Dr. Adam Werner

1  should or should not have been publicly
2  disclosed.
3     Q.   So you're essentially
4  accepting the allegations as set forth in
5  the Amended Complaint for purposes of
6  your analysis without making any
7  independent determination as to whether
8  those -- that information should or
9  should not have been disclosed; is that
10 fair to say?
11       MR. STRAUSS: Objection.
12    A.   I don't think I've --
13       MR. STRAUSS: So you're
14    asking him whether he's taking the
15    allegations as an assumption?
16       MR. PARADISE: Yes.
17       MR. STRAUSS: Are you taking
18    the allegations as an assumption?
19       THE WITNESS: I don't know.
20    A.   I'm not sure if -- I guess
21 so -- (gesturing) -- I mean, it doesn't
22 affect my -- it's an exclusion, so it
23 doesn't affect my analysis, either way.
24    Q.   What do you mean, by "it's an

Page 165

Dr. Adam Werner

1  exclusion"?
2     A.   They failed to --
3     Q.   Oh.
4     A.   -- make the announcement.
5     Q.   You mean an "omission"?
6     A.   An omission -- exclusion,
7  omission.
8     Q.   We looked at paragraph 12 a
9  little bit earlier, and I showed you the
10 press release, but we never looked at
11 them in conjunction with each other.  So
12 I'm going to ask you to take a look at
13 the press release for a moment.
14       In paragraph 12, as you
15 testified to earlier, and as it's
16 reflected in your declaration, you say
17 that: Hi-Crush disclosed the termination
18 of the supply agreement with Baker
19 Hughes, and then you go on from there to
20 say that: Hi-Crush said it had --
21 quote -- engaged in discussions with
22 Baker Hughes, but the parties were unable
23 to reach a mutually-satisfactory
24 resolution.

42 (Pages 162 - 165)

Page 166

1        Dr. Adam Werner
2        Are you aware of there being
3 any other information disclosed in the
4 November 13th press release that's not
5 reflected in paragraph 12 of your
6 declaration?
7        THE WITNESS: Could you
8 repeat the question, please?
9        (The record was read.)
10       MR. STRAUSS: Objection.
11   A.  I mean, was there additional
12 information released on that day?
13 Yeah -- they -- yes.
14   Q.  Did you do anything or make
15 any attempt to quantify the impact, if
16 any, of the disclosure of the additional
17 news on the stock price of Hi-Crush on
18 November 13th, 2012?
19   A.  "Quantify"? I don't believe
20 so.
21   Q.  Now, I had asked you earlier
22 if you had --
23   A.  But --
24   Q.  I'm sorry, go ahead.
25   A.  That having been said, there

Page 167

1        Dr. Adam Werner
2 was multiple news reports the next day
3 about people talking about the stock
4 tanking because of their failure to --
5 or, their agreement with Baker Hughes
6 having fallen apart, and there wasn't
7 very much other talk or discussion of the
8 financial results. That was the main
9 thing that people focused on.
10       So to the extent that there
11 was any effect, I'm not sure -- it might
12 very well be negligible.
13   Q.  Now, you had testified
14 earlier, you have not been asked to
15 express an opinion or do any work to
16 enable you to express an opinion as to
17 the loss that was suffered as a result of
18 the alleged fraud in this case; is that
19 correct?
20       MR. STRAUSS: Objection. I'm
21 sorry, could you repeat the
22 question?
23       (The record was read.)
24       MR. STRAUSS: What's your
25 question? That's not a question,

Page 168

1        Dr. Adam Werner
2 that's just a --
3   Q.  Is that -- is that correct?
4   A.  Um -- I'm not sure.
5        THE WITNESS: Can you -- I'm
6 sorry.
7   Q.  Let me -- this is -- what I'm
8 getting to here is damages.
9        You know, you -- as we went
10 through your CV earlier, there were a
11 number of cases where you've testified
12 about damages and a number of cases where
13 you've testified about market efficiency
14 and, of course, there are other cases.
15 And I had asked you earlier whether or
16 not you have been asked to do any work in
17 connection with damages in this case, and
18 I believe your answer was no.
19       So I'm just trying to make
20 sure that I'm right about that.
21   A.  I have not been asked to
22 opine on damages in this case.
23   Q.  But you have done on other
24 cases and you feel that you are capable
25 of doing so, if you were asked; correct?

Page 169

1        Dr. Adam Werner
2   A.  Correct.
3   Q.  If you were asked to express
4 an opinion about damages, would you feel
5 it's necessary to isolate the damage
6 that's caused by the alleged omission
7 from any other -- I'm sorry, withdrawn.
8        If you were asked to express
9 an opinion about damages in this case,
10 would you feel it necessary to separate
11 the loss caused by the alleged omission,
12 which was revealed on November 13th, from
13 other information that was revealed to
14 the market on November 13th?
15       MR. STRAUSS: Objection.
16   A.  I believe that's correct, but
17 that can go both ways. It could be
18 positive or negative.
19       Like if people thought that
20 the earnings were good, or if there was a
21 pleasant surprise, but for the
22 disclosure, you know, it's possible
23 damages would have been higher, if I
24 adjust for the fact that there is also
25 earnings --

43 (Pages 166 - 169)

Page 170

Dr. Adam Werner

1
2   Q.  Yeah, my question wasn't
3   meant to suggest higher or lower, it was
4   just that you would try to isolate the
5   harm caused by the alleged -- by the
6   revelation of the alleged truth.
7       A.  I believe that's correct.
8       Q.  Okay.  Now, let's go back to
9   the -- now I want to come back to the
10  fifth Cammer factor exhibit that we have
11  been going through this morning.
12      A.  Okay.
13      Q.  So starting -- I think we
14  covered -- we covered 7 and 8, so I
15  wanted to start for a second with 9 and
16  10, to make sure I understand them.
17      So looking at Exhibit 9,
18  which is the analysis of the speed --
19  sorry, let me start with 14.
20      A.  Exhibit 14?
21      Q.  Yes, please.
22      So -- and part of the reason
23  for this question is just to make sure
24  that this is accurate, because we've seen
25  a couple of -- and, by the way, nobody's

Page 171

Dr. Adam Werner

1
2   perfect, but we've seen a couple of
3   mistakes, and I just want to make sure
4   that this is accurate.
5       And the part that I'm asking
6   about is that there is a typo of
7   September, but I want to make sure that
8   the data you considered, in Exhibit 14,
9   is for that time period that's revealed
10  there, which is September 19th, 2012 to
11  November 12th, 2012.
12      Is that right?
13      A.  I read that as correct.
14      Q.  And that is the class period
15  as we've --
16      A.  As we've --
17      Q.  -- been discussing today.
18      A.  -- defined it, yes.
19      Q.  So why in this exhibit
20  (indicating) did you only look at the
21  class period and not your test period?
22      A.  Because, when I was looking
23  at my test period, I was -- that only
24  dealt with information.
25      Q.  By "information", you mean

Page 172

Dr. Adam Werner

1
2   market information, like news?
3       A.  Correct.
4       Q.  And you had mentioned earlier
5   that the September 19 to November 12
6   period, you felt if you had only used
7   that for your event study for Appendix A,
8   that you would have been criticized --
9   potentially criticized by Defendants'
10  experts.
11      Why do you not have the same
12  concern about Exhibit 14?
13      And, again, I'm not that
14  familiar with this stuff, so I'm not
15  asking as a trick, I'm just trying to
16  really understand the distinction.
17      A.  Well, this is the class
18  period, it's the period I looked at.
19      The problem is, when you're
20  doing an event study, you need events to
21  occur.  There was a lack of events during
22  the class period.  As a result, I --
23  again, I'd be happy to do an event study
24  just on the class period, but your --
25  someone might accuse me of cherry picking

Page 173

Dr. Adam Werner

1
2   my results.
3       Q.  And the number of
4   observations that's listed as 36, that
5   corresponds I believe to the -- is that
6   the number of trading days within that
7   period of September 19 through November
8   12, 2012?
9       A.  I believe it's either 36 or
10  37.
11      Q.  And, as far as you're
12  concerned -- I'm sorry, go ahead.
13      A.  In order to calculate
14  autocorrelation, you need two days of
15  prices.
16      Q.  So anything greater than two
17  is sufficient for this --
18      A.  No, that's not what I'm
19  saying.
20      Q.  Okay, I'm sorry.  Go ahead.
21      A.  I'm just -- it's strictly an
22  accounting thing --
23      Q.  But --
24      A.  -- I don't think we should
25  get hung up on.

44 (Pages 170 - 173)

Page 174

Dr. Adam Werner

1
2      Q.   No, but 36 is a sufficient
3   number of days to use to draw a
4   conclusion from an autocorrelation
5   analysis like this, (indicating)?
6      A.   I don't know if it's
7   sufficient or not.
8      Q.   Well, did you feel it was
9   sufficient in this instance?
10     A.   I feel that -- I felt that I
11   looked at whether or not there was
12   autocorrelation during the class period.
13   This suggests -- or, this shows that
14   there was no autocorrelation during the
15   class period.
16          I should also say that the
17   absence or inclusion of autocorrelation
18   does not necessarily -- if there is
19   autocorrelation in a stock price, it
20   doesn't necessarily mean that the stock
21   is inefficient.
22     Q.   But here, just to be clear,
23   it was -- you did not find any auto-
24   correlation; correct?
25     A.   During the class period,

Page 175

Dr. Adam Werner

1
2   correct.
3      Q.   Does the fact that the
4   adjusted R-squared is negative suggest
5   that the results are not conclusive?
6      A.   I'm sorry, I don't understand
7   the question.
8      Q.   Explain, if you would, what
9   "adjusted R-squared" means.
10     A.   It's the R-squared adjusted
11   for the number of variables.
12     Q.   And here, am I right, that
13   it's a negative -- that resulted in a
14   negative number, negative 0 -- negative
15   0.025?
16     A.   That is correct.
17     Q.   Does that indicate anything
18   to you about the meaningfulness of this
19   test, (indicating)?
20     A.   Define "meaningfulness".
21     Q.   Its relevance to determine
22   whether the market was efficient.
23     A.   I'm not sure I understand the
24   question.
25     Q.   Okay.  The bottom line is, as

Page 176

Dr. Adam Werner

1
2   far as you're concerned, this
3   (indicating) test that you conducted,
4   that's reflected in Exhibit 14, supports
5   your opinion that the market was
6   efficient during the class period;
7   correct?
8      A.   It informs upon my opinion.
9      Q.   Is there a difference between
10   "informs upon" and "supports", in your
11   mind?
12     A.   Possibly.
13     Q.   What would that difference
14   be?
15     A.   Well, again, as I said, the
16   presence or non-presence of auto-
17   correlation of, many people have argued,
18   is a test for market efficiency, has been
19   shown that even stocks that are auto-
20   correlated are efficient necessarily,
21   necessarily render a stock inefficient,
22   if there is autocorrelation present.
23     Q.   Turn to page -- please turn
24   to page 29 of Exhibit 1, paragraph 73.
25     A.   Paragraph 73, okay.

Page 177

Dr. Adam Werner

1
2      Q.   Just read the last sentence,
3   and see if that changes your answer to my
4   question, whether it supports your
5   opinion.
6      A.   (Pause.)
7          I don't believe I said it
8   didn't support my opinion.
9      Q.   Well, you said it informs
10   your opinion, I asked you -- I don't want
11   to, you know, duel with you here, that's
12   not the intention.
13     A.   Right.
14     Q.   I really thought that you
15   answered that to my question, that's why
16   I'm wondering why you didn't say yes,
17   because right here you say that Exhibit
18   14 supports your opinion, and you said:
19   It informs my opinion, but I don't know
20   if it supports my opinion, so I'm just
21   trying to understand, does this support
22   your opinion or not?
23     A.   You are correct --
24     Q.   Okay.
25     A.   -- it supports my opinion.

45 (Pages 174 - 177)

Page 178

Dr. Adam Werner

1
2  Q.  Thank you.
3      All right.  Now, let's go
4  back to Exhibit 9 of Exhibit 1.
5      Here, you use the entire test
6  period; is that correct?
7  A.  That is correct.
8  Q.  And you -- if I'm reading
9  this correctly, you found seven days in
10 the test period with statistically-
11 significant returns of the 99 percent
12 significance level on event day, which
13 you described or define as (day T); is
14 that correct?
15 A.  That is correct.
16 Q.  If you remember -- and if you
17 don't remember please feel free to refer
18 to the rest of your report, or your
19 declaration, did any of those seven days
20 occur during the class period, because
21 that would be September 19th through
22 November 12th, 2012.
23 A.  I don't believe so.
24 Q.  And I take it, then, that
25 Number 6 -- you know, the number 6, which

Page 179

Dr. Adam Werner

1
2  is essentially T plus 1, that none of
3  those days occurred within the class
4  period, by definition; correct?
5  A.  I believe that is correct.
6  Q.  So is it fair to say that,
7  effectively, the class period is not
8  included within the analysis that's
9  reflected in Exhibit 9.
10 A.  I --
11     MR. STRAUSS:  Objection.
12 A.  I don't believe that's
13 correct.
14 Q.  Let me ask you a different
15 way.
16     Is it -- it's fair to say
17 that there were no days that reflect the
18 speed or reaction to the news at the --
19 you know, the 99 percent significance
20 level within the class period?
21     THE WITNESS:  Could you read
22 back the question, please?
23     (The record was read.)
24 A.  I'm not trying to be obtuse
25 here, I don't understand the question.

Page 180

Dr. Adam Werner

1
2  Q.  That's okay.
3     MR. PARADISE:  Take a short
4  break.
5     (Recess taken: 2:20 p.m. -
6  2:23 p.m.)
7 BY MR. PARADISE:
8  Q.  Let's look at Exhibit 10.
9  A.  Okay.
10 Q.  Again, this is the -- this
11 test, that's reflected in Exhibit 10 to
12 your declaration, is for the entire test
13 period; correct?
14 A.  I believe that is correct.
15 Q.  And here you have, if I'm
16 reading it correctly, there are four days
17 where -- wait, I'm sorry, let me make
18 sure I'm reading this correctly.
19     Okay.  There are four days
20 during the test period where there were
21 significant -- what you call significant
22 news days; is that right?
23     Or maybe I'm misreading this
24 or misunderstanding it.
25 A.  Um -- I don't know if I said

Page 181

Dr. Adam Werner

1
2  there's significant Hi-Crush price
3  movement days.
4  Q.  Okay, so "significant" there
5  refers to price movement, not news?
6  A.  At one point in the exhibit,
7  "significant" deals with the news, or
8  refers to the news.
9  Q.  Okay, but I'm looking at
10 under the column where it says:  Number
11 of days, and then, underneath:  Number of
12 days, it says:  Significant and not
13 significant.
14 A.  That's statistically-
15 significant at a 95 percent confidence
16 number.
17 Q.  Price movement.
18 A.  Correct.
19 Q.  Okay, in other words, that's
20 not news, that's price movement.
21     And then there were 25 days
22 where there was not a significant price
23 movement within the 95 percent confidence
24 level.
25 A.  When the press release was

46 (Pages 178 - 181)

Page 182

1           Dr. Adam Werner
2   reported.
3       Q.   Do you remember how many of
4   these days where there was a press
5   release issued occurred during the class
6   period?
7       A.   I believe it's three, but I
8   don't -- I have to check.
9           Let me go to the appendix
10  here. (Pause.)
11          So, one --
12      Q.   Could you just identify
13  the --
14      A.   Oh, I'm looking at Appendix
15  A.
16      Q.   Right, and the date.
17          So the first one is October
18  11, am I reading that right?
19      A.   I don't -- as I sit here, I
20  don't recall whether or not Hi-Crush
21  released a press release on 9-21-2012
22  about presenting at the Energy Prospectus
23  Group but, yes, certainly October 11,
24  2012 would be one of those days.
25      Q.   Okay, I'm sorry, keep going.

Page 183

1           Dr. Adam Werner
2       A.   I believe October 19th, 2012,
3   October 22nd, 2012, and here we need to
4   delineate between "new news" and "news".
5           On 11-1-2012, I don't think
6   they had any -- yeah, that was not a
7   Hi-Crush release.  11-6-2012, I believe
8   there was a press release.  And I believe
9   that's it.
10      Q.   The one that you referred to,
11  where you have to distinguish between
12  "news" and "new news", you said that was
13  the -- did you say that was the October
14  22 -- is that the news that came out on
15  October 22?
16      A.   Correct.
17      Q.   How do you -- in your
18  parlance, how do you distinguish between
19  "news" and "new news"?
20      A.   Well, on the 19th Hi-Crush
21  filed their Form 8-K.  It was reported ou
22  the U.S. Fed news service on 10-20-2012,
23  it would be respect--
24      Q.   Understood, okay.
25          And you mentioned -- you

Page 184

1           Dr. Adam Werner
2   included November 6th, as well; right?
3       A.   I believe so.
4       Q.   Turning to Exhibit 11, which
5   I think is another analysis or test of
6   the response of the price to news, if
7   I'm -- am I right about that?
8       A.   I believe that is correct.
9       Q.   So -- and the number of
10  observations I see is 29, which I think
11  corresponds to the sum of the first line
12  of Exhibit 10, four plus 25 is 29, so is
13  this -- would it be the same answers on
14  Exhibit 11, that either three or four of
15  the days occurred during the class
16  period?
17      A.   Of the press release days?
18      Q.   Yes.
19      A.   I believe that is correct.
20          THE WITNESS:  Can we go off
21      the record for a second?  I'm just
22      going to go get some more water.
23          MR. PARADISE:  Oh, go ahead.
24          (Pause in proceedings.)
25      A.   Thank you.

Page 185

1           Dr. Adam Werner
2       Q.   On those days within the
3   class period, when there was news that
4   you've just gone through with us, did you
5   observe any statistically-significant
6   price movements?
7       A.   "News" as I defined it, in
8   this report?  I don't believe so.
9       Q.   Turning back -- I'm sorry,
10  but going back for one second to Exhibit
11  9.
12      A.   Exhibit 9.
13      Q.   Yes, the one with the speed
14  reaction to the news.
15          As you testified, none of the
16  days -- none of the seven days reported
17  in Exhibit 9 occurred during the class
18  period; is that right?
19      A.   I believe that is correct.
20      Q.   How, then, does Exhibit 9
21  inform your opinion as to the efficiency
22  of the market for Hi-Crush stock units
23  during the class period?
24      A.   It informs it because it's --
25  any analysis I did related to news I did

47 (Pages 182 - 185)

Page 186

1          Dr. Adam Werner
2 over this longer period, because there's
3 a lack of news during the class period.
4      Q.   Does that -- in your expert
5 opinion, does that allow you to draw any
6 conclusion as to how the price of the
7 stock would react during the class period
8 to the issuance of news?
9      A.   I believe so.
10         I believe there was a lack of
11 issuance of news during the class period,
12 and there were no price reductions.
13     Q.   Oh, you're doing the
14 inverse -- is that the inverse analysis,
15 rather than measuring how the price moves
16 in response to news, you're looking at
17 how the price reacts to the absence of
18 news, is that what you're saying?
19     A.   I believe that is correct.
20     Q.   Take a look at Exhibit 12,
21 please.
22     A.   Okay.
23     Q.   For this -- I don't know if
24 it's a test or an analysis, is it one or
25 the other?

Page 187

1          Dr. Adam Werner
2          What would you call this?
3      A.   Analysis.
4      Q.   For the purposes of this
5 analysis, I just want to confirm that you
6 used the entire test period; is that
7 right?
8      A.   I believe that is correct.
9      Q.   Does this enable you to
10 draw -- this analysis, that's reflected
11 in Exhibit 12, does it enable you to draw
12 any conclusions as to the relationship
13 between returns and volume during the
14 class period, just the class period?
15     A.   I believe so.
16     Q.   Can you explain?
17     A.   Well, there were no -- if I
18 remember correctly, there were no volume
19 spikes during the class period, and there
20 was a lack of information during the
21 class period, so that would agree with
22 these (indicating) results.
23     Q.   And Exhibit 13, which I
24 think, if I'm understanding you
25 correctly, is -- well, what is the

Page 188

1          Dr. Adam Werner
2 difference between the analysis that's in
3 Exhibit 12 and the analysis that's in
4 Exhibit 13?
5      A.   In 12, the dependent variable
6 is stock returns.  In the -- or, I should
7 say, the absolute value of stock returns.
8 In Exhibit 13, it's excess -- absolute
9 value of the excess stock returns.
10     Q.   And, by "stock returns",
11 you're referring to the returns for
12 Hi-Crush?
13     A.   Correct.
14     Q.   And, for my edification, what
15 is meant by "returns", as opposed to
16 "excess returns"?
17     A.   Excess or abnormal returns,
18 it's just I use my regression analysis in
19 the same way -- I guess instead of
20 "excess" you could say "abnormal
21 returns".
22     Q.   And abnormal when measured
23 against what?
24     A.   Against my regression
25 analysis.

Page 189

1          Dr. Adam Werner
2      Q.   Coming back to the Dow Jones
3 Index, which was Exhibit 4, I believe,
4 did you consider -- here -- as you
5 yourself said earlier, this is quite a
6 broad grouping of companies, that is, the
7 companies that are listed in Exhibit 4.
8          And they run the gamut, as
9 best I can tell, from mineral mining
10 companies, gold -- you know, gold mining
11 companies, nickel, copper, silica,
12 et cetera.
13         Did you consider creating
14 your own index that would more accurately
15 replicate a company that competes or is
16 in the same business as Hi-Crush, or is
17 that not necessary to do?
18     A.   May I take exception with
19 your term "accurate" --
20     Q.   Go ahead.
21     A.   -- or "more accurate".
22     Q.   Yeah.
23     A.   I considered other indices
24 and possibly creating an index, a custom
25 index.

48 (Pages 186 - 189)

Case 1:21-md-02989-CMA   Document 568-17   Entered on FLSD Docket 06/08/2023   Page 50 of
114
Case 1:12-cv-08557-CM   Document 147-1   Filed 06/17/14   Page 50 of 114

Page 190

```
 1              Dr. Adam Werner
 2     Q.   And why did you not create a
 3   custom index?
 4     A.   Well, I find that,
 5   oftentimes, when you create a custom
 6   index, defense expert will criticize one
 7   for being subjective in their choice of
 8   companies.
 9     Q.   Under-inclusive, in other
10   words?
11     A.   Under-inclusive, right.
12     Q.   Or, I guess over-.
13     A.   Or over-.
14          That having been said, if
15   you've looked at -- I did look at other
16   indices, it didn't change my results.
17     Q.   Okay, that's a good answer.
18   But did you actually go about creating
19   your own -- you know, your own index?
20     A.   I don't believe so.
21     Q.   Here's where we're going to
22   go back in time to my class in
23   undergraduate.  I just want to get an
24   understanding of some of the terms that
25   you used in your test.
```

Page 191

```
 1              Dr. Adam Werner
 2          So going back to Exhibit 7.
 3     A.   Okay.
 4     Q.   Can you just explain the
 5   different abbreviated terms that are used
 6   in the chart.
 7          So at the bottom where you
 8   have on the top co-- I think that means
 9   coefficient, standard error, t, P greater
10   than absolute value of t.
11          MR. PARADISE:  Absolute value
12   of t is (indicating) two lines with
13   a t in the middle.
14     Q.   And then we already discussed
15   95 percent confidence interval, but could
16   you just explain the first four, what is
17   meant by each of those?
18     A.   The coefficient, coefficient
19   is the regression coefficient.  Standard
20   error is the standard error of the
21   regression, or for that observ-- or for
22   that variable.  T statistic is just the
23   coefficient divided by the standard
24   error.  And the P value is -- gives us
25   basically the same thing as the 95
```

Page 192

```
 1              Dr. Adam Werner
 2   percent conf-- it tells us the level of
 3   significance.
 4     Q.   Are all of the numbers --
 5   under the Coefficient, are all of the
 6   numbers that are in that chart, under
 7   coefficient, and that means standard
 8   error -- Std.Err?
 9     A.   Correct.
10     Q.   Are all these numbers the
11   product of your regression analysis?
12     A.   I believe that's correct.
13     Q.   And what are the inputs that
14   led to the numbers that appear under:
15   Coefficient?
16          What data do you input to
17   come up with the coefficient?
18     A.   Hi-Crush's stock price, the
19   S&P 500 returns -- or, I should say --
20   yeah, S&P 500 returns, and Dow Jones
21   returns.
22          And then I ran the second
23   regression, to control for the fact that
24   there's -- the S&P 500 Mining Index is
25   highly correlated with the market index,
```

Page 193

```
 1              Dr. Adam Werner
 2   so, to exclude that combined effect, I
 3   included an error term as part of my
 4   regression from a different regression I
 5   ran.
 6     Q.   So, that, in other words, the
 7   error term essentially backs out the -- I
 8   don't know if that's the right term, but
 9   backs out the S&P 500 return?
10     A.   It backs out the impact of
11   the S&P 500 on the index -- the company
12   index, the industry index.
13     Q.   And just turning to the table
14   or chart that appears above that one, the
15   "SS", capital "SS", does that mean
16   statistically-significant?
17     A.   No, sum of squares.
18     Q.   What does "DF" mean?
19     A.   Degrees of freedom.
20     Q.   And "MS"?
21     A.   You know, as the -- as I sit
22   here, I don't remember.
23     Q.   But these are all statistical
24   terms?
25     A.   Yeah.
```

49 (Pages 190 - 193)

Page 194

Dr. Adam Werner

1
2     Q.   These are all -- they're
3   typical --
4     A.   Yeah.
5     Q.   The number of observations is
6   252.
7         Is that -- to the best of
8   your recollection, does that correspond
9   to the number of trading days in this
10  period?
11    A.   I believe that is correct.
12    Q.   What does: Stata 9 mean,
13  which appears under Footnote 2?
14    A.   It's a computer program.
15    Q.   Turn to page -- I'm sorry --
16  turn to paragraph 10 of Exhibit 1.
17        If you look at the next page,
18  the spillover of the paragraph, where it
19  continues onto page 5?
20    A.   Okay.
21    Q.   You state here that: Sales
22  to Baker Hughes represented 18.2 percent
23  of Hi-Crush's expected contract revenue
24  in 2012.
25        Do you see that?

Page 195

Dr. Adam Werner

1
2     A.   I do.
3     Q.   And according to your report,
4   or declaration, you took that from
5   Hi-Crush's Form S-1 registration
6   statement.
7     A.   Right.
8     Q.   In paragraph 12, further down
9   the page, which we've covered a few times
10  today, you report, or state, that the
11  units -- the value of the units dropped,
12  from looking at the top of page 6, over
13  26 percent when the -- what you've called
14  "corrective disclosure", was made on
15  November 13th.
16        Am I reading that correctly?
17    A.   I believe that's correct.
18    Q.   If the value of the Baker
19  Hughes contract, or if the -- I should
20  say the percentage of the revenue that
21  was supposed to be provided by the Baker
22  Hughes contract, was 18 percent -- looks
23  like you're ready for this one --
24    A.   Well, I didn't think about it
25  beforehand, but I see where you're going.

Page 196

Dr. Adam Werner

1
2     Q.   Let me ask -- I'm not sure I
3   know where I'm going, but let me get
4   there.
5         But you see that the
6   percentage of revenue reported by
7   Hi-Crush was -- you know, from the Baker
8   Hughes contract, was 18 percent, but the
9   stock price went down by 26 percent.
10        Does that suggest that the
11  market was inefficient?
12    A.   No.
13    Q.   Why not?
14    A.   "Why not?"
15    Q.   Yeah.
16    A.   It doesn't -- I mean, if you
17  can give me an example of why it would be
18  inefficient, by all means, go ahead,
19  but --
20    Q.   Well, if the market --
21  assuming the market was efficient, and
22  was taking into account the value of the
23  Baker Hughes contract, and being about 18
24  percent, and then the market goes down by
25  26 percent --

Page 197

Dr. Adam Werner

1
2     A.   18 percent of revenue.
3     Q.   Right -- seems like the
4   market overreacted to the news -- well,
5   and by where I'm sitting.
6         I mean, I --
7     A.   Your drawing a correlation
8   between the 18 percent and the 26.2
9   percent is not, necessarily, a linear
10  correlation.
11    Q.   And what do you mean by that?
12    A.   Well, I mean revenue may have
13  changed by 18-- or, what they, people,
14  believe was 18.2 percent and, again, this
15  was 18.2 percent as of July of 2012,
16  whereas now we're in --
17    Q.   November.
18    A.   -- November 2012.
19        It's not clear -- there's
20  just no clear delineation between market
21  value and revenue. I mean, there's not a
22  one-- there's not, necessarily, a
23  one-for-one relationship, I guess is what
24  I'm saying. There are other factors that
25  goes into a firm's market value beyond

50 (Pages 194 - 197)

Page 198

1        Dr. Adam Werner
2 revenue.
3      MR. PARADISE: Off the
4 record.
5     (Discussion off the record.)
6      MR. PARADISE: Back on the
7 record.
8    Q. In Appendix A, if you look at
9 the news from November 13th -- November
10 13th, 2012, that is, you see the --
11 towards the bottom of 5 or 6 up from the
12 bottom for that day, Hi-Crush plunges 35
13 percent below IPO price, and then it says
14 U.S. Silica falls 11 percent.
15    Do you see that?
16    A. Yes.
17    Q. Do you know what U.S.
18 Silica -- what they do, what business
19 they're in?
20    A. I assume that they are a
21 competitor of Hi-Crush's.
22    Q. Do you have any -- did you do
23 anything to determine what may have
24 caused U.S. Silica's stock price to go
25 down by 11 percent on that same day?

Page 199

1        Dr. Adam Werner
2    A. I believe so.
3    Q. What did you conclude?
4    A. I concluded that there was
5 some correlation between the two price
6 movements, which is why U.S. Silica is
7 also in my Dow Jones U.S. Mining Index,
8 which is in Exhibit 4.
9    Q. Was there -- was that -- did
10 you conclude that that was an industry
11 effect or did something happen that day,
12 was there some news that affected U.S.
13 Silica, that caused its price to go down
14 that same day?
15    A. As I sit here, I don't know,
16 but to the extent it was an industrywide
17 effect, it's reflected in my regression
18 analysis by controlling for an industry
19 index, or using an industry index.
20    Q. With the errors or without
21 the errors, in either case; right?
22    A. Errors?
23    Q. What you called the
24 "error" -- what you called the "error",
25 "error" term, on Dow Jones U.S. Mining

Page 200

1        Dr. Adam Werner
2 Index returns?
3    A. Ah, ah.
4    Q. You know, I meant with the
5 adjusted --
6    A. With the adjusted --
7    Q. -- for or without the S&P
8 movement.
9    Did you look at any other
10 specific competitors of Hi-Crush and the
11 movement in their stock price on November
12 13, 2012 in connection with the work that
13 you did?
14    THE WITNESS: Could you
15 re-read the question?
16    Q. That was a bad question, let
17 me try again.
18    Did you look specifically at
19 the stock price of any of Hi-Crush's
20 other competitors, on November 13th, to
21 see whether there was any movements in
22 those stock prices that correlated to the
23 movement you saw in Hi-Crush and
24 Silica's -- U.S. Silica's?
25    A. I believe so, by looking at

Page 201

1        Dr. Adam Werner
2 the movement of the industry index I
3 used.
4    If you're asking me did I
5 specifically look at the stock
6 performance of individual companies?
7    Q. That's what I meant, yes.
8    A. Or individual competitors? I
9 don't believe so.
10    Q. I assume you feel that wasn't
11 necessary for your work?
12    A. Well, to the extent that
13 there was any industry effect, I adjusted
14 for that.
15    Q. Through the index of the
16 roughly -- I don't know if we talked
17 about how many companies, but I think the
18 exhibit said roughly 200 companies.
19    A. Correct, including Hi-Crush
20 and U.S. Silica, which was mentioned in
21 Appendix A.
22    Actually, can we take a short
23 break?
24    Q. Yes.
25    A. Thank you.

51 (Pages 198 - 201)

Page 202

1     Dr. Adam Werner
2     Q.   Go ahead.
3         (Recess taken: 2:51 p.m. -
4     3:23 p.m.)
5         MR. PARADISE: Back on the
6     record.
7 BY MR. PARADISE:
8     Q.   You had said earlier that you
9 were going to send an e-mail to see if
10 you could get a copy of your --
11     A.   Oh, I completely forgot.
12     Q.   Okay.
13     A.   But now remind me what I was
14 supposed to get a copy of?
15     Q.   The index that you used. You
16 thought that might be what I handed to
17 you as Exhibit 4.
18     A.   Oh, it is.
19     Q.   A hundred percent?
20     A.   99.99 percent.
21     Q.   Okay.
22     A.   I mean, that was definitely
23 the index I saw.
24     Q.   But I think, if I'm not
25 mistaken, that you also -- there was also

Page 203

1     Dr. Adam Werner
2 a part of it, maybe something additional
3 to what is on that list, that showed the
4 movement of those -- the price movement
5 of those 200 --
6     A.   That --
7     Q.   -- companies?
8     A.   That should have been
9 produced.
10     Q.   We haven't --
11     A.   Not -- yeah, didn't you get
12 all the Bloomberg data?
13     MS. BRANDON: We have the
14     separate Bloomberg -- no, we don't
15     have all of that.
16     THE WITNESS: You didn't get
17     like the returns on -- I thought
18     that -- okay.
19     MS. BRANDON: No.
20     THE WITNESS: I was under the
21     impression that you had already
22     received that.
23     (Discussion off the record.)
24     MR. PARADISE: All right,
25     back on.

Page 204

1     Dr. Adam Werner
2 BY MR. PARADISE:
3     Q.   There is a number of court
4 filings that you describe as "court
5 filings" listed in Exhibit 2 that you
6 relied upon, and some of these are
7 reported decisions.
8         How did you choose which
9 reported decisions to rely upon?
10     A.   Well, some of them are
11 standard, like Cammer and Krogman, Basic,
12 I believe, was it --
13     Q.   Mm-hmm.
14     A.   -- was in there. Hold on,
15 let me --
16     Q.   It was Exhibit 2.
17     A.   Okay. (Pause.)
18         Yeah. So the ones I'm
19 familiar with, I just -- in general, is
20 Basic -v- Levinson --
21         THE WITNESS: It's under:
22     Court filings, on Exhibit 2, you'll
23     find it, they're all there.
24     A.   -- Cammer versus Bloom,
25 Cheney versus CyberGuard, Kroginan versus

Page 205

1     Dr. Adam Werner
2 Sterritt.
3         The other ones were cases
4 like I learned about from discussions
5 with other economists.
6     Q.   And these are cases that you
7 relied upon for what purpose? The other
8 ones that you mentioned, not the standard
9 ones.
10     A.   They support the analysis
11 that I used. They were cases in which
12 the analysis that I've used have been
13 found to be sufficient by the court to
14 establish market efficiency. And I
15 should mention that it -- the analysis in
16 these cases are both by plaintiff and
17 defendant.
18         So I believe in the
19 Polymedica Corporation was a case that
20 Fred Dunbar did in which he did the same
21 type of analysis that I did, in
22 arguing -- I mean, I don't know what
23 he -- right, he was arguing against
24 market efficiency, but he was using the
25 same analysis.

