**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-2989-MDL-ALTONAGA/Damian**

In re: JANUARY 2021 SHORT SQUEEZE
TRADING LITIGATION

**This Document Relates to: All Actions Involving the Federal Securities Laws**

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF DR. ADAM
WERNER ON MARKET EFFICIENCY**

## **TABLE OF CONTENTS**

I.      PRELIMINARY STATEMENT ...................................................................... 1

II.     STATEMENT OF RELEVANT FACTS ......................................................... 2

III.    LEGAL STANDARD ..................................................................................... 3

IV.    ARGUMENT ................................................................................................... 4

    A.     The Eleventh Circuit Eschews a Daubert Analysis Not Critical to Class Certification ................................................................................................... 4

    B.     Dr. Werner's Opinions Concerning Efficiency in His Opening Report Are Helpful and Reliable ................................................................................... 5

         1.     Analysis of the Year Preceding the Class Period is Helpful ..................... 5

         2.     Robinhood's Data "Commingling" Attack on Reliability Fails ................ 5

         3.     Use of a Dummy Variable for January 27, 2021, Was Appropriate ........ 6

         4.     Werner's Method of Selecting News is Helpful and Reliable .................. 7

             a.     Werner's Definition of Efficiency is Appropriate ................................ 7

             b.     Werner's News/No-News Test is Appropriate Because it Avoids Subjective Determination of Value Relevant News ............................. 9

             c.     It Is Appropriate to Include Articles Discussing Price Movement ..... 10

             d.     It Was Appropriate Not to Examine the Articles' Substance ............. 11

         5.     Werner's Choice of Methodology Is Consistent with Other Cases ........ 13

    C.     The Opinions in Dr. Werner's Rebuttal Report are Helpful and Reliable ............. 14

    D.     Market Efficiency is Unnecessary to Prove Class-wide Damages ............ 17

V.     CONCLUSION ............................................................................................. 18

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### <u>Cases</u>

*Affiliated Ute Citizens of Utah v. United States,*
   406 U.S. 128, 92 S. Ct. 1456, 31 L. Ed. 2d 741 (1972) .............................................................17

*Alcott Co. v. Raphael,*
   275 F.2d 551 (5th Cir. 1960)............................................................................................................12

*Allison v. McGhan Med. Corp.,*
   184 F.3d 1300 (11th Cir. 1999)........................................................................................................16

*Altidor v. Carnival Corp.,*
   550 F. Supp.3d 1322 (S.D. Fla.-Miami 2021)...............................................................................16

*Angley v. UTi Worldwide Inc.,*
   311 F. Supp. 3d 1117 (C.D. Cal. 2018)...............................................................................9, 10, 11

*Bd. of Educ. of City School Dist. of City of New York v. Califano,*
   584 F.2d 576.........................................................................................................................................15

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston,*
   853 F. Supp. 2d 181 (D. Mass. 2012) .............................................................................................7

*Brokop v. Farmland Partners Inc.,*
   No. 18-cv-02104-DME-NYW, 2021 WL 4916240 (D. Colo. July 23, 2021) .....................6, 14

*Bruschi v. Brown,*
   876 F.2d 1526 (11th Cir. 1989).........................................................................................................17

*Buttonwood Tree Value Partners, LP v. Sweeney,*
   No. SACV1000537CJCMLGX, 2013 WL 12125980 (C.D. Cal. Sept. 12, 2013)......................7

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC,*
   310 F.R.D. 69 (S.D.N.Y. 2015)...........................................................................................................4

*Castaneda v. Partida,*
   430 U.S. 482 (1977) ............................................................................................................................15

*City of Tuscaloosa v. Harcros Chemicals, Inc.,*
   158 F.3d 548 (11th Cir. 1998)........................................................................................................4, 6

*Cordoves v. Miami-Dade Cnty.,*
   104 F. Supp. 3d 1350 (S.D. Fla. 2015).............................................................................................14

ii

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ..................................................................................................3

*FindWhat Inv. Grp. v. FindWhat.com*,
    658 F.3d 1282 (11th Cir. 2011) ..........................................................................8, 17

*Griffin v. Coffee Cnty.*,
    608 F. Supp. 3d 1363 (S.D. Ga. 2022) .....................................................................3

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014) ..................................................................................................9

*In re Alstom SA Sec. Litig.*,
    253 F.R.D. 266 (S.D.N.Y. 2008) ..............................................................................9

*In re Countrywide Fin. Corp. Sec. Litig.*,
    273 F.R.D. 586 (C.D. Cal. 2009) ..............................................................................9

*In re Diamond Foods, Inc., Sec. Litig.*,
    295 F.R.D. 240 (N.D. Cal. 2013) ..............................................................................8

*In re Groupon, Inc. Sec. Litig.*,
    No. 12 C 2450, 2015 WL 1043321 (N.D. Ill. Mar. 5, 2015) ....................................7

*In re Initial Pub. Offering Sec. Litig.*,
    260 F.R.D. 81 (S.D.N.Y. 2009) ..............................................................................17

*In re Montage Technology Grp. Ltd. Sec. Litig.*,
    No. 14-CV-00722-SI, 2016 WL 1598666 (N.D. Cal. Apr. 21, 2016) .......................12

*In re Netbank, Inc. Sec. Litig.*,
    259 F.R.D. 656 (N.D. Ga. 2009) ..............................................................................9

*In re PolyMedica Corp. Sec. Litig.*,
    432 F.3d 1 (1st Cir. 2005) ........................................................................................8

*In re Teva Sec. Litig.*,
    No. 3:17-CV-558 (SRU), 2021 WL 872156 (D. Conn. Mar. 9, 2021) .......................9

*In re Zantac (Ranitidine) Prod. Liab. Litig.*,
    No. 20-MD-2924, 2022 WL 17480906 (S.D. Fla. Dec. 6, 2022) ............................14

*In re: Petrobras Sec. Litig.*,
    312 F.R.D. 354 (S.D.N.Y. 2016) ..............................................................................9

*Johnson v. Comm'r of Internal Revenue*,
   74 T.C. 89 (1980) ..............................................................................................................18

*Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*,
   762 F.3d 1248 (11th Cir. 2014) ..........................................................................................4

*Manpower, Inc. v. Ins. Co. of Pa.*,
   732 F.3d 796 (7th Cir. 2013) .............................................................................................11

*Mcgarity v. FM Carriers, Inc.*,
   No. CV410-130, 2012 WL 1028593 (S.D. Ga. Mar. 26, 2012)...........................................11

*McIntire v. ChinaMedia Express Holdings, Inc.*,
   38 F. Supp. 3d 415 (S.D.N.Y. 2014) ...............................................................................9, 10

*Monroe Cnty. Employees' Ret. Sys. v. S. Co.*,
   332 F.R.D. 370 (N.D. Ga. 2019) .......................................................................................1, 4

*Nat'l Sur. Corp. v. Georgia Power Co.*,
   No. 2:17-CV-68-RWS, 2019 WL 4394403 (N.D. Ga. Sept. 12, 2019) ......................................12

*Pidcock v. Sunnyland Am., Inc.*,
   854 F.2d 443 (11th Cir. 1988)............................................................................................18

