Page 1

1

2   UNITED STATES DISTRICT COURT

    SOUTHERN DISTRICT OF FLORIDA

3   _____

4   In re:

5   JANUARY 2021 SHORT SQUEEZE TRADING

6   LITIGATION

7

8   Case No. 21-2989-MDL-ALTONAGA

9   _____

10                      April 12, 2023

                        10:11 a.m.

11

12

13

14           DEPOSITION of DANIEL R. FISCHEL,

15   taken by Plaintiffs, pursuant to Notice,

16   held at the offices of CRAVATH, SWAINE &

17   MOORE LLP, 825 Eighth Avenue, New York,

18   New York before Wayne Hock, a Notary

19   Public of the State of New York.

20

21

22

23

24

25

Page 2

```
 1
 2  A P P E A R A N C E S:
 3
        THE ROSEN LAW FIRM
 4      Attorneys for Plaintiffs
            275 Madison Avenue
 5          New York, New York 10016
        BY:   LAURENCE ROSEN, ESQ.
 6          lrosen@rosenlegal.com
 7
 8  CRAVATH, SWAINE & MOORE LLP
        Attorneys for Defendants
 9          825 Eighth Avenue
            New York, New York 10019
10      BY:   KEVIN J. ORSINI, ESQ.
            korsini@cravath.com
11          CHARLOTTE LEPIC, ESQ.
            clepic@cravath.com
12
13              *    *    *
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2  D A N I E L  R.  F I S C H E L, having
 3      been first duly sworn by a
 4      Notary Public of the State of
 5      New York, upon being examined,
 6      testified as follows:
 7  EXAMINATION BY
 8  MR. ROSEN:
 9      Q.   What is your current address?
10      A.   332 South Michigan Avenue,
11  Chicago, Illinois 60604.
12      Q.   Good morning, Mr. Fischel.
13      A.   Good morning.
14      Q.   Could you just state your name
15  for the record.
16      A.   Daniel Robert Fischel.
17      Q.   And could you state which
18  organizations you are employed by or
19  currently affiliated with?
20      A.   An economics consulting firm by
21  the name of Compass Lexecon, and also
22  University of Chicago.
23      Q.   And what's your role at Compass
24  Lexecon?
25      A.   I'm the president and chairman
```

Page 4

```
 1              D. R. Fischel
 2  of the firm.
 3      Q.   And what's your role at the
 4  university of Chicago?
 5      A.   I'm currently the Lee and Brena
 6  professor of law and business emeritus at
 7  the University of Chicago Law School.
 8      Q.   Are you still teaching there?
 9      A.   Well, it's sort at my
10  discretion.  But in the last couple of
11  years I haven't, although they always ask
12  me to, because I've just gotten too busy.
13      Q.   So you spend most of your time
14  running Lexecon or Compass Lexecon?
15      A.   I wouldn't say running, but I
16  would say, for all practical purposes,
17  Compass Lexecon really takes up my entire
18  time devoted to professional activities.
19      Q.   And are you -- I assume you're
20  not -- you didn't take any medication or
21  anything, you don't have any medical
22  conditions that would interfere with your
23  cognition or memory or ability to testify
24  today?
25      A.   No, correct.
```

Page 5

```
 1              D. R. Fischel
 2      Q.   So you are a lawyer?
 3      A.   Trained lawyer, not a practicing
 4  lawyer.
 5      Q.   Are you admitted to any Bars,
 6  state Bars?
 7      A.   I was.  I haven't had any
 8  connection to law practice since I think
 9  1980.
10      Q.   But you practiced for some time?
11      A.   I practiced for less than a year
12  after clerking before beginning my
13  academic career.
14      Q.   And you're familiar with the
15  federal securities laws?
16      A.   That's sort of an overbroad
17  question.  I'm not sure how to answer it.
18      Q.   Have you taught classes covering
19  the Securities Exchange Act of 1934?
20      A.   I've actually never taught a
21  course in securities regulation.  I've
22  taught many courses dealing with, in one
23  way or the other, the economics of
24  financial markets which covered certain
25  aspects of securities regulation.  I've
```

D. R. Fischel

1
2 also written in that area as well.
3     Q.   And do you consider yourself an
4 expert on securities class action
5 litigation under Section 10b of the
6 Exchange Act?
7         MR. ORSINI: I object to form.
8         THE WITNESS:  It's really the
9 same answer as I just gave you.  I'm
10 not sure what you mean by that
11 question, whether you're asking me for
12 a legal opinion or some other kind of
13 opinion.
14     Q.   Well, you're here today as an
15 expert; right?
16     A.   I am.
17     Q.   What's your expertise?
18     A.   I have a number of areas of
19 expertise, but for purposes of this
20 course, I would say the economics of
21 financial markets.
22     Q.   Economics of financial markets.
23         And you've testified in a lot of
24 10b cases; is that right?
25     A.   That's I think fair.  I've

D. R. Fischel

1
2 testified in a lot of cases where there
3 are allegations under the anti-fraud
4 provisions of the securities laws.
5     Q.   So did you offer an opinion in
6 this case?
7     A.   Yes, I did.
8         MR. ROSEN: So let's introduce
9 Exhibit 113.  That's your expert
10 report, your opening expert report.
11         (Whereupon, a document entitled
12 Report of Daniel R. Fischel was marked
13 Exhibit 113 for identification.)
14     Q.   Tell me, is that expert report
15 your work?
16     A.   Well, I don't know what the
17 exhibit number is, but --
18     Q.   It's Exhibit 113.
19     A.   Well, if you're referring to my
20 report dated February 16, 2023, yes, I did
21 author this report.
22     Q.   Now, what opinions do you offer
23 in your report?
24     A.   They're stated on page ten in
25 paragraph nineteen.

D. R. Fischel

1
2         Do you want me to read them?
3     Q.   Well, let me see.
4         So paragraph nineteen contains
5 all of the opinions in the report?
6         MR. ORSINI: Objection.  Vague.
7         THE WITNESS:  I would say
8 they're my principal opinions in the
9 case.  There's a lot of paragraphs
10 that I guess you could say contain
11 opinions.
12     Q.   But that's a concise summary of
13 your opinions?
14     A.   Those are my principal opinions
15 in the case.
16     Q.   Now, did anyone assist you in
17 forming your opinions?
18     A.   I would say there was a team of
19 people who were working under my direction
20 and supervision who worked with me in the
21 case, but of course the opinions are my
22 own.
23     Q.   And how many people were on your
24 team?
25     A.   I would say the principal

D. R. Fischel

1
2 members of the team were maybe three or
3 four people.
4     Q.   And what are their names?
5     A.   You know, in no particular
6 order, I would say Jessica Mandel, Laura
7 Yergesheva, Jonathan Polonsky, and Alex
8 Rinaudo.
9     Q.   Alex, what's his last name?
10     A.   Rinaudo.
11         And there were research
12 assistants and other lower level
13 professionals as well who worked on the
14 matter.  But the people that I mentioned
15 were the people that I coordinated with
16 directly.
17     Q.   And what was Jessica Mandel's
18 role?
19     A.   What I just described, working
20 on the matter with me under my direction
21 and supervision.
22     Q.   Did all of them share the exact
23 same responsibilities, or did some have
24 responsibilities for certain aspects of
25 the opinion and others for different

D. R. Fischel

1
2 aspects of the opinion?
3    A.   I would say a fair description
4 would be they all worked on the case, all
5 aspects of the case with me.
6    Q.   And as part of your opinion, you
7 ran a regression analysis; is that right?
8    A.   That's right.
9    Q.   Who ran the regression analysis?
10    A.   Well, it's done by a computer,
11 so I'm not sure how to answer the
12 question.
13    Q.   Well, somebody hit the keys on
14 the computer and told it what to do;
15 right?
16    A.   Yes.  I'm not sure who actually
17 hit the keys on the computer.  The design
18 of the regression analysis was, as I said,
19 done by me under my -- with the assistance
20 of others working under my direction and
21 supervision.
22    Q.   So to run a regression, you need
23 a certain software package that has that
24 function in it; correct?
25    A.   Correct.

D. R. Fischel

1
2    Q.   What software package did you
3 use to run the regression?
4    A.   I'd have to check.
5    Q.   And what did you do to ensure
6 that the regression analysis was conducted
7 correctly by your team?
8    A.   It's a very standard type of
9 event study regression.  We do make an
10 attempt to check all of our findings from
11 the event study or otherwise, so I would
12 say that's what we did.
13    Q.   But what did you personally do
14 to check to make sure that your team ran
15 the regression properly?
16    A.   I gave direction as to what to
17 do, looked at the results, had the results
18 checked.
19    Q.   But you didn't personally check
20 the results to make sure they were
21 accurate?
22    A.   Not other than what I've already
23 described.
24    Q.   Now, as part of your regression
25 analysis, you also -- well, as part of

D. R. Fischel

1
2 your event study, you did an event study;
3 correct?
4    A.   Correct.
5    Q.   And as part of your event study,
6 there were a substantial number of news
7 articles that were identified and reviewed
8 to determine if there were news that might
9 cause the stock prices of these nine
10 affected stocks to move up or down;
11 correct?
12    A.   I'm sorry, can you repeat that
13 question?  I don't know what you mean by
14 "nonaffected stocks."
15    Q.   Nine.
16    A.   Nine, sorry, I misheard you.
17    Q.   I'll lay a proper foundation.
18       So this case involves nine
19 stocks that are traded publicly and they
20 are GameStop, AMC Entertainment, Bed, Bath
21 and Beyond, BlackBerry, Trivago, Tootsie
22 Roll, but you know the nine stocks I'm
23 talking about; right?
24    A.   I do.
25    Q.   Koss I think is another one.

D. R. Fischel

1
2       So as part of this -- of your
3 expert report and as part of the event
4 study, you searched for and identified and
5 reviewed a number of news articles during
6 the period that your event study covers;
7 right?
8    A.   That's right.
9    Q.   Now, who obtained the news
10 articles?
11    A.   The news articles were obtained
12 from the sources that were identified.
13    Q.   Do you know who on your team
14 obtained the news articles?
15    A.   Again, there's a data source
16 called Factiva and Bloomberg.  That's the
17 sources for the news articles.  What
18 research assistant presumably got those
19 articles from those sources I don't know
20 without asking.
21    Q.   And did you personally review
22 each of those news articles that were
23 obtained from Factiva and Bloomberg and
24 elsewhere?
25    A.   All of the news articles that

Page 14

D. R. Fischel

1
2 were referred to in my report I did look
3 at.
4     Q.   When you say referred to in your
5 report, is that every news article that
6 was obtained that was published about
7 these companies during the class period?
8     A.   I would say that it would be the
9 articles that fit the description in the
10 report from the sources that are referred
11 to.  There were instances where the same
12 article was published multiple times, so
13 it probably didn't include the duplicates.
14 But the basic idea was to have a certain
15 set of search criteria from a set of
16 sources and to be inclusive with respect
17 to those sources and the article contained
18 in those sources.
19     Q.   So let's go to paragraph
20 thirty-six of your report.
21         It says, "accordingly, we
22 searched news articles for mentions of
23 company names of the affected stocks in
24 the headline and lead paragraphs of Dow
25 Jones and Wall Street Journal articles, as

Page 15

D. R. Fischel

1
2 well as Bloomberg News for each of the
3 companies between January 4 and January 27
4 to determine whether any value-relevant
5 specific news was disclosed that could
6 have impacted the price of the affected
7 stocks on days when a statistically
8 significant price movement occurred".
9         So you wrote that paragraph;
10 correct?
11     A.   I don't remember if the exact
12 words in this paragraph were written by
13 me.  But as I've mentioned several times,
14 the entire report was prepared under my
15 direction and supervision.
16     Q.   And then it says, "we
17 supplemented the news articles searches by
18 also searching for any SEC filings for the
19 affected stocks' companies over the same
20 period".  And then it says, "This review
21 demonstrates that the vast majority of the
22 price increases for all nine affected
23 stocks cannot be explained by new
24 value-relevant company-specific
25 information".

Page 16

D. R. Fischel

1
2         So I guess the first question
3 is: Is it true that someone in your office
4 -- you can't say who as we sit here today
5 -- but someone at Compass Lexecon created
6 a set of news articles between January 4,
7 2021 and January 27, 2021 that had the
8 name of the nine affected stocks in the
9 headline or lead paragraphs; is that
10 right?
11         MR. ORSINI: When you say
12     "created", I assume you mean compiled?
13         MR. ROSEN: Right.
14         THE WITNESS:  I mean, if what
15     you're asking is what's said in the
16     sentence that you just read, I would
17     say correct.
18     Q.   Now, that collection of news
19 articles that was compiled, did you read
20 each article in that compilation of news
21 articles?
22     A.   I would say all or part of each
23 article that is referred to in the various
24 event studies for the different stocks,
25 and this paragraph only refers to the

Page 17

D. R. Fischel

1
2 articles in the event study, which is not
3 the sum total of all the articles.
4     Q.   Right.
5         So who went about to determine
6 which of these articles that were compiled
7 that you would actually review?  Because
8 someone actually did a first pass and
9 determined which ones were relevant and
10 which ones were not relevant; is that fair
11 to say?
12     A.   No, that's not fair to say.
13     Q.   So all of the articles from Dow
14 Jones, Wall Street Journal, Bloomberg, and
15 SEC filings you took a look at?
16     A.   The articles that are referred
17 to in this particular paragraph concluding
18 with appendix D, all the articles in
19 appendix D I looked at.
20     Q.   What about the articles that are
21 not in appendix D, did you look at those
22 articles?
23         MR. ORSINI: Objection.  Vague.
24         THE WITNESS:  Paragraph
25     thirty-six is for a particular

5 (Pages 14 - 17)

Page 18

D. R. Fischel

1
2     purpose.  There are other articles
3     that are referred to in the report
4     that are not contained in paragraph
5     thirty-six because they were compiled
6     for a different purpose.
7     Q.   So the articles in appendix D
8   are a small subset of the total number of
9   articles that were identified by your
10  staff as containing news about the nine
11  affected stocks; correct?
12    A.   Not really correct the way
13  you're phrasing the question.
14    Q.   Well, appendix D does not
15  contain the articles that were reported in
16  Wall Street Journal, Bloomberg, Dow Jones,
17  and SEC filings listed in paragraph
18  thirty-six; right?
19    A.   That's right.  There are a lot
20  of articles mentioned in the report that
21  are not contained in appendix D, because
22  appendix D was, as I've just said,
23  compiled for a particular purpose.
24    Q.   So explain how you narrowed the
25  articles, the number of articles, and the

Page 19

D. R. Fischel

1
2   specific articles from the greater set
3   from all the articles reported about the
4   nine affected stocks and those articles
5   you mentioned in appendix D, how did you
6   go from the larger subset to the smaller
7   subset?  How was that done?
8     A.   Well, at a high level I would
9   say appendix D was for the purpose of
10  listing articles which mentioned the name
11  of companies in connection with
12  information about those companies as
13  distinguished between -- as distinguished
14  from, I should say, articles about the
15  effect of perceived short squeezes or
16  other causes of -- other potential causes
17  of artificial prices.  Those articles are
18  discussed separately in the report but
19  would not be included in appendix D.
20        In addition, with respect to
21  appendix D itself, as I mentioned, there
22  were instances of just repetition of
23  articles -- the same article was repeated
24  multiple times.  We tried to only include
25  one mention as opposed to multiple

Page 20

D. R. Fischel

1
2   mentions of the exact same article.
3     Q.   So there's two sets of news
4   articles, a larger one and a smaller one;
5   correct?
6     A.   You have to be a little bit more
7   specific.
8     Q.   So let's -- there was a set of
9   news articles between January 4, 2021 and
10  January 27, 2021 that your staff collected
11  that either mentioned the one of the nine
12  affected stocks in the headline or
13  discussed it in the lead paragraphs;
14  correct?
15    A.   You're talking about appendix D?
16    Q.   No, it would be the third
17  sentence of paragraph thirty-six in your
18  report.
19    A.   The third sentence, the
20  "accordingly" sentence?
21    Q.   Yes.
22        So that is a larger set of news
23  articles that is in appendix D; correct?
24    A.   Well, in context, the sentence
25  refers to the articles in appendix D.  You

Page 21

D. R. Fischel

1
2   can see there are many other articles that
3   are discussed in the report that are not
4   contained in appendix D because they are
5   not articles about potentially
6   value-relevant company-specific news but
7   rather articles about the lack of
8   value-relevant -- potentially
9   value-relevant company-specific news,
10  rather the effective perceived short
11  squeezes or other potential causes of
12  artificial price movements.
13    Q.   Let's focus on the question.
14        The question is there is a
15  larger set of news articles that someone
16  on your staff compiled, in fact, I believe
17  you sent us a copy of them all.  If you
18  want, I can show them to you.  It would
19  make it easier.
20        But you will agree that someone
21  on your staff compiled a set of news
22  articles that contained the name of the
23  nine affected stocks either in the
24  headline or in the lead paragraph of the
25  news articles, correct, between January 4,

6 (Pages 18 - 21)

Page 22

D. R. Fischel

1
2 and January 27, 2021; right?
3    A.   Yes, I would agree with that.
4 But even the word "compiled" is a little
5 bit ambiguous.
6    Q.   So what did they do if they
7 didn't compile them?  They collected them?
8 What word would you like to use?
9    A.   They searched for articles
10 referred to in the headlines or lead
11 paragraphs of Dow Jones and the Wall
12 Street Journal as well as for certain --
13 as well as Bloomberg in certain specific
14 instances that were obtained from those
15 sources that I just mentioned.
16    Q.   And you didn't look at all those
17 news articles; correct?
18    A.   Again, as I've said, I looked at
19 all of the articles referred to in
20 appendix D as well as all of the articles
21 contained in the report.
22    Q.   Right.
23       I'm talking about what I just
24 asked you about, which is the greater
25 subset of news articles that were searched

Page 23

D. R. Fischel

1
2 for and identified by your staff about the
3 nine affected stocks that contained the
4 name of the nine affected stocks in either
5 the headline or the lead paragraph between
6 January 4 and January 27, 2021.  Let's
7 call that the greater set of news
8 articles.  We'll define that as the
9 greater set of news articles.
10       Are you with me?
11    A.   Yes, but I just want to make
12 sure -- because you're reading the
13 sentence out of context, you're no longer
14 referring to appendix D, you're just --
15    Q.   Exactly.  Thank you, thank you.
16 I'm not referring to Exhibit D.  I'm
17 referring to the greater set of news
18 articles that was compiled by your staff
19 about the nine affected stocks during this
20 period January 4 to January 27, 2021.
21       So you understand when I define
22 the greater set of news articles, you know
23 what I mean now; right?
24    A.   Yes, but you're taking the
25 sentence that you're reading out of

Page 24

D. R. Fischel

1
2 context.  That's the only point that I'm
3 making.
4    Q.   Did you personally review the
5 greater set of news articles?
6    A.   I attempted to review all of the
7 articles that fit the description that I
8 described that are contained in the report
9 that come from these sources.
10    Q.   So you did not review the
11 greater set of news articles; isn't that
12 true, Mr. Fischel?
13    A.   I'm not sure that is true, that
14 meet the criteria that I just described.
15    Q.   I'm not talking about your
16 criteria, I'm talking about my criteria,
17 I'm talking about my criteria because I'm
18 asking the questions.
19       I defined the greater set of
20 news articles to be the larger set of news
21 articles that contained the name of one of
22 the nine affected stocks in the lead
23 paragraph or in the headline between
24 January 4 and January 27, 2021.  We both
25 understand what the greater set of news

Page 25

D. R. Fischel

1
2 articles is; right?
3    A.   Well, I assume any article, the
4 way you're defining the question, any
5 article where the name of the company was
6 mentioned in the headline or the lead
7 paragraph, so in Dow Jones or Wall Street
8 Journal between January 4 and January 27,
9 whether or not it met the criteria of
10 appendix D.
11    Q.   Correct.
12       So understanding that, isn't it
13 true that you did not personally review
14 each of the articles in the greater set of
15 news articles that your staff compiled or
16 collected?
17    A.   I'm not sure it is true.  You'd
18 have to show me an article and I could
19 tell you if I remember reviewing it or not
20 reviewing it.
21    Q.   So which articles -- so when you
22 got -- at some point your staff gave you
23 some articles to review; right?
24    A.   Yes, by definition, that's
25 correct.

7 (Pages 22 - 25)

Page 26

```
1           D. R. Fischel
2    Q.   And isn't it true that the only
3 articles you reviewed were in appendix D?
4    A.   No, that's not correct.  That's
5 what I've been trying to explain to you.
6    Q.   So what different subset, if not
7 the greater set of news articles as
8 defined or appendix D, what other subset
9 of news articles did you review?
10   A.   There's a whole other set of
11 articles, many of which are described in
12 report, many of which were collected but
13 not described in the -- just let me finish
14 my answer, please -- that were not
15 potentially value-relevant articles about
16 the companies themselves but were the
17 impact of perceived short squeezes or
18 other causes of artificial price movements
19 in the particular securities in question.
20   Q.   Now, who went through the
21 greater set of news articles and
22 determined what was value-relevant?
23   A.   With respect to Exhibit -- the
24 articles on appendix D, there was an
25 attempt to identify every article that was
```

Page 27

```
1           D. R. Fischel
2 mentioned that was about the news about
3 the company in terms of either disclosures
4 by the company or SEC -- information from
5 SEC filings about the company other than
6 the articles which discussed the effect of
7 potential short squeezes or other
8 potential causes of artificial private
9 movements for those securities during the
10 particular period in question.
11   Q.   So who made this attempt to
12 identify every article that was mentioned
13 about the companies in terms of
14 disclosures by the SEC and SEC filings in
15 the articles?  Who did that first pass to
16 determine what was value-relevant?
17   A.   I didn't say they were
18 value-relevant, I said articles which
19 mentioned the name of the company other
20 than articles that talked about the effect
21 of potential short squeezes or other
22 possible causes of artificial price
23 movements that affected the prices of
24 these nine securities during the relevant
25 period, this period between January 4 and
```

Page 28

```
1           D. R. Fischel
2 January 27.
3    Q.   So someone on your staff went
4 through the greater set of news articles
5 and determined which articles to present
6 to you; isn't that correct?
7    A.   No, it's not correct.  All the
8 articles were presented to me and I
9 reviewed them all.
10   Q.   In the greater set?
11   A.   All the articles that are
12 contained in the report, whether or not
13 they're in Exhibit D -- excuse me,
14 appendix D, as well as many other articles
15 that were collected that are not in the
16 report because they just repeat the same
17 sentiments as the ones in the report.  So
18 for example, there are paragraphs that
19 talk about articles that are illustrative
20 of particular points.  The articles that
21 are illustrative of particular points are
22 a subset of the total number of articles
23 that make the point in that particular
24 paragraph, and those have been collected
25 as well.
```

Page 29

```
1           D. R. Fischel
2    Q.   So somebody on your staff went
3 through the greater set of articles and
4 determined which ones to give to you to
5 look at; is that correct?
6    A.   If you mean somebody or maybe
7 more than one person was responsible for
8 collecting the articles from the data
9 sources that were identified in the
10 report, I guess by definition that's
11 correct.
12   Q.   And they filtered those articles
13 and didn't give you all of the ones that
14 they identified and collected; correct?
15   A.   No, I don't think that is
16 correct.
17   Q.   So that means you read every
18 single article that was part of the
19 greater set of articles?  Either they
20 filtered it or you read them all.  One or
21 the other.  Which is it?
22   A.   I don't agree that those are the
23 only two possible choices.
24   Q.   If you didn't read all of them
25 and you only read some of them --
```

8 (Pages 26 - 29)

Page 30

D. R. Fischel

1
2    A.   I didn't say I only read some of
3  them.  I said if you think there's an
4  article that fit the criteria that you
5  think I didn't read, show it to you and
6  I'll tell you if I remember reading it or
7  not.
8    Q.   So what was the criteria of
9  articles that you read?
10   A.   I think I've gone over this
11 several times, but I'll say it again, the
12 articles in appendix D as well as a set of
13 other articles that mention the name of
14 companies but not in connection with
15 information that's potentially
16 value-relevant about those companies but
17 rather the effect of potential short
18 squeezes and other possible causes of
19 artificial price movements on those
20 companies as an explanation for why those
21 companies' stock prices were behaving the
22 way they were.
23   Q.   So who selected the articles
24 that you read?
25   A.   As I've also indicated several

Page 31

D. R. Fischel

1
2  times, the articles came from particular
3  data sources and those data sources are
4  part of data services that we subscribe to
5  and I assume one or more research
6  assistants downloaded the articles from
7  the sources that I've identified.
8    Q.   Did you read all of the articles
9  in the greater set of news articles?
10     MR. ORSINI: Objection.  Asked
11 and answered.
12     THE WITNESS:  I don't know how
13 to --
14   Q.   You can say yes or no.  Either
15 you read them all you didn't.
16     Did you read them all or did you
17 not read them all?
18   A.   I'll refer to answer the way --
19   Q.   No, no, it's a yes or no
20 question.
21     MR. ORSINI: He can answer the
22 question the way he sees fit.  He's
23 already answered multiple times.
24     But go ahead, Mr. Fischel.
25     THE WITNESS:  All of the

Page 32

D. R. Fischel

1
2  articles that are referred to in the
3  report as well as many articles that
4  are not referred to in the report I've
5  read.  If you think there are articles
6  that I didn't read, show them to me
7  and I'll tell you if I remember
8  reading them or not.  I'm not aware of
9  any search criteria that identified
10 articles other than what I've already
11 identified in terms of just articles
12 repeating the same point that comes
13 out in multiple news services or
14 something like that.
15   Q.   So based on your answer, it's
16 clear you did not read all of the articles
17 in the greater set of news articles that
18 were mentioned in paragraph thirty-six in
19 the third sentence?
20   A.   Well, now you're taking the
21 sentence out of context again with respect
22 to the articles that are referred to in
23 appendix D.  I tried to clarified that as
24 best I can multiple times.
25   Q.   Did you or did you not read all

Page 33

D. R. Fischel

1
2  of the articles; yes or no?  The answer is
3  no; correct?
4    A.   No, it's not correct.
5    Q.   You read all the articles, all
6  of the articles that mentioned one of the
7  nine affected stocks in the headline or
8  the lead paragraph; is that right?  Is
9  that what you're telling me?
10   A.   I'm telling you I looked at all
11 or parts of all the articles that are
12 referred to in appendix D as well as a
13 wide set of other articles collected for a
14 different purpose not mentioned in
15 appendix D.  I'm not aware of any set of
16 articles that I did not review that met
17 either of those criteria, but the only way
18 to know for sure is if you show me
19 whatever article you want me to look at
20 and I'll tell you if I remember reading it
21 or not reading it.
22   Q.   So is it your testimony that you
23 read every article that your staff
24 identified that mentioned one of the nine
25 affected stocks in the headline or lead

Page 34

D. R. Fischel

1        D. R. Fischel
2  paragraph during this period January 4 to
3  January 27, 2021?
4      A.   I really can't add anything to
5  what I've already said.
6      Q.   Yes or no.
7          MR. ORSINI: He's already
8      answered the question.
9          MR. ROSEN: No, he hasn't.  He's
10     avoiding the truth.
11     Q.   And now is the time for the
12 truth, Mr. Fischel.  Please tell the
13 truth.
14         MR. ORSINI: Let's let him ask a
15     question instead of pontificating.
16     Q.   I'll re-read it.
17         So is it your testimony that you
18 read every article that your staff
19 identified and mentioned -- identified
20 that mentioned one of the nine affected
21 stocks in the headline or lead paragraph
22 during this period January 4 to
23 January 27, 2021?
24         MR. ORSINI: Asked and answered.
25         THE WITNESS:  You want me to

Page 35

D. R. Fischel

1        D. R. Fischel
2      answer?  I'll just repeat what I've
3      said four times already.
4      Q.   You can answer yes or no.  Not
5  obfuscate, not make things up, just yes or
6  no?
7          MR. ORSINI: Stop with the
8      argument.  Ask a question.
9          MR. ROSEN: I've asked the
10     question.
11         MR. ORSINI: Mr. Fischel has
12     answered it multiple times already.
13     Q.   Give us a straight answer,
14 please.
15     A.   I've attempted to look at in
16 whole or in part every article that's
17 referred to in appendix D as well as
18 multiple articles that were collected for
19 a different purpose.  That's what I can
20 say.  I can't answer definitively whether
21 I've read or looked at every single
22 article without knowing what articles
23 there are that you think I might not have
24 looked at.  If you show them to me, I can
25 give you a more definitive answer if I

Page 36

D. R. Fischel

1        D. R. Fischel
2  remember looking at them or not, but I'm
3  not aware of any set of articles that I
4  did not review that met any of the
5  criteria that I've identified.
6      Q.   Do you know who Steven Grenadier
7  is?
8      A.   Yes, I do.
9      Q.   When is last time you spoke to
10 him?
11     A.   I spoke to him fairly recently,
12 actually, about an unrelated engagement.
13     Q.   You're aware that he's offered
14 an opinion in this case?
15     A.   I am aware of that.
16     Q.   Have you read his report?
17     A.   No.
18     Q.   Has anyone discussed his report
19 with you?
20     A.   It's been mentioned, but other
21 than that, I would say no.
22     Q.   Who mentioned it?
23     A.   I think -- oh, let me mention
24 another individual who was part of the
25 team, and your question reminded me.  Adel

Page 37

D. R. Fischel

1        D. R. Fischel
2  Turki.  He didn't work with me on a
3  day-to-day basis the way the others did,
4  but he was certainly involved in the
5  matter.  And I think he was the first one
6  that identified that Professor Grenadier
7  was also submitting an expert report.
8      Q.   Did he tell you what Grenadier
9  was including in his report?
10     A.   No, not that I recall.
11     Q.   Did your staff coordinate your
12 report with his staff?
13     A.   I don't believe so, no.
14     Q.   Have you ever purchased equity
15 securities?
16     A.   Ever?  You mean individual
17 stocks?  Not that I can remember.  I don't
18 think so.
19     Q.   Do you invest in mutual funds or
20 ETFs?
21     A.   I guess I would say indirectly,
22 yes, I do.
23     Q.   Indirectly in what respect?
24     A.   That I don't choose them.  Some
25 of my retirement accounts have had mutual

Page 38

```
1              D. R. Fischel
2  funds in them.
3      Q.   What are the allegations of
4  misconduct in this case?
5      A.   Well, my understanding of the
6  allegations are contained in my report.
7  Obviously they're not my allegations, so
8  it's really a question better addressed to
9  you than to me.   But my understanding of
10 the allegations is what's contained in my
11 report.
12     Q.   And do you know what the
13 elements of the claims in this case are?
14     A.   That sounds like a question
15 asking for a legal opinion.  I'm not
16 offering any legal opinions.
17     Q.   Now, in your report you
18 mentioned that there are other brokerage
19 firms that implemented restrictions on the
20 purchase or sale of the stocks or options
21 of one or more of the nine affected
22 stocks; is that correct?
23     A.   That's correct.
24     Q.   How did you come to identify the
25 names of those firms and the nature of the
```

Page 39

```
1              D. R. Fischel
2  restrictions and the timings of those
3  restrictions?
4      A.   From the sources that are
5  identified in my report.
6      Q.   And what did you do to check the
7  accuracy of those sources?
8      A.   I'm not sure we did anything to
9  check the accuracy of the sources.  If
10 you're referring to the introduction
11 basically, the background material, I
12 think that refers to my understanding of
13 the relevant background based on the
14 sources that are referred to in that
15 discussion in my report.
16     Q.   So on January 28, 2021, the
17 share prices of each of the nine affected
18 stocks declined; is that correct?
19     A.   Are you referring to something
20 specific?
21     Q.   The stock prices of the nine
22 affected stocks.
23     A.   I know that, but an exhibit or a
24 chart or something like that?  I haven't
25 memorized the stock price movements on
```

Page 40

```
1              D. R. Fischel
2  every minute of every day.
3      Q.   Are you familiar with your
4  report?
5      A.   I hope so.
6      Q.   So within it you say that the
7  share price declined for reasons other
8  than the restrictions placed by Robinhood;
9  right?
10     A.   Why don't you show me what
11 you're referring to.
12     Q.   So paragraph twenty-three of
13 your report, you assert that the affected
14 stocks experienced large price increases
15 during the preclass period; is that right?
16     A.   Yes, that's the first sentence
17 of the paragraph.
18     Q.   And do you have an opinion as to
19 what caused those price increases?
20     A.   I think I discuss that at length
21 in my report.  I think there was certainly
22 a perception of a short squeeze that was
23 occurring as well as intensive social
24 media speculation.  That combination is
25 based on the analysis that was conducted
```

Page 41

```
1              D. R. Fischel
2  contemporaneously at the time.  I think
3  that's the best explanation for the
4  extreme artificial price movements during
5  what I refer to as the preclass period.
6          MR. ORSINI: We've been going
7      over an hour.
8          Do you want to take a break or
9      do you want to go longer?  It's your
10     call.
11         THE WITNESS: I'm fine.  I'm
12     happy to go as long as convenient for
13     others.
14     Q.   So you said there was a
15 perception of a short squeeze?
16     A.   Correct.
17     Q.   Do you know whether or not there
18 was, in fact, a short squeeze for any of
19 the nine affected stocks?
20     A.   I don't have an independent
21 opinion about that.  I know there was
22 widespread commentary about the existence
23 of a short squeeze.
24     Q.   So you didn't take any steps to
25 confirm whether or not there was, in fact,
```

11 (Pages 38 - 41)

Page 42

D. R. Fischel

1
2 a short squeeze?
3    A.   As I said, I didn't form any
4 independent opinion about it other than
5 forming an opinion about the causes of the
6 artificial price movements.
7    Q.   What's your --
8    A.   Excuse me, during the preclass
9 period that I've identified.
10    Q.   You said you formed an opinion
11 about the cause of the artificial price
12 movements in the preclass period; is that
13 correct?
14    A.   That's right.
15    Q.   What is your opinion about the
16 cause of the artificial price movements in
17 the preclass period?
18    A.   What I said and what's discussed
19 extensively in my report, the perception
20 of a short squeeze combined with excessive
21 social media speculation.
22    Q.   Let's start with the short
23 squeeze.
24       So is it your opinion that, even
25 if there isn't a short squeeze, if there's

Page 43

D. R. Fischel

1
2 a perception of a short squeeze, that
3 would cause the price of the affected
4 stocks to increase?
5    A.   My opinion is not an opinion in
6 the abstract, it's an opinion based on the
7 materials that I've reviewed as described
8 in my report about the explanations that
9 were given for the extreme artificial
10 price movements during what I refer to as
11 the preclass period.
12    Q.   So are you answering my question
13 with a yes?
14    A.   I'm answering your question the
15 way I answered it.
16    Q.   Well, you didn't answer it.
17       Is it is it your opinion that,
18 even if there is not a short squeeze, if
19 there is merely a perception of a short
20 squeeze, that would cause the price of the
21 nine affected stocks to increase?
22       MR. ORSINI: Incomplete
23 hypothetical.
24       THE WITNESS:  Well, first of
25 all, I didn't say there was or there

Page 44

D. R. Fischel

1
2 wasn't.  I didn't say what would
3 happen if there wasn't a short
4 squeeze.  I just said that the
5 explanations given for the extreme
6 artificial price movements during what
7 I refer to as the preclass period were
8 the perception of the existence of a
9 short squeeze as well as excessive
10 social media speculation.
11    Q.   You used the term "artificial
12 price movements".
13       What makes a price movement
14 artificial?
15    A.   In this particular context, the
16 existence of extreme price movements that
17 are not linked in any way to changes in
18 information about the value of the --
19 fundamental value of any of the affected
20 companies and particularly price movements
21 that are understood to be not just
22 artificial but temporary precisely because
23 there is artificial.
24    Q.   Is it your opinion that because
25 the stock prices moved and there was not,

Page 45

D. R. Fischel

1
2 in your opinion, news that would affect
3 the fundamental value of the stocks, such
4 price movement is, by definition,
5 artificial?
6    A.   You know, that's too broad of a
7 statement.  I was referring to the
8 particular context of the facts and
9 circumstances of this case and in the
10 context of the facts and circumstances of
11 this case where certain stocks went up by
12 two thousand percent in a matter of weeks
13 without any value-relevant explanation for
14 those stocks -- for those stock price
15 movements combined with all of the
16 analysis and commentary that's contained
17 in my reports during the preclass period,
18 I would say that under those facts and
19 circumstances I would say that those price
20 movements were artificial and widely
21 understood to be such.
22    Q.   What does it mean to be
23 artificial?  There was a real price
24 movement; right?  It went from X dollars
25 to Y dollars.

12 (Pages 42 - 45)

Page 46

D. R. Fischel

1  
2        What makes it artificial?  
3    A.   What I just said, which is just  
4  a summary of what I've already described  
5  earlier and also described in my reports.  
6    Q.   The lack of value-relevant news,  
7  is that what makes it artificial?  
8    A.   I think, as I've just mentioned,  
9  my opinion is based on the facts and  
10 circumstances of this case, the extreme  
11 price movements in a very short period of  
12 time that were widely understood to be  
13 artificial and temporary as a product of a  
14 perceived short squeeze and excessive  
15 social media speculation.  
16   Q.   So you said there's two things  
17 that made the price movements artificial.  
18 One was the perceived short squeeze and  
19 the other was excessive media speculation;  
20 is that right?  
21   A.   No, that's not right.  
22   Q.   So the excessive social media  
23 speculation did not cause any artificial  
24 price movements in these nine affected  
25 stocks?

Page 47

D. R. Fischel

1  
2    A.   I didn't say that either.  
3    Q.   So what role did the perceived  
4  short squeeze have in the increase in  
5  these stocks in the preclass period?  
6    A.   It was widely attributed to be a  
7  cause of the extreme price movements.  
8    Q.   And is your opinion based on  
9  this wide attribution you're adopting as  
10 your opinion the attribution you found in  
11 the news media; is that right?  
12   A.   It's not just in the news media,  
13 but my opinions are what I've stated.  
14   Q.   But make any effort to determine  
15 what caused the prices of these stocks to  
16 increase in the preclass period?  
17   A.   Yes, the ones that I've  
18 described that are also contained in my  
19 report.  
20   Q.   So what efforts did you make to  
21 determine the cause of these price  
22 increases?  
23   A.   I analyzed all the publicly  
24 available information that I could find  
25 about the contemporaneous explanations for

Page 48

D. R. Fischel

1  
2  the extreme artificial price movements  
3  during the class period as well as some I  
4  guess you could say after-the-fact  
5  explanations as well.  
6    Q.   Now, you say there were -- there  
7  was excessive social media speculation  
8  about the nine affected stocks in the  
9  preclass period?  
10   A.   Correct.  
11   Q.   How do you define excessive  
12 social media speculation?  
13   A.   Again, the explanations that  
14 were given contemporaneously for what was  
15 responsible for the extreme artificial  
16 price movements during the period.  
17   Q.   But what social media  
18 speculation?  Can you give me an example  
19 of social media speculation?  
20   A.   I discuss the, for example, all  
21 of the commentary on social media sites  
22 such as Reddit about the possibility or  
23 the perceived short squeeze and the  
24 possible effect that had on prices and the  
25 ability of retail investors to take

Page 49

D. R. Fischel

1  
2  advantage of the position the short sale  
3  created by institutional investors.  
4    Q.   Did you review any of the  
5  postings on Reddit?  
6    A.   I saw some referred to.  I  
7  didn't make -- I did not make an attempt  
8  to review all the systematic -- I did not  
9  make a systematic review of all the  
10 commentary on Reddit.  
11   Q.   Did you review any specific  
12 postings on Reddit?  
13   A.   I saw some referred to in other  
14 documents that I referred to.  That's what  
15 I recall.  
16   Q.   So you saw Reddit postings  
17 referred to in other news articles?  
18   A.   Or other sources, correct.  
19   Q.   But you never actually read any  
20 Reddit postings yourself; is that correct?  
21   A.   Well, I read them when they were  
22 contained in other postings or other  
23 articles or other sources that I reviewed.  
24   Q.   What other sources are you  
25 referring to?

13 (Pages 46 - 49)

Page 50

```
1            D. R. Fischel
2      A.   I looked at a lot of pleadings,
3  briefs, court opinions, analyst reports
4  containing target prices.
5      Q.   So you --
6      A.   That's what I recall.
7      Q.   -- relied on other sources to
8  provide you with information about the
9  social media?
10     A.   Well, I wouldn't say that
11 exactly, just the existence of a
12 perception that what was going on in
13 social media was one of the drivers of the
14 artificial price movements.  I also cited
15 some academic studies that discussed the
16 role of social media in terms of how they
17 contribute to the existence of fads and
18 bubbles and artificial price movements.
19 That's also discussed in my report.
20     Q.   Is it your opinion that each of
21 the nine affected stocks were overvalued
22 as of the close of business on January 27,
23 2021?
24     A.   Well, I focused on -- I looked
25 at all nine.  I focused on seven more than
```

Page 51

```
1            D. R. Fischel
2  nine because of my understanding of the
3  claims in the case and it's my opinion
4  that certainly the seven and possibly the
5  nine as well experienced artificial price
6  movements for the reasons that I described
7  during the -- what I referred to as the
8  preclass period between January 4 and
9  January 27, 2021.
10     Q.   So just focusing on the seven,
11 the seven stocks that Dr. Werner found to
12 be efficient in the year prior to the
13 class period?  Is what the seven you're
14 talking about?
15     A.   Yes.
16     Q.   So focusing on the seven, is it
17 your opinion that those seven stocks were
18 overvalued as of the close of trading on
19 January 27, 2021?
20     A.   To the extent the definition of
21 "overvalued" means inflated by artificial
22 price movements particularly as a result
23 of the price movements on January 27, I
24 would say yes, that is my opinion.
25     Q.   And what was the true value for
```

Page 52

```
1            D. R. Fischel
2  each of those stocks on January 27, 2021,
3  if not the market price?
4      A.   Well, I would say one way to
5  analyze that question is to look at the
6  market prices subsequent to the class
7  period.  And I actually have an exhibit on
8  that in my report.  So I would say based
9  on the analysis that I've done, that would
10 be at least one estimate of a true value
11 on January 27, although that's not --
12 those prices in my report are not --
13 they're as of a later date and there may
14 be continued dissipation of article
15 Fischel inflation subsequent to that day.
16 But in terms of what I've analyzed, I
17 would say that is a good estimate subject
18 to those caveats of true value.
19     Q.   What is your analysis?
20     A.   I analyzed the relationship
21 between prices on January 27 and during
22 the class period and prices at the end of
23 the class period.  I have an exhibit about
24 that.
25     Q.   And which exhibit is that?
```

Page 53

```
1            D. R. Fischel
2      A.   I'm trying to find which report
3  it's in.  It's here somewhere.
4         I'm flipping pages too fast.
5  Sorry, I have to do this.
6      Q.   No worries.
7      A.   No wonder.  I was looking at
8  Grenadier's report.
9         It's table three on page fifteen
10 of my rebuttal report.
11     Q.   I was going to ask you about
12 this.  I might as well ask you about it
13 now?
14        MR. ORSINI:  To you want to mark
15 his rebuttal?
16        MR. ROSEN:  Sure.
17        We're going to mark the rebuttal
18 report as Exhibit 114.
19        (Whereupon, a document entitled
20 Rebuttal Report of Daniel R. Fischel
21 was marked Exhibit 114
22 for identification.)
23     Q.   So could you explain what
24 Exhibit 1 on page -- I'm sorry, table
25 three on page fifteen is in your rebuttal
```

14 (Pages 50 - 53)

Veritext Legal Solutions
212-279-9424          www.veritext.com          212-490-3430

Page 54

D. R. Fischel

1  report?
2      A.   It's a comparison of trading
3  prices during the class period measured in
4  a particular way versus the price
5  immediately after the class period again
6  measured a particular way.
7      Q.   So let's look at -- you're using
8  volume-weighted average price?
9      A.   That's right.
10     Q.   So it's the volume-weighted
11  average price as of what point in time?
12  First explain what a volume-weighted
13  average price is.
14     A.   It's a price weighted by volume.
15     Q.   For each trade in a day?
16     A.   Well, the volume-weighted price
17  per day is a statistic quoted by
18  Bloomberg.
19     Q.   So if there were a thousand
20  shares traded and half were at a dollar
21  and half were at $2, the volume-weighted
22  price would be $1.50?
23     A.   I assume so.  I'm not exactly
24  sure how Bloomberg calculates it, but it's

Page 55

D. R. Fischel

1  a data source that comes from Bloomberg.
2      Q.   So that's a daily price, an
3  average daily price, more or less; right?
4      A.   Weighted by volume.
5      Q.   Weighted by volume.
6          And then column one says class
7  period, so is that an average of the
8  volume-weighted average price for each day
9  during the class period?
10     A.   It's each day during the class
11  period weighted by volume.  In other
12  words, you have six different
13  volume-weighted prices for each day during
14  a class period and those days themselves
15  are then averaged based on volume during
16  the class period.
17     Q.   And then you have a February 5,
18  2021 price, and that's just the
19  volume-weighted average price for that
20  day; is that correct?
21     A.   That's correct.
22     Q.   And that's the day after the
23  class period; is that right?
24     A.   That's correct.

Page 56

D. R. Fischel

1      Q.   Now, what do you believe this
2  table shows then?  What inference are you
3  asking the reader to take from it?
4      A.   It's an indication going back to
5  paragraph twenty-six which really relates
6  to the question that you asked me a couple
7  of minutes ago about the difference
8  between the alleged damages -- alleged
9  model of Dr. Werner and the typical
10  securities case where -- I'm just now
11  paraphrasing paragraph twenty-six -- in
12  the typical securities case inflation is
13  measured as the difference between the
14  prices paid and the true value to
15  generalize at a very high level where the
16  true value is measured based on what the
17  price is absent the alleged wrongdoing.
18  But in this case, the alleged wrongdoing,
19  according to the plaintiffs as measured by
20  Dr. Werner, are the actions that occurred
21  during the class period.  So therefore,
22  one way to think about what the true value
23  is is what prices are when those alleged
24  wrongful activities cease, when they're no

Page 57

D. R. Fischel

1  longer occurring.  And based on that
2  analysis, you would look at the
3  relationship between the sale prices and
4  the price that existed subsequent to the
5  alleged wrongful activities and you would
6  conclude exactly the opposite of what Dr.
7  Werner concluded.
8          In other words, you wouldn't
9  measure damages by the difference between
10  the sale price and the highest inflated
11  price, which is what Dr. Werner does.  You
12  would instead measure damages or the
13  existence of damages by comparing the sale
14  price with a true value which in this case
15  is lower than the sale price and would
16  conclude there are no damages, and that's
17  really the point of the exhibit and this
18  particular paragraph.  And that conclusion
19  would be even stronger if you compared the
20  prices on February 5 with the price on
21  January 27, which is not on this exhibit
22  but it's on other exhibits that are
23  contained in my reports, and what you
24  would see was that the price on February 5

Page 58

D. R. Fischel

1 is dramatically lower than the price on
2 January 27. And for all the reasons that
3 I've stated, the price on February 5 is
4 much -- is a much better and a much closer
5 measure of true value than the maximum
6 artificial inflated price on January 27.
7    Q.   And the February 5 price is a
8 better estimate of true value because, in
9 your opinion, on February 5, when the last
10 of the restrictions was lifted, the prices
11 should have shot back up to the January 27
12 level?
13    A.   I don't believe they should have
14 shot back up, but I would say one test of
15 the validity of Plaintiffs' claim, if the
16 -- if Dr. Werner were correct and
17 Plaintiffs were correct that the price on
18 January 27 was the so-called true value of
19 the stocks and they were manipulated away
20 from its true value during the class
21 period is whether or not there was a
22 return to the January 27 price when the
23 alleged wrongful conduct was no longer
24 occurring. And what you observe is the

Page 59

D. R. Fischel

1 exact opposite which, in my opinion, is a
2 direct refutation of the plaintiffs' case
3 as well as the damage -- the so-called
4 damage model, which I describe as
5 incoherent presented by Dr. Werner.
6       THE WITNESS: This is a good time
7 for a break, if that's okay.
8       MR. ORSINI: Sure.
9       (Whereupon a break was taken)
10    Q.   So in your rebuttal report, we
11 were looking at that table on page
12 fifteen, I think it was, and -- table
13 three. And it shows that after
14 January 27, the prices declined, is that
15 right, for these nine stocks?
16    A.   Yes. As I said, I have other
17 exhibits which show that a little bit more
18 directly.
19    Q.   What exhibit would that be?
20    A.   That would be --
21    Q.   Table two?
22    A.   Let me just find it.
23    Q.   Page eight, table two of your
24 rebuttal?

Page 60

D. R. Fischel

1    A.   Yes, exactly.
2    Q.   So it shows the first column --
3 sorry, first row for January 28, 2021
4 matched against each column for each
5 stock, it shows the decline on that
6 specific day; is that right?
7    A.   It shows the residual decline.
8    Q.   And so AMC went down fifty-four
9 percent on January 28?
10    A.   Not the price but the product of
11 the regression analysis, there was a
12 decline by fifty-four percent.
13    Q.   It says total -- so the residual
14 return?
15    A.   That's right, went down by
16 fifty-four percent.
17    Q.   When you take out market factors
18 and industry factors, did you have an
19 industry index, I assume?
20    A.   Yeah.
21    Q.   So the residual decline,
22 firm-specific decline is fifty-four
23 percent for AMC?
24    A.   On January 28, that's correct.

Page 61

D. R. Fischel

1    Q.   Now, what caused that decline in
2 AMC stock on January 28?
3    A.   You know, I say in my report
4 that it's very hard to disentangle the
5 various possible causes of the decline.
6 First of all, there was a huge increase on
7 January 27 which is understood to be
8 temporary, so there's going to be some
9 decline at some point just by virtue of
10 the nature of a temporary artificial price
11 increase. In addition to that, there are
12 all the actions that I describe in the
13 background section of my report and one of
14 the criticisms that I have of Dr. Werner's
15 damage model and more generally whether
16 it's possible to have a common method to
17 analyze damages as all the different
18 potential causes of the stock price
19 decline. So that's what I would say.
20    Q.   So on table two, does that go
21 from closing prices on January 27 to
22 closing price on January 28; is that
23 right?
24    A.   Adjusted for market and industry

16 (Pages 58 - 61)

Page 62

D. R. Fischel

1
2 movements, correct.
3      Q.   Now, you said there were two
4 things that caused the price decline.
5          One was the temporary nature of
6 the price increase on January 27; is that
7 correct?
8          MR. ORSINI: I object to form.
9          THE WITNESS:  That's not exactly
10     what I said.
11     Q.   I just want to make sure I
12 understand it before I go further.
13         So what were the causes -- what
14 were the potential causes of the price
15 decline on February 28 for these stocks?
16     A.   I think that's what I just said.
17 There was going to be, in the absence of
18 any actions by anyone, there was going to
19 be some mean reversion at some point in
20 time, particularly in light of the
21 dramatic increase on residual return on
22 January 27.  I have another table that
23 shows that.
24         In addition to that, there was a
25 series of actions taken by different

Page 63

D. R. Fischel

1
2 economic actors that are described in the
3 background section of my report.
4      Q.   Any others besides those two?
5      A.   Well, to the extent that any
6 part of the decline is explained by market
7 and industry movements, but I wouldn't say
8 that would come close to explaining
9 declines in residual returns by fifty-four
10 percent, since that's the one you were
11 asking me about before the break.
12     Q.   Presumably these residual
13 returns have excluded the -- have taken
14 into account the market industry factors;
15 right?
16     A.   Right.
17     Q.   So we're left with this mean
18 reversion and the actions of third parties
19 and others; right?
20     A.   Correct.
21     Q.   So let's start with the mean
22 reversion.
23         Where in your report do you
24 describe this mean reversion or this
25 temporary nature of the stock prices on

Page 64

D. R. Fischel

1
2 January 27 that was bound to revert to a
3 mean?  Where is that described in your
4 report?
5      A.   I discuss several places in my
6 report where I discuss the fact that the
7 extreme artificial price movements that
8 occurred in what I referred to as the
9 preclass period were understood to be
10 temporary.  I also discuss academic
11 literature that discusses the temporary
12 nature of artificial price movements.  And
13 that's what I was referring to in my
14 previous answers.
15     Q.   Could you tell me what academic
16 literature supports your assertion that
17 the prices of these nine stocks were bound
18 to decline at some point?
19     A.   Well, the academic literature
20 doesn't discuss these nine stocks, it's a
21 more general discussion of the effect of,
22 in this case, artificial price increases.
23     Q.   Could you point me to where in
24 your report this literature is mentioned?
25     A.   (Reviewing).

Page 65

D. R. Fischel

1
2          Academic literature is discussed
3 in various places:  In paragraph
4 twenty-seven of my original report, in
5 footnote twenty-six of my rebuttal report,
6 paragraph twenty-one and footnote
7 thirty-one, thirty-two --
8      Q.   Say that again?  Footnote
9 twenty-six?  Which academic literature
10 talks about mean reversion of temporary
11 stock price inflation?  Which articles in
12 footnote twenty-six of your rebuttal
13 report are you referring to?
14     A.   The Ferrillo article talks about
15 the recommendations of authors to inspect
16 the affected stocks for bubbles and
17 overreactions.  It's Ferrillo, Dunbar, and
18 Tabak.  That's what I was referring to in
19 footnote twenty-six.
20     Q.   So you're telling me that
21 article states that if a stock price has
22 increased greatly because of speculation,
23 it will revert to its mean?
24     A.   That's not what I said.
25     Q.   Well, but you said that -- you

17 (Pages 62 - 65)

D. R. Fischel

1 did say that one of the reasons the stock
2 price declined was it was going to revert
3 to the mean, meaning it was inflated and
4 it was going to go back down to a lower
5 price just by the nature of the inflation?
6 Am I missing something?
7     A.   That's not a real accurate
8 characterization of what I said.
9     Q.   Why don't you explain it then.
10     A.   That fads and bubbles that are
11 characterized by overreactions are by
12 definition temporary.  That's what it
13 means to say there is a fad or a bubble.
14 That's what I meant.
15     Q.   And how temporary was this -- so
16 are you saying the stock price on
17 January 27, 2021 for these nine stocks
18 were a bubble?
19     A.   You could call them a bubble.
20     Q.   I'm asking what you call them.
21     A.   I call them what I said, extreme
22 price inflation resulting in artificial
23 prices which were widely understood to be
24 temporary and therefore were going to


D. R. Fischel

1 did say that one of the reasons the stock
2 price declined was it was going to revert
3 to the mean, meaning it was inflated and
4 it was going to go back down to a lower
5 price just by the nature of the inflation?
6 Am I missing something?
7     A.   That's not a real accurate
8 characterization of what I said.
9     Q.   Why don't you explain it then.
10     A.   That fads and bubbles that are
11 characterized by overreactions are by
12 definition temporary.  That's what it
13 means to say there is a fad or a bubble.
14 That's what I meant.
15     Q.   And how temporary was this -- so
16 are you saying the stock price on
17 January 27, 2021 for these nine stocks
18 were a bubble?
19     A.   You could call them a bubble.
20     Q.   I'm asking what you call them.
21     A.   I call them what I said, extreme
22 price inflation resulting in artificial
23 prices which were widely understood to be
24 temporary and therefore were going to

D. R. Fischel

1 decline at some point in time.
2     Q.   If there had not been any
3 restrictions imposed by Robinhood or any
4 other firm on the trading of these nine
5 affected securities, would -- is it your
6 opinion that the prices would have
7 declined anyway on January 28 through
8 February 4?
9     A.   That's too specific.  It's I
10 think impossible to know what would have
11 happened in a world that never occurred.
12 But because of the nature of the extreme
13 price increases, gains of two thousand
14 percent in a couple of week period for
15 some of the stocks with no connection to
16 any change in fundamental value, those
17 increases were understood to be temporary,
18 widely commented on to be temporary, so
19 that decline was going to occur inevitably
20 at some point in time.
21     Q.   It might have happened in a
22 week, it might have happened in a month;
23 right?
24     A.   I think there's no way to --

D. R. Fischel

1 because you're now asking a question about
2 trying to predict what would have happened
3 in a world which didn't exist, it's really
4 impossible to pinpoint the time where the
5 decline would have occurred other than
6 saying that it was widely understood that
7 the -- the increase was widely understood
8 to be artificial, temporary, and was sure
9 to decline at some point in time.
10     Q.   So do you have any opinion as to
11 when this inevitable decline for the nine
12 affected stocks would have occurred?
13     A.   No, that's just what I said.  No
14 specific opinion because there's no way to
15 know other than I guess you could say the
16 nature of these kinds of fads or bubbles
17 are inherently short term, so they don't
18 last forever.  But beyond that, once you
19 basically change the assumptions of what
20 happened in the real world to ask what
21 would have happened in a different world,
22 there's no way to know what could have
23 happened in a different world, other than
24 to say it was widely understood and

D. R. Fischel

1 commented upon about the price increases
2 were artificial and temporary.
3     And just to complete the answer
4 as I was describing before the break, the
5 level of prices subsequent to the time of
6 the alleged wrongful conduct, the fact
7 that they did not rebound and were below
8 the level of prices during the class
9 period is illustrative of the temporary
10 nature of the price increases to begin
11 with.
12     Q.   So let's talk about the second
13 potential cause of the stock price
14 declines on January 28 for these nine
15 affected stocks.
16     You said that -- in your report
17 in the background section, you mentioned
18 some of the actions taken by Robinhood and
19 third parties.  Let's see if we can
20 identify this.
21     Where in your report do you
22 describe the actions of firms other than
23 Robinhood that might have affected the
24 stock prices on January 28?

Page 70

D. R. Fischel

1
2    A.   Again, that's not really an
3 accurate description of what I said.  But
4 in response to where I discuss the actions
5 of third party actors in response to the
6 large increase in volatility and prices,
7 that's discussed in multiple paragraphs it
8 looks like beginning on paragraph ten.
9    Q.   So there was some trading halts,
10 according to you, on January 27 and
11 January 28.
12        Did these trading halts cause an
13 increase or a decrease in stock price of
14 these companies?
15        MR. ORSINI: Objection.
16        THE WITNESS:  I didn't
17    separately calculate if it's even
18    possible to separately calculate the
19    effect of those particular actions
20    versus all the other things that were
21    happening during these particular
22    days.
23    Q.   Well, so footnote sixteen says
24 NYSE halted trading in GME three times for
25 a total of fifteen minutes on January 27.

Page 71

D. R. Fischel

1
2        Did that cause an increase or a
3 decrease in the stock price?
4    A.   As I said, I didn't separately
5 perform any calculations of those specific
6 actions, recognizing that there are a lot
7 of other things going on even during those
8 minutes on January 27 and 28.
9    Q.   So is it your opinion the NYSE
10 trading halt on January 27 had an effect
11 on these nine stocks or it didn't have an
12 effect on the nine stocks' prices?
13    A.   My opinion is what's stated in
14 the report that these actions taken in
15 response to the perceived volatility in
16 price movements that were occurring in the
17 meme stocks during this period and prior
18 to this period in what I refer to as the
19 preclass period.
20    Q.   Do you have an opinion as to
21 whether the trading halts on January 27
22 did or did not on effect on any of the
23 nine affected stocks' prices?
24        MR. ORSINI: I object it form.
25        THE WITNESS:  I think I've

Page 72

D. R. Fischel

1
2 answered that to the best of my
3 ability.
4    Q.   And the answer is yes or no?
5    A.   The answer is I didn't perform
6 any separate calculation of those trading
7 halts.  And I think it's also important
8 that I'm not sure how confident one could
9 be in the conclusion because there was so
10 many other things going on during those
11 two days, including during those minutes
12 where the trading halts occurred.
13    Q.   And how about the trading halts
14 on January 28?  Do you have any opinion as
15 to whether those trading halts had any
16 effect on the prices of any of the nine
17 affected stocks?
18    A.   It's really the same answer
19 again.
20    Q.   And that answer is?
21    A.   That other than knowing that on
22 the twenty-eighth there were big declines
23 across the board in the nine stocks,
24 exactly what was responsible for those
25 declines, trying to disentangle the effect

Page 73

D. R. Fischel

1
2 of the mean reversion from the extreme
3 price increases, artificial price
4 increases on the twenty-seventh, the
5 actions of all the economic actors that
6 began to be imposed by all the different
7 economic actors that I describe in my
8 report, it's very hard if not impossible
9 to try and disentangle.
10    Q.   Do you have an opinion as to
11 whether or not the mean reversion was a
12 material cause of the stock price decline
13 to the affected stocks on January 28?
14    A.   Not that specifically for the
15 reasons that I already said, other than
16 that reversion was going to occur at some
17 point in time.
18    Q.   So you have no evidence that
19 that mean reversion was the cause of any
20 stock price declines for the nine affected
21 stocks on January 28?
22    A.   With respect to that specific
23 day, I don't think it's possible to
24 isolate in a factor from all the other
25 factors in the same way it's not possible

19 (Pages 70 - 73)

Page 74

1         D. R. Fischel
2 to isolate the effect of all of the
3 different economic actors versus all the
4 other things that were going on during
5 that period.
6     Q.   And I appreciate the difficulty
7 of isolating specific factors.  But let's
8 just focus on that one factor, mean
9 reversion that you mentioned.
10        Do you have any evidence at all
11 that mean reversion was a material cause
12 of any of the stock price declines for the
13 nine affected stocks on January 28?
14    A.   As I said, I don't have an
15 opinion about that specific day other than
16 the artificial price -- the extreme
17 artificial price increases were understood
18 to be temporary.  The most extreme price
19 increase occurred on January 27 across the
20 board, and that was understood to be
21 temporary, and so a decline was going to
22 occur at some point in time based upon the
23 general -- both the contemporary
24 literature as well as academic literature
25 in the short term.  But since you're

Page 75

1         D. R. Fischel
2 asking about something that's so specific
3 to one day, whether prices would have
4 continued to increase, whether they would
5 have decreased, whether they would have
6 decreased on the same day, on the same
7 days, by the same amounts, there's no way
8 to know precisely because there's so many
9 different factors that were occurring at
10 the same time.
11    Q.   Could you cite one piece of
12 evidence for the proposition that mean
13 reversion was responsible for any of the
14 share price declines for any of the nine
15 affected stocks during the class period?
16    A.   The evidence that I can cite is
17 what I've stated, that there was
18 widespread understanding both at the time
19 and in the academic literature that the
20 type of extreme price movements that
21 occurred where some stocks went up by two
22 thousand percent in a matter of weeks with
23 no change in the information about their
24 fundamental values is by definition
25 temporary, and those prices were not going

Page 76

1         D. R. Fischel
2 to persist because they were temporary.
3     Q.   So the evidence that the price
4 declines are related to mean reversion is
5 a, quote, widespread understanding in the
6 news media and academic literature?
7     A.   Exactly.
8     Q.   Anything else?
9     A.   Well, I think contemporaneous
10 discussions combined with academic
11 literature.  That's what I would say.
12    Q.   How would you define "extreme
13 social-driven media enthusiasm"?
14    A.   Well, the way I'm defining it is
15 -- in response to your earlier questions
16 of what the discussion was at the time of
17 the reasons for the extreme artificial
18 price movements as well as the -- again,
19 the academic literature that I also
20 discuss in my report that discusses the
21 role of social media in creating
22 artificial price movements in the form of
23 bubbles or fads.
24    Q.   So did you ever hear the term
25 "diamond hands"?

Page 77

1         D. R. Fischel
2     A.   Diamond hands?
3     Q.   Yes.
4     A.   No, I don't think I have, or at
5 least I don't remember it.
6     Q.   The social media enthusiasm for
7 the nine affected stocks, was that -- what
8 was that enthusiasm based on?
9     A.   Well, as I mentioned, what I'm
10 familiar with is the discussion of the
11 short squeeze or the perceived short
12 squeeze and the possible implications that
13 that has on investment opportunities for
14 retail investors.
15    Q.   Now, if somebody wants to go
16 long and squeeze short sellers, is that a
17 long-term investment or is that an
18 investment that has to be sold relatively
19 quickly in order to profit and not lose
20 money?
21        MR. ORSINI: I object to form.
22        THE WITNESS:  I'm not sure I
23    understand the question.  But in order
24    to profit, you have to sell at a
25    higher price than what you paid.  So

Page 78

D. R. Fischel

1
2    by definition, the horizon of the
3    investment has to be at an expectation
4    that you're going to be able to sell
5    at a higher price than what you paid,
6    assuming that -- if you're asking in
7    the abstract, assuming that you're
8    purchasing for investment purposes as
9    opposed to for diversification or some
10   other purpose.
11   Q.   Now, the people that you're
12   referring to who had extreme social
13   media-driven enthusiasm, are those retail
14   investors?
15   A.   I think the social
16   media-focused, at least my understanding
17   based on what I've reviewed, focused on
18   retail investors.
19   Q.   And did all of these retail
20   investors who are part of this social
21   media-driven enthusiasm, were they all
22   focused on making money as part of the
23   short squeeze?
24   A.   You'd have to ask them.  I don't
25   know.  I was commenting on the commentary

Page 79

D. R. Fischel

1
2    in social media, not on the motivations of
3    all retail investors, although I do think
4    some of the testimony by the class
5    representatives was, in my opinion, highly
6    revealing as to what their reasons were
7    for purchasing.
8    Q.   Is it possible that there were
9    many people who were part of this social
10   media enthusiasm who intended to hold the
11   nine affected stocks for the long-term as
12   an investment?
13   A.   You are you're asking me is it
14   possible?
15   Q.   Yes.
16   A.   I can't comment on what's
17   possible, only that in order to profit by
18   purchasing at a knowingly artificial
19   price, you have to expect that you're
20   going to be able to sell at an even more
21   -- an even higher artificially inflated
22   price.
23   Q.   Do you know whether or not there
24   was a large contingent of people active in
25   the social media who were purchasing and

Page 80

D. R. Fischel

1
2    advocating the purchase for the long-term
3    to hold and never sell?
4    A.   No, I don't.  I think all kinds
5    of things were being said on social media.
6    My focus was on the class members
7    specifically or the alleged class members.
8    Q.   You mean the class
9    representatives?
10   A.   The class representatives and
11   the class members.
12   Q.   Well, how do you know who the
13   class members are besides the people who
14   are part of our lawsuit?
15   A.   There's extended analysis of
16   that in my reports as to not who they were
17   by name but the timing of their investment
18   decisions.
19   Q.   Now, is it your opinion that the
20   people who were buying shares of the nine
21   affected stocks during the preclass period
22   that you defined were manipulating the
23   market for these stocks?
24   A.   My opinion is what I stated,
25   that -- in my report that they're going to

Page 81

D. R. Fischel

1
2    be members of the class who purchased at
3    artificial prices knowing that the prices
4    were artificial.
5    Q.   Did everyone who's a member of
6    the class purchase knowing the prices were
7    artificial?
8    A.   I don't have that opinion.  My
9    opinion is individualized inquiry is
10   required to distinguish between those
11   class members who purchased based on an
12   awareness of the existence of artificial
13   prices as several class members, in fact,
14   testified.  And with respect to those
15   investors, they did not purchase based on
16   a belief in the integrity of market prices
17   but rather an attempt to profit by the
18   lack of existence of an integrity of
19   market prices, as I state in my report.
20   Q.   And what questions would you ask
21   class members to determine whether or not
22   they relied on the integrity of the market
23   price when they purchased?
24   A.   Well, I'm not offering an
25   opinion on what questions to ask, but --

21 (Pages 78 - 81)

Page 82

D. R. Fischel

1
2    Q.    You said individual inquiry is
3 necessary.
4        What individual inquiry would
5 you make?  You say it's necessary so that
6 presupposes you know what those necessary
7 questions are.
8    A.    I guess I would ask the
9 questions that were asked -- if I were in
10 that business, which I'm not, I guess I
11 would ask the questions that were asked of
12 the class representatives to see if they
13 would give the same answers as the class
14 members whose answers I reviewed based on
15 their sworn testimony.
16    Q.    But what question -- what
17 evidence would show that someone did or
18 did not rely on the integrity of the
19 market price?
20    A.    As I said, I would think I would
21 copy the questions that were asked of the
22 class representatives in the testimony
23 that I reviewed because I thought those
24 answers were very revealing.
25    Q.    What answers are those?

Page 83

D. R. Fischel

1
2    A.    Well, I quote them in my report,
3 which I can find if you want me to.  And I
4 also saw --
5    Q.    What do they relate to?  Does it
6 relate to where they live?  What's the
7 issue that you think hinges on the
8 integrity -- their reliance on the
9 integrity of the market price?
10    A.    You know, I think the simplest
11 thing for me to do is to refer to the
12 testimony that I quoted which was not
13 based on where they live but rather based
14 on why they purchased, what they
15 understood when they purchased, and that
16 to me demonstrated, with respect to those
17 class members as well as an additional one
18 that I became aware of subsequent to the
19 time of my rebuttal report.
20    Q.    What does it mean to rely on the
21 integrity of the market price?
22    A.    It means that market prices
23 reflect the true value of the underlying
24 securities or an expectation that they do.
25    Q.    So to rely on the integrity of

Page 84

D. R. Fischel

1
2 the market prices, is it your testimony
3 that one has to believe that the
4 underlying market price is the true value
5 of the security?
6    A.    Or no reason to disbelieve it, I
7 guess is the -- I would phrase it that
8 way.
9    Q.    Why don't you rephrase it the
10 way you think it's correct.
11    A.    That there's no reason to
12 believe that prices are distorted by fraud
13 or misrepresentations or manipulations.
14    Q.    So I'll make sure --
15    A.    For example.
16    Q.    -- I have this right, to rely on
17 the integrity of the market price is to
18 have no reason to believe that prices are
19 distorted by fraud or misrepresentations
20 or manipulations?
21    A.    As an example, correct.
22    Q.    Can you think of any other
23 examples?
24    A.    You know, maybe depending upon
25 the context that the price is not

Page 85

D. R. Fischel

1
2 sufficiently liquid, to be confident that
3 the trading prices reflect fair market
4 value.  That's another example that comes
5 to mind.
6    Q.    So if -- as long as a purchaser
7 has no reason to believe that prices are
8 distorted by fraud, misrepresentation,
9 manipulation, or illiquidity, they rely on
10 the integrity of the market price; is that
11 a fair statement?
12    A.    No, I said those are examples of
13 situations where --
14    Q.    Well, let's just --
15    A.    Let me just finish.
16        Those are examples where
17 investors could, assuming that those
18 things did not -- were not expected to
19 distort market prices at the time of a
20 purchase, that would be -- those would be
21 examples of situations where investors
22 could rely on the integrity of market
23 prices.
24    Q.    Now, let's put this in the
25 context of our litigation here.

22 (Pages 82 - 85)

Page 86

D. R. Fischel

1
2  A.  Okay.
3  Q.  With Robinhood.
4      When you are evaluating a class
5  member's reliance on the integrity of the
6  market price here, besides
7  misrepresentations, fraud, manipulation,
8  or illiquidity, are there any other things
9  that could cause a class member not to
10 rely on the integrity of the market price
11 in this case?
12 A.  Well, again, I would just quote
13 the answers by the class representatives
14 that believe prices have increased because
15 of a short squeeze, believe that prices
16 have increased so far without a reason and
17 therefore are not expected to continue to
18 increase for fundamental reasons.  Those
19 are the things that come to mind based on
20 my recollection of the testimony of class
21 members.
22 Q.  And why does knowledge of a
23 short squeeze -- why does knowledge of a
24 short squeeze render a person's reliance
25 on the integrity of the market -- why does

Page 87

D. R. Fischel

1  it mean that they did not rely on the
2  integrity of the market if they have
3  knowledge of the short squeeze?
4  A.  Well, more generally if they
5  have knowledge of artificial prices, all
6  the massive amount of publicity to that
7  effect during the preclass period, what it
8  means is that prices are inflated for
9  those reasons and anybody who purchased at
10 a time when they know that prices are
11 inflated, then they are not purchasing
12 based on the integrity of the market
13 price, they're purchasing based on
14 speculation of how long artificial prices
15 are going to continue and whether they
16 will be able to profit from those
17 artificial prices by selling at an even
18 higher artificial price than the price
19 that they purchased, and that's why
20 individualized inquiry is necessary to
21 distinguish between class members like the
22 class representatives who testified to
23 what I just said versus other class
24 members who do not fall into that

Page 88

D. R. Fischel

1
2  category.
3      MR. ROSEN:  I'm going to
4  introduce a new exhibit.
5      (Whereupon, a Seeking Alpha
6  article dated February 1, 2021
7  was marked Exhibit 115
8  for identification.)
9  Q.  This is an article that you
10 mentioned in footnote sixty-four of your
11 opening report.
12 A.  Okay.
13 Q.  So paragraph twenty-eight in
14 your report, you offer the opinion that
15 artificial prices caused by short squeezes
16 are temporary and tend to be unrelated to
17 company news, performance, and prospects.
18 And then you quote a commentator and
19 there's a footnote.
20      Is this article introduced as
21 Exhibit 114 the basis for your opinion in
22 paragraph twenty-eight?
23 A.  Paragraph twenty-eight of my
24 opening report?
25 Q.  Yes.

Page 89

D. R. Fischel

1
2  A.  That's the article that's cited
3  at the end of the paragraph.
4  Q.  Do you have any other support
5  for the proposition that you make in
6  paragraph twenty-eight other than this
7  footnote sixty-four?
8  A.  Yes.  Squeezes are a form of
9  distorted market prices.  I should say
10 squeezes have the capability to create
11 distorted market prices and that's a
12 widespread understanding, that's not just
13 the product of this particular article.
14 Q.  And is it your opinion that, in
15 this case for these nine affected stocks,
16 there was a short squeeze that caused
17 these prices to go up?
18 A.  I think I've discussed that at
19 length earlier.  There was certainly a
20 perceived short squeeze, and even some of
21 the class representatives talked about
22 trying to profit from a short squeeze.  So
23 that's what I would say.
24 Q.  And is it your opinion that the
25 stock price declines for the nine affected

23 (Pages 86 - 89)

Page 90

1          D. R. Fischel
2 stocks during the class period was caused
3 in part by the dissipation or the end of
4 the short squeeze?
5     A.   I think I answered that again
6 already.  It's the existence of the
7 extreme artificial prices that was caused
8 in part by the perception of a short
9 squeeze that was by definition temporary
10 and therefore would result in those price
11 increases declining, which is exactly what
12 occurred.
13     Q.   So you're saying that prices
14 would decline even if there's a perception
15 of a short squeeze whether or not there
16 actually was a short squeeze?
17     A.   No, I'm not saying that.
18     Q.   Well, it says in paragraph
19 twenty-eight, "short squeezes typically
20 don't last long.  The average short
21 squeeze in this data set lasted
22 approximately twelve days".  And that
23 "when a short squeeze eventually exhausts
24 itself, the stock price declines by fifty
25 percent within the next three to four

Page 91

1          D. R. Fischel
2 days".
3          So why did you include that
4 information in your paragraph
5 twenty-eight?
6     A.   Because I think it was important
7 to highlight that artificial price
8 movements such as the ones that occurred
9 between January 4 and January 27,
10 particularly on January 27, are by nature
11 temporary, by definition temporary, and
12 widely understood to be such.  And that
13 was not only widely understood at the time
14 but also is something that's widely
15 understood in the academic literature.
16     Q.   So you want the court to make an
17 inference that the perceived short squeeze
18 as the cause of the price rise on the
19 twenty-seventh and also the decline on the
20 twenty-eighth; is that right?
21     A.   No, it's not exactly right.
22 First of all, I don't have any opinion
23 about wanting the court to make
24 inferences.  I have an opinion on what I
25 think occurred, which if asked I will

Page 92

1          D. R. Fischel
2 communicate at the appropriate time.
3     Q.   So did the termination of a
4 short squeeze cause stock prices to
5 decline on January 28, 29, or any other
6 day during the class period?
7     A.   I answered that question
8 multiple times.  I think there were a
9 combination of things that occurred,
10 various actions by different market actors
11 that I describe in my report, as well as
12 the inherent temporary nature of
13 artificial price movements in this
14 particular case where a perceived short
15 squeeze was one of the main reasons at the
16 time that was given to explain the extreme
17 price movements and volatility that
18 existed between January 4 and January 27,
19 particularly on the day of January 27.
20     Q.   I think my question was about
21 whether the termination of the short -- of
22 a short squeeze caused stock prices to
23 decline during the class period.
24          MR. ORSINI: That's not a
25     question, that's a statement.

Page 93

1          D. R. Fischel
2     Q.   And so I'll repeat the question
3 for you.
4          Did the termination of a short
5 squeeze cause stock prices to decline
6 during the class period?
7          MR. ORSINI: Asked and answered
8     repeatedly.
9          THE WITNESS: I'm just going to
10     repeat what I said multiple times.  I
11     think there are multiple factors that
12     occurred during the class period that
13     resulted in a decline, the actions of
14     a lot of economic actors plus the fact
15     that the price increases in the
16     preclass period were widely understood
17     to be temporary and were inevitably
18     going to dissipate over time.
19     Q.   You said there were multiple
20 factors that occurred during the class
21 period that resulted in the decline of
22 share prices.
23          True so far?
24     A.   Correct.
25     Q.   Let's list each factor.

24 (Pages 90 - 93)

Page 94

D. R. Fischel

1      A.  It's the actions by all the
2  different economic actors that I described
3  in my report, combined with the fact that
4  the price increases that occurred, the
5  artificial price increases that occurred
6  between January 4 and January 27,
7  particularly on the day of January 27 are
8  by definition were temporary or widely
9  understood to be temporary, widely
10 commented on to be temporary, and
11 therefore would inevitably dissipate over
12 time and over some relatively short
13 interval, as the article in paragraph
14 twenty-eight reflects.
15     Q.  Other than the article in
16 paragraph twenty-eight, can you cite any
17 specific evidence that the termination of
18 a short squeeze caused share prices to
19 decline during the class period?
20     MR. ORSINI: Mischaracterizes the
21 document, and it's been asked and
22 answered.
23     THE WITNESS:  I don't really
24 have anything to add to what I've

Page 95

D. R. Fischel

1  already said multiple times.
2      Q.  I guess that's a no.  All right.
3  You said that the prices of
4  these nine affected stocks was
5  artificially inflated as of January 27; is
6  that right?
7      A.  Yes, that's what I said,
8  particularly the seven that I focused on,
9  but really all nine.
10     Q.  What was the true value of those
11 prices on January 27?
12     MR. ORSINI: We're going in
13 circles here.  You've asked that
14 question three times.
15     THE WITNESS:  You know, I've
16 answered that as well.  As I said, I
17 didn't perform a specific calculation
18 as of January 27, but the price
19 subsequent to the end of the class
20 period when the -- all the alleged
21 wrongdoing ended is an indication of
22 the true value a couple of days
23 earlier on January 27.  Not a perfect
24 indication because there's remaining

Page 96

D. R. Fischel

1  artificial inflation that gets
2  dissipated over additional days, but
3  as a starting position, as a first
4  approximation those prices on
5  February 5 are a good initial
6  approximation of the true value on
7  January 27.
8      Q.  So Exhibit 115 is a Seeking
9  Alpha post by a guy Hugh Akston; is that
10 right?
11     A.  I'm looking at it on the screen,
12 a title of an article by Mr. Akston.
13     Q.  Well, it actually says Hugh
14 Akston Investments.
15     Do you know who wrote it?
16     A.  No, I don't, I just know what's
17 on the screen.  Unless the text of the
18 article which I don't have in front of me
19 says something additional to what's on the
20 screen.
21     Q.  Was this article published in
22 any academic journal or industry journal?
23     A.  I actually don't know what the
24 -- what Seeking Alpha, whether that's an

Page 97

D. R. Fischel

1  industry or academic journal.  I'd have to
2  look.
3      Q.  Did you make any effort to see
4  if Hugh Akston Investments is actually a
5  real money management firm?
6      A.  No, I didn't.  If I had it in
7  front of me, I might be able to tell you,
8  but I didn't make any independent
9  investigation of that.
10     Q.  Did the retail investors who
11 were active on social media, you know,
12 Reddit, Wall Street Bets, who were buying
13 these nine affected stocks during the
14 preclass period, did they manipulate the
15 stocks?
16     A.  Well, again, as I've indicated,
17 I'm not making a commentary on everyone in
18 the class.  My analysis focuses on the
19 existence of class members who suffered a
20 loss and for that to occur when they had
21 to purchase and the publicly available
22 information during the time of those
23 purchases coupled with the actual
24 testimony of several of the class members

Page 98

D. R. Fischel

1 all of which is described in my report.
2 And with respect to the
3 testimony, I would say that some of the
4 testimony indicates class members
5 attempting to profit from a manipulation
6 as opposed to themselves causing a
7 manipulation.
8 Q.   What was the manipulation?
9 A.   The perceived short squeeze.
10 Q.   So is it your opinion that, when
11 investors purchase stock in the hope of
12 causing it to go up or the hope that it
13 will go up because of there being great
14 short interest, that is manipulation?
15 MR. ORSINI: I object to form.
16 THE WITNESS:  I mean, I don't
17 know if that's meant to be a
18 characterization of my previous
19 answer, but if it is, it's not an
20 accurate one.  And the answer to your
21 question is no, I would not say that
22 by itself that's manipulation.
23 Q.   Well, you say that there was
24 testimony indicating class members

Page 99

D. R. Fischel

1 attempted to profit from the manipulation.
2 What manipulation are you
3 referring to?
4 A.   The testimony itself -- I think
5 rather than to continue to paraphrase it,
6 I'll find it and read it to you.
7 Q.   Please.
8 A.   Actually, can we take a
9 one-minute break?
10 MR. ORSINI: Why don't we break
11 for lunch.  It's been sitting out
12 there for a while.
13 (Lunch recess taken at 1:01
14 p.m.)

Page 100

D. R. Fischel

1 A F T E R N O O N    S E S S I O N
2 April 12, 2023
3 1:56 p.m.
4 D A N I E L  R.  F I S C H E L, having
5 been previously duly sworn by a
6 Notary Public of the State of
7 New York, upon being examined,
8 testified as follows:
9 EXAMINATION CONTINUED BY
10 MR. ROSEN:
11 Q.   Earlier you said that the prices
12 for the nine affected stocks were
13 overvalued or artificially inflated as of
14 January 27; is that correct?
15 A.   Yes, basically correct.
16 Overvalued in the sense that the price
17 movements between January 4 and January 27
18 and particularly on January 27 were
19 artificial price movements that were
20 widely understood to be temporary in
21 nature.
22 Q.   And you also said that people
23 purchasing during the preclass period
24 between January 4 and -- well, you said

Page 101

D. R. Fischel

1 people purchasing during the preclass
2 period were aware that the prices were
3 distorted or artificially inflated; is
4 that right?
5 A.   No, that's not right.
6 Q.   Well, what was the basis for
7 your statement that class members --
8 certain class members were not entitled to
9 a presumption that they relied on the
10 integrity of the market price?
11 A.   Because -- and just to be clear,
12 I was not making a statement about every
13 class member as your previous question
14 suggested -- but that if you look at the
15 timing of when investors had to purchase
16 in order to purchase at a loss, that a
17 significant percentage of class members
18 purchased during a time when there was
19 extensive commentary about the existence
20 of artificial prices because of a
21 perceived short squeeze and the excessive
22 social media speculation, and that was
23 confirmed, at least with respect to
24 several class representatives, by their

26 (Pages 98 - 101)

Page 102

D. R. Fischel

1
2   testimony which I quote in my rebuttal
3   report where they describe the reasons why
4   they purchased and what their expectations
5   were.
6       Q.   Is it your opinion that anyone
7   purchasing during the period January 4 to
8   January 27 should have been aware that the
9   prices were artificially inflated?
10      A.   No, it's not my testimony.
11      Q.   Is it your opinion that anyone
12  purchasing during the period January 23 to
13  January 27 should have been aware that the
14  prices were artificially inflated?
15      A.   No.  I don't express any opinion
16  on what investors should have been aware
17  of or should have done.  My only opinion
18  is that during the time when a significant
19  percentage of class members had to
20  purchase in order to sell at a loss, there
21  was extensive commentary and publicly
22  available information from multiple
23  sources about the existence of artificial
24  prices as confirmed by the testimony of
25  several of the class representatives and

Page 103

D. R. Fischel

1
2   therefore individualized inquiry is
3   necessary in order to determine which
4   class members relied on the integrity of
5   the market price and which class members
6   did not.
7       Q.   And why is it important in this
8   case that investors have relied on the
9   integrity of the market price when they
10  purchased their shares?
11          MR. ORSINI: Objection to the
12      extent it's calling for a legal
13      conclusion.
14          THE WITNESS:  I was going to say
15      the same thing.  If it's important,
16      the reason why it's important is
17      because a significant percentage of
18      class members purchased at a time when
19      there was extensive publicity from
20      multiple sources about the existence
21      of artificial prices and the temporary
22      nature of those artificial prices and
23      therefore, for those class members who
24      fit that description, the possibility
25      exists that those class members not

Page 104

D. R. Fischel

1
2   only purchased at a time of artificial
3   prices but purchased because of the
4   existence of artificial prices,
5   demonstrating that for those class
6   members, they did not rely on the
7   integrity of the market price as was
8   confirmed by the testimony that I
9   quote in my rebuttal report of several
10  of the class representatives.  And as
11  I said, there's another class member
12  whose testimony that I received after
13  the time of my rebuttal report which
14  where the testimony was basically the
15  same thing.
16      Q.   Now, would you agree that a
17  large number of the shares purchased in
18  the preclass period were purchased by high
19  frequency traders?
20      A.   I would neither agree nor
21  disagree with that statement.  I don't
22  know.
23      Q.   So do you know what high
24  frequency trading is?
25      A.   Yes, I do.

Page 105

D. R. Fischel

1
2       Q.   Do you know what program trading
3   is?
4       A.   Yes, I do.
5       Q.   What's program trading?
6       A.   It's algorithmic trading based
7   on the triggers derived from a program.
8       Q.   Isn't it true that a large
9   number of the world's largest financial
10  institutions engage in program trading in
11  stocks in the United States?
12      A.   You know, that's too broad of a
13  statement.  I wouldn't want to express an
14  opinion on that one way or the other
15  without studying the issue.
16      Q.   So you have no idea what portion
17  of the shares traded in the preclass
18  period for these nine affects stocks were
19  traded by high frequency traders?
20      A.   Correct, I don't have any
21  opinion on that one way or the other.
22      Q.   Now, would high frequency
23  traders be barred from relying on the
24  integrity of the market for some reason,
25  in your opinion?

27 (Pages 102 - 105)

Page 106

D. R. Fischel

1
2       MR. ORSINI: Objection. Vague.
3  To the extent it calls for a legal
4  conclusion.
5       THE WITNESS: I don't know what
6  that means. I'm not offering any
7  legal opinions on who is barred, to
8  use your phrase, from --
9  Q.   Relying on the integrity of the
10 market price.
11      You have an opinion on the
12 integrity of the market price in this
13 case; right?
14 A.   The opinion that I have is what
15 I repeated several times and it's stated
16 in my reports.
17 Q.   So that opinion does not impact
18 -- does not speak to whether or not high
19 frequency traders relied on the integrity
20 of the market price; correct?
21 A.   I don't know what you mean does
22 not speak to, but there's no separate
23 opinion I have about high frequency
24 traders.
25 Q.   So if somebody was engaged in

Page 107

D. R. Fischel

1
2  high frequency trading, would they have
3  relied on the integrity of the market
4  price or not?
5  A.   I don't think you know without
6  investigating the relevant facts and
7  circumstances.
8  Q.   So basically everybody in the
9  class you'd have to ask them if they
10 relied on the integrity of the market
11 price in order for them to get a
12 presumption of reliance; is that your
13 opinion?
14      MR. ORSINI: Objection.
15      THE WITNESS: That also sounds
16 like a legal question.
17 Q.   Well, you say everyone needs
18 individual inquiries; is that right?
19 A.   I said --
20 Q.   Yes or no, do we need individual
21 inquiry or not for this issue?
22      MR. ORSINI: What issue?
23      MR. ROSEN: Integrity of the
24 market price.
25      THE WITNESS: I think the issue

Page 108

D. R. Fischel

1
2  of -- under the facts and
3  circumstances of this case, the issue
4  of reliance on the integrity of the
5  market price cannot be determined on a
6  class-wide basis in light of the
7  economic evidence that I've reviewed
8  and I've described at length in my two
9  reports as well as the testimony of
10 the class representatives that I quote
11 in my report.
12 Q.   What about momentum traders? If
13 someone's a momentum trader and buying at
14 momentum AMC, GEM on January 26 of 2021,
15 are they relying on the integrity of the
16 market price or not?
17 A.   It would just depend on the
18 relevant facts and circumstances.
19 Q.   The relevant fact is a momentum
20 trader saw the stock price going up and
21 they said, oh, look, it's going up. I'm
22 going to buy it because I'm a momentum
23 trader.
24      Are they relying on the
25 integrity of the market price or not?

Page 109

D. R. Fischel

1
2  A.   I think it depends on the
3  relevant facts and circumstances. Are
4  they aware of all of the articles about
5  artificial prices and they're aware of the
6  -- they interpret the momentum in light of
7  that information, you know, just as one
8  question that occurs to me. I think it
9  would depend on the relevant facts and
10 circumstances.
11 Q.   So is it your opinion that
12 anybody who read the media news articles
13 that you cite as showing, quote,
14 artificial prices during the preclass
15 period did not rely on the integrity of
16 the market?
17 A.   That's not my opinion.
18 Q.   So someone could read these
19 media news articles that you cite as
20 indicating artificial prices and still
21 have relied on the integrity of the
22 market?
23 A.   You mean is that possible? Yes,
24 I think that's possible.
25 Q.   Under what circumstances would

28 (Pages 106 - 109)

Page 110

D. R. Fischel

1 it be possible?
2    A.   Whether a purchase was based on
3 the integrity of the market price as
4 opposed to trying to profit by the lack of
5 integrity of the market price, as was
6 testified to by the class representatives.
7    Q.   So if somebody was hoping the
8 price would go up because there was a
9 short squeeze, they were not relying on
10 the integrity of the market?
11    A.   I would say if somebody -- as
12 one of their class representatives
13 testified -- was aware that prices were
14 inflated because of a short squeeze and
15 hoped to profit by prices increasing
16 further because of the perceived short
17 squeeze or any other reason, I would say
18 they are not relying on the integrity of
19 the market price.
20    Q.   But if an investor was aware of
21 the short squeeze but didn't hope to
22 profit by it, they just wanted to buy the
23 stock because it was a momentum trade,
24 they would have relied on the integrity of

Page 111

D. R. Fischel

1 the market price?
2    A.   You'd have to examine the
3 relevant facts and circumstances.  If
4 somebody's aware but it has no influence
5 on their investment decision, that's a
6 different situation than the class
7 representative whose testimony I quoted.
8 And I keep paraphrasing the testimony, but
9 it's in footnotes fourteen and fifteen of
10 my rebuttal report where in footnote
11 fourteen the testimony is:  "I was banking
12 on there being a short squeeze.  Do you
13 mean like" -- question:  "Do you mean like
14 in your own investing you're assuming or
15 hoping that there was going to be a short
16 squeeze.
17       Answer: "Yes.
18       Question: "And you were going to
19 make a profit from that.
20       Answer: "I was hoping to, yes".
21       That to me -- that testimony is
22 inconsistent with a reliance on the
23 integrity of the market price.
24    Q.   Do you have any academic

Page 112

D. R. Fischel

1 literature that supports that?
2    A.   Yes, the fact that --
3    Q.   What's that?
4    A.   -- short squeezes cause a
5 distortion in prices that are temporary in
6 nature and therefore anybody who's
7 purchasing because of an attempt to profit
8 by the existence of artificial inflation
9 hoping that the artificial -- the
10 existence of artificial inflation not only
11 continues but increases in order to be
12 able to sell at a profit, that's
13 inconsistent with relying on the integrity
14 of the market price.  That's relying on a
15 distortion in the market price and hoping
16 that the distortion continues and, in
17 fact, increases.
18    Q.   Was there an illegal
19 manipulation of any of the nine affected
20 stocks in the preclass period?
21       MR. ORSINI: Calls for a legal
22 conclusion.
23       THE WITNESS:  That's a legal
24 opinion, and I don't have any legal

Page 113

D. R. Fischel

1 opinions on that or any other subject.
2    Q.   Do you have any evidence of any
3 manipulation of the prices of the nine
4 affected stocks in the preclass period?
5    A.   My preclass period, I have
6 evidence of a perception that the cause of
7 the artificial inflation was a perceived
8 short squeeze coupled with excessive
9 social media speculation about the
10 abilities created for retail investors by
11 the perceived short squeeze.  That's what
12 my opinions are.
13    Q.   And is the perceived short
14 squeeze and the excessive social media
15 speculation, are either of those
16 manipulation?
17       MR. ORSINI: I object to form.
18       THE WITNESS:  That's also a
19 legal opinion.
20    Q.   So you're not making the opinion
21 that the perceived short squeeze or the
22 excessive social media speculation are
23 manipulation; is that correct?
24       MR. ORSINI: I object to form.

29 (Pages 110 - 113)

Page 114

D. R. Fischel

1
2       THE WITNESS:  In terms of a
3   legal conclusion, that's correct.
4       Q.   How about as an economic
5   conclusion?
6       A.   Well, the existence of
7   manipulation is a legal concept.  So if
8   you're defining manipulation in terms of
9   whether prices were distorted,
10  artificially inflated --
11      Q.   No, the term "manipulation", I'm
12  not talking about distortion, I'm talking
13  about manipulation.  That was the term.
14      So are you offering any opinion,
15  whether it be economic, legal, or any
16  other form, are you offering any opinion
17  in this litigation as to whether the
18  perceived short squeeze or the excessive
19  social media speculation was a
20  manipulation?
21      MR. ORSINI: Objection.  Vague.
22      THE WITNESS:  Well, first of
23  all, the perception is not a
24  manipulation, a perception could be
25  based on and was attributed to a

Page 115

D. R. Fischel

1
2   perceived short squeeze.  Whether you
3   want to define a short squeeze or not
4   as a manipulation, particularly since
5   the concept of manipulation --
6       Q.   Well, that's the question.
7       Do you want to define it as a
8   manipulation?
9       A.   Excuse me, you have to let me
10  finish my answer.
11      A manipulation involves not just
12  an effect on prices but a certain intent
13  by the actors, you know, things that I
14  don't press an opinion about one way or
15  another, particularly since it's a legal
16  opinion.
17      Q.   So you're not offering any
18  opinion as to whether or not there was any
19  manipulation in the preclass period in
20  respect to the perceived short squeeze or
21  the excessive social media enthusiasm?
22      MR. ORSINI: Same objections.
23      THE WITNESS:  Correct, to the
24  extent you're asking me for a legal
25  opinion.

Page 116

D. R. Fischel

1
2       Q.   And what if I'm not asking you
3   for a legal opinion, then what?
4       A.   Then I would say that there was
5   a distortion in prices, a creation of
6   artificial -- extreme price movements and
7   volatility during the preclass period as I
8   define the preclass period was the product
9   of a perceived short squeeze and excessive
10  social media speculation that was by
11  definition and widely understood to be
12  artificial price movements that were
13  inherently temporary in nature.
14      Q.   You've written on stock market
15  manipulation; isn't that correct?
16      A.   I have.
17      Q.   And you've defined it, correct,
18  in your articles?
19      A.   I think you'd have to show me
20  what you're referring to, but I think it
21  would be more accurate to say I've
22  discussed the difficulty of defining it.
23      Q.   Are you able to define it?
24      A.   Again, it's a legal concept, and
25  I'm not offering any legal opinions.

Page 117

D. R. Fischel

1
2       Q.   Have you ever heard the term
3   "assumption of reliance on an efficient
4   market free of manipulation"?
5       A.   Have I ever heard that term?
6       Q.   Yes.
7       A.   That's not a term, it's a
8   phrase.  I don't know if I've ever come
9   across that phrase.
10      Q.   Do you know what it means?
11      A.   Well, just based on the ordinary
12  usage of the English language, I think I
13  know what it means.
14      Q.   And does it mean the same thing
15  as reliance on the integrity of the market
16  price in an efficient market?
17      A.   Not necessarily, no.
18      Q.   Do you offer any opinion in this
19  case as to whether Plaintiffs or the class
20  were entitled to an assumption of reliance
21  on an efficient market free of
22  manipulation?
23      A.   That sounds like a legal
24  opinion.  I'm not offering any legal
25  opinions one way or the other.

30 (Pages 114 - 117)

Page 118

D. R. Fischel

1
2    Q.    So do you know what the class
3  definition in this case is?
4    A.    My understanding of the class
5  definition is in my report.
6    Q.    And what would your
7  understanding be?
8    A.    I believe it's investors in the
9  nine stocks who held a position on
10 January 27 and sold at a loss during the
11 class period.  That's my understanding.
12   Q.    Do you offer any opinion as to
13 whether -- as to what investors relied on
14 in selling their shares during the class
15 period?
16   A.    No.  The only opinion that I
17 offer is the timing and prices of those
18 sales relative to the timing and prices of
19 purchases.
20   Q.    Do you offer any opinion as to
21 whether the restrictions imposed by
22 Robinhood in the purchase of the affected
23 securities induced or did not induce class
24 members to sell their shares during the
25 class period?

Page 119

D. R. Fischel

1
2    A.    I don't have any opinion on that
3  one way or the other.
4    Q.    So this being a seller's class,
5  why is the reason for the class members'
6  purchase relevant to this litigation?
7        MR. ORSINI: Objection to the
8    extent it's calling for a legal
9    conclusion.
10       THE WITNESS:  The reasons why I
11   think it's relevant is what I've been
12   describing in my answers to your
13   questions and explained at greater
14   length in my reports relevant for my
15   opinion, again not offering any legal
16   opinions as to what the court
17   ultimately determines is relevant or
18   not relevant.
19   Q.    Have you ever testified in a
20 stock market manipulation case before?
21       MR. ORSINI: At deposition,
22   trial, either?
23   Q.    In any form; submitted a report,
24 testified live.
25   A.    I've certainly testified in

Page 120

D. R. Fischel

1
2  manipulation cases involving futures
3  markets, and I've been a witness and I'm
4  currently a witness in cases involving
5  alleged manipulation in equity markets, I
6  mean apart from this case.
7    Q.    What's the current -- sorry, go
8  ahead.
9    A.    I'd have to check, actually,
10 look at my CV to the extent I could
11 remember every alleged cause of action.
12 The cases I'm confident without recalling
13 anything specific that some of the equity
14 market cases involved allegations of
15 manipulation.
16   Q.    What's the current case you're
17 working on that involves manipulation?
18   A.    I'm not going to disclose it.
19   Q.    Have you ever analyzed market
20 efficiency using the Cammer factors
21 before?
22   A.    Yes, I'm sure I have.
23   Q.    And is it your opinion that the
24 Cammer factors are a sound basis for
25 determining market efficiency?

Page 121

D. R. Fischel

1
2    A.    Again, without offering a legal
3  opinion, I think the extent to which
4  they're a sound factor in economic terms
5  can vary depending on the relevant facts
6  and circumstances.
7    Q.    So it depends on the case; is
8  that what your position is?
9    A.    On the facts and circumstances
10 of the case.
11   Q.    Did you analyze market
12 efficiency for these nine affected stocks
13 in this case?
14   A.    Yes, I did.
15   Q.    Did you use each of the five
16 Cammer factors for the nine stocks?
17   A.    Again, what I did is laid out in
18 my report, but I focused on the factor
19 that is -- I think I referred to all the
20 factors, but I focused on the factor
21 that's generally considered to be the most
22 important of the Cammer factors, the
23 relationship between information and price
24 movements.
25       MR. ROSEN: I'll ask you to take

31 (Pages 118 - 121)

Page 122

D. R. Fischel

1        D. R. Fischel
2 a look at a document here.
3        (Whereupon, a document entitled
4     In re Initial Public Offering
5     Securities Litigation was marked
6     Exhibit 116 for identification.)
7    Q.   So take a look at Exhibit 116.
8    A.   What do you want me to take a
9 look at?
10    Q.   Well, see if you recognize that
11 document.
12    A.   Well, I certainly recognize the
13 case, because I was an expert in the case.
14 I'm not sure I recognize this particular
15 document.
16    Q.   This is a decision by Judge
17 Scheindlin in the In Re IPO Securities
18 Litigation.  It's dated January 10, 2009.
19 It's published in the reporter 260 FRD 81,
20 Southern District of New York 2009.
21        So you were an expert witness in
22 that case?
23    A.   I was.
24    Q.   And that was a litigation
25 involving markets for three hundred nine

Page 123

1        D. R. Fischel
2 different IPOs; is that right?
3    A.   That's right.  I thought it was
4 three hundred six, but whatever the number
5 is, it was approximately three hundred
6 nine.
7    Q.   And in that case, did you
8 testify on behalf of the plaintiff class?
9    A.   I did, plaintiff classes.
10    Q.   And what issues did you testify
11 for them on?
12    A.   It's more than fifteen years
13 ago, so if you show me my testimony, I can
14 be able to remember more carefully.  But
15 as I sit here, it had something to do with
16 the pricing of initial public offerings
17 and what happened on the first day and
18 what happened over time in light of the
19 particular allegations in the case.  But
20 beyond that, I just don't recall.
21    Q.   If you go to page twenty-four of
22 the PDF document.
23        MR. ORSINI:  What's the page?  Is
24    it the page on the lower left-hand
25    corner?

Page 124

1        D. R. Fischel
2        MR. ROSEN:  Yes.
3    Q.   So that's where your name first
4 comes up in the document on page
5 twenty-four.  It's actually I think
6 ninety-seven of the reported decision but
7 twenty-four of the document.
8        And it says that "Plaintiffs
9 proffered Professor Daniel Fischel to
10 opine with respect to the efficiency of
11 the markets for six focus cases as
12 applicable to the three hundred three
13 nonfocus cases".
14        I guess question one is: Is it
15 true that you provided an opinion on
16 market efficiency for six of these three
17 hundred nine cases; is that right?
18    A.   It sounds right and the court is
19 saying that that's what I did, so I have
20 no reason to disagree.  As I said, I don't
21 have a career recollection of exactly what
22 my opinions were.
23    Q.   Have you ever had a case before
24 in which there were three hundred nine
25 different issuers' stocks being evaluated

Page 125

1        D. R. Fischel
2 for market efficiency?
3    A.   It's safe to say this was the
4 only case I've ever been involved in where
5 there were three hundred nine consolidated
6 cases.
7    Q.   Now, according to this opinion
8 -- not opinion, this decision -- well,
9 it's a judicial opinion, I suppose, it
10 says that you evaluated the market
11 efficiency of these stocks using the
12 Cammer factors; is that right?
13    A.   At least what I'm looking at, I
14 don't see where it says that.
15    Q.   Well, if you scroll down from
16 twenty-four to twenty-five to twenty-six
17 to twenty-six to twenty-seven, she
18 discusses your analysis of the Cammer
19 factors?
20    A.   That's possible.  I just don't
21 have that on the screen.
22        MR. ORSINI:  Where are you
23    referring to, page twenty-five?
24        MR. ROSEN:  Twenty-five to
25    twenty-nine, I guess.  I guess

32 (Pages 122 - 125)

Page 126

D. R. Fischel

1
2       twenty-five to thirty.
3           THE WITNESS:  Where the court's
4       addressing the criticisms by
5       Defendants' experts of my analysis; is
6       that what you're referring to?
7       Q.   She just goes through the Cammer
8   factors and your analysis of the Cammer
9   factors.  She cites your report.
10      A.   (Reviewing).
11          Okay.  I've read it.
12      Q.   So it's true that you used the
13  Cammer factors to analyze market
14  efficiency for these six focus stocks in
15  the IPO litigation?
16      A.   Yes.  I said I've done that more
17  than just this particular instance, but
18  that's what I did here as well.
19      Q.   Now, page thirty, they discuss
20  -- the judge in this decision discusses
21  incorporation of information into share
22  price, which is the fifth Cammer factor.
23          You're familiar with that;
24  right?
25      A.   I am.

Page 127

D. R. Fischel

1
2       Q.   Go to page thirty.
3       A.   I'm really bad at this, I
4   apologize.  It disappeared from the
5   screen.
6           MR. ORSINI:  That's impressive.
7       I think you closed out of it.  Good
8       thing you're better at finance and
9       economics theory.
10      Q.   Now, this fifth factor, this is
11  -- it says, "using event study
12  methodology, Fischel determined that the
13  focus case shares tended to react
14  significantly to unexpected corporate
15  events".  And then it says, "for each
16  focus case, Fischel listed examples where
17  unexpected information was released to the
18  public and the share price moved in a
19  statistically significant manner".
20          So you did an event study for
21  these focus cases; right?
22      A.   Yes, I'm sure I did.
23      Q.   And do you recall what process
24  you used to -- how you selected the events
25  and exactly how you went about it?

Page 128

D. R. Fischel

1
2       A.   No, I don't.
3       Q.   Then you go to the next page,
4   top of the next page, thirty-one.  It says
5   that "Defendants' expert submitted a
6   number of challenges to Fischel's
7   findings".
8       A.   I see that.
9       Q.   Those challenges were
10  unsuccessful; weren't they?
11      A.   I believe so.
12      Q.   And it says, "first they argued
13  that because Fischel analyzed share price
14  movements on a daily basis" -- let's keep
15  going.
16          So let's go to the one that's at
17  the bottom of page thirty-one where it
18  says, "second, Gompers, after examining
19  the twenty-eight days identified by
20  Fischel as having a statistically
21  significant price change for Sycamore,
22  concluded that the price moved without the
23  release of relevant new information
24  twenty-two of those days".
25          Now, Gompers is -- is it Paul

Page 129

D. R. Fischel

1
2   Gompers, Professor Paul Gompers?
3       A.   That's what it is.
4       Q.   He's at Harvard; right?
5       A.   He's at Harvard, yes.
6       Q.   So he was trying to point out
7   flaws in your analysis; is that right?
8       A.   Again, I really have no
9   recollection of this.  I'm just reading
10  what the court stated.
11      Q.   And it says that Gompers
12  examined the twenty-eight days identified
13  by you as having a statistically
14  significant price change for Sycamore and
15  concluded that the price moved without the
16  release of relevant new information on
17  twenty-two of those twenty-eight days;
18  right?  Do you see that?
19      A.   Yes, I see that.
20      Q.   And it says, "Fischel responded
21  that a conclusion of inefficiency does not
22  follow merely because significant share
23  price changes are not always explained by
24  known announcements".  And it says, "he
25  argued that most of the daily variation in

Page 130

D. R. Fischel

1  stock prices generally is unexplained by
2  market factors, industry factors, or
3  firm-specific news", and it cites footnote
4  one hundred eighty-three to an article by
5  Richard Roll called R Squared.
6      Do you see that?
7      A.  Yes, I see that.
8      Q.  Are you familiar with that Roll
9  article?
10     A.  Well, I haven't looked at it in
11 a long time, but it's a well-known
12 article, so I'm generally familiar with
13 it.
14     Q.  And is it -- so twenty-two
15 divided by twenty-eight, let's see what we
16 get, that equals 78.6.  So only 11.4
17 percent of the news days were explained by
18 firm-specific news for Sycamore; is that
19 correct?
20     A.  I don't know if it's correct.
21     Q.  Well, twenty-two divided by
22 twenty-eight --
23     A.  No, I'm not quarreling about the
24 arithmetic.  In other words, I can read

Page 131

D. R. Fischel

1  what the court says.  Exactly what my
2  analysis was and why I said it, it looks
3  like I was commenting on the low power of
4  R Squared typically and regression
5  analyses, meaning that the independent
6  variables generally have low explanatory
7  power in understanding stock price
8  movements.  That's what I infer from what
9  the court referred to as the authority
10 that I cited based on that Roll article.
11 Again, I don't have my testimony in front
12 of me.  I'm just looking at what you're
13 saying the court said.
14     MR. ROSEN: I'm going to show you
15     the Roll article.
16     (Whereupon, a Journal of Finance
17     article was marked Exhibit 117
18     for identification.)
19     Q.  This is an article by Richard
20 Roll titled -- in the Journal of Finance,
21 volume forty-three, issue three.
22     This is the article that you
23 cite or that the court asserts you cited
24 in your report in the IPO litigation; is

Page 132

D. R. Fischel

1  that right?
2      A.  Yes, this is the article that I
3  apparently cited based on the description
4  by the court.
5      Q.  Are you aware of any subsequent
6  academic literature that would render the
7  Roll article no longer reliable?
8      MR. ORSINI: I object to form.
9      THE WITNESS:  Well, I haven't
10     investigated that.  I mean, Professor
11     Roll is regarded as a distinguished
12     authority in finance and I myself,
13     after having conducted countless event
14     studies, have observed the same
15     patterns of R Squared's frequently
16     fairly low in their explanatory power
17     of the independent variables in the
18     regression.
19     But other than that, as I said,
20     I haven't done any study of the
21     findings, subsequent study of the
22     findings in this article.
23     Q.  If you go down to the bottom of
24 page thirty-two, other factors, so there's

Page 133

D. R. Fischel

1  a section on other factors and it looks
2  like you also evaluated for the market
3  efficiency study in the IPO litigation
4  what are called Krogman factors; is that
5  right?
6      A.  Maybe I'm looking at the wrong
7  page, but at least on the page that I'm
8  looking at I don't see that.
9      Q.  So you just looked at the
10 additional factors were market
11 capitalization and bid/ask spread; is that
12 right?
13     A.  Again, that's what's discussed
14 here in addition to the court's conclusion
15 that the prices -- that I showed that the
16 price of the focus stocks were generally
17 responsive to the release of information
18 throughout the class period.
19     Q.  Let's go to the loss causation
20 section, page thirty-seven.
21     So tell me when you get to the
22 section on loss causation.
23     A.  I have the first page of it.
24     Q.  Do you recall what the alleged

34 (Pages 130 - 133)

Page 134

D. R. Fischel

1
2 manipulation was in the IPO litigation?
3     A.   Only in the most general terms.
4 It dealt with the pricing of initial
5 public offerings and whether the
6 allegation was manipulation or something
7 else, I don't recall.
8     Q.   So if you go to the top of page
9 thirty-eight, there's a description of a
10 methodology that you used to demonstrate
11 loss causation.  That might refresh your
12 recollection a bit.
13     A.   All right.  I see where the
14 court describes my methodology.
15     Q.   So it says here, "Fischel's
16 second analysis seeks to demonstrate a
17 causal link between the tie-in agreements
18 and continued inflation in stock prices".
19         So does that refresh your
20 recollection as to the nature of the
21 manipulation alleged in this case?
22     A.   You know, in the most general
23 terms.  Again, manipulation is a legal
24 concept which it might be that's what the
25 allegation was.  I'm analyzing the

Page 135

D. R. Fischel

1
2 economic evidence.  I'm not focused on the
3 legal causes of action.
4     Q.   And it says that you proposed
5 two theories, the comparable index
6 approach and the event study procedure;
7 correct?
8     A.   That's what it says.
9     Q.   And what's the comparable index
10 approach; do you recall?
11     A.   Well, I have no recollection,
12 actually, other than what the court says
13 here, which appears to be quoting me that
14 it approximates what the returns on the
15 security would have been had the fraud not
16 occurred.
17     Q.   Have you ever used a comparable
18 index approach methodology in determining
19 loss causation damages in the last ten
20 years?
21     A.   I've used what could be called a
22 comparable index approach many times for
23 different reasons over the past ten years,
24 I would say.
25     Q.   Could you explain conceptually

Page 136

D. R. Fischel

1
2 how that works, that methodology?
3     A.   Again speaking at a high level
4 of generality because I'm not thinking of
5 application of any particular set of
6 relevant facts and circumstances, is if
7 you're trying to estimate what a price
8 would be independent of the act factor
9 that's affecting prices during the
10 particular period, one way of doing that
11 is to estimate what the price would have
12 been had it performed the same way as a
13 comparable industry index.
14     Q.   So you assumed that, during the
15 class period, it would have performed like
16 the index and been subject to market
17 forces and industry forces and you
18 excluded the company-specific events?
19     A.   I'm not sure I'd accept that
20 paraphrase.  You know what the price is
21 but you know what the price is in the
22 actual world because of a particular
23 factor or events and you're trying to
24 estimate what the price would be or would
25 have been in the absence of that factor or

Page 137

D. R. Fischel

1
2 event.  One way of doing that is to,
3 again, depending upon the relevant facts
4 and circumstances, is to calculate what
5 the price would have been in a but-for
6 world if the price had behaved the same
7 way that a comparable index behaved over
8 whatever period you're trying to measure.
9     Q.   The other methodology was the
10 event study methodology that's mentioned
11 there, event study procedure.
12         How would the event study
13 procedure be used to calculate loss
14 causation?
15     A.   Well, it looks like under the
16 facts and circumstances of the IPO
17 litigation -- which again I'm speaking
18 based on what the court says as opposed to
19 a distinct memory myself of what I did --
20 but the idea would be that, when you know
21 actual returns on days that are alleged to
22 be influenced by the alleged fraud,
23 substituting the predicted return on those
24 days based on a regression analysis for
25 the actual return and then just

35 (Pages 134 - 137)

Page 138

D. R. Fischel

1 calculating a true value line on that
2 basis.
3
4       MR. ROSEN: This will be
5 Exhibit 118. It's a report -- it
6 looks like a report that you authored
7 for this IPO litigation. It's dated
8 January 20, 2004 on the front. That
9 may or may not be the date it's
10 signed, I don't know, but that's the
11 date on the report.
12      (Whereupon, a document entitled
13 In re: Initial Public Offering Sec.
14 was marked Exhibit 118
15 for identification.)
16 Q.   Just take a look at it and tell
17 me if that's a report that you authored in
18 or about that time frame.
19 A.   It looks like it.
20 Q.   What was the purpose of this
21 report?
22 A.   I'd have to read it to know.
23 Q.   Paragraph seven says, "I have
24 been asked by counsel" --
25 A.   I see it.

Page 139

D. R. Fischel

1
2 Q.   It says that you were asked by
3 counsel for Plaintiffs to address various
4 issues concerns loss causation in the six
5 focus cases.
6 A.   For the limited purpose of class
7 certification analysis.
8 Q.   You should read the fine print.
9 A.   It's just a continuation of the
10 sentence. It's hardly fine print.
11 Q.   So you authored this report?
12 A.   I did.
13 Q.   So paragraph twelve, take a look
14 at paragraph twelve.
15 A.   (Reviewing).
16      Okay.
17 Q.   So it mentions that investors
18 who receive information that the value of
19 the security exceeds its current market
20 price will want to buy the security.
21      That's not controversial; right?
22 A.   Well, it's a very contested
23 case. Under the facts and circumstances
24 of the case, that was part of my opinion.
25 Q.   The next sentence,

Page 140

D. R. Fischel

1 "consequently, if market participants
2 observe strong demand for a stock by
3 investors as alleged in the instant cases,
4 market participants would likely infer
5 that purchasers have positive information
6 about the stock. This would cause market
7 participants to revise their expectations
8 about the value of the stock upwards,
9 causing the price to be higher than it
10 would otherwise be".
11 Q.   So is there any academic
12 literature that supports that proposition?
13 A.   At least on its face, that's
14 simply a statement that if market
15 participants believe that the value of a
16 stock is higher than its market price,
17 they're going to be, as a general
18 statement, inclined to purchase and the
19 context of the case, which is coming back
20 to me now as I'm looking at what you're
21 showing me is the allegation was that
22 there was an agreement between certain
23 underwriters to create false demand for
24 these particular stocks through tie-in

Page 141

D. R. Fischel

1 agreements where sophisticated investors
2 would agree to purchase the stocks at
3 particular prices and increase volume and
4 demand to create the impression for
5 uninformed investors that the informed
6 people in the market believe the stocks
7 were undervalued and that would
8 communicate information to other market
9 participants. As I think I said in the
10 earlier discussion, I just assumed that
11 alleged to be true based on the
12 allegations in the case and assuming it to
13 be true, tried to calculate the effect of
14 those agreements for purposes of loss
15 causation.
16 Q.   So you're just assuming --
17 you're saying that paragraph twelve, that
18 statement, "consequently, if market
19 participants observe strong demand for a
20 stock by investors as alleged in the
21 instant cases, market participants would
22 likely infer that purchasers have positive
23 information about the stock", so that an
24 assumption rather than an opinion?

36 (Pages 138 - 141)

Page 142

D. R. Fischel

1
2    A.   No, that's an opinion based on
3  the allegations, assuming the allegation
4  was true.
5    Q.   So let's go to paragraph
6  fifteen.
7    A.   Okay.
8    Q.   So that paragraph says that the
9  stock prices of issuers' shares would
10  continue to be inflated as long as the
11  false and misleading information generated
12  by Defendants' alleged misconduct
13  continued to influence issuers' share
14  prices; is that correct?
15    A.   That's what it says.
16    Q.   And it says, the last sentence
17  of that paragraph, "indeed, as I explain
18  more fully in part four below, the
19  economic evidence supports plaintiff's
20  claim that the artificial inflation
21  persisted through December 6, 2000 and
22  thereafter"; is that right?
23    A.   You're reading it correctly.
24    Q.   So just to short-circuit this,
25  if you go to paragraphs twenty-one and

Page 143

D. R. Fischel

1
2  twenty-two, the IPO of this -- like say
3  for example FirePond stock was in February
4  of 2000.  And it was your opinion that the
5  price for this stock was inflated,
6  artificially inflated for, I don't know,
7  ten months until December 6, 2000; is that
8  right?
9    A.   Well, I'm just reading the
10  paragraph, and it talks about how the
11  declines in FirePond's stock price are
12  consistent with the dissipation of some of
13  the inflation in the absence of any
14  corrective disclosure, although the
15  existence of the inflated prices
16  dissipated over time.  That's what the
17  paragraph says.
18    Q.   So then if you go to paragraph
19  twenty-seven, the heading in that section
20  is empirical evidence supports Plaintiff's
21  allegations of continued price inflation
22  in the six focus case stocks after
23  December 6, 2000.
24         So it looks like on December 6,
25  2000 there was a corrective disclosure in

Page 144

D. R. Fischel

1
2  the Wall Street Journal and you opine that
3  that corrective disclosure did not
4  dissipate all of the inflation, that there
5  continued to be inflation in the stock for
6  a longer period of time; is that correct?
7    A.   You know, again I don't
8  remember.  I'm just interpreting the
9  court's language here, which obviously
10  speaks for itself.  But it looks like I
11  concluded that on the assumption that
12  prices were inflated by the IPO pricing
13  with the combined alleged tie-in sales to
14  prop up the IPO price that the price
15  movements of the stocks discussed in these
16  paragraphs were consistent with the
17  existence of that artificial inflation and
18  notwithstanding the fact that there was a
19  Wall Street article -- Wall Street Journal
20  article on December 6, there were
21  subsequent investigations of Defendants'
22  alleged misconduct after December 6 by the
23  U.S. Attorney, by NASDAQ, and therefore
24  it's not correct to treat what occurred on
25  December 6 as a complete disclosure based

Page 145

D. R. Fischel

1
2  on the liability assumptions that I was
3  assuming, complete corrective disclosure.
4    Q.   You're familiar with the
5  efficient market hypothesis, I assume?
6    A.   I am.
7    Q.   Do you believe that the stock
8  market is efficient?
9    A.   I think that depends entirely on
10  the relevant facts and circumstances of
11  which stock over which time period, but I
12  think generally speaking, stocks traded on
13  organized exchanges such as the New York
14  Stock Exchange, it's reasonable to start
15  with an assumption that, absent contrary
16  evidence and obviously subject before
17  analysis, that those stocks are more
18  likely to trade in an efficient market.
19    Q.   Is it possible to manipulate the
20  stock of an issuer whose stock is traded
21  in an efficient market?
22    A.   Again putting aside whether
23  you're asking me for a legal opinion, but
24  if you're asking me is it possible for
25  prices for stocks that are otherwise

37 (Pages 142 - 145)

D. R. Fischel

1
2  traded in an efficient market, for those
3  prices to be distorted by conduct, yes,
4  that's absolutely possible.
5      Q.    What about stocks that are
6  traded in an inefficient market?  Can
7  those stocks be manipulated?
8      A.    The same answer about not
9  offering any legal opinions, but prices
10  that trade in an inefficient market, those
11  prices can be distorted, also.  It just
12  depends on the relevant facts and
13  circumstances.
14      Q.    What does it mean for prices to
15  be distorted?
16      A.    If, for example, there are false
17  representations about the value of the
18  security being traded, whether the
19  security is traded in an efficient market
20  or an inefficient market, that would be an
21  obvious example.
22      Q.    So the social media enthusiasm
23  that you referred to in your report, is
24  all of it related to a short squeeze or is
25  some of the enthusiasm unrelated to a

D. R. Fischel

1
2  short squeeze?
3      A.    You'd have to look.  As I said,
4  I didn't do a comprehensive analysis of
5  all the discussion on social media, but a
6  lot of it that I'm familiar with was about
7  the situation that institutional investors
8  were in because of the short squeeze
9  positions that they took and the
10  opportunities that that created for retail
11  investors.
12      Q.    What is the difference between a
13  stock's market price and its value?
14      A.    You have to have a definition of
15  what "value" means.
16      Q.    Do you have a definition of
17  "value" for a stock?
18      A.    Well, there's a general
19  definition of what a fair market value is,
20  a price between a willing buyer and a
21  willing seller where both have reasonably
22  complete information and neither is under
23  a compulsion to buy or sell.  That's a
24  generally accepted definition of fair
25  market value.  So under that definition,

D. R. Fischel

1
2  as long as those criteria are met, price
3  and value are the same.  There could also
4  be private information which suggests a
5  departure from price and value, at least
6  in the opinions of certain traders.
7          There's an economic literature
8  on the reasons why prices are efficient is
9  because of the consent attempt by market
10  participants, particularly sophisticated
11  market participants, to identify mispriced
12  securities so arbitrage opportunities are
13  eliminated in that process, creating the
14  existence of an efficient market.  But as
15  has been discussed in the economic
16  literature, it's something of a paradox,
17  meaning that, in order for markets to be
18  efficient, they can't be perfectly
19  efficient because if it's perfectly
20  efficient, then there's no incentive to
21  search and there has to be an incentive to
22  search, which is in other words a reward
23  for finding mispriced securities which is
24  what eliminates the existence of mispriced
25  securities because of the arbitrage

D. R. Fischel

1
2  opportunities that result.
3          MR. ROSEN: Why don't we take a
4  break.
5          (Whereupon a break was taken)
6      Q.    What are noise traders; do you
7  know?
8          MR. ORSINI: Sorry, did you say
9  "noise"?
10          MR. ROSEN: "Noise", yes.
11          THE WITNESS:  That's just -- I
12  don't know if there's a fixed
13  definition.  It's a term that's
14  usually used for uninformed traders.
15      Q.    Were the social media investors
16  in these nine stocks noise traders?
17      A.    As I said, I'm not sure there is
18  a fixed definition of what a noise trader
19  is.  And what the particular circumstance
20  for any trader is would depend on the
21  relevant facts and circumstances for that
22  trader.
23      Q.    Do you know what the term
24  "investor sentiment" means?
25      A.    I think that's similar, meaning

Page 150

D. R. Fischel

1
2 -- it means the sentiment of investors.
3 Other than that, I'm not sure how else it
4 could be defined.
5     Q.   In the academic literature, the
6 term "noise traders" is often used.
7         Are you familiar with that?
8     A.   Yes.
9     Q.   Now, in the academic literature,
10 is it understood that noise traders make
11 judgment errors in their investment?
12     A.   You know, you'd have to show me
13 what academic literature you're referring
14 to, whether you're talking about
15 individual traders or traders as a class.
16 And again, I'm not sure what academic
17 literature you're referring to.  If you
18 were doing any study of a particular
19 situation, it would depend on the relevant
20 facts and circumstances.
21     Q.   Why didn't you address the first
22 four Cammer factors in your opening
23 report?
24     A.   Because I didn't think they were
25 particularly relevant for the issues that

Page 151

D. R. Fischel

1
2 I was analyzing.  They weren't necessary
3 to my opinion.
4     Q.   Let's look at your event study.
5         It begins at paragraph
6 thirty-three of your opening report; is
7 that right?
8     A.   Was that a question, I'm sorry?
9     Q.   I was just saying that it looks
10 like your event study's described in your
11 report beginning at paragraph
12 thirty-three.
13     A.   That's the section of my report
14 that deals with whether the stocks during
15 the -- what I refer to as the preclass
16 period traded in an efficient market.
17     Q.   So we'll focus on the events in
18 the preclass period.
19         So did you do an event study on
20 just the preclass period or both the
21 preclass period and the class period?
22     A.   I did an event study in the
23 preclass period in my opening report and,
24 in light of what Dr. Werner stated, I also
25 did an event study of the class period in

Page 152

D. R. Fischel

1
2 my rebuttal report.
3     Q.   And why did you do an event
4 study of the class period in your rebuttal
5 report?
6     A.   Because Dr. Werner expressed an
7 opinion that the stocks during the class
8 period traded in an inefficient market
9 because of the alleged manipulation, and I
10 didn't think that was an accurate
11 characterization as I described in my
12 rebuttal report.
13     Q.   Why -- so you think that the --
14 well, what was inaccurate about it?
15     A.   I don't believe that the reasons
16 that the stocks traded in an inefficient
17 market was because of alleged wrongdoing
18 by the defendants, which was the basis of
19 Dr. Werner's opinion, as I discuss in my
20 rebuttal report.
21     Q.   So you believe that the stocks
22 traded in an inefficient market during the
23 class period, but not because of the
24 restrictions on the purchase of the
25 affected stocks?

Page 153

D. R. Fischel

1
2     A.   I believe the stocks traded in
3 an inefficient market during the class
4 period because they also fail factor five
5 of the Cammer factors, which is generally
6 regarded as the most important of all the
7 Cammer factors.
8     Q.   But if a stock is being
9 manipulated, wouldn't the normal test for
10 efficiency be affected by that
11 manipulation under certain circumstances?
12     A.   I mean, are you asking the
13 abstract or under the facts and
14 circumstances of this case?
15     Q.   Let's start with the abstract.
16     A.   I wouldn't say you could draw
17 that implication necessarily.  I think it
18 would depend on the facts and
19 circumstances again suggesting that I'm
20 giving a legal opinion on the meaning of
21 "manipulation".
22     Q.   Well, now that you mention it,
23 let's go to paragraph thirty-eight of your
24 opening report.
25     A.   Okay.

39 (Pages 150 - 153)

Page 154

D. R. Fischel

1
2     Q.   And the second sentence says --
3  well, the first sentence says, "as
4  described above, the prices of the
5  affected stocks increased dramatically and
6  artificially during the preclass period.
7  These artificial price increases were
8  widely recognized by market participants
9  as temporary market manipulations and/or
10 coordinated purchasing by retail traders
11 due to heightened commentary on social
12 media".
13        So was it your opinion that
14 there were temporary market manipulations
15 in the nine affected stocks during the
16 preclass period?
17    A.   That is my opinion as to the
18 reasons that were given and widely
19 recognized for the causes of the
20 artificial price movements during what I
21 refer to as the preclass period.
22    Q.   So what are the market
23 manipulations you're referring to there?
24    A.   Specifically the perceived
25 existence of short squeezes in multiple

Page 155

D. R. Fischel

1
2  stocks.
3     Q.   Anything else?
4     A.   With respect to the use of the
5  term "temporary market manipulations", it
6  says, "and/or coordinated purchasing by
7  retail traders due to heightened
8  commentary on social media".
9     Q.   Is it your opinion that
10 coordinated purchasing by retail traders
11 was market manipulation in this case?
12    A.   Again, that's asking for a legal
13 conclusion.  It's my view that that
14 contributed or was perceived to have
15 contributed to the extreme price increases
16 and extreme increase in volatility during
17 what I refer to as the preclass period.
18    Q.   But it's not your opinion that
19 coordinated purchasing is market
20 manipulation?
21    A.   Again, that's a legal
22 conclusion.  I'm not offering any legal
23 opinions one way or another, and I'm
24 certainly not suggesting that any
25 particular individual in the preclass

Page 156

D. R. Fischel

1
2  period satisfied all the legal
3  requirements for manipulation.  I'm not
4  expressing any legal opinions on any
5  subject.
6     Q.   The next sentence says, "absent
7  Robinhood's and other brokers' action,
8  there is no way to know in the but-for
9  word whether prices would have kept
10 rising, how long they would have remained
11 artificially high, and how quickly they
12 would have fallen to nonmanipulated
13 levels".
14        So is it your opinion that the
15 prices were at manipulated levels?
16    A.   It's my opinion that prices were
17 at artificial levels because of a
18 perception of the existence of short
19 squeezes, which is generally understood as
20 a type of manipulation, as well as the
21 effect of coordinated purchasing by retail
22 investors due to heightened commentary on
23 social media.
24    Q.   Let's go back to your event
25 study.

Page 157

D. R. Fischel

1
2        So to do your event study on the
3  preclass period for your opening report,
4  could you please list -- give me a
5  step-by-step process that you undertook to
6  do the event study?
7     A.   The step-by-step process which
8  is described in appendix C.
9     Q.   And which sentence is it that
10 you're referring to in appendix C?
11    A.   The entire first paragraph at
12 table one.  That's a step-by-step
13 description of --
14    Q.   So --
15    A.   A step-by-step description of
16 the event study that was used in this
17 case, the regression analysis that
18 produced the event study.
19    Q.   The third sentence of paragraph
20 one says, "this is typically done by one,
21 estimating historical relationship", et
22 cetera.
23        So when it says this is
24 typically done, are you saying this is
25 what was actually done?

40 (Pages 154 - 157)

Page 158

D. R. Fischel

1
2    A.   Yes.  If you keep reading in the
3  paragraph, that's exactly what it says.
4    Q.   So is it fair to say the first
5  thing you did in your event study is you
6  estimated the relationship between the
7  affected stocks' returns, the broad market
8  return, and the returns of various
9  industry indices?
10    A.   You establish a relationship
11  between the returns on a particular
12  security and the returns of the overall
13  market and industry index during a
14  particular period, you could call it a
15  control period, in this case for the one
16  hundred twenty trading days prior to
17  January 1, 2021 and then use that
18  relationship to generate predicted returns
19  during the forecast period and then
20  calculate the difference between the
21  actual returns and the predicted returns
22  and then analyze whether that difference
23  is large enough or not to be deemed
24  statistically significant so that it's
25  possible to reject the null hypothesis.

Page 159

D. R. Fischel

1
2    Q.   So first you did this regression
3  analysis and you determined which days
4  during the preclass period were
5  statistically significant -- had
6  statistically stock price movements and
7  which days didn't; is that correct?
8    A.   I'm sorry, I'm not sure it is
9  correct, the way you formulated the
10  question.
11        Can you repeat it?
12    Q.   So first you performed the
13  regression analysis and determined which
14  days during the preclass period were
15  statistically significant and which days
16  were not?
17    A.   But when you say first, that's
18  what's misleading about your question.
19    Q.   What did you do first?  If that
20  wasn't the first thing, what was the first
21  thing?
22    A.   You establish a relationship
23  between the movements of a particular
24  security and the movements of the overall
25  market and a particular industry index as

Page 160

D. R. Fischel

1
2  a separate independent variable during a
3  period, as I said, you could call it a
4  control period on an estimation period and
5  then use that to generate predicted
6  returns during the period in question, in
7  this case what I refer to as the preclass
8  period.
9    Q.   So I meant to subsume the
10  creation of the market index and the
11  industry index as part of the regression
12  analysis.
13        So first you have create your
14  market and industry index and estimated
15  returns and then you plug that into the
16  regression analysis; is that right?
17    A.   No, that's not right.
18    Q.   Well, tell me what's right.
19    A.   I'm going to repeat what I just
20  said.  First you establish a relationship,
21  which is not a manner of predicting
22  returns, you establish a relationship
23  between actual movements of the security
24  in question in relation to movements in
25  the overall market and movements in a

Page 161

D. R. Fischel

1
2  particular industry index.  And once you
3  have that relationship established, you
4  then use that relationship to generate
5  predicted returns during the forecast
6  period, which for purposes of my initial
7  report, was the preclass period.
8    Q.   And then what did you do?
9    A.   Then you can compare the
10  predicted returns with the actual returns.
11  And once you know what that difference is,
12  in light of the relationship that you've
13  calculated, you're able to determine
14  whether the difference between the actual
15  return and the predicted return is large
16  enough to be calculated -- is large enough
17  to be determined to be statistically
18  significant typically at the ninety-five
19  percent confidence level, which enables
20  you to reject the null hypothesis, meaning
21  that you could observe a difference
22  between the actual and predicted
23  relationship -- the actual and predicted
24  returns, excuse me, that large solely as a
25  result of chance less than five percent of

41 (Pages 158 - 161)

Page 162

D. R. Fischel

1 the time.
2    Q.   And did you do that?
3    A.   Yes, that's exactly what we did.
4    Q.   And then let's see if I've got
5 this right.
6         And the results of that is on
7 page twenty-three, Exhibit 3?
8    A.   Yes.
9    Q.   So once you got Exhibit 3 and
10 you understood which days were
11 statistically significant during the
12 preclass period and which days weren't,
13 then what did you do for your event study?
14    A.   Report all the different results
15 and calculate a total cumulative residual
16 return.
17    Q.   And then was that the completion
18 of your event study, just determining what
19 days were statistically significant and
20 what days weren't, or was there more to
21 it?
22    A.   Well, it's the percentage return
23 on every day for all the different stocks,
24 which days are statistically significant

Page 163

D. R. Fischel

1 for all the different stocks, and what the
2 cumulative -- the total cumulative
3 residual return is for all the different
4 stocks.
5    Q.   But then do you do some analysis
6 to determine whether the share prices for
7 these stocks move in response to news, or
8 you didn't do that?
9    A.   You know, that's the analysis in
10 appendix D.
11    Q.   Was that part of an event study,
12 your analysis in appendix D?
13    A.   An event study is the
14 relationship between events and prices.
15 The event study itself just tells you what
16 the stock price returns were in relation
17 to the predicted returns under a
18 particular model. It doesn't tell you
19 anything about events. What the purpose
20 of an event study is to study the
21 relationship between events and prices and
22 that's what was done in Exhibit D with
23 respect to information about particular
24 companies that was publicly disclosed

Page 164

D. R. Fischel

1 during the preclass period.
2    Q.   You said Exhibit D or was it
3 appendix D?
4    A.   Appendix D, I'm sorry.
5    Q.   Now, is the work in appendix D
6 here, is that what was commonly referred
7 to as the fifth Cammer factor analysis
8 whether stock prices are moving in
9 response to news?
10    A.   I would say Exhibit D in
11 relation to Exhibit 3 is something that
12 can be used to analyze factor five of the
13 Cammer factors.
14    Q.   Is that what you did?
15    A.   In part.
16    Q.   Which part?
17    A.   What's included on appendix D.
18    Q.   So is appendix D the analysis of
19 the fifth Cammer factor then, whether or
20 not it's responding to news?
21    A.   In part. There's also a
22 discussion in my report about all of the
23 disclosures by companies, price targets,
24 demonstrating that there was a lot of

Page 165

D. R. Fischel

1 economic evidence demonstrating that price
2 movements were not attributable to new
3 value-relevant information about companies
4 but were only explained by factors
5 unrelated to fundamentals about the
6 companies, especially the perception of
7 short squeezes and the excessive
8 discussion in social media about the
9 effect of the short squeeze position of
10 large institutional investors. I would
11 say all of that information on appendix D
12 as well as the other information discussed
13 in my report that I just described is all
14 relevant to the application of factor five
15 of the Cammer factors.
16    Q.   Now, is it true that before you
17 looked at any of the news, you first
18 determined which days during the preclass
19 period were statistically significant, had
20 statistically significant stock price
21 movements?
22    A.   No, that's not true.
23    Q.   So how did you determine which
24 days -- which news days to include in your

42 (Pages 162 - 165)

D. R. Fischel

1          D. R. Fischel
2 event study?
3     A.   Every day was included in the
4 event study in a particular period.  There
5 was no choice of days.
6     Q.   Is that how event studies are
7 normally done, you just look at every day
8 during a particular period?
9     A.   Again, every case depends on the
10 facts and circumstances of that case, but
11 typically I would say yes.
12    Q.   Isn't it highly biased to do the
13 event study the way you did it?
14    A.   It's not at all biased.  It's
15 completely routine and standard.
16    Q.   Really?
17        So isn't it true you identified
18 statistically significant days and then
19 went to see if there was news on those
20 days?  Isn't that what you did?
21    A.   No, I wouldn't say that's
22 exactly what we did.
23    Q.   Tell me what you did then.  Tell
24 me what you did.
25    A.   The model is a model to

1          D. R. Fischel
2 determine the existence of statistically
3 significant days.  You don't know the
4 existence of statistically significant
5 days by an I-know-it-when-I-see-it test.
6 You have to perform the statistical
7 analysis to know which days are
8 statistically significant.  That analysis
9 is done in a particular context, and the
10 particular context in this case depending
11 on whether you're looking at the preclass
12 period or the class period depends on what
13 you're trying to analyze.
14    Q.   So when you -- for example, on
15 January 4 it says there's no
16 company-specific news.
17        Did you make that determination
18 before or after you had determined which
19 days were statistically significant during
20 the preclass period?
21    A.   I'm trying to figure out the
22 best way to make it clear what we did.
23    Q.   Just tell the truth.
24    A.   Which is to pick a period of
25 days to analyze whether stock price

1          D. R. Fischel
2 movements over some period of days is --
3 which days were statistically significant
4 and which days were not.  And what
5 appendix D does is look at every day
6 during that period, whether the days were
7 statistically significant or not
8 statistically significant, and analyze
9 what potentially relevant firm-specific
10 information was disclosed on those days
11 based on the search criteria that we used
12 that are described in my report.
13    Q.   I'm going to give you a chance
14 to give me a yes or no answer here.
15        At the time you determined
16 whether news was value-relevant material
17 news for each of these days during the
18 preclass period, had you already
19 determined which days were statistically
20 significant?
21    A.   It's just not an accurate
22 description of --
23    Q.   You don't want to say yes or no?
24 You don't want to tell the truth?
25        MR. ORSINI: Okay.  Objection.

1          D. R. Fischel
2        Argumentative.
3     Q.   I'm asking did you know when you
4 determined which days had value-relevant
5 news, did you or did you not know whether
6 the stock price had had a statistically
7 significant move that day.
8     A.   The analysis with respect to
9 publicly available news had nothing to do
10 whether stocks were -- whether movement of
11 stocks was statistically significant on
12 any particular day.  It was an analysis of
13 every day during a particular period.  You
14 don't know whether stock prices are
15 statistically significant until you
16 perform the statistical model, but you can
17 analyze whether information was publicly
18 disclosed on every day whether or not
19 stock price movements were statistically
20 significant, and that's exactly what we
21 did.
22    Q.   Do you deny having knowledge of
23 whether a day was statistically
24 significant or not at the time you made
25 the determination whether or not there was

43 (Pages 166 - 169)

Page 170

D. R. Fischel

1 value-relevant news that day?
2
3     A.   Yes, I deny that.  One thing has
4 nothing to do with the other.  The
5 existence of statistically significant
6 price movements did not determine or
7 affect what days we looked for publicly
8 available news.
9     Q.   You're not answering the
10 question.  You just avoided the question.
11         I didn't ask the question
12 whether it determined, I asked whether you
13 had knowledge of whether a day's stock
14 price movement was statistically
15 significant or not at the time you made
16 the determination that there was or there
17 was not value-relevant news, and you said
18 you're not answering the question.  And
19 it's quite obvious from your report that
20 you had knowledge of whether the stock
21 price move what is statistically
22 significant or not at the time you
23 determined whether there was
24 value-relevant news.  So you can either
25 own up to it or obfuscate.

Page 171

D. R. Fischel

1
2         So what would you prefer to do?
3         MR. ORSINI: That's not a real
4     question.
5         Ask a question and he'll answer
6     it.
7     Q.   So who went through and
8 determined whether there was
9 value-relevant company-specific news in
10 appendix D?  Who did that?  Whose job was
11 that?
12         MR. ORSINI: We covered that this
13     morning.
14         THE WITNESS:  I think one or
15     more research assistants attempted to
16     find every single firm-specific
17     announcement or SEC announcement --
18     information contained in an SEC filing
19     that was publicly disclosed for every
20     stock on every day.
21     Q.   Did I ask find?  I didn't use
22 the word "find".  I said who determined
23 whether it was value-relevant.
24     A.   I just told you one or more
25 research assistants.

Page 172

D. R. Fischel

1
2     Q.   So you didn't determine whether
3 news was value-relevant?
4     A.   There was no determination
5 whether the news was, in a fact,
6 value-relevant.  It was every disclosure
7 that identified a particular firm, that's
8 what's listed in appendix D.
9     Q.   So you're telling me appendix D
10 lists every news article about every firm?
11     A.   Every news article putting aside
12 repetitions of the same article other than
13 articles which attribute price movements
14 not to firm-specific announcements about
15 the firms but rather -- the lack of
16 firm-specific announcements but rather the
17 existence of artificial prices caused by a
18 perceived short squeeze or excessive
19 social media discussion about the effect
20 of the short position of institutional
21 investors in terms of opportunities for
22 retail investors.
23     Q.   Isn't it true that to do a
24 proper event study, one should select the
25 event or events to be studied before

Page 173

D. R. Fischel

1
2 determining whether or not there was a
3 statistically significant stock price
4 movement on the date of the events?
5     A.   It's true that you have to
6 select a period of time that you want to
7 analyze, so that's true.  In other words,
8 the event study doesn't analyze a random
9 time.  There's a period of time that's
10 connected to the facts and circumstances
11 of what you want to analyze and you try
12 and conduct a regression analysis based on
13 a statistical model that's responsive to
14 the period that you want to analyze.
15     Q.   So if I wanted to do an event
16 study over a period of a year, I would
17 look at every trading -- I was first
18 statistically do an analysis and determine
19 which days were statistically significant
20 and then I would look at the news for each
21 day and determine whether there's
22 value-relevant news?
23     A.   That's completely wrong.
24     Q.   But isn't that what you did
25 here?

44 (Pages 170 - 173)

Page 174

D. R. Fischel

1
2  A.   No.
3  Q.   Didn't you do a regression
4  analysis and determine which days were
5  statistically significant for each day
6  during this time frame for the preclass
7  period?
8  A.   Yes, but that's a product of the
9  statistical analysis which is very
10 different from the description of it that
11 you had in your previous question.
12 Q.   So once you knew which days were
13 statistically significant, you then looked
14 to see if there was news that could be
15 considered value-relevant; is that
16 correct?
17        MR. ORSINI: Asked and answered.
18        THE WITNESS: No, that's not
19    correct.  We looked for news on every
20    day, whether or not the result was
21    statistically significant.
22 Q.   So when you went to look for
23 news on every day to see if there was any
24 value-relevant news, you had already
25 determined which days were statistically

Page 175

D. R. Fischel

1
2  significant; correct?
3  A.   No, the two analyses that I'm
4  trying to describe to you are completely
5  separate.
6  Q.   Well, which happens first
7  chronologically?
8  A.   I think they happened
9  simultaneously, as they typically do.
10 Q.   Simultaneously?
11 A.   Yes, I think a statistical model
12 does not tell you anything about events.
13 So if you want to analyze events during a
14 particular period, that's a completely
15 different search than the process of
16 calculating a statistical analysis of
17 stock price movements.
18 Q.   Now, who is the person who
19 determined whether there was
20 value-relevant news on each day during the
21 preclass period?
22 A.   You know, as I've stated, the
23 analysis isn't attempting to filter which
24 days are value-relevant, it's attempting
25 to report all news articles that satisfy

Page 176

D. R. Fischel

1
2  certain criteria for a certain search
3  based on particular sources and
4  information.
5  Q.   Let's start, page D1, your
6  report.
7  A.   Page D1 of my report.  Let me
8  just find it.
9        I have it.
10 Q.   The first row, January 4, 2021,
11 this shows whether there was the abnormal
12 return and the T statistic, and then it
13 shows company-specific news.
14        Who determined whether or not
15 there was company-specific news on
16 January 4, 2021?
17        MR. ORSINI: Asked and answered
18    about twenty times.
19        THE WITNESS:  As I've said
20    multiple times, there is standard
21    databases that we use and one or more
22    research assistants.
23 Q.   So a research assistant
24 determined whether or not there was
25 company-specific news on January 4, 2021?

Page 177

D. R. Fischel

1
2  A.   Whether they could identify a --
3  not whether it's value specific news,
4  whether it's any news on that day that was
5  publicly announced based on the sources
6  that we looked at.
7  Q.   So does appendix D list all of
8  the company-specific news, every single
9  piece of company-specific news during the
10 preclass period?
11 A.   That is about developments in
12 the different stocks as opposed to
13 announcements about the stocks that talk
14 about the absence of any explanation for
15 price movements.  Those announcements are
16 also discussed but are not listed in
17 appendix D because appendix D is conducted
18 for a different purpose, and you can see
19 that there are some days with no
20 announcements, there's some days with
21 announcements, there are announcements are
22 days that are statistically significant,
23 as well as announcements on days that are
24 not statistically significant.  That's the
25 purpose of appendix D.

45 (Pages 174 - 177)

Page 178

D. R. Fischel

1
2     Q.   And who determined whether or
3  not the news set forth in -- the
4  company-specific news was value-relevant
5  or not?
6     A.   As I said multiple times, the
7  purpose was not to determine whether the
8  information was, in fact, value-relevant.
9  I think the term that's used in the text
10 is potentially value-relevant, meaning
11 that it's a company-specific news
12 announcement which could or could not be
13 value-relevant depending on the nature of
14 the information and the stock price
15 reaction to the announcement of the
16 information.
17    Q.   So you're not the person who
18 determined whether or not the
19 company-specific news that was obtained
20 from Factiva was value-relevant or not
21 during the preclass period; is that
22 correct?
23        MR. ORSINI: That
24    mischaracterizes probably an hour of
25    testimony on the same question

Page 179

D. R. Fischel

1
2  already.
3        If you have something to add, go
4  ahead.
5        THE WITNESS:  That's a
6  mischaracterization of the analysis
7  that was performed and the reasons why
8  it was performed.
9     Q.   So who is the person who
10 determined whether or not the news on any
11 specific day during the class period was
12 value-relevant?
13        MR. ORSINI: Literally asked and
14    answered at least a dozen times.
15        MR. ROSEN: He hasn't given me a
16    name.
17    Q.   Who's the name?  Give me the
18 name.  Tell us the name of the person who
19 did this.
20        MR. ORSINI: The "this", the
21    notion that there was a "this" is
22    mischaracterizing the testimony.
23    Q.   Who is the person that did
24 appendix D?
25    A.   The statistical analysis is one

Page 180

D. R. Fischel

1
2  part of appendix D.  I've described the
3  model, how the model was created.  The
4  results of the model --
5     Q.   I'm just asking for a name.  I'm
6  just asking for a name.
7        Give me a name.
8     A.   The statistical analysis was
9  designed by me.
10    Q.   The --
11    A.   Excuse me, let me just finish.
12        As I stated earlier, the person
13 who actually did the analysis of pushing
14 the buttons on the computer to produce the
15 work product on the model that was
16 specified by me that's reported in
17 appendix D, I don't know the name of that
18 person.
19        Similarly, with respect to the
20 right side of appendix D, the
21 company-specific news, that was derived
22 from data sources that were identified by
23 one or more research assistants.  That's
24 the answer to your question.
25    Q.   But you don't know their names?

Page 181

D. R. Fischel

1
2     A.   Not as I sit here, no.
3     Q.   And what did you do to ensure
4  that the company-specific news listed in
5  Exhibit D was properly listed there?
6     A.   I looked at all the disclosures,
7  every single one, and I made a
8  determination that they fit the criteria
9  that was established for appendix D, and
10 recognizing that the process of
11 downloading articles from standard
12 databases is a -- just a matter of
13 plugging into the databases to generate
14 the output on Exhibit D subject to my
15 review of every single article that's
16 referred to, that's the process that was
17 used.
18    Q.   So on page D1 of appendix D,
19 there are a number of rows that are empty
20 under company-specific news, particularly
21 January 4, 5, and seventh through
22 fifteenth shows no news.
23        Do you see that?
24    A.   Correct.
25    Q.   What did you do to ensure that

46 (Pages 178 - 181)

Page 182

D. R. Fischel

1
2 appendix D accurately -- was accurate in
3 not listing any company-specific news for
4 those days?
5    A.   I trusted our process so that
6 relatively, as I said, purely mechanical
7 process of downloading articles and having
8 results checked and rechecked.
9    Q.   So you had the research
10 assistants ensure that all the
11 company-specific news was listed in those
12 rows where there is nothing listed in
13 appendix D1?
14    A.   I think it's fair to say that I
15 relied on research assistants to download
16 the standard data sources that I referred
17 to, but there's also the relevant facts
18 and circumstances of the case.  If there
19 was any discussion in any of the
20 voluminous amounts of information that I
21 reviewed in the complaint, the court's
22 opinion, all the analyst reports of other
23 firm-specific, company-specific
24 information that I saw that wasn't listed
25 on appendix D, that would have been a red

Page 183

D. R. Fischel

1
2 flag at least to investigate further.  I'm
3 not aware that there are any omissions in
4 appendix D for the -- under the criteria
5 that I specified.  If anybody points
6 anything out that was left out, which is
7 possible because human error is always
8 possible, I would take that into account
9 and add it to appendix D.  But I don't
10 think the qualitative conclusions from
11 appendix D in light of the facts and
12 circumstances described in my report would
13 be affected even if there were some --
14 even if there was some news on the days
15 that you mentioned, January 7 to
16 January 15, where none of those days was
17 statistically significant, whether or not
18 there was any company-specific news that
19 were disclosed on that -- that was
20 disclosed on that day that our research
21 assistants omitted if, in fact, they did
22 omit anything, which I'm not aware that
23 they did.
24    Q.   Now, paragraph thirty-six says,
25 "this review demonstrates that the vast

Page 184

D. R. Fischel

1
2 majority of the price increases for all
3 nine affected stocks cannot be explained
4 by new value-relevant company-specific
5 information".
6    Did you write that?
7    A.   I'm sorry, I'm looking at --
8    Q.   Paragraph thirty-six.
9    MR. ORSINI: It's the penultimate
10 sentence in that paragraph.
11    THE WITNESS:  And there's a
12 footnote after that.
13    So I would say I did a lot of
14 writing in connection with this
15 report.  I don't remember if I wrote
16 this specific sentence as opposed to
17 wanting to highlight the importance of
18 this specific sentence as one of the
19 important conclusions of my analysis.
20    Q.   And paragraph thirty-seven says,
21 "thus, I find the affected stocks did not
22 trade in an efficient market during the
23 class period".
24    Is that because the vast
25 majority of the price increases for all

Page 185

D. R. Fischel

1
2 nine affected stocks during the preclass
3 period cannot be explained by new
4 value-relevant company-specific
5 information?
6    A.   Yes, in light of the relevant
7 facts and circumstances in this case.  If
8 you look at Exhibit 3 which is on the next
9 page which is also part of paragraph
10 thirty-six, not the part that you asked me
11 to read but it's the introduction to the
12 paragraph that you're referring to, if you
13 look at January 27 and you look at the
14 price increases on that day -- not price
15 increases, I'm sorry, the increases in
16 returns on that day for AMC, 298.35
17 percent going across ranging from I guess
18 480.08 percent is the largest number and
19 11.95 percent is the lowest number with no
20 value-relevant information disclosed on
21 that day, I would say that's an
22 illustration of why this period of time
23 cannot be described as trading in an
24 efficient market combined with the other
25 facts and circumstances that I describe in

47 (Pages 182 - 185)

Page 186

D. R. Fischel

1          D. R. Fischel
2    my report.
3       Q.  And what proportion of stock
4    price increases, in your opinion, must be
5    explained by the existence of
6    value-relevant news for a stock to trade
7    in an efficient market?
8       A.  I don't know if there's a
9    particular dividing line.  I think it just
10   depends on the relevant facts and
11   circumstances.
12      Q.  Is there a range, a guidepost,
13   anything you can think of?
14      A.  Well, I can certainly think of
15   what I analyzed in this particular case
16   under the facts and circumstances of this
17   case, but it's function of the nature of
18   the price increases, the commentary about
19   the price increases, the lack of
20   company-specific value information
21   explaining those price increases, all the
22   commentary by companies and other market
23   participants about the lack of
24   relationship between value-relevant
25   information for particular companies and

Page 187

1          D. R. Fischel
2    the stock price -- increase in returns to
3    holding particular securities during this
4    period, the price targets, really all the
5    different facts and circumstances and
6    economic evidence that I discuss in my
7    report.
8       Q.  So in the IPO litigation, you
9    testified that even though only eleven
10   percent of the days with statistically
11   significant stock price increases had
12   value-relevant news, it was still
13   efficient, but you don't think that same
14   proportion would hold here, for some
15   reason?
16          MR. ORSINI: Objection to form.
17   Incomplete.
18          THE WITNESS:  I'm not sure I
19   would compare the circumstances in
20   that case, to the extent I remember
21   them, to the circumstances in this
22   case.  And again, I would -- even
23   though I don't have a clear
24   recollection of everything that I did
25   and why I included it, I did notice in

Page 188

1          D. R. Fischel
2    what you referred me to that the court
3    concluded that I demonstrated that
4    there was a clear relationship between
5    events, information disclosing events
6    and stock price reactions to those
7    events.
8       Q.  Have you ever calculated damages
9    for a Section 10b case under the Exchange
10   Act?
11      A.  I think I was a plaintiff's
12   expert in a jury trial that resulted in
13   the largest damage verdict in history in a
14   securities fraud trial, the Household
15   case, where the -- that verdict was
16   largely affirmed but not completely
17   affirmed on appeal and then the case
18   settled for billions of dollars, as I
19   recall.  So I was a damage witness, a loss
20   causation and damage witness in that case
21   and had an opinion on damages, although my
22   opinion was on inflation per share as
23   opposed to aggregate damages, which was
24   calculated later.  And I've done that
25   analysis many other times, but that was a

Page 189

1          D. R. Fischel
2    particular example that sticks out in my
3    mind because it was contested litigation
4    that resulted in a jury trial and an
5    appeal and then a remand, and then
6    ultimately a settlement.
7          I did something similar in the
8    Pfizer securities fraud case where I was
9    also a plaintiff's damages expert, I did
10   something similar in the IPO allocation
11   cases that you've pointed me to, as well
12   as a number of other cases that just
13   didn't result in testimony.  So the answer
14   to your question is yes, many times.  And
15   it's probably the case that there were
16   allegations under Section 10b -- that was
17   your specific question -- but I'd have to
18   check to make sure that that was the case.
19      Q.  And did you use the
20   out-of-pocket method of damages?
21      A.  Again, that's a legal concept.
22   In all those cases, I calculated inflation
23   per share.
24          I've also conducted many
25   analyses -- under various assumptions

48 (Pages 186 - 189)

Page 190

D. R. Fischel

1 about what any given assumption about
2 inflation per share translates into
3 aggregate damages, which depends on, you
4 know, factors such as how many members of
5 the class are going to claim, whether
6 there are offsets of gains against losses,
7 and how to handle ins and outs, different
8 factors that can have an influence on
9 trying to translate inflation per share to
10 aggregate damages.
11 Q.   So you said that rather than
12 using the out-of-pocket measure of
13 damages, you simply calculated inflation
14 per share to arrive at damages in these
15 10b-5 cases you worked on; is that right?
16 A.   No, that's wrong, I did not say
17 that.
18 Q.   Well, what's the relationship
19 between inflation per share and the
20 out-of-pocket measure of damages?
21 A.   Again, that's a legal question,
22 and I'm not expressing any opinion on any
23 legal issue.
24 Q.   So how would one go about

Page 191

D. R. Fischel

1 calculating inflation per share or
2 deflation per share in our case here,
3 Robinhood?
4 A.   You would calculation inflation
5 per share if you felt there was inflation
6 per share with respect to allegations by
7 class members.  I don't think that issue
8 can be determined at this stage for any
9 particular class member. One would need to
10 know more facts and circumstances,
11 including whether there's any inflation
12 for any class member.  But in any event,
13 that determination for me at least at this
14 stage is premature.
15 Q.   Did you make any effort to
16 determine -- did you make any effort to
17 identify a method for determining the
18 deflation per share during the class
19 period?
20 A.   Again, if you mean deflation per
21 share meaning transaction prices away from
22 true value, that's the way I was using the
23 term "inflation" or "deflation" per share,
24 from my analysis so far I think it's the

Page 192

D. R. Fischel

1 reverse.  I think during the class period,
2 because of all the factors that I
3 mentioned earlier, prices got closer to
4 the true value, not moved further away
5 from true value, that the artificial
6 prices -- the magnitude of the existence
7 of artificial prices dissipated during the
8 class period at least in part.  So at
9 least based on my analysis, so far I don't
10 think there was any artificial deflation
11 during the class period.  I think exactly
12 the reverse, that prices during the class
13 period moved closer to their true value as
14 demonstrated by the level of prices
15 immediately after the class period as I've
16 discussed earlier and also as I discussed
17 in my reports.
18 Q.   So you made no effort to
19 determine deflation per share during the
20 class period; is that correct?
21 A.   As I said, that determination is
22 really premature in terms of the analysis
23 that I've conducted, but based on what my
24 opinion is as of this time, I think price

Page 193

D. R. Fischel

1 movement during the class period as a
2 result of all the different factors that I
3 mentioned earlier dissipated the existence
4 of artificial inflation that preceded the
5 class period so that prices moved closer
6 to their true value during the class
7 period, which is the opposite of
8 artificial deflation during the class
9 period.
10 And I said, one way to know
11 that, in addition to what happened in the
12 preclass period, is to ask the question of
13 what happened immediately after the
14 alleged wrongdoing stopped.  Did prices
15 rebound or the affected stocks did they
16 rebound to the January 27 level, and the
17 answer is the opposite.  For I think eight
18 of the nine stocks, they were lower in the
19 volume-adjusted price analysis that I did
20 in my report than they were even during
21 the class period, and that combined with
22 all the other economic evidence and the
23 relevant facts and circumstances that I
24 describe in my report is inconsistent with

49 (Pages 190 - 193)

Page 194

D. R. Fischel

1 deflation, it's removing artificial
2 inflation, moving prices closer to their
3 true value, to their correct level.
4    Q.   And it's true that you made no
5 effort to identify any methodology to
6 determine deflation per share in this
7 case; is that correct?
8    A.   No, that's incorrect.
9    Q.   What effort did you make to
10 identify the methodology for determining
11 deflation per share according to the
12 plaintiffs' allegations in this case?
13    A.   Well, recognizing that my
14 analysis was for the purpose of analyzing
15 whether individualized inquiry was
16 necessary for all the reasons that I
17 described as opposed to assuming that
18 there was integrity on the market price on
19 a class-wide basis or that there was an
20 efficient market in either the preclass
21 period or the class period, what my
22 analysis demonstrates both in terms of
23 stock price movements in the preclass
24 period and the preclass period as well as

Page 195

D. R. Fischel

1 all the other economic evidence and facts
2 and circumstances that I describe in my
3 report, that the prices during the class
4 period moved closer to their true value
5 because the temporary price inflation that
6 I described at length began to dissipate
7 during the class period, which is the
8 opposite of deflation per share if what
9 you mean by deflation per share is that
10 the difference between prices of sales and
11 true value increased during the class
12 period and, in my opinion, it decreased
13 during the class period as evidenced by
14 the price declines, the fact that the
15 price increase is caused by --
16    Q.   You're not answering the
17 question.  You're going on and on and on
18 and not answering the question.
19    MR. ORSINI: Yes, he is.
20    MR. ROSEN: We're going to have
21 to stay the whole seven hours if he
22 continues to do this.  I'm just
23 saying.
24    MR. ORSINI: If we're here seven

Page 196

D. R. Fischel

1 hours it's because you've spent five
2 hours asking the same question.
3    But continue, Professor.
4    THE WITNESS:  I was just going
5 to say the dissipation of the
6 artificial price increases during the
7 class period moved prices clear to
8 their true value for all the reasons
9 that I've just said, as well as all
10 the reasons discussed in my two
11 reports.
12    Q.   Now, if Plaintiffs win on
13 liability here and your theory that you
14 just expounded is not accepted by the jury
15 or the judge and it's determined that
16 Plaintiffs are entitled to damages for the
17 difference between the value of the stock
18 on January 27 and the sale prices, how
19 would you go about determining damages?
20    A.   I don't know.  If I make those
21 assumptions which, as you know, are
22 completely contrary to my own opinion and
23 if I were asked to try and apply a finding
24 by a jury or a court, I would have to know

Page 197

D. R. Fischel

1 what the finding was and what it was based
2 on and what the evidence was and perform
3 the analysis at that time.
4    Q.   So isn't it true that your
5 opinion that damages are not capable of
6 class-wide determination a function of
7 having to prevail on your theory of
8 whether there was artificial price
9 inflation prior to the class period?
10    A.   No, I don't think that's true.
11 First of all, I'm not the ultimate fact
12 finder, or the court, so I'm not going to
13 comment on what courts or jurors might
14 determine in the future.  That is
15 something that I'm not offering any
16 opinion on one way or the other.  I'm
17 offering opinions on what I believe based
18 on the analysis that's conducted in my
19 reports.  And I talk about multiple
20 reasons why, in my opinion, it's not
21 possible to calculate damages on a
22 class-wide basis using a common
23 methodology, not just the one that you
24 mentioned.

50 (Pages 194 - 197)

Page 198

D. R. Fischel

1
2    Q.   Let's go to paragraph forty of
3 your opening report.
4        It says, "Plaintiffs have no way
5 of disentangling the effects of
6 confounding events".
7    A.   That's right.
8    Q.   Did you make any effort to
9 disentangle the effects of confounding
10 events?
11    A.   No, I didn't, other than to
12 highlight there are a lot of confounding
13 events occurring at the same time.
14    Q.   But you made no effort to
15 identify potential methods to disentangle
16 the effects of confounding events?
17    A.   Other than to say I don't
18 believe there's anyway to do it that's
19 been demonstrated so far or that I can
20 think of.
21    Q.   What efforts did you make to
22 think of methods to disentangle the effect
23 of confounding events?
24    A.   I discussed this already.  There
25 are actions by multiple economic actors at

Page 199

D. R. Fischel

1 the time.  There is going to be reversion
2 because the price increases were, by
3 definition, temporary, so that reversion
4 was going to occur sometime in any event,
5 typically in a very short period of time
6 subsequent to the end of the perceived
7 short squeeze.  All those different
8 factors were all occurring basically at
9 the same time, and I don't know -- I can't
10 think of anyway that it's possible to
11 isolate the incremental effect of each one
12 of those factors on the stock price
13 declines during the class period.
14    Q.   And is it your opinion that
15 because you can't think of any way to
16 disentangle the effects, no one else can?
17    A.   No, that's not my opinion.  My
18 opinion is that Dr. Werner has not
19 suggested any method for doing so and,
20 based on what I know now, I think it would
21 be extremely difficult if not impossible
22 to have a common method that could be used
23 to calculate damages on a class-wide
24 basis.

Page 200

D. R. Fischel

1
2    Q.   Are you offering any opinion as
3 to whether or not a presumption of
4 reliance is available under affiliated use
5 in this case?
6    A.   I think that's a question asking
7 for a legal conclusion and I'm not
8 offering any legal conclusions.
9    Q.   Are you offering any opinion as
10 to any other presumption of reliance
11 should be made available to the class
12 members in this case?
13    A.   That's another legal opinion
14 that I'm not offering any opinion about
15 one way or the other.
16        MR. ROSEN: Let's take a break.
17        (Whereupon a break was taken)
18    Q.   Are you aware that the
19 Securities and Exchange Commission issued
20 a report about the -- I think they called
21 it the meme stock event?
22    A.   I am.
23    Q.   Did you read it?
24    A.   You know, I read parts of it.
25 I'm not sure I read the entire report.

Page 201

D. R. Fischel

1
2    Q.   Now, in your rebuttal report at
3 table three, you just look at the price --
4 prices of the various affected stocks as
5 of February 5 and you determined that
6 there are no damages based on the fact
7 that the prices on February 5 were lower
8 than the average prices during the class
9 period; is that right?
10    A.   No, that's wrong.
11    Q.   Explain it to me.
12    A.   I don't have any opinion about
13 damages that I express in this particular
14 report.
15    Q.   So how would you characterize
16 the inference drawn from table three then?
17 It says that, "thus, immediately after the
18 trading restrictions were lifted, the
19 prices for eight of the nine affected
20 stocks did not bounce back to a higher
21 level as Plaintiffs' liability theory, if
22 it were true, would suggest".
23    A.   And there's a footnote
24 thirty-eight.
25    Q.   So this goes to loss causation

51 (Pages 198 - 201)

D. R. Fischel

1 then, not damages; is that correct?
2
3     A.    In the context of this report,
4 it goes to whether there's a common method
5 that can be used to calculate damages.
6     Q.    So the fact that it didn't --
7 the stock prices didn't bounce back, how
8 does that relate to a common method to
9 calculate damages?
10     A.    Because what Dr. Werner stated
11 was the common method was to compare sale
12 prices during the class period to the
13 prices on January 27 because, in his
14 opinion, the proper method was to compare
15 trading prices at a loss with what the
16 price was on January 27, assuming that
17 that's the true value of the stocks.
18         Now, there's all kinds of things
19 wrong with that as I discuss in this
20 particular section, but one of the things
21 wrong with it is the assumption that
22 January 27 is the true value that damages
23 should be measured against by comparing
24 sale prices -- sale price declines
25 adjusted I think he says for market and

D. R. Fischel

1 industry movements to January 27 and for
2 the reasons that I state, at least one of
3 the reasons, there's no basis to assume
4 that the true value is on January -- for
5 these stocks is on January 27 and a lot of
6 reasons to believe the opposite.
7     Q.    So you chose to only look at
8 prices on February 5, 2021 in table three;
9 is that correct? You didn't go out any
10 further past February 5 to February 6 or
11 later; is that right?
12     A.    On this particular table, that's
13 right.
14     Q.    Now, why didn't you look further
15 than just one day?
16     A.    I could have, but the main
17 reason was the more days you look at, the
18 more other factors that can begin to
19 influence prices and the day when the
20 restrictions stop that are alleged to be
21 depressing prices, one test of that is to
22 look at whether the price after
23 restrictions stop bounces back to the
24 alleged true value price, which in Dr.

D. R. Fischel

1 Werner's analysis is January 27. And
2 since what you find, as demonstrated by
3 table three but not just table three, it's
4 really the opposite that the price when
5 the restrictions stop is even lower than
6 -- speaking at a high level of generality
7 with respect to the nine stocks -- than
8 what the prices were during the class
9 period and that is, in my opinion, an
10 important piece of economic data that's
11 inconsistent with Dr. Werner's proposed
12 method of calculating damages using a
13 common method.
14     Q.    So for many of these stocks,
15 they ended up going back up subsequent to
16 February 5.
17         Did you know that?
18     A.    As I said, I didn't investigate
19 what happened after February 5 for the
20 reason that I stated.
21     Q.    In the IPO litigation, I believe
22 your opinion was that the stock price --
23 prices for those IPO stocks, the three
24 hundred nine stocks, the inflation caused

D. R. Fischel

1 by the manipulation continued for ten
2 months after the misconduct at issue
3 ceased.
4         Why couldn't the deflation here
5 by the manipulative conduct continue for
6 some longer time period once the
7 restrictions were lifted?
8     A.    Well, first of all, for reasons
9 I've already stated, I don't accept the
10 premise. Based on what I've seen so far
11 that there was deflation -- I actually
12 said in my previous answers that it's
13 quite possible that the dissipation of
14 artificial inflation that existed in the
15 preclass period could have continue beyond
16 February 5, so that's certainly a
17 possibility. And the fact that prices
18 fluctuated after February 5 and prices for
19 some or most of the stocks went up, the
20 question is whether they went up to the
21 January 27 level or anything close to it
22 as a result of the cessation of the
23 restrictions and I don't believe that's
24 the case because there would be

52 (Pages 202 - 205)

Page 206

1        D. R. Fischel
2 disclosures to that effect if it was the
3 case.
4    Q.   So in paragraph thirty-nine of
5 your opening report, if you please turn to
6 that paragraph, there's an analysis of the
7 trades from some of the named plaintiffs.
8        Did you draft paragraph
9 thirty-nine of the report?
10    A.   With respect to this particular
11 paragraph, I certainly didn't draft the
12 calculations that are reflected in this
13 particular paragraph.  I think the first
14 sentence and the last sentence about what
15 the data show, those were certainly
16 conclusions of mine.
17    Q.   Now, in paragraph thirty-nine,
18 it describes the named plaintiff Joseph
19 Gurney having purchased some AMC shares,
20 and it lists his average purchase price
21 and then the average sale price.  And it
22 says that -- well, I'll read it.  It says,
23 "for example, named plaintiff Joseph
24 Gurney purchased 21.27 AMC shares at an
25 average price of $5.64 on January 26-27,

Page 207

1        D. R. Fischel
2 2021 and sold the shares at an average
3 price of $8.01 for a gain of $50.39, a
4 forty-two percent return, on January 28,
5 2021".
6        So is that -- is your testimony
7 that Mr. Gurney suffered no damages in the
8 case because he sold at a gain of $50.39
9 per share?  I'm sorry, an average --
10 because he made a gain of $50.39?  Is that
11 your opinion?
12    A.   As I said, I'm not offering any
13 opinion on damages.  My opinion in this
14 particular paragraph is that given -- as
15 the first sentence says, "given the
16 volatile and nonuniform movements of each
17 of the affected stocks during the class
18 period, even small changes in the timing
19 of trades could alter whether an
20 individual incurred a loss as a result of
21 a sale and therefore qualifies to be a
22 potential class member".  And if you look
23 at the last sentence in the paragraph it
24 says, "individualized inquiry would be
25 required to determine whether and how a

Page 208

1        D. R. Fischel
2 potential class member would have changed
3 their trading behavior and therefore
4 whether or not they would have sustained a
5 net gain or loss in the affected stocks in
6 the but-for world".
7        Those are two related by
8 different points in support of my general
9 opinion that Dr. Werner has not provided a
10 common methodology that could be used to
11 calculate damages during the class period
12 without in any way conceding on my part
13 that there were any damages.
14    Q.   So it's fair to say you're not
15 saying that Mr. Gurney or anyone else
16 didn't suffer damages based on these
17 calculations; is that correct?
18    A.   I'm not offering that specific
19 opinion, no.
20    Q.   Now, is it your opinion that the
21 plaintiffs have to prove what they would
22 have done, what transactions they would
23 have -- what sales they would have made
24 had there been no manipulation?
25    A.   Again, I'm not offering any

Page 209

1        D. R. Fischel
2 legal opinions.  My only point is on that
3 particular issue is that there's no way of
4 knowing what would have occurred in the
5 but-for world.  A calculation -- a common
6 method of calculating damages has to have
7 some comparison of what happened in the
8 real world versus what would have happened
9 in the absence of the alleged wrongdoing.
10 And the particular point that's made in
11 this particular section is there's no way
12 of knowing what would have occurred in the
13 but-for world in terms of whether class
14 members would have had bigger losses,
15 whether they would have gained, when they
16 would have sold, if they would have sold,
17 and that's all completely indeterminate.
18 So that's a point that I think is
19 important in this particular section.
20    Q.   And how does this case differ
21 from any other securities class action
22 where people might have acted differently
23 had there been no fraud?
24    A.   Well, I think it's different in
25 a lot of ways from the typical case where

Page 210

D. R. Fischel

1
2 you know what -- based on a common
3 methodology what the artificial inflation
4 was on any particular day and you know
5 what the true value was after a corrective
6 disclosure or multiple corrective
7 disclosures of the alleged misimpression
8 created by the alleged false disclosure or
9 material nondisclosure.
10    Q.   Well, I just want to focus on
11 that sentence in paragraph thirty-nine,
12 your sentence "counterfactually
13 speculating as to the timing of trades,
14 whether and when investors would have
15 traded in the but-for scenario in which
16 Robinhood did not put restrictions in
17 place requires individualized inquiries".
18       Why is it necessary to prove
19 what they would have done in this case had
20 there been no restrictions?  What
21 requirement is there?
22       MR. ORSINI: Well, I object to
23    the extent that that calls for a legal
24    conclusion.
25       MR. ROSEN: Well, he's made that

Page 211

D. R. Fischel

1
2    conclusion.
3    Q.   Tell me why it's necessary to
4 prove this.
5       MR. ROSEN: He says that this is
6    -- this required individual inquiry.
7    I just want to know why it requires
8    individual inquiry.  Is it a legal
9    requirement, is it an economic
10    requirement?  Where does it stand for
11    and why.
12       THE WITNESS: I think I've
13    answered that question.  I'm not
14    offering any legal conclusions.  I
15    think it's relevant on the question of
16    whether there's a common method that
17    can be used to calculate damages
18    during the class period, particularly
19    whether the opinion that Dr. Werner
20    has advanced on that issue is
21    credible, and in my opinion it's not
22    for multiple reasons, including this
23    one.
24    Q.   But you haven't answered my
25 question.

Page 212

D. R. Fischel

1
2       Why do they have to prove what
3 they would have done?  They sold.  We know
4 what they did.  Why do they have to prove
5 whether they would have sold or not sold
6 had there been no fraud?  They sold.  We
7 know what they did.  Why should they prove
8 something that they didn't do?  Can you
9 explain?
10       MR. ORSINI: Asked and answered.
11       THE WITNESS: That's a
12    mischaracterization of what's in my
13    report and what I've said.  You know
14    what happens in the real world.  You
15    don't know what would have happened in
16    the but-for world in order to compare
17    the real world relative to the but-for
18    world.
19    Q.   Let's go back to the IPO
20 litigation where you testified for the
21 plaintiffs and you testified that there
22 was these tie-in agreements that caused
23 inflation and these plaintiffs purchased
24 stock at inflated prices because of this
25 manipulation.

Page 213

D. R. Fischel

1
2       In that case, did the plaintiffs
3 have to prove what they would have done
4 whether they would have purchased or not
5 purchased?
6    A.   Yes, the calculation would
7 require a determination of the difference
8 between the purchase price that actually
9 occurred and what the purchase price would
10 have been based on an assumption of what
11 would have occurred had the alleged
12 wrongdoing not occurred.
13    Q.   But you don't mention sale price
14 here.  You say speculating as to the
15 timing of trades, whether and when
16 investors would have traded, not purchase
17 price, the timing.
18       Now, why did you have to show in
19 the IPO litigation exactly when they would
20 have would have purchased those shares at
21 the exact time that they did had there
22 been no fraud?
23    A.   Again, I don't want to comment
24 on the IPO litigation specifically in any
25 detail because it's somewhere between

54 (Pages 210 - 213)

Page 214

D. R. Fischel

1 fifteen and twenty years ago depending
2 upon which report you focus on.
3        But as a general matter,
4 inflation is usually calculated between
5 the difference between the actual
6 transaction price and what the transaction
7 price would have been in the absence of
8 any wrongdoing.
9    Q.   Isn't it true that you can't
10 think of a single case in the history of
11 all the work you've done, forty-plus years
12 where a plaintiff in a class action had to
13 prove whether and when they would have
14 traded in the but-for world?
15    A.   I think at least under the facts
16 and circumstances of this case, I'm saying
17 there's no way of knowing whether they
18 would have traded that all or if they
19 traded in the absence of the alleged
20 wrongdoing, whether they would have made
21 money or lost money, and I think that's a
22 relevant fact or a relevant criticism of
23 the opinion of Dr. Werner or more
24 generally whether there's particularly

Page 215

D. R. Fischel

1 combined with all the other reasons that
2 are discussed in this particular section
3 of my report, whether there's a -- it's
4 possible to have a common method to
5 calculate damages on a class-wide basis.
6    Q.   Please identify one case, one
7 case in the history of all the work you've
8 done in which a plaintiff in a class
9 action had to prove whether and when they
10 would have traded in the but-for world.
11    A.   I didn't say a plaintiff would
12 have to prove it.  I just said there's no
13 way of knowing under the facts and
14 circumstances of this case given the usual
15 methodology of comparing an actual
16 transaction date with what the transaction
17 price would have been in the absence of
18 the alleged wrongdoing.  In this
19 particular case, that is an additional
20 factor, particularly in combination with
21 the other facts and circumstances that I
22 describe in this particular section that
23 there's no evidence that investors would
24 have sold -- for example, all investors

Page 216

D. R. Fischel

1 would have sold on January 27 at the high
2 price so they would have realized that
3 value, no evidence that that's a true
4 value.  All the evidence is to the
5 contrary.
6    Q.   So you're unable to identify a
7 single case, and you acknowledge that the
8 plaintiff class in this case have no
9 obligation to prove that they would have
10 traded in the but-for world, the date they
11 would have traded, and whether or not they
12 would have traded had there been no fraud;
13 is that correct?
14        MR. ORSINI: Completely
15 mischaracterizes his testimony.
16        THE WITNESS:  When you ask
17 whether I have an opinion as to what
18 Plaintiffs would have to prove, what
19 they would have an obligation to
20 prove, I'm not offering an opinion on
21 that one way or another.
22    Q.   So if they don't have to prove
23 whether or not they would have traded on a
24 specific day had there been no fraud, why

Page 217

D. R. Fischel

1 is it relevant?
2        MR. ORSINI: Asked and answered.
3    Q.   If it has nothing to do with any
4 element of proof when they would have
5 traded, why do they have to prove it?  If
6 they don't have to prove it, why is it
7 even relevant?
8        MR. ORSINI: That's an impossibly
9 vague question.
10        THE WITNESS:  And also a
11 mischaracterization of what I've said.
12        Relevance is going to be
13 determined by a court, presumably, not
14 by me.  It's relevant to my opinion on
15 whether or not there is a common
16 method that could be used to calculate
17 damages on a class-wide basis,
18 particularly when what you were just
19 asking me about is considered in
20 combination with the other factors
21 that are discussed in this particular
22 section.  Whether a judge ultimately
23 determines that's legally relevant or
24 not relevant is not something I'm

55 (Pages 214 - 217)

Page 218

D. R. Fischel

1       D. R. Fischel
2    expressing an opinion about one way or
3    the other.
4       Q.   So much of this paragraph
5    thirty-nine is not even relevant to the
6    case; right?  Is that what you're
7    acknowledging?
8       A.   No, that's not what I'm
9    acknowledging.
10      Q.   So the last sentence of
11   paragraph thirty-nine is, "individualized
12   inquiry would be required to determine
13   whether and how a potential class member
14   would have changed their trading behavior
15   and therefore whether they would have
16   sustained a net gain or loss in the
17   affected stocks in the but-for world".
18        What's the basis for that
19   statement?
20      A.   Everything that precedes it in
21   the paragraph combined with the rest of
22   the discussion in this particular section.
23      Q.   So where does this requirement
24   stem from?  Is it a legal requirement, an
25   economic requirement?  What is it?

Page 219

D. R. Fischel

1       D. R. Fischel
2       A.   It's part of my criticism of
3    whether or not there's a common method to
4    calculate damages on a class-wide basis.
5       Q.   I understand it's a criticism.
6         But is there any basis in the
7    case law where there is a requirement for
8    individualized inquiry as to whether and
9    how a potential class member would have
10   changed their trading behavior?
11        MR. ORSINI: I'm pretty sure that
12   calls for a legal conclusion.
13        MR. ROSEN: Well, he's making one
14   here and I'm trying to understand what
15   the basis for it is.
16        MR. ORSINI: He's not making a
17   legal conclusion.  He's already
18   testified multiple times.
19      Q.   So other than it's your
20   criticism, do you have any basis for why
21   it's a requirement here?
22      A.   I don't understand the question.
23      Q.   Well, you say it's a criticism,
24   but where does this requirement stem from?
25   Just articulate the basis for this

Page 220

D. R. Fischel

1       D. R. Fischel
2    requirement.  Thin air?  What is it?
3       A.   The reason why it's a criticism
4    is described in my report and I've tried
5    to explain to you in my answers which part
6    of my opinion about why it's impossible to
7    calculate damages using a common
8    methodology during this class period at
9    least in comparison with the opinion that
10   Dr. Werner has expressed.
11      Q.   Can you think of a single other
12   case that supports -- that you've worked
13   on that supports this claim that you make,
14   this so-called requirement in paragraph
15   thirty-nine?
16      A.   I don't know how to answer that
17   except by repeating --
18      Q.   Just tell me the case.  Tell me
19   the case, whatever it is.
20      A.   The opinion isn't based on case
21   research, it's based on my analysis --
22      Q.   Well, some history, is there
23   another securities class action that you
24   can point to that had the same
25   requirement?

Page 221

D. R. Fischel

1       D. R. Fischel
2       A.   You know, I don't know of
3    another case where the maximum artificial
4    price is assumed to be the true value
5    under some assumption that everybody would
6    have sold on that price so therefore the
7    difference between that price and the
8    prices where prices are moving away from
9    the artificial price is the assumed common
10   method for calculating damages without any
11   showing of how behavior would have been
12   different in a but-for world.
13      Q.   So I'll give you thirty seconds
14   to identify a single case that supports
15   this requirement that you're identifying
16   in paragraph thirty-nine.  I'll give you
17   thirty seconds and tell me what you have.
18        MR. ORSINI: He's answered the
19   question multiple times.  If you want
20   to waste thirty seconds, that's your
21   prerogative.
22        MR. ROSEN: Thank you for your
23   time, Mr. Fischel.
24        THE WITNESS:  Thank you.
25        (CONTINUED ON NEXT PAGE)

56 (Pages 218 - 221)

Page 222

```
1              D. R. Fischel
2        MR. ORSINI: I have no questions.
3        (TIME NOTED:  5:51 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 224

```
1
2            *   *   *
3
4              I N D E X
5  WITNESS      EXAMINED BY      PAGE
6  D. R. Fischel  Mr. Rosen       3
7
8            E X H I B I T S
9  FOR I.D.   DESCRIPTION         PAGE
10 Exhibit 113 Document entitled
11       Report of Daniel R.
12       Fischel              7
13 Exhibit 114 Document entitled
14       Rebuttal Report of
15       Daniel R. Fischel    53
16 Exhibit 115 Seeking Alpha article
17       dated February 1, 2021    88
18 Exhibit 116 Document entitled
19       In re Initial Public
20       Offering Securities
21       Litigation            122
22 Exhibit 117 Journal of Finance
23       article              131
24
25
```

Page 223

```
1  IN RE JANUARY 2021 SHORT SQUEEZE
   TRADING LITIGATION
2  4/12/2023 - DANIEL R. FISCHEL
3       ACKNOWLEDGEMENT OF DEPONENT
4  I, DANIEL R. FISCHEL, do hereby declare
5  that I have read the foregoing transcript,
6  I have made any corrections, additions, or
7  changes I deemed necessary as noted on the
8  Errata to be appended hereto, and that the
9  same is a true, correct and complete
10 transcript of the testimony given by me.
11
12 _____  _____
13 DANIEL R. FISCHEL        Date
14 *If notary is required
15
16    SUBSCRIBED AND SWORN TO BEFORE ME THIS
17    _____ DAY OF _____, 20___.
18
19
20    _____
21    NOTARY PUBLIC
22
23
24
25
```

Page 225

```
1
2        I N D E X (continued)
3        E X H I B I T S (continued)
4  FOR I.D.   DESCRIPTION         PAGE
5  Exhibit 118 Document entitled
6       In re: Initial Public
7       Offering Sec.         138
8
9
10        *   *   *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

57 (Pages 222 - 225)

Page 226

```
1
2        CERTIFICATION BY REPORTER
3
4        I, Wayne Hock, a Notary Public of the
5   State of New York, do hereby certify:
6        That the testimony in the within
7   proceeding was held before me at the
8   aforesaid time and place;
9        That said witness was duly sworn
10  before the commencement of the testimony,
11  and that the testimony was taken
12  stenographically by me, then transcribed
13  under my supervision, and that the within
14  transcript is a true record of the
15  testimony of said witness.
16       I further certify that I am not
17  related to any of the parties to this
18  action by blood or marriage, that I am not
19  interested directly or indirectly in the
20  matter in controversy, nor am I in the
21  employ of any of the counsel.
22       IN WITNESS WHEREOF, I have hereunto
23  set my hand this 13th day of April, 2023.
24
25             Wayne Hock
```

Page 227

```
1   IN RE JANUARY 2021 SHORT SQUEEZE
    TRADING LITIGATION
2   4/12/2023 - DANIEL R. FISCHEL
3        E R R A T A   S H E E T
4   PAGE_____ LINE_____ CHANGE_____
5   _____
6   REASON_____
7   PAGE_____ LINE_____ CHANGE_____
8   _____
9   REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____ _____
24  DANIEL R. FISCHEL      Date
25
```

58 (Pages 226 - 227)

[& - 50.39]                                                          Page 1

| & | | | |
|---|---|---|---|
| **&**   1:16 2:8 | **1934**   5:19 | 25:8 28:2 34:3 | **3** |
| **1** | **1980**   5:9 | 34:23 50:22 | **3**   162:8,10 |
| **1**   53:24 88:6 | **1:56**   100:4 | 51:9,19,23 | 164:12 185:8 |
| 158:17 224:17 | **2** | 52:2,11,21 | 224:6 |
| **1.50**   54:23 | **2**   54:22 | 57:22 58:3,7 | **332**   3:10 |
| **10**   122:18 | **20**   138:8 | 58:12,19,23 | **3922**   226:24 |
| **10016**   2:5 | 223:17 | 59:15 61:8,22 | **4** |
| **10019**   2:9 | **2000**   142:21 | 62:6,22 64:2 | **4**   15:3 16:6 |
| **10:11**   1:10 | 143:4,7,23,25 | 66:18 70:10,25 | 20:9 21:25 |
| **10b**   6:5,24 | **2004**   138:8 | 71:8,10,21 | 23:6,20 24:24 |
| 188:9 189:16 | **2009**   122:18,20 | 74:19 91:9,10 | 25:8 27:25 |
| 190:16 | **2021**   1:5 16:7,7 | 92:18,19 94:7 | 34:2,22 51:8 |
| **11.4**   130:17 | 20:9,10 22:2 | 94:8 95:6,12 | 67:9 91:9 |
| **11.95**   185:19 | 23:6,20 24:24 | 95:19,24 96:8 | 92:18 94:7 |
| **113**   7:9,13,18 | 34:3,23 39:16 | 100:15,18,19 | 100:18,25 |
| 224:10 | 50:23 51:9,19 | 102:8,13 | 102:7 167:15 |
| **114**   53:18,21 | 52:2 55:19 | 118:10 185:13 | 176:10,16,25 |
| 88:21 224:13 | 60:4 66:18 | 193:17 196:19 | 181:21 |
| **115**   88:7 96:9 | 88:6 108:14 | 202:13,16,22 | **4/12/2023** |
| 224:16 | 158:17 176:10 | 203:2,6 204:2 | 223:2 227:2 |
| **116**   122:6,7 | 176:16,25 | 205:22 216:2 | **480.08**   185:18 |
| 224:18 | 203:9 207:2,5 | **275**   2:4 | **5** |
| **117**   131:18 | 223:1 224:17 | **28**   39:16 60:4 | **5**   55:18 57:21 |
| 224:22 | 227:1 | 60:10,25 61:3 | 57:25 58:4,8 |
| **118**   138:5,14 | **2023**   1:10 7:20 | 61:23 62:15 | 58:10 96:6 |
| 225:5 | 100:3 226:23 | 67:8 69:15,25 | 181:21 190:16 |
| **12**   1:10 100:3 | **21-2989**   1:8 | 70:11 71:8 | 201:5,7 203:9 |
| **122**   224:21 | **21.27**   206:24 | 72:14 73:13,21 | 203:11 204:17 |
| **131**   224:23 | **23**   102:12 | 74:13 92:5 | 204:20 205:17 |
| **138**   225:7 | **26**   108:14 | 207:4 | 205:19 |
| **13th**   226:23 | **26-27**   206:25 | **29**   92:5 | **5.64**   206:25 |
| **15**   183:16 | **260**   122:19 | **298.35**   185:16 | **50.39**   207:3,8 |
| **16**   7:20 | **27**   15:3 16:7 | | 207:10 |
| | 20:10 22:2 | | |
| | 23:6,20 24:24 | | |

**[53 - affected]**

**53**  224:15
**5:51**  222:3

**6**

**6**  142:21 143:7
143:23,24
144:20,22,25
203:11
**60604**  3:11

**7**

**7**  183:15
224:12
**78.6.**  130:17

**8**

**8.01**  207:3
**81**  122:19
**825**  1:17 2:9
**88**  224:17

**a**

**a.m.**  1:10
**abilities**  113:11
**ability**  4:23
48:25 72:3
**able**  78:4 79:20
87:17 97:8
112:13 116:23
123:14 161:13
**abnormal**
176:11
**above**  154:4
**absence**  62:17
136:25 143:13
177:14 209:9
214:8,20
215:18

**absent**  56:18
145:15 156:6
**absolutely**
146:4
**abstract**  43:6
78:7 153:13,15
**academic**  5:13
50:15 64:10,15
64:19 65:2,9
74:24 75:19
76:6,10,19
91:15 96:23
97:2 111:25
132:7 140:12
150:5,9,13,16
**accept**  136:19
205:10
**accepted**
147:24 196:15
**account**  63:14
183:8
**accounts**  37:25
**accuracy**  39:7
39:9
**accurate**  11:21
66:8 70:3
98:21 116:21
152:10 168:21
182:2
**accurately**
182:2
**acknowledge**
216:8
**acknowledge...**
223:3

**acknowledging**
218:7,9
**act**  5:19 6:6
136:8 188:10
**acted**  209:22
**action**  6:4
120:11 135:3
156:7 209:21
214:13 215:10
220:23 226:18
**actions**  56:21
61:13 62:18,25
63:18 69:19,23
70:4,19 71:6
71:14 73:5
92:10 93:13
94:2 198:25
**active**  79:24
97:12
**activities**  4:18
56:25 57:6
**actors**  63:2
70:5 73:5,7
74:3 92:10
93:14 94:3
115:13 198:25
**actual**  97:24
136:22 137:21
137:25 158:21
160:23 161:10
161:14,22,23
214:6 215:16
**actually**  5:20
10:16 17:7,8
36:12 49:19

52:7 90:16
96:14,24 97:5
99:9 120:9
124:5 135:12
157:25 180:13
205:12 213:8
**add**  34:4 94:25
179:3 183:9
**addition**  19:20
61:12 62:24
133:15 193:12
**additional**
83:17 96:3,20
133:11 215:20
**additions**  223:6
**address**  3:9
139:3 150:21
**addressed**  38:8
**addressing**
126:4
**adel**  36:25
**adjusted**  61:25
193:20 202:25
**admitted**  5:5
**adopting**  47:9
**advanced**
211:20
**advantage**  49:2
**advocating**
80:2
**affect**  45:2
170:7
**affected**  12:10
14:23 15:6,19
15:22 16:8

**[affected - analyzed]** Page 3

18:11 19:4
20:12 21:23
23:3,4,19
24:22 27:23
33:7,25 34:20
38:21 39:17,22
40:13 41:19
43:3,21 44:19
46:24 48:8
50:21 65:16
67:6 68:13
69:16,24 71:23
72:17 73:13,20
74:13 75:15
77:7 79:11
80:21 89:15,25
95:5 97:14
100:13 112:20
113:5 118:22
121:12 152:25
153:10 154:5
154:15 158:7
183:13 184:3
184:21 185:2
193:16 201:4
201:19 207:17
208:5 218:17
**affecting** 136:9
**affects** 105:18
**affiliated** 3:19
200:4
**affirmed**
188:16,17
**aforesaid** 226:8

**aggregate**
188:23 190:4
190:11
**ago** 56:8
123:13 214:2
**agree** 21:20
22:3 29:22
104:16,20
141:3
**agreement**
140:23
**agreements**
134:17 141:2
141:15 212:22
**ahead** 31:24
120:8 179:4
**air** 220:2
**akston** 96:10
96:13,15 97:5
**alex** 9:7,9
**algorithmic**
105:6
**allegation**
134:6,25
140:22 142:3
**allegations** 7:3
38:3,6,7,10
120:14 123:19
141:13 142:3
143:21 189:16
191:7 194:13
**alleged** 56:9,9
56:18,19,24
57:6 58:24
69:7 80:7

95:21 120:5,11
133:25 134:21
137:21,22
140:4 141:12
141:21 142:12
144:13,22
152:9,17
193:15 203:21
203:25 209:9
210:7,8 213:11
214:20 215:19
**allocation**
189:10
**alpha** 88:5
96:10,25
224:16
**alter** 207:19
**altonaga** 1:8
**ambiguous**
22:5
**amc** 12:20 60:9
60:24 61:3
108:14 185:16
206:19,24
**amount** 87:7
**amounts** 75:7
182:20
**analyses** 131:6
175:3 189:25
**analysis** 10:7,9
10:18 11:6,25
40:25 45:16
52:9,19 57:3
60:12 80:15
97:19 125:18

126:5,8 129:7
131:3 134:16
137:24 139:7
145:17 147:4
157:17 159:3
159:13 160:12
160:16 163:6
163:10,13
164:8,19 167:7
167:8 169:8,12
173:12,18
174:4,9 175:16
175:23 179:6
179:25 180:8
180:13 184:19
188:25 191:25
192:10,23
193:20 194:15
194:23 197:4
197:19 204:2
206:6 220:21
**analyst** 50:3
182:22
**analyze** 52:5
61:18 121:11
126:13 158:22
164:13 167:13
167:25 168:8
169:17 173:7,8
173:11,14
175:13
**analyzed** 47:23
52:16,20
120:19 128:13
186:15

analyzing
134:25 151:2
194:15
announced
177:5
announcement
171:17,17
178:12,15
announcements
129:24 172:14
172:16 177:13
177:15,20,21
177:21,23
answer 5:17
6:9 10:11
26:14 31:18,21
32:15 33:2
35:2,4,13,20,25
43:16 69:4
72:4,5,18,20
98:20,21
111:18,21
115:10 146:8
168:14 171:5
180:24 189:13
193:18 220:16
answered
31:11,23 34:8
34:24 35:12
43:15 72:2
90:5 92:7 93:7
94:23 95:17
174:17 176:17
179:14 211:13
211:24 212:10

217:3 221:18
answering
43:12,14 170:9
170:18 195:17
195:19
answers 64:14
82:13,14,24,25
86:13 119:12
205:13 220:5
anti 7:3
anybody 87:10
109:12 112:7
183:5
anyway 67:8
198:18 199:11
apart 120:6
apologize 127:4
apparently
132:4
appeal 188:17
189:5
appears 135:13
appended
223:8
appendix 17:18
17:19,21 18:7
18:14,21,22
19:5,9,19,21
20:15,23,25
21:4 22:20
23:14 25:10
26:3,8,24
28:14 30:12
32:23 33:12,15
35:17 157:8,10

163:11,13
164:4,5,6,18,19
165:12 168:5
171:10 172:8,9
177:7,17,17,25
179:24 180:2
180:17,20
181:9,18 182:2
182:13,25
183:4,9,11
applicable
124:12
application
136:5 165:15
apply 196:24
appreciate 74:6
approach
135:6,10,18,22
appropriate
92:2
approximately
90:22 123:5
approximates
135:14
approximation
96:5,7
april 1:10
100:3 226:23
arbitrage
148:12,25
area 6:2
areas 6:18
argued 128:12
129:25

argument 35:8
argumentative
169:2
arithmetic
130:25
arrive 190:15
article 14:5,12
14:17 16:20,23
19:23 20:2
25:3,5,18
26:25 27:12
29:18 30:4
33:19,23 34:18
35:16,22 52:14
65:14,21 88:6
88:9,20 89:2
89:13 94:14,16
96:13,19,22
130:5,10,13
131:11,16,18
131:20,23
132:3,8,23
144:19,20
172:10,11,12
181:15 224:16
224:23
articles 12:7
13:5,10,11,14
13:17,19,22,25
14:9,22,25
15:17 16:6,19
16:21 17:2,3,6
17:13,16,18,20
17:22 18:2,7,9
18:15,20,25,25

19:2,3,4,10,14
19:17,23 20:4
20:9,23,25
21:2,5,7,15,22
21:25 22:9,17
22:19,20,25
23:8,9,18,22
24:5,7,11,20,21
25:2,14,15,21
25:23 26:3,7,9
26:11,15,21,24
27:6,15,18,20
28:4,5,8,11,14
28:19,20,22
29:3,8,12,19
30:9,12,13,23
31:2,6,8,9 32:2
32:3,5,10,11,16
32:17,22 33:2
33:5,6,11,13,16
35:18,22 36:3
49:17,23 65:11
109:4,12,19
116:18 172:13
175:25 181:11
182:7
**articulate**
219:25
**artificial**   19:17
21:12 26:18
27:8,22 30:19
41:4 42:6,11
42:16 43:9
44:6,11,14,22
44:23 45:5,20

45:23 46:2,7
46:13,17,23
48:2,15 50:14
50:18 51:5,21
58:7 61:11
64:7,12,22
66:23 68:9
69:3 73:3
74:16,17 76:17
76:22 79:18
81:3,4,7,12
87:6,15,18,19
88:15 90:7
91:7 92:13
94:6 96:2
100:20 101:21
102:23 103:21
103:22 104:2,4
109:5,14,20
112:9,10,11
113:8 116:6,12
142:20 144:17
154:7,20
156:17 172:17
192:6,8,11
193:5,9 194:2
196:7 197:9
205:15 210:3
221:3,9
**artificially**
79:21 95:6
100:14 101:4
102:9,14
114:10 143:6
154:6 156:11

**aside**   145:22
172:11
**asked**   22:24
31:10 34:24
35:9 56:7 82:9
82:11,21 91:25
93:7 94:22
95:14 138:24
139:2 170:12
174:17 176:17
179:13 185:10
196:24 212:10
217:3
**asking**   6:11
13:20 16:15
24:18 38:15
56:4 63:11
66:21 68:2
75:2 78:6
79:13 115:24
116:2 145:23
145:24 153:12
155:12 169:3
180:5,6 196:3
200:6 217:20
**aspects**   5:25
9:24 10:2,5
**assert**   40:13
**assertion**   64:16
**asserts**   131:24
**assist**   8:16
**assistance**
10:19
**assistant**   13:18
176:23

**assistants**   9:12
31:6 171:15,25
176:22 180:23
182:10,15
183:21
**assume**   4:19
16:12 25:3
31:5 54:24
60:20 145:5
203:4
**assumed**
136:14 141:11
221:4,9
**assuming**   78:6
78:7 85:17
111:15 141:13
141:17 142:3
145:3 194:18
202:16
**assumption**
117:3,20
141:25 144:11
145:15 190:2
202:21 213:10
221:5
**assumptions**
68:20 145:2
189:25 196:22
**attempt**   11:10
26:25 27:11
49:7 81:17
112:8 148:9
**attempted**   24:6
35:15 99:2
171:15

**[attempting - big]**

**attempting**
98:6 175:23,24
**attorney**
144:23
**attorneys** 2:4,8
**attributable**
165:3
**attribute**
172:13
**attributed** 47:6
114:25
**attribution**
47:9,10
**author** 7:21
**authored** 138:6
138:17 139:11
**authority**
131:10 132:13
**authors** 65:15
**available** 47:24
97:22 102:22
169:9 170:8
200:4,11
**avenue** 1:17 2:4
2:9 3:10
**average** 54:9
54:12,14 55:4
55:8,9,20
90:20 201:8
206:20,21,25
207:2,9
**averaged** 55:16
**avoided** 170:10
**avoiding** 34:10

**aware** 32:8
33:15 36:3,13
36:15 83:18
101:3 102:8,13
102:16 109:4,5
110:14,21
111:5 132:6
183:3,22
200:18
**awareness**
81:12

**b**

**b** 224:8 225:3
**back** 56:5
58:12,15 66:5
140:20 156:24
201:20 202:7
203:24 204:16
212:19
**background**
39:11,13 61:14
63:3 69:18
**bad** 127:3
**banking** 111:12
**barred** 105:23
106:7
**bars** 5:5,6
**based** 32:15
39:13 40:25
43:6 46:9 47:8
52:8 55:16
56:17 57:2
74:22 77:8
78:17 81:11,15
82:14 83:13,13

86:19 87:13,14
105:6 110:3
114:25 117:11
131:11 132:4
137:18,24
141:12 142:2
144:25 168:11
173:12 176:3
177:5 192:10
192:24 197:2
197:18 199:21
201:6 205:11
208:16 210:2
213:10 220:20
220:21
**basic** 14:14
**basically** 39:11
68:20 100:16
104:14 107:8
199:9
**basis** 37:3
88:21 101:7
108:6 120:24
128:14 138:3
152:18 194:20
197:23 199:25
203:4 215:6
217:18 218:18
219:4,6,15,20
219:25
**bath** 12:20
**bed** 12:20
**began** 73:6
195:7

**beginning** 5:12
70:8 151:11
**begins** 151:5
**behalf** 123:8
**behaved** 137:6
137:7
**behaving** 30:21
**behavior** 208:3
218:14 219:10
221:11
**belief** 81:16
**believe** 21:16
37:13 56:2
58:14 84:3,12
84:18 85:7
86:14,15 118:8
128:11 140:16
141:7 145:7
152:15,21
153:2 197:18
198:18 203:7
204:22 205:24
**best** 32:24 41:3
72:2 167:22
**bets** 97:13
**better** 38:8
58:5,9 127:8
**beyond** 12:21
68:19 123:20
205:16
**biased** 166:12
166:14
**bid** 133:12
**big** 72:22

| | | | |
|---|---|---|---|
| **bigger** 209:14 | **bubbles** 50:18 | **calculation** | **carefully** |
| **billions** 188:18 | 65:16 66:11 | 72:6 95:18 | 123:14 |
| **bit** 20:6 22:5 | 68:17 76:23 | 191:5 209:5 | **case** 1:8 7:6 8:9 |
| 59:18 134:12 | **business** 4:6 | 213:6 | 8:15,21 10:4,5 |
| **blackberry** | 50:22 82:10 | **calculations** | 12:18 36:14 |
| 12:21 | **busy** 4:12 | 71:5 206:12 | 38:4,13 45:9 |
| **blood** 226:18 | **buttons** 180:14 | 208:17 | 45:11 46:10 |
| **bloomberg** | **buy** 108:22 | **call** 23:7 41:10 | 51:3 56:11,13 |
| 13:16,23 15:2 | 110:23 139:20 | 66:20,21,22 | 56:19 57:15 |
| 17:14 18:16 | 147:23 | 158:14 160:3 | 59:3 64:22 |
| 22:13 54:19,25 | **buyer** 147:20 | **called** 13:16 | 86:11 89:15 |
| 55:2 | **buying** 80:20 | 58:19 59:4 | 92:14 103:8 |
| **board** 72:23 | 97:13 108:13 | 130:6 133:5 | 106:13 108:3 |
| 74:20 | **c** | 135:21 200:20 | 117:19 118:3 |
| **bottom** 128:17 | **c** 2:2 3:2 100:5 | 220:14 | 119:20 120:6 |
| 132:24 | 157:8,10 | **calling** 103:12 | 120:16 121:7 |
| **bounce** 201:20 | **calculate** 70:17 | 119:8 | 121:10,13 |
| 202:7 | 70:18 137:4,13 | **calls** 106:3 | 122:13,13,22 |
| **bounces** 203:24 | 141:14 158:20 | 112:22 210:23 | 123:7,19 |
| **bound** 64:2,17 | 162:16 197:22 | 219:12 | 124:23 125:4 |
| **break** 41:8 59:8 | 199:24 202:5,9 | **cammer** 120:20 | 127:13,16 |
| 59:10 63:11 | 208:11 211:17 | 120:24 121:16 | 134:21 139:23 |
| 69:5 99:10,11 | 215:6 217:17 | 121:22 125:12 | 139:24 140:20 |
| 149:4,5 200:16 | 219:4 220:7 | 125:18 126:7,8 | 141:13 143:22 |
| 200:17 | **calculated** | 126:13,22 | 153:14 155:11 |
| **brena** 4:5 | 161:13,16 | 150:22 153:5,7 | 157:17 158:15 |
| **briefs** 50:3 | 188:8,24 | 164:8,14,20 | 160:7 166:9,10 |
| **broad** 45:6 | 189:22 190:14 | 165:16 | 167:10 182:18 |
| 105:12 158:7 | 214:5 | **capability** | 185:7 186:15 |
| **brokerage** | **calculates** | 89:10 | 186:17 187:20 |
| 38:18 | 54:25 | **capable** 197:6 | 187:22 188:9 |
| **brokers** 156:7 | **calculating** | **capitalization** | 188:15,17,20 |
| **bubble** 66:14 | 138:2 175:16 | 133:12 | 189:8,15,18 |
| 66:19,20 | 191:2 204:13 | **career** 5:13 | 191:3 194:8,13 |
| | 209:6 221:10 | 124:21 | 200:5,12 |

[case - cite]                                                          Page 8

| | | | |
|---|---|---|---|
| 205:25 206:3 | 120:11 140:7 | **certify** 226:5,16 | **chicago** 3:11,22 |
| 207:8 209:20 | **caused** 40:19 | **cessation** | 4:4,7 |
| 209:25 210:19 | 47:15 61:2 | 205:23 | **choice** 166:5 |
| 213:2 214:11 | 62:4 88:15 | **cetera** 157:22 | **choices** 29:23 |
| 214:17 215:7,8 | 89:16 90:2,7 | **chairman** 3:25 | **choose** 37:24 |
| 215:15,20 | 92:22 94:19 | **challenges** | **chose** 203:8 |
| 216:8,9 218:6 | 172:17 195:16 | 128:6,9 | **chronologica...** |
| 219:7 220:12 | 204:25 212:22 | **chance** 161:25 | 175:7 |
| 220:18,19,20 | **causes** 19:16,16 | 168:13 | **circles** 95:14 |
| 221:3,14 | 21:11 26:18 | **change** 67:17 | **circuit** 142:24 |
| **cases** 6:24 7:2 | 27:8,22 30:18 | 68:20 75:23 | **circumstance** |
| 120:2,4,12,14 | 42:5 61:6,19 | 128:21 129:14 | 149:19 |
| 124:11,13,17 | 62:13,14 135:3 | 227:4,7,10,13 | **circumstances** |
| 125:6 127:21 | 154:19 | 227:16,19 | 45:9,10,19 |
| 139:5 140:4 | **causing** 98:7,13 | **changed** 208:2 | 46:10 107:7 |
| 141:22 189:11 | 140:10 | 218:14 219:10 | 108:3,18 109:3 |
| 189:12,22 | **caveats** 52:18 | **changes** 44:17 | 109:10,25 |
| 190:16 | **cease** 56:25 | 129:23 207:18 | 111:4 121:6,9 |
| **category** 88:2 | **ceased** 205:4 | 223:7 | 136:6 137:4,16 |
| **causal** 134:17 | **certain** 5:24 | **characterizati...** | 139:23 145:10 |
| **causation** | 9:24 10:23 | 66:9 98:19 | 146:13 149:21 |
| 133:20,23 | 14:14 22:12,13 | 152:11 | 150:20 153:11 |
| 134:11 135:19 | 45:11 101:9 | **characterize** | 153:14,19 |
| 137:14 139:4 | 115:12 140:23 | 201:15 | 166:10 173:10 |
| 141:16 188:20 | 148:6 153:11 | **characterized** | 182:18 183:12 |
| 201:25 | 176:2,2 | 66:12 | 185:7,25 |
| **cause** 12:9 | **certainly** 37:4 | **charlotte** 2:11 | 186:11,16 |
| 42:11,16 43:3 | 40:21 51:4 | **chart** 39:24 | 187:5,19,21 |
| 43:20 46:23 | 89:19 119:25 | **check** 11:4,10 | 191:11 193:24 |
| 47:7,21 69:14 | 122:12 155:24 | 11:14,19 39:6 | 195:3 214:17 |
| 70:12 71:2 | 186:14 205:17 | 39:9 120:9 | 215:15,22 |
| 73:12,19 74:11 | 206:11,15 | 189:18 | **cite** 75:11,16 |
| 86:9 91:18 | **certification** | **checked** 11:18 | 94:17 109:13 |
| 92:4 93:5 | 139:7 226:2 | 182:8 | 109:19 131:24 |
| 112:5 113:7 | | | |

**[cited - commonly]**

| | | | |
|---|---|---|---|
| **cited** 50:14 | 107:9 108:6,10 | 196:8 | **comes** 32:12 |
| 89:2 131:11,24 | 110:7,13 111:7 | **clepic** 2:11 | 55:2 85:4 |
| 132:4 | 117:19 118:2,4 | **clerking** 5:12 | 124:4 |
| **cites** 126:9 | 118:11,14,23 | **close** 50:22 | **coming** 140:20 |
| 130:4 | 118:25 119:4,5 | 51:18 63:8 | **commencem...** |
| **claim** 58:16 | 123:8 133:19 | 205:22 | 226:10 |
| 142:20 190:6 | 136:15 139:6 | **closed** 127:7 | **comment** 79:16 |
| 220:13 | 150:15 151:21 | **closer** 58:5 | 197:14 213:23 |
| **claims** 38:13 | 151:25 152:4,7 | 192:4,14 193:6 | **commentary** |
| 51:3 | 152:23 153:3 | 194:3 195:5 | 41:22 45:16 |
| **clarified** 32:23 | 167:12 179:11 | **closing** 61:22 | 48:21 49:10 |
| **class** 6:4 14:7 | 184:23 190:6 | 61:23 | 78:25 97:18 |
| 48:3 51:13 | 191:8,10,13,19 | **cognition** 4:23 | 101:20 102:21 |
| 52:6,22,23 | 192:2,9,12,13 | **collected** 20:10 | 154:11 155:8 |
| 54:4,6 55:7,10 | 192:16,21 | 22:7 25:16 | 156:22 186:18 |
| 55:11,15,17,24 | 193:2,6,7,9,22 | 26:12 28:15,24 | 186:22 |
| 56:22 58:21 | 194:20,22 | 29:14 33:13 | **commentator** |
| 69:9 75:15 | 195:4,8,12,14 | 35:18 | 88:18 |
| 79:4 80:6,7,8 | 196:8 197:7,10 | **collecting** 29:8 | **commented** |
| 80:10,11,13 | 197:23 199:14 | **collection** | 67:19 69:2 |
| 81:2,6,11,13,21 | 199:24 200:11 | 16:18 | 94:11 |
| 82:12,13,22 | 201:8 202:12 | **column** 55:7 | **commenting** |
| 83:17 86:4,9 | 204:9 207:17 | 60:3,5 | 78:25 131:4 |
| 86:13,20 87:22 | 207:22 208:2 | **combination** | **commission** |
| 87:23,24 89:21 | 208:11 209:13 | 40:24 92:9 | 200:19 |
| 90:2 92:6,23 | 209:21 211:18 | 215:21 217:21 | **common** 61:17 |
| 93:6,12,20 | 214:13 215:6,9 | **combined** | 197:23 199:23 |
| 94:20 95:20 | 216:9 217:18 | 42:20 45:15 | 202:4,8,11 |
| 97:19,20,25 | 218:13 219:4,9 | 76:10 94:4 | 204:14 208:10 |
| 98:5,25 101:8 | 220:8,23 | 144:13 185:24 | 209:5 210:2 |
| 101:9,14,18,25 | **classes** 5:18 | 193:22 215:2 | 211:16 215:5 |
| 102:19,25 | 123:9 | 218:21 | 217:16 219:3 |
| 103:4,5,18,23 | **clear** 32:16 | **come** 24:9 | 220:7 221:9 |
| 103:25 104:5 | 101:12 167:22 | 38:24 63:8 | **commonly** |
| 104:10,11 | 187:23 188:4 | 86:19 117:8 | 164:7 |

**[communicate - contained]**                              Page 10

communicate
  92:2 141:9
companies  14:7
  15:3,19 19:11
  19:12 26:16
  27:13 30:14,16
  30:20,21 44:20
  70:14 163:25
  164:24 165:4,7
  186:22,25
company  14:23
  15:24 21:6,9
  25:5 27:3,4,5
  27:19 88:17
  136:18 167:16
  171:9 176:13
  176:15,25
  177:8,9 178:4
  178:11,19
  180:21 181:4
  181:20 182:3
  182:11,23
  183:18 184:4
  185:4 186:20
comparable
  135:5,9,17,22
  136:13 137:7
compare  161:9
  187:19 202:11
  202:14 212:16
compared
  57:20
comparing
  57:14 202:23
  215:16

comparison
  54:3 209:7
  220:9
compass  3:21
  3:23 4:14,17
  16:5
compilation
  16:20
compile  22:7
compiled  16:12
  16:19 17:6
  18:5,23 21:16
  21:21 22:4
  23:18 25:15
complaint
  182:21
complete  69:4
  144:25 145:3
  147:22 223:9
completely
  166:15 173:23
  175:4,14
  188:16 196:23
  209:17 216:15
completion
  162:18
comprehensive
  147:4
compulsion
  147:23
computer
  10:10,14,17
  180:14
conceding
  208:12

concept  114:7
  115:5 116:24
  134:24 189:21
conceptually
  135:25
concerns  139:4
concise  8:12
conclude  57:7
  57:17
concluded  57:8
  128:22 129:15
  144:11 188:3
concluding
  17:17
conclusion
  57:19 72:9
  103:13 106:4
  112:23 114:3,5
  119:9 129:21
  133:15 155:13
  155:22 200:7
  210:24 211:2
  219:12,17
conclusions
  183:10 184:19
  200:8 206:16
  211:14
conditions  4:22
conduct  58:24
  69:7 146:3
  173:12 205:6
conducted  11:6
  40:25 132:14
  177:17 189:24
  192:24 197:19

confidence
  161:19
confident  72:8
  85:2 120:12
confirm  41:25
confirmed
  101:24 102:24
  104:8
confounding
  198:6,9,12,16
  198:23
connected
  173:10
connection  5:8
  19:11 30:14
  67:16 184:14
consent  148:9
consequently
  140:2 141:19
consider  6:3
considered
  121:21 174:15
  217:20
consistent
  143:12 144:16
consolidated
  125:5
consulting  3:20
contain  8:10
  18:15
contained
  14:17 18:4,21
  21:4,22 22:21
  23:3 24:8,21
  28:12 38:6,10

45:16 47:18
49:22 57:24
171:18
**containing**
18:10 50:4
**contains** 8:4
**contemporan...**
47:25 76:9
**contemporan...**
41:2 48:14
**contemporary**
74:23
**contested**
139:22 189:3
**context** 20:24
23:13 24:2
32:21 44:15
45:8,10 84:25
85:25 140:20
167:9,10 202:3
**contingent**
79:24
**continuation**
139:9
**continue** 86:17
87:16 99:6
142:10 196:4
205:6,16
**continued**
52:14 75:4
100:10 134:18
142:13 143:21
144:5 205:2
221:25 225:2,3

**continues**
112:12,17
195:23
**contrary**
145:15 196:23
216:6
**contribute**
50:17
**contributed**
155:14,15
**control** 158:15
160:4
**controversial**
139:21
**controversy**
226:20
**convenient**
41:12
**coordinate**
37:11
**coordinated**
9:15 154:10
155:6,10,19
156:21
**copy** 21:17
82:21
**corner** 123:25
**corporate**
127:14
**correct** 4:25
10:24,25 12:3
12:4,11 15:10
16:17 18:11,12
20:5,14,23
21:25 22:17

25:11,25 26:4
28:6,7 29:5,11
29:14,16 33:3
33:4 38:22,23
39:18 41:16
42:13 48:10
49:18,20 55:21
55:22,25 58:17
58:18 60:25
62:2,7 63:20
84:10,21 93:24
100:15,16
105:20 106:20
113:24 114:3
115:23 116:15
116:17 130:20
130:21 135:7
142:14 144:6
144:24 159:7,9
174:16,19
175:2 178:22
181:24 192:21
194:4,8 202:2
203:10 208:17
216:14 223:9
**corrections**
223:6
**corrective**
143:14,25
144:3 145:3
210:5,6
**correctly** 11:7
142:23
**counsel** 138:24
139:3 226:21

**counterfactua...**
210:12
**countless**
132:14
**couple** 4:10
56:7 67:15
95:23
**coupled** 97:24
113:9
**course** 5:21
6:20 8:21
**courses** 5:22
**court** 1:2 50:3
91:16,23
119:16 124:18
129:10 131:2
131:10,14,24
132:5 134:14
135:12 137:18
188:2 196:25
197:13 217:14
**court's** 126:3
133:15 144:9
182:21
**courts** 197:14
**covered** 5:24
171:12
**covering** 5:18
**covers** 13:6
**cravath** 1:16
2:8
**cravath.com**
2:10,11
**create** 89:10
140:24 141:5

**[create - d]**                                    Page 12

| | | | |
|---|---|---|---|
| 160:13 | 13:1 14:1 15:1 | 94:1 95:1 96:1 | 164:1,3,4,5,6 |
| **created**  16:5,12 | 16:1 17:1,18 | 97:1 98:1 99:1 | 164:11,18,19 |
| 49:3 113:11 | 17:19,21 18:1 | 100:1,5 101:1 | 165:1,12 166:1 |
| 147:10 180:3 | 18:7,14,21,22 | 102:1 103:1 | 167:1 168:1,5 |
| 210:8 | 19:1,5,9,19,21 | 104:1 105:1 | 169:1 170:1 |
| **creating**  76:21 | 20:1,15,23,25 | 106:1 107:1 | 171:1,10 172:1 |
| 148:13 | 21:1,4 22:1,20 | 108:1 109:1 | 172:8,9 173:1 |
| **creation**  116:5 | 23:1,14,16 | 110:1 111:1 | 174:1 175:1 |
| 160:10 | 24:1 25:1,10 | 112:1 113:1 | 176:1 177:1,7 |
| **credible**  211:21 | 26:1,3,8,24 | 114:1 115:1 | 177:17,17,25 |
| **criteria**  14:15 | 27:1 28:1,13 | 116:1 117:1 | 178:1 179:1,24 |
| 24:14,16,16,17 | 28:14 29:1 | 118:1 119:1 | 180:1,2,17,20 |
| 25:9 30:4,8 | 30:1,12 31:1 | 120:1 121:1 | 181:1,5,9,14,18 |
| 32:9 33:17 | 32:1,23 33:1 | 122:1 123:1 | 182:1,2,25 |
| 36:5 148:2 | 33:12,15 34:1 | 124:1 125:1 | 183:1,4,9,11 |
| 168:11 176:2 | 35:1,17 36:1 | 126:1 127:1 | 184:1 185:1 |
| 181:8 183:4 | 37:1 38:1 39:1 | 128:1 129:1 | 186:1 187:1 |
| **criticism** | 40:1 41:1 42:1 | 130:1 131:1 | 188:1 189:1 |
| 214:23 219:2,5 | 43:1 44:1 45:1 | 132:1 133:1 | 190:1 191:1 |
| 219:20,23 | 46:1 47:1 48:1 | 134:1 135:1 | 192:1 193:1 |
| 220:3 | 49:1 50:1 51:1 | 136:1 137:1 | 194:1 195:1 |
| **criticisms** | 52:1 53:1 54:1 | 138:1 139:1 | 196:1 197:1 |
| 61:15 126:4 | 55:1 56:1 57:1 | 140:1 141:1 | 198:1 199:1 |
| **cumulative** | 58:1 59:1 60:1 | 142:1 143:1 | 200:1 201:1 |
| 162:16 163:3,3 | 61:1 62:1 63:1 | 144:1 145:1 | 202:1 203:1 |
| **current**  3:9 | 64:1 65:1 66:1 | 146:1 147:1 | 204:1 205:1 |
| 120:7,16 | 67:1 68:1 69:1 | 148:1 149:1 | 206:1 207:1 |
| 139:19 | 70:1 71:1 72:1 | 150:1 151:1 | 208:1 209:1 |
| **currently**  3:19 | 73:1 74:1 75:1 | 152:1 153:1 | 210:1 211:1 |
| 4:5 120:4 | 76:1 77:1 78:1 | 154:1 155:1 | 212:1 213:1 |
| **cv**  120:10 | 79:1 80:1 81:1 | 156:1 157:1 | 214:1 215:1 |
| **d** | 82:1 83:1 84:1 | 158:1 159:1 | 216:1 217:1 |
| | 85:1 86:1 87:1 | 160:1 161:1 | 218:1 219:1 |
| **d**  3:2 4:1 5:1 | 88:1 89:1 90:1 | 162:1 163:1,11 | 220:1 221:1 |
| 6:1 7:1 8:1 9:1 | 91:1 92:1 93:1 | 163:13,23 | 222:1 224:4,6 |
| 10:1 11:1 12:1 | | | |

**[d - defined]**                                                    Page 13

225:2
**d1** 176:5,7
  181:18 182:13
**daily** 55:3,4
  128:14 129:25
**damage** 59:4,5
  61:16 188:13
  188:19,20
**damages** 56:9
  57:10,13,14,17
  61:18 135:19
  188:8,21,23
  189:9,20 190:4
  190:11,14,15
  190:21 196:17
  196:20 197:6
  197:22 199:24
  201:6,13 202:2
  202:5,9,22
  204:13 207:7
  207:13 208:11
  208:13,16
  209:6 211:17
  215:6 217:18
  219:4 220:7
  221:10
**daniel** 1:14
  3:16 7:12
  53:20 124:9
  223:2,4,13
  224:11,15
  227:2,24
**data** 13:15 29:8
  31:3,3,4 55:2
  90:21 180:22

182:16 204:11
  206:15
**databases**
  176:21 181:12
  181:13
**date** 52:13
  138:9,11 173:4
  215:17 216:11
  223:13 227:24
**dated** 7:20 88:6
  122:18 138:7
  224:17
**day** 37:3,3 40:2
  52:15 54:16,18
  55:9,11,14,21
  55:23 60:7
  73:23 74:15
  75:3,6 92:6,19
  94:8 123:17
  162:24 166:3,7
  168:5 169:7,12
  169:13,18,23
  170:2 171:20
  173:21 174:5
  174:20,23
  175:20 177:4
  179:11 183:20
  185:14,16,21
  203:16,20
  210:4 216:25
  223:17 226:23
**day's** 170:13
**days** 15:7 55:15
  70:22 72:11
  75:7 90:22

91:2 95:23
  96:3 128:19,24
  129:12,17
  130:18 137:21
  137:24 158:16
  159:3,7,14,15
  162:11,13,20
  162:21,25
  165:19,25,25
  166:5,18,20
  167:3,5,7,19,25
  168:2,3,4,6,10
  168:17,19
  169:4 170:7
  173:19 174:4
  174:12,25
  175:24 177:19
  177:20,22,23
  182:4 183:14
  183:16 187:10
  203:18
**dealing** 5:22
**deals** 151:14
**dealt** 134:4
**december**
  142:21 143:7
  143:23,24
  144:20,22,25
**decision** 111:6
  122:16 124:6
  125:8 126:20
**decisions** 80:18
**declare** 223:4
**decline** 60:6,8
  60:13,22,23

61:2,6,10,20
  62:4,15 63:6
  64:18 67:2,20
  68:6,10,12
  73:12 74:21
  90:14 91:19
  92:5,23 93:5
  93:13,21 94:20
**declined** 39:18
  40:7 59:15
  66:3 67:8
**declines** 63:9
  69:15 72:22,25
  73:20 74:12
  75:14 76:4
  89:25 90:24
  143:11 195:15
  199:14 202:24
**declining** 90:11
**decrease** 70:13
  71:3
**decreased** 75:5
  75:6 195:13
**deemed** 158:23
  223:7
**defendants** 2:8
  126:5 128:5
  142:12 144:21
  152:18
**define** 23:8,21
  48:11 76:12
  115:3,7 116:8
  116:23
**defined** 24:19
  26:8 80:22

[defined - determining]                                              Page 14

116:17 150:4
**defining**  25:4
76:14 114:8
116:22
**definition**
25:24 29:10
45:4 51:20
66:13 75:24
78:2 90:9
91:11 94:9
116:11 118:3,5
147:14,16,19
147:24,25
149:13,18
199:4
**definitive**  35:25
**definitively**
35:20
**deflation**  191:3
191:19,21,24
192:11,20
193:9 194:2,7
194:12 195:9
195:10 205:5
205:12
**demand**  140:3
140:24 141:5
141:20
**demonstrate**
134:10,16
**demonstrated**
83:16 188:3
192:15 198:19
204:3

**demonstrates**
15:21 183:25
194:23
**demonstrating**
104:5 164:25
165:2
**deny**  169:22
170:3
**departure**
148:5
**depend**  108:17
109:9 149:20
150:19 153:18
**depending**
84:24 121:5
137:3 167:10
178:13 214:2
**depends**  109:2
121:7 145:9
146:12 166:9
167:12 186:10
190:4
**deponent**  223:3
**deposition**  1:14
119:21
**depressing**
203:22
**derived**  105:7
180:21
**describe**  59:5
61:13 63:24
69:23 73:7
92:11 102:3
175:4 185:25
193:25 195:3

215:23
**described**  9:19
11:23 24:8,14
26:11,13 43:7
46:4,5 47:18
51:6 63:2 64:3
94:3 98:2
108:8 151:10
152:11 154:4
157:8 165:14
168:12 180:2
183:12 185:23
194:18 195:7
220:4
**describes**
134:14 206:18
**describing**  69:5
119:12
**description**
10:3 14:9 24:7
70:3 103:24
132:4 134:9
157:13,15
168:22 174:10
224:9 225:4
**design**  10:17
**designed**  180:9
**detail**  213:25
**determination**
167:17 169:25
170:16 172:4
181:8 191:14
192:22 197:7
213:7

**determine**  12:8
15:4 17:5
27:16 47:14,21
81:21 103:3
161:13 163:7
165:24 167:2
170:6 172:2
173:18,21
174:4 178:7
191:17 192:20
194:7 197:15
207:25 218:12
**determined**
17:9 26:22
28:5 29:4
108:5 127:12
159:3,13
161:17 165:19
167:18 168:15
168:19 169:4
170:12,23
171:8,22
174:25 175:19
176:14,24
178:2,18
179:10 191:9
196:16 201:5
217:14
**determines**
119:17 217:24
**determining**
120:25 135:18
162:19 173:2
191:18 194:11
196:20

developments
177:11
devoted 4:18
diamond 76:25
77:2
differ 209:20
difference 56:8
56:14 57:10
147:12 158:20
158:22 161:11
161:14,21
195:11 196:18
213:7 214:6
221:7
different 9:25
16:24 18:6
26:6 33:14
35:19 55:13
61:18 62:25
68:22,24 73:6
74:3 75:9
92:10 94:3
111:7 123:2
124:25 135:23
162:15,24
163:2,4 174:10
175:15 177:12
177:18 187:5
190:8 193:3
199:8 208:8
209:24 221:12
differently
209:22
difficult 199:22

difficulty 74:6
116:22
direct 59:3
direction 8:19
9:20 10:20
11:16 15:15
directly 9:16
59:19 226:19
disagree
104:21 124:20
disappeared
127:4
disbelieve 84:6
disclose 120:18
disclosed 15:5
163:25 168:10
169:18 171:19
183:19,20
185:20
disclosing
188:5
disclosure
143:14,25
144:3,25 145:3
172:6 210:6,8
disclosures
27:3,14 164:24
181:6 206:2
210:7
discretion 4:10
discuss 40:20
48:20 64:5,6
64:10,20 70:4
76:20 126:19
152:19 187:6

202:19
discussed 19:18
20:13 21:3
27:6 36:18
42:18 50:15,19
65:2 70:7
89:18 116:22
133:14 144:15
148:15 165:13
177:16 192:17
192:17 196:11
198:24 215:3
217:22
discusses 64:11
76:20 125:18
126:20
discussion
39:15 64:21
76:16 77:10
141:11 147:5
164:23 165:9
172:19 182:19
218:22
discussions
76:10
disentangle
61:5 72:25
73:9 198:9,15
198:22 199:17
disentangling
198:5
dissipate 93:18
94:12 144:4
195:7

dissipated 96:3
143:16 192:8
193:4
dissipation
52:14 90:3
143:12 196:6
205:14
distinct 137:19
distinguish
81:10 87:22
distinguished
19:13,13
132:12
distort 85:19
distorted 84:12
84:19 85:8
89:9,11 101:4
114:9 146:3,11
146:15
distortion
112:6,16,17
114:12 116:5
district 1:2,2
122:20
diversification
78:9
divided 130:16
130:22
dividing 186:9
document 7:11
53:19 94:22
122:2,3,11,15
123:22 124:4,7
138:12 224:10
224:13,18

[document - empty]                                                    Page 16

225:5
**documents**
49:14
**doing** 136:10
137:2 150:18
199:20
**dollar** 54:21
**dollars** 45:24
45:25 188:18
**dow** 14:24
17:13 18:16
22:11 25:7
**download**
182:15
**downloaded**
31:6
**downloading**
181:11 182:7
**dozen** 179:14
**dr** 51:11 56:10
56:21 57:7,12
58:17 59:6
61:15 151:24
152:6,19
199:19 202:10
203:25 204:12
208:9 211:19
214:24 220:10
**draft** 206:8,11
**dramatic** 62:21
**dramatically**
58:2 154:5
**draw** 153:16
**drawn** 201:16

**driven** 76:13
78:13,21
**drivers** 50:13
**due** 154:11
155:7 156:22
**duly** 3:3 100:6
226:9
**dunbar** 65:17
**duplicates**
14:13

e

**e** 2:2,2 3:2,2
100:2,2,5,5
224:4,8 225:2
225:3 227:3,3
227:3
**earlier** 46:5
76:15 89:19
95:24 100:12
141:11 180:12
192:4,17 193:4
**easier** 21:19
**economic** 63:2
73:5,7 74:3
93:14 94:3
108:7 114:4,15
121:4 135:2
142:19 148:7
148:15 165:2
187:6 193:23
195:2 198:25
204:11 211:9
218:25
**economics** 3:20
5:23 6:20,22

127:9
**effect** 19:15
27:6,20 30:17
48:24 64:21
70:19 71:10,12
71:22 72:16,25
74:2 87:8
115:12 141:14
156:21 165:10
172:19 198:22
199:12 206:2
**effective** 21:10
**effects** 198:5,9
198:16 199:17
**efficiency**
120:20,25
121:12 124:10
124:16 125:2
125:11 126:14
133:4 153:10
**efficient** 51:12
117:3,16,21
145:5,8,18,21
146:2,19 148:8
148:14,18,19
148:20 151:16
184:22 185:24
186:7 187:13
194:21
**effort** 47:14
97:4 191:16,17
192:19 194:6
194:10 198:8
198:14

**efforts** 47:20
198:21
**eight** 59:24
88:13,22,23
89:6 90:19
91:5 94:15,17
128:19 129:12
129:17 130:16
130:23 134:9
153:23 193:18
201:19,24
**eighth** 1:17 2:9
72:22 91:20
**eighty** 130:5
**either** 20:11
21:23 23:4
27:3 29:19
31:14 33:17
47:2 113:16
119:22 170:24
194:21
**element** 217:5
**elements** 38:13
**eleven** 187:9
**eliminated**
148:13
**eliminates**
148:24
**emeritus** 4:6
**empirical**
143:20
**employ** 226:21
**employed** 3:18
**empty** 181:19

enables   161:19
ended   95:22
   204:16
engage   105:10
engaged   106:25
engagement
   36:12
english   117:12
ensure   11:5
   181:3,25
   182:10
entertainment
   12:20
enthusiasm
   76:13 77:6,8
   78:13,21 79:10
   115:21 146:22
   146:25
entire   4:17
   15:14 157:11
   200:25
entirely   145:9
entitled   7:11
   53:19 101:9
   117:20 122:3
   138:12 196:17
   224:10,13,18
   225:5
equals   130:17
equity   37:14
   120:5,13
errata   223:8
error   183:7
errors   150:11

especially
   165:7
esq   2:5,10,11
establish
   158:10 159:22
   160:20,22
established
   161:3 181:9
estimate   52:10
   52:17 58:9
   136:7,11,24
estimated
   158:6 160:14
estimating
   157:21
estimation
   160:4
et   157:21
etfs   37:20
evaluated
   124:25 125:10
   133:3
evaluating   86:4
event   11:9,11
   12:2,2,5 13:3,6
   16:24 17:2
   127:11,20
   132:14 135:6
   137:2,10,11,12
   151:4,10,19,22
   151:25 152:3
   156:24 157:2,6
   157:16,18
   158:5 162:14
   162:19 163:12

163:14,16,21
   166:2,4,6,13
   172:24,25
   173:8,15
   191:13 199:5
   200:21
events   127:15
   127:24 136:18
   136:23 151:17
   163:15,20,22
   172:25 173:4
   175:12,13
   188:5,5,7
   198:6,10,13,16
   198:23
eventually
   90:23
everybody
   107:8 221:5
evidence   73:18
   74:10 75:12,16
   76:3 82:17
   94:18 108:7
   113:3,7 135:2
   142:19 143:20
   145:16 165:2
   187:6 193:23
   195:2 197:3
   215:24 216:4,5
evidenced
   195:14
exact   9:22
   15:11 20:2
   59:2 213:21

exactly   23:15
   50:11 54:24
   57:7 60:2 62:9
   72:24 76:7
   90:11 91:21
   124:21 127:25
   131:2 158:3
   162:4 166:22
   169:20 192:12
   213:19
examination
   3:7 100:10
examine   111:3
examined   3:5
   100:8 129:12
   224:5
examining
   128:18
example   28:18
   48:18,20 84:15
   84:21 85:4
   143:3 146:16
   146:21 167:14
   189:2 206:23
   215:25
examples   84:23
   85:12,16,21
   127:16
exceeds   139:19
except   220:17
excessive   42:20
   44:9 46:14,19
   46:22 48:7,11
   101:22 113:9
   113:15,23

114:18 115:21
116:9 165:8
172:18
**exchange** 5:19
6:6 145:14
188:9 200:19
**exchanges**
145:13
**excluded** 63:13
136:18
**excuse** 28:13
42:8 115:9
161:24 180:11
**exhausts** 90:23
**exhibit** 7:9,13
7:17,18 23:16
26:23 28:13
39:23 52:7,23
52:25 53:18,21
53:24 57:18,22
59:20 88:4,7
88:21 96:9
122:6,7 131:18
138:5,14 162:8
162:10 163:23
164:3,11,12
181:5,14 185:8
224:10,13,16
224:18,22
225:5
**exhibits** 57:23
59:18
**exist** 68:4
**existed** 57:5
92:18 205:15

**existence** 41:22
44:8,16 50:11
50:17 57:14
81:12,18 90:6
97:20 101:20
102:23 103:20
104:4 112:9,11
114:6 143:15
144:17 148:14
148:24 154:25
156:18 167:2,4
170:5 172:17
186:5 192:7
193:4
**exists** 103:25
**expect** 79:19
**expectation**
78:3 83:24
**expectations**
102:4 140:8
**expected** 85:18
86:17
**experienced**
40:14 51:5
**expert** 6:4,15
7:9,10,14 13:3
37:7 122:13,21
128:5 188:12
189:9
**expertise** 6:17
6:19
**experts** 126:5
**explain** 18:24
26:5 53:23
54:13 66:10

92:16 135:25
142:17 201:11
212:9 220:5
**explained**
15:23 63:6
119:13 129:23
130:18 165:5
184:3 185:3
186:5
**explaining** 63:8
186:21
**explanation**
30:20 41:3
45:13 177:14
**explanations**
43:8 44:5
47:25 48:5,13
**explanatory**
131:7 132:17
**expounded**
196:15
**express** 102:15
105:13 201:13
**expressed**
152:6 220:10
**expressing**
156:4 190:23
218:2
**extended** 80:15
**extensive**
101:20 102:21
103:19
**extensively**
42:19

**extent** 51:20
63:5 103:12
106:3 115:24
119:8 120:10
121:3 187:20
210:23
**extreme** 41:4
43:9 44:5,16
46:10 47:7
48:2,15 64:7
66:22 67:13
73:2 74:16,18
75:20 76:12,17
78:12 90:7
92:16 116:6
155:15,16
**extremely**
199:22

**f**

**f** 3:2 100:2,5
**face** 140:14
**fact** 21:16
41:18,25 48:4
64:6 69:7
81:13 93:14
94:4 108:19
112:3,18
144:18 172:5
178:8 183:21
195:15 197:12
201:6 202:6
205:18 214:23
**factiva** 13:16
13:23 178:20

[factor - first]                                                        Page 19

**factor** 73:24
  74:8 93:25
  121:4,18,20
  126:22 127:10
  136:8,23,25
  153:4 164:8,13
  164:20 165:15
  215:21
**factors** 60:18
  60:19 63:14
  73:25 74:7
  75:9 93:11,20
  120:20,24
  121:16,20,22
  125:12,19
  126:8,9,13
  130:3,3 132:25
  133:2,5,11
  150:22 153:5,7
  164:14 165:5
  165:16 190:5,9
  192:3 193:3
  199:9,13
  203:19 217:21
**facts** 45:8,10,18
  46:9 107:6
  108:2,18 109:3
  109:9 111:4
  121:5,9 136:6
  137:3,16
  139:23 145:10
  146:12 149:21
  150:20 153:13
  153:18 166:10
  173:10 182:17

  183:11 185:7
  185:25 186:10
  186:16 187:5
  191:11 193:24
  195:2 214:16
  215:14,22
**fad** 66:14
**fads** 50:17
  66:11 68:17
  76:23
**fail** 153:4
**fair** 6:25 10:3
  17:10,12 85:3
  85:11 147:19
  147:24 158:4
  182:14 208:14
**fairly** 36:11
  132:17
**fall** 87:25
**fallen** 156:12
**false** 140:24
  142:11 146:16
  210:8
**familiar** 5:14
  40:3 77:10
  126:23 130:9
  130:13 145:4
  147:6 150:7
**far** 86:16 93:23
  191:25 192:10
  198:19 205:11
**fast** 53:4
**february** 7:20
  55:18 57:21,25
  58:4,8,10

  62:15 67:9
  88:6 96:6
  143:3 201:5,7
  203:9,11,11
  204:17,20
  205:17,19
  224:17
**federal** 5:15
**felt** 191:6
**ferrillo** 65:14
  65:17
**fifteen** 53:9,25
  59:13 70:25
  111:10 123:12
  142:6 214:2
**fifteenth**
  181:22
**fifth** 126:22
  127:10 164:8
  164:20
**fifty** 60:9,13,17
  60:23 63:9
  90:24
**figure** 167:21
**filing** 171:18
**filings** 15:18
  17:15 18:17
  27:5,14
**filter** 175:23
**filtered** 29:12
  29:20
**finance** 127:8
  131:17,21
  132:13 224:22

**financial** 5:24
  6:21,22 105:9
**find** 47:24 53:2
  59:23 83:3
  99:7 171:16,21
  171:22 176:8
  184:21 204:3
**finder** 197:13
**finding** 148:23
  196:24 197:2
**findings** 11:10
  128:7 132:22
  132:23
**fine** 41:11
  139:8,10
**finish** 26:13
  85:15 115:10
  180:11
**firepond** 143:3
**firepond's**
  143:11
**firm** 2:3 3:20
  4:2 60:23 67:5
  97:6 130:4,19
  168:9 171:16
  172:7,10,14,16
  182:23
**firms** 38:19,25
  69:23 172:15
**first** 3:3 16:2
  17:8 27:15
  37:5 40:16
  43:24 54:13
  60:3,4 61:7
  91:22 96:4

**[first - focus]**                                                            Page 20

| | | | |
|---|---|---|---|
| 114:22 123:17 | 61:1 62:1 63:1 | 141:1 142:1 | 211:1 212:1 |
| 124:3 128:12 | 64:1 65:1 66:1 | 143:1 144:1 | 213:1 214:1 |
| 133:24 150:21 | 67:1 68:1 69:1 | 145:1 146:1 | 215:1 216:1 |
| 154:3 157:11 | 70:1 71:1 72:1 | 147:1 148:1 | 217:1 218:1 |
| 158:4 159:2,12 | 73:1 74:1 75:1 | 149:1 150:1 | 219:1 220:1 |
| 159:17,19,20 | 76:1 77:1 78:1 | 151:1 152:1 | 221:1,23 222:1 |
| 159:20 160:13 | 79:1 80:1 81:1 | 153:1 154:1 | 223:2,4,13 |
| 160:20 165:18 | 82:1 83:1 84:1 | 155:1 156:1 | 224:6,12,15 |
| 173:17 175:6 | 85:1 86:1 87:1 | 157:1 158:1 | 227:2,24 |
| 176:10 197:12 | 88:1 89:1 90:1 | 159:1 160:1 | **fischel's**   128:6 |
| 205:9 206:13 | 91:1 92:1 93:1 | 161:1 162:1 | 134:15 |
| 207:15 | 94:1 95:1 96:1 | 163:1 164:1 | **fit**   14:9 24:7 |
| **fischel**   1:14 | 97:1 98:1 99:1 | 165:1 166:1 | 30:4 31:22 |
| 3:12,16 4:1 5:1 | 100:1 101:1 | 167:1 168:1 | 103:24 181:8 |
| 6:1 7:1,12 8:1 | 102:1 103:1 | 169:1 170:1 | **five**   121:15 |
| 9:1 10:1 11:1 | 104:1 105:1 | 171:1 172:1 | 125:16,23,24 |
| 12:1 13:1 14:1 | 106:1 107:1 | 173:1 174:1 | 126:2 153:4 |
| 15:1 16:1 17:1 | 108:1 109:1 | 175:1 176:1 | 161:18,25 |
| 18:1 19:1 20:1 | 110:1 111:1 | 177:1 178:1 | 164:13 165:15 |
| 21:1 22:1 23:1 | 112:1 113:1 | 179:1 180:1 | 196:2 |
| 24:1,12 25:1 | 114:1 115:1 | 181:1 182:1 | **fixed**   149:12,18 |
| 26:1 27:1 28:1 | 116:1 117:1 | 183:1 184:1 | **flag**   183:2 |
| 29:1 30:1 31:1 | 118:1 119:1 | 185:1 186:1 | **flaws**   129:7 |
| 31:24 32:1 | 120:1 121:1 | 187:1 188:1 | **flipping**   53:4 |
| 33:1 34:1,12 | 122:1 123:1 | 189:1 190:1 | **florida**   1:2 |
| 35:1,11 36:1 | 124:1,9 125:1 | 191:1 192:1 | **fluctuated** |
| 37:1 38:1 39:1 | 126:1 127:1,12 | 193:1 194:1 | 205:19 |
| 40:1 41:1 42:1 | 127:16 128:1 | 195:1 196:1 | **focus**   21:13 |
| 43:1 44:1 45:1 | 128:13,20 | 197:1 198:1 | 74:8 80:6 |
| 46:1 47:1 48:1 | 129:1,20 130:1 | 199:1 200:1 | 124:11 126:14 |
| 49:1 50:1 51:1 | 131:1 132:1 | 201:1 202:1 | 127:13,16,21 |
| 52:1,15 53:1 | 133:1 134:1 | 203:1 204:1 | 133:17 139:5 |
| 53:20 54:1 | 135:1 136:1 | 205:1 206:1 | 143:22 151:17 |
| 55:1 56:1 57:1 | 137:1 138:1 | 207:1 208:1 | 210:10 214:3 |
| 58:1 59:1 60:1 | 139:1 140:1 | 209:1 210:1 | |

focused   50:24
50:25 78:16,17
78:22 95:9
121:18,20
135:2
focuses   97:19
focusing   51:10
51:16
follow   129:22
follows   3:6
100:9
footnote   65:5,6
65:8,12,19
70:23 88:10,19
89:7 111:11
130:4 184:12
201:23
footnotes
111:10
forces   136:17
136:17
forecast   158:19
161:5
foregoing
223:5
forever   68:19
form   6:7 42:3
62:8 71:24
76:22 77:21
89:8 98:16
113:18,25
114:16 119:23
132:9 187:16
formed   42:10

forming   8:17
42:5
formulated
159:9
forth   178:3
forty   131:22
198:2 207:4
214:12
found   47:10
51:11
foundation
12:17
four   9:3 35:3
60:9,13,17,23
63:9 88:10
89:7 90:25
123:21 124:5,7
125:16 142:18
150:22
fourteen
111:10,12
frame   138:18
174:6
fraud   7:3 84:12
84:19 85:8
86:7 135:15
137:22 188:14
189:8 209:23
212:6 213:22
216:13,25
frd   122:19
free   117:4,21
frequency
104:19,24
105:19,22

106:19,23
107:2
frequently
132:16
front   96:19
97:8 131:12
138:8
fully   142:18
function   10:24
186:17 197:7
fundamental
44:19 45:3
67:17 75:24
86:18
fundamentals
165:6
funds   37:19
38:2
further   62:12
110:17 183:2
192:5 203:11
203:15 226:16
future   197:15
futures   120:2

**g**

gain   207:3,8,10
208:5 218:16
gained   209:15
gains   67:14
190:7
gamestop
12:20
gem   108:14
general   64:21
74:23 134:3,22

140:18 147:18
208:8 214:4
generality
136:4 204:7
generalize
56:16
generally   61:16
87:5 121:21
130:2,13 131:7
133:17 145:12
147:24 153:5
156:19 214:25
generate
158:18 160:5
161:4 181:13
generated
142:11
give   29:4,13
35:13,25 48:18
82:13 157:4
168:13,14
179:17 180:7
221:13,16
given   43:9 44:5
48:14 92:16
154:18 179:15
190:2 207:14
207:15 215:15
223:10
giving   153:20
gme   70:24
go   14:19 19:6
31:24 41:9,12
61:21 62:12
66:5 77:15

**[go - history]**                                                    Page 22

89:17 98:13,14
110:9 120:7
123:21 127:2
128:3,16
132:24 133:20
134:8 142:5,25
143:18 153:23
156:24 179:3
190:25 196:20
198:2 203:10
212:19
**goes** 126:7
201:25 202:4
**going** 41:6
50:12 53:11,17
56:5 61:9
62:17,18 66:3
66:5,25 67:20
71:7 72:10
73:16 74:4,21
75:25 78:4
79:20 80:25
87:16 88:3
93:9,18 95:13
103:14 108:20
108:21,22
111:16,19
120:18 128:15
131:15 140:18
160:19 168:13
185:17 190:6
195:18,21
196:5 197:13
199:2,5 204:16
217:13

**gompers**
128:18,25
129:2,2,11
**good** 3:12,13
52:17 59:7
96:6 127:7
**gotten** 4:12
**great** 98:14
**greater** 19:2
22:24 23:7,9
23:17,22 24:5
24:11,19,25
25:14 26:7,21
28:4,10 29:3
29:19 31:9
32:17 119:13
**greatly** 65:22
**grenadier** 36:6
37:6,8
**grenadier's**
53:8
**guess** 8:10 16:2
29:10 37:21
48:4 68:16
82:8,10 84:7
95:3 124:14
125:25,25
185:17
**guidepost**
186:12
**gurney** 206:19
206:24 207:7
208:15
**guy** 96:10

## h

**h** 3:2 100:5
224:8 225:3
227:3
**half** 54:21,22
**halt** 71:10
**halted** 70:24
**halts** 70:9,12
71:21 72:7,12
72:13,15
**hand** 123:24
226:23
**handle** 190:8
**hands** 76:25
77:2
**happen** 44:3
**happened**
67:12,22,23
68:3,21,22,24
123:17,18
175:8 193:12
193:14 204:20
209:7,8 212:15
**happening**
70:21
**happens** 175:6
212:14
**happy** 41:12
**hard** 61:5 73:8
**harvard** 129:4
129:5
**he'll** 171:5
**heading** 143:19
**headline** 14:24
16:9 20:12

21:24 23:5
24:23 25:6
33:7,25 34:21
**headlines** 22:10
**hear** 76:24
**heard** 117:2,5
**heightened**
154:11 155:7
156:22
**held** 1:16 118:9
226:7
**hereto** 223:8
**hereunto**
226:22
**high** 19:8 56:16
104:18,23
105:19,22
106:18,23
107:2 136:3
156:11 204:7
216:2
**higher** 77:25
78:5 79:21
87:19 140:10
140:17 201:20
**highest** 57:11
**highlight** 91:7
184:17 198:12
**highly** 79:5
166:12
**hinges** 83:7
**historical**
157:21
**history** 188:13
214:11 215:8

220:22

**hit** 10:13,17
**hock** 1:18
226:4,25
**hold** 79:10 80:3
187:14
**holding** 187:3
**hope** 40:5
98:12,13
110:22
**hoped** 110:16
**hoping** 110:8
111:16,21
112:10,16
**horizon** 78:2
**hour** 41:7
178:24
**hours** 195:22
196:2,3
**household**
188:14
**huge** 61:7
**hugh** 96:10,14
97:5
**human** 183:7
**hundred**
122:25 123:4,5
124:12,17,24
125:5 130:5
158:16 204:25
**hypothesis**
145:5 158:25
161:20
**hypothetical**
43:23

**i**

**i.d.** 224:9 225:4
**idea** 14:14
105:16 137:20
**identification**
7:13 53:22
88:8 122:6
131:19 138:15
**identified** 12:7
13:4,12 18:9
23:2 29:9,14
31:7 32:9,11
33:24 34:19,19
36:5 37:6 39:5
42:9 128:19
129:12 166:17
172:7 180:22
**identify** 26:25
27:12 38:24
69:21 148:11
177:2 191:18
194:6,11
198:15 215:7
216:7 221:14
**identifying**
221:15
**illegal** 112:19
**illinois** 3:11
**illiquidity** 85:9
86:8
**illustration**
185:22
**illustrative**
28:19,21 69:10

**immediately**
54:6 192:16
193:14 201:17
**impact** 26:17
106:17
**impacted** 15:6
**implemented**
38:19
**implication**
153:17
**implications**
77:12
**importance**
184:17
**important** 72:7
91:6 103:7,15
103:16 121:22
153:6 184:19
204:11 209:19
**imposed** 67:4
73:6 118:21
**impossible**
67:11 68:5
73:8 199:22
220:6
**impossibly**
217:9
**impression**
141:5
**impressive**
127:6
**inaccurate**
152:14
**incentive**
148:20,21

**inclined** 140:19
**include** 14:13
19:24 91:3
165:25
**included** 19:19
164:18 166:3
187:25
**including** 37:9
72:11 191:12
211:22
**inclusive** 14:16
**incoherent**
59:6
**incomplete**
43:22 187:17
**inconsistent**
111:23 112:14
193:25 204:12
**incorporation**
126:21
**incorrect** 194:9
**increase** 43:4
43:21 47:4,16
61:7,12 62:6
62:21 68:8
70:6,13 71:2
74:19 75:4
86:18 141:4
155:16 187:2
195:16
**increased**
65:22 86:14,16
154:5 195:12
**increases** 15:22
40:14,19 47:22

[increases - initial]                                              Page 24

64:22 67:14,18
69:2,11 73:3,4
74:17 90:11
93:15 94:5,6
112:12,18
154:7 155:15
184:2,25
185:14,15,15
186:4,18,19,21
187:11 196:7
199:3
**increasing**
110:16
**incremental**
199:12
**incurred**
207:20
**independent**
41:20 42:4
97:9 131:6
132:18 136:8
160:2
**indeterminate**
209:17
**index** 60:20
135:5,9,18,22
136:13,16
137:7 158:13
159:25 160:10
160:11,14
161:2
**indicated** 30:25
97:17
**indicates** 98:5

**indicating**
98:25 109:20
**indication** 56:5
95:22,25
**indices** 158:9
**indirectly**
37:21,23
226:19
**individual**
36:24 37:16
82:2,4 107:18
107:20 150:15
155:25 207:20
211:6,8
**individualized**
81:9 87:21
103:2 194:16
207:24 210:17
218:11 219:8
**induce** 118:23
**induced** 118:23
**industry** 60:19
60:20 61:25
63:7,14 96:23
97:2 130:3
136:13,17
158:9,13
159:25 160:11
160:14 161:2
203:2
**inefficiency**
129:21
**inefficient**
146:6,10,20
152:8,16,22

153:3
**inevitable**
68:12
**inevitably**
67:20 93:17
94:12
**infer** 131:9
140:5 141:23
**inference** 56:3
91:17 201:16
**inferences**
91:24
**inflated** 51:21
57:11 58:7
66:4 79:21
87:9,12 95:6
100:14 101:4
102:9,14
110:15 114:10
142:10 143:5,6
143:15 144:12
212:24
**inflation** 52:15
56:13 65:11
66:6,23 96:2
112:9,11 113:8
134:18 142:20
143:13,21
144:4,5,17
188:22 189:22
190:3,10,14,20
191:2,5,6,12,24
193:5 194:3
195:6 197:10
204:25 205:15

210:3 212:23
214:5
**influence** 111:5
142:13 190:9
203:20
**influenced**
137:22
**information**
15:25 19:12
27:4 30:15
44:18 47:24
50:8 75:23
91:4 97:23
102:22 109:7
121:23 126:21
127:17 128:23
129:16 133:18
139:18 140:6
141:9,24
142:11 147:22
148:4 163:24
165:4,12,13
168:10 169:17
171:18 176:4
178:8,14,16
182:20,24
184:5 185:5,20
186:20,25
188:5
**informed** 141:6
**inherent** 92:12
**inherently**
68:18 116:13
**initial** 96:6
122:4 123:16

134:4 138:13
161:6 224:19
225:6
**inquiries**
107:18 210:17
**inquiry** 81:9
82:2,4 87:21
103:2 107:21
194:16 207:24
211:6,8 218:12
219:8
**ins** 190:8
**inspect** 65:15
**instance** 126:17
**instances** 14:11
19:22 22:14
**instant** 140:4
141:22
**institutional**
49:3 147:7
165:11 172:20
**institutions**
105:10
**integrity** 81:16
81:18,22 82:18
83:8,9,21,25
84:17 85:10,22
86:5,10,25
87:3,13 101:11
103:4,9 104:7
105:24 106:9
106:12,19
107:3,10,23
108:4,15,25
109:15,21

110:4,6,11,19
110:25 111:24
112:14 117:15
194:19
**intended** 79:10
**intensive** 40:23
**intent** 115:12
**interest** 98:15
**interested**
226:19
**interfere** 4:22
**interpret** 109:6
**interpreting**
144:8
**interval** 94:14
**introduce** 7:8
88:4
**introduced**
88:20
**introduction**
39:10 185:11
**invest** 37:19
**investigate**
183:2 204:19
**investigated**
132:11
**investigating**
107:6
**investigation**
97:10
**investigations**
144:21
**investing**
111:15

**investment**
77:13,17,18
78:3,8 79:12
80:17 111:6
150:11
**investments**
96:15 97:5
**investor** 110:21
149:24
**investors** 48:25
49:3 77:14
78:14,18,20
79:3 81:15
85:17,21 97:11
98:12 101:16
102:16 103:8
113:11 118:8
118:13 139:17
140:4 141:2,6
141:21 147:7
147:11 149:15
150:2 156:22
165:11 172:21
172:22 210:14
213:16 215:24
215:25
**involved** 37:4
120:14 125:4
**involves** 12:18
115:11 120:17
**involving** 120:2
120:4 122:25
**ipo** 122:17
126:15 131:25
133:4 134:2

137:16 138:7
143:2 144:12
144:14 187:8
189:10 204:22
204:24 212:19
213:19,24
**ipos** 123:2
**isolate** 73:24
74:2 199:12
**isolating** 74:7
**issue** 83:7
105:15 107:21
107:22,25
108:3 131:22
190:24 191:8
205:3 209:3
211:20
**issued** 200:19
**issuer** 145:20
**issuers** 124:25
142:9,13
**issues** 123:10
139:4 150:25

| j |
|---|

**j** 2:10
**january** 1:5
15:3,3 16:6,7
20:9,10 21:25
22:2 23:6,6,20
23:20 24:24,24
25:8,8 27:25
28:2 34:2,3,22
34:23 39:16
50:22 51:8,9
51:19,23 52:2

52:11,21 57:22
58:3,7,12,19,23
59:15 60:4,10
60:25 61:3,8
61:22,23 62:6
62:22 64:2
66:18 67:8
69:15,25 70:10
70:11,25 71:8
71:10,21 72:14
73:13,21 74:13
74:19 91:9,9
91:10 92:5,18
92:18,19 94:7
94:7,8 95:6,12
95:19,24 96:8
100:15,18,18
100:19,25
102:7,8,12,13
108:14 118:10
122:18 138:8
158:17 167:15
176:10,16,25
181:21 183:15
183:16 185:13
193:17 196:19
202:13,16,22
203:2,5,6
204:2 205:22
206:25 207:4
216:2 223:1
227:1
**jessica** 9:6,17
**job** 171:10

**jonathan** 9:7
**jones** 14:25
  17:14 18:16
  22:11 25:7
**joseph** 206:18
  206:23
**journal** 14:25
  17:14 18:16
  22:12 25:8
  96:23,23 97:2
  131:17,21
  144:2,19
  224:22
**judge** 122:16
  126:20 196:16
  217:23
**judgment**
  150:11
**judicial** 125:9
**jurors** 197:14
**jury** 188:12
  189:4 196:15
  196:25

### k

**keep** 111:9
  128:14 158:2
**kept** 156:9
**kevin** 2:10
**keys** 10:13,17
**kind** 6:12
**kinds** 68:17
  80:4 202:18
**knew** 174:12
**know** 7:16 9:5
  12:13,22 13:13

13:19 23:22
31:12 33:18
36:6 38:12
39:23 41:17,21
45:6 61:4
67:11 68:16,23
75:8 78:25
79:23 80:12
82:6 83:10
84:24 87:11
95:16 96:16,17
96:24 97:12
98:18 104:22
104:23 105:2
105:12 106:5
106:21 107:5
109:7 115:13
117:8,10,13
118:2 130:21
134:22 136:20
136:21 137:20
138:10,22
143:6 144:7
149:7,12,23
150:12 156:8
161:11 163:10
167:3,5,7
169:3,5,14
175:22 180:17
180:25 186:8
190:5 191:11
193:11 196:21
196:22,25
199:10,21
200:24 204:18

210:2,4 211:7
212:3,7,13,15
220:16 221:2,2
**knowing** 35:22
  72:21 81:3,6
  209:4,12
  214:18 215:14
**knowingly**
  79:18
**knowledge**
  86:22,23 87:4
  87:6 169:22
  170:13,20
**known** 129:24
  130:12
**korsini** 2:10
**koss** 12:25
**krogman** 133:5

### l

**l** 3:2,2 100:5,5
**lack** 21:7 46:6
  81:18 110:5
  172:15 186:19
  186:23
**laid** 121:17
**language**
  117:12 144:9
**large** 40:14
  70:6 79:24
  104:17 105:8
  158:23 161:15
  161:16,24
  165:11
**largely** 188:16

**[larger - look]**                                               Page 27

**larger** 19:6
  20:4,22 21:15
  24:20
**largest** 105:9
  185:18 188:13
**lasted** 90:21
**laura** 9:6
**laurence** 2:5
**law** 2:3 4:6,7
  5:8 219:7
**laws** 5:15 7:4
**lawsuit** 80:14
**lawyer** 5:2,3,4
**lay** 12:17
**lead** 14:24 16:9
  20:13 21:24
  22:10 23:5
  24:22 25:6
  33:8,25 34:21
**lee** 4:5
**left** 63:17
  123:24 183:6
**legal** 6:12
  38:15,16
  103:12 106:3,7
  107:16 112:22
  112:24,25
  113:20 114:3,7
  114:15 115:15
  115:24 116:3
  116:24,25
  117:23,24
  119:8,15 121:2
  134:23 135:3
  145:23 146:9

153:20 155:12
  155:21,22
  156:2,4 189:21
  190:22,24
  200:7,8,13
  209:2 210:23
  211:8,14
  218:24 219:12
  219:17
**legally** 217:24
**length** 40:20
  89:19 108:8
  119:14 195:7
**lepic** 2:11
**level** 9:12 19:8
  56:16 58:13
  69:6,9 136:3
  161:19 192:15
  193:17 194:4
  201:21 204:7
  205:22
**levels** 156:13
  156:15,17
**lexecon** 3:21,24
  4:14,14,17
  16:5
**liability** 145:2
  196:14 201:21
**lifted** 58:11
  201:18 205:8
**light** 62:20
  108:6 109:6
  123:18 151:24
  161:12 183:11
  185:6

**likely** 140:5
  141:23 145:18
**limited** 139:6
**line** 138:2
  186:9 227:4,7
  227:10,13,16
  227:19
**link** 134:17
**linked** 44:17
**liquid** 85:2
**list** 93:25 157:4
  177:7
**listed** 18:17
  127:16 172:8
  177:16 181:4,5
  182:11,12,24
**listing** 19:10
  182:3
**lists** 172:10
  206:20
**literally** 179:13
**literature**
  64:11,16,19,24
  65:2,9 74:24
  74:24 75:19
  76:6,11,19
  91:15 112:2
  132:7 140:13
  148:7,16 150:5
  150:9,13,17
**litigation** 1:6
  6:5 85:25
  114:17 119:6
  122:5,18,24
  126:15 131:25

133:4 134:2
  137:17 138:7
  187:8 189:3
  204:22 212:20
  213:19,24
  223:1 224:21
  227:1
**little** 20:6 22:4
  59:18
**live** 83:6,13
  119:24
**llp** 1:17 2:8
**long** 41:12
  77:16,17 79:11
  80:2 85:6
  87:15 90:20
  130:12 142:10
  148:2 156:10
**longer** 23:13
  41:9 57:2
  58:24 132:8
  144:6 205:7
**look** 14:2 17:15
  17:21 22:16
  29:5 33:19
  35:15 52:5
  54:8 57:3 97:3
  101:15 108:21
  120:10 122:2,7
  122:9 138:16
  139:13 147:3
  151:4 166:7
  168:5 173:17
  173:20 174:22
  185:8,13,13

201:3 203:8,15
203:18,23
207:22
**looked**  11:17
17:19 22:18
33:10 35:21,24
50:2,24 130:11
133:10 165:18
170:7 174:13
174:19 177:6
181:6
**looking**  36:2
53:7 59:12
96:12 125:13
131:13 133:7,9
140:21 167:11
184:7
**looks**  70:8
131:3 133:2
137:15 138:6
138:19 143:24
144:10 151:9
**lose**  77:19
**loss**  97:21
101:17 102:20
118:10 133:20
133:23 134:11
135:19 137:13
139:4 141:15
188:19 201:25
202:15 207:20
208:5 218:16
**losses**  190:7
209:14

**lost**  214:22
**lot**  6:23 7:2 8:9
18:19 50:2
71:6 93:14
147:6 164:25
184:13 198:12
203:6 209:25
**low**  131:4,7
132:17
**lower**  9:12
57:16 58:2
66:5 123:24
193:19 201:7
204:6
**lowest**  185:19
**lrosen**  2:6
**lunch**  99:12,14

**m**

**made**  27:11
46:17 169:24
170:15 181:7
192:19 194:5
198:14 200:11
207:10 208:23
209:10 210:25
214:21 223:6
**madison**  2:4
**magnitude**
192:7
**main**  92:15
203:17
**majority**  15:21
184:2,25
**make**  11:9,14
11:20 21:19

23:11 28:23
35:5 47:14,20
49:7,7,9 62:11
82:5 84:14
89:5 91:16,23
97:4,9 111:20
150:10 167:17
167:22 189:18
191:16,17
194:10 196:21
198:8,21
220:13
**makes**  44:13
46:2,7
**making**  24:3
78:22 97:18
101:13 113:21
219:13,16
**management**
97:6
**mandel**  9:6
**mandel's**  9:17
**manipulate**
97:15 145:19
**manipulated**
58:20 146:7
153:9 156:15
**manipulating**
80:22
**manipulation**
85:9 86:7 98:6
98:8,9,15,23
99:2,3 112:20
113:4,17,24
114:7,8,11,13

114:20,24
115:4,5,8,11,19
116:15 117:4
117:22 119:20
120:2,5,15,17
134:2,6,21,23
152:9 153:11
153:21 155:11
155:20 156:3
156:20 205:2
208:24 212:25
**manipulations**
84:13,20 154:9
154:14,23
155:5
**manipulative**
205:6
**manner**  127:19
160:21
**mark**  53:14,17
**marked**  7:12
53:21 88:7
122:5 131:18
138:14
**market**  52:3,6
60:18 61:25
63:6,14 80:23
81:16,19,22
82:19 83:9,21
83:22 84:2,4
84:17 85:3,10
85:19,22 86:6
86:10,25 87:3
87:13 89:9,11
92:10 101:11

[market - meme]                                                      Page 29

| | | | |
|---|---|---|---|
| 103:5,9 104:7 | 194:19,21 | 120:6 132:11 | 97:12 101:23 |
| 105:24 106:10 | 202:25 | 146:14 153:12 | 109:12,19 |
| 106:12,20 | **markets**  5:24 | 191:21 195:10 | 113:10,15,23 |
| 107:3,10,24 | 6:21,22 120:3 | **meaning**  66:4 | 114:19 115:21 |
| 108:5,16,25 | 120:5 122:25 | 131:6 148:17 | 116:10 146:22 |
| 109:16,22 | 124:11 148:17 | 149:25 153:20 | 147:5 149:15 |
| 110:4,6,11,20 | **marriage** | 161:20 178:10 | 154:12 155:8 |
| 111:2,24 | 226:18 | 191:22 | 156:23 165:9 |
| 112:15,16 | **massive**  87:7 | **means**  29:17 | 172:19 |
| 116:14 117:4 | **matched**  60:5 | 51:21 66:14 | **medical**  4:21 |
| 117:15,16,21 | **material**  39:11 | 83:22 87:9 | **medication** |
| 119:20 120:14 | 73:12 74:11 | 106:6 117:10 | 4:20 |
| 120:19,25 | 168:16 210:9 | 117:13 147:15 | **meet**  24:14 |
| 121:11 124:16 | **materials**  43:7 | 149:24 150:2 | **member**  81:5 |
| 125:2,10 | **matter**  9:14,20 | **meant**  66:15 | 86:9 101:14 |
| 126:13 130:3 | 37:5 45:12 | 98:18 160:9 | 104:11 191:10 |
| 133:3,11 | 75:22 181:12 | **measure**  57:10 | 191:13 207:22 |
| 136:16 139:19 | 214:4 226:20 | 57:13 58:6 | 208:2 218:13 |
| 140:2,5,7,15,17 | **maximum**  58:6 | 137:8 190:13 | 219:9 |
| 141:7,9,19,22 | 221:3 | 190:21 | **member's**  86:5 |
| 145:5,8,18,21 | **mdl**  1:8 | **measured**  54:4 | **members**  9:2 |
| 146:2,6,10,19 | **mean**  6:10 | 54:7 56:14,17 | 80:6,7,11,13 |
| 146:20 147:13 | 12:13 16:12,14 | 56:20 202:23 | 81:2,11,13,21 |
| 147:19,25 | 23:23 29:6 | **mechanical** | 82:14 83:17 |
| 148:9,11,14 | 37:16 45:22 | 182:6 | 86:21 87:22,25 |
| 151:16 152:8 | 62:19 63:17,21 | **media**  40:24 | 97:20,25 98:5 |
| 152:17,22 | 63:24 64:3 | 42:21 44:10 | 98:25 101:8,9 |
| 153:3 154:8,9 | 65:10,23 66:4 | 46:15,19,22 | 101:18 102:19 |
| 154:14,22 | 73:2,11,19 | 47:11,12 48:7 | 103:4,5,18,23 |
| 155:5,11,19 | 74:8,11 75:12 | 48:12,17,19,21 | 103:25 104:6 |
| 158:7,13 | 76:4 80:8 | 50:9,13,16 | 118:24 119:5 |
| 159:25 160:10 | 83:20 87:2 | 76:6,13,21 | 190:5 191:8 |
| 160:14,25 | 98:17 106:21 | 77:6 78:13,16 | 200:12 209:14 |
| 184:22 185:24 | 109:23 111:14 | 78:21 79:2,10 | **meme**  71:17 |
| 186:7,22 | 111:14 117:14 | 79:25 80:5 | 200:21 |

**memorized**
39:25
**memory** 4:23
137:19
**mention** 19:25
30:13 36:23
153:22 213:13
**mentioned** 9:14
15:13 18:20
19:5,10,21
20:11 22:15
25:6 27:2,12
27:19 32:18
33:6,14,24
34:19,20 36:20
36:22 38:18
46:8 64:24
69:18 74:9
77:9 88:10
137:10 183:15
192:4 193:4
197:25
**mentions** 14:22
20:2 139:17
**merely** 43:19
129:22
**met** 25:9 33:16
36:4 148:2
**method** 61:17
189:20 191:18
199:20,23
202:4,8,11,14
204:13,14
209:6 211:16
215:5 217:17

219:3 221:10
**methodology**
127:12 134:10
134:14 135:18
136:2 137:9,10
194:6,11
197:24 208:10
210:3 215:16
220:8
**methods**
198:15,22
**michigan** 3:10
**mind** 85:5
86:19 189:3
**mine** 206:16
**minute** 40:2
99:10
**minutes** 56:8
70:25 71:8
72:11
**mischaracteri...**
179:6 212:12
217:12
**mischaracteri...**
94:21 178:24
216:16
**mischaracteri...**
179:22
**misconduct**
38:4 142:12
144:22 205:3
**misheard** 12:16
**misimpression**
210:7

**misleading**
142:11 159:18
**mispriced**
148:11,23,24
**misrepresent...**
85:8
**misrepresent...**
84:13,19 86:7
**missing** 66:7
**model** 56:10
59:5 61:16
163:19 166:25
166:25 169:16
173:13 175:11
180:3,3,4,15
**momentum**
108:12,13,14
108:19,22
109:6 110:24
**money** 77:20
78:22 97:6
214:22,22
**month** 67:23
**months** 143:7
205:3
**moore** 1:17 2:8
**morning** 3:12
3:13 171:13
**motivations**
79:2
**move** 12:10
163:8 169:7
170:21
**moved** 44:25
127:18 128:22

129:15 192:5
192:14 193:6
195:5 196:8
**movement** 15:8
44:13 45:4,24
169:10 170:14
173:4 193:2
**movements**
21:12 26:18
27:9,23 30:19
39:25 41:4
42:6,12,16
43:10 44:6,12
44:16,20 45:15
45:20 46:11,17
46:24 47:7
48:2,16 50:14
50:18 51:6,22
51:23 62:2
63:7 64:7,12
71:16 75:20
76:18,22 91:8
92:13,17
100:18,20
116:6,12
121:24 128:14
131:9 144:15
154:20 159:6
159:23,24
160:23,24,25
165:3,22 168:2
169:19 170:6
172:13 175:17
177:15 194:24
203:2 207:16

moving   164:9 194:3 221:8

multiple   14:12 19:24,25 31:23 32:13,24 35:12 35:18 70:7 92:8 93:10,11 93:19 95:2 102:22 103:20 154:25 176:20 178:6 197:20 198:25 210:6 211:22 219:18 221:19

mutual   37:19 37:25

**n**

n   2:2 3:2 100:2 100:2,2,5 224:4 225:2

name   3:14,21 9:9 16:8 19:10 21:22 23:4 24:21 25:5 27:19 30:13 80:17 124:3 179:16,17,18 179:18 180:5,6 180:7,17

named   206:7 206:18,23

names   9:4 14:23 38:25 180:25

narrowed 18:24

nasdaq   144:23

nature   38:25 61:11 62:5 63:25 64:12 66:6 67:13 68:17 69:11 91:10 92:12 100:22 103:22 112:7 116:13 134:20 178:13 186:17

necessarily 117:17 153:17

necessary   82:3 82:5,6 87:21 103:3 151:2 194:17 210:18 211:3 223:7

need   10:22 107:20 191:10

needs   107:17

neither   104:20 147:22

net   208:5 218:16

never   5:20 49:19 67:12 80:3

new   1:17,18,19 2:5,5,9,9 3:5 15:23 88:4 100:8 122:20 128:23 129:16

145:13 165:3 184:4 185:3 226:5

news   12:6,8 13:5,9,11,14,17 13:22,25 14:5 14:22 15:2,5 15:17 16:6,18 16:20 18:10 20:3,9,22 21:6 21:9,15,21,25 22:17,25 23:7 23:9,17,22 24:5,11,20,20 24:25 25:15 26:7,9,21 27:2 28:4 31:9 32:13,17 45:2 46:6 47:11,12 49:17 76:6 88:17 109:12 109:19 130:4 130:18,19 163:8 164:10 164:21 165:18 165:25 166:19 167:16 168:16 168:17 169:5,9 170:2,8,17,24 171:9 172:3,5 172:10,11 173:20,22 174:14,19,23 174:24 175:20 175:25 176:13

176:15,25 177:3,4,8,9 178:3,4,11,19 179:10 180:21 181:4,20,22 182:3,11 183:14,18 186:6 187:12

nine   12:9,15,16 12:18,22 15:22 16:8 18:10 19:4 20:11 21:23 23:3,4 23:19 24:22 27:24 33:7,24 34:20 38:21 39:17,21 41:19 43:21 46:24 48:8 50:21,25 51:2,5 59:16 64:17,20 66:18 67:5 68:12 69:15 71:11,12 71:23 72:16,23 73:20 74:13 75:14 77:7 79:11 80:20 89:15,25 95:5 95:10 97:14 100:13 105:18 112:20 113:4 118:9 121:12 121:16 122:25 123:6 124:17 124:24 125:5

125:25 149:16
154:15 184:3
185:2 193:19
201:19 204:8
204:25 206:4,9
206:17 210:11
218:5,11
220:15 221:16
**nineteen**  7:25
8:4
**ninety**  124:6
161:18
**noise**  149:6,9
149:10,16,18
150:6,10
**nonaffected**
12:14
**nondisclosure**
210:9
**nonfocus**
124:13
**nonmanipula...**
156:12
**nonuniform**
207:16
**normal**  153:9
**normally**  166:7
**notary**  1:18 3:4
100:7 223:14
223:21 226:4
**noted**  222:3
223:7
**notice**  1:15
187:25

**notion**  179:21
**notwithstandi...**
144:18
**null**  158:25
161:20
**number**  6:18
7:17 12:6 13:5
18:8,25 28:22
104:17 105:9
123:4 128:6
181:19 185:18
185:19 189:12
**nyse**  70:24 71:9

**o**

**o**  100:2,2,2
**obfuscate**  35:5
170:25
**object**  6:7 62:8
71:24 77:21
98:16 113:18
113:25 132:9
210:22
**objection**  8:6
17:23 31:10
70:15 103:11
106:2 107:14
114:21 119:7
168:25 187:16
**objections**
115:22
**obligation**
216:10,20
**observe**  58:25
140:3 141:20
161:21

**observed**
132:15
**obtained**  13:9
13:11,14,23
14:6 22:14
178:19
**obvious**  146:21
170:19
**obviously**  38:7
144:9 145:16
**occur**  67:20
73:16 74:22
97:21 199:5
**occurred**  15:8
56:21 64:8
67:12 68:6,13
72:12 74:19
75:21 90:12
91:8,25 92:9
93:12,20 94:5
94:6 135:16
144:24 209:4
209:12 213:9
213:11,12
**occurring**
40:23 57:2
58:25 71:16
75:9 198:13
199:9
**occurs**  109:8
**offer**  7:5,22
88:14 117:18
118:12,17,20
**offered**  36:13

**offering**  38:16
81:24 106:6
114:14,16
115:17 116:25
117:24 119:15
121:2 122:4
138:13 146:9
155:22 197:16
197:18 200:2,8
200:9,14
207:12 208:18
208:25 211:14
216:21 224:20
225:7
**offerings**
123:16 134:5
**office**  16:3
**offices**  1:16
**offsets**  190:7
**oh**  36:23
108:21
**okay**  59:8 86:2
88:12 126:11
139:16 142:7
153:25 168:25
**omissions**
183:3
**omit**  183:22
**omitted**  183:21
**once**  68:19
161:2,11
162:10 174:12
205:7
**ones**  17:9,10
28:17 29:4,13

47:17 91:8
**opening**  7:10
88:11,24
150:22 151:6
151:23 153:24
157:3 198:3
206:5
**opine**  124:10
144:2
**opinion**  6:12,13
7:5 9:25 10:2,6
36:14 38:15
40:18 41:21
42:4,5,10,15,24
43:5,5,6,17
44:24 45:2
46:9 47:8,10
50:20 51:3,17
51:24 58:10
59:2 67:7
68:11,15 71:9
71:13,20 72:14
73:10 74:15
79:5 80:19,24
81:8,9,25
88:14,21 89:14
89:24 91:22,24
98:11 102:6,11
102:15,17
105:14,21,25
106:11,14,17
106:23 107:13
109:11,17
112:25 113:20
113:21 114:14

114:16 115:14
115:16,18,25
116:3 117:18
117:24 118:12
118:16,20
119:2,15
120:23 121:3
124:15 125:7,8
125:9 139:24
141:25 142:2
143:4 145:23
151:3 152:7,19
153:20 154:13
154:17 155:9
155:18 156:14
156:16 182:22
186:4 188:21
188:22 190:23
192:25 195:13
196:23 197:6
197:17,21
199:15,18,19
200:2,9,13,14
201:12 202:14
204:10,23
207:11,13,13
208:9,19,20
211:19,21
214:24 216:18
216:21 217:15
218:2 220:6,9
220:20
**opinions**  7:22
8:5,8,11,13,14
8:17,21 38:16

47:13 50:3
106:7 113:2,13
116:25 117:25
119:16 124:22
146:9 148:6
155:23 156:4
197:18 209:2
**opportunities**
77:13 147:10
148:12 149:2
172:21
**opposed**  19:25
78:9 98:7
110:5 137:18
177:12 184:16
188:23 194:18
**opposite**  57:7
59:2 193:8,18
195:9 203:7
204:5
**options**  38:20
**order**  9:6 77:19
77:23 79:17
101:17 102:20
103:3 107:11
112:12 148:17
212:16
**ordinary**
117:11
**organizations**
3:18
**organized**
145:13
**original**  65:4

**orsini**  2:10 6:7
8:6 16:11
17:23 31:10,21
34:7,14,24
35:7,11 41:6
43:22 53:14
59:9 62:8
70:15 71:24
77:21 92:24
93:7 94:21
95:13 98:16
99:11 103:11
106:2 107:14
107:22 112:22
113:18,25
114:21 115:22
119:7,21
123:23 125:22
127:6 132:9
149:8 168:25
171:3,12
174:17 176:17
178:23 179:13
179:20 184:9
187:16 195:20
195:25 210:22
212:10 216:15
217:3,9 219:11
219:16 221:18
222:2
**output**  181:14
**outs**  190:8
**overall**  158:12
159:24 160:25

| | | | |
|---|---|---|---|
| **overbroad** 5:16 | **paragraph** | **paraphrase** | 149:19 150:18 |
| **overreactions** | 7:25 8:4 14:19 | 99:6 136:20 | 155:25 158:11 |
| 65:17 66:12 | 15:9,12 16:25 | **paraphrasing** | 158:14 159:23 |
| **overvalued** | 17:17,24 18:4 | 56:12 111:9 | 159:25 161:2 |
| 50:21 51:18,21 | 18:17 20:17 | **part** 10:6 11:24 | 163:19,24 |
| 100:14,17 | 21:24 23:5 | 11:25 12:5 | 166:4,8 167:9 |
| **own** 8:22 | 24:23 25:7 | 13:2,3 16:22 | 167:10 169:12 |
| 111:15 170:25 | 28:24 32:18 | 29:18 31:4 | 169:13 172:7 |
| 196:23 | 33:8 34:2,21 | 35:16 36:24 | 175:14 176:3 |
| | 40:12,17 56:6 | 63:6 78:20,22 | 186:9,15,25 |
| **p** | 56:12 57:19 | 79:9 80:14 | 187:3 189:2 |
| | 65:3,6 70:8 | 90:3,8 139:24 | 191:10 201:13 |
| **p** 2:2,2 | 88:13,22,23 | 142:18 160:11 | 202:20 203:13 |
| **p.m.** 99:15 | 89:3,6 90:18 | 163:12 164:16 | 206:10,13 |
| 100:4 222:3 | 91:4 94:14,17 | 164:17,22 | 207:14 209:3 |
| **package** 10:23 | 138:23 139:13 | 180:2 185:9,10 | 209:10,11,19 |
| 11:2 | 139:14 141:18 | 192:9 208:12 | 210:4 215:3,20 |
| **page** 7:24 53:9 | 142:5,8,17 | 219:2 220:5 | 215:23 217:22 |
| 53:24,25 59:12 | 143:10,17,18 | **participants** | 218:22 |
| 59:24 123:21 | 151:5,11 | 140:2,5,8,16 | **particularly** |
| 123:23,24 | 153:23 157:11 | 141:10,20,22 | 44:20 51:22 |
| 124:4 125:23 | 157:19 158:3 | 148:10,11 | 62:20 91:10 |
| 126:19 127:2 | 183:24 184:8 | 154:8 186:23 | 92:19 94:8 |
| 128:3,4,17 | 184:10,20 | **particular** 9:5 | 95:9 100:19 |
| 132:25 133:8,8 | 185:9,12 198:2 | 17:17,25 18:23 | 115:4,15 |
| 133:21,24 | 206:4,6,8,11,13 | 26:19 27:10 | 148:10 150:25 |
| 134:8 162:8 | 206:17 207:14 | 28:20,21,23 | 181:20 211:18 |
| 176:5,7 181:18 | 207:23 210:11 | 31:2 44:15 | 214:25 215:21 |
| 185:9 221:25 | 218:4,11,21 | 45:8 54:5,7 | 217:19 |
| 224:5,9 225:4 | 220:14 221:16 | 57:19 70:19,21 | **parties** 63:18 |
| 227:4,7,10,13 | **paragraphs** 8:9 | 89:13 92:14 | 69:20 226:17 |
| 227:16,19 | 14:24 16:9 | 122:14 123:19 | **parts** 33:11 |
| **pages** 53:4 | 20:13 22:11 | 126:17 136:5 | 200:24 |
| **paid** 56:15 | 28:18 70:7 | 136:10,22 | **party** 70:5 |
| 77:25 78:5 | 142:25 144:16 | 140:25 141:4 | |
| **paradox** | | | |
| 148:16 | | | |

**[pass - phrase]**                                                  Page 35

| | | | |
|---|---|---|---|
| **pass**   17:8 27:15 | 185:18,19 | 54:4,6 55:8,10 | 168:2,6,18 |
| **past**   135:23 | 187:10 207:4 | 55:12,15,17,24 | 169:13 173:6,9 |
| 203:11 | **percentage** | 56:22 58:22 | 173:14,16 |
| **patterns** | 101:18 102:19 | 64:9 67:15 | 174:7 175:14 |
| 132:16 | 103:17 162:23 | 69:10 71:17,18 | 175:21 177:10 |
| **paul**   128:25 | **perception** | 71:19 74:5 | 178:21 179:11 |
| 129:2 | 40:22 41:15 | 75:15 80:21 | 184:23 185:3 |
| **pdf**   123:22 | 42:19 43:2,19 | 87:8 90:2 92:6 | 185:22 187:4 |
| **penultimate** | 44:8 50:12 | 92:23 93:6,12 | 191:20 192:2,9 |
| 184:9 | 90:8,14 113:7 | 93:16,21 94:20 | 192:12,14,16 |
| **people**   8:19,23 | 114:23,24 | 95:21 97:15 | 192:21 193:2,6 |
| 9:3,14,15 | 156:18 165:7 | 100:24 101:3 | 193:8,10,13,22 |
| 78:11 79:9,24 | **perfect**   95:24 | 102:7,12 | 194:22,22,25 |
| 80:13,20 | **perfectly** | 104:18 105:18 | 194:25 195:5,8 |
| 100:23 101:2 | 148:18,19 | 109:15 112:21 | 195:13,14 |
| 141:7 209:22 | **perform**   71:5 | 113:5,6 115:19 | 196:8 197:10 |
| **perceived** | 72:5 95:18 | 116:7,8 118:11 | 199:6,14 201:9 |
| 19:15 21:10 | 167:6 169:16 | 118:15,25 | 202:12 204:10 |
| 26:17 46:14,18 | 197:3 | 133:19 136:10 | 205:7,16 |
| 47:3 48:23 | **performance** | 136:15 137:8 | 207:18 208:11 |
| 71:15 77:11 | 88:17 | 144:6 145:11 | 211:18 220:8 |
| 89:20 91:17 | **performed** | 151:16,18,20 | **persist**   76:2 |
| 92:14 98:10 | 136:12,15 | 151:21,21,23 | **persisted** |
| 101:22 110:17 | 159:12 179:7,8 | 151:25 152:4,8 | 142:21 |
| 113:8,12,14,22 | **period**   13:6 | 152:23 153:4 | **person**   29:7 |
| 114:18 115:2 | 14:7 15:20 | 154:6,16,21 | 175:18 178:17 |
| 115:20 116:9 | 23:20 27:10,25 | 155:17 156:2 | 179:9,18,23 |
| 154:24 155:14 | 27:25 34:2,22 | 157:3 158:14 | 180:12,18 |
| 172:18 199:7 | 40:15 41:5 | 158:15,19 | **person's**   86:24 |
| **percent**   45:12 | 42:9,12,17 | 159:4,14 160:3 | **personally** |
| 60:10,13,17,24 | 43:11 44:7 | 160:4,4,6,8 | 11:13,19 13:21 |
| 63:10 67:15 | 45:17 46:11 | 161:6,7 162:13 | 24:4 25:13 |
| 75:22 90:25 | 47:5,16 48:3,9 | 164:2 165:20 | **pfizer**   189:8 |
| 130:18 161:19 | 48:16 51:8,13 | 166:4,8 167:12 | **phrase**   84:7 |
| 161:25 185:17 | 52:7,22,23 | 167:12,20,24 | 106:8 117:8,9 |

**[phrasing - predicting]** Page 36

**phrasing** 18:13
**pick** 167:24
**piece** 75:11
  177:9 204:11
**pinpoint** 68:5
**place** 210:17
  226:8
**placed** 40:8
**places** 64:5
  65:3
**plaintiff** 123:8
  123:9 206:18
  206:23 214:13
  215:9,12 216:9
**plaintiff's**
  142:19 143:20
  188:11 189:9
**plaintiffs** 1:15
  2:4 56:20
  58:16,18 59:3
  117:19 124:8
  139:3 194:13
  196:13,17
  198:4 201:21
  206:7 208:21
  212:21,23
  213:2 216:19
**pleadings** 50:2
**please** 26:14
  34:12 35:14
  99:8 157:4
  206:5 215:7
**plug** 160:15
**plugging**
  181:13

**plus** 93:14
  214:12
**pocket** 189:20
  190:13,21
**point** 24:2
  25:22 28:23
  32:12 54:12
  57:18 61:10
  62:19 64:18,23
  67:2,21 68:10
  73:17 74:22
  129:6 209:2,10
  209:18 220:24
**pointed** 189:11
**points** 28:20,21
  183:5 208:8
**polonsky** 9:7
**pontificating**
  34:15
**portion** 105:16
**position** 49:2
  96:4 118:9
  121:8 165:10
  172:20
**positions** 147:9
**positive** 140:6
  141:23
**possibility**
  48:22 103:24
  205:18
**possible** 27:22
  29:23 30:18
  48:24 61:6,17
  70:18 73:23,25
  77:12 79:8,14

79:17 109:23
  109:24 110:2
  125:20 145:19
  145:24 146:4
  158:25 183:7,8
  197:22 199:11
  205:14 215:5
**possibly** 51:4
**post** 96:10
**postings** 49:5
  49:12,16,20,22
**potential** 19:16
  21:11 27:7,8
  27:21 30:17
  61:19 62:14
  69:14 198:15
  207:22 208:2
  218:13 219:9
**potentially**
  21:5,8 26:15
  30:15 168:9
  178:10
**power** 131:4,8
  132:17
**practical** 4:16
**practice** 5:8
**practiced** 5:10
  5:11
**practicing** 5:3
**preceded** 193:5
**precedes**
  218:20
**precisely** 44:22
  75:8

**preclass** 40:15
  41:5 42:8,12
  42:17 43:11
  44:7 45:17
  47:5,16 48:9
  51:8 64:9
  71:19 80:21
  87:8 93:16
  97:15 100:24
  101:2 104:18
  105:17 109:14
  112:21 113:5,6
  115:19 116:7,8
  151:15,18,20
  151:21,23
  154:6,16,21
  155:17,25
  157:3 159:4,14
  160:7 161:7
  162:13 164:2
  165:19 167:11
  167:20 168:18
  174:6 175:21
  177:10 178:21
  185:2 193:13
  194:21,24,25
  205:16
**predict** 68:3
**predicted**
  137:23 158:18
  158:21 160:5
  161:5,10,15,22
  161:23 163:18
**predicting**
  160:21

| | | | |
|---|---|---|---|
| **prefer** 171:2 | 44:20 45:4,14 | 100:20 101:11 | 188:6 192:25 |
| **premature** | 45:19,23 46:11 | 103:5,9 104:7 | 193:20 194:19 |
| 191:15 192:23 | 46:17,24 47:7 | 106:10,12,20 | 194:24 195:6 |
| **premise** 205:11 | 47:21 48:2,16 | 107:4,11,24 | 195:15,16 |
| **prepared** 15:14 | 50:14,18 51:5 | 108:5,16,20,25 | 196:7 197:9 |
| **prerogative** | 51:22,23 52:3 | 110:4,6,9,20 | 199:3,13 201:3 |
| 221:21 | 54:5,9,12,14,15 | 111:2,24 | 202:16,24 |
| **present** 28:5 | 54:17,23 55:3 | 112:15,16 | 203:23,25 |
| **presented** 28:8 | 55:4,9,19,20 | 116:6,12 | 204:5,23 |
| 59:6 | 56:18 57:5,11 | 117:16 121:23 | 206:20,21,25 |
| **president** 3:25 | 57:12,15,16,21 | 126:22 127:18 | 207:3 213:8,9 |
| **press** 115:14 | 57:25 58:2,4,7 | 128:13,21,22 | 213:13,17 |
| **presumably** | 58:8,18,23 | 129:14,15,23 | 214:7,8 215:18 |
| 13:18 63:12 | 60:11 61:11,19 | 131:8 133:17 | 216:3 221:4,6 |
| 217:14 | 61:23 62:4,6 | 136:7,11,20,21 | 221:7,9 |
| **presumption** | 62:14 64:7,12 | 136:24 137:5,6 | **prices** 12:9 |
| 101:10 107:12 | 64:22 65:11,21 | 139:20 140:10 | 19:17 27:23 |
| 200:3,10 | 66:3,6,17,23 | 140:17 143:5 | 30:21 39:17,21 |
| **presupposes** | 67:14 69:2,11 | 143:11,21 | 44:25 47:15 |
| 82:6 | 69:14 70:13 | 144:14,14 | 48:24 50:4 |
| **pretty** 219:11 | 71:3,16 73:3,3 | 147:13,20 | 52:6,12,21,22 |
| **prevail** 197:8 | 73:12,20 74:12 | 148:2,5 154:7 | 54:4 55:14 |
| **previous** 64:14 | 74:16,17,18 | 154:20 155:15 | 56:15,24 57:4 |
| 98:19 101:14 | 75:14,20 76:3 | 159:6 163:17 | 57:21 58:11 |
| 174:11 205:13 | 76:18,22 77:25 | 164:24 165:2 | 59:15 61:22 |
| **previously** | 78:5 79:19,22 | 165:21 167:25 | 63:25 64:17 |
| 100:6 | 81:23 82:19 | 169:6,19 170:6 | 66:24 67:7 |
| **price** 15:6,8,22 | 83:9,21 84:4 | 170:14,21 | 69:6,9,25 70:6 |
| 21:12 26:18 | 84:17,25 85:10 | 172:13 173:3 | 71:12,23 72:16 |
| 27:22 30:19 | 86:6,10 87:14 | 175:17 177:15 | 75:3,25 81:3,3 |
| 39:25 40:7,14 | 87:19,19 89:25 | 178:14 184:2 | 81:6,13,16,19 |
| 40:19 41:4 | 90:10,24 91:7 | 184:25 185:14 | 83:22 84:2,12 |
| 42:6,11,16 | 91:18 92:13,17 | 185:14 186:4 | 84:18 85:3,7 |
| 43:3,10,20 | 93:15 94:5,6 | 186:18,19,21 | 85:19,23 86:14 |
| 44:6,12,13,16 | 95:19 100:17 | 187:2,4,11 | 86:15 87:6,9 |

87:11,15,18
88:15 89:9,11
89:17 90:7,13
92:4,22 93:5
93:22 94:19
95:4,12 96:5
100:12 101:3
101:21 102:9
102:14,24
103:21,22
104:3,4 109:5
109:14,20
110:14,16
112:6 113:4
114:9 115:12
116:5 118:17
118:18 130:2
133:16 134:18
136:9 141:4
142:9,14
143:15 144:12
145:25 146:3,9
146:11,14
148:8 154:4
156:9,15,16
163:7,15,22
164:9 169:14
172:17 191:22
192:4,7,8,13,15
193:6,15 194:3
195:4,11 196:8
196:19 201:4,7
201:8,19 202:7
202:12,13,15
202:24 203:9

203:20,22
204:9,24
205:18,19
212:24 221:8,8
**pricing** 123:16
134:4 144:12
**principal** 8:8
8:14,25
**print** 139:8,10
**prior** 51:12
71:17 158:16
197:10
**private** 27:8
148:4
**probably** 14:13
178:24 189:15
**procedure**
135:6 137:11
137:13
**proceeding**
226:7
**process** 127:23
148:13 157:5,7
175:15 181:10
181:16 182:5,7
**produce** 180:14
**produced**
157:18
**product** 46:13
60:11 89:13
116:8 174:8
180:15
**professional**
4:18

**professionals**
9:13
**professor** 4:6
37:6 124:9
129:2 132:11
196:4
**proffered**
124:9
**profit** 77:19,24
79:17 81:17
87:17 89:22
98:6 99:2
110:5,16,23
111:20 112:8
112:13
**program** 105:2
105:5,7,10
**proof** 217:5
**prop** 144:14
**proper** 12:17
172:24 202:14
**properly** 11:15
181:5
**proportion**
186:3 187:14
**proposed** 135:4
204:12
**proposition**
75:12 89:5
140:13
**prospects**
88:17
**prove** 208:21
210:18 211:4
212:2,4,7

213:3 214:14
215:10,13
216:10,19,21
216:23 217:6,7
**provide** 50:8
**provided**
124:15 208:9
**provisions** 7:4
**public** 1:19 3:4
100:7 122:4
123:16 127:18
134:5 138:13
223:21 224:19
225:6 226:4
**publicity** 87:7
103:19
**publicly** 12:19
47:23 97:22
102:21 163:25
169:9,17 170:7
171:19 177:5
**published** 14:6
14:12 96:22
122:19
**purchase** 38:20
80:2 81:6,15
85:20 97:22
98:12 101:16
101:17 102:20
110:3 118:22
119:6 140:19
141:3 152:24
206:20 213:8,9
213:16

[purchased - r]                                                    Page 39

**purchased**
37:14 81:2,11
81:23 83:14,15
87:10,20
101:19 102:4
103:10,18
104:2,3,17,18
206:19,24
212:23 213:4,5
213:20
**purchaser** 85:6
**purchasers**
140:6 141:23
**purchases**
97:24 118:19
**purchasing**
78:8 79:7,18
79:25 87:12,14
100:24 101:2
102:7,12 112:8
154:10 155:6
155:10,19
156:21
**purely** 182:6
**purpose** 18:2,6
18:23 19:9
33:14 35:19
78:10 138:20
139:6 163:20
177:18,25
178:7 194:15
**purposes** 4:16
6:19 78:8
141:15 161:6

**pursuant** 1:15
**pushing** 180:13
**put** 85:24
210:16
**putting** 145:22
172:11

**q**

**qualifies**
207:21
**qualitative**
183:10
**quarreling**
130:24
**question** 5:17
6:11 10:12
12:13 16:2
18:13 21:13,14
25:4 26:19
27:10 31:20,22
34:8,15 35:8
35:10 36:25
38:8,14 43:12
43:14 52:5
56:7 68:2
77:23 82:16
92:7,20,25
93:2 95:15
98:22 101:14
107:16 109:8
111:14,19
115:6 124:14
151:8 159:10
159:18 160:6
160:24 170:10
170:10,11,18

171:4,5 174:11
178:25 180:24
189:14,17
190:22 193:13
195:18,19
196:3 200:6
205:21 211:13
211:15,25
217:10 219:22
221:19
**questions** 24:18
76:15 81:20,25
82:7,9,11,21
119:13 222:2
**quickly** 77:19
156:11
**quite** 170:19
205:14
**quote** 76:5 83:2
86:12 88:18
102:2 104:9
108:10 109:13
**quoted** 54:18
83:12 111:8
**quoting** 135:13

**r**

**r** 1:14 2:2 3:2
4:1 5:1 6:1 7:1
7:12 8:1 9:1
10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1 26:1 27:1

28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1,20
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1
63:1 64:1 65:1
66:1 67:1 68:1
69:1 70:1 71:1
72:1 73:1 74:1
75:1 76:1 77:1
78:1 79:1 80:1
81:1 82:1 83:1
84:1 85:1 86:1
87:1 88:1 89:1
90:1 91:1 92:1
93:1 94:1 95:1
96:1 97:1 98:1
99:1 100:1,2,5
101:1 102:1
103:1 104:1
105:1 106:1
107:1 108:1
109:1 110:1
111:1 112:1
113:1 114:1
115:1 116:1
117:1 118:1
119:1 120:1

**[r - rebuttal]**                                                    Page 40

| | | | |
|---|---|---|---|
| 121:1 122:1 | 190:1 191:1 | 29:24,25 30:2 | 86:16 103:16 |
| 123:1 124:1 | 192:1 193:1 | 30:5,9,24 31:8 | 105:24 110:18 |
| 125:1 126:1 | 194:1 195:1 | 31:15,16,17 | 119:5 124:20 |
| 127:1 128:1 | 196:1 197:1 | 32:5,6,16,25 | 187:15 203:18 |
| 129:1 130:1,6 | 198:1 199:1 | 33:5,23 34:16 | 204:21 220:3 |
| 131:1,5 132:1 | 200:1 201:1 | 34:18 35:21 | 227:6,9,12,15 |
| 132:16 133:1 | 202:1 203:1 | 36:16 49:19,21 | 227:18,21 |
| 134:1 135:1 | 204:1 205:1 | 99:7 109:12,18 | **reasonable** |
| 136:1 137:1 | 206:1 207:1 | 126:11 130:25 | 145:14 |
| 138:1 139:1 | 208:1 209:1 | 138:22 139:8 | **reasonably** |
| 140:1 141:1 | 210:1 211:1 | 185:11 200:23 | 147:21 |
| 142:1 143:1 | 212:1 213:1 | 200:24,25 | **reasons** 40:7 |
| 144:1 145:1 | 214:1 215:1 | 206:22 223:5 | 51:6 58:3 66:2 |
| 146:1 147:1 | 216:1 217:1 | **reader** 56:4 | 73:15 76:17 |
| 148:1 149:1 | 218:1 219:1 | **reading** 23:12 | 79:6 86:18 |
| 150:1 151:1 | 220:1 221:1 | 23:25 30:6 | 87:10 92:15 |
| 152:1 153:1 | 222:1 223:2,4 | 32:8 33:20,21 | 102:3 119:10 |
| 154:1 155:1 | 223:13 224:6 | 129:9 142:23 | 135:23 148:8 |
| 156:1 157:1 | 224:11,15 | 143:9 158:2 | 152:15 154:18 |
| 158:1 159:1 | 227:2,3,3,24 | **real** 45:23 66:8 | 179:7 194:17 |
| 160:1 161:1 | **ran** 10:7,9 | 68:21 97:6 | 196:9,11 |
| 162:1 163:1 | 11:14 | 171:3 209:8 | 197:21 203:3,4 |
| 164:1 165:1 | **random** 173:8 | 212:14,17 | 203:7 205:9 |
| 166:1 167:1 | **range** 186:12 | **realized** 216:3 | 211:22 215:2 |
| 168:1 169:1 | **ranging** 185:17 | **really** 4:17 6:8 | **rebound** 69:8 |
| 170:1 171:1 | **rather** 21:7,10 | 18:12 34:4 | 193:16,17 |
| 172:1 173:1 | 30:17 81:17 | 38:8 56:6 | **rebuttal** 53:10 |
| 174:1 175:1 | 83:13 99:6 | 57:18 68:4 | 53:15,17,20,25 |
| 176:1 177:1 | 141:25 172:15 | 70:2 72:18 | 59:11,25 65:5 |
| 178:1 179:1 | 172:16 190:12 | 94:24 95:10 | 65:12 83:19 |
| 180:1 181:1 | **react** 127:13 | 127:3 129:8 | 102:2 104:9,13 |
| 182:1 183:1 | **reaction** 178:15 | 166:16 187:4 | 111:11 152:2,4 |
| 184:1 185:1 | **reactions** 188:6 | 192:23 204:5 | 152:12,20 |
| 186:1 187:1 | **read** 8:2 16:16 | **reason** 84:6,11 | 201:2 224:14 |
| 188:1 189:1 | 16:19 29:17,20 | 84:18 85:7 | |

**[recall - relevant]**                                            Page 41

recall  37:10
  49:15 50:6
  123:20 127:23
  133:25 134:7
  135:10 188:19
recalling
  120:12
receive  139:18
received
  104:12
recently  36:11
recess  99:14
rechecked
  182:8
recognize
  122:10,12,14
recognized
  154:8,19
recognizing
  71:6 181:10
  194:14
recollection
  86:20 124:21
  129:9 134:12
  134:20 135:11
  187:24
recommendat...
  65:15
record  3:15
  226:14
red  182:25
reddit  48:22
  49:5,10,12,16
  49:20 97:13

refer  31:18
  41:5 43:10
  44:7 71:18
  83:11 151:15
  154:21 155:17
  160:7
referred  14:2,4
  14:10 16:23
  17:16 18:3
  22:10,19 32:2
  32:4,22 33:12
  35:17 39:14
  49:6,13,14,17
  51:7 64:8
  121:19 131:10
  146:23 164:7
  181:16 182:16
  188:2
referring  7:19
  23:14,16,17
  39:10,19 40:11
  45:7 49:25
  64:13 65:13,18
  78:12 99:4
  116:20 125:23
  126:6 150:13
  150:17 154:23
  157:10 185:12
refers  16:25
  20:25 39:12
reflect  83:23
  85:3
reflected
  206:12

reflects  94:15
refresh  134:11
  134:19
refutation  59:3
regarded
  132:12 153:6
regression  10:7
  10:9,18,22
  11:3,6,9,15,24
  60:12 131:5
  132:19 137:24
  157:17 159:2
  159:13 160:11
  160:16 173:12
  174:3
regulation  5:21
  5:25
reject  158:25
  161:20
relate  83:5,6
  202:8
related  76:4
  146:24 208:7
  226:17
relates  56:6
relation  160:24
  163:17 164:12
relationship
  52:20 57:4
  121:23 157:21
  158:6,10,18
  159:22 160:20
  160:22 161:3,4
  161:12,23
  163:15,22

186:24 188:4
  190:19
relative  118:18
  212:17
relatively  77:18
  94:13 182:6
release  128:23
  129:16 133:18
released  127:17
relevance
  217:13
relevant  15:4
  15:24 17:9,10
  21:6,8,9 26:15
  26:22 27:16,18
  27:24 30:16
  39:13 45:13
  46:6 107:6
  108:18,19
  109:3,9 111:4
  119:6,11,14,17
  119:18 121:5
  128:23 129:16
  136:6 137:3
  145:10 146:12
  149:21 150:19
  150:25 165:4
  165:15 168:9
  168:16 169:4
  170:2,17,24
  171:9,23 172:3
  172:6 173:22
  174:15,24
  175:20,24
  178:4,8,10,13

178:20 179:12
182:17 184:4
185:4,6,20
186:6,10,24
187:12 193:24
211:15 214:23
214:23 217:2,8
217:15,24,25
218:5
**reliable**  132:8
**reliance**  83:8
86:5,24 107:12
108:4 111:23
117:3,15,20
200:4,10
**relied**  50:7
81:22 101:10
103:4,8 106:19
107:3,10
109:21 110:25
118:13 182:15
**rely**  82:18
83:20,25 84:16
85:9,22 86:10
87:2 104:6
109:15
**relying**  105:23
106:9 108:15
108:24 110:10
110:19 112:14
112:15
**remained**
156:10
**remaining**
95:25

**remand**  189:5
**remember**
15:11 25:19
30:6 32:7
33:20 36:2
37:17 77:5
120:11 123:14
144:8 184:15
187:20
**reminded**
36:25
**removing**
194:2
**render**  86:24
132:7
**repeat**  12:12
28:16 35:2
93:2,10 159:11
160:19
**repeated**  19:23
106:15
**repeatedly**  93:8
**repeating**
32:12 220:17
**repetition**
19:22
**repetitions**
172:12
**rephrase**  84:9
**report**  7:10,10
7:12,14,20,21
7:23 8:5 13:3
14:2,5,10,20
15:14 18:3,20
19:18 20:18

21:3 22:21
24:8 26:12
28:12,16,17
29:10 32:3,4
36:16,18 37:7
37:9,12 38:6
38:11,17 39:5
39:15 40:4,13
40:21 42:19
43:8 47:19
50:19 52:8,12
53:2,8,10,18,20
54:2 59:11
61:4,14 63:3
63:23 64:4,6
64:24 65:4,5
65:13 69:17,22
71:14 73:8
76:20 80:25
81:19 83:2,19
88:11,14,24
92:11 94:4
98:2 102:3
104:9,13
108:11 111:11
118:5 119:23
121:18 126:9
131:25 138:5,6
138:11,17,21
139:11 146:23
150:23 151:6
151:11,13,23
152:2,5,12,20
153:24 157:3
161:7 162:15

164:23 165:14
168:12 170:19
175:25 176:6,7
183:12 184:15
186:2 187:7
193:21,25
195:4 198:3
200:20,25
201:2,14 202:3
206:5,9 212:13
214:3 215:4
220:4 224:11
224:14
**reported**  18:15
19:3 124:6
180:16
**reporter**
122:19 226:2
**reports**  45:17
46:5 50:3
57:24 80:16
106:16 108:9
119:14 182:22
192:18 196:12
197:20
**representations**
146:17
**representative**
111:8
**representatives**
79:5 80:9,10
82:12,22 86:13
87:23 89:21
101:25 102:25
104:10 108:10

**[representatives - right]**                                    Page 43

110:7,13
**require** 213:7
**required** 81:10
207:25 211:6
218:12 223:14
**requirement**
210:21 211:9
211:10 218:23
218:24,25
219:7,21,24
220:2,14,25
221:15
**requirements**
156:3
**requires**
210:17 211:7
**research** 9:11
13:18 31:5
171:15,25
176:22,23
180:23 182:9
182:15 183:20
220:21
**residual** 60:8
60:14,22 62:21
63:9,12 162:16
163:4
**respect** 14:16
19:20 26:23
32:21 37:23
73:22 81:14
83:16 98:3
101:24 115:20
124:10 155:4
163:24 169:8

180:19 191:7
204:8 206:10
**responded**
129:20
**responding**
164:21
**response** 70:4,5
71:15 76:15
163:8 164:10
**responsibilities**
9:23,24
**responsible**
29:7 48:15
72:24 75:13
**responsive**
133:18 173:13
**rest** 218:21
**restrictions**
38:19 39:2,3
40:8 58:11
67:4 118:21
152:24 201:18
203:21,24
204:6 205:8,24
210:16,20
**result** 51:22
90:10 149:2
161:25 174:20
189:13 193:3
205:23 207:20
**resulted** 93:13
93:21 188:12
189:4
**resulting** 66:23

**results** 11:17
11:17,20 162:7
162:15 180:4
182:8
**retail** 48:25
77:14 78:13,18
78:19 79:3
97:11 113:11
147:10 154:10
155:7,10
156:21 172:22
**retirement**
37:25
**return** 58:23
60:15 62:21
137:23,25
158:8 161:15
161:15 162:17
162:23 163:4
176:12 207:4
**returns** 63:9,13
135:14 137:21
158:7,8,11,12
158:18,21,21
160:6,15,22
161:5,10,10,24
163:17,18
185:16 187:2
**revealing** 79:6
82:24
**reverse** 192:2
192:13
**reversion** 62:19
63:18,22,24
65:10 73:2,11

73:16,19 74:9
74:11 75:13
76:4 199:2,4
**revert** 64:2
65:23 66:3
**review** 13:21
15:20 17:7
24:4,6,10
25:13,23 26:9
33:16 36:4
49:4,8,9,11
181:15 183:25
**reviewed** 12:7
13:5 26:3 28:9
43:7 49:23
78:17 82:14,23
108:7 182:21
**reviewing**
25:19,20 64:25
126:10 139:15
**revise** 140:8
**reward** 148:22
**richard** 130:6
131:20
**right** 6:15,24
10:7,8,15
12:23 13:7,8
16:10,13 17:4
18:18,19 22:2
22:22 23:23
25:2,23 33:8
40:9,15 42:14
45:24 46:20,21
47:11 54:10
55:4,24 59:16

[right - section]                                      Page 44

60:7,16 61:24
63:15,16,19
67:24 84:16
91:20,21 95:3
95:7 96:11
101:5,6 106:13
107:18 123:2,3
124:17,18
125:12 126:24
127:21 129:4,7
129:18 132:2
133:6,13
134:13 139:21
142:22 143:8
151:7 160:16
160:17,18
162:6 180:20
190:16 198:7
201:9 203:12
203:14 218:6
**rinaudo**  9:8,10
**rise**  91:18
**rising**  156:10
**robert**  3:16
**robinhood**  40:8
67:4 69:19,24
86:3 118:22
191:4 210:16
**robinhood's**
156:7
**role**  3:23 4:3
9:18 47:3
50:16 76:21
**roll**  12:22
130:6,9 131:11

131:16,21
132:8,12
**rosen**  2:3,5 3:8
7:8 16:13 34:9
35:9 53:16
88:3 100:11
107:23 121:25
124:2 125:24
131:15 138:4
149:3,10
179:15 195:21
200:16 210:25
211:5 219:13
221:22 224:6
**rosenlegal.com**
2:6
**routine**  166:15
**row**  60:4
176:10
**rows**  181:19
182:12
**run**  10:22 11:3
**running**  4:14
4:15

---
               **s**
---

**s**  2:2 3:2 100:2
100:2,2,5
224:8 225:3
227:3
**safe**  125:3
**sale**  38:20 49:2
57:4,11,14,16
196:19 202:11
202:24,24
206:21 207:21

213:13
**sales**  118:18
144:13 195:11
208:23
**satisfied**  156:2
**satisfy**  175:25
**saw**  49:6,13,16
83:4 108:20
182:24
**saying**  66:17
68:7 90:13,17
124:19 131:14
141:18 151:9
157:24 195:24
208:15 214:17
**says**  14:21
15:16,20 55:7
60:14 70:23
90:18 96:14,20
124:8 125:10
125:14 127:11
127:15 128:4
128:12,18
129:11,20,24
131:2 134:15
135:4,8,12
137:18 138:23
139:2 142:8,15
142:16 143:17
154:2,3 155:6
156:6 157:20
157:23 158:3
167:15 183:24
184:20 198:4
201:17 202:25

206:22,22
207:15,24
211:5
**scenario**
210:15
**scheindlin**
122:17
**school**  4:7
**screen**  96:12,18
96:21 125:21
127:5
**scroll**  125:15
**search**  14:15
32:9 148:21,22
168:11 175:15
176:2
**searched**  13:4
14:22 22:9,25
**searches**  15:17
**searching**
15:18
**sec**  15:18 17:15
18:17 27:4,5
27:14,14
138:13 171:17
171:18 225:7
**second**  69:13
128:18 134:16
154:2
**seconds**  221:13
221:17,20
**section**  6:5
61:14 63:3
69:18 133:2,21
133:23 143:19

**[section - short]**

151:13 188:9
189:16 202:20
209:11,19
215:3,23
217:23 218:22
**securities** 5:15
5:19,21,25 6:4
7:4 26:19 27:9
27:24 37:15
56:11,13 67:6
83:24 118:23
122:5,17
148:12,23,25
187:3 188:14
189:8 200:19
209:21 220:23
224:20
**security** 84:5
135:15 139:19
139:20 146:18
146:19 158:12
159:24 160:23
**see** 8:3 21:2
57:25 69:20
82:12 97:4
122:10 125:14
128:8 129:18
129:19 130:7,8
130:16 133:9
134:13 138:25
162:5 166:19
167:5 174:14
174:23 177:18
181:23

**seeking** 88:5
96:9,25 224:16
**seeks** 134:16
**seen** 205:11
**sees** 31:22
**select** 172:24
173:6
**selected** 30:23
127:24
**sell** 77:24 78:4
79:20 80:3
102:20 112:13
118:24 147:23
**seller** 147:21
**seller's** 119:4
**sellers** 77:16
**selling** 87:18
118:14
**sense** 100:17
**sent** 21:17
**sentence** 16:16
20:17,19,20,24
23:13,25 32:19
32:21 40:16
139:10,25
142:16 154:2,3
156:6 157:9,19
184:10,16,18
206:14,14
207:15,23
210:11,12
218:10
**sentiment**
149:24 150:2

**sentiments**
28:17
**separate** 72:6
106:22 160:2
175:5
**separately**
19:18 70:17,18
71:4
**series** 62:25
**services** 31:4
32:13
**set** 14:15,15
16:6 19:2 20:8
20:22 21:15,21
23:7,9,17,22
24:5,11,19,20
24:25 25:14
26:7,10,21
28:4,10 29:3
29:19 30:12
31:9 32:17
33:13,15 36:3
90:21 136:5
178:3 226:23
**sets** 20:3
**settled** 188:18
**settlement**
189:6
**seven** 50:25
51:4,10,11,13
51:16,17 65:4
95:9 124:6
125:17 133:21
138:23 143:19
184:20 195:22

195:25
**seventh** 73:4
91:19 181:21
**several** 15:13
30:11,25 64:5
81:13 97:25
101:25 102:25
104:9 106:15
**share** 9:22
39:17 40:7
75:14 93:22
94:19 126:21
127:18 128:13
129:22 142:13
163:7 188:22
189:23 190:3
190:10,15,20
191:2,3,6,7,19
191:22,24
192:20 194:7
194:12 195:9
195:10 207:9
**shares** 54:21
80:20 103:10
104:17 105:17
118:14,24
127:13 142:9
206:19,24
207:2 213:20
**short** 1:5 19:15
21:10 26:17
27:7,21 30:17
40:22 41:15,18
41:23 42:2,20
42:22,25 43:2

**[short - somebody's]**

43:18,19 44:3
44:9 46:11,14
46:18 47:4
48:23 49:2
68:18 74:25
77:11,11,16
78:23 86:15,23
86:24 87:4
88:15 89:16,20
89:22 90:4,8
90:15,16,19,20
90:23 91:17
92:4,14,21,22
93:4 94:13,19
98:10,15
101:22 110:10
110:15,17,22
111:13,16
112:5 113:9,12
113:14,22
114:18 115:2,3
115:20 116:9
142:24 146:24
147:2,8 154:25
156:18 165:8
165:10 172:18
172:20 199:6,8
223:1 227:1
**shot** 58:12,15
**show** 21:18
25:18 30:5
32:6 33:18
35:24 40:10
59:18 82:17
116:19 123:13

131:15 150:12
206:15 213:18
**showed** 133:16
**showing** 109:13
140:22 221:11
**shows** 56:3
59:14 60:3,6,8
62:23 176:11
176:13 181:22
**side** 180:20
**signature**
226:24
**signed** 138:10
**significant** 15:8
101:18 102:18
103:17 127:19
128:21 129:14
129:22 158:24
159:5,15
161:18 162:12
162:20,25
165:20,21
166:18 167:3,4
167:8,19 168:3
168:7,8,20
169:7,11,15,20
169:24 170:5
170:15,22
173:3,19 174:5
174:13,21
175:2 177:22
177:24 183:17
187:11
**significantly**
127:14

**similar** 149:25
189:7,10
**similarly**
180:19
**simplest** 83:10
**simply** 140:15
190:14
**simultaneously**
175:9,10
**single** 29:18
35:21 171:16
177:8 181:7,15
214:11 216:8
220:11 221:14
**sit** 16:4 123:15
181:2
**sites** 48:21
**sitting** 99:12
**situation** 111:7
147:7 150:19
**situations**
85:13,21
**six** 14:20 17:25
18:5,18 20:17
32:18 55:13
56:6,12 65:5,9
65:12,19 123:4
124:11,16
125:16,17
126:14 139:4
143:22 183:24
184:8 185:10
**sixteen** 70:23
**sixty** 88:10
89:7

**small** 18:8
207:18
**smaller** 19:6
20:4
**social** 40:23
42:21 44:10
46:15,22 48:7
48:12,17,19,21
50:9,13,16
76:13,21 77:6
78:12,15,20
79:2,9,25 80:5
97:12 101:23
113:10,15,23
114:19 115:21
116:10 146:22
147:5 149:15
154:11 155:8
156:23 165:9
172:19
**software** 10:23
11:2
**sold** 77:18
118:10 207:2,8
209:16,16
212:3,5,5,6
215:25 216:2
221:6
**solely** 161:24
**somebody**
10:13 29:2,6
77:15 106:25
110:8,12
**somebody's**
111:5

| | | | |
|---|---|---|---|
| **someone's** | **speaking** 136:3 | **speculation** | 113:12,15,22 |
| 108:13 | 137:17 145:12 | 40:24 42:21 | 114:18 115:2,3 |
| **sophisticated** | 204:7 | 44:10 46:15,19 | 115:20 116:9 |
| 141:2 148:10 | **speaks** 144:10 | 46:23 48:7,12 | 146:24 147:2,8 |
| **sorry** 12:12,16 | **specific** 15:5,24 | 48:18,19 65:22 | 165:10 172:18 |
| 53:5,24 60:4 | 19:2 20:7 21:6 | 87:15 101:23 | 199:8 223:1 |
| 120:7 149:8 | 21:9 22:13 | 113:10,16,23 | 227:1 |
| 151:8 159:8 | 39:20 49:11 | 114:19 116:10 | **squeezes** 19:15 |
| 164:5 184:7 | 60:7,23 67:10 | **spend** 4:13 | 21:11 26:17 |
| 185:15 207:9 | 68:15 71:5 | **spent** 196:2 | 27:7,21 30:18 |
| **sort** 4:9 5:16 | 73:22 74:7,15 | **spoke** 36:9,11 | 88:15 89:8,10 |
| **sound** 120:24 | 75:2 94:18 | **spread** 133:12 | 90:19 112:5 |
| 121:4 | 95:18 120:13 | **squared** 130:6 | 154:25 156:19 |
| **sounds** 38:14 | 130:4,19 | 131:5 | 165:8 |
| 107:15 117:23 | 136:18 167:16 | **squared's** | **staff** 18:10 |
| 124:18 | 168:9 171:9,16 | 132:16 | 20:10 21:16,21 |
| **source** 13:15 | 172:14,16 | **squeeze** 1:5 | 23:2,18 25:15 |
| 55:2 | 176:13,15,25 | 40:22 41:15,18 | 25:22 28:3 |
| **sources** 13:12 | 177:3,8,9 | 41:23 42:2,20 | 29:2 33:23 |
| 13:17,19 14:10 | 178:4,11,19 | 42:23,25 43:2 | 34:18 37:11,12 |
| 14:16,17,18 | 179:11 180:21 | 43:18,20 44:4 | **stage** 191:9,15 |
| 22:15 24:9 | 181:4,20 182:3 | 44:9 46:14,18 | **stand** 211:10 |
| 29:9 31:3,3,7 | 182:11,23,23 | 47:4 48:23 | **standard** 11:8 |
| 39:4,7,9,14 | 183:18 184:4 | 77:11,12,16 | 166:15 176:20 |
| 49:18,23,24 | 184:16,18 | 78:23 86:15,23 | 181:11 182:16 |
| 50:7 102:23 | 185:4 186:20 | 86:24 87:4 | **start** 42:22 |
| 103:20 176:3 | 189:17 208:18 | 89:16,20,22 | 63:21 145:14 |
| 177:5 180:22 | 216:25 | 90:4,9,15,16,21 | 153:15 176:5 |
| 182:16 | **specifically** | 90:23 91:17 | **starting** 96:4 |
| **south** 3:10 | 73:14 80:7 | 92:4,15,22 | **state** 1:19 3:4 |
| **southern** 1:2 | 154:24 213:24 | 93:5 94:19 | 3:14,17 5:6 |
| 122:20 | **specified** | 98:10 101:22 | 81:19 100:7 |
| **speak** 106:18 | 180:16 183:5 | 110:10,15,18 | 203:3 226:5 |
| 106:22 | **speculating** | 110:22 111:13 | **stated** 7:24 |
| | 210:13 213:14 | 111:17 113:9 | 47:13 58:4 |

71:13 75:17
80:24 106:15
129:10 151:24
175:22 180:12
202:10 204:21
205:10
**statement** 45:7
85:11 92:25
101:8,13
104:21 105:13
140:15,19
141:19 218:19
**states** 1:2 65:21
105:11
**statistic** 54:18
176:12
**statistical**
167:6 169:16
173:13 174:9
175:11,16
179:25 180:8
**statistically**
15:7 127:19
128:20 129:13
158:24 159:5,6
159:15 161:17
162:12,20,25
165:20,21
166:18 167:2,4
167:8,19 168:3
168:7,8,19
169:6,11,15,19
169:23 170:5
170:14,21
173:3,18,19

174:5,13,21,25
177:22,24
183:17 187:10
**stay** 195:22
**stem** 218:24
219:24
**stenographic...**
226:12
**step** 157:5,5,7,7
157:12,12,15
157:15
**steps** 41:24
**steven** 36:6
**sticks** 189:2
**stock** 12:9
30:21 39:21,25
44:25 45:14
60:6 61:3,19
63:25 65:11,21
66:2,17 69:14
69:25 70:13
71:3 73:12,20
74:12 89:25
90:24 92:4,22
93:5 98:12
108:20 110:24
116:14 119:20
130:2 131:8
134:18 140:3,7
140:9,17
141:21,24
142:9 143:3,5
143:11 144:5
145:7,11,14,20
145:20 147:17

153:8 159:6
163:17 164:9
165:21 167:25
169:6,14,19
170:13,20
171:20 173:3
175:17 178:14
186:3,6 187:2
187:11 188:6
194:24 196:18
199:13 200:21
202:7 204:23
212:24
**stock's** 147:13
**stocks** 12:10,14
12:19,22 14:23
15:7,19,23
16:8,24 18:11
19:4 20:12
21:23 23:3,4
23:19 24:22
33:7,25 34:21
37:17 38:20,22
39:18,22 40:14
41:19 43:4,21
45:3,11,14
46:25 47:5,15
48:8 50:21
51:11,17 52:2
58:20 59:16
62:15 64:17,20
65:16 66:18
67:16 68:13
69:16 71:11,12
71:17,23 72:17

72:23 73:13,21
74:13 75:15,21
77:7 79:11
80:21,23 89:15
90:2 95:5
97:14,16
100:13 105:11
105:18 112:21
113:5 118:9
121:12,16
124:25 125:11
126:14 133:17
140:25 141:3,7
143:22 144:15
145:12,17,25
146:5,7 149:16
151:14 152:7
152:16,21,25
153:2 154:5,15
155:2 158:7
162:24 163:2,5
163:8 169:10
169:11 177:12
177:13 184:3
184:21 185:2
193:16,19
201:4,20
202:17 203:6
204:8,15,24,25
205:20 207:17
208:5 218:17
**stop** 35:7
203:21,24
204:6

**[stopped - takes]**

stopped   193:15
straight   35:13
street   14:25
  17:14 18:16
  22:12 25:7
  97:13 144:2,19
  144:19
strong   140:3
  141:20
stronger   57:20
studied   172:25
studies   16:24
  50:15 132:15
  166:6
study   11:9,11
  12:2,2,5 13:4,6
  17:2 127:11,20
  132:21,22
  133:4 135:6
  137:10,11,12
  150:18 151:4
  151:19,22,25
  152:4 156:25
  157:2,6,16,18
  158:5 162:14
  162:19 163:12
  163:14,16,21
  163:21 166:2,4
  166:13 172:24
  173:8,16
study's   151:10
studying
  105:15
subject   52:17
  113:2 136:16

145:16 156:5
181:14
submitted
  119:23 128:5
submitting
  37:7
subscribe   31:4
subscribed
  223:16
subsequent
  52:6,15 57:5
  69:6 83:18
  95:20 132:6,22
  144:21 199:7
  204:16
subset   18:8
  19:6,7 22:25
  26:6,8 28:22
substantial
  12:6
substituting
  137:23
subsume   160:9
suffer   208:16
suffered   97:20
  207:7
sufficiently
  85:2
suggest   201:22
suggested
  101:15 199:20
suggesting
  153:19 155:24
suggests   148:4

sum   17:3
summary   8:12
  46:4
supervision
  8:20 9:21
  10:21 15:15
  226:13
supplemented
  15:17
support   89:4
  208:8
supports   64:16
  112:2 140:13
  142:19 143:20
  220:12,13
  221:14
suppose   125:9
sure   5:17 6:10
  10:11,16 11:14
  11:20 23:12
  24:13 25:17
  33:18 39:8
  53:16 54:25
  59:9 62:11
  68:9 72:8
  77:22 84:14
  120:22 122:14
  127:22 136:19
  149:17 150:3
  150:16 159:8
  187:18 189:18
  200:25 219:11
sustained   208:4
  218:16

swaine   1:16 2:8
sworn   3:3
  82:15 100:6
  223:16 226:9
sycamore
  128:21 129:14
  130:19
systematic   49:8
  49:9

**t**

t   100:2 176:12
  224:8 225:3
  227:3,3
tabak   65:18
table   53:9,24
  56:3 59:12,13
  59:22,24 61:21
  62:22 157:12
  201:3,16 203:9
  203:13 204:4,4
take   4:20 41:8
  41:24 48:25
  56:4 60:18
  99:9 121:25
  122:7,8 138:16
  139:13 149:3
  183:8 200:16
taken   1:15
  59:10 62:25
  63:13 69:19
  71:14 99:14
  149:5 200:17
  226:11
takes   4:17

**[talk - think]**

| | | | |
|---|---|---|---|
| **talk** 28:19 | **tells** 163:16 | **terms** 27:3,13 | **thank** 23:15,15 |
| 69:13 177:13 | **temporary** | 32:11 50:16 | 221:22,24 |
| 197:20 | 44:22 46:13 | 52:16 114:2,8 | **theories** 135:5 |
| **talked** 27:20 | 61:9,11 62:5 | 121:4 134:3,23 | **theory** 127:9 |
| 89:21 | 63:25 64:10,11 | 172:21 192:23 | 196:14 197:8 |
| **talking** 12:23 | 65:10 66:13,16 | 194:23 209:13 | 201:21 |
| 20:15 22:23 | 66:25 67:18,19 | **test** 58:15 | **thin** 220:2 |
| 24:15,16,17 | 68:9 69:3,10 | 153:9 167:5 | **thing** 83:11 |
| 51:14 114:12 | 74:18,21 75:25 | 203:22 | 103:15 104:15 |
| 114:12 150:14 | 76:2 88:16 | **testified** 3:6 | 117:14 127:8 |
| **talks** 65:10,14 | 90:9 91:11,11 | 6:23 7:2 81:14 | 158:5 159:20 |
| 143:10 | 92:12 93:17 | 87:23 100:9 | 159:21 170:3 |
| **target** 50:4 | 94:9,10,11 | 110:7,14 | **things** 35:5 |
| **targets** 164:24 | 100:21 103:21 | 119:19,24,25 | 46:16 62:4 |
| 187:4 | 112:6 116:13 | 187:9 212:20 | 70:20 71:7 |
| **taught** 5:18,20 | 154:9,14 155:5 | 212:21 219:18 | 72:10 74:4 |
| 5:22 | 195:6 199:4 | **testify** 4:23 | 80:5 85:18 |
| **teaching** 4:8 | **ten** 7:24 70:8 | 123:8,10 | 86:8,19 92:9 |
| **team** 8:18,24 | 135:19,23 | **testimony** | 115:13 202:18 |
| 9:2 11:7,14 | 143:7 205:2 | 33:22 34:17 | 202:20 |
| 13:13 36:25 | **tend** 88:16 | 79:4 82:15,22 | **think** 5:8 6:25 |
| **tell** 7:14 25:19 | **tended** 127:13 | 83:12 84:2 | 12:25 29:15 |
| 30:6 32:7 | **term** 44:11 | 86:20 97:25 | 30:3,5,10 32:5 |
| 33:20 34:12 | 68:18 74:25 | 98:4,5,25 99:5 | 35:23 36:23 |
| 37:8 64:15 | 76:24 77:17 | 102:2,10,24 | 37:5,18 39:12 |
| 97:8 133:22 | 79:11 80:2 | 104:8,12,14 | 40:20,21 41:2 |
| 138:16 160:18 | 114:11,13 | 108:9 111:8,9 | 46:8 56:23 |
| 163:19 166:23 | 117:2,5,7 | 111:12,22 | 59:13 62:16 |
| 166:23 167:23 | 149:13,23 | 123:13 131:12 | 67:11,25 71:25 |
| 168:24 175:12 | 150:6 155:5 | 178:25 179:22 | 72:7 73:23 |
| 179:18 211:3 | 178:9 191:24 | 189:13 207:6 | 76:9 77:4 |
| 220:18,18 | **termination** | 216:16 223:10 | 78:15 79:3 |
| 221:17 | 92:3,21 93:4 | 226:6,10,11,15 | 80:4 82:20 |
| **telling** 33:9,10 | 94:18 | **text** 96:18 | 83:7,10 84:10 |
| 65:20 172:9 | | 178:9 | 84:22 89:18 |

90:5 91:6,25
92:8,20 93:11
99:5 107:5,25
109:2,8,24
116:19,20
117:12 119:11
121:3,19 124:5
127:7 141:10
145:9,12
149:25 150:24
152:10,13
153:17 171:14
175:8,11 178:9
182:14 183:10
186:9,13,14
187:13 188:11
191:8,25 192:2
192:11,12,25
193:18 197:11
198:20,22
199:11,16,21
200:6,20
202:25 206:13
209:18,24
211:12,15
214:11,16,22
220:11
**thinking** 136:4
**third** 20:16,19
32:19 63:18
69:20 70:5
157:19
**thirty** 14:20
17:25 18:5,18
20:17 32:18

65:7,7 126:2
126:19 127:2
128:4,17
132:25 133:21
134:9 151:6,12
153:23 183:24
184:8,20
185:10 201:24
206:4,9,17
210:11 218:5
218:11 220:15
221:13,16,17
221:20
**thought** 82:23
123:3
**thousand** 45:12
54:20 67:14
75:22
**three** 9:2 40:12
53:9,25 59:14
70:24 90:25
95:15 122:25
123:4,5 124:12
124:12,16,24
125:5 130:5
131:22,22
151:6,12 162:8
201:3,16 203:9
204:4,4,24
**tie** 134:17
140:25 144:13
212:22
**time** 4:13,18
5:10 34:11
36:9 41:2

46:12 54:12
59:7 62:20
67:2,21 68:5
68:10 69:6
73:17 74:22
75:10,18 76:16
83:19 85:19
87:11 91:13
92:2,16 93:18
94:13 97:23
101:19 102:18
103:18 104:2
104:13 123:18
130:12 138:18
143:16 144:6
145:11 162:2
168:15 169:24
170:15,22
173:6,9,9
174:6 185:22
192:25 197:4
198:13 199:2,6
199:10 205:7
213:21 221:23
222:3 226:8
**times** 14:12
15:13 19:24
30:11 31:2,23
32:24 35:3,12
70:24 92:8
93:10 95:2,15
106:15 135:22
176:18,20
178:6 179:14
188:25 189:14

219:18 221:19
**timing** 80:17
101:16 118:17
118:18 207:18
210:13 213:15
213:17
**timings** 39:2
**title** 96:13
**titled** 131:21
**today** 4:24 6:14
16:4
**told** 10:14
171:24
**took** 17:15
147:9
**tootsie** 12:21
**top** 128:4 134:8
**total** 17:3 18:8
28:22 60:14
70:25 162:16
163:3
**trade** 54:16
110:24 145:18
146:10 184:22
186:6
**traded** 12:19
54:21 105:17
105:19 145:12
145:20 146:2,6
146:18,19
151:16 152:8
152:16,22
153:2 210:15
213:16 214:15
214:19,20

**[traded - typically]**

215:11 216:11
216:12,13,24
217:6
**trader** 108:13
108:20,23
149:18,20,22
**traders** 104:19
105:19,23
106:19,24
108:12 148:6
149:6,14,16
150:6,10,15,15
154:10 155:7
155:10
**trades** 206:7
207:19 210:13
213:15
**trading** 1:5
51:18 54:3
67:5 70:9,12
70:24 71:10,21
72:6,12,13,15
85:3 104:24
105:2,5,6,10
107:2 158:16
173:17 185:23
201:18 202:15
208:3 218:14
219:10 223:1
227:1
**trained** 5:3
**transaction**
191:22 214:7,7
215:17,17

**transactions**
208:22
**transcribed**
226:12
**transcript**
223:5,10
226:14
**translate**
190:10
**translates**
190:3
**treat** 144:24
**trial** 119:22
188:12,14
189:4
**tried** 19:24
32:23 141:14
220:4
**triggers** 105:7
**trivago** 12:21
**true** 16:3 24:12
24:13 25:13,17
26:2 51:25
52:10,18 56:15
56:17,23 57:15
58:6,9,19,21
83:23 84:4
93:23 95:11,23
96:7 105:8
124:15 126:12
138:2 141:12
141:14 142:4
165:17,23
166:17 172:23
173:5,7 191:23

192:5,6,14
193:7 194:4,5
195:5,12 196:9
197:5,11
201:22 202:17
202:22 203:5
203:25 210:5
214:10 216:4
221:4 223:9
226:14
**trusted** 182:5
**truth** 34:10,12
34:13 167:23
168:24
**try** 73:9 173:11
196:24
**trying** 26:5
53:2 68:3
72:25 89:22
110:5 129:6
136:7,23 137:8
167:13,21
175:4 190:10
219:14
**turki** 37:2
**turn** 206:5
**twelve** 90:22
139:13,14
141:18
**twenty** 40:12
56:6,12 65:4,5
65:6,9,12,19
72:22 73:4
88:13,22,23
89:6 90:19

91:5,19,20
94:15,17
123:21 124:5,7
125:16,16,16
125:17,17,23
125:24,25
126:2 128:19
128:24 129:12
129:17,17
130:15,16,22
130:23 142:25
143:2,19
158:16 162:8
176:18 214:2
**two** 20:3 29:23
45:12 46:16
59:22,24 61:21
62:3 63:4 65:7
67:14 72:11
75:21 108:8
128:24 129:17
130:15,22
132:25 135:5
143:2 175:3
196:11 207:4
208:7
**type** 11:8 75:20
156:20
**typical** 56:10
56:13 209:25
**typically** 90:19
131:5 157:20
157:24 161:18
166:11 175:9
199:6

**[u.s. - variables]** Page 53

| u | | | |
|---|---|---|---|

**u.s.** 144:23
**ultimate**
197:12
**ultimately**
119:17 189:6
217:23
**unable** 216:7
**under** 6:5 7:3
8:19 9:20
10:19,20 15:14
45:18 108:2
109:25 137:15
139:23 147:22
147:25 153:11
153:13 163:18
181:20 183:4
186:16 188:9
189:16,25
200:4 214:16
215:14 221:5
226:13
**underlying**
83:23 84:4
**understand**
23:21 24:25
62:12 77:23
219:5,14,22
**understanding**
25:12 38:5,9
39:12 51:2
75:18 76:5
78:16 89:12
118:4,7,11
131:8

**understood**
44:21 45:21
46:12 61:8
64:9 66:24
67:18 68:7,8
68:25 74:17,20
83:15 91:12,13
91:15 93:16
94:10 100:21
116:11 150:10
156:19 162:11
**undertook**
157:5
**undervalued**
141:8
**underwriters**
140:24
**unexpected**
127:14,17
**unexplained**
130:2
**uninformed**
141:6 149:14
**united** 1:2
105:11
**university** 3:22
4:4,7
**unrelated**
36:12 88:16
146:25 165:6
**unsuccessful**
128:10
**upwards** 140:9
**usage** 117:12

**use** 11:3 22:8
106:8 121:15
155:4 158:17
160:5 161:4
171:21 176:21
189:19 200:4
**used** 44:11
126:12 127:24
134:10 135:17
135:21 137:13
149:14 150:6
157:16 164:13
168:11 178:9
181:17 199:23
202:5 208:10
211:17 217:17
**using** 54:8
120:20 125:11
127:11 190:13
191:23 197:23
204:13 220:7
**usual** 215:15
**usually** 149:14
214:5

| v | | | |
|---|---|---|---|

**vague** 8:6
17:23 106:2
114:21 217:10
**validity** 58:16
**value** 15:4,24
21:6,8,9 26:15
26:22 27:16,18
30:16 44:18,19
45:3,13 46:6
51:25 52:10,18

56:15,17,23
57:15 58:6,9
58:19,21 67:17
83:23 84:4
85:4 95:11,23
96:7 138:2
139:18 140:9
140:16 146:17
147:13,15,17
147:19,25
148:3,5 165:4
168:16 169:4
170:2,17,24
171:9,23 172:3
172:6 173:22
174:15,24
175:20,24
177:3 178:4,8
178:10,13,20
179:12 184:4
185:4,20 186:6
186:20,24
187:12 191:23
192:5,6,14
193:7 194:4
195:5,12 196:9
196:18 202:17
202:22 203:5
203:25 210:5
216:4,5 221:4
**values** 75:24
**variable** 160:2
**variables** 131:7
132:18

**variation**
129:25
**various**   16:23
61:6 65:3
92:10 139:3
158:8 189:25
201:4
**vary**   121:5
**vast**   15:21
183:25 184:24
**verdict**   188:13
188:15
**versus**   54:5
70:20 74:3
87:24 209:8
**view**   155:13
**virtue**   61:10
**volatile**   207:16
**volatility**   70:6
71:15 92:17
116:7 155:16
**volume**   54:9,11
54:13,15,17,22
55:5,6,9,12,14
55:16,20
131:22 141:4
193:20
**voluminous**
182:20

**w**

**wall**   14:25
17:14 18:16
22:11 25:7
97:13 144:2,19
144:19

**want**   8:2 21:18
23:11 33:19
34:25 41:8,9
53:14 62:11
83:3 91:16
105:13 115:3,7
122:8 139:20
168:23,24
173:6,11,14
175:13 210:10
211:7 213:23
221:19
**wanted**   110:23
173:15
**wanting**   91:23
184:17
**wants**   77:15
**waste**   221:20
**way**   5:23 18:12
25:4 30:22
31:18,22 33:17
37:3 43:15
44:17 52:4
54:5,7 56:23
67:25 68:15,23
73:25 75:7
76:14 84:8,10
105:14,21
115:14 117:25
119:3 136:10
136:12 137:2,7
155:23 156:8
159:9 166:13
167:22 191:23
193:11 197:17

198:4 199:16
200:15 208:12
209:3,11
214:18 215:14
216:22 218:2
**wayne**   1:18
226:4,25
**ways**   209:25
**we've**   41:6
**week**   67:15,23
**weeks**   45:12
75:22
**weighted**   54:9
54:11,13,15,17
54:22 55:5,6,9
55:12,14,20
**went**   17:5
26:20 28:3
29:2 45:11,24
60:9,16 75:21
127:25 166:19
171:7 174:22
205:20,21
**werner**   51:11
56:10,21 57:8
57:12 58:17
59:6 151:24
152:6 199:19
202:10 208:9
211:19 214:24
220:10
**werner's**   61:15
152:19 204:2
204:12

**whereof**   226:22
**wide**   33:13
47:9 108:6
194:20 197:7
197:23 199:24
215:6 217:18
219:4
**widely**   45:20
46:12 47:6
66:24 67:19
68:7,8,25
91:12,13,14
93:16 94:9,10
100:21 116:11
154:8,18
**widespread**
41:22 75:18
76:5 89:12
**willing**   147:20
147:21
**win**   196:13
**witness**   6:8 8:7
16:14 17:24
31:12,25 34:25
41:11 43:24
59:7 62:9
70:16 71:25
77:22 93:9
94:24 95:16
98:17 103:14
106:5 107:15
107:25 112:24
113:19 114:2
114:22 115:23
119:10 120:3,4

**[witness - york]**                                                    Page 55

122:21 126:3
132:10 149:11
171:14 174:18
176:19 179:5
184:11 187:18
188:19,20
196:5 211:12
212:11 216:17
217:11 221:24
224:5 226:9,15
226:22
**wonder**   53:7
**word**   22:4,8
156:9 171:22
**words**   15:12
55:13 57:9
130:25 148:22
173:7
**work**   7:15 37:2
164:6 180:15
214:12 215:8
**worked**   8:20
9:13 10:4
190:16 220:12
**working**   8:19
9:19 10:20
120:17
**works**   136:2
**world**   67:12
68:4,21,22,24
136:22 137:6
208:6 209:5,8
209:13 212:14
212:16,17,18
214:15 215:11

216:11 218:17
221:12
**world's**   105:9
**worries**   53:6
**write**   184:6
**writing**   184:14
**written**   6:2
15:12 116:14
**wrong**   133:7
173:23 190:17
201:10 202:19
202:21
**wrongdoing**
56:18,19 95:22
152:17 193:15
209:9 213:12
214:9,21
215:19
**wrongful**   56:25
57:6 58:24
69:7
**wrote**   15:9
96:16 184:15

| x |
| :---: |

**x**   45:24 224:4,8
225:2,3

| y |
| :---: |

**y**   45:25
**yeah**   60:21
**year**   5:11 51:12
173:16
**years**   4:11
123:12 135:20
135:23 214:2

214:12
**yergesheva**   9:7
**york**   1:17,18,19
2:5,5,9,9 3:5
100:8 122:20
145:13 226:5

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foreging transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.