# Exhibit 2

In re Global Brokerage, Inc. f/k/a FXCM Inc. Securities Litigation, Docket No. 1:17-cv-00916 (S.D.N.Y. Feb 07,

## Multiple Documents

| Part | Description |
|------|-------------|
| 1 | Main Document |
| 2 | Exhibit 1- Hendershott Report |
| 3 | Exhibit 2- Services Agreement as of 5/1/10 |
| 4 | Exhibit 3- FXCM Form S-1 dated 12/1/10 |
| 5 | Exhibit 4- FXCM SEC Form 8-K dated 6/3/13 |
| 6 | Exhibit 5- CFTC Initial Order |
| 7 | Exhibit 6- FXCM SEC Form 8-K dated 2/7/17 |
| 8 | Exhibit 7- Werner Transcript |
| 9 | Exhibit 8- Regukh Transcript |
| 10 | Exhibit 9- Patt Transcript (REDACTED) |
| 11 | Exhibit 10- 683 Transcript |
| 12 | Exhibit 11- E-Global Trade Transcript |

© 2023 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

# EXHIBIT 7

Page 1

1                UNITED STATES DISTRICT COURT

2                SOUTHERN DISTRICT OF NEW YORK

3

4
                                    )
5                                   )
      IN RE GLOBAL BROKERAGE, INC.  )
6     F/K/A FXCM INC.               )   MASTER FILE NO.
      SECURITIES LITIGATION         )   1:17-CV-00916-RA
7                                   )
      _____)
8                                   )
      THIS DOCUMENT RELATES TO:     )
9     ALL ACTIONS.                  )
      _____)
10

11

12

13

14        VIDEOTAPED DEPOSITION OF ADAM WERNER, PH.D.

15              FRIDAY, FEBRUARY 28, 2020

16

17

18

19

20

21    REPORTED BY:  REAGAN EVANS, RPR, RMR, CRR, CCRR,

22              CLR, CRC, CA CSR NO. 8176

23

24

25

Page 2

```
 1   VIDEOTAPED DEPOSITION OF ADAM WERNER, PH.D., TAKEN
 2   ON BEHALF OF THE DEFENDANTS AT 9:39 A.M., FRIDAY,
 3   FEBRUARY 28, 2020, AT 633 WEST FIFTH STREET,
 4   SUITE 1600, LOS ANGELES, CALIFORNIA, BEFORE REAGAN
 5   EVANS, CA CSR NO. 8176, RPR, RMR, CRR, CCRR, CLR,
 6   CRC.
 7
 8   APPEARANCES OF COUNSEL
 9
10
     FOR THE PLAINTIFFS:
11       THE ROSEN LAW FIRM
         BY:  GONEN HAKLAY, ESQ.
12       BY:  JOSH BAKER, ESQ.
         101 GREENWOOD AVENUE
13       SUITE 440
         JENKINTOWN, PENNSYLVANIA  19046
14       (215) 600-2817
         GHAKLAY@ROSENLEGAL.COM
15       JBAKER@ROSENLEGAL.COM
16
     FOR THE DEFENDANT GLOBAL BROKERAGE, INC., F/K/A
17   FXCM, INC.:
         KING & SPALDING
18       BY:  PETER ISAJIW, ESQ.
         BY:  EVAN C. ENNIS, ESQ.
19       1185 AVENUE OF THE AMERICAS
         NEW YORK, NEW YORK 10036-2601
20       (212) 556-2235
         PISAJIW@KSLAW.COM
21       EENNIS@KSLAW.COM
22
23   ALSO PRESENT:
24       ALEXANDER AGANIN, PH.D., CORNERSTONE RESEARCH
25       JULIO LUEVANO, JR., VIDEOGRAPHER
```

                                                          Page 3

1                          I N D E X

2

3     WITNESS                 EXAMINATION                      PAGE

4     ADAM WERNER, PH.D.   BY MR. ISAJIW                        5

5

6

7                        E X H I B I T S

8

9

      NO.            PAGE        DESCRIPTION

10

      EXHIBIT 1       7      MEMORANDUM OF LAW IN SUPPORT

11                           OF MOTION FOR CLASS

                             CERTIFICATION AND APPOINTMENT

12                           OF CLASS REPRESENTATIVES AND

                             CLASS COUNSEL

13

      EXHIBIT 2       10     OPENING REPORT ON MARKET

14                           EFFICIENCY BY DR. ADAM WERNER,

                             PH.D., DATED JANUARY 6, 2020

15

      EXHIBIT 3       11     NOTICE OF ERRATA

16

      EXHIBIT 4       14     CORRECTED OPENING REPORT ON

17                           MARKET EFFICIENCY BY DR. ADAM

                             WERNER, PH.D., DATED

18                           JANUARY 10, 2020, 214 PAGES

19    EXHIBIT 5       17     CONSOLIDATED SECURITIES

                             CLASS ACTION COMPLAINT,

20                           FILED 6-19-2017

21    EXHIBIT 6       19     SECOND AMENDED CONSOLIDATED

                             SECURITIES CLASS ACTION

22                           COMPLAINT FILED IN THIS MATTER

                             ON APRIL 6, 2018

23

      EXHIBIT 7       20     OPINION & ORDER – CLASS ACTION

24

25

```
                                            Page 4
 1                    LOS ANGELES, CALIFORNIA
 2           FRIDAY, FEBRUARY 28, 2020; 9:39 A.M.
 3
 4             THE VIDEOGRAPHER:  Good morning.  We are on
 5     the record.  The time is 9:39 a.m.
 6             Today's date is February 28th, 2020.
 7             My name is Julio Luevano, Jr.  I am the
 8     notary video technician with Veritext Legal
 9     Solutions, located in Los Angeles, California.
10             We are recording these proceedings at
11     633 West Fifth Street, Los Angeles, California.
12             This is Media 1 for the video deposition of
13     Dr. Adam Werner, M.D., in the action entitled,
14     "Global Brokerage, Inc., F/K/A FXCM, Inc.,
15     Securities Litigation."
16             This deposition is being taken on behalf of
17     Defendants.
18             The case number is 1:17-cv-00916-RA.
19             Now, may I please have an introduction for
20     the record, beginning with counsel.
21             MR. ISAJIW:  Yeah.
22             Peter Isajiw with King & Spalding, counsel
23     for Defendant Global Brokerage, formerly known as
24     FXCM.
25             MS. ENNIS:  Evan Ennis also with
```

Case 1:21-cv-02796-VCM-BLM Document 568-2 Entered on FLSD Docket 09/20/2023 Page 8 of 332

```
 1   King & Spalding, counsel for Defendants.
 2           DR. ALEXANDER AGANIN:  Alexander Aganin,
 3   Cornerstone Research.
 4           MR. HAKLAY:  Gonen Haklay from the Rosen
 5   Law Firm on behalf of the witness.
 6           MR. BAKER:  Josh Baker, the Rosen Law Firm
 7   on behalf of the witness.
 8           THE VIDEOGRAPHER:  Thank you.
 9           Ms. Reporter, please swear in the witness.
10
11               ADAM WERNER, PH.D.,
12    having been first duly sworn by the reporter, was
13           examined and testified as follows:
14
15           THE WITNESS:  I do.
16
17                   EXAMINATION
18   BY MR. ISAJIW:
19       Q   Hi, Dr. Werner.  We met off the record
20   briefly.
21           But, for the record, I'm Peter Isajiw
22   representing the defendants in this case.  And I
23   wanted to thank you for taking the time to come out
24   here today and talk to us.
25           Just real quick, you were introduced as an
```

```
                                             Page 6

 1    M.D. earlier on.  I wanted to correct that.  It's a

 2    Ph.D.; correct?

 3         A    Correct.

 4         Q    Good.

 5         A    That was a first, by the way.  I said

 6    "Thank you."

 7         Q    Just making sure that we're clear.

 8              I assume you have been deposed several

 9    times before, and you're familiar with the process;

10    is that correct?

11         A    Yes.

12         Q    Okay.

13              So if at any point you don't understand a

14    question that I'm asking, please let me know.  And

15    before we begin, I'm not going to go through all of

16    the normal, kind of, witness instructions because

17    I'm pretty sure you're familiar with them, but is

18    there anything that's preventing you from testifying

19    truthfully and fully today?

20         A    No.

21         Q    Okay.  Great.

22              You're aware that the plaintiffs in this

23    case have sought class certification; is that right?

24         A    I believe that is correct.

25         Q    Okay.
```

                                                              Page 7

 1              And you were asked to provide an expert

 2    opinion in support of their motion for class

 3    certification; is that right?

 4        A    I believe so.

 5        Q    Okay.

 6              MR. ISAJIW:  I'm just going to introduce a

 7    couple of exhibits here just for housekeeping

 8    purposes.

 9              The first one is a Memorandum of Law in

10    Support of Class Certification and Appointment of

11    Class Representatives that counsel filed by the

12    plaintiffs in this case.

13              THE REPORTER:  Is that Exhibit 1?

14              MR. ISAJIW:  That's Exhibit 1.

15              (Whereupon Werner Exhibit 1 was

16              marked for identification by the

17              Court Reporter.)

18    BY MR. ISAJIW:

19        Q    Have you seen that Memorandum of Law

20    before?

21        A    As I sit here, I don't recall.

22              If you give me my report, I'm pretty sure I

23    didn't rely on this, but I'm more than happy to

24    refresh my memory by looking at the report and

25    seeing somehow if I looked at this at some point.

```
                                            Page 8

 1        Q    Sure.

 2             We'll get to your report pretty quickly

 3   actually, but just sitting here today right now, do

 4   you remember ever seeing that document before?

 5        A    Again, I'm happy to refresh my memory by

 6   seeing if it's something I saw before.  I guess --

 7   so I don't know, as I sit here today.

 8        Q    Okay.

 9             Can you turn to page 1 of that document.

10             And in the Preliminaries, under the title

11   "Preliminary Statement," there is a block quote.

12   And this block quote represents the class the

13   plaintiffs are asking to certify, which is (as read

14   and/or reflected):

15                  All persons and/or entities

16             that purchased or otherwise

17             acquired publicly traded Global

18             Brokerage, Inc., formerly known as

19             FXCM Securities, including FXCM 2.5

20             percent Convertible Senior Notes

21             due 2018, and Class A common stock,

22             during the period March 15, 2012

23             through February 6, 2017, both

24             dates inclusive.

25             Do you see that?
```

```
                                            Page 9

 1        A    I do.
 2        Q    Is that your understanding of the class
 3   that your testimony and expert report is intended to
 4   assist in certification?
 5        A    Again, I'm happy to look at my report to
 6   refresh my memory.  So without -- just looking at
 7   this and reading this, I would like to look at my
 8   report to know whether or not I cite that.
 9        Q    Sitting here right now, does that sound at
10   all familiar to you?
11        A    I have no reason to disagree with it, as I
12   sit here.
13        Q    Okay.
14             But you don't specifically recall it being
15   part of the class that your report is supporting?
16        A    Again, I'm happy to look at my report to
17   refresh my memory.
18             As I sit here today, it sounds reasonable,
19   but it's not something I remember.  I'm sure --
20   again -- well, let's go with a different document.
21             How about the complaint?
22        Q    Yeah, we'll get to that.
23             I'm just asking you right now, sitting here
24   today, and we'll introduce you to the report in a
25   second, and we'll probably talk about your report
```

```
                                      Page 10
 1   for most of today.
 2           But so today, you don't have a general
 3   recollection of that being the class?
 4       A    It seems familiar, but I would like to
 5   refresh my memory to give you a complete answer.
 6       Q    Sure.
 7           MR. ISAJIW:  This will be Exhibit 2.
 8           (Whereupon Werner Exhibit 2 was
 9           marked for identification by the
10           Court Reporter.)
11   BY MR. ISAJIW:
12       Q    So what you have been handed as Exhibit 2
13   is a document called the "Opening Report on Market
14   Efficiency" by Dr. Adam Werner, dated January 6,
15   2020.
16           That is the original report you filed in
17   this matter.
18           Do you recognize that document?
19       A    When you say "original report," do you mean
20   the report with the corrections or the report
21   without the corrections?
22       Q    I'm talking about the first one.
23       A    So that's the report without the
24   corrections?
25       Q    That's correct.
```

```
                                           Page 11

 1        A    Yes, I believe I've seen this before.

 2        Q    Does flipping through this document refresh

 3   your recollection on the class?

 4        A    Yes.

 5        Q    Okay.

 6             So is -- going back to the original

 7   question on the class certification motion, the

 8   definition of class is consistent; is that correct?

 9        A    That -- I believe that is correct.

10        Q    You can put that to the side.

11             I'm going to put in front of you what we're

12   marking as Exhibit 3.

13             (Whereupon Werner Exhibit 3 was

14             marked for identification by the

15             Court Reporter.)

16   BY MR. ISAJIW:

17        Q    And this is a Notice of Errata that

18   indicates that (as read and/or reflected):

19                  On January 6th, 2020,

20             Plaintiffs inadvertently filed a

21             version of the "Opening Report on

22             Market Efficiency" by Dr. Adam

23             Werner that contained

24             non-substantive errors.

25             And it replaces a corrected copy.
```

```
                                                    Page 12

 1              Do you recognize that document?
 2       A    I don't think I've seen this letter before,
 3   but, otherwise, yes.
 4       Q    Okay.
 5              And so this document has your original
 6   report and your corrected report; correct?
 7       A    Oh, does it?  I don't --
 8       Q    I'm sorry.  I'm sorry.
 9              It has the corrected report and a redline
10   showing the changes from your original report.
11       A    Okay.
12       Q    So you recognize that document as both your
13   corrected report and a redline indicating the
14   changes to your prior report?
15       A    Well, I haven't seen the redlines.  Can you
16   point me to a particular page?
17       Q    Generally speaking, what is your
18   recollection of what you needed to correct in the
19   second report?
20       A    I believe there was some statistics that
21   were slightly off.
22       Q    Okay.
23              Anything else?
24       A    Not that I recall, but, again, if you --
25   I'm happy to go through all of this, if you would
```

```
                                          Page 13

 1    like me to fully refresh my memory.
 2         Q    I'll get there.
 3              I'm just asking what you remember first.
 4         A    Okay.
 5         Q    So you had to correct some statistics.
 6              Do you remember what the issue was with
 7    those statistics?
 8         A    I believe they were miscalculated.
 9         Q    And who recognized the miscalculation?
10         A    I believe I did.
11         Q    Okay.
12              And what was the context for you to realize
13    that there were miscalculations?
14         A    I had noticed that between drafts the
15    numbers had changed.
16         Q    Okay.
17              After you submitted the first report, so
18    you were just reviewing the report?
19         A    I -- correct.
20         Q    Okay.
21              So we have taken the corrected report,
22    which is an exhibit there, and just bound it so it's
23    easier to deal with today.
24              So I'm going to hand you this as Exhibit 4
25    so that when we flip through, it will just be easier
```

```
                                                    Page 14
 1   to navigate.
 2              (Whereupon Werner Exhibit 4 was
 3              marked for identification by the
 4              Court Reporter.)
 5              THE WITNESS:  Do you think you will return
 6   to Exhibit 3?
 7   BY MR. ISAJIW:
 8       Q    I don't think so.  We may, though.
 9       A    I'm just going to place it up there.  It's
10   not like I'm going to --
11       Q    We're just using Exhibit 4 to make it
12   easier so that you don't have to deal with that pile
13   of paper.
14       A    Thank you.
15       Q    So that is your corrected report.  Like I
16   said, we just bound it for ease of navigating.
17              Did you write that report?
18       A    I wrote the report and was assisted by
19   people at Crowninshield in writing this report.
20   They helped me draft the report.  But I approved
21   everything that is in this report.
22       Q    Okay.
23              Anyone other than Crowninshield help you
24   draft the report?
25       A    I'm trying to remember.  There may be
```

Case 1:21-cv-02969-DLC Document 58-2 Filed on FLSD Docket 08/23/2023 Page 18 of 332

Page 15

1   someone who is named Narinder Walia, who I'm not

2   sure what his relationship with Crowninshield is.

3        Q    Can you spell that?

4        A    Sure.  It's "W" as in Werner; "A" as in

5   Adam; "L" as in Larry; "I" as in imbécil; "A" as in

6   Adam.

7        Q    Okay.

8        A    Do you want his first name?

9        Q    Sure.

10       A    Sure.  So it's Narinder.  "N" as in Nancy;

11  "A" as in Adam; "R" as in Robert; "I" as in -- we'll

12  deal with something else -- interesting; "N" as in

13  Nancy; "D" as in David; "E" as in eventually; "R" as

14  in Robert.

15       Q    Okay.

16            And you believe that Mr. Walia -- is it

17  Mr. or Mrs.?

18       A    Mr.

19       Q    You think Mr. Walia works for

20  Crowninshield?

21       A    I don't know what his relationship with

22  Crowninshield is.

23       Q    Okay.

24       A    Sorry.

25       Q    Sure.

Case 1:23-cv-00916-RA Document 58-2 Filed 07/12/20 Page 19 of 332

```
 1        A    If anything, he's a 1099 employee.

 2        Q    Okay.

 3        A    So, yeah, he's not -- I don't think he --

 4   he does not receive a W-2 from Crowninshield.

 5        Q    So aside from those people, anybody else

 6   you can think of who assisted you with the report?

 7        A    No.

 8        Q    Okay.

 9             Have you done any more work on this matter

10   since filing that corrected report?

11        A    No.

12        Q    When were you retained?

13        A    I don't recall.

14             So what are we in?  We're in -- it's not --

15        Q    Approximately?

16        A    I probably was contacted in October or

17   November.  That's speculative -- speculating on my

18   part.  I don't have the exact date.

19        Q    Okay.

20             Do you know what year you were retained?

21        A    Last -- oh -- so when you say "retained,"

22   you mean signed a retention agreement?

23        Q    Let's start with that.

24        A    I don't know.

25        Q    Okay.
```

```
                                      Page 17

 1            Let's start with just contacted to
 2    potentially work on this matter.
 3        A    I believe that would be 2019.
 4        Q    Okay.
 5            Can you keep that in front of you because
 6    we'll talk about it, but I want to have you take a
 7    look at two more documents.
 8        A    Sure.
 9            Can I put Exhibit 1 up here as well?
10        Q    Sure.
11            Just keep Exhibit 4, your corrected report,
12    handy.
13            MR. ISAJIW:  Which one is this?
14            THE REPORTER:  5.
15            (Whereupon Werner Exhibit 5 was
16            marked for identification by the
17            Court Reporter.)
18    BY MR. ISAJIW:
19        Q    I'm handing you what is being marked as
20    Exhibit 5, a Consolidated Securities Class Action
21    Complaint in this matter, which was filed 6-19-2017.
22            Have you seen this document before?
23        A    I have.
24        Q    Okay.
25            And did you review this document in
```

```
                                        Page 18
 1   connection with your work on this matter?

 2        A    I did.

 3        Q    Okay.

 4             And did you review this document before you

 5   started your analysis on this matter?

 6        A    Define "analysis."

 7        Q    So you were asked to render a couple of

 8   opinions which you put into this report; is that

 9   correct?

10        A    That is correct.

11        Q    Okay.

12             In the process of rendering those opinions,

13   you did some analysis in order to come up with those

14   opinions; is that correct?

15        A    That is correct.

16        Q    Okay.

17             Prior to beginning the analysis to support

18   your opinions, did you review this complaint?

19        A    I don't know the exact timeline.  My guess

20   is yes, but, again, that's a guess.

21        Q    Okay.

22             I'm going to put one more document in front

23   of you.  This is going to be Exhibit 6.

24   ///

25   ///
```

```
                                    Page 19

 1            (Whereupon Werner Exhibit 6 was

 2            marked for identification by the

 3            Court Reporter.)

 4   BY MR. ISAJIW:

 5        Q    And Exhibit 6 is the Second Amended

 6   Consolidated Securities Class Action Complaint filed

 7   in this matter on April 6, 2018.

 8            Do you recognize that document?

 9        A    I do.

10        Q    Okay.

11            And have you reviewed this document before?

12        A    I have.

13        Q    Okay.

14        A    Let me correct my previous testimony now.

15            I'm not sure that I've reviewed the first

16   complaint.

17        Q    Okay.

18        A    I may have just reviewed the second amended

19   complaint.

20        Q    Okay.

21            So did you review the second amended

22   complaint before beginning your analysis in this

23   matter?

24        A    I don't recall.

25        Q    Okay.
```

```
                                               Page 20

 1            So when we were talking about the first

 2    amended complaint, you said you may have reviewed it

 3    before the amended -- before the analysis.

 4            And so does that answer change with the

 5    second amended or --

 6        A    No.

 7        Q    Okay.

 8            So you just don't remember if you reviewed

 9    it before or after?

10        A    Right.

11            As I -- that's what I stated with regards

12    to this first complaint.  It's the same answer.

13        Q    Okay.

14            But you certainly reviewed it during your

15    analysis?

16        A    Yes.

17        Q    And you reviewed it before you finalized

18    your report?

19        A    Yes.

20            (Whereupon Werner Exhibit 7 was

21            marked for identification by the

22            Court Reporter.)

23    BY MR. ISAJIW:

24        Q    And what I've just handed you as Exhibit 7

25    is the Opinion & Order on the motion to dismiss in
```

Page 21

```
 1    the class action in this case, which was decided
 2    March 28th, 2019.
 3              Have you seen this document before?
 4              If you don't mind, I'm just wondering,
 5    looking at that document, do you recognize it?
 6        A    I mean, it looks like any other legal
 7    filing I've seen.
 8        Q    Okay.
 9        A    So I would like to refresh my memory by
10    seeing if it's something I have seen before.
11        Q    So just to be clear, you're saying that you
12    can't remember if you've ever seen that document
13    before, just sitting here today?
14        A    I believe that is accurate.
15        Q    Okay.
16        A    I don't believe I've seen it before.
17        Q    Okay.
18              Has anyone ever summarized it for you?
19        A    No.
20        Q    Are you aware that there was an order on
21    the motion to dismiss in this matter?
22        A    I believe I was aware.
23        Q    How did you become aware?
24        A    I think I was told by Counsel.
25        Q    Okay.
```

Page 22

```
 1              When did you become aware?
 2      A    I don't know.
 3      Q    Did you become aware before you finished
 4   your report?
 5      A    I don't recall.
 6      Q    Were you aware of the result of the order?
 7      A    Can you repeat the question, please.
 8              (The record was read back as
 9              follows:
10                  "Question:  Were you aware of
11              the result of the order?")
12              THE WITNESS:  And so when you mean the
13   "result," you mean the conclusions on page 38 and
14   39?
15   BY MR. ISAJIW:
16      Q    I'm just trying to understand your
17   understanding of the results.
18      A    Right.
19              And I'm just trying to understand your
20   definition of results.
21      Q    Using your best definition of the word
22   "results," are you aware of the results of the
23   motion to dismiss?
24              MR. HAKLAY:  Objection.  He stated that he
25   doesn't know what you mean by it.  He doesn't want
```

1  to give an answer where somebody might one day say,

2  here's what results mean.

3          So define what you mean by "results" and

4  he'll answer it.

5          MR. ISAJIW:  Okay.

6          We can limit the speaking -- just objection

7  to form --

8          MR. HAKLAY:  I'll limit it to whatever is

9  necessary.

10          MR. ISAJIW:  -- is the appropriate way to

11  go.

12          MR. HAKLAY:  That's fine.

13          Don't answer it until he does.

14          MR. ISAJIW:  You're instructing him not to

15  answer the question?

16          MR. HAKLAY:  If you don't understand it.

17  BY MR. ISAJIW:

18      Q   So you told me earlier, and correct me if I

19  am wrong, that you were aware that there was a

20  decision on the motion to dismiss.

21      A   Correct.

22      Q   Okay.

23          And you don't remember exactly when you

24  became aware that there was a decision on the motion

25  to dismiss?

```
                                          Page 24
 1        A    That is correct.
 2        Q    Whenever you became aware of the decision
 3   on the motion to dismiss, what did you understand
 4   the decision to be?
 5        A    I'm not sure I even thought about it.
 6        Q    So in what context did you become aware of
 7   it?
 8        A    Someone told me they survived a motion to
 9   dismiss.
10        Q    Did someone tell you anything else, other
11   than they survived the motion to dismiss?
12        A    I don't believe so.
13        Q    Okay.  Sitting here today, you have no
14   additional context whatsoever for "what survived the
15   motion to dismiss" means?
16        A    In general, or in this matter?
17        Q    Let's start in general.
18        A    Could you repeat the question, please.
19             (The record was read back as
20             follows:
21                 "Question:  Sitting here
22             today, you have no additional
23             context whatsoever for "what
24             survived the motion to dismiss"
25             means?")
```

```
                                                  Page 25
 1              THE WITNESS:  I don't understand the
 2    question.
 3    BY MR. ISAJIW:
 4         Q    In your view, what does "surviving a motion
 5    to dismiss" mean?
 6         A    In practical terms, in general, it means
 7    that the judge has allowed the case to go forward.
 8         Q    Okay.
 9              In context of this case, specifically, what
10    do you understand surviving the motion to dismiss to
11    mean?
12         A    It wouldn't be any different than my
13    general understanding of what it means to survive a
14    motion to dismiss.
15         Q    Do you have any understanding if any claims
16    or allegations were removed from the case in
17    connection with the decision on the motion to
18    dismiss?
19         A    I do not.
20         Q    Okay.
21              So the motion to dismiss came out in March
22    of 2019?
23              MR. HAKLAY:  You mean the opinion?
24              MR. ISAJIW:  I'm sorry.  The order.
25              THE WITNESS:  March of 2019, correct.
```

Page 26

1    That's what it says anyway.  Excuse me.

2    BY MR. ISAJIW:

3         Q    And your first report came out in January

4    of 2020; is that correct?

5         A    Yes.

6         Q    Okay.

7              So to the extent you were notified of the

8    decision on the motion to dismiss, do you believe it

9    would have been before or after you started your

10   work on the report?

11        A    Well, I'm just -- and just based on logic,

12   I don't think -- if they hadn't survived the motion

13   to dismiss, my guess is they wouldn't have asked me

14   to submit a report in this matter.

15             So I guess I was probably aware of it

16   before I started working on my report.

17        Q    Okay.

18        A    But that's just based on logic.  I don't

19   recall any specific date.

20        Q    Okay.

21             So the -- you're employed by The Rosen Law

22   Firm here; is that correct?

23             I'm sorry.  Retained by The Rosen Law Firm?

24        A    I believe that's correct.

25        Q    Okay.

Case 1:21-cv-09769-PAC   Document 133-17   Filed 08/28/2023   Page 30 of 332

```
                                              Page 27
 1        A    But I think formally, Crown- -- I'm not
 2   sure how the exact relationship works because they
 3   sign the engagement letter with Crowninshield.
 4        Q    Okay.
 5        A    So I don't know if that means that
 6   technically Crowninshield is retained by The Rosen
 7   Law Firm.
 8        Q    Okay.
 9             Are you aware if Rosen -- The Rosen Law
10   Firm is paying Crowninshield for your efforts in
11   this case?
12        A    I believe so.
13        Q    And do you know how much they are paying
14   Crowninshield for your efforts in this case?
15        A    You mean for my work?
16        Q    Yes.
17        A    And I'm referring now to paragraph 7 of my
18   report.
19        Q    Uh-huh.
20        A    $675 per hour.
21        Q    And you mentioned earlier that some
22   additional Crowninshield consultants have assisted.
23             Are you aware of what their rate is?
24        A    Again, referring to paragraph 7, it's
25   between 250 to $500 per hour.
```

```
                                            Page 28
 1        Q    And do you know how much Crowninshield has
 2   billed for this matter so far?
 3        A    I do not.
 4        Q    Approximately, how many hours have you
 5   spent in connection with this matter so far?
 6        A    Somewhere between 20 and 30 hours.
 7        Q    Do you know if Crowninshield has submitted
 8   invoices to The Rosen Firm for your work in this
 9   matter?
10        A    I believe they have.
11        Q    Do you know if they've been paid?
12        A    I -- well, I believe so.
13        Q    Okay.
14        A    If I could just add.  The Rosen Law Firm is
15   very timely in their payment of bills.  So that's
16   why -- I don't know if we've submitted a bill for
17   January.  I know they've paid their bill through
18   December -- sorry -- on my work through December.
19        Q    Okay.
20             And so going back to your report, you were
21   asked by The Rosen Law Firm to provide an expert
22   opinion on market efficiency as to the FXCM common
23   stock; is that correct?
24        A    Well, again, let's just turn to my report.
25   I was retained (as read and/or reflected:)
```

Page 29

```
 1              To provide an opinion that
 2         will assist the court in
 3         determining whether the common
 4         stock of -- and this is paragraph 1
 5         in my report -- Global Brokerage,
 6         Inc., formerly known as, and that's
 7         F/K/A/ -- oh, no slash after the
 8         "A," sorry, FXCM Inc., and that's
 9         the abbreviation for incorporated,
10         ("FXCM" or the "Company") and the
11         FXCM 2.25 percent Convertible
12         Senior Notes due 2018 traded in
13         efficient markets during the
14         periods for March 15, 2012, through
15         February 6, 2017 (the "Class
16         Period"), and June 24, 2014,
17         through February 6, 2017 (the
18         "Notes Period"), respectively.
19         Oh, sorry (as read and/or reflected:)
20              In addition -- and this is
21         paragraph 2 -- The Rosen Firm asked
22         me to provide an opinion that will
23         assist the court in understanding
24         and determining whether the trier
25         of fact will be able to measure
```

Page 30

1              damages in this matter by means of
2              a common methodology and calculate
3              them on a class-wide basis for all
4              Class members in connection with
5              their claims under Section 10(b) of
6              the Exchange Act of 1934 (the
7              "Exchange Act") and the U.S.
8              Securities & Exchange Commission
9              ("SEC") Rule 10b-5 adopted
10             thereunder.
11             And we'll just leave it at that.
12     Q    Thank you for that.
13             So my question was:  You were asked to
14    provide an expert opinion on market efficiency
15    concerning the FXCM common stock; is that correct?
16     A    That was your question, correct.
17     Q    Yeah.
18             Did you need to refer to your report to
19    answer that question?
20     A    Well, in any deposition, I try to be as
21    accurate as possible.
22             And so to the extent that this reflects my
23    opinion and full understanding of what I have been
24    asked to do, as well as my opinions on this matter,
25    I would like to refer to my report.  It's just

Case 1:21-cv-02769-DLC Document 588 Entitled from Filed 01/22/20 Page 34 of 332

1    generally what I like to do.

2         Q    Okay.

3         A    So that is my full understanding of what I

4    was retained.

5              So I guess your question -- the answer to

6    your question is yes, but then I was also hired to

7    determine or opine upon market efficiency for the

8    notes, which was not part of your question.

9         Q    It was going to be my next question.

10        A    Well --

11        Q    But my current question is:  Could you have

12   answered that without reference to your report?

13        A    Is it possible?  It is possible for me to

14   do so.  But, again, in any deposition, I try to be

15   as accurate as possible.

16             And so this fully reflects what I was hired

17   to do in this matter.

18        Q    Okay.

19             Does this corrected report in front of you

20   embody the sum total of your opinions in this

21   matter?

22        A    As of this date, yes.

23        Q    Have there been any other opinions you have

24   been asked to provide in connection with this

25   litigation that are not in that report?

```
                                              Page 32

 1        A    Not at this time.

 2        Q    Are you offering any opinion as to whether

 3   the defendants in this case made any false or

 4   misleading statements?

 5        A    I don't believe so.

 6        Q    Have you done any independent review to

 7   determine whether or not the statements that

 8   Plaintiffs are challenging in their complaint are

 9   accurate or inaccurate?

10        A    What do you mean by "independent review"?

11             And I mean that because I have seen

12   documents, such as the SEC or -- they're not the

13   SEC, the order at the end of the Class Period.  That

14   certainly formed my opinion.

15             But I don't -- so I don't know if that's

16   independent work or work that was done as part of

17   this report.

18        Q    It informs your opinion on what?

19        A    Well, so -- right.

20             So I saw, and I'm referring now to

21   Footnote 126 of my report.

22             I've seen this document from the

23   U.S. Commodities Futurist Trading Commission press

24   release.

25             I don't know if that -- if that, under your
```

1    definition, is considered independent research or

2    it's research that I was done -- that was done, you

3    know, in forming my opinions.

4        Q    Okay.

5             The original question that I was asking is

6    whether or not you were asked to form an opinion on

7    the accuracy of the statement that the plaintiffs

8    are challenging in their complaint.

9             And I believe your answer was you were not.

10       A    That is correct.

11       Q    Okay.

12            When I was asking the next question of if

13   you did any independent research to confirm the

14   accuracy of the statements that Plaintiffs are

15   challenging in the complaint, you mentioned the

16   document in the footnote.

17            Is it fair to say that you have not

18   rendered any opinions as to the accuracy of the

19   statements that Plaintiffs are challenging in their

20   complaint?

21       A    That is correct.

22       Q    Okay.

23            Let's flip to Exhibit 1 of your report,

24   which begins on page 65.  And I just want to run

25   through some of your -- it's your curriculum vitae,

```
 1   your C.V.
 2           MR. HAKLAY:  Can we have an understanding
 3   that when he says "my report" or you say "my
 4   report," unless otherwise indicated, we're looking
 5   at the -- at Exhibit 4, the correct reported, just
 6   so --
 7           MR. ISAJIW:  That is an excellent
 8   housekeeping note.
 9      Q   So just looking at this -- I just want to
10   run through your background.
11           You have a BA in economics from Overland
12   College; is that correct?
13      A   Correct.
14      Q   And a Ph.D. in finance from Northwestern?
15      A   As well as a master's in finance, but I
16   don't normally list that.
17      Q   Any other degrees?
18      A   I don't believe so.
19      Q   Any other professional certifications
20   relevant to your work here?
21      A   No.
22      Q   And you're currently a lecturer in finance
23   and economics at Cal Poly, San Luis Obispo; is that
24   correct?
25      A   I think it would be more accurate to say
```

Case 1:21-cv-02969-CCB-BAH Document 583-2 Entered on FLSD Docket 08/28/2023 Page 38 of 332

```
 1    I'm a lecturer in economics.  I can't -- I haven't
 2    taught a course in finance probably in three or four
 3    years.
 4         Q    Okay.
 5              Have you lectured in economics in the last
 6    three or four years?
 7         A    Yes.
 8         Q    Okay.
 9              And where were those lectures?
10              I guess my question was, you were currently
11    a lecturer, and then you made a clarification.  So
12    I'm trying to figure out what's the -- what's the
13    clarification.
14         A    Oh, the clarification is I don't teach -- I
15    can't -- I haven't taught finance in a couple of
16    years.  So it's probably more accurate to say that I
17    am a lecturer in economics at Cal Poly as opposed to
18    a lecturer in economics and finance.
19         Q    I see.  Okay.  Thank you for that.
20              You have been a lecturer since 2014?
21         A    Correct.
22         Q    Okay.
23              Is that a tenured-track position?
24         A    No.
25         Q    And can you just briefly describe your work
```

Case 1:21-cd-02969-JGVK-BCM Document 588-2 Entered 88d7on FLSED01c/20 0B/l3/2028f 3Bage 39 of 332

1    there with Cal Poly?

2         A    Yeah.

3              I teach classes almost -- now almost

4    exclusively in macroeconomics.  There have been

5    discussions of teaching other courses, but --

6         Q    And how many classes a year do you teach?

7         A    When you say, "how many classes," do you

8    mean how many sections?

9         Q    I don't know how the curriculum at Cal Poly

10   is cut up.

11             Do you teach one course a year?  Two

12   courses a year?

13        A    Okay.

14             So let me ask a clarifying question, right.

15             So when you say "course," all right, I

16   would consider macroeconomics a course.  All right.

17        Q    Okay.

18        A    Now -- so if that's the definition, I

19   normally teach one course a year.

20             Now, if we're talking about the number of

21   sections I have, because I have multiple sections, I

22   probably teach between eight and nine sections a

23   year.

24             Now, I don't know if you consider each

25   section a course, as you've defined it.  Or --

Case 1:23-cv-02969-DAE Document 58-2 Entitled on FiLED DOL2/20 08/29/2023 Page 40 of 332

1      Q    What is a section?

2      A    It is a classroom filled with students.

3      Q    Okay.

4           So for macroeconomics, a classroom filled

5  with students meets eight or nine times a year?

6      A    No.

7      Q    Okay.

8      A    I'm not sure what the confusion is on this.

9  It's no different than any other college or

10  university.

11           I mean, you went to law school and got a

12  BA; right?

13           If you went to an economics class, would

14  you say that was a class or a course?

15      Q    Let's, for the purposes of this

16  conversation, call that a course.

17      A    Okay.

18           And so you take a course in economics, and

19  then you take another course in English.

20           Is that a separate course?

21      Q    Yes.

22      A    Okay.

23           If you had taken the same macroeconomics

24  class again for whatever reason, would that be

25  considered a different course but the same class?

Case 1:23-cv-11195-SHS-OTW Document 188-7 Filed 08/12/24 Page 41 of 332

Page 38

```
 1        Q    Is that a common phenomenon in your
 2   experience?
 3        A    Well, I'm -- well, unfortunately, yes.
 4   Some students fail the course and then have to
 5   retake it.
 6             So it's more common than one would like.
 7             But I'm just -- I'm really not trying to
 8   make this difficult.  I'm just trying to have --
 9   understand the question.  I don't understand why you
10   are confused about the difference between a course
11   and a class.
12        Q    I don't believe that I am.  I'm just trying
13   to understand how many -- how many subjects do you
14   teach a year?
15        A    So now we're on subjects.
16        Q    Okay.
17             Students sign up to learn from you in some
18   capacity; is that correct?
19        A    I believe that's correct.
20        Q    Okay.
21             When they sign up, they sign up for what?
22   A class?  A course?  A section?  What do they sign
23   up for?
24        A    I think, in layman's terms, I would call it
25   a class.
```

Page 39

1      Q    Okay.

2           In those terms, how many classes do you

3    teach?

