# Exhibit 4

# EXHIBIT  B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

IN RE NETBANK, INC.             |     CIVIL ACTION FILE
SECURITIES LITIGATION      |     NO. 1:07-CV-2298-BBM

## EXPERT REPORT OF R. ALAN MILLER

### I.   SCOPE OF PROJECT AND REPORT

I, R. Alan Miller, state the following to be true to the best of my knowledge, based on my experience and expertise in the matters discussed.

1.    I have been asked by counsel for the Lead Plaintiff in this matter for my opinion: a) whether, during the Class Period (March 16, 2005 through May 21, 2007), the common stock of NetBank, Inc. ("NetBank" or the "Company") traded in an efficient market and whether its stock price reflected the mix of information available to the investment community; and b) whether any decline in the price of NetBank's common stock was caused by the correction or revelation of the misrepresentations or omissions alleged by the Lead Plaintiff's operative Amended and Consolidated Class Action Complaint ("Complaint").

2.    This Report, inclusive of exhibits, presents my findings and

conclusions, as well as methodologies used.  In preparing this Report, the

following is among the information I have reviewed to date:

- Lead Plaintiff's Complaint;

- Defendants' Answer;

- Order dated January 29, 2009;

- Reports filed with the Securities and Exchange Commission by NetBank, including its Forms 10-K, 10-Q and 8-K which were filed during 2005, 2006 and 2007;

- NetBank's stock price and volume information and index data as provided by The Bloomberg, L.P.;

- Brokerage industry analyst reports on NetBank from databases provided by Thomson Financial and Reuters;

- News reports and press releases on NetBank provided by The Bloomberg, L.P. and Reuters;

- Sources of internet information such as NASDAQ.com, SEC.gov, and various stock message board websites.

## II.   SUMMARY OF CONCLUSIONS

3.    Based on my background, experience and expertise as described

herein and the analysis as is set forth herein, it is my opinion that, during the

Class period at issue, NetBank common stock traded in an efficient market.  It is

2

also my opinion that the declines in NetBank's stock price after the relevant disclosures during the Class Period were substantially related to the allegations of wrongdoing set forth in the Complaint, and that the purchase of shares at inflated prices throughout the Class Period was caused by the omissions and misstatements described in the Complaint. A fuller statement of all relevant opinions and the basis and reason for them are expressed below.

### III. QUALIFICATIONS

4. I am President of Philadelphia Investment Banking Company ("PIBC"), a corporate finance consulting and litigation support firm located in Villanova, Pennsylvania. I am submitting this Expert Report in connection with Lead Plaintiff's Motion for Class Certification in the above litigation.

5. PIBC has provided a wide range of corporate finance services to a diverse clientele of businesses and individuals located throughout the United States. These services include: raising capital through private placements of debt and equity financings; financial analysis and advisory services for public offerings of securities; merger, acquisition and divestiture services; evaluation and economic analysis services; consulting and litigation support; and other financial services.

6. PIBC and its principals perform a considerable amount of work in the areas of evaluation of businesses and securities and the factors involved in such evaluation. These are done on a formal basis for a variety of purposes, as well as continuously on an informal basis in the process of performing corporate finance consulting functions in areas such as raising capital and assisting in mergers and acquisitions. The factors used in such evaluations and their importance and materiality to the investment community are areas in which I have developed expertise and had substantial experience over the last thirty-six years. Additionally, we have prepared a substantial number of analyses of market impact and damages in connection with numerous shareholder litigations.

7. Attached hereto as Exhibit A is a copy of my resume, which outlines the professional experience and expertise I have developed in over thirty-six years in practice. I have testified in court as a financial expert in thirty-one cases. As such, I have been qualified or accepted as an expert on the operations and efficiency of the securities markets, damages, materiality issues, investment banking practices, valuations and related corporate finance matters in numerous federal and state courts nationwide beginning in 1977. In addition, I have provided, in these and other cases, many depositions and submitted numerous

4

Declarations and Affidavits on matters in these areas, including many dealing with market efficiency questions or the factors relevant to such studies.

8. I received a B.S. in Economics from Cornell University in 1970, and a Masters in Business Administration (major in Financial Accounting) from the Wharton School of Finance and Commerce of the University of Pennsylvania in 1973. I have attended various Practising Law Institute and similar programs and seminars on topics such as corporate finance and due diligence. I have been a guest lecturer at the Wharton School and at LaSalle University on various corporate finance and capital markets topics.

9. I have actively worked in the investment banking field for 36 years. My work experience includes:

- Howard & Co., a corporate finance research and consulting firm, Philadelphia, 1972 to 1976. Performed research, writing and consulting on a wide range of corporate finance topics including bank debt, long term debt—private and public, mergers and acquisitions, equity capital—private and public, going public and being public. Topics included cost of each type of capital or project, terms, advantages and disadvantages to issuer and financing party, sources of capital, roles of participants (agents, underwriters, counsel, accountants, rating agencies, regulators, issuers, sources of financing), and time to accomplish tasks. Such research included a detailed and comprehensive study of 550 IPO's that had occurred in the five years prior to 1973; issues studied included determination of required disclosures, materiality, due diligence practices and procedures, terms and

5

pricing, roles of participants, costs, timing, other issues that arose. Authored and/or edited numerous articles in a series of newsletters on above topics and prepared research for presentation at seminars and to clients. Consultation to clients on corporate finance projects and issues.

- Butcher and Singer, a major regional investment banking firm headquartered in Philadelphia, corporate finance department 1976 to 1980. Performed corporate finance functions for investment banking/brokerage firm. Work included private placements and public offerings of debt and equity securities, merger and acquisition work, evaluations, fairness opinions, tender offer management, creating and structuring leasing transactions, corporate finance advisory and consulting work. Obtained professional license as registered representative.

- Philadelphia Capital Advisors, a corporate finance services group of Philadelphia National Bank, 1980 to 1983. Continued corporate finance functions, except for public offering activities, for a wide rage of clients. Supervised and instructed other group members.

- Philadelphia Investment Banking Company, a corporate finance services firm, 1983 to present. Continued corporate finance activities, with increasing work in litigation support.

10. PIBC is being compensated for the time spent by its personnel on this matter at its normal hourly rates on a non-contingent basis. Currently my rate is $495 per hour; others in the firm are billed at rates from $75 to $435 per hour. PIBC's compensation is in no way contingent on the outcome of this litigation or otherwise.

