**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-2989-MDL-ALTONAGA/Damian**

In re: JANUARY 2021 SHORT SQUEEZE
TRADING LITIGATION

<u>**This Document Relates to: All Actions Involving the Federal Securities Laws**</u>

<u>**PLAINTIFFS' REPLY IN SUPPORT OF THE MOTION FOR CLASS CERTIFICATION**</u>

## TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT .............................................. 1

II.    ROBINHOOD MISUSES CERTIFICATION TO PUT THE CLASS ON TRIAL ............... 1

   A.   Closing Prices on January 27 Were Not Manipulated Upward ........................................... 2

   B.   Robinhood-Induced Purchases of the Affected Stocks Raised Their Prices........................ 3

   C.   Robinhood's Inadequate Capitalization Led Directly to the Price Declines........................ 4

III.   CLASS-WIDE ISSUES PREDOMINATE AND MERIT CERTIFICATION ...................... 5

   A.   Plaintiffs Have Shown that Class-wide Reliance Issues Predominate............................... 5

      1.   *Affiliated Ute*, a Rule 10b-5(a)&(c) case, applies here.............................................. 6

      2.   Robinhood's common scheme of misconduct applied to all class members..................... 9

      3.   Investors assumed they traded in a *bona fide* market, free of manipulation ................... 10

      4.   Although not required, Plaintiffs satisfy the Eleventh Circuit's standards for *Basic* market efficiency.................................................................................................... 11

         a.   Basic market efficiency is not required in manipulation cases................................... 12

         b.   Although not required, Plaintiffs have proved Basic efficiency................................. 13

IV.   PLAINTIFFS MEET *COMCAST*'S CLASS-WIDE DAMAGES REQUIREMENT........... 16

V.    THE PROPOSED REPRESENTATIVES ARE TYPICAL RETAIL INVESTORS ............. 20

   A.   Retread Non-Reliance Arguments Do Not Demonstrate Atypicality ................................ 20

      1.   Although purchasing decisions are irrelevant, named plaintiffs are typical.................... 20

      2.   Awareness of PCOs is not knowledge of the facts Robinhood concealed....................... 21

   B.   Robinhood Prefers to Be Sued By Institutional Investors ................................................. 22

      1.   There is no minimum financial literacy requirement. ........................................................ 22

      2.   Robinhood's trading strategy attacks are ill-suited to the facts of this case. ................... 23

   C.   The Proposed Representatives Need Not Have Sold All Nine Affected Stocks............... 24

VI.   PLAINTIFFS SATISFY THE ADEQUACY REQUIREMENT OF RULE 23(A)(4)....... 25

VII.   CONCLUSION ............................................................................................................. 25

# <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Affiliated Ute Citizens of Utah v. U.S.*,
  406 U.S. 128 (1972) ................................................................................................. 16, 18

*Alki Partners, L.P. v. Vatas Holding GMBH*,
  769 F. Supp. 2d 478 (S.D.N.Y. 2011) ....................................................................... 11

*Amgen v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013) ................................................................................................... 12

*ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ......................................................................................... 10

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ................................................................................................. 6, 16

*Carriuolo v. Gen. Motors Co.*,
  823 F.3d 977 (11th Cir. 2016) .................................................................................... 16

*Carter v. U.S.*,
  No. 5:18-civ-01380, 2019 WL 3767479 (N.D. Ala. Aug. 9, 2019) ............................ 19

*Cavalier Carpets, Inc. v. Caylor*,
  746 F.2d 749 (11th Cir. 1984) ...................................................................................... 8

*Chemetron Corp. v. Bus. Funds, Inc.*,
  682 F.2d 1149 ............................................................................................................... 9

*Cheney v. Cyberguard Corp.*,
  213 F.R.D. 484 (S.D. Fla. 2003) ........................................................................... 20, 23

*City of Providence v. BATS Global Markets, Inc.*,
  878 F.3d 36 (2d Cir. 2017) ........................................................................................... 7

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ...................................................................................................... 16

*Desai v. Deutsche Bank Secs. Ltd.*,
  573 F.3d 931  (9th Cir. 2009) .................................................................................... 6, 7

*Dodona, I LLC v. Goldman Sachs*,
  847 F. Supp. 2d 624 (S.D.N.Y. 2012) .................................................................... 12, 13

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) .................................................................................................... 18

*Fezzani v. Bear Stearns & Co.*,
   716 F.3d 18 (2d Cir. 2013) ................................................................................................ 11

*Fezzani v. Bear Stearns & Co.*,
   777 F.3d 18  (2015) ........................................................................................................... 11

*FindWhat Investor Grp. v. FindWhat.com*,
   658 F.3d 1282 (11th Cir. 2011) ................................................................................. 12, 15

*Gruber v. Gilbertson*,
   No. 16-cv-9727, 2019 WL 4439415 (S.D.N.Y Sept. 17, 2019) ........................................ 7

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014) ...................................................................................................... 21

*In re Acclaim Ent., Inc. Sec. Litig.*,
   No. 3-CV-1270, 2006 WL 8441287 (E.D.N.Y. Aug. 7, 2006) ..................................... 23

*In re Amerifirst Sec. Litig.*,
   139 F.R.D. 423 (S.D. Fla. 1991) ................................................................................. 22

*In re Barclays Liquidity Cross & High Frequency Trading Litig.*,
   390 F. Supp. 3d 432 (S.D.N.Y. 2019) ............................................................................ 8

*In re Dreyfus Aggressive Growth Mut. Fund Litig.*,
   No. 98-cv-4318, 2000 WL 1357509 (S.D.N.Y. Sept. 20, 2000) ................................... 25

*In re DVI Inc. Sec. Litig.*,
   249 F.R.D. 196 (E.D. Pa. 2008) .................................................................................. 15

*In re GenesisIntermedia Inc. Secs. Litig.*,
   No. 01-CV-9024, 2007 WL 1953475 (C.D. Cal. Jun. 28, 2007) ................................. 12

*In re GenesisIntermedia, Inc. Sec. Litig.*,
   232 F.R.D. 321 (D. Minn. 2005) ................................................................................ 21

*In re HealthSouth Secs. Litig.*,
   261 F.R.D. 616 (N.D. Ala. 2009) ................................................................................ 10

*In re IPO Secs. Litig.*,
   227 F.R.D. 65 (S.D.N.Y. 2004) .................................................................................. 23

*In re IPO Secs. Litig.*,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003) .......................................................................... 8

*In re IPO Secs. Litig.*,
   260 F.R.D. 81 (S.D.N.Y. 2009) .......................................................................... 4, 15, 17

*In re IPO Secs. Litig.*,
   671 F. Supp. 2d 467 (S.D.N.Y. 2009) ........................................................................... 7

*In re LTV Sec. Litig.*,
  88 F.R.D. 134 (N.D.Tex.1980) ................................................................................................... 24

*In re Merrill Lynch Auction Rate Secs. Litig.*,
  704 F. Supp. 2d 378 (S.D.N.Y. 2010) .................................................................................. 6, 10

*In re Safeguard,*
  *Scis.*, 216 F.R.D. 577 (E.D. Pa. 2003) ...................................................................................... 23

*In re Sanofi-Aventis Sec. Litig.*,
  293 F.R.D. 449 (S.D.N.Y. 2013) ............................................................................................... 20

*In re Sunbeam Sec. Litig.*,
  2001 WL 899658 (S.D. Fla. July 3, 2001) ............................................................................... 23

*In re UBS Auction Rate Secs. Litig.,*
  No. 08 Civ. 2967, 2010 WL 2541166 (S.D.N.Y. Jun. 10, 2010) ............................................... 7

*Kennedy v. Tallant,*
  710 F.2d 711 (11th Cir. 1983) ............................................................................................ 9, 22

*Kirkpatrick v. J.C. Bradford & Co.*,
  827 F.2d 718 (11th Cir. 1987) .......................................................................................... 10, 25

*Krukever v. TD Ameritrade, Futures & Forex LLC,*
  328 F.R.D. 649 (S.D. Fla. 2018) ............................................................................................... 25

*Landry v. Price Waterhouse Chartered,*
  *Accts.*, 123 F.R.D. 474 (S.D.N.Y. 1989) ................................................................................... 20

Loc. 703, I.B. of T. Grocery & Food Emp*s. Welfare Fund v. Regions Fin. Corp.*,
  762 F.3d 1248 (11th Cir. 2014) ........................................................................................ passim

*Lorenzo v. S.E.C.*,
  ___ U.S. __, 139 S. Ct. 1094 (2019) ............................................................................................ 6

*Luczak v. Nat'l Beverage Corp.*,
  548 F. Supp.3d 1256 (S.D. Fla. 2021) ........................................................................... 22, 23, 25

*Lumen v. Anderson,*
  280 F.R.D. 451 (W.D. Mo. 2012) .............................................................................................. 15

*Makhlouf v. Tailored Brands, Inc.*,
  2017 WL 1092311 (S.D. Tex. Mar. 23, 2017) .......................................................................... 24

*Monroe Cnty. Employees' Ret. Sys. v. S. Co.*,
  332 F.R.D. 370 (N.D. Ga. 2019) ......................................................................................... 13, 18

*Montgomery v. New Piper Aircraft, Inc.*,
  209 F.R.D. 221 (S.D. Fla. 2002) ............................................................................................... 25

*Powers v. Gov't Emps. Ins. Co.*,
  192 F.R.D. 313 (S.D. Fla. 1998) ............................................................................................. 25

*Ramos v. Patrician Equities Corp.*,
  765 F. Supp. 1196 (S.D.N.Y. 1991) ........................................................................................ 25

*Set Cap. LLC v. Credit Suisse Grp. AG*,
  996 F.3d 64 (2d Cir. 2021) ........................................................................................................ 7

*Set Cap. LLC v. Credit Suisse Grp. AG*,
  No. 18 Civ. 2268, 2023 WL 2535175 (S.D.N.Y. Mar. 16, 2023) ......................................... 17

*Spicer v. Chicago Bd. of Options Exch., Inc.*, No. 88 C,
  2139, 1990 WL 16983 (N.D. Ill. Jan. 31, 1990) ........................................................... 8, 9, 24

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
  No. 05 Civ. 1898, 2005 WL 2148919 (S.D.N.Y. Sept. 6, 2005) ........................................... 24

*Thorpe v. Walter Inv. Mgmt., Corp.*,
  No. 1:14-CV-20880, 2016 WL 4006661 (S.D. Fla. Mar. 16, 2016)................................. 13, 18

*U.S. S.E.C. v. Santos*,
  355 F. Supp. 2d 917 (N.D. Ill. 2003) ........................................................................................ 8

*U.S. v. Regan*,
  937 F.2d 823 (2d Cir. 1991) ...................................................................................................... 8

