# EXHIBIT 37

Page 1

1

2    UNITED STATES DISTRICT COURT

     SOUTHERN DISTRICT OF FLORIDA

3    _____

4    In re:

5    JANUARY 2021 SHORT SQUEEZE TRADING

6    LITIGATION

7

8    Case No. 21-2989-MDL-ALTONAGA

9    _____

10                        April 12, 2023

                          10:11 a.m.

11

12

13

14            DEPOSITION of DANIEL R. FISCHEL,

15   taken by Plaintiffs, pursuant to Notice,

16   held at the offices of CRAVATH, SWAINE &

17   MOORE LLP, 825 Eighth Avenue, New York,

18   New York before Wayne Hock, a Notary

19   Public of the State of New York.

20

21

22

23

24

25

Page 2

1

2   A P P E A R A N C E S:

3

      THE ROSEN LAW FIRM
4     Attorneys for Plaintiffs
              275 Madison Avenue
5             New York, New York 10016
      BY:     LAURENCE ROSEN, ESQ.
6             lrosen@rosenlegal.com

7

8     CRAVATH, SWAINE & MOORE LLP
      Attorneys for Defendants
9             825 Eighth Avenue
              New York, New York 10019
10    BY:     KEVIN J. ORSINI, ESQ.
              korsini@cravath.com
11            CHARLOTTE LEPIC, ESQ.
              clepic@cravath.com

12

13                  *       *       *

14

15

16

17

18

19

20

21

22

23

24

25

```
                                              Page 3

 1

 2   D A N I E L   R.   F I S C H E L, having

 3        been first duly sworn by a

 4        Notary Public of the State of

 5        New York, upon being examined,

 6        testified as follows:

 7   EXAMINATION BY

 8   MR. ROSEN:

 9        Q.    What is your current address?

10        A.    332 South Michigan Avenue,

11   Chicago, Illinois 60604.

12        Q.    Good morning, Mr. Fischel.

13        A.    Good morning.

14        Q.    Could you just state your name

15   for the record.

16        A.    Daniel Robert Fischel.

17        Q.    And could you state which

18   organizations you are employed by or

19   currently affiliated with?

20        A.    An economics consulting firm by

21   the name of Compass Lexecon, and also

22   University of Chicago.

23        Q.    And what's your role at Compass

24   Lexecon?

25        A.    I'm the president and chairman
```

Page 4

```
 1                    D. R. Fischel
 2    of the firm.
 3         Q.    And what's your role at the
 4    university of Chicago?
 5         A.    I'm currently the Lee and Brena
 6    professor of law and business emeritus at
 7    the University of Chicago Law School.
 8         Q.    Are you still teaching there?
 9         A.    Well, it's sort at my
10    discretion.  But in the last couple of
11    years I haven't, although they always ask
12    me to, because I've just gotten too busy.
13         Q.    So you spend most of your time
14    running Lexecon or Compass Lexecon?
15         A.    I wouldn't say running, but I
16    would say, for all practical purposes,
17    Compass Lexecon really takes up my entire
18    time devoted to professional activities.
19         Q.    And are you -- I assume you're
20    not -- you didn't take any medication or
21    anything, you don't have any medical
22    conditions that would interfere with your
23    cognition or memory or ability to testify
24    today?
25         A.    No, correct.
```

```
 1                    D. R. Fischel
 2      Q.     So you are a lawyer?
 3      A.     Trained lawyer, not a practicing
 4   lawyer.
 5      Q.     Are you admitted to any Bars,
 6   state Bars?
 7      A.     I was.  I haven't had any
 8   connection to law practice since I think
 9   1980.
10      Q.     But you practiced for some time?
11      A.     I practiced for less than a year
12   after clerking before beginning my
13   academic career.
14      Q.     And you're familiar with the
15   federal securities laws?
16      A.     That's sort of an overbroad
17   question.  I'm not sure how to answer it.
18      Q.     Have you taught classes covering
19   the Securities Exchange Act of 1934?
20      A.     I've actually never taught a
21   course in securities regulation.  I've
22   taught many courses dealing with, in one
23   way or the other, the economics of
24   financial markets which covered certain
25   aspects of securities regulation.  I've
```

Page 6

1                    D. R. Fischel

2     also written in that area as well.

3        Q.    And do you consider yourself an

4     expert on securities class action

5     litigation under Section 10b of the

6     Exchange Act?

7                MR. ORSINI: I object to form.

8                THE WITNESS:  It's really the

9         same answer as I just gave you.  I'm

10        not sure what you mean by that

11        question, whether you're asking me for

12        a legal opinion or some other kind of

13        opinion.

14        Q.    Well, you're here today as an

15     expert; right?

16        A.    I am.

17        Q.    What's your expertise?

18        A.    I have a number of areas of

19     expertise, but for purposes of this

20     course, I would say the economics of

21     financial markets.

22        Q.    Economics of financial markets.

23              And you've testified in a lot of

24     10b cases; is that right?

25        A.    That's I think fair.  I've

```
 1                    D. R. Fischel
 2   testified in a lot of cases where there
 3   are allegations under the anti-fraud
 4   provisions of the securities laws.
 5       Q.    So did you offer an opinion in
 6   this case?
 7       A.    Yes, I did.
 8            MR. ROSEN: So let's introduce
 9       Exhibit 113.  That's your expert
10       report, your opening expert report.
11            (Whereupon, a document entitled
12       Report of Daniel R. Fischel was marked
13       Exhibit 113 for identification.)
14       Q.    Tell me, is that expert report
15   your work?
16       A.    Well, I don't know what the
17   exhibit number is, but --
18       Q.    It's Exhibit 113.
19       A.    Well, if you're referring to my
20   report dated February 16, 2023, yes, I did
21   author this report.
22       Q.    Now, what opinions do you offer
23   in your report?
24       A.    They're stated on page ten in
25   paragraph nineteen.
```

Page 8

```
 1                  D. R. Fischel
 2           Do you want me to read them?
 3      Q.    Well, let me see.
 4           So paragraph nineteen contains
 5  all of the opinions in the report?
 6           MR. ORSINI: Objection.  Vague.
 7           THE WITNESS:  I would say
 8      they're my principal opinions in the
 9      case.  There's a lot of paragraphs
10      that I guess you could say contain
11      opinions.
12      Q.    But that's a concise summary of
13  your opinions?
14      A.    Those are my principal opinions
15  in the case.
16      Q.    Now, did anyone assist you in
17  forming your opinions?
18      A.    I would say there was a team of
19  people who were working under my direction
20  and supervision who worked with me in the
21  case, but of course the opinions are my
22  own.
23      Q.    And how many people were on your
24  team?
25      A.    I would say the principal
```

Page 9

```
 1                  D. R. Fischel
 2   members of the team were maybe three or
 3   four people.
 4       Q.    And what are their names?
 5       A.    You know, in no particular
 6   order, I would say Jessica Mandel, Laura
 7   Yergesheva, Jonathan Polonsky, and Alex
 8   Rinaudo.
 9       Q.    Alex, what's his last name?
10       A.    Rinaudo.
11             And there were research
12   assistants and other lower level
13   professionals as well who worked on the
14   matter.  But the people that I mentioned
15   were the people that I coordinated with
16   directly.
17       Q.    And what was Jessica Mandel's
18   role?
19       A.    What I just described, working
20   on the matter with me under my direction
21   and supervision.
22       Q.    Did all of them share the exact
23   same responsibilities, or did some have
24   responsibilities for certain aspects of
25   the opinion and others for different
```

Page 10

```
 1                    D.  R.  Fischel
 2   aspects  of  the  opinion?
 3        A.     I  would  say  a  fair  description
 4   would  be  they  all  worked  on  the  case,  all
 5   aspects  of  the  case  with  me.
 6        Q.     And  as  part  of  your  opinion,  you
 7   ran  a  regression  analysis;  is  that  right?
 8        A.     That's  right.
 9        Q.     Who  ran  the  regression  analysis?
10        A.     Well,  it's  done  by  a  computer,
11   so  I'm  not  sure  how  to  answer  the
12   question.
13        Q.     Well,  somebody  hit  the  keys  on
14   the  computer  and  told  it  what  to  do;
15   right?
16        A.     Yes.  I'm  not  sure  who  actually
17   hit  the  keys  on  the  computer.  The  design
18   of  the  regression  analysis  was,  as  I  said,
19   done  by  me  under  my  --  with  the  assistance
20   of  others  working  under  my  direction  and
21   supervision.
22        Q.     So  to  run  a  regression,  you  need
23   a  certain  software  package  that  has  that
24   function  in  it;  correct?
25        A.     Correct.
```

```
 1                    D. R. Fischel
 2       Q.    What software package did you
 3  use to run the regression?
 4       A.    I'd have to check.
 5       Q.    And what did you do to ensure
 6  that the regression analysis was conducted
 7  correctly by your team?
 8       A.    It's a very standard type of
 9  event study regression.  We do make an
10  attempt to check all of our findings from
11  the event study or otherwise, so I would
12  say that's what we did.
13       Q.    But what did you personally do
14  to check to make sure that your team ran
15  the regression properly?
16       A.    I gave direction as to what to
17  do, looked at the results, had the results
18  checked.
19       Q.    But you didn't personally check
20  the results to make sure they were
21  accurate?
22       A.    Not other than what I've already
23  described.
24       Q.    Now, as part of your regression
25  analysis, you also -- well, as part of
```

Page 12

1                    D. R. Fischel

2    your event study, you did an event study;

3    correct?

4         A.     Correct.

5         Q.     And as part of your event study,

6    there were a substantial number of news

7    articles that were identified and reviewed

8    to determine if there were news that might

9    cause the stock prices of these nine

10   affected stocks to move up or down;

11   correct?

12        A.     I'm sorry, can you repeat that

13   question?  I don't know what you mean by

14   "nonaffected stocks."

15        Q.     Nine.

16        A.     Nine, sorry, I misheard you.

17        Q.     I'll lay a proper foundation.

18             So this case involves nine

19   stocks that are traded publicly and they

20   are GameStop, AMC Entertainment, Bed, Bath

21   and Beyond, BlackBerry, Trivago, Tootsie

22   Roll, but you know the nine stocks I'm

23   talking about; right?

24        A.     I do.

25        Q.     Koss I think is another one.

```
                                              Page 13
 1                    D. R. Fischel
 2              So as part of this -- of your
 3    expert report and as part of the event
 4    study, you searched for and identified and
 5    reviewed a number of news articles during
 6    the period that your event study covers;
 7    right?
 8         A.    That's right.
 9         Q.    Now, who obtained the news
10    articles?
11         A.    The news articles were obtained
12    from the sources that were identified.
13         Q.    Do you know who on your team
14    obtained the news articles?
15         A.    Again, there's a data source
16    called Factiva and Bloomberg.  That's the
17    sources for the news articles.  What
18    research assistant presumably got those
19    articles from those sources I don't know
20    without asking.
21         Q.    And did you personally review
22    each of those news articles that were
23    obtained from Factiva and Bloomberg and
24    elsewhere?
25         A.    All of the news articles that
```

```
 1                  D. R. Fischel
 2   were referred to in my report I did look
 3   at.
 4      Q.     When you say referred to in your
 5   report, is that every news article that
 6   was obtained that was published about
 7   these companies during the class period?
 8      A.     I would say that it would be the
 9   articles that fit the description in the
10   report from the sources that are referred
11   to.  There were instances where the same
12   article was published multiple times, so
13   it probably didn't include the duplicates.
14   But the basic idea was to have a certain
15   set of search criteria from a set of
16   sources and to be inclusive with respect
17   to those sources and the article contained
18   in those sources.
19      Q.     So let's go to paragraph
20   thirty-six of your report.
21             It says, "accordingly, we
22   searched news articles for mentions of
23   company names of the affected stocks in
24   the headline and lead paragraphs of Dow
25   Jones and Wall Street Journal articles, as
```

```
                                        Page 15
 1                    D. R. Fischel
 2    well as Bloomberg News for each of the
 3    companies between January 4 and January 27
 4    to determine whether any value-relevant
 5    specific news was disclosed that could
 6    have impacted the price of the affected
 7    stocks on days when a statistically
 8    significant price movement occurred".
 9              So you wrote that paragraph;
10    correct?
11       A.    I don't remember if the exact
12    words in this paragraph were written by
13    me.  But as I've mentioned several times,
14    the entire report was prepared under my
15    direction and supervision.
16       Q.    And then it says, "we
17    supplemented the news articles searches by
18    also searching for any SEC filings for the
19    affected stocks' companies over the same
20    period".  And then it says, "This review
21    demonstrates that the vast majority of the
22    price increases for all nine affected
23    stocks cannot be explained by new
24    value-relevant company-specific
25    information".
```

Page 16

1           D. R. Fischel
2           So I guess the first question
3    is: Is it true that someone in your office
4    -- you can't say who as we sit here today
5    -- but someone at Compass Lexecon created
6    a set of news articles between January 4,
7    2021 and January 27, 2021 that had the
8    name of the nine affected stocks in the
9    headline or lead paragraphs; is that
10   right?
11          MR. ORSINI: When you say
12       "created", I assume you mean compiled?
13          MR. ROSEN: Right.
14          THE WITNESS:  I mean, if what
15       you're asking is what's said in the
16       sentence that you just read, I would
17       say correct.
18       Q.    Now, that collection of news
19   articles that was compiled, did you read
20   each article in that compilation of news
21   articles?
22       A.    I would say all or part of each
23   article that is referred to in the various
24   event studies for the different stocks,
25   and this paragraph only refers to the

Page 17

                              D. R. Fischel

1                         D. R. Fischel

2      articles in the event study, which is not

3      the sum total of all the articles.

4          Q.     Right.

5                 So who went about to determine

6      which of these articles that were compiled

7      that you would actually review?  Because

8      someone actually did a first pass and

9      determined which ones were relevant and

10     which ones were not relevant; is that fair

11     to say?

12         A.     No, that's not fair to say.

13         Q.     So all of the articles from Dow

14     Jones, Wall Street Journal, Bloomberg, and

15     SEC filings you took a look at?

16         A.     The articles that are referred

17     to in this particular paragraph concluding

18     with appendix D, all the articles in

19     appendix D I looked at.

20         Q.     What about the articles that are

21     not in appendix D, did you look at those

22     articles?

23                MR. ORSINI: Objection.  Vague.

24                THE WITNESS:  Paragraph

25          thirty-six is for a particular

1                     D. R. Fischel

2          purpose.   There are other articles

3          that are referred to in the report

4          that are not contained in paragraph

5          thirty-six because they were compiled

6          for a different purpose.

7          Q.     So the articles in appendix D

8    are a small subset of the total number of

9    articles that were identified by your

10   staff as containing news about the nine

11   affected stocks; correct?

12         A.     Not really correct the way

13   you're phrasing the question.

14         Q.     Well, appendix D does not

15   contain the articles that were reported in

16   Wall Street Journal, Bloomberg, Dow Jones,

17   and SEC filings listed in paragraph

18   thirty-six; right?

19         A.     That's right.   There are a lot

20   of articles mentioned in the report that

21   are not contained in appendix D, because

22   appendix D was, as I've just said,

23   compiled for a particular purpose.

24         Q.     So explain how you narrowed the

25   articles, the number of articles, and the

Page 19

```
 1                    D. R. Fischel
 2   specific articles from the greater set
 3   from all the articles reported about the
 4   nine affected stocks and those articles
 5   you mentioned in appendix D, how did you
 6   go from the larger subset to the smaller
 7   subset?  How was that done?
 8       A.     Well, at a high level I would
 9   say appendix D was for the purpose of
10   listing articles which mentioned the name
11   of companies in connection with
12   information about those companies as
13   distinguished between -- as distinguished
14   from, I should say, articles about the
15   effect of perceived short squeezes or
16   other causes of -- other potential causes
17   of artificial prices.  Those articles are
18   discussed separately in the report but
19   would not be included in appendix D.
20           In addition, with respect to
21   appendix D itself, as I mentioned, there
22   were instances of just repetition of
23   articles -- the same article was repeated
24   multiple times.  We tried to only include
25   one mention as opposed to multiple
```

Page 20

```
 1                    D. R. Fischel
 2   mentions of the exact same article.
 3        Q.    So there's two sets of news
 4   articles, a larger one and a smaller one;
 5   correct?
 6        A.    You have to be a little bit more
 7   specific.
 8        Q.    So let's -- there was a set of
 9   news articles between January 4, 2021 and
10   January 27, 2021 that your staff collected
11   that either mentioned the one of the nine
12   affected stocks in the headline or
13   discussed it in the lead paragraphs;
14   correct?
15        A.    You're talking about appendix D?
16        Q.    No, it would be the third
17   sentence of paragraph thirty-six in your
18   report.
19        A.    The third sentence, the
20   "accordingly" sentence?
21        Q.    Yes.
22              So that is a larger set of news
23   articles that is in appendix D; correct?
24        A.    Well, in context, the sentence
25   refers to the articles in appendix D.  You
```

```
 1                     D. R. Fischel
 2    can see there are many other articles that
 3    are discussed in the report that are not
 4    contained in appendix D because they are
 5    not articles about potentially
 6    value-relevant company-specific news but
 7    rather articles about the lack of
 8    value-relevant -- potentially
 9    value-relevant company-specific news,
10    rather the effective perceived short
11    squeezes or other potential causes of
12    artificial price movements.
13         Q.    Let's focus on the question.
14              The question is there is a
15    larger set of news articles that someone
16    on your staff compiled, in fact, I believe
17    you sent us a copy of them all.  If you
18    want, I can show them to you.  It would
19    make it easier.
20              But you will agree that someone
21    on your staff compiled a set of news
22    articles that contained the name of the
23    nine affected stocks either in the
24    headline or in the lead paragraph of the
25    news articles, correct, between January 4,
```

```
                                        Page 22
 1                  D. R. Fischel
 2   and January 27, 2021; right?
 3        A.     Yes, I would agree with that.
 4   But even the word "compiled" is a little
 5   bit ambiguous.
 6        Q.     So what did they do if they
 7   didn't compile them?  They collected them?
 8   What word would you like to use?
 9        A.     They searched for articles
10   referred to in the headlines or lead
11   paragraphs of Dow Jones and the Wall
12   Street Journal as well as for certain --
13   as well as Bloomberg in certain specific
14   instances that were obtained from those
15   sources that I just mentioned.
16        Q.     And you didn't look at all those
17   news articles; correct?
18        A.     Again, as I've said, I looked at
19   all of the articles referred to in
20   appendix D as well as all of the articles
21   contained in the report.
22        Q.     Right.
23               I'm talking about what I just
24   asked you about, which is the greater
25   subset of news articles that were searched
```

Page 23

1                    D. R. Fischel

2    for and identified by your staff about the

3    nine affected stocks that contained the

4    name of the nine affected stocks in either

5    the headline or the lead paragraph between

6    January 4 and January 27, 2021.  Let's

7    call that the greater set of news

8    articles.  We'll define that as the

9    greater set of news articles.

10                Are you with me?

11       A.    Yes, but I just want to make

12   sure -- because you're reading the

13   sentence out of context, you're no longer

14   referring to appendix D, you're just --

15       Q.    Exactly.  Thank you, thank you.

16   I'm not referring to Exhibit D.  I'm

17   referring to the greater set of news

18   articles that was compiled by your staff

19   about the nine affected stocks during this

20   period January 4 to January 27, 2021.

21                So you understand when I define

22   the greater set of news articles, you know

23   what I mean now; right?

24       A.    Yes, but you're taking the

25   sentence that you're reading out of

Page 24

```
 1                    D. R. Fischel
 2  context.  That's the only point that I'm
 3  making.
 4      Q.    Did you personally review the
 5  greater set of news articles?
 6      A.    I attempted to review all of the
 7  articles that fit the description that I
 8  described that are contained in the report
 9  that come from these sources.
10      Q.    So you did not review the
11  greater set of news articles; isn't that
12  true, Mr. Fischel?
13      A.    I'm not sure that is true, that
14  meet the criteria that I just described.
15      Q.    I'm not talking about your
16  criteria, I'm talking about my criteria,
17  I'm talking about my criteria because I'm
18  asking the questions.
19              I defined the greater set of
20  news articles to be the larger set of news
21  articles that contained the name of one of
22  the nine affected stocks in the lead
23  paragraph or in the headline between
24  January 4 and January 27, 2021.  We both
25  understand what the greater set of news
```

```
                                          Page 25
 1                  D. R. Fischel
 2   articles is; right?
 3       A.    Well, I assume any article, the
 4   way you're defining the question, any
 5   article where the name of the company was
 6   mentioned in the headline or the lead
 7   paragraph, so in Dow Jones or Wall Street
 8   Journal between January 4 and January 27,
 9   whether or not it met the criteria of
10   appendix D.
11       Q.    Correct.
12             So understanding that, isn't it
13   true that you did not personally review
14   each of the articles in the greater set of
15   news articles that your staff compiled or
16   collected?
17       A.    I'm not sure it is true.  You'd
18   have to show me an article and I could
19   tell you if I remember reviewing it or not
20   reviewing it.
21       Q.    So which articles -- so when you
22   got -- at some point your staff gave you
23   some articles to review; right?
24       A.    Yes, by definition, that's
25   correct.
```

Page 26

```
 1                    D. R. Fischel
 2        Q.    And isn't it true that the only
 3    articles you reviewed were in appendix D?
 4        A.    No, that's not correct.  That's
 5    what I've been trying to explain to you.
 6        Q.    So what different subset, if not
 7    the greater set of news articles as
 8    defined or appendix D, what other subset
 9    of news articles did you review?
10        A.    There's a whole other set of
11    articles, many of which are described in
12    report, many of which were collected but
13    not described in the -- just let me finish
14    my answer, please -- that were not
15    potentially value-relevant articles about
16    the companies themselves but were the
17    impact of perceived short squeezes or
18    other causes of artificial price movements
19    in the particular securities in question.
20        Q.    Now, who went through the
21    greater set of news articles and
22    determined what was value-relevant?
23        A.    With respect to Exhibit -- the
24    articles on appendix D, there was an
25    attempt to identify every article that was
```

Page 27

```
1              D. R. Fischel
2   mentioned that was about the news about
3   the company in terms of either disclosures
4   by the company or SEC -- information from
5   SEC filings about the company other than
6   the articles which discussed the effect of
7   potential short squeezes or other
8   potential causes of artificial private
9   movements for those securities during the
10  particular period in question.
11       Q.    So who made this attempt to
12  identify every article that was mentioned
13  about the companies in terms of
14  disclosures by the SEC or SEC filings in
15  the articles?  Who did that first pass to
16  determine what was value-relevant?
17       A.    I didn't say they were
18  value-relevant, I said articles which
19  mentioned the name of the company other
20  than articles that talked about the effect
21  of potential short squeezes or other
22  possible causes of artificial price
23  movements that affected the prices of
24  these nine securities during the relevant
25  period, this period between January 4 and
```

Page 28

1              D. R. Fischel

2    January 27.

3         Q.    So someone on your staff went

4    through the greater set of news articles

5    and determined which articles to present

6    to you; isn't that correct?

7         A.    No, it's not correct.  All the

8    articles were presented to me and I

9    reviewed them all.

10        Q.    In the greater set?

11        A.    All the articles that are

12   contained in the report, whether or not

13   they're in Exhibit D -- excuse me,

14   appendix D, as well as many other articles

15   that were collected that are not in the

16   report because they just repeat the same

17   sentiments as the ones in the report.  So

18   for example, there are paragraphs that

19   talk about articles that are illustrative

20   of particular points.  The articles that

21   are illustrative of particular points are

22   a subset of the total number of articles

23   that make the point in that particular

24   paragraph, and those have been collected

25   as well.

Page 29

D. R. Fischel

1    Q.    So somebody on your staff went

2    through the greater set of articles and

3    determined which ones to give to you to

4    look at; is that correct?

