# EXHIBIT C

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 21-2989-MDL-ALTONAGA/Damian

| | |
|---|---|
| In re: JANUARY 2021 SHORT SQUEEZE TRADING LITIGATION | CLASS ACTION<br><br>**NOTICE OF DEPOSITION OF ROBINHOOD MARKETS, INC., ROBINHOOD FINANCIAL, INC., AND ROBINHOOD SECURITIES, LLC** |

TO:    ALL PARTIES AND THEIR ATTORNEYS OF RECORD

PLEASE TAKE NOTICE that, pursuant to Rules 30(b)(6) of the Federal Rules of Civil Procedure, Lead Plaintiff Blue Laine-Beveridge, named Plaintiffs Abraham Huacuja, Ava Bernard, Brendan Clarke, Brian Harbison, Cecilia Rivas, Doi Nguyen, Joseph Gurney, Marcel Poirier, Sandy Ng, Santiago Gil Bohórquez, and Thomas Cash   (collectively "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, will take the deposition upon oral examination of the designated representative or representatives of Robinhood Markets, Inc., Robinhood Financial, Inc., and Robinhood Securities, LLC (collectively "Robinhood"). Such deposition will take place on June 6, 2023, commencing at 9:00 a.m., at the offices of The Rosen Law Firm, P.A., 275 Madison Avenue, 40th Floor, New York, NY 10016, or at such other time and place as the parties mutually agree. Such deposition will be recorded stenographically and videotaped by a qualified videographer, and shall continue from day to day until completed.

Pursuant to Federal Rules of Civil Procedure 30(b)(6), Robinhood is requested to designate one or more officers, directors, managing agents, or other persons who consent to

testify on behalf all three defendant corporate matters, as to the matters set forth in Schedule A. If any of the defendants do not believe that one or more representatives can testify on behalf of all three corporate entities in response to this deposition notice then please so state and we shall have three separate deposition dates, one for each entity, for the topics in Schedule A.

DATED: May 5, 2023

**THE ROSEN LAW FIRM, P.A.**

*/s/ Laurence M. Rosen*
Laurence M. Rosen, FBN# 0182877
Phillip Kim
Robin Bronzaft Howald
Michael A. Cohen
Jon Stern
Brent J. LaPointe
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: lrosen@rosenlegal.com
       pkim@rosenlegal.com
       rhowald@rosenlegal.com
       mcohen@rosenlegal.com
       jstern@rosenlegal.com
       blapointe@rosenlegal.com

*Lead Counsel for Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2023, a true and correct copy of the foregoing document was served to counsel for each Robinhood defendant by email.

*/s/ Laurence M. Rosen*

## <u>SCHEDULE A</u>

**I.    DEFINITIONS**

1.    The "Action" refers to all tranches of *In re January 2021 Short Squeeze Trading Litigation,* Case No. 21-2989-MDL (Altonaga/Damian).

2.    The "Affected Stocks" refers to common stock in AMC Entertainment Holdings, Inc. ("AMC"), Bed Bath & Beyond Inc. ("BBBY"), BlackBerry Ltd. ("BB"), Express Inc. ("EXPR"), GameStop Corp. ("GME"), Koss Corp. ("KOSS"), Tootsie Roll Industries Inc. ("TR"), or American Depositary Shares of foreign-issuers Nokia Corp. ("NOK") and trivago N.V. ("TRVG"), individually and collectively.

3.    "Alleged Omissions and Half-Truths" means the statements that Robinhood made omitting to disclose that it had a liquidity problem, that it would have allowed trading to continue were it adequately capitalized, and that Robinhood knew the prices of the Affected Stocks would decline as a result of its actions, as identified in Paragraphs 62 and 63, inclusive, of the Complaint.

4.    "Complaint" means the Amended Consolidated Class Action Complaint, filed January 17, 2023 (Docket No. 527), in the above-captioned action.

5.    "Communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

6.    "Concern" or "concerning" means relating to, referring to, describing, evidencing, or constituting.

7.    "Digital Communications" means Communications (whether by text, image, audio, video, or otherwise) through or via any collaboration application or platform, social media

platform or service, chat client, or electronic messaging medium, including but not limited Email and Instant Messages as defined herein.

