UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-2989-MDL-ALTONAGA/Damian

In re: JANUARY 2021 SHORT SQUEEZE
TRADING LITIGATION

This Document Relates to the Federal Securities Tranche

**PLAINTIFFS' DISCOVERY MEMORANDUM REGARDING REQUESTS FOR
PRODUCTION OF DOCUMENTS DIRECTED TO ROBINHOOD MARKETS, INC.,
ROBINHOOD FINANCIAL LLC, AND ROBINHOOD SECURITIES, LLC
("ROBINHOOD")**

After extensive negotiations with respect to Plaintiffs' Requests for Production ("RFPs") 1–88, Plaintiffs now move to compel production of Robinhood's communications with Congress and regulators arising from the stock restrictions at issue, and data reflecting Robinhood's manipulative transactions in customer accounts.[1]

A. **Official Requests By and Communications With Various Investigators**

On June 3, 2021, the Court ordered all defendants to produce: "Records already produced by Defendants to Congress and other government entities". Order, Jun. 3, 2021 (ECF 323) at 2, ¶6.[2] Robinhood refuses to produce communications pertaining to the multiple regulatory investigations, including: requests for data, information, and documents; responses to Congress's and investigators' questions; and exchanges regarding the scope of documents/information to be produced. *See* Ex. A (RFPs 4-6 and responses). This refusal contrasts not just with the Court's order, but also with the productions made by other MDL defendants who turned over the investigators' requests, responsive correspondence, and documents (some with Bates stamps identifying the investigator).[3] *See Id*. Despite its blanket objections, Robinhood has produced one regulator's request (Ex. B hereto), but not its response(s) thereto. Robinhood's answers to the questions posed, including the reasons for Robinhood's imposing the restrictions, are surely

---

[1] Document production is complete with respect to only 18 RFPs. This motion pertains only to specific areas of disagreement, not the sufficiency of Robinhood's actual production.

[2] Defendants were required to produce these same documents to Plaintiffs in the Federal Securities Tranche upon denial of the pending motion to dismiss, which occurred on 8/22/2022. Order, Nov. 23, 2021 (ECF 443) at 10, ¶7.1.

[3] Robinhood not only refused to produce prior productions intact, but also insisted upon *removing Bates-stamps identifying the investigator* (later agreeing only to provide a data overlay only for 130 pages specifically referenced in the House Financial Services Committee Report). Thus, even though Robinhood uniquely tagged its earlier productions, in the event the Court grants this motion without ordering complete data overlays, Robinhood will succeed in hindering Plaintiffs' ability to match a particular investigator's requests to responsive information provided to that investigator, an especially daunting task with respect to untitled spreadsheets produced with scant metadata.

1

relevant to the action and should be produced.

In support of its "clone discovery" objections, Robinhood cited cases with vastly different facts, *e.g.*, where a blanket request for all discovery from an earlier related action was not tailored to the case at hand,[4] or where information from a prior governmental investigation was a matter of public record, accessible to plaintiffs.[5] In contrast, in cases where investigative requests pertain to the claims asserted, such documents are often volunteered. *See, e.g., In re Apple iPhone/iPad Application Consumer Privacy Litig.*, 2012 WL 5897351, at *6 (N.D. Cal. Nov. 21, 2012) ("Apple notes that it will provide responsive documents prepared at a government's request … and government subpoenas"). Production is also ordered to aid in discovery efforts. *See Ft. Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 297 F.R.D. 99, 111 (S.D.N.Y. 2013) ("[R]esponses to government investigations should therefore be produced. [T]o help guide this disclosure, J.P. Morgan shall provide the plaintiffs with copies of any government subpoenas ..."). As in *J.P. Morgan*, the *Zantac* court noted that production of investigative requests can help contextualize a party's responses. 2020 WL 5585137, at *3.[6]

Correspondence with the government is "relevant if it discusses the conduct that was under investigation." *Id.* Even where a privilege exists to protect some disclosures – none is present here – factual information in communications with Congress and various regulators is discoverable. *See*

---

[4] *Stellato v. Medtronic Minimed, Inc.*, 2021 WL 3134685, at *3 (M.D. Fla. Feb. 2, 2021); *Pictsweet Co. v. R.D. Offutt Co.*, 2020 WL 12968432, at *5 (M.D. Tenn. Apr. 23, 2020).

