**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-2989-MDL-ALTONAGA/Torres**

In re:

**JANUARY 2021 SHORT SQUEEZE**
**TRADING LITIGATION**
_____/

This Document Relates to the Actions in the Federal Securities Tranche

**ORDER**

**THIS CAUSE** came before the Court on two motions.  Lead Plaintiff, Blue Laine-Beveridge and Named Plaintiffs, Abraham Huacuja, Ava Bernard, Brendan Clarke, Brian Harbison, Cecilia Rivas, Doi Nguyen, Joseph Gurney, Marcel Poirier, Sandy Ng, Santiago Gil Bohórquez, and Thomas Cash (collectively, "Plaintiffs") have filed a Motion for Class Certification [ECF No. 559] ("Class Cert. Motion").  Plaintiffs seek to certify a class asserting market manipulation claims under the federal securities laws against Defendants, Robinhood Markets, Inc., Robinhood Financial LLC, and Robinhood Securities, LLC (together, "Robinhood").  Robinhood filed a Memorandum of Points and Authorities in Opposition ("Response") [ECF No. 568], to which Plaintiffs filed a Reply [ECF No. 585].

Separately and in response to the Class Certification Motion, Robinhood filed a Motion to Exclude Opinion of Adam Werner ("*Daubert* Motion") [ECF No. 566], seeking to exclude expert testimony Plaintiffs rely on in support of class certification.  Plaintiffs filed a Response ("*Daubert* Response") [ECF No. 582], to which Robinhood filed a Reply ("*Daubert* Reply") [ECF No. 583].

The Court has carefully considered the parties' written submissions, the record, and applicable law.  For the following reasons, Plaintiffs' Motion is denied.  Because the Court does

not rely on the challenged expert testimony to decide the Motion, Robinhood's *Daubert* Motion is denied as moot.

## I.      INTRODUCTION

This case involves allegations of market manipulation by Robinhood arising from its transaction restrictions in early 2021 following the "meme stock" short squeeze.  Specifically, in January 2021, market volatility prompted regulators to raise deposit requirements for clearing brokers, including Robinhood, to ensure they could cover the costs of unexecuted trades. Robinhood could not afford the new deposit requirements and sought another way to appease regulators.  It succeeded after regulators agreed to waive the deposit requirements — so long as Robinhood restricted its customers' access to certain stocks.

Robinhood agreed.  Robinhood did not want knowledge of its lack of liquidity to become widespread, however, so it blamed market volatility for its restrictions and vehemently denied any trouble with its own liquidity.  Plaintiffs allege Robinhood manipulated the market when it imposed such restrictions, accompanied by "half-truths" about market volatility while conveniently omitting any mention of liquidity issues.

Plaintiffs now seek to certify a class asserting market manipulation claims.  Robinhood asks the Court to deny class certification because the class representatives are deficient, and individualized issues of reliance and damages will predominate over common issues.  Plaintiffs insist their representatives are adequate and the case is otherwise appropriate for class certification. Although Plaintiffs demonstrate in most respects that the case and their representatives are adequate for class treatment, they fail to convince the Court that individualized reliance issues will not predominate.

## II.     BACKGROUND

Before turning to the parties' arguments, the Court provides a summary of the relevant facts and this multidistrict litigation's procedural history. The facts are taken from the operative pleading — the Amended Consolidated Class Action Complaint ("ACCAC") [ECF No. 527] — and are largely adopted from the August 10, 2022 Order on Robinhood's Motion to Dismiss [ECF No. 503] ("Order on MTD").

### A.     Robinhood's History

In the wake of the Occupy Wall Street protests, Vlad Tenev and Baiju Bhatt came up with an idea to democratize finance: Robinhood. (*See* ACCAC ¶ 31). The two Robinhood founders set out to create an application-based trading platform that would give anyone with a smart phone access to public markets. (*See id.* ¶ 2). Its users joined a growing trend of lay traders, also known as retail investors, who use online brokerage firms to trade securities. (*See id.* ¶¶ 2, 5, 8, 35, 37). This caused an increase in the online retail trading industry and proved quite lucrative for Robinhood. (*See id.* ¶¶ 32, 25).[1]

---

[1] Robinhood relies on a revenue model called "payment for order flow" ("PFOF"), whereby customers bid on securities through their brokerage platform, but instead of taking the bid directly to an exchange, like the New York Stock Exchange (NYSE) or NASDAQ, the broker brings the bid to a market maker. (ACCAC ¶ 32). Market makers stand ready to buy or sell securities but typically respond to the bid with an ask price that, if accepted, decreases or increases the return for the customer. *See* Robinhood Fin., LLC, Securities Act Release No. 10906, Exchange Act Release No. 90694, 2020 WL 7482170, at *3 (Dec. 17, 2020). High volume trading makes PFOF extremely lucrative because market makers compensate brokers for routing their customers' orders to them — hence "payment for order flow." (ACCAC ¶¶ 32, 49). For example, in 2020, Citadel Securities, a market maker, paid Robinhood $326 million, up from $80.5 million in 2019. (*See id.* ¶ 49).

Market makers also route the trading data from Robinhood's platform to high-frequency traders ("HFTs"). (*See id.* ¶¶ 3, 33 n.9). HFTs use algorithms that automatically trade based on existing trends. (*See id.* ¶ 30 n.5). Upon receiving bid data from market makers, HFTs front-run the bid, anticipating the effect of the bid on the security's price before the transaction is consummated. (*See id.* ¶¶ 3, 30 n.5, 31).

Robinhood's popularity also reflected the growing trend of retail trading during the COVID-19 pandemic.  (*See id.* ¶ 35).  Retail investors convened on social media sites, like Reddit and Stockwit, "to discuss investment strategy and the merits of trading in particular stocks."  (*Id.*).  By December 2020, Robinhood claimed "to have opened nearly 50% of all retail brokerage accounts in the past five years" and had a total of 12.5 million online accounts.  (*Id.* ¶ 5 (footnote call number omitted)).   In December 2020, the press reported that Robinhood had selected Goldman Sachs to manage Robinhood's initial public offering; Robinhood would go on to add another 3 million accounts in January 2021.  (*See id.* ¶¶ 5, 39 (citation omitted)).

**B.      The January 2021 Short-Squeeze**

Several prominent investors planted seeds of crisis in November 2020, when they purchased shares in what became known as "meme stocks" or the "Affected Stocks."[2]  (*Id.* ¶¶ 4, 40 (quotation marks omitted)).  The investments pitted these well-known investors against several hedge funds that took short positions in the meme stocks.  (*See id.* ¶¶ 35, 40, 43).  Melvin Capital was one such hedge fund that took a short position in GameStop.  (*See id.* ¶ 43).

Short positions derive from a belief that the price of a security is overvalued and will eventually fall.  To capitalize on this hunch, investors, known as short sellers, purchase a "short."  (*See id.* ¶¶ 40–43, 70–72).  The mechanics of a short are as follows: (1) an investor identifies a security that she wants to short, such as a stock, and deposits capital, or margin, into a brokerage account to cover the risk of loss associated with the short; (2) a lender loans the security to the investor; (3) upon receiving the borrowed security, the investor sells it for a high price; (4) the investor waits until the anticipated drop in share price occurs and then repurchases the stock for

---

[2] The "Affected Stocks" include AMC Entertainment Holdings, Inc. ("AMC"); Bed Bath & Beyond Inc. ("BBBY"); BlackBerry Ltd. ("BB"); Express Inc. ("EXPR"); GameStop Corp. ("GME"); Koss Corp. ("KOSS"); Tootsie Roll Industries Inc. ("TR"); and American Depositary Shares of foreign-issuers Nokia ("NOK") and trivago N.V ("TRVG").  (*See* ACCAC ¶¶ 1, 128).

less than she sold it; and (5) the investor returns the stock to the lender, pocketing the difference as profit.  (*See* Jan. 26, 2022 Order [ECF No. 453] 3 ("Robinhood Tranche Order")).[3]

Short positions may bear substantial risk.  (*See, e.g.*, ACCAC ¶¶ 41–43).  If the stock price rises a little, the short seller loses money.  (*See, e.g.*, *id.* ¶ 41).  If the stock price rises a lot, the broker may issue a margin call, which requires that the short seller deposit more capital into its brokerage account to minimize the risk of the rising stock.  (*See id.* ¶¶ 38, 38 n.18, 42); *see also* SEC, *Staff Report on Equity and Options Market Structure Conditions in Early 2021*, at 26 (Oct. 28, 2021), https://www.sec.gov/files/staff-report-equity-options-market-struction-conditions-early-2021.pdf ("SEC Staff Report"))).  If the stock price continues to rise with no end in sight, short sellers will capitulate and purchase the stock to cover their losses.  (*See, e.g.*, ACCAC ¶ 43).  This pattern results in a vicious cycle known as a short squeeze: (1) a stock's price rises; (2) short sellers purchase the stock to cover their losses; (3) short sellers' capitulation causes the stock price to rise further; (4) and other short sellers are forced to purchase the stock; (5) sending the stock price rising even further, and so on.

After noticing the contest between hedge funds and other investors, retail investors rallied against the hedge funds.  (*See id.* ¶¶ 40–41).  Using a sub-Reddit thread called WallStreetBets as a collective action platform, retail investors purchased millions of shares of GME, sending the stock price soaring.  (*See id.* ¶¶ 35, 40–43, 76).

GME closed at $43.03 on January 21, 2021.  (*See id.* ¶ 41).  Twenty-four hours later, it closed at $65.01.  (*See id.*).  By January 27, the share price reached $347.51.  (*See id.* ¶¶ 76, 121).  The skyrocketing share price created a short squeeze, which forced hedge funds, like Melvin

---

[3] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.  Citations to deposition testimony rely on the pagination and line numbering in the original document.

Capital, to try and cover their losses.  (*See id.* ¶ 43).  Despite receiving loans for $750 million and $2 billion each, Melvin Capital had to close out its short position.  (*See id.*).

**C.     The Short-Squeeze Fallout**

The short squeeze forced Robinhood to reckon with its newfound popularity.  Specifically, the short squeeze created volatile market conditions that forced the National Securities Clearing Corporation ("NSCC")[4] to impose higher collateral requirements on Robinhood (*see id.* ¶ 58) — requirements that Robinhood could not meet (*see id.* ¶¶ 58–59).

Market volatility affects two components of the collateral requirements: the core clearing fund charge and excess capital premium charge.  (*See id.*).  The core clearing fund charge also encompasses a value at risk ("VaR") charge, which the NSCC calculates based on the estimated risk in the member's portfolio.  (*See id.* ¶ 58).  The excess capital premium charge is the difference between the member's excess net capital and its core clearing fund charge.  (*See id.*).  "The more the core charges exceed the member's capital cushion, the larger the [excess] capital premium charge.  To avoid incurring the latter charge the member must either reduce the level of risk or raise additional capital."  (*Id.* (alteration added; footnote call number omitted)).

Robinhood knew its collateral requirements would rise.  (*See id.* ¶¶ 44–47).  As a consequence, Robinhood raised margin requirements on its users for GME to 80% on January 26, 2021 and to 100% on January 27, 2021.  (*See id.* ¶¶ 47, 47 n.24).  Still, Robinhood knew its collateral requirements would rise even higher.  So, on January 28, 2021, in anticipation of the

---

[4] The NSCC is a national clearing agency regulated by the SEC that provides services to its clearinghouse members, including Robinhood Securities.  (*See* Robinhood Tranche Order 3 n.7).  Among its services, the NSCC guarantees that clearinghouses will complete securities transactions.  (*See id.*).  To ensure that it can guarantee the transaction, the NSCC imposes collateral requirements on its members.  (*See id.*).  These collateral requirements create the capital necessary for clearinghouses to complete a trade.  (*See id.*).  The NSCC imposes higher collateral requirements for volatile stocks.  (*See* ACCAC ¶¶ 12, 58).

NSCC's deposit requirements, Robinhood imposed a position closing only ("PCO") restriction on GME and AMC options with an expiration of January 29, 2021. (*See id.* ¶ 52). This meant that traders could only sell, and not buy, options. Despite Robinhood's preemptive attempt to decrease its deposit requirements, the NSCC requested that Robinhood deposit $3.7 billion to ensure it could complete its unsettled trades. (*See id.* ¶ 58).

The $3.7 billion deposit requirement caused Robinhood a "major liquidity issue[,]" and Robinhood moved eight stocks — AMC, GME, NOK, BB, NAKD, KOSS, EXPR and BBBY — to PCO; no Robinhood user could purchase these stocks. (*Id.* ¶ 59 (alteration added; quotation marks omitted)). After Robinhood promised to maintain the PCO restriction on stocks "that had driven the increased deposit requirements," the NSCC waived Robinhood's capital premium charge through February 1, 2021. (*Id.* ¶ 60 (quotation marks and footnote call number omitted)).[5]

Robinhood notified its customers that several stocks had been moved to PCO but failed to apprise investors that it had also closed out existing options (*see id.* ¶ 52)[6] and cancelled orders after markets closed on January 27 (*see id.* ¶ 62). Instead, customers received an abbreviated explanation of Robinhood's actions:

> Our mission at Robinhood is to democratize finance for all. We're proud to have created a platform that has helped everyday people, from all backgrounds, shape their financial futures and invest for the long term.

---

[5] According to Michael Bodson, Chief Executive Officer of the Depository Trust and Clearing Corporation ("DTCC") that oversees the NSCC, the NSCC never "instruct[ed] any clearing member to impose restrictions during the market volatility events of late January." (ACCAC ¶ 60 n.37 (alteration added; citation and quotation marks omitted)).

[6] The ACCAC does not specify whether Robinhood cancelled put or call options. Call options give the buyer the ability to pay a premium to purchase a security at a certain price, known as a strike price. (*See* SEC Staff Report 5 n.5). Put options are the opposite: they give the purchaser the ability to sell the security at the strike price. (*See* SEC, *Investor Bulletin: An Introduction to Options* (Mar. 18, 2015) https://www.sec.gov/oiea/investor-alerts-bulletins/ib_introductionoptions). While the ACCAC is silent on this point, the SEC's report suggests that call options contributed to the short squeeze. (*See* SEC Staff Report 29, 43, 43 n.117).

> We continuously monitor the markets and make changes where necessary. In light of recent volatility, we are restricting transactions for certain securities to position closing only, including $AAL, $AMC, $BB, $BBY, $CTRM, $EXPR, $GME, $KOSS, $NAKD, $NOK, $SNDL, $TR, and $TRVG. We also raised margin requirements for certain securities.
>
> Amid significant market volatility, it's important as ever that we help customers stay informed. That's why we're committed to providing people with educational resources. We recently revamped and expanded Robinhood Learn to help people take advantage of the hundreds of financial resources we offer and educate themselves, including how to make sense of a volatile market. In 2020, more than 3.2 million people read our articles through Robinhood Learn.

(*Id.* ¶ 63 (footnote call number omitted)).

By market close, Robinhood managed to raise $1 billion from existing investors.

(*See id.* ¶ 61). Nonetheless, after switching the Affected Stocks to PCO, each stock experienced significant decline:

|  | Closing Price January 27, 2021 | Closing Price January 28, 2021 |
|---|---|---|
| AMC (AMC Entertainment Holdings Inc.) | $19.90 | $8.63 |
| BB (BlackBerry Ltd.) | $25.10 | $14.65 |
| BBBY (Bed Bath & Beyond Inc.) | $52.89 | $33.64 |
| EXPR (Express Inc.) | $9.55 | $4.70 |
| GME (Gamestop Corp.) | $347.51 | $193.60 |
| KOSS (Koss Corp.) | $58.00 | $41.96 |
| NOK (Nokia Oyj) | $6.55 | $4.69 |
| TR (Tootsie Roll Industries Inc.) | $41.25 | $37.33 |
| TRVG (Trivago N.V.) | $3.19 | $2.48 |

(*Id.* ¶ 76).

Robinhood's trading restrictions prompted immediate outrage from investors and elected officials alike.  (*See id.* ¶ 69).  Many speculated that Robinhood imposed the restrictions to appease hedge funds, including Robinhood's largest source of revenue: Citadel Securities.  (*See id.* ¶ 70; *see supra* note 1 and accompanying text).

Tenev appeared on several news outlets, where he made two notable statements.  (*See* ACCAC ¶¶ 77–80).  First, he rejected the theory that Robinhood issued the restrictions "at the direction of any market maker or hedge fund or anyone we route to or any other market participants."  (*Id.* ¶ 77 (emphasis and footnote call number omitted)).  Second, he stated "[t]here was no liquidity problem" at Robinhood (*id.* ¶ 79 (alteration added; emphasis omitted), instead attributing the restrictions to market volatility (*see id.* ¶ 78).

