## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

July 25, 2024

FILED BY _____ AP _____ D.C.

Jul 25, 2024

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

Clerk - Southern District of Florida
U.S. District Court
400 N MIAMI AVE
MIAMI, FL 33128-1810

Appeal Number:  22-11873-DD
Case Style: Angel Guzman, et al v. Robinhood Markets, Inc., et al
District Court Docket No: 1:21-md-02989-CMA

A copy of this letter, and the judgment form if noted above, but not a copy of the court's
decision, is also being forwarded to counsel and pro se parties. A copy of the court's decision
was previously forwarded to counsel and pro se parties on the date it was issued.

The enclosed copy of the judgment is hereby issued as mandate of the court. The court's opinion
was previously provided on the date of issuance.

Clerk's Office Phone Numbers
General Information:    404-335-6100      Attorney Admissions:        404-335-6122
Case Administration:   404-335-6135      Capital Cases:               404-335-6200
CM/ECF Help Desk:      404-335-6125      Cases Set for Oral Argument: 404-335-6141

Enclosure(s)

MDT-1 Letter Issuing Mandate

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-11873

_____

In re: JANUARY 2021 SHORT SQUEEZE TRADING
LITIGATION,

_____

ANGEL GUZMAN,
BURKE MINAHAN,
CHRISTOPHER MILLER,
TERELL STERLING,

Plaintiffs-Appellants,

*versus*

ROBINHOOD MARKETS, INC.,
ROBINHOOD FINANCIAL LLC,
ROBINHOOD SECURITIES, LLC,
CITADEL LLC,
d.b.a. Citadel Securities,

2                                                          22-11873

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:21-md-02989-CMA

_____

JUDGMENT

It is hereby ordered, adjudged, and decreed that the opinion is-
sued on this date in this appeal is entered as the judgment of this
Court.

Entered: June 26, 2024

For the Court: DAVID J. SMITH, Clerk of Court

ISSUED AS MANDATE: July 25, 2024

[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-11873

_____

In re: JANUARY 2021 SHORT SQUEEZE TRADING
LITIGATION,

_____

ANGEL GUZMAN,
BURKE MINAHAN,
CHRISTOPHER MILLER,
TERELL STERLING,

Plaintiffs-Appellants,

*versus*

ROBINHOOD MARKETS, INC.,
ROBINHOOD FINANCIAL LLC,
ROBINHOOD SECURITIES, LLC,
CITADEL LLC,
d.b.a. Citadel Securities,

2                    Opinion of the Court                    22-11873

                                            Defendants-Appellees.

———————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:21-md-02989-CMA

———————————————

Before BRANCH, LUCK, and TJOFLAT, Circuit Judges.

BRANCH, Circuit Judge:

This is an appeal from the dismissal of a class action alleging an antitrust conspiracy under Section 1 of the Sherman Act, 15 U.S.C. § 1, for failure to state a claim. The events giving rise to the suit took place during a short period of market volatility caused by aggressive trading in a handful of securities.[1] Purchases of the relevant securities grew rapidly during the week before January 27, 2021, due to their surging popularity among retail investors in the online community. This increase in demand sent the stock prices

---

[1] The relevant securities, referred to colloquially as "meme stocks" due to their popularity in online discussion forums, include GameStop ("GME"), AMC Entertainment ("AMC"), Bed Bath & Beyond ("BBBY"), BlackBerry ("BB"), Express ("EXPR"), Koss ("KOSS"), Nokia ("NOK"), Tootsie Roll Industries ("TR"), and Trivago NV ("TRVG").

of the relevant securities "to the moon."[2] But on January 28, 2021, Robinhood and other retail brokerage firms suspended retail investors from using their electronic platforms to buy the relevant securities.

Retail investors who sold the relevant securities at a deflated price because of Robinhood's trading restrictions sued. They alleged that Robinhood implemented these restrictions as part of a conspiracy with its market maker, Citadel LLC, to reduce the stock prices of the relevant securities and save Citadel from the massive losses it faced due to its short positions in those securities. According to Plaintiffs, Robinhood acquiesced because Robinhood heavily depends on Citadel for revenue and so needed Citadel to stay afloat. Defendants reject Plaintiffs' conspiracy allegations and argue that Robinhood implemented the restrictions on its own accord to reduce market volatility and thereby reduce its collateral requirements with the National Securities Clearing Corporation ("NSCC").

