## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

December 05, 2024



FILED BY____JG____D.C.

Dec 5, 2024

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

Clerk - Southern District of Florida
U.S. District Court
400 N MIAMI AVE
MIAMI, FL 33128-1810

Appeal Number:  23-10436-DD
Case Style: Peter Jang, et al v. Apex Clearing Corporation
District Court Docket No: 1:21-md-02989-CMA

Enclosed is the Bill of Costs.

A copy of this letter, and the judgment form if noted above, but not a copy of the court's decision, is also being forwarded to counsel and pro se parties. A copy of the court's decision was previously forwarded to counsel and pro se parties on the date it was issued.

<u>Clerk's Office Phone Numbers</u>

| | | | |
|---|---|---|---|
| General Information: | 404-335-6100 | Attorney Admissions: | 404-335-6122 |
| Case Administration: | 404-335-6135 | Capital Cases: | 404-335-6200 |
| CM/ECF Help Desk: | 404-335-6125 | Cases Set for Oral Argument: | 404-335-6141 |

Enclosure(s)

MDT-1 Letter Issuing Mandate

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-10436

_____

In re: JANUARY 2021 SHORT SQUEEZE TRADING
LITIGATION,
_____

SANTIAGO GIL BOHRQUEZ, et al.,

Plaintiffs,

PETER JANG,
ERIK CHAVEZ,

Plaintiffs-Appellants,

*versus*

SOFI SECURITIES LLC, et al.,

Defendants,

APEX CLEARING CORPORATION,

ISSUED AS MANDATE 12/5/2024

2                                                        23-10436

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:21-md-02989-CMA

_____

JUDGMENT

It is hereby ordered, adjudged, and decreed that the opinion issued
on this date in this appeal is entered as the judgment of this Court.

Entered: October 8, 2024

For the Court: DAVID J. SMITH, Clerk of Court

[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————

No. 23-10436

————————————

In re: JANUARY 2021 SHORT SQUEEZE TRADING
LITIGATION,

_____

SANTIAGO GIL BOHRQUEZ, et al.,

                                                            Plaintiffs,

PETER JANG,
ERIK CHAVEZ,

                                                Plaintiffs-Appellants,

*versus*

SOFI SECURITIES LLC, et al.,

                                                            Defendants,

APEX CLEARING CORPORATION,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:21-md-02989-CMA

_____

Before ROSENBAUM, NEWSOM, and LUCK, Circuit Judges.

PER CURIAM:

Trading stocks can be risky.  In January 2021, thousands of investors jumped into the field.  Many of these individual investors, like the plaintiffs in this case, decided to take a long position.  That is, they bought stocks to sell later, acting on a bet that the stock price would rise so that they could pocket the difference between a lower buy price and a higher sell price.  But many other investors took a short position.  Those in the short position had borrowed stocks, sold those borrowed stocks to other investors, and needed to buy back the now-sold stocks to pay off their original loans.  They had bet that the stock price would fall and that they would pocket the difference between the higher sell price and the lower buy price.

Meanwhile, retail investors on social media noticed that institutional investors were taking heavy short positions against stocks like Gamestop ("GME"), AMC Theaters ("AMC"), and Koss Corporation ("KOSS") (together, the "meme stocks" or the "suspended stocks"). Their bets made sense; those companies seemed to be floundering, and their stock prices seemed sure to fall further. But on January 13, prices instead shot up as retail investors banded together to buy shares of the heavily shorted meme stocks en masse. In the next two weeks, stock prices reached one record high after another as other retail investors joined in the buying frenzy, and panicked institutional investors raced to close their short positions to minimize their already massive losses. The result was extreme market volatility.

The plaintiffs in this case ("Investors" or "Plaintiffs") and other retail investors took the long position in this short squeeze. They bought shares of the meme stocks—and would have continued buying shares on January 28, 2021. But on that day, at Defendant Apex Clearing Corporation's direction, their brokers barred them from buying any additional shares for hours, all while allowing sell orders. The Investors argue that this one-way trading suspension suppressed the appreciation of the prices of the meme stocks. Put simply, the Investors bet big on the stocks but claim they didn't win big because Apex interfered with the short squeeze.

So like many other investors, Plaintiffs came to court to make up for those losses. Here, they allege that Apex is liable for negligence, breach of fiduciary duty, breach of the implied

covenant of good faith and fair dealing, and tortious interference under New York law for its trading suspension.  Upon consideration of the parties' briefing, the record, and the relevant law, and with the benefit of oral argument, we affirm the district court's order dismissing their complaint.

## I.    Background

### A.    *Factual Background*

#### 1.  The Parties

Apex Clearing Corporation is a securities broker-dealer, a financial entity that executes securities trades.  It interacts with its customers in one of two ways.

In some cases, Apex acts as a broker-dealer for its direct customers.  These customers directly purchase and sell securities through Apex's trading platform.

But in other cases, Apex acts as a clearing broker for the customers it shares with other broker-dealers.  These shared customers open investment accounts with other broker-dealers ("introducing brokers").  But because the introducing brokers don't have the same operational capacity, they contract with Apex to provide their customers with a trading platform, clearing services, and a variety of other backroom and administrative functions.  Apex served as a clearing broker for Investors Eric Chavez and Peter Jang, shared customers who worked with introducing brokers Webull Financial LLC ("Webull") and Ally Invest Securities ("Ally"), respectively.

Critical to Apex's role as a clearing broker is its membership in the National Securities Clearing Corporation ("NSCC"). The NSCC is the main clearinghouse that clears and settles stock transactions in the United States and is a subsidiary of the Depository Trust and Clearing Corporation ("DTCC"). Together, the DTCC, NSCC, and their members guarantee that stock trades are completed even if a buyer fails to pay for the securities he purchased or the seller fails to deliver the securities he sold. In performing this function, the clearinghouses, along with their member clearing brokers, reallocate to themselves the risks that buyers and sellers might otherwise bear.

Because it is on the hook for potential defaults in every transaction to which investors agree, the NSCC imposes a variety of risk-management rules on their member clearing brokers. Under these rules, Apex must post collateral for the trades that Apex has agreed to process but hasn't yet cleared. The NSCC calculates this collateral requirement by considering several factors, including market volatility. If the market is particularly volatile, the NSCC might apply a volatility multiplier to its collateral calculation.

Apex must post collateral at the start of each day and again during the day if the NSCC determines the market is volatile. These margin requirements protect the clearinghouse, the clearing brokers, and the investors from defaults.