52 (Pages 202 - 205)

Page 206

1           Dr. Adam Werner
2      Q.   And in that case, he, Mr.
3  Dunbar, found that -- or, Dr. Dunbar
4  found that the market was inefficient?
5      A.   I don't recall, as I sit
6  here.
7      Q.   Did you consider -- are you
8  familiar with a case, at the United
9  States Supreme Court from last year,
10  called Comcast?
11     A.   I believe I'm familiar with
12  it.
13          I've certainly heard of it, I
14  don't know why.
15     Q.   It was a ruling involving a
16  class cert-- you know, it went to class
17  certification. It was an antitrust
18  case --
19     A.   I was going to say, it was an
20  antitrust case, yeah, I'm definitely --
21  I'm familiar with it.
22     Q.   You didn't consider it in
23  connection with the work you did here; is
24  that right?
25     A.   No.

Page 207

1           Dr. Adam Werner
2      Q.   Are you familiar with a case
3  out of your neighborhood, Northern
4  District of California, called Diamond
5  Foods?
6      A.   Again, I've heard of it, but
7  I don't....
8      Q.   You didn't consider it in
9  connection with the work that you did
10  here.
11     A.   I don't believe so.
12     Q.   Okay. I want to turn now to
13  paragraph 77 of your declaration, where
14  you discuss -- I think the pronunciation
15  is, "arbitrageurs"?
16     A.   Right.
17     Q.   A-R-B-I-T-R-A-G-E-U-R-S.
18     A.   And that is -- I should say
19  that that is a term of art and not a
20  term -- not a technical economic
21  definition of what an arbitrageur should
22  be.
23          MR. STRAUSS: Which
24  paragraph?
25          MR. PARADISE: Paragraph 77.

Page 208

1           Dr. Adam Werner
2          THE WITNESS: Paragraph 77.
3      Q.   In your own words, can you
4  explain what it is that arbitrageurs do
5  and -- well, leave it at that.
6      A.   Okay. Theoretically, an
7  arbitrageur, or someone who engages in
8  arbitrage, is supposed to be able to earn
9  a profit without enduring any risk.
10          So people will talk about an
11  arbitrage opportunity. Like if I know --
12          (Discussion off the record.)
13     Q.   You had said that they should
14  be -- or, they try to earn a profit
15  without incurring any risk.
16     A.   That's, theoretically, what
17  someone engaging in arbitrage should be
18  doing, but that's not what people who're
19  called "arbitrageurs" are actually
20  performing.
21          I mean, they do incur risk in
22  trying to make a profit.
23     Q.   So --
24     A.   But --
25     Q.   Go ahead, sorry.

Page 209

1           Dr. Adam Werner
2      A.   So, again, that's more a term
3  of art as opposed to -- or, an
4  industry -- a financial industry term, as
5  opposed to an economic definition of an
6  "arbitrageur".
7      Q.   And, for purposes of your
8  opinion, and the way you used the term, I
9  take it you're referring to the second
10  (indicating) category, rather than the
11  first, meaning the ones that do actually
12  incur risk?
13     A.   That is correct.
14     Q.   -- profit.
15          How, in your opinion, do
16  arbitrageurs, and the activities in which
17  they engage, contribute or fail to
18  contribute to market efficiency?
19     A.   Well --
20          THE WITNESS: I'm sorry,
21  could you read the question back,
22  please?
23          (The record was read.)
24     A.   To the extent that there
25  are -- there might be pricing

53 (Pages 206 - 209)

Page 210

Dr. Adam Werner

1
2 discrepancies in a security, or that the
3 arbitrageurs believe the securities are
4 mispriced, they can -- they will try
5 to -- they will attempt to exploit that
6 mispricing such as, you know, if they
7 believe the stock is too high, the value
8 of the stock is too high, and again,
9 that's their belief, it's not a statement
10 of fact, they will oftentimes sell those
11 shares in an attempt to drive the price
12 down to what they believe the true value
13 of the company is.
14      So to the extent that these
15 people are more informed than other
16 individuals -- and, again, I put
17 "informed" in quotation marks -- they
18 will attempt to exploit what they believe
19 are mispricings in equities, or other
20 securities.
21      That's my Corporate Finance
22 101 description.
23      Q.  Is it fair to say, in your
24 opinion, that arbitrageurs ferret out or
25 do more work to obtain -- and information

Page 211

Dr. Adam Werner

1
2 that research companies -- and obtain
3 information that enables them to engage
4 in the activity that you just described?
5      MR. STRAUSS: Objection.
6      A.  Is it fair? Define "fair".
7      Q.  Well, do you agree with that
8 statement?
9      A.  I don't know if I formed an
10 opinion, one way or the other.
11      Q.  And, again, if you don't have
12 an opinion, please just say so, but you
13 described, I thought very ably, the
14 activities that arbitrageurs supposedly
15 engage in to exploit mispricing of
16 securities, and you yourself said --
17      A.  And they --
18      Q.  I'm sorry, I didn't mean to
19 interrupt.
20      A.  They do engage in these
21 activities.
22      It's a question of whether or
23 not they're more informed.
24      Q.  No, that's what I was going
25 to get to, because you had said to the

Page 212

Dr. Adam Werner

1
2 extent that they are more informed, which
3 I took to mean that you don't,
4 necessarily, believe that they always are
5 more informed; is that right?
6      A.  I believe that is accurate.
7      Q.  But they're -- to the extent
8 that they are successful and good
9 arbitrageurs and are able to be more
10 informed, what is your understanding as
11 to how they obtain that additional
12 infor-- you know, that better
13 information, you know, i.e. how do they
14 become more informed?
15      MR. STRAUSS: Objection.
16      Q.  If you know.
17      A.  I mean, there's all sorts of
18 ways. You know, they may talk to company
19 executives.
20      I have, actually, a pump-
21 and-dump case now where, you know, this
22 guy, like: Oh, I'm a great trader, you
23 should invest with me, he talks about
24 hanging out with the CFO's of the
25 corporations that he's touting for

Page 213

Dr. Adam Werner

1
2 investment. That would be one form of
3 information. You know, general research.
4 I don't -- I mean, there are multiple
5 ways --
6      Q.  That's fair.
7      A.  -- that people can attempt to
8 be more informed.
9      Q.  And, again, in your
10 experience, or in your opinion, is one
11 way or one method that they use to go
12 out -- and, for example, let's use
13 Hi-Crush as an example, and this is a
14 hypothetical but we'll use Hi-Crush to
15 form the hypothetical.
16      So Hi-Crush sells fracking
17 sand. Would you expect that
18 arbitrageurs, if they were engaged in
19 arbitrageur activity, for Hi-Crush, might
20 go and do research on the customers of
21 Hi-Crush to analyze potential demand for
22 Hi-Crush's product?
23      A.  I'm --
24      MR. STRAUSS: Objection.
25      Go ahead.

54 (Pages 210 - 213)

Page 214

1          Dr. Adam Werner
2     A.   That sounds reasonable.
3     Q.   You talk about the -- in
4  paragraph 77, the last sentence, you say:
5  If the price is -- this is a quote: If
6  the price is too high, however, the
7  arbitrageur might attempt to -- quote --
8  short -- closed quote -- the stock.
9          How would an arbitrageur know
10 if the price is too high in that
11 circumstance?
12    A.   It would be their opinion.
13    Q.   And do you know -- well, have
14 you ever engaged in arbitrage activity on
15 your own?
16    A.   (Gesturing) -- have I
17 ever --
18        MR. STRAUSS: Objection.
19    A.   I'm not sure --
20        MR. STRAUSS: Yeah, I mean,
21 come on, that's -- you're asking
22 about his personal investments?
23 It's, you know --
24    Q.   Well, do you know --
25        MR. STRAUSS: Has he ever

Page 215

1          Dr. Adam Werner
2  been employed at an investment firm
3  and engaged professionally in
4  trading? You can ask him that,
5  but --
6        MR. PARADISE: Okay.
7        MR. STRAUSS: -- I don't
8  think it's fair to --
9        MR. PARADISE: That's fine.
10        MR. STRAUSS: -- ask him
11 about his personal finances.
12    Q.   I'll accept Mr. Strauss's
13 comment -- question.
14    A.   Have I ever worked for an
15 investment firm?
16    Q.   And engaged in arbitrage
17 activity.
18    A.   Again, I'm uncomfortable with
19 this definition of "arbitrage" because
20 it's a huge umbrella.
21        All sorts of things can be
22 termed as "arbitrage".
23    Q.   I'm sorry --
24    A.   So in terms of the academic
25 sense? No.

Page 216

1          Dr. Adam Werner
2     Q.   Okay. By the way, just
3  for -- just to -- when you say you are
4  uncomfortable with the definition, I'm
5  trying to use the definition that you
6  used before, not any other definition.
7  So, you know, exploiting, mispricing
8  securities, essentially, is the
9  definition I'm working off of.
10    A.   Is there a belief that those
11 securities are mispriced, or you could --
12 I guess there are forms of arbitrage, if
13 you think about this flash trading
14 phenomenon, if I know the price of the
15 stock on one exchange and I see that it's
16 being traded at another price on another
17 exchange -- well, you know, I take back.
18 I guess there is still risk involved
19 there.
20        There is a possibility that I
21 won't get -- my trades won't get
22 executed, so --
23    Q.   Right.
24        Turning to paragraph 78, for
25 a moment, of Exhibit 1. Here, if I'm

Page 217

1          Dr. Adam Werner
2  understanding this correctly, you're
3  comparing the amount of the short
4  interest in Hi-Crush's stock -- I'm
5  sorry -- in Hi-Crush's units, to the
6  average for all New York Stock Exchange-
7  listed stocks during the class period; is
8  that correct?
9     A.   I believe that is correct.
10    Q.   And, according to your
11 calculation, the shortages for Hi-Crush
12 was .47 percent as compared with --
13    A.   Between --
14    Q.   Wait, I'm sorry -- I'm sorry,
15 between .47 percent and 1.53 percent, and
16 the average shortages for the New York
17 Stock Exchange, during the comparable New
18 York Stock Exchange-listed stocks --
19 during the comparable -- during the class
20 period of 3.1 percent; is that right?
21    A.   That is correct.
22    Q.   Okay. So, turning to -- so
23 turning to Exhibit 3, I just want to make
24 sure I'm seeing where these numbers
25 appear on there.

55 (Pages 214 - 217)

Page 218

1      Dr. Adam Werner
2          These -- first off, so
3  Exhibit 3, just to make sure, is for the
4  class period; right? It goes from
5  September 19, 2012 through November 12th,
6  2012; right?
7      A.   I believe that is correct.
8      Q.   So the New York Stock
9  Exchange average is -- you say, is 3.1
10 percent.
11         Is that -- where is that
12 found on here? Is that --
13     A.   That's just taken from the
14 NYSE.
15     Q.   No, I mean, where -- is
16 that -- I'm going to point to the exhibit
17 for a minute -- (indicating) -- is that
18 this number?
19         Again, I'm pointing to the
20 second page of Exhibit 3.
21     A.   Ah -- you mean the column to
22 the one over from the right?
23     Q.   Right.
24     A.   I believe that is correct.
25     Q.   And where on Exhibit 3 do you

Page 219

1      Dr. Adam Werner
2  find that -- the corresponding numbers
3  for the Hi-Crush, the .47 percent to the
4  1.53 percent? Could you just point me to
5  the column?
6          Is that this column,
7  (indicating)? I'm pointing to the --
8      A.   I can't see it.
9      Q.   I'm sorry, I'm pointing to
10 the fifth (indicating) from the right.
11     A.   I believe that is correct.
12     Q.   And then the average of 1.07
13 percent, is that at the bottom of the
14 second page under that same column, the
15 column that's headed: Percentage of
16 outstanding shares sold short?
17     A.   Right.
18         Technically, it's 1.068 but I
19 rounded up.
20     Q.   Do you consider the
21 difference between the average for
22 Hi-Crush, of 1.068, and the average for
23 all New York Stock Exchange-listed
24 companies, at 3.1, do you consider that
25 to be a large gap, a large difference, in

Page 220

1      Dr. Adam Werner
2  percentage?
3      A.   I haven't formed an opinion,
4  one way or the other.
5      Q.   In any event, what is the
6  basis for your opinion that -- and I'm
7  reading from paragraph 78 -- that the
8  level of short interest in relation to
9  common units outstanding provides no
10 indication of any constraint on short-
11 selling activities during the class
12 period, such as the inability to locate
13 or borrow the necessary common units to
14 initiate a short position. And that's
15 from paragraph 78.
16     A.   Right. I don't believe that
17 there were --
18         THE WITNESS: Could you re-
19 read the question, please?
20         (The record was read.)
21     Q.   And it's just the last
22 sentence of paragraph 78.
23     A.   So what's the question?
24     Q.   I want to understand the
25 basis for your opinion that you expressed

Page 221

1      Dr. Adam Werner
2  there.
3      A.   I didn't see any indication
4  that people were -- could not short stock
5  in Hi-Crush.
6          I believe there were
7  stoppages. There may have been two
8  during the entire test period, where Rule
9  202 went into effect.
10     Q.   That's during the entire test
11 period, so that's the class period plus
12 the supplemental period that we talked
13 about.
14     A.   Correct, but I don't -- that
15 did not occur during the class period.
16     Q.   You don't know, though,
17 whether or not anyone during that -- we
18 talked first about the class period,
19 whether anyone who wanted to sell
20 Hi-Crush stock units short was unable to
21 borrow the units necessary to complete
22 that transaction; do you?
23         MR. STRAUSS: Objection.
24     A.   I don't personally know of
25 anyone who was unable to short the stock.

56 (Pages 218 - 221)

Page 222

1      Dr. Adam Werner
2   Q.  Is there any way to -- that
3 you know of, to find out that
4 information, any, you know, publicly-
5 available means to find out that
6 information.
7   A.  I'd have to think about that.
8   Q.  Please do, and let me know if
9 you come up with an answer.
10      (REQUEST.)
11   Is it true that shares --
12 withdrawn.  Is it true that -- if you
13 know, that institutional holders of stock
14 are often -- or, stock or units, are
15 often the parties that loan stocks or
16 units for short sales?
17      MR. STRAUSS:  Objection.
18   A.  I don't know, one way or the
19 other.
20      I mean, I know I certainly
21 had seen examples of people's brokerage
22 accounts having loaned out shares.
23   Q.  You mean individuals?
24   A.  Yeah.
25   Q.  Does the presence of

Page 223

1      Dr. Adam Werner
2 institutional unit holders for Hi-Crush
3 units suggest that there were units
4 available to borrow -- suggest to you
5 that there were units available to
6 borrow?
7   A.  It's possible.
8      That having been said,
9 Hi-Crush isn't the type of stock that
10 most institutions would hold, because
11 it's a dividend-paying stock, and
12 dividends are treated different for tax
13 purposes.
14   Q.  So -- okay, that's a good
15 segue into my next line of questioning,
16 which is about institutional holders,
17 because you speak about that in your
18 report, as well.
19   A.  Correct.
20   Q.  And let me ask you a general
21 question first, before we get to the
22 specifics, but why is the presence of
23 institutional holders, or investors, if
24 you will -- and these are units, so I may
25 be --

Page 224

1      Dr. Adam Werner
2   A.  I understand.
3   Q.  -- I may be mistakenly
4 referring to stock or shares, and what
5 have you, but --
6      MR. STRAUSS:  No problem.
7   Q.  -- for all intents and
8 purposes I'm talking about units, but why
9 is the presence of institutional
10 investors important for market
11 efficiency?
12      Generally speaking, not
13 specific to Hi-Crush.
14   A.  Quoting, in paragraph 74 of
15 my report, this is I believe quoting
16 Barbara Griffin and Lev -- L-E-V:  The
17 institutional investors e.g. mutual
18 funds, money managers, banks, are
19 presumed to be better informed about the
20 securities they hold and better able to
21 interpret new information than individual
22 investors.
23   Q.  So is it fair to say that
24 their better information or better
25 knowledge enables them to trade the stock

Page 225

1      Dr. Adam Werner
2 so that it gets to its true value?  Is
3 that what you're saying?
4      MR. STRAUSS:  Objection.
5   Q.  I'm just trying to get an
6 understanding as to why that means that
7 the market is more efficient.
8   A.  I'm sorry, I don't understand
9 the question.
10   Q.  Well, you, in response to my
11 question as to why the presence of
12 institutional investors makes a market
13 more efficient, you just read from your
14 report, or your declaration, you quoted
15 from this resource that you relied upon,
16 and I'm just not understanding why that
17 means that the market is more efficient
18 or why that makes the market more
19 efficient.
20   A.  Well, if one believes the
21 premise that these people are better
22 informed than other market participants,
23 then their presence would suggest that
24 more information, possibly information
25 that uninformed investors, or

57 (Pages 222 - 225)

Page 226

Dr. Adam Werner

1
2 individuals, could not receive, would be
3 incorporated into the stock price.
4    Q.   Because of their trading;
5 right?
6    A.   Because of their trading.
7    Q.   Okay, that's what I thought
8 you were saying, maybe I didn't
9 articulate it that way.
10    In that same paragraph, you
11 actually refer, two sentences later, to
12 an arbitrageur again -- actually, an
13 arbitrageur, groups among institutional
14 iuvestors, in the first sentence, and
15 then you talk about arbitrageurs again in
16 the last sentence.
17    Are you distinguishing, in
18 this paragraph, between an "arbitrageur"
19 and "institutional investor" or could
20 this be one -- could this also be one and
21 the same?
22    Do you understand my
23 question?
24    A.   Not really.
25    Q.   Are you suggesting that an

Page 227

Dr. Adam Werner

1
2 "institutional investor" is one category
3 of investor and an "arbitrageur" is
4 another separate, or might there be some
5 arbitrageurs who are also institutional
6 investors?
7    A.   That's certainly a
8 possibility.
9    Q.   But, by distinguishing, or
10 using both terms here, you're not trying
11 to suggest that it's either one or the
12 other.
13    A.   I don't believe so.
14    Q.   Let's look at paragraph 76,
15 for a moment, where you provide some data
16 about the institutional investors holding
17 units of Hi-Crush.
18    Do you see that, in the first
19 sentence of paragraph 76?
20    A.   Yes.
21    Q.   And you -- the numbers that
22 you include there is roughly 15 percent
23 to 33 percent.
24    Is that during the -- that's
25 during the class period, right, as

Page 228

Dr. Adam Werner

1
2 opposed to the test period?
3    A.   Correct.
4    Q.   Look at Exhibit -- if you
5 would, please look at Exhibit 15 for a
6 moment.
7    Would this be the backup for
8 those -- for the numbers that appear in
9 paragraph 76?
10    A.   Yes.
11    Q.   Why do you say, in paragraph
12 76, that the level of ownership is 15.4
13 percent to 32.6 percent, and I'm reading
14 from your declaration, paragraph 76:
15 provides no additional support to my
16 opinion that the market for Hi-Crush was
17 informationally-efficient during the
18 class period.
19    A.   Why do I state that?
20    Q.   Yes.
21    A.   Well, I believe the courts
22 have found that -- and this is off the
23 top of my head -- I believe you need
24 something like 80 institutional investors
25 to be deemed as being sufficient for the

Page 229

Dr. Adam Werner

1
2 finding of market efficiency.
3    But, again, that's one
4 standard. I'm sure other courts will
5 have had different findings.
6    Q.   Understood. No, I just
7 wanted to come -- understand why you
8 didn't feel that those numbers provided
9 you additional support, but you talked
10 about the number, the absolute number, of
11 institutional investors rather than a
12 percentage.
13    Do you know what the number
14 of institutional investors was during the
15 class period that corresponds to these
16 percentages?
17    A.   I believe it was between one
18 and ten.
19    Q.   How did you go about
20 determining what the number of
21 institutional investors was during that
22 period of time?
23    A.   I looked up the data on
24 Bloomberg, or someone did that at my
25 behest.

58 (Pages 226 - 229)

Page 230

Dr. Adam Werner

1
2  Q.  Did you -- does Bloomberg
3  provide that, you know, wrapped in a bow,
4  or did you have to go to like the
5  Schedule 13 aps and actually compute the
6  numbers yourself?
7  A.  I'm not sure "wrapped in a
8  bow" is a technical term, but --
9  Q.  It's not.
10  A.  -- I believe that is correct,
11  it is wrapped in a bow.
12  Q.  Bloomberg provides the number
13  for you rather than you having to go and
14  compute it yourself?
15  A.  Correct.
16  Q.  That being said, did you, or
17  anyone on your -- at your behest, look at
18  any of the SEC forms, 13-F, for Hi-Crush
19  during this period of time, during the
20  class period?
21  A.  Yes.
22  Q.  You did.
23  A.  Yes.
24  Q.  Was that done as a check, to
25  verify that the information you obtained

Page 231

Dr. Adam Werner

1
2  from Bloomberg was accurate?
3  A.  Yes.
4  Q.  And did you find that
5  anything was not accurate in the
6  Bloomberg information?
7  A.  Not that I'm aware of.
8  Q.  And turning back to Exhibit
9  15 for a moment, you will see that --
10  well, let me take it one step back.
11  So my understanding is that
12  Schedule 13 -- Schedules 13-F -- or Forms
13  13-F, are filed on a quarterly basis. Is
14  that your understanding, as well?
15  A.  I believe that's correct, but
16  I don't think there's any limitation on
17  when -- on how many you can file. I
18  mean, you could file them weekly, if one
19  chose to -- (gesturing).
20  Q.  Looking at the data in
21  Exhibit 15, you'll see that the
22  institutional holdings remains unchanged
23  from September -- I guess you're listing
24  it here on a weekly basis, it looks like;
25  is that right?

Page 232

Dr. Adam Werner

1
2  A.  That is correct.
3  Q.  So it looks like the data
4  remains unchanged from September 16th
5  through October 14th.
6  So, am I reading that
7  correctly?
8  A.  I believe so.
9  Q.  So, if that's correct, that
10  would mean that, at the end of the third
11  quarter of 2012, the number of
12  institutional units held was 2,097,326.
13  A.  Approximately.
14  Q.  And then, a week later, which
15  is now into the fourth quarter of 2012,
16  it remains at that same number, and it
17  remains at that same number the following
18  week, as well.
19  Does that strike you as
20  unusual, that the institutional holdings
21  would not change after a quarter ends?
22  A.  I didn't say the
23  institutional holdings didn't change.
24  Q.  Okay.
25  A.  I'm saying the data is what

Page 233

Dr. Adam Werner

1
2  it is.
3  Q.  Oh.
4  A.  And you alluded previously to
5  the fact that these things are often
6  filed quarterly. I believe that
7  that -- this phenomenon that you're
8  discussing is a result of data being
9  filed quarterly.
10  Q.  I guess what I'm really
11  getting at is, is this possibly another
12  error or mistake in the report, or your
13  declaration, I should say.
14  A.  No, it's an estimation.
15  I could have just said
16  between September 16, 2012 and
17  10-21-2012, there were approximately
18  2.097326 shares held, based on
19  Bloomberg's review of the 13-F filings
20  for these companies that held shares in
21  Hi-Crush.
22  I don't know their exact
23  number of holdings each day, nor do they
24  have to report them.
25  Q.  Okay. But, as far as you

VERITEXT REPORTING COMPANY
212-279-9424         www.veritext.com         212-490-3430

Page 234

Dr. Adam Werner

1
2 know, Bloomberg reported the same number
3 on September 30th as it did on October
4 7th.
5    A.   I believe that is correct.
6         Again, I'm more than happy to
7 change that to a date range, in which
8 case I know for sure that that represents
9 the average number of shares held by
10 institutional investors during that time
11 period.
12    Q.   No, I'm not quibbling with
13 that.
14         I just want to make sure that
15 this is -- that these numbers are right,
16 that's all.
17    A.   (Gesturing) -- okay.
18    Q.   So, as far as you know, they
19 are, that's your testimony.
20    A.   Correct.
21    Q.   And I have no reason to doubt
22 that.
23         Just seemed odd that they did
24 not change, that's all.
25         MR. PARADISE:  I'm sorry, off

Page 235

Dr. Adam Werner

1
2 the record for one second.
3         (Recess taken: 3:59 p.m. -
4 4:10 p.m.)
5 BY MR. PARADISE:
6    Q.   So let me hand you what I'm
7 asking Wendy to mark as I believe Exhibit
8 6.
9         MR. PARADISE:  Is that right?
10         (Whereupon Deposition Exhibit
11 6, Document, represented to be a
12 compilation of information
13 retrieved from Thomson Reuters of
14 13-F filings as of September 30th,
15 2012, was marked for
16 identification, as of this date.)
17    Q.   This is -- Wendy's just
18 handed you -- the court reporter's just
19 handed you what is marked as Exhibit 6,
20 which I'll represent to you is a
21 compilation of information that we
22 retrieved from Thomson Reuters of 13-F
23 filings as of September 30th, 2012.
24         And I just wanted to show
25 this to you and see if we can reconcile

Page 236

Dr. Adam Werner

1
2 your numbers in Exhibit 15 to these
3 numbers, because they are vastly
4 different.
5         So you see that your number
6 is 2,097,326, and you also see, I think
7 on line 12, that one institutional holder
8 has that exact number of shares -- or,
9 units, but the total units held by
10 institutional investors, as of September
11 30, is actually 7,838,548.  And that
12 makes the percentage of shares
13 outstanding actually 57 -- percentage of
14 shares held by institutional investors
15 outstanding, as 57 -- rounded down to 57
16 percent.
17         Do you have any explanation
18 for this discrepancy?
19    A.   Yeah.
20    Q.   What's that?
21    A.   Thomson Reuters is terrible
22 at collecting data.
23    Q.   Okay.
24    A.   I mean, I've found that,
25 especially when it comes to these type of

Page 237

Dr. Adam Werner

1
2 filings, they're oftentimes -- it's like
3 significantly off, but -- and to the
4 point where I've called them before, when
5 I used to use Thomson Reuters, and said,
6 like: Oh, look, you know, this -- here,
7 I'm looking at the filing, it's not --
8 you know, whatever it is, these numbers
9 not right.  And they'll be like: Oh, you
10 know what, you're right.
11         Now, that having been said,
12 if you want me to take these numbers on
13 face value, these numbers would only
14 boost my opinion that the market for
15 Hi-Crush was inefficient, but I will tell
16 you that data garnered on -- from 13-F
17 filings, is terribly inconsistent across
18 all data providers, and Thomson Reuters
19 is one of the worst in providing that
20 data.
21    Q.   Perhaps not now, but perhaps
22 when you go back to San Francisco, you
23 can take a -- have somebody take another
24 look, and if it turns out, in this
25 instance, that Thomson Reuters is right,

60 (Pages 234 - 237)

Page 238

1           Dr. Adam Werner
2   or perhaps somebody at Gnarus, other
3   than you, I'm sure, might have made a
4   mistake, you could let us know and we
5   can -- you know.
6           (REQUEST.)
7       A.   Well, I can tell you that
8   this data was taken from Bloomberg, this
9   is what Bloomberg represents as
10  institutional holders.  So I wouldn't say
11  anyone made a mistake.  (Indicating) --
12  someone else looked at Thomson Reuters
13  and took these numbers off the Thomson
14  Reuters.
15          Did they make a mistake?  I
16  don't know.
17      Q.   Okay.
18      A.   I assume they accurately
19  entered this data onto this page.
20      Q.   Well, you had said earlier --
21  it's your declaration so, obviously, you
22  don't have to do any of this, but you had
23  said earlier that you verified the
24  Bloomberg data by reviewing the 13-F.
25  So, obviously, if you go to the 13-F's --

Page 239

1           Dr. Adam Werner
2   you don't have to go to all of them, if
3   you even went to just a few of them,
4   because there's 29 institutional
5   iuvestors on this list, and you had I
6   think said there were ten so, obviously,
7   that would be pretty easy to see, if
8   there was a mistake by either Thomson
9   Reuters or perhaps Bloomberg or perhaps
10  someone at Gnarus, but that's all I'll
11  say on that.  It is what it is.
12          If -- you said this
13  strengthens your opinion on market
14  efficiency, anyway, "this" being the data
15  in Exhibit 6.
16      A.   That is correct.  But, again,
17  I'd be very suspect of delineating that
18  data -- trusting that data.
19      Q.   Understood.
20          We were able to find the
21  spreadsheets -- or, the Excel
22  spreadsheet, that you said you thought
23  you had provided regarding the Dow Jones
24  Index, so I want to show it, if I have
25  a -- do I have a copy of that?  And I

Page 240

1           Dr. Adam Werner
2   think -- I should say, I think we were
3   able to find it, but you will have to
4   tell us if I'm right or wrong.
5           MR. PARADISE:  So let's mark
6   this as Exhibit 7.
7           (Whereupon Deposition Exhibit
8   7, Document, which says Dow Jones
9   U.S. Mining Index (Index DJUSMG),
10  was marked for identification, as
11  of this date.)
12      Q.   So the court reporter has
13  handed you what's been marked as Exhibit
14  7, which I can represent to you came from
15  the documents that were provided by
16  Plaintiffs' counsel in connection with
17  your deposition.
18          Can you identify this for the
19  record?
20      A.   As I sit here, no.
21      Q.   Okay.
22      A.   I mean, if I'm reading it, it
23  says Dow Jones U.S. Mining Index (Index
24  DJUSMG).
25          MR. PARADISE:  Off the record

Page 241

1           Dr. Adam Werner
2   for one second.
3           (Discussion off the record.)
4       Q.   You're not disputing that
5   this came from your --
6       A.   I believe you.
7       Q.   Okay.  You said earlier that
8   you had accounted for -- I believe you
9   testified earlier, that you had accounted
10  for U.S. Silica in your event study; is
11  that correct?
12      A.   I said I adjusted for the
13  industry -- industry effects of my
14  analysis.
15      Q.   And the reason -- and we were
16  looking at U.S. Silica, because they --
17  there was some news about U.S. Silica
18  reported in that same headline in your
19  event study in Appendix A on November
20  13th.
21          Do you remember that, that we
22  talked about that?
23      A.   I remember discussing that,
24  yes.
25      Q.   Well, let me ask you, did you

61 (Pages 238 - 241)

Page 242

1      Dr. Adam Werner
2  account for the price movement in U.S.
3  Silica on November 13th in your event
4  study?
5       MR. STRAUSS: Objection.
6    A.  "Objection", asked and
7  answered?
8    Q.  You can answer.
9    A.  To the extent that U.S.
10 Silica is part of this industry index, I
11 would say yes.
12   Q.  And to the extent that U.S.
13 Silica is not part of this industry
14 index, would that have any impact on your
15 event study, in your opinion?
16      MR. STRAUSS: Objection.
17      MR. PARADISE: Okay.
18      MR. STRAUSS: Are you sure
19   that's the question you want to
20   ask, you're assuming that it's not?
21      MR. PARADISE: I said to the
22   extent that it is not. He said to
23   the extent that it is that he
24   accounted for it.
25   Q.  I'm asking to the extent that

Page 243

1      Dr. Adam Werner
2  it's not, would that have an impact on
3  your event study.
4       MR. STRAUSS: Objection. I
5   don't understand your question.
6       You mean did he evaluate it
7   individually into that study? Do
8   you want to ask that?
9       MR. PARADISE: My question
10   stands.
11   Q.  Do you understand my
12 question?
13   A.  I do not.
14   Q.  Okay, let's do this again.
15      You testified earlier that
16 you accounted for U.S. Silica -- and you
17 just said it again, just now -- in your
18 event study to the extent that it was
19 part of the index, the Dow Jones Index --
20 I probably should have -- the Dow Jones
21 Industry Index to which you relied;
22 correct?
23   A.  I believe that is correct.
24   Q.  If it was not part of that
25 index, would that have any effect on your

Page 244

1      Dr. Adam Werner
2  event study, in your opinion, if U.S.
3  Silica was not part of the index?
4    A.  I have no -- it's a
5  hypothetical, I have no way of being able
6  to answer it.
7    Q.  Well, do you think it's
8  important, for the purpose of your event
9  study, to account for a competitor like
10 U.S. Silica?
11   A.  I think --
12      MR. STRAUSS: Objection.
13      Go ahead.
14   A.  I think it's important to
15 account for market- and industry-specific
16 factors in my analysis.
17   Q.  Turning back to Exhibit 7 for
18 a moment and, again, this came from
19 your -- I mean, either your files or
20 Kirby McInerney files, but it was
21 represented to us that this was an
22 information or data that was relied upon
23 in connection with you're -- the
24 preparation of your declaration. Okay?
25   A.  Okay.

Page 245

1      Dr. Adam Werner
2    Q.  So, if you look at the top
3  line, number 1, you see at the top of the
4  page, line 1, there's a reference to an
5  index DJX:DJUSMG.
6       Do you see that?
7    A.  Yes.
8    Q.  Now turn back to -- I think
9  it was Exhibit 3.
10      Do you know what that symbol
11 is, the DJUSMG?
12   A.  Exhibit 3 -- I'm sorry, where
13 is Exhibit 3?
14   Q.  Well, the first -- the
15 reference to the DJUSMG, on Exhibit 7,
16 that I just read to you.
17      Do you know what that
18 represents, DJUSMG?
19   A.  This is irrelevant to Exhibit
20 3.
21   Q.  No, I'm asking you, do you
22 know what DJUSMG, from Exhibit 7, means?
23   A.  It could be the index symbol,
24 it could be the Bloomberg code for the
25 symbol.