*Pub. Employees' Ret. Sys. of Mississippi v. Mohawk Indus., Inc.*,
   2022 WL 17920570 (N.D. Ga. Nov. 28, 2022)......................................................................1

*Reynolds v. Giuliani*,
   118 F. Supp. 2d 352 (S.D.N.Y. 2000) .................................................................................15

*Schleicher v. Wendt*,
   No. 1:02-CV-1332-DFH-TAB, 2009 WL 761157 (S.D. Ind. Mar. 20, 2009) ...........................5

*Schoen v. State Farm Fire & Cas. Co.*,
   No. CV 21-00264-JB-N, 2022 WL 16579767 (S.D. Ala. Nov. 1, 2022)................................12

*Scott v. City of Indianapolis*,
   No. 1:08-CV-0150-SEB-TAB, 2010 WL 1265990 (S.D. Ind. Mar. 25, 2010).........................15

*Thorpe v. Walter Inv. Mgmt., Corp.*,
   No. 1:14-CV-20880-UU, 2016 WL 4006661 (S.D. Fla. Mar. 16, 2016)................................18

*U.S. v. Reddy*,
   534 F. App'x. 866 (11th Cir. 2013)......................................................................................6

*UCB, Inc. v. Teva Pharms. USA, Inc.*,
   No. 1:12-CV-4420-CAP, 2015 WL 11199058 (N.D. Ga. Mar. 18, 2015)................................11

*Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*,
   674 F. Supp. 2d 1321 (S.D. Fla. 2009).......................................................................16

*Willis v. Big Lots, Inc.*,
   No. 2:12-cv-604, 2017 WL 1074048 (S.D. Ohio Mar. 17, 2017).......................................6, 8, 12

## **Rules**

Fed. R. Evid. 702 ...........................................................................................................3

## **Other Authorities**

Daniel R. Fischel, *Efficient Capital Markets, the Crash, and the Fraud on the Market Theory*, 74
   Cornell L. Rev. 907 (1989) ..........................................................................................8

## DEFINED TERMS AND OTHER ABBREVIATIONS

| | |
|---|---|
| **ACCC ¶** | References are to paragraphs of the Amended Consolidated Class Action Complaint, filed January 17, 2023 (ECF No. 527) |
| Cert. Br. | Motion for Class Certification (ECF No. 559). |
| Dates | Unless a year is noted, the year is 2021 |
| Defendants | Robinhood Markets, Inc. and its two wholly-owned subsidiaries, Robinhood Financial, LLC and Robinhood Securities, LLC (also referred to collectively as "Robinhood") |
| Fischel Depo. | Deposition of Daniel R. Fischel, taken April 12, 2023 (Rosen Decl. Ex 1) |
| Fischel ECM Article | D. Fischel, "Efficient Capital Markets, the Crash, and the Fraud on the Market Theory," 74 Cornell L. Rev. 907, 912–13 (1989) (ECF. No. 559-36) |
| Fischel Rpt. | Report of Daniel R. Fischel, dated February 16, 2023 (ECF. No. 559-8) |
| Fischel Reb. Rpt. | Rebuttal Report of Daniel R. Fischel, dated March 28, 2023 (ECF. No. 559-32) |
| Grenadier Depo. | Deposition of Steven Grenadier, taken April 19, 2023 (Rosen Decl. Ex 2) |
| Grenadier Rpt. | Corrected Expert Report of Professor Steven Grenadier, dated February 24, 2023 (ECF. No. 559-7) |
| Grenadier Reb. Rpt. | Rebuttal Expert Report of Professor Steven Grenadier, dated March 28, 2023 (ECF. No. 559-30) |
| Def. Br. | Motion to Exclude the Opinions of Dr. of Adam Werner (ECF No. 566) |
| Order | Order on Motion to Dismiss, dated Aug. 11, 2022 (ECF No. 503) |
| Rosen Decl. | Declaration of Laurence Rosen, filed concurrently with this Memorandum. |
| Werner Decl. | Declaration of Adam Werner dated June 21, 2023 (Rosen Decl. Ex. 3) |
| Werner Rpt. | Report of Dr. Adam Werner, dated February 16, 2023 (ECF. No. 559-14) |
| Werner Reb. Rpt. | Rebuttal Report of Dr. Adam Werner, dated March 28, 2023 (ECF. No. 559-5) |

## I.     PRELIMINARY STATEMENT

Robinhood's motion to exclude the expert opinions of Dr. Adam Werner regarding market efficiency in connection with Plaintiffs' motion for class certification is irrelevant for two reasons. First, as explained in Plaintiffs' opening brief, there are multiple bases for finding that common issues pertaining to reliance predominate without Plaintiffs demonstrating the Affected Stocks traded in efficient markets.[1] Market efficiency is required when price changes are used as a proxy for class-wide reliance in a misstatement case; Plaintiffs do not allege incorporation of misstatements into the Affected Stocks' prices. Second, because the Eleventh Circuit does not require an event study proving a cause-and-effect relationship between the release of new information and stock price movements, and will find market efficiency if the other pertinent factors (the so-called "*Cammer/Krogman* factors") point in its favor, Robinhood's challenges to Dr. Werner's event study cannot doom class certification.[2] Because the Court can, and should, certify the class without ruling on this motion, the Court could dismiss the motion as moot.

Beyond being unnecessary, Robinhood's motion is also meritless, often conflating weight and admissibility arguments, or making arguments that have no bearing on class certification. Robinhood faults Dr. Werner for examining the one-year period prior to the class period, instead of analyzing efficiency during the one-week class period. This ignores the fact that Plaintiffs' theory of the case is that Robinhood's manipulation rendered the markets *inefficient* during the class period. Robinhood also attacks Dr. Werner's opinion that it is possible to calculate damages on a class-wide basis by claiming that proof of market efficiency is required to calculate class-wide damages. Untrue. Damages are measured based upon market prices, not prices set by an efficient market.

Robinhood's motion also attempts to turn case law on its head, arguing that Dr. Werner erred by not conducting subjective analyses of individual news items pertaining to nine issuers to determine whether they are "value relevant," and that his failure to do this renders his opinions

---

[1] Cert. Br. at 10-16. Should the Court credit *any one* of these arguments, proof of market efficiency is not required, rendering attacks on Dr. Werner's report immaterial.

[2] "[T]he Court is not aware of *any* case in the Eleventh Circuit … finding a market inefficient where all *Cammer/Krogman* factors but *Cammer* factor five were satisfied. The Eleventh Circuit is not alone in its determination that the fifth *Cammer* factor is not a prerequisite to a finding of market efficiency..." *Monroe Cnty. Employees' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 384 (N.D. Ga. 2019) (emphasis in original); *Pub. Employees' Ret. Sys. of Mississippi v. Mohawk Indus., Inc.*, 2022 WL 17920570, at *10 (N.D. Ga. Nov. 28, 2022) (citing *Monroe*). *See* Sec. IV.A, *infra*.

unreliable and biased. Not so. Multiple courts have affirmed the propriety of Dr. Werner's methodology, holding that he used a reliable method. The procedure Robinhood advocates – conducting individual and subjective determinations of "value relevance," is the method that is disfavored. Dr. Werner's methodology assured his objectivity and his report's reliability.