4      A    Between eight and nine.

5      Q    In what subjects?

6      A    Macroeconomics.

7      Q    All macroeconomics?

8      A    Well, I mean, macroeconomics encompasses a

9    large field, but, yes, all in macroeconomics.

10          Yeah, well, so sometimes I teach survey of

11   economics, which would include macroeconomics.  I

12   have taught managerial economics and international

13   finance.  And this, again, is at Cal Poly, but

14   mostly I just -- now I just teach macroeconomics.

15     Q    Okay.

16     A    Occasionally I will teach another course

17   or -- yes.

18     Q    How many hours a week do you devote to that

19   effort, generally?

20     A    So this is teaching and prep?

21     Q    Yes.

22     A    Somewhere between 15 and 20 hours a week.

23     Q    Okay.

24     A    It varies from quarter.  Some quarters I

25   teach a large lecture class, and so then I have what

Case 1:21-cv-02900-CJN Document 581-2 Entered on FLSD Docket 05/23/2023 Page 43 of 332

```
 1    I consider two sections of my macroeconomics course.
 2    But those lectures also have, like, 230 students in
 3    them.  So ...
 4         Q    Okay.
 5              You also work for Crowninshield; is that
 6    correct?
 7         A    Again, just for accuracy, when you say
 8    "work," do you mean employed?
 9         Q    I mean render services in exchange for
10    money.
11         A    I believe that's accurate.
12         Q    Okay.
13              What is your position at Crowninshield?
14         A    I think they refer to me as -- it's either
15    expert or associated expert.
16              Here on the card it says "expert."  If you
17    want me to look at the website, I can give you the
18    exact title, but -- oh, affiliated expert.  There we
19    go.  I believe I -- if you look at the website, I'm
20    under the title Affiliated Expert.
21              Which is --
22         Q    How long have you been an affiliated expert
23    with Crowninshield, roughly speaking?
24         A    Hold on one second.  I just want to make
25    sure.
```

Case 1:21-cv-02158-RA-BCM  Document 558-2  Entered on FLSD Docket 08/28/2023  Page 44 of 332

1      Q   I'm just looking for your best

2  understanding right now.

3      A   Yes.  No.  No.  No.

4      Q   Do you not -- are you not able to answer

5  the question?

6      A   No.  I'm trying to refresh my memory about

7  the previous question.

8      Q   Which question are you trying to answer?

9      A   My title at Crowninshield.

10         Yes.  I am also an affiliated expert.  So

11  that is paragraph 4 of my report.  So that is my

12  official title with Crowninshield.

13     Q   How long -- how many years have you

14  rendered services in exchange for money with

15  Crowninshield?

16     A   Since 2015.

17     Q   How many hours a week, on average, do you

18  spend in connection with your services for

19  Crowninshield?

20     A   On average?  Maybe ten.

21     Q   Okay.

22         In terms of proportion of your yearly

23  income, which is larger, the income you derive from

24  your work at Crowninshield or the income you derive

25  from your work at Cal Poly?

1      A    Crowninshield.  Depending on the year.

2      Q    Let's look at last year.

3      A    Crowninshield.

4      Q    Are you employed by, or work for, in any

5    capacity any entity, other than Cal Poly or

6    Crowninshield?

7      A    Okay.

8          So I work as a planning commissioner for

9    the City of Pismo Beach for which I receive I

10   believe it's $50 per meeting.  So I don't know if

11   that would be considered employment or not.  I think

12   of it more as community service.

13     Q    Focusing on economics.

14     A    Well, part of my job on the planning

15   commission would include my understanding of

16   economics.  So --

17     Q    Okay.

18          Any other jobs?

19     A    No.

20     Q    Taking a look at page 66, starting at 65

21   going over to 66, we were talking about your Papers

22   and Publications.

23          The most recent one under Publications I

24   see is a "Law360" article from 2013 entitled, "More

25   'Dark Pools' Deepen Litigation Issues"; is that

Page 43

1   correct?

2        A    That's what it states.  I had a "Law360"

3   article, I think, last year.

4        Q    Okay.

5             That "Law360" article is not listed in this

6   list of publications; is that right?

7        A    That is correct.

8        Q    So your most recent one was last year?

9        A    I believe so.

10        Q    And what was the topic of that "Law360"

11   article?

12        A    It had to do with settlements, settlement

13   statistics, looking at -- I think that fairly

14   summarizes it.

15        Q    And under Presentations, I see the most

16   recent one also in September of 2013, "Cause or

17   Effect:  Are Settlement Statistics Driving Down

18   Settlement?"  And it's a presentation to a number of

19   law firms.

20             Do you see that?

21        A    I do.

22        Q    Is that your last and most recent

23   presentation?

24        A    I believe that's accurate.  Other than

25   presenting in a classroom environment.

Page 44

```
 1        Q    How many peer-reviewed articles, broadly
 2   speaking on the subject of economics, have you
 3   published?
 4        A    Well, okay.  So this -- it really depends.
 5   I would not -- I mean, one might argue that the
 6   Federal Reserve paper I wrote was peer reviewed.
 7             And what I've seen defendant experts refer
 8   to "Law360" articles as peer-reviewed articles.  I
 9   don't personally consider them as peer-reviewed
10   articles.  So based on that definition, possibly
11   one.
12        Q    Okay.
13        A    I mean, based on my definition.  If you
14   want me to go with the defendant expert's
15   definition, possibly three.
16        Q    Okay.
17             So based on your definition, it's one.  And
18   that the 1993 Federal Reserve Bank of Cleveland
19   Economic Commentary that you're talking about?
20        A    Right.
21             I mean, I suppose you could consider my
22   dissertation peer reviewed, but ...
23        Q    When was that?
24        A    That was completed in 1999.
25        Q    Okay.
```

                                                      Page 45

 1              How much of your time is dedicated to

 2      research in the area of market efficiency?

 3          A    When you say "research," do you mean

 4      academic research?

 5          Q    I do.

 6          A    I mean, to the extent that I discuss market

 7      efficiency in my macroeconomics class, a small

 8      portion of it.

 9          Q    Okay.

10          A    But outside -- outside of that -- I mean, I

11      certainly read about market efficiency and -- I

12      don't know if you -- that would fall under your

13      definition.

14          Q    How much time do you spend reading about

15      market efficiency?

16          A    To the extent I read these reports about

17      market efficiency, I don't know.  Five hours a

18      month.

19          Q    Okay.

20              And in your research on market efficiency,

21      how much time would you spend researching the

22      difference in market efficiency in connection with

23      equity securities versus fixed income securities?

24          A    I don't understand the question.

25          Q    When you research market efficiency --

Page 46

1      A   Well, so -- and I'm sorry.  I don't mean to

2   interrupt you.  I just want to ask a clarifying

3   question so to help move this along.

4           So when you say "research," do you mean

5   reading about market efficiency?  Because I'm not

6   actively, like, writing papers on market efficiency.

7   If that's what you want to consider research.

8      Q   Okay.

9           Before you mentioned academic research when

10  I asked you about how much time you spend

11  researching.

12          Using that same definition of academic

13  research, how much, if any, time do you spend in

14  academic research in connection with market

15  efficiency and differences between equity securities

16  and fixed income securities?

17     A   Okay.

18          So I'm excluding just reading papers.  I

19  would say none.

20     Q   If we turn to the expert reports and

21  testimony section of your report, starting on

22  page 67 and 68.  There are a number of cases listed

23  where you've provided expert reports and testimony.

24          And I'm just wondering if you can tell me

25  whether any of these expert reports or testimony

Page 47

1   were on behalf of a defendant in a federal
2   securities action.
3        A    Well, so let me just go through this.
4             So I'm not sure if you would consider this
5   a securities matter.
6             This Gwyn Hartman -- I'm now looking at
7   page 69 of -- well, just go with page 69 of
8   Exhibit 4.  "Gwyn Hartman Revocable Living Trust
9   versus Southern Michigan Bancorp."  That was not a
10  10b-5 case, but I don't know if you would consider
11  that a securities matter.
12       Q    But that was for a defendant in a
13  litigation?
14       A    Correct.
15       Q    Okay.
16            Is it fair to say that the majority of your
17  engagements, expert reports, and testimonies listed
18  here are for plaintiffs --
19       A    So when you --
20       Q    -- in securities litigations?
21       A    When you say "engagements," you mean
22  engaged as an expert?
23       Q    I mean, for each of the lists of expert
24  reports and testimony starting on page 67 and
25  continuing on to page 71.  To the extent they are in

Page 48

```
 1    connection with federal securities cases, is it fair
 2    to say that the majority are for plaintiff's side?
 3         A    And, again, I'm not trying to be difficult.
 4    I'm just trying to define what you mean by
 5    "experts."
 6              So having submitted a report; right?
 7    Because I've worked on hundreds of defendant cases
 8    at places like Cornerstone and CRA and NERA.  I
 9    don't consider myself having been retained as an
10    expert in those cases.
11         Q    I'm just referring to the section of your
12    CV entitled "Expert Reports and Testimony."
13              So I assume those are, based on your CV,
14    matters in which you were retained to submit an
15    expert report or testimony.
16         A    Right.  Which is why I asked the clarifying
17    question when you said "expert," whether you meant
18    retained as an expert to provide an opinion.
19              So as long as that's the definition --
20         Q    Yeah.
21         A    -- yes, your statement would be correct.
22         Q    The statement that the majority is for the
23    plaintiff's side?
24         A    That is correct.
25         Q    Okay.
```

 1          In any of these matters listed on pages 67
 2   to 71 of your CV, and we're referring to the same
 3   set of expert reports and testimony related to fixed
 4   income securities as opposed to equity securities.
 5       A   Is there a question?  Could you read
 6   that -- I didn't think there was a question.  I
 7   think it was a statement.
 8              (The record was read back as
 9              follows:
10                 "Question:  In any of these
11              matters listed on pages 67 to 71 of
12              your CV, and we're referring to the
13              same set of expert reports and
14              testimony related to fixed income
15              securities as opposed to equity
16              securities.")
17              THE WITNESS:  I think it's an incomplete
18   question.  If you're asking me how many reports have
19   I rendered an opinion about efficiency in a fixed
20   income security?  Is that the question?
21   BY MR. ISAJIW:
22       Q   That's not the question.  But let's answer
23   that question.
24       A   A few.
25       Q   Can you give me context for what "a few"

Page 50

1    is?  Is it one?  Five?  Ten?

2        A    I don't recall.  No.  It would certainly be

3    less than ten.

4        Q    Okay.

5        A    And I would be surprised if it was five.

6        Q    And in those approximately five or less

7    matters, were any of them Rule 144A bonds?

8        A    I don't recall.

9            (Reporter clarification.)

10   BY MR. ISAJIW:

11       Q    Have you ever issued a written opinion in

12   any case indicating that a security stock or a bond

13   did not trade in an efficient market?

14       A    Well, so I'm not -- I'm not sure I've

15   actually seen anyone ever render an opinion that a

16   stock or bond has not traded in an efficient market,

17   specifically said -- stated that.

18           To the extent that I have found instances

19   where I believed that the market for these -- for a

20   stock or a bond is inefficient and I relay that to

21   my potential clients, I'm usually then not asked to

22   write a report.

23       Q    Okay.

24           In those situations, what findings led you

25   to conclude that the market for the security would

```
                                        Page 51
 1   not be efficient?
 2            MR. HAKLAY:  Objection.  Vague.
 3            THE WITNESS:  I mean, again, I would look
 4   at the same factors I would look at in providing my
 5   opinion here.
 6            So I would look at the Cammer and Krogman
 7   factors.
 8   BY MR. ISAJIW:
 9       Q    Okay.
10            In those situations where you have made a
11   decision that you cannot issue the report and,
12   therefore, you're not asked to issue the report --
13       A    Well, it's not that I can't issue a report.
14   I could issue a report.  Right?  I mean, I could
15   issue a report with my findings.  So that ...
16       Q    How often have you been asked about whether
17   or not a market is efficient and you've come to the
18   conclusion that it is not?
19       A    I don't recall.
20       Q    Roughly speaking, how often?
21       A    I have no idea.
22       Q    More than five times?
23       A    Maybe.
24       Q    No idea whatsoever?
25       A    I mean, it's less than 20.
```

```
                                                   Page 52
 1       Q    Okay.
 2       A    Probably less than ten, but beyond that, I
 3   would be speculating.
 4       Q    The very last time that this situation came
 5   up, what were the reasons that led you to believe
 6   that the market was not efficient?
 7       A    Well, again, it's not that the market was
 8   inefficient.
 9            It was that I could not opine that the
10   market was efficient.  Those two statements are
11   different.
12       Q    Okay.
13            What was the basis on which you could not
14   opine that the market was in- -- was efficient?
15       A    My review of the Cammer and Krogman
16   factors.
17       Q    Which Cammer and Krogman factors in
18   particular?
19       A    I can't recall.
20       Q    No recollection whatsoever?
21       A    Not as I sit here, no.
22       Q    Have you ever been disqualified by any
23   court from serving as an expert?
24       A    No.
25       Q    Have any of your opinions been subject to a
```

```
                                        Page 53
 1   Daubert motion?
 2        A    Subject to a Daubert motion?
 3        Q    Yes.
 4        A    As in one was filed against me?
 5        Q    Correct.
 6        A    I believe so.
 7        Q    Have any of your opinions been excluded
 8   pursuant to a Daubert motion?
 9        A    No.
10        Q    Going back to the documents you considered
11   in connection with this report, were there any
12   materials that you requested as part of your
13   engagement that you did not receive?
14        A    When you say "receive," you mean received
15   from either Plaintiffs' counsel or Crowninshield?
16        Q    In any capacity.
17        A    I don't believe so.
18        Q    And did you conduct any market efficiency
19   analysis that is not reflected in your report?
20        A    I don't believe so.
21        Q    How much time did you spend prepping for
22   this deposition?
23        A    So when you say "prepping," do you mean
24   meeting with counsel, or do you mean prepping on my
25   own, like, reviewing material?
```

Page 54

```
 1       Q    Both.
 2       A    Both.  Total, probably, I don't know, eight
 3  hours, maybe less.
 4       Q    And in connection with your prep, I assume,
 5  based on your answer, you did meet with counsel?
 6       A    I did.
 7       Q    How many times?
 8       A    Once.
 9       Q    And roughly how long?
10       A    Forty-five minutes.  Thirty minutes.
11       Q    And reviewing on your own, how long?
12       A    Well, then the rest would be reviewing on
13  my own.
14       Q    And how much was the total?  I'm sorry.
15       A    Could you read back my answer, please.
16       Q    I think it was eight hours, maybe less.
17       A    Right.  So subtract 30 minutes, 45 minutes
18  from -- possibly an hour.  The rest was spent
19  reviewing on my own.
20            Is now a good time to take a break?
21       Q    Would you like to take a break?
22       A    I mean, I wouldn't mind, but --
23       Q    Sure.
24       A    -- if you're just -- if we're going to go
25  through this in five minutes.
```

```
                                              Page 55

 1            MR. ISAJIW:  We're about to switch gears,

 2     so now is a great time.

 3            THE WITNESS:  Right.  I assumed we were

 4     about to.  Fantastic.  Thank you.

 5            THE VIDEOGRAPHER:  We're going off the

 6     record.

 7            The time is 10:35 a.m.

 8            (Recess was taken at 10:35 a.m.

 9            until 10:45 a.m.)

10            THE VIDEOGRAPHER:  We are back on the

11     record.

12            The time is 10:45 a.m.

13     BY MR. ISAJIW:

14        Q   Dr. Werner, I want to turn to Appendix A of

15     your report, which is on page 60 and entitled

16     "Primer on Market Efficiency."

17            Are you there?

18        A   I am.

19        Q   Okay.

20            Did you draft this section, this primer?

21        A   Over many years, yes.

22        Q   And do you normally include this type of

23     thing in your reports?

24        A   It's usually in the body of my report.

25     I've been -- I had been thinking about pulling it
```

```
                                          Page 56
 1   out and putting it as an appendix, to make it --
 2        Q    Okay.
 3             In the very first paragraph on paragraph 1
 4   on page 60, it says (as read and/or reflected:)
 5                  The efficient market
 6             hypothesis is the foundation of
 7             modern finance theory.  In essence,
 8             a stock trades in an efficient
 9             market when all publicly available
10             information is incorporated in the
11             stock price.  And any new
12             information that impacts the
13             economic outlook of the firm gets
14             quickly reflected in the stock
15             price.
16             Did I read that correctly?
17        A    You did.
18        Q    How do you define "quickly"?
19        A    I mean, it depends on the situation.
20             I mean, I've seen courts rule that quickly
21   can be a couple days.  So within a reasonable amount
22   of time.
23        Q    In your view as an economist, does that
24   mean the price should both start and finish reacting
25   to news in one day?  Two days?  Three days?
```

Case 1:21nd-0796d-0094s-BAeBMent 588t2nmeFnt886d7onFFESDODt2/cl2n OB/28/2028 3f P35e 60 of 332

1       A    Again, it would depend on the situation.   I

2    think normally what you would see would be within

3    one day.

4       Q    Okay.

5            Would that statement apply to bonds as

6    well?

7       A    With the same caveat, yes.

8       Q    Have you done it --

9       A    Well -- go ahead.  Sorry.

10      Q    Have you done any test to see if the price

11   reactions for both FXCM common stock and notes meet

12   that definition of quickly here?

13      A    Meet that definition of quickly test.

14   Well, I mean, I performed an event study and a

15   news/no-news analysis.

16      Q    Okay.

17           Did -- I believe you said that the price

18   for quickly, generally speaking, the price would

19   start and finish reacting to the news within a day?

20      A    Correct.

21           I mean, but we see periods of market

22   uncertainty where -- or people -- people -- it takes

23   the market time to fully digest information and the

24   implication of those -- of that information.

25      Q    Okay.

```
                                                          Page 58
 1           But so for your event study here, you use

 2    one-day returns in your study; is that correct?

 3        A    That is correct.

 4        Q    For both the stock and the bond?

 5        A    Well, let's go -- let's go to what I did

 6    with regards to the bond specifically.

 7        Q    We're going to get there later.

 8             Do you recall right now, sitting here

 9    today?

10        A    I'm trying to answer your question to the

11    best of my ability.  So looking at my report will

12    refresh my recollection.

13             Yeah.  So -- and I'm looking at

14    paragraph 142 of my report.

15             (As read and/or reflected:)

16                 For the notes, the regression

17                 data series included only days on

18                 which there was a trading price for

19                 two consecutive trading days so

20                 that a one-day return could be

21                 computed.

22                     All returns for the Effex --

23                 Well, I don't need to read any more.

24        Q    Does that refresh your recollection that

25    you used a one-day return for the bond?
```

Case 1:21-cv-02769-DLC Document 58-2 Filed 08/28/23 Page 62 of 332

```
 1        A    Well, with the caveat that it had to have
 2   two consecutive trading days.
 3        Q    You mention in the first paragraph there
 4   that an efficient market the information that
 5   impacts the economic -- sorry.  First paragraph on
 6   page 60.
 7        A    Hold on.
 8             MR. HAKLAY:  He's there.
 9             MR. ISAJIW:  Okay.
10        Q    That (as read and/or reflected:)
11               The stock price and any new
12             information that impacts the
13             economic outlook of the firm gets
14             quickly reflected in the price.
15             Correct?
16        A    That is correct.
17        Q    Would you agree that the market, in order
18   to be efficient, must also fully incorporate the new
19   value-relevant news?
20        A    I don't know how to answer that.
21             And what I mean by that is there's no
22   assumption that the market has to be fully correct
23   about -- it is an average of what peoples'
24   expectations are.  And so people may update their
25   beliefs and stock prices may move based on those
```

Page 60

1    updated beliefs.

2         Q    So the stock price, when it updates based

3    on updated beliefs, do you believe in order for the

4    market to be efficient it must fully reflect those

5    beliefs and the information at the time?

6         A    To the best of the market's ability, yes.

7         Q    So both quickly and fully reflect the

8    available information at the time?

9         A    Well, again, I've suggested cases where --

10   I mean, let's look at the Coronavirus, right.

11             I don't know.  I mean, the market

12   presumably has some expectation of the impact of

13   that and, yet, so if I said to you, well, what's the

14   impact of the Coronavirus on the market?  I wouldn't

15   expect that the market would fully incorporate all

16   of the implications of that on one single day,

17   right.

18             And -- I mean, we've seen -- I didn't look

19   at the market today, but when I did look at it

20   earlier, it continued to go down.

21             I don't -- I'm not sure anyone would argue

22   that the S&P 500 was inefficient based on the fact

23   that we were still talking about the Coronavirus.

24        Q    Okay.

25             You'll agree with me that the Coronavirus

Page 61

1    and the stock price reaction to the Coronavirus has

2    nothing to do with the case that we're here talking

3    about today; correct?

4         A    Well, we're -- you asked me about stock

5    price reactions.  And so that would be one such

6    example; correct?

7              MR. HAKLAY:  Don't ask him questions.

8              MR. ISAJIW:  Yeah.  Thank you.

9              THE WITNESS:  All right.  Correct.  Period.

10   BY MR. ISAJIW:

11        Q    You base your work off of the work of other

12   economics and you've cited a number -- other

13   economists and you've cited a number of them in the

14   footnotes of your report; is that correct?

15        A    I believe that's accurate.

16        Q    Okay.

17             One of those economists is Fama, who

18   drafted a paper in 1970 called the "Efficient

19   Capital Markets: A Review of Theory and Empirical

20   Work" for the "Journal of Finance."

21             And you quote him in Footnote 12 of your

22   report on page 62 of the appendix.

23        A    Right.

24             So Footnote 12 of the appendix, not

25   Footnote 12 of my report.

```
                                                 Page 62

 1        Q    Yes.

 2             Are you on page 62?

 3        A    Not yet.

 4        Q    So on Footnote 12, you have -- and towards

 5   the bottom of the footnote -- a citation to, it says

 6   (as read and/or reflected):

 7                  (Quoting Efficient Capital

 8             Markets: A Review of Theory and

 9             Empirical Work, Eugene Fama,

10             "Journal of Finance," 1970).

11             And then you quote (as read and/or

12   reflected:)

13                  A market in which prices

14             always, 'fully reflect' available

15             information is called 'efficient.'

16             Do you agree with that?

17        A    I agree with that statement, yeah.

18             I agree that that's what I wrote or that's

19   what I quoted from Fama, yes.

20        Q    Do you agree with the statement that you

21   quoted, not that you quoted it?

22        A    Generally, yes.

23        Q    Are you familiar with the concept of price

24   overreaction?

25        A    The concept?  What do you mean by "the
```

Page 63

```
 1   concept"?
 2        Q   As an economist, if I was to say "stock
 3   price overreaction," what would that mean to you?
 4        A   I mean, it would depend upon the context.
 5   Do you mean overreact to information?
 6        Q   So if a piece of value-relevant information
 7   came into the market and the stock price initially
 8   increased very quickly, but then reversed in the
 9   next few days, would that be consistent with your
10   understanding of an overreaction?
11        A   In your -- I would need to know more in
12   order to answer your hypothetical.
13        Q   What additional facts would you need in
14   order to determine whether or not that would be
15   consistent with your understanding of an
16   overreaction?
17        A   Well, I would need more context in terms of
18   what else -- what was happening during that time
19   period, what was happening to the market, what would
20   happen to comparable companies over that period,
21   what people were saying about the stock at the time.
22        Q   Okay.
23        A   So there's a whole host of factors that I
24   would need to consider when looking at that.
25        Q   Okay.
```

```
 1          So outside of a specific example, just
 2   generally speaking, conceptually, the stock --
 3   concept of stock-price overreaction is not something
 4   that you're familiar with?
 5       A   Are you asking:  Is it possible for a stock
 6   price to overreact?
 7       Q   No.  I'm asking if you're familiar with the
 8   concept of stock-price overreaction.
 9       A   If you want to show me a document that
10   defines it.  I'm just not -- it's not clear to me
11   what your definition of --
12       Q   I'm trying to get your definition.
13       A   Well, and, again, so it would -- it would
14   depend upon the context.
15       Q   Okay.
16          What about stock-price underreaction?
17   Conceptually speaking, what does that describe?
18       A   Concept -- in general, I guess the -- I --
19   not fully incorporating the news.  I don't -- I
20   don't know.  I would really need to know more.
21          Again, if you want to put a definition in
22   front of me, I'm happy to answer your question.
23       Q   Okay.
24          But sitting here today, as an expert in
25   economics, who teaches several courses in economics,
```

Page 65

```
 1   who has drafted a report related to stock-price
 2   movement, you have no general definition of either
 3   the concept of price overreaction or underreaction
 4   in connection with stock prices?
 5        A    That's not it.  I just don't want to give
 6   an inaccurate answer.
 7             So if you want to put a specific definition
 8   in front of me, I will be happy to review that
 9   definition and give you my understanding.
10             I mean, presumably there have been papers
11   on this -- on under or overreaction.  So I'm just
12   asking that you put it in front of me so we have a
13   common understanding of what you mean.
14        Q    Yeah.  I'm just looking for your
15   understanding of it.
16        A    Well, so, I mean, can a stock overreact to
17   news or underreact to news?  Yeah, it's possible.
18        Q    If a stock overreacts or underreacts to
19   news, is that a suggestion that the market for that
20   stock is inefficient?
21        A    I would need to think more about that.
22             Again, I would need to look at the specific
23   case and the situation around it, or I would need
24   more specifics to answer your hypothetical question.
25             If you want to place a full example in
```

Case 1:Case 1:17-cv-00916-RA-BCM Document 588-2 Entered on FLSD Docket 08/28/2023 Page 69 of 332

 1    front of me, I would be happy to look at it and then

 2    answer your question, but as I sit here today, I'd

 3    need more information.

 4         Q   In connection with your work, sitting here

 5    today, did you do any test to confirm whether or not

 6    the price of FXCM securities over- or underreacted

 7    to value-relevant news?

 8         A   I'm not sure I've seen specific -- I'm not

 9    sure I've seen -- I would need to refresh my memory

10    with regards to specific academic tests for over-

11    and underreaction.

12         Q   You need to refresh your memory for those

13    tests to determine if you tested in this case for

14    over- and underreaction?

15         A   Well, again, it would inform my opinion --

16    it could be under the context of these tests that

17    you're talking about that I did -- I don't know what

18    these tests do.

19              I'm not sure I -- again, I'm not sure I've

20    specifically seen a test in economics that defines

21    over- or underreaction.  My guess is it's some kind

22    of event study.  And so to the extent I've performed

23    an event study, I suppose that information would

24    inform my opinion of over- or underreaction.

25              But, again, I would need to know more

Page 67

1   information in order to answer that question.
2        Q   So in connection with your event study, did
3   you evaluate whether or not the price of FXCM
4   securities overreacted?
5        A   I found that the -- my findings are that
6   the market for FXCM's equity and notes were
7   efficient during the Class Period.  That was my
8   finding.  That's what I concluded.  That's what I
9   was asked to do.  That's what I concluded.
10            I also concluded that damages could be
11   calculated in this case.
12        Q   Okay.
13            So you did not evaluate whether or not they
14   over- or underreacted?
15        A   Again, I'm not sure what you mean by
16   "evaluate" because I don't know -- I'd need to fully
17   understand these tests that you are describing.
18        Q   I just want to know what test you
19   conducted.
20        A   And I -- I've answered your question.
21        Q   Okay.
22            Generally speaking, is it possible for a
23   market to be efficient at one point in time but not
24   another?
25        A   Is it possible?

```
                                        Page 68
 1        Q    Yes.
 2        A    I mean, I -- yeah, I believe it is
 3    possible.
 4        Q    So if you tested the efficiency of FXCM
 5    securities in 2010, would that tell you whether or
 6    not the market for the same securities would be
 7    efficient today?
 8        A    No.
 9        Q    Okay.
10             And if you tested the efficiency of a
11    security in 2010 and today, would that tell you
12    whether the market for that security would be
13    efficient throughout 2015?
14        A    So I looked at two snapshots in time.
15    That -- is it possible?  It's possible.  My guess is
16    it would not be sufficient to determine -- to opine
17    upon market efficiency.
18        Q    And is that true for both stocks and notes?
19        A    Yes.
20        Q    Okay.
21             Generally speaking, would stocks and bonds
22    react differently to the same types of information?
23        A    It's certainly possible.
24        Q    Okay.
25             Why so?
```

Page 69

1       A    Bondholders are typically more concerned

2   with bankruptcy risks because they're senior

3   securities.  Equityholders, while still probably

4   concerned about a firm's bankruptcy, less so.

5       Q    So if a company's stocks and bond react

6   differently to the same news -- sorry -- strike

7   that.

8            Can a security -- can a company's

9   securities stocks and bonds react differently to the

10  same news in an efficient market?

11      A    When you say "differently," do you mean in

12  different directions?

13      Q    Yes.

14      A    So, like, one went -- goes up and one goes

15  down?

16      Q    That would be one example of differently.

17      A    Okay.

18           So in that example, yes, that's certainly

19  possible.

20      Q    It's possible that they would react in

21  different directions?

22      A    Yeah, I've seen that before.

23      Q    And can that happen in an efficient market?

24      A    Yes.

25      Q    If that happens, could it also be evidence

```
 1    that either the stock or the bond is trading in an
 2    inefficient market?
 3         A    As I sit here today, I have no reason to
 4    conclude that.
 5         Q    Hypothetically possible?
 6         A    Right.  In your hypothetical -- well, so
 7    hypo- -- in your hypothetical, is it -- so you're
 8    asking me, hypothetically, is it possible that if a
 9    stock and a bond for the same company moved in a
10    different direction, that one of those securities
11    was inefficient?
12              It is possible.
13         Q    Okay.
14              Would that suggest inefficiency?
15         A    As I sit here, I have no reason to believe
16    that it would necessarily suggest inefficiency based
17    on your current hypothetical question.
18         Q    Do you have any basis in your methodology
19    to determine what types of news would cause a stock
20    and a bond to react similarly or differently?
21         A    I don't understand the question.
22         Q    Before actually conducting an event study,
23    would you have a general sense of what type of news
24    would cause stocks and bonds to react differently?
25         A    And I'm trying to -- I have been trying to
```

```
 1   think about that as we have it -- we've had this
 2   conversation.
 3            I should be able to answer your question.
 4   I need -- but I need to think more about it.  It is
 5   certainly something I have been considering as we
 6   have been having this conversation.
 7        Q   If a piece of news had clear positive
 8   implications for a company's asset value and the
 9   bond was trading substantially below par, would you
10   expect the bond and the stock to be more likely to
11   react to the news that had a positive value for the
12   firm's asset or have a similar reaction?
13        A   Yeah, that's a completely incomplete
14   hypothetical.  Like, I can't answer, as I sit here
15   today.
16        Q   Okay.
17            What additional information would you need?
18        A   I don't know.  If you want to place the
19   question in front of me, I will be happy to look it
20   over and try to opine upon what additional
21   information I would need.
22            But as it is, it's a compound, complex,
23   hypothetical example.
24            And so it would be completely speculative
25   on my part to attempt to answer it without knowing
```

```
                                              Page 72

 1   more.

 2        Q    Generally speaking, if a bond was a

 3   convertible bond, meaning convertible into equity,

 4   would it be more or less likely to react differently

 5   to news in the market?

 6        A    Differently than the equity?

 7        Q    Yeah.

 8        A    I would have to think more about that, as I

 9   sit here.

10             As I sit here today, I'm not sure.

11        Q    Looking back at your appendix.  In

12   paragraph 3 you say (as read and/or reflected:)

13             While financial economists

14             rely on event study analysis as

15             direct evidence demonstrating stock

16             price response to new information,

17             they accept other factors as

18             tending to support the existence of

19             an efficient market for security.

20             For example, financial

21             economists have argued that trading

22             volume is correlated with the

23             market sufficiency, such that the

24             higher the trading volume, the more

25             likely it is to be efficient.
```

```
                                          Page 73
 1            Did I read that correctly?
 2      A    That is correct.
 3      Q    What do you mean when you say they -- (as
 4  read and/or reflected):
 5                 Financial economists accept
 6            other factors as tending to support
 7            the existence of an efficient
 8            market?
 9      A    Well, I mean off the top of my head,
10  generally, the Cammer and Krogman factors would be
11  included in that.
12            I'm not sure I've actually ever seen any
13  economic study that's looked at S3 eligibility as a
14  function of market efficiency.
15      Q    Okay.
16            And what do you mean by the "Cammer
17  factors"?
18      A    The Cammer and Krogman factors as listed in
19  my report.  I'm happy to --
20      Q    Just wondering if you can summarize them
21  off the top of your head.
22      A    Sure.
23      Q    I think we can probably get on the same
24  page pretty quickly here, but we're talking about
25  average weekly trading volume as one; is that
```

```
                                              Page 74
 1    correct?

 2          A    That is correct.

 3          Q    And analyst coverage as a second?

 4          A    Correct.

 5          Q    Market makers as part of the third?

 6          A    And listing on the NYSE, yes.

 7          Q    Okay.

 8               Eligibility for S3 registration?

 9          A    That is a Cammer factor.

10          Q    And price reaction to new information?

11          A    I believe -- yeah.  I mean, the fifth

12    Cammer specifically says, and I'm reading from

13    page -- paragraph 44 (as read and/or reflected):

14                    It would be helpful to have

15               empirical facts showing a cause and

16               effect relationship between

17               unexpected corporate events or

18               financial releases and an immediate

19               response in the stock price.

20          Q    Okay.

21               THE WITNESS:  Can we pause for a second?

22    Or could one of you get me a Diet Coke?

23               MR. HAKLAY:  I think I took the last one.

24               THE WITNESS:  I'm sure King & Spalding has

25    more.
```

```
                                              Page 75

 1   BY MR. ISAJIW:

 2       Q    So in the paragraph of your appendix, which

 3   I believe is paragraph 3 that I just read.

 4       A    Okay.  So remind me.  We're on page 60

 5   something?

 6            MR. HAKLAY:   61.

 7            THE WITNESS:   61.

 8   BY MR. ISAJIW:

 9       Q    61, paragraph 3 of Appendix A.

10            You said (as read and/or reflected:)

11                These other factors -- I'm

12            sorry -- financial economists

13            accept these other factors,

14            including the Cammer factors, as

15            tending to support the evidence of

16            an efficient market.

17            What do you mean by "tending to support"?

18       A    I guess just the general definition of

19   tending.

20       Q    Are they direct proof of the market

21   efficiency?

22       A    Well, so yours is a complicated question

23   and this is why.

24            You know, there's -- courts have ruled

25   stocks efficients ignoring, in fact, Factor 5.  And
```

```
1    so, I mean, is it sufficient to just look at the

2    first four factors?

3             Certainly courts have found it's sufficient

4    to look at the first four factors.

5             I think most academics would agree that you

6    want to look and see if there's a cause and effect

7    relationship between a stock and information to

8    determine whether or not a stock was efficient.  Or

9    a bond for that matter.

10        Q   Okay.

11            In your view, how many Cammer factors would

12   have to be satisfied to find a market for a security

13   efficient?

14        A   I have no opinion about that.  I've

15   never -- nor have I ever been asked to opine upon

16   that.

17        Q   Okay.

18            For example, if analyst coverage was very

19   high, but trading very low, would that be

20   sufficient?

21        A   Again --

22            MR. HAKLAY:  Objection.  Sufficient to

23   what?

24            MR. ISAJIW:  Determine the market to be

25   efficient.
```

```
 1          MR. HAKLAY:  Thank you.
 2          THE WITNESS:  From an academics perspective
 3   or a court's perspective?
 4   BY MR. ISAJIW:
 5      Q   From an academics perspective.
 6      A   I have no idea.  It's not anything I've
 7   ever thought about.
 8          MR. HAKLAY:  Here's four Diet Cokes for
 9   you.
10          THE WITNESS:  Sorry.  They're trying to get
11   me hopped up on caffeine.  Are we off the record for
12   that?  I know.  I'm joking.  Sorry.  You'll edit the
13   video.
14   BY MR. ISAJIW:
15      Q   When conducting market efficiency analysis
16   in evaluating the Cammer factors, are there any
17   factors that you would feel comfortable excluding in
18   your determination that a market is efficient?
19      A   So now we're just talking about the Cammer
20   factors?
21      Q   Yes.
22      A   I would need to think about it.  I mean,
23   again, I don't think S3 eligibility really plays
24   into market efficiency.
25          I mean, it has to do with firm size, I
```

1    suppose, and their ability to file financials.

2            Is there anyone I would ignore?

3            Again, it's not a question I've ever asked

4    myself.  I mean, the court demands that I opine on

5    these factors, or at least case law has suggested I

6    need to opine on the factors and the court will then

7    decide whether or not the market for that stock is

8    efficient.

9            So it's not anything I've thought about

10   other than S3.

11       Q    Okay.

12           What if there was insufficient data to

13   conduct an event study, for instance?

14       A    So, again, so your hypothetical is there's

15   insufficient information to conduct an event study.

16   And I guess my question would be why?  Because

17   that --

18       Q    Say there was not enough trading to conduct

19   an event study over a specific period.

20       A    I'm sorry.  I just -- I don't understand

21   your hypothetical example or your hypothetical

22   question.