6

## IV.  MARKET EFFICIENCY

11.    Stock prices are determined by the supply of and demand for a stock.  At any point in time, if there are more buyers than sellers, the buyers will bid the price up to get the (relatively scarcer) seller's shares.  Conversely, if there are more sellers than buyers at any time, they will push the price down until enough buyers are found.  The U.S. stock markets generally function smoothly and with adequate liquidity to facilitate those who want to buy and sell.

12.    In order to further explain how information is reflected in the price of publicly-traded stock, economists and financial experts over the last several decades have developed what has become known as the Efficient Market Hypothesis.  There are three versions which differ based on what type and amount of information is believed to be "impounded" or incorporated into stock prices:

- The weak form suggests that a current stock price is the result of past stock prices; the implication is that knowledge of past stock prices, in the absence of other information, will not enable an analyst to accurately predict future or even near-future stock prices.

- The semi-strong form suggests that all currently public information available to market participants is reflected in stock prices fairly rapidly after being obtained by the market.  The clarity of the information and the degree to which it would obviously affect future

7

cash flows, as well as the manner of dissemination, affect the speed of incorporation of the information into the price.

- The strong version suggests that in addition to known information, private information or any information that might be knowable is incorporated into stock pricing. Most observers believe that this version is only theoretical and does not exist in practice.

Most market practitioners and academics believe that the semi-strong version is operative in the U.S. securities markets, including the NASDAQ, currently (and during the Class Period)—that the market price of a stock reflects all information known to market participants. In my opinion, the semi-strong version was operative for NetBank's common stock during the Class Period.

13.    The term "Market Efficiency", as it arises in the class certification stage of securities fraud litigation, is used to describe whether the market for a particular security is informationally efficient. The relevant inquiry has therefore focused on whether a market mechanism exists to allow trading to occur if participants so wish, and on whether information is available to these participants on which they could base an investment decision. The context of the examination is important in defining the factors to examine. The central question is whether stocks trade on, and their prices are set based on, information about the issuer and whether misinformation could therefore affect the level of prices.

8

14. When considering whether the market for a stock is efficient, the object is to determine whether there are sufficient participants in the market with capital who are prepared to trade the stock; whether information about the stock is regularly provided or available to market participants; and whether the stock's price responds to information. Specific factors to consider in evaluating market efficiency are addressed in *In re Scientific-Atlanta, Inc. Secs. Litig.*, No. 1:01-cv-1950-RWS (N.D. Ga. Sept. 7, 2007), which discussed and applied the widely accepted factors in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), and which are used by the courts to assess whether information is flowing to market participants and whether there is a mechanism that permits them to incorporate such information into their decisions to buy, sell or hold a security. Before reviewing the specific factors, however, several general comments are appropriate.

15. At least for class certification, it is appropriate to presume that *all* NYSE, AMEX and NASDAQ National Market System ("NMS") stocks trade on efficient markets—and this is before considering the vast improvements in information availability since that text was written in 1988. This premise comports with the *Cammer* court's analysis, as well as commentators on the law

9

such as Bromberg & Lowenfels, 4 Securities Fraud and Commodities Fraud

(August 1988), p. 1292.

16.    Although the proper focus in an examination of market efficiency is

on the particular stock in question, factors describing the general market in which

a stock trades can also be relevant. Here, NetBank traded on the NASDAQ

Global Market which is widely considered an efficient marketplace in the

investment community.[1] Included in Exhibit B hereto are informational materials

on the NASDAQ Global Market which highlight the many reasons for concluding

it is efficient as a marketplace.

17.    Since *Cammer v. Bloom* was decided in 1989, markets such as the

NASDAQ Global Market in which NetBank traded, have generally become even

more efficient. Information has been increasingly disseminated electronically and

much of it is available for retrieval at an investor's convenience. SEC

---

[1] At the beginning of the Class Period, NetBank traded on the NASDAQ National Market
System. On July 1, 2006, NASDAQ changed this designation and created three new
classifications: the NASDAQ Global Select Market, the NASDAQ Global Market, and the
NASDAQ Capital Market (for small cap stocks). After this reclassification, NetBank traded
on the NASDAQ Global Market (which was renamed from the NASDAQ National Market
System). According to information on NASDAQ's web site on the new designations: "All
companies on NASDAQ, regardless of market designation, must maintain compliance with
rigorous financial and corporate governance listing qualifications standards. NASDAQ
provides the best trading environment for both value and growth stocks in a well-regulated
environment." See the information on the NASDAQ Markets in Exhibit B.

documents, which were previously retrieved physically in Washington, DC or through a very expensive private copying service have become available, and were available during the Class Period, via the Internet at no charge, on the SEC's EDGAR system as well as other sites. Other news sources, press and wire releases, and brokerage analyst reports are electronically archived and retrievable. Trading information—quotes, trades, historical price and volume data, bids, asks, market makers—all are available on-line. Local newspapers or financial hard-copy publications are no longer the only source of information and trading data. Information is available to market participants, including investors, much more directly than previously, so the intermediary information distribution mechanism of analysts and brokerage firm involvement is not nearly as important as it once was to ensure dissemination of information.

### The *Scientific-Atlanta* and *Cammer* Factors

18.    In accord with *Scientific-Atlanta* and *Cammer*, the relevant factors for consideration include:  a) the average weekly trading volume expressed as a percentage of total outstanding shares; b) the number of analysts following and reporting on the stock; c) the extent to which market makers and arbitrageurs trade in the stock; d) the company's eligibility to file SEC registration Form S-3

(as opposed to Form S-1 or S-2); e) the existence of empirical facts "showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price"; f) the company's market capitalization; g) the bid-ask spread for stock sales; and h) float, the stock's trading volume without counting insider-owned stock.

19. The Average Weekly Trading Volume Expressed as a Percentage of Total Outstanding Shares

Average weekly trading volume is the total trading volume for the period being studied divided by the number of weeks in the period. In my experience, this factor is important as it demonstrates investor interest in the stock.