*Underwood v. Lampert*,
  No. 02-21154-CIV, 2005 WL 8155010 (S.D. Fla. Sept. 9, 2005) ................................... 21, 22

*Waggoner v. Barclays PLC*,
  875 F.3d 79 (2d Cir. 2017) ...................................................................................................... 17

*Willis v. Big Lots Inc.*,
  No. 2:12-cv-604, 2017 WL 1074048 (S.D. Ohio Mar. 17, 2017) .......................................... 14

## Other Authorities

*Efficient Capital Markets, the Crash, and the Fraud on the Market Theory*,
  74 Cornell L. Rev. 913 (1989) ................................................................................................. 19

*The "Less than" Efficient Capital Markets Hypothesis, etc.*
  78 St. Johns's Law Review 81 (winter 2004) .......................................................................... 19

## DEFINED TERMS AND OTHER ABBREVIATIONS

| | |
|---|---|
| ¶ | References are to paragraphs of the Amended Consolidated Class Action Complaint, filed January 17, 2023 (ECF No. 527) |
| Affected Stocks | Common stock of AMC Entertainment Holdings, Inc. ("AMC"), Bed Bath & Beyond Inc. ("BBBY"), BlackBerry Ltd. ("BB"), Express Inc. ("EXPR"), GameStop Corp. ("GME"), Koss Corp. ("KOSS"), Tootsie Roll Industries Inc. ("TR"), or American Depositary Shares of foreign-issuers Nokia Corp. ("NOK") and trivago N.V. ("TRVG") |
| Dates | Unless a year is noted, the year is 2021 |
| Defendants | Robinhood Markets, Inc. and its two wholly-owned subsidiaries, Robinhood Financial, LLC and Robinhood Securities, LLC (also referred to collectively as "Robinhood") |
| ECP charge | Excess Capital Premium charge (component of clearinghouse deposit) |
| Fischel Depo. | The deposition of Daniel Fischel, taken on April 12, 2023 (Rosen Decl., Ex. 37) |
| Fischel Rpt. | Report of Daniel R. Fischel, dated February 16, 2023 (ECF No. 559-8) |
| Grenadier Depo. | The deposition of Steven Grenadier, Ph. D., taken on April 19, 2023 (Rosen Decl., Ex. 38) |
| Grenadier Reb. Rpt. | Rebuttal Expert Report of Steven Grenadier, dated March 28, 2023 (ECF No. 559-30) |
| HFSC Report | "Game Stopped: How the Meme Stock Market Event Exposed Troubling Business Practices, Inadequate Risk Management, and the Need for Legislative and Regulatory Reform," U.S. House of Representatives, Maj. Staff Report, 117th Congress (2nd Session) (June 2022) |
| ITM | In the money |
| NSCC | National Securities Clearing Corporation (a DTCC subsidiary) |
| Opp. | Robinhood's Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Class Certification (ECF No. 567) |
| Order | Order on Motion to Dismiss, dated Aug. 11, 2022 (ECF No. 503) |
| PCO | Position closing only (restriction whereby customer may only sell, not purchase the security at issue) |
| Pl. Br. | Plaintiffs' Motion for Class Certification (ECF No. 559) |
| Robinhood | All three defendant corporations sued in this action |
| Rosen Decl. | When referring to Exhibits 1-34, the Declaration in support of Plaintiffs' Motion for Class Certification, filed on April 28, 2023 (ECF No. 559-2). When referring to Exhibits 35-49, the Declaration in support of Plaintiffs' Reply in Support of the Motion for Class Certification, filed on June 30, 2023. |

| | |
|---|---|
| SEC Staff Report | "Staff Report on Equities and Options Market Structure and Conditions in Early 2021," Staff of the U.S. Securities and Exchange Commission, dated October 14, 2021 |
| Werner Decl. | Declaration of Dr. Adam Werner in Response to Defendants' Daubert Motion, dated June 21, 2023 (ECF No. 582-4) |
| Werner Rpt. | Declaration of Dr. Adam Werner, dated February 16, 2023 (ECF No. 559-14) |
| Werner Reb. Rpt. | Rebuttal Report of Dr. Adam Werner, dated March 28, 2023 (ECF No. 559-5) |

## I.     PRELIMINARY STATEMENT

Spanning 7,150 pages, Robinhood's submissions in opposition to Plaintiffs' motion for class certification exemplify the philosophy "more is more." In reality, however, there is less there than meets the eye. Robinhood's only hope of defeating class certification is to convince the Court of all of the following points, *none* of which is supported by the facts or applicable law:

- Due to its NSCC deposit obligations, Robinhood was an innocent bystander sucked into a coordinated effort by retail investors to squeeze short sellers (Opp. at 3-8);

- "Meme stock" price bubbles burst on January 28th – which "coincided" with the day Robinhood banned purchases of these stocks (Opp. at 1, 22, and 29);

- The 12 proposed class representatives – all of whom are retail customers – are non-serious investors, making them *both* unworthy of prosecuting this action and deserving of their losses for buying the Affected Stocks at "artificially inflated" prices (Opp. at 9-12; 29-35);

- The material omissions the Court found to have rendered Robinhood's restrictions manipulative (Order at 42-48) do not qualify for the *Affiliated Ute* presumption because Robinhood asserts this is a misstatement case (Opp. at 25-26);

- Minor differences in class representatives' responses to Robinhood's identical conduct directed at all investors preclude a finding of predominance pursuant to the Eleventh Circuit's "common scheme" doctrine (Opp. at 22-24);

- The Court should ignore Circuit precedent to hold that class-wide reliance must be satisfied by proof of market efficiency in Rule 10b5-(a)&(c) cases (Opp. at 15-18);

- The Court should disregard *Regions*' flexible approach to market efficiency, *which does not require a cause-and-effect event study*, and find that market efficiency cannot be shown based on their attack of Dr. Werner's event study (Opp. at 18-22);

- Damages cannot be computed class-wide because a method suggested by Plaintiffs' expert used the closing prices of the Affected Stocks on January 27th which, while set by the natural interplay of supply and demand, was deemed "untethered from value-relevant information" by Robinhood's experts (Opp. at 26-29)[1]

Although the underlying events are now fodder for a star-studded Hollywood "biographical comedy-drama,"[2] the SEC Staff Report and HFSC Report demonstrate that the billions of dollars of damage caused by Robinhood's manipulation is not funny. Class-wide accountability is in order.

## II.     ROBINHOOD MISUSES CERTIFICATION TO PUT THE CLASS ON TRIAL

While concealing its actions were precipitated by a liquidity crunch, Robinhood halted

---

[1] If a customer who bought GME at the closing bell on January 27th refused to settle the trade because Robinhood tanked the stock the next day, Robinhood would hardly excuse non-payment by the customer on the basis that the purchase price of $347.51 a share was "artificially inflated."

[2] https://www.imdb.com/news/ni64021698/ ("Dumb Money" premiers in the fall of 2023).

purchases of and cancelled orders for the Affected Stocks across-the-board on January 28, crashing prices down from the market close on January 27. To avoid certification of a class whose members lost billions of dollars, Robinhood flips the script and blames the class for everything. Robinhood tells a short-squeeze/coordinated-social-media tale about "gamblers" and "joke orders … with sexual and drug references" (Opp. at 3-6)[3] not just to segue into a smear of all 12 twelve individuals who stepped up to prosecute this case, but to rebuke *all* retail investors for not taking an institutional investor's approach to trading. *Id.* at 9-11, 29-35. And its experts' assertion that retail investors' irresponsible behavior sent the Affected Stocks' prices sky high, such that they were "untethered from value-relevant information," is not just an effort to defeat predominance by arguing that markets were inefficient. At bottom, the opposition papers mainly present a defense on the merits, to wit, there is no damage because class members are to blame for their losses.

A closer look at this trope reveals it is not a tenable vehicle to defeat class certification.

A. **Closing Prices on January 27 Were Not Manipulated Upward**

Contrary to Robinhood's short-squeeze narrative, the SEC Staff report found that more complex dynamics were at play. Pl. Br. at 6. That said, the reasons that the Affected Stocks rose to their closing prices on January 27th are irrelevant to transaction causation for a seller class harmed by Robinhood's restrictions and material omissions. To avoid legitimately-established January 27 closing prices from being used to compute class-wide damages, Robinhood argues that they are invalid because they were inflated by manipulation. Its experts would not go that far:

- ***They did not opine that prices were "manipulated" in the pre-Class Period***.[4]

- ***Dr. Grenadier did not opine that the Affected Stocks were overpriced relative to their fair value at the close of the market on January 27th***, just that prices were not tethered to "value-relevant information" – whatever that means. Fischel opined they were overpriced, but his definition of "fair market value" dictates otherwise;[5]

---

[3] At third-party depositions, Robinhood played clips of or referred to films concerning the underlying events in which the witness was featured. Rosen Decl., Exs. 35-36 (indices of exhibits to Alvan Chow and Joseph Fonicello depositions, respectively).

[4] *See* Fischel Depo. at 112-15 (Rosen Decl., Ex. 37); Grenadier Depo. at 156 (Rosen Decl., Ex. 38). Fischel testified that "manipulation involves not just an effect on prices but a certain intent by the actors, you know, things that I don't express an opinion about one way or another, particularly since it's a legal opinion." Fischel Depo. at 115:11-16 (and errata notice); Grenadier Depo. at 125:3-4 ("I am not as [sic] ascribing causation to the price run up.") and 156:20-24 ("Q. Is it your opinion that the supposed or alleged short squeeze for these nine stocks was illegal manipulation? A. I have no opinion about the legality or lack of legality of that sort of behavior.").

[5] Grenadier Depo at 34:15-25 ("Q: [I]s it your opinion that those nine stocks were overvalued as

- ***Neither opine that Robinhood's actions had no impact on the prices of the Affected Stocks***, the evidence defendants are permitted to submit to rebut a finding of market efficiency pursuant to *Halliburton II*.[6]

**B.      Robinhood-Induced Purchases of the Affected Stocks Raised Their Prices**

Under the guise of disputing a class-wide damages model, Robinhood prematurely contests loss causation. Specifically, Robinhood leans hard on Fischel's opinion that the Affected Stocks experienced "extreme price inflation resulting in artificial prices which were widely understood to be temporary and therefore were going to decline at some point in time" Fischel Depo. at 66:22-67:2 (Rosen Decl., Ex. 37). In layman's terms, price bubbles formed and were bound to burst. Opp. at 1, 22, and 29. To argue that they happened to pop on January 28, Fischel relied upon a three-page *Seeking Alpha* post (Rosen Decl., Ex. 39), which provided a handful of examples of the lifespan of bubbles and subsequent price declines, to imply the Affected Stocks' behavior conformed to that pattern. Fischel Rpt. ¶28 & n.64; Pl. Br. at 4. However, when asked whether the so-called "artificial prices" would have declined starting on January 28, absent Robinhood's restrictions, Fischel testified that was "too specific," adding "it's really impossible to pinpoint the time where the decline would have occurred." Fischel Depo. at 67:3-68:10 (Rosen Decl., Ex. 37).