5    A.    If you mean somebody or maybe

6    more than one person was responsible for

7    collecting the articles from the data

8    sources that were identified in the

9    report, I guess by definition that's

10   correct.

11   Q.    And they filtered those articles

12   and didn't give you all of the ones that

13   they identified and collected; correct?

14   A.    No, I don't think that is

15   correct.

16   Q.    So that means you read every

17   single article that was part of the

18   greater set of articles?  Either they

19   filtered it or you read them all.  One or

20   the other.  Which is it?

21   A.    I don't agree that those are the

22   only two possible choices.

23   Q.    If you didn't read all of them

24   and you only read some of them --

```
                                            Page 30
 1                 D. R. Fischel
 2       A.    I didn't say I only read some of
 3   them.  I said if you think there's an
 4   article that fit the criteria that you
 5   think I didn't read, show it to you and
 6   I'll tell you if I remember reading it or
 7   not.
 8       Q.    So what was the criteria of
 9   articles that you read?
10       A.    I think I've gone over this
11   several times, but I'll say it again, the
12   articles in appendix D as well as a set of
13   other articles that mention the name of
14   companies but not in connection with
15   information that's potentially
16   value-relevant about those companies but
17   rather the effect of potential short
18   squeezes and other possible causes of
19   artificial price movements on those
20   companies as an explanation for why those
21   companies' stock prices were behaving the
22   way they were.
23       Q.    So who selected the articles
24   that you read?
25       A.    As I've also indicated several
```

Page 31

                    D. R. Fischel

1
2    times, the articles came from particular
3    data sources and those data sources are
4    part of data services that we subscribe to
5    and I assume one or more research
6    assistants downloaded the articles from
7    the sources that I've identified.
8        Q.    Did you read all of the articles
9    in the greater set of news articles?
10            MR. ORSINI: Objection.  Asked
11        and answered.
12            THE WITNESS:  I don't know how
13        to --
14        Q.    You can say yes or no.  Either
15   you read them all you didn't.
16            Did you read them all or did you
17   not read them all?
18        A.    I'll refer to answer the way --
19        Q.    No, no, it's a yes or no
20   question.
21            MR. ORSINI: He can answer the
22        question the way he sees fit.  He's
23        already answered multiple times.
24            But go ahead, Mr. Fischel.
25            THE WITNESS:  All of the

```
                                            Page 32

 1                        D. R. Fischel

 2          articles that are referred to in the

 3          report as well as many articles that

 4          are not referred to in the report I've

 5          read.  If you think there are articles

 6          that I didn't read, show them to me

 7          and I'll tell you if I remember

 8          reading them or not.  I'm not aware of

 9          any search criteria that identified

10          articles other than what I've already

11          identified in terms of just articles

12          repeating the same point that comes

13          out in multiple news services or

14          something like that.

15          Q.    So based on your answer, it's

16     clear you did not read all of the articles

17     in the greater set of news articles that

18     were mentioned in paragraph thirty-six in

19     the third sentence?

20          A.    Well, now you're taking the

21     sentence out of context again with respect

22     to the articles that are referred to in

23     appendix D.  I tried to clarified that as

24     best I can multiple times.

25          Q.    Did you or did you not read all
```

```
 1                    D. R. Fischel
 2   of the articles; yes or no?  The answer is
 3   no; correct?
 4        A.     No, it's not correct.
 5        Q.     You read all the articles, all
 6   of the articles that mentioned one of the
 7   nine affected stocks in the headline or
 8   the lead paragraph; is that right?  Is
 9   that what you're telling me?
10        A.     I'm telling you I looked at all
11   or parts of all the articles that are
12   referred to in appendix D as well as a
13   wide set of other articles collected for a
14   different purpose not mentioned in
15   appendix D.  I'm not aware of any set of
16   articles that I did not review that met
17   either of those criteria, but the only way
18   to know for sure is if you show me
19   whatever article you want me to look at
20   and I'll tell you if I remember reading it
21   or not reading it.
22        Q.     So is it your testimony that you
23   read every article that your staff
24   identified that mentioned one of the nine
25   affected stocks in the headline or lead
```

Page 34

```
 1                    D. R. Fischel
 2   paragraph during this period January 4 to
 3   January 27, 2021?
 4       A.    I really can't add anything to
 5   what I've already said.
 6       Q.    Yes or no.
 7             MR. ORSINI: He's already
 8        answered the question.
 9             MR. ROSEN: No, he hasn't.  He's
10        avoiding the truth.
11       Q.    And now is the time for the
12   truth, Mr. Fischel.  Please tell the
13   truth.
14             MR. ORSINI: Let's let him ask a
15        question instead of pontificating.
16       Q.    I'll re-read it.
17             So is it your testimony that you
18   read every article that your staff
19   identified and mentioned -- identified
20   that mentioned one of the nine affected
21   stocks in the headline or lead paragraph
22   during this period January 4 to
23   January 27, 2021?
24             MR. ORSINI: Asked and answered.
25             THE WITNESS:  You want me to
```

```
                                     Page 35
 1                   D. R. Fischel
 2      answer?  I'll just repeat what I've
 3      said four times already.
 4      Q.    You can answer yes or no.  Not
 5   obfuscate, not make things up, just yes or
 6   no?
 7            MR. ORSINI: Stop with the
 8      argument.  Ask a question.
 9            MR. ROSEN: I've asked the
10      question.
11            MR. ORSINI: Mr. Fischel has
12      answered it multiple times already.
13      Q.    Give us a straight answer,
14   please.
15      A.    I've attempted to look at in
16   whole or in part every article that's
17   referred to in appendix D as well as
18   multiple articles that were collected for
19   a different purpose.  That's what I can
20   say.  I can't answer definitively whether
21   I've read or looked at every single
22   article without knowing what articles
23   there are that you think I might not have
24   looked at.  If you show them to me, I can
25   give you a more definitive answer if I
```

Page 36

```
 1                      D. R. Fischel
 2   remember looking at them or not, but I'm
 3   not aware of any set of articles that I
 4   did not review that met any of the
 5   criteria that I've identified.
 6        Q.    Do you know who Steven Grenadier
 7   is?
 8        A.    Yes, I do.
 9        Q.    When is last time you spoke to
10   him?
11        A.    I spoke to him fairly recently,
12   actually, about an unrelated engagement.
13        Q.    You're aware that he's offered
14   an opinion in this case?
15        A.    I am aware of that.
16        Q.    Have you read his report?
17        A.    No.
18        Q.    Has anyone discussed his report
19   with you?
20        A.    It's been mentioned, but other
21   than that, I would say no.
22        Q.    Who mentioned it?
23        A.    I think -- oh, let me mention
24   another individual who was part of the
25   team, and your question reminded me.  Adel
```

Page 37

```
 1                    D. R. Fischel
 2   Turki.  He didn't work with me on a
 3   day-to-day basis the way the others did,
 4   but he was certainly involved in the
 5   matter.  And I think he was the first one
 6   that identified that Professor Grenadier
 7   was also submitting an expert report.
 8        Q.    Did he tell you what Grenadier
 9   was including in his report?
10        A.    No, not that I recall.
11        Q.    Did your staff coordinate your
12   report with his staff?
13        A.    I don't believe so, no.
14        Q.    Have you ever purchased equity
15   securities?
16        A.    Ever?  You mean individual
17   stocks?  Not that I can remember.  I don't
18   think so.
19        Q.    Do you invest in mutual funds or
20   ETFs?
21        A.    I guess I would say indirectly,
22   yes, I do.
23        Q.    Indirectly in what respect?
24        A.    That I don't choose them.  Some
25   of my retirement accounts have had mutual
```

```
                                              Page 38
 1                    D. R. Fischel
 2      funds in them.
 3           Q.    What are the allegations of
 4      misconduct in this case?
 5           A.    Well, my understanding of the
 6      allegations are contained in my report.
 7      Obviously they're not my allegations, so
 8      it's really a question better addressed to
 9      you than to me.   But my understanding of
10      the allegations is what's contained in my
11      report.
12           Q.    And do you know what the
13      elements of the claims in this case are?
14           A.    That sounds like a question
15      asking for a legal opinion.   I'm not
16      offering any legal opinions.
17           Q.    Now, in your report you
18      mentioned that there are other brokerage
19      firms that implemented restrictions on the
20      purchase or sale of the stocks or options
21      of one or more of the nine affected
22      stocks; is that correct?
23           A.    That's correct.
24           Q.    How did you come to identify the
25      names of those firms and the nature of the
```

```
                                    Page 39
 1                    D. R. Fischel
 2    restrictions and the timings of those
 3    restrictions?
 4        A.    From the sources that are
 5    identified in my report.
 6        Q.    And what did you do to check the
 7    accuracy of those sources?
 8        A.    I'm not sure we did anything to
 9    check the accuracy of the sources.  If
10    you're referring to the introduction
11    basically, the background material, I
12    think that refers to my understanding of
13    the relevant background based on the
14    sources that are referred to in that
15    discussion in my report.
16        Q.    So on January 28, 2021, the
17    share prices of each of the nine affected
18    stocks declined; is that correct?
19        A.    Are you referring to something
20    specific?
21        Q.    The stock prices of the nine
22    affected stocks.
23        A.    I know that, but an exhibit or a
24    chart or something like that?  I haven't
25    memorized the stock price movements on
```

Page 40

                              D. R. Fischel

1

2    every minute of every day.

3        Q.    Are you familiar with your

4    report?

5        A.    I hope so.

6        Q.    So within it you say that the

7    share price declined for reasons other

8    than the restrictions placed by Robinhood;

9    right?

10       A.    Why don't you show me what

11   you're referring to.

12       Q.    So paragraph twenty-three of

13   your report, you assert that the affected

14   stocks experienced large price increases

15   during the preclass period; is that right?

16       A.    Yes, that's the first sentence

17   of the paragraph.

18       Q.    And do you have an opinion as to

19   what caused those price increases?

20       A.    I think I discuss that at length

21   in my report.  I think there was certainly

22   a perception of a short squeeze that was

23   occurring as well as intensive social

24   media speculation.  That combination is

25   based on the analysis that was conducted

Page 41

```
 1                     D. R. Fischel
 2    contemporaneously at the time.  I think
 3    that's the best explanation for the
 4    extreme artificial price movements during
 5    what I refer to as the preclass period.
 6              MR. ORSINI: We've been going
 7         over an hour.
 8              Do you want to take a break or
 9         do you want to go longer?  It's your
10         call.
11              THE WITNESS:  I'm fine.  I'm
12         happy to go as long as convenient for
13         others.
14         Q.    So you said there was a
15    perception of a short squeeze?
16         A.    Correct.
17         Q.    Do you know whether or not there
18    was, in fact, a short squeeze for any of
19    the nine affected stocks?
20         A.    I don't have an independent
21    opinion about that.  I know there was
22    widespread commentary about the existence
23    of a short squeeze.
24         Q.    So you didn't take any steps to
25    confirm whether or not there was, in fact,
```

```
                                    Page 42
 1                 D. R. Fischel
 2   a short squeeze?
 3        A.    As I said, I didn't form any
 4   independent opinion about it other than
 5   forming an opinion about the causes of the
 6   artificial price movements.
 7        Q.    What's your --
 8        A.    Excuse me, during the preclass
 9   period that I've identified.
10        Q.    You said you formed an opinion
11   about the cause of the artificial price
12   movements in the preclass period; is that
13   correct?
14        A.    That's right.
15        Q.    What is your opinion about the
16   cause of the artificial price movements in
17   the preclass period?
18        A.    What I said and what's discussed
19   extensively in my report, the perception
20   of a short squeeze combined with excessive
21   social media speculation.
22        Q.    Let's start with the short
23   squeeze.
24              So is it your opinion that, even
25   if there isn't a short squeeze, if there's
```

Page 43

```
 1                    D. R. Fischel
 2   a perception of a short squeeze, that
 3   would cause the price of the affected
 4   stocks to increase?
 5      A.    My opinion is not an opinion in
 6   the abstract, it's an opinion based on the
 7   materials that I've reviewed as described
 8   in my report about the explanations that
 9   were given for the extreme artificial
10   price movements during what I refer to as
11   the preclass period.
12      Q.    So are you answering my question
13   with a yes?
14      A.    I'm answering your question the
15   way I answered it.
16      Q.    Well, you didn't answer it.
17            Is it is it your opinion that,
18   even if there is not a short squeeze, if
19   there is merely a perception of a short
20   squeeze, that would cause the price of the
21   nine affected stocks to increase?
22            MR. ORSINI:  Incomplete
23        hypothetical.
24            THE WITNESS:  Well, first of
25        all, I didn't say there was or there
```

Page 44

1                      D. R. Fischel

2      wasn't.  I didn't say what would

3      happen if there wasn't a short

4      squeeze.  I just said that the

5      explanations given for the extreme

6      artificial price movements during what

7      I refer to as the preclass period were

8      the perception of the existence of a

9      short squeeze as well as excessive

10     social media speculation.

11     Q.    You used the term "artificial

12  price movements".

13          What makes a price movement

14  artificial?

15     A.    In this particular context, the

16  existence of extreme price movements that

17  are not linked in any way to changes in

18  information about the value of the -- the

19  fundamental value of any of the affected

20  companies and particularly price movements

21  that are understood to be not just

22  artificial but temporary precisely because

23  there is artificial.

24     Q.    Is it your opinion that because

25  the stock prices moved and there was not,

Page 45

```
 1                  D. R. Fischel
 2   in your opinion, news that would affect
 3   the fundamental value of the stocks, such
 4   price movement is, by definition,
 5   artificial?
 6        A.    You know, that's too broad of a
 7   statement.  I was referring to the
 8   particular context of the facts and
 9   circumstances of this case and in the
10   context of the facts and circumstances of
11   this case where certain stocks went up by
12   two thousand percent in a matter of weeks
13   without any value-relevant explanation for
14   those stocks -- for those stock price
15   movements combined with all of the
16   analysis and commentary that's contained
17   in my reports during the preclass period,
18   I would say that under those facts and
19   circumstances I would say that those price
20   movements were artificial and widely
21   understood to be such.
22        Q.    What does it mean to be
23   artificial?  There was a real price
24   movement; right?  It went from X dollars
25   to Y dollars.
```

Page 46

1              D. R. Fischel

2         What makes it artificial?

3      A.    What I just said, which is just

4   a summary of what I've already described

5   earlier and also described in my reports.

6      Q.    The lack of value-relevant news,

7   is that what makes it artificial?

8      A.    I think, as I've just mentioned,

9   my opinion is based on the facts and

10   circumstances of this case, the extreme

11   price movements in a very short period of

12   time that were widely understood to be

13   artificial and temporary as a product of a

14   perceived short squeeze and excessive

15   social media speculation.

16      Q.    So you said there's two things

17   that made the price movements artificial.

18   One was the perceived short squeeze and

19   the other was excessive media speculation;

20   is that right?

21      A.    No, that's not right.

22      Q.    So the excessive social media

23   speculation did not cause any artificial

24   price movements in these nine affected

25   stocks?

Page 47

1                    D. R. Fischel

2       A.    I didn't say that either.

3       Q.    So what role did the perceived

4  short squeeze have in the increase in

5  these stocks in the preclass period?

6       A.    It was widely attributed to be a

7  cause of the extreme price movements.

8       Q.    And is your opinion based on

9  this wide attribution you're adopting as

10 your opinion the attribution you found in

11 the news media; is that right?

12      A.    It's not just in the news media,

13 but my opinions are what I've stated.

14      Q.    But make any effort to determine

15 what caused the prices of these stocks to

16 increase in the preclass period?

17      A.    Yes, the ones that I've

18 described that are also contained in my

19 report.

20      Q.    So what efforts did you make to

21 determine the cause of these price

22 increases?

23      A.    I analyzed all the publicly

24 available information that I could find

25 about the contemporaneous explanations for

```
                                      Page 48
```

1                    D. R. Fischel

2    the extreme artificial price movements

3    during the class period as well as some I

4    guess you could say after-the-fact

5    explanations as well.

6        Q.    Now, you say there were -- there

7    was excessive social media speculation

8    about the nine affected stocks in the

9    preclass period?

10       A.    Correct.

11       Q.    How do you define excessive

12   social media speculation?

13       A.    Again, the explanations that

14   were given contemporaneously for what was

15   responsible for the extreme artificial

16   price movements during the period.

17       Q.    But what social media

18   speculation?  Can you give me an example

19   of social media speculation?

20       A.    I discuss the, for example, all

21   of the commentary on social media sites

22   such as Reddit about the possibility or

23   the perceived short squeeze and the

24   possible effect that had on prices and the

25   ability of retail investors to take

```
                                        Page 49
 1                  D. R. Fischel
 2   advantage of the position the short sale
 3   created by institutional investors.
 4       Q.    Did you review any of the
 5   postings on Reddit?
 6       A.    I saw some referred to.  I
 7   didn't make -- I did not make an attempt
 8   to review all the systematic -- I did not
 9   make a systematic review of all the
10   commentary on Reddit.
11       Q.    Did you review any specific
12   postings on Reddit?
13       A.    I saw some referred to in other
14   documents that I referred to.  That's what
15   I recall.
16       Q.    So you saw Reddit postings
17   referred to in other news articles?
18       A.    Or other sources, correct.
19       Q.    But you never actually read any
20   Reddit postings yourself; is that correct?
21       A.    Well, I read them when they were
22   contained in other postings or other
23   articles or other sources that I reviewed.
24       Q.    What other sources are you
25   referring to?
```

Page 50

```
 1                    D. R. Fischel
 2      A.    I looked at a lot of pleadings,
 3  briefs, court opinions, analyst reports
 4  containing target prices.
 5      Q.    So you --
 6      A.    That's what I recall.
 7      Q.    -- relied on other sources to
 8  provide you with information about the
 9  social media?
10      A.    Well, I wouldn't say that
11  exactly, just the existence of a
12  perception that what was going on in
13  social media was one of the drivers of the
14  artificial price movements.  I also cited
15  some academic studies that discussed the
16  role of social media in terms of how they
17  contribute to the existence of fads and
18  bubbles and artificial price movements.
19  That's also discussed in my report.
20      Q.    Is it your opinion that each of
21  the nine affected stocks were overvalued
22  as of the close of business on January 27,
23  2021?
24      A.    Well, I focused on -- I looked
25  at all nine.  I focused on seven more than
```

```
                                    Page 51
 1                   D. R. Fischel
 2   nine because of my understanding of the
 3   claims in the case and it's my opinion
 4   that certainly the seven and possibly the
 5   nine as well experienced artificial price
 6   movements for the reasons that I described
 7   during the -- what I referred to as the
 8   preclass period between January 4 and
 9   January 27, 2021.
10        Q.    So just focusing on the seven,
11   the seven stocks that Dr. Werner found to
12   be efficient in the year prior to the
13   class period?  Is what the seven you're
14   talking about?
15        A.    Yes.
16        Q.    So focusing on the seven, is it
17   your opinion that those seven stocks were
18   overvalued as of the close of trading on
19   January 27, 2021?
20        A.    To the extent the definition of
21   "overvalued" means inflated by artificial
22   price movements particularly as a result
23   of the price movements on January 27, I
24   would say yes, that is my opinion.
25        Q.    And what was the true value for
```

Page 52

```
 1                    D. R. Fischel
 2    each of those stocks on January 27, 2021,
 3    if not the market price?
 4        A.    Well, I would say one way to
 5    analyze that question is to look at the
 6    market prices subsequent to the class
 7    period.  And I actually have an exhibit on
 8    that in my report.  So I would say based
 9    on the analysis that I've done, that would
10    be at least one estimate of a true value
11    on January 27, although that's not --
12    those prices in my report are not --
13    they're as of a later date and there may
14    be continued dissipation of article
15    Fischel inflation subsequent to that day.
16    But in terms of what I've analyzed, I
17    would say that is a good estimate subject
18    to those caveats of true value.
19        Q.    What is your analysis?
20        A.    I analyzed the relationship
21    between prices on January 27 and during
22    the class period and prices at the end of
23    the class period.  I have an exhibit about
24    that.
25        Q.    And which exhibit is that?
```

```
                                            Page 53
 1                    D. R. Fischel
 2      A.    I'm trying to find which report
 3   it's in.  It's here somewhere.
 4             I'm flipping pages too fast.
 5   Sorry, I have to do this.
 6      Q.    No worries.
 7      A.    No wonder.  I was looking at
 8   Grenadier's report.
 9             It's table three on page fifteen
10   of my rebuttal report.
11      Q.    I was going to ask you about
12   this.  I might as well ask you about it
13   now?
14             MR. ORSINI: To you want to mark
15      his rebuttal?
16             MR. ROSEN: Sure.
17             We're going to mark the rebuttal
18      report as Exhibit 114.
19             (Whereupon, a document entitled
20      Rebuttal Report of Daniel R. Fischel
21      was marked Exhibit 114
22      for identification.)
23      Q.    So could you explain what
24   Exhibit 1 on page -- I'm sorry, table
25   three on page fifteen is in your rebuttal
```

Page 54

1                  D. R. Fischel

2   report?

3        A.    It's a comparison of trading

4   prices during the class period measured in

5   a particular way versus the price

6   immediately after the class period again

7   measured a particular way.

8        Q.    So let's look at -- you're using

9   volume-weighted average price?

10        A.    That's right.

11        Q.    So it's the volume-weighted

12   average price as of what point in time?

13   First explain what a volume-weighted

14   average price is.

15        A.    It's a price weighted by volume.

16        Q.    For each trade in a day?

17        A.    Well, the volume-weighted price

18   per day is a statistic quoted by

19   Bloomberg.

20        Q.    So if there were a thousand

21   shares traded and half were at a dollar

22   and half were at $2, the volume-weighted

23   price would be $1.50?

24        A.    I assume so.  I'm not exactly

25   sure how Bloomberg calculates it, but it's

```
                                              Page 55
 1                     D. R. Fischel
 2     a data source that comes from Bloomberg.
 3         Q.     So that's a daily price, an
 4     average daily price, more or less; right?
 5         A.      Weighted by volume.
 6         Q.      Weighted by volume.
 7                 And then column one says class
 8     period, so is that an average of the
 9     volume-weighted average price for each day
10     during the class period?
11         A.     It's each day during the class
12     period weighted by volume.  In other
13     words, you have six different
14     volume-weighted prices for each day during
15     a class period and those days themselves
16     are then averaged based on volume during
17     the class period.
18         Q.     And then you have a February 5,
19     2021 price, and that's just the
20     volume-weighted average price for that
21     day; is that correct?
22         A.      That's correct.
23         Q.      And that's the day after the
24     class period; is that right?
25         A.      That's correct.
```

Page 56

1                    D. R. Fischel

2        Q.      Now, what do you believe this

3    table shows then?  What inference are you

4    asking the reader to take from it?

5        A.      It's an indication going back to

6    paragraph twenty-six which really relates

7    to the question that you asked me a couple

8    of minutes ago about the difference

9    between the alleged damages -- alleged

10   model of Dr. Werner and the typical

11   securities case where -- I'm just now

12   paraphrasing paragraph twenty-six -- in

13   the typical securities case inflation is

14   measured as the difference between the

15   prices paid and the true value to

16   generalize at a very high level where the

17   true value is measured based on what the

18   price is absent the alleged wrongdoing.