8.      "Document" or "Documents" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Fed. R. Civ. P. 34(a)(1)(A). A draft or non-identical copy is a separate Document within the meaning of this term. The terms "Document" and "Documents" specifically include, but are not limited to, Communications, Digital Communications, and Electronically-Stored Information ("ESI"), as each is defined herein.

9.      "DTCC" means the Depository Trust & Clearing Corporation, together with its subsidiaries, affiliates, officers, employees, agents, and anyone acting or purporting to act on its behalf.

10.      "Electronically Stored Information" ("ESI") as used herein has the same meaning as in the Federal Rules of Civil Procedure and other applicable law, including Rules 26 and 34(a) of the Federal Rules of Civil Procedure. Examples of ESI include:

   a.  Digital Communications (e.g., e-mail, voice mail, and Instant Messages, as defined herein);

   b.  E-mail server stores (e.g., Microsoft Exchange .edb);

   c.  Word-processed documents (e.g., Word files and drafts thereof);

   d.  Spreadsheets and tables (e.g., Excel worksheets);

   e.  Accounting application data (e.g. Quickbooks);

   f.  Image and facsimile files (e.g., .PDF, .TIFF, .JPG, .GIF);

   g.  Sound recordings (e.g., .WAV and .MP3);

   h.  Video and animation files(e.g., .AVI and .MOV);

      i.   Databases (e.g., Access, Oracle, SAP, SQL data);

      j.   Contact and relationship management data (e.g., Outlook contacts);

      k.   Calendar and diary application data (e.g., Outlook calendar entries, blog entries);

      l.   Presentations (e.g., PowerPoint);

      m.  Network access and server activity logs;

      n.   Project management application data;

      o.   Computer aided design/drawing files; and

      p.   Cloud-based or other virtualized ESI, including applications, infrastructure, and data.

11.    "Email" means electronic messages sent or received via web/HTML interface or through messaging applications or clients, whether on personal computing devices, smartphones, tablets, or any other similar device, including but not limited to Google (Android) Mail, GMail, Microsoft Outlook, Mozilla Thunderbird, and/or Apple Mail.

12.    "Employee" means, without limitation, current and former officers, directors, executives, managers, supervisors, department heads, employees, secretaries, clerical staff, messengers, agents, attorneys, representatives, or any Person acting or authorized to act on behalf of an entity.

13.    "Financial Statements" means, without limitation, any interim, final, actual, projected, complete, or partial, annual, quarterly, monthly, weekly, or otherwise, audited or unaudited, budgets, budget plans, balance sheets, schedules of direct costs, schedules of miscellaneous income, schedules of general services, fiscal serviceman administrative services, statements of earnings and earnings per share, income statements, cash flow statements,

statements of revenues and statements of expenses, all notes or other commentary concerning any of the foregoing, and all underlying work papers and all drafts used in connection with the preparation of any of the foregoing.

14.     "FINRA" means the Financial Industry Regulatory Authority, together with its subsidiaries, affiliates, officers, employees, agents, and anyone acting or purporting to act on its behalf.

15.     "HFSC Report" refers to "Game Stopped: How the Meme Stock Market Event Exposed Troubling Business Practices, Inadequate Risk Management, and the Need for Regulatory and Legislative Reform," a report issued by the Majority Staff of the U.S. House of Representatives Financial Services Committee in June 2022.

16.     "Identify" when used to refer to a Document, shall mean: (i) the date of each Document; (ii) the type of each such Document (*i.e.* correspondence, memorandum, business record, etc.); (iii) the identity of the author(s) or preparer(s) of each such Document; and (iv) the present location of each such Document or copies thereof.

17.     "Identify" when used to refer to a natural person, shall mean to set forth that person's: (i) full name and title, if any; (ii) present or last known address; (iii) present or last known business and home telephone number(s); and (iv) present or last known employer.

18.     "Instant Messages" means real-time communications, including but not limited to ephemeral communications, sent text message (e.g. SMS/MMS), or via chat application, platform, or client, or any similar standard, including but not limited to Bloomberg Chat, Slack, Google Talk, Google Chat, Google Hangouts, Apple iMessage, WhatsApp, WeChat, QQ, Viber, Facebook Messenger, Microsoft Teams, Skype, Zoom, Discord, Snapchat, Signal, Line, Telegram, AOL Instant Messenger, Huawei Cloud, Blackberry Messenger, ICQ, Pidgin,

Audium, Trillian, or any proprietary Instant Messaging system

19.     "IPO" refers to the Company's Initial Public Offering of approximately 52.4 million shares of Company common stock priced at $38 per share, which closed on or around July 29, 2021, raising nearly $2 billion.