[5] *In re Zantac (Ranitidine) Prod. Liab. Litig.*, 2020 WL 5585137, at *3-4 (S.D. Fla. Sept. 16, 2020).

[6] Here, documents produced to unspecified investigators include hundreds of spreadsheets without enough information to discern what they represent and/or to explain discrepancies among them. For example, Robinhood appears to have produced spreadsheets to two SEC offices in response to requests for equity orders cancelled in January 2021 – but the total number of cancelled GameStop orders in RHMDL00018578 and in RHMDL00013428 do not match. Access to the initial requests and correspondence is essential to determine the basis for such differences (if any) and to enable Plaintiffs' experts to make apt comparisons to the same Class Period data sought by Plaintiffs.

*In re Wilmington Trust Secs. Litig.*, 2016 WL 9753979, at *5-6 (D. Del. Aug. 16, 2016) (bank examiner privilege does not shield factual information provided to regulators from production in securities fraud case). Plaintiffs need to review both the requests and Robinhood's responses to ensure the completeness and accuracy of information produced to Plaintiffs. Data overlays of the original Bates stamps are also necessary to link each investigator's requests to the documents and data produced in response thereto.

**C.  Data Reflecting Robinhood's False Supply and Demand Signaling to the Market**

On January 28, 2021, the National Securities Clearing Corporation ("NSCC") requested an additional $3.2 billion of collateral from grossly undercapitalized Robinhood. Robinhood could not fund its NSCC deposit that day. To reduce its collateral requirements and avert a liquidity crisis and potential bankruptcy, Robinhood killed the "meme" stock rally by imposing PCO ("position closing only") restrictions, *i.e.,* customers could sell but not buy the stocks at issue, which caused an immediate and drastic decline of the stock prices and reduced its NSCC collateral requirements. In addition to §10(b) liability for the PCOs, §9(a)(2) liability arises from Robinhood's forced or "involuntary" transactions in customer accounts by which Robinhood manipulated demand for and supply of the Affected Stocks – also inducing sales and lowering stock prices. *See* MTD Order (ECF 503) at 19-23. These transactions include cancelled purchases, margin sales, and early close-outs of options prior to expiration. Plaintiffs requested information and data concerning the manipulative transactions, but Robinhood refuses to produce it. Ex. A (RFPs 19, 20 and 23 and responses).

**Cancelled Purchases**: Robinhood cancelled an extraordinary number of purchase orders for the stocks it decided to PCO and later restrict, primarily orders placed between the close of the market on January 27 and the opening of trading on the 28th. Removal of this significant amount

3

of demand from the market manipulated prices by inducing a downward spiral of panicked selling. Only Robinhood can provide this data, critical to proof of loss causation and damages, because internal order cancellation information is not reported outside of Robinhood.

Plaintiffs sought documents and data "evidencing the cancellation and/or rejection of purchase orders … including the date and time customers received such notifications" (RFP 19), to measure, *inter alia*, demand reduction, price impact, and damages caused by Robinhood's Class Period actions. Robinhood objected that the request was overbroad – to the extent it sought cancellations/rejections not initiated by Robinhood or not related to the claims alleged – and unduly burdensome. At the initial meet-and-confer, the parties agreed to limit the scope of the production to involuntary cancellations of valid orders[7] and, because of the purported burden, Plaintiffs initially agreed to accept daily, aggregated cancellation data, not trade-by-trade information. Thereafter, Robinhood produced to Plaintiffs two spreadsheets with trade-by-trade cancelation data, *with 16 fields of information,* provided to FINRA (RHMDL00047925-26), which demonstrated it is not burdensome to produce. In March, after Plaintiffs renewed the request for trade-by-trade information because its production is not an undue burden, counsel stated that the FINRA data was a "sample" of what Robinhood *would* produce.