According to Plaintiffs, Tenev's assurances led to a flurry of premarket trading activity on the morning of January 29, 2021.  (*See id.* ¶ 83).  Investors incorrectly believed Robinhood would lift the PCO restrictions soon, a belief bolstered by Robinhood's acquisition of $1 billion in investor financing.  (*See id.*).  Robinhood instead maintained restrictions on the number of shares and option contracts an investor could purchase.  (*See id.* ¶¶ 84–85).  It continued to impose greater purchase restrictions throughout January 29, as the Affected Stocks rebounded from the previous day's close price.  (*See id.* ¶ 85).

Tenev publicly claimed the trade restrictions were commonplace and "just a standard part of practices in the brokerage industry and the broader financial industry."  (*Id.* ¶ 92).  Through January 30 and 31, he maintained that Robinhood simply followed standard industry practices and was not in the pocket of institutional investors.  (*See id.* ¶¶ 98–100).  When asked by Elon Musk why Robinhood implemented a purchase-only restriction as opposed to a complete purchase-sale

restriction, Tenev stated it would be "categorically worse" to restrict both purchases and sales because "[p]eople get really pissed off if they're holding stock and they want to sell it and they can't." (*Id.* ¶ 101 (alteration added; quotation marks omitted)).  But other Robinhood employees felt the PCO restriction would still result in outrage, noting in internal chats that Robinhood would "get crucified for pco-ing." (*Id.* ¶ 102 n.60 (alteration adopted; citations and quotation marks omitted)).

Over the weekend, Robinhood raised $2.4 billion from venture capital funds and consequently loosened trading restrictions on some, but not all, of the Affected Stocks going into Monday, February 1, 2021.  (*See id.* ¶¶ 107, 109–10).  The purchase restrictions eased further on February 2, 2021; still, some restrictions remained in place.  (*See id.* ¶¶ 112–13).  Robinhood did not lift all restrictions until late in the day on February 4, 2021.  (*See id.* ¶ 121).

Robinhood's conduct left investors and onlookers disgruntled and concerned.  (*See id.* ¶¶ 80, 101–03, 119, 126).  On February 23, 2021, the CEO of Barstool Sports, Dave Portnoy, outlined the frustrations during an interview with Tenev.  (*See id.* ¶ 80).  When asked whether Robinhood would have permitted continued trading absent the NSCC's initial deposit requirements, Tenev agreed that Robinhood would have allowed trading to continue.  (*See id.*).  Portnoy pointed out that Tenev's answer suggested Robinhood had a liquidity problem (*see id.*) — a problem Tenev had previously denied (*see, e.g.*, *id.* ¶ 79 ("There was no liquidity problem." (emphasis and quotation marks omitted))).  Tenev initially resisted Portnoy's observation but conceded that Robinhood might have experienced a liquidity crisis if it had not restricted trading.  (*See id.* ¶ 80).

Portnoy also asked why Robinhood had instituted purchase-only restrictions instead of a complete freeze on meme stock trading.  (*See id.* ¶ 103).  Tenev had previously told Elon Musk that Robinhood implemented PCOs to avoid "piss[ing] off" customers eager to sell (*id.* ¶ 101

(alteration added; quotation marks omitted)); to Portnoy, Tenev changed his answer and conceded that the PCO restrictions allowed Robinhood to mitigate its deposit requirements (*see id.* ¶ 103). Tenev stated that restricting *sales*, as opposed to *purchases*, would not have decreased Robinhood's VaR charges from the NSCC. (*See id.* ("The VaR formula was in this case driven by the one-sided long position, so it actually wouldn't help us; wouldn't help the deposit requirements to restrict selling in this case[.]" (alteration added))).

## D.    The Present Case

Several plaintiffs asserted putative class actions and individual claims against Robinhood, all of which the Judicial Panel on Multi-District Litigation consolidated here. (*See generally* Sept. 7, 2023 Order [ECF No. 607]). Plaintiffs asserting violations of the federal securities laws filed a Consolidated Class Action Complaint ("CCAC") [ECF No. 409] against Robinhood on November 30, 2021. (*See generally id.*).[7] Each Plaintiff owned shares of at least one of the Affected Stocks at the close of markets on January 27, 2021 and sold those shares on or before February 4, 2021. (*See id.* ¶¶ 21–22). Only some of the Plaintiffs used the Robinhood platform. (*See id.*).

Robinhood moved to dismiss the CCAC. (*See generally* Mot. Dismiss Federal Securities Tranche Compl. [ECF No. 449]). The Court dismissed one of Plaintiffs' claims and allowed two others to proceed (*see generally* Order on MTD); these claims now appear in the ACCAC as Counts I and II (*see* ACCAC ¶¶ 136–149). Plaintiffs allege in Count I that Robinhood intentionally manipulated the market to artificially depress the prices of the Affected Stocks, in violation of section 9(a)(2) of the Securities Exchange Act of 1934. (*See id.* ¶¶ 136–41).[8] In Count II, Plaintiffs

---

[7] Plaintiffs are Abraham Huacuja, Ava Bernard, Blue Laine-Beveridge, Brendan Clarke, Brian Harbison, Cecilia Rivas, Doi Nguyen, Joseph Gurney, Marcel Poirier, Sandy Ng, Santiago Gil Bohórquez, and Thomas Cash. (*See* ACCAC ¶¶ 21–22).

[8] Codified in 15 U.S.C. section 78i(a).

allege an identical theory, but relying on section 10(b) and Rule 10b-5 promulgated thereunder. (*See id.* ¶¶ 142–49).[9]  In both Counts, Plaintiffs allege Robinhood manipulated the market when it: (1) raised margin requirements (2) canceled purchase orders for the Affected Stocks, (3) closed out options in AMC and GME early, and (4) prohibited and restricted purchases of the Affected Stocks on its platform.  (*See id.* ¶¶ 72, 143).[10]

These actions allegedly "created a false impression of actual demand for the Affected Stocks" and "artificially increased supply of the Affected Stocks[.]"  (Resp. 20 (alteration added)). In Plaintiffs' view, they "roll[ed] the dice in a crooked crap game" when they sold their shares (Mot. 24 (alteration added; quotation marks and citation omitted)), because Plaintiffs traded in reliance on the integrity of the market — a market Robinhood had rigged, unbeknownst to Plaintiffs (*see id.* 23–24; *see also* Order on MTD 33, 43, 47–48, 51–52).

Plaintiffs now seek to certify the following class:

> All persons or entities who held common stock in AMC Entertainment Holdings, Inc. ("AMC"), Bed Bath & Beyond Inc. ("BBBY"), BlackBerry Ltd. ("BB"), Express Inc. ("EXPR"), GameStop Corp. ("GME"), Koss Corp. ("KOSS"), Tootsie Roll Industries Inc. ("TR"), or American Depositary Shares of foreign-issuers Nokia Corp. ("NOK") and trivago N.V. ("TRVG") (collectively "the Affected Stocks") as of the close of trading on January 27, 2021, and sold any such shares between January 28, 2021, and February 4, 2021 ("Class Period").  Excluded from the class are those who suffered no damages, Defendants, the officers and directors of Defendants, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants or any excluded persons have or had a controlling interest[.]

(Mot. 9 (alteration added)).  Plaintiffs also ask the Court to appoint as class representatives Abraham Huacuja, Ava Bernard, Blue Laine-Beveridge, Brendan Clarke, Brian Harbison, Cecilia

---

[9] Codified in 15 U.S.C. section 78j(b) and 17 C.F.R. section 240.10b-5, respectively.

[10] Although Count II incorporates a claim under Rule 10b-5, the Court refers to Count II as the section 10(b) or Rule 10b-5 claim interchangeably.

Rivas, Doi Nguyen, Joseph Gurney, Marcel Poirier, Sandy Ng, Santiago Gil Bohórquez, and Thomas Cash; and as class counsel, The Rosen Law Firm, P.A. (*See id.*).

### III.    LEGAL STANDARD

Federal Rule of Civil Procedure 23 governs the certification of class actions. "For a class to be certified, the named plaintiff must have standing[,] and the putative class must satisfy both the requirements of [] Rule] [] 23(a) and the requirements found in one of the subsections of Rule 23(b)." *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1267 (11th Cir. 2019) (footnote call numbers omitted; alterations added). "The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quotation marks and citation omitted). "Questions concerning class certification are left to the sound discretion of the district court." *Cooper v. So. Co.*, 390 F.3d 695, 711 (11th Cir. 2004) (citations omitted), *overruled on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006)). With "great power comes great responsibility; the awesome power of a district court must be 'exercised within the framework of [R]ule 23.'" *Klay v. Humana, Inc.*, 382 F.3d 1241, 1251 (11th Cir. 2004) (alteration added; quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996)), *abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008).

"Ascertainability is an implied prerequisite to the requirements of Rule 23(a)[,]" *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1302 (11th Cir. 2021) (alteration added), which "ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate[,]" *Wal-Mart Stores, Inc.*, 564 U.S. at 349 (alteration added). Moreover, Rule 23(a)'s four requirements — numerosity, commonality, typicality, and adequacy — ensure class claims are limited to those "fairly encompassed by the named plaintiff's claims." *Id.* (citations and quotation

13

marks omitted).  Rule 23(b)(3), the subsection Plaintiffs rely on for class certification (*see* Mot. 18), requires a court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy[,]" Fed. R. Civ. P. 23(b)(3) (alteration added).

To obtain class certification, plaintiffs "must affirmatively demonstrate [their] compliance with the Rule[.]"  *Wal-Mart Stores, Inc.*, 564 U.S. at 350 (alterations added).  This is no "mere pleading standard."  *Id.*  A plaintiff bears the burden of proving its compliance with Rule 23 and "establish[ing] the propriety of class certification[.]"  *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1187 (11th Cir. 2003) (alterations added; citations and footnote call number omitted); *see also Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).  "[C]ertification is proper only if the trial court is satisfied, after a rigorous analysis, that Rule 23's prerequisites have been satisfied."  *Comcast*, 569 U.S. at 27–28 (first alteration added; citation, other alteration, and quotation marks omitted).

"Frequently, that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim.  That cannot be helped."  *Wal-Mart Stores, Inc.*, 564 U.S. at 351 (citation omitted).  This is so because "[t]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action."  *Id.* (alteration added; quotation marks and citations omitted).

Thus, to decide the issue of class certification, "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question[.]"  *Comcast Corp.*, 569 U.S. at 33 (alteration added; citation and quotation marks omitted).  Doing so will ensure the court "understand[s] the claims, defenses, relevant facts, and applicable substantive law in order to make

a meaningful determination of the certification issues." *Castano*, 84 F.3d at 744 (alteration added; citation omitted). "Although the trial court should not determine the merits of the plaintiffs' claim at the class certification stage, the trial court can and should consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied." *Valley Drug Co.*, 350 F.3d at 1188 n.15 (citing *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 160 (1982)).

Class actions are "'a particularly appropriate means for resolving securities fraud actions.'" *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 489 (S.D. Fla. 2003) (quoting *In re Amerifirst Sec. Litig.*, 139 F.R.D. 423, 427 (S.D. Fla. 1991)). "The Eleventh Circuit has explicitly recognized that securities class actions serve both the public interest in maintaining the integrity of the securities markets and the private interests of investors who would not otherwise obtain redress of grievances through a multiplicity of small individual damage suits." *In re Theragenics Corp. Sec. Litig.*, 205 F.R.D. 687, 693–94 (N.D. Ga. 2002) (citing *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 727 (11th Cir. 1987), *cert. denied sub nom*, *Robinson Humphrey/American Express v. Sanders*, 485 U.S. 959 (1988)); *see also In re Miller Indus., Inc. Sec. Litig.*, 186 F.R.D. 680, 687 (N.D. Ga. 1999) (noting "the Eleventh Circuit's inclination to certify classes in securities-fraud cases").

Some "courts have generally followed a policy of liberal construction of Rule 23 in the context of federal securities fraud actions[,]" *In re Theragenics Corp. Sec. Litig.*, 205 F.R.D. at 693 (alteration added; citing *Kennedy v. Tallant*, 710 F.2d 711, 717–18 (11th Cir. 1983); other citation omitted), and have said that "[i]n a doubtful case, it is better to allow the case to proceed as a class action[,]" *id.* (alterations added; citing *Esplin v. Hirschi*, 402 F.2d 94, 101 (10th Cir. 1968), *cert. denied*, 394 U.S. 928 (1969)). Nonetheless, the Eleventh Circuit has rejected any standard that weighs in favor of class certification, because "[t]he party *seeking* class certification has the burden of proof." *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1233 (11th Cir.

2016) (emphasis in original; alteration added; citation omitted.).  If there is any doubt remaining, "the party with the burden of proof loses." *Id.* (quotations marks and citation omitted).  Indeed, "[a]ll else being equal, the presumption is against class certification because class actions are an exception to our constitutional tradition of individual litigation." *Id.* (alteration added, citations omitted).

Consequently, "a court that is not satisfied that the requirements of Rule 23 have been met should refuse certification until they have been met." Fed. R. Civ. P. 23 advisory comm. note to 2003 amend.  Notably, even where no party contests the issue of class certification, "a court nevertheless has the responsibility of conducting its own inquiry as to whether the requirements of Rule 23 have been satisfied in a particular case." *Valley Drug Co.*, 350 F.3d at 1188 (footnote call number omitted; citing *Martinez-Mendoza v. Champion Int'l Corp.*, 340 F.3d 1200, 1216 n.37 (11th Cir. 2003)).

## IV.    DISCUSSION

Plaintiffs argue each of Rule 23(a)'s four requirements are satisfied (*see* Mot. 15–18; Reply 29–34), the class satisfies Rule 23(b)(3) because common issues predominate, and a class action is the superior method of adjudicating the claims (*see* Mot. 18–33; Reply 14–34).  Robinhood disputes only the typicality and adequacy requirements of Rule 23(a) (*see* Resp. 21 n.14; 36–42), and the predominance requirement of Rule 23(b)(3) (*see id.* 22–36).  Despite the lack of objection, given the Court's "responsibility of conducting its own inquiry as to whether the requirements of Rule 23" are "satisfied[,]" *Valley Drug Co.*, 350 F.3d at 1188 (alteration added; citation omitted), the Court also addresses those requirements that Robinhood does not contest.  For the reasons explained below, Plaintiffs satisfy the prerequisite of ascertainability and Rule 23(a)'s four

requirements, but they fail to demonstrate that individualized issues of reliance will not predominate.

## A.    Rule 23(a) — Ascertainability, Numerosity, Commonality, Typicality, and Adequacy

The "four prerequisites of Rule 23(a) are commonly referred to as 'numerosity, commonality, typicality, and adequacy of representation, and they are designed to limit class claims to those fairly encompassed by the named plaintiffs' individual claims.'" *Valley Drug Co.*, 350 F.3d at 1188 (quoting *Prado-Steiman v. Bush*, 221 F.3d 1266, 1278 (11th Cir. 2000)). "[A]scertainability . . . is an implied prerequisite to the requirements of Rule 23(a)." *Cherry*, 986 F.3d at 1302–03 (alterations added; citing William B. Rubenstein, 1 *Newberg on Class Actions* § 3:2, at 155–56 (5th ed. 2011)).  The Court first addresses the ascertainability prerequisite, then the Rule 23(a) requirements.

### 1.    Implied Requirement of Ascertainability

The Eleventh Circuit requires that a class be "adequately defined and clearly ascertainable" before a court may consider whether the requirements of Rule 23(a) are satisfied.  *Id.* at 1302 (quotation marks and citation omitted).  "A class is 'clearly ascertainable' if . . . its membership is 'capable of being' determined." *Id.* at 1303 (alteration added; citation omitted)).  In other words, if a court can determine who belongs in the class from the class definition, regardless of administrative feasibility, the class is clearly ascertainable, and the court can proceed to evaluate the Rule 23(a) prerequisites.  *See id.* ("[M]embership can be capable of determination without being capable of *convenient* determination." (alteration added; emphasis in original)).

The class definition here contains clear, objective criteria that show membership in the class is "capable of being determined." *Id.* (citation and quotation marks omitted).  The Court thus

proceeds to evaluate the Rule 23(a) factors, the first two of which are uncontested.  (*See* Resp. 21 n.14).

### 2.      23(a)(1) — Numerosity

Rule 23(a)(1) requires that "the class [be] so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1) (alteration added).  "'Impracticable' does not mean 'impossible'; plaintiffs need only show that it would be extremely difficult or inconvenient to join all members of the class."  *In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677, 698 (N.D. Ga. 1991) (citing 3 Herbert B. Newberg, Newberg on Class Actions § 18.03 (2d ed. 1985)). "Numerosity is generally presumed when a claim involves nationally traded securities."  *In re Theragenics Corp. Sec. Litig.*, 205 F.R.D. at 694 (citing *Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1039 (5th Cir. 1981)).  To support a finding of numerosity, the court can make "common sense assumptions."  *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 274 (N.D. Ala. 2009) (alteration adopted; quotation marks omitted; citing *Zeidman*, 651 F.2d at 1039).