The district court dismissed the complaint, holding (1) that Plaintiffs did not plausibly allege an agreement between Defendants to prohibit purchases of the relevant securities, and (2) even if they had, Plaintiffs did not plausibly allege that Defendants' behavior was an unreasonable restraint of trade because they did not allege harm to a relevant market. Plaintiffs

---

[2] Justin Hartwig, *WallStreetBets Slang and Memes*, INVESTOPEDIA (Feb. 10, 2021), https://www.investopedia.com/wallstreetbets-slang-and-memes-5111311 [https://perma.cc/ZM38-L3M2].

appeal, arguing that the district court erred in dismissing the complaint because they plausibly alleged both the existence of a conspiracy and an unreasonable restraint of trade. After careful review and with the benefit of oral argument, we hold that Plaintiffs failed to plausibly allege an unreasonable restraint of trade.

Because this failure is dispositive of their claim, we need not decide whether Plaintiffs plausibly alleged an agreement between Defendants to prohibit purchases of the relevant securities. Accordingly, we affirm.

## I.     Background

### A. *The Parties and their Roles in the Securities Trading Services Industry*

We start with an overview of the parties and a discussion of their roles in the securities trading industry, as set forth in the Amended Complaint.

The named Plaintiffs are retail investors who, during the relevant time period, held shares or call options of the relevant securities through Robinhood, and sold the relevant securities at a discounted rate because of Robinhood's trading restrictions.[3]

---

[3] The named Plaintiffs brought this class action on behalf of:

> All persons or entities in the United States that held shares of stock or call options through Robinhood in GameStop Corp. (GME), AMC Entertainment Holdings Inc. (AMC), Bed Bath

Retail investors like Plaintiffs are individual investors who make investments in the stock market on their own behalf.  They rely on websites and applications provided by retail brokerage firms or other investment service providers to buy securities (*e.g.*, stocks, bonds, options, mutual funds, and exchange traded funds).

Robinhood is one of the largest retail brokerage firms in the United States.  It is a collection of distinct entities, three of which are named defendants here: Robinhood Markets, Inc., Robinhood Financial LLC, and Robinhood Securities, LLC (collectively, "Robinhood").  Robinhood Markets is the parent corporation. Robinhood Financial is an "introducing broker," and is the company that Robinhood's customers interface with whenever they use Robinhood's app to buy securities.  Robinhood Financial forwards purchase requests to Robinhood Securities, which routes the trade to a market maker to fill the order.

Citadel is one such market maker.  As a market maker, Citadel receives and fills trade orders from brokerage firms like Robinhood.  Citadel may fill these orders by taking the other side of a transaction.  That is, if a retail investor is buying a security, Citadel will sometimes sell the security and vice versa.  Citadel

---

& Beyond Inc. (BBBY), BlackBerry Ltd. (BB), Express, Inc. (EXPR), Koss Corporation (KOSS), Nokia Corp. (NOK), Tootsie Roll Industries, Inc. (TR), or Trivago N.V. (TRV) as of the close of market on January 27, 2021, and sold the above-listed securities from January 28, 2021 up to and including February 4, 2021, (the "Class Period").

maintains an inventory of securities from its own trading, which it then uses to fill orders. Citadel profits from the bid-ask "spread": the difference between the price it pays to buy the security and the price at which it sells the security.

Once the trade is executed, Robinhood relays the information to the NSCC. The NSCC essentially insures the process. For example, if Robinhood defaulted on its obligations to the retail investor, the NSCC guarantees the delivery of cash and securities. The NSCC requires clearing members (like Robinhood) to pay contributions, known as margin requirements, as collateral at the start of each day or intraday in volatile markets. The greater the volatility in the market, the greater the collateral requirements.

While Robinhood and Citadel are both involved in the trading of securities, they operate in different markets. Robinhood is described as competing in the downstream market, which Plaintiffs call the "No-Fee Brokerage Trading App [m]arket."[4] In

---

[4] The Amended Complaint defines the "No-Fee Brokerage Trading App [m]arket" as the

> downstream or consumer-facing relevant product market consist[ing] of zero account-minimum, no-fee brokerages that 1) offer a user-friendly mobile app to Retail Investors to place orders to buy and sell stocks, exchange-traded funds (ETFs), and other securities or investments strategies such as trading on margin or using options strategies, and 2) receive payment for order flow from market makers instead of fees from Retail Investors[.]

this market, Robinhood has "by far the most users on its platform," and it had "nearly three-times as many users" as the second-place brokerage in January 2021.