But these requirements aren't the only rules by which Apex must abide. As a registered entity with the Securities and Exchange Commission ("SEC"), Apex must "'at all times have and maintain

net capital' no less than the greatest of the minimum requirement applicable to its business." This Net Capital Rule "protect[s] . . . the market as a whole from the systemic risk that highly volatile stocks can produce, especially when a broker's position has significant risk concentration in such stocks."

Apex is also registered with the Financial Regulatory Authority ("FINRA"), a non-governmental securities regulator. FINRA mandates that its members "observe high standards of commercial honor and just and equitable principles of trade." It also requires that its members make an agreement to clear for an introducing broker on a fully disclosed basis that "specif[ies] the responsibilities of each party to the agreement including at a minimum . . . (A) Opening and approving accounts[,] (B) Acceptance of orders[,] (C) Transmission of orders for execution[,] (D) Execution of Orders[,] (E) Extension of Credit[,] (F) Receipt and delivery of funds and securities[,] (G) Preparation and transmission of confirmations[,] (H) Maintenance of books and records[,] and (I) Monitoring of accounts." FINRA Rule 4311(c)(1).

Based on this FINRA requirement, Apex enters into a Customer Agreement with introducing brokers and its shared customers. The Customer Agreement states that Apex has "the right to refuse to execute securities transactions for the Customer at any time and for any reason."

## 2. The Short Squeeze

In the six days from Thursday, January 21, to Wednesday, January 27, 2021, GME's price underwent a nearly nine-fold

increase, shooting from $43.03 to $380.00.  AMC and KOSS's prices experienced similar rocket rides over the same period.

Then, the next day, at 9:30 a.m. on January 28, 2021, Apex received an unconfirmed report from the NSCC that showed Apex would need to make "a substantially increased clearing deposit."  It hadn't expected such a high collateral requirement and wasn't prepared to post those funds.  Despite its surprise, Apex didn't confirm the collateral requirement with either the NSCC or the DTCC.

Instead, to manage the risk that it couldn't meet an increased margin requirement, Apex imposed certain trading restrictions on the activity causing market volatility—meme stock trading.  Two hours after it received the unconfirmed report, around 11:30 a.m., Apex barred its direct customers and shared customers from buying shares of the meme stocks.  In the case of its direct customers, Apex refused to accept any purchase orders.  And in the case of its shared customers, Apex directed introducing brokers to refuse to accept any purchase orders.  Introducing brokers complied with this direction.  Still, Apex permitted its direct customers and shared customers to continue to sell shares of the meme stocks.

Apex also set margin requirements for the Meme Stocks at 100%.

Apex soon learned that the unconfirmed report was incorrect.  By 11:41 a.m., the DTCC was aware that Apex's "collateral exposure was going down."  So the clearinghouse called Apex at 11:47 a.m. to report that the new collateral requirement "was in fact lower [than projected at 9:30 a.m.] and in line with [Apex's]

8                    Opinion of the Court                    23-10436

expectations and ability to pay[.]"  This downward projection con-
tinued throughout the day, and ultimately, Apex didn't pay any ad-
ditional collateral on January 28.

Despite these developments, Apex maintained its trading
suspension until 2:55 p.m.—a total of three hours and 25 minutes.

### B .    *Procedural History*

Retail investors across the country filed lawsuits against
Apex and other broker-dealers for imposing trading restrictions on
the meme stocks during the short squeeze.  The Judicial Panel on
Multidistrict Litigation consolidated these cases into a multi-district
litigation ("MDL") in the Southern District of Florida and separated
the cases into four "tranches."  *In re Jan. 2021 Short Squeeze Trading
Litig.*, No. 1:21-md-02989 (S.D. Fla. Apr. 1, 2021).  Plaintiffs are pro-
ceeding on the "Other Broker Tranche" in this MDL.  They bring
state-law claims against Apex on behalf of themselves and a puta-
tive class of Apex customers.[1]

---

[1] Plaintiffs have proposed two classes.  The first class is a Nationwide Investor
Class of all investors in the United States who (1) held meme stock shares or
call options at the end of the trading day on January 27, 2021; (2) sold their
shares or options at a loss between January 28, 2021, and February 23, 2021,
or whose options expired as worthless during that period; and (3) who suffered
damages.  The second class is an Apex Broker-Dealer Class of all Apex's direct
customers and shared customers who (1) held meme stock shares or call op-
tions at the end of the trading day on January 27, 2021, and had to sell their
shares or options at a loss or whose options expired as worthless between Jan-
uary 28, 2021, and February 23, 2021; (2) placed a sale order on meme stock
shares or call options and whose orders were delayed between January 28,
2021, and February 23, 2021; or (3) placed buy orders for meme stock shares

The district court ordered Apex to produce significant discovery at the outset of this litigation. After reviewing this discovery and upon order by the district court, the Investors filed a master complaint for the Other Broker Tranche.

In their first complaint, the Investors alleged a single claim for negligence against Apex. They quickly amended their complaint in response to Apex's motion to dismiss the first complaint and added claims alleging breach of fiduciary duty and tortious interference. But the district court dismissed this second complaint for lack of subject-matter jurisdiction without considering the substance of the Investors' claims.

The Investors then filed a third complaint against Apex in the Southern District of New York. Over the Investors' objection, the MDL panel transferred the case from the Southern District of New York to the MDL in the Southern District of Florida. Immediately after transfer, the district court ordered the Investors to amend their complaint to plead diversity jurisdiction.

So on June 15, 2022, the Investors filed their fourth complaint, which is now the operative complaint in this litigation. In this complaint, the Investors allege four claims against Apex: (1) negligence, (2) breach of fiduciary duty, (3) in the alternative, breach of the implied covenant of good faith and fair dealing, and (4) in the alternative, tortious interference. They incorporated into

---

or call options that Apex initially accepted but ultimately rejected between January 28, 2021, and February 23, 2021.

this complaint the Customer Agreement, the discovery Apex and other defendants produced in the MDL, an SEC staff report, and congressional testimony on the January 28, 2021, short squeeze.

Apex moved to dismiss the Investors' complaint for a third time. As a threshold matter, Apex argued that the Investors lacked standing to sue under Article III. It also asserted that federal securities law preempts the Investors' claims and that all four claims fail as a matter of law. The Investors contested each ground for dismissal.

The district court granted Apex's motion in part. *In re Jan. 2021 Short Squeeze Trading Litig.*, No. 21-2989-MDL, 2023 WL 418821, at *19 (S.D. Fla. Jan. 9, 2023). At the outset, the district court clarified that New York law governs this action because New York has a strong interest in this litigation. *Id.* at *9. It then rejected Apex's standing and preemption arguments. *Id.* at *9–13. And finally, the district court concluded that all four claims fail as a matter of law. So it dismissed the complaint with prejudice. *Id.* at *13–19.