62 (Pages 242 - 245)

Page 246

```
 1              Dr. Adam Werner
 2        As I sit here today, I don't
 3 know.
 4     Q.   So, here's Exhibit 3. And if
 5 you look at the upper left side, in
 6 black, it says: DJUSMG Index.
 7        Do you see that?
 8     A.   I see that.
 9     Q.   And you said to us earlier
10 that this was not the index that you
11 relied upon.
12     A.   I believe that is correct.
13     Q.   Okay. So, even though the
14 index that's identified on your document,
15 Exhibit 7, is DJUSMG, and even though
16 this Bloomberg screen shot is of the
17 DJUSMG index, it's your testimony that
18 these are not the same index -- the same
19 indices.
20     A.   (Pause.)
21        As I sit here today, I don't
22 know.
23     Q.   Okay. Let's see if we can do
24 it this way.
25        Let's take a look at the
```

Page 247

```
 1              Dr. Adam Werner
 2 Exhibit 7 for a moment, and if you need
 3 to get your computer out, that's fine,
 4 but if you can use the more simple
 5 calculator, I'll give you that again, but
 6 if you need to do it, I'm going to ask
 7 you to do a calculation with me, so if
 8 you need to get your computer -- I know
 9 you don't like the HP 12C, but -- oh, you
10 have a calculator right in front of you.
11 If you need to get your computer, please
12 feel free to do so.
13     A.   I'm going to hold off.
14     Q.   Okay. I want you to look at
15 line 63 and line 64, and I wanted you to
16 compute with me the percentage change in
17 the price from the 12th to the 13th.
18        So --
19     A.   Okay, I'll need it.
20     Q.   Yeah. And, if you don't
21 mind, can you just tell me out loud how
22 you're doing that, just to make sure that
23 I'm doing it the same way?
24     A.   (Using computer.)
25        Okay, you want me to do the
```

Page 248

```
 1              Dr. Adam Werner
 2 price change from the 12th to the 13th?
 3     Q.   Correct.
 4     A.   Okay. So I'm taking the
 5 quantity of 140.07 minus 141.72 and
 6 dividing that by 141.72.
 7     Q.   (Using calculator.)
 8     A.   Oops, I forgot the equal
 9 sign.
10        So negative 1.2 percent,
11 that's with rounding.
12     Q.   Right. And I have the
13 HP 12C, so going all the way, four
14 decimal places, I got negative 1.16.
15     A.   Negative 1.16?
16     Q.   Well, because it went down,
17 the price went down.
18     A.   Oh, you've converted into
19 percentages.
20     Q.   Well, you had -- I thought
21 you had 1.2; didn't you?
22     A.   Percent.
23     Q.   Right.
24     A.   Yeah, I thought you were
25 reading off the screen.
```

Page 249

```
 1              Dr. Adam Werner
 2     Q.   Oh, oh, oh. No, I'm sorry, I
 3 have negative 1.16 percent, okay.
 4        Turn now to your Appendix A,
 5 and tell me what the industry return was
 6 on November 13th, 2012.
 7     A.   (Pause.)
 8        Minus 1.16.
 9     Q.   Yes, okay.
10        So do you find it odd that
11 that's the same number that is on your
12 report, even though you didn't -- you say
13 you didn't use -- well, withdrawn,
14 withdrawn.
15     A.   I'm sorry, I don't understand
16 the question.
17     Q.   It's okay.
18        There's no question, I
19 withdrew it.
20     A.   May I put away my computer?
21     Q.   Yes, thank you.
22        Just for the record, if you'd
23 take a look at Exhibit 3 for one moment.
24 I just want you to agree or disagree with
25 me.
```

63 (Pages 246 - 249)

Page 250

1      Dr. Adam Werner
2          I do not see U.S. Silica on
3  this list, or this index, if that's
4  represented by Exhibit 3. Do you agree
5  with me on that?
6      A.   I do.
7      Q.   Okay.
8      A.   Maybe you can represent for
9  me why these numbers start on 11 and go
10 through 23?
11     Q.   I actually asked that same
12 question. And the answer is that's the
13 Bloomberg thing, I think, because it says
14 13 members.
15         If you look at the line below
16 alert, where it says: 7 alert, on the
17 top of the page, (indicating).
18     A.   Right, okay.
19     Q.   It says 13 members --
20     A.   Okay.
21     Q.   -- and even though it starts
22 at 11 it still has 13 members.
23         Look, all we're trying to get
24 at is, we're trying to figure out
25 what -- we're trying to just figure

Page 251

1      Dr. Adam Werner
2  out -- we think, no surprise, that this
3  (indicating) is this, and we think this
4  is the index this represents, and you're
5  telling us it's not, so perhaps you can
6  give us the backup to show what companies
7  are -- comprise this DJUSMG Index that's
8  represented in this spreadsheet, if you
9  know, if you have an employee to do that,
10 so that's -- we're just trying to get --
11 to make sure that we're all on the same
12 page here.
13     A.   I understand.
14     Q.   So, that's all. I mean, we
15 just -- you know, we have this,
16 (indicating), we have Exhibit 7, but we
17 don't have -- and I had asked you earlier
18 if you had a list of the companies, you
19 said you think you do, and you're going
20 to ask to get that but, you know, we
21 don't have it.
22         We have what we gave you, you
23 said it was the list, but we don't think
24 that's right, frankly. So that's it.
25     A.   Okay.

Page 252

1      Dr. Adam Werner
2      MS. BRANDON: Off the record.
3      (Discussion off the record.)
4  BY MR. PARADISE:
5      Q.   Now, let's go back to
6  paragraph -- our favorite paragraph on
7  your declaration, paragraph 12, the one
8  we spent the most time talking about
9  today, I think.
10         I want to just make sure --
11 I'm not asking you to answer, I just want
12 to make sure I understand what you
13 answered earlier, that I'm on the right
14 track.
15         When I asked you earlier
16 about what the corrected disclosure was,
17 you directed us to paragraph 12 and to
18 the Amended Complaint, but I think we
19 were able to do it in paragraph 12, and
20 you pointed to the information that you
21 quote here, which was that Hi-Crush
22 terminated the contract with Baker
23 Hughes -- Hi-Crush terminated the supply
24 agreement -- I'm paraphrasing now, but if
25 anything I say is not accurate you'll

Page 253

1      Dr. Adam Werner
2  correct me -- that Hi-Crush terminated
3  the supply agreement with Baker Hughes --
4  full stop.
5          Is that --
6      A.   I believe that's correct.
7      Q.   Okay. Would you agree with
8  me that Hi-Crush could not have disclosed
9  the fact that it had terminated the
10 contract with Baker Hughes any earlier
11 than November 12th, 2012?
12     MR. STRAUSS: Objection,
13 that's not an expert -- I don't
14 understand, you're asking him
15 whether they had a legal obligation
16 to do it?
17     MR. PARADISE: No, not a
18 legal obligation, I'm asking him a
19 factual question.
20     Q.   Could you disclose something
21 that hasn't happened yet?
22     MR. STRAUSS: Can you re-read
23 the question, please?
24         And you're making a legal
25 argument, you're not making a --

64 (Pages 250 - 253)

Page 254

1        Dr. Adam Werner
2    you're not asking for an expert
3    opinion.
4        But go ahead, what was the
5    question again?
6        (The record was read.)
7        MR. STRAUSS: That's not an
8    expert question -- that's not a
9    proper expert question for the
10   scope of this deposition.
11       You want to ask him about his
12   opinion, did he render an opinion
13   about when they could or would have
14   disclosed something, then you can
15   ask him, but he didn't render an
16   opinion about that.
17   Q.   Can you answer my question?
18   A.   No.
19   Q.   Okay, why not?
20   A.   I don't understand it.
21   Q.   Okay, let me try to do it
22   this way.
23       If something happens, occurs,
24   tomorrow, can I tell you that it happened
25   today?

Page 255

1        Dr. Adam Werner
2        MR. STRAUSS: Objection. Is
3    this a metaphysics class or an
4    expert deposition?
5    A.   I'm sorry, I didn't follow
6    that.
7    Q.   If something happens
8    tomorrow, can I disclose to you that it
9    happened, that it occurred today?
10       MR. STRAUSS: Objection,
11   nonsense.
12   A.   I have no idea.
13       I honestly don't understand
14   the question.
15   Q.   Let's go -- you've testified
16   numerous times as an expert on damages,
17   correct, in securities litigation cases.
18   A.   I believe that's correct.
19   Q.   And we talked earlier
20   about -- we touched upon earlier, a
21   situation where -- we didn't call it
22   this, but are you familiar with the
23   concept of an overdisclosure?
24       Have you heard that term
25   before?

Page 256

1        Dr. Adam Werner
2    A.   I don't believe so.
3    Q.   You know, you are familiar
4    with, and you cite to, an article by -- I
5    think it's Brad Cornell, and I'm not sure
6    of Morgan's first name, but it's somebody
7    Morgan.
8        Do you know -- are you
9    familiar with that article?
10   A.   Yes.
11   Q.   You cite to them on page 10,
12   Footnote 31.
13   A.   Oh, I'm sorry, page 10.
14   Q.   Yes, paragraph -- I'm
15   sorry -- Footnote 31, which appears at
16   the top of the page.
17   A.   Okay.
18   Q.   And you say that that --
19   well, you cite them as one source of
20   support for the use of event studies. I
21   believe you're saying that they are one
22   source of -- withdrawn.
23       You cite -- why do you
24   cite -- let me just ask you, why do you
25   cite to Mr. Cornell and Mr. Morgan's

Page 257

1        Dr. Adam Werner
2    article there?
3    A.   Can you hand me the article?
4    Q.   Oh, yeah.
5        MR. PARADISE: Do you have a
6    copy?
7    Q.   While she's looking for that,
8    did you work with Brad Cornell at
9    Charles -- was it Charles River?
10   A.   I did.
11   Q.   Do you respect him as an
12   economist?
13   A.   I believe so.
14   Q.   Okay.
15       MR. PARADISE: Let's have
16   this marked as Exhibit 8.
17       (Whereupon Deposition Exhibit
18   8, Article, HeinOnline, was marked
19   for identification, as of this
20   date.)
21   A.   Okay. So what did you want
22   to ask me about this?
23   Q.   I'm just asking you what --
24   for what purpose you cited to Cornell's
25   and Brad -- and Morgan's article.

65 (Pages 254 - 257)

Page 258

1      Dr. Adam Werner
2    A.  I suppose to back up the idea
3 that damage experts have used event
4 studies to calculate losses and under the
5 efficient market hypothesis.
6    Q.  Have you read this article in
7 its entirety at some point?
8    A.  At some point.
9    Q.  Do you recall -- and it's a
10 difficult question, so if you don't you
11 don't, but I'm going to ask it, anyway --
12 do you recall if there's anything in this
13 article that you disagree with?
14    A.  I don't recall.
15    Q.  I asked you earlier, are you
16 familiar with the term "overdisclosure",
17 and I don't remember what your answer
18 was.
19    A.  My answer was I don't believe
20 so.
21    Q.  Okay.  Well, let me tell you
22 what I understand.
23       They used the term
24 "overdisclosure" in here, I can't find it
25 at the moment, but my understanding of

Page 259

1      Dr. Adam Werner
2 what it means, and maybe you understand
3 the concept and you call it something
4 else, is when there is a corrective
5 disclosure that reveals more than what is
6 necessary to correct a prior
7 misrepresentation or omission.
8       So, in other words, if you
9 had a press release, we talked about
10 earlier the November 13th press release
11 disclosed the termination of the contract
12 by -- the termination of the Baker Hughes
13 contract -- by Hi-Crush, but it also
14 disclosed earnings.  So the earnings is
15 not necessary to cor-- you know, the
16 earnings that were described, or
17 discussed, in that press release, was
18 more information than was necessary to
19 correct what was allegedly a prior
20 omission.  So that's what they determined
21 "overdisclosure."
22       So does that concept --
23    A.  I understand what you're
24 talking about, but I don't know why you
25 would -- why they term it an

Page 260

1      Dr. Adam Werner
2 "overdisclosure".
3    Q.  Well, they don't term it an
4 "overdisclosure" in this case.
5       They talk about, generically,
6 that something like that would be an
7 "overdisclosure".  They weren't speaking
8 of the Hi-Crush case.  They're saying
9 it's an "over"-- they're calling it an
10 "overdisclosure", because they're saying
11 it is more information than is necessary
12 to correct the prior misrepresentation or
13 omission, so that's why they're saying
14 "overdisclosure".
15    A.  I don't know if that's more
16 or less information.
17    Q.  Okay.  In any event, turn to
18 page 897 for a moment.
19       And I'm looking at this
20 paragraph that begins with: In summary,
21 and it says -- I'll read it into the
22 record:  In summary, one can
23 unambiguously define the disclosure date
24 and the associated disclosure price only
25 in simple situations.  In most

Page 261

1      Dr. Adam Werner
2 circumstances, the parties must conduct
3 financial analysis to determine the price
4 at which the security would have traded
5 had the misrepresented or omitted
6 information, and only that information,
7 been disclosed.
8       Do you see that?
9    A.  I do.
10    Q.  Do you agree with that
11 statement?
12    A.  I don't know, as I sit here
13 today.
14    Q.  If you were -- and we touched
15 upon this a little bit earlier, but just
16 to come back to it for a second -- if you
17 were asked by Mr. Strauss, or someone
18 else with Kirby McInerney, to construct a
19 damages model for this case, what would
20 you do?  How would you go about doing
21 that?
22       MR. STRAUSS:  Objection.
23    A.  Use an event study to measure
24 the abnormal return, I'd investigate what
25 other news was released on that day, how

66 (Pages 258 - 261)

Page 262

1           Dr. Adam Werner
2 the market viewed that news, all the news
3 that was released. Um -- if it turned
4 out that, you know, something was --
5 there was a compounding factor in what we
6 were -- in the announcement, I'd take
7 that into account.
8      Q.  When you say "all" -- when
9 you refer to "all the news", are you
10 referring to the company's specific news
11 or all the news in the market at large?
12           MR. STRAUSS: Objection.
13      A.  I'm speaking of the company-
14 specific news --
15      Q.  Okay.
16      A.  -- on the disclosure date.
17      Q.  So -- and the reason for
18 that, the reason for doing that, where
19 you said you'd try to -- let me withdraw
20 that.
21           So would your -- would you be
22 trying or attempting to kind of isolate
23 the drop in the stock price that was
24 attributable to the corrective
25 disclosure?

Page 263

1           Dr. Adam Werner
2           Would that be your objective?
3           MR. STRAUSS: Objection.
4           Once again, you're talking about a
5 hypothetical --
6           MR. PARADISE: Yes.
7           MR. STRAUSS: -- a
8 hypothetical exercise.
9           MR. PARADISE: Yes, one that
10 he's done numerous times.
11           THE WITNESS: Could you read
12 back the question, please?
13           (The record was read.)
14      A.  It depends on what I would be
15 tasked with.
16      Q.  Tasked with determining the
17 damages caused by the alleged fraud.
18           MR. STRAUSS: Objection.
19      A.  Again, it would depend upon
20 what someone asked me to do.
21      Q.  So you can't -- you are
22 unable to answer the question, based on
23 these -- this hypothetical?
24      A.  Based on the way you've
25 described the situation, that is correct.

Page 264

1           Dr. Adam Werner
2           Put another way, I believe it
3 is an incomplete hypothetical.
4      Q.  Let's look at another part of
5 Morgan and Cornell's article, on page
6 891.
7           The first full paragraph, and
8 for the record I'll just read:  Yet cases
9 in which a company announces A and then
10 announces strictly A is not true are
11 rare.
12           Do you agree with that
13 statement?
14           MR. STRAUSS: Objection.
15           Go ahead.
16      A.  In which a company
17 announces -- are you asking do companies
18 try to hide bad news with other news
19 so -- to have these compounding effects,
20 so they --
21      Q.  I'm --
22      A.  -- confuse the situation
23 about whether or not a disclosure is a
24 clear disclosure or not?
25      Q.  I'm asking simply do you

Page 265

1           Dr. Adam Werner
2 agree with the statement that -- I'm not
3 being pejorative, you put a pejorative
4 description in there, but I'm just simply
5 asking, in your experience, whether you
6 think it's for the purpose of hiding, or
7 whatever, is it your opinion, if you have
8 one, that it's rare for companies to
9 simply say A and then announce later on
10 that A is not true.
11           MR. STRAUSS: Objection.
12      A.  I don't understand what Brad
13 means -- or, Dr. Cornell means, in
14 this -- by simply -- maybe you're adding
15 "simply" --
16      Q.  "Strictly."
17      A.  "Strictly", yes, I'm sorry.
18 "Strictly".
19      Q.  He said "strictly", I didn't;
20 right?
21      A.  Correct, he did, he said
22 "strictly", I'm not sure --
23      Q.  Okay.
24      A.  -- in what context he's using
25 that term.

67 (Pages 262 - 265)

Page 266

1      Dr. Adam Werner
2      Q.   If I said "simply", then I
3   misspoke, and I meant to say "strictly",
4   but I don't know.
5           MR. PARADISE: Did I say --
6      (The record was read.)
7           MR. PARADISE: Okay, it
8     sounds like either I garbled it or
9     you didn't get it all down.
10     Q.   But, the bottom line is, I
11   think the substance is the same, but I
12   can correct it in the record.
13          It's -- what it should say
14   is: Yet cases in which a company
15   announces A and then announces strictly A
16   is not true are rare.  That's what I
17   meant to quote.
18     A.   Okay.
19     Q.   The bottom line is, you can't
20   agree or disagree because you're not sure
21   of the context in which he's saying it;
22   is that right?
23     A.   Correct.
24     Q.   Okay.
25          MR. PARADISE: All right,

Page 267

1      Dr. Adam Werner
2   let's take two minutes.
3      (Recess taken: 4:48 p.m. -
4      5:05 p.m.)
5           MR. PARADISE: Back on the
6   record.
7   BY MR. PARADISE:
8      Q.   I want to take you back to
9   the "halcyon" days, when you worked for
10  Defendants.
11          Do you remember those days?
12     A.   I would say that that
13  mischaracterizes who I work for
14  currently.
15     Q.   Who you work for currently?
16     A.   Well, I mean, I will do
17  defense work.
18     Q.   I'm sorry, I was being
19  tongue-in-cheek, and I shouldn't have.
20  Okay.
21          But you testified that in
22  your -- in the past, you have worked for
23  defendants; is that correct?
24     A.   Correct.
25     Q.   And have you been asked in

Page 268

1      Dr. Adam Werner
2   any of those matters -- were you ever
3   asked to calculate the share price
4   inflation at the time of the disclosure
5   that's supposedly, you know, revealed the
6   truth to the market?
7           MR. STRAUSS: Objection.
8      Go ahead.
9      A.   "Asked", do you mean as when
10  I have been an expert, or are you
11  speaking to when I've supported other
12  individuals?
13     Q.   If it's a different answer,
14  then we can break it out like that, but I
15  would say either/or.
16     A.   I believe, yes.
17     Q.   Okay.
18     A.   That has been the case.
19     Q.   In those -- in any of those
20  matters, either as an expert or a --
21  supporting an expert, did you ever
22  conclude that what was disclosed at the
23  end of the class period could not have
24  been disclosed at the beginning of the
25  class period?

Page 269

1      Dr. Adam Werner
2           MR. STRAUSS: Objection.
3      I don't understand the
4      question.
5      A.   Well -- I don't understand
6   the question, but I don't believe I've
7   ever been asked to do that.
8      Q.   Well --
9      A.   To the extent that I
10  understand what you're saying.
11     Q.   Well, let me try it this way.
12          What I'm asking is, that
13  information that was revealed at the end
14  of the class period -- okay?
15     A.   Okay.
16     Q.   -- could not have been
17  disclosed at the beginning of the class
18  period, for whatever reason, be it that
19  that information wasn't available at the
20  beginning of the class period, that some
21  event hadn't occurred at the beginning of
22  the class period that had occurred at the
23  end of the class period and it was
24  disclosed at the class period, but
25  couldn't have been disclosed earlier

68 (Pages 266 - 269)

Page 270

1       Dr. Adam Werner
2  because it had not yet occurred, that's
3  what I'm getting at.
4          MR. STRAUSS: Objection.
5      A.   I'm just -- I'm very confused
6  about this notion of has not yet occurred
7  but has occurred or will occur -- I'm
8  sorry, I'm trying to be --
9      Q.   No --
10     A.    -- as honest as I can with
11 you, but I just -- I can't wrap my head
12 around what you're trying to get at.
13         MR. STRAUSS: You're trying
14     to back into a factual argument
15     that really has nothing to do with
16     his opinion on market efficiency.
17         And, you know, if you want to
18     make your factual argument in your
19     papers, that's great, and I think
20     you already did but lost on that,
21     on the motion to dismiss, but it's
22     just not really appropriate for
23     market --
24     Q.   Oh, is that why you can't --
25         MR. STRAUSS: -- efficiency

Page 271

1       Dr. Adam Werner
2  examination.
3      Q.   -- answer it, or you can't
4  answer it because you don't understand
5  it?
6      A.   I can't answer it because I
7  don't understand it.
8      Q.   Okay, I'm trying to come up
9  with a hypothetical to try to see if it
10 helps you understand it.
11         So let's take this as an
12 example. You have a company that is
13 engaged in merger negotiations on day
14 one, okay?
15     A.   Okay.
16     Q.   And it tells the market: We
17 are not engaged in merger negotiations,
18 okay? On day one.
19         On day 30, the company
20 announces that it has completed a merger,
21 okay?
22     A.   Okay.
23     Q.   So day 30 they complete the
24 merger, day one they deny being involved
25 in any merger negotiations.

Page 272

1       Dr. Adam Werner
2         On day 30, in addition to
3  saying that: We've completed the merger,
4  they also disclose that: We've been
5  involved in merger negotiations since day
6  one. Okay?
7      A.   Okay.
8      Q.   What I'm trying to get at is,
9  could they have disclosed on day one that
10 they had completed a merger?
11         MR. STRAUSS: Objection.
12     Q.   That's the whole -- that's
13 what I'm getting at with all of these
14 questions I've been trying to ask you.
15         MR. STRAUSS: You're making a
16     factual argument, you're not asking
17     an expert opinion question or
18     anything about his expert opinion
19     or any of the analyses or
20     assumptions that he offers expert
21     opinion.
22         This has nothing to do with
23     his expert opinion or market
24     efficiency.
25         How does this relate to

Page 273

1       Dr. Adam Werner
2  market efficiency?
3         MR. PARADISE: In fairness,
4      I'm trying to get to the answer of
5      the question I asked previously,
6      which he said he couldn't answer,
7      because he doesn't understand my
8      question, because he doesn't
9      understand the has occurred/has not
10     occurred. So I'm trying to give an
11     example of why I'm using that term,
12     something that has occurred/has not
13     occurred.
14         That's just an example of
15     that.
16         MR. STRAUSS: What does this
17     have to do with market efficiency
18     or his opinion on market
19     efficiency?
20         MR. PARADISE: Well, he's
21     testified in here that he completed
22     an event study, he testified that
23     there was a corrective disclosure,
24     that these are relevant to his
25     analysis of market efficiency.

69 (Pages 270 - 273)

Page 274

1          Dr. Adam Werner
2          But if you'll represent to
3   us, on the record, that Dr. Werner
4   is not going to be asked to do any
5   other work on this case in
6   connection with the class
7   certification motion, including
8   calculating damages, then I'll
9   withdraw the question.
10         MR. STRAUSS: I'm not going
11  to represent that.
12         MR. PARADISE: I didn't think
13  you would.
14  BY MR. PARADISE:
15     Q.  So does that help you
16  understand --
17         MR. PARADISE: And again --
18         MR. STRAUSS: If you ask him
19  if he's been asked to calculate
20  damages or if he has an opinion on
21  damages, and he's said no, so I
22  don't understand why that's not the
23  end of the analysis.
24         If he renders an additional
25  opinion on damages, you'll have the

Page 275

1          Dr. Adam Werner
2   opportunity to depose him on that.
3          MR. PARADISE: Will we? I
4   don't know. Not with the schedule
5   we have right now, I don't know
6   that we will.
7          So, but let me just answer
8   your other objection.
9          The hypothetical was only for
10  the purpose of trying to explain to
11  him what my question was about.
12     Q.  And, I don't know, did
13  that -- putting aside Mr. Strauss's
14  objections, for the moment, did that --
15  do you at least now understand where I'm
16  coming from or what I'm getting at, with
17  that question?
18     A.  It just -- it doesn't make --
19  I understand, I think, what you're trying
20  to say.
21         It's like you're saying if
22  something didn't occur, or something is
23  going to occur in the future, can I --
24  and I don't know whether it's going to
25  occur, can I talk about it today -- it's

Page 276

1          Dr. Adam Werner
2   just -- it seems like some kind of
3   time-travel thing that I'm not quite
4   wrapping my head around.
5      Q.  I assure you, it's not the
6   "time-travel thing".
7          The bottom line is, you
8   never -- you said you've never been asked
9   to express an opinion -- at least as far
10  as you understand my question -- you've
11  not been asked to express that opinion in
12  any of these other matters that you've
13  worked on in the past for other
14  defendants.
15     A.  I have no idea.
16     Q.  All right.
17         MR. STRAUSS: Yes, no
18  opinions on time travel.
19         THE WITNESS: Could be cool,
20  certainly go back and fix some
21  errors in my life.
22     Q.  You list, in Exhibit 2, one
23  of the documents that you relied upon,
24  the decision and order granting, in part,
25  and denying in part, Defendants' motion

Page 277

1          Dr. Adam Werner
2   to dismiss in this case. Is that right?
3          It's -- I think it's Document
4   Number 2.
5      A.  Okay. You know what? Let me
6   amend Exhibit 2.
7          I believe that it should say:
8   Documents reviewed.
9      Q.  Okay, as opposed to:
10  Documents relied on?
11     A.  Yes.
12     Q.  And what's that -- what's the
13  distinction, in your mind?
14     A.  These are all things that I
15  have looked at. I'm not sure that every
16  little thing on this page has formed my
17  opinion -- or, helped form my opinion.
18     Q.  Well, let me ask you
19  specifically about that document, Number
20  two. And if it's okay with Mr. Strauss,
21  I'll just refer to it as a decision and
22  order on the motion to dismiss.
23         Is that a document that you
24  relied upon, as opposed to reviewed?
25     A.  Can I -- I think you've

70 (Pages 274 - 277)

**Page 278**

1         Dr. Adam Werner
2 already entered it as an exhibit.
3     Q.  Not the Decision and order.
4     A.  Oh.
5     Q.  But I can give it to you.
6     A.  Yeah, I would like to take a
7 look at it.
8     Q.  Sure. Always ask that, if
9 you like.
10     A.  I guess you gave me the
11 Amended complaint over there.
12     Q.  Right.
13     MR. PARADISE: This would be
14 Exhibit 9.
15     (Whereupon Deposition Exhibit
16     9, Decision and order granting in
17     part and denying in part
18     Defendants' motion to dismiss, was
19     marked for identification, as of
20     this date.)
21     THE WITNESS: Okay, now that
22 I have it in front of me, could you
23 re-ask the question?
24     Q.  The question is, using the
25 distinction that you just drew, is this

**Page 279**

1         Dr. Adam Werner
2 something that you reviewed and relied
3 upon or just reviewed for the purposes of
4 your opinion.
5     A.  Well, to the extent that I
6 believe this document informed my
7 understanding of what the class period
8 was, I believe -- to that extent I relied
9 upon it and, in relying upon it, I
10 reviewed it.
11     Q.  Okay. There is -- let me ask
12 you about some other things, besides
13 that, and ask quickly if you have an
14 opinion about them or you even are
15 familiar with them.
16     The court ruled in this
17 decision -- or this Decision and order,
18 that -- well, she didn't rule, she
19 stated, in this Decision and order, that
20 the letter that Baker Hughes sent to
21 Hi-Crush on September 19, 2012 did not --
22 was not an effective termination of the
23 supply agreement.
24     MR. STRAUSS: Objection.
25     A.  I don't know what that means.

**Page 280**

1         Dr. Adam Werner
2     Q.  Okay, so do you have -- you
3 don't agree or disagree with that
4 statement; is that fair to say?
5     A.  I'll stick with my answer --
6     MR. STRAUSS: Objection.
7     A.  -- I don't know what that
8 means.
9     Q.  When you say you don't know
10 what it means, what -- you don't know
11 what what means?
12     A.  I don't know what the judge
13 meant by that.
14     Q.  Okay, I'm sorry, you don't
15 know what you meant -- what I meant by
16 what I said, okay.
17     Let's look at -- maybe this
18 will help, let's look -- sometimes it's
19 easier to understand things in writing
20 than oral, look at page 27, this first --
21 second full paragraph.
22     Read the first sentence of
23 that paragraph.
24     A.  (Pause.)
25     Yeah, I don't know what the

**Page 281**

1         Dr. Adam Werner
2 judge was --
3     Q.  So you don't agree or
4 disagree with her statement there.
5     MR. STRAUSS: Which
6 statement?
7     MR. PARADISE: The first --
8 the one I just asked about, the
9 first sentence of -- the first --
10 second full paragraph on page 27.
11     Do you want me to read it
12 into the record?
13     MR. STRAUSS: No, I see the
14 first sentence.
15     A.  Just the first sentence?
16     MR. STRAUSS: Of the second
17 paragraph on page 27.
18     A.  I would turn the question
19 over to you, did you counter the Baker
20 Hughes purported termination was invalid?
21     Q.  I don't usually answer
22 questions at depositions but, I'm
23 curious, I don't know what you mean by
24 that.
25     A.  Maybe I'm looking at the

71 (Pages 278 - 281)

Page 282

1        Dr. Adam Werner
2  wrong thing.
3        My thing says: The 10 B
4  Defendants countered the Baker Hughes
5  purported --
6        MR. STRAUSS: No, the second
7  paragraph.
8        MS. BRANDON: Why don't you
9  read it into the record.
10  A.    I'm sorry.
11       MR. STRAUSS: Why don't you
12  read the second paragraph,
13  please --
14       THE WITNESS: Okay.
15       MR. STRAUSS: -- and then you
16  can --
17  A.    Should I point out the typo?
18  Q.    Yeah, I see it, too.
19       You don't point out typos to
20  judges.
21  A.    Yeah, that's a bad idea.
22  (Pause.)
23       I don't understand that.
24  Q.    You don't understand the
25  first sentence or did you read more than

Page 283

1        Dr. Adam Werner
2  just the first sentence?
3  A.    I continued on.
4  Q.    Okay, let's take a look at
5  page 29 of the decision.
6        The second full paragraph,
7  so -- and I'll just read it, to make this
8  easier, the one that begins, at the
9  bottom of the page: The 10 B Defendants
10  are correct that Baker Hughes violated
11  the agreement's termination provision by
12  sending a termination notice prior to the
13  occurrence of four serial uncured
14  breaches. Thus, Hi-Crush did not --
15  quote -- receive a notice of termination
16  pursuant to the terms of the agreement,
17  and the agreement was not terminated
18  within the meaning of item 1.02.
19  Accordingly, this rule did not require
20  Hi-Crush to disclose Baker Hughes'
21  repudiation via Form 8-K.
22       Do you see that?
23  A.    I do see it.
24  Q.    Okay. The letter in which --
25  and we talked about this this morning,

Page 284

1        Dr. Adam Werner
2  it's been a while but we talked about
3  this morning what happened on September
4  19th, and you've answered, after we
5  looked at your declaration, and some
6  other documents, that that was the date
7  on which Baker Hughes sent the letter to
8  Hi-Crush.
9  A.    Yeah, I believe that's
10  correct.
11  Q.    Okay. So, what the judge is
12  saying here is the receipt of that letter
13  by itself did not require disclosure by
14  Hi-Crush.
15       Do you have any reason to
16  disagree with that?
17       MR. STRAUSS: Objection.
18  A.    Well, first, that's what
19  you're representing the judge is saying.
20  I personally don't read this and say
21  that's the conclusion I come to. I don't
22  understand it.
23  Q.    Okay.
24  A.    I'm not a lawyer.
25  Q.    Okay. Fair to say that

Page 285

1        Dr. Adam Werner
2  this -- the reasoning and the language
3  that the judge used in her decision, was
4  not something you relied upon in coming
5  to your opinion in this case, that you've
6  expressed in this case?
7        MR. STRAUSS: Objection.
8        Which part of the language or which
9        part of the decision?
10       MR. PARADISE: Well, this
11  language about whether Hi-Crush was
12  required to file an 8-K on -- upon
13  receipt of the repudiation letter.
14       THE WITNESS: Can you re-read
15  the question, please.
16       (A portion of the record was
17  read.)
18  A.    I don't know the answer to
19  that question.
20  Q.    You don't know whether you
21  relied on it or not?
22  A.    I don't believe -- I don't
23  know, as I sit here today, only because,
24  again, I don't understand the language.
25  Q.    Well, does it have any

72 (Pages 282 - 285)

Page 286

1          Dr. Adam Werner
2  bearing on whether the market for
3  Hi-Crush was efficient or not efficient
4  during the class period?
5          A.   As I sit here today, I don't
6  know.
7          Q.   Okay.
8              MR. PARADISE: Thank you, no
9  further questions.
10             (Time noted: 5:21 p.m.)
11             MR. STRAUSS: Okay. I'll
12  just ask a few questions.
13  EXAMINATION
14  BY MR. STRAUSS:
15         Q.   I'd just like to ask you a
16  couple of follow-up questions about the
17  methodology that you used for your event
18  study.
19             Was the methodology that you
20  used the methodology that's recognized in
21  the literature in the field?
22         A.   Yes, by numerous people.
23             I can turn to the articles by
24  Tabak, Ferrillo, and Dunbar, and the St.
25  John's Law Review. I believe they have

Page 287

1          Dr. Adam Werner
2  another article -- not Ferrillo, just
3  Dunbar and Tabak, in the -- it's -- I'll
4  have to get it, the exhibit here -- oh,
5  so turning to Exhibit 1 -- well, Exhibit
6  2 and Exhibit 1 -- right, in here, Number
7  27: The Tabak and Dunbar materiality
8  magnitude event studies in the courtroom
9  in the litigation service handbook, that
10  was what I was looking for, the role of
11  the financial expert, so yes, it's
12  recognized, and by other individuals.
13  Those are just two examples of....
14         Q.   And is the methodology the
15  same methodology that you used when you
16  were at Cornerstone?
17         A.   Yes.
18         Q.   And is it the same
19  methodology that you used when you were
20  at NERA?
21         A.   Yes.
22         Q.   Okay. I'd like to turn back
23  to there were some questions earlier
24  about the control period that you used
25  and whether or not you -- and about the

Page 288

1          Dr. Adam Werner
2  control period that you used and the fact
3  that you excluded November 12th, 2012
4  from the control period.
5          Could you explain why you
6  excluded November 12th, 2012 from the
7  control period?
8              MR. PARADISE: Objection.
9          A.   I believe -- well, typically,
10  when you do this type of analysis, you
11  want to correct -- or, not "correct", you
12  want to make sure that your sample is
13  neutral, for want of a better term, such
14  that I could have included it in my
15  analysis, I could have run the event
16  study over a different time period. I
17  just would have used a dummy variable to
18  account for this disclosure.
19         Q.   And is it -- is either
20  method -- are you describing two
21  different methods, there is one method
22  where you would use a dummy variable and
23  include the event that you're evaluating,
24  and another method where you would not
25  include the event that you are evaluating

Page 289

1          Dr. Adam Werner
2  and then you don't have to use a dummy
3  variable to explain?
4          A.   Well, no, I mean, it's all
5  part and parcel of an event study. So
6  when people do event studies, they can
7  look at -- you know, they determine what
8  their measurement period is.
9              Oftentimes, people do that
10  over a class period, and in doing -- but,
11  when doing so, use dummy variables to
12  correct for the fact that you have these
13  disclosures during the event period --
14  or, during the class period. Otherwise,
15  people will use what's called a "neutral
16  period" or period that is untainted by,
17  in this case, the alleged fraud and
18  estimate their event study over that
19  period.
20         Q.   And that's what you did here.
21         A.   Correct.
22             MR. STRAUSS: Okay, that's
23  it, I don't have anything else.
24             MR. PARADISE: I have no
25  questions, no further questions.