## II.  STATEMENT OF RELEVANT FACTS

Robinhood, an online stock brokerage, rapidly and recklessly expanded in January 2021, adding 3 million accounts that month – even courting customers on TV and in print on January 27 to become the most-downloaded app that day – knowing it lacked the infrastructure to support that many new accounts. ACCC ¶47; Cert. Br. at 5. At 5:11 a.m. on the morning of January 28, Robinhood did not have $3 billion required to meet its NSCC collateral requirement. ECF 559-29 at 3. After obtaining a one-day waiver of its ECP charge ($2.2 billion), Robinhood barred purchases, but not sales, of the Affected Stocks to prevent another liquidity crisis the very next day. ACCC ¶80(d). Robinhood would have allowed purchases to continue had it been adequately capitalized. *Id.* Robinhood misled investors by concealing these facts, and that Robinhood knew its actions would "trigger a crash" in the markets of the Affected Stocks. Cert. Br. at 1; Order at 45-46. This manipulative conduct tanked the Affected Stocks' prices, damaging investors.

Plaintiffs moved for class certification on April 28, 2023. To address Rule 23(b)'s "predominance" requirement, plaintiffs presented three arguments with respect to the element of reliance: (1) common issues predominate because Robinhood's manipulative scheme was directed at all class members; (2) because the deception accompanying Robinhood's restrictions was a failure to disclose material information, *Affiliated Ute* excuses the need for proof of reliance; and (3) reliance on an assumption of an efficient market free of manipulation is a merits issue that is common to all class members and only requires proof of a *bona fide* market, not proof of efficiency akin to that required by *Basic v. Levinson*. That said, mindful of the unique nature of this case, in an abundance of caution, Plaintiffs submitted an expert report from Dr. Adam Werner, demonstrating that the markets for seven of the nine Affected Stocks were efficient under the *Cammer* and *Krogman* tests (eight factors, in total).

Prior to his recent retirement, Dr. Werner was a lecturer at the Orfalea College of Business at California Polytechnic State University, where he taught economics courses to graduate and undergraduate students. Werner Rpt. ¶4. He is an affiliated expert at Crowninshield Financial Research, Inc. He previously worked for consulting firms such as Cornerstone Research (with

whom Robinhood expert Dr. Steven Grenadier is affiliated), CRA International, and NERA. He has been retained numerous times as an expert on a variety of economic matters, by both plaintiffs and defendants. His opinions have been accepted in Federal, State, and Bankruptcy Courts, as well as courts in Australia and Canada. He holds a Ph.D. in finance from Northwestern University's Kellogg Graduate School of Management. *Id.* ¶5.

In connection with *Cammer* Factor 5, price reaction to new information, Dr. Werner conducted an event study. Werner Rpt. ¶¶52-79. Specifically, he performed a "news vs. no-news test" which compared stock price movements on "high information" days (the top 10% of news days in the study period, measured by the number of articles identified) with movements on "low information" days (the remaining 90% of news days). *Id.* at ¶¶67-79. Dr. Werner expressly adopted a broad definition of news – any article about each of the nine Affected Stocks identifiable through a search of the news database Factiva – to be as objective as possible. *Id.* at ¶68. Comparing the occurrence of statistically-significant price movements on high news days with those on low news days, Dr. Werner found evidence of a cause-and-effect relationship for eight of the nine Affected Stocks and concluded that this factor supported efficiency for those stocks. *Id.* at Table 9 & ¶79. Werner Rpt. at 34.

Robinhood does not attack Dr. Werner's analysis on any other *Cammer/Krogman* factor.

## III.    LEGAL STANDARD

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588-596 (1993) established a "liberal" approach to admit expert testimony that is both relevant and reliable. *Id.* at 594-95. "The focus [of the *Daubert* analysis] must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 596. "[T]he rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 (advisory committee notes (2000)). "[I]n a *Daubert* inquiry, a court is not concerned with the correctness of an expert's opinion. Instead, the focus is on whether the expert is qualified to give the opinion, whether the expert's methodology is reliable, and whether the opinion is helpful." *Griffin v. Coffee Cnty.*, 608 F. Supp. 3d 1363, 1372-73 (S.D. Ga. 2022), *objections overruled,* No. 5:19-CV-92, 2022 WL 2805037 (S.D. Ga. July 18, 2022).

The Eleventh Circuit summarized the *Daubert* test as boiling down to three requirements:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 562 (11th Cir. 1998). Defendants challenge only the reliability of Dr. Werner's methodology and the helpfulness of his testimony.

## IV.     ARGUMENT

### A.     The Eleventh Circuit Eschews a Daubert Analysis Not Critical to Class Certification

In addition to being moot because Plaintiffs meet the "predominance" requirement without a finding of market efficiency, the motion is also procedurally improper. In *Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1258 n.7 (11th Cir. 2014), the Eleventh Circuit held that a full *Daubert* analysis is only needed when the challenged expert opinion is critical to class certification. Here, it is not.

Dr. Werner's report included an analysis of the five "*Cammer* factors" and the three "*Krogman* factors" which courts typically consider in determining efficiency. Robinhood objects to Werner's methodology only as to *Cammer* Factor 5, which Werner addressed with an event study. However, the Eleventh Circuit has held that *Cammer* Factor 5 is not dispositive of market efficiency and that an event study is not required to establish a fraud-on-the-market presumption at class certification. *Regions*, 762 F.3d at 1256.  Indeed, the court in *Monroe Cnty.*, *supra*, noted that *Regions* affirmed a finding of market efficiency even though the plaintiffs did not proffer an event study. 332 F.R.D. at 384. *Monroe* further observed that the Eleventh Circuit is joined by five other circuits in not requiring proof under *Cammer* Factor 5, *id.* at 384-85, because "[r]equiring a plaintiff to submit proof of market reactions – and to do so with an event study – ignores Supreme Court precedent as well as practical considerations." *Id.* at 385 & n.8 (quoting *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 83 (S.D.N.Y. 2015) and collecting cases).

In fact, where the other *Cammer* and *Krogman* factors support a finding of market efficiency, courts in the Eleventh Circuit dispense with proof under *Cammer* Factor 5. *Id.* (no Eleventh Circuit case failed to find market efficiency where the other seven factors were satisfied). Here, the other factors are met, an event study is *not* critical to class certification, and a *Daubert*

analysis is unneeded.

**B.      Dr. Werner's Opinions Concerning Efficiency in His Opening Report Are Helpful and Reliable**

**1.      Analysis of the Year Preceding the Class Period is Helpful**

Robinhood argues that "securities plaintiffs may establish [*Basic*] reliance on a class-wide basis by showing that the market was efficient at the time they transacted—in other words, during the Class Period." Def. Br. at 7-8. While this is true in a misrepresentation case, the Court already acknowledged that the elements of a §10(b) claim are different in a manipulation case, especially a case where it is alleged that material omissions made both the defendants' price-deflationary acts manipulative and the markets inefficient. Indeed, both of Robinhood's experts testified that manipulation can render inefficient a market that had previously been efficient. Grenadier Depo. at 44:18-25; Fischel Depo. at 145:19-146:4. The assertion that Dr. Werner's analysis is unhelpful because it "answers the wrong question by addressing the wrong time period" (Def. Br. at 8) is therefore meritless. Plaintiffs do not contend that the markets for the Affected Stocks were efficient *during* the class period, but that they were efficient *before* Robinhood's manipulations, and Dr. Werner's event study is helpful for that purpose.