23           I'm not -- have I ever seen literature

24   discussing the number of days needed to conduct an

25   event study?

```
 1              I'm not sure I have, as I sit here today.
 2         Q    Do you have a personal opinion -- I'm
 3    sorry.
 4              Do you have a professional opinion?
 5         A    It's not something I've ever thought about.
 6         Q    Let's dig in a little bit more into the
 7    specific Cammer factor.  So No. 1 was average weekly
 8    trading volume.
 9              Why is trading volume an important measure
10    of market efficiency, in your opinion?
11         A    It's -- well, let's go to my report.
12         Q    So --
13         A    I'm trying to read my report.  Hold on one
14    second.
15              Yeah.  I mean, it's -- again, it's not
16    something I've thought about.  It's something that
17    the court demand.
18         Q    What, in your view, would be the
19    implication for market efficiency if a security had
20    high trading volume?
21         A    In general, I think economists believe that
22    higher trading volume is an indicator of efficiency.
23    But, again, it's -- it's not something I've ever
24    considered.
25              I mean, there is a benchmark the courts
```

Page 80

```
 1   have used of 1 and 2 percent.  I don't know if, you
 2   know, if it's 50 percent, is it somehow more
 3   efficient than a stock that's average weekly trading
 4   volume is 30 percent?  It's not something I really
 5   thought about.
 6        Q    What would be the implication if trading
 7   volume was very low in terms of market efficiency?
 8            MR. HAKLAY:  Objection.  Vague as to the
 9   words "very low."
10            THE WITNESS:  Yeah.  Again, I'm not --
11   there's no -- again, the court asked me to provide
12   my opinion on this or provide my analysis with
13   regards to this factor.  So I've provided this
14   analysis.
15            It -- yours is a question I've never really
16   thought about.
17   BY MR. ISAJIW:
18        Q    If a security had low trading volume or no
19   trading volume, you've never thought about whether
20   or not that would weigh on the efficiency of the
21   market for that security?
22            MR. HAKLAY:  Objection as to the word "low"
23   as being vague.
24            THE WITNESS:  Well, I mean, certainly --
25   for instance, I mean, we've seen bond cases where
```

Page 81

1   there's no trading volume on a number of days.  And
2   the courts have found the market for those bonds are
3   efficient.
4          So, you know, it's not something that I
5   personally think about.  To the extent that a court
6   might think about it, I don't know.  You could ask
7   the judge or what his or her opinion is about that.
8   BY MR. ISAJIW:
9      Q   I'm asking you for your opinion as an
10  expert who has rendered a report discussing Cammer
11  Factor 1 and the effect of weekly trading volume on
12  inefficiency analysis.
13         And if your answer is you've never thought
14  of it, that's fine, but I'm asking what your opinion
15  is.
16         THE WITNESS:  Could you reread his original
17  question, please.
18         (The record was read back as
19         follows:
20             "Question:  If a security had
21         low trading volume or no trading
22         volume, you've never thought about
23         whether or not that would weigh on
24         the efficiency of the market for
25         that security?")

```
                                                  Page 82
 1           MR. HAKLAY:  Same objections I rendered
 2      before.
 3           THE WITNESS:  Yeah.  You would need to look
 4      at that on a case-by-case basis.
 5      BY MR. ISAJIW:
 6      Q   So in the case of no trading volume.
 7      A   I refer to my previous answer with
 8      regards --
 9      Q   Which was what?
10      A   I told you, I found that there are --
11      certainly have been bonds with no trading volume or
12      on days which found -- which courts have found to
13      have been traded in an efficient market.
14      Q   And as an economist, do you have a view as
15      to whether or not that is an indication of an
16      efficient market?
17      A   I have no opinion one way or the other.
18      Q   Let's talk about analyst coverage, which is
19      the Cammer Factor 2.
20           Why, in your view, is analyst coverage an
21      indicator for market efficiency?
22      A   Well, I mean, I refer to this quote from
23      the Cammer cover.  And I'm looking at paragraph 26
24      of my report.
25           (As read and/or reflected:)
```

```
 1              When investment professionals

 2         closely monitor a firm's

 3         information subsequently making

 4         buy/sell recommendations to their

 5         clients based on that information,

 6         investors bid up or down the market

 7         price of the stock to reflect the

 8         company's financial information as

 9         interpreted by the securities

10         analyst.

11         So that's what the court finds.

12    Q    So I'm asking about your professional

13  opinion as an expert economist.

14         What would be the implication if a company

15  has very high analyst coverage?

16    A    Well, the implication would be that a lot

17  of analysts follow the company.

18    Q    In terms of whether or not the company

19  trades in an efficient market.

20    A    I think in -- I mean, I'm not quite sure

21  how to answer the question.

22         I know -- again, I think -- let's look

23  for -- yeah.  Right.

24         So, for instance, and I'm reading from

25  paragraph 26 of my report, this suggests that (as
```

Page 84

1   read and/or reflected:)

2           The more analysts who followed

3           a stock, the greater the likelihood

4           that a stock traded in an efficient

5           market.

6           I should have started this next sentence

7   here.  (As read and/or reflected:)

8           Barber, et al, 1994, found

9           that coverage by one or two

10          analysts strengthened the

11          presumption of efficiency for a

12          publicly traded stock.

13      Q   So other than quoting from Barber, in your

14  opinion, what is the implication of high analyst

15  coverage?

16      A   What's the implication?  My -- my -- the

17  implication is a lot of analysts follow the stock.

18  Probably a large -- large company.

19      Q   What would be in the implication in a

20  market efficiency analysis if very few analysts

21  covered a stock?

22          MR. HAKLAY:  Okay.  Vague as to what "very

23  few" means.

24          THE WITNESS:  Right.  Again, I mean, the --

25  my best understanding with regards to academic work

Page 85

1   is the work by Barber who basically -- Barber,

2   et al, who found that one or two -- well, let's just

3   read it again.

4   BY MR. ISAJIW:

5       Q    Before you read it, I'm just asking for

6   your view, sitting here today, as an expert

7   economist.

8       A    Right.  My view is informed by their paper.

9       Q    Do you have a view independent of the

10  paper?

11      A    No.

12      Q    Okay.

13          When you are conducting a market efficiency

14  analysis, how many analysts do you believe are

15  required to cover a company before you believe it is

16  an indicator of an efficient market?

17      A    Again, I would have to look at that on a

18  case-by-case basis.  Clearly in this case, I believe

19  that, as I've found -- let's just go to what I said

20  with regards to my finding.

21          Right.  So I'm reading from, excuse me,

22  paragraph 32 of my report.

23          (As read and/or reflected:)

24              The number of analysts

25              covering FXCM and the wide

Page 86

```
 1              dissemination of information about

 2              FXCM from Company press releases

 3              and from well-regarded and widely

 4              read sources in the news media

 5              support a finding of market

 6              efficiency for FXCM common stock

 7              during the Class Period.

 8              And I -- that's for the equity.

 9              If you want me to opine on the bonds as

10    well, I'm happy to review my findings.

11         Q    Did you draft that paragraph?

12         A    Yes.

13         Q    If there is a period of a year or two where

14    only three analysts issued reports on FXCM, would

15    you believe that that is sufficient under Cammer

16    Factor 2?

17              MR. HAKLAY:  Objection.  Assumes facts not

18    in evidence.

19              THE WITNESS:  It's not my opinion -- it's

20    not -- or it's not my job to form an opinion on your

21    hypothetical example.

22              I present the information to the courts.

23    In this case, I found that there was sufficient

24    analyst coverage to indicate market efficiency in

25    this specific case.
```

```
                                               Page 87
 1   BY MR. ISAJIW:
 2        Q   So sitting here today, you can't answer the
 3   question that if there was a period of a year where
 4   only two or three analysts issued reports on FXCM,
 5   whether you would believe that that would be
 6   sufficient under Cammer Factor 2?
 7            MR. HAKLAY:  Objection.  Misstates his
 8   testimony.  It's asked and answered.
 9            THE WITNESS:  It certainly could be
10   efficient -- I mean, sorry.  It certainly could be
11   sufficient.
12   BY MR. ISAJIW:
13        Q   Let's talk about Cammer Factor 3.  This is
14   under your heading "Market Makers and Listing on the
15   NYSE."
16            Why is the existence of market makers an
17   indication of efficiency, in your view?
18        A   Well, I mean, I think it largely agrees
19   with the -- my view coincides with the Cammer
20   court's opinion that (as read and/or reflected:)
21                The existence of market
22            makers -- and I'm reading from
23            paragraph 33 of my report -- and
24            arbitrageurs would ensure
25            completion of the market mechanism;
```

Page 88

```
 1              these individuals would react
 2              swiftly to company news and
 3              reported financial results by
 4              buying or selling stock and driving
 5              it to a changed price level.
 6     BY MR. ISAJIW:
 7         Q    Independent of the report, as an economist,
 8     what would be the -- your view of the implication if
 9     there were no market makers for a security in
10     connection with an efficiency analysis?
11         A    Well, so what do you mean by "market
12     maker"?
13              And I mean that -- do you mean someone who
14     is designated as a market maker whose job title is
15     market maker?
16         Q    In what context did you mean market maker
17     when you wrote it in your report?
18         A    My understanding of the Cammer court --
19         Q    Was it --
20         A    -- opinion.
21         Q    -- somebody who was designated as a market
22     maker?
23         A    Right.  So there is a title of a designated
24     market maker in an NYSE stock.
25              Is that what you're referring to?
```

Page 89

1     Q   I'm asking what you were referring to when
2   you used the phrase "market maker" in the report.
3           Were you referring to somebody who was
4   designated as a market maker?
5     A   So I don't know exactly what you mean by
6   "designated."
7           And let me explain why.
8           Because there is a position called a --
9   there is someone called a "designated market maker"
10  for each NYSE stock.  Or at least one for each NYSE
11  stock.
12          So I wouldn't, like, necessarily
13  consider -- I mean, there are NASDAQ market makers.
14  I don't know if you would consider them designated
15  market makers.
16          There are people who are making markets off
17  the floor.  I don't know if you would consider them
18  designated market makers.
19    Q   I'm asking if you consider them designated
20  market makers.
21    A   Again, if you -- I don't believe -- I
22  believe that there are many individuals or companies
23  making markets in a stock that are not -- that do
24  not fall under the definition of a designated market
25  maker as explained or it's laid out by the NYSE.

1      Q    In this case, can you give me any examples

2   of those entities?

3      A    Which entities?

4      Q    The ones you just described who are making

5   a market in a stock but are not designated market

6   makers under your definition.

7      A    Well, it -- well, so I do not know and,

8   again, this is based on a mis- -- a clear definition

9   of a designated market maker.  Certainly Barclays

10  Capital, BNY Mellon Capital Markets, JPMorgan,

11  Morgan Stanley and Wedbush Morgan Securities made a

12  market in this stock.

13           If we want to go to a complete list of

14  market makers who made a market in the stock during

15  the Class Period, we can go to my Exhibit 5.

16           MR. HAKLAY:  Page 114.

17           THE WITNESS:  Right.  So there's multiple

18  firms here.  I don't -- what is it?  180, I believe.

19  No.  I'm sorry.  It goes on to 115.  So 205.  I

20  don't know if any of those are designated market

21  makers as you -- because you have not defined

22  designated market maker for me.

23           Again, if you're talking about the --

24  a designated market maker on the New York Stock

25  Exchange as defined by the New York Stock Exchange,

Page 91

1    as I sit here today, I don't know.

2    BY MR. ISAJIW:

3        Q    In paragraph 34, you indicate that there

4    were at least 205 market makers for FXCM common

5    stock.

6            Did I read that correctly?

7        A    I'm sorry.  What paragraph?

8        Q    34, page 14.

9        A    Page 34.  Yes.  That is correct.

10       Q    Okay.

11           In your opinion, does the fact that there

12   were at least 205 market makers for FXCM common

13   stock tend to support the idea that the market for

14   FXCM common stock was efficient?

15       A    I believe that -- and I'm reading from

16   page 38 in my report.  (As read and/or reflected:)

17               The large number of market

18           makers ... supports that FXCM

19           common stock traded in an efficient

20           market.

21           MR. HAKLAY:  Let me just correct it.  You

22   read from paragraph 38, not page 38.

23           THE WITNESS:  Oh, sorry.

24   BY MR. ISAJIW:

25       Q    What would be the implication if there were

Page 92

1    no market makers for FXCM common stock in terms of

2    an analysis of market efficiency?

3        A    I mean, I don't -- I haven't really thought

4    about your hypothetical.

5             I mean, because I'm not clear.  My

6    understanding, I -- sorry.

7             If we're talking about designated market

8    makers defined by the NYSE, it wouldn't have an

9    effect necessarily.

10            I mean, people make markets off the floor.

11   So -- I'm sorry.  Let's --

12       Q    If somebody made a market in any --

13       A    -- what --

14            MR. HAKLAY:  He's still answering.

15            THE WITNESS:  Can you -- can you reread his

16   question, please.

17            (The record was read back as

18            follows:

19                "Question:  What would be the

20            implication if there were no market

21            makers for FXCM common stock in

22            terms of an analysis of market

23            efficiency?")

24            THE WITNESS:  I mean, that's honestly

25   never -- something I've never even thought about.

Page 93

1   BY MR. ISAJIW:

2       Q    What if there were instead of 205 market

3   makers, 100 market makers?

4       A    That's not anything I've considered.

5       Q    What if there were 50 market makers?

6       A    Again, not a question I've asked myself.

7       Q    What if there were less than ten market

8   makers?

9       A    Yeah.  It would depend upon the situation.

10      Q    But sitting here today, you can express no

11  view as to whether or not that would have an

12  implication for a market efficiency analysis?

13          MR. HAKLAY:  Objection.  Misstates his

14  testimony.

15          THE WITNESS:  It might have an implication.

16  BY MR. ISAJIW:

17      Q    And if it had an implication, what would

18  your view be on the implication it has?

19          MR. HAKLAY:  Objection.  Assumes facts not

20  in evidence.  Asked and answered.

21          Go ahead.

22          THE WITNESS:  Okay.

23          I would need to look at that on a

24  case-by-case basis.

25  ///

Page 94

```
 1   BY MR. ISAJIW:

 2        Q   So currently, you cannot -- you do not have

 3   a view of the implication?

 4            MR. HAKLAY:  Objection.  Misstates.  Asked

 5   and answered.

 6            THE WITNESS:  Again, I would need to look

 7   at it on a case-by-case basis.

 8   BY MR. ISAJIW:

 9        Q   You also note in this section of your

10   opinion, you discuss the fact that FXCM's common

11   stock was listed on an exchange; is that correct?

12        A   Where are you reading from?

13        Q   I'm not reading from your report.  I'm

14   just ...

15            Let's take it outside of the context of the

16   report.

17            Do you know whether or not FXCM's common

18   stock was listed on an exchange?

19        A   It was -- yeah.  It was -- yes.

20        Q   Okay.

21            Was the fact that FXCM's common stock was

22   listed on an exchange relevant to your analysis as

23   to whether or not FXCM's common stock traded in an

24   efficient market?

25        A   Well, to the extent that some judges find
```

Page 95

```
 1    it helpful to be informed upon that question, I
 2    included that information.
 3         Q   In your view as an economist, is that
 4    relevant information to the analysis of whether or
 5    not FXCM stock traded in an efficient market?
 6         A   I'm not sure it's something I've ever
 7    really thought about.
 8              So in your hypothetical, the stock doesn't
 9    trade on an exchange?
10         Q   I haven't posed a hypothetical.  I'm just
11    asking if whether or not the fact that you cite in
12    your report that FXCM common stock did, in fact,
13    trade on an exchange is relevant to your analysis of
14    whether or not FXCM common stock traded in an
15    efficient market.
16              MR. HAKLAY:  Objection.  That question was
17    asked and answered.
18              THE WITNESS:  It formed my opinion that it
19    traded in an efficient market.
20    BY MR. ISAJIW:
21         Q   Okay.
22              In what way did it inform your opinion --
23    strike that.
24              Let me ask a better question.
25              Is being listed on an exchange an indicator
```

Page 96

```
 1   of efficiency, in your opinion?
 2        A    In my opinion?  I believe that courts rely
 3   on that information to determine market efficiency.
 4        Q    When you were making a determination of
 5   market efficiency, do you rely on that information?
 6        A    I don't know if I've ever really thought
 7   about it.
 8             I mean, can you give me -- well, I'm not
 9   supposed to ask questions.  I apologize.
10        Q    In your opinion, if a security was not
11   listed on any exchange, would that have a bearing on
12   whether or not it trades in an efficient market?
13             MR. HAKLAY:  Objection.  Asked and
14   answered.
15             THE WITNESS:  It's possible.  I mean, when
16   you say "exchange," what do you mean?
17   BY MR. ISAJIW:
18        Q    When -- have you ever heard the phrase
19   "listed on an exchange" before?
20        A    I have.
21        Q    What is your understanding of the phrase
22   "listed on an exchange"?
23        A    Well, it's going to vary from place to
24   place.  I mean, my -- if I had to guess what your
25   definition of exchange was, you would probably be
```

```
                                              Page 97
 1   talking about the NYSE or the NASDAQ.
 2            We're sitting, I don't know -- I don't know
 3   actually.  Do they still have the Los Angeles Stock
 4   Exchange?
 5            Certainly there's a San Francisco Stock
 6   Exchange.  I don't know if that would fall under
 7   your definition --
 8       Q    So if all of --
 9       A    I'm trying to answer the question, please.
10            I'm not sure if that would fall under your
11   definition of exchange.
12            And then, of course, stocks are traded off
13   markets between companies.  I don't know if you
14   would consider that an exchange.
15       Q    In this analysis for FXCM common stock, do
16   you have an opinion as to whether or not it would be
17   an indication of market efficiency if FXCM common
18   stock did not trade on the NYSE?
19       A    If it did not -- so the fact alone that it
20   did not trade on the --
21            THE WITNESS:  Could you reread the
22   question, please.
23            (The record was read back as
24            follows:
25                "Question:  In this analysis
```

```
 1              for FXCM common stock, do you have
 2              an opinion as to whether or not it
 3              would be an indication of market
 4              efficiency if FXCM common stock did
 5              not trade on the NYSE?")
 6              MR. HAKLAY:  Objection.  Assumes facts not
 7    in evidence.  Not a hypothetical, but couched as
 8    one.
 9              MR. ISAJIW:  I don't believe I couched that
10    as a hypothetical.  I was just asking about his
11    opinion.
12              MR. HAKLAY:  Okay.
13              Assumes facts not in evidence.  Asks him to
14    consider a situation that doesn't exist in his
15    report.
16              THE WITNESS:  So in your hypothetical
17    example, you're suggesting that if -- if FXCM didn't
18    trade on the NYSE, would that inform my opinion or
19    would that inform my opinion about market
20    efficiency?
21              Probably not.  I mean, it can -- certainly
22    there are all sorts of other exchanges it can trade
23    on.  Like the NASDAQ, which it did.
24              So I don't -- it's a really odd question.
25    I'm not quite sure I --
```

Page 99

1    BY MR. ISAJIW:

2        Q    What if it traded on no exchanges?

3            MR. HAKLAY:  Same objection.

4            THE WITNESS:  Again, it's not something

5    I've ever thought about.  I mean, what do you --

6    what's a world with no exchanges?  So it's traded

7    within -- just between, let's say, institutional

8    investors?  Is that the world you're imagining?

9            I think I'm okay in asking this question

10   because I'm clarifying his hypothetical example.

11   BY MR. ISAJIW:

12       Q    Let's take that as an example.

13       A    You know, that's something I would need to

14   think about.  I mean, there's no reason to think

15   that if stocks are traded off exchanges between two

16   parties that the stock is inefficient -- that a

17   stock is not efficient.

18       Q    There's no reason to believe that if a

19   stock is just traded between two parties that it

20   doesn't trade in an inefficient market?

21           MR. HAKLAY:  Objection.  Misstates his

22   answer as to completeness.

23           But go ahead.

24           THE WITNESS:  Again, I -- you would need to

25   look at this type of thing on a case-by-case basis.

```
 1          I mean, again, I gave you a hypothetical
 2  example, and I'm not -- I'm not even sure how to
 3  answer my own hypothetical example.
 4          And I clearly -- I'm not quite sure how to
 5  answer your hypothetical example.
 6  BY MR. ISAJIW:
 7     Q   Does listing on an exchange in and of
 8  itself mean that the security trades in an efficient
 9  market?
10     A   Does trading on an exchange --
11          THE WITNESS:  Could you reread the
12  question, please.
13          (The record was read back as
14          follows:
15              "Question:  Does listing on an
16          exchange in and of itself mean that
17          the security trades in an efficient
18          market?")
19          THE WITNESS:  I think courts have certainly
20  found that to be the case.
21  BY MR. ISAJIW:
22     Q   And what about your professional opinion?
23     A   It's not any -- it's not something I've
24  thought about.
25          I don't think anyone's ever asked me that
```

Case 1:21-cv-00916-RA-BCM Document 588-2 Filed on FLSD Docket 08/28/2023 Page 104 of 332

1    question before.

2        Q    And when you conduct your market efficiency

3    analysis, do you have a professional opinion as to

4    whether any of the Cammer factors are more important

5    for finding of efficiency than others, generally

6    speaking?

7        A    That's an interesting question.

8            Let's go to my discussion in Factor 5.

9            I mean, I think economists, when they talk

10   about market efficiency, oftentimes discuss event

11   studies.  But as I've stated previously, you know,

12   we're seeing an increasing number of courts find for

13   market efficiency ignoring the fifth Cammer factor.

14       Q    When you say "economists," do you include

15   yourself in that statement?

16       A    I do.

17       Q    Okay.

18            So do you believe that Factor 5 is one of

19   the more important Cammer factors in a market

20   efficiency analysis?

21       A    It's not something I've ever been asked to

22   opine upon.

23            I present the information that courts use

24   to determine market efficiency.  And so I do event

25   studies.

```
 1       Q    What is an event study designed to analyze?

 2            Let me withdraw that question.

 3            Is it fair to say that you use an event

 4   study to try to determine whether or not there's a

 5   cause and effect relationship between new material

 6   information and the reaction in the stock price

 7   establishing -- to establish market efficiency?

 8       A    Is that stated somewhere in my report?  It

 9   sounds like something from my report.

10       Q    I'm asking if you agree with the statement.

11       A    Well, if the statement is in the report, I

12   would like to see the statement.

13       Q    Other than -- I'll point you to the

14   paragraph where you discuss it, but before I do, you

15   can't answer it without reference to the report?

16       A    I just want to be as accurate as possible.

17   We are trying to be as accurate as possible here;

18   right?

19       Q    We are.

20       A    Well, so if you're reading from something

21   from my report, by all means, let me look at it.

22       Q    It's paragraph 52.

23       A    So it is from my report.

24            Okay.

25       Q    Now that you've reviewed paragraph 52, is
```

Page 103

1    it fair to say that you conduct an event study to
2    determine if there is a cause and effect
3    relationship between new material information and
4    the reaction in the stock price in order to help
5    establish market efficiency?
6        A    I believe that is correct.
7        Q    In your view, if there is information that
8    is new and material but the security price does not
9    react, does that suggest that the market is not
10   efficient?
11       A    No.
12       Q    What if the information is new and material
13   and the security doesn't trade at all, does that
14   suggest that the market is not efficient?
15       A    Not necessarily.
16       Q    Can you -- in the presence of new and
17   material information -- sorry -- strike that.
18            If a security does not react to new and
19   material information in terms of price and does not
20   trade based on new and material information, do you
21   believe that has any bearing on whether or not the
22   security trades in an efficient market?
23            MR. HAKLAY:  Objection.  Vague as to "any
24   bearing."
25            THE WITNESS:  Not necessarily.

Case 1:21-cv-02960-DAB Document 58-2 Filed 07/12/23 Page 107 of 332

1   BY MR. ISAJIW:

2       Q    Would you incorporate that into your

3   analysis of market efficiency?

4       A    What do you mean by "incorporate"?

5       Q    Would you incorporate -- sorry.

6            When you analyze market efficiency, if you

7   encountered a situation where you believed there was

8   new and material information but the price did not

9   react, would that be relevant to your market

10  efficiency analysis?

11      A    Possibly.

12           I mean, if I -- if a firm announces

13  earnings, I would argue that that information was

14  material.  If that earnings announcement was in line

15  with expectations, I wouldn't necessarily expect to

16  see a stock price movement.

17           I mean, that would just be one such

18  example.

19      Q    In that example, if the announcement was in

20  line with expectations, would it be new?

21      A    To the extent that the company is stating

22  it?  I mean, there's all sorts of things in an

23  earnings report.

24           So, I mean, without -- I mean, my guess is,

25  yeah, there's certainly some information in there.

1          I mean, is confirmation of expectations new

2     information?  I mean, from a philosophical

3     standpoint?  I would think so.

4          Q    From an economist's standpoint, do you

5     agree with that?

6          A    Well, I think the information -- I think

7     information -- let's say -- let's go back to my

8     example.

9          I believe that that information, even if

10    it's just confirming expectations, is material to

11    investors.

12          I would not nec- -- but, again, even with

13    that being material information and it is new to the

14    fact that it has confirmed previous expectations,

15    that would be something that would interest the

16    investing public.  And all other things equal, in a

17    vacuum, I wouldn't necessarily expect the stock

18    price to move.

19          Is now a good time for a break?

20          MR. HAKLAY:  It's been about 57 minutes.

21          THE WITNESS:  Is that a "yes" or "no"?

22          I would like to take a break.

23          MR. ISAJIW:  Okay.

24          We can go off the record.

25          MR. HAKLAY:  Okay.

1           THE VIDEOGRAPHER:  We are going off the

2    record.

3           The time is 11:42 a.m.

4           (At 11:42 a.m., the deposition of

5           ADAM WERNER, Ph.D., was adjourned

6           for noon recess.)

7    ///

8    ///

9           (At 12:37 p.m., the deposition of

10           ADAM WERNER, Ph.D., was

11           reconvened.)

12           THE VIDEOGRAPHER:  We are back on the

13    record.

14           The time is 12:37 p.m.

15

16                EXAMINATION (Continued)

17    BY MR. ISAJIW:

18       Q   Dr. Werner, I want to take you back to

19    Exhibit 4 of your report where you tally the number

20    of reports issued by analysts during the Class

21    Period in this case.  Page 104.

22           Was it important, in your view, that these

23    analysts issued a report as opposed to just

24    attending FXCM's earnings calls in connection with

25    your market efficiency analysis?

Page 107

```
 1        A    Again, I just present the information that
 2   the courts ask for.  So if they want to know about
 3   analyst's coverage, that's one of the Cammer
 4   factors, that's what I present them with.
 5        Q    When you're analyzing the Cammer factors,
 6   it's not an important part of your analysis?  You're
 7   literally just presenting the facts?
 8        A    No.  I mean, I read the analyst reports,
 9   review the analyst reports, but if you're asking
10   me --
11             THE WITNESS:  Can you repeat his initial
12   question, please.
13             (The record was read back as
14             follows:
15                 "Question:  Dr. Werner, I want
16             to take you back to Exhibit 4 of
17             your report where you tally the
18             number of reports issued by
19             analysts during the Class Period in
20             this case.  Page 104.
21                 Was it important, in your
22             view, that these analysts issued a
23             report as opposed to just attending
24             FXCM's earnings calls in connection
25             with your market efficiency
```

1           analysis?")

2           THE WITNESS:  That's not something I've

3   ever thought about.

4   BY MR. ISAJIW:

5       Q   And there are a number of reports listed

6   here.  Again, in your view, if there was a period of

7   time for a year or two where only one or two

8   analysts covered the report, would that be relevant

9   to your market efficiency analysis?

10      A   It's possible.

11      Q   Okay.

12          Is it something that you considered here?

13      A   I found that based on analyst coverage

14  and -- the analyst coverage for this stock supported

15  my finding on market efficiency.

16      Q   Let's switch back to Cammer Factor 3 in

17  connection with the common stock, which is

18  paragraph 34 of your report.

19      A   I'm sorry.  Does Exhibit 4, doesn't

20  Exhibit 4 deal with Cammer Factor 3 or --

21      Q   Exhibit 4 is analyst coverage; is that

22  right?

23      A   Yeah.

24      Q   In your view, is analyst coverage Cammer

25  Factor 3?

1        A    Well, it says (as read and/or reflected:)

2                    Factor 3:  Prominent

3              Underwriters and Market Makers.

4              You suggested it was different the way you

5    posed your question.

6        Q    Maybe we misunderstood.  I was saying, I

7    want to go and focus now on Cammer Factor 3,

8    paragraph 34, of your report.

9              Where am I?

10       A    Paragraph -- oh, sorry.

11            MR. HAKLAY:  The market makers.

12            MR. ISAJIW:  Yes.

13            MR. HAKLAY:  Okay.

14            Analyst coverage is the early one.

15            MR. ISAJIW:  I was trying to move from

16   analyst coverage to market makers --

17            THE WITNESS:  Oh, I'm sorry.

18            MR. ISAJIW:  -- well, to Cammer Factor 3

19   more generally.

20            MR. HAKLAY:  Got you.  Thank you.

21            THE WITNESS:  Okay.

22   BY MR. ISAJIW:

23       Q    So if you look at paragraph -- I'm sorry --

24   33 of your report on page 14, second sentence, it

25   says (as read and/or reflected:)

```
                                                Page 110

 1              The Cammer court stated,

 2         quote, the existence of market

 3         makers and arbitrageurs would

 4         ensure completion of the market

 5         mechanism; these individuals would

 6         react swiftly to company news and

 7         reported financial results by

 8         buying or selling stock and driving

 9         it to a changed price level.

10         Did I read that correctly?

11    A    That is correct.

12    Q    Okay.

13         What is your understanding of arbitrageurs,

14 as you use it in that sentence?

15    A    People who are trying to make arbitrage

16 profits.  Not in your common academic definition of

17 arbitrage, but ...

18    Q    What is the common academic definition of

19 arbitrage?

20    A    I think ac- -- and you'll forgive me.  It's

21 been years since I've actually looked at the formal

22 definition.  I believe it is making a riskless

23 profit.

24    Q    Okay.

25         And what do you think it means in
```

1 connection with how it's used in paragraph 33?

2     A    I think here it's more common understanding

3 of, you know, people trying to make money buying and

4 selling stuff.

5     Q    Okay.

6         Why would arbitrageurs be relevant to your

7 market efficiency analysis?

8     A    Oh, well, to the extent that there might be

9 market inefficiencies, oftentimes, that's how

10 arbitrageurs attempt to make money.

11     Q    How so?

12     A    What do you mean -- well, I mean, what do

13 we say?  Buy low, sell high?  Is that right?  Buy

14 low, sell high.  Yeah.  Sell high, buy low.

15     Q    So if there are inefficiencies, the

16 arbitrageur is attempting to capitalize on those

17 efficiencies; is that -- is that the concept?

18     A    Well, I mean, you call it an inefficiency.

19 They're attempting to -- I guess -- yeah, to the --

20 I believe actually that sentiment is correct.

21         To the extent that there are

22 inefficiencies, an arbitrageur would try to

23 capitalize on them.

24     Q    In connection with this analysis of FXCM

25 common stock, what investigation did you do to

Page 112

```
 1   determine whether or not there was the existence of
 2   arbitrageurs, if any?
 3        A    Well, I don't know if you -- I wouldn't
 4   necessarily consider institutional investors
 5   arbitrageurs.
 6             Some institutional investors probably are
 7   trying to make arbitrageur profits, so I'm not sure
 8   how to answer that question.
 9        Q    Sitting here today, do you believe that you
10   did an investigation into arbitrageurs in connection
11   with your analysis?
12        A    I don't think I ever looked at a piece of
13   paper that described any specific individuals or
14   firms, entities, agents as arbitrageurs.
15        Q    Is it fair to say, then, the arbitrageurs
16   did not factor into your analysis in connection with
17   this particular report?
18        A    Is it fair to say?  I don't know if it's
19   fair or unfair.
20        Q    Would you agree with it?
21        A    I don't know.  I mean, again, to the extent
22   that I don't know enough about the institutional
23   investors to know whether or not they're
24   arbitrageurs.
25        Q    Okay.
```

Case 1:21-cv-10496-BAE BOkat 588-2mentEnte6ad7on FF&ID0712420 08/28/2023 of Page 116 of 332

1      A    So the fact that they were institutional

2    investors certainly informed my opinion.

3      Q    And the fact you don't know enough about

4    them would be evidence that you did not

5    independently analyze them as arbitrageurs in

6    connection with your analysis?

7      A    I did not independently do research on the

8    trading strategies of the institutional investor.

9    That is correct.

10      Q    Okay.

11           Switching back to the selection -- not

12    switching back.

13           Let's switch gears to focus on your event

14    study in connection with Cammer Factor 5.

15      A    So now let me just ask a clarifying

16    question.  When we talk about events studies, for

17    the time being, we're focusing on the equity;

18    correct?

19      Q    Yes, for right now.

20      A    Okay.

21           So I should just assume that any question

22    you ask about an event study, at least during this

23    time period, you're referring to equity.

24      Q    I'll do my best to make sure the questions

25    are clear, but to the extent there's a difference

1   that makes a difference and you believe it's

2   unclear, please let me know.

3              MR. HAKLAY:  So you should not assume that

4   it's one and not the other unless he says so.

5              THE WITNESS:  Yeah.  I guess -- right.

6   That is exactly.

7              MR. ISAJIW:  There's no question pending to

8   clarify.  So if there is confusion, please let me

9   know.  That's all I'm asking.

10             THE WITNESS:  No.  I'm just trying to save

11  time.

12  BY MR. ISAJIW:

13     Q   So for your event study -- before you

14  conducted the event study in this case, what did you

15  know about FXCM as a company?

16     A   Before I performed the event study?

17     Q   Correct.

18     A   I mean, I suppose I had probably read the

19  complaint and read some analyst articles before the

20  event study was performed.

21     Q   Anything else?

22     A   Not off the top of my head.

23         I mean, maybe I looked at the website.  I

24  honestly don't recall.

25     Q   Okay.

1    And when you're designing an event study,

2    how do you identify which dates to include in -- for

3    testing market efficiency?

4        A    Well, it depends on the situation.

5             I mean, typically, I think I -- with

6    regards to event studies, I almost always -- and I'm

7    now looking at page 25.  So this is paragraph 66 and

8    67.  I always attempt to at least as part of my

9    event study, or an event study, (as read and/or

10   reflected:)

11            Focus on disclosures of

12            information related to the

13            allegations in the Complaint.

14            I'm reading from paragraph 67.

15       Q    Okay.

16            And generally when you're designing an

17   event study, is there anything else that you almost

18   always look at, any other types of events?

19       A    In a litigation setting?

20       Q    In the setting of doing an expert report to

21   determine market efficiency.

22       A    It really depends on the company.

23            In this -- as I said, I always attempt to

24   use this third criterion or this third event that

25   I've highlighted in my last answer.  Beyond that,

Case 1:21-cv-00196-BAe DoBument 588-2 meEntered on FLSD Docket 08/28/2023 Page 119 of 332

```
 1    it's really on a case-by-case basis.
 2         Q    And the -- what you highlight, is that
 3    the -- I just want to make sure I understand
 4    correctly -- the allegations in the complaint?
 5         A    Correct.
 6         Q    Okay.
 7              You state in your report --
 8         A    I'm sorry to interrupt you.
 9              Just for clarification, are we making a
10    distinction between the event study and the
11    news/no-news analysis?
12         Q    For right now we're talking about the event
13    study.  I'll have questions about the news/no-news
14    analysis later on.
15         A    Right.  You understand that that is
16    based -- the analysis is based partially on my event
17    study.
18         Q    I don't understand what's in your report.
19    So I'm trying to understand.
20         A    Well, you perform -- in order to do a
21    news/no-news analysis, you have to perform an event
22    study.
23         Q    Okay.
24         A    So if we're talking about the event study
25    section as opposed to my news/no-news analysis,
```

```
1    that's fine.  I just wanted to make sure when you
2    were talking about event study, you were
3    specifically talking about this section and not an
4    event study in general.
5         Q   I thought that that was clear --
6         A   Well --
7         Q   -- but if it wasn't, I appreciate the
8    qualification.
9             I'm looking for when you were designing
10   your event study, the process by which you chose the
11   events to include in the event study.
12            And I believe that you said one of the
13   things that you always do is look at the events as
14   described in the complaint.
15        A   Well, I believe I said attempt to always
16   do, but, yes, that's accurate.
17        Q   Okay.
18            You state in your report at paragraph 68
19   that (as read and/or reflected:)
20                An event study testing market
21            efficiency does not require a
22            comprehensive identification of all
23            events during the Class Period,
24            including all of those cited in the
25            Complaint.  An objective screen for
```

Page 118

1          a market efficiency event study may

2          capture only some of those events.

3          Did I read that correctly?

4     A    That is correct.

5     Q    What is your objective screen process?

6     A    Again, it depends on the case.

7     Q    What was it here?

8     A    In terms of -- well, there was one

9  corrective disclosure, and I don't believe during

10  the Class Period there were any other -- what was

11  the term I used here?  Allegation-related events

12  during the Class Period.

13     Q    So your objective screen process included

14  looking at the corrective disclosures in the

15  complaint?

16     A    Well, I mean, no, if there was, like, in a

17  case, let's say, where there is some kind of

18  inflationary statement or the allegation is that,

19  let's say, your client in the middle of the Class

20  Period said we're earning a billion dollars in

21  drafts when, in fact, they weren't, that would

22  typically -- and I would typically, or I might look

23  at that.

24          So that wouldn't be a corrective

25  disclosure.  All right.

1      Q   So focusing on this event study for this

2   particular case, you looked at the corrective

3   disclosure and you discussed an objective screen.

4           I'm just asking what else was involved in

5   your objective screen for this case.

6      A   Well, that, to my knowledge, that is the

7   only -- I did not find any inflationary statements

8   made during the class, or I have not seen any

9   allegations, as I sit here today, about inflationary

10  statements or other corrective disclosures.

11          So the screen I used was, as I stated here,

12  focusing on disclosures of information related to

13  the allegations in the complaint.

14     Q   And how many events did you settle on after

15  your objective screen for this event study?

16     A   For this particular event?

17     Q   Correct.  For this particular event study.

18     A   Oh, for the particular event study.  In

19  full, three.

20     Q   Okay.

21          And those three were January 14th, 2012;

22  correct?

23     A   Well, that was one.

24     Q   Okay.

25     A   Wait.  Let me go there before we start

                                                        Page 120

 1   misquoting me.
 2        Q    I don't believe I was misquoting you.
 3        A    No, it's just possible.
 4             All right.  So where are we?  Selection and
 5   selective of acquisition.
 6        Q    Let me withdraw that question.
 7             Do you agree that you chose three event
 8   dates in connection with this event study?
 9        A    That is correct.
10        Q    And only three event dates in connection
11   with this event study?
12        A    I'm sorry.
13             THE WITNESS:  Can you reread the question.
14             (The record was read back as
15             follows:
16                  "Question:  Do you agree that
17             you chose three event dates in
18             connection with this event study?")
19             THE WITNESS:  I chose to look at three
20   events.  I believe there was another acquisition
21   that was small during the Class Period.  So if I was
22   looking at all acquisitions, I suppose I looked at
23   that event.
24             But there was -- I don't remember the exact
25   size, but it was extremely small and it wouldn't be

Case 1:22-cv-10910-BAE Document 58-2 Entitled on Filed 06/02/40 08/28/2023 of 335 Page 124 of 332

1  something that I would expect to result in a

2  material change in information about the company

3  that would result in a -- be significant enough to

4  result in an abnormal stock return.