As shown in Exhibit C, NetBank experienced substantial weekly trading volume during the Class Period. In *Cammer* the Court stated that weekly trading volume of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one. NetBank had between 46,236,885 and 46,586,415 shares outstanding during the Class Period. Using the midpoint of this range, two percent of 46,411,650 = 928,233 shares. At 1,368,983 average weekly shares traded, in my experience NetBank had sufficient investor participation to indicate the existence of an efficient market, and this is supported by *Cammer*.

12

20.   The Number of Securities Analysts Following and Reporting on the Stock

Thomson Financial's database of analyst reports, Investext, lists 114 analyst reports from 14 analysts during the Class Period; Reuters' database of analyst reports, Multexnet, lists 114 reports from 15 analysts. Some of these may overlap and the two sources sometimes list different types of reports. See Exhibit D. This is more than adequate coverage to support a conclusion of market efficiency, even without considering the substantial improvements in information dissemination since the 1989 discussion in *Cammer* discussed herein.

21.   The Extent to Which Market Makers and Arbitrageurs Trade in the Stock

a.   Market makers function to maintain a fair and orderly market by providing liquidity, as acknowledged in *Scientific-Atlanta* and *Cammer*. This is in accord with the NASDAQ's glossary on its web site, which defines market makers as follows:

> The NASD member firms that use their own capital, research, retail and/or systems resources to represent a stock and compete with each other to buy and sell the stocks they represent. There are over 500 member firms that act as NASDAQ Market Makers. One of the major differences between The NASDAQ Stock Market and other major markets in the U.S. is NASDAQ's structure of competing Market Makers. Each Market

13

Maker competes for customer order flow by displaying buy and sell quotations for a guaranteed number of shares. Once an order is received, the Market Maker will immediately purchase for or sell from its own inventory, or seek the other side of the trade until it is executed, often in a matter of seconds.

b.     During the Class Period, NetBank had at least 73 different market makers participating in the market for its common stock as identified by NASDAQ data. This is certainly sufficient to provide an interested group of market participants ready to commit capital upon investors' receipt of information affecting their investment opinions. According to NASDAQ's Going Public publication in Exhibit B, an average of 20 market makers covered each NASDAQ stock in 2005. NetBank was covered by at least 66 market makers in 2005; at least 62 in 2006, and at least 50 in 2007. In a 2008 publication, NASDAQ stated that the average number of market makers for NASDAQ companies was still 20.

c.     What is important to market efficiency is that the mechanism is in place to facilitate trading when those who wish to trade receive information. Here, there is huge capacity for trading from some of the largest, most active NASDAQ market-making firms. Of the top ten largest NASDAQ market makers in October 2006 and March 2007, seven had positions in NetBank; in May 2007,

14

six of the ten largest market makers had positions in NetBank. In my opinion,

NetBank enjoyed excellent market-making support.

    22.    The Company's Eligibility to File SEC Registration Form S-3

        This factor relates primarily to the size of a company's market

capitalization and technical factors regarding previous filings. Pursuant to Form

S-3, companies which are registered under Section 12(g) of the Exchange Act

(among other specified sections) may use this form if the company has timely

filed its reports with the SEC for the last twelve months and if it has an aggregate

value of outstanding securities, not in the hands of affiliates, which totals greater

than $75 million. NetBank qualified for this type of registration during the Class

Period based on the market capitalization factor and to the extent it was current

with its SEC filings.

    23.    Empirical Facts Demonstrating That NetBank's Stock Price
            Responded to News

        a.    We reviewed publicly available databases to determine

whether information was regularly provided to the market regarding NetBank,

the nature of that information, whether that information appeared to be

incorporated into the market price and whether the market reacted to apparently

unexpected news. We considered NetBank's reports filed with the SEC (Exhibit

E), its press releases to the investment community issued during the Class Period (Exhibit F), the analyst reports discussed heretofore (Exhibit D), and other news stories about the Company (Exhibit F).

> b.  For the Class Period, the Factiva.com news retrieval service (a service of Dow Jones & Reuters) lists 1,930 articles mentioning NetBank. The Factiva.com news retrieval service shows 622 articles from "major" sources only and 1,930 for "all" sources (which will overlap somewhat with EDGAR) for the Class Period.  There was a substantial amount of information provided to the marketplace regarding NetBank.  See Exhibit F.  In addition, NetBank regularly filed reports with the Securities and Exchange Commission ("SEC") through November of 2006.  See Exhibit E (EDGAR list).  The Company continued to issue press releases about its results and to conduct investor conference calls, therefore continuing to inform the market of its performance and prospects.  While the filing of SEC reports is in itself not dispositive in determining market efficiency, as the extensive discussion in *Cammer* shows, factors such as this are a valid and important component of the provision of information to the marketplace and when coupled with the other structural factors

identified by *Scientific-Atlanta* and *Cammer* (market makers, trading volume,

etc.) are exactly the elements that need to be present to have an efficient market.

      c.     Attached as Exhibit G are price and volume charts with

markings showing times when information was being provided to the market.

There are many hundreds of pieces of information known to have been available

to the market in and around the time of the Class Period. A few examples of

such information are presented here alongside the price and volume data for

illustration.

| Event Date | Reported Volume | Closing Price | % Price Change | News Event |
|---|---|---|---|---|
| 3/5/07 | 689,488 | $2.68 | -11.55% | On March 5, 2007, Barron's reported that the analyst from Sandler O'Neill reduced NetBank's price target on worsening financial results. |
| 5/17/07 | 922,773 | $1.70 | -10.53% | On May 17, 2007, it was reported that NetBank received a warning from NASDAQ because it was late in filing its most recent quarterly report. |
| 5/21/07 | 11,218,123 | $0.59 | -66.29% | On May 21, 2007, NetBank announced that it will be selling most of its assets to EverBank Financial Corp. |

24.     The Company's Market Capitalization

Market capitalization is a recognized factor which contributes to market efficiency. The market capitalization for NetBank was as follows at times shown during the Class Period:

| Date | Shares Outstanding | Stock Price | Market Capitalization | Source |
|------|--------------------|-------------|------------------------|--------|
| 3/7/05 | 46,322,131 | $8.97 | $415,509,515.07 | 12/31/04 10-K |
| 5/1/05 | 46,236,855 | $8.21 | $379,604,579.55 | 3/31/05 10-Q |
| 7/31/05 | 46,318,407 | $9.33 | $432,150,737.31 | 6/30/05 10-Q |
| 10/31/05 | 46,359,564 | $7.82 | $362,531,790.48 | 9/30/05 10-Q |
| 3/6/06 | 46,586,415 | $7.28 | $339,149,101.20 | 12/31/05 10-K |
| 4/30/06 | 46,336,115 | $7.00 | $324,353,085.00 | 3/31/06 10-Q |
| 7/31/06 | 46,373,702 | $5.50 | $255,055,361.00 | 6/30/06 10-Q |
| 10/31/06 | 46,400,456 | $5.31 | $246,386,421.36 | 9/30/06 10-Q |