Not coincidentally, two of the five examples of bubbles in the *Seeking Alpha* post appear to have been caused by *Robinhood customers' purchases* of the shares of two issuers that had filed for bankruptcy, Hertz and Valaris. Steep price drops due to the bankruptcy filings caused the issuers to appear on Robinhood's "Top Movers" list, a screen with a combined list of the day's largest losers and gainers.[7] Academic research shows that inclusion in the Top Movers list induces

---

of close of trading on January 27, 2021? A. So that is not part of my opinion … my opinion was whatever their value was, it wasn't tethered to value-relevant information.") (Rosen Decl., Ex. 38). Although Fischel testified that prices on January 27 were artificially inflated, he testified that "fair market value" is "a price between a willing buyer and a willing seller where both have reasonably complete information and neither is under a compulsion to buy or sell … [A]s long as those criteria are met, price and value are the same." Fischel Depo. at 147:18-148:6. Rosen Decl., Ex. 37. Here, there are no claims of duress, and the market was saturated with information about these stocks. By Fischel's definition, the Affected Stocks' prices were not overvalued on January 27.

[6] Grenadier Depo. at 189:20 - 190:1 ("Q. Do you know what caused these nine affected stock prices to decline dramatically on January 28th …? … A. I don't have an opinion on causality"). Rosen Decl., Ex. 38. Nor did Fischel. *See* Fischel Depo. at 198:8-13. ("Q. Did you make any effort to disentangle the effects of confounding events? A. No, I didn't, other than to highlight there are a lot of confounding events occurring at the same time."). Rosen Decl., Ex. 37.

[7] M. Lyck, "Danger to All Robinhooders," *Medium.com* (Jun 19, 2020) (170,000 Robinhood customers purchased Hertz *after* its bankruptcy filing caused it to appear on the Top Movers list);

Robinhood customers to buy stock in the listed issuers, even the big losers.[8] Fischel pointing to the Hertz and Valaris bubbles bursting to cast suspicion away in this case is paradoxical at best.[9]

As noted in the opening brief, when one Robinhood employee expressed concern, because its customers represent more than 10% of the market for these stocks, that PCOs would move the market, another responded that letting their customers buy them also moved the market. Pl. Br. at 5 & n.17. Just before the Class Period, Robinhood's Top Movers list likely included the Affected Stocks, eight of which purportedly experienced their highest five-day returns in 25 years in the week leading up to January 28th. Opp. at 5. Robinhood – which defended its "lists of stocks … that help people discover investments and *notifications about stock movements that help them stay informed*"[10] – played an active role in customers' attention-induced purchases of the Affected Stocks. Attributing the steep increases to an internet mob, in an attempt to delegitimize pre-Class Period market prices, is not relevant to certification of a seller class. Besides, Robinhood need only look in the mirror for a big reason prices were purportedly untethered from value-relevant news.

### C.     Robinhood's Inadequate Capitalization Led Directly to the Price Declines

Vlad Tenev told Dave Portnoy that Robinhood would have let purchases continue on January 28th if it had been adequately capitalized. ACCC, ¶80(d)(i). If Robinhood had not killed the rally, according to Thomas Peterffy, the founder of Interactive Brokers, prices of the Affected Stocks would have continued to rise, with GME perhaps reaching into four-digit territory. Pl. Br. at 4 & n.10. Regardless of whether prices were tied to "value-relevant" information, *Robinhood*

---

13D Research, "Retail-Investor Euphoria Will Come To Tears, etc.," *Medium.com* (Jun. 23, 2020) (chart referenced as "Exhibit 6" shows steep increase in Robinhood customers buying Hertz and Valaris immediately *after* their bankruptcy filings). Rosen Decl., Exs. 40-41, respectively.

[8] *See* B.M. Barber, et al., "Attention Induced Trading and Returns: Evidence From Robinhood Users," 77 *Journal of Finance* 3141, 3143-44 (Dec. 2022) (increased purchases of stocks on "Top Movers" list compared with stocks with similar price movements that did not qualify for inclusion because their market capitalizations were slightly below $300 million) (Rosen Decl. Ex. 42).

[9] Approving the settlement in *In re IPO Secs. Litig.*, 260 F.R.D. 81, 104-05 (S.D.N.Y. 2009), in which Fischel served as plaintiffs' expert, the court rejected a defense argument that the existence of the so-called "Internet bubble" rendered markets inefficient during the class period.

[10]   Vlad Tenev, "Robinhood Users Come Under Attack," *Wall Street Journal* (Sept. 27, 2021) (Rosen Decl., Ex. 43). Robinhood asks the Court to strike Dr. Werner's event study because he did not weed out news only pertaining to price movements from his analysis. *See* Opp. Br. at 19; *Daubert* Mot. at 12. If Robinhood pushes price movement notifications *to keep customers informed* – and to trigger trading – how can it argue that very information is not relevant to analyzing stock price movements? **CEO Tenev undermines Robinhood's experts' main line of attack.**

*would have allowed trading to continue – and prices to rise – if it had sufficient cash on hand.* Having crashed prices for the Affected Stocks, as several of its employees had predicted (Pl. Br. at 5), Robinhood's defense is that the bubbles were bound to burst anyway. Opp. at 1, 22, 29. Maybe so, but that should have occurred naturally, not as a result of a manipulation of supply and demand.

Moreover, industry risk managers viewed the liquidity crunch that triggered Robinhood's restrictions as both an epic fail and completely puzzling, because "[i]t's pretty much just math." ECF 454-1 at 4.[11] Contrary to Robinhood's claim that those responsible for such matters were aware of the components of the NSCC charge, as evidenced by the NSCC handbook produced in discovery (Opp. at 6 n. 6), the HFSC Report detailed that Robinhood had not modelled the ECP component of its NSCC collateral deposit prior to January 28th, had not accessed the NSCC's online calculation tool before that date, and, as its President, Jim Swartwout, admitted, prior to the NSCC directing Robinhood to view the manual on its member portal on January 28, *Robinhood had not reviewed the NSCC manuals concerning these charges.* HFSC Report at 19-20, 97-98 (ECF 559-3 at 21-22, 99-100). For this reason, one risk professional cited in the *Bloomberg* article, stated "If they didn't study it, well then shame on them." ECF 454-1 at 5. (Rosen Decl., Ex. 44). Shame indeed, for not modelling its charges (and raising capital) before January 28.

## III.   CLASS-WIDE ISSUES PREDOMINATE AND MERIT CERTIFICATION

Robinhood concedes Rule 23(a)(1)&(2) are satisfied and that common issues predominate with respect to most of the elements of Plaintiffs' two claims, *e.g.,* scienter, intent to induce sales of the Affected Stocks. Robinhood contests reliance, for a failure to prove *Basic* market efficiency, and damages, by arguing that the prices paid and received by real-world investors on January 27 cannot be used to calculate damages because they were set by inefficient markets and not tethered to value-relevant information. Both arguments can be easily rejected.

### A.   Plaintiffs Have Shown that Class-wide Reliance Issues Predominate

Plaintiffs set forth four bases for the Court to conclude that Rule 23(b)(3)'s predominance requirement is satisfied. Pl. Br. at 10-21 (common fraudulent scheme, *Affiliated Ute* presumption, assumption of an efficient market free of manipulation, and the Affected Stocks traded in efficient markets). Robinhood spills a lot of ink trying to prove *Basic* market efficiency is required but was not established (Opp. at 15-22), while relying upon dated authority to dispute the *Affiliated Ute*

---

[11] A. Massa, et al. "Robinhood's Collateral-Crunch Explanation Puzzles Wall Street," *Bloomberg* (Feb. 6, 2021). Rosen Decl., Ex. 44.

presumption, and predictably focusing on individual reactions to its uniform misconduct to argue against application of the common scheme. *Id.* at 22-26. These arguments all fall short.

1.  *Affiliated Ute*, a Rule 10b-5(a)&(c) case, applies here

Robinhood points out that many named plaintiffs did not recall that Robinhood blamed its PCOs on "market volatility" and the Lead Plaintiff thought the restrictions caused prices to decline, not the reason given for imposing them. From this, Robinhood asks the Court to conclude "*they could not have relied on the alleged omission* – that Robinhood imposed the restrictions because of liquidity issues[12] – in making their investment decisions." Opp. at 26 (emphasis added). However, "[r]equiring a plaintiff to show a speculative state of facts, *i.e.,* how he would have acted if omitted material information had been disclosed [citation to *Affiliated Ute*] … would place an unnecessarily unrealistic evidentiary burden on the Rule 10b–5 plaintiff..." *Basic Inc. v. Levinson*, 485 U.S. 224, 245 (1988). Here, Robinhood carefully worded its "market volatility" blog post (ACCC ¶66; Pl. Br. at 2 & n.6) and stayed mum the rest of the trading day. That a vague statement crafted to conceal the truth was not memorable *proves that it succeeded, not* that class members would not find the truth material. Had Robinhood said "a cash crunch prevents us from letting you buy these stocks temporarily; if you sell during the PCO, prices will plummet," investors could have been spared significant losses. *See* Pl. Br. at 2 & nn. 4-5. Robinhood's omissions left investors in the dark, causing them to sell because they did not know when restrictions would be lifted. For this reason, the *Affiliated Ute* presumption applies.

After baldly asserting that *Basic* market efficiency must be proved for "misrepresentation and manipulation claims alike" (Opp. at 17),[13] Robinhood changes course and cites *Desai v. Deutsche Bank Secs. Ltd.*, 573 F.3d 931 940-41 (9th Cir. 2009), to assert that manipulative conduct and omissions claims are completely different and *Affiliated Ute* only applies to Rule 10b-5(b) omissions claims and not Rule 10b5-(a)&(c) claims. Opp. at 25. But the Supreme Court obliterated such rigid distinctions among the subsections of Rule 10b-5 in *Lorenzo v. S.E.C.*, ___ U.S. __, 139

---

[12] Robinhood also omitted (a) to state that if adequately capitalized, it would have allowed trading to continue; and (b) that the PCOs would cause price declines. Pl. Br. at 12 (quoting Order at 45).

[13] Robinhood cites a 12(b)(6) ruling, *In re Merrill Lynch Auction Rate Secs. Litig.*, 704 F. Supp. 2d 378 (S.D.N.Y. 2010), to claim that in manipulation cases, proof of *Basic* market efficiency is required for certification. The court only held: "While the fraud on the market theory has been used primarily for claims … under Rule 10b–5(b), several courts have held that the presumption **_can_** also apply to claims of market manipulation." 704 F. Supp. 2d at 394 (emphasis added).