19   But in this case, the alleged wrongdoing,

20   according to the plaintiffs as measured by

21   Dr. Werner, are the actions that occurred

22   during the class period.  So therefore,

23   one way to think about what the true value

24   is is what prices are when those alleged

25   wrongful activities cease, when they're no

Page 57

```
 1                    D. R. Fischel
 2   longer occurring.  And based on that
 3   analysis, you would look at the
 4   relationship between the sale prices and
 5   the price that existed subsequent to the
 6   alleged wrongful activities and you would
 7   conclude exactly the opposite of what Dr.
 8   Werner concluded.
 9               In other words, you wouldn't
10   measure damages by the difference between
11   the sale price and the highest inflated
12   price, which is what Dr. Werner does.  You
13   would instead measure damages or the
14   existence of damages by comparing the sale
15   price with a true value which in this case
16   is lower than the sale price and would
17   conclude there are no damages, and that's
18   really the point of the exhibit and this
19   particular paragraph.  And that conclusion
20   would be even stronger if you compared the
21   prices on February 5 with the price on
22   January 27, which is not on this exhibit
23   but it's on other exhibits that are
24   contained in my reports, and what you
25   would see was that the price on February 5
```

```
 1                    D. R. Fischel
 2   is dramatically lower than the price on
 3   January 27.  And for all the reasons that
 4   I've stated, the price on February 5 is
 5   much -- is a much better and a much closer
 6   measure of true value than the maximum
 7   artificial inflated price on January 27.
 8        Q.     And the February 5 price is a
 9   better estimate of true value because, in
10   your opinion, on February 5, when the last
11   of the restrictions was lifted, the prices
12   should have shot back up to the January 27
13   level?
14        A.     I don't believe they should have
15   shot back up, but I would say one test of
16   the validity of Plaintiffs' claim, if the
17   -- if Dr. Werner were correct and
18   Plaintiffs were correct that the price on
19   January 27 was the so-called true value of
20   the stocks and they were manipulated away
21   from their true value during the class
22   period is whether or not there was a
23   return to the January 27 price when the
24   alleged wrongful conduct was no longer
25   occurring.  And what you observe is the
```

```
                                        Page 59
 1                  D. R. Fischel
 2   exact opposite which, in my opinion, is a
 3   direct refutation of the plaintiffs' case
 4   as well as the damage -- the so-called
 5   damage model, which I describe as
 6   incoherent presented by Dr. Werner.
 7            THE WITNESS: This is a good time
 8        for a break, if that's okay.
 9            MR. ORSINI: Sure.
10            (Whereupon a break was taken)
11       Q.    So in your rebuttal report, we
12   were looking at that table on page
13   fifteen, I think it was, and -- table
14   three.  And it shows that after
15   January 27, the prices declined, is that
16   right, for these nine stocks?
17       A.    Yes.  As I said, I have other
18   exhibits which show that a little bit more
19   directly.
20       Q.    What exhibit would that be?
21       A.    That would be --
22       Q.    Table two?
23       A.    Let me just find it.
24       Q.    Page eight, table two of your
25   rebuttal?
```

```
                                    Page 60
```

1                    D. R. Fischel
2        A.    Yes, exactly.
3        Q.    So it shows the first column --
4    sorry, first row for January 28, 2021
5    matched against each column for each
6    stock, it shows the decline on that
7    specific day; is that right?
8        A.    It shows the residual decline.
9        Q.    And so AMC went down fifty-four
10   percent on January 28?
11       A.    Not the price but the product of
12   the regression analysis, there was a
13   decline by fifty-four percent.
14       Q.    It says total -- so the residual
15   return?
16       A.    That's right, went down by
17   fifty-four percent.
18       Q.    When you take out market factors
19   and industry factors, did you have an
20   industry index, I assume?
21       A.    Yeah.
22       Q.    So the residual decline,
23   firm-specific decline is fifty-four
24   percent for AMC?
25       A.    On January 28, that's correct.

```
                                          Page 61
 1                    D. R. Fischel
 2        Q.      Now, what caused that decline in
 3    AMC stock on January 28?
 4        A.      You know, I say in my report
 5    that it's very hard to disentangle the
 6    various possible causes of the decline.
 7    First of all, there was a huge increase on
 8    January 27 which is understood to be
 9    temporary, so there's going to be some
10    decline at some point just by virtue of
11    the nature of a temporary artificial price
12    increase.  In addition to that, there are
13    all the actions that I describe in the
14    background section of my report and one of
15    the criticisms that I have of Dr. Werner's
16    damage model and more generally whether
17    it's possible to have a common method to
18    analyze damages as all the different
19    potential causes of the stock price
20    decline.  So that's what I would say.
21        Q.      So on table two, does that go
22    from closing prices on January 27 to
23    closing price on January 28; is that
24    right?
25        A.      Adjusted for market and industry
```

```
                                              Page 62
 1                    D. R. Fischel

 2    movements, correct.

 3        Q.     Now, you said there were two

 4    things that caused the price decline.

 5              One was the temporary nature of

 6    the price increase on January 27; is that

 7    correct?

 8              MR. ORSINI: I object to form.

 9              THE WITNESS:  That's not exactly

10        what I said.

11        Q.     I just want to make sure I

12    understand it before I go further.

13              So what were the causes -- what

14    were the potential causes of the price

15    decline on February 28 for these stocks?

16        A.     I think that's what I just said.

17    There was going to be, in the absence of

18    any actions by anyone, there was going to

19    be some mean reversion at some point in

20    time, particularly in light of the

21    dramatic increase on residual return on

22    January 27.  I have another table that

23    shows that.

24              In addition to that, there was a

25    series of actions taken by different
```

Page 63

1                    D. R. Fischel

2    economic actors that are described in the

3    background section of my report.

4        Q.    Any others besides those two?

5        A.    Well, to the extent that any

6    part of the decline is explained by market

7    and industry movements, but I wouldn't say

8    that would come close to explaining

9    declines in residual returns by fifty-four

10   percent, since that's the one you were

11   asking me about before the break.

12       Q.    Presumably these residual

13   returns have excluded the -- have taken

14   into account the market industry factors;

15   right?

16       A.    Right.

17       Q.    So we're left with this mean

18   reversion and the actions of third parties

19   and others; right?

20       A.    Correct.

21       Q.    So let's start with the mean

22   reversion.

23             Where in your report do you

24   describe this mean reversion or this

25   temporary nature of the stock prices on

```
                                      Page 64

 1                 D. R. Fischel
 2   January 27 that was bound to revert to a
 3   mean?  Where is that described in your
 4   report?
 5      A.    I discuss several places in my
 6   report where I discuss the fact that the
 7   extreme artificial price movements that
 8   occurred in what I referred to as the
 9   preclass period were understood to be
10   temporary.  I also discuss academic
11   literature that discusses the temporary
12   nature of artificial price movements.  And
13   that's what I was referring to in my
14   previous answers.
15      Q.    Could you tell me what academic
16   literature supports your assertion that
17   the prices of these nine stocks were bound
18   to decline at some point?
19      A.    Well, the academic literature
20   doesn't discuss these nine stocks, it's a
21   more general discussion of the effect of,
22   in this case, artificial price increases.
23      Q.    Could you point me to where in
24   your report this literature is mentioned?
25      A.    (Reviewing).
```

Page 65

```
 1                 D. R. Fischel
 2              Academic literature is discussed
 3      in various places:  In paragraph
 4      twenty-seven of my original report, in
 5      footnote twenty-six of my rebuttal report,
 6      paragraph twenty-one and footnote
 7      thirty-one, thirty-two --
 8          Q.    Say that again?  Footnote
 9      twenty-six?  Which academic literature
10      talks about mean reversion of temporary
11      stock price inflation?  Which articles in
12      footnote twenty-six of your rebuttal
13      report are you referring to?
14          A.    The Ferrillo article talks about
15      the recommendations of authors to inspect
16      the affected stocks for bubbles and
17      overreactions.  It's Ferrillo, Dunbar, and
18      Tabak.  That's what I was referring to in
19      footnote twenty-six.
20          Q.    So you're telling me that
21      article states that if a stock price has
22      increased greatly because of speculation,
23      it will revert to its mean?
24          A.    That's not what I said.
25          Q.    Well, but you said that -- you
```

Page 66

1                    D. R. Fischel
2    did say that one of the reasons the stock
3    price declined was it was going to revert
4    to the mean, meaning it was inflated and
5    it was going to go back down to a lower
6    price just by the nature of the inflation?
7    Am I missing something?
8         A.    That's not a real accurate
9    characterization of what I said.
10        Q.    Why don't you explain it then.
11        A.    That fads and bubbles that are
12   characterized by overreactions are by
13   definition temporary.  That's what it
14   means to say there is a fad or a bubble.
15   That's what I meant.
16        Q.    And how temporary was this -- so
17   are you saying the stock price on
18   January 27, 2021 for these nine stocks
19   were a bubble?
20        A.    You could call them a bubble.
21        Q.    I'm asking what you call them.
22        A.    I call them what I said, extreme
23   price inflation resulting in artificial
24   prices which were widely understood to be
25   temporary and therefore were going to

Page 67

1              D. R. Fischel
2    decline at some point in time.
3       Q.    If there had not been any
4    restrictions imposed by Robinhood or any
5    other firm on the trading of these nine
6    affected securities, would -- is it your
7    opinion that the prices would have
8    declined anyway on January 28 through
9    February 4?
10      A.    That's too specific.  It's I
11   think impossible to know what would have
12   happened in a world that never occurred.
13   But because of the nature of the extreme
14   price increases, gains of two thousand
15   percent in a couple of week period for
16   some of the stocks with no connection to
17   any change in fundamental value, those
18   increases were understood to be temporary,
19   widely commented on to be temporary, so
20   that decline was going to occur inevitably
21   at some point in time.
22      Q.    It might have happened in a
23   week, it might have happened in a month;
24   right?
25      A.    I think there's no way to --

Page 68

1                     D. R. Fischel
2    because you're now asking a question about
3    trying to predict what would have happened
4    in a world which didn't exist, it's really
5    impossible to pinpoint the time where the
6    decline would have occurred other than
7    saying that it was widely understood that
8    the -- the increase was widely understood
9    to be artificial, temporary, and was sure
10   to decline at some point in time.
11        Q.    So do you have any opinion as to
12   when this inevitable decline for the nine
13   affected stocks would have occurred?
14        A.    No, that's just what I said.  No
15   specific opinion because there's no way to
16   know other than I guess you could say the
17   nature of these kinds of fads or bubbles
18   are inherently short term, so they don't
19   last forever.  But beyond that, once you
20   basically change the assumptions of what
21   happened in the real world to ask what
22   would have happened in a different world,
23   there's no way to know what could have
24   happened in a different world, other than
25   to say it was widely understood and

Page 69

```
 1              D. R. Fischel
 2  commented upon about the price increases
 3  were artificial and temporary.
 4              And just to complete the answer
 5  as I was describing before the break, the
 6  level of prices subsequent to the time of
 7  the alleged wrongful conduct, the fact
 8  that they did not rebound and were below
 9  the level of prices during the class
10  period is illustrative of the temporary
11  nature of the price increases to begin
12  with.
13      Q.    So let's talk about the second
14  potential cause of the stock price
15  declines on January 28 for these nine
16  affected stocks.
17              You said that -- in your report
18  in the background section, you mentioned
19  some of the actions taken by Robinhood and
20  third parties.  Let's see if we can
21  identify this.
22              Where in your report do you
23  describe the actions of firms other than
24  Robinhood that might have affected the
25  stock prices on January 28?
```

```
                                        Page 70
```

 1                    D. R. Fischel

 2        A.    Again, that's not really an

 3   accurate description of what I said.  But

 4   in response to where I discuss the actions

 5   of third party actors in response to the

 6   large increase in volatility and prices,

 7   that's discussed in multiple paragraphs it

 8   looks like beginning on paragraph ten.

 9        Q.    So there was some trading halts,

10   according to you, on January 27 and

11   January 28.

12             Did these trading halts cause an

13   increase or a decrease in stock price of

14   these companies?

15             MR. ORSINI: Objection.

16             THE WITNESS:  I didn't

17        separately calculate if it's even

18        possible to separately calculate the

19        effect of those particular actions

20        versus all the other things that were

21        happening during these particular

22        days.

23        Q.    Well, so footnote sixteen says

24   NYSE halted trading in GME three times for

25   a total of fifteen minutes on January 27.

1                    D. R. Fischel

2              Did that cause an increase or a

3    decrease in the stock price?

4        A.    As I said, I didn't separately

5    perform any calculations of those specific

6    actions, recognizing that there are a lot

7    of other things going on even during those

8    minutes on January 27 and 28.

9        Q.    So is it your opinion the NYSE

10   trading halt on January 27 had an effect

11   on these nine stocks or it didn't have an

12   effect on the nine stocks' prices?

13       A.    My opinion is what's stated in

14   the report that these actions taken in

15   response to the perceived volatility in

16   price movements that were occurring in the

17   meme stocks during this period and prior

18   to this period in what I refer to as the

19   preclass period.

20       Q.    Do you have an opinion as to

21   whether the trading halts on January 27

22   did or did not on effect on any of the

23   nine affected stocks' prices?

24              MR. ORSINI: I object it form.

25              THE WITNESS:  I think I've

Page 72

                    D. R. Fischel

1                       D. R. Fischel

2      answered that to the best of my

3      ability.

4         Q.    And the answer is yes or no?

5         A.    The answer is I didn't perform

6   any separate calculation of those trading

7   halts.  And I think it's also important

8   that I'm not sure how confident one could

9   be in the conclusion because there was so

10  many other things going on during those

11  two days, including during those minutes

12  where the trading halts occurred.

13        Q.    And how about the trading halts

14  on January 28?  Do you have any opinion as

15  to whether those trading halts had any

16  effect on the prices of any of the nine

17  affected stocks?

18        A.    It's really the same answer

19  again.

20        Q.    And that answer is?

21        A.    That other than knowing that on

22  the twenty-eighth there were big declines

23  across the board in the nine stocks,

24  exactly what was responsible for those

25  declines, trying to disentangle the effect

Page 73

```
 1                  D. R. Fischel
 2    of the mean reversion from the extreme
 3    price increases, artificial price
 4    increases on the twenty-seventh, the
 5    actions of all the economic actors that
 6    began to be imposed by all the different
 7    economic actors that I describe in my
 8    report, it's very hard if not impossible
 9    to try and disentangle.
10        Q.    Do you have an opinion as to
11    whether or not the mean reversion was a
12    material cause of the stock price decline
13    to the affected stocks on January 28?
14        A.    Not that specifically for the
15    reasons that I already said, other than
16    that reversion was going to occur at some
17    point in time.
18        Q.    So you have no evidence that
19    that mean reversion was the cause of any
20    stock price declines for the nine affected
21    stocks on January 28?
22        A.    With respect to that specific
23    day, I don't think it's possible to
24    isolate in a factor from all the other
25    factors in the same way it's not possible
```

Page 74

1                    D. R. Fischel

2    to isolate the effect of all of the

3    different economic actors versus all the

4    other things that were going on during

5    that period.

6        Q.    And I appreciate the difficulty

7    of isolating specific factors.  But let's

8    just focus on that one factor, mean

9    reversion that you mentioned.

10              Do you have any evidence at all

11   that mean reversion was a material cause

12   of any of the stock price declines for the

13   nine affected stocks on January 28?

14       A.    As I said, I don't have an

15   opinion about that specific day other than

16   the artificial price -- the extreme

17   artificial price increases were understood

18   to be temporary.  The most extreme price

19   increase occurred on January 27 across the

20   board, and that was understood to be

21   temporary, and so a decline was going to

22   occur at some point in time based upon the

23   general -- both the contemporary

24   literature as well as academic literature

25   in the short term.  But since you're

1                D. R. Fischel

2    asking about something that's so specific

3    to one day, whether prices would have

4    continued to increase, whether they would

5    have decreased, whether they would have

6    decreased on the same day, on the same

7    days, by the same amounts, there's no way

8    to know precisely because there's so many

9    different factors that were occurring at

10   the same time.

11       Q.    Could you cite one piece of

12   evidence for the proposition that mean

13   reversion was responsible for any of the

14   share price declines for any of the nine

15   affected stocks during the class period?

16       A.    The evidence that I can cite is

17   what I've stated, that there was

18   widespread understanding both at the time

19   and in the academic literature that the

20   type of extreme price movements that

21   occurred where some stocks went up by two

22   thousand percent in a matter of weeks with

23   no change in the information about their

24   fundamental values is by definition

25   temporary, and those prices were not going

```
                                    Page 76
 1                 D. R. Fischel
 2   to persist because they were temporary.
 3       Q.    So the evidence that the price
 4   declines are related to mean reversion is
 5   a, quote, widespread understanding in the
 6   news media and academic literature?
 7       A.    Exactly.
 8       Q.    Anything else?
 9       A.    Well, I think contemporaneous
10   discussions combined with academic
11   literature.  That's what I would say.
12       Q.    How would you define "extreme
13   social-driven media enthusiasm"?
14       A.    Well, the way I'm defining it is
15   -- in response to your earlier questions
16   of what the discussion was at the time of
17   the reasons for the extreme artificial
18   price movements as well as the -- again,
19   the academic literature that I also
20   discuss in my report that discusses the
21   role of social media in creating
22   artificial price movements in the form of
23   bubbles or fads.
24       Q.    So did you ever hear the term
25   "diamond hands"?
```

```
                                        Page 77
 1                  D. R. Fischel
 2       A.    Diamond hands?
 3       Q.    Yes.
 4       A.    No, I don't think I have, or at
 5   least I don't remember it.
 6       Q.    The social media enthusiasm for
 7   the nine affected stocks, was that -- what
 8   was that enthusiasm based on?
 9       A.    Well, as I mentioned, what I'm
10   familiar with is the discussion of the
11   short squeeze or the perceived short
12   squeeze and the possible implications that
13   that has on investment opportunities for
14   retail investors.
15       Q.    Now, if somebody wants to go
16   long and squeeze short sellers, is that a
17   long-term investment or is that an
18   investment that has to be sold relatively
19   quickly in order to profit and not lose
20   money?
21            MR. ORSINI: I object to form.
22            THE WITNESS:  I'm not sure I
23       understand the question.  But in order
24       to profit, you have to sell at a
25       higher price than what you paid.  So
```

1                    D. R. Fischel

2         by definition, the horizon of the

3         investment has to be at an expectation

4         that you're going to be able to sell

5         at a higher price than what you paid,

6         assuming that -- if you're asking in

7         the abstract, assuming that you're

8         purchasing for investment purposes as

9         opposed to for diversification or some

10        other purpose.

11        Q.     Now, the people that you're

12   referring to who had extreme social

13   media-driven enthusiasm, are those retail

14   investors?

15        A.     I think the social

16   media-focused, at least my understanding

17   based on what I've reviewed, focused on

18   retail investors.

19        Q.     And did all of these retail

20   investors who are part of this social

21   media-driven enthusiasm, were they all

22   focused on making money as part of the

23   short squeeze?

24        A.     You'd have to ask them.  I don't

25   know.  I was commenting on the commentary

Page 79

1                    D. R. Fischel
2    in social media, not on the motivations of
3    all retail investors, although I do think
4    some of the testimony by the class
5    representatives was, in my opinion, highly
6    revealing as to what their reasons were
7    for purchasing.
8         Q.    Is it possible that there were
9    many people who were part of this social
10   media enthusiasm who intended to hold the
11   nine affected stocks for the long-term as
12   an investment?
13        A.    You are you're asking me is it
14   possible?
15        Q.    Yes.
16        A.    I can't comment on what's
17   possible, only that in order to profit by
18   purchasing at a knowingly artificial
19   price, you have to expect that you're
20   going to be able to sell at an even more
21   -- an even higher artificially inflated
22   price.
23        Q.    Do you know whether or not there
24   was a large contingent of people active in
25   the social media who were purchasing and

Page 80

```
 1                    D. R. Fischel
 2     advocating the purchase for the long-term
 3     to hold and never sell?
 4         A.    No, I don't.  I think all kinds
 5     of things were being said on social media.
 6     My focus was on the class members
 7     specifically or the alleged class members.
 8         Q.    You mean the class
 9     representatives?
10         A.    The class representatives and
11     the class members.
12         Q.    Well, how do you know who the
13     class members are besides the people who
14     are part of our lawsuit?
15         A.    There's extended analysis of
16     that in my reports as to not who they were
17     by name but the timing of their investment
18     decisions.
19         Q.    Now, is it your opinion that the
20     people who were buying shares of the nine
21     affected stocks during the preclass period
22     that you defined were manipulating the
23     market for these stocks?
24         A.    My opinion is what I stated,
25     that -- in my report that they're going to
```

Page 81

1              D. R. Fischel

2     be members of the class who purchased at

3     artificial prices knowing that the prices

4     were artificial.

5          Q.    Did everyone who's a member of

6     the class purchase knowing the prices were

7     artificial?

8          A.    I don't have that opinion.  My

9     opinion is individualized inquiry is

10    required to distinguish between those

11    class members who purchased based on an

12    awareness of the existence of artificial

13    prices as several class members, in fact,

14    testified.  And with respect to those

15    investors, they did not purchase based on

16    a belief in the integrity of market prices

17    but rather an attempt to profit by the

18    lack of existence of an integrity of

19    market prices, as I state in my report.

20         Q.    And what questions would you ask

21    class members to determine whether or not

22    they relied on the integrity of the market

23    price when they purchased?

24         A.    Well, I'm not offering an

25    opinion on what questions to ask, but --

Page 82

1          D. R. Fischel

2     Q.     You said individual inquiry is

3  necessary.

4          What individual inquiry would

5  you make?  You say it's necessary so that

6  presupposes you know what those necessary

7  questions are.

8     A.     I guess I would ask the

9  questions that were asked -- if I were in

10  that business, which I'm not, I guess I

11  would ask the questions that were asked of

12  the class representatives to see if they

13  would give the same answers as the class

14  members whose answers I reviewed based on

15  their sworn testimony.

16     Q.     But what question -- what

17  evidence would show that someone did or

18  did not rely on the integrity of the

19  market price?

20     A.     As I said, I would think I would

21  copy the questions that were asked of the

22  class representatives in the testimony

23  that I reviewed because I thought those

24  answers were very revealing.

25     Q.     What answers are those?

```
                                          Page 83

 1                    D. R. Fischel

 2        A.    Well, I quote them in my report,

 3    which I can find if you want me to.  And I

 4    also saw --

 5        Q.    What do they relate to?  Does it

 6    relate to where they live?  What's the

 7    issue that you think hinges on the

 8    integrity -- their reliance on the

 9    integrity of the market price?

10        A.    You know, I think the simplest

11    thing for me to do is to refer to the

12    testimony that I quoted which was not

13    based on where they live but rather based

14    on why they purchased, what they

15    understood when they purchased, and that

16    to me demonstrated, with respect to those

17    class members as well as an additional one

18    that I became aware of subsequent to the

19    time of my rebuttal report.

20        Q.    What does it mean to rely on the

21    integrity of the market price?

22        A.    It means that market prices

23    reflect the true value of the underlying

24    securities or an expectation that they do.

25        Q.    So to rely on the integrity of
```

Page 84

```
 1                   D. R. Fischel
 2    the market prices, is it your testimony
 3    that one has to believe that the
 4    underlying market price is the true value
 5    of the security?
 6        A.    Or no reason to disbelieve it, I
 7    guess is the -- I would phrase it that
 8    way.
 9        Q.    Why don't you rephrase it the
10    way you think it's correct.
11        A.    That there's no reason to
12    believe that prices are distorted by fraud
13    or misrepresentations or manipulations.
14        Q.    So I'll make sure --
15        A.    For example.
16        Q.    -- I have this right, to rely on
17    the integrity of the market price is to
18    have no reason to believe that prices are
19    distorted by fraud or misrepresentations
20    or manipulations?
21        A.    As an example, correct.
22        Q.    Can you think of any other
23    examples?
24        A.    You know, maybe depending upon
25    the context that the price is not
```

Page 85

```
 1                    D. R. Fischel
 2   sufficiently liquid, to be confident that
 3   the trading prices reflect fair market
 4   value.  That's another example that comes
 5   to mind.
 6       Q.    So if -- as long as a purchaser
 7   has no reason to believe that prices are
 8   distorted by fraud, misrepresentation,
 9   manipulation, or illiquidity, they rely on
10   the integrity of the market price; is that
11   a fair statement?
12       A.    No, I said those are examples of
13   situations where --
14       Q.    Well, let's just --
15       A.    Let me just finish.
16             Those are examples where
17   investors could, assuming that those
18   things did not -- were not expected to
19   distort market prices at the time of a
20   purchase, that would be -- those would be
21   examples of situations where investors
22   could rely on the integrity of market
23   prices.
24       Q.    Now, let's put this in the
25   context of our litigation here.
```

```
                                        Page 86
 1                  D. R. Fischel
 2      A.     Okay.
 3      Q.     With Robinhood.
 4             When you are evaluating a class
 5   member's reliance on the integrity of the
 6   market price here, besides
 7   misrepresentations, fraud, manipulation,
 8   or illiquidity, are there any other things
 9   that could cause a class member not to
10   rely on the integrity of the market price
11   in this case?
12      A.     Well, again, I would just quote
13   the answers by the class representatives
14   that believe prices have increased because
15   of a short squeeze, believe that prices
16   have increased so far without a reason and
17   therefore are not expected to continue to
18   increase for fundamental reasons.  Those
19   are the things that come to mind based on
20   my recollection of the testimony of class
21   members.
22      Q.     And why does knowledge of a
23   short squeeze -- why does knowledge of a
24   short squeeze render a person's reliance
25   on the integrity of the market -- why does
```

Page 87

1                    D. R. Fischel

2     it mean that they did not rely on the

3     integrity of the market if they have

4     knowledge of the short squeeze?