20.     "Later-Restricted Stocks" means the fifty stocks set forth in the table in Paragraph 87 of the Complaint, indicating that the stock was subject to a restriction on January 29, 2021.

21.     "Meme Stock Market Event" refers to the name used by the U.S. House of Representatives Financial Services Committee to describe the facts and circumstances which gave rise to, *inter alia*, the instant action.

22.     "Meeting" means the contemporaneous presence, whether in person or through any means of communication, of any natural persons, whether or not such presence was by chance or prearranged and whether or not the meeting was formal, informal or occurred in connection with some other activity.

23.     "NSCC" means the National Securities Clearing Corporation, together with its subsidiaries, affiliates, officers, employees, agents, and anyone acting or purporting to act on its behalf.

24.     "Person" means any natural person, proprietorship, corporation, partnership, trust, joint venture, group, association, organization, and governmental agency and other agency. With respect to a business entity, the term "Person" includes any natural Person acting formally or informally as a director, trustee, officer, agent, attorney, or other representative of the business entity.

25.     "OCC" means the Options Clearing Corporation, together with its subsidiaries, affiliates, officers, employees, agents, and anyone acting or purporting to act on its behalf.

26.     "Prospectus" refers to the Prospectus for the IPO, originally filed with the SEC on Form S-1 on or about July 1, 2021, as amended, with the second and final amendment on SEC Form S-1/A filed on or about July 27, 2021.

27.     "Regard," "regarding," "refer," "referring," "relate," relating," "pertain," or "pertaining" means all Documents that comprise, explicitly or implicitly refer to, were reviewed in conjunction with or were created, generated or maintained as a result of the subject matter of the Request, including, without limitation, all Documents that reflect, record, memorialize, embody, discuss, evaluate, consider, review or report on the subject matter of the Request.

28.     "Registration Statement" refers to the SEC Form DRS originally filed by Robinhood on or about March 1, 2020, as amended, with the third and final amendment on SEC Form DRS/A dated June 15, 2021, which was declared effective by the SEC on or about July 29, 2021. The Prospectus (as defined herein) also forms part of the Registration Statement.

29.     "Restrictions" include all measures Robinhood implemented during the "Restriction Period" changing the margin requirements for the Affected Stocks and/or the Later Restricted Stocks, restricting the purchase of the Affected Stocks and/or Later Restricted Stocks, or forcing the sale of the Affected Stocks and/or Later Restricted Stocks and/or put or call options in the Affected Stocks and/or Later Restricted Stocks.

30.     "Restriction Period" means the period between the first imposition of any form of restriction, to wit, closing call option positions prior to their expiry, position closing only, purchase limits (including of fractional shares), and total holdings limits, and the lifting of all such limits during the Relevant Period.

31.     "Relevant Period" is defined as January 12, 2021 through February 12, 2021, unless otherwise stated.

32.     "Underwriters" refers to Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, Barclays Capital Inc., Citigroup Global Markets, Inc., Wells Fargo Securities, LLC, Mizuho Securities USA LLC, JMP Securities LLC, KeyBanc Capital Markets, Inc., Piper Sandler & Co., Rosenblatt Securities, Inc., BMO Capital Markets Corp., BTIG, LLC, Santander Investment Securities, Inc., Academy Securities, Inc., Loop Capital Markets, LLC., Samuel A Ramirez & Company, Inc., and Siebert Williams Shank & Co., LLC, individually and collectively.

33.     "Robinhood" and the "Company" means Robinhood Markets, Inc. Robinhood Financial, LLC and Robinhood Securities, LLC,  individually and collectively, together with all of their respective present and former officers, directors, committees, employees, partners, corporate parents, predecessors, successors, direct and indirect subsidiaries, affiliates, divisions, branch offices, agents, representatives, and all other Persons acting, or purporting to act, on behalf of any of the foregoing.

34.     "You" or "Your" means Robinhood.