Alas, more than three months later, Robinhood did not produce the granular, trade-by-trade data provided to FINRA, but only the limited daily data initially offered, to wit: date, symbol, number of cancellations, and number of shares/contracts. Alarmingly, the data in the few fields Robinhood *did* produce is wildly different from the Class Period cancellation data provided to

---

[7] Orders not cancelled by Robinhood or legitimately rejected/cancelled (*e.g.,* due to insufficient funds) are outside of the claims alleged and not subject to production. To compare Class Period cancellations with Robinhood-initiated cancellations of valid orders in periods before and after, the time period requested is Dec. 1, 2020, through Mar. 5, 2021, for all restricted stocks.

4

FINRA. Although the differences may stem from Robinhood's stated decision – contrary to the agreed-upon scope limitation – to provide all rejections and cancellations, its offer to remove irrelevant trades from the daily data is insufficient. Trade-by-trade data is needed to show the exact dates/times on which orders were placed and cancelled because most of the buy orders at issue straddle parts of two days (the 27th and 28th), rendering daily data imprecise.

**Involuntary Sales Due to Margin Calls:** RFP 22 sought data pertaining to all involuntary sales of customers' shares; RFP 20 requested a subset of that data: sales of long positions in the restricted stocks due to margin calls. Because Robinhood objected that the requests were burdensome, the parties' negotiations focused on margin-sales data showing that Robinhood sent false signals to the market by artificially increasing supply. After nine months, Robinhood produced *one* spreadsheet vaguely titled "Equity Close Outs." When questioned, Robinhood stated it combined data responding to RFPs 20 and 22 to provide an "exhaustive response." Although Robinhood indicated that it would try to "provide the narrower data set if that would be helpful to Plaintiffs …. close-outs due to margin calls are not directly identifiable in Robinhood's systems."

If true, Plaintiffs should have been informed of such a limitation from the outset. Further, this appears to be at odds with documents produced in response to earlier investigative requests for daily margin call data for January 2021, including date, symbol, and the number of margin calls issued, met, and those resulting in liquidation. RHMDL00004341-42. Moreover, Plaintiffs cannot reconcile the Robinhood's "Equity Close Out" figures with that data. While the difference *could* arise from Robinhood's unilateral combination of RFP 20 and 22 data, its removal may not suffice if, as Robinhood now claims, the narrower results might still be "overinclusive". As with cancellations, the production of granular trade-by-trade data rather than aggregated daily totals is necessary to ensure the completeness and accuracy of the data.

Dated: August 7, 2023                                Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, FBN# 0182877
Phillip Kim
Robin Bronzaft Howald
Jonathan Stern
Brent LaPointe
Michael Cohen

By: /s/ Laurence M. Rosen
Laurence M. Rosen, Esq.
275 Madison Avenue 40th Floor
New York, New York 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com

*Counsel for Lead Plaintiff Blue Laine-Beveridge and Named Plaintiffs Abraham Huacuja, Ava Bernard, Brendan Clarke, Brian Harbison, Cecilia Rivas, Doi Nguyen, Joseph Gurney, Marcel Poirier, Sandy Ng, Santiago Gil Bohórquez, and Thomas Cash*

## CERTIFICATE OF GOOD FAITH CONFERENCE

Pursuant to Local Rule 7.1(a)(3), undersigned Plaintiffs' counsel conferred with all parties who may be affected by the relief sought in the motion in a good faith effort to resolve the issues raised in the motion and have been unable to do so.

/s/ *Laurence M. Rosen*

## CERTIFICATE OF SERVICE

I hereby certify that on August 7, 2023, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/ *Laurence M. Rosen*