Robinhood does not dispute numerosity (*see* Resp. 21 n.14), and all nine Affected Stocks traded on either the NYSE or NASDAQ — both national public exchanges (*see* Rebuttal Report of Adam Werner [ECF No. 559-5] Table 4; *see generally* Resp.).  The Court accordingly makes a "common sense assumption" and agrees with Plaintiffs that joinder of thousands of holders of Affected Stocks during the Class Period would be "extremely difficult or inconvenient" — if not outright impossible.  *In re Domestic Air Transp. Antitrust Litig.*, 17 F.R.D. at 698 (citation omitted).  Plaintiffs thus satisfy Rule 23(a)(1)'s numerosity requirement.

### 3.      23(a)(2) — Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class[.]"  Fed. R. Civ. P. 23(a)(2) (alteration added).  To satisfy the commonality requirement, Plaintiffs need

only clear the "low hurdle" of demonstrating "'the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation.'"  *Krukever v. TD Ameritrade, Futures & Forex LLC*, 328 F.R.D. 649, 657 (S.D. Fla. 2018) (emphasis in original; quoting *Wal-Mart Stores, Inc.*, 564 U.S. at 350).

Robinhood also does not dispute commonality (*see* Resp. 21 n.14), and this litigation is certainly capable of producing common answers as required by Rule 23(a)(2).  There are many overlapping questions in the case, *e.g.*, whether Robinhood's omissions were material, whether Robinhood acted with scienter, and whether the restrictions caused price declines and damages, among others.  (*See* Mot. 15).  Because common answers to these questions will "drive the resolution of the litigation[,]" Plaintiffs have cleared the "low hurdle" necessary to establish commonality under Rule 23(a)(2).  *Krukever*, 328 F.R.D. at 657 (alteration added; quotation marks and citation omitted).

### 4.    23(a)(3) — Typicality

Now, to the first disputed Rule 23(a) requirement: typicality.  Plaintiffs assert their claims are typical of the proposed class, as all members "held shares in the Affected Stocks and, as a result of Robinhood's manipulation, suffered damages on their Class Period sales."  (Mot. 16).  Robinhood disagrees, lodging several attacks at Plaintiffs' standing and investment strategies and arguing these issues mean some Plaintiffs will be subject to unique defenses, rendering them atypical of the class.  (*See* Resp. 29–41).  The Court addresses the parties' competing positions.

To be typical, "[a] class representative must possess the same interest and suffer the same injury as the class members . . . .  Typicality measures whether a sufficient nexus exists between the claims of the named representatives and those of the class at large."  *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1275 (11th Cir. 2009) (alteration added; other alteration adopted; quotation

marks and citation omitted).  "Like commonality, the test for typicality is not demanding."  *In re Checking Account Overdraft Litig.*, 286 F.R.D. 645, 653 (S.D. Fla. 2012) (citing *In re Disposable Contact Lens Antitrust Litig.*, 170 F.R.D. 524, 532 (M.D. Fla. 1996)).  Often, "the commonality and typicality requirements of Rule 23(a) tend to merge."  *Wal-Mart Stores, Inc.*, 564 U.S. at 350 n.5 (alteration adopted; quotation marks omitted; quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157–158, n.13 (1982)).  Provided "the claims or defenses of the class and the class representative[s] arise from the same event or pattern or practice and are based on the same legal theory[,]" the nexus is sufficient.  *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984) (alterations added).

The class representatives' factual situations need not be identical; "factual variation will not render a class representative's claim atypical unless the factual position of the representative markedly differs from that of other members of the class."  *Id.* (citations omitted).  Indeed, "'when there is a strong similarity of legal theories[,]'" "'[t]he typicality requirement may be satisfied despite substantial factual differences[.]'"  *Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.* ("*Regions*"), 762 F.3d 1248, 1259 (11th Cir. 2014) (alterations added; quoting *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1357 (11th Cir. 2009)).

Likewise, stronger or unique defenses against class representatives do not necessarily create typicality issues.  That a defendant "ha[s] a stronger defense against [some representatives] does not render the [representatives] atypical."  *Kornberg*, 741 F.2d at 1337 (alterations added).  And the presence of a unique defense against a representative does not render that representative atypical "*unless* that defense threatens to become the focus of litigation thereby prejudicing the absent class members."  *Swack v. Credit Suisse First Bos.*, 230 F.R.D. 250, 264 (D. Mass. 2005) (emphasis in original; collecting cases).  A unique defense will only preclude a finding of typicality

if it places the class's interests in "significant jeopardy." *Walco Invs., Inc. v. Thenen*, 168 F.R.D. 315, 326 (S.D. Fla. 1996) (quotation marks and citation omitted).

Plaintiffs state they satisfy typicality. First, they assert that the proposed representatives have identical interests to the class; and as what they propose is a *seller* class, any differences in *purchase* decisions are irrelevant. (*See* Mot. 17). Instead, Plaintiffs explain it is "'[t]he alleged conduct of Defendants, rather than the subjective investments strategy of individual Plaintiffs, [that] is determinative for the purpose of demonstrating typicality.'" (*Id.* (alterations added; quoting *Underwood v. Lampert*, No. 02-21154-Civ, 2005 WL 8155010, at *3 (S.D. Fla. Sept. 9, 2005)). Robinhood responds by highlighting what it deems several "unique defenses that threaten to become the focus of the litigation" if a class is certified with these representatives. (Resp. 37). These defenses can be lumped into two categories: standing defenses and reliance defenses. (*See id.* 36–41).

### a.    Unique Standing Defenses

Robinhood makes two standing arguments: first, it asserts that Plaintiffs Laine-Beveridge, Cash, and Poirier lack standing because of profits realized in the Affected Stocks; and second, it asserts that Plaintiffs lack standing to represent class members who traded in BBBY, KOSS, TR, or TRVG, because no named Plaintiff traded in those stocks. (*See* Resp. 36–38; 40–41). According to Plaintiffs, Laine-Beveridge, Cash, and Poirier "all suffered losses during the Class Period," and Robinhood "misstates the standing inquiry[.]" (Reply 33 (alteration added; citations omitted)). Plaintiffs are correct.

Article III limits federal courts' power to decide only "Cases" or "Controversies." U.S. Const. art. III. "The principle of standing is derived from [] Article III[.]" *Cuban Am. Bar Ass'n, Inc. v. Christopher*, 43 F.3d 1412, 1422 (11th Cir. 1995) (alterations added; other alteration

adopted; quotation marks and citation omitted).  The Eleventh Circuit recently reiterated the "basic principle that at the class certification stage only the named plaintiffs need have standing." *Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th 883, 888–889 (11th Cir. 2023) (footnote call number omitted; citing *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1264 (11th Cir. 2019)).

To assess named a plaintiff's standing, a court determines whether the named plaintiff's allegations meet Article III's requirements that (1) "the plaintiff has experienced an injury that is concrete and particularized"; (2) "the defendant's conduct is the cause of the plaintiff's injury"; and (3) "a decision by the court would likely redress the plaintiff's injury." *Id.* at 889 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  Needless to say, "[a] plaintiff cannot bring suit on behalf of a class when he himself suffered no injury." *Katz v. Comdisco, Inc.*, 117 F.R.D. 403, 407 (N.D. Ill. 1987) (alteration added; citing *Mintz v. Mathers Fund, Inc.*, 463 F.2d 495 (7th Cir. 1972)).

In securities fraud class actions, where a proposed representative is "'a beneficiary of the alleged fraud'" and thus incurred no damages, the representative is "'in a different position from the other victims of the alleged fraud'" and cannot represent them. *Id.* at 408 (quoting *Kraus v. Paterson Parchment Paper Co.*, 65 F.R.D. 368, 369 (S.D.N.Y. 1974)).  *Katz*, which Robinhood relies on, provides color to this point. *See id*.  There, the defendant "withheld from the investing public important information about [an] IRS audit and the company's potential tax liability." *Id.* at 406 (alteration added).  Once news of the audit was made public, the company's stock prices "fell sharply." *Id.*  A putative class sued the company under sections 10(b) and 20(a) and Rule 10b-5, alleging the company's material concealment artificially inflated the company's stock; proposing a class period beginning when the audit began and ending when the information was publicized; and employing an out-of-pocket damages measure, where a defrauded buyer could

"recover the difference between what he paid for the stock and the stock's actual value, all measured at the time of the transaction." *Id.* at 408 (quotation marks and citation omitted).

The court excluded any transactions that occurred before or after the class period and looked only at the transactions during the class period. *See id.* at 407 n.2. One of the proposed class representatives bought and sold the company's stock at various times during the audit, but the amount he earned from sales during the class period far exceeded his losses from purchases during the same time frame. *See id.* Because he benefited from the defendant's fraud during the class period, he was not typical under Rule 23(a). *See id.* at 408 (citations omitted).

Contrast *Regions*, 762 F.3d 1248. There, Regions "manipulated the way unhealthy assets were carried on its books to avoid disclosing significant losses that would compromise the company's value[,]" causing "artificially high stock prices for Regions, and allow[ing] it to avoid" massive stock declines during the 2008 recession. *Id.* at 1252 (alterations added). Once Regions corrected its disclosures, its share price plummeted, causing investors significant losses. *See id.* Regions argued that one of the proposed lead plaintiffs was not typical because "(1) it benefited from the alleged misrepresentations by selling some of its Regions stock at inflated prices during the class period; and (2) it purchased many shares of Regions stocks following the corrective disclosure." *Id.* at 1259.

The Eleventh Circuit rejected this argument. *See id.* After analyzing the lead plaintiff's transactions during the class period, the court concluded the lead plaintiff suffered a net loss during the class period. *See id.* at 1259–60. Absent "any evidence suggesting that [the lead plaintiff's] gains during the period [may have] arguably offset its losses under any generally accepted accounting method[,]" Regions' arguments were "misguided." *Id.* (alterations added).

Robinhood's arguments are similarly "misguided." *Id.* Plaintiffs do not appear to contest that Laine-Beveridge, Cash, and Poirier each profited on some transactions during the Class Period. (*See* Resp. 36–37, 38 n.28 (citations omitted); Reply 33). And Laine-Beveridge sold some of his shares long after the close of the Class Period for a profit, which Robinhood takes great care to emphasize. (*See* Resp. 37 (citing Mot. Appoint Lead Pl. Blue Laine-Beveridge [ECF No. 366]; Loss Chart [ECF No. 366-4]; Mot., PSLRA Certifications [ECF No. 559-6] 5–6)). But Robinhood does not dispute that each of these Plaintiffs suffered net *losses* during the Class Period from their transactions in the Affected Stocks. (*See generally* Resp. 37 ("While Plaintiffs' counsel may now contend that Mr. Laine-Beveridge lost money if the Court only examines his AMC sales during the Class Period, any such loss is relatively small.")).

That Laine-Beveridge turned a profit on some shares months after the close of the Class Period is of no moment. In short, there is no "evidence suggesting that [the Plaintiffs'] gains during the [Class P]eriod might arguably offset [their] losses under any generally accepted accounting method." *Regions*, 762 F.3d at 1259–60 (alterations added). Because each Plaintiff suffered a net loss during the Class Period, Robinhood's arguments regarding Plaintiffs' purported profits find no basis in standing jurisprudence. *See id.*; *see also Kraus*, 65 F.R.D. at 369 ("Kraus purchased Paterson stock prior to the first alleged fraud and sold this stock in December, 1971 *during the period of the alleged frauds*, at the inflated price attributable to it." (emphasis added)); *In re Comdisco Sec. Litig.*, 150 F. Supp. 2d 943, 945–46 (N.D. Ill. 2001) (declining to appoint a lead plaintiff who derived a net gain from its purchases and sales *during the class period*). Consequently, Plaintiffs' net losses during the Class Period are concrete, particularized injuries that confer standing on Plaintiffs to sue Robinhood for these alleged wrongs and do not subject them to an atypical standing defense, even if their injuries are "relatively small." (Resp. 37).

Robinhood next argues that no proposed representative traded in BBBY, KOSS, TR, and TRVG; and thus, the proposed representatives lack standing to assert claims related to these securities.  (*See id.* 40–41).  Plaintiffs deem this argument a "misstate[ment of] the standing inquiry, which concerns the right to sue a specific *defendant* for a specific *injury*, not on the specific securities." (Reply 33 (alteration added)).  Provided the "class's injuries arise out of the same conduct by the same defendants," Plaintiffs insist that "courts routinely certify a single class embracing different securities." (*Id.*).  The Court agrees with Plaintiffs.

Robinhood's position is that "'[a] named plaintiff in a class action that purchased securities from one issuer does not have standing to bring claims on behalf of purchasers of securities from a different issuer.'"  (Resp. 40–41 (alteration added; quoting *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, No. 05-1898-Civ, 2005 WL 2148919, at *4 (S.D.N.Y. Sept. 6, 2005) (alteration added); citing *Luczak v. Nat'l Beverage Corp.*, 548 F. Supp. 3d 1256, 1262–63 (S.D. Fla. 2021)).  But "[c]ourts have repeatedly certified classes where the class representatives had not invested in all of the subject securities."  *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98-4318-Civ, 2000 WL 1357509, at *3 (S.D.N.Y. Sept. 20, 2000) (alteration added) (discussing *Hoxworth v. Binder, Robinson & Co., Inc.*, 980 F.2d 912, 923 (3d Cir. 1992) (upholding certification of class where class representatives purchased only 15 of 21 class securities), *abrogated on other grounds by White v. Samsung Elecs. Am., Inc.*, 61 F.4th 334 (3d Cir. 2023))); *see also Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 56–57 (S.D.N.Y. 1993) (finding plaintiffs who invested in three of five partnerships had standing to raise claims regarding all five); *Spicer v. Chicago Bd. Options Exch., Inc.*, No. 88-cv-2139, 1990 WL 16983, at *3–*4 (N.D. Ill. Jan. 31, 1990) (certifying class where class representatives purchased only six of 187 options); *Krukever*, 328 F.R.D. at 655, 658 (finding typicality was satisfied where

named plaintiffs did not allege they owned all 888 options, but claims "ar[o]se from the same event or pattern or practice and [was] based on the same legal theory" as the putative class members' claims (alterations added)).

The cases Robinhood cites do not support its position.  (*See* Resp. 40–41 (citing *Teamsters*, 2005 WL 2148919, at \*4; *Luczak*, 548 F. Supp. 3d at 1262–63, 1265, 1268)).  Admittedly, in *Teamsters*, the court stated that "[a] named plaintiff in a class action that purchased securities from one issuer does not have standing to bring claims on behalf of purchasers of securities from a different issuer."  2005 WL 2148919, at \*4 (alteration added; emphasis and footnote call number omitted).  But the court ultimately held that the plaintiff could represent a class of purchasers who owned different classes of certificate offerings, even though the plaintiff itself did not purchase all classes of securities.  *See id.* at \*8.  Although each series of debt certificates was collateralized differently, the plaintiff alleged that the value of each class of certificates was impacted by the defendants' uniform conduct.  *See id.*  The plaintiff thus had standing to represent the class, which, like the putative class here, "suffered the same injury when the value of their securities declined." *Id.*

*Luczak* is inapt.  *See* 548 F. Supp. 3d at 1263–64.  There, only one type of stock was at issue, and the court's standing analysis related to the timing of corrective disclosures, not whether a plaintiff who sold stock from one issuer could represent a class who sold stock from a different issuer.  *See id.*  As discussed, Plaintiffs individually have Article III standing, and *Luczak* does not aid in answering the question of whether a plaintiff with standing can represent others who suffered the same type of injury arising from the same conduct.  *See id.*

Robinhood also nitpicks at the factual distinctions between this case and the authorities Plaintiffs rely on.  (*See* Resp. 41 (citing *Krukever*, 328 F.R.D. at 655; *In re Dreyfus Aggressive*

*Growth Mut. Fund Litig.*, 2000 WL 1357509, at *10)).  Robinhood argues that the plaintiffs in *Krukever* asserted a best execution claim, which — unlike a securities fraud claim — does not turn on price movements for each security in the class period; and that the case involved one underlying securities basket, not 888 different securities.  (*See id.* 41 & n.31 (citing 328 F.R.D. at 655)).  Robinhood contends that Plaintiffs treat the Affected Stocks as "a nearly fungible set of nine securities from a single issuer," erroneously "conclud[ing] that 'by proving their claims' as to GME that they will 'necessarily prove the claims' as to KOSS, an entirely different stock."  (*Id.* 41 (alteration added; quoting *In re Dreyfus Aggressive Growth Mutual Fund Litig.*, 2000 WL 1357509, at *5)).  These are distinctions without a difference.