Citadel is described as competing in the upstream market, which Plaintiffs call the Payment for Order Flow ("PFOF") market.[5]   In this market, Citadel holds a high market share, accounting "for approximately 27% of U.S. equities volume and executing approximately 37% of all U.S.-listed retail volume." And Citadel "is (by far) *the* leading PFOF market maker in the United States . . . ."

Both markets are characterized as having high barriers to entry.  Participants in these markets need specialized knowledge, licenses, memberships, and technology.  They also need significant cash and startup funds, as there are high fixed costs.

Despite occupying different markets, retail brokerage firms like Robinhood and large market makers like Citadel are largely dependent on each other for profits.  For instance, Robinhood does

---

This market "consists of brokerages such as Robinhood, Charles Schwab, E*Trade, TD Ameritrade, WeBull, and others."  And "[t]he geographic scope of the . . . [m]arket is limited to the United States[.]"

[5] The Amended Complaint defines the PFOF market as the "relevant upstream product market," which "consists of market makers that pay brokerage firms to route their clients' trades to that market maker . . . includ[ing] Citadel Securities . . . G1 Execution Services, Global Execution Brokers, Virtu Americas, and other relatively minor competitors." And "[t]he geographic scope of the PFOF [m]arket is limited to the United States[.]"

not charge its users any fees to place orders on its application; instead, Robinhood derives the bulk of its revenue from market makers, which pay Robinhood for the orders that Robinhood routes to them. These PFOF payments comprise between 60% to 70% of Robinhood's revenue.

While Robinhood receives PFOF from several market makers, Robinhood heavily depends on a few market makers, including Citadel. Citadel was responsible for 29% of Robinhood's total revenue in 2019, 34% of its total revenue in 2020, and 43% of its PFOF revenue in the first quarter of 2021. And in its form S-1, Robinhood stated that "59% of our total revenues came from four market makers" in the first quarter of 2021. It added that "[i]f any of these market makers . . . were unwilling to continue to receive orders from us or to pay us for those orders (including, for example, as a result of unusually high volatility), we may have little to no recourse . . . ."

With an understanding of the relevant actors, we now turn to the events prompting this lawsuit.

### B. Freeze on Purchases of the Relevant Securities

As early as 2019, retail investors began hypothesizing, via online discussion forums, that the relevant securities were trading at lower prices than they should be. Thus, retail investors began

taking long positions in the relevant securities.[6]   Generally, this trading was done via stock market intermediaries like Robinhood.

As more retail investors took long positions in these stocks, the price of the stocks rose at unprecedented levels.  To illustrate, the stock price of GameStop ("GME") went from $2.00 in 2019, to $43.03 on January 21, 2021, to $380.00 on January 27, 2021.  The rest of the relevant securities grew on a similar trajectory.  On January 27, 2021, the SEC released a statement that it was "aware of and actively monitoring the on-going market volatility in the options and equities markets[.]"

But not all investors were pleased with the increased stock price.  Some institutional investors, such as Citadel, had taken short positions in the relevant securities.[7]  But because the stock prices were appreciating at unprecedented levels, Citadel was exposed to massive losses.

---

[6] As explained in the Amended Complaint, a long position means an investor buys a stock anticipating the value of the stock will increase over time, allowing them to resell the stock later at a higher price.

[7] As explained in the Amended Complaint, a short position is a bet that the stock price will fall.  Essentially, Citadel had borrowed securities at a certain price and then sold those securities to execute buy orders from retail investors. The bet Citadel took was that when the borrowed security was due back to the lender, Citadel could buy back the security at a lower price.  The profit in a short position is the difference between the price at which the security is borrowed and the price at which the security is bought back when the security is due back to the lender.

Before the stock markets opened on January 28, 2021, analytics captured a strong uptick in short transactions for GME "indicating that the after-hour traders were trading in anticipation of a GME sell-off." Because these transactions occurred before the markets opened, the transactions were likely made by institutional investors like Citadel. Other phenomena, such as failures to deliver—*i.e.*, when one party in a trading contract does not deliver on its obligations—also spiked in the period leading up to January 28, 2021, consistent with an uptick in short interest by market makers like Citadel.