The Investors now appeal the district court's dismissal of their complaint.

## II.      Standard of Review

We review *de novo* the district court's dismissal of a complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Godelia v. Doe 1*, 881 F.3d 1309, 1316 (11th Cir. 2018) (citing *Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003) (per curiam)). In reviewing this motion, we must "accept the factual

allegations in the complaint as true and construe them in the light most favorable to the plaintiff." *Echols v. Lawton*, 913 F.3d 1313, 1319 (11th Cir. 2019) (citing *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1303 (11th Cir. 2008)). We also review *de novo* the district court's interpretation of state law. *Godelia*, 881 F.3d at 1316 (citing *Tampa Bay Water v. HDR Eng'g, Inc.*, 731 F.3d 1171, 1177 (11th Cir. 2013)).

## III.   Discussion

### A.  *The Investors failed to allege a claim for negligence under New York law.*

We start with the Investors' negligence claim. Because we are a federal court sitting in diversity and this case arises under New York law, we apply New York's substantive law. *See Admiral Ins. Co. v. Feit Mgmt. Co.*, 321 F.3d 1326, 1328 (11th Cir. 2003). We follow the precedent of the state's highest court unless none is available. *Pendergast v. Sprint Nextel Corp.*, 592 F.3d 1119, 1133 (11th Cir. 2010). In that case, we follow the decisions of the state's intermediate courts of appeals unless we are convinced that the highest state court would rule differently. *Id.* (quoting *Bravo v. United States*, 577 F.3d 1324, 1325 (11th Cir. 2009)).

To make their *prima facie* case under New York law, the Investors must show (1) that Apex owed them a duty of care; (2) that Apex breached that duty; and (3) that they suffered an injury as a result of Apex's breach. *See Solomon v. City of New York*, 66 N.Y.2d 1026, 1027 (N.Y. 1985).

In the operative complaint, the Investors assert that Apex was under two duties: (1) to ensure that its trading platforms could

"reliably deliver [trading] services" during periods of market vola-
tility, and (2) "to exercise reasonable care in safeguarding [their] in-
vestments" by promptly executing their trade orders.  On appeal,
the Investors clarify that Apex owed them a duty not to refuse their
trade orders "for hours for the express purpose of torpedoing the
market price of securities . . . either for its own conflicted financial
benefit . . . or for no business reason."

The district court determined that the Investors failed to al-
lege a duty recognized under New York law.  *In re Jan. 2021 Short
Squeeze Trading Litig.*, 2023 WL 418821, at \*17.  We agree.

### 1.  The economic-loss doctrine bars the Investors'
### negligence claim.

The first hurdle the Investors must overcome to establish
that Apex owed them a duty is the economic-loss doctrine.[2]  Courts
apply the economic-loss doctrine "when determining whether tort
claims are maintainable alongside breach of contract claims."  *IKB
Int'l, S.A. v. Wells Fargo Bank, N.A.*, 40 N.Y.3d 277, 290 (N.Y. 2023).
Under the economic-loss doctrine, plaintiffs can't maintain tort
claims against a defendant for "purely economic loss" unless they
show that the defendant owed an independent duty to protect

---

[2] As the district court correctly explained, courts applying New York law some-
times refer to the economic-loss doctrine as the economic-loss rule.  *In re Jan.
2021 Short Squeeze Trading Litig.*, 2023 WL 418821, at \*13 n.12.  But in fact, the
economic-loss rule is a "related but distinct" legal principle not at issue in this
case.  *See Ambac Assurance Corp. v. U.S. Bank Nat'l Ass'n ("Ambac I")*, 328 F. Supp.
3d 141, 158–59 (S.D.N.Y. 2018); *Travelers Cas. & Sur. Co. v. Dormitory Auth.–
State of N.Y.*, 734 F. Supp. 2d 368, 378 n.15 (S.D.N.Y. 2010).

them "against the risk of harm"—a duty that "may arise from a special relationship." *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 750 N.E.2d 1097, 1101, 1103 (N.Y. 2001).

New York imposes this requirement to plead an independent duty for two reasons: (1) to prevent tort claims that are duplicative of those that should sound in breach of contract, *IKB Int'l*, 40 N.Y.3d at 290–91; and (2) "to avoid exposing defendants to unlimited liability to an indeterminate class of persons conceivably injured by any negligence in a defendant's act," *532 Madison Ave.*, 750 N.E.2d at 1101.

Here, the Investors allege a purely economic injury in their claim for negligence, so they must establish that Apex owed a duty to protect them against the risk of harm, *id.*  The district court concluded that they failed to do that.  *In re Jan. 2021 Short Squeeze Trading Litig.*, 2023 WL 418821, at *13–15.  We think the district court got the analysis exactly right.

Before we explain why, we first address the Investors' attempt to escape application of the economic-loss doctrine altogether by pointing out that they aren't bringing contract claims, except in the alternative, and then for only breach of the covenants of good faith and fair dealing.  But whether the Investors have brought contract claims makes no difference to our analysis. "[T]he economic loss doctrine centers on whether the defendant owed a duty to protect against the risk of harm to the plaintiff." *Ambac I*, 328 F. Supp. 3d at 159. And to avoid the economic-loss doctrine bar, a plaintiff must plead that a "legal duty independent of

the contract itself has been violated." *IKB Int'l*, 40 N.E. 3d at 290. As the New York courts have explained, when a plaintiff "is essentially seeking enforcement of the bargain, the action should proceed under a contract theory." *Id.* (citation and quotation marks omitted). So the mere fact that the Investors pled their breach-of-implied-covenant claim in the alternative only does not render the economic-loss doctrine inapplicable.

Now that we've established that the economic-loss doctrine governs, we next explain why it precludes the Investors' claims here. Under this doctrine, the Investors must plead that Apex owed a duty to protect them against economic losses. *Ambac I*, 328 F. Supp. 3d at 159. This duty "may arise from a special relationship[.]" *Id.* (quoting *532 Madison Ave.*, 750 N.E.2d at 1101).

The Investors assert that they are not required to plead a special relationship to meet this burden. But they cite no authority, and we know of no cases, in which a New York court determined that the plaintiff overcame the economic-loss doctrine absent a special relationship. So we conclude that the Investors must plead a special relationship under New York law. They have not met this requirement.