73 (Pages 286 - 289)

Page 290

```
 1        Dr. Adam Werner
 2    Thank you.
 3        THE WITNESS:  Thank you.
 4    (Time noted:  5:26 p.m.)
 5
 6
 7    DR. ADAM WERNER
 8
 9
10  Subscribed and sworn to before me
11  this _____ day of _____, 2014.
12
13
14        Notary Public
15
16
17
18
19
20
21
22
23
24
25
```

Page 291

```
 1
 2        C E R T I F I C A T E
 3
     STATE OF NEW YORK )
 4                    : ss.
     COUNTY OF NEW YORK)
 5
 6        I, Wendy D. Boskind, an RPR
 7    and Notary Public within and for the
 8    State of New York, do hereby certify:
 9        That DR. ADAM WERNER, the
10    witness whose deposition is
11    hereinbefore set forth, was duly
12    sworn by me, and that such deposition
13    is a true and accurate record of the
14    testimony given by the witness.
15        I further certify that I am
16    not related to any of the parties to
17    this action by blood or marriage, and
18    that I am in no way interested in the
19    outcome of this matter.
20        IN WITNESS WHEREOF, I have
21    hereunto set my hand this 28th day
22    of April, 2014.
23
24        _____
          WENDY D. BOSKIND, RPR
25
```

Page 292

```
 1
 2  April 24, 2014
              INDEX
 3                           PAGE
 4  WITNESS:
 5  DR. ADAM WERNER
 6
 7  EXAMINATION
 8  BY MR PARADISE               4
    BY MR STRAUSS:             286
 9
10
11          EXHIBITS
12  Exhibit 1  Declaration of Dr.    6
              Adam Werner April
13            15, 2014
14  Exhibit 2  Press release, dated  114
              November 13th
15
    Exhibit 3  Document, DJUSMG      154
16            Index, as of January
              18th, 2013
17
    Exhibit 4  Document, Dow Jones   158
18            U S Mining Index,
              with a list of the
19            companies
20  Exhibit 5  Amended consolidated  162
              class action
21            complaint for
              violations of the
22            federal Securities
23            Laws
24
25
```

Page 293

```
 1
 2  Exhibit 6  Document,            235
              represented to be a
 3            compilation of
              information
 4            retrieved from
              Thomson Reuters of
 5            13-F filings as of
              September 30th, 2012
 6
    Exhibit 7  Document, which says  240
 7            Dow Jones U.S.
              Mining Index (Index
 8            DJUSMG)
 9  Exhibit 8  Article, HeinOnline  257
10  Exhibit 9  Decision and order   278
              granting in part and
11            denying in part
              Defendants' motion
12            to dismiss
13
14
15
16  (REQUEST.)                      59
    (REQUEST.)                     222
17  (REQUEST.)                     238
18
19
20
21
22
23
24
25
```

74 (Pages 290 - 293)

Page 294

```
 1        ERRATA SHEET
          VERITEXT REPORTING COMPANY
 2            1250 BROADWAY
          NEW YORK, NEW YORK 10001
 3            800-362-2520
 4   CASE: HI-CRUSH PARTNERS L.P. SECURITIES LITIGATION
     DEPOSITION DATE: 4/24/14
 5   DEPONENT: DR. ADAM WERNER
 6   PAGE LINE(S) CHANGE      REASON
 7   ___|___|_____|_____
 8   ___|___|_____|_____
 9   ___|___|_____|_____
10   ___|___|_____|_____
11   ___|___|_____|_____
12   ___|___|_____|_____
13   ___|___|_____|_____
14   ___|___|_____|_____
15   ___|___|_____|_____
16   ___|___|_____|_____
17   ___|___|_____|_____
18   ___|___|_____|_____
19   ___|___|_____|_____
20
21   _____
          DR. ADAM WERNER
22
     SUBSCRIBED AND SWORN TO BEFORE ME
23   THIS ____ DAY OF _____, 20___.
24
     _____   _____
25   (NOTARY PUBLIC)    MY COMMISSION EXPIRES:
```

75 (Page 294)

[& - 2005]                                                                                              Page 1

| & | | | |
|---|---|---|---|

**&**

& 1:15 2:13 72:22

**0**

0 175:14
0.025 175:15
08557 1:3

**1**

1 6:14,17,21,23 7:8
7:11 20:25,25 21:2
21:4,12 25:6,18
26:11,19,19 33:14
33:14 44:14 54:9
56:10,13,13 57:7
65:2,18 71:9,9
76:14 79:2 99:8
102:12,13 115:17
122:15 147:17
152:14,19 153:5,5
163:2 176:24 178:4
179:2 194:16 195:5
216:25 245:3,4
287:5,6 292:12
**1.02.** 283:18
**1.068** 219:18,22
**1.07** 219:12
**1.16** 248:15 249:3
**1.16.** 248:14 249:8
**1.2** 248:10,21
**1.25** 150:12
**1.53** 217:15 219:4
**1.67** 135:17
**1.96** 132:12
10 65:9 139:20
163:14,17 170:16
180:8,11 184:12
194:16 256:11,13
282:3 283:9
**10-20-2012** 183:22
**10-21-2012** 233:17
**10001** 294:2
**10022** 2:7
**101** 210:22

**10103-0040** 2:17
**104** 137:5
**1099** 17:8 18:11
**10:09** 1:11
**10:55** 50:12
**11** 99:7 139:20
182:18,23 184:4,11
198:14,25 250:9,22
**11-1-2012** 183:5
**11-6-2012** 183:7
**114** 292:14
**11:09** 50:13
**12** 1:3 78:24 104:20
104:24 106:21
110:2 111:25
113:12 122:18
139:20 165:9,15
166:5 172:5 173:8
186:20 187:11
188:3,5 195:8 236:7
252:7,17,19
**1250** 294:2
**12:09** 114:17
**12:19** 114:18
**12:50** 144:24
**12c** 150:24 247:9
248:13
**12th** 68:23 69:2,10
70:25 102:10 104:8
104:11 106:24
111:12,20 112:11
112:21 113:25
116:23 117:12,15
117:17,20,23 118:5
118:12,24 119:10
119:15,23 120:8
121:11 123:17
131:7 171:11
178:22 218:5
247:17 248:2
253:11 288:3,6
**13** 121:11 124:13,13
139:10,11,20
140:10 187:23
188:4,8 200:12

230:5,18 231:12,12
231:13 233:19
235:14,22 237:16
238:24,25 250:14
250:19,22 293:5
**13th** 40:6 103:23
105:21,25 108:20
108:23 109:10,11
109:16,24 112:4,12
112:15,21 113:24
114:12 116:16,22
117:8 120:21,22
122:25 123:2
127:23,24 129:24
130:4,10,12 131:4
131:15 139:18
140:16,23 143:20
144:3 166:4,18
169:12,14 195:15
198:9,10 200:20
241:20 242:3
247:17 248:2 249:6
259:10 292:14
**14** 129:23 130:6
139:22,22 140:10
141:10 170:19,20
171:8 172:12 176:4
177:18
**140.07** 248:5
**141.72** 248:5
**141.72.** 248:6
**14th** 67:7 71:7 131:9
131:11 139:18
143:20,24 144:2
232:5
**15** 6:18 68:18 93:8
227:22 228:5 231:9
231:21 236:2
292:13
**15.4** 228:12
**154** 292:15
**158** 292:17
**15th** 67:7
**16** 138:18,19,21
233:16

**162** 292:20
**16th** 71:21 232:4
**17** 157:15
**17th** 71:23
**18** 195:22 196:8,23
197:2,8,13
**18.2** 194:22 197:14
197:15
**18th** 68:19 154:22
155:3 292:16
**19** 99:9 100:10
122:17 172:5 173:7
218:5 279:21
**19th** 68:23 69:10
70:24 97:24 98:4,17
98:21 99:6 100:11
101:15 105:20
111:12 120:7
123:16 128:9
171:10 178:21
183:2,20 284:4
**1:43** 145:3

**2**

2 7:20 24:23 25:5
31:24 52:13,21
64:24 65:2,3,18,18
76:13,15 94:7
105:15,16 106:11
114:9,11,22 116:14
125:24 153:4,5
194:13 204:5,16,22
276:22 277:4,6
287:6 292:14
**2,097,326** 232:12
236:6
**2.097326** 233:18
**20** 294:23
**200** 155:10 156:23
201:18 203:5
**2000** 12:8 13:18
**2003** 13:15,25
**2004** 15:15
**2005** 15:14

[2007 - 78]                                                                                                Page 2

| | | | |
|---|---|---|---|
| **2007** 13:13 | **21** 128:10 | 246:4 249:23 250:4 | 292:20 |
| **2008** 10:10 16:5 | **210** 4:4 | 292:15 | **50** 60:24 |
| **2009** 16:5 18:14 | **212** 2:9,21 | **3.1** 217:20 218:9 | **50/50** 24:9 |
| **2010** 18:14 | **214** 2:22 | 219:24 | **500** 192:19,20,24 |
| **2012** 40:6 62:20,21 | **22** 183:14,15 | **30** 83:2,3 84:12,19 | 193:9,11 |
| 63:25 64:2 65:14 | **220-7929** 2:22 | 84:21 89:20 236:11 | **57** 236:13,15,15 |
| 66:24 67:9 68:18 | **222** 293:16 | 271:19,23 272:2 | **59** 293:16 |
| 69:10,10 70:24,25 | **22nd** 183:3 | **30th** 234:3 235:14 | **5:05** 267:4 |
| 71:21,22,23 97:24 | **23** 250:10 | 235:23 293:5 | **5:21** 286:10 |
| 98:4 99:9 100:3 | **235** 293:2 | **31** 148:24 149:14 | **5:26** 290:4 |
| 102:10 104:11 | **237-0016** 2:21 | 256:12,15 | |
| 105:20 106:24 | **238** 293:17 | **312** 3:10 | **6** |
| 111:12,13,20 112:4 | **24** 1:10 118:16 | **32.6** 228:13 | **6** 21:5,6 68:2,14 |
| 116:23 119:23 | 128:10 138:16 | **322-0200** 3:10 | 69:21 115:17 |
| 120:8,8,21 121:11 | 292:2 | **33** 227:23 | 178:25,25 195:12 |
| 122:17,18,25 | **240** 293:6 | **332** 3:8 | 198:11 235:8,11,19 |
| 124:13 127:23 | **25** 181:21 184:12 | **35** 198:12 | 239:15 292:12 |
| 129:24 131:4,17 | **252** 194:6 | **36** 173:4,9 174:2 | 293:2 |
| 140:10 143:20 | **2550** 4:3 | **36,674,570** 151:19 | **60604** 3:9 |
| 144:2 148:24 162:4 | **257** 293:9 | **37** 173:10 | **61** 138:16 |
| 163:23 166:18 | **25th** 100:3 | **371-6600** 2:9 | **63** 247:15 |
| 171:10,11 173:8 | **26** 195:13 196:9,25 | **3:23** 202:4 | **64** 247:15 |
| 178:22 182:24 | **26.2** 197:8 | **3:59** 235:3 | **666** 1:16 2:15 |
| 183:2,3 194:24 | **269** 152:4 | | **67** 152:11 |
| 197:15,18 198:10 | **26th** 2:16 | **4** | **6th** 184:2 |
| 200:12 218:5,6 | **27** 280:20 281:10,17 | **4** 10:11 94:6 126:14 | |
| 232:11,15 233:16 | 287:7 | 126:17 150:13 | **7** |
| 235:15,23 249:6 | **278** 293:10 | 158:5,7,13,17 189:3 | **7** 129:2,18,22 |
| 253:11 279:21 | **286** 292:8 | 189:7 199:8 202:17 | 136:22 137:3,7 |
| 288:3,6 293:5 | **28th** 291:21 | 292:8,17 | 139:2,9,16 140:2 |
| **2013** 65:14 66:24 | **29** 79:2,4 84:16 | **4/24/14** 294:4 | 141:9,19,25 163:13 |
| 69:4,5 105:21,25 | 85:25 176:24 | **40** 9:13 60:24 | 163:17 170:14 |
| 109:25 120:22 | 184:10,12 239:4 | **44** 157:14,16 | 191:2 240:6,8,14 |
| 121:11 123:2 | 283:5 | **45** 9:13 | 244:17 245:15,22 |
| 124:14 127:24 | **290** 125:20 | **47** 217:12,15 219:3 | 246:15 247:2 |
| 131:7 140:10 | **2:20** 180:5 | **475** 60:2 | 250:16 251:16 |
| 143:21 144:3 | **2:23** 180:6 | **49** 125:23 133:24 | 293:6 |
| 154:22 155:3 | **2:51** 202:3 | 135:15 | **7,838,548** 236:11 |
| 292:16 | | **4:10** 235:4 | **73** 176:24,25 |
| **2014** 1:10 6:18 | **3** | **4:48** 267:3 | **74** 224:14 |
| 290:11 291:22 | **3** 21:14 147:16,17 | **4th** 130:2 | **76** 227:14,19 228:9 |
| 292:2,13 | 147:20,22 148:21 | | 228:12,14 |
| **202** 221:9 | 154:19,21 160:4 | **5** | **77** 207:13,25 208:2 |
| **20th** 128:9 | 217:23 218:3,20,25 | **5** 99:8 150:20 | 214:4 |
| | 245:9,12,13,20 | 162:17,19 163:2 | **78** 216:24 220:7,15 |
| | | 194:19 198:11 | 220:22 |

[7th - adam]                                                                     Page 3

| 7th   234:4 | a | 252:25 291:13 | 107:1 108:1 109:1 |
|---|---|---|---|
| **8** | a.m.   1:11 50:12,13 | accurately   189:14 | 110:1 111:1 112:1 |
| 8   65:10 101:19,21 | abbreviated   191:5 | 238:18 | 113:1 114:1 115:1 |
| 101:25 102:2 139:3 | aberrational   142:23 | accuse   172:25 | 116:1 117:1 118:1 |
| 139:17 140:2 141:9 | able   25:15 51:17 | acquired   7:25 38:7 | 119:1 120:1 121:1 |
| 141:20,25 163:14 | 84:3 124:8 141:10 | 38:9 | 122:1 123:1 124:1 |
| 163:17 170:14 | 157:24 159:10 | acquiring   8:14 | 125:1 126:1 127:1 |
| 183:21 257:16,18 | 208:8 212:9 224:20 | acquisition   8:10 | 128:1 129:1 130:1 |
| 283:21 285:12 | 239:20 240:3 244:5 | act   32:7 | 131:1 132:1 133:1 |
| 293:9 | 252:19 | action   34:8 46:15 | 134:1 135:1 136:1 |
| 80   228:24 | ably   211:13 | 162:20 291:17 | 137:1 138:1 139:1 |
| 800-362-2520   294:3 | abnormal   37:6 | 292:20 | 140:1 141:1 142:1 |
| 825   2:6 | 188:17,20,22 | activities   209:16 | 143:1 144:1 145:1 |
| 89   137:11 | 261:24 | 211:14,21 220:11 | 146:1 147:1 148:1 |
| 89.6   137:2 | absence   126:5 | activity   211:4 | 149:1 150:1 151:1 |
| 89.6.   137:22 | 174:17 186:17 | 213:19 214:14 | 152:1 153:1 154:1 |
| 891   264:6 | absent   132:12 | 215:17 | 155:1 156:1 157:1 |
| 896   137:11 | absolute   137:4 | actual   72:9 | 158:1 159:1 160:1 |
| 897   260:18 | 188:7,8 191:10,11 | adam   1:14 5:1 6:1 | 161:1 162:1 163:1 |
| **9** | 229:17 | 6:17 7:1 8:1 9:1 | 164:1 165:1 166:1 |
| 9   71:21 139:20 | absorbed   74:12 | 10:1 11:1 12:1 13:1 | 167:1 168:1 169:1 |
| 141:9 161:12,23 | 119:17 | 14:1 15:1 16:1 17:1 | 170:1 171:1 172:1 |
| 163:14,17 170:15 | academic   52:5 | 18:1 19:1 20:1 21:1 | 173:1 174:1 175:1 |
| 170:17 178:4 179:9 | 76:13 77:3 94:25 | 22:1 23:1 24:1 25:1 | 176:1 177:1 178:1 |
| 185:11,12,17,20 | 148:17 215:24 | 26:1 27:1 28:1 29:1 | 179:1 180:1 181:1 |
| 194:12 278:14,16 | accept   80:4 215:12 | 30:1 31:1 32:1 33:1 | 182:1 183:1 184:1 |
| 293:10 | acceptable   90:4 | 34:1 35:1 36:1 37:1 | 185:1 186:1 187:1 |
| 9-21-2012   182:21 | 136:24 137:16,20 | 38:1 39:1 40:1 41:1 | 188:1 189:1 190:1 |
| 90   22:24 133:6,16 | accepted   90:5 98:22 | 42:1 43:1 44:1 45:1 | 191:1 192:1 193:1 |
| 134:11,15,22 135:3 | 108:18 | 46:1 47:1 48:1 49:1 | 194:1 195:1 196:1 |
| 135:8,18 136:2,18 | accepting   103:8,14 | 50:1 51:1 52:1 53:1 | 197:1 198:1 199:1 |
| 137:13,17 | 103:15 164:5 | 54:1 55:1 56:1 57:1 | 200:1 201:1 202:1 |
| 94710   4:5 | accidentally   6:2 | 58:1 59:1 60:1 61:1 | 203:1 204:1 205:1 |
| 95   132:18 133:9 | account   196:22 | 62:1 63:1 64:1 65:1 | 206:1 207:1 208:1 |
| 134:14 135:10 | 242:2 244:9,15 | 66:1 67:1 68:1 69:1 | 209:1 210:1 211:1 |
| 181:15,23 191:15 | 262:7 288:18 | 70:1 71:1 72:1 73:1 | 212:1 213:1 214:1 |
| 191:25 | accounted   241:8,9 | 74:1 75:1 76:1 77:1 | 215:1 216:1 217:1 |
| 99   133:4,8 178:11 | 242:24 243:16 | 78:1 79:1 80:1 81:1 | 218:1 219:1 220:1 |
| 179:19 | accounting   8:20 | 82:1 83:1 84:1 85:1 | 221:1 222:1 223:1 |
| 99.99   202:20 | 173:22 | 86:1 87:1 88:1 89:1 | 224:1 225:1 226:1 |
| 9th   120:7 | accounts   222:22 | 90:1 91:1 92:1 93:1 | 227:1 228:1 229:1 |
| | accurate   8:4 170:24 | 94:1 95:1 96:1 97:1 | 230:1 231:1 232:1 |
| | 171:4 189:19,21 | 98:1 99:1 100:1 | 233:1 234:1 235:1 |
| | 212:6 231:2,5 | 101:1 102:1 103:1 | 236:1 237:1 238:1 |
| | | 104:1 105:1 106:1 | 239:1 240:1 241:1 |

[adam - appeared]

242:1 243:1 244:1
245:1 246:1 247:1
248:1 249:1 250:1
251:1 252:1 253:1
254:1 255:1 256:1
257:1 258:1 259:1
260:1 261:1 262:1
263:1 264:1 265:1
266:1 267:1 268:1
269:1 270:1 271:1
272:1 273:1 274:1
275:1 276:1 277:1
278:1 279:1 280:1
281:1 282:1 283:1
284:1 285:1 286:1
287:1 288:1 289:1
290:1,7 291:9 292:5
292:12 294:5,21
add  87:19
adding  265:14
addition  272:2
additional  12:18
22:8,9 44:25 115:14
166:11,16 203:2
212:11 228:15
229:9 274:24
address  4:3 24:23
adjust  169:24
adjusted  175:4,9,10
200:5,6 201:13
241:12
advised  114:24
advisors  7:14,22,25
affect  164:23,24
aggregate  159:18
ago  49:21 50:24
agree  55:6,25 72:2
79:10,12,14 80:19
81:4 85:18 86:10
107:24 122:13
151:2 187:21 211:7
249:24 250:4 253:7
261:10 264:12
265:2 266:20 280:3
281:3

agreed  88:11
agreement  1:17
105:5 106:23
111:19 116:25
165:19 167:5
252:24 253:3
279:23 283:16,17
agreement's  283:11
agritech  27:6,17
28:16 29:23
ah  69:20 76:5 200:3
200:3 218:21
ahead  9:21 14:6
19:18 29:2 42:18
64:13 69:22 81:24
82:20 84:5 99:4
115:4 145:16
166:24 173:12,20
184:23 189:20
196:18 202:2
208:25 213:25
244:13 254:4
264:15 268:8
ainslie  35:4
alange  27:4
alert  250:16,16
allegations  107:13
164:5,16,19
alleged  31:5 32:6,7
32:15 34:13 36:12
36:15 37:3,6,8,16
37:18,24 42:12,14
98:20 101:8 102:17
106:13,16 167:18
169:6,11 170:5,6
263:17 289:17
allegedly  259:19
allow  186:5
alluded  233:4
alpha  118:22
alternatively  141:3
amazingly  96:3
amend  277:6
amended  162:14,19
163:10,20 164:6

252:18 278:11
292:20
amount  40:16 61:6
61:8 217:3
analyses  139:15
272:19
analysis  52:7,8
81:23 82:16 90:20
90:21 92:12,13
98:23 107:14 127:6
130:4,22 131:25
133:2 134:23
138:25 140:12
141:12 154:3
158:25 164:7,24
170:18 174:5 179:8
184:5 185:25
186:14,24 187:3,5
187:10 188:2,3,18
188:25 192:11
199:18 205:10,12
205:15,21,25
241:14 244:16
261:3 273:25
274:23 288:10,15
analyst  66:22 67:3
67:15 71:14 72:5,7
73:25 79:20 83:7
85:12 88:9 89:13,25
90:15 91:7,8,13,15
92:10 115:6,6 116:7
118:21 125:17
155:9
analysts  68:12,15
69:6 70:17 71:16
72:11 74:11 75:3,19
76:3 79:7,20 80:2
80:25 81:5 82:11
83:4 86:18,21,24
88:3,24 89:4,14,18
91:22 92:4,7
analyze  91:17
213:21
analyzed  138:3
152:4

angeles  16:10
announce  265:9
announcement
165:5 262:6
announces  264:9,10
264:17 266:15,15
271:20
answer  5:14,23,25
6:3,9 14:14 29:3
36:21 40:13 41:6,20
43:5 55:4 56:3,3
61:23 95:5 102:3
107:20 110:7 118:8
122:5,9,10 124:7
145:13 146:15
168:18 177:3
190:17 222:9 242:8
244:6 250:12
252:11 254:17
258:17,19 263:22
268:13 271:3,4,6
273:4,6 275:7 280:5
281:21 285:18
answered  25:22
36:7 177:15 242:7
252:13 284:4
answering  110:5
answers  50:18 115:2
116:5 184:13
antitrust  206:17,20
anybody  53:10,13
66:18
anymore  8:22
anything's  97:11
anyway  239:14
258:11
apart  167:6
apologize  45:17
90:14 138:20
139:22
appear  33:25 35:9
192:14 217:25
228:8
appeared  35:18

[appears - background]                                                                 Page 5

appears 4:21 25:8
  31:3 34:4 39:23
  193:14 194:13
  256:15
appendix 65:20
  67:16 77:6,10 119:4
  119:7 122:14 128:3
  129:13,14 132:3
  172:7 182:9,14
  198:8 201:21
  241:19 249:4
applied 30:23 73:24
apply 30:21,22 37:2
  38:6,17 42:15 148:2
applying 40:15
appreciate 155:14
  155:21
appropriate 270:22
approximately 12:6
  21:6 22:17 232:13
  233:17
approximations
  12:5
april 1:10 6:18
  291:22 292:2,12
aps 230:5
arbitrage 208:8,11
  208:17 214:14
  215:16,19,22
  216:12
arbitrageur 207:21
  208:7 209:6 213:19
  214:7,9 226:12,13
  226:18 227:3
arbitrageurs 207:15
  208:4,19 209:16
  210:3,24 211:14
  212:9 213:18
  226:15 227:5
area 15:3 16:13,21
argued 176:17
arguing 205:22,23
argument 81:21
  253:25 270:14,18
  272:16

arises 161:25
armtec 28:2
art 207:19 209:3
article 145:25
  146:11 256:4,9
  257:2,3,18,25 258:6
  258:13 264:5 287:2
  293:9
articles 52:4,5 76:14
  77:3,9 91:11,12
  286:23
articulate 226:9
aside 275:13
asked 14:21 22:5
  24:10,18 25:14,23
  31:10,21,22 32:13
  32:23 35:20 42:11
  44:24,24 46:23
  49:24 50:4,24 51:18
  54:22 61:10 64:6,11
  70:15 80:2 84:9
  95:23 102:15 103:6
  108:17,19 166:21
  167:14 168:15,16
  168:21,25 169:3,8
  177:10 242:6
  250:11 251:17
  252:15 258:15
  261:17 263:20
  267:25 268:3,9
  269:7 273:5 274:4
  274:19 276:8,11
  281:8
asking 23:14,16
  29:8 32:10,12 41:24
  54:15 55:12,14,19
  57:5,7 58:8,22,23
  58:24 60:15 69:17
  71:15 80:13,20
  82:14,25 83:13,19
  84:22 85:8,11 87:4
  87:6,10 88:13 101:2
  102:23 107:10,12
  107:13 109:9,14
  164:15 171:5

172:15 201:4
  214:21 235:7
  242:25 245:21
  252:11 253:14,18
  254:2 257:23
  264:17,25 265:5
  269:12 272:16
aspect 28:24
assisted 53:4,6
associate 11:6
associated 260:24
assume 59:15 63:4
  74:20 86:13 93:3
  198:20 201:10
  238:18
assuming 82:7
  108:3 123:2,3
  196:21 242:20
assumption 103:16
  108:12 123:6,7
  156:15 164:16,19
assumptions 43:21
  272:20
assure 276:5
asterisked 132:6
asterisks 122:21,24
  123:4
attaching 99:21
attempt 145:12
  166:15 210:5,11,18
  213:7 214:7
attempting 262:22
attorneys 2:5,14
  49:17
attributable 262:24
august 68:18
australia 27:18,23
auto 126:5 174:23
  176:16,19
autocorrelation
  126:8 173:14 174:4
  174:12,14,17,19
  176:22
available 149:16
  222:5 223:4,5

269:19
avenue 1:16 2:6,15
  3:8
average 148:5 149:9
  150:22 151:14
  152:11 217:6,16
  218:9 219:12,21,22
  234:9
aversion 20:18
aware 29:19 32:5
  65:22 74:25 75:14
  90:10 104:6,7 118:3
  118:12,19 166:2
  231:7
awful 18:12

b

b 149:22,24 207:17
  282:3 283:9
back 9:23 15:10
  16:13 20:24 31:14
  32:19 36:6 37:17,17
  37:20 40:13 50:14
  50:21 69:21 70:4,10
  76:12 84:11 90:23
  91:10 99:5 100:7
  106:19 116:10
  124:5 128:24 132:3
  147:6,10 148:22
  150:23 157:23,25
  160:16 170:8,9
  178:4 179:22 185:9
  185:10 189:2
  190:22 191:2 198:6
  202:5 203:25
  209:21 216:17
  231:8,10 237:22
  244:17 245:8 252:5
  258:2 261:16
  263:12 267:5,8
  270:14 276:20
  287:22
background 7:6
  53:25

[backs - bp]                                                                    Page 6

backs  193:7,9,10
backup  228:7 251:6
bad  32:7 121:19
  200:16 264:18
  282:21
baird  67:5 72:20
  73:2
baker  99:10,12,24
  100:4,13,14 101:16
  105:11 106:25
  109:5 111:21 119:2
  163:8 165:19,23
  167:5 194:22
  195:18,21 196:7,23
  252:22 253:3,10
  259:12 279:20
  281:19 282:4
  283:10,20 284:7
ballpark  152:7
bank  27:18,23
banks  224:18
barbara  224:16
barclays  72:19,25
bartend  14:7,12
  15:9
based  16:12 43:21
  95:25 98:2 100:11
  115:10 123:21
  124:9 125:8 147:21
  149:9 150:15
  162:12 233:18
  263:22,24
bases  153:6
basic  204:11,20
basically  11:10,12
  191:25
basis  30:3 60:5
  66:20 73:7 220:6,25
  231:13,24
basket  159:5,19
  160:6
bay  16:13,20
bearing  286:2
bears  116:4

beginning  10:22
  21:4 38:8 63:25
  116:17 134:6
  138:15 268:24
  269:17,20,21
begins  76:14 97:23
  98:21 260:20 283:8
behalf  19:14,15 20:4
  21:25 30:14 32:25
  35:14,18 47:23
behest  52:7 229:25
  230:17
belaboring  90:14
belief  210:9 216:10
believe  7:2,7,16,18
  9:22 11:24 12:8,17
  13:12,22 16:25
  18:23 19:2,25 23:11
  24:13,17 25:12,21
  26:4 28:3,9,15
  29:20 30:2,5,25
  31:8,25 32:21 33:22
  34:15 35:6 36:3,10
  39:20,22 40:7 42:10
  43:7,19,24 45:22
  47:4,15,21 48:5,15
  49:24 50:20 51:7,9
  51:12 52:25 53:7,16
  53:23 58:5 59:10,17
  60:3 62:7 63:5
  65:13,19 66:21,25
  67:6,10 68:25 69:11
  71:4,17,24 72:12
  73:22 74:11 78:7
  80:24 82:24 83:11
  84:16 85:23 86:3,8
  89:2 92:21 93:25
  94:21 95:5,13
  100:16 101:17
  102:6,14 103:19
  106:15 107:7 112:7
  113:19 114:3 115:2
  116:6 118:11 119:3
  119:6 125:22,22
  126:18,22 128:13

128:23 132:13
136:11,23 138:11
139:2,8,10 144:4
148:5,8,12 149:25
150:25 152:6,21
153:18,23 158:15
158:24 159:7,22
161:2,14 162:15
166:19 168:18
169:16 170:7 173:5
173:9 177:7 178:23
179:5,12 180:14
182:7 183:2,7,8
184:3,8,19 185:8,19
186:9,10,19 187:8
187:15 189:3
190:20 192:12
194:11 195:17
197:14 199:2
200:25 201:9
204:12 205:18
206:11 207:11
210:3,7,12,18 212:4
212:6 217:9 218:7
218:24 219:11
220:16 221:6
224:15 227:13
228:21,23 229:17
230:10 231:15
232:8 233:6 234:5
235:7 241:6,8
243:23 246:12
253:6 255:18 256:2
256:21 257:13
258:19 264:2
268:16 269:6 277:7
279:6,8 284:9
285:22 286:25
288:9
believes  225:20
berkeley  4:4 8:2,14
  8:24,25 9:4,7,18,24
  9:25 10:3,8 18:4,16
  18:18,22,24 19:13
  19:21 24:12

best  5:10 23:3
  155:23,24 189:9
  194:7
better  12:25 15:13
  15:17 37:9 212:12
  224:19,20,24,24
  225:21 288:13
beyond  5:14 31:23
  36:19 44:12 64:9
  82:18 87:12 141:8
  197:25
bid  125:21 148:6
  149:9,11
bit  36:24 40:9 45:11
  55:17 87:17 165:10
  261:15
black  246:6
blair  72:22 73:2
blood  145:18 291:17
bloom  204:24
bloomberg  149:5,12
  149:16 150:4
  159:11,13,16,22
  203:12,14 229:24
  230:2,12 231:2,6
  234:2 238:8,9,24
  239:9 245:24
  246:16 250:13
bloomberg's  233:19
bond  96:16
bookkeeping  8:20
books  76:14
boost  237:14
borrow  70:2 220:13
  221:21 223:4,6
boskind  1:18 4:7
  291:6,24
bother  92:11
bottom  175:25
  191:7 198:11,12
  219:13 266:10,19
  276:7 283:9
bow  230:3,8,11
bp  34:23

brad 256:5 257:8,25
  265:12
brandon 2:20 4:18
  84:10,17 104:17
  138:18 203:13,19
  252:2 282:8
brattle 10:5
breached 99:19
breaches 283:14
break 6:6,10 36:24
  50:9,19 114:15
  116:2 144:20,23
  145:18 157:9 180:4
  201:23 268:14
briefly 7:5
brings 13:13 16:4
broad 29:6,7 51:20
  61:24 95:5 189:6
broader 127:17
broadly 61:23
broadway 294:2
broke 114:20
brokerage 115:19
  222:21
brought 95:23
bunch 11:13 126:25
  147:9
business 4:3 15:10
  62:4,20 63:24 64:18
  189:16 198:18
buy 39:4
buyer 100:5

            c

c 2:2,20 3:2 126:9
  149:21 291:2,2
calculate 173:13
  258:4 268:3 274:19
calculated 150:7
calculating 274:8
calculation 151:17
  217:11 247:7
calculations 152:3
calculator 151:3,23
  247:5,10 248:7

calendar 117:18
california 4:5 207:4
call 37:8 39:3 43:2
  51:3 105:18 113:16
  157:17 180:21
  187:2 255:21 259:3
called 8:2 21:15
  37:25 63:11 195:13
  199:23,24 206:10
  207:4 208:19 237:4
  289:15
calling 133:12 260:9
cammer 73:20 74:3
  74:7 75:5,22 76:9
  79:5,13,21 80:7
  81:10,10,17,25 82:3
  82:12 85:13 86:3,25
  87:21 88:12,14,23
  89:2 91:4,18 92:13
  92:16,21 138:3
  147:7 148:3,5,13
  170:10 204:11,24
cammer's 80:23
capable 168:24
capacity 7:22 9:8
  11:3 18:10
capital 193:15
capitalization
  148:11
caps 48:13,14
care 8:19
case 7:3 14:16 19:21
  24:19 25:24 27:3,5
  27:6,6,19,23 28:2
  28:16 30:21 31:11
  32:14 34:2,6,12,17
  34:23,25 35:10
  38:13 39:8,8,23
  42:12,14 43:12 45:5
  46:5,5 47:2,2,13
  48:23 49:15,19 51:6
  66:6 75:18 90:21
  97:24 123:19
  127:22 152:9
  161:25 167:18

168:17,22 169:9
  199:21 205:19
  206:2,8,18,20 207:2
  212:21 234:8 260:4
  260:8 261:19
  268:18 274:5 277:2
  285:5,6 289:17
  294:4
cases 11:14 20:21
  21:9,14,24 22:2
  26:13 28:5,7,11,19
  29:15 33:4 35:17
  36:11 42:16 44:4
  48:3 95:14,20,23
  96:10 126:2 168:11
  168:12,14,24 205:3
  205:6,11,16 255:17
  264:8 266:14
category 209:10
  227:2
caused 169:6,11
  170:5 198:24
  199:13 263:17
ceases 18:24
cert 206:16
certain 31:5 89:4
  133:10
certainly 72:7 95:22
  104:6 126:4 182:23
  206:13 222:20
  227:7 276:20
certification 206:17
  274:7
certify 291:8,15
cetera 94:13 189:12
cfo's 212:24
change 17:2 42:23
  50:18 137:22,23
  154:8 190:16
  232:21,23 234:7,24
  247:16 248:2 294:6
changed 9:17 55:11
  197:13
changes 53:17 57:19
  177:3

charles 257:9,9
chart 191:6 192:6
  193:14
check 51:8 155:8
  182:8 230:24
cheek 267:19
cheney 204:25
cherry 121:4 172:25
chicago 3:9
china 27:5,6,9,17
  28:15 29:23
choice 190:7
choose 153:21 204:8
chose 132:22 140:25
  153:13,15,16
  231:19
chronologic 13:24
chronologically
  10:17
circuiting 87:16
circumstance
  214:11
circumstances 8:13
  133:10 261:2
citation 57:13 163:2
cite 256:4,11,19,23
  256:24,25
cited 146:3 257:24
citigroup 46:10
clarify 58:17 114:25
  145:12,12
clarifying 146:13
class 25:2 26:2
  32:17 38:8,10 46:15
  49:5,6 69:7,8,18
  70:22 71:11 72:13
  72:22 74:24 86:18
  97:21,23 98:5,9,15
  98:20,25 101:5
  102:9 103:3,11,24
  108:17 110:12,17
  110:20 111:11
  112:5,20 113:2,10
  115:12,20 121:9,15
  121:17 122:16

[class - connection]                                                                 Page 8