Further undercutting Robinhood's claim that only class-period efficiency should be studied is its submission of expert reports from Dr. Grenadier and Mr. Fischel opining that markets for the Affected Stocks were inefficient during abbreviated *pre-class* periods. *See* Fischel Rpt. at ¶¶ 21 n. 44 & 34 (finding market inefficiency during the period between January 4 and 27); Grenadier Rpt. at ¶¶4 n.1 & 13, (finding inefficiency during the period January 21-27). Robinhood cannot claim that Dr. Werner's analysis of efficiency in the pre-class period is unhelpful to the finder of fact while proffering expert reports on exactly the same topic.

Moreover, an event study of the year prior to the class period can be helpful to the court's market efficiency review. *See Schleicher v. Wendt*, No. 1:02-CV-1332-DFH-TAB, 2009 WL 761157, at *5 (S.D. Ind. Mar. 20, 2009), *aff'd*, 618 F.3d 679 (7th Cir. 2010) ("[A]s part of this event study, Dr. Feinstein studied the price movement on a daily basis for the year before the class period …. Those observations also tended to support the finding of an efficient market …").

**2.      Robinhood's Data "Commingling" Attack on Reliability Fails**

Robinhood contends that because the market behaved atypically in the period leading up to January 28 (which period is unclear: Mr. Fischel starts his analysis on January 4 while Dr.

Grenadier begins his on January 21), Dr. Werner's use of a one-year period for determining efficiency prior to the class period (Def. Br. at 6-9) was inappropriate because it improperly "commingles" two sets of distinct data. Robinhood claims that even if the one-year data is relevant, it improperly masks extraordinary activity that amounted to market inefficiency during some point in January. Robinhood cites no case where this comingling concept was used to exclude an expert report in a securities fraud case. Cases where courts admit the reports but find that efficiency has not been shown for the entire proposed class period are not applicable here.[3]   More importantly, Robinhood does not cite either of its experts' opinions in support of this theory. Robinhood's *ipse dixit* is no basis for exclusion.

There are scientific tests to determine whether there are in fact substantial variations within the one- year period such that it would require separating sub-periods to analyze for efficiency, such as the Breusch-Pagan test for heteroskedasticity. Werner Dec. ¶15. But Robinhood's experts never performed that test, and it is no wonder why, because when Dr. Werner performed it, he found there was no indication that for any of the Affected Stocks, there were variations in the one-year period that would undermine his use of a one-year analysis. *Id.* ¶16. *Cf. Willis v. Big Lots, Inc.*, No. 2:12-cv-604, 2017 WL 1074048, at *5 (S.D. Ohio Mar. 17, 2017) (an attack on methodology but not on the outcome does not demonstrate lack of reliability or disturb efficiency finding).

### 3.    Use of a Dummy Variable for January 27, 2021, Was Appropriate

Robinhood asserts that Dr. Werner's exclusion of January 27 2021, from his regression somehow makes the results unreliable.  Dr. Werner explained that he excluded January 27 from

---

[3] In *U.S. v. Reddy*, 534 F. App'x. 866 (11th Cir. 2013) a defense expert's analysis of radiology images for an 18-month period matching the period of alleged wrongdoing was partially excluded because a superseding indictment was handed down with a shorter but overlapping period of wrongdoing. Unlike the indictment's clear line of demarcation, it is only Robinhood's say-so as to which part of Dr. Werner's opinion should be excluded as not relevant to the case. Similarly, in *Harcros Chems*, 158 F.3d at 566, data concerning collusive activity in Florida could not be commingled with data regarding Alabama as evidence of a conspiracy alleged to have occurred solely in the state of Alabama. Again, a state line is clear, when the atypical activity began is not even agreed upon by Robinhood's experts. The court in *Brokop v. Farmland Partners Inc.*, No. 18-cv-02104-DME-NYW, 2021 WL 4916240 at *17-18 (D. Colo. July 23, 2021), did not exclude the expert report and only shortened the class period because plaintiffs' expert conceded that he had not shown efficiency in early part of class period.

*his regression analysis* because it was the event that led to Robinhood imposing the Restrictions. Werner Depo. at 124:2-125:4. Similar to a corrective disclosure date in a misstatement case, Dr. Werner knew in advance of conducting his news/no news test that there would be a potentially extreme price return on this day, as this is a date alleged to be eventful in this case.. Therefore, he excluded that date to avoid biasing the results of his regression analysis by removing potentially abnormal price movements. Importantly, the purpose of a regression model is to estimate typical stock price behavior so that individual dates can be compared against this benchmark in determining statistical significance. Dr. Werner did not exclude any dates from his ultimate tests to determine whether news days vs non-news days were more frequently associated with statistically significant stock price movements. That is, January 27, 2021, was in fact included in Dr. Werner's tests of market efficiency. Moreover, use of dummy variables is "a common and accepted component of securities fraud event studies, although courts have cautioned against their overuse." *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston*, 853 F. Supp. 2d 181, 188 (D. Mass. 2012) (dummying out 54% of trading days is too many); *Buttonwood Tree Value Partners, LP v. Sweeney*, No. SACV1000537CJCMLGX, 2013 WL 12125980, at *11 (C.D. Cal. Sept. 12, 2013) (dummying out 6.4% of trading days is acceptable).

Dr. Werner dummied out only *five* trading days out of 253 or 2.0% - an immaterial number.[4] Werner Rpt. at ¶63. Dr. Werner also stated that whether or not he included January 27 in his regression analysis had no effect on the results. Werner Depo, pg. 124:2-20. Robinhood's criticism is thus immaterial. Indeed, neither of their experts mention it in their rebuttal reports. *See In re Groupon, Inc. Sec. Litig.*, No. 12 C 2450, 2015 WL 1043321, at *7 (N.D. Ill. Mar. 5, 2015), objections overruled, No. 12 CV 2450, 2015 WL 13628131 (N.D. Ill. May 12, 2015) (criticism of expert's use of dummy variable dismissed because expert testified it made no difference either way and opposing expert did not test whether it made a difference).

### 4. Werner's Method of Selecting News is Helpful and Reliable

#### a. Werner's Definition of Efficiency is Appropriate

Robinhood's argument that Dr. Werner's definition of efficiency is inappropriate because it does not match *the* academic definition of efficiency lacks merit for the simple reason that there is no single academic definition of efficiency. As Mr. Fischel himself noted:

---

[4] Robinhood's calculation of 365 trading days in the one-year estimation period is an error.