5  BY MR. ISAJIW:

6      Q    So you did not include whatever that

7  acquisition was in your event study?

8      A    I -- that is correct.

9      Q    And your event study covers a Class Period

10 that is nearly five years long; is that correct?

11     A    That is correct.

12     Q    Are you comfortable drawing any reasonable

13 conclusions based on analyzing three days over a

14 five-year period?

15     A    Well, with -- in combination with my

16 news/no-news study, yes.

17     Q    What if you excluded the news/no-news study

18 and just looked at an event study three days for a

19 five-year Class Period?

20          MR. HAKLAY:  Objection.  Calls for

21 hypothetical.

22          THE WITNESS:  Right.

23          So in your hypothetical, I didn't do the

24 additional analysis.  I only looked at three days

25 during the Class Period.  It would really depend

```
 1   on -- I would need to look at that on a case-by-case
 2   basis.
 3   BY MR. ISAJIW:
 4       Q   As an economist conducting a market
 5   efficiency analysis, would you have concerns
 6   conducting an event study for a five-year period
 7   based on three events?
 8           MR. HAKLAY:  Objection.  Vague.
 9           THE WITNESS:  Along with my news/no-news
10   analysis, in combination with those two things, no.
11   I clearly didn't have a concern, as I only looked at
12   three --
13   BY MR. ISAJIW:
14       Q   What about with -- I'm sorry.
15           MR. HAKLAY:  Finish the sentence.
16           THE WITNESS:  I only looked at three days.
17   BY MR. ISAJIW:
18       Q   What about excluding a news/no-news
19   analysis, would you have a concern?
20       A   So that's an incomplete hypothetical and I
21   would need -- it would really -- I would need to
22   determine that on a case-by-case basis.
23       Q   So as an economist, sitting here today, you
24   can't tell me whether or not you would have concerns
25   basing a five-year Class Period conclusion on three
```

```
 1    events without a news/no-news event study?
 2              MR. HAKLAY:  Objection.  Vague.
 3              I apologize.  I thought you were done.
 4              THE WITNESS:  I refer to my previous
 5    answer.
 6    BY MR. ISAJIW:
 7         Q    Okay.
 8              In your prior work, have you ever looked at
 9    a five-year class study with fewer than -- I'm
10    sorry.
11              Have you ever conducted an event study for
12    a Class Period of five years with fewer than three
13    events?
14         A    In a market efficiency analysis?
15         Q    Yes.
16         A    As I sit here, I don't recall.
17         Q    Sitting here today as an economist, do you
18    have a view on -- for a Class Period of five years
19    how many events would be too few events?
20         A    It's not anything I've thought about.
21              I mean, again, that is the purpose of
22    including a news/no-news analysis is it looks at
23    news over the entire Class Period.
24         Q    Okay.
25              So for the event study if you had two
```

Case 1:21-cv-00096-DAB Document 58-2 Filed 07/01/21 Page 127 of 332

1    events over a five-year Class Period, that would not

2    cause you concern?

3         A    Again, it would have depended upon the

4    situation.

5              I mean, certainly, I looked at two days

6    during the bond event study period.

7              So ...

8         Q    Okay.

9              So the first day in your event study is

10   June 14th, 2012.  And that is the day that FXCM

11   announced the acquisition of Leucadia Markets; is

12   that correct?

13             I'm sorry.  Lucid Markets; is that correct?

14        A    That is correct.

15        Q    Okay.

16             Why did you decide to include this

17   acquisition event?

18        A    Well, in conducting my event study, and I'm

19   reading from paragraph 56 now (as read and/or

20   reflected:)

21                  I reviewed the history of the

22             company over the course of the

23             Class Period as presented in news

24             articles, analyst reports, and

25             Company announcements and filings.

```
                                          Page 125

 1              The events during and immediately

 2              following the Class Period that I

 3              determined are appropriate for the

 4              inclusion in the market efficiency

 5              event study are June 14th, 2012;

 6              January 20th, 2015; and

 7              February 7th, 2017.  The events

 8              were selected on the following

 9              basis.

10              And so if you wanted me to read

11      paragraphs 57 and 58 as to how I chose that, I would

12      be happy to do that as well.

13          Q   We have your report.  So I don't want you

14      to read it again.  I'm just asking for additional

15      color, if you have it, on your selection process for

16      these event studies.

17          A   I think my report fully lays that out for

18      you.  So ...

19          Q   When you conduct event studies, do you

20      always look for acquisition dates?

21          A   Not necessarily.

22          Q   Why did you look for acquisition dates for

23      this event study?

24          A   Well, so I'm reading from paragraph 57 (as

25      read and/or reflected:)
```

```
                                          Page 126

 1              In 2012, 2013 and 2014, FXCM's

 2         business strategy included making

 3         acquisitions to expand its customer

 4         base -- if I'm going too fast let

 5         me know -- in those markets where

 6         it has low penetration.  The

 7         Company acquired other companies

 8         "to expand [its] presence and

 9         capabilities in the institutional

10         marketplace."

11              Given FXCM's business

12         strategy, announcements of large

13         acquisitions could be expected to

14         impact the value of the Company.

15         It follows that on certain dates

16         when the Company announced a large

17         acquisition, the value of FXCM

18         common stock would be expected to

19         move.

20    Q    Thank you.

21         How many acquisitions did FXCM make during

22    the Class Period?

23    A    Well, let's see -- as I sit here, I believe

24    it was two.

25    Q    Okay.
```

1           How many did you include in your event

2    study?

3         A    One.

4         Q    On what basis did you exclude the second

5    acquisition that you're aware of?

6         A    It was small.  And as an economist, I

7    wouldn't have expected it to have a statistically

8    significantly impact on the stock price.

9         Q    What is the threshold by which you

10   determined it was small?

11        A    As I sit here, I don't recall.

12        Q    Did you test whether or not it has a

13   statistically significant result on the stock price?

14        A    Well, to the extent that my Event Study

15   Results are presented in -- let's see where it is

16   here.

17        Q    Just before you go in there, does the

18   second acquisition that you did not include in your

19   event study include the -- would that be included in

20   your results?

21        A    Well, the abnormal return on that date

22   would be included in my results.  So yes.

23        Q    Okay.

24             Sitting here today --

25        A    I'm just -- hold on.  Let me just refresh

Case 1:21-cv-00146-BAe BODM ent 588-2 entitled on File 80 d/0 b/28 0B/ag#2023 of 35 e 131 of 332

```
 1    my recollection.
 2         Q    I don't believe there's a question pending.
 3         A    Oh, okay.  Go ahead.
 4         Q    Sitting here today, and I -- is there --
 5    can you give me any explanation for why you excluded
 6    this second acquisition?
 7              MR. HAKLAY:  Objection.  Asked and
 8    answered.
 9              You may answer again.
10              THE WITNESS:  Yeah, it was too small.
11    BY MR. ISAJIW:
12         Q    Okay.
13              And do you have any recollection on how
14    small it was?
15         A    I do not.
16         Q    Do you remember if it was half the size of
17    the event -- the acquisition that you included?
18         A    At this point, I would be speculating.  I
19    believe it was smaller than that.  But I do not
20    recall.
21         Q    And is that information included anywhere
22    in your report?
23         A    It -- I don't believe so.
24         Q    Okay.
25              The second event that you chose was the
```

```
                                            Page 129

 1   January 20, 2015; is that correct?

 2        A    That is correct.

 3        Q    And why did you choose that day?

 4             I'm sorry.  I'll withdraw that question.

 5             Do you recall that that was the day that

 6   the Swiss National Bank had a flash crash?

 7        A    I believe that's correct.

 8        Q    And that was the day that FXCM announced a

 9   $225 million loss and a possible regulatory capital

10   breach?

11        A    Let me just look at the data to fully

12   refresh my memory.

13             Yeah, I believe that's correct.

14        Q    What is your understanding of FXCM's

15   regulatory capital requirements?

16        A    As I sit here today, I don't remember.

17        Q    You don't remember, does that imply that

18   you at one point knew but don't remember now?

19        A    I believe that's correct.

20        Q    Generally speaking, what is your

21   understanding of a regulatory requirement?

22        A    Well, it's usually a requirement stated by

23   a government agency or some kind of -- I don't know,

24   I mean, I suppose if you -- I don't know if you

25   consider things like this CFTC a government
```

Page 130

1    agency -- requirement with regards to how much
2    capital they have.
3        Q    Okay.
4            In this case, do you know which regulator
5    was relevant to the regulatory capital requirement
6    for FXCM?
7        A    I can refresh my memory by looking at the
8    press release by the company on January 15th, 2015.
9            But as I sit here right now -- well, hold
10   on.  I may be able to give you an answer to that
11   question.
12           MR. HAKLAY:  Can you hang on a second while
13   you do that?
14   BY MR. ISAJIW:
15       Q    Let me ask a different question.
16           Are regulatory capital breaches normally
17   something that you would look for when conducting an
18   event study?
19       A    It depends on the situation.
20       Q    What situations would you look for
21   regulatory capital events when conducting an event
22   study?
23       A    Well, I mean, so by way of example, one
24   that would require a 300-million-dollar infusion of
25   cash would certainly be one.

```
                                            Page 131

 1        Q    Have you ever used a regulatory capital
 2   breach in any other market efficiency event study?
 3        A    I believe so.
 4        Q    Which ones?
 5        A    I don't recall.  Certainly -- I've
 6   certainly worked on FDA cases where that's been the
 7   case.
 8             Yeah, at least some.  Yes.
 9        Q    Were you aware of the January 2015
10   regulatory capital breach before you conducted your
11   event study?
12        A    Well, I believe I had read about it prior
13   to conducting my event study.
14        Q    Was that in the complaint?  Meaning, did
15   you read about it in the complaint?
16             I don't think it's -- I don't want to
17   require you to read the entire complaint.
18             Would it be fair to say that you likely
19   found out about the regulatory capital event from
20   the complaint?
21        A    I don't know.
22        Q    Can you think of any other source where you
23   would have found out about it?
24        A    Yeah.  Sure.  In my review of news and
25   analyst reports.
```

Page 132

1    Q   And is regulatory capital violations

2   something that you typically review for when

3   designing an event study in connection with a market

4   efficiency analysis?

5    A   As I stated -- yeah.  So I'm going back to

6   paragraph 56.  (As read and/or reflected:)

7           To identify appropriate event

8           dates for the market efficiencies

9           event study I reviewed the history

10          of the Company over the course of

11          the Class Period, as presented in

12          news articles, analyst reports, and

13          Company announcements and filings.

14   Q   When you start any event study, not

15  necessarily this one, is regulatory capital events

16  one of the things that you look out for when you're

17  looking at a company's reports?

18   A   I typically do the exact same process that

19  I just described.

20          Oftentimes, there are not regulatory

21  capital breaches in some of my cases.  So to the

22  extent that those are not in any news related to an

23  additional company, I don't review them.

24   Q   The third event that you chose was

25  February 6th -- the third date was February 6th,

Page 133

1   2017, and that's the alleged corrective disclosure

2   event.

3           Is that correct?

4      A   Correct.

5      Q   Okay.

6           And I think you testified -- well, sorry.

7   I don't want to -- do you always use alleged

8   corrective disclosure events in your market

9   efficiency studies?

10     A   To the extent that I believe they were

11  material, I attempt to.

12     Q   And how do you determine that they were

13  material before conducting the study?

14     A   Well, I mean, there are certain, you know,

15  there may be things mentioned in a complaint that

16  have nothing to do with the alleged allegations.

17  And so I would typically ignore those.

18     Q   So your process to determine which events

19  to include in the event study come from a review of

20  the complaint and a judgment as to which ones you

21  believe are material to the allegations in the

22  complaint?

23     A   In addition to the process I described

24  previously.

25     Q   Which was what?

```
 1        A    Again, reading from paragraph 56 (as read
 2   and/or reflected:)
 3                 To identify --
 4        Q    If that's what you're referring to, you
 5   don't need to reread it.  I wanted to make sure that
 6   when you said what I had described previously that
 7   we were on the same page.
 8        A    Did you -- oh, okay.
 9        Q    In paragraph 8 of your report, you state
10   that (as read and/or reflected:)
11                 FXCM common stock traded in an
12            efficient market during the Class
13            Period.
14                 Does that mean that you conducted -- that
15   you concluded that the stock traded in an efficient
16   market on each day during the Class Period?
17        A    My conclusion is that it traded in an
18   efficient market throughout the Class Period.
19        Q    Okay.
20        A    That is my conclusion.
21        Q    And so --
22        A    That is what I was asked to perform.
23   That's what I concluded.
24        Q    And does that conclusion mean that you
25   concluded that it traded in an efficient market on
```

Page 135

```
 1    each day of the five-year Class Period?
 2              MR. HAKLAY:  Objection.  Asked and
 3    answered.
 4              THE WITNESS:  I've explained to you what I
 5    have been asked to do.  That's what I did.
 6    BY MR. ISAJIW:
 7        Q    Sitting here today, based on the analysis
 8    that you did, did you conclude that FXCM common
 9    stock, in fact, traded in an efficient market in
10    each day of the five-year Class Period?
11        A    Again, I was asked to determine whether or
12    not the stock traded in an efficient market during
13    the Class Period.  That is what I did -- did an
14    analysis on, and that's what I concluded.
15        Q    Would you agree that over a five-year Class
16    Period a market for a particular security could be
17    efficient at some periods and inefficient during
18    other periods?
19        A    So you're asking me a hypothetical based --
20    the question is could it occur?
21        Q    That's my question.
22        A    Anything -- almost anything can occur.  So
23    based on that definition, it is possible.
24        Q    Okay.
25              Did you do an analysis in this case to
```

Page 136

1    determine whether it did occur?

2        A    Again, I was asked to determine whether or

3    not the stock was efficient during the Class Period.

4    That is what I looked at.

5        Q    So when you come to the conclusion that it

6    was efficient -- it traded in an efficient market

7    during the Class Period, are you inferring that

8    trading over the whole Class Period for FXCM common

9    stock was efficient based on your sample of -- based

10   on your sample event of three days?

11       A    Again, I performed a news/no-news analysis.

12   I did my event study.  I looked at the other eight

13   Cammer factors or other seven Cammer factors and

14   determined that the stock traded in an efficient

15   market during the Class Period.

16       Q    You also state that (as read and/or

17   reflected:)

18                FXCM Notes traded in an

19            efficient market during the portion

20            of the Class Period when they

21            traded, which is June 24th, 2014,

22            through February 7, 2017.

23            Is that correct?

24       A    That is correct.

25       Q    In your opinion, does that mean that the

1  bond also traded in an efficient market on each day

2  between June 24th, 2014, and February 7th, 2017?

3      A   Again, my finding was that the stock -- I'm

4  sorry -- the bonds traded in an efficient market

5  through June 24th, 2014, through February 7th, 2017.

6          That's what I was asked to opine upon.

7  That's the analysis I performed.  That's the

8  conclusion I reached.

9      Q   And did you do any -- other than what's in

10 your report, did you do any direct testing of the

11 efficiency of markets on a daily basis throughout

12 the Class Period for either the notes or the stock?

13     A   I'm confused.

14         What do you mean by tested for efficiency

15 on a daily basis?  Like explain -- describe one of

16 these tests to me.

17     Q   I'm asking what test you did.

18     A   Well, I told you what I did.  And I told

19 you that I determined the stock traded in an

20 efficient market over the Class Period, and it's

21 traded during an efficient market during those --

22 its period.

23     Q   And my question was:  Other than the test

24 described in your report, did you perform any

25 others?

```
1        A    Oh, other than the tests performed in my
2    report?  I don't believe so.
3        Q    Okay.
4             When you were designing your event study,
5    did you look at earnings days as potential events?
6        A    Well, to the extent that 8-Ks possibly
7    looked -- talk about earnings, I certainly did my
8    news/no-news analysis.
9        Q    So focusing on the event study portion of
10   your analysis, did you include any earnings days?
11       A    Unless -- I don't know.  I mean, let me
12   look at their 10-Qs.  I don't know if there was an
13   overlap between the event days I used and the
14   issuance of 10-Qs.
15            I assume when you say "earnings days," are
16   we just talking about 10-Qs and 10-Ks?  Is that your
17   definition of an earnings day?
18       Q    Would any other events be included in your
19   definition of earnings days?
20       A    Not typically.  But, again, it's -- it
21   would depend on the situation.  I suppose you could
22   have, I don't know, when you consider -- well, I
23   don't want to speculate.
24            So let's look at their ...
25            Do you have a pen I can borrow?  Do you
```

Page 139

```
 1   have a piece of paper?
 2            MR. HAKLAY:  I do.
 3            THE WITNESS:  Thank you.
 4            I'm more than happy to turn this over to
 5   you, which I'm obligated to do.
 6            Hold on one second.
 7   BY MR. ISAJIW:
 8        Q    Let me ask a different question.
 9        A    Okay.
10        Q    The three days that we just discussed which
11   were included in your event study, were any of them
12   included because they were an earnings day?
13        A    I stated the reason why I chose them.
14            (Reporter clarification.)
15            THE WITNESS:  I guess the logical
16   conclusion is no.
17            MR. ISAJIW:  Okay.
18            MR. HAKLAY:  He said, "why I chose them."
19   BY MR. ISAJIW:
20        Q    Were there earnings days, during the
21   five-year class periods, available to include in
22   your event study?
23        A    There were certainly earnings days.  I
24   don't recall whether or not those earnings days were
25   earnings surprises.
```

1    I mean, look, that's what -- that's one of

2 the difficulties in performing an earnings day event

3 study.

4    Most of the time when earnings are -- meet

5 expectations, you don't typically see a

6 statistically significant stock price movement.

7    So looking at those days doesn't really

8 provide you with any information.

9    Now, in a lot of these classes; right, the

10 end of the Class Period or one of the corrective

11 disclosures might be in an earnings announcement,

12 and so then you'd certainly look at an earnings day.

13    But so over, like, if I were to look at a

14 five-year Class Period, my expectation on how many

15 of those earnings days would contain new material

16 information that would cause -- that were severe

17 enough to cause a statistically significant stock

18 change, or stock decline, stock increase, would be

19 relatively low.

20    Q    What -- did you do an analysis to determine

21 that in this case when you conducted -- when you

22 designed your event study?

23    THE WITNESS:  Can you reread the question,

24 please.

25    (The record was read back as

Page 141

```
 1            follows:
 2                 "Question:  Did you do an
 3            analysis to determine that in this
 4            case when you conducted -- when you
 5            designed your event study?")
 6            THE WITNESS:  I don't understand the
 7     question.
 8     BY MR. ISAJIW:
 9         Q   Did you do an analysis in connection with
10     your event study in this case to determine whether
11     or not earnings days were appropriate to include?
12         A   To the extent that I, again -- well, rather
13     than go there.  I refer you to paragraph 56.  And so
14     to the extent that there were earnings days during
15     the Class Period, yes, certainly would be something
16     I considered.
17         Q   Let me point you to paragraph 76 of your
18     report, page 29.
19             When you were conducting your event study
20     for the stock here, you chose to break the Class
21     Period up into yearly sub periods; is that correct?
22         A   That is correct.
23         Q   Okay.
24             Can you give me an explanation as to why
25     you chose to do that?
```

Case 1:21-cv-02960-VM-BCM-RA BCM Document 58-2 Entitled 188d7on FHS8D6712/23 08/28/2023 of Page 145 of 332

1       A    Based on my experience.

2       Q    What in your experience suggested that

3   breaking it up into sub periods was appropriate?

4       A    Something I've oftentimes seen based on the

5   fact that there was a structural break in the

6   company's stock.  All those things informed my

7   opinion.

8       Q    All which things?

9       A    All the things I just mentioned.

10      Q    It's something you've often seen and based

11  on the fact that there was a structural break in the

12  company's stock.

13           Any other things?

14      A    Oh, it's something that has commonly been

15  accepted by courts, also would be another.

16      Q    What difference in the analysis would there

17  be if you did not break it up into sub periods?

18           MR. HAKLAY:  Objection.

19           In this case or is it a hypothetical?

20           MR. ISAJIW:  In this case.

21           MR. HAKLAY:  Okay.  Thank you.

22           THE WITNESS:  Well, given that there was a

23  structural break, my guess is you would have some

24  weird regression results.

25  ///

Page 143

 1    BY MR. ISAJIW:
 2         Q    And what do you mean by "structural break"?
 3         A    Well, the stock -- as of the flash crash,
 4    the stock traded differently before and after that
 5    date.
 6         Q    Okay.
 7              In paragraph 76 you say (as read and/or
 8    reflected:)
 9                   Prior to running a regression,
10              one often decides on an event
11              window over which to measure the
12              relationship between the security
13              at issue and the corresponding
14              market and/or industry factors.
15                   Given that the Class Period in
16              the current case for FXCM is
17              approximately five years in length,
18              and so that the regression
19              estimates would be relatively
20              contemporaneous for the events I
21              [verbatim] tested, I ran
22              regressions on a daily returns
23              covering the entire Class Period
24              broken down into 252 day periods.
25              Did I read that correctly?

Case 1:23-cv-02969-DLC-BCM Document 58-2 Entered on FL SD Docket 08/28/2023 Page 147 of 332

```
 1        A    Where are you reading from?

 2        Q    Paragraph 76.

 3        A    Well, do you want to reread it?

 4        Q    I don't.

 5        A    Will you stipulate that what you read was

 6   from my report?

 7             MR. HAKLAY:  It was.

 8             MR. ISAJIW:  I generally don't stipulate

 9   with witnesses.

10             MR. HAKLAY:  That's fine.  There was one

11   word, whatever, it was not important.

12             THE WITNESS:  He just -- I didn't know that

13   he was reading from my report.

14   BY MR. ISAJIW:

15        Q    I'm not trying to be argumentative.  I'm

16   literally just trying to understand the process

17   here.

18        A    Okay.  But then just point me to the

19   paragraph.  And I'm happy -- if you're reading from

20   the report, just tell me, hey, we're on

21   paragraph 56, or whatever it is.

22        Q    I believe I've pointed you to --

23        A    Paragraph 76.

24        Q    -- 76 a number of times.  But, again, I'm

25   asking you, feel free if you have questions or if
```

Page 145

1    I'm not clear, let me know.

2              What I want to focus you on in this report

3    is in connection with your breaking this down into

4    multiple sub periods, you say, in paragraph 76, that

5    (as read and/or reflected:)

6                    The regression estimates would

7              be relatively contemporaneous for

8              the events being tested.

9              Do you see that?

10   A    Yes, I do.

11   Q    Okay.

12             What do you mean by "relatively

13   contemporaneous"?

14   A    Well, that's when the events are taking

15   place.  So in just, I guess, a common understanding

16   of what contemporaneous means.

17   Q    That's when which events are taking place?

18   A    Well, events throughout the -- I mean,

19   announcements are being made throughout the entire

20   Class Period; right.  There is news being released

21   during the entire Class Period.

22             So when I say "contemporaneous," I mean

23   contemporaneous when the news is being released.

24   Q    Are you talking about the news related to

25   the three dates you chose as the basis of your event

```
                                              Page 146
 1    study?

 2         A    I'm talking about all company news.

 3              So, again, referring to paragraph 56.

 4         Q    So you chose five regression estimation

 5    periods here, March 15th, 2012, to February 1, 2013;

 6    February 4, 2013, to February 3, 2014, et cetera.

 7    This is the last couple of sentences of

 8    paragraph 76; is that right?

 9         A    That is correct.

10         Q    How did you decide how many sub periods to

11    use in connection with this analysis?

12         A    Well, when I decided to use annual trading

13    days -- or annual -- what do I say here?  When I

14    decide to use a full year of data, that's how the

15    sub periods broke up.

16         Q    Is it fair to say that you broke it out --

17    you broke the analysis out into sub periods because

18    stocks may behave differently during the sub periods

19    in connection with your analysis?

20         A    Is it safe to say?

21              I'm not sure I would use that terminology.

22         Q    I believe I said "fair."

23         A    Oh, I'm sorry.

24              THE WITNESS:  Could you reread the

25    question.  Maybe I misunderstood it.
```

```
 1              (The record was read back as

 2              follows:

 3                  "Question:  Is it fair to say

 4              that you broke the analysis out

 5              into sub periods because stocks may

 6              behave differently during the sub

 7              periods in connection with your

 8              analysis?")

 9              THE WITNESS:  I don't know if I would

10     say -- I'm not sure I would use the word "fair."  I

11     mean, it's something I've done before.  It's

12     something I did in this case.

13     BY MR. ISAJIW:

14         Q   Is it true to say that you broke -- that

15     you broke out the analysis into sub periods because

16     stocks may behave differently during the sub periods

17     in connection with your analysis?

18         A   I'm sorry.

19              THE WITNESS:  Can you reread the question,

20     please.

21              (The record was read back as

22              follows:

23                  "Question:  Is it true to say

24              that you broke out the analysis

25              into sub periods because stocks may
```

Page 148

```
1              behave differently during the sub
2              periods in connection with your
3              analysis?")
4              THE WITNESS:  I don't know if it's true or
5    not.  I'm not quite sure.
6              I don't understand the question.
7    BY MR. ISAJIW:
8         Q   So other than what's in your report, do you
9    have -- can you give me any other explanation as to
10   why you broke this out into five sub periods?
11        A   You mean other -- other than what's in my
12   report and what I've stated previously in my
13   deposition?
14        Q   Correct.
15        A   I don't believe so.  I mean -- well, I
16   mean -- yeah.  We'll leave it at that.  That's fine.
17        Q   I'm just trying to get your best answer as
18   to why you conducted the analysis in this way.  And
19   if you believe you've already given me your best
20   answer, that's great.
21             And if not, that's what I'm trying to
22   understand.
23        A   Okay.
24             Let -- let -- well, I don't want to --
25             MR. HAKLAY:  There's no question for you.
```

Page 149

```
 1              THE WITNESS:  Right.  That's correct.  Yes.
 2              MR. HAKLAY:  Don't worry.  He'll ask
 3    another one.
 4    BY MR. ISAJIW:
 5        Q   So let's turn to Exhibit 8a of your report
 6    on page 165.
 7              Backing up for a second.
 8              When you were doing your study in
 9    connection with this report, did you find that FXCM
10    financial and market positions changed throughout
11    the Class Period?
12        A   What do you mean by their "market
13    positions"?
14        Q   Let's say financial position.
15        A   That's still vague.  I don't understand the
16    question.
17        Q   As an economist, you don't understand what
18    a financial position of a company would be in
19    connection with an analysis throughout a Class
20    Period in a securities litigation case?
21              MR. HAKLAY:  That's actually not a
22    question.
23              Please ask one.
24              MR. ISAJIW:  I believe it was a question.
25        Q   What do you understand about -- just based
```

```
                                              Page 150
 1    on your common understanding as an economist -- a

 2    company's financial position throughout a Class

 3    Period?

 4         A    Well, okay.

 5              So let me ask a clarifying question.

 6              So, I mean, if we're talking about, let's

 7    say, Apple, all right.  And we talked about their

 8    financial position, I would look at, you know, their

 9    market -- not their market structure, sorry, their

10    capital structure.

11              If you're talking about a trading firm and

12    you're talking about -- we certainly -- we could

13    look at a --

14         Q    I'm talking about FXCM.

15         A    Can I -- I'm trying to answer the question

16    to the best of my ability.

17              You have asked a vague question.

18              MR. HAKLAY:  Please continue.

19              THE WITNESS:  So when you say "financial

20    position," do you mean as in the holdings of the

21    company, which oftentimes when you're talking about

22    an investment firm is referred to as a financial

23    position?

24              Or are you referring to the firm's

25    financials, as in the SEC filings?
```

```
 1   BY MR. ISAJIW:
 2        Q    I think I'm referring to both collectively.
 3   But what I'm asking you is, do you have a general
 4   understanding of the term "a firm's financial
 5   position"?
 6            MR. HAKLAY:  Objection.  Asked and
 7   answered.
 8            MR. ISAJIW:  Well, it was asked.
 9            MR. HAKLAY:  It was answered.
10            THE WITNESS:  Like I --
11            MR. HAKLAY:  He told you there's more than
12   one -- one possibility.  That's an answer.
13            Go ahead, sir.
14            THE WITNESS:  Like I said, it varies from
15   firm to firm.
16   BY MR. ISAJIW:
17        Q    Okay.
18            Looking at Exhibit 8a, this is (as read
19   and/or reflected:)
20                 FXCM Common Stock Regression
21            Results, Estimation Period:
22            March 15, 2012, through February 1,
23            2013.
24            Can you just explain to me what this
25   exhibit demonstrates at a very high level.
```

Case 1:23-cr-01969-DOMA6-DAeBoKm t Fissu2enEnteEsd7onFilesdD6D712/2a0 OPage2053 of Page 155 of 332

```
1        A    Yeah.   It's a market model with the results
2    of my regression.
3        Q    Okay.
4             So what does R squared, for instance, mean?
5        A    I'm not sure -- can I give you a formal
6    definition?
7        Q    Informal is fine.   You asked me a question.
8        A    No.   No.   Sorry.   I was talking out to -- I
9    was speaking out to myself.   I apologize.   It seemed
10   as if it was a question to you.
11            It just -- in some sense, it just explains
12   how -- how much of the model is described -- how
13   much of the data is described by the model.
14       Q    Okay.
15            And what about adjusted R squared?
16       A    That's typically -- it would be the same
17   answer, but it's adjusted for the number of
18   variables included in the model.
19       Q    Standard error.
20       A    Would just be, I don't know, if you want to
21   think of it as a variance of the model.
22       Q    Okay.
23            Jumping down below, we have coefficients.
24   Intercept coefficient.
25            What does that indicate?
```

1     A    It's the coefficient on the intercept.

2     Q    Market index.

3     A    The term "market index" or "coefficient on

4  the market index"?

5     Q    Coefficient on the index demonstrates what?

6     A    It's the coefficient on the market index.

7  Let me -- I'll give you a more formal definition.

8          It is a measure of the relationship between

9  how the market moves on a daily basis and how the

10  common stock moves on a daily basis, if we're just

11  talking about this particular regression analysis.

12     Q    I am.

13          And what about peer index?

14     A    Similar to the answer I just gave you, but

15  it's with regards to peers as opposed to the market.

16     Q    Those two index, which measure against the

17  market and the peer, they can change over time; is

18  that correct?

19     A    That is -- when you say "they can change

20  over time," you mean their components can change

21  over time?

22     Q    I mean the coefficients, the calculation.

23     A    So that's -- okay.  So now you're asking

24  can the coefficients change over time?

25          Certainly.

```
                                              Page 154
 1        Q    Okay.
 2             And in connection with your analysis, they
 3   did change substantially between the different
 4   periods that you looked at; is that correct?
 5        A    They changed over the different periods I
 6   looked at.
 7        Q    So, for instance, the one that we're
 8   looking at now on page 165, we have a market index
 9   of 0.691.
10        A    Yep.
11        Q    And a peer index of 0.357?
12        A    Uh-huh.
13        Q    And a standard error of 2.05?
14        A    Correct.
15        Q    Okay.
16             And if you turn to 8d, which is 168.
17        A    All right.
18             What are we looking at again?  I'm sorry.
19   Can you read back the question.  I need to write
20   these down.
21        Q    I'll try to do this as easy as possible.
22        A    I want to look at them side by side.
23        Q    That's fine.  Look at page 165.
24        A    Yeah.
25        Q    Okay.
```

Case 1:23-cv-11195-SHS-OTW Document 188-2 Filed 06/12/24 Page 158 of 332

1        Grab page 166 in your right hand, flip it

2    over and you will see 8d, 168; right?

3        A   Yeah.  I want to be able to look at the

4    numbers together --

5        Q   I got you.

6        A   -- to compare them.

7            Do you want to give me one of those?  I'm

8    happy to look.  Just give me two.

9            MR. HAKLAY:  Why don't you look at 165 here

10   and he can show you 168, and then you'll have them

11   next to each other.

12           THE WITNESS:  There you go.

13   BY MR. ISAJIW:

14       Q   So for 8a, the market index is 0.691;

15   correct?

16       A   That's what it says, yes, correct.

17       Q   And then 8d, the market index is 0.023?

18       A   Correct.

19       Q   Okay.

20           Would you characterize that as a change

21   over time?

22       A   It's certainly different.

23       Q   Okay.

24           And is it a substantial change over time?

25       A   My guess is if I ran some statistical

Case 1:21-cv-00196-BAcBCMnt 5document 188-d7onFile 06/01/20 0Page 157 3of Page 159 of 332

1    analyses, there would be a statistically significant

2    difference between those two coefficients.

3        Q    And then the peer index on 0.357 on 8a.

4    And if you look at 8d, which is for the period of

5    February 6, 2015, through February 5, 2016, we have

6    0.579.

7        A    Correct.

8        Q    Okay.  Again, would you characterize that

9    as a substantial change over time?

10       A    It's certainly different.  I don't -- I --

11   I'm not sure if it would be statistically

12   significantly different.

13       Q    And then the standard error in 8a is 2.05.

14   And the standard error in 8d for this other period

15   is 6.59.

16           Do you see that?

17       A    I do.

18       Q    Okay.

19           Again, would you agree they are

20   substantially different?

21       A    Again, I will -- I agree that they are

22   different.

23       Q    How would you -- you have no

24   characterization for the extent to which they are

25   different?

Case 1:21-cv-00046-BAH Document 588-2 Entered on FLSD Docket 08/28/2023 Page 160 of 332

1      A    They're different.  I mean, if I were to --

2  if someone were to ask me to perform statistical

3  tests, I could determine whether or not they were

4  statistically significantly different.

5           And I guess when -- if there's some formal

6  definition of substantial, I mean, we talk about

7  significant in economics and then we talk about

8  statistically significant.  So that has a standard

9  meaning.

10          Substantial, if you're measuring it by

11  differences in coefficients, I don't -- I'm not

12  quite sure how to -- how to answer in economic

13  terms.

14      Q    Would you say it's a de minimis difference

15  between the two?

16      A    I haven't even thought about that.

17      Q    An insignificant difference between the

18  two?

19      A    Is it insignificant?

20          Again, so now you're using formal

21  definitions.  I would need to form -- I would need

22  to perform a statistical test to determine whether

23  or not it's insignificant or significant.

24      Q    What do those differences represent in

25  terms -- just looking at the market index, what does

Page 158

1   the difference represent?  The market index you

2   described is a relationship between -- I'm sorry.

3   Can -- you can look back.

4          How did you describe the market index and

5   what that means?

6      A   You mean the coefficient on the market

7   index?

8      Q   Yes.

9      A   It's how the underlying stock responds, on

10  average, to changes in the market index.

11     Q   Okay.

12         And so the 0.691, as compared to 0.023, how

13  would you -- what would drive that difference?

14     A   What would drive the difference?

15     Q   What would the difference in the

16  coefficients indicate in terms of the measurement

17  that you're trying to achieve here?

18     A   That during that one-year period in

19  Exhibit A, a 1 percent increase in the market would

20  result in a 0.691 percent increase in the underlying

21  stock.  A 1 percent -- in the second example, a

22  1 percent increase in the market would result in

23  a 0.023 percent change in the stock.

24     Q   Okay.

25         And the same question for the peer index.

1     A    I'm sorry.

2          THE WITNESS:  Can you repeat the question,

3  please.

4          (The record was read back as

5          follows:

6               "Question:  What would the

7          difference in the coefficients

8          indicate in terms of the

9          measurement that you're trying to

10         achieve here?")

11  BY MR. ISAJIW:

12     Q    I'm trying to get the same explanation for

13  the peer index.

14     A    So here it looks like a 1 percent -- and

15  this is Exhibit 8a -- a 1 percent change in the peer

16  index would result in a 0.357 percent increase in

17  the underlying stock.

18          And the -- and in the other, this is

19  Exhibit 8d, a 1 percent increase in the peer index

20  would result in a 0.579 percent increase in the

21  underlying stock.

22          Now, I'm just talking about positives.

23  Obviously, it could also be negative.

24          MR. HAKLAY:  Finish your subject.  We're

25  getting close to an hour.  I'm not suggesting we

```
                                        Page 160
 1   break right now, but close.

 2           MR. ISAJIW:  You know what, this is as good

 3   a time as any to take a break.

 4           MR. HAKLAY:  Okay.

 5           THE VIDEOGRAPHER:  We are going off the

 6   record.

 7           The time is 1:34 p.m.

 8           (Recess was taken at 1:34 p.m.

 9           until 1:47 p.m.)

10           THE VIDEOGRAPHER:  We are back on the

11   record.

12           The time is 1:47 p.m.

13   BY MR. ISAJIW:

14       Q   Just before we broke, we were discussing

15   your regression analysis for the common stock and

16   the five regression estimate periods you used in

17   connection with that analysis.

18           Correct?

19       A   Correct.

20       Q   Okay.

21           Did you use any regression estimation

22   periods in connection with your analysis of the bond

23   in this case?

24       A   Did I use any -- I'm sorry.  Can you repeat

25   the question?
```

1      Q    Let me ask it, hopefully, better.

2           You broke your analysis for the common

3      stock into five sub periods; correct?  Paragraph 76

4      of your report.

5      A    That is correct.

6      Q    Did you break your analysis of the bond

7      into any sub periods in connection with your

8      analysis?

9      A    No.  The estimation period I used on the

10     bonds or the notes was June 24th, 2014, through

11     August 16, 2016.

12     Q    Why didn't you subdivide that into sub

13     periods?

14     A    It was after the -- well, hold on.  Before

15     I answer that.

16          That's a good question.  I certainly could

17     have.  I don't think it would change my results at

18     all.

19     Q    Was it a conscious decision not to?

20     A    No.

21     Q    Okay.

22          Focus on paragraph 77 of your report,

23     page 29.