According to Bloomberg data, at the beginning of the Class Period on March 16, 2005, there were 3,215 stocks in the NASDAQ Composite Index, a market capitalization-weighted index of stocks comprising the three NASDAQ classifications. When ranking all these stocks by market capitalization, NetBank was ranked 913; NetBank's inclusion in the top 30 percentile signals its efficiency. On December 29, 2006, NetBank ranked 1,653 out of 3,150 stocks in the NASDAQ Composite.

This level of market capitalization supports a finding of market efficiency.

25.   Bid-Ask Spread for Stock Sales

       The bid price is the highest price an investor will pay for a security,
while the ask price is the lowest price a seller will accept for the same security.
The bid-ask spread is simply the absolute value of the difference between these
two prices.  Using NetBank's daily closing bid and ask prices for the Class
Period, the average daily bid-ask spread is $0.016, or 0.29% of the average stock
price.  In my experience, these are very tight spreads and low percentages and
further indicate market efficiency in NetBank's stock.

26.   Float

       "Float" is considered as the number of shares available for trading
by the public.  It is calculated by subtracting the number of shares held by
insiders from the total number of shares outstanding.  The following table
summarizes NetBank's insider holdings as disclosed in its proxy statements filed
from 2004 to 2006 (there was no NetBank proxy statement published in 2007):

| Date of Proxy Report | Shares Outstanding (Referenced in Proxy) | Amount Of Insider Holdings | Insider Holdings as a % of Outstanding | Float as a % of Outstanding |
|---|---|---|---|---|
| 3/25/04 | 47,114,828 | 2,979,362 | 6.32% | 93.68% |
| 3/28/05 | 46,322,131 | 3,262,948 | 7.04% | 92.96% |
| 3/31/06 | 46,586,415 | 3,435,189 | 7.37% | 92.63% |

A conclusion of market efficiency is supported by the high percentage of shares available for public trading to the total shares outstanding.

## V.   LOSS CAUSATION

27.   We have reviewed the daily trading prices and volumes for NetBank's stock along with news articles, analyst reports, Company SEC filings and other information which was publicly-disseminated during the Class Period. We have observed market index movements, industry index movements, and comparative company movements, and compared them with those of NetBank's stock price movements.  Based on this review and my professional experience, it is my opinion that the declines in NetBank's stock price after the relevant disclosures during the Class Period were substantially related to the issues raised in the Complaint, and that the purchase of shares at inflated prices throughout the Class Period was caused by the omissions and misstatements described in the Complaint and/or discussed heretofore.  See Exhibit H.

28.   The Complaint contends that, during the Class Period, NetBank and the Defendants engaged in a scheme to deceive the market and artificially inflate

the price of NetBank's shares. In doing so, Defendants made material

misrepresentations and omissions regarding, among other things, the Company's

financial reporting, financial condition, internal controls, business operations,

corporate restructuring, core banking business, lending practices and exposure to

subprime mortgages. As a result of their purchases of NetBank stock during the

Class Period at artificially inflated prices and subsequent disclosures which

removed the inflation from such securities, Plaintiffs and other members of the

Class suffered losses. The type of information which Defendants allegedly

omitted and misstated during the Class Period regarding the financial condition

and performance, and internal controls, is of the utmost importance to investors,

as it is used to assess the financial strength of the Company and its likely future

prospects. The financial control issues are especially important as without them,

the reliability of the financial information cannot be assumed.

     29.    A regression analysis calculates the relationship between movements

in a dependent variable (stock price) compared with movements in an

independent variable (typically an index of stock prices) as expressed in a

formula, applies the formula to the Class Period to predict the movement of the

price given the movement of the index, observes the differences between the

actual price movements and the predicted movements, and expresses those differences in terms of standard deviations. A regression analysis was generated under my direction whereby the movement of NetBank's stock price was compared with that of the NASDAQ Banking Index[2]. On each date of the Class Period, the results of the regression were used to segregate the portion of the price change "explained" by company-specific factors and the portion "explained" by the index movement, by comparing the company's actual stock price movements with a prediction of the same based on the stock price and index's respective movements during a "base period"[3] (assumed to be unaffected by fraud). On dates when NetBank's stock price decline was statistically significant[4], we reviewed sources such as news articles and analyst reports to determine if the disclosures were "corrective" of or related to the omissions and misstatements described in the Complaint. The following table summarizes some

---

[2] The NASDAQ Banking Index was the industry index used by NetBank in its Proxy Statements during the Class Period. The SEC requires filers to include a comparative factor to its stock price performance; NetBank presented this index as its comparative index.

[3] The base period used here was January 1, 2004 through March 15, 2005.

[4] The threshold for statistical significance at the 95% confidence level was set at a t-statistic of 1.967903, which represents 1.97 standard deviations of divergence from the predicted value (which varies according to the model based on the index change on a given day). The threshold for statistical significance at the 90% confidence level was set at a t-statistic of 1.6499487 with the same implications.

of NetBank's stock price declines which reflect the issues raised in the Complaint