S. Ct. 1094, 1102 (2019): "The premise of [defendant's] argument is that each of these provisions should be read as governing different, mutually exclusive, spheres of conduct. But this Court and the Commission have long recognized considerable overlap among the subsections of the Rule…"

Even before *Lorenzo*, courts rejected *Desai*, noting that *Affiliated Ute* itself was a Rule 10b5-(a)&(c) case. *See In re UBS Auction Rate Secs. Litig.,* No. 08 Civ. 2967, 2010 WL 2541166, at *26 (S.D.N.Y. Jun. 10, 2010)(citing *In re IPO Secs. Litig.*, 671 F. Supp. 2d 467, 495-96 (S.D.N.Y. 2009)). Moreover, this case is distinguishable from *Desai*, where, once it found 10b-5(b) and 10b5-(a)&(c) claims to be distinct, the court was concerned that if the *sole* alleged omission were that the defendant engaged in manipulative acts, the distinction would cease to exist. 573 F.3d at 941. Here, one of Robinhood's manipulative acts—the PCOs – was quite public; the material omissions concerned something else: that, *inter alia*, a temporary liquidity problem shut down purchases. Where *other* material facts are omitted, *Desai* does not apply. *See Gruber v. Gilbertson*, No. 16-cv-9727, 2019 WL 4439415, at *6-7 (S.D.N.Y Sept. 17, 2019) (*Desai*'s "concern is not implicated here because Gruber's allegations are premised on the fact that had investors known of Gilbertson and Reger's involvement with the Company, they would not have invested.")

Robinhood next tries to eschew *Affiliated Ute* by recharacterizing this as a misstatement case, citing its "market volatility" blog post. Opp. at 25. This ignores the Court's prior analysis. A manipulation claim is composed of an act plus deception; the deception can be an omission or a misstatement. Order at 43-44. "But there's more: … "'half-truths' – literally true statements that create a materially misleading impression – will support claims for securities fraud." Order at 44. As the Court explained, *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64 (2d Cir. 2021), and *City of Providence v. BATS Global Markets, Inc.*, 878 F.3d 36 (2d Cir. 2017), involved literally true statements – in the former there were extensive risk warnings, in the latter, the special products at issue were described in public documents issued by the exchanges. Nevertheless, based upon material omissions, they became actionable half-truths. Order at 43-47. Here, it is literally true that there was "market volatility" but the blog post is actionable because of what was omitted – due to the volatility Robinhood was inadequately capitalized and temporarily suspended trading it would have otherwise allowed, and that the PCOs would tank prices. Order at 45-46.

Robinhood also points to CEO Tenev's denials of a liquidity problem to argue that this is a misstatement case. Opp. at 25. But the Court also found these comments to be half-truths: "Regurgitating 'market volatility' as the basis for restrictions, while simultaneously denying any

concerns about liquidity despite internal and subsequent statements to the contrary … can hardly be characterized as an open and accurate disclosure." Order at 47 (internal punctuation omitted). While being less than candid, Robinhood kept adjusting the restrictions: purchases of the Affected Stocks resumed on January 29; tighter purchase and total holding restrictions were twice imposed that afternoon – and briefly imposed on as many as 50 stocks; and restrictions were slowly eased (from February 1-4), although Robinhood raised more money than it needed to lift all restrictions days earlier. ACCC ¶¶84-89, 107-09, 112, 117, 121 & HFSC Report at 74-75 (ECF 559-3 at 76-77). With many of its Class Period actions thus unexplained, the Court found CEO Tenev's statements to be "selective disclosures … [that] constitute manipulative conduct." Order at 47-48.

Finally, Robinhood asserts that *Cavalier Carpets, Inc. v. Caylor*, 746 F.2d 749 (11th Cir. 1984) holds that *Affiliated Ute* only applies to omissions cases in which a duty to disclose existed. Opp. at 25. *Cavalier*, which concerned a private transaction, was a "mixed" Rule 10b5-(b) case in which misstatements predominated over omissions. 746 F.2d at 757. Moreover, Robinhood *had* an affirmative duty to disclose. First, its half-truths triggered a duty to disclose. *In re Barclays Liquidity Cross & High Frequency Trading Litig.*, 390 F. Supp. 3d 432, 449 (S.D.N.Y. 2019) ("'upon choosing to speak,' one acquires a 'duty to be both accurate and complete'") (citation omitted). Second, in *In re IPO Secs. Litig.* the court held "[w]here a defendant has engaged in conduct that amounts to 'market manipulation' under Rule 10b–5(a) or (c), that misconduct creates an independent duty to disclose." 241 F. Supp. 2d 281, 381 (S.D.N.Y. 2003); *see also U.S. S.E.C. v. Santos*, 355 F. Supp. 2d 917, 920 (N.D. Ill. 2003) (citing *IPO*); *U.S. v. Regan,* 937 F.2d 823, 829 (2d Cir. 1991) ("Failure to disclose that market prices are being artificially depressed operates as a deceit on the marketplace and is an omission of material fact … Appellant's argument that a fiduciary relationship must exist before liability can be found is without merit.").

Robinhood's efforts to distinguish *Spicer v. Chicago Bd. of Options Exch., Inc.*, No. 88 C 2139, 1990 WL 16983 (N.D. Ill. Jan. 31, 1990) – finding reliance to be a class-wide issue in a §9 claim based upon the CBOE's alleged manipulation of the mechanism of options trading on the day after Black Monday – are specious. Opp. at 25-26 n.23. In *Spicer*, the §9 manipulation claim concerns transactions that deceived the market, a separate §10(b) claim was based on alleged omissions from an OCC prospectus. Moreover, this Court's analysis of the later Rule 12(b) motion in that case (which plaintiffs lost) demonstrates why Robinhood's active role in sending false supply and demand signals permits non-Robinhood users to be class members. Order at 20-21.

Although *Spicer* did not specifically reference *Affiliated Ute*, it noted there may be a reliance requirement for all §9 claims, based on *Chemetron Corp. v. Bus. Funds, Inc.,* 682 F.2d 1149, 1163–64 & n. 30 (5th Cir.1982), *vac'd on other grounds*, 460 U.S. 1007 (1983) so holding with respect to §9(a)(4). *Spicer*, 1990 WL 16983, at *15. Regardless, *Spicer* rejected that individual issues would predominate: "[T]hat plaintiffs did not rely on CBOE's allegedly manipulative actions in deciding to trade would necessarily have to apply to *all* class members. We find it unlikely that [it would] require individual adjudication, particularly *since the class members may well have been unaware of some or all of those actions*." *Id.* (Emphasis added.) Here, class members were completely unaware of cancelled orders, involuntary margin sales, and early ITM call option close-outs when they were induced to sell in reliance on the false signals those transactions sent to the market.

> 2.     Robinhood's common scheme of misconduct applied to all class members

Robinhood's objections to the application of the "common scheme" doctrine are really a single attack, to wit, the facts here differ from those in cases where it was applied. Opp. at 22-24. The claim that it only applies in misrepresentation cases (Opp. at 22), misses the mark for two reasons. First, the doctrine was established in *Kennedy v. Tallant*, to reject the argument that small differences in oral representations precluded class treatment. 710 F.2d 711, 717 (11th Cir. 1983) (defendants "committed the same unlawful acts in the same method against an entire class"). It applies more forcefully here because Robinhood's conduct and statements were uniform. Second, the identical "misrepresentations" in this case are the deceptive "half-truths" that accompanied the manipulative acts – half-truths because the Court found that they omitted several material facts.

To refute proof that "the same or substantially the same misrepresentations *were made* to the putative class," Opp. at 23 (emphasis added), Robinhood next argues that many people *may not have seen* its "market volatility" blog post or CEO Tenev's national TV appearances the night after Robinhood's actions caused it to become a household name. *Id.* (noting five named plaintiffs testified they did not know why the PCOs were imposed). In contrast, Robinhood argues, all members of the *Kennedy* class received a prospectus which omitted material facts. *Id.* This disingenuous focus on whether class members similarly experienced Robinhood's uniform conduct was firmly rejected in *Kennedy*: "the degree of reliance placed on the prospectuses by the various class members is not a controlling element of the action." 710 F.2d at 717. In fact, the plaintiff was an experienced investor who did not read or rely upon the prospectus. *Id.*

Robinhood then claims that the doctrine cannot be applied in cases where *Basic* market efficiency can be proved, citing *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 723 (11th Cir. 1987). Opp. at 24. *Kirkpatrick* did not so hold. Thus, in certifying a bondholder class in *In re HealthSouth Secs. Litig.*, 261 F.R.D. 616 (N.D. Ala. 2009), the court systematically determined the applicability of *Basic* market efficiency, the fraud-created-the-market theory, *and* the common scheme doctrine – citing both *Kennedy* and *Kirkpatrick*. *Id.* at 630-46.

Another inapt argument against applying the common scheme doctrine is that the named plaintiffs purportedly did not rely on the integrity of the market when making their pre-Class Period purchases, therefore, they did not suddenly assume the market became efficient during the Class Period. Opp. at 24. Again, the common scheme doctrine applies to Robinhood's conduct starting on January 28; it has nothing to do with market efficiency or what plaintiffs knew. Moreover, this is a seller class: the reasons class members *purchased* stock and whether they thought a short squeeze would raise prices even higher – as Interactive Brokers' Thomas Peterffy did (Pl. Br. at 4) – are not relevant to Robinhood's uniform conduct towards class members.

Finally, Robinhood cites *Merrill Lynch*, 704 F. Supp. 2d at 398 (Opp. at 22-23), which held that the "comprehensive scheme" doctrine does not apply in manipulation cases because reliance is a required element after *ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007). However, as *ATSI* was not a class action, as Robinhood noted, *id.* at 17, why would the court pass on the viability of the "comprehensive scheme" doctrine to prove class-wide reliance? Regardless of its status in the Second Circuit, the common scheme doctrine was applied in the Eleventh Circuit in *HealthSouth* in 2009, after *ATSI*. 261 F.R.D. at 645-46. Finally, the *Merrill Lynch* court refused to apply the "comprehensive scheme" doctrine after a finding, on a pleading motion, that "Merrill Lynch's ability to intervene in the ARS market to prevent auction failures and to set clearing rates was fully disclosed to the market." 704 F. Supp. 2d at 398. Robinhood's half-truths did not disclose, *inter alia*, that its undercapitalization was the cause of the restrictions.