5        A.    Well, more generally if they

6     have knowledge of artificial prices, all

7     the massive amount of publicity to that

8     effect during the preclass period, what it

9     means is that prices are inflated for

10    those reasons and anybody who purchased at

11    a time when they know that prices are

12    inflated, then they are not purchasing

13    based on the integrity of the market

14    price, they're purchasing based on

15    speculation of how long artificial prices

16    are going to continue and whether they

17    will be able to profit from those

18    artificial prices by selling at an even

19    higher artificial price than the price

20    that they purchased, and that's why

21    individualized inquiry is necessary to

22    distinguish between class members like the

23    class representatives who testified to

24    what I just said versus other class

25    members who do not fall into that

```
                                    Page 88
 1                  D. R. Fischel
 2   category.
 3              MR. ROSEN: I'm going to
 4       introduce a new exhibit.
 5              (Whereupon, a Seeking Alpha
 6       article dated February 1, 2021
 7       was marked Exhibit 115
 8       for identification.)
 9       Q.    This is an article that you
10   mentioned in footnote sixty-four of your
11   opening report.
12       A.    Okay.
13       Q.    So paragraph twenty-eight in
14   your report, you offer the opinion that
15   artificial prices caused by short squeezes
16   are temporary and tend to be unrelated to
17   company news, performance, and prospects.
18   And then you quote a commentator and
19   there's a footnote.
20              Is this article introduced as
21   Exhibit 114 the basis for your opinion in
22   paragraph twenty-eight?
23       A.    Paragraph twenty-eight of my
24   opening report?
25       Q.    Yes.
```

```
                                        Page 89
```

```
 1                  D. R. Fischel
 2      A.    That's the article that's cited
 3   at the end of the paragraph.
 4      Q.    Do you have any other support
 5   for the proposition that you make in
 6   paragraph twenty-eight other than this
 7   footnote sixty-four?
 8      A.    Yes.  Squeezes are a form of
 9   distorted market prices.  I should say
10   squeezes have the capability to create
11   distorted market prices and that's a
12   widespread understanding, that's not just
13   the product of this particular article.
14      Q.    And is it your opinion that, in
15   this case for these nine affected stocks,
16   there was a short squeeze that caused
17   these prices to go up?
18      A.    I think I've discussed that at
19   length earlier.  There was certainly a
20   perceived short squeeze, and even some of
21   the class representatives talked about
22   trying to profit from a short squeeze.  So
23   that's what I would say.
24      Q.    And is it your opinion that the
25   stock price declines for the nine affected
```

Page 90

1                   D. R. Fischel

2    stocks during the class period was caused

3    in part by the dissipation or the end of

4    the short squeeze?

5        A.    I think I answered that again

6    already.  It's the existence of the

7    extreme artificial prices that was caused

8    in part by the perception of a short

9    squeeze that was by definition temporary

10   and therefore would result in those price

11   increases declining, which is exactly what

12   occurred.

13       Q.    So you're saying that prices

14   would decline even if there's a perception

15   of a short squeeze whether or not there

16   actually was a short squeeze?

17       A.    No, I'm not saying that.

18       Q.    Well, it says in paragraph

19   twenty-eight, "short squeezes typically

20   don't last long.  The average short

21   squeeze in this data set lasted

22   approximately twelve days".  And that

23   "when a short squeeze eventually exhausts

24   itself, the stock price declines by fifty

25   percent within the next three to four

```
                                        Page 91
 1                    D. R. Fischel
 2    days".
 3               So why did you include that
 4    information in your paragraph
 5    twenty-eight?
 6         A.    Because I think it was important
 7    to highlight that artificial price
 8    movements such as the ones that occurred
 9    between January 4 and January 27,
10    particularly on January 27, are by nature
11    temporary, by definition temporary, and
12    widely understood to be such.  And that
13    was not only widely understood at the time
14    but also is something that's widely
15    understood in the academic literature.
16         Q.    So you want the court to make an
17    inference that the perceived short squeeze
18    as the cause of the price rise on the
19    twenty-seventh and also the decline on the
20    twenty-eighth; is that right?
21         A.    No, it's not exactly right.
22    First of all, I don't have any opinion
23    about wanting the court to make
24    inferences.  I have an opinion on what I
25    think occurred, which if asked I will
```

Page 92

```
 1                    D. R. Fischel
 2    communicate at the appropriate time.
 3        Q.    So did the termination of a
 4    short squeeze cause stock prices to
 5    decline on January 28, 29, or any other
 6    day during the class period?
 7        A.    I answered that question
 8    multiple times.  I think there were a
 9    combination of things that occurred,
10    various actions by different market actors
11    that I describe in my report, as well as
12    the inherent temporary nature of
13    artificial price movements in this
14    particular case where a perceived short
15    squeeze was one of the main reasons at the
16    time that was given to explain the extreme
17    price movements and volatility that
18    existed between January 4 and January 27,
19    particularly on the day of January 27.
20        Q.    I think my question was about
21    whether the termination of the short -- of
22    a short squeeze caused stock prices to
23    decline during the class period.
24            MR. ORSINI: That's not a
25        question, that's a statement.
```

```
                                           Page 93
 1                    D. R. Fischel
 2      Q.     And so I'll repeat the question
 3   for you.
 4             Did the termination of a short
 5   squeeze cause stock prices to decline
 6   during the class period?
 7             MR. ORSINI: Asked and answered
 8         repeatedly.
 9             THE WITNESS:  I'm just going to
10         repeat what I said multiple times.  I
11         think there are multiple factors that
12         occurred during the class period that
13         resulted in a decline, the actions of
14         a lot of economic actors plus the fact
15         that the price increases in the
16         preclass period were widely understood
17         to be temporary and were inevitably
18         going to dissipate over time.
19      Q.     You said there were multiple
20   factors that occurred during the class
21   period that resulted in the decline of
22   share prices.
23             True so far?
24      A.     Correct.
25      Q.     Let's list each factor.
```

Page 94

1                    D. R. Fischel

2       A.      It's the actions by all the

3    different economic actors that I described

4    in my report, combined with the fact that

5    the price increases that occurred, the

6    artificial price increases that occurred

7    between January 4 and January 27,

8    particularly on the day of January 27 are

9    by definition were temporary or widely

10   understood to be temporary, widely

11   commented on to be temporary, and

12   therefore would inevitably dissipate over

13   time and over some relatively short

14   interval, as the article in paragraph

15   twenty-eight reflects.

16       Q.      Other than the article in

17   paragraph twenty-eight, can you cite any

18   specific evidence that the termination of

19   a short squeeze caused share prices to

20   decline during the class period?

21              MR. ORSINI: Mischaracterizes the

22         document, and it's been asked and

23         answered.

24              THE WITNESS:  I don't really

25         have anything to add to what I've

Page 95

1           D. R. Fischel

2     already said multiple times.

3     Q.    I guess that's a no.  All right.

4           You said that the prices of

5   these nine affected stocks was

6   artificially inflated as of January 27; is

7   that right?

8     A.    Yes, that's what I said,

9   particularly the seven that I focused on,

10  but really all nine.

11    Q.    What was the true value of those

12  prices on January 27?

13          MR. ORSINI: We're going in

14     circles here.  You've asked that

15     question three times.

16          THE WITNESS:  You know, I've

17     answered that as well.  As I said, I

18     didn't perform a specific calculation

19     as of January 27, but the price

20     subsequent to the end of the class

21     period when the -- all the alleged

22     wrongdoing ended is an indication of

23     the true value a couple of days

24     earlier on January 27.  Not a perfect

25     indication because there's remaining

Page 96

```
 1                   D. R. Fischel
 2         artificial inflation that gets
 3         dissipated over additional days, but
 4         as a starting position, as a first
 5         approximation those prices on
 6         February 5 are a good initial
 7         approximation of the true value on
 8         January 27.
 9         Q.     So Exhibit 115 is a Seeking
10    Alpha post by a guy Hugh Akston; is that
11    right?
12         A.     I'm looking at it on the screen,
13    a title of an article by Mr. Akston.
14         Q.     Well, it actually says Hugh
15    Akston Investments.
16                Do you know who wrote it?
17         A.     No, I don't, I just know what's
18    on the screen.  Unless the text of the
19    article which I don't have in front of me
20    says something additional to what's on the
21    screen.
22         Q.     Was this article published in
23    any academic journal or industry journal?
24         A.     I actually don't know what the
25    -- what Seeking Alpha, whether that's an
```

Page 97

```
1              D. R. Fischel
2    industry or academic journal.  I'd have to
3    look.
4       Q.    Did you make any effort to see
5    if Hugh Akston Investments is actually a
6    real money management firm?
7       A.    No, I didn't.  If I had it in
8    front of me, I might be able to tell you,
9    but I didn't make any independent
10   investigation of that.
11      Q.    Did the retail investors who
12   were active on social media, you know,
13   Reddit, Wall Street Bets, who were buying
14   these nine affected stocks during the
15   preclass period, did they manipulate the
16   stocks?
17      A.    Well, again, as I've indicated,
18   I'm not making a commentary on everyone in
19   the class.  My analysis focuses on the
20   existence of class members who suffered a
21   loss and for that to occur when they had
22   to purchase and the publicly available
23   information during the time of those
24   purchases coupled with the actual
25   testimony of several of the class members
```

Page 98

```
 1                    D. R. Fischel
 2   all of which is described in my report.
 3              And with respect to the
 4   testimony, I would say that some of the
 5   testimony indicates class members
 6   attempting to profit from a manipulation
 7   as opposed to themselves causing a
 8   manipulation.
 9        Q.    What was the manipulation?
10        A.    The perceived short squeeze.
11        Q.    So is it your opinion that, when
12   investors purchase stock in the hope of
13   causing it to go up or the hope that it
14   will go up because of there being great
15   short interest, that is manipulation?
16              MR. ORSINI: I object to form.
17              THE WITNESS:  I mean, I don't
18        know if that's meant to be a
19        characterization of my previous
20        answer, but if it is, it's not an
21        accurate one.  And the answer to your
22        question is no, I would not say that
23        by itself that's manipulation.
24        Q.    Well, you say that there was
25   testimony indicating class members
```

Page 99

```
 1                    D. R. Fischel
 2    attempted to profit from the manipulation.
 3              What manipulation are you
 4    referring to?
 5         A.    The testimony itself -- I think
 6    rather than to continue to paraphrase it,
 7    I'll find it and read it to you.
 8         Q.    Please.
 9         A.    Actually, can we take a
10    one-minute break?
11              MR. ORSINI: Why don't we break
12         for lunch.  It's been sitting out
13         there for a while.
14              (Lunch recess taken at 1:01
15         p.m.)
16
17
18
19
20
21
22
23
24
25
```

```
                                      Page 100
```

1                  D. R. Fischel

2          A F T E R N O O N    S E S S I O N

3                  April 12, 2023

4                  1:56 p.m.

5    D A N I E L   R.   F I S C H E L, having

6          been previously duly sworn by a

7          Notary Public of the State of

8          New York, upon being examined,

9          testified as follows:

10   EXAMINATION CONTINUED BY

11   MR. ROSEN:

12       Q.    Earlier you said that the prices

13   for the nine affected stocks were

14   overvalued or artificially inflated as of

15   January 27; is that correct?

16       A.    Yes, basically correct.

17   Overvalued in the sense that the price

18   movements between January 4 and January 27

19   and particularly on January 27 were

20   artificial price movements that were

21   widely understood to be temporary in

22   nature.

23       Q.    And you also said that people

24   purchasing during the preclass period

25   between January 4 and -- well, you said

Page 101

                    D. R. Fischel

1
2    people purchasing during the preclass
3    period were aware that the prices were
4    distorted or artificially inflated; is
5    that right?
6        A.    No, that's not right.
7        Q.    Well, what was the basis for
8    your statement that class members --
9    certain class members were not entitled to
10   a presumption that they relied on the
11   integrity of the market price?
12       A.    Because -- and just to be clear,
13   I was not making a statement about every
14   class member as your previous question
15   suggested -- but that if you look at the
16   timing of when investors had to purchase
17   in order to purchase at a loss, that a
18   significant percentage of class members
19   purchased during a time when there was
20   extensive commentary about the existence
21   of artificial prices because of a
22   perceived short squeeze and the excessive
23   social media speculation, and that was
24   confirmed, at least with respect to
25   several class representatives, by their

Page 102

```
 1              D. R. Fischel
 2  testimony which I quote in my rebuttal
 3  report where they describe the reasons why
 4  they purchased and what their expectations
 5  were.
 6      Q.    Is it your opinion that anyone
 7  purchasing during the period January 4 to
 8  January 27 should have been aware that the
 9  prices were artificially inflated?
10      A.    No, it's not my testimony.
11      Q.    Is it your opinion that anyone
12  purchasing during the period January 23 to
13  January 27 should have been aware that the
14  prices were artificially inflated?
15      A.    No.  I don't express any opinion
16  on what investors should have been aware
17  of or should have done.  My only opinion
18  is that during the time when a significant
19  percentage of class members had to
20  purchase in order to sell at a loss, there
21  was extensive commentary and publicly
22  available information from multiple
23  sources about the existence of artificial
24  prices as confirmed by the testimony of
25  several of the class representatives and
```

Page 103

1               D. R. Fischel
2    therefore individualized inquiry is
3    necessary in order to determine which
4    class members relied on the integrity of
5    the market price and which class members
6    did not.
7        Q.    And why is it important in this
8    case that investors have relied on the
9    integrity of the market price when they
10   purchased their shares?
11              MR. ORSINI: Objection to the
12        extent it's calling for a legal
13        conclusion.
14              THE WITNESS:  I was going to say
15        the same thing.  If it's important,
16        the reason why it's important is
17        because a significant percentage of
18        class members purchased at a time when
19        there was extensive publicity from
20        multiple sources about the existence
21        of artificial prices and the temporary
22        nature of those artificial prices and
23        therefore, for those class members who
24        fit that description, the possibility
25        exists that those class members not

Page 104

                              D. R. Fischel

1
2       only purchased at a time of artificial
3       prices but purchased because of the
4       existence of artificial prices,
5       demonstrating that for those class
6       members, they did not rely on the
7       integrity of the market price as was
8       confirmed by the testimony that I
9       quote in my rebuttal report of several
10      of the class representatives.  And as
11      I said, there's another class member
12      whose testimony that I received after
13      the time of my rebuttal report which
14      where the testimony was basically the
15      same thing.
16         Q.     Now, would you agree that a
17  large number of the shares purchased in
18  the preclass period were purchased by high
19  frequency traders?
20         A.     I would neither agree nor
21  disagree with that statement.  I don't
22  know.
23         Q.     So do you know what high
24  frequency trading is?
25         A.     Yes, I do.

Page 105

                         D. R. Fischel

1        Q.      Do you know what program trading
2   is?
3        A.      Yes, I do.
4        Q.      What's program trading?
5        A.      It's algorithmic trading based
6   on the triggers derived from a program.
7        Q.      Isn't it true that a large
8   number of the world's largest financial
9   institutions engage in program trading in
10  stocks in the United States?
11       A.      You know, that's too broad of a
12  statement.  I wouldn't want to express an
13  opinion on that one way or the other
14  without studying the issue.
15       Q.      So you have no idea what portion
16  of the shares traded in the preclass
17  period for these nine affects stocks were
18  traded by high frequency traders?
19       A.      Correct, I don't have any
20  opinion on that one way or the other.
21       Q.      Now, would high frequency
22  traders be barred from relying on the
23  integrity of the market for some reason,
24  in your opinion?

Page 106

```
 1              D. R. Fischel

 2         MR. ORSINI: Objection.  Vague.

 3     To the extent it calls for a legal

 4     conclusion.

 5         THE WITNESS:  I don't know what

 6     that means.  I'm not offering any

 7     legal opinions on who is barred, to

 8     use your phrase, from --

 9     Q.    Relying on the integrity of the

10  market price.

11         You have an opinion on the

12  integrity of the market price in this

13  case; right?

14     A.    The opinion that I have is what

15  I repeated several times and it's stated

16  in my reports.

17     Q.    So that opinion does not impact

18  -- does not speak to whether or not high

19  frequency traders relied on the integrity

20  of the market price; correct?

21     A.    I don't know what you mean does

22  not speak to, but there's no separate

23  opinion I have about high frequency

24  traders.

25     Q.    So if somebody was engaged in
```

Page 107

```
1                    D. R. Fischel
2    high frequency trading, would they have
3    relied on the integrity of the market
4    price or not?
5        A.    I don't think you know without
6    investigating the relevant facts and
7    circumstances.
8        Q.    So basically everybody in the
9    class you'd have to ask them if they
10   relied on the integrity of the market
11   price in order for them to get a
12   presumption of reliance; is that your
13   opinion?
14             MR. ORSINI: Objection.
15             THE WITNESS:  That also sounds
16        like a legal question.
17       Q.    Well, you say everyone needs
18   individual inquiries; is that right?
19       A.    I said --
20       Q.    Yes or no, do we need individual
21   inquiry or not for this issue?
22             MR. ORSINI: What issue?
23             MR. ROSEN: Integrity of the
24        market price.
25             THE WITNESS:  I think the issue
```

Page 108

```
 1              D. R. Fischel
 2     of -- under the facts and
 3     circumstances of this case, the issue
 4     of reliance on the integrity of the
 5     market price cannot be determined on a
 6     class-wide basis in light of the
 7     economic evidence that I've reviewed
 8     and I've described at length in my two
 9     reports as well as the testimony of
10     the class representatives that I quote
11     in my report.
12          Q.    What about momentum traders?  If
13   someone's a momentum trader and buying at
14   momentum AMC, GEM on January 26 of 2021,
15   are they relying on the integrity of the
16   market price or not?
17          A.    It would just depend on the
18   relevant facts and circumstances.
19          Q.    The relevant fact is a momentum
20   trader saw the stock price going up and
21   they said, oh, look, it's going up.  I'm
22   going to buy it because I'm a momentum
23   trader.
24                Are they relying on the
25   integrity of the market price or not?
```

Page 109

                        D. R. Fischel

1

2     A.     I think it depends on the

3     relevant facts and circumstances.  Are

4     they aware of all of the articles about

5     artificial prices and they're aware of the

6     -- they interpret the momentum in light of

7     that information, you know, just as one

8     question that occurs to me.  I think it

9     would depend on the relevant facts and

10    circumstances.

11    Q.     So is it your opinion that

12    anybody who read the media news articles

13    that you cite as showing, quote,

14    artificial prices during the preclass

15    period did not rely on the integrity of

16    the market?

17    A.     That's not my opinion.

18    Q.     So someone could read these

19    media news articles that you cite as

20    indicating artificial prices and still

21    have relied on the integrity of the

22    market?

23    A.     You mean is that possible?  Yes,

24    I think that's possible.

25    Q.     Under what circumstances would

Page 110

```
 1                    D. R. Fischel
 2    it be possible?
 3        A.    Whether a purchase was based on
 4    the integrity of the market price as
 5    opposed to trying to profit by the lack of
 6    integrity of the market price, as was
 7    testified to by the class representatives.
 8        Q.    So if somebody was hoping the
 9    price would go up because there was a
10    short squeeze, they were not relying on
11    the integrity of the market?
12        A.    I would say if somebody -- as
13    one of their class representatives
14    testified -- was aware that prices were
15    inflated because of a short squeeze and
16    hoped to profit by prices increasing
17    further because of the perceived short
18    squeeze or any other reason, I would say
19    they are not relying on the integrity of
20    the market price.
21        Q.    But if an investor was aware of
22    the short squeeze but didn't hope to
23    profit by it, they just wanted to buy the
24    stock because it was a momentum trade,
25    they would have relied on the integrity of
```

```
 1                    D. R. Fischel
 2    the market price?
 3        A.    You'd have to examine the
 4    relevant facts and circumstances.  If
 5    somebody's aware but it has no influence
 6    on their investment decision, that's a
 7    different situation than the class
 8    representative whose testimony I quoted.
 9    And I keep paraphrasing the testimony, but
10    it's in footnotes fourteen and fifteen of
11    my rebuttal report where in footnote
12    fourteen the testimony is:  "I was banking
13    on there being a short squeeze.  Do you
14    mean like" -- question: "Do you mean like
15    in your own investing you're assuming or
16    hoping that there was going to be a short
17    squeeze.
18               Answer: "Yes.
19               Question: "And you were going to
20    make a profit from that.
21               Answer: "I was hoping to, yes".
22               That to me -- that testimony is
23    inconsistent with a reliance on the
24    integrity of the market price.
25        Q.    Do you have any academic
```

Page 112

```
 1                    D. R. Fischel
 2   literature that supports that?
 3       A.     Yes, the fact that --
 4       Q.     What's that?
 5       A.     -- short squeezes cause a
 6   distortion in prices that are temporary in
 7   nature and therefore anybody who's
 8   purchasing because of an attempt to profit
 9   by the existence of artificial inflation
10   hoping that the artificial -- the
11   existence of artificial inflation not only
12   continues but increases in order to be
13   able to sell at a profit, that's
14   inconsistent with relying on the integrity
15   of the market price.  That's relying on a
16   distortion in the market price and hoping
17   that the distortion continues and, in
18   fact, increases.
19       Q.     Was there an illegal
20   manipulation of any of the nine affected
21   stocks in the preclass period?
22              MR. ORSINI: Calls for a legal
23       conclusion.
24              THE WITNESS:  That's a legal
25       opinion, and I don't have any legal
```

```
 1                    D. R. Fischel
 2       opinions on that or any other subject.
 3       Q.    Do you have any evidence of any
 4   manipulation of the prices of the nine
 5   affected stocks in the preclass period?
 6       A.    My preclass period, I have
 7   evidence of a perception that the cause of
 8   the artificial inflation was a perceived
 9   short squeeze coupled with excessive
10   social media speculation about the
11   abilities created for retail investors by
12   the perceived short squeeze.  That's what
13   my opinions are.
14       Q.    And is the perceived short
15   squeeze and the excessive social media
16   speculation, are either of those
17   manipulation?
18            MR. ORSINI: I object to form.
19            THE WITNESS:  That's also a
20       legal opinion.
21       Q.    So you're not making the opinion
22   that the perceived short squeeze or the
23   excessive social media speculation are
24   manipulation; is that correct?
25            MR. ORSINI: I object to form.
```

```
                                    Page 114
 1                 D. R. Fischel
 2            THE WITNESS:  In terms of a
 3      legal conclusion, that's correct.
 4      Q.    How about as an economic
 5   conclusion?
 6      A.    Well, the existence of
 7   manipulation is a legal concept.  So if
 8   you're defining manipulation in terms of
 9   whether prices were distorted,
10   artificially inflated --
11      Q.    No, the term "manipulation", I'm
12   not talking about distortion, I'm talking
13   about manipulation.  That was the term.
14            So are you offering any opinion,
15   whether it be economic, legal, or any
16   other form, are you offering any opinion
17   in this litigation as to whether the
18   perceived short squeeze or the excessive
19   social media speculation was a
20   manipulation?
21            MR. ORSINI: Objection.  Vague.
22            THE WITNESS:  Well, first of
23      all, the perception is not a
24      manipulation, a perception could be
25      based on and was attributed to a
```

Page 115

1                    D. R. Fischel
2        perceived short squeeze.  Whether you
3        want to define a short squeeze or not
4        as a manipulation, particularly since
5        the concept of manipulation --
6        Q.    Well, that's the question.
7              Do you want to define it as a
8    manipulation?
9        A.    Excuse me, you have to let me
10   finish my answer.
11             A manipulation involves not just
12   an effect on prices but a certain intent
13   by the actors, you know, things that I
14   don't press an opinion about one way or
15   another, particularly since it's a legal
16   opinion.
17       Q.    So you're not offering any
18   opinion as to whether or not there was any
19   manipulation in the preclass period in
20   respect to the perceived short squeeze or
21   the excessive social media enthusiasm?
22             MR. ORSINI: Same objections.
23             THE WITNESS:  Correct, to the
24        extent you're asking me for a legal
25        opinion.