## TOPICS FOR ROBINHOOD 30(b)(6) DEPOSITION

1. The communications media, devices, platforms, and applications used by Robinhood's employees for work-related communications.

2. The hardware devices used by Robinhood's employees to perform their work-related functions.

3. Robinhood's policies and procedures related to the use of personal communications devices, personal email, personal computing devices or any non-Robinhood maintained device work related communications or any work-related functions, including but not limited to the location and identification of all Documents related to this topic.

4. Robinhood's record retention policies and practices, including but not limited to:

    a. The location, format, accessibility, architecture, and quantity of Robinhood's electronically stored information, including all personal computing devices (including phones and tablets), network servers, cloud servers, instant messaging, enterprise servers, and email servers;

    b. Robinhood's litigation hold, if any, concerning Documents relevant to this litigation; specifically, when such a hold was instituted, to whom, and how such a hold is being monitored for compliance.

5. Document production: Robinhood's production of Documents in this litigation, including but not limited to the manner in which Documents responsive to Plaintiffs' Requests For Production of Documents, were searched for, identified, and retrieved, and the databases, hardware, and devices searched.

6. Custodians whose files were searched in connection with Robinhood's production of Documents in this litigation, including but not limited to, the location and identification of all documents related to this topic.

7. Robinhood's public statements concerning the Meme Stock Market Event, including but not limited to, the location and identification of all Documents related to this topic.

8. Robinhood's public statements about the Restrictions it imposed on trading in the Affected Stocks, including but not limited to, the location and identification of all Documents related to this topic.

9. Robinhood's statements to its customers about the Restrictions it imposed on trading or lifted on the Affected Stocks, including but not limited to, the location and identification of all Documents related to this topic.

10. The trading Restrictions Robinhood imposed during the Meme Stock Market Event. In particular:

(a) The nature and extent of each of the Restrictions.

(b) The precise time each Restriction was announced, imposed and lifted.

(c) The details of the processes by which Robinhood's decision to impose (and lift) each of the Restrictions was discussed, evaluated, approved, implemented, and publicized, including the identities, by job title and specific roles and responsibilities, of any persons involved in such decisions.

(d) The reasons Robinhood imposed and lifted each of the trading Restrictions at the various times during the Restrictions Period.

(e) The basis for how Robinhood selected the stocks on which to impose and lift Restrictions during the two weeks prior to, and during, the Restrictions Period, including but not limited to each factor Robinhood considered in determining whether or not to impose or lift Restrictions and the sources of information from which those factors were evaluated and determined.

(f) Robinhood's consideration of its customers' reactions to the imposition and lifting of the Restrictions.

(g) Robinhood's consideration of the possibility that purchasing demand for the Affected Stocks or Later Affected Stocks might decline when Robinhood imposed the Restrictions

(h) Robinhood's consideration of the possibility that selling pressure for the Affected Stocks or Later Affected Stocks might increase when Robinhood imposed the Restrictions;

(i)   Robinhood's consideration of the possibility that the prices of the Affected Stocks or Later Affected Stocks might decline when Robinhood imposed the Restrictions

(j)   Robinhood's consideration and discussion of the impact a decline in the prices of the Affected Stocks or Later Affected Stocks would have on its customers, the market as a whole, market participants with positions in the Later Affected Stocks, Robinhood itself and its business relationships, including the Identity of any participants in any such discussions.

(k)   The names, titles, functions, and roles of all persons responsible for and/or participating in the decisions to implement or lift any such Restrictions.

(l)   The location and identification of all Documents related to this topic.

11. Why Robinhood maintained position limits on several of the Affected Stocks as late as the market close on February 4, 2021, given that "Robinhood's collateral deposit requirements were within manageable levels by January 29, 2021, and the company had raised the capital that its models suggested was sufficient to handle shock scenarios by the end of the day on February 2, 2021," as referenced in the HFSC Report at 75, including but not limited to, the location and identification of all Documents related to this topic.

12. All bases for the comment (*see* RHMDL00077158) that Robinhood's customers represented more than 10% of the market for the Affected Stocks just prior to and/or during the Restrictions Period including but not limited to, the location and identification of all Documents related to this topic.

13. The existence and nature of any testimony or interviews with Robinhood employees regarding the Meme Stock Market Event, including but not limited to, the location and

identification of all Documents related to this topic.