Robinhood fails to persuade that securities from different *issuers* should be treated differently than securities in different *classes* from the same issuer in a case like this, where Plaintiffs suffered the same alleged injury as the entire class, arising from the same course of conduct, by the same Defendants.  Robinhood does not explain how Plaintiffs who traded in one Affected Stock are "differently situated" from class members who traded in another.  (*Id.*).  In sum,

> it is not necessary for the named plaintiffs to have invested in all of the investment vehicles. The [ACCAC] alleges a single pattern of fraud. The named [P]laintiffs' claims arise out of that scheme, which also gives rise to the claims of the other class members. Further, the claims of the named [P]laintiffs and the class members are based on identical legal theories. Thus[,] the claims of the named [P]laintiffs are typical of the claims of the other class members.

*Tedesco v. Mishkin*, 689 F. Supp. 1327, 1335–36 (S.D.N.Y. 1988) (alterations added; citations omitted).

### b.    Unique Reliance Defenses

Robinhood also argues that some Plaintiffs are subject to atypical reliance defenses, because they have "conceded facts showing that they did not rely on the integrity of the market

when they purchased the Affected Stocks" and engaged in certain trading strategies that demonstrate they did not trade in reliance on an assumption of market efficiency.  (Resp. 38).  Plaintiffs disagree, explaining that Plaintiffs are "typical unsophisticated investors" and Robinhood's jabs at Plaintiffs' trading strategies are unavailing.  (Reply 32).  The Court agrees with Plaintiffs.

Robinhood first identifies some Plaintiffs who "admitted they knew about brokerage trading restrictions at the time they sold their shares of the Affected Stocks" and others who did not "recall[] receiving or viewing any statement regarding *why* Robinhood imposed the restrictions."  (Resp. 38 (alteration added)).  Laine-Beveridge in particular "testified he did not think Robinhood's reasons had anything to do with the stock price decline." (*Id.* (citing Deposition of Blue Laine-Beveridge ("Laine-Beveridge Dep.") [ECF No. 568-9] 169:14–20)).  Robinhood concludes that "[b]ecause Named Plaintiffs did not rely on Robinhood's statements about the reasons for the restrictions in deciding to sell their shares, they are atypical of any class that could pursue viable claims." (*Id.* 38–39 (citing *Underwood*, 2005 WL 8155010, at *4)).  Not so.

These potential reliance defenses will not "threaten[] to become the focus of the litigation thereby prejudicing the absent class members."  *Swack*, 230 F.R.D. at 264 (alteration added; quotation marks and citation omitted).  First, Plaintiffs' knowledge of Robinhood's restrictions is irrelevant; their access to this public, true information does not signify a successful reliance defense because Robinhood has not shown that these Plaintiffs "relied on information not available to the market." *In re Miller Indus., Inc. Sec. Litig.*, 186 F.R.D. at 686 (citation omitted).  In fact, Plaintiffs' knowledge of the trading restrictions makes Plaintiffs rather typical.

Still, in a market manipulation claim like the one here, "[a]ny evidence that the market was not defrauded, despite alleged misstatements or omissions, would directly undermine the theory

upon which the class seeks to build its case." *Underwood*, 2005 WL 8155010, at *3 (alteration added).  In *Underwood*, a misrepresentation case under Rule 10b-5(b) premised on the fraud-on-the-market theory, the proposed class representative "testified that the market knew" about the fraud during the class period, suggesting he "did not believe the market was defrauded during the class period." *Id.* at *4.  His statements, although "general," "str[uck] at the core of the 'fraud on the market' theory and threaten[ed] the common claim of the class[,]" rendering the proposed representative atypical.  *Id.* (alterations added).

The testimony here is unlike the representative's testimony in *Underwood*.  No Plaintiff has expressed a belief that the market was not defrauded.  And Plaintiffs' failure to recall Robinhood's statements about why it imposed the restrictions, or Laine-Beveridge's belief that it was ultimately the restrictions that caused the stocks' prices to drop, do not "strike at the core of" Plaintiffs' theory.  *Underwood*, 2005 WL 8155010, at *4.  Instead, this testimony is largely in harmony with Plaintiffs' relatively consistent position that Robinhood manipulated the market when it restricted the Affected Stocks while giving a false reason why, meaning the market price Plaintiffs allegedly relied on did not reflect the true situation.  (*See, e.g.*, Reply 30 ("All of these restrictions were coupled with half-truths that collectively sent a false pricing signal to the market." (alteration adopted; quotation marks and citation omitted))).  This slight "factual variation [does] not render [these representatives'] claim[s] atypical" because their situations do not "markedly differ[] from that of other members of the class."  *Kornberg*, 741 F.2d at 1337 (alterations added; citations omitted).

Robinhood next highlights four categories of "unusual trading practices" it believes subject all Plaintiffs to unique defenses.  (Resp. 9, 39–40).  None of Robinhood's punches land, because none of the criticisms effectively rebut Plaintiffs' showing that "the claims or defenses of the class

and the class representative[s] arise from the same event or pattern or practice and are based on the same legal theory." *Kornberg*, 741 F.2d at 1337 (alterations added).   Put differently, Robinhood's arguments do not demonstrate that Plaintiffs did not rely on the integrity of the market.  The Court examines each of the four categories of purportedly "unusual trading practices."

**Lack of Investing Experience and Research**.   Robinhood claims that Rivas, Bernard, Huacuja, Nguyen, Ng, and Laine-Beveridge are atypical because they are unsophisticated investors.   (*See* Resp. 39–40).   Two admitted not having real investment strategy or investing experience (*see id.* (citing Deposition of Cecilia Rivas ("Rivas Dep.") [ECF No. 568-14] 43:16– 20, 120:18–20; Deposition of Bernard ("Bernard Dep.") [ECF No. 568-1] 102:20–103:18, 110:22– 111:17)); five admitted they did not research the financials or business metrics of the Affected Stocks (*see id.* (citing Deposition of Abraham Huacaja ("Huacaja Dep.") [ECF No. 568-8] 54:4– 17; Deposition of Doi Nguyen ("Nguyen Dep.") [ECF No. 568-12] 33:21–36:9; Rivas Dep. 50:11– 20; Deposition of Sandy Ng ("Ng Dep.") [ECF No. 568-11] 54:7–10; Laine-Beveridge Dep. 57– 59)); and two did not recall why they decided to trade (*see id.* (citing Nguyen Dep. 83:21–24, 107:4–16; Bernard Dep. 149:5–151:13)).

Robinhood cites *Luczak* to support its argument that these investors are atypical.   (*See id.* 40 (citing *Luczak*, 548 F. Supp. 3d at 1267–68)).   There, the proposed representative's factual situation "differ[ed] markedly" from the class for many reasons, but "it was not [the representative's] sophistication that concern[ed] the [c]ourt[;]" instead, the court focused on "inconsistencies and incredible assertions related to his investment behaviors" in his deposition testimony. *Luczak*, 548 F. Supp. 3d at 1266–67 (alterations added).   Robinhood does not reference any "haphazard" or "highly unusual trading practices[;]" nor does it make any credibility assertions

that render any Plaintiffs atypical, making this argument unconvincing.  *Id.* at 1267 (alteration added).

Further, courts have routinely rejected similar attacks, because "[t]he degree of investment experience or sophistication of each of the class members is irrelevant." *Kennedy v. Tallant*, 710 F.2d 711, 717 (11th Cir. 1983) (alteration added; citation omitted).  A class will no doubt consist of "investors of varied proficiency," but the unexacting typicality requirement is met if the defendant "committed the same unlawful acts in the same method against an entire class." *Id.* Here, the testimony Robinhood references highlights that these investors are not unique in their unsophistication but rather are typical of the proposed class: retail investors of varied investment proficiency.

***Trading on Momentum***.  Robinhood next attacks Clarke, Nguyen, and Laine-Beveridge because each testified to trading the Affected Stocks based on momentum.  (*See* Resp. 40 (citing Deposition of Brendan Clarke ("Clarke Dep.") [ECF No. 568-5] 73:15–74:9; Nguyen Dep. 73:13–20; Laine-Beveridge Dep. 107:25–108:5)).  Ironically, that three of the named Plaintiffs were momentum traders highlights that they are likely *typical* of the proposed class.  In other words, "[t]he classes as pled include many investors with similar investment strategies, so any 'unique defenses' based on those strategies are in fact common questions." *In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. 65, 96 (S.D.N.Y. 2004) (alteration added; citation and footnote call number omitted) (declining to find momentum traders and day traders atypical), *vacated and remanded on other grounds sub nom. In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006).

Further, "day and momentum traders have the same incentives to prove [Robinhood's] liability as all other class members, and their presence in a securities class does not create intra-class conflicts." *Id.* at 108 (footnote call number omitted); *see also In re WorldCom, Inc. Sec.*

*Litig.*, 219 F.R.D. 267, 281–82 (S.D.N.Y. 2003) (rejecting challenges to reliance on computer models, advice of investment managers, and statements from defendant, and noting "[e]ach of these methods of making investment decisions is representative of methods used by many other investors. Each of the methods reflects an evaluation of the publicly available information about [the defendant.]" (alterations added)).

   ***Buying and Selling on the Same Day***.  Robinhood also faults Bernard, Bohórquez, Poirier, and Ng for buying and selling shares the same day.  (*See* Resp. 40 (citations omitted)).  This case is unlike *Applestein v. Medivation Inc.*, No. 10-cv-00998, 2010 WL 3749406, at *3 (N.D. Cal. Sept. 20, 2010), a case assessing typicality at the lead plaintiff stage, and the sole authority Robinhood cites on this point (*see* Resp. 40).  The proposed lead plaintiff in *Applestein* engaged in hundreds of trades during the 644-day class period, many of which occurred on the same day, raising the concern that "he was trading in response to information other than the alleged misstatements and omissions[.]"  2010 WL 3749406, at *3 (alteration added).

   Plaintiffs' more isolated instances of day trading (*see* Resp. 40) do not raise serious concerns that Plaintiffs did not rely on the integrity of the market price of the Affected Stocks when they transacted.  For the same reasons the momentum traders are not atypical, these Plaintiffs are not either.  *See In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. at 108; *In re Acclaim Ent., Inc. Sec. Litig.*, No. 03-cv-1270, 2006 WL 8441287, at *3 (E.D.N.Y. Aug. 7, 2006) ("[C]ourts in this Circuit have generally rejected the argument that a day trader is barred from representing a class in a securities action[] for reasons of atypicality." (alteration added; citations omitted)), *report and recommendation adopted*, No. 03-cv-1270, 2006 WL 8441288 (E.D.N.Y. Sept. 25, 2006).

*Investing Based on Recommendations*.  Finally, Robinhood faults Ng for making trading decisions because of Reddit posts and admitting that he continued holding shares in GME because of online posts by well-known Reddit user, social-media influencer, and investor Keith Gill, referred to on social media as "DFV."  (*See* Resp. 40).  As Ng put it, "[i]f DFV [wa]s holding, . . . [he] was holding."  (*Id.* (first three alterations in original; fourth alteration added; quoting Ng. Dep. 43:12–21, 83:11–20)).

Robinhood cites *Landry v. Price Waterhouse Chartered Accountants*, where the court found a plaintiff atypical because he traded on non-public information and recommendations of friends and associates, not the integrity of the market or public statements issued by the defendant. *See* 123 F.R.D. 474, 476 (S.D.N.Y. 1989).  Nothing suggests that Ng had access to non-public information, and the Eleventh Circuit has approved of a class representative who relied on investment advisors, because "[e]ven sophisticated investment advisors . . . rely on the integrity of the market."  *Regions*, 762 F.3d at 1260 (alteration added; citing *Blackie v. Barrack*, 524 F.2d 891, 907 (9th Cir. 1975)).

Plaintiffs meet the less-than-demanding test for typicality.  *See In re Checking Account Overdraft Litig.*, 286 F.R.D. at 653 (citations omitted).  At bottom, Plaintiffs present "a strong similarity of legal theories[,]" so the typicality requirement is satisfied "despite [some] factual differences" among Plaintiffs.  *Regions*, 762 F.3d at 1259 (alterations added; quotation marks and citation omitted).

## 5.    23(a)(4) — Adequacy

Robinhood's final attack on the representatives' qualifications under Rule 23(a) focuses on their adequacy; in particular, (1) their lack of awareness of and interest in the litigation and (2)

intra-class conflicts due to some investors purchasing Affected Stocks during the Class Period. (*See* Resp. 41–42).  The Court rejects both arguments.

Rule 23(a)(4) requires that named plaintiffs have "sufficient participation in and awareness of the litigation." *Kirkpatrick*, 827 F.2d at 727 (citations omitted).  Thus, class representatives are inadequate if they "have abdicated their role in the case beyond that of furnishing their names as plaintiffs." *Id.* (quotation marks and citation omitted).  A class representative is also inadequate if his interests conflict with that of the class.  *See In re Photochromic Lens Antitrust Litig.*, No. 10-cv-984, 2014 WL 1338605, at *14 (M.D. Fla. Apr. 3, 2014).

Robinhood first attacks Laine-Beveridge and Gurney for their lack of involvement in the litigation.  (*See* Resp. 42).  Robinhood cites Laine-Beveridge's failure to review the motion-to-dismiss briefing, the Order on the Motion to Dismiss, and the Motion for Class Certification; as well as his lack of communication with Plaintiffs' counsel about the class certification briefing. (*See id.*).  Robinhood deems this behavior "inadequate as a matter of law." (*Id.* (citing *Welling v. Alexy*, 155 F.R.D. 654, 659 (N.D. Cal. 1994)).  Robinhood also sets its sights on Gurney, accusing him of "show[ing] a complete lack of interest in the litigation" because he could not define the class; could not confirm whether he was suing on his AMC sales on which he profited; and gave his deposition from the driver's seat of his car, while driving.  (*Id.* (alteration added)).

Plaintiffs insist they are all sufficient, because they "reviewed and approved of the pleadings, regularly communicate with counsel and each other, understand the role of a class representative, produced documents, and testified at deposition[,]" thereby meeting the adequacy requirement.  (Reply 34 (alteration added; citing *Powers v. Gov't Emps. Ins. Co.*, 192 F.R.D. 313, 318 (S.D. Fla. 1998); other citation omitted)).  They are right.

"It is well-settled that it is not necessary for named class representatives to be knowledgeable, intelligent or have a firm understanding of the legal or factual basis on which the case rests in order to maintain a class action." *Powers*, 192 F.R.D. at 317 (citations omitted). "This is especially true in cases involving complex areas of the law." *Id.* at 318 (citing *Morris v. Transouth Fin. Corp.*, 175 F.R.D. 694, 698 (N.D. Ala. 1997)). Class representatives need not be pseudo-lawyers; all Robinhood has demonstrated is that some Plaintiffs are "not well-versed in [securities] law or the intricacies of [their] case[.]" *Id.* (alterations added). Plaintiffs' lack of legal prowess is insufficient to preclude an adequacy finding.

Plaintiffs have appeared for depositions, produced documents, and conferred with counsel. (*See generally* Rosen Decl., Ex. 48, Summary of Deposition Testimony Regarding Adequacy of Plaintiffs [ECF No. 585-15] (citations omitted)). That suffices. *See Powers*, 175 F.R.D. at 698; *Eastwood v. S. Farm Bureau Cas. Ins. Co.*, 291 F.R.D. 273, 294 (W.D. Ark. 2013) (finding representative adequate because he "appeared for deposition; . . . participated in telephonic and in-person meetings with counsel; he ha[d] a basic understanding of the nature of the action; and he ha[d] reviewed numerous documents relating to the action" (alterations added)).

Robinhood next highlights supposed intra-class conflicts. (*See* Resp. 42). Robinhood explains Cash sold GME the same day Ng bought GME, and many Plaintiffs bought shares during the Class Period despite seeking to represent a seller class. (*See id.*). According to Robinhood, "[t]hese variations establish intraclass conflicts." (*Id.* (alteration added; citation omitted)).

The only authority Robinhood cites is a products liability case involving sellers and buyers/current owners of the defective product during the class period. (*See id.* (citing *Montgomery v. New Piper Aircraft, Inc.*, 209 F.R.D. 221, 226 (S.D. Fla. 2002))). There, the court found intra-class conflicts existed because the sellers would need to prove "they received a

depressed price" to recover damages, and the buyers would need to prove "they paid full price in order to claim that the value of their [product] declined during their period of ownership, thereby entitling them to damages." *Montgomery*, 209 F.R.D. at 226–27 (alteration added). Here, this is a proposed seller class only; that some Plaintiffs purchased Affected Stocks during the Class Period does not present a risk of antagonistic interests. Because there are not two categories of claimants, there is no risk that they will present conflicting views on damages. *Cf. id.*

In sum, Plaintiffs have established they are adequate representatives, and Robinhood's arguments to the contrary are unavailing. The requirements of Rule 23(a) are satisfied.