Around 1:00 AM EST on January 28, 2021, Robinhood informed its users that, because of market volatility, retail investors would be unable to buy any more GME or AMC Entertainment ("AMC") options. Soon after, Robinhood moved all the relevant securities to position close only ("PCO"), meaning that users could only sell shares of the relevant securities. The "buy" button was deactivated for users on the app, overnight buy orders were canceled, and users could not search the ticker symbols of the relevant securities. Robinhood was not the only brokerage firm to adjust its trading requirements. The same day, at least eight other major brokerages restricted purchases of two or three of the relevant securities, and two other brokerages "adjusted margin requirements for certain securities[.]"

Also on the same day, several of the named Plaintiffs attempted to set up accounts with other brokerages that had not restricted trading in the relevant securities, with mixed success.

Plaintiffs Guzman and Miller were unable to purchase the relevant securities on new accounts because of the amount of time required to open an account.  However, Minahan successfully set up a new brokerage account and was able to buy one of the relevant securities that day.

On January 29, 2021, Robinhood lifted many restrictions but maintained limitations on certain securities through February 4, 2021.  But by this point, the damage had been done.  Plaintiffs allege that the massive restriction on buying led to a collapse of the prices of the relevant securities.  For example, GME declined 44.29% in one day.  Similarly, AMC fell 56.63%, Express ("EXPR") fell 50.79%, and Bed Bath & Beyond ("BBBY") fell 36.40%.  While retail investors could not make purchases, institutional investors like Citadel could buy the relevant securities at artificially reduced prices because they had access to private stock exchanges known as "dark pools."  As a result, Citadel could buy back the relevant securities at deflated prices and exit its short positions.

*C. Procedural History*

As a result of the restrictions placed on the relevant securities on January 28, 2021, several lawsuits were brought against Robinhood and other retail brokers and securities market participants across the country.  The cases were consolidated into a multidistrict litigation in the Southern District of Florida.  *In re January 2021 Short Squeeze Trading Litigation*, No. 1:21-md-02989 (S.D. Fla. 2021).  The district court organized the various claims

into four separate "tranches."[8]   Lead plaintiffs and counsel were appointed for each tranche, and the lead plaintiffs were ordered to file superseding complaints.

The instant appeal concerns only one of those four tranches—the "Antitrust Tranche."  On July 27, 2021, Plaintiffs in the Antitrust Tranche filed the original Consolidated Class Action Complaint, asserting conspiracy claims against multiple brokers, including Robinhood, and one market maker, Citadel.  The district court dismissed that complaint but allowed Plaintiffs to amend.  On January 20, 2022, Plaintiffs filed their Amended Consolidated Class Action Complaint against only Robinhood and Citadel.

The Amended Complaint alleged that Citadel and Robinhood conspired to restrict trading of the relevant securities on Robinhood's platform in violation of the Sherman Act, 15 U.S.C. § 1.  The Amended Complaint alleged that this was done with the intent of "artificially constrict[ing] the price appreciation" of those securities to protect the short positions of Citadel, and,

---

[8] The four tranches include:

> (1) antitrust claims against Defendants (the "Antitrust Tranche"); (2) state-law claims against the Robinhood entities and other Robinhood-related Defendants (the "Robinhood Tranche"); (3) state-law claims against the other broker-dealer Defendants and other related Defendants (the "Other Broker Tranche"); and (4) federal security law claims.

We affirmed a motion to dismiss Plaintiffs' claim on the "Robinhood Tranche" in *In re January 2021 Short Squeeze Trading Litig.*, 76 F.4th 1335 (11th Cir. 2023).

presumably, maintaining the positive business relations between Robinhood and Citadel.[9]