New York law recognizes the existence of a special relationship under only limited circumstances. The textbook example is the landowner and tenant relationship; that is, landowners have a duty to protect their tenants from foreseeable harm "because the special relationship puts them in the best position to protect against the risk" of harm on the premises. *532 Madison Ave., 750 N.E.2d at*

1101 (citing *Nallan v. Helmsley–Spear, Inc.*, 407 N.E.2d 451, 457–58 (N.Y. 1980)).  But because there is no special relationship between the landlord and the general public, the landlord does not owe these duties to the general public.  *See 532 Madison Ave.*, 750 N.E.2d at 1101–02 (citing *Waters v. New York City Hous. Auth.*, 505 N.E.2d 922, 924 (N.Y. 1987)).

A special relationship specifically occurs when "one party owes the other a fiduciary duty."  *Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 329 (S.D.N.Y. 2011) (citing *Stewart v. Jackson & Nash*, 976 F.2d 86, 90 (2d Cir. 1992)).  A "fiduciary relationship," as New York law defines it, "exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation."  *EBC I, Inc. v. Goldman, Sachs & Co.*, 832 N.E.2d 26, 31 (N.Y. 2005) (citations omitted).  This relationship, "necessarily fact-specific, is grounded in a higher level of trust than normally present in the marketplace between those involved in arm's length business transactions."  *Id.* (citations omitted).  So the Investors could establish a "special relationship" by demonstrating Apex owed them a fiduciary duty.

The Investors cannot meet this standard.  Under New York law, clearing brokers like Apex generally don't owe individual investors any fiduciary duties.  *See Greenfield v. Tassinari*, 779 N.Y.S.2d 531, 532 (N.Y. App. Div. 2004) (citing *McDaniel v. Bear Stearns Inc.*, 196 F. Supp. 2d. 343 (S.D.N.Y. 2002); *Rozsa v. May Davis Grp., Inc.* ("*Rozsa I*"), 152 F. Supp. 2d 526 (S.D.N.Y. 2001); *Schwarz v. Bear Stearns Companies, Inc.*, 698 N.Y.S.2d 855 (N.Y. App. Div. 1999)).

New York courts have affirmed this principle repeatedly for decades, *Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 465–66 (2d Cir. 2013) (collecting cases); *Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1296 n.12 (11th Cir. 2002) (citing *Connolly v. Havens*, 763 F. Supp. 6, 10 (S.D.N.Y. 1991)).[3]

The existence of a contract between the Investors and Apex—the Customer Agreement—neither undermines this principle nor creates a fiduciary relationship between the parties. Under the Customer Agreement, the Investors are customers of both their introducing brokers and Apex. New York caselaw repeatedly addresses situations in which the plaintiff investors are customers of introducing brokers. *See, e.g.*, *Rozsa v. May Davis Grp., Inc.* ("*Rozsa II*"), 187 F. Supp. 2d 123, 131–32 (S.D.N.Y. 2002) (collecting cases), *aff'd sub nom. Rozsa v. SG Cowen Sec. Corp.*, 165 F. App'x 892 (2d Cir. 2006).[4] And New York law has not held that the mere existence of

---

[3] The Investors contend that, under New York law, the stockbroker-investor relationship is a fiduciary relationship. True, New York sometimes recognizes this relationship as "fiduciary in nature." *Conway v. Icahn & Co.*, 16 F.3d 504, 510 (2d Cir. 1994) (citing 11 N.Y. Jur. 2d Brokers § 45 (1981); *People v. Mercer Hicks Corp.*, 155 N.Y.S.2d 740, 744 (N.Y. Sup. Ct. 1956)). But the scope of a fiduciary relationship—and the duties owed because of that relationship—"are determined by the terms of the agreement between the parties." Restatement (Second) of Agency § 376.

[4] In addition, the Investors attempt to establish a duty with reference to *Rioseco v. Gamco Asset Management, Inc.*, No. 15862/10, 2011 WL 4552544 (N.Y. Sup. Ct. Sep. 23, 2011). In *Rioseco*, the state trial court considered a suit by investors against their broker for negligence and for breach of fiduciary duty. *Rioseco*, 2011 WL 4552544. In a footnote, that court explained that cases like *Rozsa* involving clearing brokers were inapplicable because the broker in *Rioseco*

a contractual relationship creates a fiduciary duty. *Cf. Pross v. Katz*, 784 F.2d 455, 458 (2d Cir. 1986) ("Fiduciary duties are based on notions of contract, but they are judicial creations rather than the product of private bargaining.").

True, New York law does suggest clearing brokers have "a fiduciary duty to investors in certain extenuating circumstances." *Rozsa I*, 152 F. Supp. 2d at 531 (citing *Goldman v. McMahan, Brafman, Morgan & Co.*, No. 85 Civ. 2236, 1987 WL 12820, at *22 (S.D.N.Y. June 18, 1987)). And New York courts have identified at least three relevant situations qualifying as "extenuating circumstances" in this context. First, when the clearing broker "asserts control over the introducing broker's business, or becomes actively and directly involved in an introductory broker's actions." *Glob. Enter. Grp. Holding, S.A. v. Ottimo*, No. 07-CV-4904, 2010 WL 11629556, at *5 (E.D.N.Y. June 8, 2010) (citing *Stern v. Legent Clearing LLC*, No. 09-CV-0794, 2009 WL 2244616, at *3 (N.D. Ill. July 28, 2009)). Second, when the clearing broker was actively involved in a fraud scheme. *Id.* (citing *Goldman*, 1987 WL 12820, at *22). And third, "where there were allegations that a clearing broker undertook more than mere clearing duties, *and* became aware of an investment broker's fraud[.]" *Id.* (emphasis in original) (citing *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*, No. 97-CV-4978, 2002 WL 88226, at *4 (S.D.N.Y. Jan. 23, 2002)).

---

wasn't a clearing broker. *Id.* n.22. The district court therefore correctly determined that *Rioseco* is inapplicable. *See In re Jan. 2021 Short Squeeze Trading Litig.*, 2023 WL 418821, at *16.

But the Investors have not demonstrated any of these situations here.

As to the first possibility, the Investors have failed to show that Apex took control over or otherwise became "actively and directly involved" in their introducing brokers' businesses. *Id.* The Investors contend that Apex "improperly directed" their introducing brokers to refuse to accept purchase orders of the suspended stocks "for its own financial benefit and to the detriment of its customers."

But this behavior does not amount to "active[] and direct[] involve[ment]" in the introducing brokers' operation. Clearing brokers are responsible for "receiving, maintaining[,] and delivering customers' securities and funds." *McDaniel*, 196 F. Supp. 2d at 347. Embedded within that responsibility is the right, which all brokers share, to refuse to accept a customer's orders "so long as [the broker] makes clear at the time the orders are given that he refuses to perform them." *Courtland v. Walston & Co.*, 340 F. Supp. 1076, 1080 (S.D.N.Y. 1972) (citing *Busch v. L. F. Rothschild & Co.*, 259 N.Y.S.2d 239, 240–41 (N.Y. App. Div. 1965)). New York courts haven't recognized many limits to the broker's right to refuse to accept trades; the breadth of this right is a foundational principle of New York law, *cf. Le Marchant v. Moore*, 44 N.E. 770, 772 (N.Y. 1896). The facts the Investors have alleged show only that Apex exercised this right.