123:11,12,21 124:2
124:18 125:11,17
125:18 127:7
130:23 146:20
147:3 151:22
162:19 171:14,21
172:17,22,24
174:12,15,25 176:6
178:20 179:3,7,20
182:5 184:15 185:3
185:17,23 186:3,7
186:11 187:14,14
187:19,21 190:22
206:16,16 217:7,19
218:4 220:11
221:11,15,18
227:25 228:18
229:15 230:20
255:3 268:23,25
269:14,17,20,22,23
269:24 274:6 279:7
286:4 289:10,14
292:20
clause 89:24 99:20
clean 142:8
clear 26:23 48:6
146:7 174:22
197:19,20 264:24
clearly 157:20 160:4
client 32:8
closed 79:9 118:18
136:3 214:8
closing 112:10
cm 1:3
coast 14:24 16:12
code 245:24
coefficient 134:7
191:9,18,18,19,23
192:5,7,15,17
colleague 4:17
collecting 236:22
collectively 48:24
column 149:19
181:10 218:21
219:5,6,14,15

combined 193:2
comcast 206:10
come 38:11 39:16
42:8 43:4 62:17
81:16 116:10
126:24 147:6,10
157:23,25 159:21
170:9 192:17
214:21 222:9 229:7
261:16 271:8
284:21
comes 236:25
coming 20:14 36:14
40:13 50:21 100:7
124:5 128:24 189:2
275:16 285:4
comment 215:13
commission 294:25
common 24:25
25:25 135:21
153:10 160:21
220:9,13
communicating
74:11,19
communications
54:16 55:2,13,16
66:3
commute 17:20
companies 10:19
115:8 154:7 156:2,9
156:24 158:9,17
159:5 189:6,7,10,11
190:8 201:6,17,18
203:7 211:2 219:24
233:20 251:6,18
264:17 265:8
292:19
company 9:16 72:22
74:2 78:8 83:6
125:21 189:15
193:11 210:13
212:18 262:13
264:9,16 266:14
271:12,19 294:1

company's 79:8
262:10
comparable 217:17
217:19
compared 153:14
161:6 217:12
comparing 158:21
217:3
compartmentalize
51:21
compass 3:7
compasslexecon.c...
3:11
compensation 61:16
competes 189:15
competitor 198:21
244:9
competitors 65:23
200:10,20 201:8
compilation 235:12
235:21 293:3
complain 110:23
111:5,7
complaint 57:15
104:2,14,16 105:9
162:10,14,20 163:2
163:10,21 164:6
252:18 278:11
292:21
complete 6:3,9
162:6 221:21
271:23
completed 271:20
272:3,10 273:21
completely 202:11
completeness 31:10
components 155:10
compounding 262:5
264:19
comprise 251:7
computation 150:15
compute 149:7,8
230:5,14 247:16
computer 151:8
194:14 247:3,8,11

247:24 249:20
concept 255:23
259:3,22
concern 172:12
concerned 58:6
173:12 176:2
concerning 59:8
conclude 88:5 96:13
124:9 199:3,10
268:22
concluded 47:14
95:7 199:4
concluding 73:8
conclusion 28:23
81:16 96:22,24
122:20 174:4 186:6
284:21
conclusions 107:11
147:21 187:12
conclusive 175:5
conduct 261:2
conducted 82:17
176:3
conducting 96:23,25
conducts 145:21
conf 192:2
confidence 132:18
132:22,25 133:5,6
133:16 134:11,15
134:16,21 135:4,10
135:19 136:2
181:15,23 191:15
confidentiality
99:20
confirm 97:22 187:5
conflict 51:7
confuse 264:22
confused 30:6 270:5
confusion 103:21
130:12
conjunction 165:12
connection 62:4,14
62:18 66:4 76:17
77:12 78:10,16
94:23 168:17

Case 1:21-md-02989-CMA  Document 568-17  Entered on FLSD Docket 06/08/2023  Page 85 of
114
Case 1:12-cv-08557-CM  Document 97-1  Filed 06/17/14  Page 85 of 114

[connection - court]                                                      Page 9

| | | | |
|---|---|---|---|
| 200:12 206:23 | 196:8,23 252:22 | 68:21,24 69:5 70:20 | 106:12,15 107:7 |
| 207:9 240:16 | 253:10 259:11,13 | 71:4,24 73:21 74:22 | 108:2,4,7,13,25 |
| 244:23 274:6 | contribute 209:17 | 77:4 85:23 86:8 | 109:18,21 195:14 |
| consider 82:9 | 209:18 | 94:21 99:3 100:15 | 259:4 262:24 |
| 103:24 108:7 | control 140:9,13 | 100:24 102:14 | 273:23 |
| 127:21 133:10,13 | 143:2,4,6,7,18 | 103:19 112:25 | correctly 36:8 46:13 |
| 138:4 189:4,13 | 146:10,17 192:23 | 114:3 115:3,22 | 68:8 69:16 86:2 |
| 206:7,22 207:8 | 287:24 288:2,4,7 | 117:13 126:22 | 90:13 132:17 |
| 219:20,24 | controlling 199:18 | 128:23 132:14,15 | 153:16 178:9 |
| considered 78:8,9 | converted 248:18 | 132:20 137:10,14 | 180:16,18 187:18 |
| 171:8 189:23 | conveyance 113:15 | 141:5 143:21 144:4 | 187:25 195:16 |
| considers 65:22 | conveyed 117:16 | 149:17 150:2,18 | 217:2 232:7 |
| consolidated 162:10 | cool 276:19 | 153:20 156:3,5 | corrects 57:13 |
| 162:14,19 163:10 | copper 189:11 | 167:19 168:3,25 | correlated 176:20 |
| 292:20 | copy 6:14 27:12 | 169:2,16 170:7 | 192:25 200:22 |
| constraint 220:10 | 59:19,21 104:16 | 171:13 172:3 | correlation 126:6 |
| construct 40:25 | 202:10,14 239:25 | 174:24 175:2,16 | 153:9 174:24 |
| 41:2 261:18 | 257:6 | 176:7 177:23 178:6 | 176:17 197:7,10 |
| consultant 17:10,12 | cor 259:15 | 178:7,14,15 179:4,5 | 199:5 |
| consulting 8:3 11:10 | cornell 256:5,25 | 179:13 180:13,14 | correspond 138:25 |
| 15:11 18:5 52:18 | 257:8 265:13 | 181:18 183:16 | 194:8 |
| 126:13 | cornell's 257:24 | 184:8,19 185:19 | corresponding |
| cont'd 3:2 | 264:5 | 186:19 187:8 | 219:2 |
| contacted 49:16 | cornerstone 10:24 | 188:13 192:9,12 | corresponds 132:17 |
| 50:23 | 11:4,20,25 12:7,16 | 194:11 195:17 | 173:5 184:11 |
| contained 44:13 | 12:20,21,23 13:3,6 | 201:19 209:13 | 229:15 |
| 45:12 53:15 58:12 | 13:18 14:24 15:22 | 217:8,9,21 218:7,24 | counsel 32:13 47:24 |
| 64:23 | 41:17 95:18 287:16 | 219:11 221:14 | 51:8 53:6,16,18 |
| contains 25:19 | corp 27:4 | 223:19 228:3 | 54:17 55:10,20 58:3 |
| content 59:3 | corporate 210:21 | 230:10,15 231:15 | 59:12,13 82:21 |
| contents 55:19 | corporation 205:19 | 232:2,9 234:5,20 | 98:20 240:16 |
| context 265:24 | corporations 212:25 | 239:16 241:11 | count 28:5 |
| 266:21 | correct 4:24 7:16,23 | 243:22,23 246:12 | counted 72:25 |
| contingent 61:17 | 7:24 10:20,25 11:2 | 248:3 253:2,6 | counter 281:19 |
| continue 19:20 | 12:11 14:10 16:5,6 | 255:17,18 259:6,19 | countered 282:4 |
| 106:6 | 16:22 18:8,15,23 | 260:12 263:25 | county 117:2 291:4 |
| continued 20:4 | 19:2,6,7,25 20:16 | 265:21 266:12,23 | couple 5:3 148:25 |
| 100:4 145:14 283:3 | 22:7 23:12 24:13,17 | 267:23,24 283:10 | 170:25 171:2 |
| continues 76:15 | 25:12,21 26:3,4 | 284:10 288:11,11 | 286:16 |
| 194:19 | 28:9 30:18,25 31:7 | 289:12,21 | course 48:17 168:14 |
| continuing 21:5 | 31:8 36:2 40:7 | corrected 58:3 | court 1:2 5:17 6:20 |
| contract 99:11,21 | 42:10,25 43:16 | 107:8 152:23 | 21:10 27:14 28:12 |
| 99:22 100:15 107:4 | 46:16 47:15 53:20 | 252:16 | 28:18,22 29:9,10,14 |
| 109:6 111:22 163:8 | 53:23 54:4 58:5 | corrective 38:2 39:6 | 29:22 30:2,5 74:25 |
| 194:23 195:19,22 | 59:17 60:3 63:4,5,7 | 39:17,24 106:3,10 | 75:12 92:14,16 |

[court - decisions]

99:16 114:21 117:2
126:2 148:16,18
158:11 204:3,4,22
205:13 206:9
235:18 240:12
279:16
court's 30:4
courtroom 287:8
courts 44:8 228:21
229:4
coverage 71:14
73:18 75:25 76:2
79:21 83:5,7 85:11
88:9 89:13,25 90:15
91:7,8,15 92:11
115:6 116:7 125:17
covered 68:3 73:17
170:14,14 195:9
covering 70:5,6,16
72:3,4,6,12,21
73:11,14 74:2 75:3
75:20 85:21 88:4
89:14 92:4,7
cra 13:25 14:9 15:11
15:19,25 16:9,16,19
95:18
crashing 145:19
crazy 125:2
create 159:9 190:2,5
created 107:25
160:6
creating 189:13,24
190:18
credit 71:22
criticize 28:21 190:6
criticized 28:18
29:16 120:9 172:8,9
crush 1:5 24:20
32:16 39:7 62:3
64:16 65:3,22 66:4
66:9,23 68:4,16
69:7 70:7,19 72:6
72:12 73:11,14,17
75:19 86:21 99:10
99:19,23 100:4,12

101:15 104:9,10
105:4 106:22
110:13,16 111:18
115:9,12,15 116:24
118:25 147:25
153:14,24 154:3,13
155:25 156:7,10,15
158:22 159:14
160:25 161:3,7,11
162:2,7 165:18,21
166:17 181:2
182:20 183:7,20
185:22 188:12
189:16 196:7
198:12 200:10,23
201:19 213:13,14
213:16,19,21
217:11 219:3,22
221:5,20 223:2,9
224:13 227:17
228:16 230:18
233:21 237:15
252:21,23 253:2,8
259:13 260:8
279:21 283:14,20
284:8,14 285:11
286:3 294:4
crush's 24:25 25:25
62:20 63:24 66:19
106:4 153:10
160:20 192:18
194:23 195:5
198:21 200:19
213:22 217:4,5
curious 134:13
281:23
current 7:14
currently 7:15 47:3
95:23 267:14,15
curriculum 7:7
custom 189:24
190:3,5
customers 81:6
213:20

cut 6:2,4 35:12
cv 1:3 10:12 22:11
31:3 33:13 35:5
46:6 168:10
cyberguard 204:25

d

d 1:18 4:2,2,7 145:5
145:5 151:15 291:6
291:24
damage 38:17,18
40:17,20 41:9 43:14
43:15 46:21 169:5
258:3
damaged 38:24
damages 34:5 38:12
39:3,4 40:16 42:13
46:14 107:2 111:22
168:8,12,17,22
169:4,9,23 255:16
261:19 263:17
274:8,20,21,25
data 52:6,6,8,10
53:4 54:23 77:8
128:6,18 149:2,6,12
149:14,15 150:10
150:15 171:8
192:16 203:12
227:15 229:23
231:20 232:3,25
233:8 236:22
237:16,18,20 238:8
238:19,24 239:14
239:18,18 244:22
date 6:19 37:8,10,11
37:18,25 60:10,11
98:5 101:4 102:16
108:11,24 109:12
109:22 110:3
112:25 114:6,13
116:18 117:7 119:9
123:5 141:4 154:5
154:10,23 155:2
158:10 162:23
182:16 234:7

235:16 240:11
257:20 260:23
262:16 278:20
284:6 294:4
dated 114:11 116:16
148:24 292:14
dates 10:18 12:3
122:16,23 123:10
128:8,17 132:5
day 17:21 18:2
52:16,17 53:2
101:14 113:2,19
117:18 118:16
128:20 131:19,21
166:12 167:2
178:12,13 198:12
198:25 199:11,14
233:23 261:25
271:13,18,19,23,24
272:2,5,9 290:11
291:21 294:23
day's 149:9
days 101:24 128:19
132:10 161:5,6,7
173:6,14 174:3
178:9,19 179:3,17
180:16,19,22 181:3
181:11,12,21 182:4
182:24 184:15,17
185:2,16,16 194:9
267:9,11
deal 13:2
deals 148:6 181:7
dealt 171:24
decide 42:7
decided 15:10 16:19
decimal 248:14
decision 29:13,15
30:4 148:16,18
276:24 277:21
278:3,16 279:17,17
279:19 283:5 285:3
285:9 293:10
decisions 75:2 204:7
204:9

[declaration - discuss]                                                    Page 11

**declaration** 6:15,17
21:2,8 25:6,18 33:9
33:18 40:3 44:13,14
53:8,11,15 54:7,8
55:9 56:9 60:18
78:16,25 79:4
104:21 105:16
113:13 126:14
132:7 133:11,13
138:14 147:7
152:14 165:17
166:6 178:19
180:12 195:4
207:13 225:14
228:14 233:13
238:21 244:24
252:7 284:5 292:12
**deemed** 228:25
**defendant** 20:8
205:17
**defendants** 2:14
4:19 19:15,22 20:5
20:18 23:22 24:12
30:14 33:2 35:15,19
48:21,22,24 172:9
267:10,23 276:14
276:25 278:18
282:4 283:9 293:11
**defense** 190:6
267:17
**defer** 82:21
**deferred** 60:6
**define** 9:5 18:20
22:20 28:21 33:8
42:20 53:12 54:10
56:11 62:24 64:6
70:5,15,22 72:4,5
73:18 75:25,25
77:22 78:13 81:25
88:2 89:6 105:19
106:5 115:9 118:6
130:15 175:20
178:13 211:6
260:23

**defined** 35:24 66:7
78:12 86:3 103:25
111:11 118:10
171:18 185:7
**defines** 74:7
**defining** 78:22
127:13
**definitely** 202:22
206:20
**definition** 71:14
72:3,11 74:21 79:25
80:3,5 81:4 85:18
92:23 94:19 123:13
123:14 128:25
130:14 135:2 140:6
179:4 207:21 209:5
215:19 216:4,5,6,9
**definitively** 89:3
**degrees** 193:19
**delineate** 183:4
**delineating** 239:17
**delineation** 197:20
**demand** 62:25
213:21
**demands** 92:14
**demonstrate** 75:21
**deny** 271:24
**denying** 276:25
278:17 293:11
**depend** 263:19
**dependent** 188:5
**depending** 42:23
**depends** 263:14
**deponent** 294:5
**depose** 275:2
**deposition** 1:14 4:22
6:16 48:17 64:12
82:19 87:13 99:9
107:17 114:10
154:20 158:6
162:18 235:10
240:7,17 254:10
255:4 257:17
278:15 291:10,12
294:4

**depositions** 281:22
**derivation** 93:21
**derivative** 34:8
**describe** 11:20 62:8
204:4
**described** 146:9
178:13 211:4,13
259:16 263:25
**describing** 288:20
**description** 210:22
265:4
**designated** 66:17
125:20
**determination**
95:25 98:24 99:25
101:10 102:18,24
103:7 164:8
**determine** 30:11
37:3,24 40:15 95:24
101:14 103:2,11
110:13 112:22
175:21 198:23
261:3 289:7
**determined** 85:20
97:16 98:10 259:20
**determining** 73:25
79:18 90:16,18,19
98:8 134:17 138:9
229:20 263:16
**developing** 44:11
**df** 193:18
**diamond** 207:4
**difference** 21:17
176:9,13 188:2
219:21,25
**different** 9:15,16
12:12,15 30:8,11,20
32:10 37:22 38:23
42:2 43:21 44:20,25
56:13,15 57:16,20
57:22 58:9,10,10,24
61:8 68:17 97:15
121:3 139:25
151:18 154:16
179:14 191:5 193:4

223:12 229:5 236:4
268:13 288:16,21
**differentiate** 81:15
**differently** 38:20
**difficult** 57:8 60:15
258:10
**diligence** 62:3
**dimensions** 72:21
**directed** 252:17
**disagree** 28:13
55:25 86:11 88:21
107:19 249:24
258:13 266:20
280:3 281:4 284:16
**disagreeing** 117:4
**disclose** 99:24 162:3
162:8 253:20 255:8
272:4 283:20
**disclosed** 110:16
163:22 164:3,10
165:18 166:3 253:8
254:14 259:11,14
261:7 268:22,24
269:17,24,25 272:9
**disclosure** 37:10,11
38:2,14,21 39:24
101:25 106:4,10,14
107:8 108:3,4,7,14
109:19,21 110:21
111:2,10 113:8,11
113:14,21,23,25
166:16 169:22
195:14 252:16
259:5 260:23,24
262:16,25 264:23
264:24 268:4
273:23 284:13
288:18
**disclosures** 39:2,7
39:15,18 289:13
**discover** 152:22
**discrepancies** 210:2
**discrepancy** 236:18
**discuss** 88:25
105:17 113:12

[discuss - drop]                                                                      Page 12

| | | | |
|---|---|---|---|
| 116:3 157:12<br>207:14 | 279:6 292:15,17<br>293:2,6 | 81:1,3 82:1 83:1<br>84:1 85:1 86:1 87:1 | 218:1 219:1 220:1<br>221:1 222:1 223:1 |
| **discussed** 59:7 73:3<br>116:6 138:15 140:5<br>163:12 191:14<br>259:17 | **documents** 62:11<br>64:23 240:15<br>276:23 277:8,10<br>284:6 | 88:1 89:1 90:1 91:1<br>92:1 93:1 94:1 95:1<br>96:1 97:1 98:1 99:1<br>100:1 101:1 102:1 | 224:1 225:1 226:1<br>227:1 228:1 229:1<br>230:1 231:1 232:1<br>233:1 234:1 235:1 |
| **discussing** 19:5<br>116:12 171:17<br>233:8 241:23 | **doing** 9:18 36:19<br>40:21 51:13 74:5<br>86:18 126:20 133:2<br>137:10 151:21 | 103:1 104:1 105:1<br>106:1 107:1 108:1<br>109:1 110:1 111:1<br>112:1 113:1 114:1 | 236:1 237:1 238:1<br>239:1 240:1 241:1<br>242:1 243:1 244:1<br>245:1 246:1 247:1 |
| **discussiou** 50:2<br>61:21 70:9 129:17<br>143:13 151:13<br>167:7 198:5 203:23<br>208:12 241:3 252:3 | 154:2 168:25<br>172:20 186:13<br>208:18 247:22,23<br>261:20 262:18<br>289:10,11 | 115:1 116:1 117:1<br>118:1 119:1 120:1<br>121:1 122:1 123:1<br>124:1 125:1 126:1<br>127:1 128:1 129:1 | 248:1 249:1 250:1<br>251:1 252:1 253:1<br>254:1 255:1 256:1<br>257:1 258:1 259:1<br>260:1 261:1 262:1 |
| **discussions** 59:5<br>146:5 165:22 205:4 | **dollars** 60:13 | 130:1 131:1 132:1 | 263:1 264:1 265:1 |
| **dismiss** 270:21<br>277:2,22 278:18<br>293:12 | **double** 148:22,23<br>**doubt** 234:21<br>**dow** 153:15,17 | 133:1 134:1 135:1<br>135:20 136:1 137:1<br>138:1 139:1 140:1 | 265:13 266:1 267:1<br>268:1 269:1 270:1<br>271:1 272:1 273:1 |
| **dispute** 71:13 72:2 | 157:17 158:7 160:6 | 141:1 142:1 143:1 | 274:1,3 275:1 276:1 |
| **disputing** 241:4 | 189:2 192:20 199:7 | 144:1 145:1,10 | 277:1 278:1 279:1 |
| **distinction** 112:20<br>172:16 277:13<br>278:25 | 199:25 239:23<br>240:8,23 243:19,20<br>292:17 293:7 | 146:1 147:1 148:1<br>149:1 150:1 151:1<br>152:1 153:1 154:1 | 280:1 281:1 282:1<br>283:1 284:1 285:1<br>286:1 287:1 288:1 |
| **distinguish** 183:11<br>183:18 | **downgrade** 67:6<br>**dr** 1:14 4:13 5:1 6:1 | 155:1 156:1 157:1<br>158:1 159:1 160:1 | 289:1 290:1,7 291:9<br>292:5,12 294:5,21 |
| **distinguishing**<br>226:17 227:9 | 6:17 7:1 8:1 9:1<br>10:1 11:1 12:1 13:1 | 161:1 162:1 163:1<br>164:1 165:1 166:1 | **draft** 51:8 56:19,20<br>57:2,4,16,22 58:10 |
| **district** 1:2,2 92:17<br>117:2 207:4 | 14:1 15:1 16:1 17:1<br>18:1 19:1 20:1 21:1 | 167:1 168:1 169:1<br>170:1 171:1 172:1 | 58:19<br>**drafted** 53:8,24 |
| **divided** 149:22,24<br>151:15 191:23 | 22:1 23:1 24:1 25:1<br>26:1 27:1 28:1 29:1 | 173:1 174:1 175:1<br>176:1 177:1 178:1 | 161:14<br>**drafting** 53:11 |
| **dividend** 223:11 | 30:1 31:1 32:1 33:1 | 179:1 180:1 181:1 | 60:17,20 |
| **dividends** 223:12 | 34:1 35:1 36:1 37:1 | 182:1 183:1 184:1 | **drafts** 54:6 55:8,15 |
| **dividing** 248:6 | 38:1 39:1 40:1 41:1 | 185:1 186:1 187:1 | 56:7,9,11,17 57:6 |
| **djusmg** 154:21<br>240:9,24 245:5,11<br>245:15,18,22 246:6<br>246:15,17 251:7<br>292:15 293:8 | 42:1 43:1 44:1 45:1<br>46:1 47:1 48:1 49:1<br>50:1 51:1 52:1 53:1<br>54:1 55:1 56:1,16<br>57:1 58:1 59:1 60:1 | 188:1 189:1 190:1<br>191:1 192:1 193:1<br>194:1 195:1 196:1<br>197:1 198:1 199:1<br>200:1 201:1 202:1 | 57:20 58:22,25<br>**draw** 174:3 186:5<br>187:10,11<br>**drawing** 122:20<br>125:7 197:7 |
| **djx** 245:5 | 61:1 62:1 63:1 64:1 | 203:1 204:1 205:1 | **drew** 278:25 |
| **document** 56:20<br>154:21 158:7<br>235:11 240:8<br>246:14 277:3,19,23 | 65:1 66:1 67:1 68:1<br>69:1 70:1 71:1 72:1<br>73:1 74:1 75:1 76:1<br>77:1 78:1 79:1 80:1 | 206:1,3 207:1 208:1<br>209:1 210:1 211:1<br>212:1 213:1 214:1<br>215:1 216:1 217:1 | **drive** 210:11<br>**driving** 18:2<br>**drop** 262:23 |

[dropped - established]

dropped 195:11
due 62:2
duel 177:11
duly 4:6 145:6
  291:11
dummy 141:5
  288:17,22 289:2,11
dump 212:21
dunbar 146:2
  205:20 206:3,3
  286:24 287:3,7

**e**

e 2:2,2 3:2,2 4:2,2
  48:12 54:12 94:6
  126:9 145:2,2,5,5
  151:15 153:8 157:6
  202:9 207:17
  224:16 291:2,2
e.g. 224:17
earlier 18:5 23:2
  31:21 55:8 59:7
  86:20 89:21 97:20
  101:19 113:9
  138:17 140:5,15
  152:12 165:10,16
  166:21 167:14
  168:10,15 172:4
  189:5 202:8 238:20
  238:23 241:7,9
  243:15 246:9
  251:17 252:13,15
  253:10 255:19,20
  258:15 259:10
  261:15 269:25
  287:23
earn 208:8,14
earnings 169:20,25
  259:14,14,16
easier 133:21
  280:19 283:8
easy 160:7 239:7
ebix 27:3
ebrandon 2:24

econometric 133:2
economic 8:3 18:4
  87:8 207:20 209:5
economics 10:3
  15:11
economist 132:25
  257:12
economists 205:5
edification 188:14
edited 54:3
effect 167:11 193:2
  199:11,17 201:13
  221:9 243:25
effective 279:22
effectively 179:7
effects 241:13
  264:19
efficiencies 94:9
efficiency 29:23
  30:8,12 49:25 50:25
  61:12 73:21 75:4,21
  83:20,21 87:8,23
  88:6 89:16 90:17
  91:9,14 93:9 95:3
  95:24 123:22 135:7
  136:8 138:10
  147:24 153:7
  168:13 176:18
  185:21 205:14,24
  209:18 224:11
  229:2 239:14
  270:16,25 272:24
  273:2,17,19,25
efficient 24:25 25:25
  26:2,8,17 28:8
  30:24 83:8 88:10
  89:12 91:19 92:4,8
  92:9,10,23 93:2,4
  93:14,22 94:13,15
  94:19 95:9 97:7
  110:14 121:13,17
  122:2,3 123:20,20
  124:17 125:4,10
  175:22 176:6,20
  196:21 225:7,13,17

225:19 228:17
  258:5 286:3,3
eight 69:12 72:15
  73:6
either 22:3 33:9
  51:10 67:7 69:11
  94:23 112:10
  164:24 173:9
  184:14 199:21
  227:11 239:8
  244:19 266:8
  268:15,20 288:19
elaborate 17:17
electronically 51:11
eliminate 140:16
  142:16
eliminated 156:16
elizabeth 2:20 4:18
elkins 1:15 2:13
employed 7:15
  215:2
employee 17:5
  251:9
employees 9:3,5
  18:18,20 52:21
employer 9:15
employers 41:18
employment 7:6
  10:13
enable 167:16 187:9
  187:11
enables 211:3
  224:25
encapsulates 130:23
encountered 97:13
ends 102:9 112:20
  232:21
enduring 208:9
energy 27:4 182:22
engage 209:17 211:3
  211:15,20
engaged 22:10
  45:23 165:22
  213:18 214:14
  215:3,16 271:13,17

engagement 49:14
  50:22 51:9 59:13,22
  60:2 61:7
engagements 61:10
engages 208:7
engaging 208:17
enjoy 17:24
enlighten 140:7
entered 238:19
  278:2
entire 23:24 139:21
  140:25 141:11
  178:5 180:12 187:6
  221:8,10
entirety 258:7
entities 59:8 66:8
entitled 55:11
entries 128:6
equal 132:11 248:8
equally 156:20,21
equals 149:21
  151:15
equation 20:11
equities 210:19
eric 27:3
errata 294:1
error 128:12,13
  149:3 151:20,24
  191:9,20,20,24
  192:8 193:3,7
  199:24,24,25
  233:12
errors 152:22
  199:20,21,22
  276:21
especially 236:25
esq 2:8,18,20
essentially 85:9,10
  126:10 164:4 179:2
  193:7 216:8
establish 87:7
  110:12 113:20
  205:14
established 87:22
  89:17 125:25

establishing  86:24
estimate  31:4 38:16
  40:19 41:9 42:9
  60:16,17 127:14
  130:21 289:18
estimating  24:5
estimation  23:20
  43:15 233:14
et  94:13 189:12
eva  72:20
evaluate  30:23
  146:25 243:6
evaluating  146:19
  288:23,25
event  32:4 36:18,20
  36:25 37:3 78:11
  91:12 96:25 101:3
  101:24 119:10,12
  120:23 122:14
  127:4,10,10,14,15
  127:20,21 128:25
  129:20,22 130:14
  130:16,18,19,23
  131:2 132:8 136:5
  140:6,18,22 142:5
  142:13,16,17
  145:21 172:7,20,23
  178:12 220:5
  241:10,19 242:3,15
  243:3,18 244:2,8
  256:20 258:3
  260:17 261:23
  269:21 273:22
  286:17 287:8
  288:15,23,25 289:5
  289:6,13,18
events  30:9,11,20
  124:10 133:14,18
  172:20,21
eventually  13:8
everyone's  123:14
evidence  115:13,14
exact  10:3 24:6
  233:22 236:8

exactly  17:9 26:20
  103:5
examination  4:11
  145:14 271:2
  286:13 292:7
examined  4:8 145:7
  154:11
example  93:11
  133:23 149:8
  152:16 196:17
  213:12,13 271:2
  273:11,14
examples  93:20
  126:4 146:4 222:21
  287:13
exceedingly  63:16
excel  239:21
exception  189:18
excess  188:8,9,16,17
  188:20
exchange  66:18
  216:15,17 217:6,17
  217:18 218:9
  219:23
exclude  156:8 193:2
excluded  21:10
  154:3 156:7 288:3,6
exclusion  164:23
  165:2,7
exclusively  23:4
excuse  141:7
executed  216:22
executive  3:6
executives  212:19
exercise  263:8
exhibit  6:14,16,21
  6:22 7:8,10,11
  20:25,25 21:2 25:6
  25:18 26:11,19,19
  27:15 33:14,14
  44:14 54:9 56:10,12
  56:13 57:7 64:24
  65:2,2,18,18 68:2
  68:14 69:21 76:13
  78:25 99:8 114:9,10

  114:22 115:17,17
  116:14 122:14
  129:2,18,22 136:22
  137:3,6,7 139:9,10
  139:10,16,17
  147:15,17,17,20,21
  148:21 150:13,19
  152:14,19 153:5,5
  154:19,20 158:5,6
  158:12,17 160:4
  162:17,18 170:10
  170:17,20 171:8,19
  172:12 176:4,24
  177:17 178:4,4
  179:9 180:8,11
  181:6 184:4,12,14
  185:10,12,17,20
  186:20 187:11,23
  188:3,4,8 189:3,7
  191:2 194:16 199:8
  201:18 202:17
  204:5,16,22 216:25
  217:23 218:3,16,20
  218:25 228:4,5
  231:8,21 235:7,10
  235:19 236:2
  239:15 240:6,7,13
  244:17 245:9,12,13
  245:15,19,22 246:4
  246:15 247:2
  249:23 250:4
  251:16 257:16,17
  276:22 277:6 278:2
  278:14,15 287:4,5,5
  287:6 292:12,14,15
  292:17,20 293:2,6,9
  293:10
exhibits  138:24
  139:2,6,7,20 140:2
  140:3 141:8,9,9,13
  141:17,19,25
  147:14 292:11
exist  18:24
expect  96:17 213:17

expected  194:23
experience  21:15,20
  46:9 137:17 213:10
  265:5
experiment  143:10
expert  11:9 15:22
  21:13,18,22 22:3,10
  27:5,10 30:6,13,17
  30:21 33:25 35:10
  35:25 49:18 54:16
  55:7 82:16,17 88:20
  94:24 95:20 137:16
  186:4 190:6 253:13
  254:2,8,9 255:4,16
  268:10,20,21
  272:17,18,20,23
  287:11
experts  15:23
  110:22 120:9
  172:10 258:3
expires  294:25
explain  21:16 46:16
  93:5 94:14 124:8
  130:8 142:11
  147:19 175:8
  187:16 191:4,16
  208:4 275:10 288:5
  289:3
explained  120:4
explanation  81:14
  236:17
explanatory  21:23
exploit  210:5,18
  211:15
exploiting  216:7
express  25:23 31:23
  34:12 44:20,25
  58:11 62:5 66:5
  89:20 167:15,16
  169:3,8 276:9,11
expressed  44:7
  75:18 76:8 80:22
  100:19 220:25
  285:6

[expressing - form]                                                                          Page 15

| | | | |
|---|---|---|---|
| expressing 32:2 | fail 209:17 | fewer 89:9 | 215:15 |
| 44:12 | failed 162:2,7 165:3 | field 286:21 | firm's 197:25 |
| extended 69:18 | failure 167:4 | fifth 1:16 2:15 | firms 19:12 47:20 |
| 120:17 | fair 11:19 14:20 | 170:10 219:10 | 73:10 115:19 |
| extensive 21:3 | 22:6 25:17 28:4 | figure 250:24,25 | first 4:5 9:24 49:16 |
| extent 32:3 64:15 | 38:2 43:7 47:10 | figures 46:21 | 56:5 68:17 79:3 |
| 159:12 167:10 | 49:7,12 54:24 78:6 | file 102:2 231:17,18 | 85:16,25 87:25 |
| 199:16 201:12 | 96:8 98:22 113:4 | 285:12 | 128:5,7,8 129:13 |
| 209:24 210:14 | 120:11 123:5,7,18 | filed 77:25 105:10 | 182:17 184:11 |
| 212:2,7 242:9,12,22 | 125:7 127:2 162:12 | 106:25 111:21 | 191:16 209:11 |
| 242:23,25 243:18 | 164:11 179:6,16 | 113:18 116:25 | 218:2 221:18 |
| 269:9 279:5,8 | 210:23 211:6,6 | 117:11,15,22 118:4 | 223:21 226:14 |
| eyeball 97:3 | 213:6 215:8 224:23 | 119:2 183:21 | 227:18 245:14 |
| | 280:4 284:25 | 231:13 233:6,9 | 256:6 264:7 280:20 |
| **f** | fairly 135:25 145:19 | files 244:19,20 | 280:22 281:7,9,9,14 |
| **f** 145:2 151:15 | fairness 273:3 | filing 119:17 237:7 | 281:15 282:25 |
| 160:19 230:18 | fallen 167:6 | filings 39:22 64:22 | 283:2 284:18 |
| 231:12,13 233:19 | falls 198:14 | 77:9 204:4,5,22 | five 9:10 16:3 72:16 |
| 235:14,22 237:16 | familiar 73:19 | 233:19 235:14,23 | 138:2,4,11,13 139:2 |
| 238:24 291:2 293:5 | 101:18,20 172:14 | 237:2,17 293:5 | 139:11 147:9 148:3 |
| **f's** 238:25 | 204:19 206:8,11,21 | final 62:13 | fix 276:20 |
| face 237:13 | 207:2 255:22 256:3 | finalizing 54:8 | flash 216:13 |
| fact 20:20 28:13 | 256:9 258:16 | finance 12:21 16:11 | float 43:17 |
| 30:6 99:25 110:23 | 279:15 | 46:10 210:21 | floor 2:16 |
| 115:15 117:14,21 | far 53:21 173:11 | finances 215:11 | fluctuation 141:6 |
| 125:19 157:6 | 176:2 233:25 | financial 12:25 | focused 167:9 |
| 169:24 175:3 | 234:18 276:9 | 93:12 167:8 209:4 | focusing 117:19 |
| 192:23 210:10 | fast 99:14 | 261:3 287:11 | follow 255:5 286:16 |
| 233:5 253:9 288:2 | favorable 121:5 | financials 62:11 | followed 68:16 79:8 |
| 289:12 | favorite 252:6 | 65:3 | 80:7 |
| factor 75:22 76:10 | fed 183:22 | find 7:11 41:14 56:5 | following 24:24 69:7 |
| 79:5,21 80:23 82:12 | federal 11:15 22:23 | 155:2 157:11 | 72:8 74:2 82:5 |
| 85:13 86:25 87:21 | 74:25 162:21 | 174:23 190:4 | 89:18 110:11 115:7 |
| 88:14,16 91:4 92:13 | 292:22 | 204:23 219:2 222:3 | 115:8,15 232:17 |
| 138:11,13,25 | feel 65:2 67:16 | 222:5 231:4 239:20 | follows 4:9 145:8 |
| 139:11 147:9 148:5 | 110:9 120:5 168:24 | 240:3 249:10 | foods 207:5 |
| 148:7,12,14,15 | 169:4,10 174:8,10 | 258:24 | fool 118:22 |
| 170:10 262:5 | 178:17 201:10 | finder 28:13 | footnote 71:9 |
| factors 73:20 75:5 | 229:8 247:12 | finding 153:7 229:2 | 102:12 105:16,18 |
| 88:12 91:18 138:3,4 | felt 141:18 172:6 | findings 229:5 | 106:11 162:25 |
| 138:12 147:8 148:3 | 174:10 | fine 12:5 33:7 49:3 | 194:13 256:12,15 |
| 197:24 244:16 | ferret 210:24 | 215:9 247:3 | forgot 202:11 248:8 |
| facts 54:23 | ferrillo 146:2 | finish 5:22,24 | form 9:25 32:14 |
| factual 253:19 | 286:24 287:2 | firm 7:25 8:16 10:6 | 36:17 93:4,9 101:19 |
| 270:14,18 272:16 | | 16:17 161:20 215:2 | 101:20,25 102:2 |