> Much of the discussion of efficient capital markets suffers from ambiguity concerning what characteristics capital markets must satisfy to be considered "efficient." At least two definitions of "efficient" capital markets exist. The first … focuses on the speed with which market prices reflect publicly-available information and whether the price reaction to new information is without bias … I refer to this definition as "trading-rule efficiency."
>
> The second definition of efficient capital markets focuses on the extent to which security prices reflect the present value of the net cash flows generated by a firm's assets. I refer to this definition of efficiency as "value efficiency."

Daniel R. Fischel, *Efficient Capital Markets, the Crash, and the Fraud on the Market Theory*, 74 Cornell L. Rev. 907, 912–13 (1989) ("Fischel ECM Article"). ECF 559-36. Other sources refer to these two types of efficiency as "informational efficiency" and "fundamental efficiency." *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 14-15 (1st Cir. 2005) (the latter fully incorporates information both quickly and accurately). Even if there were one academic definition of market efficiency, financial economists do not dictate the means by which market efficiency is determined by the courts. *Big Lots*, 2017 WL 1074048, at *4 ("This does not mean that Defendants (or their expert …) are incorrect in what they say—it means that Defendants (and their expert) often describe a different conception of an efficient market than is used by the law.").

Dr. Werner testified that it is his understanding courts typically look for "informational efficiency" when evaluating the applicability of the fraud-on-the-market presumption. Werner Depo. 66:13-67:23. This is correct. In *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1310 (11th Cir. 2011), the Eleventh Circuit held: "A 'fraud on the market' occurs when a material misrepresentation is knowingly disseminated to an informationally efficient market."[5] Robinhood quibbles with Dr. Werner's reading of *Halliburton II* but neither that decision nor the cases cited herein require proof of "fundamental efficiency" or "value efficiency" as Robinhood claims. Def. Br. at 10-12. Dr. Werner used the definition adopted by courts and is correct that *Halliburton II* rejected a strict adherence to fundamental efficiency, holding that "[d]ebates about the precise degree to which stock prices accurately reflect public information are thus largely beside the

---

[5] *See PolyMedica*, 432 F.3d at 16 ("Our focus on whether a particular market has absorbed all available information (and misinformation) … is not a fundamental value inquiry."); *In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 247 (N.D. Cal. 2013) ("The majority of courts in this circuit agree that … market 'efficiency' means that prices will 'reflect all relevant information,' a definition of efficiency known as informational efficiency.").

point." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 272 (2014).

        **b.**      **Werner's News/No-News Test is Appropriate Because it Avoids Subjective Determination of Value Relevant News**

One necessary step in performing an event study is to determine at the outset a definition of "news". Experts performing this analysis use different definitions of news as their point of comparison*, e.g.,* any day with an earnings announcement, any day with an earnings surprise, or any mention of a company in a news story.[6] Given that there are multiple methodologies for classifying news, selection of the appropriate criteria requires some discretion. "Courts recognize that reality, and, in the normal course, do not discount or exclude *Cammer* 5 event studies based on that fact." *In re Teva Sec. Litig.*, No. 3:17-CV-558 (SRU), 2021 WL 872156, at *33 (D. Conn. Mar. 9, 2021); *see also In re: Petrobras Sec. Litig.*, 312 F.R.D. 354, 368 (S.D.N.Y. 2016) (refusing to consider challenges to news day selection methodology in event study) (vacated in part on otherer grounds). For this case, Dr. Werner used the criterion of all news articles identifiable through a search on the database Factiva that mentioned the Affected Stocks during the Relevant period. Dr. Werner testified that he did this to minimize subjectivity, analyzing all news rather than making his own determination of what an investor would find informative. Werner Depo. 229:44-231:2; Werner Decl. ¶31. Objectivity in selecting event criteria ensures reliability. *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 618 (C.D. Cal. 2009) ("[E]vents for study should be selected using criteria that are as objective as possible."). Courts routinely reject *Daubert* challenges to event studies using very similar methods to Dr. Werner's when granting class certification.[7]

Robinhood's experts' use of subjective methodologies demonstrates the appropriateness of this approach. As Dr. Werner observed in his rebuttal report, Mr. Fischel and Dr. Grenadier cannot

---

[6] D. Tabak, "What Should We Expect When Testing for Price Response to News in Securities Litigation,?" at 6 (NERA Economic Consulting Aug. 2016); Rosen Decl. Ex. 6.

[7] *See, e.g. Angley v. UTi Worldwide Inc.*, 311 F. Supp. 3d 1117, 1124 (C.D. Cal. 2018) (rejecting attack on event study that treated as "news days" all days with articles mentioning the company through a *Bloomberg* search); *McIntire v. ChinaMedia Express Holdings, Inc.,* 38 F. Supp. 3d 415, 429-30 (S.D.N.Y. 2014) (rejecting attack on study defining "news days" as those with articles on *Bloomberg* and Factiva); *In re Netbank, Inc. Sec. Litig.*, 259 F.R.D. 656, 673-74 (N.D. Ga. 2009) (rejecting Dr. Tabak's attack on an event study that treated as "news days" all days with articles mentioning the subject company through a search on Factiva); *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008).

even agree as to which days during the single week in which their study periods overlapped should be identified as news days for five of the Affected Stocks. Werner Reb. Rpt. at ¶47. at 24. Similarly, when Dr. Grenadier re-ran Dr. Werner's analyses using three different *ex ante* definitions of "news," it resulted in different findings concerning proof of cause-and-effect with respect to the Affected Stocks each time. Grenadier Reb. Rpt. at ¶53 & Ex. 1A-C. (defining "news" as earnings and guidance: BB, BBBY and NOK; defining "news" as 8Ks and 6Ks: AMC and BBBY; defining "news" as press releases: BBBY).

### c.     It Is Appropriate to Include Articles Discussing Price Movement

Even though Mr. Fischel himself recognizes the difference between informational/trading-rule efficiency and fundamental/value efficiency, the former of which has been widely adopted by courts, Robinhood faults Dr. Werner for not screening out information that "has nothing to do with the company's future cash flows." Def. Br. at 13. But courts have consistently held that the better practice is to use objective criteria in selecting news to include in an event study, and to avoid just such subjective *ex ante* determinations. *Angley*, 311 F. Supp. 3d at 1124 (collecting cases); *McIntire*, 38 F. Supp. 3d at 429 (rejecting attack that expert included news about company's price movement in its definition of news and finding that the expert's "methodology for categorizing News Days and Non–News Days was sufficiently reliable, objective, and consistent with scientific principles").

Excluding articles about price movement would have been inappropriate because they contained information that reasonable investors might have traded on. As Dr. Werner noted, some investors trade on momentum, which involves looking at stock price movement in determining what trade to make. Werner Dep. Tr. 230:9-18. Dr. Grenadier himself worked at a hedge fund that conducted momentum trading. Grenadier Depo. 12:7-8 In fact, CEO Vlad Tenev stated that Robinhood provides its customers with "notifications about stock movements that help them stay informed."[8] How can Robinhood argue the very price movement information they provide to their customers is not relevant?[9]

---

[8]   Vlad Tenev, "Robinhood Users Come Under Attack," *Wall Street Journal* (Sept. 27, 2021) (Rosen Decl., Ex. 7).