24          Do you have paragraph 77?

25     A    Yeah.

Page 162

1      Q    Great.

2           In this paragraph you described using (as

3    read and/or reflected:)

4               (Dummy) variables to control

5               for potential abnormal returns on

6               news events for which the company

7               filed a form 8-K with the SEC.

8           Can you explain to me at a high level

9    what -- why you used dummy variables and what you

10   were trying to achieve there.

11     A    Well, so if you -- really at least with

12   regards to these specific dummy variables, this goes

13   to my news/no-news test.

14          So -- so to the extent that I define -- and

15   I'm looking at starting at paragraph 96 (as read

16   and/or reflected):

17               I conducted an empirical test

18               to compare the stock price

19               reactions on a sample of "news

20               days" to all other "non-news days."

21          If the underlying assumption is that those

22   days are news days, I typically want to don't use --

23   I mean, I would want to adjust for them somehow.

24          That having been said, if I exclude the

25   dummy variables, it doesn't change my results.

1      Q   So what is the use of the dummy variable

2  designed to achieve?

3      A   What is it designed to achieve?

4         It's designed -- I don't quite understand

5  the question.

6         It's -- yeah.  I don't -- I'm sorry.  I

7  don't understand the question.

8      Q   You are focusing, in this analysis, on what

9  you term as "news days"; is that correct?

10     A   Now, we're looking, again, at that

11  paragraph I was just citing?  What are you -- are we

12  talking about the news/no-news analysis, or are we

13  talking about the event study?

14     Q   So I'm talking about the use of dummy

15  variables.

16        Let's back up.

17        Your use of dummy variables to control for

18  potentially abnormal returns on news events for

19  which the company filed a form 8-K with the SEC, was

20  that in connection with the event study or the

21  news/no-news analysis?

22     A   Well, because I did a news/no-news analysis

23  on days on which Company filed a form 8-K with the

24  SEC, that, I, then, included those dummy variables

25  in the market models I used.

Page 164

```
 1       Q    Okay.  So I'm trying to understand the
 2   process.
 3            You didn't include all 8-K days in your
 4   news/no-news analysis, or did you?
 5       A    I didn't include all 8-K days.
 6            I believe I used all 8-K days during the
 7   Class Period.
 8       Q    For some of the 8-K days, did you use a
 9   dummy variable?
10       A    Oh, for each of the 8-K days, I used a
11   dummy variable.
12       Q    Okay.
13       A    Because under my news/no-news test, I am
14   trying to come up with an objective definition of
15   news.
16            And so I define "news" as 8-K days.  To the
17   extent that the underlying assumption is, is that
18   the stock price would move on those news days, I
19   would usually want to remove that abnormal movement
20   out of my market models.
21            So it's something I commonly do.
22       Q    So is it fair to say you're trying to
23   estimate the volatility of the stock to benchmark
24   whether the price movement is normal or abnormal?
25       A    I'm sorry.
```

Case 1:ased 1:27969-0094A6-RAcBownt 588-2 ment Estebend 7 on Filed 06/72/2420 0Page2063 of 355 168 of 332

```
 1            THE WITNESS:  Can you read back that
 2   question, please.
 3            (The record was read back as
 4            follows:
 5                "Question:  So is it fair to
 6            say you're trying to estimate the
 7            volatility of the stock to
 8            benchmark whether the price
 9            movement is normal or abnormal?")
10            THE WITNESS:  I don't understand that
11   statement.
12   BY MR. ISAJIW:
13       Q   Do you know how many -- just focusing on
14   the common stock, do you know how many days you
15   dummy out of your regression analysis for FXCM
16   common stock?
17       A   107 days.  And I'm looking -- I'm now
18   reading from paragraph 97 of my report.
19       Q   Out of approximately 1,230 days?
20       A   Well, let's go to -- 1,231 days, yes.
21       Q   Okay.
22       A   Sorry.  I'm reading from paragraph 104
23   there.
24       Q   So that's roughly, what, 8 percent or so?
25       A   That sounds right.
```

1       Q    And for the bond, do you know how many days

2   you dummy out?

3       A    Ten.

4       Q    Okay.

5            And that's out of how many?  Sixty-six, I

6   think?

7       A    I believe that is correct, yes.

8       Q    So that's roughly 15 or so percent?

9       A    Sure.

10      Q    Okay.

11           In your view, when conducting these

12  analysis, is there a threshold of days that would be

13  too high to dummy out and still have a reliable

14  analysis?

15      A    Well, so this is the way I would put this.

16           I have seen courts reject models by

17  economists when they've dummied out, I don't know,

18  maybe 50 percent of the days.  I don't remember the

19  case.

20           But it is the -- in this case, it is --

21  intellectually, it is the proper thing to do.

22           That having been said, if I exclude those

23  dummy variables except for those dummy variables

24  after -- immediately after the break or the stock

25  flash trash, my results do not change at all.

```
                                        Page 167

 1              (Reporter clarification.)

 2   BY MR. ISAJIW:

 3        Q    Okay.

 4              Are you aware of any academic peer-reviewed

 5   literature supporting the use of dummy variables in

 6   connection with this type of analysis?

 7        A    Using dummy variables with an event study?

 8   Sure.

 9              But I can't give you -- I mean, I've seen

10   hundreds of articles use dummy variables in

11   performing event studies.  I can't name them off the

12   top of my head.

13        Q    Do you cite any in your report?

14        A    You know, I don't remember if -- where are

15   we looking?

16              I don't remember -- I'm happy if you have

17   them.  So it's possible that "The 'Less Than'

18   Efficient Capital Markets Hypothesis," in

19   Footnote 129 might have contained that, as well as

20   Footnote 131.

21              Here's another paper.  "Use and Misuse of

22   Event Studies to Examine Market Efficiency," which

23   is a NERA working paper.

24              "The Curious Incident of the Dog That

25   Didn't Bark and Establishing Cause-and-Effect in
```

Page 168

1    Class Action Securities Litigation."

2            I don't -- again, without having those

3    papers in front of me, I don't remember if they

4    specifically used dummy variables.

5            But, like I said, I've seen it used

6    numerous times.  I've used it hundreds of times,

7    both in my role as an expert here, and then, you

8    know, when I used to work at places like

9    Cornerstone.

10           So it is a common practice.

11           That having been said, if I exclude those

12   dummy variables, save for the days in which

13   immediate -- that immediately followed the flash

14   crash, it does not alter my regression results at

15   all or my findings at all.

16      Q    Okay.

17      A    Forget the regression results.

18      Q    Again, I'm just looking for the best

19   answers to my questions here.  And when I asked if

20   you were aware of any academic peer-reviewed

21   literature supporting the use of dummy variables in

22   connection with this type of analysis, you looked

23   and read a number of the articles in the footnotes

24   of your paper.

25           Are you telling me specifically that these

Page 169

1    articles support the use of dummy variables within

2    events -- these are academic peer-reviewed

3    literature supporting the use of dummy variables in

4    connection with this type of analysis?

5        A    As I sit here, again, I don't recall.

6        Q    Okay.

7        A    If you would like to place the articles in

8    front of me, I'll be happy to look at them.

9            It is certainly possible that they -- as I

10   stated before, that they used dummy variables in

11   their analysis.

12           I guess there is an implicit assumption

13   that if they used dummy variables to conduct their

14   analysis that they are suggesting that they are in

15   support of that type of analysis.

16       Q    Okay.

17           You also mention that courts criticize the

18   use of dummy variables at, I think you said,

19   50 percent or more.

20       A    I can think of one case.  I don't recall

21   the case.  I don't recall what happened.  I don't

22   recall -- I don't remember any details.  So, yes,

23   there's at least one case I can think of.

24           I can also think of thousands of cases in

25   which courts have accepted dummy variables in this

Page 170

```
 1    type of analysis.
 2            So, yes, there's one example I can think of
 3    where they did not accept it and found a flaw with
 4    it.  There are thousands -- probably not thousands;
 5    that might be an exaggeration -- hundreds where they
 6    have been accepted and used.
 7        Q   In your view as an economist and an expert
 8    witness conducting market efficiency analysis, is
 9    there a threshold by percentage that is too high to
10    use for dummy variables in order to get reliable
11    results?
12        A   That's not something I've ever thought
13    about.
14        Q   Okay.
15            Would you -- you mentioned 50 percent
16    before and I recognize that that wasn't from a
17    specific recollection of a specific case, but could
18    you, sitting here today, believe that 50 percent
19    would be too high?
20        A   I have no idea, as I sit here today.  I
21    don't know what happened to that case.
22            I mean, it's complete speculation on my
23    part.
24        Q   Independent of that case, have you ever
25    given any consideration about what level of dummy
```

```
 1   variables would be too high to get reliable results

 2   in connection with this type of an analysis?

 3        A    What level of dummy variables?

 4             I --

 5             THE WITNESS:  Could you reread the

 6   question, please.

 7             (The record was read back as

 8             follows:

 9                 "Question:  Independent of

10             that case, have you ever given any

11             consideration about what level of

12             dummy variables would be too high

13             to get reliable results in

14             connection with this type of an

15             analysis?")

16             THE WITNESS:  I have never thought about

17   levels.  I -- and this analysis and all analysis I

18   attempt to do, I try to do the intellectually honest

19   thing.

20             That having been said, my results are

21   robust to the inclusion or exclusion of the majority

22   of those dummy variables, specifically the exclusion

23   of all of those 8-K dummy variables.

24   BY MR. ISAJIW:

25        Q    Switching gears to your news/no-news
```

Page 172

```
 1    analysis, which I think you describe in and around
 2    paragraph 49 on page 18.
 3         A    Paragraph 49.
 4              Okay.
 5         Q    So in paragraph 49, you write (as read
 6    and/or reflected:)
 7                   To determine whether the
 8              requisite cause and effect
 9              relationship existed, I performed a
10              collective test of the efficiency
11              of the market for FXCM's stock on a
12              broad set of FXCM news events that
13              occurred over the course of the
14              Class Period.
15              Did I read that correctly?
16         A    That is correct.
17         Q    And the cause-and-effect relationship that
18    you were testing to see whether it existed, that
19    related to Cammer Factor 5, the price impact of new
20    information?
21         A    I believe that's correct.
22         Q    For this -- the paragraph goes on to state
23    (as read and/or reflected:)
24                   For the second empirical test,
25              I examined whether the proportion
```

Page 173

1          of statistically significant

2          abnormal returns exhibited by FXCM

3          common stock on the news dates was

4          significantly different than the

5          proportion of statistically

6          abnormal returns on other dates --

7          I'm sorry -- on all other dates.

8          This test is often referred to as a

9          "news no-news test."

10         What does this test entail mechanically?

11    A    So running the market models.  Typically,

12   you -- again, you would use dummy variables on -- in

13   your market models on those days that you have

14   defined as news.

15         Well, so I guess the first thing you need

16   to do is define what a news day is.

17         So, you know what, let's just go to

18   paragraph 97 because that will give you a better

19   explanation.

20         (As read and/or reflected:)

21             First, one must define what

22         constitutes a "news" day.  It is

23         important to use a specific and

24         objective criteria to identify news

25         events that contain a higher flow

```
                                              Page 174

 1              of information.

 2                   For purposes of these tests, I

 3              identify news days as unique days

 4              on which the Company filed an 8-K.

 5      Q    Did you write that paragraph?

 6      A    Yes.

 7      Q    Yourself, from scratch?

 8      A    From scratch?

 9      Q    Uh-huh.

10      A    Certainly at some point I have.

11      Q    In connection with this report?

12      A    I believe so.

13      Q    The very first time you wrote that

14  paragraph was for this report?

15              MR. HAKLAY:  Objection.  Misstates.

16              THE WITNESS:  That's -- that's not what I

17  said.

18  BY MR. ISAJIW:

19      Q    I was asking if you wrote it from scratch

20  in connection with this report, and I think you said

21  "I believe so."  So I was asking for clarity.

22              MR. HAKLAY:  That's a mistake.

23  BY MR. ISAJIW:

24      Q    Let's withdraw those questions.

25      A    What I stated was is that I believe at some
```

Page 175

1    point in time I have written that -- that sentence.
2        Q    Okay.
3        A    Because this is typically how I would do a
4    news/no-news analysis.
5        Q    Okay.
6        A    Now, did I go ahead and specifically type
7    out this sentence separately as opposed to use --
8    taking it from another report?  I don't recall.
9        Q    Okay.
10            Is it a fair summary of the news/no-news
11   test that you determined that there were news days
12   where FXCM issued 8-Ks and no-news days where there
13   were no 8-Ks, as -- that's the collection of
14   information you were looking at?
15       A    Maybe I'm missing something.
16            THE WITNESS:  Could you reread the
17   question, please.
18            (The record was read back as
19            follows:
20                "Question:  Is it a fair
21            summary of the news/no-news test
22            that you determined that there were
23            news days where FXCM issued 8-Ks
24            and no-news days where there were
25            no 8-Ks, as -- that's the

```
1          collection of information you were
2          looking at?")
3          THE WITNESS:  I don't believe that that
4    statement is necessarily correct.
5          I refer you to paragraph 97 in my report as
6    to what exactly I did.
7    BY MR. ISAJIW:
8      Q   What do you believe is not correct about
9    that statement that I made?
10     A   Well, I'm not sure how you are necessarily
11   defining news.  And my guess is you mean news as in
12   all-company news.
13         And so I'm not sure -- I don't know what
14   definition of news you're using.
15         So to be specific -- as specific as
16   possible, I would like to rely on paragraph 97 to
17   accurately reflect my opinion in this matter.
18     Q   So I was saying news days were days where
19   FXCM issued 8-Ks.
20         Is that different than the definition
21   you're using in paragraph 97?
22     A   That has -- that is how, in this test, I
23   have defined news days.
24     Q   And I also said that no-news days were
25   where there were no 8-Ks.
```

1       Is that different than how you defined it

2  in paragraph 97?

3       A    That is the underlying assumption in this

4  model.

5       Q    Okay.

6       A    But that having been said, it's possible

7  that there are news days that aren't captured under

8  this definition.  I am using this specific

9  definition as a news day.

10      Q    Okay.

11      So if it counts as a news day for the

12 purpose of your news/no-news analysis, it had to be

13 an 8-K day?

14      A    That is correct.

15      Q    Okay.

16      Do you know of any peer-reviewed academic

17 studies supporting the use of the news/no-news test,

18 as you've set it forth here?

19      A    Well, so I suppose -- I'm not sure that

20 there -- it's something that academicians would

21 normally look at.

22      That having been said, it is certainly --

23 when we talk about a news/no-news analysis, hold on.

24 One second.

25      Certainly the less and efficient capital

Case 1:21-cv-00096-BAK-BAK Document 56-2 Entered on FLSD Docket 08/28/2023 Page 181 of 332

1   market hypothesis.  This is the paper.  Excuse me.

2   In paragraph 127.  I believe they do it -- hold on.

3            And where am I?  Paragraph 130.  Maybe --

4   this may not be considered academic, but another

5   way, and I'm quoting from paragraph 101 (as read

6   and/or reflected:)

7              Another way to perform an

8              event study is to provide the days

9              of the Class Period ex ante into

10             expected news days and non-news

11             days before examining price

12             movements, and then compare the

13             stock's price movements in the two

14             categories to see if there's a

15             statistically significant

16             difference in price movement

17             between the two categories.

18              If the study finds a

19             difference in price movement

20             between the two sample sets (e.g.,

21             earnings-release dates versus

22             non-earnings-release dates), that

23             is statistical evidence that the

24             market incorporates new public

25             information into the price of the

Page 179

```
 1          stock.
 2          And that is quoting from the (as read
 3   and/or reflected:)
 4               Brief of Testifying Economists
 5               as Amici Curiae -- I'm sure I
 6               botched that -- in Support of
 7               Respondent, Halliburton,
 8               Incorporated, and David Lesar v.,
 9               Erica P. John Fund, Incorporated,
10               FKA Archdiocese of Milwaukee
11               Supporting Fund, February 5th,
12               2014, page 10.
13          So I don't know if that brief by all those
14   economists would be considered an academic article
15   or not, but they're certainly in favor of it.
16     Q    As an academic, you don't know if a brief
17   filed in connection with a court proceeding would be
18   considered a peer-reviewed academic study?
19     A    Well, I mean, it's -- it's presumably been
20   read by other peers.
21          So I -- it has not appeared -- to my
22   knowledge or to the best of my knowledge, it has not
23   appeared in a journal, but it certainly suggests
24   that the economists support that.
25          If you specifically want peer reviewed, as
```

```
                                            Page 180
 1    normally defined in academia, at least off the top
 2    of my head, I believe the article I noted in
 3    paragraph 129 suggests this as a use.
 4              MR. HAKLAY:  You mean Footnote 129?
 5              THE WITNESS:  I'm sorry.  Yes.
 6    Footnote 129.
 7              But, again, that's going off the top of my
 8    head.  I'm happy to look through the article if you
 9    have it.
10    BY MR. ISAJIW:
11         Q    Okay.
12              Have you used this news/no-news test when
13    evaluating market efficiency in prior engagements?
14         A    You mean prior to issuing this report?
15         Q    Yes.
16         A    Yes.
17         Q    Okay.
18              Roughly how many times?
19              Maybe it's an easier question to ask.  In
20    what proportion of cases involving market efficiency
21    have you used this test?  Most of them?  Half of
22    them?
23         A    Probably more than 20.  I don't remember
24    exactly.
25         Q    Twenty reports as opposed to 20 percent of
```

Page 181

1    your reports?

2         A    Yes.

3         Q    Okay.

4         A    But that's, again, that's complete

5    speculation on my part.  I've used it what I would

6    consider to be numerous times.

7         Q    In connection with this test, what would

8    you conclude if a security did not have a

9    significantly higher proportion of significant

10   returns on news days than it did on no-news days?

11        A    That's an interesting question.

12             I would have to think about it.  Do you

13   mean with regards to market efficiency?

14        Q    Yes.

15        A    It would -- obviously, it would depend on

16   the case because in determining market efficiency,

17   I'm looking at all eight factors.

18        Q    Would that kind of finding be inconsistent

19   with the conclusion of market efficiency?

20             MR. HAKLAY:  Objection.  Asked and

21   answered.

22             THE WITNESS:  Would it be inconsistent with

23   the definition of market efficiency?

24   BY MR. ISAJIW:

25        Q    With the conclusion of market efficiency.

Page 182

1      A    Well, I mean, I can think of all sorts of

2   examples where you could get the wrong answer.  Like

3   you identify, you know, you come up with a bad

4   definition of news days.

5           You know, maybe I decided that a news day

6   would be a Monday and so I dummied out all Mondays,

7   you know, that would give me a spurious result

8   presumably.

9           So it's not -- it's not something I've

10   given a lot of thought to, but I can certainly think

11   of situations where, you know, if the test is

12   misspecified, you're going to get bad results.

13           And so that -- it may -- yeah.  Well,

14   that's it.  I'll leave it at that.

15      Q    Barring testing errors, if a security did

16   not have a significantly higher proportion of

17   significant returns on news days than it did on

18   no-news days, would that be inconsistent with the

19   conclusion of market efficiency?

20           MR. HAKLAY:  Objection.  Asked and

21   answered.

22           THE WITNESS:  It would depend on the case.

23           So beyond testing errors, I mean, the

24   definition of a news day is something that's

25   integral to this process.  And so you need to be

1   specific about how you define a news day.

2          So that wouldn't be a testing error.  And

3   so -- I mean, there's all sorts of things.  It's --

4   there's all sorts of things that go into this.

5          And so if you would like to be more

6   specific about your example, certainly I would take

7   under consideration that additional information, but

8   just on its face alone, not necessarily.

9   BY MR. ISAJIW:

10     Q   So in a hypothetical where you do a

11  news/no-news test, you define news days as days with

12  8-Ks; you define no-news days as days without 8-Ks;

13  you run the analysis; and you conclude that the

14  security did not have a significantly higher

15  proportion of significant returns on the news days

16  than it did the no-news days, would that be

17  inconsistent with the conclusion that the security

18  traded in an efficient market?

19         MR. HAKLAY:  Objection.  Asked and

20  answered.

21         THE WITNESS:  Yeah.  I refer to my previous

22  answers.  I don't have anything more I can say on

23  this topic.

24  BY MR. ISAJIW:

25     Q   The only thing I was trying to add was in

Page 184

1    your previous issue I believe you said if there was

2    an issue about defining news days.  I was trying to

3    ask a new question defining news days as 8-K days.

4         A    Ah.  Okay.  Yeah, I refer to my previous

5    answer.

6         Q    I want to flip for a minute to the

7    Unger/Krogman factors in connection with the FXCM

8    common stock.

9              And this is your analysis on paragraphs 108

10   to 111.

11        A    108 to 111.  Okay.

12        Q    And that's paragraphs -- looks like page

13   42.

14             MR. HAKLAY:  I think it's more than -- you

15   can ask him about those.  I think that analysis goes

16   beyond 111.

17             MR. ISAJIW:  I apologize.  It begins on

18   page 42.  Give me one second.

19             Just give me a second.  I have a pretty

20   targeted question.  I'm just trying to find it.

21             THE WITNESS:  Okay.

22   BY MR. ISAJIW:

23        Q    In paragraph 117, on page 44 --

24        A    117.  Okay.

25        Q    -- you've discussed the bid-ask spread.

1    And the bid-ask spread is one of the, to your

2    understanding, that's one of the Unger/Krogman

3    requirements -- sorry, factors; correct?

4         A    Correct.

5         Q    And you state that (as read and/or

6    reflected:)

7                   The average bid-ask spread for

8              FXCM's common stock during the

9              Class Period was 0.28 percent.

10             Why is it important, in your view, to study

11   the bid-ask spread?

12        A    Well, it's what the court requires.  That's

13   what the court asks for.  So I presented it.

14        Q    So a number of times you have said that's

15   what the court asked for.  You haven't been retained

16   by the court in this matter; right?

17        A    No.  But I have presented -- I have been

18   retained to present evidence that the court will

19   consider.  And so to the extent that, in forming an

20   opinion about market efficiency, this is one of the

21   factors a court typically undertakes or looks at,

22   I've included it in my report.

23        Q    Okay.

24             And you've been asked by the plaintiffs'

25   counsel to be an expert to submit a report that the

Page 186

1    court will consider in connection with a
2    determination as to whether or not these securities
3    traded in an efficient market; is that correct?
4         A    That sounds right.
5         Q    Okay.
6              So as an expert economist, why as an
7    economist would you -- analyzing the bid-ask spread
8    be important in your determination as to whether or
9    not a market is efficient for FXCM's common stock?
10        A    Well, so as an economist, I'm not sure I
11   would -- undertaking an academic exercise, I'm not
12   sure I would normally look at whether or not FXCM
13   traded in an efficient market.
14             To the extent that this is something that
15   is commonly relied upon by courts and their
16   determination of market efficiency, I have included
17   this analysis.
18        Q    Okay.
19             In your determination as an economist, do
20   you have a belief that a narrow bid-ask spread is --
21   tends to support the concept that a security traded
22   in an efficient market?
23        A    Tends to?
24             I believe it -- some economists -- well,
25   let's see.  I'm pretty sure -- right.  So -- and

```
 1   this is paragraph 7 of my appendix.
 2            MR. HAKLAY:  What page are you on, sir?
 3            THE WITNESS:  Page 62.
 4            MR. HAKLAY:  Thank you.
 5            THE WITNESS:  So (as read and/or
 6   reflected:)
 7                    A narrow bid-ask spread of a
 8            particular security is also often
 9            associated with efficiency.  In
10            academia, a stock's bid-ask spread
11            is frequently used as a measure of
12            liquidity or cost of trading.
13            (Reporter clarification.)
14            THE WITNESS:  So that's my understanding of
15   bid-ask spread in academia and why it's sometimes
16   looked at.
17            I don't know of a specific paper in
18   academia -- well, let me correct that.
19            There might be papers that talk about
20   market efficiency and bid-ask spread.
21            But I personally have presented it here
22   based upon my assignment and what my understanding
23   of what courts like to look at in their
24   determination of market efficiency.
25   ///
```

```
                                          Page 188

 1    BY MR. ISAJIW:

 2         Q    Independent of -- if a court did not have

 3    an opinion that looked at bid-ask spread, would you

 4    view it as an important thing to evaluate in

 5    connection with your analysis as to whether or not

 6    FXCM securities traded in an efficient market?

 7         A    So if I was performing an academic study

 8    where I was trying to determine whether an

 9    individual stock traded in an efficient market,

10    that's not anything I've ever seen.

11              But given your hypothetical, which, again,

12    I have never seen that I recall anyway in academia,

13    it may be a factor that I would take into

14    consideration, but it's an incomplete hypothetical

15    and not something that most academicians would ever

16    consider or take into consideration.

17              Not the bid-ask spread.  I'm saying most

18    academicians would not perform an event study for a

19    single stock.

20         Q    Just in this same section on Unger/Krogman,

21    you discuss two additional factors, market

22    capitalization and float?

23         A    I'm sorry.  I closed this.  What page are

24    we looking at?

25         Q    42 and 43.
```

Case 1:21md-02989-RAEBOkunt 588ument 8818d7on FileD67/12/20 0Page 202B3 of Page 192 of 332

1      A    42 and 43.

2      Q    For market capitalization as an economist

3  conducting this analysis, do you have an independent

4  view as to whether or not market capitalization is

5  relevant to a determination of trading in an

6  efficient market?

7      A    Again, I don't think economists --

8  academicians look at a single company and try to

9  determine whether or not a single stock trades in an

10  efficient market.

11          Now, that having been said, let me take a

12  look at my appendix here.

13     Q    I'm not asking for support from others.

14  I'm just asking for your view today.

15     A    Right.

16          Well, and so I'm refreshing my memory of

17  what other economists have said and that will, then,

18  help refresh my memory as to how I -- what my

19  position on such things are.

20          Yeah.  So -- yeah.  So Fama -- right.  It

21  says (as read and/or reflected:)

22                 Similarly, financial

23             economists have considered the

24             market value -- I'm reading from

25             paragraph 6 of my appendix -- and

Page 190

```
 1              its relationship with market
 2              efficiency.  Larger companies tend
 3              to attract more analysts and news
 4              media coverage and gain the
 5              attention of a greater number of
 6              investors.
 7         MR. HAKLAY:  Slow down.
 8         THE WITNESS:  Oh, sorry.
 9         A little too much Coke.
10         MR. HAKLAY:  Keep going.
11         THE WITNESS:  (As read and/or reflected:)
12              All of these characteristics,
13         which accompany a large market
14         capitalization, promote, and,
15         therefore, tend to support, market
16         efficiency.
17         So I agree with that statement.
18    BY MR. ISAJIW:
19       Q   For float, again, I'm not asking what other
20    economists believe.  I'm asking what you, sitting
21    here today as an economist, believe, does the size
22    of the public float -- is the size of the public
23    float relevant in your professional opinion to
24    whether a security trades in an efficient market?
25       A   Well, so -- okay.
```

1    So you talked about my professional opinion

2  as an academician.  I don't believe I've ever seen

3  any academic articles that discuss float as a factor

4  in market efficiency.  And so that informs my

5  opinion.

6    I mean, look at if no one ever looked at it

7  before, I might say, well, okay, then I probably

8  wouldn't look at it.  Right.  Seems reasonable.

9    So to the extent that I'm not sure I've

10  seen it discussed anywhere, I don't -- I don't think

11  float in and of itself is some kind of magic

12  criterion.

13    But, again, the courts find it informative.

14  That's what -- this is one of the factors that they

15  consider in their analysis.  And so I present it

16  here in my report.

17    Q   Okay.

18    Let's take a look at the note section of

19  your report, starting on page 45.  I just wanted to

20  go through some of the Cammer factors with respect

21  to the notes.

22    Before we start:  Are you aware of any

23  court ruling suggesting that there could be a

24  presumption of efficiency for bonds based on the

25  same analysis that you performed for the common

Page 192

1    stock?

2        A    I have no idea.

3        Q    Okay.

4            In your professional opinion, do you

5    believe it's appropriate to apply the same Cammer

6    factors in an analysis of market efficiency to bonds

7    as it is for common stock?

8        A    Well, so let's go to my report,

9    paragraph 119 (as read and/or reflected:)

10                In assessing bond market

11           efficiency, courts recognize that

12           bond characteristics are distinct

13           from common stock characteristics.

14           And that cites to at least one securities

15   case.   (As read and/or reflected:)

16               The indicia typically relied

17           upon in assessing market efficiency

18           for equity securities need to

19           therefore be adjusted, when

20           appropriate, for the bond market.

21               Trading behavior --

22           Now in paragraph 120 (as read and/or

23   reflected:)

24               Trading behavior in the bond

25           market can differ drastically from

Page 193

1       the stock market.  Because the bond

2       market is comprised of large

3       institutional investors, pension

4       funds, and hedge funds that trade

5       in much larger volumes per

6       transaction than typical trades in

7       the stock market, bonds also trade

8       less frequently than typical

9       stocks.

10           Though the trading frequency

11      in the bond market is typically

12      lower, participants in the bond

13      market, being institutions, pension

14      funds, and hedge funds, are

15      nonetheless very well-informed

16      traders.

17           Thus, even if the FXCM notes

18      do not trade every day during the

19      Class Period, this pattern is

20      typical in the bond market, is not

21      unique to FXCM notes and does not

22      indicate an efficient market --

23      MR. HAKLAY:  An inefficient market.

24      THE WITNESS:  -- an inefficient market.

25      Thank you very much.

Page 194

```
 1   BY MR. ISAJIW:
 2        Q    Okay.  Thank you for that.
 3             You just mentioned in your response,
 4   patterns that are typical for the bond market.
 5             What, in your experience, would be the
 6   typical trading volume or turnover as a percentage
 7   of par for a corporate bond?
 8        A    I have no way to answer that.
 9             Typical?  I have no idea.
10        Q    Okay.
11             Do you believe that a typical corporate
12   bond would trade in any way that is different from a
13   typical Rule 144A bond?
14        A    Do I think a corporate bond would trade --
15   so what do you mean by "trade"?
16        Q    What does the term "trading bonds" mean to
17   you?
18        A    Well, I'm trying -- I mean, bonds being
19   sold back and forth.
20        Q    Okay.
21             Do you believe a typical corporate bond
22   would be sold back and forth at a higher or lower
23   level than a typical Rule 144A bond?
24        A    That's not something I ever thought about.
25        Q    Do you believe that bonds generally trade
```

1    as frequently as stocks trade?

2              MR. HAKLAY:  Objection.  Vague.

3              You can answer.

4              THE WITNESS:  I think bonds typically trade

5    less -- normally, if I were to look at one

6    corporation's equity and its bonds, normally the --

7    there would be more frequent trading in the equity

8    than in the bond.  I guess -- so if that's your

9    definition of frequency, I guess that addresses

10   that.

11       Q    I believe in paragraph 120 where you just

12   read, four lines down, there's a sentence that says

13   (as read and/or reflected:)

14                  Though the trading frequency

15              in the bond market is typically

16              lower, participants in the bond

17              market, being institutions, pension

18              funds, and hedge funds, are

19              nonetheless very well-informed

20              traders.

21              Did I read that correctly?

22       A    That is correct.

23       Q    And when you say "typically lower," what

24   are you comparing it to?

25       A    The equity market.

Page 196

1    Q    Okay.

2         And what is the basis for your statement

3    that participants in the bond market are nonetheless

4    very well-informed traders?

5    A    My understanding of the bond market.

6    Q    Who are participants in the bond market,

7    based on your understanding?

8    A    Well, again, quoting from paragraph 120 (as

9    read and/or reflected:)

10             Institutions, pension funds,

11        and hedge funds.

12        Now, obviously that does not -- although

13   those are typically informed traders, that obviously

14   doesn't exclude individuals.

15   BY MR. ISAJIW:

16   Q    Cammer Factor 1, I believe we discussed

17   earlier today, focuses on the volume of trading in

18   connection with the security; is that correct?

19   A    Correct.

20   Q    And generally, higher volume of trading, I

21   think, would be associated with more likely

22   efficient market than lower trading?

23   A    I think courts have found that, what is it?

24   Over 2 percent -- oh, let me go back to my other

25   discussion in Cammer Factor 1.

1      Q    So regardless of actual percentages, you

2    state in paragraph 120, in the last sentence, that

3    the lower trading frequency of FXCM notes (as read

4    and/or reflected:)

5                    Does not indicate an

6            inefficient market.

7            Why not?

8      A    Because bonds typically trade less

9    frequently than equities.

10     Q    Is there a threshold of trading below which

11   you think would be an indication of an inefficient

12   market?

13     A    Hmm.  That's not something I've thought

14   about.  And to the extent that this met the

15   2 percent threshold that's been specified previously

16   by the Cammer court, that's not something I've

17   really thought about.

18     Q    In paragraph 125, you determine that the

19   (as read and/or reflected:)

20                    Trading volume as a percentage

21           of par value of outstanding notes

22           for the FXCM notes was

23           2.92 percent.

24           Is that correct?

25     A    That is correct.

1      Q    You go on to say (as read and/or

2   reflected:)

3                    This level of average weekly

4              trading volume exceeded the Cammer

5              benchmark of 2 percent necessary

6              for a "strong presumption" of

7              market efficiency for common stock

8              securities.

9              (Reporter clarification.)

10  BY MR. ISAJIW:

11     Q    Did I read that correct?

12     A    You did.

13     Q    Okay.

14              The 2.9 percent based on that sentence

15  there was related to common stock; right?

16     A    You mean the court's -- when the court was

17  discussing Cammer, were they referring to equity?

18  Yes.

19     Q    Okay.

20              And they weren't -- the 2.92 percent

21  threshold was not in connection with the notes;

22  right, with the fixed income or debt security?

23     A    Well, that was -- I don't understand the

24  question.

25              The 2.92 percent was the average weekly

1    trading volume of the notes.

2        Q   Okay.

3            So from your perspective, and you're doing

4    the analysis, is the analysis equal?

5            Is 2.92 percent good enough for common

6    stock; same should be true for notes?  Or do you

7    need to adjust the analysis in some way when you're

8    dealing with notes?

9        A   I'm sorry.  I just don't understand the

10   question.

11           It's -- the court has determined in Cammer

12   that 2 percent is sufficient for equities.  To the

13   extent that I've stated here that bonds trade less

14   frequently than equity, the fact that it meets that

15   2 percent threshold might indicate to the court,

16   probably would be considered by the court in their

17   determination as to whether or not these bonds

18   traded in the efficient market.

19           That's the answer to the best of my

20   ability.  I'm not quite sure I understand the

21   question.

22       Q   So the trading period you used to analyze

23   the notes was January 24th, 2014, to February 6th,

24   2017; correct?

25       A   I'm sorry.  Where are you looking?

```
                                              Page 200
```

1      Q    I'm sorry.  I said "January."  I meant

2    "June."

3      A    Where are you looking?

4      Q    This is the notes trading period.  I'm not

5    pointing to a particular part of your report.

6           It is a part of your report.

7      A    Right.  So yes.

8           (As read and/or reflected:)

9                 The test described herein for

10               the F- -- and I'm reading from

11               paragraph 122 now -- for the FXCM

12               notes were performed over the

13               period during the Class Period when

14               trading data was available,

15               June 24th, 2014, through

16               February 6th, 2017.

17     Q    Would you concede that there was not an

18   efficient market for the notes before they began

19   trading on June 24, 2014?

20     A    I don't know enough about the notes,

21   sitting here, to opine on that.

22          Are you telling me that that's what

23   happened?

24     Q    I'm just asking the question.

25          The notes were issued before June 24th,

1  2014; correct?

2       A    Let's see what he said.

3            Okay.  Could you reask the question,

4  please.

5       Q    Would you concede that there was not an

6  efficient market for the notes before they began

7  trading on June 24th, 2014?

8       A    That was not something that I was asked to

9  look at.

10       Q    Do you agree that before June 24th, 2014,

11  the notes were issued?

12       A    That's my -- well, I don't -- I believe

13  that is true.

14       Q    Okay.

15            Do you believe that -- strike that.

16            You were not asked to opine on the

17  efficiency of the notes prior to June 24th, 2014?

18       A    That is correct.

19       Q    In connection with your notes analysis, you

20  found an average weekly trading volume of 292 over

21  the entire Notes Period.

22            Sorry.  I said "292."  I meant

23  2.92 percent.

24       A    Correct.

25       Q    Okay.

```
                                        Page 202
```

1          Did you calculate a median weekly trading

2    volume over the same period?

3        A   I did not.

4        Q   Would it surprise you to know that the

5    median weekly trading volume for the notes over that

6    same percent was 0.54 percent?

7              MR. HAKLAY:  Objection.  Relevance.

8              THE WITNESS:  Would it surprise me?

9    BY MR. ISAJIW:

10       Q   Yeah.

11       A   Well, I've never seen a court look at

12   median statistics when looking at this -- doing this

13   type of analysis.

14             Would it surprise me?  I guess that's the

15   actual question.  I don't know.  It's not something

16   I really ever thought about.

17       Q   Okay.

18       A   As I said, look, bonds are different than

19   stocks.  They trade less frequently.

20       Q   In your analysis, would the significantly

21   lower median trading of the notes during the time

22   period be relevant to whether or not they traded in

23   an efficient market throughout that entire time

24   period?

25       A   Not necessarily.

1      Q    Would it be irrelevant?

2      A    Would it be irrelevant?

3           Well, I mean, to the extent that any

4    information has value, I suppose it, by definition,

5    would be relevant.  So I -- or would not be

6    irrelevant.  That's a double-negative.

7           So I don't know.  It's a philosophical

8    matter.  I would need to think about that more.

9      Q    Do you have any idea why the weekly trading

10   volume, as you calculated it, and the mean trading

11   volume would be so different?

12          MR. HAKLAY:  You mean "median"?  I thought

13   you said "mean."  That's why.

14          MR. ISAJIW:  Apparently, I did say "mean"

15   and I meant "median."

16          MR. HAKLAY:  It's otherwise the same.

17          THE WITNESS:  You're asking me why the mean

18   and median are different?