(for specific news details for these dates, see Exhibit H):

| Drop Date | Actual $ NTBK Decline | Net $ NTBK Decline | Actual % NTBK Decline | Net % NTBK Decline | Level of Significance | t-statistic |
|---|---|---|---|---|---|---|
| 10/25/06 | ($0.35) | ($0.37) | -5.88% | -6.20% | 95% | -3.69 |
| 10/26/06 | ($0.14) | ($0.18) | -2.50% | -3.23% | 90% | -1.92 |
| 11/8/06 | ($0.26) | ($0.27) | -5.01% | -5.22% | 95% | -3.11 |
| 12/18/06 | ($0.40) | ($0.36) | -8.68% | -7.75% | 95% | -4.60 |
| 2/7/07 | ($0.11) | ($0.13) | -2.87% | -3.43% | 95% | -2.04 |
| 2/27/07 | ($0.27) | ($0.14) | -7.65% | -4.03% | 95% | -2.34 |
| 3/19/07 | ($0.14) | ($0.16) | -5.71% | -6.40% | 95% | -3.81 |
| 3/30/07 | ($0.12) | ($0.12) | -5.15% | -5.16% | 95% | -3.07 |
| 4/27/07 | ($0.07) | ($0.07) | -3.38% | -3.34% | 95% | -1.99 |
| 5/3/07 | ($0.06) | ($0.06) | -2.90% | -3.04% | 90% | -1.81 |
| 5/16/07 | ($0.05) | ($0.06) | -2.56% | -3.22% | 90% | -1.91 |
| 5/21/07 | ($1.16) | ($1.17) | -66.29% | -66.87% | 95% | -39.75 |

30.    The stock price declines shown in the above table could increase

based on: a) inclusion of price declines on relevant disclosures that initially

appear to be, by themselves, statistically insignificant but which on further

analysis may be significant; b) price declines on relevant disclosures lasting more

than one day (the dates on the table above are only one-day windows); and c)

relevant disclosures occurring after the Class Period. It is highly likely that

relevant declines lasted more than one day in this matter. In my opinion, loss

causation is demonstrated by the above analysis. The stock price declines

identified in the table above are, in my opinion, statistically significant and

causally related to news and other disclosures of the alleged fraud or of business

reversals related to the alleged fraud. See, for example, the decline on May 21,

2007 with its t-statistic of –39.75.

31. The following Exhibits are attached hereto:

Exhibit A    Resume of R. Alan Miller
Exhibit B    NASDAQ Stock Market Materials
Exhibit C    Weekly Trading Volume Data
Exhibit D    Securities Analysts' Reports
Exhibit E    EDGAR List
Exhibit F    Articles and Press Releases
Exhibit G    Price and Volume Chart Marked With
                Information Provided To Market
Exhibit H    News Items on Selected Dates With
                Significant Price Movements

## VI.   LIMITING FACTORS AND OTHER ASSUMPTIONS

32. This report is furnished solely for the parties and the court in the

matter of the In re NetBank, Inc. Securities Litigation identified in the above-

referenced caption, and solely in connection with Lead Plaintiff's Motion for

Class Certification.

33. We have generated this preliminary report in advance of the

conclusion of fact discovery, which may cause us to modify or amplify the

opinions expressed in this report. Further analysis may be performed. This information may also be supplemented or presented in different format(s).

_4/17/09_____

Date

_R. alm miller_____

R. Alan Miller

# EXHIBIT  A

# RESUME OF R. ALAN MILLER

# PHILADELPHIA INVESTMENT BANKING COMPANY

## R. ALAN MILLER

### President

Mr. Miller was a founder of PIBC in September of 1983. A summary of PIBC's services is attached.

From November of 1980 until the formation of PIBC, Mr. Miller served as Senior Vice President of Philadelphia Capital Advisors, the corporate finance services division of the Philadelphia National Bank. At Philadelphia Capital Advisors, Mr. Miller was responsible for corporate finance activities, including private placements of debt and equity capital; mergers, acquisitions and divestitures; financial consulting, evaluation and expert witness services; leasing and other alternate sources of capital; and for providing assistance and advice to PCA's staff on their projects.

Prior to joining Philadelphia Capital Advisors, Mr. Miller was Vice President, Corporate Finance at Butcher & Singer, Inc., an investment banking firm based in Philadelphia, from 1976 to 1980. At Butcher & Singer his duties included private placements of debt and equity capital; mergers and acquisitions; public offerings of securities; leasing, evaluations, financial consulting and expert witness assignments.

From 1972 to 1976 Mr. Miller was a Senior Associate and General Manager with Howard & Co., a Philadelphia based financial consulting company. Assignments there included research and consulting on a wide range of corporate finance topics. Mr. Miller also edited and wrote many of the articles for a series of newsletters on corporate finance published by Howard & Co.

Mr. Miller received a B.S. in Economics from Cornell University in 1970 and an M.B.A. in Financial Accounting from the Wharton School of the University of Pennsylvania in 1973. He served in the United States Marine Corps Reserve from 1970 through 1976. Mr. Miller has authored several articles on various corporate finance topics and has been a guest lecturer at the Wharton School and La Salle University. He currently lives in Wayne, Pa.

# PHILADELPHIA INVESTMENT BANKING COMPANY

## Summary of Services

The following are specific categories of PIBC services.  All situations are unique; we invite your inquiries as to our capabilities.

FINANCINGS

       Private debt and equity financings
       Joint ventures
       "Operational" or trade financing
       Marketing/distribution arrangements as capital sources
       Public offerings--advisory
       Leasing and "managed" equipment financing
       Other specialized financings

EVALUATIONS AND ECONOMIC ANALYSES

       Litigation consulting and support
       General business valuations
       Merger, acquisition and divestiture analyses
       Shareholder representation
       Fairness opinions
       Estate or gift tax; estate planning
       Marital or property settlement; other dispute resolution
       ESOP transactions/annual evaluations; corporate repurchases
       Recapitalizations
       Assistance to fiduciaries
       Offeree representative, prospective investor analysis

MERGERS AND ACQUISITIONS, LEVERAGED AND MANAGEMENT BUYOUTS

REFINANCING, TURNAROUND "PROJECT MANAGEMENT" AND WORKOUT FINANCING; BANKRUPTCY PLANS

TRUSTEE/FIDUCIARY, ASSET MANAGER ASSIGNMENTS

CORPORATE FINANCIAL ADVISORY; CONSULTING; "WORKING DIRECTOR" ASSIGNMENTS

## R. ALAN MILLER

### Expert Witness Testimony in Court

1. <u>Vadakin v. Vadakin.</u> State Court of Ohio Court System, Marietta, Ohio, 1977.

2. <u>Baer v. Fidelco Growth Investors.</u> Court of Common Pleas, Montgomery County, PA, 1978.

3. <u>Shanno v. Magee Industrial Enterprises, Inc.</u> United States District Court for the Eastern District of Pennsylvania. Civil Action 79-2038, J. Fullam, October 12, 1983.