3.   Investors assumed they traded in a *bona fide* market, free of manipulation

Robinhood accuses Plaintiffs of misstating the applicable standard for evaluating market efficiency by conflating the reliance element of its market manipulation claim with *Basic* market efficiency. Opp. at 16-18. Not so. The opening brief first addresses this merits element of a market manipulation Rule 10b-5 claim – which only requires evidence of a *bona fide* market free of manipulation (Pl. Br. at 14-16), then provides proof of *Basic* market efficiency as an alternative

(but not required) basis for establishing class-wide reliance. *Id.* at 16-21. Because the assumption that markets for the Affected Stocks were *bona fide* and free of manipulation will have to be proved on the merits, Robinhood makes a disingenuous argument to avoid that result. Because both *ATSI* and *Fezzani*[14] did not involve class claims, Robinhood misreads the statement in *Fezzani I* that *ATSI*'s requirement of "the assumption of an efficient market free of manipulation" only refers to "a *bona fide* market free of manipulation," *Fezzani I*, 716 F.3d at 23 n.3, as only applying in the context of an individual action. Opp. at 17. To the contrary, in *dicta*, *Fezzani I* noted potential difficulties associated with proving *Basic* market efficiency in manipulation cases, concluding:

> [T]he implications of these insights **relate principally to class actions.** There may thus be some merit to a modified presumption of reliance in market manipulation cases because **reliance by investors on a misrepresentation of a price as being set by an active, arms-length market may be presumed.**

716 F.3d at 21 n.2 (emphasis added); *see also Fezzani II*, 777 F.3d at 572 ("Not only did our opinion … read *ATSI* in a way favorable to manipulation claims. **Our opinion stated the 'market' 'signaled' by manipulative conduct need not be fully efficient…"**) (emphasis added).

Robinhood asks the Court to draw the incorrect conclusion that *Basic* market efficiency must be proved in *all* §10(b) cases – both in Rule 10b5-(b) cases, in which price movement is used as a proxy for reliance on misstatements, and *in addition to* proof of the element of the "assumption of an efficient market free of manipulation" in Rule 10b5-(a)&(c) cases. Opp. at 17. Not true. These are parallel forms of the same element in two types of §10(b) cases. *See* Order at 38-39.

Here, Plaintiffs have established reliance under *ATSI* and *Fezzani.* The Affected Stocks all actively traded on the NYSE or NASDAQ. Pl. Br. at 17-18 (and evidence cited therein); *cf. Alki Partners, L.P. v. Vatas Holding GMBH*, 769 F. Supp. 2d 478, 493 (S.D.N.Y. 2011) , *aff'd sub nom. Alki Partners, L.P. v. Windhorst*, 472 F. App'x 7 (2d Cir. 2012) (this element of a market manipulation claim was not satisfied because the OTCBB, where the stock traded, was not recognized as an efficient market). When they sold, class members were unaware of Robinhood's behind-the-scenes manipulations, *e.g.,* order cancellations, involuntary margin sales, and early ITM call option close outs and only knew "market volatility" as the reason for the PCOs.

        4.      Although not required, Plaintiffs satisfy the Eleventh Circuit's standards for *Basic* market efficiency

---

[14] *Fezzani v. Bear Stearns & Co.* 716 F.3d 18 (2d Cir. 2013), *reh'g denied*, 777 F.3d 556 (2015) ("*Fezzani I*" and "*Fezzani II*").

Robinhood's "Hail Mary" is to convince the Court that *Basic* market efficiency during the Class Period must be proved and that Plaintiffs have failed to do so. Neither argument has legs.

a.   <u>*Basic* market efficiency is not required in manipulation cases</u>

A heading in Robinhood's brief asserts "Plaintiffs Need to Meet the *Basic* Requirement of Efficient Markets To Satisfy Reliance on a Classwide Basis." Opp. at 16. To make this argument, Robinhood strings together a series of curated soundbites from various cases and asks the Court to rule that although several presumptions may be available in Rule 10b-5(b) cases, *e.g.*, *Affiliated Ute*, common scheme, and fraud-created-the-market, none of those are available in Rule 10b5-(a)&(c) cases. *Id.* at 16-18. That is not the law. The cases Robinhood cites do not hold that it is:

**Amgen v. Conn. Ret. Plans & Tr. Funds,** 568 U.S. 455 (2013): Materiality, an element of a Rule 10b5-(b) claim, is objectively measured. The question is common to all class members and to be determined on the merits. *Id.* at 459-60. The test used to invoke the *Basic* presumption to prove class-wide reliance – another element of a Rule 10b-5-(b) claim – requires proof of market efficiency at class certification, otherwise individual issues predominate. 568 U.S. at 473-74. *Amgen* does not require *Basic* market efficiency to be proved in manipulation cases.

**FindWhat Investor Grp. v. FindWhat.com,** 658 F.3d 1282 (11th Cir. 2011): Plaintiffs alleged a "quotidian" Rule 10b5-(b) claim (Order at 38) of 11 misstatements and omissions. 658 F.3d at 1290. There is no mention of certification requirements in a manipulation case. Contrary to Robinhood's assertion (Opp. at 16), the opinion does *not* hold that a stock price should not move significantly without value-relevant news. Rather, a stock price's failure to increase in response to confirmatory misstatements causes loss by *maintaining* preexisting inflation. 658 F.3d at 1314.

**In re GenesisIntermedia Inc. Secs. Litig.**, No. 01-CV-9024, 2007 WL 1953475 (C.D. Cal. Jun. 28, 2007) (the district court opinion in *Desai*): Robinhood cites this case for the proposition that "the district court rejected a proposed exception to the *Basic* theory of reliance because courts may not presume reliance in a manipulation case if the market is not efficient." Opp. at 17 (internal citations and punctuation omitted). Counsel there conceded market inefficiency, but argued for an "integrity of the market" presumption because there was "no real market for the stock." 2007 WL 1953475, at *7. (In this Circuit, there is a fraud-created-the-market presumption.) On appeal, the Ninth Circuit did not apply *Affiliated Ute*, holding that "manipulative conduct has always been distinct from actionable omissions" (*Desai.*573 F.3d at 940) – a notion later scuttled by *Lorenzo.*

**Dodona, I LLC v. Goldman Sachs,** 847 F. Supp. 2d 624 (S.D.N.Y. 2012): Although the

court stated "[i]n *ATSI,* the Second Circuit essentially incorporated 'fraud on the market' into the standard for market manipulation by requiring that plaintiffs show 'reliance on an assumption of an efficient market,'" *Id.* at 651, its definition of an efficient market adheres to *ATSI*'s *bona fide* market, "one that is 'open and developed .... in which anyone, or at least a large number of persons, can buy or sell[,]' and 'for which trading information (*e.g.,* price and volume) is widely available.'" *Id*. The plaintiff did not allege that there was "an open and developed market for the Hudson CDOs." *Id.* Also, *Dodona* pre-dates *Fezzani*. This Rule 12(b) decision does not hold that *Basic* market efficiency is required at class certification in market manipulation cases.

b.   <u>Although not required, Plaintiffs have proved *Basic* efficiency</u>

Robinhood acknowledges the markets for the Affected Stocks were "generally efficient" but claims that they were "temporarily inefficient." Opp. at 18. After its two-word citation of *Regions*,[15] Robinhood's brief is practically case-citation-free for a number of pages. Robinhood hopes that if it picks its nits with Dr. Werner's event study, the Court will not view the issue of market efficiency through the lens of *Regions*' "flexible approach" (762 F.3d at 1255) as to what is required for its proof. Most important, proof of "Cammer Factor 5" – the subject of Dr. Werner's event study – is *not* a prerequisite to a finding of efficiency. *Id.* at 1256; *see also* Pl. Br. at 19 & n.49 (*Monroe Cnty. Employees' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 384-85 (N.D. Ga. 2019), noting that five other circuits and a dozen district courts do not require such proof). Moreover, Robinhood does not contest the adequacy of Dr. Werner's proof on the other *Cammer/Krogman* factors. *See* ECF 566 (*Daubert* motion). The *Monroe* court could not locate a case in this Circuit finding a stock's market inefficient when all the other factors were satisfied. 332 F.R.D. at 384.

Although Plaintiffs do not seek to exclude Robinhood's expert reports, neither designed nor executed an event study. Similar to (but not as deficient as) the expert's opinion in *Thorpe v. Walter Inv. Mgmt., Corp.,* No. 1:14-CV-20880, 2016 WL 4006661, at *14 (S.D. Fla. Mar. 16, 2016), their opinions rely heavily on commentary and apply no empirical testing to "undergird the conclusion[s]." Moreover, although Robinhood asserts market inefficiency "during the relevant time period," Opp. at 15, the experts cannot pinpoint when that period began – January 4 (Fischel) or January 21 (Dr. Grenadier). Indeed, because their experts employ subjective definitions of so-

---

[15] *Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248 (11th Cir. 2014), does not discuss temporary inefficiency. To avoid misattribution, Robinhood's citation to *Regions* should have appeared between "generally efficient" and this argument.

13

called "value-relevant news," they do not even agree on the days such news was issued for the Affected Stocks during the one-week overlap of the periods they studied. Pl. Br. at 20.

While, for all of the reasons stated above, the Court could grant class certification without crediting Dr. Werner's report, as set forth below, Robinhood's punches (Opp. at 18-22) do not land.

*First*, Robinhood baldly asserts that Dr. Werner's report is irrelevant because he did not opine about market efficiency *during the period of Robinhood's manipulation*. *Id*. at 18-19. However, as Dr. Grenadier testified, manipulation would render a market inefficient. Grenadier Depo. at 44:17-25 (Rosen Decl., Ex. 38). Here, in fact, Dr. Werner proffered evidence (Pl. Br. at 23-24) that confirmed the fears of Robinhood employees that because its customers made up 10+% of the markets for these stocks (Pl. Br. at 5), Robinhood's early-morning restrictions would cause them to crash. Under *Regions*, the Court can "consider the nature of the market on a case-by-case basis to decide whether the totality of the circumstances supports a finding of market efficiency." 762 F.3d at 1255. Because the manipulations removed its customers' ability to buy shares of the Affected Stocks, Robinhood prevented its customers' positive views of information about the stocks from being incorporated into their prices – blocking the mechanism of efficiency. If a finding of efficiency is required at all, *Regions* authorizes the Court to find it pre-Class Period.

Even though CEO Tenev proudly declared that Robinhood provides notifications about price movements to customers to keep them informed – and customers are induced to trade on such information – Robinhood is highly-critical of the inclusion of the very same information in Dr. Werner's news/no news test, calling it non-value-relevant. Opp. at 19. Worse, Robinhood does not address the cases cited by Plaintiffs that reject attacks on the objective criteria used by Dr. Werner to locate articles for a "news/no news" test. *See*, Pl. Br. at 20. Moreover, the exclusion of such news makes no difference. *See* Werner Depo. 245:24-250:23 (ECF 567-15 at 63-65); Werner Decl., ¶33 & Table 2 (ECF 582-4 at 18). If it had, Robinhood's experts would have already said so after running their own tests on Dr. Werner's data. *See Willis v. Big Lots Inc.*, No. 2:12-cv-604, 2017 WL 1074048, at *5 (S.D. Ohio Mar. 17, 2017) (finding it "significant" that defendants did not contend that plaintiffs' expert's purported error affected the outcome of the study).