Page 116

                    D. R. Fischel

1
2       Q.     And what if I'm not asking you

3   for a legal opinion, then what?

4       A.     Then I would say that there was

5   a distortion in prices, a creation of

6   artificial -- extreme price movements and

7   volatility during the preclass period as I

8   define the preclass period was the product

9   of a perceived short squeeze and excessive

10  social media speculation that was by

11  definition and widely understood to be

12  artificial price movements that were

13  inherently temporary in nature.

14      Q.     You've written on stock market

15  manipulation; isn't that correct?

16      A.     I have.

17      Q.     And you've defined it, correct,

18  in your articles?

19      A.     I think you'd have to show me

20  what you're referring to, but I think it

21  would be more accurate to say I've

22  discussed the difficulty of defining it.

23      Q.     Are you able to define it?

24      A.     Again, it's a legal concept, and

25  I'm not offering any legal opinions.

```
                                        Page 117
 1                  D. R. Fischel
 2       Q.     Have you ever heard the term
 3   "assumption of reliance on an efficient
 4   market free of manipulation"?
 5       A.     Have I ever heard that term?
 6       Q.     Yes.
 7       A.     That's not a term, it's a
 8   phrase.  I don't know if I've ever come
 9   across that phrase.
10       Q.     Do you know what it means?
11       A.     Well, just based on the ordinary
12   usage of the English language, I think I
13   know what it means.
14       Q.     And does it mean the same thing
15   as reliance on the integrity of the market
16   price in an efficient market?
17       A.     Not necessarily, no.
18       Q.     Do you offer any opinion in this
19   case as to whether Plaintiffs or the class
20   were entitled to an assumption of reliance
21   on an efficient market free of
22   manipulation?
23       A.     That sounds like a legal
24   opinion.  I'm not offering any legal
25   opinions one way or the other.
```

```
                                    Page 118
 1                  D. R. Fischel
 2       Q.    So do you know what the class
 3   definition in this case is?
 4       A.    My understanding of the class
 5   definition is in my report.
 6       Q.    And what would your
 7   understanding be?
 8       A.    I believe it's investors in the
 9   nine stocks who held a position on
10   January 27 and sold at a loss during the
11   class period.  That's my understanding.
12       Q.    Do you offer any opinion as to
13   whether -- as to what investors relied on
14   in selling their shares during the class
15   period?
16       A.    No.  The only opinion that I
17   offer is the timing and prices of those
18   sales relative to the timing and prices of
19   purchases.
20       Q.    Do you offer any opinion as to
21   whether the restrictions imposed by
22   Robinhood in the purchase of the affected
23   securities induced or did not induce class
24   members to sell their shares during the
25   class period?
```

Page 119

D. R. Fischel

1    A.    I don't have any opinion on that

2   one way or the other.

3    Q.    So this being a seller's class,

4   why is the reason for the class members'

5   purchase relevant to this litigation?

6         MR. ORSINI: Objection to the

7         extent it's calling for a legal

8         conclusion.

9         THE WITNESS:  The reasons why I

10        think it's relevant is what I've been

11        describing in my answers to your

12        questions and explained at greater

13        length in my reports relevant for my

14        opinion, again not offering any legal

15        opinions as to what the court

16        ultimately determines is relevant or

17        not relevant.

18    Q.    Have you ever testified in a

19   stock market manipulation case before?

20        MR. ORSINI: At deposition,

21        trial, either?

22    Q.    In any form; submitted a report,

23   testified live.

24    A.    I've certainly testified in

Page 120

```
 1              D. R. Fischel
 2   manipulation cases involving futures
 3   markets, and I've been a witness and I'm
 4   currently a witness in cases involving
 5   alleged manipulation in equity markets, I
 6   mean apart from this case.
 7       Q.    What's the current -- sorry, go
 8   ahead.
 9       A.    I'd have to check, actually,
10   look at my CV to the extent I could
11   remember every alleged cause of action.
12   The cases I'm confident without recalling
13   anything specific that some of the equity
14   market cases involved allegations of
15   manipulation.
16       Q.    What's the current case you're
17   working on that involves manipulation?
18       A.    I'm not going to disclose it.
19       Q.    Have you ever analyzed market
20   efficiency using the Cammer factors
21   before?
22       A.    Yes, I'm sure I have.
23       Q.    And is it your opinion that the
24   Cammer factors are a sound basis for
25   determining market efficiency?
```

Page 121

```
 1                    D. R. Fischel
 2      A.     Again, without offering a legal
 3   opinion, I think the extent to which
 4   they're a sound factor in economic terms
 5   can vary depending on the relevant facts
 6   and circumstances.
 7      Q.     So it depends on the case; is
 8   that what your position is?
 9      A.     On the facts and circumstances
10   of the case.
11      Q.     Did you analyze market
12   efficiency for these nine affected stocks
13   in this case?
14      A.     Yes, I did.
15      Q.     Did you use each of the five
16   Cammer factors for the nine stocks?
17      A.     Again, what I did is laid out in
18   my report, but I focused on the factor
19   that is -- I think I referred to all the
20   factors, but I focused on the factor
21   that's generally considered to be the most
22   important of the Cammer factors, the
23   relationship between information and price
24   movements.
25                 MR. ROSEN: I'll ask you to take
```

```
                                        Page 122
 1              D. R. Fischel

 2      a look at a document here.

 3              (Whereupon, a document entitled

 4      In re Initial Public Offering

 5      Securities Litigation was marked

 6      Exhibit 116 for identification.)

 7      Q.    So take a look at Exhibit 116.

 8      A.    What do you want me to take a

 9   look at?

10      Q.    Well, see if you recognize that

11   document.

12      A.    Well, I certainly recognize the

13   case, because I was an expert in the case.

14   I'm not sure I recognize this particular

15   document.

16      Q.    This is a decision by Judge

17   Scheindlin in the In Re IPO Securities

18   Litigation.  It's dated January 10, 2009.

19   It's published in the reporter 260 FRD 81,

20   Southern District of New York 2009.

21              So you were an expert witness in

22   that case?

23      A.    I was.

24      Q.    And that was a litigation

25   involving markets for three hundred nine
```

Page 123

```
 1                   D. R. Fischel
 2   different IPOs; is that right?
 3        A.    That's right.  I thought it was
 4   three hundred six, but whatever the number
 5   is, it was approximately three hundred
 6   nine.
 7        Q.    And in that case, did you
 8   testify on behalf of the plaintiff class?
 9        A.    I did, plaintiff classes.
10        Q.    And what issues did you testify
11   for them on?
12        A.    It's more than fifteen years
13   ago, so if you show me my testimony, I can
14   be able to remember more carefully.  But
15   as I sit here, it had something to do with
16   the pricing of initial public offerings
17   and what happened on the first day and
18   what happened over time in light of the
19   particular allegations in the case.  But
20   beyond that, I just don't recall.
21        Q.    If you go to page twenty-four of
22   the PDF document.
23             MR. ORSINI: What's the page?  Is
24        it the page on the lower left-hand
25        corner?
```

Page 124

1              D. R. Fischel

2         MR. ROSEN: Yes.

3    Q.    So that's where your name first

4    comes up in the document on page

5    twenty-four.  It's actually I think

6    ninety-seven of the reported decision but

7    twenty-four of the document.

8              And it says that "Plaintiffs

9    proffered Professor Daniel Fischel to

10   opine with respect to the efficiency of

11   the markets for six focus cases as

12   applicable to the three hundred three

13   nonfocus cases".

14             I guess question one is: Is it

15   true that you provided an opinion on

16   market efficiency for six of these three

17   hundred nine cases; is that right?

18   A.    It sounds right and the court is

19   saying that that's what I did, so I have

20   no reason to disagree.  As I said, I don't

21   have a career recollection of exactly what

22   my opinions were.

23   Q.    Have you ever had a case before

24   in which there were three hundred nine

25   different issuers' stocks being evaluated

Page 125

```
 1                    D. R. Fischel
 2   for market efficiency?
 3       A.    It's safe to say this was the
 4   only case I've ever been involved in where
 5   there were three hundred nine consolidated
 6   cases.
 7       Q.    Now, according to this opinion
 8   -- not opinion, this decision -- well,
 9   it's a judicial opinion, I suppose, it
10   says that you evaluated the market
11   efficiency of these stocks using the
12   Cammer factors; is that right?
13       A.    At least what I'm looking at, I
14   don't see where it says that.
15       Q.    Well, if you scroll down from
16   twenty-four to twenty-five to twenty-six
17   to twenty-six to twenty-seven, she
18   discusses your analysis of the Cammer
19   factors?
20       A.    That's possible.  I just don't
21   have that on the screen.
22            MR. ORSINI: Where are you
23       referring to, page twenty-five?
24            MR. ROSEN: Twenty-five to
25       twenty-nine, I guess.  I guess
```

Page 126

```
 1                    D. R. Fischel
 2       twenty-five to thirty.
 3             THE WITNESS:  Where the court's
 4       addressing the criticisms by
 5       Defendants' experts of my analysis; is
 6       that what you're referring to?
 7       Q.    She just goes through the Cammer
 8  factors and your analysis of the Cammer
 9  factors.  She cites your report.
10       A.    (Reviewing).
11             Okay.  I've read it.
12       Q.    So it's true that you used the
13  Cammer factors to analyze market
14  efficiency for these six focus stocks in
15  the IPO litigation?
16       A.    Yes.  I said I've done that more
17  than just this particular instance, but
18  that's what I did here as well.
19       Q.    Now, page thirty, they discuss
20  -- the judge in this decision discusses
21  incorporation of information into share
22  price, which is the fifth Cammer factor.
23             You're familiar with that;
24  right?
25       A.    I am.
```

Page 127

1                    D. R. Fischel

2       Q.     Go to page thirty.

3       A.     I'm really bad at this, I

4    apologize.  It disappeared from the

5    screen.

6              MR. ORSINI: That's impressive.

7         I think you closed out of it.  Good

8         thing you're better at finance and

9         economics theory.

10      Q.     Now, this fifth factor, this is

11   -- it says, "using event study

12   methodology, Fischel determined that the

13   focus case shares tended to react

14   significantly to unexpected corporate

15   events".  And then it says, "for each

16   focus case, Fischel listed examples where

17   unexpected information was released to the

18   public and the share price moved in a

19   statistically significant manner".

20              So you did an event study for

21   these focus cases; right?

22      A.     Yes, I'm sure I did.

23      Q.     And do you recall what process

24   you used to -- how you selected the events

25   and exactly how you went about it?

Page 128

1                    D. R. Fischel

2       A.    No, I don't.

3       Q.    Then you go to the next page,

4    top of the next page, thirty-one.  It says

5    that "Defendants' expert submitted a

6    number of challenges to Fischel's

7    findings".

8       A.    I see that.

9       Q.    Those challenges were

10   unsuccessful; weren't they?

11      A.    I believe so.

12      Q.    And it says, "first they argued

13   that because Fischel analyzed share price

14   movements on a daily basis" -- let's keep

15   going.

16           So let's go to the one that's at

17   the bottom of page thirty-one where it

18   says, "second, Gompers, after examining

19   the twenty-eight days identified by

20   Fischel as having a statistically

21   significant price change for Sycamore,

22   concluded that the price moved without the

23   release of relevant new information

24   twenty-two of those days".

25           Now, Gompers is -- is it Paul

```
                                        Page 129
 1                    D. R. Fischel
 2   Gompers, Professor Paul Gompers?
 3       A.     That's what it is.
 4       Q.     He's at Harvard; right?
 5       A.     He's at Harvard, yes.
 6       Q.     So he was trying to point out
 7   flaws in your analysis; is that right?
 8       A.     Again, I really have no
 9   recollection of this.  I'm just reading
10   what the court stated.
11       Q.     And it says that Gompers
12   examined the twenty-eight days identified
13   by you as having a statistically
14   significant price change for Sycamore and
15   concluded that the price moved without the
16   release of relevant new information on
17   twenty-two of those twenty-eight days;
18   right?  Do you see that?
19       A.     Yes, I see that.
20       Q.     And it says, "Fischel responded
21   that a conclusion of inefficiency does not
22   follow merely because significant share
23   price changes are not always explained by
24   known announcements".  And it says, "he
25   argued that most of the daily variation in
```

```
                                    Page 130
```

1                    D. R. Fischel

2    stock prices generally is unexplained by

3    market factors, industry factors, or

4    firm-specific news", and it cites footnote

5    one hundred eighty-three to an article by

6    Richard Roll called R Squared.

7            Do you see that?

8        A.    Yes, I see that.

9        Q.    Are you familiar with that Roll

10   article?

11       A.    Well, I haven't looked at it in

12   a long time, but it's a well-known

13   article, so I'm generally familiar with

14   it.

15       Q.    And is it -- so twenty-two

16   divided by twenty-eight, let's see what we

17   get, that equals 78.6.  So only 11.4

18   percent of the news days were explained by

19   firm-specific news for Sycamore; is that

20   correct?

21       A.    I don't know if it's correct.

22       Q.    Well, twenty-two divided by

23   twenty-eight --

24       A.    No, I'm not quarreling about the

25   arithmetic.  In other words, I can read

Page 131

```
 1                    D. R. Fischel
 2   what the court says.  Exactly what my
 3   analysis was and why I said it, it looks
 4   like I was commenting on the low power of
 5   R Squared typically and regression
 6   analyses, meaning that the independent
 7   variables generally have low explanatory
 8   power in understanding stock price
 9   movements.  That's what I infer from what
10   the court referred to as the authority
11   that I cited based on that Roll article.
12   Again, I don't have my testimony in front
13   of me.  I'm just looking at what you're
14   saying the court said.
15            MR. ROSEN: I'm going to show you
16        the Roll article.
17            (Whereupon, a Journal of Finance
18        article was marked Exhibit 117
19        for identification.)
20        Q.    This is an article by Richard
21   Roll titled -- in the Journal of Finance,
22   volume forty-three, issue three.
23            This is the article that you
24   cite or that the court asserts you cited
25   in your report in the IPO litigation; is
```

Page 132

                        D. R. Fischel

1
2    that right?
3        A.    Yes, this is the article that I
4    apparently cited based on the description
5    by the court.
6        Q.    Are you aware of any subsequent
7    academic literature that would render the
8    Roll article no longer reliable?
9               MR. ORSINI: I object to form.
10              THE WITNESS:  Well, I haven't
11         investigated that.  I mean, Professor
12         Roll is regarded as a distinguished
13         authority in finance and I myself,
14         after having conducted countless event
15         studies, have observed the same
16         patterns of R Squared's frequently
17         fairly low in their explanatory power
18         of the independent variables in the
19         regression.
20              But other than that, as I said,
21         I haven't done any study of the
22         findings, subsequent study of the
23         findings in this article.
24        Q.    If you go down to the bottom of
25    page thirty-two, other factors, so there's

Page 133

                            D. R. Fischel

1                           D. R. Fischel

2      a section on other factors and it looks

3      like you also evaluated for the market

4      efficiency study in the IPO litigation

5      what are called Krogman factors; is that

6      right?

7           A.    Maybe I'm looking at the wrong

8      page, but at least on the page that I'm

9      looking at I don't see that.

10          Q.    So you just looked at the

11     additional factors were market

12     capitalization and bid/ask spread; is that

13     right?

14          A.    Again, that's what's discussed

15     here in addition to the court's conclusion

16     that the prices -- that I showed that the

17     price of the focus stocks were generally

18     responsive to the release of information

19     throughout the class period.

20          Q.    Let's go to the loss causation

21     section, page thirty-seven.

22                So tell me when you get to the

23     section on loss causation.

24          A.    I have the first page of it.

25          Q.    Do you recall what the alleged

Page 134

```
 1                    D. R. Fischel
 2    manipulation was in the IPO litigation?
 3        A.    Only in the most general terms.
 4    It dealt with the pricing of initial
 5    public offerings and whether the
 6    allegation was manipulation or something
 7    else, I don't recall.
 8        Q.    So if you go to the top of page
 9    thirty-eight, there's a description of a
10    methodology that you used to demonstrate
11    loss causation.  That might refresh your
12    recollection a bit.
13        A.    All right.  I see where the
14    court describes my methodology.
15        Q.    So it says here, "Fischel's
16    second analysis seeks to demonstrate a
17    causal link between the tie-in agreements
18    and continued inflation in stock prices".
19            So does that refresh your
20    recollection as to the nature of the
21    manipulation alleged in this case?
22        A.    You know, in the most general
23    terms.  Again, manipulation is a legal
24    concept which it might be that's what the
25    allegation was.  I'm analyzing the
```

Page 135

```
1              D. R. Fischel
2   economic evidence.  I'm not focused on the
3   legal causes of action.
4       Q.     And it says that you proposed
5   two theories, the comparable index
6   approach and the event study procedure;
7   correct?
8       A.     That's what it says.
9       Q.     And what's the comparable index
10  approach; do you recall?
11      A.     Well, I have no recollection,
12  actually, other than what the court says
13  here, which appears to be quoting me that
14  it approximates what the returns on the
15  security would have been had the fraud not
16  occurred.
17      Q.     Have you ever used a comparable
18  index approach methodology in determining
19  loss causation damages in the last ten
20  years?
21      A.     I've used what could be called a
22  comparable index approach many times for
23  different reasons over the past ten years,
24  I would say.
25      Q.     Could you explain conceptually
```

```
 1                  D. R. Fischel
 2    how that works, that methodology?
 3        A.    Again speaking at a high level
 4    of generality because I'm not thinking of
 5    application of any particular set of
 6    relevant facts and circumstances, is if
 7    you're trying to estimate what a price
 8    would be independent of the act factor
 9    that's affecting prices during the
10    particular period, one way of doing that
11    is to estimate what the price would have
12    been had it performed the same way as a
13    comparable industry index.
14        Q.    So you assumed that, during the
15    class period, it would have performed like
16    the index and been subject to market
17    forces and industry forces and you
18    excluded the company-specific events?
19        A.    I'm not sure I'd accept that
20    paraphrase.  You know what the price is
21    but you know what the price is in the
22    actual world because of a particular
23    factor or events and you're trying to
24    estimate what the price would be or would
25    have been in the absence of that factor or
```

Page 137

```
 1                    D. R. Fischel
 2   event.  One way of doing that is to,
 3   again, depending upon the relevant facts
 4   and circumstances, is to calculate what
 5   the price would have been in a but-for
 6   world if the price had behaved the same
 7   way that a comparable index behaved over
 8   whatever period you're trying to measure.
 9        Q.    The other methodology was the
10   event study methodology that's mentioned
11   there, event study procedure.
12              How would the event study
13   procedure be used to calculate loss
14   causation?
15        A.    Well, it looks like under the
16   facts and circumstances of the IPO
17   litigation -- which again I'm speaking
18   based on what the court says as opposed to
19   a distinct memory myself of what I did --
20   but the idea would be that, when you know
21   actual returns on days that are alleged to
22   be influenced by the alleged fraud,
23   substituting the predicted return on those
24   days based on a regression analysis for
25   the actual return and then just
```

```
                                       Page 138
 1                    D. R. Fischel
 2   calculating a true value line on that
 3   basis.
 4                MR. ROSEN: This will be
 5        Exhibit 118.  It's a report -- it
 6        looks like a report that you authored
 7        for this IPO litigation.  It's dated
 8        January 20, 2004 on the front.  That
 9        may or may not be the date it's
10        signed, I don't know, but that's the
11        date on the report.
12                (Whereupon, a document entitled
13        In re: Initial Public Offering Sec.
14        was marked Exhibit 118
15        for identification.)
16        Q.    Just take a look at it and tell
17   me if that's a report that you authored in
18   or about that time frame.
19        A.    It looks like it.
20        Q.    What was the purpose of this
21   report?
22        A.    I'd have to read it to know.
23        Q.    Paragraph seven says, "I have
24   been asked by counsel" --
25        A.    I see it.
```

Page 139

1                    D. R. Fischel

2        Q.    It says that you were asked by

3    counsel for Plaintiffs to address various

4    issues concerns loss causation in the six

5    focus cases.

6        A.    For the limited purpose of class

7    certification analysis.

8        Q.    You should read the fine print.

9        A.    It's just a continuation of the

10   sentence.  It's hardly fine print.

11       Q.    So you authored this report?

12       A.    I did.

13       Q.    So paragraph twelve, take a look

14   at paragraph twelve.

15       A.    (Reviewing).

16             Okay.

17       Q.    So it mentions that investors

18   who receive information that the value of

19   the security exceeds its current market

20   price will want to buy the security.

21             That's not controversial; right?

22       A.    Well, it's a very contested

23   case.  Under the facts and circumstances

24   of the case, that was part of my opinion.

25       Q.    The next sentence,

Page 140

1                    D. R. Fischel
2    "consequently, if market participants
3    observe strong demand for a stock by
4    investors as alleged in the instant cases,
5    market participants would likely infer
6    that purchasers have positive information
7    about the stock.  This would cause market
8    participants to revise their expectations
9    about the value of the stock upwards,
10   causing the price to be higher than it
11   would otherwise be".
12            So is there any academic
13   literature that supports that proposition?
14      A.    At least on its face, that's
15   simply a statement that if market
16   participants believe that the value of a
17   stock is higher than its market price,
18   they're going to be, as a general
19   statement, inclined to purchase and the
20   context of the case, which is coming back
21   to me now as I'm looking at what you're
22   showing me is the allegation was that
23   there was an agreement between certain
24   underwriters to create false demand for
25   these particular stocks through tie-in

1            D. R. Fischel

2    agreements where sophisticated investors

3    would agree to purchase the stocks at

4    particular prices and increase volume and

5    demand to create the impression for

6    uninformed investors that the informed

7    people in the market believe the stocks

8    were undervalued and that would

9    communicate information to other market

10   participants.  As I think I said in the

11   earlier discussion, I just assumed that

12   alleged to be true based on the

13   allegations in the case and assuming it to

14   be true, tried to calculate the effect of

15   those agreements for purposes of loss

16   causation.