14. The daily amount of PFOF earned by Robinhood from each of its six market makers on each of the Later Restricted Stocks during the Relevant Period, including any communications about this subject that occurred during the Relevant Period, including but not limited to the location and identification of all Documents related to this topic.

15. How Robinhood's PFOF from Citadel and other market makers was calculated during the Relevant Period, any changes, adjustments to the fees paid by Citadel or other brokers for PFOF, how and why the formulas for PFOF changed over that time period, and any contracts pursuant to which they were paid, including but not limited to, the location and identification of all Documents related to this topic.

16. The project or proposal that Robinhood discussed with Citadel beginning on or around January 20, 2021, as referenced in ¶¶ 226-32 of the Antitrust Complaint (Dkt. No 451), including but not limited to, the location and identification of all Documents related to this topic.

17. All Robinhood's communications with Citadel on January 27, 2021, including but not limited to those referenced in the HFSC Report at 47-51, *e.g.*, the 8 p.m. call between Robinhood and Citadel referenced in the HFSC Report at 50-51, and including but not limited to, the location and identification of all Documents related to this topic.

18. The importance to Robinhood's financial performance, liquidity and financial condition of PFOF during the Relevant Period, including the percentage of its revenues that PFOF and in particular PFOF from Citadel had to its financial performance, liquidity and financial condition.

19. Robinhood's liquidity position and financial condition during the Relevant Period, as it

related to its ability to meet its collateral and deposit requirements with all of its regulators during that time period, including but not limited to, the location and identification of all Documents related to this topic.

20. Robinhood's communications with the NSCC and DTCC during the Meme Stock Market Event, including but not limited to, the location and identification of all such communications and all Documents memorializing both any part of the interactions with the NSCC and DTCC, as well as Robinhood's strategy in its dealings with the NSCC and DTCC, and Documents gathered in response to requests by the NSCC and DTCC.

21. Robinhood's ability or inability to meet the collateral and deposit requirements of the NSCC/DTCC during the Meme Stock Market Event, including the necessity of a capital infusion to meet such requirements, and including but not limited to, the location and identification of all Documents related to this topic, *e.g.,* cash or liquidity projections, bank records, financial statements, fundraising efforts, and responses to requests made by the NSCC and DTCC.

22. The bases for CEO Vlad Tenev's statement that Robinhood would have continued to allow unrestricted trading in the Later Affected Stocks during the Restrictions Period had Robinhood been more adequately capitalized as stated by CEO Tenev to Mark Portnoy and others.

23. The reasons why Robinhood did not disclose to the market during the Restrictions period the complete detailed set of reasons for imposing, lifting and reimposing Restrictions, including that it did not have adequate capitalization or liquidity to meet the collateral and deposit requirements of the NSCC/DTCC on January 28, 2021, and that had it not maintained the Restrictions during the Restrictions Period it might not have had adequate

capitalization or liquidity to meet the collateral and deposit requirements of the NSCC/DTCC during the entirety of the Restrictions Period.

24. The reasons why Robinhood did not announce publicly (i) the date when Robinhood intended to fully remove the Restrictions, and (ii) the contingencies affecting when it would fully remove the Restrictions.

25. Robinhood's belief as to whether the Alleged Omissions and Half-Truths were in fact disclosed and if so the basis for any such belief.

26. Robinhood's belief as to whether the Alleged Omissions and Half-Truths during the Restrictions Period: (1) caused or contributed to decreased demand for the purchase of the Affected Stocks, (3) caused or contributed to decreased demand for the Affected Stocks, which in turn caused a decrease in the share prices of the Affected Stock, (4) caused or contributed to a sell-off for the Affected Stocks that detrimentally affected the prices of the Affected Stocks or (3) caused or contributed to damages to Robinhood customers and other investors with positions in the Affected Stocks who sold shares of the Affected Stocks during the Class Period, and (4) the bases for any such beliefs.

27. Robinhood's beliefs or positions as to whether during the Restrictions Period the Alleged Omissions and Half-Truths had an effect on: (i) Robinhood customers, (ii) investors with positions in the Affected Stocks, or (iii) the prices of the Affected Stocks, and the bases for any of Robinhood's beliefs or positions related to this topic.