**B.     Rule 23(b)(3) — Predominance**

In addition to satisfying the four requirements of Rule 23(a), a proposed class must fit within one of the three "[t]ypes" specified in Rule 23(b). Fed. R. Civ. P. 23(b) (alteration added); *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1233 (11th Cir. 2000), *cert. denied sub nom. Zeirei Agudath Isr. Bookstore*, 532 U.S. 919 (2001). Plaintiffs seek class certification under Rule 23(b)(3), which requires both that "questions of law or fact common to class members predominate over any questions affecting only individual members" and that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Robinhood disputes the first prong — predominance — arguing that individualized issues of reliance and damages predominate, precluding class certification. (*See* Resp. 22–36). The Court agrees with Robinhood that Plaintiffs have failed to demonstrate that common issues will predominate, because Plaintiffs have not offered a method of proving reliance class wide. Because

this is fatal to class certification, the Court does not reach the parties' arguments regarding damages or the second Rule 23(b)(3) prong, superiority.

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997) (citation and footnote call number omitted). To assess predominance, a court must determine whether issues in the class action subject to generalized proof predominate over those issues subject to individualized proof. *See Rutstein*, 211 F.3d at 1233. "Common questions 'predominate' . . . when the substance and quantity of the evidence necessary to prove the class claims w[ill no]t vary significantly from one plaintiff to another." *Tershakovec v. Ford Motor Co., Inc.*, 79 F.4th 1299, 1306 (11th Cir. 2023) (alterations added; citation omitted). In contrast, "[w]here, after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish . . . the elements of their individual claims, such claims are not suitable for class certification under Rule 23(b)(3)." *Klay*, 382 F.3d at 1255 (alterations added; citation omitted).

In many respects, predominance is like the typicality inquiry under Rule 23(a)(3). *See Amchem Prods., Inc.*, 521 U.S. at 623 n.18. Yet, the predominance analysis diverges in important ways. "Typicality ensures the interests of the class and the class representatives are aligned so that the latter will work to benefit the entire class through the pursuit of their own goals." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 182–83 (3d Cir. 2001) (quotation marks and citation omitted). Predominance is "more stringent" and focuses on whether the class representatives can use common evidence to "prove the claims of the entire class" rather than resort to "individual inquiry[.]" *Id.* at 184, 186–187 (alteration added); *see also In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 262 (D.D.C. 2002) ("[I]n general, predominance is met when

there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class members' [sic] individual position." (alteration added; internal quotation marks and citation omitted)).

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.* ("*Halliburton I*"), 563 U.S. 804, 809 (2011); *see also Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1260 (11th Cir. 2003), *aff'd sub nom. Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546 (2005) ("[T]o determine whether common questions predominate, we are called upon to examine the cause[] of action asserted in the complaint on behalf of the putative class." (alterations in original; quotation marks and citation omitted)). If the elements of the claims are "susceptible to class-wide proof[,]" common issues predominate. *In re Sci.-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1336 (N.D. Ga. 2007) (alteration added).

Plaintiffs bring market manipulation claims under section 9(a)(2), and section 10(b) and Rule 10b-5. Section 9(a)(2) prohibits "any person" from effecting

> alone or with 1 or more other persons, a series of transactions in any security registered on a national securities exchange, any security not so registered, or in connection with any security-based swap or security-based swap agreement with respect to such security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

15 U.S.C. § 78i(a)(2). A section 9(a)(2) cause of action requires a plaintiff to establish that:

> (1) a series of transactions in a security creating actual or apparent trading in that security or raising or depressing the price of that security, (2) carried out with scienter, (3) for the purpose of inducing the security's sale or purchase by others, (4) was relied on by the plaintiff (5) and affected plaintiff's purchase or selling price.

*Chemetron Corp. v. Bus. Funds, Inc.*, 682 F.2d 1149, 1164 (5th Cir. 1982) (footnote call numbers omitted), *vacated on other grounds*, 460 U.S. 1007 (1983).

The elements of a private securities fraud claim under section 10(b) and Rule 10b-5 when premised on market manipulation are "(1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.* ("*ATSI*"), 493 F.3d 87, 101 (2d Cir. 2007) (citations omitted).[11]

Notably, both claims require a showing of reliance. *See Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 206 (1976)). Courts treat reliance under section 9(a)(2) and section 10(b) identically. *See, e.g.*, *Harrington Global Opportunity Fund, Ltd. v. CIBC World Markets Corp.*, No. 21-761-Civ, 2023 WL 6316252, at *5, *8–*9 (S.D.N.Y. Sept. 28, 2023) (analyzing reliance under sections 9(a)(2) and 10(b) in the same way at the pleading stage); *Koenig v. Smith*, 88 F.R.D. 604, 606 (E.D.N.Y. 1980) (making no distinction between reliance under section 9(a)(2) or under section 10(b) at class certification stage). So do the parties. (*See generally* Mot.; Resp.; Reply). The Court sees no reason why it should not apply the principles of reliance under section 10(b) to the section 9(a)(2) claim, especially given the parties' apparent agreement on this point.

"Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of" these claims because "proof of reliance ensures that there is a proper connection between a defendant's [misconduct] and a plaintiff's injury." *Halliburton I*, 563 U.S. at 810 (alteration added; quotation marks and citations omitted) (discussing claims under section 10(b)). Reliance

---

[11] This is in contrast with "a more quotidian misrepresentation claim" which would require that a plaintiff "allege '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" (Order on MTD 38 (quoting *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008))).

CASE NO. 21-2989-MDL-ALTONAGA/Torres

is synonymous with "'transaction causation,'" an inquiry which "typically focuse[s] on facts surrounding the investor's decision to engage in the transaction." *Id.* at 812 (alteration added; quoting *Dura Pharmas., Inc. v. Broudo*, 544 U.S. 336, 341–342 (2005) (citing *Basic*, 485 U.S. at 248–249)). This alternative phrasing recognizes that the reliance inquiry focuses on whether the defendant's misconduct "cause[d] the plaintiff to engage in the transaction in question." *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997) (alteration added; quotation marks and citation omitted); *see also FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1311 (11th Cir. 2011) ("[R]eliance focuses on the front-end causation question of whether the defendant's fraud induced or influenced the plaintiff's stock purchase[.]" (alterations added; citation omitted)); *Rowe v. Maremont Corp.*, 850 F.2d 1226, 1233 (7th Cir. 1988) (reliance requires a defendant's bad act to have "played a substantial part in the plaintiff's investment decision"). By its nature, reliance is "inherently individualized[,]" *Halliburton Co. v. Erica P. John Fund, Inc.* ("*Halliburton II*"), 573 U.S. 258, 287 (2014) (Thomas, J., concurring) (alteration added), making it an important focus of Rule 23(b)(3)'s predominance inquiry.[12]

The parties vigorously dispute whether proving reliance will pose a predominance barrier to class certification. (*See* Mot. 18–33; Resp. 22–33; Reply 14–25). In Plaintiffs' view, they can prove reliance class wide on any one of four alternative theories. Plaintiffs insist they are entitled to two different presumptions of reliance endorsed by the Supreme Court: the *Affiliated Ute* presumption from *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) (*see* Mot.

---

[12] By contrast, loss causation "requires a plaintiff to show that a [defendant's misconduct] that affected the integrity of the market price *also* caused a subsequent economic loss." *Halliburton I*, 563 U.S. at 812 (alteration added; emphasis in original). There can be many intervening reasons for an inflated stock to drop in price, separate from a defendant's manipulative acts or misstatements. This inquiry, however, "has nothing to do with whether an investor relied on the [defendant's conduct] in the first place" and is not a required showing at class certification. *Id.* at 813 (alteration added).

19–22; Reply 15–18), and the *Basic* presumption, from *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) (*see* Mot. 24–29; Reply 21–25).  Additionally, they argue reliance can be proved class wide by demonstrating that Plaintiffs traded in a *bona fide* market.  (*See* Mot. 22–24; Reply 19–21). Finally, Plaintiffs argue that they are entitled to class certification even without proving reliance class wide based on the Eleventh Circuit's common scheme doctrine.  (*See* Mot. 18–19; Reply 18–19).

Robinhood disagrees, insisting neither the *Affiliated Ute* nor the *Basic* presumption is available to Plaintiffs (*see* Resp. 24–29; 32–33); Plaintiffs' *bona fide* market arguments are unavailing (*see id.* 23–25); and the common scheme doctrine is inapplicable here (*see id.* 29–31). Robinhood explains that Plaintiffs must resort to individualized proof of reliance, making class certification improper because individual issues will predominate.  (*See id.* 22–33).  The Court examines the parties' positions.

## 1.    *Affiliated Ute*

Plaintiffs first seek to invoke the *Affiliated Ute* presumption.  (*See* Mot. 20–22).  The parties take opposing positions on whether this is the type of case *Affiliated Ute* applies to.  (*See* Resp. 32–33; Reply 15–18).  Unfortunately for Plaintiffs, *Affiliated Ute* does not assist them here.

*Affiliated Ute* involved the management and distribution of the Ute Indian Tribe's assets. *See Affiliated Ute*, 406 U.S. at 136–37.  The Ute Distribution Corporation ("UDC") was charged with managing the assets, and any "mixed-blood" tribe-member shareholder wishing to sell her shares in the UDC needed to offer a right of first refusal to other members of the tribe before offering the shares to a non-member.  *Id.* at 137.  Two employees of a bank — which acted as the UDC stock transfer agent — concocted a scheme by which they would solicit and purchase UDC shares from mixed-blood tribe-members for themselves or other nonmembers, without disclosing

certain "material facts that reasonably could have been expected to influence their decisions to sell" — namely, that the employees were profiting from their purchases of the shares and the shares were selling for higher prices in the market. *Id.* at 153.

Several plaintiffs sued for violations of the federal securities laws, including Rule 10b-5. *See id.* at 140. The Supreme Court held that under those circumstances, "involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision." *Id.* at 153–54 (citations omitted).

Thus, *Affiliated Ute* created a presumption of reliance for plaintiffs in such cases, because where "no positive statements exist[,] reliance as a practical matter is impossible to prove." *Wilson v. Comtech Telecommc'ns Corp.*, 648 F.2d 88, 93 (2d Cir. 1981) (alteration added; citations omitted). The Eleventh Circuit has clarified that *Affiliated Ute* applies only to cases "involving primarily a failure to disclose in which defendants who had an affirmative duty to disclose stood mute, leaving plaintiffs absolutely nothing upon which to rely." *Cavalier Carpets, Inc. v. Caylor*, 746 F.2d 749, 755 (11th Cir. 1984) (footnote call number omitted). By contrast, in cases alleging affirmative misrepresentations or in those "mixing allegations of omissions and misstatements[,]" the *Affiliated Ute* presumption is unavailable. *Id.* at 757 (alteration added); *see also Huddleston v. Herman & MacLean*, 640 F.2d 534, 548 (5th Cir. 1981) ("This case, involving alleged misstatements and omissions in a prospectus published pursuant to a public offering, cannot properly be characterized as an omissions case of the type for which the *Affiliated Ute* presumption was fashioned."), *aff'd in part and rev'd in part on other grounds*, 459 U.S. 375 (1983). As "every misstatement both advances false information and omits truthful information[,]" analyzing whether a case is appropriate for the *Affiliated Ute* presumption is not always an easy task. *Bruhl*

*v. Price Waterhousecoopers Int'l*, 257 F.R.D. 684, 692 (S.D. Fla. 2008) (alteration added; citation omitted).

Plaintiffs insist *Affiliated Ute* applies to their claims.  (*See* Mot. 20–22; Reply 15–18). Their argument is as follows: (1) "Market activity is manipulative when combined with material omissions to 'send[] a false pricing signal to the market.'" (Mot. 19–20 (alteration in original; quoting Order on MTD 41, 46 (quoting *ATSI*, 493 F.3d at 100))); (2) Robinhood's restrictions were manipulative, because Robinhood attributed them "solely to 'market volatility'" and omitted mention of its liquidity problem, depriving investors "of the full picture as they debated whether to hold or sell their Affected Stocks" (*id.* 20 (quoting Order on MTD 43 n.16, 46)); and (3) these half-truths were material, so this case is a material omissions case to which *Affiliated Ute* applies (*id.*).

Robinhood's response is two-fold.  (*See* Resp. 32–33).  First, Robinhood maintains that *Affiliated Ute* "does not apply to market manipulation claims."  (*Id.* 32 (citing *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 940 (9th Cir. 2009))).  Even if it does, Robinhood argues it does not apply to *this* claim, because "the alleged manipulation here depends primarily on misrepresentations" rather than omissions.  (*Id.* 33 (footnote call number omitted)).  While the Court is not convinced *Affiliated Ute* is inapplicable to market manipulation claims, it agrees with Robinhood that *Affiliated Ute* does not apply here.  The Court explains.

Turning to Robinhood's first argument, courts disagree on whether *Affiliated Ute* applies to market manipulation claims.  Generally, courts categorize claims under section 10(b) and Rule 10b-5 into three types: misrepresentation cases, omissions cases, and market manipulation cases. *See, e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 335 (S.D.N.Y. 2003) (treating

43

manipulation as a violation of Rule 10b-5(a) or (c) and misrepresentations and omissions as violations of Rule 10b-5(b)).

In *Desai*, the Ninth Circuit limited the application of *Affiliated Ute* to omissions cases only, *i.e.*, not manipulative conduct cases under Rule 10b-5(a) or (c). *See* 573 F.3d at 941. In the court's view, "to succeed, manipulative schemes must usually remain undisclosed to the general public." *Id.* (citation omitted). The court reasoned that "[i]f such nondisclosure of a defendant's fraud was an actionable omission, then every manipulative conduct case would become an omissions case[,]" rendering "the Supreme Court's discussion of what constitutes manipulative activity . . . redundant." *Id.* (alterations added). The Tenth Circuit reached a similar conclusion. It disallowed "the mere fact of [] concealment to transform [] alleged malfeasance into an omission rather than an affirmative act" because "[t]o do otherwise would permit the *Affiliated Ute* presumption to swallow the reliance requirement almost completely." *Joseph v. Wiles*, 223 F.3d 1155, 1163 (10th Cir. 2000) (alterations added), *abrogated on other grounds by Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 582 U.S. 497 (2017).

Predictably, Plaintiffs disagree with *Desai*. (*See* Reply 15–16). They say, "the Supreme Court obliterated such rigid distinctions among the subsections of Rule 10b-5 in *Lorenzo v. S.E.C.*, 139 S. Ct. 1094, 1102 (2019)." (*Id.*). The issue in *Lorenzo* surrounded the definition of "maker" under Rule 10b-5(b), a matter not relevant here. *See generally Lorenzo*, 139 S. Ct. 1094. In reaching its conclusion, however, the Supreme Court emphasized the "considerable overlap among the subsections of the Rule and related provisions of the securities laws" and rejected the premise that Rule 10b-5's subsections "govern[] different, mutually exclusive, spheres of conduct." *Id.* at 1102 (alteration added). This suggests the categorical distinctions Robinhood invites do not comport with the Supreme Court's more fluid interpretation of the Rule.

Even before *Lorenzo*, courts criticized *Desai*'s categorical approach.   As one court reasoned, "*Affiliated Ute* itself was a case based on manipulative conduct." *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d at 496; *see In re Barclays Liquidity Cross & High Frequency Trading Litigation* ("*In re Barclays*"), 390 F. Supp. 3d 432, 448–49 (S.D.N.Y. 2019) (rejecting *Desai*'s distinctions and applying *Affiliated Ute* to a market manipulation claim), *on remand after reversal sub nom. by City of Providence v. Bats Glob. Markets, Inc.*, 878 F.3d 36 (2d Cir. 2017). Indeed, it would be quite the bizarre result to hold the presumption cannot apply to market manipulation cases when the case creating the presumption involved a manipulative scheme.

It does not appear the Eleventh Circuit has confronted this question.   But the Court need not do so.   Putting aside whether *Affiliated Ute* could apply to *a* market manipulation claim, it cannot apply to *this* market manipulation claim because Plaintiffs' claims are not based primarily on omissions.