The district court granted Defendants' motion to dismiss on two grounds. First, the district court held that, even if Defendants had an economic motive to conspire, such a motive was not alone sufficient to advance Plaintiffs' alleged conspiracy from possible to plausible. Second, the district court held that, even if the Plaintiffs plausibly alleged a conspiracy, Plaintiffs failed to plausibly allege an unreasonable restraint of trade because the anticompetitive harm that they alleged did not occur in a relevant market defined in the Amended Complaint, as required to state a claim for violating the Sherman Act. The district court reasoned that the anticompetitive harm that plaintiffs were alleging occurred in the stock market, where prices of the relevant securities dropped. However, the Amended Complaint did not define the stock market as a relevant market—which the district court noted was "not surprising" given that "there is an extensive body of persuasive case law holding that transactions in a particular stock do not fall within § 1 of the Sherman Act." Instead, Plaintiffs only defined the PFOF market

---

[9] The Amended Complaint also describes tense communications between representatives of Citadel and Robinhood in the days leading up to and following the trading restrictions, which Plaintiffs allege are indicative of an agreement between Defendants to prohibit purchases of the relevant securities. Because we hold that Plaintiffs failed to allege an unreasonable restraint of trade, Plaintiffs' claim fails regardless of whether they plausibly alleged an agreement between Defendants to restrict trading; we thus need not give a detailed recitation of those allegations here. *See infra* Section III.

where Citadel competes, and the No-Fee Brokerage market where Robinhood competes.   And the district court held that no anticompetitive effects occurred in either market.  Specifically, as for the PFOF market, the district court held that "Plaintiffs do not describe any connection between Defendants' alleged agreement and competition in the PFOF market, much less that any anticompetitive effects there caused the prices of the Restricted Securities to fall."   And as for the No-Fee Brokerage market, the district court held that the alleged restraint between Citadel and Robinhood "did not concern price, quality, or output for any other broker-dealer's services."   The district court held that Plaintiffs' failure to define the relevant market was fatal to their claim.

Plaintiffs appealed.

## II.    Standard of Review

"We review *de novo* a district court decision to dismiss an antitrust complaint under Rule 12(b)(6) for failure to state a claim." *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1070 (11th Cir. 2004).  To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## III.    Discussion

Plaintiffs assert one claim under § 1 of the Sherman Act. Section 1 of the Sherman Act provides that "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. Section 1 claims require two or more parties to agree on a restriction—wholly independent actions are not covered by § 1. *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 767–68 (1984). Additionally, "the Supreme Court has long concluded that Congress intended only to prohibit 'unreasonable' restraints on trade." *Quality Auto Painting Ctr. Of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1260 (11th Cir. 2019). Thus, to plead a § 1 claim, a plaintiff must show that defendants had a (1) conspiracy that (2) unreasonably restrained trade. *Id.* The district court held that Plaintiffs failed to plausibly allege both the conspiracy element and the unreasonable restraint of trade element. Because we find that Plaintiffs failed to plausibly allege the unreasonable restraint of trade element, which is dispositive of their claim, we need not reach the conspiracy element. Accordingly, we will assume without deciding that Plaintiffs plausibly alleged a conspiracy.[10]

---

[10] Defendants also argued below that Plaintiffs' antitrust theory was precluded by federal securities laws. But the district court declined to reach that argument because it concluded that Plaintiffs failed to plausibly allege the existence of an agreement that unreasonably restrained trade. The parties present no arguments on this point on appeal, so we do not address it.

Assuming Plaintiffs plausibly alleged a conspiracy between Defendants to restrict trading, Plaintiffs must also show that the conspiracy had an unreasonable restraint on competition. Plaintiffs argue that they alleged an unreasonable restraint on competition because they alleged that the conspiracy (1) "excluded Plaintiffs from the No-Fee Brokerage [m]arket and reduced output in that market," and (2) was targeted at harming Plaintiffs.

Section 1 of the Sherman Act outlaws "only *unreasonable* restraints [of trade]." *Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018) (emphasis in original) (quotations omitted). "Restraints [of trade] can be unreasonable in one of two ways." *Id.* First, "[a] small group of restraints are unreasonable *per se* because they always or almost always tend to restrict competition and decrease output." *Id.* (quotations omitted). *Per se* unreasonable restraints of trade are typically only "horizontal restraints"—restraints that are imposed between competitors. *Id.* at 540–41.

Second, "[r]estraints [of trade] that are not unreasonable *per se* are judged under the 'rule of reason.'" *Id.* at 541 (quotations omitted). Nearly every vertical restraint—"restraints imposed by agreement between firms at different levels of distribution"—are evaluated under "the rule of reason." *Id.* (quotations omitted); *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988). Under the "rule of reason" approach, courts must ask whether the plaintiff "has shown that the alleged restraint has had an anticompetitive effect on the market." *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1084 (11th Cir. 2016).