As to the second possibility, the Investors also do not plead facts demonstrating that Apex acted as part of a fraudulent scheme. Instead, they contend only that involvement in a fraud scheme is

not a requirement to showing extenuating circumstances in this context.

But in any event, there are no allegations of a fraudulent scheme here.  And each of the cases the Investors cite for support of their position involves clearing brokers alleged to have engaged in broader fraudulent schemes. *See McDaniel*, 196 F. Supp. 2d 343, 355-356 (concluding that restricting trades was one of "nine 'key factual elements' that constituted [the clearing broker's] 'active participation, substantial assistance and aiding abetting'" in a fraudulent scheme even while the restrictions alone were insufficient to show such a scheme); *Berwecky v. Bear Stearns & Co.,* 197 F.R.D. 65, 66-69 (S.D.N.Y. 2000) (granting class certification in an action by investors against a clearing broker for a fraudulent scheme involving several actions, including restricting trades); *In re Blech Sec. Litig.*, 961 F. Supp. 569, 573, 576 (S.D.N.Y. 1997) (denying a motion to dismiss a complaint alleging that a clearing broker engaged in securities fraud under federal law and common-law fraud); *Cannizaro v. Bache, Halsey, Stuart, Shields, Inc.,* 81 F.R.D. 719, 721-22 (S.D.N.Y. 1979) (denying in part a clearing broker's motion for summary judgment on claims they had violated federal securities laws when investors met the requirements for alleging liability under an aiding and abetting theory).

And third, because the Investors do not allege fraud, they cannot demonstrate that Apex "undertook more than mere clearing duties, *and* became aware of an investment broker's fraud[.]" *Glob. Enter. Grp. Holding, S.A.*, 2010 WL 11629556, at *5 (emphasis

in original) (citing *A.I.A. Holdings, S.A.*, 2002 WL 88226, at *4). So
the Investors have not established the third scenario either.  Apex's
action here—refusing to accept purchase orders for the suspended
stocks—simply doesn't rise to the level of involvement that the In-
vestors need to establish "extenuating circumstances." *Cf. Cromer
Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001) ("A clear-
ing broker does not provide 'substantial assistance' to or 'partici-
pate' in a fraud when it merely clears trades.").

In all, the Investors have not demonstrated that Apex as
their clearing broker owed them an additional duty to avoid the
economic loss they experienced. The economic-loss doctrine there-
fore bars their claim for negligence.

## 2. Even without the economic-loss doctrine, the Investors have failed to allege that Apex owed them a duty of care.

The Investors also assert that Apex owed them a duty of or-
dinary care under traditional agency law and under the industry
rules they claim the Customer Agreement incorporates.  We ad-
dress each possible basis in turn and conclude that, even if the eco-
nomic-loss doctrine didn't bar the Investors' claim for negligence,
they still failed to allege a duty that New York law recognizes.

We begin, as the Investors do, with traditional agency law.
Under New York law, "[t]he relationship between a stockbroker
and its customer is that of principal and agent." *Conway*, 16 F.3d at
510 (citing 11 N.Y. Jur. 2d Brokers § 45 (1981); *Mercer Hicks Corp.*,
155 N.Y.S.2d at 744).  Like other principals, brokers owe their

customers "a duty of reasonable care" in the "performance of [their] obligations to customers," like the Investors, who have non-discretionary accounts. *de Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293, 1305 (2d Cir. 2002) (collecting cases). Based on these broad statements by the Second Circuit, the Investors assert that Apex owed them a duty of ordinary care.

The Investors have misread *Conway* and *de Kwiatkowski*. *Conway* concerned a very narrow duty—the duty to notify a customer and secure that customer's consent before executing a sell-out to meet a margin call. *Conway*, 16 F.3d at 507. But since *Conway*, the Second Circuit has clarified that *Conway* means only that brokers owe a duty "'to use reasonable efforts to give [their customers] information relevant to the affairs that [have] been entrusted to them.'" *United States v. Szur*, 289 F.3d 200, 211 (2d Cir. 2002) (citing *Indep. Ord. of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 941 (2d Cir. 1998); *Conway*, 16 F.3d at 510; 37 Am. Jur. 2d § 207 (2001)). This, of course, doesn't help the Investors' case.

The Second Circuit's decision in *de Kwiatkowski* also confirms that New York imposes only limited duties on brokers. There, the Second Circuit considered an appeal by Bear, Stearns from a jury verdict finding it negligent for not advising a nondiscretionary customer to liquidate his position. *See de Kwiatkowski*, 306 F.3d at 1296–301. The district court had instructed the jury that Bear, Stearns owed the plaintiff "a duty to use the same degree of skill and care that other brokers would reasonably use under the same circumstances." *Id.* at 1301 (internal quotation marks

omitted) (quoting trial transcript).  The Second Circuit reversed, holding, in relevant part, that the broker's duty is not so expansive. *See id.* at 1305–14.  The court explained that brokers owe only "defined duties," not "an open-ended duty of reasonable care." *Id.* at 1306.  So the Investors need a "defined duty" to support their claim that Apex owed them a duty here. *Id.*

For two reasons, traditional agency law won't get the Investors to a duty New York law recognizes.  First, clearing brokers don't owe investors any duties.  *Rozsa II*, 187 F. Supp. 2d at 131 (explaining that courts applying New York law "have determined that clearing brokers do not owe duties to plaintiffs who are customers of their introducing brokers").  The Investors advance a narrower reading of New York law than we recognize, asserting that clearing brokers don't owe a duty only when they act as "generic clearing agent[s]."  But even if we were to adopt this understanding, the Investors' factual allegations establish that Apex acted only as a "generic clearing agent" in refusing to accept their trade orders on January 28.  *Courtland*, 340 F. Supp. at 1080; *Busch*, 259 N.Y.S.2d at 240–41.

Second, brokers aren't under a duty to accept new orders. Although, under New York law, a broker owes certain duties to its customers who, like the Investors, have nondiscretionary accounts, those duties begin and end with each transaction. *de Kwiatkowski*, 306 F.3d at 1302; *see also Schenck v. Bear, Stearns & Co.*, 484 F. Supp. 937, 947 (S.D.N.Y. 1979) ("The scope of affairs entrusted to a broker is generally limited to the completion of a

transaction."). They do not extend to the decision to enter into a transaction.