VERITEXT REPORTING COMPANY
www.veritext.com

[form - guess]

124:16 183:21
195:5 213:2,15
277:17 283:21
formally 46:25
103:25 105:4
106:22 111:18
116:24
formed 10:3,4 39:21
211:9 220:3 277:16
former 16:16
forms 216:12
230:18 231:12
formula 43:3,4
149:21
forth 7:7 103:9
164:5 291:11
forward 126:25
found 95:20,22
150:25 178:9
205:13 206:3,4
218:12 228:22
236:24
four 9:10 16:3 128:6
128:7,8,19 148:12
148:14 180:16,19
184:12,14 191:16
248:13 283:13
fourth 134:6 232:15
frac 63:12 100:6
fracking 63:6,12
213:16
francisco 15:2
237:22
frankly 130:19
251:24
fraud 37:18 106:13
106:16 167:18
263:17 289:17
fred 205:20
free 67:16 178:17
247:12
freedom 193:19
front 247:10 278:22
full 144:17,18 253:4
264:7 280:21

281:10 283:6
functions 11:7
funds 224:18
further 122:19
195:8 286:9 289:25
291:15
future 44:17,21 45:4
48:16 275:23

g

g 148:10 161:5
207:17
game 54:24
gamut 189:8
gap 219:25
garbled 266:8
garnered 237:16
gathered 52:5,6,10
gathering 53:4
general 19:9,9 51:8
59:12,12 155:8
204:19 213:3
223:20
generally 43:9 62:8
65:17 121:22
224:12
generically 260:5
gentlemen 10:4 18:7
gesturing 8:16
41:12 44:19 132:2
161:11 164:22
214:16 231:19
234:17
getting 13:23 42:5
58:13 88:15 112:8
131:12 168:8
233:11 270:3
272:13 275:16
give 23:20 81:14
93:19 162:9,25
196:17 247:5 251:6
273:10 278:5
given 291:14
gives 191:24

gnarus 7:13,22,24
8:14 9:12,19 18:17
18:19 20:3,8 22:16
23:2,5,19 52:16,19
53:22 60:11 76:23
238:2 239:10
gnarus's 59:12
61:16
go 8:15 9:21 14:6
15:10 18:10,18
19:18 29:2 34:20
36:13 37:12 40:14
40:21 42:7,18 51:14
57:2 64:13 69:22
70:10 81:24 82:20
84:5,11 99:4,7
115:4 126:3 145:16
159:10,20 165:20
166:24 169:17
170:8 173:12,20
178:3 182:9 184:20
184:22,23 189:20
190:18,22 196:18
198:24 199:13
202:2 208:25
213:11,20,25
229:19 230:4,13
237:22 238:25
239:2 244:13 250:9
252:5 254:4 255:15
261:20 264:15
268:8 276:20
goes 140:4 148:12
196:24 197:25
218:4
going 5:2 7:4,5 9:23
11:17 17:4 19:8
33:16 34:19 40:11
45:18 48:19,23
54:13 55:3,21,23
61:22 64:8,16,17
69:21 70:4 74:16
85:10 89:17 91:10
98:16 99:5,13 106:7
106:19 111:5,6

112:16 121:21
126:23,24 135:22
147:13 150:11
154:25 160:15
165:13 170:11
182:25 184:22
185:10 190:21
191:22 195:25 196:3
202:9 206:19
211:24 218:16
247:6,13 248:13
251:19 258:11
274:4,10 275:23,24
gold 189:10,10
good 4:13,14 10:9
169:20 190:17
212:8 223:14
gotten 13:2
government 11:15
graduate 10:23
grammatical 53:17
granting 276:24
278:16 293:10
great 157:8 212:22
270:19
greater 132:10,11
132:11 137:4
173:16 191:9
griffin 224:16
ground 5:2
group 10:5 16:15
182:23
grouping 189:6
groups 226:13
guess 15:12,16 21:5
24:9 25:5 42:22
86:11 102:20
106:12 120:21
127:8 130:12
146:20 156:14,18
164:21 188:19
190:12 197:23
216:12,18 231:23
233:10 278:10

[guy - included]                                                                                    Page 17

guy  212:22
guys  111:5

**h**

h  48:12
halcyon  267:9
haley  161:17
hand  114:4 235:6
  257:3 291:21
handbook  287:9
handed  6:20 114:20
  158:12 202:16
  235:18,19 240:13
hanging  212:24
happen  98:6 199:11
happened  98:4
  104:8 105:3 109:10
  113:24 253:21
  254:24 255:9 284:3
happens  143:5
  254:23 255:7
happy  75:12 88:25
  110:19 111:3
  162:10 172:23
  234:6
harm  170:5
harris  117:2
head  5:15,18 125:24
  126:21 228:23
  270:11 276:4
headed  149:19
  219:15
heading  10:12 21:13
  21:15
headline  241:18
hear  85:6
heard  206:13 207:6
  255:24
hearing  46:22
hecla  33:16,17 34:2
hedge  48:13
heinonline  257:18
  293:9
held  1:15 75:2
  232:12 233:18,20

234:9 236:9,14
help  37:15 57:10
  274:15 280:18
helped  277:17
helps  104:19 271:10
hereinbefore  291:11
hereunto  291:21
hesitating  8:6
hi  1:5 24:20,25
  25:25 32:16 39:7
  62:3,20 63:24 64:16
  65:3,22 66:4,9,19
  66:23 68:4,16 69:7
  70:7,19 72:6,12
  73:11,14,17 75:19
  86:21 99:10,19,23
  100:4,12 101:15
  104:9,10 105:4
  106:4,22 110:13,16
  111:18 115:9,12,15
  116:24 118:25
  147:25 153:10,14
  153:24 154:3,13
  155:25 156:7,10,15
  158:22 159:14
  160:20,25 161:3,7
  161:11 162:2,7
  165:18,21 166:17
  181:2 182:20 183:7
  183:20 185:22
  188:12 189:16
  192:18 194:23
  195:5 196:7 198:12
  198:21 200:10,19
  200:23 201:19
  213:13,14,16,19,21
  213:22 217:4,5,11
  219:3,22 221:5,20
  223:2,9 224:13
  227:17 228:16
  230:18 233:21
  237:15 252:21,23
  253:2,8 259:13
  260:8 279:21
  283:14,20 284:8,14

285:11 286:3 294:4
hide  264:18
hiding  265:6
high  210:7,8 214:6
  214:10
higher  133:9 169:23
  170:3
highly  135:23
  192:25
hire  20:21 111:6
history  7:6 23:24
hite  48:12,13 59:8
hmm  89:22 204:13
hold  10:10 27:8 39:4
  109:7 119:3 204:14
  223:10 224:20
  247:13
holder  236:7
bolders  222:13
  223:2,16,23 238:10
bolding  24:6 227:16
holdings  231:22
  232:20,23 233:23
holds  44:17
hone  84:8
honest  270:10
honestly  61:2
  255:13
hopefully  15:13
host  74:18
hour  17:20 60:2
hourly  59:25
hours  18:2 60:24,24
  118:11,14,16,25
hp  150:24 247:9
  248:13
huge  215:20
bughes  99:10,12,24
  100:5,13,14 101:16
  105:11 106:25
  109:5 111:21 119:2
  163:8 165:20,23
  167:5 194:22
  195:19,22 196:8,23
  252:23 253:3,10

259:12 279:20
281:20 282:4
283:10,20 284:7
hundred  202:19
hung  173:25
hypothesis  258:5
hypothetical  111:9
  213:14,15 244:5
  263:5,8,23 264:3
  271:9 275:9

**i**

i.e.  135:7 212:13
idea  115:10 140:20
  142:18 255:12
  258:2 276:15
  282:21
identical  128:11
identification  6:19
  114:13 154:23
  158:10 162:22
  235:16 240:10
  257:19 278:19
identified  46:6
  72:17 246:14
identify  6:23 26:12
  65:4 155:19 182:12
  240:18
illinois  3:9
imagine  14:14
impact  106:3 152:8
  166:15 193:10
  242:14 243:2
impacts  144:15
implies  83:5
important  100:5
  138:5,6,8 141:18
  224:10 244:8,14
impression  203:21
inability  220:12
inarticulate  145:20
include  130:3 141:2
  227:22 288:23,25
included  141:4
  153:24 154:8

[included - investment]                                                                      Page 18

161:10 179:8 184:2
193:3 288:14
**includes** 147:3
159:22
**including** 60:18
92:12 131:21
201:19 274:7
**inclusion** 174:17
**inclusive** 190:9,11
**incomplete** 264:3
**inconsistent** 237:17
**incorporated** 226:3
**incur** 208:21 209:12
**incnrring** 208:15
**independent** 98:24
101:13 102:18
103:11 164:8
**index** 135:24 136:4
153:19,22 154:4,10
154:13,21 155:6,11
156:2,7,13,19
157:12,17,21 158:8
158:14 160:9 189:3
189:14,24,25 190:3
190:6,19 192:24,25
193:11,12,12 199:7
199:19,19 200:2
201:2,15 202:15,23
239:24 240:9,9,23
240:23 242:10,14
243:19,19,21,25
244:3 245:5,23
246:6,10,14,17,18
250:3 251:4,7 292:2
292:16,18 293:7,7
**indexes** 154:8,12
**indicate** 154:12
175:17
**indicated** 145:11
**indicating** 52:9
56:10 83:25 105:13
106:17 113:12
116:18 151:7
152:18 160:17
171:20 174:5

175:19 176:3
187:22 191:12
209:10 218:17
219:7,10 238:11
250:17 251:3,16
**indication** 220:10
221:3
**indice** 153:14
**indices** 153:12
189:23 190:16
246:19
**individual** 201:6,8
224:21
**individually** 243:7
**individuals** 210:16
222:23 226:2
268:12 287:12
**industry** 41:5,23
42:7 64:19 100:2
136:4 153:11,13,17
153:22 193:12
199:10,18,19 201:2
201:13 209:4,4
241:13,13 242:10
242:13 243:21
244:15 249:5
**industrywide**
199:16
**inefficient** 95:21
96:2,14 97:8 174:21
176:21 196:11,18
206:4 237:15
**inference** 125:8
127:5,6
**infinite** 91:7
**inflation** 31:5 32:4,6
32:15,24 33:20
34:13 35:2,15,21
36:13,15 37:4,13,17
37:24 38:6,17 40:15
46:14 268:4
**influence** 143:6
**infor** 212:12
**inform** 125:3 126:4
185:21

**information** 39:25
40:4 74:12,19 93:11
93:17 94:16 96:17
96:20,21 104:3
109:2 110:16
111:15 112:9,23
113:15 117:3,6,14
117:20,23 118:17
118:20,23 120:15
125:3 127:12
131:20 136:16
141:23 144:15
149:10 158:19
162:2,6,13 163:6,19
164:9 166:3,12
169:13 171:24,25
172:2 187:20
210:25 211:3
212:13 213:3 222:4
222:6 224:21,24
225:24,24 230:25
231:6 235:12,21
244:22 252:20
259:18 260:11,16
261:6,6 269:13,19
293:3
**informational** 94:8
**informationally**
93:21 94:13,15
228:17
**informative** 138:12
**informed** 210:15,17
211:23 212:2,5,10
212:14 213:8
224:19 225:22
279:6
**inforuis** 124:4
125:13,14 136:11
176:8,10 177:9,19
185:24
**initial** 62:14
**initiate** 220:14
**input** 192:16
**inputs** 42:3,7,23
43:3,12 192:13

**inserts** 57:13
**instance** 161:2
174:9 237:25
**instances** 96:5,11
**institutional** 222:13
223:2,16,23 224:9
224:17 225:12
226:13,19 227:2,5
227:16 228:24
229:11,14,21
231:22 232:12,20
232:23 234:10
236:7,10,14 238:10
239:4
**institutions** 223:10
**instruct** 56:3
**instructing** 56:2
**instructions** 101:20
**insufficient** 120:10
**intellectual** 12:19
**intention** 44:11
177:12
**intents** 224:7
**interest** 83:5 217:4
220:8
**interested** 141:22
142:2 291:18
**international** 14:2
15:12,19 16:2
**internet** 93:12
118:20
**interpret** 29:10
224:21
**interrupt** 211:19
**interrupted** 63:17
**interval** 191:15
**introduced** 4:15
**intruding** 54:25
**invalid** 281:20
**inverse** 186:14,14
**invest** 212:23
**investigate** 261:24
**investment** 213:2
215:2,15

[investments - lawyers]

investments 27:24
  214:22
investor 33:19
  226:19 227:2,3
investors 223:23
  224:10,17,22
  225:12,25 226:14
  227:6,16 228:24
  229:11,14,21
  234:10 236:10,14
  239:5
involve 33:19 34:5
involved 22:18
  26:13 39:15 216:18
  271:24 272:5
involving 206:15
ipo 99:22 198:13
irrelevant 90:16
  245:19
isolate 169:5 170:4
  262:22
issuance 186:8,11
issue 26:6 28:22
  29:15,16 39:24 72:8
  121:16
issued 29:13 33:18
  40:6 62:14 66:23
  68:15 113:18
  115:11,20 116:22
  124:23 182:5
issuing 70:7,16,17
  73:9 74:4,9,23 76:4
  79:23 80:3,25 85:14
  85:20 86:14,21
item 77:22 283:18
items 76:17 77:12
  77:15,21 78:7
  126:14

j

james 71:20
january 154:22
  155:3 292:16
job 11:7 15:18,20
  103:2

john 145:25
john's 286:25
johnson 161:19
join 10:7 11:3 12:9
  13:25 18:19
joined 10:24 13:19
  14:9 15:11 18:4
  19:13,21 20:3
joining 23:5,19
jones 153:15,17
  157:17 158:7 160:6
  189:2 192:20 199:7
  199:25 239:23
  240:8,23 243:19,20
  292:17 293:7
judge 46:19,23
  92:17 98:7 280:12
  281:2 284:11,19
  285:3
judge's 98:2
judges 282:20
july 197:15
jury 29:24

k

k 101:19,21,25
  102:2 148:10
  183:21 283:21
  285:12
k's 65:9,10
keable 3:5 138:19
  157:14
keep 20:22 133:12
  160:15 182:25
kellogg 10:23
kept 13:7
kind 142:10 262:22
  276:2
kirby 2:4 45:24
  47:17 49:17 53:19
  54:7 55:15 59:15
  244:20 261:18
kmllp.com 2:10
knew 64:16

know 5:9 6:3,7 8:17
  10:2,2 19:10 22:15
  22:25 24:5,22 26:13
  27:19 29:3,10,21
  30:3 36:14,21 37:7
  37:7 38:23 41:6,20
  44:17 47:5 54:18,24
  55:11 56:6,16,18
  58:9 59:18 60:10,11
  60:14 61:3,14 62:21
  63:3,25 64:18 67:20
  69:25 72:20 73:13
  73:23 75:7 76:5
  77:8,23 78:2 82:2,7
  84:3 86:10 90:11
  95:19 98:3 101:12
  102:3,22 103:22
  104:5 110:11 113:3
  114:14 121:4,14
  122:5,8 123:24
  124:7 128:7,15,22
  129:24 134:24
  137:19 140:21
  142:10 148:22
  154:5,10,14,17
  155:9,16 160:2,4
  163:25 164:20
  168:9 169:22 174:6
  177:11,19 178:25
  179:19 180:25
  186:23 189:10
  190:19 193:8,21
  196:3,7 198:17
  199:15 200:4
  201:16 205:22
  206:14,16 208:11
  210:6 211:9 212:12
  212:13,16,18,21
  213:3 214:9,13,23
  214:24 216:7,14,17
  221:16,24 222:3,4,8
  222:13,18,20
  229:13 230:3
  233:22 234:2,8,18
  237:6,8,10 238:4,5

238:16 245:10,17
  245:22 246:3,22
  247:3 251:9,15,20
  256:3,8 259:15,24
  260:15 261:12
  262:4 266:4 268:5
  270:17 275:4,5,12
  275:24 277:5
  279:25 280:7,9,10
  280:12,15,25
  281:23 285:18,20
  285:23 286:6 289:7
knowledge 23:3
  90:6 97:22 224:25
knows 84:4
krogman 148:7,14
  148:16 204:11,25

l

l 126:9 224:16
l.p. 1:5 48:13,14
  294:4
lack 172:21 186:3
  186:10 187:20
language 144:11
  285:2,8,11,24
large 8:18 92:7
  131:20 141:6
  219:25,25 262:11
larger 8:16 155:7
largest 140:23
law 47:20 145:25
  286:25
laws 22:23 162:21
  292:22
lawsuit 4:20 47:25
  102:17 103:10
  113:18 117:11,15
  117:21,22 118:4
  119:2,18
lawsuits 11:15 22:22
  45:25 77:24 78:2
lawyer 98:13 284:24
lawyers 47:17

**learn** 62:3
**learned** 205:4
**leave** 12:6,22 14:11
  14:21 16:19 128:2
  208:5
**led** 96:13 107:15
  192:14
**left** 10:22 13:18,25
  18:3 19:3 44:2
  246:5
**legal** 80:13,20 81:21
  82:15,25 83:10,13
  83:14,23 87:4,11
  88:19 102:23 103:7
  107:11 112:19
  253:15,18,24
**legally** 112:22
**letter** 51:9 59:13,22
  100:13 101:16
  153:8 160:19
  279:20 283:24
  284:7,12 285:13
**letters** 126:16
**lev** 224:16
**level** 132:18,22,25
  133:5,7,16 134:12
  134:15,16,22 135:4
  135:9,11,19 136:2
  178:12 179:20
  181:24 192:2 220:8
  228:12
**levinson** 204:20
**lexecon** 3:7
**life** 94:25 276:21
**limitation** 231:16
**limits** 55:22
**line** 148:24 150:22
  175:25 184:11
  223:15 236:7 245:3
  245:4 247:15,15
  250:15 266:10,19
  276:7 294:6
**linear** 197:9
**lines** 191:12

**lingo** 119:21
**list** 10:11 21:3,12
  34:20 35:16,17,22
  35:23,24 64:23 68:2
  68:14 76:13 128:8
  153:6 158:8,17
  160:11 203:3 239:5
  250:3 251:18,23
  276:22 292:18
**listed** 10:16 21:18
  21:19 22:11 65:20
  76:17 77:10 115:19
  126:15,15 173:4
  189:7 204:5 217:7
  217:18 219:23
**listing** 231:23
**literature** 90:9
  286:21
**litigation** 1:6 4:19
  11:10 19:23,24 20:6
  22:18,20 23:8,8,12
  23:17 24:15,19,20
  31:6 33:17 45:25
  46:11 95:12,12
  255:17 287:9 294:4
**litinomics** 16:15,24
  17:5,12 18:4
**little** 36:24 40:9
  45:11 55:17 87:17
  110:15 165:10
  261:15 277:16
**lives** 118:16
**llp** 2:4,13
**loan** 222:15
**loaned** 222:22
**loans** 11:16
**locate** 220:12
**located** 17:18
**long** 13:10,20 15:25
  16:23 63:16 100:5
  123:3,8
**longer** 141:16,22
  160:10 186:2
**look** 6:22 26:10
  30:10 33:13 40:8,17

67:17 69:13 71:8,9
75:12 78:24 83:2
91:3 94:2 102:12
104:14,20 110:20
112:25 121:2,8
125:16 127:11,16
127:16 129:18
130:9,11 133:23
136:21 137:3
141:21 143:3
148:20,20 149:18
150:19 151:14
165:13 171:20
180:8 186:20
190:15 194:17
198:8 200:9,18
201:5 227:14 228:4
228:5 230:17 237:6
237:24 245:2 246:5
246:25 247:14
249:23 250:15,23
264:4 278:7 280:17
280:18,20 283:4
289:7
**looked** 30:8 35:16
  39:10,12,15 52:3
  67:21 97:14 154:11
  165:9,11 172:18
  174:11 190:15
  229:23 238:12
  277:15 284:5
**looking** 30:20 89:23
  104:18 110:24,25
  119:9 121:10 128:5
  129:2 130:5 138:24
  139:12 163:11
  170:17 171:22
  181:9 182:14
  186:16 195:12
  200:25 231:20
  237:7 241:16 257:7
  260:19 281:25
  287:10
**looks** 34:7 152:6
  195:22 231:24

232:3
**los** 16:10
**loss** 167:17 169:11
**losses** 33:19 258:4
**lost** 13:24 270:20
**lot** 4:25 147:8
**loud** 247:21
**lower** 170:3
**lunch** 144:23
**luncheon** 144:24

**m**

**m** 4:2 145:5 148:10
**magnitude** 287:8
**mail** 51:11 54:12
  157:6 202:9
**main** 65:23 167:8
**maker** 66:11,17
  125:20
**makers** 66:4,7,13
  68:3,10 91:19
**making** 66:20 150:9
  164:7 253:24,25
  272:15
**management** 10:23
**managers** 224:18
**manner** 119:15
**manually** 159:20
**marentette** 35:5
**mark** 2:8 6:13 69:25
  107:24 114:9
  154:18 155:15
  158:5 162:16 235:7
  240:5
**marked** 6:18,21
  54:9 114:12,21
  129:5,10 154:22
  158:9,12 162:22
  235:15,19 240:10
  240:13 257:16,18
  278:19
**market** 24:24 25:24
  26:7,16 28:8 29:22
  30:7,12,24 43:22
  49:25 50:25 61:11

[market - mischaracterizes]                                    Page 21

| | | | |
|---|---|---|---|
| 66:3,7,11,13,17,20 | matter 24:24 25:9 | 213:4 214:20 | menlo 17:18 |
| 68:3,10 73:20 74:13 | 27:20 33:18 47:18 | 218:15,21 222:20 | mention 71:10 73:4 |
| 75:4,21 83:9,19,21 | 59:9 60:7 61:16,17 | 222:23 231:18 | 91:13,15 205:15 |
| 87:7,23 88:6,10 | 62:6 64:12 76:19 | 232:10 236:24 | mentioned 18:5 |
| 89:12,16 90:3,16 | 77:13 79:23 291:19 | 240:22 243:6 | 28:6 59:11,24 64:21 |
| 91:9,14,19 92:3,23 | matters 19:23,25 | 244:19 251:14 | 101:19 131:2 144:6 |
| 92:25 93:14 94:19 | 20:6 21:3,17,19 | 267:16 268:9 | 156:6 172:4 183:25 |
| 95:3,8,21,24 96:2 | 22:9,19,21 23:9,12 | 281:23 289:4 | 201:20 205:8 |
| 96:13 97:6 110:13 | 23:17 31:6 268:2,20 | meaning 41:2 62:25 | merger 271:13,17 |
| 111:16 112:11,12 | 276:12 | 70:6 85:14 86:20 | 271:20,24,25 272:3 |
| 112:23 117:6,16,17 | mcinerney 2:4 | 136:7 209:11 | 272:5,10 |
| 118:3,6,7,10,11,18 | 45:24 47:18 49:17 | 283:18 | mess 131:22 |
| 118:25 119:16 | 53:19 54:7 55:15 | meaningfulness | metaphysics 255:3 |
| 121:12,16,25 | 59:15 244:20 | 175:18,20 | method 213:11 |
| 123:20 124:17 | 261:18 | means 49:10 58:22 | 288:20,21,24 |
| 125:10,20 131:21 | mcmahon 92:17 | 59:7 74:22 82:3 | methodology 28:23 |
| 135:7,24 136:4,9 | mean 7:19 11:10 | 86:14 93:6 94:16 | 30:22 32:5 142:13 |
| 138:9 147:24 | 20:10 21:21 24:2,4 | 121:16 124:12 | 145:23 146:6,8 |
| 148:11 153:7,11 | 26:18 29:8 33:4 | 143:19 175:9 191:8 | 286:17,19,20 |
| 161:10 168:13 | 37:19 39:12,20 | 192:7 196:18 222:5 | 287:14,15,19 |
| 169:14 172:2 | 41:19 43:20 44:16 | 225:6,17 245:22 | methods 288:21 |
| 175:22 176:5,18 | 48:3 51:19 52:3 | 259:2 265:13,13 | michael 3:5 |
| 185:22 192:25 | 54:15 56:17,17 | 279:25 280:8,10,11 | michigan 3:8 |
| 196:11,20,21,24 | 58:21 64:15,17 | meant 149:15 | mid 62:21 63:25 |
| 197:4,20,25 205:14 | 67:11 75:15 91:3,22 | 152:12 170:3 | 64:2 |
| 205:24 206:4 | 92:25 93:13 94:15 | 188:15 191:17 | middle 110:4 191:13 |
| 209:18 224:10 | 95:17 97:3 103:14 | 200:4 201:7 266:3 | million 89:14 |
| 225:7,12,17,18,22 | 103:15,20 106:9 | 266:17 280:13,15 | 125:21 |
| 228:16 229:2 | 111:3 112:7 117:25 | 280:15 | mind 20:22 67:13 |
| 237:14 239:13 | 117:25 120:23 | measure 32:4 37:5 | 119:8,21 140:8 |
| 244:15 258:5 262:2 | 122:3,8 124:19,25 | 37:12 120:24 | 176:11 247:21 |
| 262:11 268:6 | 126:20 129:21 | 261:23 | 277:13 |
| 270:16,23 271:16 | 130:16,17,18 135:2 | measured 188:22 | mineral 189:9 |
| 272:23 273:2,17,18 | 135:5 137:21 | measurement | mining 33:16,17 |
| 273:25 286:2 | 141:21 143:16 | 120:25 159:21 | 34:2 153:17,21 |
| markets 66:8 | 145:23 146:8 150:5 | 289:8 | 157:17 158:7 189:9 |
| marks 210:17 | 157:6 159:8,15 | measuring 73:20 | 189:10 192:24 |
| marriage 291:17 | 161:9 164:22,25 | 186:15 | 199:7,25 240:9,23 |
| material 57:19 | 165:6 166:11 | meeting 100:3 | 292:18 293:7 |
| materiality 287:7 | 171:25 174:20 | members 250:14,19 | minus 248:5 249:8 |
| materially 57:20,22 | 193:15,18 194:12 | 250:22 | minute 77:7 218:17 |
| materials 76:25 | 196:16 197:6,11,12 | memory 12:3 67:18 | minutes 267:2 |
| math 137:10 150:24 | 197:21 202:22 | 67:21 | mirror 146:5 |
| math's 15:13,16 | 205:22 208:21 | memory's 10:9 | mischaracterizes |
| | 211:18 212:3,17 | | 267:13 |

Case 1:21-md-02989-CMA   Document 568-17   Entered on FLSD Docket 06/08/2023   Page 98 of
114
Case 1:12-cv-08557-CM   Document 47-1   Filed 06/17/14   Page 98 of 114

[mispriced - november]                                                                    Page 22

| | | | |
|---|---|---|---|
| mispriced 210:4 216:11 | morgan 256:7 264:5 | necessarily 38:22 85:19 174:18,20 176:21 197:9,22 212:4 | news 62:11 78:8,9 78:12,14,15,20,22 118:21 119:17 124:23 142:7 |
| mispricing 210:6 211:15 216:7 | morgan's 256:6,25 257:25 | | |
| mispricings 210:19 | morning 4:13,14 170:11 283:25 284:3 | necessary 83:7 90:2 91:20 110:9 169:5 169:10 189:17 201:11 220:13 221:21 259:6,15,18 260:11 | 160:21,24,25,25 161:3,5,6,6,7,10 166:17 167:2 172:2 179:18 180:22 181:5,7,8,20 183:4 183:4,12,12,14,19 183:19,22 184:6 185:3,7,14,25 186:3 186:8,11,16,18 197:4 198:9 199:12 241:17 261:25 262:2,2,9,10,11,14 264:18,18 |
| misreading 180:23 | | | |
| misrepresentation 107:6 259:7 260:12 | motion 270:21 274:7 276:25 277:22 278:18 293:11 | | |
| misrepresented 261:5 | | | |
| misspoke 266:3 | motley 118:21 | | |
| mistake 149:4 150:25 233:12 238:4,11,15 239:8 | mountain 17:19 | | |
| | move 40:11 61:25 86:10 90:13 119:15 119:19,22 126:25 | need 6:6 50:17 85:6 87:25 88:4,12 105:12 112:25 156:12,13 160:16 172:20 173:14 183:3 228:23 247:2 247:6,8,11,19 | |
| mistaken 202:25 | | | newspaper 52:4 |
| mistakenly 224:3 | | | nickel 189:11 |
| mistakes 152:23 171:3 | moved 16:10,13 | | ninth 4:3 |
| | movement 140:24 153:11 160:8 181:3 181:5,17,20,23 200:8,11,23 201:2 203:4,4 242:2 | | nobody's 170:25 |
| misunderstanding 180:24 | | needed 53:5 58:16 85:9 152:23 | nod 5:15 |
| | | | nodding 5:16 |
| misuse 144:10 | | negative 169:18 175:4,13,14,14,14 248:10,14,15 249:3 | nods 5:18 |
| mkeable 3:11 | movements 124:22 125:2 128:17 135:24 185:6 199:6 200:21 | | non 161:6 176:16 |
| mlp 48:14 | | | nonsense 255:11 |
| mm 89:22 204:13 | | negligible 167:12 | normally 142:7 |
| model 40:23,24 41:3 41:4,8,11,15,16,22 42:6,8,15,20,21,22 43:4,13 44:6 261:19 | moves 110:21 186:15 | negotiations 271:13 271:17,25 272:5 | northern 207:3 |
| | mstrauss 2:10 | neighborhood 207:3 | notary 1:19 4:6 290:14 291:7 294:25 |
| | multiple 39:2 95:19 167:2 213:4 | nera 12:9,15 13:2,7 13:11,19,21,25 14:11,15,15,19,21 14:23 15:6,21 41:17 95:18 287:20 | |
| models 42:3 | muriel 35:4 | | note 129:9 |
| moment 20:24 76:12 78:25 116:11 119:8 128:4 129:19 133:24 138:14 153:8 165:14 216:25 227:15 228:6 231:9 244:18 247:2 249:23 258:25 260:18 275:14 | mutual 224:17 | | noted 286:10 290:4 |
| | mutually 165:24 | net 136:4 | notice 1:17 128:6 283:12,15 |
| | **n** | neutral 288:13 289:15 | |
| | n 2:2 3:2 4:2 63:13 126:9 145:2,2,2,5 148:10 | never 22:5 46:24 137:18 165:11 276:8,8 | notified 99:10 |
| | | | notifying 100:13 |
| | naivete 141:7 | new 1:2,16,16,20 2:7,7,17,17 4:7 15:6 66:17 92:18 96:21 183:4,12,19 217:6 217:16,17 218:8 219:23 224:21 291:3,4,8 294:2,2 | notion 270:6 |
| money 8:8 12:24 13:7,8 224:18 | name 9:16 256:6 | | november 40:6 67:8 67:8,9,9 68:23 69:2 69:10 70:23,24 99:25 102:9 103:23 104:8,11,24 105:20 105:25 106:24 108:20,22 109:10 |
| month 110:24 | names 27:13 | | |
| months 15:7 49:20 50:23 | nasdaq 66:11 | | |
| | national 27:18,23 | | |
| | nature 15:24 142:5 | | |

[november - okay]

109:11,16,24
111:12,20 112:4
114:11 116:16,22
116:23 117:7 118:5
118:24 119:10,15
119:23 120:8,20,21
120:21 121:10,11
122:18,25,25
123:17,23 124:13
124:13 127:23,24
129:23,24 130:2,4,6
130:9,11 131:4,5,9
131:11,15 139:18
139:18 140:10,10
143:20,20,24 144:2
144:2 166:4,18
169:12,14 171:11
172:5 173:7 178:22
184:2 195:15
197:17,18 198:9,9
200:11,20 218:5
241:19 242:3 249:6
253:11 259:10
288:3,6 292:14

**number** 24:6 36:14
38:12,16 40:17,20
41:9 57:14 63:17
75:4 79:7,20 82:6,8
82:10,11 86:23
87:20 88:24 89:4,18
92:6,7 136:20
150:21 151:18
168:11,12 173:5,6
174:3 175:11,14
178:25,25 181:10
181:11,16 184:9
194:5,9 204:3
218:18 229:10,10
229:13,20 230:12
232:11,16,17
233:23 234:2,9
236:5,8 245:3
249:11 277:4,19
287:6

**numbers** 150:4
192:4,6,10,14
217:24 219:2
227:21 228:8 229:8
230:6 234:15 236:2
236:3 237:8,12,13
238:13 250:9

**numerous** 48:22
57:6 91:12 122:23
255:16 263:10
286:22

**nyse** 125:19 152:11
218:14

**o**

**o** 63:13 126:9,9,9
145:2,2,2 148:10

**object** 54:14 55:3
64:9 80:17

**objection** 9:20 19:17
28:20,25 29:18,25
31:12 33:3 36:16
42:17 43:6 44:15
45:3,15 48:2 50:6
56:14 61:13 62:22
64:5 65:24 73:12
75:6,10,23 76:20
77:2,14 79:16 80:12
81:20 82:13 87:3,15
87:24 88:7 91:2,21
92:20 97:10 100:21
102:5,11 103:13
106:18 107:9
121:18 122:4
134:19 135:12
136:10 163:24
164:12 166:10
167:20 169:15
179:11 211:5
212:15 213:24
214:18 221:23
222:17 225:4 242:5
242:6,16 243:4
244:12 253:12
255:2,10 261:22

262:12 263:3,18
264:14 265:11
268:7 269:2 270:4
272:11 275:8
279:24 280:6
284:17 285:7 288:8