[9]   In addition to price movement information, several of the articles that Robinhood claims should have been excluded contain information that an investor might find relevant, such as the fact that trading in these companies has come under regulatory scrutiny. *See, e.g.,* ECF 566-17 and 566-27.

Robinhood implies there is no precedent for Dr. Werner's methodology (despite its use in cases cited herein) because he only pointed to one example of such testing at his deposition, Dr. Tabak's event study in the *Alibaba* class certification motion, which did not employ the exact same methodology. Def. Br. at 13-14 (citing Werner Dep. Tr. 225:7-13). In that case, one of several permutations of the news/no news tests Dr. Tabak ran analyzed all news mentions of Alibaba in a Factiva database and compared the days with the highest 10% of news mentions to those with fewer mentions. It is that test that Dr. Werner looked to in designing his own event study. ECF 566-7, Ex. 8a. While it is true that Dr. Tabak performed an *additional* test where he excluded articles that "were solely reporting on Alibaba's price movements or volume," when Dr. Werner removed those articles he continued to find a statistically significant correlation between high news days and price movement. Werner Decl. ¶33. Finally, Robinhood notes that Dr. Tabak excluded from his Factiva searches articles that fell into the category of "recurring pricing and market data" – an option on Factiva that weeds out a subsection of articles. If Dr. Werner's methodology slightly deviated from Dr. Tabak's that is no basis to exclude his report. *See Angley*, 311 F. Supp. 3d 1125-26 (where expert strove to minimize subjectivity, certain decision points require some subjectivity). This deviation goes to weight, not admissibility. *Id.,* at 1126.

In essence, their criticisms of Dr. Werner's decision not to exclude documents that discuss only price movement are complaints about the quality of his underlying data. Numerous courts have held that "the type of data used by [an expert] to perform his damages analysis is merely grounds for cross-examination at trial." *UCB, Inc. v. Teva Pharms. USA, Inc.*, No. 1:12-CV-4420-CAP, 2015 WL 11199058, at *7 (N.D. Ga. Mar. 18, 2015); *see also Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013) ("Reliability … is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used…"); *McGarity v. FM Carriers, Inc.*, No. CV410-130, 2012 WL 1028593, at *7 (S.D. Ga. Mar. 26, 2012) ("[T]he identification of flawed data or facts relied upon by an expert is precisely the role of cross-examination and does not render expert testimony inadmissible").

### d.   It Was Appropriate Not to Examine the Articles' Substance

Robinhood faults Dr. Werner for failing to filter out certain articles included in his sample that could be considered extraneous because, while they mention the names of the various companies, they actually do not relate to the companies themselves, such as an article related to

the rapper "Princess Nokia" and an article related to "Blackberry Township, Pennsylvania."[10] Robinhood and its experts submitted no evidence that the exclusion of the extraneous news articles that they identified would have changed the outcome of Dr. Werner's event study. In the absence of such a showing, exclusion is inappropriate. *Willis v. Big Lots, Inc.*, No. 2:12-CV-604, 2017 WL 1074048, at *5 (S.D. Ohio Mar. 17, 2017) (rejecting *Daubert* motion and noting that "it is significant that Defendants do not contend that Steinholt's failure to perform an ex-ante hypothesis affected the outcome of the event study in any way").

In addition, Robinhood's argument fails because, as noted in the previous section, the quality of data an expert uses goes to the weight of the expert's opinion, not its admissibility. The cases Robinhood cites for the contrary proposition do not support their argument. For example, *Schoen v. State Farm Fire & Cas. Co.*, No. CV 21-00264-JB-N, 2022 WL 16579767, at *8 (S.D. Ala. Nov. 1, 2022), is readily distinguishable because the expert testifying as to the costs of a repair had not prepared the underlying estimate of the repair which itself was so poorly prepared as to be unreliable, *e.g.,* including the wrong insulation, flooring that did not need to be replaced, popcorn texture for twice ceiling square footage, and an error in the cost of house wrap by a hundred-fold. Inclusion of a handful of articles not pertinent to the nine issuers in a data set of over 14,000 news articles is hardly the same as a completely defective repair estimate. And the other cases cited are no better.[11] Werner Rpt. Ex. 8, pg. 202.

Finally, Robinhood claims that Dr. Werner should have reviewed all of the articles for the nine issuers over a one-year period to remove those articles where he subjectively determined the information was not new. Def. Br. at 15-16. However, as discussed in the previous section, courts disfavor subjective screening of potential news dates. In *In re Montage Technology Grp. Ltd. Sec. Litig.*, No. 14-CV-00722-SI, 2016 WL 1598666, at *10 (N.D. Cal. Apr. 21, 2016), the only case Robinhood cites where a report was excluded for failure to exclude confirmatory information from among 51 documents generated over a 4.5-month class period, the expert had defined "news" as analyst reports that "contained new and unexpected information." Here, where the data set included all Factiva articles pertaining to nine issuers over a one-year period, Dr. Werner did not

---

[10] Neither Robinhood nor their expert, identify any such articles with respect to AMC, GME, KOSS, TR, or TRVG. Def. Br. at 15 and Fischel Reb. Rpt. ¶ 22 n.33.
[11] *Nat'l. Sur. Corp. v. Georgia Power Co.*, No. 2:17-CV-68-RWS, 2019 WL 4394403, at *5 (N.D. Ga. Sept. 12, 2019) does not address data quality and *Alcott Co. v. Raphael*, 275 F.2d 551, 557 (5th Cir. 1960) preceded *Daubert* by over thirty years.

and would not claim that all of the articles contained new and unexpected information.

**5.      Werner's Choice of Methodology Is Consistent with Other Cases**

Mischaracterizing Dr. Werner's testimony, Robinhood argues that because this was the first time he used this methodology, his expert report should be excluded because it was contrived to reach a particular result. Def. Br. at 16-18. First, the only change in this case is that Dr. Werner used a broader and more objective definition of news. Nothing else changed.  The methodology for testing news event days against non-news days is the same as his prior reports.  Werner Decl. ¶38. Second, Dr. Werner explains that he made this decision after first reviewing news "to better understand the industry and markets that the Affected Companies were operating in …[because it] … is one of the first steps I take before employing any event selection methodology" *Id*. ¶45. Importantly, this "is not the same as testing for market efficiency as Defendants attempt to portray." *Id*.  Dr. Werner did not perform any tests for market efficiency before first selecting the news event criteria. *Id.* ¶44.

Dr. Werner explained that when he began working on this case, he *considered* using the tests he had in the past but, mindful of the flaws in those methodologies, *e.g.,* the use of press releases or 8-Ks as a proxy for news could be overinclusive, in that those sources could contain non-material or non-new information, or underinclusive, in that news about an issuer might come from another source – he determined that it was more appropriate to use a broader, more objective definition of news. Werner Depo. 174:6-175:19. Dr. Werner also explained that as he began considering how to define news for the event study, he realized that  selecting individual news dates as he had in the past would be criticized as inherently subjective. *Id.* at 229:11-23; Werner Decl. ¶37-39. Also, with nine Affected Stocks, each had its own policies and practices for what information to include in earnings announcements, 8-Ks and press releases. Werner Decl. ¶40. This would have led to inconsistencies within the report. As noted above, this is borne out by Dr. Grenadier not getting the same results across companies when testing earnings/guidance, press releases, and 8-Ks and 6-Ks – a fact that underscores the limitations of the prior methodologies and supports the broader test he employed.