19   BY MR. ISAJIW:

20     Q    Yeah.

21     A    Again, bonds tend to trade less frequently

22   than equities, so it wouldn't surprise me that the

23   mean and median are different.

24     Q    If you look at Exhibit 3b on page 101 of

25   your report.

1      A    Exhibit 3b, did you say?

2      Q    I did.

3      A    Okay.

4      Q    I'm sorry.  I said "page 101" and I meant

5  page 100.

6      A    Ah, okay.  Yep.

7      Q    Is one explanation for the difference

8  between the average weekly and the median trading

9  volume the fact that there were small number of a

10  high-volume weeks at the beginning of the trading

11  period for the bond as composed to the rest of the

12  period?

13     A    I'm sorry.  High volume during the

14  beginning of the trading period?

15     Q    Yes.

16     A    I'm not quite sure I would agree with that

17  characterization.  But, I mean, I agree that there's

18  a difference between -- I would expect that there's

19  a difference between the median and the mean.

20     Q    So of --

21     A    I have presented what the court's asked

22  me -- or usually asked experts to present.  So

23  that's what I did.

24     Q    Okay.

25          And other than the fact that the courts

1    usually ask experts to present on this information,

2    you have no independent view of the information's

3    meaningfulness?

4         A    Hmm.   Interesting question.

5              THE WITNESS:  Could you repeat the

6    question, please.

7                   (The record was read back as

8                   follows:

9                      "Question:  And other than the

10                   fact that the courts usually ask

11                   experts to present on this

12                   information, you have no

13                   independent view of the

14                   information's meaningfulness?")

15              THE WITNESS:  I was asked to opine upon

16   market efficiency for FXCM and their equities and

17   notes.

18              Beyond my -- beyond my job in this case,

19   I'm not sure that's -- your questions are things

20   that I've thought about.

21   BY MR. ISAJIW:

22        Q    Okay.

23              Would it be relevant in your analysis if

24   the notes had, during the entire period, only

25   35 weeks with volume over 2 percent, but 103 weeks

Page 206

 1  with volume under 2 percent?

 2       A    Would it be relevant to my analysis?

 3            Well, again, to the extent that courts look

 4  at average trading volume, no, that would not be

 5  relevant to my analysis.

 6       Q    Did you analyze the notes trading on a

 7  quarterly basis?

 8       A    Did I analyze the notes traded on a

 9  quarterly basis?

10            I'm not sure how to answer that question.

11  I looked at average weekly trading volume.  I

12  don't -- I mean, I suppose I could somehow aggregate

13  these things into quarters.

14       Q    Okay.

15            And you looked at average weekly trading

16  volume because that is what you understand courts to

17  look at as a relevant factor?

18       A    That -- under Cammer, that is correct.

19       Q    If a security had an average weekly trading

20  volume of 0.5 percent over several quarters within a

21  period, would you view that as consistent with an

22  efficient market in connection with Cammer Factor 1?

23       A    It certainly could be, but it wouldn't --

24  yeah, it certainly could be.

25       Q    Is there any situation where it would not

Page 207

1    be?

2         A    So it would not be what?

3         Q    Consistent with an efficient market in

4    connection with Cammer Factor 1.

5         A    Is there a case where it would not be

6    consistent with -- is there a double-negative in

7    there?  I don't know why I'm tripping over this.

8              Could you just restate the question and

9    I'll try to answer it.

10        Q    In your expert -- in your analysis, if you

11   looked at a security whose average weekly trading

12   volume was 0.05 percent over several quarters of a

13   Class Period, would you perceive that to be an

14   indication of it being in an inefficient market

15   pursuant to Cammer Factor 1?

16             MR. HAKLAY:  Objection.  Asked and

17   answered.

18             Go ahead.

19             THE WITNESS:  It would depend on the

20   security.

21             Certainly -- I mean, look, if I present --

22   I don't remember.  Did you say "average"?

23             I'm pretty sure a court would -- well, I'm

24   not going to speculate what a court would do.

25   ///

```
 1   BY MR. ISAJIW:
 2        Q   I'm not asking for a court's opinion.  I'm
 3   asking for yours.
 4        A   Yeah.  And so it would depend upon the type
 5   of security.
 6        Q   If the security was a Rule 144A note.
 7        A   And so what happened with the Rule 144A
 8   notes?  The average -- was it the average trading
 9   volume you were talking about?
10        Q   If it had an average weekly trading volume
11   of 0.5 percent over several quarters within a Class
12   Period, would that be consistent with market
13   efficiency pursuant to Cammer Factor 1?
14             MR. HAKLAY:  Objection.  Asked and
15   answered.
16             THE WITNESS:  I don't -- I mean, pursuant
17   to Cammer Factor 1?
18             Cammer Factor 1 gives you a specific
19   benchmark at least for equities.
20             We -- I think we've read paragraph 120
21   numerous times.  Bonds are a different animal.  So I
22   don't know how to answer your question because
23   Cammer Factor 1, at least the Cammer court gave us
24   some thresholds.  So I don't know how to answer your
25   question.
```

```
 1   BY MR. ISAJIW:

 2        Q    What were those thresholds?

 3        A    2 percent and 1 percent.

 4        Q    And 0.5 percent in my hypothetical is below

 5   those thresholds; correct?

 6        A    In your hypothetical?

 7        Q    Yeah.

 8        A    Yes.  But it's not -- again, the Cammer

 9   court was not ruling on bonds.  This was an analysis

10   of equities.

11        Q    Okay.  Thank you.

12             Let's move to Cammer Factor 2.

13             MR. HAKLAY:  Let's take a -- it's been an

14   hour.  Let's take a break.  The witness has

15   indicated to me he would like to take a break.

16             MR. ISAJIW:  When did he indicate that?

17             MR. HAKLAY:  About ten minutes ago.  I told

18   him it was ten more minutes until the hour goes by.

19             MR. ISAJIW:  I apologize.

20             THE WITNESS:  He is right.  I did.

21             MR. HAKLAY:  He's doing his watch thing and

22   I'm, like, ten more minutes.

23             MR. ISAJIW:  He did not indicate to me.

24             MR. HAKLAY:  No.  No.  No.  He looked at me

25   and I slapped him down.
```

```
 1            MR. ISAJIW:  All right.  We can go off.

 2            THE VIDEOGRAPHER:  We're going off the

 3    record.

 4            The time is 2:46 p.m.

 5            (Recess was taken at 2:46 p.m.

 6            until 2:59 p.m.)

 7            THE VIDEOGRAPHER:  We are back on the

 8    record.

 9            The time is 2:59 p.m.

10    BY MR. ISAJIW:

11        Q   So, Dr. Werner, I want to focus on Cammer

12    Factor 2 in relation to the notes, which is an

13    analysis that begins on page 47.

14            Are you there?

15        A   I am.  Oh, sorry, yes.

16        Q   Here is an example where you take a

17    slightly different approach for the notes than you

18    do with the stock in connection with analyst reports

19    where you look at, quote, other avenues of

20    information dissemination.

21        A   I'm sorry.  Where are you looking at?

22            Oh, because it -- oh, I see where you're

23    reading.

24            Go ahead.

25        Q   Why did you do that?
```

Case 1:2sed-1-0790-00946-BAeBOcMent 588-2mentit88d7onFileSDO7t2/20 08/28/2023ofP3ge 214 of 332

1      A   I'm not sure -- I mean -- while that is the

2   statement, I'm not sure that that's an accurate

3   statement.  So let's go back to my discussion of

4   equities.

5           Yeah, that's poorly worded on my part.

6      Q   So you did not look at other avenues of

7   information dissemination?

8      A   I looked at analysts following FXCM.  So I

9   did that for equities.

10          I looked at their conference calls in both

11  cases.

12          What -- I'm sorry.  Just let me finish

13  here.

14          And I looked at news articles.  Maybe -- I

15  mean, I believe I -- again, I think I was just

16  inartful in stating that.

17     Q   Okay.

18     A   Oh, wait.  I'm sorry.  It's been a long

19  day.

20     Q   Did you -- let's just go back to your

21  analyst report.

22          Do you remember how many analyst reports

23  were issued over the full Class Period?  It's

24  paragraph 27 of your report.  That's the number.

25     A   I'm sorry.  Paragraph 27?

```
                                              Page 212

 1              Okay.  Now, I understand why I say a

 2      different approach or additional analyses.

 3              So -- right.  During the Class Period,

 4      1,608 stories -- this was for the equity Class

 5      Period.

 6          Q    Uh-huh.

 7              So in paragraph 27, the last sentence, you

 8      say that (as read and/or reflected:)

 9                  These firms and analysts

10                  released at least 263 reports and

11                  recommendations during the Class

12                  Period.

13          A    That is correct.

14          Q    And then in paragraph 126 --

15          A    Let me just write down that number.

16              Are you going to refer back to that number?

17          Q    I am.

18          A    Okay.  So where was that?  263.  Okay.

19          Q    And in paragraph 126 on page 47 --

20      actually, part of 126 that bleeds over to 48.  You

21      say (as read and/or reflected:)

22                  These firms and analysts

23                  released at least 89 reports and

24                  recommendations during the Notes

25                  Period.
```

Page 213

1        Do you see that?

2    A    I do.

3    Q    So that's a significantly fewer number of

4    reports; 263 versus 89?

5    A    Well, I would agree it's fewer.  We're

6    looking at different periods of time.

7        So by definition, yes, 89 is less than 263.

8    Q    Okay.

9        And for the notes, you found that

10   12 analysts followed FXCM during the Note Period?

11   A    That is what is stated in our

12   paragraph 120, yeah.

13   Q    And how did you conduct that analysis to

14   figure out the 12?  Did you actually just add them

15   all up yourself, or did somebody provide you with

16   that information?

17   A    Did I add them all up myself?

18       I believe that information was provided to

19   me.

20   Q    Okay.

21       And of the analysts that covered the

22   company in this period, in paragraph 127, you

23   indicate that three did not issue reports; is that

24   right?

25   A    Well, I believe that, yes, that is the gist

 1  of what I was saying in that paragraph.

 2      Q   In connection with a Cammer Factor 2

 3  analysis of analyst coverage, does the fact that an

 4  analyst doesn't issue a report weigh in favor of

 5  finding market -- an efficient market or against?

 6      A   I don't think that's something I've ever

 7  seen discussed in discussions of Cammer Factor 2.

 8      Q   Regardless of whether or not you've seen it

 9  discussed, do you have an opinion, sitting here

10  today?

11      A   No.

12      Q   Of all the analyst reports that you

13  considered in connection with your review, were any

14  of them specifically covering the FXCM notes?

15      A   I remember seeing a couple.

16      Q   Do you remember which ones?

17      A   I do not as I sit here today.

18      Q   And how many is a couple?

19      A   I don't recall.

20          But, again -- I mean, it's not clear to me

21  why the information -- the information would still

22  be firm relevance, so -- but, again, I don't

23  remember.  We'll leave it at that.

24      Q   When you say "a couple," do you mean five?

25  Ten?  A hundred?

Page 215

1      A    Where was that?

2      Q    We determined that there were 89 reports

3  and recommendations.

4      A    Right.  So that's the number I was looking

5  for.  So, yeah, it would definitely be less than a

6  hundred.

7      Q    Okay.

8      A    But I don't remember.

9      Q    Would it be 89?

10      A    No.

11      Q    Okay.

12           Would it be 40?

13      A    I don't -- I -- again, a couple.

14      Q    Okay.

15      A    So less than five.

16      Q    Okay.

17      A    Less than ten.  Is that sufficient?

18      Q    That's fine.  I'm just trying to get a

19  gauge.

20           So the analyst reports tended not to refer

21  to the FXCM notes?

22      A    They referred to the economic conditions of

23  the company, which would affect the FXCM notes.

24      Q    Did they also refer to the stock?

25      A    Yes.

1     Q   Okay.

2          So they specifically discussed one of the

3  securities at issue in this litigation, but they did

4  not discuss the other?

5     A   To the extent that they were not reports

6  that discuss both, I believe that statement is

7  accurate.

8     Q   And I think what we're getting at is the

9  majority of the reports you looked at were not both,

10  only --

11     A   I -- again, I said "a couple."  Less than

12  five or ten.  That's the answer.

13     Q   Is it relevant in your analysis as to

14  whether or not an analyst discusses the specific

15  security at issue in connection with the market that

16  you're studying?

17     A   Not necessarily.

18     Q   Why not?

19     A   Why?  Because we're worried about firm

20  information and its impact on securities.

21          And so to the extent that an analyst report

22  is talking about the firm's financial condition,

23  that is going to affect both equity and stock.

24     Q   Would it be more likely that a security

25  trades in an efficient market if the analyst

```
 1   discussed the security as opposed to just the
 2   company?
 3        A    That's an interesting question.  I've never
 4   really thought about that.
 5             I would need to think about that more.
 6        Q    Sitting here today, you have no view on
 7   that?
 8        A    It's -- well, yeah, I would want to think
 9   about that more.
10        Q    One of the things you considered in your
11   analysis for Cammer Factor 2 for your notes that you
12   did not for the common stock is institutional
13   ownership.
14        A    That is correct.
15        Q    Why is that?
16        A    Because these -- as economists, we
17   typically think of these institutions as more
18   informed, and, thus, the fact that they held those
19   would suggest that information was incorporated into
20   the bond prices.
21        Q    Okay.
22             Is it -- what is your understanding as to
23   who -- who is eligible to purchase the FXCM notes at
24   issue in this case?
25        A    Well, I -- I need to refer somewhere else
```

1   in my report, but looking at paragraph 130, (as read

2   and/or reflected:)

3              Because Rule 144A notes are

4          held and traded solely as by QIBs,

5          the entire issue of the FXCM notes

6          was owned by an institutional

7          investors.

8          I don't remember what -- it's, like,

9   qualified in -- I don't remember exactly what QIB

10  stands for or the exact -- something about qualified

11  investors.  So I think I have that somewhere else in

12  my report.

13      Q   Okay.

14          What is your understanding of what a

15  Rule 144A note is just at a very high level?

16      A   Well, I mean, it's a bond offering

17  obviously.  It can only be -- it can only be held by

18  QIB investors.  But I think --

19      Q   Is that true of all bond offerings, that

20  they can only be held by QIB investors?

21      A   No.

22      Q   What's different at a high level between

23  Rule 144A notes and other bond offerings?

24      A   Well, so these are -- and I'm reading from

25  paragraph 21 (as read and/or reflected:)

Page 219

```
 1              Notes that are not registered
 2         with the SEC and are exempt from
 3         the typical registration
 4         requirements are commonly referred
 5         to as Rule 144A issues.
 6              Notes issued under Rule 144A
 7         can only be traded by qualified
 8         "investment" buyers, hence QIBs --
 9         MR. HAKLAY:  I think it's "institutional."
10         THE WITNESS:  What did I say?
11         MR. HAKLAY:  "Investors."
12         THE WITNESS:  (As read and/or reflected:)
13              -- qualified institutional
14         buyers, which are entities acting
15         for [their] own account or the
16         accounts of other qualified
17         institutional buyers, that in the
18         aggregate owns and invests on a
19         discretionary basis at least
20         $100 million in security of issuers
21         that are not affiliated with the
22         entity.
23    BY MR. ISAJIW:
24         Q   Other than what's on that paragraph, do you
25    have any other understanding of Rule 144A?
```

Case 1:21-cv-11269-BAe BOkument D58u2 mEnti88d7on FHeS D6/d2/48 08/28/2023 ofPa3ge 223 of 332

1      A    I think that gives an accurate description

2    of my understanding of Rule 144A.

3      Q    And that's the entirety of your

4    understanding of Rule 144A as it relates to your

5    opinions in this case?

6      A    I don't know.  It's an overly broad

7    question.  I'm not sure how to answer that.

8      Q    Have you ever done an event -- I'm sorry.

9           Have you ever done a market efficiency

10   analysis in any other matters related to Rule 144A

11   bonds?

12     A    So yes.

13     Q    Which ones?

14     A    I don't know.  I mean, I've done hundreds

15   of cases over my lifetime.

16     Q    How many of those hundreds of cases do you

17   believe had to do with Rule 144A notes?

18     A    I have no idea.

19     Q    Proportionately, do you think it is

20   20 percent?  10 percent?  5 percent?

21     A    In my lifetime, in terms of cases that I've

22   worked on?

23     Q    In the last ten years.

24     A    Okay.

25          Let me ask a clarifying question.  Do you

```
 1   mean issued expert reports on?
 2        Q   Let's start there.
 3        A   Okay.
 4            Because that is a different question than
 5   what you asked me.
 6        Q   Okay.
 7            Let's ask that question.
 8        A   I have no idea.
 9        Q   How many times have you issued an expert
10   report on Rule 144A bonds?
11        A   I have no idea.
12        Q   Other than this case, do you remember that
13   you have, in fact, issued an expert report on a
14   Rule 144A bond?
15        A   I'll stick with I have no idea.
16        Q   What about just being engaged as a
17   consultant?  How many times have you been engaged as
18   a consultant in connection with an analysis for an
19   efficient market in a Rule 144A bond?
20        A   Yeah, I don't recall.  When did I start --
21   well, let's go to my ...
22        Q   I'm not looking for exact numbers.  Is it
23   at least once?
24        A   Sure.
25        Q   Okay.
```

```
 1          Is it more than 20?
 2     A    Again, at this point -- at that point, I
 3  would be speculating.
 4     Q    Okay.
 5     A    I have no idea -- when I say "I have no
 6  idea," I mean I have no idea.  If -- I know it's
 7  more than one, less than 20.  I have no idea.
 8     Q    Okay.
 9     A    I'm giving you the best answer I possibly
10  can give you.
11     Q    I appreciate that and I'm trying to make
12  sure we get to there.  So ...
13          In connection with your Cammer Factor 2
14  analysis of the FXCM notes, would you consider
15  coverage by rating agencies to be potentially
16  important?
17     A    With regards to 144A bonds?  I'm sorry.
18          THE WITNESS:  Could you reread the
19  question.
20          (The record was read back as
21          follows:
22              "Question:  In connection with
23          your Cammer Factor 2 analysis of
24          the FXCM notes, would you consider
25          coverage by rating agencies to be
```

 1              potentially important?")
 2              THE WITNESS:  So when you say "coverage by
 3     the rating agencies," do you mean of the bonds?
 4     BY MR. ISAJIW:
 5         Q    What is your understanding of what a credit
 6     rating agency does when it covers a fixed income
 7     security?
 8         A    Well, it performs analysis.  It looks at --
 9         Q    What kind of --
10         A    Looks at things like the firm's
11     profitability.
12         Q    To do -- to determine what?
13         A    How "safe" the bonds are for -- well, and I
14     put safe in quotation marks because rating agencies
15     don't always do the best jobs.
16              To help inform people about whether or not
17     the risk associated with holding these securities.
18         Q    Do you have a view as an economist as to
19     whether or not a bond being covered by a rating
20     agency would tend to support it being traded in an
21     efficient market?
22         A    I could certainly see where that would be
23     something that I might take into consideration.
24              And I can think of other cases where I have
25     looked at that.

Case 1:21-cv-01969-CM-BCM Document 58-2 Filed 09/01/23 Page 227 of 332

```
 1        Q    Okay.

 2             Would the lack of rating agency coverage

 3   for a security tend to be inconsistent with the

 4   conclusion that it traded in an efficient market?

 5        A    Not necessarily.

 6        Q    But possibly?

 7        A    Anything is possible.

 8        Q    Is it more likely that a security trades in

 9   an efficient market if it is covered or not covered

10   by a rating agency?

11        A    That's not any -- that's not a question

12   I've ever been asked to consider, so it's not

13   something I've ever thought about.

14        Q    Okay.

15             Sitting here today, you've never thought of

16   it once?

17        A    No.

18        Q    Okay.

19             Do you know if these FXCM notes were

20   covered by a rating agency?

21        A    I don't believe so, but I don't -- I don't

22   specifically recall.

23        Q    Is it something that you looked into when

24   you were conducting your analysis?

25        A    As I sit here, I don't recall.  I mean --
```

```
 1    here.  I'm sorry.  Let's be more precise.
 2            Yeah.  To the best of my recollection, I
 3    don't believe they were covered by a ratings agency.
 4        Q    Okay.
 5            Looking at page 48, under Cammer Factor 2,
 6    one of the additional factors you looked at is
 7    institutional ownership.
 8            Do you know which institutions transacted
 9    in the notes during the Notes Period?
10        A    As I sit here today, no.
11        Q    Is it anywhere in your report?
12        A    I don't believe so.
13        Q    Is that information available to you?
14        A    I don't believe so.
15        Q    Did you request it?
16        A    No.
17        Q    So let's move to Cammer Factor 3,
18    "Prominent Underwriters and Market Makers."
19            This is another example where you took a
20    slightly different analysis from the common stock to
21    the notes in that you discuss not only market makers
22    but also underwriters; is that correct?
23        A    Correct.
24        Q    Why is that at a very high level?
25        A    At a very high level?  Well, underwriters
```

Page 226

1    oftentimes make markets -- well, let's -- yeah.  As

2    I stated here (as read and/or reflected:)

3                Investment banks that

4            underwrite --

5            And I'm looking at paragraph 132. (As read

6    and/or reflected:)

7                Investment banks that

8            underwrite notes typically then

9            serve as market makers for the

10           notes.

11               It would be a mistake to think

12           that once the bonds are all sold,

13           the investment banking firm's ties

14           with the deal are ended.  Those who

15           bought the bonds will look to the

16           investment banking firm to make a

17           market in the issue.  This means

18           that the investment banking firm

19           must be willing to take a principal

20           position in a secondary market

21           transaction.

22       Q   And the footnote to the section of your

23   report you just read references (as read and/or

24   reflected:)

25               "The Primary and Secondary

Page 227

```
 1            Bond Markets," by Frank J. Fabozzi,
 2            F-a-b-o-z-z-i, and Frank J. Jones,
 3            Chapter 3, in "The Handbook of
 4            Fixed Income Securities," 7th
 5            edition, edited by Frank J. Fabozzi
 6            and Steven V. Mann.
 7            Is that correct?
 8      A    That is correct.
 9      Q    Other than that source, what are you basing
10  that statement on?
11            The statement that investment banks
12  underwrite notes -- that investment banks that
13  underwrite notes typically then serve as market
14  makers for the notes.
15      A    I don't know.  Thirty years of experience
16  doing Ph.D., which focused on the role of investment
17  banks in securities offerings.
18      Q    In connection with notes?
19      A    Specifically 144A notes?  No.  But in
20  general, yes.
21      Q    Okay.
22            Does Fabozzi discuss how long an investment
23  bank will act as a market maker after the initial
24  issuance of a note?
25      A    As I sit here, I don't recall.
```

Page 228

1      Q   Do they discuss whether all of the

2   underwriters who are involved in the initial

3   issuance of a note will continue on as market

4   makers?

5      A   As I sit here, I don't recall.

6      Q   Do you know in connection with this

7   analysis how long any of these underwriters operated

8   as a market maker in connection with the FXCM notes?

9      A   I don't -- I need to relook at -- I need to

10  relook at the TRACE data, but as I sit here, no.

11     Q   Would the TRACE data tell you which

12  underwriters operated as a market maker in

13  connection with the 144A notes?

14     A   I don't -- I don't recall as I sit here.

15     Q   Do you have any understanding as to whether

16  the underwriters acted as a market maker throughout

17  the entire notes period at issue here?

18     A   I do not.

19     Q   Did you do any investigation to determine

20  whether or not the underwriters acted as a market

21  maker throughout the entire Notes Period here?

22     A   As I sit here, I don't recall.

23     Q   To the extent -- to the extent these

24  underwriters did not act as a market maker for the

25  notes throughout the Notes Period, would that tend

1  to indicate that the notes did not trade in an

2  efficient market?

3          MR. HAKLAY:  Objection.

4          THE WITNESS:  No.

5  BY MR. ISAJIW:

6      Q   It would at least remove whatever evidence

7  of trading in an efficient market was ascribable to

8  the time period when they did act as a market maker;

9  is that correct?

10     A   I'm sorry.  I don't understand the

11 question.

12     Q   If I understand what you're saying in this

13 report correctly, the fact that underwriters act as

14 market makers for these notes is one -- under Cammer

15 Factor 2, one indicia that the notes traded in an

16 efficient market; is that correct?

17     A   I believe that's accurate.

18     Q   Okay.

19         MR. HAKLAY:  I'm sorry.  I think you meant

20 Cammer Factor 3.  Just so the record is clear.

21         THE WITNESS:  Oh, yeah, sorry.

22         MR. ISAJIW:  Thank you for your

23 clarification.

24         MR. HAKLAY:  You both meant it, I know.

25 ///

Page 230

```
 1   BY MR. ISAJIW:
 2       Q   So to the extent that wasn't true for some
 3   period of the Notes Period, that would no longer
 4   support for the period where it wasn't true that the
 5   notes traded in an efficient market; correct?
 6       A   Not necessarily.
 7       Q   I'm just -- so if it is true that an
 8   underwriter acting as a market maker tends to
 9   support efficiency, it can't also be true that an
10   underwriter not acting as a market maker would still
11   support the efficiency; it stopped.
12       A   Well, okay.  I guess you then need to
13   discuss or differentiate between efficiency and
14   inefficiency.  Right.
15           Efficiency is not a yes-or-no phenomenon.
16   It's not a bipolar or two tail, whatever you want --
17   however you want to say it.  It is not a yes or no.
18   It is on a sliding scale.
19       Q   So to the extent on that sliding scale that
20   an underwriter acting as a market maker tends
21   towards efficiency, when it stops acting as a market
22   maker, it no longer tends towards efficiency, does
23   it?
24       A   I'm not sure that's correct.  I would need
25   to think about it more.
```

```
 1        Q    Other than the underwriters for the FXCM

 2   notes, how many market makers were there?

 3            And I'll point you to paragraph 133, which

 4   I believe is where you describe -- paragraph 144 --

 5   no.  Paragraph 133, it says (as read and/or

 6   reflected:)

 7                   Additionally, Barclays,

 8             Sandler O'Neill, and UBS published

 9             a report stating that they made a

10             market in FXCM securities during

11             the Class Period.

12             Did I read that correctly?

13        A    That's correct.

14        Q    The reason I'm asking is:  Do you know as

15   part of your analysis that Barclays, Sandler

16   O'Neill, and UBS made a market in FXCM notes during

17   the Notes Period?

18        A    I'm sorry.

19            THE WITNESS:  Could you reread that,

20   please.

21            (The record was read back as

22             follows:

23                  "Question:  Do you know as

24             part of your analysis that

25             Barclays, Sandler O'Neill, and UBS
```

```
 1          made a market in FXCM notes during
 2          the Notes Period?")
 3          THE WITNESS:  I would need to take a
 4    close -- a closer look at these reports to refresh
 5    my memory.
 6    BY MR. ISAJIW:
 7      Q   Would -- which reports are you talking
 8    about?
 9      A   The reports published by Barclays, Sandler
10    O'Neill, and UBS where they state they made a market
11    in FXCM securities during the Class Period.
12      Q   Okay.
13          So this is in the notes section of your
14    analysis; correct?
15      A   That is correct.
16      Q   And you're citing these in connection with
17    FXCM securities, not stock or notes, but securities,
18    the broader term.  And you're citing the Class
19    Period, not the Notes Period.  Again, the broader
20    term.
21          So I'm just trying to determine if you did
22    any analysis in connection with your report to
23    determine that these three entities were market
24    makers in the notes for the subsection of the Class
25    Period that was the Notes Period.
```

Page 233

1     A    Right.

2          And so in order to refresh my memory, I

3    would need to look at the reports in which those

4    statements were made.

5     Q    Did you previously look at the reports in

6    which those statements were made and conclude that

7    they did and now you just don't remember?  Or did

8    you not do the analysis initially?  That's what I'm

9    trying to understand.

10    A    Right.  And I don't recall.

11    Q    Okay.

12         Would you agree that there are

13   significantly few market makers for the notes than

14   there were in your analysis for the class -- for the

15   common stock?

16         MR. HAKLAY:  Objection.  More

17   significantly.

18         THE WITNESS:  Could you reread the

19   question, please.

20   BY MR. ISAJIW:

21    Q    You identified 205 market makers for FXCM

22   common stock; correct?

23    A    That is correct.

24    Q    Okay.

25         At best, based on what I'm reading in your

1    report, there are between 5 and 7 potential market

2    makers for the notes, although it's unclear, based

3    on the report, how many of them were actually market

4    makers for the notes.

5              So what I'm asking is, did you do anything

6    in your analysis to account for the fact that there

7    is a significant difference in the number of market

8    makers in common stock, 205, versus the notes,

9    roughly 5 to 7?

10             MR. HAKLAY:  Objection.  Vague.

11             THE WITNESS:  Yeah.  I don't understand the

12   question.

13             What type of analysis are you referring to?

14   BY MR. ISAJIW:

15        Q    You did an analysis on market efficiency.

16        A    Correct.

17        Q    For both the common stock and the notes;

18   correct?

19        A    That is correct.

20        Q    In both of those analysis, you looked at

21   Cammer Factor 3, which deals with, amongst other

22   things, market makers; is that correct?

23        A    That is correct.

24        Q    Is it your view that more market makers

25   tend to support a finding of market efficiency than

```
                                            Page 235

 1    less market makers?

 2         A    I don't know how courts rule on that.

 3         Q    I'm not asking how courts rule on it.  I'm

 4    asking how you as an economic expert rendering an

 5    expert report view that factor.

 6         A    Right.  But I'm doing that -- I'm doing

 7    this in the context of litigation in which that -- I

 8    have been asked to provide this information.

 9              My understanding is courts find this

10    information helpful, and so I presented it to them.

11         Q    So sitting here today, as an economist,

12    have you ever thought about whether or not more

13    market makers tend to support efficiency versus

14    fewer market makers?

15         A    Hold on one second.  I just need to look at

16    something here.

17              THE WITNESS:  Could you repeat the

18    question, please.

19              (The record was read back as

20              follows:

21                  "Question:  So sitting here

22              today, as an economist, have you

23              ever thought about whether or not

24              more market makers tend to support

25              efficiency versus fewer market
```

Case 1:21-cv-01096-RA Document 58-2 Entered on FLSD Docket 08/28/2023 Page 239 of 332

```
 1            makers?")
 2            THE WITNESS:  I mean, I would need more
 3   information to ask that -- answer that question.
 4   BY MR. ISAJIW:
 5       Q   If a security traded in a market that had
 6   205 market makers, in your view, as an economist,
 7   would it be more likely that that security is --
 8   trades in an efficient market than one that has
 9   seven market makers?
10       A   Not necessarily.
11       Q   Is the number of market makers relevant in
12   any way to your analysis of efficient market?
13       A   Could be.
14       Q   In connection with this analysis, was the
15   number of market makers relevant in connection with
16   your conclusion that the common stock traded in an
17   efficient market?
18       A   Well, let's see.
19            It informed my opinion, yes.
20       Q   In your opinion, is there a number of
21   market makers that would be too few to establish an
22   efficient market?
23       A   I -- that's not anything I've ever thought
24   about.
25       Q   If there were no market makers for a
```

```
 1    security and they traded just between individual
 2    buyers and sellers, would that support market
 3    efficiency under Cammer Factor 3?
 4         A   Well, so now you're asking me about under
 5    Cammer Factor 3.  And then you get to court rulings.
 6         Q   Are you giving a legal opinion in your
 7    report or an economic opinion?
 8         A   No.  I am presenting evidence that I
 9    believe supports my findings in this report.
10         Q   If the evidence, under Cammer Factor 3 in
11    your analysis, was that there was only one market
12    maker for a security, would that support a
13    conclusion that the security traded in an efficient
14    market?
15              MR. HAKLAY:  Objection.
16              THE WITNESS:  It's possible.
17    BY MR. ISAJIW:
18         Q   If there were no market makers in a
19    security, would that support the conclusion in your
20    analysis that the security traded in an efficient
21    market?
22              MR. HAKLAY:  Objection.  Assumes facts not
23    in evidence.
24              THE WITNESS:  So in your hypothetical
25    example, nobody makes markets in the security.
```

```
 1   Sure.  Something could still about efficient with no

 2   market makers if just traded between individuals.

 3            There's no reason to -- yeah.  That's the

 4   answer.

 5   BY MR. ISAJIW:

 6       Q    Take a look at paragraph 134, page 49.

 7            It says (as read and/or reflected:)

 8                During the Class Period,

 9            according to the trades reported to

10            TRACE, between 35 percent and

11            40 percent of the trades reported

12            were dealer transactions which

13            results from a large number or

14            dealers facilitating transactions

15            similarly to how Market Makers

16            increase the efficiency of the

17            equity market.

18            Do you see that?

19       A    I do.

20       Q    Did I read that correctly?

21       A    Yeah.

22       Q    Based on your analysis of the TRACE data --

23   I'm sorry.  Let me step back for a second.

24            Why would the proportion of

25   dealer-to-dealer trades be relevant to your
```

Page 239

1    analysis?

2         A    Well, to the extent that oftentimes in

3    economics people make the argument that dealers are

4    more informed, that would -- that would influence my

5    analysis.

6         Q    Okay.

7              What do you mean by "dealer transactions"?

8         A    Dealer transactions defined by the TRACE

9    data.

10        Q    Okay.

11             And what is that -- is that between one

12   securities broker dealer and another securities

13   broker dealer?

14        A    As I sit here today, I would need to look

15   at the data to refresh my recollection.

16        Q    Do you believe, as you sit here today, that

17   a dealer transaction would -- in the TRACE data be

18   relevant to a dealer trading with a qualified -- a

19   QIB?

20        A    I don't understand the question.

21        Q    You indicated to me that the TRACE data, at

22   least in some way, indicates when it's a dealer

23   transaction.

24        A    That is correct.

25        Q    Does the TRACE data demonstrate any other

Page 240

```
 1   type of transaction?

 2        A    As I sit here, I don't recall.

 3        Q    Did you review the TRACE data yourself in

 4   connection with your analysis?

 5        A    I did.

 6        Q    Do you know if the TRACE data identifies

 7   which dealers are trading the notes?

 8        A    Well, I -- when you say "which dealers,"

 9   you mean -- I don't believe so, as I sit here today,

10   but, again, I would need to look at the data

11   specifically to refresh my memory.

12        Q    Assuming you're correct that the TRACE data

13   does not identify which dealers were trading in a

14   transaction, how did you determine that there was a

15   large number of dealers?

16        A    Well, based on the fact that 35, 40 percent

17   of the trades were dealer transactions.

18             Maybe I was inartful.

19        Q    Based on the TRACE data, can you tell how

20   many dealers traded during the Notes Period?

21        A    Again, I would need to look at the TRACE

22   data to refresh my recollection.

23             I'm happy -- I'm happy if you have the

24   TRACE dataset, or at least a page of the TRACE

25   dataset to look over that.
```

Case 1:21-cv-10987-DASBOM Document 588-2 Entered on FLSD Docket 08/28/2023 Page 244 of
332

1          But as I sit here today, I don't

2    specifically remember the answer to that question.

3          Q    When you were doing your analysis, do you

4    remember if you ever tried to determine how many

5    dealers traded during the Notes Period?

6          A    Again, I would refer to the same answer.

7          Q    So you don't recall right now whether or

8    not you ever tried to determine whether -- how many

9    dealers traded during the Notes Period?

10         A    Again, looking at the TRACE data will help

11   me refresh my recollection.

12         Q    As to whether or not you tried to determine

13   that initially?

14         A    It will refresh my memory regarding the

15   TRACE data, and so, then, yes, it will refresh my

16   memory with regards to your question.

17         Q    So in connection with the note in Cammer

18   Factor 3, you looked at prominent underwriters,

19   market makers.

20              Cammer Factor 3, as we discussed earlier

21   today, also discusses arbitrageurs; correct?

22         A    I believe that -- so let's look back at ...

23   yes.

24              And I'm reading from paragraph 33 (as read

25   and/or reflected:)

Page 242

```
 1              The Cammer court stated, "the
 2         existence of market makers and
 3         arbitrageurs would ensure
 4         completion of the market
 5         mechanism"...
 6    Q    So in connection with your analysis of the
 7   FXCM notes, under Cammer Factor 3, did you examine
 8   arbitrageurs?
 9    A    So is your question in the TRACE dataset is
10   there an indicator with regards to whether or not
11   these dealers are arbitrageurs?
12    Q    No.
13         My question is (as read and/or reflected:)
14              So in connection with your
15         analysis for the FXCM notes, under
16         Cammer Factor 3, did you examine
17         arbitrageurs?
18    A    I don't know how to answer that question.
19    Q    Did you conduct any analysis to determine
20   whether or not arbitrageurs existed in trading for
21   the FXCM notes?
22    A    I do not know -- I have not pulled the
23   market participants and asked them why they bought
24   or sold the notes --
25    Q    Okay.
```

Page 243

1      A   -- which is what I would need to determine

2   whether or not they were arbitrageurs.

3      Q   Okay.

4          So the existence or nonexistence of

5   arbitrageurs is not a factor in your analysis of the

6   FXCM notes?

7          THE WITNESS:  Could you read the question,

8   please.

9          (The record was read back as

10         follows:

11             "Question:  So the existence

12         or nonexistence of arbitrageurs is

13         not a factor in your analysis of

14         the FXCM notes?")

15         THE WITNESS:  Again, I don't know the

16  overlap between what these traders were doing and

17  their purposes in doing it.

18         So to the extent that I was unable to ask

19  them the purposes of their trades, I guess that was

20  accurate.

21  BY MR. ISAJIW:

22     Q   Okay.

23     A   But, again, that's a guess based on

24  speculation.

25     Q   You don't remember incorporating the

Page 244

1   concept of arbitrageurs into your analysis of the

2   FXCM notes, sitting here today?

3           MR. HAKLAY:  Objection.  Asked and

4   answered.

5           THE WITNESS:  Yeah.  I'm -- I'm not sure

6   your question makes sense.

7           MR. HAKLAY:  Peter, before you ask your

8   next question, at the last break the witness ask

9   that we take breaks more frequently than every hour,

10  so I was thinking every 45 minutes, which is not for

11  another seven minutes, but I meant to tell you that

12  before we started again.