4. <u>Raymond K. Peil v. Speiser, et al.</u> (Health-Chem Securities Litigation). United States District Court for the Eastern District of Pennsylvania. Civil Action No. 82-1289, J. O'Neill, April 1985.

5. <u>Gordon McShane, et al. v. Pennwalt Corporation, et al.</u> United States District Court for the Eastern District of Pennsylvania. Civil Action No. 85-6020, J. Ludwig, March 10, 1986.

6. <u>Harry Lewis v. John D. DePaul, et al.</u> (Lehigh Press Litigation). Court of Common Pleas, Philadelphia County, PA. Civil Action No. 4760, November Term, 1986. March 5, 1987.

7. <u>California Natural v. Nestle.</u> United States District Court for the District of New Jersey, J. Brotman, June 1987.

8. <u>GCA Corporation Securities Litigation.</u> United States District Court for the District of Massachusetts, Master File No. 85-4693-c, J. Caffrey. October 1987.

9. <u>Van de Walle v. Unimation, et al.</u> Court of Chancery of the State of Delaware, New Castle County. Civil Action No. 7046, Vice Chancellor Jack B. Jacobs, February and April 1989.

10. <u>U.S. Healthcare Securities Litigation.</u> United States District Court for the Eastern District of Pennsylvania. Civil Action No. 88-0559, J. McGlynn, April 1989.

11. <u>California Natural v. Nestle.</u> United States District Court for the District of New Jersey (Camden). J. Brotman. April 1989.

12. <u>IA Holdings Corporation Dissenter's Appraisal Action.</u> Court of Common Pleas, Delaware County, Pennsylvania. Civil Action 86-14981, J. Lawhorne, October 1989.

R. Alan Miller / Expert Witness Testimony in Court / Page 2

13. Kulicke & Soffa Securities Litigation. United States District Court for the Eastern District of Pennsylvania. Master File No. 86-1656, J. Ditter, March 1990.

14. McKinley Allsopp, Inc. v. Jetborne International, Inc. United States District Court for the Southern District of New York. 89 CIV. 1489 (DNC), J. Leval, May 1990.

15. Kay Jewelers Securities Litigation. United States District Court for the Eastern District of Virginia, Alexandria Division. Civil Action No. 90-1663-A through 90-1688-A, J. Bryan, June 1991.

16. Pennsylvania Enterprises Securities Litigation (Lindner Fund, et al. v. Pollock, et al.). United States District Court for the Eastern District of Pennsylvania. Civil Action No. 91-6901, J. VanArtsdalen, December 1991.

17. O & M Investment Partners v. Windon, et al. United States District Court for the Eastern District of Pennsylvania. Civil Action No. 91-CV1970, J. Robert F. Kelly, September 1992.

18. National Media (Derivative) Securities Litigation. United States District Court for the Eastern District of Pennsylvania. Civil Action No. 90-8113, J. Bechtle, November 1992.

19. First Pennsylvania Securities Litigation (Grossman v. First Pennsylvania Corporation, et al.). United States District Court for the Eastern District of Pennsylvania. Civil Action No. 89-9234, J. Brody, July 1993.

20. In the Matter of R. Glen Fenstermacher, et al., Debtors. United States Bankruptcy Court for the District of New Jersey. Case No. 93-13041, J. Wizmur, July 1993.

21. Sunkyong America, Inc. v. Omega Sports, Inc. United States District Court for the Eastern District of Pennsylvania. Civil Action No. 93-CV-5355, J. Van Antwerpen, September 1994.

22. Geriatric & Medical Centers Securities Litigation (Hoffman v. Geriatric & Medical Centers, Inc., et al.). United States District Court for the Eastern District of Pennsylvania. Civil Action No. 93-CV-2129, J. Fullam, May and June, 1995.

23. U.S. Banknote Securities Litigation (Vladimir v. U.S. Banknote and Morris Weissman). United States District Court for the Southern District of New York. 94 Civ. 0255(MGC), J. Cedarbaum, January 1997.

R. Alan Miller / Expert Witness Testimony in Court / Page 3

24. <u>Lewin, et al. v. Saidel, et al.</u> (MetroBank Proxy/Securities Litigation).  Court of Common Pleas, County of Philadelphia, PA.  No. 96-04-SD-0015.  J. Levin, November 1997.

25. <u>Kenney (as Ch. 11 Trustee for Daisy Systems Corp., et al.) v. Bear Stearns & Co., Inc.</u> United States District Court for the Northern District of California, Oakland Division. No. C92-1845-DLJ, J. Jensen, April 1998.

26. <u>Alpha Group Consultants, Ltd., et al., and Pension Reserves Investment Trust Fund of the Commonwealth of Massachuetts v. Bear Stearns & Co., Inc.</u>  United States District Court for the Southern District of California.  Case No. CV-91-00143-IEG, J. Gonzalez, July and August, 1998.

27. <u>Fightertown Entertainment, Inc. v. Robertson, Stephens & Company, et al.</u>  Superior Court of the State of California In and For the County of Orange.  No. 750511, J. Kline, October 1998.

28. <u>First Pension Cases I—Murray v. Belka.</u>  Superior Court of the State of California In and For the County of Orange.  No. 740706, J. Firmat, April 2000.

29. <u>Krogman, et al. v. Sterritt, et al. (Continental Investment Corp. Securities Litigation).</u> United States District Court for the Northern District of Texas.  Civil Action No. 3-98-CV 2895-T, J. Lynn, November 2000.

30. <u>Heiser, et al., v. Southeastern Pennsylvania Transportation Authority.</u>  City of Philadelphia Court of Common Pleas.  Case No. 9907-3167, J. Shepard, December 2002.

31. <u>PolyMedica Corp. Securities Litigation.</u>  United States District Court for the District of Massachusetts, Civil Action No. 00-12426 REK, J. Young, March 23, 2006.

R. ALAN MILLER

<u>Deposition and Arbitration Testimony</u>

The following list is of matters in which I have given testimony at deposition or in arbitration since January 1, 1990.

<u>Depositions</u>

1. Shearson/Indian Wells Securities Litigation.  United States District Court for the Western District of Washington at Seattle.  No. C88-695WD, May 14, 15 and 16, 1990.

2. Kay Jewelers Securities Litigation.  United States District Court for the Eastern District of Virginia, Alexandria Division.  Civil Action No. 90-1663-A through 90-1688-A,  May 15, 1991.