*Second*, Robinhood's experts argue against efficiency because the sharp price run-ups before the Class Period were not a response to "value-relevant" news but the result of social media posts, reckless gambling, and dirty jokes – resulting in a bubble. Opp. at 4, 20-22. The experts' approach is quite radical, as it would apply a demanding filter as to which information market

participants are permitted to consider. But, as noted in *FindWhat*, "just as an efficient market translates all available *truthful* information into the stock price, the market processes the publicly disseminated *falsehood* and prices it into the stock as well." 658 F.3d at 1310. That prices responded to the good, the bad, and the ugly information in the pre-Class Period markets proves their efficiency. *See IPO*, 260 F.R.D. at 104 (rejecting market inefficiency opinion predicated on the fact that "irrational investor sentiment was widespread" and caused market values to deviate from fundamental values).

Courts and academics also agree that stock price movement in the absence of news ***is not*** evidence of market ***in***efficiency. *Lumen v. Anderson,* 280 F.R.D. 451, 460–61 (W.D. Mo. 2012); *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 211–12 (E.D. Pa. 2008), *aff'd sub nom. In re DVI, Inc. Sec. Litig.*, 639 F.3d 623 (3d Cir. 2011).[16] That confirmatory information will not move markets (Opp. at 21) is precisely why Dr. Werner cast a wide net with his objective approach to what constitutes "news." Werner Depo. at 84:12-22 (ECF 566-1) In the past, Dr. Werner pre-selected events to study that were likely to move markets, *i.e.* Form 8-K/6-K filings, earnings releases, and press releases. Grenadier Reb. Rpt. at 25 (ECF 559-32 at 28-29). Dr. Grenadier ran Dr. Werner's news/no news test several times, using a different set of pre-selected event types each time, and obtained different results with respect to the efficiency of the Affected Stocks. As Dr. Grenadier's results show, pre-selection of event types may be over- or under-inclusive. *Regions* made this very point in rejecting an event study requirement, *i.e.,* confirmatory information in an earnings release may not move markets, or a class period might not even have any events likely to move the market. 762 F.3d at 1256-57.

***Third***, Robinhood contends that it has severed the link between the manipulation and class members' decisions to *sell* in the wake of its PCOs (and other undisclosed restrictions that affected supply and demand) by showing that many of the named plaintiffs were well aware, at the time of

---

[16] In *IPO*, defendants' expert noted that of the 28 days identified by Fischel as having a statistically-significant price changes, the price moved without the release of relevant new information on 22 of those days. 260 F.R.D. at 102. **Fischel responded that "significant share price changes are not *always* explained by known announcements,"** adding that "most of the daily variation in stock prices generally is unexplained by market factors, industry factors, or firm-specific news." *Id*. & n.183 (citing R. Roll, $R^2$, 43 J. Fin. 541, 541 (1988)) (emphasis in original) (Rosen Decl., Ex. 45). Roll found that fewer than 30% of statistically-significant stock price movements were explained by firm-specific news. *Id.* at 565. *See also* A. Shleifer, *Inefficient Markets*, 20-21 (2000) (Rosen Decl., Ex. 46).

*purchase*, that there may be short squeezes at play or that certain issuers' prices were not supported by their fundamentals. Opp. at 21-22. So what? The SEC Staff Report, at 26 (ECF 559-12 at 28), found nothing untoward: "Whether driven by a desire to squeeze short sellers and thus to profit from the resultant rise in price, or by belief in the fundamentals … it was the positive sentiment … that sustained the weeks-long price appreciation …" No one was charged with manipulation, and SEC Chair Gensler described the internet discussions that occurred as free-speech expressions of why retail investors liked certain stocks.[17] Pl. Br. at 6. Why class members bought stocks is not relevant to why they *sold* them. As did Interactive Brokers' Thomas Peterffy, Class Period investors thought prices would continue to rise. But they "rolled the dice in a crooked crap game," *Basic*, 485 U.S. at 246-47, when they sold because Robinhood had rigged it by enacting the PCOs and imposing undisclosed restrictions on January 28 without explaining it did so only because of a cash crunch and knowing that prices would tank if people sold in a panic.

## IV.    PLAINTIFFS MEET *COMCAST*'S CLASS-WIDE DAMAGES REQUIREMENT

"*Comcast* simply requires that 'any model supporting a plaintiff's damages case must be consistent with its liability case.'" *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 988 (11th Cir. 2016) (*quoting Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013)). In *Carriuolo*, plaintiffs alleged false sticker-price safety claims enabled GM to obtain a price premium from car buyers (*e.g.* they paid too much). Certification was affirmed because plaintiffs' model measured "the difference in the market value of the [vehicle] in the condition in which it was delivered and its market value in the condition in which it should have been delivered." 823 F.3d at 989.

Here, Plaintiffs allege that Robinhood's restrictions removed demand for the Affected Stocks on January 28, driving prices down and damaging those who sold shares while they were in effect. Robinhood does not dispute the *measure* of damages for a defrauded seller is the difference between "the fair value [the] seller received and the fair value of what he would have received had there been no fraudulent conduct." *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128, 155 (1972). Rather it disputes the "fair value" Dr. Werner chose for the no-fraud state of affairs. Opp. at 27. This out-of-pocket damages methodology, for example,[18] uses the Affected

---

[17] Keith Gill's July 2020 GameStop video (Opp. at 4 n.2), is a "*fundamental & technical deep value analysis*" of SEC filings and an investor presentation. *See* Werner Reb. Rpt., App. A (ECF 559-5 at 58). Mr. Fonicello runs a GameStop investment website. Rosen Decl. Ex. 36 (at Ex. 92).

[18] Werner Rpt. ¶95 (ECF 559-14 at 43). To satisfy *Comcast*, Dr. Werner's initial opinion explained one of several methods to calculate class-wide damages under this model. *See* Werner Depo. at

Stocks' closing prices on January 27 as a measure of the "fair value" sellers would have received had Robinhood not imposed restrictions on January 28.[19] Because options were expiring on January 29, Interactive Brokers' Thomas Peterffy predicted prices would have risen on January 28, with GME's price reaching the thousands. Pl. Br. at 4 & n.10. Use of the January 27 closing prices as a baseline for "fair value" satisfies *Comcast*.[20]

As with its market efficiency argument that ignores *Regions*, Robinhood jumps into its criticism of Dr. Werner's model without acknowledging that courts in securities class actions routinely deny such attacks.[21] The court ruled in *Set Cap. LLC v. Credit Suisse Grp. AG*, No. 18 Civ. 2268, 2023 WL 2535175, at *6-7 (S.D.N.Y. Mar. 16, 2023), that an expert need not "identify a specific quantitative model before all the relevant facts are before him." Yet, having set forth a traditional out-of-pocket model, Dr. Werner is attacked for not selecting a "specific quantitative model" and running the numbers. *See* Werner Depo. at 59:11-61:2 (after Dr. Werner identified several ways to calculate damages under the parameters of his model, he was asked to concede – which he did – that he had not yet analyzed loss causation or damages) (ECF 567-15 at 17).

An artificial inflation case, *Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017), noted that damages "could be calculated by applying a method across the entire class that focused on the decline in stock price following the disclosure." Here, substituting the word "manipulation" for "disclosure," Dr. Werner does just that, generally explaining how the price decline following Robinhood's imposition of restrictions could be measured, one method being subtraction of class members' sales price from the January 27 price, less non-Robinhood-caused declines. *See* Werner Rpt. at ¶¶95-97 (ECF 559-14 at 43-44). Although loss causation need not be part of a *Comcast*

---

59:16-60:6 (ECF 567-15 at 17).

[19] As explained in the opening brief, at 24-25, "out-of-pocket" is not interpreted literally for a seller class; the price *paid* for the stock is not relevant, as Robinhood's calculations suggest. Opp. at 12 (arguing some named plaintiffs made money). As the Court explained in the Apex case: "Plaintiffs' shares were worth one amount on January 27, Defendant took action that allegedly suppressed the value of the shares the next day, and Plaintiffs were out the difference." ECF 525 at 18.

[20] In *IPO*, plaintiffs alleged a manipulative scheme to artificially inflate the share prices of new issuers. Because there could have been upward price movements during the post-IPO class period not attributable to the manipulative scheme, Fischel's damages model "propose[d] capping the amount of inflation by the amount of artificial inflation at the IPO date." 260 F.R.D. at 112. Although discovery and further analysis may indicate greater damages because prices may have increased during the Class Period, using Fischel's *IPO* cap in a *Comcast* damages model is proper.

[21] *See* ECF 559-31 (78 securities fraud cases rejecting *Comcast* challenges, through April 2022).

damages model, *Thorpe*, 2016 WL 4006661 at *16, Dr. Werner demonstrated how one could use a regression analysis to isolate the price declines caused by Robinhood's restrictions from those imposed by others. *See* Pl. Br. at 22 (and cited evidence). Thus, Dr. Werner has provided more detail than is required at class certification. *Thorpe, supra,* at *16 ("nothing in *Comcast* requires an expert to perform his analyses at the class certification stage") (citations omitted); *Monroe,* 332 F.R.D. at 399 ("although Professor Feinstein has not yet specified which valuation tools – an input into the damages model – he will ultimately use, such specification is not required at this stage.").

Robinhood's *Comcast* argument is that market prices on January 27 were the result of a bubble, "untethered" from any "fair" or "fundamental" value [22] and, thus, cannot be used in any "fair value" damages model. Opp. at 27. This argument asks the Court to disregard actual prices because they were just plain wrong. This is not the law. First, in *Affiliated Ute*, the Supreme Court was not referring to a fundamental or correct value when it used the term "fair value." Rather, because "some sellers actually received second-hand automobiles or other tangible property" that had to be attributed a "fair value" in dollars. 406 U.S. at 146. Here, where class members exchanged dollars for their shares, price established their "fair value" on January 27. Moreover, Prof. Fama states that true "bubbles" don't exist because at that instant the assets are worth their market prices and no one can predict when the prices may fall.[23] Fischel admitted he had no idea when the "bubble" might burst – perhaps weeks, or months, or later. *See* pp. 3-4, *supra*.

Second, even were one to credit the artificial bubble theory – an absurd suggestion given Robinhood's role in the price run-ups (*see* Sec. II.B, *supra*). If the rally continued, sellers (even those who purchased on January 27) – would have obtained those high prices – or even higher. As the Supreme Court explained in *Dura Pharms., Inc. v. Broud*o, 544 U.S. 336, 342 (2005):

> [A]t the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value … [If] the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss.