17       Q.    So you're just assuming --

18   you're saying that paragraph twelve, that

19   statement, "consequently, if market

20   participants observe strong demand for a

21   stock by investors as alleged in the

22   instant cases, market participants would

23   likely infer that purchasers have positive

24   information about the stock", so that an

25   assumption rather than an opinion?

Page 142

                    D. R. Fischel

1
2      A.      No, that's an opinion based on
3   the allegations, assuming the allegation
4   was true.
5      Q.      So let's go to paragraph
6   fifteen.
7      A.      Okay.
8      Q.      So that paragraph says that the
9   stock prices of issuers' shares would
10  continue to be inflated as long as the
11  false and misleading information generated
12  by Defendants' alleged misconduct
13  continued to influence issuers' share
14  prices; is that correct?
15     A.      That's what it says.
16     Q.      And it says, the last sentence
17  of that paragraph, "indeed, as I explain
18  more fully in part four below, the
19  economic evidence supports plaintiff's
20  claim that the artificial inflation
21  persisted through December 6, 2000 and
22  thereafter"; is that right?
23     A.      You're reading it correctly.
24     Q.      So just to short-circuit this,
25  if you go to paragraphs twenty-one and

Page 143

```
                              D. R. Fischel
 1
 2   twenty-two, the IPO of this -- like say
 3   for example FirePond stock was in February
 4   of 2000.  And it was your opinion that the
 5   price for this stock was inflated,
 6   artificially inflated for, I don't know,
 7   ten months until December 6, 2000; is that
 8   right?
 9       A.    Well, I'm just reading the
10   paragraph, and it talks about how the
11   declines in FirePond's stock price are
12   consistent with the dissipation of some of
13   the inflation in the absence of any
14   corrective disclosure, although the
15   existence of the inflated prices
16   dissipated over time.  That's what the
17   paragraph says.
18       Q.    So then if you go to paragraph
19   twenty-seven, the heading in that section
20   is empirical evidence supports Plaintiff's
21   allegations of continued price inflation
22   in the six focus case stocks after
23   December 6, 2000.
24             So it looks like on December 6,
25   2000 there was a corrective disclosure in
```

1          D. R. Fischel
2    the Wall Street Journal and you opine that
3    that corrective disclosure did not
4    dissipate all of the inflation, that there
5    continued to be inflation in the stock for
6    a longer period of time; is that correct?
7         A.    You know, again I don't
8    remember.  I'm just interpreting the
9    court's language here, which obviously
10   speaks for itself.  But it looks like I
11   concluded that on the assumption that
12   prices were inflated by the IPO pricing
13   with the combined alleged tie-in sales to
14   prop up the IPO price that the price
15   movements of the stocks discussed in these
16   paragraphs were consistent with the
17   existence of that artificial inflation and
18   notwithstanding the fact that there was a
19   Wall Street article -- Wall Street Journal
20   article on December 6, there were
21   subsequent investigations of Defendants'
22   alleged misconduct after December 6 by the
23   U.S. Attorney, by NASDAQ, and therefore
24   it's not correct to treat what occurred on
25   December 6 as a complete disclosure based

Page 145

                          D. R. Fischel

1

2    on the liability assumptions that I was

3    assuming, complete corrective disclosure.

4        Q.    You're familiar with the

5    efficient market hypothesis, I assume?

6        A.    I am.

7        Q.    Do you believe that the stock

8    market is efficient?

9        A.    I think that depends entirely on

10   the relevant facts and circumstances of

11   which stock over which time period, but I

12   think generally speaking, stocks traded on

13   organized exchanges such as the New York

14   Stock Exchange, it's reasonable to start

15   with an assumption that, absent contrary

16   evidence and obviously subject before

17   analysis, that those stocks are more

18   likely to trade in an efficient market.

19       Q.    Is it possible to manipulate the

20   stock of an issuer whose stock is traded

21   in an efficient market?

22       A.    Again putting aside whether

23   you're asking me for a legal opinion, but

24   if you're asking me is it possible for

25   prices for stocks that are otherwise

Page 146

1                    D. R. Fischel
2    traded in an efficient market, for those
3    prices to be distorted by conduct, yes,
4    that's absolutely possible.
5        Q.    What about stocks that are
6    traded in an inefficient market?  Can
7    those stocks be manipulated?
8        A.    The same answer about not
9    offering any legal opinions, but prices
10   that trade in an inefficient market, those
11   prices can be distorted, also.  It just
12   depends on the relevant facts and
13   circumstances.
14       Q.    What does it mean for prices to
15   be distorted?
16       A.    If, for example, there are false
17   representations about the value of the
18   security being traded, whether the
19   security is traded in an efficient market
20   or an inefficient market, that would be an
21   obvious example.
22       Q.    So the social media enthusiasm
23   that you referred to in your report, is
24   all of it related to a short squeeze or is
25   some of the enthusiasm unrelated to a

Page 147

1                   D. R. Fischel

2    short squeeze?

3        A.    You'd have to look.  As I said,

4    I didn't do a comprehensive analysis of

5    all the discussion on social media, but a

6    lot of it that I'm familiar with was about

7    the situation that institutional investors

8    were in because of the short squeeze

9    positions that they took and the

10   opportunities that that created for retail

11   investors.

12       Q.    What is the difference between a

13   stock's market price and its value?

14       A.    You have to have a definition of

15   what "value" means.

16       Q.    Do you have a definition of

17   "value" for a stock?

18       A.    Well, there's a general

19   definition of what a fair market value is,

20   a price between a willing buyer and a

21   willing seller where both have reasonably

22   complete information and neither is under

23   a compulsion to buy or sell.  That's a

24   generally accepted definition of fair

25   market value.  So under that definition,

1                     D. R. Fischel

2    as long as those criteria are met, price

3    and value are the same.  There could also

4    be private information which suggests a

5    departure from price and value, at least

6    in the opinions of certain traders.

7                There's an economic literature

8    on the reasons why prices are efficient is

9    because of the consent attempt by market

10   participants, particularly sophisticated

11   market participants, to identify mispriced

12   securities so arbitrage opportunities are

13   eliminated in that process, creating the

14   existence of an efficient market.  But as

15   has been discussed in the economic

16   literature, it's something of a paradox,

17   meaning that, in order for markets to be

18   efficient, they can't be perfectly

19   efficient because if it's perfectly

20   efficient, then there's no incentive to

21   search and there has to be an incentive to

22   search, which is in other words a reward

23   for finding mispriced securities which is

24   what eliminates the existence of mispriced

25   securities because of the arbitrage

Page 149

```
 1                    D. R. Fischel
 2    opportunities that result.
 3                MR. ROSEN: Why don't we take a
 4         break.
 5                (Whereupon a break was taken)
 6         Q.    What are noise traders; do you
 7    know?
 8                MR. ORSINI: Sorry, did you say
 9         "noise"?
10                MR. ROSEN: "Noise", yes.
11                THE WITNESS:  That's just -- I
12         don't know if there's a fixed
13         definition.  It's a term that's
14         usually used for uninformed traders.
15         Q.    Were the social media investors
16    in these nine stocks noise traders?
17         A.    As I said, I'm not sure there is
18    a fixed definition of what a noise trader
19    is.  And what the particular circumstance
20    for any trader is would depend on the
21    relevant facts and circumstances for that
22    trader.
23         Q.    Do you know what the term
24    "investor sentiment" means?
25         A.    I think that's similar, meaning
```

```
                                      Page 150
 1                  D. R. Fischel
 2   -- it means the sentiment of investors.
 3   Other than that, I'm not sure how else it
 4   could be defined.
 5       Q.    In the academic literature, the
 6   term "noise traders" is often used.
 7            Are you familiar with that?
 8       A.    Yes.
 9       Q.    Now, in the academic literature,
10   is it understood that noise traders make
11   judgment errors in their investment?
12       A.    You know, you'd have to show me
13   what academic literature you're referring
14   to, whether you're talking about
15   individual traders or traders as a class.
16   And again, I'm not sure what academic
17   literature you're referring to.  If you
18   were doing any study of a particular
19   situation, it would depend on the relevant
20   facts and circumstances.
21       Q.    Why didn't you address the first
22   four Cammer factors in your opening
23   report?
24       A.    Because I didn't think they were
25   particularly relevant for the issues that
```

Page 151

1                    D. R. Fischel
2    I was analyzing.   They weren't necessary
3    to my opinion.
4        Q.    Let's look at your event study.
5              It begins at paragraph
6    thirty-three of your opening report; is
7    that right?
8        A.    Was that a question, I'm sorry?
9        Q.    I was just saying that it looks
10   like your event study's described in your
11   report beginning at paragraph
12   thirty-three.
13       A.    That's the section of my report
14   that deals with whether the stocks during
15   the -- what I refer to as the preclass
16   period traded in an efficient market.
17       Q.    So we'll focus on the events in
18   the preclass period.
19              So did you do an event study on
20   just the preclass period or both the
21   preclass period and the class period?
22       A.    I did an event study in the
23   preclass period in my opening report and,
24   in light of what Dr. Werner stated, I also
25   did an event study of the class period in

Page 152

```
                              D. R. Fischel
 1
 2   my rebuttal report.
 3        Q.    And why did you do an event
 4   study of the class period in your rebuttal
 5   report?
 6        A.    Because Dr. Werner expressed an
 7   opinion that the stocks during the class
 8   period traded in an inefficient market
 9   because of the alleged manipulation, and I
10   didn't think that was an accurate
11   characterization as I described in my
12   rebuttal report.
13        Q.    Why -- so you think that the --
14   well, what was inaccurate about it?
15        A.    I don't believe that the reasons
16   that the stocks traded in an inefficient
17   market was because of alleged wrongdoing
18   by the defendants, which was the basis of
19   Dr. Werner's opinion, as I discuss in my
20   rebuttal report.
21        Q.    So you believe that the stocks
22   traded in an inefficient market during the
23   class period, but not because of the
24   restrictions on the purchase of the
25   affected stocks?
```

Page 153

                    D. R. Fischel

1
2      A.     I believe the stocks traded in

3   an inefficient market during the class

4   period because they also fail factor five

5   of the Cammer factors, which is generally

6   regarded as the most important of all the

7   Cammer factors.

8      Q.     But if a stock is being

9   manipulated, wouldn't the normal test for

10  efficiency be affected by that

11  manipulation under certain circumstances?

12     A.     I mean, are you asking the

13  abstract or under the facts and

14  circumstances of this case?

15     Q.     Let's start with the abstract.

16     A.     I wouldn't say you could draw

17  that implication necessarily.  I think it

18  would depend on the facts and

19  circumstances again suggesting that I'm

20  giving a legal opinion on the meaning of

21  "manipulation".

22     Q.     Well, now that you mention it,

23  let's go to paragraph thirty-eight of your

24  opening report.

25     A.     Okay.

D. R. Fischel

1

2      Q.    And the second sentence says --

3  well, the first sentence says, "as

4  described above, the prices of the

5  affected stocks increased dramatically and

6  artificially during the preclass period.

7  These artificial price increases were

8  widely recognized by market participants

9  as temporary market manipulations and/or

10 coordinated purchasing by retail traders

11 due to heightened commentary on social

12 media".

13          So was it your opinion that

14 there were temporary market manipulations

15 in the nine affected stocks during the

16 preclass period?

17     A.    That is my opinion as to the

18 reasons that were given and widely

19 recognized for the causes of the

20 artificial price movements during what I

21 refer to as the preclass period.

22     Q.    So what are the market

23 manipulations you're referring to there?

24     A.    Specifically the perceived

25 existence of short squeezes in multiple

Page 155

```
1                    D. R. Fischel
2    stocks.
3        Q.    Anything else?
4        A.    With respect to the use of the
5    term "temporary market manipulations", it
6    says, "and/or coordinated purchasing by
7    retail traders due to heightened
8    commentary on social media".
9        Q.    Is it your opinion that
10   coordinated purchasing by retail traders
11   was market manipulation in this case?
12       A.    Again, that's asking for a legal
13   conclusion.  It's my view that that
14   contributed or was perceived to have
15   contributed to the extreme price increases
16   and extreme increase in volatility during
17   what I refer to as the preclass period.
18       Q.    But it's not your opinion that
19   coordinated purchasing is market
20   manipulation?
21       A.    Again, that's a legal
22   conclusion.  I'm not offering any legal
23   opinions one way or another, and I'm
24   certainly not suggesting that any
25   particular individual in the preclass
```

Page 156

D. R. Fischel

1  period satisfied all the legal

2  requirements for manipulation.  I'm not

3  expressing any legal opinions on any

4  subject.

5  Q.    The next sentence says, "absent

6  Robinhood's and other brokers' action,

7  there is no way to know in the but-for

8  word whether prices would have kept

9  rising, how long they would have remained

10  artificially high, and how quickly they

11  would have fallen to nonmanipulated

12  levels".

13          So is it your opinion that the

14  prices were at manipulated levels?

15  A.    It's my opinion that prices were

16  at artificial levels because of a

17  perception of the existence of short

18  squeezes, which is generally understood as

19  a type of manipulation, as well as the

20  effect of coordinated purchasing by retail

21  investors due to heightened commentary on

22  social media.

23  Q.    Let's go back to your event

24  study.


Page 157

1                    D. R. Fischel
2              So to do your event study on the
3     preclass period for your opening report,
4     could you please list -- give me a
5     step-by-step process that you undertook to
6     do the event study?
7         A.    The step-by-step process which
8     is described in appendix C.
9         Q.    And which sentence is it that
10    you're referring to in appendix C?
11        A.    The entire first paragraph at
12    table one.  That's a step-by-step
13    description of --
14        Q.    So --
15        A.    A step-by-step description of
16    the event study that was used in this
17    case, the regression analysis that
18    produced the event study.
19        Q.    The third sentence of paragraph
20    one says, "this is typically done by one,
21    estimating historical relationship", et
22    cetera.
23              So when it says this is
24    typically done, are you saying this is
25    what was actually done?

Page 158

1                    D. R. Fischel

2       A.    Yes.  If you keep reading in the

3   paragraph, that's exactly what it says.

4       Q.    So is it fair to say the first

5   thing you did in your event study is you

6   estimated the relationship between the

7   affected stocks' returns, the broad market

8   return, and the returns of various

9   industry indices?

10      A.    You establish a relationship

11  between the returns on a particular

12  security and the returns of the overall

13  market and industry index during a

14  particular period, you could call it a

15  control period, in this case for the one

16  hundred twenty trading days prior to

17  January 1, 2021 and then use that

18  relationship to generate predicted returns

19  during the forecast period and then

20  calculate the difference between the

21  actual returns and the predicted returns

22  and then analyze whether that difference

23  is large enough or not to be deemed

24  statistically significant so that it's

25  possible to reject the null hypothesis.

Page 159

1                    D. R. Fischel

2        Q.     So first you did this regression

3    analysis and you determined which days

4    during the preclass period were

5    statistically significant -- had

6    statistically stock price movements and

7    which days didn't; is that correct?

8        A.     I'm sorry, I'm not sure it is

9    correct, the way you formulated the

10   question.

11            Can you repeat it?

12       Q.     So first you performed the

13   regression analysis and determined which

14   days during the preclass period were

15   statistically significant and which days

16   were not?

17       A.     But when you say first, that's

18   what's misleading about your question.

19       Q.     What did you do first?  If that

20   wasn't the first thing, what was the first

21   thing?

22       A.     You establish a relationship

23   between the movements of a particular

24   security and the movements of the overall

25   market and a particular industry index as

```
 1                D. R. Fischel
 2   a separate independent variable during a
 3   period, as I said, you could call it a
 4   control period on an estimation period and
 5   then use that to generate predicted
 6   returns during the period in question, in
 7   this case what I refer to as the preclass
 8   period.
 9        Q.    So I meant to subsume the
10   creation of the market index and the
11   industry index as part of the regression
12   analysis.
13             So first you have create your
14   market and industry index and estimated
15   returns and then you plug that into the
16   regression analysis; is that right?
17        A.    No, that's not right.
18        Q.    Well, tell me what's right.
19        A.    I'm going to repeat what I just
20   said.  First you establish a relationship,
21   which is not a manner of predicting
22   returns, you establish a relationship
23   between actual movements of the security
24   in question in relation to movements in
25   the overall market and movements in a
```

Page 161

```
 1                    D. R. Fischel
 2   particular industry index.  And once you
 3   have that relationship established, you
 4   then use that relationship to generate
 5   predicted returns during the forecast
 6   period, which for purposes of my initial
 7   report, was the preclass period.
 8        Q.    And then what did you do?
 9        A.    Then you can compare the
10   predicted returns with the actual returns.
11   And once you know what that difference is,
12   in light of the relationship that you've
13   calculated, you're able to determine
14   whether the difference between the actual
15   return and the predicted return is large
16   enough to be calculated -- is large enough
17   to be determined to be statistically
18   significant typically at the ninety-five
19   percent confidence level, which enables
20   you to reject the null hypothesis, meaning
21   that you could observe a difference
22   between the actual and predicted
23   relationship -- the actual and predicted
24   returns, excuse me, that large solely as a
25   result of chance less than five percent of
```

Page 162

1                        D. R. Fischel

2    the time.

3         Q.    And did you do that?

4         A.    Yes, that's exactly what we did.

5         Q.    And then let's see if I've got

6    this right.

7                And the results of that is on

8    page twenty-three, Exhibit 3?

9         A.    Yes.

10        Q.    So once you got Exhibit 3 and

11   you understood which days were

12   statistically significant during the

13   preclass period and which days weren't,

14   then what did you do for your event study?

15        A.    Report all the different results

16   and calculate a total cumulative residual

17   return.

18        Q.    And then was that the completion

19   of your event study, just determining what

20   days were statistically significant and

21   what days weren't, or was there more to

22   it?

23        A.    Well, it's the percentage return

24   on every day for all the different stocks,

25   which days are statistically significant

                                                        Page 163

1                         D. R. Fischel

2      for all the different stocks, and what the

3      cumulative -- the total cumulative

4      residual return is for all the different

5      stocks.

6          Q.     But then do you do some analysis

7      to determine whether the share prices for

8      these stocks move in response to news, or

9      you didn't do that?

10         A.     You know, that's the analysis in

11     appendix D.

12         Q.     Was that part of an event study,

13     your analysis in appendix D?

14         A.     An event study is the

15     relationship between events and prices.

16     The event study itself just tells you what

17     the stock price returns were in relation

18     to the predicted returns under a

19     particular model.  It doesn't tell you

20     anything about events.  What the purpose

21     of an event study is to study the

22     relationship between events and prices and

23     that's what was done in Exhibit D with

24     respect to information about particular

25     companies that was publicly disclosed

Page 164

                              D. R. Fischel

1
2    during the preclass period.
3        Q.    You said Exhibit D or was it
4    appendix D?
5        A.    Appendix D, I'm sorry.
6        Q.    Now, is the work in appendix D
7    here, is that what was commonly referred
8    to as the fifth Cammer factor analysis
9    whether stock prices are moving in
10   response to news?
11       A.    I would say Exhibit D in
12   relation to Exhibit 3 is something that
13   can be used to analyze factor five of the
14   Cammer factors.
15       Q.    Is that what you did?
16       A.    In part.
17       Q.    Which part?
18       A.    What's included on appendix D.
19       Q.    So is appendix D the analysis of
20   the fifth Cammer factor then, whether or
21   not it's responding to news?
22       A.    In part.  There's also a
23   discussion in my report about all of the
24   disclosures by companies, price targets,
25   demonstrating that there was a lot of

Page 165

                              D. R. Fischel

1
2    economic evidence demonstrating that price
3    movements were not attributable to new
4    value-relevant information about companies
5    but were only explained by factors
6    unrelated to fundamentals about the
7    companies, especially the perception of
8    short squeezes and the excessive
9    discussion in social media about the
10   effect of the short squeeze position of
11   large institutional investors.  I would
12   say all of that information on appendix D
13   as well as the other information discussed
14   in my report that I just described is all
15   relevant to the application of factor five
16   of the Cammer factors.
17       Q.    Now, is it true that before you
18   looked at any of the news, you first
19   determined which days during the preclass
20   period were statistically significant, had
21   statistically significant stock price
22   movements?
23       A.    No, that's not true.
24       Q.    So how did you determine which
25   days -- which news days to include in your

```
                                            Page 166
 1                   D. R. Fischel
 2    event study?
 3        A.     Every day was included in the
 4    event study in a particular period.  There
 5    was no choice of days.
 6        Q.     Is that how event studies are
 7    normally done, you just look at every day
 8    during a particular period?
 9        A.     Again, every case depends on the
10    facts and circumstances of that case, but
11    typically I would say yes.
12        Q.     Isn't it highly biased to do the
13    event study the way you did it?
14        A.     It's not at all biased.  It's
15    completely routine and standard.
16        Q.     Really?
17               So isn't it true you identified
18    statistically significant days and then
19    went to see if there was news on those
20    days?  Isn't that what you did?
21        A.     No, I wouldn't say that's
22    exactly what we did.
23        Q.     Tell me what you did then.  Tell
24    me what you did.
25        A.     The model is a model to
```

Page 167

```
 1                    D. R. Fischel
 2   determine the existence of statistically
 3   significant days.  You don't know the
 4   existence of statistically significant
 5   days by an I-know-it-when-I-see-it test.
 6   You have to perform the statistical
 7   analysis to know which days are
 8   statistically significant.  That analysis
 9   is done in a particular context, and the
10   particular context in this case depending
11   on whether you're looking at the preclass
12   period or the class period depends on what
13   you're trying to analyze.
14       Q.   So when you -- for example, on
15   January 4 it says there's no
16   company-specific news.
17           Did you make that determination
18   before or after you had determined which
19   days were statistically significant during
20   the preclass period?
21       A.   I'm trying to figure out the
22   best way to make it clear what we did.
23       Q.   Just tell the truth.
24       A.   Which is to pick a period of
25   days to analyze whether stock price
```

Page 168

```
 1                    D. R. Fischel
 2   movements over some period of days is --
 3   which days were statistically significant
 4   and which days were not.  And what
 5   appendix D does is look at every day
 6   during that period, whether the days were
 7   statistically significant or not
 8   statistically significant, and analyze
 9   what potentially relevant firm-specific
10   information was disclosed on those days
11   based on the search criteria that we used
12   that are described in my report.
13      Q.    I'm going to give you a chance
14   to give me a yes or no answer here.
15             At the time you determined
16   whether news was value-relevant material
17   news for each of these days during the
18   preclass period, had you already
19   determined which days were statistically
20   significant?
21      A.    It's just not an accurate
22   description of --
23      Q.    You don't want to say yes or no?
24   You don't want to tell the truth?
25             MR. ORSINI: Okay.  Objection.
```

```
                                           Page 169

 1                  D. R. Fischel

 2       Argumentative.

 3       Q.    I'm asking did you know when you

 4   determined which days had value-relevant

 5   news, did you or did you not know whether

 6   the stock price had had a statistically

 7   significant move that day.

 8       A.    The analysis with respect to

 9   publicly available news had nothing to do

10   whether stocks were -- whether movement of

11   stocks was statistically significant on

12   any particular day.  It was an analysis of

13   every day during a particular period.  You

14   don't know whether stock prices are

15   statistically significant until you

16   perform the statistical model, but you can

17   analyze whether information was publicly

18   disclosed on every day whether or not

19   stock price movements were statistically

20   significant, and that's exactly what we

21   did.

22       Q.    Do you deny having knowledge of

23   whether a day was statistically

24   significant or not at the time you made

25   the determination whether or not there was
```

Page 170

```
 1                    D. R. Fischel
 2    value-relevant news that day?
 3        A.    Yes, I deny that.  One thing has
 4    nothing to do with the other.  The
 5    existence of statistically significant
 6    price movements did not determine or
 7    affect what days we looked for publicly
 8    available news.
 9        Q.    You're not answering the
10    question.  You just avoided the question.
11            I didn't ask the question
12    whether it determined, I asked whether you
13    had knowledge of whether a day's stock
14    price movement was statistically
15    significant or not at the time you made
16    the determination that there was or there
17    was not value-relevant news, and you said
18    you're not answering the question.  And
19    it's quite obvious from your report that
20    you had knowledge of whether the stock
21    price move what is statistically
22    significant or not at the time you
23    determined whether there was
24    value-relevant news.  So you can either
25    own up to it or obfuscate.
```

```
                                        Page 171

 1                    D. R. Fischel

 2            So what would you prefer to do?

 3            MR. ORSINI: That's not a real

 4     question.

 5            Ask a question and he'll answer

 6     it.

 7     Q.    So who went through and

 8  determined whether there was

 9  value-relevant company-specific news in

10  appendix D?  Who did that?  Whose job was

11  that?

12            MR. ORSINI: We covered that this

13     morning.

14            THE WITNESS:  I think one or

15     more research assistants attempted to

16     find every single firm-specific

17     announcement or SEC announcement --

18     information contained in an SEC filing

19     that was publicly disclosed for every

20     stock on every day.

21     Q.    Did I ask find?  I didn't use

22  the word "find".  I said who determined

23  whether it was value-relevant.

24     A.    I just told you one or more

25  research assistants.
```

Page 172

1                    D. R. Fischel

2       Q.     So you didn't determine whether

3    news was value-relevant?