28. Robinhood's awareness of, and methods for, its internal calculations of its deposit and collateral requirements owed to the NSCC and DTCC during the Relevant Period, including but not limited to VaR and ECP charges, and including the location and identification of all Documents related to this topic.

29. The specific amounts for Robinhood's collateral deposit and capital charges associated with each of the restricted stocks during each day of the Relevant Period and how those compared to other stocks that were heavily bought on Robinhood at the same time and the reasons and calculations therefore including but not limited to, the location and identification of all Documents related to this topic.

30. The day and time Robinhood first discovered the potential for a liquidity problem during the Relevant Period, and how it discovered it, including but not limited to, the location and identification of all Documents related to this topic.

31. The liquidity problem that Robinhood experienced during the Restriction Period, such as that referenced in the HFSC Report at 24, 30, 31, 54, 55, 61, 66, 68 and 69, including but not limited to, the location and identification of all Documents related to this topic.

32. Robinhood's belief that it would not be shut down or forced to liquidate its customers' positions by the NSCC/DTCC because it was "to[o] big to fail," as referenced in the HFSC Report at 65 (citing RH_HFSC_00007111), including but not limited to the location and identification of all documents related to this topic.

33. .Robinhood's predictions for its customers' daily demand (*i.e.* likely purchase and sale quantities) for the Affected Stocks in the two weeks prior to, and during, the Restrictions Period, including but not limited to, the location and identification of all Documents related to this topic.

34. Robinhood's view that Robinhood's systems were having trouble handling the volume of trades on its platform, e.g., "handling scale," such as those referenced in the HFSC Report at pp. 23-25, 31, 36 and 57, and reasons why, including but not limited to the location and identification of all documents related to this topic.

35. Robinhood's awareness that imposing Restrictions on the Affected Stocks could cause a decline in the market price of the Affected Stocks, including but not limited to that referenced in the HFSC Report at 31 (citing RH_HFSC_00029118) ("us PCO will trigger a crash, I am certain"), including but not limited to the location and identification of all Documents related to this topic.

36. Robinhood's consideration of, and its decision to, limit in any way the number or pace of new account sign-ups during the Relevant Period, and the reasons therefor such as those referenced in the HFSC Report at 31, 56, and 58, including but not limited to the location and identification of all documents related to this topic.

37. The number of total Robinhood accounts, daily new Robinhood account sign-ups, and the total dollar amount held in Robinhood accounts on a daily basis during the Relevant Period, including but not limited to the location and identification of all Documents related to this topic.

38. The volume and type of trading (buys, sells, options, stocks) in the Affected Stocks by new accounts in the period, including but not limited to the location and identification of all Documents related to this topic.

39. The amount and the changes in total daily volume of trading in Robinhood accounts in the stock and options of the Affected Stocks during the Relevant Period, including but not limited to, the location and identification of Documents related to this topic.

40. Robinhood's efforts to raise capital from investors or any other source of funding during the Relevant Period, including but not limited to the reasons for Robinhood raising capital, the search for and identification of investors, negotiations, and Robinhood's representations of the reasons for the capital infusion, and the terms and nature of the

transactions by which Robinhood raised additional capital during the Relevant Period, including but not limited to the location and identification of all Documents related to this topic.

41. The impact of the Meme Stock Market Event on Robinhood's efforts to pursue and complete an initial public offering, including but not limited to the location and identification of all documents related to this topic.

42. Robinhood's insurance policies covering (i) securities fraud claims, and (ii) errors and omissions, including but not limited to the location and identification of all Documents related to this topic.

43. Robinhood's policies governing its employees' trading of stocks and options during the Relevant Period, including but not limited to the location and identification of all Documents related to this topic.

44. How Robinhood uses Workday, its human resources management system, including its capabilities, the information available on it, and what types of information related to individual custodians and key employees are available on it.

45. Robinhood's data analytics platform, Looker, including but not limited to:

    (a) a description Looker's capabilities;

    (b) a description of Looker's functions;

    (c) the tasks Robinhood uses Looker to perform;

    (d) how Robinhood uses Looker in its business;

    (e) The type of data does Robinhood use Looker to analyze;

    (f) The type of data analyses Looker performs for Robinhood; and

    (g) The final product or output Looker produces.

(h) Whether and how Looker allows Robinhood to access its data lake.