According to Plaintiffs, this case involves primarily omissions because Plaintiffs' claims are premised on Robinhood's half-truths.   (*See* Reply 16 ("[H]ere, it is literally true that there was 'market volatility' but the blog post is actionable because of what was omitted — due to the volatility Robinhood was inadequately capitalized[.]" (alterations added)); *see also* Order on MTD at 43–47).   As the Court previously found, Robinhood's conduct was manipulative because its statements that it halted trading due to market volatility were deceptive in that they omitted the true reason for the restrictions: liquidity issues.   (*See* Order on MTD at 45).   "Robinhood misled users into thinking that only market volatility — not its lack of capital — played a role in its decision to raise margin requirements, impose purchase restrictions, close out option positions early, and cancel purchase orders." (*Id.*).   Because Robinhood failed to disclose the liquidity issues, Plaintiffs characterize this as an omissions case.   (*See* Mot. 19–22).   Plaintiffs point to *In*

*re Barclays*, a market manipulation case that applied the *Affiliated Ute* presumption and "in which the 'omissions bear marked similarities' to Robinhood's." (Mot. 21 (citing 390 F. Supp. 3d 432; quoting Order on MTD 47)).

*In re Barclays* involved allegations that certain exchanges created products only high-frequency trading firms could afford. The products gave the firms access to market data at a faster rate, so they could obtain non-public information and take priority over ordinary investors' trades. *See In re Barclays*, 390 F. Supp. 3d at 440. The plaintiffs alleged stock exchanges' failure to disclose the products' full effect on market activity created a false appearance of market liquidity that resulted in plaintiffs' bids and orders not being filled at the best available prices. *See id.* at 440, 446. To be sure, the exchanges disclosed the existence of the products but described them in a manner that omitted material information. *See id.* at 448 (citing *City of Providence*, 878 F.3d at 51 (accepting as true at the pleading stage that the exchanges' omissions were material)). The district court held that *Affiliated Ute* applied, based on the Second Circuit's prior characterization of the case as "premised on the [e]xchanges 'failure to fully disclose' how [high-frequency trading] firms could use certain products and services on the [e]xchanges' trading platforms." *In re Barclays*, 390 F. Supp. 3d at 448 (alterations added; quoting *City of Providence*, 878 F.3d at 52; footnote call number omitted).

There is no denying the similarity between this case and in *In re Barclays*. Be that as it may, the Eleventh Circuit "has recognized the limited reach of the [*Affiliated*] *Ute* presumption" and consequently, takes a more restrictive approach when cases involve both misstatements and omissions. *Cavalier Carpets, Inc.*, 746 F.2d at 756 (alteration added). *Huddleston*, for example, involved "alleged misstatements and omissions in a prospectus published pursuant to a public offering[.]" 640 F.2d at 548 (alteration added). The *Affiliated Ute* presumption did not apply,

because the case did not involve primarily omissions and thus did not present the "difficulties of proof of reliance" the presumption was fashioned for. *Id.* There, as here,

> [t]he defendants did not 'stand mute' in the face of a duty to disclose . . . . They undertook instead to disclose relevant information in an offering statement now alleged to contain certain misstatements of fact and to fail to contain other facts necessary to make the statements made, in light of the circumstances, not misleading.

*Id.* (alterations added).

Likewise, in *Cavalier Carpets* — a case involving claims under section 10(b) and rule 10b-5 — the plaintiffs "allege[d] three omissions and three misstatements," so the "mixed case rule of *Huddleston*" applied and *Affiliated Ute* did not. 746 F.2d at 757–58 (alteration added; citations omitted); *see also Kirkpatrick*, 827 F.2d at 721–22 (holding a case did not involve primarily omissions when plaintiffs' claims were based on defendants' dissemination of misleading prospectuses and continued promotion of a company despite knowing of and not disclosing the company's financial difficulties).

The Court is bound by these decisions. This case is based on Robinhood's misstatements — that its restrictions were due to market volatility — coupled with omissions — that Robinhood was suffering from liquidity issues. (*See* Order on MTD 45 ("Robinhood outright denied having a liquidity issue and blamed market volatility exclusively.")). The ACCAC also repeatedly cites to Robinhood's positive statements. (*See* ACCAC ¶¶ 63, 77–80). Despite these allegations, Plaintiffs attempt to recharacterize the ACCAC as making claims based on omissions to invoke the *Affiliated Ute* presumption. (*See* Reply 16–18). "But this type of verbal refashioning cannot transform this case into one based 'primarily on omissions.'" *Bruhl*, 257 F.R.D. at 694 (quoting *Mergens v. Dreyfoos*, 166 F.3d 1114, 1119 n.3 (11th Cir. 1999); citing *Young v. Nationwide Life Ins. Co.*, 183 F.R.D. 502, 510 (S.D. Tex. 1998) (rejecting the plaintiff's attempt to recharacterize the alleged misrepresentations as omissions, observing that "such a

circular argument would result in every case of misrepresentation becoming a case of omission as a result of the defendant's failure to correct a misrepresentation")).

Here, Plaintiffs' own allegations make clear that Robinhood did not simply "stand mute in the face of a duty to disclose[.]" *Huddleston*, 640 F.2d at 548 (alteration added; quotation marks omitted). Instead, Robinhood "undertook [] to disclose relevant information . . . now alleged to contain certain misstatements of fact and to fail to contain other facts necessary to make the statements made, in light of the circumstances, not misleading." *Id.* (alterations added). At best, then, this is a case based on mixed allegations of misrepresentations and omissions, not primarily omissions. *See id.*; *see also Bacon v. Stiefel Lab'ys, Inc.*, 275 F.R.D. 681, 698 (S.D. Fla. 2011) ("Although Plaintiffs' claims may be predicated in large part upon the Defendants' omissions, the pleadings indicate that the omissions are inextricably intertwined with the alleged misrepresentations.").

In sum, there can be no *Affiliated Ute* presumption of reliance in a case of such mixed allegations. *See Cavalier Carpets*, 746 F.2d at 757. Because Plaintiffs' claims stem from Robinhood's "half-truths" and "misstatements whose only omission is the truth that the statement misrepresents[,]" the *Affiliated Ute* presumption cannot apply. *Waggoner v. Barclays PLC*, 875 F.3d 79, 96 (2d Cir. 2017) (alteration added; citation omitted).

### 2.   *Basic* **and** *Fezzani*

Plaintiffs next put forth two interrelated arguments to overcome the reliance hurdle, both based on certain characteristics of the markets they traded in. (*See* Mot. 22–29; Reply 19–25). First, Plaintiffs argue that by virtue of demonstrating they traded in a *bona fide* market, they have sufficiently established reliance class wide. (*See* Mot. 22–24; Reply 19–22). Alternatively, Plaintiffs argue they are entitled to the fraud-on-the-market presumption articulated in *Basic*, 485

U.S. at 246–49, also referred to as the *Basic* presumption.  (*See* Mot. 24–29; Reply 22–25). Robinhood disputes both theories of reliance, insisting neither is viable here.  (*See* Resp. 22–29). Understanding the parties' arguments regarding both the *bona fide* market theory and the *Basic* presumption requires keen comprehension of the fraud-on-the-market theory and related Supreme Court precedent, so the Court provides the necessary backdrop before considering the parties' competing positions.

Although reliance is a necessary element of a section 10(b) claim, in *Basic*, the Supreme Court acknowledged that demanding direct proof of reliance "would place an unnecessarily unrealistic evidentiary burden on the [] plaintiff who has traded on an impersonal market."  485 U.S. at 245 (alteration added; citation omitted).  It would also have the practical effect of preventing plaintiffs from bringing class actions in securities cases, because it would require each individual plaintiff to establish reliance, necessarily ensuring that "individual issues . . . would . . . overwhelm[] the common ones."  *Id.* at 242 (alterations added).  To resolve this quandary, the Supreme Court in *Basic* approved of a presumption that would allow plaintiffs to prove reliance indirectly.  *See* 485 U.S. at 245–49.

Taking a step back, "[p]resumptions typically serve to assist courts in managing circumstances in which direct proof, for one reason or another, is rendered difficult."  *Id.* at 245 (citation omitted).  Prior to *Basic*, many lower courts had allowed securities fraud plaintiffs to invoke a presumption based on a fraud-on-the-market theory, a theory which rests on the efficient capital markets hypothesis "that the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations."  *Id.* at 245–46 (citation and footnote call number omitted).  In other words, an efficient market — one that is open and well developed — incorporates all public information: the good, the bad, and the

ugly.  When a defendant makes a public misrepresentation in an efficient market, it defrauds the market.

The *Basic* Court approved of a presumption resting on this economic theory.  It reasoned that in drafting the 1934 Securities Act, "Congress expressly relied on the premise that securities markets are affected by information, and enacted legislation to facilitate an investor's reliance on the integrity of those markets[.]"  *Id.* at 246 (alteration added).  The Court accepted as true the general proposition that "[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price."  *Id.* at 247 (alteration added).  If an investor relies on price integrity, and a stock's price has absorbed a public misrepresentation, fraudulently inflating or deflating the stock's price, then it can be said that the investor indirectly relied on the misrepresentation by relying on the integrity of the stock's price.  The Court concluded that "an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action[,]" provided certain conditions are met.  *Id.* (alteration added).  These conditions are: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed."  *Halliburton II*, 573 U.S. at 268 (citations omitted).

The presumption is a rebuttable one.  *See id.*  "Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance."  *Basic*, 485 U.S. at 248.  Examples of this include where corrective statements were made prior to a plaintiff's trading activity, or when a plaintiff "would have divested [himself] of [his] [] shares without relying on the integrity of the market" — such as a plaintiff who "believed that [a] stock was

artificially underpriced[] but sold his shares nevertheless because of other unrelated concerns, *e.g.*, potential antitrust problems, or political pressures[.]" *Id.* at 249 (alterations added).

Market efficiency is at the heart of the fraud-on-the-market theory and the *Basic* presumption, because without it, the stock price does not function as a reliable proxy for publicly available information. *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 462 (2013). The applicability of the presumption often turns on whether a market was efficient, and as a result, class certification itself often depends on market efficiency. *See, e.g., id.* at 462–63.

Following *Basic*, economists and lawyers alike have criticized the fraud-on-the-market presumption and the theory on which it rests for the salient reason that "overwhelming empirical evidence suggests that capital markets are not fundamentally efficient." Baruch Lev & Meiring de Villiers, *Stock Price Crashes and 10b-5 Damages: A Legal, Economic, and Policy Analysis*, 47 Stan. L. Rev. 7, 20 (1994); *see also Halliburton II*, 573 U.S. at 270 (citation omitted). Said differently, studies show that "public information is often not incorporated immediately (much less rationally) into market prices." *Halliburton II*, 573 U.S. at 271 (quotation marks and citation omitted) (discussing briefs from petitioners and law professors as *amici curiae*).

Critics argued that *Basic* erred by failing to acknowledge that "efficiency is not a binary, yes or no question." *Id.* (citing Donald C. Langevoort, Basic *at Twenty: Rethinking Fraud on the Market*, 2009 Wis. L. Rev. 151, 167 (2009); quotation marks and other citation omitted). In these critics' view, some markets are more efficient than others, "and even a single market can process different information more or less efficiently, depending on how widely the information is disseminated and how easily it is understood." *Id.* (citation omitted). Further, some deemed an overgeneralization *Basic*'s fundamental premise that "investors invest in reliance on the integrity of the market price." *Id.* at 273 (alteration adopted; quotation marks and citations omitted). For

example, value investors "believe[] that certain stocks are undervalued or overvalued and attempt[] to 'beat the market' by buying the undervalued stocks and selling the overvalued ones." *Id.* (alterations added; quotation marks and citation omitted).  How, then, can such value investors be presumed to rely on price integrity when they are "indifferent to prices"? *Id.* (quotation marks and citation omitted).

The Supreme Court confronted these criticisms and passed on overruling *Basic*. *See generally id.* The Court clarified that *Basic* does not adopt a conclusive theory and "does not rest on a 'binary' view of market efficiency"; rather, it makes "the presumption rebuttable," thereby recognizing "that market efficiency is a matter of degree and accordingly ma[king] it a matter of proof."[13] *Id.* at 272 (alteration added).  As to value investors, "*Basic* never denied the existence of such investors" and "concluded only that 'it is reasonable to presume that *most* investors — knowing that they have little hope of outperforming the market in the long run based solely on their analysis of publicly available information — will rely on the security's market price as an unbiased assessment of the security's value in light of all public information.'" *Id.* at 273 (emphasis in original; citation omitted).  Even the value investor is not truly indifferent to the integrity of market prices, the Court reasoned, but "implicitly relies on the fact that a stock's market price will eventually reflect material information — how else could the market correction on which his profits depend occur?" *Id.*

It is worth noting that some continue to lob criticisms at the "folly of litigating market efficiency[.]"  Murdock, *supra* note 13, at 557 (alteration added).  In market manipulation cases, the criticisms of market efficiency are especially pronounced, with some scholars arguing the

---

[13] "Paradoxically, while Justice Roberts recognized that market efficiency is not a 'yes or no' question, 'yes or no' is exactly what a trial court must determine, so long as the focus is upon market efficiency."  Charles W. Murdock, *The Significance and Impact of Price Distortion and the Fraud-on-the-Market Theory After Halliburton II*, 46 Loy. U. Chi. L.J. 551, 556 (2015).

requirement "sever[s]" the "connection between reliance on market price and manipulative conduct" and "leads to perverse results" in litigation, in part because inefficient markets are prone to manipulation, and efficient markets are not.  Charles R. Korsmo, *Mismatch: The Misuse of Market Efficiency in Market Manipulation Class Actions*, 52 Wm. & Mary L. Rev. 1111, 1180 (2011) (alteration added).  Consequently, some scholars see imposing the market efficiency requirement as "weeding out plausible claims of manipulation while allowing implausible claims a free pass." *Id.* at 1179.

With this backdrop in mind, the Court turns to the parties' arguments.

Plaintiffs' first argument is that they can establish reliance in a market manipulation claim without relying on *Basic*.  Plaintiffs say the word "efficient" in the reliance element of a market manipulation claim means something different than *Basic*'s version of efficiency; according to Plaintiffs, "efficient" in a market manipulation claim means only "a *bona fide* market free of manipulation."  (Mot. 22–23 (alteration added; quotation marks omitted; citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.* ("*ATSI*"), 493 F.3d 87, 101 (2d Cir. 2007); *Fezzani v. Bear, Stearns & Co. Inc.* ("*Fezzani I*"), 716 F.3d 18 (2d Cir. 2013), *reh'g denied*, 777 F.3d 566 (2d Cir. 2015) ("*Fezzani II*")).  In other words, Plaintiffs insist they do not need to demonstrate market efficiency; they only need show the market they were trading in was *bona fide* — a much lighter lift than demonstrating efficiency under *Basic*.  Second, Plaintiffs argue that even if *Basic* market efficiency is required, they have made the necessary showing to obtain the presumption.  (*See id.* 24–29). For reasons explained below, Plaintiffs fail to persuade.

### a.   Reliance on an Assumption of a *Bona Fide* Market

The Court first addresses Plaintiffs' argument that they need only establish the market the Affected Stocks traded in was *bona fide*.  Plaintiffs' argument can be summarized as follows.  In

CASE NO. 21-2989-MDL-ALTONAGA/Torres

market manipulation claims, the Second Circuit requires plaintiffs to allege damage "caused by reliance on an assumption of an efficient market free of manipulation[,]" *ATSI*, 493 F.3d at 101 (alteration added; citations omitted); the Second Circuit has interpreted an "efficient" market under *ATSI* to mean a "*bona fide* 'market free of manipulation'" and therefore not fully efficient in the *Basic* sense, *Fezzani I*, 716 F.3d at 23 n.3 (citation omitted); and because Plaintiffs have shown that the market here was *bona fide* due to the securities trading on national exchanges, they can demonstrate reliance class wide (*see* Mot. 22–23; Reply 19–21).   At first, this argument seems persuasive, but a closer look reveals serious flaws in its logic and the implications of accepting such showing as sufficient.

In *ATSI*, the Second Circuit set forth the elements of a market manipulation claim as follows: "(1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." 493 F.3d at 101 (citations omitted).[14]   By comparison, elements (1) and (3) of a misrepresentation claim differ in that they require a misrepresentation and reliance on such misrepresentation.   *See Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008) (citation omitted).