In doing so, the plaintiff "must identify the relevant market in which the harm occurs" and "must present enough information in their complaint to plausibly suggest the contours of th[at] relevant . . . market[]." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1336 (11th Cir. 2010). That is because "[w]ithout a definition of the market there is no way to measure the defendant's ability to lessen or destroy competition." *Am. Express Co.*, 585 U.S. at 543 (alterations adopted) (quotations omitted). And the plaintiff must plead specific anticompetitive effects (be they actual or potential) in the relevant market to avoid dismissal. *See Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1551 (11th Cir. 1996) ("Rule of reason analysis requires the plaintiff to prove . . . an anticompetitive effect of the defendant's conduct on the relevant market[.]"). In other words, the plaintiff must allege "a factual connection between the alleged harmful conduct and its impact [or likely impact] on competition in the market[.]" *Jacobs*, 626 F.3d at 1339.

Examples of "[a]ctual anticompetitive effects include, but are not limited to, reduction of output, increase in price, or deterioration in quality." *Id.* For example, in *Jacobs v. Tempur-Pedic International Inc.*, we held that a plaintiff did not adequately plead anticompetitive effects where plaintiff pleaded "that consumers lost hundreds of millions of dollars," but did not plead the "level above which [defendant's] allegedly anticompetitive conduct artificially raised prices." *Id.*; *see also Levine*, 72 F.3d at 1552 (physician did not create a genuine dispute of material fact as to whether anticompetitive effects resulted from the denial of his membership in a preferred provider organization by alleging rising

fees among preferred providers because the physician did not account for non-preferred provider fees, resource costs, or inflation); *S. Card & Novelty, Inc. v. Lawson Mardon Label, Inc.*, 138 F.3d 869, 877 (11th Cir. 1998) (distributor failed to show anticompetitive effects stemming from manufacturer's tying agreement with distributor because distributor did not show that other manufacturers were precluded from entering the market, that the cost of goods increased, or that quality decreased).

As an initial matter, we evaluate Plaintiffs' claim under the "rule of reason." The district court found that the relationship between Defendants was vertical because Defendants operate at two levels within the distribution of securities trading: Citadel operates in the "PFOF [m]arket" while Robinhood operates in the "No-Fee Brokerage Trading App [m]arket." Thus, the district court applied the rule of reason. We agree with the district court, and Plaintiffs do not challenge that determination on appeal.[11] *See Am. Express Co.*, 585 U.S. at 541 (noting that vertical restraints are evaluated using the "rule of reason").

Applying the "rule of reason," we hold that Plaintiffs fail to plausibly allege an unreasonable restraint of trade because they have not alleged anticompetitive effects in a relevant market. Plaintiffs defined two relevant markets, the PFOF market and the

---

[11] Plaintiffs do, however, argue that this determination should not be made at the motion-to-dismiss stage. But courts routinely decide to use the rule of reason—rather than finding a restraint illegal *per se*— at this stage. *See, e.g., Jacobs*, 626 F.3d at 1336.

No-Fee Brokerage market.   Plaintiffs have alleged nothing suggesting that competition among market makers in the PFOF market was reduced as a result of the alleged conspiracy. *See Jacobs*, 626 F.3d at 1339 (stating that "[t]he plaintiff has the burden of demonstrating damage to competition" in the relevant market as a result of the alleged conspiracy "with specific factual allegations" (quotations omitted)).   Plaintiffs instead focus their argument on anticompetitive effects in the No-Fee Brokerage market.  But the Amended Complaint falls flat here, too.

The Amended Complaint is void of allegations of anticompetitive effects among Robinhood's competitors. *See id.* There is no allegation, for example, that competitors raised the price their customers had to pay to use the apps. *See id.* (plaintiff did not adequately plead anticompetitive effects where plaintiff did not plead "the competitive level above which [defendant's] allegedly anticompetitive conduct artificially raised prices").