The Investors agree that a broker's duties are limited to transactions, but they urge us to adopt a more "expansive view as to the definition of 'transaction'" based on the district court's ruling on the claims that another tranche in this MDL raised. *See In re Jan. 2021 Short Squeeze Trading Litig.*, 620 F. Supp. 3d 1231, 1249 (S.D. Fla. 2022). But the district court interpreted the term "transaction" broadly within the context of the Securities Exchange Act, *id.*, and we shouldn't impose the contours of a federal statute onto New York tort law.

We instead interpret "transaction" the same way that New York courts do. A transaction begins when a broker accepts a customer's order and ends upon execution of that order. *See Busch*, 259 N.Y.S.2d at 240–41. The broker therefore has a duty to execute the order—but only if he accepted that order. *See id.* Applying these principles to the Investors' claims, we are bound to conclude that Apex didn't owe the Investors a duty because Apex didn't accept any purchase orders during the trading suspension. In short, traditional agency law dictates that the Investors' claim for negligence must fail.

The Investors also contend that Apex owed them a duty under industry rules they claim the Customer Agreement incorporates. Under the Customer Agreement, Apex has "the right to refuse to execute securities transactions for the Customer at any time and for any reason." Despite the absence of any limitation in that

provision of the contract, the Investors assert that we should reject an "unconstrained reading" of Apex's right to refuse because the Customer Agreement makes all transactions "subject to the constitution, rules, regulations, customs and usages of the exchange or market and its clearing house."  Because Apex is a member of FINRA, the NYSE, and the NASDAQ, the Investors argue that Apex must "observe high standards of commercial honor and just and equitable principles of trade when dealing with [its] customers."  They direct our attention to one rule in particular—FINRA Regulatory Notice 21-12, a notice issued after the meme stock frenzy of January 2021, which states that "the foundation of the securities industry is fair dealing with customers . . . even during times of market stress."  And they claim that New York holds brokers liable for failure to abide by these industry rules.

But FINRA and other industry regulations don't impose an independent duty on brokers because they aren't private causes of action.  *Fox v. Lifemark Sec. Corp.*, 84 F. Supp. 3d 239, 245 (W.D.N.Y. 2015) (citing *Richman v. Goldman Sachs Group, Inc.*, 868 F. Supp. 2d 261, 274 (S.D.N.Y. 2012)) (concluding that "plaintiff[s] cannot recover for negligence based on the alleged violation of FINRA [rules].")

In short, New York law clearly establishes that clearing brokers generally don't owe investors any duties. Neither traditional agency law nor industry rules support the Investors' claims.

### B.  The Investors failed to allege a fiduciary duty to state a claim for breach of fiduciary duty.

The Investors next appeal the district court's dismissal of their claim for breach of fiduciary duty. We believe the district court correctly concluded the Investors have failed to state this claim. *In re Jan. 2021 Short Squeeze Trading Litig.*, 2023 WL 418821, at *17.

To recover for breach of fiduciary duty, the Investors needed to plead "(1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct." *Baldeo v. Majeed*, 55 N.Y.S.3d 340, 344 (N.Y. App. Div. 2017) (citing *Deblinger v. Sani–Pine Prods. Co., Inc.*, 967 N.Y.S.2d 394, 396 (N.Y. App. Div. 2013); *Rut v. Young Adult Inst., Inc.*, 901 N.Y.S.2d 715, 717 (N.Y. App. Div. 2010)). Under New York law, a fiduciary relationship exists between two parties when one party "is under a duty to act for . . . the benefit of another upon matters within the scope of the relation." *EBC I, Inc.*, 832 N.E.2d at 31 (internal quotation marks omitted) (quoting Restatement (Second) of Torts § 874 cmt. a). So to state a claim for breach of fiduciary duty, the Investors must show that Apex owed them a fiduciary duty.

As we explained in our discussion of the economic-loss doctrine, Plaintiffs haven't alleged that Apex owed them a fiduciary duty. Clearing brokers generally don't owe a fiduciary duty to investors. *See Greenfield*, 779 NY.S.2d at 532. And Plaintiffs haven't established any extenuating circumstances to overcome this general rule. *See Glob. Enter. Grp. Holding, S.A.*, No. 07-CV-4904, 2010 WL 11629556, at *5. They therefore cannot succeed on a claim for breach of fiduciary duty.

### C. New York law precludes the Investors' claim that Apex breached the implied covenant of good faith and fair dealing.

Third, we have the Investors' alternative claim that Apex breached the covenant of good faith and fair dealing by "restricting one-sided trading (purchases) on January 28, 2021" for the purpose "of causing the trading price of the suspended stocks to go down." The district court dismissed this claim, explaining that the Investors may not use this implied covenant to undercut the express terms of the Customer Agreement. *In re Jan. 2021 Short Squeeze Trading Litig.*, 2023 WL 418821, at *18. We agree with this conclusion.

All contracts governed by New York law, including the Customer Agreement between the parties here, contain an implied covenant of good faith and fair dealing in the course of performance. *Singh v. City of New York*, 217 N.E.3d 1, 5 (N.Y. 2023) (citing *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496 (N.Y. 2002); *Kirke La Shelle Co. v. Paul Armstrong Co.*, 188 N.E. 163 (N.Y. 1933)). This covenant is "'a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Id.* (quoting *Jennifer Realty Co.*, 773 N.E.2d at 500). But this covenant extends to the parties' reasonable expectations only. *Bank of China v. Chan*, 937 F.2d 780, 789 (2d Cir. 1991) (citing *Havel v. Kelsey–Hayes Co.*, 445 N.Y.S.2d 333, 336 (N.Y. App. Div. 1981)). It cannot be used "'to remake the contract agreed to by the parties,'" *Cordero v. Transamerica Annuity Serv. Corp.*, 211 N.E.3d 663, 670 (N.Y. 2023) (quoting *Rowe v. Great Atl. & Pac. Tea Co.*, 385 N.E.2d 566, 570 (N.Y. 1978)), or "nullify express contractual terms," *Bersin Props., LLC v. Nomura Credit*

*& Cap., Inc.*, 183 N.Y.S.3d 376, 378 (N.Y. App. Div. 2023) (citing *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Xerox Corp.*, 807 N.Y.S.2d 344 (N.Y. App. Div. 2006)).