**objections** 275:14

**objective** 263:2

**obligated** 102:2

**obligation** 253:15
253:18

**observ** 191:21

**observation** 123:22
125:8 132:9 134:23

**observations** 173:4
184:10 194:5

**observe** 185:5

**observing** 132:7

**obtain** 210:25 211:2
212:11

**obtained** 150:16
230:25

**obtuse** 179:24

**obviously** 133:8
152:24 158:16
238:21,25 239:6

**occur** 100:10 172:21
178:20 221:15
270:7 275:22,23,25

**occurred** 100:9,11
101:4 104:10 109:4
113:10 179:3 182:5
184:15 185:17
255:9 269:21,22
270:2,6,7 273:9,10
273:12,13

**occurrence** 283:13

**occurs** 254:23

**october** 67:7 71:21
71:21,22 148:24
149:14 182:17,23
183:2,3,13,15 232:5
234:3

**odd** 234:23 249:10

**offer** 13:9

**offered** 30:14,17

**offering** 13:7 62:15

**offers** 272:20

**office** 157:7

**offices** 1:15

**oftentimes** 132:24
190:5 210:10 237:2
289:9

**oh** 13:16 27:8,25
53:24 55:24 75:13
76:3 84:22 104:25
129:3 130:6 146:16
148:18 149:7
156:21 157:8
160:12 163:7 165:4
182:14 184:23
186:13 202:11,18
212:22 233:3 237:6
237:9 247:9 248:18
249:2,2,2 256:13
257:4 270:24 278:4
287:4

**okay** 5:4,12 6:5 7:13
8:9 10:21 13:19,23
15:16 16:7 17:25
19:3,8 23:18 24:7,9
26:21 27:2,25 32:9
33:23 34:9,22 36:4
36:23 38:4 41:24
42:4 43:25 44:18
48:18,20 49:2 55:24
58:6,15,20 63:8
69:20 70:4 73:5
75:17 76:5 85:24
86:9,16,22 87:14
89:8,22 94:10,18
96:8 100:7,25
103:18 105:24
106:8 107:18 110:8
112:8,18 113:4,7
114:4 115:23
118:13 119:14,25
121:21 122:11
123:18 124:15

[okay - paradise]

126:19 128:14
129:7 130:6,20
131:13 132:21
134:2 136:24 138:2
138:23 141:16
143:7 144:12,19
146:11 147:2
149:13 150:19
153:4 155:12 156:4
157:5,16 160:13,18
161:22 163:4 170:8
170:12 173:20
175:25 176:25
177:24 180:2,9,19
181:4,9,19 182:25
183:24 186:22
190:17 191:3
194:20 202:12,21
203:18 204:17
207:12 208:6 215:6
216:2 217:22
223:14 226:7
232:24 233:25
234:17 236:23
238:17 240:21
241:7 242:17
243:14 244:24,25
246:13,23 247:14
247:19,25 248:4
249:3,9,17 250:7,18
250:20 251:25
253:7 254:19,21
256:17 257:14,21
258:21 260:17
262:15 265:23
266:7,18,24 267:20
268:17 269:14,15
271:8,14,15,18,21
271:22 272:6,7
277:5,9,20 278:21
279:11 280:2,14,16
282:14 283:4,24
284:11,23,25 286:7
286:11 287:22
289:22

old  150:23
omission  42:14
  107:7 109:2,4 165:6
  165:7,8 169:6,11
  259:7,20 260:13
omitted  261:5
once  82:14 107:10
  263:4
ones  35:17 65:5
  67:12 147:11
  204:18 205:3,8,9
  209:11
ongoing  60:5,8
oops  248:8
open  117:17
opening  112:12,15
  112:24
opine  168:22
opinion  24:18 25:10
  25:14,19,20,23
  26:14,15,16 28:7,10
  28:14,18,24 29:9,17
  29:23 31:11 32:15
  32:23 33:8,20 34:13
  35:21 36:12 39:6,17
  39:19,21 42:12 44:7
  44:7 49:25 50:24
  51:17 54:22 58:11
  58:12 61:11 62:5
  66:6 75:12,18 76:8
  80:14,21,22 81:22
  82:15,16,18,25 83:4
  83:10,13,14 87:2,5
  87:11 88:5,23 89:8
  89:19 90:5,10 92:9
  93:15 97:5 98:2,14
  100:12,17,18
  106:17 107:14,15
  107:21,22 108:13
  109:17 117:24
  118:3 121:12,25
  123:19 124:4,17
  125:13,15 126:5,13
  135:6 136:8,12,14
  136:17 137:24

152:9 167:15,16
169:4,9 176:5,8
177:5,8,10,18,19,20
177:22,25 185:21
186:5 209:8,15
210:24 211:10,12
213:10 214:12
220:3,6,25 228:16
237:14 239:13
242:15 244:2 254:3
254:12,12,16 265:7
270:16 272:17,18
272:21,23 273:18
274:20,25 276:9,11
277:17,17 279:4,14
285:5
opinions  24:23 25:7
  31:23 44:12,21 45:2
  50:4 64:10 74:15
  276:18
opportunity  208:11
  275:2
opposed  11:21
  23:22 109:12 115:9
  146:10 188:15
  209:3,5 228:2 277:9
  277:24
oral  280:20
order  10:17 173:13
  276:24 277:22
  278:3,16 279:17,19
  293:10
orient  27:5,9
original  124:6
originally  13:5
outcome  61:17
  291:19
outlier  142:15,17,20
outside  94:22 112:5
  121:9 124:2
outstanding  43:18
  149:20 219:16
  220:9 236:13,15
overall  136:8

overbroad  95:4
overdisclosure
  255:23 258:16,24
  259:21 260:2,4,7,10
  260:14
overly  51:19 95:4
overreacted  197:4
owned  8:2 118:15
owner  8:24
ownership  228:12

**p**

p  2:2,2 3:2,2 63:13
  63:13,13 191:9,24
p.m.  114:17,18
  144:24 145:3 180:5
  180:6 202:3,4 235:3
  235:4 267:3,4
  286:10 290:4
pad  70:2
page  10:11 21:4,5,6
  21:12,14 57:14 65:2
  65:18 71:9 76:14,15
  78:24 94:4,6 99:8
  102:13 105:15
  129:11,13 138:15
  138:18,19,21
  148:21 153:4,5
  157:15 163:2
  176:23,24 194:15
  194:17,19 195:9,12
  218:20 219:14
  238:19 245:4
  250:17 251:12
  256:11,13,16
  260:18 264:5
  277:16 280:20
  281:10,17 283:5,9
  292:3 294:6
paid  8:7 60:5,9,11
paper  27:5,9 53:14
  70:2
papers  270:19
paradise  2:18 4:12
  4:17 6:13 25:3

[paradise - period]                                                      Page 25

| | | | |
|---|---|---|---|
| 26:20,24 27:11 | 161:13,23 163:9,13 | 67:23 70:21 72:14 | 236:16 248:10,22 |
| 31:16 33:5 45:10 | 163:14,14,14 165:9 | 72:18,20 104:12 | 249:3 |
| 47:8,10 48:4 49:7 | 165:15 166:5 | 119:5 126:2 133:25 | **percentage** 23:21 |
| 49:12 50:10,14,16 | 176:24,25 194:16 | 151:22 163:3,13 | 149:19 195:20 |
| 55:5,24 57:11,17,24 | 194:18 195:8 | 177:6 182:10 | 196:6 219:15 220:2 |
| 59:18 61:19 63:11 | 207:13,24,25 208:2 | 184:24 204:17 | 229:12 236:12,13 |
| 63:18,21 66:14 | 214:4 216:24 220:7 | 246:20 249:7 | 247:16 |
| 80:19 83:25 87:14 | 220:15,22 224:14 | 280:24 282:22 | **percentages** 229:16 |
| 88:21 91:23 103:17 | 226:10,18 227:14 | **pay** 96:6,7 | 248:19 |
| 104:15 107:18 | 227:19 228:9,11,14 | **paying** 223:11 | **perfect** 171:2 |
| 108:15 109:15 | 252:6,6,7,17,19 | **payment** 60:6 | **perform** 51:5 |
| 110:2 114:8,19 | 256:14 260:20 | **peak** 137:3 | **performance** 158:20 |
| 129:8,15 135:15 | 264:7 280:21,23 | **peer** 90:5,7 91:11 | 158:22 159:4,19 |
| 137:8 143:11,25 | 281:10,17 282:7,12 | **pejorative** 265:3,3 | 201:6 |
| 144:20,22 145:10 | 283:6 | **pen** 53:13 69:23 | **performed** 52:7 |
| 145:15 151:11 | **paragraphs** 163:20 | 70:8 | 77:13 90:20,21 |
| 154:18 155:15,21 | **paraphrasing** | **pending** 6:8 47:3,3 | 139:15 140:11 |
| 156:11 158:4 | 252:24 | **people** 9:6,11 14:18 | **performing** 141:12 |
| 162:16 164:17 | **parcel** 289:5 | 16:16 18:21 38:24 | 208:20 |
| 180:3,7 184:23 | **parentheses** 136:3 | 42:3 52:6,10,11,15 | **period** 25:2 26:3 |
| 191:11 198:3,6 | **parenthetical** | 53:21 111:6 167:3,9 | 32:17 38:8,10 62:23 |
| 202:5,7 203:24 | 105:25 106:2 | 169:19 176:17 | 64:2 65:11 66:24 |
| 204:2 207:25 215:6 | 135:25 | 197:13 208:10,18 | 68:4,18 69:8,8,9,18 |
| 215:9 234:25 235:5 | **park** 17:19 | 210:15 213:7 221:4 | 69:19 70:22 71:11 |
| 235:9 240:5,25 | **parlance** 183:18 | 225:21 286:22 | 71:17 72:13,22 |
| 242:17,21 243:9 | **part** 51:15 103:24 | 289:6,9,15 | 74:24 81:2 86:19 |
| 252:4 253:17 257:5 | 115:10 123:25 | **people's** 222:21 | 97:7,9,17,21,23 |
| 257:15 263:6,9 | 125:12 152:10 | **percent** 22:24 | 98:5,9,15,21,25 |
| 266:5,7,25 267:5,7 | 154:13 170:22 | 125:23,25 132:18 | 101:5 102:9 103:3,9 |
| 273:3,20 274:12,14 | 171:5 193:3 203:2 | 133:4,6,8,9,16 | 103:12,25 105:19 |
| 274:17 275:3 | 242:10,13 243:19 | 134:11,15,16,22 | 106:5 107:25 108:8 |
| 278:13 281:7 | 243:24 244:3 264:4 | 135:4,8,10,18 136:2 | 108:14,18 109:13 |
| 285:10 286:8 288:8 | 276:24,25 278:17 | 136:19 137:2,17 | 110:10,12,17,20,25 |
| 289:24 292:8 | 278:17 285:8,9 | 150:12 152:5,11 | 111:11,16 112:6,20 |
| **paragraph** 24:23 | 289:5 293:10,11 | 178:11 179:19 | 113:2,11 115:12,20 |
| 25:5 31:24 57:15 | **participants** 225:22 | 181:15,23 191:15 | 116:11 120:3,6,10 |
| 79:2,4 83:2,3 84:12 | **participate** 53:10,12 | 192:2 194:22 | 120:17,19 121:3,5,6 |
| 84:16,18,21 85:25 | **particular** 95:8 | 195:13,22 196:8,9 | 121:9,9,14,14,15,17 |
| 89:20 93:8 94:6 | **parties** 165:23 | 196:24,25 197:2,8,9 | 122:2,16,22,24 |
| 99:7 100:19,23 | 222:15 261:2 | 197:14,15 198:13 | 123:11,12,21,23,24 |
| 104:20 106:20 | 291:16 | 198:14,25 202:19 | 123:25 124:2,3,11 |
| 111:24 113:12 | **partners** 1:5 294:4 | 202:20 217:12,15 | 124:18,24 125:9,11 |
| 126:14,17 133:24 | **pathway** 27:24 | 217:15,20 218:10 | 125:17,18 127:7,11 |
| 135:15,20 138:16 | **pause** 6:25 24:22 | 219:3,4,13 227:22 | 127:17 129:21,22 |
| 157:14,16 161:12 | 25:11 27:2 28:2 | 227:23 228:13,13 | 130:22,24 131:3 |

[period - prior]

| | | | |
|---|---|---|---|
| 139:17,19,21 140:9 | phone 46:23,24 81:7 | polymedica 205:19 | 116:14,17,21 117:7 |
| 140:14,18,25 | pick 121:4 | poole 27:3 | 165:11,14 166:4 |
| 141:11,16,18,19 | picking 172:25 | populate 43:12 | 181:25 182:4,21 |
| 142:9 143:2,3,4,5,6 | piece 56:21 111:15 | portion 31:18 45:13 | 183:8 184:17 259:9 |
| 143:8,18,19 144:6,9 | 127:5 136:15 | 45:20 61:15 84:14 | 259:10,17 292:14 |
| 144:14,16,17,18 | place 85:16 | 85:2 90:24 139:19 | presumably 161:8 |
| 146:10,18,18,19,20 | places 94:12 148:25 | 285:16 | presumed 224:19 |
| 146:23,25 147:4 | 149:14 248:14 | position 220:14 | pretty 239:7 |
| 151:22 155:4 159:5 | plaintiff 34:3,17 | positions 19:4 | previous 10:13 |
| 160:22 171:9,14,21 | 205:16 | positive 169:18 | 115:2 |
| 171:21,23 172:6,18 | plaintiffs 2:5 19:14 | possibility 216:20 | previously 4:22 8:2 |
| 172:18,22,24 173:7 | 19:22 20:5,15 23:4 | 227:8 | 26:5 47:16 73:3 |
| 174:12,15,25 176:6 | 23:22 24:12 30:16 | possible 44:20 73:16 | 115:11 145:6 233:4 |
| 178:6,10,20 179:4,7 | 32:13,25 35:11 | 88:8 89:11 97:6,11 | 273:5 |
| 179:20 180:13,20 | 47:23,24,25 48:11 | 97:12 161:9 169:22 | price 74:13 94:17 |
| 182:6 184:16 185:3 | 48:19 49:10,11 53:6 | 223:7 | 96:16 103:23 104:4 |
| 185:18,23 186:2,3,7 | 59:6 96:3 98:20 | possibly 176:12 | 106:4 110:22 |
| 186:11 187:6,14,14 | 240:16 | 189:24 225:24 | 119:14 124:21 |
| 187:19,21 194:10 | pleasant 169:21 | 233:11 | 125:2 128:16,21 |
| 217:7,20 218:4 | please 5:9,20,21 6:2 | post 112:10 | 130:3 140:24 141:6 |
| 220:12 221:8,11,11 | 6:22 31:14 36:6 | potential 50:3 | 141:23 144:15 |
| 221:12,15,18 | 77:19 83:17 93:6 | 213:21 | 153:10 160:8,21 |
| 227:25 228:2,18 | 114:8 134:3 145:16 | potentially 49:18 | 166:17 174:19 |
| 229:15,22 230:19 | 158:5 166:8 170:21 | 172:9 | 181:2,5,17,20,22 |
| 230:20 234:11 | 176:23 178:17 | practice 12:21 16:11 | 184:6 185:6 186:6 |
| 268:23,25 269:14 | 179:22 186:21 | premise 225:21 | 186:12,15,17 |
| 269:18,20,22,23,24 | 209:22 211:12 | preparation 244:24 | 192:18 196:9 |
| 279:7 286:4 287:24 | 220:19 222:8 228:5 | prepare 11:9 15:22 | 198:13,24 199:5,13 |
| 288:2,4,7,16 289:8 | 247:11 253:23 | 76:24 | 200:11,19 203:4 |
| 289:10,13,14,16,16 | 263:12 282:13 | prepared 44:6 55:8 | 210:11 214:5,6,10 |
| 289:19 | 285:15 | 59:13 | 216:14,16 226:3 |
| periods 68:5,17 | plunges 198:12 | preparing 94:24 | 242:2 247:17 248:2 |
| 97:15 139:14,25 | plural 25:7 | 152:17 | 248:17 260:24 |
| 141:22,24 | plus 179:2 184:12 | presence 124:9 | 261:3 262:23 268:3 |
| person 11:22 148:17 | 221:11 | 176:16,16 222:25 | prices 93:9,10,16,17 |
| personal 214:22 | point 42:24 76:21 | 223:22 224:9 | 173:15 200:22 |
| 215:11 | 87:8 103:22 110:10 | 225:11,23 | pricing 209:25 |
| personally 60:21 | 115:7 116:20 | present 3:4 176:22 | primarily 19:14,15 |
| 221:24 284:20 | 145:22 146:5 181:6 | presentation 100:2 | 53:22 |
| perspective 138:7 | 218:16 219:4 237:4 | presenting 182:22 | prior 23:19 45:24 |
| persuasive 79:6,15 | 258:7,8 282:17,19 | president 3:6 | 56:9 83:22 85:7,8 |
| 79:17,18 | pointed 106:20 | press 40:5,9 62:10 | 112:11,14,23 113:2 |
| phenomenon 216:14 | 252:20 | 65:16,17 77:9 78:3 | 113:19 115:12,20 |
| 233:7 | pointing 218:19 | 78:20 93:12 112:17 | 116:4,5 145:13 |
| | 219:7,9 | 113:17 114:5,11 | 259:6,19 260:12 |

[prior - read]

283:12

**probably** 9:13 11:6
22:24 131:22
243:20

**problem** 111:4
172:19 224:6

**proceedings** 184:24

**process** 47:9 57:3

**produced** 155:18
203:9

**product** 63:2,4
192:11 213:22

**professional** 1:19

**professionally** 215:3

**profit** 66:13 208:9
208:14,22 209:14

**program** 194:14

**project** 61:7

**promote** 100:4

**pronunciation**
207:14

**proper** 87:13 107:16
112:25 254:9

**property** 12:19

**proppants** 63:8,13

**prospectus** 62:13,13
65:7 182:22

**prove** 75:4 87:21

**proven** 92:10

**provide** 24:19 25:14
25:15 227:15 230:3

**provided** 54:23
59:21 195:21 229:8
239:23 240:15

**providers** 237:18

**provides** 220:9
228:15 230:12

**providing** 11:22
237:19

**provision** 283:11

**public** 1:19 4:6
46:22 62:15 93:10
93:17 290:14 291:7
294:25

**publicly** 26:7 99:24
162:2,8 163:21
164:2 222:4

**published** 86:6
118:20

**pulled** 154:12

**pump** 212:20

**purported** 281:20
282:5

**purpose** 116:19
150:8 205:7 244:8
257:24 265:6
275:10

**purposes** 85:13
86:24 98:23 106:7
106:16 129:2
134:16 143:19
164:6 187:4 209:7
223:13 224:8 279:3

**pursuant** 1:17
283:16

**purview** 64:20

**put** 41:3 42:3 43:3
52:8 53:13 56:21
60:17 61:6,9 129:23
210:16 249:20
264:2 265:3

**putting** 275:13

**puzzled** 102:21

**q**

**qualify** 96:20

**quantify** 166:15,19

**quantity** 248:5

**quarter** 162:3
163:22 232:11,15
232:21

**quarterly** 231:13
233:6,9

**question** 5:9,24 6:8
6:9 19:9 29:4 31:14
31:17 32:10,19
34:20 36:6,22 37:22
40:14 41:7,20 45:8
51:20 57:9 61:24

63:15,16,22 64:3
68:13 70:5,11,13
74:21 76:7 77:19
78:5 80:18 81:22
82:8 83:13,17,22
84:8,11,18,23,25
85:5,7,8 86:12
87:10,13,19 88:19
88:19,20 90:23
91:10 92:2 95:5
99:6 100:8 108:21
117:5 121:19,20
123:9,9 124:6 127:9
140:5 159:25 161:4
166:8 167:22,25,25
170:2,23 175:7,24
177:4,15 179:22,25
200:15,16 209:21
211:22 215:13
220:19,23 223:21
225:9,11 226:23
242:19 243:5,9,12
249:16,18 250:12
253:19,23 254:5,8,9
254:17 255:14
258:10 263:12,22
269:4,6 272:17
273:5,8 274:9
275:11,17 276:10
278:23,24 281:18
285:15,19

**questioning** 223:15

**questions** 5:14,22
23:15 40:10 46:20
46:24 116:4,13
272:14 281:22
286:9,12,16 287:23
289:25,25

**quibbling** 234:12

**quick** 26:10

**quickly** 5:6,7 279:13

**quite** 127:18 130:19
142:11 189:5 276:3

**quotation** 210:17

**quote** 79:6 165:22
214:5,7,8 252:21
266:17 283:15

**quoted** 225:14

**quotes** 79:9

**quoting** 224:14,15

**r**

**r** 2:2,18 3:2 4:2,2,2
63:13 126:9,9 145:2
145:5,5,5 148:10
175:4,9,10 207:17
207:17,17 291:2

**ran** 51:7 151:16
192:22 193:5

**range** 234:7

**rare** 264:11 265:8
266:16

**rate** 59:25,25

**raymond** 71:20

**rbc** 71:21

**reach** 165:24

**reached** 96:23,24
147:21

**react** 186:7

**reacted** 160:21

**reaction** 103:23
130:3 179:18
185:14

**reacts** 141:23
186:17

**read** 29:12 31:2,13
31:15,19 32:19,20
36:6,9 45:8,9,14,19
45:21 52:3,5 64:21
67:11 70:12 76:16
77:11,20,25 78:2,3
78:7 83:17 84:15,24
85:2,3,24 89:21
90:23,24,25 100:20
100:22 134:3
135:23 161:24
166:9 167:23
171:13 177:2
179:21,23 200:15

212-279-9424                                                          212-490-3430

Case 1:21-md-02989-CMA   Document 568-17   Entered on FLSD Docket 06/08/2023   Page 104
Case 1:12-cv-08557-CM   Document 114   Filed 06/17/14   Page 104 of 114
of 114

[read - remember]

| | | | |
|---|---|---|---|
| 209:21,23 220:19 | receive 226:2 | reference 48:16 | relate 272:25 |
| 220:20 225:13 | 283:15 | 57:14 104:23 | related 185:25 |
| 245:16 253:22 | received 59:19 | 162:25 245:4,15 | 291:16 |
| 254:6 258:6 260:21 | 100:12 101:15 | referenced 67:16 | relation 220:8 |
| 263:11,13 264:8 | 203:22 | references 133:4,6 | relationship 187:12 |
| 266:6 280:22 | recess 50:12 114:17 | referred 65:17 | 197:23 |
| 281:11 282:9,12,25 | 144:24 180:5 202:3 | 113:9 163:19 | release 40:5,9 78:3 |
| 283:7 284:20 | 235:3 267:3 | 183:10 | 112:17 113:18 |
| 285:14,17 | recite 105:3 107:12 | referring 25:5 49:5 | 114:5,11 116:14,18 |
| reading 46:12 67:5 | recognized 286:20 | 53:19 69:9 71:19,20 | 116:22 117:7 |
| 98:13 132:6,16 | 287:12 | 96:11,12 111:24 | 120:13 165:11,14 |
| 178:8 180:16,18 | recollection 155:25 | 113:9,22,23 115:17 | 166:4 181:25 182:5 |
| 182:18 195:16 | 194:8 | 115:18 126:12,12 | 182:21 183:7,8 |
| 220:7 228:13 232:6 | reconcile 30:10 81:9 | 134:5,5 135:14 | 184:17 259:9,10,17 |
| 240:22 248:25 | 134:14 235:25 | 160:24 162:7 163:6 | 292:14 |
| reads 56:23,24 | record 4:16 6:24 | 188:11 209:9 224:4 | released 71:16 |
| 84:12 | 25:4 26:12 31:15,18 | 262:10 | 111:15 112:3,10,23 |
| ready 6:23 195:23 | 32:20 36:9 45:9,13 | refers 135:16 181:5 | 117:6,20 131:20 |
| real 56:18 | 45:20 50:11 61:20 | 181:8 | 166:12 182:21 |
| really 56:18 57:8 | 61:21 70:9 77:20 | reflect 93:9,16 | 261:25 262:3 |
| 58:22,23 64:19 78:4 | 84:14 89:21 113:8 | 179:17 | releases 62:10 65:16 |
| 85:4 172:16 177:14 | 114:23 115:16 | reflected 94:17 | 65:17 77:9 78:21 |
| 226:24 233:10 | 129:9,16,17 137:9 | 104:3 112:24 | relevance 175:21 |
| 270:15,22 | 143:12,13 147:12 | 165:17 166:5 176:4 | relevant 79:24 81:2 |
| reason 8:5 16:18,19 | 151:12,13 156:12 | 179:9 180:11 | 81:8 85:12 273:24 |
| 20:9 30:9 39:19 | 161:24 166:9 | 187:10 199:17 | relied 64:24 204:6 |
| 48:25 107:23 | 167:23 179:23 | reflecting 161:7 | 205:7 225:15 |
| 108:23 120:19 | 184:21 198:4,5,7 | refreshes 67:17,20 | 243:21 244:22 |
| 130:7 141:10 | 202:6 203:23 | regarding 239:23 | 246:11 276:23 |
| 170:22 234:21 | 208:12 209:23 | regards 51:4 120:12 | 277:10,24 279:2,8 |
| 241:15 262:17,18 | 220:20 235:2 | 127:11 145:20 | 285:4,21 |
| 269:18 284:15 | 240:19,25 241:3 | 147:24 | rely 204:9 |
| 294:6 | 249:22 252:2,3 | registered 1:18 | relying 279:9 |
| reasonable 214:2 | 254:6 260:22 | registrant 101:25 | remain 13:10 |
| reasoning 285:2 | 263:13 264:8 266:6 | registration 99:22 | remainder 140:3 |
| reasons 153:24 | 266:12 267:6 274:3 | 195:5 | remains 231:22 |
| recall 27:21 31:20 | 281:12 282:9 | regression 130:21 | 232:4,16,17 |
| 33:12 34:24 50:7 | 285:16 291:13 | 140:11 141:12 | remember 5:20 11:5 |
| 62:16 65:25 67:12 | redefine 48:9 | 158:25 188:18,24 | 40:4 65:12 67:5 |
| 67:25 76:11 96:12 | redo 63:14 | 191:19,21 192:11 | 92:6 93:23 96:9,24 |
| 97:19 104:13 | reductions 186:12 | 192:23 193:4,4 | 136:18 178:16,17 |
| 125:23 182:20 | refer 40:2 48:19,23 | 199:17 | 182:3 187:18 |
| 206:5 258:9,12,14 | 104:7 160:16 161:5 | rejected 28:10 29:22 | 193:22 241:21,23 |
| receipt 284:12 | 178:17 226:11 | 44:8 | 258:17 267:11 |
| 285:13 | 262:9 277:21 | | |

[remind - right]                                                                 Page 29

| | | | |
|---|---|---|---|
| remind 202:13 | reports 11:9 15:22 | 141:8 183:23 | reverse 10:17 |
| remove 159:13 | 21:13,18,22,25 30:7 | 257:11 | review 62:12 66:22 |
| render 31:11,22 | 30:17 35:25 52:4 | respond 91:4 96:16 | 76:23 78:23 119:4 |
| 33:8 36:12 42:11 | 66:23 67:3,15 68:15 | 96:18 | 145:25 152:17 |
| 49:25 50:5,24 51:17 | 70:7,18 71:15,19 | responds 142:6 | 233:19 286:25 |
| 51:18 54:22 61:11 | 72:9 73:10 74:5,10 | response 161:25 | reviewed 54:2 62:10 |
| 64:11 176:21 | 74:23 75:14 76:4 | 184:6 186:16 | 67:4 90:5,7 91:11 |
| 254:12,15 | 77:8 79:23 80:3,25 | 225:10 | 152:14 277:8,24 |
| rendered 32:23 | 85:14 86:21 115:11 | responsibilities 9:17 | 279:2,3,10 |
| 35:20 39:16 108:12 | 115:20 118:21,21 | 12:14,16 15:19,21 | reviewing 132:8 |
| rendering 33:20 | 167:2 | rest 152:3 178:18 | 152:13 238:24 |
| renders 274:24 | represent 4:18 | result 32:7 42:13 | revise 56:25 |
| rep 20:4 | 33:24 34:16 35:7 | 83:4 167:17 172:22 | rhody 27:4 |
| repeat 77:18 84:8 | 105:2 112:13 | 233:8 | right 4:23 5:19 7:13 |
| 166:8 167:21 | 235:20 240:14 | resulted 175:13 | 10:15 15:4 23:13 |
| rephrase 5:10 63:20 | 250:8 274:2,11 | results 37:2 127:16 | 31:11 46:15 49:8 |
| 121:20 | representatives 59:6 | 140:17,19,22 167:8 | 50:8 52:22 59:2 |
| replicate 189:15 | represented 194:22 | 173:2 175:5 187:22 | 68:11 69:3 71:12 |
| replicated 128:19 | 235:11 244:21 | 190:16 | 72:25 78:19 81:18 |
| report 7:3 22:4,6 | 250:4 251:8 293:2 | resumed 145:6 | 85:13,22 86:7,13 |
| 24:22 27:20 30:13 | representing 20:18 | retained 21:4 26:6 | 90:17 91:24 92:19 |
| 52:9 69:13 71:3,10 | 284:19 | 31:4 47:22 | 92:22 101:9 102:19 |
| 80:6,7,17 85:20 | represents 234:8 | retrieved 235:13,22 | 104:22 105:12 |
| 86:6,15 91:5 93:7 | 238:9 245:18 251:4 | 293:4 | 109:3,22 115:21 |
| 94:24 96:4 104:7 | repudiation 283:21 | return 16:20 37:6 | 116:21 119:12,22 |
| 132:17 133:3,11,12 | 285:13 | 128:21 193:9 249:5 | 120:11,14 121:10 |
| 146:3 157:12 | request 59:20,23 | 261:24 | 123:15 124:20 |
| 159:16 178:18 | 222:10 238:6 | returns 135:22 | 126:17,23 131:18 |
| 185:8 195:3,10 | 293:16,16,17 | 178:11 187:13 | 132:19 134:8 |
| 223:18 224:15 | require 283:19 | 188:6,7,9,10,11,15 | 138:16,20,22,23 |
| 225:14 233:12,24 | 284:13 | 188:16,17,21 | 139:4 142:7,25 |
| 249:12 | required 34:12 | 192:19,20,21 200:2 | 143:25 146:24 |
| reported 79:8 82:2,3 | 85:12 285:12 | 203:17 | 149:24 155:5 |
| 86:4,7,14 118:23 | requirement 83:24 | reuters 235:13,22 | 156:25,25,25 |
| 182:2 183:21 | requires 101:24 | 236:21 237:5,18,25 | 157:22,23 159:2 |
| 185:16 196:6 204:7 | rerunning 152:2 | 238:12,14 239:9 | 168:20 171:12 |
| 204:9 234:2 241:18 | research 10:24 | 293:4 | 175:12 177:13,17 |
| reporter 1:19 5:17 | 51:13,15,24,25 62:2 | revealed 40:5 | 178:3 180:22 |
| 6:20 27:14 63:9 | 62:19 63:23 70:7,17 | 169:12,13 171:9 | 182:16,18 184:2,7 |
| 99:16 114:21 | 73:9 95:2 101:13 | 268:5 269:13 | 185:18 187:7 |
| 158:11 240:12 | 211:2 213:3,20 | reveals 259:5 | 190:11 193:8 195:7 |
| reporter's 235:18 | resolution 165:25 | revelation 170:6 | 197:3 199:21 |
| reporting 9:14 | resource 225:15 | revenue 194:23 | 203:24 205:23 |
| 80:11 81:12 294:1 | respect 104:9,10 | 195:20 196:6 197:2 | 206:24 207:16 |
| | 132:5 135:6 136:7 | 197:12,21 198:2 | 212:5 216:23 |

[right - september]

217:20 218:4,6,22 218:23 219:10,17 220:16 226:5 227:25 231:25 234:15 235:9 237:9 237:10,25 240:4 247:10 248:12,23 250:18 251:24 252:13 265:20 266:22,25 275:5 276:16 277:2 278:12 287:6

risk 208:9,15,21 209:12 216:18

river 257:9

robert 72:19 73:2

role 11:20,21 287:10

roughly 201:16,18 227:22

round 136:25 137:17

rounded 136:19,19 219:19 236:15

rounding 137:12 248:11

rpr 4:8 291:6,24

rule 54:19 221:8 279:18 283:19

ruled 279:16

rules 5:2

ruling 206:15

run 189:8 288:15

runs 107:25 110:10

s

s 2:2 3:2 63:13 145:2 145:2,2 195:5 207:17 294:6

s&p 192:19,20,24 193:9,11 200:7

sake 31:9 74:20 82:7

sales 194:21 222:16

salespeople 74:15 81:7

sample 143:3 144:5 144:6 157:4 288:12

san 15:2 237:22

sand 63:6,12,12 100:6 213:17

satisfaction 54:3

satisfactory 165:4

satisfied 80:24

satisfies 83:23

satisfy 76:9 79:20 82:11 87:18 88:12 88:13,15

savings 11:16

saw 79:25 124:25 133:5 200:23 202:23

saying 73:16 80:6 86:5 89:10,11 90:15 96:21 111:8,10,14 125:6 159:2 173:19 186:18 197:24 225:3 226:8 232:25 256:21 260:8,10,13 266:21 269:10 272:3 275:21 284:12,19

says 25:7 46:12,13 56:23 79:4,13 80:7 81:17 89:5,24 134:10 135:21 149:13 161:24 181:10,12 198:13 240:8,23 246:6 250:13,16,19 260:21 282:3 293:6

schedule 230:5 231:12 275:4

schedules 231:12

school 10:23

scientific 143:9

scope 54:18 64:10 82:18 87:12 107:16 254:10

screen 246:16 248:25

sec 62:11 64:22 77:9 230:18

second 5:13 27:8 30:13 31:17 34:21 56:25 68:22 79:5 80:23 82:11 86:25 87:21 88:14 89:24 109:8 112:17 119:4 132:4 147:12 148:21 150:20 161:22 163:16 170:15 184:21 185:10 192:22 209:9 218:20 219:14 235:2 241:2 261:16 280:21 281:10,16 282:6,12 283:6

section 53:25

securities 1:6 4:19 11:13 19:23,24 20:6 22:18,20,23 23:7,8 23:11,16 24:15 31:6 33:17 45:24 46:10 46:14 66:10 79:7 83:6 95:12 162:21 210:3,20 211:16 216:8,11 224:20 255:17 292:22 294:4

security 26:8,17 33:21 66:19 75:20 83:8 85:21 90:2 95:8 97:6,16 210:2 261:4

see 10:14 27:12,12 34:10 35:12 67:17 68:18,20 103:22 104:19 105:6,8,13 105:22 108:8 114:6 116:17 122:21,23 124:20 126:3 133:4 134:9 139:16 156:13 158:3 160:5 160:7 177:3 184:10