That Dr. Werner's careful consideration of the proper testing to use in this rather unique case led him to use a methodology he personally had not used before is not disqualifying where it has not only been used by other experts but has been used by Dr. Werner in two *subsequent* reports in different cases, working with different law firms. Rosen Decl. Exs. 4 & 5. Robinhood's

authorities are thus distinguishable: The methodology in *Cordoves v. Miami-Dade Cnty.*, 104 F. Supp. 3d 1350, 1364 (S.D. Fla. 2015) was not just different from past practice, it was inferior; *In re Zantac (Ranitidine) Prod. Liab. Litig.*, No. 20-MD-2924, 2022 WL 17480906, at *132 (S.D. Fla. Dec. 6, 2022) dealt with unexplained inconsistency with prior practice. *See also Brokop*, 2021 WL 4916240, at *12 (fact that expert never before performed a test not found in literature is not disqualifying if explained). Here, as in *Brokop* and *Zantac*, Dr. Werner explained why he adopted a new methodology – to avoid the over- or under-inclusiveness of an *ex ante* selection of news types.

### C.    The Opinions in Dr. Werner's Rebuttal Report are Helpful and Reliable

In his rebuttal report, Dr. Werner conducted tests to complete the partial, anecdotal analyses performed by Mr. Fischel and Dr. Grenadier in their opening reports. Essentially, Robinhood's experts performed a highly-biased, "backward" event study – without testing any hypothesis. They first identified dates with abnormal stock movements and then sought out news on those dates, if any. Werner Reb. Rpt. ¶¶41, 44. However, they never conducted a statistical analysis to determine the *likelihood* that the association of news days with abnormal price movements could occur by chance. *Id.*

On rebuttal, Dr. Werner used a binomial test to show that Robinhood's experts' anecdotal analyses fall apart under statistical scrutiny. *Id.* at ¶45. A binomial test is a simple application that is designed to calculate whether the frequency of one of two outcomes (hence, "binomial") could occur by chance. For instance, a binomial test could be used to answer the question of whether, if we flip a coin 100 times and it lands on heads 60 times, the coin is fair. If it is unlikely that a fair coin could reach that result, the binomial test can be used to conclude that the coin is not fair. Similarly, Dr. Werner used the binomial test to calculate whether, in the week leading up to the class period, the co-occurrence of news (according to the definitions of news selected by Mr. Fischel and Dr. Grenadier) and statistically-significant price movements could be attributed to chance. If the odds that the association could be attributed to chance is below 5%, that is evidence of efficiency. For six of the seven stocks that Dr. Werner tested, the binomial test in fact showed such evidence of efficiency. *Id.* at ¶50 & Table 7.

The binomial test is a well-known and widely-accepted tool of statistical analysis. It is routinely taught in undergraduate- and graduate-level statistics courses. *See, e.g.*, Rosen Decl. Ex. 8 (excerpt from R.V. Hogg, J.W. McKean & A.T. Craig, *Introduction to Mathematical Statistics*

(6th ed.) p. 133-34 (Pearson Prentice Hall, 2005)). Binomial tests have been included in expert reports accepted by federal courts. *See, e.g. Scott v. City of Indianapolis*, No. 1:08-CV-0150-SEB-TAB, 2010 WL 1265990, at *4 (S.D. Ind. Mar. 25, 2010) ("Because the binomial distribution test is a method that is accepted and recognized in the relevant scientific community, we conclude that [the expert] utilized a sufficiently reliable methodology in evaluating the data before him, and that his testimony thus meets the standard outlined in *Daubert*"); *Reynolds v. Giuliani*, 118 F. Supp. 2d 352, 374 (S.D.N.Y. 2000) ("…[B]inomial tests of statistical significance are recognized by courts as being valid…"); *Castaneda v. Partida,* 430 U.S. 482, 496 n. 17 (1977) (adopting binomial distribution as statistical model to evaluate racial discrimination in grand jury selection); *Bd. of Educ. of City School Dist. of City of New York v. Califano,* 584 F.2d 576, 585 n. 29 (2nd Cir.1978), *aff'd,* 444 U.S. 130 (1979) (same).

Robinhood falsely suggests that Dr. Werner "admitted" that his binomial test "does not *compare* 'news' days to 'non-news' days." Def. Br. at 18 (citing Werner Depo. at 334:14-21) (emphasis added). Yet the passage they quote is in response to a question where Dr. Werner states that he did not perform a separate statistical test called a Fisher's exact test:

> Q. Yes. And do you see that *he then runs a Fisher's exact test* and finds there is no statistically significant difference on the days with news and the days without news, right?
>
> A. Based on his definition of news, again, I haven't had a -- I haven't examined this thoroughly, but on the surface that appears to be what it is.
>
> Q. Okay. And when you conducted your binomial test results for your rebuttal report *you did not do this kind of comparison* between the news dates and the non-news dates during the one-week period before the proposed class period, did you?
>
> A. Right, based on the small sample size, that is correct.

Werner Depo. at 334:14-21 (emphasis added). Werner was simply explaining he did not perform a Fisher's exact test (as he had with his original data) because the sample size was too small for that test to be meaningful.

Dr. Grenadier's purported competing test[12] (ECF 566-13), is itself fundamentally flawed,

---

[12] The alleged Grenadier document, introduced at Dr. Werner's deposition, was produced *after* the parties' exchanged opening and rebuttal reports has never been authenticated by Dr. Grenadier or by counsel. Robinhood asserts in its motion to strike that this is proper as a response to Dr. Werner performing a binomial test for the first time in rebuttal, disregarding the fact that it is entirely proper to perform a new analysis in rebuttal *to rebut an opposing expert's analysis*. Dr. Grenadier

as it excludes from its calculation the "news days" that Mr. Fischel identified. Because it is not working from the same data set, it can have no bearing on the reliability of Dr. Werner's test. There is no basis to exclude Dr. Werner's analysis on rebuttal because his data set included *both experts'* set of news dates.

The bone Robinhood (and Dr. Grenadier) have to pick is not with the reliability of the methodology employed (here, binomial test) but with Dr. Werner's decision of what to test.  He tested days that Grenadier and Fischel had identified as news days to ensure objectivity. Certainly, Robinhood cannot fault Dr. Werner for selecting as news days the same days that its experts determined were news days. That Dr. Grenadier suggests he should test something else as well – Grenadier's selection of non-news days while ignoring Fischel's non-news days - is not a criticism of the methodology of *Dr. Werner's* binomial test. Robinhood does not get to dictate what statistical tests Dr. Werner may perform in rebuttal, particularly when neither Dr. Grenadier nor Prof. Fischel performed any statistical tests on news days vs. non-news days.   At most, these are the kind of "battle of the experts" arguments – going to the weight of the evidence and the experts' relative credibility, not the relevance or reliability of their method – that this and other courts in the Eleventh Circuit have found to be uniquely the province of the factfinder, and therefore inappropriate for determination by the Court on a *Daubert* motion. *See*, *e.g., Altidor v. Carnival Corp.,* 550 F. Supp.3d 1322, 1331 (S.D. Fla.-Miami 2021) ("It is not the role of the district court to make conclusions as to the persuasiveness of the proffered evidence… courts must be careful not to conflate questions of admissibility of expert testimony with the weight appropriately to be accorded to such testimony by the fact finder." ) (internal citations and quotations omitted); *Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009) ("so long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility") (internal marks omitted); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1313 (11th Cir. 1999) ("[T]he proponent of the testimony does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence, it is reliable.").[13]

himself performed new analyses in his own rebuttal. Grenadier Reb. Rpt. This, however, is a sur-rebuttal.