13          MR. ISAJIW:  I'm happy to accommodate, but

14  let's discuss that off the record when we get a

15  chance.

16      Q   Let's turn to Cammer Factor 5 as it relates

17  to your FXCM notes analysis.

18          And, again, this is (as read and/or

19  reflected:)

20                  Price Reaction to New

21          Information.

22          Let me know when you're there.

23      A   Yep.

24      Q   Okay.

25          Did you include all three of the event days

1   we discussed earlier with the common stock analysis

2   in your notes analysis?

3       A   Did I include them?

4           I think they're implicitly included, but

5   that was not one -- I did not look at the first

6   event date that I looked at with regards to the

7   equity when I was looking at the bonds.

8       Q   And why is that?

9       A   Because there's no reason for me to think

10  that the transaction undertaken by the company would

11  have any impact whatsoever on the firm's probability

12  of bankruptcy.

13      Q   Why not?

14      A   Why not?

15      Q   Yeah.

16      A   I -- there's no reason for me to think that

17  buying another company in this -- in which the

18  analyst said it was a positive would necessarily

19  impact the probability of bankruptcy.

20      Q   And that's the reason you've excluded it?

21      A   Yeah.

22          As I state in my report (as read and/or

23  reflected):

24              Of the three events I selected

25          for testing FXCM common stock

```
 1              market efficiency, only two events

 2              occurred following the issuance of

 3              the FXCM notes.

 4              (Reporter clarification.)

 5   BY MR. ISAJIW:

 6       Q    So what I heard in your answer just a

 7   moment ago is that you also had the view that unless

 8   an event relates to the possibility of FXCM's

 9   bankruptcy, it wouldn't be relevant to a noteholder?

10       A    No.  Let's -- let's be very specific here.

11              So turning to paragraph 137 of my report.

12              Clearly lays out my belief on this subject

13   matter (as read and/or reflected:)

14                  Because of bonds' seniority in

15              the capital structure of a company,

16              bonds' values and therefore prices

17              are insulated from all but the most

18              extreme news by a common stock

19              valuation cushion.

20                  As a result, bonds are

21              typically the least sensitive of

22              all securities to company-specific

23              news while being the most sensitive

24              to a change in a firm's probability

25              of default.
```

```
 1              It follows that not all of the
 2          event study events selected for
 3          FXCM common stock would make
 4          suitable candidates for a bond
 5          market efficiency event study.
 6     Q    I recognize that that's what's written
 7   there.  But I'm talking about what you said earlier,
 8   which is (as read and/or reflected:)
 9              There was no reason for me to
10          think that buying another company
11          in this -- in which the analyst
12          said it was positive would
13          necessarily impact the probability
14          of bankruptcy.
15          I asked (as read and/or reflected:)
16              And that's the reason you
17          excluded it?
18          And you said (as read and/or reflected:)
19              Yeah.
20              Of the three events I selected
21          for testing FXCM common stock
22          market efficiency, only two events
23          occurred following the issuance of
24          the FXCM notes.
25          So I'm just getting back, not to what you
```

Page 248

1    wrote there, but I'm trying to better understand

2    your answer orally about the relationship to the

3    likelihood of bankruptcy and relevance to efficiency

4    of markets and notes.

5         A    Right.

6              So I didn't think that that particular

7    transaction would change the firm's probability of

8    default would be a more precise way to state what I

9    inarticulately stated before.

10        Q    Generally speaking, if an event would

11   change the firm's probability of default, is it more

12   likely that you would include it in an event study

13   for notes like the FXCM notes?

14        A    I mean, I would need to do -- I would need

15   to do that on a case-by-case basis.

16             I guess it --

17             THE WITNESS:  Could you ask the question

18   again or reread the question.  Sorry.

19             (The record was read back as

20             follows:

21                  "Question:  Generally

22             speaking, if an event would change

23             the firm's probability of default,

24             is it more likely that you would

25             include it in an event study for

Page 249

```
 1              notes like the FXCM notes?")
 2              THE WITNESS:  It would depend on the
 3    situation.
 4    BY MR. ISAJIW:
 5         Q   The situation is it's more like -- more
 6    likely to result in a bankruptcy.
 7         A   Well, okay.
 8              Oh.
 9              When you say "more likely," 1 percent more
10    likely?  Two percent more likely?
11         Q   I'm trying to get your view of how -- what
12    percentage of likeliness to increase the probability
13    of bankruptcy is the threshold above which you would
14    enter an event into an event study for the FXCM
15    notes.
16              MR. HAKLAY:  For that reason alone?
17              THE WITNESS:  No.  I don't think --
18              MR. HAKLAY:  Objection.  Calls for a
19    hypothetical.
20              THE WITNESS:  That's not a --
21              MR. HAKLAY:  Misstates the facts in
22    evidence.
23              Please.
24              THE WITNESS:  That's not a question that
25    I've ever been asked to address in these types of
```

```
                                        Page 250
 1   analysis.
 2   BY MR. ISAJIW:
 3        Q    You have been asked just now.
 4        A    Not in the context of doing my report.
 5        Q    No.  I'm asking you the question now.  I'm
 6   asking when you're -- you talked earlier about an
 7   objective screening of events to include in the
 8   event study.
 9             You've just indicated that an event that is
10   increasing the probability of bankruptcy would be an
11   event that you would look at to include in the event
12   study related to the notes.
13             I'm asking:  What percentage of an
14   increased likelihood is required for you to actually
15   include it?
16             MR. HAKLAY:  Objection.  Argumentative.
17             Objection.  Misstates his --
18             MR. ISAJIW:  "Objection" is fine.
19             MR. HAKLAY:  Excuse me?
20             MR. ISAJIW:  "Objection" is fine.  We don't
21   need speaking objections.
22             MR. HAKLAY:  You don't need to tell me what
23   to say.  If I want to give a 50-word objection, I
24   will.  You can tell the judge one day, if you like.
25             Objection.  Argumentative.
```

```
                                            Page 251

 1              Objection.  Misstates his testimony.

 2              You can answer, sir.

 3              THE WITNESS:  I don't think I've ever

 4   thought about a bright-line test like it has to --

 5   it has to be done on a case-by-case basis.

 6   BY MR. ISAJIW:

 7        Q    Okay.

 8              On --

 9        A    In this --

10        Q    In this case --

11        A    In this case, I did not --

12        Q    -- it was -- I'm sorry.

13              MR. HAKLAY:  Finish your answer.  No, no,

14   just finish your answer, please.

15              THE WITNESS:  In this case, I did not

16   believe it significantly changed the firm's

17   probability of bankruptcy.

18   BY MR. ISAJIW:

19        Q    In this case, if one of the events you

20   reviewed in your objective screen increased the

21   probability of bankruptcy by 1 percent, would that

22   be likely to be included in your analysis or

23   unlikely?

24              MR. HAKLAY:  Objection.  Assumes facts not

25   in evidence.
```

```
                                        Page 252
```

 1              THE WITNESS:  Right.  It's an incomplete

 2      hypothetical.  I mean, I can't do it.

 3              Again, you would need -- I need to have the

 4      entire context, look at the entire facts associated

 5      with the situation in order to arrive at my

 6      determination.

 7      BY MR. ISAJIW:

 8          Q   If an event, as part of your objective

 9      screen -- strike that.

10              If in part of your objective screen you

11      reviewed an event that you determined was 87 percent

12      likely to increase the probability of FXCM's

13      bankruptcy, do you think you would include it in

14      your event study?

15              MR. HAKLAY:  Same objections.

16              THE WITNESS:  So in your hypothetical, the

17      probability of bankruptcy would be -- would increase

18      by 87 percent or the -- there would be an 87 percent

19      probability that that event would impact the

20      probability of bankruptcy?

21      BY MR. ISAJIW:

22          Q   I don't know.  I'm asking you.  Which of

23      those two would be relevant for your objective

24      screen?

25          A   Yours is an incomplete hypothetical.  It's

```
                                              Page 253
1    unclear.  I can't answer it, as I sit here today.
2        Q   If an event would increase by 87 percent
3    the likelihood of bankruptcy, would that be
4    something you would probably include in your event
5    study?
6            MR. HAKLAY:  Same objection.
7            THE WITNESS:  So in your incomplete
8    hypothetical example, if an event occurs that
9    increases the probability of a firm defaulting by
10   87 percent.  Again, I can't -- I would need more
11   facts in order to make that determination.
12   BY MR. ISAJIW:
13       Q   Of the events that you reviewed in
14   connection with designing your event study in this
15   case, was your view of probability of increasing
16   bankruptcy relevant to your selection process?
17           MR. HAKLAY:  Objection.  Asked and
18   answered.
19           Please answer it.
20           THE WITNESS:  I don't understand the
21   question.
22           I thought -- I don't understand the
23   question.
24           Can we take a break now?
25           MR. ISAJIW:  One second.
```

1      Q    Earlier today you testified that you

2   reviewed a number of possible events for inclusion

3   in your event study; correct?

4      A    That is correct.

5      Q    And that you -- we talked about you have a

6   process where you considered to be an objective

7   screening for selecting amongst those which are the

8   actual events that you include; is that correct?

9      A    Well, we're not discussing my news/no-news

10   analysis, that is correct.

11      Q    Okay.

12           In that or any other context in your

13   analysis here, was probability of bankruptcy a

14   selection criteria?

15      A    I don't know how to answer that question.

16      Q    In the news/no-news context, was

17   probability of bankruptcy a selection criteria?

18      A    No.

19      Q    Okay.

20           In the event study, choosing the three --

21      A    Well, I do not believe so.

22      Q    Okay.

23           In your decision-making process to pick the

24   three days that you ultimately included in your

25   event study, was the probability of bankruptcy a

Page 255

1   selection criteria?

2        A    In my equity analysis?

3        Q    Let's start there.

4        A    I don't know.  It's not something I've ever

5   been asked before.  It's not something I've -- I

6   mean, I thought that those three events were new

7   material information that would result in a

8   statistically significant stock -- that was material

9   enough to result in a statistically significant

10  stock price movement.

11            With regards to the bonds, same answer

12  except I only found two events.

13       Q    Okay.

14            And was the selection process for the bonds

15  of those two events related to your perception of

16  increased likelihood of bankruptcy?

17            MR. HAKLAY:  Objection.  Asked and

18  answered.

19            THE WITNESS:  So is your question:  Do I

20  think the firm losing $220 million increased their

21  probability of bankruptcy?

22  BY MR. ISAJIW:

23       Q    That's not my question.  My question is --

24       A    Well, it is -- sorry.

25            May I please finish my answer?

Page 256

1      Q    You asked me a question --

2      A    No, I'm asking --

3      Q    I'm answering your question.

4           You asked me --

5           MR. HAKLAY:  You know what, it's been

6    almost an hour.  It's time to take a break.

7           THE WITNESS:  Let's take a break.

8    BY MR. ISAJIW:

9      Q    There's a question pending.  I would like

10   you to answer the question pending before we take a

11   break.  It's a relatively simple question.  If the

12   answer is yes or the answer is no, that's fine.

13           I'm just asking if your perception of

14   likelihood of bankruptcy was a selection criteria

15   for the event study in connection with the notes.

16           MR. HAKLAY:  Objection.  Argumentative.

17   Repetitive.  Asked and answered.

18           Please.  You can answer one more time.

19           THE WITNESS:  I believe -- and let me get

20   the number exactly correct.

21           For instance ...

22   BY MR. ISAJIW:

23      Q    Maybe I can reframe the question.

24      A    Well, no.  Let me answer your question as

25   stated.

Page 257

```
 1        Q    Okay.

 2        A    So on paragraph 85, I'm quoting here (as

 3   read and/or reflected:)

 4                  FXCM -- let's see --

 5             Their clients owed them approximately $225

 6   million.

 7             So do I think that having their clients owe

 8   them $225 million increases their probility of

 9   bankruptcy?

10             Yes, I do believe that, but I did not

11   select that date strictly because it increased the

12   probability of the firm's bankruptcy.

13   BY MR. ISAJIW:

14        Q    Was it a relevant factor?

15        A    That's a question I have not considered, as

16   I sit here.

17        Q    Okay.  Now take a break --

18        A    I'm giving you the best answer I can give

19   you.

20             MR. ISAJIW:  I appreciate that.

21             THE VIDEOGRAPHER:  We are going off the

22   record.

23             The time is 3:52 p.m.

24             (Recess was taken at 3:52 p.m.

25             until 4:07 p.m.}
```

Case 1:21-cv-00146-BAK Document 58-2 Entered on FLSD Docket 08/28/2023 Page 261 of 332

1          THE VIDEOGRAPHER:  We are back on the

2   record.

3          The time is 4:07 p.m.

4   BY MR. ISAJIW:

5      Q   Dr. Werner, I want to talk about your --

6   again, in relation to the notice, your event study

7   that you conducted under Cammer Factor 5, the

8   section titled "Cammer Factor 5:  Price Reduction

9   and New Information."

10         MR. HAKLAY:  Price reaction.

11  BY MR. ISAJIW:

12     Q   "Price Reaction to New Information."

13     A   All right.  Okay.

14         And what page?

15     Q   50.

16     A   Okay.

17     Q   And specifically just to start off, if you

18  turn a couple pages to 53.

19     A   Page 53?

20     Q   Yes.

21         We see "Event Study Results" as a heading

22  for the January 16th, 2015 day and the February 7th,

23  2017 day on 53 and 54, respectively.

24         And my first question is:  Did you perform

25  a news/no-news analysis for the FXCM notes like you

Page 259

1   did for the FXCM common stock?

2        A    I did not.

3        Q    Okay.

4             Why not?

5        A    I mean, I haven't seen it done in the past.

6   Certainly, no one's asked me to do it in the past.

7   I'm not sure I've ever seen a news/no-news analysis

8   for a bond offering.  So I guess I would say, to the

9   best of my understanding, it's not part of industry

10  practice.

11       Q    As an economist, is there a principal

12  difference between the equity and the bond -- the

13  equity security and the bond that would make the

14  news/no-news analysis inappropriate?

15       A    Well, so let's go back to what I -- where I

16  describe bonds.

17            So, again, this is reading from

18  paragraph 137 (as read and/or reflected:)

19                 Because of bonds' seniority in

20            the capital structure of a Company,

21            bonds' values and therefore prices

22            are insulated from all but the most

23            extreme news by a common stock

24            valuation cushion.

25                 As a result, bonds are

Page 260

```
 1              typically the least sensitive of

 2              all securities to company-specific

 3              news while being the most sensitive

 4              to a change in a firm's probability

 5              of default.

 6                   It follows that not all of the

 7              event study selected for --

 8              sorry -- all of the event study

 9              events selected for FXCM common

10              stock would make suitable

11              candidates for a bond market

12              efficiency event study.

13      Q    Okay.

14           And so that's why there are few -- fewer

15   events in your event study for the bond, but I'm

16   just talking about the news/no-news analysis that we

17   discussed earlier with the common stock.

18      A    Right.  And that's my answer to your

19   question.

20      Q    What about that answer would indicate that

21   you cannot do a news/no-news study for bonds?

22           MR. HAKLAY:  Objection.  Misstates his

23   testimony.

24           THE WITNESS:  Right.  So you're asking --

25   now you say "cannot."
```

```
                                            Page 261
 1           So is it possible to do one?  It is
 2    possible to do one.  I'm not sure I've ever seen one
 3    performed.
 4    BY MR. ISAJIW:
 5         Q    Okay.
 6           You mentioned that twice that you haven't
 7    seen one performed and that you don't believe that
 8    it is part of any kind of industry standard.
 9           What are you basing that on?
10         A    As I sit here today, my recollection.
11         Q    Okay.
12           Earlier we talked about how many times you
13    analyzed notes transactions from a market efficiency
14    perspective, as opposed to common stock, and I think
15    the summary of that was notes are a far fewer -- the
16    subject of notes is far fewer times the subject of
17    your analysis -- let me rephrase that.
18           Earlier we discussed your prior work in
19    connection with market efficiency analysis as
20    between common stock and notes.
21           And I believe you testified that you
22    analyzed notes far fewer than you do common stock;
23    is that correct?
24         A    I believe it is correct with regards to --
25    with regards to me acting as an expert.
```

Case 1:21-cv-10959-LA-BDC Document 588-2 Entered on FLSD Docket 08/28/2023 Page 265 of 332

```
 1            In general, there are much fewer bond cases
 2    than there are equity cases brought.
 3            So I think industrywide, that statement is
 4    true as well.
 5        Q    Which statement?
 6        A    That people analyze bonds less than they do
 7    stock.
 8        Q    Okay.
 9            I'm asking if there's any reason why you --
10    why a news/no-news analysis would not be conducted
11    with a bond, as opposed to a stock.
12            MR. HAKLAY:  Objection.  Asked and
13    answered.
14            Please answer.
15            THE WITNESS:  Again, I refer you to
16    paragraph 137 and not -- I'm speaking not just of my
17    own analysis.  I've seen, obviously, other reports
18    on bond market efficiency.  I've just never -- to
19    the best of my recollection, as I sit here today, I
20    have not seen it done.
21    BY MR. ISAJIW:
22        Q    Which other reports on bond market
23    efficiency are you talking about?
24        A    I don't recall, as I sit here today.
25        Q    Is it possible to do a news/no-news
```

Page 263

1    analysis on bonds?

2            MR. HAKLAY:  Objection.  Asked and

3    answered.

4            THE WITNESS:  As I stated before, is it

5    possible?  So in the grand -- in the world of

6    possibilities, yes, it is possible.

7            Again, that having been said, I have, to

8    the best of my recollection, I have never seen one

9    performed.

10   BY MR. ISAJIW:

11       Q    And at any point in connection with this

12   analysis, did you try to perform one?

13           MR. HAKLAY:  Objection.  Asked and

14   answered.

15           Please answer.

16           THE WITNESS:  I don't believe so.

17   BY MR. ISAJIW:

18       Q    And when you made the decision not to

19   perform one, was that based on anything, other than

20   you just haven't seen them being done before and

21   that you were not asked to do one?

22       A    Asked to do one.

23           So I don't understand the question.

24           Are you suggesting that -- I don't

25   understand the question.

1   Q   I thought when I asked you earlier about
2   whether or not you did, you said no.
3           And I said, "Why not?"
4           And I believe you said you weren't asked to
5   do one.
6   A   No.
7   Q   Okay.
8   A   That's inaccurate.
9   Q   Okay.
10          Were you asked to do one?
11  A   I'm never asked to do any specific
12  analysis.
13  Q   So at some point during your analysis, you
14  did a news/no-news for the common stock; correct?
15  A   Not at the -- that is correct, but not at
16  the behest of plaintiffs' counsel.
17  Q   I wasn't suggesting it was.  I was just
18  asking if you did it.
19  A   Right.  But your previous question was
20  about had anyone asked me to do an analysis.  And so
21  I'm just trying to be clear about what we're talking
22  about here.
23  Q   Okay.
24          To be clear, at some point during your
25  analysis, you did a news/no-news analysis for the

```
 1   common stock.

 2           Yes or no?

 3       A   That is correct.

 4       Q   Okay.

 5           You also, at some point in your analysis,

 6   had to make a decision whether or not to do a

 7   news/no-news analysis with the bond; correct?

 8       A   I -- I'm sorry.  Could you reread the

 9   question?

10           (The record was read back as

11           follows:

12               "Question:  You also, at some

13           point in your analysis, had to make

14           a decision whether or not to do a

15           news/no-news analysis with the

16           bond; correct?")

17           THE WITNESS:  I'm not sure how to answer

18   that question.

19           I refer you to my previous answers about

20   why I didn't do one.

21   BY MR. ISAJIW:

22       Q   And your previous answer is paragraph which

23   again?  I'm sorry.

24       A   Well, can you read back my answer from

25   before?
```

Case 1:23-cv-02954-LAK-BCM Document 58-2 Entered on FDC Docket 08/28/2023 Page 269 of 332

1      Q    Is it one -- I believe it's 137.

2      A    It is paragraph 137, but I don't -- I don't

3  believe that that was the only reason I stated I did

4  not do it.  And so as to be as accurate as possible,

5  if you would like me to have her read back the exact

6  statement --

7      Q    I don't want her to read back.  I'm just

8  trying to make sure that I get your best answer.

9           You did not do a news/no-news analysis for

10  the bond, partly because of the reasons in 137;

11  correct?

12      A    That is correct.

13      Q    Okay.

14           Were there any other reasons?

15      A    Other than the ones -- the other ones I

16  stated?

17      Q    Which are the other ones that you stated?

18      A    Again, just for accuracy, can you please

19  read back my statement where I discussed my decision

20  initially not to do this type of analysis?

21      Q    I think reading that record would be

22  difficult to do.

23           So let me try to break it down.

24           Of the reasons you did not do a

25  news/no-news analysis, one of them were the reasons

Case 1:21-cv-00916-RA-BCM Document 588-2 Filed 07/21/22 Page 270 of 332

Case 1:21-cv-00916-RA-BCM Document 588-2 Entered on FLSD Docket 08/28/2023 Page 270 of 332

1    in paragraph 137; correct?

2         A    That is correct.

3         Q    One of them is you do not believe it is an

4    industry standard to do a news/no-news analysis for

5    bonds; is that correct?

6         A    If that is what I stated, then that is

7    correct.

8         Q    I'm asking you if that's correct now as you

9    sit here today, regardless of whether or not you

10   said that before.

11        A    I don't remember the exact way I phrased

12   it.  At this point, I'm just confused about the

13   question.

14             I'm -- let me say it this way:  I have

15   answered your question to the best of my ability.

16        Q    And I'm trying to make sure I understand

17   your answer.

18             So part of the reason was 137.  Part of the

19   reason was, you don't believe it's an industry

20   standard to do a news/no-news analysis on the bond;

21   correct?

22        A    I'm not sure that that's exactly what I

23   said.

24             I believe I --

25        Q    Would you adopt that statement now

Page 268

```
 1   regardless of whether or not you said it before?
 2        A   Oh, so now the statement is it is not an
 3   industry standard.
 4            I do not believe I have seen a news/no-news
 5   analysis performed for bonds before.
 6        Q   Okay.
 7        A   That is my full understanding.
 8        Q   So part of the reason is that you have not
 9   seen it done before; correct?
10        A   I'm telling you -- I've answered your
11   question to the best of my ability.
12        Q   Is any part of the reason that it could not
13   be done?
14            MR. HAKLAY:  Objection.  Asked and
15   answered.
16            THE WITNESS:  I'm sorry.  What was the
17   question?
18            (The record was read back as
19            follows:
20                "Question:  Is any part of the
21            reason that it could not be done?")
22            THE WITNESS:  Oh, so, again, I would refer
23   you read my previous answer.  It is possible to do
24   one.
25            That having been said, I have never seen,
```

```
 1    to the best of my knowledge or the best of my
 2    remembrance, as we sit here today, one having been
 3    performed.
 4    BY MR. ISAJIW:
 5         Q   Other than the reasons we've talked about,
 6    can you think of any other reason why you did not
 7    perform a news/no-news event analysis on the bond?
 8         A   Any other reason than what I have
 9    previously stated?
10             I don't believe so, but at this point, I'm
11    not -- I don't believe so.
12         Q   Okay.
13             In your review of the bond, do you note
14    whether or not the bond traded on each day of the
15    Notes Period?
16         A   I'm sorry.  Where are you looking?
17         Q   I'm not looking anywhere.  I'm asking you a
18    question.
19         A   Okay.
20             Sorry.  Then, I don't understand the
21    question.
22         Q   Do you know if the bond traded on each day
23    of the Notes Period?
24         A   Oh, I don't believe so.
25         Q   Okay.
```

```
                                          Page 270
```

 1          Would it be appropriate in your analysis to
 2    consider trading of the bond that occurred over a
 3    weekend?
 4          MR. HAKLAY:  Objection.  Vague.
 5          THE WITNESS:  I don't understand the
 6    question.
 7    BY MR. ISAJIW:
 8       Q    If a bond traded over a weekend, would you
 9    include that in your analysis of market efficiency,
10    pursuant to your report?
11          MR. HAKLAY:  Same objection.
12          THE WITNESS:  So in your hypothetical
13    example, the bond trades over the weekend?
14    BY MR. ISAJIW:
15       Q    Uh-huh.
16       A    So someone buys and sells it over the
17    weekend, like, let's say, Saturday?
18       Q    Yes.
19       A    I'm -- that's not anything I've ever had to
20    consider before.
21          I would need more time to think about that.
22       Q    Do you know if the FXCM bonds at issue in
23    this case that you analyzed ever traded over a
24    weekend in connection with the Notes Period?
25       A    And, again, just for my clarification, when

```
 1   we talk about "traded," we mean bought and sold --
 2   and when you say "over a weekend"; right, because
 3   over a weekend, when we usually talk about it from
 4   the point of view of these types of analysis, it
 5   means from, like, Friday to Monday.
 6             So you're saying, in your hypothetical
 7   example -- and to the best of my knowledge, it is
 8   hypothetical -- maybe it did occur?
 9             When you say "over the weekend," you're
10   talking about a transaction, just by way of my
11   example, someone bought and sold a bond on a
12   Saturday?
13        Q    In that example, would it be appropriate to
14   consider that trading activity in your analysis?
15        A    That's not something I've ever been asked
16   to think about before.  So I would need more time to
17   think about it.
18             As I sit here today, I can't answer that
19   question.
20        Q    Do you know if that occurred with the FXCM
21   notes during the Notes Period?
22        A    As I sit here today, I do not know.
23        Q    Okay.
24             If it did occur, do you believe you've
25   included those trades in your analysis?
```

Page 272

1      A    Again, I don't know.

2      Q    Do you believe you've included all trades

3  during the Notes Period in your analysis?

4      A    To the best of my -- what do you mean by

5  "all trades"?  I'm not sure I understand the

6  question.

7      Q    There's a specific period of time that

8  we've been referring to as the Notes Period; is that

9  correct?

10      A    That is correct.

11      Q    You understand that specific period of

12  time; correct?

13      A    I do.

14      Q    Trading of the notes occurred within that

15  window of time?

16      A    That is correct.

17      Q    You studied the trading of the notes within

18  that period of time in connection with your market

19  efficiency study for the notes; correct?

20      A    That is correct.

21      Q    Did you include all trading of the notes in

22  that window of time in your analysis?

23      A    Right.  And so here's where we -- this is

24  where I'm having problems, right.

25           I mean, there could be off-market trades

1    that aren't necessarily reported.  And I could think

2    of all sorts of examples where trading occurs.  And

3    when people talk about things like dark pools, when

4    we talk about equity, trading occurs.  It's not

5    necessarily reported.

6              So I'm -- if you want to -- if you want to

7    show me where this has occurred, I may have a better

8    understanding of it.  But given -- given my

9    understanding of how trading is defined, I don't

10   know the answer to your question.

11       Q   Do you believe that Rule 144A bonds trade

12   in dark pools?

13       A   I don't -- I, as I sit here today, have no

14   opinion about that one way or the other.

15       Q   Okay.

16       A   Certainly -- oh.

17       Q   Any of the trading of the bonds in relation

18   to the FXCM notes that you analyzed -- sorry.  Let

19   me rephrase that.

20              Are you aware of any trading in connection

21   with the FXCM notes that you looked at in connection

22   with your market efficiency analysis that occurred

23   through a dark pool?

24       A   Well, so let's just be clear.

25              I was giving you an example of a period of

Page 274

1   time where a trade might occur that it would not

2   necessarily be reported.

3           I was not -- I did not mean to suggest that

4   FXCM's notes were traded in a dark pool.  That was

5   not my intention.

6       Q   Okay.

7           Looking at paragraph 140 of your report, it

8   says (as read and/or reflected:)

9               For the February 7, 2017

10              event, there was no trading price

11              for the FXCM notes in the eight

12              days preceding February 7, 2017.

13              The earliest available price for

14              FXCM notes prior to the February

15              2017 was on January 2016.

16              Consequently, I performed the

17              event study for February 7, 2017,

18              using the FXCM notes' return from

19              January, 26, 2017, to February --

20              February 7th, 2017.

21          MR. HAKLAY:  I'm going to -- just for you

22   at one point in the middle there, unintentionally

23   you said "January 2016."  I know you meant

24   "January 26, 2017," as you later said.

25          MR. ISAJIW:  Thank you for that correction.

Case 1:21-cv-07964-BA
Case 1:21-cv-00046-BA
Document 58-2
Entered on FLSD Docket 06/28/2023
Page 278 of 385
Page 278 of 332

1      Q    Did I read that, other than that

2  correction, correctly?

3      A    Yes.

4      Q    Is it -- did you use the return from

5  January 26, 2017, because there was no evidence of

6  trades on January 27, 2017?

7          I'm just trying to understand the import of

8  that paragraph.

9      A    I don't understand the question.

10     Q    Explain to me at a very high level why you

11  performed the event study from -- for February 7,

12  2017, using FXCM notes return from January 26 to

13  February 7, 2017.

14         MR. HAKLAY:  Objection to the term "at a

15  very high level."

16         THE WITNESS:  Right.

17         So my understanding is that the earliest

18  available price for the FXCM notes prior to

19  February 7th, 2017, was on January 26, 2017.  That

20  is the reason why I used it.

21  BY MR. ISAJIW:

22     Q    Okay.

23         So there was no trading -- there was no

24  other trading?  That was the only trading that you

25  could find?

```
 1          MR. HAKLAY:  Objection.  Asked and

 2   answered.

 3          THE WITNESS:  Could you read back my

 4   question -- my answer, please.

 5          (The record was read back as

 6          follows:

 7              "Answer:  Right.

 8                  So my understanding is

 9          that the earliest available price

10          for the FXCM notes prior to

11          February 7th, 2017, was on

12          January 26, 2017.  That is the

13          reason why I used it.")

14          THE WITNESS:  That is correct.  That is my

15   understanding.

16   BY MR. ISAJIW:

17      Q   Okay.

18          And in paragraph 142, one, two, three, four

19   lines down, you say (as read and/or reflected:)

20              For the Notes, the regression

21          data series included only days on

22          which there was a trading price for

23          two consecutive trading days, so

24          that a one-day return could be

25          computed.
```

```
 1            Why is it important to have two consecutive
 2    trading days?
 3        A   Why is it important to have two consecutive
 4    trading days?  It's just -- it's commonly what's
 5    done in the -- in the profession.
 6        Q   Any other reason?
 7        A   No.  That's ...
 8        Q   And when you say (as read and/or
 9    reflected:)
10                It's commonly done within the
11            profession.
12            Which profession are you referring to?
13        A   Profession where anyone tries to -- tries
14    to undertake a market model estimating bond returns.
15        Q   Would that be economists?
16        A   I believe economists might undertake that.
17        Q   Anybody else?
18        A   I'm sure other people undertake that as
19    well.
20        Q   Any other profession that springs to mind
21    when you say "it's common in the profession"?
22        A   I mean -- I mean, if -- I'm sure if I went
23    to some trading firms and they were trying to do
24    models predicting bond returns or trying -- they
25    would commonly use that as well.
```

1          So that would be one such example.

2      Q    Okay.

3          Do you know how many days have consecutive

4   trading in the bond during the Notes Period?

5          MR. HAKLAY:  I'm going to object as vague

6   because I don't know if you mean both days count as

7   one or both days count as two, if it's consecutive.

8          THE WITNESS:  Yeah.  As I sit here today, I

9   don't recall.

10  BY MR. ISAJIW:

11     Q    Do you believe it was uncommon to have

12  consecutive trading days in the bond during your

13  analysis of the Note Period?

14         MR. HAKLAY:  Objection.  Vague as to the

15  word "uncommon."

16         THE WITNESS:  I was going to ask you to

17  define uncommon.  So I guess I agree with the

18  objection that the term is vague.  I can't answer

19  the question.

20  BY MR. ISAJIW:

21     Q    Do you have -- what is your understanding

22  of the term "uncommon"?

23     A    In what context?

24     Q    In this context.

25     A    I don't know your -- if I use the word

 1   "uncommon" in my report, I'm happy to have you point
 2   it out to me, and then I'll be able to give you a
 3   better understanding.
 4           But I'm not sure.  You're asking the
 5   question.  I don't know.
 6       Q   Let me rephrase the question.
 7           When you reviewed the trading of the bonds
 8   during the Notes Period, how many pairs of
 9   consecutive trading days were there?
10       A   I refer to my previous answer.
11       Q   Which is what?
12       A   I don't recall.
13           You asked it about a minute ago, that
14   specific question.
15       Q   So if you look at Exhibit 11.
16           MR. HAKLAY:  11 he said.  Not 12.
17   BY MR. ISAJIW:
18       Q   What is Exhibit 11?
19       A   It's my regression results for the bonds.
20       Q   Is there anything on Exhibit 11 that would
21   refresh your recollection as to how many
22   consecutive -- how many days -- how many pairs of
23   consecutive days the bonds traded?
24       A   As I sit here today, I see the number 66.
25   So my guess is that's probably the right number.

1    Q    And that's 66 out of how many days?

2    A    Well, whatever --

3    Q    It's more than two years?

4    A    It is more than two years.  That is

5    correct.

6    Q    So that is a relatively low number of days

7    with consecutive trading.  Would you agree?

8         MR. HAKLAY:  Objection to the term.

9         Please answer.

10        THE WITNESS:  No, I would not agree.

11   BY MR. ISAJIW:

12   Q    Is it more than half of the days?

13   A    That's a different question.  Is it more

14   than half of the days?  More than half of the days

15   during the -- during that period?

16   Q    Yes.

17   A    It is -- so is 66 more than 252 times 2?

18   66 is not more than -- and, again, 252 times 2 is

19   just an estimation on my part.

20   Q    So 66 is under observations.  And that

21   means bond price observations in connection with

22   your regression study; is that correct?

23   A    With my mark -- with my market model, I

24   believe that is correct.

25   Q    Do you know how many bond price

Case 1:21-cv-00196-RA-BCM Document 588-2 Entered on FLSD Docket 08/28/2023 Page 284 of 332

1    observations you excluded from your analysis because

2    the bond price did not occur within a consecutive

3    trading day?

4         A    Do I know how many?

5              THE WITNESS:  Could you repeat the

6    question, please.

7              (The record was read back as

8              follows:

9                   "Question:  Do you know how

10             many bond price observations you

11             excluded from your analysis because

12             the bond price did not occur within

13             a consecutive trading day?")

14             THE WITNESS:  As I sit here today, I do

15   not.

16   BY MR. ISAJIW:

17        Q    But there were some?

18        A    I believe that's an accurate statement.

19        Q    Do you know if there were more than 66?

20        A    As I sit here today, I don't know.

21        Q    Is there anything in your report that you

22   could refer to, to figure that out?

23        A    Possibly.  It looks like I could add up all

24   the observations on Exhibit 12.

25             So one, two --

```
                                                Page 282
 1              MR. HAKLAY:  Hold on.
 2      BY MR. ISAJIW:
 3          Q    I'm not asking you to add it up.  I'm just
 4      asking to see if that's how you would figure it out,
 5      Exhibit 12.
 6          A    I believe so.
 7          Q    Okay.  Thank you.
 8               So referring back to paragraph 140 on
 9      page 51.
10          A    Okay.  Paragraph 140 on page -- there we
11      go.  140.
12               Yeah.  Okay.
13          Q    So for the February 7th, 2017 event, you
14      used an 11-day window to calculate the return on the
15      bond, meaning from January 26, 2017, to February 7,
16      2017; is that correct?
17          A    What do you mean by "window"?
18          Q    Number of days.
19          A    So could you restate the question with
20      "number of days" instead of "window"?
21          Q    Is there anything particular about the word
22      "window" that is confusing you?
23               MR. HAKLAY:  Objection.  Argumentative.
24               THE WITNESS:  Well, oftentimes window is a
25      term of art in economics.  So I don't know how
```

Page 283

1    you're using it.

2    BY MR. ISAJIW:

3        Q   And what does that term of art refer to in

4    economics?

5        A   It would depend on the situation.  But it's

6    not -- it's not -- there's not a -- necessarily a

7    common definition of it.

8        Q   Your calculation here results in an 11-day

9    return; is that correct?

10       A   I'm not sure that's correct.

11       Q   Okay.

12           In this particular example for this one

13   event, you used an 11-day period to calculate the

14   return on the bond; is that correct?

15       A   I used the price on February 7th and

16   January 26th.  If that's 11 days, then I believe the

17   answer to your question is yes.

18       Q   Okay.

19           And that's to calculate the return in

20   connection with the February 7th event; correct?

21       A   I'm sorry.  The what?

22       Q   The return.

23       A   On which day?

24       Q   February 7, 2017.

25       A   That is correct.

1     Q    Okay.

2          Have you ever seen an 11-day return used to

3     measure a single-day event in any peer-reviewed

4     academic study?

5     A    Have I ever seen -- I have -- as I sit here

6     today, I have no idea.

7     Q    Okay.

8          When you do this type of analysis, is it

9     often -- is it common for you to use an 11-day

10    period in your calculation for a single-day event?

11    A    Well, to the extent that normally when I

12    perform this analysis, it's on equities, no; that

13    would be uncommon.

14    Q    Okay.

15    A    But to the extent that this is a bond

16    offering, I can't say whether it would be common or

17    uncommon.

18    Q    Okay.

19         In your calculation, are you assuming that

20    the bond price stayed constant between the last

21    trade on January 26th and the first trade on

22    February 7th?

23    A    What do you mean by remain constant?

24    Q    Did not change.

25    A    Am I making the assumption that the price

Page 285

1    did not change -- I don't understand the question.

2         Q    If the price changed in the 11-day period,

3    would that affect your calculation?

4         A    Possibly.

5         Q    Are you assuming for the sake of this

6    calculation that the price did not change during

7    those 11 days?

8         A    And, again, I'm just not -- so are you --

9    is the question did another trade occur during that

10   11 days in which the price changed?

11        I don't -- I don't quite understand the

12   question.

13        Q    I'm just trying to think of different ways

14   to phrase it.

15        Are you assuming, for the sake of this

16   calculation, that the bond would have traded at the

17   same price on February 1 as January 26th?

18        A    Am I making the assumption that the bond

19   price would have --

20        THE WITNESS:  Can you reread the question,

21   please.