3. Rospatch Securities Litigation.  United States District Court for the Western District of Michigan, Southern Division.  No. 1:90-CV-805, February 4, 1992, March 6, 1992.

4. National Media (Derivative) Securities Litigation.  United States District Court for the Eastern District of Pennsylvania.  Civil Action No. 90-8113, October 21, 1992.

5. Federal Express Securities Litigation.  United States District Court for the Western District of Tennessee.  Master File No. 90-2359-4B, November 24, 1992.

6. Gillette Securities Litigation.  United States District Court for the District of Massachusetts.  Civil Action No. 88-1858-K, March 12 and 26, 1993.

7. HBO & Co. Securities Litigation.  United States District Court for the Northern District of Georgia, Atlantic Division.  Civil Action No. 1:87-CV-657A-JTC, May 6, 1993.

8. American Dental Laser Securities Litigation.  United States District Court for the Eastern District of Michigan, Southern Division.  Master File No. 92-CV-71917-DT, August 3, 11, 18, and 31, 1993.

9. Mesa Petroleum Securities Litigation.  United States District Court for the Northern District of Texas, Dallas Division.  Case No. 3:91-CV-2376-x,  March 28, 1994.

10. Geriatric and Medical Centers Securities Litigation.  United States District Court for the Eastern District of Pennsylvania.  Civil Action Nos. 92-CV-5113 and 93-CV-2129, October 10 and 20, 1994.

R. Alan Miller / Deposition and Arbitration Testimony / Page 2

11. Moore Medical Corporation Securities Litigation. United States District Court for the Southern District of New York. Civil Action No. 91 Civ. 3701 (ML), November 3 and 4, 1994.

12. Cellcor Securities Litigation. Court of Chancery of the State of Delaware in and for New Castle County. Civil Action No. 12725, April 12 and 13, 1995.

13. New America Securities Litigation. United States District Court for the District of Massachusetts. Civil Action No. 90-10782-MA, May 11 and 12, 1995.

14. U.S. Banknote Securities Litigation. United States District Court for the Southern District of New York. Civil Action No. 94 Civ. 0255(MGC), February 23, 1996.

15. U.S. Wireless Data Securities Litigation. United States District Court for the District of Colorado. Civil Action No. 94-2-2258, April 9, 1996.

16. Bay Financial Corporation Securities Litigation. United States District Court for the District of Massachusetts. Civil Action Master File No. 89 2377-WD, April 18 and 19, 1996.

17. American Mobile Systems, Inc. Securities Litigation. United States District Court for the Eastern District of Pennsylvania. Civil Action No. 92-1782, May 21, 1996.

18. Clinicorp Securities Litigation. United States District Court for the Southern District of Florida--West Palm Beach Division. 94-8163-CIV-RYSKAMP, July 9, 1996.

19. Circle K Bankruptcy Litigation. United States Bankruptcy Court for the District of Arizona. Bankruptcy Court Nos. 90-5052-PHX-GBN to 90-5075-PHX-GBN Jointly Administered, Advisory Proceeding No. 93-1123, August 8, 1996.

20. People's Bank Securities Litigation. United States District Court, District of Connecticut. Civil Action No. B-90-600 (JAC), February 5 and 6, 1997.

21. Castle Pines Securities Litigation. District Court, County of Douglas, Colorado. Civil Action No. 91-CV-429, Division 2, August 21, 1997.

22. Thomas P. Jasin v. Brown & Company Securities Corporation. United States District Court for the Eastern District of Pennsylvania. Civil Action No. 96-CV-6872, October 31, 1997.

23. Goldfine v. Steinberg, et al. (Shearson) Litigation. Circuit Court of Cook County, Illinois. No. 93L5223, February 11 and 12, 1998.

R. Alan Miller / Deposition and Arbitration Testimony / Page 3

24. Kenney (as Ch. 11 trustee for Daisy Systems Corp., et al.) vs. Bear Stearns & Co., Inc. United States District Court for the Northern District of California, Oakland Division. Case No. C-92-1845-DLJ, March 20, 1998.

25. Rolite, Inc. v. Wheelabrator Environmental Systems, Inc. and WMX Technologies, Inc. United States District Court for the Eastern District of Pennsylvania, No. 94-CV-5894, April 29, 1998.

26. Alpha Group Consultants, Ltd., et al., and Pension Reserves Investment Trust Fund of the Commonwealth of Massachusetts v. Bear Stearns & Co., Inc. United States District Court for the Southern District of California, Case No. CV-91-00143-IEG (JAH), July 8, 1998.

27. Fightertown Entertainment, Inc. v. Robertson, Stephens & Co. Superior Court of the State of California for the County of Orange, Case No. 750511, August 6 and 7, 1998.

28. Kidder Peabody Securities Litigation. United States District Court for the Southern District of New York, Master File Civil Action No. 94-CV-3954 (BSJ) (MHD), January 28, 1999 and February 18, 1999.

29. Micrion Corporation Securities Litigation. United States District Court for the District of Massachusetts, No. 96-11596-REK, May 7, 1999.

30. Mizel IRA et al. v. Butler et al.—Avatex Derivative Litigation. Supreme Court of the State of New York—County of New York, Index No. 602773/98, September 8, 1999.

31. First Pension Cases—Coordination Proceeding No. 3131 (Murray v. Belka et al.). Superior Court of the State of California for the County of Orange, No. 740706, December 15, 16 and 17, 1999.

32. Miller Industries Securities Litigation. United States District Court for the Northern District of Georgia, Atlanta Division, Civil Action, Master File No. 1:97-CV-2811 (TWT), March 15 and 16, 2000.

33. Continental Investment Corp. Securities Litigation. United States District Court for the Northern District of Texas, Civil Action No. 3-98-CV2895-T, May 8, 2000.

34. IKON Office Solutions, Inc. Securities Litigation. United States District Court for the Eastern District of Pennsylvania, MDL Docket No. 1318 (MK) No. 98-CV-4286, September 27 and 28, 2000.

35. PaineWebber Incorporated v. NetRatings, Inc. Supreme Court of the State of New York, County of New York, Index No. 99/605036, October 20, 2000.

R. Alan Miller / Deposition and Arbitration Testimony / Page 4

36. Jacobs, et al. v. Coopers & Lybrand, L.L.P., et al. (Happiness Express Securities Litigation). United States District Court for the Southern District of New York, Case No. 97 CIV. 3374 (RPP), January 18, 2001.