Loss only occurs when an investor sells at a price that has been deflated for reasons directly tied to the fraud. *Id.* at 346 (requiring loss causation and damages). There is no evidence that anything

---

[22] There is no such agreed upon "fair value." Dr. Grenadier testified that there is no "fundamental value" except one that's "known to a deity" Grenadier Depo. at 23:20-24:3 (Rosen Decl., Ex. 38)

[23]  Eugene F. Fama, *Two Pillars of Asset Pricing,* 104 Aм. Econ. Rev. 1467, 1474-1477 (2014). Professor Fama also points out that prices often rebound after crashes and no one can be sure whether the price increase was irrational or the price decrease or both. *Id.* at 1476.

other than Robinhood's restrictions caused the January 28 price declines. Werner Reb. Rpt. at ¶¶100-07 & Tables 12-13. (ECF 559-5 at 47-52). Indeed, neither of Robinhood's experts opine on what caused the price declines. *See* p. 3 & n.6, *supra*. Thus, the argument that losses were incurred when shares were purchased at prevailing prices in the pre-Class Period is shattered by *Dura*.

> Moreover, Fischel wrote that price is the best proxy for value *even during "bubbles"*: .
>
> These uninformed or noise traders who are motivated by factors other than the present value of future net cash flows create the possibility of speculative bubbles …. [and] prices can change dramatically with a change in expectations – even with no change in the value of the underlying assets.
>
> ***
>
> Prices are still the best indicators of value even assuming that they are noisier signals because of psychologically motivated traders.
>
> ***
>
> And, to emphasize again, the critical question is not whether market prices are always a perfect proxy for the underlying value of assets but whether a better proxy exists on a consistent basis. Thus far the answer to this critical question is no.

D.R. Fischel, "Efficient Capital Markets, the Crash, and the Fraud on the Market Theory," 74 *Cornell L. Rev.* 913-15 (1989) (Rosen Decl., Ex. 34) (ECF 559-36 at 7-9); *see also Carter v. U.S.*, No. 5:18-civ-01380, 2019 WL 3767479, at *9–11 (N.D. Ala. Aug. 9, 2019) (exchange-traded stock's fair value is market price even if misrepresentations inflated market price).

Third, Robinhood cites no case supporting its claim that an efficient market is a prerequisite to using January 27 closing prices as a baseline to measure damages for the Affected Stocks' price declines. Opp. at 29 (citing one law review article).[24] But the article addresses misstatement cases, where damages are measured by the price differential before and after a corrective disclosure. In that context, market efficiency guarantees both that the misstatement – which could have been made years earlier – and the corrective disclosure are incorporated into market prices, such that the decline after disclosure accurately measures damages. In this manipulation case, the new lower market prices on January 28 are a direct result of removal of demand. Because prices of the Affected Stocks crashed when Robinhood imposed restrictions, market efficiency is not needed to connect Robinhood's misconduct to the share price declines.

Indeed, Fischel defined "fair market value" without any reference to market efficiency:

Q. Do you have a definition of "value" for a stock?

---

[24] P.A. Ferillo, F.C. Dunbar & D. Tabak, "The 'Less than' Efficient Capital Markets Hypothesis, etc." 78 *St. John's Law Review* 81, 122-23 (Winter 2004) (ECF 567-56 at 43-44).

A. Well, there's a general definition of what a fair market value is, a price between a willing buyer and a willing seller where both have reasonably complete information and neither is under a compulsion to buy or sell. That's a generally accepted definition of fair market value. So under that definition, as long as those criteria are met, price and value are the same.

Fischel Depo. 147:12-148:6 (Rosen Decl., Ex. 37).[25] This refutes Robinhood's assertion that the closing market prices on January 27 cannot be used as a baseline for determining damages.

## V.    THE PROPOSED REPRESENTATIVES ARE TYPICAL RETAIL INVESTORS

Robinhood again trots out its artificial-inflation-by-an-internet-mob trope to argue that awareness of market events at the time of *purchase* somehow defeats typicality in a *seller* class action based upon on Robinhood's Class Period restrictions and half-truths. Not so. Besides, if retail investors *legally* coordinated online, how are the proposed representatives atypical? Seeing this paradox, Robinhood, the proverbial fox guarding the henhouse, then cobbles together so-called "unusual trading practices" to assert that the proposed representatives are not just atypical but unworthy of representing the class. Opp. 31-33. These predictable attacks do not defeat typicality.

### A.    Retread Non-Reliance Arguments Do Not Demonstrate Atypicality

1.    <u>Although purchasing decisions are irrelevant, named plaintiffs are typical.</u>

Robinhood harps on some named plaintiffs' knowledge of coordinated trading on social media and possible short squeezes at the time of *purchase*. Opp. at 9-10, 31-32. To what end? Its experts did not opine that there was illegal manipulation and events played out quite publicly. Following along and trading on this information renders them typical. *See In re Sanofi-Aventis Sec. Litig.*, 293 F.R.D. 449, 454–55 (S.D.N.Y. 2013) ("Because they were closely following news of the markets …. that Lead Plaintiffs had the same knowledge that the rest of the market had makes them, in fact, typical") (citations omitted). So does *buying* the Affected Stocks based on social-media buzz rather than on fundamental value – as so many did. For whatever reason, class members bought the Affected Stocks at fair market prices believing they would rise. *See Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 492-93 (S.D. Fla. 2003) (short of access to inside information, a plaintiff who buys regardless of how high the price is, is typical of all class members and relies on market integrity).[26]

---

[25] The Affected Stocks' prices on January 27 were set by the willing exchange of buyers and sellers on the NYSE and NASDAQ, both *bona fide* and highly liquid markets. Pl. Br. at 17-18.

[26] Robinhood's citation to *Landry v. Price Waterhouse Chartered Accts.*, 123 F.R.D. 474, 475-76 (S.D.N.Y. 1989) (Opp. at 32) is inapposite as the plaintiff's atypicality related to receipt of inside

2.      <u>Awareness of PCOs is not knowledge of the facts Robinhood concealed.</u>

Citing *In re GenesisIntermedia, Inc. Sec. Litig.*, 232 F.R.D. 321, 329 (D. Minn. 2005), Robinhood claims that the proposed representatives did not rely on market integrity because, aside from Ng, they "knew about the brokerage trading restrictions at the time they sold their shares". Opp. at 31. But the plaintiff in *GenesisIntermedia* only testified that he believed the market did not accurately price the stock when he bought it – which, as *Halliburton II* later explained, does not render him atypical.[27] Moreover, mere knowledge of the PCOs cannot render anyone atypical – as the PCOs caused markets to crash, Robinhood instantly became a household name. In addition to the well-publicized PCOs, purchase cancellations, involuntary margin sales, and early ITM call option close outs were *not disclosed.* All of these restrictions were coupled with half-truths that collectively 'sen[t] a false pricing signal to the market.'" Order at 46. As noted in Sec. IV.A.1, above, the fact that Robinhood's carefully-worded blog post concealed material facts that, while embarrassing to Robinhood, could have tempered the massive sell-off (Pl. Br. at 2 & n. 4), demonstrates that named plaintiffs were as clueless as other class members about why Robinhood shut down purchases.

Robinhood cannot shoehorn the facts of this case into *Underwood v. Lampert*, No. 02-21154-CIV, 2005 WL 8155010 (S.D. Fla. Sept. 9, 2005). In that Rule 10b-5(b) case, one lead plaintiff testified that facts alleged to have been withheld were actually known to the market early in the class period. *Id.* at *4. In this manipulation case, while named plaintiffs may have known about some manipulative acts (the PCOs), Robinhood's half-truths withheld critical information during the Class Period. CEO Tenev did not admit the liquidity problem until February 18 (Pl. Br. at 15 n.31) and the fact that Robinhood shut down purchases to avoid the liquidity crisis it would have faced on January 29, from trying to pay its NSCC deposit had prices continued to rise, was only revealed in the February 23 discussion with Dave Portnoy. Thus, some named plaintiffs not remembering the "market volatility" blog post and Lead Plaintiff pointing to the PCOs (not the

---

information.

[27] "There is no reason to suppose … the value investor … [is] indifferent to the integrity of market prices … To be sure, the value investor 'does not believe that the market price accurately reflects public information *at the time he transacts*.'" *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 273-74 (2014) (emphasis in original). Desai read about a 3:1 stock split to occur on Sept. 25, 2001. That day, the price was lower, but did not reflect a 3:1 split. Desai read the split was put off and decided to invest before it occurred. 232 F.R.D. at 325. Under *Halliburton II* he is typical.

blog post) as a reason for the price declines proves the deception worked, not that they sold when aware of all the facts. To the contrary, as Huacuja testified (ECF 567-8 at 99):

> I didn't know for how long they were going to do this … They didn't bother to send me any kind of message at all. I was on their app before their market opened, after their market opened, during the market … during the whole thing was happening. I didn't get any kind of notification. I didn't get any email. I didn't get anything on their app. I was on their app the whole time. Nothing. So I decided to pull out because I didn't know how long this was going to last. I had no idea what else they could do. And I just -- it was just horrible. So I just decided to cut my losses. [28]

**B.     Robinhood Prefers to Be Sued By Institutional Investors**

In a section entitled "Named Plaintiffs' Investment Strategies (or Lack Thereof)," Opp. at 10-11, Robinhood ridicules the proposed representatives as not being sophisticated enough investors to sue Robinhood: they have little investing experience, trade on "gut" or "momentum," and don't research SEC filings.[29] Apparently, instead of its average customer, Robinhood's "typical" class member is an institutional investor. Because individuals are often appointed in PSLRA cases, all of Robinhood's criticisms are commonly rejected. *See* Opp. at 32-33.

      1.     <u>There is no minimum financial literacy requirement.</u>

"The degree of investment experience or sophistication of each of the class members is irrelevant." *Kennedy,* 710 F.2d at 717 (citation omitted). As it is invariable that a class will consist of "investors of varied proficiency," *id.,* "typicality" is met if it is alleged the defendant "committed the same unlawful acts in the same method against an entire class." *See id.*; *Underwood*, 2005 WL 8155010, at *3 (citing *In re Amerifirst Sec. Litig.*, 139 F.R.D. 423, 429 (S.D. Fla. 1991)). All of the proposed representatives are retail investors who bought stock anticipating the price would go up; all testified that Robinhood's market manipulation caused the prices to crash.[30]

To counter 40 years of precedent, Robinhood asks *Luczak v. Nat'l Beverage Corp.*, 548 F.