4       A.     There was no determination

5    whether the news was, in a fact,

6    value-relevant.  It was every disclosure

7    that identified a particular firm, that's

8    what's listed in appendix D.

9       Q.     So you're telling me appendix D

10   lists every news article about every firm?

11      A.     Every news article putting aside

12   repetitions of the same article other than

13   articles which attribute price movements

14   not to firm-specific announcements about

15   the firms but rather -- the lack of

16   firm-specific announcements but rather the

17   existence of artificial prices caused by a

18   perceived short squeeze or excessive

19   social media discussion about the effect

20   of the short position of institutional

21   investors in terms of opportunities for

22   retail investors.

23      Q.     Isn't it true that to do a

24   proper event study, one should select the

25   event or events to be studied before

```
                                          Page 173
 1                    D. R. Fischel
 2    determining whether or not there was a
 3    statistically significant stock price
 4    movement on the date of the events?
 5         A.    It's true that you have to
 6    select a period of time that you want to
 7    analyze, so that's true.  In other words,
 8    the event study doesn't analyze a random
 9    time.  There's a period of time that's
10    connected to the facts and circumstances
11    of what you want to analyze and you try
12    and conduct a regression analysis based on
13    a statistical model that's responsive to
14    the period that you want to analyze.
15         Q.    So if I wanted to do an event
16    study over a period of a year, I would
17    look at every trading -- I was first
18    statistically do an analysis and determine
19    which days were statistically significant
20    and then I would look at the news for each
21    day and determine whether there's
22    value-relevant news?
23         A.    That's completely wrong.
24         Q.    But isn't that what you did
25    here?
```

Page 174

```
 1                    D. R. Fischel
 2        A.    No.
 3        Q.    Didn't you do a regression
 4   analysis and determine which days were
 5   statistically significant for each day
 6   during this time frame for the preclass
 7   period?
 8        A.    Yes, but that's a product of the
 9   statistical analysis which is very
10   different from the description of it that
11   you had in your previous question.
12        Q.    So once you knew which days were
13   statistically significant, you then looked
14   to see if there was news that could be
15   considered value-relevant; is that
16   correct?
17             MR. ORSINI: Asked and answered.
18             THE WITNESS:  No, that's not
19        correct.  We looked for news on every
20        day, whether or not the result was
21        statistically significant.
22        Q.    So when you went to look for
23   news on every day to see if there was any
24   value-relevant news, you had already
25   determined which days were statistically
```

Page 175

                    D. R. Fischel

1    significant; correct?

2        A.    No, the two analyses that I'm

3    trying to describe to you are completely

4    separate.

5        Q.    Well, which happens first

6    chronologically?

7        A.    I think they happened

8    simultaneously, as they typically do.

9        Q.    Simultaneously?

10       A.    Yes, I think a statistical model

11   does not tell you anything about events.

12   So if you want to analyze events during a

13   particular period, that's a completely

14   different search than the process of

15   calculating a statistical analysis of

16   stock price movements.

17       Q.    Now, who is the person who

18   determined whether there was

19   value-relevant news on each day during the

20   preclass period?

21       A.    You know, as I've stated, the

22   analysis isn't attempting to filter which

23   days are value-relevant, it's attempting

24   to report all news articles that satisfy

Page 176

1                    D. R. Fischel

2    certain criteria for a certain search

3    based on particular sources and

4    information.

5        Q.    Let's start, page D1, your

6    report.

7        A.    Page D1 of my report.  Let me

8    just find it.

9              I have it.

10       Q.    The first row, January 4, 2021,

11   this shows whether there was the abnormal

12   return and the T statistic, and then it

13   shows company-specific news.

14             Who determined whether or not

15   there was company-specific news on

16   January 4, 2021?

17             MR. ORSINI: Asked and answered

18        about twenty times.

19             THE WITNESS:  As I've said

20        multiple times, there is standard

21        databases that we use and one or more

22        research assistants.

23       Q.    So a research assistant

24   determined whether or not there was

25   company-specific news on January 4, 2021?

Page 177

1                    D. R. Fischel

2        A.     Whether they could identify a --

3   not whether it's value specific news,

4   whether it's any news on that day that was

5   publicly announced based on the sources

6   that we looked at.

7        Q.     So does appendix D list all of

8   the company-specific news, every single

9   piece of company-specific news during the

10  preclass period?

11       A.     That is about developments in

12  the different stocks as opposed to

13  announcements about the stocks that talk

14  about the absence of any explanation for

15  price movements.  Those announcements are

16  also discussed but are not listed in

17  appendix D because appendix D is conducted

18  for a different purpose, and you can see

19  that there are some days with no

20  announcements, there's some days with

21  announcements, there are announcements are

22  days that are statistically significant,

23  as well as announcements on days that are

24  not statistically significant.  That's the

25  purpose of appendix D.

Page 178

1                    D. R. Fischel

2        Q.     And who determined whether or

3    not the news set forth in -- the

4    company-specific news was value-relevant

5    or not?

6        A.     As I said multiple times, the

7    purpose was not to determine whether the

8    information was, in fact, value-relevant.

9    I think the term that's used in the text

10   is potentially value-relevant, meaning

11   that it's a company-specific news

12   announcement which could or could not be

13   value-relevant depending on the nature of

14   the information and the stock price

15   reaction to the announcement of the

16   information.

17       Q.     So you're not the person who

18   determined whether or not the

19   company-specific news that was obtained

20   from Factiva was value-relevant or not

21   during the preclass period; is that

22   correct?

23            MR. ORSINI: That

24       mischaracterizes probably an hour of

25       testimony on the same question

Page 179

1                    D. R. Fischel

2       already.

3               If you have something to add, go

4       ahead.

5               THE WITNESS:  That's a

6       mischaracterization of the analysis

7       that was performed and the reasons why

8       it was performed.

9       Q.    So who is the person who

10   determined whether or not the news on any

11   specific day during the class period was

12   value-relevant?

13              MR. ORSINI: Literally asked and

14       answered at least a dozen times.

15              MR. ROSEN: He hasn't given me a

16       name.

17       Q.    Who's the name?  Give me the

18   name.  Tell us the name of the person who

19   did this.

20              MR. ORSINI: The "this", the

21       notion that there was a "this" is

22       mischaracterizing the testimony.

23       Q.    Who is the person that did

24   appendix D?

25       A.    The statistical analysis is one

Page 180

1                    D. R. Fischel
2    part of appendix D.  I've described the
3    model, how the model was created.  The
4    results of the model --
5        Q.    I'm just asking for a name.  I'm
6    just asking for a name.
7              Give me a name.
8        A.    The statistical analysis was
9    designed by me.
10       Q.    The --
11       A.    Excuse me, let me just finish.
12             As I stated earlier, the person
13   who actually did the analysis of pushing
14   the buttons on the computer to produce the
15   work product on the model that was
16   specified by me that's reported in
17   appendix D, I don't know the name of that
18   person.
19             Similarly, with respect to the
20   right side of appendix D, the
21   company-specific news, that was derived
22   from data sources that were identified by
23   one or more research assistants.  That's
24   the answer to your question.
25       Q.    But you don't know their names?

Page 181

```
                              D. R. Fischel
 1
 2        A.     Not as I sit here, no.
 3        Q.     And what did you do to ensure
 4   that the company-specific news listed in
 5   Exhibit D was properly listed there?
 6        A.     I looked at all the disclosures,
 7   every single one, and I made a
 8   determination that they fit the criteria
 9   that was established for appendix D, and
10   recognizing that the process of
11   downloading articles from standard
12   databases is a -- just a matter of
13   plugging into the databases to generate
14   the output on Exhibit D subject to my
15   review of every single article that's
16   referred to, that's the process that was
17   used.
18        Q.     So on page D1 of appendix D,
19   there are a number of rows that are empty
20   under company-specific news, particularly
21   January 4, 5, and seventh through
22   fifteenth shows no news.
23             Do you see that?
24        A.     Correct.
25        Q.     What did you do to ensure that
```

Page 182

1                D. R. Fischel

2    appendix D accurately -- was accurate in

3    not listing any company-specific news for

4    those days?

5        A.    I trusted our process so that

6    relatively, as I said, purely mechanical

7    process of downloading articles and having

8    results checked and rechecked.

9        Q.    So you had the research

10   assistants ensure that all the

11   company-specific news was listed in those

12   rows where there is nothing listed in

13   appendix D1?

14       A.    I think it's fair to say that I

15   relied on research assistants to download

16   the standard data sources that I referred

17   to, but there's also the relevant facts

18   and circumstances of the case.  If there

19   was any discussion in any of the

20   voluminous amounts of information that I

21   reviewed in the complaint, the court's

22   opinion, all the analyst reports of other

23   firm-specific, company-specific

24   information that I saw that wasn't listed

25   on appendix D, that would have been a red

Page 183

```
 1              D. R. Fischel
 2   flag at least to investigate further.  I'm
 3   not aware that there are any omissions in
 4   appendix D for the -- under the criteria
 5   that I specified.  If anybody points
 6   anything out that was left out, which is
 7   possible because human error is always
 8   possible, I would take that into account
 9   and add it to appendix D.  But I don't
10   think the qualitative conclusions from
11   appendix D in light of the facts and
12   circumstances described in my report would
13   be affected even if there were some --
14   even if there was some news on the days
15   that you mentioned, January 7 to
16   January 15, where none of those days was
17   statistically significant, whether or not
18   there was any company-specific news that
19   were disclosed on that -- that was
20   disclosed on that day that our research
21   assistants omitted if, in fact, they did
22   omit anything, which I'm not aware that
23   they did.
24      Q.    Now, paragraph thirty-six says,
25   "this review demonstrates that the vast
```

Page 184

```
1                    D. R. Fischel
2    majority of the price increases for all
3    nine affected stocks cannot be explained
4    by new value-relevant company-specific
5    information".
6            Did you write that?
7    A.     I'm sorry, I'm looking at --
8    Q.     Paragraph thirty-six.
9            MR. ORSINI: It's the penultimate
10           sentence in that paragraph.
11           THE WITNESS:  And there's a
12           footnote after that.
13           So I would say I did a lot of
14           writing in connection with this
15           report.  I don't remember if I wrote
16           this specific sentence as opposed to
17           wanting to highlight the importance of
18           this specific sentence as one of the
19           important conclusions of my analysis.
20    Q.     And paragraph thirty-seven says,
21    "thus, I find the affected stocks did not
22    trade in an efficient market during the
23    class period".
24           Is that because the vast
25    majority of the price increases for all
```

Page 185

```
 1                D. R. Fischel
 2   nine affected stocks during the preclass
 3   period cannot be explained by new
 4   value-relevant company-specific
 5   information?
 6       A.    Yes, in light of the relevant
 7   facts and circumstances in this case.  If
 8   you look at Exhibit 3 which is on the next
 9   page which is also part of paragraph
10   thirty-six, not the part that you asked me
11   to read but it's the introduction to the
12   paragraph that you're referring to, if you
13   look at January 27 and you look at the
14   price increases on that day -- not price
15   increases, I'm sorry, the increases in
16   returns on that day for AMC, 298.35
17   percent going across ranging from I guess
18   480.08 percent is the largest number and
19   11.95 percent is the lowest number with no
20   value-relevant information disclosed on
21   that day, I would say that's an
22   illustration of why this period of time
23   cannot be described as trading in an
24   efficient market combined with the other
25   facts and circumstances that I describe in
```

```
 1                  D. R. Fischel
 2   my report.
 3       Q.    And what proportion of stock
 4   price increases, in your opinion, must be
 5   explained by the existence of
 6   value-relevant news for a stock to trade
 7   in an efficient market?
 8       A.    I don't know if there's a
 9   particular dividing line.  I think it just
10   depends on the relevant facts and
11   circumstances.
12       Q.    Is there a range, a guidepost,
13   anything you can think of?
14       A.    Well, I can certainly think of
15   what I analyzed in this particular case
16   under the facts and circumstances of this
17   case, but it's function of the nature of
18   the price increases, the commentary about
19   the price increases, the lack of
20   company-specific value information
21   explaining those price increases, all the
22   commentary by companies and other market
23   participants about the lack of
24   relationship between value-relevant
25   information for particular companies and
```

the stock price -- increase in returns to holding particular securities during this period, the price targets, really all the different facts and circumstances and economic evidence that I discuss in my report.

Q. So in the IPO litigation, you testified that even though only eleven percent of the days with statistically significant stock price increases had value-relevant news, it was still efficient, but you don't think that same proportion would hold here, for some reason?

MR. ORSINI: Objection to form. Incomplete.

THE WITNESS: I'm not sure I would compare the circumstances in that case, to the extent I remember them, to the circumstances in this case. And again, I would -- even though I don't have a clear recollection of everything that I did and why I included it, I did notice in


```
                                    Page 188
 1                 D. R. Fischel
 2      what you referred me to that the court
 3      concluded that I demonstrated that
 4      there was a clear relationship between
 5      events, information disclosing events
 6      and stock price reactions to those
 7      events.
 8      Q.    Have you ever calculated damages
 9  for a Section 10b case under the Exchange
10  Act?
11      A.    I think I was a plaintiff's
12  expert in a jury trial that resulted in
13  the largest damage verdict in history in a
14  securities fraud trial, the Household
15  case, where the -- that verdict was
16  largely affirmed but not completely
17  affirmed on appeal and then the case
18  settled for billions of dollars, as I
19  recall.  So I was a damage witness, a loss
20  causation and damage witness in that case
21  and had an opinion on damages, although my
22  opinion was on inflation per share as
23  opposed to aggregate damages, which was
24  calculated later.  And I've done that
25  analysis many other times, but that was a
```

Page 189

1                    D. R. Fischel

2      particular example that sticks out in my

3      mind because it was contested litigation

4      that resulted in a jury trial and an

5      appeal and then a remand, and then

6      ultimately a settlement.

7                    I did something similar in the

8      Pfizer securities fraud case where I was

9      also a plaintiff's damages expert, I did

10     something similar in the IPO allocation

11     cases that you've pointed me to, as well

12     as a number of other cases that just

13     didn't result in testimony.  So the answer

14     to your question is yes, many times.  And

15     it's probably the case that there were

16     allegations under Section 10b -- that was

17     your specific question -- but I'd have to

18     check to make sure that that was the case.

19         Q.    And did you use the

20     out-of-pocket method of damages?

21         A.    Again, that's a legal concept.

22     In all those cases, I calculated inflation

23     per share.

24                    I've also conducted many

25     analyses -- under various assumptions

Page 190

                    D. R. Fischel

1    about what any given assumption about

2    inflation per share translates into

3    aggregate damages, which depends on, you

4    know, factors such as how many members of

5    the class are going to claim, whether

6    there are offsets of gains against losses,

7    and how to handle ins and outs, different

8    factors that can have an influence on

9    trying to translate inflation per share to

10   aggregate damages.

11        Q.    So you said that rather than

12   using the out-of-pocket measure of

13   damages, you simply calculated inflation

14   per share to arrive at damages in these

15   10b-5 cases you worked on; is that right?

16        A.    No, that's wrong, I did not say

17   that.

18        Q.    Well, what's the relationship

19   between inflation per share and the

20   out-of-pocket measure of damages?

21        A.    Again, that's a legal question,

22   and I'm not expressing any opinion on any

23   legal issue.

24        Q.    So how would one go about

Page 191

1              D. R. Fischel

2    calculating inflation per share or

3    deflation per share in our case here,

4    Robinhood?

5         A.    You would calculation inflation

6    per share if you felt there was inflation

7    per share with respect to allegations by

8    class members.  I don't think that issue

9    can be determined at this stage for any

10   particular class member. One would need to

11   know more facts and circumstances,

12   including whether there's any inflation

13   for any class member.  But in any event,

14   that determination for me at least at this

15   stage is premature.

16        Q.    Did you make any effort to

17   determine -- did you make any effort to

18   identify a method for determining the

19   deflation per share during the class

20   period?

21        A.    Again, if you mean deflation per

22   share meaning transaction prices away from

23   true value, that's the way I was using the

24   term "inflation" or "deflation" per share,

25   from my analysis so far I think it's the

```
 1                    D. R. Fischel
 2   reverse.  I think during the class period,
 3   because of all the factors that I
 4   mentioned earlier, prices got closer to
 5   the true value, not moved further away
 6   from true value, that the artificial
 7   prices -- the magnitude of the existence
 8   of artificial prices dissipated during the
 9   class period at least in part.  So at
10   least based on my analysis, so far I don't
11   think there was any artificial deflation
12   during the class period.  I think exactly
13   the reverse, that prices during the class
14   period moved closer to their true value as
15   demonstrated by the level of prices
16   immediately after the class period as I've
17   discussed earlier and also as I discussed
18   in my reports.
19        Q.    So you made no effort to
20   determine deflation per share during the
21   class period; is that correct?
22        A.     As I said, that determination is
23   really premature in terms of the analysis
24   that I've conducted, but based on what my
25   opinion is as of this time, I think price
```

Page 193

```
                              D. R. Fischel
 1
 2   movement during the class period as a
 3   result of all the different factors that I
 4   mentioned earlier dissipated the existence
 5   of artificial inflation that preceded the
 6   class period so that prices moved closer
 7   to their true value during the class
 8   period, which is the opposite of
 9   artificial deflation during the class
10   period.
11             And I said, one way to know
12   that, in addition to what happened in the
13   preclass period, is to ask the question of
14   what happened immediately after the
15   alleged wrongdoing stopped.  Did prices
16   rebound or the affected stocks did they
17   rebound to the January 27 level, and the
18   answer is the opposite.  For I think eight
19   of the nine stocks, they were lower in the
20   volume-adjusted price analysis that I did
21   in my report than they were even during
22   the class period, and that combined with
23   all the other economic evidence and the
24   relevant facts and circumstances that I
25   describe in my report is inconsistent with
```

Page 194

                    D. R. Fischel

1
2   deflation, it's removing artificial

3   inflation, moving prices closer to their

4   true value, to their correct level.

5        Q.    And it's true that you made no

6   effort to identify any methodology to

7   determine deflation per share in this

8   case; is that correct?

9        A.    No, that's incorrect.

10        Q.    What effort did you make to

11   identify the methodology for determining

12   deflation per share according to the

13   plaintiffs' allegations in this case?

14        A.    Well, recognizing that my

15   analysis was for the purpose of analyzing

16   whether individualized inquiry was

17   necessary for all the reasons that I

18   described as opposed to assuming that

19   there was integrity on the market price on

20   a class-wide basis or that there was an

21   efficient market in either the preclass

22   period or the class period, what my

23   analysis demonstrates both in terms of

24   stock price movements in the preclass

25   period and the preclass period as well as

```
 1              D. R. Fischel
 2   all the other economic evidence and facts
 3   and circumstances that I describe in my
 4   report, that the prices during the class
 5   period moved closer to their true value
 6   because the temporary price inflation that
 7   I described at length began to dissipate
 8   during the class period, which is the
 9   opposite of deflation per share if what
10   you mean by deflation per share is that
11   the difference between prices of sales and
12   true value increased during the class
13   period and, in my opinion, it decreased
14   during the class period as evidenced by
15   the price declines, the fact that the
16   price increase is caused by --
17       Q.    You're not answering the
18   question.  You're going on and on and on
19   and not answering the question.
20            MR. ORSINI: Yes, he is.
21            MR. ROSEN: We're going to have
22       to stay the whole seven hours if he
23       continues to do this.  I'm just
24       saying.
25            MR. ORSINI: If we're here seven
```

Page 196

D. R. Fischel

1    hours it's because you've spent five

2    hours asking the same question.

3         But continue, Professor.

4         THE WITNESS:  I was just going

5    to say the dissipation of the

6    artificial price increases during the

7    class period moved prices clear to

8    their true value for all the reasons

9    that I've just said, as well as all

10   the reasons discussed in my two

11   reports.

12   Q.    Now, if Plaintiffs win on

13   liability here and your theory that you

14   just expounded is not accepted by the jury

15   or the judge and it's determined that

16   Plaintiffs are entitled to damages for the

17   difference between the value of the stock

18   on January 27 and the sale prices, how

19   would you go about determining damages?

20   A.    I don't know.  If I make those

21   assumptions which, as you know, are

22   completely contrary to my own opinion and

23   if I were asked to try and apply a finding

24   by a jury or a court, I would have to know

```
                                      Page 197

 1                D. R. Fischel

 2    what the finding was and what it was based

 3    on and what the evidence was and perform

 4    the analysis at that time.

 5         Q.    So isn't it true that your

 6    opinion that damages are not capable of

 7    class-wide determination a function of

 8    having to prevail on your theory of

 9    whether there was artificial price

10    inflation prior to the class period?

11         A.    No, I don't think that's true.

12    First of all, I'm not the ultimate fact

13    finder, or the court, so I'm not going to

14    comment on what courts or jurors might

15    determine in the future.  That is

16    something that I'm not offering any

17    opinion on one way or the other.  I'm

18    offering opinions on what I believe based

19    on the analysis that's conducted in my

20    reports.  And I talk about multiple

21    reasons why, in my opinion, it's not

22    possible to calculate damages on a

23    class-wide basis using a common

24    methodology, not just the one that you

25    mentioned.
```

Page 198

```
                                    D. R. Fischel
 1
 2      Q.     Let's go to paragraph forty of
 3   your opening report.
 4            It says, "Plaintiffs have no way
 5   of disentangling the effects of
 6   confounding events".
 7      A.     That's right.
 8      Q.     Did you make any effort to
 9   disentangle the effects of confounding
10   events?
11      A.     No, I didn't, other than to
12   highlight there are a lot of confounding
13   events occurring at the same time.
14      Q.     But you made no effort to
15   identify potential methods to disentangle
16   the effects of confounding events?
17      A.     Other than to say I don't
18   believe there's anyway to do it that's
19   been demonstrated so far or that I can
20   think of.
21      Q.     What efforts did you make to
22   think of methods to disentangle the effect
23   of confounding events?
24      A.     I discussed this already.  There
25   are actions by multiple economic actors at
```

Page 199

1                    D. R. Fischel
2    the time.  There is going to be reversion
3    because the price increases were, by
4    definition, temporary, so that reversion
5    was going to occur sometime in any event,
6    typically in a very short period of time
7    subsequent to the end of the perceived
8    short squeeze.  All those different
9    factors were all occurring basically at
10   the same time, and I don't know -- I can't
11   think of anyway that it's possible to
12   isolate the incremental effect of each one
13   of those factors on the stock price
14   declines during the class period.
15        Q.    And is it your opinion that
16   because you can't think of any way to
17   disentangle the effects, no one else can?
18        A.    No, that's not my opinion.  My
19   opinion is that Dr. Werner has not
20   suggested any method for doing so and,
21   based on what I know now, I think it would
22   be extremely difficult if not impossible
23   to have a common method that could be used
24   to calculate damages on a class-wide
25   basis.

```
 1                 D. R. Fischel
 2       Q.    Are you offering any opinion as
 3   to whether or not a presumption of
 4   reliance is available under affiliated use
 5   in this case?
 6       A.    I think that's a question asking
 7   for a legal conclusion and I'm not
 8   offering any legal conclusions.
 9       Q.    Are you offering any opinion as
10   to any other presumption of reliance
11   should be made available to the class
12   members in this case?
13       A.    That's another legal opinion
14   that I'm not offering any opinion about
15   one way or the other.
16             MR. ROSEN: Let's take a break.
17             (Whereupon a break was taken)
18       Q.    Are you aware that the
19   Securities and Exchange Commission issued
20   a report about the -- I think they called
21   it the meme stock event?
22       A.    I am.
23       Q.    Did you read it?
24       A.    You know, I read parts of it.
25   I'm not sure I read the entire report.
```

```
 1                    D. R. Fischel
 2        Q.     Now, in your rebuttal report at
 3   table three, you just look at the price --
 4   prices of the various affected stocks as
 5   of February 5 and you determined that
 6   there are no damages based on the fact
 7   that the prices on February 5 were lower
 8   than the average prices during the class
 9   period; is that right?
10        A.     No, that's wrong.
11        Q.     Explain it to me.
12        A.     I don't have any opinion about
13   damages that I express in this particular
14   report.
15        Q.     So how would you characterize
16   the inference drawn from table three then?
17   It says that, "thus, immediately after the
18   trading restrictions were lifted, the
19   prices for eight of the nine affected
20   stocks did not bounce back to a higher
21   level as Plaintiffs' liability theory, if
22   it were true, would suggest".
23        A.     And there's a footnote
24   thirty-eight.
25        Q.     So this goes to loss causation
```

1                    D. R. Fischel

2    then, not damages; is that correct?