(i) Whether and how Looker can be used to create, identify or obtain any of the documents Plaintiffs have requested from Robinhood in their various Document requests.

46. The nature, purpose, participants, dates, times, and outcome(s) of the scaling meeting(s) described in RHMDL0049839, including but not limited to the location and identification of all other Documents related to this topic.

47. The existence, nature and use of any algorithm or optimization program ("Algorithm") Robinhood used to identify the stocks that are driving the greatest fees as referenced in RHMDL 0072580, including but not limited to: (i) when it was developed; (ii) when Robinhood first started using it; (iii) whether Robinhood used it during the Relevant Period; (iv) the reasons it was developed; (v) the uses it was put to; (vi) the identify of all persons at Robinhood that analyzed the output of the Algorithm; (vii) the decisions the Algorithm supported; (viii) the decisions the Algorithm affected; (ix) the Identity of all persons at Robinhood that used any aspect of the Algorithm to make decisions during the Relevant Period; (x) the identity and location of all documents that relate to this topic.

48. The process Robinhood undertook to monitor Reddit, WallStreetBets, StockTwits or other social media channels for potential increases in demand for specific stocks, which stocks it monitored and identified, and in what channels during the Relevant Period, including but not limited to which stocks it monitored, the reasons therefore, how it selected such stocks to monitor, and how Robinhood used the information found on these social media channels to determine in which stocks to consider restricting. The location and identification of all Documents related to this topic.

49. The nature, extent and methods by which Robinhood engaged in advertising or postings of any kind on social media linked to WallStreetBets or other social media channels to induce traders to open accounts on Robinhood during or prior to the Class Period.  The location and identification of all Documents related to this topic.

50. When, why and the methods by which Robinhood removed their advertising or other postings at any time during or prior to the class period.  The location and identification of all Documents related to this topic.

51. Whether Robinhood possessed any internal company estimates of the impact of changes in Robinhood customer demand for certain stocks on those stocks' prices and what these estimates were for the nine Affected Stocks during the Relevant Period.  If so, the amount and other specifics of these estimates each day and what were the bases for the estimates.  The location and identification of all Documents related to this topic.

52. Robinhood's beliefs, including any discussions, as to whether a decrease in demand to purchase any of the nine Affected Stocks or an increase in selling pressure for the nine Affected Stocks would lead to lower share prices for such stocks during the Relevant Period.

53. The number of in the money options that Robinhood closed out early from January 27 to February 4, 2021, including but not limited to the location and identity of relevant documents and including a thorough explanation of the meaning, source and completeness of RHMDL00004341 and RHMDL00004343.

54. Robinhood's policies for selling out or liquidating positions based on margin calls during the Relevant Period, including any changes in such policies and the reasons for such

changes including but not limited to the location and identification of all other documents related to this topic.

55. The identity of customers who were and were not given notice of margin calls from January 27, 2021 to February 5, 2021 for the nine Affected Stocks and whether they were afforded an opportunity to meet such margin calls and the notice and time provided and whether the notice and time provided for the nine Affected Stocks differed from margin calls for other stocks, including but not limited to the location and identification of all other Documents related to this topic.

56. All rules and requirements that Robinhood had for customers seeking to move their assets from Robinhood to other brokerage firms from January 27, 2021 to February 5, 2021, including but not limited to the existence or non-existence of any rules that customers must sell their securities before moving their assets to a new brokerage account, and including but not limited to the location and identification of all Documents related to this topic.

57. The nature and extent of any proceedings, suits, investigations, regulatory actions of any nature, and enforcement proceedings commenced against Robinhood that are in any way related to the Meme Stock Market Event, including but not limited to, the location and identification of all Documents related to this topic.

58. Robinhood's organizational structure and the management structure of the Company's business functions, for each of the entities that are defendants in this Action during the Relevant Period, including the names of the heads of relevant departments and their reporting structure and the financial and reporting interaction and interrelationships between and amongst the Robinhood's parent holding company and its subsidiaries,

including whether officers of one entity are officers or others and whether officers of one entity that are not officers of another entity are allowed to give orders to employees of entities for which such officer does not work.

59. The identities, by job title or description and the specific roles and responsibilities, of any persons who were responsible for or may possess information concerning any of the topics in the preceding paragraphs.