Later, in *Fezzani I*, the Second Circuit clarified that reliance under *ATSI* requires only "a misplaced belief in the price of security as being set by arms-length, *bona fide* trading[.]"  716 F.3d at 22–23 (alteration added; footnote call number omitted).   The *Fezzani I* court went on to explain that it did "not read *ATSI*'s reference to 'reliance on an assumption of an efficient market

---

[14] Plaintiffs make the remarkable, half-hearted argument that market efficiency is an element of a manipulation claim and thus "a merits question not ripe for decision at class certification." (Mot. 22 (citing *Amgen Inc.*, 568 U.S. at 459–60)).   As explained, the Court "can and should consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied."  *Krukever*, 328 F.R.D. at 656 (citation omitted).

free of manipulation' as referring to a liquid, efficient market with prices publicly reported in real time." *Id.* at 23 n.3. Instead, the court "read *ATSI*'s reference to an 'efficient' market to mean only a *bona fide* 'market free of manipulation.'" *Id.* (citations omitted). Later, on rehearing, the *Fezzani II* court clarified that its earlier "opinion . . . read *ATSI* in a way favorable to manipulation claims. [It] stated the 'market' 'signaled' by manipulative conduct need not be fully efficient" because "a highly efficient market is an unlikely site for manipulation[.]" *Fezzani II*, 777 F.3d at 572 (alterations added; quoting *Fezzani I*, 716 F.3d at 21 n.2).

Relying on *Fezzani I*, Plaintiffs insist they have adequately established reliance, because the markets for the Affected Stocks are clearly *bona fide*: they all "traded on the NYSE or NASDAQ." (Reply 20 (citations omitted)). Robinhood takes issue with Plaintiffs' argument for two reasons: first, it criticizes the theory as "logically flawed[,]" asserting that market efficiency alone should control whether reliance may be presumed; second, it criticizes the cases Plaintiffs rely on as inapplicable in the class action context and misinterpreted by Plaintiffs. (Resp. 24 (alteration added; quotation marks and citation omitted); *see id.* 23–25).

Taking a step back, recall that the *Basic* presumption is premised on the efficient capital markets theory that an informationally efficient market incorporates public misrepresentations in a security's price; therefore, a plaintiff's reliance on the integrity of a stock's price serves as a proxy for reliance on the defendant's misrepresentations. *See Halliburton II*, 573 U.S. at 270–71. Courts apply *Basic* to "misrepresentation and manipulation claims alike . . . because both types of misconduct result in the injection of a false premise into the marketplace." *In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 394 (S.D.N.Y. 2010) (alteration added; citation omitted) (collecting cases applying *Basic* to market manipulation claims), *aff'd sub nom. Wilson v. Merrill Lynch & Co.*, 671 F.3d 120 (2d Cir. 2011). With market manipulation claims, "[i]n an

efficient market, trading engineered to stimulate demand can mislead investors into believing that the market has discovered some positive news and seeks to exploit it; the duped investors then transact accordingly." *ATSI*, 493 F.3d at 101 (alteration added; citation omitted). So, if a plaintiff can show she transacted in an efficient market, a court can presume the plaintiff "reli[ed] on an assumption of an efficient market free of manipulation[.]" *Id.* (alterations added; citations omitted).

Before *Fezzani I*, some lower courts read *ATSI* to "essentially incorporate[] 'fraud on the market' into the standard for market manipulation by requiring that plaintiffs show 'reliance on an assumption of an efficient market.'" *Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 651 (S.D.N.Y. 2012) (alteration added; quoting *ATSI*, 493 F.3d at 99–103). But *Fezzani I*, at least in dictum, rejected this more restrictive reading, adopting instead an incredibly expansive interpretation of *ATSI*'s reliance element. *See* 716 F.3d at 21 n.2. Going even further, the *Fezzani I* court also suggested that "a future court might create a rebuttable presumption of reliance in a less-than-efficient market context." *Fezzani II*, 777 F.3d at 572 (citing *Fezzani I*, 716 F.3d at 21 n.2).

Plaintiffs now invite this presumption. They ask the Court to find individualized reliance issues will not predominate because they have demonstrated that the market they traded in was "*bona fide*[.]" (Mot. 23 (alteration added)). To be clear, Plaintiffs do not explicitly request a new presumption; instead, they baldly assert "*ATSI* reliance has been satisfied." (*Id.*). Regardless of the wording, a presumption must be what Plaintiffs seek.

Of course, individualized issues would still predominate if Plaintiffs were required to show that each individual class member "reli[ed] on an assumption of an efficient market[,]" *ATSI*, 493 F.3d at 101 (citations omitted); or, more aptly, "relied on an assumption of a[] [*bona fide*]

56

market[,]" *id.* (alterations added; citations omitted).   Apparently, Plaintiffs believe that by demonstrating that the markets for the Affected Stocks were *bona fide*, the Court can presume that class members who traded in such *bona fide* markets "reli[ed] on an assumption of an efficient market free of manipulation[.]"  *Id.* (alterations added; citations omitted).  For clarity, the Court refers to this as the *bona fide* market presumption.

Robinhood lobs several disjointed arguments in protest, all of which can be synthesized into two points: (1) that for one reason or another, *Basic* efficiency is mandatory for class actions asserting section 10(b) and Rule 10b-5 claims and (2) the *bona fide* market presumption is poorly reasoned.  (*See* Resp. 23–25).  The former argument lacks legs, but the latter persuades.

Robinhood insists that *Fezzani I* is unpersuasive merely because it did not involve a class action, so "fraud on the market and the *Basic* presumption were not at issue."  (Resp. 24 (citation and footnote call number omitted)).  Yet, the court addressed class actions when discussing the difficulties faced in proving market efficiency, noting:

> [T]he implications of these insights relate principally to class actions.  There may thus be some merit to a modified presumption of reliance in market manipulation cases because reliance by investors on a misrepresentation of a price as being set by an active, arms-length market may be presumed.

*Fezzani I*, 716 F.3d at 21 n.2 (alteration added; citation omitted).  That *Fezzani I* was not itself a class-action case matters little.  Nevertheless, Robinhood believes *Fezzani I* set the standard of reliance for an individual investor only and *Basic* demands more of class actions.  (*See* Resp. 24).  This argument relies on a faulty premise: it impliedly assumes that the *Basic* presumption is mandatory in class actions asserting misrepresentation or market manipulation claims.

*Basic* accepted a judicially created presumption that aligned with then-well-accepted economic theory and Congress's perception of the securities markets.  *See* 485 U.S. at 246–49.  But nothing in *Basic* or later Supreme Court decisions discussing its approved presumptions have

excluded the possibility of future or modified presumptions of reliance.  *See, e.g.*, *Stoneridge*, 552 U.S. at 159 (acknowledging the *Affiliated Ute* and *Basic* presumptions but not identifying these presumptions as exclusive).  Other courts have acknowledged the possibility of new presumptions developing.  *See Desai*, 573 F.3d at 942 (discussing *Stoneridge* and explaining that it "may not forbid the recognition of new presumptions"); *Fezzani I*, 716 F.3d at 21 n.2.

The question, then, is whether Plaintiffs persuade the Court to accept a modified presumption: the *bona fide* market presumption.  The answer is "No."

Courts have rejected similar proposals from plaintiffs in putative class actions asserting market manipulation claims.  In *In re Genesisintermedia, Inc. Securities Litigation*, the plaintiffs sought the creation of an "integrity on the market" presumption, which is almost identical to the *bona fide* market presumption Plaintiffs propose.  *See* No. 01-cv-9024, 2007 WL 1953475, at *12 (C.D. Cal. June 28, 2007), *aff'd sub nom. Desai*, 573 F.3d 931.  The investors explained that "you can't possibly require the plaintiff to prove an efficient market when, by definition, . . . . the whole proof of the case is going to be that these guys manipulated the market to destroy the very efficiency."  *Id.* at *8 (alteration added; citation omitted).  They further rationalized that investors typically rely on the "integrity of the market[,]" that is, that no one has destroyed the market's efficiency by manipulation.  *Id.* (alteration added; citation omitted). In those plaintiffs' view, like that of Plaintiffs here, that consideration justified a presumption of reliance when manipulation destroys the efficiency of the market — and with it, the reliability of the market's price.  *See id.*

The court rejected the plaintiffs' proposal for four reasons:

First, courts treat manipulation claims the same as misrepresentation claims for the purposes of demonstrating reliance.  As a result, the Court may not presume reliance in a manipulation case if the market is not efficient.  Second, Plaintiffs have failed to identify a single case which has adopted their "integrity of the market" theory.  Third, Plaintiffs' theory is logically flawed because the inference of reliance is broken if the market price of a security does not reflect the

manipulative activity.  Finally, Plaintiffs' complaint contains both manipulation and misrepresentation claims.

*Id.* at *8; *see also id.* at *8–*13.  Confronted with this new presumption on appeal, the Ninth Circuit was "chary."  *Desai*, 573 F.3d at 942.  Keeping in mind the Supreme Court's cautionary statement against extending the private section 10(b) action "'beyond its present boundaries[,]'" the Ninth Circuit held that the district court did not err in refusing to accept the new presumption, even though the law did not necessarily forbid it.  *Id.* (alteration added; quoting *Stoneridge*, 552 U.S. at 165).

Although the Ninth Circuit did not examine the viability of the proposed integrity of the market presumption, in concurrence, Judge O'Scannlain concluded the presumption was "inadvisable because it would swallow the reliance requirement."  *Id.* at 944 (O'Scannlain, J., concurring).  It is for this same reason that the Court cannot accept the *bona fide* market presumption Plaintiffs propose.

The Court agrees with the general premise that most investors "assume that the markets are not corrupt."  *Id.* (citing *Basic*, 485 U.S. at 246–47).  Certainly, as Plaintiffs repeatedly press, "'[w]ho would knowingly roll the dice in a crooked crap game?'" (Mot. 24 (alteration added; quoting *Basic*, 485 U.S. at 246–47)).  "But if that hypothesis sufficed to presume reliance, then no plaintiff would ever have to prove reliance."  *Desai*, 573 F.3d at 944 (O'Scannlain, J., concurring).  The reason *Basic* is an acceptable presumption is because it provides "'the requisite causal connection,' which lies at the heart of the reliance element, 'between a defendant's bad act and a plaintiff's injury.'"  *Id.* (alteration adopted; quoting *Basic*, 485 U.S. at 243).

Here, as in *Desai*, Plaintiffs' *bona fide* market presumption "only connects the buyer or seller of securities with the market price; it does not connect the price to the defendant's manipulative conduct."  *Id.* at 945.  Regardless of "how unlikely it is that the market price in

question would actually reflect the alleged manipulation[,]" the theory would permit a presumption of reliance. *Id.* at 945 (alteration added). The *bona fide* market presumption "would prove too much while doing too little. Prove too much, because it would obviate the need for plaintiffs in manipulative conduct cases to prove reliance; do too little because it does not complete the causal connection between a plaintiff's transaction in securities and a defendant's manipulation." *Id.*

Although such a presumption would solve the quandary referenced by those scholars critical of the market efficiency requirement, it would run afoul of the Supreme Court's requirement that a presumption of reliance indirectly prove transaction causation. Consequently, the Court declines Plaintiffs' invitation to apply a *bona fide* market presumption.

### b.     Fraud-on-the-Market Presumption

Plaintiffs argue in the alternative that they are entitled to a presumption of reliance under *Basic*, based on "evidence . . . that the markets for seven of the Affected Stocks were efficient in the one-year period *prior* to the Class Period." (Mot. 24 (alteration and emphasis added)). Robinhood maintains that the market's "temporary inefficiency" during and just before the proposed Class Period precludes application of *Basic*. (Resp. 25). Robinhood also clarifies it is not suggesting "the markets for the Affected Stocks were never efficient, but rather that the expert analysis and facts establish that they were inefficient immediately preceding the Class Period as well as during the Class Period." (*Id.*).

The Court need not delve into "expert analysis and facts" to reach such a conclusion (*id.*); in fact, it need look no further than Plaintiffs' own theory of the case. Plaintiffs do "not contend that the markets for the Affected Stocks were efficient during the [C]lass [P]eriod." (*Daubert* Resp. 12 (alterations added)). Instead, "Plaintiffs' theory of the case is that Robinhood's

manipulation rendered the markets inefficient during the [C]lass [P]eriod." (*Id.* (alterations added)). "Normally, that would amount to a fatal concession." *Desai*, 573 F.3d at 942.

Plaintiffs nevertheless insist that "[i]f a finding of efficiency is required at all, *Regions* authorizes the Court to find it pre-Class Period." (Reply 23 (alteration added; citing *Regions*, 762 F.3d 1248)). The Court is skeptical.

A plaintiff seeking to invoke the *Basic* presumption must prove "that the shares were traded on an efficient market[.]" 485 U.S. at 248 n.27 (alteration added; citation omitted). Plaintiffs ask the Court to accept an extraordinary interpretation of *Basic*: that the presumption may apply if a market was generally efficient prior to any alleged manipulation, even if it was unquestionably inefficient when a plaintiff traded. This is nonsense.

As repeatedly emphasized, *Basic*'s "fundamental premise" is "that an investor presumptively relies on a [defendant's conduct] so long as it was reflected in the market price *at the time of his transaction*." *Halliburton I*, 563 U.S. at 813 (alteration and emphasis added). In an efficient market, an investor's purchase at a given price functions as a proxy for reliance on a defendant's bad act because an informationally efficient market absorbs the manipulative conduct, reflecting it in the price the plaintiff paid. If a market is not informationally efficient *when the plaintiff transacts*, how can a court presume that the price reflects the bad act? The answer is simple: it cannot.

Plaintiffs insist that *Regions* saves them. They state *Regions*' "'flexible approach'" permits the Court to look pre-Class Period to analyze market efficiency. (Reply 22–23 (quoting *Regions*, 762 F.3d at 1255)). But *Regions*' acceptance of a "flexible approach" is not about *when* to look at market efficiency, but what *factors* a district court may consider when assessing market efficiency. *Id.* at 1254–55 (declining to impose a "mandatory analytical framework" for market efficiency and

acknowledging that a district court may in the future "consider new factors yet unknown"). Employing the flexibility Plaintiffs request would stretch the *Basic* presumption to the point of breaking, destroying the causal link it would provide between Robinhood's alleged fraud and Plaintiffs' alleged reliance on the fraud.

Faced with a dearth of evidence that the markets for the Affected Stocks were efficient when Plaintiffs transacted, coupled with their admission that the market during the transaction period, *i.e.*, the Class Period, was inefficient, the Court cannot apply the *Basic* presumption. This said, some have suggested that a modified *Basic* presumption is appropriate in cases where a defendant "directly manipulated [a security's] price." *Desai*, 573 F.3d at 945 n.1 (O'Scannlain, J., concurring) (alteration added); *see also* Korsmo, *supra*, at 1174 (suggesting a showing of market impact at class certification as a viable substitute for market efficiency to "suppl[y] the missing causal link between reliance and the manipulation" (alteration added)). Of course, the plaintiff would still need to "show that the market . . . could absorb into the price the misinformation communicated by the alleged manipulation." *Desai*, 573 F.3d at 945 n.1 (O'Scannlain, J., concurring) (alteration added).

Plaintiffs here assert that Robinhood "block[ed] the mechanism of efficiency" (Reply 23 (alteration added)), perhaps presenting the type of case where a modified fraud-on-the-market presumption could apply. The Court takes no position on whether such a presumption is viable, and the parties have not briefed this issue. Plaintiffs do not propose a modification of the presumption, describe what showing the modification would entail, or explain how such a modification would adequately connect Robinhood's acts with Plaintiffs' decision to sell their shares in the Affected Stocks. (*See generally* Mot.; Reply). At this juncture, Plaintiffs have not "show[n] that the market . . . could absorb into the [Affected Stocks'] price the misinformation

communicated by the alleged manipulation[,]" precluding any modified fraud-on-the-market presumption.  *Desai*, 573 F.3d at 945 n.1 (O'Scannlain, J., concurring) (alterations added).

Because Plaintiffs have forsaken a traditional *Basic* presumption by admitting that the market was not efficient when Plaintiffs transacted, the Court need not consider the experts' competing views on market efficiency.  The Court thus turns to Plaintiffs' final predominance argument.

### 3.      Common Scheme Doctrine

Plaintiffs' last hope is what they call the common scheme doctrine.  (*See* Mot. 18–19).  In Plaintiffs' view, the Eleventh Circuit approves of presuming reliance where a common scheme of fraud is alleged.  (*See id.* (discussing *Kennedy*, 710 F.2d 711)).  Robinhood questions the doctrine's applicability to a market manipulation claim and distinguishes the line of common-scheme doctrine cases from the facts here.  (*See* Resp. 29–31).  Robinhood has the better arguments.

The common scheme doctrine owes its origin to *Kennedy*.  *See generally* 710 F.2d 711. There, the named plaintiff in a putative class purchased 1,000 shares of a company's class A common stock at $2.00 a share, then later purchased another two hundred shares at $5.00 per share. *See id.* at 714.  Each time, he was approached by the company's salesperson and given a prospectus; he admittedly never read or relied on these prospectuses before purchasing the stock. *See id.*  These prospectuses were designed to mislead the recipients.  *See id.* at 715.