Relatedly, there is no allegation that the brokerages collectively restricted the output of the services they provided in order to raise the prices of providing those services. *See id.* (reduced output is one form of anticompetitive effect); *cf. F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 451, 460 (1986) (actual anticompetitive effects shown where horizontal conspiracy between dentists to not provide x-rays to insurers resulted in nearly complete reduction in the output of x-rays in certain areas and forced insurers to resort to more costly evaluation methods).   Indeed, Robinhood's alleged conspiracy with Citadel still left available every other brokerage on

the market.  *See Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1026 (9th Cir. 2013) (plaintiff failed to show anticompetitive effects in relevant market where "[a] number of other manufacturers . . . serve this market and provide substitutable products").  And while some other brokerages also restricted trading of certain securities for a short period of time, there is no allegation that those restrictions were caused by Robinhood's restrictions.

Finally, there is no plausible allegation that the quality of the services offered in the No-Fee Brokerage market suffered as a result of the alleged conspiracy.  *See Jacobs*, 626 F.3d at 1339 (reduced quality is one form of anticompetitive effect).  Plaintiffs highlight that several named Plaintiffs experienced a delay in changing brokerages.  But even setting aside the fact that at least one Plaintiff managed to change brokerages immediately, delays are a feature of the No-Fee Brokerage market.  Plaintiffs do not suggest that the conspiracy created, worsened, or otherwise affected those delays. *Cf. Lifewatch Servs. Inc. v. Highmark, Inc.*, 902 F.3d 323, 340 (3d Cir. 2018) (seller of telemetry monitor adequately alleged anticompetitive effects, in part, by showing that alleged conspiracy to deny insurance coverage for telemetry monitors reduced demand for more effective devices and reduced the quality of cardiac monitors in general).

If Plaintiffs are instead suggesting that the reduction in the stock price and supply of the relevant securities are the anticompetitive effects, this argument falls short for a different

reason.  While these may be anticompetitive effects, they are not anticompetitive effects *in a relevant market defined by their Amended Complaint*.  *See Levine*, 72 F.3d at 1551 ("Rule of reason analysis requires the plaintiff to prove . . . an anticompetitive effect of the defendant's conduct on the relevant market[.]").  An allegation that stock prices and supply were reduced below competitive levels is an allegation that the stock market was not behaving competitively.  In other words, such an allegation points to anticompetitive effects *in the stock market*—which Plaintiffs have not alleged to be a relevant market[12]—rather than the No-Fee Brokerage market or the PFOF market.  The product that No-Fee Brokerages provide is free investment services, and the product that market makers in the PFOF market provides is receiving and filling trade orders from brokerage firms.  The products in neither market are the underlying securities themselves.

Ultimately, the alleged conspiracy restricted, for a short period of time, Robinhood users' ability to exercise *some* functions of the Robinhood app that they were previously able to use— placing "buy" orders for the relevant securities.  But such a restriction does not implicate the antitrust laws absent a showing

---

[12] We note that if Plaintiffs had alleged the stock market as a relevant market, they would have a different set of problems.  For one, at least one of our sister circuits has suggested that transactions in a particular stock fall outside § 1 of the Sherman Act.  *See, e.g.*, *Kalmanovitz v. G. Heileman Brewing Co.*, 769 F.2d 152, 156 (3d Cir. 1985).  Furthermore, it would be much harder to show that Defendants have market power if the relevant market is the entire stock market, rather than just the PFOF or No-Fee Brokerage markets.

that the restriction had an anticompetitive effect on the broader No-Fee Brokerage market. *See Clear Channel Commc'ns, Inc.*, 376 F.3d at 1071–72 (noting that "anticompetitive effects are measured by their impact on the market" (quotations omitted)). Plaintiffs have not made that showing.

Plaintiffs focus much of their argument on appeal arguing that they sustained a foreseeable injury (reduction in stock price) as a result of the alleged conspiracy, and so they have adequately alleged a harm. But this conflates the injury requirement for antitrust standing with the requirement that Plaintiffs allege anticompetitive effects in a relevant market. While Plaintiffs must allege that they suffered an injury sufficient to confer antitrust standing, this showing is distinct from alleging that the injury was caused by anticompetitive effects in a relevant market. *See Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1493 (11th Cir. 1985) (stating that, in order to establish standing to bring an antitrust action, "the court must find a close relationship between the plaintiff's injury and the alleged antitrust violation"); *Levine*, 72 F.3d at 1545 (declining to reach whether plaintiff had antitrust standing because plaintiff failed to prove any anticompetitive effects); *see also SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 432 (4th Cir. 2015) ("In a viable complaint, 'the plaintiff must allege, not only an injury to himself, but an injury to the market as well.'" (quoting *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012)). Indeed, the cases Plaintiffs cite are cases in which the question of whether plaintiff established harm in a relevant market was not at issue; instead, the question was whether the plaintiff had

suffered an injury *resulting from* the anticompetitive effects in a relevant market sufficient to confer antitrust standing.