Here, the Customer Agreement gave Apex the "right to refuse to execute securities transactions for [the Investors] at any time and for any reason." Still, the Investors contend that Apex could exercise this right to refuse orders only "on a limited basis" because they reasonably expected that Apex couldn't act in a way that might depress stock prices and undermine their "ability to reap the fruits of the contract." And according to the Investors, we must read the implied covenant to cabin Apex's discretion because New York tort law and FINRA rules prevent Apex "from contracting itself out of liability."

This interpretation of the implied duty of good faith and fair dealing directly contradicts the plain language of the Customer Agreement. The Customer Agreement doesn't impose any restrictions on Apex's right to refuse to accept trading orders; in fact, it clearly states that Apex can exercise this right "at any time and for any reason." New York law forbids us from implying a duty that is "inconsistent with other terms of the contractual relationship." *Murphy v. Am. Home Prods. Corp.*, 448 N.E.2d 86, 91 (N.Y. 1983).

New York courts have considered and rejected similar claims to those of the Investors for decades. For instance, in *Murphy*, the New York Court of Appeals considered whether the implied covenant of good faith and fair dealing limits an employer's "unfettered

28                    Opinion of the Court                    23-10436

right" to terminate an employment at will at any time. *Id.* The court ultimately determined that the implied covenant doesn't restrict the employer's right of termination because "it would be incongruous to say that" the employer "impliedly agreed to a provision which would be destructive of his right" to terminate employees at any time. *Id.*

The New York Court of Appeals reaffirmed this principle just last year in response to a question of law that this Court certified. *Cordero*, 211 N.E.3d at 665. We asked the New York court to clarify whether the implied covenant of good faith and fair dealing imposes a duty on defendants to enforce the anti-assignment provisions in structured settlement agreements and refrain from taking certain actions. *Id.* The New York Court of Appeals determined that the implied covenant can't create a new fiduciary duty that is stricter than the express terms of the contract. *Id.* at 671.

The same principle applies here. The Customer Agreement gave Apex an "unfettered right" to refuse trading orders "at any time and for any reason." The duty that the Investors argue we must imply would impose an additional and unwritten obligation that would prevent Apex from exercising its express right under the contract. Because the implied covenant would be inconsistent with the express terms of the contract, we must reject the Investors' claim.

### D. *The Investors failed to state a claim for tortious interference.*

Lastly, the Investors contend that they have adequately pled that Apex tortiously interfered with their business relationship with

their introducing brokers.  To state a claim for tortious interference under New York law, the Investors need to show (1) that they had a business relationship with the introducing brokers; (2) that Apex knew about and intentionally interfered with that relationship; (3) that Apex's "actions were motivated solely by malice or otherwise constituted illegal means"; and (4) that Apex's interference injured the business relationship.  *684 E. 222nd Realty Co., LLC v. Sheehan*, 128 N.Y.S.3d 273, 275 (N.Y. App. Div. 2020) (citing *Tri–Star Light. Corp. v. Goldstein*, 58 N.Y.S.3d 448, 453 (N.Y. App. Div. 2017); *Amaranth LLC v. J.P. Morgan Chase & Co.*, 71 A.D.3d 40, 47, 888 N.Y.S.2d 489, 494 (N.Y. App. Div. 2009)).  We agree with the district court that the Investors failed to establish that Apex acted solely out of malice or otherwise acted unlawfully.  *In re Jan. 2021 Short Squeeze Trading Litig.*, 2023 WL 418821, at *19.

The Investors raise two arguments on appeal.  First, they argue that Apex acted unlawfully because it committed two separate and independent torts—negligence and breach of fiduciary duty. This argument isn't convincing; as we've explained, the Investors have failed to state a claim for either tort.  So neither tort helps the Investors establish the third element of their claim for tortious interference.

But even if the Investors had stated a claim for negligence or for breach of fiduciary duty, New York does not appear to recognize either tort as constituting "illegal means" for purposes of a claim for tortious interference.  *See Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1104 (N.Y. 2004).  New York law appears to recognize

only the following as "illegal means" in this context: "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure." *Id.* (quoting *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.*, 406 N.E.2d 445, 449 (N.Y. 1980)).

Second, the Investors contend that Apex employed illegal means because the trading restriction was a form of economic pressure. We are not persuaded. For economic pressure to be wrongful under New York law, it must be "extreme and unfair." *Carvel Corp.*, 818 N.E.2d at 1105. Conduct that "the express words of the contracts" permit can't constitute wrongful economic pressure. *Id.* So because the Customer Agreement expressly allowed Apex to refuse trading orders "at any time and for any reason," Apex didn't engage in wrongful conduct by refusing the Investors' purchase orders.

In sum, the Investors didn't allege that Apex acted out of malice and failed to adequately allege that Apex committed some other unlawful act. The district court therefore correctly dismissed their claim for tortious interference.

## IV. Conclusion

The Investors took a gamble on the meme stocks in January 2021. That gamble didn't pay off in precisely the ways they'd hoped. Although they may disagree with how Apex handled the volatility of the market on January 28, they have failed to show that Apex is liable for its actions under New York law. So for the

23-10436               Opinion of the Court                    31

foregoing reasons, we affirm the district court's order dismissing
Plaintiffs' complaint for failure to state a claim under Rule 12(b)(6).

**AFFIRMED.**

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

October 08, 2024

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  23-10436-DD
Case Style:  Peter Jang, et al v. Apex Clearing Corporation
District Court Docket No:  1:21-md-02989-CMA

Opinion Issued
Enclosed is a copy of the Court's decision issued today in this case. Judgment has been entered
today pursuant to FRAP 36. The Court's mandate will issue at a later date pursuant to FRAP
41(b).

Petitions for Rehearing
The time for filing a petition for panel rehearing is governed by 11th Cir. R. 40-3, and the time
for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise
provided by FRAP 25(a) for inmate filings, a petition for rehearing is timely only if received in
the clerk's office within the time specified in the rules. **A petition for rehearing must include
a Certificate of Interested Persons and a copy of the opinion sought to be reheard.** See 11th
Cir. R. 35-5(k) and 40-1.

Costs
Costs are taxed against Appellant(s) / Petitioner(s).

Bill of Costs
If costs are taxed, please use the most recent version of the Bill of Costs form available on the
Court's website at www.ca11.uscourts.gov. For more information regarding costs, see FRAP 39
and 11th Cir. R. 39-1.

Attorney's Fees
The time to file and required documentation for an application for attorney's fees and any
objection to the application are governed by 11th Cir. R. 39-2 and 39-3.