194:25 195:25 196:5 198:10,15 200:21 202:9 216:15 219:8 221:3 227:18 231:9,21 235:25 236:5,6 239:7 245:3,6 246:7 246:8,23 250:2 261:8 271:9 281:13 282:18 283:22,23

seeing 217:24

seeking 107:2 111:22 118:22

seen 118:17 137:19 153:3 170:24 171:2 222:21

segue 223:15

selected 109:11

self 21:23

sell 14:8,12 15:9 210:10 221:19

selling 220:11

sells 213:16

semantics 112:8

semi 93:3,8

send 54:11 202:9

sending 283:12

sense 24:8 52:13 82:23,24 215:25

sensitive 135:23,25

sent 279:20 284:7

sentence 79:3 83:3 84:20 85:25 134:4,6 161:23 177:2 214:4 220:22 226:14,16 227:19 280:22 281:9,14,15 282:25 283:2

sentences 226:11

separate 68:5 169:10 203:14 227:4

separately 77:16

september 68:19,23 69:9 70:24 97:24

[september – specify]                                                  Page 31

| | | | |
|---|---|---|---|
| 98:4,17,21 99:6,9 | 112:16 114:5 | simpler 23:14 | 173:12,20 175:6 |
| 100:3,10,11 101:15 | 116:15,16 133:20 | simply 264:25 265:4 | 180:17 182:25 |
| 105:20 111:12 | 154:14 235:24 | 265:9,14,15 266:2 | 185:9 194:15 |
| 120:7,7 122:17 | 239:24 251:6 | sit 22:12,14 33:11 | 208:25 209:20 |
| 123:16 128:9,9,10 | showed 165:10 | 44:10,16 65:21 67:2 | 211:18 215:23 |
| 128:10 171:7,10 | 203:3 | 67:12,24 90:11 | 217:5,14,14 219:9 |
| 172:5 173:7 178:21 | showing 116:19 | 95:15,16 101:22 | 225:8 234:25 |
| 218:5 231:23 232:4 | 147:20 | 102:8 128:22 | 245:12 249:2,15 |
| 233:16 234:3 | shown 176:19 | 150:11 155:23 | 255:5 256:13,15 |
| 235:14,23 236:10 | shows 74:17 158:19 | 182:19 193:21 | 265:17 267:18 |
| 279:21 284:3 293:5 | 174:13 | 199:15 206:5 | 270:8 280:14 |
| serial 283:13 | side 20:10,15 33:23 | 240:20 246:2,21 | 282:10 |
| series 21:14 | 33:25 35:9 246:5 | 261:12 285:23 | sort 54:25 121:4 |
| service 183:22 287:9 | sided 148:23,23 | 286:5 | 160:5 |
| set 7:7 103:9 164:5 | sign 248:9 | sitting 197:5 | sorts 125:2 212:17 |
| 291:11,21 | signed 59:16 | situation 35:19 | 215:21 |
| settlement 47:6 | significance 108:5 | 97:14 255:21 | sounds 12:4 214:2 |
| settlements 46:20 | 133:15 178:12 | 263:25 264:22 | 266:8 |
| seven 28:5 69:11 | 179:19 192:3 | situations 260:25 | source 118:22 |
| 72:25 79:25 178:9 | significant 79:7 82:9 | six 15:7 | 150:16 159:11 |
| 178:19 185:16 | 82:10 83:6 89:25 | skew 131:24,25 | 256:19,22 |
| share 31:5 32:16,24 | 110:21 111:10,15 | 140:17,19,22 | south 3:8 |
| 33:21 34:14 35:2,15 | 119:23 122:15 | slash 62:2 | southern 1:2 92:17 |
| 35:21 36:13 37:4 | 123:5,10 124:10,21 | slightly 32:9 | sparadise 2:23 |
| 43:17 268:3 | 124:23 128:16 | slow 55:16 163:15 | speak 5:6,6 223:17 |
| shares 38:7,9,17,18 | 133:17 134:11,18 | small 157:3 | speaking 224:12 |
| 40:18,20 41:10 | 135:3,8,10,18 | sold 149:20 219:16 | 260:7 262:13 |
| 43:15,15,17 90:9 | 178:11 180:21,21 | sole 8:24 | 268:11 |
| 118:15 149:20 | 181:2,4,7,12,13,15 | solely 53:22 | speaks 139:11 |
| 210:11 219:16 | 181:22 185:5 | somebody 56:22 | specific 19:10 48:25 |
| 222:11,22 224:4 | 193:16 | 161:18,20 237:23 | 61:25 64:25 65:5,15 |
| 233:18,20 234:9 | significantly 237:3 | 238:2 256:6 | 88:16 121:23 |
| 236:8,12,14 | signify 123:4 | sorry 7:17 8:18 | 160:25 161:3,7 |
| sheet 294:1 | silica 189:11 198:14 | 13:16,17,23 14:6 | 200:10 224:13 |
| shenk 34:6 | 198:18 199:6,13 | 19:12 27:7,8,17,22 | 244:15 262:10,14 |
| short 87:16 149:20 | 201:20 241:10,16 | 32:18 33:24 35:8 | specifically 89:23 |
| 180:3 201:22 214:8 | 241:17 242:3,10,13 | 45:7 63:9 66:15 | 104:13 122:12 |
| 217:3 219:16 220:8 | 243:16 244:3,10 | 68:9 70:23 75:13,24 | 133:20 135:13 |
| 220:10,14 221:4,20 | 250:2 | 90:22 91:23 99:4 | 200:18 201:5 |
| 221:25 222:16 | silica's 198:24 | 107:3 119:11 123:2 | 277:19 |
| shortages 217:11,16 | 200:24,24 | 129:6,21 133:15 | specifics 49:14 |
| shorter 141:17,19 | similar 94:18 | 137:6 149:18 | 223:22 |
| shot 246:16 | 145:24 160:10 | 161:23 163:15 | specifies 116:23 |
| show 75:11 83:7 | simple 247:4 260:25 | 166:24 167:21 | specify 23:15 |
| 88:22,23 90:2 94:3 | | 168:6 169:7 170:19 | |

Case 1:21-md-02989-CMA   Document 568-17   Entered on FLSD Docket 06/08/2023   Page 108
of 114
Case 1:12-cv-08557-CM   Document 111   Filed 06/17/14   Page 108 of 114

[specifying - study]

specifying 24:14
speculate 24:3
speculating 24:2
  61:2
speed 151:25 160:19
  160:20 162:24
  170:18 179:18
  185:13
spell 148:9
spend 4:25 60:23
spent 15:6 147:8
  252:8
spikes 187:19
spillover 194:18
spread 125:21 148:6
  149:9,12
spreadsheet 239:22
  251:8
spreadsheets 239:21
squared 175:4,9,10
squares 193:17
ss 193:15,15 291:4
st 145:25 286:24
stand 80:9
standard 41:22
  73:24 142:12 191:9
  191:19,20,23 192:7
  204:11 205:8 229:4
standing 127:19
stands 243:10
starred 132:9
start 7:4 10:21
  38:15 51:24 55:18
  61:22 68:13 91:25
  98:5,8 99:2 101:5
  103:3 109:13,23
  131:15 170:15,19
  250:9
started 16:16 18:6
  51:13 60:19 84:18
  98:15 138:17
starting 33:15
  147:15 170:13
starts 97:23 250:21

stat 132:10 135:16
stata 194:12
state 1:20 4:7
  116:25 194:21
  195:10 228:19
  291:3,8
stated 279:19
statement 43:8
  79:11 99:23 195:6
  210:9 211:8 261:11
  264:13 265:2 280:4
  281:4,6
states 1:2 89:3 206:9
statistic 191:22
statistical 133:14
  142:24 193:23
statistically 119:22
  122:15 123:4,10
  124:10,21 128:16
  133:17 134:10,10
  134:18 135:3,8,9,17
  178:10 181:14
  185:5 193:16
stay 119:7,25 128:3
std.err 192:8
step 231:10
steps 51:16
sterritt 205:2
steven 2:18 4:16
stick 110:6 280:5
sticks 67:13
stock 32:6 43:22
  66:18 72:8 74:13,16
  75:3 79:9 88:4,9
  89:12,18 91:8 94:17
  95:21 96:2,15,15
  103:23 104:4 106:4
  110:22 118:16
  119:15 121:13
  122:2 125:2,4
  135:21 140:24
  141:23 142:6
  144:15 158:22,23
  160:8 166:17 167:3
  174:19,20 176:21

185:22 186:7 188:6
  188:7,9,10 192:18
  196:9 198:24
  200:11,19,22 201:5
  210:7,8 214:8
  216:15 217:4,6,17
  217:18 218:8
  219:23 221:4,20,25
  222:13,14 223:9,11
  224:4,25 226:3
  262:23
stocks 158:20
  159:19 176:19
  217:7,18 222:15
stop 17:11 68:6
  106:7 253:4
stoppages 221:7
stories 62:11
straight 150:14,14
strauss 2:8 9:20
  19:17 26:18,22
  28:20,25 29:18,25
  31:12 33:3,7 36:16
  42:17 43:6 44:15
  45:3,15 47:6,9 48:2
  48:18 49:4,9 50:6,8
  51:12 54:13 55:18
  56:14 57:10,12,18
  61:13 62:22 63:14
  63:19 64:4,8 65:24
  66:12 73:12 75:6,10
  75:23 76:20 77:2,14
  77:18 79:16 80:12
  81:18,20 82:13
  83:15,18 84:2,7
  87:3,24 88:7,18
  91:2,21 92:20 97:10
  100:21 101:7 102:5
  102:11 103:13,18
  106:18 107:9
  108:10 109:9,24
  116:3 121:18 122:4
  134:19 135:12
  136:10 143:23
  144:21 155:19

156:17 163:24
  164:12,14,18
  166:10 167:20,24
  169:15 179:11
  207:23 211:5
  212:15 213:24
  214:18,20,25 215:7
  215:10 221:23
  222:17 224:6 225:4
  242:5,16,18 243:4
  244:12 253:12,22
  254:7 255:2,10
  261:17,22 262:12
  263:3,7,18 264:14
  265:11 268:7 269:2
  270:4,13,25 272:11
  272:15 273:16
  274:10,18 276:17
  277:20 279:24
  280:6 281:5,13,16
  282:6,11,15 284:17
  285:7 286:11,14
  289:22 292:8
strauss's 215:12
  275:13
street 4:4
strengthens 239:13
strictly 12:20
  173:21 264:10
  265:16,17,18,19,22
  266:3,15
strike 232:19
strikes 128:11
strong 93:4,8 153:9
studied 95:2
studies 91:14 120:24
  256:20 258:4 287:8
  289:6
study 32:4 36:18,20
  36:25 37:3 78:11
  91:12 96:25 119:11
  119:12 122:14
  127:4,10,15 129:21
  130:14,16,18,19,23
  132:8 140:6 142:6

[study - tell]                                                                 Page 33

142:13 144:14
145:21 172:7,20,23
241:10,19 242:4,15
243:3,7,18 244:2,9
261:23 273:22
286:18 288:16
289:5,18
**stuff** 11:11 172:14
**subject** 25:9 26:17
33:21 64:12
**subjective** 190:7
**submit** 21:25 22:5
27:20 33:9 54:6
55:14 56:22 96:4
**submitted** 7:3 21:9
30:7 54:10 55:9
57:23 59:14 152:15
**submitting** 22:4
**subscribed** 290:10
294:22
**subsequent** 122:24
123:23,24 124:3,11
125:9
**subsequently** 10:5
**substance** 266:11
**substantively** 58:8,9
61:8
**subsumed** 8:11
18:17
**successful** 212:8
**suffered** 42:13
167:17
**sufficient** 75:3 79:19
86:23 87:7,20 88:2
88:25 89:5,7,9 90:3
97:17 173:17 174:2
174:7,9 205:13
228:25
**sufficiently** 82:10
**sugar** 145:18
**suggest** 170:3 175:4
196:10 223:3,4
225:23 227:11
**suggesting** 226:25

**suggests** 119:16
174:13
**suisse** 71:22
**suit** 105:10,10
106:25 111:21
116:25
**suite** 4:4
**sum** 184:11 193:17
**summaries** 76:24
**summarize** 85:10
**summary** 78:3
260:20,22
**supplemental**
221:12
**supply** 99:11,20
105:5 106:23
111:19 116:24
165:19 252:23
253:3 279:23
**support** 11:21 15:23
25:19 136:13,17
147:23 177:8,21
205:10 228:15
229:9 256:20
**supported** 22:3
268:11
**supporting** 14:16
268:21
**supports** 136:16
176:4,10 177:4,18
177:20,25
**suppose** 258:2
**supposed** 195:21
202:14 208:8
**supposedly** 211:14
268:5
**supreme** 206:9
**sure** 6:11 20:7 22:13
24:10 35:14 36:7
48:10 50:10 57:11
69:15,15,24 71:6
74:14 94:5 110:22
114:16 118:2
137:12 142:11
143:16 146:12,13

147:12 149:3 150:9
151:2,10,20 156:17
160:9 162:5 164:21
167:11 168:4,20
170:16,23 171:3,7
175:23 180:18
196:2 214:19
217:24 218:3 229:4
230:7 234:8,14
238:3 242:18
247:22 251:11
252:10,12 256:5
265:22 266:20
277:15 278:8
288:12
**surprise** 169:21
251:2
**suspect** 239:17
**sworn** 4:6 46:17,25
145:7 290:10
291:12 294:22
**symbol** 245:10,23
245:25

---

**t**

**t** 48:12 63:13 126:9
126:9 132:10
135:16 137:4 145:2
178:13 179:2 191:9
191:10,12,13,22
207:17 291:2,2
**tabak** 146:2 286:24
287:3,7
**table** 193:13
**tabs** 7:10
**take** 5:17 6:10,22
8:19 26:10 28:22
33:13 35:16 36:23
37:16,17,19 40:8
50:9 51:16 54:2
56:4 78:24 94:2,6
114:15 126:11
129:18 136:21
144:20 158:18
165:13 178:24

180:3 186:20
189:18 201:22
209:9 216:17
231:10 237:12,23
237:23 246:25
249:23 262:6 267:2
267:8 271:11 278:6
283:4
**taken** 13:6 50:12
114:17 180:5 202:3
218:13 235:3 238:8
267:3
**talk** 49:13 78:15
88:24 120:2,2
122:11 126:24
153:8 167:7 208:10
212:18 214:3
226:15 260:5
275:25
**talked** 65:6 97:20
146:17 201:16
221:12,18 229:9
241:22 255:19
259:9 283:25 284:2
**talking** 38:13 57:19
59:2 66:12,16 71:7
81:6 114:2 115:5
127:19 133:21
161:3 167:3 224:8
252:8 259:24 263:4
**talks** 212:23
**tangent** 85:16
**tanking** 167:4
**tasked** 263:15,16
**tax** 223:12
**tech** 137:21
**technical** 207:20
230:8
**technically** 137:2
149:25 219:18
**technologies** 35:5
**technology** 34:25
**tell** 67:3 95:14
134:24 152:2
162:11 163:5 189:9

[tell - title]

| | | | |
|---|---|---|---|
| 237:15 238:7 240:4 | 123:25 139:19,21 | **things** 8:19 15:23 | 293:4 |
| 247:21 249:5 | 141:11 142:6,25 | 21:21 63:17 77:24 | **thought** 23:9 85:19 |
| 254:24 258:21 | 144:16,17,18 | 126:4 215:21 233:5 | 98:14 102:25 120:6 |
| **telling** 74:14 251:5 | 146:22,25 155:4 | 277:14 279:12 | 140:16 146:14 |
| **tells** 192:2 271:16 | 160:22 171:21,23 | 280:19 | 157:13,18 169:19 |
| **ten** 229:18 239:6 | 175:19 176:3,18 | **think** 9:13 11:17 | 177:14 202:16 |
| **tend** 5:5 | 178:5,10 180:11,12 | 14:13 21:23 22:7,11 | 203:17 211:13 |
| **term** 37:9 68:12 | 180:20 184:5 | 22:14 24:21 28:6 | 226:7 239:22 |
| 93:18,20,21,24 | 186:24 187:6 | 31:16 55:7,22 58:3 | 248:20,24 |
| 100:5 142:20 | 190:25 221:8,10 | 60:2 64:22 65:8 | **thousand** 60:13 |
| 189:19 193:3,7,8 | 228:2 | 67:8,14,19 68:7 | **three** 13:12,22 49:20 |
| 199:25 207:19,20 | **testified** 4:8,22 | 69:22 72:23,24 74:7 | 50:23 71:17,18,19 |
| 209:2,4,8 230:8 | 11:25 22:25 23:10 | 80:10 82:4 84:10 | 72:17 73:3 74:24 |
| 255:24 258:16,23 | 35:14 46:13 80:16 | 85:17 86:4,5,9 87:9 | 75:2,19 76:3,9 |
| 259:25 260:3 | 86:19 108:10 145:7 | 87:12,14,16 89:10 | 80:25 82:7,8 86:17 |
| 265:25 273:11 | 165:16 167:13 | 91:11 101:7 102:23 | 86:20 87:20 89:9,10 |
| 288:13 | 168:11,13 185:15 | 104:17 108:16,19 | 149:14 182:7 |
| **termed** 215:22 | 241:9 243:15 | 109:20 116:9 125:5 | 184:14 |
| **termin** 112:9 | 255:15 267:21 | 136:15,25 138:17 | **threshold** 125:25 |
| **terminated** 105:4 | 273:21,22 | 138:24 140:4,14 | **time** 4:25 9:23 11:8 |
| 106:23 109:6 | **testify** 15:23 26:6 | 143:23 145:17,19 | 12:10 18:6 19:11 |
| 111:19 116:24 | 33:10 47:23 80:15 | 151:4 155:17 | 22:15 40:11 45:19 |
| 252:22,23 253:2,9 | **testifying** 83:20 | 163:12 164:13 | 49:22 50:3 60:16,19 |
| 283:17 | 94:23 | 170:13 173:24 | 61:6,9 62:21 64:2 |
| **terminating** 99:11 | **testimony** 11:23 | 183:5 184:5,10 | 65:11 66:24 68:17 |
| 100:14 | 21:8,13,19,22 22:4 | 187:24 191:8 | 68:17 71:16 73:11 |
| **termination** 107:5 | 22:6 34:5 35:25 | 195:24 201:17 | 73:15,18 81:2 97:7 |
| 111:23 163:7 | 163:18 234:19 | 202:24 207:14 | 97:8,15,17 106:25 |
| 165:18 259:11,12 | 246:17 291:14 | 215:8 216:13 222:7 | 108:8 110:25 |
| 279:22 281:20 | **thank** 6:12 20:22 | 231:16 236:6 239:6 | 111:16,21 120:10 |
| 283:11,12,15 | 24:16 26:24 27:16 | 240:2,2 244:7,11,14 | 120:17,25 121:3,5 |
| **terminology** 68:7 | 47:10 70:2 147:5 | 245:8 250:13 251:2 | 121:13,14 122:2,22 |
| **terms** 58:24 115:8 | 178:2 184:25 | 251:3,19,23 252:9 | 125:9 126:21 |
| 117:18 138:2 | 201:25 249:21 | 252:18 256:5 265:6 | 127:10,25 129:21 |
| 143:15 190:24 | 286:8 290:2,3 | 266:11 270:19 | 130:22 139:14 |
| 191:5 193:24 | **theoretically** 208:6 | 274:12 275:19 | 147:9 154:8 159:6 |
| 215:24 227:10 | 208:16 | 277:3,25 | 171:9 190:22 |
| 283:16 | **thing** 6:7 88:15 | **thinks** 81:5 | 229:22 230:19 |
| **terrible** 236:21 | 103:20 117:10 | **third** 2:6 5:21 57:3 | 234:10 252:8 268:4 |
| **terribly** 237:17 | 130:17 151:5 | 162:3 163:22 | 276:3,6,18 286:10 |
| **terrific** 12:4 | 160:10 167:9 | 232:10 | 288:16 290:4 |
| **test** 69:18 105:19 | 173:22 191:25 | **thirty** 60:13 | **times** 133:3 195:9 |
| 106:5 107:25 | 250:13 276:3,6 | **thomson** 235:13,22 | 255:16 263:10 |
| 109:13 110:9 | 277:16 282:2,3 | 236:21 237:5,18,25 | **title** 11:5 |
| 116:11 120:3 | | 238:12,13 239:8 | |

[today ~ understand]                                                                      Page 35

| | | | |
|---|---|---|---|
| today 18:13,25 20:2 | travel 17:14 276:3,6 | turned 262:3 | uh 8:4 118:9 |
| 22:12,14,15 44:10 | 276:18 | turning 20:24 76:12 | ultimate 152:9 |
| 44:16 65:21 67:2 | treated 223:12 | 77:6 89:19 93:7 | ultimately 57:6 |
| 102:8 152:17 | trend 64:20 | 105:15 153:4 | 59:16 |
| 155:24 171:17 | trends 62:19,24,25 | 161:12 184:4 185:9 | um 33:11 43:22 |
| 195:10 246:2,21 | 63:24 64:7,19 | 193:13 216:24 | 126:2 168:4 180:25 |
| 252:9 254:25 255:9 | trick 159:24 172:15 | 217:22,23 231:8 | 262:3 |
| 261:13 275:25 | tripath 34:25 | 244:17 287:5 | umbrella 215:20 |
| 285:23 286:5 | trouble 52:24 | turnover 152:4,4 | unable 165:23 |
| told 44:24 50:22 | true 210:12 222:11 | turns 237:24 | 221:20,25 263:22 |
| 79:22 80:2,4,10 | 222:12 225:2 | tv 74:16 | unacceptable |
| 81:3 131:4 | 264:10 265:10 | twenty 60:12 | 137:20 |
| tomorrow 254:24 | 266:16 291:13 | two 10:4 18:2,7 30:6 | unambiguously |
| 255:8 | trusting 239:18 | 30:16 49:20 50:23 | 260:23 |
| tongue 267:19 | trusty 150:23 | 59:8 68:5,16 92:13 | uncertainty 32:2 |
| top 125:24 126:21 | truth 170:6 268:6 | 110:24 143:15 | unchanged 231:22 |
| 191:8 195:12 | try 5:20,21,23 32:11 | 173:14,16 191:12 | 232:4 |
| 228:23 245:2,3 | 61:24 98:18 142:22 | 199:5 221:7 226:11 | uncomfortable |
| 250:17 256:16 | 154:25 170:4 | 267:2 277:20 | 215:18 216:4 |
| total 236:9 | 200:17 208:14 | 287:13 288:20 | uncured 283:13 |
| touched 255:20 | 210:4 254:21 | type 18:10 43:10 | undergraduate |
| 261:14 | 262:19 264:18 | 44:5,6 51:25 78:20 | 190:23 |
| tough 126:8 | 269:11 271:9 | 90:20 146:6,8 | underneath 181:11 |
| touting 212:25 | trying 52:20 80:8 | 205:21 223:9 | understand 5:7,8,11 |
| track 252:14 | 81:8,13 109:19 | 236:25 288:10 | 12:3 24:4 42:4 |
| trade 89:12 224:25 | 113:20 121:24 | types 38:24 55:2 | 43:11 52:14 57:24 |
| traded 26:8 43:22 | 124:3 131:8 136:6 | typical 194:3 | 58:20 61:4 81:9,13 |
| 83:8 88:10 90:3 | 139:13,23 141:15 | typically 288:9 | 85:4 87:15 109:20 |
| 125:19 150:22 | 142:3,16 154:9 | typo 25:8 129:25 | 112:19 113:5 125:5 |
| 151:14 216:16 | 157:11 160:3 | 171:6 282:17 | 125:6 127:9 130:25 |
| 261:4 | 168:19 172:15 | typos 58:4,7 282:19 | 131:8,14 136:6 |
| trader 212:22 | 177:21 179:24 | | 141:15 142:4 |
| trades 66:19 216:21 | 208:22 216:5 225:5 | **u** | 143:16 146:13 |
| trading 40:23,24 | 227:10 250:23,24 | u 126:9 207:17 | 147:13 150:9 160:3 |
| 41:8,11,15,16,21,22 | 250:25 251:10 | u.s. 157:17 158:7 | 170:16 172:16 |
| 41:22 91:9 97:15 | 262:22 270:8,12,13 | 183:22 198:14,17 | 175:6,23 177:21 |
| 118:10,14 125:18 | 271:8 272:8,14 | 198:24 199:6,7,12 | 179:25 220:24 |
| 128:7,8,20 173:6 | 273:4,10 275:10,19 | 199:25 200:24 | 224:2 225:8 226:22 |
| 194:9 215:4 216:13 | turn 7:9 24:21 | 201:20 240:9,23 | 229:7 243:5,11 |
| 226:4,6 | 138:14 176:23,23 | 241:10,16,17 242:2 | 249:15 251:13 |
| transaction 221:22 | 194:15,16 207:12 | 242:9,12 243:16 | 252:12 253:14 |
| transmit 54:11 | 245:8 249:4 260:17 | 244:2,10 250:2 | 254:20 255:13 |
| transmitted 51:10 | 281:18 286:23 | 292:18 293:7 | 258:22 259:2,23 |
| 59:14 | 287:22 | ubs 72:19 73:2,4 | 265:12 269:3,5,10 |
| | | | 271:4,7,10 273:7,9 |

Case 1:21-md-02989-CMA   Document 568-17   Entered on FLSD Docket 06/08/2023   Page 112
of 114
Case 1:12-cv-08557-CM   Document 114   Filed 06/17/14   Page 112 of 114

[understand - werner]

Page 36

274:16,22 275:15
275:19 276:10
280:19 282:23,24
284:22 285:24
**understanding**
62:18 78:4 80:8
93:15 97:25 102:8
108:6 118:2 124:12
127:3 130:13
139:13,24 141:14
153:2,16 154:9
187:24 190:24
212:10 217:2 225:6
225:16 231:11,14
258:25 279:7
**understood** 59:4
64:17 69:16 86:2
90:12 140:15
146:14 183:24
229:6 239:19
**unfortunately** 7:10
**uninformed** 225:25
**unit** 153:10 160:21
223:2
**united** 1:2 206:8
**units** 24:25 25:25
185:22 195:11,11
217:5 220:9,13
221:20,21 222:14
222:16 223:3,3,5,24
224:8 227:17
232:12 236:9,9
**untainted** 289:16
**unusual** 232:20
**upper** 246:5
**use** 37:12 41:9 43:12
106:10 108:22
110:9 119:20
120:24 127:15
132:23 133:2
139:17 141:10,16
141:18,21 142:8,19
145:24 146:9 151:5
151:6,9 159:13
174:3 178:5 188:18

213:11,12,14 216:5
237:5 247:4 249:13
256:20 261:23
288:22 289:2,11,15
**usually** 37:5 281:21

**v**

**v** 204:20 224:16
**valid** 87:10 108:8
**valuable** 138:9
**value** 132:12 137:4
188:7,9 191:10,11
191:24 195:11,18
196:22 197:21,25
210:7,12 225:2
237:13
**variable** 141:5
188:5 191:22
288:17,22 289:3
**variables** 175:11
289:11
**various** 10:18 77:8
139:15 153:6
**vastly** 236:3
**velaw.com** 2:23,24
**verified** 238:23
**verify** 230:25
**veritext** 294:1
**version** 56:12 99:21
157:19
**versus** 27:4 35:5
112:11,21 135:9
204:24,25,25
**vice** 3:6
**view** 17:20 87:9
**viewed** 262:2
**vinson** 1:15 2:13
**violated** 283:10
**violations** 162:20
292:21
**vitae** 7:8
**volition** 19:5
**volume** 43:17
125:18 128:20
148:4,6 150:22

151:15 187:13,18

**w**

**w** 4:2 7:20 52:13,21
72:19 145:5
**wait** 5:22,23 13:16
180:17 217:14
**want** 6:3 7:4 10:10
17:2 24:8 26:22
27:11 37:7,8 52:23
54:21 57:21 64:11
68:6 75:11 84:7,11
88:17,22 89:7 94:3
96:4 105:8 108:5
113:16 115:7
117:25 120:2
129:20 131:22
137:12 142:8,8,19
143:2,14,15 144:14
144:22 146:12
147:6,10,10 149:2
150:6 151:2,6 153:7
157:7,10 170:9
171:3,7 177:10
187:5 190:23
207:12 217:23
220:24 234:14
237:12 239:24
242:19 243:8
247:14,25 249:24
252:10,11 254:11
257:21 267:8
270:17 281:11
288:11,12,13
**wanted** 8:15 16:20
71:6 97:21 116:15
127:2 140:15
145:22 152:25
170:15 221:19
229:7 235:24
247:15
**wanting** 151:19
**water** 184:22
**way** 17:21 29:14
44:23 47:13 52:20

56:23,24 61:5 74:10
75:7 76:6 89:7
98:18 119:19,23
133:22 164:24
170:25 179:15
188:19 209:8
211:10 213:11
216:2 220:4 222:2
222:18 226:9 244:5
246:24 247:23
248:13 254:22
263:24 264:2
269:11 291:18
**ways** 74:18 169:17
212:18 213:5
**we've** 19:4 170:24
171:2,15,16 195:9
272:3,4
**week** 232:14,18
**weekly** 148:6 231:18
231:24
**weighted** 156:19,20
156:21 157:21
**weighting** 156:19
**welcome** 20:20
137:22
**wendy** 1:18 4:7
235:7 291:6,24
**wendy's** 235:17
**went** 10:5 16:14
18:9 120:20 150:23
168:9 196:9 206:16
221:9 239:3 248:16
248:17
**werner** 1:14 4:13
5:1 6:1,17 7:1 8:1
9:1 10:1 11:1 12:1
13:1 14:1 15:1 16:1
17:1 18:1 19:1 20:1
21:1 22:1 23:1 24:1
25:1 26:1 27:1 28:1
29:1 30:1 31:1 32:1
33:1 34:1 35:1 36:1
37:1 38:1 39:1 40:1
41:1 42:1 43:1 44:1

[werner - year]                                                          Page 37

| | | | |
|---|---|---|---|
| 45:1 46:1 47:1 48:1 | 189:1 190:1 191:1 | 131:2 136:5 | 200:12 201:11 |
| 49:1 50:1 51:1 52:1 | 192:1 193:1 194:1 | **windstar** 11:14 | 206:23 207:9 |
| 53:1 54:1 55:1 56:1 | 195:1 196:1 197:1 | **wine** 14:8,12 15:9 | 210:25 257:8 |
| 56:16 57:1 58:1 | 198:1 199:1 200:1 | **withdraw** 68:13 | 267:13,15,17 274:5 |
| 59:1 60:1 61:1 62:1 | 201:1 202:1 203:1 | 91:25 262:19 274:9 | **worked** 9:6,8 10:18 |
| 63:1 64:1 65:1 66:1 | 204:1 205:1 206:1 | **withdrawn** 8:12 | 11:18 18:22 19:11 |
| 67:1 68:1 69:1 70:1 | 207:1 208:1 209:1 | 12:13 54:5 154:6 | 19:22 47:16 215:14 |
| 71:1 72:1 73:1 74:1 | 210:1 211:1 212:1 | 169:7 222:12 | 267:9,22 276:13 |
| 75:1 76:1 77:1 78:1 | 213:1 214:1 215:1 | 249:13,14 256:22 | **working** 7:21 14:23 |
| 79:1 80:1 81:1,3 | 216:1 217:1 218:1 | **withdrew** 249:19 | 17:6,11,22 19:13 |
| 82:1 83:1 84:1 85:1 | 219:1 220:1 221:1 | **witness** 25:4 31:13 | 22:16 23:3 47:18 |
| 86:1 87:1 88:1 89:1 | 222:1 223:1 224:1 | 32:18 36:5 45:7,17 | 52:12 216:9 |
| 90:1 91:1 92:1 93:1 | 225:1 226:1 227:1 | 49:8 70:12 83:16 | **worst** 237:19 |
| 94:1 95:1 96:1 97:1 | 228:1 229:1 230:1 | 84:24 90:22 99:13 | **wrap** 270:11 |
| 98:1 99:1 100:1 | 231:1 232:1 233:1 | 101:9 107:3 126:7 | **wrapped** 230:3,7,11 |
| 101:1 102:1 103:1 | 234:1 235:1 236:1 | 129:9 164:20 166:7 | **wrapping** 276:4 |
| 104:1 105:1 106:1 | 237:1 238:1 239:1 | 168:5 179:21 | **write** 53:14 161:13 |
| 107:1 108:1 109:1 | 240:1 241:1 242:1 | 184:20 200:14 | **writing** 70:3 280:19 |
| 110:1 111:1 112:1 | 243:1 244:1 245:1 | 203:16,20 204:21 | **written** 86:6,14 |
| 113:1 114:1 115:1 | 246:1 247:1 248:1 | 208:2 209:20 | **wrong** 68:12 151:21 |
| 116:1 117:1 118:1 | 249:1 250:1 251:1 | 220:18 263:11 | 240:4 282:2 |
| 119:1 120:1 121:1 | 252:1 253:1 254:1 | 276:19 278:21 | **x** |
| 122:1 123:1 124:1 | 255:1 256:1 257:1 | 282:14 285:14 | **x** 1:4,7 |
| 125:1 126:1 127:1 | 258:1 259:1 260:1 | 290:3 291:10,14,20 | **y** |
| 128:1 129:1 130:1 | 261:1 262:1 263:1 | 292:4 | **yeah** 7:2,12 13:4 |
| 131:1 132:1 133:1 | 264:1 265:1 266:1 | **wondering** 177:16 | 38:16 46:19 48:8,15 |
| 134:1 135:1,21 | 267:1 268:1 269:1 | **word** 52:12 118:7 | 75:16 78:3 106:22 |
| 136:1 137:1 138:1 | 270:1 271:1 272:1 | **words** 28:12 39:14 | 145:17 146:12 |
| 139:1 140:1 141:1 | 273:1 274:1,3 275:1 | 53:14 90:8 92:24 | 148:10,23 150:3 |
| 142:1 143:1 144:1 | 276:1 277:1 278:1 | 94:25 142:21 | 154:24 160:12 |
| 145:1,10 146:1 | 279:1 280:1 281:1 | 158:21 181:19 | 166:13 170:2 183:6 |
| 147:1 148:1 149:1 | 282:1 283:1 284:1 | 190:10 193:6 208:3 | 189:22 192:20 |
| 150:1 151:1 152:1 | 285:1 286:1 287:1 | 259:8 | 193:25 194:4 |
| 153:1 154:1 155:1 | 288:1 289:1 290:1,7 | **work** 9:11 11:13 | 196:15 203:11 |
| 156:1 157:1 158:1 | 291:9 292:5,12 | 12:18 13:20 15:5,25 | 204:18 206:20 |
| 159:1 160:1 161:1 | 294:5,21 | 16:23 20:4,8,14 | 214:20 222:24 |
| 162:1 163:1 164:1 | **west** 14:24 16:12 | 22:17 23:16,21 | 236:19 247:20 |
| 165:1 166:1 167:1 | **whereof** 291:20 | 24:11 27:15 28:17 | 248:24 257:4 278:6 |
| 168:1 169:1 170:1 | **who're** 208:18 | 32:14 34:11 43:10 | 280:25 282:18,21 |
| 171:1 172:1 173:1 | **william** 27:4 72:22 | 44:5 47:13 49:18 | 284:9 |
| 174:1 175:1 176:1 | 73:2 | 50:21 51:5 52:16 | **year** 10:3 14:7 15:8 |
| 177:1 178:1 179:1 | **winded** 123:8 | 53:2,5 56:21 59:9 | 16:25 17:13 106:3 |
| 180:1 181:1 182:1 | **window** 120:24 | 60:18 62:4 66:5 | 108:2 109:18 110:3 |
| 183:1 184:1 185:1 | 127:14,20,22 | 76:18 77:12 94:22 | 110:11,11 120:19 |
| 186:1 187:1 188:1 | 128:25 129:22 | 167:15 168:16 | |

[year - zero]                                                     Page 38

120:20,24 121:4
150:23 151:15
206:9
**years**   13:12,22 16:3
18:13
**york**   1:2,16,16,20
2:7,7,17,17 4:7 15:6
66:17 92:18 217:6
217:16,18 218:8
219:23 291:3,4,8
294:2,2

**z**

**zero**   91:19 92:4,10