[13]     Robinhood also cites *FindWhat* for the proposition, irrelevant to the binomial test, that disclosure of . . . information already known by the market will not cause a change in the stock price." *FindWhat,* 658 F.3d at 1310.  All that *FindWhat* held is that false statements during a class

**D.**      **Market Efficiency is Unnecessary to Prove Class-wide Damages**

In connection with *Comcast's* requirement that plaintiffs show that it is possible to calculate damages on a class-wide basis to support a "predominance" finding, Dr. Werner described one way to measure out-of-pocket damages: Subtract the sale price of the Affected Stock during the Class Period (while the Restrictions were in place) from the market price of the Affected Stocks at close of trading on January 27, 2021 (the price just before Robinhood imposed trading restrictions). Werner Rpt. ¶95. As Dr. Werner testified, this is true whether or not that January 27 price was the result of an efficient market. Werner Depo. at 381:10-382:5. As predicted, Robinhood's attack on Dr. Werner's market efficiency opinion is the means by which to attack his *Comcast* damages opinion. Cert. Br. at 23-25.

Robinhood asserts, without citing *any* legal authority, that Dr. Werner's use of the closing price on January 27 to measure damages is dependent upon proof that the price was set by an efficient market; because they argue that it was not, they seek to exclude his class-wide damages opinion. This is not the law. Securities fraud damages for defrauded sellers are "the difference between the fair value of all that the [] seller received and the fair value of what he would have received had there been no fraudulent conduct …." *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155, 92 S. Ct. 1456, 1473, 31 L. Ed. 2d 741 (1972), *followed by*, *Bruschi v. Brown*, 876 F.2d 1526, 1531 (11th Cir. 1989); *Pidcock v. Sunnyland Am., Inc.*, 854 F.2d 443, 446 (11th Cir. 1988).

Importantly, the best proxy for the value of a stock is its market price. This is true, Mr.

---

period that confirm false statements preceding the class period are not expected to cause a price increase, because the false statements are already incorporated in the stock price. Thus, the failure of the share price to increase upon the false statements does not defeat loss causation. What it does not say is that a rise in the absence of new news is evidence of inefficiency. In the *In re IPO* class certification motion, Prof. Fischel acted as an expert for plaintiffs, testifying that the markets there were efficient. To rebut Fischel's opinion, defendants' expert pointed out that of the "twenty-eight days identified by Fischel as having a statistically significant price change for Sycamore-concluded that the price moved without the release of relevant new information on twenty-two of those days" – that is only 21.4% of the time were price movements accompanied by news. *In re Initial Pub. Offering Sec. Litig.*, 260 F.R.D. 81, 102 (S.D.N.Y. 2009). Prof. Fischel responded that "significant share price changes are not always explained by known announcements. He opined that 'most of the daily variation in stock prices generally is unexplained by market factors, industry factors, or firm-specific news.' He also noted that prices can change when investors trade on private information, and that it is not always possible to identify the relevant information that moved share prices years after the fact." *Id.* None of this defeats efficiency.

Fischel wrote, even when there is a large presence of irrational retail "noise traders," as he claims was the case in the markets for the Affected Stocks just prior to the class period. *See* Fischel ECM Article at 914-15. (ECF 559-36). The closing price on January 27, before Robinhood's restrictions manipulated both supply and demand, falls squarely within Mr. Fischel's definition of fair value:

> Q. What is the difference between a stock's market price and its value?
>
> A. You have to have a definition of what "value" means.
>
> Q. Do you have a definition of "value" for a stock?
>
> A. Well, there's a general definition of what a fair market value is, a price between a willing buyer and a willing seller where both have reasonably complete information and neither is under a compulsion to buy or sell. That's a generally accepted definition of fair market value. So under that definition, as long as those criteria are met, price and value are the same.

Fischel Depo. at 147:12-148:6. When shares are traded on a national exchange such as the NYSE and NASDAQ, the market price is the best estimate of fair market value, even when the stock is alleged to be artificially inflated, because the owner can sell the shares and receive the market price. *Johnson v. Comm'r of Internal Revenue*, 74 T.C. 89, 96 (1980), *aff'd sub nom. Johnson v. Comm'r*, 673 F.2d 262 (9th Cir. 1982) (citing cases).[14] Here, Plaintiffs held shares with recognized market values set by willing buyers and sellers in highly liquid markets. If Robinhood had not implemented the Restrictions, Plaintiffs' would have received approximately the prices prevailing on January 27. In truth, Robinhood is arguing that something other than the Restrictions, a short squeeze or a bubble bursting, caused the decline in the price of the Affected Stocks.[15] That is a loss causation argument not properly addressed on class certification. *Thorpe v. Walter Inv. Mgmt., Corp.*, No. 1:14-CV-20880-UU, 2016 WL 4006661, at *16 (S.D. Fla. Mar. 16, 2016) (citations omitted). Therefore, it is not properly the subject of a *Daubert* challenge at class certification.

## V.   CONCLUSION

For the foregoing reasons, Robinhood's motion to exclude the expert report of Dr. Adam Werner should be denied in all respects.

---

[14]   While these decisions are in the context of valuing stock for tax purposes, the IRS's definition of fair market value is identical to Prof. Fischel's.

[15]   Dr. Werner showed that there were no intervening events between the time Robinhood imposed the restrictions and the immediate decline in the Affected Stocks' prices. Werner Reb. Rpt. ¶¶102-108 tables 12, 13.

Dated:  June 21, 2023    Respectfully submitted,

        **THE ROSEN LAW FIRM, P.A.**
        Laurence M. Rosen, FBN# 0182877
        Robin Bronzaft Howald
        Michael A. Cohen
        By: /s/Laurence M. Rosen
        Laurence M. Rosen, Esq.
        275 Madison Avenue 40th Floor
        New York, New York 10016
        Tel: (212) 686-1060
        Fax: (212) 202-3827
        Email: lrosen@rosenlegal.com

        *Counsel for Lead Plaintiff Blue Laine-Beveridge and Named Plaintiffs Abraham Huacuja, Ava Bernard, Brendan Clarke, Brian Harbison, Cecilia Rivas, Doi Nguyen, Joseph Gurney, Marcel Poirier, Sandy Ng, Santiago Gil Bohórquez, and Thomas Cash*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 21, 2023, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

<u>/s/Laurence M. Rosen</u>