22        (The record was read back as

23        follows:

24             "Question:  Are you assuming,

25        for the sake of this calculation,

1       that the bond would have traded at

2       the same price on February 1 as

3       January 26th?")

4       THE WITNESS:  I don't understand the

5  question.

6  BY MR. ISAJIW:

7       Q   If the bond price could have moved between

8  January 26th and February 7th due to other

9  information occurring within that time period, how

10 can you interpret that return as measuring the

11 impact on the alleged disclosure of the

12 February 7th, 2017 event?

13      Can you?

14      A   Oh, so you're -- wait.

15      Are you assuming that additional events

16 occurred during that window that moved the -- that

17 would have impacted the bond price?

18      Is that what your hypothetical is assuming?

19      Q   I'm asking if that happened.

20      A   To the best of my knowledge.

21      I mean -- well, so information -- I'm sure

22 information came out during that period, but

23 information that affected the bond prices?  Not to

24 my knowledge.

25      Or information that would have affected the

Page 287

```
 1   bond prices?  Not to my knowledge.
 2        Q    If it did occur, would that affect this
 3   calculation?
 4        A    So in your hypothetical, news that would be
 5   of such import occurred during that seven-day window
 6   that would have been significant enough to change
 7   the bond price, would that have moved the bond
 8   price?
 9             I -- I don't know.  I don't even know how
10   to answer that question.
11        Q    No.  I'm asking, are you assuming for this
12   calculation that that did not occur, that the bond
13   price remained constant between January 26, 2017,
14   and February 7, 2017?
15        A    And, again, I think I've stated, I don't
16   know how to answer that question.
17        Q    Okay.
18             When you were analyzing the corrected --
19   the disclosure event for the common stock, do you
20   use the sub period of February 8, 2016, to
21   February 6, 2017, when you're testing the reaction
22   of the common stock?
23        A    I'm sorry.  Could you repeat the question.
24        Q    In connection with your analysis in common
25   stock for this trading event, the February 7th, 2017
```

1    trading event -- I'm sorry -- disclosure event, you

2    used a sub period, which was February 16 to

3    February 17.

4        A    The sub period?  I'm sorry.  I don't

5    understand the question.

6        Q    You broke down your analysis of the common

7    stock into sub periods; correct?

8        A    Well, so which sub periods are we talking

9    about?  Are we talking about the market model sub

10   periods?

11       Q    Okay.  Yes.

12       A    Well, then yes.  By definition, I broke

13   those down into sub periods.

14       Q    Why didn't you do that with the notes?

15       A    Oh, so we're going -- okay.

16            I -- at this point in time, I would refer

17   to my answer, which I previously gave, with regards

18   to that question.

19       Q    Which answer?

20       A    I don't have anything more to say on that

21   subject.

22            It occurred maybe an hour or two hours ago.

23   That specific question was asked.

24       Q    Was one of the reasons because you did not

25   have enough consecutive trading days for the bond?

Case 1:21-cv-02586-GBD Document 568-2 Entered on FLSD Docket 06/28/2023 Page 292 of 332

1      A    I've answered that question to the best of

2    my ability.  I believe my -- the answer that I gave

3    previously is the best answer I can give at this

4    point in time.

5      Q    When we went through that answer, was one

6    of them that you did not have enough consecutive

7    trading days for the bond?

8      A    I don't recall whether or not that was part

9    of my answer.

10     Q    Sitting here today, do you believe that one

11    of the reasons is because you did not have enough

12    consecutive trading days for the bond?

13     A    I don't have an opinion one way or the

14    other, as I sit here today.

15     Q    For the period of February 8th, 2016, to

16    February 6th, 2017, do you know how many consecutive

17    trading days there are for the bond?

18     A    I'm sorry.  So February 8th?

19     Q    2016.

20     A    Okay.  February 8th, 2016, to when?

21     Q    February 6th, 2017.

22     A    February 6th, 2017.

23          Okay.  Hold on.

24          Based on -- and, again, I'm reviewing

25    Exhibit 12.  I believe the answer to your question

```
 1    is zero, but I would have to fully review all the
 2    data to -- I would need to look at each -- my entire
 3    dataset to give you a more accurate answer to that
 4    question.
 5         Q    Okay.
 6              Let's move to the Unger/Krogman factors in
 7    connection with the notes, which is on page 54 and
 8    paragraph 152.
 9              Let me know when you're there.
10         A    Okay.
11         Q    You state (as read and/or reflected:)
12                   In addition to evaluating the
13                   efficiency of the market for FXCM
14                   notes using the Cammer factors, I
15                   also analyzed the Unger/Krogman
16                   factors that are relevant to the
17                   bond market, market capitalization
18                   (or total par value) and float.
19         A    Maybe I'm looking at the wrong part.
20              Which paragraph?
21         Q    152.
22         A    Oh, so is that in the beginning of the
23    paragraph?
24              MR. HAKLAY:  Yes.  He's reading from the
25    very beginning of the paragraph.
```

Case 1:21-cv-10914-DEH Document 588-2 Filed 06/02/25 Page 294 of 332

```
 1              THE WITNESS:  Oh, okay.  So -- okay.
 2    BY MR. ISAJIW:
 3         Q    The next sentence says (as read and/or
 4    reflected):
 5                   Because bid-ask data are not
 6              reported by TRACE for bond
 7              transactions, this Unger/Krogman
 8              factor was not assessed for the
 9              FXCM note.
10              Did I read that correctly?
11              (Reporter clarification.)
12              THE REPORTER:  Thank you.
13    BY MR. ISAJIW:
14         Q    Did I read that correctly?
15         A    You did.
16         Q    Okay.
17              Are there any other data sources for
18    bid-ask spread quotes, other than TRACE?
19         A    For bonds?
20         Q    Yes.
21         A    As I sit here today, I don't know.
22         Q    Did you endeavor to look for any other
23    sources of bid-ask data, other than TRACE for bonds,
24    in connection with your review of the FXCM notes in
25    this matter?
```

Page 292

1      A    I do not believe so.

2      Q    Why didn't you?

3      A    Why didn't I?  Again, I'm going back to

4   industry standards.  TRACE is the dataset usually

5   used to perform these types of analysis.  It doesn't

6   report bid-ask spread --

7           THE REPORTER:  It doesn't report what?

8           THE WITNESS:  Bid-ask spreads.  So ...

9   BY MR. ISAJIW:

10     Q    Let's look at paragraph 154 on page 55.

11   And this is under the ultimate heading on the top of

12   the page, "Outstanding Par Value (Market

13   Capitalization)."

14          MR. HAKLAY:  He's there.

15          THE WITNESS:  Oh, I'm sorry.  Yes.

16   BY MR. ISAJIW:

17     Q    You state (as read and/or reflected:)

18              Beyond FXCM's large common

19          stock market capitalization, the

20          total par value of the FXCM notes

21          was larger than the market

22          capitalizations of some

23          publicly-traded companies.

24          Is that correct?

25     A    That is correct.

Page 293

1      Q    Throughout this report, you highlight the

2   differences between how stocks and how bonds trade.

3           So why did you benchmark the bond size to

4   an equity market capitalization?

5      A    Because that was the universe that I had

6   data on.

7      Q    Do you believe that that analysis is an

8   industry standard?

9      A    I don't know one way or the other whether

10  that analysis is an industry standard.

11     Q    Did you look for any other sources of data

12  to benchmark the bond against?

13     A    In this context?

14     Q    Yes.

15     A    For this analysis?  I don't believe so.

16     Q    Are you aware of any peer-reviewed academic

17  literature supporting this methodology?

18     A    I'm not familiar one way or the other.

19          I mean, this typically -- I don't -- I

20  don't think people -- I don't think this is an

21  analysis that's commonly done outside of litigation.

22     Q    Okay.

23          MR. ISAJIW:  How are we on time?

24          MR. HAKLAY:  We started this one at 4:07.

25          THE VIDEOGRAPHER:  Do you need a time?

1          We're at 5 hours and 23 minutes.

2          MR. HAKLAY:  You meant total time?

3          MR. ISAJIW:  No.

4          I'm asking how long have we been since the

5   last break?

6          MR. HAKLAY:  43 minutes.  So --

7          MR. ISAJIW:  Maybe this would be a good

8   time to stop while we change gears.

9          MR. HAKLAY:  Thank you.

10         I didn't understand the question.

11         Yes.

12         THE VIDEOGRAPHER:  We are going off the

13  record.

14         The time is 4:50 p.m.

15         (Recess was taken at 4:50 p.m.

16         until 5:02 p.m.}

17         THE VIDEOGRAPHER:  We are back on the

18  record.

19         The time is 5:02 p.m.

20  BY MR. ISAJIW:

21     Q   So, Dr. Werner, I wanted to discuss your

22  damages opinion and damages methodology for a little

23  bit.

24         On page 5 of this report, Opinion 3, you

25  state (as read and/or reflected:)

```
 1              With expert assistance, the
 2          finder of fact in this matter will
 3          be able to compute damages using a
 4          common class-wide methodology that
 5          applies to the calculation of
 6          damages for each and every Class
 7          member.
 8          Is that correct?
 9      A   You read that correctly.
10      Q   And then on page 56 you have a heading,
11  "Common Damages Methodology."
12      A   "Common Damage," singular, "Methodology."
13  Maybe it should say "damages."
14      Q   Okay.
15          Did you draft this section of your report?
16      A   At some point in my life, yes.
17      Q   Okay.
18          So this is -- this section or parts of it
19  have been used in prior reports of yours?
20      A   I believe that's correct.
21          So, by way of example, I mean, I would
22  typically use this language (as read and/or
23  reflected):
24              Plaintiffs' counsel -- and
25          this is paragraph 156 -- has asked
```

Page 296

```
 1              me to opine on whether per share
 2              out-of-pocket damages could be used
 3              for each Class member under Section
 4              10(b) of the Exchange Act using a
 5              common methodology for all Class
 6              members.
 7         Q    Okay.
 8              I was just asking because you said at some
 9    point in your life, and I thought that meant not
10    necessarily for the first time here.
11         A    Well, it -- no.  I mean, if we're going
12    through the entire thing, yes, certain portions of
13    this were specifically drafted for this report.
14         Q    Okay.
15         A    Or this case, I guess.
16         Q    Generally speaking, does one damage model
17    work for all securities litigation cases?
18              MR. HAKLAY:  Objection.
19              THE WITNESS:  Does one -- I don't
20    understand the question.
21    BY MR. ISAJIW:
22         Q    You describe a damages methodology in this
23    report; correct?
24         A    Yes, that is correct.
25         Q    Is part of that damages methodology a
```

```
                                                  Page 297

 1   damages model?

 2       A    So a damages model, I think, is slightly

 3   more complex.  I have been asked to opine on whether

 4   or not per-share damages could be measured each --

 5   for each Class member under Section 10(b) of the

 6   Exchange Act using a common methodology for all

 7   Class members.

 8            So I've opined upon that.  I have not --

 9   until the record is complete.  I could not give you

10   a full-blown damage model.

11       Q    Okay.

12            So you haven't created a damage model?

13       A    Created a damage model?

14            I have provided a framework under which one

15   could calculate damages.

16       Q    That framework that you provided, would

17   that work for all securities class action cases?

18       A    I think by definition, no.

19       Q    Okay.

20            Have you ever proposed a different

21   framework in any of the securities cases that you've

22   been a testifying expert for in the past?

23       A    At the market efficiency stage?

24       Q    Yes.

25       A    I don't know.  I would need to think about
```

Page 298

```
 1    that.

 2            Yeah.  I'm just providing a framework under

 3    which to calculate damages.

 4            I don't know.  I'm sorry.  I don't know how

 5    to answer your question.

 6        Q   So you provided a particular framework in

 7    this report, which we'll get into the details of,

 8    but, generally speaking, you provided a framework;

 9    correct?

10        A   What do you mean by "generally speaking"?

11        Q   Let me rephrase it.

12            I believe you just told me that you

13    provided a framework for calculation of damages in

14    this report.

15        A   That is correct.

16        Q   Okay.

17            Have you provided that same framework in

18    prior securities litigation cases in a market

19    efficiency report?

20        A   Have I provided that same framework?

21            I'm not sure how to answer that question.

22        Q   Help me help you -- help me ask a better

23    question.

24            What is confusing about the question?

25        A   I just don't understand it.
```

1     Q   You refer to a framework in this report.

2   I'm asking if you used this framework in prior

3   matters at the market efficiency stage -- I'm

4   sorry -- at the class certification stage.

5     A   I have provided a framework under which one

6   could estimate damages in this specific case.

7     Q   Okay.

8         Have you ever proposed a different

9   framework in another matter?

10     A   I'm sure I have.

11     Q   Have you ever proposed a different

12   framework in a securities class action case?

13     A   Hmm.  I don't know, as I sit here today.

14     Q   You currently cannot think of a time when

15   you proposed a different framework in a securities

16   class action case?

17     A   I think --

18         THE WITNESS:  What was my answer to the

19   previous question?

20         (The record was read back as

21         follows:

22             "Answer:  I don't know, as I

23         sit here today.")

24         THE WITNESS:  Yeah.  Still I don't know, as

25   I sit here today.

Page 300

1    BY MR. ISAJIW:

2        Q    Turning to page 57, paragraph 159,

3    subparagraph "i." You talk about a number of

4    valuation tools including an event study analysis

5    and potentially other empirical analyses, if

6    necessary.

7             Do you see that?

8        A    Yes.

9        Q    Okay.

10            Apart from an event study, what are the

11   other empirical analyses that you're referring to?

12       A    I mean -- again, until I have the full

13   record for this case, I would be -- I would be

14   speculating to talk about other empirical analyses.

15       Q    Can you give me just an idea of what's on

16   the menu for potential other empirical analyses?

17       A    Not until I have a full record of the case.

18       Q    In any other case, have you used other

19   empirical analyses, apart from an event study?

20       A    I believe so.

21       Q    In a securities litigation case?

22       A    I'm sorry.

23            Under market efficiency, or are we talking

24   now about loss causation and damages when we're

25   talking about a securities case?

1      Q   We're talking about damages methodology, as

2   described in paragraph 159, sub "i," where you say

3   that you would use an event study and potentially

4   other empirical analyses, if necessary.

5           I'm just trying to figure out what are the

6   potential other empirical analyses.

7           You've suggesting you've used others in

8   other cases.  So I'm now just asking, which ones?

9      A   Right.  But so when I say "other cases,"

10  I'm talking about at a lost causation or damages

11  stage.

12     Q   Let's start with at the class certification

13  stage.

14     A   So I have not -- I don't think I've ever

15  been asked to calculate damages.

16     Q   Okay.

17     A   Specific damages at the class certification

18  stage.

19     Q   That makes sense.

20          And so then at the damages expert report

21  stage, what types of other empirical analysis have

22  you used in the past to calculate damages?

23     A   Again, and this is to the best of my

24  recollection, I mean, possibly earnings, earnings

25  multiplier -- not earning multiplier.  Sorry.

Case 1:21-cv-00146-BAe BOKnt D88umEnt1386d7onFHe3D0712/20 0Bd9e2023 of P35e 305 of 332

```
 1    Earnings ratios.  I mean, a series of financial
 2    ratios.
 3              Again, it varies from case to case.
 4         Q    Okay.
 5              In the next sentence of the same paragraph
 6    you say (as read and/or reflected:)
 7                   This analysis, after
 8              controlling for potentially
 9              confounding non-fraud-related
10              information, would determine if the
11              alleged misrepresentations and
12              omissions had caused the stock
13              prices to be artificially inflated,
14              and that the corrective
15              disclosure(s) caused the inflation
16              to dissipate, in turn causing
17              investor losses.
18              Did I read that correctly?
19         A    Yes.
20         Q    What do you mean by "potentially
21    confounding non-fraud-related information"?
22         A    Information not related to the fraud.
23         Q    What does "confounding" mean?
24         A    Confounding, different, conflicting with.
25         Q    As you're using it in this sentence, I'm
```

Page 303

1   just trying to understand.

2       A    Information that's not the same as the

3   fraud-related information.

4       Q    What types of information can be

5   confounding information, in your experience?

6       A    It depends on the situation.

7       Q    In the situation of the last time you

8   opined on a damages model in a securities case, what

9   type of confounding information was present there?

10          MR. HAKLAY:  Objection.  Assumes facts not

11  in evidence.

12          You can answer.

13          THE WITNESS:  I don't recall.  I mean, how

14  about if I just give you an example.

15          So I don't know.  Some -- some announcement

16  comes out about the fraud.  If there was no other

17  information on that day, the stock price would go

18  down.  But on that day, at the same time, they

19  announced they had made a billion dollars in

20  profits, which was much more than they had ever

21  earned before, you know, by a magnitude of 10.

22          That might be an example -- so I would

23  expect -- my -- again, in this hypothetical, my

24  expectation is that kind of announcement might, on

25  its own, might lead to a price increase, whereas,

 1   the information with regarding -- with regards to

 2   the alleged fraud might lead to a price decline.

 3           And so those two things would be moving in

 4   a different direction.

 5   BY MR. ISAJIW:

 6       Q   Okay.

 7           Any other examples you can think of?

 8       A   I think that's probably the simplest, as I

 9   sit here today.

10           And, again, that was a hypothetical

11   example.  It wasn't an actual example from a case.

12       Q   Okay.

13           Looking at the next subparagraph you state

14   (as read and/or reflected:)

15               Second, an inflation ribbon

16               would be constructed, indicating

17               how much artificial inflation

18               caused by the alleged

19               misrepresentations and omissions

20               was in the price of FXCM securities

21               on the date -- on each day during

22               the Class Period.

23           What is "inflation," as you use it there?

24       A   I think I define it somewhere else in my

25   report.

1          So let's just go to a general case.

2          Inflation would be the difference between

3     the actual price and the but-for price assuming some

4     type of fraud because usually when we talk about

5     inflation, it's in regards to fraud or alleged

6     fraud.  Or omissions, misstatements.

7          Q   Can the level of inflation change over

8     time?

9          A   Yes.

10         Q   How would you calculate inflation in your

11    model over time?

12         A   Without -- without all -- full discovery in

13    this case, I can't opine on that.

14         Q   I'm just wondering generally, high level,

15    what are the mechanics?

16         A   Again, it differs on a case-by-case basis.

17         Q   If you would do that, do you believe you

18    would use the same event study analysis that you

19    have used in your current report?

20         A   Unless -- I mean, it would depend on

21    whether or not other facts became apparent during

22    discovery.

23         Q   Sitting here today, do you know of any

24    changes you would need to make to the event study

25    you used in your report?

```
 1           MR. HAKLAY:  Objection.  Asked and
 2   answered.
 3           THE WITNESS:  Well, I can't predict what
 4   facts will be discovered throughout the rest of
 5   discovery.  So it would be speculative of me to talk
 6   about any changes that one might make to a
 7   hypothetical inflation area as of this date.
 8   BY MR. ISAJIW:
 9       Q   So just from a mechanics perspective, once
10   you conduct an event study on an alleged corrected
11   disclosure, how do you translate that into damages
12   throughout the Class Period?
13       A   So can -- I'm not quite sure I understand
14   the question.
15           THE WITNESS:  Could you repeat the
16   question, please.
17           (The record was read back as
18           follows:
19               "Question:  So just from a
20           mechanics perspective, once you
21           conduct an event study on an
22           alleged corrected disclosure, how
23           do you translate that into damages
24           throughout the Class Period?")
25           THE WITNESS:  You would adjust the
```

1    inflation ribbon to reflect that corrective

2    disclosure.

3    BY MR. ISAJIW:

4        Q    Would you adjust the inflation ribbon based

5    on the number of corrective disclosures or the time

6    period between the corrective disclosure and the

7    purchase price?

8              I'm just trying -- what's the relationship

9    between the corrective disclosure and adjusting the

10   event ribbon -- I'm sorry, the inflation ribbon?

11       A    At this point in time, it's an incomplete

12   hypothetical.  Again, I'm more than happy to provide

13   an opinion about this if and when this case gets

14   to -- discovery is completed and I am asked to opine

15   upon loss causation and damages.

16       Q    Sitting here today, you don't have an

17   opinion on that then?

18       A    I don't believe I have been asked to form

19   an opinion as of this date.  That was not what I was

20   asked to do at this stage in litigation.

21       Q    Jumping backwards to paragraph 15 of your

22   report.  And this is regarding the February 6, 2017

23   press release announcing the CFTC and NFA

24   settlement.

25              You state (as read and/or reflected:)

```
                                              Page 308

 1                   As a result of this news, the

 2              value of FXCM common stock dropped

 3              over 68 percent (on a logarithmic

 4              basis) from $6.85 to $3.45 on

 5              February 17 -- I'm sorry --

 6              February 7, 2017, on heavy trading

 7              volume (1.9 million shares of

 8              common stock, compared to a Class

 9              Period daily average of 0.15

10              million shares of common stock.)

11              Did I read that correctly?

12        A    That is correct.

13        Q    Can you define for me what a logarithmic

14   basis is?

15        A    So I use a log return as opposed to the

16   normal return.

17        Q    What is a log return?

18        A    It's based on -- it's -- do you want me to

19   write down on a piece of paper what it might look

20   like?

21        Q    I would like you to describe just

22   conceptually what it is.

23        A    Well, okay.  What's your understand --

24   sorry.

25                   If your understanding of a return -- I
```

Page 309

```
 1    don't -- wait.

 2            I may describe it in my report with more

 3    precision than what I'm going to give you.  I mean,

 4    it's literally just a different way to calculate the

 5    return, but ...

 6            So let's take an example.  Let's do an

 7    example.

 8            So yesterday the price of a stock was $5.

 9    Today it's $10.  So the return over that period --

10    the way people would commonly -- I better write

11    these numbers down just so I --

12            All right.

13            So let's say the price is $10 today -- or

14    yesterday and it's $5 today.

15            So normally what you would do in

16    calculating the return is you would take 5 minus 10

17    and then divide it by 10; whereas, when you're

18    calculating log returns, you would take the natural

19    log of 5 divided by 10.

20        Q    Okay.

21            Going back to paragraph 15, the trading

22    price change that you describe there equates to a

23    drop of about $3.40 per share; is that correct?

24        A    $3.40 -- yeah, it appears that's right.

25        Q    Do you attribute 100 percent of this
```

1   decline to the information that was disclosed in the

2   CFTC press release?

3        A   I'm not sure I have been asked to opine on

4   that at this point.

5        Q   At this point, do you have any opinion on

6   that?

7        A   As I sit here, it certainly was a

8   contributing factor, but beyond that, I don't -- I

9   haven't formed an opinion.

10       Q   So you haven't formed an opinion whether or

11  not 100 percent of this decline was attributable to

12  the information in the CFTC press release?

13            MR. HAKLAY:  Objection.  Asked and

14  answered.

15            THE WITNESS:  I have not been asked to

16  opine on that at this point in time.

17  BY MR. ISAJIW:

18       Q   Is it your opinion that all of this decline

19  would have been caused by the market learning -- the

20  alleged truth about the FXCM's relationship with

21  Effex?

22            MR. HAKLAY:  Objection.  Same question.

23  Asked and answered.

24            THE WITNESS:  Same answer.

25  ///

 1  BY MR. ISAJIW:

 2      Q   And that answer is you do not -- sitting

 3  here today, you have not formed an opinion?

 4          THE WITNESS:  Could you read back my answer

 5  from the previous question.

 6          (The record was read back as

 7          follows:

 8              "Answer:  As I sit here, it

 9          certainly was a contributing

10          factor, but beyond that, I don't --

11          I haven't formed an opinion.")

12          THE WITNESS:  Yeah.  Same answer.

13          I believe was there also something about I

14  have not been asked to provide that opinion at this

15  point in time?

16          THE REPORTER:  (No audible response.)

17          THE WITNESS:  There may have been something

18  about that as well.

19  BY MR. ISAJIW:

20      Q   Would you agree that if some of the decline

21  in FX- -- FXCM's stock on February 6 and 7, 2017,

22  was caused by other factors, that it would not be

23  appropriate to include those losses in your damage

24  calculation?

25      A   I don't understand your incomplete

Page 312

1    hypothetical.

2        Q    When conducting a damages analysis, if some

3    of the decline in the stock price was related to

4    factors, other than the alleged fraud, would it be

5    appropriate to include the losses in the damage

6    calculation?

7        A    What do you mean by "losses"?

8            So now you're saying that there are losses?

9    Do you mean a price decline attributable to

10   non-fraud-related information?

11           I'm sorry.  I don't -- I just don't

12   understand the question.  Let's leave it at that.

13       Q    If a -- if you determine in a damages

14   analysis that a stock price declines and some of the

15   decline is related to the alleged fraud in a case

16   and some of the decline is related to other factors,

17   in your opinion, is it appropriate to include all of

18   the decline in your damages analysis?

19       A    So it would depend upon the situation, but

20   at this stage with regards to this specific

21   litigation, that's not something I have been asked

22   to do.

23       Q    Can you think of a situation where it would

24   be appropriate to attribute the loss -- I'm sorry --

25   the decline in the stock price attributable to

```
 1   non-fraud actions in a loss calculation or damages
 2   calculation?
 3        A    Can I think -- wait.
 4             In your hypothetical, there's other
 5   factors, other news comes out on that day.  It's an
 6   incomplete hypothetical.
 7        Q    Let's control for all factors in the
 8   hypothetical, other than -- you know what.
 9             I withdraw the question.
10             What is your understanding of FXCM and its
11   business?
12        A    My understanding is that -- and I'm reading
13   from paragraph 10 now of my report (as read and/or
14   reflected:)
15                  FXCM described itself as "an
16             online provider of foreign exchange
17             trading and related services"
18             headquartered in New York, New
19             York.  The Company provided "access
20             to over-the-counter ('OTC') FX
21             markets through [its] proprietary
22             technology platform."  During the
23             Class Period, the Company's
24             platform sought to provide its
25             customers "the best price
```

Page 314

1          quotations" on currency pairs from

2          various market makers, global

3          banks, and financial institutions.

4     Q    Okay.

5          Did you draft that section of your report?

6     A    I believe so.

7     Q    And what information did you rely on in

8     drafting that section of your report?

9     A    Let's see, I believe it was the -- at least

10    one of the 10-Ks.

11         Well, certainly at least some of -- one of

12    the financial statements.

13    Q    What is your understanding of the term "No

14    Dealing Desk"?

15    A    Well, my understanding is that in this type

16    of model a customer executes a trade -- and again,

17    I'm reading now from paragraph 11.  (As read and/or

18    reflected:)

19              "Customer executes a trade on

20          the best price quotation offered by

21          [FXCM's] FX market makers," with

22          FXCM acting as a credit

23          intermediary while "simultaneously

24          entering into offsetting trades

25          with both the customer and the FX

```
 1           market maker."

 2      Q    Is that your complete understanding of the

 3   No Dealing Desk?

 4      A    I believe that's an accurate description of

 5   my understanding.

 6      Q    Looking at the footnotes of your report, is

 7   that understanding based on a combination of FXCM

 8   form 10-Ks and the second amended consolidated

 9   securities class action complaint in this case?

10           (Reporter clarification.)

11           MR. HAKLAY:  Objection.  Misstates what's

12   written in that paragraph, as you're referring to

13   it.

14           THE WITNESS:  I believe that's informed my

15   opinion about it.

16   BY MR. ISAJIW:

17      Q    Okay.

18           Do you have a view as to whether or not

19   FXCM's No Dealing Desk model was viewed as preferred

20   or even relevant to its customers?

21      A    As I sit here today, no.

22      Q    Do you believe FXCM's -- do you have a view

23   as to whether or not FXCM's No Dealing Desk model

24   was relevant to its shareholders?

25      A    As I sit here today, I do not.
```

Page 316

1     Q   What about its noteholders?

2     A   Same answer.

3     Q   Do you have any understanding as to whether

4  or not the relationship between FXCM and Effex

5  changed over the Class Period?

6        I'm sorry.  Let me ask -- let me take one

7  step back.

8        What is your understanding of Effex?

9        Effex is -- I want to make sure I spell it

10  correctly.  It's E-F-F-E-X.

11    A   Yeah, I'm trying to ...

12        Right.

13        So my understanding, I guess, is based on

14  my reading of the second amended complaint.

15    Q   Okay.

16        Other than what's in the second amended

17  complaint, did you do any independent analysis about

18  the relationship between FXCM and Effex?

19    A   Again, I don't remember if it was mentioned

20  in some of the press releases around the corrective

21  disclosure.  So that -- if you have those, I would

22  be happy to take a look at those and refresh my

23  memory.

24        But I think to the extent that I've looked

25  at it, it would be this (indicating), and then,

Page 317

1   again, I don't have a recollection of whether or not

2   I've seen it somewhere else.

3          MR. HAKLAY:  Just for the record, when he

4   said "this," he put his hand on the second amended

5   complaint.

6          THE WITNESS:  Second amended complaint,

7   Exhibit 6.

8   BY MR. ISAJIW:

9      Q   Are you familiar with the business model of

10  any other FX brokerage firms?

11     A   What do you mean by "business model"?

12     Q   The way they operate their trading activity

13  in connection with -- in relation to their

14  customers.

15         Let me ask it -- we just discussed a No

16  Dealing Desk and you read from a portion of your

17  report about what you believe the No Dealing Desk

18  is.

19         Are you aware of any other FX trading

20  entities that have a No Dealing Desk model?

21     A   Am I aware?

22         Well, again, I -- I don't know how to

23  answer that question.  I mean, as I sit here today,

24  I can't answer your question.

25     Q   Okay.

```
 1              So as you sit here today, you do not know

 2     one way or the other whether or not the No Dealing

 3     Desk model was employed by other FX trading

 4     entities?

 5          A    That is correct.

 6          Q    I want to just jump back real quick to the

 7     damage, singular, section of your report.

 8          A    Oh, it may -- it probably should say

 9     damages, but you --

10          Q    And this is focusing on paragraph, I

11     believe, 159?

12          A    159.

13          Q    And subsection "ii" where we were

14     discussing earlier about the inflation ribbon.

15          A    Okay.

16          Q    Okay.

17              A few sentences down below when we

18     discussed earlier, it's six sentences down (as read

19     and/or reflected:)

20                  Construction -- construction

21              of the inflation ribbon generally

22              employs event study analysis,

23              combined with widely used and

24              generally accepted valuation tools

25              and models.
```

```
                                           Page 319

 1            Did I read that correctly?
 2      A    Yes.
 3      Q    Can you describe what the "widely used and
 4   generally accepted valuation tools and models" are?
 5      A    Yeah.
 6            I would refer to my answer before when we
 7   were discussing subpoint "i" about (as read and/or
 8   reflected):
 9                 First, valuation tools, which
10            would include event study analysis,
11            such as that described herein, and
12            potentially other empirical
13            analyses if necessary, would be
14            used to establish that the
15            disclosure(s) correcting the
16            alleged misrepresentations and
17            omissions, caused the price of FXCM
18            securities to fall.
19            So when you asked me that question before,
20   I would refer you to that same answer in respect to
21   this question that you've just asked me.
22            That answer would not change.
23      Q    Okay.
24            So there's no additional valuation tools or
25   models that you can think of that you did not
```

Page 320

1    mention earlier today?

2        A    I'm not sure that that's correct, but ...

3        Q    If it's not, please let me know what the

4    additional tools are.

5        A    Well, again, let's -- I refer you to my

6    previous answer.

7             I believe I said that the tools I would use

8    are case specific.  I believe I cited one example

9    for you of a type of analysis that -- what I would

10   do.

11            So I will rely on that answer that I gave

12   previously.

13       Q    Do these valuation tools and models require

14   data?

15       A    It's possible that they do.

16       Q    What sort of data would you need to utilize

17   the valuation tools to calculate the inflation at

18   the start of the Class Period?

19       A    What -- I'm sorry.

20            THE WITNESS:  Could you repeat that

21   question.

22            (The record was read back as

23            follows:

24                 "Question:  What sort of data

25            would you need to utilize the

Case 1:21-cv-10964-DAE  Document 588-2  Entered on FLSD Docket 08/28/2023  Page 324 of
332

```
 1          valuation tools to calculate the

 2          inflation at the start of the Class

 3          Period?")

 4  BY MR. ISAJIW:

 5      Q   And it probably should have been "with the

 6  valuation tools" in that question.

 7      A   Yeah.  At this point, it would be

 8  speculative of me for me to opine upon that or

 9  discuss that.

10      Q   What types of datasets have you relied on

11  in the past?

12      A   It differs from case to case.

13      Q   Can you give me some examples of the

14  datasets in any case?

15      A   Sure.

16          I might use datasets from Compustat or

17  datasets from Bloomberg.  That would be two

18  examples.

19      Q   And what would the Compustat data show you?

20      A   You know, the Compustat, I don't remember.

21  I think Compustat was bought.  Typically, firm

22  financial data.

23          As I sit here today, I'm speculating

24  because I believe that they underwent a transaction.

25          So when I used Compustat 30 years ago, I
```

1    probably -- like I said, again, I believe it has

2    been acquired, and so it is not proper for me to say

3    Compustat.

4         Q    And you also mentioned datasets from

5    Bloomberg.

6              What type of data did you receive from

7    Bloomberg?

8         A    Well, data from Bloomberg.  Again, it

9    depends on the case.  I don't remember off the top

10   of my head.

11             You just asked me for examples of what

12   other data I might or what other avenues of data I

13   might look at.  And so I was responding to that

14   question.

15        Q    Do you have any view of what type of data

16   you would want to review in connection with this

17   case if you're asked to do a damage calculation?

18        A    Not as I sit here today.

19             MR. ISAJIW:  I think now would be a good

20   time for us to take a quick break just so I can

21   go -- so I can go see if we can shorten things up.

22             Is that okay with everybody?

23             MR. HAKLAY:  Sure.  It's your deposition.

24             THE VIDEOGRAPHER:  We are going off the

25   record.

Page 323

1                The time is 5:38 p.m.

2                (Recess was taken at 5:38 p.m.

3           until 5:47 p.m.}

4                THE VIDEOGRAPHER:  We are back on the

5      record.

6                The time is 5:47 p.m.

7      BY MR. ISAJIW:

8           Q    Dr. Werner, earlier when we were talking

9      about the framework advantages set forth in your

10     report, you -- we were talking about various

11     valuation tools.  And you said it would be

12     speculative as to what data you would need in

13     connection with doing an analysis pursuant to those

14     tools at this point.

15               Sitting here today, can you be sure that

16     the data exists that will allow you to calculate

17     inflation in this case if you were asked to do so?

18          A    I would see no reason why that data

19     wouldn't exist.

20          Q    And what kind of data do you believe that

21     would be?

22          A    Well, again, I just -- I don't know.  It

23     would be speculative of me at this point in time,

24     but I don't -- in doing damage analyses, I can't

25     ever remember coming across a case where I couldn't

1  get the data I needed.

2          I mean, it can always be subpoenaed.  I

3  don't -- so I don't know.

4          In your -- it's an incomplete hypothetical

5  and not anything I've thought of at this point in

6  the day.

7      Q   So if it's not something you've thought

8  about at this point, you can't be sure one way or

9  the other?

10          MR. HAKLAY:  Objection.  Asked and

11  answered.

12          Please answer.

13          THE WITNESS:  In your hypothetical example,

14  you're asking me do I know as of this date -- it's

15  not anything I've thought about.

16  BY MR. ISAJIW:

17      Q   Okay.

18      A   That's the most accurate answer I can give

19  you at this point in the day.

20      Q   Okay.

21          MR. ISAJIW:  I think with that, I have no

22  more questions.

23          So I thank you for your time.

24          MR. HAKLAY:  I was joking about the

25  59 minutes.

1          I have nothing.

2          MR. ISAJIW:  I figured you were.

3          THE VIDEOGRAPHER:  This is Media 1.  And

4     this marks the conclusion of today's deposition of

5     Dr. Adam Werner, Ph.D.

6          We're going off the record.

7          The time is 5:49 p.m.

8          (Whereupon, at 5:49 p.m., the

9          deposition of ADAM WERNER, Ph.D.,

10         was concluded.)

11                    ---oOo---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 326

1          ACKNOWLEDGMENT OF DEPONENT

2          I, ADAM WERNER, PH.D., do hereby certify

3    that I have read the foregoing transcript of my

4    testimony taken on 2/28/2020, and further certify

5    that it is a true and accurate record of my

6    testimony (with the exception of the corrections

7    listed below):

8    Page    Line                    Correction

9    _____|_____|_____|_____

10   _____|_____|_____|_____

11   _____|_____|_____|_____

12   _____|_____|_____|_____

13   _____|_____|_____|_____

14   _____|_____|_____|_____

15   _____|_____|_____|_____

16   _____|_____|_____|_____

17   _____|_____|_____|_____

18   _____|_____|_____|_____

19   _____|_____|_____|_____

20   _____|_____|_____|_____

21                    _____

                           ADAM WERNER, PH.D.

22

     SUBSCRIBED AND SWORN TO BEFORE ME

23   THIS _____ DAY OF _____, 20___.

24

     _____        _____

25   (NOTARY PUBLIC)               MY COMMISSION EXPIRES:

```
                                        Page 327

 1   STATE OF CALIFORNIA    )

 2   COUNTY OF LOS ANGELES )    ss.

 3

 4       I, Reagan Evans, RPR, RMR, CRR, CCRR, CLR, CRC,

 5   CSR No. 8176, in and for the State of California, do

 6   hereby certify:

 7       That prior to being examined, the witness named

 8   in the foregoing deposition was by me duly sworn to

 9   testify to the truth, the whole truth, and nothing

10   but the truth;

11       That said deposition was taken down by me in

12   shorthand at the time and place therein named and

13   thereafter reduced to typewriting under my

14   direction, and the same is a true, correct, and

15   complete transcript of said proceedings;

16       That if the foregoing pertains to the original

17   transcript of a deposition in a federal case, before

18   completion of the proceedings, review of the

19   transcript { } was { } was not required.

20       I further certify that I am not interested in

21   the event of the action.

22       Witness my hand this 3rd day of March, 2020.

23

24   _____
                   Certified Shorthand Reporter

25                   for the State of California
```

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.