37. Robert Mowbray, et al. v. Waste Management Holdings, Inc. United States District Court for the District of Massachusetts, Civil Action No. 98-11534-WG4, March 22 and 23, 2001.

38. Lee Adams v. Western Micro Technology, Inc., et al. Superior Court of the State of California, In and For the County of Orange, Case No. 810801, June 8, 2001.

39. BankAmerica Corp. Securities Litigation. United States District Court for the Eastern District of Missouri—Eastern Division, MDL No. 1264 (Judge Nangle), July 26 and 27, and December 6, 2001.

40. Sternbach and Ancowitz v. Network Associates and Lichtman. United States District Court for the District of New Jersey, Civil Action No. CIV. 00-1576 (JCL), August 1, 2001.

41. Sunbeam Corporation Securities Litigation (Debentures). United States District Court for the Southern District of Florida, Miami Division, MDL No. 1297, November 1 and 2, 2001.

42. Infocure Corporation Litigation. United States District Court for the Northern District of Georgia, Atlanta Division, C.A. No. 01-CV-0001-TWT, November 14, 2001.

43. Equimed, Inc. Securities Litigation. United States District Court for the Eastern District of Pennsylvania, Master File No. 98-CV-5374 (NS), December 20, 2001.

44. Merz Pharmaceuticals v. Accupac, Inc. United States District Court for the Eastern District of Pennsylvania, Civil Action No. 01-CV-1668, January 23, 2002.

45. Smallworldwide PLC Securities Litigation. United States District Court for the District of Colorado, Civil Action No. 99-K-1254, March 28 and April 24, 2002.

46. PSINet Securities Litigation. United States District Court for the Eastern District of Virginia, Alexandria Division, Civil Action No. 00-1850-A, January 8, 2003.

47. DaimlerChrysler Securities Litigation. United States District Court for the District of Delaware, Master Docket No. 00-0993 (JJF), January 13, 2003.

R. Alan Miller / Deposition and Arbitration Testimony / Page 5

48. Hayden v. FleetBoston Financial Corporation and Robertson Stephens, Inc.  JAMS Arbitration, August 27, 2003.

49. Rollins-Safety Kleen (Proxy) Litigation.  United States District Court for the District of South Carolina, Civil Action No. 3:00-1343-17, October 1, 2003.

50. AMF Bowling Securities Litigation.  United States District Court for the Southern District of New York, Civil Action No. 99 CIV 3023 (DL), December 17, 2003.

51. Telxon Corporation Securities Litigation and Hayman v. PricewaterhouseCoopers, LLP.  United States District Court for the Northern District of Ohio—Eastern Division, Case No. 5:98-CV-2876, January 13 and 14, 2004.

52. Apropos Securities Litigation.  United States District Court for the Northern District of Illinois, Civil Action No. 01C8406, January 30, 2004.

53. Safeguard Scientifics Securities Litigation.  United States District Court for the Eastern District of Pennsylvania, Civil Action 01-3208, June 29, 2004.

54. Official Committee of Unsecured Creditors of Tri Valley Growers vs. Deloitte & Touche LLP.  Superior Court of the State of California, County of San Francisco, No. 406914, August 25 and 26, 2004.

55. Levitan v. McCoy, et al. (Bank One Securities Litigation).  United States District Court for the Northern District of Illinois—Eastern Division, Civil Action No. 00-C-5096, May 4, 2005.

56. Commercial Financial Services, Inc. v. Chase Securities, Inc.  United States District Court for the Northern District of Oklahoma, May 25, 2005.

57. Ahearn v. Credit Suisse First Boston (Winstar).  United States District Court for the District of Massachusetts, No. 03-CV-10956 (JLT), January 3, 2006.

58. Touch America Holdings, Inc. (Montana Power Company) ERISA Litigation.  United States District Court for the District of Montana—Butte Division, No. CV-02-106-BU-SHE, June 27 and July 20, 2006.

59. Fiala, et al. v. Metropolitan Life Insurance Company, et al.  Court of the State of New York, County of New York:  Part 49, No. 601181/00, No. 108887/00, July 14, 2006.

60. Adams Golf Securities Litigation.  United States District Court for the District of Delaware, Consolidated C.A. No. 99-371 (KAJ), August 11, 2006.

R. Alan Miller / Deposition and Arbitration Testimony / Page 6

61. Enron Securities Litigation (Public Employees' Retirement System of Ohio v. Andrew S. Fastow, et al.).  United States District Court for the Southern District of Texas, Houston Division, Civil Action No. H-02-4788, December 11 and 12, 2006.

62. Jack E. Salmon, Jr. v. KPMG LLP et al.  Arbitration.  May 1, 2007.

63. Parmalat Securities Litigation.  United States District Court, Southern District of New York, Case No. 04MD-1653 (LAK), August 6 and 7, 2007.

64. Peregrine Securities Litigation (Bains, et al. v. Moores, et al.).  Superior Court of the State of California for the County of San Diego, No. GIC 806212, August 15, 2007.

65. Motorola ERISA Litigation (Lingis et al. v. Motorola, Inc. et al.).  United States District Court, Northern District of Illinois, Eastern Division, No. 03C5044, November 2, 2007.

66. SBA, as Receiver for Acorn Technology Fund, L.P. v. Smith Stratton, et al.  United States District Court for the Eastern District of Pennsylvania, Civil Action No. 05-190, September 29, 2008.


<u>Arbitrations</u>

1. Liberty University v. Kemper.  American Arbitration Association.  AAA Arbitration No. 11-136-00194-91, November 21, 1991.

2. Raymond James Customer Arbitration.  NYSE.  November 17 and 18, 1992.  NYSE Arbitration Docket No. 1991-001538.

3. Saponaro Customer Arbitration.  NASD.  March 8, 1996.  NASD No. 94-01491.

4. Kennilworth Partners v. Bear Stearns.  NASD.  February 26 and 27, 2003.  NASD No. 00-01232.

5. Hayden v. FleetBoston Financial Corporation and Robertson Stephens, Inc.  JAMS Arbitration, September 9, 2003.

6. Jack E. Salmon, Jr. v. KPMG LLP, et al.  May 25, 2007.