---

[28] Others sold due to the market panic caused by Robinhood's manipulation. Opp. Ex. 8, Huacuja 98:2-18; Opp. Ex. 9, Laine-Beveridge 128:13-20; Opp. Ex. 7, Harbison 154:3-17; Opp. Ex. 14, Rivas 166:9-12; Opp. Ex. 3 Cash 200:9-202:20.

[29] Robinhood largely treats the proposed representatives as an undifferentiated mass, but names Rivas, Nguyen, Harbison, Ng, Gurney, Clarke, Laine-Beveridge, Huacuja, and Bernard.

[30] Opp. Ex. 9, Laine-Beveridge 10:17-23, 17:12-18; Opp. Ex. 8, Huacuja 97:9-25; Opp. Ex. 1, Bernard 43:9-14, 158:8-19; Opp. Ex. 5, Clarke 76:24-77:3; Opp. Ex. 6, Gurney 119:6-9; Opp. Ex. 7, Harbison 154:3-17; Opp. Ex. 14, Rivas 166:9-21, Opp. Ex. 2, Bohorquez 139:24-140:6; Opp. Ex. 13, Poirier 152:3-7, 193:8-22, 194:9-13; Opp. Ex. 12, Nguyen 123:11-16; Opp. Ex. 11, Ng 8:25-9:4; Opp. Ex. 3, Cash 187:12-188:9.

Supp.3d 1256 (S.D. Fla. 2021) to do much heavy lifting. But Luczak's belated assertion of an earlier corrective disclosure to rescue his standing not only raised credibility issues but a typicality concern, because his theory now differed from the claims of the class. *Id.* at 1266. Moreover, while he claimed to be a "typical unsophisticated investor" his "deposition [was] rife with inconsistencies and incredible assertions related to his investment behaviors…" *Id.* at 1267. Robinhood does not even suggest the 12 proposed representatives *combined* engaged in Luczak's litany of bizarre behavior. Rather, they are faulted for being typical unsophisticated investors. Opp. at 32-33.[31]

        2.    <u>Robinhood's trading strategy attacks are ill-suited to the facts of this case.</u>

*First,* jabs at momentum trading (Opp. at 10-11, 33) fall flat because: (1) Robinhood pushes lists of investments and price movements to customers to "keep them informed," *see* p. 4 & n.10; (2) the SEC Staff Report, at 22, found that "quantitative and high-frequency hedge funds" joined the market rally (ECF 559-12 at 24); (3) Dr. Grenadier not only acknowledged momentum trading as a strategy, but served as a director for a momentum fund. Grenadier Depo. at 26:15-34:4; 27:9-24; 11:18-12:8. (Rosen Decl., Ex. 38). *See In re IPO Secs. Litig.*, 227 F.R.D. 65, 108 (S.D.N.Y. 2004)(finding that "day and momentum traders have the same incentives to prove defendants' liability as all other class members, and their presence in a securities class does not create intra-class conflicts"); *followed by, In re Acclaim Ent., Inc. Sec. Litig.*, No. 3-CV-1270, 2006 WL 8441287, at *3 (E.D.N.Y. Aug. 7, 2006), r*eport and recommendation adopted*, No. 03-CV-1270, 2006 WL 8441288 (E.D.N.Y. Sept. 25, 2006). *Second*, calling named plaintiffs "day traders" because, on isolated occasions, they bought and sold shares of the same stock on the same day (Opp. at 33) is a mischaracterization. Moreover, attacks on day traders as "atypical" have been rejected for years. *See e.g., In re Sunbeam Sec. Litig.*, 2001 WL 899658, at *1 (S.D. Fla. July 3, 2001).. *Third,* if "investing based on recommendations" is disqualifying, few could serve. *See, e.g., Regions*, 762 F.3d at 1260 (institutional investors may rely on advisers); *Cheney*, 213 F.R.D. at 492 (analyst advised individual). Online advice is no different; SEC Chair Gensler called such discourse a "free speech right." Pl. Br. at 6.

In a *Wall Street Journal* op-ed, CEO Tenev decried stereotypes of Robinhood customers as

---

[31] In *In re Safeguard Scis.*, 216 F.R.D. 577, 582-83 (E.D. Pa. 2003) is out of date: plaintiffs were found atypical for purchasing after the disclosure of the fraud, being day-traders, and trading on technical movements. Also, one plaintiff had recovered from his broker for unauthorized trading.

uninformed gamblers as "offensive." (Rosen Dec., Ex. 43) [32] The proposed representatives agree.

Finally, Robinhood argues that Lead Plaintiff Laine-Beveridge and named plaintiffs Cash and Poirier profited on their sales of Affected Stocks during the Class Period. Opp. at 30-31, n. 28. Although Robinhood repeatedly argues against damages for this seller class being calculated based on the January 27 price, they conveniently ignore that date when calculating damages. These three plaintiffs all suffered losses during the Class Period, as demonstrated in Exhibit 47 to the Rosen Declaration. *See Regions*, 762 F.3d at 1259-60 (rejecting typicality challenge where plaintiff had net loss during Class Period).[33]

### C.   The Proposed Representatives Need Not Have Sold All Nine Affected Stocks

Ignoring this Court's ruling that indirect purchasers had standing to sue Apex on behalf of direct purchasers, Pl. Br. at 8 (citing ECF 525 at 22), Robinhood incorrectly argues that the proposed representatives have no standing to assert class claims related to BBBY, KOSS, TR and TRVG, because they did not suffer losses on those specific securities. Opp. at 33-34. This misstates the standing inquiry, which concerns the right to sue a specific *defendant* for a specific *injury*, not on the specific securities. Where, as here, the class's injuries arise out the same conduct by the same defendants, courts routinely certify a single class embracing different securities. *See, e.g., Spicer,* 1990 WL 16983, at *3-4 (class representatives purchased six of 187 options); *In re LTV Sec. Litig.*, 88 F.R.D. 134, 138 (N.D.Tex.1980) (certifying class for eight types of securities).

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, No. 05 Civ. 1898, 2005 WL 2148919 (S.D.N.Y. Sept. 6, 2005), is consistent with the Court's ruling in the Apex case. Discussing various rules applicable to a Rule 105-(b) misrepresentation case, the court explained that their purpose is to "limit [ ] the class of plaintiffs to those who have at least dealt in the security to which the prospectus, representation, or omission relates." *Id.* *3. This is not a Rule 10b5-(b) action where Robinhood made misstatements unique to any of the Affected Stocks. Pertinent to this case, a "plaintiff does not have standing to bring claims on behalf of purchasers of different

---

[32] Although Robinhood built its platform "[f]or those who are making their voices heard through the markets," ACCC, ¶99, it criticizes Bernard for tweeting that "she wanted to 'send[] a message' with her trading," Opp. at 10, and Rivas for describing her Class Period trading as a form of "social activism." Opp. at 9, n.11. *See Makhlouf v. Tailored Brands, Inc.*, 2017 WL 1092311, at *7-8, 10 (S.D. Tex. Mar. 23, 2017) (rejecting typicality attack based on ESG investing).

[33] The attack on the Lead Plaintiff as not having the largest financial interest in the litigation (Opp. at 30) is meritless. Robinhood compares its computation of his damages for the one-week class period in the ACCC with the other lead plaintiff movant whose class period extended to June.

securities where those claims are based on different factual allegations and legal theories." *Id.* *4. Here, there are two claims alleged against Robinhood based upon the same conduct with respect to all issuers.[34] In *Luczak,* 548 F. Supp. 3d at 1262, the plaintiff did not have standing because he sold before the first corrective disclosure pertaining to the extant claims. *Id.*[35]

## VI.    PLAINTIFFS SATISFY THE ADEQUACY REQUIREMENT OF RULE 23(A)(4)

The proposed representatives meet Rule 23(a)(4)'s adequacy requirement, as they all reviewed and approved the pleadings, regularly communicate with counsel and each other, understand the role of a class representative, produced documents, and testified at deposition. *See* Rosen Decl., Ex. 48; *Powers v. Gov't Emps. Ins. Co.*, 192 F.R.D. 313, 318 (S.D. Fla. 1998) (performing these functions demonstrates adequacy).[36] They are engaged and have not "abdicated to their attorneys the conduct of the case." *Kirkpatrick*, 827 F.2d at 727-28. Robinhood's criticism of Lead Plaintiff Laine-Beveridge for failing to read the motion to dismiss is baseless. *Powers, supra, id.* ("The mere fact that Powers is not well-versed in insurance law or the intricacies of her case does not warrant a finding that she is inadequate to represent the class.").[37]

## VII.   CONCLUSION

Lead Plaintiff and Named Plaintiffs respectfully request that the Court grant their motion for class certification.

---

[34] *See Ramos v. Patrician Equities Corp.,* 765 F. Supp. 1196, 1199 (S.D.N.Y. 1991) ("[A] class representative [] must have individual standing to assert the *claims* in the complaint against each *defendant* being sued by him.") (emphases added).

[35] Robinhood cannot distinguish Plaintiffs' cases. That *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98-cv-4318, 2000 WL 1357509 (S.D.N.Y. Sept. 20, 2000), concerned a single issuer with multiple funds (Opp. at 34), is meaningless where a "single course of wrongful conduct" is alleged against Robinhood. *Id.* at *3. In *Krukever v. TD Ameritrade, Futures & Forex LLC,* 328 F.R.D. 649 (S.D. Fla. 2018), after noting that standing is a requirement, *id.* at 655, the Court found a handful of proposed representatives could represent 888 options. 328 F.R.D. at 658-59.

[36] That Gurney had to drive to several locations for his work during his deposition speaks to a scheduling conflict, as the parties had to squeeze the depositions of twelve clients, several experts and four third-parties into a short timeframe. He spent half the day answering questions, exhibited more than sufficient knowledge, and has demonstrated the commitment that *Kirkpatrick* requires.

[37] No conflicts exist because some named plaintiffs bought shares of the Affected Stocks during the one-week class period while Robinhood depressed prices. Opp. at 35. The fact that Robinhood cited a product defect case, *Montgomery v. New Piper Aircraft, Inc.*, 209 F.R.D. 221 (S.D. Fla. 2002), instead of a securities case demonstrates the weakness of the argument in a deflation case.

Dated: June 30, 2023

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, FBN# 0182877
Robin Bronzaft Howald
Michael A. Cohen
By: /s/Laurence M. Rosen
Laurence M. Rosen, Esq.
275 Madison Avenue 40th Floor
New York, New York 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com

*Counsel for Lead Plaintiff Blue Laine-Beveridge and Named Plaintiffs Abraham Huacuja, Ava Bernard, Brendan Clarke, Brian Harbison, Cecilia Rivas, Doi Nguyen, Joseph Gurney, Marcel Poirier, Sandy Ng, Santiago Gil Bohórquez, and Thomas Cash*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 30, 2023, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

<u>/s/Laurence M. Rosen</u>

27