3        A.    In the context of this report,

4    it goes to whether there's a common method

5    that can be used to calculate damages.

6        Q.    So the fact that it didn't --

7    the stock prices didn't bounce back, how

8    does that relate to a common method to

9    calculate damages?

10       A.    Because what Dr. Werner stated

11   was the common method was to compare sale

12   prices during the class period to the

13   prices on January 27 because, in his

14   opinion, the proper method was to compare

15   trading prices at a loss with what the

16   price was on January 27, assuming that

17   that's the true value of the stocks.

18            Now, there's all kinds of things

19   wrong with that as I discuss in this

20   particular section, but one of the things

21   wrong with it is the assumption that

22   January 27 is the true value that damages

23   should be measured against by comparing

24   sale prices -- sale price declines

25   adjusted I think he says for market and

Page 203

```
 1                    D. R. Fischel
 2    industry movements to January 27 and for
 3    the reasons that I state, at least one of
 4    the reasons, there's no basis to assume
 5    that the true value is on January -- for
 6    these stocks is on January 27 and a lot of
 7    reasons to believe the opposite.
 8         Q.    So you chose to only look at
 9    prices on February 5, 2021 in table three;
10    is that correct?  You didn't go out any
11    further past February 5 to February 6 or
12    later; is that right?
13         A.    On this particular table, that's
14    right.
15         Q.    Now, why didn't you look further
16    than just one day?
17         A.    I could have, but the main
18    reason was the more days you look at, the
19    more other factors that can begin to
20    influence prices and the day when the
21    restrictions stop that are alleged to be
22    depressing prices, one test of that is to
23    look at whether the price after
24    restrictions stop bounces back to the
25    alleged true value price, which in Dr.
```

Page 204

1                  D. R. Fischel

2    Werner's analysis is January 27.  And

3    since what you find, as demonstrated by

4    table three but not just table three, it's

5    really the opposite that the price when

6    the restrictions stop is even lower than

7    -- speaking at a high level of generality

8    with respect to the nine stocks -- than

9    what the prices were during the class

10   period and that is, in my opinion, an

11   important piece of economic data that's

12   inconsistent with Dr. Werner's proposed

13   method of calculating damages using a

14   common method.

15       Q.    So for many of these stocks,

16   they ended up going back up subsequent to

17   February 5.

18            Did you know that?

19       A.    As I said, I didn't investigate

20   what happened after February 5 for the

21   reason that I stated.

22       Q.    In the IPO litigation, I believe

23   your opinion was that the stock price --

24   prices for those IPO stocks, the three

25   hundred nine stocks, the inflation caused

Page 205

```
 1                    D. R. Fischel
 2   by the manipulation continued for ten
 3   months after the misconduct at issue
 4   ceased.
 5              Why couldn't the deflation here
 6   by the manipulative conduct continue for
 7   some longer time period once the
 8   restrictions were lifted?
 9       A.    Well, first of all, for reasons
10   I've already stated, I don't accept the
11   premise.  Based on what I've seen so far
12   that there was deflation -- I actually
13   said in my previous answers that it's
14   quite possible that the dissipation of
15   artificial inflation that existed in the
16   preclass period could have continue beyond
17   February 5, so that's certainly a
18   possibility.  And the fact that prices
19   fluctuated after February 5 and prices for
20   some or most of the stocks went up, the
21   question is whether they went up to the
22   January 27 level or anything close to it
23   as a result of the cessation of the
24   restrictions and I don't believe that's
25   the case because there would be
```

```
 1                    D. R. Fischel
 2   disclosures to that effect if it was the
 3   case.
 4       Q.    So in paragraph thirty-nine of
 5   your opening report, if you please turn to
 6   that paragraph, there's an analysis of the
 7   trades from some of the named plaintiffs.
 8            Did you draft paragraph
 9   thirty-nine of the report?
10       A.    With respect to this particular
11   paragraph, I certainly didn't draft the
12   calculations that are reflected in this
13   particular paragraph.  I think the first
14   sentence and the last sentence about what
15   the data show, those were certainly
16   conclusions of mine.
17       Q.    Now, in paragraph thirty-nine,
18   it describes the named plaintiff Joseph
19   Gurney having purchased some AMC shares,
20   and it lists his average purchase price
21   and then the average sale price.  And it
22   says that -- well, I'll read it.  It says,
23   "for example, named plaintiff Joseph
24   Gurney purchased 21.27 AMC shares at an
25   average price of $5.64 on January 26-27,
```

```
                                    Page 207
 1                  D. R. Fischel
 2   2021 and sold the shares at an average
 3   price of $8.01 for a gain of $50.39, a
 4   forty-two percent return, on January 28,
 5   2021".
 6            So is that -- is your testimony
 7   that Mr. Gurney suffered no damages in the
 8   case because he sold at a gain of $50.39
 9   per share?  I'm sorry, an average --
10   because he made a gain of $50.39?  Is that
11   your opinion?
12       A.    As I said, I'm not offering any
13   opinion on damages.  My opinion in this
14   particular paragraph is that given -- as
15   the first sentence says, "given the
16   volatile and nonuniform movements of each
17   of the affected stocks during the class
18   period, even small changes in the timing
19   of trades could alter whether an
20   individual incurred a loss as a result of
21   a sale and therefore qualifies to be a
22   potential class member".  And if you look
23   at the last sentence in the paragraph it
24   says, "individualized inquiry would be
25   required to determine whether and how a
```

Page 208

```
 1                    D. R. Fischel
 2   potential class member would have changed
 3   their trading behavior and therefore
 4   whether or not they would have sustained a
 5   net gain or loss in the affected stocks in
 6   the but-for world".
 7             Those are two related by
 8   different points in support of my general
 9   opinion that Dr. Werner has not provided a
10   common methodology that could be used to
11   calculate damages during the class period
12   without in any way conceding on my part
13   that there were any damages.
14      Q.    So it's fair to say you're not
15   saying that Mr. Gurney or anyone else
16   didn't suffer damages based on these
17   calculations; is that correct?
18      A.    I'm not offering that specific
19   opinion, no.
20      Q.    Now, is it your opinion that the
21   plaintiffs have to prove what they would
22   have done, what transactions they would
23   have -- what sales they would have made
24   had there been no manipulation?
25      A.    Again, I'm not offering any
```

```
 1              D. R. Fischel
 2  legal opinions.  My only point is on that
 3  particular issue is that there's no way of
 4  knowing what would have occurred in the
 5  but-for world.  A calculation -- a common
 6  method of calculating damages has to have
 7  some comparison of what happened in the
 8  real world versus what would have happened
 9  in the absence of the alleged wrongdoing.
10  And the particular point that's made in
11  this particular section is there's no way
12  of knowing what would have occurred in the
13  but-for world in terms of whether class
14  members would have had bigger losses,
15  whether they would have gained, when they
16  would have sold, if they would have sold,
17  and that's all completely indeterminate.
18  So that's a point that I think is
19  important in this particular section.
20      Q.    And how does this case differ
21  from any other securities class action
22  where people might have acted differently
23  had there been no fraud?
24      A.    Well, I think it's different in
25  a lot of ways from the typical case where
```

```
 1                D. R. Fischel
 2   you know what -- based on a common
 3   methodology what the artificial inflation
 4   was on any particular day and you know
 5   what the true value was after a corrective
 6   disclosure or multiple corrective
 7   disclosures of the alleged misimpression
 8   created by the alleged false disclosure or
 9   material nondisclosure.
10        Q.    Well, I just want to focus on
11   that sentence in paragraph thirty-nine,
12   your sentence "counterfactually
13   speculating as to the timing of trades,
14   whether and when investors would have
15   traded in the but-for scenario in which
16   Robinhood did not put restrictions in
17   place requires individualized inquiries".
18             Why is it necessary to prove
19   what they would have done in this case had
20   there been no restrictions?  What
21   requirement is there?
22             MR. ORSINI: Well, I object to
23        the extent that that calls for a legal
24        conclusion.
25             MR. ROSEN: Well, he's made that
```

Page 211

```
                          D. R. Fischel
 1

 2      conclusion.

 3      Q.    Tell me why it's necessary to

 4   prove this.

 5              MR. ROSEN: He says that this is

 6        -- this required individual inquiry.

 7        I just want to know why it requires

 8        individual inquiry.  Is it a legal

 9        requirement, is it an economic

10        requirement?  Where does it stand for

11        and why.

12              THE WITNESS:  I think I've

13        answered that question.  I'm not

14        offering any legal conclusions.  I

15        think it's relevant on the question of

16        whether there's a common method that

17        can be used to calculate damages

18        during the class period, particularly

19        whether the opinion that Dr. Werner

20        has advanced on that issue is

21        credible, and in my opinion it's not

22        for multiple reasons, including this

23        one.

24        Q.    But you haven't answered my

25   question.
```

Page 212

1              D. R. Fischel

2           Why do they have to prove what

3    they would have done?  They sold.  We know

4    what they did.  Why do they have to prove

5    whether they would have sold or not sold

6    had there been no fraud?  They sold.  We

7    know what they did.  Why should they prove

8    something that they didn't do?  Can you

9    explain?

10          MR. ORSINI: Asked and answered.

11          THE WITNESS:  That's a

12      mischaracterization of what's in my

13      report and what I've said.  You know

14      what happens in the real world.  You

15      don't know what would have happened in

16      the but-for world in order to compare

17      the real world relative to the but-for

18      world.

19      Q.    Let's go back to the IPO

20    litigation where you testified for the

21    plaintiffs and you testified that there

22    was these tie-in agreements that caused

23    inflation and these plaintiffs purchased

24    stock at inflated prices because of this

25    manipulation.

Page 213

1                     D. R. Fischel
2              In that case, did the plaintiffs
3    have to prove what they would have done
4    whether they would have purchased or not
5    purchased?
6        A.    Yes, the calculation would
7    require a determination of the difference
8    between the purchase price that actually
9    occurred and what the purchase price would
10   have been based on an assumption of what
11   would have occurred had the alleged
12   wrongdoing not occurred.
13       Q.    But you don't mention sale price
14   here.  You say speculating as to the
15   timing of trades, whether and when
16   investors would have traded, not purchase
17   price, the timing.
18             Now, why did you have to show in
19   the IPO litigation exactly when they would
20   have would have purchased those shares at
21   the exact time that they did had there
22   been no fraud?
23       A.    Again, I don't want to comment
24   on the IPO litigation specifically in any
25   detail because it's somewhere between

Page 214

D. R. Fischel

1  fifteen and twenty years ago depending

2

3  upon which report you focus on.

4          But as a general matter,

5  inflation is usually calculated between

6  the difference between the actual

7  transaction price and what the transaction

8  price would have been in the absence of

9  any wrongdoing.

10     Q.     Isn't it true that you can't

11  think of a single case in the history of

12  all the work you've done, forty-plus years

13  where a plaintiff in a class action had to

14  prove whether and when they would have

15  traded in the but-for world?

16     A.     I think at least under the facts

17  and circumstances of this case, I'm saying

18  there's no way of knowing whether they

19  would have traded that all or if they

20  traded in the absence of the alleged

21  wrongdoing, whether they would have made

22  money or lost money, and I think that's a

23  relevant fact or a relevant criticism of

24  the opinion of Dr. Werner or more

25  generally whether there's particularly

```
 1                    D. R. Fischel
 2   combined with all the other reasons that
 3   are discussed in this particular section
 4   of my report, whether there's a -- it's
 5   possible to have a common method to
 6   calculate damages on a class-wide basis.
 7        Q.    Please identify one case, one
 8   case in the history of all the work you've
 9   done in which a plaintiff in a class
10   action had to prove whether and when they
11   would have traded in the but-for world.
12        A.    I didn't say a plaintiff would
13   have to prove it.  I just said there's no
14   way of knowing under the facts and
15   circumstances of this case given the usual
16   methodology of comparing an actual
17   transaction date with what the transaction
18   price would have been in the absence of
19   the alleged wrongdoing.  In this
20   particular case, that is an additional
21   factor, particularly in combination with
22   the other facts and circumstances that I
23   describe in this particular section that
24   there's no evidence that investors would
25   have sold -- for example, all investors
```

```
 1              D. R. Fischel
 2  would have sold on January 27 at the high
 3  price so they would have realized that
 4  value, no evidence that that's a true
 5  value.  All the evidence is to the
 6  contrary.
 7      Q.    So you're unable to identify a
 8  single case, and you acknowledge that the
 9  plaintiff class in this case have no
10  obligation to prove that they would have
11  traded in the but-for world, the date they
12  would have traded, and whether or not they
13  would have traded had there been no fraud;
14  is that correct?
15            MR. ORSINI: Completely
16      mischaracterizes his testimony.
17            THE WITNESS:  When you ask
18      whether I have an opinion as to what
19      Plaintiffs would have to prove, what
20      they would have an obligation to
21      prove, I'm not offering an opinion on
22      that one way or another.
23      Q.    So if they don't have to prove
24  whether or not they would have traded on a
25  specific day had there been no fraud, why
```

Page 217

```
 1                    D. R. Fischel
 2    is it relevant?
 3               MR. ORSINI: Asked and answered.
 4        Q.     If it has nothing to do with any
 5    element of proof when they would have
 6    traded, why do they have to prove it?  If
 7    they don't have to prove it, why is it
 8    even relevant?
 9               MR. ORSINI: That's an impossibly
10         vague question.
11               THE WITNESS:  And also a
12         mischaracterization of what I've said.
13               Relevance is going to be
14         determined by a court, presumably, not
15         by me.  It's relevant to my opinion on
16         whether or not there is a common
17         method that could be used to calculate
18         damages on a class-wide basis,
19         particularly when what you were just
20         asking me about is considered in
21         combination with the other factors
22         that are discussed in this particular
23         section.  Whether a judge ultimately
24         determines that's legally relevant or
25         not relevant is not something I'm
```

Page 218

1              D. R. Fischel

2       expressing an opinion about one way or

3       the other.

4       Q.    So much of this paragraph

5    thirty-nine is not even relevant to the

6    case; right?  Is that what you're

7    acknowledging?

8       A.    No, that's not what I'm

9    acknowledging.

10      Q.    So the last sentence of

11   paragraph thirty-nine is, "individualized

12   inquiry would be required to determine

13   whether and how a potential class member

14   would have changed their trading behavior

15   and therefore whether they would have

16   sustained a net gain or loss in the

17   affected stocks in the but-for world".

18            What's the basis for that

19   statement?

20      A.    Everything that precedes it in

21   the paragraph combined with the rest of

22   the discussion in this particular section.

23      Q.    So where does this requirement

24   stem from?  Is it a legal requirement, an

25   economic requirement?  What is it?

```
 1                    D. R. Fischel
 2        A.    It's part of my criticism of
 3    whether or not there's a common method to
 4    calculate damages on a class-wide basis.
 5        Q.    I understand it's a criticism.
 6              But is there any basis in the
 7    case law where there is a requirement for
 8    individualized inquiry as to whether and
 9    how a potential class member would have
10    changed their trading behavior?
11              MR. ORSINI: I'm pretty sure that
12         calls for a legal conclusion.
13              MR. ROSEN: Well, he's making one
14         here and I'm trying to understand what
15         the basis for it is.
16              MR. ORSINI: He's not making a
17         legal conclusion.  He's already
18         testified multiple times.
19        Q.    So other than it's your
20    criticism, do you have any basis for why
21    it's a requirement here?
22        A.    I don't understand the question.
23        Q.    Well, you say it's a criticism,
24    but where does this requirement stem from?
25    Just articulate the basis for this
```

Page 220

1                    D. R. Fischel

2    requirement.  Thin air?  What is it?

3        A.    The reason why it's a criticism

4    is described in my report and I've tried

5    to explain to you in my answers which part

6    of my opinion about why it's impossible to

7    calculate damages using a common

8    methodology during this class period at

9    least in comparison with the opinion that

10   Dr. Werner has expressed.

11       Q.    Can you think of a single other

12   case that supports -- that you've worked

13   on that supports this claim that you make,

14   this so-called requirement in paragraph

15   thirty-nine?

16       A.    I don't know how to answer that

17   except by repeating --

18       Q.    Just tell me the case.  Tell me

19   the case, whatever it is.

20       A.    The opinion isn't based on case

21   research, it's based on my analysis --

22       Q.    Well, some history, is there

23   another securities class action that you

24   can point to that had the same

25   requirement?

1                D. R. Fischel

2      A.    You know, I don't know of

3  another case where the maximum artificial

4  price is assumed to be the true value

5  under some assumption that everybody would

6  have sold on that price so therefore the

7  difference between that price and the

8  prices where prices are moving away from

9  the artificial price is the assumed common

10  method for calculating damages without any

11  showing of how behavior would have been

12  different in a but-for world.

13      Q.    So I'll give you thirty seconds

14  to identify a single case that supports

15  this requirement that you're identifying

16  in paragraph thirty-nine.  I'll give you

17  thirty seconds and tell me what you have.

18            MR. ORSINI: He's answered the

19      question multiple times.  If you want

20      to waste thirty seconds, that's your

21      prerogative.

22            MR. ROSEN: Thank you for your

23      time, Mr. Fischel.

24            THE WITNESS:  Thank you.

25            (CONTINUED ON NEXT PAGE)

Page 222

1                    D. R. Fischel

2              MR. ORSINI: I have no questions.

3              (TIME NOTED:  5:51 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 223

1    IN RE JANUARY 2021 SHORT SQUEEZE

     TRADING LITIGATION

2    4/12/2023 - DANIEL R. FISCHEL

3           ACKNOWLEDGEMENT OF DEPONENT

4     I, DANIEL R. FISCHEL, do hereby declare

5    that I have read the foregoing transcript,

6    I have made any corrections, additions, or

7    changes I deemed necessary as noted on the

8    Errata to be appended hereto, and that the

9    same is a true, correct and complete

10   transcript of the testimony given by me.

11

12   _____    _____

13   DANIEL R. FISCHEL              Date

14   *If notary is required

15

16        SUBSCRIBED AND SWORN TO BEFORE ME THIS

17        _____ DAY OF _____, 20___.

18

19

20        _____

21        NOTARY PUBLIC

22

23

24

25

Page 224

1

2                          *      *      *

3

4                        I N D E X

5    WITNESS            EXAMINED BY            PAGE

6    D. R. Fischel   Mr. Rosen                 3

7

8                       E X H I B I T S

9    FOR I.D.     DESCRIPTION                  PAGE

10   Exhibit 113 Document entitled

11               Report of Daniel R.

12               Fischel                       7

13   Exhibit 114 Document entitled

14               Rebuttal Report of

15               Daniel R. Fischel            53

16   Exhibit 115 Seeking Alpha article

17               dated February 1, 2021       88

18   Exhibit 116 Document entitled

19               In re Initial Public

20               Offering Securities

21               Litigation                  122

22   Exhibit 117 Journal of Finance

23               article                     131

24

25

Page 225

1

2                    I N D E X (continued)

3                  E X H I B I T S (continued)

4     FOR I.D.     DESCRIPTION                    PAGE

5     Exhibit 118 Document entitled

6                 In re: Initial Public

7                 Offering Sec.                   138

8

9

10                    *      *      *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 226

1

2              CERTIFICATION BY REPORTER

3

4        I, Wayne Hock, a Notary Public of the

5    State of New York, do hereby certify:

6        That the testimony in the within

7    proceeding was held before me at the

8    aforesaid time and place;

9        That said witness was duly sworn

10   before the commencement of the testimony,

11   and that the testimony was taken

12   stenographically by me, then transcribed

13   under my supervision, and that the within

14   transcript is a true record of the

15   testimony of said witness.

16       I further certify that I am not

17   related to any of the parties to this

18   action by blood or marriage, that I am not

19   interested directly or indirectly in the

20   matter in controversy, nor am I in the

21   employ of any of the counsel.

22       IN WITNESS WHEREOF, I have hereunto

23   set my hand this 13th day of April, 2023.

24                  

25                  Wayne Hock

Page 227

1    IN RE JANUARY 2021 SHORT SQUEEZE

     TRADING LITIGATION

2    4/12/2023 - DANIEL R. FISCHEL

3             E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   DANIEL R. FISCHEL                Date

25

***ERRATA SHEET***

NAME OF CASE:  <u>In re January 2021 Short Squeeze Trading Litigation</u>
No. 21-MDL-2989 (S.D. Fla.)
DATE OF DEPOSITION:  04/12/2023
NAME OF DEPONENT:  Daniel R. Fischel

I have read the transcript of my deposition taken on April 12, 2023.  The contents thereof are an accurate transcription of the deposition, subject to the following corrections or changes:

| Page | Line(s) | Original | Correction | Reason |
|------|---------|----------|------------|--------|
| 4 | 9 | sort at | sort of at | Transcription Error |
| 30 | 5 | you | me | Transcription Error |
| 32 | 23 | clarified | clarify | Transcription Error |
| 52 | 14-15 | article Fischel | artificial | Transcription Error |
| 115 | 14 | press | express | Transcription Error |
| 124 | 21 | career | clear | Transcription Error |
| 136 | 8 | act factor | factor | Transcription Error |
| 141 | 12 | alleged | allegation | Transcription Error |
| 148 | 9 | consent | constant | Transcription Error |
| 153 | 19 | again suggesting | again not suggesting | Transcription Error |
| 191 | 5 | calculation | calculate | Transcription Error |
| 196 | 8 | clear | closer | Transcription Error |
| 208 | 7 | by | but | Transcription Error |
|  |  |  |  |  |
|  |  |  |  |  |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_Daniel R. Fischel_

Daniel R. Fischel

CONFIDENTIAL