After the truth about the company's financial situation was revealed, a plaintiff brought a putative class action against the company and certain individual defendants for violations of section 10(b) and Rule 10b-5.  *See id.*  The trial court certified the class, and on appeal, the defendants raised two typicality objections based on the plaintiff's investment proficiency and degree of reliance on the at-issue prospectuses, and several predominance objections (none having

CASE NO. 21-2989-MDL-ALTONAGA/Torres

to do with reliance).  *See id.* at 717.  The court found the plaintiff's claims typical of the class because the defendants had "committed the same unlawful acts in the same method against an entire class" and that common issues predominated because "common issues of conspiracy, fraud, and material omissions [were] clear."  *Id.* (alteration added).

The Eleventh Circuit seemingly expanded the doctrine in *Kirkpatrick*, 827 F.2d at 724, relying on *Kennedy*.  There, the district court had certified a class asserting fraudulent scheme and misrepresentation claims against a brokerage firm and its officers, based on their engagement in a common course of conduct to misrepresent the financial condition of certain gas investment funds. *See id.* at 720.  On appeal, the court found the fraud-created-the-market theory formulated in *Shores v. Sklar*, 647 F.2d 462 (5th Cir. 1981) (en banc),[15] applied to the plaintiffs' claims, making them suitable for class treatment.  *See id.* at 724.  The fraud-created-the-market theory made "virtually irrelevant the possibility that the various purchasers may have relied on different representations . . . [because] all ha[d] relied on the integrity of the market[.]"  *Id.* at 723 (alterations added; footnote call number omitted).  Further, the court found the misrepresentations were not materially different and concluded as follows:

> In view of the overwhelming number of common factual and legal issues presented by plaintiffs' misrepresentation claims, however, the mere presence of the factual issue of individual reliance could not render the claims unsuitable for class treatment.  Here, as in *Kennedy v. Tallant*, each of the complaints alleges a single conspiracy and fraudulent scheme against a large number of individuals and thus is particularly appropriate for class action.

*Id.* at 724–25 (quotation marks and citations omitted).

---

[15] "The basis of the fraud-created-the-market theory is that the fraudster directly interfered with the market by introducing something that is not like the others: an objectively unmarketable security that has no business being there."  *Regents of Univ. of Cal. v. Credit Suisse First Bos. (USA), Inc.*, 482 F.3d 372, 391 (5th Cir. 2007) (footnote call number omitted).  This contrasts with fraud-on-the-market claims based on "transactions elsewhere that gave a misleading impression of the value of [] securities that were already on the market."  *Id.* (alteration added; footnote call number omitted).

This trend continued in *Klay v. Humana Inc.*, 382 F.3d 1241, a case involving RICO claims against health maintenance organizations ("HMOs") for misrepresenting and concealing how much and when they would pay plaintiffs for medically necessary services and procedures. *See id.* at 1252. In upholding the district court's certification of the class, the court found important that the plaintiffs alleged the HMOs all conveyed the same message to doctors. *See id.* at 1258. In finding that individual reliance could be established by common proof, the Eleventh Circuit said a jury could infer that guarantees concerning physician pay — the consideration upon which the agreements at issue were based — went to the heart of the agreements, and that doctors based their assent upon them. *See id.* at 1259. It thus did "not strain credulity to conclude that each plaintiff, in entering into contracts with the defendants, relied upon the defendants' representations and assumed they would be paid the amounts they were due." *Id.*

Relying on this line of cases, some district courts have certified classes "even without a presumption of reliance, based on the single, common fraudulent scheme alleged." *Medine v. Washington Mut., FA*, 185 F.R.D. 366, 371 (S.D. Fla. 1998) (citations omitted) (finding that *Affiliated Ute* applied, but even if it did not, the common fraudulent scheme warranted class treatment); *Walco Invs., Inc.*, 168 F.R.D. at 334 (certifying class involving misrepresentation claims); *see Bruhl*, 257 F.R.D. at 696 (certifying class asserting misrepresentation claims where "the same or substantially the same misrepresentations were made to the putative class[,]" which "were of such a nature that it can be presumed that all members of the class relied on them" (alteration added)); *In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. at 645 (finding fraud-on-the-market and fraud-created-the-market theories applied, permitting presumptions of reliance, but that "logic and common sense — as well as the *Kennedy* line of cases — support[ed] a finding that individual issues of reliance do not predominate" (alteration added)).

CASE NO. 21-2989-MDL-ALTONAGA/Torres

Plaintiffs state that the common-scheme doctrine applies here, where Robinhood made a uniform public misstatement and imposed restrictions, a common course of fraudulent conduct affecting the entire class.  (*See* Mot. 18–19; Reply 18–19).  Robinhood identifies five reasons it believes the doctrine is inapplicable: because (1) Plaintiffs cite no cases where a court has applied the doctrine to a market manipulation claim (*see* Resp. 29); (2) the doctrine requires that all members of the class received the misrepresentations, a circumstance not present here (*see id.* 30); (3) the statements are not of such a nature that reliance can be presumed, and many Plaintiffs "were completely unaware" of the misstatements (*id.* 30–31); (4) the doctrine only applies to securities not traded on the open market (*see id.* 31); and (5) many Plaintiffs admittedly did not rely on the integrity of the market when they sold the stocks, so it does not make sense to presume reliance on the integrity of the market (*see id.* 31).  Plaintiffs attempt to rebut these arguments but cannot. (*See* Reply 18–19).

At first blush, *Kennedy*'s language seems to encompass the claims here.  Nevertheless, the Court is not convinced it should apply the common-scheme doctrine because salient factual and legal distinctions counsel against doing so.

To start, Robinhood is correct that the Eleventh Circuit's common-scheme cases share a common theme: they involve uniform misrepresentations made to each plaintiff.  *See Klay*, 382 F.3d at 1258–59; *Kirkpatrick*, 827 F.2d at 722–24; *Kennedy*, 710 F.2d at 714, 717–18.  One district court even dubbed the doctrine the "[u]niform [m]isrepresentation [t]heory[.]" *Bruhl*, 257 F.R.D. at 694 (alterations added); *see also id.* n.13 ("[A] fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action[.]" (first alteration in original; other alteration added; citing Fed. R. Civ. P. 23, advisory comm. notes to

1966 amends., subdivision (b)(3))).  After analyzing the *Kennedy* line of cases, *Bruhl* synthesized the types of cases the doctrine applies to, as follows:

> [T]o obtain class certification under the "common fraudulent scheme" theory, it must be demonstrated that the same or substantially the same misrepresentations were made to the putative class and that they were of such a nature that it can be presumed that all members of the class relied upon them either to invest in the first instance, to remain in the investment, or to redeem their interest in the investment.

*Id.* at 696 (alteration added).

Following the two-factor *Bruhl* formulation, the common scheme doctrine does not apply here.  First, as a matter of common sense, it is likely that the putative class — comprised of both Robinhood and non-Robinhood users — includes many persons who did not receive Robinhood's blog post or Tenev's public media statements.  Some also may not have known about the PCOs at all.  This is unsurprising, because Plaintiffs' claims are based on a fraud-on-the-market theory: Robinhood's public half-truths sent a false signal to the *market*, not necessarily directly to Plaintiffs, artificially inflating the Affected Stocks' prices.

Plaintiffs deem irrelevant that some class members "may" not have received Robinhood's misstatements.  (Reply 18).  But it is not up for debate; although Robinhood's misrepresentations were indisputably public, the record is rife with testimony that named Plaintiffs did not know of Robinhood's misrepresentations.  (*See* Resp. 30 (citing Huacaja Dep. 94:15–98:16 ("I didn't know for how long [Robinhood was] going to do this . . . [Robinhood] didn't bother to send me any kind of message at all. . . .  So I just decided to cut my losses." (alterations added); Clarke Dep. 110:24–111:12 ("Q: So you don't recall hearing anything about the reason Robinhood implemented restrictions when you made those sales.  Is that accurate?  A: Correct."); Harbison Dep. 153:13–18 ("Q: When you first learned about the trading restrictions Robinhood imposed, do you recall hearing anything about the reason that Robinhood implemented those restrictions? A: No.");

Gurney Dep. 93:22–25 ("Q: Around this time do you recall hearing anything about the reason that Robinhood implemented any restrictions? A: I do not recall."); other citation omitted)).

It is apparent that this case is unlike *Kennedy*, *Kirkpatrick*, and *Klay*; these all involved materially similar misrepresentations that the record reflected were actually made to and received by all putative class members. *See Kennedy*, 710 F.2d at 717–18 (stating all class members received same prospectus); *Kirkpatrick*, 827 F.2d at 724 (explaining all named plaintiffs received materially similar messages either via their brokers or widely distributed written information); *Klay*, 382 F.3d at 1258 (noting all HMOs conveyed the same message to the physicians). In other words, Plaintiffs have not demonstrated that the representations here were made "to the putative class." *Bruhl*, 257 F.R.D. at 696.

Even if all members of the putative class here did receive the same message, the misrepresentations were not "of such a nature that it can be presumed that all members of the class relied upon them" in deciding to sell their shares in the Affected Stocks. *See Bruhl*, 257 F.R.D. at 696. Surely, it would be odd to presume the class members relied on this information when several Plaintiffs themselves disclaim knowledge of it.

Putting that aside, the Eleventh Circuit provides useful guidance in deciding when uniform misrepresentations are of the type the doctrine should be applied to. Tasked recently with deciding whether to apply *Klay* to various state-law claims against a car manufacturer for misrepresentations about a car's capabilities, the Eleventh Circuit declined to do so. It found *Klay* "distinguishable in important respects . . . for two reasons[:]"

> First, [*Klay*] emphasized that the doctors relied on the HMO's standardized misrepresentation that they would be reimbursed for medically necessary services provided to insureds and that the HMO's nationwide conspiracy to underpay doctors was the "very gravamen of the RICO claims." And second, [*Klay*] stressed that the transactional exchange between the physicians and the HMO hinged on the latter's payment guarantees, which served as the "heart of the agreements" and was

the "very consideration upon which those agreements are based." . . . [C]ontractual financial transactions between a purchaser and provider of medical services don't implicate the same type or degree of personal idiosyncratic choice as does a consumer purchase. While one who provides services in exchange for a payment relies only on the payment guarantee, a purchaser of a car may choose to rely on any of a number of marketing and branding representations.

*Tershakovec*, 79 F.4th at 1310 n.6 (alterations added; citations omitted).

Similar distinctions prove noteworthy here.  First, *Kirkpatrick* and *Kennedy* involved securities not traded on the open market.  *See Kennedy*, 710 F.2d at 714, 717–18; *Kirkpatrick*, 827 F.2d at 722–24.  As a matter of common sense, those who trade on the open market — like the putative class members here — may choose to rely on "any of a number of" factors,[16] decreasing the likelihood that Plaintiffs relied at all on the uniform misrepresentations.  *Tershakovec*, 79 F.4th at 1310 n.6.  Public half-truths made as part of an impersonal, open-market transaction are unlike the prospectuses or sales pitches at issue in *Kennedy* and *Kirkpatrick* that contained misrepresentations made in more personal transactions.  Further, because Plaintiffs theorize that Robinhood defrauded the market by sending a false pricing signal to it, and the class did not necessarily receive Robinhood's half-truths, the misrepresentations are not at the "heart of the" transactions in the same way the doctors' contracts were in *Klay*.  *Tershakovec*, 79 F.4th at 1310 n.6.

As another point of distinction, *Kennedy* and *Kirkpatrick* both involved the fraud-created-the-market theory, "whereby actors who introduced an otherwise unmarketable security into the market by means of fraud are deemed guilty of manipulation, and a plaintiff can plead that he relied on the integrity of the market rather than on individual fraudulent disclosures."  *Regents of Univ. of Cal.*, 482 F.3d at 391 (citation omitted).  The fraud-*created*-the-market theory is different

---

[16] Such factors may include price movements, trading recommendations, or the general popularity of a stock.

from the similarly named fraud-*on*-the-market theory in that some Circuits have created a presumption of reliance based on the theory that is applicable only where the securities at issue "could not have been offered on the market at any price absent the fraudulent scheme." *Ross v. Bank S., N.A.*, 885 F.2d 723, 729 (11th Cir. 1989) (en banc) (quotation marks and citation omitted). Fraud-created-the-market claims differ "qualitatively [] from what [Robinhood is] alleged to have done, namely engage in transactions elsewhere that gave a misleading impression of the value of [the Affected Stocks] that were already on the market." *Regents of Univ. of Cal.*, 482 F.3d at 391 (alterations added; footnote call number omitted).

Putting the several distinctions aside, applying the doctrine to a case like this — where public misrepresentations were made involving securities traded on the open market — would render *Basic* and its progeny a nullity. The entire function of the *Basic* presumption is to allow plaintiffs to demonstrate reliance on information they did not directly receive, because efficient markets indirectly transmit a public message like Robinhood's to all market participants through a stock's price. *See* 485 U.S. at 246–48. Yet, Plaintiffs' position is this: if a defendant makes uniform, public misrepresentations as part of common course of conduct, claims on this basis are suitable for class treatment regardless of whether the plaintiffs received the statements or the dubious nature of their reliance on the statements. (*See* Mot. 18–19).

Consider, then, what circumstances the doctrine would cover. *Basic* involved a company's public misrepresentations about merger talks, *see* 485 U.S. at 226–28; *Halliburton II* involved public misrepresentations about the potential liability, expected revenue, and anticipated benefits of a merger with another company, *see* 573 U.S. at 264; *Regions* involved public misstatements about the company's financial health and underreporting of its losses, *see* 762 F.3d at 1252. If Plaintiffs' reading of the *Kennedy* line of cases is right, then the common-scheme doctrine covers

the claims in *Basic*, *Halliburton*, and *Regions* — all cases which involved public misrepresentations and a uniform course of conduct. Arguably, under Plaintiffs' interpretation of it, the common scheme doctrine would cover any fraud-on-the-market claim involving public misstatements and a common course of conduct, which amounts to most section 10(b) and Rule 10b-5 claims. This reading would make *Basic* and its progeny redundant. The Court will not reach a conclusion that all but eviscerates the fraud-on-the-market presumption — a doctrine that is certainly alive and well. *See Halliburton II*, 573 U.S. at 270–71.

As a final note, presumptions arise "out of considerations of fairness, public policy, and probability, as well as judicial economy[.]" *Basic*, 485 U.S. at 245 (alteration added; citation omitted). The fraud-on-the-market presumption "is supported by common sense and probability[,]" *id.* at 246 (alteration added); as is the *Affiliated Ute* presumption, which prevents a plaintiff from having to "show a speculative state of facts, *i.e.*, how he would have acted if omitted material information had been disclosed," *id.* at 245 (citations omitted). In the same vein, the *Kennedy* line of cases permits a presumption of reliance "where it is logical to presume that reliance in fact existed[,]" because the plaintiffs in those cases each received the same message — a messages "of such a nature that it c[ould] be presumed that all members of the class relied upon them either to invest in the first instance, to remain in the investment, or to redeem their interest in the investment." *Bruhl*, 257 F.R.D. at 696 (alterations added). But applying the common-scheme doctrine here would, once again, "prove too much while doing too little." *Desai*, 573 F.3d at 945 (O'Scannlain, J., concurring). It would obviate the need for Plaintiffs to prove reliance and allow certification of a class despite the dubious causal connection between Robinhood's acts and Plaintiffs' trading. The Court will not abuse its "great power" to allow such result. *Klay*, 382 F.3d at 1251 (citation omitted).

\*      \*      \*

Although Plaintiffs demonstrate compliance with each of Rule 23(a)'s requirements, they have failed to show that common issues predominate because they have not offered a method of proving reliance class wide or otherwise assured the Court that individualized issues of reliance will not predominate.  The Court thus declines to reach the parties' arguments on damages or Rule 23(b)(3)'s superiority requirement.

Because the Court did not rely on the challenged expert testimony in reaching its determination, the Court also does not engage in a *Daubert* analysis.  *See Regions*, 762 F.3d at 1258 n.7 (citing *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815–16 (7th Cir. 2010) (holding that a district court must consider a *Daubert* challenge before ruling on class certification only where the challenged testimony is "critical to class certification")).  Accordingly, the Court's denial of class certification renders moot Robinhood's challenges to Dr. Adam Werner's testimony on market efficiency and damages.

## V.      CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that Plaintiffs' Motion for Class Certification **[ECF No. 559]** is **DENIED without prejudice**.  Defendants' Motion to Exclude Opinion of Adam Werner **[ECF No. 566]** is **DENIED as moot**.

**DONE AND ORDERED** in Miami, Florida, this 13th day of November, 2023.

**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:      counsel of record