For example, Plaintiffs cite *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982). In that case, an insurance company allegedly entered an agreement with a neuropsychiatric society in which the insurance company would reimburse its insureds for selecting psychiatrists rather than psychologists. *Id.* at 467–68. A patient sued, alleging that the insurance company and neuropsychiatric society conspired "to exclude and boycott clinical psychologists from receiving compensation under" the insurance plans. *Id.* at 469–70. In other words, she alleged a harm to competition (restricting psychologists from competing) in a relevant market (the psychotherapy market). The issue in the case was whether the patient, who was not a psychologist and so was not a competitor in the effected market, had antitrust standing to collect damages she suffered *as a result of* the anticompetitive conduct in the psychotherapy market. *Id.* at 468–71. Thus, the Court was not tasked with deciding whether an antitrust violation had occurred (*i.e.*, whether the plaintiff had alleged a harm in a relevant market). Instead, the Court was tasked with determining whether her injury was too remote from the antitrust violation to confer antitrust standing.

By focusing on *McCready*, Plaintiffs are overlooking a critical difference between their case and *McCready*. The patient in *McCready* had alleged anticompetitive effects in a relevant market (psychologists being excluded from the psychotherapy market) and

was attempting to connect her injury (increased costs) to those effects. But as discussed above, Plaintiffs have not alleged anticompetitive effects in a relevant market with which to connect their injury. Thus, while reduced stock price and supply of the relevant securities may be a cognizable injury, Plaintiffs have not connected that injury to anticompetitive effects in either of their defined relevant markets. Accordingly, they have failed to state a claim.

## IV.   Conclusion

Plaintiffs' complaint fails to state a claim because it does not allege anticompetitive effects in a relevant market defined by the Amended Complaint, and therefore does not allege an unreasonable restraint of trade. Thus, we affirm the district court.

**AFFIRMED.**

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

June 26, 2024

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  22-11873-DD
Case Style:  Angel Guzman, et al v. Robinhood Markets, Inc., et al
District Court Docket No:  1:21-md-02989-CMA

<u>Opinion Issued</u>
Enclosed is a copy of the Court's decision issued today in this case. Judgment has been entered today pursuant to FRAP 36. The Court's mandate will issue at a later date pursuant to FRAP 41(b).

<u>Petitions for Rehearing</u>
The time for filing a petition for panel rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing is timely only if received in the clerk's office within the time specified in the rules. **A petition for rehearing <u>must</u> include a Certificate of Interested Persons and a copy of the opinion sought to be reheard.** <u>See</u> 11th Cir. R. 35-5(k) and 40-1.

<u>Costs</u>
Costs are taxed against Appellant(s) / Petitioner(s).

<u>Bill of Costs</u>
If costs are taxed, please use the most recent version of the Bill of Costs form available on the Court's website at <u>www.ca11.uscourts.gov</u>. For more information regarding costs, <u>see</u> FRAP 39 and 11th Cir. R. 39-1.

<u>Attorney's Fees</u>
The time to file and required documentation for an application for attorney's fees and any objection to the application are governed by 11th Cir. R. 39-2 and 39-3.

<u>Appointed Counsel</u>
Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation via the eVoucher system no later than 45 days after issuance of the mandate or the filing of a petition for writ of certiorari. Please contact the CJA Team at (404) 335-6167 or

cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Clerk's Office Phone Numbers

| | | | |
|---|---|---|---|
| General Information: | 404-335-6100 | Attorney Admissions: | 404-335-6122 |
| Case Administration: | 404-335-6135 | Capital Cases: | 404-335-6200 |
| CM/ECF Help Desk: | 404-335-6125 | Cases Set for Oral Argument: | 404-335-6141 |

OPIN-1 Ntc of Issuance of Opinion