Appointed Counsel
Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming
compensation via the eVoucher system no later than 45 days after issuance of the mandate or
the filing of a petition for writ of certiorari. Please contact the CJA Team at (404) 335-6167 or

cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Clerk's Office Phone Numbers

| General Information: | 404-335-6100 | Attorney Admissions: | 404-335-6122 |
| Case Administration: | 404-335-6135 | Capital Cases: | 404-335-6200 |
| CM/ECF Help Desk: | 404-335-6125 | Cases Set for Oral Argument: | 404-335-6141 |

OPIN-1 Ntc of Issuance of Opinion

**UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT**
**Bill of Costs**

Court of Appeals Docket No. __23-10436__

## PETER JANG, ERIK CHAVEZ    vs.    APEX CLEARING CORPORATION

A Bill of Costs should only be filed when the Clerk's Office has advised a party that the party is entitled to costs.  FRAP 39 and 11th Cir. R. 39-1 govern costs taxable in this court and the time for filing the Bill of Costs.  A motion for leave to file out of time is required for a Bill of Costs not timely received.

### INSTRUCTIONS

The appellate docketing fee is set in the fee schedule issued pursuant to 28 U.S.C. § 1913.  However, the $5 fee for filing a notice of appeal is recoverable as a cost in the district court.  In the grid below, multiply the number of original pages of each document by the total number of documents reproduced to calculate the total number of copies reproduced.  Multiply this number by the cost per copy ( $.15 per copy for "In-House", up to $.25 per copy for commercial reproduction, supported by receipts) showing the product as costs requested.

| | Repro. Method (Mark One) In-House | Comm* | No. of Original Pages | Total No. Documents Reproduced | Total No. of Copies | COSTS REQUESTED | CT. USE ONLY COSTS ALLOWED |
|---|---|---|---|---|---|---|---|
| Appellate Docketing Fee | — | — | — | — | — | | |
| Appellant's Brief | | | | | | | |
| Appendix | | | | | | | |
| Appellee's Brief | X | | 68 | 7 | 476 | 119 | $119.00 |
| Reply Brief | | | | | | | |
| Appellee's Supplemental Appendix | X | | 234 | 3 | 702 | 175.5 | $175.50 |
| | | | | | | | |
| *Note: If reproduction was done commercially, receipt(s) must be attached. | | | | **TOTAL** | | $ 294.5 REQUESTED | $$294.50 ALLOWED |

I hereby swear or affirm that the costs claimed were actually and necessarily incurred in this appeal and that I have served this Bill of Costs on counsel/parties of record.

Signature: _____

Attorney Name: Jack E. Pace III
(Type or print your name)

E-mail: jpace@whitecase.com

Street Address/City/State/Zip: White & Case LLP
1221 Avenue of the Americas, New York, NY 10020-1095

Date Signed: October 22, 2024

Attorney for: Apex Clearing Corporation
(Type or print name of client)

Phone: (212) 819-8520

### FOR COURT USE ONLY

Costs are hereby taxed in the amount of $ $294.50 against Appellants

and are payable directly to Appellees

David J. Smith, Clerk of Court

Issued on: _____    By: /S/ Tresa A. Raines    DATE: 10/23/2024
Deputy Clerk

BOC Rev.: 6/17

# Invoice

**Counsel Press Inc.**

PO Box 65019
Baltimore, Maryland 21264-5019

Phone:  (800) 427-7325

| | |
|---|---|
| Invoice Number: | 0009153784 |
| Date: | 10/18/2023 |
| Fed. Tax ID: | 47-3380949 |
| Terms: | ON RECEIPT |

**Sold To**

White & Case LLP
1221 Avenue of Americas
New York, NY 10020   USA

Attention:  Kim King, Esq.

| | |
|---|---|
| File No.: | 322093 |
| Court: | USCOA - 11TH |
| Case Name: | Peter Jang, et al. v Apex Clearing Corp. |

| | | | | Amount |
|---|---|---|---|---|
| | **APPELLEE'S APPENDIX** | | | |
| 234.00 | Page(s) | @ | $4.15 | $971.10 |
| 21.00 | Exhibit Tabs - (3 x 7) | @ | $2.45 | $51.45 |
| 3.00 | Volumes Spiral Bound | @ | $5.25 | $15.75 |
| 1.00 | Filing of Documents | @ | $80.00 | $80.00 |
| 1.00 | Shipping & Handling | @ | $368.00 | $368.00 |
| | | | | |
| | **ANSWERING APPELLEE'S BRIEF** | | | |
| 1.00 | Preparation of Brief | @ | $750.00 | $750.00 |
| 68.00 | Page(s) | @ | $0.00 | |
| 3.00 | Volumes Spiral Bound | @ | $5.25 | $15.75 |

**00-VW**
10/20/2023 09:59 AM

> This Invoice is Due Upon Receipt. Please Show Invoice Number on Check When Submitting Payment.

Page 1 of 1

| | |
|---|---|
| Subtotal | $2,252.05 |
| Sales Tax | $199.87 |
| | $0.00 |
| Payment/Credit | $0.00 |
| **Balance** | $2,451.92 |

# Invoice

**Counsel Press Inc.**

PO Box 65019
Baltimore, Maryland 21264-5019

Phone: (800) 427-7325

| | |
|---|---|
| Invoice Number: | 0009149640 |
| Date: | 06/28/2023 |
| Fed. Tax ID: | 47-3380949 |
| Terms: | ON RECEIPT |

**Sold To**

White & Case LLP
1221 Avenue of Americas
New York, NY 10020   USA

Attention:  Kim King, Esq.

| | |
|---|---|
| File No.: | 320956 |
| Court: | USCOA - 11TH |
| Case Name: | Peter Jang v. Apex Clearing Corporation |

| | | | | Amount |
|---|---|---|---|---|
| | APPELLEE'S BRIEF | | | |
| | - (39 copies) | | | |
| 1.00 | Preparation of Brief Page(s) | @ | $1,765.00 | $1,765.00 |
| 39.00 | Volumes Spiral Bound | @ | $5.25 | $204.75 |
| 1.00 | Filing of Documents | @ | $80.00 | $80.00 |
| 1.00 | Shipping & Handling | @ | $252.00 | $252.00 |

**00-VW**

07/13/2023 13:48 PM

This Invoice is Due Upon Receipt. Please Show Invoice Number on Check When Submitting Payment.

| | |
|---|---|
| Subtotal | $2,301.75 |
| Sales Tax | $204.28 |
| | $0.00 |
| Payment/Credit | $0.00 |
| **Balance** | $2,506.03 |

Page 1 of 1

NEW YORK, NY - WASHINGTON, DC - PHILADELPHIA, PA - LOS ANGELES, CA - CHICAGO, IL
BUFFALO, NY - RICHMOND, VA - BOSTON,MA - ISELIN, NJ - SYRACUSE, NY - ROCHESTER, NY - DELHI, NY